UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY),<br><br>        Plaintiffs,<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>        Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO. 05-11150-DPW |

## SUPPLEMENTAL COMPLAINT

### Introduction

1.    This is an action for fraud, breach of contract, and indemnification in which plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and ManuLife Insurance Company (f/k/a "Investors Partner Life Insurance") seek compensatory and punitive damages, costs and attorneys' fees for defendant Abbott Laboratories' misrepresentations and other conduct that violates the Research Funding Agreement entered into by and between the plaintiffs and defendant and dated as of March 13, 2001 (the "Agreement").    This action is filed as a separate related action to the pending matter captioned *John Hancock Life Insurance Company, et al. v. Abbott Laboratories*, Civil Action

No. 03-12501-DPW (the "Existing Action"), pursuant to Section (1) of the Court's Scheduling Order entered in the Existing Action on March 30, 2004.

## The Parties

2.      Plaintiff John Hancock Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.    John Hancock Life Insurance Company is one of the nation's leading insurance companies, providing a broad array of insurance and investment products to retail and institutional customers, primarily in North America.

3.      Plaintiff John Hancock Variable Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.    John Hancock Variable Life Insurance Company provides variable life insurance products that link life insurance coverage and an investment return to an underlying portfolio of investments chosen by the policyholder.

4.      Plaintiff ManuLife Insurance Company (collectively, with plaintiffs John Hancock Life Insurance Company and John Hancock Variable Life Insurance Company, "John Hancock") is a company, duly formed and existing under the laws of the State of Delaware, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts. ManuLife Insurance Company is a wholly-owned subsidiary of John Hancock Variable Life Insurance Company that sells various types of life insurance products.    ManuLife Insurance Company formerly was known as "Investors Partner Life Insurance."

-2-

5.     Defendant Abbott Laboratories ("Abbott") is a corporation, duly formed and existing under the laws of the State of Illinois, that maintains its corporate headquarters in Abbott Park, Illinois. Abbott is a broad-based healthcare company that discovers, develops, manufactures and markets products and services that span the continuum of care -- from prevention and diagnosis to treatment and cure. Abbott's principal businesses are global pharmaceuticals, nutritionals, and medical products, including diagnostics and cardiovascular devices. Abbott achieved record sales and net earnings of $19.7 billion and $3.2 billion, respectively, in 2004. Its leadership positions in several multibillion-dollar businesses provide Abbott with a unique balance of revenue growth opportunities and cash flow sources that allow Abbott to invest in its future.

### Jurisdiction and Venue

6.     This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(a)(1) because defendant Abbott resides in this district within the meaning of 28 U.S.C. § 1391(c), and further because Section 16.2 of the parties' Agreement provides that Abbott,

> consents ... to the exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts ... for the purpose of any suit, action or other proceeding arising out of any of its obligations hereunder or thereunder or with respect to the transactions contemplated hereby or thereby, and expressly waives any and all objections that it may have as to venue in such courts.

## The Facts

### *The Agreement And Its Relevant Terms*

8.    On March 13, 2001, John Hancock and Abbott entered the Agreement, whereby John Hancock agreed to provide funding to Abbott for research and development activities on a portfolio of potential pharmaceutical products or "Program Compounds" (the "Research Program") in exchange for the right to receive certain management fees and future milestone and royalty payments from Abbott.

9.    The nine Program Compounds encompassed by the Abbott Research Program are: (a) ABT-773, a kelotide that may be useful as an antibiotic; (b) ABT-627, an endothelin-A receptor agonist that may be useful in the treatment of prostate cancer; (c) ABT-594, a non-opiod analgesic that may be useful in the treatment of chronic pain; (d) ABT-492, a quinolone that may be useful as an antibiotic; (e) ABT-510, a synthetic peptide that may be useful in the treatment of cancer; (f) ABT-518, a metalloproteinase inhibitor that may be useful in the treatment of cancer; (g) ABT-751, an antimitotic tubulin agonist that may be useful in the treatment of cancer; (h) ABT-100, a farnesyltransferase protein inhibitor that may be useful in the treatment of cancer; and (i) ABT-724, a dopamine receptor agonist that may be useful in the treatment of erectile dysfunction.

10.    Under the terms of the Agreement, John Hancock agreed to contribute up to a specified maximum amount toward the costs incurred by Abbott in operating the Research Program ("Program Related Costs") in four annual installments (the "Program Payments") over the period from March 13, 2001 through December 31, 2004 (individually, the four "Program Years" and, collectively, the four-year "Program Term"). Abbott agreed, in return, to invest at least twice the amount of John Hancock's contribution from its own funds towards

the operation of the Research Program, and committed to spend certain minimum amounts on Program Related Costs during each Program Year (the "Annual Minimum Spending Target"), as well as a minimum aggregate total on Program Related Costs over the four-year Program Term (the "Aggregate Spending Target").

11.    The Agreement, which comprises more than thirty-five (35) pages, was the subject of extensive negotiations between the parties and their counsel over a period of approximately one year.  From John Hancock's perspective, the financial attractiveness of the Agreement turned largely upon the specific identity of, and commercial prospects for, the nine Program Compounds encompassed by the Research Program.  John Hancock ran numerous analytical models based on financial projections for the Program Compounds in order to ensure, as best that it could, that the risks associated with its anticipated investment in the Research Program were justified by the potential rewards that John Hancock would receive if and when some or all of the Program Compounds were approved and commercialized.

12.    Because the financial return, if any, that John Hancock ultimately will receive on its investment in the Program Compounds is heavily dependent on the commercial success of those Compounds, John Hancock had a strong interest in ensuring, before the Agreement was signed, that: (a) Abbott had a good faith intention to aggressively pursue development of each of the Program Compounds; and (b) Abbott had a good faith belief that each of the Program Compounds possessed reasonably favorable commercial prospects.  In order to satisfy John Hancock's concerns on these points, Abbott agreed to provide John Hancock, in Article 12 of the Agreement, with certain written representations and warranties concerning the development status of the Program Compounds, including, *inter alia*, a representation and warranty that,

-5-

[s]et forth on Exhibit 12.2(d) is the full name, chemical name, detailed description of the stage of development and current status for each Program Compound. Set forth on Exhibit 1.6 in each Annual Research Plan is a description of projected milestones and dates thereof, projected year of NDA filing, and projected costs to be incurred by Abbott during the Program Term, for each Program Compound. Such projections were prepared in good faith and with due care based on reasonable assumptions, and represent the reasonable estimate of Abbott based on information available as of the date of such projections and as of the date hereof.... (Section 12.2[d]).

13.    Abbott further represented and warranted to John Hancock that,

[t]here is no fact known to Abbott (other than generally available information concerning the pharmaceutical industry in general) as of the date of this Agreement that has not been disclosed in this Agreement or any Exhibit to this Agreement which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial [viability]) of the Research Program or any of the Program Compounds. (Section 12.2[i]).

14.    The Agreement contains various other terms that are intended to protect John Hancock's interests by ensuring that Abbott fairly and diligently fulfills its research and development obligations under the Agreement, including terms which provide, *inter alia*, that Abbott:

(a)    must employ "Commercially Reasonable Efforts" (defined in the Agreement as "efforts which are consistent with those normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market potential at a similar stage of development or product life") to develop each of the Program Compounds and "achieve the objectives of the Research Program efficiently and expeditiously" (Sections 1.10, 2.3 and 4.1);

(b)    must keep John Hancock fully informed of any modifications to its written "Annual Research Plans" ("ARPs") by requiring that "[a]ny such modifications ... be promptly provided to John Hancock" (Section 2.2);

-6-

(c)     shall not "research, develop, manufacture, market, sell, distribute, out-license or otherwise treat" the Program Compounds any differently "as compared to any other Abbott compounds or products" on account of any of the rights granted to John Hancock under Agreement (Section 4.4); and

(d)     shall, "as soon as is practicable," out-license or divest any "Ceased Compound" (defined in the Agreement as a Program Compound that Abbott has "substantially cease[d] developing, marketing or selling") to a third party, and shall "remunerate John Hancock based on sales of such Ceased Compound by the third party that has acquired or licensed the Ceased Compound ... in a manner most consistent with the allocation that would have applied hereunder had such Ceased Compound not been so out-licensed or divested..." (Section 4.3[d]).

15.     John Hancock's obligation under the Agreement to make additional Program Payments during the four-year Program Term is not absolute, however. In entering into the Agreement, John Hancock did not want to obligate itself to continue investing in the Program Compounds if the commercial prospects for those Compounds diminished significantly over the four-year Program Term. Accordingly, John Hancock's obligation to make its second, third and fourth Program Payments was made expressly contingent upon the demonstration by Abbott, on an annual basis, of the continued commercial viability of the Program Compounds.

16.     For purposes of the Agreement, the continued commercial viability of the Program Compounds is measured by reference to Abbott's planned expenditures on Program Related Costs over the four-year Program Term. Section 2.2 of the Agreement requires Abbott to provide John Hancock, at least forty-five days (45) prior to the start of each Program Year, with a written ARP that spells out Abbott's anticipated Research Program expenditures for that year and for each year remaining in the Program Term. If Abbott's ARP for any given year did not "reasonably demonstrate [Abbott's] ... intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target" as set forth in the Agreement, then John Hancock's "obligation to

make any remaining Program Payments for any succeeding Program Years" automatically would terminate pursuant to Section 3.4(iv) of the Agreement.

17.    Section 3.3 of the Agreement sets forth Abbott's obligations to John Hancock in the event that Abbott fails to reach the Aggregate Spending Target for Program Related Costs over the four-year Program Term.    Section 3.3(b) states that Abbott "will expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the "Aggregate Carryover Amount") on Program Related Costs during the *subsequent year* commencing immediately after the end of the Program Term (emphasis added)." If Abbott fails to spend the entire Aggregate Carryover Amount during such subsequent year, Section 3.3(b) obligates Abbott to "pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days after the end of such subsequent year."

18.    The four-year Program Term ended on December 31, 2004, and the "subsequent year commencing immediately after the end of the Program Term" ended on December 31, 2005. Accordingly, Abbott was required to spend the Aggregate Carryover Amount by December 31, 2005, and required to pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott as of that date on or before January 30, 2006.

19.    The Agreement further provides John Hancock with the power to objectively verify Abbott's compliance with the terms of the Agreement, including the right to retain an independent auditor of John Hancock's choosing (and reasonably acceptable to Abbott) who is empowered to inspect, copy and audit the "books and records of Abbott and each Subcontractor related to the Research Program ... at any time and from time to time." John

Hancock is required to pay the fees and expenses of its chosen auditor in the first instance. If, however, the work of John Hancock's auditor "reveals any material breach of Abbott's responsibilities" under the Agreement, then Section 2.5 provides that Abbott "shall (i) pay the reasonable fees and expenses charged by such auditor, and (ii) fully and promptly cure such breach."

### John Hancock's Efforts to Audit Abbott's Compliance
### With The Terms of the Agreement

20.    Since the Agreement was executed on March 13, 2001, John Hancock has become aware of certain potential breaches of the Agreement by Abbott. Such potential breaches include, but are not limited to, misrepresentations by Abbott in the negotiation and execution of the Agreement, as well as violations by Abbott of its development and administrative responsibilities under the Agreement.

21.    Consistent with the terms of the Agreement, and in an effort to assist in confirming or refuting Abbott's suspected violations, John Hancock initiated an independent audit of Abbott's books and records on April 12, 2004. On that date, John Hancock sent a letter to Abbott notifying Abbott of John Hancock's intention to undertake a compliance audit pursuant to Section 2.5 of the Agreement, and identifying the independent auditor that had been selected by John Hancock. John Hancock accompanied its audit notification letter to Abbott with a description of the specific books and records related to the Research Program that John Hancock requested be made available for examination by its independent auditor within thirty (30) days.

22.    Abbott unreasonably and unjustifiably has delayed, and continues to delay, its response to John Hancock's audit request, and has taken affirmative steps to obstruct the legitimate efforts of John Hancock's independent auditors to confirm or refute Abbott's

compliance with terms of the Agreement. Tactics employed by Abbott to hinder, delay and obstruct John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement include, but are not limited to:

(a)    unreasonably and unjustifiably objecting to John Hancock's chosen auditor for a period of months, then arbitrarily withdrawing its objection;

(b)    unreasonably and unjustifiably delaying production of the majority of the relevant books and records requested by John Hancock's auditor for almost one year (and counting);

(c)    unreasonably and unjustifiably refusing to make certain relevant books and records available for inspection and copying at all (including, without limitation, various books and records documenting Abbott's actual expenditures on Program Related Costs);

(d)    unreasonably and unjustifiably redacting various relevant books and records produced during the course of the audit so as to eliminate relevant information and render certain materials effectively unintelligible, notwithstanding the existence of a written confidentiality agreement between the parties;

(e)    unreasonably and unjustifiably understaffing and under-funding Abbott's response to John Hancock's audit request in order to further delay the examination of Abbott's relevant books and records by John Hancock's auditor;

(f)    unreasonably and unjustifiably delaying for periods of six months or more the photocopying of books and records designated by John Hancock's auditor during the inspection process;

(g)    unreasonably and unjustifiably refusing to provide John Hancock's auditor with photocopies of various books and records produced by Abbott, and designated by John Hancock's auditor, during the inspection process;

(h)    unreasonably and unjustifiably refusing to permit John Hancock or its independent auditor to make their own photocopies of Abbott's books and records produced for audit purposes;

(i)    unreasonably and unjustifiably violating acknowledged deadlines for the completion of Abbott's production of books and records responsive to John Hancock's audit requests;

(j)    unreasonably and unjustifiably ignoring or refusing to answer various written and oral inquiries by John Hancock and its auditor regarding Abbott's relevant books and records; and

(k)    unreasonably and unjustifiably acting in a manner contrary to the usual course of contractual compliance audits, and contrary to Abbott's own conduct in reasonably similar circumstances in the past.

23.    As of the date of its original Complaint in this action, Abbott still had not produced all of the material books and records related to the Research Program that were requested by John Hancock and its auditor on April 12, 2004, and refused to do so. Abbott also refused to answer inquiries by John Hancock and its auditor seeking information that is necessary to complete the audit of Abbott's compliance with the Agreement.

*Abbott's Violations of the Agreement*

A.   Obstructing John Hancock's Compliance Audit

24.    Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement as expressly permitted under Section 2.5.   Upon information and belief, Abbott's efforts to hinder, delay and obstruct John Hancock's audit activities are intended to undermine, and have had the effect of undermining, John Hancock's ability to obtain information which would tend to confirm that Abbott has breached the Agreement in various other ways as set forth below.

B.   Misrepresenting the Development Status of ABT-518

25.    Upon information and belief, Abbott misrepresented the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that ABT-518 was "a compelling development candidate with the potential to demonstrate antitumor effects superior to the MMP inhibitors currently undergoing clinical trials." Abbott understood before the Agreement was

-11-

executed, however, that the actual development status of ABT-518 was not as represented in the Agreement. For example, Abbott personnel already had plans as of early March 2001 to terminate the development of ABT-518, but understood that full disclosure of that fact to John Hancock "could have been the deathnell (*sic*) to the deal." Accordingly, Abbott personnel took affirmative steps on and prior to March 13, 2001 to conceal from John Hancock the true development status of ABT-518 so as to induce John Hancock to enter into the Agreement. Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-518.

26.    The development status of ABT-518 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-518 in making that decision. Had John Hancock known the true development status of ABT-518 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

### C. Misrepresenting the Development Status of ABT-594

27.    Upon information and belief, Abbott misrepresented the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that a "phase IIb [clinical] study for neuropathic pain at higher, titrated doses of ABT-594 began in April 2000 and ends in June 2001," and that ABT-594 was "expected to be the first neuronal nicotinic receptor agonist to receive an indication for pain." Abbott understood before the Agreement was executed,

however, that the development status of ABT-594 was not as represented in the Agreement. For example, Abbott already knew prior to the execution of the Agreement that the termination rate for patients enrolled in the phase IIb clinical study of ABT-594 was unusually high, and that the final results of that study were likely to be unfavorable. Abbott also knew, no later than March 2001, that the development of ABT-594 was likely to be significantly delayed or even discontinued by Abbott as a consequence. Abbott failed to disclose these facts to John Hancock before the Agreement was executed in order to induce John Hancock to enter into the Agreement. Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-594.

28.    The development status of ABT-594 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-594 in making that decision. Had John Hancock known the true development status of ABT-594 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

### D. Misrepresenting Its Intended and Reasonably Expected Spending on Program Related Costs

29.    Upon information and belief, Abbott has misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock. The Research Program cost projections that Abbott has provided to John Hancock in various ARPs reflect Abbott's "nominal" spending, as opposed to its "expected" spending. At all relevant times, Abbott's true "expected" spending on Program Related Costs

was considerably less than the amounts communicated to John Hancock in Abbott's ARPs. Abbott has misrepresented its intended and reasonably expected spending plans to John Hancock in order to induce John Hancock to enter into the Agreement, and to make Program Payments to Abbott that would not otherwise be due under the terms of the Agreement.

30.    Abbott's intended and reasonably expected expenditures on Program Related Costs constitute material facts for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding its intended and reasonably expected expenditures on Program Related Costs in making that decision. Had John Hancock known the true level of Abbott's intended and reasonably expected expenditures, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, may not have made certain Program Payments, or may not have entered into the Agreement at all.

### E.  Failing to Use Commercially Reasonable Efforts to Develop the Program Compounds

31.    Upon information and belief, Abbott has failed to use Commercially Reasonable Efforts to develop the Program Compounds. Abbott previously represented to John Hancock in its 2005 ARP that the current commercial prospects for the active Program Compounds warrant the expenditure of a stated sum towards Program Related Costs in 2005. Upon information and belief, Abbott since has modified its 2005 ARP so as to reduce its intended and reasonably expected expenditures on Program Related Costs by more than fifty percent (50%) in retaliation, *inter alia*, for the automatic termination of John Hancock's obligation to make additional Program Payments for the third and fourth Program Years pursuant to the express terms of the Agreement.

-14-

32.    Abbott's decision to reduce its intended and reasonably expected expenditures on Program Related Costs in 2005 to less than one-half the amount that Abbott has represented is warranted by the current commercial prospects for the active Program Compounds is inconsistent with the level of effort normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market at a similar stage of development and, therefore, not Commercially Reasonable for purposes of Section 4.1 of the Agreement.

F.  Refusing to Provide John Hancock With a Copy
of Abbott's Modified 2005 ARP

33.    Abbott has refused to provide John Hancock with a copy of its modified 2005 ARP.  Abbott provided its original 2005 ARP to John Hancock in November 2004.  Upon information and belief, Abbott since has modified its original 2005 ARP so as to dramatically reduce Abbott's intended and reasonably expected expenditures on Program Related Costs in 2005.  Section 2.2 of the Agreement obligates Abbott to "promptly provide[]" John Hancock with "[a]ny ... modifications" to its ARPs.  Notwithstanding the express requirements of Section 2.2, Abbott has refused or ignored John Hancock's requests for a copy of Abbott's modified 2005 ARP.

G.  Failing to Out-License or Divest Various Ceased Compounds

34.    Upon information and belief, Abbott has failed to out-license or divest itself of various Ceased Compounds, including, without limitation, ABT-518 and ABT-594, "as soon as is practicable" as required under Section 4.3(d) of the Agreement.

35.    Upon further information and belief, Abbott has chosen not to out-license or divest itself of the foregoing Ceased Compounds for fear that, if those Compounds were successfully developed and marketed by a third party, Abbott might lose future sales of various

competing compounds that Abbott has under development, which are not subject to John Hancock's royalty rights.

### H. Failing To Pay John Hancock One-Third Of The Actual Aggregate Carryover Amount

36.    Because Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement, Abbott's actual spending on Program Related Costs over the four-year Program Term ended on December 31, 2004, and the "subsequent year commencing immediately after the end of the Program Term" ended on December 31, 2005, currently is unknown. Abbott has represented and John Hancock has reason to believe, however, that Abbott's actual spending on Program Related Costs during the Program Term was considerably less than the Aggregate Spending Target, and that Abbott's actual spending on Program Related Costs during such subsequent year was considerably less than the Aggregate Carryover Amount.

37.    Pursuant to Section 3.3(b) of the Agreement, Abbott was required to pay John Hancock one-third of the actual, unspent Aggregate Carryover Amount on or before January 30, 2006. Notwithstanding the express requirements of Section 3.3(b), Abbott has failed to make such payment to John Hancock.

*John Hancock's Efforts to Resolve Its Claims Against Abbott Amicably*

38.    On April 1, 2005, John Hancock provided written notification to Abbott of the existence and nature of the disputes identified in Sections A-G above in accordance with Section 16.7 of the Agreement. Authorized representatives of John Hancock and Abbott subsequently met in Chicago, Illinois on May 20, 2005, in an effort to resolve their disputes amicably. That effort was unsuccessful.

39.    On January 5, 2006, John Hancock provided written notification to Abbott of the existence and nature of the disputes identified in Section H above in accordance with Section 16.7 of the Agreement. Representatives of Abbott did not meet with John Hancock for the purpose of resolving those disputes within the time period permitted under Section 16.7.

### Claims

### COUNT I
### (Fraud)

40.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 39 of this Complaint, *supra*.

41.    Abbott materially misrepresented the development status of the Program Compounds in the representations and warranties contained in Sections 12.2 of the Agreement, and applicable Schedules thereto, all in the manner described in this Complaint.

42.    Abbott materially misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock, all in the manner described in this Complaint.

43.    Abbott made the foregoing misrepresentations to John Hancock wantonly and willfully for the purpose of fraudulently inducing John Hancock to enter into the Agreement, and to make various Program Payments to Abbott on the terms stated therein.

44.    John Hancock justifiably relied upon Abbott's misrepresentations to its detriment by, among other things, entering into the Agreement, and making Program Payments to Abbott in accordance with the terms thereof.

45.    As a result of Abbott's misrepresentations, John Hancock has been defrauded by Abbott and has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

## COUNT II
(Breach of Contract)

46.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 45 of this Complaint, *supra*.

47.    The Agreement constitutes a valid and binding contract between the parties. John Hancock has performed all of its obligations under the Agreement.

48.    Abbott has breached its obligations to John Hancock under the Agreement, *inter alia*, by:

(a)    misrepresenting the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement;

(b)    misrepresenting the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement;

(c)    misrepresenting Abbott's intended and reasonably expected expenditures on Program Related Costs in ARPs that Abbott has provided to John Hancock;

(d)    failing to use Commercially Reasonable Efforts to develop the Program Compounds;

(e)    refusing to provide John Hancock with a copy of Abbott's modified 2005 ARP;

(f)    failing to out-license or divest itself of certain Ceased Compounds, including, without limitation, ABT-518 and ABT-594, as soon as is practicable; and

(g)    unreasonably and unjustifiably hindering, delaying and obstructing John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement.

(h)    failing to pay John Hancock one-third of the actual, unspent Aggregate Carryover Amount pursuant to Section 3.3(b) of the Agreement.

49.     By engaging in the foregoing conduct, Abbott further has breached the covenant of good faith and fair dealing that is implied by law in every contract, including the Agreement.

50.     Abbott has breached its express and implied obligations under the Agreement willfully and wantonly in order to induce John Hancock to enter into the Agreement, induce John Hancock to make various Program Payments to Abbott on the terms stated therein, and inhibit John Hancock's ability to detect and confirm Abbott's misconduct.

51.     As a result of Abbott's willful and wanton breaches of its express and implied obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

## COUNT III
### (Indemnification)

52.     John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 51 of this Complaint, *supra*.

53.     Abbott has breached its representations, warranties and obligations to John Hancock under the Agreement as set forth herein.

54.     As a result of Abbott's various breaches of its representations, warranties and obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, "Losses" as defined in Section 1.27 of the Agreement. John Hancock's Losses include, without limitation, costs, damages, and other reasonable expenses such as audit charges and attorneys' fees.

55.    Abbott agreed in Section 12.6 of the Agreement to indemnify John Hancock, *inter alia*, "from and against all Losses related to or arising out of, directly or indirectly ... any breach by Abbott of its representations, warranties or obligations hereunder..."

56.    On April 1, 2005, John Hancock provided written notification to Abbott that John Hancock has sustained, and likely will continue to sustain, compensable Losses on account of Abbott's various breaches of its representations, warranties and obligations under the Agreement, for which John Hancock is entitled to indemnification pursuant to Section 12.6 of the Agreement.

57.    Notwithstanding John Hancock's request for indemnification, Abbott has refused to indemnify John Hancock for its compensable Losses.

### Prayers for Relief

WHEREFORE, John Hancock respectfully requests that the Court:

(a)    award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's fraud under Count I of the Complaint;

(b)    award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's various breaches of contract under Count II of the Complaint;

(c)    enter an order directing Abbott to indemnify John Hancock for its compensable Losses, including John Hancock's damages, costs, and other reasonable expenses such as audit charges and attorneys' fees, under Count III of the Complaint;

(d)    award John Hancock punitive damages for Abbott's willful and wanton misconduct in an amount to be determined under Counts I and II of the Complaint; and

(e)    grant John Hancock such other and further relief as the Court deems just and appropriate in the circumstances.

JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY AND MANULIFE INSURANCE COMPANY

By their attorneys,

/s/ Brian A. Davis
Brian A. Davis (BBO No. 546462)
Joseph H. Zwicker (BBO No. 560219)
Stacy Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Telephone: 617-248-5000

Date: June 23, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 23, 2006.

/s/ Brian A. Davis
Brian A. Davis

4090288.1