**CHOATE**

CHOATE HALL & STEWART LLP

December 13, 2006

Brian A. Davis, P.C.
(617) 248-5056
bad@choate.com

BY HAND AND ELECTRONICALLY

The Honorable Douglas P. Woodlock
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
John Joseph Moakley U.S. Courthouse, Suite 4110
One Courthouse Way
Boston, Massachusetts 02210

Re:   John Hancock Life Insurance Company, *et al.*
      v. Abbott Laboratories
      U.S.D.C. (Mass.) Civil Action No. 05-11150-DPW

Dear Judge Woodlock:

Choate, Hall & Stewart represents plaintiffs John Hancock Life Insurance Company *et al.* (collectively, "John Hancock") in this action. I write in response to the Court's request, made at the December 6, 2006 motion hearing, for further submissions from the parties concerning the enforceability of Section 3.3(b) of the Research Funding Agreement (the "Agreement"), which provides that "[i]f Abbott does not spend the Aggregate Carryover Amount on Program Related Costs" by the end of calendar year 2005, "Abbott will pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days after the end of such ... year." John Hancock understands, in particular, that the Court is interested in guidance as to whether Section 3.3(b) constitutes a permissible liquidated damages provision or an unenforceable penalty under Illinois law.

The short answer is that, under Illinois law, Section 3.3(b) is neither a liquidated damages provision, nor a penalty. It is, instead, a binding contractual provision negotiated by experienced businesspeople and their legal counsel that, at the time of contracting, allocated the financial risks that would be borne by the parties under certain reasonably foreseeable circumstances. See Fleet Business Credit, LLC v. Enterasys Networks, Inc., 352 Ill. App. 3d 456, 466, 471-473 (2004) (rejecting defendant's argument that contractual provision, which required it to purchase certain financing contracts from lender in the event of a default, was a "liquidated damages clause" and

Letter to Hon. Douglas P. Woodlock
UNITED STATES DISTRICT COURT
December 13, 2006
Page 2

an "unenforceable penalty provision," rather than a "risk-allocation contract"). Illinois law expressly recognizes and embraces "a widespread policy of permitting competent parties to contractually allocate business risks as they see fit." McClure Eng'g Assoc., Inc. v. Reuben H. Donnelley Corp., 95 Ill. 2d 68, 72 (1983); see also Chicago Steel Rule and Die Fabricators Co. v. ADT Security Systems, Inc., 327 Ill. App. 3d 642, 651 (2002) (upholding an exculpatory clause in a business contract on the ground that "[w]e find nothing unreasonable about the fact that the commercial parties of equal bargaining power were free to allocate the risk of loss by contract"). That policy has been held to be especially applicable in cases involving "sophisticated businesses, capable of protecting their own interests – and appropriately allocating risks – in the bargaining process." Intrastate Piping & Controls, Inc. v. Robert-James Sales, Inc., 315 Ill. App. 3d 248, 258 (2000).

The recent decision of the Appellate Court of Illinois in Fleet Business Credit is particularly instructive in the present case. Fleet, the plaintiff, entered into a contract with Enterasys, the defendant, in March 2000 pursuant to which Fleet agreed to supply financing to various third-parties for the purchase of Enterasys' telecommunications and networking equipment. Fleet Business Credit, 352 Ill. App. 3d at 458. Enterasys, in return, obligated itself in Section 4.4(b) of its contract with Fleet to take certain, specified steps to preserve and remarket any financed equipment that was returned to Enterasys by its customers, and to purchase all of its customers' financing agreements from Fleet -- thereby taking onto itself the risk of loss -- in the event that Enterasys ever failed to fulfill those obligations. Id. at 459-462. When one Enterasys customer (Vitts) filed for bankruptcy and returned its financed equipment to Enterasys in early 2001, Enterasys did not preserve and remarket the equipment as required under the terms of Section 4.4(b) of the Fleet contract. Id. at 463-465. Fleet thereupon demanded that Enterasys purchase the Vitts financing agreement from Fleet and Enterasys declined. Id. at 466. As justification for its refusal, Enterasys argued, in part, that its contractual obligation to purchase the Vitts' financing agreement from Fleet actually was a liquidated damages clause that constituted "an unenforceable penalty provision under Illinois law" because,

> (1) the parties did not agree in advance that section 4.4(b) was an appropriate measure of damages for any breach of [the Fleet contract]; (2) section 4.4(b) was not a reasonable forecast of actual damages resulting from a breach of the [Fleet contract]; and (3) the actual damages, if any, sustained by Fleet as a result of the alleged breaches are capable of estimation.

Id. at 466-467 (relying on the holding in Northern Illinois Gas Co. v. Energy Coop., Inc., 122 Ill. App. 3d 940, 947 (1984)).

Letter to Hon. Douglas P. Woodlock
UNITED STATES DISTRICT COURT
December 13, 2006
Page 3

The Appellate Court of Illinois, however, disagreed. It held that Enterasys' obligation to purchase the Vitts' financing agreement from Fleet "d[id] not constitute a liquidated damages clause" because, *inter alia*, "the parties did not agree to a liquidated sum in the event of default," but rather "allocated ... Fleet's risk by requiring Enterasys to purchase the remaining Vitts Retail Contracts if Enterasys breached certain covenants that were agreed upon" in the parties' contract. Fleet Business Credit, 352 Ill. App. 3d at 472. The Appellate Court ultimately rejected Enterasys' liquidated damages provision analogy and argument on the ground that Enterasys had "failed to provide this court with either appropriate legal authority or record evidence to establish that [the alleged liquidated damages provision] is anything other than a purchase obligation that arose upon Enterasys' breach of certain covenants." *Id.* at 473.

The relevant facts of this case between John Hancock and Abbott are strikingly similar to those presented in Fleet Business Credit and warrant the same result. Section 3.3 of the Agreement, which is titled simply "Carryover Provisions," does not purport to be, and cannot reasonably be read as, a liquidated damages clause that specifies "the amount of damages which must be paid in the event of default." Northern Illinois Gas, 122 Ill. App. 3d at 947. The words "damages" or "losses" appear nowhere in Section 3.3 (even though the term "Losses" is expressly defined and referenced elsewhere in the Agreement). *See, e.g.,* §§ 1.27, 12.6-12.8. Moreover, Abbott's one-third payment obligation under Section 3.3(b) is not triggered by, and does not require, any default or breach on Abbott's part whatsoever.

Rather, Section 3.3(b) is a bargained-for provision in a heavily-negotiated contract among sophisticated business entities that allocates the amount of financial risk and costs each party would bear in the unhappy event that Abbott's actual spending on Program Related Costs over the four-year Program Term and the fifth, "subsequent year" fell below the Aggregate Spending Target, which is defined unequivocally in Section 1.3 of the Agreement as "Six Hundred Fourteen Million Dollars ($614,000,000)." In the current circumstances, the application of Section 3.3(b) according to its plain terms results in an immediate payment to John Hancock of $21.8 million and a general allocation of financial risk and costs over the Program Term that, in relative terms, is *nearly identical* to the allocation reflected in the Agreement as originally executed by the parties (*i.e.*, an actual contribution ratio of 4.8 to 1 versus a projected contribution ratio of 4.7 to 1). As the Court of Appeals for the First Circuit observed in comparable circumstances in *Hancock I*, whether the risk allocation that the parties expressly adopted in Section 3.3(b) represents "the best, the fairest, or most efficient way to structure the contract is not [a] concern" of the courts. Court of Appeals Opinion, dated September 28, 2006, at 15-16.

Letter to Hon. Douglas P. Woodlock
UNITED STATES DISTRICT COURT
December 13, 2006
Page 4

Even assuming that Section 3.3(b) qualified as a "liquidated damages provision" under Illinois law, however, Abbott still has not demonstrated that it would constitute an unenforceable penalty. See XCO Int'l Inc. v. Pacific Scientific Co., 369 F.3d 998, 1003 (7th Cir. 2004) (the party asserting that a provision is an impermissible penalty bears the burden of proof on that issue). In order to do so, Abbott must prove that Section 3.3(b) imposes a result that is "grossly disproportionate" to the "contractual benefits" that the parties reasonably could estimate John Hancock was "likely" to enjoy when they entered into their agreement and, thus, was at risk of losing. Automotive Finance Corp. v. Ridge Chrysler Plymouth L.L.C., 219 F. Supp. 2d 945, 950-951 (N.D. Ill. 2002); see also River East Plaza, L.L.C. v. The Variable Annuity Life Co., No. 03 C 4354, 2006 WL 2787483, at *9 (N.D. Ill. Sept. 22, 2006) (for a payment provision to be deemed unreasonable and unenforceable, "it must be 'clearly disproportionate to a reasonable estimate of the actual damages likely to be caused by a breach,'" quoting XCO, supra). Abbott cannot meet this burden. At or about the time the Agreement was executed, the estimated "contractual benefits" that John Hancock was considered likely to receive on its investment in Abbott's Research Program exceeded *$600 million* in gross revenues, and more than *$400 million* in net revenues. See John Hancock - Abbott Laboratories Research and Development Transaction Investment Analysis, Document Bates Nos. JH 002424 - JH 002429 (a relevant, true excerpt of which is appended to this letter as Exhibit A for the convenience of the Court). The $21.8 million payment that John Hancock currently is entitled to receive under Section 3.3(b) simply pales in comparison and cannot reasonably be described as a "penalty."

Indeed, even in the highly unlikely event that Abbott was called upon to make a *$172 million* payment under Section 3.3(b), as hypothesized by Abbott in its motion papers and at oral argument, that payment still would be dramatically less than John Hancock's originally estimated "contractual benefits." This is true even though Abbott's extreme hypothetical -- which only could come about if Abbott reduced its total spending on Program Related Costs from over $1.2 billion to under $80 million in the first nine months of the Agreement -- cannot fairly be said to reflect a "reasonable expectation" of the parties at the time the Agreement was executed. See, e.g., Automotive Finance, 219 F. Supp. 2d at 952-955 (rejecting plaintiff's hypothetical scenario that postulated "zero sales" of the products at issue as an "absurdity" and not a "'reasonable' expectation in a situation that is premised on [the defendant's] continued performance under the Agreement."). Thus, Section 3.3(b) does not qualify as an unenforceable penalty on either a hypothetical basis, or as actually applied in the present case.

Lastly, Abbott is estopped from asserting that Section 3.3(b) of the Agreement constitutes an unenforceable penalty based upon Abbott's prior express representations to the contrary. Abbott's Assistant Secretary, Divisional Vice President and in-house counsel, Brian J. Smith, provided John Hancock with an opinion letter in conjunction with the execution of the Agreement that states, in relevant part, that "the Research

Letter to Hon. Douglas P. Woodlock
UNITED STATES DISTRICT COURT
December 13, 2006
Page 5


Funding Agreement has been duly and validly authorized by [Abbott] ... *and constitutes a valid and binding legal obligation of [Abbott] enforceable against it in accordance with its terms ....*" Letter of Brian J. Smith to John Hancock Life Insurance Company, *et al.*, dated March 13, 2001, at 2 (emphasis added) (a true copy of which is appended to this letter as Exhibit B for the convenience of the Court). The purpose of that opinion letter was to preclude Abbott from doing precisely what it is attempting to do in this proceeding; *i.e.*, escape one or more provisions of the Agreement that it had negotiated with John Hancock by subsequently arguing that they impose invalid or legally unenforceable obligations. Illinois law provides that the doctrine of estoppel applies when an "unjust effect [would] result[] from allowing another person to raise a claim inconsistent with his or her former declarations." Geddes v. Mill Creek Country Club, Inc., 196 Ill. 2d 302, 313 (2001). It would be patently unjust in the present circumstances to allow Abbott to induce John Hancock to enter into the Research Funding Agreement, *inter alia*, by making a purportedly "valid and binding" promise in Section 3.3(b) to "pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days after the end" of 2005, then permit Abbott later to renounce that obligation as an invalid and unenforceable penalty when it comes time to pay. Other courts have held that the doctrine of estoppel applies in directly comparable circumstances. *See, e.g.,* Leventhal v. New Valley Corp., No. 91 Civ. 4238 (CSH), WL 15989, at *5 (S.D.N.Y. Jan 16, 1992) (a "corporation's general counsel cannot, in order to procure [plaintiff's] agreement, give an opinion that the instrument was 'legally binding' ... and then deny the validity of the instrument when it becomes economically convenient to do so."); In re Luis Elec. Contracting Corp., 149 B.R. 751, 758-759 (E.D.N.Y. Oct. 2, 1992) (debtor estopped from denying liability under agreements based on prior representations in opinion letter and corporate resolutions). It should apply in this case as well.

Thank you for your consideration.

Very truly yours,

/s/ Brian A. Davis

Brian A. Davis

Attachments

cc:   Jeffrey I. Weinberger, Esq. (by electronic and regular mail)
      Peter E. Gelhaar, Esq. (by electronic and regular mail)
      Michael S. D'Orsi, Esq. (by electronic and regular mail)

4154742.1

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent to those non-registered participants (if any) on December 13, 2006.

                                          */s/ Russell J. Edelstein*
                                          Russell J. Edelstein

# EXHIBIT A

Case 1:05-cv-11150-DPW    Document 98-2    Filed 12/13/2006    Page 1 of 5

John Hancock - Abbott Laboratories
Research and Development Transaction

Investment Analysis

1.  John Hancock is considering committing [$50 million] per year for a period of four years to fund the development and commercialization of a specified pool of compounds owned by Abbott Laboratories. During the four year period, Abbott will commit three-to-four times John Hancock's investment for those compounds, and will spend over seven times our investment during the term of the transaction. In return, Abbott will agree to pay John Hancock milestone and royalty payments for each compound that reaches regulatory approval and has commercial sales.

This transaction is valuable to Abbott because it allows them to offset R&D expenditures with research and development income – improving their net income. This transaction is valuable to John Hancock because it allows us to generate equity returns in the form of current (royalty) income for a sizeable investment.

Abbott Laboratories is the eight largest pharmaceutical company in the U.S. Its revenues were approximately $13 billion in 1999 and its current market capitalization is approximately $60 billion. Abbott is rated "Aaa" by the major rating agencies.

Our business relationship with Abbott began in 1997 when we funded a $30 million equity investment in a development stage company called Metabolex and received the right to sell our equity to Abbott at a slight premium. Since then, Abbott has introduced us to a number of other proprietary investment opportunities and we have completed one (Idun).

2.  Determining the fair economics of the proposed transaction is highly dependent upon the number of compounds included, the characteristics of the compounds (i.e. status of development, potential sales), the structure of the royalty rates, and an estimation of what is a fair return. To help us answer these questions, we have taken several steps. First, we have researched industry standards for likelihood of success and probable sales curves for compounds in different stages of development. Second, we have developed a spreadsheet model that calculates the rate of return for a chosen portfolio and have developed a minimum number of compounds and associated milestone/royalty payments to provide us with returns that adequately compensate us for the risk we are taking. Third, we have tried to determine what rate of return the capital markets would require for the level of risk that we are willing to take.

3.  The current portfolio of compounds that we are considering consists of five of Abbott's late-stage development compounds and a basket of three pre-clinical cancer compounds. The late-stage compounds range from mid-Phase II to starting Phase-III. Peak annual sales for these compounds range from $400 million to $1.2 billion. With the exception of the "cancer basket", the compounds are independent of each other. We have not completed any diligence on the specific compounds yet other than to read Abbott's press releases and analyst reports. Assuming that Abbott has correctly characterized the development stage of each compound, we have assigned probabilities of success ("regulatory approval") and time to success for each compound. Our probabilities of success come from a 1995 study by Dr. Joseph A. DiMasi at the Tufts Center for the Study of Drug Development. Dr. DiMasi's study is generally accepted by the pharmaceutical industry as an accurate assessment of the probability of success and of the time and costs associated with drug development. Dr. DiMasi looked at a random sample of 93



CONFIDENTIAL
JH 002424

compounds in four broad disease categories from 12 pharmaceutical companies that were first tested in humans between 1970 and 1982.

Dr. DiMasi's results are summarized below:

| Entering Phase | Probability of Success | | | | |
|---|---|---|---|---|---|
| | NSAID | Cardio-vascular | Anti-infective | Neuro-pharm | All |
| I | 22% | 26% | 30% | 20% | 23% |
| II | 30% | 41% | 38% | 22% | 31% |
| III | 71% | 72% | 77% | 51% | 63% |

Dr. DiMasi calculated the average time to approval as 8.75 years for compounds entering Phase I, 7.5 years for compounds entering Phase II, and 5.5 years for compounds entering Phase III. Embedded in these times was an approximately 30-month review process by the FDA. Due to legislative and process changes, the average FDA review time is now approximately 12 months. A revised timeframe for approval (which was been published by TCSDD in 1999), based on accelerated review by the FDA, and quicker processes within the pharmaceutical companies, is 6.0 years for Phase I, 5.0 years for Phase II, and 3.0 years for Phase III.

<u>During the past four years, we have evaluated many equity investments in emerging pharmaceutical and medical device companies, and we have completed several transactions. During that period, we have established relationships with reliable scientific advisors. If we proceed beyond the current step of working with Abbott on the framework of a transaction, we will test Dr. DiMasi's model for reasonableness and we will engage scientific consultants to evaluate the compounds in the portfolio.</u>

4. In estimating sales projections by compound, we start with expected peak sales for the compound. For now, we have accepted Abbott's number for peak sales. In our diligence process, however, we will look at sales for similar compounds, the relative success of first-to-market drugs versus others, and other factors. Our next step is to use a Sales Curve calculated by Lehman Brothers that projects ramp-up and ramp-down for sizeable drugs. In general, this Curve shows peak sales being reached seven years after launch. Ramp-up is achieved by 5% of peak sales in the first year, followed by 13%, 25%, 50%, 80%, and 90%. Peak sales are maintained for three years, and the compound then achieves 85% of peak, 75%, 70%, etc. As expected, every compound has its own unique curve, and Lehman's is only a general estimate. We have compared the curve to IMS data of prescription sales for individual compounds in a number of drug classes from 1981 to 1999. Our analysis indicates that Lehman's curve is a good fit.

5. We developed a spreadsheet that incorporates multiple drug compounds (and their specific probability of success, time to launch, and expected sales pattern) and a milestone/royalty structure that is intended to lower our risk in the transaction. Having multiple compounds that are substantially far along in clinical trial, we limit our exposure to the possibility that no compound is approved and that we lose all of our money. Based on the current proposed portfolio, we believe that the risk of losing all of our money is approximately 1%. The second component of our model is to receive a milestone payment from Abbott upon regulatory approval. We have proposed $10 million per compound. This payment is intended to return cash to John Hancock sooner and to somewhat lower the risk that actual sales do not meet projected sales. The third component of our model is to have a tiered royalty structure – such as 8% of the first $400 million of <u>aggregate</u> annual sales, 4% of the next $600 million of <u>aggregate</u> annual sales, and 1% of <u>aggregate</u> annual sales in excess of $1 billion.

CONFIDENTIAL
JH 002425

6.  The last step of our analysis is to determine what a fair economic return for this transaction should be. We have benchmarked this transactions in a number of ways, such as: R&D vehicles for pre-clinical compounds were sold with expected IRRs (over a three-to-five year period) of approximately 40%; Hambrecht & Quist has estimated pharmaceutical IRRs for single phase-II compounds to be 40% and single phase-III compounds to be 25%; the Palisade Partners (Sony movies) transaction that we participated in last year has an expected IRR of 20%; Elan Pharmaceuticals in currently in the market with a pooled transaction with an IRR of 25% (over 18-24 months); and our proprietary analysis of the equity market's IRR for Abbott's entire R&D pipeline of 16-22%. Based on these comparisons, we think that an IRR of 20-25% is reasonable -- and Abbott agrees.

We also evaluated the relationship between our investment (and Abbott's) in the entire portfolio and the average royalty rate that we expect to receive – which is approximately 4-5%. We estimate that the current value of the compounds that Abbott is contributing to the transaction is about $1 billion. During the four year investment period, Abbott expects to invest $800 million on the compounds, in addition to our $200 million. Based on these amounts, our investment is approximately 10% of the total invested dollars. Most pharmaceutical companies earn about a 50% pre-tax margin (excluding R&D expenses) on sales. On a net basis, then, our expected royalty should be about 5%.

7.  The current proposed portfolio consists of (1) a mid Phase II compound with projected peak sales of $700 million, (2) a late Phase II with peak sales of $1.2 billion, (3) an early Phase III with peak sales of $700 million, (4) an early Phase III with peak sales of $700 million, (5) an early Phase II with peak sales of $400 million, and (6) a basket of three cancer compounds currently in pre-clinical trials, each of which may have peak sales of $400 million.

John Hancock will fund [$50 million] per year for four years. Milestone payments of $10 million will be paid for each compound that receives regulatory approval. Royalty rates will equal [8%] on the first $400 million in sales, [4%] on the next $600 million of sales, and [1%] on sales in excess of $1 billion. Abbott would also like to build in a provision to limit royalties if our actual IRR exceeds a certain amount.

Based on this portfolio, and running our model 500 times, the probability of losing all of our money is about 1%. There is also about a 1% probability of just getting our money back (with no return). The average return is approximately 20% and tightly bound around that percentage. The maximum return is 25%. Looking at sensitivities to our assumptions, if the $1.2 billion compound generated only $600 million in revenues or if all compounds generated only 75% of projected sales, our IRR would be reduced by approximately 1-2%. Our probability of failure would not change.

It is important to note that the expected IRRs are over a long period of time (10-15 years). Assuming that we could sell our future royalty stream after the fifth year, our five-year IRR would be about 24% (and the maximum return would be about 35%).

A one-percent probability of total loss combined with a one-percent chance of not earning a return is approximately equivalent to a 30 basis point annual loss over five years – or a "Baa" credit rating. The expected return of 20% is attractive relative to the risk that we would be taking.

CONFIDENTIAL
JH 002426

Estimated Cash Flow
($ millions)

| Year | JH Cash Payments | Milestone Payments | Royalty Payments | Aggregate Cash Received | JH Net Cash Flow |
|---|---|---|---|---|---|
| 2000 | (50) | | | | (50) |
| 2001 | (50) | | | | (50) |
| 2002 | (50) | | 6 | 6 | (44) |
| 2003 | (50) | | 18 | 18 | (32) |
| 2004 | | 30 | 35 | 65 | 65 |
| 2005 | | | 48 | 48 | 48 |
| 2006 | | | 58 | 58 | 58 |
| 2007 | | | 62 | 62 | 62 |
| 2008 | | | 65 | 65 | 65 |
| 2009 | | | 65 | 65 | 65 |
| 2010 | | | 66 | 66 | 66 |
| 2011 | | | 64 | 64 | 64 |
| 2012 | | | 61 | 61 | 61 |
| 2013 | | | 32 | 32 | 32 |
| 2014 | | | 14 | 14 | 14 |
| TOTAL | (200) | 30 | 594 | 624 | 424 |

CONFIDENTIAL
JH 002427

# EXHIBIT B

Brian J. Smith
Assistant Secretary and Divisional Vice President
Domestic Legal Operations
Abbott Laboratories
100 Abbott Park Road
Abbott Park, Illinois 60064

March 13, 2001

John Hancock Life Insurance Company
Investors Partner Life Insurance Company
John Hancock Variable Life Insurance Company
Attention: Stephen J. Blewitt
John Hancock Place
P.O. Box 111
Boston, MA 02117

Ladies and Gentlemen,

    I have acted as counsel for Abbott Laboratories, an Illinois corporation (the "Company"), in connection with the Company's collaboration with John Hancock Life Insurance Company, a Massachusetts corporation, Investors Partner Life Insurance Company, a Massachusetts corporation, John Hancock Variable Life Insurance Company, a Delaware corporation (collectively, "John Hancock") pursuant to the Research Funding Agreement made as of March 13, 2001 (the "Research Funding Agreement"). Capitalized terms used herein without definition have the meanings assigned to them in the Research Funding Agreement.

    In connection with the opinions expressed herein, I have made such examination of matters of law and of fact as I considered appropriate or advisable for purposes hereof. As to matters of fact material to the opinions expressed herein, I have relied upon certificates and statements of government officials and of officers of the Company. I have also examined originals or copies of such corporate documents or records of the Company as I have considered appropriate for the opinions expressed herein. I have assumed for the purposes of this opinion the genuineness of all signatures (other than those of individuals signing on behalf of the Company which are genuine), the legal capacity of natural persons, the authenticity of the documents submitted to me as originals, the conformity to the original documents of all documents submitted to me as certified, facsimile or photostatic copies, and the authenticity of the originals of such copies.

MAR. 13. 2001 12:29PM                                                                NO. 2199   P. 3/3

John Hancock Life Insurance Company
Investors Partner Life Insurance Company
John Hancock Variable Life Insurance Company
March 13, 2001
Page 2

    Based upon the foregoing, and subject to the qualifications and limitations stated herein, I am of the opinion that: (i) the Company is duly organized, validly existing and in good standing in the State of Illinois; (ii) the Company has the requisite corporate power and authority to execute, deliver and perform the Research Funding Agreement; (iii) the Research Funding Agreement has been duly and validly authorized by the Company, and duly executed and delivered by an authorized officer of the Company and constitutes a valid and binding legal obligation of the Company enforceable against it in accordance with its terms; (iv) the performance of the Research Funding Agreement by the Company does not constitute a breach or violation of its organizational documents or any other agreement or understanding, written or oral, to which the Company is a party or any existing law, statute, rule or regulation by which the Company is bound; (v) no consents or approvals of any court or governmental authority is required on the part of the Company in connection with the execution, delivery, and performance of the Research Funding Agreement; (vi) there is no litigation pending, or to my knowledge threatened, which calls into question the validity of the Research Funding Agreement.

    My opinion expressed above is limited to the law of the State of Illinois and the federal law of the United States, and I do not express any opinion herein concerning any other law.

    The opinion set forth herein is rendered only to you and solely for your benefit in connection with the above described transactions. This opinion may not be relied upon by you for any other purpose, or relied upon by any other person for any purpose, without my prior written consent.

                                Very truly yours,

                                Brian J. Smith

M:\Domestic\Pals & Adams\John Hancock\Opinion 010313.doc