UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER LIFE INSURANCE COMPANY),<br><br>*Plaintiffs,*<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>*Defendant.* | Civil Action No. 05-11150-DPW |

### ABBOTT LABORATORIES' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS AND IN OPPOSITION TO HANCOCK'S MOTION FOR PARTIAL SUMMARY JUDGMENT

As requested by the Court at the December 6, 2006 hearing, Defendant Abbott Laboratories ("Abbott") submits this supplemental memorandum in support of its motion to dismiss the claim in Count II, ¶ 48(h) of the Supplemental Complaint filed by John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and Manulife Insurance Company (f/k/a Investors Partner Life Insurance) (collectively, "Hancock") and in opposition to Hancock's cross-motion for partial summary judgment.

### INTRODUCTION

According to Hancock's interpretation of Section 3.3(b), if Abbott fails to spend $614 million on Program Related Costs during the Program Term and the subsequent year – even if the shortfall is caused by Hancock's termination of payments pursuant to Section 3.4 – it must pay Hancock one-third of the difference between $614 million and its actual spending. For the reasons stated in its earlier briefs and at oral argument, Abbott submits that the Agreement should not be construed in this manner. Rather, Section 3.4 provides Hancock with the remedy

of termination for the reasons specified therein, and Section 3.3(b) provides Hancock with a different remedy for Abbott's failure to spend $614 million in the four-year period plus the carryover year, in the absence of such termination. If Section 3.3(b) were construed as Hancock advocates, however, it would be an invalid and unenforceable penalty under Illinois law rather than a reasonable estimate of damages.

## ARGUMENT

### A.   Illinois Law Prohibits Enforcement of Penalty Clauses

"Under Illinois law, as in most if not all states, contracting parties cannot agree to penalty provisions even if the parties are sophisticated corporations." *USX Corp. v. Int'l Minerals & Chemicals Corp.*, No. 86C2254 1987 WL 20427 at *5 (N.D. Ill. Nov. 24, 1987) (citing *Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1289 (7th Cir. 1985)). "In interpreting contract provisions that specify damages, Illinois law draws a distinction between liquidated damages, which are enforceable, and penalties, which are not." *Checkers Eight Ltd. Partnership v. Hawkins*, 241 F.3d 558, 561 (7th Cir. 2001).

A liquidated damages clause is valid and enforceable only if "(1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained; and (3) actual damages would be uncertain in amount and difficult to prove." *Med+Plus Neck & Back Pain Ctr. v. Noffsinger*, 311 Ill. App. 3d 853, 860 (2000); *Jameson Realty Group v. Kostiner*, 351 Ill. App. 3d 416, 423 (2004) (noting that the Illinois courts have "parsed [these] three elements" from section 356 of the Restatement (Second) of Contracts). "Additionally, the damages must be for a specific amount for a specific breach; they may not be a penalty to punish nonperformance or [] a threat used to secure performance." *Noffsinger*, 311 Ill. App. 3d at 860. *See also Jameson*, 351 Ill. App. 3d at 423 ("It is a general rule of contract law that, for reasons of public policy, a liquidated damages clause which operates as a penalty for nonperformance or as a threat to secure performance will not be enforced.").

At the hearing, in an attempt to avoid scrutiny of Section 3.3 under the liquidated damages/penalty case law, Hancock counsel contended that Section 3.3 was not a liquidated damages clause at all, but simply a provision giving Abbott alternative performance obligations – either spend $614 million or pay Hancock one-third of the Aggregate Carryover Amount. Hancock cannot escape the law regarding invalid penalties so easily. "Illinois law does not require that a contract provision be categorized as either liquidated damages or compensation. Under either categorization, the payment will not be enforceable if found to be a penalty." *USX*, 1987 WL 20427 at *3 (citing *Joseph v. Lake Michigan Mortgage Co.*, 106 Ill. App. 3d 988 (1982); *Steel v. People's Oil & Gas Co.*, 147 Ill. App. 133, 136 (1909)). *See also id.* at *5 (noting that contract terms providing for "alternate payments, whether purported to be liquidated damages or alternate compensation, are invalid if they are actually a penalty" and holding that an alternate payment provision was an invalid penalty).

In *Automotive Finance*, the plaintiff, like Hancock, argued that a contract term was not a liquidated damages provision, but merely gave the defendant an alternative means of performance (payment of specified funds to plaintiff), and that it was simply suing for damages based on the defendant's failure to provide the alternative performance. *Automotive Finance Corp. v. Ridge Chrysler Plymouth L.L.C.*, 219 F. Supp. 2d 945, 949-50 (N.D. Ill. 2002). The court soundly rejected that argument, holding that "the real question is not whether [the provision] sets damages for a breach, but rather whether that paragraph calls for payment of an unenforceable penalty." *Id.* at 949. It noted that the agreement set forth the desired method for the defendant's performance and the provision at issue "states what would happen if [the defendant] did not perform in accordance with the stated method." *Id.* at 949-50. Therefore, although defendant's failure to perform as set forth in the agreement "is not technically a breach of the Agreement," the provision at issue "represented a means of creating pressure on [the defendant] to adhere" to those obligations. *Id.* at 950. Thus, the court applied the liquidated damages/penalty analysis and held that the provision requiring payment to the plaintiff was an unenforceable penalty. *Id.* at 949-56. Similarly, Section 3.3(b) sets forth the desired

performance by Abbott – spending of the Aggregate Spending Target in the Program Term and subsequent year – and the last sentence of Section 3.3(b) sets forth the consequences for Abbott's failure to satisfy those obligations. Thus, regardless of how Hancock chooses to characterize the provision, it must be analyzed under the liquidated damages/penalty test. *Id.*

    1.    **The Parties Did Not Intend to Agree In Advance to Settlement of Damages That Might Arise From Abbott's Failure to Spend $614 Million Due to Hancock's Termination of Payments**

The first consideration in determining whether a contract provision is a valid liquidated damages provision or a penalty is whether the parties intended to agree in advance to the settlement of damages that might arise from the breach. *Noffsinger*, 311 Ill. App. 3d at 860. It is undisputed that Section 3.3(b) was not intended to serve this function. All of the extrinsic evidence cited by Abbott in its earlier briefing demonstrates that there was no intent by either party that this provision would operate as a liquidated damage remedy *in addition* to the remedy of termination. Abbott's Reply Mem. In Supp. in Supp. of Mot. to Dismiss and in Opp. To Hancock Mot. for Summ. Judg. ("Abbott Reply Memo") at 12-16. Furthermore, the Agreement does not describe Section 3.3(b) as a liquidated damages clause or include any recital that the term is intended to provide a reasonable estimate of anticipated damages from Abbott's failure to spend $614 million (particularly where that failure results from Hancock's termination of payments) or, conversely, that it is not intended as a penalty. While failure to include such a recital is not determinative, it does provide some evidence that the provision was not intended to provide a reasonable estimate of likely actual damages. *See Rose Marine Transportation, Inc. v. Kaiser Alum. & Chem. Corp.*, 758 F. Supp. 1218, 1223 (N.D. Ill. 1990) (noting that the provision in question does not "even purport to reflect a reasonable estimate of what the damages might likely be at the time of breach" and holding that it is an invalid penalty).

    2.    **Actual Damages Are Not Uncertain in Amount and Difficult to Prove**

Section 3.3(b), as interpreted by Hancock, also does not satisfy the requirement that "actual damages would be uncertain in amount and difficult to prove." *Noffsinger*, 311 Ill. App. 3d at 860. Assuming *arguendo* that the Agreement requires Abbott to spend $614 million

regardless of whether Hancock terminates its Program Payments, there is no reason why Hancock could not use well established economic tools to prove its damages if Abbott fails to meet this obligation and if Hancock is harmed by this failure. As Hancock's counsel admitted at the hearing, for example, Hancock established a target rate of return for this investment. If the alleged failure by Abbott to provide funding caused Hancock not to achieve this rate of return, a calculation could be made modeling the "but for" world – what Hancock's return would have been had the alleged breach not occurred. This type of proof, usually offered through an economist or accounting expert, is common in commercial litigation. Indeed, Hancock has already submitted an expert report in this case which is based precisely upon this type of "but for" calculation. Of course, if Abbott's alleged breach of the spending obligation did not cause any actual harm, e.g. if the compounds dropped by Abbott were simply not viable, and the infusion of another $65.4 million would not have changed this fact, Hancock would not be entitled to *any* damages. This possibility is not evidence that actual damages are uncertain in amount or difficult to prove, but simply evidence that there might not be any actual damages.[1]

### 3. The Amount of Liquidated Damages in Section 3.3(b) Was Not a Reasonable Estimate of Actual Damages at The Time of Contracting

A liquidated damages clause is not valid unless the damages constitute a reasonable estimate, at the time of contracting, of the damages which might be sustained. *Noffsinger*, 311 Ill. App. 3d at 860. If Section 3.3(b) is interpreted as Hancock suggests, the payments purportedly due under that provision would not be a reasonable estimate, as of the time of the Agreement, of potential actual damages for a number of reasons. For example, it is not a reasonable estimate of damages because it fails to account for Hancock's cost savings. Under Hancock's interpretation, Abbott must pay one-third of the unspent Aggregate Carryover Amount regardless of whether Hancock has made the full Program Payments of $214 million or

---

[1] The possibility that actual damages from Abbott's reduced spending might be minimal or non-existent also illustrates the penal nature of Hancock's proposed interpretation of Section 3.3. As discussed below, under Hancock's interpretation of Section 3.3, Abbott would be required to pay a large penalty not reasonably related to the expected range of actual damages.

has been relieved of a portion of its payments pursuant to Section 3.4. In other words, Hancock would receive the *same amount* of "liquidated damages" regardless of how much it has invested in the program.

This point is best illustrated by comparing two scenarios under Section 3.3(b). First, assume that Section 3.4 was not triggered and Hancock made the full Program Payments of $214 million, but Abbott, due to unforeseen circumstances, only spent $548.6 million during the Program Term and the subsequent year.[2] In that case, Abbott's failure to spend $614 million would not have resulted in any cost savings to Hancock. Hancock would have incurred $214 million in costs, and been deprived of the benefit, if any, of Abbott spending an additional $65.4 million on development of the Program Compounds.

In the instant case, however, Hancock claims that the same remedy under Section 3.3(b) should also apply when the shortfall is caused by the termination of Hancock's Program Payments under Section 3.4. But it is evident that Hancock's damages are *far lower* in this scenario than in the one previously discussed. Here, Hancock spent only $104 million, not $214 million. It has avoided costs of $110 million. Yet, under its interpretation of Section 3.3(b), it is entitled to exactly the same amount of "liquidated damages", with no provision for "netting out" to account for this significant difference.

This type of clause, which specifies the same damages without regard for potentially major cost savings accrued by the non-breaching party is not a reasonable estimate of damages and is an invalid and unenforceable penalty under Illinois law. *Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1290-91 (7th Cir. 1985) (Posner, J.). *Lake River* involved a contract in which the defendant agreed to ship a minimum quantity of industrial abrasive powder to the plaintiff for bagging. *Id.* at 1286. In order to ensure that the plaintiff could recoup costs of new equipment and make a profit of 20 percent, the contract provided that if the defendant failed to ship the agreed-upon minimum, plaintiff could invoice defendant at the prevailing rate for the

---

[2] As Abbott showed in its earlier briefs, this was actually the situation that Section 3.3(b) was intended to address. *See* Abbott Reply Memo. at 12-13.

-6-

difference between the quantity actually bagged and the minimum guaranteed. *Id.* The court held that it was an invalid penalty clause because it failed to account for the costs avoided by the plaintiff as a result of defendant's breach and thus was not a reasonable estimate of damages. *Id.* at 1290-92. The court explained that:

> When a contract specifies a single sum in damages for any and all breaches even though it is apparent that all are not of the same gravity, the specification is not a reasonable effort to estimate damages; and when in addition the fixed sum greatly exceeds the actual damages likely to be inflicted by a minor breach, its character as a penalty becomes unmistakable.

*Id.* at 1290. The court held that the clause "is within the gravitational field of these principles even though the minimum guarantee clause does not fix a single sum as damages." *Id.* at 1290. In other words, even though the damages provision in *Lake River* included a formula that accounted for the defendant's partial performance – rather than requiring payment of a fixed sum for all breaches – it was not a reasonable estimate of damages because it failed to account for the plaintiff's cost savings. *Id. at 1291. See also USX*, 1987 WL 20427 at *2, 6 (alternative compensation formula that failed to account for the claimant's ability to mitigate by recouping a portion of its costs was an unenforceable penalty). Similarly, although Section 3.3(b) provides for payment based on a formula rather than a fixed amount, it is not a reasonable estimate of damages because it fails to account for Hancock's substantial avoided costs. Moreover, it fails to distinguish between any of the types of breaches specified in Section 3.4 which would trigger Hancock's right to terminate payments and according to Hancock, then result in additional remedies under Section 3.3(b).

The lack of reasonable correlation between Section 3.3 and actual damages is also apparent from consideration of its application in other scenarios. As Abbott showed in its reply brief, if Hancock's payment obligations were terminated under Section 3.4(i) because Abbott determined to abandon development of the Program Compounds, application of Section 3.3(b) could produce draconian results. For example, if Abbott made this determination after Hancock

made its first payment of $50 million and Abbott had spent a total of $125 million (including Hancock's payment), Abbott would be required to spend an additional $489 million of its own funds on compounds it had determined were not viable, or pay $163 million to Hancock. Assuming Abbott decided to pay the penalty rather than make the irrational expenditure, the payment would give Hancock a rate of return in excess of 300 percent over five years. Obviously, this damage payout under Section 3.3 would bear no relation whatsoever to Hancock's actual expectation damages, since Hancock conceded at the hearing that its expected rate of return was approximately 17 percent.

At the hearing, Hancock attempted to avoid the consequences of this example in several ways. First, it contended that this Court should only look at the specific scenario before it in determining the validity of the provision. This, however, is not the approach utilized by the courts under Illinois law. To be valid, the amount of liquidated damages must have been "reasonable *at the time of contracting*, bearing some relation to the damages which *might be sustained*." *Noffsinger*, 311 Ill. App. 3d at 860 (emphasis added). *See also Automotive Fin. Corp.*, 219 F. Supp. 2d at 950 (liquidated damages "must be reasonably related to the anticipated harm likely to come from noncompliance"). Therefore, courts frequently consider hypothetical scenarios to determine whether a provision is a reasonable estimate of potential damages or an invalid penalty. *See, e.g., id.* at 952-53; *Lake River*, 769 F.2d at 1290-92.[3]

---

[3] Hancock may might argue that *XCO Int'l, Inc. v. Pacific Scientific Co.*, 369 F.3d 998, 1004-05 (7th Cir. 2004) stands for the proposition that the court should disregard hypothetical scenarios in which the liquidated damages provision would clearly not be a reasonable estimate of damages, and apply the provision in the current situation. Hancock's reliance on *XCO* would be misplaced for several reasons. First, the language in *XCO* is dicta because the court had already held that the clause was not intended to cover those breaches which produced the penal results. *Id.* at 1004. Thus, it was not presented with the issue of whether a clause should be enforced where, as here, it is applicable to other situations and clearly does not provide a reasonable estimate of damages in the range of situations. Second, the court does not cite any Illinois law to support the dicta. *Id.* at 1005. Third, as explained below, unlike in *XCO*, Section 3.3 is not a reasonable estimate of damages in the actual circumstances presented.

Hancock next argued, for the first time, that Section 3.3(b) does not apply if Hancock terminated its payments pursuant to Section 3.4(i), but does apply if Hancock terminated its payments pursuant to the other subsections of Section 3.4. Apart from the fact that there is no basis in the Agreement to support this construction, Hancock's argument is erroneous because similarly penal results could occur where Hancock terminates its payments under the other subsections of Section 3.4, including subsection (iii), the one at issue here. For example, if Abbott submitted an Annual Research Plan in the second year of the Program Term showing that it intended to spend $613 million, $1 million short of the spending target, it would trigger not only Hancock's right to terminate its remaining $164 million in payments but the obligation by Abbott to spend an additional $164 million of its own funds on development of the compounds or pay Hancock nearly $55 million (plus royalties and milestone payments). The same consequences would flow if Abbott's stated intentions missed the target by $100 million. There is no reason to believe this payment bears any relationship to the actual damages, if any, caused by Abbott's alleged breach.

Even if the Court were to limit its analysis to the particular situation before it, however, Abbott submits that the provision operates as a penalty for several reasons. First, as discussed above, it does not account for the $110 million Hancock saved by not making its last two payments, and provides Hancock with the same monetary recovery as if it had spent $214 million but Abbott had failed to meet the spending target. *See supra* at 5-7. Stated another way, Section 3.3(b) cannot be a reasonable estimate of damages in the current situation because it fails to account for the relief Hancock has already obtained for essentially the same breach.

The provision is also clearly a penalty even if the Court looks at nothing more than the actual result in this situation without reference to any hypotheticals. Hancock contended at the hearing, that, viewed in the absolute, a recovery of $21 million on a net investment of $90 million is not an unreasonable estimate of damages given its original expected rate of return of 17 percent. This argument lacks merit because it ignores the fact that Hancock's expected rate of return was derived from royalty and milestone payments, *which it will continue to have the full*

*rights to receive* despite termination of its program payments. Agreement, Art. 6-7. Accordingly, the remedy in Section 3.3(b) cannot be said to be a substitute for, but instead is in addition to, a reasonable estimate of its expected rate of return. Hancock's argument is also wrong because it *assumes*, without any evidentiary support, that the decrease in Hancock's expected rate of return was caused by Abbott's spending $65.4 million less than the $614 million spending target on development of the compounds. Far more likely is that if Hancock's return expectations are not met, it will be because the compounds are not viable. Indeed, in its recently submitted damage report regarding its fraud and misrepresentation claims, Hancock is seeking to recover the difference between its original and current expected rate of return, which it attributes *not* to Abbott's failure to spend an additional $65 million on development of the compounds, but to alleged undisclosed problems with the compounds. Hancock presumably will continue to seek recovery of those alleged damages even if it is awarded the "liquidated damages" under Section 3.3(b). Hancock cannot seriously rely on the decrease in its expected rate of return to argue that Section 3.3(b) provides a reasonable measure of damages for Abbott's failure to spend $614 million, while simultaneously alleging that the decrease is due to factors other than the level of Abbott's spending.

4. **Section 3.3(b) Cannot Be Upheld Because it is a Penalty to Punish Nonperformance and a Threat to Secure Performance**

At the hearing, the Court inquired as to why Section 3.3(b), as interpreted by Hancock, could not be justified as an incentive to secure performance. Under Hancock's interpretation, Section 3.3(b) would indeed give Abbott an incentive (i.e., a threat) to spend additional funds to make up for the shortfall caused by Hancock's termination of payments even if doing so was commercially irrational and unlikely to result in any benefit to Hancock. Of course, the same could be said of *any* penalty clause – that it provides an incentive to perform. But in Illinois, as elsewhere, this does not save the provision from invalidation as a penalty. "No matter what label the parties apply to a contractual term, Illinois law states that contract provisions may not serve as a 'threat used to secure performance.'" *Automotive Fin. Corp.*, 219 F. Supp. 2d at 950. "It is

well-established that 'if the purpose of the clause fixing damages is merely to secure performance of the agreement, it will not be upheld.'" *Id. See also Rose Marine*, 758 F. Supp. at 1224 (under a "long-standing principle" of Illinois law, "if the clause fixing damages is merely to secure performance of the agreement, it will be treated as a penalty and only actual damages proved can be recovered.").[4]

### 5. Any Doubt Should be Resolved in Favor of Abbott.

Finally, if there is any doubt regarding whether Section 3.3(b), as applied in situations where Hancock has terminated its payments pursuant to Section 3.4, would constitute a penalty, it should be resolved in favor of non-enforcement of the provision. "[I]n interpreting provisions which affix the amount of damages in the event of a breach, courts 'lean toward a construction which excludes the idea of liquidated damages and permits the parties to recover only damages actually sustained.'" *Grossinger Motorcorp, Inc. v. Am. Nat'l Bank & Trust*, 240 Ill. App. 3d 737, 749 (1992). *See also Lake River*, 769 F.2d at 1290 ("Illinois courts resolve doubtful cases in favor of classification as a penalty"). *Stride v. 120 West Madison Bldg. Corp.*, 132 Ill. App. 3d 601, 605 (1985) ("In doubtful cases, we are inclined to construe the stipulated sum as a penalty").

"Whether a contractual provision is a valid liquidated damages clause or a penalty clause is a question of law." *Noffsinger*, 311 Ill. App. 3d at 860. Since Section 3.3(b), as interpreted by Hancock, would constitute an invalid penalty as a matter of law, the Court should grant Abbott's motion to dismiss Hancock's claims for recovery under that provision and deny Hancock's motion for summary judgment. As observed by one court, if a liquidated damages "provision is unenforceable, [the plaintiff's] attempt to recover that amount is dead in the water. And that is so no matter how unambiguous the contract language providing for [the payment] may be." *Automotive Fin. Corp.*, 219 F. Supp. 2d at 949.

---

[4] As noted above, "contracting parties cannot agree to penalty provisions even if the parties are sophisticated corporations." *USX Corp.*, 1987 WL 20427 at *5. "Illinois continues to invalidate damages provisions in contracts that fail the [liquidated damages/penalties] test . . . even if both parties are economically sophisticated." *Checkers*, 241 F.3d at 563.

-12-

**B.      Abbott's Proposed Interpretation of the Agreement Is Consistent with the Intent of the Parties and Gives Effect to All Parts of the Agreement**

Of course, the court can avoid invalidation of Section 3.3(b) by interpreting it to only apply where Hancock has not terminated its payments pursuant to Section 3.4. As explained in Abbott's prior briefs, this interpretation gives effect both to the language of the Agreement, when read as a whole, and the intent of the parties. *See, e.g.*, Abbott Reply Memo. at 6-8, 12-16. As admitted by Stephen Blewitt, the lead Hancock negotiator, Section 3.3(b) "assum[es] that all of the other provisions are met" and that "*Hancock made its payment at the end of the Program Term*[.]" *Id.* at 13 (citing *Hancock I*, Blewitt Dep. at 64:2-15). In these situations, Section 3.3(b) would ensure that "John Hancock does not pay more than one-third of the amounts spent by Abbott on program-related costs," *id.* (citing Blewitt Dep. at 66-67), and would not necessarily constitute a penalty.[5] Here, since Hancock has contributed far less than one-third of the amount spent by Abbott (Hancock has made a total net contribution of $90 million, while Abbott contributed more than $400 million during the first five years), there is no need to provide a refund to restore the minimum 2-1 funding ratio, and requiring Abbott to make a payment pursuant to Section 3.3(b) would constitute a penalty for the reasons described above.

---

[5] Similarly, at the hearing, Hancock's counsel admitted that the intent of Section 3.3(b) was for Hancock to share in Abbott's "cost savings." *See also* Pl. Mem. In Opp. To Mot. to Dismiss at 6 (if Abbott fails to spend $614 million, Section 3.3(b) requires Abbott to "share the resulting cost savings with John Hancock"). This "cost-savings" rationale makes sense where Hancock makes its full contribution and Abbott spends less than $400 million of its own funds. But it does not make sense where Hancock terminates its payments pursuant to Section 3.4, thereby saving more than $100 million, and Abbott spends in excess of $400 million of its own funds. In such situations, *Hancock*, not Abbott, is the party that enjoyed cost savings, and there is no grounds for Hancock to obtain double recovery of its own cost savings.

DATED: December 13, 2006    Respectfully submitted,

ABBOTT LABORATORIES

By: ____/s/ Michael S. D'Orsi_____
Michael S. D'Orsi
One of its attorneys

Peter E. Gelhaar (BBO#188310)
Michael S. D'Orsi (BBO #566960)
DONNELLY, CONROY & GELHAAR LLP
1 Beacon St., 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880
peg@dcglaw.com
msd@dcglaw.com

and

Jeffrey I. Weinberger (pro hac vice)
Gregory D. Phillips (pro hac vice)
Eric J. Lorenzini (pro hac vice)
Ozge Guzelsu (pro hac vice)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Fl.
Los Angeles, CA 90071-1560
Tele: (213) 683-9100

Counsel for Abbott Laboratories

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on December 13, 2006.

Date: December 13, 2006.

/s/ Michael S. D'Orsi
Michael S. D'Orsi