## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER LIFE INSURANCE COMPANY),<br><br>*Plaintiffs,*<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>*Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 05-11150-DPW |

### ABBOTT LABORATORIES' REQUEST FOR JUDICIAL NOTICE

Defendant Abbott Laboratories ("Abbott") respectfully requests that the Court take judicial notice of the documents attached as exhibits to the Declaration of Ozge Guzelsu, submitted in support of Abbott's Motion to Strike the Prayer for Rescission in the First Amended Supplemental Complaint.

The documents consist of pleadings and orders of this Court and the First Circuit Court of Appeals in this matter and the prior action filed in this Court (*Hancock I*). The Court may take judicial notice of the pleadings and orders of the current litigation. *See* Schwarzer, Hon. William W., *et al.*, Prac. Guide Fed. Civ. Proc. Before Trial (Nat. Ed.) Ch 9-G, § 9:403 (2007). "As with motions to dismiss for failure to state a claim, the grounds for a motion to strike must appear on the face of the pleading under attack, or from matters which the court may judicially notice (e.g., the court's own files or records)." *Id.* (citations omitted); *see also See Hughes v. McMenamon*, 379 F. Supp. 2d 75, (D. Mass. 2005) ("In considering the merits of a motion to dismiss, the court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken.").

The Court may also take judicial notice of prior pleadings, orders, and judgments from *Hancock I. See Panico v. Whiting Milk Co.*, 335 F.Supp. 315, 316 n.1 (D. C. Mass. 1971) (court took judicial notice of pleadings from prior litigation in considering motion to dismiss); *see also Michigan Bell Telephone Co. v. Strand*, 26 F. Supp. 2d 993, 996 (W.D. Mich. 1998) ("Among those matters which may be judicially noticed are the outcomes of other court proceedings and administrative agency proceedings which are regularly and officially recorded.").

Abbott therefore respectfully requests that the Court take judicial notice of the documents attached as exhibits to the Declaration of Ozge Guzelsu.

DATED: January 12, 2007

Respectfully submitted,

ABBOTT LABORATORIES

By: ____/s/ Michael S. D'Orsi_____
Michael S. D'Orsi
One of its attorneys

Peter E. Gelhaar (BBO#188310)
Michael S. D'Orsi (BBO #566960)
DONNELLY, CONROY & GELHAAR LLP
1 Beacon St., 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880
peg@dcglaw.com
msd@dcglaw.com

and

Jeffrey I. Weinberger (pro hac vice)
Gregory D. Phillips (pro hac vice)
Eric J. Lorenzini (pro hac vice)
Ozge Guzelsu (pro hac vice)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Fl.
Los Angeles, CA 90071-1560
Tele: (213) 683-9100

Counsel for Abbott Laboratories

**CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on January 12, 2007.

Date: January 12, 2007

_____ /s/ Michael S. D'Orsi_____ _____
Michael S. D'Orsi

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE ) <br> COMPANY, JOHN HANCOCK ) <br> VARIABLE LIFE INSURANCE ) <br> COMPANY, and MANULIFE ) <br> INSURANCE COMPANY (f/k/a ) <br> INVESTORS PARTNER LIFE ) <br> INSURANCE COMPANY), ) <br> ) <br> ) <br> *Plaintiffs*, ) <br> ) <br> v. ) <br> ) <br> ) <br> ABBOTT LABORATORIES, ) <br> ) <br> *Defendant*. ) | Civil Action No. 05-11150-DPW |

**DECLARATION OF OZGE GUZELSU**

I, Ozge Guzelsu, hereby declare and state:

1.    I currently am employed as an associate at Munger, Tolles & Olson LLP. I make this declaration in support of Abbott Laboratories' Motion to Strike the Prayer for Rescission in the First Amended Supplemental Complaint. I make this declaration upon personal knowledge. If called as a witness, I could and would testify competently to the facts stated herein.

2.    Attached to Exhibit 1 is a true and correct copy of the First Amended Supplemental Complaint filed in this matter on December 29, 2006.

3.    Attached to Exhibit 2 is a true and correct copy of the Complaint filed in *Hancock I* on December 12, 2003.

4.      Attached to Exhibit 3 is a true and correct copy of the Final Judgment and Declaration in *Hancock I* dated September 16, 2005.

5.      Attached to Exhibit 4 is a true and correct copy of the Brief of Plaintiff-Appellee filed in the Court of Appeals for the First Circuit in *Hancock I* on April 3, 2006.

6.      Attached to Exhibit 5 is a true and correct copy of the Complaint filed in this matter on June 3, 2005.

7.      Attached to Exhibit 6 is a true and correct copy of Plaintiff's Reply Memorandum in Support of the Motion for Leave to Amend the Supplemental Complaint filed in this matter on November 29, 2006.

8.      Attached to Exhibit 7 is a true and correct copy of the Supplemental Complaint filed in this matter on June 23, 2006.

9.      Attached to Exhibit 8 is a true and correct copy of Plaintiff's Motion for Leave to Amend the Supplemental Complaint filed in this matter on October 24, 2006.

10.     Attached to Exhibit 9 is a true and correct copy of the Stipulation and Proposed Order Regarding Certain Pending Motions and Scheduling filed in this matter on December 21, 2006.

11.     Attached to Exhibit 10 is a true and correct copy of selected pages of the transcript of the afternoon session of the December 6, 2006 hearing in this matter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed this 12th day of January 2007, in Los Angeles, California.

Ozge Guzelsu

/s/ Ozge Guzelsu
Ozge Guzelsu

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on January 12, 2007.

Date: January 12, 2007.

/s/ Michael S. D'Orsi
Michael S. D'Orsi

**Exhibit 1**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY),<br><br>Plaintiffs,<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>CIVIL ACTION NO. 05-11150-DPW |

## FIRST AMENDED SUPPLEMENTAL COMPLAINT

### Introduction

1.   This is an action for fraud, breach of contract, and indemnification in which plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Manulife Insurance Company (f/k/a "Investors Partner Life Insurance") seek compensatory and punitive damages, rescission, costs and attorneys' fees for defendant Abbott Laboratories' misrepresentations and other conduct that violates the Research Funding Agreement entered into by and between the plaintiffs and defendant and dated as of March 13, 2001 (the "Agreement"). This action is filed as a separate related action to the pending matter

captioned *John Hancock Life Insurance Company, et al. v. Abbott Laboratories*, Civil Action

No. 03-12501-DPW (the "Existing Action"), pursuant to Section (1) of the Court's Scheduling

Order entered in the Existing Action on March 30, 2004.

### The Parties

2.     Plaintiff John Hancock Life Insurance Company is a company, duly formed and

existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate

headquarters in Boston, Suffolk County, Massachusetts.   John Hancock Life Insurance

Company is one of the nation's leading insurance companies, providing a broad array of

insurance and investment products to retail and institutional customers, primarily in North

America.

3.     Plaintiff John Hancock Variable Life Insurance Company is a company, duly

formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its

corporate headquarters in Boston, Suffolk County, Massachusetts.   John Hancock Variable

Life Insurance Company provides variable life insurance products that link life insurance

coverage and an investment return to an underlying portfolio of investments chosen by the

policyholder.

4.     Plaintiff Manulife Insurance Company (collectively, with plaintiffs John

Hancock Life Insurance Company and John Hancock Variable Life Insurance Company, "John

Hancock") is a company, duly formed and existing under the laws of the State of Delaware,

that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts. Manulife

Insurance Company is a wholly-owned subsidiary of John Hancock Variable Life Insurance

Company that sells various types of life insurance products. Manulife Insurance Company formerly was known as "Investors Partner Life Insurance."

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, duly formed and existing under the laws of the State of Illinois, that maintains its corporate headquarters in Abbott Park, Illinois. Abbott is a broad-based healthcare company that discovers, develops, manufactures and markets products and services that span the continuum of care -- from prevention and diagnosis to treatment and cure. Abbott's principal businesses are global pharmaceuticals, nutritionals, and medical products, including diagnostics and cardiovascular devices. Abbott achieved record sales and net earnings of $19.7 billion and $3.2 billion, respectively, in 2004. Its leadership positions in several multibillion-dollar businesses provide Abbott with a unique balance of revenue growth opportunities and cash flow sources that allow Abbott to invest in its future.

## Jurisdiction and Venue

6.      This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      Venue in this district is proper pursuant to 28 U.S.C. § 1391(a)(1) because defendant Abbott resides in this district within the meaning of 28 U.S.C. § 1391(c), and further because Section 16.2 of the parties' Agreement provides that Abbott,

> consents ... to the exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts ... for the purpose of any suit, action or other proceeding arising out of any of its obligations

-3-

hereunder or thereunder or with respect to the transactions
contemplated hereby or thereby, and expressly waives any and all
objections that it may have as to venue in such courts.

## The Facts

*The Agreement And Its Relevant Terms*

8.    On March 13, 2001, John Hancock and Abbott entered the Agreement,
whereby John Hancock agreed to provide funding to Abbott for research and development
activities on a portfolio of potential pharmaceutical products or "Program Compounds" (the
"Research Program") in exchange for the right to receive certain management fees and future
milestone and royalty payments from Abbott.

9.    The nine Program Compounds encompassed by the Abbott Research Program
are: (a) ABT-773, a kelotide that may be useful as an antibiotic; (b) ABT-627, an endothelin-A
receptor agonist that may be useful in the treatment of prostate cancer; (c) ABT-594, a non-
opiod analgesic that may be useful in the treatment of chronic pain; (d) ABT-492, a quinolone
that may be useful as an antibiotic; (e) ABT-510, a synthetic peptide that may be useful in the
treatment of cancer; (f) ABT-518, a metalloproteinase inhibitor that may be useful in the
treatment of cancer; (g) ABT-751, an antimitotic tubulin agonist that may be useful in the
treatment of cancer; (h) ABT-100, a farnesyltransferase protein inhibitor that may be useful in
the treatment of cancer; and (i) ABT-724, a dopamine receptor agonist that may be useful in
the treatment of erectile dysfunction.

10.    Under the terms of the Agreement, John Hancock agreed to contribute up to a
specified maximum amount toward the costs incurred by Abbott in operating the Research
Program ("Program Related Costs") in four annual installments (the "Program Payments")

-4-

over the period from March 13, 2001 through December 31, 2004 (individually, the four "Program Years" and, collectively, the four-year "Program Term"). Abbott agreed, in return, to invest at least twice the amount of John Hancock's contribution from its own funds towards the operation of the Research Program, and committed to spend certain minimum amounts on Program Related Costs during each Program Year (the "Annual Minimum Spending Target"), as well as a minimum aggregate total on Program Related Costs over the four-year Program Term (the "Aggregate Spending Target").

11.    The Agreement, which comprises more than thirty-five (35) pages, was the subject of extensive negotiations between the parties and their counsel over a period of approximately one year. From John Hancock's perspective, the financial attractiveness of the Agreement turned largely upon the specific identity of, and commercial prospects for, the nine Program Compounds encompassed by the Research Program. John Hancock ran numerous analytical models based on financial projections for the Program Compounds in order to ensure, as best that it could, that the risks associated with its anticipated investment in the Research Program were justified by the potential rewards that John Hancock would receive if and when some or all of the Program Compounds were approved and commercialized.

12.    Because the financial return, if any, that John Hancock ultimately will receive on its investment in the Program Compounds is heavily dependent on the commercial success of those Compounds, John Hancock had a strong interest in ensuring, before the Agreement was signed, that: (a) Abbott had a good faith intention to aggressively pursue development of each of the Program Compounds; and (b) Abbott had a good faith belief that each of the

-5-

Program Compounds possessed reasonably favorable commercial prospects.  In order to satisfy

John Hancock's concerns on these points, Abbott agreed to provide John Hancock, in

Article 12 of the Agreement, with certain written representations and warranties concerning the

development status of the Program Compounds, including, *inter alia*, a representation and

warranty that,

> [s]et forth on Exhibit 12.2(d) is the full name, chemical name,
> detailed description of the stage of development and current status
> for each Program Compound.  Set forth on Exhibit 1.6 in each
> Annual Research Plan is a description of projected milestones and
> dates thereof, projected year of NDA filing, and projected costs
> to be incurred by Abbott during the Program Term, for each
> Program Compound.  Such projections were prepared in good
> faith and with due care based on reasonable assumptions, and
> represent the reasonable estimate of Abbott based on information
> available as of the date of such projections and as of the date
> hereof.... (Section 12.2[d]).

13.    Abbott further represented and warranted to John Hancock that,

> [t]here is no fact known to Abbott (other than generally available
> information concerning the pharmaceutical industry in general) as
> of the date of this Agreement that has not been disclosed in this
> Agreement or any Exhibit to this Agreement which has resulted
> in, or could reasonably be expected to result in, a material
> adverse effect on the prospects or condition (including safety,
> efficacy, scientific viability or commercial [viability]) of the
> Research Program or any of the Program Compounds.  (Section
> 12.2[i]).

14.    The Agreement contains various other terms that are intended to protect John

Hancock's interests by ensuring that Abbott fairly and diligently fulfills its research and

development obligations under the Agreement, including terms which provide, *inter alia*, that

Abbott:

-6-

(a)   must employ "Commercially Reasonable Efforts" (defined in the Agreement as "efforts which are consistent with those normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market potential at a similar stage of development or product life") to develop each of the Program Compounds and "achieve the objectives of the Research Program efficiently and expeditiously" (Sections 1.10, 2.3 and 4.1);

(b)   must keep John Hancock fully informed of any modifications to its written "Annual Research Plans" ("ARPs") by requiring that "[a]ny such modifications ... be promptly provided to John Hancock" (Section 2.2);

(c)   shall not "research, develop, manufacture, market, sell, distribute, out-license or otherwise treat" the Program Compounds any differently "as compared to any other Abbott compounds or products" on account of any of the rights granted to John Hancock under Agreement (Section 4.4); and

(d)   shall, "as soon as is practicable," out-license or divest any "Ceased Compound" (defined in the Agreement as a Program Compound that Abbott has "substantially cease[d] developing, marketing or selling") to a third party, and shall "remunerate John Hancock based on sales of such Ceased Compound by the third party that has acquired or licensed the Ceased Compound ... in a manner most consistent with the allocation that would have applied hereunder had such Ceased Compound not been so out-licensed or divested..." (Section 4.3[d]).

15.   John Hancock's obligation under the Agreement to make additional Program Payments during the four-year Program Term is not absolute, however. In entering into the Agreement, John Hancock did not want to obligate itself to continue investing in the Program Compounds if the commercial prospects for those Compounds diminished significantly over the four-year Program Term. Accordingly, John Hancock's obligation to make its second, third and fourth Program Payments was made expressly contingent upon the demonstration by Abbott, on an annual basis, of the continued commercial viability of the Program Compounds.

-7-

16.    For purposes of the Agreement, the continued commercial viability of the Program Compounds is measured by reference to Abbott's planned expenditures on Program Related Costs over the four-year Program Term.    Section 2.2 of the Agreement requires Abbott to provide John Hancock, at least forty-five days (45) prior to the start of each Program Year, with a written ARP that spells out Abbott's anticipated Research Program expenditures for that year and for each year remaining in the Program Term.    If Abbott's ARP for any given year did not "reasonably demonstrate [Abbott's] ... intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target" as set forth in the Agreement, then John Hancock's "obligation to make any remaining Program Payments for any succeeding Program Years" automatically would terminate pursuant to Section 3.4(iv) of the Agreement.

17.    Section 3.3 of the Agreement sets forth Abbott's obligations to John Hancock in the event that Abbott fails to reach the Aggregate Spending Target for Program Related Costs over the four-year Program Term.    Section 3.3(b) states that Abbott "will expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the "Aggregate Carryover Amount") on Program Related Costs during the *subsequent year* commencing immediately after the end of the Program Term (emphasis added)."    If Abbott fails to spend the entire Aggregate Carryover Amount during such subsequent year, Section 3.3(b) obligates Abbott to "pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days after the end of such subsequent year."

-8-

18.    The four-year Program Term ended on December 31, 2004, and the "subsequent year commencing immediately after the end of the Program Term" ended on December 31, 2005. Accordingly, Abbott was required to spend the Aggregate Carryover Amount by December 31, 2005, and required to pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott as of that date on or before January 30, 2006.

19.    The Agreement further provides John Hancock with the power to objectively verify Abbott's compliance with the terms of the Agreement, including the right to retain an independent auditor of John Hancock's choosing (and reasonably acceptable to Abbott) who is empowered to inspect, copy and audit the "books and records of Abbott and each Subcontractor related to the Research Program ... at any time and from time to time." John Hancock is required to pay the fees and expenses of its chosen auditor in the first instance. If, however, the work of John Hancock's auditor "reveals any material breach of Abbott's responsibilities" under the Agreement, then Section 2.5 provides that Abbott "shall (i) pay the reasonable fees and expenses charged by such auditor, and (ii) fully and promptly cure such breach."

*John Hancock's Efforts to Audit Abbott's Compliance*
*With The Terms of the Agreement*

20.    Since the Agreement was executed on March 13, 2001, John Hancock has become aware of certain potential breaches of the Agreement by Abbott. Such potential breaches include, but are not limited to, misrepresentations by Abbott in the negotiation and

execution of the Agreement, as well as violations by Abbott of its development and administrative responsibilities under the Agreement.

21.    Consistent with the terms of the Agreement, and in an effort to assist in confirming or refuting Abbott's suspected violations, John Hancock initiated an independent audit of Abbott's books and records on April 12, 2004.  On that date, John Hancock sent a letter to Abbott notifying Abbott of John Hancock's intention to undertake a compliance audit pursuant to Section 2.5 of the Agreement, and identifying the independent auditor that had been selected by John Hancock.  John Hancock accompanied its audit notification letter to Abbott with a description of the specific books and records related to the Research Program that John Hancock requested be made available for examination by its independent auditor within thirty (30) days.

22.    Abbott unreasonably and unjustifiably has delayed, and continues to delay, its response to John Hancock's audit request, and has taken affirmative steps to obstruct the legitimate efforts of John Hancock's independent auditors to confirm or refute Abbott's compliance with terms of the Agreement.  Tactics employed by Abbott to hinder, delay and obstruct John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement include, but are not limited to:

> (a)    unreasonably and unjustifiably objecting to John Hancock's chosen auditor for a period of months, then arbitrarily withdrawing its objection;
>
> (b)    unreasonably and unjustifiably delaying production of the majority of the relevant books and records requested by John Hancock's auditor for almost one year (and counting);

(c)     unreasonably and unjustifiably refusing to make certain relevant books
        and records available for inspection and copying at all (including,
        without limitation, various books and records documenting Abbott's
        actual expenditures on Program Related Costs);

(d)     unreasonably and unjustifiably redacting various relevant books and
        records produced during the course of the audit so as to eliminate
        relevant information and render certain materials effectively
        unintelligible, notwithstanding the existence of a written confidentiality
        agreement between the parties;

(e)     unreasonably and unjustifiably understaffing and under-funding Abbott's
        response to John Hancock's audit request in order to further delay the
        examination of Abbott's relevant books and records by John Hancock's
        auditor;

(f)     unreasonably and unjustifiably delaying for periods of six months or
        more the photocopying of books and records designated by John
        Hancock's auditor during the inspection process;

(g)     unreasonably and unjustifiably refusing to provide John Hancock's
        auditor with photocopies of various books and records produced by
        Abbott, and designated by John Hancock's auditor, during the inspection
        process;

(h)     unreasonably and unjustifiably refusing to permit John Hancock or its
        independent auditor to make their own photocopies of Abbott's books
        and records produced for audit purposes;

(i)     unreasonably and unjustifiably violating acknowledged deadlines for the
        completion of Abbott's production of books and records responsive to
        John Hancock's audit requests;

(j)     unreasonably and unjustifiably ignoring or refusing to answer various
        written and oral inquiries by John Hancock and its auditor regarding
        Abbott's relevant books and records; and

(k)     unreasonably and unjustifiably acting in a manner contrary to the usual
        course of contractual compliance audits, and contrary to Abbott's own
        conduct in reasonably similar circumstances in the past.

-11-

23.    As of the date of its original Complaint in this action, Abbott still had not produced all of the material books and records related to the Research Program that were requested by John Hancock and its auditor on April 12, 2004, and refused to do so.  Abbott also refused to answer inquiries by John Hancock and its auditor seeking information that is necessary to complete the audit of Abbott's compliance with the Agreement.

*Abbott's Violations of the Agreement*

A. Obstructing John Hancock's Compliance Audit

24.    Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement as expressly permitted under Section 2.5.   Upon information and belief, Abbott's efforts to hinder, delay and obstruct John Hancock's audit activities are intended to undermine, and have had the effect of undermining, John Hancock's ability to obtain information which would tend to confirm that Abbott has breached the Agreement in various other ways as set forth below.

B. Misrepresenting the Development Status of ABT-518

25.    Upon information and belief, Abbott misrepresented the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that ABT-518 was "a compelling development candidate with the potential to demonstrate antitumor effects superior to the MMP inhibitors currently undergoing clinical trials."   Abbott understood before the Agreement was executed, however, that the actual development status of ABT-518 was not as represented in the Agreement.   For example, Abbott personnel already had plans as of early March 2001 to terminate the development of ABT-518, but understood that full disclosure of that fact to John Hancock "could have been the deathnell (*sic*) to the deal."   Accordingly, Abbott personnel took affirmative steps on and prior to March 13, 2001 to conceal from John Hancock the true development status of ABT-518 so as to induce John Hancock to enter into the Agreement.

-13-

Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-518.

26.     The development status of ABT-518 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-518 in making that decision. Had John Hancock known the true development status of ABT-518 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

C.    Misrepresenting the Development Status of ABT-594

27.     Upon information and belief, Abbott misrepresented the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that a "phase IIb [clinical] study for neuropathic pain at higher, titrated doses of ABT-594 began in April 2000 and ends in June 2001," and that ABT-594 was "expected to be the first neuronal nicotinic receptor agonist to receive an indication for pain." Abbott understood before the Agreement was executed, however, that the development status of ABT-594 was not as represented in the Agreement. For example, Abbott already knew prior to the execution of the Agreement that the termination rate for patients enrolled in the phase IIb clinical study of ABT-594 was unusually high, and that the final results of that study were likely to be unfavorable. Abbott also knew, no later

-14-

than March 2001, that the development of ABT-594 was likely to be significantly delayed or even discontinued by Abbott as a consequence. Abbott failed to disclose these facts to John Hancock before the Agreement was executed in order to induce John Hancock to enter into the Agreement. Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-594.

28.     The development status of ABT-594 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-594 in making that decision. Had John Hancock known the true development status of ABT-594 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

D. Misrepresenting the Development Status of ABT-773

29.     Upon information and belief, Abbott misrepresented the development status of ABT-773 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that further development of ABT-773 was warranted due to its competitive "convenience, safety and tolerability." Abbott understood before the Agreement was executed, however, that the development status of ABT-773 was not as represented in the Agreement. For example, Abbott was aware of potentially serious liver and heart toxicity issues related to the use of ABT-773. Abbott failed to disclose

-15-

these facts to John Hancock before the Agreement was executed in order to induce John Hancock to enter into the Agreement. Then, within twelve months after the Agreement was signed, Abbott terminated the development of ABT-773.

30.     The development status of ABT-773 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-773 in making that decision. Had John Hancock known the true development status of ABT-773 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

E.   Misrepresenting Its Intended and Reasonably Expected
Spending on Program Related Costs

31.     Upon information and belief, Abbott has misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock. The Research Program cost projections that Abbott has provided to John Hancock in various ARPs reflect Abbott's "nominal" spending, as opposed to its "expected" spending. At all relevant times, Abbott's true "expected" spending on Program Related Costs was considerably less than the amounts communicated to John Hancock in Abbott's ARPs. Abbott has misrepresented its intended and reasonably expected spending plans to John Hancock in order to induce John Hancock to enter into the Agreement, and to make Program Payments to Abbott that would not otherwise be due under the terms of the Agreement.

-16-

32.   Abbott's intended and reasonably expected expenditures on Program Related Costs constitute material facts for purposes of John Hancock's decision to enter into the Agreement.  John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding its intended and reasonably expected expenditures on Program Related Costs in making that decision.  Had John Hancock known the true level of Abbott's intended and reasonably expected expenditures, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, may not have made certain Program Payments, or may not have entered into the Agreement at all.

F.   Failing to Use Commercially Reasonable Efforts
to Develop the Program Compounds

33.   Upon information and belief, Abbott has failed to use Commercially Reasonable Efforts to develop the Program Compounds.  Abbott previously represented to John Hancock in its 2005 ARP that the current commercial prospects for the active Program Compounds warrant the expenditure of a stated sum towards Program Related Costs in 2005.  Upon information and belief, Abbott since has modified its 2005 ARP so as to reduce its intended and reasonably expected expenditures on Program Related Costs by more than fifty percent (50%) in retaliation, *inter alia*, for the automatic termination of John Hancock's obligation to make additional Program Payments for the third and fourth Program Years pursuant to the express terms of the Agreement.

34.   Abbott's decision to reduce its intended and reasonably expected expenditures on Program Related Costs in 2005 to less than one-half the amount that Abbott has represented

-17-

is warranted by the current commercial prospects for the active Program Compounds is inconsistent with the level of effort normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market at a similar stage of development and, therefore, not Commercially Reasonable for purposes of Section 4.1 of the Agreement.

### G. Refusing to Provide John Hancock With a Copy of Abbott's Modified 2005 ARP

35.    Abbott has refused to provide John Hancock with a copy of its modified 2005 ARP.  Abbott provided its original 2005 ARP to John Hancock in November 2004.  Upon information and belief, Abbott since has modified its original 2005 ARP so as to dramatically reduce Abbott's intended and reasonably expected expenditures on Program Related Costs in 2005.  Section 2.2 of the Agreement obligates Abbott to "promptly provide[]" John Hancock with "[a]ny ... modifications" to its ARPs.  Notwithstanding the express requirements of Section 2.2, Abbott has refused or ignored John Hancock's requests for a copy of Abbott's modified 2005 ARP.

### H. Failing to Out-License or Divest Various Ceased Compounds

36.    Upon information and belief, Abbott has failed to out-license or divest itself of various Ceased Compounds, including, without limitation, ABT-518 and ABT-594, "as soon as is practicable" as required under Section 4.3(d) of the Agreement.

37.    Upon further information and belief, Abbott has chosen not to out-license or divest itself of the foregoing Ceased Compounds, among others, for fear that, if those Compounds were successfully developed and marketed by a third party, Abbott might lose

-18-

future sales of various competing compounds that Abbott has under development, which are not subject to John Hancock's royalty rights.

### I. Failing To Pay John Hancock One-Third Of The Actual Aggregate Carryover Amount

38.     Because Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement, Abbott's actual spending on Program Related Costs over the four-year Program Term ended on December 31, 2004, and the "subsequent year commencing immediately after the end of the Program Term" ended on December 31, 2005, currently is unknown.  Abbott has represented and John Hancock has reason to believe, however, that Abbott's actual spending on Program Related Costs during the Program Term was considerably less than the Aggregate Spending Target, and that Abbott's actual spending on Program Related Costs during such subsequent year was considerably less than the Aggregate Carryover Amount.

39.     Pursuant to Section 3.3(b) of the Agreement, Abbott was required to pay John Hancock one-third of the actual, unspent Aggregate Carryover Amount on or before January 30, 2006.  Notwithstanding the express requirements of Section 3.3(b), Abbott has failed to make such payment to John Hancock.

*John Hancock's Efforts to Resolve Its Claims Against Abbott Amicably*

40.     On April 1, 2005, John Hancock provided written notification to Abbott of the existence and nature of the disputes identified in Sections A-C, and E-H above in accordance with Section 16.7 of the Agreement.  Authorized representatives of John Hancock and Abbott subsequently met in Chicago, Illinois on May 20, 2005, in an effort to resolve their disputes

-19-

amicably.   The parties discussed the issues identified in the notice as well as the parties overall

dispute with respect to all Program Compounds, including ABT-773.   The efforts to resolve

the parties' disputes were unsuccessful.

On January 5, 2006, John Hancock provided written notification to Abbott of the existence and

nature of the disputes identified in Section I above in accordance with Section 16.7 of the

Agreement.   Representatives of Abbott did not meet with John Hancock for the purpose of

resolving those disputes within the time period permitted under Section 16.7.

### Claims

COUNT I
(Fraud)

41.   John Hancock hereby repeats and incorporates by reference the allegations set

forth in Paragraphs 1 through 40 of this Complaint, *supra*.

42.   Abbott materially misrepresented the development status of the Program

Compounds in the representations and warranties contained in Sections 12.2 of the Agreement,

and applicable Schedules thereto, all in the manner described in this Complaint.

43.   Abbott materially misrepresented its "intended and reasonably expected"

expenditures on Program Related Costs in ARPs that it has provided to John Hancock, all in

the manner described in this Complaint.

44.   Abbott made the foregoing misrepresentations to John Hancock wantonly and

willfully for the purpose of fraudulently inducing John Hancock to enter into the Agreement,

and to make various Program Payments to Abbott on the terms stated therein.

45.    John Hancock justifiably relied upon Abbott's misrepresentations to its detriment by, among other things, entering into the Agreement, and making Program Payments to Abbott in accordance with the terms thereof.

46.    As a result of Abbott's misrepresentations, John Hancock has been defrauded by Abbott and has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

COUNT II
(Breach of Contract)

47.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 46 of this Complaint, *supra*.

48.    The Agreement constitutes a valid and binding contract between the parties. John Hancock has performed all of its obligations under the Agreement.

49.    Abbott has breached its obligations to John Hancock under the Agreement, *inter alia*, by:

(a)    misrepresenting the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement;

(b)    misrepresenting the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement;

(c)    misrepresenting the development status of ABT-773 to John Hancock prior to, and at the time of, the execution of the Agreement;

(d)    misrepresenting Abbott's intended and reasonably expected expenditures on Program Related Costs in ARPs that Abbott has provided to John Hancock;

(e)    failing to use Commercially Reasonable Efforts to develop the Program Compounds;

-21-

(f)    refusing to provide John Hancock with a copy of Abbott's modified 2005 ARP;

(g)    failing to out-license or divest itself of certain Ceased Compounds, including, without limitation, ABT-518 and ABT-594, as soon as is practicable;

(h)    unreasonably and unjustifiably hindering, delaying and obstructing John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement; and

(i)    failing to pay John Hancock one-third of the actual, unspent Aggregate Carryover Amount pursuant to Section 3.3(b) of the Agreement.

50.    By engaging in the foregoing conduct, Abbott further has breached the covenant of good faith and fair dealing that is implied by law in every contract, including the Agreement.

51.    Abbott has breached its express and implied obligations under the Agreement willfully and wantonly in order to induce John Hancock to enter into the Agreement, induce John Hancock to make various Program Payments to Abbott on the terms stated therein, and inhibit John Hancock's ability to detect and confirm Abbott's misconduct.

52.    As a result of Abbott's willful and wanton breaches of its express and implied obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

COUNT III
(Indemnification)

53.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 52 of this Complaint, *supra*.

54.     Abbott has breached its representations, warranties and obligations to John Hancock under the Agreement as set forth herein.

55.     As a result of Abbott's various breaches of its representations, warranties and obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, "Losses" as defined in Section 1.27 of the Agreement. John Hancock's Losses include, without limitation, costs, damages, and other reasonable expenses such as audit charges and attorneys' fees.

56.     Abbott agreed in Section 12.6 of the Agreement to indemnify John Hancock, *inter alia*, "from and against all Losses related to or arising out of, directly or indirectly ... any breach by Abbott of its representations, warranties or obligations hereunder..."

57.     On April 1, 2005, John Hancock provided written notification to Abbott that John Hancock has sustained, and likely will continue to sustain, compensable Losses on account of Abbott's various breaches of its representations, warranties and obligations under the Agreement, for which John Hancock is entitled to indemnification pursuant to Section 12.6 of the Agreement.

58.     Notwithstanding John Hancock's request for indemnification, Abbott has refused to indemnify John Hancock for its compensable Losses.

### Prayers for Relief

WHEREFORE, John Hancock respectfully requests that the Court:

(a)     award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's fraud under Count I of the Complaint;

-23-

(b)    award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's various breaches of contract under Count II of the Complaint;

(c)    enter an order directing Abbott to indemnify John Hancock for its compensable Losses, including John Hancock's damages, costs, and other reasonable expenses such as audit charges and attorneys' fees, under Count III of the Complaint;

(d)    award John Hancock punitive damages for Abbott's willful and wanton misconduct in an amount to be determined under Counts I and II of the Complaint;

(e)    alternatively, enter an order rescinding the Agreement and restoring the *status quo ante*, including, but not limited to, directing Abbott to refund any and all Program Payments made by John Hancock, less any payments already received by John Hancock, plus interest and costs; and

(f)     grant John Hancock such other and further relief as the Court deems just
        and appropriate in the circumstances.

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY AND
MANULIFE INSURANCE COMPANY

By their attorneys,


/s/ Brian A. Davis
Brian A. Davis (BBO No. 546462)
Joseph H. Zwicker (BBO No. 560219)
Stacy Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Telephone: 617-248-5000

Date: December 29, 2006



## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non-registered participants on December 29,
2006.


/s/ Brian A. Davis
Brian A. Davis

**Exhibit 2**



UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS



JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK
VARIABLE LIFE INSURANCE
COMPANY, and INVESTORS
PARTNER LIFE INSURANCE
COMPANY,

          Plaintiffs,

v.

ABBOTT LABORATORIES,

          Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**03 CV 12501 DPW**

CIVIL ACTION NO. _____

## COMPLAINT
## FOR DECLARATORY JUDGMENT

### Introduction

1.    This is an action filed pursuant to 28 U.S.C. § 2201, *et seq.*, in which plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Investors Partner Life Insurance seek a judicial declaration that the plaintiffs' obligation to make additional Program Payments to defendant Abbott Laboratories under the Research Funding Agreement by and between the plaintiffs and the defendant, dated as of March 13, 2001 (the "Agreement") has terminated in accordance with the terms of that Agreement.

Declaratory relief is appropriate because an actual controversy currently exists between the parties with respect to the issue presented.

**Parties**

2.     Plaintiff John Hancock Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.  John Hancock Life Insurance Company is one of the nation's leading insurance companies, providing a broad array of insurance and investment products to retail and institutional customers, primarily in North America.

3.     Plaintiff John Hancock Variable Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.  John Hancock Variable Life Insurance Company provides variable life insurance products that link life insurance coverage and an investment return to an underlying portfolio of investments chosen by the policyholder.

4.     Plaintiff Investors Partner Life Insurance Company (collectively, with plaintiffs John Hancock Life Insurance Company and John Hancock Variable Life Insurance Company, "John Hancock") is a company, duly formed and existing under the laws of the State of Delaware, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts. Investors is a wholly-owned subsidiary of John Hancock Variable Life Insurance Company that sells various types of life insurance products.

-2-

5.    Defendant Abbott Laboratories ("Abbott" or "Abbott Labs") is a corporation, duly formed and existing under the laws of the State of Illinois, that maintains its corporate headquarters in Abbott Park, Illinois.   Abbott is a broad-based health care company that discovers, develops, manufactures and markets products and services that span the continuum of care – from prevention and diagnosis to treatment and cure.  Abbott's principal businesses are global pharmaceuticals, nutritionals, and medical products, including diagnostics and cardiovascular devices.  Abbott Labs achieved record sales and net earnings of $17.7 billion and $3.2 billion, respectively, in 2002.

### Jurisdiction and Venue

6.    This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy in this action exceeds $75,000, exclusive of interest and costs.

7.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(a)(1) because defendant Abbott Labs resides in this district within the meaning of 28 U.S.C. § 1391(c), and further because Section 16.2 of the parties' Agreement provides that Abbott,

> consents ... to the exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts ... for the purpose of any suit, action or other proceeding arising out of any of its obligations hereunder or thereunder or with respect to the transactions contemplated hereby or thereby, and expressly waives any and all objections that it may have as to venue in such courts.

8.    As set forth more fully below, an actual controversy currently exists for purposes of 28 U.S.C. § 2201 with respect to John Hancock's obligation to make additional payments to Abbott Labs under the terms of the Agreement.

-3-

## Facts

9.     On March 13, 2001, John Hancock and Abbott Labs entered a written Agreement whereby Hancock agreed to provide funding to Abbott Labs for research and development activities on a portfolio of potential pharmaceutical products or "Program Compounds" (the "Program") in exchange for the right to receive future milestone and royalty payments from Abbott. Specifically, Hancock agreed to pay Abbott Labs up to a specified amount in four annual installments (the "Program Payments") from 2001 through 2004 (individually, "Program Years" and collectively, the "Program Term"). Abbott Labs agreed to provide additional funding for the Program and committed, under the terms of the Agreement, to spend certain minimum amounts on the Program during each Program Year (the "Annual Minimum Spending Target"), and a specified aggregate total on the Program over the entire four year Program Term (the "Aggregate Spending Target").

10.     Section 2.2 of the Agreement obligates Abbott Labs to provide John Hancock, at least forty-five days prior to the start of each Program Year, with an Annual Research Plan ("ARP") which spells out Abbott's anticipated Program spending for that year and for the remaining Program Term. If Abbott Labs' ARP for any given year "does not reasonably demonstrate [Abbott's] ... intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target," then John Hancock's "obligation to make any remaining Program Payments for any succeeding Program Years" automatically terminates pursuant to Section 3.4(iv) of the Agreement.

-4-

11.    John Hancock made two Program payments to Abbott Labs under the Agreement for 2001 and 2002. In late 2002, John Hancock received Abbott Labs' ARP for the coming year, which stated what Abbott Labs intended to spend on the Program in 2003, but did not disclose Abbott's estimated spending amount for 2004, the final year of the Program. No complete 2002 ARP was forthcoming from Abbott Labs until, at John Hancock's specific request, a copy eventually was sent to Hancock in late September 2003. That complete 2002 ARP and the accompanying cover letter from Thomas Lyons, the Controller of Abbott's "Global Pharmaceutical Research and Development" group, plainly state that it was Abbott's intention and reasonable expectation as of October 2002 to spend many millions of dollars less than the Aggregate Spending Target over the four year Program Term.

12.    After receiving Abbott Labs' complete 2002 ARP in late September 2003, John Hancock notified Abbott Labs in a letter dated October 10, 2003, that Abbott's decision in 2002 to reduce its anticipated spending over the four year Program Term below the required Aggregate Spending Target automatically terminated John Hancock's obligation to make Program Payments to Abbott for the third and fourth Program Years pursuant to the express terms of Section 3.4 of the Agreement. A true copy of that letter is appended to this Complaint at Tab 1.

13.    Abbott Labs has responded to John Hancock's notification referenced in Paragraph 12, *supra*, by contesting John Hancock's assertion and demanding payment of the multi-million dollar third Program Payment before year end.

14.    The parties' subsequent efforts to amicably resolve their differences have proven unsuccessful.

## Claim

### COUNT I
(For a Declaratory Judgment Pursuant to 28 U.S.C. § 2201, *et seq.*)

15.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 14 of this Complaint, *supra*.

16.    Abbott's decision in 2002 to reduce its anticipated spending over the entire Program Term below the required Aggregate Spending Target automatically terminated John Hancock's obligation to make Program Payments to Abbott for the third and fourth Program Years pursuant to Section 3.4 of the Agreement.  Nonetheless, Abbott Labs continues to insist that John Hancock is obligated to make the third Program Payment before the close of 2003.

17.    Accordingly, an actual controversy exists between John Hancock and Abbott Labs with respect to John Hancock's obligation to make additional Program Payments to Abbott under the Agreement.

### Prayer for Relief

WHEREFORE, John Hancock respectfully requests that this Court enter a final judgment in its favor and against Abbott Labs:

(a)    declaring that John Hancock's obligation to make Program Payments to Abbott for the third and fourth Program Years has terminated in accordance with the terms of the Agreement;

(b)    declaring that the Agreement otherwise is in full force and effect in accordance with its terms;

-6-

(c)     awarding John Hancock its losses, including without limitation its costs,

expenses and reasonable attorney's fees, incurred in this action as permitted by

law and the terms of the Agreement; and

(d)     granting such further necessary or proper relief as the Court deems just and

appropriate in the circumstances pursuant to 28 U.S.C. § 2202.

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY, AND
INVESTORS PARTNER LIFE INSURANCE

By their attorneys,

_____
Brian A. Davis (BBO No. 546462)
Michael Arthur Walsh (BBO No. 514875)
Raymond A. O'Brien (BBO No. 629753)
Gretchen L. Edson (BBO No. 644742)
CHOATE, HALL & STEWART
Exchange Place
53 State Street
Boston, Massachusetts 02109
Tele: 617-248-5000

Date:  December 12, 2003

3633570.1

-7-

John Hancock Financial Services, Inc.

Bond and Corporate Finance Group

John Hancock Place
Post Office Box 111
Boston, Massachusetts 02117
(617) 572-9624
Fax: (617) 572-1628
E-mail: sblewitt@hancock.com

Stephen J. Blewitt
Senior Managing Director

October 10, 2003

BY TELECOPIER AND FIRST CLASS MAIL

Mr. Thomas Lyons, GPRD Controller
ABBOTT LABORATORIES
Global Pharmaceutical Research & Development
100 Abbott Park Road
Abbott Park, Illinois 60064-6120

Re:     Research Funding Agreement with John Hancock

Dear Tom:

This letter will acknowledge the receipt by John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Investors Partner Life Insurance Company (collectively, "John Hancock"), of your letter dated September 22, 2003 enclosing Abbott's Final 2003 Annual Research Plan (the "Final 2003 Plan") for the portfolio of pharmaceutical products encompassed by the March 2001 Research Funding Agreement between John Hancock and Abbott Laboratories (the "Funding Agreement").

John Hancock has reviewed the information contained in your letter and the Final 2003 Plan, in conjunction with the more limited information contained in the Preliminary 2003 Annual Research Plan that Abbott supplied to John Hancock back in December 2002. That review establishes, among other things, that Abbott's Annual Research Plan for the year 2003 did not, and does not, reasonably demonstrate Abbott's intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target, as defined in, and required under, the Funding Agreement. Please be advised that, in light of these facts, John Hancock's obligation to make any remaining Program Payments to Abbott for the third and fourth Program Years is terminated pursuant to Section 3.4 of the Funding Agreement.

Letter to Mr. Thomas Lyons
ABBOTT LABORATORIES
October 10, 2003
Page 2

Please feel free to contact me if you have any questions or wish to discuss this matter.

Sincerely,

Stephen J. Blewitt
Senior Managing Director

cc:    President, Pharmaceutical Products Division, Abbott Laboratories (by first class mail)
       General Counsel, Abbott Laboratories (by first class mail)

JS 44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS–44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS** JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and INVESTORS PARTNER LIFE INSURANCE COMPANY

**DEFENDANTS**

ABBOTT LABORATORIES

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **Suffolk**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Brian A. Davis, CHOATE, HALL & STEWART, Exchange Place, 53 State Street, Boston, MA 02109 (617) 248-5000

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| | ☐ 345 Marine Product Liability | ☐ 690 Other | | ☐ 850 Securities/Commodities/Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | **PERSONAL INJURY** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | ☐ 362 Personal Injury — Med. Malpractice | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | ☐ 365 Personal Injury — Product Liability | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | **PERSONAL PROPERTY** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 370 Other Fraud | | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 240 Torts to Land | ☐ 371 Truth in Lending | | | |
| ☐ 245 Tort Product Liability | ☐ 380 Other Personal Property Damage | | | |
| ☐ 290 All Other Real Property | ☐ 385 Property Damage Product Liability | | | |

| CIVIL RIGHTS | PRISONER PETITIONS |
|---|---|
| ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence |
| ☐ 442 Employment | **HABEAS CORPUS:** |
| ☐ 443 Housing/ Accommodations | ☐ 530 General |
| ☐ 444 Welfare | ☐ 535 Death Penalty |
| ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other |
| | ☐ 550 Civil Rights |
| | ☐ 555 Prison Condition |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

This is an action filed pursuant to 28 U.S.C. Section 2201, et seq., in which Plaintiffs seek a declaration that their obligation to make additional payments to defendant under a contract has terminated. Jurisdiction is proper pursuant to 28 U.S.C. Section 1332(a).

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P. 23

DEMAND $ Amount in controversy exceeds $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☒ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____    DOCKET NUMBER _____

DATE  12/12/03

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only)  JOHN HANCOCK LIFE INSURANCE COMPANY, et al.

_____ v. ABBOTT LABORATORIES _____

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

[ ]  I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

[ ]  II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,        *Also complete AO 120 or AO 121
            740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.          for patent, trademark or copyright cases

[X]  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
            315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
            380, 385, 450, 891.

[ ]  IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
            690, 810, 861-865, 870, 871, 875, 900.

[ ]  V.    150, 152, 153.

3.  Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

_____ N/A _____

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                        YES [ ]        NO [X]

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)

                                                        YES [ ]        NO [X]

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                        YES [ ]        NO [ ]

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                        YES [ ]        NO [X]

7.  Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                                        YES [X]        NO [ ]

    A.  If yes, in which division do all of the non-governmental parties reside?

        Eastern Division [X]      Central Division [ ]      Western Division [ ]

    B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

        Eastern Division [ ]      Central Division [ ]      Western Division [ ]

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

                                                        YES [ ]        NO [ ]

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME _____ BRIAN A. DAVIS, ESQ. _____

ADDRESS _____ CHOATE, HALL & STEWART, Exchange Place, 53 State St., Boston, MA 02109 _____

TELEPHONE NO. _____ (617) 248-5056 _____

(Coversheetlocal.wpd - 10/17/02)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only)  JOHN HANCOCK LIFE INSURANCE COMPANY, et al.

v. ABBOTT LABORATORIES

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

- [ ] I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

- [ ] II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,     *Also complete AO 120 or AO 121
         740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.       for patent, trademark or copyright cases

- [X] III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
         315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
         380, 385, 450, 891.

- [ ] IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
         690, 810, 861-865, 870, 871, 875, 900.

- [ ] V.    150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

N/A

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
   YES [ ]    NO [X]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)
   YES [ ]    NO [X]

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
   YES [ ]    NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
   YES [ ]    NO [X]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
   YES [X]    NO [ ]

   A.   If yes, in which division do all of the non-governmental parties reside?
        Eastern Division [X]    Central Division [ ]    Western Division [ ]

   B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
        Eastern Division [ ]    Central Division [ ]    Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
   YES [ ]    NO [ ]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME    BRIAN A. DAVIS, ESQ.
ADDRESS    CHOATE, HALL & STEWART, Exchange Place, 53 State St., Boston, MA 02109
TELEPHONE NO.    (617) 248-5056

(CoversheetLocal.wpd - 10/17/02)

**Exhibit 3**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN HANCOCK LIFE INSURANCE )
COMPANY, JOHN HANCOCK )
VARIABLE LIFE INSURANCE )
COMPANY, and INVESTORS )
PARTNER LIFE INSURANCE )
COMPANY, )
    Plaintiffs, )
                      )     CIVIL ACTION NO.
       v.                 )     03-12501-DPW
                      )
ABBOTT LABORATORIES, )
    Defendant. )

### FINAL JUDGMENT AND DECLARATION

September 16, 2005

    Pursuant to the Court's Memorandum and Order dated September
16, 2005 judgment is entered for Plaintiffs and counterclaim
Defendants John Hancock Life Insurance Company, John Hancock
Variable Life Insurance Company and Investors Partner Life
Insurance against Defendant and counterclaim Plaintiff Abbott
Laboratories, and it is hereby DECLARED, ADJUDGED and DECREED
that:

- Hancock's obligation to make Program Payments to Abbott for
  the third and fourth Program Years has terminated in
  accordance with the terms of the Agreement;

- Hancock's withholding of the 2003 and 2004 Program Payments
  does not constitute a breach of the Research Funding
  Agreement; and

- The Research Funding Agreement otherwise is in full force and effect in accordance with its terms.

SO ORDERED

/s/ Douglas P. Woodlock

DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

Exhibit 4

FILED UNDER SEAL
Case No. 05-2710

IN THE

# UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT

John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and Investors Partner Life Insurance Company,

*Plaintiffs-Appellees,*

— v. —

Abbott Laboratories,

*Defendant-Appellant.*

ON APPEAL FROM A FINAL JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS

## BRIEF OF PLAINTIFFS-APPELLEES JOHN HANCOCK LIFE INSURANCE COMPANY, *ET AL.*

Brian A. Davis
Joseph H. Zwicker
Stacy Blasberg
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Phone: (617) 248-5000
Fax: (617) 248-4000

*Attorneys for Plaintiffs-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Plaintiff-Appellee John Hancock Life Insurance Company states that it is a wholly-owned subsidiary of John Hancock Financial Services, Inc., which is a wholly-owned subsidiary of Manulife Financial Corporation. Plaintiff-Appellee John Hancock Variable Life Insurance Company states that it is a wholly-owned subsidiary of John Hancock Life Insurance Company. Plaintiff-Appellee Investors Partner Insurance Company (now known as "Manulife Insurance Company") is a wholly-owned subsidiary of John Hancock Variable Life Insurance Company.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

REASONS WHY ORAL ARGUMENT SHOULD NOT BE HEARD . . . . 2

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

I.    THE DISTRICT COURT DID NOT ERR, CLEARLY OR
      OTHERWISE, IN CONCLUDING THAT ABBOTT'S
      ADMITTED FAILURE IN 2002 TO DEMONSTRATE ITS
      INTENTION AND REASONABLE EXPECTATION TO
      EXPEND MORE THAN $614 MILLION ON THE PROGRAM
      COMPOUNDS OVER THE FOUR-YEAR PROGRAM TERM
      TERMINATED JOHN HANCOCK'S OBLIGATION TO
      MAKE ANY PROGRAM PAYMENTS FOR THE TWO
      REMAINING PROGRAM YEARS PURSUANT TO SECTION
      3.4(iv) OF THE AGREEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . 23

      A.    The Agreement Imposes Separate Planning And Spending
            Obligations On Abbott. . . . . . . . . . . . . . . . . . . . . . . . . . . 25

i

B.    The Parties Presented The District Court With Different Interpretations Of Abbott's Ability Under The Agreement To "Extend" The Four-Year Program Term For Planning Purposes. ................................... 29

C.    The District Court Correctly Concluded, On All of the Facts and the Law, That The "Interpretation Proffered by Hancock Is The Only Reasonable One." ........... 32

1.    The District Court's Interpretation Is Consistent With the Agreement's Express Terms. ........... 32

2.    The District Court's Interpretation Is Consistent With The Agreement's Drafting History. ......... 37

3.    The District Court's Interpretation Is Consistent With Other Extrinsic Evidence Offered by the Parties. ...................................... 43

4.    The District Court's Interpretation Is Not "Commercially Unreasonable" And Does Not Result In A "Windfall" For John Hancock. ....... 48

II.    THE DISTRICT COURT DID NOT ERR, CLEARLY OR OTHERWISE, IN CONCLUDING THAT ABBOTT'S ADMITTED FAILURE TO PROVIDE JOHN HANCOCK WITH A COMPLAINT ARP IN 2002 DID NOT ENTITLE ABBOTT TO RECEIVE AN ADDITIONAL $58 MILLION PROGRAM PAYMENT FOR 2003. ...................... 55

III.    THE DISTRICT COURT DID NOT ERR, CLEARLY OR OTHERWISE, IN DETERMINING THAT JOHN HANCOCK DID NOT WAIVE, AND WAS NOT EQUITABLY ESTOPPED FROM EXERCISING, ITS RIGHTS UNDER SECTION 3.4(iv) OF THE AGREEMENT. .............................. 59

III.    CONCLUSION ..................................... 63

ii

## TABLE OF AUTHORITIES

*Cases*

Accusoft Corp. v. Palo, 237 F.3d 31 (1st Cir. 2001) ........................... 22, 41

Air Safety, Inc. v. Teachers Realty Corp., 185 Ill. 2d 457 (1999) ............. 24

Beanstalk Group, Inc. v. AM General Corp.,
 283 F.3d 856 (7th Cir. 2002) ......................................................... 43

Cochran v. Quest Software, Inc., 328 F.3d 1 (1st Cir. 2003) ................... 24

Crellin Technologies, Inc. v. Equipment Lease Corp.,
 18 F. 3d 1 (1st Cir. 1994) ................................................................ 23

Dean Mgmt., Inc. v. TBS Construction, Inc.,
 790 N.E.2d 934 (Ill. App. 2003) ..................................................... 24

DeWitt County Public Bldg. Com'n. v. DeWitt County,
 128 Ill. App. 3d 11 (1984) .............................................................. 55

Eichengreen v. Rollins, Inc., 325 Ill. App. 3d 517 (1st Dist. 2001) ........... 24

Geddes v. Mill Creek Country Club, Inc., 196 Ill. 2d 302 (2001) ............. 62

Geier v. Hamer Enterprises, Inc.,
 226 Ill. App. 3d 372 (1st Dist. 1992) ......................................... 24, 61

Gerow v. Rohm & Haas Co., 308 F.3d 721 (7th Cir. 2002) .......... 41, 42, 43

Hanover Ins. Co. v. Comm. of Internal Revenue,
 598 F.2d 1211 (1st Cir. 1979) ........................................................ 52

In re Halas, 104 Ill. 2d 83 (1984) .............................................................. 39

In re Marriage of Olsen, 124 Ill.2d 19 (1988) ........................................... 24

Inmates of Suffolk County Jail v. Rouse,
    129 F.3d 649 (1st Cir. 1997), *cert. denied*, 118 S. Ct. 2366 (1998)  23

Johnson v. Watts Regulator Co., 63 F.3d 1129 (1st Cir. 1995) ................. 23

Klemp v. Hergott Group, Inc., 267 Ill. App. 3d 574 (1994) ....................... 36

Lambert v. Kysar, 983 F.2d 1110 (1st Cir. 1983) ....................................... 24

McMahon v. Chicago Mercantile Exchange,
    221 Ill. App. 3d 935 (1st Dist. 1991) ................................................. 54

New England Railroad Co. v. Hyde, 101 F. 401 (1st Cir. 1900) ............... 52

Quake Construction, Inc. v. American Airlines, Inc.,
    141 Ill. 2d 281 (1990) ........................................................................ 24

Rybicki v. Anesthesia & Analgesia Assoc., Ltd.,
    246 Ill. App. 3d 290 (4th Dist. 1993) ................................................ 39

Shields Pork Plus, Inc. v. Swiss Valley Ag. Service,
    329 Ill. App. 3d 305 (4th Dist. 2002) ................................................ 57

United Paperworkers International Union, Local 14 v. International
    Paper Co., 64 F.3d 28 (1st Cir. 1995) ........................................ 22, 41

United States v. Warwick, 695 F.2d 1063 (7th Cir. 1982) ........................ 52

Vaughn v. Speaker, 126 Ill. 2d 150 (1968) ................................................ 61

Wagner Excello Foods, Inc. v. Fearn International, Inc.,
    235 Ill. App. 3d 224, 232 (1st Dist. 1992) ........................................ 61

Western Illinois Oil Co. v. Thompson, 26 Ill. 2d 287 (1962) .................... 24

Whalen v. K-Mart Corp., 166 Ill. App. 3d 339 (1st Dist. 1988) ................ 61

Wright v. Chicago Title Insurance Co., 196 Ill. App. 3d 920 (1990) ........ 51

**Federal Rules**

Fed. R. App. P. 26.1 ................................................................................... 1

iv

## REASONS WHY ORAL ARGUMENT SHOULD NOT BE HEARD

Plaintiffs-Appellees John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and Investors Partner Life Insurance Company (collectively, "John Hancock" or "Hancock") respectfully submit, pursuant to L.R. 34(a), that oral argument is neither necessary, nor warranted.

This case involves the interpretation of certain ambiguous provisions of a heavily-negotiated contract for funding the development of pharmaceutical products. The district court (per the Hon. Douglas P. Woodlock), sitting jury-waived, heard and considered the arguments of the parties and all of the relevant evidence on a "case stated" basis with the full assent of both sides. The court ultimately issued an exhaustive 65-page decision that addressed each of the issues raised below and held, based on the express terms of the parties' written agreement and the district court's ancillary findings of fact, that the "interpretation proffered by Hancock is the only reasonable one."

The basis for and reasoning behind the district court's findings and conclusions – which are subject to review for clear error – are explained in detail in the court's decision and addressed comprehensively in the parties' briefs. Under the circumstances, no significant additional benefit would be gained from oral argument.

2

## JURISDICTIONAL STATEMENT

John Hancock adopts Abbott's Jurisdictional Statement.

## STATEMENT OF THE ISSUES

I.     In order to continue receiving Program Payments from John Hancock for any succeeding Program Years, Abbott was required under Section 3.4(iv) of the parties' Agreement to "demonstrate in its Annual Research Plan" each year "its intent and reasonable expectation to expend on Program Related Costs" during the four-year Program Term "an amount in excess of the Aggregate Spending Target" of $614 million.  Section 3.4 was intended by the parties to permit John Hancock to reduce its level of investment in the Program Compounds if Abbott decided to reduce its own level of spending below that agreed-upon threshold.  By its own admission, Abbott decided in 2002 to dramatically reduce its planned spending on the Program Compounds during the four-year Program Term to an amount over *$100 million less than* the Aggregate Spending Target.  Did the district court, sitting jury-waived and considering all of the evidence on a case-stated basis, commit clear error in deciding that Abbott's decision to reduce its planned spending over the four-year Program Term to an amount below the agreed-upon Aggregate Spending Target terminated John Hancock's obligation to make

3

Program Payments for the two remaining Program Years in accordance with the express terms of Section 3.4(iv)?

II.   By Abbott's own admission, the Annual Research Plan that it submitted to John Hancock as required in late 2002 was deficient in that it failed to demonstrate Abbott's "intent and reasonable expectation to expend on Program Related Costs" during the four-year Program Term "an amount in excess of the Aggregate Spending Target" of $614 million. Abbott did not supply John Hancock with a compliant Annual Research Plan until prompted to do so in the fall of 2003. Abbott contended below that its own delay in providing John Hancock with a compliant Annual Research Plan entitled Abbott to receive an additional Program Payment of $58 million from Hancock. Did the district court, sitting jury-waived and considering all of the evidence on a case-stated basis, commit clear error in deciding that Abbott's admitted failure to provide John Hancock with a timely, compliant Annual Research Plan "does not entitle it to receive an additional year's Program Payment from Hancock"?

III.  By Abbott's own admission, the Annual Research Plan that it presented to John Hancock as required in late 2002 was deficient in that it failed to demonstrate Abbott's "intent and reasonable expectation to expend on Program Related Costs" during the four-year Program Term "an amount in excess of the

4

Aggregate Spending Target" of $614 million.    That failure terminated John Hancock's obligation to make Program Payments for "any succeeding Program Years," but not for 2002.    Abbott contended below that John Hancock's payment of its 2002 Program Payment, as required under the terms of the Agreement, constituted a waiver of Abbott's admitted failure to submit a compliant ARP for 2003 and beyond, and that Hancock is estopped from enforcing its rights under the Agreement as a result.    Did the district court, sitting jury-waived and considering all of the evidence on a case-stated basis, commit clear error in rejecting Abbott's waiver and estoppel defenses?

## STATEMENT OF THE CASE

This jury-waived case involves the question of whether John Hancock's obligation to make certain additional "Program Payments" to Abbott pursuant to the terms of a written Research Funding Agreement (the "Agreement") between the parties terminated in accordance with the terms of that Agreement.    Under the Agreement, which was signed in March 2001, John Hancock agreed to share a portion of the costs of certain research and development activities (defined by the Agreement as the "Research Program") directed toward obtaining regulatory approval of commercial drug products containing certain experimental pharmaceutical compounds (defined by the Agreement as the "Program Compounds") over a four-

year "Program Term" in return for, *inter alia*, royalties on the sale of those products. John Hancock's return on its investment, if any, depends upon the eventual commercial success of the Program Compounds. John Hancock made Program Payments totaling $104 million to Abbott under the Agreement for the years 2001 and 2002. John Hancock's obligation to continue making Program Payments to Abbott was dependent, however, upon Abbott's fulfillment of certain contractual requirements that Abbott, by its own admission, did not meet. When Abbott nonetheless demanded further Program Payments from John Hancock, Hancock sought a declaratory judgment in the district court that its payment obligations had terminated in accordance with the terms of the Agreement. Abbott responded by asserting a counterclaim for John Hancock's next Program Payment.

After the close of discovery, the parties filed cross-motions for summary judgment. The district court thereupon suggested, and the parties agreed, to submit the case to the court on a "case-stated" basis, leaving the court free to draw appropriate inferences from the evidence, to make findings of fact, and to decide the case on the written record with oral argument, but without the need for a formal trial.

Oral argument took place on February 16, 2005. Thereafter, on September 16, 2005, the district court issued a detailed and carefully-reasoned 65-page "Memorandum and Order" that addresses all of the issues raised below and

6

conclues, based upon the express terms of the parties' written Agreement and the court's ancillary findings of fact, that John Hancock's obligation to make additional Program Payments terminated as a result of Abbott's admitted failure to fulfill the requirements of that Agreement.  Final Judgment consistent with the district court's findings and conclusions entered on the same day.  Abbott appeals from that Final Judgment.

## STATEMENT OF FACTS

The district court's Memorandum and Order contains a 22-page recitation of the relevant facts that John Hancock adopts in its entirety.  (SA1838-61).[1]  John Hancock respectfully submits, however, that the following facts (which are included in evidentiary record below, but were not, in some instances, referenced by the district court in its written decision) are worthy of emphasis or provide useful, additional context and support for the district court's ultimate findings and conclusions:

- The structure of the Research Funding Agreement that John Hancock and Abbott negotiated was particularly attractive to Abbott when compared to the alternative funding sources it was considering.  (SA584).  First, it would allow Abbott to share some of the commercial risks of

---

[1] Citations herein to "SA_" are to the pages of the separately bound Supplemental Joint Appendix containing materials filed under seal.

7

development while still maintaining control of the development process. (SA1572). Second, Abbott would not risk losing the commercial rights associated with the portfolio of compounds. (SA584). Finally, the contemplated investment structure offered what Abbott considered to be highly desirable accounting benefits. (SA584-85).

- The nine Program Compounds that form the subject matter of the Agreement were in various stages of development at the time the Agreement was executed and were intended to treat a variety of medical conditions and diseases. (SA61). This diverse "basket" of compounds was selected by the parties based on detailed forecasts that predicted how likely each compound was to obtain approval, when each compound was likely to obtain approval, and the commercial success each compound likely would acquire if approved. (SA706-07).

- John Hancock's obligation under the Agreement to continue making annual Program Payments towards the development of the Program Compounds was not absolute. (SA15). Rather, it was dependent on Abbott's fulfillment of various requirements that are expressly set forth in the Agreement, including, *inter alia*: (a) the requirement in Section 2.5

8

that Abbott provide John Hancock, "no later than thirty (30) days before the last day of each Program Year," with "a reasonably detailed report setting forth the status of the Research Program and all Program Related Costs expended by Abbott during such Program Year"; (b) the requirement in Sections 1.6 and 2.2 that Abbott provide John Hancock, "at least forty-five (45) days prior to the start of each Program Year," with an "Annual Research Plan" (hereinafter referred to as "ARP") containing, among other things, "a reasonably and consistently detailed statement of objectives, activities, timetable and budget for the Research Program for every Program Year remaining in the Program Term"; and © the requirement in Section 3.4 that Abbott "demonstrate in its [ARP] its intent and reasonable expectation to expend on Program Related Costs *during the Program Term* an amount in excess of the Aggregate Spending Target." (SA5, 12, 13, 15) (emphasis added).

- The "Program Term" is defined, without exception, in Section 1.44 of the Agreement as "a period of four (4) consecutive Program Years." (SA11). A "Program Year" is defined, in turn, as "a period of twelve (12) consecutive calendar months commencing on January 1 of each year, except that the first Program Year shall commence on the Execution Date

9

[March 13, 2001] and end on December 31, 2001." (SA11).  Nothing in the text of the Agreement grants Abbott the right to "extend" the Program Term itself beyond four Program Years.    (SA11, 15).    Even Section 3.3(b) of the Agreement, which Abbott argues creates an implied right to "extend" the Program Term to "five years," refers only to the "Program Term and ... *the subsequent year immediately commencing after the end of the Program Term*" (SA15)  (emphasis added).

- The "Research Program Term," as defined in the Agreement, is different than the four-year "Program Term."  (SA12).  The Research Program Term is defined in Section 2.1 of the Agreement as the period "during the Program Term, and beyond the Program Term until Abbott either abandons development in accordance with the terms hereof or receives Regulatory Approval for each Program Compound, or some combination thereof."  (SA12).  Accordingly, the Research Program Term, unlike the Program Term, is potentially variable in length.  (SA12).

- Section 3.4(iv) of the Agreement states that, if Abbott's ARP ever failed to demonstrate Abbott's "intent and reasonable expectation" to expend at least the Aggregate Spending Target on Program Related Costs over the

10

four-year Program Term, then "John Hancock's obligation to make any remaining Program Payments for any succeeding Program Years ... shall terminate." (SA15). While other provisions of the Agreement (including Section 3.3(b)) permit Abbott to "carryover" its *actual* expenditures on Program Related Costs to the "subsequent year immediately commencing after the end of the Program Term" in certain circumstances, nothing in the Agreement permits Abbott to dramatically reduce its *planned* spending (*i.e.*, its intended and reasonably expected expenditures) over the four-year Program Term to an amount less than $614 million without simultaneously terminating John Hancock's obligation to make any remaining Program Payments pursuant to Section 3.4(iv). (SA15).

- The distinction that the Agreement makes between Abbott's *planned* spending on Program Related Costs over the four-year Program Term and its *actual* spending on such costs during that period was important to John Hancock because, regardless of the commercial introduction dates of the various Program Compounds, John Hancock's contractual right to receive milestone and royalty payments from Abbott for any of the Program Compounds ends, under all circumstances, no later than December 31, 2015. (SA12). Accordingly, John Hancock wanted

11

Abbott to have a strong incentive to develop and commercialize each of the Program Compounds as quickly as possible in order to maximize John Hancock's return on its investment. (SA721). These concerns were communicated to Abbott personnel during the negotiation of the Agreement, and they indicated that they understood them. (SA721-22).

- The total amount of Abbott's planned spending over the four-year Program Term also was of importance to John Hancock. (SA721). As of the date of the Agreement, Abbott represented to John Hancock that Abbott projected its spending to be at least $1.2 billion on the development of the Program Compounds over the Program Term. (SA39-59). John Hancock regarded Abbott's planned spending over the four-year Program Term as the best barometer of the likely commercial success of those compounds. (SA721). John Hancock did not want to be obligated to continue investing its own funds in the development of the Program Compounds if the commercial prospects for those compounds, as reflected in Abbott's spending projections over the four-year Program Term as set forth in Abbott's subsequent ARPs, diminished significantly. (SA15).

12

- Due to the large number of failures among the Program Compounds, Abbott's planned spending on Program Related Costs over the four-year Program Term declined precipitously during the first eighteen months of the Research Program.    By October 2002, Abbott had reduced its intended and reasonably expected spending on the remaining Program Compounds to $559.8 million, which was *$54.2 million less* than the Aggregate Spending Target. (SA1184-1205).  Before the end of 2002, Abbott further reduced its intended and reasonably expected spending on Program Related Costs over the entire four-year Program Term to $512.6 million, which was less than half of Abbott's originally planned spending as indicated in its 2001 ARP and over *$100 million less* than the Aggregate Spending Target of $614 million.  (A8).[2]

- The large number of failures among the Program Compounds also has reduced the long-term commercial prospects for the "basket" of Program Compounds encompassed by the Agreement *by more than half* since that Agreement was executed in March 2001.  (SA 1212).  While it is true that John Hancock still will obtain the "benefit of its bargain" under the terms of the Agreement, the economic reality is that the likely value of that benefit,

---

[2] Citations herein to "A_" are to the addendum attached to this brief.

13

if any, is far less today than it was when the Agreement was executed. (SA1212). Viewed in the context of this economic reality, Section 3.4(iv) of the Agreement bestows no "windfall" on John Hancock. To the contrary, it has fulfilled its intended role as a mechanism for John Hancock to reduce its level of investment in the Program Compounds in the same manner, and to roughly the same degree, as Abbott has reduced its own level of investment in those compounds in the circumstances of this case. (SA15).

- By its own admission, Abbott did not disclose to John Hancock in its 2003 Preliminary ARP that Abbott had decided in late 2002 to reduce its intended and reasonably expected spending on Program Related Costs over the entire four-year Program Term to an amount more than $100 million less than the Aggregate Spending Target. (A8). Although Abbott's 2003 Preliminary ARP contained information regarding Abbott's actual spending on Program Related Costs in 2002 and Abbott's intended and reasonably expected spending for the year 2003, it included no data whatsoever regarding Abbott's intended and reasonably expected spending for 2004, the last "year remaining in the Program Term," as required under Section 1.6 of the Agreement. (SA724).

14

- By Abbott's own admission, the contents of its 2003 Preliminary ARP did not fulfill Abbott's reporting and disclosure obligations to John Hancock under Sections 2.2 and 3.4 of the Agreement. (A8). Had that missing spending data been included in Abbott's 2003 Preliminary ARP as required, it would have demonstrated to John Hancock in 2002 that Hancock's obligation to make any Program Payments for any Program Years subsequent to 2002 had terminated pursuant to Section 3.4(iv) of the Agreement. (SA15).

## SUMMARY OF ARGUMENT

Abbott's appeal raises three issues, each of which fails for the same reason: the district court, sitting jury-waived on a case-stated basis, made findings of fact that are not clearly erroneous, that are amply supported by the record, and that justify entry of judgment in favor of John Hancock.

First and fundamentally, the district court held that Abbott's undisputed failure in 2002 to state its "intent and reasonable expectation" to spend $614 million, the so-called "Aggregate Spending Target," over the four-year "Program Term" of the Research Funding Agreement (the "Agreement") terminated John Hancock's obligation to make its third and fourth Program Payments to Abbott pursuant to Section 3.4(iv) of the Agreement. The district court's decision turns on

15

the crucial distinction between Abbott's *planning* obligations and its *actual spending* obligations, as well as the court's factual interpretation of certain relevant language in the Agreement which the court found to be "ambiguous."

The district court expressly found, and the parties do not dispute, that Section 3.4(iv) of the Agreement – the *planning* provision – provides that if Abbott's ARP ever fails to demonstrate its "intent and reasonable expectation" to spend at least the Aggregate Spending Target on Program Related Costs over the Program Term, then "John Hancock's obligation to make any remaining Program Payments for any succeeding Program Years ... shall terminate." The district court found, and the parties do not dispute, that Section 1.44 of the Agreement defines "Program Term" as four (4) consecutive Program Years." The court also found, and the parties also do not dispute, that in December 2002, Abbott provided John Hancock with a preliminary 2003 ARP that failed to state Abbott's "intent and reasonable expectation" to satisfy the Aggregate Spending Target in four years. In fact, Abbott fell more than *$100 million* short of that minimum threshold. John Hancock's payment obligations terminated as a result pursuant to Section 3.4(iv).

Unwilling to concede that the Agreement means what it literally says, Abbott claims instead that it has certain *implied* rights under Section 3.3(b), which

16

addresses Abbott's actual spending obligations under the Agreement. Abbott argues that Section 3.3(b) grants it the right to "extend" its actual spending over the four-year Program Term and "the subsequent year immediately commencing after the end of the Program Term." From this proposition, Abbott concludes that Section 3.3(b) also impliedly "extends" the Program Term itself from "four (4) Program Years," as set forth in the Agreement, to five.

Rejecting Abbott's argument, the district court found the relevant terms of the Agreement to be ambiguous and concluded that Section 3.3(b) does not provide Abbott with the unilateral right to change the length of the Program Term. The district court found that Section 3.3(b) only provided Abbott with a "safety net": Abbott could expend any unspent amount of the Aggregate Spending Target in "the subsequent year immediately commencing after the end of the Program Term," *so long as it always "expected and intended" to meet that target in four.* The district court's interpretation was consistent with the language and the obvious objectives of the Agreement. John Hancock measured the potential commercial success of the Program Compounds as a function of Abbott's spending commitment. If Abbott eventually concluded that the prospects for the Program Compounds did not justify meeting the Aggregate Spending Target over the four-

17

year Program Term, then John Hancock's own funding commitment would be reduced as a result.

In reaching its decision, the district court carefully considered the extrinsic evidence proffered by Abbott in support its proposed construction of the Agreement. In particular, the court considered and analyzed the obscure reference to an "extension period of the Program Term" buried in the definition of "Program Related Costs," but expressly found that the reference was a "vestige" of a prior alternative structure of the deal that the parties abandoned in 2001, but mistakenly left in the operative draft through an "editing oversight." The district court concluded that the extrinsic evidence was consistent with John Hancock's interpretation of the Agreement and ruled, without error, that the intended meaning of Sections 3.4 (iv) and 3.3(b) of the Agreement resulted in the termination of John Hancock's obligation to make any additional Program Payments to Abbott in the circumstances of this case.

The district court also did not err in rejecting Abbott's argument that a literal interpretation of Section 3.4(iv) is "commercially unreasonable" and provides an unfair "windfall" to John Hancock. The parties drafted the Agreement to incentivize Abbott to develop and introduce the Program Compounds as soon as possible in order to maximize John Hancock's resulting royalty stream, which ends

18

under all circumstances no later than December 31, 2015. The parties also drafted the Agreement to permit John Hancock to reduce its investment in the Program Compounds if the commercial prospects for those Compounds, as measured by Abbott's own intended and expected spending on Program Related Costs over the four-year Program Term, ever fell below the Aggregate Spending Target of $614 million.

Abbott ceased development of six of the nine Program Compounds within approximately 18 months of signing the Agreement, and reduced its planned spending on Program Related Costs well below the Aggregate Spending Target in late 2002. The reduction in Abbott's expenditures has had corresponding and predictable financial consequences for John Hancock. While it is true that John Hancock still will obtain the "benefit of its bargain" under the terms of the Agreement, the economic reality is that the likely value of that benefit, if any, is far less today than it was when the Agreement was executed. Viewed in the context of this economic reality, Section 3.4(iv) of the Agreement is not "commercially unreasonable" and bestows no "windfall" on John Hancock. To the contrary, it has fulfilled its intended role as a mechanism for John Hancock to reduce its level of investment in the Program Compounds in the same manner, and to roughly the same degree, as Abbott has

19

reduced its own level of investment in those compounds in the circumstances of this case. The district court's interpretation of the Agreement is not clearly erroneous.

Second, Abbott claims that, even if it failed to demonstrate its intent and reasonable expectation to meet the Aggregate Spending Target during the four-year Program Term, John Hancock nonetheless owes Abbott a $58 million Program Payment for 2003 because the "triggering event" for purposes of terminating Hancock's payment obligation occurred in 2003, not 2002. Section 3.4 of the Agreement provides, in part, that "for the avoidance of doubt, the Program Payments for the Program Year in which *such event* occurs shall still be due and payable." (SA15) (emphasis added). It is undisputed that Abbott's original, non-compliant 2003 ARP, provided to John Hancock *in 2002*, failed to satisfy Abbott's obligation to state its intent and expectation to meet the Aggregate Spending Target because it set forth Program Payments for 2003, but not 2004. Abbott's second 2003 ARP, belatedly supplied to John Hancock in September 2003, only *confirmed* that Abbott had decided in 2002 to reduce its intended and expected spending on Program Related Costs to an amount well below the Aggregate Spending Target.

The district court found the relevant language of Section 3.4 to be ambiguous. Construing the Agreement reasonably and as a whole, the district court further found, as a matter of fact, that the "triggering event" took place in

20

2002 when Abbott provided its original, non-compliant 2003 ARP to John Hancock, and that Hancock's payment obligation for "any succeeding Program Years" terminated as a result. The court concluded that Abbott's admitted delay in submitting a compliant ARP to John Hancock "does not entitle it to receive an additional year's Program Payment from Hancock." That decision is not clearly erroneous.

Lastly, Abbott observes that, following the receipt in December 2002 of Abbott's original, non-compliant 2003 ARP, John Hancock nonetheless made its 2002 Program Payment to Abbott. Abbott further contends that, because John Hancock did so based on a non-compliant ARP, John Hancock necessarily waived or is equitably estopped from asserting its right "to object or withhold future payments based on the failure of the preliminary 2003 ARP to include post-2003 data."

The district court properly rejected Abbott's claim for a myriad of reasons, most of which Abbott does not even challenge on appeal. The court first returned to its primary holding: John Hancock was excused from making its third and fourth Program Payments because Abbott's preliminary 2003 ARP (provided in 2002) failed to demonstrate Abbott's intent and reasonable expectation to meet the Aggregate Spending Target over the four-year Program Term. The court further

21

held that, under the terms of the Agreement, John Hancock was obligated to make its 2002 payment regardless of whether Abbott's original 2003 ARP was compliant or not. Thus, by making the payment, Hancock could not have voluntarily relinquished "a known right, claim, or privilege." The district court also found that equitable estoppel required Abbott to prove that John Hancock "misrepresented or concealed known facts," and that Abbott had failed to make such a showing. The court's reasoning and decision is not clearly erroneous.

For the foregoing reasons, the district court's Final Judgment in favor of John Hancock should be affirmed in its entirety.

## STANDARD OF REVIEW

Abbott and John Hancock voluntarily submitted this jury-waived action to the district court for resolution on a "case stated" basis. As a consequence, the district court's findings of fact, including without limitation its findings regarding the intended meaning of ambiguous provisions of the parties' Agreement, are subject to review under a clearly erroneous standard. United Paperworkers International Union, Local 14 v. International Paper Co., 64 F.3d 28, 31 (1st Cir. 1995) (factual findings issued by the district court on a "case stated" basis "should be set aside only if they are clearly erroneous"); Accusoft Corp. v. Palo, 237 F.3d 31, 40 (1st Cir. 2001) ("factual findings concerning the intent of the parties where

22

contract language is ambiguous" are not to be disturbed on appeal "unless they are clearly erroneous"). Pure conclusions of law are subject to *de novo* review on appeal, but mixed questions of fact and law are subject to review "along a degree-of-deference continuum." Inmates of Suffolk County Jail v. Rouse, 129 F.3d 649, 661 (1st Cir. 1997), *cert. denied*, 118 S. Ct. 2366, (1998) (*quoting* Johnson v. Watts Regulator Co., 63 F.3d 1129, 1132 (1st Cir. 1995)). Where, as here, any mixed questions of fact and law reflected in the district court's construction of the parties' contract are heavily fact-dependent, review under a clearly-erroneous standard is appropriate. Crellin Technologies, Inc. v. Equipment Lease Corp., 18 F.3d 1, 8 (1st Cir. 1994) ("Mixed questions, to the extent that they are fact dominated, are subject to the clear-error review, not *de novo* review").

## ARGUMENT

I. **THE DISTRICT COURT DID NOT ERR, CLEARLY OR OTHERWISE, IN CONCLUDING THAT ABBOTT'S ADMITTED FAILURE IN 2002 TO DEMONSTRATE ITS INTENTION AND REASONABLE EXPECTATION TO EXPEND MORE THAN $614 MILLION ON THE PROGRAM COMPOUNDS OVER THE FOUR-YEAR PROGRAM TERM TERMINATED JOHN HANCOCK'S OBLIGATION TO MAKE ANY PROGRAM PAYMENTS FOR THE TWO REMAINING PROGRAM YEARS PURSUANT TO SECTION 3.4(iv) OF THE AGREEMENT.**

This case, at its core, involves the interpretation of ambiguous provisions of a written contract. Under Illinois law – which the parties agree governs the

23

interpretation of the Agreement – the primary purpose in construing a contract is to "ascertain the intent of the parties and give effect to that intent." Eichengreen v. Rollins, Inc., 325 Ill. App. 3d 517, 521 (1st Dist. 2001) (*citing* In re Marriage of Olsen, 124 Ill. 2d 19, 25-26 (1988)); *see also* Geier v. Hamer Enterprises, Inc., 226 Ill. App. 3d 372, 389 (1st Dist. 1992) ("In construing a contract, the primary objective is to give effect to the intent of the parties at the time they entered into the contract."). As a general matter, the intent of the parties to a written agreement "must be determined from the language" of the agreement itself. Air Safety, Inc. v. Teachers Realty Corp., 185 Ill. 2d 457, 462 (1999) (*quoting* Western Illinois Oil Co. v. Thompson, 26 Ill. 2d 287, 291 (1962)). "If the terms of an alleged contract are ambiguous or capable of more than one interpretation," however, "parol evidence is admissible to ascertain the parties' intent." Quake Construction, Inc. v. American Airlines, Inc., 141 Ill. 2d 281, 288 (1990). A contract term is deemed ambiguous "when it may reasonably be interpreted in more than one way."[3] Dean Mgmt., Inc. v. TBS Construction, Inc., 790 N.E.2d 934, 939 (Ill. App. 2003).

---

[3] Section 16.2 of the Agreement states that "[t]he Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois." Under applicable choice of law principles, that provision is controlling in this case. *See* Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003); Lambert v. Kysar, 983 F.2d 1110, 1118 (1st Cir. 1983).

24

John Hancock argued below that Abbott's decision in 2002 to reduce its *planned spending* on Program Related Costs to an amount less than Aggregate Spending Target over the four-year Program Term automatically terminated John Hancock's obligation to make Program Payments for any subsequent years pursuant to Section 3.4(iv) of the Agreement. Abbott argued, conversely, that Section 3.3(b) of the Agreement – which gives Abbott an additional year to *actually spend* the Aggregate Spending Target under certain circumstances – also should be interpreted to give Abbott the implied right to "extend" the length of the Program Term itself for purposes of Abbott's planning obligations under Section 3.4(iv). The district court found the relevant terms of the Agreement to be ambiguous and determined, based on the language of the contract and the extrinsic evidence presented by the parties, that the "interpretation proffered by Hancock is the only reasonable one." The court's reasoning, which is spelled out in step-by-step detail in its 65-page opinion, is thorough, well-founded in the evidence, and not clearly erroneous for the reasons discussed below.

## A. The Agreement Imposes Separate Planning And Spending Obligations On Abbott.

The Agreement, as the district court recognized, imposes separate planning and spending obligations upon Abbott. Article 3 of the Agreement, titled "Research Funding," addresses Abbott's spending obligations. Section 3.2

25

obligates Abbott to spend in excess of $614 million (defined by the Agreement as the "Aggregate Spending Target") in costs and expenses associated with the Research Program (defined by the Agreement as "Program Related Costs") during the "Program Term." (SA5, 11, 14). The Program Term is defined, without exception, as "a period of four (4) consecutive Program Years." (SA11). A "Program Year" is defined, in turn, as "a period of twelve (12) consecutive calendar months commencing on January 1 of each year, except that the first Program Year shall commence on the Execution Date [March 13, 2001] and end on December 31, 2001." (SA11). Consequently, Abbott was required under Section 3.2 of the Agreement to spend in excess of $614 million on Program Related Costs during the period from March 13, 2001 to December 31, 2004.

Section 3.3(b) of the Agreement further provides, however, that "[i]f Abbott does not expend on Program Related Costs the full amount of the Aggregate Spending Target during the Program Term," Abbott may "expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the 'Aggregate Carryover Amount') on Program Related Costs during the subsequent year immediately commencing after the end of the Program Term." (SA15).

Nothing in Section 3.3(b) (or any other provision of the Agreement), however, grants Abbott the right to extend the length of the four-year Program Term itself.

Article 2 of the Agreement, titled "Annual Research Program," addresses Abbott's planning and reporting obligations. Sections 2.1 and 2.2 obligate Abbott to provide John Hancock with a written plan (defined by the Agreement as an "Annual Research Plan" and referred to herein as "ARP") for each Program Year of the "Research Program Term" during which Abbott actively is conducting clinical research on the Program Compounds, including but not limited to each Program Year during the four-year Program Term. (SA12-13). Abbott is required to provide its ARP to John Hancock at least forty-five days prior to the start of the Program Year to which it pertains. (SA12). For Program Years falling within the Program Term, Abbott's ARP must set forth "a reasonably and consistently detailed statement of the objectives, activities, timetable and budget for the Research Program for every Program Year remaining in the Program Term...." (SA5). Abbott also is required to "demonstrate in its [ARP] its intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target." (SA15).

According to the explicit language of Section 3.4(iv), if Abbott's ARP ever fails to demonstrate Abbott's "intent and reasonable expectation" to expend at least

27

the Aggregate Spending Target on Program Related Costs over the four-year Program Term, then "John Hancock's obligation to make any remaining Program Payments for any succeeding Program Years ... shall terminate." (SA15).

The clear distinction that the Agreement draws between Abbott's spending obligations on the one hand, and its planning and reporting obligations on the other, is no coincidence.  Rather, it reflects the parties' intention to create a mechanism that protected not only Abbott's desire to obtain John Hancock's ongoing participation in funding the development of the Program Compounds, but also Hancock's desire not to be required to make additional Program Payments if the overall commercial prospects for the portfolio of Program Compounds diminished significantly over time.  Both sides recognized and fully understood before the Agreement was signed that the prospects for the Program Compounds, and the associated level of development funding, could vary significantly during the four-year Program Term.

As of the date of the Agreement, Abbott represented to John Hancock that Abbott's projected its spending to be at least $1.2 billion on the development of the Program Compounds over the four-year Program Term.  John Hancock regarded Abbott's planned spending over the Program Term, as reflected in its yearly ARPs, as the best barometer of the likely future commercial success of those compounds. Thus, if Abbott decided to dramatically decrease its planned spending on the

28

Program Compounds over that four-year period, Hancock wanted to be in a position to do so as well.

**B.   The Parties Presented The District Court With Different Interpretations Of Abbott's Ability Under The Agreement To "Extend" The Four-Year Program Term For Planning Purposes.**

It is undisputed that, within approximately eighteen (18) months of signing the Research Funding Agreement, Abbott had elected to cease development of six of the nine Program Compounds. It also is undisputed that, as a result of its revised development plans, Abbott had decided by late 2002 to dramatically reduce its planned spending on Program Related Costs over the four-year Program Term to an amount well below the $614 million Aggregate Spending Target. Pursuant to the plain language of Section 3.4(iv) of the Agreement, that decision by Abbott automatically terminated "John Hancock's obligation to make any remaining Program Payments for any succeeding Program Years."

Not wishing to forego $110 million in additional Program Payments without a fight, however, Abbott asserts instead that its ability to "carryover" a portion of its actual spending on Program Related Costs to the "subsequent year commencing immediately after the Program Term" pursuant to Section 3.3(b) of Agreement grants Abbott the implied right to "extend" the Program Term itself for purposes of Abbott's separate planning and reporting obligations under Section 3.4(iv). In making this

argument, Abbott relies not on the Agreement's definition of "Program Term," which is fixed in Section 1.44 as "a period of four (4) consecutive Program Years," but rather on what the district court described as "an irrelevant subpart" in the Agreement's definition of "Program Related Costs," which states, among other things, that such costs include "(ii) the milestone and license fees paid during a given Program Year or any extension period of the Program Term by Abbott." (SA11, 1876). Abbott argues that the obscure reference to "extension period" buried in Section 1.43(ii) necessarily means that Abbott's carryover right under Section 3.3(b) "operates to extend the 'Program Term' under § 3.4(iv)" from four years to five. Abbott Brief at 33.

Abbott also cites a memorandum written by John Hancock's outside counsel early in negotiation of Agreement that mentions the potential extension of the "Research program term," which Abbott claims is further proof that the "carrying over of expenditures under § 3.3 extends the Program Term." *Id.* at 43. From Abbott's perspective, any other interpretation of the Agreement is "economically irrational," and will result in the "destruction of the economic basis of the bargain between the parties...." *Id.* at 20, 36.

John Hancock, on the other hand, consistently has argued that Section 3.4(iv) of the Agreement means just what it says, and that Abbott's admitted decision in late

30

2002 to dramatically reduce its planned spending on Program Related Costs over the four-year Program Term to an amount below the $614 million Aggregate Spending Target, in conjunction with its admitted failure to demonstrate in its 2003 Preliminary ARP its intention and reasonable expectation to spend in excess of the Aggregate Spending Target over the four-year Program Term, terminated "John Hancock's obligation to make any remaining Program Payments for any succeeding Program Years." John Hancock bases its position not only on the express terms of the Agreement, but also on the extrinsic evidence presented by the parties, which demonstrates that: (1) the obscure reference to "any extension period of the Program Term" in Section 1.43 of the Agreement is a vestige of an "alternative [deal] structure" that even Abbott admits was "abandoned" by the parties during negotiations; (2) the early negotiation memorandum that mentions the potential extension of the "Research program term" does not provide a basis to override the parties' subsequent agreement to fix the length of the separate and distinct "Program Term" at "four (4) consecutive Program Years"; and (3) interpreting the Agreement, in the face of Abbott's severe reduction in its planned spending on Program Related Costs, so as to terminate John Hancock's obligation to make Program Payments for succeeding Program Years is both commercially reasonable and consistent with the expectations of the parties.

31

C.     **The District Court Correctly Concluded, On All of the Facts and the Law, That The "Interpretation Proffered by Hancock Is The Only Reasonable One."**

The district court found the Agreement to be ambiguous with respect to Abbott's ability to "extend" the Program Term beyond four years for planning purposes and concluded, as a matter of fact based on the language of the Agreement as a whole and the extrinsic evidence offered by the parties, that the "interpretation proffered by Hancock is the only reasonable one." (SA1869). In making this ruling, the district court carefully considered, but ultimately rejected, each of the contrary arguments and points of evidence raised by Abbott below, and now on appeal. The court's various findings and conclusions have substantial support in the record and are not clearly erroneous for the reasons discussed below.

1.     **The District Court's Interpretation Is Consistent with the Agreement's Express Terms.**

The district court commenced its analysis with a brief review of the relevant language of Sections 3.4(iv) and 3.3(b) of the Agreement, as well as the dramatic decline in Abbott's planned spending on Program Related Costs as reflected in its various ARPs. From these facts, which it accurately described as "undisputed," the court concluded:

> it is patently clear that as of December 2002, Abbott failed to demonstrate to Hancock its "intent and reasonable expectation" to expend the $614 million Aggregate Spending Target on Program

32

> Related Costs by the end of 2004. These undisputed facts would seem
> to compel the conclusion that under the plain meaning of the
> Agreement terms, Hancock was thereby relieved of any obligation to
> make Program Payments to Abbott for 2003 and 2004.

(SA1872).

Abbott does not dwell on the language of Section 3.4(iv) on appeal because it

recognizes that it cannot prevail if that provision – which, on its face, supports John

Hancock's interpretation – is given its plain meaning. Instead, Abbott repeatedly

asserts that Section 3.3(b) "permits Abbott to 'change' its funding obligations under

§ 3.2, including its obligation to meet the $614 million [Aggregate Spending Target]

within four years, by 'carrying over' its funding obligation into a fifth year." *E.g.*,

Abbott Brief at 12, 29, 31, 42. While it is undisputed that Section 3.3(b) of the

Agreement *does* in fact permit Abbott to expend any difference between its

expenditures for Program Related Costs during the four-year Program Term and the

Aggregate Spending Target "during the subsequent year immediately commencing

after the end of the Program Term," Abbott's argument is a classic red herring. The

critical issue below was not whether Abbott could "change" its actual spending on

Program Related Costs under Section 3.3(b) to encompass the year subsequent to the

four-year Program Term, but rather whether Abbott *could "extend" the length of the*

*Program Term itself.*

33

This Abbott could not do.  Section 3.4(iv) of the Agreement plainly provides that John Hancock's payment obligations "for any succeeding Program Years" terminate if Abbott "does not reasonably demonstrate in its [ARP] its intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target [or $614 million]." (SA15).  As the district court observed, the Program Term is expressly defined, without exception, to mean "a period of four (4) consecutive Program Years," and a "Program Year" is expressly defined as "a period of twelve (12) consecutive calendar months commencing on January 1 of each year, except that the first Program Year shall commence on the Execution Date [March 13, 2001] and end on December 31, 2001." (SA11, 1873).  Thus, assuming Section 3.4(iv) of the Agreement means what it says, if Abbott ever failed to demonstrate in any ARP provided to John Hancock during the Program Term that it *then intended and reasonably expected* to spend at least the Aggregate Spending Target during the period from March 13, 2001 to December 31, 2004, John Hancock's obligation to make subsequent any Program Payments automatically terminated.

That is exactly what happened in this case when Abbott submitted its 2003 Preliminary ARP to John Hancock in December 2002, which indisputably failed to demonstrate that Abbott intended or reasonably expected to expend on Program

34

Related Costs during the March 13, 2001 to December 31, 2004 period an amount in excess of the Aggregate Spending Target. Pursuant to Section 3.4(iv) of the parties' Agreement, John Hancock's obligation to make its third and fourth Program Payments terminated upon Abbott's submission of that ARP.

The district court was persuaded by the evidence and simple logic that Abbott's "carryover" rights under Section 3.3(b) are separate from, and have no effect upon, Abbott's separate obligations under Section 3.4(iv). It said,

> [t]he "Carryover Provisions" in § 3.3 of the Agreement make no mention of any extension of the Program Term. Instead, § 3.3(b), which addresses the ability of Abbott to "carryover" its funding obligations with respect to the Aggregate Spending Target, provides that "[i]f Abbott does not expend on Program Related Costs the full amount of the Aggregate Spending Target during the Program Term, Abbott will expend" this deficit – the so-called "Aggregate Carryover Amount" – "during the subsequent year commencing immediately after the end of the Program Term." The grammatical structure suggests that the provision was a contingency clause requiring Abbott to meet the Aggregate Spending Target in a fifth year if, by the end of the four-year Program Term, it had failed to do so.... Certainly, if the Agreement otherwise provided for the extension of the "Program Term," the "subsequent year ... after the end of the Program Term" language could reasonably be interpreted, as Abbott suggests, as referring to the end of the initial four-year Program Term. However, in the absence of any mechanism for the extension of the Program Term under the terms of the Agreement – as opposed to the extension of the deadline by which Abbott was required to meet the Aggregate Spending Target – Hancock is well advised to highlight this language.

(SA1874-75) (emphasis in original).

35

Abbott's strained interpretation of Sections 3.3(b) and 3.4(iv) is no more compelling on appeal. Abbott still does not identify a "mechanism for the extension of the Program Term" anywhere in the Agreement.[4] That result is not surprising because none exists. Instead, Abbott would have this court *imply* such a provision in the Agreement notwithstanding Abbott's explicit admonishment in its own opening brief that "the 'rights of the parties to a contract are limited by the terms expressed in the contract' and courts 'will not add another term about which an agreement is silent.'" Abbott Brief at 31 (*quoting* <u>Klemp v. Hergott Group, Inc.</u>, 267 Ill. App. 3d 574, 641 (1994)). The district court heeded that admonishment and rejected Abbott's invitation to read a new term – one granting Abbott the right

---

[4] Abbott asserts on appeal that "the Agreement actually *does* contain a 'mechanism for the extension of the Program Term.' The mechanism is § 3.3(b)." Abbott Brief at 34 (emphasis in original). This argument, however, does not advance the ball. As previously noted, nothing in the language of Section 3.3(b) purports to grant Abbott the right to "extend" anything, let alone the four-year Program Term. Moreover, Abbott still has not explained why, if Section 3.3(b) works to "extend" the Program Term from four to five years, the text of that Section explicitly makes reference to the "Program Term and ... *the subsequent year commencing immediately after the end of the Program Term.*" (SA15) (emphasis added). Since, by definition, the four-year Program Term must have ended before the "subsequent year" referred to in Section 3.3(b) could commence, that subsequent year cannot logically be within the "extended" Program Term.

When John Hancock raised this point below, Abbott dismissed it, without explanation, as "pure sophistry." (SA1875). The district court, however, found it to be persuasive and observed that, "[g]iven the slender supports upon which Abbott erects its proposed contract interpretation, it should be wary of casting such aspersions." (SA1875). Having no other response, Abbott simply ignores the point on appeal.

to "extend" the four-year Program Term for planning purposes – into the parties'
Agreement. That decision is not clearly erroneous. It should be affirmed.

### 2. The District Court's Interpretation Is Consistent With The Agreement's Drafting History.

The district court next considered the drafting history of the Agreement and
found that it confirmed, rather than contradicted, John Hancock's interpretation of
Sections 3.4(iv) and 3.3(b). The district court carefully traced the origin of the
obscure reference to an "extension period of the Program Term" in the contractual
definition of "Program Related Costs" through various drafts of the Agreement. It
made extensive factual findings in this regard, the most significant of which are:

> [t]he words were added to the Agreement in the November 27, 2000
> draft, which was produced in the course of the parties' negotiations
> regarding an alternative structure proposed by Hancock. Pursuant to
> this alternative structure, the initial Program Term was five years and
> thereafter could be extended by an "Extension Period," which was
> explicitly defined as the period between the end of the five-year
> Program Term on December 31, 2005 and the date on which Abbott
> received regulatory-approval from the FDA to market a product
> containing one or more of the Program Compounds as an active
> ingredient in the U.S. (SA1880).
>
> In the November 16, 2000 draft, the first one reflecting the proposed
> alternative structure, "Extension Period" was included as a defined
> term in the "Definitions" section. Its definition referred the reader to
> Section 3.1 for the precise meaning of the phrase. The definition of
> "Program Term" in this draft read "a period of five (5) consecutive
> Program Years[, as extended by the Extension Period]" (alteration in
> original). "Extension Period" also appeared as a defined term in the
> November 27, 2000 draft, a draft in which the modification to the

37

definition of "Program Term" suggested in the November 16, 2000 draft was finalized. (SA1880).

By the next draft of the Agreement, which was dated January 23, 2001, the parties had abandoned the proposed alternative structure. Accordingly, the definition of Program Term was changed back to read "a period of four (4) consecutive Program Years," and all references to a fifth Program Year in the original Program Term and to an "Extension Period" of the Program Term thereafter were deleted from § 3.1, which, as noted above, is where the definition of "Extension Period" was set forth. (SA1881).

Apparently due to an oversight, "Extension Period" was still listed in the "Definitions" section of the January 23, 2001 draft, but the definition provided – "'Extension Period' shall have the meaning given in Section 3.1" – had been rendered meaningless by the deletion of the relevant text from § 3.1. The only other reference to an "extension period" of the Program Term that survived in the January 23, 2001 draft was the one now at issue, which was buried within the definition of "Program Related Costs." (SA1881).

In reviewing the March 8, 2001 draft of the Agreement, counsel for Hancock recognized that "Extension Period" should be deleted from the "Definitions" section of the Agreement, as the parties had since abandoned the alternative structure to which it applied. Accordingly, counsel made a handwritten notation next to "Extension Period" in the "Definitions" section reading "this term is no longer used." The line was marked for deletion and the text "[Intentionally Omitted.]" was to be substituted. In this round of revisions, the reference to an "extension period of the Program Term" contained in the definition of "Program Related Costs" once again escaped notice and was not marked for deletion. (SA1881-82).

In the final version of the Agreement, which was dated March 13, 2001, the line in the "Definitions" section where "Extension Period" had previously appeared read "[Intentionally Omitted.]"; "Program Term" was defined as "a period of four (4) consecutive Program Years; and the only reference to an "extension period of the Program

Term" was the one contained in the definition of "Program Related Costs." (SA1882).

Abbott asserts on appeal that the district court improperly "ignored [the] reference to an 'extension period' of the Program Term" in its decision (Abbott Brief at 34), but the forgoing findings demonstrate that the court did exactly the opposite. The district court, in fact, expended considerable time and effort analyzing the parties' Agreement and seeking to construe its various provisions in a consistent and reasonable manner. In doing so, the court expressly acknowledged its duty under Illinois law to "reconcile[] or harmoniz[e]" any "conflicting or inconsistent" provisions in that Agreement (*quoting* In re Halas, 104 Ill. 2d 83, 92 (1984)), as well as the general rule of construction that the evidence of the parties' negotiations often "furnish[es] the best definition to be applied in the construction of the contract itself" (*quoting* Rybicki v. Anesthesia & Analgesia Assoc., Ltd., 246 Ill. App. 3d 290, 299-300 (4th Dist. 1993)). (SA1867, 1878).

In the end, the district court only was able to reconcile the ambiguous reference to "any extension period of the Program Term" in the Agreement's definition of "Program Related Costs" with the fixed length of the Program Term (*i.e.*, "four (4) consecutive Program Years"), and the ultimate lack of any contractual "mechanism" by which Abbott could "extend" the Program Term, by

39

concluding, with ample evidentiary support, that the reference was a "vestige" of a prior, alternative deal structure that the parties abandoned in early 2001. The district court concluded:

> [t]he drafting history demonstrates that the reference to an "extension period of the Program Term" was added to the definition of "Program Related Costs" while the parties were negotiating an alternative structure under which "Extension Period" was a defined term with a precise meaning, i.e., the period between the end of the then-contemplated five-year Program Term and the occurrence of certain regulatory events. The carryover provision by which Abbott argues it could extend the Program Term to five years under the final Agreement pre-dated the insertion of this phrase and, notably, makes no reference – by the words "extension period", "Extension Period" or otherwise – to any extension of the Program Term. Once the parties returned to a four-year Program Term structure, all other references to the "Extension Period," including the one contained in the definition of Program Term, were deleted through several rounds of edits. The drafting history suggests, therefore, that the phrase was added in the course of and in light of the parties' negotiations about the alternative structure proposed by Hancock, and survived the return to the four-year Program Term structure only on account of an editing oversight.

(SA1882-83).

Abbott does not dispute the accuracy of the district court's recitation of the drafting history of the Agreement, but argues that "it was a fundamental *legal* error for the court to disregard as surplusage this explicit textual support for an extendable Program Term incorporated into the crucial provisions of §§ 3.3(b) and 3.4(iv)." Abbott Brief at 35 (emphasis in original). The interpretation of an ambiguous contract is a *factual* issue to be resolved by the factfinder, however, and

40

by agreeing to submit this action to the district court on a "case-stated" basis, John Hancock and Abbott empowered the court to act as factfinder with respect to any and all unresolved factual issues. *See* Accusoft Corp. v. Palo, 237 F.3d 31, 40 (1st Cir. 2001) ("factual findings concerning the intent of the parties where contract language is ambiguous" are not to be disturbed on appeal "unless they are clearly erroneous."); United Paperworkers, 64 F.3d at 31 (in "case stated" proceeding, district court is "freed from the usual constraints that attend the adjudication of summary judgment motions, and may engage in a certain amount of factfinding, including the drawing of inferences.") (citations and quotations omitted). The district court ultimately determined, in its capacity as factfinder, that the plain language of Sections 3.4(iv) and 3.3(b) of the Agreement cannot be, and is not, superseded by "ambiguous" language left in an "irrelevant subpart" through an "editing oversight." The court's finding is not clearly erroneous. *See* Gerow v. Rohm & Haas Co., 308 F.3d 721, 724 (7th Cir. 2002).

The decision of the Court for Appeals for the Seventh Circuit in Gerow v. Rohm & Haas Co., *supra*, is instructive in the present circumstances. Gerow was a senior executive of Morton International ("Morton") who had a "golden parachute" employment agreement that entitled him to various monetary benefits in the event that Morton was acquired by another company (the "Morton Agreement"). 308

41

F.3d at 722. Morton was acquired by defendant Rohm & Haas Company ("Rohm & Haas") in 1999, after which Gerow signed a new contract with Rohm & Haas that terminated his employment and granted him certain severance benefits. *Id.* Unfortunately, Gerow's new contract with Rohm & Haas (which was governed by Illinois law) slavishly tracked the language of the prior Morton Agreement such that its express terms simultaneously and illogically provided *both* for the plaintiff's continued employment *and* for his immediate termination. *Id.* at 723. Gerow eventually sued Rohm & Haas, claiming an additional $10 million in unpaid salary and benefits. *Id.* at 722. The district court entered summary judgment for Rohm & Haas, and the Court of Appeals affirmed. *Id.* at 726.

In its opinion, the Court of Appeals discussed at length the inherent contradictions contained in Gerow's contract with Rohm & Haas, and justified its decision that Gerow was not entitled to be compensated twice for being both employed and unemployed, in part, because the contract's illogical structure was "attributable not to some subtle effort to reflect Gerow's status, but to its genesis in the Morton Agreement, which dates to 1990." *Id.* at 724. Ultimately, the Court of Appeals concluded,

> Gerow's reading of this contract ... makes no business sense, while Rohm's reading is practical. And it is a fundamental principle of contractual interpretation that courts read language to make business sense whenever possible.

42

*Id.* at 725 (*citing* <u>Beanstalk Group, Inc. v. AM General Corp.</u>, 283 F.3d 856 (7th Cir. 2002)).

In this case, the district court found that the interpretation of Sections 3.4(iv) and 3.3(b) of the Agreement proffered by Hancock "is the only reasonable one." (SA1869). That determination was based not only on the actual language of the Agreement, but also on a thorough examination of the origin and history of its relevant terms, including the genesis of the reference to "any extension period of the Program Term" in the Agreement's definition of "Program Related Costs." The district court did not "ignore" any of Abbott's evidence or arguments in making its finding. Rather, it expressly considered and rejected Abbott's evidence and arguments as inconsistent with the actual intent of the parties. The court's resulting finding as to the intended meaning of Sections 3.4(iv) and 3.3(b) is not only not clearly erroneous, it is the only finding that makes sense in the circumstances. It should be affirmed.

### 3. The District Court's Interpretation Is Consistent With Other Extrinsic Evidence Offered by the Parties.

The district court considered other extrinsic evidence offered by the parties and found that it "could be understood in a manner consistent with Hancock's reading of the Agreement and the drafting history." (SA1883). More specifically, the court

43

considered the September 18, 2000 memorandum that John Hancock's outside counsel sent to Abbott's negotiating team early in the negotiation process (the "September 2000 Memo"), in which Hancock's counsel wrote, *inter alia*, "[i]f the Research program term is extended (for instance, if Abbott's expenditures are 'carried over' in accordance with Section 3.3(ii)), we believe that the Royalty Term should be extended beyond December 31, 2014." (SA1884). Abbott cites the September 2002 Memorandum as proof positive that "the carrying over of expenditures under § 3.3 extends the Program Term." Abbott Brief at 43. What Abbott overlooks, however, is the distinction that exists in the Agreement between the "Program Term," which is defined, without exception, in Section 1.44 as "four (4) consecutive Program Years," and the "*Research* Program Term," which is defined in Section 2.1 as the period "during the Program Term, and beyond the Program Term until Abbott either abandons development is accordance with the terms hereof or receives Regulatory Approval for each Program Compound, or some combination thereof." (SA11-12).

Thus, the reference in the September 2000 Memo to a possible extension of the "Research program term," which is admittedly variable in length, actually provides little, if any, support for Abbott's ability to extend the four-year "Program Term," which is not.

44

When deposed by Abbott more than four years after preparing the September 2000 Memo, John Hancock's outside counsel could not recall any additional information regarding the intended meaning of his reference to a possible extension of the "Research program term" in that memorandum. The district court took note of this unsurprising fact, but said:

> [i]n any event, this document cannot overcome the weight of the extrinsic evidence pointing to the conclusion that the Program Term was fixed at four years and was not extended by Abbott's exercising its right to meet the Aggregate Spending Target in the "subsequent year commencing immediately after the end of the Program Term."

(SA1884). Notwithstanding Abbott's arguments to the contrary, the "weight of the extrinsic evidence," which the district court considered in its role as ultimate factfinder, has not changed. Neither should the result.

The district court also considered Abbott's argument that textual support for its interpretation of Sections 3.4(iv) and 3.3(b) could be found in Abbott's "First Annual Research Plan," which was appended to the Agreement as Exhibit 1.6. (SA52). Abbott asserts that the inclusion of spending projections for the years 2001-05 in that ARP confirms that the Program Term was intended to extend five, rather than four, Program Years. Abbott Brief at 35-36. The district court rejected Abbott's argument, noting that:

> Abbott failed to mention the fact that the first ARP also listed projected spending for 2000, the year prior to the commencement of

45

the Program Term. The appearance, therefore, of projected spending for 2005 in the first ARP carries no weight in assessing whether the parties intended for Abbott to be able to extend the Program Term to five years by exercising its carryover rights.

(SA1883) (emphasis in original).

Abbott endeavors to blunt the court's criticism on appeal by asserting that the 2000 spending data in its first ARP was "actual," as opposed to "projected" data. Abbott Brief at 36. What Abbott again fails to mention, however, is that its *second* ARP, delivered to John Hancock in late 2001, also contained projected spending for *2006*, a year that clearly falls outside the Program Term under any interpretation of the Agreement. (SA506-07). Thus, the district court was fully justified in finding that the inclusion in Abbott's ARPs of spending data for years other than 2001 through 2004 "carries no weight in assessing whether the parties intended for Abbott to be able to extend the Program Term to five years by exercising its carryover rights." (SA1883).

Finally, the district court considered a variety of contemporaneous documents from both Abbott and John Hancock, as well as excerpts from the deposition testimony of various Abbott witnesses, each of which mentioned or acknowledged that Abbott was permitted under Section 3.3(b) of the Agreement to "extend its funding obligations into a fifth year." (SA1885). The district court found this further evidence to be unremarkable and unpersuasive. It said:

46

Hancock does not dispute that Abbott, pursuant to the carryover provisions of the Agreement, could meet the Aggregate Spending Target in a fifth Program Year that would commence immediately after the end of the four-year Program Term. This carryover option is not equivalent to, and the text providing for it makes no reference to, an option to extend the Program Term beyond four years. Furthermore, the opportunity for Abbott to have a fifth year in which to meet the $614 million Aggregate Spending Target, should it fail to do so within four years, is not inconsistent with a requirement that it plan to spend the amount in four years. It is this distinction between planning and spending that gives the planning prong of the Agreement some weight. Abbott was required to plan to spend the amount within four years but, appreciating that circumstances might change, was given the flexibility to spend it in a fifth year should it fall short of the target at the end of the four-year Program Term.

(SA1885).

Other than making a passing reference to the same evidence again in its opening brief (Abbott Brief at 45-46), Abbott does not explain on appeal why such evidence compels a different conclusion, or why the district court's findings with respect to its lack of significance should be disregarded as clearly erroneous.[5] The

---

[5] Abbott's reference in its Statement of Facts to an internal John Hancock memorandum authored by Mr. John Mastromarino in March 2003 that criticized the funding arrangement memorialized in the Agreement as "too rich for my taste" (the "Mastromarino Memo") is a classic red-herring. Abbott Brief at 16. The causal relationship, if any, between the Mastromarino Memo and John Hancock's decision to seek a declaratory judgment confirming that Abbott had failed to demonstrate its "intention and reasonable expectation to spend an amount in excess of the Aggregate Spending Target on Program Related Costs" over the four-year Program Term in its 2003 Preliminary ARP was disputed below. (SA1858). The district court ultimately found the Mastromarino Memo to be "irrelevant for purposes of this analysis," however, because the "termination provisions in § 3.4 of the Agreement do not require

(continued...)

47

evidence does not, and the court's findings should not.  To the contrary, the court's findings are entirely consistent with both the evidence and the express terms of the Agreement.  There was no error.

### 4. The District Court's Interpretation Is Not "Commercially Unreasonable" And Does Not Result In A "Windfall" For John Hancock.

Abbott argues at considerable length that the district court's interpretation of the Agreement also must be reversed on appeal because it allegedly is, *inter alia*, "commercially unreasonable," "economically irrational," "destruct[ive] of the economic basis of the bargain between the parties," and results in "a windfall to Hancock." Abbott Brief at 3, 20, 36, 39.  According to Abbott:

> [t]he economic consequences are exactly the same if Abbott's estimates of its projected spending track the same five-year period over which Abbott actually is allowed to spend the $614 million aggregate minimum.

*Id.* at 38.  Abbott further argues that:

> the district court's construction allows Hancock to receive the entire benefit of its bargain -- Abbott's expenditure of more than $400 million of its own development funds through 2005 and a percentage royalty on sales of commercialized compounds -- while reducing by more than half the corresponding burden that Hancock undertook in exchange.

---

[5](...continued)
Hancock to possess a particular state of mind in order to invoke them." (SA1858).
Abbott does not challenge that ruling on appeal.

*Id.*

John Hancock contends, conversely, that a literal construction of Sections 3.4(iv) and 3.3(b) of the Agreement is eminently logical and reasonable. As manifested by the express language of the Agreement, the parties obviously intended that Abbott could avail itself of its carryover rights under Section 3.3(b) without compromising its right to receive Program Payments from John Hancock *if, but only if,* Abbott intended and reasonably expected at the start of the each Program Year during the Program Term to spend the entire Aggregate Spending Target during the four-year Program Term.

Thus, for example, with respect to the fourth and final Program Year of the Program Term, Abbott could avail itself of its carryover rights under Section 3.3(b) without compromising its rights to Program Payments from John Hancock if, but only if, it intended and reasonably expected at the start of that Program Year to spend the remaining balance of the Aggregate Spending Target during that Program Year in accordance with Section 3.4(iv), but, notwithstanding that intent and reasonable expectation, it nonetheless did not spend the remaining balance of the Aggregate Spending Target during that Program Year. Section 3.3(b) thereby protected Abbott against an unforeseen failure to spend the Aggregate Spending Target during the Program Term, notwithstanding its good faith intent to do so at the commencement of each Program Year, and helped to reduce any incentive Abbott otherwise might have

49

had to engage in unnecessary or wasteful spending during the four-year Program Term. Such a construction of Section 3.3(b) not only is logically compelled by its plain language, but also is in complete harmony with the construction required by the plain and unambiguous language of Section 3.4(iv) and the sworn testimony of the very Abbott employees who negotiated the Agreement on its behalf. (*See* SA732, 709) (Stephen Cohen testified that Section 3.3(b) was intended to address unforeseen circumstances; Philip Deemer echoed this understanding).

The timing of Abbott's planned spending on the development of the Program Compounds was of particular significance to John Hancock because, regardless of the commercial introduction dates of any of those compounds, John Hancock's right to receive milestone and royalty payments from Abbott under the Agreement ends, under all circumstances, no later than December 31, 2015. (SA12). Accordingly, it is commercially reasonable for the Agreement to contain provisions that strongly incentivize Abbott to *endeavor* to spend at least a minimum amount on Program Related Costs – *i.e.*, the Aggregate Spending Target – within the four-year Program Term, even if it simultaneously contains provisions that protect Abbott against an *unintended* failure to have actually met the Aggregate Spending Target during that same period. (SA12). Section 3.4(iv) was intended by the parties to provide that incentive. While there is little doubt that the parties also could have negotiated and

50.

agreed in March 2001 that Abbott could *plan* to spend the Aggregate Spending Target over the four-year Program Term and the "subsequent year" as Abbott now contends, they did not do so. The choice that the parties made at the time of contracting makes economic sense and should not be disturbed. *See* Wright v. Chicago Title Insurance Co., 196 Ill. App. 3d 920, 925 (1990) ("a court will not rewrite a contract to suit one of the parties").

Moreover, it is not true, as Abbott insists, that the district court's interpretation of the Agreement results in a "windfall" to John Hancock, allowing it to "receive the entire benefit of its bargain ... while reducing by more than half the corresponding burden that Hancock undertook in exchange." Abbott Brief at 38. This argument ignores the obvious and undisputed fact that the commercial prospects for the "basket" of Program Compounds encompassed by the Agreement, as measured by Abbott's own ARPs, has diminished *by more than half* since the Agreement was signed in March 2001. (SA1212). This dramatic reduction in the level of Abbott's anticipated expenditures during the four-year Program Term reflects the fact that the majority of Program Compounds have failed and/or been abandoned by Abbott. (SA1212). The resulting reduction in Abbott's expenditures has had corresponding and predictable financial consequences for John Hancock. While it is true that John Hancock still will obtain the "benefit of its bargain" under the terms of the

51

Agreement, the economic reality is that the likely value of that benefit, if any, is far less today than it was when the Agreement was executed. Viewed in the context of this economic reality, Section 3.4(iv) of the Agreement bestows no "windfall" on John Hancock. To the contrary, it has fulfilled its intended role as a mechanism for John Hancock to reduce its level of investment in the Program Compounds in the same manner, and to roughly the same degree, as Abbott has reduced its own level of investment in those compounds in the circumstances of this case.

What constitutes "commercial reasonableness is a question of fact[.]" <u>United States v. Warwick</u>, 695 F.2d 1063, 1071 (7th Cir. 1982); <em>cf.</em> <u>Hanover Ins. Co. v. Comm. of Internal Revenue</u>, 598 F.2d 1211, 1220 (1st Cir. 1979) (what constitutes a "fair and reasonable estimate" of a taxpayer's losses is a "question of fact"); <u>New England Railroad Co. v. Hyde</u>, 101 F. 401 (1st Cir. 1900) (what constitutes "reasonable conduct and reasonable action" are "questions of fact"). In this case, district court considered all of the arguments and the evidence submitted by the parties and found, as a matter of fact, that the Agreement, as interpreted by John Hancock (and by the court), was not "commercially unreasonable." (SA1888). In reaching its decision, the district court explained that:

> [i]n the ARP for each Program Year, Abbott was required to demonstrate its intention and reasonable expectation to meet the Aggregate Spending Target within the four-year Program Term, Based on Abbott's initial projected spending of $1.2 billion during

52

this period, which dwarfed the $614 million Aggregate Spending Target, this must have seemed both a reasonable and an achievable requirement at the time the parties executed the Agreement. Evidencing a certain prudence and a recognition that circumstances could change, the parties provided Abbott with an escape hatch of sorts – namely, the ability to make up any difference between the amount it had expended by the end of the four-year Program Term and the Aggregate Spending Target. This could be done next year, i.e., the fifth Program Year. But in providing Abbott with this carryover option, the parties did not relieve Abbott of its obligation to plan to spend the entire $614 million Aggregate Spending Target by December 31, 2004. In other words, Abbott was not free to decide on March 14, 2001 that it would spend only the Annual Minimum Spending Target during the next three years and then "make up" the difference between that amount and the Aggregate Spending Target in 2005. As set forth clearly in § 3.4 of the Agreement, in order for Hancock's payment obligations to continue, Abbott needed to plan to meet the Aggregate Spending Target by December 31, 2004. If, during 2004, Abbott found that it would not be able to meet the Aggregate Spending Target during that year, it had the option under § 3.3 to bridge the gap during 2005 without risking the forfeiture of future payments from Hancock as a result.

(SA1887-88).

The district court acknowledged that the incentive structure of the Agreement was "vulnerable to critique" in that, "in order to "avoid forfeiting future payments from Hancock," Abbott "might be forced to allocate funds in an inefficient manner," but it held that such a lack of perfection "does not render the Agreement 'commercially unreasonable' or an 'absurd result' requiring the court to cast aside the literal interpretation of its terms." (SA1888-89) (*citing and quoting*

53

McMahon v. Chicago Mercantile Exchange, 221 Ill. App. 3d 935, 946 (1st Dist.

1991)).  It said:

> [a]t the time of formation, the parties could have modified the
> definition of Program Term to read "four (4) consecutive Program
> Years[, and a fifth year should Abbott exercise its carryover rights
> under Section 3.3(b).]"  Alternatively, the text of § 3.4(iv) could have
> been changed to provide that Abbott demonstrate in the ARPs its
> "intent and reasonable expectation to spend on Program Related Costs
> during the Program Term [and the following year, should Abbott need
> to exercise its carryover rights under § 3.3(b)] an amount in excess of
> the Aggregate Spending Target."  I will not inject this saving language
> into either the definition of "Program Term" or into § 3.4, because "a
> presumption exists in Illinois 'against provisions that easily could
> have been included in the contract but were not ....  A court will not
> add a term about which an agreement is silent.'"  Abbott's frustration
> at failing to address in advance the contingency it now faces will not
> serve to rewrite this contract and it is bound by the terms it negotiated
> with Hancock.

(SA1889-90) (citations omitted).

In the end, Abbott again offers no reason – other than its own dissatisfaction

with the Agreement's "'inefficient' economic incentives" and the foreseeable fallout

of its voluntary decision to dramatically reduce its spending on Program Related

Costs over the four-year Program Term below the Aggregate Spending Target – to

overturn the district court's decision.[6]  Abbott Brief at 40-41.  Abbott's dissatisfaction

---

[6] Abbott's argument that the district court's interpretation of the Agreement leads to
"absurd results" because it could incentivize Abbott, in certain hypothetical
circumstances, to be less than candid in reporting its spending plans to John Hancock
in order to avoid being "penalized" under Section 3.4(iv), is wholly unpersuasive.
(continued...)

54

notwithstanding, the relevant facts and the law demonstrate that the district court's interpretation of the Agreement is well-reasoned, well-supported in the record, and not clearly erroneous. It should be affirmed.

## II.    THE DISTRICT COURT DID NOT ERR, CLEARLY OR OTHERWISE, IN CONCLUDING THAT ABBOTT'S ADMITTED FAILURE TO PROVIDE JOHN HANCOCK WITH A COMPLIANT ARP IN 2002 DID NOT ENTITLE ABBOTT TO RECEIVE AN ADDITIONAL $58 MILLION PROGRAM PAYMENT FOR 2003.

Abbott's "Plan B" is reflected in its argument that, even assuming Abbott's failure to demonstrate its intention and reasonable expectation to spend an amount in excess of the Aggregate Spending Target on Program Related Costs over the four-year Program Term terminated John Hancock's obligation to make Program Payments for any remaining Program Years pursuant to Section 3.4(iv), Hancock still owes Abbott a $58 million Program Payment for 2003 because the "triggering event" for purposes of determining when Hancock's payment obligation terminated occurred in 2003, not in 2002. Abbott Brief at 48.

---

[6](...continued)
Abbott Brief at 40. Enforcing the Agreement according to its express terms hardly qualifies as a penalty, and expecting Abbott to be forthright in its communications with John Hancock certainly is neither illogical, nor unreasonable. It is, rather, the law. DeWitt County Public Bldg. Com'n. v. DeWitt County, 128 Ill. App. 3d 11, 18 (1984) (every contract contains an implied promise of good faith and fair dealing between the contracting parties).

55

Section 3.4 of the Agreement provides, in part, that, "[f]or the avoidance of doubt, the Program Payments for the Program Year in which *such event* occurs shall still be due and payable...." (SA15) (emphasis added). Abbott interprets the phrase "such event" as necessarily meaning Abbott's submission of a fully compliant ARP demonstrating Abbott's intention and reasonable expectation to spend less than the Aggregate Spending Target on Program Related Costs over the four-year Program Term. Abbott Brief at 53-54. In Abbott's view, anything else – including Abbott's admitted submission in December 2002 of a non-compliant ARP that undeniably failed to demonstrate Abbott's intention and reasonable expectation to spend an amount in excess of the Aggregate Spending Target on Program Related Costs over the four-year Program Term – simply is not an "event" for purposes of Section 3.4. *Id.* at 54.

John Hancock, on the other hand, contends that Section 3.4 once again means what it says, and that Abbott's submission in December 2002 of an ARP which admittedly failed to demonstrate Abbott's "intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target" terminated Hancock's obligation "to make any remaining Program Payments for any succeeding Program Years[.]" John Hancock's position is based not only upon Abbott's technical failure to include the necessary

56

spending data in the ARP that it submitted in December 2002, but also upon the undisputed fact that Abbott *actually decided in late 2002 to reduce its planned spending on Program Related Costs over the four-year Program Term to an amount some $100 million less than the Aggregate Spending Target.* (SA171-72). Had Abbott disclosed its actual spending plans in its December 2002 ARP as it was required to do under Section 2.2 of the Agreement, those plans would have demonstrated to John Hancock in December 2002 that Hancock's obligation to make any Program Payments for any Program Years subsequent to 2002 had terminated pursuant to Section 3.4(iv) of the Agreement. (SA15). Thus, Abbott cannot "boot strap" its way into an additional $58 million Program Payment for 2003 by admittedly failing to comply with its reporting obligations in 2002.

The district court found the "triggering clause" language of Section 3.4 to be ambiguous because it is "'susceptible to more than one meaning or is obscure in meaning through indefiniteness of expression.'" (SA1891-92) (*quoting* Shields Pork Plus, Inc. v. Swiss Valley Ag. Service, 329 Ill. App. 3d 305, 310 (4th Dist. 2002)). The court then proceeded to construe the ambiguous language, as a matter of fact based upon the other terms of the Agreement and the available evidence, so as to provide that "the obligation-triggering event ... was Abbott's failure to reasonably demonstrate in an Annual Research Plan for 2003, 'its intent and reasonable

57

expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target.'" (SA1894) (emphasis in original).  In explaining its decision, the court said:

> I underline "for 2003" because it is clear from the definition of ARP in § 1.6 and the instructions in § 2.2 that the parties intended Abbott to present an ARP prior to the start of each Program Year that would include detailed objectives and the projected activities, timetables and budgets for the remaining Program Years in the Program Term.  Thus, the parties intended that the ARP for 2003 would be submitted to Hancock in 2002 and it would include detailed objectives and the projected activities, timetables and budgets for 2003 and 2004.  As a result, Abbott's failure to provide Hancock with a compliant ARP for 2003 occurred in 2002.  This is the most reasonable conclusion, despite the inherent problems associated with timeliness in the Agreement, that gives effect to the Agreement as a whole and the "intent of the parties at the time they entered into the contract."

(SA1894-95) (citations and footnotes omitted).  The court further stated that:

> the most reasonable interpretation yields the conclusion that the obligation-terminating event at issue – Abbott's failure to demonstrate to Hancock its intent and reasonable expectation to expend at least the remaining Aggregate Spending Target in 2003 and 2004 – took place in 2002, not 2003.

(SA1895).

The district court's determination that the Agreement, reasonably construed, provides that the "triggering event" for purposes of terminating John Hancock's payment obligations occurred in 2002, rather than 2003, is not clearly erroneous.  It is, in fact, entirely consistent with the language of Section 1.6, which clearly requires

58

that each ARP submitted by Abbott contain "a reasonably and consistently detailed statement of the objectives, activities, timetable and budget for the Research Program for every Program Year remaining in the Program Term," as well as Section 2.2, which clearly requires that Abbott submit its ARP to John Hancock "at least forty-five (45) days prior to the start of each Program Year." (SA5, 12-13). It also is entirely consistent with the notion that Abbott should not be permitted to profit – to the tune of *$58 million* – from its own admitted failure to comply in a timely manner with its reporting obligations under the Agreement. The district court ultimately concluded that the fact "Abbott did not actually provide deficient projections for 2004 until 2003, does not entitle it to receive an additional year's Program Payment from Hancock." (SA1895). There is no reason or justification in the record of this case to disturb that finding on appeal.

## III. THE DISTRICT COURT DID NOT ERR, CLEARLY OR OTHERWISE, IN DETERMINING THAT JOHN HANCOCK DID NOT WAIVE, AND WAS NOT EQUITABLY ESTOPPED FROM EXERCISING, ITS RIGHTS UNDER SECTION 3.4(iv) OF THE AGREEMENT.

In a final effort to extract an additional $58 million from John Hancock for 2003, Abbott argues that Hancock waived, or is estopped by its conduct from relying upon, Abbott's admitted failure to demonstrate its intention and reasonable expectation to spend an amount in excess of the Aggregate Spending Target on

59

Program Related Costs over the four-year Program Term in the ARP that Abbott submitted to Hancock in December 2002. Abbott Brief at 56. The "conduct" that Abbott cites as the basis for its waiver and estoppel arguments is John Hancock's act of making its Second Program Payment, in the amount of $54 million, in early 2003. *Id.* at 57. Abbott asserts that John Hancock was not, in fact, obligated to make that payment in January 2003 under Section 3.1 of the Agreement because, as of that point in time, Abbott had failed to provide Hancock with a compliant ARP. *Id.* at 56-57. From this initial premise, Abbott concludes that John Hancock "waived any ability to object or withhold future payments [under Section 3.4(iv)] based on the failure of the preliminary 2003 ARP to include post-2003 data," and wrongly "led Abbott to believe that the plan it submitted for 2003 was acceptable." *Id.* at 58.

The district court carefully considered, but ultimately rejected, Abbott's waiver and estoppel arguments on multiple grounds.

First, the district court found that John Hancock's obligation to make Program Payments for any succeeding years, including 2003, automatically terminated under Section 3.4(iv) of the Agreement when Abbott failed "to 'reasonably demonstrate' in the 'Preliminary' 2003 APR its 'intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the

60

Aggregate Spending Target." (SA1898-99). Accordingly, there was nothing for Hancock to "waive" or be estopped from doing.

Second, the district court accurately observed that, upon receipt of Abbott's ARP for 2003 in late December 2002, John Hancock's Second Program Payment for 2002 was due and payable under Section 3.4 *irrespective* of whether Abbott's ARP for 2003 demonstrated its intention and reasonable expectation to spend an amount in excess of the Aggregate Spending Target on Program Related Costs over the four-year Program Term or not. (SA1898). "In fact," the court noted,

> had Hancock <u>not</u> made the 2002 Program Payment after receiving the deficient 2003 APR in December 2002, Abbott would have had a cause of action against it for breach of contract. Hancock making this payment, therefore, did not constitute the "voluntary relinquishment of a known right, claim, or privilege," <u>Vaughn v. Speaker</u>, 126 Ill. 2d 150, 161 (1968), necessary in order for waiver to be found. *See also* <u>Wagner Excello Foods, Inc. v. Fearn International, Inc.</u>, 235 Ill. App. 3d 224, 232 (1st Dist. 1992) ("waiver is an intentional relinquishment of a known right"); <u>Whalen v. K-Mart Corp.</u>, 166 Ill. App. 3d 339, 343 (1st Dist. 1988) (same).

(SA1898) (emphasis in original).

Third, the district court found that John Hancock's act of making its Second Program Payment in January 2003 was not "'conduct indicating that strict compliance with the provision [§ 3.4(iv)] will not be required,' thereby establishing waiver." (SA1899) (*quoting* <u>Geier v. Hamer Enterprises, Inc.</u>, 226 Ill. App. 3d 372, 390 (1992)).

61

Fourth, the district court found that, "even if Hancock waived its right to suspend payment pursuant to § 3.1 until it received a complaint Annual Research Report for 2003 from Abbott," John Hancock "did not also thereby waive its rights under § 3.4" in light of the express language of Section 16.8 of the Agreement, titled "Waiver," which provides that,

> [t]he waiver by either party hereto of any right hereunder or the failure to perform or of a breach by the other party shall not be deemed a waiver of any other right hereunder or any other breach or failure by said other party whether of similar nature or otherwise.

(SA37) (emphasis in original); (SA1899).

Lastly, the district court noted that, in order to prevail on its defense of equitable estoppel, Abbott was required to prove, *inter alia*, that John Hancock had "misrepresented or concealed material facts." (SA1900) (*citing* Geddes v. Mill Creek Country Club, Inc., 196 Ill. 2d 302, 313-314 (2001)). The court expressly found, however, that John Hancock *had not* made any misrepresentations to, or concealed any material facts from, Abbott regarding the "'acceptability'" of Abbott's 2003 Preliminary ARP. (SA1901). Accordingly, the court held that Abbott had "failed to make a showing sufficient to establish the existence of essential elements of its equitable estoppel claim, the most important of which being the aforementioned misrepresentation or concealment." (SA1901).

Abbott does not even attempt to address on appeal most of the findings and rulings that the district court made in rejecting Abbott's waiver and estoppel arguments, including the obvious effect of Section 16.8, as well as Abbott's complete failure to prove that John Hancock "misrepresented or concealed material facts." This is not surprising, however, because Abbott *has no basis to challenge those findings*. The simple answer is that the district court did not err, clearly or otherwise, in deciding that John Hancock did not waive, and is not estopped from enforcing, its rights under Section 3.4(iv) of the Agreement. Its decision should be affirmed.

## CONCLUSION

This case involves the interpretation of ambiguous provisions in a heavily-negotiated contract for funding the development of human pharmaceutical products. The district court, sitting jury-waived, heard and considered the arguments of the parties and all of the relevant evidence on a "case stated" basis with the full assent of both sides. The court ultimately issued a thorough 65-page decision that addressed each of the issues raised below and concludes, based on the express terms of the parties' written agreement and the district court's ancillary findings of fact, that the "interpretation proffered by Hancock is the only reasonable one." For the reasons discussed above, the district court's findings and conclusions are not clearly erroneous. To the contrary, they are well-reasoned and well-supported by the record.

63

Accordingly, John Hancock respectfully requests that the resulting judgment of the district court be affirmed in all respects.

Respectfully submitted,

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK
VARIABLE LIFE INSURANCE
COMPANY, AND INVESTORS
PARTNER LIFE INSURANCE
COMPANY

By their attorneys,

Brian A. Davis (C.A. Bar No. 28610)
Joseph H. Zwicker (C.A. Bar No. 15320)
Stacy Blasberg (C.A. Bar No. 109066)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Tele: 617-248-5000

Date: April 3, 2006

64

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,864 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using WordPerfect Version 12 in 14 point Times New Roman font.

_____
Attorney for Appellee-Defendants John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and Investors Partner Life Insurance Company.

Date: April 3, 2006

65

ADDENDUM

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and INVESTORS PARTNER LIFE INSURANCE COMPANY,<br><br>    Plaintiffs and<br>    counter-defendants<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>    Defendant and<br>    counter-plaintiff. | Civil Action No. 03-12501-DPW<br><br>Hon. Judge Douglas P. Woodlock |

## DEFENDANT ABBOTT LABORATORIES' RESPONSE TO PLAINTIFF HANCOCK'S FIRST REQUEST FOR ADMISSIONS

Defendant Abbott Laboratories ("Abbott"), by its undersigned attorneys and pursuant to Rule 36 of the Federal Rules of Civil Procedure, hereby responds to Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and Investors Partner Life Insurance Company's (collectively, "Hancock") First Request For Admissions.

## GENERAL OBJECTIONS

The following General Objections and Responses apply to all the numbered Requests for Admission, and the General Objections and Responses shall be deemed continuing as to each individual Request for Admission and are not waived, or in any way limited, by the Specific Objections and Responses.

1.     Abbott objects to each request for admission to the extent it attempts to impose obligations on Abbott other than or beyond those imposed or authorized by the Federal Rules of Civil Procedure, the Local Rules of the United States Court for the District of Massachusetts, and/or applicable Orders of this Court.

2.     Abbott objects to each request for admission to the extent that it seeks disclosure of information containing privileged communications, attorneys' work product or trial preparation material, on the ground that such discovery is not permissible under federal law. The inadvertent disclosure of such information is not intended to be a waiver of any privilege or protection and shall not be deemed a waiver of any privilege or protection.

3.     Abbott objects to these requests for admissions to the extent that they are overly broad, unduly burdensome, calculated to harass, duplicative and not reasonably calculated to lead to the discovery of admissible evidence.

4.     Abbott objects to these requests for admissions to the extent they are vague and ambiguous and call for speculation outside the personal knowledge of Abbott's representatives.

5.     Abbott expressly reserves the right to supplement its responses and objections to these requests as additional information becomes available to it in the course of this litigation.

6.     These General Objections are incorporated by reference into each of Abbott's specific responses below.

Subject to these General Objections, and without waiving the same, Abbott answers as follows:

2

## RESPONSES TO ADMISSIONS

1.      The document attached to these Requests for Admissions as <u>Exhibit A</u> is an authentic copy of Abbott's 2001 Annual Research Plan, a copy of which was attached to the Research Funding Agreement as <u>Exhibit 1.6</u>.

<u>Response</u>:      Subject to its General Objections, and without waiving its General Objections, Abbott admits that Exhibit A contains Exhibit 1.6 to the Research Funding Agreement as well as materials not part of Exhibit 1.6 to the Research Funding Agreement.   Except as expressly admitted, Abbott denies this request.

2.      The information contained in Abbott's 2001 Annual Research Plan was truthful and accurate to the best of Abbott's knowledge information and belief as of the time that the 2001 Annual Research Plan was provided to John Hancock.

<u>Response</u>:     Abbott specifically objects to the request on the grounds that it is vague, overly broad, and ambiguous and neither relevant to the claims asserted in the litigation, nor reasonably likely to lead to the discovery of admissible evidence.   The request is vague and ambiguous because, among other things, it asks Abbott to admit or deny the truthfulness and accuracy of projected or estimated data.  Abbott further objects to this request on the grounds that the request fails to separately set forth each matter on which an admission is requested as is required by FED. R. CIV. P. 36.

3.      The document attached to these Requests for Admission as <u>Exhibit B</u> is an authentic copy of Abbott's 2002 Annual Research Plan, as provided to John Hancock.

3

**Response:**     Subject to its General Objections, and without waiving its General Objections, Abbott admits this request.

4.     Abbott did not provide John Hancock with any version of Abbott's 2002 Annual Research Plan other than the version that is attached to these Requests for Admission as <u>Exhibit B</u>.

**Response:**     Abbott specifically objects to this request as vague and ambiguous.  Subject to and without waiving these objections and its General Objections, Abbott admits that it neither sent, nor did Hancock request, any other formal written 2002 Annual Research Plan other than that attached as Exhibit B.  Except as expressly admitted, Abbott denies this request.

5.     The information contained in Abbott's 2002 Annual Research Plan was truthful and accurate to the best of Abbott's knowledge, information and belief as of the time that the 2002 Annual Research Plan was provided to John Hancock.

**Response:**     Abbott specifically objects to the request on the grounds that it is vague, overly broad, and ambiguous and neither relevant to the claims asserted in the litigation, nor reasonably likely to lead to the discovery of admissible evidence.  The request is vague and ambiguous because, among other things, it asks Abbott to admit or deny the truthfulness and accuracy of projected or estimated data.  Abbott further objects to this request on the grounds that the request fails to separately set forth each matter on which an admission is requested as is required by FED. R. CIV. P. 36.

4

6.    The document attached to these Requests for Admission as <u>Exhibit C</u> is an authentic copy of Abbott's 2003 Preliminary Annual Research Plan, as provided to John Hancock.

<u>Response</u>:    Subject to its General Objections, and without waiving its General Objections, Abbott admits that Exhibit C contains Abbott's 2003 Preliminary Annual Research Plan as well as material not contained in Abbott's 2003 Preliminary Annual Research Plan.    Except as expressly admitted, Abbott denies this request.

7.    The information contained in Abbott's 2003 Preliminary Annual Research Plan was truthful and accurate to the best of Abbott's knowledge, information and belief as of the time that the 2003 Preliminary Annual Research Plan was provided to John Hancock.

<u>Response</u>:    Abbott specifically objects to the request on the grounds that it is vague, overly broad, and ambiguous and neither relevant to the claims asserted in the litigation, nor reasonably likely to lead to the discovery of admissible evidence.    The request is vague and ambiguous because, among other things, it asks Abbott to admit or deny the truthfulness and accuracy of projected or estimated data.    Abbott further objects on the grounds that the request fails to separately set forth each matter on which an admission is requested as is required by FED. R. CIV. P. 36.    Subject to and without waiving these objections and its General Objections, Abbott admits that it believed that the information was a materially accurate projection of its intentions for the period depicted at the time it sent the Plan to Hancock.    Except as expressly admitted, Abbott denies this request.

5

8.     Abbott first provided a copy of its 2003 Preliminary Annual Research Plan to John Hancock in or about December 2002.

**Response:**     Abbott specifically objects to the request as vague and ambiguous.  Subject to and without waiving these objections and its General Objections, Abbott admits that it provided Hancock with its 2003 Preliminary Annual Research Plan in or about December 2002.  Except as expressly admitted, Abbott denies this request.

9.     The document attached to these Requests for Admission as Exhibit D is an authentic copy of Abbott's 2003 Final Annual Research Plan, as provided to John Hancock.

**Response:**     Subject to its General Objections, and without waiving its General Objections, Abbott admits this request.

10.     The information contained in Abbott's 2003 Final Annual Research Plan was truthful and accurate to the best of Abbott's knowledge, information and belief as of the time that the 2003 Final Annual Research Plan was provided to John Hancock.

**Response:**     Abbott specifically objects to the request on the grounds that it is vague, overly broad, and ambiguous and neither relevant to the claims asserted in the litigation, nor reasonably likely to lead to the discovery of admissible evidence.  The request is vague and ambiguous because, among other things, it asks Abbott to admit or deny the truthfulness and accuracy of projected or estimated data.  Subject to and without waiving these objections and its General Objections, Abbott admits that it believed that the information was a materially accurate projection of its intentions for the period depicted at the time it provided the Plan to Hancock.  Except as expressly admitted, Abbott denies this request.

6

11.     Abbott first provided a copy of its 2003 Final Annual Research Plan to John Hancock in or about September 2003.

**Response:**     Abbott specifically objects to this request as vague and ambiguous. Subject to and without waiving these objections and its General Objections, Abbott admits that it provided Exhibit D, at Hancock's request, in or about September 2003. Except as expressly admitted, Abbott denies this request.


12.     Abbott's 2003 Preliminary Annual Research Plan did not disclose Abbott's estimated expenditures on Program Related Costs for any period after December 31, 2003.

**Response:**     Subject to its General Objections, and without waiving its General Objections, Abbott admits that Exhibit C did not contain certain estimates of Program Related Costs that existed within Abbott at the time for periods after December 31, 2003. Except as expressly admitted, Abbott denies this request.


13.     Abbott's 2003 Final Annual Research Plan did not reasonably demonstrate Abbott's intent and reasonable expectation to expend on Program Related Costs, by December 31, 2004, an amount in excess of the Aggregate Spending Target.

**Response:**     Subject to its General Objections, and without waiving its General Objections, Abbott admits this request.

14.    Abbott's 2003 Final Annual Research Plan did not reasonably demonstrate Abbott's intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target.

**Response:**    Subject to its General Objections, and without waiving its General Objections, Abbott admits that its 2003 Final Annual Research Plan estimated that Abbott would spend an amount less than the Aggregate Spending Target during the initial four year Program Term. Except as expressly admitted, Abbott denies this request.

15.    Prior to December 31, 2002, Abbott formed an intention to reduce its expenditures on Program Related Costs during the period from March 13, 2001 through December 31, 2004 to an amount less than the Aggregate Spending Target.

**Response:**    Subject to its General Objections, and without waiving its General Objections, Abbott admits that certain estimates existed within Abbott prior to December 31, 2002 under which Abbott would spend an amount less than the Aggregate Spending Target through December 31, 2004. Except as expressly admitted, Abbott denies this request.

16.    John Hancock never agreed after March 13, 2001 to change or amend the definition of "Program Term" contained in the Research Funding Agreement, as originally executed by the Parties.

**Response:**    Subject to its General Objections, and without waiving its General Objections, Abbott admits this request.

17.    John Hancock never agreed after March 13, 2001 to change or amend the definition of "Aggregate Spending Target" contained in the Research Funding Agreement, as originally executed by the Parties.

Response:    Subject to its General Objections, and without waiving its General Objections, Abbott admits this request.

ABBOTT LABORATORIES

By: _michael D O'____
One Of Its Attorneys

Lawrence R. Desideri, Esq., (admitted *pro hac vice*)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

Peter E. Gelhaar, Esq., (BBO# 188310)
Michael S. D'Orsi, Esq., (BBO# 566960)
DONNELLY, CONROY & GELHAAR, LLP
1 Beacon Street, 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880

CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail/by hand

Date: 5/17/04  michael D O'

9

CHI:1365071.2

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Brief of Plaintiffs-Appellees John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and Investors Partner Insurance Company was served by overnight mail upon Peter E. Gelhaar, Esq., Donnelly, Conroy & Gelhaar, LLP, One Beacon Street, 33rd Floor, Boston, MA 02108, and by overnight mail upon Lawrence R. Desideri, Esq. and Stephen V. D'Amore, Esq., Winston & Strawn LLP, 35 West Wacker Drive, Chicago, Illinois 60601-9703, on this 3rd day of April, 2006.

Lisa H. Lipman

Exhibit 5

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

'05 JUN -3 A 11:49

U.S. DISTRICT COURT
DISTRICT OF MASS.

05 - 11150 DPW

JOHN HANCOCK LIFE INSURANCE )
COMPANY, JOHN HANCOCK )
VARIABLE LIFE INSURANCE )
COMPANY, and MANULIFE )
INSURANCE COMPANY (f/k/a )
INVESTORS PARTNER INSURANCE )
COMPANY), )
                                                    )     CIVIL ACTION NO. _____
                                                    )
            Plaintiffs,               )
                                                    )
v.                                                  )
                                                    )
ABBOTT LABORATORIES,  )
                                                    )
            Defendant.              )
                                                    )

## COMPLAINT

### Introduction

1.      This is an action for fraud, breach of contract, and indemnification in which

plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance

Company and ManuLife Insurance Company (f/k/a "Investors Partner Life Insurance") seek

compensatory and punitive damages, costs and attorneys' fees for defendant Abbott

Laboratories' misrepresentations and other conduct that violates the Research Funding

Agreement entered into by and between the plaintiffs and defendant and dated as of March 13,

2001 (the "Agreement").   This action is filed as a separate related action to the pending matter

captioned *John Hancock Life Insurance Company, et al. v. Abbott Laboratories*, Civil Action No. 03-12501-DPW (the "Existing Action"), pursuant to Section (1) of the Court's Scheduling Order entered in the Existing Action on March 30, 2004.

### The Parties

2.      Plaintiff John Hancock Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.  John Hancock Life Insurance Company is one of the nation's leading insurance companies, providing a broad array of insurance and investment products to retail and institutional customers, primarily in North America.

3.      Plaintiff John Hancock Variable Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.  John Hancock Variable Life Insurance Company provides variable life insurance products that link life insurance coverage and an investment return to an underlying portfolio of investments chosen by the policyholder.

4.      Plaintiff ManuLife Insurance Company (collectively, with plaintiffs John Hancock Life Insurance Company and John Hancock Variable Life Insurance Company, "John Hancock") is a company, duly formed and existing under the laws of the State of Delaware, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.  ManuLife Insurance Company is a wholly-owned subsidiary of John Hancock Variable Life Insurance Company that sells various types of life insurance products.  ManuLife Insurance Company formerly was known as "Investors Partner Life Insurance."

-2-

5.     Defendant Abbott Laboratories ("Abbott") is a corporation, duly formed and existing under the laws of the State of Illinois, that maintains its corporate headquarters in Abbott Park, Illinois.  Abbott is a broad-based healthcare company that discovers, develops, manufactures and markets products and services that span the continuum of care -- from prevention and diagnosis to treatment and cure.  Abbott's principal businesses are global pharmaceuticals, nutritionals, and medical products, including diagnostics and cardiovascular devices.  Abbott achieved record sales and net earnings of $19.7 billion and $3.2 billion, respectively, in 2004.  Its leadership positions in several multibillion-dollar businesses provide Abbott with a unique balance of revenue growth opportunities and cash flow sources that allow Abbott to invest in its future.

### Jurisdiction and Venue

6.     This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(a)(1) because defendant Abbott resides in this district within the meaning of 28 U.S.C. § 1391(c), and further because Section 16.2 of the parties' Agreement provides that Abbott,

> consents ... to the exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts ... for the purpose of any suit, action or other proceeding arising out of any of its obligations hereunder or thereunder or with respect to the transactions contemplated hereby or thereby, and expressly waives any and all objections that it may have as to venue in such courts.

## The Facts

### *The Agreement And Its Relevant Terms*

8.     On March 13, 2001, John Hancock and Abbott entered the Agreement, whereby John Hancock agreed to provide funding to Abbott for research and development activities on a portfolio of potential pharmaceutical products or "Program Compounds" (the "Research Program") in exchange for the right to receive certain management fees and future milestone and royalty payments from Abbott.

9.     The nine Program Compounds encompassed by the Abbott Research Program are: (a) ABT-773, a kelotide that may be useful as an antibiotic; (b) ABT-627, an endothelin-A receptor agonist that may be useful in the treatment of prostate cancer; (c) ABT-594, a non-opiod analgesic that may be useful in the treatment of chronic pain; (d) ABT-492, a quinolone that may be useful as an antibiotic; (e) ABT-510, a synthetic peptide that may be useful in the treatment of cancer; (f) ABT-518, a metalloproteinase inhibitor that may be useful in the treatment of cancer; (g) ABT-751, an antimitotic tubulin agonist that may be useful in the treatment of cancer; (h) ABT-100, a farnesyltransferase protein inhibitor that may be useful in the treatment of cancer; and (i) ABT-724, a dopamine receptor agonist that may be useful in the treatment of erectile dysfunction.

10.     Under the terms of the Agreement, John Hancock agreed to contribute up to a specified maximum amount toward the costs incurred by Abbott in operating the Research Program ("Program Related Costs") in four annual installments (the "Program Payments") over the period from March 13, 2001 through December 31, 2004 (individually, the four "Program Years" and, collectively, the four-year "Program Term"). Abbott agreed, in return, to invest at least twice the amount of John Hancock's contribution from its own funds towards

the operation of the Research Program, and committed to spend certain minimum amounts on Program Related Costs during each Program Year (the "Annual Minimum Spending Target"), as well as a minimum aggregate total on Program Related Costs over the four-year Program Term (the "Aggregate Spending Target").

11.    The Agreement, which comprises more than thirty-five (35) pages, was the subject of extensive negotiations between the parties and their counsel over a period of approximately one year. From John Hancock's perspective, the financial attractiveness of the Agreement turned largely upon the specific identity of, and commercial prospects for, the nine Program Compounds encompassed by the Research Program. John Hancock ran numerous analytical models based on financial projections for the Program Compounds in order to ensure, as best that it could, that the risks associated with its anticipated investment in the Research Program were justified by the potential rewards that John Hancock would receive if and when some or all of the Program Compounds were approved and commercialized.

12.    Because the financial return, if any, that John Hancock ultimately will receive on its investment in the Program Compounds is heavily dependent on the commercial success of those Compounds, John Hancock had a strong interest in ensuring, before the Agreement was signed, that: (a) Abbott had a good faith intention to aggressively pursue development of each of the Program Compounds; and (b) Abbott had a good faith belief that each of the Program Compounds possessed reasonably favorable commercial prospects. In order to satisfy John Hancock's concerns on these points, Abbott agreed to provide John Hancock, in Article 12 of the Agreement, with certain written representations and warranties concerning the development status of the Program Compounds, including, *inter alia*, a representation and warranty that,

-5-

[s]et forth on Exhibit 12.2(d) is the full name, chemical name, detailed description of the stage of development and current status for each Program Compound. Set forth on Exhibit 1.6 in each Annual Research Plan is a description of projected milestones and dates thereof, projected year of NDA filing, and projected costs to be incurred by Abbott during the Program Term, for each Program Compound. Such projections were prepared in good faith and with due care based on reasonable assumptions, and represent the reasonable estimate of Abbott based on information available as of the date of such projections and as of the date hereof.... (Section 12.2[d]).

13.    Abbott further represented and warranted to John Hancock that,

[t]here is no fact known to Abbott (other than generally available information concerning the pharmaceutical industry in general) as of the date of this Agreement that has not been disclosed in this Agreement or any Exhibit to this Agreement which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial [viability]) of the Research Program or any of the Program Compounds. (Section 12.2[i]).

14.    The Agreement contains various other terms that are intended to protect John Hancock's interests by ensuring that Abbott fairly and diligently fulfills its research and development obligations under the Agreement, including terms which provide, *inter alia,* that Abbott:

(a)    must employ "Commercially Reasonable Efforts" (defined in the Agreement as "efforts which are consistent with those normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market potential at a similar stage of development or product life") to develop each of the Program Compounds and "achieve the objectives of the Research Program efficiently and expeditiously" (Sections 1.10, 2.3 and 4.1);

(b)    must keep John Hancock fully informed of any modifications to its written "Annual Research Plans" ("ARPs") by requiring that "[a]ny such modifications ... be promptly provided to John Hancock" (Section 2.2);

-6-

(c)    shall not "research, develop, manufacture, market, sell, distribute, out-license or otherwise treat" the Program Compounds any differently "as compared to any other Abbott compounds or products" on account of any of the rights granted to John Hancock under Agreement (Section 4.4); and

(d)    shall, "as soon as is practicable," out-license or divest any "Ceased Compound" (defined in the Agreement as a Program Compound that Abbott has "substantially cease[d] developing, marketing or selling") to a third party, and shall "remunerate John Hancock based on sales of such Ceased Compound by the third party that has acquired or licensed the Ceased Compound ... in a manner most consistent with the allocation that would have applied hereunder had such Ceased Compound not been so out-licensed or divested..." (Section 4.3[d]).

15.    John Hancock's obligation under the Agreement to make additional Program Payments during the four-year Program Term is not absolute, however.  In entering into the Agreement, John Hancock did not want to obligate itself to continue investing in the Program Compounds if the commercial prospects for those Compounds diminished significantly over the four-year Program Term.  Accordingly, John Hancock's obligation to make its second, third and fourth Program Payments was made expressly contingent upon the demonstration by Abbott, on an annual basis, of the continued commercial viability of the Program Compounds.

16.    For purposes of the Agreement, the continued commercial viability of the Program Compounds is measured by reference to Abbott's planned expenditures on Program Related Costs over the four-year Program Term.  Section 2.2 of the Agreement requires Abbott to provide John Hancock, at least forty-five days (45) prior to the start of each Program Year, with a written ARP that spells out Abbott's anticipated Research Program expenditures for that year and for each year remaining in the Program Term.  If Abbott's ARP for any given year did not "reasonably demonstrate [Abbott's] ... intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the

Aggregate Spending Target" as set forth in the Agreement, then John Hancock's "obligation to make any remaining Program Payments for any succeeding Program Years" automatically would terminate pursuant to Section 3.4(iv) of the Agreement.

17.    The Agreement further provides John Hancock with the power to objectively verify Abbott's compliance with the terms of the Agreement, including the right to retain an independent auditor of John Hancock's choosing (and reasonably acceptable to Abbott) who is empowered to inspect, copy and audit the "books and records of Abbott and each Subcontractor related to the Research Program ... at any time and from time to time." John Hancock is required to pay the fees and expenses of its chosen auditor in the first instance. If, however, the work of John Hancock's auditor "reveals any material breach of Abbott's responsibilities" under the Agreement, then Section 2.5 provides that Abbott "shall (i) pay the reasonable fees and expenses charged by such auditor, and (ii) fully and promptly cure such breach."

<em>John Hancock's Efforts to Audit Abbott's Compliance<br>With The Terms of the Agreement</em>

18.    Since the Agreement was executed on March 13, 2001, John Hancock has become aware of certain potential breaches of the Agreement by Abbott.  Such potential breaches include, but are not limited to, misrepresentations by Abbott in the negotiation and execution of the Agreement, as well as violations by Abbott of its development and administrative responsibilities under the Agreement.

19.    Consistent with the terms of the Agreement, and in an effort to assist in confirming or refuting Abbott's suspected violations, John Hancock initiated an independent audit of Abbott's books and records on April 12, 2004. On that date, John Hancock sent a

-8-

letter to Abbott notifying Abbott of John Hancock's intention to undertake a compliance audit

pursuant to Section 2.5 of the Agreement, and identifying the independent auditor that had

been selected by John Hancock. John Hancock accompanied its audit notification letter to

Abbott with a description of the specific books and records related to the Research Program

that John Hancock requested be made available for examination by its independent auditor

within thirty (30) days.

20.     Abbott unreasonably and unjustifiably has delayed, and continues to delay, its

response to John Hancock's audit request, and has taken affirmative steps to obstruct the

legitimate efforts of John Hancock's independent auditors to confirm or refute Abbott's

compliance with terms of the Agreement. Tactics employed by Abbott to hinder, delay and

obstruct John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement

include, but are not limited to:

    (a)    unreasonably and unjustifiably objecting to John Hancock's chosen auditor for a period of months, then arbitrarily withdrawing its objection;

    (b)    unreasonably and unjustifiably delaying production of the majority of the relevant books and records requested by John Hancock's auditor for almost one year (and counting);

    (c)    unreasonably and unjustifiably refusing to make certain relevant books and records available for inspection and copying at all (including, without limitation, various books and records documenting Abbott's actual expenditures on Program Related Costs);

    (d)    unreasonably and unjustifiably redacting various relevant books and records produced during the course of the audit so as to eliminate relevant information and render certain materials effectively unintelligible, notwithstanding the existence of a written confidentiality agreement between the parties;

    (e)    unreasonably and unjustifiably understaffing and under-funding Abbott's response to John Hancock's audit request in order to further delay the

examination of Abbott's relevant books and records by John Hancock's auditor;

(f)     unreasonably and unjustifiably delaying for periods of six months or more the photocopying of books and records designated by John Hancock's auditor during the inspection process;

(g)     unreasonably and unjustifiably refusing to provide John Hancock's auditor with photocopies of various books and records produced by Abbott, and designated by John Hancock's auditor, during the inspection process;

(h)     unreasonably and unjustifiably refusing to permit John Hancock or its independent auditor to make their own photocopies of Abbott's books and records produced for audit purposes;

(i)     unreasonably and unjustifiably violating acknowledged deadlines for the completion of Abbott's production of books and records responsive to John Hancock's audit requests;

(j)     unreasonably and unjustifiably ignoring or refusing to answer various written and oral inquiries by John Hancock and its auditor regarding Abbott's relevant books and records; and

(k)     unreasonably and unjustifiably acting in a manner contrary to the usual course of contractual compliance audits, and contrary to Abbott's own conduct in reasonably similar circumstances in the past.

21.     As of the date of this Complaint, Abbott still has not produced all of the material books and records related to the Research Program that were requested by John Hancock and its auditor on April 12, 2004, and refuses to do so. Abbott also continues to refuse to answer inquiries by John Hancock and its auditor seeking information that is necessary to complete the audit of Abbott's compliance with the Agreement.

*Abbott's Violations of the Agreement*

A.    Obstructing John Hancock's Compliance Audit

22.     Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement as

-10-

expressly permitted under Section 2.5. Upon information and belief, Abbott's efforts to hinder, delay and obstruct John Hancock's audit activities are intended to undermine, and have had the effect of undermining, John Hancock's ability to obtain information which would tend to confirm that Abbott has breached the Agreement in various other ways as set forth below.

B. Misrepresenting the Development Status of ABT-518

23.    Upon information and belief, Abbott misrepresented the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that ABT-518 was "a compelling development candidate with the potential to demonstrate antitumor effects superior to the MMP inhibitors currently undergoing clinical trials." Abbott understood before the Agreement was executed, however, that the actual development status of ABT-518 was not as represented in the Agreement. For example, Abbott personnel already had plans as of early March 2001 to terminate the development of ABT-518, but understood that full disclosure of that fact to John Hancock "could have been the deathnell (*sic*) to the deal." Accordingly, Abbott personnel took affirmative steps on and prior to March 13, 2001 to conceal from John Hancock the true development status of ABT-518 so as to induce John Hancock to enter into the Agreement. Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-518.

24.    The development status of ABT-518 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-518 in making that decision. Had John Hancock known the true development status of ABT-518 before the Agreement was executed, John Hancock would have demanded

-11-

different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

C. Misrepresenting the Development Status of ABT-594

25.    Upon information and belief, Abbott misrepresented the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that a "phase IIb [clinical] study for neuropathic pain at higher, titrated doses of ABT-594 began in April 2000 and ends in June 2001," and that ABT-594 was "expected to be the first neuronal nicotinic receptor agonist to receive an indication for pain." Abbott understood before the Agreement was executed, however, that the development status of ABT-594 was not as represented in the Agreement. For example, Abbott already knew prior to the execution of the Agreement that the termination rate for patients enrolled in the phase IIb clinical study of ABT-594 was unusually high, and that the final results of that study were likely to be unfavorable. Abbott also knew, no later than March 2001, that the development of ABT-594 was likely to be significantly delayed or even discontinued by Abbott as a consequence. Abbott failed to disclose these facts to John Hancock before the Agreement was executed in order to induce John Hancock to enter into the Agreement. Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-594.

26.    The development status of ABT-594 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-594 in making that decision. Had John Hancock known the true development

-12-

status of ABT-594 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

### D. Misrepresenting Its Intended and Reasonably Expected Spending on Program Related Costs

27.    Upon information and belief, Abbott has misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock.  The Research Program cost projections that Abbott has provided to John Hancock in various ARPs reflect Abbott's "nominal" spending, as opposed to its "expected" spending.  At all relevant times, Abbott's true "expected" spending on Program Related Costs was considerably less than the amounts communicated to John Hancock in Abbott's ARPs. Abbott has misrepresented its intended and reasonably expected spending plans to John Hancock in order to induce John Hancock to enter into the Agreement, and to make Program Payments to Abbott that would not otherwise be due under the terms of the Agreement.

28.    Abbott's intended and reasonably expected expenditures on Program Related Costs constitute material facts for purposes of John Hancock's decision to enter into the Agreement.  John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding its intended and reasonably expected expenditures on Program Related Costs in making that decision.  Had John Hancock known the true level of Abbott's intended and reasonably expected expenditures, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable

-13-

financial terms with respect to the remaining Program Compounds, may not have made certain Program Payments, or may not have entered into the Agreement at all.

### E. Failing to Use Commercially Reasonable Efforts to Develop the Program Compounds

29.    Upon information and belief, Abbott has failed to use Commercially Reasonable Efforts to develop the Program Compounds. Abbott previously represented to John Hancock in its 2005 ARP that the current commercial prospects for the active Program Compounds warrant the expenditure of a stated sum towards Program Related Costs in 2005. Upon information and belief, Abbott since has modified its 2005 ARP so as to reduce its intended and reasonably expected expenditures on Program Related Costs by more than fifty percent (50%) in retaliation, *inter alia*, for the automatic termination of John Hancock's obligation to make additional Program Payments for the third and fourth Program Years pursuant to the express terms of the Agreement.

30.    Abbott's decision to reduce its intended and reasonably expected expenditures on Program Related Costs in 2005 to less than one-half the amount that Abbott has represented is warranted by the current commercial prospects for the active Program Compounds is inconsistent with the level of effort normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market at a similar stage of development and, therefore, not Commercially Reasonable for purposes of Section 4.1 of the Agreement.

### F. Refusing to Provide John Hancock With a Copy of Abbott's Modified 2005 ARP

31.    Abbott has refused to provide John Hancock with a copy of its modified 2005 ARP. Abbott provided its original 2005 ARP to John Hancock in November 2004. Upon

-14-

information and belief, Abbott since has modified its original 2005 ARP so as to dramatically reduce Abbott's intended and reasonably expected expenditures on Program Related Costs in 2005. Section 2.2 of the Agreement obligates Abbott to "promptly provide[]" John Hancock with "[a]ny ... modifications" to its ARPs. Notwithstanding the express requirements of Section 2.2, Abbott has refused or ignored John Hancock's requests for a copy of Abbott's modified 2005 ARP.

### G. Failing to Out-License or Divest Various Ceased Compounds

32.     Upon information and belief, Abbott has failed to out-license or divest itself of various Ceased Compounds, including, without limitation, ABT-518 and ABT-594, "as soon as is practicable" as required under Section 4.3(d) of the Agreement.

33.     Upon further information and belief, Abbott has chosen not to out-license or divest itself of the foregoing Ceased Compounds for fear that, if those Compounds were successfully developed and marketed by a third party, Abbott might lose future sales of various competing compounds that Abbott has under development, which are not subject to John Hancock's royalty rights.

*John Hancock's Efforts to Resolve Its Claims Against Abbott Amicably*

34.     On April 1, 2005, John Hancock provided written notification to Abbott of the existence and nature of the foregoing disputes in accordance with Section 16.7 of the Agreement.

35.     Authorized representatives of John Hancock and Abbott subsequently met in Chicago, Illinois on May 20, 2005, in an effort to resolve their disputes amicably. That effort was unsuccessful.

## Claims

### COUNT I
### (Fraud)

36.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 35 of this Complaint, *supra*.

37.    Abbott materially misrepresented the development status of the Program Compounds in the representations and warranties contained in Sections 12.2 of the Agreement, and applicable Schedules thereto, all in the manner described in this Complaint.

38.    Abbott materially misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock, all in the manner described in this Complaint.

39.    Abbott made the foregoing misrepresentations to John Hancock wantonly and willfully for the purpose of fraudulently inducing John Hancock to enter into the Agreement, and to make various Program Payments to Abbott on the terms stated therein.

40.    John Hancock justifiably relied upon Abbott's misrepresentations to its detriment by, among other things, entering into the Agreement, and making Program Payments to Abbott in accordance with the terms thereof.

41.    As a result of Abbott's misrepresentations, John Hancock has been defrauded by Abbott and has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

### COUNT II
### (Breach of Contract)

42.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 41 of this Complaint, *supra*.

43.    The Agreement constitutes a valid and binding contract between the parties. John Hancock has performed all of its obligations under the Agreement.

44.    Abbott has breached its obligations to John Hancock under the Agreement, *inter alia*, by:

(a)    misrepresenting the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement;

(b)    misrepresenting the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement;

(c)    misrepresenting Abbott's intended and reasonably expected expenditures on Program Related Costs in ARPs that Abbott has provided to John Hancock;

(d)    failing to use Commercially Reasonable Efforts to develop the Program Compounds;

(e)    refusing to provide John Hancock with a copy of Abbott's modified 2005 ARP;

(f)    failing to out-license or divest itself of certain Ceased Compounds, including, without limitation, ABT-518 and ABT-594, as soon as is practicable; and

(g)    unreasonably and unjustifiably hindering, delaying and obstructing John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement.

45.    By engaging in the foregoing conduct, Abbott further has breached the covenant of good faith and fair dealing that is implied by law in every contract, including the Agreement.

46.    Abbott has breached its express and implied obligations under the Agreement willfully and wantonly in order to induce John Hancock to enter into the Agreement, induce John Hancock to make various Program Payments to Abbott on the terms stated therein, and inhibit John Hancock's ability to detect and confirm Abbott's misconduct.

-17-

47.    As a result of Abbott's willful and wanton breaches of its express and implied obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

COUNT III
(Indemnification)

48.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 47 of this Complaint, *supra*.

49.    Abbott has breached its representations, warranties and obligations to John Hancock under the Agreement as set forth herein.

50.    As a result of Abbott's various breaches of its representations, warranties and obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, "Losses" as defined in Section 1.27 of the Agreement. John Hancock's Losses include, without limitation, costs, damages, and other reasonable expenses such as audit charges and attorneys' fees.

51.    Abbott agreed in Section 12.6 of the Agreement to indemnify John Hancock, *inter alia*, "from and against all Losses related to or arising out of, directly or indirectly ... any breach by Abbott of its representations, warranties or obligations hereunder..."

52.    On April 1, 2005, John Hancock provided written notification to Abbott that John Hancock has sustained, and likely will continue to sustain, compensable Losses on account of Abbott's various breaches of its representations, warranties and obligations under the Agreement, for which John Hancock is entitled to indemnification pursuant to Section 12.6 of the Agreement.

53.    Notwithstanding John Hancock's request for indemnification, Abbott has refused

to indemnify John Hancock for its compensable Losses.

## Prayers for Relief

WHEREFORE, John Hancock respectfully requests that the Court:

(a)    award John Hancock compensatory damages in an amount to be
determined, plus interest and costs, for Abbott's fraud under Count I of
the Complaint;

(b)    award John Hancock compensatory damages in an amount to be
determined, plus interest and costs, for Abbott's various breaches of
contract under Count II of the Complaint;

(c)    enter an order directing Abbott to indemnify John Hancock for its
compensable Losses, including John Hancock's damages, costs, and
other reasonable expenses such as audit charges and attorneys' fees,
under Count III of the Complaint;

(d)    award John Hancock punitive damages for Abbott's willful and wanton
misconduct in an amount to be determined under Counts I and II of the
Complaint; and

(e)    grant John Hancock such other and further relief as the Court deems just
and appropriate in the circumstances.

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY AND
MANULIFE INSURANCE COMPANY

By their attorneys,

Brian A. Davis (BBO No. 546462)
Karen Collari Troake (BBO No. 566922)
Stacy Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109
Tele: 617-248-5000

Date: June 3, 2005

-19-

3927619v2

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY), <br><br> Plaintiffs, <br><br> v. <br><br> ABBOTT LABORATORIES, <br><br> Defendant. | CIVIL ACTION NO. _____ |

**PLAINTIFFS' MOTION TO
IMPOUND CONFIDENTIAL INFORMATION**

Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and ManuLife Insurance Company (collectively, "John Hancock" or the "Plaintiffs") hereby move, pursuant to Local Rule 7.2, that the Court impound the Complaint in this action until further order of the Court.

Grounds are this motion are that:

1.      This action arises out of a written agreement, dated as of March 13, 2001 (the "Agreement"), between John Hancock and defendant Abbott Laboratories ("Abbott").   The Agreement is, by its terms, confidential.   Neither the Agreement nor any of its terms and conditions generally may be disclosed without the prior consent of the non-disclosing party.

2.    The Agreement also forms the basis for John Hancock's claims in the related action captioned <u>John Hancock Life Insurance Company, et al.</u> v. <u>Abbott Laboratories</u>, Civil Action No. 03-12501-DPW (the "Existing Action"). A copy of the Agreement previously was designated "Confidential" and impounded, in its entirety, in the Existing Action pursuant to the Stipulated Protective Order entered by the Court in that case on May 12, 2004.

3.    John Hancock's Complaint in this new action necessarily references and quotes from relevant provisions of the confidential Agreement. In accordance with the terms of the Agreement, John Hancock has sought Abbott's consent to file its Complaint in open court. Abbott has refused to give its consent.

WHEREFORE, John Hancock respectfully requests that its Complaint in this action be impounded until further Order of the Court. Upon termination of the impoundment period, John Hancock will retrieve and take custody of the Complaint.

Respectfully Submitted,

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY AND
MANULIFE INSURANCE COMPANY

By their attorneys,

Brian A. Davis (BBO No. 546462)
Karen Collari Troake (BBO No. 566922)
Stacy Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109-2891
Tele: 617-248-5000

Date:  June 3, 2005

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(A)(2)

The undersigned hereby certifies that counsel for John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and ManuLife Insurance Company, has conferred with Abbott Laboratories' counsel, and that Abbott Laboratories consents to the impoundment of the document referenced in the foregoing motion.

_____
Brian A. Davis

3931486v1

-3-

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY), <br><br> Plaintiffs, <br><br> v. <br><br> ABBOTT LABORATORIES, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) CIVIL ACTION NO. _____ |

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and ManuLife Insurance Company hereby state, pursuant to Fed. R. Civ. P. 7.1 and Local Rule 7.3, as follows:

1.     Plaintiff John Hancock Life Insurance Company is a wholly-owned subsidiary of John Hancock Financial Services, Inc., which is a wholly-owned subsidiary of ManuLife Financial Corporation.

2.     Plaintiff John Hancock Variable Life Insurance Company is a wholly-owned subsidiary of plaintiff John Hancock Life Insurance Company.

3.     Plaintiff ManuLife Insurance Company is a wholly-owned subsidiary of plaintiff John Hancock Variable Life Insurance Company.

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY AND
MANULIFE INSURANCE COMPANY

By their attorneys,

Brian A. Davis (BBO No. 546462)
Karen Collari Troake (BBO No. 566922)
Stacy Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109
Tele: 617-248-5000

Date:  June 3, 2005

3930415.1

-2-

℘JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and ManuLife Insurance Company

**(b)** County of Residence of First Listed Plaintiff   **Suffolk**
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Brian A. Davis, CHOATE, HALL & STEWART  LLP
Exchange Place, 53 State Street, Boston, MA  02109  (617) 248-5000

## DEFENDANTS

Abbott Laboratories

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1   U.S. Government
         Plaintiff

☐ 2   U.S. Government
         Defendant

☐ 3   Federal Question
         (U.S. Government Not a Party)

☒ 4   Diversity
         (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☒ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med. Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1   Original Proceeding

☐ 2   Removed from State Court

☐ 3   Remanded from Appellate Court

☐ 4   Reinstated or Reopened

☐ 5   Transferred from another district (specify)

☐ 6   Multidistrict Litigation

☐ 7   Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause:
This is an action for fraud, breach of contract, and indemnification. Jurisdiction is proper pursuant to 28 U.S.C. Section 1332(a).

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND S
Amount in controversy exceeds $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE  Woodlock          DOCKET NUMBER  03-12501-DPW

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #           AMOUNT           APPLYING IFP           JUDGE           MAG. JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) ___JOHN HANCOCK LIFE INSURANCE COMPANY, et al.___

___v. ABBOTT LABORATORIES___

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).

- [ ] I. 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

- [ ] II. 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
       740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.        for patent, trademark or copyright cases

- [x] III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
        315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
        380, 385, 450, 891.

- [ ] IV. 220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
       690, 810, 861-865, 870, 871, 875, 900.

- [ ] V. 150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

   John Hancock Life Insurance Co. et al. v. Abbott Laboratories,        CIVIL ACTION NO. 03-12501-DPW

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

   YES [x]    NO [ ]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

   YES [ ]    NO [x]

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

   YES [ ]    NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

   YES [ ]    NO [x]

7. Do **all** of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

   YES [x]    NO [ ]

   A.   If yes, in which division do **all** of the non-governmental parties reside?

   Eastern Division [x]       Central Division [ ]       Western Division [ ]

   B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

   Eastern Division [ ]       Central Division [ ]       Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

   YES [ ]    NO [ ]

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME ___BRIAN A. DAVIS, ESQ.___

ADDRESS ___CHOATE HALL & STEWART LLP, Exchange Place, 53 State St. Boston, MA  02109___

TELEPHONE NO. ___(617) 248-5000___

(CategoryForm.wpd - 5/2/05)

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

)
JOHN HANCOCK LIFE INSURANCE          )
COMPANY, JOHN HANCOCK                 )
VARIABLE LIFE INSURANCE               )
COMPANY, and MANULIFE                 )
INSURANCE COMPANY (f/k/a              )
INVESTORS PARTNER INSURANCE           )
COMPANY),                             )
                                      )    CIVIL ACTION NO. _____
            Plaintiffs,               )
                                      )
                                      )
v.                                    )
                                      )
ABBOTT LABORATORIES,                  )
                                      )
            Defendant.                )
                                      )

## COMPLAINT

### Introduction

1.     This is an action for fraud, breach of contract, and indemnification in which

plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance

Company and ManuLife Insurance Company (f/k/a "Investors Partner Life Insurance") seek

compensatory and punitive damages, costs and attorneys' fees for defendant Abbott

Laboratories' misrepresentations and other conduct that violates the Research Funding

Agreement entered into by and between the plaintiffs and defendant and dated as of March 13,

2001 (the "Agreement").    This action is filed as a separate related action to the pending matter

captioned *John Hancock Life Insurance Company, et al. v. Abbott Laboratories*, Civil Action

No. 03-12501-DPW (the "Existing Action"), pursuant to Section (1) of the Court's Scheduling

Order entered in the Existing Action on March 30, 2004.

### The Parties

2.      Plaintiff John Hancock Life Insurance Company is a company, duly formed and

existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate

headquarters in Boston, Suffolk County, Massachusetts.   John Hancock Life Insurance

Company is one of the nation's leading insurance companies, providing a broad array of

insurance and investment products to retail and institutional customers, primarily in North

America.

3.      Plaintiff John Hancock Variable Life Insurance Company is a company, duly

formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its

corporate headquarters in Boston, Suffolk County, Massachusetts.   John Hancock Variable

Life Insurance Company provides variable life insurance products that link life insurance

coverage and an investment return to an underlying portfolio of investments chosen by the

policyholder.

4.      Plaintiff ManuLife Insurance Company (collectively, with plaintiffs John

Hancock Life Insurance Company and John Hancock Variable Life Insurance Company, "John

Hancock") is a company, duly formed and existing under the laws of the State of Delaware,

that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.  ManuLife

Insurance Company is a wholly-owned subsidiary of John Hancock Variable Life Insurance

Company that sells various types of life insurance products.   ManuLife Insurance Company

formerly was known as "Investors Partner Life Insurance."

5.    Defendant Abbott Laboratories ("Abbott") is a corporation, duly formed and existing under the laws of the State of Illinois, that maintains its corporate headquarters in Abbott Park, Illinois.  Abbott is a broad-based healthcare company that discovers, develops, manufactures and markets products and services that span the continuum of care -- from prevention and diagnosis to treatment and cure.  Abbott's principal businesses are global pharmaceuticals, nutritionals, and medical products, including diagnostics and cardiovascular devices.  Abbott achieved record sales and net earnings of $19.7 billion and $3.2 billion, respectively, in 2004.  Its leadership positions in several multibillion-dollar businesses provide Abbott with a unique balance of revenue growth opportunities and cash flow sources that allow Abbott to invest in its future.

## Jurisdiction and Venue

6.    This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(a)(1) because defendant Abbott resides in this district within the meaning of 28 U.S.C. § 1391(c), and further because Section 16.2 of the parties' Agreement provides that Abbott,

> consents ... to the exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts ... for the purpose of any suit, action or other proceeding arising out of any of its obligations hereunder or thereunder or with respect to the transactions contemplated hereby or thereby, and expressly waives any and all objections that it may have as to venue in such courts.

-3-

## The Facts

### *The Agreement And Its Relevant Terms*

8.      On March 13, 2001, John Hancock and Abbott entered the Agreement, whereby John Hancock agreed to provide funding to Abbott for research and development activities on a portfolio of potential pharmaceutical products or "Program Compounds" (the "Research Program") in exchange for the right to receive certain management fees and future milestone and royalty payments from Abbott.

9.      The nine Program Compounds encompassed by the Abbott Research Program are: (a) ABT-773, a kelotide that may be useful as an antibiotic; (b) ABT-627, an endothelin-A receptor agonist that may be useful in the treatment of prostate cancer; (c) ABT-594, a non-opiod analgesic that may be useful in the treatment of chronic pain; (d) ABT-492, a quinolone that may be useful as an antibiotic; (e) ABT-510, a synthetic peptide that may be useful in the treatment of cancer; (f) ABT-518, a metalloproteinase inhibitor that may be useful in the treatment of cancer; (g) ABT-751, an antimitotic tubulin agonist that may be useful in the treatment of cancer; (h) ABT-100, a farnesyltransferase protein inhibitor that may be useful in the treatment of cancer; and (i) ABT-724, a dopamine receptor agonist that may be useful in the treatment of erectile dysfunction.

10.      Under the terms of the Agreement, John Hancock agreed to contribute up to a specified maximum amount toward the costs incurred by Abbott in operating the Research Program ("Program Related Costs") in four annual installments (the "Program Payments") over the period from March 13, 2001 through December 31, 2004 (individually, the four "Program Years" and, collectively, the four-year "Program Term"). Abbott agreed, in return, to invest at least twice the amount of John Hancock's contribution from its own funds towards

the operation of the Research Program, and committed to spend certain minimum amounts on Program Related Costs during each Program Year (the "Annual Minimum Spending Target"), as well as a minimum aggregate total on Program Related Costs over the four-year Program Term (the "Aggregate Spending Target").

11.    The Agreement, which comprises more than thirty-five (35) pages, was the subject of extensive negotiations between the parties and their counsel over a period of approximately one year. From John Hancock's perspective, the financial attractiveness of the Agreement turned largely upon the specific identity of, and commercial prospects for, the nine Program Compounds encompassed by the Research Program. John Hancock ran numerous analytical models based on financial projections for the Program Compounds in order to ensure, as best that it could, that the risks associated with its anticipated investment in the Research Program were justified by the potential rewards that John Hancock would receive if and when some or all of the Program Compounds were approved and commercialized.

12.    Because the financial return, if any, that John Hancock ultimately will receive on its investment in the Program Compounds is heavily dependent on the commercial success of those Compounds, John Hancock had a strong interest in ensuring, before the Agreement was signed, that: (a) Abbott had a good faith intention to aggressively pursue development of each of the Program Compounds; and (b) Abbott had a good faith belief that each of the Program Compounds possessed reasonably favorable commercial prospects. In order to satisfy John Hancock's concerns on these points, Abbott agreed to provide John Hancock, in Article 12 of the Agreement, with certain written representations and warranties concerning the development status of the Program Compounds, including, *inter alia*, a representation and warranty that,

-5-

[s]et forth on <u>Exhibit 12.2(d)</u> is the full name, chemical name, detailed description of the stage of development and current status for each Program Compound. Set forth on <u>Exhibit 1.6</u> in each Annual Research Plan is a description of projected milestones and dates thereof, projected year of NDA filing, and projected costs to be incurred by Abbott during the Program Term, for each Program Compound. Such projections were prepared in good faith and with due care based on reasonable assumptions, and represent the reasonable estimate of Abbott based on information available as of the date of such projections and as of the date hereof.... (Section 12.2[d]).

13.    Abbott further represented and warranted to John Hancock that,

[t]here is no fact known to Abbott (other than generally available information concerning the pharmaceutical industry in general) as of the date of this Agreement that has not been disclosed in this Agreement or any Exhibit to this Agreement which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial [viability]) of the Research Program or any of the Program Compounds. (Section 12.2[i]).

14.    The Agreement contains various other terms that are intended to protect John Hancock's interests by ensuring that Abbott fairly and diligently fulfills its research and development obligations under the Agreement, including terms which provide, *inter alia*, that Abbott:

(a)    must employ "Commercially Reasonable Efforts" (defined in the Agreement as "efforts which are consistent with those normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market potential at a similar stage of development or product life") to develop each of the Program Compounds and "achieve the objectives of the Research Program efficiently and expeditiously" (Sections 1.10, 2.3 and 4.1);

(b)    must keep John Hancock fully informed of any modifications to its written "Annual Research Plans" ("ARPs") by requiring that "[a]ny such modifications ... be promptly provided to John Hancock" (Section 2.2);

-6-

(c)    shall not "research, develop, manufacture, market, sell, distribute, out-license or otherwise treat" the Program Compounds any differently "as compared to any other Abbott compounds or products" on account of any of the rights granted to John Hancock under Agreement (Section 4.4); and

(d)    shall, "as soon as is practicable," out-license or divest any "Ceased Compound" (defined in the Agreement as a Program Compound that Abbott has "substantially cease[d] developing, marketing or selling") to a third party, and shall "remunerate John Hancock based on sales of such Ceased Compound by the third party that has acquired or licensed the Ceased Compound ... in a manner most consistent with the allocation that would have applied hereunder had such Ceased Compound not been so out-licensed or divested..." (Section 4.3[d]).

15.    John Hancock's obligation under the Agreement to make additional Program Payments during the four-year Program Term is not absolute, however.  In entering into the Agreement, John Hancock did not want to obligate itself to continue investing in the Program Compounds if the commercial prospects for those Compounds diminished significantly over the four-year Program Term.  Accordingly, John Hancock's obligation to make its second, third and fourth Program Payments was made expressly contingent upon the demonstration by Abbott, on an annual basis, of the continued commercial viability of the Program Compounds.

16.    For purposes of the Agreement, the continued commercial viability of the Program Compounds is measured by reference to Abbott's planned expenditures on Program Related Costs over the four-year Program Term.  Section 2.2 of the Agreement requires Abbott to provide John Hancock, at least forty-five days (45) prior to the start of each Program Year, with a written ARP that spells out Abbott's anticipated Research Program expenditures for that year and for each year remaining in the Program Term.  If Abbott's ARP for any given year did not "reasonably demonstrate [Abbott's] ... intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the

-7-

Aggregate Spending Target" as set forth in the Agreement, then John Hancock's "obligation to make any remaining Program Payments for any succeeding Program Years" automatically would terminate pursuant to Section 3.4(iv) of the Agreement.

17.    The Agreement further provides John Hancock with the power to objectively verify Abbott's compliance with the terms of the Agreement, including the right to retain an independent auditor of John Hancock's choosing (and reasonably acceptable to Abbott) who is empowered to inspect, copy and audit the "books and records of Abbott and each Subcontractor related to the Research Program ... at any time and from time to time." John Hancock is required to pay the fees and expenses of its chosen auditor in the first instance. If, however, the work of John Hancock's auditor "reveals any material breach of Abbott's responsibilities" under the Agreement, then Section 2.5 provides that Abbott "shall (i) pay the reasonable fees and expenses charged by such auditor, and (ii) fully and promptly cure such breach."

### John Hancock's Efforts to Audit Abbott's Compliance With The Terms of the Agreement

18.    Since the Agreement was executed on March 13, 2001, John Hancock has become aware of certain potential breaches of the Agreement by Abbott.  Such potential breaches include, but are not limited to, misrepresentations by Abbott in the negotiation and execution of the Agreement, as well as violations by Abbott of its development and administrative responsibilities under the Agreement.

19.    Consistent with the terms of the Agreement, and in an effort to assist in confirming or refuting Abbott's suspected violations, John Hancock initiated an independent audit of Abbott's books and records on April 12, 2004.  On that date, John Hancock sent a

-8-

letter to Abbott notifying Abbott of John Hancock's intention to undertake a compliance audit pursuant to Section 2.5 of the Agreement, and identifying the independent auditor that had been selected by John Hancock. John Hancock accompanied its audit notification letter to Abbott with a description of the specific books and records related to the Research Program that John Hancock requested be made available for examination by its independent auditor within thirty (30) days.

20.    Abbott unreasonably and unjustifiably has delayed, and continues to delay, its response to John Hancock's audit request, and has taken affirmative steps to obstruct the legitimate efforts of John Hancock's independent auditors to confirm or refute Abbott's compliance with terms of the Agreement. Tactics employed by Abbott to hinder, delay and obstruct John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement include, but are not limited to:

(a)    unreasonably and unjustifiably objecting to John Hancock's chosen auditor for a period of months, then arbitrarily withdrawing its objection;

(b)    unreasonably and unjustifiably delaying production of the majority of the relevant books and records requested by John Hancock's auditor for almost one year (and counting);

(c)    unreasonably and unjustifiably refusing to make certain relevant books and records available for inspection and copying at all (including, without limitation, various books and records documenting Abbott's actual expenditures on Program Related Costs);

(d)    unreasonably and unjustifiably redacting various relevant books and records produced during the course of the audit so as to eliminate relevant information and render certain materials effectively unintelligible, notwithstanding the existence of a written confidentiality agreement between the parties;

(e)    unreasonably and unjustifiably understaffing and under-funding Abbott's response to John Hancock's audit request in order to further delay the

-9-

examination of Abbott's relevant books and records by John Hancock's auditor;

(f)    unreasonably and unjustifiably delaying for periods of six months or more the photocopying of books and records designated by John Hancock's auditor during the inspection process;

(g)    unreasonably and unjustifiably refusing to provide John Hancock's auditor with photocopies of various books and records produced by Abbott, and designated by John Hancock's auditor, during the inspection process;

(h)    unreasonably and unjustifiably refusing to permit John Hancock or its independent auditor to make their own photocopies of Abbott's books and records produced for audit purposes;

(i)    unreasonably and unjustifiably violating acknowledged deadlines for the completion of Abbott's production of books and records responsive to John Hancock's audit requests;

(j)    unreasonably and unjustifiably ignoring or refusing to answer various written and oral inquiries by John Hancock and its auditor regarding Abbott's relevant books and records; and

(k)    unreasonably and unjustifiably acting in a manner contrary to the usual course of contractual compliance audits, and contrary to Abbott's own conduct in reasonably similar circumstances in the past.

21.    As of the date of this Complaint, Abbott still has not produced all of the material books and records related to the Research Program that were requested by John Hancock and its auditor on April 12, 2004, and refuses to do so. Abbott also continues to refuse to answer inquiries by John Hancock and its auditor seeking information that is necessary to complete the audit of Abbott's compliance with the Agreement.

*Abbott's Violations of the Agreement*

A.   Obstructing John Hancock's Compliance Audit

22.    Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement as

expressly permitted under Section 2.5. Upon information and belief, Abbott's efforts to hinder, delay and obstruct John Hancock's audit activities are intended to undermine, and have had the effect of undermining, John Hancock's ability to obtain information which would tend to confirm that Abbott has breached the Agreement in various other ways as set forth below.

B. Misrepresenting the Development Status of ABT-518

23.     Upon information and belief, Abbott misrepresented the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that ABT-518 was "a compelling development candidate with the potential to demonstrate antitumor effects superior to the MMP inhibitors currently undergoing clinical trials." Abbott understood before the Agreement was executed, however, that the actual development status of ABT-518 was not as represented in the Agreement. For example, Abbott personnel already had plans as of early March 2001 to terminate the development of ABT-518, but understood that full disclosure of that fact to John Hancock "could have been the deathnell (*sic*) to the deal." Accordingly, Abbott personnel took affirmative steps on and prior to March 13, 2001 to conceal from John Hancock the true development status of ABT-518 so as to induce John Hancock to enter into the Agreement. Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-518.

24.     The development status of ABT-518 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-518 in making that decision. Had John Hancock known the true development status of ABT-518 before the Agreement was executed, John Hancock would have demanded

-11-

different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

## C. Misrepresenting the Development Status of ABT-594

25.    Upon information and belief, Abbott misrepresented the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that a "phase IIb [clinical] study for neuropathic pain at higher, titrated doses of ABT-594 began in April 2000 and ends in June 2001," and that ABT-594 was "expected to be the first neuronal nicotinic receptor agonist to receive an indication for pain." Abbott understood before the Agreement was executed, however, that the development status of ABT-594 was not as represented in the Agreement. For example, Abbott already knew prior to the execution of the Agreement that the termination rate for patients enrolled in the phase IIb clinical study of ABT-594 was unusually high, and that the final results of that study were likely to be unfavorable. Abbott also knew, no later than March 2001, that the development of ABT-594 was likely to be significantly delayed or even discontinued by Abbott as a consequence. Abbott failed to disclose these facts to John Hancock before the Agreement was executed in order to induce John Hancock to enter into the Agreement. Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-594.

26.    The development status of ABT-594 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-594 in making that decision. Had John Hancock known the true development

-12-

status of ABT-594 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

### D. Misrepresenting Its Intended and Reasonably Expected Spending on Program Related Costs

27.     Upon information and belief, Abbott has misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock.  The Research Program cost projections that Abbott has provided to John Hancock in various ARPs reflect Abbott's "nominal" spending, as opposed to its "expected" spending.  At all relevant times, Abbott's true "expected" spending on Program Related Costs was considerably less than the amounts communicated to John Hancock in Abbott's ARPs.  Abbott has misrepresented its intended and reasonably expected spending plans to John Hancock in order to induce John Hancock to enter into the Agreement, and to make Program Payments to Abbott that would not otherwise be due under the terms of the Agreement.

28.     Abbott's intended and reasonably expected expenditures on Program Related Costs constitute material facts for purposes of John Hancock's decision to enter into the Agreement.  John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding its intended and reasonably expected expenditures on Program Related Costs in making that decision.  Had John Hancock known the true level of Abbott's intended and reasonably expected expenditures, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable

-13-

financial terms with respect to the remaining Program Compounds, may not have made certain Program Payments, or may not have entered into the Agreement at all.

### E. Failing to Use Commercially Reasonable Efforts to Develop the Program Compounds

29.    Upon information and belief, Abbott has failed to use Commercially Reasonable Efforts to develop the Program Compounds. Abbott previously represented to John Hancock in its 2005 ARP that the current commercial prospects for the active Program Compounds warrant the expenditure of a stated sum towards Program Related Costs in 2005. Upon information and belief, Abbott since has modified its 2005 ARP so as to reduce its intended and reasonably expected expenditures on Program Related Costs by more than fifty percent (50%) in retaliation, *inter alia*, for the automatic termination of John Hancock's obligation to make additional Program Payments for the third and fourth Program Years pursuant to the express terms of the Agreement.

30.    Abbott's decision to reduce its intended and reasonably expected expenditures on Program Related Costs in 2005 to less than one-half the amount that Abbott has represented is warranted by the current commercial prospects for the active Program Compounds is inconsistent with the level of effort normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market at a similar stage of development and, therefore, not Commercially Reasonable for purposes of Section 4.1 of the Agreement.

### F. Refusing to Provide John Hancock With a Copy of Abbott's Modified 2005 ARP

31.    Abbott has refused to provide John Hancock with a copy of its modified 2005 ARP. Abbott provided its original 2005 ARP to John Hancock in November 2004. Upon

-14-

information and belief, Abbott since has modified its original 2005 ARP so as to dramatically reduce Abbott's intended and reasonably expected expenditures on Program Related Costs in 2005. Section 2.2 of the Agreement obligates Abbott to "promptly provide[]" John Hancock with "[a]ny ... modifications" to its ARPs. Notwithstanding the express requirements of Section 2.2, Abbott has refused or ignored John Hancock's requests for a copy of Abbott's modified 2005 ARP.

### G. Failing to Out-License or Divest Various Ceased Compounds

32.     Upon information and belief, Abbott has failed to out-license or divest itself of various Ceased Compounds, including, without limitation, ABT-518 and ABT-594, "as soon as is practicable" as required under Section 4.3(d) of the Agreement.

33.     Upon further information and belief, Abbott has chosen not to out-license or divest itself of the foregoing Ceased Compounds for fear that, if those Compounds were successfully developed and marketed by a third party, Abbott might lose future sales of various competing compounds that Abbott has under development, which are not subject to John Hancock's royalty rights.

*John Hancock's Efforts to Resolve Its Claims Against Abbott Amicably*

34.     On April 1, 2005, John Hancock provided written notification to Abbott of the existence and nature of the foregoing disputes in accordance with Section 16.7 of the Agreement.

35.     Authorized representatives of John Hancock and Abbott subsequently met in Chicago, Illinois on May 20, 2005, in an effort to resolve their disputes amicably. That effort was unsuccessful.

<u>Claims</u>

COUNT I
(Fraud)

36.     John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 35 of this Complaint, *supra*.

37.     Abbott materially misrepresented the development status of the Program Compounds in the representations and warranties contained in Sections 12.2 of the Agreement, and applicable Schedules thereto, all in the manner described in this Complaint.

38.     Abbott materially misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock, all in the manner described in this Complaint.

39.     Abbott made the foregoing misrepresentations to John Hancock wantonly and willfully for the purpose of fraudulently inducing John Hancock to enter into the Agreement, and to make various Program Payments to Abbott on the terms stated therein.

40.     John Hancock justifiably relied upon Abbott's misrepresentations to its detriment by, among other things, entering into the Agreement, and making Program Payments to Abbott in accordance with the terms thereof.

41.     As a result of Abbott's misrepresentations, John Hancock has been defrauded by Abbott and has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

COUNT II
(Breach of Contract)

42.     John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 41 of this Complaint, *supra*.

-16-

43.    The Agreement constitutes a valid and binding contract between the parties. John Hancock has performed all of its obligations under the Agreement.

44.    Abbott has breached its obligations to John Hancock under the Agreement, *inter alia*, by:

(a)    misrepresenting the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement;

(b)    misrepresenting the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement;

(c)    misrepresenting Abbott's intended and reasonably expected expenditures on Program Related Costs in ARPs that Abbott has provided to John Hancock;

(d)    failing to use Commercially Reasonable Efforts to develop the Program Compounds;

(e)    refusing to provide John Hancock with a copy of Abbott's modified 2005 ARP;

(f)    failing to out-license or divest itself of certain Ceased Compounds, including, without limitation, ABT-518 and ABT-594, as soon as is practicable; and

(g)    unreasonably and unjustifiably hindering, delaying and obstructing John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement.

45.    By engaging in the foregoing conduct, Abbott further has breached the covenant of good faith and fair dealing that is implied by law in every contract, including the Agreement.

46.    Abbott has breached its express and implied obligations under the Agreement willfully and wantonly in order to induce John Hancock to enter into the Agreement, induce John Hancock to make various Program Payments to Abbott on the terms stated therein, and inhibit John Hancock's ability to detect and confirm Abbott's misconduct.

-17-

47.    As a result of Abbott's willful and wanton breaches of its express and implied obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

COUNT III
(Indemnification)

48.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 47 of this Complaint, *supra*.

49.    Abbott has breached its representations, warranties and obligations to John Hancock under the Agreement as set forth herein.

50.    As a result of Abbott's various breaches of its representations, warranties and obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, "Losses" as defined in Section 1.27 of the Agreement. John Hancock's Losses include, without limitation, costs, damages, and other reasonable expenses such as audit charges and attorneys' fees.

51.    Abbott agreed in Section 12.6 of the Agreement to indemnify John Hancock, *inter alia*, "from and against all Losses related to or arising out of, directly or indirectly ... any breach by Abbott of its representations, warranties or obligations hereunder..."

52.    On April 1, 2005, John Hancock provided written notification to Abbott that John Hancock has sustained, and likely will continue to sustain, compensable Losses on account of Abbott's various breaches of its representations, warranties and obligations under the Agreement, for which John Hancock is entitled to indemnification pursuant to Section 12.6 of the Agreement.

-18-

53.     Notwithstanding John Hancock's request for indemnification, Abbott has refused to indemnify John Hancock for its compensable Losses.

### Prayers for Relief

WHEREFORE, John Hancock respectfully requests that the Court:

(a)     award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's fraud under Count I of the Complaint;

(b)     award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's various breaches of contract under Count II of the Complaint;

(c)     enter an order directing Abbott to indemnify John Hancock for its compensable Losses, including John Hancock's damages, costs, and other reasonable expenses such as audit charges and attorneys' fees, under Count III of the Complaint;

(d)     award John Hancock punitive damages for Abbott's willful and wanton misconduct in an amount to be determined under Counts I and II of the Complaint; and

(e)     grant John Hancock such other and further relief as the Court deems just and appropriate in the circumstances.

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY AND
MANULIFE INSURANCE COMPANY

By their attorneys,

Brian A. Davis (BBO No. 546462)
Karen Collari Troake (BBO No. 566922)
Stacy Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109
Tele: 617-248-5000

Date: June 3, 2005

-19-

3927619v2

JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)   PLAINTIFFS

John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and ManuLife Insurance Company

## DEFENDANTS

Abbott Laboratories

(b)  County of Residence of First Listed Plaintiff   **Suffolk**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c)  Attorney's (Firm Name, Address, and Telephone Number)

Brian A. Davis, CHOATE, HALL & STEWART LLP
Exchange Place, 53 State Street, Boston, MA  02109  (617) 248-5000

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1   U.S. Government
        Plaintiff

☐ 2   U.S. Government
        Defendant

☐ 3   Federal Question
        (U.S. Government Not a Party)

☒ 4   Diversity
        (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                              and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | **PERSONAL INJURY** | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 362 Personal Injury - Med. Malpractice | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| | ☐ 365 Personal Injury - Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 480 Consumer Credit |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☒ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Remanded from Appellate Court
☐ 4  Reinstated or Reopened
☐ 5  Transferred from another district (specify)
☐ 6  Multidistrict Litigation
☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause:
This is an action for fraud, breach of contract, and indemnification. Jurisdiction is proper pursuant to 28 U.S.C. Section 1332(a).

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $
Amount in controversy exceeds $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE  Woodlock      DOCKET NUMBER  03-12501-DPW

DATE

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only)    JOHN HANCOCK LIFE INSURANCE COMPANY, et al.

v. ABBOTT LABORATORIES

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

☐ I. 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

☐ II. 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.    for patent, trademark or copyright cases

☑ III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
380, 385, 450, 891.

☐ IV. 220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
690, 810, 861-865, 870, 871, 875, 900.

☐ V. 150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.
John Hancock Life Insurance Co. et al. v. Abbott Laboratories,    CIVIL ACTION NO. 03-12501-DPW

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?    YES ☑    NO ☐

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?    (See 28 USC §2403)    YES ☐    NO ☑

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?    YES ☐    NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?    YES ☐    NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).    YES ☑    NO ☐

A.    If yes, in which division do all of the non-governmental parties reside?

Eastern Division ☑    Central Division ☐    Western Division ☐

B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division ☐    Central Division ☐    Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)    YES ☐    NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME    BRIAN A. DAVIS, ESQ.
ADDRESS    CHOATE HALL & STEWART LLP, Exchange Place, 53 State St. Boston, MA 02109
TELEPHONE NO.    (617) 248-5000

(CategoryForm.wpd - 5/2/05)

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY), <br><br> Plaintiffs, <br><br> v. <br><br> ABBOTT LABORATORIES, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) CIVIL ACTION NO. _____ <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and ManuLife Insurance Company hereby state, pursuant to Fed. R. Civ. P. 7.1 and Local Rule 7.3, as follows:

1.    Plaintiff John Hancock Life Insurance Company is a wholly-owned subsidiary of John Hancock Financial Services, Inc., which is a wholly-owned subsidiary of ManuLife Financial Corporation.

2.    Plaintiff John Hancock Variable Life Insurance Company is a wholly-owned subsidiary of plaintiff John Hancock Life Insurance Company.

3.    Plaintiff ManuLife Insurance Company is a wholly-owned subsidiary of plaintiff John Hancock Variable Life Insurance Company.

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY AND
MANULIFE INSURANCE COMPANY

By their attorneys,

_____
Brian A. Davis (BBO No. 546462)
Karen Collari Troake (BBO No. 566922)
Stacy Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109
Tele: 617-248-5000

Date:   June 3, 2005

3930415.1

-2-

**Exhibit 6**

ORIGINAL FILED UNDER SEAL – DO NOT SCAN

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER LIFE INSURANCE COMPANY), | ) ) ) ) ) ) ) | |
| | ) | CIVIL ACTION NO. 05-11150-DPW |
| Plaintiffs, | ) ) | **CONFIDENTIAL** |
| v. | ) ) ) | **SUBJECT TO PROTECTIVE ORDER** **FILED UNDER SEAL** |
| ABBOTT LABORATORIES, | ) ) | |
| Defendant. | ) ) ) | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR LEAVE TO AMEND SUPPLEMENTAL COMPLAINT**

# FILED UNDER SEAL

This envelope (or container) containing the above-identified papers filed by Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and Manulife Insurance Company (f/k/a Investors Partner Life Insurance Company), is not to be opened nor the contents thereof displayed or revealed except by further Order of the Court or by agreement of the Parties.

4149324v1

ORIGINAL FILED UNDER SEAL – DO NOT SCAN

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER LIFE INSURANCE COMPANY), | ) ) ) ) ) ) ) ) | CIVIL ACTION NO. 05-11150-DPW |
| Plaintiffs, | ) ) ) | **CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER** |
| v. | ) ) | **FILED UNDER SEAL** |
| ABBOTT LABORATORIES, | ) ) | |
| Defendant. | ) ) ) | |

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR LEAVE TO AMEND SUPPLEMENTAL COMPLAINT

Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and Manulife Insurance Company (f/k/a Investors Partner Life Insurance) (collectively "John Hancock" or "Hancock") hereby submit this Reply Memorandum in Support of their Motion for Leave to Amend Supplemental Complaint.

### Introduction

From the start, this case has centered on John Hancock's claims that Abbott Laboratories ("Abbott") made material misrepresentations in the context of the parties' Research Funding Agreement (the "Agreement" or "RFA"), or omitted material information from that Agreement, in order to induce John Hancock to invest up to $214 million in a "basket" of pharmaceutical

compounds that Abbott purportedly had under development as of March 13, 2001. John Hancock first became suspicious of Abbott's potential misconduct in late 2003. John Hancock has been trying since that time to determine the full extent of Abbott's misrepresentations and omissions, first through an independent audit of Abbott's books and records conducted pursuant to Section 2.5 of the Agreement, and later through discovery in this action. Abbott, for its part, has endeavored at each and every turn to obstruct John Hancock's efforts to uncover the truth, first by refusing to cooperate in Hancock's audit and later by improperly delaying the bulk of its document production and depositions of its knowledgeable personnel until late in the discovery process.[1] The picture that slowly has emerged from Abbott's incomplete discovery responses to date, however, reveals that Abbott affirmatively misrepresented to John Hancock the true development status as of March 2001 of at least three compounds (ABT-518, ABT-594, and ABT-773) in the agreed-upon "basket" of Program Compounds, and that Abbott's misrepresentations and omissions are so pervasive and material as to justify rescinding the Agreement in its entirety.

The allegations of its existing Supplemental Complaint, as described in Hancock's prior discovery responses in this litigation, are more than sufficient to support Hancock's breach of contract and fraud claims with respect to the various Program Compounds, including ABT-773, as well as an order rescinding the RFA as an alternative remedy for Abbott's misrepresentations and omissions. Notwithstanding having previously conducted its own discovery of John Hancock on these very same claims, Abbott, in a recent about-face, now argues that Hancock is

---

[1] For example, as of the date of this Reply Memorandum, Abbott has produced almost one quarter of its total document production *in the last four weeks*, including more than 47,000 pages produced to John Hancock on November 24, 2006 – the day after Thanksgiving. The documents that Abbott recently has produced are directly responsive to John Hancock's First Request for the Production of Documents and Things, which was served on Abbott *more than one year ago* in October 2005. Moreover, Abbott's document production in this litigation still is not complete.

belatedly "seeking to expand this litigation beyond the allegations of the Supplemental Complaint," and that "Abbott would be severely prejudiced if Hancock's motion for leave to amend were granted." *See* Abbott Laboratories' Memorandum in Opposition to Plaintiffs' Motion for Leave to Amend the Supplemental Complaint (the "Opposition" or "Opp."), p. 2. What really motivates Abbott, however, is not a lack of notice or fear of actual prejudice, but rather a desire by Abbott to escape its legal obligations to John Hancock by capitalizing on Abbott's extraordinary and ongoing delay in producing the relevant underlying documents and information to Hancock. John Hancock has moved to amend its Supplemental Complaint, in an abundance of caution, solely to block Abbott's intended route of escape.

Abbott's argument that John Hancock waived its right to rescission is equally unavailing because, among other reasons, Rule 54(c) – which Abbott completely ignores in its Opposition – makes clear that, regardless of whether John Hancock *ever* requested rescission as a remedy, the Court is empowered to grant such relief if the evidence demonstrates that Hancock is so entitled.

For these reason and others, which are discussed more fully below, John Hancock's Motion to Amend should be allowed.

<u>**Argument**</u>

I.    ABBOTT MISCHARACTERIZES JOHN HANCOCK'S MOTION TO AMEND AND THE DISCOVERY TO DATE.

The general rules of pleading call for "a short plain statement of the claim." Fed. R. Civ. P. 8(a). This notice pleading standard does not require John Hancock to delineate each and every fact and detail supporting its claims in order to ensure discovery of those facts and details. *See, e.g.*, <u>System Fuels, Inc. v. U.S.</u>, 2006 WL 2831119, *9 (Fed. Cl. Ct. Sept. 29, 2006) ("a fact need not be alleged in a pleading for a party to be entitled to discovery of information concerning that fact."); <u>Bob Willows Motors, Inc. v. Gen. Motors Inc.</u>, 872 F.2d 788, 791 (7th Cir. 1989) ("To

-3-

this end, pleadings are liberally construed and each theory need not be explicitly spelled out so long as the other side receives notice as to what is at issue in the case."). *See also* Plaintiffs' Memorandum in Support of Motion to Compel Defendant Abbott Laboratories to Produce Documents and Provide Substantive Responses to Certain Interrogatories ("Motion to Compel"), p. 15; Reply to Abbott's Opposition to Plaintiffs' Motion to Compel ("Reply"), p. 8.

In light of these liberal standards, any reasonable reading of the allegations of John Hancock's Supplemental Complaint establishes that they place *all nine* Program Compounds at issue. *See, e.g.,* Supplemental Complaint ("Supp. Compl."), ¶ 41 ("Abbott materially misrepresented the development status of the Program Compounds in the representations and warranties contained in Section 12.2 of the Agreement, and the applicable Schedules thereto, all in the manner described in this Complaint."). Certainly, Abbott previously read the allegations of Hancock's Complaint in this manner when it served its First Set of Requests for Production on John Hancock on December 5, 2005, seeking, *inter alia,* "[a]ny and all documents exchanged between Hancock and any consultant … concerning the Research Funding Agreement or *any compound* that is, or was contemplated to be, subject to the Research Funding Agreement." John Hancock's First Set of Requests for Production, Affidavit of Stacy L. Blasberg ("Blasberg Aff."), Ex. 5 (emphasis added).[2] Abbott also read the allegations of Hancock's Complaint in this manner when it previously produced to John Hancock documents pertaining to *all nine* Program Compounds, including ABT-773, both individually and in the context of the portfolio of Program Compounds encompassed by the Agreement,[3] and when it has questioned John Hancock witnesses at deposition regarding ABT-773. *See, e.g.,* Deposition of Stephen J. Blewitt

---

[2] The Blasberg Affidavit was submitted by John Hancock in conjunction with its Motion to Amend Supplemental Complaint on October 24, 2006. It appears on the Court Docket as entry no. 63.

[3] *Compare* Documents Bates numbered ABBT 140276.UR-77.UR, Supplemental Affidavit of Stacy L. Blasberg ("Blasberg Suppl. Aff.") Aff., Ex. I, *with* Documents Bates numbered ABBT 205042-46, ABBT 0013203, ABBT 0013212, ABBT 220661-64, Blasberg Aff., Ex. 4.

("Blewitt Dep."), pp. 123-124, Blasberg Suppl. Aff., Ex. A; Deposition of Kevin Tormey, pp. 25-27, Blasberg Suppl. Aff., Ex. B; Deposition of Scott S. Hartz ("Hartz Dep."), pp. 224-225, Blasberg Suppl. Aff., Ex. C; Deposition of William B. Lee, pp. 21-23, 27-30, Blasberg Suppl. Aff., Ex. D; and Deposition of Roger G. Nastou, p. 97, Blasberg Suppl. Aff., Ex. E.

Although Abbott represents in the Opposition that it steadfastly has objected to "every Hancock document request that sought discovery on the development of Program Compounds other than ABT-518 and ABT-594" (Opp., p. 8), the truth of the matter is that Abbott, when challenged by John Hancock, long ago agreed to "produce documents other than those relating to ABT-518 and ABT-594" during a meet-and-confer teleconference between counsel on November 15, 2005. *See* December 2, 2005 Letter of Brian A. Davis to Stephen V. D'Amore, p. 2, Blasberg Suppl. Aff., Ex. F; December 9, 2005 Letter of Stephen V. D'Amore to Brian A. Davis, p. 1, Affidavit of Richard C. Abati, Ex. B.[4]

Abbott's conduct in discovery is particularly compelling proof that it long has understood, notwithstanding its recent protests to the contrary, that John Hancock's existing claims are broad enough to encompass all of the Program Compounds. *See, e.g.,* Bob Willows, 872 F.2d at 791-792 ("In deciding whether a complaint fairly notifies a defendant of matters sought to be litigated, courts have often looked beyond the pleadings to the pretrial conduct and communications of the parties." (internal quotations and citations omitted)).

Abbott's citations to John Hancock's early interrogatory responses do not alter the state of Abbott's own knowledge. Those responses specifically state that John Hancock was making claims with respect to *all* of the Program Compounds, and specifically list Dr. Stanley Bukofzer -- who, by Abbott's own admission, was involved in the development of only ABT-773 and

---

[4] The Abati Affidavit was submitted by John Hancock in conjunction with its Motion to Compel on September 26, 2006. It appears on the Court Docket as entry no. 50.

ABT-492 -- as an individual believed by John Hancock to possess knowledge of relevant facts. John Hancock's Objections and Responses to Abbott Laboratories' First Set of Interrogatories, pp. 19, 25, 29, 46, 51, 59, Declaration of Ozge Guzelsu ("Guzelsu Dec."), Ex. 4.[5]  John Hancock also expressly reserved the right to supplement or otherwise modify its responses as necessary in light of additional information, documents or materials produced by Abbott in the course of this litigation. *Id.*, p. 3.  In fact, certain documents and materials subsequently disclosed by Abbott have revealed evidence to support more specific allegations by John Hancock concerning ABT-773. John Hancock has not, however, asserted any new legal theories against Abbott, and does not seek to do so by way of its present Motion to Amend.  John Hancock's claims against Abbott have remained, and will remain, the same. *See* U.S. v. U.S. Trust Co., 106 F.R.D. 474, 476 (D. Mass. 1985) (plaintiff should be allowed to amend its complaint to state more precisely its original allegations); *see also* Vivian Ponte v. Robert Rodriques and the Town of Fairhaven, 1987 WL 13245 at *1 (D. Mass. June 15, 1987) (allowing amendments which clarify and make explicit the implicit grounds on which specific causes of action are based).

It is worth noting that only after Abbott retained new counsel in this action did it argue, for the first time, that the parties' existing pleadings do not encompass any claims involving ABT-773.  Because Abbott has been aware of the broad scope of John Hancock's claims since the inception of this case and clearly has acted in accordance with that understanding during discovery, it cannot now legitimately claim any "surprise" or "prejudice" on account of proposed amendments that are entirely consistent with that understanding.  For these reasons, John Hancock's Motion to Amend should be allowed.

---

[5] The Ozge Guzelsu Declaration was submitted by Abbott in conjunction with its Opposition on November 14, 2006. It appears on the Court Docket as entry no. 83.

II.    JOHN HANCOCK'S MOTION TO AMEND IS SUBJECT TO THE LIBERAL
       AMENDMENT STANDARD OF FED. R. CIV. P. 15(a) AND IS ALSO JUSTIFIED
       BY GOOD CAUSE.

Fed. R. Civ. P. 15(a) provides that "leave [to amend a pleading] shall be freely given

when justice so requires." Contrary to Abbott's contentions otherwise, the present case does not

warrant application of a different "good cause" standard that has been applied in some contexts.

*See, e.g.*, <u>Steir v. Girl Scouts of the USA</u>, 383 F.3d 7, 11-12 (1st Cir. 2004). Unlike in those

cases, John Hancock is not seeking to add additional allegations after the close of discovery or

after the parties have moved for summary judgment on the issues subject to amendment, nor is

there a firm trial date which could be affected by the amendment. *Contrast* <u>Steir</u>, 383 F.3d at 12

(denying motion to amend filed one week after the close of discovery and after the opposing

party had moved for summary judgment); <u>Stanek v. Trailmobile, Inc.</u>, 283 F.2d 827, 828 (7th

Cir. 1960) (denying motion to amend raised on first day of trial). Absent such circumstances, the

"good cause" standard should not apply.

Even if the "good cause" standard used in <u>Steir</u> did apply, however (which it does not),

John Hancock still has met that standard. According to <u>Steir</u>, whether good cause to allow a

motion to amend exists must be considered "in the context in which it is filed." 383 F.3d at 11-

12. The context in which John Hancock's Motion to Amend has been filed is one in which

Abbott repeatedly and egregiously has delayed fulfilling its various discovery obligations to

Hancock, including delaying *for more than a year*, and until shortly before the court-ordered

discovery deadline, the production of the majority of its responsive documents. *See supra*, n. 1.

Abbott also has been made aware while discovery still is ongoing of John Hancock's proposed

amendments. It also is a context in which John Hancock responded promptly to Abbott's recent

assertion, made for the first time after Abbott retained new counsel, that the parties' existing

pleadings do not encompass any claims involving ABT-773, by filing its present Motion to

Amend. These considerations and others provide more than sufficient "good cause" to justify granting John Hancock leave to amend its Supplemental Complaint now. For these reasons, John Hancock's Motion to Amend should be allowed.

III.    ABBOTT HAS HAD AMPLE TIME AND OPPORTUNITY TO PREPARE TO RESPOND TO JOHN HANCOCK'S CLAIMS REGARDING ABT-773.

Abbott's argument that it has not "conducted any significant discovery" on ABT-773 and that it "would be severely prejudiced if it were required to change its litigation strategy to include the development of ABT-773" is belied by the fact that: (a) most, if not all, of the documents relevant to the development of ABT-773 are in *Abbott's possession*, not John Hancock's; (b) Abbott already has requested and received in discovery copies of all of John Hancock's documents pertaining to each of the various Program Compounds, including ABT-773; and (c) Abbott affirmatively has chosen *not* to question various John Hancock witnesses at deposition about Hancock's claims concerning ABT-773 even when invited to do so. *See, e.g.*, Blewitt Dep., pp. 122-124, Blasberg Suppl. Aff., Ex. A; Hartz Dep., pp. 224-225, Blasberg Suppl. Aff., Ex. C. Thus, to the extent that Abbott has failed to prepare itself to defend against John Hancock's claims concerning ABT-773, it is suffering from a self-inflicted wound. Abbott's conscious lack of diligence is no basis to deny John Hancock the opportunity to proceed with an otherwise valid claim. For this reason, John Hancock's Motion to Amend should be allowed.

IV.    JOHN HANCOCK'S PROPOSED AMENDMENTS PERTAINING TO ABT-773 ARE NOT FUTILE.

Abbott's argument that John Hancock has "failed to provide Abbott with written notice of its claims regarding the development of ABT-773" as required under Section 16.7 of the Agreement is a classic red-herring. Without revisiting what the parties actually discussed at their attempted settlement meeting back on May 20, 2005, John Hancock has provided Abbott with

-8-

"written notice" of its claims with respect to ABT-773, at the very least, by means of its Motion to Amend in this case, which was served on October 24, 2006. Abbott, however, has made no effort to meet with John Hancock and "attempt to amicably resolve such dispute within thirty (30) days" after its receipt of that written notice. Thus, any defense that Abbott ever may have had under Section 16.7 has been waived. For this reason, John Hancock's Motion to Amend should be allowed.

V.     JOHN HANCOCK HAS NOT WAIVED OR UNDULY DELAYED ASSERTING ITS
       RIGHT TO SEEK RESCISSION OF THE AGREEMENT.

Abbott further argues that John Hancock cannot amend its Supplemental Complaint to make explicit its right to seek rescission of the Agreement because Hancock allegedly has engaged in "undue delay" in asserting its right to seek the remedy of rescission, or alternatively because Hancock allegedly has waived or already elected not to pursue that remedy. Opp., pp. 11-15. Abbott is wrong on all counts.

First, Federal Rule of Civil Procedure 54(c), which Abbott completely ignores in its opposition papers, effectively moots all of Abbott's arguments on this issue by providing that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, *even if the party has not demanded such relief in the party's pleadings.*" (emphasis added). Thus, the rules of this Court make it clear that, regardless of whether John Hancock *ever* requested rescission of the Agreement in its pleadings in this action, the Court is empowered to grant such relief to Hancock if the evidence demonstrates that Hancock is so entitled. *See, e.g.,* U.S. v. Marin, 651 F.2d 24, 30-31 (1st Cir. 1981) (Federal Rule 54(c) "has been liberally construed, leaving no question that it is the court's duty to grant whatever relief is appropriate in the case on the facts provided."); Forcier v. Metropolitan Life Ins., 2006 WL 3350740 at *7 (1st Cir. 2006) (citing Marin); In re Blinds to Go Share Purchase Litigation, 443 F.3d 1, 8 (1st Cir.

2006) (although plaintiff did not explicitly request rescission, the court upheld the finding of such remedy because "in choosing among equitable remedies, a nisi prius court has the ability -- indeed, the duty -- to weigh all relevant facts and circumstances and craft appropriate relief on a case-by-case basis."); Kaszuk v. Bakery & Confectionary Union, 791 F.2d 548, 559 (7th Cir. 1986) ("failure to amend the pleadings under Rule 15 does not fatally flaw a request for relief made late in the judicial proceeding").

Second, Abbott's delay argument, to the extent that it is even relevant, simply falls apart in the face of John Hancock's Answers to Interrogatories, which put Abbott on notice as far back as February 6, 2006, that John Hancock expressly has reserved the right to seek rescission of the Agreement as a potential remedy in this action pursuant to Prayer (e) of its Complaint. *See* John Hancock's Objections and Responses to Abbott Laboratories' First Set of Interrogatories, pp. 26-29, Guzelsu Dec., Ex. 4. Those discovery responses gave Abbott more than sufficient opportunity to prepare to address the appropriateness of a rescission remedy in this case, including more than sufficient opportunity to retain and inform any expert witnesses that Abbott believes would be necessary. Once again, the fact that Abbott was less than diligent in readying its defenses is not a basis to deny John Hancock the right to receive a remedy to which it is otherwise entitled.

Lastly, the cases cited by Abbott in its Opposition simply do not support the argument that a remedy of rescission is "unavailable" to John Hancock in the circumstances of this case. For example, Abbott cites to Kel-Keef Enterprises, Inc. v. Quality Components Corp., 738 N.E.2d 524 (Ill. Ct. App. 2000), for the proposition that John Hancock already elected in *Hancock I* to forego any claim for rescission of the Research Funding Agreement. Opp., p. 11. The court in Kel-Keef Enterprises, however, expressly held that "election of remedies should be

confined to cases where (1) double compensation of the plaintiff is threatened" (which is not a concern in this case), or "(2) the defendant has actually been misled by the plaintiff's conduct," (which Abbott cannot credibly assert here), or "(3) *res judicata* can be applied." 738 N.E.2d at 1009. Abbott makes a valiant effort to argue that this Court's decision in *Hancock I* has a *res judicata* effect on John Hancock's ability to seek "the inconsistent remedy of rescission after it has already obtained [a] judgment enforcing" the parties' Agreement (Opp., p. 11), but this argument overlooks the critical fact that John Hancock's claims in *Hancock I* were explicitly limited by the Court to the question of "whether or not the termination of the Plaintiff's obligations as a result of shortfalls in the aggregate spending targets is well-founded." *Hancock I* Scheduling Order, dated March 30, 2004, at 1, Blasberg Suppl. Aff., Ex. G. The same Order specifically directed John Hancock to raise any "[o]ther disputes, when ripe ... in a separate related action." *Id.* John Hancock has done what the Court directed in this regard. Abbott's argument also overlooks the critical fact that Abbott pledged in *Hancock I* not to cite that action as the basis for a *res judicata* argument in any subsequent action between the parties. *See* March 30, 2004 Transcript of Court Conference in *Hancock I*, pp. 22-23, Blasberg Suppl. Aff., Ex. H. Abbott should be made to live up to that commitment. For these reasons, John Hancock's Motion to Amend should be allowed.

## Conclusion

For the foregoing reasons as well as those set out in Plaintiffs' Memorandum of Law in Support of Their Motion for Leave to Amend Supplemental Complaint, John Hancock respectfully requests that its Motion to Amend be allowed in its entirety, and that John Hancock be granted leave to file its First Amended Supplemental Complaint.

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK VARIABLE LIFE
INSURANCE COMPANY AND MANULIFE
INSURANCE COMPANY

By their attorneys,

Brian A. Davis (BBO No. 546462)
Joseph H. Zwicker (BBO No. 560219)
Karen Collari Troake (BBO No. 566922)
Stacy L. Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART
Two International Place
Boston, MA 02110
Telephone: 617-248-5000
Fax: 617-248-4000

Date: November 29, 2006

4149012.1

-12-

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served by electronic and overnight mail upon Peter E. Gelhaar, Esq., Donnelly, Conroy & Gelhaar, LLP, One Beacon Street, 33rd Floor, Boston, MA 02108, and Gregory D. Phillips, Esq., Munger, Tolles & Olson LLP, 355 South Grand Avenue, Los Angeles, CA 90071, on this 29th day of November, 2006.

F. Thompson Reece

**Exhibit 7**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY), <br><br> Plaintiffs, <br><br> v. <br><br> ABBOTT LABORATORIES, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )    CIVIL ACTION NO. 05-11150-DPW |

## SUPPLEMENTAL COMPLAINT

### Introduction

1.      This is an action for fraud, breach of contract, and indemnification in which plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and ManuLife Insurance Company (f/k/a "Investors Partner Life Insurance") seek compensatory and punitive damages, costs and attorneys' fees for defendant Abbott Laboratories' misrepresentations and other conduct that violates the Research Funding Agreement entered into by and between the plaintiffs and defendant and dated as of March 13, 2001 (the "Agreement"). This action is filed as a separate related action to the pending matter captioned *John Hancock Life Insurance Company, et al. v. Abbott Laboratories*, Civil Action

No. 03-12501-DPW (the "Existing Action"), pursuant to Section (1) of the Court's Scheduling Order entered in the Existing Action on March 30, 2004.

## The Parties

2.     Plaintiff John Hancock Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.   John Hancock Life Insurance Company is one of the nation's leading insurance companies, providing a broad array of insurance and investment products to retail and institutional customers, primarily in North America.

3.     Plaintiff John Hancock Variable Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.   John Hancock Variable Life Insurance Company provides variable life insurance products that link life insurance coverage and an investment return to an underlying portfolio of investments chosen by the policyholder.

4.     Plaintiff ManuLife Insurance Company (collectively, with plaintiffs John Hancock Life Insurance Company and John Hancock Variable Life Insurance Company, "John Hancock") is a company, duly formed and existing under the laws of the State of Delaware, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.  ManuLife Insurance Company is a wholly-owned subsidiary of John Hancock Variable Life Insurance Company that sells various types of life insurance products.  ManuLife Insurance Company formerly was known as "Investors Partner Life Insurance."

5.     Defendant Abbott Laboratories ("Abbott") is a corporation, duly formed and existing under the laws of the State of Illinois, that maintains its corporate headquarters in Abbott Park, Illinois. Abbott is a broad-based healthcare company that discovers, develops, manufactures and markets products and services that span the continuum of care -- from prevention and diagnosis to treatment and cure. Abbott's principal businesses are global pharmaceuticals, nutritionals, and medical products, including diagnostics and cardiovascular devices. Abbott achieved record sales and net earnings of $19.7 billion and $3.2 billion, respectively, in 2004. Its leadership positions in several multibillion-dollar businesses provide Abbott with a unique balance of revenue growth opportunities and cash flow sources that allow Abbott to invest in its future.

### Jurisdiction and Venue

6.     This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(a)(1) because defendant Abbott resides in this district within the meaning of 28 U.S.C. § 1391(c), and further because Section 16.2 of the parties' Agreement provides that Abbott,

> consents ... to the exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts ... for the purpose of any suit, action or other proceeding arising out of any of its obligations hereunder or thereunder or with respect to the transactions contemplated hereby or thereby, and expressly waives any and all objections that it may have as to venue in such courts.

## The Facts

### The Agreement And Its Relevant Terms

8.     On March 13, 2001, John Hancock and Abbott entered the Agreement, whereby John Hancock agreed to provide funding to Abbott for research and development activities on a portfolio of potential pharmaceutical products or "Program Compounds" (the "Research Program") in exchange for the right to receive certain management fees and future milestone and royalty payments from Abbott.

9.     The nine Program Compounds encompassed by the Abbott Research Program are: (a) ABT-773, a kelotide that may be useful as an antibiotic; (b) ABT-627, an endothelin-A receptor agonist that may be useful in the treatment of prostate cancer; (c) ABT-594, a non-opiod analgesic that may be useful in the treatment of chronic pain; (d) ABT-492, a quinolone that may be useful as an antibiotic; (e) ABT-510, a synthetic peptide that may be useful in the treatment of cancer; (f) ABT-518, a metalloproteinase inhibitor that may be useful in the treatment of cancer; (g) ABT-751, an antimitotic tubulin agonist that may be useful in the treatment of cancer; (h) ABT-100, a farnesyltransferase protein inhibitor that may be useful in the treatment of cancer; and (i) ABT-724, a dopamine receptor agonist that may be useful in the treatment of erectile dysfunction.

10.     Under the terms of the Agreement, John Hancock agreed to contribute up to a specified maximum amount toward the costs incurred by Abbott in operating the Research Program ("Program Related Costs") in four annual installments (the "Program Payments") over the period from March 13, 2001 through December 31, 2004 (individually, the four "Program Years" and, collectively, the four-year "Program Term"). Abbott agreed, in return, to invest at least twice the amount of John Hancock's contribution from its own funds towards

-4-

the operation of the Research Program, and committed to spend certain minimum amounts on Program Related Costs during each Program Year (the "Annual Minimum Spending Target"), as well as a minimum aggregate total on Program Related Costs over the four-year Program Term (the "Aggregate Spending Target").

11.    The Agreement, which comprises more than thirty-five (35) pages, was the subject of extensive negotiations between the parties and their counsel over a period of approximately one year.  From John Hancock's perspective, the financial attractiveness of the Agreement turned largely upon the specific identity of, and commercial prospects for, the nine Program Compounds encompassed by the Research Program.  John Hancock ran numerous analytical models based on financial projections for the Program Compounds in order to ensure, as best that it could, that the risks associated with its anticipated investment in the Research Program were justified by the potential rewards that John Hancock would receive if and when some or all of the Program Compounds were approved and commercialized.

12.    Because the financial return, if any, that John Hancock ultimately will receive on its investment in the Program Compounds is heavily dependent on the commercial success of those Compounds, John Hancock had a strong interest in ensuring, before the Agreement was signed, that: (a) Abbott had a good faith intention to aggressively pursue development of each of the Program Compounds; and (b) Abbott had a good faith belief that each of the Program Compounds possessed reasonably favorable commercial prospects.  In order to satisfy John Hancock's concerns on these points, Abbott agreed to provide John Hancock, in Article 12 of the Agreement, with certain written representations and warranties concerning the development status of the Program Compounds, including, *inter alia*, a representation and warranty that,

[s]et forth on Exhibit 12.2(d) is the full name, chemical name, detailed description of the stage of development and current status for each Program Compound. Set forth on Exhibit 1.6 in each Annual Research Plan is a description of projected milestones and dates thereof, projected year of NDA filing, and projected costs to be incurred by Abbott during the Program Term, for each Program Compound. Such projections were prepared in good faith and with due care based on reasonable assumptions, and represent the reasonable estimate of Abbott based on information available as of the date of such projections and as of the date hereof.... (Section 12.2[d]).

13.     Abbott further represented and warranted to John Hancock that,

[t]here is no fact known to Abbott (other than generally available information concerning the pharmaceutical industry in general) as of the date of this Agreement that has not been disclosed in this Agreement or any Exhibit to this Agreement which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial [viability]) of the Research Program or any of the Program Compounds. (Section 12.2[i]).

14.     The Agreement contains various other terms that are intended to protect John Hancock's interests by ensuring that Abbott fairly and diligently fulfills its research and development obligations under the Agreement, including terms which provide, *inter alia*, that Abbott:

(a)     must employ "Commercially Reasonable Efforts" (defined in the Agreement as "efforts which are consistent with those normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market potential at a similar stage of development or product life") to develop each of the Program Compounds and "achieve the objectives of the Research Program efficiently and expeditiously" (Sections 1.10, 2.3 and 4.1);

(b)     must keep John Hancock fully informed of any modifications to its written "Annual Research Plans" ("ARPs") by requiring that "[a]ny such modifications ... be promptly provided to John Hancock" (Section 2.2);

-6-

(c)    shall not "research, develop, manufacture, market, sell, distribute, out-license or otherwise treat" the Program Compounds any differently "as compared to any other Abbott compounds or products" on account of any of the rights granted to John Hancock under Agreement (Section 4.4); and

(d)    shall, "as soon as is practicable," out-license or divest any "Ceased Compound" (defined in the Agreement as a Program Compound that Abbott has "substantially cease[d] developing, marketing or selling") to a third party, and shall "remunerate John Hancock based on sales of such Ceased Compound by the third party that has acquired or licensed the Ceased Compound ... in a manner most consistent with the allocation that would have applied hereunder had such Ceased Compound not been so out-licensed or divested..." (Section 4.3[d]).

15.    John Hancock's obligation under the Agreement to make additional Program Payments during the four-year Program Term is not absolute, however.  In entering into the Agreement, John Hancock did not want to obligate itself to continue investing in the Program Compounds if the commercial prospects for those Compounds diminished significantly over the four-year Program Term.  Accordingly, John Hancock's obligation to make its second, third and fourth Program Payments was made expressly contingent upon the demonstration by Abbott, on an annual basis, of the continued commercial viability of the Program Compounds.

16.    For purposes of the Agreement, the continued commercial viability of the Program Compounds is measured by reference to Abbott's planned expenditures on Program Related Costs over the four-year Program Term.  Section 2.2 of the Agreement requires Abbott to provide John Hancock, at least forty-five days (45) prior to the start of each Program Year, with a written ARP that spells out Abbott's anticipated Research Program expenditures for that year and for each year remaining in the Program Term.  If Abbott's ARP for any given year did not "reasonably demonstrate [Abbott's] ... intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target" as set forth in the Agreement, then John Hancock's "obligation to

make any remaining Program Payments for any succeeding Program Years" automatically would terminate pursuant to Section 3.4(iv) of the Agreement.

17.    Section 3.3 of the Agreement sets forth Abbott's obligations to John Hancock in the event that Abbott fails to reach the Aggregate Spending Target for Program Related Costs over the four-year Program Term.    Section 3.3(b) states that Abbott "will expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the "Aggregate Carryover Amount") on Program Related Costs during the *subsequent year* commencing immediately after the end of the Program Term (emphasis added)."    If Abbott fails to spend the entire Aggregate Carryover Amount during such subsequent year, Section 3.3(b) obligates Abbott to "pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days after the end of such subsequent year."

18.    The four-year Program Term ended on December 31, 2004, and the "subsequent year commencing immediately after the end of the Program Term" ended on December 31, 2005.    Accordingly, Abbott was required to spend the Aggregate Carryover Amount by December 31, 2005, and required to pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott as of that date on or before January 30, 2006.

19.    The Agreement further provides John Hancock with the power to objectively verify Abbott's compliance with the terms of the Agreement, including the right to retain an independent auditor of John Hancock's choosing (and reasonably acceptable to Abbott) who is empowered to inspect, copy and audit the "books and records of Abbott and each Subcontractor related to the Research Program ... at any time and from time to time."    John

Hancock is required to pay the fees and expenses of its chosen auditor in the first instance. If, however, the work of John Hancock's auditor "reveals any material breach of Abbott's responsibilities" under the Agreement, then Section 2.5 provides that Abbott "shall (i) pay the reasonable fees and expenses charged by such auditor, and (ii) fully and promptly cure such breach."

*John Hancock's Efforts to Audit Abbott's Compliance*
*With The Terms of the Agreement*

20.     Since the Agreement was executed on March 13, 2001, John Hancock has become aware of certain potential breaches of the Agreement by Abbott. Such potential breaches include, but are not limited to, misrepresentations by Abbott in the negotiation and execution of the Agreement, as well as violations by Abbott of its development and administrative responsibilities under the Agreement.

21.     Consistent with the terms of the Agreement, and in an effort to assist in confirming or refuting Abbott's suspected violations, John Hancock initiated an independent audit of Abbott's books and records on April 12, 2004. On that date, John Hancock sent a letter to Abbott notifying Abbott of John Hancock's intention to undertake a compliance audit pursuant to Section 2.5 of the Agreement, and identifying the independent auditor that had been selected by John Hancock. John Hancock accompanied its audit notification letter to Abbott with a description of the specific books and records related to the Research Program that John Hancock requested be made available for examination by its independent auditor within thirty (30) days.

22.     Abbott unreasonably and unjustifiably has delayed, and continues to delay, its response to John Hancock's audit request, and has taken affirmative steps to obstruct the legitimate efforts of John Hancock's independent auditors to confirm or refute Abbott's

compliance with terms of the Agreement.  Tactics employed by Abbott to hinder, delay and

obstruct John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement

include, but are not limited to:

(a)     unreasonably and unjustifiably objecting to John Hancock's chosen
        auditor for a period of months, then arbitrarily withdrawing its objection;

(b)     unreasonably and unjustifiably delaying production of the majority of the
        relevant books and records requested by John Hancock's auditor for
        almost one year (and counting);

(c)     unreasonably and unjustifiably refusing to make certain relevant books
        and records available for inspection and copying at all (including,
        without limitation, various books and records documenting Abbott's
        actual expenditures on Program Related Costs);

(d)     unreasonably and unjustifiably redacting various relevant books and
        records produced during the course of the audit so as to eliminate
        relevant information and render certain materials effectively
        unintelligible, notwithstanding the existence of a written confidentiality
        agreement between the parties;

(e)     unreasonably and unjustifiably understaffing and under-funding Abbott's
        response to John Hancock's audit request in order to further delay the
        examination of Abbott's relevant books and records by John Hancock's
        auditor;

(f)     unreasonably and unjustifiably delaying for periods of six months or
        more the photocopying of books and records designated by John
        Hancock's auditor during the inspection process;

(g)     unreasonably and unjustifiably refusing to provide John Hancock's
        auditor with photocopies of various books and records produced by
        Abbott, and designated by John Hancock's auditor, during the inspection
        process;

(h)     unreasonably and unjustifiably refusing to permit John Hancock or its
        independent auditor to make their own photocopies of Abbott's books
        and records produced for audit purposes;

(i)     unreasonably and unjustifiably violating acknowledged deadlines for the
        completion of Abbott's production of books and records responsive to
        John Hancock's audit requests;

(j)    unreasonably and unjustifiably ignoring or refusing to answer various written and oral inquiries by John Hancock and its auditor regarding Abbott's relevant books and records; and

(k)    unreasonably and unjustifiably acting in a manner contrary to the usual course of contractual compliance audits, and contrary to Abbott's own conduct in reasonably similar circumstances in the past.

23.    As of the date of its original Complaint in this action, Abbott still had not produced all of the material books and records related to the Research Program that were requested by John Hancock and its auditor on April 12, 2004, and refused to do so. Abbott also refused to answer inquiries by John Hancock and its auditor seeking information that is necessary to complete the audit of Abbott's compliance with the Agreement.

*Abbott's Violations of the Agreement*

A.  Obstructing John Hancock's Compliance Audit

24.    Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement as expressly permitted under Section 2.5. Upon information and belief, Abbott's efforts to hinder, delay and obstruct John Hancock's audit activities are intended to undermine, and have had the effect of undermining, John Hancock's ability to obtain information which would tend to confirm that Abbott has breached the Agreement in various other ways as set forth below.

B.  Misrepresenting the Development Status of ABT-518

25.    Upon information and belief, Abbott misrepresented the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that ABT-518 was "a compelling development candidate with the potential to demonstrate antitumor effects superior to the MMP inhibitors currently undergoing clinical trials." Abbott understood before the Agreement was

-11-

executed, however, that the actual development status of ABT-518 was not as represented in the Agreement. For example, Abbott personnel already had plans as of early March 2001 to terminate the development of ABT-518, but understood that full disclosure of that fact to John Hancock "could have been the deathnell (*sic*) to the deal." Accordingly, Abbott personnel took affirmative steps on and prior to March 13, 2001 to conceal from John Hancock the true development status of ABT-518 so as to induce John Hancock to enter into the Agreement. Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-518.

26.    The development status of ABT-518 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-518 in making that decision. Had John Hancock known the true development status of ABT-518 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

## C. Misrepresenting the Development Status of ABT-594

27.    Upon information and belief, Abbott misrepresented the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that a "phase IIb [clinical] study for neuropathic pain at higher, titrated doses of ABT-594 began in April 2000 and ends in June 2001," and that ABT-594 was "expected to be the first neuronal nicotinic receptor agonist to receive an indication for pain." Abbott understood before the Agreement was executed,

-12-

however, that the development status of ABT-594 was not as represented in the Agreement. For example, Abbott already knew prior to the execution of the Agreement that the termination rate for patients enrolled in the phase IIb clinical study of ABT-594 was unusually high, and that the final results of that study were likely to be unfavorable. Abbott also knew, no later than March 2001, that the development of ABT-594 was likely to be significantly delayed or even discontinued by Abbott as a consequence. Abbott failed to disclose these facts to John Hancock before the Agreement was executed in order to induce John Hancock to enter into the Agreement. Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-594.

28.     The development status of ABT-594 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-594 in making that decision. Had John Hancock known the true development status of ABT-594 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

### D.  Misrepresenting Its Intended and Reasonably Expected Spending on Program Related Costs

29.     Upon information and belief, Abbott has misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock. The Research Program cost projections that Abbott has provided to John Hancock in various ARPs reflect Abbott's "nominal" spending, as opposed to its "expected" spending. At all relevant times, Abbott's true "expected" spending on Program Related Costs

was considerably less than the amounts communicated to John Hancock in Abbott's ARPs. Abbott has misrepresented its intended and reasonably expected spending plans to John Hancock in order to induce John Hancock to enter into the Agreement, and to make Program Payments to Abbott that would not otherwise be due under the terms of the Agreement.

30.    Abbott's intended and reasonably expected expenditures on Program Related Costs constitute material facts for purposes of John Hancock's decision to enter into the Agreement.  John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding its intended and reasonably expected expenditures on Program Related Costs in making that decision.  Had John Hancock known the true level of Abbott's intended and reasonably expected expenditures, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, may not have made certain Program Payments, or may not have entered into the Agreement at all.

E.  Failing to Use Commercially Reasonable Efforts
to Develop the Program Compounds

31.    Upon information and belief, Abbott has failed to use Commercially Reasonable Efforts to develop the Program Compounds.  Abbott previously represented to John Hancock in its 2005 ARP that the current commercial prospects for the active Program Compounds warrant the expenditure of a stated sum towards Program Related Costs in 2005.  Upon information and belief, Abbott since has modified its 2005 ARP so as to reduce its intended and reasonably expected expenditures on Program Related Costs by more than fifty percent (50%) in retaliation, *inter alia*, for the automatic termination of John Hancock's obligation to make additional Program Payments for the third and fourth Program Years pursuant to the express terms of the Agreement.

-14-

32.    Abbott's decision to reduce its intended and reasonably expected expenditures on Program Related Costs in 2005 to less than one-half the amount that Abbott has represented is warranted by the current commercial prospects for the active Program Compounds is inconsistent with the level of effort normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market at a similar stage of development and, therefore, not Commercially Reasonable for purposes of Section 4.1 of the Agreement.

### F.    Refusing to Provide John Hancock With a Copy of Abbott's Modified 2005 ARP

33.    Abbott has refused to provide John Hancock with a copy of its modified 2005 ARP. Abbott provided its original 2005 ARP to John Hancock in November 2004. Upon information and belief, Abbott since has modified its original 2005 ARP so as to dramatically reduce Abbott's intended and reasonably expected expenditures on Program Related Costs in 2005. Section 2.2 of the Agreement obligates Abbott to "promptly provide[]" John Hancock with "[a]ny ... modifications" to its ARPs. Notwithstanding the express requirements of Section 2.2, Abbott has refused or ignored John Hancock's requests for a copy of Abbott's modified 2005 ARP.

### G.    Failing to Out-License or Divest Various Ceased Compounds

34.    Upon information and belief, Abbott has failed to out-license or divest itself of various Ceased Compounds, including, without limitation, ABT-518 and ABT-594, "as soon as is practicable" as required under Section 4.3(d) of the Agreement.

35.    Upon further information and belief, Abbott has chosen not to out-license or divest itself of the foregoing Ceased Compounds for fear that, if those Compounds were successfully developed and marketed by a third party, Abbott might lose future sales of various

competing compounds that Abbott has under development, which are not subject to John Hancock's royalty rights.

### H. Failing To Pay John Hancock One-Third Of The Actual Aggregate Carryover Amount

36.    Because Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement, Abbott's actual spending on Program Related Costs over the four-year Program Term ended on December 31, 2004, and the "subsequent year commencing immediately after the end of the Program Term" ended on December 31, 2005, currently is unknown.  Abbott has represented and John Hancock has reason to believe, however, that Abbott's actual spending on Program Related Costs during the Program Term was considerably less than the Aggregate Spending Target, and that Abbott's actual spending on Program Related Costs during such subsequent year was considerably less than the Aggregate Carryover Amount.

37.    Pursuant to Section 3.3(b) of the Agreement, Abbott was required to pay John Hancock one-third of the actual, unspent Aggregate Carryover Amount on or before January 30, 2006.  Notwithstanding the express requirements of Section 3.3(b), Abbott has failed to make such payment to John Hancock.

*John Hancock's Efforts to Resolve Its Claims Against Abbott Amicably*

38.    On April 1, 2005, John Hancock provided written notification to Abbott of the existence and nature of the disputes identified in Sections A-G above in accordance with Section 16.7 of the Agreement.  Authorized representatives of John Hancock and Abbott subsequently met in Chicago, Illinois on May 20, 2005, in an effort to resolve their disputes amicably.  That effort was unsuccessful.

39.    On January 5, 2006, John Hancock provided written notification to Abbott of the existence and nature of the disputes identified in Section H above in accordance with Section 16.7 of the Agreement.  Representatives of Abbott did not meet with John Hancock for the purpose of resolving those disputes within the time period permitted under Section 16.7.

## Claims

### COUNT I
### (Fraud)

40.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 39 of this Complaint, *supra*.

41.    Abbott materially misrepresented the development status of the Program Compounds in the representations and warranties contained in Sections 12.2 of the Agreement, and applicable Schedules thereto, all in the manner described in this Complaint.

42.    Abbott materially misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock, all in the manner described in this Complaint.

43.    Abbott made the foregoing misrepresentations to John Hancock wantonly and willfully for the purpose of fraudulently inducing John Hancock to enter into the Agreement, and to make various Program Payments to Abbott on the terms stated therein.

44.    John Hancock justifiably relied upon Abbott's misrepresentations to its detriment by, among other things, entering into the Agreement, and making Program Payments to Abbott in accordance with the terms thereof.

45.    As a result of Abbott's misrepresentations, John Hancock has been defrauded by Abbott and has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

## COUNT II
### (Breach of Contract)

46.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 45 of this Complaint, *supra.*

47.    The Agreement constitutes a valid and binding contract between the parties. John Hancock has performed all of its obligations under the Agreement.

48.    Abbott has breached its obligations to John Hancock under the Agreement, *inter alia*, by:

(a)    misrepresenting the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement;

(b)    misrepresenting the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement;

(c)    misrepresenting Abbott's intended and reasonably expected expenditures on Program Related Costs in ARPs that Abbott has provided to John Hancock;

(d)    failing to use Commercially Reasonable Efforts to develop the Program Compounds;

(e)    refusing to provide John Hancock with a copy of Abbott's modified 2005 ARP;

(f)    failing to out-license or divest itself of certain Ceased Compounds, including, without limitation, ABT-518 and ABT-594, as soon as is practicable; and

(g)    unreasonably and unjustifiably hindering, delaying and obstructing John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement.

(h)    failing to pay John Hancock one-third of the actual, unspent Aggregate Carryover Amount pursuant to Section 3.3(b) of the Agreement.

-18-

49.    By engaging in the foregoing conduct, Abbott further has breached the covenant of good faith and fair dealing that is implied by law in every contract, including the Agreement.

50.    Abbott has breached its express and implied obligations under the Agreement willfully and wantonly in order to induce John Hancock to enter into the Agreement, induce John Hancock to make various Program Payments to Abbott on the terms stated therein, and inhibit John Hancock's ability to detect and confirm Abbott's misconduct.

51.    As a result of Abbott's willful and wanton breaches of its express and implied obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

COUNT III
(Indemnification)

52.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 51 of this Complaint, *supra*.

53.    Abbott has breached its representations, warranties and obligations to John Hancock under the Agreement as set forth herein.

54.    As a result of Abbott's various breaches of its representations, warranties and obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, "Losses" as defined in Section 1.27 of the Agreement. John Hancock's Losses include, without limitation, costs, damages, and other reasonable expenses such as audit charges and attorneys' fees.

55.    Abbott agreed in Section 12.6 of the Agreement to indemnify John Hancock, *inter alia*, "from and against all Losses related to or arising out of, directly or indirectly ... any breach by Abbott of its representations, warranties or obligations hereunder..."

56.    On April 1, 2005, John Hancock provided written notification to Abbott that John Hancock has sustained, and likely will continue to sustain, compensable Losses on account of Abbott's various breaches of its representations, warranties and obligations under the Agreement, for which John Hancock is entitled to indemnification pursuant to Section 12.6 of the Agreement.

57.    Notwithstanding John Hancock's request for indemnification, Abbott has refused to indemnify John Hancock for its compensable Losses.

### Prayers for Relief

WHEREFORE, John Hancock respectfully requests that the Court:

(a)    award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's fraud under Count I of the Complaint;

(b)    award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's various breaches of contract under Count II of the Complaint;

(c)    enter an order directing Abbott to indemnify John Hancock for its compensable Losses, including John Hancock's damages, costs, and other reasonable expenses such as audit charges and attorneys' fees, under Count III of the Complaint;

(d)    award John Hancock punitive damages for Abbott's willful and wanton misconduct in an amount to be determined under Counts I and II of the Complaint; and

(e)     grant John Hancock such other and further relief as the Court deems just and appropriate in the circumstances.

> JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY AND MANULIFE INSURANCE COMPANY
>
> By their attorneys,
>
> /s/ Brian A. Davis
> Brian A. Davis (BBO No. 546462)
> Joseph H. Zwicker (BBO No. 560219)
> Stacy Blasberg (BBO No. 657420)
> CHOATE, HALL & STEWART LLP
> Two International Place
> Boston, Massachusetts 02110
> Telephone: 617-248-5000

Date: June 23, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 23, 2006.

> /s/ Brian A. Davis
> Brian A. Davis

4090288.1

**Exhibit 8**

ORIGINAL FILED UNDER SEAL - DO NOT SCAN
UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER LIFE INSURANCE COMPANY), | ) ) ) ) ) ) ) ) | CIVIL ACTION NO. 05-11150-DPW |
| Plaintiffs, | ) ) ) | CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER FILED UNDER SEAL |
| v. | ) ) |  |
| ABBOTT LABORATORIES, | ) ) |  |
| Defendant. | ) ) ) |  |

## PLAINTIFFS' MOTION FOR LEAVE TO AMEND SUPPLEMENTAL COMPLAINT

Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Manulife Insurance Company (f/k/a "Investors Partner Life Insurance Company") (collectively, "John Hancock") hereby move, pursuant to Federal Rule of Civil Procedure 15(a), for leave to serve and file the attached First Amended Supplemental Complaint in the above-captioned matter. In support of its Motion, John Hancock states that:

1.  John Hancock seeks leave to amend its complaint to: (a) make explicit that John Hancock's existing claims for fraud, breach of contract and indemnification also encompass Abbott's misrepresentations and omissions concerning ABT-773; and (b) make explicit Hancock's intention to seek rescission of the Research Funding Agreement as an alternative remedy.

2.    Rule 15(a) provides that "leave [to amend a pleading] shall be freely given when justice so requires."

3.    The courts have found that unless it can be demonstrated that the amendments would be futile or there has been undue delay resulting in prejudice, leave to amend should be granted. Glassman v. Computervision Corp., 90 F.3d 617, 622 (1st Cir. 1996).

4.    John Hancock's Supplemental Complaint plainly calls into question the veracity of Abbott's representations and warranties concerning the status of the various Program Compounds encompassed by the Agreement, including but not limited to ABT-518 and ABT-594. The allegations of the Supplemental Complaint also make it clear that, before filing suit, John Hancock attempted, without success, to determine the full extent of Abbott's misrepresentations and omissions. Discovery in this litigation now has established that Abbott's actionable misrepresentations and omissions extend to ABT-773. John Hancock's proposed amendment to the Supplemental Complaint merely expands upon Hancock's original allegations concerning Abbott's misconduct in light of that discovery. It adds no new claims and does not require broadening the scope of discovery beyond its existing parameters. See U.S. v. U.S. Trust Co., 106 F.R.D. 474, 476 (D. Mass. 1985) (plaintiff should be allowed to amend its complaint to state more precisely its original allegations); see also Vivian Ponte v. Robert Rodriques and the Town of Fairhaven, 1987 WL 13245 at *1 (D. Mass. June 15, 1987) (allowing amendments which clarify and make explicit the implicit grounds on which specific causes of action are based).

5.    The same is true with respect to John Hancock's proposed amendment adding rescission of the Agreement as an alternative remedy. Illinois law (which governs the Agreement by its terms) expressly recognizes rescission as an available remedy in cases involving fraud or material breach of contract. See, e.g., Newton v. Aitken, 260 Ill.App.3d 717,

719 (1994); Mor-Wood Contractors, Inc. v. Ottinger, 205 Ill.App.3d 132, 142 (1990). Assuming that John Hancock proves fraud or material breach on Abbott's part (as it will), Hancock would be entitled to ask the Court to rescind the Agreement regardless of whether Hancock ever demanded such relief in its pleadings. *See* Fed. R. Civ. P. 54(c) ("[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings."). John Hancock's proposed amendment simply makes it absolutely clear, for the benefit of the parties and the Court, that the "other and further relief" which Hancock already has requested in its Supplemental Complaint can and should include rescission of the Agreement in the circumstances of this case. Again, no new claims are added and no additional discovery will be required.

6.    No valid argument can be made in the present circumstances that John Hancock's proposed First Amended Supplemental Complaint would fail to state a claim against Abbott for, *inter alia*, fraud and breach of contract.

7.    John Hancock's Motion to Amend is prompted by new evidence obtained during discovery in this action and by Hancock's desire to avoid any possibility of surprise (or, more accurately, any *claim* of surprise) at trial. There has been no undue delay on Hancock's part in seeking to amend its Supplemental Complaint.

8.    In further support of its Motion, John Hancock submits an accompanying Memorandum of Law and the Affidavit of Stacy L. Blasberg (with Exhibits 1-6) filed in conjunction herewith, and cites to the Affidavit of Richard C. Abati (and accompanying Exhibits A-CC) filed on September 26, 2006, in support of John Hancock's Motion to Compel. John Hancock further submits a Proposed Order with this Motion.

9.    For the Court's convenience, John Hancock attaches as Exhibits A and B hereto a redlined version of the First Amended Supplemental Complaint highlighting the amended language, as well as a clean copy to be served and filed.

WHEREFORE, John Hancock respectfully requests that the Court enter an order granting it leave to serve and file the First Amended Supplemental Complaint.

## REQUEST FOR ORAL ARGUMENT

In accordance with Local Rule 7.1(D), Plaintiffs respectfully request oral argument on this Motion.

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK VARIABLE LIFE
INSURANCE COMPANY AND MANULIFE
INSURANCE COMPANY

By their attorneys,

Brian A. Davis (BBO No. 546462)
Joseph H. Zwicker (BBO No. 560219)
Karen Collari Troake (BBO No. 566922)
Stacy L. Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART
Two International Place
Boston, MA  02110
Telephone:  617-248-5000
Fax:  617-248-4000

Date:  October 24, 2006

## LOCAL RULE 7.1 CERTIFICATION

Pursuant to Local Rule 7.1(A)(2), the undersigned counsel for Plaintiffs hereby certifies that, on October 6, 2006, counsel for John Hancock conferred in good faith with counsel for Abbott in an effort to resolve or narrow the issues that are the subject of this Motion, but no agreement could be reached by the parties.

Karen Collari Troake

4134849v1

-5-

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served by electronic and overnight mail upon Peter E. Gelhaar, Esq., Donnelly, Conroy & Gelhaar, LLP, One Beacon Street, 33rd Floor, Boston, MA 02108, and Gregory D. Phillips, Esq., Munger, Tolles & Olson LLP, 355 South Grand Avenue, Los Angeles, CA 90071, on this 24th day of October, 2006.

_____
Stacy L. Blasberg

.

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY), | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 05-11150-DPW |
| v. | ) ) ) | |
| ABBOTT LABORATORIES, | ) ) | |
| Defendant. | ) ) | |

## FIRST AMENDED SUPPLEMENTAL COMPLAINT

### Introduction

1.    This is an action for fraud, breach of contract, and indemnification in which plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Manulife Insurance Company (f/k/a "Investors Partner Life Insurance") seek compensatory and punitive damages, rescission, costs and attorneys' fees for defendant Abbott Laboratories' misrepresentations and other conduct that violates the Research Funding Agreement entered into by and between the plaintiffs and defendant and dated as of March 13, 2001 (the "Agreement").    This action is filed as a separate related action to the pending matter

captioned *John Hancock Life Insurance Company, et al. v. Abbott Laboratories*, Civil Action No. 03-12501-DPW (the "Existing Action"), pursuant to Section (1) of the Court's Scheduling Order entered in the Existing Action on March 30, 2004.

## The Parties

2.      Plaintiff John Hancock Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.   John Hancock Life Insurance Company is one of the nation's leading insurance companies, providing a broad array of insurance and investment products to retail and institutional customers, primarily in North America.

3.      Plaintiff John Hancock Variable Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.   John Hancock Variable Life Insurance Company provides variable life insurance products that link life insurance coverage and an investment return to an underlying portfolio of investments chosen by the policyholder.

4.      Plaintiff Manulife Insurance Company (collectively, with plaintiffs John Hancock Life Insurance Company and John Hancock Variable Life Insurance Company, "John Hancock") is a company, duly formed and existing under the laws of the State of Delaware, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts. Manulife Insurance Company is a wholly-owned subsidiary of John Hancock Variable Life Insurance

-2-

Company that sells various types of life insurance products.  Manulife Insurance Company formerly was known as "Investors Partner Life Insurance."

5.     Defendant Abbott Laboratories ("Abbott") is a corporation, duly formed and existing under the laws of the State of Illinois, that maintains its corporate headquarters in Abbott Park, Illinois.  Abbott is a broad-based healthcare company that discovers, develops, manufactures and markets products and services that span the continuum of care -- from prevention and diagnosis to treatment and cure.  Abbott's principal businesses are global pharmaceuticals, nutritionals, and medical products, including diagnostics and cardiovascular devices.  Abbott achieved record sales and net earnings of $19.7 billion and $3.2 billion, respectively, in 2004.  Its leadership positions in several multibillion-dollar businesses provide Abbott with a unique balance of revenue growth opportunities and cash flow sources that allow Abbott to invest in its future.

## Jurisdiction and Venue

6.     This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(a)(1) because defendant Abbott resides in this district within the meaning of 28 U.S.C. § 1391(c), and further because Section 16.2 of the parties' Agreement provides that Abbott,

> consents ... to the exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts ... for the purpose of any suit, action or other proceeding arising out of any of its obligations

-3-

hereunder or thereunder or with respect to the transactions contemplated hereby or thereby, and expressly waives any and all objections that it may have as to venue in such courts.

## The Facts

### *The Agreement And Its Relevant Terms*

8.     On March 13, 2001, John Hancock and Abbott entered the Agreement, whereby John Hancock agreed to provide funding to Abbott for research and development activities on a portfolio of potential pharmaceutical products or "Program Compounds" (the "Research Program") in exchange for the right to receive certain management fees and future milestone and royalty payments from Abbott.

9.     The nine Program Compounds encompassed by the Abbott Research Program are: (a) ABT-773, a kelotide that may be useful as an antibiotic; (b) ABT-627, an endothelin-A receptor agonist that may be useful in the treatment of prostate cancer; (c) ABT-594, a non-opiod analgesic that may be useful in the treatment of chronic pain; (d) ABT-492, a quinolone that may be useful as an antibiotic; (e) ABT-510, a synthetic peptide that may be useful in the treatment of cancer; (f) ABT-518, a metalloproteinase inhibitor that may be useful in the treatment of cancer; (g) ABT-751, an antimitotic tubulin agonist that may be useful in the treatment of cancer; (h) ABT-100, a farnesyltransferase protein inhibitor that may be useful in the treatment of cancer; and (i) ABT-724, a dopamine receptor agonist that may be useful in the treatment of erectile dysfunction.

10.     Under the terms of the Agreement, John Hancock agreed to contribute up to a specified maximum amount toward the costs incurred by Abbott in operating the Research Program ("Program Related Costs") in four annual installments (the "Program Payments")

-4-

over the period from March 13, 2001 through December 31, 2004 (individually, the four "Program Years" and, collectively, the four-year "Program Term"). Abbott agreed, in return, to invest at least twice the amount of John Hancock's contribution from its own funds towards the operation of the Research Program, and committed to spend certain minimum amounts on Program Related Costs during each Program Year (the "Annual Minimum Spending Target"), as well as a minimum aggregate total on Program Related Costs over the four-year Program Term (the "Aggregate Spending Target").

11.    The Agreement, which comprises more than thirty-five (35) pages, was the subject of extensive negotiations between the parties and their counsel over a period of approximately one year. From John Hancock's perspective, the financial attractiveness of the Agreement turned largely upon the specific identity of, and commercial prospects for, the nine Program Compounds encompassed by the Research Program. John Hancock ran numerous analytical models based on financial projections for the Program Compounds in order to ensure, as best that it could, that the risks associated with its anticipated investment in the Research Program were justified by the potential rewards that John Hancock would receive if and when some or all of the Program Compounds were approved and commercialized.

12.    Because the financial return, if any, that John Hancock ultimately will receive on its investment in the Program Compounds is heavily dependent on the commercial success of those Compounds, John Hancock had a strong interest in ensuring, before the Agreement was signed, that: (a) Abbott had a good faith intention to aggressively pursue development of each of the Program Compounds; and (b) Abbott had a good faith belief that each of the

Program Compounds possessed reasonably favorable commercial prospects. In order to satisfy John Hancock's concerns on these points, Abbott agreed to provide John Hancock, in Article 12 of the Agreement, with certain written representations and warranties concerning the development status of the Program Compounds, including, *inter alia*, a representation and warranty that,

> [s]et forth on Exhibit 12.2(d) is the full name, chemical name, detailed description of the stage of development and current status for each Program Compound. Set forth on Exhibit 1.6 in each Annual Research Plan is a description of projected milestones and dates thereof, projected year of NDA filing, and projected costs to be incurred by Abbott during the Program Term, for each Program Compound. Such projections were prepared in good faith and with due care based on reasonable assumptions, and represent the reasonable estimate of Abbott based on information available as of the date of such projections and as of the date hereof.... (Section 12.2[d]).

13.    Abbott further represented and warranted to John Hancock that,

> [t]here is no fact known to Abbott (other than generally available information concerning the pharmaceutical industry in general) as of the date of this Agreement that has not been disclosed in this Agreement or any Exhibit to this Agreement which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial [viability]) of the Research Program or any of the Program Compounds. (Section 12.2[i]).

14.    The Agreement contains various other terms that are intended to protect John Hancock's interests by ensuring that Abbott fairly and diligently fulfills its research and development obligations under the Agreement, including terms which provide, *inter alia*, that Abbott:

-6-

(a)    must employ "Commercially Reasonable Efforts" (defined in the Agreement as "efforts which are consistent with those normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market potential at a similar stage of development or product life") to develop each of the Program Compounds and "achieve the objectives of the Research Program efficiently and expeditiously" (Sections 1.10, 2.3 and 4.1);

(b)    must keep John Hancock fully informed of any modifications to its written "Annual Research Plans" ("ARPs") by requiring that "[a]ny such modifications ... be promptly provided to John Hancock" (Section 2.2);

(c)    shall not "research, develop, manufacture, market, sell, distribute, out-license or otherwise treat" the Program Compounds any differently "as compared to any other Abbott compounds or products" on account of any of the rights granted to John Hancock under Agreement (Section 4.4); and

(d)    shall, "as soon as is practicable," out-license or divest any "Ceased Compound" (defined in the Agreement as a Program Compound that Abbott has "substantially cease[d] developing, marketing or selling") to a third party, and shall "remunerate John Hancock based on sales of such Ceased Compound by the third party that has acquired or licensed the Ceased Compound ... in a manner most consistent with the allocation that would have applied hereunder had such Ceased Compound not been so out-licensed or divested..." (Section 4.3[d]).

15.    John Hancock's obligation under the Agreement to make additional Program Payments during the four-year Program Term is not absolute, however. In entering into the Agreement, John Hancock did not want to obligate itself to continue investing in the Program Compounds if the commercial prospects for those Compounds diminished significantly over the four-year Program Term. Accordingly, John Hancock's obligation to make its second, third and fourth Program Payments was made expressly contingent upon the demonstration by Abbott, on an annual basis, of the continued commercial viability of the Program Compounds.

16.    For purposes of the Agreement, the continued commercial viability of the Program Compounds is measured by reference to Abbott's planned expenditures on Program Related Costs over the four-year Program Term.  Section 2.2 of the Agreement requires Abbott to provide John Hancock, at least forty-five days (45) prior to the start of each Program Year, with a written ARP that spells out Abbott's anticipated Research Program expenditures for that year and for each year remaining in the Program Term.  If Abbott's ARP for any given year did not "reasonably demonstrate [Abbott's] ... intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target" as set forth in the Agreement, then John Hancock's "obligation to make any remaining Program Payments for any succeeding Program Years" automatically would terminate pursuant to Section 3.4(iv) of the Agreement.

17.    Section 3.3 of the Agreement sets forth Abbott's obligations to John Hancock in the event that Abbott fails to reach the Aggregate Spending Target for Program Related Costs over the four-year Program Term.  Section 3.3(b) states that Abbott "will expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the "Aggregate Carryover Amount") on Program Related Costs during the *subsequent year* commencing immediately after the end of the Program Term (emphasis added)."  If Abbott fails to spend the entire Aggregate Carryover Amount during such subsequent year, Section 3.3(b) obligates Abbott to "pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days after the end of such subsequent year."

-8-

18.     The four-year Program Term ended on December 31, 2004, and the "subsequent year commencing immediately after the end of the Program Term" ended on December 31, 2005. Accordingly, Abbott was required to spend the Aggregate Carryover Amount by December 31, 2005, and required to pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott as of that date on or before January 30, 2006.

19.     The Agreement further provides John Hancock with the power to objectively verify Abbott's compliance with the terms of the Agreement, including the right to retain an independent auditor of John Hancock's choosing (and reasonably acceptable to Abbott) who is empowered to inspect, copy and audit the "books and records of Abbott and each Subcontractor related to the Research Program ... at any time and from time to time." John Hancock is required to pay the fees and expenses of its chosen auditor in the first instance. If, however, the work of John Hancock's auditor "reveals any material breach of Abbott's responsibilities" under the Agreement, then Section 2.5 provides that Abbott "shall (i) pay the reasonable fees and expenses charged by such auditor, and (ii) fully and promptly cure such breach."

*John Hancock's Efforts to Audit Abbott's Compliance
With The Terms of the Agreement*

20.     Since the Agreement was executed on March 13, 2001, John Hancock has become aware of certain potential breaches of the Agreement by Abbott. Such potential breaches include, but are not limited to, misrepresentations by Abbott in the negotiation and

-9-

execution of the Agreement, as well as violations by Abbott of its development and administrative responsibilities under the Agreement.

21.    Consistent with the terms of the Agreement, and in an effort to assist in confirming or refuting Abbott's suspected violations, John Hancock initiated an independent audit of Abbott's books and records on April 12, 2004.  On that date, John Hancock sent a letter to Abbott notifying Abbott of John Hancock's intention to undertake a compliance audit pursuant to Section 2.5 of the Agreement, and identifying the independent auditor that had been selected by John Hancock.  John Hancock accompanied its audit notification letter to Abbott with a description of the specific books and records related to the Research Program that John Hancock requested be made available for examination by its independent auditor within thirty (30) days.

22.    Abbott unreasonably and unjustifiably has delayed, and continues to delay, its response to John Hancock's audit request, and has taken affirmative steps to obstruct the legitimate efforts of John Hancock's independent auditors to confirm or refute Abbott's compliance with terms of the Agreement.  Tactics employed by Abbott to hinder, delay and obstruct John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement include, but are not limited to:

(a)    unreasonably and unjustifiably objecting to John Hancock's chosen auditor for a period of months, then arbitrarily withdrawing its objection;

(b)    unreasonably and unjustifiably delaying production of the majority of the relevant books and records requested by John Hancock's auditor for almost one year (and counting);

-10-

(c)     unreasonably and unjustifiably refusing to make certain relevant books and records available for inspection and copying at all (including, without limitation, various books and records documenting Abbott's actual expenditures on Program Related Costs);

(d)     unreasonably and unjustifiably redacting various relevant books and records produced during the course of the audit so as to eliminate relevant information and render certain materials effectively unintelligible, notwithstanding the existence of a written confidentiality agreement between the parties;

(e)     unreasonably and unjustifiably understaffing and under-funding Abbott's response to John Hancock's audit request in order to further delay the examination of Abbott's relevant books and records by John Hancock's auditor;

(f)     unreasonably and unjustifiably delaying for periods of six months or more the photocopying of books and records designated by John Hancock's auditor during the inspection process;

(g)     unreasonably and unjustifiably refusing to provide John Hancock's auditor with photocopies of various books and records produced by Abbott, and designated by John Hancock's auditor, during the inspection process;

(h)     unreasonably and unjustifiably refusing to permit John Hancock or its independent auditor to make their own photocopies of Abbott's books and records produced for audit purposes;

(i)     unreasonably and unjustifiably violating acknowledged deadlines for the completion of Abbott's production of books and records responsive to John Hancock's audit requests;

(j)     unreasonably and unjustifiably ignoring or refusing to answer various written and oral inquiries by John Hancock and its auditor regarding Abbott's relevant books and records; and

(k)     unreasonably and unjustifiably acting in a manner contrary to the usual course of contractual compliance audits, and contrary to Abbott's own conduct in reasonably similar circumstances in the past.

-11-

23.     As of the date of its original Complaint in this action, Abbott still had not produced all of the material books and records related to the Research Program that were requested by John Hancock and its auditor on April 12, 2004, and refused to do so. Abbott also refused to answer inquiries by John Hancock and its auditor seeking information that is necessary to complete the audit of Abbott's compliance with the Agreement.

*Abbott's Violations of the Agreement*

### A. Obstructing John Hancock's Compliance Audit

24.    Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement as expressly permitted under Section 2.5.   Upon information and belief, Abbott's efforts to hinder, delay and obstruct John Hancock's audit activities are intended to undermine, and have had the effect of undermining, John Hancock's ability to obtain information which would tend to confirm that Abbott has breached the Agreement in various other ways as set forth below.

### B. Misrepresenting the Development Status of ABT-518

25.    Upon information and belief, Abbott misrepresented the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that ABT-518 was "a compelling development candidate with the potential to demonstrate antitumor effects superior to the MMP inhibitors currently undergoing clinical trials." Abbott understood before the Agreement was executed, however, that the actual development status of ABT-518 was not as represented in the Agreement. For example, Abbott personnel already had plans as of early March 2001 to terminate the development of ABT-518, but understood that full disclosure of that fact to John Hancock "could have been the deathnell (*sic*) to the deal." Accordingly, Abbott personnel took affirmative steps on and prior to March 13, 2001 to conceal from John Hancock the true development status of ABT-518 so as to induce John Hancock to enter into the Agreement.

-13-

Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-518.

26.     The development status of ABT-518 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-518 in making that decision. Had John Hancock known the true development status of ABT-518 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

### C. Misrepresenting the Development Status of ABT-594

27.     Upon information and belief, Abbott misrepresented the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that a "phase IIb [clinical] study for neuropathic pain at higher, titrated doses of ABT-594 began in April 2000 and ends in June 2001," and that ABT-594 was "expected to be the first neuronal nicotinic receptor agonist to receive an indication for pain." Abbott understood before the Agreement was executed, however, that the development status of ABT-594 was not as represented in the Agreement. For example, Abbott already knew prior to the execution of the Agreement that the termination rate for patients enrolled in the phase IIb clinical study of ABT-594 was unusually high, and that the final results of that study were likely to be unfavorable. Abbott also knew, no later

-14-

than March 2001, that the development of ABT-594 was likely to be significantly delayed or even discontinued by Abbott as a consequence. Abbott failed to disclose these facts to John Hancock before the Agreement was executed in order to induce John Hancock to enter into the Agreement. Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-594.

28.    The development status of ABT-594 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-594 in making that decision. Had John Hancock known the true development status of ABT-594 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

### CD.   Misrepresenting the Development Status of ABT-773

29.    Upon information and belief, Abbott misrepresented the development status of ABT-773 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that further development of ABT-773 was warranted due to its competitive "convenience, safety and tolerability." Abbott understood before the Agreement was executed, however, that the development status of ABT-773 was not as represented in the Agreement. For example, Abbott was aware of potentially serious liver and heart toxicity issues related to the use of ABT-773. Abbott failed to disclose

these facts to John Hancock before the Agreement was executed in order to induce John Hancock to enter into the Agreement. Then, within twelve months after the -Agreement was signed, Abbott terminated the development of ABT-773.

30.    The development status of ABT-773 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-773 in making that decision. Had John Hancock known the true development status of ABT-773 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

### ~~D~~E.  Misrepresenting Its Intended and Reasonably Expected
Spending on Program Related Costs

~~29.~~31. Upon information and belief, Abbott has misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock. The Research Program cost projections that Abbott has provided to John Hancock in various ARPs reflect Abbott's "nominal" spending, as opposed to its "expected" spending. At all relevant times, Abbott's true "expected" spending on Program Related Costs was considerably less than the amounts communicated to John Hancock in Abbott's ARPs. Abbott has misrepresented its intended and reasonably expected spending plans to John Hancock in order to induce John Hancock to enter into the Agreement, and to make Program Payments to Abbott that would not otherwise be due under the terms of the Agreement.

-16-

30. 32. Abbott's intended and reasonably expected expenditures on Program Related Costs constitute material facts for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding its intended and reasonably expected expenditures on Program Related Costs in making that decision. Had John Hancock known the true level of Abbott's intended and reasonably expected expenditures, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, may not have made certain Program Payments, or may not have entered into the Agreement at all.

### E.F. Failing to Use Commercially Reasonable Efforts to Develop the Program Compounds

31. 33. Upon information and belief, Abbott has failed to use Commercially Reasonable Efforts to develop the Program Compounds. Abbott previously represented to John Hancock in its 2005 ARP that the current commercial prospects for the active Program Compounds warrant the expenditure of a stated sum towards Program Related Costs in 2005. Upon information and belief, Abbott since has modified its 2005 ARP so as to reduce its intended and reasonably expected expenditures on Program Related Costs by more than fifty percent (50%) in retaliation, *inter alia*, for the automatic termination of John Hancock's obligation to make additional Program Payments for the third and fourth Program Years pursuant to the express terms of the Agreement.

32. 34. Abbott's decision to reduce its intended and reasonably expected expenditures on Program Related Costs in 2005 to less than one-half the amount that Abbott has represented

is warranted by the current commercial prospects for the active Program Compounds is inconsistent with the level of effort normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market at a similar stage of development and, therefore, not Commercially Reasonable for purposes of Section 4.1 of the Agreement.

### F̶G. Refusing to Provide John Hancock With a Copy of Abbott's Modified 2005 ARP

33.35. Abbott has refused to provide John Hancock with a copy of its modified 2005 ARP. Abbott provided its original 2005 ARP to John Hancock in November 2004. Upon information and belief, Abbott since has modified its original 2005 ARP so as to dramatically reduce Abbott's intended and reasonably expected expenditures on Program Related Costs in 2005. Section 2.2 of the Agreement obligates Abbott to "promptly provide[]" John Hancock with "[a]ny ... modifications" to its ARPs. Notwithstanding the express requirements of Section 2.2, Abbott has refused or ignored John Hancock's requests for a copy of Abbott's modified 2005 ARP.

### G̶H. Failing to Out-License or Divest Various Ceased Compounds

34.36. Upon information and belief, Abbott has failed to out-license or divest itself of various Ceased Compounds, including, without limitation, ABT-518 and ABT-594, "as soon as is practicable" as required under Section 4.3(d) of the Agreement.

35.37. Upon further information and belief, Abbott has chosen not to out-license or divest itself of the foregoing Ceased Compounds, among others, for fear that, if those Compounds were successfully developed and marketed by a third party, Abbott might lose

-18-

future sales of various competing compounds that Abbott has under development, which are not subject to John Hancock's royalty rights.

### H̶I. Failing To Pay John Hancock One-Third Of The
### Actual Aggregate Carryover Amount

3̶6̶.̶38. Because Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement, Abbott's actual spending on Program Related Costs over the four-year Program Term ended on December 31, 2004, and the "subsequent year commencing immediately after the end of the Program Term" ended on December 31, 2005, currently is unknown. Abbott has represented and John Hancock has reason to believe, however, that Abbott's actual spending on Program Related Costs during the Program Term was considerably less than the Aggregate Spending Target, and that Abbott's actual spending on Program Related Costs during such subsequent year was considerably less than the Aggregate Carryover Amount.

3̶7̶.̶39. Pursuant to Section 3.3(b) of the Agreement, Abbott was required to pay John Hancock one-third of the actual, unspent Aggregate Carryover Amount on or before January 30, 2006. Notwithstanding the express requirements of Section 3.3(b), Abbott has failed to make such payment to John Hancock.

*John Hancock's Efforts to Resolve Its Claims Against Abbott Amicably*

3̶8̶.̶40. On April 1, 2005, John Hancock provided written notification to Abbott of the existence and nature of the disputes identified in Sections A-C, and E-H above in accordance with Section 16.7 of the Agreement. Authorized representatives of John Hancock and Abbott subsequently met in Chicago, Illinois on May 20, 2005, in an effort to resolve their disputes amicably. The parties discussed the issues identified in the notice as well as the parties overall

-20-

dispute with respect to all Program Compounds, including ABT-773.  The ~~at~~ efforts to resolve the parties' disputes were~~was~~ unsuccessful.

On January 5, 2006, John Hancock provided written notification to Abbott of the existence and nature of the disputes identified in Section ~~11~~ 1 above in accordance with Section 16.7 of the Agreement.  Representatives of Abbott did not meet with John Hancock for the purpose of resolving those disputes within the time period permitted under Section 16.7.

## Claims

### COUNT I
### (Fraud)

~~40.~~41. John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through ~~39~~ 40 of this Complaint, *supra*.

~~41.~~42. Abbott materially misrepresented the development status of the Program Compounds in the representations and warranties contained in Sections 12.2 of the Agreement, and applicable Schedules thereto, all in the manner described in this Complaint.

~~42.~~43. Abbott materially misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock, all in the manner described in this Complaint.

~~43.~~44. Abbott made the foregoing misrepresentations to John Hancock wantonly and willfully for the purpose of fraudulently inducing John Hancock to enter into the Agreement, and to make various Program Payments to Abbott on the terms stated therein.

-21-

44. 45. John Hancock justifiably relied upon Abbott's misrepresentations to its detriment by, among other things, entering into the Agreement, and making Program Payments to Abbott in accordance with the terms thereof.

45. 46. As a result of Abbott's misrepresentations, John Hancock has been defrauded by Abbott and has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

## COUNT II
### (Breach of Contract)

46. 47. John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 45 46 of this Complaint, *supra*.

47. 48. The Agreement constitutes a valid and binding contract between the parties. John Hancock has performed all of its obligations under the Agreement.

48. 49. Abbott has breached its obligations to John Hancock under the Agreement, *inter alia*, by:

    (a)    misrepresenting the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement;

    (b)    misrepresenting the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement;

    (c)    misrepresenting the development status of ABT-773 to John Hancock prior to, and at the time of, the execution of the Agreement;

    (e d)    misrepresenting Abbott's intended and reasonably expected expenditures on Program Related Costs in ARPs that Abbott has provided to John Hancock;

    (d e)    failing to use Commercially Reasonable Efforts to develop the Program

-22-

Compounds;

(e̶f) refusing to provide John Hancock with a copy of Abbott's modified 2005 ARP;

(f̶g) failing to out-license or divest itself of certain Ceased Compounds, including, without limitation, ABT-518 and ABT-594, as soon as is practicable; a̶n̶d̶

(g̶h) unreasonably and unjustifiably hindering, delaying and obstructing John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement̶-̶; and

(h̶i) failing to pay John Hancock one-third of the actual, unspent Aggregate Carryover Amount pursuant to Section 3.3(b) of the Agreement.

4̶9̶.50. By engaging in the foregoing conduct, Abbott further has breached the covenant of good faith and fair dealing that is implied by law in every contract, including the Agreement.

5̶0̶.51. Abbott has breached its express and implied obligations under the Agreement willfully and wantonly in order to induce John Hancock to enter into the Agreement, induce John Hancock to make various Program Payments to Abbott on the terms stated therein, and inhibit John Hancock's ability to detect and confirm Abbott's misconduct.

5̶1̶.52. As a result of Abbott's willful and wanton breaches of its express and implied obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

## COUNT III
### (Indemnification)

5̶2̶.53. John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 5̶1̶52 of this Complaint, *supra*.

-23-

53.54. Abbott has breached its representations, warranties and obligations to John Hancock under the Agreement as set forth herein.

54.55. As a result of Abbott's various breaches of its representations, warranties and obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, "Losses" as defined in Section 1.27 of the Agreement. John Hancock's Losses include, without limitation, costs, damages, and other reasonable expenses such as audit charges and attorneys' fees.

55.56. Abbott agreed in Section 12.6 of the Agreement to indemnify John Hancock, *inter alia*, "from and against all Losses related to or arising out of, directly or indirectly ... any breach by Abbott of its representations, warranties or obligations hereunder..."

56.57. On April 1, 2005, John Hancock provided written notification to Abbott that John Hancock has sustained, and likely will continue to sustain, compensable Losses on account of Abbott's various breaches of its representations, warranties and obligations under the Agreement, for which John Hancock is entitled to indemnification pursuant to Section 12.6 of the Agreement.

57.58. Notwithstanding John Hancock's request for indemnification, Abbott has refused to indemnify John Hancock for its compensable Losses.

### Prayers for Relief

WHEREFORE, John Hancock respectfully requests that the Court:

(a)  award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's fraud under Count I of the Complaint;

(b)    award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's various breaches of contract under Count II of the Complaint;

(c)    enter an order directing Abbott to indemnify John Hancock for its compensable Losses, including John Hancock's damages, costs, and other reasonable expenses such as audit charges and attorneys' fees, under Count III of the Complaint;

(d)    award John Hancock punitive damages for Abbott's willful and wanton misconduct in an amount to be determined under Counts I and II of the Complaint; ~~and~~

(e)    alternatively, enter an order rescinding the Agreement and restoring the *status quo ante*, including, but not limited to, directing Abbott to refund any and all Program Payments made by John Hancock, less any payments already received by John Hancock, plus interest and costs~~-~~; and

(ef)    grant John Hancock such other and further relief as the Court deems just
and appropriate in the circumstances.

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY AND
MANULIFE INSURANCE COMPANY

By their attorneys,

/s/ Brian A. Davis
Brian A. Davis (BBO No. 546462)
Joseph H. Zwicker (BBO No. 560219)
Stacy Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Telephone: 617-248-5000

Date: June 23October     , 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non-registered participants on
June 23October   , 2006.

/s/ Brian A. Davis
Brian A. Davis

4090288.1
4131720.2

-26-

UNITED STATES DISTRICT COURT

# EXHIBIT B

captioned *John Hancock Life Insurance Company, et al. v. Abbott Laboratories*, Civil Action No. 03-12501-DPW (the "Existing Action"), pursuant to Section (1) of the Court's Scheduling Order entered in the Existing Action on March 30, 2004.

### The Parties

2.      Plaintiff John Hancock Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts. John Hancock Life Insurance Company is one of the nation's leading insurance companies, providing a broad array of insurance and investment products to retail and institutional customers, primarily in North America.

3.      Plaintiff John Hancock Variable Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts. John Hancock Variable Life Insurance Company provides variable life insurance products that link life insurance coverage and an investment return to an underlying portfolio of investments chosen by the policyholder.

4.      Plaintiff Manulife Insurance Company (collectively, with plaintiffs John Hancock Life Insurance Company and John Hancock Variable Life Insurance Company, "John Hancock") is a company, duly formed and existing under the laws of the State of Delaware, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts. Manulife Insurance Company is a wholly-owned subsidiary of John Hancock Variable Life Insurance

-2-

Company that sells various types of life insurance products. Manulife Insurance Company formerly was known as "Investors Partner Life Insurance."

5.    Defendant Abbott Laboratories ("Abbott") is a corporation, duly formed and existing under the laws of the State of Illinois, that maintains its corporate headquarters in Abbott Park, Illinois. Abbott is a broad-based healthcare company that discovers, develops, manufactures and markets products and services that span the continuum of care -- from prevention and diagnosis to treatment and cure. Abbott's principal businesses are global pharmaceuticals, nutritionals, and medical products, including diagnostics and cardiovascular devices. Abbott achieved record sales and net earnings of $19.7 billion and $3.2 billion, respectively, in 2004. Its leadership positions in several multibillion-dollar businesses provide Abbott with a unique balance of revenue growth opportunities and cash flow sources that allow Abbott to invest in its future.

## Jurisdiction and Venue

6.    This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(a)(1) because defendant Abbott resides in this district within the meaning of 28 U.S.C. § 1391(c), and further because Section 16.2 of the parties' Agreement provides that Abbott,

> consents ... to the exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts ... for the purpose of any suit, action or other proceeding arising out of any of its obligations

-3-

hereunder or thereunder or with respect to the transactions contemplated hereby or thereby, and expressly waives any and all objections that it may have as to venue in such courts.

## The Facts

*The Agreement And Its Relevant Terms*

8.    On March 13, 2001, John Hancock and Abbott entered the Agreement, whereby John Hancock agreed to provide funding to Abbott for research and development activities on a portfolio of potential pharmaceutical products or "Program Compounds" (the "Research Program") in exchange for the right to receive certain management fees and future milestone and royalty payments from Abbott.

9.    The nine Program Compounds encompassed by the Abbott Research Program are: (a) ABT-773, a kelotide that may be useful as an antibiotic; (b) ABT-627, an endothelin-A receptor agonist that may be useful in the treatment of prostate cancer; (c) ABT-594, a non-opiod analgesic that may be useful in the treatment of chronic pain; (d) ABT-492, a quinolone that may be useful as an antibiotic; (e) ABT-510, a synthetic peptide that may be useful in the treatment of cancer; (f) ABT-518, a metalloproteinase inhibitor that may be useful in the treatment of cancer; (g) ABT-751, an antimitotic tubulin agonist that may be useful in the treatment of cancer; (h) ABT-100, a farnesyltransferase protein inhibitor that may be useful in the treatment of cancer; and (i) ABT-724, a dopamine receptor agonist that may be useful in the treatment of erectile dysfunction.

10.    Under the terms of the Agreement, John Hancock agreed to contribute up to a specified maximum amount toward the costs incurred by Abbott in operating the Research Program ("Program Related Costs") in four annual installments (the "Program Payments")

-4-

over the period from March 13, 2001 through December 31, 2004 (individually, the four "Program Years" and, collectively, the four-year "Program Term"). Abbott agreed, in return, to invest at least twice the amount of John Hancock's contribution from its own funds towards the operation of the Research Program, and committed to spend certain minimum amounts on Program Related Costs during each Program Year (the "Annual Minimum Spending Target"), as well as a minimum aggregate total on Program Related Costs over the four-year Program Term (the "Aggregate Spending Target").

11.    The Agreement, which comprises more than thirty-five (35) pages, was the subject of extensive negotiations between the parties and their counsel over a period of approximately one year. From John Hancock's perspective, the financial attractiveness of the Agreement turned largely upon the specific identity of, and commercial prospects for, the nine Program Compounds encompassed by the Research Program. John Hancock ran numerous analytical models based on financial projections for the Program Compounds in order to ensure, as best that it could, that the risks associated with its anticipated investment in the Research Program were justified by the potential rewards that John Hancock would receive if and when some or all of the Program Compounds were approved and commercialized.

12.    Because the financial return, if any, that John Hancock ultimately will receive on its investment in the Program Compounds is heavily dependent on the commercial success of those Compounds, John Hancock had a strong interest in ensuring, before the Agreement was signed, that: (a) Abbott had a good faith intention to aggressively pursue development of each of the Program Compounds; and (b) Abbott had a good faith belief that each of the

-5-

Program Compounds possessed reasonably favorable commercial prospects. In order to satisfy John Hancock's concerns on these points, Abbott agreed to provide John Hancock, in Article 12 of the Agreement, with certain written representations and warranties concerning the development status of the Program Compounds, including, *inter alia*, a representation and warranty that,

> [s]et forth on Exhibit 12.2(d) is the full name, chemical name, detailed description of the stage of development and current status for each Program Compound. Set forth on Exhibit 1.6 in each Annual Research Plan is a description of projected milestones and dates thereof, projected year of NDA filing, and projected costs to be incurred by Abbott during the Program Term, for each Program Compound. Such projections were prepared in good faith and with due care based on reasonable assumptions, and represent the reasonable estimate of Abbott based on information available as of the date of such projections and as of the date hereof.... (Section 12.2[d]).

13. Abbott further represented and warranted to John Hancock that,

> [t]here is no fact known to Abbott (other than generally available information concerning the pharmaceutical industry in general) as of the date of this Agreement that has not been disclosed in this Agreement or any Exhibit to this Agreement which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial [viability]) of the Research Program or any of the Program Compounds. (Section 12.2[i]).

14. The Agreement contains various other terms that are intended to protect John Hancock's interests by ensuring that Abbott fairly and diligently fulfills its research and development obligations under the Agreement, including terms which provide, *inter alia*, that Abbott:

(a)    must employ "Commercially Reasonable Efforts" (defined in the Agreement as "efforts which are consistent with those normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market potential at a similar stage of development or product life") to develop each of the Program Compounds and "achieve the objectives of the Research Program efficiently and expeditiously" (Sections 1.10, 2.3 and 4.1);

(b)    must keep John Hancock fully informed of any modifications to its written "Annual Research Plans" ("ARPs") by requiring that "[a]ny such modifications ... be promptly provided to John Hancock" (Section 2.2);

(c)    shall not "research, develop, manufacture, market, sell, distribute, out-license or otherwise treat" the Program Compounds any differently "as compared to any other Abbott compounds or products" on account of any of the rights granted to John Hancock under Agreement (Section 4.4); and

(d)    shall, "as soon as is practicable," out-license or divest any "Ceased Compound" (defined in the Agreement as a Program Compound that Abbott has "substantially cease[d] developing, marketing or selling") to a third party, and shall "remunerate John Hancock based on sales of such Ceased Compound by the third party that has acquired or licensed the Ceased Compound ... in a manner most consistent with the allocation that would have applied hereunder had such Ceased Compound not been so out-licensed or divested..." (Section 4.3[d]).

15.    John Hancock's obligation under the Agreement to make additional Program Payments during the four-year Program Term is not absolute, however. In entering into the Agreement, John Hancock did not want to obligate itself to continue investing in the Program Compounds if the commercial prospects for those Compounds diminished significantly over the four-year Program Term. Accordingly, John Hancock's obligation to make its second, third and fourth Program Payments was made expressly contingent upon the demonstration by Abbott, on an annual basis, of the continued commercial viability of the Program Compounds.

16.    For purposes of the Agreement, the continued commercial viability of the Program Compounds is measured by reference to Abbott's planned expenditures on Program Related Costs over the four-year Program Term.  Section 2.2 of the Agreement requires Abbott to provide John Hancock, at least forty-five days (45) prior to the start of each Program Year, with a written ARP that spells out Abbott's anticipated Research Program expenditures for that year and for each year remaining in the Program Term.  If Abbott's ARP for any given year did not "reasonably demonstrate [Abbott's] ... intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target" as set forth in the Agreement, then John Hancock's "obligation to make any remaining Program Payments for any succeeding Program Years" automatically would terminate pursuant to Section 3.4(iv) of the Agreement.

17.    Section 3.3 of the Agreement sets forth Abbott's obligations to John Hancock in the event that Abbott fails to reach the Aggregate Spending Target for Program Related Costs over the four-year Program Term.  Section 3.3(b) states that Abbott "will expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the "Aggregate Carryover Amount") on Program Related Costs during the *subsequent year* commencing immediately after the end of the Program Term (emphasis added)."  If Abbott fails to spend the entire Aggregate Carryover Amount during such subsequent year, Section 3.3(b) obligates Abbott to "pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days after the end of such subsequent year."

-8-

18.    The four-year Program Term ended on December 31, 2004, and the "subsequent year commencing immediately after the end of the Program Term" ended on December 31, 2005. Accordingly, Abbott was required to spend the Aggregate Carryover Amount by December 31, 2005, and required to pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott as of that date on or before January 30, 2006.

19.    The Agreement further provides John Hancock with the power to objectively verify Abbott's compliance with the terms of the Agreement, including the right to retain an independent auditor of John Hancock's choosing (and reasonably acceptable to Abbott) who is empowered to inspect, copy and audit the "books and records of Abbott and each Subcontractor related to the Research Program ... at any time and from time to time." John Hancock is required to pay the fees and expenses of its chosen auditor in the first instance. If, however, the work of John Hancock's auditor "reveals any material breach of Abbott's responsibilities" under the Agreement, then Section 2.5 provides that Abbott "shall (i) pay the reasonable fees and expenses charged by such auditor, and (ii) fully and promptly cure such breach."

*John Hancock's Efforts to Audit Abbott's Compliance*
*With The Terms of the Agreement*

20.    Since the Agreement was executed on March 13, 2001, John Hancock has become aware of certain potential breaches of the Agreement by Abbott. Such potential breaches include, but are not limited to, misrepresentations by Abbott in the negotiation and

-9-

execution of the Agreement, as well as violations by Abbott of its development and administrative responsibilities under the Agreement.

21.    Consistent with the terms of the Agreement, and in an effort to assist in confirming or refuting Abbott's suspected violations, John Hancock initiated an independent audit of Abbott's books and records on April 12, 2004.  On that date, John Hancock sent a letter to Abbott notifying Abbott of John Hancock's intention to undertake a compliance audit pursuant to Section 2.5 of the Agreement, and identifying the independent auditor that had been selected by John Hancock.  John Hancock accompanied its audit notification letter to Abbott with a description of the specific books and records related to the Research Program that John Hancock requested be made available for examination by its independent auditor within thirty (30) days.

22.    Abbott unreasonably and unjustifiably has delayed, and continues to delay, its response to John Hancock's audit request, and has taken affirmative steps to obstruct the legitimate efforts of John Hancock's independent auditors to confirm or refute Abbott's compliance with terms of the Agreement.  Tactics employed by Abbott to hinder, delay and obstruct John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement include, but are not limited to:

(a)    unreasonably and unjustifiably objecting to John Hancock's chosen auditor for a period of months, then arbitrarily withdrawing its objection;

(b)    unreasonably and unjustifiably delaying production of the majority of the relevant books and records requested by John Hancock's auditor for almost one year (and counting);

-10-

(c)     unreasonably and unjustifiably refusing to make certain relevant books and records available for inspection and copying at all (including, without limitation, various books and records documenting Abbott's actual expenditures on Program Related Costs);

(d)     unreasonably and unjustifiably redacting various relevant books and records produced during the course of the audit so as to eliminate relevant information and render certain materials effectively unintelligible, notwithstanding the existence of a written confidentiality agreement between the parties;

(e)     unreasonably and unjustifiably understaffing and under-funding Abbott's response to John Hancock's audit request in order to further delay the examination of Abbott's relevant books and records by John Hancock's auditor;

(f)     unreasonably and unjustifiably delaying for periods of six months or more the photocopying of books and records designated by John Hancock's auditor during the inspection process;

(g)     unreasonably and unjustifiably refusing to provide John Hancock's auditor with photocopies of various books and records produced by Abbott, and designated by John Hancock's auditor, during the inspection process;

(h)     unreasonably and unjustifiably refusing to permit John Hancock or its independent auditor to make their own photocopies of Abbott's books and records produced for audit purposes;

(i)     unreasonably and unjustifiably violating acknowledged deadlines for the completion of Abbott's production of books and records responsive to John Hancock's audit requests;

(j)     unreasonably and unjustifiably ignoring or refusing to answer various written and oral inquiries by John Hancock and its auditor regarding Abbott's relevant books and records; and

(k)     unreasonably and unjustifiably acting in a manner contrary to the usual course of contractual compliance audits, and contrary to Abbott's own conduct in reasonably similar circumstances in the past.

-11-

23.    As of the date of its original Complaint in this action, Abbott still had not produced all of the material books and records related to the Research Program that were requested by John Hancock and its auditor on April 12, 2004, and refused to do so.  Abbott also refused to answer inquiries by John Hancock and its auditor seeking information that is necessary to complete the audit of Abbott's compliance with the Agreement.

*Abbott's Violations of the Agreement*

### A.  Obstructing John Hancock's Compliance Audit

24.     Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement as expressly permitted under Section 2.5.  Upon information and belief, Abbott's efforts to hinder, delay and obstruct John Hancock's audit activities are intended to undermine, and have had the effect of undermining, John Hancock's ability to obtain information which would tend to confirm that Abbott has breached the Agreement in various other ways as set forth below.

### B.  Misrepresenting the Development Status of ABT-518

25.     Upon information and belief, Abbott misrepresented the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that ABT-518 was "a compelling development candidate with the potential to demonstrate antitumor effects superior to the MMP inhibitors currently undergoing clinical trials."  Abbott understood before the Agreement was executed, however, that the actual development status of ABT-518 was not as represented in the Agreement.  For example, Abbott personnel already had plans as of early March 2001 to terminate the development of ABT-518, but understood that full disclosure of that fact to John Hancock "could have been the deathnell (*sic*) to the deal."  Accordingly, Abbott personnel took affirmative steps on and prior to March 13, 2001 to conceal from John Hancock the true development status of ABT-518 so as to induce John Hancock to enter into the Agreement.

-13-

Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-518.

26.     The development status of ABT-518 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-518 in making that decision. Had John Hancock known the true development status of ABT-518 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

### C. Misrepresenting the Development Status of ABT-594

27.     Upon information and belief, Abbott misrepresented the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that a "phase IIb [clinical] study for neuropathic pain at higher, titrated doses of ABT-594 began in April 2000 and ends in June 2001," and that ABT-594 was "expected to be the first neuronal nicotinic receptor agonist to receive an indication for pain." Abbott understood before the Agreement was executed, however, that the development status of ABT-594 was not as represented in the Agreement. For example, Abbott already knew prior to the execution of the Agreement that the termination rate for patients enrolled in the phase IIb clinical study of ABT-594 was unusually high, and that the final results of that study were likely to be unfavorable. Abbott also knew, no later

-14-

than March 2001, that the development of ABT-594 was likely to be significantly delayed or even discontinued by Abbott as a consequence. Abbott failed to disclose these facts to John Hancock before the Agreement was executed in order to induce John Hancock to enter into the Agreement. Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-594.

28.    The development status of ABT-594 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-594 in making that decision. Had John Hancock known the true development status of ABT-594 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

D. Misrepresenting the Development Status of ABT-773

29.    Upon information and belief, Abbott misrepresented the development status of ABT-773 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that further development of ABT-773 was warranted due to its competitive "convenience, safety and tolerability." Abbott understood before the Agreement was executed, however, that the development status of ABT-773 was not as represented in the Agreement. For example, Abbott was aware of potentially serious liver and heart toxicity issues related to the use of ABT-773. Abbott failed to disclose

-15-

these facts to John Hancock before the Agreement was executed in order to induce John Hancock to enter into the Agreement. Then, within twelve months after the Agreement was signed, Abbott terminated the development of ABT-773.

30.    The development status of ABT-773 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-773 in making that decision. Had John Hancock known the true development status of ABT-773 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

E.    Misrepresenting Its Intended and Reasonably Expected
Spending on Program Related Costs

31.    Upon information and belief, Abbott has misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock. The Research Program cost projections that Abbott has provided to John Hancock in various ARPs reflect Abbott's "nominal" spending, as opposed to its "expected" spending. At all relevant times, Abbott's true "expected" spending on Program Related Costs was considerably less than the amounts communicated to John Hancock in Abbott's ARPs. Abbott has misrepresented its intended and reasonably expected spending plans to John Hancock in order to induce John Hancock to enter into the Agreement, and to make Program Payments to Abbott that would not otherwise be due under the terms of the Agreement.

-16-

32.     Abbott's intended and reasonably expected expenditures on Program Related Costs constitute material facts for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding its intended and reasonably expected expenditures on Program Related Costs in making that decision.   Had John Hancock known the true level of Abbott's intended and reasonably expected expenditures, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, may not have made certain Program Payments, or may not have entered into the Agreement at all.

### F. Failing to Use Commercially Reasonable Efforts to Develop the Program Compounds

33.     Upon information and belief, Abbott has failed to use Commercially Reasonable Efforts to develop the Program Compounds.  Abbott previously represented to John Hancock in its 2005 ARP that the current commercial prospects for the active Program Compounds warrant the expenditure of a stated sum towards Program Related Costs in 2005.   Upon information and belief, Abbott since has modified its 2005 ARP so as to reduce its intended and reasonably expected expenditures on Program Related Costs by more than fifty percent (50%) in retaliation, *inter alia*, for the automatic termination of John Hancock's obligation to make additional Program Payments for the third and fourth Program Years pursuant to the express terms of the Agreement.

34.     Abbott's decision to reduce its intended and reasonably expected expenditures on Program Related Costs in 2005 to less than one-half the amount that Abbott has represented

-17-

is warranted by the current commercial prospects for the active Program Compounds is inconsistent with the level of effort normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market at a similar stage of development and, therefore, not Commercially Reasonable for purposes of Section 4.1 of the Agreement.

### G. Refusing to Provide John Hancock With a Copy of Abbott's Modified 2005 ARP

35.    Abbott has refused to provide John Hancock with a copy of its modified 2005 ARP. Abbott provided its original 2005 ARP to John Hancock in November 2004. Upon information and belief, Abbott since has modified its original 2005 ARP so as to dramatically reduce Abbott's intended and reasonably expected expenditures on Program Related Costs in 2005. Section 2.2 of the Agreement obligates Abbott to "promptly provide[]" John Hancock with "[a]ny ... modifications" to its ARPs. Notwithstanding the express requirements of Section 2.2, Abbott has refused or ignored John Hancock's requests for a copy of Abbott's modified 2005 ARP.

### H. Failing to Out-License or Divest Various Ceased Compounds

36.    Upon information and belief, Abbott has failed to out-license or divest itself of various Ceased Compounds, including, without limitation, ABT-518 and ABT-594, "as soon as is practicable" as required under Section 4.3(d) of the Agreement.

37.    Upon further information and belief, Abbott has chosen not to out-license or divest itself of the foregoing Ceased Compounds, among others, for fear that, if those Compounds were successfully developed and marketed by a third party, Abbott might lose

-18-

future sales of various competing compounds that Abbott has under development, which are not subject to John Hancock's royalty rights.

## I. Failing To Pay John Hancock One-Third Of The Actual Aggregate Carryover Amount

38.    Because Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement, Abbott's actual spending on Program Related Costs over the four-year Program Term ended on December 31, 2004, and the "subsequent year commencing immediately after the end of the Program Term" ended on December 31, 2005, currently is unknown. Abbott has represented and John Hancock has reason to believe, however, that Abbott's actual spending on Program Related Costs during the Program Term was considerably less than the Aggregate Spending Target, and that Abbott's actual spending on Program Related Costs during such subsequent year was considerably less than the Aggregate Carryover Amount.

39.    Pursuant to Section 3.3(b) of the Agreement, Abbott was required to pay John Hancock one-third of the actual, unspent Aggregate Carryover Amount on or before January 30, 2006. Notwithstanding the express requirements of Section 3.3(b), Abbott has failed to make such payment to John Hancock.

*John Hancock's Efforts to Resolve Its Claims Against Abbott Amicably*

40.    On April 1, 2005, John Hancock provided written notification to Abbott of the existence and nature of the disputes identified in Sections A-C, and E-H above in accordance with Section 16.7 of the Agreement. Authorized representatives of John Hancock and Abbott subsequently met in Chicago, Illinois on May 20, 2005, in an effort to resolve their disputes

-19-

amicably.   The parties discussed the issues identified in the notice as well as the parties overall

dispute with respect to all Program Compounds, including ABT-773.   The efforts to resolve

the parties' disputes were unsuccessful.

On January 5, 2006, John Hancock provided written notification to Abbott of the existence and

nature of the disputes identified in Section I above in accordance with Section 16.7 of the

Agreement.   Representatives of Abbott did not meet with John Hancock for the purpose of

resolving those disputes within the time period permitted under Section 16.7.

## Claims

## COUNT I
### (Fraud)

41.    John Hancock hereby repeats and incorporates by reference the allegations set

forth in Paragraphs 1 through 40 of this Complaint, *supra*.

42.    Abbott materially misrepresented the development status of the Program

Compounds in the representations and warranties contained in Sections 12.2 of the Agreement,

and applicable Schedules thereto, all in the manner described in this Complaint.

43.    Abbott materially misrepresented its "intended and reasonably expected"

expenditures on Program Related Costs in ARPs that it has provided to John Hancock, all in

the manner described in this Complaint.

44.    Abbott made the foregoing misrepresentations to John Hancock wantonly and

willfully for the purpose of fraudulently inducing John Hancock to enter into the Agreement,

and to make various Program Payments to Abbott on the terms stated therein.

45.    John Hancock justifiably relied upon Abbott's misrepresentations to its detriment by, among other things, entering into the Agreement, and making Program Payments to Abbott in accordance with the terms thereof.

46.    As a result of Abbott's misrepresentations, John Hancock has been defrauded by Abbott and has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

### COUNT II
### (Breach of Contract)

47.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 46 of this Complaint, *supra*.

48.    The Agreement constitutes a valid and binding contract between the parties. John Hancock has performed all of its obligations under the Agreement.

49.    Abbott has breached its obligations to John Hancock under the Agreement, *inter alia*, by:

(a)    misrepresenting the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement;

(b)    misrepresenting the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement;

(c)    misrepresenting the development status of ABT-773 to John Hancock prior to, and at the time of, the execution of the Agreement;

(d)    misrepresenting Abbott's intended and reasonably expected expenditures on Program Related Costs in ARPs that Abbott has provided to John Hancock;

(e)    failing to use Commercially Reasonable Efforts to develop the Program Compounds;

-21-

(f) refusing to provide John Hancock with a copy of Abbott's modified 2005 ARP;

(g) failing to out-license or divest itself of certain Ceased Compounds, including, without limitation, ABT-518 and ABT-594, as soon as is practicable;

(h) unreasonably and unjustifiably hindering, delaying and obstructing John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement; and

(i) failing to pay John Hancock one-third of the actual, unspent Aggregate Carryover Amount pursuant to Section 3.3(b) of the Agreement.

50. By engaging in the foregoing conduct, Abbott further has breached the covenant of good faith and fair dealing that is implied by law in every contract, including the Agreement.

51. Abbott has breached its express and implied obligations under the Agreement willfully and wantonly in order to induce John Hancock to enter into the Agreement, induce John Hancock to make various Program Payments to Abbott on the terms stated therein, and inhibit John Hancock's ability to detect and confirm Abbott's misconduct.

52. As a result of Abbott's willful and wanton breaches of its express and implied obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

COUNT III<br>(Indemnification)

53. John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 52 of this Complaint, *supra*.

-22-

54.    Abbott has breached its representations, warranties and obligations to John Hancock under the Agreement as set forth herein.

55.    As a result of Abbott's various breaches of its representations, warranties and obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, "Losses" as defined in Section 1.27 of the Agreement. John Hancock's Losses include, without limitation, costs, damages, and other reasonable expenses such as audit charges and attorneys' fees.

56.    Abbott agreed in Section 12.6 of the Agreement to indemnify John Hancock, *inter alia*, "from and against all Losses related to or arising out of, directly or indirectly ... any breach by Abbott of its representations, warranties or obligations hereunder..."

57.    On April 1, 2005, John Hancock provided written notification to Abbott that John Hancock has sustained, and likely will continue to sustain, compensable Losses on account of Abbott's various breaches of its representations, warranties and obligations under the Agreement, for which John Hancock is entitled to indemnification pursuant to Section 12.6 of the Agreement.

58.    Notwithstanding John Hancock's request for indemnification, Abbott has refused to indemnify John Hancock for its compensable Losses.

### Prayers for Relief

WHEREFORE, John Hancock respectfully requests that the Court:

(a)    award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's fraud under Count I of the Complaint;

-23-

(b)    award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's various breaches of contract under Count II of the Complaint;

(c)    enter an order directing Abbott to indemnify John Hancock for its compensable Losses, including John Hancock's damages, costs, and other reasonable expenses such as audit charges and attorneys' fees, under Count III of the Complaint;

(d)    award John Hancock punitive damages for Abbott's willful and wanton misconduct in an amount to be determined under Counts I and II of the Complaint;

(e)    alternatively, enter an order rescinding the Agreement and restoring the *status quo ante*, including, but not limited to, directing Abbott to refund any and all Program Payments made by John Hancock, less any payments already received by John Hancock, plus interest and costs; and

-24-

(f)    grant John Hancock such other and further relief as the Court deems just and appropriate in the circumstances.

JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY AND MANULIFE INSURANCE COMPANY

By their attorneys,

/s/ Brian A. Davis
Brian A. Davis (BBO No. 546462)
Joseph H. Zwicker (BBO No. 560219)
Stacy Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Telephone: 617-248-5000

Date: October 24, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 24, 2006.

/s/ Brian A. Davis
Brian A. Davis

4131720.2

-25-

**Exhibit 9**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER LIFE INSURANCE COMPANY), | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) |
| v. | )<br>) |
| ABBOTT LABORATORIES, | )<br>) |
| Defendant. | ) |

CIVIL ACTION NO. 05-11150-DPW

## STIPULATION AND PROPOSED ORDER REGARDING CERTAIN PENDING MOTIONS AND SCHEDULING

WHEREAS on December 6, 2006, the Parties appeared before the Court regarding various pending motions, including: (1) Plaintiffs' Motion to Compel Defendant to Produce Documents and Provide Substantive Answers to Interrogatories ("John Hancock's Motion to Compel") (Docket No. 48); (2) Defendant's Motions for Protective Orders Regarding Depositions of: (a) Dr. Stanley Bukofzer, (b) Dr. Jeffrey Leiden, and (c) William Dempsey ("Abbott's Motions for Protective Orders") (Docket Nos. 53, 94 and 92); (3) Plaintiffs' Motion to Amend Supplemental Complaint ("John Hancock's Motion to Amend") (Docket No. 62); (4) Defendant's Motion to Prohibit Disclosure of Abbott's Highly Confidential Documents to Dr. William Fairweather Pursuant to Stipulated Protective Order ("Abbott's Motion to Prohibit

Disclosure") (Docket No. 72); (5) Plaintiffs' Motion for Issuance of Subpoena to Be Issued Abroad ("John Hancock's Motion for Issuance of Subpoena") (Docket No. 75); and (6) Joint Motion to Modify Scheduling Order and Set Briefing Schedule (the "Joint Scheduling Order Motion") (Docket No. 51) (collectively, the "Discovery-Related Motions");

WHEREAS the Court directed the parties to meet and confer regarding whether they could resolve the Discovery-Related Motions without the Court's intervention; and

WHEREAS after meeting and conferring with respect to the Discovery-Related Motions, as well as other matters, the Parties have reached the following agreement:

A.     RESOLUTION OF THE DISCOVERY-RELATED MOTIONS

        1.      John Hancock's Motion to Compel

        (a)     John Hancock agrees to narrow Requests Nos. 1-4 and 55-58 of its First Request for Production of Documents to: (i) all documents concerning Abbott's termination of ABT-773 or consideration of whether to terminate ABT-773, whether created or dated before or after the Research Funding Agreement; and (ii) documents sufficient to show the complete developmental status, and nature and extent of any material change in the safety, efficacy, scientific viability, or commercial viability, of ABT-773 for the period August 1, 2000 to March 13, 2001. Abbott agrees to produce all non-privileged documents responsive to the requests as so modified;

        (b)     Abbott agrees to produce all of the documents described in subparagraph (a) above to John Hancock on a rolling basis beginning on January 31, 2006 and concluding no later than March 8, 2007;

        (c)     Abbott agrees to complete its "supplemental production" of documents to John Hancock as described in Abbott's letter of December 5, 2006, no later than December 15, 2006; provided however, that Abbott is searching for additional responsive May 2001 ASCO

-2-

conference materials regarding MMPI compounds and drafting a supplemental privilege log, and

will produce any such documents and the supplemental privilege log as soon as possible but in

any event no later than ten (10) days prior to the deposition of Azmi Nabulsi on January 24,

2007;

(d)    John Hancock agrees to withdraw its request, pursuant to the Motion to

Compel, for further documents relating to ABT-100, ABT-724, and ABT-492 pursuant to RFP

Nos. 1-4 and 55-58;

(e)    John Hancock agrees to withdraw its request, pursuant to the Motion to

Compel, for documents related to other compliance audits pursuant to RFP No. 14; and

(f)    John Hancock agrees to withdraw its request, pursuant to the Motion to

Compel, for further answers to Interrogatory Nos. 16 and 17 of John Hancock's Second Set of

Interrogatories.

2.    Abbott's Motions for Protective Orders

(a)    Abbott agrees to withdraw its Motion for a Protective Order regarding the

deposition of Dr. Stanley Bukofzer.  Abbott agrees to make Dr. Bukofzer available for

deposition on a mutually convenient date within fifty-three (53) days of completing its

production of documents concerning ABT-773 and before the close of fact discovery;

(b)    Abbott agrees to withdraw its Motion for a Protective Order regarding the

deposition of Dr. Jeffrey Leiden.  Abbott agrees to provide alternative dates for Dr. Leiden's

deposition all within fifty-three (53) days of completing its production of documents concerning

ABT-773 and before the close of fact discovery; and

(c)    Abbott agrees to withdraw its Motion for a Protective Order regarding the

deposition of Mr. William Dempsey.  Following the production of Abbott's documents

concerning ABT-773, the parties agree to meet and confer in good faith regarding whether Mr.

-3-

Dempsey should be deposed in this action. Abbott reserves its right to object to file a protective order to preclude the deposition of Mr. Dempsey. If Abbott voluntarily agrees to allow the deposition of Mr. Dempsey, then Abbott agrees to make him available on a mutually convenient date within fifty-three (53) days of completing its production of documents concerning ABT-773 and before the close of fact discovery. If, on the other hand, Abbott seeks a protective order and is ordered by the Court to make Mr. Dempsey available, Abbott agrees to do so, if necessary, following the close of fact discovery.

3.      John Hancock's Motion to Amend

(a)      Abbott agrees to withdraw its opposition to John Hancock's Motion to Amend. John Hancock's First Amended Supplemental Complaint shall be filed on or before December 29, 2006, and Abbott's response shall be filed on or before January 12, 2006. Abbott otherwise reserves the right to contest any and all claims asserted in John Hancock's Amended Supplemental Complaint.

4.      Abbott's Motion to Prohibit Disclosure

(a)      Abbott agrees to withdraw its Motion to Prohibit Disclosure. Abbott otherwise reserves the right to object to the testimony of Dr. Fairweather on any ground other than John Hancock's allegedly late proffer.

5.      John Hancock's Motion for Issuance of Subpoena

(a)      Abbott agrees not to oppose John Hancock's Motion for Issuance of Subpoena. Abbott further agrees to execute the agreement setting forth the conditions proposed for Dr. Azmi Nabulsi's deposition described in the letter of Stephen C. Carlson, Esq., counsel for Dr. Nabulsi, to Joseph H. Zwicker, dated December 1, 2006.

6.      Joint Scheduling Order Motion

(a)      The Parties agree to modify the existing scheduling order as follows:

-4-

| Completion of Abbott's Supplemental Document Production: | December 15, 2006 |
| Service of Rebuttal Expert Reports (except rebuttal to statistical issues): | January 19, 2007 |
| Service of Expert Report of Dr. William Fairweather: | January 19, 2007 |
| Service of Rebuttal Expert Report Regarding (i) Dr. William Fairweather and (ii) other reports regarding statistical issues: | February 19, 2007 |
| Abbott's Completion of Document Production Regarding ABT-773: | March 8, 2007 |
| Completion of Fact Discovery: | April 30, 2007 |
| Completion of Expert Discovery: | May 29, 2007 |
| Filing of Motions for Summary Judgment: | June 29, 2007 |
| Filing of Oppositions to Motions for Summary Judgment: | July 31, 2007 |
| Filing of Replies to Oppositions: | August 21, 2007 |
| Status Conference: | To Be Determined By The Court |

B.     RESOLUTION OF OTHER ISSUES

    1.     Depositions

(a)     The parties agree that each side may take a total of twenty-three depositions, provided however that a party may take up to twenty-five depositions if it believes in good faith it is necessary to discover non-cumulative relevant evidence;

(b)     The parties agree that, with the exception of the deposition of Dr. Azmi Nabulsi, all presently scheduled depositions shall be taken off calendar and re-noticed. The parties agree to work cooperatively to select mutually convenient dates for each such deposition;

(c)     John Hancock will provide Abbott with a list of deponents anticipated to provide testimony regarding ABT-773 (and other issues) within 14 days of Abbott's completion

of its document production concerning ABT-773.  Except with respect to Mr. William Dempsey as provided herein, and subject to a reservation of rights to object to the deposition of any witnesses, Abbott agrees to complete the depositions of deponents who are current Abbott employees or represented by Abbott counsel on or before the close of fact discovery;

(d)    John Hancock agrees to provide Abbott with a list of deponents anticipated to provide testimony on subjects other than ABT-773 within a reasonable time after completion of Abbott's Supplemental Production on December 15, 2006.  The parties agree to work cooperatively to begin scheduling depositions of these witnesses in January 2007;

(e)    John Hancock agrees not to seek attorney's fees and costs related to the continued deposition of Diane D'Amico on November 28, 2006;

(f)    Abbott agrees to permit John Hancock to reopen the depositions of Marilyn Collicott and Bruce McCarthy for the limited purpose of examining them with respect to documents produced after the date of their original depositions and any topics reasonable related thereto;

(g)    Abbott agrees to permit John Hancock to reopen the deposition of John Leonard for the limited purpose of examining him with respect to ABT-773 and/or documents produced after the date of his original deposition and any topics reasonably related thereto;

(h)    John Hancock agrees to permit Abbott to reopen the deposition of Stephen Blewitt and Lynn Klotz for the limited purpose of examining them concerning ABT-773 and/or documents responsive to Abbott's First Request for Production that are produced after the date of their original depositions and any topics reasonably related thereto;

(i)    John Hancock agrees to permit Abbott to reopen the deposition of Mark Hair and Chris Martinez for the limited purpose of examining them with respect to any

-6-

documents responsive to Abbott's First Request for Production that are produced after the date of their original depositions and any topics reasonably related thereto;

       (j)    The parties agree to use their good faith best efforts to complete any reopened deposition in four (4) hours or less of questioning; and

       (k)    The parties agree to bear their respective attorney's fees and costs incurred in connection with any reopened deposition, and that no reopened depositions shall count towards any party's total number of permitted depositions as set forth in paragraph B.1(a) above.

       2.    <u>Abbott's Third Set of Requests For Production of Documents</u>.  John Hancock agrees to respond and object to Abbott's Third Set of Requests on or before December 15, 2006. Pursuant to its response, John Hancock shall produce documents responsive to Abbott's Third Set of Requests (to the extent they have not already been produced in this litigation) on or before December 29, 2006.

       3.    <u>StoneTurn Documents</u>.  John Hancock agrees to produce certain documents regarding StoneTurn work with respect to the compliance audit which are responsive to Abbott's First Request for Production of Documents and have not already been produced in this litigation on or before December 29, 2006, namely, the documents identified in the December 5, 2006 letter from Eric Lorenzini to Richard Abati, on or before December 29, 2006. Abbott agrees that production of the documents identified in the December 5, 2006 letter shall not constitute a waiver of any claim of attorney-client privilege, work product, or any other privilege by John Hancock or StoneTurn with respect to such documents, or any other materials or information.

ABBOTT LABORATORIES

By its attorney,


/s/ Michael S. D'Orsi
Peter E. Gelhaar (BBO No. 188310)
Michael S. D'Orsi (BBO No. 566960)
DONNELLY, CONROY & GELHAAR LLP
1 Beacon Street, 33rd Floor
Boston, MA 02108
Tele: (617) 720-2880



/s/ Jeffrey I. Weinberger
Jeffrey I. Weinberger
Gregory D. Philips
Munger, Tolles & Olson
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90012
Tele: (213) 683-9276

JOHN    HANCOCK    LIFE    INSURANCE
COMPANY, JOHN HANCOCK VARIABLE
LIFE    INSURANCE    COMPANY    and
MANULIFE INSURANCE COMPANY

By their attorneys,


/s/ Brian A. Davis
Brian A. Davis (BBO No. 546462)
Joseph H. Zwicker (BBO No. 560219)
Richard C. Abati (BBO No. 6510370)
Stacy L. Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Tele: (617) 248-5000


IT IS SO ORDERED.


Date: _____        _____
                                     United States District Court Judge

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent to those non-registered participants (if any) on December 21, 2006.

/s/ Richard C. Abati
Richard C. Abati

4152328v5

Exhibit 10

Hancock V Abbott  120606.txt

1

1                  UNITED STATES DISTRICT COURT

2                   DISTRICT OF MASSACHUSETTS

3       * * * * * * * * * * * * * * * *

4       JOHN HANCOCK LIFE INSURANCE

5         COMPANY
                              Plaintiff

6            VERSUS                        CA-05-11150-DPW

7       ABBOTT LABORATORIES

8                              Defendant

9       * * * * * * * * * * * * * * * *

10

11           BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

12             UNITED STATES DISTRICT COURT JUDGE

13               HEARING - MORNING SESSION

14                  DECEMBER 6, 2006

15

16      APPEARANCES:

17      BRIAN A. DAVIS, ESQ. AND JOSEPH H. ZWICKER, ESQ., Choate,
        Hall & Stewart, LLP, Two International Place, 100-150
18      Oliver Street, Boston, Massachusetts  02110, on behalf
        of the Plaintiff
19
        ERIC J. LORENZINI, ESQ. AND JEFFREY I. WEINBERGER, ESQ.,
20      Munger, Tolles & Olson, LLP, 355 South Grand Avenue,
        35th Floor, Los Angeles, California  90071-1560, on
21      behalf of the Defendant

22      PETER E. GELHAAR, ESQ., Donnelly, Conroy & Gelhaar, LLP,
        One Beacon Street, 33rd Floor, Boston, Massachusetts  02108,
23      on behalf of the Defendant

24

25

2

Hancock V Abbott   120606.txt

5

6

7

8

9

10

11

12

13

14

15

16

17

18                                  Courtroom No. 1 - 3rd Floor
                                    1 Courthouse Way
19                                  Boston, Massachusetts 02210
                                    10:00 A.M. - 11:05 A.M.
20

21

22

23          Pamela R. Owens - Official Court Reporter
              John Joseph Moakley District Courthouse
24              1 Courthouse Way - Suite 3200
                Boston, Massachusetts  02210
25

                                                              3

1             THE COURT:  Well, perhaps a preliminary matter is I

2     feel like I'm watching the sorcerer's apprentice with emergency

3     motions having to do with the dates of depositions?  I will

4     deal with it if you really want me to deal with it.  I can't

5     imagine how, with adult supervision and a little bit of client

6     management, it's necessary to impose on the Court this way.  I

7     suppose that companies with lots of money assume that everybody

8     jumps to their bidding.  But there are some other cases in this

9     Court.  And the idea of filing an emergency motion to set the

                                  Page 2

Hancock V Abbott (PM)   120606.txt

6     dollar cap was reached.

7              THE COURT:  I thought you said there was something

8     like 90 million dollars of milestones.

9              MR. DAVIS:  Well, there's 90 million.  It's plus

10    the management fees, Your Honor.  When you add the management

11    fees that were received and the milestone payments, I think it

12    comes to 14 million.  So you take that away from the 104 that

13    was invested.  That's how you get to the 90.

14             THE COURT:  Oh, when you said 90 million, you're

15    talking about the shortfall.

16             MR. DAVIS:  The net that's been invested at this

17    point.

18             THE COURT:  I understand.

19             MR. DAVIS:  So, again, these are all ways that were

20    built into the agreement to give Hancock some comfort and

21    assurance that if things went south, Hancock would at least see

22    at least some portion of its capital back, hopefully all of it

23    and hopefully some means of getting some return.  Now, again,

24    the way it plays out in the current circumstances is we're

25    talking about Abbott spending somewhere in the vicinity of 466

                                                              41

1     million would come out of their pocket over five years which is

2     not dramatically different and it's certainly -- again, they

3     keep talking about a minimum 400 million dollar investment.

4     Okay.  That's what -- I agree with that, that at a minimum they

5     committed to putting in 400 million of their own money.  That's

6     what the parties expected.  And yet Abbott -- and Hancock would

7     be investing somewhere in the vicinity of 80 million of its own

8     money.  Again, this is giving effect to 3.3(b) as written.

9     That's not an irrational result.  That's still 80 some odd

10    million that Hancock has invested with Abbott.  It's invested

                              Page 34

Hancock V Abbott (PM)  120606.txt

11    in a series of compounds which have almost across the board

12    failed, not quite entirely yet.  A few more just failed

13    recently, but we've still got one or two that are still kicking

14    around.  None of them have been commercialized.  Okay.  So we

15    have Hancock has 80 some odd million still in this deal.  What

16    are the royalties going to be on this?  Who knows.  But right

17    now, it's not looking very good.  So, 3.3(b) is another means

18    for Hancock to at least protect itself against some portion of

19    that loss.  That's the way it was written.  That's the way --

20    that's what it says.  That's the way it ought to be applied.

21            THE COURT:  All right.  So, let me go back to this

22    dimension of the arithmetic.  In order to avoid paying 21

23    thousand dollars or 21.7 million dollars, Abbott has to pay 110

24    -- put 110 into the deal?

25            MR. DAVIS:  I'm sorry, Your Honor.  I'm afraid

                                                              42

1    that's a little bit broad, but I see the big --

2            THE COURT:  What's happened is that they have put

3    in there what I have called their 400.  You've put in 104.

4            MR. DAVIS:  Correct.  The difference is --

5            THE COURT:  The shortfall is 110.  All right.  Now

6    they put some portion of that 110 in.  I can't do the figures

7    right now or if I ever recall them.  But they have to make a

8    commitment -- in order to avoid paying 21.7 million dollars,

9    they have to commit to 110 million dollars.  Now, there's a

10   sliding scale -- obviously a sliding scale involved in that.

11   But that's basically what they have to do to protect themselves

12   against this.

13            MR. DAVIS:  They could look at it that way, Your

14   Honor.

15            THE COURT:  Why wouldn't someone look at it that
                          Page 35