UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER LIFE INSURANCE COMPANY),<br><br>Plaintiffs,<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>Defendant. | CIVIL ACTION NO. 05-11150-DPW |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO STRIKE PRAYER FOR RESCISSION
IN PLAINTIFFS' FIRST AMENDED SUPPLEMENTAL COMPLAINT**

Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and Manulife Insurance Company (f/k/a Investors Partner Life Insurance) (collectively, "John Hancock" or "Hancock") hereby submit this Memorandum in Opposition to Defendant's Motion to Strike the Prayer for Rescission contained in John Hancock's First Amended Supplemental Complaint.

John Hancock added that prayer to its complaint just over one month ago after defendant Abbott Laboratories ("Abbott") expressly and voluntarily agreed to withdraw its opposition to John Hancock's Motion for Leave to Amend its Supplemental Complaint. That agreement, among others, was memorialized in a written Stipulation and Proposed Order that allowed John Hancock to amend its Supplemental Complaint to add an explicit prayer for rescission, which the parties filed with this Court on December 21, 2006 (Docket Entry No. 102), and which the Court subsequently adopted on January 5, 2007 (Electronic Order No. 102).   Notwithstanding its still-warm Stipulation with Hancock and the Court's endorsement of the parties' Proposed Order, Abbott now has moved to strike the *very same prayer* on the *very same grounds* that Abbott previously relied upon in opposing John Hancock's original Motion to Amend.

Abbott's Motion to Strike should be denied.  Abbott waived the arguments that it asserts when it stipulated to allow John Hancock's Motion to Amend.  Those issues were resolved, by agreement, in John Hancock's favor.  Even if they were not, however, Abbott's Motion to Strike should be denied for the further reason that it fails to satisfy the standard under Fed. R. Civ. P. 12(f). John Hancock is well within its rights to request that the Court consider rescission of the Research Funding Agreement as a remedy for Abbott's increasingly-apparent misrepresentation and fraud in the negotiation and execution of that Agreement.

1

## Factual and Procedural Background

*Abbott's Representations To John Hancock In The Agreement*

The parties have trod this particular ground before, and many of the relevant facts already are known to this Court. On March 13, 2001, John Hancock and Abbott entered into a Research Funding Agreement (the "Agreement"), pursuant to which Hancock agreed to contribute up to $214 million over a four-year "Program Term" to help fund Abbott's research, development and commercialization activities (defined in the Agreement as the "Research Program") for nine pharmaceutical compounds (defined in the Agreement as the "Program Compounds") in return for, *inter alia*, royalties on the sale of those products. The Agreement was the subject of extensive negotiations between John Hancock, Abbott and their respective legal counsel over a period of approximately one year. First Amended Supplemental Complaint ("Complaint" or "Compl."), ¶ 11. Because the financial return, if any, that John Hancock ultimately may receive on its investment in the Program Compounds is heavily dependent on the commercial success of those Compounds, John Hancock had a strong interest in negotiating the Agreement to ensure that Abbott had: (a) a good faith intention to aggressively pursue development of each of the Program Compounds; and (b) a good faith belief that each of the Program Compounds possessed reasonably favorable commercial prospects. *Id.*, ¶ 12.

In order to satisfy John Hancock's concerns, Abbott agreed to provide John Hancock, in Article 12 of the Agreement, with certain written representations and warranties concerning the development status of the Program Compounds, including, *inter alia*, a representation and warranty that:

2

[s]et forth on Exhibit 12.2(d) is the full name, chemical name, detailed description of the stage of development and current status for each Program Compound. Set forth on Exhibit 1.6 in each Annual Research Plan is a description of projected milestones and dates thereof, projected year of NDA filing, and projected costs to be incurred by Abbott during the Program Term, for each Program Compound. Such projections were prepared in good faith and with due care based on reasonable assumptions, and represent the reasonable estimate of Abbott based on information available as of the date of such projections and as of the date hereof.... (Section 12.2[d]).

Compl., ¶ 12. Abbott further represented and warranted to Hancock that:

[n]either this Agreement nor any Exhibit to this Agreement (including the compound reports attached as Exhibit 12.2(i) hereto (the "Compound Reports")) contains any untrue statement of material fact or omits to state any material fact necessary to make the statements contained therein not misleading. There is no fact known to Abbott (other than generally available information concerning the pharmaceutical industry in general) as of the date of this Agreement that has not been disclosed in this Agreement or any Exhibit to this Agreement which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial [viability]) of the Research Program or any of the Program Compounds. (Section 12.2[i]).

*Id.*, ¶ 13.

Each of the "Compound Reports" that Abbott provided to John Hancock prior to the execution of the Agreement, and that are incorporated in the Agreement as Exhibit 12.2(i), provided John Hancock, *inter alia*, with what Abbott represented was an up-to-date "Opportunity Overview" of the relevant Program Compound, as well as a description of the current developmental status of the Compound, including the status of all clinical trials. *See generally* Agreement, Exhibit 12.2(i), Bates nos. JH008165-73 (Compound Report, ABT-594), JH008193-99 (Compound Report, ABT-518), JH008153-58 (Compound Report, ABT-773), Affidavit of Stacy L. Blasberg ("Blasberg Aff."), Ex. 1.

For example, the Compound Report for ABT-518 stated that it was a "compelling development candidate with the potential to demonstrate antitumor effects superior to [similar compounds] currently undergoing clinical trials." *Id.*, Compound Report, ABT-518, Bates

3

nos. JH008194-95. Abbott further represented that "Phase I clinical trials" of ABT-518 by Abbott "began March 2001," and that "[c]linical studies across a wide range of solid tumors will be initiated...." *Id.*, Bates nos. JH008195, JH008199.

Similarly, Abbott's Compound Report for ABT-594 represented, among other things, that: (1) ABT-594 was "expected to be the first neuronal nicotinic receptor agonist to receive an indication for pain"; (2) a "phase IIb study for neuropathic pain at higher, titrated doses of ABT-594 began in April 2000 and ends in June 2001" with a "total of 320 patients anticipated to be included in the study"; and (3) a "[New Drug Application] filing" with the FDA for ABT-594 was "expected in 3Q2003." *Id.*, Compound Report, ABT-594, Bates nos. JH008166, JH008171.

Lastly, Abbott's Compound Report for ABT-773 represented, among other things, that: (1) ABT-773 was one of "a promising new class of antibiotics known as ketolides"; (2) that ABT-773 likely exhibited competitive "convenience, safety and tolerability"; and (3) ABT-773 had "an expected U.S. launch date in Q1, 2004." *Id.*, Compound Report, ABT-773, Bates nos. JH 008154, JH008156.

### *Abbott's Misrepresentations And Material Omissions*

Notwithstanding the foregoing representations to John Hancock, Abbott terminated its internal development of ABT-518 *before* the Agreement was executed, and terminated ABT-594 and ABT-773 less than twelve months after the Agreement was executed. Compl., ¶¶ 25, 27, 29. When this action was commenced in June 2005, John Hancock had reason to believe that Abbott misrepresented or failed to disclose material facts concerning the development status of at least two of those Program Compounds (ABT-518 and ABT-594) as of the date of the Agreement. John Hancock alleges sufficient facts in the Complaint to support these claims.

4

*See* Compl., ¶¶ 25-30.[1] Discovery to date -- which has moved slowly because of ongoing delays in Abbott's document production -- has confirmed John Hancock's suspicions and well-pled allegations. Specifically, John Hancock has been able to establish, *inter alia*, the following:

<u>ABT-518</u> -



REDACTED



_____

[1] Moreover, the facts alleged in the Complaint alone are sufficient to support John Hancock's claim for rescission and defeat Abbott's Motion to Strike. *See infra*, pp. 8-10, 16-20.

REDACTED

ABT-594 -

REDACTED

6

REDACTED

ABT-773 -

REDACTED

7

REDACTED

*John Hancock's Claims*

John Hancock has asserted claims against Abbott in this action for fraud (Count I), breach of contract (Count II), and indemnification (Count III).[2]  Compl., ¶¶ 41-58.  The principal allegations underlying these claims are that Abbott, intentionally or otherwise, misrepresented or omitted material information concerning the actual development status of certain Program Compounds, specifically ABT-518, ABT-594, and ABT-773, prior to the execution of that Agreement.  *See id.*, ¶¶ 42, 49(a)-(c).  John Hancock further has alleged, *inter alia*, that,

Abbott made the foregoing misrepresentations to John Hancock wantonly and willfully for the purpose of fraudulently inducing John Hancock to enter into the Agreement, and to make various Program Payments to Abbott on the terms stated therein (*Id.*, ¶ 44);

John Hancock justifiably relied upon Abbott's misrepresentations to its detriment by, among other things, entering into the Agreement, and making Program Payments to Abbott in accordance with the terms thereof (*Id.*, ¶ 45);

[h]ad John Hancock known the true development status of [ABT-518, ABT-594 and/or ABT-773] before the Agreement was executed, John Hancock would have demanded

---

[2] John Hancock filed its original Complaint on June 3, 2005 ("Original Complaint" or "Org. Compl.") (Docket Entry No. 1), its Supplemental Complaint on June 23, 2006 (Docket Entry No. 27), and its First Amended Supplemental Complaint on December 29, 2006 (Docket Entry No. 103).

different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all (*Id.*, ¶ 26); and

[a]s a result of Abbott's misrepresentations, John Hancock has been defrauded by Abbott and has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined (*Id.*, ¶ 46).

John Hancock's Original Complaint in this action included prayers not only for damages, but also for "such other and further relief as the Court deems just and appropriate in the circumstances," including, if appropriate, the remedy of rescission. *See* Orig. Compl., Prayer (e). After learning of the extensive nature of Abbott's misrepresentations and omissions in the Agreement in discovery, John Hancock again put Abbott on notice that it intended to seek rescission of the Agreement as an alternative remedy in this action. *See, e.g.,* John Hancock's Objections and Responses to Abbott Laboratories' First Set of Interrogatories dated February 6, 2006 ("February Ints."), pp. 26-29, Blasberg Aff., Ex. 18; Letter from Brian A. Davis to Gregory D. Phillips dated August 14, 2006 ("August Letter"), Blasberg Aff., Ex. 19.

Abbott responded to John Hancock's notice by contesting Hancock's right and ability to seek rescission as a remedy. Accordingly, on October 24, 2006, John Hancock filed with this Court a Motion For Leave to Amend the Supplemental Complaint ("Motion to Amend") (Docket Entry No. 62). Hancock's Motion to Amend was prompted by new evidence obtained during discovery in this action, some of which is discussed above, and by Hancock's desire to avoid any possibility of surprise (or, more accurately, any *claim* of surprise) by Abbott at trial. Therefore, in an abundance of caution and in order to placate Abbott, John Hancock sought to

amend its Supplemental Complaint to make explicit its desire to seek rescission of the Agreement in the alternative.[3]

Abbott opposed Hancock's request to amend its Supplemental Complaint. In its Memorandum in Opposition to Plaintiffs' Motion for Leave to Amend the Supplemental Complaint (the "Opposition" or "Opp."), Abbott raised two principal arguments: (1) the claim for rescission was barred because Hancock previously had "elected" to enforce, rather than rescind, the Agreement (*see* Opp., pp. 11-13); and (2) the request for rescission was barred because Hancock unduly delayed in making that request (*see id.*, pp. 13-15). In particular, Abbott argued that John Hancock's failure to seek rescission of the Agreement in the prior related action between the parties titled *John Hancock Life Insurance Company, et al. v. Abbott Laboratories*, Civil Action No. 03-12501-DPW ("*Hancock I*"), effectively precluded Hancock from seeking to rescind the Agreement in this action, and that Hancock's purported sixteen-month delay in requesting rescission was unjustified. *See* Opp., pp. 11-15.

### The December 2006 Hearing

Oral argument on Hancock's Motion to Amend, as well as numerous other motions, was scheduled by the Court for December 6, 2006 (the "December Hearing"). At the commencement of the December Hearing, the Court urged the parties to reach agreement on the pending "detritus" motions, including John Hancock's Motion to Amend, and thereby obviate the need for further intervention by the Court. *See* December Hearing, Morning Session Transcript, pp. 46-48, Blasberg Aff., Ex. 20. The parties did just that during the mid-day break, and informed the Court during the afternoon session that they intended to jointly

---

[3] In addition to amending to make its claim for rescission explicit, Hancock's Motion to Amend also sought to add allegations with respect to ABT-773. Abbott withdrew its opposition to those amendments and, consistent with the parties' agreements, as set out in the Stipulation, has not moved to strike those allegations.

10

file a stipulation memorializing their agreements on those motions the following week. *See*

December 2006 Hearing, Afternoon Session Transcript, pp. 3-5, Blasberg Aff., Ex. 21.

Specifically, the following colloquy took place:

> THE COURT: Okay. So, by my last count, although this was only at, say, 9 o'clock this morning, there were 12 motions outstanding.

> MR. DAVIS: That sounds about right, Your Honor.

> THE COURT: Pardon me?

> MR. DAVIS: It sounds about right, Your Honor. I lost track myself.

> THE COURT: Well, but anything that has been filed or is in the gleam in the eye of any of the attorneys is going to be resolved by this; is that right?

> MR. DAVIS: Yes, Your Honor.

> THE COURT: You hope.

> MR. DAVIS: I can't think of anything else that is pending or that is currently threatened that would not be resolved by this agreement.

> THE COURT: All right. Is that your understanding as well?

> MR. WEINBERGER: Yes, Your Honor.

*See id.*

As promised, the parties filed their Stipulation And Proposed Order Regarding Certain

Pending Motions And Scheduling (the "Stipulation") on December 21, 2006 (Docket Entry

No. 102). In the Stipulation, Abbott expressly agreed, *inter alia*, "to withdraw its opposition

to John Hancock's Motion to Amend" its Supplemental Complaint, including its opposition to

the addition of an explicit prayer for rescission. *See* Stipulation, p. 4. The parties further

11

agreed that Hancock's Complaint would be filed on or before December 29, 2006, and that

Abbott's response would be filed on or before January 12, 2007. *See id.[4]*

### Abbott's Motion To Strike

In direct conflict with its representations at the December Hearing and the plain

language of the Stipulation, Abbott filed a Motion to Strike the Prayer for Rescission in John

Hancock's First Amended Supplemental Complaint (the "Motion to Strike") on January 12,

2007 (Docket Entry No. 104). Abbott's Motion to Strike simply reiterates the same arguments

that Abbott raised in its Opposition to John Hancock's Motion to Amend; *i.e.*, the same

arguments that Abbott voluntarily agreed to withdraw, and assured the Court were resolved,

less than one month earlier. More specifically, Abbott once again argues that John Hancock's

request for rescission of the Agreement is barred because Hancock previously "elected" to

enforce the Agreement, and because Hancock unduly delayed in making that request.

*Compare* Motion to Strike, pp. 16-17 (arguing that vague, boilerplate language in the Prayer

for Relief requesting "other relief as the Court deems just and appropriate" does not constitute

a request for rescission) *with* Opp., p. 15 (arguing that Prayer for Relief included the

boilerplate request for "such other and further relief as the Court deems just and appropriate in

the circumstances" which did not specify rescission); *compare* Motion to Strike, pp. 11-14, 17-

19 (arguing that prayer for rescission is barred because Hancock continued to treat the contract

as valid and binding) *with* Opp., pp. 11-13 (arguing that rescission is not available as a remedy

because Hancock already elected to enforce the Agreement); *compare* Motion to Strike, pp. 7-

10 (arguing that prayer for rescission is barred because Hancock delayed in seeking rescission)

---

[4] In its Answer and Affirmative Defenses to the First Amended Supplemental Complaint (the "Answer"),
Abbott admitted that Hancock asserted claims for fraud, breach of contract and indemnification, seeking, among
other things, "rescission." *See* Answer, ¶ 1 (Docket Entry No. 107).

*with* Opp., pp. 13-15 (arguing that even if Hancock were not barred from seeking rescission after obtaining judgment, it would be barred by its undue delay). For the reasons set forth below (and, more often than not, previously), John Hancock opposes Abbott's Motion to Strike.

## Argument

I.   ABBOTT'S MOTION TO STRIKE SHOULD BE DENIED BECAUSE ABBOTT WAIVED THE ARGUMENTS THEREIN WHEN IT VOLUNTARILY WITHDREW ITS OPPOSITION TO JOHN HANCOCK'S PRIOR MOTION TO AMEND ITS COMPLAINT TO ADD AN EXPLICIT PRAYER FOR RESCISSION.

As noted above, Abbott's present Motion to Strike simply reiterates the same arguments concerning John Hancock's prayer for rescission that Abbott previously asserted in opposing Hancock's Motion to Amend. *See supra*, pp. 12-13. Having knowingly and voluntarily withdrawn its Opposition to that Motion to Amend in the parties' Stipulation, and having expressly represented to the Court at the December Hearing that the parties' agreement resolved "anything that ha[d] been filed or [was] in the gleam in the eye of any of the attorneys," Abbott waived the arguments that it now seeks to assert in its Motion to Strike. *See, e.g., Lopez del Valle v. Gobierno de la Capital*, 855 F. Supp. 34, 35 (D.P.R. 1994) (party that withdraws opposition to opposing party's motion and confirms its withdrawal when explicitly asked by Court at oral proceeding "can be understood as waiving any objection."); *Mountain Wireless, Inc. v. Cumulus Broadcasting, Inc.*, 2001 WL 40908, *1 (D. Me. Jan. 17, 2001) (by dropping previous assertion of misrepresentation in its reply memorandum to defendant's opposition, plaintiff waived argument). On this basis alone, the Court can and should deny Abbott's Motion to Strike.

13

Apparently anticipating a challenge to its obvious about-face, Abbott attempts to preempt a finding of waiver by arguing that in the Stipulation, Abbott "otherwise reserve[d] the right to contest any and all claims asserted in John Hancock's Supplemental Complaint." Motion to Strike, p. 5. This excuse is unavailing. By expressly withdrawing its objections to John Hancock's Motion to Amend while "otherwise" reserving its rights, Abbott cannot be said to have fairly signaled its intention to raise the *very same objections* in a Motion to Strike the *very same amendment* just *two weeks later*. Moreover, Abbott's purported reservation of the right to subsequently renew its objections to John Hancock's prayer for rescission in the guise of a Motion to Strike simply cannot be reconciled with the explicit representation that Abbott's counsel made to the Court at the December Hearing that the parties' Stipulation would resolve not only the pending motions, but also anything that was a "gleam in the eye of any of the attorneys." *See* December Hearing, Afternoon Session Transcript, pp. 3-5, Blasberg Aff., Ex. 21. The arguments contained in Abbott's present Motion to Strike constitute such a "gleam" and they have been waived. Accordingly, Abbott's Motion to Strike should be denied.

II.    ABBOTT'S MOTION TO STRIKE SHOULD BE DENIED BECAUSE ABBOTT HAS NOT DEMONSTRATED, AS A MATTER OF LAW, THAT RESCISSION OF THE AGREEMENT IS UNAVAILABLE OR AN INAPPROPRIATE REMEDY FOR ABBOTT'S FRAUD AND BREACH OF CONTRACT.

Even assuming Abbott has not waived its objections to the sufficiency of the pleading in Hancock's Complaint (which it has), Abbott has not, and cannot, satisfy Fed. R. Civ. P. 12(f) and cannot demonstrate that the prayer for rescission deserves to be stricken as a matter of law. Motions to strike are not favored and are granted sparingly, and then only if clearly warranted, with doubt being resolved in favor of the pleading. *See Wyeth v. King Pharma,*

14

*Inc.*, 396 F. Supp.2d 280, 293 (E.D.N.Y. 2005).[5]  In order to succeed on its Motion, Abbott

must demonstrate that: (1) no question of fact which would allow Plaintiff's claim to proceed

exists; (2) no substantial question of law exists; and (3) it is prejudiced by the inclusion of the

claim.  *See Wyeth*, 396 F. Supp.2d at 293; *Telewizja Polska USA, Inc. v. Echostar Satellite

Corp.*, 2004 U.S. Dist. LEXIS 17936, *8 (E.D. Ill. Sept. 1, 2004) (material questions of fact

relating to contract dispute preclude the court from allowing a motion to strike).  Abbott cannot

meet this standard.

    1.    *Abbott's Motion To Strike Is Mooted By Fed. R. Civ. P. 54(c).*

Abbott asserts that John Hancock unreasonably delayed in seeking rescission and,

therefore, it previously waived any right to rescind the Agreement.  In making this argument,

Abbott once again completely ignores Fed. R. Civ. P. 54(c), which provides that "every final

judgment shall grant the relief to which the party in whose favor it is rendered is entitled, *even

if the party has not demanded such relief in the party's pleadings*" (emphasis added).  Rule

54(c) makes it crystal clear that this Court may order rescission of the Agreement as a remedy,

if supported by the facts, regardless of whether John Hancock ever included a prayer for

rescission in its Complaint.  *See, e.g., U.S. v. Marin*, 651 F.2d 24, 30-31 (1st Cir. 1981)

(Rule 54(c) "has been liberally construed, leaving no question that it is the court's duty to

grant whatever relief is appropriate in the case on the facts provided.");  *In re Blinds to Go

Share Purchase Litig.*, 443 F.3d 1, 8 (1st Cir. 2006) (although plaintiff did not explicitly

request rescission, court upheld finding of such remedy because "in choosing among equitable

remedies, a *nisi prius* court has the ability -- indeed, the duty -- to weigh all the relevant facts

---

[5] Fed. R. Civ. P. 12(f), upon which Abbott bases its Motion to Strike, provides that "the court may order stricken from any pleading any insufficient defense."  Fed. R. Civ. P. 12(f).

and circumstances and to craft appropriate relief on a case-by-case basis."). Thus, from the very start, Abbott's argument that John Hancock unduly delayed in requesting rescission of the Agreement as a remedy is effectively moot.

2.    *Questions Of Fact Exist As To Whether John Hancock Is Entitled To Rescission.*

Even if the issue were not moot, any question of whether John Hancock has waived its right to seek rescission of the Agreement presents an issue of fact that should be resolved by the Court based on *all* the evidence, not just the pleadings. *See, e.g., Trimec, Inc. v. Zale Corp.,* 1991 WL 208896, \*4 (N.D. Ill. Oct. 10, 1991) (whether party waived rescission rights due to a delay in asserting such rights "is an issue of fact, and resolution of this fact question is better left to a forum which allows the court to consider the facts."). In this case, there are more than adequate facts - as alleged in the Complaint and elsewhere in the record[6] - to support a finding that Hancock has not waived its right to seek rescission of the Agreement.

For example, John Hancock's Original Complaint in this action expressly alleged, *inter alia,* that,

> [h]ad John Hancock known the true development status of [certain Program Compounds] before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, *or may not have entered into the Agreement at all.*

*See, e.g.,* Original Compl., ¶¶ 24, 26 (emphasis added). These allegations were more than sufficient to put Abbott on notice that John Hancock believed that the Agreement, as a whole, may have been fraudulently induced and potentially was subject to rescission.[7] Even if Abbott

---

[6] John Hancock has alleged sufficient facts in its Original Complaint, as well as subsequent pleadings and supporting documents on the record, to support its claim for rescission and defeat Abbott's Motion to Strike. Any additional evidence further submitted in this opposition shows that Hancock's claims have born out in discovery.

[7] Because the allegations of John Hancock's Original Complaint were sufficient to put Abbott on notice that Hancock believed the Agreement, as a whole, may have been fraudulently induced and potentially was subject

16

did not fully appreciate the allegations of John Hancock's Original Complaint, however, the interrogatory answers that John Hancock served on Abbott almost *one year ago* in February 2006 made it absolutely explicit that Hancock intended to seek rescission of the Agreement as an alternative remedy. *See* February Ints., pp. 26-29, Blasberg Aff., Ex. 18. John Hancock simultaneously informed Abbott that it intended to introduce expert testimony on the topic of rescission. *See* August Letter, Blasberg Aff., Ex. 19.[8] Abbott then waited more than *six months*, until October 2006, to notify John Hancock that it was Abbott's position that Hancock could not pursue rescission as a remedy under its existing Supplemental Complaint. It was then, in the interest of completeness and out of an abundance of caution, that John Hancock sought leave to amend the Supplemental Complaint to explicitly add rescission as an additional prayer for relief. These facts demonstrate that John Hancock did not unduly delay in putting Abbott on notice of its intention to seek rescission of the Agreement as an alternative remedy, and has not waived its right to do so.[9]

Abbott further argues that John Hancock waived or elected not to pursue the remedy of rescission by "demand[ing] and accept[ing] Abbott's performance under the Agreement"; *e.g.*, requiring Abbott to submit to an audit of its books and records. *See* Motion to Strike, p. 10. This argument overlooks the fact that Illinois law expressly permits a party to simultaneously

---

to rescission, Abbott's analysis of when Hancock first learned of the basis for its fraud claims is irrelevant. *See Bob Willows Motors, Inc. v. Gen. Motors Inc.*, 872 F.2d 788, 791 (1st Cir. 1989) ("To this end, pleadings are liberally construed and each theory need not be explicitly spelled out, so long as the other side receives notice as to what is at issue in the case.").

[8] The Original Complaint and Exhibits 18 and 19 were previously submitted to the Court with John Hancock's Motion to Amend filed on October 24, 2006. *See* Docket Entry No. 62.

[9] Abbott also argues that John Hancock impermissibly included a request to rescind the Agreement only after determining that rescission was the best outcome for Hancock, citing to *Guy v. Duff & Phelps, Inc.*, 628 F. Supp. 252 (N.D. Ill. 1985). *See* Motion to Strike, pp. 17-19. This argument, however, wholly ignores the fact that John Hancock, unlike the plaintiff in *Guy, did not* unduly delay in notifying Abbott of its intention to seek rescission of the Agreement as an alternative remedy after learning the true extent of Abbott's misrepresentations and fraud. *See Guy*, 628 F. Supp. at 261 ("[t]he demand is that *advice* of the determination be given within a reasonable time after discovery of the ground for rescission.") (emphasis added).

17

pursue a claim for damages and a claim for rescission based upon the same violations. *See Kel-Keef Enterprises, Inc. v. Quality Components Corp.*, 738 N.E.2d 524, 531-32 (Ill. Ct. App. 2000). No election is required. Furthermore, Abbott does not attempt to explain how Hancock could have waived its right to rescind the Agreement merely by attempting to determine, through the audit procedures prescribed in that Agreement, whether it had been misled by Abbott in the first instance. It is simply illogical to conclude that John Hancock unequivocally "elected" not to rescind the Agreement by investigating whether it has the right to do so. *See Kel-Keef*, 738 N.E.2d at 531-32 (election of remedies confined to cases where double compensation threatened, party actually misled or *res judicata* can be applied).

Abbott's argument that this Court's decision in *Hancock I* has a *res judicata* effect on John Hancock's ability to seek rescission is equally unconvincing. *See* Motion to Strike, pp. 13-14. This argument overlooks the critical fact that John Hancock's claims in *Hancock I* were explicitly limited by the Court to the question of "whether or not the termination of the Plaintiff's obligations as a result of shortfalls in the aggregate spending targets is well-founded." *Hancock I* Scheduling Order, dated March 30, 2004, p. 1, Blasberg Aff., Ex. 22. The same Order specifically directed John Hancock to raise any "[o]ther disputes, when ripe ... in a separate related action." *Id.; see also* Compl., ¶ 1. John Hancock has done precisely what the Court directed. Abbott's argument also overlooks the fact that Abbott agreed in *Hancock I* not to cite that action as the basis for a *res judicata* argument in any subsequent action between the parties. *See* March 30, 2004 Transcript of Court Conference in *Hancock I*, pp. 22-23, Blasberg Aff., Ex. 23. Abbott remains bound by that commitment.

18

Lastly, the summary of evidence provided above establishes that there is more than a colorable factual basis for John Hancock's request to rescind the Agreement.[10] That evidence - - most if not all of which comes from Abbott's own documents and witnesses -- demonstrates that Abbott misrepresented or failed to disclose to John Hancock various material facts concerning the true developmental status of at least three of the Program Compounds, including, but not limited to, the fact that the development of ABT-518 *already had been terminated by Abbott before the Agreement even was signed. See supra*, pp. 5-6. Abbott's apparent misrepresentation and fraud provide more than sufficient grounds to rescind the Agreement. *See, e.g., Newton v. Aitken*, 633 N.E.2d 213, 216 (Ill. App. 3d 1994) (court may award rescission where there is material breach or fraud); *Mor-Wood Contractors, Inc. v. Ottinger*, 562 N.E.2d 1247, 1253 (Ill. App. 3d 1990) (rescission is an equitable remedy afforded to one party under a contract because of other party's fraud or breach). Accordingly, Abbott's Motion to Strike should be denied.

3.    *Abbott Is Not Unfairly Prejudiced By John Hancock's Prayer For Rescission.*

Abbott's claim that it is unfairly prejudiced by John Hancock's prayer for rescission is completely lacking in substance. The mere fact that Abbott may have partially performed certain obligations under the Agreement -- including allegedly engaging in "commercially reasonable efforts" to develop at least some of the Program Compounds "for the benefit of both parties" -- does not constitute undue "prejudice" sufficient to deprive John Hancock the otherwise available remedy of recission as a matter of law. *See, e.g., Time Warner Sports*

---

[10] Abbott claims that the allegations of John Hancock's Complaint do not entitle Hancock to rescission as a matter of law because there is no allegation that the Agreement is "void or voidable." *See* Motion to Strike, p. 4. First, Abbott cites to no authority for this proposition. Second, Abbott waived any argument on this ground at the December Hearing and in the Stipulation. *See supra*, pp. 13-14. Finally, this argument, as with Abbott's other arguments, completely ignores Fed. R. Civ. P. 54(b). *See supra*, pp. 15-16.

19

*Merch. v. Chicagoland Processing Corp.*, 974 F. Supp. 1163, 1170 (N.D. Ill. 1997) (rejecting

claim of prejudice based on party's continued performance of contract). If and when the Court

ultimately determines that recission is an appropriate remedy, it easily can return the parties to

the *status quo ante* simply by canceling the Agreement and ordering Abbott to repay to

Hancock with prejudgment interest the $104 million in Program Payments that it made for

2001 and 2002, net of any milestone payments, management fees, or other payments that

Hancock already may have received from Abbott.   In that way, the parties will be in

effectively the same positions that they likely would have been in (and likely would have stayed

in) had Abbott disclosed the true developmental status of all of the Program Compounds before

the Agreement was signed in March 2001.  Absolutely no unfair prejudice to Abbott would

result.

## Conclusion

For the foregoing reasons, John Hancock respectfully requests that Abbott's Motion to

Strike be denied in its entirety.

> JOHN HANCOCK LIFE INSURANCE
> COMPANY, JOHN HANCOCK VARIABLE
> LIFE INSURANCE COMPANY and MANULIFE
> INSURANCE COMPANY
>
> By their attorneys,
>
> Brian A. Davis (BBO No. 546462)
> Joseph H. Zwicker (BBO No. 560219)
> Karen Collari Troake (BBO No. 566922)
> Stacy L. Blasberg (BBO No. 657420)
> CHOATE, HALL & STEWART
> Two International Place
> Boston, MA 02110
> Telephone: 617-248-5000, Fax: 617-248-4000

Date: February 9, 2007

20

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served by electronic and overnight mail upon Peter E. Gelhaar, Esq., Donnelly, Conroy & Gelhaar, LLP, One Beacon Street, 33rd Floor, Boston, MA 02108, and Gregory D. Phillips, Esq., Munger, Tolles & Olson LLP, 355 South Grand Avenue, Los Angeles, CA 90071, on this 9th day of February, 2007.

Stacy L. Blasberg

# Exhibit 2

MAY. 31. 2005  11:34AM                                        NO. 3057    P. 15



**Diane L D'Amico**
03/12/01 10:08 PM

To: jhm@nki.nl
cc: j.maaskant@telescan.nki.nl, ldvi@telescan.nki.nl, Jim
Looman/HOOFDDORP/AI/ABBOTT@ABBOTT, Else
Meijer/HOOFDDORP/AI/ABBOTT@ABBOTT, Willy
Jansen/HOOFDDORP/ADD/ABBOTT@ABBOTT, Todd J
Janus/LAKE/PPRD/ABBOTT@ABBOTT, Paige
Gjelsten/LAKE/PPRD/ABBOTT@ABBOTT, Lori V
Rountree/LAKE/PPRD/ABBOTT@ABBOTT, Azmi A
Nabulsi/LAKE/PPRD/ABBOTT@ABBOTT, Diane C
Bronson/LAKE/PPRD/ABBOTT@ABBOTT, Robert
Hansen/LAKE/PPRD/ABBOTT@ABBOTT
Subject: M00-235 Update

Dear Professor Schellens,

As you know, we have been instructed to halt the M00-235 study.  I assume that you know that the
AZU enrolled a patient into the study today.

At this time, we have instructed the AZU to proceed with the M00-235 patient per the protocol until
they hear from us otherwise.  We hope to have further instructions by tomorrow (Tuesday, 13Mar01).

We ask that you refrain from enrolling any additional patients at your site at this time.

Thank you for your patience and understanding in this matter.

Best regards,

Diane

**CONFIDENTIAL**

ABBT 0033104

# Exhibit 3

1       UNITED STATES DISTRICT COURT

2     FOR THE DISTRICT OF MASSACHUSETTS

3

4                                         ORIGINAL

5   JOHN HANCOCK LIFE INSURANCE          )

6   COMPANY, JOHN HANCOCK VARIABLE       )

7   LIFE INSURANCE COMPANY and           )

8   MANULIFE INSURANCE COMPANY           )

9   (f/k/a INVESTORS PARTNER             )

10  INSURANCE COMPANY),                  )

11              Plaintiffs,              )   Civil Action No.

12      -vs-                             )   05-11150-DPW

13  ABBOTT LABORATORIES,                 )

14              Defendant.               )

15

16          THE VIDEOTAPED DEPOSITION OF

17                 AZMI NABULSI

18

19             January 24, 2007

20

21

22

23

24

| 12:16:13 | 1 | BY MR. ZWICKER: |
| 12:16:26 | 2 | Q. You made a pitch to Dr. Leiden on |
| 12:16:29 | 3 | March the 7th that notwithstanding the adverse data |
| 12:16:33 | 4 | from the competitors that development of 518 should |
| 12:16:36 | 5 | continue, correct? |
| 12:16:37 | 6 | MR. PHILLIPS: Object to the form. |
| 12:16:37 | 7 | BY THE WITNESS: |
| 12:16:38 | 8 | A. We -- we argued to continue 518. |
| 12:16:43 | 9 | BY MR. ZWICKER: |
| 12:16:43 | 10 | Q. Okay. And, sir, isn't it a fact that on |
| 12:16:47 | 11 | or about March 9th Dr. Leiden rejected your |
| 12:16:52 | 12 | recommendation and immediately directed a halt to |
| 12:16:56 | 13 | all development activities relating to ABT-518? |
| 12:17:00 | 14 | MR. PHILLIPS: Object to the form, compound. |
| 12:17:03 | 15 | BY THE WITNESS: |
| 12:17:04 | 16 | A. I don't recall the exact date, but in |
| 12:17:10 | 17 | the -- after that meeting, I don't know if it's a |
| 12:17:12 | 18 | day or a week or two weeks, after that meeting, the |
| 12:17:16 | 19 | March 7th meeting, we were asked to stop -- to stop |
| 12:17:26 | 20 | the Phase I. I don't recall if it was to stop all |
| 12:17:29 | 21 | development or stop the Phase I or so on. But we |
| 12:17:32 | 22 | were asked to stop the Phase I. |
| 12:17:33 | 23 | BY MR. ZWICKER: |
| 12:17:33 | 24 | Q. Okay. But, sir, isn't it true that you |

| 12:17:36 | 1 | were directed to cease all development activities |
| 12:17:40 | 2 | for 518 by Dr. Leiden? |
| 12:17:43 | 3 | A.    We were asked -- |
| 12:17:44 | 4 | MR. PHILLIPS:  Objection; asked and answered. |
| 12:17:45 | 5 | BY THE WITNESS: |
| 12:17:45 | 6 | A.    We were asked to stop 518.  I don't -- I |
| 12:17:50 | 7 | don't recall the exact nature and the language of |
| 12:17:53 | 8 | the order.  It came to me through from Perry.  I |
| 12:17:56 | 9 | never -- did not talk to Jeff Leiden directly. |
| 12:18:00 | 10 | MR. ZWICKER:  Let's mark as the next exhibit |
| 12:18:08 | 11 | these two, and we're going to mark them in this |
| 12:18:12 | 12 | order. |
| 12:18:12 | 13 | (WHEREUPON, certain documents were |
| 12:18:12 | 14 | marked Nabulsi Deposition Exhibit |
| 12:18:12 | 15 | Nos. 12 and 13, for identification, |
| 12:18:37 | 16 | as of 01-24-2007.) |
| 12:18:37 | 17 | BY MR. ZWICKER: |
| 12:18:38 | 18 | Q.    I'd like you, Dr. Nabulsi, to review |
| 12:18:41 | 19 | Nabulsi Exhibit No. 12, which is a typewritten |
| 12:18:46 | 20 | document to Jim from Azmi bearing Bates |
| 12:18:56 | 21 | No. ABBT0507886 and take a look at it. |
| 12:19:09 | 22 | MR. ZWICKER:  Let's go off the record for one |
| 12:19:11 | 23 | minute. |
| 12:19:12 | 24 | THE VIDEOGRAPHER:  Going off the record.  The |

| 14:01:38 | 1 | document before? |
| 14:01:49 | 2 | A.    No. |
| 14:01:50 | 3 | Q.    Are you familiar with the term |
| 14:01:52 | 4 | "portfolio rationalization"? |
| 14:01:54 | 5 | A.    No. |
| 14:01:56 | 6 | Q.    Was there a portfolio rationalization |
| 14:02:00 | 7 | immediately following the portfolio review in |
| 14:02:03 | 8 | March 2001, to your knowledge? |
| 14:02:08 | 9 | MR. PHILLIPS:    Counsel, are you referring |
| 14:02:09 | 10 | to -- you are using "rationalization"? |
| 14:02:11 | 11 | MR. ZWICKER:    The title.    Initial portfolio -- |
| 14:02:15 | 12 | yeah.    My apologies. |
| 14:02:17 | 13 | BY MR. ZWICKER: |
| 14:02:17 | 14 | Q.    The document is titled "Initial |
| 14:02:19 | 15 | Portfolio Prioritization." |
| 14:02:21 | 16 | A.    I'm familiar with "portfolio |
| 14:02:23 | 17 | prioritization" term. |
| 14:02:24 | 18 | Q.    What does it mean? |
| 14:02:26 | 19 | A.    To look at the overall list of compounds |
| 14:02:33 | 20 | and projects that Abbott has and ranking them by |
| 14:02:42 | 21 | priority and determining which ones should be |
| 14:02:47 | 22 | supported going forward. |
| 14:02:49 | 23 | Q.    Who performed the portfolio |
| 14:02:51 | 24 | prioritization -- |

| | | |
|---|---|---|
| 14:02:51 | 1 | MR. PHILLIPS:  Object. |
| 14:02:51 | 2 | BY MR. ZWICKER: |
| 14:02:55 | 3 | Q.    -- in 2001? |
| 14:02:56 | 4 | MR. PHILLIPS:  Object to the form. |
| 14:02:56 | 5 | BY THE WITNESS: |
| 14:02:57 | 6 | A.    I don't recall the individuals, but |
| 14:02:58 | 7 | that's the PEC job. |
| 14:03:02 | 8 | BY MR. ZWICKER: |
| 14:03:02 | 9 | Q.    Were you involved at all in prioritizing |
| 14:03:07 | 10 | oncology compounds for Abbott's portfolio? |
| 14:03:13 | 11 | MR. PHILLIPS:  Object to the form. |
| 14:03:15 | 12 | BY THE WITNESS: |
| 14:03:19 | 13 | A.    In such -- in such venue? |
| 14:03:24 | 14 | BY MR. ZWICKER: |
| 14:03:24 | 15 | Q.    I will ask a different question. |
| 14:03:25 | 16 | Was your input solicited in the process |
| 14:03:27 | 17 | of prioritizing Abbott's oncology portfolio? |
| 14:03:33 | 18 | MR. PHILLIPS:  Object to the form. |
| 14:03:34 | 19 | BY THE WITNESS: |
| 14:03:35 | 20 | A.    I would have submitted my and my team |
| 14:03:40 | 21 | assessment on the oncology portfolio to Perry. |
| 14:03:46 | 22 | BY MR. ZWICKER: |
| 14:03:46 | 23 | Q.    Nisen? |
| 14:03:47 | 24 | A.    Yes. |

| | | |
|---|---|---|
| 14:03:48 | 1 | Q.    When did the portfolio prioritization |
| 14:03:52 | 2 | process occur in 2001? |
| 14:03:56 | 3 | A.    Since I wasn't in those meetings, I |
| 14:03:59 | 4 | don't know exactly.  The practice, after the |
| 14:04:03 | 5 | presentations by VPs to management, they separately |
| 14:04:12 | 6 | review the portfolio and prioritize.  Whether the |
| 14:04:15 | 7 | same day or different venue, different day, I'm not |
| 14:04:19 | 8 | sure. |
| 14:04:19 | 9 | Q.    Would that have been the portfolio |
| 14:04:21 | 10 | review we discussed in March 2001? |
| 14:04:23 | 11 | A.    That's right.  So, this would be |
| 14:04:25 | 12 | subsequent to that. |
| 14:04:27 | 13 | Q.    Afterwards? |
| 14:04:27 | 14 | A.    Afterwards. |
| 14:04:28 | 15 | Q.    Within a few days? |
| 14:04:31 | 16 | A.    I don't know for sure.  But that's |
| 14:04:34 | 17 | typical practice, within a few days. |
| 14:04:38 | 18 | Q.    Take a look, sir, if you will, at -- |
| 14:04:42 | 19 | it's page 1, but it's actually the second page of |
| 14:04:47 | 20 | the document.  And you will see an entry for |
| 14:04:48 | 21 | ABT-518.  Can you read that to yourself. |
| 14:05:14 | 22 | A.    Okay. |
| 14:05:14 | 23 | Q.    Were you shown this document during your |
| 14:05:17 | 24 | preparation for today's testimony and did it |

# Exhibit 5

# Oncology Status Report

## As Of: March 16, 2001

### ABT-518 (MMPI)

### M00-235 MD Study in Patients

- **Meetings:**
    - Mace Rothenberg Teleconference: Needs to be rescheduled
    - PK Update Teleconference with the Dutch: 3/20/01
    - Next MMPI Team Meeting: 4/12/01
- **Activities:**
  1. **Clinical**
     - The first patient was enrolled on 3/12/01.
     - A teleconference is scheduled for 3/20/01 with the Dutch to assess the status of their PK validation. Even though Abbott has a validated PK method, there is still some sentiment to allow the Dutch team to continue until they are successful. No decision will be made until after the call on Tuesday.
     - On 3/13/01 we received some data (MMP-2 and MMP-9 levels) from the PD validations being performed by Dr. Beerepoot. Beerepoot said additional validation work (including MMP-2 and MMP-9 activity assays) would be completed by 3/16/01, but we didn't receive anything today.
     - The PK contract is currently being routed for signatures within Abbott.
  2. **IND**
     - All IND timelines previously disclosed are no longer in effect.
     - The IND study is no longer funded, so all protocol design-related activities have ceased.
     - We are looking into outsourcing the IND filing, therefore, the only IND-related activity that will be pursued is the collection of reports from the support groups over the next few weeks (Todd).
     - The Investigator's Brochure (IB) will be updated over the next few weeks (Diane D). Prior to handing over the IND, we will finalize the IB so it is as current as possible.
  3. **Metabolism - No changes from the previous report; D. Hickman did not respond to email/voicemail.**
     - Experiments aimed at estimating Ki and Kinact for positive controls are underway and look promising. Some results with ABT-518 are expected by the next MMPI Team meeting (4/12/01).
     - Analysis of plasma and excreta from the *in vivo* rat ADME study is completed. These data are being combined with *in vivo* recovery (of radioactivity) data for interpretation. So far, 3 major metabolites from this study have been submitted for structural identification (LC/MS).

Confidential                                                                    ABBT0045321

- CEDRA reported good data for positive controls in their metabolism-based inhibition CYP3A in human liver microsomes. They are currently repeating ABT-518 and metabolite inhibition of CYP3A using their working method. A draft report of ALL data will be available by 3/16/01. The data will be summarized at the next MMPI Team meeting.

4. **Toxicology**

- The in-life phase of the 6- week rat study has been completed. A meeting was held 3/14/01 to discuss the data that was available and analyzed from the mitochondrial function analyses. While there is no glaring evidence of effects on mitochondrial function, a follow-up meeting is scheduled for next week to further discuss some of the findings. The group plans to complete only those analyses already started; they will not initiate any new analyses, however, they may decide to go back and look at the long-chain fatty acids. We are still on target for draft results by 5/2001 and the report by 6/2001.

- 3- month GLP rat study (with recovery) began week of 1/8/00; in-life phase will be done 4/13/01; recovery phase will be done 5/10/01; draft results with histopathlogy by 7/2001 and report by 9/2001.

5. **Drug – No changes from the previous version per J. Cannon (3/15/01)**

- The 200mg ABT-518 capsules manufactured at MDS Pharma arrived at Abbott on 3/2/01 to begin the lot approval process. A stability study began 3/8/01 and 4,140 capsules were sent to Abbott for the clinical supply. The lower than expected yield (75%) is being investigated.

- The next manufacturing campaign is scheduled for June 2001. This will likely be at MDS; a decision for capsule strength (50/100/200) for this run will have to be made in April or May. Discussions continue with both MDS and IDC for additional 2001 campaigns.

- **Issues**

  - A decision tree needs to be established regarding the prohibited medications for the Ph I study. Diane D'Amico will facilitate this.

Confidential

Oncology Status Report                                           3/16/01

# Timeline

ABT-518
Study
M00-235

First Patient
Enrolled (25mg)
3/12/01

Drug shipped to
sites: 2/28/01 and
3/1/01

Study Initiated
14,15 Feb 2001

Confidential

ABBT0045323

## MMPI WORKING GROUP MEETING MINUTES

### 4/12/01

### Objective: Overall Project Update

Toxicology                                                           *Lise Loberg*

- An update of the two current toxicology studies was presented (see attached slides -- MMPI Toxicology Update).
- The in-life phase of the six-week study has been completed. The study was designed to answer two questions: 1) Does steatosis occur in all treatment groups (low, mid and high dose) and 2) Will steatosis occur with continued dosing versus only in recovery. Results were similar to the four-week study (hepatocellular steatosis in the higher dose recovery group). No steatosis was noted in either treated group. There is no glaring evidence of effects on mitochondrial function, however, selected samples will be sent out for assay of very long-chain fatty acids (VLCFA) to further investigate the possibility that peroxisomes are affected. The study did not provide an etiology for the steatosis, but one possible explanation may be that the steatosis is an effect of re-feeding.
- Necropy analysis of samples from the 3-month study was put on hold until further notice.

PARD                                                           *John Cannon*

- A clinical supplies update was presented (see attached slides -- MMPI Drug Update).
- The first 200 mg capsule campaign (4,140 capsules) was delivered to IDS for the clinical supply.
- PARD is still investigating the lower than expected yield rate of 75% versus the expected 95%. To date, it is suspected that the bulk density of sieved drug and standard deviation of empty capsules account for the yield difference.

Process Research and Development in GPRD                        *Steve Wittenberger*

- Review of the planned timelines for bulk drug manufacturing was presented (see attached slides – MMPI Bulk Plan).
- Bulk drug production was put on hold until further notice. Bulk drug needs and timelines must be re-evaluated.

Metabolism                                                      *Dean Hickman*

- An overview of the ongoing metabolism work was presented (see attached slides – MMPI Metabolism Update).
- Results from a single dose administration using intact male rats (N=2) showed drug metabolites are eliminated primarily through feces. Results from a single dose administration using bile duct cannulated rats (N=2) showed drug metabolites are eliminated primarily through bile. The profile of metabolites was very different in the bile duct cannulated rats.
- A new metabolite, sulphonic acid, has been identified in rats. It was not seen in the earlier toxicology studies for one of two reasons: it elutes very early (in the void) on the HPLC system or it co-eluted with another analyte.

Confidential                                        ABBT0052926

## MMPI WORKING GROUP MEETING MINUTES

**4/12/01**

- Re-analysis of rat and monkey tissue and plasma samples for sulphonic acid after multiple dosing will take place. Analysis of human plasma for sulphonic acid after multiple dosing of ABT-518 should be considered (investigative, non-GLP pilot study?)

<u>Clinical</u>                                                                                          *Diane D'Amico*

- Two patients have enrolled in study M00-235. One patient prematurely discontinued and the other patient is currently active. The active patient will have their Day 22 visit next week. Two more patients are scheduled to dose on 4/23/01.
- The third and final PK method validation run was completed in the Netherlands (NKI). NKI expects to assay the first human samples in May. All samples for each day of a single cohort will be assayed together.



Diane C
Bronson/LAKE/PPRD/ABBO
TT
05/28/2001 08:45 PM

To  Lise I Loberg/LAKE/PPRD/ABBOTT@ABBOTT

cc  Diane L D'Amico/LAKE/PPRD/ABBOTT@ABBOTT

bcc

Subject  Re: ABT-518 Tox

Lise,

I sent Diane D a similar note. I would wait until we have the go ahead from Perry to spend additional money on this project. I'll see if I can find out where we are on this. I know they have been working on trying to pursue this compounds development

diane

CONFIDENTIAL
ABBT0155970



Lise I
Loberg/LAKE/PPRD/ABBOT
T

06/06/2001 06:29 PM

To  William M Bracken/LAKE/PPRD/ABBOTT@ABBOTT, Bruce
    A Trela/LAKE/PPRD/ABBOTT@ABBOTT, Ken R
    Majors/LAKE/PPRD/ABBOTT@ABBOTT, Chudy I
    Nduaka/LAKE/PPRD/ABBOTT@ABBOTT

cc

bcc

Subject  ABT-518 update

As you heard in this morning's meeting, ABT-518 is on indefinite hold. (I guess that's what you'd call it.) At
tomorrow's MMPI Team Meeting, I will give an update on ongoing projects and timelines for concluding
the project. Please take a look at the attached file and fill in any dates that you can. Thank you!

(Oh yeah, the meeting is at 10:30 and I'd like to stop over at the Technology Exchange before the
meeting. I'd appreciate your update by 9am if possible. Sorry for the short notice.)



MMPI Toxicology Activities.doc

CONFIDENTIAL
ABBT0157798

## MMPI Toxicology Activities

**Ongoing projects:**
**All studies completed (in-life) with reports in progress**

1. Three-month rat toxicity study (TA00-230)
   In-life: **complete**
   Processing histopathology slides **on hold**
   Draft report (w/o histo, PK) completed _____
   Final report _____

2. Six-week rat hepatotoxicity study (TA00-231, non-GLP)
   Analysis of VLCFA on hold
   Draft report **in progress**; completed (w/o PK, VLCFA) **6/30/01**

3. Four-week oral toxicity study in monkeys (TC00-072)
   Draft report (w/o PK) finished
   Final report _____

4. One-month oral toxicity study in rats (TA00-070)
   Draft report (w/o PK) finished
   Final report _____

5. Genotoxicity studies (TX00-132, TX00-133, TD00-134)
   Awaiting final reports from Covance
   TD00-134 awaiting PK

**Completed projects:**

6. Acute toxicity studies (TA00-100, TD00-101, TA00-102, TD00-103)
   All final reports **issued**

CONFIDENTIAL
ABBT0157799

Jim,

Greetings.

We had a project review with upper management this Wednesday.  During this review their was a concern regarding the continuation with ABT-518 development.  Although, we thought that we will be allowed to continue at this time,  I and Perry have learned , 45 minutes ago, that we should stop all development activities immediately.  As much as I hate to do this to you, I would like to ask you to communicate with Drs. Zonnenberg and Schellen that we are not proceeding with the trial as a result of the projects re-prioritization  following the acquisition of Knoll.  I will call you on you mobile phone (I do not have your home #) to discuss this further with you and check you comfort level with this very difficult task.  If you prefer to call me, my home number:847-382-3818, mobile : 847-380-5830.  <u>As you know, at AZU they are expecting a patient Monday morning, so this has to be done ASAP.</u>

I did not have the chance to tell Todd and Diane D. this news since I was informed late in the day and they have left already.  So please do not copy others until I have a chance to inform them directly.

Thanks

Azmi

Confidential                                                                                    ABBT0507866

# Exhibit 6

```
 1              UNITED STATES DISTRICT COURT

 2                      FOR THE

 3                DISTRICT OF MASSACHUSETTS

 4   JOHN HANCOCK LIFE INSURANCE     )

 5   COMPANY, JOHN HANCOCK           )

 6   VARIABLE LIFE INSURANCE         )

 7   COMPANY, and MANULIFE           )

 8   INSURANCE COMPANY  (f/k/a       )

 9   INVESTORS  PARTNER INSURANCE    )   Civil Action No.

10   COMPANY),                       )   05-11150-DPW

11                  Plaintiffs,      )

12        -vs-                       )

13   ABBOTT LABORATORIES,            )         ORIGINAL

14              Defendant.           )
```

15       H I G H L Y   C O N F I D E N T I A L

16            The confidential videotaped deposition

17  of JOHN LEONARD, called for examination, taken

18  pursuant to the Federal Rules of Civil Procedure

19  of the United States District Courts pertaining to

20  the taking of depositions, taken before THERESA A.

21  VORKAPIC, a Notary Public within and for the

22  County of Kane, State of Illinois, and a Certified

23  Shorthand Reporter, CSR No. 84-2589, of said

24  state, at Suite 1300, Two North LaSalle Street,

CONFIDENTIAL

1    programs as they understood at that point in time.

2          Q.     You understood at that point in time

3    that Dr. Leiden was saying halt the Phase I

4    clinical trial of ABT-518 because I don't think,

11:08:21    5    "I" being Dr. Leiden, don't think that it makes

6    sense for Abbott to continue to put money into the

7    development of this compound; do you agree with

8    that?

9          MR. WEINBERGER:    If you want to know what

11:08:29    10   Leiden said, ask him.    You're putting words into

11   his mouth.

12         MR. DAVIS:    Please, you can state your

13   objections.    Please don't interrupt my

14   questioning.

11:08:38    15   BY THE WITNESS:

16         A.     I don't recall what he said.

17   BY MR. DAVIS:

18         Q.     Is that your understanding of what he

19   was --

11:08:42    20         A.     I don't recall.

21         Q.     Was the halt on the -- strike that.

22                Whom do you recall discussing

23   Dr. Leiden's instruction that Abbott halt the

24   Phase I clinical trial of ABT-518 with within

```
          1   Abbott?
          2        A.    I recall generally talking with
          3   Dr. Nisen.
          4        Q.    Anyone else?
11:09:10  5        A.    No, not that I recall specifically.
          6        Q.    Do you recall any discussions on that
          7   topic with Phil Deemer?
          8        A.    I may have.  I don't specifically
          9   recall those discussions.
11:09:19 10        Q.    Do you recall generally any discussions
         11   with Mr. Deemer on that topic in March of 2001?
         12        A.    I don't know if we spoke.  I don't
         13   specifically recall that.
         14        Q.    Do you recall that at some point in
11:09:34 15   time after Dr. Leiden instructed that that Phase I
         16   trial be halted that the trial was resumed?
         17        A.    It was resumed subsequently.  I
         18   remember that.
         19        Q.    Right now you don't know precisely when
11:09:49 20   it was resumed; is that right?
         21        A.    Not without -- I don't know
         22   specifically.  What I recall was it was resumed
         23   very, very shortly thereafter.
         24        Q.    Why was it resumed?
```

JOHN LEONARD, NOVEMBER 30, 2006
H I G H L Y   C O N F I D E N T I A L

| | |
|---|---|
| | 1    A.    I'm doing it again.  I'm sorry.  I |
| | 2  remember going back and talking to Dr. Leiden -- |
| | 3  there is tape on your wire that became taped to my |
| | 4  shoe.  I'm sorry here. |
| 11:10:28 | 5          Could you repeat the question?  I'm |
| | 6  sorry. |
| | 7    MR. DAVIS:  Would you just reread the |
| | 8  question? |
| | 9              (WHEREUPON, the record was |
| 11:10:44 | 10              read by the reporter.) |
| | 11  BY THE WITNESS: |
| | 12    A.    Why was the trial resumed? |
| | 13    Q.    Yes. |
| | 14    A.    I remember generally discussing with |
| 11:10:49 | 15  Dr. Leiden why we believed that our compound had |
| | 16  prospects that were different from other compounds |
| | 17  in the field.  We had a preclinical hypothesis |
| | 18  that had not yet been ruled out by any clinical |
| | 19  data and therefore any information that was out |
| 11:11:06 | 20  there at that time probably did not bear directly |
| | 21  on the molecule. |
| | 22          Secondly, I reminded him that we had a |
| | 23  partner in this program and this was part of our |
| | 24  general risk mitigation strategy of risk sharing |

JOHN LEONARD, NOVEMBER 30, 2006
HIGHLY CONFIDENTIAL

```
 1   and that we should proceed.
 2       Q.    When you say you had a partner in the
 3   program, you're referring to John Hancock?
 4       A.    I am.
 5       Q.    You are?
 6       A.    I am.
 7       Q.    And so is it fair to say that the
 8   decision to restart the Phase I clinical trial
 9   within Abbott was turned in part on the fact that
10   Abbott was entering into the Research Funding
11   Agreement with John Hancock?
12       MR. WEINBERGER:   Objection.
13   BY THE WITNESS:
14       A.    I don't think that's true at all.
15   BY MR. DAVIS:
16       Q.    Then how was it that the fact that
17   Abbott had a partner for ABT-518 in John Hancock
18   that caused you to go to Dr. Leiden and say please
19   restart this clinical trial?
20       A.    The program, my recommendation to
21   proceed on this program was based entirely on the
22   prospects, the medical prospects, preclinical
23   prospects of the program.  My recommendation was
24   that we should proceed because I thought that the
```

11:11:31 — 5
11:11:49 — 10
11:11:55 — 15
11:12:09 — 20

1    hypothesis still stood and bore testing.

2        Q.    How was it relevant to your discussion

3    with Dr. Leiden about why Abbott should restart

4    the Phase I clinical trial for ABT-518 that Abbott

11:12:44  5    was entering into the Research Funding Agreement

6    with John Hancock?

7        A.    I don't know how it bears on the

8    Research Funding Agreement at that point in time.

9    Generally speaking I reminded him that we had a

11:12:57  10    risk mitigation, risk sharing approach for what he

11    was viewing as a very high risk program.

12        Q.    And how did that -- why did you think

13    that that would impact Dr. Leiden's decision to

14    halt the Phase I clinical trial of ABT-518?

11:13:17  15        A.    Because if he thought it was high risk

16    and the risk was lower, that would be desirable.

17        Q.    Did you believe at the time that

18    Abbott's decision to halt the Phase I clinical

19    trial of ABT-518 could have an effect on Hancock's

11:13:35  20    willingness to enter into the deal?

21        A.    I have no idea what Hancock -- I

22    thought at the time I was not part of the

23    negotiation, the signing or the approval.

24        Q.    Do you recall anyone within Abbott ever

# Exhibit 7



Perry D                          To   Philip M Deemer/LAKE/CORP/ABBOTT@ABBOTT
Nisen/LAKE/PPRD/ABBOTT           cc
03/21/2001 10:30 AM              bcc
                              Subject   Re: Hancock and Alcon

Phil
Mega mazal tov! You are the most tenacious guy I know- you deserve a new car not just a pen. I know all about the 518 debacle (I tell you more over the phone). Since we killed 839 (this was the FTI) I have no objection to sending them some (talk to Saul). There is much I would like to discuss with you. I'm in LA )(my sister is quite ill), then if she is stable, to Worchester tonight, then Boston, then return Fri night, but out all next week (school break- vacation).
My cell phone is 847 682 7188. I hope you and Diane are well- haven't spoken to you in ages. We need a f/u mtg with Eisei- Azmi has the clinical brochure and protocols- you may want to send those
pn

From: Philip M Deemer on 03/20/2001 09:53 AM

From:    Philip M Deemer on 03/20/2001 09:53 AM
To.      Perry D Nisen/LAKE/PPRD/ABBOTT@ABBOTT
cc:
Subject:  Hancock and Alcon

You probably heard that Hancock was signed last week  $214,000,000 over 4 years!  A long time coming but finally done.  We had a little scare at the end when it looked like 518 was being slowed down which could have been the deathknell to the deal  I worked with John to protest that and I understand it is back on track.

On another matter, Alcon called me looking for 2g of 839.  We don't need to work with them if there is no/little synergy.  I told them I thought it would be difficult to give them that amount at this time but that I would check with you.

Perry, We should catch up with one another before too long

Best regards.

                          ABBT246501

# Exhibit 8



Tamara L
Garavalla /LAKE/PPRD/ABB
OTT

05/02/2001 07:23 AM

To  Michaela L
    James/QUEENBOROUGH/Al/ABBOTT@ABBOTT
cc  Diane L D'Amico/LAKE/PPRD/ABBOTT@ABBOTT

bcc

Subject  Re: ABT518

Hi Michaela,

I posed this question to Diane D'Amico the CPM for this project. Per Diane, this study (M00-235) is
funded and ongoing. Other studies for this compound have been put on hold/cancelled but this study is
not affected.

I will be sure to pass on any changes to you. Thanks for your support on this project.

Regards,
Tamara
Michaela L James

Michaela L James

05/01/01 09:56 AM

To: Tamara L Garavalla/LAKE/PPRD/ABBOTT@ABBOTT
cc:
Subject: ABT518

Tamara

We understand that the ABT518 study may have been cancelled. Do you know if any decisions have been
made on what to do with the supplies already packed for M00-235.

Regards

Michaela

CONFIDENTIAL
ABBT0055426

MAY. 31. 2005   11:31AM                                                    NO. 3057    P. 5



Paige Gjelsten
13-03-2001 21:25

To: Jim Looman/HOOFDDORP/AI/ABBOTT@ABBOTT, Willy
     Jansen/HOOFDDORP/ADD/ABBOTT@ABBOTT, Else
     Meijer/HOOFDDORP/AI/ABBOTT@ABBOTT
cc: Diane L D'Amico/LAKE/PPRD/ABBOTT@ABBOTT, Todd J
     Janus/LAKE/PPRD/ABBOTT@ABBOTT, Azmi A
     Nabulsi/LAKE/PPRD/ABBOTT@ABBOTT, Lori V
     Rountree/LAKE/PPRD/ABBOTT@ABBOTT, Diane C
     Bronson/LAKE/PPRD/ABBOTT@ABBOTT, Robert
     Hansen/LAKE/PPRD/ABBOTT@ABBOTT
Subject: M00-235 Study Hold Lifted

I just want to let you know that the M00-235 study hold has been lifted.  Prof. Schellens and Prof.
Voest have been contacted.  As we gather more information, we will keep you informed.

Kind regards,

Paige

CONFIDENTIAL

ABBT 0033094

# Exhibit 13



Marilyn J
Collicott /LAKE/PPRD/ABBO
TT

12/14/2000 12:20 PM

To   JSCHANZENBACH@rsi-nc.com@internet

cc

bcc

Subject   Study Termination

Hi John

We've decided to end enrollment as of 1/5/01. The attached letter (which explains our reasoning) will be fedexed out to all investigators today. You may get some phone calls tomorrow. Let me know if you have any questions. Thanks............mc



stopenroll

Confidential

ABBT233539

December 14, 2000

<name>
<address>

RE: Protocol M99-114: A Randomized, Double-Blind, Placebo-Controlled Comparison of the
Safety and Efficacy of ABT-594 to Placebo in Subjects with Painful Diabetic Neuropathy

Dear Dr. <name>,

We have decided to end enrollment in the above referenced study on January 5, 2001.

As specified in the protocol, 80% power would have been achieved with the randomization of
320 subjects, assuming there were no premature terminations. Our current premature
termination rate, however, will result in less than 80% power even if we were to reach our
enrollment goal. After reviewing possible outcomes with our statisticians, we concluded that
ending enrollment prior to reaching our goal of 320 subjects will not meaningfully change our
ability to interpret the results of this study. In addition, the sooner we review the data from M99-
114, the sooner we may be able to move forward into Phase III.

In order to allow you to enroll any subjects that may have already been scheduled, the last date
for randomization into study M99-114 will be 1/5/01. We sincerely apologize if this causes you or
your staff any inconvenience.

The Analgesia Venture thanks you for your hard work and dedication to ABT-594 and study M99-
114. Your efforts have allowed us to move forward more quickly than anticipated. If you have
any questions or concerns please don't hesitate to contact me.

Sincerely,


Marilyn Collicott
Clinical Project Manager
Analgesia Venture

Confidential

ABBT233540

**ABBOTT LABORATORIES**

**Clinical Study Report No. R&D/01/171**

**A Randomized, Double-Blind, Placebo-Controlled, Comparison of the Safety and Efficacy of ABT-594 to Placebo in Subjects With Painful Diabetic Polyneuropathy**

**ABT-594/Protocol M99-114**

**31 July 2001**

*I have read this report and confirm that to the best of my knowledge it accurately describes the conduct and results of the study.*

| | |
|---|---|
| Marilyn J. Collicott<br>Clinical Project Manager, Analgesia Venture | Date |
| David D. Morris, Ph.D.<br>Assistant Director, Statistics | Date |
| Bruce G. McCarthy, M.D.<br>Medical Director, Analgesia Venture | Date |
| Marleen H. Verlinden, Pharm.D., Ph.D.<br>Vice President, Global Pharmaceutical Research and<br>Development Neurology/Urology | Date |

▦ **Abbott Laboratories**

CONFIDENTIAL
ABBT0518849

## 9.8    Changes in the Conduct of the Study or Planned Analyses

### 9.8.1    Protocol Changes

Significant changes in the developmental strategy of ABT-594 resulted in the study being prematurely discontinued by the sponsor. Therefore, although the protocol specified that approximately 320 subjects (80 per treatment group) were to be enrolled, enrollment was stopped at 266 subjects.

The final clinical protocol incorporated Amendment Number 1. All subjects were enrolled under the final protocol (Table 14.1__2). Full details of the clinical protocol and its amendment are presented in Appendix 16.1.1. Important changes included in the amendment are summarized below:

Amendment 1 (29 February 2000)

- Modified the inclusion criteria such that subjects were required to have good control (in the opinion of the investigator) of their serum glucose for at least the last 3 months prior to the Screening Visit.
- Added that subjects with a hemoglobin $A_{1c}$ >11% were to be excluded.
- Added hemoglobin $A_{1c}$ at the Screening Visit and Treatment Visit IV and deleted the hemoglobin $A_{1c}$ at the Baseline Visit.
- Added mixed serotonin and norepinephrine reuptake inhibitors and St. John's Wort to the list of excluded medications.
- Added that the Screening hemoglobin $A_{1c}$ result served as the baseline result.

### 9.8.2    Statistical Changes

Although not specified in the protocol, efficacy analyses were also performed on a dataset that included subjects who did not prematurely discontinue from the study (study completers).

ABT-594 (ABBOTT-165594)
Study No. M99-114                                                                          47
R&D/01/171 - Clinical/Statistical

The change from baseline of the average diary-based Pain Rating score from each
subject's diary to the corresponding average of each of the consecutive 7-day intervals
after the first dose of study drug was summarized using both LOCF and OC techniques.

The percentage of subjects having a positive response to study drug, defined as a 50% or
greater improvement from baseline to final, was analyzed for the following variables:
diary- and site-based average Pain Rating Scale scores and Neuropathic Pain Scale Total
Scores.  Comparisons between treatment groups were performed using the CMH test,
with investigator as the stratification variable.

## 10.0  Study Subjects

### 10.1  Disposition of Subjects

The location of premature discontinuation data is presented below.

| Assessment | Statistical Analyses Table | Individual Subject Listing Appendix |
|---|---|---|
| Number and Percentage of Subjects Prematurely Discontinued | 14.1__3.1 | 16.2__1.1 |
| Listing of Subject Numbers by Reason for Premature Discontinuation | 14.1__3.2 | 16.2__1.1 |
| Subjects Who Prematurely Discontinued and Any Adverse Events for Which Study Drug was Prematurely Discontinued | 14.1__3.3 | 16.2__1.1 16.2__7.1.1 |
| Number of Subjects Who Prematurely Discontinued by Days of Exposure to Study Drug | 14.1__3.4 | 16.2__1.1 16.2__5.1.1 16.2__5.1.2 |
| Number and Percentage of Subjects that Prematurely Discontinued for Each Investigator | 14.1__3.5 | 16.2__1.1 |
| Previous and Concurrent Medications (Subjects Who Prematurely Discontinued) | none | 16.2__1.1 16.2__1.2 |

CONFIDENTIAL
ABBT0518911

# Exhibit 17



Stan
Bukofzer /LAKE/PPRD/ABBO
TT

07/11/2002 09:17 AM

To

AI_HR_GMS_EUR, AI_HR_GMS_LA, AI_HR_GMS_PAA, AI_HR_PRESSTAF_AREAHQ, John Arnott/LAKE/AI/ABBOTT@ABBOTT, Tony C Deahl/LAKE/AI/ABBOTT@ABBOTT, Mark Masterson/LAKE/AI/ABBOTT@ABBOTT, Sybil L Dahan/LAKE/AI/ABBOTT@ABBOTT, Roberto C Taboada/LAKE/AI/ABBOTT@ABBOTT, Christian Holmer/LAKE/AI/ABBOTT@ABBOTT, Willy Pardinas/LAKE/AI/ABBOTT@ABBOTT, Richard Ambler/LAKE/AI/ABBOTT@ABBOTT, Stefan Bergunde/LAKE/AI/ABBOTT@ABBOTT, Carlos Alban/LAKE/AI/ABBOTT@ABBOTT, Frank W Zhou/LAKE/AI/ABBOTT@ABBOTT, Bernard Grimm/LAKE/AI/ABBOTT@ABBOTT, Susan Boynton/LAKE/AI/ABBOTT@ABBOTT, Laureen M Cassidy/LAKE/AI/ABBOTT@ABBOTT, Albertus A Bouw/AMADORA/AI/ABBOTT@ABBOTT, Arshad Ahmed/KARACHI/AI/ABBOTT@ABBOTT, holger.liepmann@abbott.com, David G Clayton/AUSTRALIA/AI/ABBOTT@ABBOTT, Eduardo Furia/BUENOSAIRES/AI/ABBOTT@ABBOTT, Hugo E Pezzarossi/GUATEMALA/AI/ABBOTT@ABBOTT, Jairo Bonilla/BOGOTA/AI/ABBOTT@ABBOTT, Jean-Pierre Chauvin/RUNGIS/AI/ABBOTT@ABBOTT, Jose P Dominguez/SANTIAGO/AI/ABBOTT@ABBOTT, Lele Ozturanli/ISTANBUL/AI/ABBOTT@ABBOTT, Laniati Suwanda/JAKARTA/AI/ABBOTT@ABBOTT, Luis A Usan/MADRID/AI/ABBOTT@ABBOTT, Mariana Gayoso/MONTEVIDEO/AI/ABBOTT@ABBOTT, Marisol Martinez/CAROLINA/AI/ABBOTT@ABBOTT, Martha Penna/SAOPAULO/AI/ABBOTT@ABBOTT, Martin Bravo/COYOACAN/AI/ABBOTT@ABBOTT, Maryse Marcopoulos/ATHENS/AI/ABBOTT@ABBOTT, Michael Hansen/STOCKHOLM/AI/ABBOTT@ABBOTT, Nick G Warwick/MAIDENHEAD/AI/ABBOTT@ABBOTT, Olga Kroftova/PRAGUE/AI/ABBOTT@ABBOTT, Paul Cauchie/BRUSSELS/AI/ABBOTT@ABBOTT, Peter K Kirchner/DEUXENHEIM/AI/ABBOTT@ABBOTT, Rafik X Zakhari/MONTREAL/AI/ABBOTT@ABBOTT, Raul Velarde/LIMA/AI/ABBOTT@ABBOTT, Ricardo Fonseca/CARACAS/AI/ABBOTT@ABBOTT, Tibor Fabo/BUDAPEST/AI/ABBOTT@ABBOTT, Umberto Paparatti/CAMPOVERDE/AI/ABBOTT@ABBOTT, Woei Shiong Chen/KUALALUMPUR/AI/ABBOTT@ABBOTT, Wojciech Bem/WARSAW/AI/ABBOTT@ABBOTT, Yoshihiro Fujiwara/OSAKA/AI/ABBOTT@ABBOTT, Zeke Solomon/SYDNEY/AI/ABBOTT@ABBOTT, abbotthn@hn.vnn.vn, AD Paul/BOMBAY/AI/ABBOTT@ABBOTT, Ahmad Swailam/CAIRO/AI/ABBOTT@ABBOTT, Ali Muzammil Abdullah/KUALALUMPUR/AI/ABBOTT@ABBOTT, Amry Bustamam/JAKARTA/AI/ABBOTT@ABBOTT, Angela Rodrigues/BOMBAY/AI/ABBOTT@ABBOTT, Ann Sofie Pettersson/ESPOO/AI/ABBOTT@ABBOTT, Banu Ciftci/ISTANBUL/AI/ABBOTT@ABBOTT, Bernardita Garin Hoyng/SANTIAGO/AI/ABBOTT@ABBOTT, Bienvenido V Tianco/MANILA/AI/ABBOTT@ABBOTT, Bruno Truempi/BAAR/AI/ABBOTT@ABBOTT, Celina Marun/BUENOSAIRES/AI/ABBOTT@ABBOTT, Chris Somers/BRUSSELS/AI/ABBOTT@ABBOTT, Connie

Confidential

ABBT203446



Bueno/BOGOTA/AI/ABBOTT@ABBOTT, Daniel
Katz/TELAVIV/AI/ABBOTT@ABBOTT, Danuta
Witkowska/WARSAW/AI/ABBOTT@ABBOTT, Emma Du
Four/MAIDENHEAD/AI/ABBOTT@ABBOTT, Esther de
Pietri/CARACAS/AI/ABBOTT@ABBOTT, Eva
Svorenova/BRATISLAVA/AI/ABBOTT@ABBOTT, Fatima
Pelicot/SANTODOMINGO/AI/ABBOTT@ABBOTT,
Fernando Fernandez/CAROLINA/AI/ABBOTT@ABBOTT,
Finny Liu/TAIPEI/AI/ABBOTT@ABBOTT, Francesco De
Maio/CAMPOVERDE/AI/ABBOTT@ABBOTT, Ghislaine van
Alphen/HOOFDDORP/AI/ABBOTT@ABBOTT, Gina
Partridge/JOHANNESBURG/AI/ABBOTT@ABBOTT, Gloria
Vera-Rebollar/LIMA/AI/ABBOTT@ABBOTT, Hiroki
Taguchi/OSAKA/AI/ABBOTT@ABBOTT, Ingela
Frick/STOCKHOLM/AI/ABBOTT@ABBOTT, Ingrid G
Haider-Salabergen/VIENNA/AI/ABBOTT@ABBOTT, Jack
Wong/HONGKONG2/AI/ABBOTT@ABBOTT, Jacqueline
Schaemaker/GUATEMALA/AI/ABBOTT@ABBOTT, Jitka
Urbankova/PRAGUE/AI/ABBOTT@ABBOTT, Jose M
Infante/MADRID/AI/ABBOTT@ABBOTT, Kanehiro
Gohda/KATSUYAMA/AI/ABBOTT@ABBOTT, Karolyn
Castro/SANTODOMINGO/AI/ABBOTT@ABBOTT, Kwee
Foong Leow/SINGAPORE/AI/ABBOTT@ABBOTT, Laura S
Lees/AUSTRALIA/AI/ABBOTT@ABBOTT, Laura
Zerbi/MONTEVIDEO/AI/ABBOTT@ABBOTT, Loretta X Del
Bosco/MONTREAL/AI/ABBOTT@ABBOTT, Marcia
Moscatelli/SAOPAULO/AI/ABBOTT@ABBOTT, Margarida
M Montezinho/AMADORA/AI/ABBOTT@ABBOTT, Maria T
Bonifax/COYOACAN/AI/ABBOTT@ABBOTT, Marianna
Karafoulidou/ATHENS/AI/ABBOTT@ABBOTT, Martha
Penna/SAOPAULO/AI/ABBOTT@ABBOTT, Mohammed
Abul Hasan/DUBAI/AI/ABBOTT@ABBOTT, Nur
Demirseren/ISTANBUL/AI/ABBOTT@ABBOTT, Paul
Eenhoorn/HOOFDDORP/AI/ABBOTT@ABBOTT, Rebeca
Lopez/COYOACAN/AI/ABBOTT@ABBOTT, Ricardo
Lama/QUITO/AI/ABBOTT@ABBOTT, Sandor
Peter/BUDAPEST/AI/ABBOTT@ABBOTT, Seema
Khan/KARACHI/AI/ABBOTT@ABBOTT, Stephan
Vogel/DELKENHEIM/AI/ABBOTT@ABBOTT, Sumalee
Nathikanjanalab/BANGKOK/AI/ABBOTT@ABBOTT, Sunil
Soni/MAIDENHEAD/AI/ABBOTT@ABBOTT, Tariq
Hamdan/RIYADH/AI/ABBOTT@ABBOTT, Thirapan
Guttasingi/BANGKOK/AI/ABBOTT@ABBOTT, Ulla
Kock/VEDBAEK/AI/ABBOTT@ABBOTT, Ulrike
Thomas/LUDWIGSHAFEN/AI/ABBOTT@ABBOTT, Vareerat
Hiranrat/BANGKOK/AI/ABBOTT@ABBOTT, Victoria
Nunes/AMADORA/AI/ABBOTT@ABBOTT, Xiaotong
Zhao/SHANGHAI/AI/ABBOTT@ABBOTT, Y H
Cha/SEOUL/AI/ABBOTT@ABBOTT, Zdenek
Stralil/BAAR/AI/ABBOTT@ABBOTT, John
Price/LAKE/PPD/ABBOTT@ABBOTT, Gary C
Vandoros/LAKE/AI/ABBOTT@ABBOTT, Mary T
Szela/LAKE/PPD/ABBOTT@ABBOTT, Jeanmarie
Doleno/LAKE/AI/ABBOTT@ABBOTT

cc    William Dempsey, David Goffredo, John Leonard, Eugene
Sun, James L Tyree/LAKE/GPRD/ABBOTT@ABBOTT,
Siobhan NiBhuachalla/LAKE/PPRD/ABBOTT@ABBOTT

bcc    Carol S Meyer/LAKE/PPRD/ABBOTT@ABBOTT

Subject    ABT 773 communication

Confidential                                                                ABBT203447

Dear affiliate colleague,

Today we informed your colleagues working on the ABT-773 project team that we will not independently develop ABT-773 for the U.S. and European markets. The attached "773 announcement" document outlines our decision.

For those of you with an open CTX or IND for ABT-773, medical and regulatory staff should consider informing your local authorities regarding our long-term plans for this compound.

Attached is a copy of a Q&A that can assist you with this effort.

Please contact Stan Bukofzer or Chris Ward with any questions you have regarding ongoing studies with ABT-773.

Regards,

Stan

Stan Bukofzer MD
Global Project Head
Infectious Diseases
Global Product R&D
Abbott Laboratories
Tel 847-935-8844

     

773 Announcement.doc MASTERQ&A for Conclusion of 773 G.c

Confidential

ABBT203448

# Exhibit 18

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY),<br><br>            Plaintiffs,<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>            Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CIVIL ACTION NO. 05-11150-DPW<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## JOHN HANCOCK'S OBJECTIONS AND RESPONSES
## TO ABBOTT LABORATORIES' FIRST SET OF INTERROGATORIES

Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and ManuLife Insurance Company (f/k/a Investors Partner Life Insurance Company) (collectively, "John Hancock") hereby object and respond, pursuant to Fed. R. Civ. P. 33(b) and the Local Rules of this Court, to defendant Abbott Laboratories' ("Abbott") First Set of Interrogatories (the "Interrogatories") as follows:

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

**Interrogatory No. 4:**

For each and every breach of the Agreement identified in response to Interrogatory No. 4, above [sic], please separately and with particularity identify each and every component of damage or loss Hancock is seeking as a result of such claimed breach, including the dollar amount of each element or component of such damage or loss and the identity of any and all individuals having knowledge of such damage or loss suffered by Hancock.

**Response No. 4:**

John Hancock objects to Interrogatory No. 4 on the ground that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock has had an opportunity to conduct meaningful discovery. Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 4 after it has had the opportunity to do so.

Subject to, and without waiving or compromising the general and specific objections, John Hancock seeks to recover damages (including compensatory and punitive damages, where applicable), lost profits, lost royalties and other losses, including without limitation its costs, expenses and reasonable attorneys' fees, as permitted by law and the terms of the Research Funding Agreement, in an amount to be determined and which is subject to further discovery and expert analysis. John Hancock further reserves the right, in the alternative, to seek recission of the Research Funding Agreement and a refund of all monies paid by John Hancock to Abbott.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of damage or loss suffered by John Hancock by Abbott's breaches of the Agreement include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Daphne Pals, Former Abbott Senior Counsel, 1014 Elmwood, Wilmette, IL 60091, telephone number: unknown;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-27-

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-29-

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

## Interrogatory No. 5:

Please describe with particularity each and every misrepresentation of material fact or omission of Abbott concerning ABT-518 that Hancock is claiming in this case, including, without limitation, an identification of the following with respect to each such misrepresentation or omission:

(a)     when, where, and the manner in which such misrepresentation or omission was made;

(b)     specifically how such misrepresentation was false or misleading, including the true or actual state of affairs regarding such misrepresentation;

(c)     when and how Hancock first became aware such misrepresentation was false or misleading;

(d)     any and all individuals at Hancock who relied upon such misrepresentation or omission and the manner in which they relied; and

(f)     [sic] any and all individuals having knowledge of such misrepresentation or omission.

## Response No. 5:

John Hancock objects to Interrogatory No. 5 on the grounds that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock has had an opportunity to conduct meaningful discovery from Abbott. Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 5 after it has had the opportunity to do so.

As to objections:

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY, and
MANULIFE INSURANCE COMPANY (f/k/a
INVESTORS PARTNER LIFE INSURANCE
COMPANY)

By their attorneys,

Brian A. Davis (BBO No. 546462)
Joseph H. Zwicker (BBO No. 560219)
Christopher Edwards (BBO No. 640758)
Stacy L. Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA  02110
Tele: 617-248-5000
Fax: 617-248-4000

Date:   February 6, 2006

## VERIFICATION

I, Stephen J. Blewitt, state under penalties of perjury that: I am Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company (collectively, with John Hancock Variable Life Insurance Company and ManuLife Insurance Company [f/k/a Investors Partner Life Insurance Company], "John Hancock"). I have read the foregoing responses to interrogatories and know the contents thereof; that said answers were prepared with the assistance and advice of counsel and employees of John Hancock; that responses set forth herein, subject to inadvertent or undiscovered errors, are based on and therefore necessarily limited by the records and information still in existence, presently collected, and thus far discovered in the course of the preparation of these answers; that John Hancock reserves the right to make any changes in the responses if it appears at any time that omissions or errors have been made therein or that more accurate information is available; and that, subject to the limitations set forth herein, the responses are true to the best of my knowledge, information and belief.

Interrogatory answers signed under the pains and penalties of perjury this __ day of February 2006.

Stephen J. Blewitt

-61-

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing John Hancock's Objections and Responses to Abbott Laboratories' First Set of Interrogatories was served by e-mail upon Peter E. Gelhaar, Esq., Donnelly, Conroy & Gelhaar, LLP, One Beacon Street, 33rd Floor, Boston, MA 02108, and Lawrence R. Desideri, Esq. and Stephen V. D'Amore, Esq., Winston & Strawn LLP, 35 West Wacker Drive, Chicago, Illinois 60601-9703, on this 6th day of February, 2006.

_____
Stacy L. Blasberg

4039694v1

-68-

# Exhibit 19

**C H O A T E**

CHOATE HALL & STEWART LLP

August 14, 2006

Brian A. Davis, P.C.
(617) 248-5056
bad@choate.com

BY ELECTRONIC AND OVERNIGHT MAIL

Gregory D. Phillips, Esquire
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue,  35th Floor
Los Angeles, CA 90071

Re:    John Hancock Life Insurance Company, *et al.*
      v. Abbott Laboratories
      U.S.D.C. (Mass.) Civil Action No. 05-11150-DPW

Dear Greg:

I write pursuant to the Scheduling Order in this litigation, as amended by the parties' Joint Motion to Modify Scheduling Order which was allowed by the Court on August 2, 2006, to provide you with the expert proffer of plaintiffs John Hancock Life Insurance Company, et al. (collectively, "John Hancock" or "Hancock"). Before doing so, however, I note that the delays in Abbott's document production that necessitated the parties' Joint Motion to Modify the Scheduling Order in March of this year continue to seriously impede John Hancock's ability to identify and prepare appropriate expert witnesses in this matter. As discussed in our letters of July 21 and August 9, 2006, other critical documents still are missing. Accordingly, John Hancock expressly reserves the right to supplement this proffer at a later date both by identifying additional experts and by changing the proposed areas of testimony of the expert witnesses identified herein, as Hancock deems necessary.

With the foregoing reservations, John Hancock currently expects that it may call Dr. Nelson L. Levy, 1391 Concord Drive, Lake Forest, Illinois 60045. You already have a copy of Dr. Levy's C.V. Hancock expects that Dr. Levy may testify concerning some or all of the following topics: the pharmaceutical business generally; various development considerations, practices and procedures that commonly are employed in the pharmaceutical industry; the Program Compounds described in the March 13, 2001 Research Funding Agreement (the "RFA"); the status and reasonable prospects for commercial success of various Program Compounds leading up to, at the time of, and subsequent to the execution of the RFA; material misrepresentations and omissions in Abbott's disclosures, warranties and representations to John Hancock concerning the Program Compounds and the status of, and reasonable commercial prospects for, those compounds; the differences between nominal and expected spending as those terms commonly are used in the pharmaceutical industry; common

Gregory D. Phillips, Esquire
August 14, 2006
Page 2

out-licensing practices in the pharmaceutical industry; and Abbott's efforts to out-license certain Ceased Program Compounds.

John Hancock also currently expects that it may call Mr. Alan Freidman, CRA International, Inc., 1155 Avenue of the Americas, 18th Floor, New York, New York 10036.     A copy of Mr. Friedman's C.V. is attached.     Hancock expects that Mr. Friedman may testify concerning some or all of the following topics: Abbott's projected and actual expenditures on Program Related Costs; the differences between nominal and expected spending; the benefits due John Hancock under the RFA; and John Hancock's estimated damages resulting from Abbott's violations of the RFA and other misconduct, including alternative calculation methodologies as well as payments that would be due John Hancock upon recission of the RFA.

John Hancock looks forward to receiving Abbott's expert proffer, as required under the modified Scheduling Order, by the close of business today.

Very truly yours,

Brian A. Davis (BY JHZ)

Brian A. Davis

Enclosure

cc:     Joseph H. Zwicker, Esq.

4101908.1

4101908v2



INTERNATIONAL

## ALAN FRIEDMAN, CMC
Vice President

M.B.A. Finance,
Northeastern University

B.A. Economics and Business,
Lafayette College

Post-Graduate Course Work
University of Chicago,
Graduate School of Business

Alan Friedman has 25 years of financial consulting experience and has provided expert testimony on the subject of damages in numerous intellectual property cases and complex commercial litigations. He has consulted on mergers and acquisitions, financings, operations improvement, valuations, and claims for economic loss. He has led teams of professionals to arrange and evaluate transactions ranging from $3 million to $3 billion.

In intellectual property litigation matters, Mr. Friedman has been retained to compute damages in patent infringement, software copyright infringement, and trade secret cases, including one which resulted in one of the largest copyright infringement awards ever given. In complex commercial litigations, he has been retained to testify on damages in matters involving breach of contract, acquisitions, financings, mutual fund investing, and employee termination. He has testified in federal and state court, as well as in arbitrations and mediations.

He has accomplished assignments for private and publicly-owned companies, both domestic and foreign. The industry groups in which those companies operate include healthcare, manufacturing, business services, retail, computer hardware and software, consumer products, apparel, and financial services.

Mr. Friedman founded and served as President of a 14-man boutique consulting and investment banking firm which advised in the areas of acquisition analysis and structuring, financing, strategic and tactical planning, and damage analysis and expert testimony.

Prior to that, Mr. Friedman worked for Deloitte & Touche as a Consulting Partner and Staff Member, held leadership positions in the National Financial Consulting and Litigation Consulting Groups, and chaired its Financial Modeling Task Force.

Mr. Friedman also worked for the Continental Group, Inc., in its U.S. and International Packaging Divisions and its Corporate Office in the areas of finance, acquisitions, business development financial systems, and new product evaluation.

# Exhibit 20

Hancock V Abbott   120606.txt

1

1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3    * * * * * * * * * * * * * * * *

4    JOHN HANCOCK LIFE INSURANCE

5      COMPANY
                         Plaintiff

6
       VERSUS                        CA-05-11150-DPW
7
     ABBOTT LABORATORIES
8
                         Defendant
9
     * * * * * * * * * * * * * * * *

10

11
           BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
12
            UNITED STATES DISTRICT COURT JUDGE
13
               HEARING - MORNING SESSION
14
                   DECEMBER 6, 2006
15

16
     APPEARANCES:
17
     BRIAN A. DAVIS, ESQ. AND JOSEPH H. ZWICKER, ESQ., Choate,
18   Hall & Stewart, LLP, Two International Place, 100-150
     Oliver Street, Boston, Massachusetts  02110, on behalf
19   of the Plaintiff

20   ERIC J. LORENZINI, ESQ. AND JEFFREY I. WEINBERGER, ESQ.,
     Munger, Tolles & Olson, LLP, 355 South Grand Avenue,
21   35th Floor, Los Angeles, California  90071-1560, on
     behalf of the Defendant
22
     PETER E. GELHAAR, ESQ., Donnelly, Conroy & Gelhaar, LLP,
23   One Beacon Street, 33rd Floor, Boston, Massachusetts  02108,
     on behalf of the Defendant
24

25

⬚                                                      2

 1

 2

 3

 4
                         Page 1

Hancock v Abbott 120606.txt

4    THE COURT: You mean parol evidence from Hancock.

5    MR. WEINBERGER: Yes. But you asked me the
6    situation that this applies to and I think that is supported by
7    the contract claim.

8    THE COURT: Where in the claim language does it say
9    this applies under circumstances in which they think they're
10   going to make the payments, but they don't?

11   MR. WEINBERGER: Because 3.4 tells you what happens
12   if they don't state their intention to make the payments. And
13   that states the remedy for that. Then 3.4 simply talks of --
14   3.3 simply talks about their actual expenditures, not about
15   their plans or their intents. It talks about their actual
16   expenditures. So you have one section that's addressing one
17   issue or possibility, and another section that's addressing
18   another one.

19   THE COURT: I don't see it. And, so, you're going
20   to have to show me why the 3.4 covers (a) the entire waterfront
21   and (b) should be read as something that I can characterize as
22   additional to 3.3(b).

23   Now, what I'm going to do -- because I have another
24   matter -- is I'm going to take a break at this point. I've
25   indicated to the parties that they would do well to think long

f                                                                    47

1    and hard about the other motions that you have here, both in
2    terms of resolving those other motions before 2:30, but also
3    with a view toward prospective conduct in this case. And we
4    will continue with the hearing on the motion to dismiss and
5    motion for summary judgment at 2:30.

6    MR. WEINBERGER: Your Honor, what about the motion
7    to amend? Where does that fall in this --

8    THE COURT: It falls within the same set of

Page 39

Hancock V Abbott  120606.txt

9   circumstances.  How you could say you don't want them to amend

10  something that specifies one of the nine compounds strikes me

11  as rather odd and formulaic to be perfectly candid.  I want a

12  resolution of this.  I don't want a Hancock-Three.  Let's put

13  it that way.

14          So, if the parties are -- one can make the

15  argument.  You have made it, in effect, that Hancock is being

16  piggy about this, that not only did they win on the first one,

17  now they want to take something more out of your hide in this

18  one.  But we're going to resolve it in one case or I should say

19  this case.  And the idea that you're going to get me to say you

20  can't amend the complaint strikes me as unlikely, but I'm going

21  to hear argument about it if you want to press that kind of

22  arguement.

23          MR. WEINBERGER:  Understood.

24          THE COURT:  Fair warning about the degree of

25  hospitality that you're going to receive.

f                                                               48

1          MR. WEINBERGER:  That's why I asked.

2          THE COURT:  Okay.

3          MR. DAVIS:  Your Honor, may I just ask in that

4   context, in order to resolve those motions, we may require some

5   adjustments in the schedule.  I'm happy to talk to

6   Mr. Weinberger about that.  Would Your Honor be willing to

7   entertain that if we can come up with some --

8          THE COURT:  Yes, anything reasonable.  I mean, the

9   idea that a man from Japan can only show up on one day strikes

10  me as nuts.

11          MR. DAVIS:  Your Honor, we will talk about it and

12  hopefully get back with you at 2:30 this afternoon.

13                  RECESSED AT 11:05 A.M.

Page 40

# Exhibit 21

Hancock V Abbott (PM)   120606.txt

1

1                   UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3        * * * * * * * * * * * * * * * * *

4     JOHN HANCOCK LIFE INSURANCE
         COMPANY
5                         Plaintiff

6        VERSUS                          CA-05-11150-DPW

7     ABBOTT LABORATORIES

8                        Defendant

9        * * * * * * * * * * * * * * * * *


10
               BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
11
                UNITED STATES DISTRICT COURT JUDGE
12
                  HEARING - AFTERNOON SESSION
13
                       DECEMBER 6, 2006
14

15
      APPEARANCES:
16
      BRIAN A. DAVIS, ESQ. AND JOSEPH H. ZWICKER, ESQ., Choate,
17    Hall & Stewart, LLP, Two International Place, 100-150
      Oliver Street, Boston, Massachusetts  02110, on behalf
18    of the Plaintiff

19    ERIC J. LORENZINI, ESQ. AND JEFFREY I. WEINBERGER, ESQ.,
      Munger, Tolles & Olson, LLP, 355 South Grand Avenue,
20    35th Floor, Los Angeles, California  90071-1560, on
      behalf of the Defendant
21
      PETER E. GELHAAR, ESQ., Donnelly, Conroy & Gelhaar, LLP,
22    One Beacon Street, 33rd Floor, Boston, Massachusetts  02108,
      on behalf of the Defendant
23

24

25


□                                                              2

 1

 2

 3

 4
                           Page 1

Hancock V Abbott (PM)  120606.txt

5

6

7

8

9

10

11

12

13

14

15

16

17                                    Courtroom No. 1 – 3rd Floor
                                      1 Courthouse Way
18                                    Boston, Massachusetts  02210
                                      2:45 P.M. – 3:45 P.M.
19

20

21
           Pamela R. Owens – Official Court Reporter
22         John Joseph Moakley District Courthouse
              1 Courthouse Way – Suite 3200
23            Boston, Massachusetts  02210

24

25

▯                                                              3
1              THE COURT:  Well, where do we stand on these other
2    motions?
3              MR. DAVIS:  Your Honor, thank you for the
4    additional time.  We did confer.  And I think what the parties
5    agreed to do is we have a framework for agreement that will
6    resolve the other motions that were on for today.
7              And actually we typed up something and we've noted
8    it and the parties are going to have to put together a proposed
9    order along those lines.  Just so the Court knows, this will
                                  Page 2

Hancock V Abbott (PM)  120606.txt

10    require adjusting some of the deadlines in the case.  Precisely
11    how long is, as yet, unclear because what we tried to do is
12    tease some of the dates off of when Abbott will complete its
13    production pertaining to presenting 773.  And they need some
14    time to determine that.

15              THE COURT:  Okay.

16              MR. DAVIS:  So, what we propose to do is we will
17    submit to the Court next week a proposed order that should give
18    Abbott enough time to figure out how much time they are going
19    to need.

20              THE COURT:  All right.

21              MR. DAVIS:  We're going to try to keep the amount
22    of additional time as limited as possible.  However, we'll try
23    to agree on that in good faith.  If we can't, we may come back
24    to the Court for some guidance on what both sides think is a
25    reasonable amount of time for that process.  But my hope is

D                                                                    4

1     that we can reach agreement on that.  And if we do, we have the
2     other elements of an agreement in place and I think that will
3     resolve the pending discovery motions as well as the motion to
4     amend.

5               THE COURT:  Okay.  So, by my last count, although
6     this was only at, say, 9 o'clock this morning, there were 12
7     motions outstanding.

8               MR. DAVIS:  That sounds about right, Your Honor.
9               THE COURT:  Pardon me?

10              MR. DAVIS:  It sounds about right, Your Honor.  I
11    lost track myself.

12              THE COURT:  Well, but anything that has been filed
13    or is in the gleam in the eye of any of the attorneys is going
14    to be resolved by this; is that right?
                          Page 3

Hancock v Abbott (PM)   120606.txt

15          MR. DAVIS:  Yes, Your Honor.

16          THE COURT:  You hope.

17          MR. DAVIS:  I can't think of anything else that is

18   pending or that is currently threatened that would not be

19   resolved by this agreement.

20          THE COURT:  All right.  Is that your understanding

21   as well?

22          MR. WEINBERGER:  Yes, Your Honor.

23          THE COURT:  Okay.  So let's go back to the actual

24   terms.  I heard you to say -- not happily, but heard you to say

25   that literally the language of 3.3(b) would apply under these

O                                                                      5

1    circumstances.

2          MR. WEINBERGER:  Well, no, not exactly, Your Honor.

3          THE COURT:  Well, how literally?  And literally

4    means literally, not by implication, not by transference, but

5    literally does it not apply?

6          MR. WEINBERGER:  I think literally is by looking

7    at the definition of aggregate spending target alone and then I

8    take that definition and put that into 3.3 alone, literally

9    would apply.

10          THE COURT:  Okay.  Now, what am I supposed to be

11   doing here?  How am I supposed to be importing different views

12   regarding this?  I'll put to one side for a moment -- although

13   I want to come back to it -- the rather substantial return that

14   this would provide in the most extreme case to Hancock.  Now, I

15   want to understand more generally how as a matter of not quite

16   formalistic, not quite a literalistic construction, I can find

17   that 3.3(b) doesn't apply.

18          MR. WEINBERGER:  I think, Your Honor, you can find

19   that 3.4 was meant to be the exclusive remedy for Hancock in

                                Page 4

# Exhibit 22

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN HANCOCK LIFE INS. CO, ET AL.,
    Plaintiffs

                                 CIVIL ACTION NO. 03-12501-DPW

v.

ABBOT LABORATORIES,
    Defendant

<u>SCHEDULING ORDER</u>

WOODLOCK, D.J.

        This Order is intended primarily to aid and assist counsel in scheduling and planning the preparation and presentation of cases, thereby insuring the effective, speedy and fair disposition of cases, either by settlement or trial.

        The above-entitled action having been heard on March 30, 2004, it is hereby ORDERED pursuant to Rule 16(b) of the Federal Rules of Civil Procedure and Local Rule 16.1(F), that:

    (1)    discovery is limited to the declaratory judgment as presently framed, and the contract interpretation issues [i.e. whether or not the termination of Plaintiff's obligations as a result of shortfalls in aggregate spending targets is well-founded]. Other disputes, when ripe, may be raised in a separate related action. Discovery on these issues shall be completed by **JULY 30, 2004;**

    (2)    No expert discovery is contemplated on the contract interpretation issues.

    (3)    Cross motions for summary judgment are to be filed by **SEPTEMBER 17, 2004**, after completion of the necessary discovery and responses are to be filed within fourteen (14) calendar days thereafter pursuant to Local Rule 7.1 and all filings must conform to the requirements of Local Rule 56.1; No replies permitted.

    (4)    **ELECTRONIC FILING**: All future submissions in this case are subject to electronic filing and all counsel who choose to appear must make arrangements to register for participation in electronic case filing, if they have not already done so. In addition

to electronically filing any pleading, counsel shall also file all submissions relating to dispositive matters with the Court in hard copy, clearly marked **"Courtesy Copy - Do Not Scan"** on the cover page of each pleading/submission. Notices, orders and memoranda of the Court will only be filed and served electronically.

(5)    A further scheduling/status conference is set for **OCTOBER 14, 2004 AT 2:30 P.M.**. in Courtroom 1 on the 3rd floor before Hon. Douglas P. Woodlock, U.S.D.J. By **OCTOBER 7, 2004**, the parties shall file a STATUS REPORT indicating the current status of the case, including discovery proceedings, settlement discussions, pending or contemplated motions, proposed dates for pretrial conferences and for trial, and any other matters which should be addressed at the further conference.

All provisions and deadlines contained in this order having been established with the participation of the parties to this case, any requests for modification must be presented to the judge or magistrate judge, if referred for case management proceedings. Any requests for extension will be granted only for good cause shown supported by affidavits, other evidentiary materials, or reference to pertinent portions of the record. The request shall be made by motion and shall contain the reasons for the request, a summary of the discovery which remains to be taken, and a date certain when the requesting party will complete the additional discovery, join other parties, amend the pleadings or file motions. The Court may then enter a final scheduling order, if necessary.

Counsel are encouraged to seek an early resolution of this matter. Additional case management conferences may be scheduled by the court or upon the request of counsel, if the Court can be of assistance in resolving preliminary issues or in settlement.

By the Court,

/s/ Rebecca Greenberg

DATED: March 30, 2004                    Deputy Clerk

# Exhibit 23

1                  UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS

3      * * * * * * * * * * * * * * * *  *
                                        *
4      JOHN HANCOCK LIFE INSURANCE      *
       COMPANY, ET AL                   *
5                       Plaintiffs      *
                                        *
6          VERSUS                       *      CA-03-12501-DPW
                                        *
7      ABBOTT LABORATORIES              *
                   Defendant            *
8      * * * * * * * * * * * * * * *  * *

9          BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

10            UNITED STATES DISTRICT COURT JUDGE

11                         HEARING

12                    MARCH 30, 2004

13     APPEARANCES:

14          BRIAN A. DAVIS, ESQ. AND RAYMOND A. O'BRIEN, ESQ.
            Choate, Hall & Stewart, Exchange Place, 53 State
15          Street, 33rd Floor, Boston, Massachusetts  02109,
            on behalf of the Plaintiffs
16
            LAWRENCE R. DESIDERI, ESQ., Winston & Strawn, LLP,
17          35 W. Wacker Drive, Chicago, Illinois  60601-9703,
            on behalf of the Defendant
18
            PETER E. GELHAAR, ESQ., Donnelly, Conroy & Gelhaar,
19          LLP, One Beacon Street, 33rd Floor, Boston,
            Massachusetts  02108, on behalf of the Defendant
20
                          Courtroom No. 1 - 3rd Floor
21                        1 Courthouse Way
                          Boston, Massachusetts  02210
22                        2:30 P.M. - 3:00 P.M.

23          Pamela R. Owens - Official Court Reporter
                 John Joseph Moakley District Courthouse
24               1 Courthouse Way - Suite 3200
                    Boston, Massachusetts  02210
25     Method of Reporting:  Computer-Aided Transcription

1          THE COURT:  Do you dispute that --

2          MR. DAVIS:  Yes.

3          MR. DESIDERI:  I don't believe it showed that

4     we fell behind in the --

5          THE COURT:  Okay.  Well, so four months of

6     discovery on this.  At some point, the parties will

7     figure out exactly what they really want to dispute here

8     and what's really in dispute on it.  We're not going to

9     get into the pharmaceutical compounds or anything like

10    that.  This really is focused on the question -- I want

11    to use the terms that the parties seem to be using -- of

12    whether or not termination of Hancock's obligation as a

13    result of shortfalls in aggregate spending targets is

14    well-founded.  I mean, isn't that what it is?

15         MR. DAVIS:  Your Honor -- yes, Your Honor.  As

16    currently pled, it is.  So I'm clear, Your Honor, as I

17    understand it, if we believe that we have other

18    disputes, should I seek to amend or should I file a

19    separate action?

20         THE COURT:  I guess my --

21         MR. DAVIS:  Because I want to make sure I'm

22    not precluded, Your Honor, from bringing those claims at

23    a later point in time by some argument by Abbott that

24    they should have been brought in this action and were

25    not.

1              THE COURT:  Oh, please.  The short of it is --
2    are you going to plead that?
3              MR. DESIDERI:  Am I going to say that?
4              THE COURT:  Yes.
5              MR. DESIDERI:  I didn't plan on it.
6              THE COURT:  Well, he's not going to say that.
7    It's simply not going to happen.
8              MR. DAVIS:  Understood.
9              THE COURT:  Once it's ripe, you bring it.  You
10   don't have to worry about relation-back and all of that
11   sort of thing.
12             MR. DAVIS:  Understood.
13             THE COURT:  But you file a lawsuit.  You try
14   to get it in some sort of reasonable order promptly.
15   And if you've got other disputes, maybe you'll bring
16   another lawsuit.  But I don't see it happening within
17   the four months if you haven't even asked for your audit
18   rights yet after commencing the dispute in December of
19   last year, the dispute here.
20             So, four months to complete discovery, which
21   is July 30th.  I don't think there are experts involved
22   in this contract interpretation.  I'm not even sure that
23   there's parol evidence, although you can spend time
24   trying to figure out if there is.  But I don't see any
25   experts on this issue, do you?  Do either of you?