UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER LIFE INSURANCE COMPANY), <br><br> Plaintiffs, <br><br> v. <br><br> ABBOTT LABORATORIES, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) CIVIL ACTION NO. 05-11150-DPW <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFFS' MOTION FOR THE ISSUANCE OF
## A LETTER OF REQUEST FOR DR. PAUL ANDREWS

Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Manulife Insurance Company (f/k/a "Investors Partner Life Insurance Company") (collectively, "John Hancock" or "Hancock") respectfully request issuance of a Letter of Request from this Court pursuant to Fed. R. Civ. P. 28(b)(2), 28 U.S.C. § 1781, and the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Evidence Convention") (reprinted in 28 U.S.C. § 1781), so as to enable John Hancock to obtain evidence from a non-resident, non-party witness, Dr. Paul Andrews, in the United Kingdom. Dr. Andrews' business address is: Centre of Molecular and Metabolic Signaling, Basic Medical Sciences, St. George's University of London, Cranmer Terrace, London, SW17 ORE, United Kingdom. For the reasons discussed more fully below, John Hancock seeks evidence from Dr. Andrews -- both testimonial and documentary -- that is highly relevant, necessary and material to

John Hancock's prosecution of its fraud and breach of contract claims against Abbott Laboratories ("Abbott") in this action. A proposed Letter of Request, which seeks the assistance of The Queen's Bench Division, Royal Courts of Justice (London), in obtaining evidence from Dr. Andrews that John Hancock intends to use at trial, is attached hereto at Tab A.

### Factual Background

This is an action for fraud, breach of contract and indemnification in which John Hancock alleges that Abbott, intentionally or otherwise, misrepresented or omitted to provide John Hancock with material information concerning the true development status of certain pharmaceutical compounds encompassed by a Research Funding Agreement that Hancock and Abbott signed on March 13, 2001 (the "Agreement"), prior to the execution of that Agreement. Under the terms of the parties' Agreement, John Hancock agreed to contribute up to $214 million over a four-year "Program Term" to help fund Abbott's research and development activities directed towards obtaining regulatory approval of a portfolio of nine pharmaceutical compounds (defined in the Agreement as the "Program Compounds"), in return for, *inter alia*, royalties on the sale of those products. John Hancock alleges that:

> because the financial return, if any, that John Hancock ultimately will receive on its investment in the Program Compounds is heavily dependent on the commercial success of those Compounds, John Hancock had a strong interest in ensuring, before the Agreement was signed, that: (a) Abbott had a good faith intention to aggressively pursue development of each of the Program Compounds; and (b) Abbott had a good faith belief that each of the Program Compounds possessed reasonably favorable commercial prospects.

(First Amended Supplemental Complaint ("Amended Complaint"), ¶ 12.)

In order to allay John Hancock's concerns regarding the developmental status of the Program Compounds, Abbott expressly warranted to Hancock in Article 12 of the Agreement, *inter alia*, that:

> [n]either this Agreement nor any Exhibit to this Agreement (including the compound reports attached … hereto…) contains any untrue statement of material

fact or omits to state any material fact necessary to make the statements contained herein or therein not misleading. There is no fact known to Abbott (other than generally available information concerning the pharmaceutical industry in general) as of the date of this Agreement that has not been disclosed in this Agreement or any Exhibit to this Agreement which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial [viability]) of the Research Program or any of the Program Compounds.

(Agreement, § 12.2(i), Affidavit of Stacy L. Blasberg ("Blasberg Aff."), Ex. 1.)[1]

John Hancock has developed substantial evidence that various representations that Abbott made to Hancock in the Agreement regarding the developmental status of the Program Compounds were false. For example, although Abbott represented to John Hancock in the Agreement that one of the Program Compounds, ABT-594, was "expected to be the first neuronal nicotinic receptor agonist to receive an indication for pain," the truth was something different. Documents obtained in discovery demonstrate that Abbott recognized emesis (*i.e.*, vomiting) as a potential problem with ABT-594 as early as 1999. (*See* Bates Nos. ABBT0005027-37, ABBT0024357, ABBT0024363-69, Blasberg Aff., Ex. 10.) When Abbott later commenced a Phase IIb clinical trial of ABT-594 for neuropathic pain in April 2000, it experienced a large number of "premature terminations" among subjects who were enrolled in the study, due primarily to episodes of moderate to severe nausea, dizziness and emesis among the trial participants. (*See* Bates No. ABBT0082516, Blasberg Aff., Ex. 11.) Preliminary data concerning the Phase IIb trial, including the high premature patient termination rate, was discussed with members of Abbott's senior management in a series of meetings beginning no later than November 2000; *i.e.*, four months before the Agreement with John Hancock was signed. (*See* Bates Nos. ABBT0019102-37, ABBT326427, ABBT0162921-25, Blasberg Aff.,

---

[1] Reference to the Affidavit of Stacy L. Blasberg and its Exhibits refer to the Affidavit and Exhibits filed by John Hancock on February 13, 2007, in conjunction with its Memorandum In Opposition To Defendant's Motion To Strike Prayer For Rescission In Plaintiffs' First Amended Supplemental Complaint.

Ex. 12.) By late November 2000, Dr. Jeffrey M. Leiden, Abbott's Executive Vice President of Pharmaceuticals and Chief Scientific Officer, in a presentation to Abbott's upper management, described ABT-594's commercial viability as "questionable." (*See id.* at ABBT162925.)

In early January 2001, Abbott "prematurely discontinued" its Phase IIb clinical trial of ABT-594 because of the high rate of early patient terminations and as yet still unexplained "[s]ignificant changes in the developmental strategy of ABT-594." (*See* Bates Nos. ABBT233539, ABBT0518910, Blasberg Aff., Ex. 13.) Abbott discontinued the Phase IIb trial two months ahead of schedule and about 50 patients short of the allegedly "anticipated" enrollment described in the Compound Report for ABT-594 that Abbott provided to John Hancock approximately two months later. (*See id.*) Then, just days before the Agreement was signed, Abbott's senior management listed ABT-594 in an "Initial Portfolio Prioritization" as "probable T[erminate]." (*See* Bates No. ABBT0155584, Blasberg Aff., Ex. 4.) None of these material facts was disclosed to Hancock anywhere in the Agreement or otherwise.

Abbott denies that it misrepresented or failed to disclose any material information concerning ABT-594 to John Hancock before the Agreement was executed on March 13, 2001. Accordingly, John Hancock intends to adduce evidence at trial demonstrating the extent of Abbott's knowledge and concerns regarding ABT-594 on or prior to that date. Documents obtained in discovery reveal that Dr. Andrews was at the center of Abbott's assessment of ABT-594 prior to the execution of the Agreement. As of early 2001, Dr. Andrews was a Reader in Physiology at St. George's Hospital Medical School in London. (Bates No. ABBT163932, Affidavit of Richard C. Abati ("Abati Aff."), Ex. A.) In February 2001, Abbott retained Dr. Andrews to provide information and advice regarding "the mechanism or mechanisms [] of ABT-594-induced nausea and emesis[]." (Bates Nos. ABBT556316-17, ABBT163996, Abati Aff. Exs. B and C.) To assist him in his work, Abbott provided Dr. Andrews with a "large

volume of material," "documentation" and other "information" concerning ABT-594, and asked him to present his findings to a group of Abbott personnel in March 2001.  (*Id.*; Bates No. ABBT163931, Abati Aff. Ex. D.)

Abbott's meeting with Dr. Andrews went forward, as scheduled, at Abbott's facilities in Illinois on March 12, 2001; *i.e.*, the day before the Agreement with John Hancock was executed. (Bates No. ABBT556316, Abati Aff. Ex. B.)  It was billed at the time as a "discussion of ABT-594's tolerability issues, especially the emetic liability," and was attended by various members of Abbott's management.  (Bates No. ABBT163931, Abati Aff. Ex. D.)  Little more has been disclosed by Abbott, however, regarding the precise substance of the March 12, 2001 meeting with Dr. Andrews, and Dr. Andrews' evidence is needed as to the substance of that meeting. Although Abbott has produced certain correspondence concerning the scheduling of the meeting, it has failed to produce the "large volume of material," "documentation" and other "information" provided to Dr. Andrews for his analysis. (Bates Nos. ABBT163996, Abati Aff. Ex. C.)  Nor has Abbott produced any minutes or other notes concerning the meeting, or any other documents concerning Abbott's discussions with Dr. Andrews regarding "ABT-594's tolerability issues" prior to the execution of the Agreement.  Two attendees of the meeting who have been deposed, Drs. Bruce McCarthy and Michael Meyer, claimed to have limited recall of the discussion about ABT-594.  (Excerpts from the Deposition Transcript of Dr. Bruce McCarthy at 218-226, Abati Aff. Ex. E; Excerpts from the Deposition Transcript of Michael Meyer at 183-188, Abati Aff. Ex. F.)  Moreover, none of the Abbott witnesses has been able to identify the "large volume of material," "documentation" and other "information" concerning ABT-594 that Abbott provided to Dr. Andrews in advance of the meeting.  (*Id.*)

By means of its present Motion for Issuance of a Letter of Request, John Hancock seeks to obtain Dr. Andrews' evidence for use at trial in this action.

**Procedural Background**

Pursuant to Fed. R. Civ. P. 28(b)(2), 28 U.S.C. § 1781, and the Hague Evidence Convention, John Hancock satisfies the standard for issuance of a Letter of Request for the deposition of Dr. Paul Andrews. First, the evidence sought from Dr. Andrews is relevant and necessary to the resolution of this dispute. John Hancock's Amended Complaint alleges, *inter alia*, that Abbott made material misrepresentations or omissions regarding the developmental status of ABT-594 prior to and at the time the parties entered into their Agreement on March 13, 2001. Dr. Andrews is uniquely situated to provide crucial evidence on that issue as the last outsider to advise Abbott on "ABT-594's tolerability issues" before the Agreement was signed. Accordingly, John Hancock justifiably seeks to obtain for trial additional evidence regarding Abbott's interactions with Dr. Andrews. Second, in light of Dr. Andrews' status as a non-party living abroad, this Motion properly conforms with the Hague Evidence Convention. The proposed Letter of Request, which is attached hereto at Tab A, provides the specific information proscribed by the terms of the international agreement. Furthermore, in compliance with the United Kingdom's reservations to the Hague Evidence Convention and with U.K. legislation, the proposed Letter of Request has been carefully drafted to request only evidence for use at trial. As a result, the information that John Hancock seeks from Dr. Andrews is precisely targeted to obtain evidence needed for the resolution of this case.

Accordingly, John Hancock's Motion for Issuance of a Letter of Request for Dr. Paul Andrews should be granted.

## Argument

I.    DR. ANDREWS' DEPOSITION IS "SIGNIFICANT TO THE RESOLUTION" OF THIS LITIGATION AND, THEREFORE, SHOULD BE ORDERED PURSUANT TO A LETTER OF REQUEST.

A Letter of Request (formerly known as Letter Rogatory) is a device "whereby one country, speaking through one of its courts, requests another country, acting through its own courts and by methods of court procedure peculiar thereto and entirely within the latter's control, to assist the administration of justice in the former country; such request being made, and being usually granted, by reason of the comity existing between nations in ordinary peaceful times."[2] *DBMS Consultants Limited v. Computer Associates International, Inc.*, 131 F.R.D. 367, 369 (D. Mass. 1990). Courts have inherent authority to issue a Letter of Request "directly . . . to the foreign or international tribunal, officer or agency to whom it is addressed . . . ." 28 U.S.C. § 1781(b)(2); *see also* Fed. R. Civ. P. 28(b)(2) (providing for depositions to be conducted in foreign countries pursuant to Letters of Request); *DBMS Consultants Limited*, 131 F.R.D. at 369 (inherent authority recognized).

On a motion for the issuance of a Letter of Request seeking a deposition in a foreign country, a court ordinarily will not weigh the evidence to be elicited by the Letter of Request, or otherwise attempt to predict whether the witness will, in fact, be able to provide the testimony sought. *DBMS Consultants Limited*, 131 F.R.D. at 369. Where the requested discovery is pertinent to an issue that is "significant to the resolution" of the litigation, a motion for issuance of a Letter of Request generally will be granted. *Id.*; *see also Evanston Insurance Co. v. OEA, Inc.*, No. CIV S-02-1505 DFL PAN, 2006 WL 1652315, at *2 (E.D. Cal. June 13, 2006) (allowing motion because the requested deposition was "relevant and necessary to the

---

[2] Letters of Request commonly were known as Letters Rogatory until the 1993 amendments to the Federal Rules of Civil Procedure began using the current term, "Letters of Request." *See* James Wm. Moore *et al.*, Moore's Federal Practice, 28.12[1] n. 1 (3d ed. 1999).

prosecution of th[e] action"); *Elliot Associates, L.P. v. The Republic of Peru*, Nos. 96 CIV. 7916, 7917 (RWS), 1997 WL 436493, at *2 (S.D.N.Y. Aug. 1, 1997) (same).  The burden is on the party opposing a Letter of Request to show "[g]ood cause" why the application should be denied.  *Zassenhaus v. Evening Star Newspaper Co.*, 404 F. 2d 1361, 1364 (D.C. Cir. 1968); 8 Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, *Federal Practice & Procedure* § 2083 (1994) ("There are still cases in which it may be proper to refuse the issuance of a commission or letters rogatory, but there must be some good reason to deny a party the particular type of judicial assistance it seeks").

In the present case, John Hancock seeks evidence from third party Dr. Andrews that is highly relevant, necessary, and material to John Hancock's prosecution of its fraud and breach of contract claims against Abbott arising out of the development and termination of ABT-594.  It is undisputed that Abbott urgently sought Dr. Andrews' advice and assistance in early 2001 to address what Abbott personnel then described as "ABT-594's tolerability issues."  *See* p. 5, *supra*.  How Abbott defined those issues, what information it provided to Dr. Andrews on those issues, and what it learned from Dr. Andrew concerning those issues prior to the execution of the Agreement may constitute important evidence demonstrating the extent of Abbott's knowledge and concerns regarding ABT-594 in that time frame.  The testimony of Dr. Andrews is, therefore, critical to an issue that is "significant to the resolution" of this litigation.  *See, e.g., DBMS Consultants Limited*, 131 F.R.D. at 369.  The only obstacle to John Hancock taking Dr. Andrews' testimony for use at trial is his place of residence, an obstacle that Letters of Request are designed to overcome.

For the foregoing reasons, John Hancock's Motion for Issuance of a Letter of Request directed to Dr. Andrews should be allowed.

II.    JOHN HANCOCK'S PROPOSED LETTER OF REQUEST CONFORMS TO THE
       HAGUE EVIDENCE CONVENTION, AS WELL AS LOCAL ENGLISH PRACTICE.

Where, as here, the testimony from abroad is sought from a non-party who is not a United

States citizen, the application must comply with the Hague Evidence Convention. *See Elliot*

*Assocs., L.P.*, 1997 WL 436493, at *2 ("Application for a letter of request to take testimony

pursuant to the Hague Convention is an appropriate mechanism for obtaining discovery of a non-

party witness in a foreign country"); 28 U.S.C. § 1781 (appending Hague Evidence Convention);

*see also Societe Nationale Industrielle Aerospatiale v. United States District Court for the*

*Southern District of Iowa*, 482 U.S. 522, 522 (1987) (courts lack sovereign power over non-

parties abroad to compel, under the Federal Rules of Civil Procedure, their compliance with an

issued Letter of Request).[3]   Furthermore, English law requires that any Letter of Request that is

issued for a deposition in that country only should seek evidence that is intended for use at trial

in the underlying case. *First Am. Corp. v. Price Waterhouse LLP*, 154 F. 3d 16, 22 (2nd Cir.

1988); Hague Evidence Convention (reprinted in 28 U.S.C. § 1781) at Article 23; Robert C.

O'Brien, *Compelling the Production of Evidence by Nonparties in England under the Hague*

*Convention*, 24 Syracuse J. Int'l L. & Commerce 77, 104-05 (1997).

John Hancock's proposed Letter of Request conforms to both the requirements of the

Hague Evidence Convention and to English law. *See* Tab A.  More specifically, as required by

the terms of Article 3 of the Hague Evidence Convention, John Hancock's proposed Letter of

Request sets out: (a) the authority requesting its execution and the authority requested to execute

it; (b) the names and addresses of the persons, the proceedings and the representatives, if any; (c)

the nature of the proceedings in which the evidence is required, giving only necessary

information in regard thereto; (d) the evidence to be obtained or the judicial act to be performed;

---

[3]   Both the United States and the United Kingdom are parties to the Hague Evidence Convention. *See*
*Elliot Assocs., L.P.*, 1997 WL 436493, at *2.

(e) the names and addresses of the person to be examined; and (f) the questions to be put to the person to be examined or a statement of the subject matter about which they are to be examined. *See also Evanston Insurance Co.*, 2006 WL 1652315, at *2 (citing Article 3 of the Hague Evidence Convention). John Hancock also has carefully drafted its proposed Letter of Request to address only issues that are intended for use at trial, and to identify any requested documents with particularity. Accordingly, if the Court grants this motion for the reasons set forth above, it may issue the proposed Letter of Request in its current form.

### Conclusion

For the reasons set forth above, John Hancock respectfully requests that its Motion for the Issuance of a Letter of Request be allowed, and that the Court issue the proposed Letter of Request in the form provided.

<div style="margin-left:40%">

JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY AND MANULIFE INSURANCE COMPANY

By their attorneys,


/s/      Karen Collari Troake
Brian A. Davis (BBO No. 546462)
Joseph H. Zwicker (BBO No. 560219)
Karen Collari Troake (BBO No. 566922)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Telephone: 617-248-5000
Fax: 617-248-4000

</div>

Date: March 2, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served by electronic and overnight mail upon Peter E. Gelhaar, Esq., Donnelly, Conroy & Gelhaar, LLP, One Beacon Street, 33rd Floor, Boston, MA 02108, and Gregory D. Phillips, Esq., Munger, Tolles & Olson LLP, 355 South Grand Avenue, Los Angeles, CA 90071, on this 2nd day of March, 2007.

/s/  Karen Collari Troake
Karen Collari Troake

4166702v3

## LOCAL RULE 7.1 CERTIFICATION

I, Karen Collari Troake, hereby certify that attorneys for John Hancock have conferred with opposing counsel before filing this Motion in an effort to resolve or narrow the issues presented.

_/s/_ _____
Karen Collari Troake

4181347v1

**A**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER LIFE INSURANCE COMPANY),<br><br>Plaintiffs,<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO. 05-11150-DPW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

## LETTER OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE
### (Dr. Paul Andrews)

TO THE SENIOR MASTER OF THE QUEEN'S BENCH DIVISION, ROYAL COURTS OF JUSTICE, STRAND, LONDON, WC2:

The United States District Court for the District of Massachusetts presents its compliments to you and respectfully requests your assistance in the following manner:

WHEREAS, this proceeding is properly under the jurisdiction of and pending before the United States District Court for the District of Massachusetts, located in Boston, Massachusetts between Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Manulife Insurance Company (f/k/a "Investors Partner Life Insurance Company") (collectively, "John Hancock" or "Hancock") and Defendant Abbott Laboratories ("Abbott"). This proceeding is a civil action.

The names and addresses of the representatives of the parties are:

John Hancock

Brian A. Davis
Joseph H. Zwicker
Karen Collari Troake
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110

Abbott

Jeffrey I. Weinberger
Gregory D. Phillips
MUNGER, TOLLES & OLSON LLP
335 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560

The claim by John Hancock can be summarized as follows:

(a)    Nature of Claim:

John Hancock alleges causes of action against Abbott for fraud, breach of contract and indemnification. John Hancock's claims arise out of a Research Funding Agreement ("RFA") dated March 13, 2001, that obligated the parties to contribute sums, under certain conditions, to develop and commercialize nine drug compounds owned by Abbott (including ABT-594).

(b)    Relief:

John Hancock seeks to recover damages, lost profits, lost royalties and other losses, including without limitation its costs, expenses and reasonable attorneys' fees, incurred in this action, as permitted by law and the terms of the RFA. John Hancock has also reserved the right, in the alternative, to seek rescission of the RFA and a refund of all monies paid by John Hancock to Abbott.

(c)    Summary of Facts and Issues In Dispute:

This is an action for fraud, breach of contract and indemnification in which John Hancock alleges that Abbott, intentionally or otherwise, misrepresented or omitted to provide John Hancock with material information concerning the true development status of certain pharmaceutical compounds encompassed by a Research Funding Agreement that Hancock and Abbott signed on March 13, 2001 (the "Agreement"), prior to the execution of that Agreement. Under the terms of the parties' Agreement, John Hancock agreed to contribute up to $214 million over a four-year "Program Term" to help fund Abbott's research and development activities directed towards obtaining regulatory approval of a portfolio of nine pharmaceutical compounds (defined in the Agreement as the "Program Compounds"), in return for, *inter alia*, royalties on the sale of those products. John Hancock alleges that:

-2-

because the financial return, if any, that John Hancock ultimately will receive on its investment in the Program Compounds is heavily dependent on the commercial success of those Compounds, John Hancock had a strong interest in ensuring, before the Agreement was signed, that: (a) Abbott had a good faith intention to aggressively pursue development of each of the Program Compounds; and (b) Abbott had a good faith belief that each of the Program Compounds possessed reasonably favorable commercial prospects.

(First Amended Supplemental Complaint ("Amended Complaint"), ¶ 12, Ex. 1.)

In order to allay John Hancock's concerns regarding the developmental status of the Program Compounds, Abbott expressly warranted to Hancock in Article 12 of the Agreement, *inter alia*, that:

[n]either this Agreement nor any Exhibit to this Agreement (including the compound reports attached … hereto…) contains any untrue statement of material fact or omits to state any material fact necessary to make the statements contained herein or therein not misleading. There is no fact known to Abbott (other than generally available information concerning the pharmaceutical industry in general) as of the date of this Agreement that has not been disclosed in this Agreement or any Exhibit to this Agreement which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial [viability]) of the Research Program or any of the Program Compounds.

(Agreement, § 12.2(i), Ex. 2.)

John Hancock has developed substantial evidence that various representations that Abbott made to Hancock in the Agreement regarding the developmental status of the Program Compounds were false. For example, although Abbott represented to John Hancock in the Agreement that one of the Program Compounds, ABT-594, was "expected to be the first neuronal nicotinic receptor agonist to receive an indication for pain," the truth was something different. Documents obtained in discovery demonstrate that Abbott recognized emesis (*i.e.*, vomiting) as a potential problem with ABT-594 as early as 1999. (*See* Bates Nos. ABBT0005027-37, ABBT0024357, ABBT0024363-69, Ex. 3.) When Abbott later commenced a Phase IIb clinical trial of ABT-594 for neuropathic pain in April 2000, it experienced a large number of "premature terminations" among subjects who were enrolled in the study, due primarily to episodes of moderate to severe nausea, dizziness and emesis among the trial participants. (*See* Bates No. ABBT0082516, Ex. 4.) Preliminary data concerning the Phase IIb trial, including the high premature patient termination rate, was discussed with members of Abbott's senior management in a series of meetings beginning no later than November 2000; *i.e.*, four months before the Agreement with John Hancock was signed. (*See* Bates Nos. ABBT0019102-37, ABBT326427, ABBT0162921-25, Ex. 5.) By late November 2000, Dr. Jeffrey M. Leiden, Abbott's Executive Vice President of Pharmaceuticals and Chief Scientific Officer, in a presentation to Abbott's upper management, described ABT-594's commercial viability as "questionable." (*See id.*)

In early January 2001, Abbott "prematurely discontinued" its Phase IIb clinical trial of ABT-594 because of the high rate of early patient terminations and as yet still unexplained "[s]ignificant changes in the developmental strategy of ABT-594." (*See* Bates Nos. ABBT233539, ABBT0518910, Ex. 6.) Abbott discontinued the Phase IIb trial two months ahead of schedule and about 50 patients short of the allegedly "anticipated" enrollment described in the Compound Report for ABT-594 that Abbott provided to John Hancock approximately two months later. (*See id.*) Then, just days before the Agreement was signed, Abbott's senior management listed ABT-594 in an "Initial Portfolio Prioritization" as "probable T[erminate]." (*See* Bates No. ABBT0155584, Ex. 7.) None of these material facts was disclosed to Hancock anywhere in the Agreement or otherwise.

Abbott denies that it misrepresented or failed to disclose any material information concerning ABT-594 to John Hancock before the Agreement was executed on March 13, 2001. Accordingly, John Hancock intends to adduce evidence at trial demonstrating the extent of Abbott's knowledge and concerns regarding ABT-594 on or prior to that date. Documents which will be entered as evidence at the trial of this matter clearly show that Dr. Andrews was at the center of Abbott's assessment of ABT-594 prior to the execution of the Agreement. As of early 2001, Dr. Andrews was a Reader in Physiology at St. George's Hospital Medical School in London. (Bates No. ABBT163932, Ex. 8.) In February 2001, Abbott retained Dr. Andrews to provide information and advice regarding "the mechanism or mechanisms [] of ABT-594-induced nausea and emesis[]." (Bates Nos. ABBT556317, ABBT163996, Exs. 9 and 10.) To assist him in his work, Abbott provided Dr. Andrews with a "large volume of material," "documentation" and other "information" concerning ABT-594, and asked him to present his findings to a group of Abbott personnel in March 2001. (*Id.*; Bates No. ABBT163931, Ex. 11.)

Abbott's meeting with Dr. Andrews went forward, as scheduled, at Abbott's facilities in Illinois on March 12, 2001; *i.e.*, the day before the Agreement with John Hancock was executed. (Bates No. ABBT556316, Ex. 12.) It was billed at the time as a "discussion of ABT-594's tolerability issues, especially the emetic liability," and was attended by various members of Abbott's management. (Bates No. ABBT163931, Ex. 13.) Little more has been disclosed by Abbott, however, regarding the precise substance of the March 12, 2001 meeting with Dr. Andrews, and Dr. Andrews' evidence is needed as to the substance of that meeting. Although Abbott has produced certain correspondence concerning the scheduling of the meeting, it has failed to produce the "large volume of material," "documentation" and other "information" provided to Dr. Andrews for his analysis. (Bates Nos. ABBT163996, ABBT163931, Exs. 10 and 11.) Nor has Abbott produced any minutes or other notes concerning the meeting, or any other documents concerning Abbott's discussions with Dr. Andrews regarding "ABT-594's tolerability issues" prior to the execution of the Agreement. Two attendees of the meeting who have been deposed, Drs. Bruce McCarthy and Michael Meyer, claimed to have limited recall of the discussion about ABT-594. (Excerpts from the Deposition Transcript of Dr. Bruce McCarthy at 219-224, Ex. 14; Excerpts from the Deposition Transcript of Michael Meyer at 176-179, Ex. 15.) Moreover, none of the Abbott witnesses has been able to identify the "large volume of material," "documentation" and other "information" concerning ABT-594 that Abbott provided to Dr. Andrews in advance of the meeting. (*Id.*)

By means of this Letter of Request, John Hancock seeks to obtain Dr. Andrews' evidence for use at trial in this action. It is necessary for the purposes of justice and for the due determination of the matters in dispute between the parties that you cause the following witness,

who is resident within your jurisdiction, to be examined. The name and address of the witness is as follows:

> Dr. Paul Andrews
> Centre of Molecular and Metabolic Signaling, Basic Medical Sciences
> St George's University of London, Cranmer Terrace
> London, SW17 ORE, United Kingdom

The evidence of Dr. Andrews is required for these civil proceedings and is sought solely for use at the trial of the matter. Dr. Andrews' evidence is highly relevant, necessary, and material to John Hancock's prosecution of its fraud and breach of contract claims against Abbott arising out of the development and termination of ABT-594. John Hancock's Amended Complaint alleges, *inter alia*, that Abbott made material misrepresentations or omissions regarding the developmental status of ABT-594 prior to and at the time the parties entered into their Agreement on March 13, 2001. Dr. Andrews is uniquely situated to provide crucial evidence on that issue as the last outsider to advise Abbott on "ABT-594's tolerability issues" before the Agreement was signed. Accordingly, John Hancock justifiably seeks to obtain for trial additional evidence regarding Abbott's interactions with Dr. Andrews.

The witness should be examined regarding the following topics:

*(a)*   Dr. Andrews' professional background as a consultant, including, in particular, his experience with the analysis of drug compounds such as ABT-594.

*(b)*   The facts and circumstances surrounding Dr. Andrews' retention by Abbott in February 2001, one month prior to the execution of the RFA.

*(c)*   A detailed description of Dr. Andrews' work for Abbott in March and February of 2001 in so far as that work related to ABT-594 (including the identification of the "documentation" provided to Dr. Andrews by Abbott in connection with his analysis of ABT-594, which is referenced by Abbott in documents produced by Abbott in this litigation, see below).

*(d)*   A detailed summary of Dr. Andrews' meeting with Abbott on March 12, 2001, one day before the execution of the RFA, regarding his analysis of ABT-594.

*(e)*   Dr. Andrews work related to ABT-594 following his meeting with Abbott on March 12, 2001.

We have provided at Exhibit A attached hereto a non-exhaustive and provisional list of questions for Dr. Andrews, expanding upon each of these topics.

The witness should produce to John Hancock -- one week prior to the date of examination -- two particular types of documents which are believed to be in his possession, custody or power. *First*, Dr. Andrews should produce the "large volume of material," "documentation" and other "information" provided to Dr. Andrews by Abbott during January, February and/or March of 2001 in connection with his analysis. (Document Bates numbered ABBT163996, Exs. 10 and 11.) This highly relevant "documentation" is referenced by Abbott and Dr. Andrews in documents produced by Abbott in the course of this litigation. For example, on February 28, 2001, Dr. Andrews sent an electronic message to Abbott which stated in relevant part: "I was under the impression that we were to have discussions of the documentation you provided." (Document Bates numbered ABBT163996, Ex. 10) *Second*, Dr. Andrews should produce the working papers for his services provided to Abbott in February and March of 2001. Specifically, such papers should include: (a) Dr. Andrews' notes and minutes of the meeting with Abbott on March 12, 2001; (b) Dr. Andrews' notes and other working papers created in preparation for his meeting with Abbott on March 12, 2001; and (c) Dr. Andrews' notes and other working papers created following and in connection with his meeting with Abbott on March 12, 2001.

As for the mode of Dr. Andrews' production of these two particular types of documents, John Hancock shall collect and photocopy these documents on a date and time convenient to Dr. Andrews (but at least one week prior to the date of examination). John Hancock shall bear all costs and expenses associated with such photocopying.

It is requested that the examination be conducted by the legal representatives of John Hancock (the requesting party) in the English mode under the supervision of a fit and proper person to be nominated by John Hancock's legal representatives in England, with your approval. It is further requested that the witness be permitted to have a legal adviser present during the

examination. I would ask that you cause me and the representatives of the parties to be informed of the date and place where the examination is to take place.

WHEREAS, this Court is authorized by Rule 28(b) of the Federal Rules of Civil Procedure, 28 U.S.C. § 1781, and the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters to issue this Letter of Request to the appropriate judicial authority in the United Kingdom requesting assistance in this matter;

NOW THEREFORE, I, Douglas P. Woodlock, United States District Court Judge for the District of Massachusetts, pursuant to Rule 28(b) of the Federal Rules of Civil Procedure, 28 U.S.C. § 1781, and the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, hereby request that, in furtherance of justice and by the proper and usual process of your court, you order Dr. Paul Andrews, at a time and place by you to be fixed, to answer questions upon oral examination and to produce documents, as set out above and in the annex hereto.

In addition, I request that you will cause the evidence of the said witness to be committed to writing and to be videotaped, and all documents produced to be duly marked for identification and that the transcript of all oral evidence, videotape and documents produced be sent to:

> Michelle Rynne
> Clerk To The Honorable Douglas P. Woodlock
> United States District Court, District of Massachusetts
> John Joseph Moakley U.S. Courthouse
> One Courthouse Way – Suite 2300
> Boston, Massachusetts 02210

Finally, I request that you provide the representatives of all parties the opportunity to attend the oral examination and to cross-examine Dr. Andrews.

This Court expresses its appreciation to you for your courtesy and assistance in this matter and states that, pursuant to the authority of 28 U.S.C. § 1782, it stands ready and willing to do the same for you in a similar matter when required.

Date: _____                    _____
                                               United States District Court Judge

# Exhibit A

## **Non-Exhaustive List of Questions for Dr. Paul Andrews**

Background

    1.     What is your full name?
    2.     How old are you?
    3.     Where do you currently reside?
    4.     What is your educational background?
    5.     What is your employment history?
    6.     What professional degrees and/or certifications have you achieved?
    7.     Where are you currently employed?
    8.     What is your title?
    9.     During your employment at St. George's Hospital Medical School, have you undertaken consulting work for outside parties?
    10.    Please identify the names of any outside parties for which you have consulted, and the scope of these projects.
    11.    What experience do you have of analyzing drug compounds such ABT-594?

Facts and circumstances Surrounding Dr. Andrews' Retention by Abbott in February 2001

    12.    Where were you employed in the years 2000 and 2001?
    13.    Were you approached by anyone at Abbott during this time period to perform work related to certain drug compounds?
    14.    If so, when?
    15.    And, by whom?
    16.    What did the representatives of Abbott ask you to do?
    17.    What was the scope of your work?
    18.    What was the timeline for this work?
    19.    Were you comfortable with this timeline?
    20.    Why (or why not)?
    21.    What, if anything, did the representatives of Abbott disclose to you regarding their views concerning the viability of ABT-594 at the time you were hired?
    22.    What, if anything, did the representatives of Abbott disclose to you regarding enrollment in the ABT-594 study?
    23.    What, if anything, did the representatives of Abbott disclose to you regarding potential delays in the ABT-594 study?
    24.    Did the representatives of Abbott make mention of John Hancock in connection with the requested work?
    25.    If so, what did they say?

Description of Dr. Andrews' Work for Abbott in March and February of 2001

    26.    Were you provided with materials, documentation or information by anyone at Abbott in connection with this work?
    27.    If so, please describe each of these materials, documents and pieces of information?

28.    Did any of these relate to ABT-594?
29.    If so, please describe the content of such materials, documentation and information.
30.    Please describe your work for Abbott as it related to ABT-594 prior to March 12, 2001.
31.    What conclusions did you draw regarding the viability of ABT-594 prior to March 12, 2001?
32.    Did you convey these conclusions to anyone at Abbott prior to March 12, 2001.
33.    If so, to whom?
34.    And, in what form?
35.    Did you receive a response from anyone at Abbott?
36.    If so, what was the response?
37.    What form did the response take?
38.    Who responded?
39.    What were your impressions of Abbott's assessment of the viability of ABT-594 prior to the March 12, 2001 meeting?
40.    What conclusions did you draw regarding enrollment in the ABT-594 study?
41.    Did you convey these conclusions to anyone at Abbott prior to March 12, 2001.
42.    If so, to whom?
43.    And, in what form?
44.    What were your impressions of Abbott's assessment of enrollment in the ABT-594 study?
45.    What conclusions did you draw regarding potential delays in the ABT-594 study?
46.    Did you convey these conclusions to anyone at Abbott prior to March 12, 2001.
47.    If so, to whom?
48.    And, in what form?
49.    What were your impressions of Abbott's assessment of potential delays in the ABT-594 study?

## Dr. Andrews' Meeting with Abbott on March 12, 2001

50.    Did anyone at Abbott ask you to present your findings regarding ABT-594 on March 12, 2001?
51.    Did you, in fact, present your findings regarding ABT-594 on March 12, 2001?
52.    Regarding your March 12, 2001 meeting with representatives at Abbott, where did it occur?
53.    Who attended?
54.    Please describe any presentations made by representatives of Abbott to you regarding ABT-594 during the March 12, 2001 meeting.
55.    Please describe your presentation(s) to representatives of Abbott regarding ABT-594 during the March 12, 2001 meeting.
56.    Please describe each question asked by a representative of Abbott regarding ABT-594 during the March 12, 2001 meeting.
57.    Please describe your response to each question asked by a representative of Abbott regarding ABT-594 during the March 12, 2001 meeting.

58. What questions did you ask representatives of Abbott regarding ABT-594 during the March 12, 2001 meeting?

59. What were the responses of the Abbott representatives to your questions regarding ABT-594 during the March 12, 2001 meeting?

60. What was your assessment of the viability of ABT-594 during the March 12, 2001 meeting?

61. What were your impressions of Abbott's assessment of the viability of ABT-594 during the March 12, 2001 meeting?

62. Did the Abbott representatives make mention of John Hancock during the March 12, 2001 meeting?

63. If so, what did they say?

64. Did the Abbott representatives make mention of the enrollment of its ABT-594 study?

65. If so, what did they say?

66. Did the Abbott representatives make mention of potential delays in ABT-594 study?

67. If so, what did they say?

## Dr. Andrews Work Related to ABT-594 Following His Meeting with Abbott on March 12, 2001

68. Did you have communications with anyone at Abbott regarding ABT-594 following the March 12, 2001 meeting?

69. If so, please describe those communications.

70. Did you perform any additional work on ABT-594 following the March 12, 2001 meeting?

71. If so, please describe that additional work.

72. What was the timeframe for this additional work?

73. What was the scope of this work?

74. Who did you communicate with at Abbott regarding this work?

75. Were you provided additional documentation by anyone at Abbott?

76. If so, please describe this documentation.

77. Did you present the results of this additional work to anyone at Abbott?

78. If so, when?

79. To whom?

80. And, in what form?

81. Did you reach any conclusions based on this additional work?

82. If so, what were your conclusions?

83. Did you communicate those conclusions to anyone at Abbott?

84. If so, to whom?

85. When?

86. And, in what form?

87. What was your assessment of the future development of ABT-594 at this time?

88. Did Abbott inform you of its decision to terminate ABT-594?

89. If so, when?

90. Did any one at Abbott communicate with you following the termination of ABT-594?

91.     If so, when?
92.     If this communication related to ABT-594, please describe the participant(s) in, and content of, this communication.