# Exhibit A

1

## CURRICULUM VITAE

Name:          Paul Lyn Rodney ANDREWS

Date of birth:   30th March 1953

## QUALIFICATIONS

| | |
|---|---|
| 1974 | University of Sheffield<br>1st Class Honours BSc, Physiology |
| March 1979 | PhD University of Sheffield<br>'The Vagal Control of the Gastro-intestinal Tract' |

## CAREER

| | |
|---|---|
| 1974 | MRC Research Studentship<br>(Supervisor Prof T Scratcherd)<br>Department of Physiology, University of Sheffield |
| Feb 1976 | Temporary Lecturer<br>Department of Physiology, University of Sheffield |
| Jan 1980 | Lecturer<br>Department of Physiology, Medical School, University of Edinburgh |
| Oct 1983 | Lecturer<br>Department of Physiology, St George's Hospital Medical School, London |
| March 1987 | Senior Lecturer<br>Department of Physiology, St George's Hospital Medical School, London |
| October 1991 | Reader in Physiology<br>Department of Physiology, St George's Hospital Medical School, London<br>SW17 0RE<br>Tel:         020 8725 5369<br>Fax:        020 8725 2993<br>E-mail:    pandrews@sghms.ac.uk |

CONFIDENTIAL
ABBT0163932

# Exhibit B

**Paul Andrews, PhD**
**St. George's Hospital Medical School**
**London, UK**

**Meeting Agenda**
**Monday, 12 March 2001**

ABT-594 Discussion

Attendees:  Marleen Verlinden, James Sullivan, Michael Meyer, Kennan Marsh, Walid Awni, Mark Osinski, Bryan Cox, Rick Granneman, Sandeep Dutta, David Morris, James Thomas, Michael Biarnesen, Aldona Matalonis, Bruce McCarthy

| | | |
|---|---|---|
| 8:30 am – 9:45 am | ABT-594 Review:<br>Preclinical Data<br>Clinical Data | Mike Meyer<br>Bruce McCarthy |
| 9:45 am – 10:00 am | Break | |
| 10:00 am – 10:30 am | Paul Andrews' Presentation<br>Mechanisms of ABT-594 Induced Emesis | Paul Andrews |
| 10:30 am – 11:30 am | Discussion:<br>Mechanism<br>Hypothesis Generation<br>Experiments Proposed<br>Next Steps | |
| 11:30 am – 12:30 pm | Lunch | |

Dexmedetomidine Discussion

Attendees:  Marleen Verlinden, James Sullivan, Kennan Marsh, Bryan Cox, Mila Etropolski, Charles McLeskey, Michael Karol, Steven Buckner, Bruce McCarthy

| | | |
|---|---|---|
| 12:30 pm – 1:45 pm | Dexmedetomidine Review:<br>Preclinical Data<br>Clinical Data | Jim Sullivan<br>Mila Etropolski |
| 1:45 pm – 2:00 pm | Break | |
| 2:00 pm – 4:00 pm | Discussion:<br>Separation of Analgesics and CNS Effects | |

Confidential

ABT-594 Questions for Paul Andrews

1.    Describe the known pathways of emesis. Describe the mechanisms by which existing pharmacologies induce emesis or inhibit emesis. What is meant by a "local" vs. "central" mechanism of drug-induced emesis? Are these distinctions important? If so, why? How can the different sites of drug-induced emesis be dissected (either via animal or human experimentation)? What is the effect of a full stomach ("fed" vs. "fasted" state) on the likelihood of emesis on exposure to an emetogenic drug? How does this fed or fasted effect vary by site of drug action (local vs. central)? For drugs that induce emesis via central mechanisms, does a fed stomach alter the gain on emetic sensitivity? For drugs that induce emesis via local mechanisms, is the effect of a fed stomach purely volumetric or mechanical or is there a similar effect on the sensitivity of the system?

2.    Describe the predictive value of the ferret model, including the profiles of known pharmacologies in the model. Describe the predictive value of the various portions of a dose response curve in the ferret model: what is the value of a no-emesis level, an $ED_{50}$, $ED_{90}$, etc, in predicting the emetic liability in humans? In addition, describe the model in terms of predicting efficacy of various classes of anti-emetic drugs against a particular class of pro-emetic drugs. What are your impressions about the model's predictive value given the across species comparison for the efficacy component (emetic liability as judged by ferrets, efficacy in rats)? What other models are available and what are the relative merits?

2.    Hypothesize the mechanism or mechanisms (including molecular target, anatomical sites of action, and molecular and physiological effects) of ABT-594-induced nausea and emesis. Describe animal and human experiments that would prove any hypothesis. Which drug classes might be expected to ameliorate ABT-594-induced emesis? What mechanisms may explain tolerance over time to the emetic effect of ABT-594? Discuss the possible role of the pharmacodynamic effect of ABT-594-induced emesis: what is the meaning of relationship of Tmax, Cmax and rate of rise to emetic effect.

Dexmedetomidine Questions for Paul Andrews

1.    What is the level of separation between dexmedetomidine-associated analgesia and sedation, as suggested by animal models? How might animal models confound the two effects? If confounded, how might the two effects be discriminated? What is the level of separation between dexmedetomidine-associated analgesia and cardiovascular effects, as suggested by animal models?

Confidential                                                          ABBT0556317

1

# CURRICULUM VITAE

Name:           Paul Lyn Rodney ANDREWS

Date of birth:  30th March 1953

## QUALIFICATIONS

1974            University of Sheffield
                1st Class Honours BSc, Physiology

March 1979      PhD University of Sheffield
                'The Vagal Control of the Gastro-intestinal Tract'

## CAREER

1974            MRC Research Studentship
                (Supervisor Prof T Scratcherd)
                Department of Physiology, University of Sheffield

Feb 1976        Temporary Lecturer
                Department of Physiology, University of Sheffield

Jan 1980        Lecturer
                Department of Physiology, Medical School, University of Edinburgh

Oct 1983        Lecturer
                Department of Physiology, St George's Hospital Medical School, London

March 1987      Senior Lecturer
                Department of Physiology, St George's Hospital Medical School, London

October 1991    Reader in Physiology
                Department of Physiology, St George's Hospital Medical School, London
                SW17 0RE
                Tel:      020 8725 5369
                Fax:      020 8725 2993
                E-mail:   pandrews@sghms.ac.uk

Confidential

ABBT0556318

**Visiting scholar**

Department of Pharmacology, University of Sydney - April 1992.

**Awards**

1989 Pfizer Academic Award for "Studies which have furthered our understanding of the nervous control of gut function".

1993 Students Prize for "Best Organised Pre-clinical Course" (Alimentary System). First Year Prize awarded.

1995 Students Prize for "Best Organised Pre-clinical Course" (Alimentary System).

1995 Students Prize for "Best Pre-clinical Teacher".

2000 Students Prize for "Best First Year Course" (Alimentary I).

## GENERAL EXPERIENCE

**Symposia and Workshop Organisation**

Co-organiser (with Professor J G Widdicombe) of a Physiological Society symposium on "The Pathophysiology of Gut and Airways". November 1989.

Organiser of workshop at Brain Research Association meeting: The autonomic nervous system: an outmoded concept? Held in Bristol, March 1990.

Co-organiser (with Dr M A Pilot) of an IUPS Workshop on "Pathophysiology of Serotonergic Systems". Glasgow, August 1993.

Co-organiser (with Dr C J Davis and Dr J Reynolds) of International Symposium on "Serotonin and the control of emesis: a decade of progress?". Oxford, March 1995.

Co-organiser (with Prof J Z Young) of Symposium on "Comparative Physiology of Vomiting" at International Congress of Comparative Physiology and Biochemistry Birmingham, August 1995.

Organising Committee Motion Sickness - Human and medical factors. Spain, May 1997.

Chair of Programme Committee of International Society of Autonomic Neuroscience Symposium London, July 2000.

ABBT0556319

3

**International/National Committees/Working Groups**

Executive Committee of the International Society for Autonomic Neuroscience (1997-2000).

Basic Science Brain Gut Sub-Committee (Chair: Prof M Costa) of the multi-national working team to develop diagnostic criteria for functional gastrointestinal disorders (Rome II).

Corticosteroid Working Group of European Association for Palliative Care.

Cancer Fatigue Forum.

Adviser to Cyclic Vomiting Syndrome Association.

**Physiological Society**

Convenor Gastrointestinal Tract Special Interest Group (from Sept 1997).

**Editorial Board**

Associate Editor, Journal of The Autonomic Nervous System (June 1995 – December 2000).). This position involves running the largest of the five editorial offices around the world. I deal with approximately 60 manuscripts/year.

Member of the Editorial Board of the Journal of Neurogastroenterology and Motility (from 1989).

Current Opinion in Central and Peripheral Nervous System Investigational Drugs.

**Reviewing**

Reviewer for 3 years for Gastric Motility section of Current Opinion in Gastroenterology.

I have reviewed manuscripts for Journal of Physiology, Journal of Neuroscience Methods, Neuropharmacology, Quarterly Journal of Physiology, Journal of Psychosomatic Research, Asia and Pacific Journal of Pharmacology, the British Journal of Pharmacology, the Journal of the Autonomic Nervous System, the European Journal of Pharmacology, Archives Internationales de Pharmacodynamie et de Therapie, International Journal of Obesity, Journal of Pharmacology and Experimental Therapeutics, Comparative and General Endocrinology, Australian Drug Information Service, Cancer Chemotherapy and Pharmacology, Clinical Autonomic Research, Neuroscience Letters, Gut, European Journal of Cancer, American Journal of Physiology, Canadian Journal of Zoology, Journal of the Marine Biological Association.

I have also reviewed grant applications for the Medical Research Council, Wellcome Trust, Cancer Research Campaign and Hong Kong Research Council.

                                                                          ABBT0556320

# Exhibit C

 **Bruce McCarthy**
02/28/2001 02:11 PM

To: pandrews@sghms.ac.uk
cc:
Subject: Re: abbott visit

Will call you tomorrow, but I apogize to have sent our formidable legal language! The meeting planned is as we have discussed: an informal session in which members of our team would present info and we would discuss the issues and propose a way forward. For ABT-594, the scope is the separation of emesis and efficacy. The only "presentation" we would be looking for would be in the form of your consolidated thoughts on the materials forwarded and to the questions sent in advance(which I have failed to forward!! I will do so in the next several days...apologies!!). I had asked our legal and contracts department to throw together an agreement that would address the activities we've discussed and the payment of the fee and I was told this was typical (I agree...we have had other guests with no agreement beyond a confidentiality agreement...our new contract department has been generating more elaborate agreements of late). There is an alternative agreement (a consulting agreement), but I fear that most of the verbage will be similar.
Again, I will contact you tomorrow to discuss and make sure that things go smoothly from your perspective.
Bruce.
pandrews@sghms.ac.uk on 02/28/2001 10:27:39 AM

 pandrews@sghms.ac.uk on 02/28/2001 10:27:39 AM

To:      bruce.mccarthy@abbott.com
cc:
Subject:  Re: abbott visit

Dear Dr MaCarthy,
Thank you for the fax of the agreement for
discussion. I am unable to recall having to sign such an
agreement for a single day of consultancy. The
confidentiality agreement is usually enough.The agreement is
written in such legal jargon that I am really unsure
exactly what I would be signing particularly in section 5.
I have neither the time nor resources to seek a legal
opinion. Section 3 is already breached as my secretary
knows that I am coming to Abbott to consult.

I appreciate that some sort of agreement may be needed in
the US but does it have to be so complex?

With regard to the visit itself I note that you have
included presentation of a seminar. I was under the
impression that we were to have discussions of the
documentation you provided. I was certainly not expecting
to have to present a strategy seminar on the large
volume of material that I will only have completed reading
by the time I arrive. It is also difficut to design a
strategy "in vacuo", without the input from your
researchers. I agreed to visit at short notice and changed
meetings here to do so. As a result I simply do not have
time to prepare such a seminar taking into account my
committments here. I spent last weekend reading the
information on ABT594 and will spend next weekend reading

CONFIDENTIAL
ABBT0163996

the dexmetomidine files. From earlier communications I was
expecting a list of questions for discussion so I can focus
on particular aspects.
 Please let me know how you would like to procede. I am
still committed to coming and looking forward to discussing
the material.
With best wishes,
Yours sincerely,
Paul Andrews

CONFIDENTIAL
ABBT0163997

# Exhibit D


Bruce McCarthy
02/26/2001 10:12 AM

To:     Marleen H Verlinden/LAKE/PPRD/ABBOTT@ABBOTT, James
        Sullivan/LAKE/PPRD/ABBOTT@ABBOTT, Michael D
        Meyer/LAKE/PPRD/ABBOTT@ABBOTT, Kennan C
        Marsh/LAKE/PPRD/ABBOTT@ABBOTT, Walid
        Awni/LAKE/PPRD/ABBOTT@ABBOTT, Mark A
        Osinski/LAKE/PPRD/ABBOTT@ABBOTT, Bryan F
        Cox/LAKE/PPRD/ABBOTT@ABBOTT, Richard G
        Granneman/LAKE/PPRD/ABBOTT@ABBOTT, Sandeep
        Dutta/LAKE/PPRD/ABBOTT@ABBOTT, David D
        Morris/LAKE/PPRD/ABBOTT@ABBOTT, James W
        Thomas/LAKE/PPRD/ABBOTT@ABBOTT, Michael K
        Biarnesen/LAKE/PPRD/ABBOTT@ABBOTT
cc:
Subject:  ABT-594 Guest Speaker and Discussion

### Paul Andrews, PhD
### Department of Physiology
### St. George's Hospital Medical School
### London, UK

On March 12, 2001, Paul Andrews, PhD, will be joining us for a discussion of ABT-594's tolerability issues, especially the emetic liability.

Please attend the discussion from 8:30 a.m. - 11:30 a.m. and join us for lunch from 11:30 a.m. - 12:30 p.m.

A calendar invitation and agenda will be sent to you soon   Dr. Andrews' curriculum vitae is attached (for internal circulation only).

Bruce McCarthy
Marleen Verlinden



CONFIDENTIAL
ABBT0163931

# Exhibit E

Page 1

1              UNITED STATES DISTRICT COURT

2                      FOR THE

3                DISTRICT OF MASSACHUSETTS

4

5      JOHN HANCOCK LIFE INSURANCE

6      COMPANY, JOHN HANCOCK VARIABLE

7      LIFE INSURANCE COMPANY, and

8      MANULIFE INSURANCE COMPANY

9      (f/k/a INVESTORS PARTNER

10     INSURANCE COMPANY),

11             Plaintiffs,

12     vs              Civil Action No. 05-11150-DPW

13     ABBOTT LABORATORIES,

14             Defendant.

15     _____/

16                                    COPY

17

18     DEPONENT:    BRUCE GERALD MCCARTHY, M.D.

19     DATE:        Friday, September 29, 2006

20     TIME:        9:00 a.m.

21     LOCATION:    350 South Main Street, Suite 400

22                  Ann Arbor, Michigan

23     REPORTER:    Angela E. Broccardo, CSR 4679

24

25

Page 6

1                              Ann Arbor, Michigan

2                              Friday, September 29, 2006

3                              9:00 a.m.

4                    *    *    *

5          BRUCE GERALD MCCARTHY, M.D.,

6      having first been duly sworn, was examined and

7      testified as follows:

8                    EXAMINATION

9    BY MR. DAVIS:

10   Q.   Good morning.

11   A.   Good morning.

12   Q.   Dr. McCarthy, my name is Brian Davis.  I'm an

13        attorney representing John Hancock in litigation

14        with Abbott Labs involving the research funding

15        agreement that the parties entered into back in

16        March of 2001.

17             I'm going to ask you a series of

18        questions here today.  If at any point in time

19        you don't understand any of my questions, please

20        just say so, and I'll try to rephrase them and

21        make them clear.  Do you understand that?

22   A.   Yes.

23   Q.   And if you respond to my questions, I'm going to

24        assume that you understood them.  Is that fair?

25   A.   Yes.

Page 218

```
 1   A.   Not that we knew were related to 594.

 2   Q.   You knew there had been tolerability issues

 3        during the course of that trial?

 4             MR. PHILLIPS:  Objection.

 5             THE WITNESS:  Yes.

 6   BY MR. DAVIS:

 7   Q.   And adverse events associated with nausea,

 8        vomiting and dizziness?

 9   A.   Yes.

10   Q.   At that point in time you just didn't have the

11        unblinded data; correct?

12   A.   Correct.

13             (Marked for identification

14             Deposition Exhibit No. 43.)

15   BY MR. DAVIS:

16   Q.   Dr. McCarthy, when did you last see this

17        document?

18   A.   Oh, I don't recall.

19   Q.   If you take a look, there seems to be a

20        calendar, maybe an electronic calendar entry and

21        then an agenda for a meeting scheduled for

22        Monday the 12th of March 2001.  Do you see that?

23   A.   Yes.

24   Q.   Did you see -- have you seen this document?

25   A.   I think I might have seen it yesterday.
```

Page 219

```
 1   Q.   Who was Paul Andrews, Ph.D.?

 2   A.   If I remember, he is a researcher who is an

 3        expert on gastrointestinal disease, in

 4        particular with respect to animal models of

 5        emesis.

 6   Q.   Now, is this a meeting that you scheduled?

 7   A.   I can't remember.  I can't remember if I did or

 8        the discovery folks did.

 9   Q.   It says on the first page that:

10              Paul Andrews, Ph.D. will be

11           joining us for a discussion of

12           ABT-594's tolerability issues,

13           especially the emetic liability.

14              Do you recall this discussion?

15   A.   I do recall the discussion, that it occurred,

16        yes.

17   Q.   Did Abbott invite Dr. Andrews to come to talk

18        about 594?

19   A.   No.

20   Q.   How did it come about that a meeting was

21        scheduled in which Dr. Andrews would speak on

22        ABT-594's tolerability issues?

23   A.   We invited Dr. Andrews to talk about animal

24        models of emesis, and I don't recall if we sent

25        him any information on 594 or what we asked him
```

Page 220

```
 1          to do to comment on 594 at this point.
 2   Q.     Would you look at the agenda on the next page.
 3          It's titled -- underneath the date it says
 4          ABT-594 discussion, and it lists you among the
 5          attendees.  Do you see that?
 6   A.     Yes.
 7   Q.     And the first area, subject area is ABT-594
 8          review, preclinical data and clinical data.  Do
 9          you see that?
10   A.     Yes.
11   Q.     And from 10:00 to 11:00 a.m. was scheduled a
12          presentation from Dr. Andrews regarding the
13          mechanisms of ABT-594 induced emesis?
14   A.     Yes.
15   Q.     Does this refresh your recollection on whether
16          Dr. Andrews was asked to come and comment on
17          mechanisms of ABT-594 induced emesis?
18   A.     It doesn't, because my recollection is that Dr.
19          Andrews talked about mechanisms of emesis in
20          general, and I don't remember -- certainly I
21          remember the meeting.  I remember, as this
22          agenda suggests, that there was a preface
23          component where 594 was discussed, and given Dr.
24          Andrew's focus on preclinical models, it was
25          predominantly Mike Meyer, but I remember just
```

```
 1        dimly that Dr. Andrews predominantly talked

 2        about pathways of emesis in preclinical models

 3        more than anything.

 4   Q.   Would it be fair to say that your interest and

 5        Abbott's interest in speaking to Dr. Andrews at

 6        that point in time was focused on 594?

 7                  MR. PHILLIPS:  Objection.

 8                  THE WITNESS:  No.

 9   BY MR. DAVIS:

10   Q.   So all the references here to ABT-594 discussion

11        and ABT-594 review and mechanisms of ABT-594

12        induced emesis, that doesn't mean that the

13        interest in this meeting was focused on 594?

14   A.   That's correct.

15                  MR. PHILLIPS:  Objection.  The

16        skepticism in your voice and your expression,

17        Counsel, is not particularly appreciated and I

18        think is inappropriate.

19                  MR. DAVIS:  Do not at any point in time

20        correct me with respect to the tone of my voice

21        or skepticism expressed in my questions.  That

22        is not your place, Counselor.  That is not an

23        appropriate objection.  Don't make them.

24                  MR. PHILLIPS:  Don't lecture me, Mr.

25        Davis.  I told you that yesterday, and I'll tell
```

Page 222

1        you that again today.

2                    MR. DAVIS:  Mr. Phillips, that was

3        called for, you got exactly what you deserve;

4        please do not instruct me on how to run my

5        deposition.

6                    MR. PHILLIPS:  Okay.  Don't instruct me

7        as to what objections to make or what comments

8        to make, Mr. Davis.  My comment stands on the

9        record.

10                    MR. DAVIS:  You know that that

11        objection is inappropriate.  Don't make them.

12                    MR. PHILLIPS:  I do not know that.

13    BY MR. DAVIS:

14    Q.    Did this particular meeting have anything to do

15          with 594?

16    A.    I'm sure 594 was discussed.

17    Q.    Was it focused in any way on 594?

18    A.    My recollection is that it was less focused on

19          594 and more focused on preclinical models that

20          could be used to further understand emetic

21          liability with NNRs.

22    Q.    Did you -- at the point in time that this

23          meeting was scheduled, did you have a belief

24          that there was a need to investigate further

25          tolerability issues, particularly emesis issues,

Page 223

1          pertaining to 594?

2    A.    Yes.

3    Q.    Why?

4    A.    Because since 1997 we knew that 594 was

5          associated with nausea, vomiting and dizziness.

6    Q.    Had you seen anything in the preliminary results

7          of the 114 study as of early March 2001 that led

8          you to believe that 594 did not have continued

9          tolerability issues?

10   A.    To my knowledge, there were no preliminary

11         results from 114.  There was only the results --

12         the final results.

13   Q.    Had you seen anything in the adverse event data

14         or the premature termination data from the 114

15         study prior to this meeting that led you to

16         believe that 594 did not continue to suffer from

17         tolerability issues?

18              MR. PHILLIPS:  Objection.

19              THE WITNESS:  No.

20   BY MR. DAVIS:

21   Q.    Did you see anything in that data that you

22         thought tended to confirm or tended to

23         demonstrate more likely than not that 594

24         continued to have tolerability issues?

25              MR. PHILLIPS:  Objection.

```
 1                    THE WITNESS:  No.

 2    BY MR. DAVIS:

 3    Q.   You didn't draw any conclusions one way or the

 4         other from the number of adverse events

 5         involving nausea and vomiting in that trial

 6         before the data was unblinded?

 7    A.   I did not.

 8    Q.   And did the data that you had received regarding

 9         adverse events and premature terminations from

10         the 114 trial prior to March 12, 2001 play any

11         role in Abbott's decision to speak to Dr.

12         Andrews about emetic liability associated with

13         594 or NNRs?

14    A.   Not that I was aware of.

15    Q.   Who specifically made the arrangements for the

16         meeting with Dr. Andrews?

17    A.   I don't know.  I believe Marleen Verlinden knew

18         Paul Andrews, because Marleen's drug development

19         experience had been predominantly in disorders

20         of reflux from her time at Janssen, so she had

21         an extensive network of relationships, and so it

22         was likely -- I believe she knew Dr. Andrews

23         personally and was likely the one who set it up.

24         I don't have a specific recollection that I did.

25    Q.   Did Dr. Andrews actually make a presentation
```

Page 225

```
 1          during the course of this meeting?

 2   A.     Yes.

 3   Q.     Did he use slides?

 4   A.     I believe so.

 5   Q.     Did he give copies of those slides to anyone at

 6          Abbott?

 7   A.     I don't remember.

 8   Q.     Where did this meeting take place?

 9   A.     I have the distinct recollection that it

10          happened in AP34 in a room facing south on maybe

11          the third or fourth floor in a conference room.

12          Oddly, I can almost remember it.

13   Q.     And was the presentation made by Dr. Andrews --

14          was it a PowerPoint presentation?

15   A.     I don't remember.

16   Q.     Were there handouts?

17   A.     I don't remember.

18   Q.     Was the presentation recorded in any way?

19   A.     No.

20   Q.     Did anybody participate in the presentation via

21          telephone or via some other electronic link?

22   A.     Not that I remember.

23   Q.     What do you recall Dr. Andrews had to say in the

24          course of the presentation about mechanisms of

25          ABT-594 induced emesis?
```

Page 226

```
 1                    MR. PHILLIPS:  Objection.

 2                    THE WITNESS:  I don't remember.  I

 3          remember -- the part that I remember is being

 4          moderately lost in his description, which seemed

 5          relatively generic, to pathways of emesis

 6          preclinically, and not particularly helpful or

 7          specific to NNRs.

 8                    (Marked for identification

 9                    Deposition Exhibit No. 44.)

10     BY MR. DAVIS:

11     Q.   Dr. McCarthy, you have what's been marked as

12          Exhibit 44.  I'd ask you to look at the document

13          and tell me if you've seen it before.

14     A.   Not this one, to my recollection.

15     Q.   It appears to be an e-mail from Ms. Kowaluk to

16          you, among others, dated March 27th, 2001

17          concerning the ABT-594 pain DSG core team.  The

18          fourth paragraph down of the e-mail says:

19                         We will be taking a brief

20                    hiatus from the DSG analysis for

21                    about a month while some members of

22                    the team participate in pulling

23                    together a review for the R&D

24                    strategy off-site called by Jeff

25                    Leiden for the first week of May.
```

# Exhibit F

Page 1

1                UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MASSACHUSETTS

3

4    JOHN HANCOCK LIFE INSURANCE          )

5    COMPANY, JOHN HANCOCK VARIABLE       )

6    LIFE INSURANCE COMPANY and           )

7    MANULIFE INSURANCE COMPANY           )

8    (f/k/a INVESTORS PARTNER             )

9    INSURANCE COMPANY),                  )

10               Plaintiffs,              )   Civil Action No.

11        -vs-                            )   05-11150-DPW

12   ABBOTT LABORATORIES,                 )

13               Defendant.               )

14                                        **ORIGINAL**

15

16         THE VIDEOTAPED DEPOSITION OF

17

18             MICHAEL DAVID MEYER

19

20             January 23, 2007

21

22

23

24

Page 4

1      THE VIDEOGRAPHER:  Good morning.  We are going

2  on the video record at 9:07 a.m.

3          My name is Joe Elsey.  I am a legal

4  videographer with Esquire Deposition Services.  Our

5  address is 155 North Wacker Drive, Chicago,

6  Illinois.  The Court Reporter today is Corey Marut

7  of Esquire Deposition Services.

8          Here begins the videotaped deposition of

9  Michael Meyer, taking place in Chicago, Illinois.

10          Today's date is January 23, 2007.

11          This deposition is being taken in the

12  matter of John Hancock Life Insurance Company,

13  et al., vs. Abbott Laboratories.

14          Will counsel please state their names

15  for the record.

16      MR. DAVIS:  I'm Brian Davis from Choate Hall &

17  Stewart in Boston, representing John Hancock and

18  the other Plaintiffs.

19      MS. GÜZELSU:  Özge Güzelsu from Munger,

20  Tolles & Olson in Los Angeles representing Abbott

21  Laboratories.

22      THE VIDEOGRAPHER:  Will the reporter now swear

23  in the witness, please.

24

Page 5

```
 1                    (WHEREUPON, the witness was duly

 2                    sworn.)

 3                    MICHAEL DAVID MEYER,

 4    called as a witness herein, having been first duly

 5    sworn, was examined and testified as follows:

 6                         EXAMINATION

 7    BY MR. DAVIS:

 8         Q.    Good morning, Dr. Meyer.

 9         A.    Good morning.

10         Q.    And my name is Brian Davis.  I'm going

11    to be asking you a series of questions here today.

12    If at any point in time you don't understand any of

13    my question, please just say so and I will try to

14    give you a clear question.  Is that fair?

15         A.    Okay.

16         Q.    In addition, as we go through the

17    deposition, you will need to verbalize your

18    responses.  The Court Reporter cannot record head

19    shakes or the like.  Do you understand that?

20         A.    Yes.

21         Q.    And if at any point in time you'd like

22    to take a break, please me know and I'll try to

23    accommodate you as soon as I can after that.  This

24    is not intended to be a torture test.  Do you
```

Page 183

1      Q.    Was it one of the key issues of concern

2    that's referenced in Ms. Kowaluk's e-mail dated

3    3/8/01?

4      MS. GÜZELSU:   Objection.

5    BY THE WITNESS:

6      A.    I believe it was.

7      MR. DAVIS:   Mark this as the next exhibit,

8    please.

9                     (WHEREUPON, a certain document was

10                    marked Meyer Deposition Exhibit

11                    No. 19, for identification, as of

12                    01-23-2007.)

13   BY MR. DAVIS:

14     Q.    Dr. Meyer, you have what's been marked

15   as Exhibit 19 at your deposition.  Ask you to take

16   a look at this document for a moment and tell me if

17   you've seen it before.

18     A.    I believe I have.

19     Q.    This is a notice of a meeting or a

20   presentation to be made by Dr. Paul Andrews from

21   the department of physiology at St. George's

22   Hospital Medical School in London to various people

23   at Abbott on March 12, 2001, is that right?

24     A.    Yes.

1      Q.    Did you actually attend this meeting and

2    presentation?

3      A.    Yes, I did.

4      Q.    Did you meet Dr. Andrews?

5      A.    Yes.

6      Q.    Did this meeting with Dr. Andrews relate

7    in any way to the work of the ABT-594 pain DSG core

8    team?

9      A.    I don't think there was any direct

10   relationship one to the other.

11     Q.    Did you expect that the information

12   obtained in the course of this meeting with

13   Dr. Andrews would be utilized by the ABT-594 pain

14   DSG core team in doing its work?

15     MS. GÜZELSU:  Objection.

16   BY THE WITNESS:

17     A.    As I recall, Dr. Andrews was brought in

18   as an expert in mechanisms of nausea and emesis to

19   provide information to the team that we hoped would

20   be helpful in helping us understand nausea and

21   emesis as it associates to nicotinics.

22   BY MR. DAVIS:

23     Q.    Including ABT-594?

24     A.    Including ABT-594.

Page 185

1      Q.    Was any information or data provided to

2  Dr. Andrews before this meeting for him to review

3  in preparation for the meeting?

4      MS. GÜZELSU:  Objection.

5  BY THE WITNESS:

6      A.    Not that I know of.

7  BY MR. DAVIS:

8      Q.    You don't recall participating in any

9  effort to collect data to provide to Dr. Andrews in

10  advance of the meeting?

11      MS. GÜZELSU:  Objection.

12  BY THE WITNESS:

13      A.    Not in advance of the meeting.

14  BY MR. DAVIS:

15      Q.    When you met Dr. Andrews at this meeting

16  had he reviewed, to your knowledge, any information

17  about ABT-594 before the meeting took place?

18      MS. GÜZELSU:  Objection.

19  BY THE WITNESS:

20      A.    I don't know whether he had.  To the

21  best of my knowledge, we presented at the meeting

22  data to him regarding ABT-594.

23  BY MR. DAVIS:

24      Q.    Had you met Dr. Andrews prior to this

Page 186

1    meeting back in March of 2001?

2        A.    No, I don't think so.

3        Q.    Have you met him since?

4        A.    No.

5        Q.    The second page of Exhibit 19 has a

6    meeting agenda for that March 12th meeting.  Do you

7    see that?

8        A.    Yes.

9        Q.    The meeting occurred at Abbott's

10   offices, correct?

11       A.    Yes.

12       Q.    Here in the United States, correct?

13       A.    Yes.

14       Q.    The agenda indicates that it started at

15   8:30 a.m. between 8:30 a.m. and 9:45 a.m. with an

16   ABT-594 review including preclinical data and

17   clinical data.  Do you see that?

18       A.    Yes.

19       Q.    You made a presentation regarding the

20   preclinical data, is that right?

21       A.    Yes.

22       Q.    And Dr. McCarthy made the presentation

23   regarding the clinical data on 594, is that right?

24       A.    Yes.

Page 187

1        Q.      Did Dr. McCarthy's presentation

2    regarding ABT-594 clinical data include any

3    information or preliminary information obtained

4    from the 114 trial?

5        MS. GÜZELSU:   Objection.

6    BY THE WITNESS:

7        A.      I don't remember.

8    BY MR. DAVIS:

9        Q.      Do you recall whether the presentation

10   that Dr. McCarthy made to Dr. Andrews and others at

11   this March 12 meeting included PowerPoint slides?

12       A.      I think it did.

13       Q.      Did you retain a set of those slides?

14       A.      I may have the slides that I presented.

15   I'm pretty certain that I don't have any slides

16   from Dr. McCarthy.

17       Q.      Did you work on a joint presentation?

18       A.      No, I believe they were separate.

19       Q.      Do you recall whether there was any

20   discussion in the course of this meeting with

21   Dr. Andrews and others concerning the preliminary

22   results on the 114 trial?

23       A.      I don't recall.

24       MR. DAVIS:  Let's mark this as the next

Page 188

1    exhibit, please.

2                        (WHEREUPON, a certain document was

3                        marked Meyer Deposition Exhibit

4                        No. 20, for identification, as of

5                        01-23-2007.)

6    BY MR. DAVIS:

7         Q.    Dr. Meyer, you have what's been marked

8    as Exhibit 20 at your deposition.  Ask you to look

9    at this document for a moment and tell me if you

10   have seen it before.

11        A.    Yes, I have seen this before.

12        Q.    When did you first see this document?

13        A.    I can't remember whether I may have seen

14   it a day or two before this 23rd meeting or whether

15   this was the first time I saw it on the 23rd.

16        Q.    Do you recall learning at some point in

17   time that the results of the 114 study had been

18   unblinded?

19        A.    I -- yes.

20        Q.    How did you learn that the results had

21   been unblinded?

22        A.    I don't recall.  I think my boss

23   probably told me.

24        Q.    And how does it work within Abbott?  Do

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

---

| | | |
|---|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER LIFE INSURANCE COMPANY), | ) ) ) ) ) ) ) | |
| | ) | CIVIL ACTION NO. 05-11150-DPW |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| ABBOTT LABORATORIES, | ) ) | |
| Defendant. | ) ) ) | |

---

### AFFIDAVIT OF RICHARD C. ABATI

I, Richard C. Abati, on oath, depose and say as follows:

1.    I am an attorney with Choate, Hall & Stewart LLP ("Choate"), counsel for Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and ManuLife Insurance Company (f/k/a "Investors Partner Life Insurance Company") (collectively, "John Hancock").

2.    I am duly admitted to practice law in Massachusetts.

3.    I, along with other attorneys at Choate, represent John Hancock in the above-captioned matter.  The following statements are made with my personal knowledge and if sworn as a witness I could and would testify competently thereto.

4.    Attached as Exhibit A hereto is a true and accurate copy of a document produced by Abbott, and bearing Bates number ABBT163932.

5.    Attached as Exhibit B hereto is a true and accurate copy of a document produced by Abbott, and bearing Bates number ABBT556316-20.

6.    Attached as Exhibit C hereto is a true and accurate copy of a document produced by Abbott, and bearing Bates number ABBT163996-97.

7.    Attached as Exhibit D hereto is a true and accurate copy of a document produced by Abbott, and bearing Bates number ABBT163931.

8.    Attached as Exhibit E hereto is a true and accurate copy of excerpts from the Deposition Transcript of Dr. Bruce McCarthy at 1,6, 218-226.

9.    Attached as Exhibit F hereto is a true and accurate copy of excerpts from the Deposition Transcript of Michael Meyer at 1,4, 183-188.

Signed under the pains and penalties of perjury this 2nd day of March, 2007, in Boston, Massachusetts.

_/s/ Richard C. Abati_
Richard C. Abati

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document and attached exhibits were served by electronic and overnight mail upon Peter E. Gelhaar, Esq., Donnelly, Conroy & Gelhaar, LLP, One Beacon Street, 33rd Floor, Boston, MA 02108, and Gregory D. Phillips, Esq., Munger, Tolles & Olson LLP, 355 South Grand Avenue, Los Angeles, CA 90071, on this 2nd day of March, 2007.

*/s/ Richard C. Abati*
Richard C. Abati

4180445v1

## <u>LOCAL RULE 7.1 CERTIFICATION</u>

    I, Karen Collari Troake, hereby certify that attorneys for John Hancock have conferred with opposing counsel before filing this Motion in an effort to resolve or narrow the issues presented.


                        */s/ Karen C. Troake*
                        Karen Collari Troake