# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY), | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| ABBOTT LABORATORIES, | ) ) |
| Defendant. | ) ) |

Civil Action No. 05-11150-DPW
Hon. Judge Douglas P. Woodlock

PUBLIC REDACTED VERSION

## ABBOTT'S REPLY IN SUPPORT OF MOTION TO STRIKE THE PRAYER FOR RESCISSION IN HANCOCK'S FIRST AMENDED SUPPLEMENTAL COMPLAINT

Defendant Abbott Laboratories ("Abbott") respectfully submits this reply memorandum in Support of its Motion to Strike the Prayer for Rescission in the First Amended Supplemental Complaint filed by Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and Manulife Insurance Company (f/k/a Investors Partner Life Insurance) (collectively, "Hancock").

## I.    INTRODUCTION

Hancock's request for rescission comes five and a half years into the Agreement, and more than two and a half years after it admittedly had notice of Abbott's alleged

misrepresentations. Rather than promptly seek to rescind the Agreement, Hancock requested and obtained a declaratory judgment from this Court in *Hancock I* enforcing the Agreement and affirming that it "remains in full force and effect." Hancock also continued to demand and accept performance of the Agreement by Abbott. Now, after having concluded that "the [expected] royalties [from the Agreement] are not looking very good," Hancock belatedly seeks to void the Agreement and get its money back. As a matter of law, based on the facts admitted by Hancock in the pleadings, Hancock is barred from seeking rescission based on the doctrines of waiver and judicial estoppel.

In response to this motion, Hancock alleges that Abbott waived its right to challenge Hancock's prayer for rescission by withdrawing its opposition to Hancock's motion for leave to amend its complaint. The stipulation, however, was limited to the issue of whether Hancock could file an amended complaint. Abbott *expressly* reserved its right to otherwise contest Hancock's right to rescission. Hancock also argues that issues of fact preclude dismissal of its rescission claim on the pleadings. But even assuming for the purposes of this motion that all the facts alleged by Hancock are true (which they are not), Hancock is barred as a matter of law from seeking rescission.

## II.    ABBOTT DID NOT WAIVE ITS RIGHT TO SEEK DISMISSAL OF THE RESCISSION CLAIM, IT MERELY ASSENTED TO HANCOCK'S FILING OF AN AMENDED COMPLAINT

After the December 2006 hearing, Abbott stipulated to withdrawal of its opposition to Hancock's motion for leave to amend while reserving its right to attack the amended complaint in subsequent substantive motions. Hancock's position that Abbott waived its right to seek dismissal of Hancock's claim for rescission is in direct contradiction to the parties' stipulation

1247121.1

which expressly provides that Abbott "otherwise reserves the right to contest any and all claims asserted in John Hancock's Amended Supplemental Complaint." *See* December 21, 2006 Stipulation (Docket Entry 102), § 3. The intent of the stipulation was to resolve pending and anticipated discovery and procedural motions ("detritus motions"), not substantive motions. Abbott's current motion is a substantive motion that seeks to narrow the issues in the case by disposing of a claim for relief that is unavailable as a matter of law.

## III.    BASED UPON THE FACTS ALLEGED BY HANCOCK, HANCOCK'S PRAYER FOR RESCISSION IS BARRED AS A MATTER OF LAW

Hancock's prayer for rescission is subject to a motion to strike under Rule 12(f) because the pleadings disclose that the remedy is unavailable as a matter of law. *See Bureerong v. Uvawas*, 922 F.Supp. 1450, 1479 n.34 (C.D. Cal. 1996) ("a motion to strike may be used to strike any part of the prayer for relief when the damages sought are not recoverable as a matter of law"). *See also* Mot. at 6. Even if Hancock's allegations are assumed for the purposes of this motion to be true, Hancock has waived its right to rescission. There are no substantial questions of law that justify deferral of this issue, since the doctrines of waiver and judicial estoppel clearly bar Hancock's claim. Furthermore, Abbott is prejudiced by the inclusion of Hancock's rescission claim in this case since it would require commitment of time and resources litigating a claim that is unavailable as a matter of law. *Cf. Narragansett Tribe of Indians v. So. Rhode Island Land Dev. Corp.*, 418 F. Supp. 798, 801 (D.R.I. 1976) (Rule 12(f) motions "may be extremely valuable to all concerned 'in order to avoid the needless expenditures of time and money' in litigating issues which can be foreseen to have no bearing on the outcome."); *State of California v. United States*, 512 F. Supp. 36, 38 (N.D. Cal. 1981) ("where the motion may have

- 3 -

the effect of making the trial of the action less complicated, or have the effect of otherwise

streamlining the ultimate resolution of the action, the motion to strike will be well taken").

**A.    Abbott's Motion is Not Rendered Moot by Rule 54(c), Since That Rule Only Allows the Court to Grant Relief "To Which The Party . . . Is Entitled," and Hancock Is Not "Entitled" to Rescission as a Matter of Law**

Hancock argues that Abbott's motion is "effectively moot" because Rule 54(c) provides

that "every final judgment shall grant the relief to which the party . . . is entitled, even if the party

has not demanded such relief in the party's pleadings." Opp. at 15. Hancock overlooks a key

condition of Rule 54(c) – the Court may only award relief "*to which the party . . . is entitled*"

(emphasis added). As explained below, Hancock is not "entitled" to rescission because it is

barred from such relief under the doctrines of waiver and judicial estoppel. The *In re Blinds* case

cited by Hancock is inapposite because it merely held that, based on the evidence presented in

that particular action, rescission was "appropriate" and therefore the court was authorized to

grant such relief. *See In re Blinds to Go Share Purchase Litig.*, 443 F.3d 1, 8 (1st Cir. 2006). By

contrast, rescission is not "appropriate" in this case since Hancock is barred from such relief as a

matter of law.

**B.    There Are No Questions of Fact That Would Allow Hancock to Proceed on Its Claim for Rescission**

Hancock incorrectly argues that the issue of whether it waived its right to rescission

presents an issue of fact that cannot be resolved on the pleadings. Opp. at 16. *Trimec*, cited by

Hancock, does not hold that waiver of rescission can never be decided on the pleadings. In

*Trimec*, the court merely denied a motion to dismiss a rescission claim because the plaintiff's

allegation that the delay was attributable to settlement negotiations created an issue of fact that

precluded a decision on the pleadings. *Trimac v. Zale Corp.*, 1991 WL 208896, at *4 (N.D. Ill.

1247121.1

Oct 10, 1991).  By contrast, Hancock does not allege that its delay in seeking rescission was due to settlement negotiations.  Nor does Hancock allege any other facts that are legally sufficient to excuse its delay.

> **1.    Hancock Is Judicially Estopped from Seeking Rescission Because It Sought and Obtained a Final Declaratory Judgment in *Hancock I* Enforcing the Agreement and Affirming That It "Remains In Full Force and Effect"**

Hancock's actions before this Court and the First Circuit in *Hancock I* provide the clearest reason why Hancock is barred from seeking rescission.  After notice of the alleged fraud, Hancock not only obtained judgment enforcing the Agreement, it expressly requested and obtained a declaration that the Agreement "remains in full force and effect."  Mot. at 13.  Just last year, Hancock asked the First Circuit to affirm that judgment "in its entirety" and its request was granted on September 28, 2006.  *Id.*  By electing to obtain final judgment enforcing and affirming the continued validity of the Agreement, Hancock waived its right to seek the inconsistent remedy of rescission.  *Wollenberger v. Hoover*, 179 N.E. 42, 55-57 (Ill. 1931); *City of Chicago v. Michigan Beach Housing Coop.*, 297 Ill. App. 3d 317, 320 (1998); *Anderson v. Chicago Trust & Sav. Bank*, 195 Ill. 341 (1902); *Kel-Keef Enter., Inc. v. Quality Components Corp.*, 738 N.E. 2d 524, 531-32 (Ill. Ct. App. 2000) ("It is clear that the prosecution of one remedial right to judgment or decree constitutes an election barring subsequent prosecution of inconsistent remedial rights.").

Hancock also is barred by the doctrine of judicial estoppel.  Judicial estoppel is a "discrete doctrine" and is distinct from *res judicata*.  *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001).  The judicial estoppel doctrine "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."  *Id.* at

1247121.1

749 (quoting 18 Moore's Federal Practice § 134.30 at 134-62 (3rd ed. 2000)).  *See also*

*Alternative System Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004) ("judicial

estoppel applies when a party has adopted one position, secured a favorable decision, and then

taken a contradictory position in search of legal advantage") (internal quotations omitted).  The

purpose of the doctrine is "to protect the integrity of the judicial process by prohibiting parties

from deliberately changing positions according to the exigencies of the moment." *New

Hampshire*, 532 U.S. at 749-50 (internal quotations and citations omitted).  Hancock took the

position in *Hancock I* that the Agreement was valid and binding, even after it admittedly had

knowledge of the alleged fraud.  It prevailed on that theory, obtaining a final declaratory

judgment relieving it of $100 million in Program Payments (based on enforcement of Section

3.3(b) of the Agreement) and a declaration that the Agreement "remains in full force and

effect."[1]  Hancock also succeeded in obtaining the First Circuit's affirmation of that judgment in

September 2006, once again, long after it had notice of the alleged fraud.  Only then, after

securing the benefits of its original position that the Agreement was valid and binding, did

Hancock change course and file an amended complaint asserting the inconsistent position that

the Agreement should be rescinded.  The judicial estoppel doctrine prohibits Hancock from

"playing fast and loose with the courts" in this manner.  *Id*. (internal quotations omitted).

In an attempt to evade this dispositive argument, Hancock resorts to attacking a straw

man.  It mischaracterizes Abbott's position as an argument for application of the *res judicata*

doctrine.  Opp. At 18.  Abbott's motion has nothing to do with *res judicata*.  Abbott does not

---

[1] Even now, despite amending its complaint to add a claim for rescission, Hancock continues to allege
that the Agreement "constitutes a valid and binding contract between the parties."  RJN, Ex. 1, ¶ 48.

contend that Hancock is barred by *res judicata* from pursuing fraud claims in this follow-on action based on its failure to assert the claims in *Hancock I*.  Rather, Abbott's motion is based on the doctrines of waiver and judicial estoppel.

> **2.    Based on the Facts In the Complaint, Hancock Delayed At Least Two and a Half Years After Notice of the Alleged Fraud Before Seeking Rescission**

Hancock attempts to conjure up a factual dispute regarding the timing of its assertion of the right to rescission.  Opp. at 16-17.  But Hancock does not (and cannot) contest the dispositive facts admitted in its complaint.  Hancock does not dispute that it was on notice of the alleged fraud *at least as early* as April 12, 2004.  By that date, Hancock admits it had become aware of alleged "misrepresentations by Abbott in the negotiation and execution of the Agreement" and initiated an audit for the purpose of "confirming or refuting" these "suspected violations." Request for Judicial Notice, filed Jan. 12, 2007 ("RJN"), Ex. 1 (First Am. Cmplt.), ¶¶ 20-21.[2] Hancock also does not dispute that it remained aware of the alleged fraud in April 2005, when it provided formal notice of its allegations to Abbott, *id.*, ¶ 40.  Nor does Hancock deny it was aware of the alleged misrepresentations in June 2005, when it filed its original complaint alleging that "Abbott materially misrepresented the development status of the Program Compounds . . . for the purpose of fraudulently inducing John Hancock to enter into the Agreement" and that Hancock "justifiably relied upon Abbott's misrepresentations to its detriment by, among other things, entering into the Agreement[.]"  *Id.*, Ex. 5, ¶¶ 24, 26. Hancock also cannot dispute that it did not seek to add a prayer for rescission to its complaint

---

[2] In fact, Hancock had notice of the alleged misrepresentations much earlier than April 2004.  In November 2003 – three years before seeking rescission – Hancock raised accusations of

until the fall of 2006.  Thus, based solely on the facts admitted in the pleadings, Hancock waited *at least two and a half years* after notice of the purported fraud before seeking to file a complaint with a prayer for rescission.

In an attempt to minimize this delay, Hancock argues that its original June 2005 complaint implicitly "put Abbott on notice that John Hancock believed that the Agreement, as a whole, may have been fraudulently induced and *potentially* was subject to rescission."  Opp. at 16 (emphasis added).  Hancock points to its allegation in the original complaint that if it "had known the true development status" of ABT-518 and ABT-594 it "would have demanded different terms . . . or *may not* have entered into the Agreement at all."  *Id.* (emphasis added). This allegation, however, merely asserts reliance on the purported misrepresentation – an element of fraud Hancock was required to plead in order to state a claim.[3]  Hancock did not allege that the agreement was voidable or that it intended to seek rescission as a remedy for the alleged fraud.  To the contrary, Hancock alleged that "the Agreement constitutes a valid and binding contract" and it requested only compensatory damages, interest, costs, punitive damages, and indemnification.  RJN, Ex. 5, ¶ 43 and p. 19.  Indeed, Hancock effectively concedes that the original complaint did not affirmatively request rescission – it merely argues that the complaint provided notice that the Agreement "*potentially* was subject to rescission."  Opp. at 16.[4]

---

misrepresentation in a letter to Abbott.  On this motion to strike, however, Abbott does not rely on this fact since it is outside of the pleadings.

[3] It is also noteworthy that Hancock merely alleged that it "*may not* have entered into the Agreement at all", in contrast to its assertion that it "*would have* demanded different terms."  *Id.* (emphasis added).

[4] Even if the allegation of reliance in the original June 2005 complaint were somehow considered an assertion of the right to rescission, that complaint was not filed until *at least* one year after Hancock had notice of the alleged fraud and after the parties had performed under the Agreement for four years.  This delay alone would bar Hancock from seeking rescission.  *See* Mot. at 7-9 (citing cases).

- 8 -

The allegations in Hancock's original complaint are insufficient to avoid waiver of the right to rescission. To avoid waiver, a party must promptly "*announce his purpose* and adhere to it." *Kanter v. Ksander*, 344 Ill. 415 (1931) (emphasis added). Similarly, it is immaterial that Hancock purported to "reserve[] the right" to seek rescission in its February 2006 interrogatory responses. Opp. at 17. A party seeking rescission must do more than merely threaten or "reserve[] the right" to seek rescission at some later date. *See Booker v. Myler*, 2006 WL 1302521, *5 ("where a party desires to rescind for fraud he must, upon discovery of the facts, at once *commence proceedings* for relief as soon as reasonably possible.") (*quoting Mrotzek*, 158 Ill. App. 3d 15, 16-17 (1987)) (emphasis added); *Swartz v. Schaub*, 826 F. Supp. 274, 278 (1993) (rescission claim was barred where the plaintiff's lawyer first warned that plaintiff might sue for damages and/or rescission two months after learning of the alleged fraud, but did not file a claim for rescission until seven months later).[5]

### 3. After Notice of the Alleged Fraud, Hancock Continued to Demand and Accept Performance By Abbott Under the Agreement, Rather Than Seeking Rescission

Hancock did not merely delay seeking rescission and obtain enforcement and affirmation of the Agreement in the courts, it also continued to demand and accept performance by Abbott pursuant to the Agreement. *See* Mot. at 11-12. Hancock's "election to proceed with

---

[5] Hancock incorrectly states that it served its interrogatory responses in February 2006 and "*simultaneously* informed Abbott that it intended to introduce expert testimony on the topic of rescission" and that "Abbott then waited more than six months, until October 2006," to object. Opp. at 17 (emphasis added). By Hancock's own admission, it did not provide its expert disclosure until August 2006 – hardly "simultaneous[]" with its February 2006 interrogatory responses. Opp. at 17 (citing Blasberg Aff., Ex. 19). Shortly thereafter, in September 2006, Hancock informed Abbott for the first time of its "intention to ask the District Court . . . to rescind" the Agreement and its plans to seek leave to amend its complaint. Declaration of Eric J. Lorenzini ("Lorenzini Decl."), Ex. A. Abbott promptly objected to Hancock's belated request for rescission. *Id.*, Ex. B.

performance on the contract is inconsistent with the remedy of rescission." *Zeidler v. A & W Restaurants, Inc.*, 2001 WL 62571, at *7 (N.D. Ill.). *See also Brown v. Brown*, 142 Ill. 409, 430 (1892).

*Kel-Keef Enter., Inc. v. Quality Components Corp.*, 738 N.E. 2d 524, 531-32 (Ill. Ct. App. 2000), cited by Hancock, is inapposite. *Kel-Keef* held that there was no waiver of the right to rescission where a party had initiated but not yet obtained final judgment on an action for enforcement of the contract, and the other party had not changed its position in reliance on the suit at law. *Id.* at 1010-11. Here, Hancock obtained final judgment enforcing the Agreement and affirming that it "remains in full force and effect." Also, Abbott relied on Hancock's affirmation of the Agreement by continuing to perform its obligations. Having obtained these benefits, Hancock is barred from now seeking the inconsistent remedy of rescission. *Id.* at 1008.

In its opening brief, Abbott cited Hancock's exercise of its contractual audit rights as one example of Hancock's continued affirmation of the Agreement after notice of the alleged misrepresentations. Hancock contends that it is "illogical" to conclude that Hancock waived its rescission right merely by availing itself of its audit rights to investigate the alleged misrepresentations. Opp. at 18. Hancock's argument is flawed in at least two respects. First, Hancock's exercise of its audit rights is only one example of Hancock's affirmation of the Agreement. It is undisputed that Hancock demanded that Abbott continue to perform all of its contractual obligations, including its obligation to make commercially reasonable efforts to develop the Program Compounds and to spend specified amounts on development of the Program Compounds. Mot. at 11-12 (citing First Am. Supp. Cmplt., ¶¶ 17-18, 33-34); Opp. at 17-18. Second, there is nothing "illogical" about barring Hancock from seeking rescission

- 10 -

where, after notice of the alleged fraud, it elected to enforce its rights under the Agreement (including, but not limited to its audit rights) rather than seeking rescission. By choosing to avail itself of the benefits of the Agreement, Hancock waived its right to later disavow the Agreement and limited itself to monetary damages for any breaches or misrepresentations. *Zeidler*, 2001 WL 62571, *7. Hancock was "duty bound to make [its] election at once, or at least before requiring further performance by the other party. [It] was not at liberty to insist upon the validity of the contract until fully performed and then shift [its] position and rescind." *Brown*, 142 Ill. at 430.

        **4.**      **Hancock's Misleading Allegations of Misrepresentation Are Irrelevant to this Motion; Even if the Facts Alleged by Hancock Were True (Which They Are Not), Hancock Is Barred from Rescission Based on Waiver and Judicial Estoppel**

In its opposition, Hancock includes an irrelevant, and misleading, recitation of evidence it argues supports its fraud claim. Opp. at 3-8. Hancock cites the general rule that rescission is a potential remedy for material breach and fraud and contends its "summary of evidence . . . establishes that there is more than a colorable factual basis for John Hancock's request to rescission the Agreement." Opp. at 19. Hancock apparently misconstrues the nature of this motion. This motion is based on the doctrines of waiver and estoppel. For the purposes of this motion only, Hancock's factual allegations are assumed to be true; even with that assumption, Hancock's claim for rescission is barred as a matter of law based on waiver and judicial estoppel. Abbott will defer a complete response to Hancock's misleading recitation of the "facts" regarding the substance of its misrepresentation claims until such time as it is relevant. By way of background, however, Abbott provides the following summary response to Hancock's factual allegations:

1247121.1

ABT-518 – In both its internal documents and its statements to Hancock, Abbott expressed its belief that ABT-518, a matrix metalloproteinase inhibitor ("MMPI") compound, was a "compelling development candidate with the potential to demonstrate antitumor effects superior to [similar compounds] currently undergoing clinical trial." *Compare* Blasberg Aff., Ex. 1 at JH 008194 *with* Lorenzini Decl., Ex. C at 4 (internal Abbott report). In March 2001, Abbott initiated a Phase I clinical trial of ABT-518 in the Netherlands. Lorenzini Decl., Ex. D. In a budget prioritization decision, Abbott executive Dr. Jeffrey Leiden placed a temporary hold on this trial. But the hold was promptly lifted at the urging of other Abbott executives, who noted that ABT-518 could have a competitive advantage over other MMPI compounds and that additional funds for development of ABT-518 would soon be available from the Hancock investment. Blasberg Aff., Ex. 6, Ex. 8 at ABBT 0033094. Thus, when the Agreement was executed on March 13, 2001 the Phase I clinical trial of ABT-518 was in progress, with one patient already dosed. Blasberg Aff., Ex. 8 at ABBT 0033094. Hancock contends that toxicology and other aspects of ABT-518 development "remained" on hold as of March 13, 2001, but its own exhibits indicate that these development activities were ongoing. *See* Blasberg Aff., Ex. 5 at ABBT0045322 (3/16/01 status report noting that Abbott is "still on target" to complete toxicology report on 6-week rat study by June 2001 and report on 3-month rat study by September 2001); *id.* at ABBT0052926 (4/12/01 meeting minutes noting "ongoing metabolism work" and plans to conduct a toxicology study of very long-chain fatty acids).[6] Only after the

---

[6] In support of its contention that toxicology and other tangential development activities were on hold when the Agreement was executed in March 2001, and "remained" on hold, Hancock cites documents dated May and June 2001. Blasberg Aff., Ex. 5, ABBT0155970 (May 28, 2001 email), ABBT0157798 (June 6, 2001 email); Ex. 8, ABBT0055426 (May 2, 2001 email). But those documents do not provide any indication that a hold existed on these activities from March 2001, as opposed to being put in place

- 12 -

release of negative information regarding the class of MMPI compounds at the May 2001

American Society of Clinical Oncologists ("ASCO") conference did Abbott decide to terminate

development of ABT-518. Lorenzini Decl., Ex. E. While termination was disappointing to both

Hancock and Abbott, it could not have come as a surprise to Hancock – Hancock understood that

the odds of any Phase I compound reaching the market were very low and it had estimated that

ABT-518's probability of success was only 10%. Lorenzini Decl., Ex. F at 13.

ABT-594 – Abbott's disclosures to Hancock regarding the prospects of ABT-594 (an

analgesic) were entirely consistent with its internal assessments of the compound. *Compare*

Blasberg Aff., Ex. 1, JH 008171 (ABT-594 is "expected to be the first neuronal nicotinic

receptor agonist to receive an indication for pain") *with* Lorenzini Decl., Ex. G (internal Abbott

document). For example, Abbott fully disclosed the potential problem with nausea and vomiting

side effects. *See, e.g.*, Blasberg Aff., Ex. 1 at JH 008171-72 (Compound Report provided to

Hancock, stating that "common adverse events" included nausea and vomiting and there is only

a "Low" probability of achieving "Low nausea/vomiting" rates). In April 2000, Abbott began a

double-blinded Phase IIb clinical trial, M99-144, in which patients were randomly sorted into

groups that received either a placebo, or escalating doses of ABT-594 up to a maximum of 150,

225 or 300 mcg. Lorenzini Decl., Ex. H. Hancock argues that, while the study was ongoing and

still blinded, Abbott should have disclosed information regarding premature terminations of

patients in the study due to nausea, dizziness and vomiting. Opp. at 6-7. But until the data was

unblinded, this information was immaterial because it was impossible to determine whether

---

after execution of the Agreement as a result of new developments. Even if these activities had been on
hold, it would not have been material since the Phase I study was the only critical development activity at
the time. Lorenzini Decl., Ex. N.

1247121.1

patients experiencing the adverse events were receiving the highest dose, a lower dose, or a placebo. Lorenzini Decl., Ex. I. Hancock also incorrectly contends that Abbott "discontinued" the Phase IIb clinical trial in January 2001. In fact, Abbott merely closed enrollment early in order to stay on target for *completion* of the study. Blasberg Aff., Ex. 13 at ABBT233539-40. Abbott had concluded, after consultation with statisticians, that "ending enrollment prior to reaching our goal of 320 subjects will not meaningfully change our ability to interpret the results of this study" and that "the sooner we review the data from M99-114, the sooner we may be able to move forward into Phase III." *Id.* at ABBT233540. The Phase IIb study was ongoing when the Agreement was executed on March 13, 2001 and was completed in April 2001. Lorenzini Decl, Ex. J at ABBT0000491.[7] Abbott did not terminate development of ABT-594 until September 2001, after it had analyzed the Phase IIb trial data that was unblinded in April. *Id.*, Ex. L.

**REDACTED**

---

[7] Hancock was aware that, like other Phase II compounds, ABT-594's commercial viability was uncertain. Hancock's expert noted that "[t]here appears to be some risk of not passing phase II clinical trials" and Hancock estimated ABT-594's odds of success at only 50/50. Lorenzini Decl., Ex. K at 6; Ex. F at 13. Hancock cites an unauthenticated and undated document stating that development of ABT-594 is "P[ending]" and Abbott will "Await results from ongoing PII trial – probable T." These statements are consistent with Abbott's disclosures and Hancock's own assessments of ABT-594. Abbott told Hancock it would make a "Go/NoGo decision" after obtaining Phase II results and Hancock knew there was a good chance ABT-594 would not proceed past that decision point. Blasberg Aff., Ex. 1 at JH 008166, JH 008171; Lorenzini Decl., Ex. K, Ex. F.

- 14 -

**REDACTED**

5.     **Although A Showing of Prejudice is Not Necessary, Abbott Was Prejudiced by Hancock's Delay and Affirmation of the Agreement**

Hancock's contention that Abbott was not prejudiced by its delay in seeking rescission and its affirmation of the Agreement is flawed in two respects.  First, as explained in Abbott's opening brief, delay alone is sufficient to bar a claim for rescission and a showing of prejudice is generally not necessary.  Opp. at 8-10, 15.  Second, Abbott would be prejudiced if Hancock were allowed to pursue its belated claim for rescission.  Mot. at 15.  Contrary to Hancock's assertions, the Court cannot – six years into the Agreement – "easily return the parties to the status quo ante."  Opp. at 20.  Certain benefits received by Hancock, and costs borne by Abbott, are not readily quantifiable.  For example, Hancock obtained a declaratory judgment that the Agreement

- 15 -

"remains in effect" and demanded that Abbott continue to perform under the Agreement (e.g., by making commercially reasonable efforts to develop the Program Compounds and spending a minimum threshold on development of the Compounds). If Hancock had promptly sought rescission, Abbott would not have been bound by these contractual obligations, which could have resulted in benefits that are difficult to quantify. Hancock's enforcement of the Agreement through exercise of its contractual audit rights and prosecution of *Hancock I*, also resulted in benefits to Hancock and costs to Abbott that are not entirely quantifiable.

Hancock cites *Time Warner Sports Merchandising v. Chicagoland Processing Corp* for the proposition that Abbott's performance of the Agreement does not constitute prejudice sufficient to bar rescission. Opp. 19-20. *Time Warner* is distinguishable two grounds. First, *Time Warner* concerned an assertion that the claimant "waived its fraud claim" entirely (i.e., waived the right to monetary damages as well as rescission) and Illinois courts have applied a different (and more stringent) test for waiver in such circumstances. *See Time Warner*, 974 F. Supp. 1163, 1167-68 n. 10 (N.D. Ill. 1997) (citing *Lee v. Heights Bank*, 112 Ill. App. 3d 987, 995 (1983). Furthermore, *Time Warner* dealt with the issue of whether *the claimant's* continued performance of the contract, while receiving reassurances from the defendant that its complaints would be rectified, resulted in prejudice to the defendant. *Time Warner*, 974 F. Supp. at 1170. Here, the issue is not continued performance (if any) by the claimant, Hancock; rather, the issue is Hancock's demand and acceptance of continued performance by Abbott. In addition, unlike in *Time Warner*, Hancock does not allege that its decision to affirm the contract rather than seek rescission is excused by reliance on any reassurances by Abbott.

1247121.1

## IV.    CONCLUSION

For the reasons stated above, and in its opening brief, Abbott respectfully requests that

the Court grant its motion to strike the prayer for rescission from Hancock's complaint.

ABBOTT LABORATORIES

By its attorneys,

/s/ Michael D'Orsi
Jeffrey I. Weinberger (Admitted Pro Hac Vice)
Gregory D. Phillips (Admitted Pro Hac Vice)
Eric J. Lorenzini (Admitted Pro Hac Vice)
Özge Güzelsu (Admitted Pro Hac Vice)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA  90071
Dated: March 2, 2007                     (213) 683-9100

- 17 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 9, 2007.

Date: March 9, 2007.

_____ /s/ Michael S. D'Orsi _____
Michael S. D'Orsi

1247121.1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| JOHN HANCOCK LIFE INSURANCE | ) | |
| COMPANY, JOHN HANCOCK | ) | |
| VARIABLE LIFE INSURANCE | ) | |
| COMPANY, and MANULIFE | ) | |
| INSURANCE COMPANY (f/k/a | ) | Civil Action No. 05-11150-DPW |
| INVESTORS PARTNER LIFE | ) | |
| INSURANCE COMPANY), | ) | PUBLIC REDACTED VERSION |
| | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ABBOTT LABORATORIES, | ) | |
| | ) | |
| *Defendant*. | ) | |

## DECLARATION OF ERIC J. LORENZINI IN SUPPORT OF MOTION TO STRIKE

I, Eric J. Lorenzini, hereby declare and state that:

1.      I currently am employed as an associate at Munger, Tolles & Olson LLP.  I submit this declaration in support of Defendant Abbott Laboratories' ("Abbott's") Reply in Support of Motion to Strike the Prayer for Rescission in Hancock's First Amended Supplemental Complaint.  If called as a witness, I could and would testify competently to the facts stated herein.

2.      Attached hereto as Exhibit A is a true and correct copy of a letter from Richard C. Abati, Esq. to Gregory D. Phillips, Esq., dated October 12, 2006.

3.      Attached hereto as Exhibit B is a true and correct copy of an email from Eric Lorenzini, Esq. to Richard Abati, Esq., dated October 22, 2006.

4.      Attached hereto as Exhibit C is a true and correct copy of the document entitled "ABT-518 Transition Strategy (MMPI)," Bates-numbered ABBT256634 – ABBT256645,  and dated August 2000.

5.      Attached hereto as Exhibit D are true and correct copies of a letter from E.J. Vos to Dr. J. Schellens, Bates-numbered ABBT05008717 and dated February 28, 2001, and a letter from Prof. Dr. G.H. Blijham to Dr. B.A. Zonnenberg, Bates-numbered ABBT0033110 and dated March 1, 2001.

6.      Attached hereto as Exhibit E are true and correct copies of excerpts from the deposition of John Leonard taken November 30, 2006 .

7.      Attached hereto as Exhibit F is a true and correct copy of a report authored by Stephen J. Blewitt and Scott Hartz, Bates-numbered JH001203 – JH001220 and dated September 21, 2000.

8.      Attached hereto as Exhibit G is a true and correct copy of a document entitled "ABT-594 Development Plan," Bates-numbered ABBT0018986 – ABBT0019028 and dated June 1999.

9.      Attached hereto as Exhibit H are true and correct copies of excerpts from the document entitled "Clinical Study Report No. R&D/01/171, A Randomized, Double-Blind, Placebo-Controlled, Comparison of the Safety and Efficacy of ABT-594 to Placebo in Subjects with Painful Diabetic Polyneuropathy," Bates-numbered ABBT238578 – ABBT238580 and dated July 6, 2001.

10.      Attached hereto as Exhibit I are true and correct copies of excerpts from

the deposition of Michael Meyer taken January 23, 2007.

11.    Attached hereto as Exhibit J is a true and correct copy of a document entitled "ABT-594 Neuronal Nicotinic Receptor Agent," Bates-numbered ABBT0000491 – ABBT0000496 and dated April 2001.

12.    Attached hereto as Exhibit K is a true and correct copy of Exhibit 15 to the deposition of Lynn Klotz taken November 16, 2006.

13.    Attached hereto as Exhibit L is a true and correct copy of an email entitled "ABT-594 Project Team Update," Bates-numbered ABBT246334 – ABBT 246336 and dated October 10, 2001.

14.    Attached hereto as Exhibit M is a true and correct copy of a document entitled "Update of Recent Advanced Life Sciences Activities," Bates-numbered ABBT213252 – ABBT213253 and dated March 7, 2005.

15.    Attached hereto as Exhibit N are true and correct copies of excerpts from the deposition of Azmi Nabulsi taken January 24, 2007.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed this 2nd day of March, 2007, in Los Angeles, California.

_____
Eric J. Lorenzini

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 9, 2007.

Date: March 9, 2007.

_____        /s/ Michael S. D'Orsi_____
                    Michael S. D'Orsi

# EXHIBIT A



CHOATE HALL & STEWART LLP

R E C E I V E D

OCT 1 3 2006

GDP

October 12, 2006

Richard C. Abati
(617) 248-5076
rabati@choate.com

BY ELECTRONIC & OVERNIGHT MAIL

Gregory D. Phillips, Esq.
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue,  35th Floor
Los Angeles, CA 90071

Re:    John Hancock Life Insurance Company, *et al.*
       v. Abbott Laboratories
       <u>Civil Action No. 05-11150-DPW</u>

Dear Greg:

This follows up on our September 6, 2006 conversation regarding John Hancock's intention to ask the District Court, in the alternative, to rescind the Research Funding Agreement (the "Agreement") at issue in this case.  As we discussed, John Hancock believes that no amendment of its existing Supplemental Complaint is necessary in order for the Court to grant that alternative remedy.  I informed you, however, that, for the sake of clarity, John Hancock intends to file a motion to amend the Supplemental Complaint (the "Motion") and is seeking Abbott's assent to that motion.  In response, you requested the following:  (1) support for the proposition that one remedy available to John Hancock under the existing Supplemental Complaint is complete rescission of the Agreement; and (2) John Hancock's proposed amendment.

John Hancock responds to your requests seriatim.  First, rescission is a remedy under Illinois law.  *See e.g., Newton v. Aitken,* 260 Ill. App. 3d. 717 (1994); *Mor-Wood Contractors, Inc. v. Ottinger,* 205 Ill. App. 3d 132 (1990).  Second, both the rules of civil procedure and Illinois law allow John Hancock to seek rescission pursuant to its Supplemental Complaint.  *See* Fed. R. Civ. P. 54(c) ("[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings."); *Kel-Keef Enterprises, Inc. v. Quality Components Corp.,* 316 Ill. App. 3d 998, 1010 (2000) ("Corbin [on Contracts] states that a choice of remedy will only be a bar to an alternative remedy if 'the party against whom the remedy is asked makes a substantial change of position  in reliance on the manifestation of intention before notice of its retraction.'").  This is particularly so in light of the fact that Abbott has had more than sufficient notice of John Hancock's intention to pursue this alternative remedy.  *See* Letter from Brian A. Davis to Gregory D. Phillips dated August 14, 2006 ("Hancock expects that Mr. Friedman may testify concerning some or all of the following topics [] including [] payments that would be due

Gregory D. Phillips, Esq.
October 12, 2006
Page 2

John Hancock upon rescission of the RFA.").

Third, attached hereto is John Hancock's proposed amendment to the Supplemental Complaint.   In our view, the language of the amendment is non-controversial and, significantly, would not deny Abbott the opportunity to contest the merits of John Hancock's request for an alternative remedy.

Please let me know whether Abbott will assent to the Motion by Monday, October 16, 2006.

Very truly yours,

Richard C. Abati

cc:    Brian A. Davis, Esq.
       Joseph H. Zwicker, Esq.
       Karen Collari Troake, Esq.

CHS DRAFT: 10.12.06

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY), <br><br> Plaintiffs, <br><br> v. <br><br> ABBOTT LABORATORIES, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> CIVIL ACTION NO. 05-11150-DPW |

## FIRST AMENDED SUPPLEMENTAL COMPLAINT

### Introduction

1.    This is an action for fraud, breach of contract, and indemnification in which plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and ManuLife Insurance Company (f/k/a "Investors Partner Life Insurance") seek compensatory and punitive damages, rescission, costs and attorneys' fees for defendant Abbott Laboratories' misrepresentations and other conduct that violates the Research Funding Agreement entered into by and between the plaintiffs and defendant and dated as of March 13, 2001 (the "Agreement").  This action is filed as a separate related action to the pending matter captioned *John Hancock Life Insurance Company, et al. v. Abbott Laboratories*, Civil Action

### Prayers for Relief

WHEREFORE, John Hancock respectfully requests that the Court:

(a)    award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's fraud under Count I of the Complaint;

(b)    award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's various breaches of contract under Count II of the Complaint;

(c)    enter an order directing Abbott to indemnify John Hancock for its compensable Losses, including John Hancock's damages, costs, and other reasonable expenses such as audit charges and attorneys' fees, under Count III of the Complaint;

(d)    award John Hancock punitive damages for Abbott's willful and wanton misconduct in an amount to be determined under Counts I and II of the Complaint; and

(e)    alternatively, enter an order rescinding the Agreement and restoring the status quo *ante*, including, but not limited to, directing Abbott to refund any and all Program Payments made by John Hancock, less any payments already received by John Hancock, plus interest and costs; and

(f)    grant John Hancock such other and further relief as the Court deems just and appropriate in the circumstances.

**EXHIBIT B**

## Lorenzini, Eric

**From:** Lorenzini, Eric
**Sent:** Sunday, October 22, 2006 9:55 AM
**To:** 'Abati, Richard'; Phillips, Gregory
**Cc:** Weinberger, Jeffrey; Guzelsu, Ozge
**Subject:** RE: Hancock/Abbott

Rich,

Thank you for providing the case law on which Hancock is relying to support its proposed motion for leave to amend the Supplemental Complaint. We do not believe the case law gives Hancock the right to amend its Supplemental Complaint in the present circumstances. Accordingly, Abbott will oppose Hancock's proposed motion.

Eric

> -----Original Message-----
> **From:** Abati, Richard [mailto:RAbati@choate.com]
> **Sent:** Wednesday, October 18, 2006 11:50 AM
> **To:** Lorenzini, Eric; Phillips, Gregory
> **Cc:** Weinberger, Jeffrey; Guzelsu, Ozge
> **Subject:** RE: Hancock/Abbott
>
> Eric,
>
> Thank you. Please let us know whether Abbott assents by tomorrow at 5 pm (EDT). If we do hear from by that time (which will be a week since our original request), Hancock will assume that Abbott opposes the motion for purposes of filing its motion to amend.
>
> Rich
> -----Original Message-----
> **From:** Lorenzini, Eric [mailto:Eric.Lorenzini@mto.com]
> **Sent:** Wednesday, October 18, 2006 2:41 PM
> **To:** Abati, Richard; Phillips, Gregory
> **Cc:** Weinberger, Jeffrey; Guzelsu, Ozge
> **Subject:** RE: Hancock/Abbott
>
> Rich - We are looking into this request and will get back to you as soon as possible.
>
> > -----Original Message-----
> > **From:** Abati, Richard [mailto:RAbati@choate.com]
> > **Sent:** Tuesday, October 17, 2006 9:43 AM
> > **To:** Phillips, Gregory
> > **Cc:** Weinberger, Jeffrey; Guzelsu, Ozge; Lorenzini, Eric
> > **Subject:** Hancock/Abbott
> >
> > Greg,
> >
> > I am writing to follow-up on my letter dated October 12, 2006 concerning Hancock's intention to ask the District Court, in the alternative, to rescind the RFA at issue in this case. I asked you to let me know by yesterday whether Abbott would assent to a motion to amend the supplemental complaint. (In the October 12 letter I provided supporting case law and proposed language for the amendment, as you requested.) Having not heard back from you, could you let me know as soon as possible

whether Abbott will assent to Hancock's motion?  Thank you,

Rich

Richard C. Abati

C H O A T E

Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
t 617-248-5076
f 617-248-4000
rabati@choate.com
www.choate.com

Confidentiality Statement:

This Message is transmitted to you by the law firm of Choate, Hall & Stewart LLP.  The substance of
this message, along with any attachments, may be confidential and legally privileged.  If you are
not the designated recipient of this message, please destroy it and notify the sender of the error by
return e-mail or by calling 1-800-520-2427.

Under regulations of the Treasury Department, we are required to include the following statement
in this message: Any advice contained herein (or in any attachment hereto) regarding federal tax
matters was not intended or written by the sender to be used, and it cannot be used by any
taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer.

For more information about Choate, Hall & Stewart LLP, please visit us at choate.com

Confidentiality Statement:

This Message is transmitted to you by the law firm of Choate, Hall & Stewart LLP.  The substance of this
message, along with any attachments, may be confidential and legally privileged.  If you are not the
designated recipient of this message, please destroy it and notify the sender of the error by return e-mail
or by calling 1-800-520-2427.

Under regulations of the Treasury Department, we are required to include the following statement in this
message: Any advice contained herein (or in any attachment hereto) regarding federal tax matters was
not intended or written by the sender to be used, and it cannot be used by any taxpayer, for the purpose
of avoiding penalties that may be imposed on the taxpayer.

For more information about Choate, Hall & Stewart LLP, please visit us at choate.com

# EXHIBIT C

# Redacted-Confidential

**EXHIBIT D**

Het Nederlands Kanker Instituut
**Antoni van Leeuwenhoek ziekenhuis**

Dr. J. Schellens
internist
<u>Alhier</u>

<u>Ref.</u>: EV080                                        Amsterdam, 28 February 2001

Dear Dr Schellens,

The protocol M00ABT 'A phase I escalating multiple dose study of matrix metalloproteinase inhibitor (ABT-518) in patients with advanced cancer, including amendments nos. 1 and 2 (version 31-01-2001)' and its informed consent (version 3, 21-02-2001) have been approved by the Medical Ethical Committee.

The members of the Committee are:

<u>Internal</u>
| | |
|---|---|
| Dr H. Boot | vice-chairman, gastro-enterologist |
| Dr W. ten Bokkel Huinink | medical oncologist |
| Dr L. Moonen | radiation oncologist |
| Dr A. van Lindert | gynaecologist |
| R. Dubbelman | registered nurse |
| Ir A.A.M. Hart | chairman, statistician |
| O.B. Dalesio | methodologist |
| Prof. Dr N.K. Aaronson | medical psychologist |
| Prof. Dr J.H. Beijnen | pharmacist |

<u>External</u>
| | |
|---|---|
| Mr M.C. Ploem | lawyer |
| Dr H. van Luijn | ethics |
| D. de Boer | general practitioner |

Yours sincerely,

E.J. Vos, MSc
Secretary of the Medical Ethical Committee/Institutional Review Board

Pesmanlaan 121  1066 CX Amsterdam.
Telefoon 020 - 512 91 11  Telefax 020 - 617 26 25.
Bank ABN-AMRO rekeningnummer 54.87.11.089  Postbank 29.89.455.

Confidential

ABBT0508717

MAY. 31. 2005   11:36AM                                                                      NO. 3057    P. 21

**Academic Medical Center Utrecht**
Board of Directors
Medical Ethics Committee

DIGD
Department of Oncology
Attn: Dr. B.A. Zonnenberg
Internal post: E.02.222

Mrs. Drs. C.G.M.M. Beckers
Tel. Number: 030-2506375/8701
Fax: 030-2505400
Internal post: D.01.343
Email: metc@azu.nl

Date: 1 March 2001
Re: METC protocol number 00/262

Our reference: CBe/se/02854

Dear Mr. Zonnenberg,

With this letter, the Board of Directors, after hearing the approval of the Medical Ethics Committee dated 20 February 2001, gives it's approval for conducting the research proposal with METC-protocol number 00/262 entiteld: "A phase 1 escalating multiple dose study of a matrix metalloproteinase inhibitor (ABT-518) in patients with advanced cancer", in the UMC Utrecht.

I wish you all the best with this study,

Kind regards,
On behalf of the Board of Directors,

[signature]

Prof. Dr. G.H. Blijham
Chairman

c.c. METC

I certify that the English version is a true reflection of the Dutch Version
Else Meijer
[signature]   1 Mar 01

**CONFIDENTIAL**

ABBT 0033110

**EXHIBIT E**

1          UNITED STATES DISTRICT COURT

2               FOR THE

3          DISTRICT OF MASSACHUSETTS

4   JOHN HANCOCK LIFE INSURANCE        )

5   COMPANY, JOHN HANCOCK              )

6   VARIABLE LIFE INSURANCE            )

7   COMPANY, and MANULIFE              )

8   INSURANCE COMPANY  (f/k/a          )

9   INVESTORS  PARTNER INSURANCE       )   Civil Action No.

10  COMPANY),                         )   05-11150-DPW

11          Plaintiffs,               )

12      -vs-                          )

13  ABBOTT LABORATORIES,              )

14          Defendant.                )

15     H I G H L Y   C O N F I D E N T I A L

16          The confidential videotaped deposition

17  of JOHN LEONARD, called for examination, taken

18  pursuant to the Federal Rules of Civil Procedure

19  of the United States District Courts pertaining to

20  the taking of depositions, taken before THERESA A.

21  VORKAPIC, a Notary Public within and for the

22  County of Kane, State of Illinois, and a Certified

23  Shorthand Reporter, CSR No. 84-2589, of said

24  state, at Suite 1300, Two North LaSalle Street,

COPY

CONFIDENTIAL

1   Chicago, Illinois, on the 30th day of November,

2   A.D. 2006, at approximately 9:16 a.m.

3   PRESENT:

4        CHOATE HALL & STEWART, LLP,

5        (Two International Place,

6        Boston, Massachusetts 02110,

7        617-248-5000), by:

8        MR. BRIAN A. DAVIS,

9        bad@choate.com,

10          appeared on behalf of Plaintiffs;

11   MUNGER TOLLES & OLSON, LLP,

12   (355 South Grand Avenue, 35th Floor,

13   Los Angeles, California 90071-1560,

14   213-683-9207), by:

15   MR. JEFFREY I. WEINBERGER,

16   weinbergerji@mto.com,

17         appeared on behalf of Defendant.

18   ALSO PRESENT:

19        MR. PETER N. WITTY, Abbott Labs,

20        Commerical Litigation.

21   VIDEOTAPED BY:  WES FRANCE, Legal Videographer,

22         Esquire Deposition Services

23   REPORTED BY:  THERESA A. VORKAPIC,

24        C.S.R. Certificate No. 84-2589

JOHN LEONARD, NOVEMBER 30, 2006
HIGHLY CONFIDENTIAL

1      A.      Presumably in this case.

2      Q.      It goes on to say:  "Current animal

3  models seem to predict Abbott's compound is

4  superior to those currently in clinical trials,

10:46:44    5  and has the potential to be best in class."

6          What does it mean to be best in class?

7      A.      That's something generically that we

8  try to ascertain for any area that we work in.  As

9  I said earlier, when we bring a compound forward,

10:46:57   10  we do so in the expectation or belief that there

11  will be some competitive advantage based on what

12  we know about the compound and competitive

13  dynamics out there.

14      Q.      Did you believe these statements to be

10:47:10   15  true as of May 2000?

16      A.      I may well have.

17      Q.      As you sit here today, do you recall

18  whether at the time as of May 2000 you thought

19  these statements were true?

10:47:20   20      A.      I recall being enthusiastic about this

21  program in general and probably believed this at

22  that time.

23      Q.      How about as of March 2001, do you

24  believe these statements were true as of March

JOHN LEONARD, NOVEMBER 30, 2006
HIGHLY CONFIDENTIAL

1    2001?

2        A.    I don't recall precisely points in

3    time.  I remained enthusiastic about the MMP

4    program until we gained competitive information

5    suggesting it would not be successful.

6        Q.    When was that?

7        A.    I don't recall specifically a date.

8    There was an ASCO meeting that was quite

9    informative for us.

10        Q.    What was the competitive information

11    that you learned that tempered your enthusiasm?

12        A.    Well, generally speaking, this was --

13    this area was novel pharmacology that, there was

14    no validation of this work by anyone anywhere on

15    earth to our knowledge.  There was an inkling, I

16    believe, from British Biotech that this general

17    approach might have some utility and there was a

18    race of companies to go and be successful.

19    However, the general approach was not validated in

20    the best possible sense.  Tumor types, toxicity

21    profiles, dosing regimens, mono therapy versus

22    combo therapy, a whole host of variables were

23    unknown to us which would be very valuable

24    information to know if this would be a productive

10:47:41
10:47:51
10:48:09
10:48:29

JOHN LEONARD, NOVEMBER 30, 2006
HIGHLY CONFIDENTIAL

1  way to proceed in treating cancer.

2      Q.    I think earlier just a few moments ago

3  you made some reference to some information that

4  you learned that caused you to be less

10:49:03   5  enthusiastic about ABT-518; is that right?

6      A.    Yes.

7      Q.    As best you recall, precisely what

8  information did you learn that caused you to be

9  less enthusiastic?

10:49:11   10      A.    Well, there is scientific meetings that

11  take place during the course of every year and

12  there is always information that is anxiously

13  awaited, particularly in competitive areas when

14  it's disclosed there for the first time and as I

10:49:26   15  recall, after we had begun this program, we were

16  very anxious to learn of some information on

17  competitor compounds that would be disclosed at I

18  believe it was the American Society For Clinical

19  Oncology meeting of I think it was 2001 if I

10:49:42   20  remember right because a range of molecules in a

21  series of different tumor types in different

22  combinations, different doses and different

23  toxicity profiles would be made available for the

24  first time and we thought that was crucial

JOHN LEONARD, NOVEMBER 30, 2006
HIGHLY CONFIDENTIAL

1    information to judge the overall utility of our

2    approach and the possible clinical utility of this

3    particular compound.

4        Q.    Was there information that Abbott

10:50:06    5    learned for the first time at the ASCO conference

6    that caused Abbott to be less enthusiastic about

7    518?

8        A.    As I recall, yes.  I think there was

9    extensive information made available that was

10:50:16    10    quite helpful to us in determining the utility of

11    this particular approach and this molecule.

12        Q.    Again, as precisely as you recall, what

13    was the new information that Abbott learned at the

14    ASCO conference that it didn't previously have?

10:50:30    15        A.    I'm not going to be able to recall

16    precisely, but generally my recollection is that

17    we saw a range of different competitor compounds

18    that were presented for the first time.  We saw a

19    range of different tumors that were presented with

10:50:44    20    those different molecules.  We saw a range of

21    doses.  We saw products that had different

22    toxicity profiles from what had been disclosed

23    previously that undermined our fundamental

24    hypothesis and collectively we thought that

1  information essentially made the likelihood of

2  success of ABT-518 diminish to unacceptably small

3  numbers.

4      Q.     Prior to that ASCO conference, had you

10:51:14  5  heard anyone within Abbott express concerns or

6  doubt about ABT-518 because of information that

7  had come out regarding competitor compounds?

8      A.     We doubt every single compound.  Part

9  of what we do -- we work in an incredibly risky

10:51:33  10  business, but we are always looking for ways a

11  compound may succeed or it may fail.

12          This particular compound which was -- I

13  can't remember precisely when we began our first

14  in human studies, we had precious little

10:51:50  15  information of it in human beings and the overall

16  likelihood of success in a compound of that stage

17  in our industry in oncology is about a five

18  percent meaning there is a 95 likelihood it's

19  going to fail.  We take that into consideration

10:52:06  20  when we begin and there's always major concern

21  about even embarking on those programs before we

22  do.  That's why it's so essential to believe that

23  there is an underlying reason why a product could

24  be different relative to competitors.

JOHN LEONARD, NOVEMBER 30, 2006
H I G H L Y   C O N F I D E N T I A L

```
 1  STATE OF ILLINOIS )
 2                   )  SS:
 3  COUNTY OF K A N E )
 4           I, THERESA A. VORKAPIC, a Notary Public
 5  within and for the County of Kane, State of
 6  Illinois, and a Certified Shorthand Reporter, CSR
 7  No. 84-2589, of said state, do hereby certify:
 8           That previous to the commencement of
 9  the examination of the witness, the witness was
10  duly sworn to testify the whole truth concerning
11  the matters herein;
12           That the foregoing deposition
13  transcript was reported stenographically by me,
14  was thereafter reduced to typewriting under my
15  personal direction and constitutes a true record
16  of the testimony given and the proceedings had;
17           That the said deposition was taken
18  before me at the time and place specified;
19           That the said deposition was adjourned
20  as stated herein;
21           That I am not a relative or employee or
22  attorney or counsel, nor a relative or employee of
23  such attorney or counsel for any of the parties
24  hereto, nor interested directly or indirectly in
```

1  the outcome of this action.

2          IN WITNESS WHEREOF, I do hereunto set

3  my hand and affix my seal of office at Chicago,

4  Illinois, this 22nd day of December, 2006.

5

6

7          Theresa A. Vorkapic

8          Notary Public, Kane County,

9          Illinois.

10

11

12  C.S.R. Certificate No. 84-2589.

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT F

# Redacted-Confidential

# EXHIBIT G

# Redacted-Confidential

# EXHIBIT H

**ABBOTT LABORATORIES**

**Clinical Study Report No. R&D/01/171**

**A Randomized, Double-Blind, Placebo-Controlled, Comparison of the Safety and Efficacy of ABT-594 to Placebo in Subjects With Painful Diabetic Polyneuropathy**

**ABT-594/Protocol M99-114**

**06 July 2001**

*I have read this report and confirm that to the best of my knowledge it accurately describes the conduct and results of the study.*

| | |
|---|---|
| Marilyn J. Collicott<br>Clinical Project Manager, Analgesia Venture | Date |
| David D. Morris, Ph.D.<br>Assistant Director, Statistics | Date |
| Bruce G. McCarthy, M.D.<br>Medical Director, Analgesia Venture | Date |
| Marleen H. Verlinden, Pharm.D., Ph.D.<br>Vice President, Global Pharmaceutical Research and<br>    Development Neurology/Urology | Date |

**⊞ Abbott Laboratories**

ABBT238578

ABT-594 (ABBOTT-165594)
Study No. M99-114
R&D/01/171 - Clinical/Statistical

i

## 1.0    Title Page

**ABBOTT LABORATORIES**
**Clinical Study Report R&D/01/171**

**A Randomized, Double-Blind, Placebo-Controlled, Comparison of the Safety and Efficacy of ABT-594 to Placebo in Subjects With Painful Diabetic Polyneuropathy**

*ABT-594/Protocol M99-114*

| | |
|---|---|
| Development Phase: | II |
| Investigators: | Multicenter |
| Date First Subject Dosed: | 24 April 2000 |
| Date Last Subject Completed Dosing: | 24 February 2001 |
| Sponsor/Signatory: | Marleen H. Verlinden, Pharm. D., Ph.D. |
| | Vice President, Global Pharmaceutical |
| |     Research and Development |
| | Neurology/Urology |
| | D42U, AP30 |
| | 200 Abbott Park Road |
| | Abbott Park, Illinois 60064-6145 |
| | Phone:  (847) 935-4096 |
| | Fax:  (847) 938-1629 |
| Report Date: | 06 July 2001 |

This study was conducted in compliance with Good Clinical Practice, including the
archiving of essential documents.

Highly Confidential

ABBT238579

ABT-594 (ABBOTT-165594)
Study No. M99-114
R&D/01/171 - Clinical/Statistical

ii

## 2.0   Synopsis

| Name of Company: Abbott Laboratories | Individual Study Table Referring to Item of the Submission: not applicable (N/A) Volume: N/A Page: N/A | (For National Authority Use Only): N/A |
|---|---|---|
| Name of Finished Product: ABT-594 Hard Gelatin Capsule (HGC) | | |
| Name of the Active Ingredient: Abbott-165594 | | |

**Title of Study:** A Randomized, Double-Blind, Placebo-Controlled, Comparison of the Safety and Efficacy of ABT-594 to Placebo in Subjects With Painful Diabetic Polyneuropathy

| Investigator(s): Multicenter | Study Center: Multicenter |
|---|---|

| Publication (reference): not applicable | |
|---|---|

| Study Period (years): Date First Subject Dosed: 24 April 2000 Date Last Subject Completed Dosing: 24 February 2001 | Phase of Development: II |
|---|---|

**Objective:**
The objective of this study was to compare the safety and analgesic efficacy of 150 µg, 225 µg, and 300 µg twice daily (BID) of ABT-594 to placebo in subjects who had painful distal symmetric diabetic polyneuropathy, an average of ≥4 points on the diary-based Pain Rating Scale (11-Point Likert Scale) during the Baseline Pain Assessment Phase (completed on at least 6 of the 7 days), and ≥4 points on the site-based Pain Rating Scale (11-Point Likert Scale) at the Baseline Visit.

**Methodology:**
This was a Phase II, randomized, double-blind, placebo-controlled, multicenter study to examine the safety and analgesic efficacy of ABT-594 in subjects who had painful diabetic polyneuropathy.  Approximately 320 subjects were assigned randomly in an equal ratio to receive 1 of 4 treatments: ABT-594 150 µg, 225 µg, 300 µg BID, or placebo for 49 days on an outpatient basis.  Thirty-four sites were recruited in order to enroll approximately 320 subjects who met entry criteria for this study.

Prior to any study-specific procedures at the Screening Visit, an informed consent was signed by the subject and study eligibility determined.

Prior to study drug administration, subjects discontinued all analgesic medications (at least 7 days prior to the Baseline Pain Assessment Phase) and completed the 7-day Baseline Pain Assessment Phase.
Following the Baseline Pain Assessment Phase, subjects who met entry criteria were randomized to a dose of study medication for 49 days (Primer and Treatment Phases).  During the Primer Phase, subjects took BID doses of ABT-594 or placebo. Study drug was initiated at 75 µg BID.  The dose was increased every 2 days in 75-µg BID increments until subjects were taking their assigned treatment dose (150 µg, 225 µg, or 300 µg BID).  Following the Primer Phase, subjects entered the Treatment Phase (Day 8) and continued their treatment for a total of 49 days.  During the Treatment Phase, subjects returned to the site for Treatment Visits I, II, III and IV (Days 14, 21, 35 and 49, respectively).  Subjects were to complete diary-based assessments of their diabetic polyneuropathy pain each day from the 7 days prior to study drug administration (Baseline Pain Assessment Phase) through Day 49 of study drug administration.
In addition, subjects underwent site-based assessments of their neuropathic pain at the Baseline Visit and at Treatment Visits I, II, III and IV.  Subjects discontinued study drug administration after Treatment Visit IV and returned to the site for the Follow-Up Visit 7-10 days later.

Highly Confidential

# EXHIBIT I

Page 1

1          UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MASSACHUSETTS

3

4   JOHN HANCOCK LIFE INSURANCE        )

5   COMPANY, JOHN HANCOCK VARIABLE     )

6   LIFE INSURANCE COMPANY and         )

7   MANULIFE INSURANCE COMPANY         )

8   (f/k/a INVESTORS PARTNER           )

9   INSURANCE COMPANY),                )

10           Plaintiffs,              )   Civil Action No.

11      -vs-                           )   05-11150-DPW

12   ABBOTT LABORATORIES,              )

13           Defendant.               )

14                                         COPY

15

16      THE VIDEOTAPED DEPOSITION OF

17

18        MICHAEL DAVID MEYER

19

20        January 23, 2007

21

22

23

24

Page 2

1

2

3

4

5              The videotaped deposition of

6    MICHAEL DAVID MEYER, called by the Plaintiffs for

7    examination, taken pursuant to the Federal Rules of

8    Civil Procedure of the United States District

9    Courts pertaining to the taking of depositions,

10   taken before CORINNE T. MARUT, C.S.R. No. 84-1968,

11   a Notary Public within and for the County of

12   DuPage, State of Illinois, and a Certified

13   Shorthand Reporter of said state, at the offices of

14   Levenfeld & Pearlstein LLC, Suite 1300, Two North

15   LaSalle Street, Chicago, Illinois, on the 23rd day

16   of January, A.D. 2007, commencing at 9:07 a.m.

17

18

19

20

21

22

23

24

Page 162

1    Q.    The adverse side effects of emesis,

2  nausea and dizziness that you knew had been

3  experienced in the 114 trial as of March 2001

4  didn't impact your belief one way or the other on

5  whether it was likely that the therapeutic window

6  for ABT-594 would be, say, enlarged as a result of

7  that trial?

8    MS. GÜZELSU:   Objection.

9  BY THE WITNESS:

10    A.    We were examining three different dose

11  groups.  We didn't know what adverse events

12  associated with -- were associated with which dose

13  group.  We didn't know what level of efficacy was

14  being observed in any of the dose groups.  So we

15  couldn't draw much of a conclusion at all.

16    It may very well have been that the 150

17  was very well tolerated.  We didn't know it at that

18  point in time.  And was highly efficacious.  That

19  was unknown information.

20    I think we can infer based on the number

21  of adverse events that at least one of the dose

22  groups had to be contributing significantly to it.

23  It's simple math.  You know that that has to be the

24  case.  But we didn't know which one or to what

Page 163

1  extent.

2      Q.    Did anyone within Abbott perform any

3  analysis of the preliminary data on -- of the 114

4  trial before the results were unblinded in an

5  attempt to try to determine, you know, which of the

6  dose levels was likely causing emesis, nausea,

7  dizziness?

8      MS. GÜZELSU:  Objection.

9  BY THE WITNESS:

10     A.    Not that I'm aware of.

11  BY MR. DAVIS:

12     Q.    Your report further says, "Hence, the

13  challenge facing the project team is to maintain

14  the broad-spectrum analgesic efficacy of ABT-594

15  across models of acute, persistent and neuropathic

16  pain while decreasing side effect liability,

17  particularly in models of emesis."

18         Did I read that correctly?

19     A.    Yes.

20     Q.    The project team you're referring there

21  is the NNR project team, correct?

22     A.    I'm referring to the Discovery team, not

23  the ABT-594 development team.

24     Q.    And, again, the Discovery team is the

Page 227

1  STATE OF ILLINOIS )

2                    )  SS:

3  COUNTY OF DU PAGE )

4        I, CORINNE T. MARUT, C.S.R. No. 84-1968,

5  a Notary Public within and for the County of

6  DuPage, State of Illinois, and a Certified

7  Shorthand Reporter of said state, do hereby

8  certify:

9        That previous to the commencement of the

10 examination of the witness, the witness was duly

11 sworn to testify the whole truth concerning the

12 matters herein;

13       That the foregoing deposition transcript

14 was reported stenographically by me, was thereafter

15 reduced to typewriting under my personal direction

16 and constitutes a true record of the testimony

17 given and the proceedings had;

18       That the said deposition was taken

19 before me at the time and place specified;

20       That the reading and signing by the

21 witness of the deposition transcript was agreed

22 upon as stated herein;

23       That I am not a relative or employee or

24 attorney or counsel, nor a relative or employee of

Page 228

1    such attorney or counsel for any of the parties

2    hereto, nor interested directly or indirectly in

3    the outcome of this action.

4            IN WITNESS WHEREOF, I do hereunto set my

5    hand and affix my seal of office at Chicago,

6    Illinois, this 28th day of January, 2007.

7

8

9    *Corinne T Marut*

10            CORINNE T. MARUT, C.S.R. No. 84-1968

11            Notary Public, DuPage County, Illinois.

12            My commission expires August 15, 2009.

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT J

# Redacted-Confidential

# EXHIBIT K

# Redacted-Confidential

# EXHIBIT L



**Michael K Biarnesen /LAKE/PPRD/ABBOTT**
10/10/2001 09:05 AM

To  Danhui Wang/LAKE/PPD/ABBOTT@ABBOTT, Philip M Deemer/LAKE/CORP/ABBOTT@ABBOTT, Elizabeth Kowaluk/LAKE/PPRD/ABBOTT@ABBOTT

cc  Catherine K Kacos/LAKE/PPRD/ABBOTT@ABBOTT, Bruce McCarthy/LAKE/PPRD/ABBOTT@ABBOTT

bcc

Subject  ABT-594 Project Team Update

Danhui, Phil and Liz,

Can you let me know if there is any potential of outlicensing this product? If there is, then our wrapup activities need to be different than if we are strictly shelving the program for good.

Cathy - Please send Danhui, Phil and Liz an invite to the meeting.

Thanks,

Mike Biarnesen
Operations Manager, Neuroscience Venture
Abbott Laboratories Global Pharmaceutical R&D
(847)938-6514     Fax: (847)938-5258
----- Forwarded by Michael K Biarnesen/LAKE/PPRD/ABBOTT on 10/10/01 09:02 AM -----



**Catherine K Kacos**
10/10/01 08:26 AM

To: Laura Robinson/LAKE/HPD/ABBOTT@ABBOTT, Marilyn J Collicott/LAKE/PPRD/ABBOTT@ABBOTT, Aldona T Matalonis/LAKE/PPRD/ABBOTT@ABBOTT, Bruce McCarthy/LAKE/PPRD/ABBOTT@ABBOTT, Michael K Biarnesen/LAKE/PPRD/ABBOTT@ABBOTT, Carol J Feige/LAKE/PPRD/ABBOTT@ABBOTT, Marian L Borgstrom/LAKE/PPRD/ABBOTT@ABBOTT, Raymond A Morales/LAKE/PPRD/ABBOTT@ABBOTT, Joan M Freehoff/LAKE/PPRD/ABBOTT@ABBOTT, Robert ODea/LAKE/PPRD/ABBOTT@ABBOTT, Susan E Nunn/LAKE/PPRD/ABBOTT@ABBOTT, Beth H Wilson/LAKE/PPRD/ABBOTT@ABBOTT, Judith S Brownell/LAKE/PPRD/ABBOTT@ABBOTT, Katherine M Landwer/LAKE/PPRD/ABBOTT@ABBOTT, Tawakol A El-Shourbagy/LAKE/PPRD/ABBOTT@ABBOTT, Megan R Hughes/LAKE/PPRD/ABBOTT@ABBOTT, Gary D Jones/LAKE/PPRD/ABBOTT@ABBOTT, Howard S Cheskin/LAKE/PPRD/ABBOTT@ABBOTT, Lloyd S Dias/LAKE/PPRD/ABBOTT@ABBOTT, Rhonda J Peck/LAKE/PPRD/ABBOTT@ABBOTT, Andrew C Plasz/LAKE/PPRD/ABBOTT@ABBOTT, David G Stroz/LAKE/PPRD/ABBOTT@ABBOTT, Diana L Green/LAKE/PPRD/ABBOTT@ABBOTT, Walid Awni/LAKE/PPRD/ABBOTT@ABBOTT, Sandeep Dutta/LAKE/PPRD/ABBOTT@ABBOTT, David C Ross/LAKE/PPRD/ABBOTT@ABBOTT, David D Morris/LAKE/PPRD/ABBOTT@ABBOTT, Charles Locke/LAKE/PPRD/ABBOTT@ABBOTT, James W Thomas/LAKE/PPRD/ABBOTT@ABBOTT, Yiming Zhang/LAKE/PPRD/ABBOTT@ABBOTT, Karen L Cox/LAKE/PPRD/ABBOTT@ABBOTT, Joseph M Machinist/LAKE/PPRD/ABBOTT@ABBOTT, Stanley A Roberts/LAKE/PPRD/ABBOTT@ABBOTT, Jim J Ciullo/LAKE/CAPD/ABBOTT@ABBOTT, John R Donaubauer/LAKE/CAPD/ABBOTT@ABBOTT, Michael L

Confidential



Branton/LAKE/PPD/ABBOTT@ABBOTT, Michael D
Meyer/LAKE/PPRD/ABBOTT@ABBOTT, James
Sullivan/LAKE/PPRD/ABBOTT@ABBOTT, William M
Bracken/LAKE/PPRD/ABBOTT@ABBOTT, Julia Y
Hui/LAKE/PPRD/ABBOTT@ABBOTT, Teresita P
Curry/LAKE/PPRD/ABBOTT@ABBOTT, Laurie B
Corsi/LAKE/PPRD/ABBOTT@ABBOTT, Kennan C
Marsh/LAKE/PPRD/ABBOTT@ABBOTT, Rosemarie K
Waleska/LAKE/PPD/ABBOTT@ABBOTT, James
Stock/LAKE/PPRD/ABBOTT@ABBOTT, Linda M
Fisher/LAKE/PPRD/ABBOTT@ABBOTT, Steve
Szostak/LAKE/PPRD/ABBOTT@ABBOTT, Julie E
Debus-Levy/LAKE/PPRD/ABBOTT@ABBOTT, Susan
Boynton/LAKE/AI/ABBOTT@ABBOTT

cc:
Subject: ABT-594 Project Team Update



Michael K Biarnesen
10/09/2001 05:35 PM

To: Catherine K Kacos/LAKE/PPRD/ABBOTT@ABBOTT
cc:
Subject: ABT-594 Project Team Update

Dear Team,

As I communicated last month, there was a possibility that ABT-594 would be funded for a new Phase IIb study in 2002, but coming through the Budget Review meetings this week, the Global Pharmaceutical Executive Committee has decided that we will not move forward with the study. Based on this decision, we will discontinue efforts to manufacture fresh clinical supplies, and switch into a complete wrap-up mode.

Our next project team meeting is scheduled for Thursday, October 25 from 2:00 - 4:-00 in AP52 Conference Room B. We will hold this meeting, and I ask that each of you review what activities you are involved in that need to wrapped-up or discussed for continuation (i.e.: stability studies.) It is not clear at this time if ABT-594 will be put on the shelf, or be a candidate for outlicensing, so please be prepared with recommendations for either scenario.

If you have any questions before the team meeting, please feel free to give me a call or email

Thanks,

Mike Biarnesen
Operations Manager, Neuroscience Venture
Abbott Laboratories Global Pharmaceutical R&D
(847)938-6514      Fax: (847)938-5258
----- Forwarded by Michael K Biarnesen/LAKE/PPRD/ABBOTT on 10/09/01 05:23 PM -----

Michael K Biarnesen



Michael K Biarnesen
09/14/2001 02:15 PM

To: Marilyn J Collicott/LAKE/PPRD/ABBOTT@ABBOTT, Aldona T
Matalonis/LAKE/PPRD/ABBOTT@ABBOTT, Bruce
McCarthy/LAKE/PPRD/ABBOTT@ABBOTT, Carol J
Feige/LAKE/PPRD/ABBOTT@ABBOTT, Marian L
Borgstrom/LAKE/PPRD/ABBOTT@ABBOTT, Raymond A
Morales/LAKE/PPRD/ABBOTT@ABBOTT, Joan M
Freehoff/LAKE/PPRD/ABBOTT@ABBOTT, Robert

Confidential



ODea/LAKE/PPRD/ABBOTT@ABBOTT, Susan E
Nunn/LAKE/PPRD/ABBOTT@ABBOTT, Beth H
Wilson/LAKE/PPRD/ABBOTT@ABBOTT, Judith S
Brownell/LAKE/PPRD/ABBOTT@ABBOTT, Katherine M
Landwer/LAKE/PPRD/ABBOTT@ABBOTT, Tawakol A
El-Shourbagy/LAKE/PPRD/ABBOTT@ABBOTT, Megan R
Hughes/LAKE/PPRD/ABBOTT@ABBOTT, Gary D
Jones/LAKE/PPRD/ABBOTT@ABBOTT, Howard S
Cheskin/LAKE/PPRD/ABBOTT@ABBOTT, Lloyd S
Dias/LAKE/PPRD/ABBOTT@ABBOTT, Rhonda J
Peck/LAKE/PPRD/ABBOTT@ABBOTT, Andrew C
Plasz/LAKE/PPRD/ABBOTT@ABBOTT, David G
Stroz/LAKE/PPRD/ABBOTT@ABBOTT, Diana L
Green/LAKE/PPRD/ABBOTT@ABBOTT, Ji
Zhou/LAKE/PPRD/ABBOTT@ABBOTT, Walid
Awni/LAKE/PPRD/ABBOTT@ABBOTT, Sandeep
Dutta/LAKE/PPRD/ABBOTT@ABBOTT, David C
Ross/LAKE/PPRD/ABBOTT@ABBOTT, David D
Morris/LAKE/PPRD/ABBOTT@ABBOTT, Charles
Locke/LAKE/PPRD/ABBOTT@ABBOTT, James W
Thomas/LAKE/PPRD/ABBOTT@ABBOTT, Yiming
Zhang/LAKE/PPRD/ABBOTT@ABBOTT, Joseph M
Machinist/LAKE/PPRD/ABBOTT@ABBOTT, Stanley A
Roberts/LAKE/PPRD/ABBOTT@ABBOTT, Jim J
Ciullo/LAKE/CAPD/ABBOTT@ABBOTT, John R
Donaubauer/LAKE/CAPD/ABBOTT@ABBOTT, Steve
King/LAKE/PPRD/ABBOTT@ABBOTT, Michael L
Branton/LAKE/PPRD/ABBOTT@ABBOTT, Michael D
Meyer/LAKE/PPRD/ABBOTT@ABBOTT, James
Sullivan/LAKE/PPRD/ABBOTT@ABBOTT, William M
Bracken/LAKE/PPRD/ABBOTT@ABBOTT, Julia Y
Hui/LAKE/PPRD/ABBOTT@ABBOTT, Teresita P
Curry/LAKE/PPRD/ABBOTT@ABBOTT, Laurie B
Corsi/LAKE/PPRD/ABBOTT@ABBOTT, Kennan C
Marsh/LAKE/PPRD/ABBOTT@ABBOTT, Rosemarie K
Waleska/LAKE/PPD/ABBOTT@ABBOTT, Susan
Boynton/LAKE/AI/ABBOTT@ABBOTT, Danhui
Wang/LAKE/PPD/ABBOTT@ABBOTT, Steve
Szostak/LAKE/PPRD/ABBOTT@ABBOTT
cc: Nancy M Palbicke/LAKE/PPRD/ABBOTT@ABBOTT, Selia T
Patterson/LAKE/PPD/ABBOTT@Abbott
Subject: 09/20 ABT-594 Project Meeting

Next week's ABT-594 project meeting is cancelled.

As you may have heard, we had our executive review with Jeff Leiden, etal. on Monday, and he has
asked us to evaluate the costs, time and probabilities of success of a new study. In general, this is better
news than expected, since the odds-makers had us preparing our horse for the glue factory. For the 2002
planning process, we are still assumed to be unfunded, but there is a chance that we will be back in the
race for funding once the preliminary cost and time for a Phase IIb, Part 2 study are reviewed with Jeff. If
we get a positive read, a new team meeting will be convened to discuss the study design and critical
issues. Please bear with us as we wait to see if there is a miraculous resurrection for this program!

Mike B

Confidential

ABBT246336

# EXHIBIT M

# Redacted-Confidential

# EXHIBIT N

1           UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF MASSACHUSETTS

3

4                                           COPY

5   JOHN HANCOCK LIFE INSURANCE        )

6   COMPANY, JOHN HANCOCK VARIABLE     )

7   LIFE INSURANCE COMPANY and         )

8   MANULIFE INSURANCE COMPANY         )

9   (f/k/a INVESTORS PARTNER           )

10  INSURANCE COMPANY),                )

11              Plaintiffs,            )   Civil Action No.

12       -vs-                          )   05-11150-DPW

13  ABBOTT LABORATORIES,               )

14              Defendant.             )

15

16          THE VIDEOTAPED DEPOSITION OF

17               AZMI NABULSI

18

19              January 24, 2007

20

21

22

23

24

1

2

3

4          The videotaped deposition of AZMI NABULSI,

5    called by the Plaintiffs for examination, taken

6    pursuant to the Federal Rules of Civil Procedure of

7    the United States District Courts pertaining to the

8    taking of depositions, taken before CORINNE T.

9    MARUT, C.S.R. No. 84-1968, a Notary Public within

10   and for the County of DuPage, State of Illinois,

11   and a Certified Shorthand Reporter of said state,

12   at the Marriott Lincolnshire Resort, 10 Marriott

13   Drive, Lincolnshire, Illinois, on the 24th day of

14   January, A.D. 2007, commencing at 9:00 a.m.

15

16

17

18

19

20

21

22

23

24

AZMI NABULSI, JANUARY 24, 2007

13:53:04   1      A.    That he discussed the -- our reasoning

13:53:11   2   again with Jeff.

13:53:13   3      Q.    Leiden?

13:53:13   4      A.    With Jeff Leiden and they were able --

13:53:16   5   and he was able to convince him to restart.

13:53:27   6      Q.    Did Dr. Nisen tell you exactly what

13:53:30   7   information he discussed with Dr. Leiden that

13:53:33   8   caused Dr. Leiden to restart the clinical trial?

13:53:37   9      A.    I don't recall.

13:53:39   10     Q.    Now, sir, in fact, Dr. Leiden didn't

13:53:43   11  agree to recommence all development activities for

13:53:48   12  518 but only the clinical trial.  Is that right?

13:53:55   13     A.    I don't recall, but it would not have

13:53:58   14  mattered.  The reason for that, the clinical trial

13:54:03   15  was the key thing we were doing at the time to get

13:54:05   16  our first clue on the activity or the safety for

13:54:09   17  518.  We had significant amount of compound.  So,

13:54:14   18  the chemistry part was covered.  Any additional

13:54:18   19  preclinical work would not have been necessary to

13:54:22   20  complete the Phase I.

13:54:24   21     Q.    My question to you was a little bit

13:54:26   22  different.  It is:  Isn't it true that Dr. Leiden

13:54:31   23  allowed only the recommencement of the clinical

13:54:35   24  trial but no other development activities with

| | | |
|---|---|---|
| 13:54:39 | 1 | respect to 518? |
| 13:54:42 | 2 | A.    I cannot answer your question as stated |
| 13:54:45 | 3 | because I did not talk to Jeff directly.  My |
| 13:54:52 | 4 | recollection is that we are to continue the Phase I |
| 13:55:00 | 5 | to generate data from 518 to be able to convince |
| 13:55:07 | 6 | management, including Jeff, that this product does |
| 13:55:12 | 7 | possess -- does have characteristics to |
| 13:55:15 | 8 | differentiate it from the competition. |
| 13:55:20 | 9 | Q.    The development of ABT-518 included more |
| 13:55:25 | 10 | than the clinical trial, correct? |
| 13:55:28 | 11 | A.    Correct. |
| 13:55:29 | 12 | Q.    Your understanding was that Dr. Leiden |
| 13:55:32 | 13 | had lifted the halt only on the clinical trial, |
| 13:55:35 | 14 | correct? |
| 13:55:36 | 15 | MR. PHILLIPS:  Objection; asked and answered. |
| 13:55:38 | 16 | BY THE WITNESS: |
| 13:55:38 | 17 | A.    I cannot recall.  But as I said, it's |
| 13:55:40 | 18 | not really significant for me at the time, the |
| 13:55:45 | 19 | other activities, because the clinical trial was |
| 13:55:47 | 20 | the key thing I'm looking for. |
| 13:55:48 | 21 | BY MR. ZWICKER: |
| 13:55:48 | 22 | Q.    I'm not at this moment asking for your |
| 13:55:51 | 23 | opinion.  I'm just asking whether you understood |
| 13:55:52 | 24 | that all development activities except for the |

AZMI NABULSI, JANUARY 24, 2007

| | | |
|---|---|---|
| 13:55:55 | 1 | clinical trial would remain on hold. |
| 13:55:58 | 2 | A.    I don't recall such an instruction. |
| 13:56:11 | 3 | Q.    Do you recall Dr. Leiden instructing |
| 13:56:16 | 4 | that development activities for 518 would remain on |
| 13:56:22 | 5 | hold until May of 2001 when Pfizer would release |
| 13:56:28 | 6 | new data for prinomastat? |
| 13:56:31 | 7 | MR. PHILLIPS:  Objection to the form. |
| 13:56:32 | 8 | BY THE WITNESS: |
| 13:56:33 | 9 | A.    Again, the question is difficult to |
| 13:56:35 | 10 | answer that way. |
| 13:56:38 | 11 | BY MR. ZWICKER: |
| 13:56:38 | 12 | Q.    Do you want me to try to put it to you |
| 13:56:40 | 13 | again? |
| 13:56:41 | 14 | A.    Please. |
| 13:56:41 | 15 | Q.    Did you learn in March 2001 that |
| 13:56:46 | 16 | Dr. Leiden decided to continue to hold development |
| 13:56:53 | 17 | activities for 518 pending review of information |
| 13:56:57 | 18 | from Pfizer in May of 2001? |
| 13:57:01 | 19 | MR. PHILLIPS:  Object to the form. |
| 13:57:02 | 20 | BY THE WITNESS: |
| 13:57:05 | 21 | A.    The way it's stated, I would say no. |
| 13:57:05 | 22 | BY MR. ZWICKER: |
| 13:57:09 | 23 | Q.    Do you have any knowledge that |
| 13:57:13 | 24 | development activities for 518, the continuation of |

1  STATE OF ILLINOIS )

2                   )  SS:

3  COUNTY OF DU PAGE )

4          I, CORINNE T. MARUT, C.S.R. No. 84-1968,

5  a Notary Public within and for the County of

6  DuPage, State of Illinois, and a Certified

7  Shorthand Reporter of said state, do hereby

8  certify:

9          That previous to the commencement of the

10  examination of the witness, the witness was duly

11  sworn to testify the whole truth concerning the

12  matters herein;

13          That the foregoing deposition transcript

14  was reported stenographically by me, was thereafter

15  reduced to typewriting under my personal direction

16  and constitutes a true record of the testimony

17  given and the proceedings had;

18          That the said deposition was taken

19  before me at the time and place specified;

20          That the reading and signing by the

21  witness of the deposition transcript was agreed

22  upon as stated herein;

23          That I am not a relative or employee or

24  attorney or counsel, nor a relative or employee of

1  such attorney or counsel for any of the parties

2  hereto, nor interested directly or indirectly in

3  the outcome of this action.

4          IN WITNESS WHEREOF, I do hereunto set my

5  hand and affix my seal of office at Chicago,

6  Illinois, this 30th day of January, 2007.

7

8          *Corinne T Marut*

9

10         CORINNE T. MARUT, C.S.R. No. 84-1968

11         Notary Public, DuPage County, Illinois.

12         My commission expires August 15, 2009.

13

14

15

16

17

18

19

20

21

22

23

24