UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ABBOTT LABORATORIES, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) )  Civil Action No. 05-11150-DPW |

**AFFIDAVIT OF ANDREW C. GRIESINGER IN SUPPORT OF MOTION OF
NONPARTY STONETURN GROUP, LLP TO QUASH OR MODIFY SUBPOENA**

Andrew C. Griesinger, on oath, deposes and says as follows:

1.     I am a partner in the law firm of Griesinger, Tighe & Maffei, LLP, counsel to the

nonparty StoneTurn Group, LLP ("StoneTurn"). I have represented StoneTurn in connection

with subpoenas issued to StoneTurn by the defendant Abbott Laboratories ("Abbott") and the

depositions that Abbott has taken in the above-captioned case of two of StoneTurn's employees,

Christopher Martinez and Mark Hair.

2.      Exhibit 1 attached hereto is a copy of a subpoena for the production of

documents by StoneTurn that was issued by Abbott's counsel on January 24, 2006 (the "First

Subpoena").

3.      Exhibit 2 attached hereto is a copy of my letter dated February 7, 2006 to

Abbott's counsel in which I objected on behalf of StoneTurn to the First Subpoena.

4.      Abbott deposed Mr. Martinez on November 3, 2006 and on March 22, 2007. I

attended the deposition. Mr. Martinez was deposed for more than seven hours. Abbott obtained

a total of 435 pages of deposition testimony from Mr. Martinez. The deposition testimony of Mr. Martinez concerning other contractual compliance audits was designated confidential, in order to protect confidential information concerning third parties. Nevertheless, Mr. Martinez answered all of Abbott's questions about the other compliance audits he conducted. Approximately 35 pages of his deposition testimony is devoted to audits unrelated to the contractual compliance audit involving the parties in this action.

5.     Mr. Hair was deposed on November 2, 2006 for approximately seven hours. I attended that deposition. Abbott obtained a total of 194 pages of deposition testimony from Mr. Hair on that day. StoneTurn has agreed to produce Mr. Hair for examination on a second day, provided that the examination is limited to four hours or less and concerns StoneTurn's documents that were produced after Mr. Hair testified on November 2, 2006. Mr. Hair provided confidential testimony concerning other contractual compliance audits in which he was involved.

6.     Exhibit 3 is a copy of excerpts from the transcript of the deposition of Mr. Martinez taken on November 3, 2006. Because, as noted above, Mr. Martinez's testimony concerning unrelated contractual audits that he performed was designated confidential, only the pages from Mr. Martinez's deposition that generally describe the number of contractual compliance audits Mr. Martinez has performed are included in Exhibit 3. Only the excerpts which contain this general information are attached in this manner so that the Court will not need to consider or rule on a motion to file this affidavit under seal. StoneTurn does not waive any rights it has under the protective order entered in this case to maintain the confidentiality of any testimony disclosing any details concerning the contractual compliance audits that do not involve the parties in this action.

7.    Exhibit 4 is a copy of the subpoena for documents and a deposition issued by the defendant Abbott Laboratories on March 23, 2007 (the "Subpoena").  I accepted service of the Subpoena on March 30, 2007.

8.    Exhibit 5 is a copy of my letter dated April 3, 2007 to Abbott's counsel in which I objected on behalf of StoneTurn to the Subpoena.

9.    Exhibit 6 is a copy of a letter dated April 12, 2007 that I received from counsel for Abbott.

10.    Exhibit 7 is an example of an agreement between StoneTurn and other parties to maintain the confidentiality of information that StoneTurn received in connection with one of the contractual compliance audits that StoneTurn was engaged to perform for parties other than the parties in this action.  The names of the parties to the agreement other than StoneTurn and other identifying information have been redacted.

Signed under the pains and penalties of perjury this 19th day of April, 2007.

/s/ Andrew C. Griesinger
Andrew C. Griesinger

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants (if any) on April 19, 2007.

/s/ Andrew C. Griesinger
Andrew C. Griesinger

EXHIBIT 1

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# United States District Court
### DISTRICT OF MASSACHUSETTS

## SUBPOENA IN A CIVIL CASE

John Hancock Life Insurance Company, et al
Plaintiffs

v.

Abbott Laboratories,
Defendant.

CASE NUMBER: 05-11150-DPW

Honorable Douglas Woodlock

Case Pending in the District of Massachusetts

TO: Custodian of Records
StoneTurn Group LLP
60 State Street
Suite 700
Boston, MA 02109

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
SEE EXHIBIT A

| PLACE | DATE AND TIME |
|---|---|
| Donnelly, Conroy & Gelhaar, LLP<br>ATTN: Michael S. D'Orsi<br>1 Beacon Street, 33rd Floor<br>Boston, MA 02108 | February 8, 2006 at 9:30 am |

☐ YOU ARE COMMANDED to produce and permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| Issuing Officer Signature and Title (Indicate if attorney for Plaintiff or Defendant) | Date |
|---|---|
| Stephanie McCallum, Attorney for Defendant | January 24, 2006 |

Issuing Officer's Name, Address, and Phone Number

Stephanie McCallum, Winston & Strawn, 35 West Wacker Drive, Chicago, Illinois 60601  (312) 558-7958

(See Rule 45, Federal Rules of Civil Procedure Parts C & D on Reverse)

## EXHIBIT A

### I.    DEFINITIONS AND INSTRUCTIONS

1.    "StoneTurn", "you", or "your" shall mean StoneTurn Group LLP as well as its predecessors, successors, subsidiaries, parent companies, agents, representatives, partners, employees or persons purporting to act on the company's behalf including but not limited to Mark Hair and/or Chris Martinez.

2.    "Abbott" shall mean Abbott Laboratories, as well as its predecessors, successors, subsidiaries, parent companies, agents, representatives, partners, employees, attorneys, or other persons acting or purporting to act on the company's behalf.

3.    "Hancock" or "John Hancock" shall mean John Hancock Life Insurance Company, John Hancock Variable Like Insurance Company and/or Manulife Insurance Company (f/k/a Investors Partner Insurance Company) and any of their predecessors, successors, subsidiaries, parent companies, agents, attorneys, representatives, partners, employees, former employees, or other persons acting or purporting to act on their behalf.

4.    "Document" shall mean any written, graphic, recorded or illustrative material of any kind or description, however produced or reproduced, and regardless of whether approved, signed, sent, received, redrafted, or executed, prepared by or for you, in your possession, custody, or control.   The term "document" includes, but is not limited to, the following: correspondence, memoranda, drafts, computerized records, notes, jottings, books, lab notebooks, records, reports, surveys, studies, analyses, things, videotapes, recordings, computer disks, electronic mail, e-mail, transcriptions of verbal conversations or statements however made, business forms, labels, papers and films filed with courts or other governmental bodies, notices, messages, calendar and diary entries, appointment books, minutes and other formal or informal

memoranda of meetings, and copies of documents that are not identical duplicates of the originals (e.g., because handwritten or "blind" notes appear thereon or are attached thereto).

5. "Thing" shall mean any physical specimen or tangible item other than a document.

6. "Person" shall mean any natural person, firm, association, partnership, government agency, or other entity and its officers, directors, partners, employees, representatives and agents.

7. The terms "reflecting," "referring," "relating to," or any derivation thereof shall mean, without limitation, consisting of, constituting, containing, mentioning, describing, summarizing, evidencing, listing, indicating, analyzing, explaining, supporting, undermining, contradicting, concerning, pertaining to, prepared in connection with, used in preparation for, or being in any way legally, logically, or factually connected with the matter discussed.

8. "Communication" shall mean or refer to all inquires, discussions, conversations, negotiations, agreements, understandings, meetings, telephone conversations, letters, notes, telegrams, advertisements, or other forms of information exchanged, whether oral, electronic, or written.

9. The term "RFA" shall mean the Research Funding Agreement that was entered into between Hancock and Abbott on March 13, 2001.

10. The term "'Program Compounds" shall mean the pharmaceutical compounds that are subject to the RFA, including, without limitation, the compounds ABT 100, ABT 492, ABT 510, ABT 518, ABT 594, ABT 724, ABT 627, ABT 751 and ABT 773.

11. The "Audit" shall mean the purported contractual compliance audit begun by Hancock by letter dated April 12, 2004 pursuant to Section 2.5 of the RFA.

12. Unless the request specifically states otherwise, references to the singular shall include the plural and vice versa; references to one gender shall include the other gender; references to the past include the present and vice versa; and disjunctive terms include the conjunctive and vice versa.

13. If you at any time had possession or control of a document requested herein and if such document has been lost, destroyed, purged, or is not presently in your possession or control, identify the document, the date of its loss, destruction, purge or separation from your possession or control, and the circumstances surrounding its loss, destruction, purge or separation from your possession or control.

14. Should you refuse, on the grounds of attorney-client privilege, work product immunity or any other privilege, to produce any document or tangible thing, then you shall provide at the time of making said refusal a list of all such non-produced documents or things. As to any such document or thing, state the following: the nature of the privilege or immunity being claimed; the number of the request calling for its production; the date of the document; the name of each person who signed or prepared the document; the name of each addressee and person to whom the document or copies thereof were given or sent; a description of the general subject matter of the document; an identification of any document or other material transmitted with or attached to the document; and the nature or character of the document or thing.

## III.    DOCUMENTS REQUESTED

1.       All documents constituting or concerning communications between you, on the one hand, and Hancock on the other hand, regarding the RFA, any Program Compound or the Audit.

2.　　　All documents constituting or concerning communications between you, on the one hand, and Abbott, on the other hand, regarding the RFA, any Program Compound, or the Audit.

3.　　　All documents constituting or concerning communications between you and any persons other than Abbott and Hancock referring or relating to the Program Compounds, the RFA, or the Audit.

4.　All reports, evaluations, opinions, analyses, memorandums or other work product, including drafts thereof, provided to Hancock regarding the RFA, the Program Compounds, or the Audit.

5.　　　Any and all engagement letters concerning the Audit or any other work performed by you in connection with the RFA.

6.　All invoices for services rendered and expenses incurred by StoneTurn in connection with the Audit.

7.　All documents reflecting the individuals from StoneTurn that were involved in the Audit.

8.　　　All time sheets or other diary entries of any employee of StoneTurn reflecting work performed in connection with the Audit.

9.　　　All indices or summaries of the documents and other materials made available by Abbott for inspection in connection with the Audit.

10.　　　All documents constituting or concerning any instructions regarding the audit.

11.　　　All Abbott documents inspected or obtained by StoneTurn in connection with the audit that were provided by StoneTurn to Hancock.

12.     Any and all other documents, not specified in the foregoing requests,

concerning the Audit, the RFA, or the Program Compounds.

EXHIBIT 2

# GRIESINGER, TIGHE & MAFFEI, LLP

Attorneys at Law
176 Federal Street
Boston, Massachusetts 02110-2214

TELEPHONE (617) 542-9900
FACSIMILE (617) 542-0900
www.gtmllp.com

Andrew C. Griesinger, P.C.
Direct Dial (617) 542-9914

February 7, 2006

**By Overnight Mail and Facsimile to (312) 558-5700**

Stephanie McCallum, Esquire
Winston & Strawn
35 West Wacker Drive
Chicago, IL 60601

Re:     John Hancock Life Insurance Company, *et al.* v. Abbott Laboratories,
Civil Action No. 05-11150-DPW

Dear Ms. McCallum:

This firm represents StoneTurn Group LLP ("StoneTurn") with respect to the subpoena to StoneTurn's custodian of records that was issued by your firm on behalf of Abbott Laboratories ("Abbott") and served on Thursday, January 26, 2006 (the "Subpoena"). This letter sets forth StoneTurn's objections to the Subpoena in accordance with Fed. R. Civ. P. 45.

Please be advised that StoneTurn has been instructed to assert the attorney-client privilege and the work product doctrine with respect to any communications between or among StoneTurn, John Hancock and Choate, Hall & Stewart LLP ("Choate, Hall") that concern in any way StoneTurn's work as the independent auditor for John Hancock under the terms of a Research Funding Agreement dated March 13, 2001. StoneTurn accordingly objects to producing any documents in response to document requests 1 and 3 – 12 set forth on Exhibit A of the Subpoena on the grounds that such documents are protected from discovery by the attorney-client privilege and the work product doctrine.

StoneTurn also objects to the request for documents included in Exhibit A to the Subpoena in the following respects:

1.     StoneTurn objects to the Definitions and Instructions to the extent that they purport to impose obligations or burdens on StoneTurn that are different from or greater than the obligations or burdens imposed on a nonparty by the applicable rules. In particular, StoneTurn objects to the Definitions and Instructions to the extent that they purport to require StoneTurn to search for, produce or identify documents that are not currently within its possession, custody

Stephanie McOshan, Esquire
Winston & Strawn
February 7, 2006
Page 2

and control within the meaning of the applicable rules. To the extent that StoneTurn agrees to produce any documents, it will do so in compliance with the applicable rules, without regard to any inconsistent Definitions and Instructions included in Exhibit A.

2.     StoneTurn objects to each and every specific request set forth in Exhibit A on the grounds that each such request is overbroad and unduly burdensome, particularly with respect to any request that seeks the production of any documents that Abbott provided to StoneTurn. It is my understanding that Abbott made the arrangements for copying any documents supplied to StoneTurn, and that Abbott made its own copy of any documents supplied to StoneTurn. Therefore, Abbott already has in its possession a copy of all documents it provided to StoneTurn.

3.     StoneTurn objects to each and every specific request set forth in Exhibit A on the grounds that each such request is overbroad and unduly burdensome to the extent that it purports to require StoneTurn to search for and produce multiple copies of documents that contain identical or substantially identical information.

4.     StoneTurn objects to each and every specific request set forth in Exhibit A to the extent that such request seeks the disclosure of trade secret or other confidential research, development or commercial information of StoneTurn or John Hancock.

5.     StoneTurn objects to each and every specific request set forth in Exhibit A to the extent that such request seeks medical information concerning individuals that is protected from disclosure by the Health Insurance Portability and Accountability Act of 1996 and rules promulgated thereunder.

6.     StoneTurn objects to each and every specific request set forth in Exhibit A to the extent that such request seeks documents and information that is already in the possession, custody or control of Abbott.

7.     StoneTurn objects to document request 12 set forth in Exhibit A on the grounds that it is overbroad and vague and it is virtually impossible to determine what specific documents are or are not intended to be included within the scope of the request.

8.     StoneTurn objects to each and every specific request set forth in Schedule A to the extent that the request purports to require StoneTurn to search for and produce electronic documents, including but not limited to e-mails, on the ground that the burden and cost of searching for and producing such documents is excessive.

9.     StoneTurn objects to each and every specific request set forth in Exhibit A to the extent that Abbott or your firm do not agree to reimburse StoneTurn for its costs of producing documents in response to the request, including but not limited to all necessary reproduction costs and the costs of attorneys, paralegals and other personnel who may be required to search for, review, list and/or summarize any documents, including any documents that could be listed on a privilege log.

Stephanie McCallum, Esquire
Winston & Strawn
February 7, 2006
Page 3

Notwithstanding and without waiving the foregoing objections, StoneTurn will produce, and has enclosed with the original of this letter, a copy of its communications with Abbott that are responsive to document request 2 set forth in Exhibit A.  I am informed that StoneTurn has not communicated with any parties other than Abbott, John Hancock and Choate, Hall concerning the Program Compounds, the RFA or the Audit.  Therefore, StoneTurn does not have any documents that are responsive to document request 3 set forth in Exhibit A.

The documents that are enclosed with the original of this letter have all been marked "confidential" and are subject to the terms of the Stipulated Protective Order entered by Judge Woodlock in the above-referenced case.

Please do not hesitate to call me if you wish to discuss the objections set forth in this letter.  Thank you for your anticipated courtesy.

Very truly yours,

Andrew C. Griesinger

/jdv
Enclosure

cc:  Peter E. Gelhaar, Esquire (by fax only and w/out enc.)
     Brian A. Davis, Esquire
     Mr. Christopher A. Martinez (w/out enc.)

EXHIBIT 3

Volume:    I

Pages :    1 - 270

Exhibits: 1 - 9

CONFIDENTIAL

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-1150DPW

- - - - - - - - - - - - - - - - - - - - - x

JOHN HANCOCK LIFE INSURANCE COMPANY,

JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY,

and MANULIFE INSURANCE COMPANY

(f/k/a INVESTORS PARTNER INSURANCE COMPANY),

        Plaintiffs,

   V.

ABBOTT LABORATORIES,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - x

C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF CHRISTOPHER A. MARTINEZ

Friday, November 3, 2006,  9:10 a.m.

Donnelly, Conroy & Gelhaar

One Beacon Street

Boston, Massachusetts

Reporter:  Rosemary F. Grogan, CSR, RPR

LegaLink, a Merrill Communications Company
800-826-0277  818-593-2300  Fax 818-593-2301  www.legalink.com

**Page 2**

```
 1  APPEARANCES:
 2  Representing the Plaintiff:
 3      CHOATE HALL & STEWART LLP
 4      Two International Place
 5      Boston, MA  02110
 6      (617)248-5000
 7      ktroake@choate.com
 8      BY:  KAREN COLLARI TROAKE, ESQUIRE
 9      BY:  STACY L. BLASBERG, ESQUIRE (a.m. session)
10
11  Representing the Defendants:
12      MUNGER, TOLLES & OLSON LLP
13      355 South Grand Avenue, 35th Floor
14      Los Angeles, CA  90071-1560
15      (213)683-9207
16      eric.lorenzini@mto.com
17      BY:  ERIC J. LORENZINI, ESQUIRE
18
19  Representing StoneTurn Group and Deponent Hair:
20      GRIESINGER, TIGHE & MAFFEI, LLP
21      176 Federal Street
22      Boston, MA  02110-2214
23      (617)542-9900
24      BY:  ANDREW C. GRIESINGER, P.C.
```

**Page 4**

```
 1              I N D E X
 2  WITNESS:            PAGE NO.
 3  CHRISTOPHER A. MARTINEZ
 4  By Mr. Lorenzini        6/266
 5  By Ms. Collari Troake       265
 6
 7           E X H I B I T S
 8  NO.    DESCRIPTION           PAGE NO.
 9  1    Letter from Winston & Strawn 6/15/04   53
10  2    Letter from Hancock 4/12/04      76
11  3    E-mail Chain ABBT 0000265 - 0000266   95
12  4    Choate Hall Fax Sheet and Attachment  160
13       ABT 0000117 - 0000123
14  5    E-mail Chain ABBT 0000257 - 0000260   179
15  6    E-mail Chain ABBT 0000250 - 0000253   185
16  7    John Hancock's Objections and     190
17       Responses to Abbott Laboratories'
18       First Set of Interrogatories
19  8    E-mail Chain ABT 0000235        194
20  9    E-mail Chain ABT 0000280 - 0000284   204
21  (Original exhibits attached to original transcript)
22
23
24
```

**Page 3**

```
 1  APPEARANCES:  (Cont.)
 2
 3  Also present:
 4      Josh Snider, Videographer
```

**Page 5**

```
 1      THE VIDEOGRAPHER:  Here begins videotape No. 1
 2  in the deposition of Christopher A. Martinez in the
 3  matter of John Hancock Life Insurance, et al.
 4  versus Abbott Laboratories in the U.S. District
 5  Court for the District of Massachusetts, Case
 6  No. 05-11150-DPW.
 7      Today's date is November 3rd, 2006.  The time
 8  on the video monitor is 9:09.  The video operator
 9  today is Josh Snider contracted by Merrill Legal
10  Solutions.  This video deposition is taking place
11  at One Beacon Street, Boston, Mass., and was
12  noticed by Eric Lorenzini from Munger, Tolles &
13  Olson.
14      Counsel please voice identify yourselves and
15  state who you represent.
16      MR. LORENZINI:  Eric Lorenzini, Munger, Tolles
17  & Olson representing Abbott Laboratories.
18      MR. GRIESINGER:  Andrew Griesinger,
19  Griesinger, Tighe & Maffei in Boston representing
20  the witness and StoneTurn Group.
21      MS. COLLARI TROAKE:  Karen Collari Troake,
22  Choate Hall & Stewart representing John Hancock.
23      MS. BLASBERG:  Stacy Blasberg, Choate Hall &
24  Stewart representing John Hancock.
```

Page 10

```
 1   think, January of 1990, at which point I went to the
 2   firm called Barrington Consulting, which was a split-off
 3   group from Peterson; worked there until about September
 4   of 19 -- I'm sorry, I'm getting my dates confused.
 5           I worked at Peterson from June of '98 --
 6   I'm sorry, let me step back. June of 1998 through
 7   January of 1991. January of 1991, I went to Barrington
 8   Consulting; worked there from September of '91, at which
 9   point I went back to school to the University of
10   California, Los Angeles.
11       Q.  Okay.  And was Barrington Consulting also a
12   litigation consulting firm?
13       A.  Yes, it was.  And then I was in school from
14   '91 to June of '93; went to work for Coopers & Lybrand,
15   big accounting firm, at the time the big eight
16   accounting firms.  I worked at Coopers, gosh,
17   approximately three years.
18           During the course of that work, I did
19   financial statement audits, started doing contract
20   compliance audits and reviews, among other
21   consulting-type projects.  I guess in or about '96, I
22   went back to the Barrington Consulting Group.  And in or
23   around 1998, I left Barrington and went to Deloitte &
24   Touche.  And Deloitte & Touche was doing consulting,
```

Page 11

```
 1   providing consulting services, around litigation, around
 2   contract compliance.  Was with Deloitte until January of
 3   2000, when I went to work for a startup company called
 4   Commercegov.com.
 5           I worked there until maybe May of that
 6   same year, 2000, and I went to work for another start-up
 7   firm called Fish Eye; worked at Fish Eye through, I
 8   would say, October of 2000, at which point I returned to
 9   Deloitte; and I worked at Deloitte from October of 2000
10   through, oh, approximately September, October 2003.
11           I went to work for SBC Knowledge
12   Ventures, which was a wholly-owned subsidiary of SBC
13   Corporation, the phone company; and then in April of
14   2004, I went to work at StoneTurn Group, where I've
15   worked since.
16       Q.  When you were at Coopers & Lybrand from 1993
17   to 1996 -- do I have those years correct?
18       A.  Yeah.
19       Q.  What was your position during that time?
20       A.  I had a number of positions.  I think my final
21   position was a manager in the audit group.
22       Q.  And what were your responsibilities as a
23   manager at Coopers & Lybrand?
24       A.  I was the planning, supervision and
```

Page 12

```
 1   performance of audits of one form or another.
 2       Q.  Were the audits that you planned and
 3   supervised primarily financial statement audits?
 4       A.  I would say about 50 percent of them were
 5   financial statement audits and the other 50 percent were
 6   other types of attest services.
 7       Q.  Other types of what services?
 8       A.  Attest.
 9       Q.  Can you define that term for me?
10       A.  Yeah, attest, in the accounting world,
11   there -- a financial statement audit is considered part
12   of -- considered a subset of an attest engagement,
13   you're attesting to something.  There are a whole --
14   there are many other types of attest services.
15       Q.  What are the other types of attest services
16   that you performed or that you planned and supervised at
17   Coopers & Lybrand?
18       A.  For instance, contract compliance reviews,
19   contract compliance audits, where we would look at a
20   contract, be asked by one party or another to determine
21   whether or not the other party or several other parties
22   to that contract were in compliance, and so we undertake
23   various procedures to corroborate their actions, their
24   activities, including looking at documents, speaking to
```

Page 13

```
 1   individuals related and had knowledge of those parties'
 2   dealings and coming up with an attestation as to
 3   compliance one way or another.
 4       Q.  What percentage of the audits that you planned
 5   and supervised at Coopers & Lybrand consisted of
 6   contractual compliance audits?
 7       A.  I mean I would say probably 30 percent.
 8       Q.  How many contractual compliance reviews did
 9   you plan and supervise while at Coopers & Lybrand?
10       A.  I'm going to say probably around a dozen.
11       Q.  And what was your general procedure, if there
12   was one, in planning and supervising those contractual
13   compliance audits while at Coopers and Lybrand?
14       A.  Generally speaking, what we would do is, we
15   would request documentation relative to the contract.  I
16   should step back.  First, we would review the contract
17   at issue.  Second, we would ask information relevant to
18   contract compliance from the parties that we were going
19   to be reviewing.
20           Usually there would be an exchange of
21   information, discussions about what precisely we were
22   looking for, to what level of detail we were looking for
23   that information.  So there was a fair bit of
24   interaction with the parties that we were reviewing.
```

4

Page 30

1 manager?
2   A. Like, again, to supervise, plan, execute, work
3 in a leadership role within the teams.
4   Q. And this was, again, providing litigation
5 support services?
6   A. Yes, generally speaking.
7   Q. Of the same type you just described?
8   A. Yes, generally speaking.
9   Q. Did you act as an expert witness in your
10 employment at Barrington?
11   A. I did.
12   Q. On how many occasions?
13   A. I think just one occasion at Barrington.
14   Q. Did you conduct any contractual compliance
15 audits while employed at Barrington?
16   MR. GRIESINGER: We're talking about both
17 times he was employed at Barrington?
18   MR. LORENZINI: Correct.
19   A. You know I don't recall. I don't recall if I
20 did or not at Barrington.
21   Q. When you were employed by Deloitte & Touche
22 the first time, from 1998 to January 2000, what was your
23 position at that time?
24   A. I was a senior manager.

Page 31

1   Q. And what were your responsibilities at senior
2 manager at Deloitte & Touche?
3   A. Again, to plan, supervise and execute
4 engagements.
5   Q. What type of engagements?
6   A. Litigation support, contract compliance
7 engagements.
8   Q. What percentage of your time do you estimate
9 at Deloitte & Touche in '98 to 2000, was spent on
10 litigation support activities?
11   A. Roughly 50 percent.
12   Q. And what percentage of your time roughly at
13 Deloitte from '98 to 2000 was spent on contractual
14 compliance?
15   A. Roughly 50.
16   Q. How many engagements did you have in the 1998
17 to 2000 period in which you conducted a contractual
18 compliance audit?
19   A. I'm having trouble answering the question
20 because I can think of my whole Deloitte experience, but
21 I'm having trouble breaking it up into those periods.
22   Q. Okay. Well, let's get some background on your
23 next engagement at Deloitte.
24   Between October 2000 and September 2003,

Page 32

1 what was your position at Deloitte?
2   A. Senior manager.
3   Q. And were your responsibilities the same as
4 when you were employed between '98 and 2000?
5   A. Yes.
6   Q. And was the proportion of the time spent on
7 litigation support versus contractual compliance
8 essentially the same?
9   A. Yes.
10   Q. Okay. Why don't you tell me how many
11 contractual compliance audits you conducted while
12 employed at Deloitte & Touche overall, including both
13 periods of employment?
14   A. Probably conducted 80.
15   Q. 80?
16   A. 80 contract compliance engagements, yes.
17   Q. Who were the companies on which you conducted
18 contract compliance audits?
19   MS. COLLARI TROAKE: We'll have the same
20 approach here, that this bit of the transcript will
21 be designated confidential pursuant to the
22 protective order in the case.
23   A. And again, your question was, who did I
24 perform them on?

Page 33

REDACTED

Page 58

1   development of our people. I've got financial
2   responsibilities to the firm.
3       Q.  Do your responsibilities include testifying as
4   an expert witness?
5       A.  I do testify as an expert witness, yes.
6       Q.  And how many times have you testified as an
7   expert witness while at StoneTurn?
8       A.  While at StoneTurn?  I guess when you say
9   testify, are you speaking of deposition?  Trial?  How do
10  you define that?
11      Q.  Let's not limit it to testifying.
12          In how many instances have you been
13  designated as an expert witness and either provided an
14  expert report or had been deposed or testified at trial?
15          MR. GRIESINGER:  So designated to the point at
16      which at least a report was prepared, is what
17      you're asking for?
18          MR. LORENZINI:  Correct.
19      A.  While at StoneTurn?
20      Q.  Yes.
21      A.  Again, I'm going to take an estimation here,
22  but I would say it's in the order of 20 times.
23      Q.  You mentioned before that you're not involved
24  in the computer forensic work at StoneTurn.

Page 59

1           Are you involved in the forensic
2   accounting side of StoneTurn?
3       A.  Yes, I do forensic accounting work.
4       Q.  Is there any type of work you do other
5   forensic accounting and testifying or acting as an
6   expert witness?
7       A.  Yes.
8       Q.  What other type of work is that?
9       A.  I work in licensing.  I help companies license
10  in or out technology.
11      Q.  In what ways do you help companies with
12  licensing technology?
13      A.  Well, I help them value that technology.  I
14  help them build business cases for paying a certain
15  price, excepting a certain price for technology.  I help
16  them with strategy around building technology
17  portfolios.
18      Q.  Is there any other type of work you perform at
19  StoneTurn other than working as an expert witness,
20  working in forensic accounting and assisting with
21  licensing technology?
22      A.  Well, the contract compliance work that I do.
23      Q.  How many contractual compliance audits have
24  you personally participated in while at StoneTurn?

Page 60

1       A.  I would say probably eight.
2       Q.  Can you list those contract compliance matters
3   that you've been involved with, to the best of your
4   recollection?
5           MS. COLLARI TROAKE:  Excuse me for -- and
6       again, to the extent you're going to list
7       particular company names, I'll designate this
8       portion of the transcript as confidential pursuant
9       to the protective order in the case.
10          THE WITNESS:  Thank you.

REDACTED

16

EXHIBIT 4

OAO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF TEXAS

JOHN HANCOCK LIFE INSURANCE COMPANY, et al.

V.

ABBOTT LABORATORIES

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 05-11150-DPW

TO:    StoneTurn Group LLP            512-469-5577
       100 Congress Avenue, Suite 2000
       Austin, TX  78701

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
|  | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.  **See Ex. A**

| PLACE OF DEPOSITION     Affiliated Reporters, 805 W. 10th Street, Suite 400, Austin, TX 78701 | DATE AND TIME April 23, 2007 at 9:30 a.m. |
| --- | --- |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
       **See Ex. B**

| PLACE | DATE AND TIME April 9, 2007 at 9:30 a.m. |
| --- | --- |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
| --- | --- |
|  |  |

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)          Attorneys for Abbott Laboratories | DATE March 23,2007 |
| --- | --- |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Eric J. Lorenzini                   213-683-9207
Munger, Tolles & Olson LLP, 355 South Grand Avenue, 35th Floor, Los Angeles, CA  90071

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1]If action is pending in district other than district of issuance, state district under case number.

American LegalNet, Inc.
www.USCourtForms.com

AO 88 (Rev 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| DATE SERVED: | PLACE |
|---|---|
| | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

SIGNATURE OF SERVER

ADDRESS OF SERVER

American LegalNet, Inc.
www.USCourtForms.com

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

American LegalNet, Inc.
www.USCourtForms.com

## Exhibit A:  Subject Matter of the Deposition

### Instructions

Pursuant to Rule 30(b)(6) of the Rules of Federal Procedure, StoneTurn Group LLP shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf regarding the matters described below.  The person(s) so designated shall testify as to matters known or reasonably available to the organization.

### Definitions

"Contractual compliance audit" means an audit initiated by one or more parties to an agreement, pursuant to a provision of the agreement, in order to determine whether another party or parties are in compliance with the terms of the agreement.

"StoneTurn" means StoneTurn Group LLP and its partners, officers, employees, and agents.

### Deposition Topics

1.      StoneTurn's policies regarding the conduct of contractual compliance audits during the period from January 1, 2004 to the present.

2.      StoneTurn's practices with respect to contractual compliance audits conducted from January 1, 2004 to the present, including but not limited to:

       a.      The relationship between audits conducted by StoneTurn and any pending or threatened litigation;

       b.      The contractual provisions pursuant to which StoneTurn conducted the audits;

       c.      The purpose and scope of the audits;

       d.      Documents and interviews requested by StoneTurn from the subjects of the audit; and

       e.      Audit reports created by StoneTurn.

2.      The responses by subjects of contractual compliance audits conducted by StoneTurn from January 1, 2004 to the present to the audits, including but not limited to:

       a.      Objections to document requests;

       b.      The quantity, type, and responsiveness of documents made available;

      c.     The extent to which documents were redacted for reasons other than attorney-client privilege or the work product doctrine;

      d.     Whether the subject of the audit provided StoneTurn with an index of the documents it made available and, if so, the nature of the index;

      e.     The time from StoneTurn's initial document requests to completion of document production by the subject of the audit, and the extent to which the subject of the audit missed deadlines or target dates for production of documents;

      f.     The procedures for copying of documents requested by StoneTurn (i.e., were copies made by StoneTurn or the subject of the audit);

      g.     Any objections to the selection of StoneTurn as auditor;

      h.     The extent to which the subject of the audit permitted StoneTurn to interview its employees and the nature and scope of any such interviews;

      i.     The number of staff the subject of the audit devoted to responding to the audit (to the extent known to StoneTurn); and

      j.     Any significant delays or refusals by the subject of the audit to respond to inquiries by StoneTurn.

4.     The authenticity, nature, and content of the documents produced by StoneTurn pursuant to this subpoena.

5.     StoneTurn's search, collection, and production of documents responsive to this subpoena.

## Exhibit B:  Document Requests

### Instructions

Unless otherwise indicated, these requests call for documents created between January 1, 2004 and the present.

### Definitions

"Contractual compliance audit" means an audit initiated by one or more parties to an agreement, pursuant to a provision of the agreement, in order to determine whether another party or parties are in compliance with the terms of the agreement.

"Documents" means every writing or record of every type and description that is in StoneTurn's possession, control or custody, whether maintained in paper, electronic, or other form.

"StoneTurn" means StoneTurn Group LLP and its partners, officers, employees, and agents.

### Documents Requested

1.    Documents sufficient to show StoneTurn's policies and practices regarding contractual compliance audits.

2.    With respect to each contractual compliance audit conducted by StoneTurn, the written agreement pursuant to which the audit was conducted.

3.    With respect to each contractual compliance audit conducted by StoneTurn, documents sufficient to reflect the purpose and scope of the audit (e.g., any notices of the audit provided to the subject of the audit).

4.    With respect to each contractual compliance audit conducted by StoneTurn, the final audit report(s), if any, that StoneTurn provided to its client(s).

5.    With respect to each contractual compliance audit conducted by StoneTurn, documents sufficient to reflect the name of the party on whose behalf the audit was initiated and the subject of the audit.

6.    With respect to each contractual compliance audit conducted by StoneTurn, documents sufficient to reflect whether StoneTurn was retained directly by a party to the contract or by counsel to the party.

7.    With respect to each contractual compliance audit conducted by StoneTurn, documents sufficient to reflect whether, as of the date the audit was initiated, litigation

1248108.1

related to the contract at issue was pending or threatened between the party initiating the audit and the subject of the audit.

8.     With respect to each contractual compliance audit conducted by StoneTurn, documents sufficient to reflect StoneTurn's requests for documents from the subject of the audit.

9.     With respect to each contractual compliance audit conducted by StoneTurn, documents sufficient to reflect any objections by the subject of the audit to StoneTurn's document requests.

10.     With respect to each contractual compliance audit conducted by StoneTurn, documents sufficient to show the approximate quantity and type of documents the subject of the audit made available to StoneTurn.

11.     With respect to each contractual compliance audit conducted by StoneTurn, documents sufficient to reflect whether the subject of the audit made available all of the documents requested by StoneTurn.

12.     With respect to each contractual compliance audit conducted by StoneTurn, documents sufficient to reflect whether, and to what extent, the subject of the audit redacted documents made available to StoneTurn for reasons other than attorney-client privilege or the work product doctrine.

13.     With respect to each contractual compliance audit conducted by StoneTurn, documents sufficient to show whether the subject of the audit provided StoneTurn with an index of the documents it made available.

14.     With respect to each contractual compliance audit conducted by StoneTurn, all indicies of documents provided to StoneTurn by the subject of the audit.

15.     With respect to each contractual compliance audit conducted by StoneTurn, documents sufficient to show the approximate length of time from StoneTurn's initial request for documents to completion of document production by the subject of the audit.

16.     With respect to each contractual compliance audit conducted by StoneTurn, documents sufficient to reflect whether the subject of the audit missed any deadlines or target dates for production of documents requested by StoneTurn.

17.     With respect to each contractual compliance audit conducted by StoneTurn, documents sufficient to show the procedures for copying documents made available by the subject of the audit (e.g., whether StoneTurn made copies of documents itself or submitted requests for copies to the subject of the audit).

18.    With respect to each contractual compliance audit conducted by StoneTurn, documents sufficient to reflect whether the subject of the audit objected to the selection of StoneTurn as auditor.

19.    With respect to each contractual compliance audit conducted by StoneTurn, documents sufficient to reflect the name and position of any employees of the subject of the audit who were interviewed by StoneTurn and the subject matter of any such interviews.

20.    With respect to each contractual compliance audit conducted by StoneTurn, documents sufficient to reflect the number of staff the subject of the audit devoted to responding to the audit (to the extent known to StoneTurn).

21.    With respect to each contractual compliance audit conducted by StoneTurn, documents sufficient to reflect any significant delays or refusals by the subject of the audit to respond to inquiries by StoneTurn.

21.    All documents that Abbott copied and produced to StoneTurn pursuant to the audit that StoneTurn conducted on behalf of John Hancock Life Insurance Company.

EXHIBIT 5

# GRIESINGER, TIGHE & MAFFEI, LLP

Attorneys at Law
176 Federal Street
Boston, Massachusetts 02110-2214

TELEPHONE (617) 542-9900
FACSIMILE (617) 542-0900
www.gtmllp.com

Andrew C. Griesinger, P.C.
Direct Dial (617) 542-9914

April 3, 2007

**By Overnight Mail and E-mail**

Eric J. Lorenzini, Esquire
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071

Re:     John Hancock Life Insurance Company, *et al.* v. Abbott Laboratories,
        Civil Action No. 05-11150-DPW

Dear Eric:

As you know, I represent StoneTurn Group LLP ("StoneTurn"). On March 30, 2007, I accepted service of the subpoena to StoneTurn that you issued on behalf of Abbott Laboratories ("Abbott") on March 23, 2007 (the "Subpoena"). The Subpoena calls for the production of documents on April 9, 2007. You extended the date for the production of documents to April 13, 2007 in your e-mail to me dated March 30, 2007. The subpoena also requires StoneTurn to produce a witness for a deposition on April 23, 2007, pursuant to Fed. R. Civ. P. 30(b)(6). This letter sets forth StoneTurn's objections to the Subpoena.

### *Objections and Response to Document Requests in Exhibit B to the Subpoena*

1.      StoneTurn previously produced documents in response to a subpoena served on January 26, 2006 (the "First Subpoena"). StoneTurn set forth its objections to the First Subpoena in my letter dated February 7, 2006 to predecessor counsel for Abbott. StoneTurn repeats and incorporates herein the objections set forth in that letter.

2.      Paragraph 1 of Exhibit B seeks the production of "documents sufficient to show StoneTurn's policies and procedures regarding contractual compliance audits." This request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of documents that are relevant to the claims or defenses of any party. Nothwithstanding and without waiving the foregoing objection, StoneTurn states that it has not adopted any written policies or procedures that specifically concern contractual compliance audits.

Eric J. Lorenzini, Esquire
Munger, Tolles & Olson LLP
April 3, 2007
Page 2

      3.     Paragraphs 2 through the first paragraph numbered 21 in Exhibit B seek the production of twenty different categories of documents relating to contractual compliance audits that StoneTurn performed from January 1, 2004 to the present relating to contracts other than the Research Funding Agreement dated March 13, 2001 between Abbott and John Hancock Life Insurance Company ("John Hancock") that is the subject of the above-referenced action (the "Abbott/John Hancock Contract"). StoneTurn objects to these twenty requests for the following reasons:

      a.     The requests are not reasonably likely to lead to the discovery of documents relevant to the claims or defenses of any party because the documents requested do not concern Abbott, John Hancock or the Abbott/John Hancock Contract. Instead, they concern completely unrelated contracts between persons or entities that are not parties to this action.

      b.     The requests are unduly burdensome because they seek twenty different categories of documents. In order to look for all twenty different categories of documents, StoneTurn necessarily would have to review all documents within all of its files concerning unrelated contractual compliance audits that it performed and to analyze those documents in order to determine which, in combination, might be "sufficient to show" the information responsive to each of the twenty different requests.

      c.     The requests seek confidential information that belongs to third parties that StoneTurn is not authorized to produce. Examples of confidential information that could be disclosed in response to the requests are (i) contracts that contain confidentiality provisions and obligations, (ii) business information provided in confidence by StoneTurn's clients or the other party to the contractual compliance audit, (iii) trade secret or other confidential research, development or commercial information of third parties, and (iv) information concerning the nature of disputes between third parties that were intended to be resolved confidentially. StoneTurn is not necessarily able to identify which information the third parties consider to be confidential. Before producing any documents, StoneTurn would have to follow a burdensome procedure of notifying the parties to each contractual compliance audit and their counsel of the Subpoena, so that they would have a fair opportunity to seek redress from the Court.

      d.     The requests seek documents that are protected from discovery by the attorney-client privilege and the work product doctrine, including documents that may be subject to the attorney-client privilege or work product doctrine that could be asserted by the parties to contractual compliance audit. StoneTurn is not authorized to waive the attorney-client privilege or work product protections that belong to third parties.

      e.     Certain of the requests may seek medical information concerning individuals that is protected from disclosure by the Health Insurance Portability and Accountability Act of 1996 and rules promulgated thereunder.

Eric J. Lorenzini, Esquire
Munger, Tolles & Olson LLP
April 3, 2007
Page 3

   f.  StoneTurn objects to each and every specific request set forth in Schedule B to the extent that the request purports to require StoneTurn to search for and produce electronic documents, including but not limited to e-mails, on the ground that the burden and cost of searching for and producing such documents is excessive.

   4.  The second paragraph numbered 21 of the Exhibit B seeks the production back to Abbott of all documents that Abbott copied and produced to StoneTurn while StoneTurn was attempting to perform a compliance audit with respect to the Abbott/John Hancock Contract. The same documents were requested in response to the First Subpoena. In my letter dated February 7, 2006, I stated:

> [StoneTurn objects to] any request that seeks the production of any documents that Abbott provided to StoneTurn. It is my understanding that Abbott made the arrangements for copying any documents supplied to StoneTurn, and that Abbott made its own copy of any documents supplied to StoneTurn. Therefore, Abbott already has in its possession a copy of all documents it provided to StoneTurn.

StoneTurn also objected to the First Subpoena in my letter dated February 7, 2006 to the extent that it "seeks documents and information that is already in the possession, custody or control of Abbott." I assume that all the documents that Abbott produced to StoneTurn have been produced again by Abbott to John Hancock or have been produced back to Abbott by John Hancock. StoneTurn objects to providing unnecessary, cumulative and duplicative discovery of documents Abbot already has.

   5.  StoneTurn objects to each and every specific request set forth in Exhibit B to the extent that Abbott or your firm do not agree to reimburse StoneTurn for its costs of producing documents in response to the request, including but not limited to all necessary reproduction costs and the costs of attorneys, paralegals and other personnel who may be required to search for, review, list and/or summarize any documents, including any documents that could be listed on a privilege log.

### *Objection to a Deposition concerning the Subject Matters Listed in Exhibit A*

   Schedule A to the Subpoena indicates that Abbott seeks to take the deposition of a witness produced by StoneTurn concerning contractual compliance audits that do not relate in any way to Abbott or John Hancock or to the Abbott/John Hancock Contract. StoneTurn objects to each of the subject matters set forth in Exhibit A and objects to producing a witness for the deposition on the grounds as those set forth in paragraph 3 above and on the further grounds described below.

   The deposition sought by Abbott does not appear to be reasonably related to any claim or defense of any party in this action. Moreover, the request for a deposition is cumulative and unduly burdensome because Abbott has already deposed at length the two employees of

Eric J. Lorenzini, Esquire
Munger, Tolles & Olson LLP
April 3, 2007
Page 4

StoneTurn who were primarily involved in the compliance audit of the Abbott/John Hancock Contract. If StoneTurn were to produce a witness for the deposition, it would likely produce Chris Martinez. Mr. Martinez has already appeared on two separate days for his deposition, however, and Abbott's counsel has already asked him questions for one and one half days, including a substantial number of questions concerning compliance audits Mr. Martinez performed for clients other than John Hancock. There is no basis upon which Abbott can impose any additional burden on StoneTurn or Mr. Martinez by conducting yet another deposition.

Please let me know by Tuesday, April 10, 2007 whether Abbott intends to insist on taking another deposition of StoneTurn. If I do not hear from you by then, I intend to file a motion for a protective order or to quash the Subpoena. If StoneTurn is forced to file such a motion, the motion will include a request for reimbursement of StoneTurn's attorney's fees pursuant to Fed. R. Civ. P. 45(c)(1) or as a discovery sanction.

Please do not hesitate to call me if you wish to discuss the objections set forth in this letter. Thank you for your anticipated courtesy.

Very truly yours,

Andrew C. Griesinger

/jdv

cc:  Peter E. Gelhaar, Esquire (by mail)
     Karen Collari Troake, Esquire
     Mr. Christopher A. Martinez

EXHIBIT 6

MUNGER, TOLLES & OLSON LLP

355 SOUTH GRAND AVENUE

THIRTY-FIFTH FLOOR

LOS ANGELES, CALIFORNIA 90071-1560

TELEPHONE (213) 683-9100

FACSIMILE (213) 687-3702

———

560 MISSION STREET

SAN FRANCISCO, CALIFORNIA 94105-2907

TELEPHONE (415) 512-4000

FACSIMILE (415) 512-4077

PETER R. TAFT¹
ROBERT K. JOHNSON¹
ALAN V. FRIEDMAN¹
RONALD L. OLSON¹
DENNIS E. KINNAIRD¹
RICHARD S. VOLPERT
DENNIS C. BROWN¹
ROBERT E. DENHAM
JEFFREY I. WEINBERGER
ROBERT L. ADLER
CARY B. LERMAN
CHARLES D. SIEGAL
RONALD K. MEYER
GREGORY P. STONE
VILMA S. MARTINEZ
BRAD D. BRIAN
BRADLEY S. PHILLIPS
GEORGE M. GARVEY
WILLIAM D. TEMKO
STEVEN L. GUISE²
ROBERT B. KNAUSS
STEPHEN M. KRISTOVICH
JOHN W. SPIEGEL
TERRY E. SANCHEZ
STEVEN M. PERRY
MARK B. HELM
JOSEPH D. LEE
MICHAEL R. DOYEN
MICHAEL E. SOLOFF
GREGORY D. PHILLIPS
LAWRENCE C. BARTH
KATHLEEN M. McDOWELL
GLENN D. POMERANTZ
THOMAS B. WALPER
RONALD C. HAUSMANN
PATRICK J. CAFFERTY, JR.
JAY M. FUJITANI
O'MALLEY M. MILLER
SANDRA A. SEVILLE-JONES
MARK H. EPSTEIN
HENRY WEISSMANN
KEVIN S. ALLRED
MARC A. BECKER
BART H. WILLIAMS
JEFFREY A. HEINTZ
JUDITH T. KITANO

KRISTIN LINSLEY MYLES
MARC T.G. DWORSKY
JEROME C. ROTH
STEPHEN D. ROSE
JEFFREY L. BLEICH
GARTH T. VINCENT
TED DANE
MARK SHINDERMAN
STUART N. SENATOR
MARTIN D. BERN
DANIEL P. COLLINS
STEVEN B. WEISBURD
EDWARD C. HAGEROTT, JR.
RICHARD E. DROOYAN
ROBERT L. DELL ANGELO
BRUCE A. ABBOTT
JONATHAN E. ALTMAN
MARY ANN TODD
MICHAEL J. O'SULLIVAN
KELLY M. KLAUS
DAVID B. GOLDMAN
BURTON A. GROSS
KEVIN S. MASUDA
HOJOON HWANG
KRISTIN S. ESCALANTE
DAVID C. DINIELLI
ANDREA WEISS JEFFRIES
PETER A. DETRE
PAUL J. WATFORD
DANA S. TREISTER
CARL H. MOOR
DAVID M. ROSENZWEIG
DAVID H. FRY
LISA J. DEMSKY
MALCOLM A. HEINICKE
GREGORY J. WEINGART
TAMERLIN J. GODLEY
JAMES G. RUTTEN
J. MARTIN WILLHITE
RICHARD ST. JOHN
ROHIT K. SINGLA
LUIS LI
CAROLYN HOECKER LUEDTKE
C. DAVID LEE
MARK H. KIM
ALLISON B. STEIN

MARSHA HYMANSON
SUSAN R. SZABO
LINDA S. GOLDMAN
NATALIE PAGÉS STONE
BRETT J. RODDA
JOSEPH S. KLAPACH
LISA VANCE CASTLETON
MONIKA S. WIENER
LYNN HEALEY SCADUTO
RANDALL G. SOMMER
AARON M. MAY
SHONT E. MILLER
MARIA SEFERIAN
JASON L. HAAS
MANUEL F. CACHÁN
ERIC J. LORENZINI
MEGAN M. LA BELLE
KATHERINE K. HUANG
SARAH KURTIMI
KATHERINE M. FORSTER
ROSEMARIE T. RING
JOSEPH J. YBARRA
AILBA W. CHANG
AMANDA SCHREIBER
BLANCA FROMM YOUNG
ROBERT E. BATTERTHWAITE
OZGE GÜZELSU
LINDSAY D. MCCASKILL
KATE K. ANDERSON
ALISON J. MARKOVITZ
LOREN KESSLERHIGGINS
E. DORSEY HEINE
SAMUEL N. WEINSTEIN
PAUL M. ROHRER
KIT JOHNSON
JAY K. GHIYA
SUSAN TRAUB BOYD
JOHN C. DAY
JENNIFER L. POLSE
TODD J. ROSEN
DANIEL L. GEYSER
BRIAN M. HOCHLEUTNER
DEAN N. KAWAMOTO
GRANT A. DAVIS-DENNY
E. MARTIN ESTRADA
JASON RANTANEN

AMY C. TOVAR
REBECCA GOSE LYNCH
JONATHAN H. BLAVIN
JOHN R. GRIFFIN
KAREN J. FESSLER
MICHELLE T. FRIEDLAND
J. RAZA LAWRENCE
MICHAEL T. KOVALESKI
LINA C. MIYAKE
MELINDA EADES LEMOINE
ANDREW W. SONG
DANIEL A. BECK
FREYA K. RUSSELL
YOHANCE C. EDWARDS
JULIE D. CANTOR
SETH GOLDMAN
FADIA ISSAM RAFEEDIE
DANIEL J. POWELL
DANIEL B. LEVIN
DAVID H. GRABLE
JOSHUA P. GROBAN
VICTORIA L. BOESCH
JEFF J. BOWEN
ADAM M. FLAKE
HAILYN J. CHEN
BRAD SCHNEIDER
DAVID W. SWIFT
JEAN Y. RHEE
ALEXANDRA LANG SUSMAN
GENEVIEVE A. COX
MIRIAM KIM
MISTY M. SANFORD
BRIAN P. DUFF
AIKEE FEINBERG
JOEL D. WHITLEY
JEFFREY E. ZINSMEISTER
MONICA DIGGS MANGE

RICHARD D. ESBENSHADE²
OF COUNSEL

E. LEROY TOLLES
(RETIRED)

¹A PROFESSIONAL CORPORATION

WRITER'S DIRECT LINE
(213) 683-9207
(213) 593-2907 FAX
Eric.Lorenzini@mto.com

April 12, 2007

SENT VIA FEDERAL EXPRESS AND E-MAIL

Andrew C. Griesinger
Griesinger, Tighe & Maffei, LLP
176 Federal Street
Boston, MA  02110-2214

Re:  *John Hancock v. Abbott Laboratories*

Dear Andy:

I am writing to follow up on our telephone conversations on Tuesday and today, and your conversation with my colleague Greg Phillips on Monday, regarding the subpoena issued by Abbott to StoneTurn on March 23 and your April 3 letter setting forth StoneTurn's objections.

Documents Regarding StoneTurn's Policies and Practices Regarding Contractual Compliance Audits

In Paragraph 1 of the Exhibit B of the subpoena, Abbott requests "[d]ocuments sufficient to show StoneTurn's policies and practices regarding contractual compliance audits." Your letter states that StoneTurn has "not adopted any written policies or procedures that specifically concern contractual compliance audits." That representation does not relieve StoneTurn of its obligation to produce documents responsive to Paragraph 1. Mr. Martinez testified that StoneTurn has conducted contractual compliance audits of companies other than Abbott. Even if StoneTurn does not have any formal written policies specifically related to contractual compliance audits, it must have documents that reflect its practices with respect to such audits. For example, many of the documents requested in paragraphs 2 through the first paragraph numbered 21 of Exhibit B of the subpoena (i.e. documents relating to specific audits conducted

2736945.1

MUNGER, TOLLES & OLSON LLP

Andrew C. Griesinger
April 12, 2007
Page 2

by StoneTurn) would certainly reflect StoneTurn's practices and, therefore, would be responsive to paragraph 1. Also, if StoneTurn has general policies regarding audits that are applicable, in whole or in part, to contractual compliance audits, such documents are responsive and should be produced.

Paragraphs 2 through the first paragraph numbered 21 of Exhibit B to the subpoena request documents relating to contractual compliance audits conducted by StoneTurn of companies other than Abbott. Your letter objects that the requests are not reasonably likely to lead to the discovery of documents relevant to the claims or defenses of any party because the documents do not concern Abbott, John Hancock, or the Abbott/John Hancock contract. As you know, Hancock has alleged in its complaint that Abbott attempted to "hinder, delay and obstruct John Hancock's effort to audit Abbott's compliance with the terms of the Agreement [by] . . . unreasonably and unjustifiably acting in a manner contrary to the usual course of contractual compliance audits . . . ." It is possible that Hancock will seek to introduce testimony by Mr. Martinez or another employee of StoneTurn regarding audits of companies other than Abbott in an attempt to prove this claim. We believe that any such testimony would be inadmissible as irrelevant, prejudicial, confusing, misleading, and a waste of time. It also would be inadmissible as improper expert testimony (since, among other things, the deadline for designation of experts and exchange of expert reports has long since passed and Hancock has not designated anyone from StoneTurn as an expert on the subject of contractual compliance audits). As I explained on Tuesday, if Hancock stipulates that it will not seek to introduce such testimony, then we are willing to withdraw the document requests in paragraphs 1 through the first paragraph numbered 21 in Exhibit B. If Hancock is unwilling to stipulate that it will not seek to offer testimony regarding audits of companies other than Abbott, we must insist that StoneTurn produce documents related to such audits so that, if the court were to admit such testimony, we would have an opportunity to refute it. You said today that you discussed this issue with Hancock's counsel and they did not make any commitment to enter into the proposed stipulation. As we discussed, I will follow up with Hancock counsel tomorrow to confirm their position.

Your letter also objects that the requests in Paragraphs 2 through the first paragraph numbered 21 of Exhibit B are overbroad and burdensome. Contrary to your objections, the requests are tailored to seek only those documents relevant to Hancock's claim that Abbott "unreasonably and unjustifiably acting in a manner contrary to the usual course of contractual compliance audits." Also, almost all the requests call merely for production of documents "sufficient to reflect" certain information (as opposed to all documents containing such information). The other requests call for documents that should be very easy to locate (e.g., final audit reports and the contract pursuant to which the audit was conducted). In addition, StoneTurn has only conducted a small number of contractual compliance audits (as you acknowledged during our call today) so it should not have to search a large number of files to respond to the subpoena. Finally, Mr. Phillips and I have both explained that we would be glad to discuss a reasonable narrowing of the requests to address your objections.

2736945.1

MUNGER, TOLLES & OLSON LLP

Andrew C. Griesinger
April 12, 2007
Page 3

Your letter also objects that the requests seek confidential information regarding third parties and takes the position that "[b]efore producing any documents, StoneTurn would have to follow a burdensome procedure of notifying the parties to each contractual compliance audit and their counsel of the Subpoena, so that they would have a fair opportunity to seek redress from the Court." A large number of the requests, however, merely call for information regarding the mechanics of the audits (procedures for copying documents, timing of document production, quantity of documents produced, etc.), which is clearly not confidential or competitively sensitive. Also, as you know, StoneTurn may designate documents Confidential or Highly Confidential (attorneys eyes only) pursuant to the protective order in this case.

In our conversation today, you suggested that StoneTurn would not merely provide the third parties with notice of the subpoena and a "fair opportunity to seek redress from the Court", as stated in your letter, but would refuse to produce the documents unless given express permission by the third parties. You further indicated that, although the subpoena was served nearly two weeks, StoneTurn had not yet provided notice to the third parties and therefore did not intend to produce documents on April 13, 2007 (the production date in the subpoena, as modified by our agreement). You also said that you believed it was likely that the third parties would not agree to StoneTurn's production of the documents and, therefore, StoneTurn would never produce the documents. I noted that the fact that some responsive documents may be subject to confidentiality agreements does not relieve StoneTurn of its obligation to produce the documents. Unless StoneTurn and/or the third parties move to quash the subpoena, StoneTurn remains obligated to produce the requested documents. You argued that the burden was on Abbott to move to compel production. Please provide legal authority to support your position that StoneTurn may simply disregard its obligation to produce documents pursuant to the subpoena without moving to quash.

### Documents Copied by Abbott and Provided to StoneTurn in the Audit

The second paragraph numbered 21 of Exhibit B seeks the production of the documents that Abbott photocopied and produced to StoneTurn during the audit. To clarify, this request does not refer to the several hundred boxes of documents that Abbott made available in its warehouses for review by StoneTurn. The request is limited to the small subset of documents that StoneTurn asked Abbott to photocopy and deliver to its offices, plus the one box of documents that Abbott copied and mailed to StoneTurn because the documents were not available during StoneTurn's final visit to the warehouse. Your letter states that you assume all these documents have been produced by Abbott again to John Hancock in the litigation or produced back to Abbott by John Hancock. This assumption is incorrect. Hancock agreed in the litigation that Abbott did not need to re-produce documents it produced to StoneTurn in the audit. (Any such production by Abbott would be impossible, since Abbott did not retain a record of the documents it copied and delivered to StoneTurn.) Also, Hancock has not produced a set of these documents back to Abbott. Therefore, we reiterate our request that StoneTurn produce copies of documents responsive to the second paragraph numbered 21 of Exhibit B. You indicated in our call today that Hancock's counsel has a set of these documents. If Hancock,

MUNGER, TOLLES & OLSON LLP

Andrew C. Griesinger
April 12, 2007
Page 4

through its counsel, produces all documents responsive to the second paragraph numbered 21 no later than April 17, we will withdraw our request that StoneTurn produce these documents. (The April 16 production is necessary because the StoneTurn deposition is scheduled for April 23 and the deposition of Mark Hair is scheduled for April 24. It should be easy for Hancock's counsel to produce the documents within that time frame. The documents are Abbott documents, so they do not need to be reviewed by Hancock counsel for privilege or responsiveness and merely need to be photocopied or scanned.

<u>Deposition of StoneTurn Representative</u>

The subpoena also requests the deposition of a StoneTurn employee on subjects such as StoneTurn's policies and practices with respect to contractual compliance audits. Your letter objects that the request for a deposition is cumulative and unduly burdensome, since StoneTurn would designate Mr. Martinez, who you contend "has already appeared on two separate days for his depositions" and answered "a substantial number of questions concerning compliance audits Mr. Martinez performed for clients other than John Hancock." Your letter fails to note, however, that the only reason Mr. Martinez was required to return for a second half-day deposition was that StoneTurn and Hancock had failed to produce several important documents responsive to the first StoneTurn subpoena (e.g., its index of documents produced in the audit and other records from the audit) prior to the original deposition date. Also, although Mr. Martinez was asked some background questions at his deposition regarding prior audits, there was no opportunity to effectively examine him since no documents related to these prior audits had been produced by StoneTurn. Your letter also objects that a deposition of StoneTurn regarding prior contractual compliance audits is not reasonably related to any claim or defense of any party in this action. For the reasons explained above, if Hancock intends to seek to introduce testimony from a StoneTurn witness regarding prior contractual compliance audits, deposition testimony on these subjects is relevant. If Hancock will stipulate that it will not seek to introduce testimony on this subject, we will agree to withdraw the request for a deposition. If Hancock will not so stipulate, then we must insist on proceeding with the deposition. (As we discussed, there apparently was some miscommunication regarding Abbott's position on this matter during your initial call with Mr. Phillips on Monday. As you know, I have been the point person on the StoneTurn subpoena and other audit issues but was on vacation and unavailable for the call on Monday. In my absence, Mr. Phillips called you to initiate the meet-and-confer process, but noted that I was more familiar with the issues and would follow-up to continue the meet-and-confer in more detail. To be clear, Abbott's position is that it will withdraw its request for a deposition if Hancock stipulates that it will not to seek to introduce testimony regarding prior audits.)

You indicated on our call today that StoneTurn might seek to designate Mark Hair, rather than Mr. Martinez, as its 30(b)(6) witness. You did not know whether Mr. Hair, like Mr. Martinez, had participated in contractual compliance audits of companies other than Abbott. In order to allow us assess whether Mr. Hair would be an adequate representative, you agreed to provide information regarding Mr. Hair's involvement, if any, in contractual compliance audits

MUNGER, TOLLES & OLSON LLP

Andrew C. Griesinger
April 12, 2007
Page 5

of companies other than Abbott. I noted that, regardless of whether StoneTurn designates Mr. Martinez of Mr. Hair, it must produce the documents requested in the subpoena sufficiently in advance of the deposition to allow for adequate preparation. If StoneTurn fails to do so, it will effectively deny Abbott the opportunity to conduct the 30(b)(6) deposition.

Please let me know whether I have misstated StoneTurn's position or our discussions in any way. As you know, we would prefer to reach a compromise and we remain willing to discuss potential modifications of the subpoena to address your objections. If we are forced to engage in motion practice, we will request reimbursement of Abbott's attorney fees.

Sincerely,

Eric J. Lorenzini

EJL:mac1

cc:    Karen Collari Troake

2736945.1

EXHIBIT 7

REDACTED

# NON-DISCLOSURE AGREEMENT – MULTI-PARTY – NDA NO:_____

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
for itself and its affiliated companies ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓ and Stoneturn Group, having a place of business at 100 Congress Avenue, Austin TX 78701 ("Stoneturn" or "Party 3") hereby enter into this Multi-Party Non-Disclosure Agreement ("Agreement"), effective as of November 20, 2006 ("Effective Date") and agree as follows:

1. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and Stoneturn ("Disclosing Party(ies)"), for their mutual benefit, desire to disclose to one another ("Receiving Party(ies)") certain Information (defined in Paragraph 2 below) for the purpose of Conducting and Completing an Audit under the ▓▓▓▓▓▓▓▓▓▓ Agreement between ▓▓▓▓▓▓▓▓▓▓ ("Purpose/Project").

2. Information consists of certain specifications, designs, plans, drawings, software, data, prototypes, or other business and/or technical information disclosed hereunder (and all copies thereof made pursuant to Section 4) related to the completion of an audit, which is proprietary or confidential to the Disclosing Party ("Information"). Information may be in any form or medium, tangible or intangible, and may be communicated in writing, orally, or through visual observation. This Agreement shall only apply to Information (1) in tangible form, if clearly marked as proprietary when disclosed; or (2) in intangible form, if its proprietary nature is first announced, and then reduced to writing and furnished to the Receiving Party(ies) within thirty (30) days of the initial disclosure, in which case the Information contained in such summary (not information contained solely in the intangible disclosure) shall be subject to the restrictions herein. Each Disclosing Party shall endeavor to keep to a minimum the amount of Information that is furnished to the Receiving Parties upon which restrictions are imposed.

3. This Agreement applies to Information disclosed during a "Disclosure Period" beginning on the Effective Date and terminating on January 31, 2007. Either party shall have the right to terminate the Disclosure Period on five (5) days' written notice, but such termination shall not terminate or shorten the Confidentiality Period as defined herein.

4. The parties agree that for a "Confidentiality Period" beginning on the first date Information is disclosed and ending three (3) years from such date:

A. The Receiving Party(ies) shall use Information only for the Purpose/Project; hold Information in confidence using the same degree of care as it normally exercises to protect its own proprietary information, but not less than reasonable care taking into account the nature of the Information; grant access to Information only to employees who have a need to know; cause its employees to comply with this Agreement; reproduce Information

only to the extent necessary to fulfill the Purpose/Project; and prevent disclosure of Information to third parties. However, a Receiving Party may disclose the Information to its consultants and contractors with a need to know, provided that such consultants and contractors are not competitors of the Disclosing Party, and the Receiving Party binds those consultants and contractors to terms at least as restrictive as those stated herein, and advises them of their obligations.

B. Upon the Disclosing Party's request, the Receiving Party(ies) shall either return all Information or certify that all media containing Information have been destroyed. However, the Receiving Party's(ies') counsel may retain an archival copy of the Information, solely for the purpose of proving the contents of the Information.

5. The foregoing restrictions shall not apply to Information that the Receiving Party(ies) can demonstrate:

A. was independently developed by or for the Receiving Party(ies) without reference to the Information;

B. was received by the Receiving Party(ies) without restrictions;

C. has become generally available to the public without breach of this Agreement;

D. was already known to or in the possession of the Receiving Party without restriction;

E. which the Disclosing Party agrees in writing is free of such restrictions; or

F. is the subject of a subpoena or other legal or administrative demand for disclosure, provided that the applicable Receiving Party(ies) gives the applicable Disclosing Party(ies) prompt notice of the demand and reasonably cooperates with Disclosing Party's efforts to secure an appropriate protective order.

6. An individual who has seen Information under this Agreement shall not be precluded from working on projects for the Receiving Party(ies) that relate to similar subject matters, provided that the individual does not use or make reference to the Information and did not copy the substance of the Information during the Confidentiality Period. Furthermore, nothing contained herein shall be construed as restricting any Receiving Party from disclosing or using any "Residuals" for any purpose, including, without limitation, use in development, manufacture, promotion, sale and maintenance of its products and services; provided that this right to Residuals does not represent a license under any patents, copyrights or other intellectual property rights of the disclosing party. The term "Residuals" means any information retained in the unaided memories of the Receiving Party's

REDACTED

employees who have had access to the Disclosing Party's Information pursuant to the terms of this Agreement. An employee's memory is unaided if the employee has not intentionally memorized Information for the purpose of retaining and subsequently using or disclosing it.

7.      As between the parties, all Information shall remain the property of the Disclosing Party. Except for the right to use Information for the Purpose/Project and the right to reproduce as specified in Section 4A, by disclosing Information or executing this Agreement, the Disclosing Party does not grant any license, explicitly or implicitly, under any trademark, patent, copyright, mask work protection right, trade secret, or any other intellectual property right. EACH PARTY REPRESENTS AND WARRANTS THAT IT HAS THE RIGHT TO DISCLOSE AND FURNISH THE INFORMATION TO THE OTHER PARTIES FOR THE PURPOSE/PROJECT. EXCEPT AS STATED IN THIS SECTION 7, EACH DISCLOSING PARTY DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, REGARDING THE INFORMATION, INCLUDING, WITHOUT LIMITATION, ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND WITH RESPECT TO INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS AND ALL WARRANTIES AS TO THE ACCURACY OR UTILITY OF SUCH INFORMATION. Each Disclosing Party disclaims all responsibility and liability for any actions taken by any or all of the Receiving Parties on the basis of its analysis or other use of Information, including, but not limited to, any adjustments or modifications to a Receiving Party's products in light of such use of Information, and each Receiving Party acknowledges that each Disclosing Party shall have no responsibility or liability as a result of such Receiving Party's use of Information.

8.      Neither this Agreement nor the disclosure or receipt of Information shall create an obligation for any party to make any further agreement or business arrangement, purchase products or services, or engage in any present or future marketing activities.

9.      The parties acknowledge that certain products, software, and technical information provided pursuant to this Agreement may be subject to United States export laws and regulations and agree that any use or transfer of such items must be authorized by the appropriate United States government agency. None of the

Receiving Parties shall directly or indirectly use, distribute, transfer, or transmit any item of Information provided by a Disclosing Party (even if incorporated into other products, software, and technical information), except in compliance with United States export laws and regulations.

10.     A party's failure to enforce any provision, right, or remedy under this Agreement shall not constitute a waiver of such provision, right, or remedy.

11.     None of the parties shall disclose the fact that discussions related to the subject matter of this Agreement are taking place between the parties to any third party without prior written approval of the other parties.

12.     The parties are familiar with New York commercial law, desire to avoid uncertainty and disputes concerning the law that will govern this Agreement, and at least one of the parties conducts substantial business in the State of New York. Accordingly, the parties expressly intend and agree that the construction, interpretation, and performance of this Agreement shall be governed by the laws of the State of New York (U.S.), excluding its conflict of law provisions and excluding the United Nations Convention on the Sale of Goods.

13.     (A) This Agreement constitutes the entire agreement of the parties with respect to the parties' respective obligations in connection with Information disclosed hereunder and supersedes all prior oral and written agreements and discussions with respect thereto. (B) Each party intends that a facsimile of its signature printed by a receiving fax machine be regarded as an original signature and agrees that this Agreement can be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. (C) Any signature page of this Agreement may be detached from any counterpart of this Agreement without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Agreement identical in form hereto but having attached to it one or more additional signature pages. (D) The parties can amend or modify this Agreement only by a writing duly executed by their authorized representatives.

REDACTED    3

(Signature)

(Name Typed)

(Title)

11/27/06
(Date Signed)

(Signature)

(Name Typed)

(Title)

(Date Signed)

StoneTurn Group, LLP

(Signature)

CHRIS MARTINEZ
(Name Typed)

PARTNER
(Title)

11/22/06
(Date Signed)