UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER LIFE INSURANCE COMPANY), | ) ) ) ) ) ) ) ) ) | Civil Action No. 05-11150-DPW |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) ) | |
| ABBOTT LABORATORIES, | ) ) ) | |
| *Defendant*. | ) | |

**AFFIDAVIT OF ERIC J. LORENZINI IN SUPPORT OF ABBOTT'S MOTION FOR SUMMARY JUDGMENT ON HANCOCK'S RESCISSION CLAIM
(PUBLIC REDACTED VERSION)**

I, Eric Lorenzini, hereby state under oath:

1.     I currently am employed as an associate at Munger, Tolles & Olson LLP, which represents defendant Abbott Laboratories ("Abbott") in this action. I submit this affidavit, and the attached exhibits, in support of Abbott's Motion for Summary Judgment on Hancock's Rescission Claim.

2.     Attached hereto as Exhibit 1 is a true and correct copy of the Research Funding Agreement between Abbott Laboratories and John Hancock Life Insurance Company, dated March 13, 2001.

3.     Attached hereto as Exhibit 2 is a true and correct copy of a letter from

Daphne Pals to Stephen Blewitt, dated September 20, 2001 and marked as Exhibit 30 to the deposition of Philip Deemer taken October 27, 2006.

4.      Attached hereto as Exhibit 3 are true and correct copies of excerpts from the deposition of Philip Deemer taken October 27, 2006.

5.      Attached hereto as Exhibit 4 is a true and correct copy of a letter from Daphne Pals to Stephen Blewitt, dated November 16, 2001 and marked as Exhibit 35 to the deposition of Jeffrey Leiden taken April 26, 2007.

6.      Attached hereto as Exhibit 5 is a true and correct copy of a letter from Tom Lyons to Stephen Blewitt, dated December 20, 2002 and marked as Exhibit 8 to the deposition of Keith Hendricks taken April 27, 2007.

7.      Attached hereto as Exhibit 6 are true and correct copies of excerpts to the deposition of Keith Hendricks taken April 27, 2007.

8.      Attached hereto as Exhibit 7 is a true and correct copy of a letter from James L. Tyree to Stephen Blewitt dated November 12, 2003.

9.      Attached hereto as Exhibit 8 are true and correct copies of excerpts from the deposition of Stephen Blewitt taken November 17, 2006.

10.      Attached hereto as Exhibit 9 is a true and correct copy of the Complaint in *John Hancock Life Insurance Company v. Abbott Laboratories,* Case No. 03-CV-12501-DPW, filed December 12, 2003.

11.      Attached hereto as Exhibit 10 is a true and correct copy of a Hancock report, dated December 19, 2003 and marked as Exhibit 14 to the deposition of Deidre Daesen taken March 21, 2007.

12.      Attached hereto as Exhibit 11 are true and correct copies of excerpts from

the deposition of Deidre Daesen taken March 21, 2007.

13.     Attached hereto as Exhibit 12 is a true and correct copy of a Hancock report prepared by Stephen Blewitt and Scott Hartz, dated September 21, 2000 and marked as Exhibit 15 to the deposition of Stephen Blewitt taken November 17, 2006.

14.     Attached hereto as Exhibit 13 is a true and correct copy of the First Amended Supplemental Complaint in *John Hancock Life Insurance Company v. Abbott Laboratories,* Case No. 05-11150-DPW, filed December 29, 2006.

15.     Attached hereto as Exhibit 14 is a true and correct copy of a letter from Stephen Blewitt to James Tyree, dated April 12, 2004 and marked as Exhibit 2 to the deposition of Christopher Martinez taken November 3, 2006.

16.     Attached hereto as Exhibit 15 are true and correct copies of excerpts from the deposition of Christopher Martinez taken November 3, 2006.

17.     Attached hereto as Exhibit 16 is a true and correct copy of Plaintiff John Hancock Life Insurance Company's Supplemental Responses to Defendant Abbott Laboratories' Interrogatory Nos. 2,3,5(A)(B)(F) and 7, dated July 16, 2007.

18.     Attached hereto as Exhibit 17 is a true and correct copy of a letter from Stephen Blewitt to James L. Tyree, dated April 1, 2005 and marked as Exhibit 28 to the deposition of Stephen Blewitt taken November 17, 2006.

19.     Attached hereto as Exhibit 18 is a true and correct copy of the Complaint in *John Hancock Life Insurance Company v. Abbott Laboratories,* Case No. 05-11150-DPW, filed June 3, 2005.

20.     Attached hereto as Exhibit 19 is a true and correct copy of a letter from James L. Tyree to Stephen Blewitt, dated December 2, 2004.

21.    Attached hereto as Exhibit 20 is a true and correct copy of email correspondence between Stephen Blewitt, Scott Hartz, Deidre Mangan (Daesen) and Maribeth Dacey, dated September 30, 2002 through October 2, 2002 and marked as Exhibit 28 to the deposition of Scott Hartz taken November 10, 2006.

22.    Attached hereto as Exhibit 21 are true and correct copies of excerpts from the deposition of Scott Hartz taken November 10, 2006.

23.    Attached hereto as Exhibit 22 is a true and correct copy of a Hancock report, dated March 19, 2004 and marked as Exhibit 16 to the deposition of Deidre Daesen taken March 21, 2007.

24.    Attached hereto as Exhibit 23 is a true and correct copy of Abbott Laboratories' Responses and Objections to Plaintiffs' Second Set of Interrogatories, dated June 27, 2006.

25.    Attached hereto as Exhibit 24 is a true and correct copy of the Statement of Undisputed Facts in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment on Count II of Supplemental Complaint, filed September 8, 2006.

26.    Attached hereto as Exhibit 25 is a true and correct copy of a letter from James L. Tyree to Stephen Blewitt, dated November 16, 2004 and marked as Exhibit 12 to the deposition of Keith Hendricks taken April 27, 2007.

27.    Attached hereto as Exhibit 26 is a true and correct copy of a letter from Suzanne A. Lebold to Stephen Blewitt, dated January 20, 2006 and marked as Exhibit 13 to the deposition of Keith Hendricks taken April 27, 2007.

28.    Attached hereto as Exhibit 27 is a true and correct copy of a document entitled "John Hancock Activity/Communication Log between MH of StoneTurn Group and

Abbott Personnel" and marked as Exhibit 26 to the deposition of Mark Hair taken May 8, 2007.

29.     Attached hereto as Exhibit 28 are true and correct copies of excerpts from the deposition of Mark Hair taken May 8, 2007.

30.     Attached hereto as Exhibit 29 are true and correct copies of excerpts from the deposition of Michelle Campbell taken February 20, 2007.

31.     Attached hereto as Exhibit 30 is a true and correct copies of invoices from temporary employment agencies to Michelle Campbell, dated March 2005 and marked as Exhibit 6 to the deposition of Michelle Campbell taken February 20, 2007.

32.     Attached hereto as Exhibit 31 is a true and correct copy of a letter from Suzanne A. Lebold to Stephen Blewitt, dated July 19, 2005 and marked as Exhibit 27 to the deposition of Stephen Blewitt taken November 17, 2006.

33.     Attached hereto as Exhibit 32 is a true and correct copy of a Hancock report entitled "Abbott Laboratories - BA Asset," dated March 8, 2006, Bates-numbered JHII021959 - JHII021961.

34.     Attached hereto as Exhibit 33 is a true and correct copy of Plaintiffs' Motion for Summary Judgment in *John Hancock Life Insurance Company v. Abbott Laboratories,* Case No. 03-CV-12501-DPW, filed September 29, 2004.

35.     Attached hereto as Exhibit 34 is a true and correct copy of the Final Judgment and Declaration in *John Hancock Life Insurance Company v. Abbott Laboratories,* Case No. 03-CV-12501-DPW, filed September 16, 2005.

36.     Attached hereto as Exhibit 35 is a true and correct copy of a Hancock report, dated September 13, 2004, Bates-numbered JHII012067 - JHII012070.

37.     Attached hereto as Exhibit 36 is a true and correct copy of a Hancock

report, dated December 13, 2004, Bates-numbered JHII012062 - JHII012066.

38.    Attached hereto as Exhibit 37 is a true and correct copy of a Hancock report, dated June 13, 2005, Bates-numbered JHII012079 - JHII012083.

39.    Attached hereto as Exhibit 38 is a true and correct copy of a letter from Stephen Blewitt to Jim Philip, dated September 6, 2005 and marked as Exhibit 30 to the deposition of Stephen Blewitt taken November 17, 2006.

40.    Attached hereto as Exhibit 39 is a true and correct copy of a Hancock report, dated December 6, 2005, Bates-numbered JHII012050 - JHII012055.

41.    Attached hereto as Exhibit 40 is a true and correct copy of John Hancock's Objections and Responses to Abbott Laboratories' First Set of Interrogatories, dated February 6, 2006.

42.    Attached hereto as Exhibit 41 is a true and correct copy of the Supplemental Complaint in *Hancock Life Insurance Company v. Abbott Laboratories,* Case No. 05-11150-DPW, filed June 23, 2006.

43.    Attached hereto as Exhibit 42 is a true and correct copy of the Brief of Plaintiffs-Appellees John Hancock Life Insurance Company, et al, filed in Case No 05-2710 in the U.S. Court of Appeals, First District on April 3, 2006.

44.    Attached hereto as Exhibit 43 is a true and correct copy of an Opinion of the  U.S. Court of Appeals, First District in Case No 05-2710, dated September 28, 2006.

45.    Attached hereto as Exhibit 44 is a true and correct copy of a Hancock report entitled "Abbott Laboratories - BA Asset," dated December 13, 2006, Bates-numbered JHII021956 - JHII021958.

46.    Attached hereto as Exhibit 45 are true and correct copies of excerpts from

the transcript of proceedings in the hearing before Honorable Douglas P. Woodlock, dated

December 6, 2006.

47.     Attached hereto as Exhibit 46 is a true and correct copy of Plaintiffs'

Motion for Leave to Amend Supplemental Complaint, filed October 24, 2006.

48.     Attached hereto as Exhibit 47 is a true and correct copy of the Stipulation

and Proposed Order Regarding Certain Pending Motions and Scheduling, filed December 21,

2006.

I affirm under pains and penalties of perjury under the laws of the United States

of America that the foregoing is true and correct and that this declaration is executed this 20th

day of July, 2007, in Los Angeles, California.


_____
               /s/ Eric J. Lorenzini

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on July 27, 2007.

Date: July 27, 2007

_____ /s/ Michael S. D'Orsi

3310122.1

**EXHIBIT 1**

**CONFIDENTIAL - REDACTED**

**EXHIBIT 2**

## ⊐ ABBOTT

Daphne L. Pals
Senior Counsel

Abbott Laboratories
100 Abbott Park Road
Abbott Park, Illinois 60064-6049
Telephone: (847) 935-5747
Telecopy: (847) 938-1206

September 20, 2001

John Hancock Life Insurance Company
200 Clarendon Street, T-57
Boston, MA 02117
Attention: Bond & Corporate Finance Group
Fax: 617-572-1628

Re:   Research Funding Agreement dated as of March 13, 2001
      Termination of MMPI Program and ABT-518

Dear Steve,

This is to advise you that Abbott has refocused its efforts in cancer discovery and, as a result, has made the decision to terminate the MMPI Program, which includes Program Compound ABT-518. There will not be any further funding of ABT-518 or the MMPI Program, except as is required to continue to collect data on already enrolled patients.

Section 4.3(c) of the Agreement is not applicable as the cessation of the development of ABT-518 was not the result of Abbott's acquisition of a Replacement Compound. Abbott will attempt to maximize the commercial value, if any, of ABT-518 as required under Section 4.3(d).

Phil Deemer has attempted to schedule a meeting with you to discuss the termination for the MMPI Program, as well as introduce you to Tom Lyons, our new controller, Global Pharmaceuticals Research and Development. Unfortunately, due to scheduling problems, that meeting has not yet occurred. We look forward to scheduling that meeting soon.

I hope you are doing well.

Sincerely,

*Daphne Pals*

Daphne Pals
Senior Counsel

PLAINTIFF'S
EXHIBIT
*Deemer 30*
*10-27-06*

cc:   John Hancock Life Insurance Company
      200 Clarendon Street, T-50
      Boston, MA 02117
      Attention: Investment Law Division
      Fax: 617-572-9268

CONFIDENTIAL
JH 008372

**EXHIBIT 3**

Page 1

1          UNITED STATES DISTRICT COURT

2                    FOR THE

3            DISTRICT OF MASSACHUSETTS

4

5   JOHN HANCOCK LIFE INSURANCE      )

6   COMPANY, JOHN HANCOCK            )

7   VARIABLE LIFE INSURANCE          )

8   COMPANY, and MANULIFE            )

9   INSURANCE COMPANY  (f/k/a        )

10  INVESTORS  PARTNER INSURANCE     )   Civil Action No.

11  COMPANY),                        )   05-11150-DPW

12              Plaintiffs,          )

13      -vs-                         )

14  ABBOTT LABORATORIES,             )

15              Defendant.           )   COPY

16

17          The videotaped deposition of PHILIP

18  DEEMER, called for examination, taken pursuant to

19  the Federal Rules of Civil Procedure of the United

20  States District Courts pertaining to the taking of

21  depositions, taken before THERESA A. VORKAPIC, a

22  Notary Public within and for the County of Kane,

23  State of Illinois, and a Certified Shorthand

24  Reporter, CSR No. 84-2589, of said state, at Suite

Page 2

1    1300, Two North LaSalle Street, Chicago, Illinois,

2    on the 27th day of October, A.D. 2006, at

3    approximately 9:16 a.m.

4    PRESENT:

5        CHOATE HALL & STEWART, LLP,

6        (Two International Place,

7        Boston, Massachusetts 02110,

8        617-248-5000), by:

9        MR. BRIAN A. DAVIS,

10       bad@choate.com,

11           appeared on behalf of Plaintiffs;

12       MUNGER TOLLES & OLSON, LLP,

13       (355 South Grand Avenue, 35th Floor,

14       Los Angeles, California 90071-1560,

15       213-683-9207), by:

16       MR. ERIC J. LORENZINI,

17       eric.lorenzini@mto.com,

18           appeared on behalf of Defendant.

19

20   VIDEOTAPED BY:  JOE BURKE, Legal Videographer,

21           Esquire Deposition Services

22   REPORTED BY:  THERESA A. VORKAPIC,

23           C.S.R. Certificate No. 84-2589

24

Page 244

1    Q.    Would you fell Mr. Johannsen that it

2  was being terminated unless Perry can get funded

3  again without having knowledge that it had been

4  terminated for lack of funding?

5    MR. LORENZINI:  Objection.  Vague and

6  ambiguous.

7  BY THE WITNESS:

8    A.    I don't know.  I don't know.

9    MR. DAVIS:  Would you mark this, please, as

10  the next exhibit.

11                (WHEREUPON, a certain document

12                was marked Deemer Deposition

13                Exhibit No. 29, for identification,

14                as of 10/27/06.)

15                (WHEREUPON, the document was

16                tendered to the witness.)

17  BY MR. DAVIS:

18    Q.    Mr. Deemer, you have what's been marked

19  as Exhibit 29 which is an e-mail from to you Susan

20  Glad and/or Curt Whirley?

21    A.    Whirley.

22    Q.    Whirley on September 17, 2001.  Do you

23  recall sending this e-mail?

24    A.    You know, what, I don't recall sending

1    was one for each of those.

2        Q.    Was there an investigational brochure

3    prepared for ABT-594?

4        A.    I think all compounds have to have

5    investigational brochures.

6        Q.    You believe yes?

7        A.    Yes.  I believe yes.

8        Q.    Was there a DDC document prepared for

9    ABT-594?

10        A.    I believe yes.

11        Q.    Did you have copies of those at any

12    point in time?

13        A.    I don't recall having copies.  I'm

14    asking in this memo, though, for someone to

15    accepted -- I'm asking are they available

16    electronically.  Often they are not, so I don't

17    know.

18        MR. DAVIS:  Would you mark this as the next

19    exhibit, please.

20                    (WHEREUPON, a certain document

21                    was marked Deemer Deposition

22                    Exhibit No. 30, for identification,

23                    as of 10/27/06.)

24                    (WHEREUPON, the document was

Page 247

1                          tendered to the witness.)

2    BY MR. DAVIS:

3         Q.    Looking at Exhibit 30, Mr. Deemer, that

4    is letter from Daphne Powells to Mr. Blewitt dated

5    September 20, 2001.  Ms. Powells, she was an

6    in-house attorney at Abbott, correct?

7         A.    Correct.

8         Q.    And she participated in the negotiation

9    and drafting of the Research Funding Agreement,

10   correct?

11        A.    Yes, she did.

12        Q.    If you take a look at the last

13   paragraph of this letter, if says:  "Phil Deemer

14   has attempted to schedule a meeting with you to

15   discuss the termination for the MMPI program as

16   well as to introduce you to Tom Lyons, our new

17   controller, Global Pharmaceuticals Research &

18   Development."

19              Did I read that correctly?

20        A.    Yes.

21        Q.    Did that meeting ever take place?

22        A.    You know, I think it took place between

23   Tom and Steve.  I'm not sure I was ever there.

24        Q.    What was it that you intended to tell

Page 248

1    Mr. Blewitt in the course of that meeting

2    regarding the termination for the MMPI program?

3         A.    I wanted to tell him what was coming in

4    this letter in advance of the letter.

5         Q.    So you just wanted to inform him that

6    the MMPI program had been terminated?

7         A.    Yeah.

8         Q.    Anything more?

9         A.    No.  I would have preferred to have

10   told him in person as opposed to him getting this

11   letter.

12        Q.    Ms. Powell says:  "We look forward to

13   scheduling that meeting soon."

14             I take it there wasn't any need any

15   longer when Mr. Powell sent this letter for a

16   meeting to discuss the termination of the MMPI

17   program?

18        A.    I think there was another reason.

19        Q.    Go ahead answer.

20        A.    Steve Cohen had left and here was this

21   Tom Lyons person who was coming on to take over

22   his responsibilities and that was another

23   objective of that meeting.

24        Q.    You don't recall participating in such

1   a meeting with Mr. Blewitt?

2        A.    I think they ended up having a

3   telephone conversation.

4        MR. DAVIS:  Mark this as the next exhibit,

5   please.

6                    (WHEREUPON, a certain document

7                    was marked Deemer Deposition

8                    Exhibit No. 31, for identification,

9                    as of 10/27/06.)

10                   (WHEREUPON, the document was

11                   tendered to the witness.)

12  BY MR. DAVIS:

13       Q.    Mr. Deemer, you have what's been marked

14  as Exhibit 31.  It appears to be an e-mail from

15  you to Bruce at Amgen.com at internet; do you see

16  that?

17       A.    Yes.

18       Q.    Who is Bruce B at Amgen?

19       A.    He was a business development

20  individual at another biotechnology company.

21       Q.    Did you actually send this e-mail to

22  him on or about October 11, 2001?

23       A.    Well, I mean, again, I presume I did

24  because it's in front of me here so that's -- to

Page 274

1          UNITED STATES DISTRICT COURT

2                    FOR THE

3           DISTRICT OF MASSACHUSETTS

4   JOHN HANCOCK LIFE INSURANCE      )

5   COMPANY, et al.,                 )

6               Plaintiffs,          )   Civil Action No.

7        -vs-                        )   05-11150-DPW

8   ABBOTT LABORATORIES,             )

9               Defendant.           )

10          I hereby certify that I have read the

11   foregoing transcript of my deposition given at the

12   time and place aforesaid, consisting of Pages 1 to

13   273, inclusive, and I do again subscribe and make

14   oath that the same is a true, correct and complete

15   transcript of my deposition so given as aforesaid,

16   and includes changes, if any, so made by me.

17

18                        PHILIP DEEMER

19

20   SUBSCRIBED AND SWORN TO

21   before me this       day

22   of            , A.D. 200   .

23

24        Notary Public

Page 275

```
1    STATE OF ILLINOIS   )

2                        )  SS:

3    COUNTY OF K A N E   )

4               I, THERESA A. VORKAPIC, a Notary Public

5    within and for the County of Kane, State of

6    Illinois, and a Certified Shorthand Reporter, CSR

7    No. 84-2589, of said state, do hereby certify:

8               That previous to the commencement of

9    the examination of the witness, the witness was

10   duly sworn to testify the whole truth concerning

11   the matters herein;

12               That the foregoing deposition

13   transcript was reported stenographically by me,

14   was thereafter reduced to typewriting under my

15   personal direction and constitutes a true record

16   of the testimony given and the proceedings had;

17               That the said deposition was taken

18   before me at the time and place specified;

19               That I am not a relative or employee or

20   attorney or counsel, nor a relative or employee of

21   such attorney or counsel for any of the parties

22   hereto, nor interested directly or indirectly in

23   the outcome of this action.

24               IN WITNESS WHEREOF, I do hereunto set
```

Page 276

1    my hand and affix my seal of office at Chicago,

2    Illinois, this 11th day of November, 2006.

3

4

5                        Theresa A. Vorkapic

6                        Notary Public, Kane County,

7                        Illinois.

8

9

10

11   C.S.R. Certificate No. 84-2589.

12

13

14

15

16

17

18

19

20

21

22

23

24

EXHIBIT 4

**CONFIDENTIAL - REDACTED**

**EXHIBIT 5**

**CONFIDENTIAL - REDACTED**

**EXHIBIT 6**

KEITH HENDRICKS, APRIL 27, 2007

```
 1           IN THE UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF MASSACHUSETTS

 3   JOHN HANCOCK LIFE INSURANCE     )

 4   COMPANY, JOHN HANCOCK           )

 5   VARIABLE LIFE INSURANCE         )  Civil Action

 6   COMPANY, and MANULIFE           )  No. 05-11150-DPW

 7   INSURANCE COMPANY (f/k/a        )

 8   INVESTORS PARTNER INSURANCE     )

 9   COMPANY),                       )

10             Plaintiffs,           )

11        vs.                        )

12   ABBOTT LABORATORIES,            )

13             Defendant.            )

14           The videotaped deposition of KEITH

15   HENDRICKS, called for examination, taken pursuant to

16   the Federal Rules of Civil Procedure of the United

17   States District Courts pertaining to the taking of

18   depositions, taken before JENNIFER L. BERNIER, CSR

19   No. 84-4190, a Notary Public within and for the

20   County of Cook, State of Illinois, and a Certified

21   Shorthand Reporter of said state, at Suite 1300, Two

22   North LaSalle Street, Chicago, Illinois, on the 27th

23   day of April, A.D. 2007, at 9:49 a.m.

24
```

1      VIDEO TECHNICIAN:  Welcome back.  We are on

2   the video record at 12:55 p.m.  This is Tape 3.

3      MR. DAVIS:  Welcome back, Mr. Hendricks.  Mark

4   that, please, as the next exhibit.

12:55   5      THE REPORTER:  We're on 8.

6                      (WHEREUPON, a certain document was

7                       marked Hendricks' Deposition

8                       Exhibit No. 8, for identification,

9                       as of 04-27-2007.)

10                  KEITH HENDRICKS,

11   called as a witness herein, having been previously

12   duly sworn, was examined and testified as follows:

13                  EXAMINATION (CONT'D)

14   BY MR. DAVIS:

12:56  15      Q.    Mr. Hendricks, are you aware that, in the

16   course of implementing the Research Funding

17   Agreement, that Abbott periodically sent status

18   reports to John Hancock?

19      A.    I am aware now.

12:56  20      Q.    Did you participate, in any way, in the

21   creation of any of those status reports?

22      A.    No.

23      Q.    You're aware, also, that Abbott -- under

24   the terms of the Research Funding Agreement -- was

KEITH HENDRICKS,  APRIL 27, 2007

 1   required to give John Hancock annual research plans

 2   for the compounds that were included in the basket

 3   of compounds?

 4        A.     I'm sorry.  I want to restate my response

12:56  5   to the last question.

 6            I actually was -- I think, in, maybe, the

 7   last status report that was done, I actually was

 8   asked to pull some costs together.  So this would

 9   have been 200- --

12:56 10        Q.     Mm-hmm.

11        A.     -- maybe, 5 time frame.

12        Q.     Mm-hmm.

13        A.     I just want to make that clear.  Up to

14   that point, I had not had anything to do with this;

12:57 15   but I happened to have been pulled into there.  I

16   just wanted to clarify that.

17        Q.     Thank you.

18        A.     Okay.  I'm sorry.  Then your next

19   question.

12:57 20        Q.     My next question was, are you aware that

21   Abbott was also required to give John Hancock annual

22   research plans?

23        A.     I am aware of that.

24        Q.     Did you participate in the creation of

1   any annual research plans?

2       A.    No.

3       Q.    What I'm showing you as Exhibit 8 is a

4   copy of a letter with both a status report and a

12:57  5   preliminary annual research plan that Abbott sent to

6   John Hancock back in September of 2002.

7             And what I would like to do is direct

8   your attention, please, to the page that's Bates

9   numbered high up in the middle of the page that ends

12:57 10   in 8111.

11       A.    Okay.

12       Q.    Do you see that there's a chart there

13   that's labeled, "John Hancock Portfolio Summary, R&D

14   Costs and Development Timeline, 2003 Plan."

12:58 15             Do you see that?

16       A.    Yes.

17       Q.    And then you also see, under the first

18   section there, there is a list of the various

19   compounds that were part of the Research Funding

12:58 20   Agreement; do you see that?

21       A.    Yes.

22       Q.    And then there's -- next to that there is

23   a, "2001 Actuals," column?

24       A.    Yes.

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF MASSACHUSETTS
 3    JOHN HANCOCK LIFE INSURANCE      )
 4    COMPANY, et al.,                 )
 5              Plaintiffs,            ) Civil Action
 6         vs.                         ) No. 05-11150-DPW
 7    ABBOTT LABORATORIES,             )
 8              Defendant.             )
 9              I hereby certify that I have read the
10    foregoing transcript of my deposition given at the
11    time and place aforesaid, consisting of Pages 1 to
12    249, inclusive, and I do again subscribe and make
13    oath that the same is a true, correct and complete
14    transcript of my deposition so given as aforesaid,
15    and includes changes, if any, so made by me.
16
17                            KEITH HENDRICKS
18    SUBSCRIBED AND SWORN TO before me
19    this       day of                 , A.D. 2007.
20
21            Notary Public
22
23
24
```

KEITH HENDRICKS,  APRIL 27, 2007

```
 1   STATE OF ILLINOIS )
 2                     )  SS:
 3   COUNTY OF COOK    )
 4            I, JENNIFER L. BERNIER, a Notary Public
 5   within and for the County of Cook State of Illinois,
 6   and a Certified Shorthand Reporter of said state, do
 7   hereby certify:
 8            That previous to the commencement of
 9   the examination of the witness, the witness was
10   duly sworn to testify the whole truth concerning
11   the matters herein;
12            That the foregoing deposition
13   transcript was reported stenographically by me,
14   was thereafter reduced to typewriting under my
15   personal direction and constitutes a true record
16   of the testimony given and the proceedings had;
17            That the said deposition was taken
18   before me at the time and place specified;
19            That I am not a relative or employee or
20   attorney or counsel, nor a relative or employee of
21   such attorney or counsel for any of the parties
22   hereto, nor interested directly or indirectly in
23   the outcome of this action.
24            IN WITNESS WHEREOF, I do hereunto set
```

KEITH HENDRICKS,  APRIL 27, 2007

```
 1   my hand and affix my seal of office at Chicago,

 2   Illinois, this 14th day of May, 2007.

 3

 4

 5                 Notary Public, Cook County,

 6                 Illinois.

 7                 My commission expires June 17, 2008

 8

 9

10   C.S.R. Certificate No. 84-4190

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

"OFFICIAL SEAL"
JENNIFER BERNIER
Notary Public, State of Illinois
My Commission Expires 06/17/2008

**EXHIBIT 7**

**CONFIDENTIAL - REDACTED**

**EXHIBIT 8**

**CONFIDENTIAL - REDACTED**

**EXHIBIT 9**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2003 DEC 12  A 11: 36

U.S. DISTRICT COURT
DISTRICT OF MASS.

JOHN HANCOCK LIFE INSURANCE )
COMPANY, JOHN HANCOCK )
VARIABLE LIFE INSURANCE )
COMPANY, and INVESTORS )
PARTNER LIFE INSURANCE )
COMPANY, )

MAGISTRATE JUDGE _____

**03 CV 12501 DPW**

        Plaintiffs, )

v. )

ABBOTT LABORATORIES, )

        Defendant. )

CIVIL ACTION NO. _____

RECEIPT #_____
AMOUNT $_____ 150
SUMMONS ISSUED_____ /
LOCAL RULE 4.1_____
WAIVER FORM _____
MCF ISSUED_____ 
BY DPTY. CLK._____
DATE_____ 12-12-03

## COMPLAINT
## FOR DECLARATORY JUDGMENT

### Introduction

1.     This is an action filed pursuant to 28 U.S.C. § 2201, *et seq.*, in which plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Investors Partner Life Insurance seek a judicial declaration that the plaintiffs' obligation to make additional Program Payments to defendant Abbott Laboratories under the Research Funding Agreement by and between the plaintiffs and the defendant, dated as of March 13, 2001 (the "Agreement") has terminated in accordance with the terms of that Agreement.

Declaratory relief is appropriate because an actual controversy currently exists between the parties with respect to the issue presented.

## Parties

2.     Plaintiff John Hancock Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.   John Hancock Life Insurance Company is one of the nation's leading insurance companies, providing a broad array of insurance and investment products to retail and institutional customers, primarily in North America.

3.     Plaintiff John Hancock Variable Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.   John Hancock Variable Life Insurance Company provides variable life insurance products that link life insurance coverage and an investment return to an underlying portfolio of investments chosen by the policyholder.

4.     Plaintiff Investors Partner Life Insurance Company (collectively, with plaintiffs John Hancock Life Insurance Company and John Hancock Variable Life Insurance Company, "John Hancock") is a company, duly formed and existing under the laws of the State of Delaware, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts. Investors is a wholly-owned subsidiary of John Hancock Variable Life Insurance Company that sells various types of life insurance products.

5.     Defendant Abbott Laboratories ("Abbott" or "Abbott Labs") is a corporation, duly formed and existing under the laws of the State of Illinois, that maintains its corporate headquarters in Abbott Park, Illinois.  Abbott is a broad-based health care company that discovers, develops, manufactures and markets products and services that span the continuum of care -- from prevention and diagnosis to treatment and cure.  Abbott's principal businesses are global pharmaceuticals, nutritionals, and medical products, including diagnostics and cardiovascular devices.  Abbott Labs achieved record sales and net earnings of $17.7 billion and $3.2 billion, respectively, in 2002.

## Jurisdiction and Venue

6.     This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy in this action exceeds $75,000, exclusive of interest and costs.

7.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(a)(1) because defendant Abbott Labs resides in this district within the meaning of 28 U.S.C. § 1391(c), and further because Section 16.2 of the parties' Agreement provides that Abbott,

> consents ... to the exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts ... for the purpose of any suit, action or other proceeding arising out of any of its obligations hereunder or thereunder or with respect to the transactions contemplated hereby or thereby, and expressly waives any and all objections that it may have as to venue in such courts.

8.     As set forth more fully below, an actual controversy currently exists for purposes of 28 U.S.C. § 2201 with respect to John Hancock's obligation to make additional payments to Abbott Labs under the terms of the Agreement.

-3-

## Facts

9.     On March 13, 2001, John Hancock and Abbott Labs entered a written Agreement whereby Hancock agreed to provide funding to Abbott Labs for research and development activities on a portfolio of potential pharmaceutical products or "Program Compounds" (the "Program") in exchange for the right to receive future milestone and royalty payments from Abbott. Specifically, Hancock agreed to pay Abbott Labs up to a specified amount in four annual installments (the "Program Payments") from 2001 through 2004 (individually, "Program Years" and collectively, the "Program Term"). Abbott Labs agreed to provide additional funding for the Program and committed, under the terms of the Agreement, to spend certain minimum amounts on the Program during each Program Year (the "Annual Minimum Spending Target"), and a specified aggregate total on the Program over the entire four year Program Term (the "Aggregate Spending Target").

10.     Section 2.2 of the Agreement obligates Abbott Labs to provide John Hancock, at least forty-five days prior to the start of each Program Year, with an Annual Research Plan ("ARP") which spells out Abbott's anticipated Program spending for that year and for the remaining Program Term. If Abbott Labs' ARP for any given year "does not reasonably demonstrate [Abbott's] ... intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target," then John Hancock's "obligation to make any remaining Program Payments for any succeeding Program Years" automatically terminates pursuant to Section 3.4(iv) of the Agreement.

-4-

11.    John Hancock made two Program payments to Abbott Labs under the Agreement for 2001 and 2002.  In late 2002, John Hancock received Abbott Labs' ARP for the coming year, which stated what Abbott Labs intended to spend on the Program in 2003, but did not disclose Abbott's estimated spending amount for 2004, the final year of the Program.   No complete 2002 ARP was forthcoming from Abbott Labs until, at John Hancock's specific request, a copy eventually was sent to Hancock in late September 2003. That complete 2002 ARP and the accompanying cover letter from Thomas Lyons, the Controller of Abbott's "Global Pharmaceutical Research and Development" group, plainly state that it was Abbott's intention and reasonable expectation as of October 2002 to spend many millions of dollars less than the Aggregate Spending Target over the four year Program Term.

12.    After receiving Abbott Labs' complete 2002 ARP in late September 2003, John Hancock notified Abbott Labs in a letter dated October 10, 2003, that Abbott's decision in 2002 to reduce its anticipated spending over the four year Program Term below the required Aggregate Spending Target automatically terminated John Hancock's obligation to make Program Payments to Abbott for the third and fourth Program Years pursuant to the express terms of Section 3.4 of the Agreement.   A true copy of that letter is appended to this Complaint at Tab 1.

13.    Abbott Labs has responded to John Hancock's notification referenced in Paragraph 12, *supra*, by contesting John Hancock's assertion and demanding payment of the multi-million dollar third Program Payment before year end.

-5-

14.    The parties' subsequent efforts to amicably resolve their differences have proven unsuccessful.

### Claim

COUNT I
(For a Declaratory Judgment Pursuant to 28 U.S.C. § 2201, *et seq.*)

15.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 14 of this Complaint, *supra*.

16.    Abbott's decision in 2002 to reduce its anticipated spending over the entire Program Term below the required Aggregate Spending Target automatically terminated John Hancock's obligation to make Program Payments to Abbott for the third and fourth Program Years pursuant to Section 3.4 of the Agreement.    Nonetheless, Abbott Labs continues to insist that John Hancock is obligated to make the third Program Payment before the close of 2003.

17.    Accordingly, an actual controversy exists between John Hancock and Abbott Labs with respect to John Hancock's obligation to make additional Program Payments to Abbott under the Agreement.

### Prayer for Relief

WHEREFORE, John Hancock respectfully requests that this Court enter a final judgment in its favor and against Abbott Labs:

(a)    declaring that John Hancock's obligation to make Program Payments to Abbott for the third and fourth Program Years has terminated in accordance with the terms of the Agreement;

(b)    declaring that the Agreement otherwise is in full force and effect in accordance with its terms;

-6-

(c)    awarding John Hancock its losses, including without limitation its costs,

expenses and reasonable attorney's fees, incurred in this action as permitted by

law and the terms of the Agreement; and

(d)    granting such further necessary or proper relief as the Court deems just and

appropriate in the circumstances pursuant to 28 U.S.C. § 2202.

> JOHN HANCOCK LIFE INSURANCE
> COMPANY, JOHN HANCOCK VARIABLE
> LIFE INSURANCE COMPANY, AND
> INVESTORS PARTNER LIFE INSURANCE
>
> By their attorneys,
>
>
> Brian A. Davis (BBO No. 546462)
> Michael Arthur Walsh (BBO No. 514875)
> Raymond A. O'Brien (BBO No. 629753)
> Gretchen L. Edson (BBO No. 644742)
> CHOATE, HALL & STEWART
> Exchange Place
> 53 State Street
> Boston, Massachusetts 02109
> Tele: 617-248-5000

Date:   December 12, 2003

3633570.1

# EXHIBIT 10

**CONFIDENTIAL - REDACTED**

**EXHIBIT 11**

**CONFIDENTIAL - REDACTED**

**EXHIBIT 12**

**CONFIDENTIAL - REDACTED**

**EXHIBIT 13**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY), )<br><br>Plaintiffs, )<br><br>v. )<br><br>ABBOTT LABORATORIES, )<br><br>Defendant. ) | CIVIL ACTION NO. 05-11150-DPW |

## FIRST AMENDED SUPPLEMENTAL COMPLAINT

### Introduction

1.     This is an action for fraud, breach of contract, and indemnification in which plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Manulife Insurance Company (f/k/a "Investors Partner Life Insurance") seek compensatory and punitive damages, rescission, costs and attorneys' fees for defendant Abbott Laboratories' misrepresentations and other conduct that violates the Research Funding Agreement entered into by and between the plaintiffs and defendant and dated as of March 13, 2001 (the "Agreement"). This action is filed as a separate related action to the pending matter

captioned *John Hancock Life Insurance Company, et al. v. Abbott Laboratories*, Civil Action
No. 03-12501-DPW (the "Existing Action"), pursuant to Section (1) of the Court's Scheduling
Order entered in the Existing Action on March 30, 2004.

### The Parties

2.      Plaintiff John Hancock Life Insurance Company is a company, duly formed and
existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate
headquarters in Boston, Suffolk County, Massachusetts.    John Hancock Life Insurance
Company is one of the nation's leading insurance companies, providing a broad array of
insurance and investment products to retail and institutional customers, primarily in North
America.

3.      Plaintiff John Hancock Variable Life Insurance Company is a company, duly
formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its
corporate headquarters in Boston, Suffolk County, Massachusetts.    John Hancock Variable
Life Insurance Company provides variable life insurance products that link life insurance
coverage and an investment return to an underlying portfolio of investments chosen by the
policyholder.

4.      Plaintiff Manulife Insurance Company (collectively, with plaintiffs John
Hancock Life Insurance Company and John Hancock Variable Life Insurance Company, "John
Hancock") is a company, duly formed and existing under the laws of the State of Delaware,
that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.    Manulife
Insurance Company is a wholly-owned subsidiary of John Hancock Variable Life Insurance

-2-

Company that sells various types of life insurance products. Manulife Insurance Company formerly was known as "Investors Partner Life Insurance."

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, duly formed and existing under the laws of the State of Illinois, that maintains its corporate headquarters in Abbott Park, Illinois. Abbott is a broad-based healthcare company that discovers, develops, manufactures and markets products and services that span the continuum of care -- from prevention and diagnosis to treatment and cure. Abbott's principal businesses are global pharmaceuticals, nutritionals, and medical products, including diagnostics and cardiovascular devices. Abbott achieved record sales and net earnings of $19.7 billion and $3.2 billion, respectively, in 2004. Its leadership positions in several multibillion-dollar businesses provide Abbott with a unique balance of revenue growth opportunities and cash flow sources that allow Abbott to invest in its future.

### Jurisdiction and Venue

6.      This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      Venue in this district is proper pursuant to 28 U.S.C. § 1391(a)(1) because defendant Abbott resides in this district within the meaning of 28 U.S.C. § 1391(c), and further because Section 16.2 of the parties' Agreement provides that Abbott,

> consents ... to the exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts ... for the purpose of any suit, action or other proceeding arising out of any of its obligations

hereunder or thereunder or with respect to the transactions contemplated hereby or thereby, and expressly waives any and all objections that it may have as to venue in such courts.

## The Facts

*The Agreement And Its Relevant Terms*

8.    On March 13, 2001, John Hancock and Abbott entered the Agreement, whereby John Hancock agreed to provide funding to Abbott for research and development activities on a portfolio of potential pharmaceutical products or "Program Compounds" (the "Research Program") in exchange for the right to receive certain management fees and future milestone and royalty payments from Abbott.

9.    The nine Program Compounds encompassed by the Abbott Research Program are: (a) ABT-773, a kelotide that may be useful as an antibiotic; (b) ABT-627, an endothelin-A receptor agonist that may be useful in the treatment of prostate cancer; (c) ABT-594, a non-opiod analgesic that may be useful in the treatment of chronic pain; (d) ABT-492, a quinolone that may be useful as an antibiotic; (e) ABT-510, a synthetic peptide that may be useful in the treatment of cancer; (f) ABT-518, a metalloproteinase inhibitor that may be useful in the treatment of cancer; (g) ABT-751, an antimitotic tubulin agonist that may be useful in the treatment of cancer; (h) ABT-100, a farnesyltransferase protein inhibitor that may be useful in the treatment of cancer; and (i) ABT-724, a dopamine receptor agonist that may be useful in the treatment of erectile dysfunction.

10.    Under the terms of the Agreement, John Hancock agreed to contribute up to a specified maximum amount toward the costs incurred by Abbott in operating the Research Program ("Program Related Costs") in four annual installments (the "Program Payments")

-4-

over the period from March 13, 2001 through December 31, 2004 (individually, the four "Program Years" and, collectively, the four-year "Program Term"). Abbott agreed, in return, to invest at least twice the amount of John Hancock's contribution from its own funds towards the operation of the Research Program, and committed to spend certain minimum amounts on Program Related Costs during each Program Year (the "Annual Minimum Spending Target"), as well as a minimum aggregate total on Program Related Costs over the four-year Program Term (the "Aggregate Spending Target").

11. The Agreement, which comprises more than thirty-five (35) pages, was the subject of extensive negotiations between the parties and their counsel over a period of approximately one year. From John Hancock's perspective, the financial attractiveness of the Agreement turned largely upon the specific identity of, and commercial prospects for, the nine Program Compounds encompassed by the Research Program. John Hancock ran numerous analytical models based on financial projections for the Program Compounds in order to ensure, as best that it could, that the risks associated with its anticipated investment in the Research Program were justified by the potential rewards that John Hancock would receive if and when some or all of the Program Compounds were approved and commercialized.

12. Because the financial return, if any, that John Hancock ultimately will receive on its investment in the Program Compounds is heavily dependent on the commercial success of those Compounds, John Hancock had a strong interest in ensuring, before the Agreement was signed, that: (a) Abbott had a good faith intention to aggressively pursue development of each of the Program Compounds; and (b) Abbott had a good faith belief that each of the

Program Compounds possessed reasonably favorable commercial prospects. In order to satisfy John Hancock's concerns on these points, Abbott agreed to provide John Hancock, in Article 12 of the Agreement, with certain written representations and warranties concerning the development status of the Program Compounds, including, *inter alia*, a representation and warranty that,

> [s]et forth on Exhibit 12.2(d) is the full name, chemical name, detailed description of the stage of development and current status for each Program Compound. Set forth on Exhibit 1.6 in each Annual Research Plan is a description of projected milestones and dates thereof, projected year of NDA filing, and projected costs to be incurred by Abbott during the Program Term, for each Program Compound. Such projections were prepared in good faith and with due care based on reasonable assumptions, and represent the reasonable estimate of Abbott based on information available as of the date of such projections and as of the date hereof.... (Section 12.2[d]).

13.    Abbott further represented and warranted to John Hancock that,

> [t]here is no fact known to Abbott (other than generally available information concerning the pharmaceutical industry in general) as of the date of this Agreement that has not been disclosed in this Agreement or any Exhibit to this Agreement which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial [viability]) of the Research Program or any of the Program Compounds. (Section 12.2[i]).

14.    The Agreement contains various other terms that are intended to protect John Hancock's interests by ensuring that Abbott fairly and diligently fulfills its research and development obligations under the Agreement, including terms which provide, *inter alia*, that Abbott:

-6-

(a)    must employ "Commercially Reasonable Efforts" (defined in the Agreement as "efforts which are consistent with those normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market potential at a similar stage of development or product life") to develop each of the Program Compounds and "achieve the objectives of the Research Program efficiently and expeditiously" (Sections 1.10, 2.3 and 4.1);

(b)    must keep John Hancock fully informed of any modifications to its written "Annual Research Plans" ("ARPs") by requiring that "[a]ny such modifications ... be promptly provided to John Hancock" (Section 2.2);

(c)    shall not "research, develop, manufacture, market, sell, distribute, out-license or otherwise treat" the Program Compounds any differently "as compared to any other Abbott compounds or products" on account of any of the rights granted to John Hancock under Agreement (Section 4.4); and

(d)    shall, "as soon as is practicable," out-license or divest any "Ceased Compound" (defined in the Agreement as a Program Compound that Abbott has "substantially cease[d] developing, marketing or selling") to a third party, and shall "remunerate John Hancock based on sales of such Ceased Compound by the third party that has acquired or licensed the Ceased Compound ... in a manner most consistent with the allocation that would have applied hereunder had such Ceased Compound not been so out-licensed or divested..." (Section 4.3[d]).

15.    John Hancock's obligation under the Agreement to make additional Program Payments during the four-year Program Term is not absolute, however. In entering into the Agreement, John Hancock did not want to obligate itself to continue investing in the Program Compounds if the commercial prospects for those Compounds diminished significantly over the four-year Program Term. Accordingly, John Hancock's obligation to make its second, third and fourth Program Payments was made expressly contingent upon the demonstration by Abbott, on an annual basis, of the continued commercial viability of the Program Compounds.

-7-

16.     For purposes of the Agreement, the continued commercial viability of the Program Compounds is measured by reference to Abbott's planned expenditures on Program Related Costs over the four-year Program Term. Section 2.2 of the Agreement requires Abbott to provide John Hancock, at least forty-five days (45) prior to the start of each Program Year, with a written ARP that spells out Abbott's anticipated Research Program expenditures for that year and for each year remaining in the Program Term. If Abbott's ARP for any given year did not "reasonably demonstrate [Abbott's] ... intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target" as set forth in the Agreement, then John Hancock's "obligation to make any remaining Program Payments for any succeeding Program Years" automatically would terminate pursuant to Section 3.4(iv) of the Agreement.

17.     Section 3.3 of the Agreement sets forth Abbott's obligations to John Hancock in the event that Abbott fails to reach the Aggregate Spending Target for Program Related Costs over the four-year Program Term. Section 3.3(b) states that Abbott "will expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the "Aggregate Carryover Amount") on Program Related Costs during the *subsequent year* commencing immediately after the end of the Program Term (emphasis added)." If Abbott fails to spend the entire Aggregate Carryover Amount during such subsequent year, Section 3.3(b) obligates Abbott to "pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days after the end of such subsequent year."

-8-

18.    The four-year Program Term ended on December 31, 2004, and the "subsequent year commencing immediately after the end of the Program Term" ended on December 31, 2005.  Accordingly, Abbott was required to spend the Aggregate Carryover Amount by December 31, 2005, and required to pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott as of that date on or before January 30, 2006.

19.    The Agreement further provides John Hancock with the power to objectively verify Abbott's compliance with the terms of the Agreement, including the right to retain an independent auditor of John Hancock's choosing (and reasonably acceptable to Abbott) who is empowered to inspect, copy and audit the "books and records of Abbott and each Subcontractor related to the Research Program ... at any time and from time to time."  John Hancock is required to pay the fees and expenses of its chosen auditor in the first instance.  If, however, the work of John Hancock's auditor "reveals any material breach of Abbott's responsibilities" under the Agreement, then Section 2.5 provides that Abbott "shall (i) pay the reasonable fees and expenses charged by such auditor, and (ii) fully and promptly cure such breach."

### John Hancock's Efforts to Audit Abbott's Compliance
### With The Terms of the Agreement

20.    Since the Agreement was executed on March 13, 2001, John Hancock has become aware of certain potential breaches of the Agreement by Abbott.  Such potential breaches include, but are not limited to, misrepresentations by Abbott in the negotiation and

execution of the Agreement, as well as violations by Abbott of its development and administrative responsibilities under the Agreement.

21.    Consistent with the terms of the Agreement, and in an effort to assist in confirming or refuting Abbott's suspected violations, John Hancock initiated an independent audit of Abbott's books and records on April 12, 2004.  On that date, John Hancock sent a letter to Abbott notifying Abbott of John Hancock's intention to undertake a compliance audit pursuant to Section 2.5 of the Agreement, and identifying the independent auditor that had been selected by John Hancock.  John Hancock accompanied its audit notification letter to Abbott with a description of the specific books and records related to the Research Program that John Hancock requested be made available for examination by its independent auditor within thirty (30) days.

22.    Abbott unreasonably and unjustifiably has delayed, and continues to delay, its response to John Hancock's audit request, and has taken affirmative steps to obstruct the legitimate efforts of John Hancock's independent auditors to confirm or refute Abbott's compliance with terms of the Agreement.  Tactics employed by Abbott to hinder, delay and obstruct John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement include, but are not limited to:

  (a)    unreasonably and unjustifiably objecting to John Hancock's chosen auditor for a period of months, then arbitrarily withdrawing its objection;

  (b)    unreasonably and unjustifiably delaying production of the majority of the relevant books and records requested by John Hancock's auditor for almost one year (and counting);

-10-

(c)     unreasonably and unjustifiably refusing to make certain relevant books
        and records available for inspection and copying at all (including,
        without limitation, various books and records documenting Abbott's
        actual expenditures on Program Related Costs);

(d)     unreasonably and unjustifiably redacting various relevant books and
        records produced during the course of the audit so as to eliminate
        relevant information and render certain materials effectively
        unintelligible, notwithstanding the existence of a written confidentiality
        agreement between the parties;

(e)     unreasonably and unjustifiably understaffing and under-funding Abbott's
        response to John Hancock's audit request in order to further delay the
        examination of Abbott's relevant books and records by John Hancock's
        auditor;

(f)     unreasonably and unjustifiably delaying for periods of six months or
        more the photocopying of books and records designated by John
        Hancock's auditor during the inspection process;

(g)     unreasonably and unjustifiably refusing to provide John Hancock's
        auditor with photocopies of various books and records produced by
        Abbott, and designated by John Hancock's auditor, during the inspection
        process;

(h)     unreasonably and unjustifiably refusing to permit John Hancock or its
        independent auditor to make their own photocopies of Abbott's books
        and records produced for audit purposes;

(i)     unreasonably and unjustifiably violating acknowledged deadlines for the
        completion of Abbott's production of books and records responsive to
        John Hancock's audit requests;

(j)     unreasonably and unjustifiably ignoring or refusing to answer various
        written and oral inquiries by John Hancock and its auditor regarding
        Abbott's relevant books and records; and

(k)     unreasonably and unjustifiably acting in a manner contrary to the usual
        course of contractual compliance audits, and contrary to Abbott's own
        conduct in reasonably similar circumstances in the past.

-11-

23.     As of the date of its original Complaint in this action, Abbott still had not produced all of the material books and records related to the Research Program that were requested by John Hancock and its auditor on April 12, 2004, and refused to do so. Abbott also refused to answer inquiries by John Hancock and its auditor seeking information that is necessary to complete the audit of Abbott's compliance with the Agreement.

-12-

*Abbott's Violations of the Agreement*

A. Obstructing John Hancock's Compliance Audit

24.    Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement as expressly permitted under Section 2.5.   Upon information and belief, Abbott's efforts to hinder, delay and obstruct John Hancock's audit activities are intended to undermine, and have had the effect of undermining, John Hancock's ability to obtain information which would tend to confirm that Abbott has breached the Agreement in various other ways as set forth below.

B. Misrepresenting the Development Status of ABT-518

25.    Upon information and belief, Abbott misrepresented the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that ABT-518 was "a compelling development candidate with the potential to demonstrate antitumor effects superior to the MMP inhibitors currently undergoing clinical trials."   Abbott understood before the Agreement was executed, however, that the actual development status of ABT-518 was not as represented in the Agreement.   For example, Abbott personnel already had plans as of early March 2001 to terminate the development of ABT-518, but understood that full disclosure of that fact to John Hancock "could have been the deathnell (*sic*) to the deal."   Accordingly, Abbott personnel took affirmative steps on and prior to March 13, 2001 to conceal from John Hancock the true development status of ABT-518 so as to induce John Hancock to enter into the Agreement.

-13-

Then, shortly after the Agreement was signed, Abbott announced that it was terminating the

development of ABT-518.

26.    The development status of ABT-518 as of March 2001 constitutes a material

fact for purposes of John Hancock's decision to enter into the Agreement.  John Hancock

reasonably and justifiably relied upon Abbott's misrepresentations regarding the development

status of ABT-518 in making that decision.  Had John Hancock known the true development

status of ABT-518 before the Agreement was executed, John Hancock would have demanded

different terms, such as the substitution of another compound with a comparable projected

value or more favorable financial terms with respect to the remaining Program Compounds, or

may not have entered into the Agreement at all.

C.  Misrepresenting the Development Status of ABT-594

27.    Upon information and belief, Abbott misrepresented the development status of

ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement.

Specifically, Abbott represented in the Agreement, *inter alia*, that a "phase IIb [clinical] study

for neuropathic pain at higher, titrated doses of ABT-594 began in April 2000 and ends in June

2001," and that ABT-594 was "expected to be the first neuronal nicotinic receptor agonist to

receive an indication for pain."  Abbott understood before the Agreement was executed,

however, that the development status of ABT-594 was not as represented in the Agreement.

For example, Abbott already knew prior to the execution of the Agreement that the termination

rate for patients enrolled in the phase IIb clinical study of ABT-594 was unusually high, and

that the final results of that study were likely to be unfavorable.  Abbott also knew, no later

-14-

than March 2001, that the development of ABT-594 was likely to be significantly delayed or even discontinued by Abbott as a consequence. Abbott failed to disclose these facts to John Hancock before the Agreement was executed in order to induce John Hancock to enter into the Agreement. Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-594.

28. The development status of ABT-594 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-594 in making that decision. Had John Hancock known the true development status of ABT-594 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

D. Misrepresenting the Development Status of ABT-773

29. Upon information and belief, Abbott misrepresented the development status of ABT-773 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that further development of ABT-773 was warranted due to its competitive "convenience, safety and tolerability." Abbott understood before the Agreement was executed, however, that the development status of ABT-773 was not as represented in the Agreement. For example, Abbott was aware of potentially serious liver and heart toxicity issues related to the use of ABT-773. Abbott failed to disclose

-15-

these facts to John Hancock before the Agreement was executed in order to induce John Hancock to enter into the Agreement. Then, within twelve months after the Agreement was signed, Abbott terminated the development of ABT-773.

30.     The development status of ABT-773 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-773 in making that decision. Had John Hancock known the true development status of ABT-773 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

E.  Misrepresenting Its Intended and Reasonably Expected
Spending on Program Related Costs

31.     Upon information and belief, Abbott has misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock. The Research Program cost projections that Abbott has provided to John Hancock in various ARPs reflect Abbott's "nominal" spending, as opposed to its "expected" spending. At all relevant times, Abbott's true "expected" spending on Program Related Costs was considerably less than the amounts communicated to John Hancock in Abbott's ARPs. Abbott has misrepresented its intended and reasonably expected spending plans to John Hancock in order to induce John Hancock to enter into the Agreement, and to make Program Payments to Abbott that would not otherwise be due under the terms of the Agreement.

-16-

32.    Abbott's intended and reasonably expected expenditures on Program Related Costs constitute material facts for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding its intended and reasonably expected expenditures on Program Related Costs in making that decision. Had John Hancock known the true level of Abbott's intended and reasonably expected expenditures, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, may not have made certain Program Payments, or may not have entered into the Agreement at all.

F.  Failing to Use Commercially Reasonable Efforts
to Develop the Program Compounds

33.    Upon information and belief, Abbott has failed to use Commercially Reasonable Efforts to develop the Program Compounds. Abbott previously represented to John Hancock in its 2005 ARP that the current commercial prospects for the active Program Compounds warrant the expenditure of a stated sum towards Program Related Costs in 2005. Upon information and belief, Abbott since has modified its 2005 ARP so as to reduce its intended and reasonably expected expenditures on Program Related Costs by more than fifty percent (50%) in retaliation, *inter alia*, for the automatic termination of John Hancock's obligation to make additional Program Payments for the third and fourth Program Years pursuant to the express terms of the Agreement.

34.    Abbott's decision to reduce its intended and reasonably expected expenditures on Program Related Costs in 2005 to less than one-half the amount that Abbott has represented

-17-

is warranted by the current commercial prospects for the active Program Compounds is inconsistent with the level of effort normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market at a similar stage of development and, therefore, not Commercially Reasonable for purposes of Section 4.1 of the Agreement.

### G. Refusing to Provide John Hancock With a Copy of Abbott's Modified 2005 ARP

35.   Abbott has refused to provide John Hancock with a copy of its modified 2005 ARP. Abbott provided its original 2005 ARP to John Hancock in November 2004. Upon information and belief, Abbott since has modified its original 2005 ARP so as to dramatically reduce Abbott's intended and reasonably expected expenditures on Program Related Costs in 2005. Section 2.2 of the Agreement obligates Abbott to "promptly provide[]" John Hancock with "[a]ny ... modifications" to its ARPs. Notwithstanding the express requirements of Section 2.2, Abbott has refused or ignored John Hancock's requests for a copy of Abbott's modified 2005 ARP.

### H. Failing to Out-License or Divest Various Ceased Compounds

36.   Upon information and belief, Abbott has failed to out-license or divest itself of various Ceased Compounds, including, without limitation, ABT-518 and ABT-594, "as soon as is practicable" as required under Section 4.3(d) of the Agreement.

37.   Upon further information and belief, Abbott has chosen not to out-license or divest itself of the foregoing Ceased Compounds, among others, for fear that, if those Compounds were successfully developed and marketed by a third party, Abbott might lose

-18-

future sales of various competing compounds that Abbott has under development, which are not subject to John Hancock's royalty rights.

I. Failing To Pay John Hancock One-Third Of The
Actual Aggregate Carryover Amount

38.     Because Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement, Abbott's actual spending on Program Related Costs over the four-year Program Term ended on December 31, 2004, and the "subsequent year commencing immediately after the end of the Program Term" ended on December 31, 2005, currently is unknown. Abbott has represented and John Hancock has reason to believe, however, that Abbott's actual spending on Program Related Costs during the Program Term was considerably less than the Aggregate Spending Target, and that Abbott's actual spending on Program Related Costs during such subsequent year was considerably less than the Aggregate Carryover Amount.

39.     Pursuant to Section 3.3(b) of the Agreement, Abbott was required to pay John Hancock one-third of the actual, unspent Aggregate Carryover Amount on or before January 30, 2006. Notwithstanding the express requirements of Section 3.3(b), Abbott has failed to make such payment to John Hancock.

*John Hancock's Efforts to Resolve Its Claims Against Abbott Amicably*

40.     On April 1, 2005, John Hancock provided written notification to Abbott of the existence and nature of the disputes identified in Sections A-C, and E-H above in accordance with Section 16.7 of the Agreement. Authorized representatives of John Hancock and Abbott subsequently met in Chicago, Illinois on May 20, 2005, in an effort to resolve their disputes

-19-

amicably. The parties discussed the issues identified in the notice as well as the parties overall

dispute with respect to all Program Compounds, including ABT-773. The efforts to resolve

the parties' disputes were unsuccessful.

On January 5, 2006, John Hancock provided written notification to Abbott of the existence and

nature of the disputes identified in Section I above in accordance with Section 16.7 of the

Agreement. Representatives of Abbott did not meet with John Hancock for the purpose of

resolving those disputes within the time period permitted under Section 16.7.

Claims

COUNT I<br/>(Fraud)

41.    John Hancock hereby repeats and incorporates by reference the allegations set

forth in Paragraphs 1 through 40 of this Complaint, *supra*.

42.    Abbott materially misrepresented the development status of the Program

Compounds in the representations and warranties contained in Sections 12.2 of the Agreement,

and applicable Schedules thereto, all in the manner described in this Complaint.

43.    Abbott materially misrepresented its "intended and reasonably expected"

expenditures on Program Related Costs in ARPs that it has provided to John Hancock, all in

the manner described in this Complaint.

44.    Abbott made the foregoing misrepresentations to John Hancock wantonly and

willfully for the purpose of fraudulently inducing John Hancock to enter into the Agreement,

and to make various Program Payments to Abbott on the terms stated therein.

-20-

45.    John Hancock justifiably relied upon Abbott's misrepresentations to its detriment by, among other things, entering into the Agreement, and making Program Payments to Abbott in accordance with the terms thereof.

46.    As a result of Abbott's misrepresentations, John Hancock has been defrauded by Abbott and has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

## COUNT II
### (Breach of Contract)

47.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 46 of this Complaint, *supra*.

48.    The Agreement constitutes a valid and binding contract between the parties. John Hancock has performed all of its obligations under the Agreement.

49.    Abbott has breached its obligations to John Hancock under the Agreement, *inter alia*, by:

(a)    misrepresenting the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement;

(b)    misrepresenting the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement;

(c)    misrepresenting the development status of ABT-773 to John Hancock prior to, and at the time of, the execution of the Agreement;

(d)    misrepresenting Abbott's intended and reasonably expected expenditures on Program Related Costs in ARPs that Abbott has provided to John Hancock;

(e)    failing to use Commercially Reasonable Efforts to develop the Program Compounds;

-21-

(f)    refusing to provide John Hancock with a copy of Abbott's modified 2005 ARP;

(g)    failing to out-license or divest itself of certain Ceased Compounds, including, without limitation, ABT-518 and ABT-594, as soon as is practicable;

(h)    unreasonably and unjustifiably hindering, delaying and obstructing John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement; and

(i)    failing to pay John Hancock one-third of the actual, unspent Aggregate Carryover Amount pursuant to Section 3.3(b) of the Agreement.

50.    By engaging in the foregoing conduct, Abbott further has breached the covenant of good faith and fair dealing that is implied by law in every contract, including the Agreement.

51.    Abbott has breached its express and implied obligations under the Agreement willfully and wantonly in order to induce John Hancock to enter into the Agreement, induce John Hancock to make various Program Payments to Abbott on the terms stated therein, and inhibit John Hancock's ability to detect and confirm Abbott's misconduct.

52.    As a result of Abbott's willful and wanton breaches of its express and implied obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

COUNT III
(Indemnification)

53.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 52 of this Complaint, *supra*.

-22-

54.    Abbott has breached its representations, warranties and obligations to John Hancock under the Agreement as set forth herein.

55.    As a result of Abbott's various breaches of its representations, warranties and obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, "Losses" as defined in Section 1.27 of the Agreement. John Hancock's Losses include, without limitation, costs, damages, and other reasonable expenses such as audit charges and attorneys' fees.

56.    Abbott agreed in Section 12.6 of the Agreement to indemnify John Hancock, *inter alia*, "from and against all Losses related to or arising out of, directly or indirectly ... any breach by Abbott of its representations, warranties or obligations hereunder..."

57.    On April 1, 2005, John Hancock provided written notification to Abbott that John Hancock has sustained, and likely will continue to sustain, compensable Losses on account of Abbott's various breaches of its representations, warranties and obligations under the Agreement, for which John Hancock is entitled to indemnification pursuant to Section 12.6 of the Agreement.

58.    Notwithstanding John Hancock's request for indemnification, Abbott has refused to indemnify John Hancock for its compensable Losses.

## Prayers for Relief

WHEREFORE, John Hancock respectfully requests that the Court:

(a)    award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's fraud under Count I of the Complaint;

-23-

(b)     award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's various breaches of contract under Count II of the Complaint;

(c)     enter an order directing Abbott to indemnify John Hancock for its compensable Losses, including John Hancock's damages, costs, and other reasonable expenses such as audit charges and attorneys' fees, under Count III of the Complaint;

(d)     award John Hancock punitive damages for Abbott's willful and wanton misconduct in an amount to be determined under Counts I and II of the Complaint;

(e)     alternatively, enter an order rescinding the Agreement and restoring the *status quo ante*, including, but not limited to, directing Abbott to refund any and all Program Payments made by John Hancock, less any payments already received by John Hancock, plus interest and costs; and

-24-

(f)    grant John Hancock such other and further relief as the Court deems just
       and appropriate in the circumstances.

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY AND
MANULIFE INSURANCE COMPANY

By their attorneys,

/s/ Brian A. Davis
Brian A. Davis (BBO No. 546462)
Joseph H. Zwicker (BBO No. 560219)
Stacy Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Telephone: 617-248-5000

Date: December 29, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non-registered participants on December 29,
2006.

/s/ Brian A. Davis
Brian A. Davis

**EXHIBIT 14**

John Hancock Financial Services, Inc.

Bond and Corporate Finance Group

John Hancock Place
Post Office Box 111
Boston, Massachusetts 02117
(617) 572-9624
Fax: (617) 572-1628
E-mail: sblewitt@jhancock.com

Stephen J. Blewitt
Senior Managing Director



April 12, 2004

BY FAX (847) 937-6683
CONFIRMATION COPY BY U.S. FIRST CLASS MAIL

Mr. James L. Tyree
Vice President, Global Licensing & New Business Development
Abbott Laboratories
200 Abbott Park Road
Abbott Park, IL 60064-6189

Re:    Research Funding Agreement by and between Abbott Laboratories and John Hancock
       Life Insurance Company, John Hancock Variable Life Insurance Company, and Investors
       Partner Life Insurance Company, dated as of March 13, 2001

Dear Jim:

        Pursuant to § 2.5 of the Research Funding Agreement by and between Abbott
Laboratories and John Hancock Life Insurance Company, John Hancock Variable Life Insurance
Company and Investors Partner Life Insurance Company, dated as of March 13, 2001 (the
"Agreement"), John Hancock Life Insurance Company, John Hancock Variable Life Insurance
Company and Investors Partner Life Insurance Company (collectively, "John Hancock") hereby
give notice of the exercise of their right to inspect and audit all books and records of Abbot and
of any Subcontractor[1] of Abbott with respect to the following matters:

   1.  All Program Related Costs expended by Abbott during each Program Year;

   2.  Compliance by Abbott with its obligations, under § 2.2 of the Agreement, to
       prepare and provide John Hancock with an Annual Research Plan, and to
       conduct the Research Program during each Program Year in accordance with
       the Annual Research Plan for such Program Year;

   3.  Compliance by Abbott with its obligation, under § 2.3 of the Agreement, to
       use Commercially Reasonable Efforts to conduct the Research Program in
       accordance with the requirements of § 2.3 of the Agreement;

   4.  Compliance by Abbott with its obligation, under § 4.3 of the Agreement, to
       substitute Program Compounds in accordance with the requirements of § 4.3
       of the Agreement;

---

[1] Unless otherwise specified herein, capitalized terms used in this letter and in the attached Schedule A
shall have the same definitions as those set forth in the Agreement.

CONFIDENTIAL
JHII 011883

5. Compliance by Abbott with its obligation, under § 4.3 of the Agreement, to out-license or divest Ceased Compounds to third parties in accordance with the requirements of § 4.3 of the Agreement;

6. The stage of development and status of each Program Compound as of March 13, 2001; and

7. The current stage of development and status of each Program Compound.

Attached hereto as Schedule A is a preliminary list of those categories of books and records that John Hancock reasonably expects will be made available for its inspection and audit of these matters. The list is provided solely to assist Abbott in complying with this notice, and not by way of limitation. John Hancock requests that all books and records of Abbott and its Subcontractors pertaining to the above-identified matters be made available for its inspection and audit, regardless whether such books and records are described on Schedule A.

John Hancock's inspection and audit of the books and records of Abbott, as set forth herein, shall be conducted by Christopher Martinez, Brian Napper and other employees of the StoneTurn Group, LLP, a firm of independent auditors retained by John Hancock. The audit shall take place during normal business hours commencing on May 12, 2004, and continuing from day to day thereafter until completion, subject to adjournment as may be necessary to accommodate scheduling exigencies. In accordance with § 2.5 of the Agreement, John Hancock reserves its right to designate for copying, at its initial expense (but subject to reimbursement by Abbott in accordance with § 2.5 of the Agreement), any or all of the books and records of Abbott that are subject to its inspection and audit.

Please inform me before the close of business on May 5, 2004 of the specific location at which Abbott will make its books and records available for inspection and audit pursuant to this notice. Please also provide me with the name of the person who the StoneTurn Group's representatives should contact upon their arrival to begin their inspection and audit.

Thank you for your anticipated cooperation.

Very truly yours,

Stephen J. Blewitt

Attachment
cc:    General Counsel (by fax, 847-938-6277; confirmation copy by mail)
       Lawrence R. Desideri, Esq.
       Peter E. Gelhaar, Esq.
       Brian A. Davis, Esq.
       Michael Arthur Walsh, Esq.

3679391v1

CONFIDENTIAL
JHII 011884

## Schedule A

1.   All records and documents indicating expenditures made by Abbott related to any compound that is now or ever was a Program Compound, including the following:

    a.   Abbott's standard policies and procedures related to accounting for project/program related expenditures;

    b.   Abbott's chart of accounts as relevant to accounting for project/program related expenditures;

    c.   Summary of costs/expenditures incurred by Program Compound by year delineating expenditures by nature (*e.g.*, direct costs incurred by Abbott, subcontractor costs, allocated indirect costs, *etc.*);

    d.   Accounting framework for compiling the expenditures presented (*i.e.*, whether cost assembled on an accrual or cash basis of accounting);

    e.   Identification of whether expenditures presented were capitalized or expensed under General Accepted Accounting Procedures ("GAAP") definitions;

    f.   Summary of the timing of expenditures for each Program Compound within each year presented;

    g.   Contracts or other governing documents and information related to all Research Program activities performed by Subcontractors;

    h.   Reconciliations of annual expenditures by Program Compound to the audited financial statements of Abbott;

    i.   Calculations, algorithms, and basis for all allocations included in the total expenditures by Program Compound by year;

    j.   Abbott standard policies and procedures related to allocation of indirect costs;

    k.   Expenditure/Costs summaries and/or reports prepared in the normal course of managing the development of each Program Compound; and

    l.   Underlying supporting records (*e.g.*, timesheets, payroll records, purchase orders, invoices, *etc.*) for all expenditures made related to each Program Compound.

2.   All records and documents discussing or evidencing the implementation and conduct of the Research Program, including but not limited to:

    a.   Reports/Updates/Summaries prepared by Abbott in the normal course of managing the development of the Program Compounds;

    b.   Listing of all reports/updates/summaries typically prepared by Abbott during the normal course of developing an experimental pharmaceutical compound;

    c.   Minutes/Summaries/Notes from all management meetings in which any of the Program Compounds where reviewed or approved for further development funding;

    d.   Analysis and documentation supporting all forward looking projections of expenditures to be incurred for each Program Compound by year;

**CONFIDENTIAL**
**JHII 011885**

     e. Abbott policies and guidance as to the appropriate and/or required methods/approaches/procedures for conducting a research program for an experimental pharmaceutical compound;

     f. Abbott's internal approval framework for determining whether or not to continue to fund and develop an experimental pharmaceutical compound, including all relevant thresholds for approval along the compound development process; and

     g. Minutes/Summaries/Notes from all Abbott meetings regarding continued funding of product development for any Program Compounds.

3.    All records and documents concerning Abbott's obligations under § 4.3 of the Agreement, including but not limited to:

     a. Records identifying any and all Replacement Compounds;

     b. Records identifying any and all Failed Early Stage Program Compounds;

     c. Records identifying any and all Ceased Compounds;

     d. All documents pertaining to Abbott's consideration or selection of any compound to replace any Failed Early Stage Program Compound;

     e. Records identifying any and all compounds that Abbott held out as or considered to be "back up" compounds for the compounds that constituted the Program Compounds (i) on the effective date of the Agreement, and (ii) as of the end of each calendar year 2001 through 2003; and

     f. All documents pertaining to the actual or attempted out-licensing or divestiture of any Ceased Compound.

4.    All records and documents concerning the status of each Program Compound as of March 13, 2001 and currently, including but not limited to:

     a. Reports/Summaries/Meeting Minutes which indicate the stage of development of each compound that originally constituted a Program Compound during the first calendar quarter of 2001;

     b. Records describing the various stages into which Abbott generally categorizes the pre-clinical and clinical development of experimental pharmaceutical compounds;

     c. Records indicating when each Program Compound reached each stage of pre-clinical or clinical development into which Abbott generally categorizes the pre-clinical and clinical development of experimental pharmaceutical compounds;

     d. Reports/Summaries/Meeting Minutes which evidence the current status of each Program Compound; and

     e. Management Reports and/or other documents prepared in the normal course of business which indicate future prospects and development expectations for each Program Compound.

3678931v1

CONFIDENTIAL
JHII 011886

**EXHIBIT 15**

CERTIFIED
COPY

CONFIDENTIAL

1          Volume:    I

2          Pages :    1 - 270

3          Exhibits: 1 - 9

4          UNITED STATES DISTRICT COURT

5          FOR THE DISTRICT OF MASSACHUSETTS

6                    CIVIL ACTION NO. 05-1150DPW

7    - - - - - - - - - - - - - - - - - - - - - - x

8    JOHN HANCOCK LIFE INSURANCE COMPANY,

9    JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY,

10   and MANULIFE INSURANCE COMPANY

11   (f/k/a INVESTORS PARTNER INSURANCE COMPANY),

12                   Plaintiffs,

13   V.

14   ABBOTT LABORATORIES,

15                   Defendant.

16   - - - - - - - - - - - - - - - - - - - - - - x

17            C O N F I D E N T I A L

18   VIDEOTAPED DEPOSITION OF CHRISTOPHER A. MARTINEZ

19        Friday, November 3, 2006,  9:10 a.m.

20           Donnelly, Conroy & Gelhaar

21              One Beacon Street

22            Boston, Massachusetts

23   Reporter:   Rosemary F. Grogan, CSR, RPR

24



LEGALINK®

A MERRILL
COMMUNICATIONS
COMPANY

20750 Ventura Blvd
Suite 205
Woodland Hills, CA 91364

tel (818) 593 2300
tel (800) 826 0277
fax (818) 593 2301

www.merrillcorp.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

1    things he was evaluating.

2        Q.    Did he review documents at an Abbott facility?

3        A.    Yes, he did.

4        Q.    Do you know what day, approximately?

5        A.    He was at the Abbott Mundelein facility, I

6    think it's High Street, on June 30th of 2004, the first

7    day of our -- the day we commenced our field work on the

8    audit.

9        Q.    What did you understand to be the scope of the

10   audit that John Hancock was conducting of Abbott?

11       MS. COLLARI TROAKE:   I'm just going to object.

12           Your answer should exclude anything that would

13           reveal attorney-client privilege or work product.

14           Aside from that, you can answer.

15       A.    The scope of our audit was really laid out, I

16   think, as Schedule A to an April 12th, 2004 letter from

17   John Hancock to Abbott, where it lists a number of areas

18   where documents are being requested.  So it really

19   related in a general sense to certain compliance by

20   Abbott of certain terms of the agreement between the two

21   parties.

22       MR. LORENZINI:   I would like to mark as

23           Martinez Exhibit No. 2, a document with Bates

24           number JHII 011883 through 011886.

75

1          (Exhibit No. 2 Marked for Identification)

2     BY MR. LORENZINI:

3          Q.   Do you recognize what's been marked as

4     Martinez Exhibit No. 2?

5          A.   Yes, I do.

6          Q.   What is it?

7          A.   This appears to be the letter I was referring

8     to, the April 14, 2004 letter from John Hancock to

9     Abbott.  I think notifies Abbott of the intention of

10    Hancock to exercise their audit rights under the

11    contract, including Schedule A, which as I said, was

12    what we were using our guidepost for our audit.

13         Q.   And this letter and the attachment accurately

14    sets forth the scope of the audit requested by John

15    Hancock?

16         MS. COLLARI TROAKE:  I'm going to object and

17         if you want to read the whole letter to satisfy

18         yourself to do that, but it is a four-page

19         document.

20         A.   And I think one thing also, there's many

21    references to the contract between the two parties here.

22    So I would say this isn't quite a stand alone because

23    there's lots of language in the contract that would be

24    relevant here as well.

76

1          But I think, generally speaking, the

2     scope was to evaluate compliance in a number of areas as

3     outlined in Schedule A.  I wouldn't say -- I wouldn't

4     say this was the entirety of our instruction, but these

5     were the main areas where we thought documents would be

6     beneficial in evaluating that compliance.

7          Q.   And the documents requested in Schedule A, you

8     thought would be relevant to assessing compliance with

9     the matters listed in numbers 1 through 7 of the letter?

10         A.   Yes, in a general sense, that's correct, but

11    we anticipated this to be a preliminary request.  As in

12    the normal course of the audits I've conducted for

13    contract compliance, you make a preliminary request

14    after looking at those documents and talking to the

15    folks and asking questions, and there's usually a

16    subsequent request as well that would help to get you to

17    an opinion on contract compliance.

18         Q.   And you mentioned previously that the purpose

19    of the audit was to assess compliance with respect to

20    certain contract provisions?

21         A.   Yes.

22         Q.   Are those the contract provisions described in

23    numbers 1 through 7 of the April 12, 2004 letter?

24         A.   Well, I would as say, 1 through 7 of this

LegaLink, a Merrill Communications Company
800-826-0277   818-593-2300   Fax 818-593-2301   www.legalink.com

Christopher A. Martinez                                          11/03/2006

CONFIDENTIAL

Page 268

```
  1                 C E R T I F I C A T E

  2   COMMONWEALTH OF MASSACHUSETTS )

  3                                 )

  4   COUNTY OF PLYMOUTH            )

  5          I, Rosemary F. Grogan, a Registered

  6   Professional Reporter and Notary Public duly

  7   commissioned and qualified in and for the Commonwealth

  8   of Massachusetts, do hereby certify:

  9          That CHRISTOPHER A. MARTINEZ, the witness

 10   whose deposition is hereinbefore set forth, was duly

 11   identified and sworn by me, and that the foregoing

 12   transcript is a true record of the testimony given by

 13   such witness to the best of my ability.

 14          I further certify that I am not related to any

 15   of the parties in this matter by blood or marriage, and

 16   that I am in no way interested in the outcome of this

 17   matter.

 18          IN WITNESS WHEREOF, I have hereunto set my

 19   hand and affixed my notarial seal this 16th day of

 20   November, 2006.

 21                     Rosemary F. Grogan

 22                     Rosemary F. Grogan, RPR

 23                     CSR No. 112993

 24   My Commission Expires:  January 7, 2011
```

```
 1                   SIGNATURE / ERRATA SHEET

 2     Re:  John Hancock Life, et al. Vs. Abbott Laboratories

 3     DEPOSITION OF:  Christopher A. Martinez    11/3/06

 4              I, CHRISTOPHER A. MARTINEZ, do hereby certify

 5     that I have read the foregoing transcript of my

 6     testimony, and I further certify that said transcript it

 7     is a true and accurate record of said testimony (with

 8     the exception of the corrections that are noted below).

 9     PAGE       LINE(S)       READS            SHOULD READ

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17              Signed under the pains and penalties of

18     perjury this _____day of _____, 2006.

19     _____

20     CHRISTOPHER A. MARTINEZ                          Date

21              Subscribed and sworn to before me this _____day

22     of _____, 2006.

23     _____

24     Notary Public        My Commission Expires:_____
```

270

**EXHIBIT 16**

**CONFIDENTIAL - REDACTED**

EXHIBIT 17

John Hancock Financial Services, Inc.

Bond and Corporate Finance Group

John Hancock Place
Post Office Box 111
Boston, Massachusetts 02117
(617) 572-9624
Fax: (617) 572-1628
E-mail: sblewitt@hancock.com

Stephen J. Blewitt
Senior Managing Director

April 1, 2005

BY FAX AND U.S. MAIL

Mr. James L. Tyree
Vice President
Global Licensing and New Business Development
ABBOTT LABORATORIES
200 Abbott Park Road
Abbott Park, IL 60064-6189

Re:   Research Funding Agreement by and between Abbott Laboratories ("Abbott") and John
      Hancock Life Insurance Company,  John Hancock Variable Life Insurance Company,
      and Investors Partner Life Insurance Company (collectively, "John Hancock"), dated as
      of March 13, 2001 (the "Agreement")

Dear Jim:

       I write pursuant to Section 16.7 of the Research Funding Agreement by and between
Abbott Laboratories and John Hancock Life Insurance Company, John Hancock Variable Life
Insurance Company and Investors Partner Life Insurance Company (now known as "ManuLife
Insurance Company"), dated as of March 13, 2001 (the "Agreement") to identify certain further
disputes that have arisen between John Hancock Life Insurance Company, John Hancock
Variable Life Insurance Company and ManuLife Insurance Company on the one hand
(collectively, "John Hancock"), and Abbott Laboratories ("Abbott") on the other, with respect to
the Agreement. The further disputes of which John Hancock currently is aware are as follows:

   (a)   Abbott unreasonably and unjustifiably has hindered, delayed and
         obstructed John Hancock's attempts to audit Abbott's compliance with
         the terms of the Agreement as expressly permitted under Section 2.5 of
         the Agreement, and accordingly has failed to demonstrate that it actually
         has made expenditures on Program Related Costs as represented in its
         written reports to John Hancock;

   (b)   Abbott misrepresented the development status of ABT-518 to John
         Hancock prior to, and at the time of, the execution of the Agreement;

   (c)   Abbott misrepresented the development status of ABT-594 to John
         Hancock prior to, and at the time of, the execution of the Agreement;

CONFIDENTIAL
JHH 011911



(d)    Abbott has misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in the Annual Research Plans that it has provided to John Hancock;

(e)    Abbott unreasonably and unjustifiably has failed to use Commercially Reasonable Efforts to develop the Program Compounds;

(f)    Abbott unreasonably and unjustifiably has refused to provide John Hancock with a copy of its modified 2005 ARP; and

(g)    Abbott unreasonably and unjustifiably has failed to out-license or divest itself of certain Ceased Compounds, including ABT-492, ABT-518 and ABT-594, "as soon as is practicable" as required under Section 4.3(d) of the Agreement.

Please be aware that, as a result of the foregoing violations by Abbott of its representations, warranties and obligations under the Agreement, which John Hancock believes may have been committed willfully and wantonly, Hancock has sustained Losses for which it intends to claim indemnification from Abbott under, *inter alia*, Sections 1.27, 12.6 and 12.8 of the Agreement.

John Hancock is prepared to participate in an executive meeting within thirty (30) days of this notice for the purpose of attempting to resolve the above-referenced disputes in accordance with the requirements of Section 16.7. I invite you to contact me at your earliest convenience to schedule such a meeting.

Very truly yours,

Stephen J. Blewitt

cc:    President – Abbott Pharmaceutical Products Division (by U.S. Mail)
General Counsel – Abbott Laboratories (by U.S. Mail)
Lawrence R. Desideri, Esq. (by fax)
Peter E. Gelhaar, Esq. (by fax)
Brian A. Davis, Esq. (by fax)

CONFIDENTIAL
JHII 011912

P. 1

* * * COMMUNICATION RESULT REPORT ( APR. 1.2005 2:53PM ) * * *

TTI    JOHN HANCOCK

| FILE | MODE | OPTION | ADDRESS (GROUP) | RESULT | PAGE |
|------|------|--------|-----------------|--------|------|
| 767 | MEMORY TX | | 29268 | OK | P. 3/3 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL          E-2) BUSY
E-3) NO ANSWER                      E-4) NO FACSIMILE CONNECTION

BOND & CORPORATE FINANCE GROUP, T-57
200 CLARENDON STREET
BOSTON, MA 02117
FAX: 617-572-1528/6454


JOHN HANCOCK
FINANCIAL SERVICES

# Fax

CONFIDENTIAL
JHII 011913

| | | | |
|------|------|------|------|
| To: | Pam Memishian | From: | Steve Blewitt |
| Fax: | 29268 | Phone: | 617-572-9624 |
| Phone: | | # of Pages: | 3 (including cover) |
| Date: | 4/1/05 | CC: | |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

• **Comments:** This facsimile communication is strictly confidential and may be subject to legal privileges. This communication is intended for the sole use of the individual(s) or

```
* * *  COMMUNICATION RESULT REPORT ( APR. 1.2005  2:51PM ) * * *          P. 1
                                                            TTI    JOHN HANCOCK
FILE MODE        OPTION         ADDRESS (GROUP)        RESULT       PAGE
`56  MEMORY TX                   21565                   OK         P. 3/3
```

```
REASON FOR ERROR
        E-1) HANG UP OR LINE FAIL              E-2) BUSY
        E-3) NO ANSWER                         E-4) NO FACSIMILE CONNECTION
```

BOND & CORPORATE FINANCE GROUP, T-57
200 CLARENDON STREET
BOSTON, MA 02117
FAX: 617-572-1628/6454



# Fax

CONFIDENTIAL
JHII 011914

| To: | Karen Morton | From: | Steve Blewitt |
| Fax: | 21565 | Phone: | 617-572-9624 |
| Phone: | | # of Pages: | 2 (including cover) |
| Date: | 4/1/05 | CC: | |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

● Comments: This facsimile communication is strictly confidential and may be subject to legal privileges. This communication is intended for the sole use of the individual(s) or

```
                                                              P. 1
    * * *  COMMUNICATION RESULT REPORT ( APR. 1.2005  3:49PM ) * * *
```

| FILE MODE | OPTION | ADDRESS (GROUP) | TTI  JOHN HANCOCK |  |
|-----------|--------|-----------------|-------------------|--|
|           |        |                 | RESULT | PAGE |
| ?69  MEMORY TX |   | 96172484000 | OK | P. 3/3 |

```
REASON FOR ERROR
       E-1) HANG UP OR LINE FAIL            E-2) BUSY
       E-3) NO ANSWER                       E-4) NO FACSIMILE CONNECTION
```

BOND & CORPORATE FINANCE GROUP, T-57
200 CLARENDON STREET
BOSTON, MA 02117
FAX: 617-572-1628/6454

**JOHN HANCOCK
FINANCIAL SERVICES**

# Fax

CONFIDENTIAL
JHII 011915

| To: Brian David | From: Steve Hewitt |
|-----------------|--------------------|
| Fax: 617-248-4600 | Phone: 617-572-9624 |
| Phone: | # of Pages: 3 (including cover) |
| Date: 4/1/05 | CC: |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

* Comments: This facsimile communication is strictly confidential and may be subject to
legal privileges. This communication is intended for the sole use of the individual(s) or

**EXHIBIT 18**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

'05 JUN -3 A 11: 49

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY),  )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 05 - 11150 DPW |
| Plaintiffs,  )<br>) | CIVIL ACTION NO. _____ |
| )<br>v.  )<br>) | |
| ABBOTT LABORATORIES,  )<br>)<br>Defendant.  )<br>) | |

## COMPLAINT

### Introduction

1.    This is an action for fraud, breach of contract, and indemnification in which plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and ManuLife Insurance Company (f/k/a "Investors Partner Life Insurance") seek compensatory and punitive damages, costs and attorneys' fees for defendant Abbott Laboratories' misrepresentations and other conduct that violates the Research Funding Agreement entered into by and between the plaintiffs and defendant and dated as of March 13, 2001 (the "Agreement"). This action is filed as a separate related action to the pending matter

captioned *John Hancock Life Insurance Company, et al. v. Abbott Laboratories*, Civil Action No. 03-12501-DPW (the "Existing Action"), pursuant to Section (1) of the Court's Scheduling Order entered in the Existing Action on March 30, 2004.

## The Parties

2.      Plaintiff John Hancock Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.   John Hancock Life Insurance Company is one of the nation's leading insurance companies, providing a broad array of insurance and investment products to retail and institutional customers, primarily in North America.

3.      Plaintiff John Hancock Variable Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.   John Hancock Variable Life Insurance Company provides variable life insurance products that link life insurance coverage and an investment return to an underlying portfolio of investments chosen by the policyholder.

4.      Plaintiff ManuLife Insurance Company (collectively, with plaintiffs John Hancock Life Insurance Company and John Hancock Variable Life Insurance Company, "John Hancock") is a company, duly formed and existing under the laws of the State of Delaware, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.   ManuLife Insurance Company is a wholly-owned subsidiary of John Hancock Variable Life Insurance Company that sells various types of life insurance products.   ManuLife Insurance Company formerly was known as "Investors Partner Life Insurance."

-2-

5.    Defendant Abbott Laboratories ("Abbott") is a corporation, duly formed and existing under the laws of the State of Illinois, that maintains its corporate headquarters in Abbott Park, Illinois. Abbott is a broad-based healthcare company that discovers, develops, manufactures and markets products and services that span the continuum of care -- from prevention and diagnosis to treatment and cure. Abbott's principal businesses are global pharmaceuticals, nutritionals, and medical products, including diagnostics and cardiovascular devices. Abbott achieved record sales and net earnings of $19.7 billion and $3.2 billion, respectively, in 2004. Its leadership positions in several multibillion-dollar businesses provide Abbott with a unique balance of revenue growth opportunities and cash flow sources that allow Abbott to invest in its future.

### Jurisdiction and Venue

6.    This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(a)(1) because defendant Abbott resides in this district within the meaning of 28 U.S.C. § 1391(c), and further because Section 16.2 of the parties' Agreement provides that Abbott,

> consents ... to the exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts ... for the purpose of any suit, action or other proceeding arising out of any of its obligations hereunder or thereunder or with respect to the transactions contemplated hereby or thereby, and expressly waives any and all objections that it may have as to venue in such courts.

-3-

**The Facts**

*The Agreement And Its Relevant Terms*

8.     On March 13, 2001, John Hancock and Abbott entered the Agreement, whereby John Hancock agreed to provide funding to Abbott for research and development activities on a portfolio of potential pharmaceutical products or "Program Compounds" (the "Research Program") in exchange for the right to receive certain management fees and future milestone and royalty payments from Abbott.

9.     The nine Program Compounds encompassed by the Abbott Research Program are: (a) ABT-773, a kelotide that may be useful as an antibiotic; (b) ABT-627, an endothelin-A receptor agonist that may be useful in the treatment of prostate cancer; (c) ABT-594, a non-opiod analgesic that may be useful in the treatment of chronic pain; (d) ABT-492, a quinolone that may be useful as an antibiotic; (e) ABT-510, a synthetic peptide that may be useful in the treatment of cancer; (f) ABT-518, a metalloproteinase inhibitor that may be useful in the treatment of cancer; (g) ABT-751, an antimitotic tubulin agonist that may be useful in the treatment of cancer; (h) ABT-100, a farnesyltransferase protein inhibitor that may be useful in the treatment of cancer; and (i) ABT-724, a dopamine receptor agonist that may be useful in the treatment of erectile dysfunction.

10.     Under the terms of the Agreement, John Hancock agreed to contribute up to a specified maximum amount toward the costs incurred by Abbott in operating the Research Program ("Program Related Costs") in four annual installments (the "Program Payments") over the period from March 13, 2001 through December 31, 2004 (individually, the four "Program Years" and, collectively, the four-year "Program Term"). Abbott agreed, in return, to invest at least twice the amount of John Hancock's contribution from its own funds towards

the operation of the Research Program, and committed to spend certain minimum amounts on Program Related Costs during each Program Year (the "Annual Minimum Spending Target"), as well as a minimum aggregate total on Program Related Costs over the four-year Program Term (the "Aggregate Spending Target").

11.    The Agreement, which comprises more than thirty-five (35) pages, was the subject of extensive negotiations between the parties and their counsel over a period of approximately one year.  From John Hancock's perspective, the financial attractiveness of the Agreement turned largely upon the specific identity of, and commercial prospects for, the nine Program Compounds encompassed by the Research Program.  John Hancock ran numerous analytical models based on financial projections for the Program Compounds in order to ensure, as best that it could, that the risks associated with its anticipated investment in the Research Program were justified by the potential rewards that John Hancock would receive if and when some or all of the Program Compounds were approved and commercialized.

12.    Because the financial return, if any, that John Hancock ultimately will receive on its investment in the Program Compounds is heavily dependent on the commercial success of those Compounds, John Hancock had a strong interest in ensuring, before the Agreement was signed, that: (a) Abbott had a good faith intention to aggressively pursue development of each of the Program Compounds; and (b) Abbott had a good faith belief that each of the Program Compounds possessed reasonably favorable commercial prospects.  In order to satisfy John Hancock's concerns on these points, Abbott agreed to provide John Hancock, in Article 12 of the Agreement, with certain written representations and warranties concerning the development status of the Program Compounds, including, *inter alia*, a representation and warranty that,

-5-

[s]et forth on Exhibit 12.2(d) is the full name, chemical name, detailed description of the stage of development and current status for each Program Compound. Set forth on Exhibit 1.6 in each Annual Research Plan is a description of projected milestones and dates thereof, projected year of NDA filing, and projected costs to be incurred by Abbott during the Program Term, for each Program Compound. Such projections were prepared in good faith and with due care based on reasonable assumptions, and represent the reasonable estimate of Abbott based on information available as of the date of such projections and as of the date hereof.... (Section 12.2[d]).

13.    Abbott further represented and warranted to John Hancock that,

[t]here is no fact known to Abbott (other than generally available information concerning the pharmaceutical industry in general) as of the date of this Agreement that has not been disclosed in this Agreement or any Exhibit to this Agreement which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial [viability]) of the Research Program or any of the Program Compounds. (Section 12.2[i]).

14.    The Agreement contains various other terms that are intended to protect John Hancock's interests by ensuring that Abbott fairly and diligently fulfills its research and development obligations under the Agreement, including terms which provide, *inter alia*, that Abbott:

(a)    must employ "Commercially Reasonable Efforts" (defined in the Agreement as "efforts which are consistent with those normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market potential at a similar stage of development or product life") to develop each of the Program Compounds and "achieve the objectives of the Research Program efficiently and expeditiously" (Sections 1.10, 2.3 and 4.1);

(b)    must keep John Hancock fully informed of any modifications to its written "Annual Research Plans" ("ARPs") by requiring that "[a]ny such modifications ... be promptly provided to John Hancock" (Section 2.2);

-6-

(c)    shall not "research, develop, manufacture, market, sell, distribute, out-license or otherwise treat" the Program Compounds any differently "as compared to any other Abbott compounds or products" on account of any of the rights granted to John Hancock under Agreement (Section 4.4); and

(d)    shall, "as soon as is practicable," out-license or divest any "Ceased Compound" (defined in the Agreement as a Program Compound that Abbott has "substantially cease[d] developing, marketing or selling") to a third party, and shall "remunerate John Hancock based on sales of such Ceased Compound by the third party that has acquired or licensed the Ceased Compound ... in a manner most consistent with the allocation that would have applied hereunder had such Ceased Compound not been so out-licensed or divested..." (Section 4.3[d]).

15.    John Hancock's obligation under the Agreement to make additional Program Payments during the four-year Program Term is not absolute, however.  In entering into the Agreement, John Hancock did not want to obligate itself to continue investing in the Program Compounds if the commercial prospects for those Compounds diminished significantly over the four-year Program Term.  Accordingly, John Hancock's obligation to make its second, third and fourth Program Payments was made expressly contingent upon the demonstration by Abbott, on an annual basis, of the continued commercial viability of the Program Compounds.

16.    For purposes of the Agreement, the continued commercial viability of the Program Compounds is measured by reference to Abbott's planned expenditures on Program Related Costs over the four-year Program Term.  Section 2.2 of the Agreement requires Abbott to provide John Hancock, at least forty-five days (45) prior to the start of each Program Year, with a written ARP that spells out Abbott's anticipated Research Program expenditures for that year and for each year remaining in the Program Term.  If Abbott's ARP for any given year did not "reasonably demonstrate [Abbott's] ... intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the

Aggregate Spending Target" as set forth in the Agreement, then John Hancock's "obligation to make any remaining Program Payments for any succeeding Program Years" automatically would terminate pursuant to Section 3.4(iv) of the Agreement.

17.   The Agreement further provides John Hancock with the power to objectively verify Abbott's compliance with the terms of the Agreement, including the right to retain an independent auditor of John Hancock's choosing (and reasonably acceptable to Abbott) who is empowered to inspect, copy and audit the "books and records of Abbott and each Subcontractor related to the Research Program ... at any time and from time to time." John Hancock is required to pay the fees and expenses of its chosen auditor in the first instance. If, however, the work of John Hancock's auditor "reveals any material breach of Abbott's responsibilities" under the Agreement, then Section 2.5 provides that Abbott "shall (i) pay the reasonable fees and expenses charged by such auditor, and (ii) fully and promptly cure such breach."

*John Hancock's Efforts to Audit Abbott's Compliance*
*With The Terms of the Agreement*

18.   Since the Agreement was executed on March 13, 2001, John Hancock has become aware of certain potential breaches of the Agreement by Abbott. Such potential breaches include, but are not limited to, misrepresentations by Abbott in the negotiation and execution of the Agreement, as well as violations by Abbott of its development and administrative responsibilities under the Agreement.

19.   Consistent with the terms of the Agreement, and in an effort to assist in confirming or refuting Abbott's suspected violations, John Hancock initiated an independent audit of Abbott's books and records on April 12, 2004. On that date, John Hancock sent a

-8-

letter to Abbott notifying Abbott of John Hancock's intention to undertake a compliance audit pursuant to Section 2.5 of the Agreement, and identifying the independent auditor that had been selected by John Hancock. John Hancock accompanied its audit notification letter to Abbott with a description of the specific books and records related to the Research Program that John Hancock requested be made available for examination by its independent auditor within thirty (30) days.

20.     Abbott unreasonably and unjustifiably has delayed, and continues to delay, its response to John Hancock's audit request, and has taken affirmative steps to obstruct the legitimate efforts of John Hancock's independent auditors to confirm or refute Abbott's compliance with terms of the Agreement. Tactics employed by Abbott to hinder, delay and obstruct John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement include, but are not limited to:

(a)     unreasonably and unjustifiably objecting to John Hancock's chosen auditor for a period of months, then arbitrarily withdrawing its objection;

(b)     unreasonably and unjustifiably delaying production of the majority of the relevant books and records requested by John Hancock's auditor for almost one year (and counting);

(c)     unreasonably and unjustifiably refusing to make certain relevant books and records available for inspection and copying at all (including, without limitation, various books and records documenting Abbott's actual expenditures on Program Related Costs);

(d)     unreasonably and unjustifiably redacting various relevant books and records produced during the course of the audit so as to eliminate relevant information and render certain materials effectively unintelligible, notwithstanding the existence of a written confidentiality agreement between the parties;

(e)     unreasonably and unjustifiably understaffing and under-funding Abbott's response to John Hancock's audit request in order to further delay the

-9-

examination of Abbott's relevant books and records by John Hancock's auditor;

(f)    unreasonably and unjustifiably delaying for periods of six months or more the photocopying of books and records designated by John Hancock's auditor during the inspection process;

(g)    unreasonably and unjustifiably refusing to provide John Hancock's auditor with photocopies of various books and records produced by Abbott, and designated by John Hancock's auditor, during the inspection process;

(h)    unreasonably and unjustifiably refusing to permit John Hancock or its independent auditor to make their own photocopies of Abbott's books and records produced for audit purposes;

(i)    unreasonably and unjustifiably violating acknowledged deadlines for the completion of Abbott's production of books and records responsive to John Hancock's audit requests;

(j)    unreasonably and unjustifiably ignoring or refusing to answer various written and oral inquiries by John Hancock and its auditor regarding Abbott's relevant books and records; and

(k)    unreasonably and unjustifiably acting in a manner contrary to the usual course of contractual compliance audits, and contrary to Abbott's own conduct in reasonably similar circumstances in the past.

21.    As of the date of this Complaint, Abbott still has not produced all of the material books and records related to the Research Program that were requested by John Hancock and its auditor on April 12, 2004, and refuses to do so. Abbott also continues to refuse to answer inquiries by John Hancock and its auditor seeking information that is necessary to complete the audit of Abbott's compliance with the Agreement.

*Abbott's Violations of the Agreement*

A.  Obstructing John Hancock's Compliance Audit

22.    Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement as

expressly permitted under Section 2.5. Upon information and belief, Abbott's efforts to hinder, delay and obstruct John Hancock's audit activities are intended to undermine, and have had the effect of undermining, John Hancock's ability to obtain information which would tend to confirm that Abbott has breached the Agreement in various other ways as set forth below.

B.  Misrepresenting the Development Status of ABT-518

23.    Upon information and belief, Abbott misrepresented the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that ABT-518 was "a compelling development candidate with the potential to demonstrate antitumor effects superior to the MMP inhibitors currently undergoing clinical trials." Abbott understood before the Agreement was executed, however, that the actual development status of ABT-518 was not as represented in the Agreement. For example, Abbott personnel already had plans as of early March 2001 to terminate the development of ABT-518, but understood that full disclosure of that fact to John Hancock "could have been the deathnell (*sic*) to the deal." Accordingly, Abbott personnel took affirmative steps on and prior to March 13, 2001 to conceal from John Hancock the true development status of ABT-518 so as to induce John Hancock to enter into the Agreement. Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-518.

24.    The development status of ABT-518 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-518 in making that decision. Had John Hancock known the true development status of ABT-518 before the Agreement was executed, John Hancock would have demanded

different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

C. Misrepresenting the Development Status of ABT-594

25.    Upon information and belief, Abbott misrepresented the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that a "phase IIb [clinical] study for neuropathic pain at higher, titrated doses of ABT-594 began in April 2000 and ends in June 2001," and that ABT-594 was "expected to be the first neuronal nicotinic receptor agonist to receive an indication for pain." Abbott understood before the Agreement was executed, however, that the development status of ABT-594 was not as represented in the Agreement. For example, Abbott already knew prior to the execution of the Agreement that the termination rate for patients enrolled in the phase IIb clinical study of ABT-594 was unusually high, and that the final results of that study were likely to be unfavorable. Abbott also knew, no later than March 2001, that the development of ABT-594 was likely to be significantly delayed or even discontinued by Abbott as a consequence. Abbott failed to disclose these facts to John Hancock before the Agreement was executed in order to induce John Hancock to enter into the Agreement. Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-594.

26.    The development status of ABT-594 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-594 in making that decision. Had John Hancock known the true development

-12-

status of ABT-594 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

D. Misrepresenting Its Intended and Reasonably Expected Spending on Program Related Costs

27.    Upon information and belief, Abbott has misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock. The Research Program cost projections that Abbott has provided to John Hancock in various ARPs reflect Abbott's "nominal" spending, as opposed to its "expected" spending. At all relevant times, Abbott's true "expected" spending on Program Related Costs was considerably less than the amounts communicated to John Hancock in Abbott's ARPs. Abbott has misrepresented its intended and reasonably expected spending plans to John Hancock in order to induce John Hancock to enter into the Agreement, and to make Program Payments to Abbott that would not otherwise be due under the terms of the Agreement.

28.    Abbott's intended and reasonably expected expenditures on Program Related Costs constitute material facts for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding its intended and reasonably expected expenditures on Program Related Costs in making that decision. Had John Hancock known the true level of Abbott's intended and reasonably expected expenditures, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable

-13-

financial terms with respect to the remaining Program Compounds, may not have made certain Program Payments, or may not have entered into the Agreement at all.

E.  Failing to Use Commercially Reasonable Efforts
to Develop the Program Compounds

29.    Upon information and belief, Abbott has failed to use Commercially Reasonable Efforts to develop the Program Compounds.  Abbott previously represented to John Hancock in its 2005 ARP that the current commercial prospects for the active Program Compounds warrant the expenditure of a stated sum towards Program Related Costs in 2005.  Upon information and belief, Abbott since has modified its 2005 ARP so as to reduce its intended and reasonably expected expenditures on Program Related Costs by more than fifty percent (50%) in retaliation, *inter alia*, for the automatic termination of John Hancock's obligation to make additional Program Payments for the third and fourth Program Years pursuant to the express terms of the Agreement.

30.    Abbott's decision to reduce its intended and reasonably expected expenditures on Program Related Costs in 2005 to less than one-half the amount that Abbott has represented is warranted by the current commercial prospects for the active Program Compounds is inconsistent with the level of effort normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market at a similar stage of development and, therefore, not Commercially Reasonable for purposes of Section 4.1 of the Agreement.

F.  Refusing to Provide John Hancock With a Copy
of Abbott's Modified 2005 ARP

31.    Abbott has refused to provide John Hancock with a copy of its modified 2005 ARP.  Abbott provided its original 2005 ARP to John Hancock in November 2004.  Upon

-14-

information and belief, Abbott since has modified its original 2005 ARP so as to dramatically reduce Abbott's intended and reasonably expected expenditures on Program Related Costs in 2005. Section 2.2 of the Agreement obligates Abbott to "promptly provide[]" John Hancock with "[a]ny ... modifications" to its ARPs. Notwithstanding the express requirements of Section 2.2, Abbott has refused or ignored John Hancock's requests for a copy of Abbott's modified 2005 ARP.

### G. Failing to Out-License or Divest Various Ceased Compounds

32.    Upon information and belief, Abbott has failed to out-license or divest itself of various Ceased Compounds, including, without limitation, ABT-518 and ABT-594, "as soon as is practicable" as required under Section 4.3(d) of the Agreement.

33.    Upon further information and belief, Abbott has chosen not to out-license or divest itself of the foregoing Ceased Compounds for fear that, if those Compounds were successfully developed and marketed by a third party, Abbott might lose future sales of various competing compounds that Abbott has under development, which are not subject to John Hancock's royalty rights.

### *John Hancock's Efforts to Resolve Its Claims Against Abbott Amicably*

34.    On April 1, 2005, John Hancock provided written notification to Abbott of the existence and nature of the foregoing disputes in accordance with Section 16.7 of the Agreement.

35.    Authorized representatives of John Hancock and Abbott subsequently met in Chicago, Illinois on May 20, 2005, in an effort to resolve their disputes amicably. That effort was unsuccessful.

## Claims

### COUNT I
### (Fraud)

36.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 35 of this Complaint, *supra.*

37.    Abbott materially misrepresented the development status of the Program Compounds in the representations and warranties contained in Sections 12.2 of the Agreement, and applicable Schedules thereto, all in the manner described in this Complaint.

38.    Abbott materially misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock, all in the manner described in this Complaint.

39.    Abbott made the foregoing misrepresentations to John Hancock wantonly and willfully for the purpose of fraudulently inducing John Hancock to enter into the Agreement, and to make various Program Payments to Abbott on the terms stated therein.

40.    John Hancock justifiably relied upon Abbott's misrepresentations to its detriment by, among other things, entering into the Agreement, and making Program Payments to Abbott in accordance with the terms thereof.

41.    As a result of Abbott's misrepresentations, John Hancock has been defrauded by Abbott and has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

### COUNT II
### (Breach of Contract)

42.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 41 of this Complaint, *supra.*

-16-

43.    The Agreement constitutes a valid and binding contract between the parties. John Hancock has performed all of its obligations under the Agreement.

44.    Abbott has breached its obligations to John Hancock under the Agreement, *inter alia*, by:

(a)    misrepresenting the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement;

(b)    misrepresenting the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement;

(c)    misrepresenting Abbott's intended and reasonably expected expenditures on Program Related Costs in ARPs that Abbott has provided to John Hancock;

(d)    failing to use Commercially Reasonable Efforts to develop the Program Compounds;

(e)    refusing to provide John Hancock with a copy of Abbott's modified 2005 ARP;

(f)    failing to out-license or divest itself of certain Ceased Compounds, including, without limitation, ABT-518 and ABT-594, as soon as is practicable; and

(g)    unreasonably and unjustifiably hindering, delaying and obstructing John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement.

45.    By engaging in the foregoing conduct, Abbott further has breached the covenant of good faith and fair dealing that is implied by law in every contract, including the Agreement.

46.    Abbott has breached its express and implied obligations under the Agreement willfully and wantonly in order to induce John Hancock to enter into the Agreement, induce John Hancock to make various Program Payments to Abbott on the terms stated therein, and inhibit John Hancock's ability to detect and confirm Abbott's misconduct.

-17-

47.    As a result of Abbott's willful and wanton breaches of its express and implied obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

COUNT III
(Indemnification)

48.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 47 of this Complaint, *supra*.

49.    Abbott has breached its representations, warranties and obligations to John Hancock under the Agreement as set forth herein.

50.    As a result of Abbott's various breaches of its representations, warranties and obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, "Losses" as defined in Section 1.27 of the Agreement. John Hancock's Losses include, without limitation, costs, damages, and other reasonable expenses such as audit charges and attorneys' fees.

51.    Abbott agreed in Section 12.6 of the Agreement to indemnify John Hancock, *inter alia*, "from and against all Losses related to or arising out of, directly or indirectly ... any breach by Abbott of its representations, warranties or obligations hereunder..."

52.    On April 1, 2005, John Hancock provided written notification to Abbott that John Hancock has sustained, and likely will continue to sustain, compensable Losses on account of Abbott's various breaches of its representations, warranties and obligations under the Agreement, for which John Hancock is entitled to indemnification pursuant to Section 12.6 of the Agreement.

53.    Notwithstanding John Hancock's request for indemnification, Abbott has refused

to indemnify John Hancock for its compensable Losses.

### Prayers for Relief

WHEREFORE, John Hancock respectfully requests that the Court:

(a)    award John Hancock compensatory damages in an amount to be
determined, plus interest and costs, for Abbott's fraud under Count I of
the Complaint;

(b)    award John Hancock compensatory damages in an amount to be
determined, plus interest and costs, for Abbott's various breaches of
contract under Count II of the Complaint;

(c)    enter an order directing Abbott to indemnify John Hancock for its
compensable Losses, including John Hancock's damages, costs, and
other reasonable expenses such as audit charges and attorneys' fees,
under Count III of the Complaint;

(d)    award John Hancock punitive damages for Abbott's willful and wanton
misconduct in an amount to be determined under Counts I and II of the
Complaint; and

(e)    grant John Hancock such other and further relief as the Court deems just
and appropriate in the circumstances.

> JOHN HANCOCK LIFE INSURANCE
> COMPANY, JOHN HANCOCK VARIABLE
> LIFE INSURANCE COMPANY AND
> MANULIFE INSURANCE COMPANY
>
> By their attorneys,
>
> Brian A. Davis (BBO No. 546462)
> Karen Collari Troake (BBO No. 566922)
> Stacy Blasberg (BBO No. 657420)
> CHOATE, HALL & STEWART LLP
> Exchange Place
> 53 State Street
> Boston, Massachusetts 02109
> Tele: 617-248-5000

Date: June 3, 2005

-19-

3927619v2

**EXHIBIT 19**

**CONFIDENTIAL - REDACTED**

**EXHIBIT 20**

**CONFIDENTIAL - REDACTED**

**EXHIBIT 21**

ORIGINAL

CONFIDENTIAL

```
 1                                    Volume:    I

 2                                    Pages  :    1 - 257

 3                                    Exhibits: 1 - 46

 4               UNITED STATES DISTRICT COURT

 5            FOR THE DISTRICT OF MASSACHUSETTS

 6                    CIVIL ACTION NO. 05-1150DPW

 7       - - - - - - - - - - - - - - - - - - - - - x

 8   JOHN HANCOCK LIFE INSURANCE COMPANY,

 9   JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY,

10   and MANULIFE INSURANCE COMPANY

11   (f/k/a INVESTORS PARTNER INSURANCE COMPANY),

12                    Plaintiffs,

13       V.

14   ABBOTT LABORATORIES,

15                    Defendant.

16       - - - - - - - - - - - - - - - - - - - - - x

17              C O N F I D E N T I A L

18       VIDEOTAPED DEPOSITION OF SCOTT S. HARTZ

19        Friday, November 10, 2006,  9:45 a.m.

20            Donnelly, Conroy & Gelhaar

21               One Beacon Street

22             Boston, Massachusetts

23       Reporter:  Rosemary F. Grogan, CSR, RPR

24
```



LEGALINK®
A MERRILL
COMMUNICATIONS
COMPANY

20750 Ventura Blvd
Suite 205
Woodland Hills, CA 91364

tel (818) 593-2300          www.merrillcorp.com
tel (800) 826-0277
fax (818) 593-2301

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

1    that.

2                    Do you recall receiving the e-mail that's

3    listed first in this chain on Exhibit 27?

4        A.    I don't specifically recall this one, no.

5        Q.    Do you recall Mr. Blewitt conducting analyses

6    or updating the Monte Carlo simulation based on new

7    information after the transaction was entered into?

8        A.    Yes.

9             MR. DAVIS:  Objection; asked and answered.

10    You can respond.

11        A.    Yes.

12        Q.    Do you know specifically what inputs

13    Mr. Blewitt changed in the Monte Carlo simulation after

14    the transaction was entered into?

15        A.    No, I don't.

16        Q.    Do you know if -- do you know if John Hancock

17    impaired the Abbott transaction under 9920 at some

18    point?

19        A.    Yes.

20        Q.    Do you recall when that occurred?

21        A.    No, I'm not 100 percent sure.

22         (Exhibit No. 28 Marked for Identification)

23    BY MR. LORENZINI:

24        Q.    Mr. Hartz, you have before you Exhibit 28

211

1    which is an e-mail chain beginning October 2nd, 2002

2    with an e-mail from Mary Beth Dacey.  You're on some of

3    the e-mails that appears that are part of this chain,

4    not the final two.

5             Do you recognize the e-mails in this

6    exhibit that you are listed as recipient or sender on?

7         A.   I don't remember this, no.

8         Q.   Do you recall John Hancock receiving milestone

9    and management fees from Abbott?

10        A.   I know we did at some point, but I don't

11   specifically remember this one.

12        Q.   You state in this October 2nd, 2002 -- let me

13   first ask, do you have any reason to doubt you received

14   the e-mails here?

15        A.   No, I have no reason to doubt that.

16        Q.   In your October 2nd, 2002 e-mail, you state:

17   We're booking this per EITF 9920 so the cash can be

18   applied to reduce the BV.

19             Is BV a reference to book value?

20        A.   Yes.

21        Q.   And do you recall that cash received from the

22   Abbott transaction was applied to reduce the book value

23   pursuant to 9920?

24        A.   That's the way it's supposed to work, so I

212

CONFIDENTIAL

255

```
 1                    C E R T I F I C A T E

 2     COMMONWEALTH OF MASSACHUSETTS )

 3                                    )

 4     COUNTY OF PLYMOUTH             )

 5            I, Rosemary F. Grogan, a Registered

 6     Professional Reporter and Notary Public duly

 7     commissioned and qualified in and for the Commonwealth

 8     of Massachusetts, do hereby certify:

 9            That SCOTT S. HARTZ, the witness whose

10     deposition is hereinbefore set forth, was duly

11     identified and sworn by me, and that the foregoing

12     transcript is a true record of the testimony given by

13     such witness to the best of my ability.

14            I further certify that I am not related to any

15     of the parties in this matter by blood or marriage, and

16     that I am in no way interested in the outcome of this

17     matter.

18            IN WITNESS WHEREOF, I have hereunto set my

19     hand and affixed my notarial seal this 17th day of

20     November, 2006.

21

22                           Rosemary F. Grogan, RPR

23                           CSR No. 112993

24     My Commission Expires:  January 7, 2011
```

```
 1              SIGNATURE / ERRATA SHEET
 2    Re:   John Hancock Life, et al. Vs. Abbott Laboratories
 3    DEPOSITION OF:  Scott S. Hartz   1/10/06
 4              I, SCOTT A. HARTZ, do hereby certify that I
 5    have read the foregoing transcript of my testimony, and
 6    I further certify that said transcript it is a true and
 7    accurate record of said testimony (with the exception of
 8    the corrections that are noted below).
 9    PAGE       LINE(S)        READS           SHOULD READ
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17              Signed under the pains and penalties of
18    perjury this ___4___ day of ___December___, 2006.
19    _____
20    SCOTT S. HARTZ                                   Date
21              Subscribed and sworn to before me this ____day
22    of _____, 2006.
23    _____
24    Notary Public       My Commission Expires:_____
```

257

**EXHIBIT 22**

CONFIDENTIAL - REDACTED

**EXHIBIT 23**

**CONFIDENTIAL - REDACTED**

# EXHIBIT 24

**CONFIDENTIAL - REDACTED**

**EXHIBIT 25**

**CONFIDENTIAL - REDACTED**

**EXHIBIT 26**

**CONFIDENTIAL - REDACTED**

EXHIBIT 27

John Hancock
Activity/Communication Log between MH of StoneTurn Group & Abbott Personnel

| # | Date | Note |
|---|------|------|
| 1 | 01/25/05 | Michelle Cambell left a voicemail saying documents would not be available for StoneTurn's review in Mundelein until after they were reviewed by Abbott |
| 2 | 01/28/05 | Received box containing a binder from Abbott (Project Odin) |
| 3 | 01/31/05 | MH and CM reviewed 4 of 8 boxes in Mundelein with Carey Crimmins. Requested of Carey Crimmins that certain documents with redacted title pages be made available. |
| 4 | 02/01/05 | MH reviewed remaining available boxes in Mundelein. Carey Crimmins at warehouse. |
| 5 | 02/01/05 | Additional box of documents delivered to StoneTurn in Walnut Creek. Documents from 1/20/05 review/request |
| 6 | 02/01/05 | Made request of Carey Crimmins to copy all flagged documents during 1/31 & 2/1 review. |
| 7 | 02/15/05 | Received one box containing 3 volumes of Advisory Board Meeting minutes, Sept 2002, ABT-724 |
| 8 | 02/16/05 | Received a fed-ex envelope from Marc Streb, Winston & Stawn, with GPRD Quality Assurance Monthly Highlights, December 2003. 4 of 5 pages entirely redacted. |
| 9 | 03/07/05 | MH, CM, and JD went to High Street location to review boxes with Carey Crimmins from Abbott |
| 10 | 03/08/05 | MH discussed various excel files with Carey Crimmins that appeared to be unformatted for printing (e.g. had no column or row headings) and therefore meaningless for auditing purposes. MH requested files be better formatted, asked for electronic copies of files, and asked for similar files for the other compounds for additional years. |
| 11 | 03/08/05 | MH asked Carey Crimmins if all documents were now produced for review. Carey Crimmins affirmed that all documents (but for the few documents he was currently redacting) were made available to StoneTurn for review. MH asked for specific accounting and financial documents that identify costs in detail for each of the compounds for each of the relevant years (2000 - 2004) and he commented that he wasn't sure if or where the accounting documents were among the 19 pallets. I communicated to Carey Crimmins that I would ask Michelle Campbell the same questions; if all documents are now available for review and if all financial and accounting documents were made available. |
| 12 | 03/09/05 | Briefly met Michelle Campbell in the High Street warehouse. She talked with Carey Crimmins and I introduced myself and told her we would send her a status email (sent 3/10/05) |
| 13 | 03/10/05 | MH emailed Michelle Campbell to give status of review of documents and asked questions regarding the production of document, whether any more documents were coming, if all documents responsive to Schedule A were provided, where were they located in the various pallets and boxes, etc. |
| 14 | 03/11/05 | Received 5 boxes of copied Abbott docs in Walnut Creek (5 boxes so far from the 3/7/05 review) |
| 15 | 03/15/05 | Received 2 boxes of copied Abbott docs in Walnut Creek (7 boxes so far from the 3/7/05 review) |
| 16 | 03/15/05 | Emailed Michelle Campbell to let her know we received 7 boxes (5 on Friday 3/11/05 and 2 today, 3/15/05) and also asked her to respond to the email sent on 3/11/05 regarding the status of production and responses to schedule A, etc. |
| 17 | 03/15/05 | Michelle Campbell responded to email that more boxes are being copied and will likely be sent by end of week. She didn't respond to the questions in the status email sent by MH on 3/10/05. |
| 18 | 03/17/05 | Received 3 boxes of copied Abbott docs in Walnut Creek (10 boxes so far from the 3/7/05 review) |
| 19 | 03/22/05 | Received 1 box from Abbott (Winston & Strawn). Appears to be box #17 from the documents reviewed the week of 3/7/05 |
| 20 | 03/23/05 | MH emailed Michelle Campbell asking if all flagged documents from box #17 were provided - it appears that some documents reviewed by StoneTurn in Mundelein earlier in the month were not copied and provided to StoneTurn for further review and analysis. |
| 21 | 03/25/05 | MH received an email response from Michelle Campbell regarding missing documents from box 17, "Certain documents were removed, and are being investigated as being either non-responsive to the audit request or privileged." |
| 22 | 03/28/05 | Received one additional box from Abbott (Winston & Strawn). Confirmed with Michelle Campbell that this box contains the documents we were unable to review when in Mundelein the week of March 7th. |


EXHIBIT 26
M. Hair
tr 5/8/07

CONFIDENTIAL
JHII 021599

**EXHIBIT 28**

CERTIFIED
COPY

1                               Volume:    II

2                               Exhibits:  7-26

3              UNITED STATES DISTRICT COURT

4           FOR THE DISTRICT OF MASSACHUSETTS

5              CIVIL ACTION NO. 05-11150-DPW

6      - - - - - - - - - - - - - - - - - - - - - - - x

7      John Hancock Life Insurance Company,

8      John Hancock Variable Life Insurance Company,

9      and Manulife Insurance Company, (f/k/a Investors

10     Partner Insurance Company),

11                    Plaintiffs,

12          v.

13     Abbott Laboratories,

14                    Defendant.

15     - - - - - - - - - - - - - - - - - - - - - - - x

16

17              DEPOSITION OF MARK L. HAIR

18          Tuesday, May 8, 2007, 1:05 p.m.

19              DONNELLY CONROY & GELHAAR

20          One Beacon Street, 33rd Floor

21                 Boston, Massachusetts

22     Reporter:  Lori-Ann London, RPR

23

24

M E R R I L L   L E G A L   S O L U T I O N S

20750 Ventura Blvd, Suite 205                    818.593.2300
www.merrillcorp.com/law    Woodland Hills, CA 91364

1    during the audit?

2                MS. COLLARI TROAKE:   Objection.   Do

3    you want him to read the whole document?

4        A    I have not read this whole document.

5    I -- I saw it today.

6        Q    Okay.  I'll move on to another question.

7                Why don't you take a look at the

8    next document, which has been marked as

9    Exhibit 26.

10       A    Okay.

11       Q  . This is a document with the header

12   "Activity/Communication Log Between MH of

13   StoneTurn Group and Abbott Personnel."

14       A   Yes.

15       Q    Is this, in fact, a log created by you

16   of communications with Abbott personnel?

17       A    Yes.

18       Q    Does this log reflect all of your

19   communications with Abbott during the course of

20   the audit?

21       A    No.

22       Q    What communications did you have with

23   Abbott personnel that are not reflected in this

24   log?

329

1       A    I recall there were certain

2   conversations related to timing of when documents

3   would be provided or timing of when we would be

4   able to go to a warehouse, or administrative-type

5   items that weren't necessarily substantive related

6   to the documents or the compliance review per se.

7       Q    Do you recall any specific

8   communications that are not listed here?

9       A    I believe I had some calls with Michelle

10  Campbell prior to the January 31st, '05 date when

11  Chris Martinez and I showed up to the Abbott

12  warehouse.  I don't think they're all reflected

13  there.  And, again, as I recall, the conversations

14  were about what day to show up, what time to show

15  up, things of that nature.

16      Q    So you think this log captured all of

17  your substantive communications with Abbott

18  personnel?

19      A    Substantive, yes.

20      Q    If you look at the third entry on the

21  log, it states that you requested of Carey

22  Crimmins that certain documents with redacted

23  title pages be made available, and the date of

24  this entry is January 31st, 2005.

330

Mark L. Hair, Vol. 2                                    05/08/2007

Page 334

1                    C E R T I F I C A T E

2    COMMONWEALTH OF MASSACHUSETTS

3    BRISTOL, SS

4

5            I, Lori-Ann London, Registered

6    Professional Reporter and Notary Public in and for

7    the Commonwealth of Massachusetts, do hereby

8    certify:

9            That, MARK L. HAIR, the witness

10   whose deposition is hereinbefore set forth, was

11   duly sworn by me and that such deposition is a

12   true record of the testimony given by the witness

13   to the best of my knowledge, skill, and ability.

14           I further certify that I am neither

15   related to, nor employed by, any of the parties in

16   or counsel to this action, nor am I financially

17   interested in the outcome of this action.

18           IN WITNESS WHEREOF, I have hereunto set

19   my hand and seal of office this 21st day of May

20   2007.

21                        _Lori-Ann London_

22                        Lori-Ann London, RPR

23                        Notary Public

24   My commission expires: 6/15/2012

1                        E R R A T A   S H E E T

2              I, MARK L. HAIR, the within-named

3      deponent do hereby certify that I have read the

4      foregoing transcript of my testimony, and further

5      certify that said transcript is a true and

6      accurate record of said testimony (with the

7      exception of the following corrections listed

8      below):

9      Page          Line                    Correction

10     _____         _____         _____

11     _____         _____         _____

12     _____         _____         _____

13     _____         _____         _____

14     _____         _____         _____

15     _____         _____         _____

16     _____         _____         _____

17     _____         _____         _____

18     _____         _____         _____

19     _____         _____         _____

20             Signed under the pains and penalties of

21     perjury this     day of                , 2007.

22

23                                  _____

24                                  MARK L. HAIR

335

**EXHIBIT 29**

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MASSACHUSETTS

3

4    JOHN HANCOCK LIFE INSURANCE          )

5    COMPANY, JOHN HANCOCK VARIABLE       )

6    LIFE INSURANCE COMPANY, and          )

7    MANULIFE INSURANCE COMPANY           )

8    (f/k/a INVESTORS PARTNER             )

9    INSURANCE COMPANY),                  )

10                   Plaintiffs,          )    Civil Action

11          vs.                           )   No. 05-11150-DPW

12   ABBOTT LABORATORIES,                 )

13                   Defendant.           )   **COPY**

14

15          The videotaped deposition of MICHELLE

16   CAMPBELL, taken pursuant to the Federal Rules of

17   Civil Procedure of the United States District Courts

18   pertaining to the taking of depositions, taken

19   before LINDA SNODGRASS SABOR, a Notary Public within

20   and for the County of Cook, State of Illinois, and a

21   Certified Shorthand Reporter, CSR No. 84-1850, of

22   said state, at the Westin Chicago North Shore,

23   601 North Milwaukee Avenue, Wheeling, Illinois, on

24   the 20th day of February, 2007, at 9:33 a.m.

Page 123

1    Q.    Okay.  Now, if you would turn to Page 13,

2    please, Interrogatory 11.

3    A.    Yes.

4    Q.    And Interrogatory 11 asks, "Please

5    identify each person who participated in the

6    compliance audit --" and I'll represent to you that

7    compliance audit was defined as what we're calling

8    the John Hancock audit.

9    A.    Okay.

10    Q.    "-- on Abbott's behalf, including without

11    limitation a complete description of his or her

12    duties and responsibilities with respect to the

13    compliance audit."

14    A.    Okay.

15    Q.    Do you see that?

16    The response includes some objections,

17    but then there's a list of people on Page 14 --

18    A.    Yes, I see that.

19    Q.    -- including yourself, and a list of

20    other individuals.

21    Can you tell me who the individuals are

22    other than yourself who are on that list?

23    A.    I can tell you specifically Carey

24    Crimmins was a contract attorney who worked on the

Page 124

1    project and --

2         Q.    Do you know -- excuse me.   One second.

3         A.    Sure.

4         Q.    Do you know when he was first hired to

5    work on the project?

6         A.    No.

7         Q.    Who was responsible for hiring him?

8         A.    I requested contract attorneys through

9    Manpower.

10        Q.    When did you make that request?

11        A.    I don't remember.

12        Q.    Did you have to get authorization from

13   anyone at Abbott prior to making that request?

14        A.    Yes.

15        Q.    Who would that be?

16        A.    Ken Wittenberg.

17        Q.    And do you recall when you got that

18   approval from Mr. Wittenberg to hire a contract

19   attorney?

20        A.    No.

21        Q.    Do you know whether it was before or

22   after the December meeting at Mundelein?

23        A.    I really don't remember.

24        Q.    Okay.  Ronald Richards, who is that?

Page 125

1       A.    I don't remember the name.  I -- reading

2    the document, he was a Manpower attorney, or

3    paralegal.

4       Q.    And what about Christopher Fleck?

5       A.    I remember the name.  He was from

6    Manpower and he worked on the project.

7       Q.    And Manpower is an agency that provides

8    temporary legal assistance, is that right?

9       A.    No.  Manpower -- well, sort of.

10          Manpower is a company that Abbott

11   contracts with for contract personnel, and I believe

12   they find the contract personnel from other

13   subcontractors.

14      Q.    So it could be legal or other personnel

15   that Manpower would find?

16      A.    Depending on the type of request --

17      Q.    Yes.

18      A.    -- yes.

19      Q.    And so Karen Cole-Kearney, Ray Harris,

20   and Ron Michael, they'd all fall in the same

21   category, paralegals who were contracted through

22   Manpower to work on the project?

23      A.    Yeah, contract personnel.

24      Q.    Do you recall with respect to any of them

Page 126

1      when they were first contracted to work on the

2      John Hancock audit?

3           A.    No.

4           Q.    Were you the one who contracted to obtain

5      their services?

6           A.    I requested contract personnel.

7           Q.    Do you recall when you made that request?

8           A.    No.

9           Q.    Were there any other contract attorneys

10     or paralegals that you recall working on the

11     John Hancock audit?

12          A.    I believe Kim Surzinski helped out -- I

13     don't recall specifics on what she did, but I

14     believe she helped out on the audit, and she is a

15     contract paralegal who is contracted I believe

16     through Manpower, but I'm not certain, with Abbott

17     for a long time.  She works on many different tasks.

18          MS. COLLARI TROAKE:  This will be 6.

19                      (WHEREUPON, a document was marked

20                      Campbell Exhibit No. 6, for

21                      identification, as of 2/20/07.)

22     BY MS. COLLARI TROAKE:

23          Q.    Ms. Campbell, I put in front of you what

24     has been marked as Campbell 6.  If we could take it

Page 127

1    in two parts, the first part being what appears to

2    be an invoice from Special Counsel, which is two

3    pages --

4         A.    Okay.

5         Q.    -- marked ABBT 5098 to 99.

6         A.    Okay.

7         Q.    Do you recognize that document?

8         A.    I don't recognize it specifically.  It

9    was directed to me, so I assume I saw it at some

10   point.

11        Q.    And do you recall or do you know, is this

12   the invoice from Mr. Crimmins' time on the Hancock

13   audit?

14        A.    It appears to be an invoice for time he

15   spent on the audit or time he spent on Hancock,

16   which -- it has to be the audit.

17        Q.    Did he work on the litigation at all?

18        A.    No.

19        Q.    And if you look at Page 5098 --

20        A.    Okay.

21        Q.    -- Line 1 -- do you see that -- and it

22   says W/E, which I assume is week ending date.

23              Do you see that?

24        A.    Yes, I see that.

Page 128

1      Q.     And it says March 27, 2005?

2      A.     Yes.

3      Q.     Okay.  On the next page, 5099, similarly

4  week ending date, March 20th, 2005?

5      A.     Yeah.

6      Q.     Other than those two weeks or the time on

7  those two weeks, do you know if Mr. Crimmins spent

8  any other time working on the Hancock audit on

9  behalf of Abbott?

10      A.     I don't specifically remember the amount

11  of time he spent, so I don't know.

12      Q.     Do you have any reason to believe that he

13  spent more time than what's indicated on these

14  invoices?

15      MR. LORENZINI:  Objection.  Misleading.

16  BY THE WITNESS:

17      A.     I don't really know.  I don't remember

18  how much time he spent working on it.

19  BY MS. COLLARI TROAKE:

20      Q.     Do you recall him working on the audit in

21  early January, '05?  It would be just after

22  Christmas.

23      A.     I really don't remember.

24      Q.     If he had worked on the audit during that

1    time, would the invoice for his time have come to

2    you?

3        MR. LORENZINI:  Objection.  It calls for

4    speculation.

5    BY THE WITNESS:

6        A.    Again, I really don't know.  It might

7    have.

8    BY MS. COLLARI TROAKE:

9        Q.    On Page 5099, the second Special Counsel

10   invoice, there is a stamp there that says

11   "Redacted."

12            Do you know what that relates to?

13       A.    No.

14       Q.    And am I correct that in reading these

15   invoices the number under what looks like Unt/Hrs is

16   the number of hours the individual would have

17   worked?

18       A.    I guess I'm not seeing where you're --

19   which -- are you still on 599 -- 5099?

20       Q.    Yes.

21       A.    Okay.  And -- okay.  Unt/ --

22       Q.    Hrs --

23       A.    -- Hrs.

24       Q.    -- says 35.

Page 130

1      A.     I assume that's unit hours, but I'm not

2   positive.

3      Q.     And the word to the left of that number,

4   REG, do you know if that means regular versus

5   overtime?

6      A.     I don't know for sure, but it sounds

7   logical.

8      Q.     Were you responsible for approving these

9   invoices before they were paid?

10     A.     I don't recall specifically approving

11  them, but probably.

12     Q.     Would anyone else have been responsible

13  for approving them prior to payment?

14     A.     I don't know specifically.  If I was not

15  around, somebody else could have approved them, but

16  I don't remember.

17     Q.     Looking at the second document in

18  Exhibit 6 --

19     A.     6.

20     Q.     -- if you could take a look at that --

21  it's a few pages -- ABBT 5100 through 5112.

22     A.     Okay.

23     Q.     Just generally can you tell me whether

24  you recognize these documents?

Page 131

```
 1        A.    No.

 2              These -- I -- these are familiar --

 3        Q.    Okay.

 4        A.    -- this second half, 5106.

 5        Q.    And these being what look like to be

 6   screen shots, which are at 5106 through 5112?

 7        A.    Yeah.

 8              Let me clarify.  The screen format --

 9        Q.    Uh-huh.

10        A.    -- is Manpower's format.  The specific

11   page --

12        Q.    Uh-huh.

13        A.    -- I don't recall specifically, but the

14   format is Manpower, and I have seen that before.

15        Q.    I see.

16              And this format for these particular

17   pages, do you know what the -- what this was used

18   for?

19        A.    When we request contract personnel, we go

20   into UltraSource, as it shows up here, and -- it's

21   been a while, but we open an order, I guess.

22        Q.    Uh-huh.

23        A.    And this is the system that -- that we go

24   into.
```

Page 132

1    Q.    And on these pages do you indicate when

2    you need the person to start work?

3    A.    It doesn't look like when we need them to

4    start work is indicated on these pages.

5    Q.    Well, if you look at 5106, for example --

6    A.    Sure.

7    Q.    -- which is for Karen Cole-Kearney --

8    A.    Uh-huh.

9    Q.    -- correct?

10         It says "Date available" and "Starts

11   working on."

12   A.    Right.

13   Q.    Do you know what those refer to?

14   A.    I assume this refers to the date she's

15   available, and the bottom one refers to the date

16   she'll start working.

17   Q.    And is that information that you input as

18   to when you want the person to start or is that

19   something generated by Manpower?

20   A.    I don't believe I input that.  I don't

21   know that I would know a date a candidate was

22   available.

23   Q.    What about the starts working on date?

24   A.    I don't recall specifically.

Page 133

1          I may have said we would like them to --

2    I may have inputted we would like them to start on a

3    certain date.  I don't recall if this was the

4    date --

5          Q.    Yes.

6          A.    -- or if she is starting on the date I

7    had requested.

8          Q.    Am I correct that all the starts working

9    on dates in these various forms are all February or

10   March of 2005?

11         A.    The documents state that starts working

12   on is either February or March of 2005.

13         Q.    And then the first part of this document

14   looks to be some Manpower invoices, correct?

15         A.    It appears to be.

16               I don't believe I see these.  They're not

17   familiar to me.

18         Q.    Would you have been the one responsible

19   for requesting payment of these invoices?

20         A.    Requesting payment.

21               I would probably be the one responsible

22   for approving it --

23         Q.    Yes.

24         A.    -- but not requesting it.

Page 134

1      Q.    So would you have seen the invoices if

2   you were asked to approve payment of the invoice?

3      A.    I don't believe I've ever seen these,

4   this document, type of document.

5      Q.    And on these invoices, for each one it

6   says employee name/service type.

7            Do you see that?

8      A.    I see that, yes.

9      Q.    And then the next column says week

10  ending?

11     A.    I see that, yes.

12     Q.    And on the first one, on 5100, it says

13  week ending February 27, '05, right?

14     A.    I see that, yeah.

15     Q.    And then the second one, the same thing,

16  February 27, '05?

17     A.    I see that.

18     Q.    And then the third one is the same,

19  February 27, '05?

20     A.    I see that on the document, yes.

21     Q.    And then the next one is March 6, '05,

22  and the next one is the same, March 6, '05, and the

23  last one, March 6, '05?

24     A.    That's what the documents show, yes.

Page 135

1        Q.    Does that refresh your recollection at

2    all as to when these contract paralegals were hired

3    to work on the Hancock audit?

4        A.    No.  But I have no reason to doubt that

5    they worked on these time frames, but I don't

6    remember.

7        Q.    Do you have any reason to believe that

8    they spent any time prior to January 1, 2005,

9    working on the Hancock audit?

10       MR. LORENZINI:  Objection.  Lacks foundation.

11   BY THE WITNESS:

12       A.    I don't remember.

13   BY MS. COLLARI TROAKE:

14       Q.    Do you know someone who works at Abbott

15   with a first name of Daya, D-a-y-a?

16       A.    Yes.

17       Q.    And what's his or her full name?

18       A.    Daya Ishaya.

19             I-s-h-a-y-a, I believe.  I'm not sure on

20   the correct spelling.

21       Q.    And is that a him or a her?

22       A.    Her.

23       Q.    And where does she work at Abbott?

24       A.    She no longer works at Abbott.

Page 136

1    Q.    Back in the 2004, '05 time period did she

2    work at Abbott?

3    A.    I don't know the specific time frame.

4    She did work in Abbott as an administrative

5    assistant at one point.

6    Q.    Do you know who she worked for?

7    A.    She supported me at one point.  She also

8    supported other people.  And I'm not certain -- I

9    believe she supported Sarah Lyke.  That's the only

10   other person I can be certain she did support at one

11   point.

12   Q.    So is she in the litigation department?

13   A.    Yes, she was in litigation at some point.

14   Q.    And did she work on the John Hancock

15   audit?

16   A.    I don't know -- I don't recall, but she

17   was my assistant, so she might have done things for

18   me pertaining to the audit, as it was my project,

19   but I don't remember specifically.

20   Q.    We've been talking about the auditors for

21   a while now.

22        Do you recall the auditors were StoneTurn

23   Group?  Do you remember that?

24   A.    I recall the name, yes.

Page 315

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3

 4   JOHN HANCOCK LIFE INSURANCE      )

 5   COMPANY, et al.,                 )

 6                  Plaintiffs,       )    Civil Action

 7        vs.                         )    No. 05-11150-DPW

 8   ABBOTT LABORATORIES,             )

 9                  Defendant.        )

10

11             I hereby certify that I have read the

12   foregoing transcript of my deposition given at the

13   time and place aforesaid, consisting of Pages 1 to

14   314, inclusive, and I do again subscribe and make

15   oath that the same is a true, correct and complete

16   transcript of my deposition so given as aforesaid,

17   and includes changes, if any, so made by me.

18                              _____

19                              MICHELLE CAMPBELL

20   SUBSCRIBED AND SWORN TO

21   before me this 11 th day

22   of April            , A.D. 2007 .

23

24        Notary Public  _____
```

"OFFICIAL SEAL"
MONA LISA S. FISHER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6/9/2007

1          IN WITNESS WHEREOF, I do hereunto set my

2    hand and affix my seal of office at Chicago,

3    Illinois, this 5th day of March, 2007.

4

5                    *Linda Snodgrass Sabor*

6

7          LINDA SNODGRASS SABOR,

8          Notary Public, Cook County, Illinois.

9          My commission expires December 2, 2007.

10

11            OFFICIAL SEAL
              LINDA SNODGRASS SABOR
              NOTARY PUBLIC - STATE OF ILLINOIS
              MY COMMISSION EXPIRES:12/02/07

12

13    CSR Certificate No. 84-1850.

14

15

16

17

18

19

20

21

22

23

24

**EXHIBIT 30**

**CONFIDENTIAL - REDACTED**

**EXHIBIT 31**

**CONFIDENTIAL - REDACTED**

**EXHIBIT 32**

**CONFIDENTIAL - REDACTED**

**EXHIBIT 33**

**CONFIDENTIAL - REDACTED**

**EXHIBIT 34**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN HANCOCK LIFE INSURANCE     )
COMPANY, JOHN HANCOCK           )
VARIABLE LIFE INSURANCE         )
COMPANY, and INVESTORS          )
PARTNER LIFE INSURANCE          )
COMPANY,                        )
    Plaintiffs,             )
                                )    CIVIL ACTION NO.
        v.              )    03-12501-DPW
                                )
ABBOTT LABORATORIES,            )
    Defendant.              )

## FINAL JUDGMENT AND DECLARATION

September 16, 2005

    Pursuant to the Court's Memorandum and Order dated September 16, 2005 judgment is entered for Plaintiffs and counterclaim Defendants John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Investors Partner Life Insurance against Defendant and counterclaim Plaintiff Abbott Laboratories, and it is hereby DECLARED, ADJUDGED and DECREED that:

- Hancock's obligation to make Program Payments to Abbott for the third and fourth Program Years has terminated in accordance with the terms of the Agreement;

- Hancock's withholding of the 2003 and 2004 Program Payments does not constitute a breach of the Research Funding Agreement; and

- The Research Funding Agreement otherwise is in full force
  and effect in accordance with its terms.

                              SO ORDERED

                              /s/ Douglas P. Woodlock

                              _____
                              DOUGLAS P. WOODLOCK
                              UNITED STATES DISTRICT JUDGE

**EXHIBIT 35**

**CONFIDENTIAL - REDACTED**

**EXHIBIT 36**

**CONFIDENTIAL - REDACTED**

EXHIBIT 37

**CONFIDENTIAL - REDACTED**

**EXHIBIT 38**

**CONFIDENTIAL - REDACTED**

EXHIBIT 39

**CONFIDENTIAL - REDACTED**

# EXHIBIT 40

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY), <br><br> Plaintiffs, <br><br> v. <br><br> ABBOTT LABORATORIES, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) CIVIL ACTION NO. 05-11150-DPW ) ) ) ) ) ) ) |

## JOHN HANCOCK'S OBJECTIONS AND RESPONSES
## TO ABBOTT LABORATORIES' FIRST SET OF INTERROGATORIES

Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and ManuLife Insurance Company (f/k/a Investors Partner Life Insurance Company) (collectively, "John Hancock") hereby object and respond, pursuant to Fed. R. Civ. P. 33(b) and the Local Rules of this Court, to defendant Abbott Laboratories' ("Abbott") First Set of Interrogatories (the "Interrogatories") as follows:

## General Objections

1.    John Hancock generally objects to the Interrogatories to the extent that they seek information that is protected by the attorney-client privilege, the work product doctrine, or any other privilege. To the extent that the Interrogatories call for such information, it is excluded from John Hancock's responses.

2.    John Hancock generally objects to the Interrogatories to the extent that they seek the production of John Hancock's confidential or proprietary information. Notwithstanding and without waiving or in any way compromising the foregoing objections, John Hancock will provide such information in accordance with the Stipulated Protective Order entered in this case.

3.    John Hancock generally objects to Abbott's definition of "Hancock" to the extent that it purports to include independent entities that John Hancock does not control (such as "affiliates"), and on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving or in any way compromising the foregoing objections, John Hancock will interpret the term "Hancock" to mean John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and ManuLife Insurance Company (f/k/a Investors Partner Life Insurance Company), their corporate predecessors and successors, as applicable, and the relevant employees, officers and directors, agents and attorneys of each.

4.    John Hancock generally objects to the Interrogatories to the extent that they purport to require John Hancock to take actions or provide information not required by the Federal Rules of Civil Procedure, the Local Rules of this Court, and other applicable law.

5.    John Hancock generally objects to each Interrogatory to the extent that it is not limited to a reasonable time period.

6.    The provision of any specific answer is not intended to, and does not, act as a waiver of any General Objection.

7.    Evidence collection and discovery in this matter are continuing.  John Hancock expressly reserves the right to supplement or otherwise modify its responses to the Interrogatories as it deems necessary in light of additional information, documents or materials that are discovered or disclosed in the course of this matter.

<u>Responses to Specific Interrogatories</u>

Subject to and without waiving the foregoing General Objections, John Hancock responds to the specific Interrogatories as follows:

**Interrogatory No. 1:**

Please identify each and every person who provided information used in answering these interrogatories, including an identification of the specific interrogatories for which each such person provided such information.

**Response No. 1:**

John Hancock objects to Interrogatory No. 1 on the grounds that it seeks information protected by the attorney-client privilege and the work product doctrine.  Subject to, and without waiving or compromising the foregoing general and specific objections, John Hancock states that the following people prepared or assisted in the preparation of its answers to these Interrogatories:

Brian A. Davis, Esq., Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, telephone number: 617-248-5000;

-3-

Joseph H. Zwicker, Esq., Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, telephone number: 617-248-5000;

Christopher A. Edwards, Esq., Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, telephone number: 617-248-5000; and

Stacy L. Blasberg, Esq., Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, telephone number: 617-248-5000.

Each of the aforementioned individuals is counsel to John Hancock, and provided legal assistance with respect to each of Abbott's Interrogatories.

In addition, information provided by the following person was used in the preparation of John Hancock's answers to some or all of the Interrogatories:

Stephen J. Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000.

All persons identified in response to Interrogatory No. 1 should be contacted in connection with this action solely through the undersigned counsel for John Hancock.

**Interrogatory No. 2:**

Please describe with particularity any and all documents that Hancock alleges Abbott failed to produce or make available in connection with Hancock's audit demand under Section 2.5 of the Agreement and any and all documents that Abbott produced or made available to Hancock that were not encompassed within Hancock's audit demand.

**Response No. 2:**

John Hancock objects to Interrogatory No. 2 on the grounds that the phrase "any and all documents that Abbott produced or made available to John Hancock that were not encompassed within John Hancock's audit demand" is vague and ambiguous. Subject to, and without waiving or compromising the forgoing general and specific objections, John Hancock states that the documents Abbott failed to make available in connection with John Hancock's audit demand include, but are not limited to, those set forth in: (i) Schedule A of Steven J. Blewitt's April 12, 2004 letter to James L. Tyree, attached hereto as Exhibit A; and (ii) Tab 2 of Brian A. Davis's November 18, 2004 letter to Lawrence R. Desideri, Esq., which lists documents requested by John Hancock and/or its independent auditors in December 2004, attached hereto as Exhibit B.

**Interrogatory No. 3:**

Please describe separately and with particularity each and every breach of the Agreement that Hancock is claiming in this case, including, without limitation, an identification of all individuals with knowledge of each claim of breach, and the date and manner in which Hancock first learned of each alleged breach.

**Response No. 3:**

John Hancock objects to Interrogatory No. 3 on the grounds that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock has had an opportunity to conduct meaningful discovery. Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 3 after it has had the opportunity to conduct reasonable discovery from Abbott. Subject to, and without waiving or compromising the general and specific objections stated above, John Hancock states Abbott violated the terms of the Agreement by:

-5-

<u>Obstructing John Hancock's Compliance Audit:</u>

On April 12, 2004, John Hancock provided Abbott with notice of its intent to undertake a compliance audit pursuant to the Research Funding Agreement (the "Agreement"). Among other things, Abbott unreasonably and unjustifiably delayed its response to John Hancock's audit request, and has obstructed John Hancock's independent auditors' attempts to refute or confirm Abbott's compliance with the Agreement. John Hancock believes that documents in Abbott's possession will demonstrate that Abbott unreasonably, intentionally and purposefully obstructed John Hancock's audit.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of these facts include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Michelle Campbell, Paralegal, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Mark Hair, Managing Director of StoneTurn Group LLP, 425 Market Street, Suite 2200, San Francisco, CA 94105, telephone number: 415-912-2852;

Chris Martinez, Partner of StoneTurn Group LLP, 100 Congress Center, Suite 2000, Austin, TX 78701, telephone number: 512-469-5577;

Justin Lewis, Manager of StoneTurn Group LLP, 425 Market Street, Suite 2200, San Francisco, CA 94105, telephone number: 415-912-2852;

Kris Colt, Senior Consultant of StoneTurn Group LLP, 425 Market Street, Suite 220, San Francisco, CA 94105, telephone number: 415-912-2852; and

Jane Vaynerov, Consultant of StoneTurn Group LLP, 1875 Eye Street, NW, Suite 500, Washington, D.C. 20006, telephone number: 202-775-4942.

Misrepresenting the Development Status of ABT-518:

On March 13, 2001, Abbott affirmatively represented to John Hancock that ABT-518 was a viable compound in the first phase of clinical trials. In a Confidential Descriptive Memorandum attached as Exhibit 12.2(i) of the Agreement, Abbott identified ABT-518 as, among other things, a "compelling development candidate." On or about September 20, 2001, Abbott notified John Hancock that it had ceased development of ABT-518.

John Hancock since has discovered that as of March 13, 2001: (i) Abbott had made, or likely would make, the decision to terminate further development of ABT-518; and (ii) Abbott concealed such information from John Hancock in order to induce John Hancock to execute the Agreement. John Hancock expects that documents in Abbott's possession will further demonstrate these facts.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of Abbott's misrepresentations concerning the development status of ABT-518 include: Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

-7-

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Lynn Klotz, Ph.D., 5 Dudley Street, Gloucester, MA 01930-1107, telephone number: 978-281-6015;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Daphne Pals, Former Abbott Senior Counsel, 1014 Elmwood, Wilmette, IL 60091, telephone number: unknown;

Brian Smith, General Counsel, Hospira, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

-8-

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

-10-

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

Misrepresenting the Development Status of ABT-594:

On March 13, 2001, Abbott affirmatively represented to John Hancock that ABT-594 was a viable compound. In the Confidential Descriptive Memorandum attached as Exhibit 12.2(i) of the Agreement, Abbott represented to John Hancock, among other things, that: (i) Abbott expected ABT-594 to be "a highly differentiated product" and "the first neuronal nicotinic receptor agonist to receive an indication for pain," (ii) that a decision on clinical efficacy was expected in June 2001; and (iii) an NDA filing was expected in the third quarter of 2003. On or about November 20, 2001, Abbott notified John Hancock that it had ceased further development of ABT-594. John Hancock since has discovered that, as of March 13, 2001, Abbott: (i) knew that the Phase I clinical trial results for ABT-594 were likely to be unfavorable, and (ii) concealed ABT-594's true development status from John Hancock for the purpose of inducing John Hancock to execute the Agreement. John Hancock believes that documents in Abbott's possession will further demonstrate these facts.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of these facts include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

-11-

Lynn Klotz, Ph.D., 5 Dudley Street, Gloucester, MA 01930-1107, telephone number: 978-281-6015;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Daphne Pals, Former Abbott Senior Counsel, 1014 Elmwood, Wilmette, IL 60091, telephone number: unknown;

Brian Smith, General Counsel, Hospira, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-12-

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-13-

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

<u>Misrepresenting Its Intended and Reasonably Expected Spending on Program Related Costs:</u>

John Hancock has discovered that Abbott misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in the Annual Research Plans ("ARP") that it provided to John Hancock. Available evidence indicates that Abbott's representations in its ARPs from 2001 through at least 2005 reflected its "nominal" spending, as opposed to its "intended and reasonably expected" spending. Abbott's true intended and reasonably expected spending was materially less than the amounts represented to John Hancock. Abbott misrepresented its spending for several reasons, including to induce John Hancock to enter into the Agreement, and to make payments that John Hancock otherwise would not have made. John Hancock believes that documents in Abbott's possession will further demonstrate these facts.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of Abbott's misrepresentations concerning its intended and reasonably expected spending include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-15-

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Daphne Pals, Former Abbott Senior Counsel, 1014 Elmwood, Wilmette, IL 60091, telephone number: unknown;

Brian Smith, General Counsel, Hospira, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

-16-

<u>Failing to Use Commercially Reasonable Efforts to Develop the Program Compounds:</u>

Abbott failed to use Commercially Reasonable Efforts to develop the Program Compounds. Subject to, and without waiving or compromising its general and specific objections, John Hancock states that on or about November 16, 2004, Abbott informed John Hancock that Abbott believed that the commercial prospects for the Program Compounds warranted spending on Program Related Costs in 2005 in the amount of $149.8 million, but that Abbott arbitrarily would reduce its spending on Program Related Costs in 2005 to $62.8 million unless John Hancock agreed to make additional Program Payments that were not required under the terms of the Agreement. Abbott's arbitrary reduction in spending on Program Related Costs in 2005 is inconsistent with the level of effort normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and are at a similar stage of development. John Hancock believes that documents in Abbott's possession will further demonstrate these facts.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of these facts include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-17-

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

-18-

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-19-

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

<u>Refusing to Provide John Hancock With Abbott's Modified 2005 ARP:</u>

Notwithstanding John Hancock's request and the terms of the Agreement, Abbott refused to provide John Hancock with its modified 2005 ARP that, as set forth above, arbitrarily reduced Abbott's actual expenditures on Program Related Costs in 2005.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of these facts include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

-20-

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Smith, General Counsel, Hospira, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-21-

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

Failing to Out-License or Divest Various Ceased Compounds:

Abbott failed to out-license or divest various Ceased Compounds, including, without limitation, ABT-518 and ABT-594, as required by the Agreement. Abbott's motive for failing to do so is based on its concern that if the ceased Compounds were successfully developed and marketed by a third party, Abbott would lose future sales of competing compounds that Abbott presently has under development, which are not subject to John Hancock's royalty rights. John Hancock believes that Abbott was required under the Agreement to treat all of the ceased compounds equally with respect to Abbott's out-licensing efforts. John Hancock believes that Documents in Abbott's possession will further demonstrate that Abbott has failed to out-license or divest certain Ceased Compounds.

-22-

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of these facts include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Suzanne A. Lebold, Divisional Vice President, Scientific Assessment and Technology Licensing, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-23-

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-24-

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-25-

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

**Interrogatory No. 4:**

For each and every breach of the Agreement identified in response to Interrogatory No. 4, above [sic], please separately and with particularity identify each and every component of damage or loss Hancock is seeking as a result of such claimed breach, including the dollar amount of each element or component of such damage or loss and the identity of any and all individuals having knowledge of such damage or loss suffered by Hancock.

**Response No. 4:**

John Hancock objects to Interrogatory No. 4 on the ground that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock has had an opportunity to conduct meaningful discovery. Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 4 after it has had the opportunity to do so.

Subject to, and without waiving or compromising the general and specific objections, John Hancock seeks to recover damages (including compensatory and punitive damages, where applicable), lost profits, lost royalties and other losses, including without limitation its costs, expenses and reasonable attorneys' fees, as permitted by law and the terms of the Research Funding Agreement, in an amount to be determined and which is subject to further discovery and expert analysis. John Hancock further reserves the right, in the alternative, to seek recission of the Research Funding Agreement and a refund of all monies paid by John Hancock to Abbott.

-26-

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of damage or loss suffered by John Hancock by Abbott's breaches of the Agreement include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Daphne Pals, Former Abbott Senior Counsel, 1014 Elmwood, Wilmette, IL 60091, telephone number: unknown;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-27-

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-28-

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-29-

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

## Interrogatory No. 5:

Please describe with particularity each and every misrepresentation of material fact or omission of Abbott concerning ABT-518 that Hancock is claiming in this case, including, without limitation, an identification of the following with respect to each such misrepresentation or omission:

(a)     when, where, and the manner in which such misrepresentation or omission was made;

(b)     specifically how such misrepresentation was false or misleading, including the true or actual state of affairs regarding such misrepresentation;

(c)     when and how Hancock first became aware such misrepresentation was false or misleading;

(d)     any and all individuals at Hancock who relied upon such misrepresentation or omission and the manner in which they relied; and

(f)     [sic] any and all individuals having knowledge of such misrepresentation or omission.

## Response No. 5:

John Hancock objects to Interrogatory No. 5 on the grounds that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock has had an opportunity to conduct meaningful discovery from Abbott. Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 5 after it has had the opportunity to do so.

Subject to, and without waiving or compromising its general and specific objections, John Hancock states that, on March 13, 2001, Abbott affirmatively represented to John Hancock that ABT-518 was a viable compound in the first phase of clinical trials. In a Confidential Descriptive Memorandum attached as Exhibit 12.2(i) of the Agreement, Abbott identified ABT-518 as, among other things, a "compelling development candidate." On or about September 20, 2001, Abbott notified John Hancock that it had ceased development of ABT-518.

John Hancock since has discovered that as of March 13, 2001: (i) Abbott had made, or likely would make, the decision to terminate further development of ABT-518; and (ii) Abbott concealed such information from John Hancock in order to induce John Hancock to execute the Agreement. John Hancock expects that documents in Abbott's possession will further demonstrate these facts.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of Abbott's misrepresentations concerning the development status of ABT-518 include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Lynn Klotz, Ph.D., 5 Dudley Street, Gloucester, MA 01930-1107, telephone number: 978-281-6015;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

-31-

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Daphne Pals, Former Abbott Senior Counsel, 1014 Elmwood, Wilmette, IL 60091, telephone number: unknown;

Brian Smith, General Counsel, Hospira, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-32-

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-33-

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

**Interrogatory No. 6:**

Please describe with particularity each and every misrepresentation of material fact or omission of Abbott concerning ABT-594 that Hancock is claiming in this case, including,

-34-

without limitation, an identification of the following with respect to each such misrepresentation or omission:

      (a)    when, where, and the manner in which such misrepresentation or omission was made;

      (b)    Specifically how such misrepresentation was false or misleading, including the true or actual state of affairs regarding such misrepresentation;

      (c)    when and how Hancock first became aware such misrepresentation was false or misleading;

      (d)    any and all individuals at Hancock who relied upon such misrepresentation or omission and the manner in which they relied; and

      (f)    [sic] any and all individuals having knowledge of such misrepresentation or omission.

**Response No. 6:**

    John Hancock objects to Interrogatory No. 6 on the grounds that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock has had an opportunity to conduct any discovery with respect to such facts and matters. Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 6 after it has had the opportunity to conduct reasonable discovery from Abbott.

    Subject to, and without waiving or compromising the general and specific objections, John Hancock states that, on March 13, 2001, Abbott affirmatively represented to John Hancock that ABT-594 was a viable compound. In the Confidential Descriptive Memorandum attached as Exhibit 12.2(i) of the Agreement, Abbott represented to John Hancock, among other things, that: (i) Abbott expected ABT-594 to be "a highly differentiated product" and "the first neuronal nicotinic receptor agonist to receive an indication for pain," (ii) that a decision on clinical efficacy was expected in June 2001; and (iii) an NDA filing was expected in the third quarter of 2003. On or about November 20, 2001, Abbott notified John Hancock that it had ceased further

-35-

development of ABT-594. John Hancock since has discovered that, as of March 13, 2001, Abbott: (i) knew that the Phase I clinical trial results for ABT-594 were likely to be unfavorable, and (ii) concealed ABT-594's true development status from John Hancock for the purpose of inducing John Hancock to execute the Agreement. John Hancock believes that documents in Abbott's possession will further demonstrate these facts.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of Abbott's misrepresentations concerning the development status of ABT-594 include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Lynn Klotz, Ph.D., 5 Dudley Street, Gloucester, MA 01930-1107, telephone number: 978-281-6015;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-36-

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Daphne Pals, Former Abbott Senior Counsel, 1014 Elmwood, Wilmette, IL 60091, telephone number: unknown;

Brian Smith, General Counsel, Hospira, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-38-

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

**Interrogatory No. 7:**

Please describe with particularity each and every misrepresentation of material fact or omission of Abbott concerning Abbott's spending under the Agreement that Hancock is claiming in this case, including, without limitation, an identification of the following with respect to each such misrepresentation or omission:

(a)     when, where and the manner in which such misrepresentation or omission was made;

(b)     specifically how such misrepresentation was false or misleading, including the true state of affairs regarding such representation;

(c)     when and how Hancock first became aware such misrepresentation was false or misleading;

-39-

(d)    any and all individuals at Hancock who relied upon such misrepresentation or omission and the manner in which they relied; and

(f)    [sic] any and all individuals having knowledge of such misrepresentation or omission.

**Response No. 7:**

John Hancock objects to Interrogatory No. 7 on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. John Hancock further objects to Interrogatory No. 7 on the grounds that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock had an opportunity to conduct meaningful discovery. Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 7 after it has had an opportunity to do so.

Subject to, and without waiving or compromising its general and specific objections, John Hancock states that it has discovered that Abbott misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in the ARPs that it provided to John Hancock. Available evidence indicates that Abbott's representations in its ARPs from 2001 through at least 2005 reflected its "nominal" spending, as opposed to its "intended and "reasonably expected" spending. Abbott's true intended and reasonably expected spending was materially less than the amounts represented to John Hancock. Abbott misrepresented its spending for several reasons, including to induce John Hancock to enter into the Agreement, and to make payments that John Hancock otherwise would not have made. John Hancock believes that documents in Abbott's possession will further demonstrate these facts.

-40-

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of Abbott's misrepresentations concerning its intended and reasonably expected spending on program related costs include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Daphne Pals, Former Abbott Senior Counsel, 1014 Elmwood, Wilmette, IL 60091, telephone number: unknown;

Brian Smith, General Counsel, Hospira, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-41-

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

**Interrogatory No. 8:**

For each and every misrepresentation or omission identified in response to Interrogatories 5-7, above, please separately and with particularity identify each and every component of damage or loss Hancock is seeking as a result of such misrepresentation, including, without limitation, the dollar amount of each element or component of such damage or loss and identification of any and all individuals having knowledge of such damage or loss.

**Response No. 8:**

John Hancock objects to Interrogatory No. 8 on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. John Hancock further objects to Interrogatory No. 8 on the ground that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock has had an opportunity to

-42-

conduct meaningful discovery. Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 8 after it has had the opportunity to do so.

Subject to, and without waiving or compromising the general and specific objections, John Hancock seeks to recover damages (including compensatory and punitive damages, where applicable), lost profits, lost royalties and other losses, including, without limitation, its costs, expenses and reasonable attorneys' fees incurred in this action, as permitted by law and the terms of the Research Funding Agreement, in an amount to be determined and which is subject to further discovery and expert analysis. John Hancock further reserves the right, in the alternative, to seek recission of the Research Funding Agreement and a refund of all monies paid by John Hancock to Abbott.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of damage or loss suffered by John Hancock by Abbott's breaches of the Agreement include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Lynn Klotz, Ph.D., 5 Dudley Street, Gloucester, MA 01930-1107, telephone number: 978-281-6015;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-43-

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Daphne Pals, Former Abbott Senior Counsel, 1014 Elmwood, Wilmette, IL 60091, telephone number: unknown;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-44-

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-45-

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

**Interrogatory No. 9:**

Please describe with particularity any and all Commercially Reasonable Efforts Abbott failed to take with respect to the Program Compounds as alleged in paragraphs 29 and 30 of the Complaint, including the specific activities in which Abbott failed to engage, and for each such activity please:

(a)     state the specific level of effort for each activity "normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market at a similar state of development," as alleged in the Complaint;

-46-

(b)     identify the "other pharmaceutical compounds" and "other pharmaceutical companies" referred to in paragraph 30 of the Complaint;

(c)     identify any and all individuals having knowledge regarding any failure by Abbott to use commercially reasonable efforts, including any damages suffered by Hancock; and

(e)     [sic] state each component or element of damage or loss Hancock sustained as a result of any failure by Abbott to use commercially reasonable efforts to develop the Program Compounds, including the dollar amount and method of calculation of each such element or component of damage or loss.

**Response No. 9:**

John Hancock objects to Interrogatory No. 9 on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. John Hancock further objects to Interrogatory No. 9 on the grounds that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock has had an opportunity to conduct meaningful discovery. Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 9 after it has had an opportunity to do so.

Subject to, and without waiving or compromising its general and specific objections, John Hancock states that on or about November 16, 2004, Abbott informed John Hancock that Abbott believed that the commercial prospects for the Program Compounds warranted spending on Program Related Costs in 2005 in the amount of $149.8 million, but that Abbott arbitrarily would reduce its spending on Program Related Costs in 2005 to $62.8 million unless John Hancock agreed to make additional Program Payments that were not required under the terms of the Agreement. Abbott's arbitrary reduction in spending on Program Related Costs in 2005 is inconsistent with the level of effort normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial

-47-

value and are at a similar stage of development. John Hancock believes that documents in Abbott's possession will further demonstrate these facts.

"Other pharmaceutical companies" reasonably can be interpreted as referring to, *inter alia*: American Home Products, AstraZeneca, Aventis, Bristol-Myers Squibb, Eli Lilly, GlaxoSmithKline, Johnson & Johnson, Merck & Co., Novartis, Pfizer Inc., Pharmacia Corp., and Roche.

John Hancock further states it seeks to recover damages (including compensatory and punitive damages, where applicable), lost profits, lost royalties and other losses, including, without limitation, its costs, expenses and reasonable attorneys' fees incurred in this action, as permitted by law and the terms of the Research Funding Agreement, in an amount to be determined and which is subject to further discovery and expert analysis. John Hancock also reserves the right, in the alternative, to seek recission of the Research Funding Agreement and a refund of all monies paid by John Hancock to Abbott.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of Abbott's failing to use Commercially Reasonable Efforts to develop the Program Compounds include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Lynn Klotz, Ph.D., 5 Dudley Street, Gloucester, MA 01930-1107, telephone number: 978-281-6015;

-48-

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

**Interrogatory No. 10:**

With respect to each and every compound that Hancock claims Abbott failed to divest or out-license, as alleged in paragraph 32 and 33 of the Complaint, please identify with particularity the basis for your allegation that Abbott failed to out-license or divest itself of such compound, including, without limitation, any and all specific steps or efforts Hancock contends Abbott should have taken with respect to such compound and each component or element of damage or

loss Hancock sustained as a result of any failure by Abbott to out-license or divest itself of ceased compounds and the dollar amount thereof.

**Response No. 10:**

    John Hancock objects to Interrogatory No. 10 on the grounds that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock has had an opportunity to conduct meaningful discovery. Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 10 after it has had the opportunity to conduct reasonable discovery from Abbott.

    Subject to, and without waiving or compromising the general and specific objections, John Hancock states that at various times from March 2001 to the present, Abbott has failed to "maximize the commercial value" by refusing to out- license certain Program Compounds, including without limitation, ABT-492, ABT-518, and ABT-594, as required by the Agreement. Abbott's motive for failing to do so is based on its concern that if the ceased Compounds were successfully developed and marketed by a third party, Abbott would lose future sales of competing compounds that Abbott presently has under development, which are not subject to John Hancock's royalty rights. John Hancock believes that Abbott was required under the Agreement to treat all of the ceased compounds equally with respect to Abbott's out-licensing efforts. John Hancock believes documents in Abbott's possession will further demonstrate that Abbott failed to out-license or divest certain ceased Program Compounds.

**Interrogatory No. 11:**

Identify any and all individuals involved in Hancock's decision to enter into the Agreement or who provided information or input into that decision including, but not limited to, Hancock personnel and any outside experts or consultants, and for each such person, please describe that person's role in the decision and/or information provided.

**Response No. 11:**

John Hancock objects to Interrogatory No. 11 on the grounds that it seeks information protected by the attorney-client privilege and work product doctrine. Subject to, and without waiving or compromising the foregoing general and specific objections, John Hancock states that the following individuals and entities had significant involvement in John Hancock's decision to enter into the Research Funding Agreement:

Stephen J. Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000. Mr. Blewitt recommended to John Hancock's Bond Investment Committee and Committee of Finance that John Hancock enter into the Research Funding Agreement.

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000. Mr. Hartz recommended to John Hancock's Bond Investment Committee and Committee of Finance that John Hancock enter into the Research Funding Agreement.

John Hancock further states that John Hancock's Bond Investment Committee recommended that John Hancock's Committee of Finance approve the execution of the Research Funding Agreement by and on behalf of John Hancock.

-53-

In addition to Stephen J. Blewitt, the members of the Bond Investment Committee during the relevant period were as follows:

George H. Braun, Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Willma H. Davis, Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

John M. DeCiccio, former Executive Vice President and Chief Investment Officer, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Francis X. Felcon, former Vice President, John Hancock Life Insurance Company, 60 Highland Street, Canton, MA 02021, telephone number: unknown;

E. Kendall Hines, Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

C. Bruce Meltzer, former Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Roger G. Nastou, former Vice President, John Hancock Life Insurance Company, 7 Bremer Circle Road, Hingham, MA 02043, telephone number: 781-749-2693;

Phillip J. Peters, Second Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Jane T. Philippi, former Vice President, John Hancock Life Insurance Company, 32 Monument Avenue, Charlestown, MA 02129, telephone number: 617-241-8185;

-54-

Steven M. Ray, Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Margaret M. Stapleton, former Vice President, John Hancock Life Insurance Company, 10 Ladds Way, Scituate, MA 02066, telephone number: 781-545-1675; and

Barry E. Welch, former Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000.

John Hancock further states that John Hancock's Committee of Finance approved the execution of the Research Funding Agreement by and on behalf of John Hancock. The members of the Committee of Finance during the relevant period were as follows:

Stephen L. Brown, former Chairman, Chief Executive Officer and Director, John Hancock Life Insurance Company, 180 Beacon Street, Apartment 14G, Boston, MA 02116, telephone number: unknown;

David F. D'Alessandro, former Chairman, Chief Executive Officer, and Director, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Foster L. Aborn, former Director, Vice Chairman and Chief Investment Officer, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Nelson F. Gifford, former Director, John Hancock Life Insurance Company, 14 Windsor Road, Wellesley, MA 02181, telephone number: unknown;

Edward H. Linde, former Director, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

-55-

E. James Morton, former Director, John Hancock Life Insurance Company, 650 Independence Avenue, SE, Washington, District of Columbia 20003, telephone number: unknown;

Richard F. Syron, former Director, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000; and

Robert J. Tarr, Jr., former Director, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000.

All persons and entities identified in response to Interrogatory No. 11 should be contacted in connection with this action solely through the undersigned counsel for John Hancock.

**Interrogatory No. 12:**

Please identify the total damages or losses Hancock seeks in this case and describe each and every element or component of such damages or losses, the amount and method of calculation of such element or component of damages or losses, and identify persons having knowledge of such component or element of damages or losses.

**Response No. 12:**

John Hancock objects to Interrogatory No. 12 on the grounds that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock has had an opportunity to conduct any discovery with respect to such facts and matters. Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 12 after it has had the opportunity to conduct reasonable discovery from Abbott.

-56-

Subject to, and without waiving or compromising the general and specific objections, John Hancock seeks to recover damages (including compensatory and punitive damages, where applicable), lost profits, lost royalties and other losses, including without limitation, its costs, expenses and reasonable attorneys' fees incurred in this action, as permitted by law and the terms of the Agreement, in an amount to be determined and which is subject to further discovery and expert analysis. John Hancock further reserves the right, in the alternative, to seek recission of the Agreement and a refund of all monies paid by John Hancock to Abbott.

As set forth in John Hancock's Rule 26 initial disclosures, individuals with knowledge of damage or loss suffered by John Hancock by Abbott's breaches of the Agreement include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Lynn Klotz, Ph.D., 5 Dudley Street, Gloucester, MA 01930-1107, telephone number: 978-281-6015;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-57-

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Daphne Pals, Former Abbott Senior Counsel, 1014 Elmwood, Wilmette, IL 60091, telephone number: unknown;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

-58-

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-59-

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

As to objections:

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY, and
MANULIFE INSURANCE COMPANY (f/k/a
INVESTORS PARTNER LIFE INSURANCE
COMPANY)

By their attorneys,

Brian A. Davis (BBO No. 546462)
Joseph H. Zwicker (BBO No. 560219)
Christopher Edwards (BBO No. 640758)
Stacy L. Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Tele: 617-248-5000
Fax: 617-248-4000

Date:    February 6, 2006

-61-

## VERIFICATION

I, Stephen J. Blewitt, state under penalties of perjury that:  I am Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company (collectively, with John Hancock Variable Life Insurance Company and ManuLife Insurance Company [f/k/a Investors Partner Life Insurance Company], "John Hancock").  I have read the foregoing responses to interrogatories and know the contents thereof; that said answers were prepared with the assistance and advice of counsel and employees of John Hancock; that responses set forth herein, subject to inadvertent or undiscovered errors, are based on and therefore necessarily limited by the records and information still in existence, presently collected, and thus far discovered in the course of the preparation of these answers; that John Hancock reserves the right to make any changes in the responses if it appears at any time that omissions or errors have been made therein or that more accurate information is available; and that, subject to the limitations set forth herein, the responses are true to the best of my knowledge, information and belief.

Interrogatory answers signed under the pains and penalties of perjury this __ day of February 2006.

Stephen J. Blewitt

-61-

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing John Hancock's Objections and Responses to Abbott Laboratories' First Set of Interrogatories was served by e-mail upon Peter E. Gelhaar, Esq., Donnelly, Conroy & Gelhaar, LLP, One Beacon Street, 33rd Floor, Boston, MA 02108, and Lawrence R. Desideri, Esq. and Stephen V. D'Amore, Esq., Winston & Strawn LLP, 35 West Wacker Drive, Chicago, Illinois 60601-9703, on this 6th day of February, 2006.

_____
Stacy L. Blasberg

4039694v1

-68-

EXHIBIT A

## Schedule A

1.  All records and documents indicating expenditures made by Abbott related to any compound that is now or ever was a Program Compound, including the following:

    a.  Abbott's standard policies and procedures related to accounting for project/program related expenditures;
    b.  Abbott's chart of accounts as relevant to accounting for project/program related expenditures;
    c.  Summary of costs/expenditures incurred by Program Compound by year delineating expenditures by nature (*e.g.*, direct costs incurred by Abbott, subcontractor costs, allocated indirect costs, *etc.*);
    d.  Accounting framework for compiling the expenditures presented (*i.e.*, whether cost assembled on an accrual or cash basis of accounting);
    e.  Identification of whether expenditures presented were capitalized or expensed under General Accepted Accounting Procedures ("GAAP") definitions;
    f.  Summary of the timing of expenditures for each Program Compound within each year presented;
    g.  Contracts or other governing documents and information related to all Research Program activities performed by Subcontractors;
    h.  Reconciliations of annual expenditures by Program Compound to the audited financial statements of Abbott;
    i.  Calculations, algorithms, and basis for all allocations included in the total expenditures by Program Compound by year;
    j.  Abbott standard policies and procedures related to allocation of indirect costs;
    k.  Expenditure/Costs summaries and/or reports prepared in the normal course of managing the development of each Program Compound; and
    l.  Underlying supporting records (*e.g.*, timesheets, payroll records, purchase orders, invoices, *etc.*) for all expenditures made related to each Program Compound.

2.  All records and documents discussing or evidencing the implementation and conduct of the Research Program, including but not limited to:

    a.  Reports/Updates/Summaries prepared by Abbott in the normal course of managing the development of the Program Compounds;
    b.  Listing of all reports/updates/summaries typically prepared by Abbott during the normal course of developing an experimental pharmaceutical compound;
    c.  Minutes/Summaries/Notes from all management meetings in which any of the Program Compounds where reviewed or approved for further development funding;
    d.  Analysis and documentation supporting all forward looking projections of expenditures to be incurred for each Program Compound by year;

    e. Abbott policies and guidance as to the appropriate and/or required methods/approaches/procedures for conducting a research program for an experimental pharmaceutical compound;

    f. Abbott's internal approval framework for determining whether or not to continue to fund and develop an experimental pharmaceutical compound, including all relevant thresholds for approval along the compound development process; and

    g. Minutes/Summaries/Notes from all Abbott meetings regarding continued funding of product development for any Program Compounds.

3.    All records and documents concerning Abbott's obligations under § 4.3 of the Agreement, including but not limited to:

    a. Records identifying any and all Replacement Compounds;

    b. Records identifying any and all Failed Early Stage Program Compounds;

    c. Records identifying any and all Ceased Compounds;

    d. All documents pertaining to Abbott's consideration or selection of any compound to replace any Failed Early Stage Program Compound;

    e. Records identifying any and all compounds that Abbott held out as or considered to be "back up" compounds for the compounds that constituted the Program Compounds (i) on the effective date of the Agreement, and (ii) as of the end of each calendar year 2001 through 2003; and

    f. All documents pertaining to the actual or attempted out-licensing or divestiture of any Ceased Compound.

4.    All records and documents concerning the status of each Program Compound as of March 13, 2001 and currently, including but not limited to:

    a. Reports/Summaries/Meeting Minutes which indicate the stage of development of each compound that originally constituted a Program Compound during the first calendar quarter of 2001;

    b. Records describing the various stages into which Abbott generally categorizes the pre-clinical and clinical development of experimental pharmaceutical compounds;

    c. Records indicating when each Program Compound reached each stage of pre-clinical or clinical development into which Abbott generally categorizes the pre-clinical and clinical development of experimental pharmaceutical compounds;

    d. Reports/Summaries/Meeting Minutes which evidence the current status of each Program Compound; and

    e. Management Reports and/or other documents prepared in the normal course of business which indicate future prospects and development expectations for each Program Compound.

3678931v1

**EXHIBIT B**

## Documents Requested to be Produced by Abbott
## for Audit Purposes in December 2004

1.  Documents that refer or relate to the possibility or certainty that the development of ABT-518 was being, or would be, "slowed down" in or about February/March 2001. (Schedule A, § 4[d]).

2.  Documents that refer or relate to the development of ABT-518 being placed "back on track" in or about February/March 2001. (Schedule A, § 4[d]).

3.  Documents that refer or relate to the "518 debacle" referenced in Perry Nisen's e-mail to Philip Deemer, dated March 21, 2001. (Schedule A, § 4[d]).

4.  The documents relied upon by Abbott in formulating its Annual Research Plans for 2001-2004. (Schedule A, § 2[d]).

5.  The documents relied upon by Abbott in formulating its alternative Annual Research Plans for 2005. (Schedule A, § 2[d]).

6.  The documents relied upon by Abbott in formulating its Research Program Status Reports for 2001-2005. (Schedule A, § 2[a]).

7.  Documents that constitute, refer or relate to any and all reports or information received by Abbott on or prior to March 13, 2001 regarding ABT-594 study M99-114. (Schedule A, § 4[a] and [e]).

8.  Documents that constitute, refer or relate to any and all patient enrollment data received by Abbott on or prior to March 13, 2001 regarding ABT-594 study M99-114. (Schedule A, § 4[a] and [e]).

9.  Documents that constitute, refer or relate to any and all reports or information received by Abbott on or prior to March 13, 2001 regarding any premature terminations observed or experienced in ABT-594 study M99-114. (Schedule A, § 4[a] and [e]).

10. Documents that refer or relate to Abbott's "Pharma Executive Management Committee" and any of the Program Compounds. (Schedule A, §§ 2[a] and 4[e]).

11. Documents that constitute, refer or relate to any Abbott "Decision Analysis" with respect to any of the Program Compounds. (Schedule A, §§ 2[a] and 4[e]).

12. Documents that constitute, refer or relate to any and all opinion leader comments on any of the Program Compounds. (Schedule A, §§ 2[a] and 4[e]).

13. Documents that refer or relate to Abbott's efforts to out-license any Ceased Compounds, including ABT-773, ABT-594, ABT-492, ABT-518, ABT-100 or ABT-724. (Schedule A, § 3[f]).

14. Documents that constitute, refer or relate to the "2001 APU" or 2001 "April Update" referenced in Mr. Tom Lyons' letter to Mr. Steve Blewitt, dated November 26, 2001 (AL 000403). (Schedule A, § 2[a]).

15. Any and all monthly reports or monthly updates that refer or relate to the development status or prospects of any of the Program Compounds. (Schedule A, § 2[a]).

16. Any and all periodic reports or periodic updates that refer or relate to the development status or prospects of any of the Program Compounds. (Schedule A, § 2[a]).

17. Documents that refer or relate to Abbott's "nominal" and/or "expected" investment costs with respect to any of the Program Compounds. (Schedule A, §§ 2[a] and [d]).

18. Documents that refer or relate to Abbott's "potential" and/or "expected" research and development (R&D) costs with respect to any of the Program Compounds. (Schedule A, §§ 2[a] and [d]).

19. Summary of costs/expenditures incurred by Program Compound by year delineating expenditures by nature (e.g., direct costs incurred by Abbott, subcontractor costs, allocated indirect costs, etc.). (Schedule A, § 1[c]).

20. Documents similar to AL 001863-64, AL 001956-60, AL 001989-93, and AL 002045-48 for any and all of the Program Compounds for the period March 2001 to the present. (Schedule A, §§ 1[c] and 2[a]).

21. Documents that constitute, refer or relate to Abbott's standard policies and procedures concerning accounting for project/program related expenditures. (Schedule A, §§ 1[a]).

22. Documents refer or relate to Abbott's efforts to replace any "Failed Early Stage Program Compounds." (Schedule A, §§ 3[d]).

23. Documents sufficient to describe in reasonable detail the contents and capabilities of Abbott's "knowledge management system" with respect to any of the Program Compounds. (Schedule A, § 2[a]).

-2-

**EXHIBIT 41**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY), <br><br> Plaintiffs, <br><br> v. <br><br> ABBOTT LABORATORIES, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) CIVIL ACTION NO. 05-11150-DPW <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## SUPPLEMENTAL COMPLAINT

### Introduction

1.      This is an action for fraud, breach of contract, and indemnification in which plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and ManuLife Insurance Company (f/k/a "Investors Partner Life Insurance") seek compensatory and punitive damages, costs and attorneys' fees for defendant Abbott Laboratories' misrepresentations and other conduct that violates the Research Funding Agreement entered into by and between the plaintiffs and defendant and dated as of March 13, 2001 (the "Agreement").  This action is filed as a separate related action to the pending matter captioned *John Hancock Life Insurance Company, et al. v. Abbott Laboratories*, Civil Action

No. 03-12501-DPW (the "Existing Action"), pursuant to Section (1) of the Court's Scheduling Order entered in the Existing Action on March 30, 2004.

## The Parties

2.       Plaintiff John Hancock Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.  John Hancock Life Insurance Company is one of the nation's leading insurance companies, providing a broad array of insurance and investment products to retail and institutional customers, primarily in North America.

3.       Plaintiff John Hancock Variable Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.  John Hancock Variable Life Insurance Company provides variable life insurance products that link life insurance coverage and an investment return to an underlying portfolio of investments chosen by the policyholder.

4.       Plaintiff ManuLife Insurance Company (collectively, with plaintiffs John Hancock Life Insurance Company and John Hancock Variable Life Insurance Company, "John Hancock") is a company, duly formed and existing under the laws of the State of Delaware, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts. ManuLife Insurance Company is a wholly-owned subsidiary of John Hancock Variable Life Insurance Company that sells various types of life insurance products.  ManuLife Insurance Company formerly was known as "Investors Partner Life Insurance."

-2-

5.     Defendant Abbott Laboratories ("Abbott") is a corporation, duly formed and existing under the laws of the State of Illinois, that maintains its corporate headquarters in Abbott Park, Illinois. Abbott is a broad-based healthcare company that discovers, develops, manufactures and markets products and services that span the continuum of care -- from prevention and diagnosis to treatment and cure. Abbott's principal businesses are global pharmaceuticals, nutritionals, and medical products, including diagnostics and cardiovascular devices. Abbott achieved record sales and net earnings of $19.7 billion and $3.2 billion, respectively, in 2004. Its leadership positions in several multibillion-dollar businesses provide Abbott with a unique balance of revenue growth opportunities and cash flow sources that allow Abbott to invest in its future.

### Jurisdiction and Venue

6.     This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(a)(1) because defendant Abbott resides in this district within the meaning of 28 U.S.C. § 1391(c), and further because Section 16.2 of the parties' Agreement provides that Abbott,

> consents ... to the exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts ... for the purpose of any suit, action or other proceeding arising out of any of its obligations hereunder or thereunder or with respect to the transactions contemplated hereby or thereby, and expressly waives any and all objections that it may have as to venue in such courts.

## The Facts

### *The Agreement And Its Relevant Terms*

8.    On March 13, 2001, John Hancock and Abbott entered the Agreement, whereby John Hancock agreed to provide funding to Abbott for research and development activities on a portfolio of potential pharmaceutical products or "Program Compounds" (the "Research Program") in exchange for the right to receive certain management fees and future milestone and royalty payments from Abbott.

9.    The nine Program Compounds encompassed by the Abbott Research Program are: (a) ABT-773, a kelotide that may be useful as an antibiotic; (b) ABT-627, an endothelin-A receptor agonist that may be useful in the treatment of prostate cancer; (c) ABT-594, a non-opiod analgesic that may be useful in the treatment of chronic pain; (d) ABT-492, a quinolone that may be useful as an antibiotic; (e) ABT-510, a synthetic peptide that may be useful in the treatment of cancer; (f) ABT-518, a metalloproteinase inhibitor that may be useful in the treatment of cancer; (g) ABT-751, an antimitotic tubulin agonist that may be useful in the treatment of cancer; (h) ABT-100, a farnesyltransferase protein inhibitor that may be useful in the treatment of cancer; and (i) ABT-724, a dopamine receptor agonist that may be useful in the treatment of erectile dysfunction.

10.    Under the terms of the Agreement, John Hancock agreed to contribute up to a specified maximum amount toward the costs incurred by Abbott in operating the Research Program ("Program Related Costs") in four annual installments (the "Program Payments") over the period from March 13, 2001 through December 31, 2004 (individually, the four "Program Years" and, collectively, the four-year "Program Term"). Abbott agreed, in return, to invest at least twice the amount of John Hancock's contribution from its own funds towards

-4-

the operation of the Research Program, and committed to spend certain minimum amounts on Program Related Costs during each Program Year (the "Annual Minimum Spending Target"), as well as a minimum aggregate total on Program Related Costs over the four-year Program Term (the "Aggregate Spending Target").

11.     The Agreement, which comprises more than thirty-five (35) pages, was the subject of extensive negotiations between the parties and their counsel over a period of approximately one year.  From John Hancock's perspective, the financial attractiveness of the Agreement turned largely upon the specific identity of, and commercial prospects for, the nine Program Compounds encompassed by the Research Program.  John Hancock ran numerous analytical models based on financial projections for the Program Compounds in order to ensure, as best that it could, that the risks associated with its anticipated investment in the Research Program were justified by the potential rewards that John Hancock would receive if and when some or all of the Program Compounds were approved and commercialized.

12.     Because the financial return, if any, that John Hancock ultimately will receive on its investment in the Program Compounds is heavily dependent on the commercial success of those Compounds, John Hancock had a strong interest in ensuring, before the Agreement was signed, that: (a) Abbott had a good faith intention to aggressively pursue development of each of the Program Compounds; and (b) Abbott had a good faith belief that each of the Program Compounds possessed reasonably favorable commercial prospects.  In order to satisfy John Hancock's concerns on these points, Abbott agreed to provide John Hancock, in Article 12 of the Agreement, with certain written representations and warranties concerning the development status of the Program Compounds, including, *inter alia,* a representation and warranty that,

-5-

[s]et forth on Exhibit 12.2(d) is the full name, chemical name, detailed description of the stage of development and current status for each Program Compound. Set forth on Exhibit 1.6 in each Annual Research Plan is a description of projected milestones and dates thereof, projected year of NDA filing, and projected costs to be incurred by Abbott during the Program Term, for each Program Compound. Such projections were prepared in good faith and with due care based on reasonable assumptions, and represent the reasonable estimate of Abbott based on information available as of the date of such projections and as of the date hereof.... (Section 12.2[d]).

13.     Abbott further represented and warranted to John Hancock that,

[t]here is no fact known to Abbott (other than generally available information concerning the pharmaceutical industry in general) as of the date of this Agreement that has not been disclosed in this Agreement or any Exhibit to this Agreement which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial [viability]) of the Research Program or any of the Program Compounds. (Section 12.2[i]).

14.     The Agreement contains various other terms that are intended to protect John Hancock's interests by ensuring that Abbott fairly and diligently fulfills its research and development obligations under the Agreement, including terms which provide, *inter alia*, that Abbott:

(a)     must employ "Commercially Reasonable Efforts" (defined in the Agreement as "efforts which are consistent with those normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market potential at a similar stage of development or product life") to develop each of the Program Compounds and "achieve the objectives of the Research Program efficiently and expeditiously" (Sections 1.10, 2.3 and 4.1);

(b)     must keep John Hancock fully informed of any modifications to its written "Annual Research Plans" ("ARPs") by requiring that "[a]ny such modifications ... be promptly provided to John Hancock" (Section 2.2);

-6-

    (c)     shall not "research, develop, manufacture, market, sell, distribute, out-license or otherwise treat" the Program Compounds any differently "as compared to any other Abbott compounds or products" on account of any of the rights granted to John Hancock under Agreement (Section 4.4); and

    (d)     shall, "as soon as is practicable," out-license or divest any "Ceased Compound" (defined in the Agreement as a Program Compound that Abbott has "substantially cease[d] developing, marketing or selling") to a third party, and shall "remunerate John Hancock based on sales of such Ceased Compound by the third party that has acquired or licensed the Ceased Compound … in a manner most consistent with the allocation that would have applied hereunder had such Ceased Compound not been so out-licensed or divested…" (Section 4.3[d]).

15.     John Hancock's obligation under the Agreement to make additional Program Payments during the four-year Program Term is not absolute, however. In entering into the Agreement, John Hancock did not want to obligate itself to continue investing in the Program Compounds if the commercial prospects for those Compounds diminished significantly over the four-year Program Term. Accordingly, John Hancock's obligation to make its second, third and fourth Program Payments was made expressly contingent upon the demonstration by Abbott, on an annual basis, of the continued commercial viability of the Program Compounds.

16.     For purposes of the Agreement, the continued commercial viability of the Program Compounds is measured by reference to Abbott's planned expenditures on Program Related Costs over the four-year Program Term. Section 2.2 of the Agreement requires Abbott to provide John Hancock, at least forty-five days (45) prior to the start of each Program Year, with a written ARP that spells out Abbott's anticipated Research Program expenditures for that year and for each year remaining in the Program Term. If Abbott's ARP for any given year did not "reasonably demonstrate [Abbott's] … intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target" as set forth in the Agreement, then John Hancock's "obligation to

make any remaining Program Payments for any succeeding Program Years" automatically would terminate pursuant to Section 3.4(iv) of the Agreement.

17.    Section 3.3 of the Agreement sets forth Abbott's obligations to John Hancock in the event that Abbott fails to reach the Aggregate Spending Target for Program Related Costs over the four-year Program Term.   Section 3.3(b) states that Abbott "will expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the "Aggregate Carryover Amount") on Program Related Costs during the *subsequent year* commencing immediately after the end of the Program Term (emphasis added)." If Abbott fails to spend the entire Aggregate Carryover Amount during such subsequent year, Section 3.3(b) obligates Abbott to "pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days after the end of such subsequent year."

18.    The four-year Program Term ended on December 31, 2004, and the "subsequent year commencing immediately after the end of the Program Term" ended on December 31, 2005.  Accordingly, Abbott was required to spend the Aggregate Carryover Amount by December 31, 2005, and required to pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott as of that date on or before January 30, 2006.

19.    The Agreement further provides John Hancock with the power to objectively verify Abbott's compliance with the terms of the Agreement, including the right to retain an independent auditor of John Hancock's choosing (and reasonably acceptable to Abbott) who is empowered to inspect, copy and audit the "books and records of Abbott and each Subcontractor related to the Research Program ... at any time and from time to time." John

Hancock is required to pay the fees and expenses of its chosen auditor in the first instance. If, however, the work of John Hancock's auditor "reveals any material breach of Abbott's responsibilities" under the Agreement, then Section 2.5 provides that Abbott "shall (i) pay the reasonable fees and expenses charged by such auditor, and (ii) fully and promptly cure such breach."

<em>John Hancock's Efforts to Audit Abbott's Compliance<br>With The Terms of the Agreement</em>

20.     Since the Agreement was executed on March 13, 2001, John Hancock has become aware of certain potential breaches of the Agreement by Abbott. Such potential breaches include, but are not limited to, misrepresentations by Abbott in the negotiation and execution of the Agreement, as well as violations by Abbott of its development and administrative responsibilities under the Agreement.

21.     Consistent with the terms of the Agreement, and in an effort to assist in confirming or refuting Abbott's suspected violations, John Hancock initiated an independent audit of Abbott's books and records on April 12, 2004. On that date, John Hancock sent a letter to Abbott notifying Abbott of John Hancock's intention to undertake a compliance audit pursuant to Section 2.5 of the Agreement, and identifying the independent auditor that had been selected by John Hancock. John Hancock accompanied its audit notification letter to Abbott with a description of the specific books and records related to the Research Program that John Hancock requested be made available for examination by its independent auditor within thirty (30) days.

22.     Abbott unreasonably and unjustifiably has delayed, and continues to delay, its response to John Hancock's audit request, and has taken affirmative steps to obstruct the legitimate efforts of John Hancock's independent auditors to confirm or refute Abbott's

-9-

compliance with terms of the Agreement. Tactics employed by Abbott to hinder, delay and obstruct John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement include, but are not limited to:

(a)     unreasonably and unjustifiably objecting to John Hancock's chosen auditor for a period of months, then arbitrarily withdrawing its objection;

(b)     unreasonably and unjustifiably delaying production of the majority of the relevant books and records requested by John Hancock's auditor for almost one year (and counting);

(c)     unreasonably and unjustifiably refusing to make certain relevant books and records available for inspection and copying at all (including, without limitation, various books and records documenting Abbott's actual expenditures on Program Related Costs);

(d)     unreasonably and unjustifiably redacting various relevant books and records produced during the course of the audit so as to eliminate relevant information and render certain materials effectively unintelligible, notwithstanding the existence of a written confidentiality agreement between the parties;

(e)     unreasonably and unjustifiably understaffing and under-funding Abbott's response to John Hancock's audit request in order to further delay the examination of Abbott's relevant books and records by John Hancock's auditor;

(f)     unreasonably and unjustifiably delaying for periods of six months or more the photocopying of books and records designated by John Hancock's auditor during the inspection process;

(g)     unreasonably and unjustifiably refusing to provide John Hancock's auditor with photocopies of various books and records produced by Abbott, and designated by John Hancock's auditor, during the inspection process;

(h)     unreasonably and unjustifiably refusing to permit John Hancock or its independent auditor to make their own photocopies of Abbott's books and records produced for audit purposes;

(i)     unreasonably and unjustifiably violating acknowledged deadlines for the completion of Abbott's production of books and records responsive to John Hancock's audit requests;

(j)     unreasonably and unjustifiably ignoring or refusing to answer various written and oral inquiries by John Hancock and its auditor regarding Abbott's relevant books and records; and

(k)     unreasonably and unjustifiably acting in a manner contrary to the usual course of contractual compliance audits, and contrary to Abbott's own conduct in reasonably similar circumstances in the past.

23.     As of the date of its original Complaint in this action, Abbott still had not produced all of the material books and records related to the Research Program that were requested by John Hancock and its auditor on April 12, 2004, and refused to do so. Abbott also refused to answer inquiries by John Hancock and its auditor seeking information that is necessary to complete the audit of Abbott's compliance with the Agreement.

*Abbott's Violations of the Agreement*

A. Obstructing John Hancock's Compliance Audit

24.     Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement as expressly permitted under Section 2.5. Upon information and belief, Abbott's efforts to hinder, delay and obstruct John Hancock's audit activities are intended to undermine, and have had the effect of undermining, John Hancock's ability to obtain information which would tend to confirm that Abbott has breached the Agreement in various other ways as set forth below.

B. Misrepresenting the Development Status of ABT-518

25.     Upon information and belief, Abbott misrepresented the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that ABT-518 was "a compelling development candidate with the potential to demonstrate antitumor effects superior to the MMP inhibitors currently undergoing clinical trials." Abbott understood before the Agreement was

-11-

executed, however, that the actual development status of ABT-518 was not as represented in the Agreement. For example, Abbott personnel already had plans as of early March 2001 to terminate the development of ABT-518, but understood that full disclosure of that fact to John Hancock "could have been the deathnell (*sic*) to the deal." Accordingly, Abbott personnel took affirmative steps on and prior to March 13, 2001 to conceal from John Hancock the true development status of ABT-518 so as to induce John Hancock to enter into the Agreement. Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-518.

26.     The development status of ABT-518 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-518 in making that decision. Had John Hancock known the true development status of ABT-518 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

## C.  Misrepresenting the Development Status of ABT-594

27.     Upon information and belief, Abbott misrepresented the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that a "phase IIb [clinical] study for neuropathic pain at higher, titrated doses of ABT-594 began in April 2000 and ends in June 2001," and that ABT-594 was "expected to be the first neuronal nicotinic receptor agonist to receive an indication for pain." Abbott understood before the Agreement was executed,

-12-

however, that the development status of ABT-594 was not as represented in the Agreement. For example, Abbott already knew prior to the execution of the Agreement that the termination rate for patients enrolled in the phase IIb clinical study of ABT-594 was unusually high, and that the final results of that study were likely to be unfavorable. Abbott also knew, no later than March 2001, that the development of ABT-594 was likely to be significantly delayed or even discontinued by Abbott as a consequence. Abbott failed to disclose these facts to John Hancock before the Agreement was executed in order to induce John Hancock to enter into the Agreement. Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-594.

28.     The development status of ABT-594 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-594 in making that decision. Had John Hancock known the true development status of ABT-594 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

### D. Misrepresenting Its Intended and Reasonably Expected Spending on Program Related Costs

29.     Upon information and belief, Abbott has misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock. The Research Program cost projections that Abbott has provided to John Hancock in various ARPs reflect Abbott's "nominal" spending, as opposed to its "expected" spending. At all relevant times, Abbott's true "expected" spending on Program Related Costs

-13-

was considerably less than the amounts communicated to John Hancock in Abbott's ARPs. Abbott has misrepresented its intended and reasonably expected spending plans to John Hancock in order to induce John Hancock to enter into the Agreement, and to make Program Payments to Abbott that would not otherwise be due under the terms of the Agreement.

30.     Abbott's intended and reasonably expected expenditures on Program Related Costs constitute material facts for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding its intended and reasonably expected expenditures on Program Related Costs in making that decision. Had John Hancock known the true level of Abbott's intended and reasonably expected expenditures, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, may not have made certain Program Payments, or may not have entered into the Agreement at all.

E.  Failing to Use Commercially Reasonable Efforts
to Develop the Program Compounds

31.     Upon information and belief, Abbott has failed to use Commercially Reasonable Efforts to develop the Program Compounds. Abbott previously represented to John Hancock in its 2005 ARP that the current commercial prospects for the active Program Compounds warrant the expenditure of a stated sum towards Program Related Costs in 2005. Upon information and belief, Abbott since has modified its 2005 ARP so as to reduce its intended and reasonably expected expenditures on Program Related Costs by more than fifty percent (50%) in retaliation, *inter alia*, for the automatic termination of John Hancock's obligation to make additional Program Payments for the third and fourth Program Years pursuant to the express terms of the Agreement.

-14-

32.    Abbott's decision to reduce its intended and reasonably expected expenditures on Program Related Costs in 2005 to less than one-half the amount that Abbott has represented is warranted by the current commercial prospects for the active Program Compounds is inconsistent with the level of effort normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market at a similar stage of development and, therefore, not Commercially Reasonable for purposes of Section 4.1 of the Agreement.

### F.  Refusing to Provide John Hancock With a Copy of Abbott's Modified 2005 ARP

33.    Abbott has refused to provide John Hancock with a copy of its modified 2005 ARP. Abbott provided its original 2005 ARP to John Hancock in November 2004. Upon information and belief, Abbott since has modified its original 2005 ARP so as to dramatically reduce Abbott's intended and reasonably expected expenditures on Program Related Costs in 2005. Section 2.2 of the Agreement obligates Abbott to "promptly provide[]" John Hancock with "[a]ny ... modifications" to its ARPs. Notwithstanding the express requirements of Section 2.2, Abbott has refused or ignored John Hancock's requests for a copy of Abbott's modified 2005 ARP.

### G.  Failing to Out-License or Divest Various Ceased Compounds

34.    Upon information and belief, Abbott has failed to out-license or divest itself of various Ceased Compounds, including, without limitation, ABT-518 and ABT-594, "as soon as is practicable" as required under Section 4.3(d) of the Agreement.

35.    Upon further information and belief, Abbott has chosen not to out-license or divest itself of the foregoing Ceased Compounds for fear that, if those Compounds were successfully developed and marketed by a third party, Abbott might lose future sales of various

competing compounds that Abbott has under development, which are not subject to John Hancock's royalty rights.

H.  Failing To Pay John Hancock One-Third Of The
Actual Aggregate Carryover Amount

36.     Because Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement, Abbott's actual spending on Program Related Costs over the four-year Program Term ended on December 31, 2004, and the "subsequent year commencing immediately after the end of the Program Term" ended on December 31, 2005, currently is unknown. Abbott has represented and John Hancock has reason to believe, however, that Abbott's actual spending on Program Related Costs during the Program Term was considerably less than the Aggregate Spending Target, and that Abbott's actual spending on Program Related Costs during such subsequent year was considerably less than the Aggregate Carryover Amount.

37.     Pursuant to Section 3.3(b) of the Agreement, Abbott was required to pay John Hancock one-third of the actual, unspent Aggregate Carryover Amount on or before January 30, 2006. Notwithstanding the express requirements of Section 3.3(b), Abbott has failed to make such payment to John Hancock.

*John Hancock's Efforts to Resolve Its Claims Against Abbott Amicably*

38.     On April 1, 2005, John Hancock provided written notification to Abbott of the existence and nature of the disputes identified in Sections A-G above in accordance with Section 16.7 of the Agreement. Authorized representatives of John Hancock and Abbott subsequently met in Chicago, Illinois on May 20, 2005, in an effort to resolve their disputes amicably. That effort was unsuccessful.

-16-

39.    On January 5, 2006, John Hancock provided written notification to Abbott of the existence and nature of the disputes identified in Section H above in accordance with Section 16.7 of the Agreement.  Representatives of Abbott did not meet with John Hancock for the purpose of resolving those disputes within the time period permitted under Section 16.7.

### Claims

### COUNT I
(Fraud)

40.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 39 of this Complaint, *supra*.

41.    Abbott materially misrepresented the development status of the Program Compounds in the representations and warranties contained in Sections 12.2 of the Agreement, and applicable Schedules thereto, all in the manner described in this Complaint.

42.    Abbott materially misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock, all in the manner described in this Complaint.

43.    Abbott made the foregoing misrepresentations to John Hancock wantonly and willfully for the purpose of fraudulently inducing John Hancock to enter into the Agreement, and to make various Program Payments to Abbott on the terms stated therein.

44.    John Hancock justifiably relied upon Abbott's misrepresentations to its detriment by, among other things, entering into the Agreement, and making Program Payments to Abbott in accordance with the terms thereof.

-17-

45.    As a result of Abbott's misrepresentations, John Hancock has been defrauded by Abbott and has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

COUNT II
(Breach of Contract)

46.    John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 45 of this Complaint, *supra*.

47.    The Agreement constitutes a valid and binding contract between the parties. John Hancock has performed all of its obligations under the Agreement.

48.    Abbott has breached its obligations to John Hancock under the Agreement, *inter alia*, by:

(a)    misrepresenting the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement;

(b)    misrepresenting the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement;

(c)    misrepresenting Abbott's intended and reasonably expected expenditures on Program Related Costs in ARPs that Abbott has provided to John Hancock;

(d)    failing to use Commercially Reasonable Efforts to develop the Program Compounds;

(e)    refusing to provide John Hancock with a copy of Abbott's modified 2005 ARP;

(f)    failing to out-license or divest itself of certain Ceased Compounds, including, without limitation, ABT-518 and ABT-594, as soon as is practicable; and

(g)    unreasonably and unjustifiably hindering, delaying and obstructing John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement.

(h)    failing to pay John Hancock one-third of the actual, unspent Aggregate Carryover Amount pursuant to Section 3.3(b) of the Agreement.

-18-

49.     By engaging in the foregoing conduct, Abbott further has breached the covenant of good faith and fair dealing that is implied by law in every contract, including the Agreement.

50.     Abbott has breached its express and implied obligations under the Agreement willfully and wantonly in order to induce John Hancock to enter into the Agreement, induce John Hancock to make various Program Payments to Abbott on the terms stated therein, and inhibit John Hancock's ability to detect and confirm Abbott's misconduct.

51.     As a result of Abbott's willful and wanton breaches of its express and implied obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

COUNT III
(Indemnification)

52.     John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 51 of this Complaint, *supra*.

53.     Abbott has breached its representations, warranties and obligations to John Hancock under the Agreement as set forth herein.

54.     As a result of Abbott's various breaches of its representations, warranties and obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, "Losses" as defined in Section 1.27 of the Agreement. John Hancock's Losses include, without limitation, costs, damages, and other reasonable expenses such as audit charges and attorneys' fees.

-19-

55.    Abbott agreed in Section 12.6 of the Agreement to indemnify John Hancock, *inter alia*, "from and against all Losses related to or arising out of, directly or indirectly ... any breach by Abbott of its representations, warranties or obligations hereunder..."

56.    On April 1, 2005, John Hancock provided written notification to Abbott that John Hancock has sustained, and likely will continue to sustain, compensable Losses on account of Abbott's various breaches of its representations, warranties and obligations under the Agreement, for which John Hancock is entitled to indemnification pursuant to Section 12.6 of the Agreement.

57.    Notwithstanding John Hancock's request for indemnification, Abbott has refused to indemnify John Hancock for its compensable Losses.

<u>Prayers for Relief</u>

WHEREFORE, John Hancock respectfully requests that the Court:

(a)    award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's fraud under Count I of the Complaint;

(b)    award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's various breaches of contract under Count II of the Complaint;

(c)    enter an order directing Abbott to indemnify John Hancock for its compensable Losses, including John Hancock's damages, costs, and other reasonable expenses such as audit charges and attorneys' fees, under Count III of the Complaint;

(d)    award John Hancock punitive damages for Abbott's willful and wanton misconduct in an amount to be determined under Counts I and II of the Complaint; and

(e)    grant John Hancock such other and further relief as the Court deems just
and appropriate in the circumstances.

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY AND
MANULIFE INSURANCE COMPANY

By their attorneys,

/s/ Brian A. Davis
Brian A. Davis (BBO No. 546462)
Joseph H. Zwicker (BBO No. 560219)
Stacy Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Telephone: 617-248-5000

Date: June 23, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non-registered participants on
June 23, 2006.

/s/ Brian A. Davis
Brian A. Davis

4090288.1

-21-

**EXHIBIT 42**

**CONFIDENTIAL - REDACTED**

**EXHIBIT 43**

**CONFIDENTIAL - REDACTED**

EXHIBIT 44

**CONFIDENTIAL - REDACTED**

**EXHIBIT 45**

Hancock V Abbott (PM) 120606.txt

1

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3       * * * * * * * * * * * * * * * *

4   JOHN HANCOCK LIFE INSURANCE
       COMPANY
5                        Plaintiff

6       VERSUS                        CA-05-11150-DPW

7   ABBOTT LABORATORIES

8                        Defendant

9       * * * * * * * * * * * * * * * *


10          BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

11          UNITED STATES DISTRICT COURT JUDGE

12          HEARING - AFTERNOON SESSION

13              DECEMBER 6, 2006

14

15   APPEARANCES:

16
     BRIAN A. DAVIS, ESQ. AND JOSEPH H. ZWICKER, ESQ., Choate,
17   Hall & Stewart, LLP, Two International Place, 100-150
     Oliver Street, Boston, Massachusetts  02110, on behalf
18   of the Plaintiff

19   ERIC J. LORENZINI, ESQ. AND JEFFREY I. WEINBERGER, ESQ.,
     Munger, Tolles & Olson, LLP, 355 South Grand Avenue,
20   35th Floor, Los Angeles, California  90071-1560, on
     behalf of the Defendant
21
     PETER E. GELHAAR, ESQ., Donnelly, Conroy & Gelhaar, LLP,
22   One Beacon Street, 33rd Floor, Boston, Massachusetts  02108,
     on behalf of the Defendant
23

24

25


2

1

2

3

4
                        Page 1

Hancock V Abbott (PM)  120606.txt

6    dollar cap was reached.

7              THE COURT:  I thought you said there was something

8    like 90 million dollars of milestones.

9              MR. DAVIS:  Well, there's 90 million.  It's plus

10   the management fees, Your Honor.  When you add the management

11   fees that were received and the milestone payments, I think it

12   comes to 14 million.  So you take that away from the 104 that

13   was invested.  That's how you get to the 90.

14             THE COURT:  Oh, when you said 90 million, you're

15   talking about the shortfall.

16             MR. DAVIS:  The net that's been invested at this

17   point.

18             THE COURT:  I understand.

19             MR. DAVIS:  So, again, these are all ways that were

20   built into the agreement to give Hancock some comfort and

21   assurance that if things went south, Hancock would at least see

22   at least some portion of its capital back, hopefully all of it

23   and hopefully some means of getting some return.  Now, again,

24   the way it plays out in the current circumstances is we're

25   talking about Abbott spending somewhere in the vicinity of 466

                                                              41

1    million would come out of their pocket over five years which is

2    not dramatically different and it's certainly -- again, they

3    keep talking about a minimum 400 million dollar investment.

4    Okay.  That's what -- I agree with that, that at a minimum they

5    committed to putting in 400 million of their own money.  That's

6    what the parties expected.  And yet Abbott -- and Hancock would

7    be investing somewhere in the vicinity of 80 million of its own

8    money.  Again, this is giving effect to 3.3(b) as written.

9    That's not an irrational result.  That's still 80 some odd

10   million that Hancock has invested with Abbott.  It's invested

                              Page 34

Hancock V Abbott (PM)  120606.txt

11    in a series of compounds which have almost across the board
12    failed, not quite entirely yet.  A few more just failed
13    recently, but we've still got one or two that are still kicking
14    around.  None of them have been commercialized.  Okay.  So we
15    have Hancock has 80 some odd million still in this deal.  What
16    are the royalties going to be on this?  Who knows.  But right
17    now, it's not looking very good.  So, 3.3(b) is another means
18    for Hancock to at least protect itself against some portion of
19    that loss.  That's the way it was written.  That's the way --
20    that's what it says.  That's the way it ought to be applied.
21            THE COURT:  All right.  So, let me go back to this
22    dimension of the arithmetic.  In order to avoid paying 21
23    thousand dollars or 21.7 million dollars, Abbott has to pay 110
24    -- put 110 into the deal?
25            MR. DAVIS:  I'm sorry, Your Honor.  I'm afraid

                                                                    42

1     that's a little bit broad, but I see the big --
2             THE COURT:  What's happened is that they have put
3     in there what I have called their 400.  You've put in 104.
4             MR. DAVIS:  Correct.  The difference is --
5             THE COURT:  The shortfall is 110.  All right.  Now
6     they put some portion of that 110 in.  I can't do the figures
7     right now or if I ever recall them.  But they have to make a
8     commitment -- in order to avoid paying 21.7 million dollars,
9     they have to commit to 110 million dollars.  Now, there's a
10    sliding scale -- obviously a sliding scale involved in that.
11    But that's basically what they have to do to protect themselves
12    against this.
13            MR. DAVIS:  They could look at it that way, Your
14    Honor.
15            THE COURT:  Why wouldn't someone look at it that
                                Page 35

Hancock V Abbott (PM)  120606.txt

3              MR. WEINBERGER:  Thank you, Your Honor.

4                    RECESSED AT 3:45 P.M.

5

6

7                    CERTIFICATION

8              I certify that the foregoing is a correct

9    transcript of the record of proceedings in the above-entitled

10   matter to the best of my skill and ability.

11

12   _____     _____

13   Pamela R. Owens                     Date

14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

                                                        53

1

2

3

4

5

6

7

EXHIBIT 46

ORIGINAL FILED UNDER SEAL - DO NOT SCAN

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER LIFE INSURANCE COMPANY), | ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO. 05-11150-DPW |
| Plaintiffs, | ) ) ) | **CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER FILED UNDER SEAL** |
| v. | ) ) ) |  |
| ABBOTT LABORATORIES, | ) ) ) |  |
| Defendant. | ) ) ) |  |

## PLAINTIFFS' MOTION FOR LEAVE TO AMEND SUPPLEMENTAL COMPLAINT

Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Manulife Insurance Company (f/k/a "Investors Partner Life Insurance Company") (collectively, "John Hancock") hereby move, pursuant to Federal Rule of Civil Procedure 15(a), for leave to serve and file the attached First Amended Supplemental Complaint in the above-captioned matter. In support of its Motion, John Hancock states that:

    1.    John Hancock seeks leave to amend its complaint to: (a) make explicit that John Hancock's existing claims for fraud, breach of contract and indemnification also encompass Abbott's misrepresentations and omissions concerning ABT-773; and (b) make explicit Hancock's intention to seek rescission of the Research Funding Agreement as an alternative remedy.

2.    Rule 15(a) provides that "leave [to amend a pleading] shall be freely given when justice so requires."

3.    The courts have found that unless it can be demonstrated that the amendments would be futile or there has been undue delay resulting in prejudice, leave to amend should be granted. Glassman v. Computervision Corp., 90 F.3d 617, 622 (1st Cir. 1996).

4.    John Hancock's Supplemental Complaint plainly calls into question the veracity of Abbott's representations and warranties concerning the status of the various Program Compounds encompassed by the Agreement, including but not limited to ABT-518 and ABT-594. The allegations of the Supplemental Complaint also make it clear that, before filing suit, John Hancock attempted, without success, to determine the full extent of Abbott's misrepresentations and omissions. Discovery in this litigation now has established that Abbott's actionable misrepresentations and omissions extend to ABT-773. John Hancock's proposed amendment to the Supplemental Complaint merely expands upon Hancock's original allegations concerning Abbott's misconduct in light of that discovery. It adds no new claims and does not require broadening the scope of discovery beyond its existing parameters. See U.S. v. U.S. Trust Co., 106 F.R.D. 474, 476 (D. Mass. 1985) (plaintiff should be allowed to amend its complaint to state more precisely its original allegations); see also Vivian Ponte v. Robert Rodriques and the Town of Fairhaven, 1987 WL 13245 at *1 (D. Mass. June 15, 1987) (allowing amendments which clarify and make explicit the implicit grounds on which specific causes of action are based).

5.    The same is true with respect to John Hancock's proposed amendment adding rescission of the Agreement as an alternative remedy. Illinois law (which governs the Agreement by its terms) expressly recognizes rescission as an available remedy in cases involving fraud or material breach of contract. See, e.g., Newton v. Aitken, 260 Ill.App.3d 717,

719 (1994); Mor-Wood Contractors, Inc. v. Ottinger, 205 Ill.App.3d 132, 142 (1990). Assuming that John Hancock proves fraud or material breach on Abbott's part (as it will), Hancock would be entitled to ask the Court to rescind the Agreement regardless of whether Hancock ever demanded such relief in its pleadings. *See* Fed. R. Civ. P. 54(c) ("[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings."). John Hancock's proposed amendment simply makes it absolutely clear, for the benefit of the parties and the Court, that the "other and further relief" which Hancock already has requested in its Supplemental Complaint can and should include rescission of the Agreement in the circumstances of this case. Again, no new claims are added and no additional discovery will be required.

6.    No valid argument can be made in the present circumstances that John Hancock's proposed First Amended Supplemental Complaint would fail to state a claim against Abbott for, *inter alia*, fraud and breach of contract.

7.    John Hancock's Motion to Amend is prompted by new evidence obtained during discovery in this action and by Hancock's desire to avoid any possibility of surprise (or, more accurately, any *claim* of surprise) at trial. There has been no undue delay on Hancock's part in seeking to amend its Supplemental Complaint.

8.    In further support of its Motion, John Hancock submits an accompanying Memorandum of Law and the Affidavit of Stacy L. Blasberg (with Exhibits 1-6) filed in conjunction herewith, and cites to the Affidavit of Richard C. Abati (and accompanying Exhibits A-CC) filed on September 26, 2006, in support of John Hancock's Motion to Compel. John Hancock further submits a Proposed Order with this Motion.

9.      For the Court's convenience, John Hancock attaches as Exhibits A and B hereto a redlined version of the First Amended Supplemental Complaint highlighting the amended language, as well as a clean copy to be served and filed.

WHEREFORE, John Hancock respectfully requests that the Court enter an order granting it leave to serve and file the First Amended Supplemental Complaint.

## REQUEST FOR ORAL ARGUMENT

In accordance with Local Rule 7.1(D), Plaintiffs respectfully request oral argument on this Motion.

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK VARIABLE LIFE
INSURANCE COMPANY AND MANULIFE
INSURANCE COMPANY

By their attorneys,

Brian A. Davis (BBO No. 546462)
Joseph H. Zwicker (BBO No. 560219)
Karen Collari Troake (BBO No. 566922)
Stacy L. Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART
Two International Place
Boston, MA  02110
Telephone:  617-248-5000
Fax:  617-248-4000

Date:  October 24, 2006

-4-

## LOCAL RULE 7.1 CERTIFICATION

Pursuant to Local Rule 7.1(A)(2), the undersigned counsel for Plaintiffs hereby certifies that, on October 6, 2006, counsel for John Hancock conferred in good faith with counsel for Abbott in an effort to resolve or narrow the issues that are the subject of this Motion, but no agreement could be reached by the parties.

Karen Collari Troake

4134849v1

-5-

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served by electronic and overnight mail upon Peter E. Gelhaar, Esq., Donnelly, Conroy & Gelhaar, LLP, One Beacon Street, 33rd Floor, Boston, MA 02108, and Gregory D. Phillips, Esq., Munger, Tolles & Olson LLP, 355 South Grand Avenue, Los Angeles, CA 90071, on this 24th day of October, 2006.

Stacy L. Blasberg

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY), | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ABBOTT LABORATORIES, | ) ) |
| Defendant. | )- ) |

CIVIL ACTION NO. 05-11150-DPW

## FIRST AMENDED SUPPLEMENTAL COMPLAINT

### Introduction

1.      This is an action for fraud, breach of contract, and indemnification in which plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Manulife Insurance Company (f/k/a "Investors Partner Life Insurance") seek compensatory and punitive damages, rescission, costs and attorneys' fees for defendant Abbott Laboratories' misrepresentations and other conduct that violates the Research Funding Agreement entered into by and between the plaintiffs and defendant and dated as of March 13, 2001 (the "Agreement").  This action is filed as a separate related action to the pending matter

4131720v24131720v1

captioned *John Hancock Life Insurance Company, et al. v. Abbott Laboratories*, Civil Action No. 03-12501-DPW (the "Existing Action"), pursuant to Section (1) of the Court's Scheduling Order entered in the Existing Action on March 30, 2004.

### The Parties

2.    Plaintiff John Hancock Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.    John Hancock Life Insurance Company is one of the nation's leading insurance companies, providing a broad array of insurance and investment products to retail and institutional customers, primarily in North America.

3.    Plaintiff John Hancock Variable Life Insurance Company is a company, duly formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.    John Hancock Variable Life Insurance Company provides variable life insurance products that link life insurance coverage and an investment return to an underlying portfolio of investments chosen by the policyholder.

4.    Plaintiff Manulife Insurance Company (collectively, with plaintiffs John Hancock Life Insurance Company and John Hancock Variable Life Insurance Company, "John Hancock") is a company, duly formed and existing under the laws of the State of Delaware, that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts. Manulife Insurance Company is a wholly-owned subsidiary of John Hancock Variable Life Insurance

-2-

Company that sells various types of life insurance products. Manulife Insurance Company formerly was known as "Investors Partner Life Insurance."

5.    Defendant Abbott Laboratories ("Abbott") is a corporation, duly formed and existing under the laws of the State of Illinois, that maintains its corporate headquarters in Abbott Park, Illinois. Abbott is a broad-based healthcare company that discovers, develops, manufactures and markets products and services that span the continuum of care -- from prevention and diagnosis to treatment and cure. Abbott's principal businesses are global pharmaceuticals, nutritionals, and medical products, including diagnostics and cardiovascular devices. Abbott achieved record sales and net earnings of $19.7 billion and $3.2 billion, respectively, in 2004. Its leadership positions in several multibillion-dollar businesses provide Abbott with a unique balance of revenue growth opportunities and cash flow sources that allow Abbott to invest in its future.

### Jurisdiction and Venue

6.    This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(a)(1) because defendant Abbott resides in this district within the meaning of 28 U.S.C. § 1391(c), and further because Section 16.2 of the parties' Agreement provides that Abbott,

> consents ... to the exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts ... for the purpose of any suit, action or other proceeding arising out of any of its obligations

-3-

hereunder or thereunder or with respect to the transactions contemplated hereby or thereby, and expressly waives any and all objections that it may have as to venue in such courts.

## The Facts

*The Agreement And Its Relevant Terms*

8.    On March 13, 2001, John Hancock and Abbott entered the Agreement, whereby John Hancock agreed to provide funding to Abbott for research and development activities on a portfolio of potential pharmaceutical products or "Program Compounds" (the "Research Program") in exchange for the right to receive certain management fees and future milestone and royalty payments from Abbott.

9.    The nine Program Compounds encompassed by the Abbott Research Program are: (a) ABT-773, a kelotide that may be useful as an antibiotic; (b) ABT-627, an endothelin-A receptor agonist that may be useful in the treatment of prostate cancer; (c) ABT-594, a non-opiod analgesic that may be useful in the treatment of chronic pain; (d) ABT-492, a quinolone that may be useful as an antibiotic; (e) ABT-510, a synthetic peptide that may be useful in the treatment of cancer; (f) ABT-518, a metalloproteinase inhibitor that may be useful in the treatment of cancer; (g) ABT-751, an antimitotic tubulin agonist that may be useful in the treatment of cancer; (h) ABT-100, a farnesyltransferase protein inhibitor that may be useful in the treatment of cancer; and (i) ABT-724, a dopamine receptor agonist that may be useful in the treatment of erectile dysfunction.

10.    Under the terms of the Agreement, John Hancock agreed to contribute up to a specified maximum amount toward the costs incurred by Abbott in operating the Research Program ("Program Related Costs") in four annual installments (the "Program Payments")

-4-

over the period from March 13, 2001 through December 31, 2004 (individually, the four "Program Years" and, collectively, the four-year "Program Term"). Abbott agreed, in return, to invest at least twice the amount of John Hancock's contribution from its own funds towards the operation of the Research Program, and committed to spend certain minimum amounts on Program Related Costs during each Program Year (the "Annual Minimum Spending Target"), as well as a minimum aggregate total on Program Related Costs over the four-year Program Term (the "Aggregate Spending Target").

11.    The Agreement, which comprises more than thirty-five (35) pages, was the subject of extensive negotiations between the parties and their counsel over a period of approximately one year. From John Hancock's perspective, the financial attractiveness of the Agreement turned largely upon the specific identity of, and commercial prospects for, the nine Program Compounds encompassed by the Research Program. John Hancock ran numerous analytical models based on financial projections for the Program Compounds in order to ensure, as best that it could, that the risks associated with its anticipated investment in the Research Program were justified by the potential rewards that John Hancock would receive if and when some or all of the Program Compounds were approved and commercialized.

12.    Because the financial return, if any, that John Hancock ultimately will receive on its investment in the Program Compounds is heavily dependent on the commercial success of those Compounds, John Hancock had a strong interest in ensuring, before the Agreement was signed, that: (a) Abbott had a good faith intention to aggressively pursue development of each of the Program Compounds; and (b) Abbott had a good faith belief that each of the

-5-

Program Compounds possessed reasonably favorable commercial prospects. In order to satisfy John Hancock's concerns on these points, Abbott agreed to provide John Hancock, in Article 12 of the Agreement, with certain written representations and warranties concerning the development status of the Program Compounds, including, *inter alia*, a representation and warranty that,

> [s]et forth on Exhibit 12.2(d) is the full name, chemical name, detailed description of the stage of development and current status for each Program Compound. Set forth on Exhibit 1.6 in each Annual Research Plan is a description of projected milestones and dates thereof, projected year of NDA filing, and projected costs to be incurred by Abbott during the Program Term, for each Program Compound. Such projections were prepared in good faith and with due care based on reasonable assumptions, and represent the reasonable estimate of Abbott based on information available as of the date of such projections and as of the date hereof.... (Section 12.2[d]).

13.    Abbott further represented and warranted to John Hancock that,

> [t]here is no fact known to Abbott (other than generally available information concerning the pharmaceutical industry in general) as of the date of this Agreement that has not been disclosed in this Agreement or any Exhibit to this Agreement which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial [viability]) of the Research Program or any of the Program Compounds. (Section 12.2[i]).

14.    The Agreement contains various other terms that are intended to protect John Hancock's interests by ensuring that Abbott fairly and diligently fulfills its research and development obligations under the Agreement, including terms which provide, *inter alia*, that Abbott:

-6-

(a)    must employ "Commercially Reasonable Efforts" (defined in the Agreement as "efforts which are consistent with those normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market potential at a similar stage of development or product life") to develop each of the Program Compounds and "achieve the objectives of the Research Program efficiently and expeditiously" (Sections 1.10, 2.3 and 4.1);

(b)    must keep John Hancock fully informed of any modifications to its written "Annual Research Plans" ("ARPs") by requiring that "[a]ny such modifications ... be promptly provided to John Hancock" (Section 2.2);

(c)    shall not "research, develop, manufacture, market, sell, distribute, out-license or otherwise treat" the Program Compounds any differently "as compared to any other Abbott compounds or products" on account of any of the rights granted to John Hancock under Agreement (Section 4.4); and

(d)    shall, "as soon as is practicable," out-license or divest any "Ceased Compound" (defined in the Agreement as a Program Compound that Abbott has "substantially cease[d] developing, marketing or selling") to a third party, and shall "remunerate John Hancock based on sales of such Ceased Compound by the third party that has acquired or licensed the Ceased Compound ... in a manner most consistent with the allocation that would have applied hereunder had such Ceased Compound not been so out-licensed or divested..." (Section 4.3[d]).

15.    John Hancock's obligation under the Agreement to make additional Program Payments during the four-year Program Term is not absolute, however. In entering into the Agreement, John Hancock did not want to obligate itself to continue investing in the Program Compounds if the commercial prospects for those Compounds diminished significantly over the four-year Program Term. Accordingly, John Hancock's obligation to make its second, third and fourth Program Payments was made expressly contingent upon the demonstration by Abbott, on an annual basis, of the continued commercial viability of the Program Compounds.

16.    For purposes of the Agreement, the continued commercial viability of the Program Compounds is measured by reference to Abbott's planned expenditures on Program Related Costs over the four-year Program Term.  Section 2.2 of the Agreement requires Abbott to provide John Hancock, at least forty-five days (45) prior to the start of each Program Year, with a written ARP that spells out Abbott's anticipated Research Program expenditures for that year and for each year remaining in the Program Term.  If Abbott's ARP for any given year did not "reasonably demonstrate [Abbott's] ... intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target" as set forth in the Agreement, then John Hancock's "obligation to make any remaining Program Payments for any succeeding Program Years" automatically would terminate pursuant to Section 3.4(iv) of the Agreement.

17.    Section 3.3 of the Agreement sets forth Abbott's obligations to John Hancock in the event that Abbott fails to reach the Aggregate Spending Target for Program Related Costs over the four-year Program Term.  Section 3.3(b) states that Abbott "will expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the "Aggregate Carryover Amount") on Program Related Costs during the *subsequent year* commencing immediately after the end of the Program Term (emphasis added)."  If Abbott fails to spend the entire Aggregate Carryover Amount during such subsequent year, Section 3.3(b) obligates Abbott to "pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days after the end of such subsequent year."

-8-

18.    The four-year Program Term ended on December 31, 2004, and the "subsequent year commencing immediately after the end of the Program Term" ended on December 31, 2005.  Accordingly, Abbott was required to spend the Aggregate Carryover Amount by December 31, 2005, and required to pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott as of that date on or before January 30, 2006.

19.    The Agreement further provides John Hancock with the power to objectively verify Abbott's compliance with the terms of the Agreement, including the right to retain an independent auditor of John Hancock's choosing (and reasonably acceptable to Abbott) who is empowered to inspect, copy and audit the "books and records of Abbott and each Subcontractor related to the Research Program ... at any time and from time to time."  John Hancock is required to pay the fees and expenses of its chosen auditor in the first instance.  If, however, the work of John Hancock's auditor "reveals any material breach of Abbott's responsibilities" under the Agreement, then Section 2.5 provides that Abbott "shall (i) pay the reasonable fees and expenses charged by such auditor, and (ii) fully and promptly cure such breach."

### John Hancock's Efforts to Audit Abbott's Compliance
### With The Terms of the Agreement

20.    Since the Agreement was executed on March 13, 2001, John Hancock has become aware of certain potential breaches of the Agreement by Abbott.  Such potential breaches include, but are not limited to, misrepresentations by Abbott in the negotiation and

-9-

execution of the Agreement, as well as violations by Abbott of its development and administrative responsibilities under the Agreement.

21.    Consistent with the terms of the Agreement, and in an effort to assist in confirming or refuting Abbott's suspected violations, John Hancock initiated an independent audit of Abbott's books and records on April 12, 2004. On that date, John Hancock sent a letter to Abbott notifying Abbott of John Hancock's intention to undertake a compliance audit pursuant to Section 2.5 of the Agreement, and identifying the independent auditor that had been selected by John Hancock. John Hancock accompanied its audit notification letter to Abbott with a description of the specific books and records related to the Research Program that John Hancock requested be made available for examination by its independent auditor within thirty (30) days.

22.    Abbott unreasonably and unjustifiably has delayed, and continues to delay, its response to John Hancock's audit request, and has taken affirmative steps to obstruct the legitimate efforts of John Hancock's independent auditors to confirm or refute Abbott's compliance with terms of the Agreement. Tactics employed by Abbott to hinder, delay and obstruct John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement include, but are not limited to:

    (a)    unreasonably and unjustifiably objecting to John Hancock's chosen auditor for a period of months, then arbitrarily withdrawing its objection;

    (b)    unreasonably and unjustifiably delaying production of the majority of the relevant books and records requested by John Hancock's auditor for almost one year (and counting);

(c)    unreasonably and unjustifiably refusing to make certain relevant books and records available for inspection and copying at all (including, without limitation, various books and records documenting Abbott's actual expenditures on Program Related Costs);

(d)    unreasonably and unjustifiably redacting various relevant books and records produced during the course of the audit so as to eliminate relevant information and render certain materials effectively unintelligible, notwithstanding the existence of a written confidentiality agreement between the parties;

(e)    unreasonably and unjustifiably understaffing and under-funding Abbott's response to John Hancock's audit request in order to further delay the examination of Abbott's relevant books and records by John Hancock's auditor;

(f)    unreasonably and unjustifiably delaying for periods of six months or more the photocopying of books and records designated by John Hancock's auditor during the inspection process;

(g)    unreasonably and unjustifiably refusing to provide John Hancock's auditor with photocopies of various books and records produced by Abbott, and designated by John Hancock's auditor, during the inspection process;

(h)    unreasonably and unjustifiably refusing to permit John Hancock or its independent auditor to make their own photocopies of Abbott's books and records produced for audit purposes;

(i)    unreasonably and unjustifiably violating acknowledged deadlines for the completion of Abbott's production of books and records responsive to John Hancock's audit requests;

(j)    unreasonably and unjustifiably ignoring or refusing to answer various written and oral inquiries by John Hancock and its auditor regarding Abbott's relevant books and records; and

(k)    unreasonably and unjustifiably acting in a manner contrary to the usual course of contractual compliance audits, and contrary to Abbott's own conduct in reasonably similar circumstances in the past.

23.     As of the date of its original Complaint in this action, Abbott still had not produced all of the material books and records related to the Research Program that were requested by John Hancock and its auditor on April 12, 2004, and refused to do so.  Abbott also refused to answer inquiries by John Hancock and its auditor seeking information that is necessary to complete the audit of Abbott's compliance with the Agreement.

-12-

*Abbott's Violations of the Agreement*

### A. Obstructing John Hancock's Compliance Audit

24.    Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement as expressly permitted under Section 2.5.    Upon information and belief, Abbott's efforts to hinder, delay and obstruct John Hancock's audit activities are intended to undermine, and have had the effect of undermining, John Hancock's ability to obtain information which would tend to confirm that Abbott has breached the Agreement in various other ways as set forth below.

### B. Misrepresenting the Development Status of ABT-518

25.    Upon information and belief, Abbott misrepresented the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that ABT-518 was "a compelling development candidate with the potential to demonstrate antitumor effects superior to the MMP inhibitors currently undergoing clinical trials." Abbott understood before the Agreement was executed, however, that the actual development status of ABT-518 was not as represented in the Agreement. For example, Abbott personnel already had plans as of early March 2001 to terminate the development of ABT-518, but understood that full disclosure of that fact to John Hancock "could have been the deathnell (*sic*) to the deal." Accordingly, Abbott personnel took affirmative steps on and prior to March 13, 2001 to conceal from John Hancock the true development status of ABT-518 so as to induce John Hancock to enter into the Agreement.

-13-

Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-518.

26.     The development status of ABT-518 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-518 in making that decision. Had John Hancock known the true development status of ABT-518 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

C.     Misrepresenting the Development Status of ABT-594

27.     Upon information and belief, Abbott misrepresented the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that a "phase IIb [clinical] study for neuropathic pain at higher, titrated doses of ABT-594 began in April 2000 and ends in June 2001," and that ABT-594 was "expected to be the first neuronal nicotinic receptor agonist to receive an indication for pain." Abbott understood before the Agreement was executed, however, that the development status of ABT-594 was not as represented in the Agreement. For example, Abbott already knew prior to the execution of the Agreement that the termination rate for patients enrolled in the phase IIb clinical study of ABT-594 was unusually high, and that the final results of that study were likely to be unfavorable. Abbott also knew, no later

-14-

than March 2001, that the development of ABT-594 was likely to be significantly delayed or even discontinued by Abbott as a consequence. Abbott failed to disclose these facts to John Hancock before the Agreement was executed in order to induce John Hancock to enter into the Agreement. Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-594.

28.    The development status of ABT-594 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-594 in making that decision. Had John Hancock known the true development status of ABT-594 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

### CD.  Misrepresenting the Development Status of ABT-773

29.    Upon information and belief, Abbott misrepresented the development status of ABT-773 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that further development of ABT-773 was warranted due to its competitive "convenience, safety and tolerability." Abbott understood before the Agreement was executed, however, that the development status of ABT-773 was not as represented in the Agreement. For example, Abbott was aware of potentially serious liver and heart toxicity issues related to the use of ABT-773. Abbott failed to disclose

-15-

these facts to John Hancock before the Agreement was executed in order to induce John Hancock to enter into the Agreement.  Then, within twelve months after the -Agreement was signed, Abbott terminated the development of ABT-773.

30.    The development status of ABT-773 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement.  John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-773 in making that decision.  Had John Hancock known the true development status of ABT-773 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

### DE. Misrepresenting Its Intended and Reasonably Expected Spending on Program Related Costs

29.31. Upon information and belief, Abbott has misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock.  The Research Program cost projections that Abbott has provided to John Hancock in various ARPs reflect Abbott's "nominal" spending, as opposed to its "expected" spending. At all relevant times, Abbott's true "expected" spending on Program Related Costs was considerably less than the amounts communicated to John Hancock in Abbott's ARPs. Abbott has misrepresented its intended and reasonably expected spending plans to John Hancock in order to induce John Hancock to enter into the Agreement, and to make Program Payments to Abbott that would not otherwise be due under the terms of the Agreement.

-16-

30.32. Abbott's intended and reasonably expected expenditures on Program Related Costs constitute material facts for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding its intended and reasonably expected expenditures on Program Related Costs in making that decision. Had John Hancock known the true level of Abbott's intended and reasonably expected expenditures, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, may not have made certain Program Payments, or may not have entered into the Agreement at all.

E̶F. Failing to Use Commercially Reasonable Efforts
to Develop the Program Compounds

31.33. Upon information and belief, Abbott has failed to use Commercially Reasonable Efforts to develop the Program Compounds. Abbott previously represented to John Hancock in its 2005 ARP that the current commercial prospects for the active Program Compounds warrant the expenditure of a stated sum towards Program Related Costs in 2005. Upon information and belief, Abbott since has modified its 2005 ARP so as to reduce its intended and reasonably expected expenditures on Program Related Costs by more than fifty percent (50%) in retaliation, *inter alia*, for the automatic termination of John Hancock's obligation to make additional Program Payments for the third and fourth Program Years pursuant to the express terms of the Agreement.

32.34. Abbott's decision to reduce its intended and reasonably expected expenditures on Program Related Costs in 2005 to less than one-half the amount that Abbott has represented

-17-

is warranted by the current commercial prospects for the active Program Compounds is inconsistent with the level of effort normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market at a similar stage of development and, therefore, not Commercially Reasonable for purposes of Section 4.1 of the Agreement.

FG.  Refusing to Provide John Hancock With a Copy
of Abbott's Modified 2005 ARP

33.35. Abbott has refused to provide John Hancock with a copy of its modified 2005 ARP.  Abbott provided its original 2005 ARP to John Hancock in November 2004.  Upon information and belief, Abbott since has modified its original 2005 ARP so as to dramatically reduce Abbott's intended and reasonably expected expenditures on Program Related Costs in 2005.  Section 2.2 of the Agreement obligates Abbott to "promptly provide[]" John Hancock with "[a]ny ... modifications" to its ARPs.  Notwithstanding the express requirements of Section 2.2, Abbott has refused or ignored John Hancock's requests for a copy of Abbott's modified 2005 ARP.

GH.  Failing to Out-License or Divest Various Ceased Compounds

34.36. Upon information and belief, Abbott has failed to out-license or divest itself of various Ceased Compounds, including, without limitation, ABT-518 and ABT-594, "as soon as is practicable" as required under Section 4.3(d) of the Agreement.

35.37. Upon further information and belief, Abbott has chosen not to out-license or divest itself of the foregoing Ceased Compounds, among others, for fear that, if those Compounds were successfully developed and marketed by a third party, Abbott might lose

-18-

future sales of various competing compounds that Abbott has under development, which are not subject to John Hancock's royalty rights.

## HI.  Failing To Pay John Hancock One-Third Of The
### Actual Aggregate Carryover Amount

36.38. Because Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement, Abbott's actual spending on Program Related Costs over the four-year Program Term ended on December 31, 2004, and the "subsequent year commencing immediately after the end of the Program Term" ended on December 31, 2005, currently is unknown. Abbott has represented and John Hancock has reason to believe, however, that Abbott's actual spending on Program Related Costs during the Program Term was considerably less than the Aggregate Spending Target, and that Abbott's actual spending on Program Related Costs during such subsequent year was considerably less than the Aggregate Carryover Amount.

37.39.  Pursuant to Section 3.3(b) of the Agreement, Abbott was required to pay John Hancock one-third of the actual, unspent Aggregate Carryover Amount on or before January 30, 2006.  Notwithstanding the express requirements of Section 3.3(b), Abbott has failed to make such payment to John Hancock.

*John Hancock's Efforts to Resolve Its Claims Against Abbott Amicably*

38.40.  On April 1, 2005, John Hancock provided written notification to Abbott of the existence and nature of the disputes identified in Sections A-C, and E-H above in accordance with Section 16.7 of the Agreement.  Authorized representatives of John Hancock and Abbott subsequently met in Chicago, Illinois on May 20, 2005, in an effort to resolve their disputes amicably.  The parties discussed the issues identified in the notice as well as the parties overall

dispute with respect to all Program Compounds, including ABT-773. The ~~at~~ efforts to resolve the parties' disputes were~~was~~ unsuccessful.

On January 5, 2006, John Hancock provided written notification to Abbott of the existence and nature of the disputes identified in Section ~~H~~ 1 above in accordance with Section 16.7 of the Agreement. Representatives of Abbott did not meet with John Hancock for the purpose of resolving those disputes within the time period permitted under Section 16.7.

## Claims

### COUNT I
### (Fraud)

~~40.~~ 41. John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through ~~39~~ 40 of this Complaint, *supra*.

~~41.~~ 42. Abbott materially misrepresented the development status of the Program Compounds in the representations and warranties contained in Sections 12.2 of the Agreement, and applicable Schedules thereto, all in the manner described in this Complaint.

~~42.~~ 43. Abbott materially misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock, all in the manner described in this Complaint.

~~43.~~ 44. Abbott made the foregoing misrepresentations to John Hancock wantonly and willfully for the purpose of fraudulently inducing John Hancock to enter into the Agreement, and to make various Program Payments to Abbott on the terms stated therein.

-21-

44.45. John Hancock justifiably relied upon Abbott's misrepresentations to its detriment by, among other things, entering into the Agreement, and making Program Payments to Abbott in accordance with the terms thereof.

45.46. As a result of Abbott's misrepresentations, John Hancock has been defrauded by Abbott and has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

COUNT II
(Breach of Contract)

46.47. John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 45 46 of this Complaint, *supra*.

47.48. The Agreement constitutes a valid and binding contract between the parties. John Hancock has performed all of its obligations under the Agreement.

48.49. Abbott has breached its obligations to John Hancock under the Agreement, *inter alia*, by:

    (a)    misrepresenting the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement;

    (b)    misrepresenting the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement;

    (c)    misrepresenting the development status of ABT-773 to John Hancock prior to, and at the time of, the execution of the Agreement;

    (ed)    misrepresenting Abbott's intended and reasonably expected expenditures on Program Related Costs in ARPs that Abbott has provided to John Hancock;

    (de)    failing to use Commercially Reasonable Efforts to develop the Program

-22-

Compounds;

(e<u>f</u>)    refusing to provide John Hancock with a copy of Abbott's modified 2005 ARP;

(f<u>g</u>)    failing to out-license or divest itself of certain Ceased Compounds, including, without limitation, ABT-518 and ABT-594, as soon as is practicable; ~~and~~

(g<u>h</u>)    unreasonably and unjustifiably hindering, delaying and obstructing John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement~~.~~; and

(h<u>i</u>)    failing to pay John Hancock one-third of the actual, unspent Aggregate Carryover Amount pursuant to Section 3.3(b) of the Agreement.

~~49.~~<u>50.</u> By engaging in the foregoing conduct, Abbott further has breached the covenant of good faith and fair dealing that is implied by law in every contract, including the Agreement.

~~50.~~<u>51.</u> Abbott has breached its express and implied obligations under the Agreement willfully and wantonly in order to induce John Hancock to enter into the Agreement, induce John Hancock to make various Program Payments to Abbott on the terms stated therein, and inhibit John Hancock's ability to detect and confirm Abbott's misconduct.

~~51.~~<u>52.</u> As a result of Abbott's willful and wanton breaches of its express and implied obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

COUNT III
(Indemnification)

~~52.~~<u>53.</u> John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through ~~51~~<u>52</u> of this Complaint, *supra*.

-23-

53.54. Abbott has breached its representations, warranties and obligations to John Hancock under the Agreement as set forth herein.

54.55. As a result of Abbott's various breaches of its representations, warranties and obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, "Losses" as defined in Section 1.27 of the Agreement. John Hancock's Losses include, without limitation, costs, damages, and other reasonable expenses such as audit charges and attorneys' fees.

55.56. Abbott agreed in Section 12.6 of the Agreement to indemnify John Hancock, *inter alia*, "from and against all Losses related to or arising out of, directly or indirectly ... any breach by Abbott of its representations, warranties or obligations hereunder..."

56.57. On April 1, 2005, John Hancock provided written notification to Abbott that John Hancock has sustained, and likely will continue to sustain, compensable Losses on account of Abbott's various breaches of its representations, warranties and obligations under the Agreement, for which John Hancock is entitled to indemnification pursuant to Section 12.6 of the Agreement.

57.58. Notwithstanding John Hancock's request for indemnification, Abbott has refused to indemnify John Hancock for its compensable Losses.

## Prayers for Relief

WHEREFORE, John Hancock respectfully requests that the Court:

(a)     award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's fraud under Count I of the Complaint;

-24-

(b)   award John Hancock compensatory damages in an amount to be
      determined, plus interest and costs, for Abbott's various breaches of
      contract under Count II of the Complaint;

(c)   enter an order directing Abbott to indemnify John Hancock for its
      compensable Losses, including John Hancock's damages, costs, and
      other reasonable expenses such as audit charges and attorneys' fees,
      under Count III of the Complaint;

(d)   award John Hancock punitive damages for Abbott's willful and wanton
      misconduct in an amount to be determined under Counts I and II of the
      Complaint; and

(e)   alternatively, enter an order rescinding the Agreement and restoring the
      *status quo ante*, including, but not limited to, directing Abbott to refund
      any and all Program Payments made by John Hancock, less any
      payments already received by John Hancock, plus interest and costs–;
      and

-25-

(ef)    grant John Hancock such other and further relief as the Court deems just
       and appropriate in the circumstances.

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY AND
MANULIFE INSURANCE COMPANY

By their attorneys,


/s/  Brian A. Davis
Brian A. Davis (BBO No. 546462)
Joseph H. Zwicker (BBO No. 560219)
Stacy Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Telephone: 617-248-5000

Date: June 23October     , 2006


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non-registered participants on
June 23October     , 2006.


/s/ Brian A. Davis
Brian A. Davis

4090288.1
4131720.2

-26-

UNITED STATES DISTRICT COURT

# EXHIBIT B

captioned *John Hancock Life Insurance Company, et al. v. Abbott Laboratories*, Civil Action

No. 03-12501-DPW (the "Existing Action"), pursuant to Section (1) of the Court's Scheduling

Order entered in the Existing Action on March 30, 2004.

### The Parties

2.      Plaintiff John Hancock Life Insurance Company is a company, duly formed and

existing under the laws of the Commonwealth of Massachusetts, that maintains its corporate

headquarters in Boston, Suffolk County, Massachusetts.    John Hancock Life Insurance

Company is one of the nation's leading insurance companies, providing a broad array of

insurance and investment products to retail and institutional customers, primarily in North

America.

3.      Plaintiff John Hancock Variable Life Insurance Company is a company, duly

formed and existing under the laws of the Commonwealth of Massachusetts, that maintains its

corporate headquarters in Boston, Suffolk County, Massachusetts.    John Hancock Variable

Life Insurance Company provides variable life insurance products that link life insurance

coverage and an investment return to an underlying portfolio of investments chosen by the

policyholder.

4.      Plaintiff Manulife Insurance Company (collectively, with plaintiffs John

Hancock Life Insurance Company and John Hancock Variable Life Insurance Company, "John

Hancock") is a company, duly formed and existing under the laws of the State of Delaware,

that maintains its corporate headquarters in Boston, Suffolk County, Massachusetts.  Manulife

Insurance Company is a wholly-owned subsidiary of John Hancock Variable Life Insurance

-2-

Company that sells various types of life insurance products. Manulife Insurance Company formerly was known as "Investors Partner Life Insurance."

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, duly formed and existing under the laws of the State of Illinois, that maintains its corporate headquarters in Abbott Park, Illinois. Abbott is a broad-based healthcare company that discovers, develops, manufactures and markets products and services that span the continuum of care -- from prevention and diagnosis to treatment and cure. Abbott's principal businesses are global pharmaceuticals, nutritionals, and medical products, including diagnostics and cardiovascular devices. Abbott achieved record sales and net earnings of $19.7 billion and $3.2 billion, respectively, in 2004. Its leadership positions in several multibillion-dollar businesses provide Abbott with a unique balance of revenue growth opportunities and cash flow sources that allow Abbott to invest in its future.

### Jurisdiction and Venue

6.      This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      Venue in this district is proper pursuant to 28 U.S.C. § 1391(a)(1) because defendant Abbott resides in this district within the meaning of 28 U.S.C. § 1391(c), and further because Section 16.2 of the parties' Agreement provides that Abbott,

> consents ... to the exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts ... for the purpose of any suit, action or other proceeding arising out of any of its obligations

hereunder or thereunder or with respect to the transactions contemplated hereby or thereby, and expressly waives any and all objections that it may have as to venue in such courts.

## The Facts

### The Agreement And Its Relevant Terms

8.    On March 13, 2001, John Hancock and Abbott entered the Agreement, whereby John Hancock agreed to provide funding to Abbott for research and development activities on a portfolio of potential pharmaceutical products or "Program Compounds" (the "Research Program") in exchange for the right to receive certain management fees and future milestone and royalty payments from Abbott.

9.    The nine Program Compounds encompassed by the Abbott Research Program are: (a) ABT-773, a kelotide that may be useful as an antibiotic; (b) ABT-627, an endothelin-A receptor agonist that may be useful in the treatment of prostate cancer; (c) ABT-594, a non-opiod analgesic that may be useful in the treatment of chronic pain; (d) ABT-492, a quinolone that may be useful as an antibiotic; (e) ABT-510, a synthetic peptide that may be useful in the treatment of cancer; (f) ABT-518, a metalloproteinase inhibitor that may be useful in the treatment of cancer; (g) ABT-751, an antimitotic tubulin agonist that may be useful in the treatment of cancer; (h) ABT-100, a farnesyltransferase protein inhibitor that may be useful in the treatment of cancer; and (i) ABT-724, a dopamine receptor agonist that may be useful in the treatment of erectile dysfunction.

10.    Under the terms of the Agreement, John Hancock agreed to contribute up to a specified maximum amount toward the costs incurred by Abbott in operating the Research Program ("Program Related Costs") in four annual installments (the "Program Payments")

-4-

over the period from March 13, 2001 through December 31, 2004 (individually, the four "Program Years" and, collectively, the four-year "Program Term"). Abbott agreed, in return, to invest at least twice the amount of John Hancock's contribution from its own funds towards the operation of the Research Program, and committed to spend certain minimum amounts on Program Related Costs during each Program Year (the "Annual Minimum Spending Target"), as well as a minimum aggregate total on Program Related Costs over the four-year Program Term (the "Aggregate Spending Target").

11.     The Agreement, which comprises more than thirty-five (35) pages, was the subject of extensive negotiations between the parties and their counsel over a period of approximately one year. From John Hancock's perspective, the financial attractiveness of the Agreement turned largely upon the specific identity of, and commercial prospects for, the nine Program Compounds encompassed by the Research Program. John Hancock ran numerous analytical models based on financial projections for the Program Compounds in order to ensure, as best that it could, that the risks associated with its anticipated investment in the Research Program were justified by the potential rewards that John Hancock would receive if and when some or all of the Program Compounds were approved and commercialized.

12.     Because the financial return, if any, that John Hancock ultimately will receive on its investment in the Program Compounds is heavily dependent on the commercial success of those Compounds, John Hancock had a strong interest in ensuring, before the Agreement was signed, that: (a) Abbott had a good faith intention to aggressively pursue development of each of the Program Compounds; and (b) Abbott had a good faith belief that each of the

-5-

Program Compounds possessed reasonably favorable commercial prospects. In order to satisfy John Hancock's concerns on these points, Abbott agreed to provide John Hancock, in Article 12 of the Agreement, with certain written representations and warranties concerning the development status of the Program Compounds, including, *inter alia*, a representation and warranty that,

> [s]et forth on Exhibit 12.2(d) is the full name, chemical name, detailed description of the stage of development and current status for each Program Compound. Set forth on Exhibit 1.6 in each Annual Research Plan is a description of projected milestones and dates thereof, projected year of NDA filing, and projected costs to be incurred by Abbott during the Program Term, for each Program Compound. Such projections were prepared in good faith and with due care based on reasonable assumptions, and represent the reasonable estimate of Abbott based on information available as of the date of such projections and as of the date hereof.... (Section 12.2[d]).

13.    Abbott further represented and warranted to John Hancock that,

> [t]here is no fact known to Abbott (other than generally available information concerning the pharmaceutical industry in general) as of the date of this Agreement that has not been disclosed in this Agreement or any Exhibit to this Agreement which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial [viability]) of the Research Program or any of the Program Compounds. (Section 12.2[i]).

14.    The Agreement contains various other terms that are intended to protect John Hancock's interests by ensuring that Abbott fairly and diligently fulfills its research and development obligations under the Agreement, including terms which provide, *inter alia*, that Abbott:

(a)    must employ "Commercially Reasonable Efforts" (defined in the Agreement as "efforts which are consistent with those normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market potential at a similar stage of development or product life") to develop each of the Program Compounds and "achieve the objectives of the Research Program efficiently and expeditiously" (Sections 1.10, 2.3 and 4.1);

(b)    must keep John Hancock fully informed of any modifications to its written "Annual Research Plans" ("ARPs") by requiring that "[a]ny such modifications ... be promptly provided to John Hancock" (Section 2.2);

(c)    shall not "research, develop, manufacture, market, sell, distribute, out-license or otherwise treat" the Program Compounds any differently "as compared to any other Abbott compounds or products" on account of any of the rights granted to John Hancock under Agreement (Section 4.4); and

(d)    shall, "as soon as is practicable," out-license or divest any "Ceased Compound" (defined in the Agreement as a Program Compound that Abbott has "substantially cease[d] developing, marketing or selling") to a third party, and shall "remunerate John Hancock based on sales of such Ceased Compound by the third party that has acquired or licensed the Ceased Compound ... in a manner most consistent with the allocation that would have applied hereunder had such Ceased Compound not been so out-licensed or divested..." (Section 4.3[d]).

15.    John Hancock's obligation under the Agreement to make additional Program Payments during the four-year Program Term is not absolute, however. In entering into the Agreement, John Hancock did not want to obligate itself to continue investing in the Program Compounds if the commercial prospects for those Compounds diminished significantly over the four-year Program Term. Accordingly, John Hancock's obligation to make its second, third and fourth Program Payments was made expressly contingent upon the demonstration by Abbott, on an annual basis, of the continued commercial viability of the Program Compounds.

-7-

16.    For purposes of the Agreement, the continued commercial viability of the Program Compounds is measured by reference to Abbott's planned expenditures on Program Related Costs over the four-year Program Term.  Section 2.2 of the Agreement requires Abbott to provide John Hancock, at least forty-five days (45) prior to the start of each Program Year, with a written ARP that spells out Abbott's anticipated Research Program expenditures for that year and for each year remaining in the Program Term.  If Abbott's ARP for any given year did not "reasonably demonstrate [Abbott's] ... intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target" as set forth in the Agreement, then John Hancock's "obligation to make any remaining Program Payments for any succeeding Program Years" automatically would terminate pursuant to Section 3.4(iv) of the Agreement.

17.    Section 3.3 of the Agreement sets forth Abbott's obligations to John Hancock in the event that Abbott fails to reach the Aggregate Spending Target for Program Related Costs over the four-year Program Term.  Section 3.3(b) states that Abbott "will expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the "Aggregate Carryover Amount") on Program Related Costs during the *subsequent year* commencing immediately after the end of the Program Term (emphasis added)."  If Abbott fails to spend the entire Aggregate Carryover Amount during such subsequent year, Section 3.3(b) obligates Abbott to "pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days after the end of such subsequent year."

-8-

18.    The four-year Program Term ended on December 31, 2004, and the "subsequent year commencing immediately after the end of the Program Term" ended on December 31, 2005. Accordingly, Abbott was required to spend the Aggregate Carryover Amount by December 31, 2005, and required to pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott as of that date on or before January 30, 2006.

19.    The Agreement further provides John Hancock with the power to objectively verify Abbott's compliance with the terms of the Agreement, including the right to retain an independent auditor of John Hancock's choosing (and reasonably acceptable to Abbott) who is empowered to inspect, copy and audit the "books and records of Abbott and each Subcontractor related to the Research Program ... at any time and from time to time." John Hancock is required to pay the fees and expenses of its chosen auditor in the first instance. If, however, the work of John Hancock's auditor "reveals any material breach of Abbott's responsibilities" under the Agreement, then Section 2.5 provides that Abbott "shall (i) pay the reasonable fees and expenses charged by such auditor, and (ii) fully and promptly cure such breach."

### John Hancock's Efforts to Audit Abbott's Compliance
### With The Terms of the Agreement

20.    Since the Agreement was executed on March 13, 2001, John Hancock has become aware of certain potential breaches of the Agreement by Abbott. Such potential breaches include, but are not limited to, misrepresentations by Abbott in the negotiation and

-9-

execution of the Agreement, as well as violations by Abbott of its development and administrative responsibilities under the Agreement.

21.    Consistent with the terms of the Agreement, and in an effort to assist in confirming or refuting Abbott's suspected violations, John Hancock initiated an independent audit of Abbott's books and records on April 12, 2004.  On that date, John Hancock sent a letter to Abbott notifying Abbott of John Hancock's intention to undertake a compliance audit pursuant to Section 2.5 of the Agreement, and identifying the independent auditor that had been selected by John Hancock.  John Hancock accompanied its audit notification letter to Abbott with a description of the specific books and records related to the Research Program that John Hancock requested be made available for examination by its independent auditor within thirty (30) days.

22.    Abbott unreasonably and unjustifiably has delayed, and continues to delay, its response to John Hancock's audit request, and has taken affirmative steps to obstruct the legitimate efforts of John Hancock's independent auditors to confirm or refute Abbott's compliance with terms of the Agreement.  Tactics employed by Abbott to hinder, delay and obstruct John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement include, but are not limited to:

(a)    unreasonably and unjustifiably objecting to John Hancock's chosen auditor for a period of months, then arbitrarily withdrawing its objection;

(b)    unreasonably and unjustifiably delaying production of the majority of the relevant books and records requested by John Hancock's auditor for almost one year (and counting);

(c)    unreasonably and unjustifiably refusing to make certain relevant books and records available for inspection and copying at all (including, without limitation, various books and records documenting Abbott's actual expenditures on Program Related Costs);

(d)    unreasonably and unjustifiably redacting various relevant books and records produced during the course of the audit so as to eliminate relevant information and render certain materials effectively unintelligible, notwithstanding the existence of a written confidentiality agreement between the parties;

(e)    unreasonably and unjustifiably understaffing and under-funding Abbott's response to John Hancock's audit request in order to further delay the examination of Abbott's relevant books and records by John Hancock's auditor;

(f)    unreasonably and unjustifiably delaying for periods of six months or more the photocopying of books and records designated by John Hancock's auditor during the inspection process;

(g)    unreasonably and unjustifiably refusing to provide John Hancock's auditor with photocopies of various books and records produced by Abbott, and designated by John Hancock's auditor, during the inspection process;

(h)    unreasonably and unjustifiably refusing to permit John Hancock or its independent auditor to make their own photocopies of Abbott's books and records produced for audit purposes;

(i)    unreasonably and unjustifiably violating acknowledged deadlines for the completion of Abbott's production of books and records responsive to John Hancock's audit requests;

(j)    unreasonably and unjustifiably ignoring or refusing to answer various written and oral inquiries by John Hancock and its auditor regarding Abbott's relevant books and records; and

(k)    unreasonably and unjustifiably acting in a manner contrary to the usual course of contractual compliance audits, and contrary to Abbott's own conduct in reasonably similar circumstances in the past.

23.    As of the date of its original Complaint in this action, Abbott still had not produced all of the material books and records related to the Research Program that were requested by John Hancock and its auditor on April 12, 2004, and refused to do so. Abbott also refused to answer inquiries by John Hancock and its auditor seeking information that is necessary to complete the audit of Abbott's compliance with the Agreement.

-12-

*Abbott's Violations of the Agreement*

A. Obstructing John Hancock's Compliance Audit

24.     Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement as expressly permitted under Section 2.5.   Upon information and belief, Abbott's efforts to hinder, delay and obstruct John Hancock's audit activities are intended to undermine, and have had the effect of undermining, John Hancock's ability to obtain information which would tend to confirm that Abbott has breached the Agreement in various other ways as set forth below.

B. Misrepresenting the Development Status of ABT-518

25.     Upon information and belief, Abbott misrepresented the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that ABT-518 was "a compelling development candidate with the potential to demonstrate antitumor effects superior to the MMP inhibitors currently undergoing clinical trials."  Abbott understood before the Agreement was executed, however, that the actual development status of ABT-518 was not as represented in the Agreement.  For example, Abbott personnel already had plans as of early March 2001 to terminate the development of ABT-518, but understood that full disclosure of that fact to John Hancock "could have been the deathnell (*sic*) to the deal."   Accordingly, Abbott personnel took affirmative steps on and prior to March 13, 2001 to conceal from John Hancock the true development status of ABT-518 so as to induce John Hancock to enter into the Agreement.

-13-

Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-518.

26.     The development status of ABT-518 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-518 in making that decision. Had John Hancock known the true development status of ABT-518 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

C. Misrepresenting the Development Status of ABT-594

27.     Upon information and belief, Abbott misrepresented the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that a "phase IIb [clinical] study for neuropathic pain at higher, titrated doses of ABT-594 began in April 2000 and ends in June 2001," and that ABT-594 was "expected to be the first neuronal nicotinic receptor agonist to receive an indication for pain." Abbott understood before the Agreement was executed, however, that the development status of ABT-594 was not as represented in the Agreement. For example, Abbott already knew prior to the execution of the Agreement that the termination rate for patients enrolled in the phase IIb clinical study of ABT-594 was unusually high, and that the final results of that study were likely to be unfavorable. Abbott also knew, no later

-14-

than March 2001, that the development of ABT-594 was likely to be significantly delayed or even discontinued by Abbott as a consequence. Abbott failed to disclose these facts to John Hancock before the Agreement was executed in order to induce John Hancock to enter into the Agreement. Then, shortly after the Agreement was signed, Abbott announced that it was terminating the development of ABT-594.

28.    The development status of ABT-594 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-594 in making that decision. Had John Hancock known the true development status of ABT-594 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

D.  Misrepresenting the Development Status of ABT-773

29.    Upon information and belief, Abbott misrepresented the development status of ABT-773 to John Hancock prior to, and at the time of, the execution of the Agreement. Specifically, Abbott represented in the Agreement, *inter alia*, that further development of ABT-773 was warranted due to its competitive "convenience, safety and tolerability." Abbott understood before the Agreement was executed, however, that the development status of ABT-773 was not as represented in the Agreement. For example, Abbott was aware of potentially serious liver and heart toxicity issues related to the use of ABT-773. Abbott failed to disclose

-15-

these facts to John Hancock before the Agreement was executed in order to induce John Hancock to enter into the Agreement. Then, within twelve months after the Agreement was signed, Abbott terminated the development of ABT-773.

30.    The development status of ABT-773 as of March 2001 constitutes a material fact for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding the development status of ABT-773 in making that decision. Had John Hancock known the true development status of ABT-773 before the Agreement was executed, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, or may not have entered into the Agreement at all.

E. Misrepresenting Its Intended and Reasonably Expected
Spending on Program Related Costs

31.    Upon information and belief, Abbott has misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it has provided to John Hancock. The Research Program cost projections that Abbott has provided to John Hancock in various ARPs reflect Abbott's "nominal" spending, as opposed to its "expected" spending. At all relevant times, Abbott's true "expected" spending on Program Related Costs was considerably less than the amounts communicated to John Hancock in Abbott's ARPs. Abbott has misrepresented its intended and reasonably expected spending plans to John Hancock in order to induce John Hancock to enter into the Agreement, and to make Program Payments to Abbott that would not otherwise be due under the terms of the Agreement.

-16-

32.     Abbott's intended and reasonably expected expenditures on Program Related Costs constitute material facts for purposes of John Hancock's decision to enter into the Agreement. John Hancock reasonably and justifiably relied upon Abbott's misrepresentations regarding its intended and reasonably expected expenditures on Program Related Costs in making that decision.  Had John Hancock known the true level of Abbott's intended and reasonably expected expenditures, John Hancock would have demanded different terms, such as the substitution of another compound with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds, may not have made certain Program Payments, or may not have entered into the Agreement at all.

F.  Failing to Use Commercially Reasonable Efforts
to Develop the Program Compounds

33.     Upon information and belief, Abbott has failed to use Commercially Reasonable Efforts to develop the Program Compounds.  Abbott previously represented to John Hancock in its 2005 ARP that the current commercial prospects for the active Program Compounds warrant the expenditure of a stated sum towards Program Related Costs in 2005.  Upon information and belief, Abbott since has modified its 2005 ARP so as to reduce its intended and reasonably expected expenditures on Program Related Costs by more than fifty percent (50%) in retaliation, *inter alia*, for the automatic termination of John Hancock's obligation to make additional Program Payments for the third and fourth Program Years pursuant to the express terms of the Agreement.

34.     Abbott's decision to reduce its intended and reasonably expected expenditures on Program Related Costs in 2005 to less than one-half the amount that Abbott has represented

-17-

is warranted by the current commercial prospects for the active Program Compounds is inconsistent with the level of effort normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market at a similar stage of development and, therefore, not Commercially Reasonable for purposes of Section 4.1 of the Agreement.

### G. Refusing to Provide John Hancock With a Copy of Abbott's Modified 2005 ARP

35.    Abbott has refused to provide John Hancock with a copy of its modified 2005 ARP. Abbott provided its original 2005 ARP to John Hancock in November 2004. Upon information and belief, Abbott since has modified its original 2005 ARP so as to dramatically reduce Abbott's intended and reasonably expected expenditures on Program Related Costs in 2005. Section 2.2 of the Agreement obligates Abbott to "promptly provide[]" John Hancock with "[a]ny ... modifications" to its ARPs. Notwithstanding the express requirements of Section 2.2, Abbott has refused or ignored John Hancock's requests for a copy of Abbott's modified 2005 ARP.

### H. Failing to Out-License or Divest Various Ceased Compounds

36.    Upon information and belief, Abbott has failed to out-license or divest itself of various Ceased Compounds, including, without limitation, ABT-518 and ABT-594, "as soon as is practicable" as required under Section 4.3(d) of the Agreement.

37.    Upon further information and belief, Abbott has chosen not to out-license or divest itself of the foregoing Ceased Compounds, among others, for fear that, if those Compounds were successfully developed and marketed by a third party, Abbott might lose

-18-

future sales of various competing compounds that Abbott has under development, which are not subject to John Hancock's royalty rights.

I.  Failing To Pay John Hancock One-Third Of The
Actual Aggregate Carryover Amount

38.    Because Abbott unreasonably and unjustifiably has hindered, delayed and obstructed John Hancock's attempts to audit Abbott's compliance with the terms of the Agreement, Abbott's actual spending on Program Related Costs over the four-year Program Term ended on December 31, 2004, and the "subsequent year commencing immediately after the end of the Program Term" ended on December 31, 2005, currently is unknown. Abbott has represented and John Hancock has reason to believe, however, that Abbott's actual spending on Program Related Costs during the Program Term was considerably less than the Aggregate Spending Target, and that Abbott's actual spending on Program Related Costs during such subsequent year was considerably less than the Aggregate Carryover Amount.

39.    Pursuant to Section 3.3(b) of the Agreement, Abbott was required to pay John Hancock one-third of the actual, unspent Aggregate Carryover Amount on or before January 30, 2006. Notwithstanding the express requirements of Section 3.3(b), Abbott has failed to make such payment to John Hancock.

*John Hancock's Efforts to Resolve Its Claims Against Abbott Amicably*

40.    On April 1, 2005, John Hancock provided written notification to Abbott of the existence and nature of the disputes identified in Sections A-C, and E-H above in accordance with Section 16.7 of the Agreement. Authorized representatives of John Hancock and Abbott subsequently met in Chicago, Illinois on May 20, 2005, in an effort to resolve their disputes

amicably.   The parties discussed the issues identified in the notice as well as the parties overall

dispute with respect to all Program Compounds, including ABT-773.   The efforts to resolve

the parties' disputes were unsuccessful.

On January 5, 2006, John Hancock provided written notification to Abbott of the existence and

nature of the disputes identified in Section I above in accordance with Section 16.7 of the

Agreement.   Representatives of Abbott did not meet with John Hancock for the purpose of

resolving those disputes within the time period permitted under Section 16.7.

### Claims

### COUNT I
### (Fraud)

41.    John Hancock hereby repeats and incorporates by reference the allegations set

forth in Paragraphs 1 through 40 of this Complaint, *supra*.

42.    Abbott materially misrepresented the development status of the Program

Compounds in the representations and warranties contained in Sections 12.2 of the Agreement,

and applicable Schedules thereto, all in the manner described in this Complaint.

43.    Abbott materially misrepresented its "intended and reasonably expected"

expenditures on Program Related Costs in ARPs that it has provided to John Hancock, all in

the manner described in this Complaint.

44.    Abbott made the foregoing misrepresentations to John Hancock wantonly and

willfully for the purpose of fraudulently inducing John Hancock to enter into the Agreement,

and to make various Program Payments to Abbott on the terms stated therein.

45.     John Hancock justifiably relied upon Abbott's misrepresentations to its detriment by, among other things, entering into the Agreement, and making Program Payments to Abbott in accordance with the terms thereof.

46.     As a result of Abbott's misrepresentations, John Hancock has been defrauded by Abbott and has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

## COUNT II
### (Breach of Contract)

47.     John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 46 of this Complaint, *supra*.

48.     The Agreement constitutes a valid and binding contract between the parties. John Hancock has performed all of its obligations under the Agreement.

49.     Abbott has breached its obligations to John Hancock under the Agreement, *inter alia*, by:

    (a)    misrepresenting the development status of ABT-518 to John Hancock prior to, and at the time of, the execution of the Agreement;

    (b)    misrepresenting the development status of ABT-594 to John Hancock prior to, and at the time of, the execution of the Agreement;

    (c)    misrepresenting the development status of ABT-773 to John Hancock prior to, and at the time of, the execution of the Agreement;

    (d)    misrepresenting Abbott's intended and reasonably expected expenditures on Program Related Costs in ARPs that Abbott has provided to John Hancock;

    (e)    failing to use Commercially Reasonable Efforts to develop the Program Compounds;

-21-

(f)   refusing to provide John Hancock with a copy of Abbott's modified 2005 ARP;

(g)   failing to out-license or divest itself of certain Ceased Compounds, including, without limitation, ABT-518 and ABT-594, as soon as is practicable;

(h)   unreasonably and unjustifiably hindering, delaying and obstructing John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement; and

(i)   failing to pay John Hancock one-third of the actual, unspent Aggregate Carryover Amount pursuant to Section 3.3(b) of the Agreement.

50.   By engaging in the foregoing conduct, Abbott further has breached the covenant of good faith and fair dealing that is implied by law in every contract, including the Agreement.

51.   Abbott has breached its express and implied obligations under the Agreement willfully and wantonly in order to induce John Hancock to enter into the Agreement, induce John Hancock to make various Program Payments to Abbott on the terms stated therein, and inhibit John Hancock's ability to detect and confirm Abbott's misconduct.

52.   As a result of Abbott's willful and wanton breaches of its express and implied obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, monetary damages and harm in an amount to be determined.

### COUNT III
### (Indemnification)

53.   John Hancock hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 52 of this Complaint, *supra*.

-22-

54.     Abbott has breached its representations, warranties and obligations to John Hancock under the Agreement as set forth herein.

55.     As a result of Abbott's various breaches of its representations, warranties and obligations under the Agreement, John Hancock has suffered, and likely will continue to suffer, "Losses" as defined in Section 1.27 of the Agreement. John Hancock's Losses include, without limitation, costs, damages, and other reasonable expenses such as audit charges and attorneys' fees.

56.     Abbott agreed in Section 12.6 of the Agreement to indemnify John Hancock, *inter alia*, "from and against all Losses related to or arising out of, directly or indirectly ... any breach by Abbott of its representations, warranties or obligations hereunder..."

57.     On April 1, 2005, John Hancock provided written notification to Abbott that John Hancock has sustained, and likely will continue to sustain, compensable Losses on account of Abbott's various breaches of its representations, warranties and obligations under the Agreement, for which John Hancock is entitled to indemnification pursuant to Section 12.6 of the Agreement.

58.     Notwithstanding John Hancock's request for indemnification, Abbott has refused to indemnify John Hancock for its compensable Losses.

### Prayers for Relief

WHEREFORE, John Hancock respectfully requests that the Court:

(a)     award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's fraud under Count I of the Complaint;

-23-

(b)     award John Hancock compensatory damages in an amount to be determined, plus interest and costs, for Abbott's various breaches of contract under Count II of the Complaint;

(c)     enter an order directing Abbott to indemnify John Hancock for its compensable Losses, including John Hancock's damages, costs, and other reasonable expenses such as audit charges and attorneys' fees, under Count III of the Complaint;

(d)     award John Hancock punitive damages for Abbott's willful and wanton misconduct in an amount to be determined under Counts I and II of the Complaint;

(e)     alternatively, enter an order rescinding the Agreement and restoring the *status quo ante*, including, but not limited to, directing Abbott to refund any and all Program Payments made by John Hancock, less any payments already received by John Hancock, plus interest and costs; and

-24-

(f)    grant John Hancock such other and further relief as the Court deems just and appropriate in the circumstances.

JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY AND MANULIFE INSURANCE COMPANY

By their attorneys,


/s/ Brian A. Davis
Brian A. Davis (BBO No. 546462)
Joseph H. Zwicker (BBO No. 560219)
Stacy Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Telephone: 617-248-5000

Date: October 24, 2006


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 24, 2006.


/s/ Brian A. Davis
Brian A. Davis

4131720.2

-25-

**EXHIBIT 47**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER LIFE INSURANCE COMPANY), <br><br> Plaintiffs, <br><br> v. <br><br> ABBOTT LABORATORIES, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  CIVIL ACTION NO. 05-11150-DPW |

## STIPULATION AND PROPOSED ORDER REGARDING
## CERTAIN PENDING MOTIONS AND SCHEDULING

WHEREAS on December 6, 2006, the Parties appeared before the Court regarding various pending motions, including: (1) Plaintiffs' Motion to Compel Defendant to Produce Documents and Provide Substantive Answers to Interrogatories ("John Hancock's Motion to Compel") (Docket No. 48); (2) Defendant's Motions for Protective Orders Regarding Depositions of: (a) Dr. Stanley Bukofzer, (b) Dr. Jeffrey Leiden, and (c) William Dempsey ("Abbott's Motions for Protective Orders") (Docket Nos. 53, 94 and 92); (3) Plaintiffs' Motion to Amend Supplemental Complaint ("John Hancock's Motion to Amend") (Docket No. 62); (4) Defendant's Motion to Prohibit Disclosure of Abbott's Highly Confidential Documents to Dr. William Fairweather Pursuant to Stipulated Protective Order ("Abbott's Motion to Prohibit

Disclosure") (Docket No. 72); (5) Plaintiffs' Motion for Issuance of Subpoena to Be Issued Abroad ("John Hancock's Motion for Issuance of Subpoena") (Docket No. 75); and (6) Joint Motion to Modify Scheduling Order and Set Briefing Schedule (the "Joint Scheduling Order Motion") (Docket No. 51) (collectively, the "Discovery-Related Motions");

WHEREAS the Court directed the parties to meet and confer regarding whether they could resolve the Discovery-Related Motions without the Court's intervention; and

WHEREAS after meeting and conferring with respect to the Discovery-Related Motions, as well as other matters, the Parties have reached the following agreement:

A.    RESOLUTION OF THE DISCOVERY-RELATED MOTIONS

1.    John Hancock's Motion to Compel

(a)    John Hancock agrees to narrow Requests Nos. 1-4 and 55-58 of its First Request for Production of Documents to: (i) all documents concerning Abbott's termination of ABT-773 or consideration of whether to terminate ABT-773, whether created or dated before or after the Research Funding Agreement; and (ii) documents sufficient to show the complete developmental status, and nature and extent of any material change in the safety, efficacy, scientific viability, or commercial viability, of ABT-773 for the period August 1, 2000 to March 13, 2001. Abbott agrees to produce all non-privileged documents responsive to the requests as so modified;

(b)    Abbott agrees to produce all of the documents described in subparagraph (a) above to John Hancock on a rolling basis beginning on January 31, 2006 and concluding no later than March 8, 2007;

(c)    Abbott agrees to complete its "supplemental production" of documents to John Hancock as described in Abbott's letter of December 5, 2006, no later than December 15, 2006; provided however, that Abbott is searching for additional responsive May 2001 ASCO

conference materials regarding MMPI compounds and drafting a supplemental privilege log, and will produce any such documents and the supplemental privilege log as soon as possible but in any event no later than ten (10) days prior to the deposition of Azmi Nabulsi on January 24, 2007;

(d)     John Hancock agrees to withdraw its request, pursuant to the Motion to Compel, for further documents relating to ABT-100, ABT-724, and ABT-492 pursuant to RFP Nos. 1-4 and 55-58;

(e)     John Hancock agrees to withdraw its request, pursuant to the Motion to Compel, for documents related to other compliance audits pursuant to RFP No. 14; and

(f)     John Hancock agrees to withdraw its request, pursuant to the Motion to Compel, for further answers to Interrogatory Nos. 16 and 17 of John Hancock's Second Set of Interrogatories.

2.     <u>Abbott's Motions for Protective Orders</u>

(a)     Abbott agrees to withdraw its Motion for a Protective Order regarding the deposition of Dr. Stanley Bukofzer.   Abbott agrees to make Dr. Bukofzer available for deposition on a mutually convenient date within fifty-three (53) days of completing its production of documents concerning ABT-773 and before the close of fact discovery;

(b)     Abbott agrees to withdraw its Motion for a Protective Order regarding the deposition of Dr. Jeffrey Leiden.   Abbott agrees to provide alternative dates for Dr. Leiden's deposition all within fifty-three (53) days of completing its production of documents concerning ABT-773 and before the close of fact discovery; and

(c)     Abbott agrees to withdraw its Motion for a Protective Order regarding the deposition of Mr. William Dempsey.   Following the production of Abbott's documents concerning ABT-773, the parties agree to meet and confer in good faith regarding whether Mr.

Dempsey should be deposed in this action. Abbott reserves its right to object to file a protective order to preclude the deposition of Mr. Dempsey. If Abbott voluntarily agrees to allow the deposition of Mr. Dempsey, then Abbott agrees to make him available on a mutually convenient date within fifty-three (53) days of completing its production of documents concerning ABT-773 and before the close of fact discovery. If, on the other hand, Abbott seeks a protective order and is ordered by the Court to make Mr. Dempsey available, Abbott agrees to do so, if necessary, following the close of fact discovery.

3.    John Hancock's Motion to Amend

(a)    Abbott agrees to withdraw its opposition to John Hancock's Motion to Amend. John Hancock's First Amended Supplemental Complaint shall be filed on or before December 29, 2006, and Abbott's response shall be filed on or before January 12, 2006. Abbott otherwise reserves the right to contest any and all claims asserted in John Hancock's Amended Supplemental Complaint.

4.    Abbott's Motion to Prohibit Disclosure

(a)    Abbott agrees to withdraw its Motion to Prohibit Disclosure. Abbott otherwise reserves the right to object to the testimony of Dr. Fairweather on any ground other than John Hancock's allegedly late proffer.

5.    John Hancock's Motion for Issuance of Subpoena

(a)    Abbott agrees not to oppose John Hancock's Motion for Issuance of Subpoena. Abbott further agrees to execute the agreement setting forth the conditions proposed for Dr. Azmi Nabulsi's deposition described in the letter of Stephen C. Carlson, Esq., counsel for Dr. Nabulsi, to Joseph H. Zwicker, dated December 1, 2006.

6.    Joint Scheduling Order Motion

(a)    The Parties agree to modify the existing scheduling order as follows:

-4-

| | |
|---|---|
| Completion of Abbott's Supplemental Document Production: | December 15, 2006 |
| Service of Rebuttal Expert Reports (except rebuttal to statistical issues): | January 19, 2007 |
| Service of Expert Report of Dr. William Fairweather: | January 19, 2007 |
| Service of Rebuttal Expert Report Regarding (i) Dr. William Fairweather and (ii) other reports regarding statistical issues: | February 19, 2007 |
| Abbott's Completion of Document Production Regarding ABT-773: | March 8, 2007 |
| Completion of Fact Discovery: | April 30, 2007 |
| Completion of Expert Discovery: | May 29, 2007 |
| Filing of Motions for Summary Judgment: | June 29, 2007 |
| Filing of Oppositions to Motions for Summary Judgment: | July 31, 2007 |
| Filing of Replies to Oppositions: | August 21, 2007 |
| Status Conference: | To Be Determined By The Court |

B.    RESOLUTION OF OTHER ISSUES

1.    Depositions

(a)    The parties agree that each side may take a total of twenty-three depositions, provided however that a party may take up to twenty-five depositions if it believes in good faith it is necessary to discover non-cumulative relevant evidence;

(b)    The parties agree that, with the exception of the deposition of Dr. Azmi Nabulsi, all presently scheduled depositions shall be taken off calendar and re-noticed. The parties agree to work cooperatively to select mutually convenient dates for each such deposition;

(c)    John Hancock will provide Abbott with a list of deponents anticipated to provide testimony regarding ABT-773 (and other issues) within 14 days of Abbott's completion

of its document production concerning ABT-773. Except with respect to Mr. William Dempsey as provided herein, and subject to a reservation of rights to object to the deposition of any witnesses, Abbott agrees to complete the depositions of deponents who are current Abbott employees or represented by Abbott counsel on or before the close of fact discovery;

(d)    John Hancock agrees to provide Abbott with a list of deponents anticipated to provide testimony on subjects other than ABT-773 within a reasonable time after completion of Abbott's Supplemental Production on December 15, 2006. The parties agree to work cooperatively to begin scheduling depositions of these witnesses in January 2007;

(e)    John Hancock agrees not to seek attorney's fees and costs related to the continued deposition of Diane D'Amico on November 28, 2006;

(f)    Abbott agrees to permit John Hancock to reopen the depositions of Marilyn Collicott and Bruce McCarthy for the limited purpose of examining them with respect to documents produced after the date of their original depositions and any topics reasonable related thereto;

(g)    Abbott agrees to permit John Hancock to reopen the deposition of John Leonard for the limited purpose of examining him with respect to ABT-773 and/or documents produced after the date of his original deposition and any topics reasonably related thereto;

(h)    John Hancock agrees to permit Abbott to reopen the deposition of Stephen Blewitt and Lynn Klotz for the limited purpose of examining them concerning ABT-773 and/or documents responsive to Abbott's First Request for Production that are produced after the date of their original depositions and any topics reasonably related thereto;

(i)    John Hancock agrees to permit Abbott to reopen the deposition of Mark Hair and Chris Martinez for the limited purpose of examining them with respect to any

documents responsive to Abbott's First Request for Production that are produced after the date of their original depositions and any topics reasonably related thereto;

(j)    The parties agree to use their good faith best efforts to complete any reopened deposition in four (4) hours or less of questioning; and

(k)    The parties agree to bear their respective attorney's fees and costs incurred in connection with any reopened deposition, and that no reopened depositions shall count towards any party's total number of permitted depositions as set forth in paragraph B.1(a) above.

2.    Abbott's Third Set of Requests For Production of Documents.    John Hancock agrees to respond and object to Abbott's Third Set of Requests on or before December 15, 2006. Pursuant to its response, John Hancock shall produce documents responsive to Abbott's Third Set of Requests (to the extent they have not already been produced in this litigation) on or before December 29, 2006.

3.    StoneTurn Documents.    John Hancock agrees to produce certain documents regarding StoneTurn work with respect to the compliance audit which are responsive to Abbott's First Request for Production of Documents and have not already been produced in this litigation on or before December 29, 2006, namely, the documents identified in the December 5, 2006 letter from Eric Lorenzini to Richard Abati, on or before December 29, 2006. Abbott agrees that production of the documents identified in the December 5, 2006 letter shall not constitute a waiver of any claim of attorney-client privilege, work product, or any other privilege by John Hancock or StoneTurn with respect to such documents, or any other materials or information.

ABBOTT LABORATORIES

By its attorney,


/s/ Michael S. D'Orsi
Peter E. Gelhaar (BBO No. 188310)
Michael S. D'Orsi (BBO No. 566960)
DONNELLY, CONROY & GELHAAR LLP
1 Beacon Street, 33rd Floor
Boston, MA 02108
Tele: (617) 720-2880


/s/ Jeffrey I. Weinberger
Jeffrey I. Weinberger
Gregory D. Philips
Munger, Tolles & Olson
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90012
Tele: (213) 683-9276


JOHN    HANCOCK    LIFE    INSURANCE
COMPANY, JOHN HANCOCK VARIABLE
LIFE    INSURANCE    COMPANY    and
MANULIFE INSURANCE COMPANY

By their attorneys,


/s/ Brian A. Davis
Brian A. Davis (BBO No. 546462)
Joseph H. Zwicker (BBO No. 560219)
Richard C. Abati (BBO No. 6510370
Stacy L. Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Tele: (617) 248-5000


IT IS SO ORDERED.


Date: _____        _____
                                   United States District Court Judge

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent to those non-registered participants (if any) on December 21, 2006.

/s/ Richard C. Abati
Richard C. Abati

4152328v5