# CHOATE

CHOATE HALL & STEWART LLP

September 21, 2007

Brian A. Davis, P.C.
(617) 248-5056
bad@choate.com

BY HAND AND ELECTRONICALLY

The Honorable Douglas P. Woodlock
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
John Joseph Moakley U.S. Courthouse, Suite 4110
One Courthouse Way
Boston, Massachusetts 02210

Re:   John Hancock Life Insurance Company, *et al.*
      v. Abbott Laboratories
      U.S.D.C. (Mass.) Civil Action No. 05-11150-DPW

Dear Judge Woodlock:

I write on behalf of plaintiffs John Hancock Life Insurance Company, *et al.* (collectively, "John Hancock"), as instructed by the Court at our conference on September 19, to alert the Court to a recent decision of the Court of Appeals for the Seventh Circuit, River East Plaza, LLC v. The Variable Annuity Life Company, 2007 WL 2377383 (7th Cir. Aug. 22, 2007), that bears upon the enforceability of Section 3.3(b) of the Research Funding Agreement (the "Agreement").

As Your Honor may recall, Section 3.3(b) of the Agreement is the focus of defendant Abbott Laboratories' pending Motion to Dismiss, dated July 17, 2006 (Docket No. 30), and John Hancock's pending Cross-Motion for Partial Summary Judgment, dated September 8, 2006 (Docket No. 41). Section 3.3(b) provides that "[i]f Abbott does not spend the Aggregate Carryover Amount on Program Related Costs" by the end of calendar year 2005, "Abbott will pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days after the end of such ... year." It is undisputed in this proceeding that Abbott *did not* spend the full Aggregate Carryover Amount (which is defined in Section 1.3 of the Agreement as "Six Hundred Fourteen Million Dollars ($614,000,000)") by the end of 2005, and that Abbott

Letter to Hon. Douglas P. Woodlock
UNITED STATES DISTRICT COURT
September 21, 2007
Page 2

has not made the resulting one-third payment to John Hancock.[1]  Hancock seeks the enforcement of Section 3.3(b) according to its plain terms.

Your Honor previously questioned, however, "whether or not there are perverse incentive structures in this contract that make it unreasonable for me to construe it in the fashion that Hancock wants me to construe it," and requested further briefing on that issue.  Transcript of December 6, 2006 Hearing - Morning Session, p. 34; Transcript of December 6, 2006 Hearing - Afternoon Session, p. 47-48.  John Hancock specifically addressed why it *would not* be unreasonable, under governing Illinois law, to apply Section 3.3(b) according to its terms in a letter brief filed with the Court on December 13, 2006 (Docket No. 98).  Abbott argued to the contrary, relying heavily upon the decision of the District Court for the Northern District of Illinois in Automotive Finance Corp. v. Ridge Chrysler Plymouth L.L.C., 219 F.Supp.2d 945 (2002).  *See* Abbott's Supplemental Memorandum In Support Of Its Motion To Dismiss And In Opposition To Hancock's Motion For Partial Summary Judgment, dated December 13, 2006 ("Abbott's Letter Brief," Docket No. 99), pp. 3-4, 8, and 10.  Since the parties completed their briefing, the Seventh Circuit has issued its decision in River East Plaza (a copy of which is appended to this letter at Tab 1 for the Court's convenience), which specifically addresses the legal question raised by Your Honor and provides further direct support for John Hancock's position.

The appeal in River East Plaza followed a bench trial in which plaintiff River East, an Illinois real estate developer, claimed that the prepayment provision contained in its $12.7 million commercial mortgage loan agreement with defendant The Variable Annuity Life Insurance Company ("VALIC") constituted an "unenforceable penalty clause."  River East Plaza, LLC v. The Variable Annuity Life Company, 2006 WL 2787483, at *5 (N.D. Ill. Sept. 22, 2006).  The loan agreement plainly stated that a fee equal to one percent of the outstanding principal balance or the present value of all unpaid loan installments discounted at a rate equal to the yield on Treasury bonds having a comparable maturity date, whichever amount was greater, would be due at the time of prepayment.  *Id.* at *2-3.  Three years after entering into the twenty-year loan, River East decided to sell the mortgaged property.  *Id.* at *5.  VALIC demanded a $4.71 million prepayment fee, which VALIC calculated by discounting the unpaid installments due at the then-current Treasury bill rate.  *Id.*  River East proceeded with the sale and paid the prepayment fee, but simultaneously challenged it in court as an unenforceable penalty.  *Id.*  The district court, applying a liquidated damages analysis in reliance upon Automotive Finance, *supra*, agreed with River East and reduced the prepayment fee to $123,012.15 (*i.e.*, one percent of the principal balance of the loan).  *Id.* at *8.  It ruled

---

[1] In light of Abbott's recent attempt to revise its discovery responses, after the close of discovery, to change the reported amount of its historical spending on Program Related Costs, the full extent to which Abbott missed the Aggregate Spending Target is subject to dispute.  Abbott's *liability* to John Hancock under Section 3.3(b), however, still can be determined as a matter of law.

Letter to Hon. Douglas P. Woodlock
UNITED STATES DISTRICT COURT
September 21, 2007
Page 3

that the alternative Treasury-bill based prepayment formula set forth in the loan agreement "was not reasonable at the time of contracting," "did not bear some relationship to the damages that might have been sustained," and, therefore, was "a penalty and ... unenforceable." *Id.* at *12.

On appeal by VALIC, the Seventh Circuit reversed the decision of the district court. River East Plaza, 2007 WL 2377383 at *9. In doing so, Court of Appeals explicitly criticized the district court's reliance on Automotive Finance "for the proposition that Illinois would have considered the case under a liquidated damages framework," stating that "Automotive Finance makes no such conclusion." *Id.* at *6. The Court further stated that,

> [c]ertainly under any ordinary view of the contract's unambiguous terms, the prepayment is not a breach: the parties explicitly provided that River East would be allowed to prepay.

*Id.* at *5.

The Court of Appeals ruled instead that "the underlying question is whether this clause is punitive in nature," citing a string of federal and state court decisions which hold, under Illinois law, that when "'the *sole purpose* of the clause is to secure performance of the contract, the provision is an unenforceable penalty.'" 2007 WL 2377383 at *3 (citations omitted, emphasis added). The Court went on to hold that "[p]enalties, or liquidated damages clauses in general, are distinct from alternative forms of performing the obligations under the contract," and that "[i]n determining whether a contract is one for alternative performances, the relative value of the alternatives may be decisive," citing comment (c) to Section 356 of the Restatement (Second) of Contracts, which was adopted by the Illinois Supreme Court in Bauer v. Sawyer, 134 N.E.2d 329, 333 (1956). *Id.* Because the prepayment clause in the VALIC loan agreement allowed River East to actually *reduce* its total interest payments over the life of the loan by millions of dollars, the Court of Appeals found that "River East seems to have benefited from this bargain," and that the provision 'hardly seems to be a clause whose 'sole purpose is to secure performance of the contract.'" *Id.* at *4. It concluded, "[i]n short, viewing the contract in light of Illinois's reliance on the Restatement, we find nothing to suggest that the clause is an unenforceable penalty." *Id.* at *5.

The law and the reasoning that the Seventh Circuit employed in River East Plaza is directly applicable to the facts of this case. Section 3.3(b) of the Agreement between John Hancock and Abbott -- which is titled simply "Carryover Provisions" -- does not purport to be, and cannot reasonably be construed as, a liquidated damages provision, and Abbott's reliance on Automotive Finance in support of its arguments to the contrary

Letter to Hon. Douglas P. Woodlock
UNITED STATES DISTRICT COURT
September 21, 2007
Page 4

suffers from the same flawed analysis. See Abbott's Letter Brief, pp. 3-4, 8, and 10. "Under any ordinary view of the [Agreement's] unambiguous terms," Abbott's failure to spend the entire Aggregate Carryover Amount on Program Related Costs by the end of calendar year 2005, thereby triggering its obligations under that provision, "is not a breach." 2007 WL 2377383 at *5. Rather, Section 3.3(b) provides for an "alternative performance" whereby the parties would reallocate the amount of financial risk and cost that each party would bear in the event that Program Related Costs over the four-year Program Term and the fifth "subsequent year" fell short of the Aggregate Spending Target. Id. at *3. And like the plaintiff in River East Plaza, Abbott *benefits* from the application of Section 3.3(b) because it expressly permits Abbott to retain two-thirds of each dollar that it otherwise would have expended on Program Related Costs during that period. Thus, rather than imposing a *penalty* on Abbott for failing to meet the Aggregate Spending Target within the time allotted, Section 3.3(b) actually provides Abbott with an *incentive* not to waste the parties' combined R&D dollars by permitting Abbott to keep the lion's share of the unspent funds. Given these indisputable facts, it simply cannot be said "the sole purpose" of Section 3.3(b) is "to secure [Abbott's] performance" of the Agreement, or that Section 3.3(b) reasonably can be regarded as an "unenforceable penalty." Id. at *4.

Thank you for the opportunity to bring the River East Plaza decision to Your Honor's attention, and thank you for your further consideration of this matter.

Very truly yours,

Brian A. Davis

Attachment

cc:  Jeffrey I. Weinberger, Esq. (by electronic and regular mail)
     Peter E. Gelhaar, Esq. (by electronic and regular mail)
     Michael S. D'Orsi, Esq. (by electronic and regular mail)

4253495.1

# Tab 1

Westlaw.

--- F.3d ----    Page 1
--- F.3d ----, 2007 WL 2377383 (C.A.7 (Ill.))

(Cite as: --- F.3d ----)

H
River East Plaza, L.L.C. v. Variable Annuity Life Ins. Co.
C.A.7 (Ill.),2007.
Only the Westlaw citation is currently available.
United States Court of Appeals,Seventh Circuit.
RIVER EAST PLAZA, L.L.C., formerly known as MCL Clybourn Square South, L.L.C., Plaintiff-Appellee,
v.
The VARIABLE ANNUITY LIFE INSURANCE COMPANY, Defendant-Third Party Plaintiff-Appellant,
v.
Daniel E. McLean, Third Party Defendant-Appellee.
No. 06-3856.

Argued April 11, 2007.
Decided Aug. 22, 2007.

**Background:** Development company brought action against mortgagee, challenging imposition of prepayment fee upon sale of subject commercial property. Following bench trial, the United States District Court for the Northern District of Illinois, John W. Darrah, J., 2006 WL 2787483, granted judgment in favor of company. Mortgagee appealed.

**Holding:** The Court of Appeals, Kanne, Circuit Judge, held that prepayment clause was fully enforceable.

Reversed and remanded.

[1] Mortgages 266 ⇌298(1)

266 Mortgages
   266VII Payment or Performance of Condition, Release, and Satisfaction
      266k298 Payment of Debt
         266k298(1) k. In General. Most Cited Cases
Prepayment clause within commercial mortgage, requiring payment of fee upon sale of property before term of mortgage expired, was not unenforceable penalty under Illinois law; by electing option to pay early, mortgagor avoided expending $13 million in remaining interest payments that would have been due through loan's duration.

[2] Damages 115 ⇌76

115 Damages
   115IV Liquidated Damages and Penalties
      115k75 Construction of Stipulations
         115k76 k. In General. Most Cited Cases
When sole purpose of liquidated damages clause is to secure performance of contract, provision is unenforceable penalty under Illinois law.

[3] Contracts 95 ⇌147(2)

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k147 Intention of Parties
            95k147(2) k. Language of Contract. Most Cited Cases

Contracts 95 ⇌176(2)

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k176 Questions for Jury
            95k176(2) k. Ambiguity in General. Most Cited Cases
Under Illinois law, intention of parties to contract must be determined from instrument itself, and construction of instrument where no ambiguity exists is matter of law.

Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 03 C 4354-John W. Darrah, Judge.

Arthur M. Holtzman, Pedersen & Houpt, Chicago, IL, for Plaintiff-Appellee.
George Eric Brunstad, Jr., Bingham McCutchen, Hartford, CT, for Defendant-Appellant.

Before CUDAHY, KANNE, and WOOD, Circuit Judges.
KANNE, Circuit Judge.
*1 This diversity case involves a loan used to finance a significant commercial real estate development. When the borrower sold the property and pre-paid the loan, it balked at paying a "prepayment fee" according to the terms of the note. The borrower

--- F.3d ----    Page 2
--- F.3d ----, 2007 WL 2377383 (C.A.7 (Ill.))
(Cite as: --- F.3d ----)

eventually paid the fee, subject to a reservation of rights, and sued the lender. After a bench trial, the district court entered judgment in favor of the borrower and the lender now appeals. For the reasons set forth below, we reverse the judgment of the district court and remand the case for further proceedings.

River East Plaza, L.L.C. (River East) is a real estate developer.[FN1] Third party defendant Daniel E. McLean is the president of River East. River East had worked with another party to develop a large retail store on the north side of Chicago. In 1999, the other developer offered to sell its share of the project to River East for roughly $12 million. River East, through a mortgage broker, shopped around for a loan to allow it to buy out the other developer's share. Variable Annuity Life Insurance Company (VALIC) offered to meet River East's demand for a closing date before the end of the year and agreed to an interest rate that River East wanted. Among the other terms of VALIC's offer was a "yield maintenance" prepayment clause. A yield maintenance prepayment clause is an attempt to ensure that prepayment does not deprive the lender of the yield that they bargained for over the life of the loan.

The final version of the note contained a yield maintenance calculation which the parties describe as "Treasury-flat." To arrive at the amount of the yield maintenance fee in the event that River East decided to prepay, the parties would need to know the outstanding principal as of the date of prepayment and the scheduled loan payments from that date to maturity. They would also need to determine the prevailing interest rate on United States Treasury bonds or notes maturing closest to the loan's maturity date of January 2020 ("Treasuries"). With those three amounts in hand, the clause calculates the difference between the scheduled payments and potential interest if the prepaid principal were invested in Treasuries. That amount is compared to an amount equal to one percent of the outstanding principal. The *larger* of these two numbers is then compared with the highest rate allowed by law, and the *lesser* of those two numbers is the yield maintenance fee. In short, the remaining interest due under the note is discounted by the current interest rate on Treasuries. The provision is described as Treasury-flat because parties can (and apparently occasionally do) negotiate a discount rate that is different from the Treasury yield.

Some examples are in order. If River East decided to exercise the privilege of prepayment and interest rates had fallen since the time that the loan was funded, River East would be on the hook to pay VALIC the difference between what VALIC *would have* received in interest over the life of the loan and what VALIC *could receive* by investing the prepaid principal into Treasuries. Assuming that VALIC placed the unexpected principal into Treasuries and received the prepayment fee from River East, the expected yield that VALIC bargained for would be "maintained" by River East supplementing the interest on the reinvested funds with the prepayment fee. If, however, River East prepaid the loan and interest rates had risen substantially in the interim, the interest on the Treasuries would presumably exceed the interest rate called for in the loan and the prepayment fee would equal the minimum fee of one percent of the outstanding principal. But in no case would the fee exceed the maximum interest rate allowed by law.

*2 The parties dickered over several of the terms in the note. River East sought to have the yield maintenance fee removed, but VALIC refused. Prior to closing, River East's counsel offered to both parties a seven-page opinion letter that, among many other opinions, "express[ed] no opinion as to the enforceability of any provision ... providing for a prepayment premium in the event ... such premium is held to be a penalty." Appellant's App. at 183F. Nevertheless, the parties went forward with the closing.

Several years later, River East sought to sell the property. The tenant had a right of first refusal, and offered to purchase the property. But the tenant would not assume the loan. River East eventually sold the property to the tenant and prepaid the loan.

The parties then began to dispute the size and enforceability of the prepayment penalty. River East eventually paid the penalty under protest, and brought suit in the state courts of Illinois. VALIC removed the case to the federal district court and counter-claimed against River East and McLean for costs and fees. The parties agree that, due to a mathematical error, VALIC's agent had overcharged River East by nearly one million dollars when it computed the prepayment fee. VALIC returned the overcharge, with interest, but the parties still dispute whether the amount returned was the correct amount.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----

--- F.3d ----, 2007 WL 2377383 (C.A.7 (Ill.))

(Cite as: --- F.3d ----)

Page 3

The district court conducted a bench trial, and entered judgment in favor of River East on the question of whether the prepayment fee was enforceable under Illinois law. The district court did not enter judgment on the question of whether VALIC had accurately returned the overcharge (that question being moot due to the court's first holding), and the court dismissed VALIC's cross-claim. This appeal followed.

VALIC appeals the judgment entered after a bench trial. We review the district court's findings of fact for clear error and review legal conclusions *de novo.* *Trustmark Ins. Co. v. General & Cologne Life Re of America,* 424 F.3d 542, 551 (7th Cir.2005). A federal court sitting in diversity applies the substantive law of the state in which the district resides. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). When the highest court in the state has spoken on a question of law, we apply that rule.*Reiser v. Residential Funding Corp.,* 380 F.3d 1027, 1029 (7th Cir.2005). When the highest court has not spoken, we attempt to predict how the highest court would hold. *Id.*

We have three questions before us on the appeal. First, whether the prepayment clause is enforceable under Illinois law. Second, if the clause is enforceable, whether the amount refunded by VALIC was the correct amount. Third, again only if the clause is enforceable, whether River East or McLean owes costs and fees to VALIC.

*A. Enforceability of the Prepayment Fee*

[1] Yield maintenance prepayment clauses are nothing new. *See* Dale A. Whitman, *Mortgage Prepayment Clauses: A Legal and Economic Analysis,* 40 UCLA L.REV. 851, 871 (1993). The idea behind a yield maintenance clause is to protect a lender during times when interest rates are falling. " Yield maintenance formulas are calculated to cover the lender's reinvestment loss when prepaid loans bear above-market rates." George Lefcoe, *Yield Maintenance and Defeasance: Two Distinct Paths to Commercial Mortgage Prepayment,* 28 REAL EST. L.J. 202, 202 (2000). A lender who makes a long-term loan expecting a particular rate of interest runs the risk that prepayment during a period of lower interest rates will reduce its income. VALIC argues that some lenders, itself included, need to be able to rely on predictable payments in order to live up to their other financial and regulatory obligations. When the loans in question are measured in eight digit figures, as in this case, the lost interest income can be substantial.

*3 One method that lenders might use to guard against this risk is to refuse to allow borrowers to prepay the loan. *See* Restatement (Third) Prop. (Mortgages) § 6.2 (1997) (" an agreement that prohibits payment of the mortgage obligation prior to maturity is enforceable" ). Or lenders might charge a fixed fee, a percentage of the loan balance, or a declining percentage of the loan balance. *Whitman,* 40 UCLA L.REV. at 871. However, assuming that the borrower would like the privilege of prepaying the loan instead of being locked in for its entire term, fees based on fixed numbers or the loan balance do not take into account long-term fluctuations in interest rates. Hence the development of yield maintenance clauses: formulas that attempt to account for the expected interest, the outstanding principal, and fluctuations in prevailing interest rates.

We should note at the outset that the parties are unable to agree on the legal standard that Illinois courts would apply to this question. River East maintains that Illinois would analyze the prepayment fee under a liquidated damages analysis. Appellee's Br. at 17-31. VALIC argues that Illinois would consider the clause to be a bargained-for form of alternative performance. Appellant's Br. at 16-19. The district court applied Illinois's liquidated damages analysis but did not cite any Illinois cases to support that decision.*River East Plaza, L.L. C. v. Variable Annuity Life Co.,* No. 03 C 4354, 2006 WL 2787483 at *8-9 (N.D.Ill. Sep.22, 2006).

The parties can point us to no case from the Illinois Supreme Court that establishes a rule of law for the enforceability of prepayment fees in commercial real estate loans, and we are unable to find one. Illinois has placed statutory limitations on the ability of lenders to charge prepayment fees, but those provisions apply only to certain residential mortgages. *See*815 ILL. . 205/4. River East argues that " the Illinois Supreme Court has adopted the Restatement of Contract's prohibition against penalty clauses." Appellee's Br. at 19 (citing *Bauer v. Sawyer,* 8 Ill.2d 351, 134 N.E.2d 329, 333 (1956)). VALIC appears not to take issue with this statement of the law. But we should note that *Bauer* was not a case concerning mortgage prepayment, and it specifically cited to Section 356(1) of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                                              Page 4
--- F.3d ----, 2007 WL 2377383 (C.A.7 (Ill.))

(Cite as: --- F.3d ----)

Restatement, which stands more precisely for the proposition that some liquidated damages clauses are void as against public policy because they are penalties. RESTATEMENT (SECOND) OF CONTRACTS § 356(1) (" A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty." ). The comments to the Restatement clarify: " Punishment of a promisor for having broken his promise has no justification on either economic or other grounds and a term providing such a penalty is unenforceable on grounds of public policy." REST.2D CONTR. § 356(1) cmt. a.

[2] If we start from the position that Illinois will not enforce penalty clauses, and that Illinois recognizes that some liquidated damages clauses cross the line and become penalty clauses in disguise, the underlying question is whether this clause is punitive in nature. " [W]hen the sole purpose of the clause is to secure performance of the contract, the provision is an unenforceable penalty." Checkers Eight Ltd. P'ship v. Hawkins, 241 F.3d 558, 562 (7th Cir.2001) (citing Am. Nat'l Bank & Trust Co. of Chi. v. Reg'l Transp. Auth., 125 F.3d 420, 440 (7th Cir.1997); Med+Plus Neck & Back Pain Ctr., S.C. v. Noffsinger, 311 Ill.App.3d 853, 244 Ill.Dec. 712, 726 N.E.2d 687, 693 (Ill.App.Ct.2000)). Penalties, or liquidated damages clauses in general, are distinct from alternative forms of performing the obligations under the contract. See JOHN D. CALAMARI & JOSEPH M. PERILLO, CONTRACTS § 14-34 (3d ed.1997). In order to distinguish between the two, " a court will look to the substance of the agreement to determine whether ... the parties have attempted to disguise a provision for a penalty that is unenforceable.... In determining whether a contract is one for alternative performances, the relative value of the alternatives may be decisive." RESTATEMENT SECOND OF CONTRACTS § 356 cmt c.

*4 Using the Restatement as a guide, we will first consider the " relative value of the alternatives" to see if they are decisive. All of the figures that follow (although rounded for ease of reading) come from the stipulated facts dated February 14, 2005 that the parties agreed on, and which the district court adopted. River East borrowed $12.7 million from VALIC at 8.02% interest. If River East had paid as scheduled over the course of twenty years, it would have paid roughly $16.4 million in interest to VALIC before the note matured in 2020. By July 2003, when River East prepaid the loan subject to reservation of rights, the outstanding principal remained over $12 million, and River East had already paid roughly $3.45 million in interest. On July 1, 2003, River East paid slightly more than $4.7 million in prepayment fees, but that sum was reduced to approximately $3.9 million while this litigation was pending when VALIC reimbursed the overcharge.

Looking at the relative value of the alternatives, we are not convinced that the parties used this clause to disguise a penalty that is unenforceable. By electing an option to pay early, River East avoided paying the $13 million in remaining interest payments that would have been due between 2003 and 2020, and instead paid only $3.9 million. Even assuming, due to the time value of money, that the $3.9 million was worth more in 2003 than it would have been worth over the course of the loan, River East seems to have benefitted from this bargain. This hardly seems to be a clause whose " sole purpose is to secure performance of the contract." Checkers Eight, 241 F.3d at 562. Note, for example, that this prepaid interest is automatically reduced by the operation of the discount rate in the prepayment clause: River East was not obligated to pay any of the forgone interest that VALIC could have earned back by investing the returned principal in Treasuries.

But what of the " relative value of the alternatives" to VALIC? River East makes much of the fact that VALIC was " overcompensated" by the prepayment clause. Appellee's Br. at 1, et seq. Of course, a value-laden term such as " overcompensated" only begs the question of " compared to what?" It certainly cannot be the case that VALIC was overcompensated by receiving more from River East than it contracted for. It contracted to receive $16.4 million over twenty years. Loan amortization being what it is, that income from interest would have been front-loaded into the first half of the loan term. Instead, VALIC received $3.45 million over three years and an additional $3.9 million in year four. River East also does not make the argument that the prepayment overcompensated VALIC compared to what the prepayment clause required. We recognize that there is a second question at play here, regarding whether VALIC's agent properly calculated the payoff amount, which was the subject of count two of the complaint. More on that later. But whether VALIC's agent incorrectly calculated the figure in 2003 cannot be the grounds for arguing that the clause was unenforceable as written in December 1999.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----  Page 5
--- F.3d ----, 2007 WL 2377383 (C.A.7 (Ill.))
(Cite as: --- F.3d ----)

*5 Instead, River East relies on a clever argument that VALIC is overcompensated because VALIC can now, if it so chooses, reinvest the returned principal and eventually get an even greater income stream from somebody else than it would have received from River East. This argument is worth considering in more detail. The prepayment provision is termed " Treasury-flat." This means that VALIC's 8.02% interest rate was discounted by the prevailing rate on Treasuries as of the date that River East elected to prepay. As we noted above, the unwritten assumption in such a formula is that VALIC can take the returned principal, invest it in Treasuries, and by taking the income from the Treasuries and adding it to the prepayment fee, VALIC gets the exact return it expected from the loan. Reality, we might suspect, will be different. One might believe, and expert testimony at trial supported this belief, that interest rates on commercial real estate loans will almost always exceed the interest rates on Treasuries. This spread in interest rates gives VALIC a chance to profit from the prepayment. The argument goes that sophisticated lenders like VALIC will not invest the returned principal in Treasuries, but will simply line up a new commercial real estate loan. But there is an irony to this argument. In trying to argue that the prepayment clause is a penalty, which by definition is a clause whose sole purpose is to secure the performance of the contract, River East argues that VALIC would have been effectively *worse* off if the contract had been repaid over the term of the loan instead of prepaid.

In short, viewing the contract in light of Illinois's reliance on the Restatement, we find nothing to suggest that the clause is an unenforceable penalty. Under Illinois law, the loan could have explicitly prohibited any prepayment whatsoever. River East desired the option to prepay. VALIC accommodated that desire and included a Treasury-flat yield maintenance prepayment fee. River East voluntarily prepaid, and by doing so River East escaped paying $13 million in interest over seventeen years by prepaying $3.8 million in 2003. VALIC received its principal, and was free to either reinvest it in Treasuries (in which case it would be no worse off), hold it as cash (in which case its income would be less than bargained for from River East), or invest it in additional real estate mortgages with their attendant higher risks of default. The relative value of the alternatives for both parties leads us to believe that the clause is not punitive in nature.

River East and the district court believe that Illinois courts would apply the rubric of liquidated damages to determine if the prepayment clause is unreasonable. As River East notes in its brief, Illinois follows the Restatement in holding that " [d] amages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss." RESTATEMENT SECOND OF CONTRACTS § 356; see also Bauer, 134 N.E.2d at 333. Certainly under any ordinary view of the contract's unambiguous terms, the prepayment is not a breach: the parties explicitly provided that River East would be allowed to prepay. The fee for prepaying seems a long stretch from damages for a breach if both parties entered the contract believing that the contract allowed River East to prepay.

*6 Nevertheless, it is conceivable that a state might use the law of liquidated damages as some sort of analogy to determine whether the prepayment clause is a penalty as opposed to alternative performance. As we noted above, we find nothing in decisions of Illinois courts to indicate that this is the case in Illinois. The Illinois cases that the parties have drawn to our attention are silent on the question.

The only case that uses the term is clearly off-topic. In *Goodyear Shoe Mach. Co. v. Selz, Schwab & Co.,* 51 Ill.App. 390 (Ill.App.Ct.1894), the court applied a liquidated damages analysis to a prepayment discount for early payment of amounts owed under a royalty agreement. Holding that a fifty percent discount for paying a bill two weeks early was only a device to disguise a late payment fee of one hundred percent, the court examined the reasonableness of a one hundred percent late payment fee under a liquidated damages analysis. This seems awfully flimsy precedent to support the argument that " prepayment provisions are analyzed as liquidated damages clauses." Appellee's Br. at 22.

Even the law review article that River East cites to support its argument contradicts River East's position. Appellee's Br. at 20 (citing 40 UCLA L.REV. 851, 889-90). In surveying the legal landscape of how state courts confront prepayment clauses, Professor Whitman observes that " state courts have ignored the law of liquidated damages (perhaps appropriately) when faced with the issue of the validity of prepayment fee clauses." 40 UCLA L.REV. at 889. Professor Whitman continues: " a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----   Page 6
--- F.3d ----, 2007 WL 2377383 (C.A.7 (Ill.))
(Cite as: --- F.3d ----)

freely-bargained prepayment fee clause ought to be enforced against the borrower who makes a voluntary prepayment, irrespective of the amount of money that the lender's clause demands." *Id.* at 890. After concluding that such clauses likely are, in a theoretical sense, liquidation of damages, Professor Whitman concludes that the "confusing pastiche" of liquidated damages laws should be ignored by courts, a result that is "consistent with nearly all of the nonbankruptcy cases involving voluntary prepayments." *Id.*

Nevertheless, the district court relied on a federal case, *Automotive Fin. Corp. v. Ridge Chrysler Plymouth, LLC,* 219 F.Supp.2d 945 (N.D.Ill.2002), for the proposition that Illinois would have considered the case under a liquidated damages framework. *Automotive Finance* makes no such conclusion. The court in *Automotive Finance* emphasized, as we did above, that the real question is whether the clause is a penalty intended to secure performance. *Id.* at 949 ("[T]he real question is not whether [the clause] sets out damages for a breach, but rather whether that paragraph calls for payment of an unenforceable penalty."). The court was careful to note that it was invoking a "comparison" to the law of liquidated damages, and called cases comparing liquidated damages to penalties "an apt analogy." *Id.* at 949-50.

*7 The court in *Automotive Finance* cited to this court's precedent of *In re LHD Realty Corp.,* 726 F.2d 327, 330 (7th Cir.1984). We should observe that *LHD Realty* seems particularly off-topic here for three reasons: it was a bankruptcy case, the lender accelerated the note instead of the borrower voluntarily prepaying, and the court never purported to be relying on Illinois law. *Id.* But even if an Indiana bankruptcy case should be found persuasive for an Illinois voluntary prepayment, we observe that our holding in *In re LHD Realty* that "reasonable prepayment penalties are enforceable" was modified by the district court in *Automotive Finance* to read "*only* reasonable prepayment penalties are enforceable." 219 F.Supp.2d at 949 (citing *In re LHD Realty,* 726 F.2d at 330) (emphasis added).

River East considers the clause unreasonable because the lender will almost always be able to re-lend the principal at a rate higher than the Treasury rate, because commercial real estate loans frequently carry a rate higher than the treasury rate. River East notes that many players in the industry have adjusted their prepayment clauses to account for some of that cushion between the Treasury rate and the loan's rate by adding twenty-five or more basis points to the discount rate. But this only shows that lenders and borrowers are involved in a market where the relative risk of "breach" (if we were to make an analogy to damages) is weighed against the potential fluctuations of interest rates, regulatory pressures faced by insurers like VALIC, long-term risk of depressed real estate markets, availability of suitable replacement property owners, and any of a myriad other factors. But even the lenders who are most generous, by adding twenty-five or fifty basis points to the Treasuries, would have made an "unreasonable" fee according to River East's argument because the fee would allow them to recover more from their future investments than they would have from the original borrower.

[3] River East includes a make-weight argument that the parties never intended to agree to the clause. This claim should never have been allowed to proceed to trial. "The intention of the parties to contract must be determined from the instrument itself, and construction of the instrument where no ambiguity exists is a matter of law." *Farm Credit Bank of St. Louis v. Whitlock,* 144 Ill.2d 440, 163 Ill.Dec. 510, 581 N.E.2d 664, 667 (Ill.1991). Even if the parol evidence were allowed and credited, it falls far short of establishing that the parties did not intend to be bound by the prepayment clause. An opinion letter from a party's lawyer, which itself "expresses no opinion" on the enforceability of a term, is a poor excuse for evidence that the party did not intend to be bound. This is particularly true in light of the fact that the parties went forward with the closing despite the opinion letter. The fact that a party would have preferred a different term does not make a clause in the contract unilaterally voidable at a later date.

*8 In short, we hold that VALIC is entitled to judgment as a matter of law on River East's first count of the complaint. We are convinced that a contrary result would have broad implications for both lenders and borrowers of mortgage-secured loans in Illinois, and might inadvertently effect a wide-ranging alteration of the law of real estate financing in Illinois. "The responsibility for making innovations in the common law of Illinois rests with the courts of Illinois, and not with the federal courts in Illinois." *Lake River Corp. v. Carborundum Co.,* 769 F.2d 1284, 1289 (7th Cir.1985). Accordingly, we must reverse the judgment of the district court with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----  
--- F.3d ----, 2007 WL 2377383 (C.A.7 (Ill.))  
(Cite as: --- F.3d ----)

Page 7

respect to count one of River East's complaint.

### B. The Overcharge Dispute

When River East gave final notice that it intended to prepay the loan, VALIC's agent prepared a payoff statement that included the prepayment fee. Unfortunately, that agent miscalculated the fee by nearly one million dollars. This fact did not come to light until discovery, at which point River East amended its complaint to add a second count for breach of contract for the overcharge. The parties are unable to agree on the exact date that River East gave notice. It turns out that this question of fact carries a price tag of nearly $1600. The parties stipulated that if River East gave notice on April 21, then VALIC overcharged by $828,514.00, but if River East gave notice on April 22, then VALIC only overcharged by $826,922.27. VALIC returned $826,922.27 plus interest while this litigation was pending.

The district court held that River East's second count was moot because VALIC was required to repay the entire prepayment fee. Having found above that VALIC was entitled to keep the prepayment fee, the question is relevant again. This factual dispute was submitted to the district court for determination at trial. The district court appears to have made a finding of fact that the notice was received on April 21. *River East Plaza, L.L.C. v. Variable Annuity Life Co.*, No. 03 C 4354, 2006 WL 2787483, at *13 (N.D.Ill. Sep.22, 2006) (" Based on the facsimile produced at trial, River East provided notice of its intent to prepay the Loan on April 21, 2003." ).

But the math is perplexing. If River East originally paid $4,713,601.27, and VALIC returned $826,922.27, then River East had paid a total of $3,886,679.00. The district court had awarded VALIC an alternate prepayment fee of $123,012.15. Subtracting the alternate fee of $123,012.15 from the amount paid of $3,886,679.00 would leave $3,763,666.85 to be refunded to River East. But the district court concluded that River East was entitled to a refund of $3,762,666.85. We are unsure of where that extra thousand dollars went. Perhaps we misread the district court's findings of fact regarding the date of notice, or perhaps we misread the district court's math. But if, as we suspect, the district court has found that notice was received on April 21, the exact amount of River East's refund should be clarified on the remand.

### C. VALIC's Counter-Claims and Third-Party Claim

*9 The loan documents provided that if River East sued VALIC under the note and did not prevail, then River East would owe VALIC costs and fees, to include attorney's fees. VALIC's cross-claim against River East, and third party complaint against McLean as the guarantor of River East's obligations, was based on those terms. The district court denied VALIC's claim because River East did prevail. Of course, the legal landscape has now changed. River East has not prevailed on its first count, but as we noted above we are uncertain whether River East did or should prevail on the second count. The district court is entitled to make that determination in the first instance, and it will be among the issues considered on remand.

For the reasons set forth above, the judgment of the district court is REVERSED and the case is REMANDED with instructions to enter judgment in favor of the appellant on count one of the complaint, and for further proceedings consistent with this opinion.

> FN1. Some of the actions described herein were performed by the parties' predecessors in interest or by subsidiaries of the parties. For clarity, we will uniformly refer to the parties by their current names as used in this appeal.

C.A.7 (Ill.),2007.  
River East Plaza, L.L.C. v. Variable Annuity Life Ins. Co.  
--- F.3d ----, 2007 WL 2377383 (C.A.7 (Ill.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.