UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER LIFE INSURANCE COMPANY), | ) ) ) ) ) ) ) | |
| | ) | CIVIL ACTION NO. 05-11150-DPW |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| ABBOTT LABORATORIES, | ) ) ) | |
| Defendant. | ) ) | |

## AFFIDAVIT OF MARK L. HAIR

I, Mark L. Hair hereby state under oath that:

1.    My name is Mark Hair.  I currently reside in Brentwood, California.

2.    I am a partner in The StoneTurn Group ("StoneTurn"), a consulting firm that maintains offices in, among other places, Boston, Massachusetts, San Francisco, California and Austin, Texas.  StoneTurn offers a variety of financial and litigation consulting services, including forensic accounting services and contractual compliance audits.

3.    I understand that StoneTurn was retained by plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and Manulife Insurance Company (collectively, "John Hancock" or "Hancock") in 2004 to audit

defendant Abbott Laboratories' ("Abbott") compliance with the "Research Funding Agreement" between John Hancock and Abbott, dated March 13, 2001 (the "Research Funding Agreement" or the "Agreement").   I have been called to testify in this action concerning my work on that attempted audit.   This affidavit sets forth my direct trial testimony.

*My Background*

4.      I obtained a Bachelors of Science Degree in Accounting and a concurrent Masters Degree in Accountancy from Brigham Young University in 1995.   I am a certified as a public accountant in the state of Utah.

5.      After graduating from Brigham Young University, I worked at Deloitte & Touche in various positions from January 1996 until approximately December 2004. From approximately 1996 to 1998, I was employed by Deloitte & Touche as an auditor, in which capacity I participated in several substantial financial statement audits and spent a period of time in Deloitte & Touche's tax department.   I eventually was promoted to a supervisory position that afforded me more direct contact with clients, to supervise other staff members, and to coordinate the timing and conduct of audits.

6.      In the fall of 1998, I joined the Financial Advisory Services department at Deloitte & Touche.   Over the next two years, I served as a senior consultant in the Dispute Consulting Group of this department, where I was responsible for, among other things, conducting forensic accounting services.   As I recall, I conducted approximately four contractual compliance audits during this time period.   In or about 2000, I was promoted to a managerial position within Deloitte & Touche's Financial Advisory Services department.

7.      From approximately 2002 to 2004, I worked as a Senior Manager in the auditing division of Deloitte & Touche at its national office in Wilton, Connecticut. My responsibilities included revising and implementing the firm's policies and standards for audits performed in the United States.

8.      In December of 2004, I left my position at Deloitte & Touche to become a Managing Director at StoneTurn. I became a Partner in StoneTurn in 2007. My duties at StoneTurn have included, among other activities, conducting contractual compliance audits.

*My Preparation for the Abbott Audit*

9.      Shortly after joining StoneTurn in December 2004, I became a member of the team responsible for auditing Abbott's compliance with the Research Funding Agreement. It was my understanding at the time that the purpose of John Hancock's audit was to examine and assess Abbott's fulfillment of its obligations under the Agreement and its conduct in developing the "Program Compounds" (*i.e.*, ABT-100, ABT-492, ABT-510, ABT-518, ABT-594, ABT-627, ABT-724, ABT-751, and ABT-773), including but not limited to Abbott's investment therein and/or termination and out-licensing thereof, as well as to determine the status of each Program Compound as of March 13, 2001.

10.     In particular, I recall that one of the primary goals of the audit was to assess the accuracy and completeness of Abbott's initial and subsequent "Annual Research Plans" ("ARPs"), which purported to disclose Abbott's intended and reasonably expected spending on each of the Program Compounds. I also understood that the assessment of Abbott's contract compliance would be based on StoneTurn's review of

Abbott's documents and, if necessary, interviews of knowledgeable Abbott personnel regarding the same.

11.     I spent time preparing for the audit, which, as I understood it, had commenced nearly seven months earlier.  In preparation for the contractual compliance audit, I reviewed a letter from John Hancock to Abbott dated April 12, 2004, which I understood gave notice to Abbott of John Hancock's exercise of its audit rights under the Agreement.  I believed then and I believe now that this letter, and the categories of books and records identified in the "Schedule A" attached thereto, fairly defined the scope of the audit.  A true and correct copy of that letter is attached hereto as PLs' NO.

12.     I also reviewed the Agreement, Abbott's various ARPs, and the "StoneTurn Index," which I understood was a document prepared during the audit work performed to date by Christopher Martinez and others at StoneTurn for the purpose of memorializing the specific content and location of the documents that had been produced by Abbott.  Additionally, I reviewed copies of the few documents that StoneTurn had designated for copying and actually received from Abbott at that time.

13.     During my preparation for the Abbott audit, I spoke to Mr. Martinez regarding the status of that audit.  I understood that the audit was far from complete, and that Abbott had yet to produce numerous documents responsive to the categories set forth in Schedule A, including, for example, summary-level documents that would allow StoneTurn to assess the completeness and accuracy of Abbott's ARPs.

*My Direct Participation in the Abbott Audit*

14.     Over the next three months, I visited Abbott on two separate occasions: (a) January 31 and February 1, 2005; and (b) March 7-9, 2005.

15.    Upon my arrival for the January 31 and February 1, 2005 visit, I was met by Carey Crimmins, who introduced himself as a contract lawyer assisting Michelle Campbell, StoneTurn's primary contact at Abbott. Mr. Crimmins was the only Abbott representative who attended the audit during my first visit. As I recall, approximately eight boxes of documents were made available for our inspection at that time.

16.    There were three aspects of Abbott's document production during my January 31 and February 1, 2005 visit that I found noteworthy. First, although many of the documents contained in the eight boxes that Abbott had produced were technically responsive to Schedule A, most of the information was low-level, source data concerning selected aspects of Abbott's spending on the Program Compounds. There were no summary-level financial documents which would allow StoneTurn to test the completeness and accuracy of Abbott's ARPs. As I explained to Mr. Crimmins at the time, in order for me and my colleagues at StoneTurn to properly conduct our audit analysis, we required access to mid-to-high level summaries of Abbott's costs and expenditures as they related to the Agreement. We needed Abbott's summary-level materials in order to understand and extract useful information from the low-level data. I asked Mr. Crimmins when the summary-level documents would be available for our inspection. Mr. Crimmins' only response to my request was to acknowledge it and promise to forward it to someone at Abbott with more authority.

17.    The second aspect of Abbott's audit production during my first visit that I found noteworthy was the large number of documents that Abbott had redacted beyond all recognition. As I recall, I encountered documents that were so redacted that their title, author and content were effectively unintelligible. A true and accurate copy of just one

such redacted document is attached hereto as PLs' OL. There were many other similar documents in the boxes produced by Abbott. I voiced my concerns regarding the extent of Abbott's redactions to Mr. Crimmins. His only response was to acknowledge my concerns and promise to forward them to someone at Abbott with more authority.

18.    Lastly, I found it noteworthy that Abbott had failed to make *any* e-mails or other electronic information available for inspection by StoneTurn. Based on my review of Schedule A, it was my understanding that the audit of Abbott's books and records was not limited to hard copy documents. To the contrary, each of the categories listed in Schedule A requested all "records and documents," without limitation. *See* PLs' NO, attached hereto. I voiced my concerns regarding the lack of e-mail to Mr. Crimmins. His only response was to acknowledge my concerns and promise to forward them to someone at Abbott with more authority.

19.    During the course of my visit on January 31 and February 1, 2005, I posed numerous additional questions to Mr. Crimmins that also went unanswered. For example, because it was my understanding that Abbott previously had committed to completing its production of requested audit materials by January 31, 2005, but it was apparent that many, if not most, of the requested documents still were missing on that day, I asked Mr. Crimmins when all of Abbott's remaining documents responsive to Schedule A would be made available to StoneTurn. I also asked him various questions about the documents themselves, and requested the opportunity to speak with Abbott personnel who were familiar with the content of the documents in order to obtain answers to my questions. In each instance, Mr. Crimmins' only response was to acknowledge my questions and promise to forward them to someone at Abbott with more authority.

20.    I never received a response from Abbott to any of the questions or concerns that I voiced to Mr. Crimmins in the course of my January 31 and February 1, 2005 visit.

21.    I next visited Abbott to continue the audit on March 7-9, 2005, at which time 17 additional boxes of documents were made available for StoneTurn's review. As I recall, Mr. Crimmins was present for this entire visit, and Ms. Campbell was onsite for only a brief time during one day (March 9, 2005).

22.    During my March 7-9, 2005 visit to Abbott, I reviewed the entire production of documents, but spent most of my time reviewing the documents in the box marked "17" ("Box #17"). Box #17 contained some examples of the potentially helpful, summary-level documents that had been missing from Abbott's prior audit productions. For example, some of the documents in Box #17 summarized and analyzed Abbott's spending on each of the Program Compounds. They also analyzed payments received by John Hancock under the RFA. As a result of the responsive nature of Box #17, I fully transcribed one particular document contained in that box during my review. A true and accurate copy of my transcription is attached hereto as PLs' SC. Box #17 did not, however, contain all of the documents that StoneTurn still was seeking, and it did not contain any e-mail or other electronic information. Nonetheless, I designated the entire contents of Box #17 for copying by Abbott.

23.    I asked Mr. Crimmins during my March 7-9, 2005 visit about the whereabouts of the still-missing documents and e-mail, about when Abbott would permit me and others at StoneTurn to question knowledgeable Abbott personnel about the content of the documents that had been produced, and about the relationship between the

documents that had been produced and the categories on Schedule A.  In each instance, Mr. Crimmins' only response was to acknowledge my questions and promise to forward them to someone at Abbott with more authority.

24.     On March 10, 2005, one day after leaving Abbott, I sent Ms. Campbell an e-mail message that listed StoneTurn's various outstanding questions, including when Abbott would make available its next installment of audit documents.  I also asked Ms. Campbell to provide me with information regarding the substance and location of Abbott's audit production to date and, for convenience, attached a spreadsheet that identified each category of documents on Schedule A and provided space for Abbott to describe the status of its production in response thereto.  A true and correct copy of that e-mail is attached hereto as Ex. 48.

25.     On March 22, 2005, Ms. Campbell responded to my March 10, 2005 inquiry by announcing, in an e-mail message to me, that "Abbott has fulfilled its obligation to comply with the audit provision of the [Research Funding Agreement], subject to the production of the remaining number of documents [requested for copying by StoneTurn on March 7-9, 2005]," including the contents of Box #17.   In the same e-mail message, Ms. Campbell explicitly declined to respond to StoneTurn's outstanding inquiries.  A true and correct copy of Ms. Campbell's e-mail message to me is attached hereto as Ex. 49.

26.     Ms. Campbell's assurance that StoneTurn would receive copies of documents it had requested for copying during my March 7-9, 2005 visit proved to be inaccurate.  Specifically, in the course of reviewing Abbott's final shipment of copies to StoneTurn which arrived on March 22, 2005, I noticed that some of the contents of Box

#17 had not been copied by Abbott. One of the missing documents was the document that I had transcribed in full during my visit (see PLs' SC, attached hereto).

27.    On March 23, 2005, I sent Ms. Campbell another e-mail message specifically asking her to copy and forward to StoneTurn the missing contents of Box #17. Ms. Campbell responded to my e-mail message on March 25, 2005, by informing me that "[c]ertain documents were removed [from Box #17], and are being investigated as being either non-responsive to the audit request or privileged." A true and accurate copy of this e-mail string is attached hereto as PLs' OT.

28.    During the contractual compliance audit, I never received the missing contents of Box #17 from Abbott.

29.    It was my understanding at that time that John Hancock's counsel made a request that Abbott provide a privilege log concerning its belated assertion of privilege over certain materials in Box #17, but that it was denied. To my knowledge, Abbott never provided the requested privilege log to StoneTurn or John Hancock.

Signed under the pains and penalties of perjury this 28th day of January, 2008.


/s/ Mark L. Hair
Mark L. Hair

## CERTIFICATE OF SERVICE

I hereby certify that this document is being filed with the Court through the ECF system and that a copy will be sent electronically to counsel for defendant through the ECF system on January 28, 2008.

/s/ Richard C. Abati
Richard C. Abati  (BBO No. 651037)

4294609v1

# PLs' NO

**John Hancock Financial Services, Inc.**

Bond and Corporate Finance Group

John Hancock Place
Post Office Box 111
Boston, Massachusetts 02117
(617) 572-9624
Fax: (617) 572-1628
E-mail: sblewitt@jhancock.com



Stephen J. Blewitt
Senior Managing Director

April 12, 2004

BY FAX (847) 937-6683
CONFIRMATION COPY BY U.S. FIRST CLASS MAIL

Mr. James L. Tyree
Vice President, Global Licensing & New Business Development
Abbott Laboratories
200 Abbott Park Road
Abbott Park, IL 60064-6189

Re:   Research Funding Agreement by and between Abbott Laboratories and John Hancock
      Life Insurance Company, John Hancock Variable Life Insurance Company, and Investors
      Partner Life Insurance Company, dated as of March 13, 2001

Dear Jim:

        Pursuant to § 2.5 of the Research Funding Agreement by and between Abbott
Laboratories and John Hancock Life Insurance Company, John Hancock Variable Life Insurance
Company and Investors Partner Life Insurance Company, dated as of March 13, 2001 (the
"Agreement"), John Hancock Life Insurance Company, John Hancock Variable Life Insurance
Company and Investors Partner Life Insurance Company (collectively, "John Hancock") hereby
give notice of the exercise of their right to inspect and audit all books and records of Abbot and
of any Subcontractor[1] of Abbott with respect to the following matters:

   1.  All Program Related Costs expended by Abbott during each Program Year;

   2.  Compliance by Abbott with its obligations, under § 2.2 of the Agreement, to
       prepare and provide John Hancock with an Annual Research Plan, and to
       conduct the Research Program during each Program Year in accordance with
       the Annual Research Plan for such Program Year;

   3.  Compliance by Abbott with its obligation, under § 2.3 of the Agreement, to
       use Commercially Reasonable Efforts to conduct the Research Program in
       accordance with the requirements of § 2.3 of the Agreement;

   4.  Compliance by Abbott with its obligation, under § 4.3 of the Agreement, to
       substitute Program Compounds in accordance with the requirements of § 4.3
       of the Agreement;

_____
   [1] Unless otherwise specified herein, capitalized terms used in this letter and in the attached Schedule A
shall have the same definitions as those set forth in the Agreement.

CONFIDENTIAL
JHII 011883

5. Compliance by Abbott with its obligation, under § 4.3 of the Agreement, to out-license or divest Ceased Compounds to third parties in accordance with the requirements of § 4.3 of the Agreement;

6. The stage of development and status of each Program Compound as of March 13, 2001; and

7. The current stage of development and status of each Program Compound.

Attached hereto as Schedule A is a preliminary list of those categories of books and records that John Hancock reasonably expects will be made available for its inspection and audit of these matters. The list is provided solely to assist Abbott in complying with this notice, and not by way of limitation. John Hancock requests that all books and records of Abbott and its Subcontractors pertaining to the above-identified matters be made available for its inspection and audit, regardless whether such books and records are described on Schedule A.

John Hancock's inspection and audit of the books and records of Abbott, as set forth herein, shall be conducted by Christopher Martinez, Brian Napper and other employees of the StoneTurn Group, LLP, a firm of independent auditors retained by John Hancock. The audit shall take place during normal business hours commencing on May 12, 2004, and continuing from day to day thereafter until completion, subject to adjournment as may be necessary to accommodate scheduling exigencies. In accordance with § 2.5 of the Agreement, John Hancock reserves its right to designate for copying, at its initial expense (but subject to reimbursement by Abbott in accordance with § 2.5 of the Agreement), any or all of the books and records of Abbott that are subject to its inspection and audit.

Please inform me before the close of business on May 5, 2004 of the specific location at which Abbott will make its books and records available for inspection and audit pursuant to this notice. Please also provide me with the name of the person who the StoneTurn Group's representatives should contact upon their arrival to begin their inspection and audit.

Thank you for your anticipated cooperation.

Very truly yours,

Stephen J. Blewitt

Attachment
cc:    General Counsel (by fax, 847-938-6277; confirmation copy by mail)
       Lawrence R. Desideri, Esq.
       Peter E. Gelhaar, Esq.
       Brian A. Davis, Esq.
       Michael Arthur Walsh, Esq.

3679391v1

CONFIDENTIAL
JHII 011884

## Schedule A

1. All records and documents indicating expenditures made by Abbott related to any compound that is now or ever was a Program Compound, including the following:

    a. Abbott's standard policies and procedures related to accounting for project/program related expenditures;

    b. Abbott's chart of accounts as relevant to accounting for project/program related expenditures;

    c. Summary of costs/expenditures incurred by Program Compound by year delineating expenditures by nature (*e.g.*, direct costs incurred by Abbott, subcontractor costs, allocated indirect costs, *etc.*);

    d. Accounting framework for compiling the expenditures presented (*i.e.*, whether cost assembled on an accrual or cash basis of accounting);

    e. Identification of whether expenditures presented were capitalized or expensed under General Accepted Accounting Procedures ("GAAP") definitions;

    f. Summary of the timing of expenditures for each Program Compound within each year presented;

    g. Contracts or other governing documents and information related to all Research Program activities performed by Subcontractors;

    h. Reconciliations of annual expenditures by Program Compound to the audited financial statements of Abbott;

    i. Calculations, algorithms, and basis for all allocations included in the total expenditures by Program Compound by year;

    j. Abbott standard policies and procedures related to allocation of indirect costs;

    k. Expenditure/Costs summaries and/or reports prepared in the normal course of managing the development of each Program Compound; and

    l. Underlying supporting records (*e.g.*, timesheets, payroll records, purchase orders, invoices, *etc.*) for all expenditures made related to each Program Compound.

2. All records and documents discussing or evidencing the implementation and conduct of the Research Program, including but not limited to:

    a. Reports/Updates/Summaries prepared by Abbott in the normal course of managing the development of the Program Compounds;

    b. Listing of all reports/updates/summaries typically prepared by Abbott during the normal course of developing an experimental pharmaceutical compound;

    c. Minutes/Summaries/Notes from all management meetings in which any of the Program Compounds where reviewed or approved for further development funding;

    d. Analysis and documentation supporting all forward looking projections of expenditures to be incurred for each Program Compound by year;

CONFIDENTIAL
JHII 011885

e. Abbott policies and guidance as to the appropriate and/or required methods/approaches/procedures for conducting a research program for an experimental pharmaceutical compound;

f. Abbott's internal approval framework for determining whether or not to continue to fund and develop an experimental pharmaceutical compound, including all relevant thresholds for approval along the compound development process; and

g. Minutes/Summaries/Notes from all Abbott meetings regarding continued funding of product development for any Program Compounds.

3. All records and documents concerning Abbott's obligations under § 4.3 of the Agreement, including but not limited to:

a. Records identifying any and all Replacement Compounds;

b. Records identifying any and all Failed Early Stage Program Compounds;

c. Records identifying any and all Ceased Compounds;

d. All documents pertaining to Abbott's consideration or selection of any compound to replace any Failed Early Stage Program Compound;

e. Records identifying any and all compounds that Abbott held out as or considered to be "back up" compounds for the compounds that constituted the Program Compounds (i) on the effective date of the Agreement, and (ii) as of the end of each calendar year 2001 through 2003; and

f. All documents pertaining to the actual or attempted out-licensing or divestiture of any Ceased Compound.

4. All records and documents concerning the status of each Program Compound as of March 13, 2001 and currently, including but not limited to:

a. Reports/Summaries/Meeting Minutes which indicate the stage of development of each compound that originally constituted a Program Compound during the first calendar quarter of 2001;

b. Records describing the various stages into which Abbott generally categorizes the pre-clinical and clinical development of experimental pharmaceutical compounds;

c. Records indicating when each Program Compound reached each stage of pre-clinical or clinical development into which Abbott generally categorizes the pre-clinical and clinical development of experimental pharmaceutical compounds;

d. Reports/Summaries/Meeting Minutes which evidence the current status of each Program Compound; and

e. Management Reports and/or other documents prepared in the normal course of business which indicate future prospects and development expectations for each Program Compound.

3678931v1

CONFIDENTIAL
JHII 011886

**PLs' OL**

REDACTED

# GPRD Quality Assurance
# Monthly Highlights
# December 2003

**Projects**



CONFIDENTIAL    ABBT 0000178



REDACTED

GPRD QA Monthly Highlights                    Page 2 of 5

CONFIDENTIAL

ABBT 0000179



REDACTED

GPRD QA Monthly Highlights

Page 3 of 5

CONFIDENTIAL     ABBT 0000180



REDACTED

GPRD QA Monthly Highlights

Page 4 of 5

CONFIDENTIAL

ABBT 0000181



REDACTED

GPRD QA Monthly Highlights

Page 5 of 5

CONFIDENTIAL

ABBT 0000181A

# PLs' SC

(Example of one document reviewed in Mundelein during 3/7/05 - 3/10/05 and not copied for StoneTurn. Information input by MH at 1050 N. High Street Warehouse)

## John Hancock Portfolio summary
### Revenue Recognition
### 2003 Plan - Plan Book

| Compounds | | 2001 Actuals | 2002 LBE | 2003 Plan | Total Cumulative |
|---|---|---|---|---|---|
| ABT-773 | Ketolide Oral & IV | 80.9 | 19.7 | 1.7 | 102.3 |
| ABT-627 | Endothelin | 34.1 | 50.4 | 70.9 | 155.4 |
| ABT-594 | Neuro Pain | 7.8 | 1.4 | 0 | 9.2 |
| ABT-492 | TSP | 8.8 | 12.1 | 19.1 | 40 |
| ABT-510 | Quinolone Tablet | 23.1 | 30.6 | 7.1 | 60.8 |
| ABT-518 | MMPI | 3.7 | 0 | 0 | 3.7 |
| ABT-751 | Anti-Mitotic | 6.5 | 9.8 | 10.7 | 27 |
| ABT-100 | FTI | 3.6 | 2.4 | 0 | 6 |
| ABT-724 | Dopamine Receptor Agonist (ED) | 3.2 | 5.5 | 0 | 8.7 |
| | Total | 171.7 | 131.9 | 109.5 | 413.1 |

### 2003 Plan Revenue Recognition Tests

**Test One**
2003 Plan Spend = $110MM
Minimum Spend Required = $108MM
Ration Plan Spend / Minimum Spend ≥ 1 → Recognize Net Revenue = $56MM

**Test Two**
(Cum. Program Spend / Total Net Program Expense X Total Net Program Revenue) - Prior Net Revenue Recognized = Net Revenue Recognized
= ($413.2MM / $600 MM) X $200MM - $94MM = $44MM

Recognize lesser of Test 1 & Test 2 → Net Revenue recognized = $44MM.



EXHIBIT 14
M. Hair
lat 5/8/07

CONFIDENTIAL
JHII 021597

# Ex. 48

## Mark Hair

**From:**         Mark Hair
**Sent:**         Thursday, March 10, 2005 12:21 PM
**To:**           Michelle L Campbell
**Cc:**           Chris Martinez
**Subject:**      JH - Abbott Audit Documentation
**Attachments:**  Schedule A Status 3-10-05.xls

Michelle,

It was good to meet you briefly yesterday in Mundelein. As I mentioned yesterday, we have some observations and questions related to the documents provided for the audit.

This week, a total of 17 new boxes were provided for review. We flagged documents to be copied, gave requests to Carey Crimmins, and several boxes have already been sent out for copying. When should we plan to receive the copied documents? Please continue to send copies to my attention at the address below.

Also, we noted some financial documents/spreadsheets that appeared to provide cost details for one of the Program Compounds, ABT-627. The formatting of the documents caused various costs to be printed on separate pages from the cost descriptions, making the financial reports unusable. We discussed this issue with Carey and flagged this report as well as other documents for further follow up. We would like electronic copies of these documents or have documents printed in a usable format. Additionally, the above mentioned spreadsheet appears to be only related to program costs incurred for ABT-627 during 2004. Are similar reports available for the other Program Compounds and other years (2000 – 2004)? If so, when will these documents be made available for review?

We also noted that there are no emails included in the boxes related to the Program Compounds. It is our understanding that requests were made for emails to be available for review. Have emails been provided in the available documents? If so, which boxes contain these emails? If they have not yet been produced, when will they be available for review?

As we left the Mundelein facility today, Carey said that there was one additional set of documents (less than one box) that was not available at the time of our review, but that the entire set of documents would be copied and sent to us. Except for this one set of documents, Carey was not aware of any additional documents that were going to be produced for the audit. I wanted to confirm this with you as well. Have all documents been made available for the audit? Are you aware of any additional documents that have not yet been provided to us? If so, when will additional documents be available for review?

Attached is a spreadsheet summarizing John Hancock's requests for information/documentation as included in Schedule A of the April 12, 2004 letter from Steven Blewitt. Are all documents related to these requests included in the documents currently available for review? With respect to each of the requested items from Schedule A, please respond to the following:

(i)    Whether all requested information/documents have been produced for the Audit
(ii)   The titles and descriptions of the responsive documents
(iii)  The location of the documents, including site and box number

Thank you for your assistance, and I look forward to hearing from you.

*Campbell* 36
*2/20/07*

2/2/2006

CONFIDENTIAL
S0017

Mark Hair
StoneTurn Group, LLP

Office: 925-974-3376
Fax: 925-974-3338
Mobile: 203-300-3692
mhair@stoneturn.com
www.stoneturn.com

2121 N. California Blvd., Suite 290
Walnut Creek, CA  94596

2/2/2006

CONFIDENTIAL
S0018

**John Hancock Audit of Research Funding Agreement with Abbott**
**Status of Information and Document Requests**

| Requests* | All Items Have Been Produced for the Audit [Y/N] | Titles and Descriptions of Responsive Documents | Location of Information (Site & Box #) |
|---|---|---|---|
| 1. All records and documents indicating expenditures made by Abbott related to any compound that is now or ever was a Program Compound, including the following: | | | |
| a. Abbott's standard policies and procedures related to accounting for project/program related expenditures; | | | |
| b. Abbott's chart of accounts as relevant to accounting for project/program related expenditures; | | | |
| c. Summary of costs/expenditures incurred by Program Compound by year delineating expenditures by nature (e.g., direct costs incurred by Abbott, subcontractor costs, allocated indirect costs, etc.); | | | |
| d. Accounting framework for compiling the expenditures presented (i.e., whether cost assembled on an accrual or cash basis of accounting); | | | |
| e. Identification of whether expenditures presented were capitalized or expensed under General Accepted Accounting Procedures ("GAAP") definitions; | | | |
| f. Summary of the timing of expenditures for each Program Compound within each year presented; | | | |
| g. Contracts or other governing documents and information related to all Research Program activities performed by Subcontractors; | | | |
| h. Reconciliations of annual expenditures by Program Compound to the audited financial statements of Abbott; | | | |
| i. Calculations, algorithms, and basis for all allocations included in the total expenditures by Program Compound by year; | | | |
| j. Abbott standard policies and procedures related to allocation of indirect costs; | | | |
| k. Expenditures/Costs summaries and/or reports prepared in the normal course of managing the development of each Program Compound; and | | | |
| l. Underlying supporting records (e.g., timesheets, payroll records, purchase orders, invoices, etc.) for all expenditures made related to each Program Compound | | | |
| 2. All records and documents discussing or evidencing the implementation and conduct of the Research Program, including but not limited to: | | | |
| a. Reports/Updates/Summaries prepared by Abbott in the normal course of managing the development of the Program Compounds; | | | |
| b. Listing of all reports/updates/summaries typically prepared by Abbott during the normal course of developing an experimental pharmaceutical compound; | | | |
| c. Minutes/Summaries/Notes from all management meetings in which any of the Program Compounds where reviewed or approved for further development funding; | | | |
| d. Analysis and documentation supporting all forward looking projections of expenditures to be incurred for each Program Compound by year; | | | |
| e. Abbott policies and guidance as to the appropriate and/or required methods/approaches/procedures for conducting a research program for an | | | |

* per Schedule A of April 12, 2004 letter from John Hancock to Abbott

Page 1

CONFIDENTIAL
S0019

John Hancock Audit of Research Funding Agreement with Abbott
Status of Information and Document Requests

| Requests* | All Items Have Been Produced for the Audit (Y/N) | Titles and Descriptions of Responsive Documents | Location of Information (Site & Box #) |
|---|---|---|---|

experimental pharmaceutical compound;

f.  Abbott's internal approval framework for determining whether or not to continue to fund and develop an experimental pharmaceutical compound including all relevant thresholds for approval along the compound development process; and

g.  Minutes/Summaries/Notes from all Abbott meetings regarding continued funding of product development for any Program Compounds.

3.  All records and documents concerning Abbott's obligations under § 4.3 of the Agreement, including but not limited to:

a.  Records identifying any and all Replacement Compounds;

b.  Records identifying any and all Failed Early Stage Program Compounds;

c.  Records identifying any and all Ceased Compounds;

d.  All documents pertaining to Abbott's consideration or selection of any compound to replace any Failed Early Stage program Compound;

e.  Records identifying any and all compounds that Abbott held out as or considered to be "back up" compounds for the compounds that constituted the Program Compounds (i) on the effective date of the Agreement, and (ii) as of the end of each calendar year 2001 through 2003; and

f.  All documents pertaining to the actual or attempted out-licensing or divestiture of any Ceased Compound.

4.  All records and documents concerning the status of each Program Compound as of March 13, 2001 and currently, including but not limited to:

a.  Reports/Summaries/Meeting Minutes which indicate the stage of development of each compound that originally constituted a Program Compound during the first calendar quarter of 2001;

b.  Records describing the various stages into which Abbott generally categorizes the pre-clinical and clinical development of experimental pharmaceutical compounds;

c.  Records indicating when each Program Compound reached each stage of pre-clinical or clinical development into which Abbott generally categorizes the pre-clinical and clinical development of experimental pharmaceutical compounds;

d.  Reports/Summaries/Meeting Minutes which evidence the current status of each Program Compound; and

e.  Management Reports and/or other documents prepared in the normal course of business which indicate future prospects and development expectations for each Program Compound.

Page 2

* per Schedule A of April 12, 2004 letter from John Hancock to Abbott

CONFIDENTIAL
S0020

# Ex. 49



Michelle L
Campbell /LAKE/CORP/ABB
OTT

03/22/2005 04:43 PM

To   mhair@stoneturn.com

cc

bcc

Subject   Hancock Audit

Hi Mark -

I am responding to your March 10, 2005 e-mail regarding the audit documents  You should have received today the final box of copies of documents from among those designated during the week of March 7, 2005.  You should receive by the end of this week additional documents, less than one box, that were not available for review before your team left on Thursday, March 10.

Regarding the spreadsheet for ABT-627 mentioned in your e-mail, I will also try to send either an electronic version of the spreadsheet or a more easily readable print out of the spreadsheet as soon as possible.

Finally, regarding your remaining questions and request for identification of the specific documents that respond to each category of Hancock's audit requests, Abbott has fulfilled its obligation to comply with the audit provision of the contract, subject to the production of the remaining number of documents mentioned above

Kind Regards,

Michelle

Michelle L. Campbell
Litigation Paralegal
Abbott Laboratories
Dept. 324 Bldg. AP6D
100 Abbott Park Road
Abbott Park, Illinois 60064
Phone: 847-937-1518
Fax:    847-938-6235

This communication may contain information that is legally privileged, confidential or exempt from disclosure.  If you are not the intended recipient, please note that any dissemination, distribution, use or copying of this communication is strictly prohibited.  Anyone who receives this message in error should notify the sender immediately by return e-mail , and delete it from his or her computer.

Campbell 37
02/20/07 CS

CONFIDENTIAL
ABBT0126575

**PLs' OT**

  **Michelle L Campbell**
03/25/2005 03:05 PM

To: "Mark Hair" <mhair@stoneturn.com>
cc: "Chris Martinez" <cmartinez@stoneturn.com>
Subject: Re: John Hancock Audit

Hi Mark -

Certain documents were removed, and are being investigated as being either non-responsive to the audit request or privileged.

Have a great holiday.

Michelle L. Campbell
Litigation Paralegal
Abbott Laboratories
Dept. 324 Bldg. AP6D
100 Abbott Park Road
Abbott Park, Illinois 60064
Phone: 847-937-1518
Fax:    847-938-6235

---

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, use or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by return e-mail , and delete it from his or her computer.

---

"Mark Hair" <mhair@stoneturn.com>

  **"Mark Hair"**
<mhair@stoneturn.co
m>

03/23/2005 03:48 PM

To: "Michelle L Campbell" <michelle.campbell@abbott.com>
cc: "Chris Martinez" <cmartinez@stoneturn.com>
Subject: John Hancock Audit

Michelle,

We have gone through the copies of box #17 that we received yesterday. It appears that some of the documents requested are not included in the copy set (StoneTurn requested a complete set of copies of the entire box). Please confirm that all documents from box #17 have been provided or explain why certain documents have not been provided. Your immediate attention to this matter is appreciated. Thank you.

Mark Hair
StoneTurn Group, LLP

Office: 925-974-3376
Fax: 925-974-3338
Mobile: 203-300-3692

**CONFIDENTIAL**

Campbell        39
2/20/07 ᵉˢ

**ABBT 0000270**

mhair@stoneturn.com
www.stoneturn.com

2121 N. California Blvd., Suite 290
Walnut Creek, CA  94596

**CONFIDENTIAL**

**ABBT 0000271**