UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK
VARIABLE LIFE INSURANCE
COMPANY and MANULIFE
INSURANCE COMPANY,

                Plaintiffs,

v.

ABBOTT LABORATORIES,

                Defendant.

CIVIL ACTION NO. 05-11150-DPW

## MARKED COPY OF PLAINTIFFS' PRELIMINARY PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant Abbott Laboratories ("Abbott") respectfully submits a Marked Copy of Plaintiffs' Preliminary Proposed Findings of Fact and Conclusions of Law, attached hereto as Exhibit A, pursuant to the Court's January 15, 2008 Second Amended Order Regulating Non-Jury Trial.

Dated:  February 4, 2008                              Respectfully submitted,


                                                      ABBOTT LABORATORIES

                                                      By:  __/s/ Eric J. Lorenzini_____
                                                           Eric J. Lorenzini

                                                      Jeffrey I. Weinberger (*pro hac vice*)
                                                      Gregory D. Phillips (*pro hac vice*)
                                                      Eric J. Lorenzini *(pro hac vice)*
                                                      Ozge Guzelsu *(pro hac vice)*
                                                      MUNGER, TOLLES & OLSON LLP
                                                      355 South Grand Avenue, Thirty-Fifth
                                                      Floor
                                                      Los Angeles, CA  90071-1560
                                                      Tele:  (213) 683-9100

                                                      and

                                                      Peter E. Gelhaar (BBO#188310)
                                                      Michael S. D'Orsi (BBO #566960)
                                                      DONNELLY, CONROY &
                                                      GELHAAR LLP
                                                      1 Beacon St., 33rd Floor
                                                      Boston, Massachusetts 02108
                                                      (617) 720-2880
                                                      peg@dcglaw.com
                                                      msd@dcglaw.com


                                                      *Counsel for Abbott Laboratories*

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 4, 2008.

Date: February 4, 2008.

_____ /s/ Ozge Guzelsu _____

# EXHIBIT A

ORIGINAL FILED UNDER SEAL – DO NOT SCAN

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER LIFE INSURANCE COMPANY), | ) ) ) ) ) ) ) ) |
| | CIVIL ACTION NO. 05-11150-DPW |
| Plaintiffs, | ) ) |
| | **CONFIDENTIAL** |
| v. | ) **SUBJECT TO PROTECTIVE ORDER** |
| | ) **FILED UNDER SEAL** |
| ABBOTT LABORATORIES, | ) ) |
| Defendant. | ) ) ) |

ABBOTT LABORATORIES.
By: *[signature]*
Gregory D. Phillips (*pro hac vice*)
Munger, Tolles & Olson LLP
355 S. Grand Ave., 35th Floor
Los Angeles, CA 90071-1560
Tel: (213) 683-9100

### PLAINTIFFS' PRELIMINARY
### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Manulife Insurance Company respectfully submit the following Preliminary Proposed Findings of Fact and Conclusions of Law for consideration and adoption by the Court at the trial of this action. John Hancock reserves the right to supplement or amend these Proposed Findings and Conclusions at a later time, as Hancock deems necessary, as a result of further submissions or proceedings in this action.

I.     **Proposed Findings of Fact**

*Background Facts*

The Plaintiffs

1.      Plaintiff John Hancock Life Insurance Company, a company duly formed and existing under the laws of the Commonwealth of Massachusetts, provides insurance and investment products to retail and institutional customers.  John Hancock also is an investor in a diversified portfolio of investments, including commercial loans, corporate bonds, public and private securities and various other types of investment vehicles.

2.      Plaintiff John Hancock Variable Life Insurance Company ("JHVL") is an affiliated company of John Hancock Life Insurance Company, duly formed and existing under the laws of the Commonwealth of Massachusetts.  JHVL provides variable life insurance products that link life insurance coverage and an investment return to an underlying portfolio of investments selected by the policyholder.

3.      Plaintiff Manulife Insurance Company ("Manulife") is an insurance company duly formed and existing under the laws of the State of Delaware.  Prior to approximately February 2005, Manulife was known as "Investors Partner Life Insurance Company." Manulife is a wholly-owned subsidiary of JHVL that sells various types of life insurance products.

4.      Unless otherwise indicated, plaintiffs John Hancock, JHVL and Manulife are collectively referred to herein as "John Hancock," "Hancock" or the "Plaintiffs."

The Defendant

5.      Defendant Abbott Laboratories ("Abbott" or "Abbott Labs"), a corporation duly formed and existing under the laws of the State of Illinois, is a broad-based healthcare

company that discovers, develops, manufactures and markets products and services that span the continuum of care from prevention and diagnosis to treatment and cure.

6.     Abbott's principal businesses are global pharmaceuticals, nutritionals, and medical products.  Abbott has nearly 100 years experience developing new pharmaceutical compounds.  Abbott's "areas of expertise" in the field of pharmaceuticals include anti-infectives, neuroscience and oncology.

7.     For fiscal 2006, Abbott achieved sales and net earnings of $22.48 billion and $1.72 billion, respectively.  Abbott currently employs over 65,000 people worldwide, and spends more than $2.3 billion annually on research and development.

<u>The Negotiation of the Research Funding Agreement</u>

8.     This action arises out of a "Research Funding Agreement" that John Hancock and Abbott executed on March 13, 2001 (the "Agreement").

9.     Prior to 2001, John Hancock and Abbott had developed a business relationship based upon a series of joint investments in various pharmaceutical or biotech companies.

10.    <u>In or about 1999, Abbott and John Hancock began discussions about a possible investment by Hancock in a portfolio of new pharmaceutical compounds that Abbott had under development</u>.

11.    Most of the preliminary discussions concerning the Agreement took place between Stephen Blewitt, a Managing Director in John Hancock's Bond and Corporate Finance Group, Philip Deemer, then the Director of Abbott's Corporate Licensing Department, and Stephen Cohen, Abbott's Controller for the Pharmaceutical Research and Development Division.

12.    Abbott was interested in a potential funding agreement with Hancock, in part, because it offered Abbott the opportunity to supplement its internal research and development budget from what Abbott regarded as the least expensive external funding source. John Hancock, in turn, was seeking above-average returns on a portion of its investment portfolio, while simultaneously reducing its level of risk.

13.    Over time, the parties began to concentrate their discussions on an investment structure whereby John Hancock would invest approximately $50 million per year over a four-year period to fund the development of a specified "basket" of pharmaceutical compounds in Abbott's then current research and development portfolio. Abbott was informed by John Hancock, and understood, that the proposed deal structure was highly dependent upon the number of pharmaceutical compounds included in the transaction, as well as the stage of development and expected sales of each compound.

14.    John Hancock specifically requested a diversified basket of compounds reflecting a variety of therapeutic indications, stages of development, and expected sales in order to provide an acceptable return on Hancock's proposed investment and reduce Hancock's overall level of risk.

15.    In or about mid-2000, the parties began the process of identifying a suitable basket of pharmaceutical compounds to include in the proposed deal, and to develop a mutually-acceptable royalty payment structure.

16.    Among the compounds proposed by Abbott for inclusion in the John Hancock basket were ABT-518, a Matrix Metalloproteinase Inhibitor (MMPI) for the treatment of cancer; ABT-594, a selective neuronal nicotinic (NNR) agonist for the treatment of chronic pain that just was commencing a Phase IIb clinical trial for diabetic neuropathic pain;

-4-

ABT-773, one of a new class of powerful antibiotics known as "ketolides"; and ABT-980, a selective alpha blocker for the treatment of urinary tract blockages.

17.    In entering into its proposed investment with Abbott, John Hancock intended to invest only in promising development candidates with positive commercial prospects. John Hancock did not intend to invest in compounds that Abbott knew, or had reason to believe, would be discontinued shortly.

18.    John Hancock needed up-to-date and accurate information concerning the status of, and prospects for, the compounds that were to be included in its proposed deal with Abbott in order to understand and properly evaluate that deal.

19.    John Hancock was not in a position, however, to independently know the current status, prospects or plans for each of the deal compounds within Abbott's pharmaceutical R&D organization. That is why John Hancock required, with Abbott's agreement, that Abbott formally represent and warrant to Hancock the up-to-date status, condition and plans for the various "Program Compounds" in the proposed basket of compounds.

20.    During negotiations, Abbott provided John Hancock with a variety of technical, financial and other information concerning the Program Compounds. Abbott established internal working groups, which included personnel from Abbott's business development, new product development, and research and development organizations, to prepare a series of written "Descriptive Memoranda" for use by John Hancock in understanding and assessing the scientific status of, and commercial prospects for, each Program Compound.

21.    The Descriptive Memoranda prepared by Abbott describe, among other things: (a) the development status and technical merits of each compound (including the status and/or

-5-

results of any clinical trials); (b) the specific indications (*i.e.*, conditions or disease states) for which the compounds were being developed by Abbott; (c) the nature and severity of any known or suspected side effects; (d) the estimated size of the U.S. and ex-U.S. commercial markets for each compound; and (e) the identity of any actual or potential competing products from other pharmaceutical companies.

22.    Drafts of the Descriptive Memoranda created by the Abbott working groups were circulated to more senior Abbott management personnel, including Mr. Deemer and Dr. John Leonard, Abbott's Vice President of Development, for review before they were sent to John Hancock.

23.    During negotiations, Abbott also provided information about its planned nominal and expected spending on each of the Program Compounds over the life of the Agreement in the form of various multi-year projections and drafts of Abbott's first "Annual Research Plan" ("ARP").

24.    Abbott personnel involved in the deal with John Hancock understood that the Descriptive Memoranda, ARPs and other materials that Abbott was providing to John Hancock were being supplied to, and used by, Hancock for the purpose of understanding and evaluating the proposed deal.

25.    Abbott personnel involved in the deal with John Hancock understood that Abbott's expected spending on the Program Compounds was important to John Hancock because Hancock regarded Abbott's own internal spending plans as a useful barometer of the commercial and technical prospects for the various Program Compounds.

26.    John Hancock's employees and consultants, including Mr. Blewitt and Dr. Lynn Klotz, a pharmaceutical consultant who was retained by Hancock to assist in analyzing

the proposed Program Compounds, actually reviewed and utilized Abbott's Descriptive Memoranda, ARPs and other information in understanding and evaluating those compounds and in deciding whether to go forward with the proposed transaction.

27.    John Hancock personnel utilized the information provided by Abbott, in conjunction with general industry data obtained from other sources, to prepare a detailed computer model, known as a "Monte Carlo" simulation, that Hancock used to develop financial projections and expectations for the proposed deal with Abbott.

28.    John Hancock's Monte Carlo simulation entailed running multiple projected scenarios that assessed each Program Compound's commercial and scientific risk profile in order to calculate a combined risk-assessment and single expected rate-of-return on John Hancock's total investment, which information was used, in turn, by Hancock to determine what financial terms to demand in the Agreement, as well as whether to enter into the Agreement at all.

29.    Specific data that John Hancock's Monte Carlo simulation considered and analyzed included, among other things: (a) the number of compounds in Hancock's proposed basket; (b) the likelihood that each compound actually would be fully developed by Abbott and obtain regulatory approval; (c) the anticipated commercial launch date for each compound; (d) likely peak and total sales for each compound once launched; (e) anticipated royalty rates; (f) estimates of the milestone and royalty payments that Hancock was likely to receive on both an annual and an aggregate basis; (g) Hancock's estimated risk of loss on the transaction; and (h) Hancock's estimated annual rate of return on the transaction.

30.    In many instances, John Hancock's Monte Carlo simulation incorporated more conservative projections than those provided by Abbott in the Descriptive Memoranda and

other materials provided to Hancock by Abbott, including lower peak sales projections for the Program Compounds.

31.     Under John Hancock's method of analyzing its proposed deal with Abbott, the elimination of even a single Program Compound from the basket would have had a significant, adverse impact on the results of that analysis.

32.     John Hancock notified Abbott during negotiations of Hancock's expected returns on its investment with Abbott.  On March 7, 2000, Mr. Blewitt forwarded to Mr. Deemer and Mr. Cohen a draft Summary of Terms.  In his accompanying e-mail message, Mr. Blewitt stated, in part, that,

> [w]e believe that a diversified basket of compounds should yield the investor an IRR of 20-25%.  Based on your desire to reduce the cost of capital and our desire to lower our risk, we have built in milestone payments, a tiered royalty structure, and a termination date for the royalties.  The model provides us with an expected yield of 18-22%.

33.     Negotiations over the terms of the proposed Agreement between John Hancock and Abbott continued into the Fall of 2000.

34.     In late October 2000, Abbott notified John Hancock that it had discontinued the development of ABT-980, one of the proposed Program Compounds.  John Hancock responded by informing Abbott that Hancock was not willing to proceed with the Agreement on the terms then proposed due to the failure of ABT-980.

35.     Rather than abandoning their proposed deal, the parties first attempted to compensate for the loss of ABT-980 by significantly altering the structure and terms of the deal, including, among other things, the timing and amount of John Hancock's potential investment, as well as the milestones that would trigger Abbott's payment obligations.  Several

4384351.1

draft agreements incorporating the modified deal structure and terms were exchanged between the parties in late 2000.

36.    Unbeknownst to John Hancock, members of Abbott's senior management viewed the modified deal structure less favorably than the original structure.  In an internal memorandum that Mr. Deemer sent to Arthur Higgins, President of Abbott's Pharmaceutical Products Division, on or about December 1, 2000, Mr. Deemer acknowledged the position of Abbott's management and spelled out a planned chronology of events pursuant to which Abbott would notify John Hancock, in stages spread over a series of weeks, *inter alia*, that Abbott's "management is less enthusiastic about moving forward due to the new deal structure," and eventually that Abbott's management "wants to postpone a final decision until the new year."  Mr. Deemer simultaneously informed Mr. Higgins that he "would not anticipate reverting back to the original deal structure unless there is a change in the portfolio or possibly an IOU."

37.    Abbott's management eventually decided, in early 2001, to move forward with the proposed deal as originally structured, and to compensate John Hancock for the loss of ABT-980 by adding two new drug compounds (ABT-510 and ABT-751) to the planned portfolio of Program Compounds.

38.    After due consideration, John Hancock accepted Abbott's proposal.

39.    Abbott and John Hancock thereafter continued to modify and refine the terms of their proposed agreement in various ways, but the group of nine Program Compounds remained unaltered through the execution of the Agreement on March 13, 2001.

-9-

Abbott's Initial Portfolio Prioritization Review

40.    While Abbott was negotiating the final terms of its Agreement with John Hancock in early 2001, Abbott simultaneously was conducting a thorough review of all of the pharmaceutical compounds that it then had in development as a consequence of Abbott's acquisition of Knoll Pharmaceutical Company ("Knoll") in late 2000.

41.    Abbott retained the consulting firm of McKinsey & Company ("McKinsey") in or about January 2001 to assist in the evaluation and prioritization of Abbott's pharmaceutical development portfolio, and to help manage the eventual integration of various compounds that Abbott had acquired as part of the Knoll transaction into Abbott's existing research and development organization (the "Abbott Portfolio Prioritization Project").

42.    McKinsey's duties and responsibilities with respect to the Abbott Portfolio Prioritization Project included, but were not limited to, organization of, attendance at, participation in, and memorialization of various internal Abbott meetings and discussions concerning Abbott's evaluation, prioritization and integration efforts.

43.    Jessica Hopfield is one of the lead McKinsey consultants who worked on the Abbott Portfolio Prioritization Project.

44.    Dr. Hopfield is the co-leader of McKinsey's pharmaceuticals and medical products practice.  She holds an undergraduate degree in biology from Yale University and a Ph.D in neurobiology from Rockefeller University.  Prior to joining McKinsey, Dr. Hopfield worked for the pharmaceutical firm Merck & Co., Inc. in the areas of clinical development, project planning and management, and marketing.

45.    With McKinsey's assistance and participation, Abbott conducted an "Initial Portfolio Prioritization Review" from Wednesday, March 7, through Friday, March 9, 2001

4384351.1

(*i.e.*, approximately one week before the Agreement was executed), for the purpose of reviewing and assessing the technical, scientific, medical and commercial status of Abbott's entire portfolio of pharmaceutical compounds in development, including ABT-518, ABT-594 and ABT-773.

46.     Attendees at Abbott's Initial Portfolio Prioritization Review in early March 2001 included, among others, various members of Abbott's senior management, including Dr. Jeffrey Leiden, then Executive Vice President of Abbott's Pharmaceuticals Division and its Chief Scientific Officer, and Dr. Leonard; selected McKinsey consultants, including Dr. Hopfield; and, at appropriate points in time, the various Abbott personnel chiefly responsible for the development of the specific compounds being reviewed.

47.     [As part of their assigned duties, representatives of McKinsey, including Dr. Hopfield, memorialized and summarized the conclusions and directives that resulted from Abbott's March 2001 Initial Portfolio Prioritization Review in a document entitled the "Initial Portfolio Prioritization."]

48.     [Drafts of the Initial Portfolio Prioritization were sent by McKinsey to Dr. Leiden at Abbott for his review and comments on or prior to March 13, 2001.  Copies of the Initial Portfolio Prioritization subsequently were incorporated in various presentations and meeting materials distributed to and reviewed by Abbott personnel in the course of the Abbott Portfolio Prioritization Project.]

49.     [At no time did anyone from Abbott inform Dr. Hopfield or anyone else from McKinsey that the information contained in the March 2001 Initial Portfolio Prioritization was inaccurate in any way.]

<u>The Final Agreement</u>

50.    The final version of the Agreement between John Hancock and Abbott was executed by Mr. Blewitt of John Hancock, and Dr. Leiden of Abbott on March 13, 2001.

51.    The terms of the Agreement call for John Hancock to invest up to $214 million over four years in the development of nine Program Compounds including, but not limited to, ABT-518, ABT-594 and ABT-773.

52.    Under the terms of the Agreement, John Hancock's ability to earn a return on its investment in the Program Compounds depends on the commercial success of those compounds.  If some or all of the compounds fail or otherwise are unsuccessful, Hancock's financial return is reduced accordingly.

53.    Similarly, because John Hancock only shares in the revenues, if any, generated by the Program Compounds for a set number of years, Hancock stands to gain more if the Program Compounds are developed quickly.

54.    Mr. Deemer sent the final versions of the Descriptive Memoranda for each of the Program Compounds, as well as Abbott's first ARP, to John Hancock on February 15, 2001 (*i.e.*, approximately one month before the Agreement was executed).

55.    <u>Mr. Deemer subsequently assured Mr. Blewitt by e-mail on March 12, 2001 (*i.e.*, the day before the Agreement was executed) that Dr. Leonard, Abbott's Vice President of Development, had "looked at all of the documents one last time in preparation for execution" and noted only one "oversight"; a slight delay in the commencement of Abbott's Phase I study of ABT-518.  According to Mr. Deemer, "Phase I was to have started on December 2000 (4Q2000), but in fact did not start until earlier this month."</u>

56.    Mr. Deemer further told Mr. Blewitt that, although the purported delay in the commencement of Phase I for ABT-518 had "pushed the timeline [for ABT-518] back by a quarter throughout," the estimated "launch date [for ABT-518] is not affected and is actually planned one quarter earlier." Mr. Deemer attributed Abbott's alleged delay in starting the Phase I trial of ABT-518 to delays in "completing this financing."

57.    No other changes, concerns, discrepancies or errors regarding ABT-518 -- or any other Program Compound -- were disclosed to John Hancock by anyone at Abbott before the Agreement was executed by the parties.

58.    Mr. Deemer and other Abbott personnel understood, before the Agreement was signed, that each one of the Program Compounds in the proposed basket of compounds was important to the deal, and that even a slow down in the development of any of the Program Compounds, if disclosed to John Hancock, likely would cause Hancock to delay the proposed deal or, possibly, withdraw from the deal entirely.

59.    The final Descriptive Memoranda (also referred to in the Agreement as "Compound Reports") were attached to, and incorporated in, the Agreement as collective Exhibit 12.2(i). Abbott's purported spending plans as of the date of the Agreement were contained in its first ARP, which was attached to, and incorporated in, the Agreement as Exhibit 1.6.

60.    Abbott expressly represented and warranted both the completeness and the accuracy of the information contained in its Descriptive Memoranda and in its first ARP in Article 12 of the Agreement. More specifically, Abbott represented and warranted to John Hancock in Section 12.2(i) that,

4384351.1

[n]either this Agreement nor any Exhibit to this Agreement (including the compound reports attached as Exhibit 12.2(i) hereto (the "Compound Reports")) contains any untrue statement of material fact or omits to state any material fact necessary to make the statements contained herein or therein not misleading. There is no fact known to Abbott (other than generally available information concerning the pharmaceutical industry in general) as of the date of this Agreement that has not been disclosed in this Agreement or any Exhibit to this Agreement which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial [viability]) of the Research Program or any of the Program Compounds.

61.    Abbott further expressly represented and warranted to John Hancock in Section 12.2(m) that,

[w]ith respect to each Program Compound, since the date of its respective Compound Report, to the knowledge of Abbott, no condition, circumstance or fact has arisen (other than generally available information concerning the pharmaceutical industry in general) nor has Abbott made any change in the conduct of the Research Program which, individually or in the aggregate, has resulted in, or could reasonably be expect[ed] to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial [viability]) of such Program Compounds.

62.    John Hancock actually and justifiably relied upon various representations made by Abbott in the Agreement, including the representations contained in Sections 12.2(i) and 12.2(m), in deciding to enter into the Agreement on March 13, 2001 on the terms stated.

63.    The representations made by Abbott in Sections 12.2(i) and 12.2(m) of the Agreement, among others, were material to John Hancock's decision to enter into the Agreement on March 13, 2001 on the terms stated.

*Abbott's Misrepresentations and Fraud Regarding*
*the Actual Status and Prospects of the Program Compounds*
*as of the Date of the Agreement*

64.     As of March 13, 2001, the actual status and prospects of at least three of the Program Compounds, ABT-518, ABT-594 and ABT-773, were materially different from what Abbott represented to John Hancock in the Agreement.

65.     As of March 13, 2001, Abbott's actual plans for at least three of the Program Compounds, ABT-518, ABT-594 and ABT-773, were materially different from what Abbott represented to John Hancock in the Agreement.

ABT-518

66.     According to Abbott, ABT-518 is an MMPI, a family of compounds that is intended to inhibit the growth of cancerous tumors.

67.     Over the approximately ten months of active contract negotiations leading up to the execution of the Agreement, Abbott supplied John Hancock with three versions of its Descriptive Memorandum for ABT-518 and/or its MMPI program; an initial draft dated May 31, 2000; an updated draft dated November 1, 2000; and the final version dated February 2001 that forms part of collective Exhibit 12.2(i) to the Agreement.

68.     Each version of Abbott's Descriptive Memorandum consistently described ABT-518, *inter alia*, as follows:

   (a)     "Abbott's Matrix Metalloproteinase Inhibitor (MMPI) program represents a novel therapeutic class, with the potential to alter the way cancer is treated by preventing or modifying disease progression and/or metastases";

   (b)     "The MMP selectivity profile exhibited by ABT-518 distinguishes it from competitor's compounds"; and

   (c)     "ABT-518 is therefore a compelling development candidate with the potential to demonstrate antitumor effects superior to the [other] MMP inhibitors currently undergoing clinical trials."

-15-

4384351.1

69.    [The various versions of Abbott's Descriptive Memorandum for ABT-518 also consistently identify other "MMPIs in Clinical Development for Cancer" as including "Marimistat" [sic], which reportedly was being developed by British Biotechnology and Schering Plough, and "Prinomastat," which reportedly was being developed by a combination of Agouron Pharmaceuticals, Warner Lambert and Pfizer.]

70.    With respect to these competing MMPI compounds, each version of Abbott's Descriptive Memorandum states that,

> [a]lthough Abbott's timing to market is not optimal, the shortcomings of the competitive products provide an opportunity for a compound with an improved SE or efficacy profile. Current animal models seem to predict Abbott's compound [i.e., ABT-518] is superior to those currently in clinical trials, and has the potential to be best in class.

71.    Prior to the execution of the Agreement, Abbott never wavered in its representations to John Hancock that Abbott regarded ABT-518 as a "compelling development candidate" that had "the potential to be best in class" among a "novel therapeutic class" of similar compounds being developed by a range of pharmaceutical companies.

72.    Abbott's express representation to John Hancock in the Agreement that Abbott still regarded ABT-518 to be a "compelling development candidate" as of March 13, 2001, as well as various other representations that Abbott made to Hancock in the Agreement regarding the purported prospects and condition of ABT-518, were materially false and/or incomplete. Material facts that Abbott either misrepresented or failed to disclose to John Hancock include, *inter alia*, the following:

(a)    [Contrary to the representations made by Abbott in its Descriptive Memorandum for ABT-518, Abbott knew before the Agreement was signed that other pharmaceutical companies had dramatically curtailed or discontinued their

own MMPI programs. Members of Abbott's management were aware no later than February 2001 that Agouron Pharmaceuticals and Pfizer had announced the prior summer that they were "stopping Phase III trials of Prinomastat in advanced prostate [cancer] and NSCLC [non-small cell lung cancer] because 'primary efficacy objectives were not met,'" and that "Marimastat development was discontinued" by British Biotech on February 15, 2001;]

(b)    Less than one week prior to the execution of the Agreement, the senior management of Abbott's Pharmaceuticals Division -- led by Dr. Leiden and including Dr. Leonard -- reviewed ABT-518's current status and prospects as part of the comprehensive Initial Portfolio Prioritization Review that they conducted on March 7-9, 2001. Questions were raised about ABT-518 during the course of the review in light of the information that several competitor MMPIs already had been discontinued;

(c)    Shortly after the presentation and discussion concerning ABT-518, Dr. Leiden, in his capacity as Executive Vice President of Abbott's Pharmaceuticals Division and its Chief Scientific Officer, ordered an immediate halt to all expenditures on the development of ABT-518 due to his concerns about the low prospects of success for that compound. Dr. Leiden's order to "Hold/T[erminate]" ABT-518 and "halt all further expenditure" on that Program Compound was memorialized in the Initial Portfolio Prioritization document prepared by McKinsey and distributed shortly therafter to various Abbott personnel, including Dr. Leiden;

-17-

(d)     Consistent with the decision made at Abbott's Initial Portfolio Prioritization Review in early March 2001, Abbott personnel working on ABT-518 were instructed by their superiors on Sunday, March 11, 2001 (*i.e.*, two days before the Agreement was executed), to "stop all development activities immediately." Dr. Azmi Nabulsi, an Abbott employee who was working on the Phase I study of ABT-518 that Abbott recently had commenced in the Netherlands, notified his counterpart in Europe the same day that "we are not proceeding with the trial as a result of the [ABT-518] projects re-prioritization following the acquisition of Knoll";

(e)     As a consequence of Abbott's order to stop all development activities on ABT-518 immediately because of the low prospects of success for that compound, further enrollment in the Phase I trial of ABT-518 was halted on or about March 12, 2001 (*i.e.*, the day before the Agreement was executed);

(f)     When Mr. Deemer learned, just before the Agreement was signed, that Abbott's senior management had decided to halt further development of ABT-518, he contacted Dr. Leonard to remind him that ABT-518 was one of the Program Compounds in the planned John Hancock portfolio of compounds. Dr. Leonard, in turn, promptly spoke with Dr. Leiden, reminded him of the impending Agreement with John Hancock, and suggested that Abbott proceed with the development of ABT-518; and

(g)     On March 13, 2001 (*i.e.*, the day the Agreement was executed), Dr. Leiden directed Abbott personnel to recommence the Phase I trial of ABT-518 and signed the Agreement on Abbott's behalf.

73.    The Phase I trial of ABT-518 did not immediately recommence on March 13, 2001. It took Abbott personnel and the clinicians at the trial sites more than another week to resume patient enrollment in the trial.

74.    Certain other development work on ABT-518, including various toxicology tests and analyses, never was resumed by Abbott after being halted, per Dr. Leiden's order, on or about March 12, 2001.

75.    Abbott terminated its previously halted Phase I clinical trial of ABT-518 again less than sixty (60) days after the Agreement was executed.

76.    Although Abbott's purported reason for resuming that trial was to give Abbott personnel the opportunity to review additional data on competing MMPI compounds that was scheduled to be released at the annual meeting of the American Society of Clinical Oncology (ASCO) in San Francisco, California on May 12-15, 2001, Abbott's senior management -- again including Dr. Leiden and Dr. Leonard -- did not wait to receive and review that data before ordering, once again, a complete halt to all development work on ABT-518.

77.    Abbott's renewed decision to terminate the development of ABT-518 was made the week before the ASCO meeting during Abbott's Final Portfolio Prioritization Review and Strategy Retreat (the "Final Portfolio Prioritization Review"), which was held on May 5-6, 2001.

78.    Abbott's decision to terminate ABT-518 once-and-for-all was memorialized in a document titled "Strategy Retreat Output" that was prepared by representatives of McKinsey and subsequently distributed to various Abbott personnel, including Dr. Leiden.

79.    Even if Abbott had waited until after the May 2001 ASCO conference to make its decision, the result would not have been any different. According to Dr. Azmi Nabulsi,

-19-

4384351.1

who led Abbott's ABT-518 development team and was an attendee at the ASCO conference in San Francisco, the ASCO results did not provide significantly new information on competing MMPI compounds to Abbott.

80.    News of Abbott's renewed decision to cease the development of ABT-518 and, once again, to halt the Phase I trial of that compound was conveyed to Abbott employees working on ABT-518 in early June 2001, and to the investigators conducting the trial in mid-June 2001.

81.    As a result of Abbott's decision to terminate the development of ABT-518 in May 2001, before completion of its Phase I trial in human subjects, no pharmacodynamic analyses or formal efficacy analyses could be completed, and no safety conclusions could be drawn from the aborted Phase I study, for the purpose of making a Go/No Go decision for ABT-518.

82.    Abbott did not notify John Hancock of its renewed decision to terminate ABT-518 until September 20, 2001, at which time Abbott stated only that it had "refocused its efforts in cancer discovery and, as a result, has made the decision to terminate the MMPI Program, which includes Program Compound ABT-518."

83.    Abbott provided no additional information regarding the basis for, or the history of, its decision to terminate ABT-518 to John Hancock.

84.    Just one week after Abbott's Agreement with John Hancock was executed, Mr. Deemer sent Dr. Perry Nisen, the head of Abbott's Oncology R&D Program, an e-mail message stating, in part,

> You probably heard that Hancock was signed last week: $214,000,000 over 4 years! A long time coming but finally done. We had a little scare at the end when it looked like 518 was being slowed down which could have been the deathnell [*sic*]

to the deal.  I worked with John [Leonard] to protest that and I understand it is back on track....

85.    Mr. Deemer and other Abbott management personnel understood before the Agreement with John Hancock was executed that ABT-518 was an important part of the proposed portfolio of Program Compounds that was encompassed by that Agreement.  They recognized that even a slow down in the development of ABT-518, if disclosed to John Hancock, had the potential to delay, kill or otherwise impact the structure of that Agreement.

86.    The "scare" that Mr. Deemer referred to in his e-mail to Dr. Nisen was Abbott's fear that John Hancock would not enter into the Agreement if Hancock knew about Abbott's prior decision to halt all further development of ABT-518 because of the low prospects of success for that compound.

87.    The true prospects and condition of ABT-518 as of March 13, 2001 was information material to John Hancock's decision to enter into the Agreement.

88.    Abbott misrepresented and/or failed to disclose material information concerning the prospects and condition of ABT-518 to John Hancock in the Agreement.

89.    Abbott's misrepresentations or failures to disclose material information concerning the prospects and condition of ABT-518 to John Hancock in the Agreement were, in whole or in significant part, undertaken wantonly, willfully and with knowledge of their falsity for the purpose of fraudulently inducing Hancock to enter into that Agreement.

90.    Had Abbott informed John Hancock of the true prospects and condition of ABT-518 as of March 13, 2001, that information would have significantly altered the economics and attractiveness of the proposed funding deal from John Hancock's perspective, and Hancock would not have entered into that Agreement in its present form, or would not have entered into any funding agreement with Abbott whatsoever.

4384351.1

91.    As a result of Abbott's misrepresentations, omissions and fraud with respect to ABT-518, John Hancock has suffered monetary and other damages.

ABT-594

92.    According to Abbott, ABT-594 is a selective neuronal nicotinic ("NNR") agonist, a class of compounds intended to treat moderate to severe pain, including neuropathic pain.

93.    Neuropathic pain is chronic pain resulting from injury to the nervous system.

94.    Over the approximately ten months of active contract negotiations leading up to the execution of the Agreement, Abbott supplied John Hancock with three versions of its Descriptive Memorandum for ABT-594; an initial draft dated April 2000; an updated draft dated November 2000; and the final version, dated February 2001, that forms part of collective Exhibit 12.2(i) to the Agreement.

95.    With some minor variations, each version of Abbott's Descriptive Memorandum consistently described ABT-594, *inter alia*, as follows:

(a)    "ABT-594 is a non-opioid, non-[steroidal anti-inflammatory drug] analgesic that is ... 30 to 100-fold more potent and equally efficacious to morphine in several well-characterized animal models of pain.  The preclinical side effect and dependency liability profile of ABT-594 is superior to that of morphine";

(b)    Abbott's "initial targeted indication [for ABT-594] is symptomatic treatment of diabetic neuropathic pain";

(c)    "A phase IIb study for neuropathic pain at higher, titrated doses of ABT-594 began in April 2000 and ends in June 2001.  A total of 320 patients is anticipated to be included in the study";

(d)    Abbott's New Drug Application (NDA) filing for ABT-594 was "expected in 3Q2003"; and

(e)    Abbott "expected" ABT-594 "to be the first neuronal nicotinic receptor agonist to receive an indication for pain.  It has a novel mechanism of action and a potentially broad coverage of chronic pain conditions.  In addition, it has an

-22-

opioid-like efficacy without tolerance, dependence or abuse potential, while having equivalent/superior efficacy to other drugs used to treat neuropathic pain."

96.    [Abbott simultaneously represented to John Hancock in its first ARP that Abbott's "2001 Current Projection (Plan)" for spending on ABT-594, as of the date of the Agreement, was "35.0" million dollars, including over $11.5 million for additional Phase II and Phase III studies of the compound that Abbott purportedly planned to commence in Calendar Year 2001.]

97.    Prior to the execution of the Agreement, Abbott never wavered in its representations to John Hancock that ABT-594 had "an opioid-like efficacy without tolerance, dependence or abuse potential," and that Abbott "expected" ABT-594 "to be the first neuronal nicotinic receptor agonist to receive an indication for pain."

98.    Abbott's express representation to John Hancock in the Agreement that Abbott "expected" ABT-594 "to be the first neuronal nicotinic receptor agonist to receive an indication for pain" as of March 13, 2001, as well as various other representations that Abbott made to Hancock in the Agreement regarding the prospects and condition of ABT-594 [and Abbott's expected spending on that compound,] were materially false and/or incomplete. Material facts that Abbott either misrepresented or failed to disclose to John Hancock include, *inter alia*, the following:

(a)    Abbott's Phase IIb trial of ABT-594 for the treatment of diabetic neuropathic pain (known within Abbott as trial "M99-114") commenced in April 2000. The Phase IIb trial was designed to include 320 "subjects" or patients in a "double-blinded" format in order to achieve what Abbott perceived would be a statistically significant result.    Almost immediately, Abbott's Phase IIb trial

-23-

4384351.1

encountered problems with "premature terminations" (*i.e.*, subjects dropping out of the trial early) due primarily to "adverse events" ("AEs") or side effects among trial subjects involving moderate-to-severe nausea, emesis (*i.e.*, vomiting) and dizziness;

(b)     By June 2000, Abbott's ABT-594 Product Development Team already was reviewing the available "strategic options" to address the slow enrollment of subjects in the trial. The premature termination and enrollment problems did not improve, however. As of July 7, 2000, of the 78 subjects who had entered Abbott's Phase IIb study of ABT-594, "at least" 31 had prematurely terminated their involvement in the study due to adverse events;

(c)     By August 2000, there was "much concern with the drop out rate" in the Phase IIb trial among members of Abbott's ABT-594 Product Development Team;

(d)     Abbott continued to try various measures in the Summer and Fall of 2000 to address the premature termination and enrollment problems that it was encountering in its Phase IIb trial of ABT-594, including sending written surveys to the various clinical test sites to "examine AEs (nausea, vomiting, and dizziness)," and extending the enrollment deadline for the trial from September 22, 2000, to March 2, 2001. Abbott even investigated the possible use of one or more outside patient recruitment firms to assist in identifying and enrolling more subjects in the study. The patient recruitment firms that Abbott solicited were informed, *inter alia*, that the Phase IIb study had a "[h]igh study dropout rate of 34% primarily due to side effects of the investigational drug";

-24-

(e)    By the Fall of 2000, members of Abbott's senior management regarded ABT-594 as having "questionable commercial viability";

(f)    In mid-to-late 2000, Abbott employees with responsibility for supervising the Phase IIb trial of ABT-594 reviewed the preliminary, blinded trial data and concluded that the episodes of nausea and vomiting observed in the trial probably were dose-related. They considered, but ultimately rejected, revising the trial while it was underway to eliminate the highest dosage (*i.e.*, 300 microgram) cohort in an effort to reduce the observed rate of nausea and vomiting;

(g)    In early December 2000, Abbott's management decided not to retain a patient recruitment firm for its Phase IIb study of ABT-594, concluding that doing so was not a "viable option at this time";

(h)    Rather than continue to try to bolster patient enrollment in its Phase IIb trial of ABT-594, Abbott decided in December 2000 to prematurely terminate that trial as of January 5, 2001, a date that Abbott recognized was "2 months ahead of [its] most recent estimate of March 5, 2001" and would result in "less than [Abbott's] original target of 320 patients";

(i)    Enrollment in Abbott's Phase IIb study of ABT-594 actually was stopped on January 5, 2001, at 266 subjects;

(j)    Abbott understood as of December 2000 that prematurely terminating its Phase IIb study of ABT-594 at less than 320 subjects would undermine the statistical validity of that study and render it effectively useless for advancing the further development of ABT-594;

-25-

(k)     Abbott made the decision in early December 2000 to prematurely terminate its Phase IIb trial of ABT-594 based, in significant part, on the belief of Abbott personnel that the final results of that trial were likely to demonstrate that ABT-594 was not a viable commercial product;

(l)     Abbott made what it described internally as "significant changes" in its developmental strategy for ABT-594 at or around the time that Abbott decided to prematurely terminate its Phase IIb trial of that compound.  Those significant changes included Abbott's decision in late 2000 to explore a potential co-development partnership for ABT-594 with other pharmaceutical companies;

(m)     Abbott personnel were concerned, however, about the potential impact of disclosing what was described internally at Abbott as ABT-594's "nausea and vomiting issue" to possible co-development partners;

(n)     In the end, none of the pharmaceutical companies that Abbott approached in late 2000 or early 2001 concerning ABT-594 was willing to enter into a co-development agreement for that compound;

(o)     [At or around the same time that Abbott made significant changes in its developmental strategy for ABT-594 and began searching for a co-development partner for that compound, Abbott significantly reduced its planned spending on ABT-594 for Calendar Year 2001.  Although Abbott continued to represent to John Hancock in drafts and in the final version of its first ARP that it expected spending "35.0" million dollars on the development of ABT-594 in 2001, Abbott's actual planned spending on ABT-594 in 2001 had dropped, as of early

4384351.1

March 2001, to approximately $9.3 million, a reduction of more than 73 percent;]

(p)  [Abbott's reduced spending for 2001 included enough funds to complete a "Go/No Go" decision regarding ABT-594 following the prematurely terminated Phase IIb trial, but did not include any funding for the previously planned additional Phase II or Phase III trials of that compound, which were described in Abbott's internal 2001 Plan Final Reference Package as having been "Delayed";]

(q)  Representatives of Abbott's ABT-594 Product Development Team made a presentation concerning ABT-594 to members of Abbott's senior management (including Dr. Leiden) on February 2, 2001. Information concerning the prematurely terminated Phase IIb trial was included in the presentation. The presentation also included information about potential NNR "back-up" or "follow-on" compounds to ABT-594. At the conclusion of the presentation, Abbott's management recommended that Abbott personnel develop a "comprehensive strategy to address tolerability issues related to NNRs for pain, including ABT-594 and follow-ons";

(r)  By February or early March 2001, Abbott scientific personnel who were charged with discovering and developing new NNR compounds had concluded that "ABT-594 … is an imperfect drug" due, in large part, to the "key adverse events of emesis, nausea, and dizziness that have consistently been observed during clinical evaluation of ABT-594";

-27-

(s)     Members of Abbott's senior management, including Drs. Leiden and Leonard, reviewed ABT-594 again in the course of Abbott's Initial Portfolio Prioritization Review on March 7-9, 2001. Preliminary data from the recently discontinued Phase IIb trial of ABT-594 was discussed during the Initial Portfolio Prioritization Review, and concerns were expressed about the data;

(t)     As part of, or shortly after, the Initial Portfolio Prioritization Review, members of Abbott's senior management, again including Dr. Leiden, met in executive session and discussed what they thought would be the likely outcome of the Phase IIb trial of ABT-594 and, ultimately, Abbott's development program for that compound. Abbott's senior management surmised that the Phase IIb trial outcome would be negative, with the result that they likely would terminate ABT-594; and

(u)     [The collective consensus of Abbott's senior management, reached prior to March 13, 2001, that ABT-594 was a "probable T[erminate]" was memorialized in the Initial Portfolio Prioritization document prepared by McKinsey.]

99.     As Abbott's senior management predicted at the Initial Portfolio Prioritization Review in early March 2001, Abbott in fact terminated the development of ABT-594 not long after the results of the Phase IIb neuropathic pain trial were officially unblinded in April 2001. Those results confirmed that each of the three dosages of ABT-594 tested in the study "Were Associated with a Dose Dependent Increase in Adverse Events, Especially Nausea, Vomiting and Dizziness." The resultant "Unfavorable Side Effect Profile" was sufficient to terminate the compound.

4384351.1

100.    Abbott notified John Hancock of its decision to terminate the development of ABT-594 on November 20, 2001, at which time Abbott told Hancock only that it had "decided to terminate further development of ABT-594 (a drug for the treatment of neuropathic pain)."

101.    Abbott provided no additional information regarding the basis for, or the history of, its decision to terminate ABT-594 to John Hancock.

102.    The true prospects and condition of ABT-594 as of March 13, 2001, [as well as Abbott's actual expected spending on ABT-594 in Calendar Year 2001 as of that date,] was information material to John Hancock's decision to enter into the Agreement.

103.    Abbott misrepresented and/or failed to disclose material information concerning the prospects and condition of ABT-594, [and its expected spending on that compound,] to John Hancock in the Agreement.

104.    Abbott's misrepresentations or failures to disclose material information concerning the prospects and condition of ABT-594, [and its expected spending on that compound,] to John Hancock in the Agreement were, in whole or in significant part, undertaken wantonly, willfully and with knowledge of their falsity for the purpose of fraudulently inducing Hancock to enter into that Agreement.

105.    Had Abbott informed John Hancock of the true prospects and condition of ABT-594, [as well as Abbott's actual expected spending on that compound,] as of March 13, 2001, that information would have significantly altered the economics and attractiveness of the proposed funding deal from John Hancock's perspective, and Hancock would not have entered into that Agreement in its present form, or would not have entered into any funding agreement with Abbott whatsoever.

4384351.1

106.    As a result of Abbott's misrepresentations, omissions and fraud with respect to ABT-594, John Hancock has suffered monetary and other damages.

<u>ABT-773</u>

107.    According to Abbott, ABT-773 is a member of a "promising new class of antibiotics known as ketolides" that was "likely to have activity against resistant strains of bacteria and will, therefore, compete effectively against currently marketed antibiotics."

108.    Over the approximately ten months of active contract negotiations leading up to the execution of the Agreement, Abbott supplied John Hancock with three versions of its Descriptive Memorandum for ABT-773; an initial draft dated June 5, 2000; an updated draft dated November 1, 2000; and the final version, dated February 2001, that forms part of collective Exhibit 12.2(i) to the Agreement.

109.    Each version of Abbott's Descriptive Memorandum consistently described ABT-773, *inter alia*, as follows:

(a)    "Product features such as high efficacy, activity against resistant strains of bacteria and convenience should enable it to compete against both Zithromax and newer agents such as quinolones";

(b)    "Dosing is expected to be once-a-day.   A 5-day convenience pak at a competitive price will help maximize sales";

(c)    "The likely profile of ABT-773 justifies further development:

-    ABT-773 pertains to a new class of antibiotics.

-    Good activity against resistant Gram+ organisms, particularly macrolide-resistant *S. pneumoniae*.

-    Convenience, safety and tolerability profile competitive with [Zithromax].

-    Oral suspension and I.V. forms enabling penetration into pediatrics and hospital segments."

-30-

4384351.1

110.    Zithromax is a competing macrolide-based antibiotic that already was commercially available at the time the Agreement was executed in March 2001. Abbott believed as of early 2001 that Zithromax's tolerability had "redefined expectations for tolerability of new agents" and had "moved the market toward short course therapies dosed once daily."

111.    Quinolones are yet another type of antibiotic with which ABT-773 potentially would compete.

112.    [Prior to the execution of the Agreement, Abbott never wavered in its representations to John Hancock that ABT-773 was "expected" to have "once-a-day" or "QD" dosing and a "[c]onvenience, safety and tolerability profile competitive" with Zithromax, and that Abbott was developing "[o]ral suspension and I.V. forms" of ABT-773 that would "enable[e] penetration into pediatrics and hospital segments."]

113.    [Abbott recognized, prior to March 2001, that "once-a-day" or "QD" dosing of ABT-773 would be "necessary for [the] commercial success" of that compound because other competing drugs on the market already used once-a-day dosing for the same indications that ABT-773 was intended to address.]

114.    [Abbott further recognized, prior to March 2001, that United States Food and Drug Administration (FDA) rules typically require a drug sponsor to conduct studies in pediatrics as part of the overall approval process for new pharmaceutical compounds, and that "meeting this rule is a regulatory obligation and a cost of doing business."]

115.    [Abbott's express representations to John Hancock in the Agreement that Abbott "expected" ABT-773 to have "once-a-day" dosing and a "[c]onvenience, safety and tolerability profile competitive" with Zithromax, as well as various other representations that

-31-

4384351.1

Abbott made to Hancock in the Agreement regarding the prospects and condition of ABT-773, were materially false and/or incomplete. Material facts that Abbott either misrepresented or failed to disclose to John Hancock include, *inter alia*, the following:]

(a)     Although not referenced anywhere in the Agreement, Abbott had significant, unresolved issues concerning the safety of ABT-773 as of March 2001, particularly with respect to the potential for abnormal heartbeat prolongation (also known as "QT" or "QTc" prolongation) and chemical-driven liver damage (also known as "hepatoxicity," "hepatotoxicity," "liver toxicity" or simply "liver tox") among clinical trial subjects who took the compound. Abbott already had seen some evidence of possible liver toxicity during preclinical testing and among Japanese patients in an early study of ABT-773 conducted in Hawaii. Moreover, "despite significant issues with the quality of the QT data collection to date," senior Abbott personnel working on the development of ABT-773 internally recognized by early 2001 that a "QT signal has emerged from both the pre-clinical and clinical programs" sufficient "to establish that there probably is an issue....";

(b)     Abbott personnel had discussions concerning ABT-773 with representatives of the FDA in late 2000 in which the FDA described "hepatotoxicity and QT changes" as the "two primary toxicities they are worried about with macrolides and ketolides," and asked Abbott to undertake additional dog toxicology testing of ABT-773 focused specifically on those issues. By February 2001, Abbott internally was describing "QTc Issues" and "Liver Toxicity Issues" as "Key Issues Facing the ABT-773 development program." Both of these "Key Issues"

remained unresolved when Abbott and John Hancock entered into the Agreement just one month later;

(c)     [Abbott recognized well before the Agreement with John Hancock was signed in March 2001 that a "once-a-day formulation [of ABT-773] may not be possible based on the short half-life of the drug and the apparent short absorption window in the GI tract." In June 2000, Abbott internal documents described "[u]ncertainty in ABT-773 convenience profile *i.e.* potential for [twice-a-day] dosing" as one of the "Key Commercial Issues" facing ABT-773;]

(d)     [Although Abbott represented to John Hancock in the Agreement that the dosing of ABT-773 was "expected to be once-a-day," Abbott had concluded one month earlier that 300 mg, once-a-day dosing of ABT-773 "was not viable" for any indication "due to high levels of diarrhea (10-20%) and taste perversion (10-20%)," and still needed data from an ongoing Phase III trial before it could determine whether 150 mg, once-a-day dosing might be viable for two of the four target indications; CAP (community acquired pneumonia) and sinusitis (chronic sinus infection). Abbott simultaneously recognized that the "[a]bsence of consistent QD dosing for all indications" presented "a significant commercial hurdle" for ABT-773 in the United States;]

(e)     [Abbott knew, prior to March 2001, that the development of a pediatric oral-suspension formulation of ABT-773 would be "very difficult" because taste tests showed the compound to be "5 to 7 times more bitter than clarithromycin," another antibiotic that Abbott already marketed under the trade name Biaxin®. Abbott further knew that its inability to develop a pediatric

-33-

formulation of ABT-773 could pose a significant regulatory hurdle for that compound in the United States because of FDA rules; and]

(f)    [Notwithstanding Abbott's entire pediatric oral suspension program for ABT-773 was "on hold" and unfunded as of early 2001.]

116.    The material information concerning the prospects and condition of ABT-773 that Abbott misrepresented or failed to disclose to John Hancock in the Agreement played an important role in the decision of Abbott's Pharmaceutical Executive Committee ("PEC") (including, once again, Dr. Leiden and Dr. Leonard) to recommend, less than nine months after the Agreement was executed, that Abbott's entire ABT-773 development project "be put on hold," and that Abbott make efforts to "aggressively pursue out-licensing or selling the compound."

117.    In subsequently explaining the rationale behind the PEC's recommendations to Miles D. White, Abbott's Chief Executive Officer, in an internal memorandum sent in early January 2002, Dr. Leiden and Dr. Leonard specifically cited, among other things, that:

(a)    "Once daily dosing has not been achieved in 3 of 4 respiratory indications," which resulted in a "corresponding decrease in the commercial value; particularly given the global trend toward once-a-day/shorter course therapy";

(b)    ABT-773 had "[u]nresolved potential safety issues," including "QT prolongation ... [that] has not been fully characterized and remains a potential liability," as well as "[s]ignificant liver enzyme elevations [that] have been observed in a few subjects in clinical trials to date, most recently in a study to evaluate QT prolongation"; and

(c)    ABT-773's "emerging side effect profile," which Dr. Leiden and Dr. Leonard described as "neither significantly better nor worse than clarithromycin in terms of taste and the potential for drug-to-drug interactions."

118.    Abbott senior management adopted the PEC's recommendation and decided, in or about early 2002, to suspend further development of ABT-773.    Taisho, a Japanese

-34-

4384351.1

pharmaceutical company with whom Abbott shared certain ABT-773 development costs, was informed in January 2002 that Abbott had "deci[ded] to stop the global development of ABT-773 except for the Japan market place," and that a "strategy for the partnering of ABT-773 is being developed and will be reviewed with management at the end of February."

119.    In early February 2002, Abbott developed a "Global Communication Plan" to convey the news of its decision concerning ABT-773 both internally and externally.

120.    Word of Abbott's decision to "delay" the further development of ABT-773 first was conveyed to Abbott employees working on the project on or about February 12, 2002.

121.    Two months later, in April 2002, Dr. Leonard asked Dr. Leiden by e-mail how Dr. Leiden wished to "handle the 773 communication" to John Hancock.  Dr. Leiden responded,

> I think we should tell them that we are
>
> 1.  reviewing the Ketek [*i.e.*, another ketolide] situation re size of safety database
>
> 2.  Carrying out additional ph I studies of QT and hepatoxicity at [the] request of FDA to assess the class effects of Ketolides
>
> 3.  Analyzing existing ph II and ph III results for impact on label and market opportunity
>
> That we expect this analysis to be complete by June July and at that point we will be in a position to make a decision on if and how to proceed with additional phIII development
>
> We will keep them in the loop as our analysis proceeds.

122.    No mention was made by Dr. Leiden in his proposed response to John Hancock of Abbott's failure to achieve once daily dosing in 3 of 4 respiratory indications, of ABT-773's still "unresolved safety issues," or of the PEC's resulting recommendation, made four months earlier, to suspend further development of ABT-773.

-35-

123.    Dr. Leonard forwarded Dr. Leiden's proposed response to John Hancock to Thomas Lyons, Controller of Abbott's Global Pharmaceutical Research and Development Division, with the comment "The Hancock response that Jeff wants."

124.    Abbott never officially notified John Hancock in writing of its decision to terminate Abbott's further development of ABT-773.  John Hancock first learned of that decision during a conference call with Abbott later in 2002.

125.    The true prospects and condition of ABT-773 as of March 13, 2001 was information material to John Hancock's decision to enter into the Agreement.

126.    Abbott misrepresented and/or failed to disclose material information concerning the prospects and condition of ABT-773 to John Hancock in the Agreement.

127.    By misrepresenting and/or failing to disclose material information concerning the prospects and condition of ABT-773 to John Hancock in the Agreement, Abbott breached that Agreement.

128.    Abbott's misrepresentations or failures to disclose material information concerning the prospects and condition of ABT-773 to John Hancock in the Agreement were, in whole or in significant part, undertaken wantonly, willfully and with knowledge of their falsity for the purpose of fraudulently inducing Hancock to enter into that Agreement.

129.    Had Abbott informed John Hancock of the true prospects and condition of ABT-773 as of March 13, 2001, that information would have significantly altered the economics and attractiveness of the proposed funding deal from John Hancock's perspective, and Hancock would not have entered into that Agreement in its present form, or would not have entered into any funding agreement with Abbott whatsoever.

-36-

130.    As a result of Abbott's misrepresentations, omissions, breach of contract and fraud with respect to ABT-773, John Hancock has suffered monetary and other damages.

### Abbott's Misrepresentations and Fraud Concerning
### Its Intended and Reasonably Expected Spending

131.    Section 2.2 of the Agreement requires Abbott, *inter alia*, to provide John Hancock, at least forty-five days (45) prior to the start of each Program Year, with a written ARP that spells out Abbott's expected Research Program expenditures for that year and for each year remaining in the Program Term.

132.    If Abbott's ARP for any given year did not "reasonably demonstrate [Abbott's] … intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target" as set forth in the Agreement, then John Hancock's "obligation to make any remaining Program Payments for any succeeding Program Years" automatically would terminate pursuant to Section 3.4(iv) of the Agreement.

133.    Abbott misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in ARPs that it provided to John Hancock, including its ARP for 2002. The Research Program cost projections that Abbott has provided to John Hancock in its various ARPs reflect Abbott's "nominal" spending, as opposed to its "expected" spending.

134.    At all relevant times, Abbott's actual intended and reasonably expected spending on Program Related Costs was considerably less than the amounts communicated to John Hancock in Abbott's various ARPs, including its ARP for 2002.

135.    Abbott's actual intended and reasonably expected spending on Program Related Costs over the four-year Program Term, as of the end of 2001, was less than $614 million.

-37-

136. [John Hancock actually and justifiably relied upon the representations concerning Abbott's intended and reasonably expected spending on Program Related Costs contained in Abbott's various ARPs, including its ARP for 2002, in making its Second Program Payment of $54,000,000 to Abbott in January 2003.]

137. By misrepresenting its intended and reasonably expected spending plans to John Hancock in its various ARPs, including its ARP for 2002, Abbott breached the Agreement.

138. Abbott misrepresented its intended and reasonably expected spending plans to John Hancock in its various ARPs, including its ARP for 2002, wantonly, willfully and with knowledge of their falsity for the purpose of fraudulently inducing Hancock to make Program Payments to Abbott that otherwise would not have been due under the terms of that Agreement.

139. [Had Abbott informed John Hancock of its actual intended and reasonably expected spending plans in its various ARPs, including its ARP for 2002, Hancock likely would not have been required to make its Second Program Payment in the amount of $54,000,000 in January 2003.]

140. As a result of Abbott's misrepresentations, breach of contract and fraud with respect to its intended and reasonably expected spending plans, John Hancock has suffered monetary and other damages.

### *Abbott's Failure to Spend the Aggregate Carryover Amount*

141. In the Agreement, Abbott agreed to spend a minimum of $614 million (defined in the Agreement as the "Aggregate Spending Target") on qualified research and development expenses (defined in the Agreement as "Program Related Costs") over the four-year Program Term.

-38-

142. Under the terms of the Agreement, the four-year Program Term commenced on March 13, 2001, and ended at midnight on December 31, 2004.

143. Section 3.3(b) of the Agreement further provides that,

> [i]f Abbott does not expend on Program Related Costs the full amount of the Aggregate Spending Target during the Program Term, Abbott will expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the 'Aggregate Carryover Amount') on Program Related Costs during the subsequent year commencing immediately after the end of the Program Term. If Abbott does not spend the Aggregate Carryover Amount on Program Related Costs during such subsequent year, Abbott will pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days after the end of such subsequent year."

144. The "subsequent year commencing immediately after the end of the Program Term" was the calendar year ending at midnight on December 31, 2005.

145. Abbott did not spend the Aggregate Spending Target on Program Related Costs over the four-year Program Term.

146. Abbott's actual spending on Program Related Costs over the four-year Program Term was approximately $442.0 million (including all milestones and management fees paid by Abbott to John Hancock, which qualify as Program Related Costs under Section 1.43 of the Agreement).

147. Accordingly, the Aggregate Carryover Amount was approximately $172.0 million.

148. Abbott did not expend the Aggregate Carryover Amount in 2005.

149. Abbott's actual spending on Program Related Costs in 2005 was approximately $72.9 million.

4384351.1

150.    Accordingly, the Aggregate Carryover Amount that remained unspent by Abbott at the end of 2005 was approximately $99.1 million.

151.    One-third of the unspent portion of the Aggregate Carryover Amount is approximately $33.0 million.

152.    Abbott did not pay John Hancock one-third of the unspent portion of the Aggregate Carryover Amount within thirty (30) days of the end of 2005 (*i.e.*, January 30, 2006), or at any other time, pursuant to the terms of the Agreement.

153.    By failing to pay John Hancock one-third of the unspent portion of the Aggregate Carryover Amount within thirty (30) days of the end of 2005, Abbott breached the Agreement.

154.    As a result of Abbott's breach of its obligation to pay John Hancock one-third of the unspent portion of the Aggregate Carryover Amount, Hancock has suffered monetary and other damages.

### *Abbott's Intentional Obstruction of John Hancock's Attempted Audit of Abbott's Compliance with the Agreement*

155.    Section 2.5 of the Agreement provides, in part, that,

> Abbott shall, and shall cause each Subcontractor to, maintain complete and accurate records … for purposes of demonstrating compliance with the terms hereof, that fully and properly reflect all work done, results achieved and Program Related Costs expended in performance of the Research Program. The books and records of Abbott and each Subcontractor related to the Research Program … shall be subject to copying, inspection and audit by (and at the expense of) John Hancock at any time and from time to time. Such audit shall occur on reasonable notice and during normal business hours by an independent auditor selected by John Hancock and reasonably acceptable to Abbott.… In the event that such audit reveals any material breach of Abbott's responsibilities hereunder, Abbott shall (i) pay the

reasonable fees and expenses charged by such auditor, and (ii) fully and promptly cure such breach.

156.     On April 12, 2004, John Hancock notified Abbott in writing that Hancock was exercising its right under Section 2.5 of the Agreement to audit Abbott's compliance with the Agreement.  John Hancock simultaneously designated representatives of The StoneTurn Group ("StoneTurn"), a consulting firm founded by various former employees of the international accounting firm of Deloitte & Touche, as its independent auditor.

157.     John Hancock's April 12, 2004 notification letter included, as "Schedule A," a non-exclusive list of various specific documents and information that StoneTurn personnel wished to inspect and copy, including, *inter alia*, materials concerning Abbott's development of the Program Compounds, its termination of various Program Compounds, its expenditures on Program Related Costs, and the status of each Program Compound as of March 13, 2001.

158.     John Hancock's April 12, 2004 notification further asked that Abbott make the requested documents and information materials available to StoneTurn personnel for inspection and copying on or before May 12, 2004 (*i.e.*, approximately thirty (30) days later).

159.     Abbott responded to John Hancock's demand for an audit of Abbott's books and records pursuant to Section 2.5 of the Agreement by engaging in a protracted, unjustified and unreasonable campaign to hinder, delay and obstruct the legitimate efforts of John Hancock and its independent auditor to examine and assess Abbott's compliance with terms of the Agreement.

160.     Specific tactics employed by Abbott to hinder, delay and obstruct the legitimate efforts of John Hancock and StoneTurn include, *inter alia*:

(a)     refusing to approve John Hancock's chosen auditor, StoneTurn, for over two months, then arbitrarily withdrawing its objection;

-41-

(b)     delaying production of many of the relevant books and records requested by John Hancock and StoneTurn for almost one year;

(c)     completely refusing to collect and make available for inspection and copying numerous relevant books and records requested by John Hancock and StoneTurn, including, but not limited to, documents concerning Abbott's actual expenditures on Program Related Costs, internal Abbott e-mails discussing or pertaining to the Program Compounds, and files relating to the Program Compounds that were maintained by individual Abbott employees;

(d)     broadly redacting various books and records produced during the course of the audit so as to eliminate relevant information and effectively render certain documents completely unintelligible, notwithstanding the existence of a written confidentiality agreement between the parties;

(e)     withholding as "privileged" various financial and other business documents that did not actually qualify for protection from disclosure to John Hancock and StoneTurn;

(f)     refusing to justify or provide support for Abbott's assertion that various financial and other business documents requested by John Hancock were "privileged" and thereby protected from disclosure to Hancock and StoneTurn;

(g)     refusing to allow StoneTurn to make copies of any books or records produced in the course of the audit;

(h)     delaying for six months or more the copying of certain books and records designated for copying by StoneTurn;

(i)     completely refusing to provide John Hancock or StoneTurn with copies of numerous books and records made available for inspection by Abbott and designated for copying by StoneTurn;

(j)     repeatedly ignoring and violating previously-acknowledged deadlines for the completion of Abbott's production of books and records responsive to John Hancock and StoneTurn's requests;

(k)     ignoring or refusing to answer various written and oral inquiries by John Hancock and StoneTurn regarding the books and records actually produced by Abbott;

(l)     completely refusing to permit John Hancock or StoneTurn to interview any Abbott personnel regarding the subject matter of the audit;

(m)     knowingly under-funding and under-staffing Abbott's response to John Hancock's audit request so as to further delay the efforts of John Hancock and StoneTurn; and

(n)     [acting in a manner contrary to the usual course of contractual compliance audits, and contrary to Abbott's own conduct in reasonably similar circumstances in the past.]

161.    On March 22, 2005, Abbott arbitrarily notified John Hancock that Abbott had fulfilled its obligations with respect to the audit and that Abbott would not respond to any further requests from, or make any additional documents or information available to, Hancock or StoneTurn.

162.    As a result of Abbott's campaign to hinder, delay and obstruct the legitimate efforts of John Hancock and StoneTurn to audit Abbott's compliance with the terms of the

Agreement, Abbott never provided all of the documentation and information that was necessary for StoneTurn to complete its compliance audit on Hancock's behalf.

163.   As a result of Abbott's campaign to hinder, delay and obstruct the legitimate efforts of John Hancock and its independent auditor to audit Abbott's compliance with the terms of the Agreement, Abbott effectively deprived John Hancock of its rights under that Agreement, including, *inter alia*, Hancock's rights under Section 2.5.

164.   As a result of Abbott's campaign to hinder, delay and obstruct the legitimate efforts of John Hancock and its independent auditor to audit Abbott's compliance with the terms of the Agreement, Abbott breached its obligations to John Hancock under that Agreement, including, *inter alia*, Abbott's obligations under Section 2.5.

165.   Abbott engaged in its campaign to hinder, delay and obstruct the legitimate efforts of John Hancock and its independent auditor to audit Abbott's compliance with the terms of the Agreement, *inter alia*, in order to conceal and further Abbott's misrepresentations, omissions and fraud with respect to that Agreement.

166.   As a result of Abbott's unlawful campaign to hinder, delay and obstruct the legitimate efforts of John Hancock and its independent auditor to audit Abbott's compliance with the terms of the Agreement, John Hancock has suffered monetary and other damages.

### *Abbott's Failure to Maximize the Value of ABT-518 and ABT-594*

167.   Section 4.3(d) of the Agreement provides that, "as soon as is practicable, Abbott shall maximize the commercial value, if any, of [a] Ceased Compound" (defined in the Agreement as a Program Compound that Abbott has "substantially cease[d] developing, marketing or selling") to "both parties by out-licensing or divesting such Ceased Compound to a third party," and that Abbott thereafter shall,

remunerate John Hancock based on sales of such Ceased Compound by the third party that has acquired or licensed the Ceased Compound … in a manner most consistent with the allocation that would have applied hereunder had such Ceased Compound not been so out-licensed or divested….

168.    Abbott substantially ceased developing ABT-518 in 2001. Accordingly, ABT-518 is a "Ceased Compound" for purposes of Section 4.3(d) of the Agreement.

169.    In the more than six years since 2001, Abbott has not out-licensed or divested ABT-518 to a third party.

170.    By failing to out-license or divest ABT-518 to a third party from 2001 to the present, Abbott has breached the Agreement.

171.    Abbott substantially ceased developing ABT-594 in 2001. Accordingly, ABT-594 is a "Ceased Compound" for purposes of Section 4.3(d) of the Agreement.

172.    In the more than six years since 2001, Abbott has not out-licensed or divested ABT-594 to a third party.

173.    ABT-894 is another NNR currently under development by Abbott.

174.    ABT-894 is a back-up or follow-on compound to ABT-594.

175.    ABT-894 is not a Program Compound encompassed by the Agreement.

176.    Abbott has made little or no effort since 2001 to out-license or divest ABT-594 to a third party due, *inter alia*, to Abbott's desire to avoid a potential negative impact on the value of Abbott's back-up or follow-on compounds to ABT-594, including ABT-894.

177.    As a result of Abbott's failure to out-license or divest ABT-518 and/or ABT-594 to one or more third parties in violation of the terms of the Agreement, John Hancock has suffered monetary and other damages.

### *John Hancock's Damages*

-45-

178.    Abbott's breaches of the Agreement and fraud are of such a nature and of such importance that the Agreement would not have been made without them.

179.    [John Hancock's actual damages resulting from Abbott's breaches of the Agreement and fraud can be, and have been, calculated by Hancock's expert witness, Mr. Alan Friedman, with reasonable certainty using reliable principles and methods applied reliably to sufficient facts and data.]

180.    [As a result of Abbott's breach of contract and fraud with respect to ABT-518 alone, John Hancock has suffered actual monetary damages having a present value of $_____.]

181.    [As a result of Abbott's breach of contract and fraud with respect to ABT-594 alone, John Hancock has suffered actual monetary damages having a present value of $._____.]

182.    [As a result of Abbott's breach of contract and fraud with respect to ABT-773 alone, John Hancock has suffered actual monetary damages having a present value of $_____.]

183.    [As a result of Abbott's breach of contract and fraud with respect to its intended and reasonably expected spending plans, John Hancock has suffered actual monetary damages having a present value of $_____.]

184.    [As a result of Abbott's breach of contract with respect to its obligation to pay John Hancock one-third of the unspent portion of the Aggregate Carryover Amount, Hancock has suffered actual monetary damages having a present value of $_____.]

185.    [As a result of Abbott's breach of contract with respect to its campaign to hinder,

4384351.1

delay and obstruct the legitimate efforts of John Hancock and its independent auditor to audit Abbott's compliance with the terms of the Agreement, Hancock has suffered actual monetary damages having a present value of $              .]

186.    [As a result of Abbott's breach of contract with respect to its failure to out-license or divest ABT-518 to a third party, Hancock has suffered actual monetary damages having a present value of $              .]

187.    [As a result of Abbott's breach of contract with respect to its failure to out-license or divest ABT-594 to a third party, Hancock has suffered actual monetary damages having a present value of $              .]

188.    [John Hancock's compensable Losses under the Agreement, including its actual damages, reasonable expenses and attorneys' fees, total $              .]

189.    [Prejudgment interest on John Hancock's compensable Losses under the Agreement totals $              .]

## II.    Proposed Conclusions of Law

### *Jurisdiction, Venue, and Choice of Law*

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). There is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000 exclusive of interests and costs.

2.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(a)(1).  Abbott resides in this district within the meaning of 28 U.S.C. § 1391(c).  Furthermore, pursuant to Section 16.2 of the Agreement, the parties agreed to the "exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts ... for the purpose of any suit, action or other proceeding" arising out of their

-47-

obligations under the Agreement, and agreed to "waive[] any and all objections that [they] may have as to venue in any such courts."

3.     Pursuant to Section 16.2 of the Agreement, Illinois law governs John Hancock's causes of action against Abbott.  Agreement, § 16.2; John Hancock Life Ins. Co. v. Abbott Laboratories, 478 F.3d 1, 6 (1st Cir. 2006) (applying Illinois law to interpretation and application of the Agreement); Lambert v. Kysar, 983 F.2d 1110, 1118 (1st Cir. 1983) (Massachusetts district courts "routinely enforce choice-of-law provisions").

### *Abbott's Fraud (Count I)*

4.     Count I of John Hancock's Second Amended Supplemental Complaint (the "Complaint") asserts a cause of action against Abbott for fraud.  In order to prove fraud under Illinois law, John Hancock must demonstrate that: (a) Abbott knowingly made a false statement and/or omission of material fact; (b) Hancock relied on that statement and/or omission; (c) Abbott made the statement and/or omission with the intent to induce Hancock to enter the Agreement; and (d) the statement and/or omission caused harm to Hancock.  *See, e.g.,* Board of Ed. of City of Chicago v. A, C and S, Inc., 131 Ill.2d 428, 452, 546 N.E.2d 580, 646 (Ill. 1989); Soules v. General Motors Corp., 79 Ill.2d 282, 286, 402 N.E.2d 599, 601 (Ill. 1980).

5.     A fact is "material" in the context of an investment if it relates to the type of information that a reasonable investor would consider in making the investment.  *See, e.g.,* Wernikoff v. Health Care Services Corp., 2007 WL 2820843, at *4 (Ill. App. 1st Dist. September 28, 2007) (*citing* Connick v. Suzuki Motor Co., 174 Ill.2d 482, 505, 675 N.E.2d 584 (Ill. 1996)); SEC v. Householder, 2002 WL 1466812, at *5 (N.D. Ill. July 8, 2002) (*citing* Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988)).

-48-

6.    Abbott cannot claim "'negligence' as against [its] own deliberate fraud" by asserting that John Hancock had an independent duty to conduct an investigation that may have uncovered the falsity of Abbott's misrepresentations.  *See* Chicago Title and Trust Co. v. First Arlington Nat'l Bank, 118 Ill.App.3d 401, 408, 454 N.E.2d 723, 729 (1st Dist. 1983) (*quoting* Lining v. Strong, 107 Ill. 295, 302 (1883)); *see also* Eisenberg v. Goldstein, 29 Ill.2d 617, 620-621, 195 N.E.2d 184, 186 (1964) ("One who by misrepresentation has induced another to act to his prejudice cannot relieve himself of liability by ... imput[ing] negligence to the other merely because of the latter's reliance on the misrepresentation."); Schmidt v. Landfield, 20 Ill.2d 89, 94, 169 N.E.2d 229, 231 (Ill. 1960) ("As a general rule one who is guilty of fraudulent misrepresentation cannot interpose a defense that the person defrauded was negligent in failing to discover the truth") (internal citations omitted).

7.    In calculating damages for fraud, Illinois follows the "benefit of the bargain" approach.  *See* Giammanco v. Giammanco, 253 Ill.App.3d 750, 758-759, 625 N.E.2d 990, 998 (2nd Dist. 1994).   "Damages are determined by assessing the difference between the actual value of the property sold and the value the property would have had if the representations had been true."  Gerrill Corp. v. Jack L. Hargrove Builders, Inc., 128 Ill.2d 179, 196, 538 N.E.2d 530, 537-538 (Ill. 1989) (internal citations omitted).

8.    Under Illinois law,

> once the existence of damage is established, evidence tending to reasonably approximate the extent of the damage is admissible. Absolute certainty as to the amount of damage in such cases is not required to justify a recovery.  It is only necessary that the evidence tend to establish a basis for the assessment of damages with a fair degree of probability.

De Koven Drug Co. v. First Nat'l Bank of Evergreen Park, 27 Ill.App.3d 798, 802, 327 N.E.2d 378, 380-381 (1st Dist. 1975) (*citing* Barnett v. Caldwell Furniture Co., 277 Ill. 286, 115 N.E. 389 (1917)).

9.     John Hancock bears the burden of proving Abbott's fraud by clear and convincing evidence.  *See* Avery v. State Farm Mutual Auto. Ins. Co., 216 Ill.2d 100, 191-192, 835 N.E.2d 801, 856 (Ill. 2005); Cole v. Ignatius, 114 Ill.App.3d 66, 74, 448 N.E.2d 538, 544 (1st Dist. 1983).

10.     John Hancock has satisfied its burden of proving Abbott's fraud by clear and convincing evidence in this case.

11.     Based on the foregoing findings of fact, the Court concludes that Abbott fraudulently and intentionally induced John Hancock to enter into the Agreement by:

(a)     knowingly misrepresenting and/or failing to disclose material information concerning the prospects and condition of ABT-518 to John Hancock in the Agreement;

(b)     knowingly misrepresenting and/or failing to disclose material information concerning the prospects and condition of ABT-594 to John Hancock in the Agreement;

(c)     knowingly misrepresenting and/or failing to disclose material information concerning the prospects and condition of ABT-773 to John Hancock in the Agreement; and

(d)     knowingly misrepresenting its intended and reasonably expected spending plans to John Hancock in its various ARPs, including its ARP for 2002.

4384351.1

12.   The Court concludes that Abbott's fraudulent misrepresentations and omissions were material to John Hancock's decision to enter into the Agreement.

13.   The Court concludes that John Hancock justifiably relied upon Abbott's fraudulent misrepresentations and omissions in entering into the Agreement.

14.   [The Court concludes that John Hancock justifiably relied upon Abbott's fraudulent misrepresentations and omissions in making its Second Program Payment in the amount of $54,000,000 in January 2003.]

15.   The Court concludes that John Hancock was under no duty to independently discover the existence, or determine the veracity, of Abbott's fraudulent misrepresentations and omissions before entering into the Agreement.

16.   The Court concludes that John Hancock suffered actual, compensable harm as a result of Abbott's fraudulent misrepresentations and omissions.

17.   The Court concludes that, as a result of Abbott's fraudulent misrepresentations and omissions, Abbott is obligated to compensate John Hancock for its resulting damages.

18.   [The Court concludes that, as a result of the willful and wanton nature of Abbott's fraudulent misrepresentations and omissions, the imposition of punitive damages on Abbott in the amount of $_____ is warranted.]

### *Abbott's Breach of Contract (Count II)*

19.   Count II of John Hancock's Complaint asserts a cause of action against Abbott for breach of contract.  In order to prove breach of contract under Illinois law, John Hancock must demonstrate: (a) the existence of a valid and enforceable contract; (b) the performance of that contract by John Hancock; (c) breach of the contract by Abbott; and (d) resulting injury to

-51-

4384351.1

Hancock. *See, e.g.,* Hickox v. Bell, 195 Ill.App.3d 976, 992, 552 N.E.2d 1133, 1143 (5th Dist. 1990); *see also* Priebe v. Autobarn, Ltd., 240 F.3d 584, 587 (7th Cir. 2001).

20.    The Court concludes that the Agreement constitutes a valid and enforceable contract.

21.    The Court concludes that John Hancock has fully performed its obligations under the Agreement.

22.    [Under Illinois law, every contract includes an implied covenant of good faith and fair dealing. *See, e.g.,* Dayan v. McDonald's Corp., 125 Ill.App.3d 972, 989-990, 466 N.E.2d 958, 971 (1st Dist. 1984).]

23.    [The covenant of good faith and fair dealing requires that a party vested with contractual discretion must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. *See, e.g.,* Dayan, 125 Ill.App.3d at 989-990, 466 N.E.2d at 971; *see also* Gore v. Indiana Ins. Co., 2007 WL 2493435, at * 2 (Ill. App. 1st Dist. September 5, 2007) (the purpose of the implied covenant of good faith and fair dealing "is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract").]

24.    Violation of an express representation or warranty constitutes a breach of contract. *See* Trustees of Indiana Univ. v. Aetna Casualty & Surety Co., 920 F.2d 429, 435 n.7 (7th Cir. 2001).

25.    John Hancock is not required to prove that it actually relied on Abbott's express representations and warranties in order to prevail on its claim against Abbott for breach of

4384351.1

those representations and warranties. *See* Mowbray v. Waste Mgmt. Holdings, Inc., 45 F.Supp.2d 132, 137 (D.Mass. 1999) ("[P]roof of reliance is unnecessary when the existence of a contractual warranty is undisputed," applying Illinois law and citing Wickoff v. Vanderveld, 897 F.2d 232 (7th Cir. 1990), and Pension Benefit Guar. Corp. v. Ziffer, No. 91-C-7762, 1994 U.S. Dist. LEXIS 87 (N.D. Ill. Jan. 4, 1994)).

26.     In calculating damages for breach of contract, Illinois follows the "benefit of the bargain" approach. *See, e.g.,* Frank Horton & Co. v. Cook Elec. Co., 356 F.2d 485, 495-496 (7th Cir. 1966).

27.     As before, under Illinois law, "[a]bsolute certainty as to the amount of damage ... is not required to justify a recovery. It is only necessary that the evidence tend to establish a basis for the assessment of damages with a fair degree of probability." De Koven Drug, 27 Ill.App.3d at 802, 327 N.E.2d at 380-381.

28.     John Hancock bears the burden of proving Abbott's breach of contract by a preponderance of the evidence. *See* Mannion v. Stallings & Co., 204 Ill.App.3d 179, 186, 561 N.E.2d 1134, 1138 (1st Dist. 1990).

29.     John Hancock has satisfied its burden of proving Abbott's breach of contract by a preponderance of the evidence in this case.

30.     Based on the foregoing findings of fact, the Court concludes that Abbott breached the Agreement by:

    (a)     misrepresenting and/or failing to disclose material information concerning the prospects and condition of ABT-518 to John Hancock in the Agreement;

    (b)     misrepresenting and/or failing to disclose material information concerning the prospects and condition of ABT-594 to John Hancock in the Agreement;

(c)     misrepresenting and/or failing to disclose material information concerning the prospects and condition of ABT-773 to John Hancock in the Agreement;

(d)     misrepresenting its intended and reasonably expected spending plans to John Hancock in its various ARPs, including its ARP for 2002;

(e)     failing to pay John Hancock one-third of the unspent portion of the Aggregate Carryover Amount within thirty (30) days of the end of 2005;

(f)     hindering, delaying and obstructing the legitimate efforts of John Hancock and its independent auditor to audit Abbott's compliance with the terms of the Agreement;

(g)     failing to out-license or divest ABT-518 to a third party from 2001 to the present;

(h)     failing to out-license or divest ABT-594 to a third party from 2001 to the present; and

(i)     [exercising its discretion under the Agreement unreasonably, with improper motive, arbitrarily, capriciously, and in a manner inconsistent with the reasonable expectations of the parties.]

31.     The Court concludes that Abbott's misrepresentations, omissions and breach of contract resulted in, or reasonably could have been expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial viability) of the Research Program or any of the Program Compounds.

32.     The Court concludes that John Hancock suffered actual harm as a result of Abbott's misrepresentations, omissions and breach of contract.

-54-

33.    The Court concludes that, as a result of Abbott's misrepresentations, omissions and breach of contract, Abbott is obligated to compensate John Hancock for its resulting damages.

34.    [The Court concludes that, as a result of the willful and wanton nature of Abbott's misrepresentations, omissions and breach of contract, the imposition of punitive damages on Abbott in the amount of $_____ is warranted.]

### Indemnification by Abbott (Count III)

35.    Count III of John Hancock's Complaint asserts a cause of action against Abbott for indemnification pursuant to the terms of the Agreement.  Section 12.6 of the Agreement provides, in relevant part, that "Abbott shall indemnify and hold John Hancock ... harmless ... from and against any Losses related to or arising out of, directly or indirectly ... any breach by Abbott of its representations, warranties or obligations hereunder...."

36.    Compensable "Losses" are defined in Section 1.27 of the Agreement as "any claims, demands, liabilities, costs, damages, judgments, settlements and other reasonable expenses (including attorneys' fees)."

37.    The Court concludes that John Hancock suffered compensable Losses as a result of Abbott's various misrepresentations, omissions and breach of contract.

38.    The Court concludes that, as a result of Abbott's various misrepresentations, omissions and breach of contract, Abbott is obligated under Section 12.6 of the Agreement to indemnify John Hancock for its resulting Losses.

-55-

4384351.1

[John Hancock reserves the right to request at trial that the Court grant the following alternative remedy.]

### Alternative Remedy of Rescission (Prayer (e))

39.    Under Illinois law, rescission is an alternative and equitable remedy for fraud or breach of contract. *See* Home Savings Ass'n of Kansas City v. State Bank of Woodstock, 763 F.Supp. 292, 296 (N.D. Ill. 1991); Newton v. Aitken, 260 Ill.App.3d 717, 719, 633 N.E.2d 213, 216 (3d Dist. 1994) (court may award rescission where there is material breach or fraud).

40.    Whether rescission is warranted in a particular case depends upon whether "the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it." C3 Technologies, Inc. v. Fontana Machine & Engineering Co., 1992 WL 97712, at *4 (quotations and citations omitted); Trapkus v. Edstrom's Inc., 140 Ill.App.3d 720, 725, 489 N.E.2d 340, 345 (3d Dist. 1986).

41.    The Court concludes that Abbott's misrepresentations, omissions, fraud and breach of contract in this matter were of such a nature and of such importance that the Agreement would not have been made without them.

42.    The Court concludes that, as a result of Abbott's misrepresentations, omissions, fraud and breach of contract in this matter, the Agreement should be, and hereby is, rescinded, and that the parties shall be returned to the *status quo ante,* including, but not limited to, a refund by Abbott to John Hancock of any and all Program Payments made by Hancock (less any payments already received by Hancock), plus interest and costs.

4384351.1

*Abbott's Affirmative Defenses*

43.    Abbott has raised various affirmative defenses to John Hancock's claims in this action.  Affirmative defenses must be plainly set forth in the defendant's answer, and the facts establishing the defenses must be plead by the defendant with the same degree of specificity as is required of a plaintiff alleging the essential elements of a cause of action.  *See* Goldman v. Walco Tool & Eng. Co., 243 Ill.App.3d 981, 989, 614 N.E.2d 42, 48 (1st Dist. 1993), *appeal denied*, 152 Ill.2d 558, 622 N.E.2d 1204 (Ill. 1993).

44.    Abbott's first affirmative defense asserts that John Hancock's Complaint fails to state a claim upon which relief may be granted.   In order to succeed, such an affirmative defense must, at the minimum, fulfill the basic pleading requirements of the Federal Rules of Civil Procedure.  *See* Bobbit v. Victorian House, Inc., 532 F.Supp. 734, 737 (N.D. Ill. 1982) (cited with approval by Heller Fin. Inc. v. Midwhey Power Co., Inc., 883 F.2d 1286, 1295 (7th Cir. 1989)).

45.    An affirmative defense that the plaintiff has failed to state a claim upon which relief may be granted will be stricken if the defendant cannot prove any set of facts in support of the defense that defeats the complaint.  *See* Builders Bank v. First Bank & Trust Co. of Illinois, 2004 WL 626827, at *2 (N.D. Ill. March 25, 2004).

46.    Abbott has failed to introduce sufficient evidence to prevail on some or all of the elements of its affirmative defense that John Hancock's Complaint fails to state a claim upon which relief may be granted.   Accordingly, that defense is hereby rejected.

47.    Abbott's second affirmative defense asserts that John Hancock's claims and requests for relief are barred, in whole or in part, by the doctrine of waiver.  Under Illinois

law, waiver is the express or implied intentional relinquishment of a known right. *See, e.g.,* Pantle v. Indus. Comm'n, 61 Ill.2d 365, 372, 335 N.E.2d 491, 496 (Ill. 1975).

48.    Abbott has failed to introduce sufficient evidence to prevail on some or all of the elements of its affirmative defense that John Hancock's claims and requests for relief are barred, in whole or in part, by the doctrine of waiver.  Accordingly, that defense is hereby rejected.

49.    Abbott's third affirmative defense asserts that John Hancock's claims and requests for relief are barred, in whole or in part, by the doctrine of estoppel.  Under Illinois law, a defense of equitable estoppel requires: (1) words or conduct by the party against whom the estoppel is alleged amounting to a misrepresentation or concealment of material facts; (2) knowledge by the party against whom estoppel is asserting at the time the representations were made that the representations are false, or that the representation was made with gross negligence as to their truth; (3) the truth respecting the representations was unknown to the party asserting estoppel at the time the representations were made and when they were acted upon; (4) the party against whom estoppel is claimed must intend or reasonably expect that the representations or concealment would be acted upon by the party asserting estoppel or the public generally; (5) the party asserting estoppel must have relied upon the representation in good faith to its detriment; and (6) the party claiming the benefit of the estoppel would be prejudiced if the other party is permitted to deny the falsity of the misrepresentation or concealment.  *See* Geddes v. Mill Creek Country Club, Inc., 196 Ill.2d 302, 313-314, 751 N.E.2d 1150, 1157 (Ill. 2001) (*citing* Vaughan v. Speaker, 126 Ill.2d 150, 162-163, 533 N.E.2d 885, 890 (Ill. 1988)).

50.    Abbott has failed to introduce sufficient evidence to prevail on some or all of the elements of its affirmative defense that John Hancock's claims and requests for relief are barred, in whole or in part, by the doctrine of estoppel.  Accordingly, that defense is hereby rejected.

51.    Abbott's fourth affirmative defense asserts that John Hancock's claims and requests for relief are barred, in whole or in part, by the doctrines of laches and unclean hands.  Under Illinois law, "a party asserting laches [as an affirmative defense] must prove two fundamental elements: (1) lack of due diligence by the party asserting a claim; and (2) prejudice to the party asserting laches."  Negron v. City of Chicago, 376 Ill.App.3d 242, 247, 876 N.E.2d 148, 153 (1st Dist. 2007) (internal citations omitted).  For the doctrine of laches to apply, a defendant must assert that the plaintiff had knowledge of his right but failed to assert it in a timely manner.  Id.  Further, "[a] reasonable excuse for delay in filing the petition will defeat the defense."  Id.

52.    A defendant asserting "unclean hands" as a defense must prove that the plaintiff is guilty of fraud or bad faith toward the defendant.  See Beitner v. Marzahl, 354 Ill.App.3d 142, 150, 819 N.E.2d 1266, 1274 (2d Dist. 2004).  "It is within the sound discretion of the trial court whether to apply the doctrine of unclean hands, and its application is not favored."  Id.

53.    Abbott has failed to introduce sufficient evidence to prevail on some or all of the elements of its affirmative defense that John Hancock's claims and requests for relief are barred, in whole or in part, by the doctrines of laches and unclean hands.  Accordingly, that defense is hereby rejected.

-59-

54.    Abbott's fifth affirmative defense asserts that John Hancock's claims and requests for relief are barred, in whole or in part, by the doctrine of election of remedies. Under Illinois law, a party pursuing a claim for breach of contract simultaneously may seek both its actual damages and rescission of the underlying agreement as alternative remedies. *See* Quality Components Corporation v. Kel-Keef Enterprises, Inc., 316 Ill.App.3d 998, 1008-1011, 738 N.E.2d 524, 531-534 (1st Dist. 2000).  An election of remedies typically does not take place unless and until the claimant has prosecuted a remedial right to judgment. *Id.*, 316 Ill.App.3d at 1008, 738 N.E.2d at 532 (citations and quotations omitted).

55.    As a "general rule," Illinois confines the doctrine of election of remedies "to cases where (1) double compensation of the plaintiff is threatened or (2) the defendant has actually been misled by the plaintiff's conduct or (3) *res judicata* can be applied." Kel-Keef, 316 Ill.App.3d at 1008, 738 N.E.2d at 531.

56.    Abbott has failed to introduce sufficient evidence to prevail on some or all of the elements of its affirmative defense that John Hancock's claims and requests for relief are barred, in whole or in part, by the doctrine of election of remedies.  Accordingly, that defense is hereby rejected.

57.    Abbott's sixth affirmative defense asserts that John Hancock's claims and requests for relief are barred, in whole or in part, by the doctrine of ratification.  A victim of fraud who accepts the benefits flowing from a contract for a considerable length of time may ratify the contract.  *See* Hofferkamp v. Brehm, 273 Ill.App.3d 263, 273, 652 N.E.2d 1381, 1389 (4th Dist. 1995).  However, "ratification can be effected only when it appears that the party to be charged with ratification clearly evidences an intent to abide and be bound by the

act, with full knowledge of the act." *Id.*; *see also* Guaranty Bank and Trust Co. v. Reyna, 201 N.E.2d 144, 151 (1st Dist. 1964).

58.    Abbott has failed to introduce sufficient evidence to prevail on some or all of the elements of its affirmative defense that John Hancock's claims and requests for relief are barred, in whole or in part, by the doctrine of ratification.  Accordingly, that defense is hereby rejected.

59.    Abbott's seventh affirmative defense asserts that John Hancock's claims and requests for relief are barred, in whole or in part, by the "doctrine of delay."  Illinois courts do not recognize an affirmative defense of delay separate and apart from the defense of laches. As stated above, "a party asserting laches [as an affirmative defense under Illinois law] must prove two fundamental elements: (1) lack of due diligence by the party asserting a claim; and (2) prejudice to the party asserting laches."  Negron, 376 Ill.App.3d at 247, 876 N.E.2d at 153 (internal citations omitted).  For the doctrine of laches to apply, a defendant must assert that the plaintiff had knowledge of his right but failed to assert it in a timely manner.  *Id.* Further, "[a] reasonable excuse for delay in filing the petition will defeat the defense." *Id.*

60.    Abbott has failed to introduce sufficient evidence to prevail on some or all of the elements of its affirmative defense that John Hancock's claims and requests for relief are barred, in whole or in part, by the doctrine of delay (or laches).  Accordingly, that defense is hereby rejected.

61.    Abbott's eighth affirmative defense asserts that John Hancock's claims and requests for relief are barred, in whole or in part, by the applicable statutes of limitation. Under Illinois law, the statute of limitations for a claim alleging breach of contract is ten (10) years.  *See* 735 ILCS 5/13-205; Armstrong v. Guigler, 174 Ill.2d 281, 291, 673 N.E.2d 290,

295 (Ill. 1996) (Illinois statute of limitations for a breach of written contract claim is ten years). The statute of limitations for a claim asserting fraud is five (5) years. *See* ILCS 5/13-206; Thompson v. Howard, 32 Ill.App.3d 991, 996, 337 N.E.2d 94, 99 (3d Dist. 1975) (Illinois statute of limitations for fraud and tortious misrepresentation claims is five years).

62.    Abbott has failed to introduce sufficient evidence to prevail on its affirmative defense that John Hancock's claims against Abbott are barred by the applicable statutes of limitation. Accordingly, that defense is hereby rejected.

63.    Abbott's ninth affirmative defense asserts that John Hancock's claims and requests for relief are barred, in whole or in part, by Hancock's own alleged violations and breaches of the Agreement.

64.    John Hancock has fulfilled all of its obligations under the Agreement. Accordingly, Abbott's affirmative defense that John Hancock's claims against Abbott are barred, in whole or in part, by Hancock's own alleged violations and breaches of the Agreement is hereby rejected.

65.    Abbott's tenth affirmative defense asserts that some or all of the damages or other relief claimed by John Hancock are not recoverable as a matter of law.

66.    John Hancock is seeking damages or other relief for breach of contract, fraud and indemnification. In calculating damages for fraud and breach of contract claims, Illinois follows the "benefit of the bargain" approach. *See* Giammanco, 253 Ill.App.3d at 758-759, 625 N.E.2d at 998 (fraud); Frank Horton, 356 F.2d at 495-496 (breach of contract).

67.    Section 12.6 of the Agreement expressly provides, in relevant part, that "Abbott shall indemnify and hold John Hancock ... harmless ... from and against any Losses related to or arising out of, directly or indirectly ... any breach by Abbott of its representations,

-62-

warranties or obligations hereunder...."  Compensable "Losses" are defined in Section 1.27 of the Agreement as "any claims, demands, liabilities, costs, damages, judgments, settlements and other reasonable expenses (including attorneys' fees)."

68.     Under Illinois law, "[a]bsolute certainty as to the amount of damage ... is not required to justify a recovery.  It is only necessary that the evidence tend to establish a basis for the assessment of damages with a fair degree of probability."  De Koven Drug, 27 Ill.App.3d at 802, 327 N.E.2d at 380-381.

69.     Abbott has failed to introduce sufficient evidence to prevail on its affirmative defense that some or all of the damages or other relief claimed by John Hancock are not recoverable as a matter of law.  Accordingly, that defense is hereby rejected.

70.     Abbott's eleventh affirmative defense asserts that John Hancock's claim for fraud is barred by the economic loss doctrine.  Under Illinois law, solely economic losses are generally not recoverable in tort actions in the absence of personal injury or property damage. See, e.g., Moorman Manuf. Co. v. Nat'l Tank Co., 91 Ill.2d 69, 88-89, 435 N.E.2d 443, 452 (Ill. 1982).  However, this rule does not apply "where the plaintiff's damages are the proximate result of a defendant's intentional, false representation (fraud)."  In re Illinois Bell Switching Station Litigation, 161 Ill.2d 233, 240-241, 641 N.E.2d 440, 443-444 (Ill. 1994).

71.     Abbott has failed to introduce sufficient evidence to prevail on its affirmative defense that John Hancock's claim for fraud is barred by the economic loss doctrine. Accordingly, that defense is hereby rejected.

4384351.1

72.     [Judgment shall enter in favor of plaintiffs John Hancock, JHVL and Manulife against defendant Abbott Labs in the amount of $\underline{\hspace{3cm}}$.]

> JOHN HANCOCK LIFE INSURANCE
> COMPANY, JOHN HANCOCK VARIABLE
> LIFE INSURANCE COMPANY and
> MANULIFE INSURANCE COMPANY
>
> By their attorneys,
>
>
> _____
> Brian A. Davis
>     (bad@choate.com/BBO No. 546462)
> Joseph H. Zwicker
>     (jzwicker@choate.com/BBO No. 560219)
> Richard C. Abati
>     (rabati@choate.com/BBO No. 651037)
> CHOATE, HALL & STEWART LLP
> Two International Place
> Boston, Massachusetts  02110
> Telephone: 617-248-5000

Date:  January 14, 2008

4289700.3

4384351.1

72.    Judgment shall enter in favor of plaintiffs John Hancock, JHVL and Manulife against defendant Abbott Labs in the amount of $_____.

JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY

By their attorneys,

Brian A. Davis
    (bad@choate.com/BBO No. 546462)
Joseph H. Zwicker
    (jzwicker@choate.com/BBO No. 560219)
Richard C. Abati
    (rabati@choate.com/BBO No. 651037)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts  02110
Telephone: 617-248-5000

Date:  January 14, 2008

4289700.3

-64-

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served by electronic and overnight mail upon Peter E. Gelhaar, Esq., Donnelly, Conroy & Gelhaar, LLP, One Beacon Street, 33rd Floor, Boston, MA 02108, and by electronic mail upon Gregory D. Phillips, Munger, Tolles & Olson LLP, 355 South Grand Avenue, Los Angeles, CA 90071, on this 14th day of January, 2008.

Stacy L. Blasberg