UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY,<br><br>         Plaintiffs,<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>         Defendant. | CIVIL ACTION NO. 05-11150-DPW |

**MARKED COPY OF PLAINTIFFS' SUPPLEMENTAL AND ADDITIONAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Defendant Abbott Laboratories ("Abbott") respectfully submits a Marked Copy of Plaintiffs' Supplemental and Additional Proposed Findings of Fact and Conclusions of Law, attached hereto as Exhibit A, pursuant to the Court's January 15, 2008 Second Amended Order Regulating Non-Jury Trial.

Dated:  February 18, 2008

Respectfully submitted,

ABBOTT LABORATORIES

By:  __/s/ Eric J. Lorenzini_____
     Eric J. Lorenzini

Jeffrey I. Weinberger (*pro hac vice*)
Gregory D. Phillips (*pro hac vice*)
Eric J. Lorenzini *(pro hac vice)*
Ozge Guzelsu *(pro hac vice)*
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth Floor
Los Angeles, CA  90071-1560
Tele:  (213) 683-9100

and

Peter E. Gelhaar (BBO#188310)
Michael S. D'Orsi (BBO #566960)
DONNELLY, CONROY & GELHAAR LLP
1 Beacon St., 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880
peg@dcglaw.com
msd@dcglaw.com

*Counsel for Abbott Laboratories*

**CERTIFICATE OF SERVICE**

      I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 18, 2008.

Date: February 18, 2008.

                                                  /s/ Ozge Guzelsu

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER LIFE INSURANCE COMPANY),<br><br>Plaintiffs,<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>Defendant. | CIVIL ACTION NO. 05-11150-DPW |

ABBOTT LABORATORIES
By: [signature]
Ozge Guzelsu (*pro hac vice*)
Munger, Tolles & Olson LLP
355 S. Grand Ave., 35th Floor
Los Angeles, CA 90071-1560
Tel: (213) 683-9100

### PLAINTIFFS' PROPOSED ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Section II.3 of the Court's Second Amended Order Regulating Non-Jury Trial, dated January 15, 2008, plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Manulife Insurance Company (collectively "John Hancock" or "Hancock") respectfully submit these proposed additional findings of fact and conclusions of law in response to defendant Abbott Laboratories' Supplemental Proposed Findings of Fact and Conclusions of Law.

4460036.1

I.  PROPOSED ADDITIONAL FINDINGS OF FACT

    A.  <u>Additional Facts Contravening Abbott's Assertion that John Hancock's Claim for Rescission is Barred by Judicial Estoppel, Waiver, Laches, Delay, Ratification or the Terms of the Agreement</u>

1. In November 2003, representatives of John Hancock and Abbott engaged in settlement discussions concerning the parties' disputes regarding the March 2001 Research Funding Agreement (the "Research Funding Agreement" or the "Agreement"). <u>Abbott expressly agreed at the start of those discussions that any and all statements made in the course of the parties' settlement negotiations would not be offered or admissible for any purpose in any subsequent proceedings between the parties.</u>

2. In November 2003, James Tyree, then Abbott's Vice President of Global Licensing and New Business Development, vehemently denied any violations of the Agreement or intentional misconduct on Abbott's part. Mr. Tyree specifically stated, in part, that "Abbott takes any allegations of fraud very seriously and, after investigating the matter, has concluded that no basis exists for any such allegation by John Hancock."

3. In the aftermath of Mr. Tyree's explicit denial of any violation or other wrongdoing on Abbott's part, John Hancock requested on November 14, 2003, that Abbott provide Hancock with documents and other information sufficient to verify Abbott's assertions. <u>Abbott responded to John Hancock's request by providing a few, carefully selected documents to John Hancock that were not sufficient to verify Abbott's assertions, then refusing to provide any additional documents or information to Hancock.</u>

4. During *Hancock I*, the Court expressly limited John Hancock's claims against Abbott to the question of "whether or not the termination of the Plaintiff's obligations as a result of shortfalls in the aggregate spending targets is well-founded."

5.  During *Hancock I*, John Hancock's counsel expressed to the Court, during a scheduling conference on March 30, 2004, his concern that Abbott subsequently might seek to preclude Hancock from asserting additional claims against Abbott pertaining to the Agreement on the basis that such claims should have been asserted in *Hancock I*.

6.  Abbott, through its counsel, expressly agreed in open Court on March 30, 2004, that Abbott would not subsequently seek to preclude John Hancock from asserting additional claims against Abbott pertaining to the Agreement on the basis that such claims should have been asserted in *Hancock I*.

7.  On April 12, 2004, John Hancock informed Abbott, pursuant to Section 2.5 of the Agreement, that Hancock was exercising its right to conduct an audit of Abbott to determine Abbott's compliance with the terms of the Agreement.

8.  Abbott responded to John Hancock's demand for an audit of Abbott's compliance with the terms of the Agreement by engaging in a protracted, unjustified and unreasonable campaign to hinder, delay and obstruct the legitimate efforts of John Hancock and its independent auditor to examine and assess Abbott's compliance.

9.  As a result of Abbott's campaign to hinder, delay and obstruct the legitimate efforts of John Hancock and its independent auditor to audit Abbott's compliance with the terms of the Agreement, Abbott did not provide the documentation and information that was necessary to complete that compliance audit.

10. Abbott engaged in its campaign to hinder, delay and obstruct the legitimate efforts of John Hancock and its independent auditor to audit Abbott's compliance with the terms of the Agreement, *inter alia*, in order to conceal and further Abbott's misrepresentations, omissions and fraud with respect to that Agreement.

11. <u>John Hancock's efforts to audit Abbott's compliance with the terms of the Agreement ended in or about March 2005 after Abbott notified Hancock that Abbott would not make any additional records or other information available for inspection by John Hancock or its independent auditor.</u>

12. <u>After Abbott's March 2005 decision to cease responding to John Hancock's attempted compliance audit, and</u> prior to the Court's decision in *Hancock I*, John Hancock filed its Complaint in this action (*Hancock II*) on June 3, 2005. <u>John Hancock's original Complaint alleged that, but for Abbott's misrepresentations and omissions, John Hancock "would have demanded different terms ... or may not have entered into the Agreement at all" and requested "such other and further relief as the Court deems just and appropriate in the circumstances,"</u> including, without limitation, rescission.

13. <u>John Hancock began taking substantial write-downs on its investment in the Research Funding Agreement as a result of Abbott's termination of ABT-518, ABT-594 and ABT-773 in 2001 and 2002, long before it filed its Complaint in *Hancock II*. As of late 2003, John Hancock calculated an estimated internal rate of return of ten to thirteen percent (10-13%) on the substantially reduced book value of that investment, down from the eighteen to twenty-two percent (18-22%) estimated yield that Hancock communicated to Abbott during negotiations. John Hancock also projected a dramatically increased probability of losing its entire invested capital of approximately twelve percent (12%), almost seven times higher than Hancock's original estimated risk of total loss of one-and-a-half percent (1.5%).</u>

14. <u>In or about September 2006, Abbott argued for the first time that John Hancock could not obtain rescission of the Agreement as an alternative remedy for Abbott's</u>

misrepresentations or fraud because John Hancock did not explicitly request such relief in its Complaint.

15. On October 24, 2006, John Hancock filed a Motion for Leave to Amend its Complaint in *Hancock II* (the "Motion to Amend") to add an explicit, alternative prayer for rescission of the Agreement.

16. Abbott originally opposed John Hancock's Motion to Amend on the grounds, *inter alia*, that: (a) John Hancock allegedly had "already elected to enforce the Research Funding Agreement and failed to promptly seek rescission"; (b) Hancock allegedly was barred by its conduct in *Hancock I* "from seeking the inconsistent remedy of rescission of the [A]greement"; (c) Hancock allegedly had "continued to accept benefits under the [Agreement] after it discovered Abbott's allegedly fraudulent conduct"; (d) Hancock allegedly had "waived its right to seek rescission" of the Agreement; and (e) Abbott allegedly "would be prejudiced if Hancock were allowed to add an alternative damages theory at this late date."

17. <u>On December 6, 2006, Abbott agreed, in return for other concessions by John Hancock, to voluntarily withdraw its opposition to Hancock's Motion to Amend its Complaint to add an explicit, alternative prayer for rescission of the Agreement, including Abbott's arguments that: (a) John Hancock allegedly had "already elected to enforce the Research Funding Agreement and failed to promptly seek rescission"; (b) Hancock allegedly was barred by its conduct in *Hancock I* "from seeking the inconsistent remedy of rescission of the [A]greement"; (c) Hancock allegedly had "continued to accept benefits under the [Agreement] after it discovered Abbott's allegedly fraudulent conduct"; (d) Hancock allegedly had "waived its right to seek rescission" of the Agreement; and (e) Abbott allegedly "would be prejudiced if Hancock were allowed to add an alternative damages theory at this late date."</u>

18.  <u>Abbott, through its counsel, simultaneously represented to the Court that Abbott's withdrawal of its opposition to John Hancock's Motion to Amend resolved "anything that ha[d] been filed or [was] in the gleam in the eye of any of the attorneys" with respect to the issues raised in that motion.</u>

19.  On December 6, 2006, Abbott also withdrew its opposition to John Hancock's Motion to Compel discovery concerning ABT-773 (the "Motion to Compel"). <u>Prior to withdrawing its opposition to John Hancock's Motion to Compel, Abbott had asserted that Hancock was not permitted to undertake any discovery concerning ABT-773, and affirmatively had blocked Hancock's efforts to conduct discovery regarding that Program Compound.</u>

20.  Abbott confirmed its agreement to withdraw its opposition to John Hancock's Motion to Amend and Hancock's Motion to Compel in a Stipulation and Proposed Order that was filed jointly by the parties on December 21, 2006. The Court subsequently adopted the parties' Stipulation and Proposed Order on January 5, 2007.

21.  <u>The legal arguments that Abbott now raises in opposition to John Hancock's alternative prayer for rescission of the Research Funding Agreement are essentially identical to the legal arguments that Abbott previously agreed to withdraw in December 2006.</u>

22.  <u>Despite withdrawing its opposition to John Hancock's Motion to Compel discovery on ABT-773 on December 6, 2006, Abbott did not produce to Hancock the bulk of its documents relating to ABT-773 until March 2007.</u>

23.  <u>From November through December 2006, Abbott produced for the first time a substantial number of additional documents relating to its misrepresentations regarding ABT-518 and ABT-594, including many documents that had been requested in the course of John Hancock's attempted compliance audit of Abbott in 2004-2005.</u>

24. <u>John Hancock did not learn all of Abbott's material misrepresentations and omissions regarding ABT-518, ABT-594 and ABT-773 until the completion of discovery in 2007. On November 8, 2007, John Hancock filed, with leave of Court, a Second Amended Supplemental Complaint alleging those misrepresentations.</u>

25. <u>Section 11.2 of the Research Funding Agreement expressly and unequivocally grants John Hancock the right to terminate that Agreement, "in addition to all other rights available to John Hancock under law and equity," including, without limitation, "such other legal or equitable remedies as shall be appropriate under the circumstances."</u>

26. <u>During negotiation of the Agreement, Abbott acknowledged that Section 11.2 serves solely to provide conditions for termination of the Agreement and, therefore, is not a limitation of remedies clause.</u>

   B. <u>Additional Facts Contravening Abbott's Assertion that Enforcing Section 3.3(b) of the Agreement According to its Express Terms Would Render that Provision an Invalid and Unenforceable Penalty</u>

27. <u>During negotiation of the Research Funding Agreement, Abbott admitted that Section 3.3(b) was intended by the parties to serve as a contractual mechanism whereby Abbott would "refund" a portion of John Hancock's Program Payments to Hancock under certain circumstances set forth in that Agreement.</u>

28. At no time prior to the commencement of this action did Abbott ever contend that Section 3.3(b) of the Agreement was intended by the parties to constitute a liquidated damages provision.

29. At no time prior to the commencement of this action did Abbott ever contend that Section 3.3(b) of the Agreement constituted an invalid and unenforceable penalty.

30.     Abbott provided an opinion letter, written by Brian J. Smith, Abbott's Assistant Secretary, Divisional Vice-President and in-house counsel, to John Hancock in conjunction with the execution of the Agreement. A copy of that opinion letter is attached to the Agreement. It states, in part, that "the Research Funding Agreement," including Section 3.3(b), "has been duly and validly authorized by [Abbott] ... and constitutes a valid and binding legal obligation of [Abbott] enforceable against it in accordance with its terms...."

II.     PROPOSED ADDITIONAL CONCLUSIONS OF LAW

A.      <u>Additional Conclusions of Law Contravening Abbott's Assertion that John Hancock's Claim for Rescission is Barred by Judicial Estoppel, Laches, Waiver, Delay, Ratification or the Terms of the Agreement</u>

31.     <u>Abbott waived the legal arguments that it now asserts in opposition to John Hancock's alternative prayer for rescission of the Research Funding Agreement by voluntarily agreeing to withdraw its prior opposition, based on essentially identical grounds, to John Hancock's Motion to Amend its Complaint in December 2006.</u>

32.     <u>A party that withdraws its opposition to an opposing party's motion and confirms its withdrawal when explicitly asked by the Court at oral proceedings "can be understood as waiving any objection." Lopez del Valle v. Gobierno de la Capital, 855 F. Supp. 34, 35 (D.P.R. 1994); see also Mountain Wireless, Inc. v. Cumulus Broadcasting, Inc., 2001 WL 40908, *1 (D. Me. Jan. 17, 2001) (by dropping previous assertion of misrepresentation in its reply memorandum to defendant's opposition, plaintiff waived argument).</u>

33.     <u>John Hancock did not engage in undue delay and is not precluded by the doctrine of laches from seeking rescission of the Agreement as an alternative remedy.</u>

34.     A defendant cannot defeat a rescission claim on grounds of undue delay when the defendant itself is responsible, in whole or in large part, for the alleged delay. *See* Roda v. Berko, 401 Ill. 335, 342, 81 N.E.2d 912, 916 (Ill. 1948) ("Where there is an intentional and deliberate fraud, as appears from the allegations of the amended complaint in this case, it is not the privilege of the perpetrator of the fraud to interpose a defense that the one defrauded was not sufficiently careful to discover the fraud and prevent its accomplishment. In such a case one cannot impute negligence as against his own deliberate fraud and say that the party defrauded gave him too much credit for honesty."); *see also* Evans v. Brooks, 124 P. 599, 603 (Okla. 1912) (delay of eight months after discovery of fraud not fatal to rescission claim when the delay was caused by defendant); Denny v. Guyton, 327 Mo. 1030, 1055, 40 S.W.2d 562, 571 (1931) (delay in bringing suit does not bar rescission when "the delay was caused by defendant's conduct").

35.     Under Fed. R. Civ. P. 54(c), "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." *See, e.g.,* U.S. v. Marin, 651 F.2d 24, 30-31 (1st Cir. 1981) (Rule 54(c) "has been liberally construed, leaving no question that it is the court's duty to grant whatever relief is appropriate in the case on the facts proved" (citations omitted)); In re Blinds to Go Share Purchase Litig., 443 F.3d 1, 8 (1st Cir. 2006) (although plaintiff did not explicitly request rescission, court upheld finding of such remedy because "in choosing among equitable remedies, a *nisi prius* court has the ability -- indeed, the duty -- to weigh all the relevant facts and circumstances and to craft appropriate relief on a case-by-case basis" (citation omitted)).

36. Fed. R. Civ. P. 54(c) authorizes the Court to rescind the Agreement, irrespective of when John Hancock ever requested that remedy, if the Court believes that Hancock is entitled to such relief.

37. Rescission may be the most appropriate remedy if calculation of actual damages would require undue speculation, as Abbott has alleged in this action. *See, e.g.*, Newton v. Aitken, 260 Ill.App.3d 717, 719-720, 633 N.E.2d 213, 216 (2d Dist. 1994) (under Illinois law, a court may grant rescission for material breach of contract, particularly when damages at law would be an inadequate remedy or would create an "injustice"); Madson v. Clark, 165 Ill.App. 228, 232, 1911 WL 2887, *2 (1st Dist. Oct. 1911) (rescission is an appropriate remedy for breach of contract where the claimant otherwise "will sustain an injury for the redress of which a court of common law can afford no adequate remedy" (quotation and citations omitted)).

38. A party to a contract may seek both its actual damages and rescission of the underlying agreement as alternative remedies. *See* Kel-Keef Enters., Inc. v. Quality Components Corp., 316 Ill.App.3d 998, 1008-1011, 738 N.E.2d 524, 531-534 (1st Dist. 2000). No election of remedies typically takes place unless and until the "prosecution of one remedial right to judgment." Kel-Keef, 316 Ill.App.3d at 1008, 738 N.E.2d at 532 (citations and quotations omitted).

39. John Hancock has not made an election of remedies, or ratified the contract, in this action so as to preclude Hancock from seeking or obtaining rescission of the Agreement as an alternative remedy at trial.

40. Rescission is an equitable remedy that involves the unwinding of a contract so as to return the contracting parties, to the extent possible, to the *status quo ante*. *See, e.g.*,

Finke v. Woodard, 122 Ill.App.3d 911, 919, 462 N.E.2d 13, 19 (4th Dist. 1984) ("The purpose of a rescissionary award is to disaffirm the transaction of the parties and restore them to the *status quo ante* as it existed prior to the execution of the contract" (citation omitted)). The "termination" of a contract, on the other hand, ends the parties' contractual relationship without necessarily altering their existing conditions or status. *See, e.g.,* Wiley v. Mason, 224 B.R. 58, 71 (N.D. Ill. 1998) ("rescission amounts to the unmaking of a contract or an undoing of it from the beginning, and not merely a termination"), *rev'd on other grounds*, 237 B.R. 677 (N.D. Ill. 1999).

41. Even assuming, *arguendo*, that the language of Sections 11.2 and 11.3 limit available remedies for material misrepresentations, omissions and fraud (which they do not), under Illinois law, exculpatory clauses for willful and wanton conduct are void as a matter of public policy. *See, e.g.,* Kleinwort Benson N.A., Inc. v. Quantum Fin. Servs., Inc., 285 Ill.App.3d 201, 215-216, 673 N.E.2d 369, 379 (1st Dist. 1996) (individual citations omitted).

42. Sections 11.2 and 11.3 of the Agreement do not bar John Hancock from seeking or obtaining rescission of the Agreement as an alternative remedy at trial.

43. Judicial estoppel applies only when a party has "deliberately chang[ed] [the] positions" that it took from a previous action in order to gain some unfair "legal advantage" over a party in a subsequent proceeding. *See* New Hampshire v. Maine, 532 U.S. 742, 749-750 (2001) (internal quotations and citations omitted); Alternative System Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004); Patriot Cinemas, Inc. v. General Cinema Corp., 834 F.2d 208, 212 (1st Cir. 1987) (judicial estoppel applies when "intentional self-contradiction is being used as a means of obtaining unfair advantage..." (quotation marks omitted)). John Hancock did not do so.

44. <u>The doctrine of judicial estoppel does not preclude John Hancock from seeking or obtaining rescission of the Agreement as an alternative remedy at trial.</u>

45. <u>Illinois law requires that a party demonstrate that it actually has been prejudiced by an opposing party's purported delay in seeking rescission of a contract in order to bar rescission on that basis.</u> *See, e.g.,* Renth v. Krausz, 219 Ill.App.3d 120, 122-123, 579 N.E.2d 11, 13 (5th Dist. 1991) (rescission of contract based upon allegation of laches requires demonstration that the claimant's "lack of due diligence has caused prejudice to an opponent"); Hay v. Albrecht, 169 Ill.App.3d 120, 121, 124, 523 N.E.2d 211, 212-213 (2d Dist. 1988) (holding in an action for rescission of an installment contract to purchase a farm that "the defense of laches is only applicable if there has been unreasonable delay in asserting a right coupled with prejudice to the opposing party as a result of the delay"); Bledsoe v. Carpenter, 163 Ill.App.3d 823, 826-827, 516 N.E.2d 1013, 1015 (3d Dist. 1987) (for alleged delay to bar rescission of a contract, it "must be such that, taken with other circumstances, it has caused prejudice to the defendant").

46. <u>Bare-bones claims of prejudice based upon a party's mere continued performance of contractual obligations fails to constitute the "serious prejudice" that is necessary to justify a finding of judicial estoppel from seeking rescission of contract.</u> *See* Desjardins v. Van Buren Community Hosp., 37 F.3d 21, 23 (1st Cir. 1994) (rejecting plaintiff's judicial estoppel argument when the defendant's alleged change in position had not "been shown to have caused any serious prejudice to judicial proceedings or the position of the opposing party"); Time Warner Sports Merch. v. Chicagoland Processing Corp., 974 F.Supp. 1163, 1170 (N.D. Ill. 1997) (rejecting claim of prejudice based on continued performance of contract).

47. <u>Continued performance under a contract does not constitute sufficient prejudice to bar rescission as a remedy.</u> *See, id.*

48. <u>Abbott has not suffered, and will not suffer, any actual prejudice as a result of John Hancock seeking and obtaining rescission of the Agreement as an alternative remedy at trial.</u>

49. <u>The Court may not and will not consider, in support of Abbott's claim that John Hancock is precluded from seeking or obtaining rescission of the Agreement, Abbott's allegations regarding the November 2003 settlement negotiations between the parties. Those settlement negotiations, and any and all statements made in the course of those settlement negotiations, may not be offered or admitted for any purpose in this proceeding pursuant to Fed. R. Evid. 408.</u>

    B.    <u>Additional Conclusions of Law Contravening Abbott's Assertion that Enforcing Section 3.3(b) of the Agreement According to its Express Terms Would Render that Provision an Invalid and Unenforceable Penalty</u>

50. <u>Contractual provisions negotiated by experienced businesspeople and their legal counsel that, at the time of contracting, allocate financial risks and burdens that would be borne by the parties under certain reasonably foreseeable circumstances are valid and binding under Illinois law.</u> *See* McClure Eng'g Assoc., Inc. v. Reuben H. Donnelley Corp., 95 Ill.2d 68, 72, 447 N.E.2d 400, 403 (Ill. 1983); Fleet Business Credit, LLC v. Enterasys Networks, Inc., 352 Ill.App.3d 456, 466, 471-473, 816 N.E.2d 619, 627, 631-633 (1st Dist. 2004) (rejecting defendant's argument that contractual provision, which required it to purchase certain financing contracts from lender in the event of a default, was a "liquidated damages clause" and an "unenforceable penalty provision," rather than a "risk-allocation contract"); Chicago Steel Rule and Die Fabricators Co. v. ADT Security Systems, Inc., 327 Ill.App.3d

642, 651, 763 N.E.2d 839, 846 (1st Dist. 2002) (upholding an exculpatory clause in a business contract on the ground that "[w]e find nothing unreasonable about the fact that the commercial parties of equal bargaining power were free to allocate the risk of loss by contract"); Intrastate Piping & Controls, Inc. v. Robert-James Sales, Inc., 315 Ill.App.3d 248, 258, 733 N.E.2d 718, 725-726 (1st Dist. 2000) (noting that such provisions are especially applicable among "sophisticated businesses, capable of protecting their own interests – and appropriately allocating risks – in the bargaining process").

51. Under Illinois law, "[p]enalties, or liquidated damages clauses in general, are distinct from alternative forms of performing the obligations under the contract." River East Plaza, LLC v. Variable Annuity Life Co., 498 F.3d 718, 722 (7th Cir. 2007).

52. Under Illinois law, a contractual provision is not void or voidable as an unenforceable penalty unless "'the *sole purpose* of the clause is to secure performance of the contract." *Id.* (citations omitted, emphasis added).

53. The sole purpose of Section 3.3(b) of the Research Funding Agreement is not to secure performance of that Agreement.

54. Section 3.3(b) of the Agreement constitutes a valid risk and cost allocation mechanism agreed upon by both John Hancock and Abbott.

55. Section 3.3(b) of the Agreement is not an invalid and unenforceable penalty or liquidated damages provision.

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY and
MANULIFE INSURANCE COMPANY

By their attorneys,


*/s/ Brian A. Davis*
Brian A. Davis
   (bad@choate.com/BBO No. 546462)
Joseph H. Zwicker
   (jzwicker@choate.com/BBO No. 560219)
Richard C. Abati
   (rabati@choate.com/BBO No. 651037)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Telephone: 617-248-5000

Date: February 4, 2008