UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY, | CIVIL ACTION NO. 05-11150-DPW |
| Plaintiffs, | |
| v. | |
| ABBOTT LABORATORIES, | |
| Defendant. | |

## AFFIDAVIT OF MICHELLE M. CAMPBELL

I, Michelle L. Campbell, hereby declare and say:

1.      My name is Michelle M. Campbell.  I am over 18 years of age, and suffer from no condition or disability that would impair my ability to give sworn testimony.  This affidavit is based upon my own personal knowledge.

Education and Professional Background

2.      I received my undergraduate degree in Biology from Northern Illinois University in 1993.  I subsequently received my paralegal certificate from Harper College.

3.      I have worked for Abbott since approximately 2002, when I became a litigation paralegal in Abbott's Legal Department.  Prior to beginning work for Abbott, I worked as a paralegal for two private Chicago law firms.  I am currently employed by Abbott as a Senior Paralegal in commercial litigation.  My immediate supervisor is Ellen Klaus, Paralegal Supervisor.

4.    Since joining Abbott, I have worked on many different general litigation projects, including responses to requests for production of documents, subpoena duces tecum, and general requests for information.

5.    As part of my responsibilities as an Abbott litigation paralegal, I have often been responsible for collecting documents from various departments and individuals at Abbott, including certain central corporate and departmental repositories of documents in hard copy and electronic form. In the course of performing this work since I joined Abbott, I have become very familiar with the various sources of documents and other information at Abbott. In addition, I have interviewed many Abbott employees in the course of my collection of information and have become very familiar with the various organizations within Abbott and their respective responsibilities. This knowledge of Abbott's sources of information, employees and organization has allowed me to perform my job responsibilities at Abbott in responding for requests for information.

The Hancock Contractual Audit

6.    In 2004, one of my responsibilities was to work on Abbott's response to the Hancock audit related to the Research Funding Agreement (the "Agreement") entered into by Abbott and Hancock on March 13, 2001. Prior to working on the audit, I had been working on projects related to the lawsuit between Hancock and Abbott which is often referred to as "Hancock I," the first of the two civil lawsuits between the parties. During 2004, I was also responsible for collecting and producing documents in that litigation.

7.    I am aware that Hancock sent an audit demand dated April 12, 2004 to Abbott that included as "Schedule A," a "preliminary list" of 30 or more particular categories of

documents sought by the audit.  I was provided with a copy of "Schedule A" to enable

me to work on Abbott's production of documents in response to it.  A true and correct

copy of Hancock's letter to Abbott dated April 12, 2004, including the "Schedule A" with

which I am familiar, is attached hereto as D's Exhibit 692.

8.      I was asked by Kenneth Wittenberg, Senior Counsel, Litigation, to participate in

the audit by organizing the collection of documents and by being the principal point of

contact for Hancock's auditors from the StoneTurn firm for purposes of the audit.

Attached hereto as D's Exhibit 798 is a true and correct copy of an email dated April 20,

2004 that I received referencing an Abbott internal meeting with Mr. Wittenberg, me, and

Amy Potthoff, Kenneth Stiles, Thomas Woidat and Richard Pinto of Abbott's finance

department regarding the Hancock audit that I attended.

9.      I was given principal responsibility at Abbott for collecting, reviewing and

producing the documents in response to Hancock's audit demand.  I worked on the audit

with Mr. Wittenberg, Abbott's outside counsel (Winston & Strawn), and non-legal

personnel who participated in the identification, collection, assembly, and copying of

documents for production to StoneTurn.  We also engaged five outside contract attorneys

through Manpower, Inc. (which works with contract firms such as Special Counsel) to

perform the review and redaction of audit documents prior to making them available to

StoneTurn.  I supervised the contract attorneys from Manpower, Inc., with the assistance

an outside contractor, Carey Crimmons, who was also engaged to help with the audit

response.

10.     I began the process of identifying and collecting documents to be produced in

response to Hancock's audit demand soon after I learned of it.  Based on my prior

experience and knowledge of Abbott and discussions with the individuals who attended the meeting referenced above, I identified Abbott employees who would be able to assist me in focusing my efforts on the most relevant sources of documents. Among the Abbott employees whom I contacted initially in this regard were, in addition to Mr. Stiles, Mr. Pinto, Mr. Woidat, and Ms. Potthoff, were Chris Sopata, Richard Herst and Rhonda Rickey, each of whom worked in one of Abbott's therapeutic areas, and Keith Hendricks, the head of Abbott's Decision Support Group, among others. For example, I recall discussing Hancock's requests for timesheets with Mr. Stiles. He informed me that timesheets were housed in Abbott's Department of Corporate Records in North Chicago.

11.     Within months of receiving the audit demand, we made several hundred boxes of documents available to StoneTurn. The majority of the documents that we collected were made available during normal business hours, at an Abbott facility located in Mundelein, Illinois. The documents included in the initial productions were mostly unredacted. Production of the remaining documents in response to Hancock's audit demand was made throughout the remainder of 2004 and early 2005. We later produced approximately 50 more boxes of documents for StoneTurn's review that required redactions and further sorting before they could be produced because they contained information unrelated to the Program Compounds identified in the Agreement ("Program Compounds"). I reviewed some of the documents being redacted throughout the course of the redaction process. The process of sorting and redaction slowed down the production of materials as compared to previous several hundred boxes of mostly unredacted documents.

12.    In total, in response to Hancock's audit demand, we collected and made over 800 boxes of documents available to Hancock for inspection.

13.    I worked diligently on collecting and producing the documents responsive to Hancock's audit demand from the time I first learned of the demand until the production was completed in March 2005. At all times, I worked to the best of my ability to ensure that the responsive documents were located, collected, reviewed and produced expeditiously. Based on my work in supervising the team of individuals who assisted collection, review and production of documents, I believe that all those who worked with me also acted in good faith to complete the production on a timely basis. At one point, after Abbott had expended over $100,000 in photocopying costs responding to the audit, I was asked by Mr. Wittenberg to temporarily defer additional photocopying for cost reasons. I was instructed, however, to otherwise continue collecting and making available documents in response to the audit. Within a few weeks, Mr. Wittenberg approved the resumption.

Sources of the Documents Produced in the Audit

14.    In determining which potential sources of documents should be searched, we started with the understanding that the goal of our efforts with regard to the audit was to search for, collect and produce all non-privileged documents related to the Program Compounds and responsive to the audit demand in Abbott's custody and possession. Based on my experience with previous productions of documents from Abbott's records, as well as my discussions with Abbott employees following our receipt of Hancock's audit demand, we determined that the materials that would need to be produced in response to the demand were kept and maintained in at least four different ways: (1) at

the "RIC" Research Information Center; (2) at Corporate Records; (3) in shared drives among relevant departments; (4) and in databases and portals set up by individual areas. I had had previous knowledge of and experience with the RIC and Corporate Records from my work as a litigation paralegal at Abbott. During the course of my work on the audit, I gained knowledge regarding the shared drives, databases and portals. The specific areas that we searched, and from which we collected and produced documents, and the scope of our efforts to collect documents from each of them are described in the following paragraphs.

15.    Abbott's "RIC," or Research Information Center is a records management service that we use to maintain all of Abbott's clinical/FDA records. It is separate from Corporate Records because it has its own rules that are intended to comply with FDA guidelines for retention and storage. The RIC maintains a large quantify of documents, including the following categories of information:  (1) regulatory filings (including INDs, NDAs, supplements, serials, correspondence with regulators); (2) trial master files (including clinical documentation that support a clinical trial, such as informed consent documents, protocols, CVs, 1572 forms (Statements of Investigators), trip reports, CRFs (Case Report Forms), investigator brochures, and clinical agreements); (3) clinical reports (including final clinical reports, preclinical animal studies, analytical reports, and product development reports); (4) specimens (actual animal tissues from preclinical GLP studies); and (5) laboratory notebook supplements.  We collected and made available to StoneTurn auditors all materials in the RIC relating to the Program Compounds and the Hancock audit demand with the exception of specimens and laboratory notebooks.

16.    Unlike the RIC records, the documents stored in "Corporate Records" are not limited to a particular kind of document, such as those relating to FDA approval. Instead, any Abbott employee can place any kind of written material into Corporate Records. Examples of some types of documents that typically are housed within Corporate Records, and which generally are not maintained within the RIC, are timesheets, purchase orders, financial documents, and other voluminous data. In addition, Corporate Records includes "governmental submission" documents, such as reports filed with the FDA regarding Abbott's research and development of compounds. We collected and made available all government submissions in Corporate Records pertaining to the Program Compounds, which to some extent might have overlapped with some RIC documents. In addition, as discussed above, we also collected and produced individual time sheets from Corporate Records.

17.    Shared drives are part of our internal computer network and are segregated by department. Each therapeutic area (as well as the accounting and financial areas) has a separate shared drive. In the financial areas, shared drives were used to save, among other things, budget proposals, presentations to management related to financial issues, and work papers. In the therapeutic areas, final papers, study protocols, research memoranda and other draft documents were saved. The relevant shared drives were searched for these documents and produced in the audit to the extent they related to the Program Compounds.

18.    We also searched a database which crosses therapeutic areas called the MPSR, which stands for the Monthly Project Status Report database. The MPSR contains various project status reports, including Monthly Highlights Memoranda, Monthly

Compound Project Status Reports, PARD reports or other monthly reports. All status reports within the MPSR database for the period March 2001 to the date of the audit production were collected for each of the Program Compounds and made available to Hancock's auditors for inspection.

19.    Abbott's oncology group, which was responsible for four of the nine compounds subject to the Agreement, maintained two other databases that are referred to internally as "portals." Although some of the data contained in these portals is duplicative of the MPSR database, we searched these portals for documents pertaining to the Research Program, and all documents related to the Research Program from these portals were made available to StoneTurn.

20.    We searched three additional databases or systems for financial and accounting documents concerning the Research Program. First, we searched for documents pertaining to the Research Program from our "R/oss" database, which tracks scientist time entries. Second, we searched for documents pertaining to the Research Program in the COMPASS database, which stands for Comprehensive Project Accounting System. The COMPASS database tracks all expenses by project. Project reports were generated from these two databases for the Research Program and were made available to Hancock's auditors in the audit. Third, we searched for relevant materials in the Optika system, which is an accounts payable system into which Administrative Check Request ("ACR") backup is scanned.

21.    We did not generally collect and produce to StoneTurn the emails and individual desk files of all of the many Abbott employees who may or may not have maintained individual files pertaining to the Research Program. Instead, we collected and produced

Abbott's company files, as described above. With respect to documents concerning out-licensing, however, we collected materials responsive to Hancock's audit demand from the desk files of various individuals who we had determined had such materials as a result of our overall search for responsive documents. After these materials were reviewed for privilege, the relevant, non-privileged documents were made available to StoneTurn.

The Photocopying of Documents Selected by StoneTurn

22.    I supervised the production and photocopying of the documents produced in the audit. We allowed StoneTurn to review and take notes regarding the documents that we produced and to designate particular documents for photocopying and later delivery. We photocopied the documents, and generally produced them to StoneTurn within a short period. We never intentionally delayed the copying or delivery of any nonprivileged books and records.

23.    We copied all of the documents designated by StoneTurn and provided them to StoneTurn, except when Abbott's attorneys determined that certain documents selected for copying were privileged and/or non-responsive and had inadvertently been included for inspection. These documents were not photocopied or delivered to StoneTurn.

24.    As reflected in a letter dated January 28, 2005 from Stephen D'Amore to Brian Davis, our original best estimate was that we would complete the audit production by January 31, 2004. However, the large quantity of documents involved, and the need for redactions, caused the production to continue, on a rolling basis, into March 2005. A true and correct copy of Mr. D'Amore's January 28, 2005 letter to Mr. Davis, of which I received a copy, is attached hereto as D's Exhibit 768.

25.     On March 22, 2005, at the direction of Abbott's counsel, I sent an email to Mark

Hair of StoneTurn informing him that Abbott had fulfilled its obligation with respect to

the audit.  Attached hereto as D's Exhibit 715 is a true and correct copy of the email

dated March 22, 2005, that I sent to Mr. Hair.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct. Executed this _15_ day of February 2008, at

_Abbott Park_ .

MICHELLE L. CAMPBELL

## **CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on J 28, 2008.

Date: January 28, 2008.

/s/ Eric J. Lorenzini
Eric J. Lorenzini (*pro hac vice*)

692

**John Hancock Financial Services, Inc.**

Bond and Corporate Finance Group

John Hancock Place
Post Office Box 111
Boston, Massachusetts 02117
(617) 572-9624
Fax: (617) 572-1628
E-mail: sblewitt@jhancock.com

**Stephen J. Blewitt**
Senior Managing Director

April 12, 2004

BY FAX (847) 937-6683
CONFIRMATION COPY BY U.S. FIRST CLASS MAIL

Mr. James L. Tyree
Vice President, Global Licensing & New Business Development
Abbott Laboratories
200 Abbott Park Road
Abbott Park, IL 60064-6189

Re:     Research Funding Agreement by and between Abbott Laboratories and John Hancock
        Life Insurance Company, John Hancock Variable Life Insurance Company, and Investors
        Partner Life Insurance Company, dated as of March 13, 2001

Dear Jim:

Pursuant to § 2.5 of the Research Funding Agreement by and between Abbott Laboratories and John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Investors Partner Life Insurance Company, dated as of March 13, 2001 (the "Agreement"), John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Investors Partner Life Insurance Company (collectively, "John Hancock") hereby give notice of the exercise of their right to inspect and audit all books and records of Abbot and of any Subcontractor[1] of Abbott with respect to the following matters:

1.  All Program Related Costs expended by Abbott during each Program Year;

2.  Compliance by Abbott with its obligations, under § 2.2 of the Agreement, to prepare and provide John Hancock with an Annual Research Plan, and to conduct the Research Program during each Program Year in accordance with the Annual Research Plan for such Program Year;

3.  Compliance by Abbott with its obligation, under § 2.3 of the Agreement, to use Commercially Reasonable Efforts to conduct the Research Program in accordance with the requirements of § 2.3 of the Agreement;

4.  Compliance by Abbott with its obligation, under § 4.3 of the Agreement, to substitute Program Compounds in accordance with the requirements of § 4.3 of the Agreement;

---

[1] Unless otherwise specified herein, capitalized terms used in this letter and in the attached Schedule A shall have the same definitions as those set forth in the Agreement.

**CONFIDENTIAL**
**JHII 011883**

5. Compliance by Abbott with its obligation, under § 4.3 of the Agreement, to out-license or divest Ceased Compounds to third parties in accordance with the requirements of § 4.3 of the Agreement;

6. The stage of development and status of each Program Compound as of March 13, 2001; and

7. The current stage of development and status of each Program Compound.

Attached hereto as Schedule A is a preliminary list of those categories of books and records that John Hancock reasonably expects will be made available for its inspection and audit of these matters. The list is provided solely to assist Abbott in complying with this notice, and not by way of limitation. John Hancock requests that all books and records of Abbott and its Subcontractors pertaining to the above-identified matters be made available for its inspection and audit, regardless whether such books and records are described on Schedule A.

John Hancock's inspection and audit of the books and records of Abbott, as set forth herein, shall be conducted by Christopher Martinez, Brian Napper and other employees of the StoneTurn Group, LLP, a firm of independent auditors retained by John Hancock. The audit shall take place during normal business hours commencing on May 12, 2004, and continuing from day to day thereafter until completion, subject to adjournment as may be necessary to accommodate scheduling exigencies. In accordance with § 2.5 of the Agreement, John Hancock reserves its right to designate for copying, at its initial expense (but subject to reimbursement by Abbott in accordance with § 2.5 of the Agreement), any or all of the books and records of Abbott that are subject to its inspection and audit.

Please inform me before the close of business on May 5, 2004 of the specific location at which Abbott will make its books and records available for inspection and audit pursuant to this notice. Please also provide me with the name of the person who the StoneTurn Group's representatives should contact upon their arrival to begin their inspection and audit.

Thank you for your anticipated cooperation.

Very truly yours,

Stephen J. Blewitt

Attachment
cc:    General Counsel (by fax, 847-938-6277; confirmation copy by mail)
       Lawrence R. Desideri, Esq.
       Peter E. Gelhaar, Esq.
       Brian A. Davis, Esq.
       Michael Arthur Walsh, Esq.

3679391v1

CONFIDENTIAL
JHII 011884

## Schedule A

1. All records and documents indicating expenditures made by Abbott related to any compound that is now or ever was a Program Compound, including the following:

   a. Abbott's standard policies and procedures related to accounting for project/program related expenditures;

   b. Abbott's chart of accounts as relevant to accounting for project/program related expenditures;

   c. Summary of costs/expenditures incurred by Program Compound by year delineating expenditures by nature (*e.g.*, direct costs incurred by Abbott, subcontractor costs, allocated indirect costs, *etc.*);

   d. Accounting framework for compiling the expenditures presented (*i.e.*, whether cost assembled on an accrual or cash basis of accounting);

   e. Identification of whether expenditures presented were capitalized or expensed under General Accepted Accounting Procedures ("GAAP") definitions;

   f. Summary of the timing of expenditures for each Program Compound within each year presented;

   g. Contracts or other governing documents and information related to all Research Program activities performed by Subcontractors;

   h. Reconciliations of annual expenditures by Program Compound to the audited financial statements of Abbott;

   i. Calculations, algorithms, and basis for all allocations included in the total expenditures by Program Compound by year;

   j. Abbott standard policies and procedures related to allocation of indirect costs;

   k. Expenditure/Costs summaries and/or reports prepared in the normal course of managing the development of each Program Compound; and

   l. Underlying supporting records (*e.g.*, timesheets, payroll records, purchase orders, invoices, *etc.*) for all expenditures made related to each Program Compound.

2. All records and documents discussing or evidencing the implementation and conduct of the Research Program, including but not limited to:

   a. Reports/Updates/Summaries prepared by Abbott in the normal course of managing the development of the Program Compounds;

   b. Listing of all reports/updates/summaries typically prepared by Abbott during the normal course of developing an experimental pharmaceutical compound;

   c. Minutes/Summaries/Notes from all management meetings in which any of the Program Compounds where reviewed or approved for further development funding;

   d. Analysis and documentation supporting all forward looking projections of expenditures to be incurred for each Program Compound by year;

**CONFIDENTIAL**
**JHII 011885**

    e. Abbott policies and guidance as to the appropriate and/or required methods/approaches/procedures for conducting a research program for an experimental pharmaceutical compound;

    f. Abbott's internal approval framework for determining whether or not to continue to fund and develop an experimental pharmaceutical compound, including all relevant thresholds for approval along the compound development process; and

    g. Minutes/Summaries/Notes from all Abbott meetings regarding continued funding of product development for any Program Compounds.

3. All records and documents concerning Abbott's obligations under § 4.3 of the Agreement, including but not limited to:

    a. Records identifying any and all Replacement Compounds;

    b. Records identifying any and all Failed Early Stage Program Compounds;

    c. Records identifying any and all Ceased Compounds;

    d. All documents pertaining to Abbott's consideration or selection of any compound to replace any Failed Early Stage Program Compound;

    e. Records identifying any and all compounds that Abbott held out as or considered to be "back up" compounds for the compounds that constituted the Program Compounds (i) on the effective date of the Agreement, and (ii) as of the end of each calendar year 2001 through 2003; and

    f. All documents pertaining to the actual or attempted out-licensing or divestiture of any Ceased Compound.

4. All records and documents concerning the status of each Program Compound as of March 13, 2001 and currently, including but not limited to:

    a. Reports/Summaries/Meeting Minutes which indicate the stage of development of each compound that originally constituted a Program Compound during the first calendar quarter of 2001;

    b. Records describing the various stages into which Abbott generally categorizes the pre-clinical and clinical development of experimental pharmaceutical compounds;

    c. Records indicating when each Program Compound reached each stage of pre-clinical or clinical development into which Abbott generally categorizes the pre-clinical and clinical development of experimental pharmaceutical compounds;

    d. Reports/Summaries/Meeting Minutes which evidence the current status of each Program Compound; and

    e. Management Reports and/or other documents prepared in the normal course of business which indicate future prospects and development expectations for each Program Compound.

3678931v1

CONFIDENTIAL

JHII 011886

**715**



Michelle L
Campbell /LAKE/CORP/ABB
OTT

03/22/2005 04:43 PM

To   mhair@stoneturn.com

cc

bcc

Subject   Hancock Audit

Hi Mark -

I am responding to your March 10, 2005 e-mail regarding the audit documents. You should have received today the final box of copies of documents from among those designated during the week of March 7, 2005. You should receive by the end of this week additional documents, less than one box, that were not available for review before your team left on Thursday, March 10.

Regarding the spreadsheet for ABT-627 mentioned in your e-mail, I will also try to send either an electronic version of the spreadsheet or a more easily readable print out of the spreadsheet as soon as possible.

Finally, regarding your remaining questions and request for identification of the specific documents that respond to each category of Hancock's audit requests, Abbott has fulfilled its obligation to comply with the audit provision of the contract, subject to the production of the remaining number of documents mentioned above

Kind Regards,

Michelle

Michelle L. Campbell
Litigation Paralegal
Abbott Laboratories
Dept. 324 Bldg. AP6D
100 Abbott Park Road
Abbott Park, Illinois 60064
Phone: 847-937-1518
Fax:    847-938-6235

---

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, use or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by return e-mail , and delete it from his or her computer.

---

CONFIDENTIAL
ABBT0126575

**768**

# WINSTON & STRAWN LLP

| | | |
|---|---|---|
| 43 RUE DU RHONE<br>1204 GENEVA, SWITZERLAND | 35 WEST WACKER DRIVE<br>CHICAGO, ILLINOIS 60601-9703 | 200 PARK AVENUE<br>NEW YORK, NEW YORK 10166-4193 |
| BUCKLERSBURY HOUSE<br>3 QUEEN VICTORIA STREET<br>LONDON, EC4N 8NH | (312) 558-5600 | 21 AVENUE VICTOR HUGO<br>75116 PARIS, FRANCE |
| 333 SOUTH GRAND AVENUE<br>LOS ANGELES, CALIFORNIA 90071-1543 | FACSIMILE (312) 558-5700 | 101 CALIFORNIA STREET<br>SAN FRANCISCO, CALIFORNIA 94111-5894 |
| | www.winston.com | 1400 L STREET, N.W.<br>WASHINGTON, D.C. 20005-3502 |

STEPHEN V. D'AMORE
(312) 558-5934
sdamore@winston.com

January 28, 2005

BY FACSIMILE AND U.S. MAIL

Brian A. Davis, Esq.
Choate, Hall & Stewart
Exchange Place
53 State Street
Boston, Massachusetts 02109-2804

      Re:  Research Funding Agreement by and between Abbott Laboratories
            ("Abbott") and John Hancock Life Insurance Company, John Hancock
            Variable Life Insurance Company and Investors Partner Life Insurance
            Company (collectively "Hancock"), dated as of March 14, 2001 (the
            "Agreement")

Dear Brian:

      I am replying to your January 26, 2005 letter. Contrary to your assertion, January 31, 2005 is not and never was any sort of "deadline" for Abbott to complete its audit production. Rather, as indicated in my November 5, 2004 letter to Karen Collari Troake, that date was Abbott's best estimate in early November of when it anticipated completing its production of files in response to Hancock's audit request. Specifically, I wrote: "Abbott presently anticipates that it will complete its production of company files in response to Hancock's audit request by January 31, 2005." You state that because of the "large amount of time" that has passed since Hancock first sent its audit request to Abbott, Hancock is not willing to extend the "deadline." I remind you that over the past nine months Abbott has gathered and produced well more than 750 boxes of documents, containing over *two million* pages of documents, responsive to Hancock's overly broad audit request. Moreover, as you are well aware, the enormous scope of Hancock's demands has necessitated extremely time-consuming redaction of documents.

      Unfortunately, because of the extensive scope of Hancock's audit demand, and the complicated nature of the redaction necessary to ensure the protection of Abbott's highly confidential information unrelated to the Program Compounds, not all of the remaining audit materials will be ready for review by StoneTurn on January 31. Abbott expects that approximately five additional boxes of material will be available for review on January 31. Approximately 20 boxes of potentially responsive materials remain in the process of being reviewed and redacted and will not be available for inspection by StoneTurn on January 31.

Campbell    35
02/20/07

CONFIDENTIAL   ABBT 0000167

**WINSTON & STRAWN** LLP

Brian A. Davis, Esq.
January 28, 2005
Page 2

While Abbott has undertaken extensive efforts to complete the review and redaction of these additional materials by January 31—including hiring multiple, additional personnel and having staff work overtime—the redaction process has proved to be more time consuming than originally anticipated. The additional 20 boxes of material will continue to be reviewed and redacted and responsive items will be made available to StoneTurn promptly upon completion of the review and redaction. Abbott believes that with these additional 20 boxes, its production of materials will be substantially completed, although it is continuing to investigate some specific inquiries that both you and StoneTurn had during our December 2004 meeting.

Finally, Abbott will not permit StoneTurn to bring its own copying equipment onto Abbott's premises. In order to ensure that it has proper control over the copying and removal of its materials from its premises, Abbott will continue to make arrangements to copy materials designated by StoneTurn and will deliver those copies promptly to StoneTurn, which is the manner in which the copying of audit materials has proceeded to date. The only "delay" in copying of which Abbott is aware is an isolated occurrence of materials that apparently were designated in July 2004, but which you did not bring to my attention until our December 2004 meeting. In any case, I understand that copies of these materials have now been made and shipped directly to StoneTurn.

Please contact me if you have any questions.

Sincerely,

Stephen V. D'Amore

cc:    L. Desideri
      K. Troake, Choate, Hall & Stewart

SVD:ll

CONFIDENTIAL

ABBT 0000168



**Kenneth A Wittenberg**
Sent by: Becky L Haun

04/20/2004 12:47 PM

To: Amy E Potthoff/LAKE/PPRD/ABBOTT@ABBOTT, Kenneth D Stiles/LAKE/PPRD/ABBOTT@ABBOTT, Michelle L Campbell/LAKE/CORP/ABBOTT@ABBOTT, Richard F Pinto/LAKE/PPRD/ABBOTT@ABBOTT, Thomas E Woidat/LAKE/PPRD/ABBOTT@ABBOTT

cc:

Subject: Meeting re Hancock audit w/Ken Wittenberg, Ken Stiles and Amy Potthoff

The meeting scheduled for today at 4:00 p.m. regarding Hancock audit is to take place in Ken **Stiles'** office.  Thank you.

Ken Wittenberg
Abbott Laboratories
Senior Counsel – Litigation
Telephone:  847/ 938-8404
Facsimile:  847/ 938-6235
E-Mail:  kenneth.wittenberg@abbott.com



CONFIDENTIAL
ABBT 0036399

Kenneth D Stiles                    To: Richard F Pinto/LAKE/PPRD/ABBOTT
04/20/2004 07:37 AM            Subject: Hancock Audit

Rich - I asked Ken Wittenberg to include you on the invite list, but from looking at this notice you were not invited. I'd like you to sit in. I recognize the timing is not good (with the Update package). We need to provide material to Hancock's auditors by May 12; out of this meeting should come some direction on gathering the necessary files, etc. I think Mischelle can handle some of the effort once we're clear on what the attorneys want pulled. Ken

Calendar Entry:
# Meeting

| Subject: | Meeting re Hancock audit w/Ken Wittenberg, Ken Stiles and Amy Potthoff | Location: | Ken's office |

| Begins: | Tue 04/20/2004 | 04:00 PM | Entry type: | ☒ Meeting |
| | | | | ☐ Appointment |
| | | | | ☐ All Day Event |
| | | | | ☐ Anniversary |
| | | | | ☐ Reminder |

| Ends: | Tue 04/20/2004 | 05:00 PM |

Chair:      Kenneth A Wittenberg/LAKE/CORP/ABBOTT
Sent by:   Becky L Haun/LAKE/CORP/ABBOTT

Invitations already sent

To: Amy E Potthoff/LAKE/PPRD/ABBOTT@ABBOTT, Kenneth D Stiles/LAKE/PPRD/ABBOTT@ABBOTT
cc:

| Pencil In | Time will appear free to others. |
| Mark Private | Others cannot see any details about this event. |
| Notify me | Have Notes notify you before the event. |

Categorize:

Description:

CONFIDENTIAL        ABBT 0008949