UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY, | CIVIL ACTION NO. 05-11150-DPW |
| Plaintiffs, | |
| v. | |
| ABBOTT LABORATORIES, | |
| Defendant. | |

## ABBOTT'S DEPOSITION DESIGNATIONS AND COUNTER DESIGNATIONS FOR STANLEY BUKOFZER

Defendant Abbott Laboratories ("Abbott") respectfully submits the attached deposition

designations and counter-designations for the May 9, 2007 deposition of Stanley

Bukofzer, MBBCh., M.Med., former Head of the Anti-Infective Venture (ABT-773),

former Head of the Anti-Infective Venture (ABT-773).

Dated:  February 18, 2008

Respectfully submitted,

ABBOTT LABORATORIES

By:  __/s/ Eric J. Lorenzini_____
      Eric J. Lorenzini

Jeffrey I. Weinberger (*pro hac vice*)
Gregory D. Phillips (*pro hac vice*)
Eric J. Lorenzini *(pro hac vice)*
Ozge Guzelsu *(pro hac vice)*
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth
Floor
Los Angeles, CA  90071-1560
Tele:  (213) 683-9100

and

Peter E. Gelhaar (BBO#188310)
Michael S. D'Orsi (BBO #566960)
DONNELLY, CONROY &
GELHAAR LLP
1 Beacon St., 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880
peg@dcglaw.com
msd@dcglaw.com

*Counsel for Abbott Laboratories*

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 18, 2008.

Date: February 18, 2008.

/s/ Ozge Guzelsu

## Stanley Bukofzer Deposition Designations

| Date | Witness | Hancock Desig | Abbott Counter Desig | Abbott Desig | Hancock Counter Desig | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|------|---------|---------------|----------------------|--------------|------------------------|---------------------|--------------------|--------------------|
| 5/9/07 | Bukofzer, Stanley | 15:24-16:6 | | | | | | |
| 5/9/07 | Bukofzer, Stanley | 56:2-56:22 | | | | | | |
| 5/9/07 | Bukofzer, Stanley | 57:2-57:15 | | | | | | |
| 5/9/07 | Bukofzer, Stanley | | 57:15-57:17 | | | | | |
| 5/9/07 | Bukofzer, Stanley | 72:10-72:18 | | | | | | |
| 5/9/07 | Bukofzer, Stanley | | 72:19-73:13 | | | | | |
| 5/9/07 | Bukofzer, Stanley | 73:14-73:23 | | | | | | |
| 5/9/07 | Bukofzer, Stanley | | 73:24-74:6 | | | | | |
| 5/9/07 | Bukofzer, Stanley | 78:6-78:13 | | | | | | |
| 5/9/07 | Bukofzer, Stanley | | 78:14-79:6 | | | | | |
| 5/9/07 | Bukofzer, Stanley | | 79:17-80:23 | | | | | |
| 5/9/07 | Bukofzer, Stanley | 93:24-94:7 | | | | | | |
| 5/9/07 | Bukofzer, Stanley | | 94:8-95:8 | | | | | |
| 5/9/07 | Bukofzer, Stanley | 95:9-96:8 | | | | | | |
| 5/9/07 | Bukofzer, Stanley | 108:21-109:8 | | | | | | |
| 5/9/07 | Bukofzer, Stanley | 147:3-147:7 | | | | | | |
| 5/9/07 | Bukofzer, Stanley | 149:17-149:20 | | | | | | |
| 5/9/07 | Bukofzer, Stanley | 166:15-166:21 | | | | 9 | IM | |
| 5/9/07 | Bukofzer, Stanley | | 166:23-167:4 | | | | | |
| 5/9/07 | Bukofzer, Stanley | | 168:3-168:12 | | | | | |
| 5/9/07 | Bukofzer, Stanley | 168:19-169:6 | | | | 9 | IM | |
| 5/9/07 | Bukofzer, Stanley | | 169:7-169:17 | | | | | |
| 5/9/07 | Bukofzer, Stanley | 171:16-173:24 | | | | 9 | IM | |
| 5/9/07 | Bukofzer, Stanley | | 174:1-174:17 | | | | | |
| 5/9/07 | Bukofzer, Stanley | | 175:7-175:13 | | | | | |
| 5/9/07 | Bukofzer, Stanley | 175:15-175:18 | | | | | | |
| 5/9/07 | Bukofzer, | | 176:4- | | | | | |

| | Stanley | | 176:8 | | | | | |
|---|---|---|---|---|---|---|---|---|
| 5/9/07 | Bukofzer, Stanley | 223:1-223:10 | | | | 13 | JA | |
| 5/9/07 | Bukofzer, Stanley | 226:19-227:6 | | | | 13 | JA | |
| 5/9/07 | Bukofzer, Stanley | | 227:7-228:2 | | | | | |
| 5/9/07 | Bukofzer, Stanley | 295:10-295:17 | | | | 23 | QM | |
| 5/9/07 | Bukofzer, Stanley | 298:16-299:10 | | | | 23 | QM | |
| 5/9/07 | Bukofzer, Stanley | | 299:20-299:23 | | | | | |
| 5/9/07 | Bukofzer, Stanley | 300:14-300:19 | | | | 23 | QM | |
| 5/9/07 | Bukofzer, Stanley | | 300:20-301:1 | | | | | |
| 5/9/07 | Bukofzer, Stanley | 301:2-301:12 | | | | 23 | QM | |
| 5/9/07 | Bukofzer, Stanley | | 301:13-301:17 | | | | | |
| 5/9/07 | Bukofzer, Stanley | 301:18-301:24 | | | | | | |
| 5/9/07 | Bukofzer, Stanley | 325:16-328:7 | | | | 23 | QM | |

# Color Key to Deposition Designations

**Designation by Plaintiffs**

**Counter Designation by Defendants**

**Designation by Defendants**

1          THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3     JOHN HANCOCK LIFE INSURANCE          )

4     COMPANY, JOHN HANCOCK VARIABLE    )

5     LIFE INSURANCE COMPANY, and        )

6     MANULIFE INSURANCE COMPANY        )

7     (f/k/a INVESTORS PARTNER          ) Civil Action

8     INSURANCE COMPANY),              )     No.

9              Plaintiffs,    ) 05-11150-DPW

10        -vs-              )

11    ABBOTT LABORATORIES,              )

12            Defendant.    )

13

14        The videotaped deposition of

15    STAN BUKOFZER, M.B., B.Ch., M.Med., called as a

16    witness herein for examination, taken pursuant to

17    the Federal Rules of Civil Procedure of the United

18    States District Courts pertaining to the taking of

19    depositions, taken before ROSANNE M. NUZZO, a

20    Notary Public within and for the County of Will,

21    State of Illinois, and a Certified Shorthand

22    Reporter of said state, at Suite 1300, Two North

23    LaSalle Street, Chicago, Illinois, on the 9th day

24    of May, A.D. 2007, at approximately 9:06 a.m.

1        And my postgraduate degree, I don't

2    recall if it was 1986 or 1987.  I'd have to just

3    check on the certificate.  It's some years back.

4        Q.    You testified that you became head of

5    the Anti-infective Venture in approximately

6    April 2001, correct?

7        A.    Correct.

8        Q.    What were your responsibilities as head

9    of the Anti-infective Venture?

10        MR. PHILLIPS:  Over -- at that time or

11    overall, over the entire period?

12        MR. ZWICKER:  Well, let's take the period

13    from 2001 to 2002.

14        THE WITNESS:  Okay.

15    BY THE WITNESS:

16        A.    My spec- -- well, there were two

17    compounds that we had in development at that

18    particular time that I was responsible for.  The

19    one compound was ABT-773, and the other compound

20    was a quinolone compound.

21    BY MR. ZWICKER:

22        Q.    Was that ABT-492?

23        A.    492, correct.

24        Q.    Is it fair to say that you were

Bukofzer, Stan (Linked)   5/9/2007  9:06:00 PM

1    responsible, in your role as head of the

2    Anti-infective Venture, for the overall

3    development of ABT-773?

4        A.   It was fair to say that my

5    responsibility was to lead a team that was

6    responsible for that development.

7        Q.   You supervised that team?

8        A.   I supervised the team.

9        Q.   Is it fair to say that your supervision

10    of that team included supervising Abbott's efforts

11    to obtain FDA approval for 773?

12        A.   Can you just repeat the question,

13    please.

14        Q.   Sure.  Is it fair to say that your

15    supervision of the 773 team included supervising

16    Abbott's efforts to obtain regulatory approval

17    from the FDA for 773?

18        A.   Yes, to the extent that it was

19    possible.  We -- my -- my specific direction was

20    to try and ensure that we could get the drug

21    approved.  Obviously, one learns a lot about drugs

22    as you develop them, and -- but one's aim

23    throughout was to try and have the drug approved,

24    not only by the FDA, but by other agencies as well

Bukofzer, Stan (Linked)  5/9/2007  9:06:00 PM

1    BY MR. ZWICKER:

2        Q.   Did you come to believe that 773 would

3    have to demonstrate to the FDA -- strike that.

4           When you took over as venture head, did

5    you understand that there was an issue for 773

6    regarding the number of times per day it would be

7    dosed?

8        A.   Yes.

9        Q.   What did you understand that issue to

10   be?

11       A.   As I understood it, that there was a

12   commercial imperative that had -- well, a

13   commercial imperative or a commercial wish that to

14   meet the market needs, it would be preferable to

15   have a once-daily dosing.  It was not an absolute,

16   but it would certainly be a preference that the

17   commercial team had, to -- to have a once-daily

18   dose.  They felt that a twice-daily dose would be

19   less commercially attractive.

20       Q.   Once-daily dosing is known as

21   "QD" dosing --

22       A.   Correct.

23       Q.   -- is that right?  Twice-daily dosing

24   is known as "BID" dosing?

1     A.   Correct.

2     Q.   You said there was a preference for

3     once-a-day dosing.  Was that across all

4     indications for 773 or just some?

5     A.   As I recall, it was -- if I can just

6     step back and just expand on that, it was a

7     preference for the U.S. commercial team to have

8     once-daily dosing.  The issue was not seen as

9     imp- -- as that important in the rest of the

10    world.  In fact, in some parts of the world, such

11    as Japan, it was seen as preferable to have a more

12    frequent dosing.

13          So coming back to your specific

14    question for "all indications," I think that the

15    preference was there for all indications.  But,

16    again, there was a rank order of which ones were

17    more important and which were less important.

18    Q.   Dr. Bukofzer, when you became head of

19    the venture in April of 2001, was it your

20    understanding that the dosing decision was the

21    most important decision facing the successful

22    development of 773?

23    A.   I don't think that that's characterized

24    correctly.  I think it was one of the very

# PART 2

1    150 milligrams, or the 300 milligrams could be a

2    QD or a BID dose.

3         There was -- there was no discussion at

4    that time, as I recall, that we were going to look

5    at a different total dosage.  That work had taken

6    place prior to my joining the venture.

7    Q.   And let me focus on the 150 milligram

8    QD dose.

9    A.   Okay.

10   Q.   When you took over the venture in

11   April 2001, did you understand that there were

12   obstacles to Abbott's achievement of a

13   150 milligram QD dose for 773?

14   A.   My understanding at the time was that

15   there was not certainty around the -- around

16   whether the 150 milligram dose would reach the

17   necessary hurdles from an efficacy perspective but

18   that it certainly not excluded that it could.

19        And, therefore, the study that was

20   ongoing at the time that I took over was a

21   comparison in community-acquired pneumonia,

22   comparing the 150 milligrams daily to the

23   150 milligrams twice-daily dose, as I recall.

24   Q.   So you understood that 150 milligrams

1    dosed once a day might not be efficacious when you

2    took over the venture?

3        A.   I think -- no, that's not correct.

4    That's not correct.

5          I understood that it might not meet

6    certain efficacy hurdles when comparing it against

7    the necessary comparators that we would have been

8    required to compare against.  I felt -- I think

9    that it was thought that it would likely be

10   efficacious, but it's a question of reaching a

11   certain amount of effectiveness, compared to

12   another drug, that determines whether the agencies

13   feel it would be approvable or not.

14       Q.   When you took over the venture in

15   April 2001, did you understand that there was

16   insufficient data to support an efficacy claim for

17   150 milligrams dosed once a day for 773?

18       A.   There was insufficient data in that

19   time to support any dosing.  What the -- that was

20   the reason for doing the trials that were

21   subsequently done.  When one finishes Phase 2,

22   generally, you have a range of dosing that you can

23   choose from.

24          As I mentioned before, there is a

1    risk/benefit of that drug -- or it's a

2    risk/benefit of a certain dose given in a certain

3    way that determines whether the drug is approvable

4    or not.  That's the purpose of Phase 3 trials, to

5    do it in a patient population against a comparator

6    at a certain ...

7         MR. ZWICKER:  Let's mark this as the next

8    exhibit.

9         MR. PHILLIPS:  This is 4?

10    THE COURT REPORTER:  Yes, sir.

11    MR. PHILLIPS:  Is that correct?  Thank you.

12         (WHEREUPON, said document was

13          marked Bukofzer Deposition Exhibit

14          No. 4, for identification, as of

15          5/9/07.)

16    THE WITNESS:  Thank you.

17    MR. ZWICKER:  Before the witness is Bukofzer

18    Exhibit No. 4, which is an ABBT -- ABT-773

19    Portfolio Review dated December 5th, 2000.

20    BY MR. ZWICKER:

21    Q.   Dr. Bukofzer, could you look at the

22    document, and let me know when you're done

23    reviewing it.

24    A.   Sure.

1    insufficient data to support an efficacy claim at

2    once-a-day dosing at 150 milligrams?

3        A.   No.  I -- you need to be more specific.

4        Q.   Let me ask you a different question.

5        A.   Sure.

6        Q.   Okay.  Do you agree that at the time

7    you took over the venture, there was insufficient

8    data to support dosing once a day at

9    150 milligrams for certain indications of 773?

10       A.   I think that there was an opinion by

11   many that it would be a -- more of a challenge to

12   achieve that, given the severity of these two

13   diseases.

14           I think it's important to understand

15   that generally, medically, CAP pneumonia,

16   community-acquired pneumonia, and ABS, acute

17   bacterial sinusitis, are generally considered more

18   significant diseases than bronchitis and

19   pharyngitis and, therefore, medically speaking,

20   people would prefer to have higher doses to be

21   more sure of total eradication.

22           Coming back to your specific question

23   that insufficient data exists, the data that

24   existed was the data from preclinical data and the

# PART 3

1    Phase 1 and 2 trials.  And as far as I remember,

2    the CAP and ABS indications had not been tested at

3    the 150 milligram dose, but I would have to

4    check -- I would have to go back and have a look

5    at what data actually existed at that time to be

6    sure.

7        Q.   But you would agree with the -- with

8    the statement that as of the time you took over

9    the venture, the ability to achieve once-a-day

10   150 milligram dosing was uncertain, in part,

11   because of the limited amount of data available?

12      MR. PHILLIPS:  Objection, compound.

13   BY THE WITNESS:

14      A.   Can you -- I think that there were two

15   questions in there.  Can you just break them out.

16   BY MR. ZWICKER:

17      Q.   You would agree that at the time you

18   took over the venture, there was limited data

19   regarding efficacy for certain indications of 773

20   at 150 milligrams dosed once a day?

21      A.   Some of the indications at that time

22   had not been tested at the 150 milligrams

23   once-a-day dose.

24      Q.   And so that made the ability to achieve

1    once-a-day dosing for those indications, at least

2    at the time you took over the venture, as

3    uncertain?

4        A.   I don't know that you can say that it's

5    any more uncertain than any of the data that --

6    of -- any of the indications for which you had

7    data because, ultimately, the test to meet the

8    standard that had not been tested against.

9        Q.   As of April 2001, when you took over

10    the venture, you didn't believe that Abbott could

11    say that it was likely that it could achieve

12    once-a-day dosing for all indications for 773,

13    correct?

14        A.   No.  That's not correct.

15         I think that there were a number of

16    decision analyses made at some -- at different

17    points, and I think -- I don't know whether there

18    was any decision analyses done prior to my being

19    head of the venture.  But certainly, afterwards,

20    there were certain decision analyses made, at

21    which stage I don't even think at that time we

22    said it was not possible.  I think there's just a

23    range of probabilities.

24        Q.   Abbott eventually determines to go

Bukofzer, Stan (Linked)  5/9/2007  9:06:00 PM

1    organism, MRSP and PRSP, as I recall, which we --

2    were the two organisms which were -- that were the

3    key organisms to obtaining the resistance claims.

4        Q.    When you joined the venture, what was

5    your understanding of why Abbott wanted to obtain

6    a resistance claim for 773?

7        A.    Part of the differ- -- it would be

8    partly to differentiate the drug from macrolide

9    antibodies.  The spectrum of organisms that were

10   treated with this drug would be similar to the

11   spectrum that would be treated by macrolides.

12           However, if one could show that because

13   of its structure and that it had an additional

14   benefit to be able to treat organisms that

15   macrolides -- existing macrolides could not, it

16   would help differentiate the drug from -- from the

17   existing competition.

18       Q.    And by differentiating the drug, you

19   believed, at the time you joined the venture, that

20   Abbott would have a commercial advantage over its

21   competitors?

22       A.    Any time that you can get a claim that

23   differentiates a drug, it's helpful.

24       Q.    Did you also believe that a resistance

Bukofzer, Stan (Linked)   5/9/2007  9:06:00 PM

1    claim, at the time you joined the venture, would

2    increase the probability of FDA approval for 773?

3      A.   I think that that was discussed at --

4    at a number of meetings.

5      Q.   And the answer was "yes"?

6      A.   Yes.  I think that if you can show

7    that, it would always help.

8      Q.   At the time you joined the venture,

9    were you aware that the FDA had expressed

10   skepticism regarding 773's ability to achieve a

11   resistance claim?

12     A.   I was not specifically aware of that,

13   no.  I think that in general, there was no

14   guidance documents on how to obtain a resistance

15   claim.  A resistance claim, as I -- as I recall,

16   had only been given to one other quinolone in the

17   past.  And some of the efforts that we undertook

18   were to try and understand what the level of data

19   was that had helped them get their resistance

20   claim, and I don't even recall which of the

21   quinolones it was.

22        What I do recall, it was a very small

23   number of organisms treated in the clinical -- in

24   the clinical trials.  The problem for us was that

# PART 4

1    it's -- there was no clear definition as to how

2    to -- you know, what -- what standard you would

3    have to meet to achieve that.

4         And so one was, in some ways, hoping

5    that if you exceeded what had been done in the

6    past, we could achieve the claim; in other words,

7    exceed the number of organisms and at least exceed

8    the rate of -- of resistance.

9    Q.   You said that the problem was that at

10   the time you joined the venture, there was no

11   clear regulatory definition of the number of

12   isolates needed to achieve a resistance claim,

13   right?

14      MR. PHILLIPS:  Objection, mischaracterizes

15   the testimony.

16   BY THE WITNESS:

17      A.   I don't know my exact wording, and

18   I don't want to use the word "problem."  The -- it

19   was a fact that one needed to -- there was no

20   clear pathway forward.

21   BY MR. ZWICKER:

22      Q.   And because there was no clear pathway

23   forward, there was some uncertainty about whether

24   Abbott could achieve a resistance claim, correct?

1    A.   Not because there was no -- well, any

2    time that there's no absolute format to do it,

3    there would be some degree of uncertainty.

4    That didn't mean to say that the drug would not be

5    able to treat those organisms.  It was a question

6    of whether or not the FDA and/or other agencies

7    would agree to put wording in the label to that

8    extent.

9              (WHEREUPON, a certain document was

10             marked Bukofzer Deposition Exhibit

11             No. 6, for identification, as of

12             5/9/07.)

13    THE COURT REPORTER:  No. 6.

14    THE WITNESS:  Thank you.

15    MR. ZWICKER:  Before the witness is Bukofzer

16    Exhibit No. 6, which is a report regarding ABT-773

17    dated February 2001.

18    BY MR. ZWICKER:

19    Q.   Dr. Bukofzer, if you could review

20    Exhibit No. 6 and let me know when you're done.

21         (Short pause.)

22    BY THE WITNESS:

23    A.   Yes, I've looked at --

24    BY MR. ZWICKER:

1    the probabilities of achieving a resistance claim?

2    A.   I understood that that was one of the

3    ways that you might help achieve a resistance

4    claim.

5    Q.   Can you explain to me why that is?

6    A.   Yes.  Because medically, if doctors

7    consider a patient to be bacteremic, which is

8    another -- which is the word for organisms

9    circulating in your blood -- sometimes, one calls

10   it septicemic -- patients would generally be

11   admitted to a hospital.  And patients with

12   septicemia or bacteremia would generally be put

13   onto intravenous formulations rather than oral

14   formulations.  That is just a general standard- --

15   it's a generalization, but it's a general way that

16   doctors would respond to septicemic patients.

17        If a doctor -- so as -- and put another

18   way, that if a doctor knew a patient was

19   bacteremic, they would probably not choose to

20   treat them as an outpatient on oral therapy.

21   Q.   When you joined the venture, did you

22   understand that Abbott had declined to fund an

23   IV formulation for 773?

24   A.   I don't know that that is accurate.

Bukofzer, Stan (Linked)  5/9/2007  9:06:00 PM

1   I -- what I learnt is that the IV formulation had

2   not been tested in man yet and that it was -- but

3   no one had said it would never be funded.  I did

4   understand that the -- that funding up to that

5   stage had not been -- it hadn't been fully funded

6   or funded to an extent up to that stage.  I knew

7   that.  It wasn't that -- I don't know that there

8   was any decision never to fund an IV formulation.

9       Q.   When you joined the venture, was it

10  your understanding that the -- an IV formulation

11  had not been fully funded?  Did you understand

12  that?

13      MR. PHILLIPS:  Objection, vague.

14  BY THE WITNESS:

15      A.   Can -- can you be more specific,

16  please.

17      MR. PHILLIPS:  Joe, we have been going for

18  about another hour.  When you get to a convenient

19  stopping point, if we can take a very brief break.

20      MR. ZWICKER:  Why don't we do that now.

21      MR. PHILLIPS:  Are you sure?  Is this a good

22  time?  I don't --

23      MR. ZWICKER:  Yeah.

24      MR. PHILLIPS:  Okay.

# PART 5

1    for the CAP indication, correct?

2         Let me ask you a different question.

3         As of February 2001, Abbott hadn't

4    decided the dosing level for the CAP indication?

5    A.    "Dosing level" meaning?

6    Q.    Once a day or twice a day.

7    A.    For CAP, that's correct.

8    Q.    Depending upon the outcome of the

9    clinical trials, did you understand that there

10   could be regulatory challenges with respect to

11   dosing at 150 milligrams once a day?

12   MR. PHILLIPS:  Objection, vague as to what

13   you mean by "the clinical trials."

14   BY THE WITNESS:

15   A.    Can you just specify which clinical

16   trials you --

17   BY MR. ZWICKER:

18   Q.    Well, you just testified that --

19   A.    There were ongoing clinical trials.

20   Q.    -- there were ongoing clinical trials.

21   A.    So, in regard to that, we would look at

22   the data and make a decision on the probabilities

23   of success; and given the data, the learnings

24   that -- from the data that existed.

1    time you joined the venture, you didn't know

2    whether there would be a regulatory challenge

3    because you didn't know what the data was going to

4    show, correct?

5        A.   We didn't know what the data was going

6    to show, and that was part of a decision analysis

7    that we were going to have to do when we received

8    that data.

9            We didn't know, based on what's written

10   here -- and I recall the AI person in regulatory

11   mentioning this -- that -- that because CAP was

12   considered a more serious disease, that regulators

13   in general in Europe would err on the side of

14   conservatism and want more drug than less drug.

15   That is just the way Europe tends to be,

16   particularly in the anti-infective area.

17       Q.   So when you joined the venture in

18   April 2001, you didn't know whether CAP would be

19   dosed at QD or BID, correct?

20       A.   I didn't know.

21           (WHEREUPON, a certain document was

22           marked Bukofzer Deposition Exhibit

23           No. 8, for identification, as of

24           5/9/07.)

Bukofzer, Stan (Linked)   5/9/2007  9:06:00 PM

1      A.   I don't.  I don't have notes from --

2    from that meeting.

3         But I would have given him a very

4    effectual up-to-date update of the information

5    that I knew and would have told him what

6    information was forthcoming.

7      Q.   Do you remember telling him at the time

8    that ABT-773 -- that its development had been

9    terminated?

10     A.   I don't recall ever specifically saying

11   to him that it had been terminated because

12   I wasn't ever given -- certainly, not in the time

13   that I spoke to him -- instructions that it had

14   been terminated.

15         (WHEREUPON, a certain document was

16         marked Bukofzer Deposition Exhibit

17         No. 9, for identification, as of

18         5/9/07.)

19    MR. ZWICKER:  The -- before the witness is a

20   document entitled "ABT-773 Descriptive Memorandum,

21   February 2001, Abbott Laboratories."

22   BY MR. ZWICKER:

23    Q.   Dr. Bukofzer, could you review

24   Exhibit No. 9 and tell me if you recognize it.

Bukofzer, Stan (Linked)  5/9/2007  9:06:00 PM

1        (Short pause.)

2    BY THE WITNESS:

3      A.   Uh-uh.  I don't specifically recognize

4    the context of this document.

5    BY MR. ZWICKER:

6      Q.   Do you remember being called upon in

7    2001 to assist John Leonard or anyone else in

8    preparing a report regarding the status of 773?

9      A.   Can you please be more specific.

10      Q.   Yeah.  Do you remember in 2001 being

11    asked by John Leonard or by anyone else to prepare

12    a status report for 773?

13      A.   The -- I think I've testified earlier

14    that I think there were monthly status reports

15    that were sent out.  I don't recall any other very

16    specific status report.  I do know that I --

17    sorry.  Can you -- can you just confirm, which

18    year are you talking about?

19      Q.   2001.

20      A.   Oh, 2001.  You know, the -- and there

21    were, I think, a number of presentations that

22    I gave to the PEC and senior management that would

23    have been in some way a status report of

24    whether -- where the drug -- you know, of issues

# PART 6

1   or updates on the drug, but I don't recall a

2   specific report.

3       Q.   You -- do you have any recollection of

4   being asked by John Leonard to provide input into

5   a document that was going to be used by a party

6   investing in 773?

7       A.   No.

8          If I can just point out that this

9   document that you've just given me, document

10  No. 9, it's February of 2001, which would be just

11  in that sort of period ahead of me being involved

12  in the venture.

13      Q.   If you could focus on page 2 of the

14  document.

15      A.   I've got that.

16      Q.   And look for now at the second

17  paragraph.

18      A.   Okay.

19      Q.   It says:

20          "Product features such as high

21          efficacy, activity against resistant

22          strains of bacteria and convenience

23          should enable it to" complete -- "to

24          compete against both Zithromax and

Bukofzer, Stan (Linked)   5/9/2007  9:06:00 PM

1       newer agents such as the quinolones.

2       Dosing is expected to be once-a-day.

3       A 5-day convenience pak at a competitive

4    .   price will help maximize sales."

5       Do you see that?

6       A.   I see what you're reading.

7       Q.   Dr. Bukofzer, would you agree with me

8    that at the time you joined the venture in

9    April of 2001, that you personally did not have an

10   expectation that dosing for 773 for all

11   indications would be once a day?

12      A.   No.  I cannot say that.  I -- I think

13   I've testified earlier that a QD dosing was

14   being -- well, the QD dosing was thought for the

15   two minor indications to be what we were

16   expecting; and the two major indications were

17   still being tested, a QD versus a BID.

18      Q.   Well, so at the -- you've testified,

19   though, that at the time you joined the venture --

20      A.   Um-hum.

21      Q.   -- there was still testing going on

22   to determine what the appropriate dose would be,

23   correct?

24      A.   Correct.

1    answer.

2        MR. PHILLIPS:  I'm not instructing --

3        THE WITNESS:  No, not at all.

4        MR. PHILLIPS:  I'm not instructing you not to

5    answer.  I'm just -- I'm just making an objection

6    for the record.

7        THE WITNESS:  So -- oh, I see.  Okay.  Thank

8    you.

9    BY THE WITNESS:

10        A.   So the -- yes.  We were awaiting to see

11    what the dose -- what -- what the outcome of the

12    trials would be.  There was, as I said, a

13    preference by the commercial world to have a

14    QD dose.

15    BY MR. ZWICKER:

16        Q.   But whether or not that was going to

17    happen was going to be a function of the results

18    you got from those trials, right?

19        MR. PHILLIPS:  Objection, mischaracterizes

20    the testimony.

21    BY THE WITNESS:

22        A.   This -- the trials would certainly have

23    been one of a number of data points to -- to be

24    considered.

1    BY MR. ZWICKER:

2        Q.   And at the time you joined the venture,

3    you didn't know what those results were, correct?

4        A.   I couldn't have known the results.  The

5    trials were ongoing.

6        Q.   So you couldn't have had an

7    expectation, could you, that ABT-773 was going to

8    be dosed at once a day?

9        A.   I could not have excluded that

10   possibility.

11       Q.   But you couldn't have expected it,

12   either, correct?

13       A.   No.  I -- no.  That's different.  I --

14   I didn't have any --

15       MR. PHILLIPS:  Are you talking -- excuse me.

16   Are you talking about all indications?

17   BY THE WITNESS:

18       A.   Can you -- can you clarify?  All

19   indications or one indication?

20   BY MR. ZWICKER:

21       Q.   Well, let's start with all indications

22   for the moment.

23       A.   Well, I think, to be fair, it's

24   probably the same.  I had -- when -- why -- how

# PART 7

1    can I express this clearly?

2        The QD dosing was still a possibility

3    for all indications.  I was not -- I couldn't --

4    until one had the data, one could not be one

5    hundred percent sure that QD dosing would not be

6    available for all indications.  On the other hand,

7    I could not exclude the fact that the QD dosing

8    would be the -- sorry.  Let me -- I'm going around

9    in circles.

10       I couldn't exclude the fact that

11   QD dosing would be the -- would be present for all

12   indications.  It was -- we were waiting to see.

13       Q.   You were waiting to see?

14       A.   The trials.

15       Q.   You -- you wanted to see the results?

16       A.   Correct.  But it was still possible

17   that QD dos- -- QD dosing would be there for

18   the -- for the CAP and the sinusitis.

19       Q.   It was possible?

20       A.   Yes.

21       Q.   In your own mind, is there a difference

22   between something that's possible and something

23   that's expected?

24       A.   I think one's -- oh, it's words.

1      MR. PHILLIPS:  Well, I'm going to object to

2    the extent you're asking him to interpret the

3    document --

4      MR. ZWICKER:  I'm asking -- I didn't.

5    I didn't.  I asked him --

6      MR. PHILLIPS:  Well, then, you're asking him

7    for some sort of English language lessons?

8      MR. ZWICKER:  No.  I'm asking him in his --

9    I'll repeat the question.  He can answer it.

10    BY MR. ZWICKER:

11      Q.    In your own mind, is there a difference

12    between something that's possible and something

13    that's expected?

14      MR. PHILLIPS:  Well, I'll object to the

15    extent you're asking him to interpret the term

16    "expected" as it's used in this document as

17    calling for speculation and lacking in foundation.

18          Could you please not lean toward the

19    witness, counsel.

20      MR. ZWICKER:  I'm not imposing on him.

21      MR. PHILLIPS:  I think you are.  Can you lean

22    back.

23      MR. ZWICKER:  Well, he hasn't said so.  No.

24    I'm -- I'm -- I'm not -- I have kept my space.

Bukofzer, Stan (Linked)  5/9/2007  9:06:00 PM

1          Greg, I think you're interfering.  I --

2     there's a question pending.  Let him answer the

3     question.

4        MR. PHILLIPS:  I don't think I'm interfering,

5     counsel.

6     BY THE WITNESS:

7        A.  Sir, from my perspective, I don't know

8     what was meant by "expected" in this particular

9     paragraph.  I would have to postulate, and I don't

10    want to postulate on someone else's written word.

11         For me, "possibilities" mean that

12    they -- that one would keep an open mind as to

13    what the data said.

14    BY MR. ZWICKER:

15       Q.  My question to you was only in your

16    mind, is there a difference between something

17    that's possible and something that's expected?

18       A.  I don't know.

19       MR. PHILLIPS:  Again, I'll object to the

20    extent that you are asking him or trying to get

21    him to imply that he can interpret the term

22    "expected" as it's used in this document --

23       MR. ZWICKER:  You're coaching.

24       MR. PHILLIPS:  -- as lacking in foundation or

1    speculation.  I'm not counseling him, counsel, and

2    I object to your characterization.

3    BY MR. ZWICKER:

4        Q.   Can you answer the question?

5        A.   From my perspective, I may use the

6    words in different contexts.  I do not know the

7    person who wrote this document, how they used the

8    words.

9        MR. PHILLIPS:  Joe, you're being --

10       MR. ZWICKER:  Let's take a break.

11       THE VIDEOGRAPHER:  This will now conclude

12   Videotape No. 3, and we are going off the record

13   at 2:15 p.m.

14           (WHEREUPON, a recess was had from

15            2:15 p.m. until 2:22 p.m.)

16       THE VIDEOGRAPHER:  We are now back on the

17   record, and the time is 2:22 p.m., and this is

18   Videotape No. 4 of the deposition of Dr. Stanley

19   Bukofzer on May 9th, 2007.

20       Counsel?

21   BY MR. ZWICKER:

22       Q.   Dr. Bukofzer, turn to page 4 of

23   Bukofzer Exhibit No. 9; and at the very top,

24   you see a section called "Scientific Rationale for

# PART 8

Bukofzer, Stan (Linked)   5/9/2007  9:06:00 PM

1           (WHEREUPON, said document was

2           marked Bukofzer Deposition Exhibit

3           No. 13, for identification, as of

4           5/9/07.)

5       THE WITNESS:  Thank you.

6       MR. ZWICKER:  Before the witness is Bukofzer

7    Exhibit No. 13, which is a memorandum dated

8    May 2nd, 2001 to Stan Bukofzer and others

9    regarding a First Call Report, FDA Advisory Panel

10   recommendations on Ketek.

11   BY MR. ZWICKER:

12       Q.   Dr. Bukofzer, could you review this

13   document, and let me know when you're done.

14           (Short pause.)

15   BY THE WITNESS:

16       A.   Yes, I've seen this document.  Yes,

17   I've seen this document.

18   BY MR. ZWICKER:

19       Q.   Do you recognize it?

20       A.   Yeah, I recognize the document.

21   I mean, I --

22       MR. PHILLIPS:  Counsel --

23       THE WITNESS:  You know --

24       MR. PHILLIPS:  Excuse me.  No, no.  Please

1    were just putting our strategies together at that

2    time.

3        Q.   Do you recall any conversations with

4    John Leonard on the subject of this memorandum?

5        A.   No, not directly.  I don't recall any

6    specific conversations.  I have no doubt that had

7    I seen him at a meeting or something, he would

8    have said, "Have you seen the Ketek" or "What did

9    you think of it?"  But I don't recall any

10   specific, you know, particular conversations.

11       Q.   The memo says:

12           "I'm sure you had a chance to see

13           the FDA Advisory Panel recommendations

14           on Ketek.  The FDA is clearly taking a

15           hard line (as we expected) on the safety

16           issues associated with Ketek."

17           See that?

18       A.   Yes, I see that.

19       Q.   Speaking only for yourself, did you

20   expect the FDA to take a hard line for safety

21   issues associated with Ketek?

22       A.   Speaking for myself, I expected the

23   standards to be high in terms of the data that we

24   needed to supply the FDA to convince them that

Bukofzer, Stan (Linked)    5/9/2007  9:06:00 PM

1    there would be no safety issue -- or not no safety

2    issues but that there would be no QT or liver

3    abnormality issues.

4        Q.   You said you expected the standards to

5    be high, correct?

6        A.   Correct.

7        Q.   How high?

8        A.   Well, that's always the question.

9    There was no defined -- there was no defined

10    target that you were moving towards.  One of the

11    things, as I men- -- as I had mentioned earlier,

12    was that we as a company were trying to understand

13    the -- the standards that we would have to apply

14    to our clinical tr- -- or to our trials for QT

15    interval.  And I think that's some of the -- that

16    was what Dr. Verlinden was trying to reference in

17    her e-mail.

18        And I think we also understood that --

19    or I understood that one was going to have to make

20    a decision regarding whether we needed to have a

21    reread of all our QT -- all our -- all the QT

22    intervals in all our clinical studies.  I finally

23    made that decision, that we actually spent a lot

24    of money to try to get it -- to try and make the

Bukofzer, Stan (Linked)  5/9/2007  9:06:00 PM

1    data to the highest possible standard that we

2    could.

3        Q.    So speaking only for yourself, you

4    weren't surprised that the FDA took a hard line

5    with respect to safety issues for Ketek?

6        MR. PHILLIPS:  Objection, calls for

7    speculation.

8    BY THE WITNESS:

9        A.    I can't speculate what the FDA did.

10    I know that this was an advisory.  The Advisory

11    Panel -- I don't know if you understand Advisory

12    Panels, but essentially, the FDA -- someone from

13    the FDA presents data, and then the advisors --

14    someone from the company can present data, and

15    then the advisors discuss it.

16        This was an Advisory Committee.  The

17    FDA can accept -- it doesn't have to accept the

18    recommendations of the advisors.

19    BY MR. ZWICKER:

20        Q.    For purposes of QTc, what did Abbott do

21    in response to Ketek --

22        MR. PHILLIPS:  In response --

23    BY MR. ZWICKER:

24        Q.    (Continuing) -- or the Ketek advisory?

# PART 9

1    A.   I -- our legal counsel at Abbott,

2    Mr. Peter Witty, informed me what a 30(2)(b)

3    deposition was, but not specifically about the

4    product.

5    Q.   But my question is -- and maybe you've

6    just answered it -- is, did you talk to other

7    persons substantively involved with the compound?

8    A.   No.

9    MR. ZWICKER:  Let's mark this next exhibit.

10        (WHEREUPON, said document was

11        marked Bukofzer Deposition Exhibit

12        No. 23, for identification, as of

13        5/9/07.)

14    THE COURT REPORTER:  23.

15    THE WITNESS:  Thank you.

16    MR. ZWICKER:  Before the witness is a Notice

17    of Deposition dated March the 30th, 2007.

18    BY MR. ZWICKER:

19    Q.   Dr. Bukofzer, did you review topic

20    No. 3 of Exhibit 23 in preparation for your

21    deposition today?

22    A.   Topic No. 3?  That's --

23    Q.   I'll read it to you.  It says:

24        "Abbott's knowledge and belief

1    A.  Sorry.  Can you restate the question

2    because --

3    Q.  Yeah.  I'll restate it.

4    A.  -- it doesn't make sense.

5    Q.  Yeah.  I'll restate it.

6       As of March the 13th, 2001, Abbott is

7    evaluating whether Phase 3 clinical trials for 773

8    are going to be dosed at 150 milligrams once a day

9    or twice a day, correct?

10    A.  For which indications?

11    Q.  As of March 13th, 2001, for all

12    indications.  Is that true?

13    A.  I think the commercial intent was to

14    dose all indications at a QD dose at that

15    particular time.

16    Q.  As of March 13th, though, Abbott had

17    not decided definitively whether to dose all

18    indications at once-a-day dosing, correct?

19    A.  Further data was deemed to be necessary

20    to make that final decision.

21    Q.  And you agree with me that the decision

22    regarding whether indications for 773 would be

23    dosed once a day or twice a day had an impact on

24    the potential profitability of 773, correct?

Bukofzer, Stan (Linked)  5/9/2007  9:06:00 PM

1       A.   I think that there was preference for

2    the once-daily dosing from a commercial

3    perspective.

4       Q.   Preference because once-daily dosing,

5    in Abbott's view, made 773 potentially a more

6    valuable compound?

7       A.   Because once-daily dosing was where

8    most of the marketplace was believed to be heading

9    and, therefore, twice-daily dosing was perceived

10    by some to be -- to be less convenient.

11       Q.   So once-daily dosing, in Abbott's view,

12    was an issue that would impact differentiation

13    from competitors in the market, correct?

14       MR. PHILLIPS:  Objection.

15          I'm sorry.  Could you read the question

16    back?  I'm not sure I heard it.

17       MR. ZWICKER:  Let me -- let me rephrase it.

18       MR. PHILLIPS:  Okay.

19    BY MR. ZWICKER:

20       Q.   So once-daily dosing, in Abbott's view,

21    could conceivably differentiate 773 from other

22    products in the market, correct?

23       A.   No.

24       Q.   Okay.  Abbott viewed once-daily dosing

1    as the emerging market standard for new

2    anti-infectives?

3        MR. PHILLIPS:  Objection, vague as to what

4    you mean by "emerging market."

5    BY THE WITNESS:

6        A.   Can you rephrase that?  I don't know

7    how Abbott viewed -- or I don't know what -- what

8    you mean by "emerging market standard."

9    BY MR. ZWICKER:

10       Q.   You testified that once-daily dosing

11   was where the marketplace was believed to be

12   headed, correct?

13       A.   Correct.

14       Q.   So that Abbott believed on March 13th,

15   2001 that an inability to achieve once-daily

16   dosing would disadvantage Abbott in the

17   marketplace, fair?

18       A.   In the U.S. marketplace, consumers

19   would prefer a QD dose.

20       Q.   As of March 13th, 2001, had Abbott

21   quantified in any way the impact on value of

22   once-daily dosing as opposed to twice-daily

23   dosing?

24       A.   I'm not aware of specific

# PART 10

Bukofzer, Stan (Linked)   5/9/2007 9:06:00 PM

1    quantification at that particular time.

2        Q.   And as of March the 13th, 2001, Abbott

3    was still evaluating data that would allow it to

4    select once-daily or twice-daily dosing, correct?

5        MR. PHILLIPS:  For all indications?

6        MR. ZWICKER:  For all indications.

7    BY THE WITNESS:

8        A.   I don't believe that to be correct.

9    BY MR. ZWICKER:

10       Q.   For ABS and CAP indications?

11       A.   For ABS and CAP indications, that would

12   be true.

13       Q.   As of March the 13th, 2001, Abbott

14   believed that the ability to make a successful

15   resistance claim to the FDA would advance its

16   probabilities of FDA approval, is that right?

17       A.   No, I don't think that that's correct.

18       Q.   Did Abbott believe on March 13th, 2001,

19   that a resistance claim would have commercial

20   advantages?

21       A.   I think that Abbott believed that a

22   resistance claim would help differentiate the drug

23   from other unmarketed drugs, specifically

24   macrolides.

Bukofzer, Stan (Linked)   5/9/2007  9:06:00 PM

1          Can we take two minutes?  I'd like to

2    review my notes to see if I have any questions.

3          MR. ZWICKER:  Okay.

4          THE VIDEOGRAPHER:  We are now going off the

5    record at 6:09 p.m.

6              (WHEREUPON, a recess was had from

7                6:09 p.m. until 6:13 p.m.)

8          THE VIDEOGRAPHER:  We are now back on the

9    record at 6:13 p.m.

10             Counsel?

11             EXAMINATION

12   BY MR. PHILLIPS:

13      Q.   Dr. Bukofzer, I just have, I think, one

14   or two questions to follow up on what counsel

15   asked you.

16          On -- turning to Exhibit 16, please,

17   and you'll recall that counsel asked you a number

18   of questions about this ABT-773 Decision Analysis

19   Core Team presentation.

20      A.   Yes, I do.

21          MR. ZWICKER:  I just -- okay.  I have it.

22          MR. PHILLIPS:  I'm sorry.  You have it now?

23   BY MR. PHILLIPS:

24      Q.   Turning to page 4 of the document,

1    which is Bates numbered 103194.UR, do you see

2    that?

3        A.   I found that page.

4        Q.   You have that?

5        A.   I have.

6        Q.   Dr. Bukofzer, the -- did you prepare

7    this slide?

8        A.   I certainly did prepare part of this

9    slide.

10       Q.   At the very top, it says:

11            "Ketek advisory defined new

12            regulatory standards influences

13            program size."

14            Do you see that?

15       A.   I see that.

16       Q.   Dr. Bukofzer, what did you mean with

17   the statement -- by that statement?

18       A.   I think that it's important to

19   understand that the Ketek advisory was one of a

20   couple, maybe three, really watershed times in

21   learnings about this drug.

22            Specifically, the regulatory standard

23   that I was referring to here involves two aspects.

24   The one aspect is how many patients you needed at

1   a particular dose in order to ensure that there

2   was adequacy in general for safety.  And on -- and

3   as indicated here, there had been some questions

4   in -- by the -- I can't recall if it was a

5   committee or the FDA as to whether 3,200 patients

6   database total was adequate for the -- or for --

7   for Ketek.  I think what we did know is, the way

8   the FDA had in the past been more concerned about

9   safety aspects, such as in the quinolone

10  antibiotics, they had wanted up to 6,000 patients.

11          Additionally, I think that we talked

12  previously about the resistance claim.  And while

13  I wasn't surprised by the fact that Ketek had

14  not -- or there was not a positive feeling towards

15  a resistance claim based on the data that they had

16  supplied, the question was whether or not there

17  was adequacy in the number of samples that they

18  had presented.

19          And so this second part talks to the

20  factors, whether or not in our CAP patients in

21  particular, we would have to increase the size of

22  our trials.  And why this is important is that

23  both of these, the size of the -- the overall size

24  of the database as well as the size of the CAP

Bukofzer, Stan (Linked)   5/9/2007  9:06:00 PM

1    trials moving forward, were both pointing in the

2    direction that there would be more patients

3    necessary than perhaps we had planned in the past.

4        And that's got financial and time

5    implications associated with it, and that's why

6    we -- why it was such an important learning at

7    that particular time.

8        MR. ZWICKER:  Move to strike as

9    nonresponsive.

10        MR. PHILLIPS:  Thank you.

11        I have no other questions.

12        MR. ZWICKER:  I have none.

13        THE WITNESS:  Okay.

14        MR. ZWICKER:  Thank you.

15        THE VIDEOGRAPHER:  This will now conclude

16    today's testimony.  This will conclude Videotape

17    No. 6, and we are going off the record at

18    6:16 p.m.

19

20        FURTHER DEPONENT SAITH NAUGHT.

21

22        (Time noted:  6:17 p.m.)

23

24

9

# Bukofzer Deposition Exhibit 9

# P's Exhibit IM

*CONFIDENTIAL*

# ABT – 773

## Descriptive Memorandum

*February 2001*

## Abbott Laboratories

CONFIDENTIAL
JH 008153

Descriptive Memorandum ABT - 773     CONFIDENTIAL

EXHIBIT
Bukofzer
9
5/9/07
PENGAD 800-631-6989

## ABT-773

### Opportunity Overview

ABT-773 pertains to a promising new class of antibiotics known as ketolides. ABT-773 is likely to have activity against resistant strains of bacteria and will, therefore, compete effectively against currently marketed antibiotics. The compound is currently in Phase I/II trials. Phase III clinical trials began in Q4, 2000. ABT-773 has an expected U.S. launch date in Q1, 2004. Ex-U.S. launches are projected in 2004 for Europe and Japan.

Product features such as high efficacy, activity against resistant strains of bacteria and convenience should enable it to compete against both Zithromax and newer agents such as the quinolones. Dosing is expected to be once-a-day. A 5-day convenience pak at a competitive price will help maximize sales.

### The US Market

The overall antibiotic market in the U.S. reached $8.9 billion in sales in 1999. The tab/cap segment is the largest; sales in 1999 were $5.7 billion. The I.V. and oral suspension segments are comparatively smaller; total sales topped $2.1 and $1.1 billion, respectively.

Tab/cap and oral suspension prescription volume had been declining 1-2% per year in the period of 1995-1998, due to more appropriate prescribing in the face of increasing resistance. However, total tab/cap prescription volume recovered in 1999 and grew 6.3%. Even in the face of negative pressure on antibiotic use, dollar sales in the U.S. have continued to increase, particularly in the tab/cap market. This is due to the trend of replacing relatively low-cost generic agents with higher priced premium antibiotics. The market is willing to bear higher costs for agents that satisfy unmet needs. The I.V. market has grown slightly in terms of sales, also being driven largely by the replacement of generic agents with more costly branded agents.

Macrolides, largely fueled by the gains of Zithromax, have seen significant growth in terms of both prescriptions and sales. Zithromax prescriptions far outnumber those of other competitors, while its sales have nearly surpassed those of the sales leader, Cipro. Historically, quinolones saw relatively limited use for community respiratory tract infections (RTIs) because of poor Gram-positive coverage and sub-optimal adverse event profiles. Newer quinolones such as Levaquin have been successful in achieving more widespread use by virtue of its improved activity and adverse event profile. Levaquin currently accounts for approximately 30% of the quinolone market share. It is anticipated that recent quinolone introductions (Avelox, Tequin) will build upon the RTI momentum established by Levaquin. The growth of the macrolide and quinolone classes has come largely at the expense of cephalosporins and generic agents such as erythromycin and penicillin.

The following table shows 1999 tab/cap sales and prescriptions by class/product:

| | Sales | | | TRXs | | |
|---|---|---|---|---|---|---|
| | Sales ($MM) | Share | CAGR$_{95-99}$ | TRXs (MM) | Share | CAGR$_{95-99}$ |
| Penicillins | $148.2 | 2.6% | -1.3% | 57.5 | 25.7% | -5.6% |
| Cephalosporins | $980.9 | 17.2% | -0.3% | 37.3 | 17.1% | -3.2% |
| Cefzil | $353.9 | 6.7% | 1.9% | 5.0 | 2.3% | -1.0% |
| Ceftin | $188.7 | 3.3% | 12.6% | 7.3 | 1.3% | 11.3% |
| Other | $438.3 | 7.1% | -14.7% | 25.1 | 13.5% | -4.5% |
| Ext. Spec. Macrolides | $1,635.8 | 27.9% | 19.5% | 36.1 | 16.5% | 29.4% |
| Biaxin | $990.5 | 17.1% | 6.7% | 11.5 | 5.1% | 1.7% |
| Zithromax | $331.1 | 16.6% | 42.1% | 24.4 | 11.0% | 41.6% |
| Other | $14.9 | 0.3% | 21.8% | 0.4 | 0.2% | 33.0% |
| Quinolones | $1,632.1 | 29.4% | 17.9% | 34.0 | 10.5% | 11.7% |
| Cipro | $902.5 | 16.2% | 8.3% | 14.1 | 6.4% | 3.1% |
| Levaquin | $523.4 | 9.3% | NA | 7.0 | 3.1% | NA |
| Other | $190.2 | 3.3% | -7.2% | 8.4 | 1.3% | -8.4% |
| Augmentin | $778.1 | 13.6% | 17.9% | 10.7 | 4.8% | 11.6% |
| Other Classes | $590.5 | 10.3% | -1.1% | 60.4 | 27.3% | -4.1% |
| TOTAL TAB/CAP | $5,715.4 | 100.0% | 8.9% | 221.5 | 100.0% | 8.1% |

CONFIDENTIAL
JH 008154



### U.S. Market Projections

Resistance to antibiotics is likely to increase, creating opportunities for new agents with activity against resistance. Physicians will be urged to choose agents with an appropriate spectrum of activity relative to the infection being treated. Resistance will increasingly become part of the promotional mix for emerging agents. The ability of an agent to treat resistant strains and the real or perceived ability to slow or prevent resistance development (mutation prevention concentration, low mutation frequency, structure-activity relationships, etc) may confer competitive advantage to such agents.

• Quinolones, which historically have seen limited use in community-acquired respiratory infections, will become a significant class in this segment as new agents from this class are launched that specifically target RTIs.

• The market will become more competitive as new agents enter both the community segment (ketolides, quinolones) as well as the nosocomial segment (oxazolidinones, streptogramins, everninomycins, peptides, others).

• Several key branded antibiotics will lose patent exclusivity over the next three to five years.. This may create an opportunity in the pediatric market as the top three pediatric brands (Augmentin, Cefzil, Zithromax) are among those losing patent exclusivity.

Antiviral influenza and cold therapeutics, as well as an increasing number of antibacterial vaccines may have a negative impact on antibiotic prescriptions.

### The Ex-U.S. Market

Ex-U.S. sales of antibiotics totaled $11.7 billion in 1999. Tab/cap represents the largest segment, with sales of $9.4 billion from 770 million total prescriptions. Total Rx growth has been flat, with a 1996-99 CAGR of 0.5%. The use of antibiotics is predicted to slowly decline due to more judicious use of antibacterials in the face of increasing bacterial resistance.

Ex-U.S., the quinolone class accounted for 8% of total tab/cap market prescriptions (62 million Rxs) and 13% of sales ($1.2 billion). Ciprofloxacin is the market leader ex-U.S. with approximately 47% of the quinolone market Rxs (29 million Rxs) and 44% ($590MM) of sales. Levofloxacin launched in many European markets in 1998/1999 and holds approximately 14% Rx share of the European quinolone market and 0.6% of the overall tab/cap market. Although grepafloxacin and trovafloxacin also launched in some European countries in 1999, both products were recently pulled from the market due to liver toxicity and other complications. Moxifloxacin launched in Germany in Q4 1999, but has not yet been approved in other markets. In Japan, levofloxacin launched in 1994 and still commands a 65% Rx share of the Japanese tab/cap market and 10% of the Japanese tab/cap market overall. Japan accounts for approximately 80% of ex-U.S. levofloxacin sales ($370MM).

CONFIDENTIAL
JH 008155



*Scientific Rationale for ABT-773*

The likely profile of ABT-773 justifies further development:
- ABT-773 pertains to a new class of antibiotics.
- Good activity against resistant Gram + organisms, particularly macrolide-resistant *S. pneumoniae*.
- Convenience, safety, and tolerability profile competitive with Z-pak.
- Oral Suspension and I.V. forms enabling penetration into pediatrics and hospital segments.

*Clinical Studies*

The safety and efficacy of ABT-773 in AECB were studied in a multi-center Phase II clinical trial conducted between January and April of 1999. Dosing regimens of 100mg TID and 200mg TID were tested. Of the 169 enrolled patients, 159 were clinically evaluable and 96 were both clinically and bacteriologically evaluable. The following chart summarizes the results.

| Bacterial Eradication | ABT-773 100mg TID | ABT-773 200mg TID | Overall Eradication |
|---|---|---|---|
| *S. pneumoniae* | 100% (13/13) | 90% (9/10) | 96% (22/23) |
| *M. catarrhalis* | 100% (6/6) | 100% (7/7) | 100% (13/13) |
| *H. influenzae* | 96% (23/24) | 92% (24/26) | 92% (47/50) |
| *H. parainfluenzae* | 100% (6/6) | 86% (7/8) | 93% (13/14) |

| Clinical Response | ABT-773 100mg TID | ABT-773 200mg TID |
|---|---|---|
| Cure | 96% (77/80) | 92% (73/79) |
| Failure | 4% (3/80) | 8% (6/79) |

| Clinical and Bacterial Response | ABT-773 100mg TID | ABT-773 200mg TID |
|---|---|---|
| Cure | 96% (46/48) | 94% (45/48) |
| Failure | 4% (2/48) | 6% (3/48) |

| Adverse Events | ABT-773 100mg TID | ABT-773 200mg TID | Overall |
|---|---|---|---|
| Taste Perversion | 5% (4/84) | 8% (7/85) | 6.5% (11/169) |
| Diarrhea | 11% (9/84) | 6% (5/85) | 8% (14/169) |
| Nausea | 2% (2/84) | 2% (2/85) | 2% (4/169) |
| Abdominal Pain | 1% (1/84) | 2% (2/85) | 2% (3/169) |
| Headache | 2% (2/84) | 1% (1/85) | 2% (3/169) |
| Rash | 2% (2/84) | 1% (1/85) | 2% (3/169) |
| Dyspnea | 2% (2/84) | | 1% (2/169) |
| Abn. Liver Funct. Test | 1% (1/84) | 1% (1/85) | 1% (2/169) |
| Fever | | 2% (2/85) | 1% (2/169) |

CONFIDENTIAL
JH 008156

Descriptive Memorandum; ABT - 773          CONFIDENTIAL          4

The safety and efficacy of ABT-773 in AECB were studied in a multi-center Phase IIb clinical trial from October 1999 to March 2000. Doses of 150mg QD, 300mg QD, and 600mg QD were tested. Of the enrolled subjects, 342 were clinically evaluable, and 169 were both clinically and bacteriologically evaluable. The following chart summarizes the results.

| Bacterial Eradication | ABT-773 150mg QD | | ABT-773 300mg QD | | ABT-773 600mg QD | | Overall Eradication | |
|---|---|---|---|---|---|---|---|---|
| S.pneumoniae | 83% | (10/12) | 90% | (9/10) | 100% | (13/13) | 91% | (32/35) |
| M.catarrhalis | 80% | (8/10) | 92% | (12/13) | 91% | (10/11) | 88% | (30/34) |
| H. influenzae | 94% | (17/15) | 89% | (17/19) | 83% | (19/23) | 88% | (53/60) |

| Clinical Response | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Cure | 87% | (98/113) | 90% | (105/117) | 90% | (101/112) | | |
| Failure | 13% | (15/113) | 10% | (12/117) | 10% | (11/112) | | |

| Clinical & Bacteriological Response | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Cure | 84% | (42/50) | 88% | (49/56) | 94% | (59/63) | | |
| Failure | 16% | (8/50) | 12% | (7/56) | 6% | (4/63) | | |

| Adverse Events | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Taste Perversion | 5% | (4/84) | 19% | (25/129) | 29% | (37/129) | 17% | (66/384) |
| Diarrhea | 13% | (16/126) | 12% | (15/129) | 21% | (27/129) | 16% | (58/384) |
| Nausea | 7% | (9/126) | 13% | (17/129) | 30% | (38/129) | 17% | (64/384) |
| Vomiting | 2% | (3/126) | 3% | (4/129) | 11% | (14/129) | 5% | (21/384) |
| Nausea & Vomiting | 0 | (0/126) | 1% | (1/129) | 4% | (5/129) | 2% | (6/384) |
| Abdominal Pain | 4% | (5/126) | 4% | (5/129) | 4% | (5/129) | 4% | (15/384) |

The safety and efficacy of ABT-773 in Acute Bacterial Sinusitis (ABS) were studied in a multi-center Phase IIb clinical trial conducted from October 1999 to March 2000. Dosing regimens of 150mg QD, 300mg QD, and 600mg QD were tested. Of the 292 enrolled subjects, 246 were clinically evaluable. The following chart summarizes the results.

| Bacterial Eradication | ABT-773 150mg QD | ABT-773 300mg QD | ABT-773 600mg QD | Overall Eradication |
|---|---|---|---|---|
| S.pneumonia | 3/3 | 8/8 | 9/12 | 20/23 |
| M. catarrhalis | 8/9 | 3/4 | 4/4 | 15/17 |
| H. influenzae | 3/5 | 7/7 | 5/7 | 15/19 |
| S.aureus | 1/1 | 1/1 | 3/4 | 5/6 |

| Clinical Response | | | | | | | |
|---|---|---|---|---|---|---|---|
| Cure | 89% | (70/79) | 83% | (70/84) | 71% | (59/83) | |
| Failure | 11% | (9/79) | 17% | (14/84) | 29% | (24/83) | |

| Adverse Events | | | | | | | |
|---|---|---|---|---|---|---|---|
| Taste Perversion | 1% | 16/97) | 14% | (14/98) | 27% | (26/97) | 14% (41/292) |
| Diarrhea | 6% | (6/97) | 6% | (6/98) | 17% | (16/97) | 10% (28/292) |
| Nausea | 3% | (3/97) | 12% | (12/98) | 26% | (26/97) | 14% (40/292) |
| Vomiting | 1% | (1/97) | 6% | (6/98) | 17% | (16/97) | 8% (23/292) |

CONFIDENTIAL
JH 008157



The safety and efficacy of ABT-773 in community-acquired pneumonia (CAP) were studied in a multi-canter Phase IIb clinical trial from October 1999 to March 2000. Dosing regimens of 300mg QD and 600mg QD were tested. Of the 187 enrolled subjects, 1248 were clinically evaluable, and 15 were both clinically and bacteriologically evaluable. The following chart summarizes the results.

| Bacterial Eradication | ABT-773 300mg QD | | ABT-773 600mg QD | | Overall Eradication | |
|---|---|---|---|---|---|---|
| S. pneumoniae | 87% | (13/15) | 100% | (7/7) | 91% | (20/22) |
| M. catarrhalis | 75% | (6/8) | 50% | (2/4) | 67% | (8/12) |
| H. influenzae | 100% | (9/9) | 72% | (13/18) | 81% | (22/27) |
| M. pneumoniae | 93% | (13/14) | 93% | (14/15) | 93% | (27/29) |
| C. pneumoniae | 95% | (19/20) | 79% | (19/24) | 86% | (38/144) |
| L. pneumoniae | 100% | (3/3) | 100% | (2/2) | 100% | (5/5) |

| Clinical Response | | | | |
|---|---|---|---|---|
| Cure | 92% | (72/78) | 80% | (56/70) |
| Failure | 8% | (6/78) | 20% | (14/70) |

| Clinical & Bacterial Response | | | | |
|---|---|---|---|---|
| Cure | 92% | (54/59) | 82% | (47/57) |
| Failure | 8% | (5/59) | 18% | (10/57) |

| Adverse Events | | | | | | |
|---|---|---|---|---|---|---|
| Taste Perversion | 17% | (16/95) | 26% | (24/92) | 21% | (40/187) |
| Diarrhea | 14% | (13/95) | 18% | (17/92) | 16% | (30/187) |
| Nausea | 12% | (11/95) | 22% | (20/92) | 17% | (31/187) |
| Vomiting | 10% | (9/95) | 15% | (14/92) | 12% | (23/187) |

Appendix 1

### Key Emerging Competitors

| Generic | Brand | Company | Class | Status |
|---|---|---|---|---|
| moxifloxacin | Avelox | Bayer | Quinolone | Approved by FDA 12/13/00 |
| gatifloxacin | Tequin | BMS | Quinolone | Approved by FDA 12/21/00 |
| gemifloxacin | Factive | SKB | Quinolone | Filed NDA 12/15 |
| T-3811 | TBD | BMS/Toyama | Quinolone | Phase I |
| telithromycin | Ketek | Aventis | Ketolide | Filed NDA 3/00 |
| linezolid | Zyvox | Pharmacia | Oxazolidinone | Approved by FDA Q2 '00 |

CONFIDENTIAL
JH 008158

13

# Bukofzer Deposition Exhibit 13

# P's Exhibit JA



**JEFFREY M. LEIDEN, M.D., Ph.D**
**EXECUTIVE VICE PRESIDENT,**
**PHARMACEUTICALS AND**
**CHIEF SCIENTIFIC OFFICER**

Abbott Laboratories
Dept.    3RD    Bldg.    AP6D
100 Abbott Park Road
Abbott Park, IL   60064–6020

Phone:    (847) 938-9313
FAX:       (847) 937-2632

May 2, 2001

To:   Stan Bukofzer
      John Leonard
      ~~Eugene Sim~~

cc:   Bill Dempsey
      Arthur Higgins

Re:   First Call Report

I'm sure you had a chance to see the FDA Advisory Panel recommendations on Ketek. The FDA is clearly taking a hard line (as we expected) on the safety issues associated with Ketek. This obviously makes it essential for us to re-evaluate our strategy with regard to the safety, particularly cardiovascular safety in our 773 trials. In this regard, I would appreciate it if Stan and Eugene put together a presentation for John, Arthur, Bill and myself on our proposed approach for dealing with these safety issues with 773.

I look forward to hearing your suggestions.

Jeff

EXHIBIT
BuKOFZER
13
5/9/07
PENGAD 800-631-6989

Confidential

ABBT0573479

/4:44am EDT 27-Apr-01 Morgan Stanley/DW (Baum, Andrew) MORGAN SUMMARY AVEP.PA
Aventis: Lame US Recommendation for Ketek. Delay Possible

Europe: France
April 27, 2001
Company Update
Aventis: Lame US Recommendation for Ketek. Delay Possible

Andrew Baum  andrew.baum@msdw.com  +44 20 7513 6647
Duncan Moore    +44 20 7513 6620
Paul Mann    +44 20 7513 8273
Maria Forero      +44 20 7513 9682

- FDAAC RECOMMENDED KETEK FOR ONLY 1 OUT OF 3 PROPOSED INDICATIONS
No recommendation for use in acute bronchitis or sinusitis. In
addition, insufficient evidence of unique activity in penicillin and
erythromycin resistant disease. Major erosion of potential marketing
advantage.
- SAFETY IS THE REAL STICKING POINT
Panel needs more data. Concerned over cardiovascular risk and liver
toxicity especially in at risk patients. No support for use in
children. Panel propose "black box", more trials or monitoring.
- DELAY LIKELY WE BELIEVE. CURRENT ESTIMATE $1BN IN 2007 - 12% OF
SALES GROWTH
We sense that panel wanted to be more positive but lacked data. We
suspect AVE may chose to delay and run safety trial, rather than launch
a drug with an unattractive set of claims. Estimates under review.

OUTPERFORM-V
Price (Apr 25, 2001):          Eu84.00
Price Target:                  Eu100.00
52-Week Range:         Eu95.40 - 59.70
ADR Price, Target:       $75.10, 89

| FY ending | 2000PF | 2001E | 2002E | 2003EDecember: |
|---|---|---|---|---|
| EPS (Eu) | 1.50 | 1.85 | 2.52 | 3.18 |
| CEPS (Eu) | 3.25 | 3.69 | 4.49 | 5.25 |
| Revenue (Eum) | 16,091 | 17,090 | 18,615 | 20,294 |
| Net Income (Eum) | 1,172 | 1,445 | 1,970 | 2,490 |
| P/E | 56 | 45.4 | 33.4 | 26.4 |
| P/CE | 25.8 | 22.8 | 18.7 | 16.0 |
| EV/EBITDA | 15.6 | 13.5 | 11.6 | 10.1 |
| Curr. Yield (%) | 0.5 | 0.7 | 0.9 | 1.2 |

| | |
|---|---|
| Market Cap (US$b, Eub) | 58, 65 |
| Enterprise Value (Eum) | 60,338 |
| Return on Equity (12/00) (%) | N/A |
| L-T Est. EPS Grth. ('02 - | 11.5'07) (%) |
| Book Value (Eum) | 9,936.8 |
| 1, 3, 12-mth Rel. Perf (%) | -7, 8,48 |
| P/E to Growth | 2.90 |
| Shares Outstanding (m) | 781.0 |

| ADR Data - Ords | 2000A | 2001E | 2002E | 2003Eper ADR: 1.00 |
|---|---|---|---|---|
| EPADR (US$) | 1.35 | 1.67 | 2.27 | 2.86 |

-- FIRST CALL --

Confidential

ABBT0573480

| P/E | 56 | 45.4 | 33.4 | 26.4 |
|---|---|---|---|---|
| CEPADR (US$) | 2.93 | 3.32 | 4.04 | 4.73 |
| P/CE | 25.8 | 22.8 | 18.7 | 16.0 |
| Curr. Yield (%) | 0.5 | 0.7 | 0.9 | 1.2 |
| Exch Rate (US$/Eu) | 0.90 | 0.90 | 0.90 | 0.90 |

E = Morgan Stanley Dean Witter Research Estimates

Company Description
Aventis was formed in December 1999 through the merger of Hoechst's and
Rhone-Poulenc's Life Sciences businesses. Aventis is the largest Life Sciences
company in the world, with leading positions in both Pharmaceuticals and
Agriculture. Sales in 1999 totalled Eu20.5 billion ($20 billion), with the
pharmaceutical's contributing 75% of the Life Sciences sales and 83% of
operating profits. Lame recommendation for Ketek Investment summary and
conclusion: The FDA Advisory Committee last night gave Aventis's new
antibiotic Ketek a far inferior set of claims than anticipated by the market,
and far narrower than the recent recommendation by the European authorities,
the CPMP. Aventis approached the FDA advisory committee with a toned down set
of claims compared to the CPMP, dropping the treatment of tonsillitis and
acute pharyngitis. Three key claims were targeted, community acquired
pneumonia, acute exacerbation of chronic bronchitis and acute sinusitis. All
five claims were recommended in EU by the CPMP. FDAAC votes yes for pneumonia
only In stark contrast, the FDA rejected bronchitis and acute sinusitis by a
vote of 10/0 and 8/2 respectively. Use in community acquired pneumonia was
approved by a vote of 7/3. However, even in pneumonia, the drug was not
recommended for its key competitive advantages- the use in pneumonia caused by
organisms resistant to existing antibiotic penicillin and erythromycin. The
FDA typically follows the advice of the advisory panel in 10/11 cases. The
commercial impact of this inferior outlook will be substantial, in our view.
We had anticipated 2007 sales of $1bn in 2007, assuming the drug is approved
on the back of these recommendations, we would be looking to reduce our
forecasts by 50% or so. On our current numbers, Ketek contributes 11.4% of our
incremental revenue growth 02-07. A revised forecast would reduce the revenue
growth rate from 7.3%. to around 6.8% Safety is main concern; more data needed
The key concerns of the panel were safety given the evidence that Ketek is
associated with Qt prolongation in at risk patients, and potential for adverse
hepatic events linked to interaction between Ketek and other drugs. The key
concern is that release of the drug onto the market without further safety
data may pose a risk given : (i)safety profile (ii)proclivity of physicians to
use the drug off label in other indications (iii)proclivity of physicians to
use drug in chronic setting in indication of bronchitis, where safety has not
been fully evaluated There was also a reticence to provide support for
recommending the drugs in children between the ages of 12-18, again in
contrast the reecommendation of the CPMP The panel suggested a number of
solutions including that Aventis might consider carrying out safety trials
prior to launching the drug in order to benefit from a superior label with a
broader set of claims. This would clearly manifest into a delayed drug launch
of approximately a year we believe. Alternatively, the panel were happy to
recommend approval of Ketek just for community acquired pneumonia but with
black boxes relating to hepatic and cardiovascular risks, and/ or necessity
for cardio/ hepatic monitoring. Given the absence of any competitive advantage
in regard to activity in resistant infections, this adverse labelling is
likely to have a significant negative effect on potential usage. Delayed US
launch possible? As a result of yesterdays meeting, we suspect that Aventis
may decide to delay the US launch of Ketek and carry out further safety trials

-- FIRST CALL --

Confidential

ABBT0573481

.n the hope of ensuring a competitive label to achieve the commercial goals it
has indicated to the market ($1 bn peak sales) We believe that ultimately
Ketek is likely to fulfil close to our expectations given the panel views.
However the onus is now on Aventis to deliver the necessary clinical data to
satisfy the panel and facilitate approval of the drug with a competitive set
of claims. Given the above we would use any over-reaction in the share price
to add to positions in the stock. Rated Outperform. Target Price Eu100. V =
More volatile.  We estimate that this stock has more than a 25% chance of a
price move (up or down) of more than 25% in a month, based on a quantitative
assessment of historical data, or in the analyst's view, it is likely to
become materially more volatile over the next 1- 12 months compared with the
past three years.  Stocks with less than one year of trading history are
automatically rated as more volatile (unless otherwise noted).  We note that
securities that we do not currently consider "volatile" can still perform in
that manner.                                                         The
information and opinions in this report were prepared by Morgan Stanley & Co.
International Limited ("Morgan Stanley").  Morgan Stanley does not undertake
to advise you of changes in its opinion or information.  Morgan Stanley and
others associated with it may make markets or specialize in, have positions in
and effect transactions in securities of companies mentioned and may also
perform or seek to perform investment banking services for those companies.
This memorandum is based on information available to the public.  No
representation is made that it is accurate or complete.  This memorandum is
not an offer to buy or sell or a solicitation of an offer to buy or sell the
securities mentioned. Within the last three years, Morgan Stanley & Co.
Incorporated, Morgan Stanley DW Inc. and/or their affiliates managed or
co-managed a public offering of the securities of AVENTIS SA. Morgan Stanley &
Co. Incorporated, Morgan Stanley DW Inc. and/or their affiliates or their
employees have or may have a long or short position or holding in the
ecurities, options on securities, or other related investments of issuers
mentioned herein. The investments discussed or recommended in this report may
not be suitable for all investors.  Investors must make their own investment
decisions based on their specific investment objectives and financial position
and using such independent advisors as they believe necessary. Where an
investment is denominated in a currency other than the investor's currency,
changes in rates of exchange may have an adverse effect on the value, price
of, or income derived from the investment. Past performance is not necessarily
a guide to future performance. Income from investments may fluctuate. The
price or value of the investments to which this report relates, either
directly or indirectly, may fall or rise against the interest of investors. To
our readers in the United Kingdom: Morgan Stanley, regulated by the Securities
and Futures Authority Limited, and/or its affiliates may be providing or may
have provided significant advice or investment services, including investment
banking services, for any company mentioned in this report.  Private investors
should obtain the advice of their Morgan Stanley representative about the
investments concerned. This publication is disseminated in Japan by Morgan
Stanley Dean Witter Japan Limited and in Singapore by Morgan Stanley Dean
Witter Asia (Singapore) Pte. To our readers in the United States:  While
Morgan Stanley has prepared this report, Morgan Stanley & Co. Incorporated and
Morgan Stanley DW Inc. are distributing the report in the US and accept
responsibility for it contents.  Any person receiving this report and wishing
to effect transactions in any security discussed herein should do so only with
a representative of Morgan Stanley & Co. Incorporated or Morgan Stanley DW
Inc. To our readers in Spain: Morgan Stanley Dean Witter, SV, SA, a Morgan
Stanley group company, supervised by the Spanish Securities Markets Commission

-- FIRST CALL --

Confidential

ABBT0573482

(CNMV), hereby states that this document has been written and distributed in accordance with the rules of conduct applicable to financial research as established under Spanish regulations. To our readers in Australia: This publication has been issued by Morgan Stanley but is being distributed in Australia by Morgan Stanley Dean Witter Australia Limited A.B.N. 67 003 734 576, a licensed dealer, which accepts responsibility for its contents.  Any person receiving this report and wishing to effect transactions in any security discussed in it may wish to do so with an authorized representative of Morgan Stanley Dean Witter Australia Limited. To our readers in Canada: This publication has been prepared by Morgan Stanley and is being made available in certain provinces of Canada by Morgan Stanley Canada Limited. Morgan Stanley Canada Limited has approved of, and has agreed to take responsibility for, the contents of this information in Canada. Morgan Stanley is a service mark of Morgan Stanley Dean Witter & Co. Additional information on recommended securities is available on request.  This report may not be resold or redistributed without the prior written consent of Morgan Stanley Dean Witter & Co. Copyright 2001 Morgan Stanley Dean Witter & Co. First Call Corporation, a Thomson Financial company. All rights reserved.  888.558.2500

-> End of Note <-

-- FIRST CALL --

Confidential

ABBT0573483

23

# Bukofzer Deposition Exhibit 23

# P's Exhibit QM

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

JOHN HANCOCK LIFE INSURANCE )
COMPANY, JOHN HANCOCK )
VARIABLE LIFE INSURANCE )
COMPANY, and MANULIFE )
INSURANCE COMPANY (f/k/a )
INVESTORS PARTNER INSURANCE )     CIVIL ACTION NO. 05-11150-DPW
COMPANY), )
)
Plaintiffs, )
)
v. )
)
ABBOTT LABORATORIES, )
)
Defendant. )
)

## NOTICE OF DEPOSITION

PLEASE TAKE NOTICE that, pursuant to Fed. R. Civ. P. 30(b)(6), plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and Manulife Insurance Company (f/k/a Investors Partner Insurance Company) (collectively, "John Hancock") will take the deposition of defendant Abbott Laboratories on April 12, 2007 commencing at 9:30 a.m. at the offices of Levenfeld Pearlstein, LLC, 2 North LaSalle Street, Suite 1300, Chicago, Illinois, or such other location as may be mutually agreed to by the parties.  Abbott shall designate, prepare and produce one or more knowledgeable officers, directors, or other representatives to testify on its behalf as to the topics set forth below.



EXHIBIT
BUKOFZER
23
5/9/07

PLEASE TAKE FURTHER NOTICE that the deposition noticed above will be recorded stenographically, and through real-time court reporting, such as by LiveNote. The deposition also may be recorded by audio or video technology, such as videotape. The deposition will be taken before a notary public or other person authorized to administer oaths and will continue from day-to-day until completed, Saturdays, Sundays and holidays excepted.

## Definitions

For purposes of this Notice, John Hancock adopts the "Uniform Definitions in Discovery Requests" contained in Local Rule 26.5. The following additional terms shall have the meanings set forth below:

1. "You," "your" and "Abbott" shall mean defendant Abbott Laboratories, its various corporate parents, subsidiaries, affiliates, subdivisions and departments, and any and all representatives, successors, assigns, officers, directors, employees, agents, attorneys or other persons or entities who have acted or purported to act for or on behalf of any of them.

2. "Abbott's Senior Management" shall mean the Abbott personnel who had or have overall responsibility, authority and accountability for managing Abbott's Global Pharmaceutical Research and Development organization and operations, including, without limitation, Miles D. White and the "Senior Management" referenced in Abbott Document No. ABBT0101924.

3. "John Hancock" shall mean collectively defendants John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and Manulife Insurance Company (f/k/a Investors Partner Life Insurance Company), their various subsidiaries, affiliates, divisions and departments, and any and all representatives, successors, assigns,

-2-

officers, directors, employees, agents, auditors, attorneys or other persons or entities who have acted or purported to act for or on behalf of any of them, including, without limitation, representatives of the StoneTurn Group.

    4.    The "Research Funding Agreement" shall mean the Research Funding Agreement by and between Abbott and John Hancock, dated as of March 13, 2001.

    5.    The "Program Compounds" shall have the meaning set forth in the Research Funding Agreement.

    6.    "Program Term" shall have the meaning set forth in the Research Funding Agreement.

    7.    "Regarding" shall have the same meaning as "concerning."

    8.    "Any" also shall mean "all," and "all" also shall mean "any."

    9.    "And" as well as "or" shall be construed both disjunctively and conjunctively to mean "and/or."

## Topics Of Examination

    1.    Abbott's knowledge and belief concerning the prospects and condition (including safety, efficacy, scientific viability or commercial viability) of the Program Compound known as ABT-518 as of March 13, 2001.

    2.    Abbott's knowledge and belief concerning the prospects and condition (including safety, efficacy, scientific viability or commercial viability) of the Program Compound known as ABT-594 as of March 13, 2001.

-3-

3.    Abbott's knowledge and belief concerning the prospects and condition (including safety, efficacy, scientific viability or commercial viability) of the Program Compound known as ABT-773 as of March 13, 2001.

4.    The knowledge and belief of each member of Abbott's Senior Management concerning the prospects and condition (including safety, efficacy, scientific viability or commercial viability) of the Program Compound known as ABT-518 as of March 13, 2001.

5.    The knowledge and belief of each member of Abbott's Senior Management concerning the prospects and condition (including safety, efficacy, scientific viability or commercial viability) of the Program Compound known as ABT-594 as of March 13, 2001.

6.    The knowledge and belief of each member of Abbott's Senior Management concerning the prospects and condition (including safety, efficacy, scientific viability or commercial viability) of the Program Compound known as ABT-773 as of March 13, 2001.

7.    Abbott's valuation of, and methods for valuing (including, without limitation, any models used in such valuations) the Program Compound known as ABT-518 at any time from January 1, 2001 to the present.

8.    Abbott's valuation of, and methods for valuing (including, without limitation, any models used in such valuations) the Program Compound known as ABT-594 at any time from January 1, 2001 to the present.

9.    Abbott's valuation of, and methods for valuing (including, without limitation, any models used in such valuations) the Program Compound known as ABT-773 at any time from January 1, 2001 to the present.

10.    Abbott's nominal or intended and reasonably expected spending on the Program Compound known as ABT-518 at any time from January 1, 2001 to the present.

11.   Abbott's nominal or intended and reasonably expected spending on the Program Compound known as ABT-594 at any time from January 1, 2001 to the present.

12.   Abbott's nominal or intended and reasonably expected spending on the Program Compound known as ABT-773 at any time from January 1, 2001 to the present.

13.   Abbott's reasons for discontinuing or terminating the development of the Program Compound known as ABT-518.

14.   Abbott's reasons for discontinuing or terminating the development of the Program Compound known as ABT-594.

15.   Abbott's reasons for discontinuing or terminating the development of the Program Compound known as ABT-773.

16.   All communications among or between Abbott's Senior Management, at any time from January 1, 2000 to the present, regarding the prospects or condition (including safety, efficacy, scientific viability or commercial viability) of the Program Compound known as ABT-518.

17.   All communications among or between Abbott's Senior Management, at any time from January 1, 2000 to the present, regarding the prospects or condition (including safety, efficacy, scientific viability or commercial viability) of the Program Compound known as ABT-594.

18.   All communications among or between Abbott's Senior Management, at any time from January 1, 2000 to the present, regarding the prospects or condition (including safety, efficacy, scientific viability or commercial viability) of the Program Compound known as ABT-773.

19.    All communications among and between senior Abbott's Senior Management, at any time from January 1, 2000 to the present, regarding the actual or potential discontinuation or termination of development of the Program Compound known as ABT-518.

20.    All communications among and between senior Abbott's Senior Management, at any time from January 1, 2000 to the present, regarding the actual or potential discontinuation or termination of development of the Program Compound known as ABT-594.

21.    All communications among and between senior Abbott's Senior Management, at any time from January 1, 2000 to the present, regarding the actual or potential discontinuation or termination of development of the Program Compound known as ABT-773.

22.    The creation of, analysis reflected in, or actions taken by Abbott in connection with, the document attached hereto as Exhibit A as it pertains to the Program Compounds known as ABT-518, ABT-594 and ABT-773.

23.    The creation of, analysis reflected in, or actions taken by Abbott in connection with, the document attached hereto as Exhibit B as it pertains to the Program Compounds known as ABT-518, ABT-594 and ABT-773.

24.    The creation of, analysis reflected in, or actions taken by Abbott in connection with, the document attached hereto as Exhibit C as it pertains to the Program Compound known as ABT-594.

JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY)

By its attorneys,

Brian A. Davis (BBO No. 546462)
Joseph H. Zwicker (BBO No. 560219)
Karen Collari Troake (BBO No. 566922)
Richard C. Abati (BBO No. 651037)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Tele: (617) 248-5000
Fax: (617) 248-4000

Date: March 30, 2007

4191661.1

-7-

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served by electronic and overnight mail upon Peter E. Gelhaar, Esq., Donnelly, Conroy & Gelhaar, LLP, One Beacon Street, 33rd Floor, Boston, MA 02108, and Gregory D. Phillips, Esq., Munger, Tolles & Olson LLP, 355 South Grand Avenue, Los Angeles, CA 90071, on this 30th day of March, 2007.

Richard C. Abati

-8-

4191375v1



CHOATE HALL & STEWART LLP

# Fax                                                                    CONFIDENTIAL

| Recipient | Company | Fax | Phone |
|---|---|---|---|
| April Bernath | Levenfeld Pearlstein | 312-346-8434 | |

| From | Deborah J. Dion | Number of Pages | 9 |
|---|---|---|---|
| Date | May 9, 2007 | Client Number | 2003799-0015 |
| Phone | (617) 248-4018 | Operator | Time Sent |

**Comments**  Please deliver to Joe Zwicker in the Field Museum Conference Room

**Return by**    Inter-office Mail    Hold for pick-up

This Message is transmitted to you by the law firm of Choate, Hall & Stewart LLP. The substance of this message, along with any attachments, may be confidential and legally privileged. If you are not the designated recipient of this message, please destroy it and notify the sender of the error by return e-mail or by calling 1-800-520-2427.

Under regulations of the Treasury Department, we are required to include the following statement in this message: Any advice contained herein (or in any attachment hereto) regarding federal tax matters was not intended or written by the sender to be used, and it cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer.

For more information about Choate, Hall & Stewart LLP, please visit us at www.choate.com

Two International Place I Boston MA 02110 I t 617-248-5000 I f 617-248-4000 I choate.com