UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY,<br><br>     Plaintiffs,<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>     Defendant. | CIVIL ACTION NO. 05-11150-DPW |

## ABBOTT'S DEPOSITION DESIGNATIONS AND COUNTER DESIGNATIONS FOR WILMA H. DAVIS

Defendant Abbott Laboratories ("Abbott") respectfully submits the attached deposition

designations and counter-designations for the May 7, 2007 deposition of Wilma H. Davis

Member of John Hancock's Bond and Investment Committee

.

1

Dated:  February 18, 2008                    Respectfully submitted,

                                             ABBOTT LABORATORIES

                                             By:  __/s/ Eric J. Lorenzini_____
                                                     Eric J. Lorenzini

                                             Jeffrey I. Weinberger (*pro hac vice*)
                                             Gregory D. Phillips (*pro hac vice*)
                                             Eric J. Lorenzini *(pro hac vice)*
                                             Ozge Guzelsu *(pro hac vice)*
                                             MUNGER, TOLLES & OLSON LLP
                                             355 South Grand Avenue, Thirty-Fifth
                                             Floor
                                             Los Angeles, CA  90071-1560
                                             Tele:  (213) 683-9100

                                             and

                                             Peter E. Gelhaar (BBO#188310)
                                             Michael S. D'Orsi (BBO #566960)
                                             DONNELLY, CONROY &
                                             GELHAAR LLP
                                             1 Beacon St., 33rd Floor
                                             Boston, Massachusetts 02108
                                             (617) 720-2880
                                             peg@dcglaw.com
                                             msd@dcglaw.com

                                             *Counsel for Abbott Laboratories*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 18, 2008.

Date: February 18, 2008.

_____ /s/ Ozge Guzelsu _____

## Wilma Davis Deposition Designations

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 39209 | Davis, Wilma | | | 8:17-15:16 | 1 | | |
| 39209 | Davis, Wilma | | | 16:9-17:17 | 2 | | |
| 39209 | Davis, Wilma | | | 19:16-23:17 | | | |
| 39209 | Davis, Wilma | | | 23:20-23:24 | | | |
| 39209 | Davis, Wilma | | | 24:3-25:2 | | | |
| 39209 | Davis, Wilma | | | 26:3-31:24 | 2,3 | | |
| 39209 | Davis, Wilma | | | 32:6-33:3 | 2 | | |
| 39209 | Davis, Wilma | | | 33:7-33:7 | | | |
| 39209 | Davis, Wilma | | | 35:22-38:10 | 4 | | |
| 39209 | Davis, Wilma | | | 38:20-41:5 | | | |
| 39209 | Davis, Wilma | | | 42:10-46:9 | | | |
| 39209 | Davis, Wilma | | | 46:15-50:2 | | | |
| 39209 | Davis, Wilma | | | 50:9-50:13 | | | |
| 39209 | Davis, Wilma | | | 50:21-52:20 | 5 | | |
| 39209 | Davis, Wilma | | | 55:6-56:4 | 5 | | |
| 39209 | Davis, Wilma | | | 57:9-59:6 | 2,5 | | |
| 39209 | Davis, Wilma | | | 59:11-59:23 | 5 | | |
| 39209 | Davis, Wilma | | | 60:13-64:17 | 3 | | |
| 39209 | Davis, Wilma | | | 64:23-65:2 | | | |
| 39209 | Davis, Wilma | | | 66:1-66:5 | 4 | | |
| 39209 | Davis, Wilma | | | 66:9-66:22 | | | |
| 39209 | Davis, Wilma | | | 70:11-70:18 | | | |
| 39209 | Davis, Wilma | | | 71:13-71:19 | | | |

| 39209 | Davis, Wilma | | | 72:1-73:2 | | | |
|-------|--------------|--|--|-----------|--|--|--|
| 39209 | Davis, Wilma | | | 74:2-74:14 | | | |
| 39209 | Davis, Wilma | | | 75:2-75:11 | 6 | | |
| 39209 | Davis, Wilma | | | 76:23-85:2 | ,7, | | |
| 39209 | Davis, Wilma | | | 86:8-86:23 | 8 | | |
| 39209 | Davis, Wilma | | | 94:20-96:17 | 9 | | |
| 39209 | Davis, Wilma | | | 98:1-98:17 | | | |
| 39209 | Davis, Wilma | | | 100:23-100:24 | | | |
| 39209 | Davis, Wilma | | | 101:2-101:3 | 8 | | |
| 39209 | Davis, Wilma | | | 102:19-103:13 | 8 | | |
| 39209 | Davis, Wilma | | | 106:7-107:3 | 10 | | |
| 39209 | Davis, Wilma | | | 107:8-107:22 | | | |

.

# Color Key to Deposition Designations

Designation by Plaintiffs

Counter Designation by Defendants

Designation by Defendants

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1                    Volume:   I

                  Pages:  1-118

2                 Exhibits:  See Index

3

            UNITED STATES DISTRICT COURT

4

        FOR THE DISTRICT OF MASSACHUSETTS

5

6

7        - - - - - - - - - - - - - - - - - - x

8     JOHN HANCOCK LIFE INSURANCE COMPANY;,

9     JOHN HANCOCK VARIABLE LIFE INSURANCE

10    COMPANY; and MANULIFE INSURANCE

11    COMPANY f/k/a INVESTORS PARTNER

12    INSURANCE COMPANY,

13          Plaintiffs,

14    VS.                    No. C2-05-889

15    ABBOTT LABORATORIES, INC.,       05-11150-DPW

16          Defendant.

17        - - - - - - - - - - - - - - - - - - x

18

19        DEPOSITION OF WILMA H. DAVIS

20     Monday, May 7, 2007, 9:05 a.m.

21       Donnelly, Conroy & Gelhaar

22       One Beacon Street, 33rd Floor

23       Boston, Massachusetts  02108

24    Reporter:  Patricia M. McLaughlin, CSR

1       DEPOSITION OF WILMA DAVIS, a witness called

2    on behalf of the Defendant, in the above-captioned

3    matter, said deposition being taken pursuant to the

4    Federal Rules of Civil Procedure, by and before

5    Patricia M.  McLaughlin, a Certified Shorthand

6    Reporter and Notary Public in and for the

7    Commonwealth of Massachusetts, at the offices of

8    Donnelly, Conroy & Gelhaar, One Beacon Street,

9    Boston, Massachusetts, on Monday, May 7, 2007,

10    commencing at 9:05 a.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

```
1    APPEARANCES:

2

3    For the Plaintiffs:

4

5        CHOATE HALL & STEWART LLP

6        Two International Place

7        Boston, Massachusetts  02110

8        617.248.5000  Fax:  617.248.4000

9        Jswicker@choate.com

10       By:  Joseph H. Zwicker, Esquire

11              and

12          Stacy L. Blasberg, Esquire

13       Sblasberg@choate.com

14

15   For the Defendant:

16

17       MUNGER, TOLLES & OLSON, LLP

18       355 South Grand Avenue, 35th Floor

19       Los Angeles, California  90071-1560

20       213.683.9207

21       Eric.Lorenzini@mto.com

22       By:  Eric J. Lorenzini, Esquire

23

24
```

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1                    I N D E X

2    WITNESS          DIRECT    CROSS

3    WILMA DAVIS

4    By Mr. Lorenzini          4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# PART 2

1                    E X H I B I T S

2       No.          Description          Page

3       EXH. 1    Notice of Taking Deposition        6

4       EXH. 2    John Hancock's Objections and

5                    Responses to Abbott Laboratories'

6                    First Set of Interrogatories      12

7       EXH. 3    Bond Investment Committee meeting

8                    Minutes of September 21, 2000      31

9       EXH. 4    Document Bates stamped JH 001203

10                   Through JH 001220              36

11      EXH. 5    Document Bates stamped JH 021462   52

12      EXH. 6    Letter dated May 8, 2000, and

13                   Attachments               77

14      EXH. 7    E-mail dated September 21, 2000    81

15      EXH. 8    Committee of Finance meeting

16                   Minutes of October 10, 2000      82

17      EXH. 9    Research Funding Agreement

18                   Dated March 13, 2001          94

19      EXH. 10    Memorandum to File            106

20

21

22

23

24

1          MR. ZWICKER:  Let me just state the

2      stipulation on the record, which is that

3      objections, except as to form, and motions to

4      strike are preserved.  She will read and

5      sign.  She need not do so before a Notary.

6          I'm sure there's no issue with it, but

7      the parties agree, by Jeff Weinberger's

8      letter of April 9th, to modify Items 10 to 21

9      by striking the phrase "and/or its individual

10     members" from each of the requests.  I have a

11     copy of the letter if you want to see it.

12         MR. LORENZINI:  Could I see that?

13         MR. ZWICKER:  Yes.  Why don't we go off

14     the record for a second.

15         (Discussion held off the record.)

16         BY MR. LORENZINI:

17     Q   Miss Davis, you have before you what the

18     Court Reporter has marked as Exhibit 1.  It's

19     a Rule 30(b)(6) Notice of Deposition directed

20     to the Plaintiffs, John Hancock Life

21     Insurance Company and John Hancock Life

22     Insurance Company and Manulife Life Insurance

23     Company.

24         Have you seen this document before?

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1    A   Yes, I have.

2    Q   Do you understand that you are here today

3        testifying on behalf of the three John

4        Hancock entities listed in the deposition

5        notice, that is, John Hancock Life Insurance

6        Company, John Hancock Variable Life Insurance

7        Company and Manulife Life Insurance Company,

8        with respect to certain topics listed in this

9        notice?

10   A   Yes.

11   Q   And if you look at Topics 10 through 21, just

12       take a moment to read those to yourself, and

13       I'm going to ask you if you are prepared to

14       testify on behalf of those three entities

15       with respect to Topics 10 through 21.

16   A   (Witness complies.)

17       Yes.

18   Q   What did you do to prepare for your

19       deposition today, Miss Davis?

20   A   I reviewed documents.  I contacted members of

21       the Bond and Corporate Finance Group who are

22       still present.

23   Q   By still present, do you mean still employed?

24   A   Still employed at John Hancock.  I'm sorry.

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1    Q    Anything else?

2    A    No.

3    Q    Did you contact any former employees of John

4        Hancock?

5    A    No.

6        MR. ZWICKER:  Can we go off the record

7        for a second?

8        (Witness and counsel conferred.)

9        (Discussion held off the record.)

10        MR. ZWICKER:  Back on.

11        BY MR. LORENZINI:

12    Q    Miss Davis, did you want to amend your prior

13        answer?

14    A    Yes, with respect to the parties I spoke to,

15        I spoke to the members of the part of the

16        Bond and Corporate Finance Group who are not

17        official members of the Bond Committee, so I

18        just wanted to be clear.  I had attended

19        meetings.

20    Q    Did you speak with anyone who is currently or

21        formerly a member of the Committee of

22        Finance?

23    A    No, I did not.

24    Q    Did you communicate with anyone who attended

1     meetings of the Committee of Finance back in

2     October of 2000 regarding the Abbott deal?

3     A   Those are the parties I referred to in my

4     second question.

5     Q   So you spoke with people who are part of the

6     Bond and Corporate Finance Group who

7     attended --

8     A   Right, both the BIC Committee and Finance.

9     Q   Who were the members of the Bond Investment

10    Committee that you contacted in preparation

11    for your deposition?

12    A   I don't have the list here with me, but I can

13    give you some of the names.  But I cannot be

14    sure it would be all of them.

15    Q   Okay.  Why don't you give me what you can

16    remember?

17    A   Okay.  I tried to communicate with Scott

18    Hartz, Janice McDonough, Stephen Blewitt,

19    Chip Hodge.

20    Q   The last name was Hodge?

21    A   Hodge, H O D G E, Ken Hines, George Braun.

22    Those are the ones that come to mind.

23    MR. LORENZINI:  I'd like to mark another

24    exhibit.  This is Exhibit 2.

# PART 3

1          (Document marked Exhibit No. 2.)

2          BY MR. LORENZINI:

3     Q    Miss Davis, you have before you an exhibit

4          the Court Reporter has marked as Davis

5          Exhibit No. 2.  It's titled "John Hancock's

6          Objections and Responses to Abbott

7          Laboratories First Set of Interrogatories".

8          This is a document that was served on Abbott

9          by John Hancock answering certain

10         interrogatories.  I'm just going to use this

11         to refresh your recollection.

12             Could you turn to Page 53, please?  Have

13         you seen this document before, Miss Davis?

14     A    I don't believe so.

15     Q    If you'll look at Interrogatory No. 11,

16         you'll see that John Hancock was asked to

17         identify any and all individuals involved in

18         Hancock's decision to enter into the

19         agreement or provided information or input

20         into that decision.  In the response, John

21         Hancock listed Steve Blewitt and Scott Hartz

22         and also listed members of the Bond

23         Investment Committee and the Committee of

24         Finance.

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1        I would just like you to look through

2        the list of the members of the Bond

3        Investment Committee and Committee of Finance

4        to see if that refreshes your recollection to

5        see whether you spoke to anyone else in

6        preparation for this deposition.

7            MR. ZWICKER:  Do you want her to do the

8        Bond Investment Committee first or both?

9    Q    Why don't you start with the Bond Investment

10       Committee.

11   A    Okay.  On the Bond Committee, I did speak

12       with Phil Peters and Mark Gray.

13   Q    Is that person listed here as Stephen M.

14       Gray?  Is that Mark Gray?

15   A    Yes.

16   Q    Is there anyone else who is currently or was

17       formerly a member of the Bond Investment

18       Committee that you spoke to in preparation

19       for your deposition?

20   A    No.

21   Q    You testified a moment ago that you tried to

22       talk to the individuals that you listed on

23       the Bond Investment Committee.  I just want

24       to be clear.  Were you actually able to

1       communicate with each of the individuals that

2       you've named?

3    A   Yes.

4    Q   If you look at Pages 55 through 56 of

5       Exhibit 2, you'll see a list provided by John

6       Hancock of members of the Committee of

7       Finance during the relevant period.

8          Could you take a look at that list and

9       let me know if you spoke to any of those

10      individuals in preparation for your

11      deposition today?

12   A   I did not.

13   Q   You testified earlier that you did speak to

14      people who were in attendance at Committee of

15      Finance meetings; is that correct?

16         MR. ZWICKER:  Objection.

17   Q   Let me rephrase the question.  You spoke with

18      people who were part of the Bond and

19      Corporate Finance Group but not necessarily

20      members of the Bond Investment Committee or

21      the Committee of Finance, correct?

22         MR. ZWICKER:  Objection.

23   Q   You can answer.

24   A   Yes.

1    Q    Who were those individuals?

2    A    Kathy McDonough, Corey Gelorimi,

3        G-e-l-o-r-i-m-i.  That would be it.

4    Q    Are there any other persons that you spoke

5        with in preparation for your deposition today

6        other than those that you've named so far?

7    A    No.

8        MR. ZWICKER:  Other than counsel, right?

9        THE WITNESS:  Yes.

10   Q    You testified a moment ago that you spoke to

11       Chip Hodge.  I don't see him listed as one of

12       the members of the Bond Investment Committee

13       or the Committee of Finance.  Do you know if

14       he was a member of either of those committees

15       in the 2000 or 2001 time period?

16   A    Looking at this list, it appears he was not.

17   Q    Do you know what his position was in 2000 and

18       2001?

19   A    I'm not exactly sure what his title was.

20       MR. ZWICKER:  I think if you ask her

21       another way -- I think she's telling you that

22       she spoke to persons other than persons on

23       those lists with respect to finance and with

24       respect to the Bond Investment Committee.  So

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1    you may not have shown her a list which

2    incorporates all the persons that she's

3    spoken to.  So it may be that she's

4    interpreting your questions to be specific to

5    that list.  There may be other persons who

6    were in attendance at these meetings that may

7    refresh her recollection.

8         BY MR. LORENZINI:

9    Q   Do you know what Chip Hodge's current

10       position is at John Hancock?

11   A   He is a team leader on the oil and gas team.

12   Q   You also testified that you spoke with Janice

13       McDonough.  I don't see her listed as one of

14       the members of the two committees during that

15       time period.  Do you know if she was a member

16       of either of those committees during 2000 to

17       2001?

18   A   She obviously was not on the committee in

19       2000.  She is today a team leader of the

20       finance team.

21   Q   And you also mentioned someone named Kathy

22       McDonough.  That's a different person than

23       Janice?

24   A   Yes.

# **PART 4**

1    Q    And Kathy McDonough was not a member of

2         either committee, right?

3    A    No.

4    Q    What her position during 2000 and 2001?

5    A    She was an analyst.

6    Q    Do you know what her position is today?

7    A    She's still an analyst.

8    Q    When you spoke to these various individuals,

9         what subject did you discuss with them?

10        MR. ZWICKER:  Objection.

11   Q    Subject or subjects.

12        MR. ZWICKER:  Objection.

13   Q    You can answer.

14   A    I asked them for their recollections of the

15        September meeting in which the Abbott

16        transaction was voted at the BIC level and in

17        the October Committee of Finance meeting.

18   Q    Did you discuss any other subjects with those

19        individuals?

20   A    No.

21   Q    Did you communicate with any of those

22        individuals by E-mail?

23   A    No.

24   Q    Was counsel present during your

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1    reviewing?

2        MR. ZWICKER:  Generally speaking.

3    A   Generally speaking, the Committee of Finance

4        mandate, the BIC Committee mandate and

5        members and the committee agendas and the

6        minutes.

7    Q   Can you describe what you mean by the

8        Committee of Finance and the BIC mandates?

9        Is that a record of the vote?

10   A   No, it's the role and responsibility of the

11       respective committees.

12   Q   Are there any other documents that you

13       reviewed in preparation?

14       MR. ZWICKER:  Generally.

15   A   None that I can recall specifically.

16   Q   I just want to switch to asking you a little

17       bit about your position and background.  What

18       is your current position?

19   A   I am the head of the restructuring team.

20   Q   And is that at John Hancock Life Insurance?

21   A   At John Hancock, yes.

22   Q   How long have you held that position?

23   A   I have been in this position for the past

24       five or six years.

1    Q    And what was your position in the fall of

2        2000 and early 2001?

3    A    In the fall of 2000, I had a dual role.  I

4        was the head of our international team and

5        the head of our restructuring effort.

6    Q    What was your position before being head of

7        the international team and head of

8        restructuring?

9    A    I was the head of the consumer and industrial

10        team.

11    Q    How long did you hold that position?

12    A    For six or seven years.

13    Q    What was your position prior to being head of

14        the consumer and industrial team?

15    A    I was an analyst on that team.

16    Q    And how long were you an analyst?

17    A    Approximately three years.

18    Q    And what was your position prior to analyst?

19    A    I was at the Bank of Boston as a loan

20        officer.

21    Q    So in what year approximately did you join

22        John Hancock?

23    A    At the end of 1985.

24    Q    What were your responsibilities as analyst at

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1      John Hancock?

2  A   I was responsible for the communications

3      industry, cable companies, broadcast

4      companies, media companies.

5  Q   And specifically, what responsibilities did

6      you have with respect to those type of

7      companies?

8  A   I was responsible for analyzing and working

9      with my team leader at the time to develop

10     good investment recommendations.

11 Q   Did you attend meetings of either the Bond

12     Investment Committee or the Committee of

13     Finance when you were an analyst?

14 A   Yes.

15 Q   Were you involved as an analyst in preparing

16     any reports or memoranda for the Bond

17     Investment Committee or the Committee of

18     Finance recommending approval of

19     transactions?

20 A   Yes.

21 Q   Did you draft those reports yourself?

22 A   Yes.

23 Q   And the reports you drafted, were they

24     submitted both to the Bond Investment

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1        Committee and the Committee of Finance?

2    A   If approved at the Bond Committee, they were

3        submitted to the Committee of Finance.

4    Q   What were your responsibilities as head of

5        the consumer industrial team?

6    A   The responsibilities were to, one, manage the

7        people.  The team covered a broad range of

8        industries, from retailing to chemicals, et

9        cetera, and to develop recommendations to

10       provide good investments for the company.

11   Q   Did the consumer and industrial team include

12       within its scope healthcare or pharmaceutical

13       industries?

14   A   Yes, it did.

15   Q   In that position, head of the consumer and

16       industrial team, did you attend meetings of

17       the Bond Investment Committee or the

18       Committee of Finance?

19   A   Yes.

20   Q   Did you attend meetings of both of those

21       committees?

22   A   I attended the BIC Committee meetings always,

23       and time frames are important here, because

24       at a certain point in time, if you were a

# PART 5

1       team leader, you attended when you had deals

2       that were being presented to the Committee of

3       Finance.

4    Q   So there were occasions as team leader where

5       you attended meetings of the Committee of

6       Finance where deals that you were involved

7       with were being recommended?

8    A   Correct.

9    Q   And in that position, head of the consumer

10       industrial team, did you draft Yellow Reports

11       for preparation to the BIC and the Committee

12       of Finance?

13    A   I worked with the analyst to prepare the

14       reports.

15    Q   Would the analyst generally prepare a draft

16       and you would review it?

17    A   Yes.

18    Q   And you would approve the draft?

19       MR. ZWICKER:  Objection.

20    Q   Strike that.  Did the Yellow Reports that

21       were prepared by the analyst, did those need

22       to be approved by you or would those be

23       submitted directly by the analyst to the

24       committee?

1          MR. ZWICKER:  Objection.  You can answer

2          if you can.

3     A    They would not have been submitted without my

4          approval.

5     Q    As head of the international team, what were

6          your responsibilities?

7     A    My responsibilities were to oversee and build

8          our international portfolio.

9     Q    And what about as head of the restructuring

10         team, what were your responsibilities?

11    A    My responsibilities are to recover the

12         maximum value of troubled investments for the

13         company.

14    Q    What is your educational background?

15    A    I have a bachelor's in education from Ohio

16         State, with a master's in education from

17         Boston University.  I have a master's in

18         business from Northeastern.

19    Q    When approximately did you receive your BA in

20         education?

21    A    In the late '60s.

22    Q    And when did you receive your master's?

23    A    The early '70s.

24    Q    Did you receive both master's degrees in the

1      early '70s?

2   A   The business was in the later '70s.

3   Q   What position did you hold before becoming a

4      loan officer at the Bank of Boston?

5        THE WITNESS:  Excuse me.  Can I talk to

6      my counsel?

7        MR. ZWICKER:  Off the record?

8        MR. LORENZINI:  Yes.

9        (Witness and counsel conferred.)

10       (Discussion held off the record.)

11       BY MR. LORENZINI:

12  Q   Miss Davis, I was just asking what positions

13      you held prior to being a loan officer at the

14      Bank of Boston.

15  A   I worked for the United Way.

16  Q   What was your position there?

17  A   I was an allocations specialist basically

18      doing the budgeting for the dollars that got

19      raised each year for the various non-profits.

20  Q   Are there any other positions you held prior

21      to your employment at Bank of Boston?

22       MR. ZWICKER:  At what point, meaning

23      from the time she was -- when?

24  Q   Let's say from the time you received your

1    master's in business.

2    A   No.

3    Q   Miss Davis, can you describe generally for me

4        the role of the Bond Investment Committee at

5        John Hancock?

6        MR. ZWICKER:  When?

7    Q   In 2000 and 2001.

8    A   The role of the committee was to review all

9        of the investments, to analyze them, discuss

10       them, and approve them for recommendation to

11       the Committee of Finance.

12   Q   Did all investments need approval both by the

13       Bond Investment Committee and the Committee

14       of Finance, or were there some that only

15       needed approval only by BIC?

16       MR. ZWICKER:  Are these questions all in

17       the 2000/2001 time period?

18       MR. LORENZINI:  Yes.

19       MR. ZWICKER:  With that amendment, you

20       can answer.

21   A   There were changes that were taking place,

22       and I'm not sure exactly if they had taken

23       place before 2000, September, October, or

24       after.  But prior to changes, things were

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1      approved by the BIC Committee and by the

2      Committee of Finance.

3    Q   Everything was approved prior?

4    A   Yes.

5    Q   And then after the change, was there some

6      threshold at which deals needed to be

7      approved by the Committee of Finance?

8    A   I'm not clear on all of the details, but

9      there were some higher quality, more

10      public-like securities that could be

11      purchased between meetings and reported back

12      to the Committee of Finance.

13    Q   If you take a look back at Exhibit 2,

14      Pages 53 through 55, actually starting with

15      54 through 55, you'll see John Hancock has

16      listed in its interrogatory response members

17      of the Bond Investment Committee during the

18      relevant period in addition to Stephen

19      Blewitt, and it starts with George Braun.

20      And the list ends with Barry Welch.

21         Is that an accurate list of the members

22      of the Bond Investment Committee during the

23      2000 to 2001 time period?

24    A   Can I ask a question here?

# PART 6

1    Q   Sure.

2    A   If this was supplied by our secretary, then

3        it's an accurate list.

4    Q   You don't have any information that leads you

5        right now to doubt the accuracy of that list

6        as of that time period?

7    A   No.

8    Q   What policies or procedures did the Bond

9        Investment Committee follow as of the

10       2000/2001 time period in deciding whether to

11       recommend approval of a transaction by the

12       Committee of Finance?

13           MR. ZWICKER:  I'm going to let her

14       answer that, but her topic is just with

15       respect to the Abbott transaction, right?

16           MR. LORENZINI:  Correct.

17           MR. ZWICKER:  You can answer that

18       question generally speaking, and then let's

19       move on to the deal at issue.

20   A   The committee reviewed the Yellow Reports,

21       discussed them, determined if the credit

22       ratings were accurate, if the deals were

23       soundly underwritten, and if so, would vote

24       to recommend them to the Committee of

1      Finance.

2   Q   Did the committee generally consider the

3      expected rate of return on the investments as

4      well?

5   A   Yes, the committee always -- that's what I

6      meant when I talked about rated properly, so

7      that they would have the correct credit

8      rating and the correct pricing for that

9      credit rating.

10  Q   How would the committee generally determine

11     whether the transaction had the correct

12     pricing for the credit rating?

13        MR. ZWICKER:  Objection.  You can

14     answer.

15  A   Before a transaction would even get to the

16     committee, the team leader, the analyst,

17     would be working with the portfolio managers,

18     who really were the parties who oversaw the

19     correct pricing for the risk that was being

20     taken.  If things were not priced right for

21     the rating, then deals would not be

22     recommended further.

23        They never got to the BIC Committee

24     before work was done within the group to

1      fully scrub this opportunity.

2   Q   Was it unusual for the Bond Investment

3      Committee to not approve a deal that had been

4      recommended in the Yellow Report?

5         MR. ZWICKER:  Objection.  I'm concerned

6      that you're asking questions outside the

7      topic.  She's not here as an expert generally

8      with respect to what the committee did

9      generally over any period.

10         MR. LORENZINI:  It's background.  I'm

11      not going to pursue this very long.

12         MR. ZWICKER:  Can you read it back?

13         (Reporter read question as recorded.)

14         MR. ZWICKER:  In the 2000/2001 time

15      period?

16         MR. LORENZINI:  Yes.

17         MR. ZWICKER:  Answer, and then let's

18      move on.

19   A   It would be unusual.

20   Q   Were you a member of the Bond Investment

21      Committee in 2000 and 2001?

22   A   Yes.

23   Q   Were you also a vice-president at that time?

24   A   I was a senior officer at that time.  I can't

1    remember if I was a vice-president at that

2    time.

3    Q   Are you a vice-president of John Hancock

4    currently?

5    A   Yes.

6    (Document marked Exhibit No. 3.)

7    BY MR. LORENZINI:

8    Q   Miss Davis, you have before you what has been

9    marked as Davis Exhibit No. 3.  It's a

10   document headed "Bond Investment Committee

11   September 21, 2000".  Do you recognize this

12   document?

13   A   Yes, I do.

14   Q   What is it?

15   A   It is the minutes and the agenda of the

16   meeting.

17   Q   And was this the Bond Committee meeting at

18   which the Bond Investment Committee

19   recommended the approval of the Abbott

20   transaction?

21   A   Yes.

22   Q   Are the minutes accurate in recording what

23   transpired at that meeting?

24   A   Yes.

1          MR. SWICKER:  Vis-a-vis the Abbott

2      transaction, right?  Some of the material has

3      been redacted.

4          MR. LORENZINI:  Understood.

5          BY MR. LORENZINI:

6      Q    There are some individuals who were members

7          of the Bond and Investment Committee during

8          the relevant period that are listed on

9          PageS 53 to 54 and 55 of Exhibit No. 2 who

10         aren't listed as present at the Bond

11         Investment Committee meeting of September 21,

12         2000, specifically, Hines, Peters, Phillipe,

13         Ray, Stapleton and Welch.

14             Were those individuals members of the

15         committee as of September 21, 2000?

16             MR. ZWICKER:  Which members, the ones

17         you just read?

18             MR. LORENZINI:  Yes, you may want to

19         reference back.

20     A    On Page 53.

21     Q    The specific names that I mentioned were

22         Kendall Hines, Phillip Peters, Jane Phillipe,

23         Stephen Mark Ray, Margaret Stapleton and

24         Barry Welch.  Do you know if those

# PART 7

Davis, Wilma H. (Linked) 5/7/2007 9:05:00 AM

1     individuals were members of the Bond

2     Investment Committee as of September 21,

3     2000?

4         MR. ZWICKER:  Objection.  Outside the

5     scope.  Answer it if you can.  It's outside

6     the scope of the notice.

7   A   I believe they were.

8   Q   You mentioned that you spoke to Ken Hines and

9     Phil Peters and Mark Ray in preparation for

10    your deposition today.  Did Mr. Hines say

11    whether he was present at the Bond Investment

12    Committee at WHICH the Abbott transaction was

13    approved?

14        MR. ZWICKER:  This is, I think, Jeff's

15    agreement with us.  She's not being called

16    upon to say what individuals or members were

17    called about --

18        MR. LORENZINI:  Right.  But I think this

19    is covered by Topic 10.

20        MR. ZWICKER:  Except for individuals.  I

21    mean, I think you get to ask her what

22    happened at a meeting or meetings.

23        MR. LORENZINI:  Right, but I think --

24        MR. ZWICKER:  What topics were covered.

1      individuals remembered.  I think that's our

2      agreement.  If you could put the question to

3      her that way --

4          MR. LORENZINI:  Let's talk about this on

5      a break.  I do think at some point we have to

6      cover the ground of what the individuals --

7      the Topic 10 question.

8          MR. ZWICKER:  I think Topic 10 is the

9      roles of the various entities, bond and

10     finance, what they did and how they were

11     involved.  I don't think it's calling upon

12     her to say what each person -- who the

13     company consulted to present a knowledgeable

14     witness said.  She's not being called to

15     answer that.

16         MR. LORENZINI:  Let's discuss that off

17     the record.

18         MR. ZWICKER:  Okay.  Let's move on.

19         MR. LORENZINI:  I'll cover other

20     questions.

21         BY MR. LORENZINI:

22     Q   What information was presented at the Bond

23         Investment Committee on September 21, 2000,

24         regarding the Abbott transaction?

1    A   The Yellow Report.

2    Q   Were any other documents presented at that

3        meeting?

4    A   In connection with Abbott, no.

5    Q   Were any other documents provided to the Bond

6        Investment Committee members either prior to

7        the meeting, at the meeting or after the

8        meeting but before approval -- I'm sorry --

9        before execution of the agreement regarding

10       the transaction?

11   A   No.

12       (Document marked Exhibit No. 4.)

13       MR. ZWICKER:  For the record, I want to

14       put an objection to that question.

15       MR. LORENZINI:  Okay.

16       BY MR. LORENZINI:

17   Q   Miss Davis, you have before you what the

18       Court Reporter has marked as Exhibit No. 4.

19       Do you recognize this document?

20   A   Yes, I do.

21   Q   What is it?

22   A   It is the Yellow Report for Abbott

23       Laboratories.

24   Q   And this is the Yellow Report that was

1      presented at the September 21st, 2000

2      meeting?

3   A   Yes.

4   Q   Who presented -- strike that.

5      Did anyone make an oral presentation at

6      that meeting regarding the Abbott

7      transaction?

8   A   Yes, Steve Blewitt.

9   Q   Was anyone else involved in making that oral

10      presentation?

11   A   Scott Hartz.

12   Q   Anyone else?

13      MR. ZWICKER:  Objection.

14   A   No.

15   Q   Your answer is no?

16   A   No.

17   Q   What information did Mr. Blewitt provide to

18      the committee orally in his presentation

19      regarding the Abbott transaction?

20   A   Basically, he capsulized the contents of this

21      report where he outlines the background, the

22      structure of the transaction, the compounds,

23      the risks in the transaction, the scope of

24      the due diligence of the transaction and

Davis, Wilma H. (Linked) 5/7/2007 9:05:00 AM

1       getting independent reviews of the material

2       provided by Abbott.

3           And he goes through an extensive

4       analysis of the probabilities for success for

5       the various drugs, and he underscored the

6       importance of the partnership with Abbott.

7    Q   Are there any other subjects generally that

8       he addressed in his presentation?

9    A   Basically, the substances here in the

10      document.

11   Q   I'm assuming he didn't read the entirety of

12      the Yellow Report?

13   A   No, no.

14   Q   How long did Mr. Blewitt's oral presentation

15      last, excluding question and answer?

16   A   I don't recall how long his presentation

17      lasted, but --

18      MR. ZWICKER:  That was the question.

19      THE WITNESS:  Right.

20   Q   How long did the entire committee discussion

21      of the Abbott transaction last, including

22      Mr. Blewitt's and Mr. Hartz's presentation

23      and any question and answer and the both?

24      MR. ZWICKER:  Objection.  You can

# PART 8

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1    answer.

2    A   Between 45 minutes and an hour.

3    Q   What information did Mr. Hartz provide to the

4    committee in his presentation?

5    A   He discussed the simulation they had done on

6    the various outcomes to arrive at some of the

7    projections.

8    Q   Did he discuss anything else?

9    A   I don't recall.

10   Q   Did members of the committee have any

11   questions for Mr. Hartz or Mr. Blewitt during

12   this committee meeting?

13   A   Yes, there was discussion.

14       MR. ZWICKER:  I assume you want her to

15   tell you what that discussion was?

16       MR. LORENZINI:  Yes.

17       THE WITNESS:  There was discussion

18   around the risks of the transaction, the

19   structure of the transaction with Abbott.

20   There was concern could we be adversely

21   selected against and the types of drugs that

22   were put into the program.

23       I'd say in total there was a fair amount

24   of discussion, as you would expect in an

1        investment of this size, actually a great

2        deal of discussion.

3    Q    Were there any other questions that were

4        asked at that meeting?

5    A    Not that I've been able to dig out.

6    Q    You mentioned that Mr. Blewitt capsulized the

7        content of the Yellow Report.  Are there

8        particular sections of the report or

9        particular information in the report that he

10       focused his presentation on?

11          MR. ZWICKER:  Asked and answered.  You

12       can answer again.

13   A    He focused on the structure of the deal, the

14       importance of the relationship, the risk of

15       the transaction.  He highlighted the level of

16       the due diligence that was done, the expected

17       returns over the projected period of time.

18   Q    What did Mr. Blewitt say to the committee

19       regarding the structure of the deal?

20   A    He talked about how the payments would go and

21       how the funding would take place.

22   Q    What did he say regarding the amount of money

23       that John Hancock would be required to

24       contribute to the deal?

1    A   I don't understand the question.

2    Q   Did he specify a dollar amount that Hancock

3        would be committing to the deal?

4    A   It's on the report.  He was recommending $220

5        million.

6    Q   Did he specify how much Abbott would be

7        required to contribute of its own funds

8        towards development of the compounds?

9            MR. ZWICKER:  Objection.

10   A   Yes, he did.

11   Q   What did he say on that subject?

12   A   I think it was a billion 8, something of that

13       nature.

14   Q   Was that Abbott's expected budget for the

15       compounds?

16           MR. ZWICKER:  Objection.  Vague.

17   A   As I understand it.

18   Q   Did he specify over what length of time

19       Abbott expected to spend that amount?

20   A   I don't recall exactly.

21   Q   Did he specify whether that $1 billion

22       spending projection was risk adjusted to

23       account for the possibility of compounds

24       being terminated prior to launch?

1        MR. ZWICKER:  Objection.

2    A   I don't recall.

3    Q   Did he discuss whether that budget projection

4        was a nominal or expected budget?

5        MR. ZWICKER:  Objection.

6    A   I don't recall.

7    Q   What else did Mr. Blewitt say about the

8        structure of the deal?

9    A   I don't recall.

10   Q   You mentioned that Mr. Blewitt provided

11       information to the committee about the

12       compounds that would be included in the deal.

13       What specifically did Mr. Blewitt say about

14       the compounds?

15   A   He talked about the various disease

16       modalities they were going to be focused on,

17       and he talked about the due diligence he had

18       done with the two consultants he had worked

19       with on both researching the compounds and on

20       the projected development and sales patterns

21       of the compounds.

22   Q   And did Mr. Blewitt say anything regarding

23       his -- strike that.

24       Did Mr. Blewitt say anything regarding

# PART 9

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1    the qualification of the consultant that

2    Hancock had retained in the course of his due

3    diligence?

4       MR. ZWICKER:  Objection.  Misstates the

5    testimony.  You can answer.

6  A   The one gentleman was from Harvard.  I don't

7    exactly remember his name.  The other

8    gentleman was from, I believe, MIT or Tufts,

9    both with fairly extensive background in

10    their specialties.

11  Q   Did he mention someone named Lynn Klotz?

12  A   That's the gentleman from Harvard.

13  Q   Did Mr. Blewitt say he believed that Lynn

14    Klotz was well qualified to help John Hancock

15    assess the viability of these compounds?

16       MR. ZWICKER:  Objection.

17  A   Yes.

18  Q   What did Mr. Blewitt say, if anything,

19    regarding the particular steps that were

20    taken by Dr. Klotz in conducting the due

21    diligence?

22  A   That Dr. Klotz had reviewed the material that

23    Abbott had provided; that Dr. Klotz had

24    looked at, researched various competitors and

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1      other compounds that were being developed on

2      the market.  I don't recall much more than

3      that.

4   Q   Did Mr. Blewitt say anything to the committee

5      regarding the number of patients expected to

6      be enrolled in a Phase 2B trial of ABT-594?

7         MR. ZWICKER:  Objection.

8   A   I don't recall.

9   Q   Did he say anything to the committee

10      regarding the nausea and vomiting rates

11      associated with ABT-594?

12   A   I don't recall.

13   Q   Did he say anything regarding the expected

14      statistical power of Abbott's Phase 2B study

15      of ABT-594?

16   A   I don't recall.

17   Q   Did he say anything to the committee

18      regarding the side effect profile of ABT-773,

19      which is the Ketolide?

20   A   I don't recall.

21   Q   Did he say anything to the committee

22      regarding competitor MMPI compounds that were

23      similar to ABT-518?

24         MR. ZWICKER:  Objection.

1    A   I don't recall.

2    Q   Did Mr. Blewitt say anything else to the

3        committee regarding the compounds other than

4        what you have already testified to?

5    A   I don't recall.

6    Q   You mentioned that Mr. Blewitt included in

7        his presentation a discussion of the risks of

8        the transaction.  What did Mr. Blewitt say to

9        the committee regarding the risks of the

10       transaction?

11   A   His main risk was the FDA approvals for the

12       compounds.

13   Q   Were there any other risks associated with

14       the transaction that were mentioned by

15       Mr. Blewitt?

16       MR. ZWICKER:  Objection.  You can

17       answer.

18   A   On Page 14 of his report, he does highlight

19       that there could be some risks involved in

20       his outcome analysis.  He thought he had the

21       risk reasonably well defined.

22   Q   Did Mr. Blewitt mention to the committee that

23       he had run a downside scenario in his

24       simulation?

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1    A    Yes.

2    Q    Did he mention to the committee that John

3        Hancock had develop its own assumptions

4        regarding the probability of the FDA

5        approvals and acceptance of the products in

6        the marketplace that were more conservative

7        than Abbott's assumptions?

8        MR. ZWICKER:  Objection.

9    A    Yes.

10       MR. ZWICKER:  Do you need a break?

11       MR. LORENZINI:  I could use a break too.

12       Let's take a short break.

13       (Whereupon, a brief recess was held.)

14       BY MR. LORENZINI:

15    Q    Miss Davis, did Mr. Blewitt say anything else

16       to the committee regarding the risk

17       associated with the Abbott transaction other

18       than what you've testified to?

19    A    I don't recall.

20    Q    Just for the record, when you say you don't

21       recall, are you including within the scope of

22       that comment that you don't personally recall

23       and also based on your gathering of

24       information in preparation for this

# PART 10

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1       deposition no one else recalls?

2           MR. ZWICKER:  Objection.  That's a hard

3       question for her to answer.  She's been

4       prepared to provide testimony pursuant to

5       Rule 30(b)(6), and when she answers "I don't

6       recall," you can assume that she's relying on

7       the information in the company.  That

8       includes whatever personal knowledge she may

9       have and others as well.  Okay?

10          MR. LORENZINI:  Okay.

11          BY MR. LORENZINI:

12      Q   Miss Davis, you mentioned that Mr. Blewitt

13      also discussed the scope of due diligence

14      performed by John Hancock, and you've

15      testified previously to the fact that John

16      Hancock hired a consultant named Lynn Klotz

17      who conducted some independent research.

18          Did Mr. Blewitt say anything else

19      regarding the due diligence performed by John

20      Hancock?

21          MR. SWICKER:  Objection.  You can

22      answer.

23      A   As I stated earlier, he also engaged -- I

24      believe it was a Dr. DiMasi who was very

1    knowledgeable about drug development and

2    paths to sale once they hit levels of

3    approval, various levels of FDA approval.

4  Q    And did Mr. Blewitt inform the committee that

5    he had relied upon DiMasi's statistics to

6    calculate the probability of success for the

7    compounds?

8  A    Yes.

9  Q    And did he mention to the committee that he

10    had relied upon Dr. DiMasi's statistics in

11    projecting the sales of the compounds if they

12    made it to market?

13        MR. ZWICKER:  Objection.

14  A    Yes.

15  Q    Did Mr. Blewitt say anything else to the

16    committee in regard to the due diligence

17    performed?

18  A    I don't recall.

19  Q    You mentioned that Mr. Blewitt presented to

20    the committee information regarding the

21    analysis of the probabilities of success.

22    Other than what you've already testified to,

23    that Mr. Blewitt consulted statistics from

24    Mr. DiMasi, what else did Mr. Blewitt say, if

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1    anything, regarding their analysis of the

2    probability of success of the compounds?

3    MR. ZWICKER:  Objection.  Asked and

4    answered.

5    A    I don't recall.

6    Q    Did he say anything to the committee

7    regarding Abbott's projections of the

8    probabilities of success of any of the

9    compounds?

10    MR. ZWICKER:  Objection.

11    A    I don't recall.

12    Q    Did he say anything to the committee

13    regarding Abbott's projections of the peak

14    sales of any of the compounds?

15    A    I don't recall.

16    Q    You mentioned that Mr. Blewitt testified --

17    strike that.

18    You mentioned that Mr. Blewitt presented

19    to the committee information regarding the

20    importance of the relationship with Abbott.

21    What specifically did Mr. Blewitt say in that

22    regard?

23    A    That they had been working with Abbott for a

24    couple of years; they had done an earlier

1    transaction and periodically looked for ways

2    to transact business.

3    Q    And what did Mr. Blewitt say regarding the

4    earlier transaction with Abbott?

5         MR. ZWICKER:  Other than what she's

6    already said?

7         MR. LORENZINI:  Correct.

8    A    I don't recall.

9    Q    Did Mr. Blewitt say anything to the effect

10   that that was a positive experience, their

11   prior business relationship with Abbott?

12        MR. ZWICKER:  Asked and answered.

13   A    Yes.

14   Q    Did Mr. Blewitt say that he believed there

15   would be continuing benefits with John

16   Hancock in entering into another transaction

17   with Abbott above and beyond the transaction

18   itself?

19        MR. ZWICKER:  Objection.

20   A    I don't recall.

21   Q    You mentioned that Stephen Blewitt presented

22   to the committee about the expected returns

23   from the Abbott transaction.  What

24   specifically did he say on that subject?

# PART 11

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1    A   That the overall transaction was expected to

2        have an internal rate of return of around 17

3        percent.

4    Q   And if you look on Page 11 of Exhibit No. 4,

5        please --

6            MR. ZWICKER:  You're not talking about

7        the Bates pages, are you?

8            MR. LORENZINI:  The actual internal page

9        number.

10   Q   If you look at the first sentence of Page 11,

11       it states, "The structure of the

12       transaction," and then there's a

13       parenthetical, followed by, "offers a

14       substantial likelihood that we will receive a

15       long-term bond yield of approximately 17.5

16       percent which is substantially greater than

17       the inherent risk of the transaction."

18           MR. ZWICKER:  You can read whatever part

19       of that paragraph that you want.  Take your

20       time.

21   Q   Did Mr. Blewitt say anything to the committee

22       about what the yield would be based on the

23       inherent risk of the transaction?

24           MR. ZWICKER:  Objection.  Vague.

1      A    I don't recall.

2      Q    Did he say in general that he believed that

3            the expected yield of 17.5 percent was

4            substantially greater than the inherent risk

5            of the transaction?

6            MR. ZWICKER:  Objection.

7      A    He says it in the report.

8      Q    Did he say that orally as well?

9      A    I don't specifically recall.

10     Q    Did he discuss at all any comparison of the

11           expected rate of return of this transaction

12           with something called the curve?

13     A    I don't recall.

14           (Document marked Exhibit No. 5.)

15           BY MR. LORENZINI:

16     Q    Miss Davis, you have before you what the

17           Court Reporter has marked as Exhibit No. 5,

18           and it's entitled "GBSA Spreads to On-the-run

19           Treasuries".  Do you recognize the format of

20           this document?

21           MR. ZWICKER:  In connection with what

22           her role as a 30(b)(6) witness testifying to

23           this topics or -- because I think that's all

24           you can ask her is whether this is

1     her the foundational question of whether she

2     recognizes it or the format of it, but then

3     you have to go tie it back to the notice.

4     We'll take it a question at a time.

5         BY MR. LORENZINI:

6     Q   Miss Davis, do you recognize the format of

7        this document?

8     A   Yes, I do.

9     Q   What is it?

10    A   It is the information used by the portfolio

11       managers to determine the appropriate pricing

12       for transactions of various credit ratings.

13    Q   Did Mr. Blewitt in his presentation to the

14       committee make any reference as to how the

15       expected rate of return for the Abbott

16       transaction compared to spreads over U. S.

17       Treasuries?

18    A   I don't recall.

19    Q   Is it your understanding that this document,

20       Exhibit No. 5, does reflect the spread over

21       U.S. Treasuries for bonds of certain risk

22       levels and average life?

23        MR. ZWICKER:  Objection.  Outside the

24       scope of the notice.

1    A   Yes.

2    Q   And how do the portfolio managers utilize

3        documents such as this Exhibit 5 to determine

4        the appropriate pricing for a transaction?

5            MR. ZWICKER:  Let me object.  I'm going

6        to let her answer that if she can answer

7        that, but it's not fair, because she hasn't

8        been put forth as someone who's

9        responsibility here to today is to talk about

10       how an analyst used this document.  That's

11       not in the notice.

12           You can't just bring her here and start

13       asking her questions about stuff that's not

14       in the notice.  You can't.  I mean, that's a

15       bait and switch.  You can't notice her

16       deposition on 12 specific topics and then put

17       a document that she's now testifying you have

18       a foundation by BCFG in connection with the

19       analysis.  I'll let her answer but --

20           MR. LORENZINI:  I allowed Mr. Davis to

21       ask questions of Mr. Hendricks that were

22       outside the scope that were within his

23       personal knowledge with the understanding

24       that it was limited to his personal

# PART 12

1    knowledge.

2        MR. ZWICKER:  I'm going to let her

3    answer that, but then we're going to have to

4    move on.

5        Read it back to her.

6        (Reporter read question as recorded.)

7        MR. ZWICKER:  I object as beyond the

8    scope and as vague and ambiguous.

9    A   This is very difficult for me to answer,

10    because portfolio management, I think, in

11    conjunction with our assets and liability

12    management people, are constantly updating

13    this data based on the marketplace and

14    various risk models they studied.

15        But at the end of the day, it's the

16    analyst and his or her team leader who have

17    to arrive at the appropriate risk rating,

18    triple A through triple C, and then they work

19    with the portfolio manager to see and to push

20    back and forth, is the rating right; if so,

21    this is where the pricing is, or, gee, the

22    pricing is a little stale on this grid; and

23    we are not doing anything at a triple E minus

24    five-year rating at that price.

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1        So it's a tool used by portfolio to make

2        sure that we're properly pricing the risks in

3        the transaction.

4    Q    Are documents such as Exhibit 5 distributed

5        to members of the Bond and Investment

6        Committee?  And I'll limit this to the 2000

7        and 2001 time period.

8    A    No.

9    Q    Are documents such as Exhibit 5 accessible to

10        members of the Bond and Investment Committee?

11        MR. ZWICKER:  Objection.  Vague as to

12        time, vague.

13    Q    During 2000, 2001.

14        MR. ZWICKER:  Objection.

15    A    Members of the Bond Investment Committee who

16        were on the portfolio management side had

17        access to this document.

18    Q    Which members of the Bond and Investment

19        Committee were on the portfolio management

20        side?  We can just reference the list,

21        Exhibit No. 2.

22        MR. ZWICKER:  2000 and 2001?

23        MR. LORENZINI:  Correct.

24        MR. ZWICKER:  For the record, the

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1    witness is reviewing Exhibit No. 2.

2    A   George Braun, Fran Felcon, Roger Nastou.

3    Q   Anyone else?

4    A   These people were basically from the

5        portfolio management side, and Roger was our

6        group head.

7    Q   Would Steve Blewitt be another member of the

8        committee who was also on the portfolio

9        management side?

10   A   No, he was a team leader.

11   Q   So George Braun, Fran Felcon and Roger Nastou

12       as of September 21, 2000, would have had

13       access to documents like that marked as

14       Exhibit 5?

15   A   Right.

16   Q   Would Steve Blewitt also have had access to

17       documents such as that marked as Exhibit 5?

18       MR. ZWICKER:  Objection.

19   A   When he began working on a deal and talking

20       about it with the portfolio team, he may have

21       seen it, but it was -- typically, this

22       document was housed within the portfolio

23       management group and not widely distributed.

24   Q   What is the practice of the Bond Investment

1    Committee of determining whether the expected

2    return on a transaction is appropriate given

3    the length of the transaction and the risk

4    level?

5        MR. ZWICKER:  Are you talking about just

6    this deal?

7        MR. LORENZINI:  I'm talking first

8    generally.

9        MR. ZWICKER:  Objection.  Beyond the

10    scope, vague.  Can you answer the question?

11        THE WITNESS:  Can you repeat the

12    question?

13    Q    Sure.  In general, what policies or

14        procedures are followed by the Bond

15        Investment Committee in determining whether

16        an expected rate of return for a proposed

17        transaction is appropriate in light of the

18        credit risk of the transaction and the

19        average life of the transaction?

20            MR. ZWICKER:  Objection.  Vague as to

21        time, compound, outside the scope.

22    Q    I'll limit it just to the 2000/2001 time.

23    A    The committee would review the deals as I

24        said earlier, would review the analysis, and

# PART 13

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1        if the committee agreed, a transaction should

2        be rated triple B.  And if portfolio was

3        supporting the pricing being appropriate,

4        then the committee would usually be fine with

5        that.

6    Q    In general, did members of the Bond

7        Investment Committee consider in approving a

8        transaction whether the expected rate of

9        return was higher or lower than the yield on

10       a U.S. Treasury Bond plus the spread

11       associated with a transaction of that risk

12       level?

13           MR. ZWICKER:  Objection.

14   A    In general, yes.

15   Q    In considering the proposed transaction with

16       Abbott, did members of the Bond Investment

17       Committee consider how the expected rate of

18       return on the transaction compared to the

19       yield on U.S. Treasury Bonds plus a spread

20       for bonds of that risk level?

21           MR. ZWICKER:  Objection.

22   A    I don't recall.

23   Q    Is there any minimum expected rate of return

24       for particular risk levels that is necessary

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1    for the Bond Investment Committee to

2    recommend approval of a transaction?

3        MR. ZWICKER:  Can we tie it to the

4    2000/2001 time period?

5    Q    Yes, in fact, all of my questions, unless

6    otherwise stated, we can assume only apply to

7    the 2000/2001 time period.

8        MR. ZWICKER:  Do you need it read back?

9    A    I think I understand the question.  The

10    returns had to be appropriate for the risk

11    rating.

12    Q    And how did the Bond Investment Committee

13    determine whether the returns were

14    appropriate for the risk rating?

15    A    The report would come in with the credit

16    rating, with the proposed pricing.  If there

17    was a question on that, there might be

18    discussion before the meeting with the

19    portfolio manager or discussion at the

20    meeting.

21    Q    I understand that there might be discussion

22    if members of the committee believed that the

23    return was not appropriate for the risk

24    level.

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1        But what factors would they consider in

2        determining whether there was some doubt as

3        to whether the return was appropriate for the

4        risk level?

5    A    That's what's centered on the credit rating.

6        If the deal was rated a triple B in the

7        report and people with experience reviewed it

8        and looked at it and looked at maybe the

9        coverages, the industry, all that goes on in

10        analyzing a transaction, you might come to

11        the conclusion this deal has too high a

12        rating.  This should be a double B, not a

13        triple B, and therefore, the pricing is not

14        right.

15        MR. ZWICKER:  Just so that we're clear,

16        this is for the 2000/2001 time frame?

17        MR. LORENZINI:  Right.

18    Q    If the rating for the transaction was

19        appropriate, how would they determine whether

20        the pricing was appropriate given that

21        rating?

22    A    Usually at the meeting, the portfolio manager

23        would be -- would acknowledge he was

24        satisfied with the pricing and that it was

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1      appropriate.

2    Q   And was there any independent analysis

3      generally by the Bond Investment Committee of

4      whether the pricing was appropriate beyond

5      accepting the recommendation of the portfolio

6      manager?

7         MR. ZWICKER:  Objection.  Misstates the

8      testimony.

9    A   Not that I recall.

10   Q   Miss Davis, I'm looking back again at the

11     minutes of the Bond Investment Committee

12     meeting, which is Exhibit No. 3.  It lists as

13     one of the people present Attorney Seghezzi.

14   A   Seghezzi.

15   Q   Is he in-house counsel at John Hancock, or

16     was he at the time?

17   A   Yes.

18        MR. ZWICKER:  Just so the record is

19   clear, was he then?

20        THE WITNESS:  No, Jody Acford would have

21   been the investment counsel.

22        BY MR. LORENZINI:

23   Q   So as of September 21, 2000, what was

24     Mr. Seghezzi at Hancock?

# PART 14

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1    A    He was an in-house counsel.  He was the

2         assistant to Jody Acford.

3    Q    And during the discussion of the Abbott

4         transaction at this Bond Investment Committee

5         meeting, did this attorney play any role in

6         the discussion?

7    A    I don't recall.

8    Q    Down at the bottom of this exhibit, there's a

9         list of other people attending the meeting.

10        Without going through every single one, who

11        generally are these individuals?  Are these

12        employees of the Bond and Finance Group?

13            MR. ZWICKER:  Objection.  You mean then?

14            MR. LORENZINI:  At that time.

15   A    Yes.

16   Q    Did any of these individuals participate in

17        the discussion of the Abbott transaction at

18        that meeting?

19            MR. ZWICKER:  Objection.

20   A    I can't recall specifically.  Scott Hartz.

21   Q    There is someone named Brown who's listed as

22        attending.  Is that by any chance the

23        Chairman/CEO at the time Stephen Brown?

24            MR. ZWICKER:  Objection.

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1    Q   Let me rephrase it another way.  Did Stephen

2        Brown attend the Bond Investment Committee

3        meeting at which the transaction was

4        discussed?

5    A   I believe so.

6    Q   Did he play any role in the discussion?  Did

7        he participate?

8    A   I don't recall.

9    Q   If you look at Exhibit 4 again, if you look

10       on the first page down at the bottom, it

11       states that the credit rating for this

12       transaction is BA-1, and then on the second

13       page to the right of the issue rating on the

14       second page, it states BA-2.

15           Did Mr. Blewitt say during his

16       presentation what the credit rating was for

17       the Abbott transaction?

18   A   BA-1.

19   Q   And so BA-1 rather than BA-2 is the correct

20       credit rating for the transaction as of this

21       time?

22   A   Yes.

23   Q   We saw before on Page 11 that Mr. Blewitt and

24       Mr. Hartz's Yellow Report stated that the

1      respect to Abbott?

2          MR. ZWICKER:  Objection.  Calls for

3      speculation.

4    A   I just don't know.

5    Q   Is there anything else that Mr. Blewitt said

6      to the committee in his presentation other

7      than what you've testified to?

8          MR. ZWICKER:  Objection.  Asked and

9      answered.

10   A   Not that I recall.

11   Q   You testified that Mr. Hartz discussed with

12      the committee the simulation for expected

13      returns on the transaction.  Is that what's

14      referred to as a Monte Carlo simulation?

15   A   Yes.

16   Q   What did Mr. Hartz say about the simulation?

17   A   It's a simulation of expected outcomes, and I

18      don't recall more detail than that.

19   Q   Did Mr. Hartz say anything regarding the

20      assumptions that were used in generating

21      those expected outcomes?

22   A   I don't recall.

23   Q   You mentioned that there were questions from

24      the committee regarding risks associated with

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1        the transaction.  What specific questions

2        were raised by the committee regarding risks

3        associated with the transaction?

4    A   I can't recall specific questions.

5    Q   You also mentioned that there were questions

6        from committee members about the structure of

7        the transaction.  Do you recall any specifics

8        regarding those questions?

9            MR. ZWICKER:  Asked and answered.

10   A   As I said earlier, that had to do with the

11       structure of the payments, how the payments

12       went out, how that would work.

13   Q   Did members of the committee have any

14       concerns regarding the structure of the

15       payments?

16           MR. ZWICKER:  Objection.

17   A   They were more clarifications than concerns

18       really about how they worked, the timing of

19       them.

20   Q   Was there any discussion at the committee

21       meeting regarding the circumstances under

22       which John Hancock would be able to terminate

23       any of its program payments?

24   A   No, not that I recall.

08657-00097_Abbott-John Hancock II          None                    Page  71

# PART 15

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1    Q   Was there any discussion of the minimum

2        amount that Abbott would be required to spend

3        on development of the compounds during the

4        four-year program term?

5            MR. ZWICKER:  Objection.

6    A   I thought that was the billion eight we

7        discussed earlier.

8    Q   I think if you look in the Yellow Report --

9        turn to Page 3 of the Yellow Report, please.

10       In the top paragraph under the heading

11       "Abbott Obligations," the report states,

12       "During the program term, Abbott agrees to

13       spend, in addition to the funds provided by

14       John Hancock, a minimum of $50 million per

15       year and a minimum of 400 million in

16       aggregate on research and development

17       programs associated with the program

18       compounds."

19           Did Mr. Blewitt say anything to the

20       committee regarding Abbott's minimum spending

21       obligations under the proposed agreement?

22   A   I don't recall.

23   Q   And was there any discussion at all on the

24       committee on that subject of Abbott's minimum

1        spending obligation?

2    A   I don't recall.

3    Q   You mentioned that there were some questions

4        at the committee meeting regarding concern

5        regarding adverse selection of drugs.  What

6        specifically do you recall about those

7        questions on that subject?

8            MR. ZWICKER:  Objection.

9    A   I don't recall specific questions.

10   Q   Do you recall generally?

11   A   Generally, a discussion about how the drugs

12       got selected and which drugs would be

13       developed in-house versus in partnership,

14       that type of thing.  People were looking for

15       assurance that the interests of both

16       institutions were aligned here.

17   Q   And what did Mr. Blewitt and/or Mr. Hartz say

18       in response to that question of whether the

19       interests of Abbott and Hancock would be

20       aligned in this transaction?

21   A   That where -- as I recall, the discussion

22       went to the amount of money we would be

23       investing and the overall amount of money

24       that Abbott would be investing in these

1    compounds.

2    Q   Did Mr. Blewitt say that he believed that

3        Abbott would have an incentive to make

4        commercially reasonable efforts to develop

5        these compounds because it was devoting its

6        own money to the compounds as well as John

7        Hancock's money?

8            MR. ZWICKER:  Objection.

9    A   I don't recall if he specifically said that,

10       but that was the thrust of that avenue of

11       discussion.

12   Q   Did anyone raise any questions regarding the

13       accuracy of any information provided by

14       Abbott to Hancock regarding the compounds?

15   A   I don't recall.

16   Q   Did Mr. Blewitt comment in any way on the --

17       on his opinion on the accuracy of the

18       information that had been provided by Abbott?

19   A   I believe Dr. Klotz never validated the

20       information provided by Abbott.

21   Q   You mentioned that there was a great deal of

22       discussion regarding this transaction.  What

23       was the nature of that discussion other than

24       what you've already testified to?

1    A   It's basically what I've testified to.

2    Q   Did anyone have any questions regarding

3        whether the BA-1 credit rating that is listed

4        in the Yellow Report was appropriate for this

5        transaction?

6            MR. ZWICKER:  Objection.

7    A   I don't recall a challenge to the rating.

8    Q   And do you recall any discussion of the

9        appropriateness of the expected returns on

10       this investment?

11   A   No.

12           MR. ZWICKER:  Objection.  We're talking

13       about the period leading up to the meeting?

14       It would be exhaustive of what happened at

15       the meeting.

16           MR. LORENZINI:  I'm still talking about

17       the meeting right now.

18           MR. ZWICKER:  Asked and answered.

19   A   You asked if there was any further

20       discussion.

21   Q   Any discussion other than what you've already

22       testified to regarding the appropriateness of

23       the expected returns.

24   A   No.

# PART 16

1    Q    Was there any discussion among committee

2          members or between committee members and

3          Stephen Blewitt or Scott Hartz on that

4          subject of the expected returns on the

5          transaction outside of the committee meeting?

6              MR. ZWICKER:  Objection.  You can

7          answer.

8    A    In the data that I reviewed in preparation

9          for this, there was a memorandum in May of

10         2000 to the chairman and then president that

11         focused on this upcoming transaction, which

12         would indicate that this was broadly vetted.

13   Q    Was there any other communication involving

14         Bond Investment Committee members on the

15         subject of expected returns from the

16         transaction other than the Yellow Report and

17         this May memorandum that you mentioned?

18             MR. ZWICKER:  And other than what she's

19         already testified to.

20             MR. LORENZINI:  Correct.

21   A    And the May memorandum was not to the Bond

22         Investment Committee.

23   Q    Just to be clear for the record, you're not

24         aware of any other communications involving

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1      Bond Investment Committee members on the

2      subject of the expected returns from the

3      transaction other than what's in the Yellow

4      Report and what you testified to occurred at

5      the meeting?

6          MR. ZWICKER:  Objection.

7   A   No.

8          (Document marked Exhibit No. 6.)

9          BY MR. LORENZINI:

10  Q   Miss Davis, you have before you what's been

11     marked as Exhibit 6.  It's a memorandum dated

12     May 5, 2000, to Aborn, Brown, D'Allesandro,

13     DeCiccio, Hartz and Nastou.  Is this the May,

14     2000, memorandum that you were just

15     referencing?

16  A   Yes.

17  Q   And I believe Mr. DeCiccio is a member of the

18     Bond Investment Committee, correct, or was at

19     the time?

20  A   Yes.

21  Q   Is he the only member of the committee from

22     that time period that is listed as a

23     recipient here of the memorandum?

24  A   Roger Nastou.

1    Q   And the memorandum is from Stephen Blewitt,

2        and it says, "The attached material is for a

3        meeting on Thursday, May 11th."  Do you know

4        what was discussed at the meeting on

5        May 11th?  Do you know if a meeting occurred

6        between these individuals on May 11, 2000?

7    A   I do not know.

8    Q   Putting aside the date of the meeting if it,

9        in fact, occurred, do you know -- do you have

10       any information regarding communications

11       among this group regarding the subject of

12       this memo?

13           Let me rephrase it another way.  Are you

14       aware of whether there was discussion among

15       the recipients of this group and Stephen

16       Blewitt after the date of this memorandum?

17   A   I can answer personally, not as a BIC member.

18       Personally, I have no knowledge of what they

19       discussed and how frequently they discussed

20       it, but for the record, I'd like to state

21       Stephen Brown was the chairman of the

22       company; Foster Aborn was the vice-chairman.

23       David D'Alessandro was vice-president; and

24       John DeCiccio was the Chief Investment

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1    Officer of the company at the time.  Roger

2    was the head of the bond group.

3    Q   And for individuals here who are not members

4    of the Bond Investment Committee, what role

5    did they play, if any, in approval of the

6    Abbott transaction?

7        MR. ZWICKER:  Objection.

8    A   D'Alessandro, Brown and Aborn would have been

9    on the Committee of Finance.

10   Q   And so their role in approval of the Abbott

11   transaction would have been in connection

12   with the final Committee of Finance vote

13   approving the transaction?

14       MR. ZWICKER:  Objection.

15   A   Their role at the Committee of Finance is

16   what it is and would have been, but I think

17   the key point here is an investment was

18   discussed in May of 2000 before it was ready

19   to be presented through the process beginning

20   in September, which says to me that this is a

21   large transaction.  The top of the house had

22   to know about it and understand it, and that

23   was important.

24   Q   Going back to the Bond Investment Committee

# PART 17

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1      meeting, was there a vote at the end of the

2      discussion to recommend that the Committee of

3      Finance approve the transaction?

4      A   There's usually a vote after each investment

5      discussed.

6      Q   And was there a vote in this case?

7      A   Yes.

8      Q   And did the committee vote unanimously to

9      recommend approval of the transaction?

10     A   I don't recall if it was unanimous.

11     Q   Do you recall anyone voting against it?

12     A   I don't.

13     Q   What was the next step after the Bond

14     Investment Committee vote in the process of

15     approving the transaction?

16        MR. ZWICKER:  Do you need a break?

17     We've been going about an hour and 15

18     minutes.

19        THE WITNESS:  I'm okay.

20        MR. ZWICKER:  You're okay.  Okay.

21     A   The next step would be the Committee of

22     Finance meeting.

23        MR. LORENZINI:  Before we move on to the

24     Committee of Finance meeting, I want to ask

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1      you one more question and show you one more

2      document related to the Bond Investment

3      Committee meeting.

4          (Document marked Exhibit No. 7.)

5          BY MR. LORENZINI:

6      Q   Miss Davis, you have before you an E-mail

7      that's been marked as Exhibit 7.  It's an

8      E-mail from Scott Hartz to George Braun dated

9      September 21, 2000, and it states, "Your

10     intuition was better than mine.  If we extend

11     all our approval times by one year, the IRR

12     drops by 3 percent.  If we extend them by two

13     years, the IRR drops another 3 percent.  If

14     we shorten the approval time" -- strike that.

15     "If we shorten the times to approval by one

16     year, the IRR increases to 5 percent.

17     Clearly, it's important that we feel good

18     about the time periods to approval."

19         You're not copied on this E-mail, but

20     I'm just showing it to you to see if it

21     refreshes your recollection.  Was there any

22     discussion at the Bond Investment Committee

23     regarding the assumptions in the Yellow

24     Report regarding the times to approval for

1    the compounds?

2    A   I don't recall.

3    Q   Do you know if George Braun had questions

4    regarding that subject outside of the

5    committee meeting?

6    MR. ZWICKER:  Objection.

7    A   I don't know.

8    Q   Do you recall that Stephen Blewitt based the

9    assumptions of the time to approval on a

10   study by Joseph DiMasi?

11   A   Yes.

12   Q   Miss Davis, did you attend the Committee of

13   Finance meeting at which the Abbott

14   transaction was discussed?

15   A   Yes.

16   (Document marked Exhibit No. 8.)

17   BY MR. LORENZINI:

18   Q   Miss Davis, you have before you what's been

19   marked as Exhibit 8, and it's titled

20   "Committee of Finance Records October 10,

21   2000." Do you recognize this document?

22   A   Yes.

23   Q   What is it?

24   A   It's the minutes of the Committee of Finance

1        meeting.

2    Q   Have you had an opportunity to review these

3        minutes prior to your deposition today?

4    A   Yes.

5    Q   And are the minutes regarding the Abbott

6        transaction accurate?

7    A   Yes.

8    Q   If you look towards the bottom of the first

9        page, it states, "The Bond and Corporate

10        Finance Group materials were presented by

11        Roger Nastou."  Did Roger Nastou, in fact,

12        make a presentation regarding the proposed

13        Abbott transaction at the Committee of

14        Finance meeting?

15    A   Yes.

16    Q   Did anyone else participate in that

17        presentation?

18    A   I don't recall specifically, but it was the

19        group head who would make the presentations

20        on behalf of his group.  Then the individuals

21        responsible for an investment would be there

22        and would respond to any questions that the

23        group head could not answer.

24    Q   And so under Hancock's general procedures,

# PART 18

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1      Roger Nastou as group head would have made

2      the initial presentation, and Stephen Blewitt

3      and Scott Hartz would have been on hand to

4      answer questions?

5    A   Yes.

6    Q   Do you have any reason to believe that

7      Hancock deviated from that general practice

8      at this meeting?

9    A   No.

10   Q   Did the minutes mention Bond and Corporate

11     Finance Group materials that were presented

12     by Roger Nastou?  What documents were

13     provided to the Committee of Finance

14     regarding the Abbott transaction?

15   A   The Yellow Report.

16   Q   Were any other documents provided?

17   A   No.

18   Q   Just to be clear, were any other documents

19     regarding the Abbott transaction provided to

20     Committee of Finance members at any time

21     prior to the meeting other than --

22   A   The May 8th memo went to some of the

23     Committee of Finance members.  I do not know

24     if that was shared.

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1    Q   Any other documents besides those two?

2    A   Not that I'm aware of.

3    Q   How about after the meeting?  Were there any

4        other documents regarding the transaction

5        provided to the committee members?

6    A   I don't believe so.

7    Q   At the Committee of Finance meeting, were

8        there any slides shown during the meeting

9        regarding the Abbott transaction?

10   A   I don't recall.

11   Q   How about at the Bond and Investment

12       Committee meeting, were there any slides

13       presented?

14   A   I don't recall.

15   Q   In the general practice of Hancock, are

16       slides presented regarding the major

17       transactions at the Bond and Investment

18       Committee?

19       MR. ZWICKER:  Objection.

20   A   It would be rare.

21   Q   How about at the Committee of Finance?

22       MR. ZWICKER:  Objection.  Vague as to

23       time.

24   A   Rare.

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1    Q    Was this Committee of Finance meeting on

2         October 10th, 2000, recorded?  Was there an

3         audio or audio and video recording made?

4    A    No.

5    Q    How about at the Bond Investment Committee

6         meeting on September 21st?

7    A    No.

8    Q    These minutes that we see here, is this the

9         complete summary prepared by John Hancock of

10        the meeting?  Are there any other documents

11        that would provide any more detailed summary

12        of what transpired at that meeting?

13   A    With respect to the Abbott transaction?

14   Q    Yes.

15   A    No.

16   Q    How about with respect to the Bond Investment

17        Committee meeting, are there any other

18        documents besides the minutes that we looked

19        at earlier that would provide a more detailed

20        summary?

21            MR. ZWICKER:  Again with respect to

22        Abbott.

23   A    No.

24   Q    How long was the discussion, the presentation

1          program term?

2     A   Don't recall.

3     Q   Were members or any members of the Bond

4          Investment Committee or the Committee of

5          Finance -- let me strike that and lay some

6          foundation.

7              Are you familiar with compound reports

8          that were attached as exhibits to the final

9          research funding agreement?

10    A   No, I'm not.

11    Q   Are you familiar with annual research plans

12         that were attached to the research funding

13         agreement?

14    A   No, I'm not.

15             (Document marked Exhibit No. 9.)

16             MR. ZWICKER:  Just for the record, I

17         don't think there was a research funding

18         agreement in October of 2000.

19             MR. LORENZINI:  I know there wasn't.

20             BY MR. LORENZINI:

21    Q   Miss Davis, you have before you what has been

22         marked as Exhibit No. 9, and this is a

23         Research Funding Agreement between Abbott and

24         John Hancock dated March 13, 2001.  Have you

# PART 19

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1      ever seen this document before?

2      A   No.

3      Q   Could you turn to page -- if you look at the

4      Bates numbers on the bottom, it's JH008116.

5          MR. ZWICKER:  8116?

6          MR. LORENZINI:  Yes.

7      Q   If you can just look starting with that page

8      through 8136.  Do you recognize the format of

9      any of these documents in that Bates range?

10     A   No.

11     Q   Were you ever provided with drafts of the

12     documents that are attached in this Bates

13     range?

14     A   No.

15     Q   Were any members of the Bond Investment

16     Committee provided with any drafts or final

17     versions of the documents that are attached

18     here in this Bates range?

19     A   No.

20     Q   Same question for the Committee of Finance,

21     were any of those individuals provided with

22     drafts or final versions of these documents?

23         MR. ZWICKER:  That you know.

24     A   Not that I know of.

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1    Q   Could you turn to page JH8152 through 8209?

2    A   8209?

3    Q   Yes.  And you'll see that there's a series of

4        documents that are titled "Descriptive

5        Memorandum on Each of the Compound".  My

6        question for you, first of all:  Do you

7        recognize any of these documents?

8    A   No.

9    Q   Were members of the Bond Investment Committee

10       ever provided drafts or final versions of

11       descriptive memoranda on the compounds?

12   A   Not that I'm aware of.

13   Q   The same question for the Committee of

14       Finance, were the members ever provided with

15       drafts or final versions of descriptive

16       memorandum of the sort listed here?

17   A   Not that I'm aware of.

18       MR. LORENZINI:  Let's take a short

19       break.

20       (Whereupon, a brief recess was held.)

21       BY MR. LORENZINI:

22   Q   Miss Davis, what policies or procedures does

23       the Committee of Finance follow in approving

24       transactions that are recommended by the Bond

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1    Q    Does the Committee of Finance have any policy

2         regarding any minimum expected rate of return

3         for an investment of a given risk level that

4         is necessary for approval of the transaction?

5              MR. ZWICKER:  In 2000 to 2001?

6    A    I am not aware of any stated or written

7         policies they had.

8    Q    Are you aware of any unwritten policy in that

9         regard?

10   A    I think they were comfortable working with

11        the portfolio managers and the -- what was at

12        that time called the strategy group that

13        focused on market on risk, on pricing that

14        they knew when we brought them the deal, it

15        would have gone through all the steps and

16        would be appropriately priced, or else we

17        wouldn't be bringing it.

18   Q    And you mentioned a group, the strategy

19        group?

20   A    There was an investment strategy group.

21   Q    Who was part of that group in 2000, 2001?

22   A    That was Bob Reitano's area.

23   Q    And what was the responsibility of the

24        investment strategy group?

1    say, 16 percent rather than 17.5 percent,

2    would the Committee of Finance have approved

3    the transaction?

4       MR. ZWICKER:  Objection.

5  A  I don't know.

6  Q  If it had been 13 percent, would the

7    Committee of Finance have approved the

8    transaction?

9       MR. ZWICKER:  Objection.

10  A  I don't know.

11  Q  Is there any level below which the Committee

12    of Finance -- any level of expected rate of

13    return below which the Committee of Finance

14    would not have approved the Abbott

15    transaction?

16  A  I don't know.

17  Q  Is there anything else regarding the

18    discussion at the Committee of Finance

19    meeting on the subject of the Abbott

20    transaction that you're aware of other than

21    what you've testified to?

22  A  No.

23  Q  Did the Committee of Finance vote to approve

24    the Abbott transaction?

# PART 20

1   A   Yes.

2   Q   And that's reflected on Page 2 of Exhibit 8?

3   A   Yes.

4   Q   Could you turn to that document, please?

5   A   (Witness complies.)

6   Q   There's mention that $110 million for the

7        Abbott transaction would be for the

8        guaranteed benefit subaccount.  What is the

9        guaranteed benefit subaccount?

10  A   It was the account that basically dealt with

11       the guaranteed investment contracts the

12       company was selling at the time.  It was like

13       a CD, a big CD.

14  Q   And in the Yellow Report that we looked at

15       before, there was a list at the top of

16       various accounts that were being recommended

17       to contribute to the Abbott transaction.  How

18       did Hancock decide which accounts to use for

19       the funds for the Abbott transaction?

20  A   I don't know.

21          MR. ZWICKER:  I object.  Beyond the

22       scope.

23  A   I don't know how it was allocated.

24  Q   Was that just a recommendation for Stephen

1      Blewitt and Scott Hartz?

2          MR. ZWICKER:  Objection.

3      A   I don't think it would be a recommendation.

4          I think there was a set of policies and

5          procedures as to how deals got allocated

6          among the accounts, and I don't know what

7          those were.

8      Q   Do you recall that the Abbott transaction

9          was -- strike that.

10         Do you recall during Mr. Blewitt's

11         presentation to the Bond Investment Committee

12         that he discussed the accounting method that

13         would be used to account for the Abbott deal

14         on Hancock's books?

15     A   I don't recall.

16     Q   Was there any discussion of the accounting

17         methodology at the Committee of Finance?

18     A   I don't recall.

19     Q   Turning back to the Committee of Finance

20         minutes, Exhibit 8, on Page 2 it states, "The

21         approval to enter into the Abbott transaction

22         is subject to approval of all legal details

23         by our law department."

24         Is that standard practice for the

Davis, Wilma H. (Linked) 5/7/2007 9:05:00 AM

1      Committee of Finance to make their approval

2      subject to approval of legal details by the

3      law department?

4         MR. ZWICKER:  Objection.

5   A   It would be standard in privately-negotiated

6      transactions where term sheets may change.

7   Q   And was the -- were the legal details of the

8      Abbott deal, in fact, approved by the law

9      department?

10        MR. ZWICKER:  Objection.  Beyond the

11      scope.

12  A   It would be appear they had been since the

13      transaction was funded.

14  Q   What is the policy of John Hancock regarding

15      whether the Committee of Finance or the Bond

16      Investment Committee needs to be updated --

17      let me start over.

18        After the Committee of Finance has

19      approved a transaction, if the terms of the

20      deal change, is there any policy regarding

21      whether the portfolio manager who is working

22      on that deal needs to return to the Committee

23      of Finance before the Bond Investment

24      Committee meeting to update them on those

1    A  No.

2    Q   And there's no specific amount of change in

3        the credit rating that would require

4        resubmission to the committee?

5            MR. ZWICKER:  Objection.

6    A  No.

7            (Document marked Exhibit No. 10.)

8            BY MR. LORENZINI:

9    Q   Miss Davis, you have before you what's been

10       marked as Exhibit 10, and it's a memorandum

11       to file regarding Abbott laboratories.  Do

12       you recognize this document?

13   A   Yes.

14   Q   What is it?

15   A   It's a memorandum summing up changes from the

16       original vote.

17   Q   Have you seen this document before?

18   A   I saw it in preparation.

19   Q   Did you seen it prior to preparation for the

20       deposition?

21   A   No.

22   Q   Is it your understanding that this is a

23       memoranda prepared by Stephen Blewitt

24       summarizing changes to the terms of the

# PART 21

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1      Abbott transaction after the Committee of

2      Finance vote?

3   A  Yes.

4   Q  And was this memo provided to anyone on the

5      Bond Investment Committee or the Committee of

6      Finance?

7   A  Not that I'm aware of.

8   Q  And did this memorandum include any updates

9      to the expected rates of return or risk

10      levels based on factors other than the

11      changes in the terms of the transaction?

12      MR. ZWICKER:  Objection.  It says what

13      it says.

14   A  It updates the transaction and shows some

15      slight modification to the return

16      projections.

17   Q  And under John Hancock's standard policies,

18      were these changes sufficiently material to

19      be presented again to the Committee of

20      Finance or the Bond Investment Committee?

21      MR. ZWICKER:  Objection.

22   A  They don't appear that material.

23   Q  I just want to go back to some of these

24      individuals that were listed in the

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

1                    CERTIFICATE

2        I, WILMA H. DAVIS, do hereby certify

3    that I have read the foregoing transcript of

4    my testimony, taken on Monday, May 7,

5    2007, and further certify it is a true and

6    accurate record of my testimony (with the

7    exception of the corrections listed below):

8    Page      Line          Correction

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17       Signed under the pains and penalties of

18   perjury this _____ day of _____,

19   2007.

20               _____

21               WILMA H. DAVIS

22

23

24

Davis, Wilma H. (Linked)  5/7/2007  9:05:00 AM

```
 1              C E R T I F I C A T E

 2           COMMONWEALTH OF MASSACHUSETTS

 3    DEPOSITION OF:   WILMA H. DAVIS

 4             MONDAY, MAY 7, 2007

 5    RE:  HANCOCK, ET AL, V. ABBOTT

 6         CASE NO. 05-11150-DPW

 7           I, PATRICIA M. McLAUGHLIN, a Certified

      Shorthand Reporter and Notary Public in and

 8    for the Commonwealth of Massachusetts, do

      hereby certify as follows:

 9           1. That WILMA H. DAVIS, the witness

      whose testimony is hereinbefore set forth,

10    was duly recorded by me on Monday, May 7,

      2007;

11           2. That such testimony was transcribed

      by me and is a true and accurate record of

12    the testimony given by the said witness, to

      the best of my knowledge, skill and ability;

13           3. I further certify that I am neither

      attorney for, nor related to or employed by

14    any of the parties, nor financially

      interested in this matter; and

15           4. That a dash as used through this

      transcript is meant to represent an

16    interruption in thought or between a question

      and answer.

17           IN WITNESS THEREOF, I hereunto set my

      hand and Notarial seal this 17th day of May,

18    2007.

19

20              Patricia M. McLaughlin

                Notary Public

21              My Commission Expires:

                May 4, 2012

22

23

24
```

1

# Davis Deposition Exhibit 1

# PART 1



UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY), | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 05-11150-DPW Hon. Judge Douglas P. Woodlock |
| vs. | ) ) | |
| ABBOTT LABORATORIES, | ) ) | |
| Defendant. | ) ) | |

## RULE 30(b)(6) NOTICE OF DEPOSITION OF THE PERSON OR PERSONS MOST KNOWLEDGEABLE TO TESTIFY ON BEHALF OF JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY AND MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY)

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, Defendant Abbott Laboratories ("Abbott") will take the deposition of Plaintiffs John

Hancock Life Insurance Company, John Hancock Life Insurance Company and Manulife

Insurance Company (f/k/a Investors Partner Insurance Company (hereinafter collectively as

"Hancock") on April 11, 2007. The deposition will take place at the law offices of Donnelly,

Conroy & Gelhaar, LLP, 1 Beacon Street, 33rd Floor, Boston, MA, 02108, (617) 720-2880,

beginning at 9:00 A.M., and will continue from day to day, excluding Saturdays. Sundays, and

holidays, until completed. The deposition will be taken before a deposition officer who is

authorized to administer an oath, and will be recorded stenographically (by such means that

visual display of the deponent's testimony will be instantly available). The deposition may also

1249907.1

be recorded by videotape. Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Abbott requests that Hancock designate and produce at the deposition the person or persons who are most knowledgeable to testify on Hancock's behalf as to the following matters:

1.     The "different terms" of the Research Funding Agreement entered into by and between Plaintiffs and Abbott and dated as of March 13, 2001 (the "Agreement") that Hancock contends at paragraph 26 of the First Amended Supplemental Complaint (the "Complaint") and in its Supplemental Response to Interrogatory Nos. 5(C)(D) it "would have demanded" from Abbott "[h]ad . . . Hancock known" the alleged "true development status of ABT-518" before Hancock executed the Agreement.

2.     The "different terms" of the Agreement that Hancock alleges at paragraph 28 of the Complaint and in its Supplemental Response to Interrogatory Nos. 6(C)(D) it "would have demanded" from Abbott "[h]ad . . . Hancock known" the alleged "true development status of ABT-594" before Hancock executed the Agreement.

3.     The "different terms" of the Agreement that Hancock alleges at paragraph 30 of the Complaint it "would have demanded" from Abbott "[h]ad . . . Hancock known" the alleged "true development status of ABT-773" before Hancock executed the Agreement.

4.     The "level of effort normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and market at a similar stage of development," as referenced at paragraph 34 of the Complaint.

5.     Any and all monetary damages and harm that Hancock allegedly suffered as a result of Abbott "obstructing John Hancock's compliance audit," as alleged at paragraphs 22 through 24 of the Complaint.

6.     Any and all monetary damages and harm that Hancock allegedly suffered as a result of Abbott "misrepresenting its intended and reasonably expected spending on Program Related Costs," as alleged at paragraphs 31 and 32 of the Complaint.

1249907.1

2

7.   Any and all monetary damages and harm that Hancock allegedly suffered as a result of Abbott "failing to use Commercially Reasonable Efforts to develop the Program Compounds," as alleged at paragraphs 33 and 34 of the Complaint.

8.   Any and all monetary damages and harm that Hancock allegedly suffered as a result of Abbott "refusing to provide John Hancock with a Copy of Abbott's modified 2005 ARP," as alleged at paragraph 35 of the Complaint.

9.   Any and all monetary damages and harm that Hancock allegedly suffered as a result of Abbott allegedly "failing to out-license or divest various Ceased Compounds," as alleged at paragraphs 36 and 37 of the Complaint.

10.   The role and/or involvement in Hancock's decision to enter into the Agreement of each one of the "individuals and entities" identified by Hancock, in its Response No. 11 to Abbott's Interrogatory No. 11, set forth at pages 53 through 56 in John Hancock's Objections and Responses to Abbott Laboratories' First Set of Interrogatories ("Response No. 11"), as having had "significant involvement in John Hancock's decision to enter into the Research Funding Agreement," including without limitation Hancock's Bond Investment Committee and Committee of Finance, and the individual members of each of these two committees during the relevant period.

11.   Any and all information provided to, relied upon and or referenced by members of Hancock's Bond Investment Committee in arriving at and formulating the Bond Investment Committee's recommendation that "John Hancock's Committee of Finance approve the execution of the Research Funding Agreement by and on behalf of John Hancock," as referenced in Hancock's Response No. 11.

12.   Any and all policies and procedures used or referenced by Hancock's Bond Investment Committee and/or by its individual members in arriving at and formulating the Bond Investment Committee's recommendation that "John Hancock's Committee of Finance approve the execution of the Research Funding Agreement by and on behalf of John Hancock," as referenced in Hancock's Response No. 11.

1249907.1

13.   The criteria or factors upon which Hancock's Bond Investment Committee and its individual members based the recommendation that "John Hancock's Committee of Finance approve the execution of the Research Funding Agreement by and on behalf of John Hancock," as referenced in Hancock's Response No. 11.

14.   The decision of Hancock's Bond Investment Committee to recommend that "John Hancock's Committee of Finance approve the execution of the Research Funding Agreement by and on behalf of John Hancock," as referenced in Hancock's Response No. 11.

15.   Any and all information provided to, relied upon and/or referenced by the members of Hancock's Committee of Finance in arriving at the Committee of Finance's decision to "approve the execution of the Research Funding Agreement by and on behalf of John Hancock," as referenced in Hancock's Response No. 11.

16.   Any and all policies and procedures used or referenced by Hancock's Committee of Finance and/or by its individual members in arriving at the Committee of Finance's decision to "approve the execution of the Research Funding Agreement by and on behalf of John Hancock," as referenced in Hancock's Response No. 11.

17.   The criteria or factors upon which Hancock's Committee of Finance and its individual members based the decision to "approve the execution of the Research Funding Agreement by and on behalf of John Hancock," as referenced in Hancock's Response No. 11.

18.   The decision of Hancock's Committee of Finance to "approve the execution of the Research Funding Agreement by and on behalf of John Hancock," as referenced in Hancock's Response No. 11.

19.   The decision of Hancock's Bond Investment Committee to accept the recommendations of Stephen J. Blewitt and Scott Hartz that "John Hancock enter into the Research Funding Agreement," as referenced in Hancock's Response No. 11.

20.   The decision of Hancock's Committee of Finance to accept the recommendations of Stephen J. Blewitt and Scott Hartz that "John Hancock enter into the Research Funding Agreement," as referenced in Hancock's Response No. 11.

21.    Hancock's decision to accept the recommendations of Stephen J. Blewitt and Scott Hartz that "John Hancock enter into the Research Funding Agreement," as referenced in Hancock's Response No. 11.

22.    Communications by and among John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and/or Manulife Life Insurance Company (f/k/a Investors Partner Insurance Company) about Hancock's decision to enter into the Agreement.

23.    Communications by and between Hancock's Bond Investment Committee, on the one hand, and Hancock's Committee of Finance, on the other hand, about Hancock's decision to enter into the Agreement.

Dated: March 23, 2007                                 Respectfully submitted,

ABBOTT LABORATORIES

By: _Michael D'Orsi_ ———
         Michael S. D'Orsi

One of its attorneys

Peter E. Gelhaar (BBO#188310)
Michael S. D'Orsi (BBO #566960)
DONNELLY, CONROY & GELHAAR LLP
1 Beacon St., 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880
peg@dcglaw.com
msd@dcglaw.com
                              and
Jeffrey I. Weinberger (*pro hac vice*)
Gregory D. Phillips (*pro hac vice*)
Eric J. Lorenzini (*pro hac vice*)
Ozge Guzelsu (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA 90071-1560
Tel: (213) 683-9100

*Counsel for Abbott Laboratories*

## CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail/by hand

Date: 3/23/07 _Michael D'Orsi_ ———

2

# Davis Deposition Exhibit 2

# PART 1



Davis #2
0/7/67 pm

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY), <br><br> Plaintiffs, <br><br> v. <br><br> ABBOTT LABORATORIES, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) CIVIL ACTION NO. 05-11150-DPW ) ) ) ) ) ) ) |

**JOHN HANCOCK'S OBJECTIONS AND RESPONSES
TO ABBOTT LABORATORIES' FIRST SET OF INTERROGATORIES**

Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and ManuLife Insurance Company (f/k/a Investors Partner Life Insurance Company) (collectively, "John Hancock") hereby object and respond, pursuant to Fed. R. Civ. P. 33(b) and the Local Rules of this Court, to defendant Abbott Laboratories' ("Abbott") First Set of Interrogatories (the "Interrogatories") as follows:

## General Objections

1.    John Hancock generally objects to the Interrogatories to the extent that they seek information that is protected by the attorney-client privilege, the work product doctrine, or any other privilege. To the extent that the Interrogatories call for such information, it is excluded from John Hancock's responses.

2.    John Hancock generally objects to the Interrogatories to the extent that they seek the production of John Hancock's confidential or proprietary information. Notwithstanding and without waiving or in any way compromising the foregoing objections, John Hancock will provide such information in accordance with the Stipulated Protective Order entered in this case.

3.    John Hancock generally objects to Abbott's definition of "Hancock" to the extent that it purports to include independent entities that John Hancock does not control (such as "affiliates"), and on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving or in any way compromising the foregoing objections, John Hancock will interpret the term "Hancock" to mean John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and ManuLife Insurance Company (f/k/a Investors Partner Life Insurance Company), their corporate predecessors and successors, as applicable, and the relevant employees, officers and directors, agents and attorneys of each.

4.    John Hancock generally objects to the Interrogatories to the extent that they purport to require John Hancock to take actions or provide information not required by the Federal Rules of Civil Procedure, the Local Rules of this Court, and other applicable law.

5.    John Hancock generally objects to each Interrogatory to the extent that it is not limited to a reasonable time period.

6.    The provision of any specific answer is not intended to, and does not, act as a waiver of any General Objection.

7.    Evidence collection and discovery in this matter are continuing.  John Hancock expressly reserves the right to supplement or otherwise modify its responses to the Interrogatories as it deems necessary in light of additional information, documents or materials that are discovered or disclosed in the course of this matter.

<u>**Responses to Specific Interrogatories**</u>

Subject to and without waiving the foregoing General Objections, John Hancock responds to the specific Interrogatories as follows:

<u>**Interrogatory No. 1:**</u>

Please identify each and every person who provided information used in answering these interrogatories, including an identification of the specific interrogatories for which each such person provided such information.

<u>**Response No. 1:**</u>

John Hancock objects to Interrogatory No. 1 on the grounds that it seeks information protected by the attorney-client privilege and the work product doctrine.  Subject to, and without waiving or compromising the foregoing general and specific objections, John Hancock states that the following people prepared or assisted in the preparation of its answers to these Interrogatories:

Brian A. Davis, Esq., Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, telephone number: 617-248-5000;

-3-

Joseph H. Zwicker, Esq., Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, telephone number: 617-248-5000;

Christopher A. Edwards, Esq., Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, telephone number: 617-248-5000; and

Stacy L. Blasberg, Esq., Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, telephone number: 617-248-5000.

Each of the aforementioned individuals is counsel to John Hancock, and provided legal assistance with respect to each of Abbott's Interrogatories.

In addition, information provided by the following person was used in the preparation of John Hancock's answers to some or all of the Interrogatories:

Stephen J. Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000.

All persons identified in response to Interrogatory No. 1 should be contacted in connection with this action solely through the undersigned counsel for John Hancock.

**Interrogatory No. 2:**

Please describe with particularity any and all documents that Hancock alleges Abbott failed to produce or make available in connection with Hancock's audit demand under Section 2.5 of the Agreement and any and all documents that Abbott produced or made available to Hancock that were not encompassed within Hancock's audit demand.

-4-

**Response No. 2:**

John Hancock objects to Interrogatory No. 2 on the grounds that the phrase "any and all documents that Abbott produced or made available to John Hancock that were not encompassed within John Hancock's audit demand" is vague and ambiguous. Subject to, and without waiving or compromising the forgoing general and specific objections, John Hancock states that the documents Abbott failed to make available in connection with John Hancock's audit demand include, but are not limited to, those set forth in: (i) Schedule A of Steven J. Blewitt's April 12, 2004 letter to James L. Tyree, attached hereto as Exhibit A; and (ii) Tab 2 of Brian A. Davis's November 18, 2004 letter to Lawrence R. Desideri, Esq., which lists documents requested by John Hancock and/or its independent auditors in December 2004, attached hereto as Exhibit B.

**Interrogatory No. 3:**

Please describe separately and with particularity each and every breach of the Agreement that Hancock is claiming in this case, including, without limitation, an identification of all individuals with knowledge of each claim of breach, and the date and manner in which Hancock first learned of each alleged breach.

**Response No. 3:**

John Hancock objects to Interrogatory No. 3 on the grounds that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock has had an opportunity to conduct meaningful discovery. Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 3 after it has had the opportunity to conduct reasonable discovery from Abbott. Subject to, and without waiving or compromising the general and specific objections stated above, John Hancock states Abbott violated the terms of the Agreement by:

-5-

Obstructing John Hancock's Compliance Audit:

On April 12, 2004, John Hancock provided Abbott with notice of its intent to undertake a compliance audit pursuant to the Research Funding Agreement (the "Agreement"). Among other things, Abbott unreasonably and unjustifiably delayed its response to John Hancock's audit request, and has obstructed John Hancock's independent auditors' attempts to refute or confirm Abbott's compliance with the Agreement. John Hancock believes that documents in Abbott's possession will demonstrate that Abbott unreasonably, intentionally and purposefully obstructed John Hancock's audit.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of these facts include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Michelle Campbell, Paralegal, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Mark Hair, Managing Director of StoneTurn Group LLP, 425 Market Street, Suite 2200, San Francisco, CA 94105, telephone number: 415-912-2852;

Chris Martinez, Partner of StoneTurn Group LLP, 100 Congress Center, Suite 2000, Austin, TX 78701, telephone number: 512-469-5577;

-6-

Justin Lewis, Manager of StoneTurn Group LLP, 425 Market Street, Suite 2200, San Francisco, CA 94105, telephone number: 415-912-2852;

Kris Colt, Senior Consultant of StoneTurn Group LLP, 425 Market Street, Suite 220, San Francisco, CA 94105, telephone number: 415-912-2852; and

Jane Vaynerov, Consultant of StoneTurn Group LLP, 1875 Eye Street, NW, Suite 500, Washington, D.C. 20006, telephone number: 202-775-4942.

<u>Misrepresenting the Development Status of ABT-518:</u>

On March 13, 2001, Abbott affirmatively represented to John Hancock that ABT-518 was a viable compound in the first phase of clinical trials. In a Confidential Descriptive Memorandum attached as Exhibit 12.2(i) of the Agreement, Abbott identified ABT-518 as, among other things, a "compelling development candidate." On or about September 20, 2001, Abbott notified John Hancock that it had ceased development of ABT-518.

John Hancock since has discovered that as of March 13, 2001: (i) Abbott had made, or likely would make, the decision to terminate further development of ABT-518; and (ii) Abbott concealed such information from John Hancock in order to induce John Hancock to execute the Agreement. John Hancock expects that documents in Abbott's possession will further demonstrate these facts.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of Abbott's misrepresentations concerning the development status of ABT-518 include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Lynn Klotz, Ph.D., 5 Dudley Street, Gloucester, MA  01930-1107, telephone number: 978-281-6015;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Daphne Pals, Former Abbott Senior Counsel, 1014 Elmwood, Wilmette, IL 60091, telephone number: unknown;

Brian Smith, General Counsel, Hospira, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

-8-

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-9-

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

-10-

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

Misrepresenting the Development Status of ABT-594:

On March 13, 2001, Abbott affirmatively represented to John Hancock that ABT-594 was a viable compound.  In the Confidential Descriptive Memorandum attached as Exhibit 12.2(i) of the Agreement, Abbott represented to John Hancock, among other things, that:  (i) Abbott expected ABT-594 to be "a highly differentiated product" and "the first neuronal nicotinic receptor agonist to receive an indication for pain," (ii) that a decision on clinical efficacy was expected in June 2001; and (iii) an NDA filing was expected in the third quarter of 2003.  On or about November 20, 2001, Abbott notified John Hancock that it had ceased further development of ABT-594.  John Hancock since has discovered that, as of March 13, 2001, Abbott: (i) knew that the Phase I clinical trial results for ABT-594 were likely to be unfavorable, and (ii) concealed ABT-594's true development status from John Hancock for the purpose of inducing John Hancock to execute the Agreement.  John Hancock believes that documents in Abbott's possession will further demonstrate these facts.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of these facts include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

-11-

Lynn Klotz, Ph.D., 5 Dudley Street, Gloucester, MA 01930-1107, telephone number: 978-281-6015;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Daphne Pals, Former Abbott Senior Counsel, 1014 Elmwood, Wilmette, IL 60091, telephone number: unknown;

Brian Smith, General Counsel, Hospira, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-12-

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-13-

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

-14-

<u>Misrepresenting Its Intended and Reasonably Expected Spending on Program Related Costs:</u>

John Hancock has discovered that Abbott misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in the Annual Research Plans ("ARP") that it provided to John Hancock. Available evidence indicates that Abbott's representations in its ARPs from 2001 through at least 2005 reflected its "nominal" spending, as opposed to its "intended and reasonably expected" spending. Abbott's true intended and reasonably expected spending was materially less than the amounts represented to John Hancock. Abbott misrepresented its spending for several reasons, including to induce John Hancock to enter into the Agreement, and to make payments that John Hancock otherwise would not have made. John Hancock believes that documents in Abbott's possession will further demonstrate these facts.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of Abbott's misrepresentations concerning its intended and reasonably expected spending include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-15-

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Daphne Pals, Former Abbott Senior Counsel, 1014 Elmwood, Wilmette, IL 60091, telephone number: unknown;

Brian Smith, General Counsel, Hospira, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

<u>Failing to Use Commercially Reasonable Efforts to Develop the Program Compounds:</u>

Abbott failed to use Commercially Reasonable Efforts to develop the Program Compounds. Subject to, and without waiving or compromising its general and specific objections, John Hancock states that on or about November 16, 2004, Abbott informed John Hancock that Abbott believed that the commercial prospects for the Program Compounds warranted spending on Program Related Costs in 2005 in the amount of $149.8 million, but that Abbott arbitrarily would reduce its spending on Program Related Costs in 2005 to $62.8 million unless John Hancock agreed to make additional Program Payments that were not required under the terms of the Agreement. Abbott's arbitrary reduction in spending on Program Related Costs in 2005 is inconsistent with the level of effort normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial value and are at a similar stage of development. John Hancock believes that documents in Abbott's possession will further demonstrate these facts.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of these facts include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-17-

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

-18-

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064; telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-19-

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

<u>Refusing to Provide John Hancock With Abbott's Modified 2005 ARP:</u>

Notwithstanding John Hancock's request and the terms of the Agreement, Abbott refused to provide John Hancock with its modified 2005 ARP that, as set forth above, arbitrarily reduced Abbott's actual expenditures on Program Related Costs in 2005.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of these facts include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

-20-

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Smith, General Counsel, Hospira, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-21-

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

<u>Failing to Out-License or Divest Various Ceased Compounds:</u>

Abbott failed to out-license or divest various Ceased Compounds, including, without limitation, ABT-518 and ABT-594, as required by the Agreement. Abbott's motive for failing to do so is based on its concern that if the ceased Compounds were successfully developed and marketed by a third party, Abbott would lose future sales of competing compounds that Abbott presently has under development, which are not subject to John Hancock's royalty rights. John Hancock believes that Abbott was required under the Agreement to treat all of the ceased compounds equally with respect to Abbott's out-licensing efforts. John Hancock believes that Documents in Abbott's possession will further demonstrate that Abbott has failed to out-license or divest certain Ceased Compounds.

-22-

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of these facts include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Suzanne A. Lebold, Divisional Vice President, Scientific Assessment and Technology Licensing, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-23-

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-24-

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-25-

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

**Interrogatory No. 4:**

For each and every breach of the Agreement identified in response to Interrogatory No. 4, above [sic], please separately and with particularity identify each and every component of damage or loss Hancock is seeking as a result of such claimed breach, including the dollar amount of each element or component of such damage or loss and the identity of any and all individuals having knowledge of such damage or loss suffered by Hancock.

**Response No. 4:**

John Hancock objects to Interrogatory No. 4 on the ground that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock has had an opportunity to conduct meaningful discovery. Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 4 after it has had the opportunity to do so.

Subject to, and without waiving or compromising the general and specific objections, John Hancock seeks to recover damages (including compensatory and punitive damages, where applicable), lost profits, lost royalties and other losses, including without limitation its costs, expenses and reasonable attorneys' fees, as permitted by law and the terms of the Research Funding Agreement, in an amount to be determined and which is subject to further discovery and expert analysis. John Hancock further reserves the right, in the alternative, to seek recission of the Research Funding Agreement and a refund of all monies paid by John Hancock to Abbott.

-26-

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of damage or loss suffered by John Hancock by Abbott's breaches of the Agreement include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Daphne Pals, Former Abbott Senior Counsel, 1014 Elmwood, Wilmette, IL 60091, telephone number: unknown;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-28-

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

**Interrogatory No. 5:**

Please describe with particularity each and every misrepresentation of material fact or omission of Abbott concerning ABT-518 that Hancock is claiming in this case, including, without limitation, an identification of the following with respect to each such misrepresentation or omission:

(a)     when, where, and the manner in which such misrepresentation or omission was made;

(b)     specifically how such misrepresentation was false or misleading, including the true or actual state of affairs regarding such misrepresentation;

(c)     when and how Hancock first became aware such misrepresentation was false or misleading;

(d)     any and all individuals at Hancock who relied upon such misrepresentation or omission and the manner in which they relied; and

(f)     [sic] any and all individuals having knowledge of such misrepresentation or omission.

**Response No. 5:**

John Hancock objects to Interrogatory No. 5 on the grounds that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock has had an opportunity to conduct meaningful discovery from Abbott. Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 5 after it has had the opportunity to do so.

-30-

Subject to, and without waiving or compromising its general and specific objections, John Hancock states that, on March 13, 2001, Abbott affirmatively represented to John Hancock that ABT-518 was a viable compound in the first phase of clinical trials. In a Confidential Descriptive Memorandum attached as Exhibit 12.2(i) of the Agreement, Abbott identified ABT-518 as, among other things, a "compelling development candidate." On or about September 20, 2001, Abbott notified John Hancock that it had ceased development of ABT-518.

John Hancock since has discovered that as of March 13, 2001: (i) Abbott had made, or likely would make, the decision to terminate further development of ABT-518; and (ii) Abbott concealed such information from John Hancock in order to induce John Hancock to execute the Agreement. John Hancock expects that documents in Abbott's possession will further demonstrate these facts.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of Abbott's misrepresentations concerning the development status of ABT-518 include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Lynn Klotz, Ph.D., 5 Dudley Street, Gloucester, MA  01930-1107, telephone number: 978-281-6015;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

-31-

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Daphne Pals, Former Abbott Senior Counsel, 1014 Elmwood, Wilmette, IL 60091, telephone number: unknown;

Brian Smith, General Counsel, Hospira, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-32-

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-33-

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

**Interrogatory No. 6:**

Please describe with particularity each and every misrepresentation of material fact or omission of Abbott concerning ABT-594 that Hancock is claiming in this case, including,

-34-

without limitation, an identification of the following with respect to each such misrepresentation or omission:

     (a)    when, where, and the manner in which such misrepresentation or omission was made;

     (b)    Specifically how such misrepresentation was false or misleading, including the true or actual state of affairs regarding such misrepresentation;

     (c)    when and how Hancock first became aware such misrepresentation was false or misleading;

     (d)    any and all individuals at Hancock who relied upon such misrepresentation or omission and the manner in which they relied; and

     (f)    [sic] any and all individuals having knowledge of such misrepresentation or omission.

<u>Response No. 6:</u>

John Hancock objects to Interrogatory No. 6 on the grounds that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock has had an opportunity to conduct any discovery with respect to such facts and matters.    Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 6 after it has had the opportunity to conduct reasonable discovery from Abbott.

Subject to, and without waiving or compromising the general and specific objections, John Hancock states that, on March 13, 2001, Abbott affirmatively represented to John Hancock that ABT-594 was a viable compound. In the Confidential Descriptive Memorandum attached as Exhibit 12.2(i) of the Agreement, Abbott represented to John Hancock, among other things, that: (i) Abbott expected ABT-594 to be "a highly differentiated product" and "the first neuronal nicotinic receptor agonist to receive an indication for pain," (ii) that a decision on clinical efficacy was expected in June 2001; and (iii) an NDA filing was expected in the third quarter of 2003. On or about November 20, 2001, Abbott notified John Hancock that it had ceased further

-35-

development of ABT-594.  John Hancock since has discovered that, as of March 13, 2001, Abbott: (i) knew that the Phase I clinical trial results for ABT-594 were likely to be unfavorable, and (ii) concealed ABT-594's true development status from John Hancock for the purpose of inducing John Hancock to execute the Agreement.  John Hancock believes that documents in Abbott's possession will further demonstrate these facts.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of Abbott's misrepresentations concerning the development status of ABT-594 include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Lynn Klotz, Ph.D., 5 Dudley Street, Gloucester, MA  01930-1107, telephone number: 978-281-6015;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-36-

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Daphne Pals, Former Abbott Senior Counsel, 1014 Elmwood, Wilmette, IL 60091, telephone number: unknown;

Brian Smith, General Counsel, Hospira, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

-37-

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-38-

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

**Interrogatory No. 7:**

Please describe with particularity each and every misrepresentation of material fact or omission of Abbott concerning Abbott's spending under the Agreement that Hancock is claiming in this case, including, without limitation, an identification of the following with respect to each such misrepresentation or omission:

(a)    when, where and the manner in which such misrepresentation or omission was made;

(b)    specifically how such misrepresentation was false or misleading, including the true state of affairs regarding such representation;

(c)    when and how Hancock first became aware such misrepresentation was false or misleading;

-39-

(d)     any and all individuals at Hancock who relied upon such misrepresentation or omission and the manner in which they relied; and

(f)     [sic] any and all individuals having knowledge of such misrepresentation or omission.

**Response No. 7:**

John Hancock objects to Interrogatory No. 7 on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. John Hancock further objects to Interrogatory No. 7 on the grounds that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock had an opportunity to conduct meaningful discovery. Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 7 after it has had an opportunity to do so.

Subject to, and without waiving or compromising its general and specific objections, John Hancock states that it has discovered that Abbott misrepresented its "intended and reasonably expected" expenditures on Program Related Costs in the ARPs that it provided to John Hancock. Available evidence indicates that Abbott's representations in its ARPs from 2001 through at least 2005 reflected its "nominal" spending, as opposed to its "intended and "reasonably expected" spending. Abbott's true intended and reasonably expected spending was materially less than the amounts represented to John Hancock. Abbott misrepresented its spending for several reasons, including to induce John Hancock to enter into the Agreement, and to make payments that John Hancock otherwise would not have made. John Hancock believes that documents in Abbott's possession will further demonstrate these facts.

-40-

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of Abbott's misrepresentations concerning its intended and reasonably expected spending on program related costs include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Daphne Pals, Former Abbott Senior Counsel, 1014 Elmwood, Wilmette, IL 60091, telephone number: unknown;

Brian Smith, General Counsel, Hospira, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-41-

Davis Deposition Exhibit 2

PART 2

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

**Interrogatory No. 8:**

For each and every misrepresentation or omission identified in response to Interrogatories 5-7, above, please separately and with particularity identify each and every component of damage or loss Hancock is seeking as a result of such misrepresentation, including, without limitation, the dollar amount of each element or component of such damage or loss and identification of any and all individuals having knowledge of such damage or loss.

**Response No. 8:**

John Hancock objects to Interrogatory No. 8 on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. John Hancock further objects to Interrogatory No. 8 on the ground that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock has had an opportunity to

-42-

conduct meaningful discovery. Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 8 after it has had the opportunity to do so.

Subject to, and without waiving or compromising the general and specific objections, John Hancock seeks to recover damages (including compensatory and punitive damages, where applicable), lost profits, lost royalties and other losses, including, without limitation, its costs, expenses and reasonable attorneys' fees incurred in this action, as permitted by law and the terms of the Research Funding Agreement, in an amount to be determined and which is subject to further discovery and expert analysis. John Hancock further reserves the right, in the alternative, to seek recission of the Research Funding Agreement and a refund of all monies paid by John Hancock to Abbott.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of damage or loss suffered by John Hancock by Abbott's breaches of the Agreement include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Lynn Klotz, Ph.D., 5 Dudley Street, Gloucester, MA 01930-1107, telephone number: 978-281-6015;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-43-

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Daphne Pals, Former Abbott Senior Counsel, 1014 Elmwood, Wilmette, IL 60091, telephone number: unknown;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-44-

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-45-

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott

Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road,

Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL

60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park

Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott

Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road,

Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100

Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

**Interrogatory No. 9:**

Please describe with particularity any and all Commercially Reasonable Efforts Abbott

failed to take with respect to the Program Compounds as alleged in paragraphs 29 and 30 of the

Complaint, including the specific activities in which Abbott failed to engage, and for each such

activity please:

(a)     state the specific level of effort for each activity "normally used by other
pharmaceutical companies with respect to other pharmaceutical compounds or products which
are of comparable commercial value and market at a similar state of development," as alleged in
the Complaint;

-46-

(b)    identify the "other pharmaceutical compounds" and "other pharmaceutical companies" referred to in paragraph 30 of the Complaint;

(c)    identify any and all individuals having knowledge regarding any failure by Abbott to use commercially reasonable efforts, including any damages suffered by Hancock; and

(e)    [sic] state each component or element of damage or loss Hancock sustained as a result of any failure by Abbott to use commercially reasonable efforts to develop the Program Compounds, including the dollar amount and method of calculation of each such element or component of damage or loss.

**Response No. 9:**

John Hancock objects to Interrogatory No. 9 on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. John Hancock further objects to Interrogatory No. 9 on the grounds that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock has had an opportunity to conduct meaningful discovery. Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 9 after it has had an opportunity to do so.

Subject to, and without waiving or compromising its general and specific objections, John Hancock states that on or about November 16, 2004, Abbott informed John Hancock that Abbott believed that the commercial prospects for the Program Compounds warranted spending on Program Related Costs in 2005 in the amount of $149.8 million, but that Abbott arbitrarily would reduce its spending on Program Related Costs in 2005 to $62.8 million unless John Hancock agreed to make additional Program Payments that were not required under the terms of the Agreement. Abbott's arbitrary reduction in spending on Program Related Costs in 2005 is inconsistent with the level of effort normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable commercial

-47-

value and are at a similar stage of development. John Hancock believes that documents in Abbott's possession will further demonstrate these facts.

"Other pharmaceutical companies" reasonably can be interpreted as referring to, *inter alia*: American Home Products, AstraZeneca, Aventis, Bristol-Myers Squibb, Eli Lilly, GlaxoSmithKline, Johnson & Johnson, Merck & Co., Novartis, Pfizer Inc., Pharmacia Corp., and Roche.

John Hancock further states it seeks to recover damages (including compensatory and punitive damages, where applicable), lost profits, lost royalties and other losses, including, without limitation, its costs, expenses and reasonable attorneys' fees incurred in this action, as permitted by law and the terms of the Research Funding Agreement, in an amount to be determined and which is subject to further discovery and expert analysis. John Hancock also reserves the right, in the alternative, to seek recission of the Research Funding Agreement and a refund of all monies paid by John Hancock to Abbott.

As set forth in John Hancock's Rule 26 Initial Disclosures, individuals with knowledge of Abbott's failing to use Commercially Reasonable Efforts to develop the Program Compounds include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Lynn Klotz, Ph.D., 5 Dudley Street, Gloucester, MA 01930-1107, telephone number: 978-281-6015;

-48-

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-49-

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-50-

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

**Interrogatory No. 10:**

With respect to each and every compound that Hancock claims Abbott failed to divest or out-license, as alleged in paragraph 32 and 33 of the Complaint, please identify with particularity the basis for your allegation that Abbott failed to out-license or divest itself of such compound, including, without limitation, any and all specific steps or efforts Hancock contends Abbott should have taken with respect to such compound and each component or element of damage or

-51-

loss Hancock sustained as a result of any failure by Abbott to out-license or divest itself of ceased compounds and the dollar amount thereof.

**Response No. 10:**

John Hancock objects to Interrogatory No. 10 on the grounds that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock has had an opportunity to conduct meaningful discovery. Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 10 after it has had the opportunity to conduct reasonable discovery from Abbott.

Subject to, and without waiving or compromising the general and specific objections, John Hancock states that at various times from March 2001 to the present, Abbott has failed to "maximize the commercial value" by refusing to out- license certain Program Compounds, including without limitation, ABT-492, ABT-518, and ABT-594, as required by the Agreement. Abbott's motive for failing to do so is based on its concern that if the ceased Compounds were successfully developed and marketed by a third party, Abbott would lose future sales of competing compounds that Abbott presently has under development, which are not subject to John Hancock's royalty rights. John Hancock believes that Abbott was required under the Agreement to treat all of the ceased compounds equally with respect to Abbott's out-licensing efforts. John Hancock believes documents in Abbott's possession will further demonstrate that Abbott failed to out-license or divest certain ceased Program Compounds.

-52-

**Interrogatory No. 11:**

Identify any and all individuals involved in Hancock's decision to enter into the Agreement or who provided information or input into that decision including, but not limited to, Hancock personnel and any outside experts or consultants, and for each such person, please describe that person's role in the decision and/or information provided.

**Response No. 11:**

John Hancock objects to Interrogatory No. 11 on the grounds that it seeks information protected by the attorney-client privilege and work product doctrine. Subject to, and without waiving or compromising the foregoing general and specific objections, John Hancock states that the following individuals and entities had significant involvement in John Hancock's decision to enter into the Research Funding Agreement:

Stephen J. Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000. Mr. Blewitt recommended to John Hancock's Bond Investment Committee and Committee of Finance that John Hancock enter into the Research Funding Agreement.

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000. Mr. Hartz recommended to John Hancock's Bond Investment Committee and Committee of Finance that John Hancock enter into the Research Funding Agreement.

John Hancock further states that John Hancock's Bond Investment Committee recommended that John Hancock's Committee of Finance approve the execution of the Research Funding Agreement by and on behalf of John Hancock.

-53-

In addition to Stephen J. Blewitt, the members of the Bond Investment Committee during the relevant period were as follows:

George H. Braun, Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Willma H. Davis, Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

John M. DeCiccio, former Executive Vice President and Chief Investment Officer, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Francis X. Felcon, former Vice President, John Hancock Life Insurance Company, 60 Highland Street, Canton, MA 02021, telephone number: unknown;

E. Kendall Hines, Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

C. Bruce Meltzer, former Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Roger G. Nastou, former Vice President, John Hancock Life Insurance Company, 7 Bremer Circle Road, Hingham, MA 02043, telephone number: 781-749-2693;

Phillip J. Peters, Second Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Jane T. Philippi, former Vice President, John Hancock Life Insurance Company, 32 Monument Avenue, Charlestown, MA 02129, telephone number: 617-241-8185;

-54-

Steven M. Ray, Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Margaret M. Stapleton, former Vice President, John Hancock Life Insurance Company, 10 Ladds Way, Scituate, MA 02066, telephone number: 781-545-1675; and

Barry E. Welch, former Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000.

John Hancock further states that John Hancock's Committee of Finance approved the execution of the Research Funding Agreement by and on behalf of John Hancock. The members of the Committee of Finance during the relevant period were as follows:

Stephen L. Brown, former Chairman, Chief Executive Officer and Director, John Hancock Life Insurance Company, 180 Beacon Street, Apartment 14G, Boston, MA 02116, telephone number: unknown;

David F. D'Alessandro, former Chairman, Chief Executive Officer, and Director, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Foster L. Aborn, former Director, Vice Chairman and Chief Investment Officer, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Nelson F. Gifford, former Director, John Hancock Life Insurance Company, 14 Windsor Road, Wellesley, MA 02181, telephone number: unknown;

Edward H. Linde, former Director, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

-55-

E. James Morton, former Director, John Hancock Life Insurance Company, 650 Independence Avenue, SE, Washington, District of Columbia 20003, telephone number: unknown;

Richard F. Syron, former Director, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000; and

Robert J. Tarr, Jr., former Director, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000.

All persons and entities identified in response to Interrogatory No. 11 should be contacted in connection with this action solely through the undersigned counsel for John Hancock.

**Interrogatory No. 12:**

Please identify the total damages or losses Hancock seeks in this case and describe each and every element or component of such damages or losses, the amount and method of calculation of such element or component of damages or losses, and identify persons having knowledge of such component or element of damages or losses.

**Response No. 12:**

John Hancock objects to Interrogatory No. 12 on the grounds that it is premature because it seeks discovery with respect to facts and matters that are, in whole or in part, known to Abbott before John Hancock has had an opportunity to conduct any discovery with respect to such facts and matters. Accordingly, John Hancock reserves the right to supplement its response to Interrogatory No. 12 after it has had the opportunity to conduct reasonable discovery from Abbott.

-56-

Subject to, and without waiving or compromising the general and specific objections, John Hancock seeks to recover damages (including compensatory and punitive damages, where applicable), lost profits, lost royalties and other losses, including without limitation, its costs, expenses and reasonable attorneys' fees incurred in this action, as permitted by law and the terms of the Agreement, in an amount to be determined and which is subject to further discovery and expert analysis. John Hancock further reserves the right, in the alternative, to seek recission of the Agreement and a refund of all monies paid by John Hancock to Abbott.

As set forth in John Hancock's Rule 26 initial disclosures, individuals with knowledge of damage or loss suffered by John Hancock by Abbott's breaches of the Agreement include:

Stephen Blewitt, Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Scott Hartz, Senior Vice President, John Hancock Life Insurance Company, 200 Clarendon Street, Boston, MA 02117, telephone number: 617-572-6000;

Lynn Klotz, Ph.D., 5 Dudley Street, Gloucester, MA 01930-1107, telephone number: 978-281-6015;

Stephen Cohen, Oscient Pharmaceuticals, 100 Beaver Street, Waltham, MA 02453, telephone number: unknown;

Phillip Deemer, Director of Business Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Leiden, Executive Vice President of Pharmaceuticals, Chief Science Officer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

-57-

Thomas Lyons, Divisional Vice President, Hospital Transition Team, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

John Leonard, Vice President, Medical and Scientific Affairs, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Daphne Pals, Former Abbott Senior Counsel, 1014 Elmwood, Wilmette, IL 60091, telephone number: unknown;

James Tyree, Senior Vice President - Nutritional International Operations, Abbott Laboratories, 200 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Bruce McCarthy, M.D., Former Global Project Head, Abbott Laboratories, 1355 Burgundy Road, Ann Arbor, MI 48105, telephone number: unknown;

Steven Kuemmerle, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Elizabeth Kowaluk, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Meyer, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Marilyn Collicot, Clinical Project Manager, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Silber, M.D., Venture Head, Analgesia Venture, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Perry Nissen, Former Divisional Vice President, Pharmaceutical Development, 544 Manor Road, Wynnewood, PA 19096, telephone number: unknown;

-58-

Miles White, Chairman and CEO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jeffrey Ropes, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Christopher Turner, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Jennifer Dart, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Robert Funck, Vice President and Treasurer (Corporate), Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Brian Ford, Division Vice President, R&D Operations, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Michael Comilla, Former Employee of Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Richard Pinto, Manager Financial Planning and Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Woidat, Finance Manager, Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Donald Buell, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Stanley Bukofzer, Director, Antiinfective Development, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Srinath Reddy, Decision Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Thomas Freyman, CFO, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kenneth Stiles, Assistant Divisional Controller, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kraig Moffatt, Controller, Global Pharmaceutical R&D, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100;

Kevin Lynch, Division Support Group, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100; and

Keith Hendricks, Divisional Vice President Portfolio Analysis, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, telephone number: 847-937-6100.

As to objections:

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY, and
MANULIFE INSURANCE COMPANY (f/k/a
INVESTORS PARTNER LIFE INSURANCE
COMPANY)

By their attorneys,

_____

Brian A. Davis (BBO No. 546462)
Joseph H. Zwicker (BBO No. 560219)
Christopher Edwards (BBO No. 640758)
Stacy L. Blasberg (BBO No. 657420)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA  02110
Tele: 617-248-5000
Fax: 617-248-4000

Date:   February 6, 2006

-61-

## VERIFICATION

I, Stephen J. Blewitt, state under penalties of perjury that: I am Senior Managing Director of the John Hancock Bond & Corporate Finance Group, John Hancock Life Insurance Company (collectively, with John Hancock Variable Life Insurance Company and ManuLife Insurance Company [f/k/a Investors Partner Life Insurance Company], "John Hancock"). I have read the foregoing responses to interrogatories and know the contents thereof; that said answers were prepared with the assistance and advice of counsel and employees of John Hancock; that responses set forth herein, subject to inadvertent or undiscovered errors, are based on and therefore necessarily limited by the records and information still in existence, presently collected, and thus far discovered in the course of the preparation of these answers; that John Hancock reserves the right to make any changes in the responses if it appears at any time that omissions or errors have been made therein or that more accurate information is available; and that, subject to the limitations set forth herein, the responses are true to the best of my knowledge, information and belief.

Interrogatory answers signed under the pains and penalties of perjury this __ day of February 2006.

Stephen J. Blewitt

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing John Hancock's Objections and Responses to Abbott Laboratories' First Set of Interrogatories was served by e-mail upon Peter E. Gelhaar, Esq., Donnelly, Conroy & Gelhaar, LLP, One Beacon Street, 33rd Floor, Boston, MA 02108, and Lawrence R. Desideri, Esq. and Stephen V. D'Amore, Esq., Winston & Strawn LLP, 35 West Wacker Drive, Chicago, Illinois 60601-9703, on this 6th day of February, 2006.

_____

Stacy L. Blasberg

4039694v1

-68-

## Schedule A

1. All records and documents indicating expenditures made by Abbott related to any compound that is now or ever was a Program Compound, including the following:

   a. Abbott's standard policies and procedures related to accounting for project/program related expenditures;
   b. Abbott's chart of accounts as relevant to accounting for project/program related expenditures;
   c. Summary of costs/expenditures incurred by Program Compound by year delineating expenditures by nature (e.g., direct costs incurred by Abbott, subcontractor costs, allocated indirect costs, etc.);
   d. Accounting framework for compiling the expenditures presented (i.e., whether cost assembled on an accrual or cash basis of accounting);
   e. Identification of whether expenditures presented were capitalized or expensed under General Accepted Accounting Procedures ("GAAP") definitions;
   f. Summary of the timing of expenditures for each Program Compound within each year presented;
   g. Contracts or other governing documents and information related to all Research Program activities performed by Subcontractors;
   h. Reconciliations of annual expenditures by Program Compound to the audited financial statements of Abbott;
   i. Calculations, algorithms, and basis for all allocations included in the total expenditures by Program Compound by year;
   j. Abbott standard policies and procedures related to allocation of indirect costs;
   k. Expenditure/Costs summaries and/or reports prepared in the normal course of managing the development of each Program Compound; and
   l. Underlying supporting records (e.g., timesheets, payroll records, purchase orders, invoices, etc.) for all expenditures made related to each Program Compound.

2. All records and documents discussing or evidencing the implementation and conduct of the Research Program, including but not limited to:

   a. Reports/Updates/Summaries prepared by Abbott in the normal course of managing the development of the Program Compounds;
   b. Listing of all reports/updates/summaries typically prepared by Abbott during the normal course of developing an experimental pharmaceutical compound;
   c. Minutes/Summaries/Notes from all management meetings in which any of the Program Compounds where reviewed or approved for further development funding;
   d. Analysis and documentation supporting all forward looking projections of expenditures to be incurred for each Program Compound by year;

  e. Abbott policies and guidance as to the appropriate and/or required methods/approaches/procedures for conducting a research program for an experimental pharmaceutical compound;

  f. Abbott's internal approval framework for determining whether or not to continue to fund and develop an experimental pharmaceutical compound, including all relevant thresholds for approval along the compound development process; and

  g. Minutes/Summaries/Notes from all Abbott meetings regarding continued funding of product development for any Program Compounds.

3. All records and documents concerning Abbott's obligations under § 4.3 of the Agreement, including but not limited to:

  a. Records identifying any and all Replacement Compounds;

  b. Records identifying any and all Failed Early Stage Program Compounds;

  c. Records identifying any and all Ceased Compounds;

  d. All documents pertaining to Abbott's consideration or selection of any compound to replace any Failed Early Stage Program Compound;

  e. Records identifying any and all compounds that Abbott held out as or considered to be "back up" compounds for the compounds that constituted the Program Compounds (i) on the effective date of the Agreement, and (ii) as of the end of each calendar year 2001 through 2003; and

  f. All documents pertaining to the actual or attempted out-licensing or divestiture of any Ceased Compound.

4. All records and documents concerning the status of each Program Compound as of March 13, 2001 and currently, including but not limited to:

  a. Reports/Summaries/Meeting Minutes which indicate the stage of development of each compound that originally constituted a Program Compound during the first calendar quarter of 2001;

  b. Records describing the various stages into which Abbott generally categorizes the pre-clinical and clinical development of experimental pharmaceutical compounds;

  c. Records indicating when each Program Compound reached each stage of pre-clinical or clinical development into which Abbott generally categorizes the pre-clinical and clinical development of experimental pharmaceutical compounds;

  d. Reports/Summaries/Meeting Minutes which evidence the current status of each Program Compound; and

  e. Management Reports and/or other documents prepared in the normal course of business which indicate future prospects and development expectations for each Program Compound.

**EXHIBIT B**

**Documents Requested to be Produced by Abbott
for Audit Purposes in December 2004**

1.  Documents that refer or relate to the possibility or certainty that the development of ABT-518 was being, or would be, "slowed down" in or about February/March 2001. (Schedule A, § 4[d]).

2.  Documents that refer or relate to the development of ABT-518 being placed "back on track" in or about February/March 2001. (Schedule A, § 4[d]).

3.  Documents that refer or relate to the "518 debacle" referenced in Perry Nisen's e-mail to Philip Deemer, dated March 21, 2001. (Schedule A, § 4[d]).

4.  The documents relied upon by Abbott in formulating its Annual Research Plans for 2001-2004. (Schedule A, § 2[d]).

5.  The documents relied upon by Abbott in formulating its alternative Annual Research Plans for 2005. (Schedule A, § 2[d]).

6.  The documents relied upon by Abbott in formulating its Research Program Status Reports for 2001-2005. (Schedule A, § 2[a]).

7.  Documents that constitute, refer or relate to any and all reports or information received by Abbott on or prior to March 13, 2001 regarding ABT-594 study M99-114. (Schedule A, § 4[a] and [e]).

8.  Documents that constitute, refer or relate to any and all patient enrollment data received by Abbott on or prior to March 13, 2001 regarding ABT-594 study M99-114. (Schedule A, § 4[a] and [e]).

9.  Documents that constitute, refer or relate to any and all reports or information received by Abbott on or prior to March 13, 2001 regarding any premature terminations observed or experienced in ABT-594 study M99-114. (Schedule A, § 4[a] and [e]).

10. Documents that refer or relate to Abbott's "Pharma Executive Management Committee" and any of the Program Compounds. (Schedule A, §§ 2[a] and 4[e]).

11. Documents that constitute, refer or relate to any Abbott "Decision Analysis" with respect to any of the Program Compounds. (Schedule A, §§ 2[a] and 4[e]).

12. Documents that constitute, refer or relate to any and all opinion leader comments on any of the Program Compounds. (Schedule A, §§ 2[a] and 4[e]).

13. Documents that refer or relate to Abbott's efforts to out-license any Ceased Compounds, including ABT-773, ABT-594, ABT-492, ABT-518, ABT-100 or ABT-724. (Schedule A, § 3[f]).

14. Documents that constitute, refer or relate to the "2001 APU" or 2001 "April Update" referenced in Mr. Tom Lyons' letter to Mr. Steve Blewitt, dated November 26, 2001 (AL 000403). (Schedule A, § 2[a]).

15. Any and all monthly reports or monthly updates that refer or relate to the development status or prospects of any of the Program Compounds. (Schedule A, § 2[a]).

16. Any and all periodic reports or periodic updates that refer or relate to the development status or prospects of any of the Program Compounds. (Schedule A, § 2[a]).

17. Documents that refer or relate to Abbott's "nominal" and/or "expected" investment costs with respect to any of the Program Compounds. (Schedule A, §§ 2[a] and [d]).

18. Documents that refer or relate to Abbott's "potential" and/or "expected" research and development (R&D) costs with respect to any of the Program Compounds. (Schedule A, §§ 2[a] and [d]).

19. Summary of costs/expenditures incurred by Program Compound by year delineating expenditures by nature (e.g., direct costs incurred by Abbott, subcontractor costs, allocated indirect costs, etc.). (Schedule A, § 1[c]).

20. Documents similar to AL 001863-64, AL 001956-60, AL 001989-93, and AL 002045-48 for any and all of the Program Compounds for the period March 2001 to the present. (Schedule A, §§ 1[c] and 2[a]).

21. Documents that constitute, refer or relate to Abbott's standard policies and procedures concerning accounting for project/program related expenditures. (Schedule A, §§ 1[a]).

22. Documents refer or relate to Abbott's efforts to replace any "Failed Early Stage Program Compounds." (Schedule A, §§ 3[d]).

23. Documents sufficient to describe in reasonable detail the contents and capabilities of Abbott's "knowledge management system" with respect to any of the Program Compounds. (Schedule A, § 2[a]).

3

# Davis Deposition Exhibit 3

# PART 1



EXHIBIT
Davis #3
5/7/07 PMM

## BOND INVESTMENT COMMITTEE

September 21, 2000

**Present:** Messrs./Mss. Blewitt, Braun, Davis, DeCiccio, Felcon, Metzler and Nastou. Attorney-Seghezzi. Secretary Pro Tem-Weber.

### I. PURCHASE RECOMMENDATIONS

| | | |
|---|---|---|
| A. | Abbott Laboratories (S. Blewitt) | Recommend purchase of $220 million 20% (expected) Research and Development Funding Commitment. |

### II. BETWEEN-MEETING TRANSACTIONS

| | | |
|---|---|---|
| B. | Report of Purchases | See Yellow Report |
| C. | Report of Sales | See Yellow Report |

## REDACTED

### III. VOTE REQUEST

### IV. REPORTS FOR INFORMATION

E.    Swap Report

**Also Attending:** Messrs./Mss. Brown, Cavanaugh, DeLeon, Della Piana, Forde, Gelormini, Harris, Hartz, Hasson, Hodge, Johnson, D., Johnson, J., Kinsley, Knowlton, Kruez, Lee, Lucido, Martin, McDonough, J., McDonough, K., McWatters, Mencis, Morrison, Moses, Nguyen, Parsons, Schaffer, White, Wise and Wong.

Corinne L Weber
**SECRETARY PRO TEM**

CONFIDENTIAL
JH 005573

# Davis Deposition Exhibit 4

# PART 1



EXHIBIT

Davis # 4
5/7/07 PM

**JOHN HANCOCK LIFE INSURANCE COMPANY**
Bond & Corporate Finance Group
Report Date:                    September 21, 2000
Recommendation to B.I.C.:       September 21, 2000
Report to C.O.F.:               October 10, 2000

Private

| Purchase Recommendation | | | |
|---|---|---|---|
| GBSA | $110 mm | GBRE | $20 mm |
| CLDBLK | $ 30 mm | OPNBLK | $ 4 mm |
| PENPAR | $ 9 mm | IQA | $15 mm |
| LOLA | $ 8 mm | GRPLTC | $ 4 mm |
| RETLTC | $ 7 mm | GRPINS | $ 2 mm |
| BOLI | $ 4 mm | UNIVRSL | $ 5 mm |
| IPLI | $ 2 mm | | |

## ABBOTT LABORATORIES ("Non-Recourse")
North Chicago, IL

We are recommending a $220 million commitment to fund research and development expenses for a basket of eight pharmaceutical products ("Program Compounds") currently under development by Abbott Laboratories ("Abbott"). The commitment will be funded over a four-year period and will be subject to Abbott Laboratories co-funding at least two times our commitment on the Program Compounds during the same period of time. In return for the research and development payments, Abbott will agree to pay John Hancock milestone and royalty payments for each Compound that reaches regulatory approval and has commercial sales. The purpose of this transaction is to allow Abbott to increase its expenditures on research and development (to generate future growth in revenues and earnings) but to maintain current earnings.

The Program Compounds are a diversified pool of eight compounds owned by Abbott Laboratories and in various stages of clinical development. The Compounds are divided between late-stage and early-stage, including three Phase III, two Phase II, one Phase I, and two pre-clinical compounds. The Compounds are well-diversified from a disease/stage perspective, although several compounds are focused on the cancer market. Even within the cancer market, though, each of the Compounds targets either different types of cancer, or different mechanisms of action. Based on their current stage of development and projected sales levels, we think that the Program Compounds have a current market value of approximately $1 billion. During the term of the transaction, we expect Abbott to spend approximately $1.3 billion (including John Hancock's commitment) on further research and development for the Compounds.

Through the management fee and anticipated milestone payments, we expect to generate at least an 8% return on investment during the initial four years of the transaction. The average return is approximately 17.5% over 15 years. If we assume that we could sell our future royalty stream after the fifth year, our average five-year IRR would be about 22%.

The transaction is structured to provide a one-to two percent probability of total loss combined with a one-to-two percent chance of not earning a return. This is approximately equivalent to a 60 basis point annual loss over five years – or a "Ba1" credit rating. The expected return of 17.50% is attractive relative to the risk of the transaction.

**Report Authors:**
Stephen J. Blewitt, Managing Director
Scott Hartz, Managing Director
(t:\industrials\sjb\yellows\abbott-yo3.doc)

CONFIDENTIAL
JH 001203

**JOHN HANCOCK LIFE INSURANCE COMPANY**
**Bond & Corporate Finance Group**
Report Date:                    September 21, 2000
Recommendation to B.I.C.:       September 21, 2000
Report to C.O.F.:               October 10, 2000

Private

| Purchase Recommendation | | | |
|---|---|---|---|
| GBSA | $110 mm | GBRE | $20 mm |
| CLDBLK | $ 30 mm | OPNBLK | $ 4 mm |
| PENPAR | $ 9 mm | IQA | $15 mm |
| LOLA | $ 8 mm | GRPLTC | $ 4 mm |
| RETLTC | $ 7 mm | GRPINS | $ 2 mm |
| BOLI | $ 4 mm | UNIVRSL | $ 5 mm |
| IPLI | $ 2 mm | | |

**ISSUER:**           Abbott Laboratories  (Non-recourse)

**ISSUE:**            $220 million Research and Development Funding Commitment

**ISSUE RATING:**     JH:  Ba2

**BROKER:**           Direct

**SIC CODE:**         2830 – Drugs

**USE OF PROCEEDS:**  To fund the research and development of eight pharmaceutical products ("Program Compounds") owned Abbott, and to pre-fund management fees and projected milestone payments, and to pay for transaction and administrative expenses.

**STATE OF INC.:**    Illinois

**CIRCLE DATE:**      August 31, 2000

**TAKEDOWN DATE:**    Upon completion of documentation

**PROGRAM PAYMENTS:** During the Program Term, and in consideration of Abbott's continuing performance of the research services under the Research Plan, John Hancock shall make program payments to Abbott in the installments and on the dates set forth below:

| Date | Payment |
|---|---|
| [December,] 2000 | $50,000,000 |
| [December,] 2001 | $55,000,000 |
| [December,] 2002 | $55,000,000 |
| [December,] 2003 | $60,000,000 |

"Program Term" means the period commencing [December,] 2000 Date and ending on [December,] 2004.

"Research Plan" means a detailed statement of Abbott's objectives, activities, timetable, FTE allocation and budget for the Program Compounds during the Program Compounds during each year of the Program Term. Abbott shall provide an updated research plan on an annual basis

2

CONFIDENTIAL
JH 001204

*Abbott Obligations*

During the Program Term, Abbott agrees to spend, in addition to the funds provided by John Hancock, (i) a minimum of $50 million per year and (ii) a minimum of $400 million in aggregate on research and development programs associated with the Program Compounds.

*Program Payment Termination Provisions*

Unless the parties agree upon an alternative arrangement, if Abbott (a) ceases research and development of all Program Compounds or (b) does not spend at least the amount provided by John Hancock in a year on the research and development of Program Compounds or (c) does not reasonably demonstrate, in its updated research plan, its intent to spend a minimum of the amount provided by John Hancock in the next year of the Program Term or $620 million (including the funds provided by John Hancock) in aggregate, John Hancock's obligation to continue to make Program Payments shall cease. In the case of either (a) or (b) above, Abbott will refund to John Hancock $55 million minus half of the amount actually spent by Abbott during that year.

*Carryover Provisions*

If Abbott spends the amount provided by John Hancock in a year but does not spend at least an additional $50 million, Abbott agrees to spend the difference between $105 million and the amount actually spent in that year (the "Carryover Amount") in the subsequent year. John Hancock's obligation to make Program Payments in the subsequent year, if any, will be deferred until that time that Abbott demonstrates that it has spent the Carryover Amount in that subsequent year.

If Abbott spends the amount provided by John Hancock in each year and at least an additional $50 million in each year, but does not spend a minimum of $620 million (including the funds provided by John Hancock) in aggregate on research and development programs associated with the Program Compounds during the Program Term, Abbott agrees to spend the difference between $620 million and the aggregate amount actually spent (the "Aggregate Carryover Amount") in the subsequent year. If Abbott does not spend the Aggregate Carryover Amount in the subsequent year, Abbott will refund to John Hancock one-third of the difference between (a) $620 million and the amount actually spent.

MANAGEMENT FEE:    Commencing with the first anniversary of the Program Term and continuing until the end of the Program Term, Abbott shall pay John Hancock a fee in the amount of $2.0 million per year as compensation for monitoring Abbott's continuing performance of its research services under the Research Plan, the development of the Program Compounds, and to reimburse John Hancock for its ongoing fees and expenses incurred in connection with this transaction.

CONFIDENTIAL
JH 001205

3

**MILESTONE PAYMENTS:** Abbott shall make the following payments for each compound for each milestone achieved after commencement of the Program Term:

| | |
|---|---|
| Upon the allowance of an IND application by the FDA: | $1,000,000 |
| Upon the initiation of a Phase I Clinical Trial: | $2,000,000 |
| Upon the initiation of a Phase II Clinical Trial: | $3,000,000 |
| Upon the initiation of a Phase III Clinical Trial: | $4,000,000 |
| Upon the filing of an NDA application with the FDA: | $5,000,000 |
| Upon NDA Approval by the FDA: | $10,000,000 |

Aggregate milestone payments paid by Abbott, for all "non-NDA Approval" milestones achieved will not exceed $12 million. Aggregate milestone payments paid by Abbott, for all "NDA Approval" milestones achieved will not exceed $40 million. In addition, "non-NDA Approval" milestone payments will not exceed $3 million in the first year or $6 million in the second year after commencement of the Program Term.

**ROYALTY PAYMENTS:** Abbott shall pay to John Hancock royalties on aggregate worldwide Net Sales of Program Compounds (all Program Compound sales combined) at the following rates:

| Annualized Net Sales of Aggregate Program Compounds | Royalty Rate |
|---|---|
| $0 to $400 million | 8% |
| >$400 million and ≤ $1,000 million | 4% |
| >$1,000 million and ≤ $2,000 million | 1% |
| >$2,000 million | ½% |

The obligation to make royalty payments shall commence on the date of the First Commercial Sale of a Program Compound and shall continue with respect to Net Sales of such Program Compound for a period of ten years. Not withstanding the foregoing, the obligation to make royalty payments on all Program Compounds shall not begin until after the second anniversary of the Program Term and shall cease at December 31, 2014.

**HANCOCK HOLDINGS:** None

**RELATED HOLDINGS:** $29,000,000 Preferred Stock of Metabolex Corporation with Put Rights to Abbott

**ANALYST:** Stephen J. Blewitt

**HOUSE COUNSEL:** Amy Weed

**SPECIAL COUNSEL:** Choate, Hall & Stewart

Report Authors:
Stephen J. Blewitt, Managing Director
Scott Hartz, Managing Director
(t:\industrials\sjb\yellows\abbott-yo3 doc)

**CONFIDENTIAL
JH 001206**

4

## TRANSACTION OVERVIEW

In December 1999, John Hancock approached Abbott Laboratories, Inc. ("Abbott") with a financial structure that would allow Abbott to increase its research and development expenditures (to generate future growth in revenues and earnings) but maintain current earnings. The structure, which is presented in this investment recommendation, uses probability analysis on a diversified portfolio of drug compounds, supplemented by scientific due diligence, to achieve an investment grade or near investment grade risk for John Hancock and allow us to generate equity returns in the form of current (royalty) income for a sizeable investment.

This transaction requires John Hancock to commit to funding an average of $55 million per year for a period of four years to fund the research and development of a diversified pool of eight compounds ("Program Compounds") owned by Abbott Laboratories. We have valued the Program Compounds today at approximately $1 billion (or five times our investment) and we expect Abbott to spend over seven times our investment during the term of the transaction (during the initial four year period, Abbott will commit two times John Hancock's investment for those compounds). In return for the research and development payments, Abbott will agree to pay John Hancock milestone and royalty payments for each compound that reaches regulatory approval and has commercial sales as well as a management fee.

Through the management fee and anticipated milestone payments, we expect to generate at least an 8% return on investment during the initial four years of the transaction. The average return is approximately 17.5% over 15 years. If we assume that we could sell our future royalty stream after the fifth year, our average five-year IRR would be about 22%.

This transaction is consistent with our approach to investing in the pharmaceutical sector. During the past five years, we have invested approximately $460 million in pharmaceutical companies. Approximately $300 million is invested in straight debt for investment grade companies. The remaining $160 million is invested in equity-oriented transactions where we think that there are opportunities for exceptional value. Although we have invested in a couple of straight equity transactions, approximately $150 million of the $160 million is invested in transactions where our downside risk is protected by either "put rights" to investment grade companies (Metabolex, Nexell), senior note positions (Celgene, Cubist), or structured portfolios of drug candidates (Pharma Marketing). In these transactions, we maintain sizable up-side potential but reduce the probability of losing all of our invested capital through the structure of our investment.

In summary, we think that the structure of this transaction, which has us co-investing with Abbott Laboratories in a diversified pool of their drug compounds, which we believe have a current value of approximately $1 billion, over a four year period, during which time Abbott has to meet co-investment obligations and the drug compounds need to continue to progress in development, allows us to generate substantial current income that exceeds the risk associated with the transaction. Although we are committing to a substantial $220 million investment, our expectation is that our net investment will not exceed $176 million (due to management fees, milestone payments, and royalty payments).

The transaction is structured to provide a one-to-two percent probability of total loss combined with a one-to-two percent chance of not earning a return. This is approximately equivalent to a 60 basis point annual loss over five years – or a "Ba1" credit rating. The expected return of 17.50% is attractive relative to the risk of the transaction.

CONFIDENTIAL
JH 001207

*Expected accounting treatment*

There have been a number of royalty streams sold off in the form of an asset backed security. The most visible example is the David Bowie bond bought by Prudential Insurance. While this royalty transaction has many similar features, it is also different in that it is funded over a four year period and no royalties are currently being generated. We believe that at the end of the funding period we will be able to obtain a rating on the transaction that will allow it to be placed on our bond schedule. In the meantime, it will appear on our BA schedule. We plan to account for this investment using the guidance in ruling 9920 of the Emerging Issues Task Force. Ruling 9920 requires that each year, or more often if the assumptions change, we will project the expected cash flows and book income equal to the internal rate of return. Any changes to the expected cash flows will be spread over the remaining life of the transaction through the newly calculated IRR. This is the same method we use to account for our CBO equity investments. Initially we expect the IRR on this investment to be approximately 17%.

## OVERVIEW OF ABBOTT LABORATORIES

Abbott Laboratories is engaged in the discovery, development, manufacture and sale of healthcare products and services. Abbott has five reporting revenue segments: Pharmaceutical Products, Diagnostic Products, Hospital Products, Ross Products and International. It also has a 50%-owned joint venture, TAP Holdings, Inc. The principal products of the Pharmaceutical Products Division are the anti-infectives clarithromycin, agents for the treatment of epilepsy, migraine and bipolar disorder, including Depakote; urology products, including Flomax for the treatment of BPH; Abbokinase, a thrombolytic drug, and the anti-viral Norvir, a protease inhibitor for the treatment of HIV. The Diagnostic Division's products include diagnostic systems and tests for blood banks, hospitals, and commercial laboratories. The Hospital Products Division sells drugs and drug delivery systems, intensive care products, cardiovascular products, renal products, and intravenous and irrigation solutions. The Ross Products Division sells adult and pediatric nutritionals such as Similac, Isomil, Ensure, Glucerna, and Pedialyte. The International Division's products include a broad line of hospital, pharmaceutical, and adult and pediatric nutritional products marketed and primarily manufactured outside the United States.

For the year ended December 31, 1999, Abbott had revenues and net income of approximately $13.2 billion and $2.4 billion, respectively. Abbott is rated "Aaa" by the major rating agencies. As of September 18, 2000, Abbott had a market capitalization of approximately $74 billion.

**ABBOTT LABORATORIES**
**CONSOLIDATED STATEMENT OF OPERATIONS**

| (\$ in thousands) | Fiscal Years Ended December 31, | | |
|---|---|---|---|
| | 1997 | 1998 | 1999 |
| Net Sales | $11,889 | $12,512 | $13,177 |
| Costs and expenses. | | | |
| Cost of goods sold | 5,052 | 5,406 | 5,977 |
| Selling, general and administrative | 2,695 | 2,759 | 2,857 |
| Research and development | 1,307 | 1,228 | 1,193 |
| Total operating expenses | 9,055 | 9,395 | 10,028 |
| Operating income | 2,833 | 3,117 | 3,149 |
| Net interest expense | 85 | 102 | 81 |
| Other charges | (186) | (223) | (330) |
| Income (loss) before taxation | 2,934 | 3,241 | 3,396 |
| Net income (loss) | $2,079 | $2,331 | $2,445 |

CONFIDENTIAL
JH 001208

## TRANSACTION DETAILS

### A. PROGRAM COMPOUNDS

There are eight Program Compounds included in this transaction. The Compounds are divided between late-stage and early-stage, including three Phase III, two Phase II, one Phase I, and two pre-clinical compounds. The Compounds are well-diversified from a disease/stage perspective, although several compounds are focused on the cancer market. Even within the cancer market, each of the Compounds targets either different types of cancer, or different mechanisms of action. The products are described more fully below:

| Product | Indication | JH Est. Peak Sales ($mm) | Stage of Development | |
|---------|-----------|--------------------------|----------------------|---|
| ABT 980 (BPH) | Treatment of benign prostatic hyperplasia | 600 | Development Stage: Phase III | Expected Launch: 2003 |
| ABT 773 (Ketolide) | Antibiotic | 800 | Development Stage: Phase III | Expected Launch: 2003 |
| ABT 627 (Endothelin) | Treatment of prostate cancer | 700 | Development Stage: Phase III | Expected Launch: 2003 |
| ABT 594 (CCM) | Non-opiod, non-NSAID analgesic | 700 | Development Stage: Phase II | Expected Launch: 2004 |
| E7010 (Anti-mitotic) | Cancer | 500 | Development Stage: Phase I/II | Expected Launch: 2004 |
| MMPI | Cancer | 400 | Development Stage: Phase I | Expected Launch: 2005 |
| FTI | Cancer | 400 | Development Stage: Pre-clinical | Expected Launch: 2005 |
| Urokinase | Cancer | 400 | Development Stage: Pre-clinical | Expected Launch: 2005 |

### B. SUMMARY OF ESTIMATED SALES

In estimating sales projections by Program Compound, we started with determining the expected peak sales for each Compound. We have conservatively estimated the peak sales for each Compound based on our evaluation of market potential for each Compound relative to results for other similar drugs and expected competitive drugs. In general, our level of peak sales is significantly below Abbott's level (approximately 25%) -- but, because of the tiered royalty structure, the relative economic difference is not significant. Our next step was to use a Sales Curve calculated by Lehman Brothers that projects ramp-up and ramp-down for sizeable drugs. In general, this Curve shows peak sales being reached seven years after launch. Ramp-up is achieved by 5% of peak sales in the first year, followed by 13%, 25%, 50%, 80%, and 90%. Peak sales are maintained for three years, and the compound then achieves 85% of peak, 75%, 70%, etc. As expected, every compound has its own unique curve, and Lehman's is only a general estimate. We have compared the curve to IMS data of prescription sales for individual compounds in a number of drug classes from 1981 to 1999. Our analysis indicates that Lehman's curve is a good fit and we have applied that curve. The table below shows projected sales for each Compound and probability-weighted estimated sales for the entire portfolio of Compounds.

CONFIDENTIAL
JH 001209

## ESTIMATED SALES PROJECTION

| ($ in millions) Name | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Projected Sales* | | | | | | | | | | | | |
| ABT-980 (BPH) | 30 | 78 | 180 | 300 | 480 | 540 | 600 | 600 | 600 | 510 | 0 | 0 |
| ABT-627 (Endothelin) | 35 | 91 | 210 | 350 | 560 | 630 | 700 | 700 | 700 | 595 | 0 | 0 |
| ABT-773 (Ketolide) | 40 | 104 | 240 | 400 | 640 | 720 | 800 | 800 | 800 | 680 | 0 | 0 |
| ABT-594 | | 35 | 91 | 210 | 350 | 560 | 630 | 700 | 700 | 700 | 595 | 0 |
| E7010 (Anti-mitotic) | | 20 | 52 | 120 | 200 | 320 | 360 | 400 | 400 | 400 | 340 | 0 |
| MMPI | | | | | | | | | | | | |
| FTI | | | 20 | 52 | 120 | 200 | 320 | 360 | 400 | 400 | 400 | 340 |
| Urokinase | | | | | | | | | | | | |
| **Total Projected Sales** | 105 | 328 | 793 | 1,432 | 2,350 | 2,970 | 3,410 | 3,560 | 3,600 | 3,285 | 1,335 | 340 |
| **Estimated Sales** | 76 | 225 | 531 | 932 | 1,510 | 1,837 | 2,068 | 2,129 | 2,138 | 1,908 | 530 | 74 |

*For projection purposes, MMPI, FTI and Urokinase are considered as one Program Compound with a Phase I probability of success.*

## C. MILESTONE AND ROYALTY PAYMENTS

Under the Agreement, Abbott agrees to pay to John Hancock royalties on aggregate worldwide Net Sales of Program Compounds (all Program Compound sales combined) at the following rates: 8% on the first $400 million, 4% on the next $600 million, 1% on the next $1 billion, and ½% on any amount above $2 billion. Abbott's obligation to make royalty payments will commence on the date of the First Commercial Sale of a Program Compound and will continue with respect to Net Sales of such Program Compound for a period of ten years. Not withstanding the foregoing, the obligation to make royalty payments on all Program Compounds will not begin until after the second anniversary of the Program Term and will cease at December 31, 2014. Based on our estimate of aggregate sales for the Program Compounds, we expect the following amounts of Royalty Payments:

| ($ in millions) Name | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Estimated Sales | 76 | 225 | 531 | 932 | 1,510 | 1,837 | 2,068 | 2,129 | 2,138 | 1,908 | 530 | 74 |
| | | | | | | | | | | | | |
| Royalty Payments | | | | | | | | | | | | |
| 8.0% on $400 mm | 6 | 18 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 6 |
| 4.0% on $400-$1,000 | 0 | 0 | 5 | 21 | 24 | 24 | 24 | 24 | 24 | 24 | 5 | 0 |
| 1.0% on $1,000 - $2,0 | 0 | 0 | 0 | 0 | 5 | 8 | 10 | 10 | 10 | 9 | 0 | 0 |
| 0.5% on $2,000+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| **Total Royalty Pymts** | 6 | 18 | 37 | 53 | 61 | 64 | 66 | 67 | 67 | 65 | 37 | 6 |
| (average percent) | 8.0% | 7.0% | 5 7% | 4.0% | 3.5% | 3.2% | 3.1% | 3.1% | 3.1% | 3.4% | 7.0% | 8.0% |

CONFIDENTIAL
JH 001210

8

In addition to the Royalty Payments, Abbott will be obligated to make payments to John Hancock for certain milestones achieved for each compound. The milestone and the corresponding payments are described below. Aggregate milestone payments paid by Abbott, for all "non-NDA Approval" milestones achieved will not exceed $12 million. Aggregate milestone payments paid by Abbott, for all "NDA Approval" milestones achieved will not exceed $40 million. In addition, "non-NDA Approval" milestone payments will not exceed $3 million in the first year or $6 million in the second year after commencement of the Program Term.

| | |
|---|---|
| Upon the allowance of an IND application by the FDA: | $ 1,000,000 |
| Upon the initiation of a Phase I Clinical Trial: | $ 2,000,000 |
| Upon the initiation of a Phase II Clinical Trial: | $ 3,000,000 |
| Upon the initiation of a Phase III Clinical Trial: | $ 4,000,000 |
| Upon the filing of an NDA application with the FDA: | $ 5,000,000 |
| Upon NDA Approval by the FDA: | $10,000,000 |

Based on the number of Compounds in the Program and the number of potential milestones for each Compound, we expect to receive $3 million, $6 million, and $3 million of "non-NDA" milestone payments in the first three years. In addition, we expect to receive $20 million in 2003 and $10 million in 2004 for NDA Approvals.

In aggregate, the management fees, milestone payments, and royalty payments are approximately 4.3% of Net Sales of the Program Compounds. The tiered structure of the royalty payments and the up-front milestone payments, however, substantially reduce the downside of the transaction in the event that aggregate net sales are below our expected case. For example, if sales were 25% below projected, a flat 4.3% royalty rate would yield a loss ratio of 4% versus a loss ratio of 1.6% when using the tiered structure.

## D. ESTIMATED CASH FLOW PROJECTIONS

Based on the calculations of Net Sales and Milestone and Royalty Payments, which are described above, the Cash Flow of this transaction is as presented in the table below. In particular, the structure provides for adequate current income during the first two-to-three years when there are no approved Compounds, and substantial current royalty income based on Net Sales of approved Compounds.

| ($ in millions) Name | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JH Cash Payments | (50) | (55) | (55) | (60) | | | | | | | | | | | |
| Management Fee | 0 | 2 | 2 | 2 | 2 | | | | | | | | | | |
| Milestone Payments | 0 | 3 | 6 | 23 | 10 | | | | | | | | | | |
| Royalty Payments | 0 | 0 | 0 | 6 | 18 | 37 | 53 | 61 | 64 | 66 | 67 | 67 | 65 | 37 | 6 |
| Aggregate Cash Rcv'd | 0 | 5 | 8 | 31 | 30 | 37 | 53 | 61 | 64 | 66 | 67 | 67 | 65 | 37 | 6 |
| JH Net Cash Flow | (50) | (50) | (47) | (29) | 30 | 37 | 53 | 61 | 64 | 66 | 67 | 67 | 65 | 37 | 6 |

The projected bond equivalent yield for this transaction is approximately 17.5% and the cash to invested capital ratio is 2.7 times.

CONFIDENTIAL
JH 001211

9

## E. SUMMARY BUDGET

Abbott will be using the funds from this transaction to invest in the research and development of a specific pool of drug compounds, and to pre-fund management fees and projected milestone payments. These funds will be part of a total investment by Abbott of approximately $1,300 million during the next ten years and $900 million over the four year co-investment period. In addition, based on the stage of the development of the Program Compounds, and their expected sales, we have valued the Program Compounds today at approximately $1 billion. Our valuation is based on our knowledge of "out-licensing" transactions between pharmaceutical companies and the milestone and royalty structure that is market for different stage compounds. In general, out-license transactions provide the licensor with a royalty rate of between 10% (for Phase 1 compounds) to 30% (for Phase III compounds) and a 50/50 split for compounds that have completed Phase III. Using an average 20% royalty applied to estimated sales and a 15% discount rate, we arrived at a value of approximately $1 billion.

The following table summarizes the Company's expected budget during the Program Period:

| ($ in millions) Name | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Projected Budget* | | | | | | | | | | | | |
| ABT-980 (BPH) | 80 | 40 | 30 | 30 | 20 | 20 | 10 | 10 | 10 | 10 | 10 | 270 |
| ABT-627 (Endothelin) | 40 | 40 | 20 | 20 | 20 | 20 | 20 | 10 | 10 | 10 | 10 | 220 |
| ABT-773 (Ketolide) | 135 | 60 | 42 | 42 | 27 | 27 | 27 | 17 | 17 | 17 | 17 | 428 |
| ABT-594 | 70 | 80 | 30 | 20 | 20 | 20 | 20 | 20 | 10 | 10 | 10 | 310 |
| E7010 (Anti-mitotic) | 20 | 30 | 35 | 20 | 30 | 10 | 10 | 5 | 5 | 5 | 5 | 175 |
| MMPI | 20 | 30 | 35 | 20 | 23 | 15 | 15 | 5 | 5 | 5 | 5 | 178 |
| FTI | 5 | 10 | 37 | 17 | 15 | 15 | 5 | 5 | 5 | 5 | 5 | 124 |
| Urokinase | 15 | 25 | 35 | 33 | 15 | 15 | 5 | 5 | 5 | 5 | 5 | 163 |
| **Total Projected Budget** | 385 | 315 | 264 | 202 | 170 | 142 | 112 | 77 | 67 | 67 | 67 | 1,868 |
| **Estimated Budget** | 327 | 250 | 201 | 134 | 90 | 81 | 66 | 45 | 40 | 40 | 40 | 1,314 |

CONFIDENTIAL
JH 001212

## TRANSACTION ANALYSIS

The structure of this transaction (which includes a diversified pool of eight Abbott compounds, and a tiered royalty structure) offers a substantial likelihood that we will receive a long-term bond equivalent yield of approximately 17.5% which is substantially greater than the inherent risk of the transaction.

### Expected Return.

*Methodology*
Determining the fair economics of the proposed transaction is highly dependent upon the number of compounds included, the characteristics of the compounds (i.e. status of development, potential sales), the structure of the royalty rates, and an estimation of what is a fair return. To help us answer these questions, we have taken several steps. First, we have researched industry standards for likelihood of success and probable sales curves for compounds in different stages of development. Second, we have developed a spreadsheet model that calculates the rate of return for a chosen portfolio and have developed a minimum number of compounds and associated milestone/royalty payments to provide us with returns that adequately compensate us for the risk we are taking. Third, we have tried to determine what rate of return the capital markets would require for the level of risk that we are willing to take.

The Program Compounds consist of five of Abbott's late-stage development compounds and a basket of three pre-clinical cancer compounds. The late-stage compounds range from mid-Phase II to starting Phase-III. Peak annual sales for these compounds range from $400 million to $800 million. With the exception of the "cancer basket", the compounds are independent of each other. Our due diligence provided us with results consistent with Abbott's representations and expectations for the Program Compounds, although we have scaled back sales projections significantly.

Our scientific and market diligence for the portfolio of compounds consisted on a number of steps. As a first step, we received internal scientific and business write-ups from Abbott for each Program Compound. The material provided by Abbott demonstrated the scientific rationale for the compounds, results of clinical trials, and a competitive analysis. Through financial reports, we searched for all references to Abbott's compounds and all references to competitive compounds in the same class or same disease category. We used this information to evaluate the potential size of markets for the Program Compounds and their competitive landscape. We engaged Dr. Lynn Klotz to search the major drug and medical databases for scientific reports on the Program Compounds and competitive compounds in the same class or same disease category. We used this information to evaluate, from a scientific perspective, what research scientists had discovered about the Program Compounds from an efficacy and safety perspective. We also used this information to identify potential experts to contact for additional questions. Finally, Dr. Klotz contacted the experts on a non-disclosure basis (not revealing that we were looking at Abbott compounds) and asked the experts to assess the Program Compounds and any potential competitive products from an efficacy and market potential perspective. In summary, none of our diligence revealed any information that was materially different than what Abbott had provided to us.

Dr. Lynn Klotz is a former professor of Biochemistry and Molecular Biology at Harvard University and a former officer of two biotechnology companies, BioTechnica and Codon. Dr. Klotz is currently an independent consultant. His most recent assignment was as a member of a four-person team consulting with the President of Mississippi State University to provide a strategic plan for their Life Sciences Institute.

CONFIDENTIAL
JH 001213

*Probabilities of Success*

Based on the development stage of each compound, we assigned probabilities of success ("regulatory approval") and time to success for each compound. Our probabilities of success come from a 1995 study by Dr. Joseph A. DiMasi at the Tufts Center for the Study of Drug Development, and were modified based on our specific knowledge of the Program Compounds. Dr. DiMasi's study is generally accepted by the pharmaceutical industry as an accurate assessment of the probability of success and of the time and costs associated with drug development. Dr. DiMasi looked at a random sample of 93 compounds in four broad disease categories from 12 pharmaceutical companies that were first tested in humans between 1970 and 1982.

Dr. DiMasi's results are summarized below:

PROBABILITY OF SUCCESS

| Entering Phase | NSAID | Cardio-vascular | Anti-infective | Neuro-pharm | All |
|---|---|---|---|---|---|
| I | 22% | 26% | 30% | 20% | 23% |
| II | 30% | 41% | 38% | 22% | 31% |
| III | 71% | 72% | 77% | 51% | 63% |

Dr. DiMasi calculated the average time to approval as 8.75 years for compounds entering Phase I, 7.5 years for compounds entering Phase II, and 5.5 years for compounds entering Phase III. Embedded in these times was an approximately 30-month review process by the FDA. Due to legislative and process changes, the average FDA review time is now approximately 12 months. A revised timeframe for approval (which was been published by TCSDD in 1999), based on accelerated review by the FDA, and quicker processes within the pharmaceutical companies, is 6.0 years for Phase I, 5.0 years for Phase II, and 3.0 years for Phase III.

*Sales Estimates*

In estimating sales projections by Program Compound, we started with determining the expected peak sales for each Compound. We have conservatively estimated the peak sales for each Compound based on our evaluation of market potential for each Compound relative to results for other similar drugs and expected competitive drugs. In general, our level of peak sales is significantly below Abbott's level (approximately 25%) -- but, because of the tiered royalty structure, the relative economic difference is not significant. Our next step was to use a Sales Curve calculated by Lehman Brothers that projects ramp-up and ramp-down for sizeable drugs. In general, this Curve shows peak sales being reached seven years after launch. Ramp-up is achieved by 5% of peak sales in the first year, followed by 13%, 25%, 50%, 80%, and 90%. Peak sales are maintained for three years, and the compound then achieves 85% of peak, 75%, 70%, etc. As expected, every compound has its own unique curve, and Lehman's is only a general estimate. We have compared the curve to IMS data of prescription sales for individual compounds in a number of drug classes from 1981 to 1999. Our analysis indicates that Lehman's curve is a good fit and we have applied that curve. The table below shows projected sales for each Compound and probability-weighted estimated sales for the entire portfolio of Compounds.

*Financial Model and Results*

We've modeled the returns on this portfolio of drugs using a Monte Carlo simulation and assuming their probabilities of success are independent. Let's start, however, with some simplifying assumptions to get better intuition on the risk of the transaction. Assume the probability of success of each drug is 50%, the drugs are independent, and that the success of any one drug will give us a return of 8% on the transaction. In this case, we will lose all our investment only if all the drugs fail. The probability of this is $(1/2)^6 = 1.6\%$. Spread over a 4 year duration, the expected annual loss is 40 basis points which implies the same risk as a Baa3 bond. If only one drug is successful, which should occur with the probability of $(1/2)^6 *(6!/1!) = 6/64 = 9.4\%$, the return, in our simplified model, is 8% on the entire investment. This is approximately 200 basis points over Treasuries. If two or more drugs are successful, the structure caps the investment's return at

CONFIDENTIAL
JH 001214

approximately 20%. The probability of this is 100% –1.6% - 9.4% = 89%. Hence, the weighted average return on the investment is 1.6%*0 + 9.4%*8% + 89%*20% = 18.5%.

This example is obviously a simplification. Each of the drugs has a different probability of success, depending upon how far along each is in the approval process, and a different revenue profile. To reflect the different probabilities and different revenue streams, we developed a spreadsheet model that incorporates multiple drug compounds (and their specific probability of success, time to launch, and expected sales pattern) and a variable milestone/royalty structure. We then ran the spreadsheet model 500 times to provide us a range of outcomes as well as the expected results for returns and losses.

In our base case, we have made the following assumptions:

| Product | Phase | JH Probability Of Approval | Launch | JH Peak Sales |
|---------|-------|----------------------------|--------|---------------|
| BPH | Phase III | 65% | 2003 | $600 mm |
| Ketolide | Phase III | 70% | 2003 | $800 mm |
| Endothelin | Phase III | 70% | 2003 | $700 mm |
| CCM | Phase II | 50% | 2004 | $700 mm |
| Antimitotic | Phase I/II | 40% | 2004 | $500 mm |
| MMPI | Phase I | 10% | 2005 | $400 mm |
| FTI | PC | 10% | 2005 | $400 mm |
| Urokinase | PC | 10% | 2005 | $400 mm |

... and calculated the average bond equivalent yield of this scenario to be approximately 17.3%. It is important to note that the expected IRRs are over a long period of time (15 years). Assuming that we could sell our future royalty stream after the fifth year, our five-year IRR would be about 22%.

## Analysis of Return

The last step of our analysis was to determine what a fair economic return for this transaction should be. We have benchmarked this transactions in a number of ways, such as: R&D vehicles for pre-clinical compounds were sold with expected IRRs (over a three-to-five year period) of approximately 40%; Hambrecht & Quist has estimated pharmaceutical IRRs for single phase-II compounds to be 40% and single phase-III compounds to be 25%; the Palisade Partners (Sony movies) transaction that we participated in last year has an expected IRR of 20%; Elan Pharmaceuticals' pooled transaction has an expected five-year IRR of 13%; limited partner equity funds have about a 25% expected net IRR; and our proprietary analysis of the equity market's IRR for Abbott's entire R&D pipeline of 16-22%. Based on these comparisons, we think that an IRR of 17% over a long period of time is reasonable.

We also evaluated the relationship between our investment (and Abbott's) in the entire portfolio and the average royalty rate that we expect to receive – which is approximately 4-5%. We estimate that the current value of the compounds that Abbott is contributing to the transaction is about $1 billion. During the four year investment period, Abbott expects to invest $800 million on the compounds, in addition to our $200 million. Based on these amounts, our investment is approximately 10% of the total invested dollars. Most pharmaceutical companies earn about a 50% pre-tax margin (excluding R&D expenses) on sales. On a net basis, then, our expected royalty and milestone percentage should be about 5%.

CONFIDENTIAL
JH 001215

Risk Analysis.

The fundamental risks of this transaction are whether Abbott receives marketing approval from the FDA for a sufficient number of the Program Compounds and whether the commercial success of the Compounds are as we expect. In developing the *expected return*, we have made a number of reasonable assumptions regarding the probability of obtaining FDA approvals, acceptance of the products in the marketplace and competition. In many cases, our assumptions are significantly more conservative than Abbott's.

Again looking at our base case (which is demonstrated in the Chart I on the next page), the probability of no successful drugs is approximately 1.7% (the bar on the left). There are also a number of scenarios that produce a return of approximately 1% – 2%. These scenarios arise when only a cancer drug is successful. The cancer drugs have lower anticipated revenues, as well as lower probabilities of success, than any of the other drugs. This represents about 1.6% of the scenarios. All other scenarios give us a return of 9% or more. Assuming a 1-2% return represents a loss of half our original investment, the expected loss in this simulation is 1.7% + ½*1.6% = 2.5%. Spread over a four year duration, the annual expected loss is 62 basis points which corresponds to the risk of a Ba1 rated bond.

We also ran a downside simulation, where the probabilities of success are discounted by 25% from the DiMasi study and the expected revenues are discounted by 25% from our base case (this is shown in Chart II on the next page).

The average return in this downside scenario is 9.3%. The probability that no drugs are successful rises dramatically to 4.9%. The low return scenario is now even lower (-2%) and also has a higher probability (2.7%). So, the annual expected loss is (4.9% + .6*2.7%)/4 = 165 basis points which corresponds to the risk of a B1 rated bond.

CONFIDENTIAL
JH 001216

14

## CHART I

## BASE CASE



## CHART II

## DOWNSIDE SCENARIO



CONFIDENTIAL
JH 001217

## APPENDIX
## PRODUCT DESCRIPTIONS

### ABT-980

ABT-980 is a selective alpha blocker for the treatment of benign prostatic hyperplasia ("BPH"), a disorder that effects approximately 10 million middle-aged and elderly males in the U.S. The primary sympton of BPH is obstruction of urinary outflow and increased frequency of urination. Global sales of BPH products is approximately $2 billion and is expected to continue to grow as the population ages and as better treatments become available. Currently, alpha blockers, including Abbott's Hytrin which recently became generic, are the most frequently prescribed pharmaceutical treatment for BPH. ABT-980 has the benefit of other alpha blockers, but since it only inhibits alpha receptors in the urinary tract, side effects on the cardio-vascular system and central nervous system are expected to be reduced substantially.

One other selective alpha blocker, Boehringer Ingelheim's Flomax, the FDA and has been on the market since 1999. Flomax's current sales are approximately $300 million. Abbott completed Phase II clinical trials and entered Phase III trials this past summer. In its Phase II trials, Abbott demonstrated that it is effectively equivalent (based on safety and efficacy) to Flomax.

This month, Abbott has learned that in long-term studies with rats, that about 15% of the rats given ABT-980 developed gallstones. Abbott does not know if these results are applicable to humans and at what frequency; however, there is no evidence of gallstones in humans to-date. In addition to its usual clinical trials, Abbott will try to determine whether gallstones will develop in humans over the long-term and what implications that may have. If ABT-980 fails due to this gallstone issue, Abbott will replace ABT-980 with another compound.

Abbott expects to submit ABT-980 for approval in June 2002 and launch the product in August 2003. The patent on ABT-980 expires in 2016.

### E-7010

E-7010 is a compound that Abbott licensed from Eisai Co. Ltd. in July 2000. E7010 has completed Phase I trials for various oncology applications. E7010 is an oral medication with a unique mechanism of action that enables it to stop cell mitosis with fewer side effects than current cytotoxic therapies. Although financial terms of the Abbott-Eisai agreement have not been publicly disclosed. Abbott is committing $25 million in up-front and milestone payments to Eisai and will pay a double-digit royalty percentage on net sales. As a result of in-licensing E7010, Abbott has discontinued development of its own internally developed "anti-mitotic" compound.

Anti-mitotic compounds are not new. Taxol, the largest selling cancer drug, is an anti-mitotic. E7010, however, binds to a different site of a cell's microtubules than Taxol, and inhibits cell proliferation in a unique manner which is believed to cause fewer side effects.

E7010 has successfully completed Phase I clinical trials in Japan. These trials may be repeated in the U.S. but Abbott expects to move quickly into Phase II trials. Abbott expects to submit E7010 for approval in 2003 and launch the product in 2004. The patent on E7010 expires in 2011.

Our scientific consultants, Dr. Dennis A. Carson, UCSD School of Medicine, and Dr. John Kavanaugh, Jr., MD Anderson Cancer Center, did not have specific knowledge about the Abbott/Esai compound. However, each researcher provided us with consistent critical benchmarks to evaluate the compound (such as whether the compound has been tested against specific cancer cell lines, whether the compound has been tested in combination with other anti-cancer agents. We have confirmed that Abbott independently addressed these critical benchmark and received positive results.

### ABT-773 (Ketolide)

ABT-773 is a member of a novel group of ketolide antibiotics within the macrolide group of antimicrobials. Ketolides have a similar mechanism of action to other macrolides such as Pfizer's *Zithromax* and Abbott's

16

CONFIDENTIAL
JH 001218

*Biaxin.* Unlike macrolide antibiotics, ketolides are active against *s. pneumonia* and *h. influenza.* The antibiotics market size is approximately $25 billion; macrolides account for approximately 13% and have an increasing market share. Only one ketolide (*Ketek*) is in advanced clinical trials; this compound, discovered by Aventis, was approved for sale in Europe and was been submitted to the FDA for approval in February 2000. Aventis expects to launch *Ketek* in 2001.

ABT-773 entered Phase III clinical trials this past summer. Abbott expects to submit ABT-773 for approval in June 2002 and launch the product in August 2003. The patent on ABT-773 expires in 2016.

Our scientific consultant, Dr. Robert C. Moellering, Jr., Harvard Medical School and Beth Israel Medical Center, confirmed the scientific rationale for ketolides and their market potential. Based on information that he has seen, Dr. Moellering believes that ABT-773 has more promise than Aventis' *Ketek.*

### ABT-594

ABT-594 is a non-opiod, non-NSAID analgesic compound that is orally-administered for the treatment of diabetic neuropathic pain. In animal models, the compound has been shown to be substantially more potent than morphine with a better side effect profile. Neuropathic pain is a substantial and underserved market. Approximately 4-5 million people are thought to suffer from neuropathic pain but only a few medications provide complete pain relief and most medications have significant side effects. As more effective and tolerable medications become available, the neuropathic pain market is expected to experience significant growth.

ABT-594 is currently in Phase II clinical trials. If Phase II and Phase III trials are successful, Abbott expects to submit ABT-594 for approval in May 2003 and launch the product in July 2004. The patent on ABT-594 expires in 2016.

Our scientific consultant, Dr. Mitchell Max, NIH, eliminated an initial concern of ours that the "therapeutic window" of ABT-594 was too short and would potentially block approval. Dr. Max indicated that ABT-594's therapeutic window was acceptable. Dr. Max was not able to fully address toxicity issues raised by two of Abbott's competitors that the compound demonstrated opiod-like side effects in mice. These toxicity issues have not been found by Abbott in its mice or human trials. Dr. Max believed that ABT-594 showed a good profile in mice.

### ABT-627

ABT-627 is an inhibitor of a family of endothelin peptides that cause constriction of vascular muscles and stimulate cell proliferation. ABT-627 is currently being developed by Abbott for the treatment of prostate cancer, and other cancer types.

Prostate cancer ("PCA") is the most common cancer to strike non-smoking men. Approximately 1.7 million men live with prostate cancer in the U.S., and there are approximately 180,000 newly diagnosed cases each year. The primary treatment of advanced stage PCA is hormone therapy. Patients receiving hormone therapy become resistant to this treatment after two to three years and then have a life expectancy of only about twelve months.

The primary benefit of ABT-627 is to reduce the pain associated with PCA and to delay the progression of the disease (but not necessarily improve survival).

ABT-627 is currently in Phase III clinical trials. If Phase III trials are successful, Abbott expects to submit ABT-627 for approval in December 2003 and launch the product in June 2004. The patent on ABT-627 expires in 2015.

Our scientific consultant, Dr. Joel Byron Nelson, MD, University of Pittsburgh, has indicated that ABT-627 is safe, significantly reduces pain associated with PCA, and delays disease progression.

CONFIDENTIAL
JH 001219

## MMPI

MMPI is an inhibitor of enzymes called matrix metalloproteinase that degrade a wide range of protein substrates. High expression of these enzymes occurs in cancer and is associated with the ability of tumors to grow, invade, develop new blood vessels and metastasize.

The MMPI field is competitive. More than 30 firms have filed patents and several companies have compounds in advanced clinical development. Abbott's MMPI has the potential competitive advantage of a better side effect profile. It appears to exhibit less arthritis and tendonitis of the upper joints that its competitors. This compound is currently being evaluated in Phase I clinical trials.

Abbott hopes to submit MMPI for approval in 2004 and launch the product in 2005. The patent on MMPI expires in 2018.

## FTI

FTI is an inhibitor of enzymes called farnesyltransferase that assist certain proteins, such as the Ras protein, which are critical for malignant growths.

The FTI field is competitive. Approximately four compounds are in clinical development, and an additional five are in pre-clinical studies. Abbott has not yet chosen a specific FTI to enter into human clinical trials. It expects to enter human clinical trials in 2001

Abbott hopes to submit FTI for approval in 2004 and launch the product in 2005. The patent on FTI is not expected to expire prior to 2014.

## Urokinase

Urokinase is an inhibitor of enzymes called urokinase which are believed to promote the metastases of tumors by breaking down cell membranese.

The Urokinase field is less well-developed than MMPI and FTI. No compound has currently made it into clinical trials. Abbott is currently evaluating several compounds. If Abbott fails to take a Urokinase compound into clinical trials, Abbott will substitute another Phase I compound into the Program.

Abbott hopes to submit Urokinase for approval in 2004 and launch the product in 2005. The patent on Urokinase is not expected to expire prior to 2014.

Our scientific consultant, Dr. Edward Sausville, National Cancer Institute, has indicated that "cytostatic" therapies such as MMPI, FTI and Urokinase may be useful upon recurrence of cancer as a means to stopping the progression of the disease. He believes that they will be useful in combination with other therapies and may not be exceptional compounds by themselves.

CONFIDENTIAL
JH 001220

5

# Davis Deposition Exhibit 5

# PART 1

EXHIBIT

*Dauro #5*
*5/7/07 Pma*

*28-Jun-01*    *-7/2/61*

## GBSA Spreads to On-the-run Treasuries

| | 209 | 227 | 228 | 244 | | 259 | | | 266 | 267 | 267 | 267 | | vs Interpolated "On-the-Run" | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2 yr | 3 yr | 4 yr | 5 yr | 6 yr | 7 yr | 8 yr | 9 yr | 10 yr | 15 yr | 20yr | 30yr | | NEEDS % "ROE Adjustments" | |
| AAA | 131 | 156 | 171 | 177 | 183 | 189 | 190 | 190 | 190 | 200 | 203 | 203 | 1 | AAA | 43 |
| AA1 | 134 | 161 | 174 | 180 | 186 | 192 | 193 | 193 | 198 | 206 | 200 | 206 | | AA1 | 38 |
| AA2 | 136 | 163 | 176 | 182 | 188 | 194 | 194 | 194 | 196 | 207 | 207 | 207 | 1.5 | AA2 | 38 |
| AA3 | 140 | 166 | 182 | 188 | 194 | 201 | 201 | 201 | 202 | 214 | 214 | 214 | | AA3 | 35 |
| A1 | 146 | 174 | 187 | 194 | 204 | 207 | 208 | 208 | 209 | 208 | 222 | 222 | | A1 | 33 |
| A2 | 150 | 179 | 193 | 200 | 207 | 214 | 218 | 218 | 219 | 229 | 229 | 229 | 3.5 | A2 | 30 |
| A3 | 155 | 185 | 200 | 208 | 216 | 223 | 224 | 224 | 225 | 238 | 238 | 238 | | A3 | 27 |
| BAA1 | 159 | 190 | 206 | 215 | 223 | 231 | 232 | 232 | 234 | 247 | 247 | 247 | | BAA1 | 24 |
| BAA2 | 163 | 198 | 212 | 222 | 231 | 238 | 240 | 242 | 243 | 256 | 255 | 255 | 3.5 | BAA2 | 21 |
| BAA3 | 208 | 233 | 248 | 261 | 257 | 283 | 281 | 283 | 289 | 271 | 271 | 271 | | BAA3 | 13 |
| BA1 | 249 | 271 | 278 | 290 | 283 | 287 | 282 | 278 | 274 | 290 | 290 | 286 | | BA1 | 5 |
| BA2 | 262 | 309 | 312 | 309 | 310 | 310 | 303 | 298 | 299 | 302 | 302 | 302 | 11 | BA2 | -3 |
| BA3 | 374 | 380 | 383 | 375 | 371 | 367 | 357 | 348 | 338 | 348 | 348 | 348 | | BA3 | -19 |
| B1 | 458 | 462 | 454 | 441 | 433 | 424 | 418 | 587 | 383 | 395 | 395 | 395 | | B1 | -35 |
| B2 | 639 | 639 | 626 | 607 | 494 | 462 | 484 | 447 | 430 | 442 | 442 | 442 | 22 | B2 | -52 |
| B3 | 621 | 615 | 565 | 572 | 535 | 530 | 519 | 497 | 479 | 489 | 489 | 489 | | B3 | -68 |
| CAA | 1027 | 919 | 858 | 796 | 736 | 714 | 688 | 659 | 631 | 644 | 644 | 644 | 44 | CAA | -149 |

| | |
|---|---|
| 5.13 % 10 Yr. Treasury | |
| 7.13 % ROE after tax | |
| 37 % Tax | |
| 30 b.p. Pricing Default | |
| 5.5 % Pricing Capital | |
| 206 10 yr Pricing Spread | Cost of F = 180 |
| 48 b.p. Pricing Profit | Need = 31.5 |

| Raise by Quality | | Sprd |
|---|---|---|
| AAA | 6.57 | 1.84 |
| AA3 | 7.00 | 1.97 |
| A2 | 7.08 | 1.96 |
| BAA2 | 7.17 | 2.04 |
| BA2 | 7.41 | 2.29 |
| B2 | 7.90 | 2.77 |
| CAA | 8.99 | 3.73 |

### CREDIT FACTORS vs.    30

| | 2 yr | 3 yr | 4 yr | 5 yr | 6 yr | 7 yr | 8 yr | 9 yr | 10 yr | 15 yr | 20 yr | 30 yr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AAA | 29 | 28 | 27 | 25 | | 25 | | | 24 | 24 | 24 | 24 |
| AA | 27 | 26 | 26 | 24 | | 23 | | | 22 | 22 | 22 | 22 |
| A | 20 | 19 | 16 | 14 | | 11 | | | 9 | 9 | 9 | 9 |
| BAA | 16 | 11 | 8 | 1 | | -5 | | | -9 | -9 | -9 | -9 |
| BA | -89 | -78 | -70 | -82 | | -82 | | | -31 | -31 | -31 | 31 |
| B | -267 | -280 | -234 | -211 | | -178 | | | -123 | -123 | -123 | -123 |
| CAA | -579 | -541 | -473 | -404 | | -311 | | | -229 | -229 | -229 | -229 |

| | 2 yr | 3 yr | 4 yr | 5 yr | 7 yr | 10 yr | 15 yr | 20yr | 30yr |
|---|---|---|---|---|---|---|---|---|---|
| swap spreads | 55 | 73 | 36 | 84 | 36 | 100 | 110 | 75 | |
| BAA2 spreads | 188 | 176 | 128 | 149 | 181 | 183 | 180 | 180 | |





EXHIBIT
DAESEN
1
3/21/07

5/2004 10:02 AM

HIGHLY CONFIDENTIAL
JHII 021462

9

# Davis Deposition Exhibit 6
# PART 1

**John Hancock Financial Services, Inc.**

Bond and Corporate Finance Group

John Hancock Place
Post Office Box 111
Boston, Massachusetts 02117
(617) 572-9624
Fax: (617) 572-1628
E-mail: sblewitt@jhancock.com

**Stephen J. Blewitt**



May 8, 2000

| | |
|---|---|
| Memorandum To: | Messrs. Aborn, Brown, D'Alessandro, DeCiccio, Hartz, Nastou |
| Re: | <u>Proposed John Hancock – Abbott Laboratories Transaction</u> |

The attached material is for our meeting on Thursday, May 11ᵗʰ at 2PM.

Steve Blewitt

CONFIDENTIAL
JH 002423

**John Hancock - Abbott Laboratories**
Research and Development Transaction

**Investment Analysis**

1.    John Hancock is considering committing [$50 million] per year for a period of four years to fund the development and commercialization of a specified pool of compounds owned by Abbott Laboratories. During the four year period, Abbott will commit three-to-four times John Hancock's investment for those compounds, and will spend over seven times our investment during the term of the transaction. In return, Abbott will agree to pay John Hancock milestone and royalty payments for each compound that reaches regulatory approval and has commercial sales.

This transaction is valuable to Abbott because it allows them to offset R&D expenditures with research and development income – improving their net income. This transaction is valuable to John Hancock because it allows us to generate equity returns in the form of current (royalty) income for a sizeable investment.

Abbott Laboratories is the eight largest pharmaceutical company in the U.S. Its revenues were approximately $13 billion in 1999 and its current market capitalization is approximately $60 billion. Abbott is rated "Aaa" by the major rating agencies.

Our business relationship with Abbott began in 1997 when we funded a $30 million equity investment in a development stage company called Metabolex and received the right to sell our equity to Abbott at a slight premium. Since then, Abbott has introduced us to a number of other proprietary investment opportunities and we have completed one (Idun).

2.    Determining the fair economics of the proposed transaction is highly dependent upon the number of compounds included, the characteristics of the compounds (i.e. status of development, potential sales), the structure of the royalty rates, and an estimation of what is a fair return. To help us answer these questions, we have taken several steps. First, we have researched industry standards for likelihood of success and probable sales curves for compounds in different stages of development. Second, we have developed a spreadsheet model that calculates the rate of return for a chosen portfolio and have developed a minimum number of compounds and associated milestone/royalty payments to provide us with returns that adequately compensate us for the risk we are taking. Third, we have tried to determine what rate of return the capital markets would require for the level of risk that we are willing to take.

3.    The current portfolio of compounds that we are considering consists of five of Abbott's late-stage development compounds and a basket of three pre-clinical cancer compounds. The late-stage compounds range from mid-Phase II to starting Phase-III. Peak annual sales for these compounds range from $400 million to $1.2 billion. With the exception of the "cancer basket", the compounds are independent of each other. We have not completed any diligence on the specific compounds yet other than to read Abbott's press releases and analyst reports. Assuming that Abbott has correctly characterized the development stage of each compound, we have assigned probabilities of success ("regulatory approval") and time to success for each compound. Our probabilities of success come from a 1995 study by Dr. Joseph A. DiMasi at the Tufts Center for the Study of Drug Development. Dr. DiMasi's study is generally accepted by the pharmaceutical industry as an accurate assessment of the probability of success and of the time and costs associated with drug development. Dr. DiMasi looked at a random sample of 93

CONFIDENTIAL
JH 002424

compounds in four broad disease categories from 12 pharmaceutical companies that were first tested in humans between 1970 and 1982.

Dr. DiMasi's results are summarized below:

| Entering Phase | Probability of Success | | | | |
|---|---|---|---|---|---|
| | NSAID | Cardio-vascular | Anti-infective | Neuro-pharm | All |
| I | 22% | 26% | 30% | 20% | 23% |
| II | 30% | 41% | 38% | 22% | 31% |
| III | 71% | 72% | 77% | 51% | 63% |

Dr. DiMasi calculated the average time to approval as 8.75 years for compounds entering Phase I, 7.5 years for compounds entering Phase II, and 5.5 years for compounds entering Phase III. Embedded in these times was an approximately 30-month review process by the FDA. Due to legislative and process changes, the average FDA review time is now approximately 12 months. A revised timeframe for approval (which was been published by TCSDD in 1999), based on accelerated review by the FDA, and quicker processes within the pharmaceutical companies, is 6.0 years for Phase I, 5.0 years for Phase II, and 3.0 years for Phase III.

During the past four years, we have evaluated many equity investments in emerging pharmaceutical and medical device companies, and we have completed several transactions. During that period, we have established relationships with reliable scientific advisors. If we proceed beyond the current step of working with Abbott on the framework of a transaction, we will test Dr. DiMasi's model for reasonableness and we will engage scientific consultants to evaluate the compounds in the portfolio.

4.     In estimating sales projections by compound, we start with expected peak sales for the compound. For now, we have accepted Abbott's number for peak sales. In our diligence process, however, we will look at sales for similar compounds, the relative success of first-to-market drugs versus others, and other factors. Our next step is to use a Sales Curve calculated by Lehman Brothers that projects ramp-up and ramp-down for sizeable drugs. In general, this Curve shows peak sales being reached seven years after launch. Ramp-up is achieved by 5% of peak sales in the first year, followed by 13%, 25%, 50%, 80%, and 90%. Peak sales are maintained for three years, and the compound then achieves 85% of peak, 75%, 70%, etc. As expected, every compound has its own unique curve, and Lehman's is only a general estimate. We have compared the curve to IMS data of prescription sales for individual compounds in a number of drug classes from 1981 to 1999. Our analysis indicates that Lehman's curve is a good fit.

5.     We developed a spreadsheet that incorporates multiple drug compounds (and their specific probability of success, time to launch, and expected sales pattern) and a milestone/royalty structure that is intended to lower our risk in the transaction. Having multiple compounds that are substantially far along in clinical trial, we limit our exposure to the possibility that no compound is approved and that we lose all of our money. Based on the current proposed portfolio, we believe that the risk of losing all of our money is approximately 1%. The second component of our model is to receive a milestone payment from Abbott upon regulatory approval. We have proposed $10 million per compound. This payment is intended to return cash to John Hancock sooner and to somewhat lower the risk that actual sales do not meet projected sales. The third component of our model is to have a tiered royalty structure – such as 8% of the first $400 million of aggregate annual sales, 4% of the next $600 million of aggregate annual sales, and 1% of aggregate annual sales in excess of $1 billion.

CONFIDENTIAL
JH 002425

6.    The last step of our analysis is to determine what a fair economic return for this transaction should be.  We have benchmarked this transactions in a number of ways, such as: R&D vehicles for pre-clinical compounds were sold with expected IRRs (over a three-to-five year period) of approximately 40%;  Hambrecht & Quist has estimated pharmaceutical IRRs for single phase-II compounds to be 40% and single phase-III compounds to be 25%; the Palisade Partners (Sony movies) transaction that we participated in last year has an expected IRR of 20%; Elan Pharmaceuticals in currently in the market with a pooled transaction with an IRR of 25% (over 18-24 months); and our proprietary analysis of the equity market's IRR for Abbott's entire R&D pipeline of 16-22%.  Based on these comparisons, we think that an IRR of 20-25% is reasonable – and Abbott agrees.

        We also evaluated the relationship between our investment (and Abbott's) in the entire portfolio and the average royalty rate that we expect to receive – which is approximately 4-5%. We estimate that the current value of the compounds that Abbott is contributing to the transaction is about $1 billion.  During the four year investment period, Abbott expects to invest $800 million on the compounds, in addition to our $200 million.  Based on these amounts, our investment is approximately 10% of the total invested dollars.  Most pharmaceutical companies earn about a 50% pre-tax margin (excluding R&D expenses) on sales.  On a net basis, then, our expected royalty should be about 5%.

7.    The current proposed portfolio consists of (1) a mid Phase II compound with projected peak sales of $700 million, (2) a late Phase II with peak sales of $1.2 billion, (3) an early Phase III with peak sales of $700 million, (4) an early Phase III with peak sales of $700 million, (5) an early Phase II with peak sales of $400 million, and (6) a basket of three cancer compounds currently in pre-clinical trials, each of which may have peak sales of $400 million.

        John Hancock will fund [$50 million] per year for four years.  Milestone payments of $10 million will be paid for each compound that receives regulatory approval.   Royalty rates will equal [8%] on the first $400 million in sales, [4%] on the next $600 million of sales, and [1%] on sales in excess of $1 billion.  Abbott would also like to build in a provision to limit royalties if our actual IRR exceeds a certain amount.

        Based on this portfolio, and running our model 500 times, the probability of losing all of our money is about 1%.  There is also about a 1% probability of just getting our money back (with no return).  The average return is approximately 20% and tightly bound around that percentage.  The maximum return is 25%.  Looking at sensitivities to our assumptions, if the $1.2 billion compound generated only $600 million in revenues or if all compounds generated only 75% of projected sales, our IRR would be reduced by approximately 1-2%.  Our probability of failure would not change.

        It is important to note that the expected IRRs are over a long period of time (10-15 years). Assuming that we could sell our future royalty stream after the fifth year, our five-year IRR would be about 24% (and the maximum return would be about 35%).

        A one-percent probability of total loss combined with a one-percent chance of not earning a return is approximately equivalent to a 30 basis point annual loss over five years – or a "Baa" credit rating.  The expected return of 20% is attractive relative to the risk that we would be taking.

CONFIDENTIAL
JH 002426

Estimated Cash Flow
($ millions)

| Year | JH Cash Payments | Milestone Payments | Royalty Payments | Aggregate Cash Received | JH Net Cash Flow |
|---|---|---|---|---|---|
| 2000 | (50) | | | | (50) |
| 2001 | (50) | | | | (50) |
| 2002 | (50) | | 6 | 6 | (44) |
| 2003 | (50) | | 18 | 18 | (32) |
| 2004 | | 30 | 35 | 65 | 65 |
| 2005 | | | 48 | 48 | 48 |
| 2006 | | | 58 | 58 | 58 |
| 2007 | | | 62 | 62 | 62 |
| 2008 | | | 65 | 65 | 65 |
| 2009 | | | 65 | 65 | 65 |
| 2010 | | | 66 | 66 | 66 |
| 2011 | | | 64 | 64 | 64 |
| 2012 | | | 61 | 61 | 61 |
| 2013 | | | 32 | 32 | 32 |
| 2014 | | | 14 | 14 | 14 |
| TOTAL | (200) | 30 | 594 | 624 | 424 |

CONFIDENTIAL
JH 002427

**Accounting Structure**

Anticipated Structure:

We would establish a trust to make the investment and issue one series of certificates backed by the royalty cash flows. Rating agency would rate the certificate to a minimum return (approximately 8 – 10%). In early years, when no cash flow is available, bond would accrete at this minimum return. When cash flow is available it first pays the current period return, then the accreted return, then pays down the bond. If certain targets are hit, some cash flow beyond the minimum return can be designated as excess interest and booked as income.

**Balance sheet treatment:** Bond, with an NAIC 2 or NAIC 3 rating. This requires we get a rating agency to rate the bond.

**Income treatment:** Current, fixed return of minimum rated yield. If deal is successful, excess income in later years.

**Downside scenario:** If the program is performing poorly, bond will be downgraded and ultimately rated category 6. Bond will be written down each period as necessary to reflect drop in value. This will spread the loss over several years and many quarters.

**Issues:**

1) **Can this be considered a bond?**
   Many royalty streams have been securitized in this fashion. The David Bowie bond (bought by Prudential Insurance) is the most visible example, but other musical groups have sold off royalties in bond form and a drug royalty deal is currently being marketed. The SVO will consider it an Asset Backed Security if we get it rated by a reputable rating agency.

2) **Can we accrete income during the first few years when no cash flow is available?**
   There are plenty of examples of accreting bonds. Corporate bonds can be issued on a zero coupon or pay-in-kind (PIK) basis. In the asset-backed arena, principal only strips allow accretion of income. A recent deal backed by film revenues was rated by Duff & Phelps to a minimum yield. This should allow the accretion of income.

CONFIDENTIAL
JH 002428

<u>Alternative Structure:</u>

If we either cannot get a rating agency comfortable rating this bond or E&Y will not buy off on the structure, we can create a RACERS trust. Our accountants and E&Y do agree that a RACERS structure meets the accounting rules (we spent lots of time exploring the possibility of placing our volatile BA assets in a RACERS trust), with the provision that a 3% equity portion be sold to a third party.. The idea behind a RACERS is to put a zero coupon bond and the contemplated investment in a trust. The zero coupon bond ensures the trust certificate can be rated by the SVO and hence booked as a bond. The RACERS would use structured note accounting, which requires all cash flow be booked as income. We'd create cash flow, and hence income, in the early years by including cash in the trust that can be distributed, according to preset rules, as income. We can dampen the volatility of the income in the later years by structuring a maximum coupon paid by the trust. There are several disadvantages of this structure. First, the cash and zero coupon bond drag down the economics. There are ways to mitigate this, but ultimately there is likely to be some drag. Second, structured notes can draw the attention of the rating agencies and security analysts. This could be viewed as a tool to manage earnings. While it is small relative to John Hancock's total assets, it is a large (ultimately $200 million) transaction. Finally, we would need to find a buyer of the 3% equity. Most buyers would likely demand a very high return for this investment.

CONFIDENTIAL
JH 002429

# Davis Deposition Exhibit 7

# PART 1

Abbott

Page 1 of 1

**EXHIBIT**

Davis 17.
5/7/07 Pm m

| | |
|---|---|
| **From:** | Hartz, Scott [shartz@jhancock.com] |
| **Sent:** | Thursday, September 21, 2000 5:49 PM |
| **To:** | Braun, George |
| **Cc:** | Blewitt, Stephen |
| **Subject:** | Abbott |

Your intuition was better than mine.

If we extend all our approval times by 1 year, the IRR drops by 3%. If we extend them by 2 years the IRR drops another 3%. If we shorten the times to approval by 1 year, the IRR increases by 5%.

Clearly it's important that we feel good about the time periods till approval.

CONFIDENTIAL
JH 002414

∞

**Davis Deposition Exhibit 8**

**PART 1**

*Page* ............. 1



### John Hancock Life Insurance Company
#### Boston, Massachusetts

*Committee of Finance Records*

October 10, 2000

A meeting of the Committee of Finance was held on this date, with Chairman Brown presiding.

Present: Messrs. Brown, D'Alessandro, Aborn, Gifford, Linde, Morton, Syron and Tarr

Also Present: Messrs. DeCiccio, Budd and Rubenstein, Secretary

## REDACTED

The meeting was called to order by Chairman Brown. The minutes of the prior meeting were approved.

## REDACTED

The Bond and Corporate Finance Group materials were presented by Roger Nastou. A question and answer period followed the presentation. See Attachment B for Votes approving investments with respect to Abbott Laboratories and and Reports of Purchases, Sales, Modifications and Swaps approved between meetings. A Report of Bond and Corporate Finance Group Investments and Available Capacity in Below AA - Country Investments was submitted. Materials are on file with the Secretary.



Numerous transaction reports were submitted by the Company's investment managers. These are included in the minutes.

CONFIDENTIAL
JH 005551

Meeting of October 10, 2000       John Hancock Life Insurance Company       Page_____ 4_____
                                         Committee of Finance Records

Attachment B

VOTED:                    To authorize purchase, at par, of up to

$      99,000,000.        for the General Account, and up to
$     110,000,000.        for the Guaranteed Benefit Sub Account.
                          **ABBOTT LABORATORIES**
                          $220 Million Research and Development Funding Commitment

                          Subject to approval of all legal
                          details by our Law Department.

# REDACTED

CONFIDENTIAL
JH 005552

Meeting of October 10, 2000          John Hancock Life Insurance Company          Page _____ 328 _____
                                        Committee of Finance Records

There being no further business, the meeting was adjourned.

ATTEST:

SECRETARY

Also Attending:
Messrs./Mss. Acford, Agretelis, Atamian, Blewitt, Britt, Budde, Clark, Curtis, Davis, Della Piana, Felcon, Freiberger, Garrison, Gottlieb, Hahesy, Han, Harris, Hartz, Henderson, Hines, Johnson, J., Lacasse, McAneny, McDonough, J., McDonough, K., McPadden, Mongeau, Nagle, Nastou, Navin, Nectow, Nierintz, Panthaki, Ray, Reitano, Revers, Santosuosso, Schaeffer, Stapleton, Steggall, Talbot, White, Wise and Yang.

CONFIDENTIAL
JH 005553

6

# Davis Deposition Exhibit 9

# PART 1



**EXHIBIT**

Bates # 9
5/7/07 pm

RESEARCH FUNDING AGREEMENT

by and between

ABBOTT LABORATORIES

and

JOHN HANCOCK LIFE INSURANCE COMPANY,

JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY,

and

INVESTORS PARTNER LIFE INSURANCE COMPANY

dated as of

March 13, 2001



DEPOSITION
EXHIBIT
20
11/19/06    HK

CONFIDENTIAL
JH 008076

INDEX

INDEX OF DOCUMENTS

| Tab No. | Document |
|---------|----------|
| 1. | Research Funding Agreement dated as of March 13, 2001 |
| 2. | Exhibits to Research Funding Agreement |
| 3. | Legal opinion of Brian J. Smith |
| 4. | Proposed Summary of Terms dated June 27, 2000 |
| 5. | Miscellaneous Choate, Hall & Stewart memoranda |
| 6. | Miscellaneous Choate, Hall & Stewart memoranda to John Hancock regarding "outstanding issues" |
| 7. | Miscellaneous correspondence between Choate, Hall & Stewart and Abbott Laboratories |
| 8. | Copies of Choate, Hall & Stewart legal bills |
| 9. | Working Group List |

CONFIDENTIAL
JH 008077

RESEARCH FUNDING AGREEMENT

by and between

ABBOTT LABORATORIES

and

JOHN HANCOCK LIFE INSURANCE COMPANY,

JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY,

and

INVESTORS PARTNER LIFE INSURANCE COMPANY

dated as of

March 13, 2001

CONFIDENTIAL
JH 008078

-i-

## TABLE OF CONTENTS

ARTICLE 1 - DEFINITIONS ................................................................1
ARTICLE 2 - ANNUAL RESEARCH PROGRAM .........................9
  2.1  Program Term ....................................................................9
  2.2  Research Plan ....................................................................9
  2.3  Conduct of Research .......................................................10
  2.4  Subcontracting Research .................................................10
  2.5  Research Reports and Records ........................................10
ARTICLE 3 - RESEARCH FUNDING .......................................11
  3.1  John Hancock Program Payments ..................................11
  3.2  Abbott Funding Obligation ............................................11
  3.3  Carryover Provisions ......................................................11
  3.4  Termination of John Hancock's Program Payment Obligation ....12
  3.5  Hancock Funding Obligation ..........................................13
ARTICLE 4 - PRODUCT RESEARCH AND DEVELOPMENT ....13
  4.1  Commercially Reasonable Efforts ..................................13
  4.2  Marketing and Sale Responsibility .................................13
  4.3  Failure of Program Compound to Progress ....................14
  4.4  Arm's-Length ..................................................................16
  4.5  In-License Agreements ...................................................16
ARTICLE 5 - PROGRAM INVENTIONS .....................................17
  5.1  Ownership .......................................................................17
  5.2  Patent Prosecution and Maintenance .............................17
  5.3  Enforcement ...................................................................17
ARTICLE 6 - MILESTONE PAYMENTS TO JOHN HANCOCK ...17
  6.1  [Intentionally omitted] ...................................................17
  6.2  Management Fee ..............................................................17
  6.3  Milestone Notification and Payments .............................18
ARTICLE 7 - ROYALTIES .........................................................19
  7.1  Royalty Rates ..................................................................19
  7.2  Royalty Term ...................................................................19
ARTICLE 8 - ROYALTY REPORTS AND ACCOUNTING ...........20
  8.1  Reports, Exchange Rates .................................................20
  8.2  Audits ..............................................................................20
  8.3  Confidential Financial Information .................................21
  8.4  Accounting Principles .....................................................21
ARTICLE 9 - PAYMENTS ...........................................................22
  9.1  Payment Terms ...............................................................22
  9.2  Payment Method .............................................................22
  9.3  Late Payments .................................................................22
ARTICLE 10 - CONFIDENTIALITY ...........................................22

**CONFIDENTIAL**
**JH 008079**

M:\Domestic\Pals & Adams\John Hancock\JH rfa FINAL.DOC          Last printed 3/13/01 1:47 PM

-ii-

| | | |
|---|---|---|
| 10.1 | Nondisclosure Obligations | 22 |
| 10.2 | Permitted Disclosures | 22 |
| 10.3 | Publicity Review | 23 |
| ARTICLE 11- TERM AND TERMINATION | | 23 |
| 11.1 | Expiration | 23 |
| 11.2 | Termination; Material Breach | 23 |
| 11.3 | Effect of Expiration of Termination | 24 |
| ARTICLE 12 - WARRANTIES AND INDEMNITY | | 24 |
| 12.1 | John Hancock Representations and Warranties | 24 |
| 12.2 | Abbott Representations and Warranties | 25 |
| 12.3 | No Conflict | 29 |
| 12.4 | Compliance with Law | 29 |
| 12.5 | No Other Warranties | 29 |
| 12.6 | Indemnification of John Hancock | 29 |
| 12.7 | Indemnification of John Hancock Relating to In-Licensed Compounds | 30 |
| 12.8 | Procedure | 30 |
| 12.9 | Insurance | 31 |
| 12.10 | Acknowledgement | 31 |
| ARTICLE 13 - FORCE MAJEURE | | 31 |
| ARTICLE 14 - ASSIGNMENT | | 31 |
| ARTICLE 15 - SEVERABILITY | | 32 |
| ARTICLE 16 - MISCELLANEOUS | | 32 |
| 16.1 | Notices | 32 |
| 16.2 | Applicable Law | 34 |
| 16.3 | Entire Agreement | 34 |
| 16.4 | Headings | 34 |
| 16.5 | Independent Contractors | 34 |
| 16.6 | Performance By Affiliates | 35 |
| 16.7 | Dispute Resolution | 35 |
| 16.8 | Waiver | 35 |
| 16.9 | Counterparts | 35 |

| | |
|---|---|
| EXHIBIT 1.6: | First Annual Research Plan |
| EXHIBIT 1.17: | Eisai Territory |
| EXHIBIT 1.40: | Program Compounds |
| EXHIBIT 1.43: | Example of Program Related Costs for One Program Compound |
| EXHIBIT 9.2: | Payment Instructions |
| EXHIBIT 12.2(d): | Further Information regarding Program Compounds |
| EXHIBIT 12.2(e): | Certain Patent Information |
| EXHIBIT 12.2(f): | Communications |
| EXHIBIT 12.2(i): | Compound Reports |

CONFIDENTIAL
JH 008080

## RESEARCH FUNDING AGREEMENT

This Research Funding Agreement is made as of March 13, 2001, by and between Abbott Laboratories, an Illinois corporation ("Abbott"), with its principal offices at 100 Abbott Park Road, Abbott Park, Illinois 60064-6049, and John Hancock Life Insurance Company, a Massachusetts corporation, John Hancock Variable Life Insurance Company, a Massachusetts corporation, and Investors Partner Life Insurance Company, a Delaware corporation (collectively, "John Hancock"), each with its principal offices at 200 Clarendon Street, Boston, Massachusetts 02117.

### WITNESSETH

WHEREAS, Abbott is a global healthcare company actively engaged in the research and development of human pharmaceutical products;

WHEREAS, Abbott is interested in obtaining additional funding to support such research and development activities with respect to certain pharmaceutical products which are under development; and

WHEREAS, John Hancock is interested in providing such additional funding in exchange for the right to receive future milestone and royalty payments from Abbott.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and undertakings contained herein, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

In addition to the other terms defined elsewhere herein, the following terms shall have the following meanings when used in this Agreement (and any term defined in the singular shall have the same meaning when used in the plural and vice versa, unless stated otherwise):

1.1    "Affiliate" shall mean, with respect to each party, any corporation or other form of business organization, which directly or indirectly owns, controls, is controlled by, or is under common control with, such party.  An entity shall be regarded as being in control of another entity if the former entity has the direct or indirect power to order or cause the direction of the policies of the other entity whether (i) through the ownership of more than fifty percent (50%) in the United States, or thirty percent (30%) or more outside the United States, of the outstanding voting securities (or other ownership interest for a business organization other than a corporation) of that entity; or (ii) by contract, statute, regulation or otherwise.

1.2    "Aggregate Carryover Amount" shall have the meaning given in Section 3.3.

CONFIDENTIAL
JH 008081

-2-

1.3    "Aggregate Spending Target" shall mean Six Hundred Fourteen Million Dollars ($614,000,000).

1.4    "Annual Carryover Amount" shall have the meaning given in Section 3.3.

1.5    "Annual Minimum Spending Target" for each Program Year, shall mean the sum of (i) the Program Payment of John Hancock for such Program Year as specified in Section 3.1, (ii) Fifty Million Dollars ($50,000,000), and (iii) any Annual Carryover Amount for the prior Program Year pursuant to Section 3.3.  With respect to the fifth Program Year, the "Annual Minimum Spending Target" shall mean the Annual Carryover Amount for the prior Program Year pursuant to Section 3.3.

1.6    "Annual Research Plan" shall mean, for the Program Years in the Program Term, a reasonably and consistently detailed statement of the objectives, activities, timetable and budget for the Research Program for every Program Year remaining in the Program Term, it being understood that less detail shall be required for Program Years that are not the current Program Year.  The first Annual Research Plan is attached as Exhibit 1.6.  "Annual Research Plan" shall mean, for those years occurring after the expiration of the Program Term, a reasonably and consistently detailed statement of the objectives, activities, timetable and budget for the Research Program for such year only.

1.7    "Bundled Product" shall have the meaning given in paragraph (b) of the definition of Net Sales.

1.8    "Ceased Program" shall mean at least one year has elapsed since Abbott ceased its directed efforts with respect to the applicable Preclinical Program (FTI Program, ED Program or MMPI Program), meaning that Abbott has eliminated the funding for the established research program identified by a core group of researchers dedicated to the applicable Preclinical Program.  The continued existence of a researcher separate and apart from such core group shall not affect the determination that a Preclinical Program has ceased.

1.9    "Combination Product" shall mean any product containing one or more Program Compounds combined as a single pharmaceutical product with one or more other therapeutically active ingredients.

1.10    "Commercially Reasonable Efforts" shall mean efforts which are consistent with those normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable potential commercial value and market potential at a similar stage of development or product life, taking into account, without limitation, issues of safety and efficacy, compound or product profile, proprietary status, the regulatory environment and the status of the compound or product and other relevant scientific factors.

1.11    "Compound Reports" shall have the meaning given in Section 12.2(i).

M:\Domestic\Pals & Adams\John Hancock\JH rfa FINAL.DOC                Last printed 3/13/01 1:47 PM

CONFIDENTIAL
JH 008082

-3-

1.12   "Confidential Information" shall have the meaning given in Section 10.2.

1.13   "Delivery System Product" shall have the meaning given in paragraph (d) of the definition of Net Sales.

1.14   "Dollars" or "$" shall mean United States dollars.

1.15   "ED Program" shall mean all of Abbott's discovery efforts to identify compounds (including the identification of pre-clinical and development compounds owned by third parties) which modulate dopamine receptors for the purpose of treating erectile dysfunction.

1.16   "Eisai Agreement" shall mean the License Agreement dated June 29, 2000 between Eisai Co., Ltd. and Abbott related to the Program Compound known as ABT-751.

1.17   "Eisai Territory" shall mean the countries listed on Exhibit 1.17 hereto.

1.18   "Execution Date" shall mean the date set forth in the introductory paragraph to this Agreement.

1.19   [Intentionally Omitted.]

1.20   "FDA" shall mean the U.S. Food and Drug Administration or any successor entity thereto.

1.21   "First Commercial Sale" shall mean the first sale of a Product in a given country by Abbott, its Affiliates or Licensees to an unaffiliated third person after Regulatory Approval has been granted in such country.

1.22   "FTI Program" shall mean all of Abbott's discovery efforts to identify compounds (including the identification of pre-clinical and development compounds owned by third parties) which act as farnesyl transferase inhibitors for the purpose of treating cancer.

1.23   "In-License Agreements" shall mean the Eisai Agreement, the Wakunaga Agreement and the Taisho Agreement.

1.24   "International Territory" shall mean all areas of the world outside the U.S. Territory.

1.25   "Investigational New Drug Application" shall mean an investigational new drug application filed with the FDA in order to commence human clinical testing of a drug in the United States.

CONFIDENTIAL
JH 008083

-4-

1.26    "Licensee" shall mean any party licensed or otherwise authorized in writing by Abbott, its Affiliates or its licensees to market, distribute or sell Products and from whom Abbott receives a royalty or other payment based upon sales of Products by such party, its affiliates or its licensees (it being understood that a party that is a merely a distributor, wholesaler or similar reseller of Products is not a Licensee hereunder). In no case shall Eisai Co., Ltd. or Taisho Pharmaceutical Co., Ltd. be considered Licensees under the terms of the Eisai Agreement or Taisho Co-Development Agreement with respect to the Eisai Territory or Japan, respectively.

1.27    "Losses" shall mean any claims, demands, liabilities, costs, damages, judgments, settlements and other reasonable expenses (including attorneys' fees).

1.28    "Milestone Payment" shall have the meaning given in Section 6.3.

1.29    "MMPI Program" shall mean all of Abbott's discovery efforts to identify compounds (including the identification of pre-clinical and development compounds owned by third parties) that inhibit matrix metalloproteinase and treat cancer.

1.30    "NDA" shall mean a New Drug Application (as defined by the FDA) filed with the FDA for the purpose of obtaining Regulatory Approval of a Product in the U.S. Territory.

1.31    "Net Sales" shall mean:

(a)    the total gross sales of the Products (or, for purposes of clauses (b) and (c), the Bundled Products and Combination Products), in each case as set forth on the invoices for such sales by Abbott, its Affiliates and Licensees to unaffiliated third parties in any given period, plus, if applicable, the fair market value of all properties and services received in consideration of a sale of the Products (or, for purposes of clauses (b) and (c), the Bundled Products and Combination Products) by Abbott, its Affiliates and Licensees to unaffiliated third parties during such period, less the following deductions directly paid or actually incurred by Abbott, its Affiliates or Licensees during such period with respect to the sale of the Products (or, for purposes of clauses (b) and (c), the Bundled Products and Combination Products) to the extent included in the gross invoiced sales price therefor:

(i)    discounts, credits, rebates, allowances, adjustments, rejections, recalls and returns;

(ii)    price reductions or rebates, retroactive or otherwise, imposed by government authorities;

(iii)    sales, excise, turnover, inventory, value-added and similar taxes assessed on the royalty-bearing sale of Products;

CONFIDENTIAL
JH 008084

-5-

(iv) transportation, importation, insurance and other handling expenses directly chargeable to the royalty-bearing sale of Products;

(v) charge backs granted to unaffiliated drug wholesalers; and

(vi) the portion of management fees paid to unaffiliated group purchasing organizations that relate specifically to the royalty-bearing sale of Products.

(b) With respect to a Product which is sold together with any other products and/or services in a country at a unit price, whether packaged together or separately (a "Bundled Product"), the Net Sales of such Bundled Product shall first be calculated in accordance with the definition of Net Sales under paragraph (a), and then the Net Sales of such Bundled Product shall be determined on a country-by-country basis as follows:

(i) multiply the Net Sales of such Bundled Product in such country by the fraction $A/(A+B)$ where A is the average selling price of such Product in such country when sold separately and B is the total of the average selling prices in such country of each such other product(s) and/or service(s) in such Bundled Product when sold separately; or

(ii) if (x) either the average selling price of such Product or the total of the average selling prices of each such other products and/or services in such Bundled Product in such country is not available as of such date or (y) such Product is not sold separately in such country, multiply the Net Sales of such Bundled Product in such country by a percentage determined by the mutual agreement of the Parties which represents the proportionate economic value in such country of such Product relative to the economic value in such country contributed by the other products and/or services in such Bundled Product.

(c) With respect to a Combination Product, the Net Sales of such Combination Product shall first be calculated in accordance with the definition of Net Sales under paragraph (a), and then the Net Sales of such Combination Product shall be determined on a country-by-country basis as follows:

(i) multiply the Net Sales of such Combination Product in such country by the fraction $A/(A+B)$, where A is the total of the average selling prices of the Program Compounds in such

CONFIDENTIAL
JH 008085

-6-

Combination Product when sold separately in such country and B is the total of the average selling prices of each other therapeutically active ingredient when sold alone as a pharmaceutical product in such country; or

(ii)  if (x) either the average selling price of all Program Compounds in such Combination Product or the total of the average selling prices of each other therapeutically active ingredient in such Combination Product in such country is not available or (y) such Program Compounds are not sold separately in such country, multiply the Net Sales of such Combination Product by a percentage determined by mutual agreement of the Parties, which represents the proportionate economic value in such country of all Program Compounds in such Combination Product relative to the economic value in such country contributed by all other therapeutically active ingredients in such Combination Product.

(d)  For purposes of this paragraph (d), a "Premium Delivery System" means any delivery system comprising device(s), equipment, instrumentation or other non-ingestible components (but not solely containers or packaging) designed to assist in the administration of a Product, such as the Abbott ADD-Vantage® System. With respect to a Product which is sold together with a Premium Delivery System (a "Delivery System Product") in a country at a unit price, the Net Sales of such Delivery System Product shall first be calculated in accordance with the definition of Net Sales under paragraph (a), and then the Net Sales of such Product shall be determined on a country-by-country basis as follows:

(i)  if the Product is sold separately without the Premium Delivery System in a country, reduce the Net Sales of such Delivery System Product in such country by the amount that the average selling price of the Delivery System Product in such country exceeds the average selling price of such Product as sold separately in such country; or

(ii)  if the Product is not sold separately without the Premium Delivery System in such country, reduce Net Sales of such Delivery System Product by an amount, determined by mutual agreement of the Parties, which represents the proportionate economic value in such country added by the Premium Delivery System.

(e)  Net Sales shall not include any sales of Products containing one Program Compound (and no other Program Compound) known as (i) ABT-751 by Eisai Co. Ltd., its affiliates or licensees in the Eisai Territory or (ii) ABT-

CONFIDENTIAL
JH 008086

-7-

773 by Taisho Pharmaceutical Co., Ltd., its affiliates or licensees in Japan. Notwithstanding the foregoing sentence, Net Sales shall include in all instances sales by such parties of such products that are outside such territories, respectively.

1.32    "Parties" shall mean Abbott and John Hancock.

1.33    "Patents" shall have the meaning set forth in Section 12.2(e).

1.34    "Phase I Clinical Trial" shall mean a clinical trial of a Program Compound which utilizes a limited number of human beings preliminarily to address safety and to determine what doses can be safely tolerated.

1.35    "Phase II Clinical Trial" shall mean a controlled clinical trial, the primary objective of which is to ascertain additional data regarding the safety and tolerance of one of the Program Compounds and preliminary data regarding such Program Compound's efficacy.

1.36    "Phase III Clinical Trial" shall mean one or a series of controlled pivotal studies of a specific Program Compound by administration of such Program Compound to human beings where the principal purpose of such trial is to provide confirmatory safety and efficacy data necessary to support the filing for Regulatory Approval of a Product.

1.37    "Preclinical Programs" shall mean the following preclinical and clinical programs with potential backup compounds in accordance with Section 4.3(a): the FTI Program, the ED Program and the MMPI Program.

1.38    "Premium Delivery System" shall have the meaning given in paragraph (d) of the definition of Net Sales.

1.39    "Product" shall mean any product containing one or more of the Program Compounds as an active ingredient, alone or in combination with other active ingredients (including any Bundled Product and any Combination Product).

1.40    "Program Compounds" shall mean (i) the compounds listed on Exhibit 1.40; (ii) the first compound (the selection of which shall be consistent with Abbott using Commercially Reasonable Efforts) from each of the Preclinical Programs to enter Phase I Clinical Trial; (iii) any compounds or products substituted or added by Section 4.3; (iv) all line extensions and formulations of the foregoing; and (v) all analogs, isomers, improvements, derivatives and modifications of the foregoing unless such analog, isomer, improvement, derivative or modification would be considered a new chemical entity and required by the FDA to reenter Phase I Clinical Trial. A compound or product shall be considered a Program Compound regardless of the indication for which it is used.

1.41    "Program Inventions" shall have the meaning given in Section 5.1.

CONFIDENTIAL
JH 008087

-8-

1.42    "Program Payments" shall have the meaning given in Section 3.1.

1.43    "Program Related Costs" shall mean (i) all direct and indirect costs and expenses that are incurred by Abbott on the Research Program during a given Program Year and allocated in a manner consistent with Abbott's internal, pharmaceutical products division-wide allocation procedures; and (ii) the milestone and license fees paid during a given Program Year or during any extension period of the Program Term by Abbott to (a) Eisai Co. Ltd. (not to exceed Eighteen Million Dollars ($18,000,000) in the aggregate with respect to the Program Compound known as ABT-751 pursuant to the Eisai Agreement) and (b) Wakunaga Pharmaceutical Co., Ltd. (not to exceed Twenty Seven Million Five Hundred Thousand Dollars ($27,500,000) in the aggregate with respect to the Program Compound known as ABT-492 pursuant to the Wakunaga Agreement). Any payments made by Abbott to John Hancock pursuant to Sections 6.2 and 6.3(a), (b), (c), (d) and (e) shall constitute Program Related Costs. Any payment made by Abbott to John Hancock pursuant to Section 6.3(f) shall not constitute Program Related Costs. Set forth on Exhibit 1.43 is an example of the calculation of Program Related Costs for a particular Program Compound.

1.44    "Program Term" shall mean a period of four (4) consecutive Program Years.

1.45    "Program Year" shall mean a period of twelve (12) consecutive calendar months commencing on January 1 of each year, except that the first Program Year shall commence on the Execution Date and end on December 31, 2001.

1.46    "Quarterly Reporting Period" shall mean the calendar quarter with respect to the U.S. Territory together with the fiscal quarter ending on the final day of February, May, August and November (as the case may be) with respect to the International Territory. For example, the Quarterly Reporting Period that comprises the second calendar quarter with respect to the U.S. Territory also includes the period from March 1 through May 31 with respect to the International Territory. If Abbott adopts the calendar year as its fiscal year for the International Territory, then the Quarterly Reporting Period for the International Territory shall also be the calendar quarter.

1.47    "Research Program" shall mean all of Abbott's, its Affiliates' and Subcontractors' activities directed towards obtaining Regulatory Approval for the Products, including research, development, safety and efficacy studies, clinical trials, process development, formulation work, regulatory, quality, data collection and analysis and project management.

1.48    "Regulatory Approval" shall mean: (i) with respect to the U.S. Territory, the receipt of approval from the FDA to market a Product in the U.S. Territory; and (ii) with respect to any country in the International Territory, receipt of the governmental approvals required to market a Product in such country, including any pricing and reimbursement authorization required in such country.

CONFIDENTIAL
JH 008088

-9-

1.49   "Replacement Compound" shall mean a compound (i) made available to Abbott as a result of any transaction involving Abbott or its Affiliates (whether by merger, acquisition or sale of assets or equity, or by license or otherwise), (ii) used for the same class of indications as the Ceased Compound (for example, anti-infectives, cancer, cardiovascular or pain), and (iii) having at least the current and projected potential commercial value to John Hancock as the Ceased Compound.

1.50   "Royalty Term" shall mean, with respect to each Product in each country, a period of ten (10) years from the later of  (x) the date of First Commercial Sale of such Product in such country and (y) the two-year anniversary of the Execution Date; provided that (i) the obligation to make royalty payments on the Product shall not begin until the two-year anniversary of the Execution Date (and only with respect to Net Sales occurring on or after such date) and (ii) Abbott's obligation to make royalty payments shall cease on December 31, 2015.

1.51   "Subcontractor" shall have the meaning given in Section 2.4.

1.52   "Taisho Agreement" shall mean the Co-Development Agreement dated September 30, 1997 between Taisho Pharmaceutical Co., Ltd. and Abbott related to the Program Compound known as ABT-773.

1.53   "Territory" shall mean both the U.S. Territory and the International Territory, excluding the Eisai Territory with respect to the Program Compound known as ABT-751.

1.54   "U.S. Territory" shall mean the United States of America, excluding Puerto Rico and the U.S. Virgin Islands.

1.55   "Wakunaga Agreement" shall mean the License Agreement dated December 1, 1999 between Wakunaga Pharmaceutical Co., Ltd. and Abbott related to the Program Compound known as ABT-492.

ARTICLE 2
ANNUAL RESEARCH PROGRAM

2.1   Research Program Term.  The Research Program shall be conducted by Abbott during the Program Term, and beyond the Program Term until Abbott either abandons development in accordance with the terms hereof or receives Regulatory Approval for each Program Compound, or some combination thereof.

2.2   Research Plan.  The Research Program shall be conducted by Abbott in each Program Year in accordance with the Annual Research Plan for such Program Year.  The Annual Research Plan will be provided to John Hancock until Abbott either abandons development in accordance with the terms hereof, or receives Regulatory Approval for, each Program Compound in the U.S. Territory, or some combination thereof.  The Annual Research Plan shall be prepared

CONFIDENTIAL
JH 008089

-10-

by Abbott and presented to John Hancock at least forty-five (45) days prior to the start of each Program Year. The first Annual Research Plan is attached as Exhibit 1.6. Abbott may modify the Annual Research Plan from time to time in order to best meet the objectives of the Research Program. Any such modifications to the Annual Research Plan shall be promptly provided to John Hancock. In addition, Abbott shall provide an Annual Research Plan for each year after the end of the Program Term as long as there is an active research program for any Program Compounds.

2.3    Conduct of Research. Abbott shall use Commercially Reasonable Efforts to conduct the Research Program in good scientific manner and using good laboratory practices, to achieve the objectives of the Research Program efficiently and expeditiously and to comply with all applicable laws and regulations. Notwithstanding anything in this Agreement to the contrary, Abbott does not represent, warrant or guarantee that the Research Program will be successful in whole or in part or result in the registration or commercialization of any pharmaceutical products or that any Products obtaining Regulatory Approval will be a commercial success.

2.4    Subcontracting Research. Abbott may subcontract or outsource to Affiliates or third persons (each, a "Subcontractor") any portion of the Annual Research Plan. Consistent with Abbott's past practices, each Subcontractor shall enter into a confidentiality agreement with Abbott and agreements pursuant to which such Subcontractor is required to comply with all applicable laws and regulations, including conducting the Research Program in good scientific manner and using good laboratory practices, with respect to its work on the Research Program. Abbott shall supervise and be responsible under this Agreement for the work of each such Subcontractor on the Research Program and no subcontracting or outsourcing shall relieve Abbott of any of its obligations hereunder.

2.5    Research Reports and Records. Abbott shall, no later than thirty (30) days before the last day of each Program Year, provide John Hancock with a reasonably detailed report setting forth the status of the Research Program and all Program Related Costs expended by Abbott during such Program Year. The Program Related Costs set forth in such report may include good faith estimates with respect to the last three (3) months of the Program Year, provided that the report under this Section 2.5 for the following Program Year contains the actual Program Related Costs for that three (3) month period. Such report shall also contain such other information related thereto as John Hancock may reasonably request from time to time. Abbott shall, and shall cause each Subcontractor to, maintain complete and accurate records, in sufficient detail and in good scientific manner appropriate for patent and regulatory purposes and for purposes of demonstrating compliance with the terms hereof, that fully and properly reflect all work done, results achieved and Program Related Costs expended in performance of the Research Program. The books and records of Abbott and each Subcontractor related to the Research Program, including, without limitation, those related to the expenditure of Program Related Costs, shall be subject to copying, inspection and audit by (and at the expense of) John Hancock at any time and from time to time. Such audit shall occur upon reasonable notice and during normal business hours by an independent auditor selected by John Hancock and reasonably acceptable to Abbott. John Hancock and its independent auditor shall maintain such

CONFIDENTIAL
JH 008090

-11-

records and information of Abbott in confidence in accordance with Article 10 and shall not use such records or information except to the extent permitted by this Agreement, including any enforcement of the provisions hereof. In the event that such audit reveals any material breach of Abbott's responsibilities hereunder, Abbott shall (i) pay the reasonable fees and expenses charged by such auditor, and (ii) fully and promptly cure such breach.

## ARTICLE 3
## RESEARCH FUNDING

3.1    John Hancock Program Payments. John Hancock shall make the following installment payments on the applicable payment date (the "Payment Date"), for the applicable Program Year, to Abbott to help support the Research Program (the "Program Payments"):

| Payment Date | Amount | Program Year |
|---|---|---|
| December 1, 2001 | $50,000,000 | First |
| December 1, 2002 | $54,000,000 | Second |
| December 1, 2003 | $58,000,000 | Third |
| December 1, 2004 | $52,000,000 | Fourth |

All Program Payments shall be expended by Abbott on Program Related Costs and for no other purpose. If John Hancock has not received at least thirty (30) days prior to the Payment Date both (i) the Annual Research Plan for such year and (ii) the report described in Section 2.5 for the previous Program Year, then John Hancock's obligation to make the Program Payment due on such Payment Date shall be suspended until thirty (30) days have elapsed from the date of John Hancock's receipt of both such Annual Research Plan and report.

3.2    Abbott Funding Obligation. Abbott shall spend on Program Related Costs: (i) during each Program Year, at least the Annual Minimum Spending Target for such Program Year and (ii) at least the Aggregate Spending Target during the Program Term. John Hancock's sole and exclusive remedies for Abbott's failure to fund the Research Program in accordance with this Section 3.2 (but not for any other breach of Abbott's other obligations hereunder) are set forth in Sections 3.3 and 3.4.

3.3    Carryover Provisions. Abbott shall be permitted to change its funding obligations under Section 3.2 only as follows:

(a)    If in any Program Year Abbott spends on Program Related Costs, the full amount of the Program Payment provided by John Hancock for such Program Year, but does not spend the full amount of the Annual Minimum Spending Target for such Program Year (including any Annual Carryover Amounts from any prior Program Years), Abbott will spend on Program Related Costs the difference between its expenditure on Program Related Costs for such Program Year and the Annual Minimum Spending Target

CONFIDENTIAL
JH 008091

-12-

for such Program Year (the "Annual Carryover Amount") in the subsequent Program Year. John Hancock's obligation to make any Program Payment for such subsequent Program Year, if any, pursuant to Section 3.1, shall be deferred until the time that Abbott has spent and notifies John Hancock that it has spent the Annual Carryover Amount in such subsequent Program Year; and

(b)     If Abbott does not expend on Program Related Costs the full amount of the Aggregate Spending Target during the Program Term, Abbott will expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the "Aggregate Carryover Amount") on Program Related Costs during the subsequent year commencing immediately after the end of the Program Term. If Abbott does not spend the Aggregate Carryover Amount on Program Related Costs during such subsequent year, Abbott will pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days after the end of such subsequent year.

3.4     Termination of John Hancock's Program Payment Obligation. If Abbott: (i) abandons development of all Preclinical Programs and Program Compounds in any Program Year during the Program Term (it being understood that such abandonment need not occur entirely in one Program Year); (ii) does not expend on Program Related Costs during any Program Year the full amount of the Program Payment made by John Hancock for such Program Year; (iii) does not reasonably demonstrate in its Annual Research Plan, its intent and reasonable expectation to expend on Program Related Costs during the next Program Year an amount in excess of the Program Payment to be provided by John Hancock for such year; or (iv) does not reasonably demonstrate in its Annual Research Plan its intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target, John Hancock's obligation to make any remaining Program Payments for any succeeding Program Years pursuant to Section 3.1 shall terminate. For the avoidance of doubt, the Program Payments for the Program Year in which such event occurs shall still be due and payable, adjusted only as set forth in the next sentence, if applicable. In addition, in the case of either (i) or (ii) above, Abbott shall (not later than the 10th day following such event) pay to John Hancock (x) the amount, if any, by which the Program Payment made by John Hancock for such year (in the case of (i) above meaning the Program Year in which all Preclinical Programs and Program Compounds were finally abandoned), if any, exceeds one-half of the Program Related Costs actually spent by Abbott during that Program Year and (y) such additional amount that, after giving effect to the payments referred to in this sentence, causes the Program Related Costs for all years in the Program Term to date to have been funded one-third (1/3) by John Hancock and two-thirds (2/3) by Abbott.

3.5     Hancock Funding Obligation. John Hancock's entire obligation hereunder shall be limited to providing the Program Payments set forth in Section 3.1. Abbott shall be solely

CONFIDENTIAL
JH 008092

-13-

responsible for funding all Program Related Costs in excess of the Program Payments from John Hancock.

## ARTICLE 4
## PRODUCT RESEARCH AND DEVELOPMENT

4.1    Commercially Reasonable Efforts.  Abbott shall be solely responsible for the clinical development, government approval, manufacturing, marketing, sales and distribution of Products.  Abbott will use, and will cause each of its Affiliates and Licensees to use, Commercially Reasonable Efforts to pursue the clinical development, government approval, manufacturing, marketing, sales and distribution of Products throughout the Territory.  The obligations of Abbott, its Affiliates and Licensees with respect to any Product under this Article 4 are expressly conditioned upon the safety, efficacy and commercial feasibility of each Product, consistent with using Commercially Reasonable Efforts, but no license, assignment or other transfer of rights by Abbott will modify or reduce Abbott's obligations hereunder (except as set forth in Article 14).  It is the parties' expectation that under normal circumstances Abbott will file for Regulatory Approval with respect to each Product in Europe within two (2) years from the date of the NDA filing for such Product in the U.S. Territory and in Japan within five (5) years from such NDA filing date; provided, however, that these time frames may be extended or otherwise altered based upon unforeseen circumstances that legitimately impact such regulatory filings in such foreign jurisdictions.

4.2    Marketing and Sale Responsibility.  Without limiting the generality of Section 4.1, within six (6) months of obtaining Regulatory Approval for a Product in a given country, Abbott, its Affiliates or Licensees shall commence to market and sell such Product in such country.  Abbott's obligation to market and sell a Product shall not apply to a Product in any country if Abbott has not commenced or has ceased marketing and selling such Product in such country substantially on account of adverse business or financial conditions caused by the regulatory authorities or other governmental authorities of such country (including not commencing marketing and selling in a country where the regulatory authorities have price or reimbursement approval and the price or reimbursement approval or that proposed by the regulatory authorities or government authorities is unacceptable to Abbott) which causes the marketing and sale of such Product in such country to be contrary to the financial best interests of John Hancock and Abbott; provided, however, that Abbott, its Affiliates or Licensees shall commence or resume marketing and sale of such Product in such country as soon as reasonably practical after such adverse business or financial conditions cease to exist.

CONFIDENTIAL
JH 008093

4.3    Failure of Program Compound to Progress.

(a)    Preclinical Programs; ED Program, FTI Program and MMPI Program.  With respect to any Program Compound resulting from a Preclinical Program that Abbott ceases to develop past Phase I Clinical Trial (i.e., does not enter a Phase II Clinical Trial) (a "Failed Early Stage Program

Compound"), for which Abbott or its Affiliates has or will have one or more other compounds in such respective Preclinical Program (which includes all in-licensed compounds not yet approved for marketing), the next compound to enter Phase I Clinical Trials from such Preclinical Program shall be considered a Program Compound in all respects hereunder, as of the date of the cessation of such Failed Early Stage Program Compound; provided however, with respect to each Preclinical Program, there shall be no more than three Program Compounds substituted under this Section 4.3(a) (for an aggregate maximum of nine (9) such substitutions for all Preclinical Programs). At the time a Preclinical Program becomes a Ceased Program, Abbott shall have no further obligation to provide a substitute for a Failed Early Stage Program Compound.

(b) Failure of ABT-492 or ABT-510 to Yield a Compound that Enters a Phase II Clinical Trial. If (i) ABT-492 fails to enter a Phase II Clinical Trial, or (ii) ABT-510 fails to enter a Phase II Clinical Trial, then within six (6) months after the failure of the first such Program Compound to enter a Phase II Clinical Trial, Abbott shall substitute a compound in a Phase II Clinical Trial having a commercial value not less than that currently expected for ABT-492 and ABT-510, respectively (as of the date of execution of this Agreement).

(c) Cessation as a Result of an Acquired Replacement Compound. If Abbott ceases or substantially ceases developing, marketing or selling any Program Compound (that is in Phase I or beyond) or Product (a "Ceased Compound"), and if such cessation or substantial cessation is a result of Abbott's acquisition of a Replacement Compound, then the Replacement Compound shall be considered a Program Compound and/or Product from the date of such acquisition and the Ceased Compound shall no longer be considered a Program Compound.

In the event that the Replacement Compound has been approved for marketing by the FDA and the Ceased Compound has not been approved for marketing by the FDA as of the date of such acquisition, Section 4.3(d) shall apply and the first paragraph of this Section 4.3(c) shall not apply.

In the event that the Ceased Compound has been approved for marketing by the FDA as of the date of such acquisition, John Hancock shall have the option, in its sole discretion, to have Abbott maximize the commercial value of the Ceased Compound pursuant to Section 4.3(d) instead of having the Ceased Compound be subject to this Section 4.3(c).

CONFIDENTIAL
JH 008094

-15-

(d) <u>Cessation for Reasons Other than Section 4.3(c)</u>. If a Program Compound (that is in Phase I or beyond) or Product becomes a Ceased Compound for any reason not as a result of the acquisition of a Replacement Compound as set forth in Section 4.3(c) above and provided that such Ceased Compound has commercial value, then

(i) as soon as is practicable Abbott shall maximize the commercial value, if any, of the Ceased Compound to both parties by out-licensing or divesting such Ceased Compound to a third party; provided, however, if the out-licensing or divestiture of such Ceased Compound requires the approval of Taisho Pharmaceutical Co., Ltd. (in the case of Program Compound ABT-773), Eisai Co., Ltd. (in the case of Program Compound ABT-751) or Wakunaga Pharmaceutical Co., Ltd. (in the case of Program Compound ABT-492), pursuant to the respective In-License Agreement, and such entity does not grant such approval, then Abbott shall within a reasonable period of time but not more than three months substitute a compound (which shall thereupon become a "Program Compound") having at least the current and projected potential commercial value as such Ceased Compound;

(ii) John Hancock shall be permitted (but have no obligation) to assist in such out-license and/or divestiture effort; and

(iii) Abbott shall remunerate John Hancock based on the sales of such Ceased Compound by the third party that has acquired or licensed the Ceased Compound (the "Acquirer") in a manner most consistent with the allocation that would have applied hereunder had such Ceased Compound not been so out-licensed or divested, i.e., in accordance with the royalties and milestones payable hereunder. The appropriate royalty rate payable to John Hancock shall be determined by adding the Acquirer's Net Sales of the Ceased Compound to the total Net Sales of other Products.

(e) <u>Divestiture</u>. Notwithstanding anything herein to the contrary, Abbott shall not divest or out-license any Program Compound (which shall mean a sale, license or other transfer by Abbott of the right to develop, market and sell any Product containing such Program Compound either (i) in all of North America or (ii) in the countries of Japan and/or the European Union that have at least two-thirds of the total population of Japan and the European Union), without John Hancock's prior written consent, which consent shall not be unreasonably withheld; provided however, if such Program Compound is being divested as a result of direction from the

CONFIDENTIAL
JH 008095

-16-

       Federal Trade Commission to so divest, John Hancock's written consent shall not be required.

(f)     <u>Notice and Information</u>.  Abbott shall promptly notify John Hancock upon occurrence of any decision by Abbott to cease or substantially cease developing, marketing or selling any Program Compound or Product.  In addition, Abbott shall provide to John Hancock all information reasonably requested by John Hancock related to any Replacement Compound, Program Compound, or Product that is subject to the provisions of this Section 4.3.

(g)     <u>Commercially Reasonable Efforts</u>.  Nothing in this Section 4.3 shall lessen any of Abbott's other obligations under this Agreement nor permit Abbott to perform in any manner that is not clearly consistent with using its Commercially Reasonable Efforts hereunder.

4.4     <u>Arm's-Length</u>.  Abbott shall not research, develop, manufacture, market, sell, distribute, out-license or otherwise treat any Program Compounds or Products differently, as compared to any other Abbott compounds or products, on account of any of John Hancock's rights hereunder.  Furthermore, all distribution agreements, licenses, out-licenses and other agreements relating to the research, development, manufacturing, marketing, sale, distribution, licensing, out-licensing or divestiture of and all other transactions involving any Program Compounds or Products to or with any third party (except to Abbott's Affiliates) shall be on arm's-length terms and conditions.

4.5     <u>In-License Agreements</u>.  Abbott shall comply in all material respects with the terms and conditions of the In-License Agreements.  Abbott shall not amend the In-License Agreements or waive any of its rights thereunder without John Hancock's prior written consent (such consent not to be unreasonably withheld), unless such amendment or waiver does not have and would not have a material adverse effect on John Hancock's interests hereunder.  To the extent that Abbott or any of its Affiliates obtains the right to market, distribute or sell Products containing the Program Compound known as ABT-751 in the Eisai Territory, then sales by Abbott, its Affiliates and Licensees of such Products in such territory shall be included in all respects hereunder (including without limitation in Net Sales and the Territory).

## ARTICLE 5
## PROGRAM INVENTIONS

CONFIDENTIAL
JH 008096

5.1     <u>Ownership</u>.  As between Abbott and John Hancock, all inventions, innovations, ideas, discoveries, technology, know-how, methods, data, applications and products (in each case whether or not patentable) arising from the Research Program or otherwise related to the Program Compounds (collectively, the "<u>Program Inventions</u>") shall be exclusively owned by or assigned to Abbott.  Abbott shall not divest, out-license or otherwise transfer any of its right, title

-17-

or interest in or to any Program Inventions which would prevent or impair Abbott's ability to fulfill its obligations to John Hancock under this Agreement.

5.2   Patent Prosecution and Maintenance.   To the extent it owns a Program Invention or has the contractual right to pursue patent protection for a Program Invention, Abbott will use Commercially Reasonable Efforts to obtain patent protection for the Program Inventions in the Territory.  As between Abbott and John Hancock, Abbott shall be responsible for all costs and expenses and control all decisions related to pursuing such patent protection, including the preparation, filing (foreign and/or domestic), prosecution, issuance and maintenance of patent applications or patents covering Program Inventions.

5.3   Enforcement.   As between Abbott and John Hancock, Abbott shall have the sole right and authority to enforce the patents or any other rights arising from the Program Inventions (including without limitation the Patents) against any infringers.  If Abbott initiates any action or lawsuit to enforce such patents or other rights, it shall be solely responsible for the cost and expense thereof.  Abbott will promptly notify John Hancock at such time as it becomes aware of any infringement activities and of any such enforcement actions or lawsuit, and Abbott will provide information concerning them as reasonably requested by John Hancock.  All moneys recovered upon the final judgment or settlement of any such action or lawsuit, less the out-of-pocket cost and expense thereof, shall be allocated between Abbott and John Hancock proportional to Abbott's lost profits and John Hancock's lost royalties as a result of such infringement.

## ARTICLE 6
## MILESTONE PAYMENTS TO JOHN HANCOCK

6.1   [Intentionally omitted].

6.2   Management Fee.   On December 1, 2002, 2003 and 2004, Abbott shall pay to John Hancock a management fee, each of which shall be in the amount of Two Million Dollars ($2,000,000).

6.3   Milestone Notification and Payments.   Abbott shall promptly notify John Hancock of the occurrence any of the following events that give rise to Abbott's obligation to make a payment pursuant to this Section 6.3 (each, a "Milestone Payment").  Except as hereinafter limited, Abbott shall pay the following Milestone Payments to John Hancock in the amounts and at the times set forth below with respect to each Program Compound:

(a)   One Million Dollars ($1,000,000) shall be paid within thirty (30) days after the allowance by the FDA of each Investigational New Drug Application for such Program Compound;

CONFIDENTIAL
JH 008097

-18-

(b)    Two Million Dollars ($2,000,000) shall be paid within thirty (30) days after the initiation of each Phase I Clinical Trial with such Program Compound;

(c)    Three Million Dollars ($3,000,000) shall be paid within thirty (30) days after the initiation of each Phase II Clinical Trial with such Program Compound;

(d)    Four Million Dollars ($4,000,000) shall be paid within thirty (30) days after the initiation of each Phase III Clinical Trial with such Program Compound; and

(e)    Five Million Dollars ($5,000,000) shall be paid within thirty (30) days after the filing of each NDA with the FDA for such Program Compound.

In addition, except as hereinafter limited, Abbott shall pay the following Milestone Payments to John Hancock in the amounts and at the times set forth below:

(f)    (i)    Twenty Million Dollars ($20,000,000) shall be paid within thirty (30) days after the Regulatory Approval of the first Product in the U.S. Territory;

       (ii)   Ten Million Dollars ($10,000,000) shall be paid within thirty (30) days after the Regulatory Approval of the second Product in the U.S. Territory; and

       (iii)  Ten Million Dollars ($10,000,000) shall be paid within thirty (30) days after the Regulatory Approval of third Product in the U.S. Territory.

The aggregate of Milestone Payments under Section 6.3(a), (b), (c), (d), and (e) for all Program Compounds shall be limited to Eight Million Dollars ($8,000,000), and once such aggregate limit has been paid, no further payments shall be due and payable under Sections 6.3(a), (b), (c), (d) or (e).

The aggregate of Milestone Payments under Sections 6.3(a), (b), (c), (d) and (e) for all Program Compounds shall be limited to zero dollars ($0) during the first Program Year, Two Million Dollars ($2,000,000) during the second Program Year, and Six Million Dollars ($6,000,000) during the third Program Year, and once such annual limit has been reached for these particular Program Years, no further payments shall be due under Sections 6.3(a), (b), (c), (d) and (e) for the remainder of such Program Year; provided that any amounts that would have been due to John Hancock but for such annual limits shall be paid in subsequent Program Years so long as the Program Compound to which it relates has not been abandoned, divested or out-licensed by Abbott, subject to the Eight Million Dollar ($8,000,000) limitation set forth above. Subject to

CONFIDENTIAL
JH 008098

-19-

the limitations above, the Milestone Payments under Sections 6.3(a), (b), (c), (d) and (e) may be made more than once with respect to each Program Compound.

The aggregate of Milestone Payments under Section 6.3(f) for all Program Compounds shall be limited to Forty Million Dollars ($40,000,000), and once such aggregate limit has been paid, no further payments shall be due and payable under Section 6.3(f). In addition, Milestone Payments under Section 6.3(f) shall not be paid more than once for any particular Program Compound.

Exhibit 1.40 sets forth the current stage of clinical development for each Program Compound.

## ARTICLE 7
## ROYALTIES

7.1    Royalty Rates.  Subject to the limitation set forth below, Abbott shall pay to John Hancock royalties equal to the following percentages of Net Sales, aggregated on a yearly basis, of all Products in the Territory:

| Royalty percentage | Yearly Net Sales (in millions) of all Products in the Territory |
|---|---|
| 8.5% of those Net Sales | up to $400 |
| and then 4% of those Net Sales | in excess of $400 up to $1,000 |
| and then 1% of those Net Sales | in excess of $1,000 up to $2,000 |
| and then 0.5% of those Net Sales | in excess of $2,000 |

Net Sales shall be aggregated yearly (i) in the case of the U.S. Territory, on a calendar year basis, together with (ii) in the case of the International Territory, on a December 1 to November 30 basis, in each case consistent with the determination of Quarterly Reporting Periods.

7.2    Royalty Term.  The duration of the obligation to make royalty payments on each Product shall be determined on a country-by-country basis and shall last for the duration of the Royalty Term in each given country for such Product.

## ARTICLE 8
## ROYALTY REPORTS AND ACCOUNTING

8.1    Reports, Exchange Rates.  With respect to every Quarterly Reporting Period for which Abbott is obligated to pay any royalty hereunder, Abbott shall furnish to John Hancock a single written report for such Quarterly Reporting Period within sixty (60) days after the end of such Quarterly Reporting Period (that is, within sixty (60) days after each March 31, June 30, September 30 and December 31, as the case may be) showing in reasonably specific detail:

CONFIDENTIAL
JH 008099

-20-

(a)    the total gross sales in each country for each Product sold by Abbott, its Affiliates and Licensees in the Territory and the detailed calculation of Net Sales from gross sales in each country for each Product;

(b)    the royalties payable in Dollars, if any, which shall have accrued hereunder;

(c)    the dates of the First Commercial Sale of each Product in any country in the Territory during such Quarterly Reporting Period; and

(d)    the exchange rates used in determining the amount of Dollars.

With respect to sales of Products invoiced in Dollars, the gross sales, Net Sales (including all adjustments and deductions permitted to be made hereunder in calculating the same), and royalties payable shall be expressed in Dollars.  With respect to sales of Products invoiced in a currency other than Dollars, the gross sales, Net Sales (including all adjustments and deductions permitted to be made hereunder in calculating the same) and royalties payable shall be expressed in their Dollar equivalent, calculated using the Inter Bank rate set forth in the International Report published by International Reports Inc. as Foreign Exchange Rates quoted in New York on the day nearest the last business day of the Quarterly Reporting Period.

8.2    Audits.

(a)    Upon the written request of John Hancock and, in the absence of any breach by Abbott hereunder, not more than once in each calendar year, Abbott shall permit John Hancock and an independent certified public accounting firm of nationally recognized standing, selected by John Hancock and reasonably acceptable to Abbott, at John Hancock's expense, to have access during normal business hours to such of the records of Abbott, its Affiliates and Licensees to verify the accuracy of the royalty reports and the amounts and calculation of any payments required hereunder for any year ending not more than five (5) years prior to the date of such request.

(b)    If such accounting firm concludes that additional royalties or other payments were owed during such period, Abbott shall have the option to invoke the proceedings of Section 16.7 below or pay the additional royalties or other payments within thirty (30) days after the date John Hancock delivers to Abbott such accounting firm's written report so concluding.  The reasonable fees and expenses charged by such accounting firm shall be paid by John Hancock; provided, however, if the audit discloses that the amounts payable by Abbott for any Quarterly Reporting Period are more than one hundred five percent (105%) of the royalties

CONFIDENTIAL
JH 008100

-21-

actually paid for such period, then Abbott shall pay the reasonable fees and expenses charged by such accounting firm.

(c)    Abbott shall cause its Affiliates to, and shall include in each license granted by it relating to a Program Compound or Product a provision requiring the Licensee to, (i) make reports to Abbott, (ii) keep and maintain records of Net Sales made pursuant to such license and (iii) grant access to such records by John Hancock and its accounting firm or other auditor to the same extent required of Abbott under this Agreement.

(d)    All reports and payments not disputed as to correctness by John Hancock within five (5) years after receipt thereof shall thereafter conclusively be deemed correct for all purposes, and Abbott, its Affiliates and Licensees shall be released from any liability or accountability with respect to such reports and payments.

8.3    Confidential Financial Information.  John Hancock shall treat all information subject to review under this Article 8, and shall cause its accounting firm to agree to treat all such information, in accordance with the provisions of Article 10.

8.4    Accounting Principles.  All accounting hereunder, including without limitation all determinations of gross sales, Net Sales (including all adjustments and deductions permitted to be made hereunder in calculating the same), Program Related Costs and all calculations underlying such determinations, shall be made in accordance with generally accepted accounting principles as in effect in the United States, consistently applied.

CONFIDENTIAL
JH 008101

ARTICLE 9
PAYMENTS

9.1    Payment Terms.  With respect to every Quarterly Reporting Period for which Abbott is obligated to pay a royalty hereunder, such royalties shall be due and payable in a single payment within sixty (60) days of the end of such Quarterly Reporting Period (that is, within sixty (60) days of each March 31, June 30, September 30 and December 31, as the case may be). Payment of royalties may be made in advance of such due date.

9.2    Payment Method.  All royalties and other payments by Abbott to John Hancock under this Agreement shall be made by bank wire transfer in immediately available funds in accordance with the instructions set forth on Exhibit 9.2 attached hereto or in accordance with such other instructions as John Hancock may give from time to time.

9.3    Late Payments.  Each party shall pay interest to the other on the aggregate amount of any payments by it that are not paid on or before the date such payments are due under this Agreement, including, without limitation, any disputed payments or payments resulting from any

-22-

audit, at a rate per annum equal to the lesser of (a) the prime rate of interest plus two hundred (200) basis points as reported by Citibank, N.A. in New York, from time to time (with any change in such reported rate being effective immediately for purposes hereof), or (b) the highest rate permitted by applicable law, calculated on the number of days such payments is delinquent until paid in full in cash. All such amounts shall be payable upon demand.

### ARTICLE 10
### CONFIDENTIALITY

10.1    Nondisclosure Obligations. Except as otherwise provided in this Article 10, during the term of the Agreement and for a period of ten (10) years thereafter, (a) John Hancock shall maintain in confidence in accordance with such procedures as are adopted by John Hancock to protect its own confidential information and shall use only for purposes of this Agreement (including, without limitation, enforcement of the terms hereof), information and data related to the Program Compounds or Products; and (b) John Hancock shall also maintain in confidence in accordance with such policies, and use only for purposes of this Agreement, all information and data supplied by Abbott under this Agreement, which if disclosed in writing is marked "confidential", if disclosed orally is promptly thereafter summarized and confirmed in writing to the other party and marked "confidential", or if disclosed in some other form is marked "confidential."

10.2    Permitted Disclosures. For purposes of this Article 10, information and data described in clause (a) or (b) above shall be referred to as "Confidential Information". John Hancock may disclose Confidential Information as required by applicable law, regulation or judicial process, provided that John Hancock shall, if legally permitted, give Abbott prompt written notice thereof. The obligation not to disclose or use Confidential Information shall not apply to any part of such Confidential Information that (i) is or becomes patented, published or otherwise part of the public domain other than by acts or omissions of John Hancock in contravention of this Agreement; or (ii) is disclosed to John Hancock by a third party, provided such Confidential Information was not obtained on a confidential basis by such third party from Abbott, its Affiliates or Licensees; or (iii) prior to disclosure under the Agreement, was already in the possession of John Hancock, provided such Confidential Information was not obtained directly or indirectly from Abbott, its Affiliates or Licensees under an ongoing obligation of confidentiality; or (iv) is disclosed in a press release agreed to by both parties under Section 10.3 below.

10.3    Publicity Review. Without the prior written consent of the other party, neither party shall make any statement to the public regarding the execution and/or any other aspect of the subject matter of this Agreement and John Hancock shall not make any statement to the public regarding any work under the Research Program; provided that, Abbott may make statements to the public regarding work done under the Research Program (without reference to or mention of John Hancock) and the commercialization of any Products resulting therefrom in accordance with its standard business practices. John Hancock and Abbott shall not disclose any

CONFIDENTIAL
JH 008102

# Davis Deposition Exhibit 9

# PART 2

-23-

terms or conditions of this Agreement to any third party without the prior consent of the other party, except as set forth above in this Section 10.3 or as required by applicable law, regulation or court order. The parties agree not to issue a press release announcing the execution of this Agreement.

## ARTICLE 11
## TERM AND TERMINATION

11.1    Expiration. This Agreement shall expire upon satisfaction of Abbott's obligations to pay royalties under Section 7.2 and all other amounts under this Agreement.

11.2    Termination; Material Breach. It is the parties' express intent that consideration shall be given to remedying any breach of this Agreement through the payment of monetary damages or such other legal or equitable remedies as shall be appropriate under the circumstances and that there shall only be a limited right to terminate this Agreement under the following circumstances.

(a)    In the event that the court, in accordance with the procedures set forth in Section 16.2, has issued a ruling that John Hancock has breached its obligation under Section 3.1 of this Agreement (obligation to make payments), and such ruling specified the actions to be taken by John Hancock on account of such breach, and John Hancock has failed to comply with the terms of such ruling within the time period specified therein for compliance and the time for any appeal has expired without the submission of an appeal, then, in addition to all other rights available to Abbott under law and equity, including its right to enforce such ruling in court, Abbott shall have the right to terminate the Agreement as a result of John Hancock's failure to abide by the terms of this Agreement and such ruling.

(b)    In the event that the court, in accordance with the procedures set forth in Section 16.2, has issued a ruling that Abbott has breached a material obligation under this Agreement, and such ruling specified the actions to be taken by Abbott on account of such breach, and Abbott has failed to comply with the terms of such ruling within the time period specified therein for compliance and the time for any appeal has expired without the submission of an appeal, then, in addition to all other rights available to John Hancock under law and equity, including its right to enforce such ruling in court, John Hancock shall have the right to terminate the Agreement, each as a result of Abbott's failure to abide by the terms of this Agreement and such ruling.

CONFIDENTIAL
JH 008103

-24-

11.3 **Effect of Expiration or Termination.** Expiration or, if applicable, termination of this Agreement shall not relieve the parties of any obligation accruing prior to such expiration or termination. The provisions of Articles 8 (Royalty Reports and Accounting), 10 (Confidentiality), 11 (Term and Termination), 12 (Warranties and Indemnification) and 16 (Miscellaneous) shall survive the expiration or termination of this Agreement.

## ARTICLE 12
## WARRANTIES AND INDEMNITY

12.1 **John Hancock Representations and Warranties.** John Hancock represents and warrants to Abbott that as of the Execution Date:

(a) The execution and delivery of this Agreement and the performance of the transactions contemplated hereby have been duly authorized by all appropriate John Hancock corporate action. This Agreement constitutes John Hancock's valid and binding legal obligation, enforceable against it in accordance with its terms.

(b) The performance by John Hancock of any of the terms and conditions of this Agreement on its part to be performed does not and will not constitute a breach or violation of its organizational documents or any other material agreement or understanding, written or oral, to which it is a party or any law, statute, rule or regulation by which it is bound.

(c) No consent, approval, license or authorization of, or designation, declaration or filing with, any court or governmental authority is or will be required on the part of John Hancock in connection with the execution, delivery and performance by John Hancock of this Agreement or any other agreements or instruments executed and delivered by John Hancock in connection herewith or therewith, including, without limitation, any filings pursuant to federal or state securities laws or pursuant to any federal anti-trust laws.

(d) Neither John Hancock nor any person acting on its behalf (i) has taken or will take any action which would subject this Agreement and the consummation of the transactions contemplated hereby to the registration or qualification requirements of any federal or state securities laws, (ii) has dealt with any broker, finder or other similar person in connection with the transactions contemplated by this Agreement or (iii) is under any obligation to pay any broker's fee, finder's fee or commission in connection with such transactions.

12.2 **Abbott Representations and Warranties.** Abbott represents and warrants to John Hancock that as of the Execution Date:

CONFIDENTIAL
JH 008104

-25-

(a)   The execution and delivery of this Agreement and the performance of the
transactions contemplated hereby have been duly authorized by all
appropriate Abbott corporate action. This Agreement constitutes Abbott's
valid and binding legal obligation, enforceable against it in accordance
with its terms.

(b)   The performance by Abbott of any of the terms and conditions of this
Agreement on its part to be performed does not and will not constitute a
breach or violation of its organizational documents or any other agreement
or understanding, written or oral, to which it is a party or any law, statute,
rule or regulation by which it is bound.

(c)   No consent, approval, license or authorization of, or designation,
declaration or filing with, any court or governmental authority is or will be
required on the part of Abbott in connection with the execution, delivery
and performance by Abbott of this Agreement or any other agreements or
instruments executed and delivered by Abbott in connection herewith or
therewith, including, without limitation, any filings pursuant to federal or
state securities laws or pursuant to any federal anti-trust laws, except those
consents, approvals, licenses, authorizations, and other requirements
imposed by governmental authorities (both U.S. and foreign) and such
declarations and filings with governmental authorities (both U.S. and
foreign) required in the normal course of pharmaceutical research,
development, marketing and sale.

(d)   Set forth on Exhibit 12.2(d) is the full name, chemical name, detailed
description of the stage of development and current status, for each
Program Compound. Set forth on Exhibit 1.6 in each Annual Research
Plan is a description of projected milestones and dates thereof, projected
year of NDA filing, and projected costs to be incurred by Abbott during
the Program Term, for each Program Compound. Such projections were
prepared in good faith and with due care based on reasonable assumptions,
and represent the reasonable estimate of Abbott based on information
available as of the date of such projections and as of the date hereof; it
being agreed that such projections do not constitute any warranty as to the
future performance of the Program Compounds and that actual results may
vary from such projections.

(e)   Set forth on Exhibit 12.2(e) is a list and description of all domestic and
foreign patents, patent rights, patent applications and all patent
applications that are in the process of being prepared that are owned by or
registered in the name of Abbott, or of which Abbott is a licensee or in
which Abbott has any right, which claim any of the Program Compounds
(the "Patents"). Abbott solely owns all of the Patents, except as indicated

CONFIDENTIAL
JH 008105

-26-

on Exhibit 12.2(e). All of the material Patents have been duly filed in or issued by the United States Patent and Trademark Office or the equivalent foreign patent office identified on Exhibit 12.2(e), as the case may be, and have been properly maintained and renewed in accordance with all applicable laws and regulations. With respect to the Patents that it does not own, Abbott has an exclusive and valid license thereunder to develop, make, have made, use, market and sell (with the right to sublicense) the applicable Program Compounds in the entire Territory; provided however, (i) with respect to Italy, Abbott has such rights that are co-exclusive with Eisai Co. Ltd. for the Program Compound known as ABT-751 and (ii) with respect to Japan, Abbott has such rights that are co-exclusive with Taisho Pharmaceutical Co., Ltd. for the Program Compound known as ABT-773. Except with respect to the Preclinical Programs, to Abbott's knowledge, it is not necessary to obtain or license any patents, patent rights, inventions, copyrights, manufacturing processes, formulae, trade secrets, proprietary rights or know-how that it does not currently have in order to (i) develop, make, have made, use, market and sell the Program Compounds or (ii) conduct the Research Program as heretofore conducted and as proposed to be conducted. Except with respect to those Program Compounds that are the subject of In-License Agreements, the Program Compounds are owned exclusively by Abbott, free and clear of any liens or encumbrances of any other person and, to Abbott's knowledge, Abbott does not require the consent of any other person to develop, make, have made, use, market and sell the Program Compounds.

(f)     Except as set forth in Exhibit 12.2(f) (but in any event, as of the Execution Date, such matters are not, and could not reasonably be expected to be material), Abbott has not received any communications alleging that, and no claim is pending or, to the knowledge of Abbott, threatened to the effect that, the operations of Abbott with respect to the Research Program or the Program Compounds infringe upon or conflict with (or will infringe or conflict with) the asserted rights of any other person under any domestic or foreign patent, trademark, service mark, copyright, trade secret, proprietary right or any other intellectual property right, and, except for the Preclinical Programs, there is no material basis known to Abbott for any such claim (whether or not pending or threatened). No claim is pending or, to the knowledge of Abbott, threatened to the effect that any of the Patents are invalid or unenforceable by Abbott, and there is no material basis known to Abbott for any such claim (whether or not pending or threatened). The publication of any material technical information with respect to the Program Compounds developed by and belonging to Abbott is subject to review and approval under Abbott's existing procedures.

(g)     Except for the In-License Agreements and customary employment and consulting agreements with Abbott's employees and consultants, there are

CONFIDENTIAL
JH 008106

-27-

no outstanding options, licenses, or agreements of any kind relating to the Patents or any of the Program Compounds or the transactions contemplated by this Agreement, which license the Patents or any technical information developed in the course of the clinical development program to any third party to register, market or sell any of the Program Compounds or Products.

(h)     To the knowledge of Abbott with respect to the Research Program and each of the Program Compounds, Abbott is not now, and in performing its obligations hereunder will not be, in any way making an unlawful or wrongful use of any confidential information, know-how, or trade secrets of any other person.

(i)     Neither this Agreement nor any Exhibit to this Agreement (including the compound reports attached as Exhibit 12.2(i) hereto (the "Compound Reports")) contains any untrue statement of material fact or omits to state any material fact necessary to make the statements contained herein or therein not misleading.  There is no fact known to Abbott (other than generally available information concerning the pharmaceutical industry in general) as of the date of this Agreement that has not been disclosed in this Agreement or any Exhibit to this Agreement which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial) of the Research Program or any of the Program Compounds.

(j)     Neither Abbott nor any person acting on its behalf (i) has taken or will take any action which would subject this Agreement and the consummation of the transactions contemplated hereby to the registration or qualification requirements of any federal or state securities laws, (ii) has dealt with any broker, finder or other similar person in connection with the transactions contemplated by this Agreement or (iii) is under any obligation to pay any broker's fee, finder's fee or commission in connection with such transactions.

(k)     Other than generally publicized actions, proceedings or investigations concerning the pharmaceutical industry in general, there is no action, proceeding or investigation pending or, to the knowledge of Abbott, threatened which (i) questions the validity of this Agreement or any action taken or to be taken by Abbott pursuant thereto or (ii) which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial) of the Research Program or any of the Program Compounds.

CONFIDENTIAL
JH 008107

(l) With respect to the Research Program and each of the Program Compounds, Abbott has (and in the future will have) obtained, to the extent permitted by law, from each of its employees, consultants, Affiliates and Subcontractors an agreement that reasonably protects Abbott's interest in the Program Inventions, Program Compounds and Products.

(m) With respect to each Program Compound, since the date of its respective Compound Report, to the knowledge of Abbott, no condition, circumstance or fact has arisen (other than generally available information concerning the pharmaceutical industry in general) nor has Abbott made any change in the conduct of the Research Program which, individually or in the aggregate, has resulted in, or could reasonably be expect to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial) of such Program Compounds.

(n) Each In-License Agreement is valid, binding and in full force and effect, and there is no event which has occurred or exists, which constitutes or which, with notice and/or the passage of time, would constitute a material default or breach under any such contract by Abbott or, to Abbott's knowledge, any other party thereto, or would cause the acceleration of any obligation of any party thereto or give rise to any right of termination or cancellation thereof. Abbott has no reason to believe that the parties to each In-License Agreement will not fulfill their obligations thereunder in all material respects or that such parties do not have the right to grant the licenses granted thereunder. Abbott has no reason to believe that it will not fulfill its obligations under the In-License Agreements. Under the Eisai Agreement, neither Abbott nor its Affiliates has the right to market, distribute or sell Products containing the Program Compound known as ABT-751 in the Eisai Territory (with the exception of Italy).

12.3 No Conflict. Abbott and John Hancock represent and warrant that this Agreement does not, and will not, conflict with any other right or obligation provided under any other agreement or obligation that Abbott or John Hancock has with or to any third party.

12.4 Compliance with Law. Each party represents and warrants to the other that it will comply with all applicable laws, regulations and guidelines in connection with its performance of its obligations and rights pursuant to this Agreement, including the regulations of the United States and any other relevant nation concerning any export or other transfer of technology, services or products.

12.5 No Other Warranties. EACH PARTY TO THIS AGREEMENT AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY OTHER REPRESENTATIONS OR

-29-

WARRANTIES, AND EACH HEREBY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES MADE BY ITSELF OR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, FINANCIAL AND LEGAL ADVISORS OR OTHER REPRESENTATIVES, WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO THE OTHER OR THE OTHER'S REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION WITH RESPECT TO ANY ONE OR MORE OF THE FOREGOING.

12.6    General Indemnification of John Hancock.  Abbott shall indemnify and hold John Hancock and its Affiliates, agents, directors and employees harmless, and hereby forever releases and discharges John Hancock and its Affiliates, agents, directors and employees, from and against all Losses related to or arising out of, directly or indirectly, (i) any negligence, recklessness or intentional misconduct of Abbott or its Affiliates, agents, directors, employees, Subcontractors, licensees (including Licensees) or sublicensees in connection with the Research Program, Program Compounds or Products, or (ii) any manufacture, use, storage, distribution or sale of the Program Compounds or Products by anyone, including without limitation all Losses related to any personal injury or death, or (iii) any breach by Abbott of its representations, warranties or obligations hereunder, or (iv) the consummation of the transactions contemplated hereby, except, in each case, to the extent any such Losses are the result of (A) any breach by John Hancock of its representations, warranties or obligations hereunder, or (B) any negligence, recklessness, or intentional misconduct by John Hancock or its Affiliates, agents, directors, employees.

12.7    Indemnification Relating to Certain In-Licensed Compounds.  Abbott shall indemnify and hold John Hancock and its Affiliates, agents, directors and employees harmless, and hereby forever releases and discharges John Hancock and its Affiliates, agents, directors and employees, from and against all Losses to the extent related to or arising out of, directly or indirectly, the fact that Abbott's rights in the Program Compounds known as ABT-773, ABT-492 and ABT-751 and the Patents and other patent rights, copyrights, trade secret rights and other intellectual property rights related thereto arise from the Taisho Agreement, the Wakunaga Agreement or the Eisai Agreement respectively, rather than being owned by Abbott as with the other Program Compounds. Accordingly, by way of example and without limiting the foregoing, Abbott's indemnification obligation under this Section 12.7 will arise upon (i) any impairment of Abbott's ability to perform its obligations under this Agreement in the entire Territory as a result of Abbott's rights to the Program Compounds known as ABT-773, ABT-442 and ABT-751 arising from the Taisho Agreement, Wakunaga Agreement and the Eisai Agreement, respectively or (ii) a breach by Abbott or any other person of any of the In-License Agreements; except, in each case, to the extent any such Losses are the result of (A) any breach by John Hancock of its representations, warranties or obligations hereunder, or (B) any negligence, recklessness, or intentional misconduct by John Hancock or its Affiliates, agents, directors, employees.

12.8    Procedure.  If John Hancock or any of its Affiliates, agents, directors or employees (each, an "Indemnitee") intends to claim indemnification under this Article 12, it shall

CONFIDENTIAL
JH 008109

-30-

promptly notify Abbott (the "Indemnitor") of any Loss or action in respect of which the Indemnitee intends to claim such indemnification, and the Indemnitor shall have the right to participate in, and, to the extent the Indemnitor so desires, to assume the defense thereof with counsel selected by the Indemnitor; provided, however, that an Indemnitee shall have the right to retain its own counsel, with the fees and expenses of such counsel to be paid by the Indemnitor, if representation of such Indemnitee by the counsel retained by the Indemnitor would be inappropriate due to actual or potential differing interests between such Indemnitee and any other party represented by such counsel in such proceedings. The indemnity obligation in this Article 12 shall not apply to amounts paid in settlement of any loss, claim, damage, liability or action if such settlement is effected without the consent of the Indemnitor, which consent shall not be withheld unreasonably or delayed. The failure to deliver notice to the Indemnitor within a reasonable time after the commencement of any such action, if materially prejudicial to its ability to defend such action, shall relieve the Indemnitor of any liability to the Indemnitee under this Article 12 only to the extent arising from the tardiness or absence of such notice, but the omission so to deliver notice to the Indemnitor will not relieve it of any liability that it may have to any Indemnitee otherwise than under this Article 12. The Indemnitee shall cooperate fully with the Indemnitor and its legal representatives in the investigation of any action, claim or liability covered by indemnification under this Article 12, at the expense of the Indemnitor.

12.9    Insurance. Abbott shall at its expense maintain, through self-insurance or otherwise, product liability insurance with respect to the development, manufacture, sale and use of Products and Program Compounds in such amounts and on such terms as Abbott customarily maintains with respect to its other similar products. Abbott shall maintain such insurance for so long as it continues to develop, manufacture or sell any Products or Program Compounds, and thereafter for so long as Abbott customarily currently maintains such insurance.

12.10    Acknowledgement. Abbott and John Hancock acknowledge that Abbott has not delivered or disclosed the contents of any of the In-License Agreements to John Hancock.

## ARTICLE 13
## FORCE MAJEURE

Neither party shall be held liable or responsible to the other party nor be deemed to have defaulted under or breached this Agreement for failure or delay in fulfilling or performing any term of this Agreement when such failure or delay is caused by or results from causes beyond the reasonable control of the affected party including but not limited to fire, floods, embargoes, war, acts of war (whether war be declared or not), insurrections, riots, civil commotions, strikes, lockouts or other labor disturbances, acts of God or acts, omission or delays in acting by any governmental authority; provided that such affected party shall provide the other party with prompt notice of the circumstances surrounding such a material failure or delay, after which the parties will amend this Agreement upon terms and conditions that are mutually agreeable to equitably account to the party that does not so fail or delay.

CONFIDENTIAL
JH 008110

-31-

## ARTICLE 14
## ASSIGNMENT

Except as expressly provided hereunder, this Agreement may not be assigned or otherwise transferred, nor may any right or obligations hereunder be assigned or transferred by either party without the consent of the other party; and, in addition, both parties acknowledge and agree that the obligations of Abbott hereunder are personal to Abbott and that Abbott is uniquely qualified to perform them; provided, however, that either party shall be obligated to assign this Agreement and its rights and obligations hereunder in connection with the transfer or sale of all or substantially all of its business, or in the event of its merger or consolidation or change in control or similar transaction and in such event such party shall cause its successor or transferee in such transaction to assume all of the obligations of such party. Any permitted assignee shall assume all obligations of its assignor under this Agreement. Notwithstanding the foregoing, John Hancock shall have the right to assign its rights (but not its obligation to make payments under Section 3.1) in whole or in part (provided that, any assignment in part shall mean an assignment of a pro rata share of the entirety of John Hancock's rights hereunder) without Abbott's consent (and following any such assignment all references to John Hancock herein shall include any such assignee), provided that: (i) each assignee of such rights must be a bank, insurance company or other institutional investor; (ii) there shall be no greater than five (5) assignees, (iii) if any such assignee is located outside the United States John Hancock shall notify Abbott at least sixty (60) days in advance, (iv) if any claim arises with respect to Abbott's failure to make payments, then during the term of the Research Program (but in any event not longer than four years from the date hereof), any such claim must be brought by John Hancock, and not an assignee. In soliciting potential assignees for such right to payments, John Hancock shall not disclose any Confidential Information hereunder to more than ten (10) potential assignees. Any potential assignee to whom John Hancock discloses Confidential Information must have executed a confidentiality agreement no less stringent than Article 10 hereof. Furthermore, if John Hancock plans to exercise its right of assignment hereunder, John Hancock shall first notify Abbott of such plans in writing. Abbott shall have the first right to negotiate the purchase of any such assignment rights. If within fifteen (15) days after receipt of such notice the parties have not agreed upon the principal terms of such arrangement or if within forty-five (45) days after receipt of such notice the parties have not executed a final written agreement reflecting such arrangement, then John Hancock shall have no further obligations to Abbott with respect to such first right of negotiation.

## ARTICLE 15
## SEVERABILITY

CONFIDENTIAL
JH 008111

Each party hereby agrees that it does not intend its execution and delivery hereof or its performance hereunder to violate any public policy, statutory or common laws, rules, regulations, treaty or decision of any government agency or executive body thereof of any country or community or association of countries. If and to the extent any term or provision of this Agreement is held to be invalid, illegal or unenforceable by a court or other governmental

-32-

authority of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement, which shall remain in full force and effect. The holding of a term or provision to be invalid, illegal or unenforceable in a jurisdiction shall not have any effect on the application of the term or provision in any other jurisdiction.

## ARTICLE 16
## MISCELLANEOUS

16.1    Notices. Any consent, notice or report required or permitted to be given or made under this Agreement by one of the parties hereto to the other shall be in writing, delivered personally or by facsimile (and promptly confirmed by personal delivery, U.S. first class mail or courier), U.S. first class mail or courier, postage prepared (where applicable), addressed to such other party at its address indicated below, or to such other address as the addressee shall have last furnished in writing to the addressor and (except as otherwise provided in this Agreement) shall be effective upon receipt by the addressee.

If to John Hancock:    John Hancock Life Insurance Company
200 Clarendon Street, T-57
Boston, MA  02117
Attention: Bond & Corporate Finance Group
Telephone:    617-572-9624
Fax:             617-572-1628

copy to:    John Hancock Life Insurance Company
200 Clarendon Street, T-50
Boston, MA  02117
Attention: Investment Law Division
Telephone:    617-572-9205
Fax:             617-572-9268

and, if it relates to making or not making a royalty payment or Milestone Payment hereunder,

copy to:    John Hancock Life Insurance Company
200 Clarendon Street
Boston, MA  02117
Attention:  Manager, Investment Accounting Division, B-3
Fax:  617-572-0628

CONFIDENTIAL
JH 008112

-33-

If to Abbott:

Abbott Laboratories
Dept. 309, Bldg. AP30
200 Abbott Park Road
Abbott Park, IL 60064-3537
Attention: President, Pharmaceutical Products Division
Telephone:    847-938-6863
Fax:          847-938-5383

copy to:

General Counsel
Abbott Laboratories
Dept. 364, Bldg. AP6D
100 Abbott Park Road
Abbott Park, IL 60064-6020
Telephone:    847-937-8905
Fax:          847-938-6277

16.2    Applicable Law. The Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois. With respect to any action hereunder, Abbott, to the extent that it may lawfully do so, hereby consents to service of process, and to be sued, in the Commonwealth of Massachusetts and consents to the exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts, as well as to the jurisdiction of all courts to which an appeal may be taken from such courts, for the purpose of any suit, action or other proceeding arising out of any of its obligations hereunder or thereunder or with respect to the transactions contemplated hereby or thereby, and expressly waives any and all objections it may have as to venue in any such courts. Abbott further agrees that a summons and complaint commencing an action or proceeding in any of such courts shall be properly served and shall confer personal jurisdiction if served personally or by certified mail to it at its address for notices as provided in this Agreement or as otherwise provided under the laws of the Commonwealth of Massachusetts. THE PARTIES EACH IRREVOCABLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY SUIT, ACTION OR OTHER PROCEEDING INSTITUTED BY OR AGAINST IT IN RESPECT OF ITS OBLIGATIONS HEREUNDER OR THEREUNDER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

16.3    Entire Agreement. This Agreement contains the entire understanding of the parties with respect to the subject matter hereof. All express or implied agreements and understandings, either oral or written, with respect to the subject matter hereof heretofore made are expressly merged in and made a part of this Agreement. This Agreement may be amended, or any term hereof modified, only by a written instrument duly executed by both parties hereto.

16.4    Headings. The captions to the several Articles and Sections hereof are not a part of this Agreement, but are merely guides or labels to assist in locating and reading the several Articles and Sections hereof.

CONFIDENTIAL
JH 008113

-34-

16.5   Independent Contractors.  It is expressly agreed that John Hancock and Abbott shall be independent contractors and that the relationship between the two parties shall not constitute a partnership, joint venture or agency.  Neither John Hancock nor Abbott shall have the authority to make any statements, representations or commitments of any kind, or to take any action, which shall be binding on the other, without the prior written consent of the other party to do so.

16.6   Performance By Affiliates, Licensees and Subcontractors.  The parties recognize that Abbott may carry out certain obligations under this Agreement through performance by its Affiliates, Licensees and Subcontractors (but in no event shall that relieve Abbott of any of its obligations hereunder).  Abbott guarantees that the activities of its Affiliates, Licensees and Subcontractors under this Agreement shall comply with this Agreement.

16.7   Dispute Resolution.  The parties shall attempt to amicably resolve disputes arising between them regarding the validity, construction, enforceability or performance of the terms of this Agreement, and any differences or disputes in the interpretation of the rights, obligations, liabilities and/or remedies hereunder, which have been identified in a written notice from one party to the other, by good faith settlement discussions between the President of Abbott's Pharmaceutical Products Division and a Managing Director of John Hancock or his designee.  The parties agree that, prior to filing any lawsuit regarding any dispute that arises in connection with this Agreement (with the exception of any action demanding a preliminary injunction), such representatives shall meet and attempt to amicably resolve such dispute within thirty (30) days after the receipt of such written notice.

16.8   Waiver.  The waiver by either party hereto of any right hereunder or the failure to perform or of a breach by the other party shall not be deemed a waiver of any other right hereunder or of any other breach or failure by said other party whether of a similar nature or otherwise.

16.9   Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[the remainder of this page is intentionally blank]

CONFIDENTIAL
JH 008114

-35-

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

JOHN HANCOCK LIFE
INSURANCE COMPANY

By: _Stephen J Blewitt_____

Name: Stephen J. Blewitt

Title: Managing Director

Date: March 13, 2001

ABBOTT LABORATORIES

By: _9/13 M vL_____

Name: Jeffrey M. Leiden, Ph.D., M.D.

Title: Executive Vice President, Pharmaceuticals
and Chief Scientific Officer

Date: March 13, 2001

JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY

By: _Stephen J Blewitt_____

Name: Stephen J. Blewitt

Title: Authorized Signatory

Date: March 13, 2001

INVESTORS PARTNER LIFE INSURANCE
COMPANY

By: _Stephen J Blewitt_____

Name: Stephen J. Blewitt

Title: Authorized Signatory

Date: March 13, 2001

CONFIDENTIAL
JH 008115

-36-

**EXHIBIT 1.6**

<u>FIRST ANNUAL RESEARCH PLAN</u>

CONFIDENTIAL
JH 008116

Ketolide Oral & IV (ABT-773)
Annual Development Plan
Exhibit 1.8

| Therapeutic Area | Antibacterial |
|---|---|
| Indications | Adult Tablet: Community-acquired respiratory infections. I.V.: Step-down therapy in community-acquired hospitalized pneumonia. |
| Description | • ABT-773 is a potent ketolide with strong activity against most macrolide resistant strains, while maintaining the broad spectrum coverage of clarithromycin.<br>• Product will be available as tablet and IV formulation.<br>• ABT-773 will address the unmet medical needs of increasing resistance to current empiric agents, particularly S. pneumonia.<br>• Maintains clari's claim of "Spans the spectrum" (G+, G-, atypicals).<br>• Cover key G+ resistant strains (S. pneumonia, S. pyogenes).<br>• Tablet dosing is 100mg OD or 150mg BID dosing based on severity of indications.<br>• Tablet: 8 days for AECB, pharyngitis, 10 days for CAP (assuming comparable drug levels to label).<br>• Incidence of GI side effects equal to clari (assuming comparable drug levels to label).<br>• COGS target $2,500/kg at launch for label. |

### Current Time Line

| Milestones | Tablet Date | IV Date |
|---|---|---|
| Phase I | 1Q1997 | 1Q2001 |
| Phase IIb | 3Q1998 | N/A |
| Phase III | 4Q2001 | 4Q2001 |
| NDA Filing | 3Q2002 | 2Q2003 |
| Launch | 1Q2004 | 2Q2004 |

| Spending | $$ |
|---|---|
| Project-to-Date Spending (thru '00) | 116.4 |
| 2001 Current Projection (Plan) | 91.5* |

* See page 2 for detail.

### Projected Spending by Year

| 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|
| 74.1 | 91.5 | 63.0 | 45.0 | 32.0 | 22.0 | 333.6 |

CONFIDENTIAL
JH 008117

# Ketolide (ABT-773)
## 2001 Plan Development Cost Summary

**Program Status**

| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|
| | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 |
| Phase IIb (Tablet) | | | | | | |
| Phase III (Tablet) | | | | | | |

Tablet NDA Filing ← Tablet Launch

**Major Development Activities and Costs**

| Clinical Program | Total Patients | Enrolled 9/28/00 | Start | End | 2000 AOU Cost | 2001 Plan Cost |
|---|---|---|---|---|---|---|
| Phase III Studies (3 Indications) | 900 | 843 | Sep-99 | Jun-00 | $5,017 | $0 |
| Phase II (4 Indications) | 5,440 | 0 | Nov-99 | May-02 | $10,885 | $41,051 |
| Japan Studies | TBD | 0 | Oct-00 | Dec-01 | $1,723 | $4,000 |
| Pediatric PK/PD / Taste Testing Studies | 24 | 42 | Mar-00 | Sep-00 | $379 | $0 |
| External Special Population Studies | 38 | 117 | Mar-00 | Mar-01 | $1,666 | $83 |
| Internal Site Studies (Phase I Center) | 250 | 182 | Jan-01 | Dec-01 | $2,624 | $2,150 |
| Microbiology Grants | N/A | N/A | Jan-01 | Dec-01 | $2,000 | $2,000 |
| Venture Management | | | | | $5,435 | $8,803 |
| European Venture Research | | | | | $1,133 | $1,474 |
| Data Management/Statistics | | | | | $3,319 | $5,037 |
| | | | | | $34,498 | $62,598 |

| Chemistry, Manufacturing, and Controls (CMC) | | 2000 AOU | 2001 Plan |
|---|---|---|---|
| Formulation & Analytical | | $8,676 | $5,504 |
| Bulk Drug / Process | | $24,539 | $16,422 |
| | | $31,205 | $22,026 |

| Drug Safety Support | | 2000 AOU | 2001 Plan |
|---|---|---|---|
| Ongoing Drug Safety support including: Long Term Toxicity Studies | | $2,374 | $1,749 |
| | | $2,374 | $1,749 |

| Other Support Costs | | 2000 AOU | 2001 Plan |
|---|---|---|---|
| Discovery | | $2,848 | $2,418 |
| Regulatory Affairs / Research QA / Investigational Drug QA | | $1,261 | $861 |
| Medical Affairs | | $1,579 | $837 |
| Other | | $37 | $91 |
| Total Program | | $74,100 | $31,400 |

CONFIDENTIAL
JH 008118

**Endothelin (ABT-627)**
**Annual Development Plan**
**Exhibit 1.6**

| Therapeutic Area | Oncology |
|---|---|
| Indications | • Hormone Refractory Prostate Cancer<br>• Potential for use in early Prostate Cancer and other cancer types |
| Description | • ABT-627 is a highly selective endothelin antagonist receptor<br>• ABT-627 is seeking an indication for the treatment of hormone refractory prostate cancer<br>• ABT-627 will probably be used with current therapies<br>• Well tolerated as chronic therapy<br>• Oral administration<br>• No major drug interactions with drugs commonly used in elderly population or hormonal therapy<br>• Demonstrated cost effectiveness at filing |

| Current Time Line | Milestones | Date |
|---|---|---|
| | Phase I | 3Q1996 |
| | Phase II | 4Q1997 |
| | Phase III | 4Q2000 |
| | NDA Filing | 2Q2004 |
| | Launch | 4Q2004 |

| Spending | $$ |
|---|---|
| Project-to-Date-Spending (thru '00) | 127.6 |
| 2001 Current Projection (Plan) | 38.4* |

* See page 2 for detail.

| Projected Spending by Year | | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|---|---|
| | PC* | 13.0 | 38.0 | 40.0 | 33.0 | 20.0* | 10.0 | 154.0 |
| | EP&A* | N/A | 6.0 | 6.0 | 6.0 | 0.0 | 0.0 | 17.0 |
| | PE* | N/A | 6.0 | 3.0 | 0.0 | 0.0 | 0.0 | 8.0 |

* End of Phase II meeting with FDA just completed. Budget impact still in process plus discussion of other cancer indications ongoing. 2001 range $34-40 depending on outcome of discussion.

CONFIDENTIAL
JH 008119

**Endothelin (ABT-627)**
**2001 Plan Development Cost Summary**

| Program Status | 1998 | | | | 1999 | | | | 2000 | | | | 2001 | | | | 2002 | | | | 2003 | | | | 2004 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Phase II | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Phase III | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

NDA ← Launch ←

## Major Development Activities and Costs

| Clinical Program | Total Patients | Enrollment as of 06/21/00 | Start | End | 2000 AGU Cost | 2001 Plan |
|---|---|---|---|---|---|---|
| European Prostate Cancer Study | 204 | 285 | Oct-1997 | Dec-2000 | $1,033 | $681 |
| Open Extension of 508 & 594 Studies | 300 | 199 | Jun-1998 | Jun-2001 | ... | ... |
| Refractory Malignancies | 30 | 34 | Jul-1999 | Dec-2000 | ... | ... |
| Phase III Pivotal Studies | 2,000 | 0 | 1Q 2001 | 3Q 2003 | $250 | $16,794 |
| Other Studies / BVR | | | | | $75 | $18 |
| Venture Management | | | | | $6,447 | $6,361 |
| Clinical Pharmacology Support (Drug Interaction Studies) | | | | | | $518 |
| Data Management/Statistics | | | | | $2,156 | $2,601 |
| | | | | | $9,961 | $26,882 |

| Chemistry, Manufacturing, and Controls (CMC) | | | | | 2000 AGU | 2001 Plan |
|---|---|---|---|---|---|---|
| Formulation & Analytical | | | | | $1,159 | $7,147 |
| Bulk Drug / Process | | | | | $330 | $1,400 |
| | | | | | $1,502 | $8,547 |

| Drug Safety Support | | | | | 2000 AGU | 2001 Plan |
|---|---|---|---|---|---|---|
| Ongoing Drug Safety support including clinical program support | | | | | $661 | $2,060 |

| Other Support Costs | | | | | 2000 AGU | 2001 Plan |
|---|---|---|---|---|---|---|
| Discovery | | | | | | |
| Medical Affairs | | | | | $186 | $129 |
| Regulatory Affairs / Research Quality Assurance | | | | | $134 | $207 |
| Other | | | | | $170 | $215 |
| | | | | | $572 | $460 |
| **Total Program** | | | | | **$13,000** | **$38,000** |

CONFIDENTIAL
JH 008120

CCM (ABT-594)
Annual Development Plan
Exhibit 1.6

| Therapeutic Area | Neuroscience |
|---|---|
| Indications | ABT-594 primary target indication is the treatment of neuropathic pain (NP). |
| Description | • ABT-594 is a nonopioid, non-NSAID analgesic that is a potent and selective neuronal nicotinic receptor modulator.<br>• ABT-594 is effective in nociceptive pain and neuropathic pain.<br>• ABT-594 is expected to have a better side effect profile than opioids, no tolerance, no abuse, and no DEA scheduling.<br>• Pre-clinical data show ABT-594 to be 30 to 100 times more potent and equally efficacious to morphine in treating moderate to severe pain in several well characterized animal models of pain.<br>• ABT-594 has a unique mechanism of action which may enable its use in combination with other analgesics as well as monotherapy.<br>• Slow onset of action (approx. 1.5 – 3 hours) at low doses tested may suggest limited utility in acute pain types.<br>• Favorable safety profile.<br>• Oral formulation, BID dosing. |

| Current Time Line | Milestones | Date |
|---|---|---|
| | IND Filing | 4Q1996 |
| | Phase I | 3Q1997 |
| | Phase II | 3Q1998 |
| | Phase III | 4Q2001 |
| | NDA Filing | 3Q2003 |
| | Launch | 3Q2004 |

| Spending | $$ |
|---|---|
| Project-to-Date Spending (thru '99) | 97.3 |
| 2001 Current Projection (Plan) | 35.0* |

\* See page 2 for detail.

| Projected Spending by Year | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|---|
| | 14.4 | 35.0 | 46.0 | 33.0 | 15.0 | 12.0 | 155.4 |

CONFIDENTIAL
JH 008121

ABT-594
2001 Plan Development Cost Summary

**Program Status**

| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|
| | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 |

Phase I
Phase II
Phase III

NDA filing ← Launch

**Major Development Activities and Costs**

**Clinical Program**

| | Total Patients | Enrolled 12/2000 | Start | End | 2000 ACU Cost | 2001 Plan Cost |
|---|---|---|---|---|---|---|
| Phase IIb Neuropathic Pain | 320 | 135 | Apr-00 | Nov-00 | $3,000 | $241 |
| Phase I Studies | 281 | N/A | Feb-01 | Sep-02 | $0 | $0 |
| Phase IIb Osteoarthritis | 573 | N/A | Jan-01 | Nov-01 | $0 | $2,129 |
| Phase III Studies | 3,400 | N/A | Oct-01 | May-04 | $0 | $3,261 |
| Venture Management | | | | | $0 | $6,370 |
| Clinical Pharmacology Support (Phase 1 Center Studies) | | | | | $4,493 | $5,137 |
| IVR Support | | | | | $210 | $5,042 |
| Data Management/Statistics | | | | | $0 | $105 |
| | | | | | $366 | $2,192 |
| | | | | | $8,249 | $24,241 |

**Chemistry, Manufacturing, and Controls (CMC)**

| | 2000 ACU Cost | 2001 Plan Cost |
|---|---|---|
| Packaging of Phase IIb clinical supplies and Phase III formulation development and pre-scale up | $1,624 | $3,268 |
| Formulation & Analytical | $339 | $950 |
| Bulk Drug / Process | | |
| Other | $785 | $11,000 |
| | $2,768 | $15,427 |

**Drug Safety Support**

| | 2000 ACU | 2001 Plan |
|---|---|---|
| Ongoing Drug Safety support including Toxicity, carcinogenicity, and animal pharmacology studies | | |
| Clinical Program Support | $2,417 | $1,402 |

**Other Support Costs**

| | 2000 ACU | 2001 Plan |
|---|---|---|
| Discovery | $10 | $154 |
| Medical Affairs | $91 | $152 |
| Regulatory Affairs / Research QA / Investigational Drug QA | $115 | $1,147 |
| Other | $352 | $547 |
| **Total Program** | $14,816 | $55,005 |

CONFIDENTIAL
JH 008122

Quinolone (ABT-492)
Annual Development Plan
Exhibit 1.6

| Therapeutic Area | Anti-bacterial |
|---|---|
| Indications | Community acquired respiratory, nosocomial pneumonia, complicated and uncomplicated urinary tract and skin/soft tissue infections. |

**Description**
- ABT-492 is a potent broad-spectrum quinolone with activity against Gram+, Gram-, and atypical pathogens, including most penicillin, macrolide, and quinolone resistant strains of S. pylums.
- Commercial objective is "Trovan-like" safety with "Levaquin-like" safety.
- Preliminary in-vivo safety assays suggest good safety profile.
- Product will be available in tablet and injectable formulations.
- Targeting QD dosing for both formulations (not confirmed).
- Targeting 5-7 day dosing for most indications (not confirmed).
- CO33 at $1,500-2,000/kg at launch pending chemistry optimization.

**Current Time Line**

| Milestone | Date |
|---|---|
| Phase I | 4Q2000 |
| Phase II | 3Q2001 |
| Phase III | 3Q2002 |
| NDA Filing | 4Q2004 |
| Launch | 4Q2006 |

**Spending**

| | $ |
|---|---|
| Project-to-Date Spending (thru '00) | 11.5 |
| 2001 Current Projection (Plan) | 25.0* |

* See page 2 for detail.

**Projected Spending by Year**

| 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|
| 6.9 | 25.0 | 76.0 | 100.0 | 62.0 | 11.0 | 289.8 |

CONFIDENTIAL
JH 008123

## Quinolone (ABT-492)
## 2001 Plan Development Cost Summary

**Program Status**

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|
| | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 |
| Phase I | | | | | | |
| Phase II | | | | | | |
| Phase III | | | | | | |

NDA ← | Launch ←

**Major Development Activities and Costs**

| | Total Patients | Enrolled 8/31/2000 | Start | End | 2000 AGU Cost | 2001 Plan Cost |
|---|---|---|---|---|---|---|
| **Clinical Program** | | | | | | |
| Phase I | | | | | | |
| Single Rising Dose / Food Effects in Healthy Volunteers | 116 | 0 | Nov-00 | Jan-01 | $500 | $170 |
| Multiple Rising Dose in Healthy Volunteers | 80 | 0 | Nov-00 | Apr-01 | $500 | $300 |
| External PK Studies | N/A | 0 | Apr-01 | Sep-01 | $0 | $900 |
| Microbiology Studies | N/A | N/A | | | $0 | $713 |
| Phase IIA - AECB | 250 | 0 | Jan-01 | Dec-01 | $0 | $2,083 |
| Phase IIB - CAP | 250 | 0 | Aug-01 | Apr-02 | $0 | $833 |
| Venture Management | | | Nov-01 | Jul-02 | $201 | $1,320 |
| European Venture Research | | | | | $28 | $59 |
| Phase I Center | | | | | $70 | $130 |
| Data Management/Statistics | | | | | $53 | $149 |
| | | | | | $1,152 | $6,086 |

| Chemistry, Manufacturing, and Controls (CMC) | 2000 AGU | 2001 Plan |
|---|---|---|
| Bulk Drug / Process | $598 | $7,872 |
| Formulation & Analytical | $593 | $961 |
| | $1,191 | $8,833 |

| Drug Safety Support | 2000 AGU | 2001 Plan |
|---|---|---|
| Ongoing Drug Safety support including: | | |
| Toxicity Studies | $1,841 | $2,531 |
| | $1,841 | $2,531 |

| Other Support Costs | 2000 AGU | 2001 Plan |
|---|---|---|
| Discovery | $2,326 | $3,224 |
| Reg / Res. Quality Assurance / Investigational Drug QA | $110 | $554 |
| Medical Affairs | $0 | $35 |
| Other | $0 | $47 |
| Milestone Payments (Initiation of Phase IIA) | $0 | $3,000 |
| | $2,316 | $6,860 |

| Total Program | $6,500 | $24,000 |
|---|---|---|

CONFIDENTIAL
JH 008124

TSP (ABT-510)
Annual Development Plan
Exhibit 1.8

| Therapeutic Area | Oncology |
|---|---|
| Indications | Solid tumors such as lung, breast, colon, bladder and prostate. |

**Description**
- Thrombospondin peptide
- Novel anti-angiogenesis agent
- Premature ending
- ABT-510 is seeking an indication for the treatment of solid tumors
- Mechanism may prevent the growth of tumors and prevent the spread of metastases by preventing or inhibiting the growth of nutrient supplying blood vessels

| Current Time Line | Milestone | Date |
|---|---|---|
| | DDC | 4Q1998 |
| | Phase I | 2Q2000 |
| | Phase II | 4Q2001 |
| | Phase III | 1Q2003 |
| | NDA Filing | 1Q2005 |
| | Launch | 3Q2006 |

| Spending | $$ |
|---|---|
| Project-to-Date Spending (thru '00) | 45.8 |
| 2001 Current Projection (Plan) | 9.0* |

* See page 2 for detail.

| Projected Spending by Year | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|---|
| | 6.5 | 9.0 | 37.0 | 29.0 | 23.0 | 15.0 | 119.5 |

CONFIDENTIAL
JH 008125

## TSP (ABT-510)
### 2001 Plan Development Cost Summary

| Program Status | 1998 | | | | 1999 | | | | 2000 | | | | 2001 | | | | 2002 | | | | 2003 | | | | 2004 | | | | 2005 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Phase I | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Phase II | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Phase III | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

DDC ← ... NDA ←

### Major Development Activities and Costs

| Clinical Program | Total Patients | Enrolled as of 8/00 | Start | End | 2000 AGU Cost | 2001 Plan Cost |
|---|---|---|---|---|---|---|
| Single Escalating Dose in Healthy Subjects | 38 | 38 | Apr-2000 | Sep-2000 | $240 | ... |
| Multiple Dose in Cancer Patients | 40 | ... | Feb-2000 | Sep-2001 | $700 | $945 |
| IND Study | 14 | ... | Jun-2001 | Nov-2001 | ... | $500 |
| Other Studies / EVR | | | | | $309 | $328 |
| Phase-I Center | | | | | $151 | $108 |
| Venture Management | | | | | $960 | $800 |
| Data Management/Statistics | | | | | $122 | $164 |
| | | | | | $2,552 | $2,845 |

| Chemistry, Manufacturing, and Controls (CMC) | 2000 AGU | 2001 Plan |
|---|---|---|
| Formulation / Analytical | $762 | $1,650 |

| Drug Safety Support | 2000 AGU | 2001 Plan |
|---|---|---|
| Ongoing Drug Safety support. | $1,808 | $1,759 |

| Other Support Costs | 2000 AGU | 2001 Plan |
|---|---|---|
| Discovery | $1,202 | $2,664 |
| Medical Affairs | $3 | ... |
| Regulatory Affairs / Research Quality Assurance | $68 | $45 |
| Other / In-licensing Fees | $196 | $37 |
| Total Program | $6,600 | $9,000 |

CONFIDENTIAL
JH 008126

# MMPI (ABT-518)
## Annual Development Plan
### Exhibit 1.6

| Therapeutic Area | Oncology |
|---|---|
| Indications | Solid tumors such as lung, ovarian, pancreas, breast, colorectal and bladder. |

**Description**
- Novel metalloproteinase inhibitor.
- Cytostatic mechanism.
- Oral dosing.
- May prevent the growth of metastatic lesions and/or inhibit primary tumor growth.
- Superior efficacy or side-effect profile to competitive agents.

**Current Time Line**

| Milestones | Date |
|---|---|
| DDO | 1Q2000 |
| Phase I | 1Q2001 |
| Phase II | 3Q2002 |
| Phase III | 4Q2003 |
| NDA Filing | 4Q2005 |
| Launch | 2Q2006 |

**Spending**

| | $ |
|---|---|
| Project-to-Date Spending (thru '00) | 40.0 |
| 2001 Current Projection (Plan) | 7.0* |

\* See page 2 for detail.

| Projected Spending by Year | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|---|
| | 5.0 | 7.0 | 31.0 | 35.0 | 28.0 | 20.0 | 124.0 |

CONFIDENTIAL
JH 008127

## MMPY (ABT-518)
### 2001 Plan Development Cost Summary

**Program Status**

| | 1999 | | | | 2000 | | | | 2001 | | | | 2002 | | | | 2003 | | | | 2004 | | | | 2005 | | | | 2006 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Phase I | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Phase II | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Phase III | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NDA | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

DDC ← (2000)    NDA ← (2005)    Launch ← (2006)

### Major Development Activities and Costs

| | Total Patients | Enrolled as of 8/00 | Start | End | 2000 AGU Cost | 2001 Plan Cost |
|---|---|---|---|---|---|---|
| **Clinical Program** | | | | | | |
| Multiple Dose In Cancer Patients | 40 | ... | 1Q/01 | 1Q/02 | $300 | $769 |
| IND Study | 14 | ... | 3Q/01 | 1Q/02 | ... | $500 |
| Other Studies / EVR | | | | | ... | $108 |
| Phase-I Center / PK | | | | | $70 | $65 |
| Venture Management | | | | | $778 | $754 |
| Data Management/Statistics | | | | | $57 | $118 |
| | | | | | $1,205 | $2,314 |

| | 2000 AGU | 2001 Plan |
|---|---|---|
| **Chemistry, Manufacturing, and Controls (CMC)** | | |
| Formulation / Analytical | $546 | $1,031 |

| | 2000 AGU | 2001 Plan |
|---|---|---|
| **Drug Safety Support** | | |
| Ongoing Drug Safety support | $1,681 | $2,125 |

| | 2000 AGU | 2001 Plan |
|---|---|---|
| **Other Support Costs** | | |
| Discovery | $1,447 | $1,348 |
| Medical Affairs | $5 | $20 |
| Regulatory Affairs / Research Quality Assurance | $26 | $39 |
| Other / In-licensing Fees | $90 | $123 |
| **Total Program** | $5,000 | $7,000 |

CONFIDENTIAL
JH 008128

Anti-Mitotic (ABT-751)
Annual Development Plan
Exhibit 1.6



| Therapeutic Area / Indication(s) | Oncology |
| --- | --- |
| | Solid tumors such as breast, lung, colorectal, and ovarian |

**Description**
- Novel oral cytotoxic agent that inhibits tumor growth by inhibiting the polymerization of tubulin, similar to the MOA of taxanes
- May be effective in patients resistant to other cytotoxic agents

**Current Time Line**

| Milestones | Date |
| --- | --- |
| Pre-License | 2/23/2000 |
| Phase I | 1Q/2001 |
| Phase II | 4Q/2001 |
| Phase III | 4Q/2002 |
| NDA Filing | 1Q/2005 |
| Launch | 1Q/2006 |

| Spending | $ |
| --- | --- |
| Project-to-Date Spending (thru '00) | 6.0 |
| 2001 Current Projection (PLAN) | 10.0* |

* See page 2 for detail.

| Projected Spending by Year | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 6.0 | 10.0 | 27.0 | 35.0 | 25.0 | 12.0 | 115.0 |

CONFIDENTIAL
JH 008129

Anti-Mitotic (ABT-751)
2001 Plan Development Cost Summary

| Program Status | 1998 | | | | 1999 | | | | 2000 | | | | 2001 | | | | 2002 | | | | 2003 | | | | 2004 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Phase I | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Phase II | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Phase III | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

← In-license

**Major Development Activities and Costs**

| Clinical Program | Total Patients | Enrolled as of 8/31/00 | Start | End | 2000 AGU Cost | 2001 Plan Cost |
|---|---|---|---|---|---|---|
| Multiple Dose in Cancer Patients #1 | 24 | ... | Jan-2001 | Nov-2001 | ... | $600 |
| Multiple Dose in Cancer Patients #2 | 24 | ... | Apr-2001 | May-2002 | ... | $466 |
| Safety and Efficacy #1-#6 | 180 | ... | Aug-2001 | Oct-2002 | ... | $1,052 |
| Other Studies / EVR | | | | | ... | $2,762 |
| Venture Management | | | | | ... | |
| Data Management/Statistics | | | | | ... | $412 |
| | | | | | ... | $5,331 |

**Chemistry, Manufacturing, and Controls (CMC)**

| | 2000 AGU | 2001 Plan |
|---|---|---|
| Formulation / Analytical | ... | $2,300 |

**Drug Safety Support**

| | 2000 AGU | 2001 Plan |
|---|---|---|
| Ongoing Drug Safety support | ... | $1,683 |

**Other Support Costs**

| | 2000 AGU | 2001 Plan |
|---|---|---|
| Discovery | | $26 |
| Medical Affairs | ... | |
| Regulatory Affairs / Research Quality Assurance | | $301 |
| Other / In-Licensing Fees | $6,000 | $315 |
| Total Program | $6,000 | $10,000 |

CONFIDENTIAL
JH 008130

FTI (ABT-xxx)
Annual Development Plan
Exhibit 1.8



| Therapeutic Area | Oncology |
| Indications | Solid tumors such as lung, breast, ovary, bladder and pancreas. |
| Description | • Farnesyltransferase inhibitor. <br> • Mechanism of action is unknown, but thought to inhibit farnesylated proteins which are integral for malignant tumor growth. |

**Current Time Line**

| Milestones | Date |
|---|---|
| DDC | 1Q/2001 |
| Phase I | 4Q/2001 |
| Phase II | 2Q/2003 |
| Phase III | 3Q/2004 |
| NDA Filing | 4Q/2008 |
| Launch | 4Q/2007 |

**Spending**

| | 55 |
|---|---|
| Project-to-Date-Spending (thru '00) | 36.0 |
| 2001 Current Projection (Plan) | 6.0* |

* See page 2 for detail.

**Projected Spending by Year**

| 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|
| N/A | 6.0 | 16.0 | 30.0 | 30.0 | 18.0 | 99.0 |

CONFIDENTIAL
JH 008131

## ONCOLOGY - FTI ABT-xxx
### 2001 Plan Development Cost Summary

| Program Status | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|
| | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 |
| Phase I | | | | | | | | |
| Phase II | | | | | | | | |
| Phase III | | | | | | | | |

DDC → (2001)    NDA → (2006)    Launch → (2007)

### Major Development Activities and Costs

| Clinical Program | Total Patients | Enrolled | Start | End | 2000 AGU Cost | 2001 Plan Cost |
|---|---|---|---|---|---|---|
| Phase I Multiple Escalating Dose | 40 | ... | Dec-2001 | Nov-2002 | N/A | $150 |
| | | | | | | |
| Phase-I Center | | | | | ... | ... |
| Venture Management | | | | | N/A | $228 |
| Data Management/Statistics | | | | | N/A | $100 |
| | | | | | N/A | $278 |

| Chemistry, Manufacturing, and Controls (CMC) | 2000 AGU Cost | 2001 Plan Cost |
|---|---|---|
| Formulation / Analytical | N/A. | $1,100 |

| Drug Safety Support | 2000 AGU Cost | 2001 Plan Cost |
|---|---|---|
| Drug Safety support. | N/A | $2,184 |

| Other Support Costs | 2000 AGU Cost | 2001 Plan Cost |
|---|---|---|
| Discovery | | |
| Medical Affairs | N/A | $2,000 |
| Regulatory Affairs / Research Quality Assurance | N/A | ... |
| Other Costs / In-licensing Fees | N/A | $138 |
| Total Program | N/A | $6,000 |

CONFIDENTIAL
JH 008132

Dopamine Receptor Agonist (ABT-xxx)
Annual Development Plan
Exhibit 1.6

| Therapeutic Area | Other |
| Indications | Male Erectile Dysfunction (MED) |

**Description**

- D4 Dopamine Receptor Agonist.
- Targets D4 receptors in the brain which offers the potential for efficacy in patients with MED but do not respond to Viagra.
- Additionally this approach offers opportunity for compounds with improved tolerability relative to other Dopamine agents that are clinically used for MED.

**Current Time Line**

| Milestones | Date |
|---|---|
| DOC | 4Q/2001 |
| Phase I | 2Q/2002 |
| Phase II | 4Q/2003 |
| Phase III | 1Q/2005 |
| NDA Filing | 1Q/2007 |
| Launch | 4Q/2007 |

**Spending**

| | |
|---|---|
| Projects-to-Date-Spending (thru '00) | 34.0 |
| 2001 Current Projection (Plan) | 6.0* |

*See page 2 for detail.

**Projected Spending by Year**

| 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|
| N/A | 6.0 | 16.0 | 30.0 | 30.0 | 18.0 | 90.0 |

CONFIDENTIAL
JH 008133

## Dopamine Receptor Agonist  ABT-xxx
### 2001 Plan Development Cost Summary

**Program Status**

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|
| Phase I | | | | | | | | |
| Phase II | | | | | | | | |
| Phase III | | | | | | | | |

DDC ← ... ← NDA ← Launch

**Major Development Activities and Costs**

| Clinical Program | Total Patients | | Enrolled | Start | End | 2000 AGU Cost | 2001 Plan Cost |
|---|---|---|---|---|---|---|---|
| Phase I Multiple Escalating Dose | ... | | ... | Start | End | N/A | ... |
| Phase-I Center | | | | | | N/A | ... |
| Venture Management | | | | | | N/A | ... |
| Data Management/Statistics | | | | | | N/A | ... |
| | | | | | | N/A | $0 |

| Chemistry, Manufacturing, and Controls (CMC) | 2000 AGU | 2001 Plan |
|---|---|---|
| Formulation / Analytical | N/A | $0 |

| Drug Safety Support | 2000 AGU | 2001 Plan |
|---|---|---|
| Drug Safety support | N/A | $1,000 |

| Other Support Costs | 2000 AGU | 2001 Plan |
|---|---|---|
| Discovery | N/A | $5,000 |
| Medical Affairs | N/A | ... |
| Regulatory Affairs / Research Quality Assurance | N/A | ... |
| Other Costs / In-licensing Fees | N/A | $0 |
| **Total Program** | **N/A** | **$6,000** |

CONFIDENTIAL
JH 008134

Pharmaceutical Products Division
Sample Direct/Indirect Project Funding Distribution
2001 Plan ($000)

| | ABT - 772 (Late Stage - Phase III) | | | MMPI (Early Stage) | | |
|---|---|---|---|---|---|---|
| | Direct | Indirect | Total | Direct | Indirect | Total |
| PPD Investigational Drug | 0.3 | 0.0 | 0.4 | . | . | . |
| Venture Management | 4.8 | 1.6 | 6.5 | 0.8 | 0.2 | 0.9 |
| Discovery | 2.2 | 0.2 | 2.4 | 1.1 | 0.3 | 1.3 |
| Drug Safety | 1.6 | 0.2 | 1.7 | 1.8 | 0.3 | 2.1 |
| PARD | 4.8 | 0.4 | 5.3 | 0.8 | 0.2 | 1.0 |
| Phase I Center | 2.0 | 0.1 | 2.1 | 0.1 | 0.0 | 0.1 |
| Development Operations | 4.2 | 0.5 | 4.6 | 0.1 | 0.0 | 0.1 |
| Regulatory Affairs | 0.2 | 0.0 | 0.3 | 0.0 | 0.0 | 0.0 |
| Medical Affairs | 0.8 | 0.1 | 0.9 | 0.0 | 0.0 | 0.0 |
| Administration | 1.6 | . | 1.6 | 0.1 | . | 0.1 |
| At Manpower | 0.7 | . | 0.7 | . | . | . |
| Bulk Drug / Process | 15.0 | . | 15.0 | . | . | . |
| Clinical Grants | 43.1 | . | 43.1 | 1.3 | . | 1.3 |
| Total | 81.4 | 3.2 | 84.6 | 6.2 | 0.9 | 7.1 |
| % Split | 96.2% | 3.8% | 100.0% | 86.6% | 13.4% | 100.0% |

CONFIDENTIAL
JH 008135

**Pharmaceutical Products Division**
**Sample Direct/Indirect Rate & Headcount Distribution**
**2001 Plan**

| Rate: | Data Management | | Toxicology/Pathology | |
|---|---|---|---|---|
| **Direct** | | | | |
| Payroll (Both PMP and Supv/Mgr) | 6,577 | | 5,277 | |
| Office Supplies | 53 | | 51 | |
| T & E | 26 | | 84 | |
| Sem/Edu | 21 | | 73 | |
| Supplies | 41 | | 440 | |
| Consultant | 291 | | 67 | |
| Printing | 73 | | 4 | |
| Clinical Tracking Costs | 4,075 | | -- | |
| Depreciation | 1,031 | | 258 | |
| UNIX Based Support | 3,453 | | 921 | |
| Utilities | 62 | | -- | |
| Floorspace | 579 | | 1,479 | |
| Housekeeping | 23 | | -- | |
| Other | 112 | | 389 | |
| Sub-Total Direct | 16,416 | | 9,042 | |
| **Indirect** | | | | |
| Patents & Trademarks | 285 | | 388 | |
| Corporate Indirect | 697 | | 949 | |
| PPD Indirect (Mgmt.) | 337 | | 458 | |
| Department Overhead | 396 | | 584 | |
| Other | 46 | | 62 | |
| Sub-Total Indirect | 1,761 | | 2,441 | |
| **Total** | 18,177 | | 11,483 | |
| % Direct | 90% | | 79% | |
| % Indirect | 10% | | 21% | |
| **Headcount:** | | | | |
| Direct Headcount | 123 | 88% | 53 | 88% |
| Indirect Headcount | 17 | 12% | 7 | 12% |
| Total Headcount | 140 | | 60 | |
| Rate | 92.06 | | 135.42 | |
| Hours | 1,600 | | 1,600 | |
| Annual Rate | 147,296 | | 216,672 | |

CONFIDENTIAL
JH 008136

-37-

## EXHIBIT 1.17

### EISAI TERRITORY

1.  Bhutan
2.  Brunei
3.  Cambodia
4.  People's Republic of China
5.  Republic of China (Taiwan)
6.  India
7.  Indonesia
8.  Japan
9.  Democratic People's Republic of Korea (North Korea)
10. Republic of Korea
11. Laos
12. Macao
13. Malaysia
14. Mongolia
15. Myanmar
16. Nepal
17. Pakistan
18. Papua New Guinea
19. Philippines
20. Singapore
21. Sri Lanka
22. Thailand
23. Vietnam
24. Italy, co-exclusive rights with Abbott, unless Abbott exercises its rights under the terms of the Eisai Agreement to take an exclusive right to Italy.

CONFIDENTIAL
JH 008137

-38-

EXHIBIT 1.40

PROGRAM COMPOUNDS

| In-License Agreement | Program Compound | Development Phase |
|---|---|---|
| | ABT-627 (Endothelin antagonist) | phase III |
| Taisho | ABT-773 (Ketolide antibiotic) | phase III |
| | ABT-594 (Cholinergic channel modulator) | late phase II |
| Wakunaga | ABT-492 (Quinolone antibiotic) | phase I |
| Eisai | ABT-751 (Antimitotic) | phase I |
| | ABT-510 (Thrombospondin peptide) | phase I |

Preclinical Programs:

| | | |
|---|---|---|
| FTI Program | | late preclinical |
| ED Program | | late preclinical |
| MMPI Program | ABT-518 (Matrix metalloproteinase inhibitor) | phase I |

CONFIDENTIAL
JH 008138

-39-

EXHIBIT 1.43

## EXAMPLE OF PROGRAM RELATED COSTS FOR ONE PROGRAM COMPOUND

CONFIDENTIAL
JH 008139

## 2001 KEY RATES

| | 2000 | | | 2001 | | | % Change | | |
|---|---|---|---|---|---|---|---|---|---|
| | Rate | Hours | Annual Rate | Rate | Hours | Annual Rate | Hourly Rate | Total Hours | Annual Rate |
| **DRUG SAFETY** | | | | | | | | | |
| Toxicology/Pathology - PMP/TMP | 121.52 | 1,680 | 204,154 | 135.42 | 1,600 | 216,872 | 11.4% | -4.8% | 6.1% |
| Metabolism/Microscopy - PMP/TMP | 144.75 | 1,600 | 231,600 | 141.64 | 1,650 | 233,706 | -2.1% | 3.1% | 0.9% |
| Comparative Medicine - PMP/TMP | 115.60 | 1,768 | 204,381 | 116.88 | 1,850 | 216,228 | 1.1% | 4.6% | 5.8% |
| Strategic & Exploratory - PMP/TMP | 121.52 | 1,680 | 204,154 | 173.56 | 1,600 | 277,696 | 42.8% | -4.8% | 36.0% |
| **PHASE I CENTER** | | | | | | | | | |
| Pharmacokinetics 4PK - PMP/TMP | 144.75 | 1,600 | 231,600 | 135.00 | 1,600 | 216,000 | -6.7% | ... | -8.7% |
| Clin. Res. MDs 42P - PMP | ... | ... | | 180.35 | 1,500 | 270,525 | ... | ... | ... |
| Clin. Res. Spec. 420-PMP/TMP | 113.59 | 1,700 | 193,103 | 123.75 | 1,700 | 210,375 | 8.9% | ... | 8.9% |
| **PARD** | | | | | | | | | |
| Prod Dev - PMP, TMP | 108.54 | 1,800 | 195,372 | 116.71 | 1,800 | 210,078 | 7.5% | ... | 7.5% |
| IDS - PMP, TMP | 160.80 | 1,600 | 257,280 | 162.11 | 1,600 | 259,376 | 0.8% | ... | 0.8% |
| **DEV OPERATIONS** | | | | | | | | | |
| Data Mgmt D433 - TMP/PMP | 90.04 | 1,600 | 144,084 | 92.06 | 1,600 | 147,296 | 2.2% | ... | 2.2% |
| Stats - PMP/TMP | 97.75 | 1,800 | 175,950 | 98.10 | 1,800 | 178,380 | 1.4% | ... | 1.4% |
| **RAQA** | | | | | | | | | |
| RAQA - PMP & TMP | 125.50 | 1,600 | 200,800 | 134.49 | 1,600 | 215,184 | 7.2% | ... | 7.2% |
| **DISCOVERY** | 137.65 | 1,800 | 247,770 | 142.91 | 1,800 | 257,238 | 3.8% | ... | 3.8% |

03/13/01  02:09:34 PM

2001 KEY RATES 201.123

CONFIDENTIAL
JH 008140

-40-

EXHIBIT 9.2

PAYMENT INSTRUCTIONS

Fleet Boston
ABA No. 011000390
Boston, Massachusetts 02110
Account of: John Hancock Life Insurance Co. Private Placement Collection Acct.
Account Number: 541-55417
On Order of: Abbott Laboratories — Research Funding Agreement dated as of March 13, 2001

E-3233160

CONFIDENTIAL
JH 008141

M:\Domestic\Pals & Adams\John Hancock\JH rfa FINAL.DOC                    Last printed 3/13/01 1:47 PM

-41-

Exhibit 12.2(d)

Further Information Regarding Program Compounds

| COMPOUND | CHEMICAL NAME | CURRENT STAGE OF DEVELOPMENT |
|---|---|---|
| ABT-627 Endothelin antagonist | (2R,3R,4S)-4-(1,3-benzodioxol-5-yl)-1-[2-(dibutylamino)-2-oxoethyl]-2-(4-methoxyphenyl)-3-pyrrolidinecarboxylic acid | Phase III |
| ABT-773 Ketolide antibiotic | (3aS,4R,7R,9R,10R,11S,13R,15R,15aR)-4-ethyl-3a,7,9,11,13,15-hexamethyl-2,6,8,14-tetraoxo-11-{[(2E)-3-(3-quinolinyl)-2-propenyl]oxy}tetradecahydro-2H-oxacyclotetradecino[4,3-d][1,3]oxazol-10-yl 3,4,6-trideoxy-3-(dimethylamino)--D-xylo-hexopyranoside | Phase III |
| ABT-594 Cholinergic channel modulator | (2R)-azetidinylmethyl 6-chloro-3-pyridinyl ether hydrochloride | Phase II |
| ABT-492 Quinoline Antibiotic | potassium 1-(6-amino-3,5-difluoro-2-pyridinyl)-8-chloro-6-fluoro-7-(3-hydroxy-1-azetidinyl)-4-oxo-1,4-dihydro-3-quinolinecarboxylate | Phase I |
| ABT-518 Matrix metalloproteinase inhibitor | (1S)-1-[(4S)-2,2-dimethyl-1,3-dioxolan-4-yl]-2-{[4-[4-(trifluoromethoxy)phenoxy]phenyl]sulfonyl}ethyl(hydroxy)formamide | Phase I |
| ABT-751 Antimitotic | N-[2-(4-hydroxyanilino)-3-pyridinyl]-4-methoxybenzenesulfonamide | Phase I |
| Farnesyltransferase inhibitor | N.A. | Pre-Clinical Program |
| Dopamine Receptor Agonist for Erectile Dysfunction | N.A. | Pre-Clinical Program |

CONFIDENTIAL
JH 008142

-42-

## EXHIBIT 12.2(e)

Certain Patent Information

### ABT-627

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---|---|---|---|---|
| Australia | 08/04/1995 | 711832 | *Issued* | 08/04/2015 |
| Brazil | 02/12/1997 | | *Pending* | |
| Canada | 08/04/1995 | | *Pending* | |
| EP* | 08/04/1995 | | *Pending* | |
| Hong Kong | 07/15/1998 | | *Pending* | |
| Israel | 08/10/1995 | | *Pending* | |
| Japan | 08/04/1995 | | *Pending* | |
| Korea | 08/04/1995 | | *Pending* | |
| Mexico | 08/04/1995 | | *Pending* | |
| Philippines | 08/17/1995 | | *Pending* | |
| USA | 05/30/1995 | 5,767,144 | *Issued* | 06/16/2015 |

*Europe: Austria, Belgium, Great Britain, Denmark, France, Germany, Greece, Ireland, Italy, Luxembourg, Netherlands, Portugal, Spain, Sweden, Switzerland

CONFIDENTIAL
JH 008143

-43-

Exhibit 12.2(e) (Cont'd)

ABT-773
(Subject to Taisho Agreement)

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---------|-------------|---------------|--------|-----------|
| Argentina | 09/03/1997 | | Pending | |
| Australia | 09/02/1997 | | Pending | |
| Brazil | 05/13/1997 | | Pending | |
| Brazil | 09/02/1997 | | Pending | |
| Bulgaria | 09/02/1997 | | Pending | |
| Belarus | 09/02/1997 | | Pending | |
| China | 09/02/1997 | | Pending | |
| Chile | 09/04/1997 | | Pending | |
| Canada | 09/02/1997 | | Pending | |
| Columbia | 09/02/1997 | | Pending | |
| Czech Republic | 09/02/1997 | | Pending | |
| EP* | 09/02/1997 | | Pending | |
| Guatemala | 08/29/1997 | | Pending | |
| Hong Kong | 09/02/1997 | | Pending | |
| Croatia | 09/03/1997 | | Pending | |
| Hungary | 09/02/1997 | | Pending | |
| Indonesia | 09/04/1997 | | Pending | |
| India | Pending-Black Box | | Pending | |
| Israel | 09/02/1997 | | Pending | |
| Japan | 09/02/1997 | | Pending | |
| Korea | 09/02/1997 | | Pending | |
| Mexico | 09/02/1997 | | Pending | |
| Malaysia | 08/26/1997 | | Pending | |
| Norway | 09/02/1997 | | Pending | |

CONFIDENTIAL
JH 008144

-44-

Exhibit 12.2(e) (cont'd)

ABT-773 (cont'd)
(Subject to Taisho Agreement)

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---|---|---|---|---|
| New Zealand | 09/02/1997 | | Pending | |
| Philippines | 09/02/1997 | | Pending | |
| Pakistan | 10/13/1997 | 136010 | Issued | 10/13/2013 |
| Poland | 09/02/1997 | | Pending | |
| Romania | 09/02/1997 | | Pending | |
| Russia | 09/02/1997 | | Pending | |
| South Africa | 08/20/1997 | 97/7474 | Issued | 08/20/2017 |
| Singapore | 09/02/1997 | | Pending | |
| Slovak Republic | 09/02/1997 | | Pending | |
| Slovenia | 09/02/1997 | 20023 | Issued | 09/02/2017 |
| Saudi Arabia | 02/10/1998 | | Pending | |
| Thailand | 09/03/1997 | | Pending | |
| Turkey | 09/02/1997 | TR 01127 B | Issued | 09/02/2017 |
| Taiwan | 09/05/1997 | | Pending | |
| UA | 09/02/1997 | | Pending | |
| USA | 07/03/1997 | 5,866,549 | Issued | 09/04/2016 |
| Yugoslavia | 09/02/1997 | | Pending | |

*Europe: Austria, Belgium, Great Britain, Denmark, France, Germany, Greece, Ireland, Italy, Luxembourg, Netherlands, Portugal, Spain, Sweden, Switzerland

CONFIDENTIAL
JH 008145

-45-

EXHIBIT 12.2(e) (Cont'd)

## ABT-594

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---|---|---|---|---|
| Australia | 10/08/1993 | 687017 | Issued | 10/18/2013 |
| Brazil | 04/30/1997 | | Pending | |
| Canada | 10/08/1993 | | Pending | |
| EP* | 10/06/1993 | | Pending | |
| Hong Kong | 12/10/1998 | | Pending | |
| Israel | 10/04/1993 | 107184 | Issued | 10/04/2013 |
| Japan | 10/08/1993 | 3098035 | Issued | 10/08/2013 |
| Korea | 10/08/1993 | | Pending | |
| Mexico | 10/08/1993 | | Pending | |
| Philippines | 10/07/1993 | | Pending | |
| USA | 06/07/1995 | 5,948,793 | Issued | 09/07/2016 |

*Europe:  Austria, Belgium, Great Britain, Denmark, France, Germany, Greece, Ireland, Italy, Luxembourg, Netherlands, Portugal, Spain, Sweden, Switzerland

CONFIDENTIAL
JH 008146

-46-

EXHIBIT 12.2(e) (Cont'd)

ABT-492

(Subject to Wakunaga Agreement)

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---|---|---|---|---|
| Australia | 09/24/1999 | | Pending | |
| Brazil | 11/29/1999 | | Pending | |
| Canada | 12/06/1999 | | Pending | |
| China | 10/22/1999 | 1258674A | Issued | |
| Hong Kong | | | | |
| EP* | 12/08/1999 | 0992501 | Issued | |
| Hungary | 11/23/1999 | 9904389 | Issued | |
| Republic of Korea | 08/29/2000 | | | |
| Mexico | 10/14/1999 | | Pending | |
| Russian Federation | 05/26/2000 | | Pending | |
| USA | 06/10/1999 | | Pending | |
| Japan | 10/06/1999 | 2000-136191 | Issued | |

*Europe:  Austria, Belgium, Switzerland, Germany, Denmark, Spain, Finland, France, Great Britain, Greece, Ireland, Italy, Luxembourg, Monaco, Netherlands, Portugal, Sweden

CONFIDENTIAL
JH 008147

-47-

EXHIBIT 12.2(e) (Cont'd)

## ABT-510

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---|---|---|---|---|
| Argentina | 05/21/1999 | | Pending | |
| Australia | 05/21/1999 | | Filing in Process | |
| Brazil | 05/21/1999 | | Filing in Process | |
| Bulgaria | 05/21/1999 | | Filing in Process | |
| China | 05/21/1999 | | Filing in Process | |
| Chile | 05/20/1999 | | Pending | |
| Canada | 05/21/1999 | | Filing in Process | |
| Columbia | 05/21/1999 | | Pending | |
| Czech Republic | 05/21/1999 | | Filing in Process | |
| EP* | 05/21/1999 | | Filing in Process | |
| Hong Kong | 05/21/1999 | | Filing in Process | |
| Hungary | 05/21/1999 | | Pending | |
| India | 05/21/1999 | | Filing in Process | |
| Israel | 05/21/1999 | | Filing in Process | |
| Japan | 05/21/1999 | | Filing in Process | |
| Korea | 05/21/1999 | | Filing in Process | |
| Mexico | 05/21/1999 | | Filing in Process | |
| Norway | 05/21/1999 | | Filing in Process | |
| New Zealand | 05/21/1999 | | Filing in Process | |
| Phillipines | 05/21/1999 | | Pending | |
| Poland | 05/21/1999 | | Filing in Process | |
| South Africa | 05/21/1999 | | Filing in Process | |
| Slovak Republic | 05/21/1999 | | Filing in Process | |
| Saudi Arabia | 05/21/1999 | | Pending | |
| Turkey | 05/21/1999 | | Filing in Process | |
| Taiwan | 05/21/1999 | | Pending | |
| USA | 05/21/1999 | | Pending | |

*Europe: Austria, Belgium, Great Britain, Cyprus, Denmark, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, Netherlands, Portugal, Romania, Slovenia, Spain, Sweden, Switzerland

CONFIDENTIAL
JH 008148

-48-

EXHIBIT 12.2(e) (Cont'd)

ABT-518

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---|---|---|---|---|
| Argentina | 07/30/1998 | | Pending | |
| Australia | 07/27/1998 | | Pending | |
| Brazil | 07/27/1998 | | Pending | |
| Bulgaria | 07/27/1998 | | Pending | |
| China | 07/27/1998 | | Pending | |
| Chile | 07/17/1998 | | Pending | |
| Canada | 07/27/1998 | | Pending | |
| Columbia | 07/29/1998 | | Pending | |
| Czech Republic | 07/27/1998 | | Pending | |
| EP* | 07/27/1998 | | Pending | |
| Hungary | 07/27/1998 | | Pending | |
| Israel | 07/27/1998 | | Pending | |
| Japan | 07/27/1998 | | Pending | |
| Korea | 07/27/1998 | | Pending | |
| Mexico | 07/27/1998 | | Pending | |
| Norway | 07/27/1998 | | Pending | |
| New Zealand | 07/27/1998 | | Pending | |
| Philippines | 07/27/1998 | | Pending | |
| Poland | 07/27/1998 | | Pending | |
| South Africa | 07/30/1998 | 98/6828 | Issued | 07/30/2018 |
| Slovak Republic | 07/27/1998 | | Pending | |
| Saudi Arabia | 12/15/1998 | | Pending | |
| Turkey | 07/27/1998 | | Pending | |
| Taiwan | 07/31/1998 | | Pending | |
| USA | 08/05/1998 | | Pending | |

*Europe:  Austria, Belgium, Great Britain, Denmark, France, Germany, Greece, Ireland, Italy, Luxembourg, Netherlands, Portugal, Spain, Sweden, Switzerland

CONFIDENTIAL
JH 008149

-49-

EXHIBIT 12.2(e) (Cont'd)

ABT-751
(Subject to Eisai Agreement)

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---|---|---|---|---|
| USA | 08/08/1991 | 5,250,549 5,292,758 | Issued | 08/08/2011 08/08/2011 |
| Germany | 08/07/1991 | EP 472,053 | Issued | 08/07/2011 |
| United Kingdom | 08/07/1991 | EP 472,053 | Issued | 08/07/2011 |
| France | 08/07/1991 | EP 472,053 | Issued | 08/07/2011 |

CONFIDENTIAL
JH 008150

-50-

EXHIBIT 12.2(f)

COMMUNICATIONS

With respect to ABT-594, Abbott has received the following communications:

- Correspondence from Sibia Neurosciences, 505 Coast Blvd. South, Suite 300, La Jolla, CA 92037 (Sibia was acquired by Merck & Co., Inc. in August, 1999) including, most recently, a letter dated March 13, 1998.
- Correspondence from ICT Pharmaceuticals c/o Stadheim and Grear, Ltd., 400 North Michigan Ave., Chicago, IL 60611 including, most recently, a letter dated September 14, 2000.

The Sibia and ICT correspondence each refer to their patents on research tools.

CONFIDENTIAL
JH 008151

-51-

EXHIBIT 12.2(i)

Compound Reports

CONFIDENTIAL
JH 008152

Davis Deposition Exhibit 9

PART 3

*CONFIDENTIAL*

# ABT – 773

## Descriptive Memorandum

*February 2001*

## Abbott Laboratories

**CONFIDENTIAL**
**JH 008153**

## ABT-773

### Opportunity Overview

ABT-773 pertains to a promising new class of antibiotics known as ketolides. ABT-773 is likely to have activity against resistant strains of bacteria and will, therefore, compete effectively against currently marketed antibiotics. The compound is currently in Phase II/III trials. Phase III clinical trials began in Q4, 2000. ABT-773 has an expected U.S. launch date in Q1, 2004. Ex-U.S. launches are projected in 2004 for Europe and Japan.

Product features such as high efficacy, activity against resistant strains of bacteria and convenience should enable it to compete against both Zithromax and newer agents such as the quinolones. Dosing is expected to be once-a-day. A 5-day convenience pak at a competitive price will help maximize sales.

### The US Market

The overall antibiotic market in the U.S. reached $8.9 billion in sales in 1999. The tab/cap segment is the largest; sales in 1999 were $5.7 billion. The I.V. and oral suspension segments are comparatively smaller; total sales topped $2.1 and $1.1 billion, respectively.

Tab/cap and oral suspension prescription volume had been declining 1-2% per year in the period of 1995-1998, due to more appropriate prescribing in the face of increasing resistance. However, total tab/cap prescription volume recovered in 1999 and grew 6.3%. Even in the face of negative pressure on antibiotic use, dollar sales in the U.S. have continued to increase, particularly in the tab/cap market. This is due to the trend of replacing relatively low-cost generic agents with higher priced premium antibiotics. The market is willing to bear higher costs for agents that satisfy unmet needs. The I.V. market has grown slightly in terms of sales, also being driven largely by the replacement of generic agents with more costly branded agents.

Macrolides, largely fueled by the gains of Zithromax, have seen significant growth in terms of both prescriptions and sales. Zithromax prescriptions far outnumber those of other competitors, while its sales have nearly surpassed those of the sales leader, Cipro. Historically, quinolones saw relatively limited use for community respiratory tract infections (RTIs) because of poor Gram-positive coverage and sub-optimal adverse event profiles. Newer quinolones such as Levaquin have been successful in achieving more widespread use by virtue of its improved activity and adverse event profile. Levaquin currently accounts for approximately 30% of the quinolone market share. It is anticipated that recent quinolone introductions (Avelox, Tequin) will build upon the RTI momentum established by Levaquin. The growth of the macrolide and quinolone classes has come largely at the expense of cephalosporins and generic agents such as erythromycin and penicillin.

The following table shows 1999 tab/cap sales and prescriptions by class/product:

| | Sales | | | TRXs | | |
|---|---|---|---|---|---|---|
| | Sales ($MM) | Share | CAGR$_{95-99}$ | TRXs (MM) | Share | CAGR$_{95-99}$ |
| Penicillin | $148.3 | 2.6% | -1.6% | 52.5 | 23.7% | -5.6% |
| Cephalosporins | $980.9 | 17.2% | -5.8% | 37.9 | 17.1% | -3.5% |
| Ceftin | $383.9 | 6.7% | 1.8% | 5.0 | 2.5% | -1.0% |
| Cefzil | $198.7 | 3.3% | 12.5% | 2.7 | 1.2% | 11.3% |
| Other | $408.3 | 7.1% | -14.7% | 30.1 | 13.6% | -4.8% |
| Ext. Spec. Macrolides | $1,595.5 | 27.9% | 19.0% | 36.1 | 16.3% | 20.8% |
| Biaxin | $690.5 | 12.1% | 6.1% | 11.3 | 5.1% | 1.2% |
| Zithromax | $891.1 | 15.6% | 42.1% | 24.4 | 11.0% | 41.5% |
| Other | $14.0 | 0.2% | 21.0% | 0.4 | 0.2% | 53.0% |
| Quinolones | $1,622.1 | 28.4% | 17.0% | 24.0 | 10.8% | 11.7% |
| Cipro | $902.5 | 15.8% | 8.3% | 14.1 | 6.4% | 5.1% |
| Levaquin | $529.4 | 9.3% | NA | 7.0 | 3.1% | NA |
| Other | $190.2 | 3.3% | -2.2% | 3.0 | 1.3% | -6.4% |
| Augmentin | $778.1 | 13.6% | 17.8% | 10.7 | 4.8% | 11.8% |
| Other Classes | $590.5 | 10.3% | -1.1% | 60.4 | 27.3% | -4.1% |
| TOTAL TAB/CAP | $5,715.4 | 100.0% | 8.9% | 221.5 | 100.6% | 0.1% |

CONFIDENTIAL
JH 008154

### U.S. Market Projections

Resistance to antibiotics is likely to increase, creating opportunities for new agents with activity against resistance. Physicians will be urged to choose agents with an appropriate spectrum of activity relative to the infection being treated. Resistance will increasingly become part of the promotional mix for emerging agents. The ability of an agent to treat resistant strains and the real or perceived ability to slow or prevent resistance development (mutation prevention concentration, low mutation frequency, structure-activity relationships, etc) may confer competitive advantage to such agents.

• Quinolones, which historically have seen limited use in community-acquired respiratory infections, will become a significant class in this segment as new agents from this class are launched that specifically target RTIs.

• The market will become more competitive as new agents enter both the community segment (ketolides, quinolones) as well as the nosocomial segment (oxazolidinones, streptogramins, everninomycins, peptides, others).

• Several key branded antibiotics will lose patent exclusivity over the next three to five years. This may create an opportunity in the pediatric market as the top three pediatric brands (Augmentin, Cefzil, Zithromax) are among those losing patent exclusivity.

Antiviral influenza and cold therapeutics, as well as an increasing number of antibacterial vaccines may have a negative impact on antibiotic prescriptions.

### The Ex-U.S. Market

Ex-U.S. sales of antibiotics totaled $11.7 billion in 1999. Tab/cap represents the largest segment, with sales of $9.4 billion from 770 million total prescriptions. Total Rx growth has been flat, with a 1996-99 CAGR of 0.5%. The use of antibiotics is predicted to slowly decline due to more judicious use of antibacterials in the face of increasing bacterial resistance.

Ex-U.S., the quinolone class accounted for 8% of total tab/cap market prescriptions (62 million Rxs) and 13% of sales ($1.2 billion). Ciprofloxacin is the market leader ex-U.S. with approximately 47% of the quinolone market Rxs (29 million Rxs) and 44% ($530MM) of sales. Levofloxacin launched in many European markets in 1998/1999 and holds approximately 14% Rx share of the European quinolone market and 0.8% of the overall tab/cap market. Although grepafloxacin and trovafloxacin also launched in some European countries in 1999, both products were recently pulled from the market due to liver toxicity and other complications. Moxifloxacin launched in Germany in Q4 1999, but has not yet been approved in other markets. In Japan, levofloxacin launched in 1994 and still commands a 65% Rx share of the quinolone market and 10% of the Japanese tab/cap market overall. Japan accounts for approximately 80% of ex-U.S. levofloxacin sales ($370MM).

CONFIDENTIAL
JH 008155

*Scientific Rationale for ABT-773*

The likely profile of ABT-773 justifies further development:
- ABT-773 pertains to a new class of antibiotics.
- Good activity against resistant Gram + organisms, particularly macrolide-resistant *S. pneumoniae*.
- Convenience, safety, and tolerability profile competitive with Z-pak.
- Oral Suspension and I.V. forms enabling penetration into pediatrics and hospital segments.

*Clinical Studies*

The safety and efficacy of ABT-773 in AECB were studied in a multi-center Phase II clinical trial conducted between January and April of 1999. Dosing regimens of 100mg TID and 200mg TID were tested. Of the 169 enrolled patients, 159 were clinically evaluable and 96 were both clinically and bacteriologically evaluable. The following chart summarizes the results.

| Bacterial Eradication | ABT-773 100mg TID | ABT-773 200mg TID | Overall Eradication |
|---|---|---|---|
| S. pneumoniae | 100% (13/13) | 90% (9/10) | 96% (22/23) |
| M. catarrhalis | 100% (6/6) | 100% (7/7) | 100% (13/13) |
| H. influenzae | 96% (23/24) | 92% (24/26) | 92% (47/50) |
| H. parainfluenzae | 100% (6/6) | 88% (7/8) | 93% (13/14) |

| Clinical Response | ABT-773 100mg TID | ABT-773 200mg TID |
|---|---|---|
| Cure | 96% (77/80) | 92% (73/79) |
| Failure | 4% (3/80) | 8% (6/79) |

| Clinical and Bacterial Response | ABT-773 100mg TID | ABT-773 200mg TID |
|---|---|---|
| Cure | 96% (46/48) | 94% (45/48) |
| Failure | 4% (2/48) | 6% (3/48) |

| Adverse Events | ABT-773 100mg TID | ABT-773 200mg TID | Overall |
|---|---|---|---|
| Taste Perversion | 5% (4/84) | 3% (7/85) | 6.5% (11/169) |
| Diarrhea | 11% (9/84) | 6% (5/85) | 8% (14/169) |
| Nausea | 2% (2/84) | 2% (2/85) | 2% (4/169) |
| Abdominal Pain | 1% (1/84) | 2% (2/85) | 2% (3/169) |
| Headache | 2% (2/84) | 1% (1/85) | 2% (3/169) |
| Rash | 2% (2/84) | 1% (1/85) | 1% (3/169) |
| Dyspnea | 2% (2/84) | | 1% (2/169) |
| Elev. Liver Funct. Test | 1% (1/84) | 1% (1/85) | 1% (2/169) |
| Fever | | 2% (2/85) | 1% (2/169) |

CONFIDENTIAL
JH 008156

The safety and efficacy of ABT-773 in AECB were studied in a multi-center Phase IIb clinical trial from October 1999 to March 2000. Doses of 150mg QD, 300mg QD, and 600mg QD were tested. Of the enrolled subjects, 342 were clinically evaluable, and 169 were both clinically and bacteriologically evaluable. The following chart summarizes the results.

| Bacterial Eradication | ABT-773 150mg QD | | ABT-773 300mg QD | | ABT-773 600mg QD | | Overall Eradication | |
|---|---|---|---|---|---|---|---|---|
| S.pneumoniae | 83% | (10/12) | 90% | (9/10) | 100% | (13/13) | 91% | (32/35) |
| M.catarrhalis | 80% | (8/10) | 92% | (12/13) | 91% | (10/11) | 88% | (30/34) |
| H. influenzae | 94% | (17/16) | 89% | (17/19) | 83% | (19/23) | 88% | (53/60) |

| Clinical Response | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Cure | 87% | (98/113) | 90% | (105/117) | 90% | (101/112) | | |
| Failure | 13% | (15/113) | 10% | (12/117) | 10% | (11/112) | | |

| Clinical & Bacteriological Response | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Cure | 84% | (42/50) | 88% | (49/56) | 94% | (59/63) | | |
| Failure | 16% | (8/50) | 12% | (7/56) | 6% | (4/63) | | |

| Adverse Events | ABT-773 150mg QD | | ABT-773 300mg QD | | ABT-773 600mg QD | | Overall | |
|---|---|---|---|---|---|---|---|---|
| Taste Perversion | 5% | (4/84) | 19% | (25/129) | 29% | (37/129) | 17% | (66/384) |
| Diarrhea | 13% | (16/126) | 12% | (15/129) | 21% | (27/129) | 15% | (58/384) |
| Nausea | 7% | (9/126) | 13% | (17/129) | 30% | (38/129) | 17% | (64/384) |
| Vomiting | 2% | (3/126) | 3% | (4/1229) | 11% | (14/129) | 5% | (21/384) |
| Nausea & Vomiting | 0 | (0/126) | <1% | (1/129) | 4% | (5/129) | 2% | (6/384) |
| Abdominal Pain | 4% | (5/126) | 4% | (5/129) | 4% | (5/129) | 4% | (15/384) |

The safety and efficacy of ABT-773 in Acute Bacterial Sinusitis (ABS) were studied in a multi-center Phase IIb clinical trial conducted from October 1999 to March 2000. Dosing regimens of 150mg QD, 300mg QD, and 600mg QD were tested. Of the 292 enrolled subjects, 246 were clinically evaluable. The following chart summarizes the results.

| Bacterial Eradication | ABT-773 150mg QD | ABT-773 300mg QD | ABT-773 600mg QD | Overall Eradication |
|---|---|---|---|---|
| S.pneumonia | 3/3 | 8/8 | 9/12 | 20/23 |
| M. catarrhalis | 8/9 | 3/4 | 4/4 | 15/17 |
| H. influenzae | 3/5 | 7/7 | 5/7 | 15/19 |
| S.aureus | 1/1 | 1/1 | 3/4 | 5/6 |

| Clinical Response | | | | | | |
|---|---|---|---|---|---|---|
| Cure | 89% | (70/79) | 83% | (70/84) | 71% | (59/83) |
| Failure | 11% | (9/79) | 17% | (14/84) | 29% | (24/83) |

| Adverse Events | ABT-773 150mg QD | | ABT-773 300mg QD | | ABT-773 600mg QD | | Overall | |
|---|---|---|---|---|---|---|---|---|
| Taste Perversion | 1% | 16/97 | 14% | (14/98) | 27% | (26/97) | 14% | (41/292) |
| Diarrhea | 6% | (6/97) | 6% | (5/98) | 17% | (16/97) | 10% | (28/292) |
| Nausea | 3% | (3/97) | 12% | (12/98) | 26% | (25/97) | 14% | (40/292) |
| Vomiting | 1% | (1/97) | 6% | (6/98) | 17% | (16/97) | 8% | (23/292) |

CONFIDENTIAL
JH 008157

The safety and efficacy of ABT-773 in community-acquired pneumonia (CAP) were studied in a multi-center Phase Ib clinical trial from October 1999 to March 2000. Dosing regimens of 300mg QD and 600mg QD were tested. Of the 187 enrolled subjects, 1248 were clinically evaluable, and 15 were both clinically and bacteriologically evaluable. The following chart summarizes the results.

| Bacterial Eradication | ABT-773 300mg QD | | ABT-773 600mg QD | | Overall Eradication | |
|---|---|---|---|---|---|---|
| S. pneumoniae | 87% | (13/15) | 100% | (7/7) | 91% | (20/22) |
| M. catarrhalis | 75% | (6/8) | 50% | (2/4) | 67% | (8/12) |
| H. influenzae | 100% | (9/9) | 72% | (13/18) | 81% | (22/27) |
| M. pneumoniae | 93% | (13/14) | 93% | (14/15) | 93% | (27/29) |
| C. pneumoniae | 95% | (19/20) | 79% | (19/24) | 86% | (38/144) |
| L. pneumoniae | 100% | (3/3) | 100% | (2/2) | 100% | (5/5) |
| **Clinical Response** | | | | | | |
| Cure | 92% | (72/78) | 80% | (56/70) | | |
| Failure | 8% | (6/78) | 20% | (14/70) | | |
| **Clinical & Bacterial Response** | | | | | | |
| Cure | 92% | (54/59) | 82% | (47/57) | | |
| Failure | 8% | (5/59) | 18% | (10/57) | | |
| **Adverse Events** | | | | | | |
| Taste Perversion | 17% | (16/95) | 26% | (24/92) | 21% | (40/187) |
| Diarrhea | 14% | (13/95) | 19% | (17/92) | 16% | (30/187) |
| Nausea | 12% | (11/95) | 22% | (20/92) | 17% | (31/187) |
| Vomitting | 10% | (9/95) | 15% | (14/92) | 12% | (23/187) |

- Appendix 1

**Key Emerging Competitors**

| Generic | Brand | Company | Class | Status |
|---|---|---|---|---|
| moxifloxacin | Avelox | Bayer | Quinolone | Approved by FDA 12/13/00 |
| gatifloxacin | Tequin | BMS | Quinolone | Approved by FDA 12/21/00 |
| gemifloxacin | Factive | SKB | Quinolone | Filed NDA 12/15 |
| T-3811 | TBD | BMS/Toyama | Quinolone | Phase I |
| telithromycin | Ketek | Aventis | Ketolide | Filed NDA 3/00 |
| linezolid | Zyvox | Pharmacia | Oxazolidinone | Approved by FDA Q2 '00 |

CONFIDENTIAL
JH 008158

*CONFIDENTIAL*

# ABT – 627

## Descriptive Memorandum

*February 2001*

## Abbott Laboratories

CONFIDENTIAL
JH 008159

## ABT-627

### Opportunity Overview

ABT-627 is an orally bioavailable endothelin antagonist with a high selectivity for the Eta receptor. The endothelins (ET-1, ET-2, ET-3) are a family of 21 amino acid peptides first identified in 1988. Endothelin is a potent, long acting vasoconstrictor produced by vascular endothelial cells. The known biological effect of ET-1 are believed to be mediated principally through the Eta receptor. These include potent and uniquely sustained vasoconstriction of vascular smooth muscle, positive inotropy of myocardium, and the stimulation of cell proliferation or the hypertrophy in vascular smooth muscle cells, cardiac myocytes, and fibroblasts.

In vitro studies in cultured cells have established that ABT-627 selectively binds to the Eta receptor, and that ABT-627 is a potent inhibitor of ET-1 binding to the Eta receptor.

Studies in cultured human prostate cancer cells and other cultured cells have shown that ABT-627 acts as a functional antagonist of ET-1, and these effects have been confirmed in vivo by assessing the effect of ABT-627 on the ET-1 induced pressor response in rats. Further animal studies have suggested that oral ABT-627 may be effective in the treatment of congestive heart failure, pulmonary hypertension, hypertension, arterial restenosis, and myocardial infarction.

In addition to literature and animal models supporting the role of endothelin antagonists in cardiovascular indications, data exists supporting the role of the ET-1 cytokine as a pathogenic mediator in cancer.

The current role of endothelin in the manifestations of metastatic prostate cancer (PCA) and other tumors have yet to be fully defined. However, Abbott scientists and thought leaders have made multiple observations about endothelin biology which suggest that endothelin may play a role in the biology and pathophysiology of metastatic prostate disease and other metastatic disease such as ovarian, cervical and renal tumors

ABT-627 has successfully completed Phase II trials for PCA, and the results demonstrate efficacy in hormone refractory PCA. The end of Phase II meeting with the FDA was held on October 4th. The data from Phase II was very favorably received and "best package" comments were made. Fast track designation and rolling NDA were granted. The FDA was conceptually in agreement with preliminary design of Phase III clinicals and clinical end points to measure. While not a dictate, a second Phase III trial will likely be conducted to insure the best opportunity for a successful outcome. The Phase III program is scheduled to commence before year-end. It is expected that filing on ABT 627 will occur in US and ex-US 1Q 2004. The compound is also in Phase I trials for other cancer types. Phase II studies in other cancer types will commence in 2Q01. Other indications outside of oncology are also being considered, to optimize the commercial potential of this asset.

CONFIDENTIAL
JH 008160

### The US Market

Prostate cancer is the most common cancer to strike nonsmoking men. The NCI estimates that there are over 1.7 million men living with prostate cancer in the U.S., and another 179,300 will be diagnosed in 1999. Nearly 80% of these cases are men over 60 years of age. It is estimated that the prevalence of prostate cancer is 380,000 in Western Europe and 45,000 in Japan. While the vast majority of these patients will be identified with potentially curable disease (25% in Stage I and 50% in Stage II) in the U.S., half of these patients will go undiagnosed until late stage disease in W. Europe and Japan. The skewed distribution of diagnosed cases ex-U.S. is largely due to less aggressive prostate cancer screening programs compared to the U.S.

Prostate cancer has seen few additions or innovations in treatment regimens in the past two decades. Treatments remain, in general, radical prostatectomy (RP) for localized disease, radiotherapy for locally advanced disease and hormone therapy for advanced disease. Patients receiving hormone therapy become refractory to this treatment after two to three years, although many will continue on hormone therapy. These hormone refractory prostate cancer (HRPCa) patients usually have a life expectancy of approximately 12 months, and no existing standard of care exists for treating these patients. No therapy has shown a significant impact on survival in these patients, although some chemotherapeutic regimens may offer promise.

There is a general trend toward using hormone therapy in earlier stage patients. In some centers, patients are receiving hormone therapy prior to surgery or radiation, in an attempt to improve outcomes in these definitive treatments. Some thought leaders suggest that this earlier utilization has contributed to the overall mortality improvements in PCA. Studies are ongoing looking at different uses for hormone therapy, including intermittent therapy, in an attempt to improve outcomes and mitigate the morbidity associated with hormonal therapy.

Hormone therapy remains the mainstay of prostate cancer treatment in earlier stages. Chemotherapy, however, has gained additional attention in hormone refractory disease as new combinations and regimens offer the potential for greater therapeutic benefit with fewer side-effects. This trend will take several years before clinical trials are completed and community based oncologists adopt these regimens, so the current cytotoxic market in PCA is small.

The total dollar growth of this market has slowed as the two market leaders, Lupron (leuprolide/TAP) and Zoladex (goserelin/Zeneca), have experienced increased price pressures from managed care and Medicare. About half the states are currently reimbursing these therapies at a least cost option (only paying for the cheapest alternative), putting downward price pressures on Lupron ($6,500/yr) to match Zoladex's ($4,500/yr) lower price point. Thus, US Lupron dollar sales declined between 1997 and 1998, despite an increase in patient volume.

Growth has also stagnated due to a lack of innovation in this hormone dominated category. There have been few therapeutic advances in the treatment of PCA in the last 5 years.

The only chemotherapy approved for use in HRPCa patients with pain is Novantrone (mitoxantrone/Immunex), but the marginal benefits this compound delivers is deeply undercut by its severe toxicities and a lifetime cap on dose. Novantrone and steroids significantly reduced the metastatic pain in 40% of patients, but it does not appear to provide a survival advantage. Novantrone is dosed by i.v. infusion every 21 days, at a cost of $560 per treatment, or an annual cost of $8,000. Use of this agent is associated with significant side-effects, including myelosuppression, cardiac toxicity (which limits dosing) and nausea. It is this negative side-effect profile that inhibits the use of this agent in more patients. Only about 4% of U.S. HRPCa patients received Novantrone therapy in 1998. Novantrone has not been approved ex-US.

Only about 17% of HRPCa patients received any chemotherapy in 1998. The most common drugs included estramustine, paclitaxel and etoposide. These drugs continue to be some of the most studied compounds in HRPCa ongoing research and represent the greatest short-term promise in the cytotoxic treatment of this advanced disease state.

CONFIDENTIAL
JH 008161

### US Sales of Products to Treat Prostate Cancer

| Product | 1997 Dollar Sales (MM) | 1998 Dollar Sales (MM) | % chng '97-'98 |
|---|---|---|---|
| Lupron (leuprolide/TAP) | $650 | $667 | 2.6% |
| Zoladex (goserelin/Zeneca) | 233 | 296 | 27.3 |
| Casodex (bicalutamide/Zeneca) | 58 | 68 | 17.24 |
| Eulexin (flutamide/Schering) | 74 | 67 | -9.5 |
| Novantrone (mitoxantrone/Immunex) | 33 | 35 | 8.1 |
| Nilandrone (nilutamide/Hoechst) | 12 | 24 | 100 |
| Emcyt (estramustine/Pharmacia/Upjohn) | 8 | 14 | 75 |
| Taxol (paclitaxel/BMS) | 4 | 8 | 100 |
| VePesid (etoposide/BMS) | 5 | 4 | -20 |
| Others | 27 | 31 | 14.8 |
| Total | 1,104 | 1,214 | 10% |

Source: Tandem Research and Price Probe

*US Market Projections*

- Novantrone (mitoxantrone/Immunex) is currently the only product approved for the treatment of hormone refractory PCA with pain. It currently falls short on the market needs in terms of efficacy and side-effect profile.

| Attribute | Novantrone Profile |
|---|---|
| Dosing | I.V. Infusion cycles |
| Cost | Expensive, ~$10,000/yr |
| Efficacy | Provides marginal improvements in quality of life |
| Reimbursed | Yes |
| Side-effects | Dose limiting toxicities |
| Promo Efforts | 108 oncology reps |
| Targets | Oncologists |

Several surveys indicate that there are over 100 compounds in preclinical and clinical development for prostate cancer and various solid tumors. The compounds listed in the appendix represent compounds that appear to offer the greatest promise and/or potential for competition for ABT-627. However, since the most likely use of ABT-627 will be in combination with best therapy, it is difficult to define the extent of competitive threat that any of these compounds represent. In general, other cytostatic agents probably offer the greatest threat as a replacement for ABT-627. However, even other cytostatic agents may be combined to maximize the activity of the various mechanisms.

To date, PPD is aware of only one other endothelin receptor antagonist in development for cancer, from Yamanouchi, which began Phase I studies in the Fall of 1999. ABT-627 is still poised to be the first endothelin receptor antagonist to reach the market for oncology.

Descriptive Memorandum: ABT - 627          CONFIDENTIAL

CONFIDENTIAL
JH 008162

4

*Scientific Rationale for ABT-627*

There are relatively low hurdles for entry for a product to treat hormone refractory prostate cancer, as no truly effective agents presently exists. Quality of life is paramount in this population, followed by improvements in disease progression and survival. Quality of life parameters could include an impact on pain and/or delay in pain onset or other performance type measures of daily activities. As all hormone therapy ultimately fails, a product that delays disease progression is needed.

| Unmet Need | Pipeline Impact |
|---|---|
| Improvements in QOL | • ABT-627's profile goal is to provide improvements to a patient's QOL or blunt a decrease in QOL<br>• Cytotoxic agents rarely have significant positive impacts on QOL<br>• Other cytostatic agents may offer this benefit |
| Improvements in survival | • It is unlikely that improvements in survival will be seen in our current trials<br>• Cytotoxic agents may offer a survival advantage, perhaps in combination with ABT-627 |
| Improvements in time to disease progression | • Cytostatic and cytotoxic agents offer the greatest promise for this benefit |

Our objective is to provide physicians and patients with a novel option for the treatment of hormone refractory prostate cancer, distinguish ABT-627 from current cytotoxic therapies and encourage the treatment of advanced prostate cancer patients currently only receiving hormonal therapy.

ABT-627 will be positioned as a physician and patient-friendly choice for advanced prostate cancer patients who have failed hormone therapy. ABT-627's novel mechanism of action provides a delay in disease progression and a positive impact on QOL. The oral, QD dosing enhances compliance and minimizes disruptions to daily living.

The message will focus on 3 key attributes:

• Efficacy (defined as increased time to tumor progression) in a patient group with few options
• Improvements in quality of life
• Convenience

Physicians no longer have to choose between *treating* advanced prostate cancer patients and a patient's quality of life. ABT-627 has a positive impact on disease progression and symptoms associated with quality of life, without the baggage of significant side-effects or the inconvenience of parenteral administration associated with current therapy choices.

This message expresses the key features of the agent in terms of patient benefits, as opposed to emphasizing the scientific/clinical aspects. Since prostate cancer is a terminal disease with a relatively long time for disease progression, the quality of a patient's life becomes even more critical. Especially in cancer treatment, where the therapy can often feel worse than the disease, the benefits that ABT-627 will bring, coupled with its benign side-effect profile, will have a significant impact on prostate cancer patients' lives.

Clinical Studies

Phase II trials have been completed and the data are being analyzed. Preliminary results for the primary endpoint of time-to-disease progression and the secondary endpoint of time-to-PSA progression show that ABT-627 favorably delays both phenomena with a benign adverse event profile. The results are summarized below:

Disease Progression: The delay in median time-to-disease progression for evaluable subjects was improved by 52% and 43% for the 10mg and 2.5mg doses respectively over the placebo time-to-disease progression of 4.3 months.

Time-to-PSA Increase: A 150% and 150% improvement in median time-to-PSA progression for evaluable subjects was observed for the 10mg and 2.5mg doses respectively over the time-to-PSA progression placebo of 2 months.

Significant dose related decreases were observed in markers of metastatic bone disease.

## Key Prostate Cancer Competitors

| Product | Company | Phase | Projected NDA Filing | Description | Anticipated Impact on ABT-627 |
|---------|---------|-------|---------------------|-------------|-------------------------------|
| AG 3340 | Agouron | III | 2000 | MMPI | In combination with mitoxantrone/prednisone. Unknown impact. |
| Marimastat | British Biotech | II | 2001 | MMPI | Side-effect profile significantly worse than ABT-627. Probably minimal impact. |
| SU 101 | Sugen | I/II | 2002 | PDGF TK antagonist | Phase III in combination with mitoxantrone set to start in 1998. Uncertain impact. |
| AR 623 | Aronex | II | 2002 | All-transretinoic acid | IV liposomal form of ATRA. HRPCa trial began November 1998. Probably additive. |
| MGI 114 | MGI Pharma | II | 2002 | Alkylating agent | Lead compound is acylfulvenes. Fairly toxic. Probably additive. |
| Liposomal Encapsulated doxorubicin | NeoPharm and P&U/Alza and others | II | 2002 | Anthracycline | Various forms being developed by various companies. Probably additive. |
| Sataraplatin | BMS | III | 2000 | Platinum complex | Oral platinum analog w/toxicities comparable to carboplatin. Probably additive. |
| Taxol | BMS | II | 2001 | taxane | In various combinations with other chemo agents. Probably additive. |
| Taxotere | RPR | II | 2001 | taxane | In various combinations with other chemo agents. Probably additive. |

CONFIDENTIAL
JH 008164

CONFIDENTIAL

# ABT-594

## Descriptive Memorandum

*February 2001*

## Abbott Laboratories

CONFIDENTIAL
JH 008165

### ABT-594 Opportunity Overview

ABT-594 is a non-opioid, non-NSAID analgesic that is a potent and selective neuronal nicotinic receptor (NNR) agonist being studied for the treatment of pain. ABT-594 is 30 to 100-fold more potent and equally efficacious to morphine in several well-characterized animal models of pain. The preclinical side effect and dependency liability profile of ABT-594 is superior to that of morphine.

ABT-594 is orally administered, and BID dosing is expected. Its initial targeted indication is symptomatic treatment of diabetic neuropathic pain. It is covered by a composition of matter patent through June of 2016, and also has a use patent pending in analgesia that would provide protection through September of 2017.

The IND filing of ABT-594 was in December 1998. A Phase IIb (dose ranging) trial began April 2000 in diabetic neuropathic pain. A Go/No Go decision for clinical efficacy is expected June 2001. The NDA filing is expected in 3Q2003. Development of additional formulations is under consideration (parenteral, transdermal, extended-release).

U.S. sales in 1999 for the key neuropathic pain treatments, Neurontin, carbamazepine, and tricyclic antidepressants (TCAs), are estimated to be $350 million. Neurontin sales account for the bulk of this, with an estimated 40% of this antiepileptic drug's sales being for neuropathic pain. Neurontin's 2000 sales are expected to reach $1 billion with perhaps 50% of its use in neuropathic pain. This dollar market value likely underestimates this market's potential due to a number of factors. Only the anticonvulsant, Tegretol (carbamazepine), currently off patent, and Lidoderm, a lidocaine patch, have specific indications for a type of neuropathic pain (trigeminal neuralgia and post-herpetic neuralgia, respectively) in the U.S. Currently, there is an unmet market need for novel neuropathic pain treatments such as ABT-594. Therefore, this compound is likely to be well received in this arena. Outside the U.S., Neurontin recently received an indication in the U.K. for the treatment of neuropathic pain. Despite these opportunities, there has been little to no funding from the pharmaceutical industry to improve diagnosis and treatment of neuropathic pain and drive market growth.

Ex-U.S. sales of carbamazepine and Neurontin for treatment of neuropathic pain are estimated to be approximately $140MM in 1999. Carbamazepine is still the treatment of choice ex-U.S., with estimated sales of approximately $90MM in neuropathic pain. Neurontin has achieved only $53MM in sales for this pain segment, with a price approximately 3-4 times that of carbamazepine, suggesting a patient share of only 10-20%.

Nociceptive pain is categorized by duration (acute or chronic) and by severity (mild, moderate, and severe). The mild and, to a lesser extent, moderate segments have multiple product entries and are generally well satisfied by OTC products such as aspirin, acetaminophen and ibuprofen. The prescription market for nociceptive pain is made up of four key classes of analgesics: NSAIDs, COX-2s, Opioids (and combination products), and Other Non-Opioids. In 1999, sales for these four classes of analgesics exceeded $12BB ($6.7BB U.S., $5.6BB Ex-U.S.)

CONFIDENTIAL
JH 008166

*Market Size / Prevalence*

Pain is the most common symptom of disease and the most frequent complaint with which patients present to physicians. Chronic pain, including both neuropathic and nociceptive pain, is considered to be the single most common cause of suffering and disability in the industrialized world with an estimated 25-30% of the population experiencing some form of chronic pain.

Neuropathic pain is a frequent sequela of diabetes, cancer, AIDS and other viral infections, as well as entrapment neuropathies such as carpal tunnel syndrome. Diabetes and its associated complications are increasing at an alarming rate in the United States. Despite advances in treatment, the development of diabetic complications such as neuropathy remains significant. The diagnosed prevalence of diabetic neuropathy is estimated to be about 2 to 3 million patients, with at least 10 to 20% of those patients experiencing painful symptoms (~200,000 to 600,000.) AIDS-related neuropathic pain is estimated to affect approximately 40% of HIV-infected individuals (~14 million.) Post-herpetic neuralgia (PHN) is another virally induced neuropathic pain syndrome. Annually, acute herpes zoster infection (shingles) occurs in almost a quarter of a million people over the age of 60 in the U.S. alone. Pain lasting more than one year has been reported in 22% of patients over the age of 55 and in 48% of those over 70 years of age. In cancer, nerves can be damaged by mechanical distortion from a tumor mass, infiltration by tumor, chemotherapy, or radiation therapy and, therefore, neuropathic pain is common. An estimate of the prevalence rate for cancer-related neuropathic pain in the U.S. is 200,000 people.

Chronic nociceptive pain categories include osteoarthritis (OA), chronic back and neck pain, rheumatoid arthritis (RA), and cancer pain. These diagnoses are expected to become more prevalent as the population ages. Current overall prevalence for these disorders is staggering (over 200 million worldwide) and, although the diagnosed and treated populations are lower, improved treatment options and awareness have the potential to drive significant growth. OA is one of the most common nociceptive pain conditions treated by primary care physicians and three-fourths of OA sufferers surveyed indicate that the disease interferes with their daily activities. Chronic back and neck pain are also highly prevalent and represent an estimated 40% of a primary care physician's (PCP's) chronic pain patient population.

CONFIDENTIAL
JH 008167

**Competition, Current Marketed Products:**

The following tables show the factored U.S. and ex-U.S. prescription and sales volume for key neuropathic pain therapies in 1999.

| 1999 Key Neuropathic Pain Products, Estimated TRxs | | | | |
|---|---|---|---|---|
| Product/Class | 1999 U.S. TRx (MM) | U.S. TRx CAGR '97-'99 | 1999 ex-U.S. TRx (MM) | ex-U.S. TRx CAGR '97-'99 |
| Neurontin | 3.3 | 26.3% | N/A | N/A |
| carbamezepine | 1.0 | 12.6% | N/A | N/A |
| TCAs | 8.2 | 1.1% | N/A | N/A |
| TOTAL | 12.5 | 5.6% | N/A | N/A |

Source: IMS, factored for neuropathic uses.

N/A = not available

| 1999 Key Neuropathic Pain Products, Estimated $ Sales | | | | |
|---|---|---|---|---|
| Product/Class | 1999 U.S. Sales ($MM) | U.S. Sales CAGR '97-'99 | 1999 ex-U.S. Sales ($MM) | ex-U.S. Sales CAGR '97-'99 |
| Neurontin | $308 | 28.7% | $53 | 57.6% |
| carbamezepine | $17 | 13.1% | $87 | 2.6% |
| TCAs | $26 | -3.3% | N/A | N/A |
| TOTAL | $351 | 21.7% | $140 | 19.1% |

Source: IMS, factored for neuropathic uses; Ex-U.S. data includes retail pharmacy data from all audited markets.

N/A = not available

**Competition, Products in Development**

Almost 100 compounds are currently in development for prescription pain management, though some of these compounds are also being developed for non-analgesic indications. Most of the analgesic compounds in the pipeline represent incremental improvements over the opioids or NSAIDs, or consist of new formulations or delivery mechanisms for the standard analgesics. Fewer than 30% of the compounds in development have novel mechanisms of action. Drugs with novel mechanisms are expected to provide the bulk of promoted competition for ABT-594.

In addition to the novel analgesics in the table below, a number of new formulation and combination products, most often containing an opioid, are in development. Second generation COX-2s are also in development but are not likely to represent major breakthroughs on the scale of the first generation products.

CONFIDENTIAL
JH 008168

| Analgesia Development Pipeline -- Key Novel Agents | | | | |
|---|---|---|---|---|
| Product | Company | Mechanism | Phase | Comments |
| pregabalin | Pfizer | Unknown; possibly through (2ᵐᵈ subunit binding | III | Neuropathic pain; chronic pain, follow-up to Neurontin |
| saredutant | Sanofi | NK-2 receptor antagonist | II | General pain; MOA losing favor; active program |
| ZD4952, ZD 6416 | Zeneca | Prostaglandin receptor antagonist | II | Moderate to severe pain, neurogenic pain |
| GV196771 | Glaxo | Glycine antagonist | II | Chronic pain; showing promise |
| Tepoxalin | Johnson & Johnson | COX/5-LO inhibitor | II | OA, described as 'steroid replacing anti-inflammatory drug' |
| darbufelone | Parke-Davis | COX/5-LO inhibitor | II | General pain |
| 117mSn DTPA | Brookhaven National Lab/Diatide | Unknown | II | Cancer pain Bone cancer (preclinical) |
| cizolirtine | Esteve | Substance P agonist | II | Analgesia, antipyretic |
| ADD 234837/ harkoseride | Houston University | Glycine NMDA associated antagonist | II | Neurogenic pain |
| LY303870/ lanepitant | Eli Lilly | Neurokinin 1 antagonist | II | Pain (migraine -- discontinued) |
| colykade devacade | Merck | Cholecystokinin B antagonists | II | Pain (UK) |
| RPR 100893 dapitant | Aventis | Neurokinin 1 antagonist | II | Pain (France) |
| prosaptide TX14A | Myelos Neurosciences | Unknown | I/II | Diabetic neuropathies, Pain |
| CNS 5161 | Cambridge NeuroScience | Glutamata antagonist, NMDA receptor antagonist | I | Neurogenic pain |
| HCT-3012 | NicOx | Nitric oxide NSAID | I | Pain and inflammation |
| Sources: ADIS, IMS, Decision Resources, company reports | | | | |

CONFIDENTIAL
JH 008169

| Analgesia Development Pipeline – Nicotinic Mechanisms | | | |
|---|---|---|---|
| Product | Company | Phase | Comments |
| GTS-21 | Taisho | II | Target is Alzheimer's disease; may have preclinical pain program; looking for partner |
| CMI 960 | Cytomed | Preclinical | Target is pain; epibatidine analog |
| SIB-T1887 | Sibia | Preclinical | Target is pain |
| FID 072021 | Fidia | Preclinical | Target is pain; not actively funding |
| Sources: ADIS, IMS, company reports | | | |

### Unmet Needs

In general, a significant unmet need exists for safer, non-abusable, non-addicting, non-tolerance-producing, and non-scheduled efficacious oral and parenteral analgesic products for the treatment of moderate to severe neuropathic and chronic nociceptive pain.

| Unmet Market Needs and the Impact of the Pipeline | |
|---|---|
| Unmet Need | Pipeline Impact |
| Efficacy in moderate to severe pain without tolerance, dependence or abuse potential | Novel nicotinic agents like ABT-594 may provide efficacy in more severe pain states without opioid-like liabilities. |
| Efficacy in neuropathic pain | Pregabalin may provide incremental improvement in neuropathic pain efficacy over gabapentin, but may also have increased frequency of adverse events.

Novel nicotinic agents like ABT-594 appear to have efficacy in neuropathic pain, based on animal models. |
| Reduction in the GI bleeding risk of NSAIDs | COX-2 inhibitors appear to reduce the incidence and severity of GI ulcers and bleeding; second generation COX-2s may increase therapeutic window further; ABT-594 may need to demonstrate low G.I. complication rate. |
| Overcome ceiling effect of NSAIDs | Preclinical studies did not indicate a ceiling effect for novel nicotinic agents like ABT-594. |
| Extended dosage intervals or novel delivery mechanisms for improved compliance and convenience | Once weekly dosing formulations being explored for COX-2s, etc. Transdermal patch technology improvements likely; may need to provide line-extension / alternate formulations for ABT-594. |
| Therapies aimed at disease modification, prevention | Agents that decrease rate of diabetic complications (e.g., aldose reductase inhibitors) or directly treat neuropathy (bimoclomol) may decrease incidence of neuropathic pain, thereby decreasing available market for ABT-594. |

CONFIDENTIAL
JH 008170

## Product / Development Background

### Scientific Rationale for ABT-594

Recent findings in the understanding of pain mechanisms have led to new conceptual approaches to clinical pain and a new understanding of potential novel molecular targets for analgesic drug development. Molecular targets have included modulators of glutamate neurotransmission (NMDA antagonists), ion channel modulators (neuron specific calcium channels, TTX-resistant sodium channels), neurokinin antagonists (NK-1), and novel anti-epileptics targeting the calcium receptor. None of these approaches has yet produced compounds exhibiting broad-spectrum analgesic efficacy with decreased side effect liability.

ABT-594 is a non-opioid, non-NSAID analgesic that is 30- to 100-fold more potent and equally efficacious to morphine in treating moderate to severe pain in several well-characterized animal models of pain. The preclinical side effect and dependence liability profile of ABT-594 is superior to that of morphine. Mechanistically, ABT-594 is a potent and selective neuronal nicotinic receptor (NNR) agonist with high oral bioavailability in rat, dog, and monkey.

In pre-clinical studies, ABT-594 rapidly distributes to the brain following systemic administration and, like morphine, can work at multiple levels in the central and peripheral nervous system to modulate pain perception. ABT-594 produces antinociceptive effects by interacting at both central and peripheral nAChRs. Injections of ABT-594 into brain at doses 1000-fold lower than given peripherally produce marked antinociceptive activity, indicating that ABT-594 can also activate descending pathways from the CNS to modulate pain processing. It also inhibits the release of the primary nociceptive transmitters, substance P and calcitonin gene related peptide (CGRP) *in vitro*, at the level of the dorsal horn of the spinal cord suggesting that ABT-594 can attenuate mechanisms leading to neurogenic inflammation, central sensitization and consolidation of pain-mediated neuronal changes.

ABT-594 is expected to be a highly differentiated product. It is expected to be the first neuronal nicotinic receptor agonist to receive an indication for pain. It has a novel mechanism of action and a potentially broad coverage of chronic pain conditions. In addition, it has an opioid-like efficacy without tolerance, dependence or abuse potential, while having equivalent/superior efficacy to other drugs used to treat neuropathic pain.

### Clinical Studies

Human clinical trials began in 1997. Phase I trials with an oral solution formulation indicated that 150ug/day would be the maximum tolerated dose. Results from subsequent phase I and phase II trials with soft elastic capsule (SEC) and hard gelatin capsule (HGC) suggest that higher doses would be tolerated. Phase IIa studies with ABT-594 SEC formulation suggest a trend towards analgesic effect at 75ug BID, the maximum dose studied in this protocol. ABT-594 was generally well tolerated in these studies. The most common adverse events for subjects receiving ABT-594 75ug BID were nausea (15%), headache (13%), dizziness (7%), insomnia (6%), and vomiting (5%).

A phase IIb study for neuropathic pain at higher, titrated doses of ABT-594 began in April 2000 and ends in June 2001. A total of 320 patients is anticipated to be included in the study.

CONFIDENTIAL
JH 008171

## Considerations

### Target Profile:

The current status of ABT-594's profile vs. target profile is summarized in the table below:

| Target Profile Attribute | Probability |
|---|---|
| Not scheduled (DEA) | High |
| Very few abnormal Liver Function Tests | High |
| Few Drug Interactions | High |
| BID / TID dosing | High |
| No reduced efficacy or Increased AEs in nicotine users | High |
| Onset of action 1.5 – 2.0 hours | High |
| Neuropathic efficacy | Medium |
| No tolerance, dependence or withdrawal | Medium |
| Other safety OK | Medium |
| No cravings in ex-nicotine users | Medium |
| Low nausea / vomiting | Low |

### Label Strategy:

BASE:   Indicated for the treatment of diabetic neuropathic pain.

UPSIDE:        1) Treatment of pain associated with OA

2) Treatment of post-herpetic neuralgia

3) Treatment of neuropathic pain

4) Treatment of chronic pain

5) Treatment of cancer pain

### Cost of Goods Sold:

The projected average daily dose is expected to be a maximum of approximately 600 mcg base equivalent / day. Based upon this dosage projection and the estimated cost of bulk drug substance of $40M per Kg base equivalent, the estimated cost for drug substance at launch will be approximately $0.024 per day.

CONFIDENTIAL
JH 008172

*Pricing:*

US: Pricing new, and particularly novel, products at a reasonable premium will likely continue to be the norm in the years leading up to the launch of ABT-594. Current forecast assumptions put the price of ABT-594 at a level comparable to Celebrex and Neurontin, grown at a modest 2% per year to launch year AWP of approximately $95 for a 30 day prescription.

Ex-US: New pain medications must demonstrate a true advantage in efficacy and/or side effects to receive regulatory approval, especially by the European Medicines Evaluation Agency (EMEA); assuming the target efficacy and tolerability profile of ABT-594 is achieved, ABT-594 would meet this requirement. Because ABT-594 may have application in both neuropathic and chronic nociceptive pain, the ex-U.S. pricing assumption for ABT-594 is comparable to COX-2 pricing. The current average price for COX-2's is approximately $1.10 per day; however, this reflects a large percentage of sales in "free-pricing" countries, where COX-2s launched first, which tend to have higher than average prices. Therefore, the average ex-U.S. price for ABT-594 is assumed to be $0.90/day.

CONFIDENTIAL
JH 008173

CONFIDENTIAL

# ABT - 751

## Descriptive Memorandum

*February 2001*

## Abbott Laboratories

CONFIDENTIAL
JH 008174

## ABT-751

### Opportunity Overview

Cytotoxic agents and hormones constitute the dominant classes of drugs available to treat cancer and are responsible for 96% of the total market. Since 1993, Taxol, a taxane developed and marketed by BMS, has been widely used. Another taxane, Taxotere, developed and marketed by Aventis, was launched in 1996. Combined worldwide sales of these two products were of nearly $2 Billion US in 1999. Clinically, the development of drug resistance is the primary factor that limits the efficacy achievable with these drugs.

Abbott's anti-mitotic agent (ABT-751) is a novel, oral cytotoxic agent that acts by a mechanism similar to that of the taxanes but retains activity against taxane resistant cells. ABT-751 binds to the colchicine site on tubulin and inhibits the *in vitro* polymerization of microtubules. The interference with normal microtubule dynamics leads to a block in the cell cycle at the G2/M phase that ultimately results in the induction of cellular apoptosis. ABT-751 is a potent antimitotic agent that inhibits the proliferation of a broad spectrum of human tumor derived cell lines including those that are paclitaxel and doxorubicin resistant due to the multidrug-resistant (MDR) phenotype or other genetic changes.

ABT-751 demonstrated impressive oral antitumor activity when evaluated in both synegeic and human xenograft tumor models. The antitumor response was independent of the MDR status of the model, consistent with the activity observed in cell cultures. In sharp contrast with other cytoxic drugs, the maximum tolerated dosage of ABT-751, on a q.d. 1-5 schedule, could be administered for an extended period (q.d. 1-21 or q.d. 1-28) resulting in a dramatic enhancement of the antitumor activity. These results suggest that the colchicine site ligands, such as ABT-751, will exhibit a broad spectrum of activity that will be distinct from that of other classes of antimitotic drugs. Oral availability of the compound is high. Taxol and Taxotere, in contrast, have no oral bioavailability.

The most significant finding in toxicology studies was a change in systemic and pulmonary vascular resistance following intravenous infusion of ABT-751 to anesthetized dogs. These effects led to an inverse response in cardiac output. Similar changes were observed following infusion of a structurally unrelated colchicine-site ligand, and therefore most likely represent a class effect. Additional toxicology studies focusing on vascular pathology will be performed to further elucidate this finding.

ABT-751 was administered to patients with advanced cancer in Japan in a Phase I study. Toxicities seen after single doses and 5 days of q.d. dosing were nausea, vomiting, diarrhea, epigastric pain, ileus and peripheral neuropathy. Grade 2 toxicity was peripheral neuropathy and associated paresthesias. Pharmacokinetic analyses showed plasma concentrations equivalent to those that affected systemic resistance and cardiac output in the anesthetized dog study. However, no adverse cardiovascular effects were observed in the Japanese Phase I trial. Evidence of ABT-751 efficacy was exhibited in one patient with uterine sarcoma, one patient with NSCLC after single doses, one patient with gastric cancer and one patient with uterine cervical carcinoma demonstrated decreased tumor markers after repeated dosing.

CONFIDENTIAL
JH 008175

The planned initial Phase I study in the U.S. will determine the maximum tolerated dose and dose-limiting toxicities of ABT-751 given orally once a day or twice daily for multiple cycles in patients with advanced malignancies. In addition, pharmacokinetics in a western population, and optimal dose and schedule will be determined. Phase II studies will be initiated in patients with different cancer types:

- Refractory breast (taxane failures)
- Hormone refractory prostate
- Bladder
- Lung
- Cervical
- Hepatocellular
- Other possibilities: colorectal, sarcoma, renal cell, pancreatic, HNSCC

Cytotoxic agents represent the largest, and fastest growing, class of oncology agents by sales volume. The following chart summarizes the value of the current oncology market.

### Global Sales by Market Segment ($ MM)

|  | 1996 Sales | 1997 Sales | 1998 Sales | 1999 Sales (est) | CAGR '96-'98 |
|---|---|---|---|---|---|
| Hormone | 4,414 | 4,784 | 4,884 | 5,000 | 5.2% |
| Cytotoxic | 4,278 | 5,212 | 6,268 | 7,300 | 21.0% |
| Adjunctive | 3,367 | 3,651 | 4,166 | 4,900 | 11.2% |
| Total | 12,059 | 13,647 | 15,318 | 17,200 | 12.7% |

Source: Datamonitor

### Sales by Region ($ MM)

|  | 1996 Sales | 1997 Sales | 1998 Sales | 1999 Sales (est) | CAGR '96-'98 |
|---|---|---|---|---|---|
| US | 5,564 | 6,276 | 7,422 | 8,500 | 15.5% |
| Ex-US | 6,495 | 7,370 | 7,896 | 8,700 | 10.3% |

Source: Datamonitor

This growth of the cytotoxic segment has been driven primarily by the introduction of new, more effective and expensive therapies such as Taxol (paclitaxel/BMS), Gemzar (gemcitabine/Lilly), Taxotere (docetaxel/RPR) and Hycamtin (topotecan/SB). Uptake of these newer agents, however, can be dependent on the cost sensitivity of the local market.

The clinical targets identified for this compound include late stage breast cancer, late stage NSCL cancer (on-label), with late stage ovarian and pancreatic cancer as additional cancer types where efficacy has been demonstrated, but not filed. This product may also be potentially efficacious in cancers such as gastric, colorectal, prostate, bladder, esophageal, hepatocellular (ex US), lymphoma, and leukemia. Targets will be refined as we know more about this compound's in-vivo activity.

CONFIDENTIAL
JH 008176

The following tables summarize the key competitive products by indication (US data only):

### Late Stage Breast

| Product | Share |
|---------|-------|
| Cyclophosphamide/Cytoxan/BMS | 18.7 |
| Doxorubicin/Adriamycin/P&U | 17.11 |
| Docetaxel/Taxotere/RPR | 16.25 |
| Paclitaxel/Taxol/BMS | 16.11 |
| Trastuzumab/Herceptin/Genetech | 11.28 |

### Late Stage NSCL

| Product | Share |
|---------|-------|
| Carboplatin/Paraplatin/BMS | 50.32 |
| Paclitaxel/Taxol/BMS | 44.14 |
| Vinorelbine/Navelbine/Glaxo | 22.78 |
| Gemcitabine/Gemzar/Lilly | 22.14 |
| Cisplatin/Platinol/BMS | 11.28 |

### Late Stage Ovarian

| Product | Share |
|---------|-------|
| Paclitaxel/Taxol/BMS | 47.11 |
| Carboplatin/Paraplatin/BMS | 45.42 |
| Topotecan/Hycamtin/SKB | 22.54 |
| Dox SL/Doxil/Alza | 9.14 |
| Cisplatin/Platinol/BMS | 7.58 |

### Late Stage Pancreas

| Product | Share |
|---------|-------|
| Gemcitabine/Gemzar/Lilly | 78.5 |
| 5-FU/Efudex/ICN Pharma | 21.0 |
| Leucovorin/ | 10.7 |
| Cisplatin/Platinol/BMS | 4.72 |

*Compounds in Development*

ABT-751 induces a mitotic block by binding to the colchicine site on tubulin and thereby affecting tubulin polymerization. There are no currently available drugs which function by the mechanism described above. However, vinca alkaloids and taxanes fall into the broad category of anti-mitotics although they produce the anti-mitotic effect through different mechanisms. The following table summarizes anti-mitotic compounds in development.

CONFIDENTIAL
JH 008177

Descriptive Memorandum: ABT-751         CONFIDENTIAL                    4

| Company | Compound | Indication | Status of compound | Status of project |
|---------|----------|------------|--------------------|--------------------|
| **Colchicine-site ligands** | | | | |
| Oxgene | combretastatin-A4 phosphate | Tumor vasculature | Phase I | active |
| Tularik | T138607 (phosphate prodrug) | Cancer (unspecified) | Phase I | active |
| Tularik | T900607 | Cancer (unspecified) | Preclinical | active |
| ICI/CRC | Amphethinile | Cancer (unspecified) | Phase I (abandoned 1988) | inactive |
| Welcome Research | 1069C | Cancer (unspecified) | Phase I (abandoned 1996) | inactive |
| NIH | Trimethylcolchicinic acid | Various tumors | Phase I (1990, abandoned) | inactive |
| Parke-Davis | CI-980 | ovarian, colorectal | Phase II (abandoned 2000) | inactive |
| **Vinca alkaloid-site ligands** | | | | |
| BASF | LU103793 (dolastatin 15 analog) | Cancer (unspecified) | Phase II (abandoned) | active |
| Servier | Vinxaltine | Cancer (unspecified) | Phase I | unknown |
| NCI | dolastatin 10 | Adv. Cancers | Phase I | unknown |
| Teikoku Hormone | TZT-1027 (dolastatin 10 analog) | Cancer (unspecified) | Phase I (Jpn) | unknown |
| Lilly | LY 355703 (cryptophycin 52) | Cancer (unspecified) | Preclinical | unknown |
| Takeda | Maltansine | Cancer (unspecified) | Preclinical | unknown |
| **Microtubule stabilizing agents (non-taxanes)** | | | | |
| Soc. Biotech. Res/ Bristol-Myers Squibb | Epothilone | Cancer (unspecified) | Preclinical | active |
| Bristol-Myers Squibb | eleutherobin | Cancer (unspecified) | Preclinical | active |
| Pharmacia & Upjohn | sarcodictyins | Cancer (unspecified) | Preclinical | active |
| Takeda | GS-164 | Cancer (unspecified) | Preclinical | active |

The novelty of this mechanism offers the promise of differentiation that will diminish the threat from potential competitors. However, this novelty is balanced by the similarity to current mechanisms, such as taxanes and vinca alkaloids, which suggests the promise of clinical efficacy. With the opportunity to be first or second to market with an agent that binds to the colchicine site, the competitive situation seems modest.

CONFIDENTIAL
JH 008178

Descriptive Memorandum: ABT-751          CONFIDENTIAL                    5

*CONFIDENTIAL*

# ABT – 492

## Descriptive Memorandum

*February 2001*

## Abbott Laboratories

**CONFIDENTIAL**
**JH 008179**

Hancock_ABT 492

ABT 492

### Overview

The commercial success of fluoroquinolones such as ciprofloxacin and levofloxacin, along with the desire to further improve the properties of these compounds (microbiological spectrum and safety, for example) has led to fierce competition to identify analogs with superior therapeutic properties. In addition, the development of resistance to present antibiotics will drive a continued need for new agents. Goals for a quinolone antibiotic include broad-spectrum indications equal to trovafloxacin, antibacterial activity comparable to trovafloxacin, tolerability comparable to levofloxacin, oral and intravenous formulations, once daily dosing, length of treatment equal to moxifloxacin, and an acceptable cost of goods. ABT-492, an in-licensed compound from the Wakunaga Pharmaceutical Co., is being developed for evaluation to meet these goals.

The *in vitro* antibacterial activity of ABT-492 was consistently more potent than trovafloxacin against most quinolone-susceptible pathogens, including species responsible for community and nosocomial respiratory tract infections, urinary tract infections, blood stream infections, skin and skin structure infections, and anaerobic infections. The compound has potent activity against multidrug-resistant *S. pneumoniae* (penicillin-, macrolide-, tetracycline-resistant) and retained activity against *S. pneumoniae* strains resistant to other quinolones including trovafloxacin. ABT-492 was also highly active against anaerobes and ciprofloxacin-susceptible *P. aeruginosa*. ABT-492 was as active as trovafloxacin against *C. trachomatis*, indicating good intracellular penetration. Thus, ABT-492 is likely to be a useful broad-spectrum antibacterial agent. The enhanced antibacterial activity of ABT-492 relative to ciprofloxacin, levofloxacin, and trovafloxacin is likely to be explained, in part, by it's potent interactions with bacterial topoisomerases. ABT-492's equivalent activity against both the DNA gyrase and the topoisomerase IV of pathogens, give ABT-492 a potential for decreased development of resistance.

The *in vitro* potency data suggests that ABT-492 has the potential to be therapeutically effective at doses comparable to trovafloxacin and superior to levofloxacin. In addition, ABT-492 was consistently more potent than trovafloxacin against MRSA and vancomycin-resistant enterococci. In both these cases, however, therapeutic utility remains to be assessed in the clinical setting.

*S. pneumoniae* was chosen as the dose-defining pathogen since it is the key pathogen in severe respiratory tract infections and treatment of infections caused by this pathogen has traditionally been a weakness of most quinolones. For treatment of fluoroquinolone-susceptible *S. pneumoniae* respiratory tract infections, oral dosing may be similar to trovafloxacin based on data generated in lung infection models. Because of the excellent potency of ABT-492 against fluoroquinolone-resistant *S. pneumoniae* with an $MIC_{90}$ of 0.12 pg/ml, this group of emerging strains may be targeted as a key differentiation point from other quinolones. Also, data from the thigh infection model suggests significantly greater efficacy for ABT-492 than for trovafloxacin.

### The Market

ABT-492 is broad-spectrum anti-infective agent with potential application across a broad range of indications, including respiratory infections, genito-urinary infections, and skin/soft tissue infections. It is assumed that a pediatric formulation would not be a part of the primary development plan due to the known adverse events caused by quinolones in pediatric populations. Nonetheless, reports of quinolone pediatric development has been reported (gatifloxacin), hence the pediatric market should be regarded as a potential upside for this quinolone should its safety profile merit its use in pediatrics.

CONFIDENTIAL
JH 008180

CONFIDENTIAL

2

Current Treatment Options

| Class | Mechanism of Action | Comments |
|---|---|---|
| Penicillins | Cell wall synthesis inhibitor | Mostly generic, class has seen significant decrease as a result of penicillin resistance. |
| Cephalosporins | Cell wall synthesis inhibitor | Some generic, class has seen significant decrease in use as a result of prevalence of B-lactamase producing strains and modification of penicillin-binding proteins. |
| Tetracyclines | Protein synthesis inhibitor | Generic agents, relatively high levels of resistance but are still useful in some indications |
| Sulfonamides | Folic acid synthesis | Generic agents, relatively high levels of resistance but are still useful in some indications |
| Macrolides | Protein synthesis inhibitor | Widespread use in RTI, macrolide resistance has been increasing rapidly, but has not yet translated into declines in clinical efficacy; H. flu activity continues to be class weakness, along with GI adverse events, drug-drug interactions, & taste perversion |
| Quinolones | DNA synthesis inhibitor | Fastest growing antibiotic class, used in a broad spectrum of indications; class historically associated with poor Gram+ pathogen coverage and sub-optimal safety profiles; newer agents (Levaquin, Tequin, Avelox) have improved dramatically along both spectrum and safety dimensions. |
| Oxazolidinones | Protein synthesis inhibitor | Newest antibiotic class to reach market, due to limited Gram- profile will be used primarily in nosocomial setting |

U.S. Market

1999 U.S. antibiotic prescription and sales data are presented in the table below.

| | | | 1995 | 1996 | 1997 | 1998 | 1999 | CAGR₉₅₋₉₉ |
|---|---|---|---|---|---|---|---|---|
| U.S. | TRXs (MM) | Tab/Cap | 220 | 215 | 211 | 208 | 221 | 0.1% |
| | | Oral Susp. | 76 | 66 | 63 | 59 | 61 | -5.3% |
| | | I.V. | NA | NA | NA | NA | NA | NA |
| | Sales ($MM) | Tab/Cap | $4,057 | $4,220 | $4,467 | $4,848 | $5,715 | 8.9% |
| | | Oral Susp. | $1,075 | $979 | $977 | $1,001 | $1,120 | 1.0% |
| | | I.V. | $1,865 | $1,829 | $1,855 | $1,890 | $2,117 | 3.2% |

Tab/cap and oral suspension prescriptions had been declining 1-2% per year in the period of 1995-1998, presumably from increased attention to appropriate prescribing in the face of increasing resistance; however, prescriptions recovered in 1999, though this may be explained at least in part by a relatively late 1998-99 flu season. Even in the face of this negative pressure on antibiotic use, however, sales in the U.S. have continued to increase, particularly in the tab/cap market. This is due to the trend of replacing relatively low-cost generic agents with higher priced premium antibiotics; during 1995-1999, generic tab/cap prescriptions declined by 30MM. So while negative pressure on the use of these antibiotics continues, it appears the market is willing to bear higher costs for agents that meet unmet need. The IV market has grown slightly in terms of sales, also being driven largely by the replacement of generic agents with more costly branded agents.

CONFIDENTIAL
JH 008181

Quinolones have seen dramatic growth, with oral and IV sales growing at 17% and 16% compound annual rates, respectively, from 1995-1999. This growth is a function of the newer quinolones successfully penetrating the RTI segment, which was initiated with the 1997 launches of Levaquin and Trovan (withdrawn) and continues with the recent introductions of Tequin and Avelox.

### Ex-U.S. Market

Ex-U.S. sales of antibiotics totaled $11.7 billion in 1999. The tab/cap represents the largest segment, with sales of $9.4 billion on 770 MM TRX. TRX growth has been flat, with a 1996-99 CAGR of 0.5%; the use of antibiotics is predicted to slowly decline due to more judicious use of antibacterials in the face of increasing bacterial resistance.

Ex-US, the quinolone class accounted for 8% (62MM) of total tab/cap market prescriptions and 13% of sales ($1.2 billion). Ciprofloxacin is the market leader ex-US, with approximately 47% of the quinolone market Rxs (29MM) and 44% ($530MM) of sales. Levofloxacin launched in many European markets in 1998/1999 and holds approximately 14% Rx share of the European quinolone market, and 0.8% of the overall tab/cap market. Although grepafloxacin and trovafloxacin also launched in some European countries in 1999, both products were recently pulled from the market due to liver toxicity and other complications. Moxifloxacin launched in Germany in Q4 1999, but has not yet been approved in other markets. In Japan, levofloxacin launched in 1994 and still commands a 65% Rx share of the quinolone market and 10% of the Japanese tab/cap market overall. Japan accounts for approximately 80% of ex-US levofloxacin sales ($370MM).

| Class | 1999 Ex-US Tab/Cap Market | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Sales ($MM) | Sales Share | Sales CAGR '96-'99 | TRXs (MM) | TRX Share | TRX CAGR '96-'99 |
| Market | $9,348 | – | 3.6% | 770 | – | 0.8% |
| Quinolone Class | $1219 | 13% | -12% | 62 | 8% | NA |
| Cipro | $530 | 5.7% | 4.9% | 29 | 3.8% | NA |
| Levaquin | $466 | 5.0% | NA | 18 | 2.3% | NA |
| Trovan | $12 | 0.1% | NA | 0.5 | 0.1% | NA |

### Competition

The anti-infective pipeline is very competitive, but most of the competition is focused on improving the activity and safety of the quinolones. Ketolide development is the only other area of activity which is in late stage of development. The quinolone compounds in present development may fall out because of safety or lack of activity against resistant pathogens.

| Competitive Analysis – Emerging Competition | | | | | |
| --- | --- | --- | --- | --- | --- |
| Product | Company | Class | Phase/Estimated Time to Market | Country | Comment |
| Ketek (telithromycin) | Aventis | Ketolide | Filed 3/00 Est. launch 3/01 | U.S. | Respiratory indications; filed NDA 3/00; 800 mg QD; first in ketolide class to reach market. |

CONFIDENTIAL
JH 008182

Davis Deposition Exhibit 9

PART 4

| Competitive Analysis – Emerging Competition | | | | | |
|---|---|---|---|---|---|
| Product | Company | Class | Phase/Estimated Time to Market | Country | Comment |
| Factive (gemifloxacin) | SKB | Quinolone | Filed 12/99 Est. launch 12/00 | US | Superior to quinolones for MRSA; highly potent vs. RTI pathogens H. flu, M. cat, and S. pneumo and UTI pathogens E. coli and P. mirabilis, CRSP; potency > spar, trova, grepa and ≥ moxi; activity vs. P. aeruginosa?; good atypical and mycoplasma coverage; intracellular penetration; low photo/CNS tox; 700 patient database |
| Sitafloxacin io | Daiichi Seiyaku | Quinolone (IV only) | III Est. launch 2002 | Japan U.S., Europe | Very potent MRSA, pseudomonas and bacteroides activity; diarrhea, ALT, low WBC; will likely be target to severe rather than community infections |
| Ecenofloxacin | Chici Foods | Quinolone | II Est. launch 2002 | UK | Active against UTI and RTI pathogens; superior to least and olio vs. P. aeruginosa. T½ ≈ 14-19 hr; will likely be target to severe rather than community infections |
| CS-940 | Sankyo | Quinolone | II Est. launch 2002 | Japan | Active against G+/-; excellent activity against H. flu, e. jejuni, M. pneumo, and C. trachomatis; greater potency than cipro; t½ ~7 hr; BA~80% |
| T-3811 | Toyama/BMS | Quinolone | I Est. launch 2005 | Japan | Excellent potency and low toxicity |
| DC-756 | Daiichi Pharma | Quinolone | Pre-clin Est. launch 2006 | Japan | Low toxicity; in vitro potency ≥ trova, STFX & HSR-903 |

*Unmet Needs*

Overall unmet need in the anti-infective market is low. Resistance represents the largest unmet need, which will continue to evolve over time. Satisfaction with other product attributes, such as convenience, spectrum of activity, and tolerability/safety is quite high. Any improvements in these areas will be incremental and will offer little in the way of differentiation.

ABT-492 is one of the most active agents against the resistant organisms. It has indications that will have a low propensity for the development of resistance. ABT-492 will be developed to maximize any opportunities to shorten therapy. ABT-492 was chosen from hundreds of quinolones because of its potential to be well tolerated and safe in humans. ABT-492 will have few interactions with other drugs.

| Unmet Need | Pipeline Impact |
|---|---|
| Activity against resistant organisms | Strep. pneumo, MRSA, and VRE represent most problematic pathogens although new quinolones/ketolides do well with most resistant Strep. pneumo strains; quinolone-resistant Strep. pneumo may develop; pseudomonas resistance is also increasing; resistance will likely continue to be a source of unmet need due to its dynamic nature. |
| Low propensity for resistance development | Given that most compounds in development are from classes of drugs already in use, this need is largely unmet. Unclear how quickly resistance will build to new classes of drug; gatifloxacin claims 8-methoxy functional group results in lower propensity for resistance development |
| Convenience (duration/frequency) | Standard moves toward 6-7 days of therapy with QD dosing; may start to see 3-day therapies for some indications (AECB) |
| Increased tolerability | While some degree of unmet need exists, increasingly, agents (which have not been withdrawn) are reaching the marketplace with adverse event profiles that approach clinical insignificance; a very clean safety |

CONFIDENTIAL          CONFIDENTIAL          5
                                  JH 008183

| | |
|---|---|
| | profile should be regarded as a necessary component rather than a differentiating one |
| Few drug-drug interactions | Quinolones, macrolides, and ketolides all interact with other drugs to varying degrees; a potent drug with no interactions would be a benefit in this market |

*Considerations*

*Product Usage:* Physicians are likely to use ABT-492 for the sicker patients with the most difficult infections to treat. In the outpatient arena it will be used to treat community-acquired pneumonia and acute bacterial exacerbations of chronic bronchitis in the older patients with an underlying illness. It will also be used in the hospital for the community-acquired pneumonia patient who requires hospitalization and for serious nosocomial infections.

While many regard quinolones as agents that should be reserved for 2nd line use, their activity against H. influenzae and resistant Strep. pneumoniae (which current macrolides do not offer) have resulted in a high level of acceptance for empiric 1st line use. The improved safety profiles of several recent quinolones have facilitated their use as 1st line agents. Provided that ABT-492 is proven to have a benign safety/adverse event profile, it will likely receive usage in both 1st-line (non-severe) and 2nd-line (severe) infections.

*Side Effects:* The quinolone class has potential prolongation of the QT interval and other cardiovascular effects. There is also increased regulatory scrutiny due to recent quinolone withdrawals from international markets. ABT-492 has been evaluated in the standard *in vivo* models used to evaluate QT interval potentials of other antibiotics and has shown no evidence of increasing QT. Also, compared to marketed quinolones, preclinical studies show no evidence or no increase incidence of CNS drug concentration (ie. less potential for dizziness); phototoxicity; and liver toxicity.

*Off-label use:* It is difficult to predict at this time what off-label uses will be seen for this compound. Initial development will be for the more common respiratory, urinary tract, skin, and hospital infections. Other indications will be evaluated after the primary approval of this compound. Many of the secondary indications will get usage before we have regulatory approval.

*COGS:* The initial cost of goods is in $6000/kg range, but will come down rapidly after the initial starting materials are determined. At time of launch ABT-492 will have a cost of goods in the $1500/kg range which is competitive compared to other quinolones and other new antibiotics.

*Dosing:* Based on animal models and the *in vitro* activity of ABT-492 the dose for most oral indications will be in the range of 100 to 200 mg give once daily.

*Development/Regulatory:* Anti-infective compounds are well understood by regulatory agencies globally and they have clearly defined clinical development path and regulatory guidelines for reference. Abbott Laboratories has been in this arena for many years and has experience with the FDA and European regulatory agencies and so the hurdles to development are well known. ABT-492 has begun but not yet completed its first Phase I study in healthy volunteers.

*Other Approaches:* Because of the well defined development guidelines there are not many options. The major development options are in dosing regiments. ABT-492 is a very potent drug which has demonstrated rapid killing of pathogens *in vitro* and *in vivo*, and the development plan will attempt to shorten treatment durations to increase the competitive advantages of this activity.

CONFIDENTIAL
JH 008184

*Pricing:* The community infection market is quite competitive from a pricing standpoint, with recent quinolones priced at approximately $45 per 5-7 days of therapy. The pricing strategy will depend on strengths/weaknesses of the ABT-492 product label, the competitive landscape at launch, and the managed care environment, but current pricing assumption is parity for ABT-492 with respect to other quinolones.

CONFIDENTIAL
JH 008185

*CONFIDENTIAL*

# ABT – 510

## Descriptive Memorandum

*February 2001*

## Abbott Laboratories

CONFIDENTIAL
JH 008186

C

## ABT 510

### Overview

There is abundant evidence that primary tumor growth and metastatic progression require new blood vessel formation (angiogenesis). Tumors secrete inducer proteins including bFGF and VEGF that activate microvascular endothelial cells (EC) causing them to proliferate, migrate and organize into capillary structures. Activated endothelial cells also enhance malignant progression by producing signal molecules (cytokines) that inhibit programmed cell death (apoptosis) of tumor cells. Since anti-angiogenic therapy targets genetically stable endothelial cells, resistance typically seen following cytotoxic chemotherapy is not observed. Moreover, angiogenesis inhibitors should not have the intrinsic toxicity of anti-proliferative chemotherapy. Angiogenesis is also a feature of several other pathophysiologic states of large unmet medical need (macular degeneration, psoriasis, and arthritis, among others).

Angiogenesis sustains the growth and progression of tumors. Unlike chemotherapy or radiation, both of which can damage normal cells in addition to tumor cells, anti-angiogenic agents are hypothesized to prevent growth of new blood vessels and to disrupt critical tumor survival signals produced by EC. These agents may keep tumors in a dormant state for as long as the compound is administered and tumor regressions may occur. Proof of this principle has been demonstrated in pre-clinical models. Currently, at least thirteen compounds with anti-angiogenic activity in cancer are in various phases of clinical development, however few act directly and specifically on the angiogenesis process. Anti-angiogenesis drugs are not expected to replace or compete with current therapies. Instead, if these agents prove to be effective, it is believed that they will be used as supplemental therapy to prevent metastasis following surgery, cytotoxic chemotherapy or radiotherapy. As for cases where tumors have already metastasized, these agents could slow down disease progression and maintain "disease dormancy".

Thrombospondin-1 (TSP-1) was the first natural angiogenesis inhibitor to be discovered. TSP-1 is a large, multifunctional protein. TSP-1 rapidly inhibits EC migration and increases EC apoptosis through activation of caspase-3-like proteases. The normal tissue expression of TSP-1 limits inappropriate neovascularization, however it is transcriptionally activated by the tumor suppressor gene product p53. Therefore, TSP-1 is down-regulated and under-produced in p53 defective tumors. In rodent models, ectopic overexpression of TSP-1 inhibits the malignant phenotype as does direct administration of TSP-1 in the circulation. However, direct clinical use of TSP-1 is not feasible because of its scarcity, large size and multiple other biological functions.

The angiogenic activity of TSP-1 has been localized to the 50,000 MW N-terminal stalk region of this protein, and more specifically to the properdin (Type-I) repeats within this region. Although small synthetic peptides within this region have only weak antiangiogenic activity, it was discovered that a single D-amino acid replacement in a properdin region peptide led to an increase in activity of greater than 1000-fold. ABT-510 is a parenterally available nonapeptide. Although ABT-510 competes with TSP-1 for binding to the EC, the exact mechanism of anti-angiogenesis is unknown.

ABT 510 is supplied for clinical use as a sterile solution in acetate salt in 5% dextrose. ABT 510 is soluble and stable in water.

In vitro, ABT 510 inhibits chemotactic VEGF/bFGF-stimulated migration of human microvascular endothelial cells (EC) with an IC50 of approximately 0.250 nM. This effect is EC specific. ABT-510 (10mg/kg/day subcutaneously) blocks VEGF-induced corneal vascularization in mice. It potently and selectively competes with TSP-1, binding the CD 36 receptor.

CONFIDENTIAL
JH 008187

ABT 510 inhibits tumor progression in vivo. ABT 510(20mg/kg/day subcutaneous administration) inhibited tumor progression (78% growth inhibition at day 38) in a model of human breast cancer (MDA-MB-435) growing in the breast pads of nude mice. Dose dependent inhibition of B16F10 melanoma lung metastases was observed in a second murine model. ABT 526, a molecule highly similar to ABT 510 (which was not advanced into human trials because of concatemer formation) was administered to 23 companion dogs (25mg SQ BID) with sporadic cancers (head and neck carcinoma, lymphoma, sarcoma, etc) refractory to conventional chemotherapy. Surprisingly, 2 complete responses, 5 partial responses (>= 50% shrinkage) and 6 cases of disease stabilization were observed.

Assays for toxicity, histamine release, hemolysis, T-cell function neutrophil migration, platelet aggregation, receptor (CEREP) screening and CNS function were unremarkable. ABT-510 produced no physiologically significant changes in cardiovascular or hemodynamic function in anesthetized dogs. In addition, there were no physiologically significant changes in clinical blood chemistry profiles or cardiac electrophysiologic function in response to ABT-510. Doses that were many times higher than the predicted efficacious concentration produced a moderate reduction in mean arterial blood pressure in conscious monkeys. ABT-510 was not mutagenic in the Ames assay. It is concluded therefore that ABT-510 has an excellent pre-clinical safety profile.

ABT-510 is currently in Phase I clinical trials. Because of its exceptional safety profile, normal volunteers are being dosed with ABT-510 to establish human safety and pharmacokinetic parameters. Review of these data will lead to a Go/NoGo decision for Phase II trials in the Summer of 2001.

*The market*

Cytotoxic agents represent the largest, and fastest growing, class of oncology agents by sales volume. The following chart summarizes the value of the current oncology market. The market for products to treat cancer is changing rapidly. It is a growing market fueled by:

- Increasing disease incidence
- New product entries
- New therapeutic paradigms
- A growing adjunctive market, which increases the number of patients eligible for chemotherapy
- Intense research and competition

The increase in the aging population in developed countries increases the incidence of cancer. The diagnosed cancer incidence and prevalence in seven major markets, including the U.S., France, Germany, Italy, Spain, U.K. and Japan are close to 3 million and 10 million respectively. The numbers are increasing steadily. Currently, about one-third of the new medicines in development are targeted against cancer.

Cancer is not a single disease, but includes more than 100 different disorders, which have at their core uncontrolled cell growth. Of these disorders, the cancer types that offer the greatest commercial opportunity include breast, colorectal, lung, ovarian and prostate (based on incidence/prevalence/unmet need). Treatment of breast, lung and prostate cancers account for more than 50 percent of the direct medical costs of cancer therapies. Other cancer types, specific to one or more of the major international markets, may provide niche opportunities. For instance, stomach (gastric) cancer is relatively common in Japan but not in the U.S. or Europe; similarly, liver cancer has a greater occurrence in Japan, Italy and Spain.

CONFIDENTIAL
JH 008188

Depending on tumor type, cancer can be treated with surgery, radiation, chemotherapy (cytotoxic), hormonal therapy or a combination of any of these. For the purpose of this analysis, we will define the cancer market as chemotherapeutics and the adjunctive therapies used to counter the effects of chemotherapy and radiation therapy. The following charts summarize the global sales for these products.

**Global Sales by Market Segment ($ MM)**

|           | 1996 Sales | 1997 Sales | 1998 Sales | CAGR '96-'98 |
|-----------|------------|------------|------------|--------------|
| Hormone   | 4,414      | 4,784      | 4,884      | 5.2%         |
| Cytotoxic | 4,278      | 5,212      | 6,268      | 21.0%        |
| Adjunctive| 3,367      | 3,651      | 4,168      | 11.2%        |
| Total     | 12,059     | 13,647     | 15,318     | 12.7%        |

Source: Datamonitor

**Sales by Region ($ MM)**

|        | 1996 Sales | 1997 Sales | 1998 Sales | CAGR '96-'98 |
|--------|------------|------------|------------|--------------|
| US     | 5,564      | 6,276      | 7,422      | 15.5%        |
| Ex- US | 6,495      | 7,370      | 7,896      | 10.3%        |

Source: Datamonitor

*Chemotherapeutic agents*

Cytotoxic therapies include classes such as alkylating agents, anti-tumor antibiotics, anti-metabolites and antimitotics (taxanes). These agents are toxic and demonstrate dose-limiting side effects. The commercial value of this segment is significantly understated, as most of the products are available in generic form.

The growth of the cytotoxic segment in the past three years has been driven primarily by the introduction of new, more effective and expensive therapies such as Taxol (paclitaxel/BMS), Gemzar (gemcitabine/Lilly), Taxotere (docetaxel/RPR) and Hycamtin (topotecan/SB). Utilization of these newer agents, however, appears to be dependent on the cost sensitivity of the local market. For example, secondary sources indicate that Taxol has recorded over 60% of its global sales in the US market alone and is prescribed with far less frequency in the more cost sensitive UK, German and French markets.

Most chemotherapeutic agents are indicated for just one or two cancer types, but get significant off-label use once approved. Up to 60% of an oncology product's use is potentially for off-label indications. Much of this use is driven by the publication of data and/or approvals in other countries.

*Hormonal therapies*

Of the top-selling drugs in each major geographical region, hormone therapies contribute approximately one-third of the sales ex-US and one-fourth in the US. Hormone therapies for the treatment of cancer include Lupron (leuprolide/TAP), Zoladex (goserelin/Zeneca), Nolvadex (tamoxifen/Zeneca) and other agents used to treat hormone responsive diseases such as prostate and breast cancer. These agents are generally administered chronically and have reduced side effects compared to cytotoxic therapies. Sales of this category are driven primarily by Lupron and Zoladex. The US market has become increasingly cost sensitive in the Medicare sector, which accounts for over 70% of Lupron sales.

*Adjunctive agents*

CONFIDENTIAL
JH 008189

The availability of effective *adjunctive agents* also allows the cytotoxic chemotherapeutic agents to be administered at higher doses and/or more frequently, or used in a more palliative role, since the adjunctive therapies can reduce the impact of the chemotherapy on the patient's quality of life. Agents in this class include immunostimulants, anti-emetics and bisphosphonates. The growth of this market is linked to the growth of the cytotoxic market, as the increased use of cytotoxic agents drives an increased use in adjunctive therapy. The highest selling product in this class is Neupogen (filgrastim/Amgen) with 1998 sales of over $1 billion.

*Biologic Therapy*

New therapies under development offer the promise of fulfilling several unmet needs in the treatment of cancer. Experts have predicted that in the future early therapy for breast cancer will be dominated by biological approaches, such as monoclonal antibodies (Herceptin/Genentech), which is widely thought to have strong market potential. Genentech recently reported strong second quarter sales of the product in the US of $46.2 million, and it is estimated that if only half of US women with breast cancer who over-express this gene received Herceptin, sales would top $600 million. In addition to monoclonal antibodies, other biological approaches include vaccines and gene therapy.

*Future Trends*

Emerging science in the past decade offers the potential to radically alter the paradigm for cancer therapy and presents opportunities for fundamentally new ways of approaching the disease. New therapies offer the promise of fulfilling several unmet needs in the treatment of cancer. These include matrix metalloproteinase inhibitors (MMPIs), continued expansion of biologics, photodynamic therapies (PDT), anti-angiogenics, and multiple drug resistance (MDR) modifiers. This market does not yet exist, though success of "cytostatic-like" treatments, such as hormonal therapies for prostate and breast cancer, suggests that the market potential for cytostatic agents could be significant.

*Competition*

The angiogenesis pipeline is very competitive, but this level of intensity is somewhat skewed by the large number of mechanistic approaches that are being claimed to demonstrate angiogenic activity. Furthermore, clear evidence of efficacy for these agents has not yet been demonstrated. For the purposes of this summary, only those compounds considered true anti-angiogenic compounds have been included. Companies with compounds in clinical development include Genentech, Entremed, Sugen, TAP, Magainin and Pharmacia Upjohn.

Angiogenesis Compounds in Clinical Development

| Compound | Indications | Company | Phase |
|---|---|---|---|
| Neovastat | Solid tumors | Aeterna | III |
| RhuMab VEGF | Cancer | Genentech | II/III |
| Vitaxin | Arthritis, psoriasis, CVR | Ixsys | II |
| SU-5416 | Cancer | Sugen | II/III |
| TNP 470 | Cancer, arthritis | TAP | II |
| Thalidomide | Cancer | EntreMed/BMS | I |
| Squalamine, squalus | Cancer | Magainin | I |
| RPI 4610 | Cancer | Ribozyme | I |
| VEGF antagonist | Cancer, retinopathy | NeXstar | I |
| Angiostatin/Endostatin | Cancer | EntreMed | I |

CONFIDENTIAL
JH 008190

*Unmet Needs*

Cancer remains the second leading cause of death in the United States, Europe and Japan, and consequently, offers an attractive market opportunity for the pharmaceutical and biotechnology industries. This year about 563,100 Americans are expected to die of cancer, more than 1,500 people a day. In the US, 1 or 4 deaths is due to some form of cancer. In 1999, about 1,221,800 new cancer cases are expected to be diagnosed.

For most cancers, the level of physician satisfaction with current therapies is low. It has long been recognized by researchers, physicians, patients and family members that current treatment options may often be as devastating as the underlying disease.

Unmet needs in this market vary by tumor types and stages, with some tumors responding to treatment with better mortality and/or morbidity results than others. However, cancer is still treated as a terminal illness with significant shortcomings in present treatments. In general, unmet needs include:

| Need | ABT-510 Attribute |
|---|---|
| Enhanced efficacy of therapeutic agents | Potential for enhanced efficacy |
| Reduced toxicity | Potential for reduced toxicity over current cytotoxic treatment |
| Improvements in drug administration | TBD |
| Improved target delivery of cytotoxics and novel therapeutics | Unknown |
| Proven outcomes data | Quality of Life and Pharmacoeconomics to be assessed |

*Considerations*

*Product Usage:* Physicians have indicated that they would use anti-angiogenic agents initially in their more refractory patients, as follow-on or add-on to current best therapy (chemo or surgical). With experience and clinical evidence, they would be willing to use these agents in earlier stages of the disease, where they perceived the greatest benefit to be. Anti-angiogenesis agents are regarded as a maintenance therapy to be used in early disease or after primary therapy as a prophylactic process to prevent the spread of malignancy. Of course, their ultimate use will depend on the benefit provided, which cannot be determined until clinical trials have been completed. Efficacy evidence in humans manifested by tumor response of the magnitude seen in the preliminary dog studies would stimulate tremendous enthusiasm in the oncology community.

*Product Benefits/Efficacy:* Physicians are looking for improvements in time to tumor progression and prevention of metastases with cytostatic agents. There is a great deal of enthusiasm for this mechanism in the scientific and lay audience. The concept is very intuitive. Products, such as ABT-510, that promise a clinical benefit without the usual toxic trade-offs associated with current chemotherapeutic agents, will be enthusiastically received by oncologists.

*Side Effects:* The proposed safety profile of anti-angiogenic agents may enhance usage, as the dose limiting toxicity profiles of most of the other available agents has established a much lower hurdle for demonstrating a preferred profile. However, as chronic therapy, anti-angiogenic agents may have to demonstrate a cleaner profile than cytotoxic agents do to ensure compliance.

C

*Off-label use:* Off label use accounts for between 30-60% of an oncology product's usage. Off-label use is driven by publication of clinical trial results in credible journals, listing in key compendia and/or a peer's experience with the product. Therefore, development spend for off-label use is considerably less than the spend required for regulatory approval of an indication. However, promotion of these off-label uses is limited.

*Other indications:* ABT-510 may be effective in other therapeutic roles, such as arthritic diseases and macular degeneration. These other indications may offer a commercial upside, through internal development or co-development/out-licensing opportunities.

*Competition:* While there are a relatively large number of angiogenesis inhibitors in development, it is unclear whether they will demonstrate a superior efficacy or side-effect profile vs. ABT-510. The mechanism of angiogenesis suggests that multiple anti-angiogenic approaches may be required to maximize the clinical benefit.

*COGS:* Initial estimates on finished cost of drug place it in the range of Lupron costs. Depending on final dosing requirements, the cost of this compound could become a significant obstacle. However, this will need to be considered in light of the pricing flexibility in the oncology market, where there is limited pricing sensitivity for products that are reimbursed. Any financial analysis will need to include royalty obligations to Northwestern University.

*Dosing:* There is still some uncertainty regarding the route of administration and feasible dosage forms for ABT-510. An "inconvenient" formulation leaves this product extremely vulnerable to competitors with more convenient dosage forms. A convenient dosage form, such as a monthly depot, will enhance product adoption over a less convenient form. However, the effect of the various dosage forms on product adoption will be dependent on the benefits the compound provides, side-effect profile and availability of competitive agents with more convenient dosage forms. For chronic therapy, convenience will play an important role in market penetration, given alternative agents. Although less convenient than oral therapy, parenteral therapy (depot, but not self-administered sub-cutaneous) is currently reimbursed by Medicare in the US. Over 60% of all cancer patients have Medicare as their primary healthcare coverage in the US.

*Development/Regulatory:* With a new class of compounds, there is not a clearly defined clinical development path or regulatory guidelines for reference. This hurdle is similar for all the competitive products, but increases the overall development risk profile for these agents. However, with several anti-angiogenic agents in late stage development, Abbott can learn from their experience.

*Other Approaches:* Other "cytostatic" approaches may present a competitive threat if they are used as substitutes. Due to the complexity of the pathogenesis of cancer, it is more likely that these agents will be used in combinations, but incremental benefits may become more difficult to demonstrate as the number of products and approaches multiply. This will require additional studies, as these other classes become part of standard cancer treatment. However, this threat is not unique to this compound.

*Pricing:* The treatment of cancer is expensive, so there is the potential for a great deal of pricing flexibility in this market. There is also an increasing emphasis on cost-effectiveness studies that will need to be addressed in the development plan.

CONFIDENTIAL
JH 008192

*CONFIDENTIAL*

# ABT - 518

## Descriptive Memorandum

*February 2001*

## Abbott Laboratories

CONFIDENTIAL
JH 008193

*MMPI*

*Overview*

Abbott's Matrix Metalloproteinase Inhibitor (MMPI) program represents a novel therapeutic class, with the potential to alter the way that cancer is treated by preventing or modifying disease progression and/or metastases. This more "chronic" approach to therapy has the potential to transform cancer into a disease that patients live with, much like the effect of HIV protease inhibitors on patients with AIDS. It also has the potential to expand the cancer market significantly by increasing the average length of treatment and expanding the pool of patients eligible to receive therapy.

The MMPs comprise a family of enzymes that degrade a wide range of matrix protein substrates. High expression of these enzymes occurs in cancer and is associated with the ability of tumors to grow, invade, develop new blood vessels and metastasize.

MMP inhibitors (MMPIs) may suppress the progression of tumors by several mechanisms:

- Suppress invasion/metastasis by blocking the membrane traversal and access to blood/lymphatic vessels
- Blocking the remodeling of extra-cellular matrix in the vicinity of primary tumors to prevent stroma-bound growth factors from stimulating tumor growth
- Blocking angiogenesis by preventing the proliferation and migration of endothelial cells and neovascularization of tumor.

Experimental evidence suggests that gelatinase A and gelatinase B are particularly important in tumor progression, consequently the project team has targeted gelatinase selective inhibitors for the treatment of cancer. Another reason for targeting highly gelatinase-selective MMP inhibitors relates to the side effect profile exhibited by broad-spectrum agents like marimastat. Chronic administration of marimastat causes a dose-limiting side-effect characterized by severe joint pain and stiffness. Since these joint effects may be mediated by inhibition of other MMPs like fibroblast collagenase, highly gelatinase selective agents may be efficacious without producing dose-limiting side effects.

The MMP selectivity profile exhibited by ABT-518 distinguishes it from competitor's compounds. ABT-518 possesses sub-nanomolar inhibition potencies versus both gelatinase A and gelatinase B and is substantially more selective for the inhibition of the gelatinases over fibroblast collagenase than marimastat and prinomastat. Despite its high selectivity, ABT-518 demonstrates antitumor activity equal or superior to prinomastat. Inhibition of tumor growth is dose dependent in both syngeneic and xenograft models. ABT-518 is also effective in blocking vessel formation in a mouse model of angiogenesis. ABT-518 is a stable crystalline solid which can be synthesized in six steps (25% overall yield) from commercial starting material.

ABT-518 gives rise to sustained plasma concentrations following single oral dosing in monkeys, dogs and rats. Bioavailabilities range between 68 and 93% depending on formulation and species. Several metabolites are produced after repeated oral dosing of ABT-518, although their relative amounts varies with gender and species.

ABT-518 displays no meaningful effects in genotoxicity, cytotoxicity and ligand binding assays and its cardiovascular effects in dogs are unremarkable. ABT-518 produces no significant toxic effects in rats treated with 100 mg/kg/day over 28 days. Plasma concentrations generated by ABT-518 in these studies are at least 20-fold higher than those necessary to produce efficacy in cancer animal models. ABT-518 is therefore a compelling development candidate with the potential to

CONFIDENTIAL
JH 008194

2

demonstrate antitumor effects superior to the MMP inhibitors currently undergoing clinical trials. Phase 1 clinical trials in cancer patients began March 2001.

*The market*

Currently, cytotoxic agents represent the largest, and fastest growing, class of oncology agents by sales volume. The following chart summarizes the value of the current oncology market.

**Global Sales by Market Segment ($ MM)**

|            | 1996 Sales | 1997 Sales | 1998 Sales | 1999 Sales (est) | CAGR '96-'98 |
|------------|-----------|-----------|-----------|-----------|-----------|
| Hormone    | 4,414     | 4,784     | 4,884     | 5,000     | 5.2%      |
| Cytotoxic  | 4,278     | 5,212     | 6,268     | 7,300     | 21.0%     |
| Adjunctive | 3,367     | 3,651     | 4,166     | 4,900     | 11.2%     |
| Total      | 12,059    | 13,647    | 15,318    | 17,200    | 12.7%     |

Source: Datamonitor

**Sales by Region ($ MM)**

|        | 1996 Sales | 1997 Sales | 1998 Sales | 1999 Sales (est) | CAGR '96-'98 |
|--------|-----------|-----------|-----------|-----------|-----------|
| US     | 5,564     | 6,278     | 7,422     | 8,500     | 15.5%     |
| Ex-US  | 6,495     | 7,370     | 7,896     | 8,700     | 10.3%     |

Source: Datamonitor

Cytostatic agents have the potential to alter the way cancer is treated and presents opportunities for fundamentally new ways of approaching the disease. This cytostatic market does not yet exist, though success of more cytostatic "like" treatments, such as hormonal therapies for prostate and breast cancer, suggest that the market potential for cytostatic agents could be significant.

The ultimate commercial and clinical success of the MMPI will depend on the clinical benefit this product provides in key cancer types compared with current best therapy. These can be benefits provided by dosing this agent in addition to current therapy and/or as an alternative to best therapy, or as a new component of best therapy. All currently available products, including the market leaders such as Taxol, have significant shortcomings in their profiles.

However, as novel therapy, MMPIs will probably be adopted initially as add-on the current chemotherapy. As benefits are proven and clinical experience is gained, these agents may be used in earlier stages of cancer and/or in conjunction with surgery or radiation to prevent the progression of any microscopic disease that remains.

The clinical targets identified for this compound include late stage pancreatic cancer, late stage NSCL cancer (on-label), with late stage ovarian and breast cancer as additional cancer types where efficacy has been demonstrated, but not filed. Other cancer types this compound may be efficacious in include SCL, colorectal, bladder, stomach and prostate. Targets will be refined as we know more about this compound's in-vivo activity.

CONFIDENTIAL
JH 008195

The following tables summarize the key marketed competitive products by indication (US data only):

### Late Stage Breast

| Product | Share |
|---|---|
| Cyclophosphamide/Cytoxan/BMS | 18.7 |
| Doxorubicin/Adriamycin/P&U | 17.11 |
| Docetaxel/Taxotere/RPR | 16.25 |
| Paclitaxel/Taxol/BMS | 16.11 |
| Trastuzumab/Herceptin/Genetech | 11.26 |

### Late Stage NSCL

| Product | Share |
|---|---|
| Carboplatin/Paraplatin/BMS | 50.32 |
| Paclitaxel/Taxol/BMS | 44.14 |
| Vinorelbine/Navelbine/Glaxo | 22.78 |
| Gemcitabine/Gemzar/Lilly | 22.14 |
| Cisplatin/Platinol/BMS | 11.28 |

### Late Stage Ovarian

| Product | Share |
|---|---|
| Paclitaxel/Taxol/BMS | 47.11 |
| Carboplatin/Paraplatin/BMS | 45.42 |
| Topotecan/Hycamtin/SKB | 22.54 |
| Dox SL/Doxil/Alza | 9.14 |
| Cisplatin/Platinol/BMS | 7.58 |

### Late Stage Pancreas

| Product | Share |
|---|---|
| Gemcitabine/Gemzar/Lilly | 78.5 |
| 5-FU/Efudex/ICN Pharma | 21.0 |
| Leucovorin/ | 10.7 |
| Cisplatin/Platinol/BMS | 4.72 |

## Compounds in Development

The MMP inhibitor field is competitive. More than 30 firms have filed patents claiming small molecule MMP inhibitors over the past 5 years, and several companies have compounds in advanced clinical development. Abbott's compound may be 3rd or 4th to market and will have to demonstrate a competitive advantage to gain the share necessary to support the clinical development of this compound. Companies with compounds in advanced clinical development for the treatment of cancer include Agouron/Warner Lambert/Pfizer, British Biotechnology/Schering Plough and BMS and are listed below. Other companies are targeting this mechanism for arthritis.

MMPIs in Clinical Development for Cancer

CONFIDENTIAL
JH 008196

| Compound | Company | Comments | Phase |
|---|---|---|---|
| Marimistat | BritishBiotechnology/ Schering Plough | Broad spectrum, dose limiting toxicity. Activity seen in gastric cancer, but negative results in pancreatic. | III |
| Prinomastat | Agouron/ Warner Lambert/ Pfizer | Moderate gelatinase selectivity, dose limiting toxicity. May be dosing sub-optimally to avoid toxicity. Efficacy data not available. | III |
| BMS 275291 | BMS | Broad spectrum, joint effects seen in Phase I studies. | II |

Bayer recently dropped development of BAY 12-9566 due to concerns about potential toxicity. Recent results from a study with marimistat in pancreatic cancer, where adding marimistat to Gemzar resulted in no survival advantage, has led to speculation that MMPIs may be more applicable in less aggressive cancer types or earlier stages of the disease. Alternatively, it could be a reflection of the inability to examine higher doses of marimistat due to joint effects.

The joint effects produced by the compounds listed above almost certainly preclude their long-term use, limit compliance and reduce optimal efficacy. Any MMP inhibitor that lacks these side effects will possess a substantial competitive advantage. The musculoskeletal effect produced by marimistat and prinomastat in cancer patients is typically described as arthralgia, myalgia and tendinitis, which occurs predominately in the upper limbs. While mild cases respond to analgesics, interrupting therapy for a period of approximately 2 weeks is necessary when the condition is less well tolerated.

Although Abbott's timing to market is not optimal, the shortcomings of the competitive products provide an opportunity for a compound with an improved SE or efficacy profile. Current animal models seem to predict Abbott's compound is superior to those currently in clinical trials, and has the potential to be best in class.

*Product profile*

The objective of a product profile at this time in the product's development is to provide a target for the types of attributes that will be required to be commercially successful. This profile is based on market research with oncologists and consultation with opinion leaders. This profile will continue to be refined as more is known about this product's profile, development of competitive products and the market continues to evolve.

CONFIDENTIAL
JH 008197

| | Base | Optimal |
|---|---|---|
| Efficacy | ABT-518, alone or in combination with best therapy, provides at least one of | Provides more than one of efficacy benefits outlined. |

| | the following benefits in at least one solid tumor type:<br><br>- Increased survival<br>- Tumor regression<br>- Improved quality of life<br>- Increased time to tumor/disease progression | |
|---|---|---|
| Competitive advantage | ABT-518 will need to demonstrate a clinically significant advantage in efficacy (see parameters above) or additive synergistic activity with current/competitive agents or clinically significant advantage in side-effect profile relative to other MMPI agents. | Same |
| Administration | Convenient administration relative to competitive agents. | Same plus reimbursement in US market. |
| COGS | A finished cost of goods that is consistent with at least an 80% standard manufacturing margin. | A finished cost of goods that is consistent with at least a 90% standard manufacturing margin. |

### Marketing overview

*Product Usage:* Physicians have indicated that they would use MMPIs initially in their more refractory patients, as follow-on or add-on to current best therapy (chemo or surgical). With experience and clinical evidence, they would be willing to use these agents in earlier stages of the disease, where they perceived the greatest benefit to be. The MMPI was regarded as a maintenance therapy to be used in early disease or after primary therapy as a prophylactic process to prevent the spread of malignancy.

*Product Benefits/Efficacy:* Physicians are looking for improvements in time to tumor progression and prevention of metastases with cytostatic agents. The MMPI mechanism has more recently been implicated as having an even more active role in cancer pathogenesis, from preventing primary tumor growth to anti-angiogenic properties. Positive results from competitive agents, such as marimistat in gastric cancer, provides proof of principle for this mechanism.

*Side Effects:* The proposed safety profile of MMPIs (excluding joint toxicity) may enhance usage, as the dose limiting toxicity profiles of most of the other available agents has established a much lower hurdle for demonstrating a preferred profile. However, as chronic therapy, MMPIs may have to demonstrate a cleaner profile than cytotoxic agents do to ensure compliance. As the 3rd or 4th MMPI to market, SE hurdles will be even higher for this compound. As a critical Go/No Go decision point, the joint toxicity of this compound will be evaluated in an expanded Phase I multi-dose study.

*Dosing:* Discovery is currently targeting an oral dosage form. In general, oral therapies are acknowledged by physicians and patients as being more convenient to the patient. Chronic oral dosing may also reduce overall costs, as infusion support products and personnel would not be required, enhancing pharmacoeconomic evidence.

*COGS:* Initial estimates on finished cost of drug suggest that drug costs will not be significant for this compound

*Off-label use:* Off label use accounts for between 30-60% of an oncology product's usage. Off-label use is driven by publication of clinical trial results in credible journals, listing in key compendia and/or a peer's experience with the product. Therefore, development spend for off-label use is considerably less than the spend required for regulatory approval of an indication. However, promotion of these off-label uses is limited.

*Competition:* As the 3rd or 4th MMPI to market, Abbott's compound will need to demonstrate a meaningful clinical advantage over compounds that are in more advanced development. Strict Go/No Go criteria will determine if the MMPI can meet these hurdles. If they cannot be met, the compound will not move forward.

*Development/Regulatory:* With a new class of compounds, there is not a clearly defined clinical development path or regulatory guidelines for reference. This hurdle is similar for all the competitive products, but increases the overall development risk profile for these agents. However, with several MMPIs in late stage development, Abbott can learn from their experience.

*Other Approaches:* Other "cytostatic" approaches may present a competitive threat if they are used as substitutes. Due to the complexity of the pathogenesis of cancer, it is more likely that these agents will be used in combinations, but incremental benefits may become more difficult to demonstrate as the number of products and approaches multiply. This will require additional studies, as these other classes become part of standard cancer treatment. However, this threat is not unique to this compound.

*Pricing:* The treatment of cancer is expensive, so there is the potential for a great deal of pricing flexibility in this market. However, as an oral therapy in the US market, there may be additional downward price pressure for this agent. There is also an increasing emphasis on cost-effectiveness studies that will need to be addressed in the development plan.

*Dosing:* Discovery is currently targeting an oral dosage form. In general, oral therapies are preferred by physicians and patients because of the convenience to the patient. However, this form may not be the best choice for some people who already have certain digestive system symptoms (vomiting, diarrhea, or severe nausea), cannot swallow liquids or pills, or cannot remember when or how many pills to take. Additionally, in the US market there are several unique factors that currently do not favor oral therapies. Novel oral therapies are not currently reimbursed by Medicare, a significant payer for the oncology patient population. Also, 40-60% of a community oncologist's income is generated through the administration of IV drugs. An oral therapy would not be a source of revenue to the physician.

## Clinical Studies

Clinical studies across a wide range of solid tumors will be initiated, including but not limited to breast cancer, non small cell lung cancer, ovarian cancer, pancreatic cancer, etc…

Final indications pursued will depend from the results of the phase II studies.

CONFIDENTIAL
JH 008199

*CONFIDENTIAL*

# Farnesyltranserase Inhibitor

## Descriptive Memorandum

*February 2001*

## Abbott Laboratories

CONFIDENTIAL
JH 008200

## Overview

The Ras genes were the first oncogenes of mammalian origin to be discovered. Intensive research over the last decade has led to the elucidation of the normal function of cellular Ras protein, the role of Ras mutations in oncogenic transformation, and the identification of molecular targets, such as the enzyme farnesyltransferase, for inhibiting Ras activity. Although farnesyltransferase inhibitors (FTIs) were initially designed with the intention of inhibiting the posttranslational prenylation, and hence function, of Ras, it is now becoming apparent that farnesylated proteins other than Ras (e.g., RhoB) are also critical for malignant growth and may be the relevant target for inhibition of farnesylation. While it remains controversial whether blocking Ras activity or altering the RhoB prenylation status is the actual function of an FTI, these agents, exemplified by ABT-839 and FTIs in the clinic, exhibit remarkable anticancer activity against a wide variety of tumors in preclinical models. The current FTI program is projected to reach DDC status in January, 2001.

Abbott evaluated one FTI, ABT-839, in normal volunteers, but decided to discontinue development of this drug due to its poor pharmacokinetic profile. Invaluable experience was gained, however, from both the preclinical and clinical studies with this compound. Abbott's second-generation series are novel structures that exhibit significantly improved potency and oral bioavailability.

There continues to be tremendous enthusiasm in the medical community and pharmaceutical industry for this mechanism of action. Farnesyltransferase inhibitors have demonstrated impressive antitumor activity in preclinical models with activity equivalent to or better than that achieved with conventional cytotoxic chemotherapy given at the maximal tolerated dose. These agents appear to inhibit angiogenesis and, consistent with this activity, minimal resistance has been observed in preclinical models. The potential also exists for synergistic activity in combination with cytotoxic chemotherapy.

## The market

Cancer remains the second leading cause of death in the US, and consequently is an attractive market opportunity for the pharmaceutical/biotechnology industries. Approximately 40% of all Americans will develop cancer in their lifetime.

The worldwide cytotoxic and hormonal cancer therapies market is highly fragmented with only BMS and Zeneca holding a greater than 10% market share. Although the market is not concentrated, the field is highly competitive with more than 60 companies focused on the cancer research area. The growth of the oncology market is fueled by increasing disease incidence, new product entries, new therapeutic approaches, a growing adjunct therapy market that expands the number of patients eligible for chemotherapy, and intensified research competition. The data in Tables 1 and 2 summarize the value of the current oncology market. A great deal of uncertainty surrounds the concept of cytostatic treatment of cancer. Conceptually it may transform the way cancer is treated, allowing patients longer disease free survival and improved quality of life. However, at this point in development, this paradigm does not exist in cancer. Considering market, clinical and patient dynamics factors, breast, colorectal, prostate and non-small cell lung cancers are the most attractive targets for development.

CONFIDENTIAL
JH 008201

Table 1. Global sales by market segment ($ MM)

| | 1996 Sales | 1997 Sales | 1998 Sales | 1999 Sales (est.) | CAGR '96-'98 |
|---|---|---|---|---|---|
| Hormone | 4,414 | 4,784 | 4,884 | 5,000 | 5.2% |
| Cytotoxic | 4,278 | 5,212 | 6,268 | 7,300 | 21.0% |
| Adjunctive | 3,367 | 3,651 | 4,166 | 4,900 | 11.2% |
| Total | 12,059 | 13,647 | 15,318 | 17,200 | 12.7% |

Source: Datamonitor

Table 2. Sales by region ($ MM)

| | 1996 Sales | 1997 Sales | 1998 Sales | 1999 Sales (est.) | CAGR '96-'98 |
|---|---|---|---|---|---|
| US | 5,564 | 6,276 | 7,422 | 8,500 | 15.5% |
| Ex-US | 6,495 | 7,370 | 7,896 | 8,700 | 10.3% |

Source: Datamonitor

Cytostatic agents have the potential to alter the way cancer is treated and presents opportunities for fundamentally new ways of approaching the disease. This cytostatic market does not yet exist, though success of more cytostatic "like" treatments, such as hormonal therapies for prostate and breast cancer, suggest that the market potential for cytostatic agents could be significant.

The ultimate commercial and clinical success of the FTI will depend on the clinical benefit this product provides in key cancer types compared with current best therapy. These can be benefits provided by dosing this agent in addition to current therapy and/or as an alternative to best therapy, or as a new component of best therapy. All currently available products, including the market leaders such as Taxol, have significant shortcomings in their profiles.

However, as novel therapy, FTIs will probably be adopted initially as add-ons to current chemotherapy. As benefits are proven and clinical experience is gained, these agents may be used in earlier stages of cancer and/or in conjunction with surgery or radiation to prevent the progression of any microscopic disease that remains.

The clinical targets identified for this compound include late stage pancreatic cancer, late stage NSCL cancer (on-label), with late stage ovarian and breast cancer as additional cancer types where efficacy has been demonstrated, but not filed. Other cancer types this compound may be efficacious in include SCL, colorectal, bladder, stomach and prostate. Targets will be refined as we know more about this compound's in-vivo activity.

The following tables summarize the key marketed competitive products by indication (US data only):

| Late Stage Breast | |
|---|---|
| Product | Share |
| Cyclophosphamide/Cytoxan/BMS | 18.7 |
| Doxorubicin/Adriamycin/P&U | 17.11 |
| Docetaxel/Taxotere/RPR | 16.25 |
| Paclitaxel/Taxol/BMS | 16.11 |
| Trastuzumab/Herceptin/Genetech | 11.26 |

CONFIDENTIAL
JH 008202

### Late Stage NSCL

| Product | Share |
|---|---|
| Carboplatin/Paraplatin/BMS | 50.32 |
| Paclitaxel/Taxol/BMS | 44.14 |
| Vinorelbine/Navelbine/Glaxo | 22.78 |
| Gemcitabine/Gemzar/Lilly | 22.14 |
| Cisplatin/Platinol/BMS | 11.28 |

### Late Stage Ovarian

| Product | Share |
|---|---|
| Paclitaxel/Taxol/BMS | 47.11 |
| Carboplatin/Paraplatin/BMS | 45.42 |
| Topotecan/Hycamtin/SKB | 22.54 |
| Dox SL/Doxil/Alza | 9.14 |
| Cisplatin/Platinol/BMS | 7.58 |

### Late Stage Pancreas

| Product | Share |
|---|---|
| Gemcitabine/Gemzar/Lilly | 78.5 |
| 5-FU/Efudex/ICN Pharma | 21.0 |
| Leucovorin/ | 10.7 |
| Cisplatin/Platinol/BMS | 4.72 |

Emerging science within the past decade has radically altered the paradigm for cancer therapy and presents opportunities for fundamentally new ways of approaching the disease. Abbott has multiple discovery cytostatic targets, which may improve effective, but we are not alone: more than 200 compounds from other players are in development. The goal of cytostatic therapy is to improve quality of life, controlling the disease and transforming aggressive treatment to a chronic condition, which has been compared to the impact of protease inhibitors on the course of HIV.

*Clinical Studies*

Considering all the factors, market, clinical and patient dynamics, breast, colorectal, prostate and non-small cell lung cancer appear to be the most attractive targets for development. The development of cytostatic agents faces a number of challenges as regulatory agencies and physicians evaluate the new emerging paradigm of cancer therapy.

Despite the enormous medical need, drugs for chronic treatment/disease stabilization and improved quality of life for cancer patients do not yet exist. Correspondingly, animal models test efficacy that has not yet been validated as predictive of response in humans. Medical oncologists have historically depended on determination of maximum tolerated dose and response manifested by tumor shrinkage for cancer drug development. These parameters are not relevant to novel "cytostatic" agents. Combination with conventional cytotoxic drugs will be required in the near term and will have to be determined empirically. Intermediate and surrogate measures of biological response will have to be developed. Regulatory agencies are grappling with the same issues.

CONFIDENTIAL
JH 008203

Descriptive Memorandum, FTI    CONFIDENTIAL                    4

Competition:

Within Project Approach

| Company | Compound | Indication | Status of compound | Status of project |
|---|---|---|---|---|
| Janssen Pharmaceutica | R-11577 (R-251076) | Cancer (unspecified) | Phase III | active |
| Schering-Plough | Sch66336 (R-285322) | Cancer (unspecified) | Phase II | active |
| Merck | L-778123 | Cancer (unspecified) | Phase I (t.x.) abandoned | unknown |
| Bristol-Myers Squibb | BMS-214662 | Cancer (unspecified) | Phase I | active |
| LG Chemical | LB-42908 | Cancer (unspecified) | preclinical | active |
| Rhône-Poulenc Rorer | galactoidase derivatives | Cancer (unspecified) | preclinical | active |
| Pfizer | unknown structure | Cancer (unspecified) | preclinical | active |
| Parke-Davis | unknown structure | Cancer (unspecified) | preclinical | active |
| Roche | peptidomimetics | Cancer (unspecified) | preclinical | abandoned project |
| Eisai | peptidomimetics | Cancer (unspecified) | preclinical | abandoned project |
| Banyu | FPP silastic | Cancer (unspecified) | preclinical | unknown |
| ISIS | ISIS-2503 (ras antisense) | Cancer (unspecified) | Phase I | active |

Within Therapeutic Area

| Approach | Selected Compounds | Company(ies) | Status |
|---|---|---|---|
| antisense | ISIS 3521, ISIS, 5132 | ISIS | phase I |
| cytotoxic agents | camptosar, CI-980, Servitron, Genzar, Hycantin, Irofundxin, Novantrone, Oncamine, Capecitine, Toxautex | P&U, Warner-Lambert, Schering, Lilly, SKB, P&U,Immunex, Albecti, Roche, Zeneca | most phase III |
| differentiation | tazarotin, panretin, 5-azacytidine | Ligand, HCl | Ligand in phase I/III |
| drug resistance modifiers | VX-710, 776C85, RMP-7, CT-25M | Vertex, Glaxo Welcome, Alkermes, Cell Therapeutics | Vertex in phase II |
| gene therapy | Onyx-015, , MDR1, GLI-328, IL-2, GV-1301 | Onyx, Introgen, Titolon Biologics, Theragen, Genetic Therapy, Cytherol, RPR-Gencell, GeneMedicine, Titan, etc | Restricted to accessible cancers. Most advanced Phase III |
| hormonal therapy | Zoladex, analdex, delozatine, Oncolar, Riviros, Casodex, roglatiande | Zeneca, Pfizer, Novartis, Janssen, US bioscience | most phase III |
| immunotherapy |  |  |  |
| antibodies | IDEC-Y2Bu2BA, anti-HER2, anti-EGFR | IDEC, Genetech, ImClone | IDEC recently approved, others phase III |
| cytokines | IL-12, IL-4, Proleukin, Roferon-A | Roche, Schering, Chiron, Roche | phase III |
| vaccines | rY-gp100, Genevax, MGV | Apollon, Therion, Proganics | phase I, II |
| photodynamic | photofrin, pcmycin | OLT photo, Vion | phase III |
| radiation sensitizers | Neo-Guassadide, radinol | Oxigene, Robesta | phase II, III |
| metalloproteinase inhibitors | marimastat, AG-3340, CGS-27023A | British Biotech, Agouron, Novartis, Bayer | 901 in phase III |
| angiogenesis inhibitors | TNP-470, SU-5416, anti VEGF-mAb, thalidomide, DC101 | TAP, Sugen, Genentech, Entremed, ImClone, etc | see angiogenesis project review for details |

CONFIDENTIAL
JH 008204

Descriptive Memorandum, FTI    CONFIDENTIAL                          5

## Competitive Analysis

The project is on par with others in the industry. While second generation Abbott compounds are not yet in clinic, all of the compounds from other companies that are in clinical trials have deficiencies. While the Schering compound has the best oral PK profile, it is not particularly potent. The Janssen compound is potent, but has a poor PK profile. The Merck compound exhibited QTc prologation and development has been stopped. The Bristol Myers Squib compound, BMS-214662, which is in phase I, is an *in vitro* submicromolar inducer of apoptosis in human tumor cells and appears to be the most potent inducer of apoptosis of the known FTIs. This compound could have a different mechanism of action from the classical FTIs and have its own liabilities. LG42908 from LG Chemical is potent FTI and has good oral bioavailability (F= 91% in monkey), however; it's a CYP3A4 inhibitor and will have significant drug-drug interaction liabilities. Extensive preclinical pharmacology at Abbott has defined optimum parameters for a FTase inhibitor that may not be known to our competitors, or be achievable with the current generation of FTIs. Although not yet established, we anticipate that the Abbott compound will be improved over competitors' compounds with respect to potency, oral bioavailability, half-life, toxicity, efficacy, angiogenesis inhibition, and lack of resistance.

CONFIDENTIAL
JH 008205

*CONFIDENTIAL*

# DOPAMINE RECEPTOR AGONIST PROGRAM

## Descriptive Memorandum

*February 2001*

## Abbott Laboratories

CONFIDENTIAL
JH 008206

CONFIDENTIAL

## D4 Agonists for Male Erectile Dysfunction

### Scientific Overview

Male erectile dysfunction (MED) is defined as the "inability to maintain an erection sufficient for satisfactory sexual intercourse" (NIH Consensus Panel) and results from physiological (organic), psychogenic causes, or a combination thereof. This disorder is associated with decreased quality of life, including personal well being, and diminished family and social relationships. In 1999, an estimated 77 million men over the age of 40 (52% of men over 40 years-old) in the seven major pharmaceutical markets experienced some degree of MED, and the prevalence increases with age. Approximately 10-20% of patients have severe or complete MED, and the majority of the population suffers from moderate disease. While the introduction of Viagra has increased the diagnosis rate of MED in the U.S., 75% or more of patients do not seek treatment. However, as the "baby boomer" generation ages, MED will become a more prominent concern and a growing number of patients are likely to seek treatment.

Abbott's male erectile dysfunction program targeting D4 dopamine receptors represents a novel therapeutic approach to the rapidly growing male erectile dysfunction (MED) market. The current gold standard for the treatment of MED, Viagra, acts peripherally at the penile smooth muscle level to induce erection by modulating the levels of cGMP. In contrast, a selective D4 dopamine agonist will act in the brain at the sites necessary for initiation of a successful erection. Targeting the D4 receptors in brain offers the potential for efficacy in patients with MED that do not respond to Viagra (for example patients with diabetes). Additionally, targeting D4 receptors should not result in any cardiovascular adverse events unlike Viagra which can cause serious cardiovascular effects in patients who are on nitroglycerine-based medications. Since safety is of paramount importance for any life-style disorder like MED, a new agent that does not have any contraindications or warnings related to safety issues may be positioned to become the gold-standard therapy.

Evidence for the potential of a selective D4 dopamine receptor agonist for the treatment of erectile dysfunction includes:

- The non-selective dopamine receptor agonist apomorphine, (Uprima[TM]) has been shown to be effective in phase III clinical trials, and has received scientific approval for market in the EU, for the treatment of MED. This validates the utility of dopaminergic agonists to facilitate penile erections in humans. However, the clinical development of apomorphine for the US market has been hampered by dose limiting side-effects (emesis and syncope).

- Studies at Abbott have established that the efficacy of apomorphine (penile erection) and side-effect (emesis) are mediated by different dopamine receptor subtypes. There are 5 known dopamine receptors. Abbott scientists have discovered that the selective activation of $D_4$ receptors can facilitate penile erection in animals, while the $D_2$ receptor appears to mediate the emetic effect of apomorphine. The discovery of a $D_4$ selective agonist maximizes the possibility to identify a compound with equivalent/superior efficacy to apomorphine but devoid of its side-effect liabilities.

PPD is currently screening the Abbott library of compounds to identify novel and proprietary D4 dopamine receptor compounds. Initial hits have been identified that are as potent as any known D4 dopamine receptor agonist. The strategy is to aggressively profile these hits for selectivity across the five different dopamine receptor subtypes and to ensure that selective agents are effective in a number of preclinical in vivo models of MED and have no emetic or cardiovascular side effects. The D4 dopamine receptor agonist program will be discontinued if selective D4 agonists do not achieve at least a 30-fold separation between efficacy in a model of MED and cardiovascular/emetic side effects.

CONFIDENTIAL

CONFIDENTIAL
JH 008207

Abbott has a competitive advantage in the race to exploit selective D4 dopamine receptor agonists for MED. A patent application covering the use of any selective D4 agonist for the treatment of MED has been filed and no other pharmaceutical company may have the range of preclinical models of efficacy and safety in addition to access to the clinical information gained from the development of apomorphine. Our molecular modeling group has facilitated advances in the design of selective D4 agonists.

*Market Analysis*

The introduction of Viagra combined with increased disease awareness resulted in the MED market in the US exploding from $157MM in 1997 to an estimated $726MM in 2000. Worldwide, this market has seen similar growth, and is estimated at $500MM for ex-US for 2000. Viagra currently dominates the MED market, with more than $1billion in sales in the $1.3 billion worldwide market in 1999, and >95% of the MED prescriptions in the US. The market growth is expected to continue, with an estimated CAGR in the US of 17.9% (2000 – 2005), fueled by increased awareness of MED, expanded use to wider patient segments for relationship or performance enhancement, and the introduction of heavily promoted new agents. Downward pressure on growth will come from continued perceptions of safety concerns, the limited efficacy of Viagra™, and out-of-pocket cost to patients.

Market drivers influencing the potential of a D4 dopamine receptor agonist include:

- Patient Awareness and Demand   Viagra has built considerable awareness of MED. However, in the US, only 10-25% of current MED patients seek treatment for this disorder. Ex-US the percentage of patients seeking treatment is lower (10%). This is mainly due to the lack of DTC promotional campaigns in the ex-US markets. Further market expansion requires continued patient and physician education.

- Product Safety:  There are growing patient and regulatory concerns regarding the safety of Viagra. While, physicians currently perceive Viagra™ to be safe, if used by the correct patients, there is significant concern regarding the concomitant use of nitrates for cardiovascular disorders with Viagra. Approximately 10% of Viagra patient deaths have been attributed to use of nitrates. Thus, there is an opportunity to eliminate this concern for physicians and to expand the market.

- Product Efficacy:  In clinical trials Viagra allowed successful intercourse in about 50% of attempts. The limited and inconsistent efficacy of the product has resulted in patient dissatisfaction and discontinuation, thus creating a chance to drive Viagra quitters or switchers, as well as new patients, to new, more effective, MED products. The demonstration of efficacy in a broader population of MED patients might also influence physicians to try an alternative product prior to Viagra. The delay in onset (~1hr) and the variability in onset of action from patient to patient is an additional complaint about Viagra. Product features of a selective D4 agonist such as a more rapid onset of action or more reproducible onset will have a positive influence on the market opportunity for MED therapies.

- Additional Indications: Use of a D4 dopamine receptor agon in other indications such as "relationship enhancement" (female sexual dysfunction and age-related decline in male sexual performance) offers an opportunity to both expand the potential market to include women and non-MED sufferers, and reduce the embarrassment of MED for patients. Additional research is required to identify meaningful endpoints in this expanded indication. Initial studies conducted by Pfizer showed that Viagra™ was not effective to treat female sexual dysfunction.

CONFIDENTIAL

CONFIDENTIAL
JH 008208

*Competitive Overview*

The following tables summarize the key competitive activities in regard to marketed products and products in the development pipeline. To date there are no reports any other company targeting selective D4 agonists for the treatment of MED, although a number of companies do have activities in the dopamine receptor arena for other indications that could be re-focused to MED if they became aware of Abbott's insights into the D4 receptor.

A. Oral agents

| Approach | Compound/Product | Company(ies) | Status |
|---|---|---|---|
| PDE5 inhibition | Sildenafil (Viagra™) | Pfizer | Marketed |
| DA receptor | Apomorphine (Uprima™) | TAP | NDA filing withdrawn |
| Adrenergic | Phentolamine (Vasomax™) | Schering-Plough/Zonagen | NDA filing on hold (>1 year) |
| PDE5 inhibition | IC351 (Cialis™) | ICOS-Lily | Phase III |
| PDE5 inhibition | Vardenafil | Bayer | Phase II-III |

B. Intranasal

| Approach | Compound/Product | Company(ies) | Status |
|---|---|---|---|
| DA receptor | Nasal apomorphine | Nastech | Phase II |

C. Intracavernosal agents

| Approach | Compound/Product | Company(ies) | Status |
|---|---|---|---|
| EP receptor | PGE₁ (Caverject™, Edex™) | Pharmacia, Schwarz Pharma | Marketed |
| VIP receptor Adrenergic | VIP-phentolamine (Invicorp™) | Senetek | Marketed outside US |
| K channels | PNU 83757 | Pharmacia | Phase II |

D. Intraurethral agents

| Approach | Compound/Product | Company(ies) | Status |
|---|---|---|---|
| EP receptor | PGE₁ (Muse™) | Vivus, Abbott | Marketed |

E. Topical

| Approach | Compound/Product | Company(ies) | Status |
|---|---|---|---|
| EP receptor | PGE₁ (Alprox-TD; Topiglan) | NexMed; MacroChem | Phase II and III |

CONFIDENTIAL
JH 008209

CONFIDENTIAL

MAR. 13. 2001 12:29PM                              NO. 2199    P. 2/3

Brian J. Smith
Assistant Secretary and Divisional Vice President
Domestic Legal Operations
Abbott Laboratories
100 Abbott Park Road
Abbott Park, Illinois 60064

March 13, 2001

John Hancock Life Insurance Company
Investors Partner Life Insurance Company
John Hancock Variable Life Insurance Company
Attention: Stephen J. Blewitt
John Hancock Place
P.O. Box 111
Boston, MA 02117

Ladies and Gentlemen,

I have acted as counsel for Abbott Laboratories, an Illinois corporation (the "Company"), in connection with the Company's collaboration with John Hancock Life Insurance Company, a Massachusetts corporation, Investors Partner Life Insurance Company, a Massachusetts corporation, John Hancock Variable Life Insurance Company, a Delaware corporation (collectively, "John Hancock") pursuant to the Research Funding Agreement made as of March 13, 2001 (the "Research Funding Agreement"). Capitalized terms used herein without definition have the meanings assigned to them in the Research Funding Agreement.

In connection with the opinions expressed herein, I have made such examination of matters of law and of fact as I considered appropriate or advisable for purposes hereof. As to matters of fact material to the opinions expressed herein, I have relied upon certificates and statements of government officials and of officers of the Company. I have also examined originals or copies of such corporate documents or records of the Company as I have considered appropriate for the opinions expressed herein. I have assumed for the purposes of this opinion the genuineness of all signatures (other than those of individuals signing on behalf of the Company which are genuine), the legal capacity of natural persons, the authenticity of the documents submitted to me as originals, the conformity to the original documents of all documents submitted to me as certified, facsimile or photostatic copies, and the authenticity of the originals of such copies.

CONFIDENTIAL
JH 008210

MAR. 13. 2001 12:29PM                                    NO. 2199   P. 3/3

John Hancock Life Insurance Company
Investors Partner Life Insurance Company
John Hancock Variable Life Insurance Company
March 13, 2001
Page 2

Based upon the foregoing, and subject to the qualifications and limitations stated herein, I am of the opinion that: (i) the Company is duly organized, validly existing and in good standing in the State of Illinois; (ii) the Company has the requisite corporate power and authority to execute, deliver and perform the Research Funding Agreement; (iii) the Research Funding Agreement has been duly and validly authorized by the Company, and duly executed and delivered by an authorized officer of the Company and constitutes a valid and binding legal obligation of the Company enforceable against it in accordance with its terms; (iv) the performance of the Research Funding Agreement by the Company does not constitute a breach or violation of its organizational documents or any other agreement or understanding, written or oral, to which the Company is a party or any existing law, statute, rule or regulation by which the Company is bound; (v) no consents or approvals of any court or governmental authority is required on the part of the Company in connection with the execution, delivery, and performance of the Research Funding Agreement; (vi) there is no litigation pending, or to my knowledge threatened, which calls into question the validity of the Research Funding Agreement.

My opinion expressed above is limited to the law of the State of Illinois and the federal law of the United States, and I do not express any opinion herein concerning any other law.

The opinion set forth herein is rendered only to you and solely for your benefit in connection with the above described transactions. This opinion may not be relied upon by you for any other purpose, or relied upon by any other person for any purpose, without my prior written consent.

Very truly yours,

*Brian J. Smith*

M:\Domestic\Pats & Adams\John Hancock\Opinion 010313.doc

CONFIDENTIAL
JH 008211



Job : 175
Date: 5/4/2007
Time: 9:56:55 AM

$B$

Certificate Pursuant To Bond Investment Committee Guidelines
Adopted March 19, 1999

**COMPANY:**    Abbott Laboratories ("Non-Recourse")

**INSTRUMENT
AFFECTED:**    $220,000,000 Research Funding Agreement Dated as of March 31, 2001

**DATE OF
CERTIFICATE:**    January 22, 2003

**DATE OF
BROAD VOTE:**    N/A

**BACKGROUND:**    In March 2001, John Hancock made a commitment to fund $220 million for research and development expenses for a basket of nine pharmaceutical products that were under development by Abbott. The commitment requires funding over a four-year period beginning December 2001 and is subject to Abbott co-funding at least two times our commitment during the same period. During 2001 and 2002, Abbott spent approximately $195 million and $132 million, respectively, on the compounds. Abbott expects to spend approximately $111 million for research and development on the portfolio in 2003. The major developments on the portfolio through December 31, 2002 have been: termination of ABT-594 (a compound in Phase II), MMPI (a compound in Phase I), FTI (a compound in pre-clinical development), and ABT-773 – in the United States (a compound in Phase III); positive clinical data and "fast track" status for ABT-627 (a compound in Phase III), completion of Phase I trials for ABT-510, ABT-492 and ABT-751, and continued development on ABT-724 (a pre-clinical compound). Based on the developments within the portfolio, our model still shows a mid-teens expected return; however, the probability of a loss in value has increased since originally agreeing to the transaction.

**REQUEST:**    Abbott has reached an agreement to out-license ABT-773 to Elitra Pharmaceuticals Inc. for development in the United States. Elitra has agreed to make up-front and milestone payments to Abbott and to pay royalties based on sales of ABT-773 upon approval of the compound by the Food and Drug Administration. Elitra anticipates submitting ABT-773 to the FDA in 2006 and receiving approval in 2007. In connection with this out-licensing agreement, Abbott has offered to pay John Hancock $10 million as an upfront milestone payment in exchange for potentially not having to pay John Hancock $20 million if ABT-773 is the only compound in the portfolio that is ultimately approved (in accordance with our Research Funding Agreement). Abbott has made this offer so that it can remove the contingent payment associated with approval of ABT-773 and book, as income, upfront payments that it will receive from Elitra.

**RECOMMENDATION:**    We recommend consent. We are receiving $10 million four years in advance of when ABT-773 would be approved at its earliest, if at all, and we believe that the risk of ABT-773 being the only compound approved is relatively small.

1/22/03
Date            Stephen J. Blewitt, Senior Managing Director

CONFIDENTIAL
JH 001105

The undersigned authorized officer certifies that the action to be taken is in the best interests of John Hancock Financial Services, Inc., and/or its investment advisory accounts, if applicable.

(t:/industri/sjb/certifs/abbott-co1.doc)

DEPOSITION
EXHIBIT
29
11/17/06    HK

10

# Davis Deposition Exhibit 10

# PART 1



*Davis #10*
*5/7/07 p.m.*

Memorandum To:     File

Re:     **Abbott Laboratories ("Non-Recourse")**

*B file*

<u>Background</u>
In October 2000, the Committee of Finance approved a $220 million commitment to fund research and development expenses for a basket of pharmaceutical products currently under development by Abbott Laboratories. During the documentation process, which was completed on March 13, 2001, certain terms of the transaction were modified, although the basic economics were not materially changed. This memorandum describes the significant changes to the transaction compared to the initial report to the Committee of Finance.

<u>Modifications</u>

The <u>Commitment Amount</u> was reduced from $220 million to $214 million.

The <u>basket</u> of pharmaceutical products was modified and increased from eight to nine (see <u>Program Compounds</u> below for further details).

The <u>Program Payments</u> were changed from:

**CONFIDENTIAL
JH 001103**

|  | Original | Revised |
|---|---|---|
| December 2000 | $50,000,000 | $       0 |
| December 2001 | $55,000,000 | $50,000,000 |
| December 2002 | $55,000,000 | $54,000,000 |
| December 2003 | $60,000,000 | $58,000,000 |
| December 2004 | $       0 | $52,000,000 |

The <u>Program Term</u> was changed from "commencing December 2000 and ending on December 2004" to "commencing March 2001 and ending on December 2004".

The <u>Milestone Payments Upon NDA Approval by the FDA</u> were changed from $10,000,000 to $20,000,000 for the first Product and $10,000,000 for the second and third Products.



The Aggregate Milestone Payments for all "non-NDA Approval" milestones was changed from $12,000,000 to $8,000,000.

The Royalty Payments were changed from:

|  | Original | Revised |
|---|---|---|
| $0 to $400 million | 8% | 8½% |
| >$400 and ≤ $1,000 million | 4% | 4% |
| >$1,000 and ≤ $2,000 million | 1% | 1% |
| >$2,000 million | ½% | ½% |

The Royalty Payments shall cease on December 31, 2015 instead of December 31, 2014.

The Program Compounds were modified as follows:

Program Compound ABT-980 and the Urokinase Program were removed from the basket. Program Compounds ABT-492 and ABT-751 and the ED Program were added to the basket. The assumptions for the added Program Compounds are:

| Product | Indication | Peak Sales | Stage of Development |
|---|---|---|---|
| ABT-492 | Anti-infective | $400 million | Phase I/2005 |
| ABT-510 | Cancer | $400 million | Phase I/2006 |
| ED | Erectile Dysfunction | $400 million | Pre-clinical/2007 |

In addition, a provision was added that requires Abbott to substitute an additional Phase II compound with no less commercial value than initially expected for ABT-492 and ABT-510 if either ABT-492 or ABT-510 fails to enter a Phase II Clinical Trial. We modeled this contingent additional compound as a Phase II compound with 40% probability of success, $400 million of peak sales, 2006 launch date. We assumed that the probability of obtaining the contingent additional compound in the basket was approximately 84%.

Affect of Modifications on Model Results

Our initial model (without adjustments for conservatism) provided a probability of loss of approximately 0.9% and a median return of approximately 17.5% and a mean return of approximately 15.9%. Our revised model (without adjustments for conservatism) provides a probability of loss of approximately 1.3% and a median return of approximately 18.8% and a mean return of approximately 16.2%.

CONFIDENTIAL
JH 001104