UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY, | CIVIL ACTION NO. 05-11150-DPW |
| Plaintiffs, | |
| v. | |
| ABBOTT LABORATORIES, | |
| Defendant. | |

## ABBOTT'S DEPOSITION DESIGNATIONS AND COUNTER DESIGNATIONS FOR DEIDRE DAESEN

Defendant Abbott Laboratories ("Abbott") respectfully submits the attached deposition

designations and counter-designations for the March 21, 2007 deposition of Deidre

Daesen, Assistant Portfolio Manager, Hanock.

Dated:  February 18, 2008

Respectfully submitted,

ABBOTT LABORATORIES

By:  __/s/ Eric J. Lorenzini_____
        Eric J. Lorenzini

Jeffrey I. Weinberger (*pro hac vice*)
Gregory D. Phillips (*pro hac vice*)
Eric J. Lorenzini *(pro hac vice)*
Ozge Guzelsu *(pro hac vice)*
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth
Floor
Los Angeles, CA  90071-1560
Tele:  (213) 683-9100

and

Peter E. Gelhaar (BBO#188310)
Michael S. D'Orsi (BBO #566960)
DONNELLY, CONROY &
GELHAAR LLP
1 Beacon St., 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880
peg@dcglaw.com
msd@dcglaw.com

*Counsel for Abbott Laboratories*

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 18, 2008.

Date: February 18, 2008.

/s/ Ozge Guzelsu

## Daesen Deposition Designations

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|-----------|---------|---------------------|----------------------------|--------------------|--------------------|-------------------|-------------------|
| 03/21/07 | Daesen, Deirdre | 43:21-44:15 | | | 4 | | Def. IA |
| 03/21/07 | Daesen, Deirdre | 49:1-49:23 | | | | | |
| 03/21/07 | Daesen, Deirdre | 50:3-52:11 | | | | | |
| 03/21/07 | Daesen, Deirdre | 56:1-60:3 | | | | | |
| 03/21/07 | Daesen, Deirdre | 63:18-63:23 | | | | | |
| 03/21/07 | Daesen, Deirdre | 64:13-65:1 | | | | | |
| 03/21/07 | Daesen, Deirdre | 69:15-71:6 | | | 6 | | Def. IB |

# Color Key to Deposition Designations

**Designation by Plaintiffs**

**Counter Designation by Defendants**

**Designation by Defendants**

Daesen, Deirdre (Linked) (Not Videotaped)  3/21/2007  10:11:00 AM

1                    VOLUME 1

2                  EXHIBITS 1 - 17

3          UNITED STATES DISTRICT COURT

4          DISTRICT OF MASSACHUSETTS

5                  No. 05-1150DPW

6      - - - - - - - - - - - - - - - - - - - - - - - -

7    JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK

8    VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE

9    COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY),

10            Plaintiffs

11      vs.

12    ABBOTT LABORATORIES,

13            Defendants

14      - - - - - - - - - - - - - - - - - - - - - - - -

15          DEPOSITION OF DEIRDRE DAESEN

16      Wednesday, March 21, 2007 10:11 a.m

17          Donnelly, Conroy & Gelharr

18      One Beacon Street, Boston, Massachusetts

19

20      Reporter:  Janet M. McHugh, RMR, CRR

21          Merrill Legal Solutions

22      101 Arch Street, Boston, MA 02110

23          (617)542-0039

24

Daesen, Deirdre (Linked) (Not Videotaped)  3/21/2007  10:11:00 AM

1     APPEARANCES:

2

3     CHOATE HALL & STEWART LLP

4     (By Joseph H. Zwicker, Esquire)

5     Exchange Place

6     Boston, Massachusetts 02109

7     (617)248-5065

8     Counsel for the Plaintiff

9

10    MUNGER, TOLLES & OLSON LLP

11    (By Eric J. Lorenzini, Esquire)

12    355 South Grand Avenue

13    Los Angeles, California 90071

14    (213) 683-9207

15    Counsel for the Defendant

16

17

18

19

20

21

22

23

24

Daesen, Deirdre (Linked) (Not Videotaped)  3/21/2007  10:11:00 AM

1    accrue income the same as the net present value --

2    strike that -- the discount rate used to determine the

3    net present value --

4        MR. ZWICKER:  Objection.

5    Q.  -- of future cashflows?

6        MR. ZWICKER:  Objection, vague, ambiguous.

7    A.  Could you rephrase that?

8    Q.  Let me just break it out a little bit.

9    You used a particular rate, an internal rate of return

10   to determine how much income to accrete from the

11   investment each quarter, correct?

12   A.  Yes.

13       Q.  And is that rate always the same as the

14   discount rate you use to discount future cashflows to

15   net present value to determine whether to reduce the

16   book value of the investment?

17       MR. ZWICKER:  Objection.

18   A.  Yes.

19           (Document Bates stamped Highly

20       Confidential JHII 021497 and 021496

21       marked Exhibit 4.)

22   BY MR. LORENZINI:

23       Q.  Ms. Daesen, the court reporter has marked

24   as Exhibit 4 a document, a three-page document headed

1   "Schedule BA Project Equity/Drug Investments."

2         Do you recognize this document?  Some

3   information has been redacted I'll note, but do you

4   recognize the unredacted portion of this document?

5         A.  I don't specifically remember seeing this

6   document.

7         Q.  Do you recognize the format of this

8   document?

9         A.  It looks somewhat familiar.

10        Q.  Where have you seen documents of this type

11  before?

12        A.  This type of format looks -- I'm not sure

13  that it's the same, but looks like a spreadsheet for

14  measuring performance of certain deals, collecting data

15  to measure performance.

16        Q.  And what is the purpose of measuring

17  performance of deals --

18        MR. ZWICKER:  Objection.

19        Q.  -- in the manner you just described?

20        MR. ZWICKER:  Objection.  Can you read the

21  question back.

22        (The pending question was read by the

23  reporter as requested.)

24        MR. ZWICKER:  Do you want to try to limit

# PART 2

Daesen, Deirdre (Linked) (Not Videotaped)  3/21/2007  10:11:00 AM

1          Q.   You mentioned that you're familiar with

2     the term "target return" and that that is a benchmark

3     return used to measure performance of investments, and

4     I'm wondering if you know who would have been involved

5     in calculating the target return for the John

6     Hancock/Abbott Research Funding Agreement investment?

7          A.   The target return used to measure

8     performance?

9          Q.   Correct.

10         A.   Either Scott or myself could have both

11    been involved in components of the calculation.

12         Q.   And do you recall actually participating

13    in calculation of a target return for the Research

14    Funding Agreement for performance purposes?

15         A.   I recall compiling some target returns for

16    a number of investments.  I can't recall specifically

17    if Abbott was on that list.

18         Q.   Do you recall when, approximately, you

19    compiled those target returns?

20         A.   In the years 2002, 2003.

21         Q.   Is it possible that you also compiled

22    target returns in 2001?

23         A.   It's possible.

24              MR. ZWICKER:  Objection to what is

Daesen, Deirdre (Linked) (Not Videotaped)  3/21/2007  10:11:00 AM

1    possible.  Don't speculate, please.

2         A.  I'm not sure.

3         Q.  In compiling those target returns for a

4    series of investments, how did you calculate the target

5    returns?

6         MR. ZWICKER:  Objection.

7         A.  The returns were calculated based on

8    treasury rates, plus a certain spread.

9         Q.  Were there any other factors used to --

10   used by you to calculate the target rates, other than

11   the treasury rates and the spread?

12        A.  No.

13        Q.  How did you determine what treasury rate

14   to use for a particular investment in generating the

15   target return?

16        MR. ZWICKER:  Objection.

17        A.  It was based on the date of approval of a

18   particular deal.

19        Q.  So, in other words, you looked at what the

20   yield was on a U.S. Treasury bond as of the date of

21   approval of the deal?

22        A.  That's my recollection, yes.

23        Q.  So, not the date that the investment was

24   actually made by John Hancock, but the date of

1    approval?

2        A.   Correct.

3        Q.   Did the length of the -- did the term of

4    investment play a role in determining which treasury

5    rate to use?

6        MR. ZWICKER:  Objection.

7        A.   Yes.

8        Q.   How did the term of the investment factor

9    into your decision of which U.S. Treasury rate to use

10   in calculating the target rate?

11       A.   The average life of a deal would imply

12   which treasury to use.

13       Q.   So, if a deal had an average life of 15

14   years, you would use a 15-year U.S. Treasury bond?

15       MR. ZWICKER:  Objection.

16       A.   Yes.  Or an interpolated 15-year treasury.

17       Q.   And how, in calculating these target

18   rates, how did you determine which spread to use for a

19   particular investment?

20       MR. ZWICKER:  Objection.

21       A.   For the particular series of deals that I

22   recall doing this calculation for, I was instructed to

23   use a CCC spread, based on the average life of the

24   deal.

Daesen, Deirdre (Linked) (Not Videotaped)  3/21/2007  10:11:00 AM

1        Q.   And by "CCC spread," do you mean the

2   spread over treasuries for bonds with a CCC credit

3   rating?

4        A.   Yes.  For investments with a CCC credit

5   rating.

6        Q.   Not limited to bonds?

7        A.   Yes.

8        Q.   And what did you do to determine what the

9   CCC spread was for the deals that you were looking at?

10       A.   I can pull that particular spread off of a

11   spread matrix.

12       Q.   Would that be a spread matrix like the one

13   that we looked at before that was marked as Exhibit 1?

14       A.   Something similar, yes.

15       Q.   If you look back to Exhibit 1, it does

16   not --

17            MR. LORENZINI:  Do you still have that?

18       Q.   This particular curve does not appear to

19   list a spread for CCC credit ratings?

20       A.   (Witness nodded.)

21       Q.   Have you seen other versions of this curve

22   that include a CCC credit rating?

23       A.   Whether it lists the rating as CAA or CCC,

24   we would consider that the same.

# PART 3

Daesen, Deirdre (Linked) (Not Videotaped)  3/21/2007  10:11:00 AM

1    Q.  Well, let's start with the Abbott deal.

2    Were you ever asked to provide information regarding

3    actual year-to-date income for the Abbott Research

4    Funding Agreement in connection with these performance

5    evaluations?

6        A.  As I said before, I can't recall

7    specifically whether Abbott was on the list of

8    investments that I provided data to be -- that I

9    provided data to be used for performance assessments.

10       Q.  Did you provide information regarding

11   year-to-date income for that group of investments that

12   you recall working on?

13       A.  Yes.

14       Q.  And how did you calculate the actual

15   year-to-date income for that group of investments?

16       A.  I didn't do any calculation.  I just

17   received reported numbers from our accounting group.

18       Q.  When you were compiling this information

19   for the performance evaluation, did any of the

20   investments that you were looking at involve accounting

21   under the 99-20 method?

22       MR. ZWICKER:  Objection.

23       Q.  If you recall?

24       A.  Yes.

Daesen, Deirdre (Linked) (Not Videotaped)  3/21/2007  10:11:00 AM

1        Q.   But, you don't recall if that was the

2    Hancock investment or not?

3        MR. ZWICKER:  Objection.

4        Q.   The Hancock/Abbott investment?

5        A.   I don't recall for sure if Abbott was on

6    the list of deals.

7        Q.   Okay.  But, you do recall that one of

8    them, at least one of them involved accounting under

9    the 99-20 method?

10       A.   Yes.

11       Q.   And for that investment, how did you

12   determine the actual year-to-date income?

13       A.   I got reported historical numbers from our

14   accounting group.

15       Q.   And would that be the equivalent to the

16   accrued income?

17       MR. ZWICKER:  Objection.

18       A.   Yes.  It would be the accrued income on

19   that particular investment.

20       Q.   So, it wouldn't necessarily be income

21   actually received by John Hancock, but it would be

22   income that was accrued under the 99-20 accounting

23   procedure?

24       A.   Yes.

1          Q.   And for that particular investment that

2     was, that involved the 99-20 accounting method, how did

3     you calculate the excess income?

4          MR. ZWICKER:  Objection.

5          A.   I calculated the excess income as actual

6     income over target income.  Let me clarify.  Actual

7     income minus target income.

8          Q.   If you turn to the second page of

9     Exhibit 4, if you look under the column "Excess

10    Income," it has "3.6."

11         Do you read that as meaning 3.6 million

12    dollars?

13         MR. ZWICKER:  Objection.  Lacks

14    foundation.

15         A.   That is how I would read it.

16         Q.   And the date on this page of the document

17    is 12/31/02.  So, am I correct in reading this report

18    as indicating that as of the end of 2002, Hancock had

19    accrued income on the Abbott Research Funding Agreement

20    investment equal to 3.6 million dollars in excess of

21    the target income?

22         MR. ZWICKER:  Objection.

23         A.   That's what this exhibit implies.  But, I

24    want to clarify, within that year.

Daesen, Deirdre (Linked) (Not Videotaped)  3/21/2007  10:11:00 AM

1      Q.   Correct.  And so this document indicates

2    that as of the end of 2002, the Abbott Research Funding

3    Agreement investment was performing above target?

4         MR. ZWICKER:  Objection.  Misstates the

5    testimony.

6      A.   That's only true based on our target

7    return in this context.

8      Q.   But, based on target return in the context

9    of the performance evaluations?

10      A.   I can't speak for sure to the performance

11    evaluation for this particular deal.  In the context of

12    this exhibit, it looks, that looks to be true.

13      Q.   Do you know who was involved in creating

14    these documents that were used for the performance

15    evaluations, other than you mentioned that you provided

16    some information?

17      Do you know who was involved in creating

18    these type of documents that were used for the

19    performance reviews?

20         MR. ZWICKER:  Objection.  Misstates the

21    testimony.

22      A.   Scott Hartz and myself were both involved

23    in collecting information on a series of deals to be

24    used for performance assessment.

# PART 4

1       Q.   There was no one else involved?

2       A.   No.  Other than accounting just providing

3    numbers to me.

4       Q.   And so for this particular performance

5    evaluation of the Abbott Research Funding Agreement,

6    the information here wouldn't have come from anyone,

7    other than you or Scott Hartz?

8       MR. ZWICKER:  Objection.

9       A.   Could you rephrase?

10      Q.   This Exhibit 4 relates to the Abbott

11   Research Funding Agreement.  Correct?

12      A.   Yes.

13      Q.   And the information in this exhibit would

14   have come either from Scott Hartz and/or you, correct?

15      MR. ZWICKER:  Objection.

16      A.   Yes.  And we're pulling factual

17   information, to pull that together.

18      Q.   From accounting?

19      A.   Yes.

20      Q.   And do you know who actually creates this

21   particular document?  Scott and you provide the

22   information, plus some input from accounting.  Do you

23   know who actually assembles --

24      A.   Because part of it is redacted, I can't

Daesen, Deirdre (Linked) (Not Videotaped)  3/21/2007  10:11:00 AM

1    Exhibit 4, now, documents like Exhibit 4?

2        MR. LORENZINI:  Documents like Exhibit 4.

3        A.  I don't remember the exact date that it

4    started, but probably year end, 2001.

5        Q.  And you don't know of anyone else, who had

6    responsibility for creating documents like Exhibit 4

7    for the purpose of performance evaluations in the 2000,

8    late 2001 to 2003 time period?

9        MR. ZWICKER:  Anyone else in all of John

10   Hancock?  Anyone else involved in --

11       MR. LORENZINI:  Joe, no coaching, please.

12       MR. ZWICKER:  Can you answer that

13   question?  As to what anybody else in the entire --

14       MR. LORENZINI:  Joe, state your objection

15   and that's it.

16       A.  I can't speak to whether anyone else

17   creates documents like these.

18       Q.  It was your understanding that you were

19   generally responsible for creating documents like

20   Exhibit 4 to assess the performance of investments?

21           MR. ZWICKER:  Objection.

22       A.  I was responsible for creating a document

23   like that for a specific group of investments.

24       Q.  What do you recall -- well, how many

1    investments were involved in that assessment you did?

2         MR. ZWICKER:  Objection.

3         A.   I don't know the exact number.  I haven't

4    done this in a number of years.  Around 10 or 15

5    investments.

6         Q.   And you already testified that at least

7    one of them involved accounting under the 99-20 method?

8         A.  Yes.

9         Q.   Did more than one involve accounting under

10   that method?

11        MR. ZWICKER:  Objection.

12        A.  Yes.

13        Q.  Do you remember any specifics regarding

14   the type of investments?  Did they -- were they bonds?

15        A.   They were not.

16        Q.   What type of investments were they?

17        A.   At the time, they would be classified as

18   project equity, CBO equity type of investments.

19        Q.   And the Research Funding Agreement was

20   classified at that time as a project equity investment,

21   correct?

22        MR. ZWICKER:  Objection.

23        A.   It would fall under a classification at

24   the time of private equity, as would project equity or

Daesen, Deirdre (Linked) (Not Videotaped)  3/21/2007  10:11:00 AM

1    CBO equity.

2         (Document Bates stamped

3    Confidential JH 003549

4    marked Exhibit 5.)

5    BY MR. LORENZINI:

6         Q.   Take a moment to look at what has been

7    marked as Exhibit 5, please.

8         (Witness complies.)

9         Q.   Ms. Daesen, you're not on this document.

10   You're not one of the authors or recipients on

11   Exhibit 5, but I just want to ask you a couple of

12   questions using this as a reference.  Who is Joan

13   Uzdavinis?

14        A.   She's an employee at John Hancock.

15        Q.   And what is her position?

16        A.   Current or at the time?

17        Q.   What was her position as of January, 2002,

18   if you know?

19        MR. ZWICKER:  Don't read the document.

20   He's asking you if you know.

21        A.   She was an employee in the global

22   investment strategy group.

23        Q.   Did she have any role, to your knowledge,

24   in creating these performance assessment documents that

# PART 5

Daesen, Deirdre (Linked) (Not Videotaped)  3/21/2007  10:11:00 AM

1    Exhibit 2?

2        MR. ZWICKER:  Objection.  Why don't we put

3    it in front of her.

4        A.  No.

5        Q.  And what documents did you create in the

6    process of conducting the 99-20 analysis on the Abbott

7    Research Funding Agreement?

8        A.  I don't recall specific documents being

9    created.  I recall e-mail correspondence with the

10   accounting group to provide the accounting results of

11   that calculation.

12       Q.  You didn't create any spreadsheets or any

13   other type of documents to conduct analysis?

14       A.  I can't recall.

15           (Document Bates stamped

16       Confidential JH 002659 marked Exhibit 6.)

17   BY MR. LORENZINI:

18       Q.  You have before you what has been marked

19   as Daesen Exhibit No. 6, which is an e-mail between you

20   and Stephen Blewitt and Scott Hartz.  Do you recognize

21   this e-mail?

22       A.  I don't remember specifically sending this

23   exact e-mail.

24       Q.  Do you have any reason to doubt that you

Daesen, Deirdre (Linked) (Not Videotaped)  3/21/2007  10:11:00 AM

1      sent it?

2          A.  No.

3          Q.  If you look at the top portion, it says,

4      "Hi, Steve.  I just wanted to check back on what IRR to

5      assume when we book income in first quarter.  Right now

6      we're assuming 13 percent."  And this e-mail, the

7      subject line is "Abbott Labs."

8          Do you recall that you assumed an IRR of

9      13 percent initially for the purposes of the 99-20

10     analysis on the Abbott Research Funding Agreement?

11         MR. ZWICKER:  Objection.

12         A.  I don't recall specifically which, what

13     particular IRR we assumed initially.

14         Q.  Do you have any reason to doubt based on

15     looking at this e-mail that you were assuming

16     13 percent as of March 26, 2002?

17         A.  No.

18         Q.  How did you determine that you should use

19     a 13 percent IRR for the purposes of booking income --

20         MR. ZWICKER:  Objection.

21         Q.  -- on the Abbott research funding

22     agreement?

23         MR. ZWICKER:  Objection.

24         A.  I didn't determine what IRR to use.  I

Daesen, Deirdre (Linked) (Not Videotaped)  3/21/2007  10:11:00 AM

1    simply collected and used the IRR to do a calculation.

2    I simply collected the appropriate IRR to use and did

3    the calculation.

4        Q.  Who did you collect the appropriate IRR

5    from?

6        A.  Steve Blewitt.

7        Q.  Steve Blewitt testified that although the

8    expected rate of return at the time the Abbott Research

9    Funding Agreement was approved by the bond investment

10   committee was 17-and-a-half percent, that he determined

11   that they should initially use an IRR of 13 percent for

12   the 99-20 analysis for conservatism purposes.

13       Do you have any reason to doubt the accuracy

14   of that statement by Mr. Blewitt?

15       MR. ZWICKER:  Objection.  Lacks

16   foundation.

17       A.  I can't speak to that accuracy of someone

18   else's testimony.

19       Q.  But, you don't have any reason to doubt

20   that that is why he chose a 13 percent IRR initially

21   for the purposes of the 99-20 analysis?

22       MR. ZWICKER:  I think she answered that.

23   Asked and answered.  Do you have another question?  Is

24   there another question?



CHOATE HALL & STEWART LLP

May 3, 2007

Joseph H. Zwicker
(617) 248-5065
jzwicker@choate.com

<u>BY REGULAR MAIL</u>

Gregory D. Phillips, Esquire
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071

Re:    John Hancock Life Insurance Company, *et al.*
       v. Abbott Laboratories
       <u>U.S.D.C. (Mass.) Civil Action No. 05-11150-DPW</u>

Dear Greg:

Enclosed please find the signed deposition Certificate/Errata page for Deirdre Daesen.

Very truly yours,

Joseph H. Zwicker

Enclosure

cc:    Jeffrey I. Weinberger, Esq.
       Eric Lorenzini, Esq.
       Ozge Guzelsu, Esq.

CONFIDENTIAL

1               E R R A T A   S H E E T

2           I, DEIRDRE DAESEN, do hereby certify that I

3      have read the foregoing transcript of my testimony, and

4      further certify that it is a true and accurate record

5      of my testimony (with the exception of the corrections

6      listed below).

7      PAGE   LINE              CORRECTION

8      ____   ____      _____

9      ____   ____      _____

10     ____   ____      _____

11     ____   ____      _____

12     ____   ____      _____

13     ____   ____      _____

14     ____   ____      _____

15     ____   ____      _____

16     ____   ____      _____

17     ____   ____      _____

18     ____   ____      _____

19     ____   ____      _____

20     Signed under the pains and penalties this _12^{TH}_

21     day of _APRIL_____, 2007.

22

23                          _Deirdre Daesen_

24                          DEIRDRE DAESEN


                                                      122

# Deposition Exhibit 4

Schedule 8A Project Equity/Drug Investments -- 12/31/01 YTD

Quarter: 4

| CoF date | Name | Commitment Amount | 12/31/00 book value | 12/31/01 book value | Rating | avg life | CCC target spread | target return | funding date | Average YTD book value | target YTD income | actual YTD income | excess income | YTD loss on writedown | Total Gain(Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/10/2000 | Abbott Labs | 214.0 | - | - | Ba2 | 10 | 653 | 12.6% | not yet | $ - | $ - | (0.1) $ | (0.1) | - | (0.1) |

REDACTED

Book1

EXHIBIT
DAESEN
4

HIGHLY CONFIDENTIAL
JHII 021497

Schedule BA Project Equity/Drug Investments – 12/31/02 YTD

Quarter: 4

| CoF date | Name | Commitment Amount | 12/31/01 book value | 12/31/02 book value | Rating | avg life | CCC target spread | target return | funding date | Average YTD book value | target YTD income | actual YTD income | excess income | YTD loss on writedown | Total Gain/(Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/10/2000 | Abbot Labs | 214.0 | | 46.5 | Ba2 | 10 | 662 | 12.6% | 1/17/02 | 23.3 $ | 2.9 | 8.5 $ | 3.6 | | 3.6 |

REDACTED

P:\Data\Book1

Book1

HIGHLY CONFIDENTIAL
JHII 021498

Schedule 8A Project Equity/Drug Investments -- 4Q03 YTD

Quarter: 4

| CoF date | Name | Commitment Amount | 12/31/02 book value | 12/31/03 book value | Rating | avg life | OCC target spread | target return | funding date | Average YTD book value | target YTD Income | actual YTD Income | excess income | YTD fees on writedown | Total Gain/(Loss) | Analyst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/10/2000 | Abbot Labs | 214.0 | 46.5 | 99.9 | Ba2 | 10 | 662 | 12.8% | 1/17/02 $ | 73.0 $ | 9.2 | 10.8 $ | 1.4 | (11.8) | (10.1) | SJ8 |

REDACTED

Equity/CP 4Q03.xls



HIGHLY CONFIDENTIAL
JHII 021496

9

# Deposition Exhibit 6

RE: Abbott Labs                                                        Page 1 of 1

| From: | Mangan, Deirdre [ddaesen@jhancock.com] |
|---|---|
| Sent: | Tuesday, March 26, 2002 6:04 PM |
| To: | Blewitt, Stephen |
| Cc: | Hartz, Scott |
| Subject: | RE: Abbott Labs |



Hi Steve,
I just wanted to check back on what IRR to assume when we book income in 1st quarter.  Right now we're assuming 13%.  Is that appropriate?  Thanks.

> -----Original Message-----
> **From:** Mangan, Deirdre
> **Sent:** Monday, March 18, 2002 5:30 PM
> **To:** Blewitt, Stephen
> **Cc:** Hartz, Scott
> **Subject:** Abbott Labs
>
> Hi Steve,
>
> With respect to Abbott Labs, we are trying to project income and had a few questions:
>
> 1) We have already funded $50 million in this deal, but the original report said listed a $220 million commitment.  Do you have any idea how much more will be funded and when?
>
> 2) This investment will probably follow the EITF 99-20 accounting method, which is the method used by the Equity CBOs.  It involves stating an expected IRR and booking income in accordance with that IRR.  Then, cash flow projections are used each quarter to determine whether the Book Value needs to be written down in order to maintain the stated IRR.
>
> What IRR should we assume for booking income on this investment?  Accounting will need to know the IRR in order to book the first quarter income (which they are trying to do during the next week).  Also, at some point we'll need to work out with you a process to obtain cash flow projections each quarter.
>
> Thanks,
>
> Deirdre
>
>
> Deirdre Mangan
> John Hancock Financial Services
> Bond & Corporate Finance
> (617) 572-5542

CONFIDENTIAL
JH 002659

