UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY, | CIVIL ACTION NO. 05-11150-DPW |
| Plaintiffs, | |
| v. | |
| ABBOTT LABORATORIES, | |
| Defendant. | |

## ABBOTT'S DEPOSITION DESIGNATIONS AND COUNTER DESIGNATIONS FOR WILLIAM B. LEE

Defendant Abbott Laboratories ("Abbott") respectfully submits the attached deposition designations and counter-designations for the November 7, 2006 deposition of William B. Lee, Attorney, Choate, Hall & Stewart.

Dated:  February 18, 2008                    Respectfully submitted,

                                             ABBOTT LABORATORIES

                                             By:  __/s/ Eric J. Lorenzini_____
                                                   Eric J. Lorenzini

                                             Jeffrey I. Weinberger (*pro hac vice*)
                                             Gregory D. Phillips (*pro hac vice*)
                                             Eric J. Lorenzini *(pro hac vice)*
                                             Ozge Guzelsu *(pro hac vice)*
                                             MUNGER, TOLLES & OLSON LLP
                                             355 South Grand Avenue, Thirty-Fifth
                                             Floor
                                             Los Angeles, CA  90071-1560
                                             Tele:  (213) 683-9100

                                             and

                                             Peter E. Gelhaar (BBO#188310)
                                             Michael S. D'Orsi (BBO #566960)
                                             DONNELLY, CONROY &
                                             GELHAAR LLP
                                             1 Beacon St., 33rd Floor
                                             Boston, Massachusetts 02108
                                             (617) 720-2880
                                             peg@dcglaw.com
                                             msd@dcglaw.com


                                             *Counsel for Abbott Laboratories*

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 18, 2008.

Date: February 18, 2008.

_____ /s/ Ozge Guzelsu _____

## Lee Deposition Designations

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|-----------|---------|---------------------|---------------------------|--------------------|--------------------|-------------------|-------------------|
| 11/07/06 | Lee, William | 38:4-38:12 | | | 2 | | Def. IC |
| 11/07/06 | Lee, William | 40:10-40:23 | | | 4 | | 567 |
| 11/07/06 | Lee, William | 41:18-46:10 | | | 3 | | Def. ID |
| 11/07/06 | Lee, William | 58:12-60:20 | | | 6 | | Def. IE |
| 11/07/06 | Lee, William | 138:4-142:16 | | | 17<br>18 | | Def. IF<br>624 |
| 11/07/06 | Lee, William | 143:13-143:24 | | | | | |

# Color Key to Deposition Designations

    **Designation by Plaintiffs**

    **Counter Designation by Defendants**

    **Designation by Defendants**

4492904.1

# PART 2

Lee, William B. III (Linked)  11/7/2006  10:10:00 AM

1                         Volume:  I

2                      Pages :   1 - 168

3                       Exhibits: 1 - 18

4            UNITED STATES DISTRICT COURT

5          FOR THE DISTRICT OF MASSACHUSETTS

6             CIVIL ACTION NO. 05-1150DPW

7        - - - - - - - - - - - - - - - - - - - - - x

8    JOHN HANCOCK LIFE INSURANCE COMPANY,

9    JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY,

10   and MANULIFE INSURANCE COMPANY

11   (f/k/a INVESTORS PARTNER INSURANCE COMPANY),

12               Plaintiffs,

13         V.

14   ABBOTT LABORATORIES,

15               Defendant.

16       - - - - - - - - - - - - - - - - - - - - - x

17                C O N F I D E N T I A L

18   VIDEOTAPED DEPOSITION OF WILLIAM B. LEE, III, ESQUIRE

19          Tuesday, November 7, 2006,  10:10 a.m.

20             Donnelly, Conroy & Gelhaar

21               One Beacon Street

22               Boston, Massachusetts

23        Reporter:  Rosemary F. Grogan, CSR, RPR

24

1        APPEARANCES:

2        Representing the Plaintiff:

3                CHOATE HALL & STEWART LLP

4                Two International Place

5                Boston, MA  02110

6                (617)248-5000

7                ktroake@choate.com

8                BY:  KAREN COLLARI TROAKE, ESQUIRE

9                BY:  RUSSELL EDELSTEIN, ESQUIRE

10

11       Representing the Defendants:

12               MUNGER, TOLLES & OLSON LLP

13               355 South Grand Avenue, 35th Floor

14               Los Angeles, CA  90071-1560

15               (213)683-9207

16               eric.lorenzini@mto.com

17               BY:  ERIC J. LORENZINI, ESQUIRE

18

19       Also present:

20               Richard Mendes, Videographer

21

22

23

24

1          MR. LORENZINI:  Correct.

2          MS. COLLARI TROAKE:  To the extent you have a

3      recollection, you can answer.

4          A.  I don't recall.

5          (Exhibit No. 2 Marked for Identification)

6      BY MR. LORENZINI:

7          Q.  Mr. Lee, I've marked as Lee Exhibit No. 2, a

8      document entitled, Proposed Summary of Terms, 6/27/00,

9      Bate stamped AL115 through 119.

10              Do you recognize this document?

11          A.  It looks familiar, but I don't have a

12      particular recollection of it.

13          Q.  During the course of your work on the

14      Hancock/Abbott contract, did you see any term sheets

15      concerning the deal?

16          A.  Yes.

17          Q.  And you're just not sure if you saw this

18      particular term sheet?

19          A.  Correct.

20          Q.  Do you see that the payments listed on the

21      first page of Exhibit 2 under Program Payments, are in

22      brackets?

23          A.  I see that.

24          Q.  What's your understanding of the significance

# PART 3

1    this particular e-mail, do you recognize the Research

2    Funding Agreement attached to the e-mail?

3         A.   I believe it's an early draft of the Research

4    Funding Agreement.  I can't be certain that it is

5    something that I received or more than that, it appears

6    to be an early draft.

7         MR. LORENZINI:  I'm going to mark another

8    exhibit.

9         (Exhibit No. 4 Marked for Identification)

10   BY MR. LORENZINI:

11        Q.   Mr. Lee, the court reporter has marked as Lee

12   Exhibit No. 4, a document that consists of an e-mail

13   from Brewster Lee to Deborah Young dated September 18,

14   2000, along with an attachment which is a memorandum

15   from Brewster Lee and Kevin Tormey to Brian Smith and

16   various other people.

17             Could you take a look at this e-mail and

18   attachment and let me know if you recognize either the

19   e-mail or the attached memoranda?

20        A.   I recognize the memo or it certainly appears

21   to be a memo that we prepared.  I don't recall an e-mail

22   cover sheet, but it certainly appears like one that I

23   would have prepared.

24        Q.   Do you see the To line has Deborah Young at

Lee, William B. III (Linked)  11/7/2006  10:10:00 AM

1    Abbott.com?

2        A.   Yes.

3        Q.   Do you recall that Deborah Young was Brian

4    Smith's secretary?

5        A.   I don't recall that.

6        Q.   If you look at the memorandum portion of the

7    exhibit, is that heading at the top, is that Choate Hall

8    & Stewart format for a memorandum?

9        MS. COLLARI TROAKE:  Objection.  Now or then?

10       MR. LORENZINI:  Good clarification.

11   BY MR. LORENZINI:

12       Q.   As of the September 18, 2000, did you Choate

13   Hall & Stewart use this general format for memoranda?

14       A.   I don't recall their being a standard format.

15   That might have been the way I set it up that day.  It

16   doesn't look unfamiliar.  It doesn't look like it

17   couldn't have come from Choate Hall.

18       Q.   And is this a memorandum that you and Kevin

19   Tormey jointly drafted?

20       MS. COLLARI TROAKE:  Objection; to the extent

21   you recall and I believe this was covered by his

22   prior deposition.

23       A.   I recall that we worked on this memo together,

24   Kevin and I.

Lee, William B. III (Linked)  11/7/2006  10:10:00 AM

1    Q.   Could you look at the -- strike that.

2         And do you recall this was a memorandum

3    that you sent to various people at Abbott Laboratories?

4    A.   Yes.

5    Q.   Could you look at the first sentence of the

6    memorandum?  It states that this memorandum is intended

7    to present in summary fashion certain general issues

8    raised by our review of the 8/17/00 draft of the

9    Research Funding Agreement.

10        Do you see that sentence?

11   A.   Yes.

12   Q.   Does that refresh your recollection of whether

13   you reviewed the August 17, 2000 draft of the Research

14   Funding Agreement?

15        MS. COLLARI TROAKE:  I'm sorry, meaning

16   Exhibit 3?

17        MR. LORENZINI:  Correct.

18   A.   It certainly suggests that I did.

19        MS. COLLARI TROAKE:  Just whether you recall.

20   A.   I recall reviewing an early draft of the

21   Research Funding Agreement.  If it was dated 8/17 or

22   another date, I don't recall.

23   Q.   You don't have any reason to doubt, based on

24   reading the memorandum, that you did review a 8/17/2000

Lee, William B. III (Linked)  11/7/2006  10:10:00 AM

1    draft of the Research Funding Agreement?

2         MS. COLLARI TROAKE:  Objection.

3         A.  I have no reason to doubt that.

4         Q.  Do you recall that the first draft of the

5    Research Funding Agreement that you reviewed had been

6    prepared by Abbott?

7         A.  I do recall that.

8         Q.  Could you turn to Section 3.1 of Exhibit 3?

9         MS. COLLARI TROAKE:  Do you have a Bates

10       number?

11        MR. LORENZINI:  AL 149 through 150.

12        MS. COLLARI TROAKE:  Thank you.

13   BY MR. LORENZINI:

14        Q.  Do you see that Section 3.1 sets forth the

15   program payments to be made by John Hancock, and it

16   lists payment amounts that total $220 million?

17        MS. COLLARI TROAKE:  Objection.  Are you

18       asking him to tell you whether the draft says that

19       and add up the numbers?

20        MR. LORENZINI:  Yes.

21        MS. COLLARI TROAKE:  As you sit here today,

22       looking at it --

23        A.  I see that, and I just did the math in my

24   head, yes.

# PART 4

1    Q.  Do you recall that the initial terms of the

2    deal at the time you became involved with the

3    negotiation provided for John Hancock to invest

4    $220 million in the development of the program

5    compounds?

6        MS. COLLARI TROAKE:  Objection.  Are you

7        asking him separately from this draft whether he

8        recalls that understanding?

9        MR. LORENZINI:  Correct.

10       A.  I don't recall.

11       Q.  Mr. Lee, could you turn to page JH 3345 of

12   Exhibit 4?

13       A.  Yes.

14       Q.  If you look at paragraph nine of the

15   memorandum, in the last sentence of that paragraph, you

16   state:  This is inconsistent with our understanding that

17   Abbott would be obligated to fully fund its share of the

18   aggregate spending target, that is $400 million of the

19   $620 million total amount.

20           As of September 18, 2000, was it your

21   understanding that Abbott's share of the aggregate

22   spending target was $400 million of the $620 million

23   total amount?

24       MS. COLLARI TROAKE:  Objection.  You can

1        answer, if you recall.

2        A.  I don't recall.

3        Q.  Do you have any reason to doubt that that was

4    your understanding based on your review of this

5    memorandum?

6        MS. COLLARI TROAKE:  Objection.

7        A.  Sitting here now, I have no reason to think I

8    would or that I did write something that was wrong.

9        Q.  As of the date of this memorandum, what was

10   the basis for your understanding that Abbott's share of

11   the aggregate spending target was $400 million of the

12   $620 million total amount?

13       MS. COLLARI TROAKE:  Again, if you recall.

14       A.  I don't recall.

15       Q.  Was it your understanding at this time that

16   Abbott was obligated to fully fund its share of the

17   aggregate spending target?

18       MS. COLLARI TROAKE:  Objection.

19       A.  I don't recall.

20       Q.  You don't have any reason to doubt that what

21   you said here in this memorandum regarding Abbott's

22   obligations to fully fund the share of the aggregate

23   spending target were incorrect at that time?

24       MS. COLLARI TROAKE:  Objection.  The memo

1      speaks for itself.  I think he testified he doesn't

2      recall what his understanding was at the time of

3      the memo.

4    BY MR. LORENZINI:

5      Q.  You don't have any reason to doubt the

6    accuracy of what you wrote in the memorandum?

7        MS. COLLARI TROAKE:  Objection.  You can

8      answer, if you can.

9      A.  Sitting here now, I have no reason to think I

10   would have written something that was wrong.

11       Q.  Do you recall why you believed that certain

12   provisions in the August 17th, 200 draft of the Research

13   Funding Agreement were inconsistent with your

14   understanding that Abbott was required to fully fund its

15   share of the aggregate spending target?

16       A.  I don't recall.

17       Q.  Do you recall that your concerns related to

18   the fact that the August 17, 2000 draft credited Abbott

19   for certain milestone and management fees paid to John

20   Hancock; in other words, credited those amounts towards

21   the aggregate spending target?

22       A.  I don't recall.  I have just read this

23   paragraph.

24       Q.  You don't recall --

1    to Section 3.2?

2        A.   When you tie it to particular sections, I

3    don't really recall anything of that kind.

4        Q.   And you don't recall where this $620 million

5    figure in Section 1.2 of the August 17th draft came

6    from?

7        MS. COLLARI TROAKE:  Objection.  I'm not sure

8        that's consistent with his prior testimony.

9        A.   I don't recall the basis of that number.  This

10   draft, if this is the draft, we were first given -- I

11   don't recall how that 620 was chosen then.

12       Q.   You testified before that, and stated in the

13   memorandum to Abbott, that your understanding was that

14   Abbott's share of the aggregate spending target was

15   $400 million, correct?

16       A.   I can recall reading that memo earlier today,

17   and I recall that that was, I think, the phraseology I

18   used in this memo.

19       Q.   With that memorandum in mind, does that

20   refresh your recollection that the $620 million

21   aggregate spending target consisted of the $220 million

22   in Hancock program payments and the $400 million which

23   was Abbott's share of the aggregate spending target?

24       A.   Now that you've now tied it to particular

# PART 5

1    sections, yes.

2       Q.   That was your understanding?

3       A.   What?

4       Q.   Your understanding was that the aggregate

5    spending target of $620 million in this draft consisted

6    of the $220 million to be provided by John Hancock and

7    the $400 million which was Abbott's share of the

8    aggregate spending target?

9       A.   Again, I don't have a current recollection of

10   an understanding on this particular draft.

11      Q.   Okay.  Separate from this particular draft, it

12   was your general understanding during negotiation of the

13   Research Funding Agreement, that the aggregate spending

14   target consisted of the program payments from John

15   Hancock plus Abbott's share of the aggregate spending

16   target which was $400 million?

17      A.   I recall that the minimum amount that Abbott

18   was required to spend, was in part financed by Hancock.

19      Q.   And that financing by Hancock was what was

20   defined as the program payments?

21         MS. COLLARI TROAKE:  Objection, to the extent

22      that you're referring to the final agreement.  You

23      want to ask him about his recollection at the time

24      of the negotiations on that point, then he can

1     answer whether he has a recollection about that.

2   BY MR. LORENZINI:

3     Q.   Do you have a recollection that John Hancock's

4   portion of the aggregate spending target was defined in

5   the Research Funding Agreement as a series of

6   installment payments collectively referred to as the

7   program payments?

8     MS. COLLARI TROAKE:  Objection.  You can

9     answer if you have a recollection about what your

10    understanding was during the negotiations.

11    A.   I recall the term program payments and those

12   were the amounts that Hancock was going to pay as a

13   financing for the program development.

14    Q.   And those amounts, combined with Abbott's

15   share of the aggregate spending target, totaled the

16   aggregate spending target?

17    MS. COLLARI TROAKE:  Objection.  Are you

18    asking if he recalls that?  Okay.

19    A.   Yes, I recall that.

20    (Exhibit No. 6 Marked for Identification)

21   BY MR. LORENZINI:

22    Q.   Mr. Lee, we've marked as Abbott Exhibit 6, a

23   document Bate stamped JH 3270 through 3341.  And it

24   consists of what appears to be an e-mail from Brewster

1    additional changes to the representations and warranties

2    section in the agreement on or around February 28, 2001?

3        A.  No.

4        (Exhibit No. 17 Marked for Identification)

5    BY MR. LORENZINI:

6        Q.  Mr. Lee, you have before you, a document

7    that's been marked as Exhibit 17, JH 8376 through 8384.

8    It includes a fax cover sheet from Choate Hall & Stewart

9    dated March 9, 2001 and a draft of portions of the

10   Research Funding Agreement with handwritten markups.

11   And the fax cover page states:  Attached please find our

12   comments on the most recent draft of the Research

13   Funding Agreement.  The fax cover page states that it's

14   from Brewster Lee to Daphne Pals and Phil Deemer.

15        Do you recognize this fax cover sheet

16   and/or the attachment?

17        A.  No, but it certainly looks like something I

18   could have well sent out since that's my handwriting.

19        Q.  The handwriting on the draft?

20        A.  On the draft or it certainly looks like my

21   handwriting.

22        Q.  If you'll note on page JH 3 -- strike that.

23   JH 8378, there's a change in handwriting to the

24   aggregate spending target from 618 million to

Lee, William B. III (Linked)  11/7/2006  10:10:00 AM

1    614 million; and then there's a comment that states, See

2    Section 3.1.  And if you refer to Section 3.1, you'll

3    see that it includes changes to the program payments, so

4    that they now total 214 million compared to the prior

5    draft which was 218 million.

6         Why did you propose the change in the

7    aggregate spending target from 618 million to

8    614 million?

9         A.  I don't recall why at that point in time,

10   March 9, 2001.  I can guess, sitting here now, looking

11   at this handwriting, but --

12        MS. COLLARI TROAKE:  Please don't guess.

13   BY MR. LORENZINI:

14        Q.  Don't guess, but I also don't want you to

15   necessarily limit yourself to what you recall on

16   March 9, 2001.

17        What do you recall generally about the

18   reasons why you made adjustments to the aggregate

19   spending target in response to or in conjunction with

20   changes to the John Hancock program payments?

21        A.  I'm sorry, could you repeat your question?

22        Q.  Generally, during the course of the

23   negotionation of the Research Funding Agreement, why did

24   the parties make changes to the aggregate spending

# PART 6

1    target in conjunction with changes to the program

2    payment amounts?

3        MS. COLLARI TROAKE:  Objection.

4        A.   I don't recall why the -- I don't recall why.

5        Q.   Well, you testified previously that Abbott's

6    share of the aggregate spending target, was

7    $400 million.  Isn't it correct that the adjustment in

8    this draft to the aggregate spending target was to

9    reflect the fact that Abbott's share of the aggregate

10   spending target, plus $214 million in program payments

11   from John Hancock, totaled $614 million?

12       MS. COLLARI TROAKE:  Objection to the extent

13       your question mischaracterizes his prior testimony.

14       If you have a recollection about that, you can

15       testify to that.

16       A.   Again, as far as a recollection, I -- the

17   target was the amount that was going to be spent by

18   Abbott on the program.

19       Q.   And that amount would consist of Abbott's

20   share of the aggregate spending target, which was

21   400 million, plus the program payments from Abbott,

22   which in this draft, consisted of 214 million, correct?

23       MS. COLLARI TROAKE:  Same objections.

24       A.   Well, Abbott was going to spend that aggregate

1    target.  I can read from this draft.  The program

2    payments totaled 214.  So as we were reading from an

3    earlier draft, if the aggregate spending target is one

4    number and you deduct out that total, you're going to

5    have to adjust that number.

6        (Exhibit No. 18 Marked for Identification)

7    BY MR. LORENZINI:

8        Q.   Mr. Lee, you have before you what's been

9    marked as Exhibit 18, Bate stamped JH 10033 through

10   10142.  It includes an e-mail from

11   William.Adams@abbott.com to various people, including

12   WBL@choate.com, and attached to the e-mail is a draft of

13   the Research Funding Agreement; and the e-mail is dated

14   March 12, 2001.

15          Do you recognize this e-mail and

16   attachment?

17       A.   No.

18       Q.   Do you have any reason to doubt that you read

19   this e-mail and attachment?

20       A.   No.

21       Q.   If you look at page JH 10038 and 10047, you'll

22   note that the aggregate spending target has been changed

23   from 618 million to 614 million, and the program

24   payments in Section 3.1 have been changed to total

Lee, William B. III (Linked)  11/7/2006  10:10:00 AM

1    214 million.

2            Do you recall that Abbott accepted the

3    changes proposed by Hancock -- change that were proposed

4    by you in your faxed handwritten comments that were

5    marked as Exhibit 17, to those two sections of the

6    agreement?

7        A.  I don't recall them accepting those changes.

8        Q.  But it appears in this draft that they were

9    accepted?

10           MS. COLLARI TROAKE:  Objection.

11       Q.  You can answer.

12       A.  It appears in this draft that those changes

13   were made, yeah.

14       Q.  And you don't recall any discussions with

15   Abbott about those changes?

16       A.  No.

17       Q.  Did you attend a closing ceremony, closing

18   celebration, for the John Hancock/Abbott agreement at

19   Carlos Restaurant in Highland Park, Illinois?

20       A.  No.

21       Q.  If you turn back to Exhibit 1, please, if you

22   turn to page JH 8091 through 8092, you'll see that

23   there's a Section 3.3 entitled, Carryover Provisions?

24           Do you know who originally proposed the

1    terms that are included in Section 3.3 of the final

2    agreement?

3       A.   No.

4       Q.   Did you have any discussions with Abbott

5    concerning Section 3.3 of the agreement?

6       A.   I don't recall discussions with Abbott on 3.3.

7       Q.   Did you have any discussions with John Hancock

8    concerning Section 3.3?

9          MS. COLLARI TROAKE:  Objection.  I'll instruct

10       you not to answer on the grounds of attorney-client

11       privilege and work product.

12    BY MR. LORENZINI:

13       Q.   Was it your understanding during negotiation

14    of the agreement that Section 3.3 was intended to

15    provide Abbott with flexibility regarding the timing of

16    its expenditures on the program compounds?

17          MS. COLLARI TROAKE:  I'm sorry, could you read

18       that back, please?

19             (Record Read)

20       A.   Well, it allowed for Abbott to spend in the

21    following year, after the end of the program term, an

22    amount that it was supposed to have been spent within

23    the program terms, so I guess you could say that gives

24    them flexibility.

1          SIGNATURE / ERRATA SHEET

2    Re:  John Hancock Life, et al. Vs. Abbott Laboratories

3    DEPOSITION OF:  William B. Lee, III, Esquire   11/7/06

4          I, WILLIAM B. LEE,  III, ESQUIRE, do hereby

5    certify that I have read the foregoing transcript of my

6    testimony, and I further certify that said transcript it

7    is a true and accurate record of said testimony (with

8    the exception of the corrections that are noted below).

9    PAGE      LINE(S)      READS            SHOULD READ

10   19         5          fort             forth

11   46         12         200              2000

12   56         11    development exploitation   development and exploitation

13   63         9          is such          is "such

14   63         13         Section 3.2.     Section 3.2."

15   68         2          cap              capped

16   79         7-8    develop portfolio    develop the portfolio

     * continued on attached sheet.

17          Signed under the pains and penalties of

18   perjury this  11th  day of  December  , 2006.

19   [signature]

20   WILLIAM B. LEE, III, ESQUIRE                Date

21          Subscribed and sworn to before me this  /  day

22   of _____, 2006.

23   _____

24   Notary Public        My Commission Expires:_____

                                                    168

| PAGE | LINE(S) | READS | SHOULD READ |
|------|---------|-------|-------------|
| 83 | 24 | Abbott, who | Abbott, but |
| 84 | 13 | blend | blends |
| 85 | 1 | their under-contracts | their contracts |
| 85 | 7 | what | the |
| 91 | 15 | you're | your |
| 93 | 13 | warrantee | warranty |
| 119 | 6 | sent to CC | sent to, CC |
| 143 | 23 | terms | term |
| 146 | 22 | making | made |
| 161 | 12 | 30 maybe on using | 30 maybe, using |

Page 123

1           E R R A T A    S H E E T

2           I, Kevin Tormey, do hereby certify

3    that I have read the foregoing transcript of

4    my testimony, and further certify that it is a

5    true and accurate record of my testimony (with

6    the exception of the corrections listed

7    below):

8    Page    Line            Correction

9     26     23      "know" ⟶ "recall"

10    104     7      "know" ⟶ "recall"

11    119     12     "No" ⟶ "I don't recall"

12

13

14

15

16

17

18

19

20   Signed under the pains and penalties of

21   perjury this 11th day of December              ,

22   2006.

23

24   Kevin Tormey

LegaLink, a Merrill Communications Company
800-826-0277   818-593-2300   Fax 818-593-2301   www.legalink.com
b3b545c5-4830-403b-bcd0-effa68987722

2

# Deposition Exhibit 2



<div align="center">

**Proposed Summary of Terms**
6/27/00

</div>

| | |
|---|---|
| **Researcher:** | **Abbott Laboratories ("Abbott")** |
| **Funding Source:** | **John Hancock Life Insurance Company ("John Hancock")** |
| Use of Proceeds: | Fund research and development programs associated with Program Compounds. |

**Program Compounds:**

The following preclinical, phase I, phase II and phase III compounds, and any line extensions, new formulations and combination products in which the same active ingredient is present:

BPH Back-up (phase III)
Endothelin – Prostate and other cancer (phase III)
Ketolide – Oral/pediatric/IV (late phase II)
CCM – Neurological/bone/acute pain (late phase II)
Antimitotic – Cancer (phase II)
MMPI – Cancer (phase I)
FTI – Cancer (late preclinical)
Urokinase – Cancer (preclinical)

**Program Payments:**

During the Program Term, and in consideration of Abbott's continuing performance of the research services under the Research Plan, John Hancock shall make program payments to Abbott in the installments and on the dates set forth below:

| Date | Payment |
|---|---|
| [May 1,] 2000 | [$50,000,000] |
| [May 1,] 2001 | [$55,000,000] |
| [May 1,] 2002 | [$55,000,000] |
| [May 1,] 2003 | [$60,000,000] |

"Program Term" means the period commencing [May 1,] 2000 Date and ending on [April 30,] 2004.

"Research Plan" means a detailed statement of Abbott's objectives, activities, timetable, FTE allocation and budget for the Program Compounds during the Program Compounds

<div align="center">

1

</div>

CONFIDENTIAL
AL 000115

during each year of the Program Term.  Abbott shall provide an updated research plan on an annual basis.

### Abbott Obligations

During the Program Term, Abbott agrees to spend, in addition to the funds provided by John Hancock, (i) a minimum of [$50 million] per year and (ii) a minimum of $400 million in aggregate on research and development programs associated with the Program Compounds.

### Program Payment Termination Provisions

Unless the parties agree upon an alternative arrangement, if Abbott (a) ceases research and development of all Program Compounds or (b) does not spend at least [$55 million] (the amount provided by John Hancock) in a year on the research and development of Program Compounds or (c) does not reasonably demonstrate, in its updated research plan, its intent to spend a minimum of [$55 million] (the amount provided by John Hancock) in the next year of the Program Term or [$620 million] (including the funds provided by John Hancock) in aggregate, John Hancock's obligation to continue to make Program Payments shall cease.  In the case of either (a) or (b) above, Abbott will refund to John Hancock [$55 million] minus half of the amount actually spent by Abbott during that year.

### Carryover Provisions

If Abbott spends the amount provided by John Hancock in a year but does not spend at least an additional [$50 million], Abbott agrees to spend the difference between [$105 million] and the amount actually spent in that year (the "Carryover Amount") in the subsequent year.  John Hancock's obligation to make Program Payments in the subsequent year, if any, will be deferred until that time that Abbott demonstrates that it has spent the Carryover Amount in that subsequent year.

If Abbott spends the amount provided by John Hancock in each year and at least an additional [$50 million] in each year, but does not spend a minimum of [$620 million] (including the funds provided by John Hancock) in aggregate on research and development programs associated with the Program Compounds during the Program Term, Abbott agrees to spend the difference between [$620 million] and the aggregate amount actually spent (the "Aggregate Carryover Amount") in the subsequent year.  If Abbott does not spend the Aggregate Carryover Amount in the subsequent year, Abbott will refund to

2

CONFIDENTIAL
AL 000116

John Hancock one-third of the difference between (a) [$620 million] and the amount actually spent.

**Closing Fee:** At the commencement of the Program Term, Abbott shall pay John Hancock a fee in the amount of **[$0 million]** as compensation for structuring the Research and Development transaction and to reimburse John Hancock for all of its fees and expenses incurred in connection with this transaction.

**Management Fee:** Commencing with the first anniversary of the Program Term and continuing until the end of the Program Term, Abbott shall pay John Hancock a fee in the amount of **[$2.0 million]** per year as compensation for monitoring Abbott's continuing performance of its research services under the Research Plan, the development of the Program Compounds, and to reimburse John Hancock for its ongoing fees and expenses incurred in connection with this transaction.

**Milestone Payments:** Abbott shall make the following payments for each compound for each milestone achieved after commencement of the Program Term:

Upon the allowance of an Investigational New Drug application by the FDA:  [$1,000,000]
Upon the initiation of a Phase I Clinical Trial:  [$2,000,000]
Upon the initiation of a Phase II Clinical Trial:  [$3,000,000]
Upon the initiation of a Phase III Clinical Trial:  [$4,000,000]
Upon the filing of a New Drug Application with the FDA:  [$5,000,000]
Upon NDA Approval by the FDA:  [$10,000,000]

Aggregate milestone payments paid by Abbott, for all "non-NDA Approval" milestones achieved will not exceed [$12 million]. Aggregate milestone payments paid by Abbott, for all "NDA Approval" milestones achieved will not exceed [$40 million]. In addition, "non-NDA Approval" milestone payments will not exceed [$3] million in the first year or [$6] million in the second year after commencement of the Program Term.

3

CONFIDENTIAL
AL 000117

**Royalty
Payments:**    Abbott shall pay to John Hancock royalties on aggregate worldwide Net Sales of Program Compounds (all Program Compound sales combined) at the following rates:

| Annual Worldwide Net Sales of Aggregate Program Compounds | Royalty Rate |
|---|---|
| 0 to [$400] million | [ 8%] |
| > [$ 400] million and ≤ [$1,000] million | [ 4%] |
| > [$1,000] million and ≤ [$2,000] million | [ 1%] |
| > [$2,000] million | [0.5%] |

The obligation to make royalty payments shall commence on the date of the First Commercial Sale of a Program Compound and [in a given country] and shall continue with respect to Net Sales of such Program Compound [sold in such country] for a period of [10] years. Not withstanding the foregoing, the obligation to make royalty payments on all Program Compounds shall not begin until after the second anniversary of the Program Term and shall cease at December 31, 2014.

**Development, Manufacturing,
And Marketing Agreements:**

Abbott shall be solely responsible for, and agrees to use Commercially Reasonable Efforts to pursue, the clinical development, government approval, manufacturing, marketing and sales of the Program Compounds.

"Commercially Reasonable Efforts" means, with respect to any Program Compound, those efforts and resources normally used by a Person for a pharmaceutical product owned by it or to which it has rights, which is of similar market potential at a similar stage in development or product life, taking into account, without limitation, issues of safety and efficacy, product profile, the regulatory environment, the status of the product and other relevant scientific factors; provided, however, that only the Program Compounds shall be taken into

4

CONFIDENTIAL
AL 000118

<u>account and not any other product or technology owned or controlled by Abbott or any successor thereto.</u>

Unless the parties agree upon an alternative arrangement, in the event Abbott divests or out-licenses a Program Compound Abbott will substitute an alternative compound for a Program Compound, so long as John Hancock agrees that the alternative compound has a similar market opportunity and is in a comparable stage of development or has a better development risk profile as the substituted for Program Compound.

**Term:** The first to occur of (i) the termination of the development of the Program Compounds and (ii) the cessation of royalty payments.

**Assignment:** Abbott or John Hancock shall assign this agreement with its rights and obligations hereunder in connection with its merger or consolidation or change in control or similar transaction.

5

CONFIDENTIAL
AL 000119

3

# Deposition Exhibit 3



 **Philip M Deemer**          To:  sblewitt@jhancock.com
08/17/2000 08:50 AM     Subject: Draft Agreement

I changed my mind about getting the Draft Agreement to you.  While we still do not have final approval
from our CEO, I thought it prudent that we get ready to implement as soon as practical after our internal
reviews.  Of course there is still risk that this arrangement may not be approved by our CEO.

                    

John Hancock Res. Prog. Agmt 3.w John Hancock Res. Prog. Agmt 3.d

CONFIDENTIAL
AL 000138

08/17/00 DRAFT

## RESEARCH FUNDING AGREEMENT

This Research Funding Agreement is made as of _____, 2000, by and between

Abbott Laboratories, an Illinois corporation ("Abbott"), with its principal offices at 100 Abbott

Park Road, Abbott Park, Illinois 60064-6049, and John Hancock Life Insurance Company, a

_____ corporation ("John Hancock"), with its principal offices at _____.

### WITNESSETH

WHEREAS, Abbott is a global healthcare company actively engaged in the research and

development of human pharmaceutical products;

WHEREAS, Abbott is interested in obtaining additional funding to support such research

and development activities with respect to certain pharmaceutical products which are under

development;

WHEREAS, John Hancock is interested in providing such additional funding in exchange

for the right to receive future milestone and royalty payments from Abbott.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and

undertakings contained herein, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS

In addition to the other terms defined elsewhere herein, the following terms shall have the

following meanings when used in this Agreement (and any term defined in the singular shall

have the same meaning when used in the plural and vice versa, unless stated otherwise):

1.1    "Affiliate" shall mean, with respect to each party, any corporation or other form of

business organization, which directly or indirectly owns, controls, is controlled by, or is under

common control with, such party. An entity shall be regarded as being in control of another

CONFIDENTIAL
AL 000139

- 2 -

entity if the former entity has the direct or indirect power to order or cause the direction of the policies of the other entity whether (i) through the ownership of fifty percent (50%) or more in the United States, or thirty percent (30%) or more outside the United States, of the outstanding voting securities (or other ownership interest for a business organization other than a corporation) of that entity; or (ii) by contract, statute, regulation or otherwise.

1.2    "Aggregate Spending Target" shall mean Six Hundred Twenty Million dollars ($620,000,000)

1.3    "Annual Research Plan" shall mean, with respect to each Program Year during the Program Term, a reasonably detailed statement of Abbott's objectives, activities, timetable, FTE allocation and budget for its research and development activities related to the Program Compounds. The Annual Research Plan for the first Program Year shall be attached as Exhibit 1.3 within ninety (90) days of the Execution Date.

1.4    "Annual Minimum Spending Target" for each Program Year shall mean the sum of (i) the Program Payment from John Hancock for such Program Year; (ii) Fifty Million Dollars ($50,000,000); and (iii) any Annual Carryover Amount for such Program Year pursuant to Section 3.3.

1.5    "Combination Product" shall mean a product which contains one or more Program Compounds combined as a single pharmaceutical product with one or more other therapeutically active ingredients.

1.6    "Commercially Reasonable Efforts" shall mean efforts which are consistent with those used by other pharmaceutical companies with respect to other pharmaceutical products under development which are of comparable commercial value and market potential at a similar stage of development or product life, taking into account, without limitation, issues of safety and

CONFIDENTIAL
AL 000140

- 3 -

efficacy, product profile, other competitive products in the marketplace or under development, proprietary status, the regulatory environment, the status of the product and other relevant scientific factors.

1.7    "Confidential Information" shall have the meaning set forth in Section 10.2.

1.8    "Dollars" or "$" means United States dollars.

1.9    "Execution Date" shall mean the date set forth in the introductory paragraph to this Agreement.

1.10    "FDA" shall mean the U.S. Food and Drug Administration or any successor entity thereto.

1.11    "FTE" shall mean the time and work output equivalent to one year of a full time employee who is proficient in the performance of all assigned duties and responsibilities.

1.12    "First Commercial Sale" shall mean the first sale of a Product in a given country by Abbott, its Affiliates or licensees to an unrelated third person after Regulatory Approval has been granted in such country.

1.13    "International Territory" shall mean all areas of the world outside the U.S. Territory.

1.14    "Losses" shall mean any liabilities, costs, damages, judgments, settlements and other reasonable expenses (including attorney fees).

1.15    "NDA" shall mean a New Drug Application filed with the FDA for the purpose of obtaining Regulatory Approval of a Product in the United States.

1.16    "Net Sales" shall mean:

(a)    the total gross sales of the Products (as set forth on the invoices for such sales) by Abbott, its Affiliates and licensees to third parties in any given

CONFIDENTIAL
AL 000141

- 4 -

calendar quarter or calendar year, plus if applicable, the value of all

properties and services received in consideration of a sale of products by

Abbott, its Affiliates and licensees to third parties during such calendar

year, less the following deductions directly paid or incurred by Abbott, its

Affiliates or licensees with respect to the sale of the Products:

(i)      discounts, credits, rebates, allowances, adjustments, rejections,

recalls and returns;

(ii)     price reductions or rebates, retroactive or otherwise, imposed by

government authorities;

(iii)    sales, excise, turnover, inventory, value-added and similar taxes

assessed on the royalty-bearing sale of Products;

(iv)    transportation, importation, insurance and other handling expenses

directly chargeable to the royalty-bearing sale of Products;

(v)     chargebacks granted to drug wholesalers;

(vi)    management fees paid to group purchasing organizations that relate

specifically to the royalty-bearing sale of Products;

(b)    With respect to a Product which is sold together with any other products

and/or services in a country at a unit price, whether packaged together or

separately (a "Bundled Product"), the Net Sales of such Bundled Product

shall first be calculated in accordance with the definition of Net Sales

under paragraph (a) above, and then the Net Sales of such Product shall be

determined on a country-by-country basis as follows:

CONFIDENTIAL
AL 000142

- 5 -

(i)     multiply the Net Sales of such Bundled Product by the fraction A/(A+B) where A is the average selling price of such Product in such country when sold separately and B is the total average selling price in such country of such other product(s) and/or service(s) in such Bundled Product when sold separately; or

(ii)    if either the average selling price of such Product or the total average selling price of such other products and/or services in such Bundled Product is not available as of such date, multiply the Net Sales of such Bundled Product by a percentage determined by the mutual agreement of the Parties, which represents the proportionate economic value of such Product relative to the economic value contributed by the other products and/or services in such Bundled Product.

(c)     With respect to a Combination Product, then Net Sales of such Combination Product shall first be calculated in accordance with the definition of Net Sales under paragraph (a), and then the Net Sales of such Combination Product shall be determined on a country-by-country basis as follows:

(i)     Multiply the Net Sales of such Combination Product by the fraction A/(A+B), where A is the total of the average selling prices of such Collaboration Compounds, when sold separately as a pharmaceutical product in such country and B is the total of the

CONFIDENTIAL
AL 000143

- 6 -

average selling price of each other active ingredient when sold

alone as a pharmaceutical product in such country; or

(ii)    if either the average selling price of all Collaboration Compounds

in such Combination Product or the average selling price of all

other active ingredients in such Combination Product is not

available, multiply the Net Sales of such Combination Product by a

percentage in a given country, determined by mutual agreement of

the Parties, which represents the proportionate economic value of

all Collaboration Compounds in such Combination Product

relative to the economic value contributed by all other active

ingredients in such Combination Product relative to the economic

value contributed by all other active ingredients in such

Combination Product.

(d)    For purposes of this paragraph (d), a "Premium Delivery System" means

any delivery system comprising a device(s) equipment, instrumentation or

other components (but not solely containers or packaging) designed to

assist in the administration of a Product, such as the Abbott

ADD-Vantage® System.  With respect to a Product which is sold in a

Premium Delivery System (a "Delivery System Product"), the Net Sales of

such Delivery System Product shall first be calculated in accordance with

the definition of Net Sales under paragraph (a), and then the Net Sales of

such Product shall be determined on a country-by-country basis as follows:

CONFIDENTIAL
AL 000144

- 7 -

    (i)    if the Product is sold separately without the Premium Delivery System, reduce the Net Sales of such Delivery System Product by the amount that the average selling price of the Delivery System Product in such country exceeds the average selling price of such Product as sold separately in such country; or

    (ii)    if the Product is not sold separately without the Premium Delivery System, reduce Net Sales of such Delivery System Product by an amount, determined by mutual agreement of the Parties, which represents the proportionate economic value added by the Premium Delivery System.

(e)    With respect to Endothelin, if Endothelin is developed and marketed by Abbott for one or more cancer indications and one or more non-cancer indications, Net Sales shall be based upon sales of Product only for the cancer indication(s). If the product is sold with different dosage strengths for the cancer indications and non-cancer indications, Net Sales shall be calculated based on the sales of the dosage strength(s) which are approved by the FDA for the treatment of cancer. If any dosage strength is the same for one or more cancer indications and one or more non-cancer indications, the Parties shall mutually agree to a formula, based upon IMS or other market research data, that allocates the sales of such dosage strength between the cancer indication(s), which would be included as part of Net Sales, and the non-cancer indication(s) which would be excluded from Net Sales.

CONFIDENTIAL
AL 000145

- 8 -

1.17    "Phase I Clinical Trial" shall mean those clinical trials which utilize a limited number of human beings to preliminarily address safety and to determine what doses can be safely tolerated.

1.18    "Phase II Clinical Trial" shall mean those controlled clinical trials, the primary objective of which is to ascertain additional data regarding the safety and tolerance of one of the Program Compounds and preliminary data regarding such Program Compound's efficacy.

1.19    "Phase III Clinical Trial" shall mean one or a series of controlled pivotal studies of a specific Product by administration of such Product to human beings where the principal purpose of such trial is to provide confirmatory safety and efficacy data necessary to support the filing for Regulatory Approval of a Product.

1.20    "Product" shall mean any human prescription pharmaceutical product containing one or more of the Program Compounds as an active ingredient, alone or in combination with other active ingredients.

1.21    "Program Compounds" shall mean the preclinical, Phase I, Phase II, and Phase III Compounds listed on Exhibit 1.21, as well as any substitute compounds added by Section 4.3, and any line extensions, new formulations, new indications and Combination Products; provided, however, that with respect to Endothelin, the field of use for such Program Compound shall be limited to the treatment of cancer.

1.22    "Program Payments" shall have the meaning given in Section 3.1.

1.23    "Program Related Costs" shall mean all direct and indirect costs and expenses which are spent by Abbott on the Research Program during a given Program Year including (i) any payments made by Abbott to John Hancock pursuant to Article 6; and (ii) any milestone and license fees paid by Abbott with respect to any Program Compound.

CONFIDENTIAL
AL 000146

- 9 -

1.24    "Program Term" shall mean a period of four (4) Program Years.

1.25    "Program Year" shall mean a period of twelve (12) consecutive calendar months, with the first Program Year commencing on , 2000 and each subsequent Program Year commencing on the anniversary of such date.

1.26    "Quarterly Reporting Period" shall mean the calendar quarter with respect to the U.S. Territory and a fiscal quarter ending on the final day of February, May, August and November (as the case may be) for the International Territory; provided, however, that if Abbott adopts the calendar year as its fiscal year for the International Territory, then the Quarterly Reporting Period for the International Territory shall also be the calendar quarter.

1.27    "Research Program" shall mean all of Abbott's activities directed towards obtaining Regulatory Approval for the Products in the Territory, including research, development, safety and efficacy studies, clinical trials, process development, formulation work, regulatory, quality, data collection and analysis and project management.

1.28    "Regulatory Approval" shall mean: (i) with respect to the U.S. Territory, the receipt of approval from the FDA to market a Product in the United States; and (ii) with respect to the International Territory, receipt of the governmental approvals required to market a Product in a given country, including any pricing and reimbursement authorization required in such country.

1.29    "Royalty Term" shall mean, with respect to each Product in each country, a period of ten (10) years from the date of First Commercial Sale of such Product in such country.

1.30    "Territory" shall mean both the U.S. Territory and the International Territory.

1.31    "U.S. Territory" shall mean the United States of America, excluding Puerto Rico and the U.S. Virgin Islands.

CONFIDENTIAL
AL 000147

- 10 -

## ARTICLE 2

## ANNUAL RESEARCH PROGRAM

2.1     Program Term.  The Research Program shall be conducted by Abbott during the

Program Term and beyond the Program Term until Abbott either abandons development or

receives Regulatory Approval for each Program Compound.

2.2     Research Plan.  The Research Program shall be conducted by Abbott in each

Research Year in accordance with the Annual Research Plan for such Research Year.  The

Annual Research Plan shall be prepared by Abbott and presented to John Hancock at least sixty

(60) days prior to the start of each Research Year.  The Annual Research Plan for the first

Research Year shall be attached as Exhibit 1.3 within ninety (90) days of the Execution Date.

Abbott may modify the Annual Research Plan from time to time in order to best meet the

objectives of the Research Program.  Any such modifications to the Annual Research Plan shall

be promptly provided to John Hancock.

2.3     Conduct of Research.  Abbott shall use its Reasonable Commercial Efforts to

conduct the Research Program in good scientific manner, to achieve the objectives of the

Research Program efficiently and expeditiously, and to comply with all applicable laws and

regulations.  Notwithstanding anything in this Agreement to the contrary, Abbott does not

represent, warrant or guarantee that the Research Program will be successful in whole or in part

or result in the registration or commercialization of any pharmaceutical products or that any

Products obtaining Regulatory Approval will be a commercial success.

2.4     Subcontracting Research.  Abbott may subcontract or outsource to Affiliates,

licensees, or third persons any portion of the Annual Research Plan.  Any subcontracting party

CONFIDENTIAL
AL 000148

- 11 -

shall enter into a confidentiality agreement with Abbott and shall comply with all applicable laws and regulations, including good laboratory practices, with respect to its work on the Research Program.  Abbott shall supervise and be responsible under this Agreement for the work of such subcontractor on the Research Program.

2.5    Research Reports and Records.  Abbott shall on an annual basis, provide John Hancock with a reasonably detailed report setting forth the status of the Research Program and the Program Related Costs expended by Abbott.  Abbott shall use Commercially Reasonable Efforts to maintain complete and accurate records, in sufficient detail and in good scientific manner appropriate for patent and regulatory purposes, that fully and properly reflect all work done, results achieved and Program Related Costs expended in performance of the Research Program.  The books and records related to the expenditure of Program Related Costs shall be subject to audit by John Hancock.  Such audit shall occur upon reasonable notice and during normal business hours by an independent auditor selected by John Hancock and reasonably acceptable to Abbott.  John Hancock and its independent auditor shall maintain such records and information of Abbott in confidence in accordance with Article 10 and shall not use such records or information except to the extent permitted by this Agreement.

ARTICLE 3

RESEARCH FUNDING

3.1    John Hancock Program Payments.  John Hancock shall make the following installment payment to Abbott to help support the Research Programs (the "Program Payments"):

CONFIDENTIAL
AL 000149

- 12 -

| Payment Date | Payment Amount |
|---|---|
| Execution Date | $50,000,000 |
| First Anniversary of Execution Date | $55,000,000 |
| Second Anniversary of Execution Date | $55,000,000 |
| Third Anniversary of Execution Date | $60,000,000 |

Such funds shall be expended by Abbott on Program Related Costs.

3.2    Abbott Program Payments.  Abbott shall spend on Program Related Costs:  (i) at least the Amount of the Annual Minimum Spending Target for each Program year; and (ii) at least the Aggregate Spending Target during the Program Term.  John Hancock's sole and exclusive remedies for Abbott's failure to fund the Research Program in accordance with this Section 3.2 is set forth in Sections 3.3 and 3.4.

3.3    Carryover Provisions.  Abbott shall be permitted to carryover its funding obligations under Section 3.2 as follows:

(i)    If in any Program Year Abbott spends on Program Related Costs, the Program Payments provided by John Hancock for such Research Year, but does not spend the full amount of the Annual Minimum Spending Target for such Program Year, Abbott agrees to spend the difference between its expenditure on Program Related Costs for such Program Year and the Annual Minimum Spending Target for such Program Year (the "Annual Carryover Amount") in the subsequent Program Year.  John Hancock's obligation to make any program payment in such subsequent Program Year, pursuant to Section 3,1, shall be deferred until that time that Abbott notifies John Hancock that it has spent the Carryover Amount in such subsequent Program Year;

CONFIDENTIAL
AL 000150

- 13 -

    (ii)    If in each Program Year Abbott spends on Program Related Costs at least the Annual Minimum Spending Target but does not expend the full amount of the Aggregate Spending Target during the Program Term, Abbott agrees to expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the "Aggregate Carryover Amount") on Program Related Costs during the subsequent fiscal year commencing immediately after the end of the Program Term. If Abbott does not spend the Aggregate Carryover Amount on Program Related Costs during such subsequent fiscal year, Abbott will refund to John Hancock one-third of the Aggregate Carryover Amount, which remains unspent by Abbott.

    3.4    <u>Termination of John Hancock's Program Payments</u>. Unless the parties agree upon an alternative arrangement, if Abbott: (i) ceases research and development of all Program Compounds during the Program Term; (ii) does not expend the Program Payment provided by John Hancock on Program Related Costs during any Program Year; (iii) does not reasonably demonstrate in its Annual Research Plan, its intent to expend Program Related Costs during the next Program Year in excess of the Program Payment provided by John Hancock for such year; or (iv) does not reasonably demonstrate, in its updated research plan, its intent to expend Program Related Costs during the Research Term in excess of the Aggregate Spending Target, John Hancock's obligation to make any remaining Program Payments pursuant to Section 3.1 shall cease. In the case of either (i) or (ii) above, Abbott shall refund to John Hancock the Program Payment for such year minus half of the Program Related Costs actually spent by Abbott during that Program Year.

CONFIDENTIAL
AL 000151

- 14 -

3.5     John Hancock's obligation shall be limited to providing the program payments set forth in Section 3.1. Abbott shall be solely responsible for funding all Program Related Costs in excess of the Program Payments from John Hancock.

3.6     Notwithstanding anything else in this Agreement, for purposes of calculating whether Abbott has spent, or is projected to have spent, Program Related Cost in excess of (i) the Annual Minimum Spending Target for the first Program Year and (ii) the Aggregate Spending Target for the Program Term, Abbott shall be entitled to include within such calculations all cost and expenses incurred on or after March 1, 2000 up to the Execution Date, which would have otherwise qualified as Program Related Costs in the event that the period from March 1, 2000 to the Execution Date had been included within the Program Term. The extension of the first Program Year for the determination of whether the Annual Minimum Spending Target and the Aggregate Spending Target are met, takes into consideration that Abbott was funding all research and development cost for the Program Compounds during the time period involved in the negotiation and execution of this Agreement.

ARTICLE 4

PRODUCT RESEARCH AND DEVELOPMENT

CONFIDENTIAL
AL 000152

- 15 -

4.1    Development Responsibility. Abbott shall be solely responsible for the clinical development, government approval, manufacturing, marketing, sales and distribution of Products resulting from the Research Program. Abbott agrees to use Commercially Reasonable Efforts to pursue the clinical development, government approval, manufacturing, marketing, sales, and distribution of Products throughout the Territory. The obligations of Abbott with respect to any Product under this Article 4 are expressly conditioned upon the safety, efficacy and commercial feasibility of each Product. It is the parties' expectation that under normal circumstances Abbott will file for Regulatory Approvals in Europe within two (2) years from the date of the NDA filing in the United States and in Japan within five (5) years from such NDA filing date; provided, however, that these time frames may be extended or otherwise altered based upon unforeseen circumstances that legitimately impact such regulatory filings in such foreign jurisdictions.

4.2    Within six (6) months of obtaining Regulatory Approval for any Product in a given country, Abbott, its Affiliates or licensees shall commence to market and sell such Product in such country. Abbott's obligation to market and sell a Product shall not apply to a Product in any country if Abbott has not commenced or has ceased marketing and selling such Product in the country in question substantially due to adverse business or financial conditions caused by the regulatory authorities or other governmental authorities of such country which would cause the marketing of such Product in such country to be contrary to the financial best interests of John Hancock and Abbott, including not commencing marketing and selling in a country where the regulatory authorities have price or reimbursement approval and the price or reimbursement approval or proposed by the regulatory authorities or government authorities is unacceptable to Abbott; provided, however, that Abbott, its affiliates, or it licensees shall commence or resume

CONFIDENTIAL
AL 000153

- 16 -

marketing and sale of such Product in such country as soon as reasonably practical after such

adverse business or financial conditions cease to exist.

    4.3    <u>Alternative Compounds</u>. Unless the parties agree upon an alternative

arrangement, in the event Abbott divests or out-licenses a Program Compound, Abbott shall

substitute an alternative compound as a substitute for the divested and outlicensed Program

Compound, provided that John Hancock reasonably agrees that the alternative compound has a

similar market opportunity and is in a comparable stage of development or has a better

development and risk profile than the divested or outlicensed Program Compound. Upon

acceptance by John Hancock, which acceptance will occur unless John Hancock notifies Abbott

of its non-acceptance of such substitute compound within thirty (30) days from the date that

Abbott proposes such substitute compound to John Hancock , such compound shall thereafter be

treated as Program Compound.

<div align="center">ARTICLE 5</div>

<div align="center">PROGRAM INVENTIONS</div>

    5.1    <u>Ownership</u>. All inventions, innovations, ideas, discoveries, technology,

know-how, methods, data, applications and products (in each case whether or not patentable

arising from the Research Program ("Program Inventions") shall be exclusively owned by or

assigned to Abbott.

    5.2    <u>Patent Prosecution and Maintenance</u>. Abbott intends to pursue broad patent

protection for discoveries and inventions made under the Research Program. Abbott shall be

responsible for all costs and expenses and control all decisions related to filing for patent

protection, including the preparation, filing (foreign and/or domestic), prosecution, issuance, and

maintenance of patent applications or patents covering Program Inventions.

CONFIDENTIAL
AL 000154

- 17 -

5.3     Enforcement.  Abbott shall have the sole right and authority to enforce the

Compound Patents and/or any patents arising from Program Inventions against any infringers.  If

Abbott initiates any patent enforcement actions or lawsuits, it shall be solely responsible for the

cost and expense of such action and shall be entitled to receive all moneys recovered upon the

final judgment or settlement of any lawsuit.

ARTICLE 6

PAYMENTS TO JOHN HANCOCK

6.1     Closing Fee.  Within ____ days after the execution of this Agreement, Abbott shall

pay _____ ($_____) to John Hancock as compensation for structuring this

Agreement and to reimburse John Hancock for all its fees and expenses incurred in connection

with this transaction.

6.2     Management Fee.  Within thirty (30) days of the start of the second, third and

fourth Program Year, Abbott shall pay to John Hancock a fee in the amount of _____

($_____) per year as compensation for monitoring Abbott's performance of its research

and development activities under the Research Program directed to the development and

registration of products and for its ongoing fees and expenses incurred in connection with this

transaction.

6.3     Milestone Payments.  Except as hereinafter limited, Abbott shall pay the

following milestone payments to John Hancock in the amounts and at the times set forth below

with respect to each respective Program Compound:

(a)     One Million Dollars ($1,000,000) shall be paid within thirty (30) days

after the allowance of Abbott first Investigational New Drug application

for such Program Compound;

CONFIDENTIAL
AL 000155

- 18 -

    (b)    Two Million Dollars ($2,000,000) shall be paid within thirty (30) days

after the initiation of a Phase I Clinical Trial with such Program

Compound;

    (c)    Three Million Dollars ($3,000,000) shall be paid within thirty (30) days

after the initiation of the first Phase II Clinical Trial with such Program

Compound;

    (d)    Four Million Dollars ($4,000,000) shall be paid within thirty (30) days

after the initiation of the first Phase III Clinical Trial with such Program

Compound;

    (e)    Five Million Dollars ($5,000,000) shall be paid within thirty (30) days

after the filing of an NDA with the FDA for such Program Compound; and

    (f)    Ten Million Dollars ($10,000,000) shall be paid within thirty (30) days

after Regulatory Approval of such Program Compound in the United

States.

The aggregate of milestone payments under Section 6.3(a), (b), (c), (d), and (e) for all Program

Compounds shall be limited to twelve million dollars ($12,000,000), and once such aggregate

limit has been paid, no further payments shall be due and payable under Sections 6.3(a), (b), (c),

(d) or (e). The aggregate of milestone payments under Section 6.3(f) for all Program Compounds

shall be limited to Forty Million dollars ($40,000,000), and once such aggregate limit has been

paid, no further payments shall be due and payable under Section 6.3(f). The aggregate of

milestone payments under Sections 6.3(a), (b), (c), (d) and (e) for all Program Compounds shall

be limited to Three Million Dollars ($3,000,000) during the first Program Year and shall be

limited to Six Million Dollars ($6,000,000) during the second Program Year, and once such

CONFIDENTIAL
AL 000156

- 19 -

aggregate limit has been reached for a particular Program Year, no further payments shall be due under Sections 6.3(a), (b), (c), (d) and (e) for the remainder of such Program Year. Further, the milestone payments set forth in Section 6.2 will not be made more than once with respect to any given Program Compound regardless of the number of such trials, filings or approvals that may be undertaken or granted with respect to such Program Compound, including, without limitation, multiple product forms of the same Program Compounds, additional active or inactive ingredients, indications, delivery modules and/or dosage strengths. Finally, a milestone payment shall only be made with respect to a milestone achieved after the date of this Agreement. For instance, if a Program Compound is in Phase III Clinical Trials at the effective Date of this Agreement, then no milestones shall ever be paid under Sections 6.3(a), (b), (c) and (d) for such Program Compound regardless of whether the Program Compound were ever to achieve such milestones as part of a different development program for instance for a new dosage strength or new indication. Exhibit 1.21 sets forth the current stage of clinical development for each Program Compound.

## ARTICLE 7

## ROYALTIES

7.1    Royalty Rates. Subject to the limitation set forth below, Abbott shall pay to John Hancock royalties equal to the following percentages calculated on the aggregate Net Sales of all Products:

| Royalty Percentage | Annual Net Sales (in Millions) of All Products in the Territory |
| --- | --- |
| 8% of those Net Sales | up to $400 |
| and then 4% of those Net Sales | in excess of $400 up to $1,000 |
| and then 1% of those Net Sales | in excess of $1,000 up to $2,000 |
| and then .5% of those Net Sales | in excess of $2,000 |

CONFIDENTIAL
AL 000157

- 20 -

7.2    Royalty Term.  The obligation to make royalty payments on a Product shall be calculated on a country-by-country basis, and shall last for the duration of the Royalty Term in each given country for such Product.  Notwithstanding anything to the contrary, the obligation to make royalty payments on the Products shall not begin until the commencement of the Third Program Year and shall cease at December 31, 2014.

ARTICLE 8

ROYALTY REPORTS AND ACCOUNTING

8.1    Reports, Exchange Rates.  During the term of this Agreement following the First Commercial Sale of the Product, Abbott shall furnish to John Hancock a written report within sixty (60) days of the end of each calendar quarter showing in reasonably specific detail:

(a)    the Net Sales of the Product sold by Abbott, its Affiliates and licensees in the Territory during the Quarterly Reporting Period to which the report is applicable;

(b)    the royalties payable in U.S. dollars, if any, which shall have accrued hereunder based upon the Net Sales of Products;

(c)    withholding taxes, if any, required by law to be deducted in respect of such royalties;

(d)    the dates of the First Commercial Sale of the Product in any country in the Territory during the Quarterly Reporting Period;

(e)    the exchange rates used in determining the amount of U.S. dollars.

With respect to sales of the Product invoiced in U.S. dollars, the gross sales, Net Sales, and royalties payable shall be expressed in U.S. dollars.  With respect to sales of products invoiced in a currency other than U.S. dollars, the gross sales, Net Sales and royalties payable shall be

CONFIDENTIAL
AL 000158

- 21 -

expressed in their U.S. dollar equivalent, calculated using the Inter Bank rate set forth in the International Report published by International Reports Inc. as Foreign Exchange Rates quoted in New York on the day nearest the last business day of the calendar quarter. The gross sales made outside the United States during a fiscal quarter will be reported with the gross sales made in the United States during the calendar quarter in which the last month of the fiscal quarter falls.

8.2　　Audits

(a)　　Upon the written request of John Hancock and not more than once in each calendar year, Abbott shall permit an independent certified public accounting firm of nationally recognized standing, selected by John Hancock and reasonably acceptable to Abbott, at John Hancock's expense, to have access during normal business hours to such of the records of Abbott as may be reasonably necessary to verify the accuracy of the royalty reports hereunder for any year ending not more than twenty-four (24) months prior to the date of such request. The accounting firm shall disclose to John Hancock only whether the records are correct or not and, if applicable, the specific details concerning any discrepancies. No other information shall be shared unless Abbott invokes the dispute resolution proceedings of Section 16.7 of this Agreement.

(b)　　If such accounting firm concludes that additional royalties were owed during such period, Abbott shall have the option to invoke the proceedings of Section 16.7 below or pay the additional royalties within thirty (30) days of the date John Hancock delivers to Abbott such accounting firm's written report so concluding. The fees charged by such accounting firm

CONFIDENTIAL
AL 000159

- 22 -

shall be paid by John Hancock; provided, however, if the audit discloses

that the royalties payable by Abbott for the audited period are more than

one hundred five percent (105%) of the royalties actually paid for such

period, then Abbott shall pay the reasonable fees and expenses charged by

such accounting firm.

(c)     Abbott shall include in each permitted license granted by it pursuant to the

Agreement a provision requiring the licensee to make reports to Abbott, to

keep and maintain records of sales made pursuant to such sublicense and

to grant access to such records by John Hancock's accounting firm to the

same extent required of Abbott under the Agreement.

(d)     All reports and payments not disputed as to correctness by John Hancock

within three (3) years after receipt thereof shall thereafter conclusively be

deemed correct for all purposes, and Abbott and its Affiliates and licensees

shall be released from any liability or accountability with respect to such

royalties and payments.

8.3     Confidential Financial Information.  John Hancock shall treat all financial

information subject to review under this Article 8 or under any sublicense agreement as

confidential, and shall cause its accounting firm to retain all such financial information in

confidence.

CONFIDENTIAL
AL 000160

- 23 -

## ARTICLE 9

## PAYMENTS

9.1    Payment Terms.  Royalties shown to have accrued by each royalty report provided for under Article 8 of this Agreement shall be due and payable on the date such royalty report is due.  Payment of royalties in whole or in part may be made in advance of such due date.

9.2    Payment Method.  All royalties and other payments by Abbott to John Hancock under this Agreement shall be made by bank wire transfer in immediately available funds to such account as John Hancock shall designate before such payment is due.  If at any time legal restrictions in any country in the Territory prevent the prompt remittance in the manner set forth in this Section 9.2 of part or all royalties owing with respect to Product sales in such country, then the parties shall mutually determine a lawful manner of remitting the restricted part of such royalty payments so long as such legal restrictions exist.

9.3.    Withholding Taxes.  All amounts owing from Abbott to John Hancock under this Agreement shall be paid without deduction to account for any withholding taxes, value-added taxes or other taxes, levies or charges with respect to such amounts payable on behalf of Abbott or its sublicensees and any taxes required to be withheld on behalf of Abbott or its sublicensees in any country within the Territory; provided, however, that Abbott may deduct the amount of any taxes imposed on John Hancock which are required to be withheld or collected by Abbott or its sublicensees under the laws of any country on amounts owing from Abbott to John Hancock hereunder to the extent Abbott or its sublicensees pay to the appropriate governmental authority on behalf of John Hancock such withholding taxes.  Abbott shall promptly deliver to John Hancock proof of payment of such taxes together with copies of all communications from or with such governmental authority with respect thereto.

CONFIDENTIAL
AL 000161

- 24 -

9.4    Late Payments.  Unless otherwise provided in this Agreement, Abbott shall pay interest to John Hancock on the aggregate amount of any payments by Abbott that are not paid on or before the date such payments are due under the Agreement at a rate per annum equal to the lesser of the prime rate of interest; as reported by _____ bank in _____, from time to time, or the highest rate permitted by applicable law, calculated on the number of days such payments is delinquent.

<div align="center">ARTICLE 10</div>

<div align="center">CONFIDENTIALITY</div>

10.1    Nondisclosure Obligations.  Except as otherwise provided in this Article 10, during the term of the Agreement and for a period of ten (10) years thereafter, (a) John Hancock shall maintain in confidence, and shall use only for purposes of this Agreement, information and data related to the Research Compounds or Products; and (b) John Hancock shall also maintain in confidence and use only for purposes of this Agreement all information, data and materials supplied by Abbott under this Agreement, which if disclosed in writing is marked "Confidential", if disclosed orally is promptly thereafter summarized and confirmed in writing to the other party and marked confidential, or if disclosed in some other form is marked confidential.

10.2    Permitted Disclosures.  For purposes of this Article 10, information and data described in clause (a) or (b) above shall be referred to as "Confidential Information").  John Hancock may disclose Confidential Information as required by applicable law, regulation or judicial process, provided that John Hancock shall give Abbott prior written notice thereof and adequate opportunity to object to any such disclosure or to request confidential treatment thereof.  The obligation not to disclose or use Confidential Information shall not apply to any part of such Confidential Information that (i) is or becomes patented, published or otherwise part of the

CONFIDENTIAL
AL 000162

- 25 -

public domain other than by acts or omissions of John Hancock in contravention of this

Agreement; or (ii) is disclosed to John Hancock by a third party, provided such Confidential

Information was not obtained on a confidential basis by such third party from Abbott, its

Affiliates or licensees; or (iii) prior to disclosure under the Agreement, was already in the

possession of John Hancock, provided such Confidential Information was not obtained directly

or indirectly from Abbott, its Affiliates or licensees under an ongoing obligation of

confidentiality; (iv) is disclosed in a press release agreed to by both parties under Section 10.3

below.

    10.3   Publicity Review.  Without the prior written consent of the other party, neither

party shall make any statement to the public regarding the execution and/or any other aspect of

the subject matter of this Agreement or any work under the Research Program.  John Hancock

and Abbott shall not disclose any terms or conditions of this Agreement to any third party

without the prior consent of the other party, except as set forth above in this Section 10.3 or as

required by applicable law, regulation or court order.  [Do we want an initial press release?]

ARTICLE 11

TERM AND TERMINATION

    11.1   Expiration.  Unless terminated earlier by agreement of the parties or pursuant to

Sections 11.2 or 11.4 below, this Agreement shall expire upon termination of Abbott's

obligations to pay royalties under this Agreement.

    11.2   Material Breach.  It is the parties' express intent that consideration shall first and

foremost be given to remedying any breach of this Agreement through the payment of monetary

damages or such other legal or equitable remedies as shall be appropriate under the

circumstances and that there shall only be a limited right to terminate this Agreement under the

CONFIDENTIAL
AL 000163

- 26 -

following circumstances as a matter of last resort. In the event that the Neutral, in accordance with the procedures set forth in Section 16.7, has rendered a ruling that a party has materially breached this Agreement, which ruling specified the remedies imposed on such breaching party for such breach (the "Adverse Ruling"), and the breaching party has failed to comply with the terms of the Adverse Ruling within the time period specified therein for compliance, or if such compliance cannot be fully achieved by such date, the breaching party has failed to commence compliance and/or has failed to use diligent efforts to achieve full compliance as soon thereafter as is reasonably possible, then the non-breaching party shall have the following rights:

     (a)    where Abbott is the breaching party that failed to comply with the Adverse Ruling and where the basis for such breach is Abbott's failure to abide by a material obligation under this Agreement, John Hancock may, upon written notice to Abbott after expiration of the period to comply, terminate this Agreement;

     (b)    where John Hancock is the breaching party that failed to comply with the Adverse Ruling and where the basis for such breach is John Hancock's failure to abide by a material obligation under this Agreement, Abbott may, upon written notice to John Hancock after the expiration of the period to comply, terminate this Agreement.

    11.3    Effect of Expiration of Termination. Expiration or termination of this Agreement shall not relieve the parties of any obligation accruing prior to such expiration or termination. The provisions of Article 10, Article 11 and Article 12 shall survive the expiration or termination of the Agreement.

CONFIDENTIAL
AL 000164

- 27 -

11.4   Bankruptcy.  Either party shall have the right to terminate this Agreement by delivering sixty (60) days prior written notice to the other party in the event of the other party's bankruptcy (not to include reorganization) or insolvency, provided that applicable federal bankruptcy laws shall apply.

## ARTICLE 12

## WARRANTIES AND INDEMNITY

12.1   John Hancock Representations and Warranties.  John Hancock represents and warrants that:

> (a)   the execution and delivery of this Agreement and the performance of the transactions contemplated hereby have ben duly authorized by all appropriate John Hancock corporation action; and
>
> (b)   the performance by John Hancock of any of the terms and conditions of this Agreement on its part to be performed does not and will not constitute a breach or violation of any other agreement or understanding, written or oral, to which it is a party.

12.2   Abbott Representations and Warranties.  Abbott represents and warrants that:

> (a)   the execution and delivery of this Agreement and the performance of the transactions contemplated hereby have been duly authorized by all appropriate Abbott corporation action; and
>
> (b)   the performance by Abbott of any of the terms and conditions of this Agreement on its part to be performed does not and will not constitute a breach or violation of any other agreement or understanding, written or oral, to which it is a party.

CONFIDENTIAL
AL 000165

- 28 -

12.3    No Conflict.  Abbott and John Hancock represent and warrant that this Agreement does not, and will not conflict with any other right or obligation provided under any other agreement or obligation that Abbott or John Hancock has with or to any third party.

12.4    Compliance with Law.  Abbott and John Hancock each represent and warrant that it shall comply with all applicable laws, regulations and guidelines in connection with that Party's performance of its obligations and rights pursuant to this Agreement, including the regulations of the United States and any other relevant nation concerning any export or other transfer of technology, services, or products.

12.5    Disclaimers.

(a)     EXCEPT AS EXPLICITLY STATED HEREIN, ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE, ARE EXCLUDED.

(b)     EXCEPT AS EXPLICITLY STATED HEREIN, NEITHER PARTY WILL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL OR SPECIAL DAMAGES OF ANY NATURE ARISING FROM SUCH PARTY'S ACTIVITIES UNDER THIS AGREEMENT; *PROVIDED, HOWEVER*, THAT THIS LIMITATION SHALL NOT LIMIT THE INDEMNIFICATION OBLIGATION OF SUCH PARTY UNDER SECTION 12.6 BELOW FOR CONSEQUENTIAL DAMAGES RECOVERED BY A THIRD PARTY.

12.6    Direct Indemnity.  Each party shall indemnify and hold the other party and its sublicensees harmless, and hereby forever releases and discharges the other party and its

CONFIDENTIAL
AL 000166

- 29 -

sublicensees, from and against all claims, demands, liabilities, damages and expenses, including attorneys' fees and costs (collectively, "Liabilities") arising out of negligence, recklessness or intentional misconduct of the indemnifying party or its sublicensees in connection with the work performed by such party during the Research Program, or arising out of the manufacturing, use, storage, distribution or sale of Collaboration Compounds or Products hereunder; except in each case to the extent such Liabilities resulted from negligence, recklessness or intentional misconduct of the other party.

12.7    Procedure.  A party (the "Indemnitee") that intends to claim indemnification under this Article 12 shall promptly notify the other party (the "Indemnitor") of any Liability or action in respect of which the Indemnitee or any of its sublicensees intend to claim such indemnification, and the Indemnitor shall have the right to participate in, and, to the extent the Indemnitor so desires, jointly with any other Indemnitor similarly noticed, to assume the defense thereof with counsel selected by the Indemnitor; *provided, however*, that an Indemnitee shall have the right to retain its own counsel, with the fees and expenses of such counsel to be paid by the Indemnitee, if representation of such Indemnitee by the counsel retained by the Indemnitor would be inappropriate due to actual or potential differing interests between such Indemnitee and any other party represented by such counsel in such proceedings.  The indemnity obligation in this Article 12 shall not apply to amounts paid in settlement of any loss, claim, damage, liability or action if such settlement is effected without the consent of the Indemnitor, which consent shall not be withheld unreasonably.  The failure to deliver notice to the Indemnitor within a reasonable time after the commencement of any such action, if prejudicial to its ability to defend such action, shall relieve such Indemnitor of any liability to the Indemnitee under this Article 12, but the omission so to deliver notice to the Indemnitor will not relieve it of any liability that it may

CONFIDENTIAL
AL 000167

- 30 -

have to any Indemnitee otherwise than under this Article 12.  The Indemnitee, its employees and agents, shall cooperate fully with the Indemnitor and its legal representatives in the investigation of any action, claim or liability covered by indemnification under this Article 12.

    12.8    Insurance.  Abbott shall maintain, through self-insurance or otherwise, product liability insurance with respect to the development, manufacture and sale of Products in such amount as Abbott customarily maintains with respect to its other products.  Abbott shall maintain such insurance for so long as it continues to develop, manufacture or sell any Products, and thereafter for so long as Abbott maintains insurance for itself covering such manufacture or sales.

<div align="center">

ARTICLE 13

FORCE MAJEURE

</div>

    Neither party shall be held liable or responsible to the other party nor be deemed to have defaulted under or breached this Agreement for failure or delay in fulfilling or performing any term of this Agreement when such failure or delay is caused by or results from causes beyond the reasonable control of the affected party including but not limited to fire, floods, embargoes, war, acts of war (whether war be declared or not), insurrections, riots, civil commotions, strikes, lockouts or other labor disturbances, acts of God or acts, omission or delays in acting by any governmental authority or the other party.

CONFIDENTIAL
AL 000168

- 31 -

## ARTICLE 14

### ASSIGNMENT

Except as expressly provided hereunder, this Agreement may not be assigned or otherwise transferred, nor may any right or obligations hereunder be assigned or transferred by either party without the consent of the other party; *provided, however*, that either party shall be obligated to assign this Agreement and its rights and obligations hereunder in connection with the transfer or sale of all or substantially all of its business pertaining to this Agreement, or in the event of its merger or consolidation or change in control or similar transaction. Any permitted assignee shall assume all obligations of its assignor under this Agreement.

## ARTICLE 15

### SEVERABILITY

Each party hereby agrees that it does not intend to violate any public policy, statutory or common laws, rules, regulations, treaty or decision of any government agency or executive body thereof of any country or community or association of countries. In any term or provision of this Agreement is held to be invalid, illegal or unenforceable by a court or other governmental authority of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement, which shall remain in full force and effect. The holding of a term or provision to be invalid, illegal or unenforceable in a jurisdiction shall not have any effect on the application of the term or provision in any other jurisdiction.

CONFIDENTIAL
AL 000169

- 32 -

## ARTICLE 16

### MISCELLANEOUS

16.1   Notices.  Any consent, notice or report required or permitted to be given or made

under this Agreement by one of the parties hereto to the other shall be in writing, delivered

personally or by facsimile (and promptly confirmed by personal delivery, U.S. first class mail or

courier), U.S. first class mail or courier, postage prepared (where applicable), addressed to such

other party at its address indicated below, or to such other address as the addressee shall have last

furnished in writing to the addressor and (except as otherwise provided in this Agreement) shall

be effective upon receipt by the addressee.

If to John Hancock:     _____

Attention:     _____

copy to:     _____

If to Abbott:     Abbott Laboratories
Dept. 309, Bldg. AP30
200 Abbott Park Road
Abbott Park, IL 60064-3537

Attention:     President, Pharmaceutical
Products Division

copy to:     General Counsel
Abbott Laboratories
Dept. 364, Bldg. AP6D
100 Abbott Park Road
Abbott Park, IL 60064-6020

16.2   Applicable Law.  The Agreement shall be governed by and construed in

accordance with the laws of the State of Illinois.

CONFIDENTIAL
AL 000170

- 33 -

16.3    <u>Entire Agreement</u>. This Agreement contains the entire understanding of the parties with respect to the subject matter hereof. All express or implied agreements and understandings, either oral or written, heretofore made are expressly merged in and made a part of this Agreement. This Agreement may be amended, or any term hereof modified, only by a written instrument duly executed by both parties hereto.

16.4    <u>Headings</u>. The captions to the several Articles and Sections thereof are not a part of this Agreement, but are merely guides or labels to assist in locating and reading the several Articles and Sections hereof.

16.5    <u>Independent Contractors</u>. It is expressly agreed that John Hancock and Abbott shall be independent contractors and that the relationship between the two parties shall not constitute a partnership, joint venture or agency. Neither John Hancock nor Abbott shall have the authority to make any statements, representations or commitments of any kind, or to take any action, which shall be binding on the other, without the prior consent of the party to do so.

16.6    <u>Performance By Affiliates</u>. The parties recognize that Abbott may carry out certain obligations under this Agreement through performance by the Affiliates. Abbott guarantees that the activities of its Affiliates under this Agreement shall comply with this Agreement.

16.7    <u>Alternative Dispute Resolution</u>. The parties shall attempt to amicably resolve disputes arising between them regarding the validity, construction, enforceability or performance of the terms of this Agreement, and any differences or disputes in the interpretation of the rights, obligations, liabilities and/or remedies hereunder, which have been identified in a written notice from one party to the other, by good faith settlement discussions between the President of Abbott's Pharmaceutical Products Division and the President and Chief Executive Officer of

CONFIDENTIAL
AL 000171

- 34 -

John Hancock. The parties agree that any dispute that arises in connection with this Agreement, which cannot be amicably resolved by such representatives within thirty (30) days after the receipt of such written notice, shall be resolved by binding Alternative Dispute Resolution ("ADR") in the manner described in Exhibit 16.7 attached hereto.

    16.8   <u>Waiver</u>.  The waiver by either party hereto of any right hereunder or the failure to perform or of a breach by the other party shall not be deemed a waiver of any other right hereunder or of any other breach or failure by said other party whether of a similar nature or otherwise.

    16.9   <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

    IN WITNESS WHEREOF, the parties have executed this Agreement as of the dat first set forth above.

JOHN HANCOCK LIFE
INSURANCE COMPANY           ABBOTT LABORATORIES


By: _____    By: _____

Title: _____    Title: _____

CONFIDENTIAL
AL 000172

EXHIBIT 1.3

ANNUAL RESEARCH PLAN - FIRST PROGRAM YEAR

CONFIDENTIAL
AL 000173

EXHIBIT 1.21

PROGRAM COMPOUNDS

ABT 980 - BPH Back-up (phase III)
ABT 627 - Prostate and other cancer (phase III)
ABT 773 - Oral/pediatric/IV (late phase II)
ABT 594 - Neurological/bone/acute pain (late phase II)
E7010 - Cancer (phase II)
ABT 518 - Cancer (phase I)
FTI - Cancer (late preclinical)
Urokinase - Cancer (preclinical)

CONFIDENTIAL
AL 000174

EXHIBIT 16.7

ALTERNATIVE DISPUTE RESOLUTION

CONFIDENTIAL
AL 000175

# Deposition Exhibit 4

Abbott/Hancock - Memo re: Research Funding Agreement                    Page 1 of 1

---

| From: | Lee, Brewster |
|---|---|
| Sent: | Monday, September 18, 2000 5:40 PM |
| To: | deborah.young@abbott.com |
| Cc: | Kevin M. Tormey; Weed, Amy; Blewitt, Stephen |
| Subject: | Abbott/Hancock - Memo re: Research Funding Agreement |

At Brian Smith's request, attached please find our memorandum raising certain issues with respect to the Research Funding Agreement.



CONFIDENTIAL
JH 003342

# CHOATE, HALL & STEWART

## MEMORANDUM

To:        Brian Smith
                Philip Deemer
                Steve Cohen
                Abbott Laboratories

cc:        Steve Blewitt
                Amy Weed
                John Hancock Life Insurance Company

From:     Brewster Lee and Kevin Tormey

Date:     September 18, 2000

Re:       **Research Funding Agreement between Abbott Laboratories and John Hancock Life Insurance Company**

---

      This memorandum is intended to present in summary fashion certain general issues raised by our review of the 8/17/00 draft of the Research Funding Agreement (the "Agreement").[1]

      1.    <u>Substitute Compounds</u>. We understand that the parties have agreed that if, as a result of a merger or acquisition, Abbott (or its successor) obtains a compound that it wishes to pursue in lieu of one of the Program Compounds, then Abbott must include the new compound under the program in place of the Program Compound. We would like to discuss other circumstances in which Abbott will have a similar obligation to substitute a new compound. If, for instance, Abbott acquires or internally develops another compound that it wishes to pursue in place of a Program Compound, we believe that Abbott should have a similar obligation to substitute. This discussion may involve the standard of "commercially reasonable efforts" and the proviso that appeared in the definition of such phrase in the term sheet (but was omitted from the Agreement) which was intended to measure Abbott's efforts with respect to each compound in isolation from other competing compounds (as if, for the sake of such analysis, such compound was its only asset). Also, we should discuss what rights Hancock should have with respect to any new compounds that are identified by Abbott as a result of the research program financed in part by Hancock.

      On a related topic, section 4.3 of the Agreement provides that Hancock must notify Abbott of "its nonacceptance of [a] substitute compound within 30 days" of notice. We believe that a longer period of time may be necessary to fully assess the merits of a substituted compound -- in such event, Hancock should have the right to extend that period by an additional

---

[1] We also intend to propose technical revisions by sending a revised version of the Agreement marked to show our proposed drafting changes.

**CONFIDENTIAL**
**JH 003343**

Memorandum
September 18, 2000
Page 2

30-45 days. We also believe that silence should not constitute acceptance -- rather, Hancock must affirmatively approve each substituted compound.

      2.     Licensees. The Agreement refers in various provisions to "licensees" and "sublicensees" of Abbott. We would like to discuss how Hancock's rights will be affected by such license arrangements. For instance, what rights will Hancock have with respect to payments received by Abbott on account of a license agreement? (To be sure, we understand that Hancock will receive "full" royalties on sales by such licensees to third parties, not a royalty on the royalty payments paid by the licensees to Abbott). Also, at what point does a license by Abbott constitute an "out-license" for purposes of section 4.3?

      3.     Endothelin. The Agreement states that Endothelin is a Program Compound only to the extent that it is used for cancer indications. We understand that Hancock will have an option to "participate" in such non-cancer indications. We would like to discuss the terms of such option, since such terms should be settled by the time the Agreement is signed.

      4.     Remedies; Termination; Bankruptcy. We would like to discuss the need for additional remedial rights for Hancock in the event of a breach by Abbott of its obligations under the Agreement. We acknowledge that Article 3 of the Agreement sets forth the consequences of Abbott's failure to fund the Research Program. We would like to discuss, however, the consequences of other defaults on Abbott's part. We note that section 9.4 provides for interest on late payments (which we feel should be higher than prime); we would also like to discuss the concept of a "liquidated damages clause". We believe that section 11.2 inappropriately limits Hancock's rights upon a breach by Abbott to termination of the Agreement -- royalty payments by Abbott should continue notwithstanding Abbott's breach. Conversely, if, after having made one or more Program Payments, Hancock defaults with respect to subsequent Program Payments, Abbott should not have the right to terminate the Agreement and its obligation to pay all of the royalties -- the consequences of such a breach by Hancock need to be discussed. Also, we would like to discuss the need for section 11.4 of the Agreement which permits termination upon a bankruptcy.

      5.     Additional Disclosure and Representations. We would like to discuss certain additional representations that we believe should be made by Abbott to Hancock. For instance, Hancock would like to have an exhibit attached to the Agreement that would set forth the following for each compound: full name, detailed description of the current stage of development, indications, status and scope of patent coverage, estimated sales (and peak sales) per year through 2014 and expected milestones and year of product launch. We believe that Abbott should make representations as to the accuracy of such factual information and as to the reasonableness of such projected sales information. We also believe that Abbott should make other representations customarily made in financing transactions, including those confirming Abbott's title to and the validity of all intellectual property rights (patents and the like) related to the Program Compounds (and the absence of any litigation or competing claims) and those as to Abbott's having acquired all necessary governmental and third party consents for this transaction.

**CONFIDENTIAL**
**JH 003344**

E-3170376.1

Memorandum
September 18, 2000
Page 3

    6.    <u>Arm's-Length Transactions</u>. We believe that the Agreement should include a general provision to the effect that Abbott will not treat the Program Compounds or any Products (including Combination Products or Bundled Products) any differently on account of Hancock's royalty rights and that all transactions by Abbott involving the Program Compounds and/or any Products will be on arm's-length terms.

    7.    <u>Delivery of First Annual Research Plan</u>. The Agreement now provides that the Annual Research Plan for the first Program Year would not be delivered until 90 days after the Execution Date. Hancock would like to have a draft of that plan delivered well before closing, with the final plan for the first Program Year attached as an exhibit at the time of signing.

    8.    <u>Extension of Term</u>. If the Research Program term is extended (for instance, if Abbott's expenditures are "carried over" in accordance with section 3.3(ii)), we believe that the Royalty Term should be extended beyond December 31, 2014.

    9.    <u>Effective Date</u>. Section 3.6 of the Agreement permits Abbott to include costs and expenses incurred after March 1, 2000 in determining if it has met its funding obligations. Hancock does not believe that all of such amounts should be treated as "Program Related Costs" and would like to discuss which, if any, of those payments should be included. We would also like to know if, since March 1, 2000, any of the milestones specified in section 6.3 have been passed.

    On a related topic, the definition of "Program Related Costs" credits Abbott for all amounts paid by Abbott pursuant to Article 6 (<u>e.g.</u>, Closing Fee, Management Fees and Milestone Payments) and for any "milestone and license fees paid by Abbott with respect to any Program Compound". This is inconsistent with our understanding that Abbott would be obligated to fully fund its share of the Aggregate Spending Target (that is, $400,000,000 of the $620,000,000 total amount).

    10.    <u>Enforcement Activities</u>. We would like to discuss section 5.3 of the Agreement insofar as it grants Abbott the "sole right and authority" to pursue infringement claims and entitles Abbott to "all monies" recovered as a result of such enforcement action. We feel that Abbott should have some obligation to pursue such claims and that Hancock has a right to an appropriate share in monies recovered as a result thereof.

    11.    <u>Management Fee</u>. We understood that the aggregate amount of the management fee would be $8,000,000 -- that is, $2,000,000 for each of the first four years. Section 6.2 only provides for management fees in an aggregate amount of $6,000,000.

    12.    <u>Milestone Payments</u>. Under section 6.3 of the Agreement, if milestone payments earned in any year exceed the annual cap for such year they are "lost" -- we believe such "excess" milestone payments should be paid to Hancock in subsequent years (up to the annual and aggregate caps for such subsequent years).

**CONFIDENTIAL**
**JH 003345**

E-3170376.1

Memorandum
September 18, 2000
Page 4

13.     <u>Audits and Reports</u>.  We would like to discuss the provisions of section 8.2 of the Agreement that prohibit Hancock from auditing records more than two years old.  Why must access be so limited?  At the very least, if discrepancies are revealed by audit, records from prior years should be open and should not be "conclusively" correct as provided under section 8.2(d).  In addition, section 8.2 of the Agreement unnecessarily limits the information that the auditor may furnish to Hancock.  Given that Hancock is not in the pharmaceutical business, we consider this limitation to be unduly restrictive.

14.     <u>Legal Restrictions; Withholding Taxes</u>.  How can foreign legal restrictions "prevent the prompt remittance" by Abbott of payments due to Hancock (as suggested by section 9.2)?  Also, under what circumstances might payments by Abbott to Hancock be subject to withholding taxes (as suggested by section 9.3)?

15.     <u>Indemnification</u>.  We think the indemnification provisions set forth in section 12.6 of the Agreement are too narrow.  Since Hancock's only obligation is to provide financing for the Program, Abbott's indemnification of Hancock should be comprehensive (and, conversely, Hancock's indemnification obligation should be quite narrow).

16.     <u>Assignment</u>.  We believe that Hancock should be free to assign its right to payments from Abbott (though its funding obligations cannot be assigned).

\*     \*     \*     \*     \*

After you have had a chance to review this memorandum, please feel free to call.

W.B.L.
K.M.T.

CONFIDENTIAL
JH 003346

E-3170376.1

9

# Deposition Exhibit 6

# Part 1

Abbott/John Hancock Research Funding Agreement                    Page 1 of 1

_____
                              ⌐⌐   ιe

| **From:** | Lee, Brewster |
| **Sent:** | Wednesday, October 04, 2000 5:16 PM |
| **To:** | deborah.young@abbott.com |
| **Cc:** | Tormey, Kevin M.; Weed, Amy; Blewitt, Stephen |
| **Subject:** | Abbott/John Hancock Research Funding Agreement |

To:   Brian Smith
      Philip Deemer
      Steve Cohen
      Abbott Laboratories

cc:   Steve Blewitt
      Amy Weed
      John Hancock Life Insurance Company

From:  Brewster Lee and Kevin Tormey

Attached to this email please find clean and blacklined documents containing our comments to the Research Funding Agreement.

As these documents are being sent simultaneously to you and our client, we must make the usual caveats regarding our client's right to comment and make changes to the attached.

Please feel free to contact us with your comments or questions.



**CONFIDENTIAL**
**JH 003270**

08/17/00 DRAFT CHS Draft 10/4/00

RESEARCH FUNDING AGREEMENT

by and between

ABBOTT LABORATORIES, [INC.]

and

JOHN HANCOCK LIFE INSURANCE COMPANY

dated as of

October _____, 2000

CONFIDENTIAL
JH 003271

-i-

# TABLE OF CONTENTS

ARTICLE 1 - DEFINITIONS ........................................................................................................ 1
ARTICLE 2 - ANNUAL RESEARCH PROGRAM ................................................................... 8
   2.1   Program Term ........................................................................................................ 8
   2.2   Research Plan ......................................................................................................... 8
   2.3   Conduct of Research ............................................................................................. 8
   2.4   Subcontracting Research ...................................................................................... 9
   2.5   Research Reports and Records ............................................................................. 9
ARTICLE 3 - RESEARCH FUNDING ....................................................................................... 9
   3.1   John Hancock Program Payments ........................................................................ 9
   3.2   Abbott Program Payments ................................................................................. 10
   3.3   Carryover Provisions ......................................................................................... 10
   3.4   Termination of John Hancock's Program Payment Obligation ........................ 11
   3.5   Hancock Funding Obligation ............................................................................. 11
   3.6   Calculation of Expenditures .............................................................................. 11
ARTICLE 4 - PRODUCT RESEARCH AND DEVELOPMENT ........................................... 11
   4.1   Commercially Reasonable Efforts ..................................................................... 11
   4.2   Marketing and Sale Responsibility ................................................................... 12
   4.3   Alternative Compounds ..................................................................................... 12
   4.4.   Endothelin .......................................................................................................... 13
   4.5.   Arm's-Length .................................................................................................... 14
ARTICLE 5 - PROGRAM INVENTIONS ............................................................................... 14
   5.1   Ownership .......................................................................................................... 14
   5.2   Patent Prosecution and Maintenance ................................................................ 14
   5.3   Enforcement ....................................................................................................... 14
ARTICLE 6 - MILESTONE PAYMENTS TO JOHN HANCOCK ........................................ 14
   6.1   Closing Fee ........................................................................................................ 15
   6.2   Management Fee ................................................................................................ 15
   6.3   Milestone Notification and Payments ............................................................... 15
ARTICLE 7 - ROYALTIES ...................................................................................................... 16
   7.1   Royalty Rates .................................................................................................... 16
   7.2   Royalty Term ..................................................................................................... 16
ARTICLE 8 - ROYALTY REPORTS AND ACCOUNTING ................................................. 17
   8.1   Reports, Exchange Rates ................................................................................... 17
   8.2   Audits ................................................................................................................. 18
   8.3   Confidential Financial Information ................................................................... 19
   8.4   Accounting Principles ....................................................................................... 19
ARTICLE 9 - PAYMENTS ....................................................................................................... 19
   9.1   Payment Terms .................................................................................................. 19
   9.2   Payment Method ................................................................................................ 19
   9.3.   Withholding Taxes ............................................................................................ 19
   9.4   Late Payments .................................................................................................... 20
ARTICLE 10 - CONFIDENTIALITY ...................................................................................... 20
   10.1   Nondisclosure Obligations ................................................................................ 20
   10.2   Permitted Disclosures ....................................................................................... 20
   10.3   Publicity Review ............................................................................................... 21
ARTICLE 11- TERM AND TERMINATION .......................................................................... 21
   11.1   Expiration .......................................................................................................... 21
   11.2   Material Breach ................................................................................................. 21
   11.3   Effect of Expiration of Termination ................................................................. 21

CONFIDENTIAL
JH 003272

-ii-

| | | |
|---|---|---|
| 11.4 | Bankruptcy | 22 |
| **ARTICLE 12 - WARRANTIES AND INDEMNITY** | | 22 |
| 12.1 | John Hancock Representations and Warranties | 22 |
| 12.2 | Abbott Representations and Warranties | 22 |
| 12.3 | No Conflict | 25 |
| 12.4 | Compliance with Law | 25 |
| 12.5 | Certain Breaches | 25 |
| 12.6 | Indemnification of John Hancock | 26 |
| 12.7 | Procedure | 26 |
| 12.8 | Insurance | 27 |
| 12.9 | Survival | 27 |
| **ARTICLE 13 - FORCE MAJEURE** | | 27 |
| **ARTICLE 14 - ASSIGNMENT** | | 27 |
| **ARTICLE 15 - SEVERABILITY** | | 28 |
| **ARTICLE 16 - MISCELLANEOUS** | | 28 |
| 16.1 | Notices | 28 |
| 16.2 | Applicable Law | 29 |
| 16.3 | Entire Agreement | 29 |
| 16.4 | Headings | 29 |
| 16.5 | Independent Contractors | 29 |
| 16.6 | Performance By Affiliates | 29 |
| 16.7 | Alternative Dispute Resolution | 30 |
| 16.8 | Waiver | 30 |
| 16.9 | Counterparts | 30 |

| | |
|---|---|
| EXHIBIT 1.___: | Annual Research Plan - First Program Year |
| EXHIBIT 1.___: | List of Program Compounds |
| EXHIBIT 6.___: | Program Compound Status |
| EXHIBIT 9.2: | Wiring Instructions for John Hancock |
| EXHIBIT 12.2(d): | Program Compound Detail |
| EXHIBIT 12.2(e): | Patents, etc. |
| EXHIBIT 16.7: | Alternative Dispute Resolution |

CONFIDENTIAL
JH 003273

CHS Draft 10/4/00

## RESEARCH FUNDING AGREEMENT

This Research Funding Agreement is made as of _____, 2000, by and between Abbott Laboratories, [Inc.?], an Illinois corporation ("Abbott"), with its principal offices at 100 Abbott Park Road, Abbott Park, Illinois 60064-6049, and John Hancock Life Insurance Company, a Massachusetts corporation ("John Hancock"), with its principal offices at 200 Clarendon Street, Boston, Massachusetts 02117.

### WITNESSETH

WHEREAS, Abbott is a global healthcare company actively engaged in the research and development of human pharmaceutical products;

WHEREAS, Abbott is interested in obtaining additional funding to support such research and development activities with respect to certain pharmaceutical products which are under development; and

WHEREAS, John Hancock is interested in providing such additional funding in exchange for the right to receive future milestone and royalty payments from Abbott.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and undertakings contained herein, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

In addition to the other terms defined elsewhere herein, the following terms shall have the following meanings when used in this Agreement (and any term defined in the singular shall have the same meaning when used in the plural and vice versa, unless stated otherwise):

1.1     "Affiliate" shall mean, with respect to each party, any corporation or other form of business organization, which directly or indirectly owns, controls, is controlled by, or is under common control with, such party.  An entity shall be regarded as being in control of another entity if the former entity has the direct or indirect power to order or cause the direction of the policies of the other entity whether (i) through the ownership of fifty percent (50%) or more in the United States, or thirty percent (30%) or more outside the United States, of the outstanding voting securities (or other ownership interest for a business organization other than a corporation) of that entity; or (ii) by contract, statute, regulation or otherwise.

1.2     "Aggregate Carryover Amount" shall have the meaning given in Section 3.3.

1.3     "Aggregate Spending Target" shall mean Six Hundred Twenty Million dollars Dollars ($620,000,000), such amount being the sum of the aggregate Program Payments to be

3166832.3

**CONFIDENTIAL**
**JH 003274**

-2-

made by John Hancock pursuant to Section 3.1 and the aggregate expenditures to be made by Abbott pursuant to Section 3.2.

1.4 "Annual Carryover Amount" shall have the meaning given in Section 3.3.

1.5 ~~1.3~~"Annual Research Plan" shall mean ~~, with respect to each Program Year during the Program Term,~~ a reasonably and consistently detailed statement of Abbott's objectives, activities, timetable, FTE allocation and budget for its research and development activities related to the Program Compounds for every Program Year remaining in the Program Term. The Annual Research Plan for the first Program Year ~~shall be~~ is attached as Exhibit ~~1.3 within ninety (90) days of the Execution Date.~~ 1.___.

~~1.4~~
1.6 "Annual Minimum Spending Target" for each Program Year shall mean the sum of (i) the Program Payment ~~from~~ of John Hancock for such Program Year ~~;~~ as specified in Section 3.1 (without giving effect to any deferral or other change under Section 3.3), (ii) Fifty Million Dollars ($50,000,000)~~;~~, and (iii) any Annual Carryover Amount for such Program Year pursuant to Section 3.3.

1.7 "Bundled Product" shall have the meaning given in paragraph (b) of the definition of Net Sales.

1.8 ~~1.5~~"Combination Product" shall mean a any product ~~which contains~~ containing one or more Program Compounds combined as a single pharmaceutical product with one or more other therapeutically active ingredients.

~~1.6~~
1.9 "Commercially Reasonable Efforts" [subject to discussion] shall mean efforts which are consistent with those normally used by other pharmaceutical companies with respect to other pharmaceutical products ~~under development~~ which are of comparable [potential] commercial value and market potential at a similar stage of development or product life, taking into account, without limitation, issues of safety and efficacy, product profile, ~~other competitive products in the marketplace or under development,~~ proprietary status, the regulatory environment ~~;~~ and the status of the product and other relevant scientific factors; provided that, with respect to a particular Program Compound or Product, the existence of any other compound or product shall not be taken into account, including, without limitation, any compounds or products (i) in the marketplace or under development by Abbott or any other person, (ii) licensed (in-licensed or otherwise), purchased or acquired by Abbott or its Affiliates, (iii) acquired by Abbott or its Affiliates as a result of any merger or of sale of equity or assets and (iv) in existence, in the marketplace, under development or licensed (in-licensed or otherwise), purchased or acquired by any person that acquires Abbott or its Affiliates as a result of any merger or of sale of equity or assets (and, as a result in any case, shall not reduce or otherwise change the efforts required of Abbott hereunder).

~~1.7~~
1.10 "Confidential Information" shall have the meaning ~~set forth~~ given in Section 10.2.

CONFIDENTIAL
JH 003275

-3-

1.11   "Delivery System Product" shall have the meaning given in the definition of Net Sales.

1.12   1.8"Dollars" or "$" means United States dollars.

1.13   "Eisai Agreement" shall mean the [agreement] dated _____ between Eisai Co. Ltd. and Abbott related to the Program Compound "E7010".

1.14   1.9"Execution Date" shall mean the date set forth in the introductory paragraph to this Agreement.

1.10
1.15   "FDA" shall mean the U.S. Food and Drug Administration or any successor entity thereto.

1.11
1.16   "FTE" shall mean the time and work output equivalent to one year of a full time employee who is proficient in the performance of all assigned duties and responsibilities.

1.12
1.17   "First Commercial Sale" shall mean the first sale of a Product in a given country by Abbott, its Affiliates or licensees Licensees to an unrelated third person after Regulatory Approval has been granted in such country.

1.18   "Intellectual Property" shall have the meaning given Section 12.2.

1.19   1.13"International Territory" shall mean all areas of the world outside the U.S. Territory (including Puerto Rico and the U.S. Virgin Islands).

1.20   "Investigational New Drug Application" shall have the meaning given Section 6.3.

1.21   "Licensee" shall mean any party directly licensed by Abbott or its Affiliates to distribute or sell Products pursuant to a written license agreement on arm's-length terms and conditions.

1.22   1.14"Losses" shall mean any claims, demands, liabilities, costs, damages, judgments, settlements and other reasonable expenses (including attorney attorneys' fees).

1.15
1.23   "NDA" shall mean a New Drug Application filed with the FDA for the purpose of obtaining Regulatory Approval of a Product in the United States. U.S. Territory.

1.16
1.24   "Net Sales" shall mean:

     (a)   the total gross sales of the Products ((or, for purposes of clauses (b) and (c), the Bundled Products and Combination Products), in each case as set

CONFIDENTIAL
JH 003276

-4-

forth on the invoices for such sales ) by Abbott, its Affiliates and ~~licensees to~~ Licensees to unrelated third parties in any given ~~calendar quarter or calendar year, plus~~ period, plus, if applicable, the fair market value of all properties and services received in consideration of a sale of ~~products~~ Products, Bundled Products or Combination Products, as applicable, by Abbott, its Affiliates and ~~licensees to~~ Licensees to unrelated third parties during such ~~calendar year~~ period, less the following deductions directly paid or actually incurred by Abbott, its Affiliates or ~~licensees~~ Licensees during such period with respect to the sale of the Products, Bundled Products or Combination Products, as applicable, to the extent included in the gross invoiced sales price therefor:

(i)     discounts, credits, rebates, allowances, adjustments, rejections, recalls and returns;

(ii)     price reductions or rebates, retroactive or otherwise, imposed by government authorities;

(iii)     sales, excise, turnover, inventory, value-added and similar taxes assessed on the royalty-bearing sale of Products;

(iv)     transportation, importation, insurance and other handling expenses directly chargeable to the royalty-bearing sale of Products;

(v)     ~~chargebacks~~ charge backs granted to unaffiliated drug wholesalers; and

(vi)     the portion of management fees paid to unaffiliated group purchasing organizations that relate specifically to the royalty-bearing sale of Products~~.~~;

(b)     With respect to a Product which is sold together with any other products and/or services in a country at a unit price, whether packaged together or separately (a "Bundled Product"), the Net Sales of such Bundled Product shall first be calculated in accordance with the definition of Net Sales under paragraph (a) ~~above~~, and then the Net Sales of such Bundled Product shall be determined on a country-by-country basis as follows:

(i)     multiply the Net Sales of such Bundled Product in such country by the fraction A/(A+B) where A is the average selling price of such Product in such country when sold separately and B is the total of the average selling ~~price~~ prices in such country of each such other product(s) and/or service(s) in such Bundled Product when sold separately; or

(ii)     if (x) either the average selling price of such Product or the total of the average selling ~~price~~ prices of each such other products and/or

**CONFIDENTIAL**
**JH 003277**

-5-

services in such Bundled Product in such country is not available as of such date or (y) such Product is not sold separately in such country, multiply the Net Sales of such Bundled Product in such country by a percentage determined by the mutual agreement of the Parties , which represents the proportionate economic value in such country of such Product relative to the economic value in such country contributed by the other products and/or services in such Bundled Product.

(c)     With respect to a Combination Product, ~~then~~ the Net Sales of such Combination Product shall first be calculated in accordance with the definition of Net Sales under paragraph (a), and then the Net Sales of such Combination Product shall be determined on a country-by-country basis as follows:

(i)     ~~Multiply~~ multiply the Net Sales of such Combination Product in such country by the fraction A/(A+B), where A is the total of the average selling prices of ~~such Collaboration~~ the Program Compounds in such Combination Product, when sold separately ~~as a pharmaceutical product~~ in such country and B is the total of the average selling ~~price~~ prices of each other therapeutically active ingredient when sold alone as a pharmaceutical product in such country; or

(ii)    if (x) either the average selling price of all ~~Collaboration~~ Program Compounds in such Combination Product or the total of the average selling ~~price~~ prices of ~~all~~ each other therapeutically active ~~ingredients~~ ingredient in such Combination Product in such country is not available or (y) such Program Compounds are not sold separately in such country, multiply the Net Sales of such Combination Product by a percentage ~~in a given country,~~ determined by mutual agreement of the Parties, which represents the proportionate economic value in such country of all ~~Collaboration~~ Program Compounds in such Combination Product relative to the economic value in such country contributed by all other ~~active ingredients in such Combination Product relative to the economic value contributed by all other~~ therapeutically active ingredients in such Combination Product.

(d)     For purposes of this paragraph (d), a "Premium Delivery System" means any delivery system comprising a device(s), equipment, instrumentation or other components (but not solely containers or packaging) designed to assist in the administration of a Product[, such as the Abbott ADD-Vantage® System]. With respect to a Product which is sold ~~in~~ together with a Premium Delivery System (a "Delivery System Product") in a country at a unit price, the Net Sales of such Delivery System Product shall first be calculated in accordance with the definition of Net Sales

CONFIDENTIAL
JH 003278

-6-

under paragraph (a), and then the Net Sales of such Product shall be determined on a country-by-country basis as follows:

(i)    if the Product is sold separately without the Premium Delivery System in a country, reduce the Net Sales of such Delivery System Product in such country by the amount that the average selling price of the Delivery System Product in such country exceeds the average selling price of such Product as sold separately in such country; or

(ii)    if the Product is not sold separately without the Premium Delivery System in such country, reduce Net Sales of such Delivery System Product by an amount, determined by mutual agreement of the Parties, which represents the proportionate economic value in such country added by the Premium Delivery System.

(e)    With respect to Endothelin [define], if Endothelin is developed and marketed by Abbott for one or more cancer indications and one or more non-cancer indications, Net Sales shall be based upon sales of Product only for the cancer indication(s). If the ~~product~~ Product is sold with different dosage strengths for the cancer indications and non-cancer indications, Net Sales shall be calculated based on the sales of the dosage strength(s) which are approved by the FDA for the treatment of cancer. If any dosage strength is the same for one or more cancer indications and one or more non-cancer indications, the Parties shall mutually agree to a formula, based upon IMS [define] or other market research data, that allocates the sales of such dosage strength between the cancer indication(s), which would be included as part of Net Sales, and the non-cancer indication(s) which would be excluded from Net Sales.

1.25    "Neutral" shall have the meaning given in Section 11.2.

1.26    "Parties" shall mean Abbott and John Hancock.

1.27    ~~1.17~~"Phase I Clinical Trial" shall mean those clinical trials which utilize a limited number of human beings to preliminarily address safety and to determine what doses can be safely tolerated.

~~1.18~~
1.28    "Phase II Clinical Trial" shall mean those controlled clinical trials, the primary objective of which is to ascertain additional data regarding the safety and tolerance of one of the Program Compounds and preliminary data regarding such Program Compound's efficacy.

~~1.19~~
1.29    "Phase III Clinical Trial" shall mean one or a series of controlled pivotal studies of a specific Product by administration of such Product to human beings where the principal

CONFIDENTIAL
JH 003279

-7-

purpose of such trial is to provide confirmatory safety and efficacy data necessary to support the filing for Regulatory Approval of a Product.

1.30    "Premium Delivery System" shall have the meaning given in paragraph (d) of the definition of Net Sales.

1.31    1.20"Product" shall mean any human prescription pharmaceutical product containing one or more of the Program Compounds as an active ingredient, alone or in combination with other active ingredients (including any Bundled Product and any Combination Product).

1.32    1.21"Program Compounds" shall mean the preclinical, Phase I, Phase II, and Phase III Compounds compounds listed on Exhibit 1.21 1.___, as well as any substitute compounds added by Section 4.3, and any line extensions, any new formulations, new all indications and Combination Products any improvements, derivatives and modifications thereof; provided, however, that with respect to Endothelin, the field of use for such it shall only be considered a Program Compound shall be limited to the treatment of to the extent that it is used to treat cancer.

1.33    "Program Inventions" shall have the meaning given in Section 5.1.

1.34    1.22"Program Payments" shall have the meaning given in Section 3.1.

1.23
1.35    "Program Related Costs" shall mean all direct [and indirect] costs and expenses which that are spent by Abbott on the Research Program during a given Program Year including (i) any payments made by Abbott to John Hancock pursuant to Article 6; and (ii) any and the milestone and license fees paid by Abbott to Eisai Co. Ltd. with respect to any the Program Compound "E7010" pursuant to the Eisai Agreement. In no event shall (a) any payments made by Abbott to John Hancock pursuant hereto or (b) any overhead or similar charges or expenses, constitute Program Related Costs.

1.36    1.24"Program Term" shall mean a period of four consecutive (4) Program Years.

1.25
1.37    "Program Year" shall mean a period of twelve (12) consecutive calendar months, with the first Program Year commencing on _____, 2000 and each subsequent Program Year commencing on the anniversary of such date.

1.26
1.38    "Quarterly Reporting Period" shall mean the calendar quarter with respect to the U.S. Territory and a fiscal quarter ending on the final day of February, May, August and November (as the case may be) for the International Territory; provided, however, that if Abbott adopts the calendar year as its fiscal year for the International Territory, then the Quarterly Reporting Period for the International Territory shall also be the calendar quarter.

1.27

CONFIDENTIAL
JH 003280

-8-

1.39   "Research Program" shall mean all of Abbott's, its Affiliates and Subcontractors' activities directed towards obtaining Regulatory Approval for the Products in the Territory, including research, development, safety and efficacy studies, clinical trials, process development, formulation work, regulatory, quality, data collection and analysis and project management.

1.28
1.40   "Regulatory Approval" shall mean:  (i) with respect to the U.S. Territory, the receipt of approval from the FDA to market a Product in the United States U.S. Territory; and (ii) with respect to any country in the International Territory, receipt of the governmental approvals required to market a Product in a given such country, including any pricing and reimbursement authorization required in such country.

1.29
1.41   "Royalty Term" shall mean, with respect to each Product in each country, a period of ten (10) years from the date of First Commercial Sale of such Product in such country.

1.42   "Subcontractor" shall have the meaning given in Section 2.4.

1.43   1.30"Territory" shall mean both the U.S. Territory and the International Territory.

1.31
1.44   "U.S. Territory" shall mean the United States of America, excluding Puerto Rico and the U.S. Virgin Islands.


ARTICLE 2
ANNUAL RESEARCH PROGRAM

2.1   Program Term.  The Research Program shall be conducted by Abbott during the Program Term, and beyond the Program Term until Abbott either abandons development in accordance with the terms hereof or receives Regulatory Approval for each Program Compound.

2.2   Research Plan.  The Research Program shall be conducted by Abbott in each Research Program Year in accordance with the Annual Research Plan for such Research Program Year. The Annual Research Plan will be provided to John Hancock until Abbott either abandons development in accordance with the terms hereof or receives Regulatory Approval for each Program Compound. The Annual Research Plan shall be prepared by Abbott and presented to John Hancock at least sixty (60) days prior to the start of each Research Program Year. The Annual Research Plan for the first Research Program Year shall be is attached as Exhibit 1.3 within ninety (90) days of the Execution Date 1.___. Abbott may modify the Annual Research Plan from time to time in order to best meet the objectives of the Research Program. Any such modifications to the Annual Research Plan shall be promptly provided to John Hancock.

2.3   Conduct of Research.  Abbott shall use its Commercially Reasonable Commercial Efforts to conduct the Research Program in good scientific manner and using good laboratory practices, to achieve the objectives of the Research Program efficiently and expeditiously , and to comply with all applicable laws and regulations. Notwithstanding anything in this Agreement to

CONFIDENTIAL
JH 003281

-9-

the contrary, Abbott does not represent, warrant or guarantee that the Research Program will be successful in whole or in part or result in the registration or commercialization of any pharmaceutical products or that any Products obtaining Regulatory Approval will be a commercial success.

2.4     Subcontracting Research.  Abbott may subcontract or outsource to Affiliates ~~,~~ ~~licensees,~~ or third persons (each, a "Subcontractor") any portion of the Annual Research Plan. ~~Any subcontracting party~~ Each Subcontractor shall enter into a confidentiality agreement with Abbott and agreements acknowledging Abbott's exclusive ownership of the Program Compounds and shall comply with the terms hereof and with all applicable laws and regulations, including good laboratory practices, with respect to its work on the Research Program.  Abbott shall supervise and be responsible under this Agreement for the work of such ~~subcontractor~~ Subcontractor on the Research Program and no subcontracting or outsourcing shall relieve Abbott of any of its obligations hereunder.

2.5     Research Reports and Records.  Abbott shall on an annual basis [no later than the last day of each Program Year][This report must be provided before John Hancock can be obligated under section 3 to make a subsequent Program Payment], provide John Hancock with a reasonably detailed report setting forth the status of the Research Program and ~~the~~ all Program Related Costs expended by Abbott ~~. Abbott shall use Commercially Reasonable Efforts to~~ during such Program Year.  Such report shall also contain such other information related thereto as John Hancock may reasonably request from time to time.  Abbott shall, and shall cause each Subcontractor to, maintain complete and accurate records, in sufficient detail and in good scientific manner appropriate for patent and regulatory purposes and for purposes of demonstrating compliance with the terms hereof, that fully and properly reflect all work done, results achieved and Program Related Costs expended in performance of the Research Program. The books and records of Abbott and each Subcontractor related to the Research Program, including, without limitation, those related to the expenditure of Program Related Costs, shall be subject to copying, inspection and audit by (and at the expense of) John Hancock at any time and from time to time.  Such audit shall occur upon reasonable notice and during normal business hours by an independent auditor selected by John Hancock and reasonably acceptable to Abbott. John Hancock and its independent auditor shall maintain such records and information of Abbott in confidence in accordance with Article 10 and shall not use such records or information except to the extent permitted by this Agreement, including any enforcement of the provisions hereof. In the event that such audit reveals any breach of Abbott's responsibilities hereunder, Abbott shall (i) pay the fees and expenses charged by such auditor, (ii) fully and promptly cure such breach and (iii) all documents reviewed in the audit will be copied and delivered to John Hancock at its request.


ARTICLE 3
RESEARCH FUNDING

3.1     John Hancock Program Payments.  John Hancock shall make the following installment ~~payment~~ payments for the applicable Program Year to Abbott to help support the Research ~~Programs~~ Program (the "Program Payments"):

CONFIDENTIAL
JH 003282

-10-

| Payment Date | Payment Amount | Program Year |
|---|---|---|
| Execution Date | $50,000,000 | first |
| First Anniversary of Execution Date | $55,000,000 | second |
| Second Anniversary of Execution Date | $55,000,000 | third |
| Third Anniversary of Execution Date | $60,000,000 | fourth |

Such funds shall be expended by Abbott on Program Related Costs and not for any other purpose.

3.2    Abbott Program Payments.  Abbott shall spend on Program Related Costs:  (i) at least the Amount of the Annual Minimum Spending Target for and during each Program year; Year and (ii) at least the Aggregate Minimum Spending Target for and during the Program Term. John Hancock's sole and exclusive remedies for Abbott's failure to fund the Research Program in accordance with this Section 3.2 is(but not for any other breach of Abbott's other obligations) are set forth in Sections 3.3 and, 3.4 and 7.2.

3.3    Carryover Provisions.  Abbott shall be permitted to carryover change its funding obligations under Section 3.2 only as follows:

(i)    If in any Program Year Abbott spends on Program Related Costs, the full amount of the Program Payments Payment provided by John Hancock for such Research Program Year, but does not spend the full amount of the Annual Minimum Spending Target for such Program Year (including any Annual Carryover Amounts from any prior Program Years), Abbott agrees to will spend the difference between its expenditure on Program Related Costs for such Program Year and the Annual Minimum Spending Target for such Program Year (the "Annual Carryover Amount") in the subsequent Program Year.  John Hancock's obligation to make any program payment in Program Payment for such subsequent Program Year, if any, pursuant to Section 3.1 3.1, shall be deferred until that the time that Abbott notifies John Hancock that it has spent the Annual Carryover Amount in such subsequent Program Year; and

(ii)   If in each Program Year Abbott spends on Program Related Costs at least the Annual Minimum Spending Target but does not expend the full amount of the Aggregate Spending Target during the Program Term, Abbott agrees to will expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the "Aggregate Carryover Amount") on Program Related Costs during the subsequent fiscal year commencing immediately after the end of the Program Term.  If Abbott does not spend the Aggregate Carryover Amount on Program Related Costs during such subsequent fiscal year, Abbott will refund to John Hancock one-third of the Aggregate Carryover Amount , which that remains unspent by Abbott, within thirty (30) days of the end of such subsequent fiscal year.

CONFIDENTIAL
JH 003283

-11-

3.4     Termination of John Hancock's Program ~~Payments. Unless the parties agree upon an alternative arrangement, if~~ Payment Obligation.  If Abbott:  ~~(i) ceases research and~~(i) abandons development of all Program Compounds during the Program Term; (ii) does not expend during any Program Year the full amount of the Program Payment provided by John Hancock ~~on Program Related Costs during any~~ for such Program Year; ~~(iii) does~~(iii) fails to timely deliver its Annual Research Plan for any year in accordance with Section 2.2 or does not reasonably demonstrate in its Annual Research Plan, its intent and reasonable expectation to expend Program Related Costs during the next Program Year in excess of the Program Payment provided by John Hancock for such year; or (iv) does not reasonably demonstrate, in its ~~updated research plan,~~ Annual Research Plan, its intent and reasonable expectation to expend Program Related Costs during the Research Term in excess of the Aggregate Spending Target, John Hancock's obligation to make any remaining Program Payments pursuant to Section 3.1 shall cease.  In addition, in the case of either (i) or (ii) above, Abbott shall refund (not later than the 10th day following such event) to John Hancock the Program Payment for such year minus half of the Program Related Costs actually spent by Abbott during that Program Year.

3.5     Hancock Funding Obligation.  John Hancock's entire obligation hereunder shall be limited to providing the ~~program payments~~ Program Payments set forth in Section 3.1.  Abbott shall be solely responsible for funding all Program Related Costs in excess of the Program Payments from John Hancock.

3.6     Calculation of Expenditures.  Notwithstanding anything else in this Agreement, for purposes of calculating whether Abbott has spent, or is projected to have spent, Program Related ~~Cost~~ Costs in excess of (i) the Annual Minimum Spending Target for the first Program Year and (ii) the Aggregate Spending Target for the Program Term, Abbott shall be entitled to include within such calculations all cost and expenses incurred on or after ~~March 1[_____]~~, 2000 up to the Execution Date, which would have otherwise qualified as Program Related Costs in the event that the period from ~~March 1[_____]~~, 2000 to the Execution Date had been included within the first Program ~~Term. The~~ Year (and the Program Term).  This extension of the first Program Year for the determination of whether the Annual Minimum Spending Target for the first Program Year and the Aggregate Spending Target are met, takes into consideration that Abbott was funding all research and development cost for the Program Compounds ~~during the time period involved in the negotiation and execution of this Agreement.~~ commencing [_____], 2000.

ARTICLE 4
PRODUCT RESEARCH AND DEVELOPMENT

4.1     ~~Development Responsibility~~ Commercially Reasonable Efforts.  Abbott shall be solely responsible for the clinical development, government approval, manufacturing, marketing, sales and distribution of Products.  ~~resulting from the Research Program~~ Abbott ~~agrees to use~~ will use, and will cause each of its Affiliates and Licensees to use, Commercially Reasonable Efforts to pursue the clinical development, government approval, manufacturing, marketing, sales ~~,~~ and distribution of Products throughout the Territory.  The obligations of Abbott, its Affiliates and Licenses with respect to any Product under this Article 4 are expressly conditioned upon the safety, efficacy and commercial feasibility of each Product~~,~~ but no license, assignment

**CONFIDENTIAL
JH 003284**

-12-

or other transfer of rights by Abbott (by operation of Article 14 or otherwise) will modify or reduce Abbott's obligations hereunder. [It is the parties' expectation that under normal circumstances][addressed by proviso at end of sentence?] Abbott will file for Regulatory ~~Approvals~~ Approval with respect to each Product in Europe within two (2) years from the date of the NDA filing for such Product in the ~~United States~~ U.S. Territory and in Japan within five (5) years from such NDA filing date; provided, however, that these time frames may be extended or otherwise altered based upon unforeseen circumstances that legitimately impact such regulatory filings in such foreign jurisdictions.

4.2     ~~Within~~ Marketing and Sale Responsibility. Without limiting the generality of Section 4.1, within six (6) months of obtaining Regulatory Approval for ~~any~~ a Product in a given country, Abbott, its Affiliates or ~~licensees~~ Licensees shall commence to market and sell such Product in such country. Abbott's obligation to market and sell a Product shall not apply [Why doesn't "Commercially Reasonable Efforts" address all of this?] to a Product in any country if Abbott has not commenced or has ceased marketing and selling such Product in ~~the~~ such country ~~in question substantially due to~~ substantially/primarily on account of adverse business or financial conditions caused by the regulatory authorities or other governmental authorities of such country ~~which would cause the marketing of such Product in such country to be contrary to the financial best interests of John Hancock and Abbott,~~ (including not commencing marketing and selling in a country where the regulatory authorities have price or reimbursement approval and the price or reimbursement approval [or that proposed by the regulatory authorities or government authorities] is unacceptable to Abbott) which causes the marketing and sale of such Product in such country to be contrary to the financial best interests of John Hancock and Abbott; provided, however, that Abbott, its ~~affiliates, or it licensees~~ Affiliates or Licensees shall commence or resume marketing and sale of such Product in such country as soon as reasonably practical after such adverse business or financial conditions cease to exist.

4.3     Alternative Compounds. ~~Unless the parties agree upon an alternative arrangement, in the event~~ [subject to discussion] In the event that Abbott

    (a)     divests or out-licenses a Program Compound ~~, Abbott shall substitute an~~ (which shall mean a sale, license or other transfer by Abbott following which Abbott and its Affiliates no longer have the exclusive right in (i) North America or (ii) at least two-thirds (by population) of Japan and Western Europe (consisting of [the European Union]), to [develop and sell] any Product containing such Program Compound); or

    (b)     fails or ceases to research, develop, market, distribute or sell any Program Compound or Product for any reason that is not clearly consistent with using its Commercially Reasonable Efforts; or

    (c)     fails or ceases to develop any Program Compound beyond a preclinical or Phase I Clinical Trial,

Abbott shall give John Hancock a choice among three (3) alternative ~~compound~~ compounds as a substitute for ~~the divested and outlicensed~~ such Program Compound (and, in the case of subsection (a) above, John Hancock shall additionally have the alternative choice of retaining its

CONFIDENTIAL
JH 003285

-13-

rights hereunder with respect to such Program Compound), provided that John Hancock reasonably agrees that at least two (2) of the alternative ~~compound has~~ compounds then have a similar market opportunity and ~~is~~ are in a comparable stage of development or ~~has~~ have a better development and risk profile than ~~the divested or outlicensed~~ such Program Compound.  Upon ~~acceptance~~ selection by John Hancock, ~~which acceptance will occur unless John Hancock notifies Abbott of its non-acceptance of such substitute compound within thirty (30) days from the date that Abbott proposes such substitute compound to John Hancock~~, such such selected alternative compound shall thereafter be treated ~~as Program Compound.~~ hereunder as a Program Compound (including applicability of the representations and warranties herein with respect thereto as of the date it is added to the Research Program), but such selection will not occur unless John Hancock notifies Abbott of its selection of one of the alternative compounds (or of retaining its rights with respect to the Program Compound) within thirty (30) days from the date that Abbott proposes the alternative compounds to John Hancock and provides John Hancock with information about such alternative compounds of the same scope as that provided to John Hancock with respect to the initial Program Compounds and such additional information as John Hancock may reasonably request.  In addition, such thirty (30) day period shall be extendable by another forty-five (45) days by written notice to such effect from John Hancock to Abbott within such initial thirty (30) day period.

If, in the case of subsection (a) above, John Hancock elects to retain its rights hereunder with respect to a Program Compound that has been divested or out-licensed, Abbott shall cause the transferee thereof to acknowledge and agree to the terms of this Agreement as applied to such Program Compound pursuant to such agreements and other instruments as are reasonable acceptable to John Hancock.

[In addition, whether or not John Hancock elects to retain its rights with respect to a Program Compound, in the event that Abbott divests or out-licenses such Program Compound under the circumstances described in subsection (a) above, any initial or lump-sum payment received by Abbott or its Affiliates with respect thereto shall be added to and included in the Net Sales as of the date such payment is due and payable to Abbott.]

 4.4. Endothelin.  With respect to Endothelin, if Abbott, its Affiliates or Subcontractors initiates a Phase [II] Clinical Trial for one or more non-cancer indications [within _____ years from the date of this Agreement], Abbott will provide notice thereof to John Hancock together with information similar to that which John Hancock received in connection with the Program Compounds hereunder.  Abbott will provide additional information concerning Endothelin and such trial as reasonably requested by John Hancock.  Abbott agrees to give John Hancock the option, exercisable in John Hancock's sole discretion, to provide approximately ____ % of the additional research funding required with respect to Endothelin for all non-cancer indications (not to exceed $ _____ ), on terms and conditions that will (i) provide a projected rate of return to John Hancock that is at least as good as the projected rate of return provided herein with respect to the Program Compounds as of the date hereof and (ii) be negotiated in good faith by the Parties.  Unless John Hancock shall have notified Abbott of its exercise of such option, such option will expire [ _____ ] months after John Hancock receives the information requested by it as described above.

CONFIDENTIAL
JH 003286

-14-

4.5.   Arm's-Length.  Abbott shall not research, develop, manufacture, market, sell, distribute, out-license or otherwise treat any Program Compounds or Products differently, as compared to any other Abbott compounds or products, on account of any of John Hancock's rights hereunder.  Furthermore, all distribution agreements, licenses, out-licenses and other agreements relating to the research, development, manufacturing, marketing, sale, distribution, licensing, out-licensing or divestiture of and all other transactions involving any Program Compounds or Products to or with any third party (except to Abbott's Affiliates) shall be on arm's-length terms and conditions.

## ARTICLE 5
## PROGRAM INVENTIONS

5.1   Ownership.  All inventions, innovations, ideas, discoveries, technology, know-how, methods, data, applications and products (in each case whether or not patentable) arising from the Research Program (or otherwise related to the Program Compounds (collectively, the "Program Inventions") shall be exclusively owned by or assigned to Abbott and Abbott shall not divest or otherwise transfer any right, title or interest in or to any Program Inventions to any other person except in accordance with Sections 4.3 and 4.5.

5.2   Patent Prosecution and Maintenance.  Abbott ~~intends to pursue~~ will use Commercially Reasonable Efforts to obtain broad patent protection for ~~discoveries and inventions made under~~ the ~~Research~~ Program Inventions.  Abbott shall be responsible for all costs and expenses and control all decisions related to filing for patent protection, including the preparation, filing (foreign and/or domestic), prosecution, issuance ~~,~~ and maintenance of patent applications or patents covering Program Inventions.

5.3   Enforcement.  Abbott shall have the sole right and authority to enforce the ~~Compound Patents and/or any patents~~ patents or any other rights arising from Program Inventions against any infringers.  If Abbott initiates any ~~patent enforcement actions or lawsuits~~ action or lawsuit to enforce such patents or other rights, it shall be solely responsible for the cost and expense ~~of such action and shall be entitled to receive all~~ thereof.  Abbott will promptly notify John Hancock at such time as it becomes aware of any infringement activities and of any such enforcement actions or lawsuit, and Abbott will provide information concerning them as reasonably requested by John Hancock.  All moneys recovered upon the final judgment or settlement of any such action or lawsuit shall be added to and included in the Net Sales (for the years in each Royalty Term with respect to which such action or lawsuit concerns), less the out-of-pocket cost and expense thereof; provided that if such recovered moneys represent something other than Net Sales by the infringer (e.g., lost profits or a royalty), Abbott agrees to allocate a portion of the recovered moneys to John Hancock so as to approximate the appropriate royalty on Net Sales by the infringer during each year of the Royalty Terms.

## ARTICLE 6
## MILESTONE PAYMENTS TO JOHN HANCOCK

CONFIDENTIAL
JH 003287

-15-

6.1    Closing Fee.  ~~Within days after the~~ Upon execution of this Agreement, Abbott shall pay _____ ($_____) to John Hancock. ~~as compensation for structuring this Agreement and to reimburse John Hancock for all its fees and expenses incurred in connection with this transaction~~

6.2    Management Fee.  ~~Within thirty (30) days of the start of the second, third and fourth Program Year~~ On _____ 2001, 2002, 2003 and 2004, Abbott shall pay to John Hancock a ~~fee~~ management fee, each of which shall be in the amount of Two Million Dollars ($2,000,000).~~($ ) per year as compensation for monitoring Abbott's performance of its research and development activities under the Research Program directed to the development and registration of products and for its ongoing fees and expenses incurred in connection with this transaction.~~

~~6.3 Milestone Payments~~

6.3    Milestone Notification and Payments.  Abbott shall promptly notify John Hancock of the occurrence any of the following events that give rise to Abbott's obligation to make a milestone payment.  Except as hereinafter limited, Abbott shall pay the following milestone payments to John Hancock in the amounts and at the times set forth below with respect to each ~~respective~~ Program Compound:

(a)    One Million Dollars ($1,000,000) shall be paid within thirty (30) days after the allowance of ~~Abbott~~ the first Investigational New Drug ~~application~~ Application [define] for such Program Compound;

(b)    Two Million Dollars ($2,000,000) shall be paid within thirty (30) days after the initiation of a Phase I Clinical Trial with such Program Compound;

(c)    Three Million Dollars ($3,000,000) shall be paid within thirty (30) days after the initiation of the first Phase II Clinical Trial with such Program Compound;

(d)    Four Million Dollars ($4,000,000) shall be paid within thirty (30) days after the initiation of the first Phase III Clinical Trial with such Program Compound;

(e)    Five Million Dollars ($5,000,000) shall be paid within thirty (30) days after the filing of an NDA with the FDA for such Program Compound; and

(f)    Ten Million Dollars ($10,000,000) shall be paid within thirty (30) days after Regulatory Approval of such Program Compound in the ~~United States~~ U.S. Territory.

The aggregate of milestone payments under Section 6.3(a), (b), (c), (d), and (e) for all Program Compounds shall be limited to ~~twelve million dollars~~ Twelve Million Dollars ($12,000,000), and once such aggregate limit has been paid, no further payments shall be due and payable under Sections 6.3(a), (b), (c), (d) or (e).  The aggregate of milestone payments under Section 6.3(f) for

CONFIDENTIAL
JH 003288

-16-

all Program Compounds shall be limited to Forty Million ~~dollars~~ Dollars ($40,000,000), and once such aggregate limit has been paid, no further payments shall be due and payable under Section 6.3(f). The aggregate of milestone payments under Sections 6.3(a), (b), (c), (d) and (e) for all Program Compounds shall be limited to Three Million Dollars ($3,000,000) during the first Program Year and shall be limited to Six Million Dollars ($6,000,000) during the second Program Year, and once such ~~aggregate~~ annual limit has been reached for ~~a~~ these particular Program ~~Year~~ Years, no further payments shall be due under Sections 6.3(a), (b), (c), (d) and (e) for the remainder of such Program Year; provided that any amounts that would have been due to John Hancock but for such annual limits shall be paid in subsequent Program Years so long as the Program Compound to which it relates has not been abandoned, divested or out-licensed by Abbott. Further, the milestone payments set forth in Section 6.2 will not be made more than once with respect to any given Program Compound regardless of the number of such trials, filings or approvals that may be undertaken or granted with respect to such Program Compound, including, without limitation, multiple product forms of the same Program Compounds, additional active or inactive ingredients, indications, delivery modules and/or dosage strengths. Finally, a milestone payment shall only be made with respect to a milestone achieved after ~~the date of this Agreement~~[_____], 2000. For instance, if a Program Compound is in Phase III Clinical Trials ~~at the effective Date of this Agreement~~ on [_____], 2000, then no milestones shall ever be paid under Sections 6.3(a), (b), (c) and (d) for such Program Compound regardless of whether the Program Compound were ever to achieve such milestones as part of a different development program for instance for a new dosage strength or new indication. Exhibit ~~1.21~~ 6.__ sets forth the current stage of clinical development for each Program Compound.

## ARTICLE 7
## ROYALTIES

7.1    Royalty Rates. Subject to the limitation set forth below, Abbott shall pay to John Hancock royalties equal to the following percentages calculated on the aggregate Net Sales of all Products in the Territory.:

~~Annual~~

~~millions)~~

Royalty ~~Percentage~~ percentage

Calendar year Net Sales (in ~~Millions~~

of ~~All~~ all Products in the

Territory

| | |
|---|---|
| 8% of those Net Sales | up to $400 |
| and then 4% of those Net Sales | in excess of $400 up to $1,000 |
| and then 1% of those Net Sales | in excess of $1,000 up to $2,000 |
| and then .5% of those Net Sales | in excess of $2,000 |

7.2    Royalty Term. The obligation to make royalty payments on ~~a~~ each Product shall be calculated on a country-by-country basis, shall commence for such Product upon the First Commercial Sale thereof in such country, and shall last for the duration of the Royalty Term in each given country for such Product. Notwithstanding anything to the contrary herein, the obligation to make royalty payments on the Products shall not begin until [_____, 2002] [the

CONFIDENTIAL
JH 003289

-17-

commencement of the Third Program Year] (and with respect only to Net Sales occurring on or after such date) and shall cease at December 31, 2014; provided that (i) for each Annual Carryover Amount that exceeds $_____, the obligation to make royalty payments shall be extended by one additional year and (ii) if Abbott becomes obligated to pay an Aggregate Carryover Amount pursuant to Section 3.3(ii) in an aggregate amount in excess of $_____ the obligation to make royalty payments shall also be extended by one additional year.

## ARTICLE 8
## ROYALTY REPORTS AND ACCOUNTING

8.1    Reports, Exchange Rates.  ~~During the term of this Agreement following the First Commercial Sale of the Product~~ With respect to every Quarterly Reporting Period for which Abbott is obligated to pay a royalty hereunder, Abbott shall furnish to John Hancock a written report for such Quarterly Reporting Period within sixty (60) days of the end of ~~each calendar quarter~~ such Quarterly Reporting Period [(that is, within sixty (60) days of each [March 31], [June 30], [September 30] and [December 31]] showing in reasonably specific detail:

   (a)    the ~~Net Sales of the~~ total gross sales in each country for each Product sold by Abbott, its Affiliates and ~~licensees~~ Licensees in the Territory ~~during the Quarterly Reporting Period to which the report is applicable;~~ and the detailed calculation of Net Sales from gross sales in each country for each Product;

   (b)    the royalties payable in ~~U.S. dollars~~ Dollars, if any, which shall have accrued hereunder ~~based upon the Net Sales of Products;~~;

   ~~(c) withholding taxes, if any, required by law to be deducted in respect of such royalties;~~

   ~~(d)~~
   (c)    the dates of the First Commercial Sale of the Product in any country in the Territory during ~~the~~ such Quarterly Reporting Period;

   ~~(e)~~
   (d)    the exchange rates used in determining the amount of ~~U.S. dollars~~ Dollars.

With respect to sales of ~~the Product~~ Products invoiced in ~~U.S. dollars~~ Dollars, the gross sales, Net Sales (including all adjustments and deductions permitted to be made hereunder in calculating the same), and royalties payable shall be expressed in ~~U.S. dollars~~ Dollars.  With respect to sales of ~~products~~ Products invoiced in a currency other than ~~U.S. dollars~~ Dollars, the gross sales, Net Sales and royalties payable shall be expressed in their ~~U.S. dollar~~ Dollar equivalent, calculated [using the Inter Bank rate set forth in the International Report published by International Reports Inc. as Foreign Exchange Rates quoted in New York on the day nearest the last business day of ~~the calendar quarter.~~] [or the weighted average exchange rate on each day during ?] the Quarterly Reporting Period. [The gross sales made outside the ~~United States~~ U.S. Territory during a fiscal quarter will be reported with the gross sales made in the ~~United States~~ U.S. Territory during the calendar quarter in which the last month of the fiscal quarter falls.]

**CONFIDENTIAL**
**JH 003290**

-18-

8.2    Audits.

    (a)    Upon the written request of John Hancock and, in the absence of any breach by Abbott hereunder, not more than once in each calendar year, Abbott shall permit John Hancock and an independent certified public accounting firm of nationally recognized standing, selected by John Hancock and reasonably acceptable to Abbott, at John Hancock's expense, to have access during normal business hours to such of the records of Abbott as may be reasonably necessary, its Affiliates and Licensees to verify the accuracy of the royalty reports and the amounts and calculation of any payments required hereunder for any year ending not more than twenty-four (24) thirty-six (36) months prior to the date of such request. The accounting firm shall disclose to John Hancock only whether the records are correct or not and, if applicable, the specific details concerning any discrepancies. No other information shall be shared unless Abbott invokes the dispute resolution proceedings of Section 16.7 of this Agreement.; provided that, if such access reveals that any additional royalties or other payments were owed during such period, John Hancock shall have access to all such records for any year.

    (b)    If such accounting firm concludes that additional royalties or other payments were owed during such period, Abbott shall have the option to invoke the proceedings of Section 16.7 below or pay the additional royalties or other payments within thirty (30) days of the date John Hancock delivers to Abbott such accounting firm's written report so concluding. The fees and expenses charged by such accounting firm shall be paid by John Hancock; provided, however, if the audit discloses that the royalties amounts payable by Abbott for the audited period any Quarterly Reporting Period are more than one hundred five percent (105%) of the royalties actually paid for such period, then Abbott shall pay the reasonable fees and expenses charged by such accounting firm and any related costs of enforcement.

    (c)    Abbott shall include in each permitted license granted by it pursuant to the this Agreement a provision requiring the licensee Licensee (including any Affiliates of Abbott) to make reports to Abbott, to keep and maintain records of sales Net Sales made pursuant to such sublicense license and to grant access to such records by John Hancock's Hancock and its accounting firm or other auditor to the same extent required of Abbott under the this Agreement.

    (d)    All reports and payments not disputed as to correctness by John Hancock within three (3) years after receipt thereof shall thereafter conclusively be deemed correct for all purposes, and Abbott and its Affiliates and licensees shall be released from any liability or accountability with respect to such royalties and payments In the event that Abbott's document retention

CONFIDENTIAL
JH 003291

-19-

policy requires it to discard any documentation related to the Research Program, Program Compounds or Net Sales (which policy shall require documents to be retained for at least three (3) years), prior to discarding such documentation Abbott shall make it available to John Hancock for John Hancock's direct retention or copying.

8.3    Confidential Financial Information.  John Hancock shall treat all ~~financial~~ information subject to review under this Article 8 ~~or under any sublicense agreement as confidential~~, and shall cause its accounting firm to ~~retain~~ agree to treat all such ~~financial~~ information ~~in confidence.~~, in accordance with the provisions of Article 10.

8.4    Accounting Principles.  All accounting hereunder, including without limitation all determinations of gross sales, Net Sales (including all adjustments and deductions permitted to be made hereunder in calculating the same), Program Related Costs and all calculations underlying such determinations, shall be made in accordance with generally accepted accounting principles as in effect in the United States, consistently applied.


ARTICLE 9
PAYMENTS

9.1    Payment Terms.  ~~Royalties shown to have accrued by each~~ With respect to every Quarterly Reporting Period for which Abbott is obligated to pay a royalty ~~report provided for under Article 8 of this Agreement~~ hereunder, such royalties shall be due and payable ~~on the date such royalty report is due~~ within sixty (60) days of the end of such Quarterly Reporting Period [(that is, within sixty (60) days of each [March 31], [June 30], [September 30] and [December 31])].  Payment of royalties in whole or in part may be made in advance of such due date.

9.2    Payment Method.  All royalties and other payments by Abbott to John Hancock under this Agreement shall be made by bank wire transfer in immediately available funds ~~to such account~~ in accordance with the instructions set forth on Exhibit 9.2 attached hereto or in accordance with such other instructions as John Hancock ~~shall designate before such payment is due. If at any time legal restrictions in any country in the Territory prevent the prompt remittance in the manner set forth in this Section 9.2 of part or all royalties owing with respect to Product sales in such country, then the parties shall mutually determine a lawful manner of remitting the restricted part of such royalty payments so long as such legal restrictions exist.~~ may give from time to time.

9.3.    Withholding Taxes.  All amounts owing from Abbott to John Hancock under this Agreement shall be paid without deduction to account for any withholding taxes, value-added taxes or other taxes, levies or charges with respect to such amounts payable on behalf of Abbott ~~or its sublicensees~~, its Affiliates or Licensees and any taxes required to be withheld on behalf of Abbott ~~or its sublicensees~~, its Affiliates or Licensees in any country within the Territory.~~; provided, however, that Abbott may deduct the amount of any taxes imposed on John Hancock which are required to be withheld or collected by Abbott or its sublicensees under the laws of any country on amounts owing from Abbott to John Hancock hereunder to the extent Abbott or its sublicensees pay to the appropriate governmental authority on behalf of John Hancock such~~

CONFIDENTIAL
JH 003292

-20-

~~withholding taxes. Abbott shall promptly deliver to John Hancock proof of payment of such taxes together with copies of all communications from or with such governmental authority with respect thereto~~

9.4    Late Payments.  ~~Unless otherwise provided in this Agreement,~~ Abbott shall pay interest to John Hancock on the aggregate amount of any payments by Abbott that are not paid on or before the date such payments are due under ~~the~~ this Agreement, including, without limitation, any disputed payments or payments resulting from any audit, at a rate per annum equal to the lesser of (a) the prime rate of interest ; plus_____ basis points as reported by _____ bank in _____, from time to time , or (with any change in such reported rate being effective immediately for purposes hereof), or (b) the highest rate permitted by applicable law, calculated on the number of days such payments is delinquent until paid in full in cash.  All such amounts shall be payable upon demand.

<center>ARTICLE 10<br>CONFIDENTIALITY</center>

10.1    Nondisclosure Obligations.  Except as otherwise provided in this Article 10, during the term of the Agreement and for a period of ten (10) years thereafter, (a) John Hancock shall maintain in confidence in accordance with such procedures as are adopted by John Hancock to protect confidential information of third parties delivered to it, and shall use only for purposes of this Agreement (including, without limitation, enforcement of the terms hereof), information and data related to the ~~Research~~ Program Compounds or Products; and (b) John Hancock shall also maintain in confidence in accordance with such policies, and use only for purposes of this Agreement, all information ; and data ~~and materials~~ supplied by Abbott under this Agreement, which if disclosed in writing is marked ~~"Confidential""~~"confidential", if disclosed orally is promptly thereafter summarized and confirmed in writing to the other party and marked ~~confidential"~~"confidential", or if disclosed in some other form is marked ~~confidential.~~"confidential."

10.2    Permitted Disclosures.  For purposes of this Article 10, information and data described in clause (a) or (b) above shall be referred to as "Confidential Information". } John Hancock may disclose Confidential Information as required by applicable law, regulation or judicial process, provided that John Hancock shall, if legally permitted, give Abbott ~~prior~~ prompt written notice thereof.  ~~and adequate opportunity to object to any such disclosure or to request confidential treatment thereof~~ The obligation not to disclose or use Confidential Information shall not apply to any part of such Confidential Information that (i) is or becomes patented, published or otherwise part of the public domain other than by acts or omissions of John Hancock in contravention of this Agreement; or (ii) is disclosed to John Hancock by a third party, provided such Confidential Information was not obtained on a confidential basis by such third party from Abbott, its Affiliates or ~~licensees~~ Licensees; or (iii) prior to disclosure under the Agreement, was already in the possession of John Hancock, provided such Confidential Information was not obtained directly or indirectly from Abbott, its Affiliates or ~~licensees~~ Licensees under an ongoing obligation of confidentiality; or (iv) is disclosed in a press release agreed to by both parties under Section 10.3 below.

CONFIDENTIAL<br>JH 003293

-21-

10.3   Publicity Review.  Without the prior written consent of the other party, neither party shall make any statement to the public regarding the execution and/or any other aspect of the subject matter of this Agreement or any work under the Research Program.  John Hancock and Abbott shall not disclose any terms or conditions of this Agreement to any third party without the prior consent of the other party, except as set forth above in this Section 10.3 or as required by applicable law, regulation or court order.  [Do we want an initial press release?]


ARTICLE 11
TERM AND TERMINATION

11.1   Expiration.  Unless terminated earlier by agreement of the parties or pursuant to Sections 11.2 or 11.4 below, this Agreement shall expire upon termination satisfaction of Abbott's obligations to pay royalties and all other amounts under this Agreement.

11.2   Material Breach.  It is the parties' express intent that consideration shall first and foremost be given to remedying any breach of this Agreement through the payment of monetary damages or such other legal or equitable remedies as shall be appropriate under the circumstances and that there shall only be a limited right to terminate this Agreement under the following circumstances as a matter of last resort.  In the event that the Neutral [define], in accordance with the procedures set forth in Section 16.7, has rendered a ruling that a party has materially breached this Agreement, which ruling specified the remedies imposed on such breaching party for such breach (the "Adverse Ruling"), and the breaching party has failed to comply with the terms of the Adverse Ruling within the time period specified therein for compliance, or if such compliance cannot be fully achieved by such date, or if the breaching party has failed to commence compliance and/or has failed to use diligent efforts to achieve full compliance as soon thereafter after the Adverse Ruling as is reasonably possible, then the non-breaching party shall have the following rights and all other rights available to it under law:

    (a)   where Abbott is the breaching party that failed to comply with the Adverse Ruling and where the basis for such breach is Abbott's failure to abide by a material obligation under this Agreement, John Hancock may, upon written notice to Abbott after expiration of the period to comply, terminate this Agreement; and

    (b)   where John Hancock is the breaching party that failed to comply with the Adverse Ruling and where the basis for such breach is John Hancock's failure to abide by a material obligation under this Agreement, Abbott may, upon written notice to John Hancock after the expiration of the period to comply, terminate this Agreement.

11.3   Effect of Expiration of or Termination.

    (a)   Expiration or termination of this Agreement shall not relieve the parties of any obligation accruing prior to such expiration or termination.  The provisions of Article 10, Article 11 and Article 12 Articles 10 through 12, 15 and 16 shall survive the expiration or termination of the Agreement.

CONFIDENTIAL
JH 003294

-22-

[(b)    Notwithstanding anything herein to the contrary, termination of this Agreement by Abbott for any reason shall not relieve Abbott of its obligations under Articles 2 through 9, except that, to the extent that John Hancock has not made all of the Program Payments required by Article 3, then all Net Sales determinations, milestone payments (pursuant to Article 6), Annual Minimum Spending Targets and the Aggregate Spending Target shall thereafter be reduced by the fraction obtained by dividing (i) the aggregate of the Program Payments actually made by John Hancock by (ii) $220,000,000.]

11.4    Bankruptcy.  Either party shall have the right to terminate this Agreement by delivering sixty (60) days prior written notice to the other party in the event of the other party's bankruptcy (not to include reorganization) or insolvency, provided that applicable federal bankruptcy laws shall apply.  [Why?]

ARTICLE 12
WARRANTIES AND INDEMNITY

12.1    John Hancock Representations and Warranties.  John Hancock represents and warrants to Abbott that:

(a)    ~~the~~ The execution and delivery of this Agreement and the performance of the transactions contemplated hereby have ~~been~~ been duly authorized by all appropriate John Hancock corporation action, ~~; and~~ This Agreement constitutes John Hancock's valid and binding legal obligation, enforceable against it in accordance with its terms.

~~(b) the~~
(b)    The performance by John Hancock of any of the terms and conditions of this Agreement on its part to be performed does not and will not constitute a breach or violation of its organizational documents or any other material agreement or understanding, written or oral, to which it is a party or any law, statute, rule or regulation by which it is bound.

12.2    Abbott Representations and Warranties.  Abbott represents and warrants ~~that:~~ to John Hancock that:  [to be discussed – delivery of opinion of counsel with respect to certain of the following topics]

~~(a) the~~
(a)    The execution and delivery of this Agreement and the performance of the transactions contemplated hereby have been duly authorized by all appropriate Abbott corporation action, ~~; and~~ This Agreement constitutes Abbott's valid and binding legal obligation, enforceable against it in accordance with its terms.

CONFIDENTIAL
JH 003295

-23-

(b) the

(b)      The performance by Abbott of any of the terms and conditions of this
          Agreement on its part to be performed does not and will not constitute a
          breach or violation of its organizational documents or any other agreement
          or understanding, written or oral, to which it is a party or any law, statute,
          rule or regulation by which it is bound.

(c)      [FDA hereunder?] No consent, approval, license or authorization of, or
          designation, declaration or filing with, any court or governmental authority
          is or will be required on the part of Abbott in connection with the
          execution, delivery and performance by Abbot of this Agreement or any
          other agreements or instruments executed and delivered by Abbott in
          connection herewith or therewith, including, without limitation, any filings
          pursuant to federal or state securities laws or pursuant to any federal or
          foreign anti-trust laws.

(d)      Set forth on Exhibit 12.2(d) is the full name, detailed description of the
          stage of development, and current status and scope of patent coverage, for
          each Program Compound. Also set forth on Exhibit 12.2(d), are the
          projected sales and projected peak sales per calendar year through 2014,
          detailed description of projected milestones and dates thereof, and
          projected year of product launch, for each Program Compound. Such
          projections were prepared in good faith and with due care based on
          reasonable assumptions, and represent the reasonable estimate of Abbott
          as to the future performance of the Program Compounds based on
          information available as of the date of such projections and as of the date
          hereof; it being agreed that such projections do not constitute any warranty
          as to the future performance of the Program Compounds and that actual
          results may vary from projected results.

(e)      Set forth on Exhibit 12.2(e) is a list and description of all domestic and
          foreign patents, patent rights, patent applications and all patent
          applications that are in the process of being prepared that are owned by or
          registered in the name of Abbott, or of which Abbott is a licensor or
          licensee or in which Abbott has any right, which are related to the
          Research Program or cover any of the Program Compounds. All of such
          patents and patent applications have been duly filed in or issued by the
          United States Patent and Trademark Office or the equivalent foreign patent
          office, as the case may be, and have been properly maintained and
          renewed in accordance with all applicable laws and regulations. Abbott
          owns all Program Inventions, patents, patent applications, copyrights,
          manufacturing processes, formulae, trade secrets, proprietary rights and
          know how necessary or desirable with respect to the Program Compounds
          and the Research Program as heretofore conducted and as proposed to be
          conducted (collectively, the "Intellectual Property"). Abbott's use of the
          Intellectual Property does not require the consent of any other person and
          the Intellectual Property is owned exclusively by Abbott, free and clear of

CONFIDENTIAL
JH 003296

-24-

any liens or encumbrances of any other person. Abbott has not received any communications alleging that, and no claim is pending or, to the knowledge of Abbott, threatened to the effect that, the operations of Abbott with respect to the Research Program or the Program Compounds infringe upon or conflict with (or will infringe or conflict with) the asserted rights of any other person under any domestic or foreign patent, trademark, service mark, copyright, trade secret, proprietary right or any other intellectual property right, and there is no basis known to Abbott for any such claim (whether or not pending or threatened). No claim is pending or, to the knowledge of Abbott, threatened to the effect that any of the Intellectual Property is invalid or unenforceable by Abbott, and there is no basis known to Abbott for any such claim (whether or not pending or threatened). To the knowledge of Abbott, all technical information developed by and belonging to Abbott which has not been patented or copyrighted has been kept confidential.

(f)     Except for the Eisai Agreement and customary employment and consulting agreements with Abbott's own employees or consultants, there are no outstanding options, licenses, or agreements of any kind relating to the Intellectual Property or any of the Program Compounds or the transactions contemplated by this Agreement. Abbott has not granted or assigned to any other person any right to use, manufacture, have manufactured, produce or sell any of the Program Compounds or Products.

(g)     To the knowledge of Abbott and with respect to the Research Program and each of the Program Compounds, Abbott is not now, and in performing its obligations hereunder will not be, in any way making an unlawful or wrongful use of any confidential information, know-how, or trade secrets of any other person, including without limitation any former employer of any present or past employee of Abbott.

(h)     Neither this Agreement, any Exhibit to this Agreement, nor any other agreement, document or written statement made by Abbott and furnished by Abbott to John Hancock or John Hancock's counsel in connection with the transactions contemplated hereby, contains any untrue statement of material fact or omits to state any material fact necessary to make the statements contained herein or therein not misleading. There is no fact known to Abbott that has not been disclosed herein or in any other agreement, document or written statement furnished by Abbott to John Hancock or its counsel in connection with the transactions contemplated hereby which materially adversely affects or could materially and adversely affect the prospects or condition (safety, efficacy, commercial or other) of the Research Program or any of the Program Compounds.

(i)     Neither Abbott nor any person acting on its behalf (i) has taken or will take any action which would subject this Agreement and the consummation of the transactions contemplated hereby to the registration

CONFIDENTIAL
JH 003297

-25-

or qualification requirements of any foreign or domestic (federal or state) securities laws, (ii) has dealt with any broker, finder or other similar person in connection with the transactions contemplated by this Agreement or (iii) is under any obligation to pay any broker's fee, finder's fee or commission in connection with such transactions.

(i)     There is no action, proceeding or investigation pending or, to the knowledge of Abbott, threatened or any basis therefor known to Abbott which (i) questions the validity of this Agreement or any action taken or to be taken by Abbott pursuant thereto or (ii) which has resulted in, or could reasonably be expected to result in, a material adverse change in the prospects or condition (safety, efficacy, commercial or other) of the Research Program or any of the Program Compounds.

(k)     With respect to the Research Program and each of the Program Compounds, Abbott has (and in the future will have) obtained from each of its employees and from each of the employees of its Affiliates and Subcontractors an agreement in customary form pursuant to which each such person shall have agreed that all title to the Program Inventions, Program Compounds and Products is and shall be held by Abbott.

(l)     Since _____, 2000, no condition, circumstance or fact has arisen nor has Abbott made any change in the conduct of the Research Program that, individually or in the aggregate, materially adversely affects or could materially and adversely affect the prospects or condition (safety, efficacy, commercial or other) of the Research Program or any of the Program Compounds.

(o)     No royalty or other payment made hereunder to John Hancock will be subject to any withholding or similar tax imposed by any government or taxing authority.

12.3     No Conflict.  Abbott and John Hancock represent and warrant that this Agreement does not, and will not, conflict with any other right or obligation provided under any other agreement or obligation that Abbott or John Hancock has with or to any third party.

12.4     Compliance with Law.  Abbott and represents and warrants to John Hancock each represent and warrant that it shall will comply with all applicable laws, regulations and guidelines in connection with that Party's its performance of its obligations and rights pursuant to this Agreement, including the regulations of the United States and any other relevant nation concerning any export or other transfer of technology, services , or products.

12.5 Disclaimers.
[12.5   Certain Breaches.  As mentioned in our memo, in the event of certain breaches, we feel that John Hancock should be entitled to certain remedies - to be discussed.]

CONFIDENTIAL
JH 003298

-26-

~~(a) EXCEPT AS EXPLICITLY STATED HEREIN, ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE, ARE EXCLUDED.~~

~~(b) EXCEPT AS EXPLICITLY STATED HEREIN, NEITHER PARTY WILL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL OR SPECIAL DAMAGES OF ANY NATURE ARISING FROM SUCH PARTY'S ACTIVITIES UNDER THIS AGREEMENT; PROVIDED, HOWEVER, THAT THIS LIMITATION SHALL NOT LIMIT THE INDEMNIFICATION OBLIGATION OF SUCH PARTY UNDER SECTION 12.6 BELOW FOR CONSEQUENTIAL DAMAGES RECOVERED BY A THIRD PARTY.~~

~~12.6 Direct Indemnity. Each party~~

12.6    Indemnification of John Hancock. Abbott shall indemnify and hold ~~the other party~~ John Hancock and its ~~sublicensees~~ Affiliates, agents, directors and employees harmless, and hereby forever releases and discharges ~~the other party~~ John Hancock and its ~~sublicensees~~ Affiliates, agents, directors and employees, from and against all ~~claims, demands, liabilities, damages and expenses, including attorneys' fees and costs (collectively, "Liabilities")~~ Losses related to or arising out of, directly or indirectly, (a) any negligence, recklessness or intentional misconduct of ~~the indemnifying party or its~~ Abbott or its Affiliates, agents, directors, employees, Subcontractors, licensees (including Licensees) or sublicensees in connection with the ~~work performed by such party during the~~ Research Program, ~~or arising out of this agreement~~ Program Compounds or Products, or (b) any manufacture, use, storage, distribution or sale of ~~Collaboration~~ the Program Compounds or Products by anyone, including without limitation all Losses related to any personal injury or death, or (c) any breach by Abbott its representations, warranties or obligations hereunder ~~; except~~ or under any related agreement, document or instrument and/or enforcement of the terms hereof or (d) the consummation of the transactions contemplated hereby, except, in each case, to the extent ~~such Liabilities resulted from negligence, recklessness or intentional misconduct of the other party.~~ any such Losses are the result of any breach by John Hancock of its representations, warranties or obligations hereunder.

12.7    Procedure. ~~A party (the~~ If John Hancock or any of its Affiliates, agents, directors or employees (each, an "Indemnitee") ~~that~~ intends to claim indemnification under this Article 12, it shall promptly notify ~~the other party~~ Abbott (the "Indemnitor") of any ~~Liability~~ Loss or action in respect of which the Indemnitee ~~or any of its sublicensees intend~~ intends to claim such indemnification, and the Indemnitor shall have the right to participate in, and, to the extent the Indemnitor so desires, ~~jointly with any other Indemnitor similarly noticed,~~ to assume the defense thereof with counsel selected by the Indemnitor; provided, however, that an Indemnitee shall have the right to retain its own counsel, with the fees and expenses of such counsel to be paid by the ~~Indemnitee~~ Indemnitor, if representation of such Indemnitee by the counsel retained by the Indemnitor would be inappropriate due to actual or potential differing interests between such Indemnitee and any other party represented by such counsel in such proceedings. The indemnity obligation in this Article 12 shall not apply to amounts paid in settlement of any loss, claim, damage, liability or action if such settlement is effected without the consent of the Indemnitor, which consent shall not be withheld unreasonably or delayed. The failure to deliver notice to the Indemnitor within a reasonable time after the commencement of any such action, if materially prejudicial to its ability to defend such action, shall relieve ~~such~~ the Indemnitor of any liability to the Indemnitee under this Article 12 only to the extent such liability arises from the tardiness or absence of such notice, but the omission so to deliver notice to the Indemnitor will not relieve it of any liability that it may have to any Indemnitee otherwise than under this Article 12. The

CONFIDENTIAL
JH 003299

-27-

Indemnitee , its employees and agents, shall cooperate fully with the Indemnitor and its legal representatives in the investigation of any action, claim or liability covered by indemnification under this Article 12, at the expense of the Indemnitor.

12.8    Insurance.  Abbott shall at its expense maintain, through self-insurance or otherwise, product liability insurance with respect to the development, manufacture and, sale and use of Products and Program Compounds in such amount amounts and on such terms as Abbott customarily maintains with respect to its other similar products (and in any event on terms no less comprehensive and favorable than those Abbott currently maintains with respect to such other similar products).  Abbott shall maintain such insurance for so long as it continues to develop, manufacture or sell any Products or Program Compounds, and thereafter for so long as Abbott customarily currently maintains such insurance, for itself covering such manufacture or sales.

12.9    Survival.  The representations and warranties set forth in this Agreement shall survive the Execution Date.


### ARTICLE 13
### FORCE MAJEURE

Neither party shall be held liable or responsible to the other party nor be deemed to have defaulted under or breached this Agreement for failure or delay in fulfilling or performing any term of this Agreement when such failure or delay is caused by or results from causes beyond the reasonable control of the affected party including but not limited to fire, floods, embargoes, war, acts of war (whether war be declared or not), insurrections, riots, civil commotions, general strikes, lockouts or other labor disturbances, acts of God or acts, omission or delays in acting by any governmental authority. or the other party


### ARTICLE 14
### ASSIGNMENT

Except as expressly provided hereunder, this Agreement may not be assigned or otherwise transferred, nor may any right or obligations hereunder be assigned or transferred by either party without the consent of the other party; provided, however, that either party shall be obligated to assign this Agreement and its rights and obligations hereunder in connection with the transfer or sale of all or substantially all of its business pertaining to this Agreement, or in the event of its merger or consolidation or change in control or similar transaction and in such event such party shall cause its successor or transferee in such transaction to assume all of the obligations of such party.  Any permitted assignee shall assume all obligations of its assignor under this Agreement.  Notwithstanding the foregoing, John Hancock shall have right to assign without Abbott's consent any of its rights, in whole or in part, hereunder (but not its obligations) to any other person and such other person shall be permitted to enjoy and exercise all of the rights of John Hancock assigned to it.

CONFIDENTIAL
JH 003300

-28-

## ARTICLE 15
### SEVERABILITY

Each party hereby agrees that it does not intend its execution and delivery hereof or its performance hereunder to violate any public policy, statutory or common laws, rules, regulations, treaty or decision of any government agency or executive body thereof of any country or community or association of countries. In If any term or provision of this Agreement is held to be invalid, illegal or unenforceable by a court or other governmental authority of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement, which shall remain in full force and effect. The holding of a term or provision to be invalid, illegal or unenforceable in a jurisdiction shall not have any effect on the application of the term or provision in any other jurisdiction.

## ARTICLE 16
### MISCELLANEOUS

16.1    Notices.  Any consent, notice or report required or permitted to be given or made under this Agreement by one of the parties hereto to the other shall be in writing, delivered personally or by facsimile (and promptly confirmed by personal delivery, U.S. first class mail or courier), U.S. first class mail or courier, postage prepared (where applicable), addressed to such other party at its address indicated below, or to such other address as the addressee shall have last furnished in writing to the addressor and (except as otherwise provided in this Agreement) shall be effective upon receipt by the addressee.

|  |  |
|---|---|
| If to John Hancock: | John Hancock Life Insurance Company<br>200 Clarendon Street, T-57<br>Boston, MA  02117<br>Attention: Bond & Corporate Finance Group<br>Fax: 617/572-1628 |
| copy to: | John Hancock Life Insurance Company<br>200 Clarendon Street, T-50<br>Boston, MA  02117<br>Attention: Investment Law Division<br>Fax: 617/572-9268 |
| If to Abbott: | Abbott Laboratories<br>Dept. 309, Bldg. AP30<br>200 Abbott Park Road<br>Abbott Park, IL 60064-3537<br>Attention:    President, Pharmaceutical<br>                    Products Division<br>Fax: |

**CONFIDENTIAL**
**JH 003301**

-29-

copy to:    General Counsel
Abbott Laboratories
Dept. 364, Bldg. AP6D
100 Abbott Park Road
Abbott Park, IL 60064-6020
Fax: _____

16.2    Applicable Law. The Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois. Abbott, to the extent that it may lawfully do so, hereby consents to service of process, and to be sued, in the Commonwealth of Massachusetts and consents to the exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts, as well as to the jurisdiction of all courts to which an appeal may be taken from such courts, for the purpose of any suit, action or other proceeding arising out of any of its obligations hereunder or thereunder or with respect to the transactions contemplated hereby or thereby, and expressly waives any and all objections it may have as to venue in any such courts. Abbott further agrees that a summons and complaint commencing an action or proceeding in any of such courts shall be properly served and shall confer personal jurisdiction if served personally or by certified mail to it at its address for notices as provided in this Agreement or as otherwise provided under the laws of the Commonwealth of Massachusetts. THE PARTIES EACH IRREVOCABLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY SUIT, ACTION OR OTHER PROCEEDING INSTITUTED BY OR AGAINST IT IN RESPECT OF ITS OBLIGATIONS HERBUNDER OR THERBUNDER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

16.3    Entire Agreement. This Agreement contains the entire understanding of the parties with respect to the subject matter hereof. All express or implied agreements and understandings, either oral or written, with respect to the subject matter hereof heretofore made are expressly merged in and made a part of this Agreement. This Agreement may be amended, or any term hereof modified, only by a written instrument duly executed by both parties hereto.

16.4    Headings. The captions to the several Articles and Sections thereof are not a part of this Agreement, but are merely guides or labels to assist in locating and reading the several Articles and Sections hereof.

16.5    Independent Contractors. It is expressly agreed that John Hancock and Abbott shall be independent contractors and that the relationship between the two parties shall not constitute a partnership, joint venture or agency. Neither John Hancock nor Abbott shall have the authority to make any statements, representations or commitments of any kind, or to take any action, which shall be binding on the other, without the prior consent of the other party to do so.

16.6    Performance By Affiliates, Licensees and Subcontractors. The parties recognize that Abbott may carry out certain obligations under this Agreement through performance by the its Affiliates, Licensees and Subcontractors (but in no event shall that relieve Abbott of any of its obligations hereunder). Abbott guarantees that the activities of its Affiliates, Licensees and Subcontractors under this Agreement shall comply with this Agreement.

**CONFIDENTIAL**
**JH 003302**

-30-

16.7    Alternative Dispute Resolution. The parties shall attempt to amicably resolve disputes arising between them regarding the validity, construction, enforceability or performance of the terms of this Agreement, and any differences or disputes in the interpretation of the rights, obligations, liabilities and/or remedies hereunder, which have been identified in a written notice from one party to the other, by good faith settlement discussions between the President of Abbott's Pharmaceutical Products Division and the ~~President and Chief Executive Officer~~ Managing Director of John Hancock or his designee. The parties agree that any dispute that arises in connection with this Agreement, which cannot be amicably resolved by such representatives within thirty (30) days after the receipt of such written notice, shall be resolved by binding Alternative Dispute Resolution ("ADR") in the manner described in Exhibit 16.7 [please provide] attached hereto.

16.8    Waiver. The waiver by either party hereto of any right hereunder or the failure to perform or of a breach by the other party shall not be deemed a waiver of any other right hereunder or of any other breach or failure by said other party whether of a similar nature or otherwise.

16.9    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[the remainder of this page is intentionally blank]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the ~~dat~~ date first set forth above.

JOHN HANCOCK LIFE
INSURANCE COMPANY                    ABBOTT LABORATORIES[, INC.]


By: _____        By: _____

Title: _____     Title: _____

CONFIDENTIAL
JH 003303

-31-

EXHIBIT ~~1.3~~ 1

ANNUAL RESEARCH PLAN - FIRST PROGRAM YEAR

EXHIBIT ~~1.21~~ 1

PROGRAM COMPOUNDS

ABT 980 - BPH Back-up (phase III)
ABT 627 - Prostate and other cancer (phase III)
ABT 773 - Oral/pediatric/IV (late phase II)
ABT 594 - Neurological/bone/acute pain (late phase II)
E7010 - Cancer (phase II)
ABT 518 - Cancer (phase I)
FTI - Cancer (late preclinical)
Urokinase - Cancer (preclinical)

EXHIBIT 16.7

ALTERNATIVE DISPUTE RESOLUTION

CONFIDENTIAL
JH 003304

-32-

------------------ COMPARISON OF FOOTNOTES ------------------

------------------ COMPARISON OF HEADERS ------------------

-HEADER 1-
-2-ii-
⊥C

-HEADER 2-
-i-

-HEADER 2 3-
Header Discontinued

------------------ COMPARISON OF FOOTERS ------------------

-FOOTER 1-

3166832.3

CONFIDENTIAL
JH 003305

-33-

This redlined draft, generated by CompareRite (TM) - The Instant Redliner, shows the differences between -
original document   : C:\WINDOWS\TEMP\EXCHANGE_3166832_1
and revised document: C:\WINDOWS\TEMP\EXCHANGE_3166832.3

CompareRite found  499 change(s) in the text
CompareRite found   3 change(s) in the notes

Deletions appear as Overstrike text
Additions appear as Double Underline text

CONFIDENTIAL
JH 003306

CHS Draft 10/4/00

RESEARCH FUNDING AGREEMENT

by and between

ABBOTT LABORATORIES, [INC.]

and

JOHN HANCOCK LIFE INSURANCE COMPANY

dated as of

October ___, 2000

CONFIDENTIAL
JH 003307

# Deposition Exhibit 6

# Part 2

-i-

## TABLE OF CONTENTS

ARTICLE 1 - DEFINITIONS ..................................................................................................... 1
ARTICLE 2 - ANNUAL RESEARCH PROGRAM ................................................................. 8
    2.1    Program Term ................................................................................................................. 8
    2.2    Research Plan ................................................................................................................. 8
    2.3    Conduct of Research ...................................................................................................... 8
    2.4    Subcontracting Research ............................................................................................... 8
    2.5    Research Reports and Records ...................................................................................... 8
ARTICLE 3 - RESEARCH FUNDING ..................................................................................... 9
    3.1    John Hancock Program Payments ................................................................................. 9
    3.2    Abbott Program Payments ............................................................................................ 9
    3.3    Carryover Provisions .................................................................................................... 9
    3.4    Termination of John Hancock's Program Payment Obligation ................................... 10
    3.5    Hancock Funding Obligation ...................................................................................... 10
    3.6    Calculation of Expenditures ........................................................................................ 10
ARTICLE 4 - PRODUCT RESEARCH AND DEVELOPMENT .......................................... 11
    4.1    Commercially Reasonable Efforts .............................................................................. 11
    4.2    Marketing and Sale Responsibility ............................................................................ 11
    4.3    Alternative Compounds ............................................................................................... 11
    4.4.    Endothelin .................................................................................................................. 12
    4.5.    Arm's-Length ............................................................................................................. 13
ARTICLE 5 - PROGRAM INVENTIONS .............................................................................. 13
    5.1    Ownership ................................................................................................................... 13
    5.2    Patent Prosecution and Maintenance ......................................................................... 13
    5.3    Enforcement ................................................................................................................ 13
ARTICLE 6 - MILESTONE PAYMENTS TO JOHN HANCOCK ........................................ 14
    6.1    Closing Fee ................................................................................................................. 14
    6.2    Management Fee ......................................................................................................... 14
    6.3    Milestone Notification and Payments ........................................................................ 14
ARTICLE 7 - ROYALTIES ..................................................................................................... 15
    7.1    Royalty Rates ............................................................................................................. 15
    7.2    Royalty Term .............................................................................................................. 15
ARTICLE 8 - ROYALTY REPORTS AND ACCOUNTING ................................................. 16
    8.1    Reports, Exchange Rates ............................................................................................ 16
    8.2    Audits ......................................................................................................................... 16
    8.3    Confidential Financial Information ............................................................................ 17
    8.4    Accounting Principles ................................................................................................ 17
ARTICLE 9 - PAYMENTS ...................................................................................................... 17
    9.1    Payment Terms ........................................................................................................... 17
    9.2    Payment Method ........................................................................................................ 18
    9.3.    Withholding Taxes ..................................................................................................... 18
    9.4    Late Payments ............................................................................................................ 18
ARTICLE 10 - CONFIDENTIALITY ..................................................................................... 18
    10.1    Nondisclosure Obligations ....................................................................................... 18
    10.2    Permitted Disclosures .............................................................................................. 18
    10.3    Publicity Review ...................................................................................................... 19

CONFIDENTIAL
JH 003308

-ii-

ARTICLE 11- TERM AND TERMINATION..................................................................19
  11.1  Expiration .................................................................................................19
  11.2  Material Breach .........................................................................................19
  11.3  Effect of Expiration of Termination ........................................................19
  11.4  Bankruptcy ...............................................................................................20
ARTICLE 12 - WARRANTIES AND INDEMNITY ......................................................20
  12.1  John Hancock Representations and Warranties .......................................20
  12.2  Abbott Representations and Warranties ..................................................20
  12.3  No Conflict ...............................................................................................23
  12.4  Compliance with Law ..............................................................................23
  12.5  Certain Breaches.......................................................................................23
  12.6  Indemnification of John Hancock ............................................................23
  12.7  Procedure..................................................................................................24
  12.8  Insurance...................................................................................................24
  12.9  Survival.....................................................................................................24
ARTICLE 13 - FORCE MAJEURE.................................................................................25
ARTICLE 14 - ASSIGNMENT .......................................................................................25
ARTICLE 15 - SEVERABILITY......................................................................................25
ARTICLE 16 - MISCELLANEOUS ................................................................................25
  16.1  Notices......................................................................................................26
  16.2  Applicable Law.........................................................................................26
  16.3  Entire Agreement......................................................................................27
  16.4  Headings...................................................................................................27
  16.5  Independent Contractors ..........................................................................27
  16.6  Performance By Affiliates ........................................................................27
  16.7  Alternative Dispute Resolution ................................................................27
  16.8  Waiver ......................................................................................................27
  16.9  Counterparts .............................................................................................27

| | |
|---|---|
| EXHIBIT 1.__: | Annual Research Plan - First Program Year |
| EXHIBIT 1.__: | List of Program Compounds |
| EXHIBIT 6.__: | Program Compound Status |
| EXHIBIT 9.2: | Wiring Instructions for John Hancock |
| EXHIBIT 12.2(d): | Program Compound Detail |
| EXHIBIT 12.2(e): | Patents, etc. |
| EXHIBIT 16.7: | Alternative Dispute Resolution |

CONFIDENTIAL
JH 003309

CHS Draft 10/4/00

## RESEARCH FUNDING AGREEMENT

This Research Funding Agreement is made as of _____, 2000, by and between Abbott Laboratories, [Inc.?], an Illinois corporation ("Abbott"), with its principal offices at 100 Abbott Park Road, Abbott Park, Illinois 60064-6049, and John Hancock Life Insurance Company, a Massachusetts corporation ("John Hancock"), with its principal offices at 200 Clarendon Street, Boston, Massachusetts 02117.

### WITNESSETH

WHEREAS, Abbott is a global healthcare company actively engaged in the research and development of human pharmaceutical products;

WHEREAS, Abbott is interested in obtaining additional funding to support such research and development activities with respect to certain pharmaceutical products which are under development; and

WHEREAS, John Hancock is interested in providing such additional funding in exchange for the right to receive future milestone and royalty payments from Abbott.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and undertakings contained herein, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

In addition to the other terms defined elsewhere herein, the following terms shall have the following meanings when used in this Agreement (and any term defined in the singular shall have the same meaning when used in the plural and vice versa, unless stated otherwise):

1.1     "Affiliate" shall mean, with respect to each party, any corporation or other form of business organization, which directly or indirectly owns, controls, is controlled by, or is under common control with, such party.  An entity shall be regarded as being in control of another entity if the former entity has the direct or indirect power to order or cause the direction of the policies of the other entity whether (i) through the ownership of fifty percent (50%) or more in the United States, or thirty percent (30%) or more outside the United States, of the outstanding voting securities (or other ownership interest for a business organization other than a corporation) of that entity; or (ii) by contract, statute, regulation or otherwise.

1.2     "Aggregate Carryover Amount" shall have the meaning given in Section 3.3.

1.3     "Aggregate Spending Target" shall mean Six Hundred Twenty Million Dollars ($620,000,000), such amount being the sum of the aggregate Program Payments to be made by

3166832.3

CONFIDENTIAL
JH 003310

-2-

John Hancock pursuant to Section 3.1 and the aggregate expenditures to be made by Abbott pursuant to Section 3.2.

1.4    "Annual Carryover Amount" shall have the meaning given in Section 3.3.

1.5    "Annual Research Plan" shall mean a reasonably and consistently detailed statement of Abbott's objectives, activities, timetable, FTE allocation and budget for its research and development activities related to the Program Compounds for every Program Year remaining in the Program Term.  The Annual Research Plan for the first Program Year is attached as Exhibit 1.  .

1.6    "Annual Minimum Spending Target" for each Program Year shall mean the sum of (i) the Program Payment of John Hancock for such Program Year as specified in Section 3.1 (without giving effect to any deferral or other change under Section 3.3), (ii) Fifty Million Dollars ($50,000,000), and (iii) any Annual Carryover Amount for such Program Year pursuant to Section 3.3.

1.7    "Bundled Product" shall have the meaning given in paragraph (b) of the definition of Net Sales.

1.8    "Combination Product" shall mean any product containing one or more Program Compounds combined as a single pharmaceutical product with one or more other therapeutically active ingredients.

1.9    "Commercially Reasonable Efforts" [subject to discussion] shall mean efforts which are consistent with those normally used by other pharmaceutical companies with respect to other pharmaceutical products which are of comparable [potential] commercial value and market potential at a similar stage of development or product life, taking into account, without limitation, issues of safety and efficacy, product profile, proprietary status, the regulatory environment and the status of the product and other relevant scientific factors; provided that, with respect to a particular Program Compound or Product, the existence of any other compound or product shall not be taken into account, including, without limitation, any compounds or products (i) in the marketplace or under development by Abbott or any other person, (ii) licensed (in-licensed or otherwise), purchased or acquired by Abbott or its Affiliates, (iii) acquired by Abbott or its Affiliates as a result of any merger or of sale of equity or assets and (iv) in existence, in the marketplace, under development or licensed (in-licensed or otherwise), purchased or acquired by any person that acquires Abbott or its Affiliates as a result of any merger or of sale of equity or assets (and, as a result in any case, shall not reduce or otherwise change the efforts required of Abbott hereunder).

1.10    "Confidential Information" shall have the meaning given in Section 10.2.

1.11    "Delivery System Product" shall have the meaning given in the definition of Net Sales.

1.12    "Dollars" or "$" means United States dollars.

CONFIDENTIAL
JH 003311

-3-

1.13   "Eisai Agreement" shall mean the [agreement] dated _____ between Eisai Co. Ltd. and Abbott related to the Program Compound "E7010".

1.14   "Execution Date" shall mean the date set forth in the introductory paragraph to this Agreement.

1.15   "FDA" shall mean the U.S. Food and Drug Administration or any successor entity thereto.

1.16   "FTE" shall mean the time and work output equivalent to one year of a full time employee who is proficient in the performance of all assigned duties and responsibilities.

1.17   "First Commercial Sale" shall mean the first sale of a Product in a given country by Abbott, its Affiliates or Licensees to an unrelated third person after Regulatory Approval has been granted in such country.

1.18   "Intellectual Property" shall have the meaning given Section 12.2.

1.19   "International Territory" shall mean all areas of the world outside the U.S. Territory (including Puerto Rico and the U.S. Virgin Islands).

1.20   "Investigational New Drug Application" shall have the meaning given Section 6.3.

1.21   "Licensee" shall mean any party directly licensed by Abbott or its Affiliates to distribute or sell Products pursuant to a written license agreement on arm's-length terms and conditions.

1.22   "Losses" shall mean any claims, demands, liabilities, costs, damages, judgments, settlements and other reasonable expenses (including attorneys' fees).

1.23   "NDA" shall mean a New Drug Application filed with the FDA for the purpose of obtaining Regulatory Approval of a Product in the U.S. Territory.

1.24   "Net Sales" shall mean:

(a)     the total gross sales of the Products (or, for purposes of clauses (b) and (c), the Bundled Products and Combination Products), in each case as set forth on the invoices for such sales by Abbott, its Affiliates and Licensees to unrelated third parties in any given period, plus, if applicable, the fair market value of all properties and services received in consideration of a sale of Products, Bundled Products or Combination Products, as applicable, by Abbott, its Affiliates and Licensees to unrelated third parties during such period, less the following deductions directly paid or actually incurred by Abbott, its Affiliates or Licensees during such period with respect to the sale of the Products, Bundled Products or Combination Products, as applicable, to the extent included in the gross invoiced sales price therefor:

CONFIDENTIAL
JH 003312

-4-

(i)    discounts, credits, rebates, allowances, adjustments, rejections, recalls and returns;

(ii)   price reductions or rebates, retroactive or otherwise, imposed by government authorities;

(iii)  sales, excise, turnover, inventory, value-added and similar taxes assessed on the royalty-bearing sale of Products;

(iv)   transportation, importation, insurance and other handling expenses directly chargeable to the royalty-bearing sale of Products;

(v)    charge backs granted to unaffiliated drug wholesalers; and

(vi)   the portion of management fees paid to unaffiliated group purchasing organizations that relate specifically to the royalty-bearing sale of Products.

(b)    With respect to a Product which is sold together with any other products and/or services in a country at a unit price, whether packaged together or separately (a "Bundled Product"), the Net Sales of such Bundled Product shall first be calculated in accordance with the definition of Net Sales under paragraph (a), and then the Net Sales of such Bundled Product shall be determined on a country-by-country basis as follows:

(i)    multiply the Net Sales of such Bundled Product in such country by the fraction A/(A+B) where A is the average selling price of such Product in such country when sold separately and B is the total of the average selling prices in such country of each such other product(s) and/or service(s) in such Bundled Product when sold separately; or

(ii)   if (x) either the average selling price of such Product or the total of the average selling prices of each such other products and/or services in such Bundled Product in such country is not available as of such date or (y) such Product is not sold separately in such country, multiply the Net Sales of such Bundled Product in such country by a percentage determined by the mutual agreement of the Parties which represents the proportionate economic value in such country of such Product relative to the economic value in such country contributed by the other products and/or services in such Bundled Product.

(c)    With respect to a Combination Product, the Net Sales of such Combination Product shall first be calculated in accordance with the definition of Net Sales under paragraph (a), and then the Net Sales of such

CONFIDENTIAL
JH 003313

-5-

Combination Product shall be determined on a country-by-country basis as follows:

(i)    multiply the Net Sales of such Combination Product in such country by the fraction A/(A+B), where A is the total of the average selling prices of the Program Compounds in such Combination Product, when sold separately in such country and B is the total of the average selling prices of each other therapeutically active ingredient when sold alone as a pharmaceutical product in such country; or

(ii)   if (x) either the average selling price of all Program Compounds in such Combination Product or the total of the average selling prices of each other therapeutically active ingredient in such Combination Product in such country is not available or (y) such Program Compounds are not sold separately in such country, multiply the Net Sales of such Combination Product by a percentage determined by mutual agreement of the Parties, which represents the proportionate economic value in such country of all Program Compounds in such Combination Product relative to the economic value in such country contributed by all other therapeutically active ingredients in such Combination Product.

(d)   For purposes of this paragraph (d), a "Premium Delivery System" means any delivery system comprising device(s), equipment, instrumentation or other components (but not solely containers or packaging) designed to assist in the administration of a Product[, such as the Abbott ADD-Vantage® System].  With respect to a Product which is sold together with a Premium Delivery System (a "Delivery System Product") in a country at a unit price, the Net Sales of such Delivery System Product shall first be calculated in accordance with the definition of Net Sales under paragraph (a), and then the Net Sales of such Product shall be determined on a country-by-country basis as follows:

(i)    if the Product is sold separately without the Premium Delivery System in a country, reduce the Net Sales of such Delivery System Product in such country by the amount that the average selling price of the Delivery System Product in such country exceeds the average selling price of such Product as sold separately in such country; or

(ii)   if the Product is not sold separately without the Premium Delivery System in such country, reduce Net Sales of such Delivery System Product by an amount, determined by mutual agreement of the Parties, which represents the proportionate economic value in such country added by the Premium Delivery System.

CONFIDENTIAL
JH 003314

-6-

(e)    With respect to Endothelin [define], if Endothelin is developed and marketed by Abbott for one or more cancer indications and one or more non-cancer indications, Net Sales shall be based upon sales of Product only for the cancer indication(s).  If the Product is sold with different dosage strengths for the cancer indications and non-cancer indications, Net Sales shall be calculated based on the sales of the dosage strength(s) which are approved by the FDA for the treatment of cancer.  If any dosage strength is the same for one or more cancer indications and one or more non-cancer indications, the Parties shall mutually agree to a formula, based upon IMS [define] or other market research data, that allocates the sales of such dosage strength between the cancer indication(s), which would be included as part of Net Sales, and the non-cancer indication(s) which would be excluded from Net Sales.

1.25    "Neutral" shall have the meaning given in Section 11.2.

1.26    "Parties" shall mean Abbott and John Hancock.

1.27    "Phase I Clinical Trial" shall mean those clinical trials which utilize a limited number of human beings to preliminarily address safety and to determine what doses can be safely tolerated.

1.28    "Phase II Clinical Trial" shall mean those controlled clinical trials, the primary objective of which is to ascertain additional data regarding the safety and tolerance of one of the Program Compounds and preliminary data regarding such Program Compound's efficacy.

1.29    "Phase III Clinical Trial" shall mean one or a series of controlled pivotal studies of a specific Product by administration of such Product to human beings where the principal purpose of such trial is to provide confirmatory safety and efficacy data necessary to support the filing for Regulatory Approval of a Product.

1.30    "Premium Delivery System" shall have the meaning given in paragraph (d) of the definition of Net Sales.

1.31    "Product" shall mean any product containing one or more of the Program Compounds as an active ingredient, alone or in combination with other active ingredients (including any Bundled Product and any Combination Product).

1.32    "Program Compounds" shall mean the preclinical, Phase I, Phase II, and Phase III compounds listed on Exhibit 1. _, as well as any substitute compounds added by Section 4.3, and any line extensions, any new formulations, all indications and any improvements, derivatives and modifications thereof; provided, however, that with respect to Endothelin, it shall only be considered a Program Compound to the extent that it is used to treat cancer.

1.33    "Program Inventions" shall have the meaning given in Section 5.1.

1.34    "Program Payments" shall have the meaning given in Section 3.1.

CONFIDENTIAL
JH 003315

-7-

1.35    "Program Related Costs" shall mean all direct [and indirect] costs and expenses that are spent by Abbott on the Research Program during a given Program Year and the milestone and license fees paid by Abbott to Eisai Co. Ltd. with respect to the Program Compound "E7010" pursuant to the Eisai Agreement. In no event shall (a) any payments made by Abbott to John Hancock pursuant hereto or (b) any overhead or similar charges or expenses, constitute Program Related Costs.

1.36    "Program Term" shall mean a period of four consecutive (4) Program Years.

1.37    "Program Year" shall mean a period of twelve (12) consecutive calendar months, with the first Program Year commencing on _____, 2000 and each subsequent Program Year commencing on the anniversary of such date.

1.38    "Quarterly Reporting Period" shall mean the calendar quarter with respect to the U.S. Territory and a fiscal quarter ending on the final day of February, May, August and November (as the case may be) for the International Territory; provided, however, that if Abbott adopts the calendar year as its fiscal year for the International Territory, then the Quarterly Reporting Period for the International Territory shall also be the calendar quarter.

1.39    "Research Program" shall mean all of Abbott's, its Affiliates and Subcontractors' activities directed towards obtaining Regulatory Approval for the Products, including research, development, safety and efficacy studies, clinical trials, process development, formulation work, regulatory, quality, data collection and analysis and project management.

1.40    "Regulatory Approval" shall mean: (i) with respect to the U.S. Territory, the receipt of approval from the FDA to market a Product in the U.S. Territory; and (ii) with respect to any country in the International Territory, receipt of the governmental approvals required to market a Product in such country, including any pricing and reimbursement authorization required in such country.

1.41    "Royalty Term" shall mean, with respect to each Product in each country, a period of ten (10) years from the date of First Commercial Sale of such Product in such country.

1.42    "Subcontractor" shall have the meaning given in Section 2.4.

1.43    "Territory" shall mean both the U.S. Territory and the International Territory.

1.44    "U.S. Territory" shall mean the United States of America, excluding Puerto Rico and the U.S. Virgin Islands.

CONFIDENTIAL
JH 003316

-8-

## ARTICLE 2
## ANNUAL RESEARCH PROGRAM

2.1    <u>Program Term</u>.  The Research Program shall be conducted by Abbott during the Program Term, and beyond the Program Term until Abbott either abandons development in accordance with the terms hereof or receives Regulatory Approval for each Program Compound.

2.2    <u>Research Plan</u>.  The Research Program shall be conducted by Abbott in each Program Year in accordance with the Annual Research Plan for such Program Year.  The Annual Research Plan will be provided to John Hancock until Abbott either abandons development in accordance with the terms hereof or receives Regulatory Approval for each Program Compound. The Annual Research Plan shall be prepared by Abbott and presented to John Hancock at least sixty (60) days prior to the start of each Program Year.  The Annual Research Plan for the first Program Year is attached as <u>Exhibit 1.    </u>.  Abbott may modify the Annual Research Plan from time to time in order to best meet the objectives of the Research Program.  Any such modifications to the Annual Research Plan shall be promptly provided to John Hancock.

2.3    <u>Conduct of Research</u>.  Abbott shall use Commercially Reasonable Efforts to conduct the Research Program in good scientific manner and using good laboratory practices, to achieve the objectives of the Research Program efficiently and expeditiously and to comply with all applicable laws and regulations.  Notwithstanding anything in this Agreement to the contrary, Abbott does not represent, warrant or guarantee that the Research Program will be successful in whole or in part or result in the registration or commercialization of any pharmaceutical products or that any Products obtaining Regulatory Approval will be a commercial success.

2.4    <u>Subcontracting Research</u>.  Abbott may subcontract or outsource to Affiliates or third persons (each, a "<u>Subcontractor</u>") any portion of the Annual Research Plan.  Each Subcontractor shall enter into a confidentiality agreement with Abbott and agreements acknowledging Abbott's exclusive ownership of the Program Compounds and shall comply with the terms hereof and with all applicable laws and regulations, including good laboratory practices, with respect to its work on the Research Program.  Abbott shall supervise and be responsible under this Agreement for the work of such Subcontractor on the Research Program and no subcontracting or outsourcing shall relieve Abbott of any of its obligations hereunder.

2.5    <u>Research Reports and Records</u>.  Abbott shall on an annual basis [<u>no later than the last day of each Program Year</u>][<u>This report must be provided before John Hancock can be obligated under section 3 to make a subsequent Program Payment</u>], provide John Hancock with a reasonably detailed report setting forth the status of the Research Program and all Program Related Costs expended by Abbott during such Program Year.  Such report shall also contain such other information related thereto as John Hancock may reasonably request from time to time.  Abbott shall, and shall cause each Subcontractor to, maintain complete and accurate records, in sufficient detail and in good scientific manner appropriate for patent and regulatory purposes and for purposes of demonstrating compliance with the terms hereof, that fully and properly reflect all work done, results achieved and Program Related Costs expended in performance of the Research Program.  The books and records of Abbott and each Subcontractor related to the Research Program, including, without limitation, those related to the expenditure of Program Related Costs, shall be subject to copying, inspection and audit by (and at the expense

**CONFIDENTIAL**
**JH 003317**

-9-

of) John Hancock at any time and from time to time. Such audit shall occur upon reasonable notice and during normal business hours by an independent auditor selected by John Hancock and reasonably acceptable to Abbott. John Hancock and its independent auditor shall maintain such records and information of Abbott in confidence in accordance with Article 10 and shall not use such records or information except to the extent permitted by this Agreement, including any enforcement of the provisions hereof. In the event that such audit reveals any breach of Abbott's responsibilities hereunder, Abbott shall (i) pay the fees and expenses charged by such auditor, (ii) fully and promptly cure such breach and (iii) all documents reviewed in the audit will be copied and delivered to John Hancock at its request.

ARTICLE 3
RESEARCH FUNDING

3.1    John Hancock Program Payments. John Hancock shall make the following installment payments for the applicable Program Year to Abbott to help support the Research Program (the "Program Payments"):

| Payment Date | Payment Amount | Program Year |
|---|---|---|
| Execution Date | $50,000,000 | first |
| First Anniversary of Execution Date | $55,000,000 | second |
| Second Anniversary of Execution Date | $55,000,000 | third |
| Third Anniversary of Execution Date | $60,000,000 | fourth |

Such funds shall be expended by Abbott on Program Related Costs and not for any other purpose.

3.2    Abbott Program Payments. Abbott shall spend on Program Related Costs: (i) at least the Annual Minimum Spending Target for and during each Program Year and (ii) at least the Aggregate Minimum Spending Target for and during the Program Term. John Hancock's sole and exclusive remedies for Abbott's failure to fund the Research Program in accordance with this Section 3.2 (but not for any other breach of Abbott's other obligations) are set forth in Sections 3.3, 3.4 and 7.2.

3.3    Carryover Provisions. Abbott shall be permitted to change its funding obligations under Section 3.2 only as follows:

(i)    If in any Program Year Abbott spends on Program Related Costs, the full amount of the Program Payment provided by John Hancock for such Program Year, but does not spend the full amount of the Annual Minimum Spending Target for such Program Year (including any Annual Carryover Amounts from any prior Program Years), Abbott will spend the difference between its expenditure on Program Related Costs for such Program Year and the Annual Minimum Spending Target for such Program Year (the "Annual Carryover Amount") in the subsequent Program Year. John Hancock's obligation to make any Program Payment for such subsequent

CONFIDENTIAL
JH 003318

-10-

Program Year, if any, pursuant to Section 3.1, shall be deferred until the time that Abbott notifies John Hancock that it has spent the Annual Carryover Amount in such subsequent Program Year; and

(ii)     If in each Program Year Abbott spends on Program Related Costs at least the Annual Minimum Spending Target but does not expend the full amount of the Aggregate Spending Target during the Program Term, Abbott will expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the "Aggregate Carryover Amount") on Program Related Costs during the subsequent fiscal year commencing immediately after the end of the Program Term. If Abbott does not spend the Aggregate Carryover Amount on Program Related Costs during such subsequent fiscal year, Abbott will refund to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days of the end of such subsequent fiscal year.

3.4     Termination of John Hancock's Program Payment Obligation. If Abbott: (i) abandons development of all Program Compounds during the Program Term; (ii) does not expend during any Program Year the full amount of the Program Payment provided by John Hancock for such Program Year; (iii) fails to timely deliver its Annual Research Plan for any year in accordance with Section 2.2 or does not reasonably demonstrate in its Annual Research Plan, its intent and reasonable expectation to expend Program Related Costs during the next Program Year in excess of the Program Payment provided by John Hancock for such year; or (iv) does not reasonably demonstrate, in its Annual Research Plan, its intent and reasonable expectation to expend Program Related Costs during the Research Term in excess of the Aggregate Spending Target, John Hancock's obligation to make any remaining Program Payments pursuant to Section 3.1 shall cease. In addition, in the case of either (i) or (ii) above, Abbott shall refund (not later than the 10th day following such event) to John Hancock the Program Payment for such year minus half of the Program Related Costs actually spent by Abbott during that Program Year.

3.5     Hancock Funding Obligation. John Hancock's entire obligation hereunder shall be limited to providing the Program Payments set forth in Section 3.1. Abbott shall be solely responsible for funding all Program Related Costs in excess of the Program Payments from John Hancock.

3.6     Calculation of Expenditures. Notwithstanding anything else in this Agreement, for purposes of calculating whether Abbott has spent, or is projected to have spent, Program Related Costs in excess of (i) the Annual Minimum Spending Target for the first Program Year and (ii) the Aggregate Spending Target for the Program Term, Abbott shall be entitled to include within such calculations all cost and expenses incurred on or after [_____], 2000 up to the Execution Date, which would have otherwise qualified as Program Related Costs in the event that the period from [_____], 2000 to the Execution Date had been included within the first Program Year (and the Program Term). This extension of the first Program Year for the determination of whether the Annual Minimum Spending Target for the first Program Year and

CONFIDENTIAL
JH 003319

-11-

the Aggregate Spending Target are met, takes into consideration that Abbott was funding all research and development cost for the Program Compounds commencing [_____], 2000.

## ARTICLE 4
## PRODUCT RESEARCH AND DEVELOPMENT

4.1    Commercially Reasonable Efforts.  Abbott shall be solely responsible for the clinical development, government approval, manufacturing, marketing, sales and distribution of Products.  Abbott will use, and will cause each of its Affiliates and Licensees to use, Commercially Reasonable Efforts to pursue the clinical development, government approval, manufacturing, marketing, sales and distribution of Products throughout the Territory.  The obligations of Abbott, its Affiliates and Licenses with respect to any Product under this Article 4 are expressly conditioned upon the safety, efficacy and commercial feasibility of each Product, but no license, assignment or other transfer of rights by Abbott (by operation of Article 14 or otherwise) will modify or reduce Abbott's obligations hereunder.  [It is the parties' expectation that under normal circumstances][addressed by proviso at end of sentence?] Abbott will file for Regulatory Approval with respect to each Product in Europe within two (2) years from the date of the NDA filing for such Product in the U.S. Territory and in Japan within five (5) years from such NDA filing date; provided, however, that these time frames may be extended or otherwise altered based upon unforeseen circumstances that legitimately impact such regulatory filings in such foreign jurisdictions.

4.2    Marketing and Sale Responsibility.  Without limiting the generality of Section 4.1, within six (6) months of obtaining Regulatory Approval for a Product in a given country, Abbott, its Affiliates or Licensees shall commence to market and sell such Product in such country.  Abbott's obligation to market and sell a Product shall not apply [Why doesn't "Commercially Reasonable Efforts" address all of this?] to a Product in any country if Abbott has not commenced or has ceased marketing and selling such Product in such country substantially/primarily on account of adverse business or financial conditions caused by the regulatory authorities or other governmental authorities of such country (including not commencing marketing and selling in a country where the regulatory authorities have price or reimbursement approval and the price or reimbursement approval [or that proposed by the regulatory authorities or government authorities] is unacceptable to Abbott) which causes the marketing and sale of such Product in such country to be contrary to the financial best interests of John Hancock and Abbott; provided, however, that Abbott, its Affiliates or Licensees shall commence or resume marketing and sale of such Product in such country as soon as reasonably practical after such adverse business or financial conditions cease to exist.

4.3    Alternative Compounds.  [subject to discussion]  In the event that Abbott

(a)    divests or out-licenses a Program Compound (which shall mean a sale, license or other transfer by Abbott following which Abbott and its Affiliates no longer have the exclusive right in (i) North America or (ii) at least two-thirds (by population) of Japan and Western Europe (consisting of [the European Union]), to [develop and sell] any Product containing such Program Compound); or

CONFIDENTIAL
JH 003320

-12-

    (b)      fails or ceases to research, develop, market, distribute or sell any Program Compound or Product for any reason that is not clearly consistent with using its Commercially Reasonable Efforts; or

    (c)      fails or ceases to develop any Program Compound beyond a preclinical or Phase I Clinical Trial,

Abbott shall give John Hancock a choice among three (3) alternative compounds as a substitute for such Program Compound (and, in the case of subsection (a) above, John Hancock shall additionally have the alternative choice of retaining its rights hereunder with respect to such Program Compound), provided that John Hancock reasonably agrees that at least two (2) of the alternative compounds then have a similar market opportunity and are in a comparable stage of development or have a better development and risk profile than such Program Compound. Upon selection by John Hancock, such selected alternative compound shall thereafter be treated hereunder as a Program Compound (including applicability of the representations and warranties herein with respect thereto as of the date it is added to the Research Program), but such selection will not occur unless John Hancock notifies Abbott of its selection of one of the alternative compounds (or of retaining its rights with respect to the Program Compound) within thirty (30) days from the date that Abbott proposes the alternative compounds to John Hancock and provides John Hancock with information about such alternative compounds of the same scope as that provided to John Hancock with respect to the initial Program Compounds and such additional information as John Hancock may reasonably request. In addition, such thirty (30) day period shall be extendable by another forty-five (45) days by written notice to such effect from John Hancock to Abbott within such initial thirty (30) day period.

If, in the case of subsection (a) above, John Hancock elects to retain its rights hereunder with respect to a Program Compound that has been divested or out-licensed, Abbott shall cause the transferee thereof to acknowledge and agree to the terms of this Agreement as applied to such Program Compound pursuant to such agreements and other instruments as are reasonable acceptable to John Hancock.

[In addition, whether or not John Hancock elects to retain its rights with respect to a Program Compound, in the event that Abbott divests or out-licenses such Program Compound under the circumstances described in subsection (a) above, any initial or lump-sum payment received by Abbott or its Affiliates with respect thereto shall be added to and included in the Net Sales as of the date such payment is due and payable to Abbott.]

    4.4.    <u>Endothelin</u>. With respect to Endothelin, if Abbott, its Affiliates or Subcontractors initiates a Phase [II] Clinical Trial for one or more non-cancer indications [within ____ years from the date of this Agreement], Abbott will provide notice thereof to John Hancock together with information similar to that which John Hancock received in connection with the Program Compounds hereunder. Abbott will provide additional information concerning Endothelin and such trial as reasonably requested by John Hancock. Abbott agrees to give John Hancock the option, exercisable in John Hancock's sole discretion, to provide approximately ____% of the additional research funding required with respect to Endothelin for all non-cancer indications (not to exceed $_____), on terms and conditions that will (i) provide a projected rate of

**CONFIDENTIAL**
**JH 003321**

-13-

return to John Hancock that is at least as good as the projected rate of return provided herein with respect to the Program Compounds as of the date hereof and (ii) be negotiated in good faith by the Parties. Unless John Hancock shall have notified Abbott of its exercise of such option, such option will expire [_____] months after John Hancock receives the information requested by it as described above.

4.5. Arm's-Length. Abbott shall not research, develop, manufacture, market, sell, distribute, out-license or otherwise treat any Program Compounds or Products differently, as compared to any other Abbott compounds or products, on account of any of John Hancock's rights hereunder. Furthermore, all distribution agreements, licenses, out-licenses and other agreements relating to the research, development, manufacturing, marketing, sale, distribution, licensing, out-licensing or divestiture of and all other transactions involving any Program Compounds or Products to or with any third party (except to Abbott's Affiliates) shall be on arm's-length terms and conditions.

## ARTICLE 5
## PROGRAM INVENTIONS

5.1 Ownership. All inventions, innovations, ideas, discoveries, technology, know-how, methods, data, applications and products (in each case whether or not patentable) arising from the Research Program or otherwise related to the Program Compounds (collectively, the "Program Inventions") shall be exclusively owned by or assigned to Abbott and Abbott shall not divest or otherwise transfer any right, title or interest in or to any Program Inventions to any other person except in accordance with Sections 4.3 and 4.5.

5.2 Patent Prosecution and Maintenance. Abbott will use Commercially Reasonable Efforts to obtain broad patent protection for the Program Inventions. Abbott shall be responsible for all costs and expenses and control all decisions related to filing for patent protection, including the preparation, filing (foreign and/or domestic), prosecution, issuance and maintenance of patent applications or patents covering Program Inventions.

5.3 Enforcement. Abbott shall have the sole right and authority to enforce the patents or any other rights arising from Program Inventions against any infringers. If Abbott initiates any action or lawsuit to enforce such patents or other rights, it shall be solely responsible for the cost and expense thereof. Abbott will promptly notify John Hancock at such time as it becomes aware of any infringement activities and of any such enforcement actions or lawsuit, and Abbott will provide information concerning them as reasonably requested by John Hancock. All moneys recovered upon the final judgment or settlement of any such action or lawsuit shall be added to and included in the Net Sales (for the years in each Royalty Term with respect to which such action or lawsuit concerns), less the out-of-pocket cost and expense thereof; provided that if such recovered moneys represent something other than Net Sales by the infringer (e.g., lost profits or a royalty), Abbott agrees to allocate a portion of the recovered moneys to John Hancock so as to approximate the appropriate royalty on Net Sales by the infringer during each year of the Royalty Terms.

**CONFIDENTIAL**
**JH 003322**

17

# Deposition Exhibit 17



# CHOATE, HALL & STEWART

Tel: (617) 248-5051                                                        (617) 248-4000

No. of Pages:        9      (including this page)

Date:           March 9, 2001

To:             Daphne Pals                          847-938-1206
                Phil Deemer                          847-938-5852

cc:             Steve Blewitt                        617-572-1628
                Amy Weed                             617-572-9268

From:           Brewster Lee

Client No.:     0394410-0127 (Abbott)

Re:             Attached please find our comments on the most recent draft of the
                Research Funding Agreement. Please feel free to call.



If this transmission is incomplete or illegible, please call Carolyn Hunt at (617) 248-4874.

This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this transmission is not the intended recipient, or the employee or agent responsible for delivering the transmission to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us by regular mail at Exchange Place, 53 State Street, Boston, Massachusetts 02109. Thank you.

cc: K. Tormey

CONFIDENTIAL
JH 008376

-ii-



CH+S
3/9

RESEARCH FUNDING AGREEMENT

by and between

ABBOTT LABORATORIES


and

JOHN HANCOCK LIFE INSURANCE COMPANY,

JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY,

AND      and   ℓ.c.

INVESTORS PARTNER LIFE INSURANCE COMPANY

dated as of

March ___, 2001

H:\Jones\TJH rfa 010309.DOC          Last printed 3/9/01 11:16 AM

CONFIDENTIAL
JH 008377



### RESEARCH FUNDING AGREEMENT

This Research Funding Agreement is made as of March ___, 2001, by and between Abbott Laboratories, an Illinois corporation ("Abbott"), with its principal offices at 100 Abbott Park Road, Abbott Park, Illinois 60064-6049, and John Hancock Life Insurance Company, a Massachusetts corporation, and John Hancock Variable Life Insurance Company, a Massachusetts corporation, and Investors Partner Life Insurance Company (other Hancock purchasers? ) ("John, a Delaware corporation (collectively, John Hancock"), each with its principal offices at 200 Clarendon Street, Boston, Massachusetts 02117.

*chg. not marked ?*

#### WITNESSETH

WHEREAS, Abbott is a global healthcare company actively engaged in the research and development of human pharmaceutical products;

WHEREAS, Abbott is interested in obtaining additional funding to support such research and development activities with respect to certain pharmaceutical products which are under development; and

WHEREAS, John Hancock is interested in providing such additional funding in exchange for the right to receive future milestone and royalty payments from Abbott.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and undertakings contained herein, the parties hereto agree as follows:

#### ARTICLE I
#### DEFINITIONS

In addition to the other terms defined elsewhere herein, the following terms shall have the following meanings when used in this Agreement (and any term defined in the singular shall have the same meaning when used in the plural and vice versa, unless stated otherwise):

1.1    "Affiliate" shall mean, with respect to each party, any corporation or other form of business organization, which directly or indirectly owns, controls, is controlled by, or is under common control with, such party. An entity shall be regarded as being in control of another entity if the former entity has the direct or indirect power to order or cause the direction of the policies of the other entity whether (i) through the ownership of more than fifty percent (50%) in the United States, or thirty percent (30%) or more outside the United States, of the outstanding voting securities (or other ownership interest for a business organization other than a corporation) of that entity; or (ii) by contract, statute, regulation or otherwise.

1.2    "Aggregate Carryover Amount" shall have the meaning given in Section 3.3.

1.3    "Aggregate Spending Target" shall mean Six Hundred Eighteen Million Dollars ($618,000,000).    *4) see §3.1*

1.4    "Annual Carryover Amount" shall have the meaning given in Section 3.3.

1.5    "Annual Minimum Spending Target" for each Program Year, shall mean the sum of (i) the Program Payment of John Hancock for such Program Year as specified in Section 3.1, (ii) Fifty Million Dollars ($50,000,000), and (iii) any Annual Carryover Amount for the prior Program Year pursuant to Section 3.3. With respect to the fifth Program Year, the "Annual Minimum Spending Target" shall mean the Annual Carryover Amount for the prior Program Year pursuant to Section 3.3.

1.6    "Annual Research Plan" shall mean, for the Program Years in the Program Term, a reasonably and consistently detailed statement of the objectives, activities, timetable and budget for the Research Program for every Program Year remaining in the Program Term, it being understood that less detail shall be required for Program Years that are not the current Program Year. The first Annual Research Plan is attached as Exhibit 1.6. "Annual Research Plan" shall mean, for those years occurring after the expiration of the Program Term, a reasonably and

H:\Jones\TJH rla 010309.DOC                          Last printed 3/9/01 11:16 AM

CONFIDENTIAL
JH 008378

-7-

1.55    "Wakunaga Agreement" shall mean the License Agreement dated December 1, 1999 between Wakunaga Pharmaceutical Co., Ltd. and Abbott related to the Program Compound known as ABT-492.

## ARTICLE 2
## ANNUAL RESEARCH PROGRAM

2.1    Research Program Term. The Research Program shall be conducted by Abbott during the Program Term, and beyond the Program Term until Abbott either abandons development in accordance with the terms hereof or receives Regulatory Approval for each Program Compound, or some combination thereof.

2.2    Research Plan. The Research Program shall be conducted by Abbott in each Program Year in accordance with the Annual Research Plan for such Program Year. The Annual Research Plan will be provided to John Hancock until Abbott either abandons development in accordance with the terms hereof, or receives Regulatory Approval for, each Program Compound in the U.S. Territory, or some combination thereof. The Annual Research Plan shall be prepared by Abbott and presented to John Hancock at least thirty (30) days prior to the start of each Program Year. The first Annual Research Plan is attached as Exhibit 1.6. Abbott may modify the Annual Research Plan from time to time in order to best meet the objectives of the Research Program. Any such modifications to the Annual Research Plan shall be promptly provided to John Hancock. In addition, Abbott shall provide an Annual Research Plan for each year after the end of the Program Term as long as there is an active research program for any Program Compounds.

2.3    Conduct of Research. Abbott shall use Commercially Reasonable Efforts to conduct the Research Program in good scientific manner and using good laboratory practices, to achieve the objectives of the Research Program efficiently and expeditiously and to comply with all applicable laws and regulations. Notwithstanding anything in this Agreement to the contrary, Abbott does not represent, warrant or guarantee that the Research Program will be successful in whole or in part or result in the registration or commercialization of any pharmaceutical products or that any Products obtaining Regulatory Approval will be a commercial success.

45

2.4    Subcontracting Research. Abbott may subcontract or outsource to Affiliates or third persons (each, a "Subcontractor") any portion of the Annual Research Plan. Consistent with Abbott's past practices, each Subcontractor shall enter into a confidentiality agreement with Abbott and agreements pursuant to which such Subcontractor is required to comply with all applicable laws and regulations, including conducting the Research Program in good scientific manner and using good laboratory practices, with respect to its work on the Research Program. Abbott shall supervise and be responsible under this Agreement for the work of each such Subcontractor on the Research Program and no subcontracting or outsourcing shall relieve Abbott of any of its obligations hereunder.

2.5    Research Reports and Records. Abbott shall, no later than thirty (30) days before the last day of each Program Year, provide John Hancock with a reasonably detailed report setting forth the status of the Research Program and all Program Related Costs expended by Abbott during such Program Year. The Program Related Costs set forth in such report may include good faith estimates with respect to the last three (3) months of the Program Year, provided that the report under this Section 2.5 for the following Program Year contains the actual Program Related Costs for that three (3) month period. Such report shall also contain such other information related thereto as John Hancock may reasonably request from time to time. Abbott shall, and shall cause each Subcontractor to, maintain complete and accurate records, in sufficient detail and in good scientific manner appropriate for patent and regulatory purposes and for purposes of demonstrating compliance with the terms hereof, that fully and properly reflect all work done, results achieved and Program Related Costs expended in performance of the Research Program. The books and records of Abbott and each Subcontractor related to the Research Program, including, without limitation, those related to the expenditure of Program Related Costs, shall be subject to copying, inspection and audit by (and at the expense of) John Hancock at any time and from time to time. Such audit shall occur upon reasonable notice and during normal business hours by an independent auditor selected by John Hancock and reasonably acceptable to Abbott. John Hancock and its independent auditor shall maintain such records and information of Abbott in confidence in accordance with Article 10 and shall not use such records or information except to the extent permitted by this Agreement, including any enforcement of the provisions hereof.

H:\JonesTUH rfa 010309.DOC          Last printed 3/9/01 11:16 AM

CONFIDENTIAL
JH 008379

-8-

In the event that such audit reveals any material breach of Abbott's responsibilities hereunder, Abbott shall (i) pay the reasonable fees and expenses charged by such auditor, and (ii) fully and promptly cure such breach.

## ARTICLE 3
## RESEARCH FUNDING

3.1    John Hancock Program Payments.  John Hancock shall make the following installment payments on the applicable payment date (the "Payment Date"), for the applicable Program Year, to Abbott to help support the Research Program (the "Program Payments"):

| Payment Date | Amount |
|---|---|
| December 1, 2001 | ~~$52,000,000~~ |
|  | $50,000,000 |
| December 1, 2002 | $54,000,000 |
| December 1, 2003 | ~~$55,000,000~~ |
|  | $58,000,000 |
| December 1, 2004 | ~~$57,000,000~~ |
|  | $52,000,000 |

*Total $ 214 [handwritten]*

*45 [handwritten]*

All Program Payments shall be expended by Abbott on Program Related Costs and for no other purpose.  If John Hancock has not received at least ~~thirty (30)~~ days prior to the Payment Date both (i) the Annual Research Plan for such year and (ii) the report described in Section 2.5 for the previous Program Year, then John Hancock's obligation to make the Program Payment due on such Payment Date shall be suspended until thirty (30) days have elapsed from the date of John Hancock's receipt of both such Annual Research Plan and report. *and for the next succeeding year [handwritten]*

3.2    Abbott Funding Obligation.  Abbott shall spend on Program Related Costs:  (i) during each Program Year, at least the Annual Minimum Spending Target for such Program Year and (ii) at least the Aggregate Minimum Spending Target during the Program Term.  John Hancock's sole and exclusive remedies for Abbott's failure to fund the Research Program in accordance with this Section 3.2 (but not for any other breach of Abbott's other obligations hereunder) are set forth in Sections 3.3, and 3.4 and 7.2.

3.3    Carryover Provisions.  Abbott shall be permitted to change its funding obligations under Section 3.2 only as follows:

(a)    If in any Program Year Abbott spends on Program Related Costs, the full amount of the Program Payment provided by John Hancock for such Program Year, but does not spend the full amount of the Annual Minimum Spending Target for such Program Year (including any Annual Carryover Amounts from any prior Program Years), Abbott will spend on Program Related Costs the difference between its expenditure on Program Related Costs for such Program Year and the Annual Minimum Spending Target for such Program Year (the "Annual Carryover Amount") in the subsequent Program Year.  John Hancock's obligation to make any Program Payment for such subsequent Program Year, if any, pursuant to Section 3.1, shall be deferred until the time that Abbott has spent and notifies John Hancock that it has spent the Annual Carryover Amount in such subsequent Program Year; and

(b)    If Abbott does not expend on Program Related Costs the full amount of the Aggregate Spending Target during the Program Term, Abbott will expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the "Aggregate Carryover Amount") on Program Related Costs during the subsequent year commencing immediately after the end of the Program Term.  If Abbott does not spend the Aggregate Carryover Amount on Program Related Costs during such subsequent year, Abbott will pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days after the end of such subsequent year.

CONFIDENTIAL
JH 008380

-9-

3.4  Termination of John Hancock's Program Payment Obligation.  If Abbott:  (i) abandons development of all Preclinical Programs and Program Compounds in any Program Year during the Program Term (it being understood that such abandonment need not occur entirely in one Program Year); (ii) does not expend on Program Related Costs during any Program Year the full amount of the Program Payment made by John Hancock for such Program Year; (iii) does not reasonably demonstrate in its Annual Research Plan, its intent and reasonable expectation to expend on Program Related Costs during the next Program Year an amount in excess of the Program Payment to be provided by John Hancock for such year; or (iv) does not reasonably demonstrate in its Annual Research Plan its intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target, John Hancock's obligation to make any remaining Program Payments pursuant to Section 3.1 shall terminate.  In addition, in the case of either (i) or (ii) above, Abbott shall refund (not later than the 10th day following such event) pay to John Hancock (the (x) amount, if any, by which the Program Payment made by John Hancock for such year (in the case of (i) above meaning the Program Year in which all Preclinical Programs and Program Compounds were finally abandoned), if any, exceeds one-half of the Program Related Costs actually spent by Abbott during that Program Year and (y) such additional amount that after giving effect to the payments referred to in this sentence causes the Program Related Costs to have been funded one-third (1/3) by John Hancock and two-thirds (2/3) by Abbott.

3.5  Hancock Funding Obligation.  John Hancock's entire obligation hereunder shall be limited to providing the Program Payments set forth in Section 3.1.  Abbott shall be solely responsible for funding all Program Related Costs in excess of the Program Payments from John Hancock.

### ARTICLE 4
### PRODUCT RESEARCH AND DEVELOPMENT

4.1  Commercially Reasonable Efforts.  Abbott shall be solely responsible for the clinical development, government approval, manufacturing, marketing, sales and distribution of Products.  Abbott will use, and will cause each of its Affiliates and Licensees to use, Commercially Reasonable Efforts to pursue the clinical development, government approval, manufacturing, marketing, sales and distribution of Products throughout the Territory.  The obligations of Abbott, its Affiliates and Licensees with respect to any Product under this Article 4 are expressly conditioned upon the safety, efficacy and commercial feasibility of each Product, consistent with using Commercially Reasonable Efforts, but no license, assignment or other transfer of rights by Abbott will modify or reduce Abbott's obligations hereunder (except as set forth in Article 14).  It is the parties' expectation that under normal circumstances Abbott will file for Regulatory Approval with respect to each Product in Europe within two (2) years from the date of the NDA filing for such Product in the U.S. Territory and in Japan within five (5) years from such NDA filing date; provided, however, that these time frames may be extended or otherwise altered based upon unforeseen circumstances that legitimately impact such regulatory filings in such foreign jurisdictions.

4.2  Marketing and Sale Responsibility.  Without limiting the generality of Section 4.1, within six (6) months of obtaining Regulatory Approval for a Product in a given country, Abbott, its Affiliates or Licensees shall commence to market and sell such Product in such country.  Abbott's obligation to market and sell a Product shall not apply to a Product in any country if Abbott has not commenced or has ceased marketing and selling such Product in such country substantially/primarily substantially on account of adverse business or financial conditions caused by the regulatory authorities or other governmental authorities of such country (including not commencing marketing and selling in a country where the regulatory authorities have price or reimbursement approval and the price or reimbursement approval or that proposed by the regulatory authorities or government authorities is unacceptable to Abbott) which causes the marketing and sale of such Product in such country to be contrary to the financial best interests of John Hancock and Abbott; provided, however, that Abbott, its Affiliates or Licensees shall commence or resume marketing and sale of such Product in such country as soon as reasonably practical after such adverse business or financial conditions cease to exist.

4.3  Failure of Program Compound to Progress.

(a)  Preclinical Programs: ED Program, FTI Program and MMPI Program.  With respect to any Program Compound resulting from a Preclinical Program that Abbott ceases to

CONFIDENTIAL
JH 008381

-21-

12.8    Procedure.  If John Hancock or any of its Affiliates, agents, directors or employees (each, an "Indemnitee") intends to claim indemnification under this Article 12, it shall promptly notify Abbott (the "Indemnitor") of any Loss or action in respect of which the Indemnitee intends to claim such indemnification, and the Indemnitor shall have the right to participate in, and, to the extent the Indemnitor so desires, to assume the defense thereof with counsel selected by the Indemnitor; provided, however, that an Indemnitee shall have the right to retain its own counsel, with the fees and expenses of such counsel to be paid by the Indemnitor, if representation of such Indemnitee by the counsel retained by the Indemnitor would be inappropriate due to actual or potential differing interests between such Indemnitee and any other party represented by such counsel in such proceedings. The indemnity obligation in this Article 12 shall not apply to amounts paid in settlement of any loss, claim, damage, liability or action if such settlement is effected without the consent of the Indemnitor, which consent shall not be withheld unreasonably or delayed.  The failure to deliver notice to the Indemnitor within a reasonable time after the commencement of any such action, if materially prejudicial to its ability to defend such action, shall relieve the Indemnitor of any liability to the Indemnitee under this Article 12 only to the extent arising from the tardiness or absence of such notice, but the omission so to deliver notice to the Indemnitor will not relieve it of any liability that it may have to any Indemnitee otherwise than under this Article 12.  The Indemnitee shall cooperate fully with the Indemnitor and its legal representatives in the investigation of any action, claim or liability covered by indemnification under this Article 12, at the expense of the Indemnitor.

12.9    Insurance.  Abbott shall at its expense maintain, through self-insurance or otherwise, product liability insurance with respect to the development, manufacture, sale and use of Products and Program Compounds in such amounts and on such terms as Abbott customarily maintains with respect to its other similar products. Abbott shall maintain such insurance for so long as it continues to develop, manufacture or sell any Products or Program Compounds, and thereafter for so long as Abbott customarily currently maintains such insurance.

12.10    Acknowledgment.  Abbott and John Hancock acknowledge that Abbott has not delivered or disclosed the contents of any of the In-License Agreements to John Hancock.

*[handwritten: any of its rights (but not its obligation to make payments under Section 3.1) in]*

ARTICLE 13
FORCE MAJEURE   *[handwritten: whole or in part without]*

*[handwritten: Abbott's consent (and following any such assignment all references to John]*

Neither party shall be held liable or responsible to the other party nor be deemed to have defaulted under or *[handwritten: Hancock]* breached this Agreement for failure or delay in fulfilling or performing any term of this Agreement when such *[handwritten: Lure in]* failure or delay is caused by or results from causes beyond the reasonable control of the affected party including but *[handwritten: shall]* not limited to fire, floods, embargoes, war, acts of war (whether war be declared or not), insurrections, riots, civil *[handwritten: include]* commotions, strikes, lockouts or other labor disturbances, acts of God or acts, omission or delays in acting by any *[handwritten: any]* governmental authority; provided that such affected party shall provide the other party with prompt notice of the *[handwritten: such]* circumstances surrounding such a material failure or delay, after which the parties will amend this Agreement upon terms and conditions that are mutually agreeable to equitably account to the party that does not so fail or delay.  *[handwritten: assignee),]*

*[handwritten: provided that:]*

ARTICLE 14
ASSIGNMENT

[ Under Discussion ] Except as expressly provided hereunder, this Agreement may not be assigned or otherwise transferred, nor may any right or obligations hereunder be assigned or transferred by either party without the consent of the other party; and, in addition, both parties acknowledge and agree that the obligations of Abbott hereunder are personal to Abbott and that Abbott is uniquely qualified to perform them; provided, however, that either party shall be obligated to assign this Agreement and its rights and obligations hereunder in connection with the transfer or sale of all or substantially all of its business, or in the event of its merger or consolidation or change in control or similar transaction and in such event such party shall cause its successor or transferee in such transaction to assume all of the obligations of such party.  Any permitted assignee shall assume all obligations of its assignor under this Agreement. Notwithstanding the foregoing, John Hancock shall have the right to assign its right to payments in whole or in part and no other rights to any other person without Abbott's consent. John Hancock shall not have any right to assign any of its obligations to any third party.  With respect to any assignment of payments, the following shall apply: (i) any assignee of such right to payments must be a bank,

*[handwritten circled: each]*    *[handwritten circled: 5]*

CONFIDENTIAL
JH 008382

*(but in any event not longer than 4 years from the date hereof)*

-22-

insurance company or other institutional investor; (ii) there shall be no greater than five (5) assignees, (iii) if any such assignee is located outside the United States John Hancock shall notify Abbott at least sixty (60) days in advance, (iv) if any claim arises with respect to Abbott's failure to make payments, then during the term of the Research Program, any such claim must be brought by John Hancock, and not an assignee. In soliciting potential assignees for such right to payments, John Hancock shall not disclose any Confidential Information hereunder to more than ten (10) potential assignees. Any potential assignee to whom John Hancock discloses Confidential Information must have executed a confidentiality agreement no less stringent than that contained herein.

*Art. 10 here?*

ARTICLE 15
SEVERABILITY

Each party hereby agrees that it does not intend its execution and delivery hereof or its performance hereunder to violate any public policy, statutory or common laws, rules, regulations, treaty or decision of any government agency or executive body thereof of any country or community or association of countries. If and to the extent any term or provision of this Agreement is held to be invalid, illegal or unenforceable by a court or other governmental authority of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement, which shall remain in full force and effect. The holding of a term or provision to be invalid, illegal or unenforceable in a jurisdiction shall not have any effect on the application of the term or provision in any other jurisdiction.

ARTICLE 16
MISCELLANEOUS

16.1    Notices. Any consent, notice or report required or permitted to be given or made under this Agreement by one of the parties hereto to the other shall be in writing, delivered personally or by facsimile (and promptly confirmed by personal delivery, U.S. first class mail or courier), U.S. first class mail or courier, postage prepared (where applicable), addressed to such other party at its address indicated below, or to such other address as the addressee shall have last furnished in writing to the addressor and (except as otherwise provided in this Agreement) shall be effective upon receipt by the addressee.

If to John Hancock:       John Hancock Life Insurance Company
                          200 Clarendon Street, T-57
                          Boston, MA  02117
                          Attention: Bond & Corporate Finance Group
                          Telephone:      617-572-9624
                          Fax:            617-572-1628

          copy to: John Hancock Life Insurance Company
                          200 Clarendon Street, T-50
                          Boston, MA  02117
                          Attention: Investment Law Division
                          Telephone:      617-572-9205
                          Fax:            617-572-9268

          and, if it relates to making or not making a royalty payment or Milestone Payment hereunder,

          copy to: John Hancock Life Insurance Company
                          200 Clarendon Street
                          Boston, MA  02117
                          Attention:  Manager, Investment Accounting Division, B-3
                          Fax:  617-572-0628

H:\Jones\TJH rfa 010309.DOC              Last printed 3/9/01 11:16 AM

CONFIDENTIAL
JH 008383

-25-

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

JOHN HANCOCK LIFE                                    ABBOTT LABORATORIES
INSURANCE COMPANY

By: _____                       By: _____

Name: _____                       Name: _____

Title: _____                      Title: _____

Date: _____                       Date: _____

JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY

By: _____

Name: _____

Title: _____

Date: _____

INVESTOR/PARTNER LIFE INSURANCE
COMPANY

By: _____

Name: _____

Title: _____

Date: _____

H:\Jones\TUH rfa 010309.DOC          Last printed 3/9/01 11:16 AM

CONFIDENTIAL
JH 008384

18

# Deposition Exhibit 18

# Part 1





From: William Adams <william.adams@abbott.com>
Subject: latest version
Date: Mon, 12 Mar 2001 17:33:00
To: <sblewitt%jhancock@abtmr1.abbott.com>
To: <aweed@jhancock.com>
To: <wbl@choale.com>
cc: Philip Deemer <Philip.Deemer@ln.ssw.abbott.com>
Attached are the final clean and redlined versions of the agreement. Amy Weed
will consult with Steve Blewitt as to whether the new language at the end of
article 14 is acceptable.

      

JH rfa              JH rfa 010312.DOC    Mime.822 (819 KB)
10312r.DOC (311 Kt    (286 KB)



CONFIDENTIAL
JH 010033

1

RESEARCH FUNDING AGREEMENT

by and between

ABBOTT LABORATORIES

and

JOHN HANCOCK LIFE INSURANCE COMPANY,

JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY,

and

INVESTORS PARTNER LIFE INSURANCE COMPANY

dated as of

March ___, 2001

Deleted: U:\Domestic\Pals & Adams\John Hancock\JH rfa 010312r.DOC

Deleted: 3/12/01 4:22 PM

Deleted: 3/12/01 2:19 PM

Inserted: 3/12/01 4:22 PM

C:\Documents and Settings\Lanet Setting\Temporary Internet Files\OLK9C\JH rfa 010312r.DOC

CONFIDENTIAL
JH 010034

-i-

### TABLE OF CONTENTS

ARTICLE 1 - DEFINITIONS ........................................................................................ 1
ARTICLE 2 - ANNUAL RESEARCH PROGRAM .................................................... 9
   2.1   Program Term ................................................................................................ 9
   2.2   Research Plan ................................................................................................ 9
   2.3   Conduct of Research .................................................................................... 9
   2.4   Subcontracting Research ............................................................................ 10
   2.5   Research Reports and Records ................................................................... 10
ARTICLE 3 - RESEARCH FUNDING ..................................................................... 11
   3.1   John Hancock Program Payments .............................................................. 11
   3.2   Abbott Funding Obligation ........................................................................ 11
   3.3   Carryover Provisions ................................................................................. 11
   3.4   Termination of John Hancock's Program Payment Obligation ................. 12
   3.5   Hancock Funding Obligation ..................................................................... 13
ARTICLE 4 - PRODUCT RESEARCH AND DEVELOPMENT ............................. 13
   4.1   Commercially Reasonable Efforts ............................................................. 13
   4.2   Marketing and Sale Responsibility ............................................................ 13
   4.3   Failure of Program Compound to Progress .............................................. 13
   4.4   Arm's-Length ............................................................................................. 16
   4.5   In-License Agreements .............................................................................. 16
ARTICLE 5 - PROGRAM INVENTIONS ................................................................ 16
   5.1   Ownership ................................................................................................... 16
   5.2   Patent Prosecution and Maintenance ........................................................ 16
   5.3   Enforcement ............................................................................................... 17
ARTICLE 6 - MILESTONE PAYMENTS TO JOHN HANCOCK .......................... 17
   6.1   [Intentionally omitted] .............................................................................. 17
   6.2   Management Fee ......................................................................................... 17
   6.3   Milestone Notification and Payments ....................................................... 17
ARTICLE 7 - ROYALTIES ...................................................................................... 19
   7.1   Royalty Rates ............................................................................................. 19
   7.2   Royalty Term .............................................................................................. 19
ARTICLE 8 - ROYALTY REPORTS AND ACCOUNTING ................................... 19
   8.1   Reports, Exchange Rates ............................................................................ 19
   8.2   Audits ......................................................................................................... 20
   8.3   Confidential Financial Information ............................................................ 21
   8.4   Accounting Principles ................................................................................ 21
ARTICLE 9 - PAYMENTS ....................................................................................... 21
   9.1   Payment Terms ........................................................................................... 21
   9.2   Payment Method ......................................................................................... 21
   9.3   Late Payments ............................................................................................ 21

C:\Documents and Settings\Admin\Local Settings\Temporary Internet Files\OLK8C\v14 rle 010112r.DOC}

CONFIDENTIAL
JH 010035

Inserted: 9
Deleted: 10
Deleted: 10
Inserted: 10
Deleted: 11
Deleted: 10
Inserted: 10
Deleted: 11
Deleted: 11
Deleted: 12
Inserted: 11
Deleted: 12
Inserted: 12
Deleted: 13
Deleted: 13
Inserted: 13
Deleted: 14
Deleted: 16
Inserted: 16
Deleted: 17
Deleted: 16
Inserted: 16
Deleted: 16
Deleted: 16
Inserted: 17
Deleted: 17
Inserted: 17
Deleted: 18
Deleted: 17
Inserted: 18
Deleted: 17
Inserted: 17
Deleted: 18
Inserted: 17
Deleted: 18
Deleted: 19
Inserted: 19
Deleted: 20
Deleted: 19
Inserted: 19
Deleted: 20
Deleted: 19
Inserted: 19
Deleted: 20
Inserted: 19
Deleted: 20
Inserted: 19
Deleted: 19

-ii-

ARTICLE 10 - CONFIDENTIALITY ............................................................. 21
  10.1   Nondisclosure Obligations ......................................................... 21
  10.2   Permitted Disclosures ................................................................ 22
  10.3   Publicity Review ....................................................................... 22
ARTICLE 11- TERM AND TERMINATION ............................................... 22
  11.1   Expiration ................................................................................. 22
  11.2   Termination; Material Breach ................................................... 22
  11.3   Effect of Expiration of Termination ........................................ 23
ARTICLE 12 - WARRANTIES AND INDEMNITY ..................................... 23
  12.1   John Hancock Representations and Warranties ........................ 24
  12.2   Abbott Representations and Warranties .................................... 24
  12.3   No Conflict ................................................................................ 28
  12.4   Compliance with Law ................................................................ 28
  12.5   No Other Warranties .................................................................. 28
  12.6   Indemnification of John Hancock ............................................. 29
  12.7   Indemnification of John Hancock Relating to In-Licensed Compounds ..... 29
  12.8   Procedure ................................................................................... 29
  12.9   Insurance ................................................................................... 30
  12.10  Acknowledgment ...................................................................... 30
ARTICLE 13 - FORCE MAJEURE ............................................................. 30
ARTICLE 14 - ASSIGNMENT ................................................................... 30
ARTICLE 15 - SEVERABILITY ................................................................ 31
ARTICLE 16 - MISCELLANEOUS ........................................................... 31
  16.1   Notices ....................................................................................... 32
  16.2   Applicable Law .......................................................................... 33
  16.3   Entire Agreement ...................................................................... 33
  16.4   Headings ..................................................................................... 33
  16.5   Independent Contractors ........................................................... 33
  16.6   Performance By Affiliates ......................................................... 33
  16.7   Dispute Resolution .................................................................... 33
  16.8   Waiver ........................................................................................ 34
  16.9   Counterparts .............................................................................. 34

EXHIBIT 1.6:       First Annual Research Plan
EXHIBIT 1.17:      Eisai Territory
EXHIBIT 1.40:      Program Compounds
EXHIBIT 1.43:      Example of Program Related Costs for One Program Compound
EXHIBIT 9.2:       Payment Instructions
EXHIBIT 12.2(c):   Further Information regarding Program Compounds
EXHIBIT 12.2(c):   Certain Patent Information
EXHIBIT 12.2(f):   Communications
EXHIBIT 12.2(i):   Compound Reports

C:\Documents and Settings\bruck\Local Settings\Temporary Internet Files\OLK6C\U84.rta 010217i.DOC

Inserted: 22
Deleted: 1)
Deleted: 22
Inserted: 22
Deleted: 23
Deleted: 22
Deleted: 22
Inserted: 22
Deleted: 23
Deleted: 22
Inserted: 22
Deleted: 22
Deleted: 23
Deleted: 23
Deleted: 23
Deleted: 24
Inserted: 23
Deleted: 23
Deleted: 34
Inserted: 33
Deleted: 23
Inserted: 23
Deleted: 24
Inserted: 24
Deleted: 25
Deleted: 34
Inserted: 24
Deleted: 31
Deleted: 24
Inserted: 24
Deleted: 28
Inserted: 28
Deleted: 29
Deleted: 28
Inserted: 28
Deleted: 39
Deleted: 24
Inserted: 29
Deleted: 29
Deleted: 29
Inserted: 29
Deleted: 30
Deleted: 29
Inserted: 29
Deleted: 30
Inserted: 29
Deleted: 31
Deleted: 30

CONFIDENTIAL
JH 010036

### RESEARCH FUNDING AGREEMENT

This Research Funding Agreement is made as of March ___, 2001, by and between Abbott Laboratories, an Illinois corporation ("Abbott"), with its principal offices at 100 Abbott Park Road, Abbott Park, Illinois 60064-6049, and John Hancock Life Insurance Company, a Massachusetts corporation, John Hancock Variable Life Insurance Company, a Massachusetts corporation, and Investors Partner Life Insurance Company, a Delaware corporation (collectively, "John Hancock"), each with its principal offices at 200 Clarendon Street, Boston, Massachusetts 02117.

#### WITNESSETH

WHEREAS, Abbott is a global healthcare company actively engaged in the research and development of human pharmaceutical products;

WHEREAS, Abbott is interested in obtaining additional funding to support such research and development activities with respect to certain pharmaceutical products which are under development; and

WHEREAS, John Hancock is interested in providing such additional funding in exchange for the right to receive future milestone and royalty payments from Abbott.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and undertakings contained herein, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

In addition to the other terms defined elsewhere herein, the following terms shall have the following meanings when used in this Agreement (and any term defined in the singular shall have the same meaning when used in the plural and vice versa, unless stated otherwise):

1.1    "Affiliate" shall mean, with respect to each party, any corporation or other form of business organization, which directly or indirectly owns, controls, is controlled by, or is under common control with, such party.  An entity shall be regarded as being in control of another entity if the former entity has the direct or indirect power to order or cause the direction of the policies of the other entity whether (i) through the ownership of more than fifty percent (50%) in the United States, or thirty percent (30%) or more outside the United States, of the outstanding voting securities (or other ownership interest for a business organization other than a corporation) of that entity; or (ii) by contract, statute, regulation or otherwise.

1.2    "Aggregate Carryover Amount" shall have the meaning given in Section 3.3.

*Comment: This first section is automatically numbered.*

*Deleted: M:\Domestic\Pah & Adams\John Hancock\JH rfa 010312r DOC*

*Deleted: 3/12/01 4:22 PM*

*Deleted: 3/12/01 2:18 PM*

*Inserted: 3/12/01 4:22 PM*

CONFIDENTIAL
JH 010037

-2-

1.3    "Aggregate Spending Target" shall mean Six Hundred Fourteen Million Dollars ($614,000,000).

| Deleted: Eighteen |
| Deleted: ($618,000,000) |

1.4    "Annual Carryover Amount" shall have the meaning given in Section 3.3.

1.5    "Annual Minimum Spending Target" for each Program Year, shall mean the sum of (i) the Program Payment of John Hancock for such Program Year as specified in Section 3.1, (ii) Fifty Million Dollars ($50,000,000), and (iii) any Annual Carryover Amount for the prior Program Year pursuant to Section 3.3. With respect to the fifth Program Year, the "Annual Minimum Spending Target" shall mean the Annual Carryover Amount for the prior Program Year pursuant to Section 3.3.

1.6    "Annual Research Plan" shall mean, for the Program Years in the Program Term, a reasonably and consistently detailed statement of the objectives, activities, timetable and budget for the Research Program for every Program Year remaining in the Program Term, it being understood that less detail shall be required for Program Years that are not the current Program Year. The first Annual Research Plan is attached as Exhibit 1.6. "Annual Research Plan" shall mean, for those years occurring after the expiration of the Program Term, a reasonably and consistently detailed statement of the objectives, activities, timetable and budget for the Research Program for such year only.

1.7    "Bundled Product" shall have the meaning given in paragraph (b) of the definition of Net Sales.

1.8    "Ceased Program" shall mean at least one year has elapsed since Abbott ceased its directed efforts with respect to the applicable Preclinical Program (FTI Program, ED Program or MMPI Program), meaning that Abbott has eliminated the funding for the established research program identified by a core group of researchers dedicated to the applicable Preclinical Program. The continued existence of a researcher separate and apart from such core group shall not affect the determination that a Preclinical Program has ceased.

1.9    "Combination Product" shall mean any product containing one or more Program Compounds combined as a single pharmaceutical product with one or more other therapeutically active ingredients.

1.10    "Commercially Reasonable Efforts" shall mean efforts which are consistent with those normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable potential commercial value and market potential at a similar stage of development or product life, taking into account, without limitation, issues of safety and efficacy, compound or product profile, proprietary status, the regulatory environment and the status of the compound or product and other relevant scientific factors.

| Deleted: M:\Domestic\Pals & Adams\John Hancock\H rla 010312r.DOC |
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 3:19 PM |
| Inserted: 3/12/01 4:22 PM |

1.11    "Compound Reports" shall have the meaning given in Section 12.2(i).

CONFIDENTIAL
JH 010038

-3-

1.12   "Confidential Information" shall have the meaning given in Section 10.2.

1.13   "Delivery System Product" shall have the meaning given in paragraph (d) of the definition of Net Sales.

1.14   "Dollars" or "$" shall mean United States dollars.

1.15   "ED Program" shall mean all of Abbott's discovery efforts to identify compounds (including the identification of pre-clinical and development compounds owned by third parties) which modulate dopamine receptors for the purpose of treating erectile dysfunction.

1.16   "Eisai Agreement" shall mean the License Agreement dated June 29, 2000 between Eisai Co., Ltd. and Abbott related to the Program Compound known as ABT-751.

1.17   "Eisai Territory" shall mean the countries listed on Exhibit 1.17 hereto.

1.18   "Execution Date" shall mean the date set forth in the introductory paragraph to this Agreement.

1.19   [Intentionally Omitted.]

1.20   "FDA" shall mean the U.S. Food and Drug Administration or any successor entity thereto.

1.21   "First Commercial Sale" shall mean the first sale of a Product in a given country by Abbott, its Affiliates or Licensees to an unaffiliated third person after Regulatory Approval has been granted in such country.

1.22   "FTI Program" shall mean all of Abbott's discovery efforts to identify compounds (including the identification of pre-clinical and development compounds owned by third parties) which act as farnesyl transferase inhibitors for the purpose of treating cancer.

1.23   "In-License Agreements" shall mean the Eisai Agreement, the Wakunaga Agreement and the Taisho Agreement.

1.24   "International Territory" shall mean all areas of the world outside the U.S. Territory.

1.25   "Investigational New Drug Application" shall mean an investigational new drug application filed with the FDA in order to commence human clinical testing of a drug in the United States.

1.26   "Licensee" shall mean any party licensed or otherwise authorized in writing by Abbott, its Affiliates or its licensees to market, distribute or sell Products and from whom Abbott receives a royalty or other payment based upon sales of Products by such party, its affiliates or its

CONFIDENTIAL
JH 010039

-4-

licensees (it being understood that a party that is a merely a distributor, wholesaler or similar reseller of Products is not a Licensee hereunder). In no case shall Eisai Co., Ltd. or Taisho Pharmaceutical Co., Ltd. be considered Licensees under the terms of the Eisai Agreement or Taisho Co-Development Agreement with respect to the Eisai Territory or Japan, respectively.

1.27    "Losses" shall mean any claims, demands, liabilities, costs, damages, judgments, settlements and other reasonable expenses (including attorneys' fees).

1.28    "Milestone Payment" shall have the meaning given in Section 6.3.

1.29    "MMPI Program" shall mean all of Abbott's discovery efforts to identify compounds (including the identification of pre-clinical and development compounds owned by third parties) that inhibit matrix metalloproteinase and treat cancer.

1.30    "NDA" shall mean a New Drug Application (as defined by the FDA) filed with the FDA for the purpose of obtaining Regulatory Approval of a Product in the U.S. Territory.

1.31    "Net Sales" shall mean:

(a)    the total gross sales of the Products (or, for purposes of clauses (b) and (c), the Bundled Products and Combination Products), in each case as set forth on the invoices for such sales by Abbott, its Affiliates and Licensees to unaffiliated third parties in any given period, plus, if applicable, the fair market value of all properties and services received in consideration of a sale of the Products (or, for purposes of clauses (b) and (c), the Bundled Products and Combination Products) by Abbott, its Affiliates and Licensees to unaffiliated third parties during such period, less the following deductions directly paid or actually incurred by Abbott, its Affiliates or Licensees during such period with respect to the sale of the Products (or, for purposes of clauses (b) and (c), the Bundled Products and Combination Products) to the extent included in the gross invoiced sales price therefor:

(i)    discounts, credits, rebates, allowances, adjustments, rejections, recalls and returns;

(ii)    price reductions or rebates, retroactive or otherwise, imposed by government authorities;

(iii)    sales, excise, turnover, inventory, value-added and similar taxes assessed on the royalty-bearing sale of Products;

(iv)    transportation, importation, insurance and other handling expenses directly chargeable to the royalty-bearing sale of Products;

Deleted: M.\Domestic\P #s & Adams\John Hancock\JH #s 010312r.DOC

Deleted: 3/12/01 4:22 PM

Deleted: 3/12/01 2:19 PM

Inserted: 3/12/01 4:22 PM

C:\Documents and Settings\bmmk\Local Settings\Temporary Internet Files\OLK8C\JH #s 010312r.DOC

CONFIDENTIAL
JH 010040

-5-

(v)  charge backs granted to unaffiliated drug wholesalers; and

(vi)  the portion of management fees paid to unaffiliated group purchasing organizations that relate specifically to the royalty-bearing sale of Products.

(b)  With respect to a Product which is sold together with any other products and/or services in a country at a unit price, whether packaged together or separately (a "Bundled Product"), the Net Sales of such Bundled Product shall first be calculated in accordance with the definition of Net Sales under paragraph (a), and then the Net Sales of such Bundled Product shall be determined on a country-by-country basis as follows:

(i)  multiply the Net Sales of such Bundled Product in such country by the fraction A/(A+B) where A is the average selling price of such Product in such country when sold separately and B is the total of the average selling prices in such country of each such other product(s) and/or service(s) in such Bundled Product when sold separately; or

(ii)  if (x) either the average selling price of such Product or the total of the average selling prices of each such other products and/or services in such Bundled Product in such country is not available as of such date or (y) such Product is not sold separately in such country, multiply the Net Sales of such Bundled Product in such country by a percentage determined by the mutual agreement of the Parties which represents the proportionate economic value in such country of such Product relative to the economic value in such country contributed by the other products and/or services in such Bundled Product.

(c)  With respect to a Combination Product, the Net Sales of such Combination Product shall first be calculated in accordance with the definition of Net Sales under paragraph (a), and then the Net Sales of such Combination Product shall be determined on a country-by-country basis as follows:

(i)  multiply the Net Sales of such Combination Product in such country by the fraction A/(A+B), where A is the total of the average selling prices of the Program Compounds in such Combination Product when sold separately in such country and B is the total of the average selling prices of each other therapeutically active ingredient when sold alone as a pharmaceutical product in such country; or

| Deleted: M:\Domestic\Pais & Adams\John Hancock\JH rfa 010312r.DOC |
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 2:18 PM |
| Inserted: 3/12/01 4:22 PM |

CONFIDENTIAL
JH 010041

-6-

(ii) if (x) either the average selling price of all Program Compounds in such Combination Product or the total of the average selling prices of each other therapeutically active ingredient in such Combination Product in such country is not available or (y) such Program Compounds are not sold separately in such country, multiply the Net Sales of such Combination Product by a percentage determined by mutual agreement of the Parties, which represents the proportionate economic value in such country of all Program Compounds in such Combination Product relative to the economic value in such country contributed by all other therapeutically active ingredients in such Combination Product.

(d) For purposes of this paragraph (d), a "Premium Delivery System" means any delivery system comprising device(s), equipment, instrumentation or other non-ingestible components (but not solely containers or packaging) designed to assist in the administration of a Product, such as the Abbott ADD-Vantage® System. With respect to a Product which is sold together with a Premium Delivery System (a "Delivery System Product") in a country at a unit price, the Net Sales of such Delivery System Product shall first be calculated in accordance with the definition of Net Sales under paragraph (a), and then the Net Sales of such Product shall be determined on a country-by-country basis as follows:

(i) if the Product is sold separately without the Premium Delivery System in a country, reduce the Net Sales of such Delivery System Product in such country by the amount that the average selling price of the Delivery System Product in such country exceeds the average selling price of such Product as sold separately in such country; or

(ii) if the Product is not sold separately without the Premium Delivery System in such country, reduce Net Sales of such Delivery System Product by an amount, determined by mutual agreement of the Parties, which represents the proportionate economic value in such country added by the Premium Delivery System.

(e) Net Sales shall not include any sales of Products containing one Program Compound (and no other Program Compound) known as (i) ABT-751 by Eisai Co. Ltd., its affiliates or licensees in the Eisai Territory or (ii) ABT-773 by Taisho Pharmaceutical Co., Ltd., its affiliates or licensees in Japan. Notwithstanding the foregoing sentence, Net Sales shall include in all instances sales by such parties of such products that are outside such territories, respectively.

1.32 "Parties" shall mean Abbott and John Hancock.

Deleted: M:\Domestic\Pals & Adam\John Hancock\JH rfa 010312r.DOC
Deleted: 3/12/01 4:22 PM
Deleted: 3/12/01 2:19 PM
Inserted: 3/12/01 4:22 PM

C:\Documents and Settings\timmk\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010312r.DOC

CONFIDENTIAL
JH 010042

-7-

1.33   "Patents" shall have the meaning set forth in Section 12.2(c).

1.34   "Phase I Clinical Trial" shall mean a clinical trial of a Program Compound which utilizes a limited number of human beings preliminarily to address safety and to determine what doses can be safely tolerated.

1.35   "Phase II Clinical Trial" shall mean a controlled clinical trial, the primary objective of which is to ascertain additional data regarding the safety and tolerance of one of the Program Compounds and preliminary data regarding such Program Compound's efficacy.

1.36   "Phase III Clinical Trial" shall mean one or a series of controlled pivotal studies of a specific Program Compound by administration of such Program Compound to human beings where the principal purpose of such trial is to provide confirmatory safety and efficacy data necessary to support the filing for Regulatory Approval of a Product.

1.37   "Preclinical Programs" shall mean the following preclinical and clinical programs with potential backup compounds in accordance with Section 4.3(a): the FTI Program, the ED Program and the MMPI Program.

1.38   "Premium Delivery System" shall have the meaning given in paragraph (d) of the definition of Net Sales.

1.39   "Product" shall mean any product containing one or more of the Program Compounds as an active ingredient, alone or in combination with other active ingredients (including any Bundled Product and any Combination Product).

1.40   "Program Compounds" shall mean (i) the compounds listed on Exhibit 1.40; (ii) the first compound (the selection of which shall be consistent with Abbott using Commercially Reasonable Efforts) from each of the Preclinical Programs to enter Phase I Clinical Trial; (iii) any compounds or products substituted or added by Section 4.3; (iv) all line extensions and formulations of the foregoing; and (v) all analogs, isomers, improvements, derivatives and modifications of the foregoing unless such analog, isomer, improvement, derivative or modification would be considered a new chemical entity and required by the FDA to reenter Phase I Clinical Trial. A compound or product shall be considered a Program Compound regardless of the indication for which it is used.

1.41   "Program Inventions" shall have the meaning given in Section 5.1.

1.42   "Program Payments" shall have the meaning given in Section 3.1.

1.43   "Program Related Costs" shall mean (i) all direct and indirect costs and expenses that are incurred by Abbott on the Research Program during a given Program Year and allocated in a manner consistent with Abbott's internal, pharmaceutical products division-wide allocation procedures; and (ii) the milestone and license fees paid during a given Program Year or during

| Deleted: M:\Domestic\Pels & Adams\John Hancock\JH rfa 010312r.DOC |
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 2:19 PM |
| Inserted: 3/12/01 4:22 PM |

C:\Documents and Settings\Local Settings\Temporary Internet Files\OLK9C\JH rfa 010312r.DOC

CONFIDENTIAL
JH 010043

-8-

any extension period of the Program Term by Abbott to (a) Eisai Co. Ltd. (not to exceed
Eighteen Million Dollars ($18,000,000) in the aggregate with respect to the Program Compound
known as ABT-751 pursuant to the Eisai Agreement) and (b) Wakunaga Pharmaceutical Co.,
Ltd. (not to exceed Twenty Seven Million Five Hundred Thousand Dollars ($27,500,000) in the
aggregate with respect to the Program Compound known as ABT-492 pursuant to the Wakunaga
Agreement). Any payments made by Abbott to John Hancock pursuant to Sections 6.2 and
6.3(a), (b), (c), (d) and (e) shall constitute Program Related Costs. Any payment made by Abbott
to John Hancock pursuant to Section 6.3(f) shall not constitute Program Related Costs. Set forth
on Exhibit 1.43 is an example of the calculation of Program Related Costs for a particular
Program Compound.

<div style="float:right">Deleted: 6.3(k)</div>

    1.44   "Program Term" shall mean a period of four (4) consecutive Program Years.

    1.45   "Program Year" shall mean a period of twelve (12) consecutive calendar months
commencing on January 1 of each year, except that the first Program Year shall commence on
the Execution Date and end on December 31, 2001.

    1.46   "Quarterly Reporting Period" shall mean the calendar quarter with respect to the
U.S. Territory together with the fiscal quarter ending on the final day of February, May, August
and November (as the case may be) with respect to the International Territory. For example, the
Quarterly Reporting Period that comprises the second calendar quarter with respect to the U.S.
Territory also includes the period from March 1 through May 31 with respect to the International
Territory. If Abbott adopts the calendar year as its fiscal year for the International Territory, then
the Quarterly Reporting Period for the International Territory shall also be the calendar quarter.

    1.47   "Research Program" shall mean all of Abbott's, its Affiliates' and Subcontractors'
activities directed towards obtaining Regulatory Approval for the Products, including research,
development, safety and efficacy studies, clinical trials, process development, formulation work,
regulatory, quality, data collection and analysis and project management.

    1.48   "Regulatory Approval" shall mean: (i) with respect to the U.S. Territory, the
receipt of approval from the FDA to market a Product in the U.S. Territory; and (ii) with respect
to any country in the International Territory, receipt of the governmental approvals required to
market a Product in such country, including any pricing and reimbursement authorization
required in such country.

    1.49   "Replacement Compound" shall mean a compound (i) made available to Abbott
as a result of any transaction involving Abbott or its Affiliates (whether by merger, acquisition or
sale of assets or equity, or by license or otherwise), (ii) used for the same class of indications as
the Ceased Compound (for example, anti-infectives, cancer, cardiovascular or pain), and (iii)
having at least the current and projected potential commercial value to John Hancock as the
Ceased Compound.

    1.50   "Royalty Term" shall mean, with respect to each Product in each country, a period
of ten (10) years from the later of (x) the date of First Commercial Sale of such Product in such

<div style="float:right">Deleted: M:\Domestic\Pais &<br>Adams\John Hancock\JH rfa<br>010312r.DOC<br>Deleted: 3/12/01 4:22 PM<br>Deleted: 3/12/01 2:18 PM<br>Inserted: 3/12/01 4:22 PM</div>

C:\Documents and Settings\bnmh\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010312r.DOC

CONFIDENTIAL
JH 010044

-9-

country and (y) the two year anniversary of the Execution Date; provided that (i) the obligation to make royalty payments on the Product shall not begin until the two-year anniversary of the Execution Date (and only with respect to Net Sales occurring on or after such date) and (ii) Abbott's obligation to make royalty payments shall cease on December 31, 2015.

1.51    "Subcontractor" shall have the meaning given in Section 2.4.

1.52    "Taisho Agreement" shall mean the Co-Development Agreement dated September 30, 1997 between Taisho Pharmaceutical Co., Ltd. and Abbott related to the Program Compound known as ABT-773.

1.53    "Territory" shall mean both the U.S. Territory and the International Territory, excluding the Eisai Territory with respect to the Program Compound known as ABT-751.

1.54    "U.S. Territory" shall mean the United States of America, excluding Puerto Rico and the U.S. Virgin Islands.

1.55    "Wakunaga Agreement" shall mean the License Agreement dated December 1, 1999 between Wakunaga Pharmaceutical Co., Ltd. and Abbott related to the Program Compound known as ABT-492.

ARTICLE 2
ANNUAL RESEARCH PROGRAM

2.1    Research Program Term. The Research Program shall be conducted by Abbott during the Program Term, and beyond the Program Term until Abbott either abandons development in accordance with the terms hereof or receives Regulatory Approval for each Program Compound, or some combination thereof.

2.2    Research Plan. The Research Program shall be conducted by Abbott in each Program Year in accordance with the Annual Research Plan for such Program Year. The Annual Research Plan will be provided to John Hancock until Abbott either abandons development in accordance with the terms hereof, or receives Regulatory Approval for, each Program Compound in the U.S. Territory, or some combination thereof. The Annual Research Plan shall be prepared by Abbott and presented to John Hancock at least forty-five (45) days prior to the start of each Program Year. The first Annual Research Plan is attached as Exhibit 1.6. Abbott may modify the Annual Research Plan from time to time in order to best meet the objectives of the Research Program. Any such modifications to the Annual Research Plan shall be promptly provided to John Hancock. In addition, Abbott shall provide an Annual Research Plan for each year after the end of the Program Term as long as there is an active research program for any Program Compounds.

2.3    Conduct of Research. Abbott shall use Commercially Reasonable Efforts to conduct the Research Program in good scientific manner and using good laboratory practices, to

| Deleted: they [30] |

| Deleted: M:\Domestic\Pats & Adams\John Hancock\JH dia 010312r.DOC |
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 2:19 PM |
| Inserted: 3/12/01 4:22 PM |

C:\Documents and Settings\rmm\Local Settings\Temporary Internet Files\OLK6\JH dia 010312r.DOC

CONFIDENTIAL
JH 010045

-10-

achieve the objectives of the Research Program efficiently and expeditiously and to comply with all applicable laws and regulations. Notwithstanding anything in this Agreement to the contrary, Abbott does not represent, warrant or guarantee that the Research Program will be successful in whole or in part or result in the registration or commercialization of any pharmaceutical products or that any Products obtaining Regulatory Approval will be a commercial success.

2.4     Subcontracting Research. Abbott may subcontract or outsource to Affiliates or third persons (each, a "Subcontractor") any portion of the Annual Research Plan. Consistent with Abbott's past practices, each Subcontractor shall enter into a confidentiality agreement with Abbott and agreements pursuant to which such Subcontractor is required to comply with all applicable laws and regulations, including conducting the Research Program in good scientific manner and using good laboratory practices, with respect to its work on the Research Program. Abbott shall supervise and be responsible under this Agreement for the work of each such Subcontractor on the Research Program and no subcontracting or outsourcing shall relieve Abbott of any of its obligations hereunder.

2.5     Research Reports and Records. Abbott shall, no later than thirty (30) days before the last day of each Program Year, provide John Hancock with a reasonably detailed report setting forth the status of the Research Program and all Program Related Costs expended by Abbott during such Program Year. The Program Related Costs set forth in such report may include good faith estimates with respect to the last three (3) months of the Program Year, provided that the report under this Section 2.5 for the following Program Year contains the actual Program Related Costs for that three (3) month period. Such report shall also contain such other information related thereto as John Hancock may reasonably request from time to time. Abbott shall, and shall cause each Subcontractor to, maintain complete and accurate records, in sufficient detail and in good scientific manner appropriate for patent and regulatory purposes and for purposes of demonstrating compliance with the terms hereof, that fully and properly reflect all work done, results achieved and Program Related Costs expended in performance of the Research Program. The books and records of Abbott and each Subcontractor related to the Research Program, including, without limitation, those related to the expenditure of Program Related Costs, shall be subject to copying, inspection and audit by (and at the expense of) John Hancock at any time and from time to time. Such audit shall occur upon reasonable notice and during normal business hours by an independent auditor selected by John Hancock and reasonably acceptable to Abbott. John Hancock and its independent auditor shall maintain such records and information of Abbott in confidence in accordance with Article 10 and shall not use such records or information except to the extent permitted by this Agreement, including any enforcement of the provisions hereof. In the event that such audit reveals any material breach of Abbott's responsibilities hereunder, Abbott shall (i) pay the reasonable fees and expenses charged by such auditor, and (ii) fully and promptly cure such breach.

| Deleted: M:\Domestic\Pals & Adams\John Hancock\JH fls 010312r.DOC |
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 2:19 PM |
| Inserted: 3/12/01 4:22 PM |

C:\Documents and Settings\tavasi\Local Settings\Temporary Internet Files\OLK5C\JH rfa 010312r.DOC

CONFIDENTIAL
JH 010046

-11-

## ARTICLE 3
## RESEARCH FUNDING

3.1    John Hancock Program Payments.  John Hancock shall make the following installment payments on the applicable payment date (the "Payment Date"), for the applicable Program Year, to Abbott to help support the Research Program (the "Program Payments"):

| Payment Date | Amount | Program Year |
|---|---|---|
| December 1, 2001 | $50,000,000 | First |
| December 1, 2002 | $54,000,000 | Second |
| December 1, 2003 | $58,000,000 | Third |
| December 1, 2004 | $52,000,000 | Fourth |

All Program Payments shall be expended by Abbott on Program Related Costs and for no other purpose.  If John Hancock has not received at least thirty (30) days prior to the Payment Date both (i) the Annual Research Plan for such year and (ii) the report described in Section 2.5 for the previous Program Year, then John Hancock's obligation to make the Program Payment due on such Payment Date shall be suspended until thirty (30) days have elapsed from the date of John Hancock's receipt of both such Annual Research Plan and report.

3.2    Abbott Funding Obligation.  Abbott shall spend on Program Related Costs: (i) during each Program Year, at least the Annual Minimum Spending Target for such Program Year and (ii) at least the Aggregate Spending Target during the Program Term.  John Hancock's sole and exclusive remedies for Abbott's failure to fund the Research Program in accordance with this Section 3.2 (but not for any other breach of Abbott's other obligations hereunder) are set forth in Sections 3.3 and 3.4.

3.3    Carryover Provisions.  Abbott shall be permitted to change its funding obligations under Section 3.2 only as follows:

(a)    If in any Program Year Abbott spends on Program Related Costs, the full amount of the Program Payment provided by John Hancock for such Program Year, but does not spend the full amount of the Annual Minimum Spending Target for such Program Year (including any Annual Carryover Amounts from any prior Program Years), Abbott will spend on Program Related Costs the difference between its expenditure on Program Related Costs for such Program Year and the Annual Minimum Spending Target for such Program Year (the "Annual Carryover Amount") in the subsequent Program Year.  John Hancock's obligation to make any Program Payment for such subsequent Program Year, if any, pursuant to Section 3.1, shall be deferred until the time that Abbott has spent and notifies John Hancock that it has spent the Annual Carryover Amount in such subsequent Program Year; and

| Deleted: Payment Date [3] |
| Deleted: December 1, 2001 [4] |
| Deleted: December 1, 2002 [5] |
| Deleted: December 1, 2003 [6] |
| Deleted: December 1, 2004 [7] |

| Deleted: M:\Domestic\Pals & Adams\John Hancock\JH rfa 010312r.DOC |
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 2:19 PM |
| Inserted: 3/12/01 4:22 PM |

CONFIDENTIAL
JH 010047

-12-

(b)  If Abbott does not expend on Program Related Costs the full amount of the Aggregate Spending Target during the Program Term, Abbott will expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the "Aggregate Carryover Amount") on Program Related Costs during the subsequent year commencing immediately after the end of the Program Term. If Abbott does not spend the Aggregate Carryover Amount on Program Related Costs during such subsequent year, Abbott will pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days after the end of such subsequent year.

3.4  Termination of John Hancock's Program Payment Obligation. If Abbott: (i) abandons development of all Preclinical Programs and Program Compounds in any Program Year during the Program Term (it being understood that such abandonment need not occur entirely in one Program Year); (ii) does not expend on Program Related Costs during any Program Year the full amount of the Program Payment made by John Hancock for such Program Year; (iii) does not reasonably demonstrate in its Annual Research Plan, its intent and reasonable expectation to expend on Program Related Costs during the next Program Year an amount in excess of the Program Payment to be provided by John Hancock for such year; or (iv) does not reasonably demonstrate in its Annual Research Plan its intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target, John Hancock's obligation to make any remaining Program Payments for any succeeding Program Years pursuant to Section 3.1 shall terminate. For the avoidance of doubt, the Program Payments for the Program Year in which such event occurs shall still be due and payable, adjusted only as set forth in the next sentence, if applicable. In addition, in the case of either (i) or (ii) above, Abbott shall (not later than the 10th day following such event) pay to John Hancock (x) the amount, if any, by which the Program Payment made by John Hancock for such year (in the case of (i) above meaning the Program Year in which all Preclinical Programs and Program Compounds were finally abandoned), if any, exceeds one-half of the Program Related Costs actually spent by Abbott during that Program Year and (y) such additional amount that, after giving effect to the payments referred to in this sentence, causes the Program Related Costs for all years in the Program Term to date to have been funded one-third (1/3) by John Hancock and two-thirds (2/3) by Abbott.

3.5  Hancock Funding Obligation. John Hancock's entire obligation hereunder shall be limited to providing the Program Payments set forth in Section 3.1. Abbott shall be solely responsible for funding all Program Related Costs in excess of the Program Payments from John Hancock.

> Deleted: (s)

> Deleted: M:\Domestic\Pat's & Adams\John Hancock\JH rfa 010312r.DOC
> Deleted: 3/12/01 4:22 PM
> Deleted: 3/12/01 2:19 PM
> Inserted: 3/12/01 4:22 PM

C:\Documents and Settings\Administrator\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010312r.DOC"

CONFIDENTIAL
JH 010048

-13-

ARTICLE 4
PRODUCT RESEARCH AND DEVELOPMENT

4.1    Commercially Reasonable Efforts. Abbott shall be solely responsible for the clinical development, government approval, manufacturing, marketing, sales and distribution of Products. Abbott will use, and will cause each of its Affiliates and Licensees to use, Commercially Reasonable Efforts to pursue the clinical development, government approval, manufacturing, marketing, sales and distribution of Products throughout the Territory. The obligations of Abbott, its Affiliates and Licensees with respect to any Product under this Article 4 are expressly conditioned upon the safety, efficacy and commercial feasibility of each Product, consistent with using Commercially Reasonable Efforts, but no license, assignment or other transfer of rights by Abbott will modify or reduce Abbott's obligations hereunder (except as set forth in Article 14). It is the parties' expectation that under normal circumstances Abbott will file for Regulatory Approval with respect to each Product in Europe within two (2) years from the date of the NDA filing for such Product in the U.S. Territory and in Japan within five (5) years from such NDA filing date; provided, however, that these time frames may be extended or otherwise altered based upon unforeseen circumstances that legitimately impact such regulatory filings in such foreign jurisdictions.

4.2    Marketing and Sale Responsibility. Without limiting the generality of Section 4.1, within six (6) months of obtaining Regulatory Approval for a Product in a given country, Abbott, its Affiliates or Licensees shall commence to market and sell such Product in such country. Abbott's obligation to market and sell a Product shall not apply to a Product in any country if Abbott has not commenced or has ceased marketing and selling such Product in such country substantially on account of adverse business or financial conditions caused by the regulatory authorities or other governmental authorities of such country (including not commencing marketing and selling in a country where the regulatory authorities have price or reimbursement approval and the price or reimbursement approval or that proposed by the regulatory authorities or government authorities is unacceptable to Abbott) which causes the marketing and sale of such Product in such country to be contrary to the financial best interests of John Hancock and Abbott; provided, however, that Abbott, its Affiliates or Licensees shall commence or resume marketing and sale of such Product in such country as soon as reasonably practical after such adverse business or financial conditions cease to exist.

4.3    Failure of Program Compound to Progress.

(a)    Preclinical Programs: ED Program, FTI Program and MMPI Program. With respect to any Program Compound resulting from a Preclinical Program that Abbott ceases to develop past Phase I Clinical Trial (i.e., does not enter a Phase II Clinical Trial) (a "Failed Early Stage Program Compound"), for which Abbott or its Affiliates has or will have one or more other compounds in such respective Preclinical Program (which includes all in-licensed compounds not yet approved for marketing), the next compound to enter Phase I Clinical Trials from such Preclinical Program shall be considered a Program Compound in all respects

| Deleted: M:\Domestic\Pats & Adams\John Hancock\JH.rfa 010312r.DOC |
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 2:13 PM |
| Inserted: 3/12/01 4:22 PM |

C:\Documents and Settings\tamm\Local Settings\Temporary Internet Files\OLK8C\JH.rfa 010312r.DOC

CONFIDENTIAL
JH 010049

-14-

hereunder, as of the date of the cessation of such Failed Early Stage Program Compound; provided however, with respect to each Preclinical Program, there shall be no more than three Program Compounds substituted under this Section 4.3(a) (for an aggregate maximum of nine (9) such substitutions for all Preclinical Programs). At the time a Preclinical Program becomes a Ceased Program, Abbott shall have no further obligation to provide a substitute for a Failed Early Stage Program Compound.

(b)   Failure of ABT-492 or ABT-510 to Yield a Compound that Enters a Phase II Clinical Trial.  If (i) ABT-492 fails to enter a Phase II Clinical Trial, or (ii) ABT-510 fails to enter a Phase II Clinical Trial, then within six (6) months after the failure of the first such Program Compound to enter a Phase II Clinical Trial, Abbott shall substitute a compound in a Phase II Clinical Trial having a commercial value not less than that currently expected for ABT-492 and ABT-510, respectively (as of the date of execution of this Agreement).

(c)   Cessation as a Result of an Acquired Replacement Compound.  If Abbott ceases or substantially ceases developing, marketing or selling any Program Compound (that is in Phase I or beyond) or Product (a "Ceased Compound"), and if such cessation or substantial cessation is a result of Abbott's acquisition of a Replacement Compound, then the Replacement Compound shall be considered a Program Compound and/or Product from the date of such acquisition and the Ceased Compound shall no longer be considered a Program Compound.

In the event that the Replacement Compound has been approved for marketing by the FDA and the Ceased Compound has not been approved for marketing by the FDA as of the date of such acquisition, Section 4.3(d) shall apply and the first paragraph of this Section 4.3(c) shall not apply.

In the event that the Ceased Compound has been approved for marketing by the FDA as of the date of such acquisition, John Hancock shall have the option, in its sole discretion, to have Abbott maximize the commercial value of the Ceased Compound pursuant to Section 4.3(d) instead of having the Ceased Compound be subject to this Section 4.3(c).

(d)   Cessation for Reasons Other than Section 4.3(c).  If a Program Compound (that is in Phase I or beyond) or Product becomes a Ceased Compound for any reason not as a result of the acquisition of a Replacement Compound as set forth in Section 4.3(c) above and provided that such Ceased Compound has commercial value, then

| Deleted: M:\Domestic\Paul & Adams\John Hancock\JH.rfa 010312r.DOC |
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 2:19 PM |
| Inserted: 3/12/01 4:22 PM |

CONFIDENTIAL
JH 010050

-15-

(i) as soon as is practicable Abbott shall maximize the commercial value, if any, of the Ceased Compound to both parties by out-licensing or divesting such Ceased Compound to a third party; provided, however, if the out-licensing or divestiture of such Ceased Compound requires the approval of Taisho Pharmaceutical Co., Ltd. (in the case of Program Compound ABT-773), Eisai Co., Ltd. (in the case of Program Compound ABT-751) or Wakunaga Pharmaceutical Co., Ltd. (in the case of Program Compound ABT-492), pursuant to the respective In-License Agreement, and such entity does not grant such approval, then Abbott shall within a reasonable period of time but not more than three months substitute a compound (which shall thereupon become a "Program Compound") having at least the current and projected potential commercial value as such Ceased Compound;

(ii) John Hancock shall be permitted (but have no obligation) to assist in such out-license and/or divestiture effort; and

(iii) Abbott shall remunerate John Hancock based on the sales of such Ceased Compound by the third party that has acquired or licensed the Ceased Compound (the "Acquirer") in a manner most consistent with the allocation that would have applied hereunder had such Ceased Compound not been so out-licensed or divested, i.e., in accordance with the royalties and milestones payable hereunder. The appropriate royalty rate payable to John Hancock shall be determined by adding the Acquirer's Net Sales of the Ceased Compound to the total Net Sales of other Products.

(e) Divestiture. Notwithstanding anything herein to the contrary, Abbott shall not divest or out-license any Program Compound (which shall mean a sale, license or other transfer by Abbott of the right to develop, market and sell any Product containing such Program Compound either (i) in all of North America or (ii) in the countries of Japan and/or the European Union that have at least two-thirds of the total population of Japan and the European Union), without John Hancock's prior written consent, which consent shall not be unreasonably withheld; provided however, if such Program Compound is being divested as a result of direction from the Federal Trade Commission to so divest, John Hancock's written consent shall not be required.

(f) Notice and Information. Abbott shall promptly notify John Hancock upon occurrence of any decision by Abbott to cease or substantially cease developing, marketing or selling any Program Compound or Product. In addition, Abbott shall provide to John Hancock all information reasonably requested by John Hancock related to any Replacement Compound,

CONFIDENTIAL
JH 010051

-16-

Program Compound, or Product that is subject to the provisions of this Section 4.3.

(g)   Commercially Reasonable Efforts.  Nothing in this Section 4.3 shall lessen any of Abbott's other obligations under this Agreement nor permit Abbott to perform in any manner that is not clearly consistent with using its Commercially Reasonable Efforts hereunder.

4.4   Arm's-Length.  Abbott shall not research, develop, manufacture, market, sell, distribute, out-license or otherwise treat any Program Compounds or Products differently, as compared to any other Abbott compounds or products, on account of any of John Hancock's rights hereunder.  Furthermore, all distribution agreements, licenses, out-licenses and other agreements relating to the research, development, manufacturing, marketing, sale, distribution, licensing, out-licensing or divestiture of and all other transactions involving any Program Compounds or Products to or with any third party (except to Abbott's Affiliates) shall be on arm's-length terms and conditions.

4.5   In-License Agreements.  Abbott shall comply in all material respects with the terms and conditions of the In-License Agreements.  Abbott shall not amend the In-License Agreements or waive any of its rights thereunder without John Hancock's prior written consent (such consent not to be unreasonably withheld), unless such amendment or waiver does not have and would not have a material adverse effect on John Hancock's interests hereunder.  To the extent that Abbott or any of its Affiliates obtains the right to market, distribute or sell Products containing the Program Compound known as ABT-751 in the Eisai Territory, then sales by Abbott, its Affiliates and Licensees of such Products in such territory shall be included in all respects hereunder (including without limitation in Net Sales and the Territory).

ARTICLE 5
PROGRAM INVENTIONS

5.1   Ownership.  As between Abbott and John Hancock, all inventions, innovations, ideas, discoveries, technology, know-how, methods, data, applications and products (in each case whether or not patentable) arising from the Research Program or otherwise related to the Program Compounds (collectively, the "Program Inventions") shall be exclusively owned by or assigned to Abbott.  Abbott shall not divest, out-license or otherwise transfer any of its right, title or interest in or to any Program Inventions which would prevent or impair Abbott's ability to fulfill its obligations to John Hancock under this Agreement.

5.2   Patent Prosecution and Maintenance.  To the extent it owns a Program Invention or has the contractual right to pursue patent protection for a Program Invention, Abbott will use Commercially Reasonable Efforts to obtain patent protection for the Program Inventions in the Territory.  As between Abbott and John Hancock, Abbott shall be responsible for all costs and expenses and control all decisions related to pursuing such patent protection, including the

| Deleted: M:\Domestic\Pals & Adams\John Hancock\JH r\& 010312r.DOC |
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 2:19 PM |
| Inserted: 3/12/01 4:22 PM |

C:\Documents and Settings\whmm\Local Settings\Temporary Internet Files\OLK6C\JH r\& 010312r.DOC

CONFIDENTIAL
JH 010052

-17-

preparation, filing (foreign and/or domestic), prosecution, issuance and maintenance of patent applications or patents covering Program Inventions.

5.3  Enforcement.  As between Abbott and John Hancock, Abbott shall have the sole right and authority to enforce the patents or any other rights arising from the Program Inventions (including without limitation the Patents) against any infringers.  If Abbott initiates any action or lawsuit to enforce such patents or other rights, it shall be solely responsible for the cost and expense thereof.  Abbott will promptly notify John Hancock at such time as it becomes aware of any infringement activities and of any such enforcement actions or lawsuit, and Abbott will provide information concerning them as reasonably requested by John Hancock.  All moneys recovered upon the final judgment or settlement of any such action or lawsuit, less the out-of-pocket cost and expense thereof, shall be allocated between Abbott and John Hancock proportional to Abbott's lost profits and John Hancock's lost royalties as a result of such infringement.

## ARTICLE 6
## MILESTONE PAYMENTS TO JOHN HANCOCK

6.1  [Intentionally omitted].

6.2  Management Fee.  On December 1, 2002, 2003 and 2004, Abbott shall pay to John Hancock a management fee, each of which shall be in the amount of Two Million Dollars ($2,000,000).

6.3  Milestone Notification and Payments.  Abbott shall promptly notify John Hancock of the occurrence any of the following events that give rise to Abbott's obligation to make a payment pursuant to this Section 6.3 (each, a "Milestone Payment").  Except as hereinafter limited, Abbott shall pay the following Milestone Payments to John Hancock in the amounts and at the times set forth below with respect to each Program Compound:

(a)    One Million Dollars ($1,000,000) shall be paid within thirty (30) days after the allowance by the FDA of each Investigational New Drug Application for such Program Compound;

(b)    Two Million Dollars ($2,000,000) shall be paid within thirty (30) days after the initiation of each Phase I Clinical Trial with such Program Compound;

(c)    Three Million Dollars ($3,000,000) shall be paid within thirty (30) days after the initiation of each Phase II Clinical Trial with such Program Compound;

Deleted: M:\Domestic\Pals & Adams\John Hancock\JH #a 010312r.DOC

Deleted: 3/12/01 4.22 PM

Deleted: 3/12/01 2:18 PM

Inserted: 3/17/01 4:22 PM

C:\Documents and Settings\brm\Local Settings\Temporary Internet Files\OLK6C\JH #a 010312r.DOC

CONFIDENTIAL
JH 010053

-18-

(d)  Four Million Dollars ($4,000,000) shall be paid within thirty (30) days after the initiation of each Phase III Clinical Trial with such Program Compound; and

(e)  Five Million Dollars ($5,000,000) shall be paid within thirty (30) days after the filing of each NDA with the FDA for such Program Compound.

In addition, except as hereinafter limited, Abbott shall pay the following Milestone Payments to John Hancock in the amounts and at the times set forth below:

(f)  (i)  Twenty Million Dollars ($20,000,000) shall be paid within thirty (30) days after the Regulatory Approval of the first Product in the U.S. Territory;

(ii)  Ten Million Dollars ($10,000,000) shall be paid within thirty (30) days after the Regulatory Approval of the second Product in the U.S. Territory; and

(iii)  Ten Million Dollars ($10,000,000) shall be paid within thirty (30) days after the Regulatory Approval of third Product in the U.S. Territory.

The aggregate of Milestone Payments under Section 6.3(a), (b), (c), (d) and (e) for all Program Compounds shall be limited to Eight Million Dollars ($8,000,000), and once such aggregate limit has been paid, no further payments shall be due and payable under Sections 6.3(a), (b), (c), (d) or (e).

The aggregate of Milestone Payments under Sections 6.3(a), (b), (c), (d) and (e) for all Program Compounds shall be limited to zero dollars ($0) during the first Program Year, Two Million Dollars ($2,000,000) during the second Program Year, and Six Million Dollars ($6,000,000) during the third Program Year, and once such annual limit has been reached for these particular Program Years, no further payments shall be due under Sections 6.3(a), (b), (c), (d) and (e) for the remainder of such Program Year; provided that any amounts that would have been due to John Hancock but for such annual limits shall be paid in subsequent Program Years so long as the Program Compound to which it relates has not been abandoned, divested or out-licensed by Abbott, subject to the Eight Million Dollar ($8,000,000) limitation set forth above. Subject to the limitations above, the Milestone Payments under Sections 6.3(a), (b), (c), (d) and (e) may be made more than once with respect to each Program Compound.

The aggregate of Milestone Payments under Section 6.3(f) for all Program Compounds shall be limited to Forty Million Dollars ($40,000,000), and once such aggregate limit has been paid, no further payments shall be due and payable under Section 6.3(f). In addition, Milestone Payments under Section 6.3(f) shall not be paid more than once for any particular Program Compound.

Exhibit 1.40 sets forth the current stage of clinical development for each Program Compound.

| Deleted: M\Domestic\Pats & Adam\John Hancock\JH rfa 010312r.DOC |
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 2:19 PM |
| Inserted: 3/12/01 4:22 PM |

C:\Documents and Settings\anvm\Local Settings\Temporary Internet Files\OLK9C\JH rfa 010312r.DOC

CONFIDENTIAL
JH 010054

-19-

## ARTICLE 7
## ROYALTIES

7.1     Royalty Rates.  Subject to the limitation set forth below, Abbott shall pay to John Hancock royalties equal to the following percentages of Net Sales, aggregated on a yearly basis, of all Products in the Territory:

| Royalty percentage | Yearly Net Sales (in millions) of all Products in the Territory |
|---|---|
| 8.5% of those Net Sales | up to $400 |
| and then 4% of those Net Sales | in excess of $400 up to $1,000 |
| and then 1% of those Net Sales | in excess of $1,000 up to $2,000 |
| and then 0.5% of those Net Sales | in excess of $2,000 |

Net Sales shall be aggregated yearly (i) in the case of the U.S. Territory, on a calendar year basis, together with (ii) in the case of the International Territory, on a December 1 to November 30 basis, in each case consistent with the determination of Quarterly Reporting Periods.

7.2     Royalty Term.  The duration of the obligation to make royalty payments on each Product shall be determined on a country-by-country basis and shall last for the duration of the Royalty Term in each given country for such Product.

## ARTICLE 8
## ROYALTY REPORTS AND ACCOUNTING

8.1     Reports, Exchange Rates.  With respect to every Quarterly Reporting Period for which Abbott is obligated to pay any royalty hereunder, Abbott shall furnish to John Hancock a single written report for such Quarterly Reporting Period within sixty (60) days after the end of such Quarterly Reporting Period (that is, within sixty (60) days after each March 31, June 30, September 30 and December 31, as the case may be) showing in reasonably specific detail:

   (a)     the total gross sales in each country for each Product sold by Abbott, its Affiliates and Licensees in the Territory and the detailed calculation of Net Sales from gross sales in each country for each Product;

   (b)     the royalties payable in Dollars, if any, which shall have accrued hereunder;

   (c)     the dates of the First Commercial Sale of each Product in any country in the Territory during such Quarterly Reporting Period; and

   (d)     the exchange rates used in determining the amount of Dollars.

| Deleted: M:\Domestic\Pats & Adsers\John Hancock\JH rfa 01031 2r.DOC |
|---|
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 2:19 PM |
| Inserted: 3/12/01 4:22 PM |

C:\Documents and Settings\mvn\Local Settings\Temporary Internet Files\OLK6C\JH rfa 01031 2r.DOC

CONFIDENTIAL
JH 010055

-20-

With respect to sales of Products invoiced in Dollars, the gross sales, Net Sales (including all adjustments and deductions permitted to be made hereunder in calculating the same), and royalties payable shall be expressed in Dollars. With respect to sales of Products invoiced in a currency other than Dollars, the gross sales, Net Sales (including all adjustments and deductions permitted to be made hereunder in calculating the same) and royalties payable shall be expressed in their Dollar equivalent, calculated using the Inter Bank rate set forth in the International Report published by International Reports Inc. as Foreign Exchange Rates quoted in New York on the day nearest the last business day of the Quarterly Reporting Period.

8.2     Audits.

(a)     Upon the written request of John Hancock and, in the absence of any breach by Abbott hereunder, not more than once in each calendar year, Abbott shall permit John Hancock and an independent certified public accounting firm of nationally recognized standing, selected by John Hancock and reasonably acceptable to Abbott, at John Hancock's expense, to have access during normal business hours to such of the records of Abbott, its Affiliates and Licensees to verify the accuracy of the royalty reports and the amounts and calculation of any payments required hereunder for any year ending not more than five (5) years prior to the date of such request.

(b)     If such accounting firm concludes that additional royalties or other payments were owed during such period, Abbott shall have the option to invoke the proceedings of Section 16.7 below or pay the additional royalties or other payments within thirty (30) days after the date John Hancock delivers to Abbott such accounting firm's written report so concluding. The reasonable fees and expenses charged by such accounting firm shall be paid by John Hancock; provided, however, if the audit discloses that the amounts payable by Abbott for any Quarterly Reporting Period are more than one hundred five percent (105%) of the royalties actually paid for such period, then Abbott shall pay the reasonable fees and expenses charged by such accounting firm.

(c)     Abbott shall cause its Affiliates to, and shall include in each license granted by it relating to a Program Compound or Product a provision requiring the Licensee to, (i) make reports to Abbott, (ii) keep and maintain records of Net Sales made pursuant to such license and (iii) grant access to such records by John Hancock and its accounting firm or other auditor to the same extent required of Abbott under this Agreement.

(d)     All reports and payments not disputed as to correctness by John Hancock within five (5) years after receipt thereof shall thereafter conclusively be deemed correct for all purposes, and Abbott, its Affiliates and Licensees

Deleted: M:\Domestic\Pars & Adams\John Hancock\JH 6a 010317r.DOC
Deleted: 3/12/01 4:22 PM
Deleted: 3/12/01 2:19 PM
Inserted: 3/12/01 4:22 PM

C:\Documents and Settings\brent\Local Settings\Temporary Internet Files\OLK8C\jlh rfa 010317r.DOC

CONFIDENTIAL
JH 010056

-21-

shall be released from any liability or accountability with respect to such reports and payments.

8.3    Confidential Financial Information. John Hancock shall treat all information subject to review under this Article 8, and shall cause its accounting firm to agree to treat all such information, in accordance with the provisions of Article 10.

8.4    Accounting Principles. All accounting hereunder, including without limitation all determinations of gross sales, Net Sales (including all adjustments and deductions permitted to be made hereunder in calculating the same), Program Related Costs and all calculations underlying such determinations, shall be made in accordance with generally accepted accounting principles as in effect in the United States, consistently applied.

## ARTICLE 9
### PAYMENTS

9.1    Payment Terms. With respect to every Quarterly Reporting Period for which Abbott is obligated to pay a royalty hereunder, such royalties shall be due and payable in a single payment within sixty (60) days of the end of such Quarterly Reporting Period (that is, within sixty (60) days of each March 31, June 30, September 30 and December 31, as the case may be). Payment of royalties may be made in advance of such due date.

9.2    Payment Method. All royalties and other payments by Abbott to John Hancock under this Agreement shall be made by bank wire transfer in immediately available funds in accordance with the instructions set forth on Exhibit 9.2 attached hereto or in accordance with such other instructions as John Hancock may give from time to time.

9.3    Late Payments. Each party shall pay interest to the other on the aggregate amount of any payments by it that are not paid on or before the date such payments are due under this Agreement, including, without limitation, any disputed payments or payments resulting from any audit, at a rate per annum equal to the lesser of (a) the prime rate of interest plus two hundred (200) basis points as reported by Citibank, N.A. in New York, from time to time (with any change in such reported rate being effective immediately for purposes hereof), or (b) the highest rate permitted by applicable law, calculated on the number of days such payments is delinquent until paid in full in cash. All such amounts shall be payable upon demand.

## ARTICLE 10
### CONFIDENTIALITY

10.1    Nondisclosure Obligations. Except as otherwise provided in this Article 10, during the term of the Agreement and for a period of ten (10) years thereafter, (a) John Hancock shall maintain in confidence in accordance with such procedures as are adopted by John Hancock to protect its own confidential information and shall use only for purposes of this Agreement

C:\Documents and Settings\bnmLocal Settings\Temporary Internet Files\OLK6\CUH r!a 010317r.DOC

CONFIDENTIAL
JH 010057

-22-

(including, without limitation, enforcement of the terms hereof), information and data related to the Program Compounds or Products; and (b) John Hancock shall also maintain in confidence in accordance with such policies, and use only for purposes of this Agreement, all information and data supplied by Abbott under this Agreement, which if disclosed in writing is marked "confidential", if disclosed orally is promptly thereafter summarized and confirmed in writing to the other party and marked "confidential", or if disclosed in some other form is marked "confidential."

10.2   Permitted Disclosures.  For purposes of this Article 10, information and data described in clause (a) or (b) above shall be referred to as "Confidential Information".  John Hancock may disclose Confidential Information as required by applicable law, regulation or judicial process, provided that John Hancock shall, if legally permitted, give Abbott prompt written notice thereof.  The obligation not to disclose or use Confidential Information shall not apply to any part of such Confidential Information that (i) is or becomes patented, published or otherwise part of the public domain other than by acts or omissions of John Hancock in contravention of this Agreement; or (ii) is disclosed to John Hancock by a third party, provided such Confidential Information was not obtained on a confidential basis by such third party from Abbott, its Affiliates or Licensees; or (iii) prior to disclosure under the Agreement, was already in the possession of John Hancock, provided such Confidential Information was not obtained directly or indirectly from Abbott, its Affiliates or Licensees under an ongoing obligation of confidentiality; or (iv) is disclosed in a press release agreed to by both parties under Section 10.3 below.

10.3   Publicity Review.  Without the prior written consent of the other party, neither party shall make any statement to the public regarding the execution and/or any other aspect of the subject matter of this Agreement and John Hancock shall not make any statement to the public regarding any work under the Research Program; provided that, Abbott may make statements to the public regarding work done under the Research Program (without reference to or mention of John Hancock) and the commercialization of any Products resulting therefrom in accordance with its standard business practices.  John Hancock and Abbott shall not disclose any terms or conditions of this Agreement to any third party without the prior consent of the other party, except as set forth above in this Section 10.3 or as required by applicable law, regulation or court order.  The parties agree not to issue a press release announcing the execution of this Agreement.

ARTICLE 11
TERM AND TERMINATION

11.1   Expiration.  This Agreement shall expire upon satisfaction of Abbott's obligations to pay royalties under Section 7.2 and all other amounts under this Agreement.

11.2   Termination; Material Breach.  It is the parties' express intent that consideration shall be given to remedying any breach of this Agreement through the payment of monetary damages or such other legal or equitable remedies as shall be appropriate under the

CONFIDENTIAL
JH 010058

-23-

circumstances and that there shall only be a limited right to terminate this Agreement under the following circumstances.

(a) In the event that the court, in accordance with the procedures set forth in Section 16.2, has issued a ruling that John Hancock has breached its obligation under Section 3.1 of this Agreement (obligation to make payments), and such ruling specified the actions to be taken by John Hancock on account of such breach, and John Hancock has failed to comply with the terms of such ruling within the time period specified therein for compliance and the time for any appeal has expired without the submission of an appeal, then, in addition to all other rights available to Abbott under law and equity, including its right to enforce such ruling in court, Abbott shall have the right to terminate the Agreement as a result of John Hancock's failure to abide by the terms of this Agreement and such ruling.

(b) In the event that the court, in accordance with the procedures set forth in Section 16.2, has issued a ruling that Abbott has breached a material obligation under this Agreement, and such ruling specified the actions to be taken by Abbott on account of such breach, and Abbott has failed to comply with the terms of such ruling within the time period specified therein for compliance and the time for any appeal has expired without the submission of an appeal, then, in addition to all other rights available to John Hancock under law and equity, including its right to enforce such ruling in court, John Hancock shall have the right to terminate the Agreement, each as a result of Abbott's failure to abide by the terms of this Agreement and such ruling.

11.3     Effect of Expiration or Termination. Expiration or, if applicable, termination of this Agreement shall not relieve the parties of any obligation accruing prior to such expiration or termination. The provisions of Articles 8 (Royalty Reports and Accounting), 10 (Confidentiality), 11 (Term and Termination), 12 (Warranties and Indemnification) and 16 (Miscellaneous) shall survive the expiration or termination of this Agreement.

ARTICLE 12
WARRANTIES AND INDEMNITY

12.1     John Hancock Representations and Warranties. John Hancock represents and warrants to Abbott that as of the Execution Date:

(a) The execution and delivery of this Agreement and the performance of the transactions contemplated hereby have been duly authorized by all appropriate John Hancock corporate action. This Agreement constitutes

Deleted: M:\Domestic\Pats & Admin\John Hancock\JH rfa 010312r.DOC

Deleted: 3/12/01 4:22 PM

Deleted: 3/12/01 2:19 PM

Inserted: 3/12/01 4:22 PM

C:\Documents and Settings\temp\Local Settings\Temporary Internet Files\OLK5C\JH rfa 010312r.DOC

CONFIDENTIAL
JH 010059

-24-

John Hancock's valid and binding legal obligation, enforceable against it in accordance with its terms.

(b)     The performance by John Hancock of any of the terms and conditions of this Agreement on its part to be performed does not and will not constitute a breach or violation of its organizational documents or any other material agreement or understanding, written or oral, to which it is a party or any law, statute, rule or regulation by which it is bound.

(c)     No consent, approval, license or authorization of, or designation, declaration or filing with, any court or governmental authority is or will be required on the part of John Hancock in connection with the execution, delivery and performance by John Hancock of this Agreement or any other agreements or instruments executed and delivered by John Hancock in connection herewith or therewith, including, without limitation, any filings pursuant to federal or state securities laws or pursuant to any federal anti-trust laws.

(d)     Neither John Hancock nor any person acting on its behalf (i) has taken or will take any action which would subject this Agreement and the consummation of the transactions contemplated hereby to the registration or qualification requirements of any federal or state securities laws, (ii) has dealt with any broker, finder or other similar person in connection with the transactions contemplated by this Agreement or (iii) is under any obligation to pay any broker's fee, finder's fee or commission in connection with such transactions.

12.2    Abbott Representations and Warranties. Abbott represents and warrants to John Hancock that as of the Execution Date:

(a)     The execution and delivery of this Agreement and the performance of the transactions contemplated hereby have been duly authorized by all appropriate Abbott corporate action. This Agreement constitutes Abbott's valid and binding legal obligation, enforceable against it in accordance with its terms.

(b)     The performance by Abbott of any of the terms and conditions of this Agreement on its part to be performed does not and will not constitute a breach or violation of its organizational documents or any other agreement or understanding, written or oral, to which it is a party or any law, statute, rule or regulation by which it is bound.

(c)     No consent, approval, license or authorization of, or designation, declaration or filing with, any court or governmental authority is or will be required on the part of Abbott in connection with the execution, delivery and performance by Abbott of this Agreement or any other agreements or,

| Deleted: M:\Domestic\Pats & Adams\John Hancock\JH rfa 010312r.DOC |
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 2:19 PM |
| Inserted: 3/12/01 4:22 PM |

C:\Documents and Settings\tlowe\Local Settings\Temporary Internet Files\OLK8\JH rfa 010312r.DOC

CONFIDENTIAL
JH 010060

-25-

instruments executed and delivered by Abbott in connection herewith or therewith, including, without limitation, any filings pursuant to federal or state securities laws or pursuant to any federal anti-trust laws, except those consents, approvals, licenses, authorizations, and other requirements imposed by governmental authorities (both U.S. and foreign) and such declarations and filings with governmental authorities (both U.S. and foreign) required in the normal course of pharmaceutical research, development, marketing and sale.

(d)    Set forth on Exhibit 12.2(d) is the full name, chemical name, detailed description of the stage of development and current status, for each Program Compound. Set forth on Exhibit 1.6 in each Annual Research Plan is a description of projected milestones and dates thereof, projected year of NDA filing, and projected costs to be incurred by Abbott during the Program Term, for each Program Compound. Such projections were prepared in good faith and with due care based on reasonable assumptions, and represent the reasonable estimate of Abbott based on information available as of the date of such projections and as of the date hereof; it being agreed that such projections do not constitute any warranty as to the future performance of the Program Compounds and that actual results may vary from such projections.

(e)    Set forth on Exhibit 12.2(e) is a list and description of all domestic and foreign patents, patent rights, patent applications and all patent applications that are in the process of being prepared that are owned by or registered in the name of Abbott, or of which Abbott is a licensee or in which Abbott has any right, which claim any of the Program Compounds (the "Patents"). Abbott solely owns all of the Patents, except as indicated on Exhibit 12.2(e). All of the material Patents have been duly filed in or issued by the United States Patent and Trademark Office or the equivalent foreign patent office identified on Exhibit 12.2(e), as the case may be, and have been properly maintained and renewed in accordance with all applicable laws and regulations. With respect to the Patents that it does not own, Abbott has an exclusive and valid license thereunder to develop, make, have made, use, market and sell (with the right to sublicense) the applicable Program Compounds in the entire Territory; provided however, (i) with respect to Italy, Abbott has such rights that are co-exclusive with Eisai Co. Ltd. for the Program Compound known as ABT-751 and (ii) with respect to Japan, Abbott has such rights that are co-exclusive with Taisho Pharmaceutical Co., Ltd. for the Program Compound known as ABT-773. Except with respect to the Preclinical Programs, to Abbott's knowledge, it is not necessary to obtain or license any patents, patent rights, inventions, copyrights, manufacturing processes, formulae, trade secrets, proprietary rights or know-how that it does not currently have in order to (i) develop, make, have made, use, market and sell the Program Compounds or (ii) conduct the Research Program as heretofore conducted

[ C:\Documents and Settings\kmmt\Local Settings\Temporary Internet Files\OLK8C\JH rfa 01031?r DOC]

| Deleted: M:\Dome\Kid\Pals & Adams\John Hancock\JH rfa 010315r.DOC |
| Deleted: 3/12/01 4:21 PM |
| Deleted: 3/12/01 2:19 PM |
| Inserted: 3/12/01 4:22 PM |

CONFIDENTIAL
JH 010061

-26-

and as proposed to be conducted. Except with respect to those Program Compounds that are the subject of In-License Agreements, the Program Compounds are owned exclusively by Abbott, free and clear of any liens or encumbrances of any other person and, to Abbott's knowledge, Abbott does not require the consent of any other person to develop, make, have made, use, market and sell the Program Compounds.

(f)     Except as set forth in Exhibit 12.2(f) (but in any event, as of the Execution Date, such matters are not, and could not reasonably be expected to be material), Abbott has not received any communications alleging that, and no claim is pending or, to the knowledge of Abbott, threatened to the effect that, the operations of Abbott with respect to the Research Program or the Program Compounds infringe upon or conflict with (or will infringe or conflict with) the asserted rights of any other person under any domestic or foreign patent, trademark, service mark, copyright, trade secret, proprietary right or any other intellectual property right, and, except for the Preclinical Programs, there is no material basis known to Abbott for any such claim (whether or not pending or threatened). No claim is pending or, to the knowledge of Abbott, threatened to the effect that any of the Patents are invalid or unenforceable by Abbott, and there is no material basis known to Abbott for any such claim (whether or not pending or threatened). The publication of any material technical information with respect to the Program Compounds developed by and belonging to Abbott is subject to review and approval under Abbott's existing procedures.

(g)     Except for the In-License Agreements and customary employment and consulting agreements with Abbott's employees and consultants, there are no outstanding options, licenses, or agreements of any kind relating to the Patents or any of the Program Compounds or the transactions contemplated by this Agreement, which license the Patents or any technical information developed in the course of the clinical development program to any third party to register, market or sell any of the Program Compounds or Products.

(h)     To the knowledge of Abbott with respect to the Research Program and each of the Program Compounds, Abbott is not now, and in performing its obligations hereunder will not be, in any way making an unlawful or wrongful use of any confidential information, know-how, or trade secrets of any other person.

(i)     Neither this Agreement nor any Exhibit to this Agreement (including the compound reports attached as Exhibit 12.2(i) hereto (the "Compound Reports")) contains any untrue statement of material fact or omits to state any material fact necessary to make the statements contained herein or therein not misleading. There is no fact known to Abbott (other than generally available information concerning the pharmaceutical industry in

Deleted: M:\Domestic\Pats & Adams\John Hancock\JH rfa 010012r.DOC

Deleted: 3/12/01 4:22 PM

Deleted: 3/12/01 2:19 PM

Inserted: 3/12/01 4:22 PM

C:\Documents and Settings\www.ecid.Settings\Temporary Internet Files\OLK6C\JH rfa 010212.DOC

CONFIDENTIAL
JH 010062

-27-

general) as of the date of this Agreement that has not been disclosed in this Agreement or any Exhibit to this Agreement which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial) of the Research Program or any of the Program Compounds.

(j)    Neither Abbott nor any person acting on its behalf (i) has taken or will take any action which would subject this Agreement and the consummation of the transactions contemplated hereby to the registration or qualification requirements of any federal or state securities laws, (ii) has dealt with any broker, finder or other similar person in connection with the transactions contemplated by this Agreement or (iii) is under any obligation to pay any broker's fee, finder's fee or commission in connection with such transactions.

(k)    Other than generally publicized actions, proceedings or investigations concerning the pharmaceutical industry in general, there is no action, proceeding or investigation pending or, to the knowledge of Abbott, threatened which (i) questions the validity of this Agreement or any action taken or to be taken by Abbott pursuant thereto or (ii) which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial) of the Research Program or any of the Program Compounds.

(l)    With respect to the Research Program and each of the Program Compounds, Abbott has (and in the future will have) obtained, to the extent permitted by law, from each of its employees, consultants, Affiliates and Subcontractors an agreement that reasonably protects Abbott's interest in the Program Inventions, Program Compounds and Products.

(m)    With respect to each Program Compound, since the date of its respective Compound Report, to the knowledge of Abbott, no condition, circumstance or fact has arisen (other than generally available information concerning the pharmaceutical industry in general) nor has Abbott made any change in the conduct of the Research Program which, individually or in the aggregate, has resulted in, or could reasonably be expect to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial) of such Program Compounds.

(n)    Each In-License Agreement is valid, binding and in full force and effect, and there is no event which has occurred or exists, which constitutes or which, with notice and/or the passage of time, would constitute a material default or breach under any such contract by Abbott or, to Abbott's knowledge, any other party thereto, or would cause the acceleration of any

| Deleted: M:\Domestic\Pate & Adams\John Hancock\UH da 010312r\DOC |
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 2:19 PM |
| Inserted: 3/12/01 4:22 PM |

C:\Documents and Settings\illmmt\Local Setting\Temporary Internet Files\OLK6C\UH da 010312r.DOC

CONFIDENTIAL
JH 010063

-28-

obligation of any party thereto or give rise to any right of termination or cancellation thereof. Abbott has no reason to believe that the parties to each In-License Agreement will not fulfill their obligations thereunder in all material respects or that such parties do not have the right to grant the licenses granted thereunder. Abbott has no reason to believe that it will not fulfill its obligations under the In-License Agreements. Under the Eisai Agreement, neither Abbott nor its Affiliates has the right to market, distribute or sell Products containing the Program Compound known as ABT-751 in the Eisai Territory (with the exception of Italy).

12.3    No Conflict. Abbott and John Hancock represent and warrant that this Agreement does not, and will not, conflict with any other right or obligation provided under any other agreement or obligation that Abbott or John Hancock has with or to any third party.

12.4    Compliance with Law. Each party represents and warrants to the other that it will comply with all applicable laws, regulations and guidelines in connection with its performance of its obligations and rights pursuant to this Agreement, including the regulations of the United States and any other relevant nation concerning any export or other transfer of technology, services or products.

12.5    No Other Warranties. EACH PARTY TO THIS AGREEMENT AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY OTHER REPRESENTATIONS OR WARRANTIES, AND EACH HEREBY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES MADE BY ITSELF OR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, FINANCIAL AND LEGAL ADVISORS OR OTHER REPRESENTATIVES, WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO THE OTHER OR THE OTHER'S REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION WITH RESPECT TO ANY ONE OR MORE OF THE FOREGOING.

12.6    General Indemnification of John Hancock. Abbott shall indemnify and hold John Hancock and its Affiliates, agents, directors and employees harmless, and hereby forever releases and discharges John Hancock and its Affiliates, agents, directors and employees, from and against all Losses related to or arising out of, directly or indirectly, (i) any negligence, recklessness or intentional misconduct of Abbott or its Affiliates, agents, directors, employees, Subcontractors, licensees (including Licensees) or sublicensees in connection with the Research Program, Program Compounds or Products, or (ii) any manufacture, use, storage, distribution or sale of the Program Compounds or Products by anyone, including without limitation all Losses related to any personal injury or death, or (iii) any breach by Abbott of its representations, warranties or obligations hereunder, or (iv) the consummation of the transactions contemplated hereby, except, in each case, to the extent any such Losses are the result of (A) any breach by John Hancock of its representations, warranties or obligations hereunder, or (B) any negligence,

Deleted: M.\Domestic\P'als & Adams\John Hancock\JH rla 010312r.DOC

Deleted: 3/12/01 4:22 PM

Deleted: 3/12/01 2:19 PM

Inserted: 3/12/01 4:22 PM

| C:\Documents and Settings\tawa\Local Settings\Temporary Internet Files\OLK6C\JH rla 010312r.DOC

CONFIDENTIAL
JH 010064

-29-

recklessness, or intentional misconduct by John Hancock or its Affiliates, agents, directors, employees.

12.7    Indemnification Relating to Certain In-Licensed Compounds.  Abbott shall indemnify and hold John Hancock and its Affiliates, agents, directors and employees harmless, and hereby forever releases and discharges John Hancock and its Affiliates, agents, directors and employees, from and against all Losses to the extent related to or arising out of, directly or indirectly, the fact that Abbott's rights in the Program Compounds known as ABT-773, ABT-492 and ABT-751 and the Patents and other patent rights, copyrights, trade secret rights and other intellectual property rights related thereto arise from the Taisho Agreement, the Wakunaga Agreement or the Eisai Agreement respectively, rather than being owned by Abbott as with the other Program Compounds.  Accordingly, by way of example and without limiting the foregoing, Abbott's indemnification obligation under this Section 12.7 will arise upon (i) any impairment of Abbott's ability to perform its obligations under this Agreement in the entire Territory as a result of Abbott's rights to the Program Compounds known as ABT-773, ABT-442 and ABT-751 arising from the Taisho Agreement, Wakunaga Agreement and the Eisai Agreement, respectively or (ii) a breach by Abbott or any other person of any of the In-License Agreements; except, in each case, to the extent any such Losses are the result of (A) any breach by John Hancock of its representations, warranties or obligations hereunder, or (B) any negligence, recklessness, or intentional misconduct by John Hancock or its Affiliates, agents, directors, employees.

12.8    Procedure.  If John Hancock or any of its Affiliates, agents, directors or employees (each, an "Indemnitee") intends to claim indemnification under this Article 12, it shall promptly notify Abbott (the "Indemnitor") of any Loss or action in respect of which the Indemnitee intends to claim such indemnification, and the Indemnitor shall have the right to participate in, and, to the extent the Indemnitor so desires, to assume the defense thereof with counsel selected by the Indemnitor; provided, however, that an Indemnitee shall have the right to retain its own counsel, with the fees and expenses of such counsel to be paid by the Indemnitor, if representation of such Indemnitee by the counsel retained by the Indemnitor would be inappropriate due to actual or potential differing interests between such Indemnitee and any other party represented by such counsel in such proceedings.  The indemnity obligation in this Article 12 shall not apply to amounts paid in settlement of any loss, claim, damage, liability or action if such settlement is effected without the consent of the Indemnitor, which consent shall not be withheld unreasonably or delayed.  The failure to deliver notice to the Indemnitor within a reasonable time after the commencement of any such action, if materially prejudicial to its ability to defend such action, shall relieve the Indemnitor of any liability to the Indemnitee under this Article 12 only to the extent arising from the tardiness or absence of such notice, but the omission so to deliver notice to the Indemnitor will not relieve it of any liability that it may have to any Indemnitee otherwise than under this Article 12.  The Indemnitee shall cooperate fully with the Indemnitor and its legal representatives in the investigation of any action, claim or liability covered by indemnification under this Article 12, at the expense of the Indemnitor.

12.9    Insurance.  Abbott shall at its expense maintain, through self-insurance or otherwise, product liability insurance with respect to the development, manufacture, sale and use of Products and Program Compounds in such amounts and on such terms as Abbott customarily

Deleted: M:\Docments\CPals & Admin\John Hancock\JH rfa 010312r.DOC
Deleted: 3/12/01 4:22 PM
Deleted: 3/12/01 2:19 PM
Inserted: 3/12/01 4:22 PM

C:\Documents and Settings\bavel\Local Settings\Temporary Internet Files\OLK6C\JH rfa 210312r.DOC

CONFIDENTIAL
JH 010065

-30-

maintains with respect to its other similar products. Abbott shall maintain such insurance for so long as it continues to develop, manufacture or sell any Products or Program Compounds, and thereafter for so long as Abbott customarily currently maintains such insurance.

12.10  Acknowledgment. Abbott and John Hancock acknowledge that Abbott has not delivered or disclosed the contents of any of the In-License Agreements to John Hancock.

ARTICLE 13
FORCE MAJEURE

Neither party shall be held liable or responsible to the other party nor be deemed to have defaulted under or breached this Agreement for failure or delay in fulfilling or performing any term of this Agreement when such failure or delay is caused by or results from causes beyond the reasonable control of the affected party including but not limited to fire, floods, embargoes, war, acts of war (whether war be declared or not), insurrections, riots, civil commotions, strikes, lockouts or other labor disturbances, acts of God or acts, omission or delays in acting by any governmental authority; provided that such affected party shall provide the other party with prompt notice of the circumstances surrounding such a material failure or delay, after which the parties will amend this Agreement upon terms and conditions that are mutually agreeable to equitably account to the party that does not so fail or delay.

ARTICLE 14
ASSIGNMENT

Except as expressly provided hereunder, this Agreement may not be assigned or otherwise transferred, nor may any right or obligations hereunder be assigned or transferred by either party without the consent of the other party; and, in addition, both parties acknowledge and agree that the obligations of Abbott hereunder are personal to Abbott and that Abbott is uniquely qualified to perform them; provided, however, that either party shall be obligated to assign this Agreement and its rights and obligations hereunder in connection with the transfer or sale of all or substantially all of its business, or in the event of its merger or consolidation or change in control or similar transaction and in such event such party shall cause its successor or transferee in such transaction to assume all of the obligations of such party. Any permitted assignee shall assume all obligations of its assignor under this Agreement. Notwithstanding the foregoing, John Hancock shall have the right to assign its rights (but not its obligation to make payments under Section 3.1) in whole or in part (provided that, any assignment in part shall mean an assignment of a pro rata share of the entirety of John Hancock's rights hereunder) without Abbott's consent (and following any such assignment all references to John Hancock herein shall include any such assignee); provided that: (i) each assignee of such rights must be a bank, insurance company or other institutional investor; (ii) there shall be no greater than five (5) assignees, (iii) if any such assignee is located outside the United States John Hancock shall notify Abbott at least sixty (60) days in advance, (iv) if any claim arises with respect to Abbott's failure to make payments, then during the term of the Research Program (but in any event not longer than four years from the date hereof), any such claim must be brought by John Hancock, and not

| Deleted: right to payment in whole or in part and no other rights in any other person without Abbott's consent. John Hancock shall not have any right to assign any of its obligations to any third party. With respect to any assignment of payments, the following shall apply: (i) any assignee of such right to payments |
| Deleted: M:\Domestic\Pats & Adams\John Hancock\JH rla 010312I.DOC |
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 2:19 PM |
| Inserted: 3/12/01 4:22 PM |

CONFIDENTIAL
JH 010066

-31-

an assignee.  In soliciting potential assignees for such right to payments, John Hancock shall not disclose any Confidential Information hereunder to more than ten (10) potential assignees.  Any potential assignee to whom John Hancock discloses Confidential Information must have executed a confidentiality agreement no less stringent than Article 10 hereof.  Furthermore, if John Hancock plans to exercise its right of assignment hereunder, John Hancock shall first notify Abbott of such plans in writing.  Abbott shall have the first right to negotiate the purchase of any such assignment rights.  If within fifteen (15) days after receipt of such notice the parties have not agreed upon the principal terms of such arrangement or if within forty-five (45) days after receipt of such notice, the parties have not executed a final written agreement reflecting such arrangement, then John Hancock shall have no further obligations to Abbott with respect to such first right of negotiation.

Deleted: the consumed hereof.

ARTICLE 15
SEVERABILITY

Each party hereby agrees that it does not intend its execution and delivery hereof or its performance hereunder to violate any public policy, statutory or common laws, rules, regulations, treaty or decision of any government agency or executive body thereof of any country or community or association of countries.  If and to the extent any term or provision of this Agreement is held to be invalid, illegal or unenforceable by a court or other governmental authority of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement, which shall remain in full force and effect.  The holding of a term or provision to be invalid, illegal or unenforceable in a jurisdiction shall not have any effect on the application of the term or provision in any other jurisdiction.

ARTICLE 16
MISCELLANEOUS

16.1    Notices.  Any consent, notice or report required or permitted to be given or made under this Agreement by one of the parties hereto to the other shall be in writing, delivered personally or by facsimile (and promptly confirmed by personal delivery, U.S. first class mail or courier), U.S. first class mail or courier, postage prepared (where applicable), addressed to such other party at its address indicated below, or to such other address as the addressee shall have last furnished in writing to the addressor and (except as otherwise provided in this Agreement) shall be effective upon receipt by the addressee.

If to John Hancock:    John Hancock Life Insurance Company
200 Clarendon Street, T-57
Boston, MA  02117
Attention: Bond & Corporate Finance Group
Telephone:    617-572-9624
Fax:              617-572-1628

Deleted: M:\Domestic\Pats & Adams\John Hancock\JH r/a 010312r.DOC
Deleted: 3/12/01 4:22 PM
Deleted: 3/12/01 2:19 PM
Inserted: 3/12/01 4:23 PM

C:\Documents and Settings\luml\Local Settings\Temporary Internet Files\OLK6C\JH r/a 010312r.DOC

CONFIDENTIAL
JH 010067

-32-

| copy to: | John Hancock Life Insurance Company |
| | 200 Clarendon Street, T-50 |
| | Boston, MA 02117 |
| | Attention: Investment Law Division |
| | Telephone: 617-572-9205 |
| | Fax: 617-572-9268 |

and, if it relates to making or not making a royalty payment or Milestone Payment hereunder,

| copy to: | John Hancock Life Insurance Company |
| | 200 Clarendon Street |
| | Boston, MA 02117 |
| | Attention: Manager, Investment Accounting Division, B-3 |
| | Fax: 617-572-0628 |

| If to Abbott: | Abbott Laboratories |
| | Dept. 309, Bldg. AP30 |
| | 200 Abbott Park Road |
| | Abbott Park, IL 60064-3537 |
| | Attention: President, Pharmaceutical Products Division |
| | Telephone: 847-938-6863 |
| | Fax: 847-938-5383 |

| copy to: | General Counsel |
| | Abbott Laboratories |
| | Dept. 364, Bldg. AP6D |
| | 100 Abbott Park Road |
| | Abbott Park, IL 60064-6020 |
| | Telephone: 847-937-8905 |
| | Fax: 847-938-6277 |

16.2   Applicable Law.  The Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois.  With respect to any action hereunder, Abbott, to the extent that it may lawfully do so, hereby consents to service of process, and to be sued, in the Commonwealth of Massachusetts and consents to the exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts, as well as to the jurisdiction of all courts to which an appeal may be taken from such courts, for the purpose of any suit, action or other proceeding arising out of any of its obligations hereunder or thereunder or with respect to the transactions contemplated hereby or thereby, and expressly waives any and all objections it may have as to venue in any such courts.  Abbott further agrees that a summons and complaint commencing an action or proceeding in any of such courts shall be properly served and shall confer personal jurisdiction if served personally or by certified mail to it at its address for notices as provided in this Agreement or as otherwise provided under the laws of the Commonwealth of Massachusetts. THE

| Deleted: M:\Done...\IO\Pats & Adv...\John Hancock\JH rfa 010312r.DOC |
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 2:19 PM |
| Inserted: 3/12/01 4:22 PM |

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK8C\jh rfa 010312r.DOC

CONFIDENTIAL
JH 010068

-33-

PARTIES EACH IRREVOCABLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY
SUIT, ACTION OR OTHER PROCEEDING INSTITUTED BY OR AGAINST IT IN
RESPECT OF ITS OBLIGATIONS HEREUNDER OR THEREUNDER OR THE
TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

16.3    Entire Agreement.  This Agreement contains the entire understanding of the
parties with respect to the subject matter hereof.  All express or implied agreements and
understandings, either oral or written, with respect to the subject matter hereof heretofore made
are expressly merged in and made a part of this Agreement.  This Agreement may be amended,
or any term hereof modified, only by a written instrument duly executed by both parties hereto.

16.4    Headings.  The captions to the several Articles and Sections hereof are not a part
of this Agreement, but are merely guides or labels to assist in locating and reading the several
Articles and Sections hereof.

16.5    Independent Contractors.  It is expressly agreed that John Hancock and Abbott
shall be independent contractors and that the relationship between the two parties shall not
constitute a partnership, joint venture or agency.  Neither John Hancock nor Abbott shall have
the authority to make any statements, representations or commitments of any kind, or to take any
action, which shall be binding on the other, without the prior written consent of the other party to
do so.

16.6    Performance By Affiliates, Licensees and Subcontractors.  The parties recognize
that Abbott may carry out certain obligations under this Agreement through performance by its
Affiliates, Licensees and Subcontractors (but in no event shall that relieve Abbott of any of its
obligations hereunder).  Abbott guarantees that the activities of its Affiliates, Licensees and
Subcontractors under this Agreement shall comply with this Agreement.

16.7    Dispute Resolution.  The parties shall attempt to amicably resolve disputes arising
between them regarding the validity, construction, enforceability or performance of the terms of
this Agreement, and any differences or disputes in the interpretation of the rights, obligations,
liabilities and/or remedies hereunder, which have been identified in a written notice from one
party to the other, by good faith settlement discussions between the President of Abbott's
Pharmaceutical Products Division and a Managing Director of John Hancock or his designee.
The parties agree that, prior to filing any lawsuit regarding any dispute that arises in connection
with this Agreement (with the exception of any action demanding a preliminary injunction), such
representatives shall meet and attempt to amicably resolve such dispute within thirty (30) days
after the receipt of such written notice.

16.8    Waiver.  The waiver by either party hereto of any right hereunder or the failure to
perform or of a breach by the other party shall not be deemed a waiver of any other right
hereunder or of any other breach or failure by said other party whether of a similar nature or
otherwise.

| Deleted: M:\Domestic\P'ats & Admin\John Hancock\JH rfa 010312r.DOC |
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 2:19 PM |
| Inserted: 3/12/01 4:22 PM |

C:\Documents and Settings\kfmf\Local Settings\Temporary Internet Files\OLK9C\JH rfa 010312r.DOC]

CONFIDENTIAL
JH 010069

-34-

16.9   Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[the remainder of this page is intentionally blank]

| Deleted: M\Domestic\Pals & Adams\John Hancock\JH rfa 010312r.DOC |
|---|
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 2:19 PM |
| Inserted: 3/12/01 4:22 PM |

C:\Documents and Settings\umm\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010312r.DOC\

CONFIDENTIAL
JH 010070

-35-

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

JOHN HANCOCK LIFE
INSURANCE COMPANY                           ABBOTT LABORATORIES


By: _____                 By: _____

Name: _____                 Name: _____

Title: _____               Title: _____

Date: _____                Date: _____


JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY


By: _____

Name: _____

Title: _____

Date: _____


INVESTORS PARTNER LIFE INSURANCE
COMPANY


By: _____

Name: _____

Title: _____

Date: _____

| Deleted: M:\Domestic\Pats & Adams\John Hancock\JH rfa 010312r.DOC |
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 2:18 PM |
| Inserted: 3/12/01 4:22 PM |

C:\Documents and Settings\jymrl\Local Settings\Temporary Internet Files\OLK6\JH rfa 010312r.DOC

CONFIDENTIAL
JH 010071

-36-

EXHIBIT 1.6

FIRST ANNUAL RESEARCH PLAN

Deleted: M:\Domestic\Pals & Adams\John Hancock\UH rla 010319r.DOC

Deleted: 3/12/01 2:18 PM

Deleted: 3/12/01 2:18 PM

Inserted: 3/12/01 4:22 PM

C:\Documents and Settings\brent\Local Settings\Temporary Internet Files\OLK6\UH rla 010319r.DOC

CONFIDENTIAL
JH 010072

-37-

EXHIBIT 1.17

EISAI TERRITORY

1.  Bhutan
2.  Brunei
3.  Cambodia
4.  People's Republic of China
5.  Republic of China (Taiwan)
6.  India
7.  Indonesia
8.  Japan
9.  Democratic People's Republic of Korea (North Korea)
10. Republic of Korea
11. Laos
12. Macao
13. Malaysia
14. Mongolia
15. Myanmar
16. Nepal
17. Pakistan
18. Papua New Guinea
19. Philippines
20. Singapore
21. Sri Lanka
22. Thailand
23. Vietnam
24. Italy, co-exclusive rights with Abbott, unless Abbott exercises its rights under the
    terms of the Eisai Agreement to take an exclusive right to Italy.

| Deleted: M:\Domestic\Pats & Adtams\John Hancock\JH rfa 610312k.DOC |
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 2:19 PM |
| Inserted: 3/12/01 4:22 PM |

C:\Documents and Settings\summit\Local Settings\Temporary Internet Files\OLK6C\JH rfa 610312k.DOC

CONFIDENTIAL
JH 010073

-38-

EXHIBIT 1.40

PROGRAM COMPOUNDS

| In-License Agreement | Program Compound | Development Phase |
|---|---|---|
| | ABT-627 (Endothelin antagonist) | phase III |
| Taisho | ABT-773 (Ketolide antibiotic) | phase III |
| | ABT-594 (Cholinergic channel modulator) | late phase II |
| Wakunaga | ABT-492 (Quinolone antibiotic) | phase I |
| Eisai | ABT-751 (Antimitotic) | phase I |
| | ABT-510 (Thrombospondin peptide) | phase I |

Preclinical Programs:

| | | |
|---|---|---|
| FTI Program | | late preclinical |
| ED Program | | late preclinical |
| MMPI Program | ABT-518 (Matrix metalloproteinase inhibitor) | phase I |

...

Deleted: M:\Domestic\Pkts & Adams\John Hancock\JH rla 010312r.DOC
Deleted: 3/12/01 4:22 PM
Deleted: 3/12/01 2:19 PM
Inserted: 3/12/01 4:22 PM

| C:\Documents and Settings\kmd\Local Settings\Temporary Internet Files\OLK6\C\JH rla 010312r.DOC

CONFIDENTIAL
JH 010074

-39-

EXHIBIT 1.43

EXAMPLE OF PROGRAM RELATED COSTS FOR ONE PROGRAM COMPOUND

| Deleted: M:\Domestic\Pain & Adam's\John Hancock\JH rfa 010312r.DOC |
| Deleted: 3/12/01 4:22 PM |
| Deleted: 3/12/01 2:19 PM |
| Inserted: 3/12/01 4:22 PM |

C:\Documents and Settings\9mms\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010312r.DOC

CONFIDENTIAL
JH 010075

-40-

EXHIBIT 9.2

PAYMENT INSTRUCTIONS

Deleted: M:\Domestic\Pais &
Adams\John Hancock\JH rla
010312\DOC

Deleted: 3/12/01 4:22 PM

Deleted: 3/12/01 2:18 PM

Inserted: 3/12/01 4:22 PM

1   C:\Documents and Settings\rkmoht\Local Settings\Temporary Internet Files\OLK6C\JH rla 010312\.DOC

CONFIDENTIAL
JH 010076

-41-

Exhibit 12.2(d)

Further Information Regarding Program Compounds

| COMPOUND | CHEMICAL NAME | CURRENT STAGE OF DEVELOPMENT |
|---|---|---|
| ABT-627<br>Endothelin antagonist | (2R,3R,4S)-4-(1,3-benzodioxol-5-yl)-1-(2-(dibutylamino)-2-oxoethyl)-2-(4-methoxyphenyl)-3-pyrrolidinecarboxylic acid | Phase III |
| ABT-773<br>Ketolide antibiotic | (3aS,4R,7R,9R,10R,11S,13R,15 R,15aR)-4-ethyl-3a,7,9,11,13,15-hexamethyl-2,6,8,14-tetraoxo-11-([(2E)-3-(3-quinolinyl)-2-propenyl]oxy]tetradecahydro-2H-oxacyclotetradecino[4,3-d][1,3]oxazol-10-yl 3,4,6-trideoxy-3-(dimethylamino)-D-D-xylo-hexopyranoside | Phase III |
| ABT-594<br>Cholinergic channel modulator | (2R)-azetidinylmethyl 6-chloro-3-pyridinyl ether hydrochloride. | Phase II |
| ABT-492<br>Quinoline Antibiotic | potassium 1-(6-amino-3,5-difluoro-2-pyridinyl)-8-chloro-6-fluoro-7-(3-hydroxy-1-azetidinyl)-4-oxo-1,4-dihydro-3-quinolinecarboxylate | Phase I |
| ABT-518<br>Matrix metalloproteinase inhibitor | (1S)-1-[(4S)-2,2-dimethyl-1,3-dioxolan-4-yl]-2-[(4-[4-(trifluoromethoxy)phenoxy]phenyl)sulfonyl]ethylhydroxyl]formamide | Phase I |
| ABT-751<br>Antimitotic | N-[2-(4-hydroxyanilino)-3-pyridinyl]-4-methoxybenzenesulfonamide. | Phase I |
| Farnesyltransferase inhibitor | N.A. | Pre-Clinical Program |
| Dopamine Receptor Agonist for Erectile Dysfunction | N.A. | Pre-Clinical Program |

...

Deleted: M:\Domestic\Pass & Adams\John Hancock\JH rfa 010312r.DOC

Deleted: 3/12/01 4:22 PM

Deleted: 3/12/01 2:19 PM

Inserted: 3/12/01 4:22 PM

C:\Documents and Settings\Name\Local Settings\Temporary Internet Files\OLK8C\JH rfa 010312r.DOC

CONFIDENTIAL
JH 010077

-42-

EXHIBIT 12.2(e)

Certain Patent Information

<u>ABT-627</u>

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---|---|---|---|---|
| Australia | 08/04/1995 | 711832 | Issued | 08/04/2015 |
| Brazil | 02/12/1997 | | Pending | |
| Canada | 08/04/1995 | | Pending | |
| EP* | 08/04/1995 | | Pending | |
| Hong Kong | 07/15/1998 | | Pending | |
| Israel | 08/10/1995 | | Pending | |
| Japan | 08/04/1995 | | Pending | |
| Korea | 08/04/1995 | | Pending | |
| Mexico | 08/04/1995 | | Pending | |
| Philippines | 08/17/1995 | | Pending | |
| USA | 05/30/1995 | 5,767,144 | Issued | 06/16/2015 |

*Europe: Austria, Belgium, Great Britain, Denmark, France, Germany, Greece, Ireland, Italy, Luxembourg, Netherlands, Portugal, Spain, Sweden, Switzerland

Deleted: M:\Domestic\Pats & Adams\John Hancock\JH rfa 010312r.DOC
Deleted: 3/12/01 4:22 PM
Deleted: 3/12/01 2:19 PM
Inserted: 3/12/01 4:22 PM

C:\Documents and Settings\tanent\Local Settings\Temporary Internet Files\OLK8C\JH rfa 010312r.DOC

CONFIDENTIAL
JH 010078

-43-

Exhibit 12.2(c) (Cont'd)

ABT-773
(Subject to Taisho Agreement)

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---|---|---|---|---|
| Argentina | 09/03/1997 | | Pending | |
| Australia | 09/02/1997 | | Pending | |
| Brazil | 05/13/1997 | | Pending | |
| Brazil | 09/02/1997 | | Pending | |
| Bulgaria | 09/02/1997 | | Pending | |
| Belarus | 09/02/1997 | | Pending | |
| China | 09/02/1997 | | Pending | |
| Chile | 09/04/1997 | | Pending | |
| Canada | 09/02/1997 | | Pending | |
| Columbia | 09/02/1997 | | Pending | |
| Czech Republic | 09/02/1997 | | Pending | |
| EP* | 09/02/1997 | | Pending | |
| Guatemala | 06/29/1997 | | Pending | |
| Hong Kong | 09/02/1997 | | Pending | |
| Croatia | 09/03/1997 | | Pending | |
| Hungary | 09/02/1997 | | Pending | |
| Indonesia | 09/04/1997 | | Pending | |
| India | Pending-Black Box | | Pending | |
| Israel | 09/02/1997 | | Pending | |
| Japan | 09/02/1997 | | Pending | |
| Korea | 09/02/1997 | | Pending | |
| Mexico | 09/02/1997 | | Pending | |
| Malaysia | 08/26/1997 | | Pending | |
| Norway | 09/02/1997 | | Pending | |

Deleted: N:\Domestic\Pals & Adams\John Hancock\JH rfs 010312r.DOC

Deleted: 3/12/01 4:22 PM

Deleted: 3/12/01 2:19 PM

Inserted: 3/12/01 4:22 PM

C:\Documents and Settings\lumi\Local Settings\Temporary Internet Files\OLK6C\JH rfs 010312r.DOC

CONFIDENTIAL
JH 010079

-44-

Exhibit 12.2(e) (cont'd)

ABT-773 (cont'd)
(Subject to Taisho Agreement)

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---|---|---|---|---|
| New Zealand | 09/02/1997 | | Pending | |
| Philippines | 09/02/1997 | | Pending | |
| Pakistan | 10/13/1997 | 136010 | Issued | 10/13/2013 |
| Poland | 09/02/1997 | | Pending | |
| Romania | 09/02/1997 | | Pending | |
| Russia | 09/02/1997 | | Pending | |
| South Africa | 08/20/1997 | 97/7474 | Issued | 08/20/2017 |
| Singapore | 09/02/1997 | | Pending | |
| Slovak Republic | 09/02/1997 | | Pending | |
| Slovenia | 09/02/1997 | 20023 | Issued | 09/02/2017 |
| Saudi Arabia | 02/10/1998 | | Pending | |
| Thailand | 09/03/1997 | | Pending | |
| Turkey | 09/02/1997 | TR 01127 B | Issued | 09/02/2017 |
| Taiwan | 09/05/1997 | | Pending | |
| UA | 09/02/1997 | | Pending | |
| USA | 07/03/1997 | 5,866,549 | Issued | 09/04/2016 |
| Yugoslavia | 09/02/1997 | | Pending | |

*Europe:  Austria, Belgium, Great Britain, Denmark, France, Germany, Greece, Ireland, Italy, Luxemburg, Netherlands, Portugal, Spain, Sweden, Switzerland

Deleted: M:\Domestic\Pats & Adams\John Hancock\JH rla 010212r.DOC

Deleted: 3/12/01 4:22 PM

Deleted: 3/12/01 2:19 PM

Inserted: 3/12/01 4:22 PM

C:\Documents and Settings\mml_oral Settings\Temporary Internet Files\OLK0C\JH rla 010312r.DOC1

CONFIDENTIAL
JH 010080

# Deposition Exhibit 18

# Part 2

-45-

EXHIBIT 12.2(e) (Cont'd)

ABT-594

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---------|-------------|---------------|--------|-----------|
| Australia | 10/08/1993 | 687017 | Issued | 10/18/2013 |
| Brazil | 04/30/1997 | | Pending | |
| Canada | 10/08/1993 | | Pending | |
| EP* | 10/08/1993 | | Pending | |
| Hong Kong | 12/10/1998 | | Pending | |
| Israel | 10/04/1993 | 107184 | Issued | 10/04/2013 |
| Japan | 10/08/1993 | 3098035 | Issued | 10/08/2013 |
| Korea | 10/08/1993 | | Pending | |
| Mexico | 10/08/1993 | | Pending | |
| Philippines | 10/07/1993 | | Pending | |
| USA | 06/07/1995 | 5,948,793 | Issued | 09/07/2016 |

*Europe: Austria, Belgium, Great Britain, Denmark, France, Germany, Greece, Ireland, Italy, Luxembourg, Netherlands, Portugal, Spain, Sweden, Switzerland

Deleted: M:\Domestic\Pats & Adams\John Hancock\JH rfa 010312r.DOC

Deleted: 3/12/01 4:22 PM

Deleted: 3/12/01 2:19 PM

Inserted: 3/12/01 4:22 PM

| C:\Documents and Settings\knve\Local Settings\Temporary Internet Files\OLK6\CJJH rfa 010312r.DOC

CONFIDENTIAL
JH 010081

-46-

EXHIBIT 12.2(e) (Cont'd)

ABT-492

(Subject to Wakunaga Agreement)

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---|---|---|---|---|
| Australia | 09/24/1999 | | Pending | |
| Brazil | 11/29/1999 | | Pending | |
| Canada | 12/06/1999 | | Pending | |
| China | 10/22/1999 | 1258674A | Issued | |
| Hong Kong | | | | |
| EP* | 12/08/1999 | 0982501 | Issued | |
| Hungary | 11/23/1999 | 9904389 | Issued | |
| Republic of Korea | 08/29/2000 | | | |
| Mexico | 10/14/1999 | | Pending | |
| Russian Federation | 05/26/2000 | | Pending | |
| USA | 08/10/1989 | | Pending | |
| Japan | 10/06/1999 | 2000-135191 | Issued | |

*Europe:  Austria, Belgium, Switzerland, Germany, Denmark, Spain, Finland, France, Great Britain, Greece, Ireland, Italy, Luxembourg, Monaco, Netherlands, Portugal, Sweden.

Deleted: M:\Demo\Xics\Pals & Adams\John Hancock\JH rfs 010312r.DOC
Deleted: 3/12/01 4:22 PM
Deleted: 3/12/01 2:19 PM
Inserted: 3/12/01 4:22 PM

CONFIDENTIAL
JH 010082

-47-

EXHIBIT 12.2(e) (Cont'd)

<u>ABT-510</u>

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---|---|---|---|---|
| Argentina | 05/21/1999 | | Pending | |
| Australia | 05/21/1999 | | Filing in Process | |
| Brazil | 05/21/1999 | | Filing in Process | |
| Bulgaria | 05/21/1999 | | Filing in Process | |
| China | 05/21/1999 | | Filing in Process | |
| Chile | 05/20/1999 | | Pending | |
| Canada | 05/21/1999 | | Filing in Process | |
| Columbia | 05/21/1999 | | Pending | |
| Czech Republic | 05/21/1999 | | Filing in Process | |
| EP* | 05/21/1999 | | Filing in Process | |
| Hong Kong | 05/21/1999 | | Filing in Process | |
| Hungary | 05/21/1999 | | Pending | |
| India | 05/21/1999 | | Filing in Process | |
| Israel | 05/21/1999 | | Filing in Process | |
| Japan | 05/21/1999 | | Filing in Process | |
| Korea | 05/21/1999 | | Filing in Process | |
| Mexico | 05/21/1999 | | Filing in Process | |
| Norway | 05/21/1999 | | Filing in Process | |
| New Zealand | 05/21/1999 | | Filing in Process | |
| Philippines | 05/21/1999 | | Pending | |
| Poland | 05/21/1999 | | Filing in Process | |
| South Africa | 05/21/1999 | | Filing in Process | |
| Slovak Republic | 05/21/1999 | | Filing in Process | |
| Saudi Arabia | 05/21/1999 | | Pending | |
| Turkey | 05/21/1999 | | Filing in Process | |
| Taiwan | 05/21/1999 | | Pending | |
| USA | 05/21/1999 | | Pending | |

*Europe: Austria, Belgium, Great Britain, Cyprus, Denmark, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, Netherlands, Portugal, Romania, Slovenia, Spain, Sweden, Switzerland

CONFIDENTIAL
JH 010083

-48-

EXHIBIT 12.2(e) (Cont'd)

ABT-518

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---|---|---|---|---|
| Argentina | 07/30/1998 | | Pending | |
| Australia | 07/27/1998 | | Pending | |
| Brazil | 07/27/1998 | | Pending | |
| Bulgaria | 07/27/1998 | | Pending | |
| China | 07/27/1998 | | Pending | |
| Chile | 07/17/1998 | | Pending | |
| Canada | 07/27/1998 | | Pending | |
| Columbia | 07/29/1998 | | Pending | |
| Czech Republic | 07/27/1998 | | Pending | |
| EP* | 07/27/1998 | | Pending | |
| Hungary | 07/27/1998 | | Pending | |
| Israel | 07/27/1998 | | Pending | |
| Japan | 07/27/1998 | | Pending | |
| Korea | 07/27/1998 | | Pending | |
| Mexico | 07/27/1998 | | Pending | |
| Norway | 07/27/1998 | | Pending | |
| New Zealand | 07/27/1998 | | Pending | |
| Philippines | 07/27/1998 | | Pending | |
| Poland | 07/27/1998 | | Pending | |
| South Africa | 07/30/1998 | 98/6828 | Issued | 07/30/2018 |
| Slovak Republic | 07/27/1998 | | Pending | |
| Saudi Arabia | 12/15/1998 | | Pending | |
| Turkey | 07/27/1998 | | Pending | |
| Taiwan | 07/31/1998 | | Pending | |
| USA | 08/05/1998 | | Pending | |

*Europe:  Austria, Belgium, Great Britain, Denmark, France, Germany, Greece, Ireland, Italy, Luxembourg, Netherlands, Portugal, Spain, Sweden, Switzerland

Deleted: M:\Domestic\Pats & Adams\John Hancock\JH rfs 010212r.DOC
Deleted: 3/12/01 4:22 PM
Deleted: 3/12/01 2:19 PM
Inserted: 3/12/01 4:22 PM

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK5C\JH rfs 010212r.DOC

CONFIDENTIAL
JH 010084

-49-

EXHIBIT 12.2(e) (Cont'd)

ABT-751
(Subject to Eisai Agreement)

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---|---|---|---|---|
| USA | 08/08/1991 | 5,250,549 5,292,758 | Issued | 08/08/2011 08/05/2011 |
| Germany | 08/07/1991 | EP 472,053 | Issued | 08/07/2011 |
| United Kingdom | 08/07/1991 | EP 472,053 | Issued | 08/07/2011 |
| France | 08/07/1991 | EP 472,053 | Issued | 08/07/2011 |

Deleted: M:\Domestic\Pats & Adams\John Hancock\JH rfa 910312r.DOC

Deleted: 3/12/01 4:22 PM

Deleted: 3/12/01 2:19 PM

Inserted: 3/12/01 4:22 PM

[  C:\Documents and Settings\amm\Local Settings\Temporary Internet Files\OLKEC\JH rfa 910313r.DOC

CONFIDENTIAL
JH 010085

-50-

EXHIBIT 12.2(f)

COMMUNICATIONS

With respect to ABT-594, Abbott has received the following communications:

- Correspondence from Sibia Neurosciences, 505 Coast Blvd. South, Suite 300, La Jolla, CA 92037 (Sibia was acquired by Merck & Co., Inc. in August, 1999) including, most recently, a letter dated March 13, 1998.
- Correspondence from ICT Pharmaceuticals c/o Stadheim and Grear, Ltd., 400 North Michigan Ave., Chicago, IL 60611 including, most recently, a letter dated September 14, 2000.

The Sibia and ICT correspondence each refer to their patents on research tools.

Deleted: M:\Domestic\Pals & Adams\John Hancock\JH file 010312r.DOC

Deleted: 3/12/01 4:22 PM

Deleted: 3/12/01 2:19 PM

Inverted: 3/12/01 4:22 PM

| C:\Documents and Settings\Vincent.Legal Settings\Temporary Internet Files\OLK6C\JH file 010312r.DOC

CONFIDENTIAL
JH 010086

-51-

EXHIBIT 12.2(i)

Compound Reports

Deleted: M:\Domestic\Pats & Assmt\John Hancock\JH rfa 010312r.DOC

Deleted: 3/12/01 4:22 PM

Deleted: 3/12/01 2:19 PM

Inserted: 3/12/01 4:22 PM

CONFIDENTIAL
JH 010087

| | | |
|---|---|---|
| Page i: [1] Deleted | Katherine Manni | 1/9/04 11:45 PM |
| M:\Domestic\Pals & Adams\John Hancock\UH rfa 010312r.DOC | | |
| Page i: [1] Deleted | Katherine Manni | 1/9/04 11:45 PM |
| 3/12/01 4:22 PM | | |
| Page i: [2] Deleted | Katherine Manni | 1/9/04 11:45 PM |
| M:\Domestic\Pals & Adams\John Hancock\UH rfa 010312r.DOC | | |
| Page i: [2] Deleted | Katherine Manni | 1/9/04 11:45 PM |
| 3/12/01 4:22 PM | | |
| Page 11: [3] Deleted | Bill Adams | 3/12/01 2:18 PM |

<u>Payment Date</u>     <u>Amount</u>

| | | |
|---|---|---|
| Page 11: [4] Deleted | Bill Adams | 3/12/01 2:18 PM |

December 1, 2001     $50,000,000

| | | |
|---|---|---|
| Page 11: [5] Deleted | Bill Adams | 3/12/01 2:18 PM |

December 1, 2002     $54,000,000

| | | |
|---|---|---|
| Page 11: [6] Deleted | Bill Adams | 3/12/01 2:18 PM |

December 1, 2003     $58,000,000

| | | |
|---|---|---|
| Page 11: [7] Deleted | Bill Adams | 3/12/01 2:18 PM |

December 1, 2004     $52,000,000

CONFIDENTIAL
JH 010088

-i-

## TABLE OF CONTENTS

ARTICLE 1 - DEFINITIONS ........................................................................................ 1
ARTICLE 2 - ANNUAL RESEARCH PROGRAM ....................................................... 9
   2.1   Program Term ...................................................................................... 9
   2.2   Research Plan ...................................................................................... 9
   2.3   Conduct of Research ........................................................................... 9
   2.4   Subcontracting Research ..................................................................... 10
   2.5   Research Reports and Records ............................................................ 10
ARTICLE 3 - RESEARCH FUNDING .......................................................................... 11
   3.1   John Hancock Program Payments ...................................................... 11
   3.2   Abbott Funding Obligation ................................................................ 11
   3.3   Carryover Provisions ......................................................................... 11
   3.4   Termination of John Hancock's Program Payment Obligation .......... 12
   3.5   Hancock Funding Obligation .............................................................. 12
ARTICLE 4 - PRODUCT RESEARCH AND DEVELOPMENT ................................... 13
   4.1   Commercially Reasonable Efforts ...................................................... 13
   4.2   Marketing and Sale Responsibility ..................................................... 13
   4.3   Failure of Program Compound to Progress ........................................ 13
   4.4   Arm's-Length .................................................................................... 16
   4.5   In-License Agreements ....................................................................... 16
ARTICLE 5 - PROGRAM INVENTIONS ...................................................................... 16
   5.1   Ownership .......................................................................................... 16
   5.2   Patent Prosecution and Maintenance .................................................. 16
   5.3   Enforcement ....................................................................................... 17
ARTICLE 6 - MILESTONE PAYMENTS TO JOHN HANCOCK ................................ 17
   6.1   [Intentionally omitted] ....................................................................... 17
   6.2   Management Fee ................................................................................. 17
   6.3   Milestone Notification and Payments ................................................. 17
ARTICLE 7 - ROYALTIES ........................................................................................... 19
   7.1   Royalty Rates .................................................................................... 19
   7.2   Royalty Term ..................................................................................... 19
ARTICLE 8 - ROYALTY REPORTS AND ACCOUNTING .......................................... 19
   8.1   Reports, Exchange Rates .................................................................... 19
   8.2   Audits ................................................................................................ 20
   8.3   Confidential Financial Information ..................................................... 21
   8.4   Accounting Principles ........................................................................ 21
ARTICLE 9 - PAYMENTS ............................................................................................ 21
   9.1   Payment Terms .................................................................................. 21
   9.2   Payment Method ................................................................................ 21
   9.3   Late Payments ................................................................................... 21
ARTICLE 10 - CONFIDENTIALITY ............................................................................ 21
   10.1   Nondisclosure Obligations ............................................................... 21

CONFIDENTIAL
JH 010090

-ii-

| 10.2 | Permitted Disclosures | 22 |
| 10.3 | Publicity Review | 22 |
| ARTICLE 11- TERM AND TERMINATION | | 22 |
| 11.1 | Expiration | 22 |
| 11.2 | Termination; Material Breach | 22 |
| 11.3 | Effect of Expiration of Termination | 23 |
| ARTICLE 12 - WARRANTIES AND INDEMNITY | | 23 |
| 12.1 | John Hancock Representations and Warranties | 23 |
| 12.2 | Abbott Representations and Warranties | 24 |
| 12.3 | No Conflict | 28 |
| 12.4 | Compliance with Law | 28 |
| 12.5 | No Other Warranties | 28 |
| 12.6 | Indemnification of John Hancock | 28 |
| 12.7 | Indemnification of John Hancock Relating to In-Licensed Compounds | 29 |
| 12.8 | Procedure | 29 |
| 12.9 | Insurance | 29 |
| 12.10 | Acknowledgment | 30 |
| ARTICLE 13 - FORCE MAJEURE | | 30 |
| ARTICLE 14 - ASSIGNMENT | | 30 |
| ARTICLE 15 - SEVERABILITY | | 31 |
| ARTICLE 16 - MISCELLANEOUS | | 31 |
| 16.1 | Notices | 31 |
| 16.2 | Applicable Law | 32 |
| 16.3 | Entire Agreement | 33 |
| 16.4 | Headings | 33 |
| 16.5 | Independent Contractors | 33 |
| 16.6 | Performance By Affiliates | 33 |
| 16.7 | Dispute Resolution | 33 |
| 16.8 | Waiver | 33 |
| 16.9 | Counterparts | 34 |

| EXHIBIT 1.6: | First Annual Research Plan |
| EXHIBIT 1.17: | Eisai Territory |
| EXHIBIT 1.40: | Program Compounds |
| EXHIBIT 1.43: | Example of Program Related Costs for One Program Compound |
| EXHIBIT 9.2: | Payment Instructions |
| EXHIBIT 12.2(d): | Further Information regarding Program Compounds |
| EXHIBIT 12.2(e): | Certain Patent Information |
| EXHIBIT 12.2(f): | Communications |
| EXHIBIT 12.2(i): | Compound Reports |

CONFIDENTIAL
JH 010091

<u>RESEARCH FUNDING AGREEMENT</u>

This Research Funding Agreement is made as of March \_\_\_, 2001, by and between Abbott Laboratories, an Illinois corporation ("<u>Abbott</u>"), with its principal offices at 100 Abbott Park Road, Abbott Park, Illinois 60064-6049, and John Hancock Life Insurance Company, a Massachusetts corporation, John Hancock Variable Life Insurance Company, a Massachusetts corporation, and Investors Partner Life Insurance Company, a Delaware corporation (collectively, "<u>John Hancock</u>"), each with its principal offices at 200 Clarendon Street, Boston, Massachusetts 02117.

## WITNESSETH

WHEREAS, Abbott is a global healthcare company actively engaged in the research and development of human pharmaceutical products;

WHEREAS, Abbott is interested in obtaining additional funding to support such research and development activities with respect to certain pharmaceutical products which are under development; and

WHEREAS, John Hancock is interested in providing such additional funding in exchange for the right to receive future milestone and royalty payments from Abbott.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and undertakings contained herein, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

In addition to the other terms defined elsewhere herein, the following terms shall have the following meanings when used in this Agreement (and any term defined in the singular shall have the same meaning when used in the plural and vice versa, unless stated otherwise):

1.1     "Affiliate" shall mean, with respect to each party, any corporation or other form of business organization, which directly or indirectly owns, controls, is controlled by, or is under common control with, such party. An entity shall be regarded as being in control of another entity if the former entity has the direct or indirect power to order or cause the direction of the policies of the other entity whether (i) through the ownership of more than fifty percent (50%) in the United States, or thirty percent (30%) or more outside the United States, of the outstanding voting securities (or other ownership interest for a business organization other than a corporation) of that entity; or (ii) by contract, statute, regulation or otherwise.

1.2     "Aggregate Carryover Amount" shall have the meaning given in Section 3.3.

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK8C\JH rfa 010312.DOC

CONFIDENTIAL
JH 010092

-2-

1.3    "Aggregate Spending Target" shall mean Six Hundred Fourteen Million Dollars ($614,000,000).

1.4    "Annual Carryover Amount" shall have the meaning given in Section 3.3.

1.5    "Annual Minimum Spending Target" for each Program Year, shall mean the sum of (i) the Program Payment of John Hancock for such Program Year as specified in Section 3.1, (ii) Fifty Million Dollars ($50,000,000), and (iii) any Annual Carryover Amount for the prior Program Year pursuant to Section 3.3. With respect to the fifth Program Year, the "Annual Minimum Spending Target" shall mean the Annual Carryover Amount for the prior Program Year pursuant to Section 3.3.

1.6    "Annual Research Plan" shall mean, for the Program Years in the Program Term, a reasonably and consistently detailed statement of the objectives, activities, timetable and budget for the Research Program for every Program Year remaining in the Program Term, it being understood that less detail shall be required for Program Years that are not the current Program Year. The first Annual Research Plan is attached as Exhibit 1.6. "Annual Research Plan" shall mean, for those years occurring after the expiration of the Program Term, a reasonably and consistently detailed statement of the objectives, activities, timetable and budget for the Research Program for such year only.

1.7    "Bundled Product" shall have the meaning given in paragraph (b) of the definition of Net Sales.

1.8    "Ceased Program" shall mean at least one year has elapsed since Abbott ceased its directed efforts with respect to the applicable Preclinical Program (FTI Program, ED Program or MMPI Program), meaning that Abbott has eliminated the funding for the established research program identified by a core group of researchers dedicated to the applicable Preclinical Program. The continued existence of a researcher separate and apart from such core group shall not affect the determination that a Preclinical Program has ceased.

1.9    "Combination Product" shall mean any product containing one or more Program Compounds combined as a single pharmaceutical product with one or more other therapeutically active ingredients.

1.10    "Commercially Reasonable Efforts" shall mean efforts which are consistent with those normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable potential commercial value and market potential at a similar stage of development or product life, taking into account, without limitation, issues of safety and efficacy, compound or product profile, proprietary status, the regulatory environment and the status of the compound or product and other relevant scientific factors.

1.11    "Compound Reports" shall have the meaning given in Section 12.2(i).

C:\Documents and Settings\mm\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010312.DOC

CONFIDENTIAL
JH 010093

-3-

1.12   "Confidential Information" shall have the meaning given in Section 10.2.

1.13   "Delivery System Product" shall have the meaning given in paragraph (d) of the definition of Net Sales.

1.14   "Dollars" or "$" shall mean United States dollars.

1.15   "ED Program" shall mean all of Abbott's discovery efforts to identify compounds (including the identification of pre-clinical and development compounds owned by third parties) which modulate dopamine receptors for the purpose of treating erectile dysfunction.

1.16   "Eisai Agreement" shall mean the License Agreement dated June 29, 2000 between Eisai Co., Ltd. and Abbott related to the Program Compound known as ABT-751.

1.17   "Eisai Territory" shall mean the countries listed on Exhibit 1.17 hereto.

1.18   "Execution Date" shall mean the date set forth in the introductory paragraph to this Agreement.

1.19   [Intentionally Omitted.]

1.20   "FDA" shall mean the U.S. Food and Drug Administration or any successor entity thereto.

1.21   "First Commercial Sale" shall mean the first sale of a Product in a given country by Abbott, its Affiliates or Licensees to an unaffiliated third person after Regulatory Approval has been granted in such country.

1.22   "FTI Program" shall mean all of Abbott's discovery efforts to identify compounds (including the identification of pre-clinical and development compounds owned by third parties) which act as farnesyl transferase inhibitors for the purpose of treating cancer.

1.23   "In-License Agreements" shall mean the Eisai Agreement, the Wakunaga Agreement and the Taisho Agreement.

1.24   "International Territory" shall mean all areas of the world outside the U.S. Territory.

1.25   "Investigational New Drug Application" shall mean an investigational new drug application filed with the FDA in order to commence human clinical testing of a drug in the United States.

1.26   "Licensee" shall mean any party licensed or otherwise authorized in writing by Abbott, its Affiliates or its licensees to market, distribute or sell Products and from whom Abbott receives a royalty or other payment based upon sales of Products by such party, its affiliates or its

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK6C\UH rfa 010312.DOC

CONFIDENTIAL
JH 010094

-4-

licensees (it being understood that a party that is a merely a distributor, wholesaler or similar reseller of Products is not a Licensee hereunder). In no case shall Eisai Co., Ltd. or Taisho Pharmaceutical Co., Ltd. be considered Licensees under the terms of the Eisai Agreement or Taisho Co-Development Agreement with respect to the Eisai Territory or Japan, respectively.

1.27    "Losses" shall mean any claims, demands, liabilities, costs, damages, judgments, settlements and other reasonable expenses (including attorneys' fees).

1.28    "Milestone Payment" shall have the meaning given in Section 6.3.

1.29    "MMPI Program" shall mean all of Abbott's discovery efforts to identify compounds (including the identification of pre-clinical and development compounds owned by third parties) that inhibit matrix metalloproteinase and treat cancer.

1.30    "NDA" shall mean a New Drug Application (as defined by the FDA) filed with the FDA for the purpose of obtaining Regulatory Approval of a Product in the U.S. Territory.

1.31    "Net Sales" shall mean:

        (a)    the total gross sales of the Products (or, for purposes of clauses (b) and (c), the Bundled Products and Combination Products), in each case as set forth on the invoices for such sales by Abbott, its Affiliates and Licensees to unaffiliated third parties in any given period, plus, if applicable, the fair market value of all properties and services received in consideration of a sale of the Products (or, for purposes of clauses (b) and (c), the Bundled Products and Combination Products) by Abbott, its Affiliates and Licensees to unaffiliated third parties during such period, less the following deductions directly paid or actually incurred by Abbott, its Affiliates or Licensees during such period with respect to the sale of the Products (or, for purposes of clauses (b) and (c), the Bundled Products and Combination Products) to the extent included in the gross invoiced sales price therefor:

                (i)    discounts, credits, rebates, allowances, adjustments, rejections, recalls and returns;

                (ii)    price reductions or rebates, retroactive or otherwise, imposed by government authorities;

                (iii)    sales, excise, turnover, inventory, value-added and similar taxes assessed on the royalty-bearing sale of Products;

                (iv)    transportation, importation, insurance and other handling expenses directly chargeable to the royalty-bearing sale of Products;

CONFIDENTIAL
JH 010095

-5-

(v)     charge backs granted to unaffiliated drug wholesalers; and

(vi)    the portion of management fees paid to unaffiliated group purchasing organizations that relate specifically to the royalty-bearing sale of Products.

(b)     With respect to a Product which is sold together with any other products and/or services in a country at a unit price, whether packaged together or separately (a "Bundled Product"), the Net Sales of such Bundled Product shall first be calculated in accordance with the definition of Net Sales under paragraph (a), and then the Net Sales of such Bundled Product shall be determined on a country-by-country basis as follows:

(i)     multiply the Net Sales of such Bundled Product in such country by the fraction A/(A+B) where A is the average selling price of such Product in such country when sold separately and B is the total of the average selling prices in such country of each such other product(s) and/or service(s) in such Bundled Product when sold separately; or

(ii)    if (x) either the average selling price of such Product or the total of the average selling prices of each such other products and/or services in such Bundled Product in such country is not available as of such date or (y) such Product is not sold separately in such country, multiply the Net Sales of such Bundled Product in such country by a percentage determined by the mutual agreement of the Parties which represents the proportionate economic value in such country of such Product relative to the economic value in such country contributed by the other products and/or services in such Bundled Product.

(c)     With respect to a Combination Product, the Net Sales of such Combination Product shall first be calculated in accordance with the definition of Net Sales under paragraph (a), and then the Net Sales of such Combination Product shall be determined on a country-by-country basis as follows:

(i)     multiply the Net Sales of such Combination Product in such country by the fraction A/(A+B), where A is the total of the average selling prices of the Program Compounds in such Combination Product when sold separately in such country and B is the total of the average selling prices of each other therapeutically active ingredient when sold alone as a pharmaceutical product in such country; or

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010312.DOC1

CONFIDENTIAL
JH 010096

-6-

    (ii)    if (x) either the average selling price of all Program Compounds in such Combination Product or the total of the average selling prices of each other therapeutically active ingredient in such Combination Product in such country is not available or (y) such Program Compounds are not sold separately in such country, multiply the Net Sales of such Combination Product by a percentage determined by mutual agreement of the Parties, which represents the proportionate economic value in such country of all Program Compounds in such Combination Product relative to the economic value in such country contributed by all other therapeutically active ingredients in such Combination Product.

(d)    For purposes of this paragraph (d), a "Premium Delivery System" means any delivery system comprising device(s), equipment, instrumentation or other non-ingestible components (but not solely containers or packaging) designed to assist in the administration of a Product, such as the Abbott ADD-Vantage® System. With respect to a Product which is sold together with a Premium Delivery System (a "Delivery System Product") in a country at a unit price, the Net Sales of such Delivery System Product shall first be calculated in accordance with the definition of Net Sales under paragraph (a), and then the Net Sales of such Product shall be determined on a country-by-country basis as follows:

    (i)    if the Product is sold separately without the Premium Delivery System in a country, reduce the Net Sales of such Delivery System Product in such country by the amount that the average selling price of the Delivery System Product in such country exceeds the average selling price of such Product as sold separately in such country; or

    (ii)    if the Product is not sold separately without the Premium Delivery System in such country, reduce Net Sales of such Delivery System Product by an amount, determined by mutual agreement of the Parties, which represents the proportionate economic value in such country added by the Premium Delivery System.

(e)    Net Sales shall not include any sales of Products containing one Program Compound (and no other Program Compound) known as (i) ABT-751 by Eisai Co. Ltd., its affiliates or licensees in the Eisai Territory or (ii) ABT-773 by Taisho Pharmaceutical Co., Ltd., its affiliates or licensees in Japan. Notwithstanding the foregoing sentence, Net Sales shall include in all instances sales by such parties of such products that are outside such territories, respectively.

1.32    "Parties" shall mean Abbott and John Hancock.

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK6CUH rla 010312.DOC

CONFIDENTIAL
JH 010097

-7-

1.33   "Patents" shall have the meaning set forth in Section 12.2(e).

1.34   "Phase I Clinical Trial" shall mean a clinical trial of a Program Compound which utilizes a limited number of human beings preliminarily to address safety and to determine what doses can be safely tolerated.

1.35   "Phase II Clinical Trial" shall mean a controlled clinical trial, the primary objective of which is to ascertain additional data regarding the safety and tolerance of one of the Program Compounds and preliminary data regarding such Program Compound's efficacy.

1.36   "Phase III Clinical Trial" shall mean one or a series of controlled pivotal studies of a specific Program Compound by administration of such Program Compound to human beings where the principal purpose of such trial is to provide confirmatory safety and efficacy data necessary to support the filing for Regulatory Approval of a Product.

1.37   "Preclinical Programs" shall mean the following preclinical and clinical programs with potential backup compounds in accordance with Section 4.3(a): the FTI Program, the ED Program and the MMPI Program.

1.38   "Premium Delivery System" shall have the meaning given in paragraph (d) of the definition of Net Sales.

1.39   "Product" shall mean any product containing one or more of the Program Compounds as an active ingredient, alone or in combination with other active ingredients (including any Bundled Product and any Combination Product).

1.40   "Program Compounds" shall mean (i) the compounds listed on Exhibit 1.40; (ii) the first compound (the selection of which shall be consistent with Abbott using Commercially Reasonable Efforts) from each of the Preclinical Programs to enter Phase I Clinical Trial; (iii) any compounds or products substituted or added by Section 4.3; (iv) all line extensions and formulations of the foregoing; and (v) all analogs, isomers, improvements, derivatives and modifications of the foregoing unless such analog, isomer, improvement, derivative or modification would be considered a new chemical entity and required by the FDA to reenter Phase I Clinical Trial. A compound or product shall be considered a Program Compound regardless of the indication for which it is used.

1.41   "Program Inventions" shall have the meaning given in Section 5.1.

1.42   "Program Payments" shall have the meaning given in Section 3.1.

1.43   "Program Related Costs" shall mean (i) all direct and indirect costs and expenses that are incurred by Abbott on the Research Program during a given Program Year and allocated in a manner consistent with Abbott's internal, pharmaceutical products division-wide allocation procedures; and (ii) the milestone and license fees paid during a given Program Year or during

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010312.DOCi

CONFIDENTIAL
JH 010098

-8-

any extension period of the Program Term by Abbott to (a) Eisai Co. Ltd. (not to exceed Eighteen Million Dollars ($18,000,000) in the aggregate with respect to the Program Compound known as ABT-751 pursuant to the Eisai Agreement) and (b) Wakunaga Pharmaceutical Co., Ltd. (not to exceed Twenty Seven Million Five Hundred Thousand Dollars ($27,500,000) in the aggregate with respect to the Program Compound known as ABT-492 pursuant to the Wakunaga Agreement). Any payments made by Abbott to John Hancock pursuant to Sections 6.2 and 6.3(a), (b), (c), (d) and (e) shall constitute Program Related Costs. Any payment made by Abbott to John Hancock pursuant to Section 6.3(f) shall not constitute Program Related Costs. Set forth on Exhibit 1.43 is an example of the calculation of Program Related Costs for a particular Program Compound.

1.44    "Program Term" shall mean a period of four (4) consecutive Program Years.

1.45    "Program Year" shall mean a period of twelve (12) consecutive calendar months commencing on January 1 of each year, except that the first Program Year shall commence on the Execution Date and end on December 31, 2001.

1.46    "Quarterly Reporting Period" shall mean the calendar quarter with respect to the U.S. Territory together with the fiscal quarter ending on the final day of February, May, August and November (as the case may be) with respect to the International Territory. For example, the Quarterly Reporting Period that comprises the second calendar quarter with respect to the U.S. Territory also includes the period from March 1 through May 31 with respect to the International Territory. If Abbott adopts the calendar year as its fiscal year for the International Territory, then the Quarterly Reporting Period for the International Territory shall also be the calendar quarter.

1.47    "Research Program" shall mean all of Abbott's, its Affiliates' and Subcontractors' activities directed towards obtaining Regulatory Approval for the Products, including research, development, safety and efficacy studies, clinical trials, process development, formulation work, regulatory, quality, data collection and analysis and project management.

1.48    "Regulatory Approval" shall mean: (i) with respect to the U.S. Territory, the receipt of approval from the FDA to market a Product in the U.S. Territory; and (ii) with respect to any country in the International Territory, receipt of the governmental approvals required to market a Product in such country, including any pricing and reimbursement authorization required in such country.

1.49    "Replacement Compound" shall mean a compound (i) made available to Abbott as a result of any transaction involving Abbott or its Affiliates (whether by merger, acquisition or sale of assets or equity, or by license or otherwise), (ii) used for the same class of indications as the Ceased Compound (for example, anti-infectives, cancer, cardiovascular or pain), and (iii) having at least the current and projected potential commercial value to John Hancock as the Ceased Compound.

1.50    "Royalty Term" shall mean, with respect to each Product in each country, a period of ten (10) years from the later of (x) the date of First Commercial Sale of such Product in such

C:\Documents and Settings\mmm\Local Settings\Temporary Internet Files\OLK6C\JH rla 010312.DOC

CONFIDENTIAL
JH 010099

-9-

country and (y) two year anniversary of the Execution Date; provided that (i) the obligation to make royalty payments on the Product shall not begin until the two-year anniversary of the Execution Date (and only with respect to Net Sales occurring on or after such date) and (ii) Abbott's obligation to make royalty payments shall cease on December 31, 2015.

1.51    "Subcontractor" shall have the meaning given in Section 2.4.

1.52    "Taisho Agreement" shall mean the Co-Development Agreement dated September 30, 1997 between Taisho Pharmaceutical Co., Ltd. and Abbott related to the Program Compound known as ABT-773.

1.53    "Territory" shall mean both the U.S. Territory and the International Territory, excluding the Eisai Territory with respect to the Program Compound known as ABT-751.

1.54    "U.S. Territory" shall mean the United States of America, excluding Puerto Rico and the U.S. Virgin Islands.

1.55    "Wakunaga Agreement" shall mean the License Agreement dated December 1, 1999 between Wakunaga Pharmaceutical Co., Ltd. and Abbott related to the Program Compound known as ABT-492.

## ARTICLE 2
## ANNUAL RESEARCH PROGRAM

2.1    Research Program Term. The Research Program shall be conducted by Abbott during the Program Term, and beyond the Program Term until Abbott either abandons development in accordance with the terms hereof or receives Regulatory Approval for each Program Compound, or some combination thereof.

2.2    Research Plan. The Research Program shall be conducted by Abbott in each Program Year in accordance with the Annual Research Plan for such Program Year. The Annual Research Plan will be provided to John Hancock until Abbott either abandons development in accordance with the terms hereof, or receives Regulatory Approval for, each Program Compound in the U.S. Territory, or some combination thereof. The Annual Research Plan shall be prepared by Abbott and presented to John Hancock at least forty-five (45) days prior to the start of each Program Year. The first Annual Research Plan is attached as Exhibit 1.6. Abbott may modify the Annual Research Plan from time to time in order to best meet the objectives of the Research Program. Any such modifications to the Annual Research Plan shall be promptly provided to John Hancock. In addition, Abbott shall provide an Annual Research Plan for each year after the end of the Program Term as long as there is an active research program for any Program Compounds.

2.3    Conduct of Research. Abbott shall use Commercially Reasonable Efforts to conduct the Research Program in good scientific manner and using good laboratory practices, to

CONFIDENTIAL
JH 010100

-10-

achieve the objectives of the Research Program efficiently and expeditiously and to comply with all applicable laws and regulations. Notwithstanding anything in this Agreement to the contrary, Abbott does not represent, warrant or guarantee that the Research Program will be successful in whole or in part or result in the registration or commercialization of any pharmaceutical products or that any Products obtaining Regulatory Approval will be a commercial success.

     2.4    <u>Subcontracting Research</u>. Abbott may subcontract or outsource to Affiliates or third persons (each, a "<u>Subcontractor</u>") any portion of the Annual Research Plan. Consistent with Abbott's past practices, each Subcontractor shall enter into a confidentiality agreement with Abbott and agreements pursuant to which such Subcontractor is required to comply with all applicable laws and regulations, including conducting the Research Program in good scientific manner and using good laboratory practices, with respect to its work on the Research Program. Abbott shall supervise and be responsible under this Agreement for the work of each such Subcontractor on the Research Program and no subcontracting or outsourcing shall relieve Abbott of any of its obligations hereunder.

     2.5    <u>Research Reports and Records</u>. Abbott shall, no later than thirty (30) days before the last day of each Program Year, provide John Hancock with a reasonably detailed report setting forth the status of the Research Program and all Program Related Costs expended by Abbott during such Program Year. The Program Related Costs set forth in such report may include good faith estimates with respect to the last three (3) months of the Program Year, provided that the report under this Section 2.5 for the following Program Year contains the actual Program Related Costs for that three (3) month period. Such report shall also contain such other information related thereto as John Hancock may reasonably request from time to time. Abbott shall, and shall cause each Subcontractor to, maintain complete and accurate records, in sufficient detail and in good scientific manner appropriate for patent and regulatory purposes and for purposes of demonstrating compliance with the terms hereof, that fully and properly reflect all work done, results achieved and Program Related Costs expended in performance of the Research Program. The books and records of Abbott and each Subcontractor related to the Research Program, including, without limitation, those related to the expenditure of Program Related Costs, shall be subject to copying, inspection and audit by (and at the expense of) John Hancock at any time and from time to time. Such audit shall occur upon reasonable notice and during normal business hours by an independent auditor selected by John Hancock and reasonably acceptable to Abbott. John Hancock and its independent auditor shall maintain such records and information of Abbott in confidence in accordance with Article 10 and shall not use such records or information except to the extent permitted by this Agreement, including any enforcement of the provisions hereof. In the event that such audit reveals any material breach of Abbott's responsibilities hereunder, Abbott shall (i) pay the reasonable fees and expenses charged by such auditor, and (ii) fully and promptly cure such breach.

CONFIDENTIAL
JH 010101

-11-

## ARTICLE 3
### RESEARCH FUNDING

3.1    <u>John Hancock Program Payments</u>. John Hancock shall make the following installment payments on the applicable payment date (the "<u>Payment Date</u>"), for the applicable Program Year, to Abbott to help support the Research Program (the "<u>Program Payments</u>"):

| Payment Date | Amount | Program Year |
|---|---|---|
| December 1, 2001 | $50,000,000 | First |
| December 1, 2002 | $54,000,000 | Second |
| December 1, 2003 | $58,000,000 | Third |
| December 1, 2004 | $52,000,000 | Fourth |

All Program Payments shall be expended by Abbott on Program Related Costs and for no other purpose. If John Hancock has not received at least thirty (30) days prior to the Payment Date both (i) the Annual Research Plan for such year and (ii) the report described in Section 2.5 for the previous Program Year, then John Hancock's obligation to make the Program Payment due on such Payment Date shall be suspended until thirty (30) days have elapsed from the date of John Hancock's receipt of both such Annual Research Plan and report.

3.2    <u>Abbott Funding Obligation</u>. Abbott shall spend on Program Related Costs: (i) during each Program Year, at least the Annual Minimum Spending Target for such Program Year and (ii) at least the Aggregate Spending Target during the Program Term. John Hancock's sole and exclusive remedies for Abbott's failure to fund the Research Program in accordance with this Section 3.2 (but not for any other breach of Abbott's other obligations hereunder) are set forth in Sections 3.3 and 3.4.

3.3    <u>Carryover Provisions</u>. Abbott shall be permitted to change its funding obligations under Section 3.2 only as follows:

(a)    If in any Program Year Abbott spends on Program Related Costs, the full amount of the Program Payment provided by John Hancock for such Program Year, but does not spend the full amount of the Annual Minimum Spending Target for such Program Year (including any Annual Carryover Amounts from any prior Program Years), Abbott will spend on Program Related Costs the difference between its expenditure on Program Related Costs for such Program Year and the Annual Minimum Spending Target for such Program Year (the "<u>Annual Carryover Amount</u>") in the subsequent Program Year. John Hancock's obligation to make any Program Payment for such subsequent Program Year, if any, pursuant to Section 3.1, shall be deferred until the time that Abbott has spent and notifies John Hancock that it has spent the Annual Carryover Amount in such subsequent Program Year; and

**CONFIDENTIAL**
**JH 010102**

-12-

(b)     If Abbott does not expend on Program Related Costs the full amount of the Aggregate Spending Target during the Program Term, Abbott will expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the "Aggregate Carryover Amount") on Program Related Costs during the subsequent year commencing immediately after the end of the Program Term. If Abbott does not spend the Aggregate Carryover Amount on Program Related Costs during such subsequent year, Abbott will pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days after the end of such subsequent year.

3.4    Termination of John Hancock's Program Payment Obligation. If Abbott: (i) abandons development of all Preclinical Programs and Program Compounds in any Program Year during the Program Term (it being understood that such abandonment need not occur entirely in one Program Year); (ii) does not expend on Program Related Costs during any Program Year the full amount of the Program Payment made by John Hancock for such Program Year; (iii) does not reasonably demonstrate in its Annual Research Plan, its intent and reasonable expectation to expend on Program Related Costs during the next Program Year an amount in excess of the Program Payment to be provided by John Hancock for such year; or (iv) does not reasonably demonstrate in its Annual Research Plan its intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target, John Hancock's obligation to make any remaining Program Payments for any succeeding Program Years pursuant to Section 3.1 shall terminate. For the avoidance of doubt, the Program Payments for the Program Year in which such event occurs shall still be due and payable, adjusted only as set forth in the next sentence, if applicable. In addition, in the case of either (i) or (ii) above, Abbott shall (not later than the 10th day following such event) pay to John Hancock (x) the amount, if any, by which the Program Payment made by John Hancock for such year (in the case of (i) above meaning the Program Year in which all Preclinical Programs and Program Compounds were finally abandoned), if any, exceeds one-half of the Program Related Costs actually spent by Abbott during that Program Year and (y) such additional amount that, after giving effect to the payments referred to in this sentence, causes the Program Related Costs for all years in the Program Term to date to have been funded one-third (1/3) by John Hancock and two-thirds (2/3) by Abbott.

3.5    Hancock Funding Obligation. John Hancock's entire obligation hereunder shall be limited to providing the Program Payments set forth in Section 3.1. Abbott shall be solely responsible for funding all Program Related Costs in excess of the Program Payments from John Hancock.

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK6CUH rfa 010312.DOC

CONFIDENTIAL
JH 010103

-13-

## ARTICLE 4
## PRODUCT RESEARCH AND DEVELOPMENT

4.1 <u>Commercially Reasonable Efforts</u>. Abbott shall be solely responsible for the clinical development, government approval, manufacturing, marketing, sales and distribution of Products. Abbott will use, and will cause each of its Affiliates and Licensees to use, Commercially Reasonable Efforts to pursue the clinical development, government approval, manufacturing, marketing, sales and distribution of Products throughout the Territory. The obligations of Abbott, its Affiliates and Licensees with respect to any Product under this Article 4 are expressly conditioned upon the safety, efficacy and commercial feasibility of each Product, consistent with using Commercially Reasonable Efforts, but no license, assignment or other transfer of rights by Abbott will modify or reduce Abbott's obligations hereunder (except as set forth in Article 14). It is the parties' expectation that under normal circumstances Abbott will file for Regulatory Approval with respect to each Product in Europe within two (2) years from the date of the NDA filing for such Product in the U.S. Territory and in Japan within five (5) years from such NDA filing date; provided, however, that these time frames may be extended or otherwise altered based upon unforeseen circumstances that legitimately impact such regulatory filings in such foreign jurisdictions.

4.2 <u>Marketing and Sale Responsibility</u>. Without limiting the generality of Section 4.1, within six (6) months of obtaining Regulatory Approval for a Product in a given country, Abbott, its Affiliates or Licensees shall commence to market and sell such Product in such country. Abbott's obligation to market and sell a Product shall not apply to a Product in any country if Abbott has not commenced or has ceased marketing and selling such Product in such country substantially on account of adverse business or financial conditions caused by the regulatory authorities or other governmental authorities of such country (including not commencing marketing and selling in a country where the regulatory authorities have price or reimbursement approval and the price or reimbursement approval or that proposed by the regulatory authorities or government authorities is unacceptable to Abbott) which causes the marketing and sale of such Product in such country to be contrary to the financial best interests of John Hancock and Abbott; provided, however, that Abbott, its Affiliates or Licensees shall commence or resume marketing and sale of such Product in such country as soon as reasonably practical after such adverse business or financial conditions cease to exist.

4.3 <u>Failure of Program Compound to Progress</u>.

(a) <u>Preclinical Programs: ED Program, FTI Program and MMPI Program</u>. With respect to any Program Compound resulting from a Preclinical Program that Abbott ceases to develop past Phase I Clinical Trial (i.e., does not enter a Phase II Clinical Trial) (a "Failed Early Stage Program Compound"), for which Abbott or its Affiliates has or will have one or more other compounds in such respective Preclinical Program (which includes all in-licensed compounds not yet approved for marketing), the next compound to enter Phase I Clinical Trials from such Preclinical Program shall be considered a Program Compound in all respects

CONFIDENTIAL
JH 010104

-14-

hereunder, as of the date of the cessation of such Failed Early Stage Program Compound; provided however, with respect to each Preclinical Program, there shall be no more than three Program Compounds substituted under this Section 4.3(a) (for an aggregate maximum of nine (9) such substitutions for all Preclinical Programs). At the time a Preclinical Program becomes a Ceased Program, Abbott shall have no further obligation to provide a substitute for a Failed Early Stage Program Compound.

(b)     Failure of ABT-492 or ABT-510 to Yield a Compound that Enters a Phase II Clinical Trial. If (i) ABT-492 fails to enter a Phase II Clinical Trial, or (ii) ABT-510 fails to enter a Phase II Clinical Trial, then within six (6) months after the failure of the first such Program Compound to enter a Phase II Clinical Trial, Abbott shall substitute a compound in a Phase II Clinical Trial having a commercial value not less than that currently expected for ABT-492 and ABT-510, respectively (as of the date of execution of this Agreement).

(c)     Cessation as a Result of an Acquired Replacement Compound. If Abbott ceases or substantially ceases developing, marketing or selling any Program Compound (that is in Phase I or beyond) or Product (a "Ceased Compound"), and if such cessation or substantial cessation is a result of Abbott's acquisition of a Replacement Compound, then the Replacement Compound shall be considered a Program Compound and/or Product from the date of such acquisition and the Ceased Compound shall no longer be considered a Program Compound.

In the event that the Replacement Compound has been approved for marketing by the FDA and the Ceased Compound has not been approved for marketing by the FDA as of the date of such acquisition, Section 4.3(d) shall apply and the first paragraph of this Section 4.3(c) shall not apply.

In the event that the Ceased Compound has been approved for marketing by the FDA as of the date of such acquisition, John Hancock shall have the option, in its sole discretion, to have Abbott maximize the commercial value of the Ceased Compound pursuant to Section 4.3(d) instead of having the Ceased Compound be subject to this Section 4.3(c).

(d)     Cessation for Reasons Other than Section 4.3(c). If a Program Compound (that is in Phase I or beyond) or Product becomes a Ceased Compound for any reason not as a result of the acquisition of a Replacement Compound as set forth in Section 4.3(c) above and provided that such Ceased Compound has commercial value, then

CONFIDENTIAL
JH 010105

-15-

(i)    as soon as is practicable Abbott shall maximize the commercial value, if any, of the Ceased Compound to both parties by out-licensing or divesting such Ceased Compound to a third party; provided, however, if the out-licensing or divestiture of such Ceased Compound requires the approval of Taisho Pharmaceutical Co., Ltd. (in the case of Program Compound ABT-773), Eisai Co., Ltd. (in the case of Program Compound ABT-751) or Wakunaga Pharmaceutical Co., Ltd. (in the case of Program Compound ABT-492), pursuant to the respective In-License Agreement, and such entity does not grant such approval, then Abbott shall within a reasonable period of time but not more than three months substitute a compound (which shall thereupon become a "Program Compound") having at least the current and projected potential commercial value as such Ceased Compound;

(ii)    John Hancock shall be permitted (but have no obligation) to assist in such out-license and/or divestiture effort; and

(iii)    Abbott shall remunerate John Hancock based on the sales of such Ceased Compound by the third party that has acquired or licensed the Ceased Compound (the "Acquirer") in a manner most consistent with the allocation that would have applied hereunder had such Ceased Compound not been so out-licensed or divested, i.e., in accordance with the royalties and milestones payable hereunder. The appropriate royalty rate payable to John Hancock shall be determined by adding the Acquirer's Net Sales of the Ceased Compound to the total Net Sales of other Products.

(e)    Divestiture. Notwithstanding anything herein to the contrary, Abbott shall not divest or out-license any Program Compound (which shall mean a sale, license or other transfer by Abbott of the right to develop, market and sell any Product containing such Program Compound either (i) in all of North America or (ii) in the countries of Japan and/or the European Union that have at least two-thirds of the total population of Japan and the European Union), without John Hancock's prior written consent, which consent shall not be unreasonably withheld; provided however, if such Program Compound is being divested as a result of direction from the Federal Trade Commission to so divest, John Hancock's written consent shall not be required.

(f)    Notice and Information. Abbott shall promptly notify John Hancock upon occurrence of any decision by Abbott to cease or substantially cease developing, marketing or selling any Program Compound or Product. In addition, Abbott shall provide to John Hancock all information reasonably requested by John Hancock related to any Replacement Compound,

CONFIDENTIAL
JH 010106

-16-

Program Compound, or Product that is subject to the provisions of this Section 4.3.

(g) Commercially Reasonable Efforts. Nothing in this Section 4.3 shall lessen any of Abbott's other obligations under this Agreement nor permit Abbott to perform in any manner that is not clearly consistent with using its Commercially Reasonable Efforts hereunder.

4.4 Arm's-Length. Abbott shall not research, develop, manufacture, market, sell, distribute, out-license or otherwise treat any Program Compounds or Products differently, as compared to any other Abbott compounds or products, on account of any of John Hancock's rights hereunder. Furthermore, all distribution agreements, licenses, out-licenses and other agreements relating to the research, development, manufacturing, marketing, sale, distribution, licensing, out-licensing or divestiture of and all other transactions involving any Program Compounds or Products to or with any third party (except to Abbott's Affiliates) shall be on arm's-length terms and conditions.

4.5 In-License Agreements. Abbott shall comply in all material respects with the terms and conditions of the In-License Agreements. Abbott shall not amend the In-License Agreements or waive any of its rights thereunder without John Hancock's prior written consent (such consent not to be unreasonably withheld), unless such amendment or waiver does not have and would not have a material adverse effect on John Hancock's interests hereunder. To the extent that Abbott or any of its Affiliates obtains the right to market, distribute or sell Products containing the Program Compound known as ABT-751 in the Eisai Territory, then sales by Abbott, its Affiliates and Licensees of such Products in such territory shall be included in all respects hereunder (including without limitation in Net Sales and the Territory).

ARTICLE 5
PROGRAM INVENTIONS

5.1 Ownership. As between Abbott and John Hancock, all inventions, innovations, ideas, discoveries, technology, know-how, methods, data, applications and products (in each case whether or not patentable) arising from the Research Program or otherwise related to the Program Compounds (collectively, the "Program Inventions") shall be exclusively owned by or assigned to Abbott. Abbott shall not divest, out-license or otherwise transfer any of its right, title or interest in or to any Program Inventions which would prevent or impair Abbott's ability to fulfill its obligations to John Hancock under this Agreement.

5.2 Patent Prosecution and Maintenance. To the extent it owns a Program Invention or has the contractual right to pursue patent protection for a Program Invention, Abbott will use Commercially Reasonable Efforts to obtain patent protection for the Program Inventions in the Territory. As between Abbott and John Hancock, Abbott shall be responsible for all costs and expenses and control all decisions related to pursuing such patent protection, including the

C:\Documents and Settings\nmm\Local Settings\Temporary Internet Files\OLK6C\JH rla 010312.DOC

CONFIDENTIAL
JH 010107

-17-

preparation, filing (foreign and/or domestic), prosecution, issuance and maintenance of patent applications or patents covering Program Inventions.

5.3    Enforcement.  As between Abbott and John Hancock, Abbott shall have the sole right and authority to enforce the patents or any other rights arising from the Program Inventions (including without limitation the Patents) against any infringers.  If Abbott initiates any action or lawsuit to enforce such patents or other rights, it shall be solely responsible for the cost and expense thereof.  Abbott will promptly notify John Hancock at such time as it becomes aware of any infringement activities and of any such enforcement actions or lawsuit, and Abbott will provide information concerning them as reasonably requested by John Hancock.  All moneys recovered upon the final judgment or settlement of any such action or lawsuit, less the out-of-pocket cost and expense thereof, shall be allocated between Abbott and John Hancock proportional to Abbott's lost profits and John Hancock's lost royalties as a result of such infringement.

## ARTICLE 6
## MILESTONE PAYMENTS TO JOHN HANCOCK

6.1    [Intentionally omitted].

6.2    Management Fee.  On December 1, 2002, 2003 and 2004, Abbott shall pay to John Hancock a management fee, each of which shall be in the amount of Two Million Dollars ($2,000,000).

6.3    Milestone Notification and Payments.  Abbott shall promptly notify John Hancock of the occurrence any of the following events that give rise to Abbott's obligation to make a payment pursuant to this Section 6.3 (each, a "Milestone Payment").  Except as hereinafter limited, Abbott shall pay the following Milestone Payments to John Hancock in the amounts and at the times set forth below with respect to each Program Compound:

      (a)    One Million Dollars ($1,000,000) shall be paid within thirty (30) days after the allowance by the FDA of each Investigational New Drug Application for such Program Compound;

      (b)    Two Million Dollars ($2,000,000) shall be paid within thirty (30) days after the initiation of each Phase I Clinical Trial with such Program Compound;

      (c)    Three Million Dollars ($3,000,000) shall be paid within thirty (30) days after the initiation of each Phase II Clinical Trial with such Program Compound;

C:\Documents and Settings\kmml\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010312.DOC

CONFIDENTIAL
JH 010108

-18-

(d)    Four Million Dollars ($4,000,000) shall be paid within thirty (30) days after the initiation of each Phase III Clinical Trial with such Program Compound; and

(e)    Five Million Dollars ($5,000,000) shall be paid within thirty (30) days after the filing of each NDA with the FDA for such Program Compound.

In addition, except as hereinafter limited, Abbott shall pay the following Milestone Payments to John Hancock in the amounts and at the times set forth below:

(f)    (i)    Twenty Million Dollars ($20,000,000) shall be paid within thirty (30) days after the Regulatory Approval of the first Product in the U.S. Territory;

(ii)    Ten Million Dollars ($10,000,000) shall be paid within thirty (30) days after the Regulatory Approval of the second Product in the U.S. Territory; and

(iii)    Ten Million Dollars ($10,000,000) shall be paid within thirty (30) days after the Regulatory Approval of third Product in the U.S. Territory.

The aggregate of Milestone Payments under Section 6.3(a), (b), (c), (d), and (e) for all Program Compounds shall be limited to Eight Million Dollars ($8,000,000), and once such aggregate limit has been paid, no further payments shall be due and payable under Sections 6.3(a), (b), (c), (d) or (e).

The aggregate of Milestone Payments under Sections 6.3(a), (b), (c), (d) and (e) for all Program Compounds shall be limited to zero dollars ($0) during the first Program Year, Two Million Dollars ($2,000,000) during the second Program Year, and Six Million Dollars ($6,000,000) during the third Program Year, and once such annual limit has been reached for these particular Program Years, no further payments shall be due under Sections 6.3(a), (b), (c), (d) and (e) for the remainder of such Program Year; provided that any amounts that would have been due to John Hancock but for such annual limits shall be paid in subsequent Program Years so long as the Program Compound to which it relates has not been abandoned, divested or out-licensed by Abbott, subject to the Eight Million Dollar ($8,000,000) limitation set forth above. Subject to the limitations above, the Milestone Payments under Sections 6.3(a), (b), (c), (d) and (e) may be made more than once with respect to each Program Compound.

The aggregate of Milestone Payments under Section 6.3(f) for all Program Compounds shall be limited to Forty Million Dollars ($40,000,000), and once such aggregate limit has been paid, no further payments shall be due and payable under Section 6.3(f). In addition, Milestone Payments under Section 6.3(f) shall not be paid more than once for any particular Program Compound.

Exhibit 1.40 sets forth the current stage of clinical development for each Program Compound.

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK9CUH rfa 010312.DOC

CONFIDENTIAL
JH 010109

-19-

## ARTICLE 7
## ROYALTIES

7.1     Royalty Rates.  Subject to the limitation set forth below, Abbott shall pay to John Hancock royalties equal to the following percentages of Net Sales, aggregated on a yearly basis, of all Products in the Territory:

| Royalty percentage | Yearly Net Sales (in millions) of all Products in the Territory |
|---|---|
| 8.5% of those Net Sales | up to $400 |
| and then 4% of those Net Sales | in excess of $400 up to $1,000 |
| and then 1% of those Net Sales | in excess of $1,000 up to $2,000 |
| and then 0.5% of those Net Sales | in excess of $2,000 |

Net Sales shall be aggregated yearly (i) in the case of the U.S. Territory, on a calendar year basis, together with (ii) in the case of the International Territory, on a December 1 to November 30 basis, in each case consistent with the determination of Quarterly Reporting Periods.

7.2     Royalty Term.  The duration of the obligation to make royalty payments on each Product shall be determined on a country-by-country basis and shall last for the duration of the Royalty Term in each given country for such Product.

## ARTICLE 8
## ROYALTY REPORTS AND ACCOUNTING

8.1     Reports, Exchange Rates.  With respect to every Quarterly Reporting Period for which Abbott is obligated to pay any royalty hereunder, Abbott shall furnish to John Hancock a single written report for such Quarterly Reporting Period within sixty (60) days after the end of such Quarterly Reporting Period (that is, within sixty (60) days after each March 31, June 30, September 30 and December 31, as the case may be) showing in reasonably specific detail:

> (a)     the total gross sales in each country for each Product sold by Abbott, its Affiliates and Licensees in the Territory and the detailed calculation of Net Sales from gross sales in each country for each Product;

> (b)     the royalties payable in Dollars, if any, which shall have accrued hereunder;

> (c)     the dates of the First Commercial Sale of each Product in any country in the Territory during such Quarterly Reporting Period; and

> (d)     the exchange rates used in determining the amount of Dollars.

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010312.DOC

CONFIDENTIAL
JH 010110

-20-

With respect to sales of Products invoiced in Dollars, the gross sales, Net Sales (including all adjustments and deductions permitted to be made hereunder in calculating the same), and royalties payable shall be expressed in Dollars. With respect to sales of Products invoiced in a currency other than Dollars, the gross sales, Net Sales (including all adjustments and deductions permitted to be made hereunder in calculating the same) and royalties payable shall be expressed in their Dollar equivalent, calculated using the Inter Bank rate set forth in the International Report published by International Reports Inc. as Foreign Exchange Rates quoted in New York on the day nearest the last business day of the Quarterly Reporting Period.

8.2    Audits.

(a)    Upon the written request of John Hancock and, in the absence of any breach by Abbott hereunder, not more than once in each calendar year, Abbott shall permit John Hancock and an independent certified public accounting firm of nationally recognized standing, selected by John Hancock and reasonably acceptable to Abbott, at John Hancock's expense, to have access during normal business hours to such of the records of Abbott, its Affiliates and Licensees to verify the accuracy of the royalty reports and the amounts and calculation of any payments required hereunder for any year ending not more than five (5) years prior to the date of such request.

(b)    If such accounting firm concludes that additional royalties or other payments were owed during such period, Abbott shall have the option to invoke the proceedings of Section 16.7 below or pay the additional royalties or other payments within thirty (30) days after the date John Hancock delivers to Abbott such accounting firm's written report so concluding. The reasonable fees and expenses charged by such accounting firm shall be paid by John Hancock; provided, however, if the audit discloses that the amounts payable by Abbott for any Quarterly Reporting Period are more than one hundred five percent (105%) of the royalties actually paid for such period, then Abbott shall pay the reasonable fees and expenses charged by such accounting firm.

(c)    Abbott shall cause its Affiliates to, and shall include in each license granted by it relating to a Program Compound or Product a provision requiring the Licensee to, (i) make reports to Abbott, (ii) keep and maintain records of Net Sales made pursuant to such license and (iii) grant access to such records by John Hancock and its accounting firm or other auditor to the same extent required of Abbott under this Agreement.

(d)    All reports and payments not disputed as to correctness by John Hancock within five (5) years after receipt thereof shall thereafter conclusively be deemed correct for all purposes, and Abbott, its Affiliates and Licensees

C:\Documents and Settings\krum\Local Settings\Temporary Internet Files\OLK5C\JH rfa 010312.DOC1

CONFIDENTIAL
JH 010111

-21-

shall be released from any liability or accountability with respect to such reports and payments.

8.3    **Confidential Financial Information.**  John Hancock shall treat all information subject to review under this Article 8, and shall cause its accounting firm to agree to treat all such information, in accordance with the provisions of Article 10.

8.4    **Accounting Principles.**  All accounting hereunder, including without limitation all determinations of gross sales, Net Sales (including all adjustments and deductions permitted to be made hereunder in calculating the same), Program Related Costs and all calculations underlying such determinations, shall be made in accordance with generally accepted accounting principles as in effect in the United States, consistently applied.

ARTICLE 9
PAYMENTS

9.1    **Payment Terms.**  With respect to every Quarterly Reporting Period for which Abbott is obligated to pay a royalty hereunder, such royalties shall be due and payable in a single payment within sixty (60) days of the end of such Quarterly Reporting Period (that is, within sixty (60) days of each March 31, June 30, September 30 and December 31, as the case may be). Payment of royalties may be made in advance of such due date.

9.2    **Payment Method.**  All royalties and other payments by Abbott to John Hancock under this Agreement shall be made by bank wire transfer in immediately available funds in accordance with the instructions set forth on Exhibit 9.2 attached hereto or in accordance with such other instructions as John Hancock may give from time to time.

9.3    **Late Payments.**  Each party shall pay interest to the other on the aggregate amount of any payments by it that are not paid on or before the date such payments are due under this Agreement, including, without limitation, any disputed payments or payments resulting from any audit, at a rate per annum equal to the lesser of (a) the prime rate of interest plus two hundred (200) basis points as reported by Citibank, N.A. in New York, from time to time (with any change in such reported rate being effective immediately for purposes hereof), or (b) the highest rate permitted by applicable law, calculated on the number of days such payments is delinquent until paid in full in cash. All such amounts shall be payable upon demand.

ARTICLE 10
CONFIDENTIALITY

10.1    **Nondisclosure Obligations.**  Except as otherwise provided in this Article 10, during the term of the Agreement and for a period of ten (10) years thereafter, (a) John Hancock shall maintain in confidence in accordance with such procedures as are adopted by John Hancock to protect its own confidential information and shall use only for purposes of this Agreement

C:\Documents and Settings\mm\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010312.DOC

**CONFIDENTIAL
JH 010112**

-22-

(including, without limitation, enforcement of the terms hereof), information and data related to the Program Compounds or Products; and (b) John Hancock shall also maintain in confidence in accordance with such policies, and use only for purposes of this Agreement, all information and data supplied by Abbott under this Agreement, which if disclosed in writing is marked "confidential", if disclosed orally is promptly thereafter summarized and confirmed in writing to the other party and marked "confidential", or if disclosed in some other form is marked "confidential."

10.2    Permitted Disclosures. For purposes of this Article 10, information and data described in clause (a) or (b) above shall be referred to as "Confidential Information". John Hancock may disclose Confidential Information as required by applicable law, regulation or judicial process, provided that John Hancock shall, if legally permitted, give Abbott prompt written notice thereof. The obligation not to disclose or use Confidential Information shall not apply to any part of such Confidential Information that (i) is or becomes patented, published or otherwise part of the public domain other than by acts or omissions of John Hancock in contravention of this Agreement; or (ii) is disclosed to John Hancock by a third party, provided such Confidential Information was not obtained on a confidential basis by such third party from Abbott, its Affiliates or Licensees; or (iii) prior to disclosure under the Agreement, was already in the possession of John Hancock, provided such Confidential Information was not obtained directly or indirectly from Abbott, its Affiliates or Licensees under an ongoing obligation of confidentiality; or (iv) is disclosed in a press release agreed to by both parties under Section 10.3 below.

10.3    Publicity Review. Without the prior written consent of the other party, neither party shall make any statement to the public regarding the execution and/or any other aspect of the subject matter of this Agreement and John Hancock shall not make any statement to the public regarding any work under the Research Program; provided that, Abbott may make statements to the public regarding work done under the Research Program (without reference to or mention of John Hancock) and the commercialization of any Products resulting therefrom in accordance with its standard business practices. John Hancock and Abbott shall not disclose any terms or conditions of this Agreement to any third party without the prior consent of the other party, except as set forth above in this Section 10.3 or as required by applicable law, regulation or court order. The parties agree not to issue a press release announcing the execution of this Agreement.

<div align="center">

ARTICLE 11
TERM AND TERMINATION

</div>

11.1    Expiration. This Agreement shall expire upon satisfaction of Abbott's obligations to pay royalties under Section 7.2 and all other amounts under this Agreement.

11.2    Termination; Material Breach. It is the parties' express intent that consideration shall be given to remedying any breach of this Agreement through the payment of monetary damages or such other legal or equitable remedies as shall be appropriate under the

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010317.DOC

CONFIDENTIAL
JH 010113

-23-

circumstances and that there shall only be a limited right to terminate this Agreement under the following circumstances.

    (a)    In the event that the court, in accordance with the procedures set forth in Section 16.2, has issued a ruling that John Hancock has breached its obligation under Section 3.1 of this Agreement (obligation to make payments), and such ruling specified the actions to be taken by John Hancock on account of such breach, and John Hancock has failed to comply with the terms of such ruling within the time period specified therein for compliance and the time for any appeal has expired without the submission of an appeal, then, in addition to all other rights available to Abbott under law and equity, including its right to enforce such ruling in court, Abbott shall have the right to terminate the Agreement as a result of John Hancock's failure to abide by the terms of this Agreement and such ruling.

    (b)    In the event that the court, in accordance with the procedures set forth in Section 16.2, has issued a ruling that Abbott has breached a material obligation under this Agreement, and such ruling specified the actions to be taken by Abbott on account of such breach, and Abbott has failed to comply with the terms of such ruling within the time period specified therein for compliance and the time for any appeal has expired without the submission of an appeal, then, in addition to all other rights available to John Hancock under law and equity, including its right to enforce such ruling in court, John Hancock shall have the right to terminate the Agreement, each as a result of Abbott's failure to abide by the terms of this Agreement and such ruling.

11.3   <u>Effect of Expiration or Termination</u>. Expiration or, if applicable, termination of this Agreement shall not relieve the parties of any obligation accruing prior to such expiration or termination. The provisions of Articles 8 (Royalty Reports and Accounting), 10 (Confidentiality), 11 (Term and Termination), 12 (Warranties and Indemnification) and 16 (Miscellaneous) shall survive the expiration or termination of this Agreement.

<div align="center">

ARTICLE 12
<u>WARRANTIES AND INDEMNITY</u>

</div>

12.1   <u>John Hancock Representations and Warranties</u>. John Hancock represents and warrants to Abbott that as of the Execution Date:

    (a)    The execution and delivery of this Agreement and the performance of the transactions contemplated hereby have been duly authorized by all appropriate John Hancock corporate action. This Agreement constitutes

C:\Documents and Settings\wmm\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010312.DOC\

CONFIDENTIAL
JH 010114

-24-

John Hancock's valid and binding legal obligation, enforceable against it in accordance with its terms.

(b)    The performance by John Hancock of any of the terms and conditions of this Agreement on its part to be performed does not and will not constitute a breach or violation of its organizational documents or any other material agreement or understanding, written or oral, to which it is a party or any law, statute, rule or regulation by which it is bound.

(c)    No consent, approval, license or authorization of, or designation, declaration or filing with, any court or governmental authority is or will be required on the part of John Hancock in connection with the execution, delivery and performance by John Hancock of this Agreement or any other agreements or instruments executed and delivered by John Hancock in connection herewith or therewith, including, without limitation, any filings pursuant to federal or state securities laws or pursuant to any federal anti-trust laws.

(d)    Neither John Hancock nor any person acting on its behalf (i) has taken or will take any action which would subject this Agreement and the consummation of the transactions contemplated hereby to the registration or qualification requirements of any federal or state securities laws, (ii) has dealt with any broker, finder or other similar person in connection with the transactions contemplated by this Agreement or (iii) is under any obligation to pay any broker's fee, finder's fee or commission in connection with such transactions.

12.2    Abbott Representations and Warranties. Abbott represents and warrants to John Hancock that as of the Execution Date:

(a)    The execution and delivery of this Agreement and the performance of the transactions contemplated hereby have been duly authorized by all appropriate Abbott corporate action. This Agreement constitutes Abbott's valid and binding legal obligation, enforceable against it in accordance with its terms.

(b)    The performance by Abbott of any of the terms and conditions of this Agreement on its part to be performed does not and will not constitute a breach or violation of its organizational documents or any other agreement or understanding, written or oral, to which it is a party or any law, statute, rule or regulation by which it is bound.

(c)    No consent, approval, license or authorization of, or designation, declaration or filing with, any court or governmental authority is or will be required on the part of Abbott in connection with the execution, delivery and performance by Abbott of this Agreement or any other agreements or

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010312.DOC

CONFIDENTIAL
JH 010115

-25-

instruments executed and delivered by Abbott in connection herewith or therewith, including, without limitation, any filings pursuant to federal or state securities laws or pursuant to any federal anti-trust laws, except those consents, approvals, licenses, authorizations, and other requirements imposed by governmental authorities (both U.S. and foreign) and such declarations and filings with governmental authorities (both U.S. and foreign) required in the normal course of pharmaceutical research, development, marketing and sale.

(d)    Set forth on Exhibit 12.2(d) is the full name, chemical name, detailed description of the stage of development and current status, for each Program Compound. Set forth on Exhibit 1.6 in each Annual Research Plan is a description of projected milestones and dates thereof, projected year of NDA filing, and projected costs to be incurred by Abbott during the Program Term, for each Program Compound. Such projections were prepared in good faith and with due care based on reasonable assumptions, and represent the reasonable estimate of Abbott based on information available as of the date of such projections and as of the date hereof; it being agreed that such projections do not constitute any warranty as to the future performance of the Program Compounds and that actual results may vary from such projections.

(e)    Set forth on Exhibit 12.2(e) is a list and description of all domestic and foreign patents, patent rights, patent applications and all patent applications that are in the process of being prepared that are owned by or registered in the name of Abbott, or of which Abbott is a licensee or in which Abbott has any right, which claim any of the Program Compounds (the "Patents"). Abbott solely owns all of the Patents, except as indicated on Exhibit 12.2(e). All of the material Patents have been duly filed in or issued by the United States Patent and Trademark Office or the equivalent foreign patent office identified on Exhibit 12.2(e), as the case may be, and have been properly maintained and renewed in accordance with all applicable laws and regulations. With respect to the Patents that it does not own, Abbott has an exclusive and valid license thereunder to develop, make, have made, use, market and sell (with the right to sublicense) the applicable Program Compounds in the entire Territory; provided however, (i) with respect to Italy, Abbott has such rights that are co-exclusive with Eisai Co. Ltd. for the Program Compound known as ABT-751 and (ii) with respect to Japan, Abbott has such rights that are co-exclusive with Taisho Pharmaceutical Co., Ltd. for the Program Compound known as ABT-773. Except with respect to the Preclinical Programs, to Abbott's knowledge, it is not necessary to obtain or license any patents, patent rights, inventions, copyrights, manufacturing processes, formulae, trade secrets, proprietary rights or know-how that it does not currently have in order to (i) develop, make, have made, use, market and sell the Program Compounds or (ii) conduct the Research Program as heretofore conducted

CONFIDENTIAL
JH 010116

-26-

and as proposed to be conducted. Except with respect to those Program Compounds that are the subject of In-License Agreements, the Program Compounds are owned exclusively by Abbott, free and clear of any liens or encumbrances of any other person and, to Abbott's knowledge, Abbott does not require the consent of any other person to develop, make, have made, use, market and sell the Program Compounds.

(f)     Except as set forth in Exhibit 12.2(f) (but in any event, as of the Execution Date, such matters are not, and could not reasonably be expected to be material), Abbott has not received any communications alleging that, and no claim is pending or, to the knowledge of Abbott, threatened to the effect that, the operations of Abbott with respect to the Research Program or the Program Compounds infringe upon or conflict with (or will infringe or conflict with) the asserted rights of any other person under any domestic or foreign patent, trademark, service mark, copyright, trade secret, proprietary right or any other intellectual property right, and, except for the Preclinical Programs, there is no material basis known to Abbott for any such claim (whether or not pending or threatened). No claim is pending or, to the knowledge of Abbott, threatened to the effect that any of the Patents are invalid or unenforceable by Abbott, and there is no material basis known to Abbott for any such claim (whether or not pending or threatened). The publication of any material technical information with respect to the Program Compounds developed by and belonging to Abbott is subject to review and approval under Abbott's existing procedures.

(g)     Except for the In-License Agreements and customary employment and consulting agreements with Abbott's employees and consultants, there are no outstanding options, licenses, or agreements of any kind relating to the Patents or any of the Program Compounds or the transactions contemplated by this Agreement, which license the Patents or any technical information developed in the course of the clinical development program to any third party to register, market or sell any of the Program Compounds or Products.

(h)     To the knowledge of Abbott with respect to the Research Program and each of the Program Compounds, Abbott is not now, and in performing its obligations hereunder will not be, in any way making an unlawful or wrongful use of any confidential information, know-how, or trade secrets of any other person.

(i)     Neither this Agreement nor any Exhibit to this Agreement (including the compound reports attached as Exhibit 12.2(i) hereto (the "Compound Reports")) contains any untrue statement of material fact or omits to state any material fact necessary to make the statements contained herein or therein not misleading. There is no fact known to Abbott (other than generally available information concerning the pharmaceutical industry in

CONFIDENTIAL
JH 010117

-27-

general) as of the date of this Agreement that has not been disclosed in this Agreement or any Exhibit to this Agreement which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial) of the Research Program or any of the Program Compounds.

(j)     Neither Abbott nor any person acting on its behalf (i) has taken or will take any action which would subject this Agreement and the consummation of the transactions contemplated hereby to the registration or qualification requirements of any federal or state securities laws, (ii) has dealt with any broker, finder or other similar person in connection with the transactions contemplated by this Agreement or (iii) is under any obligation to pay any broker's fee, finder's fee or commission in connection with such transactions.

(k)     Other than generally publicized actions, proceedings or investigations concerning the pharmaceutical industry in general, there is no action, proceeding or investigation pending or, to the knowledge of Abbott, threatened which (i) questions the validity of this Agreement or any action taken or to be taken by Abbott pursuant thereto or (ii) which has resulted in, or could reasonably be expected to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial) of the Research Program or any of the Program Compounds.

(l)     With respect to the Research Program and each of the Program Compounds, Abbott has (and in the future will have) obtained, to the extent permitted by law, from each of its employees, consultants, Affiliates and Subcontractors an agreement that reasonably protects Abbott's interest in the Program Inventions, Program Compounds and Products.

(m)     With respect to each Program Compound, since the date of its respective Compound Report, to the knowledge of Abbott, no condition, circumstance or fact has arisen (other than generally available information concerning the pharmaceutical industry in general) nor has Abbott made any change in the conduct of the Research Program which, individually or in the aggregate, has resulted in, or could reasonably be expect to result in, a material adverse effect on the prospects or condition (including safety, efficacy, scientific viability or commercial) of such Program Compounds.

(n)     Each In-License Agreement is valid, binding and in full force and effect, and there is no event which has occurred or exists, which constitutes or which, with notice and/or the passage of time, would constitute a material default or breach under any such contract by Abbott or, to Abbott's knowledge, any other party thereto, or would cause the acceleration of any

CONFIDENTIAL
JH 010118

-28-

obligation of any party thereto or give rise to any right of termination or cancellation thereof. Abbott has no reason to believe that the parties to each In-License Agreement will not fulfill their obligations thereunder in all material respects or that such parties do not have the right to grant the licenses granted thereunder. Abbott has no reason to believe that it will not fulfill its obligations under the In-License Agreements. Under the Eisai Agreement, neither Abbott nor its Affiliates has the right to market, distribute or sell Products containing the Program Compound known as ABT-751 in the Eisai Territory (with the exception of Italy).

12.3    No Conflict. Abbott and John Hancock represent and warrant that this Agreement does not, and will not, conflict with any other right or obligation provided under any other agreement or obligation that Abbott or John Hancock has with or to any third party.

12.4    Compliance with Law. Each party represents and warrants to the other that it will comply with all applicable laws, regulations and guidelines in connection with its performance of its obligations and rights pursuant to this Agreement, including the regulations of the United States and any other relevant nation concerning any export or other transfer of technology, services or products.

12.5    No Other Warranties. EACH PARTY TO THIS AGREEMENT AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY OTHER REPRESENTATIONS OR WARRANTIES, AND EACH HEREBY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES MADE BY ITSELF OR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, FINANCIAL AND LEGAL ADVISORS OR OTHER REPRESENTATIVES, WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO THE OTHER OR THE OTHER'S REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION WITH RESPECT TO ANY ONE OR MORE OF THE FOREGOING.

12.6    General Indemnification of John Hancock. Abbott shall indemnify and hold John Hancock and its Affiliates, agents, directors and employees harmless, and hereby forever releases and discharges John Hancock and its Affiliates, agents, directors and employees, from and against all Losses related to or arising out of, directly or indirectly, (i) any negligence, recklessness or intentional misconduct of Abbott or its Affiliates, agents, directors, employees, Subcontractors, licensees (including Licensees) or sublicensees in connection with the Research Program, Program Compounds or Products, or (ii) any manufacture, use, storage, distribution or sale of the Program Compounds or Products by anyone, including without limitation all Losses related to any personal injury or death, or (iii) any breach by Abbott of its representations, warranties or obligations hereunder, or (iv) the consummation of the transactions contemplated hereby, except, in each case, to the extent any such Losses are the result of (A) any breach by John Hancock of its representations, warranties or obligations hereunder, or (B) any negligence,

CONFIDENTIAL
JH 010119

-29-

recklessness, or intentional misconduct by John Hancock or its Affiliates, agents, directors, employees.

12.7    Indemnification Relating to Certain In-Licensed Compounds.  Abbott shall indemnify and hold John Hancock and its Affiliates, agents, directors and employees harmless, and hereby forever releases and discharges John Hancock and its Affiliates, agents, directors and employees, from and against all Losses to the extent related to or arising out of, directly or indirectly, the fact that Abbott's rights in the Program Compounds known as ABT-773, ABT-492 and ABT-751 and the Patents and other patent rights, copyrights, trade secret rights and other intellectual property rights related thereto arise from the Taisho Agreement, the Wakunaga Agreement or the Eisai Agreement respectively, rather than being owned by Abbott as with the other Program Compounds.  Accordingly, by way of example and without limiting the foregoing, Abbott's indemnification obligation under this Section 12.7 will arise upon (i) any impairment of Abbott's ability to perform its obligations under this Agreement in the entire Territory as a result of Abbott's rights to the Program Compounds known as ABT-773, ABT-442 and ABT-751 arising from the Taisho Agreement, Wakunaga Agreement and the Eisai Agreement, respectively or (ii) a breach by Abbott or any other person of any of the In-License Agreements; except, in each case, to the extent any such Losses are the result of (A) any breach by John Hancock of its representations, warranties or obligations hereunder, or (B) any negligence, recklessness, or intentional misconduct by John Hancock or its Affiliates, agents, directors, employees.

12.8    Procedure.  If John Hancock or any of its Affiliates, agents, directors or employees (each, an "Indemnitee") intends to claim indemnification under this Article 12, it shall promptly notify Abbott (the "Indemnitor") of any Loss or action in respect of which the Indemnitee intends to claim such indemnification, and the Indemnitor shall have the right to participate in, and, to the extent the Indemnitor so desires, to assume the defense thereof with counsel selected by the Indemnitor; provided, however, that an Indemnitee shall have the right to retain its own counsel, with the fees and expenses of such counsel to be paid by the Indemnitor, if representation of such Indemnitee by the counsel retained by the Indemnitor would be inappropriate due to actual or potential differing interests between such Indemnitee and any other party represented by such counsel in such proceedings.  The indemnity obligation in this Article 12 shall not apply to amounts paid in settlement of any loss, claim, damage, liability or action if such settlement is effected without the consent of the Indemnitor, which consent shall not be withheld unreasonably or delayed.  The failure to deliver notice to the Indemnitor within a reasonable time after the commencement of any such action, if materially prejudicial to its ability to defend such action, shall relieve the Indemnitor of any liability to the Indemnitee under this Article 12 only to the extent arising from the tardiness or absence of such notice, but the omission to so deliver notice to the Indemnitor will not relieve it of any liability that it may have to any Indemnitee otherwise than under this Article 12.  The Indemnitee shall cooperate fully with the Indemnitor and its legal representatives in the investigation of any action, claim or liability covered by indemnification under this Article 12, at the expense of the Indemnitor.

12.9    Insurance.  Abbott shall at its expense maintain, through self-insurance or otherwise, product liability insurance with respect to the development, manufacture, sale and use of Products and Program Compounds in such amounts and on such terms as Abbott customarily

CONFIDENTIAL
JH 010120

-30-

maintains with respect to its other similar products.  Abbott shall maintain such insurance for so long as it continues to develop, manufacture or sell any Products or Program Compounds, and thereafter for so long as Abbott customarily currently maintains such insurance.

12.10   Acknowledgment.  Abbott and John Hancock acknowledge that Abbott has not delivered or disclosed the contents of any of the In-License Agreements to John Hancock.

ARTICLE 13
FORCE MAJEURE

Neither party shall be held liable or responsible to the other party nor be deemed to have defaulted under or breached this Agreement for failure or delay in fulfilling or performing any term of this Agreement when such failure or delay is caused by or results from causes beyond the reasonable control of the affected party including but not limited to fire, floods, embargoes, war, acts of war (whether war be declared or not), insurrections, riots, civil commotions, strikes, lockouts or other labor disturbances, acts of God or acts, omission or delays in acting by any governmental authority; provided that such affected party shall provide the other party with prompt notice of the circumstances surrounding such a material failure or delay, after which the parties will amend this Agreement upon terms and conditions that are mutually agreeable to equitably account to the party that does not so fail or delay.

ARTICLE 14
ASSIGNMENT

Except as expressly provided hereunder, this Agreement may not be assigned or otherwise transferred, nor may any right or obligations hereunder be assigned or transferred by either party without the consent of the other party; and, in addition, both parties acknowledge and agree that the obligations of Abbott hereunder are personal to Abbott and that Abbott is uniquely qualified to perform them; provided, however, that either party shall be obligated to assign this Agreement and its rights and obligations hereunder in connection with the transfer or sale of all or substantially all of its business, or in the event of its merger or consolidation or change in control or similar transaction and in such event such party shall cause its successor or transferee in such transaction to assume all of the obligations of such party.  Any permitted assignee shall assume all obligations of its assignor under this Agreement.  Notwithstanding the foregoing, John Hancock shall have the right to assign its rights (but not its obligation to make payments under Section 3.1) in whole or in part (provided that, any assignment in part shall mean an assignment of a pro rata share of the entirety of John Hancock's rights hereunder) without Abbott's consent (and following any such assignment all references to John Hancock herein shall include any such assignee), provided that:  (i) each assignee of such rights must be a bank, insurance company or other institutional investor; (ii) there shall be no greater than five (5) assignees, (iii) if any such assignee is located outside the United States John Hancock shall notify Abbott at least sixty (60) days in advance, (iv) if any claim arises with respect to Abbott's failure to make payments, then during the term of the Research Program (but in any event not longer than four years from the date hereof), any such claim must be brought by John Hancock, and not

C:\Documents and Settings\cmm\Local Settings\Temporary Internet Files\OLK6CL\H rfa 010312.DOC

CONFIDENTIAL
JH 010121

-31-

an assignee.  In soliciting potential assignees for such right to payments, John Hancock shall not disclose any Confidential Information hereunder to more than ten (10) potential assignees.  Any potential assignee to whom John Hancock discloses Confidential Information must have executed a confidentiality agreement no less stringent than Article 10 hereof.  Furthermore, if John Hancock plans to exercise its right of assignment hereunder, John Hancock shall first notify Abbott of such plans in writing.  Abbott shall have the first right to negotiate the purchase of any such assignment rights.  If within fifteen (15) days after receipt of such notice the parties have not agreed upon the principal terms of such arrangement or if within forty-five (45) days after receipt of such notice the parties have not executed a final written agreement reflecting such arrangement, then John Hancock shall have no further obligations to Abbott with respect to such first right of negotiation.

## ARTICLE 15
## SEVERABILITY

Each party hereby agrees that it does not intend its execution and delivery hereof or its performance hereunder to violate any public policy, statutory or common laws, rules, regulations, treaty or decision of any government agency or executive body thereof of any country or community or association of countries.  If and to the extent any term or provision of this Agreement is held to be invalid, illegal or unenforceable by a court or other governmental authority of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement, which shall remain in full force and effect.  The holding of a term or provision to be invalid, illegal or unenforceable in a jurisdiction shall not have any effect on the application of the term or provision in any other jurisdiction.

## ARTICLE 16
## MISCELLANEOUS

16.1    Notices.  Any consent, notice or report required or permitted to be given or made under this Agreement by one of the parties hereto to the other shall be in writing, delivered personally or by facsimile (and promptly confirmed by personal delivery, U.S. first class mail or courier), U.S. first class mail or courier, postage prepared (where applicable), addressed to such other party at its address indicated below, or to such other address as the addressee shall have last furnished in writing to the addressor and (except as otherwise provided in this Agreement) shall be effective upon receipt by the addressee.

If to John Hancock:    John Hancock Life Insurance Company
200 Clarendon Street, T-57
Boston, MA  02117
Attention: Bond & Corporate Finance Group
Telephone:    617-572-9624
Fax:              617-572-1628

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010312.DOC

CONFIDENTIAL
JH 010122

-32-

| | |
|---|---|
| copy to: | John Hancock Life Insurance Company<br>200 Clarendon Street, T-50<br>Boston, MA  02117<br>Attention: Investment Law Division<br>Telephone:    617-572-9205<br>Fax:            617-572-9268 |

and, if it relates to making or not making a royalty payment or Milestone Payment hereunder,

| | |
|---|---|
| copy to: | John Hancock Life Insurance Company<br>200 Clarendon Street<br>Boston, MA  02117<br>Attention:  Manager, Investment Accounting Division, B-3<br>Fax: 617-572-0628 |
| If to Abbott: | Abbott Laboratories<br>Dept. 309, Bldg. AP30<br>200 Abbott Park Road<br>Abbott Park, IL 60064-3537<br>Attention: President, Pharmaceutical Products Division<br>Telephone:    847-938-6863<br>Fax:            847-938-5383 |
| copy to: | General Counsel<br>Abbott Laboratories<br>Dept. 364, Bldg. AP6D<br>100 Abbott Park Road<br>Abbott Park, IL 60064-6020<br>Telephone:    847-937-8905<br>Fax:            847-938-6277 |

16.2    Applicable Law.  The Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois.  With respect to any action hereunder, Abbott, to the extent that it may lawfully do so, hereby consents to service of process, and to be sued, in the Commonwealth of Massachusetts and consents to the exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts, as well as to the jurisdiction of all courts to which an appeal may be taken from such courts, for the purpose of any suit, action or other proceeding arising out of any of its obligations hereunder or thereunder or with respect to the transactions contemplated hereby or thereby, and expressly waives any and all objections it may have as to venue in any such courts.  Abbott further agrees that a summons and complaint commencing an action or proceeding in any of such courts shall be properly served and shall confer personal jurisdiction if served personally or by certified mail to it at its address for notices as provided in this Agreement or as otherwise provided under the laws of the Commonwealth of Massachusetts. THE

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK6C\JH rla 010312.DOC

CONFIDENTIAL<br>JH 010123

-33-

PARTIES EACH IRREVOCABLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY
SUIT, ACTION OR OTHER PROCEEDING INSTITUTED BY OR AGAINST IT IN
RESPECT OF ITS OBLIGATIONS HEREUNDER OR THEREUNDER OR THE
TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

    16.3   Entire Agreement. This Agreement contains the entire understanding of the
parties with respect to the subject matter hereof. All express or implied agreements and
understandings, either oral or written, with respect to the subject matter hereof heretofore made
are expressly merged in and made a part of this Agreement. This Agreement may be amended,
or any term hereof modified, only by a written instrument duly executed by both parties hereto.

    16.4   Headings. The captions to the several Articles and Sections hereof are not a part
of this Agreement, but are merely guides or labels to assist in locating and reading the several
Articles and Sections hereof.

    16.5   Independent Contractors. It is expressly agreed that John Hancock and Abbott
shall be independent contractors and that the relationship between the two parties shall not
constitute a partnership, joint venture or agency. Neither John Hancock nor Abbott shall have
the authority to make any statements, representations or commitments of any kind, or to take any
action, which shall be binding on the other, without the prior written consent of the other party to
do so.

    16.6   Performance By Affiliates, Licensees and Subcontractors. The parties recognize
that Abbott may carry out certain obligations under this Agreement through performance by its
Affiliates, Licensees and Subcontractors (but in no event shall that relieve Abbott of any of its
obligations hereunder). Abbott guarantees that the activities of its Affiliates, Licensees and
Subcontractors under this Agreement shall comply with this Agreement.

    16.7   Dispute Resolution. The parties shall attempt to amicably resolve disputes arising
between them regarding the validity, construction, enforceability or performance of the terms of
this Agreement, and any differences or disputes in the interpretation of the rights, obligations,
liabilities and/or remedies hereunder, which have been identified in a written notice from one
party to the other, by good faith settlement discussions between the President of Abbott's
Pharmaceutical Products Division and a Managing Director of John Hancock or his designee.
The parties agree that, prior to filing any lawsuit regarding any dispute that arises in connection
with this Agreement (with the exception of any action demanding a preliminary injunction), such
representatives shall meet and attempt to amicably resolve such dispute within thirty (30) days
after the receipt of such written notice.

    16.8   Waiver. The waiver by either party hereto of any right hereunder or the failure to
perform or of a breach by the other party shall not be deemed a waiver of any other right
hereunder or of any other breach or failure by said other party whether of a similar nature or
otherwise.

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010312.DOC

CONFIDENTIAL
JH 010124

-34-

16.9   Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[the remainder of this page is intentionally blank]

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK6C\JH rla 010312.DOC

CONFIDENTIAL
JH 010125

-35-

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

JOHN HANCOCK LIFE                          ABBOTT LABORATORIES
INSURANCE COMPANY

By: _____              By: _____

Name: _____              Name: _____

Title: _____            Title: _____

Date: _____             Date: _____

JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY

By: _____

Name: _____

Title: _____

Date: _____

INVESTORS PARTNER LIFE INSURANCE
COMPANY

By: _____

Name: _____

Title: _____

Date: _____

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010312.DOC\

CONFIDENTIAL
JH 010126

-36-

EXHIBIT 1.6

FIRST ANNUAL RESEARCH PLAN

CONFIDENTIAL
JH 010127

-37-

## EXHIBIT 1.17

### EISAI TERRITORY

1. Bhutan
2. Brunei
3. Cambodia
4. People's Republic of China
5. Republic of China (Taiwan)
6. India
7. Indonesia
8. Japan
9. Democratic People's Republic of Korea (North Korea)
10. Republic of Korea
11. Laos
12. Macao
13. Malaysia
14. Mongolia
15. Myanmar
16. Nepal
17. Pakistan
18. Papua New Guinea
19. Philippines
20. Singapore
21. Sri Lanka
22. Thailand
23. Vietnam
24. Italy, co-exclusive rights with Abbott, unless Abbott exercises its rights under the terms of the Eisai Agreement to take an exclusive right to Italy.

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK6CUH rfa 010312.DOC!

CONFIDENTIAL
JH 010128

-38-

EXHIBIT 1.40

PROGRAM COMPOUNDS

| In-License Agreement | Program Compound | Development Phase |
|---|---|---|
| | ABT-627 (Endothelin antagonist) | phase III |
| Taisho | ABT-773 (Ketolide antibiotic) | phase III |
| | ABT-594 (Cholinergic channel modulator) | late phase II |
| Wakunaga | ABT-492 (Quinolone antibiotic) | phase I |
| Eisai | ABT-751 (Antimitotic) | phase I |
| | ABT-510 (Thrombospondin peptide) | phase I |

Preclinical Programs:

| | | |
|---|---|---|
| FTI Program | | late preclinical |
| ED Program | | late preclinical |
| MMPI Program | ABT-518 (Matrix metalloproteinase inhibitor) | phase I |

CONFIDENTIAL
JH 010129

-39-

EXHIBIT 1.43

EXAMPLE OF PROGRAM RELATED COSTS FOR ONE PROGRAM COMPOUND

CONFIDENTIAL
JH 010130

-40-

EXHIBIT 9.2

PAYMENT INSTRUCTIONS

CONFIDENTIAL
JH 010131

-41-

Exhibit 12.2(d)

Further Information Regarding Program Compounds

| COMPOUND | CHEMICAL NAME | CURRENT STAGE OF DEVELOPMENT |
|---|---|---|
| ABT-627<br>Endothelin antagonist | (2R,3R,4S)-4-(1,3-benzodioxol-5-yl)-1-[2-(dibutylamino)-2-oxoethyl]-2-(4-methoxyphenyl)-3-pyrrolidinecarboxylic acid | Phase III |
| ABT-773<br>Ketolide antibiotic | (3aS,4R,7R,9R,10R,11S,13R,15R,15aR)-4-ethyl-3a,7,9,11,13,15-hexamethyl-2,6,8,14-tetraoxo-11-{[(2E)-3-(3-quinolinyl)-2-propenyl]oxy}tetradecahydro-2H-oxacyclotetradecino[4,3-d][1,3]oxazol-10-yl 3,4,6-trideoxy-3-(dimethylamino)-ʊ-D-xylo-hexopyranoside | Phase III |
| ABT-594<br>Cholinergic channel modulator | (2R)-azetidinylmethyl 6-chloro-3-pyridinyl ether hydrochloride | Phase II |
| ABT-492<br>Quinoline Antibiotic | potassium 1-(6-amino-3,5-difluoro-2-pyridinyl)-8-chloro-6-fluoro-7-(3-hydroxy-1-azetidinyl)-4-oxo-1,4-dihydro-3-quinolinecarboxylate | Phase I |
| ABT-518<br>Matrix metalloproteinase inhibitor | (1S)-1-[(4S)-2,2-dimethyl-1,3-dioxolan-4-yl]-2-{4-[4-(trifluoromethoxy)phenoxy]phenyl}sulfonyl]ethyl)(hydroxy)formamide | Phase I |
| ABT-751<br>Antimitotic | N-[2-(4-hydroxyanilino)-3-pyridinyl]-4-methoxybenzenesulfonamide | Phase I |
| Farnesyltransferase inhibitor | N.A. | Pre-Clinical Program |
| Dopamine Receptor Agonist for Erectile Dysfunction | N.A. | Pre-Clinical Program |

CONFIDENTIAL
JH 010132

-42-

EXHIBIT 12.2(e)

Certain Patent Information

ABT-627

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---|---|---|---|---|
| Australia | 08/04/1995 | 711832 | Issued | 08/04/2015 |
| Brazil | 02/12/1997 | | Pending | |
| Canada | 08/04/1995 | | Pending | |
| EP* | 08/04/1995 | | Pending | |
| Hong Kong | 07/15/1998 | | Pending | |
| Israel | 08/10/1995 | | Pending | |
| Japan | 08/04/1995 | | Pending | |
| Korea | 08/04/1995 | | Pending | |
| Mexico | 08/04/1995 | | Pending | |
| Philippines | 08/17/1995 | | Pending | |
| USA | 05/30/1995 | 5,767,144 | Issued | 06/16/2015 |

*Europe: Austria, Belgium, Great Britain, Denmark, France, Germany, Greece, Ireland, Italy, Luxembourg, Netherlands, Portugal, Spain, Sweden, Switzerland

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK6CUH rfa 010312.DOC

CONFIDENTIAL
JH 010133

-43-

Exhibit 12.2(e) (Cont'd)

ABT-773
(Subject to Taisho Agreement)

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---------|-------------|---------------|--------|-----------|
| Argentina | 09/03/1997 | | Pending | |
| Australia | 09/02/1997 | | Pending | |
| Brazil | 05/13/1997 | | Pending | |
| Brazil | 09/02/1997 | | Pending | |
| Bulgaria | 09/02/1997 | | Pending | |
| Belarus | 09/02/1997 | | Pending | |
| China | 09/02/1997 | | Pending | |
| Chile | 09/04/1997 | | Pending | |
| Canada | 09/02/1997 | | Pending | |
| Columbia | 09/02/1997 | | Pending | |
| Czech Republic | 09/02/1997 | | Pending | |
| EP* | 09/02/1997 | | Pending | |
| Guatemala | 08/29/1997 | | Pending | |
| Hong Kong | 09/02/1997 | | Pending | |
| Croatia | 09/03/1997 | | Pending | |
| Hungary | 09/02/1997 | | Pending | |
| Indonesia | 09/04/1997 | | Pending | |
| India | Pending-Black Box | | Pending | |
| Israel | 09/02/1997 | | Pending | |
| Japan | 09/02/1997 | | Pending | |
| Korea | 09/02/1997 | | Pending | |
| Mexico | 09/02/1997 | | Pending | |
| Malaysia | 08/26/1997 | | Pending | |
| Norway | 09/02/1997 | | Pending | |

CONFIDENTIAL
JH 010134

-44-

Exhibit 12.2(e) (cont'd)

ABT-773 (cont'd)
(Subject to Taisho Agreement)

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---------|-------------|---------------|--------|-----------|
| New Zealand | 09/02/1997 | | Pending | |
| Philippines | 09/02/1997 | | Pending | |
| Pakistan | 10/13/1997 | 136010 | Issued | 10/13/2013 |
| Poland | 09/02/1997 | | Pending | |
| Romania | 09/02/1997 | | Pending | |
| Russia | 09/02/1997 | | Pending | |
| South Africa | 08/20/1997 | 97/7474 | Issued | 08/20/2017 |
| Singapore | 09/02/1997 | | Pending | |
| Slovak Republic | 09/02/1997 | | Pending | |
| Slovenia | 09/02/1997 | 20023 | Issued | 09/02/2017 |
| Saudi Arabia | 02/10/1998 | | Pending | |
| Thailand | 09/03/1997 | | Pending | |
| Turkey | 09/02/1997 | TR 01127 B | Issued | 09/02/2017 |
| Taiwan | 09/05/1997 | | Pending | |
| UA | 09/02/1997 | | Pending | |
| USA | 07/03/1997 | 5,866,549 | Issued | 09/04/2016 |
| Yugoslavia | 09/02/1997 | | Pending | |

*Europe:  Austria, Belgium, Great Britain, Denmark, France, Germany, Greece, Ireland, Italy, Luxembourg, Netherlands, Portugal, Spain, Sweden, Switzerland

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK5C\JH rfa 010312.DOC

CONFIDENTIAL
JH 010135

-45-

EXHIBIT 12.2(e) (Cont'd)

ABT-594

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---------|-------------|---------------|--------|-----------|
| Australia | 10/08/1993 | 687017 | Issued | 10/18/2013 |
| Brazil | 04/30/1997 | | Pending | |
| Canada | 10/08/1993 | | Pending | |
| EP* | 10/08/1993 | | Pending | |
| Hong Kong | 12/10/1998 | | Pending | |
| Israel | 10/04/1993 | 107184 | Issued | 10/04/2013 |
| Japan | 10/08/1993 | 3096035 | Issued | 10/08/2013 |
| Korea | 10/08/1993 | | Pending | |
| Mexico | 10/08/1993 | | Pending | |
| Philippines | 10/07/1993 | | Pending | |
| USA | 06/07/1995 | 5,948,793 | Issued | 09/07/2016 |

*Europe: Austria, Belgium, Great Britain, Denmark, France, Germany, Greece, Ireland, Italy, Luxembourg, Netherlands, Portugal, Spain, Sweden, Switzerland

CONFIDENTIAL
JH 010136

-46-

EXHIBIT 12.2(e) (Cont'd)

ABT-492

(Subject to Wakunaga Agreement)

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---|---|---|---|---|
| Australia | 09/24/1999 | | Pending | |
| Brazil | 11/29/1999 | | Pending | |
| Canada | 12/06/1999 | | Pending | |
| China | 10/22/1999 | 1258674A | Issued | |
| Hong Kong | | | | |
| EP* | 12/08/1999 | 0992501 | Issued | |
| Hungary | 11/23/1999 | 9904389 | Issued | |
| Republic of Korea | 08/29/2000 | | | |
| Mexico | 10/14/1999 | | Pending | |
| Russian Federation | 05/26/2000 | | Pending | |
| USA | 06/10/1999 | | Pending | |
| Japan | 10/06/1999 | 2000-136191 | Issued | |

*Europe:  Austria, Belgium, Switzerland, Germany, Denmark, Spain, Finland, France, Great Britain, Greece, Ireland, Italy, Luxembourg, Monaco, Netherlands, Portugal, Sweden

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010312.DOC

CONFIDENTIAL
JH 010137

-47-

EXHIBIT 12.2(e) (Cont'd)

ABT-510

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---|---|---|---|---|
| Argentina | 05/21/1999 | | Pending | |
| Australia | 05/21/1999 | | Filing in Process | |
| Brazil | 05/21/1999 | | Filing in Process | |
| Bulgaria | 05/21/1999 | | Filing in Process | |
| China | 05/21/1999 | | Filing in Process | |
| Chile | 05/20/1999 | | Pending | |
| Canada | 05/21/1999 | | Filing in Process | |
| Columbia | 05/21/1999 | | Pending | |
| Czech Republic | 05/21/1999 | | Filing in Process | |
| EP* | 05/21/1999 | | Filing in Process | |
| Hong Kong | 05/21/1999 | | Filing in Process | |
| Hungary | 05/21/1999 | | Pending | |
| India | 05/21/1999 | | Filing in Process | |
| Israel | 05/21/1999 | | Filing in Process | |
| Japan | 05/21/1999 | | Filing in Process | |
| Korea | 05/21/1999 | | Filing in Process | |
| Mexico | 05/21/1999 | | Filing in Process | |
| Norway | 05/21/1999 | | Filing in Process | |
| New Zealand | 05/21/1999 | | Filing in Process | |
| Philippines | 05/21/1999 | | Pending | |
| Poland | 05/21/1999 | | Filing in Process | |
| South Africa | 05/21/1999 | | Filing in Process | |
| Slovak Republic | 05/21/1999 | | Filing in Process | |
| Saudi Arabia | 05/21/1999 | | Pending | |
| Turkey | 05/21/1999 | | Filing in Process | |
| Taiwan | 05/21/1999 | | Pending | |
| USA | 05/21/1999 | | Pending | |

*Europe:  Austria, Belgium, Great Britain, Cyprus, Denmark, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, Netherlands, Portugal, Romania, Slovenia, Spain, Sweden, Switzerland

CONFIDENTIAL
JH 010138

-48-

EXHIBIT 12.2(e) (Cont'd)

ABT-518

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---|---|---|---|---|
| Argentina | 07/30/1998 | | Pending | |
| Australia | 07/27/1998 | | Pending | |
| Brazil | 07/27/1998 | | Pending | |
| Bulgaria | 07/27/1998 | | Pending | |
| China | 07/27/1998 | | Pending | |
| Chile | 07/17/1998 | | Pending | |
| Canada | 07/27/1998 | | Pending | |
| Columbia | 07/29/1998 | | Pending | |
| Czech Republic | 07/27/1998 | | Pending | |
| EP* | 07/27/1998 | | Pending | |
| Hungary | 07/27/1998 | | Pending | |
| Israel | 07/27/1998 | | Pending | |
| Japan | 07/27/1998 | | Pending | |
| Korea | 07/27/1998 | | Pending | |
| Mexico | 07/27/1998 | | Pending | |
| Norway | 07/27/1998 | | Pending | |
| New Zealand | 07/27/1998 | | Pending | |
| Philippines | 07/27/1998 | | Pending | |
| Poland | 07/27/1998 | | Pending | |
| South Africa | 07/30/1998 | 99/6828 | Issued | 07/30/2018 |
| Slovak Republic | 07/27/1998 | | Pending | |
| Saudi Arabia | 12/15/1998 | | Pending | |
| Turkey | 07/27/1998 | | Pending | |
| Taiwan | 07/31/1998 | | Pending | |
| USA | 08/05/1998 | | Pending | |

*Europe: Austria, Belgium, Great Britain, Denmark, France, Germany, Greece, Ireland, Italy, Luxembourg, Netherlands, Portugal, Spain, Sweden, Switzerland

CONFIDENTIAL
JH 010139

-49-

EXHIBIT 12.2(e) (Cont'd)

ABT-751
(Subject to Eisai Agreement)

| COUNTRY | FILING DATE | PATENT NUMBER | STATUS | EXP. DATE |
|---|---|---|---|---|
| USA | 08/08/1991 | 5,250,549 | Issued | 08/08/2011 |
| | | 5,292,758 | | 08/08/2011 |
| Germany | 08/07/1991 | EP 472,053 | Issued | 08/07/2011 |
| United Kingdom | 08/07/1991 | EP 472,053 | Issued | 08/07/2011 |
| France | 08/07/1991 | EP 472,053 | Issued | 08/07/2011 |

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010312.DOC

CONFIDENTIAL
JH 010140

-50-

EXHIBIT 12.2(f)

COMMUNICATIONS

With respect to ABT-594, Abbott has received the following communications:

- Correspondence from Sibia Neurosciences, 505 Coast Blvd. South, Suite 300, La Jolla, CA 92037 (Sibia was acquired by Merck & Co., Inc. in August, 1999) including, most recently, a letter dated March 13, 1998.
- Correspondence from ICT Pharmaceuticals c/o Stadheim and Grear, Ltd., 400 North Michigan Ave., Chicago, IL 60611 including, most recently, a letter dated September 14, 2000.

The Sibia and ICT correspondence each refer to their patents on research tools.

C:\Documents and Settings\kmm\Local Settings\Temporary Internet Files\OLK6C\JH rfa 010312.DOC\

CONFIDENTIAL
JH 010141

-51-

EXHIBIT 12.2(i)

Compound Reports

CONFIDENTIAL
JH 010142