UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY,<br><br>        Plaintiffs,<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>        Defendant. | CIVIL ACTION NO. 05-11150-DPW |

## ABBOTT'S DEPOSITION DESIGNATIONS AND COUNTER  DESIGNATIONS FOR BRUCE RODDA

Defendant Abbott Laboratories ("Abbott") respectfully submits the attached deposition

designations and counter-designations for the June 6, 2007 deposition of Bruce Rodda,

Ph.D., Clinial Trials and Statistics Expert.

.

Dated: February 18, 2008

Respectfully submitted,

ABBOTT LABORATORIES

By: __/s/ Eric J. Lorenzini_____
  Eric J. Lorenzini

Jeffrey I. Weinberger (*pro hac vice*)
Gregory D. Phillips (*pro hac vice*)
Eric J. Lorenzini *(pro hac vice)*
Ozge Guzelsu *(pro hac vice)*
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth
Floor
Los Angeles, CA  90071-1560
Tele:  (213) 683-9100

and

Peter E. Gelhaar (BBO#188310)
Michael S. D'Orsi (BBO #566960)
DONNELLY, CONROY &
GELHAAR LLP
1 Beacon St., 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880
peg@dcglaw.com
msd@dcglaw.com

*Counsel for Abbott Laboratories*

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 18, 2008.

Date: February 18, 2008.

<u>/s/ Ozge Guzelsu</u>

# Bruce Rodda Deposition Designations

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 6/6/2007 | Rodda, Bruce | 18:21-19:4 | | | | | |
| 6/6/2007 | Rodda, Bruce | 50:3-50:15 | 49:21-50:2 | | | | |
| 6/6/2007 | Rodda, Bruce | 50:21-52:19 | 52:20-53:13 | | | | |
| 6/6/2007 | Rodda, Bruce | 53:20-54:3 | 54:14-54:17 | | | | |
| 6/6/2007 | Rodda, Bruce | 55:2-55:8 | 55:9-55:15 | | | | |
| 6/6/2007 | Rodda, Bruce | 56:4-57:15 | 58:19-59:22 | | | | |
| 6/6/2007 | Rodda, Bruce | 60:14-60:24 | | | | | |
| 6/6/2007 | Rodda, Bruce | 63:15-63:25 | | | | | |
| 6/6/2007 | Rodda, Bruce | 64:5-64:21 | 67:22-68:12 | | | | |
| 6/6/2007 | Rodda, Bruce | | 72:16-75:20 | | | | |
| 6/6/2007 | Rodda, Bruce | 72:6-72:15 | 76:20-78:14 | | | | |
| 6/6/2007 | Rodda, Bruce | | 80:17-81:2 | | | | |
| 6/6/2007 | Rodda, Bruce | 80:9-80:16 | 82:19-85:15 | | | | |
| 6/6/2007 | Rodda, Bruce | 85:16-85:24 | | | | | |
| 6/6/2007 | Rodda, Bruce | 87:10-87:13 | 87:14-88:15 | | 6 | ES | |
| 6/6/2007 | Rodda, Bruce | 88:16-88:25 | | | 6 | ES | |
| 6/6/2007 | Rodda, Bruce | 90:11-90:22 | 90:23-91:13 | | 6 | ES | |

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 6/6/2007 | Rodda, Bruce | | 93:1-93:17 | | | | |
| 6/6/2007 | Rodda, Bruce | | 94:11-94:14 | | | | |
| 6/6/2007 | Rodda, Bruce | | 94:19-95:16 | | | | |
| 6/6/2007 | Rodda, Bruce | 95:17-95:25 | 96:1-96:20 | | | | |
| 6/6/2007 | Rodda, Bruce | 100:3-100:5 | | | | | |
| 6/6/2007 | Rodda, Bruce | 110:16-110:24 | | | | | |
| 6/6/2007 | Rodda, Bruce | 112:4-113:8 | 113:9-113:21 | | 2 | | |
| 6/6/2007 | Rodda, Bruce | | 114:5-115:10 | | | | |

.

# Color Key to Deposition Designations

Designation by Plaintiffs

Counter Designation by Defendants

Designation by Defendants

1       THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF MASSACHUSETTS

2

    JOHN HANCOCK LIFE INSURANCE   )
3   COMPANY, JOHN HANCOCK VARIABLE )
    LIFE INSURANCE COMPANY AND   )
4   MANULIFE INSURANCE COMPANY   )
    F/K/A INVESTORS PARTNER     )
5   INSURANCE COMPANY       )
                   )
6      Plaintiff,    )
                   )
7   VS.         )  CIVIL ACTION NO:
               ) 05-11150-DPW
8   ABBOTT LABORATORIES,     )
                   )
9     Defendant.    )
10  ********************************************

         ORAL/VIDEO DEPOSITION OF
11

         BRUCE RODDA, Ph.D.
12

         JUNE 6, 2007
13

  ********************************************
14

        HIGHLY CONFIDENTIAL
15

   ORAL DEPOSITION OF BRUCE RODDA, Ph.D., produced as
16

a witness at the instance of the Plaintiff, was duly
17

sworn, was taken in the above-styled and numbered cause
18

on the JUNE 6, 2007, from 9:00 a.m. to 2:50 p.m., before
19

Chris Carpenter, CSR, in and for the State of Texas,
20

reported by machine shorthand, at the Longhorn
21

Conference Room, Austin Airport Marriot South, 4415 S.
22

IH-35, Austin, Texas, pursuant to the Federal Rules of
23

Civil Procedure and the provisions stated on the record
24

or attached hereto.
25

1    testimony cause you to change any of the opinions you

2    expressed in your -- what I'll call your statistical

3    report?

4        A.  No, it did not.

5        Q.  And just for ease, I'll refer to your rebuttal

6    to Dr. Fairweather as your statistical report and your

7    rebuttal to Dr. Gold as your non statistical report; is

8    that okay?

9        A.  Sure.  Yes.

10       Q.  Did reviewing Dr. Gold's deposition transcript

11   cause you to change any of the opinions that you

12   expressed in your non statistical report?

13       A.  No, it did not.

14       Q.  When were you engaged by Munger, Tolles & Olson

15   in this matter?

16       A.  Earlier this year.

17       Q.  In 2007?

18       A.  I think so.

19       Q.  Who engaged you; which attorney?

20       A.  Mr. Phillips.

21       Q.  What tasks did Mr. Phillips ask you to do when

22   he engaged you?

23       A.  The primary task was to effectively be the

24   external statistical expert on 594, reviewing Dr. Gold's

25   and Dr. Fairweather's initial documents and other

1    documents associated with this trial from a statistical

2    perspective.

3        Q.   Is that it?

4        A.   Yes.

5        Q.   Was this engagement the first time you had ever

6    worked with the law firm of Munger, Tolles & Olson?

7        A.   Yes, it was.

8        Q.   What is your understanding about how Munger,

9    Tolles & Olson identified as you an appropriate expert

10   for this case?

11       A.   Mr. Phillips told me that I was recommended by

12   an individual at Abbott.

13       Q.   Who was that?

14       A.   I don't know.

15       Q.   Have you done work for Abbott before?

16       A.   No.

17       Q.   Do you presently have any equity or other

18   interest position in Abbott?

19       A.   No, I don't.

20       Q.   Have you at any time during the course of your

21   engagement?

22       A.   No.

23       Q.   Your present rate in this matter is how much?

24       A.   $350 a hour.

25       Q.   And from the time you were engaged until today,

Rodda, Bruce (Linked)  6/6/2007  9:00:00 AM

1    companies at which you worked, you would agree that

2    companies evaluate the likelihood of regulatory approval

3    in determining whether to pursue development of drugs,

4    wouldn't you?

5      A.  Yes.

6      Q.  And you would agree, based on your experience,

7    that companies evaluate the results of clinical trials

8    in deciding whether or not to pursue development of

9    drugs, right?

10     A.  That's correct.

11         MR. ZWICKER:  Greg, we've been going an

12   hour.  You want to take five?

13         MR. PHILLIPS:  Sure.

14         MR. ZWICKER:  Okay, let's do that.  I'm

15   about to move into a new area.

16         VIDEOGRAPHER:  We're off the record at

17   10:05 a.m.

18         (recess.)

19         VIDEOGRAPHER:  We're back on the record at

20   10:16 a.m.

21     Q.  (BY MR. ZWICKER) Dr. Rodda, from a statistical

22   standpoint, can you define the phrase "power" for me?

23     A.  Power is the probability that a study will be

24   statistically significant --

25     Q.  Your words, not mine.

# PART 2

Rodda, Bruce (Linked) 6/6/2007 9:00:00 AM

1      A.  I apologize.

2          -- given some assumptions.

3      Q.  In the world of statistics, power is known as a

4  planning tool, correct?

5      A.  Primarily, yes.

6      Q.  What does it mean to say that power is a

7  planning tool?

8      A.  The way I define power, the probability of

9  observing a statistically significant result at the end

10  of the study is used to design a study with certain

11  assumptions and certain sample size so that there will

12  be an understood assurance of success.  And by success,

13  I mean a statistically significant difference between

14  the treatment and placebo, if there just an active and

15  control agent in the study.

16          MR. ZWICKER:  Okay.  Let's go off the

17  record.

18          (Brief recess).

19          VIDEOGRAPHER:  We're back on the record at

20  10:18 a.m..

21      Q.  (BY MR. ZWICKER) Dr. Rodda, is it fair to say

22  that power is a way of maximizing the likelihood that

23  the results of a study will show a statistically

24  significant difference between a drug treatment and

25  placebo; is that accurate?

1          MR. PHILLIPS:  Objection to the form.

2     A.   Power is the probability of seeing a

3     statistically significant difference between an active

4     and a placebo.

5     Q.   Why is -- why is it important to design trials

6     with a probability of detecting a difference between

7     treatment and placebo?

8     A.   Studies are an investment, both financial and

9     in patients.  When one begins a study, when one embarks

10    on a study, it is important to understand the risks

11    associated with the study.  The study can fail for a

12    variety of reasons.  There's no guarantee that any study

13    will be positive.  There's -- and power is used to

14    create an index so that the sponsor understands the

15    probability that the study will be a success, given some

16    assumptions.

17    Q.   Would you agree that it's a way of maximizing

18    your probability of a conclusive result?

19         MR. PHILLIPS:  Object to form.

20    A.   I would not use the term maximize.  I would use

21    the term quantify.

22    Q.   (BY MR. ZWICKER) Fair to say that you testified

23    that clinical trials are expensive, correct?

24    A.   Correct.

25    Q.   So the sponsor hopes to design a study that

Rodda, Bruce (Linked)  6/6/2007  9:00:00 AM

1    will have a high probability of detecting a desired

2    difference between treatment and placebo, fair?

3        MR. PHILLIPS:  Object to the form.

4    A.  In general, yes.

5    Q.  (BY MR. ZWICKER) And one of the reasons for

6    that objective on behalf of a sponsor like Abbott is you

7    don't want to have to repeat a study, right?

8        MR. PHILLIPS:  Object to the form.

9    A.  Yes.

10    Q.  (BY MR. ZWICKER) In your experience, does --

11    can repeating studies delay development of compounds?

12    A.  Yes.

13    Q.  You've reviewed several documents relating to

14    the 99-114 study in preparation for today, correct?

15    A.  I have.

16    Q.  One of the goals of the 99-114 study was to

17    detect statistically significant difference between

18    treatment groups and placebo; is that fair?

19    A.  Yes.

20        MR. PHILLIPS:  Object to the form.

21    Q.  (BY MR. ZWICKER) Is it your understanding that

22    Abbott's objective was to detect a difference or effect

23    size of .46?

24    A.  Yes.

25    Q.  Can you explain to me what that means?

1      A.  The -- the .46 effect size that Abbott used to

2    design the study was a ratio of the difference in the

3    response of an active group compared with a placebo,

4    divided by the standard deviation.  It's a standardized

5    effect size that they used to estimate the size of that

6    study.

7      Q.  But that desired effect was Abbott's objective

8    in designing the study?

9      A.  When Abbott designed the studied, it is my

10   understanding that they identified that as the effect

11   that they wanted to be sure that they found if it were

12   there.  And they designed the study to detect that

13   difference or that treatment effect.

14     Q.  In designing the study, Abbott selected a power

15   of 80 percent, correct?

16     A.  That's correct.

17     Q.  What is your understanding of why it is that

18   Abbott selected 80 percent for the 99-114 study?

19     A.  I don't know why they selected 80 percent.

20     Q.  Would you agree with me that sponsors in

21   general like Abbott desire a high probability of a

22   conclusive study?

23          MR. PHILLIPS:  Objection to the form.

24     A.  In general, yes.

25     Q.  (BY MR. ZWICKER) And is it also fair to say

# PART 3

1    that power is a way of planning to avoid an inconclusive

2    study?  Would you agree with that?

3        A.  I would.

4        Q.  Would you also agree that at least Abbott

5    statisticians determined that 80 percent power in this

6    study would provide sufficiently conclusive results?

7            MR. PHILLIPS:  On object to the form.

8        A.  I don't know who at Abbott decided whether 80

9    percent power was appropriate.

10       Q.  (BY MR. ZWICKER) But you agree that Abbott

11   institutionally made that determination in designing

12   this study, correct?

13       A.  Apparently.

14       Q.  Putting aside oncology drugs, have you ever

15   designed a study, a clinical trial study at less than 80

16   percent power?

17       A.  Yes.

18       Q.  Have you ever designed a clinical trial for a

19   pain drug like 594?

20           MR. PHILLIPS:  Object to the form.

21       A.  Yes.

22       Q.  (BY MR. ZWICKER) How many times?

23       A.  In this particular indication, probably three

24   times in this particular indication.

25       Q.  What you do mean by particular indication?

Rodda, Bruce (Linked)  6/6/2007  9:00:00 AM

1      A.  Diabetic neuropathy.

2      Q.  And for those three studies that you designed,

3   did you select a power below 80 percent?

4      A.  No.

5      Q.  More than 80 percent?

6      A.  In one case.

7      Q.  And 80 percent in the other two?

8      A.  I think so.

9      Q.  Why did you select 80 percent or more in the

10  three that you designed?

11     A.  The selection of power is not an individual's

12  selection; it is a strategic decision by the

13  company.  So in my case, this was a decision that was

14  reached by all the parties that were responsible for the

15  design of the study.

16     Q.  But that strategic decision was informed by a

17  desire to have a conclusive result from the study, true?

18     A.  Yes.

19     Q.  You used the phrase "sample size" a few moments

20  ago.  In order to design a study with 80 percent power

21  to show a .46 effect, Abbott would have had to determine

22  a sample size, correct?

23     A.  Correct.

24     Q.  What is a sample size?

25     A.  A sample size is the number of patients that

Rodda, Bruce (Linked)  6/6/2007  9:00:00 AM

1      are assigned to a each of the treatment groups or the

2      totality of the patients that are included in all of the

3      treatment groups.

4          Q.  In your opinion, Dr. Rodda, why is it important

5      in designing a clinical trial to select a proper sample

6      size?

7              MR. PHILLIPS:  Object to the form.  Vague

8      as to "proper."

9          A.  The selection of a proper sample size provides

10     the sponsor with an understanding of their risk of

11     success and failure to find a particular treatment

12     effect.  If the -- if they use too few patients, that

13     likelihood would decrease.  If they use to too many

14     patients, they may be spending money and exposing

15     patients unnecessarily.

16         Q.  (BY MR. ZWICKER) So sponsors prefer to find the

17     right balance; is that fair?

18         A.  That's correct.

19         Q.  One of the risks of selecting too few patients

20     for a sample size is a risk that you might have to

21     repeat the study again, true?

22             MR. PHILLIPS:  Object to the form.

23         A.  That's one of the risks.

24         Q.  (By MR. ZWICKER) What are the others?

25         A.  That you may not be able to repeat the study or

1    the study may turn out to be negative.

2    Q.  How do you mean negative?

3    A.  Inconclusive.

4    Q.  By inconclusive, you mean that it doesn't show,

5    for the purposes the 99-114 study by example, it doesn't

6    show the effect that you hoped it would show when the

7    results are in?

8    A.  By conclusive, I mean that the -- the

9    statistical significance of the outcome is not

10    definitive enough to make the conclusion that the study

11    was designed to make.

12    Q.  And one of the risks of too small a sample size

13    is that you would not be able to draw that conclusion

14    that, fair?

15    A.  That's correct.

16    Q.  In the 99-114 study, Abbott selected 80 percent

17    power, correct?

18    A.  Correct.

19    Q.  And that was a decision that Abbott

20    statisticians made, correct?

21        MR. PHILLIPS:  Objection, asked and

22    answered.

23    Q.  (BY MR. ZWICKER) You can answer.

24    A.  It's a corporate -- it's a sponsor's -- excuse

25    me.  It's a strategic decision.

# PART 4

Rodda, Bruce (Linked) 6/6/2007 9:00:00 AM

1    Q.  Did you yourself, in connection with your

2    testimony today, draw -- attempt to calculate a sample

3    size that would have achieved 80 percent power with a

4    .46 effect?

5    A.  Are you asking have I -- did I try to duplicate

6    the Abbott calculations?

7    Q.  Correct, that's what I'm asking.

8    A.  I did do that.

9    Q.  You did or did not?

10   A.  I did.

11   Q.  And what were your results?

12   A.  The same as Abbott's.

13   Q.  Which means what?

14   A.  That assuming a treatment effect of .46 and a

15   power of .8 and an alpha level Type I error level of

16   .05, that the -- that 80 patients per group, their

17   sample size, would provide 82 percent power for finding

18   the .46 effect significant.

19   Q.  As a general statistical matter, if one reduces

20   sample size, is it fair to say that one also reduces

21   power?

22       MR. PHILLIPS:  Objection to the form,

23   incomplete hypothetical.

24   A.  I want to tie some things together.  I want to

25   tie power, sample size, treatment effect and

Rodda, Bruce (Linked)  6/6/2007  9:00:00 AM

1    variability, because it's very difficult and perhaps

2    impossible to talk with one without the other.

3         So to answer your question, if the

4    variability was as hypothesized --

5    Q.  Constant.

6    A.  No.  There is a -- in designing the study,

7    there was an assumption of a particular variability, and

8    Abbott did not know what the true variability would be.

9    They couldn't know.  So they had to assume that there's

10    a variability in the system to design the study.  When

11    the study is actually implemented, that variability may

12    be greater or less than what they thought it was going

13    to be.  And the impact of that will be to increase or

14    decrease the probability of success, depending on the

15    greater the variability, the less likelihood of success

16    given the same sample size.

17         Sample size works the same way.  If

18    variability is constant, if we don't think about

19    variability, if we don't think about the treatment

20    effect that we were interested in, increasing sample

21    size increases power.  Decreasing sample size decreases

22    power.

23    Q.  Abbott didn't know the actual variability of

24    the 99-114 study until it unblinded the data, right?

25    A.  That's correct.

Rodda, Bruce (Linked) 6/6/2007 9:00:00 AM

1      Q.  Before Abbott unblinded the data, it made

2   certain assumptions about variability, correct?

3      A.  I don't know.

4      Q.  Well, variability assumptions, as you said,

5   have an impact on sample size, correct?

6         MR. PHILLIPS:  You have to answer

7   verbally.

8         THE WITNESS:  I'm sorry.  I apologize.

9         MR. ZWICKER:  Thank you.  That's usually

10   my job.

11      A.  They had to make some assumptions about

12   variability to design the study, to come up with the

13   sample size in the first place.

14      Q.  (BY MR. ZWICKER) Before the results are

15   unblinded and while Abbott's initial assumptions

16   regarding variability are in place, would you agree with

17   me that reducing sample size reduces plan power?

18      A.  It would reduce it if the variability were

19   unchanged from what they hypothesized it would be and

20   that the treatment effect was unchanged from what they

21   hypothesized it would be.

22      Q.  But again, you only know actual variability

23   once you unblind the data, true?

24      A.  True.

25      Q.  You agreed Abbott made certain assumptions

1       enrollment in the 99-114 study as of December 14, 2000,

2       fair?

3               MR. PHILLIPS:  Objection, mischaracterizes

4       the document.

5           A.  It proposes that the they terminate enrollment.

6           Q.  (BY MR. ZWICKER) Based on your review of

7       documents in this case, you understood that Abbott had a

8       target enrollment of 320, correct?

9           A.  Yes.

10          Q.  And do you also understand, based on your

11      review of documents in this case, that the total number

12      of persons randomized to the 99-114 study ultimately was

13      266?

14          A.  Yes.

15          Q.  Do you agree that as of the date Abbott reduced

16      enrollment from 320 to 266, that Abbott should have

17      known that plan power would have been reduced?

18          A.  Probably.

19          Q.  Why do you say probably?

20          A.  Because of the other factors that they were

21      unaware of which could have affected the power as well,

22      the treatment difference and the variability.

23          Q.  Okay.  But as of December 2000, Abbott doesn't

24      know the variability, right?

25          A.  That's correct.

# PART 5

1      Q.   This is actually one of those examples of where

2      Mr. Phillips happens to be right, rare but true, that

3      we're speaking over one another.

4           MR. PHILLIPS:  One of many examples.

5      Q.  (BY MR. ZWICKER) And as of December 2000,

6      Abbott hasn't changed the desired effect for the 99-114

7      study, right?

8      A.   That's correct.

9      Q.   So fair to say that as of December 2000, Abbott

10     should have appreciate that reduction of the sample size

11     from 320 to 266 should reduce plan power, true?

12          MR. PHILLIPS:  Objection to the form.

13     A.   It may reduce plan power.

14     Q.  (BY MR. ZWICKER) But power is a judgment that

15     is made before you actually have results, typically,

16     it's a planning tool, right?

17     A.   That's correct.

18     Q.   So, as of December 2000, Abbott would have to

19     reduce plan power, wouldn't it?

20          MR. PHILLIPS:  Object to the form.

21     A.   I think they -- that's a probable yes.

22     Q.  (BY MR. ZWICKER) What is your understanding,

23     based on documents you reviewed or conversations that

24     you've had with Mr. Phillips, regarding why it was that

25     Abbott reduced the sample size in the 99-114 study?

1    A.  Assuming that the variability and the treatment

2    effect were as they hypothesized, it would have the

3    effect of reducing the power of the study.

4    Q.  (BY MR ZWICKER) And reducing the enrollment

5    size from 320 to 266 effectively reduces the sample size

6    as well, doesn't it?

7    A.  I'm sorry.  Would you say that again?

8    Q.  Yes.  Reducing the enrollment target

9    effectively has the result of reducing the sample size,

10    doesn't it?

11    A.  I'm sorry.  It sounds like a tautology.

12    Q.  Let me try it once more.

13        Abbott -- Abbott's objective was for a

14    sample size of 320 persons?

15    A.  Correct.

16    Q.  At the time enrollment was terminated, 266

17    patients were randomized?

18    A.  Correct.

19    Q.  Fair to say that the sample size is now been

20    reduced?

21    A.  Yes.

22    Q.  Do you agree with the proposition that stopping

23    enrollment short of target may result in a study where

24    the treatment difference between the agent and control

25    may not be statistically significant?

1          MR. PHILLIPS:  Object to the form.

2     A.  It may not.  But it also may not if you

3     completed the study to full enrollment.

4     Q.  (BY MR. ZWICKER) What do you mean by completed

5     the study to full enrollment?

6     A.  All other assumptions being the same,

7     variability and treatment difference, had the study been

8     conducted through with 320 patients, you would have had

9     a twenty percent chance of an inconclusive result.  So

10    the fact that you went through the entire sample,

11    doesn't guarantee that you're going to have a conclusive

12    result.

13    Q.  Okay.  But reducing -- terminating enrollment

14    increases the probability that the desired effect may

15    not be statistically significant, true?

16         MR. PHILLIPS:  Objection to the form.

17    A.  It does affect it.

18    Q.  (BY MR. ZWICKER) It increases the probability?

19    A.  It increases the probability.

20    Q.  And by increasing the probability, does

21    reducing the sample size also increase the probability

22    of repeating the trial?

23         MR. PHILLIPS:  Objection to the form.

24    Vague as to increasing the probability of what?

25    A.  I can't answer that question.  That would be a

1    A.  No.

2        Q.  You don't know one way or another or you

3    disagree?

4        A.  I don't think it was in the protocol stated

5    that way.

6        Q.  Based on your experience, and putting yourself

7    in Abbott's shoes as of December 2000, is it -- would it

8    be your opinion that the failure to achieve the

9    enrollment target is a potentially important fact in the

10   development of 594?

11          MR. PHILLIPS:  Objection to the form.

12       A.  It could be.

13       Q.  (BY MR. ZWICKER) Why?

14       A.  Because the -- your probability of success is

15   being potentially reduced by reducing the sample size.

16       Q.  Could you turn to page 17 of your report.  And

17   by your report, I mean Exhibit Number 2.

18          You have on page 17, you reproduced a

19   table, and you have a discussion about the implications

20   of terminating enrollment on power, see that?

21       A.  Yes.

22       Q.  You say, "It can be seen from this table that

23   the actual number of patients at the termination of

24   enrollment, 266 or about 65 per group, would provide 74

25   percent power to detect the hypothesized .46 treatment

# PART 6

1    effect compared with an initial power at least 80

2    percent as cited in the protocol." Do you see that?

3       A.  Yes.

4       Q.  In your opinion, given your review of documents

5    relating to the 99-114 study, do you think a reduction

6    in power from 80 percent to 74 percent is significant?

7          MR. PHILLIPS:  Object to the form.

8       A.  It depends on the corporate objectives, the

9    risk the company is going to take.

10      Q.  (BY MR. ZWICKER) Based on the documents you've

11   reviewed, do you have any opinion regarding the

12   company's view of reducing power from 80 to 74 percent

13   based on cutting the enrollment target?

14      A.  No.

15      Q.  Dr. Rodda, in studies that you've designed,

16   have there been situations where you view a reduction in

17   power of 6 percent to be significant in the development

18   of a compound?

19          MR. PHILLIPS:  Object to the form.

20      A.  No.

21      Q.  (BY MR ZWICKER) In other words, I want to make

22   sure my question is right, there has never been a

23   situation where you concluded that a reduction of 6

24   percent was meaningful?

25      A.  Not that I can recall.

1      Q.  Why is that?

2      A.  Can I use an example?

3      Q.  Yeah.

4      A.  May I refer to Dr. Fairweather's testimony?

5      Q.  Sure.

6      A.  Recall in that testimony, there was a question

7   of changing the variability by ten percent from 1 to

8   1.1, increasing the variability by just ten percent.  By

9   doing that, the effect on power is exactly the same as

10   reducing the sample size from 320 to 266.

11          The variability estimates that go into

12   designing a clinical trial are in fact estimates.  If

13   the variability is 1 and I estimated it as a .9 or 1.1,

14   that is -- that's pretty accurate.  So that the

15   proximations that go into estimating a sample size,

16   if -- if the difference between 1 and 1.1 would make

17   this much difference, then the reduction of a sample

18   size providing an equivalent difference in power, has to

19   be taken with that into consideration.

20          So, a small decrease in power like this is

21   not something that, in my experience, would have been

22   viewed as being a critical reduction.

23      Q.  Are you saying that for the 99-114 study,

24   Abbott assumed a range of variability in calculating

25   sample size?

Rodda, Bruce (Linked)  6/6/2007  9:00:00 AM

1      A.  I don't know that.

2      Q.  Wouldn't you have to know the range of

3   variability assumed in order to assess the impact of a 6

4   percent reduction in power?

5      A.  No.

6      Q.  Why not?

7      A.  If you -- when interpreting the impact on these

8   reductions in power or changes in variability -- excuse

9   me -- reductions in sample size or changes in

10  variabilities or changes in target treatment effects,

11  these are often compared in pairs to determine the

12  impact of one on the other, and in designing a study,

13  one knows that the estimates are in fact estimates, and

14  sensitivity may be assessed at that time.

15      There was no evidence in what I read that

16  Abbott wanted to reconsider their variability nor

17  reconsider their treatment effect, but were only

18  interested, given that those had not -- were not

19  changing the impact of their sample size reduction on

20  the power of their study.

21      Q.  So is it your testimony that Abbott assumes

22  certain -- made certain assumptions about variability in

23  the 99-114 study; is that right?

24      A.  Yes.

25      Q.  And what is the relationship between those

1    variability assumptions and a reduction in power?

2      A.  If the assumed variability is incorrect, if it

3    is too low, then the power will be reduced.  If the

4    variability that they assumed is too high and that the

5    true variability is lower, then the power will be

6    increased for the same sample size.

7      Q.  But at this point in December 2000, Abbott as

8    you've testified, doesn't know what the variability is

9    going to be?

10     A.  That's true.

11     Q.  So is Abbott in a position to assess the impact

12    of a reduction in power of 80 to 74 percent without

13    knowing what the variability is going to be?

14     A.  The impact in terms of power?

15     Q.  Yeah.

16     A.  They -- they could speculate what the impact

17    would be with different variabilities.

18     Q.  But they don't know?

19     A.  But they don't know.

20     Q.  Is there a reduction in power in studies you've

21    done that you would consider to be extremely significant

22    in determining whether a study will be conclusive or

23    not?

24      MR. PHILLIPS:  Objection to the form.

25     A.  In general -- in general, no.  The concerns

# PART 7

1    about lack of enrollment were either for a reason that

2    power then became moot or that the enrollment was

3    acceptable in terms of an adequate power.  And adequate

4    is -- I won't define that because it's -- adequate means

5    acceptable to the sponsor in that case.

6        Q.   (BY MR ZWICKER) Would you consider a reduction

7    in power to, say, 65 percent to be significant in the

8    99-114 study?

9            MR. PHILLIPS:  Object to the form.

10       A.   I think the reduction of power from 82 percent

11   to any point afterward is one that depends on a number

12   of factors, and I would just -- I would be speculating

13   without having knowledge of those factors.

14           One of the things that I would like to

15   point out is that the reduction of power from 80 percent

16   to 75 percent, say, still means that there's a three-to-

17   one chance that the study will be successful.  Reducing

18   it to 67 percent means there's a two-to-one chance that

19   the study will be successful.  Those are still high

20   odds, and it would be a corporate decision about where

21   the cutoff point came, where the risk of failure was not

22   worth the benefit.

23       Q.   (BY MR ZWICKER) In your experience, have you

24   planned most clinical trials with 80 percent power?

25       A.   I would say that many late Phase 2 and Phase 3

1    studies are planned with 80 percent power, but I want to

2    again link the -- the concept of treatment effect and

3    variability, because in many studies the sponsor will

4    say, "We'd like to have 80 percent power and we can

5    afford 100 patients.  What difference can we detect?"

6           So separating power from the treatment

7    effect, they are not separable.  They are linked.  And

8    you saw the equation in my report.  If you change one,

9    you change the others.  So you can always fix one.  You

10   always fix it to be 80 percent power and then vary your

11   treatment effect, vary your variability, vary your

12   sample size.  Now, there's no evidence that Abbott did

13   that.  But that's why I want to emphasize you can't just

14   separate power from sample size.

15       Q.  But I think your testimony is that in most of

16   the -- at least initially for the studies that you

17   planned, you selected 80 percent power or better?

18       A.  On many of them, not most of them.  Early

19   studies -- early studies are often done with less than

20   80 percent power.

21       Q.  But Phase 2 trials are mostly done with 80

22   percent power?

23       A.  Late Phase 2 and Phase 3 trials are usually

24   done with higher powers.

25       Q.  This is a late Phase 2 trial, right?

1    A.  Potentially.

2    Q.  Why only potentially?

3    A.  Because if a patient drops out of a study for a

4    specific reason, for example, tolerability or lack of

5    efficacy, that provides information.  And if they drop

6    out, for example, for tolerability reasons, that

7    provides information that may not be attainable if they

8    completed the study.

9    Q.  In your experience, does the FDA consider the

10   reasons why patients drop out of clinical trials?

11   A.  Yes.

12   Q.  What do they look at?

13        MR. PHILLIPS:  Object to the form.

14   A.  They are interested in -- if there is an

15   association for the reason for dropping out and the

16   therapies under study.

17   Q.  (BY MR. ZWICKER) And to the extent that there

18   is an association for the reasons people drop out and

19   the treatment, that's a factor that is not helpful to

20   the development of the compound?

21        MR. PHILLIPS:  Object to the form.  I'm

22   not -- object, vague.

23   A.  The purpose of any clinical trial is to

24   characterize both the safety and efficacy.  If patients

25   drop out for safety reasons, that is part of the

Rodda, Bruce (Linked)  6/6/2007  9:00:00 AM

1    characterization of the safety profile.  Whether it's

2    desirable or not is a different issue.

3        Q.  (BY MR. ZWICKER) For a drug like 594, is it

4    your opinion that the FDA would treat dropouts for

5    adverse effects in a negative way, given the nature of

6    the drug?

7            MR. PHILLIPS:  Objection.

8        A.  I'm not sure what you mean by -- treat in a

9    negative way.

10       Q.  (BY MR. ZWICKER) 594 was a pain drug, correct?

11       A.  Yes.

12       Q.  In your opinion, is the FDA more insistent that

13   pain drugs have fewer adverse effects than other kinds

14   of drugs?

15           MR. PHILLIPS:  Objection, form.

16       A.  I would be speculating about what the FDA

17   feels.

18       Q.  (BY MR. ZWICKER) Okay.  But it is your

19   testimony that the FDA does scrutinize the relationship

20   between adverse events and a treatment, correct?

21       A.  Yes, that's true.

22       Q.  You've reviewed the protocol for 99-114,

23   haven't you?

24       A.  I did.

25       Q.  What is -- based on -- well, why don't we mark

# PART 8

1    it.

2        (Exhibit 5 marked for identification).

3    Q.  (BY MR. ZWICKER) Dr. Rodda, before the witness

4    is the Abbott Laboratories clinical protocol for 99-114,

5    dated February 8, 2000, and bears Bates numbers 65818

6    through 65896.

7        Dr. Rodda, do you recognize this as the

8    protocol that you reviewed?

9    A.  Yes.

10    Q.  Take a look at page -- it's 40 of the protocol

11    and it bears Bates Number 65869.  Do you see that?  It

12    says Data Sets Analyzed?

13    A.  Yes.

14    Q.  Can you review that to yourself and let me know

15    when you're done?

16        MR. PHILLIPS:  Just that one paragraph?

17        MR. ZWICKER:  Just that one paragraph.

18    A.  Okay. I'm done.

19    Q.  (BY MR. ZWICKER) You're done?  Can you tell me,

20    based on this protocol, what an intent-to-treat analysis

21    is?

22    A.  An intent-to-treat analysis is designed to

23    include as many patients as possible in the final

24    analysis, so that patients are not excluded for reasons

25    that -- for events that happened to them during the

1  conduct of the study.  The intent-to-treat analysis in

2  general includes all patients randomized to treatment

3  that had any information that addresses the specific

4  objective.

5     Q.  What is the valuable data within the context of

6  this protocol?

7     A.  They have defined their intent-to-treat set as

8  patients who will receive one dose of study drug, had a

9  baseline, and had at least one followup pain assessment.

10     Q.  So based on this protocol, sir, it's your

11  conclusion that the intent-to-treat dataset is the

12  evaluable dataset?

13        MR. PHILLIPS:  Objection, mischaracterizes

14  the testimony.

15     A.  No.  No.  The dataset -- that evaluable dataset

16  is different.  The evaluable dataset requires a week of

17  therapy, seven days of study drug.  The intent-to-treat

18  requires one does of study drug.

19     Q.  And both evaluable date and the intent-to-treat

20  datasets are used in analyzing the results once they're

21  known?

22     A.  In general, yes.

23     Q.  Was that true here?

24     A.  They used an intent-to-treat approach and they

25  used an observed-cases approach in their evaluation of

1    efficacy.

2      Q.  For an intent-to-treat analysis, an intent-to-

3    treat analysis assumes that certain subjects, certain

4    enrolled subjects are going to prematurely terminate,

5    correct?

6      A.  It doesn't assume that.  If that happens, then

7    their information will still be included in the

8    analysis.  They will not be excluded.

9      Q.  In the intent-to-treat analysis for the 99-114

10    protocol, is Abbott going to infer data on how the

11    patients would have done had they completed the

12    protocol?

13      A.  Abbott used a technique called last observation

14    carried forward, which imputed the last observation, the

15    last pain observation for patients who dropped out

16    through what -- through their visit schedule, had they

17    completed the study.

18      Q.  So the intent-to-treat analysis at Abbott used

19    for 99-114 imputes data to subjects that prematurely

20    terminate; is that fair?

21      A.  There were -- I think there were two separate

22    analyses, both of which could be called intent-to-treat

23    because they included all the patients, but you're

24    correct in that one of them did impute data for patients

25    who dropped out, efficacy data.

1      Q.  And the other was the safety --

2      A.  The other was the observed cases where data

3   were not imputed but all cases were included, or all the

4   patients defined in the population were included.

5      Q.  So as you say, data was imputed for the

6   efficacy analysis?

7      A.  For one of the efficacy analyses.

8      Q.  The primary?

9      A.  The primary efficacy analysis.

10     Q.  And that's the Likert test, right?

11     A.  That's the variable that was used for the

12   primary variable?

13     Q.  The Likert scale?

14     A.  The Likert scale.  It's not a test, it's a

15   scale; it's an evaluation scale.

16     Q.  You would agree with me that you would rather

17   actually, as a sponsor, have the data than impute it for

18   efficacy purposes?

19     A.  I think good science would require that you

20   have as much evaluable data as possible.

21     Q.  I appreciate that, but if given your druthers,

22   wouldn't you rather have actual data from a patient that

23   completed the protocol than imputed data?

24     A.  Yes.

25     Q.  Dr. Rodda, in your report -- actually now I'm

# PART 9

1    agreement that's the subject of this litigation, okay?

2      A.  (Witness nods head yes.)

3      Q.  Would you agree with me that as of March the

4    12th, 2001, that Abbott knew that roughly half of the

5    enrollees in the 99-114 study had prematurely

6    terminated?

7          MR. PHILLIPS:  Objection to the form.

8      A.  I don't know exactly what they knew at that

9    point.

10          (Exhibit 6 marked for identification.)

11      Q.  (By MR. ZWICKER) Before the witness is Exhibit

12    Number 6, which is an e-mail and chart that bears Bates

13    numbers 238329 through 238833.

14          Dr. Rodda, can you review this document

15    and tell me if you recognize it?

16      A.  Yes, I do.

17      Q.  And do you recognize it as one of the documents

18    that was provided to you in connection with your work

19    today?

20      A.  I would have to check the list, but I think so.

21      Q.  Yeah.  I'll just represent to you that page 2

22    of the statistical report indeed lists this document.

23      A.  Thank you.

24      Q.  The date on this document is February 27, 2001,

25    which I'm sure you and Mr. Phillips and I could agree is

Rodda, Bruce (Linked)  6/6/2007  9:00:00 AM

1    before March the 12th, 2001.  Do you see that?

2       A.  Yes.

3       Q.  Take a look at page 330.

4       A.  Uh-huh, yes.

5       Q.  And look at the chart there.  Do you see Total

6    Randomized as of 1/04?

7       A.  Yes.

8       Q.  It says 269; do you see that?

9       A.  Yes.

10      Q.  That number ultimately became 266, didn't it?

11      A.  Apparently.

12      Q.  And then to the chart to the right, where it

13   says Early Terminations, and it looks like it says as of

14   2/20, it says 132.  Do you see that?

15      A.  I see that, yes.

16      Q.  And then to the right of that, it says

17   Completed Subjects as of 2/20, and then says 130.

18      A.  Yeah.

19      Q.  So based on your review of this document, would

20   you agree with me that as of March the 12th that Abbott

21   knew that roughly -- and I think the early termination

22   number is 49 percent -- that Abbott knew that roughly 50

23   percent of the enrollees had prematurely terminated?

24         MR. PHILLIPS:  Object to the form.

25      A.  It looks that way, yes.

Rodda, Bruce (Linked)  6/6/2007  9:00:00 AM

1    this table is complete, yes.

2        Q.  (BY MR. ZWICKER) And I'm just going ask you to

3    assume that there are tables that reflect all the

4    patients involved in the study and the dates they

5    terminated.

6        A.  Okay.

7            MR. PHILLIPS:  If that was a question,

8    I'll object to the form.

9            MR. ZWICKER:  Okay.  It wasn't, but you

10   can object.

11       Q.  (BY MR. ZWICKER) So you would agree with me

12   that as of February the 27th, Abbott knows that it's not

13   going to have complete data from all 266 enrollees,

14   right?

15           MR. PHILLIPS:  Object to the form.

16       A.  Yes.

17       Q.  (BY MR. ZWICKER) And that it would have to

18   impute under an ITT analysis data for the premature

19   terminations, correct?

20       A.  For one of the ITT analyses.

21       Q.  For the primary efficacy analysis.

22       A.  (Witness nods head yes.)

23       Q.  Dr. Rodda, would you agree with me that for

24   purposes of this study, that having to infer data for

25   roughly half the enrollees potentially increases the

1    variability around the mean?

2    A.   No -- sorry.

3         MR. PHILLIPS:  I was just objecting to the

4    form.

5    A.   No.

6    Q.   (BY MR. ZWICKER) Why not?

7    A.   If a patient drops out of the study, for

8    example, on day 7, and a value needs to be imputed for

9    the remainder of the study, it's the same number that

10   would be imputed for each of the subsequent visits.

11   It's going to reduce the variability, not increase the

12   variability if the same number is being given through

13   for the remainder of the study.

14   Q.   (BY MR. ZWICKER) When Abbott designed the

15   99-114 protocol, do you understand that it made -- that

16   it took account for premature terminations in assuming

17   variability?

18   A.   That wasn't clear in the protocol.

19   Q.   You couldn't tell?

20   A.   No.

21   Q.   Would you have expected it to be clear in the

22   protocol?

23   A.   Yes.

24   Q.   Do you have any understanding why an assumption

25   for variability wasn't in the protocol?

# PART 10

1      You agreed with me earlier that it's

2   preferable to have someone complete a study than

3   prematurely terminate it, right?

4      A.  The more information that a patient provides,

5   the more valuable that patient is.

6      Q.  Is it problematic to you to treat, under an ITT

7   analysis, to treat the data of a premature terminator

8   and a completer the same way?

9         MR. PHILLIPS:  Object to the form.

10      A.  You are combining patients who provide a

11   substantial amount of information with those who may

12   not, but one approach that Abbott did use was the

13   observed cases approach where all patients data,

14   whether it was in -- was used and there was no

15   imputation.  I'm not sure whether that answers your

16   question or not, but let me stop there and let you

17   re-ask the question if I haven't answered it properly.

18      Q.  (BY MR. ZWICKER) For purposes of the 99-114

19   study, should Abbott have made any adjustments to

20   assumed variability based on the fact that half of the

21   enrollees didn't complete the study?

22         MR. PHILLIPS:  Object to the form.  Vague

23   as to time.

24      Q.  (BY MR. ZWICKER) Let me actually address one

25   of his objections.  Prior to March the 12th, 2001,

Rodda, Bruce (Linked)  6/6/2007  9:00:00 AM

1    should Abbott have made any adjustments to variability

2    based on the fact that half the persons enrolled in the

3    study didn't complete it?

4       A.  I don't know how they would have.

5       Q.  Why not?

6       A.  I don't know how they would have.

7       Q.  You think they couldn't have?

8       A.  I'm saying that I don't know how you would,

9    even if you wanted to, how you would do that.  I don't

10   know of any technique to do that.

11      Q.  Does the fact that Abbott received incomplete

12   data from roughly half the enrollees in the 99-114 study

13   have any impact on the sample size, again, prior to the

14   March 12, 2001?

15          MR. PHILLIPS:  Object to the form.

16      Q.  (BY MR. ZWICKER)  Do you understand my

17   question?

18      A.  Let me try to answer it and see whether I do.

19          The intent-to-treat approach presumes

20   complete data on all patients.  So if that is the

21   primary population for analysis, there are effectively

22   no dropouts.  And even though much of that data may be

23   imputed, the data is complete.  That is, as we -- I

24   testified earlier, that isn't as desirable as having

25   more complete data on individual patients, but Abbott

1    could view this from the point of view that an intent-

2    to-treat approach was being taken and, because of that,

3    there are few if any dropouts from that analysis, and

4    thus, the sample size is adequate as it is.

5        Q.  In your experience where you have had trials

6    with substantial dropout rates, have you made

7    adjustments to sample size to accommodate for the

8    premature terminations?

9        A.  No.

10       Q.  Why not?

11       A.  For the reason that I gave, is that these were

12   -- these were intent-to-treat analysis primarily, and

13   that with substantial dropouts, the -- well, let me just

14   stop there.  That there was no support for increasing

15   the sample size if the information available was

16   addressing the question.

17       Q.  Do you view a 50 percent dropout rate for the

18   study to be substantial?

19           MR. PHILLIPS:  Object to the form.

20       A.  It is a high dropout rate.

21       Q.  (BY MR. ZWICKER)  If you were overseeing the

22   study, would you be concerned about the rate of

23   dropouts?

24       A.  I certainly would investigate the rate of

25   dropouts and the reasons for them.

1       Q.  In your experience, have you been able to draw

2    any preliminary conclusions regarding the reasons for

3    dropouts even where data is blinded?

4       A.  No, not where data is blinded.

5       Q.  Do you believe that the power for the 99-114

6    study should have been further adjusted based on the

7    fact that Abbott knew they had incomplete data from

8    roughly one half of the enrollees?

9          MR. PHILLIPS:  Objection to the form.

10      A.  No.

11      Q.  (BY MR. ZWICKER) Why?

12      A.  According to the protocol, this intent-to-treat

13    approach accommodated all the patients and, therefore,

14    the number of patients who were not part of the intent-

15    to-treat analysis was not as small as the number of

16    patients who completed the study and, therefore, the

17    power would be more associated with the sample size of

18    the 266 patients that were enrolled rather than the

19    130-something patients that actually completed the

20    study.

21      Q.  (BY MR. ZWICKER) So it's your view that power

22    should not have been further reduced, notwithstanding

23    the fact that data would have to be imputed for roughly

24    half the patients that were enrolled?

25      A.  Abbott could consider that there may be an

# PART 11

Rodda, Bruce (Linked) 6/6/2007 9:00:00 AM

1    been desirable or not might have been interesting, but I

2    certainly wouldn't have known how to do it.

3        Q.  Will you agree that this was an important study

4    in the development of 594, correct?

5        A.  I think it was.

6        Q.  And would you agree that it was important for

7    Abbott to understand what impact the premature dropout

8    rate had on its objectives for the trial?

9            MR. PHILLIPS:  Objection to the form.

10       A.  I think it was certainly something that they

11    were interested in.

12       Q.  (BY MR. ZWICKER) But based on your review of

13    the records, it's not a calculation they ever undertook,

14    correct?

15           MR. PHILLIPS:  Objection to the form.

16       A.  From what I've seen, they did not calculate the

17    impact of the premature dropouts on the ultimate outcome

18    prior to unblinding.

19       Q.  (BY MR. ZWICKER) Given the importance of the

20    study, is that a calculation that you would have

21    undertaken if you were running this clinical trial, sir?

22       A.  No, I probably wouldn't have.

23       Q.  Why?

24       A.  Two points.  One, as I mentioned before, I

25    don't -- I wouldn't know how to do it.  And secondly,

1    and March 12th is 16 days roughly, right?

2    A.  Uh-huh.

3    Q.  Do you believe that within 16 days that Abbott

4    would have known the intent-to-treat population?

5         MR. PHILLIPS:  Objection.

6    A.  I don't know.

7    Q.  (BY MR. ZWICKER) But would you agree -- let's

8    assume that, since you are testifying here as an expert,

9    if Abbott did know the intent-to-treat population as of

10   March 12th, it would know that it had 225 patients to

11   evaluate for the primary efficacy variable, correct?

12        MR. PHILLIPS:  Objection, form.

13   A.  If they did know that -- the intent-to-treat

14   population, then they would know -- would have known

15   that they had 225 patients by their definition.

16   Q.  (BY MR. ZWICKER) It's fair to say that if

17   Abbott's intent-to-treat population was 225, but that's

18   also its sample size for the purpose of the 99-114

19   study, true?

20        MR. PHILLIPS:  Objection to the form.

21   Q.  (By MR. ZWICKER) For purposes of the primary

22   efficacy?

23   A.  Yes.  That was the sample size used in that

24   analysis.

25   Q.  So as of March 12th, Abbott knew that power

1    knew that its maximum sample size was 225, correct?

2         MR. PHILLIPS:  Objection.

3    A.  They may have.

4    Q.  (BY MR. ZWICKER) And if they did, that would

5    have had an impact on power, true?

6         MR. PHILLIPS:  Objection to the form.

7    A.  It could have.

8    Q.  (By MR. ZWICKER) It would have -- it could have

9    reduced it, correct?

10    A.  It could have.

11    Q.  And assuming that each of the four arms were

12    equally distributed between the four treatment groups,

13    that comes out to roughly 56 persons per arm?

14    A.  (Witness nods head yes.)

15    Q.  True?

16    A.  Yes.

17         MR. PHILLIPS:  Object to the form.

18    Q.  (BY MR. ZWICKER) Go back to exhibit -- go back

19    to your report, which is Exhibit 2 on Page 17 and look

20    at Page 17 of your chart.

21    A.  Uh-huh.  Yes.

22    Q.  At a sample size of 55 persons with an

23    effective .46, power to be .67.  Do you see that?

24    A.  That's correct.  Yes.

25    Q.  In your opinion, is a power of .67 a

Rodda, Bruce (Linked)  6/6/2007  9:00:00 AM

1   significantly lower power than what the study should

2   have had?

3          MR. PHILLIPS:  Object to the form.

4   Incomplete hypothetical.

5      A.  Well, the study was designed for 80 for that

6   difference, so anything less than 80 would be reduced.

7   The actual importance of that again is a decision that's

8   based on other factors rather than just this.

9      Q.  (BY MR. ZWICKER)  But would you agree that --

10  with a plan power of 80 percent and a power of 67

11  percent as of March 12th, that this study would have

12  been underpowered?

13         MR. PHILLIPS:  Object to the form.

14     A.  Not necessarily.

15     Q.  (BY MR. ZWICKER)  Why not?

16     A.  Because if the true treatment difference were

17  greater than .46, it would have been very well

18  powered.  If the variability were less than

19  hypothesized, it could have been very well powered.

20  There are knowns that would prohibit me from stating

21  that the study was underpowered.

22     Q.  But you don't know what the true variability is

23  until data is unblinded, correct?

24     A.  Frankly, you never know what the true

25  variability is.  You only know what was observed in the

# PART 12

Rodda, Bruce (Linked)  6/6/2007  9:00:00 AM

1    study.

2        Q.   But you wouldn't know what was observed in the

3    study until the study is unblinded, correct?

4        A.   True.

5        Q.   And assuming the effect size was .46 -- keep

6    that assumption, okay -- would you agree that if you

7    didn't know what the variability was going to be and you

8    have an effect size of .46, that the study would have

9    been significantly underpowered as a Phase 2B study at

10   65 percent?

11           MR. PHILLIPS:  65 percent we're now going

12   to?  Objection.

13       Q.   (BY MR. ZWICKER) 67 percent.

14           MR. PHILLIPS:  Objection to the form.  I

15   didn't know if that was a trick question.  Object to the

16   form.

17       A.   I would conclude that the power was less than

18   80 percent.  I'm loathe to use the term "underpowered."

19   There are too many variables for me to make that

20   conclusion.

21       Q.   (BY MR. ZWICKER) Would you have ever -- have

22   you ever designed a Phase 2B trial with a 67 percent

23   power?

24           MR. PHILLIPS:  Object to the form.

25       A.   I'd like to answer that by going back to a

1  comment that I made earlier, is that in studies that

2  I've worked on in the past on several occasions, if my

3  client said we would like to find a, for example, a .46

4  difference with a hundred patients, and I said, well,

5  that would give you 67 percent power, and he said, well,

6  I want 80 percent power, so we change the difference.

7      So the question -- the power cannot be

8  divorced from the difference -- the treatment effect and

9  the variability.  That's why I say that you can -- it's

10  lower, but underpowered is an opinion.

11  Q.  (BY MR. ZWICKER) Okay.  If your client came to

12  you and said, "I want .46 effect and a sample size of

13  225," you would tell them that you would have a 67

14  percent power?

15  A.  I would say that, yes.

16      MR. ZWICKER:  Why don't we break?

17      VIDEOGRAPHER:  We're off the record at

18  12:16 p.m.

19      (Lunch recess.)

20      THE VIDEOGRAPHER:  We're back on the

21  record at 1:10 p.m.

22  Q.  (BY MR. ZWICKER) Good afternoon, Dr. Rodda.

23  A.  Good afternoon.

24  Q.  This morning I think you testified that you

25  couldn't find any adjustment for premature terminations

MUNGER, TOLLES & OLSON LLP

355 SOUTH GRAND AVENUE

THIRTY-FIFTH FLOOR

LOS ANGELES, CALIFORNIA 90071-1560

TELEPHONE (213) 683-9100

FACSIMILE (213) 687-3702

560 MISSION STREET

SAN FRANCISCO, CALIFORNIA 94105-2907

TELEPHONE (415) 512-4000

FACSIMILE (415) 512-4077

July 13, 2007

WRITER'S DIRECT LINE
(213) 683-9196
(213) 683-4096 FAX
Ozge.Guzelsu@mto.com

**VIA FACSIMILE AND U.S. MAIL**

Joseph H. Zwicker, Esq.
Choate Hall & Stewart LLP
Two International Place
Boston, MA  02110

Re:     <u>John Hancock Life Ins. Co., *et al.* v. Abbott Laboratories</u>

Dear Mr. Zwicker:

Bruce Rodda signed the original transcript of his June 6, 2007 deposition. The corrections made are as follows:

| Page/Line Number | Change | Reason |
|---|---|---|
| Page 44, line 18 | Change "statistic" to "statistics" | Typo |
| Page 59, line 2 | Change "with" to "about" | Clarification |
| Page 59, line 14 | Remove "depending on" and insert "--" | Clarity |
| Page 62, line 24 | After "I think it is." begins Mr. Zwicker's next question. | Correction |
| Page 63, line 5 | Remove "the" | Clarity |
| Page 64, line 10 | Change "appreciate" to "appreciated" | Typo |

3265298.1

# PART 13

MUNGER, TOLLES & OLSON LLP
Joseph H. Zwicker
July 13, 2007
Page 2

| Page/Line Number | Change | Reason |
|---|---|---|
| Page 64, line 13 | Change "plan" to "planned" | Typo |
| Page 64, line 19 | Change "plan" to "planned" | Typo |
| Page 71, line 1 | Remove a "one" | Typo |
| Page 74, line 15 | Change "proximations" to "approximations" | Typo |
| Page 75, line 18 | Replace ", given that those had not -- were not changing" with "in" | Clarification |
| Page 78, line 10 | Remove "always" | Clarification |
| Page 83, line 18 | Change "does" to "dose" | Typo |
| Page 83, line 19 | Change "date" to "dataset" | Typo |
| Page 84, line 15 | After the word "out" insert "as their imputed pain observation for the remainder of the study." Delete lines 16 and 17. | Clarification |
| Page 92, line 6 | Change "given" to "provide" | Clarity |
| Page 92, line 15 | Change "primarily" to "primary" | Typo |
| Page 93, line 14 | Remove ", whether it was in --" | Clarity |
| Page 97, line 8 | Change "equivalence" to "equivalents" | Typo |
| Page 98, line 2 | Change "plan" to "planned" | Typo |
| Page 98, line 10 | Change "plan" to "planned" | Typo |
| Page 98, line 15 | Change "to" to "from" | Clarity |
| Page 98, line 24 | Change "to be" to "be to" | Typo |
| Page 107, line 13 | Replace "as" with "is a" | Typo |
| Page 107, line 21 | Remove "to" | Typo |
| Page 109, line 4 | Replace "leave" with "least" | Typo |
| Page 113, line 20 | Replace "knowns" with "unknowns" | Typo |

MUNGER, TOLLES & OLSON LLP

Joseph H. Zwicker
July 13, 2007
Page 3

| Page/Line Number | Change | Reason |
|---|---|---|
| Page 114, line 18 | Replace "loathe" with "loath" | Typo |
| Page 131, line 10 | Delete lines 10 and 11 after the word tolerability and replace with "and adverse events." | Clarification |
| Page 133, line 13 | Insert the word "and" after the word "groups" | Clarity |

Copies of the signature page and the errata sheets are included with this letter. Please do not hesitate to call if you have any questions or comments.

Sincerely,



Ozge Guzelsu

cc:    Richard C. Abati, Esq. (w/encl.)
Jeffrey I. Weinberger, Esq. (w/encl.)
Gregory D. Phillips, Esq. (w/encl.)
Eric J. Lorenzini, Esq. (w/encl.)
Brian A. Davis, Esq. (w/encl.)
Karen Collari Troake, Esq. (w/encl.)
Andie Cardinale (w/encl.)
Kathy Herrity (w/encl.)

3265298.1

# PART 14

**HIGHLY CONFIDENTIAL**

Page 153

1    SIGNATURE AND CHANGES

2    RE: JOHN HANCOCK VS. ABBOTT LABORATORIES

3    PAGE  LINE  CHANGE                REASON

4    _Please see pages 153A, 153B, 153C_

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20       I, BRUCE RODDA, Ph.D., have read the foregoing

21   deposition and hereby affix my signature that same is

22   true and correct, except as noted above.

23                                          _7/10/07_

24   _____

                BRUCE RODDA, Ph.D.

25

**HIGHLY CONFIDENTIAL**

Page 153
A

1          SIGNATURE AND CHANGES

2     RE: JOHN HANCOCK VS. ABBOTT LABORATORIES

3     PAGE   LINE   CHANGE              REASON

4     44, 18  Change "statistic" to "statistics" – typo

5     59, 2   Change "with" to "about" – clarification

6     59, 14  Remove "depending on" insert "–" – clarity

7     62, 24  After "I think it is." begins Mr.

8             Zwicker's next question. – Correction

9     63, 5   Remove "the" – clarity

10    64, 10  Change "appreciate" to "appreciated" – typo

11    64, 13  Change "plan" to "planned" – typo

12    64, 19  Change "plan" to "planned" – typo

13    71, 1   Remove a "one" – typo

14    74, 15  Change "proximations" to "approximations" – typo

15    75, 18  Replace ", given that those had not -- were

16            not changing" with "in" – clarification

17    78, 10  Remove "always" – clarification

18    83, 18  Change "dves" to "dose" – typo

19    83, 19  Change "date" to "dataset" – typo

20         I, BRUCE RODDA, Ph.D., have read the foregoing

21    deposition and hereby affix my signature that same is

22    true and correct, except as noted above.

23                    _Bruce Rodda_              7/10/07

24                    _____
                      BRUCE RODDA, Ph.D.

25

**Esquire Deposition Services**
**1-866-619-3925**

# PART 15

**HIGHLY CONFIDENTIAL**

Page 153
B

1           SIGNATURE AND CHANGES

2  RE: JOHN HANCOCK VS. ABBOTT LABORATORIES

3  PAGE  LINE  CHANGE            REASON

4  84, 15  After the word "out" insert "as their

5         imputed pain observation for the

6         remainder of the study." Delete

7         lines 16 and 17. – clarification

8  92, 6  Change "given" to "provide" – clarify

9  92, 15  Change "primarily" to "primary" – typo

10  93, 14  Remove ", whether it was in --" -clarity

11  97, 8  Change "equivalence" to "equivalents" -typo

12  98, 2  Change "plan" to "planned" – typo

13  98, 10  Change "plan" to "planned" – typo

14  98, 15  Change "to" to "from" – clarity

15  98, 24  Change "to be" to "be to" – typo

16  107, 13  Replace "as" with "is a" – typo

17  107, 21  Remove "to" – typo

18  109, 4  Replace "leave" with "least" – typo

19  113, 20  Replace "knowns" with "unknowns – typo

20     I, BRUCE RODDA, Ph.D., have read the foregoing

21  deposition and hereby affix my signature that same is

22  true and correct, except as noted above.

23

24                _Bruce Rodda_  7/10/07
                        BRUCE RODDA, Ph.D.

25

**HIGHLY CONFIDENTIAL**

Page 153
c

1                SIGNATURE AND CHANGES

2    RE: JOHN HANCOCK VS. ABBOTT LABORATORIES

3    PAGE LINE CHANGE          REASON

4    114, 18  Replace "loathe" with "loath" - typo

5    131, 10  Delete lines 10 and 11 after the word

6          tolerability and replace with " and

7          adverse events." - clarification

8    133, 13  Insert the word "and" after the

9          word "groups". - clarity

10

11

12

13

14

15

16

17

18

19

20    I, BRUCE RODDA, Ph.D., have read the foregoing

21    deposition and hereby affix my signature that same is

22    true and correct, except as noted above.

23

24                                 _Bruce Rodda_ 7/16/07

                                 BRUCE RODDA, Ph.D.

25

9

Rodda Deposition Exhibit 6

P's Exhibit ES



**Marilyn J Collicott /LAKE/PPRD/ABBOTT**

02/27/2001 10.12 AM

To    stheriault@rsi-nc.com
cc
bcc
Subject    today's meeting

Hi Shelia

Attached are the handouts for todays meeting at 3:00 CST.

                              

agenda.pub    Investigator tracking.xls    R-Team scheduling.xls    Subject-CRF Tracking.xls

Highly Confidential



EXHIBIT
6

ABBT238329

## M99-114 INVESTIGATOR LIST

| Investigator Last Name | Inv. # | State | Coordinator | Phone # | Total Screened | Total Randomized as of 1-04-11-46 | Early Termination | | CRFs In-House as of 2/2/01 |
|---|---|---|---|---|---|---|---|---|---|
| Badamas | 14272 | WI | Cindy Wagner | (608) 283-0170 | 4 | 3 | | | 3 |
| Baumel (A) | 7379 | FL | Alfonso Moreno | (305) 865-0063 | 26 | 15 | | | 12 |
| Baumel (B) | 7379 | FL | Janette Crasto | (561) 368-1123 | | | | | |
| Bron | 7996 | AR | Donna Hairphil | (501) 227-5081 | 16 | 7 | | | 5 |
| Bromberg | 15844 | UT | Donna Baum | (801) 585-6051 | 28 | 14 | | | 13 |
| DeBold | 15088 | MN | Diane Whipple | (952) 993-2739 | 17 | 12 | | | 9 |
| Drucker | 15843 | FL | Gings Phillips | (727) 726-4197 | 7 | 6 | | | 6 |
| Elsner | 15860 | FL | Maggie Szymczak | (954) 720-1899 | 17 | 6 | | | 6 |
| Forde (I) | 15842 | NY | Michael Bakotic | (516) 496-6506 | 3 | 2 | | | 1 |
| Fried | 12999 | RI | Thomas Hoos | (401) 467-7760 | 15 | 9 | | | 8 |
| Gilloon | 15841 | AR | Kathy Ryane | (501) 227-7460 | 26 | 18 | | | 16 |
| Glasson | 15840 | NM | Karen Chance | (505) 292-7654 | 9 | 7 | | | 7 |
| Harris | 15839 | MA | Connie Silva | (413) 794-7239 | 6 | 6 | | | 6 |
| Hewitt | 14345 | GA | Ellen McKinee | (404) 778-3176 | 12 | 9 | | | 7 |
| Hoffmann | 15838 | NY | Karen Savella | (716) 887-4798 | 11 | 5 | | | 5 |
| Kallick, A. | 12497 | IL | Donna Cole | (816) 865-0300 | 15 | 7 | | | 7 |
| Kornel | 15862 | TX | Lisa Slade | (210) 615-6646 | 21 | 15 | | | 15 |
| Metz | 9575 | AZ | Stephanie Marshall | (623) 516-9774 | 20 | 10 | | | 10 |
| Klase (I) | 15837 | FL | Melissa Wright | (941) 359-4481 | 24 | 9 | | | 9 |
| McGill (I) | 15537 | MO | Katleane Anderson | (314) 362-14C4 | 17 | 8 | | | 5 |
| Rowcotten | 14968 | CA | Jessica McCoy | (415) 885-7851 | 13 | 4 | | | 4 |
| Shaibani | 16334 | TX | George Manzolean | (713) 795-0033 x26 | 48 | 18 | | | 16 |
| Simmons | 15836 | PA | Kathleen Hay | (717) 531-8694 | 7 | 6 | | | 5 |
| Singer | 16230 | FL | Mercy Novero | (954) 433-5785 | 30 | 15 | | | 10 |
| Sivakumar | 15835 | AZ | Sandra Bomerris | (602) 882-8028 | 14 | 9 | | | 9 |
| Steel | 13929 | NJ | Nancy Storr | (908) 752-4848 | 10 | 8 | | | 8 |
| Storey | 14349 | NY | Paula Levin | (518) 438-0922 press | 21 | 13 | | | 3 |
| Suri | 14358 | CA | Kathy Read | (925) 706-1991 | 4 | 3 | | | 3 |
| Vonk | 15834 | WA | Rebecca Reiter | (757) 446-5973 | 16 | 6 | | | 6 |
| Weinstein | 13258 | CA | Juanita McCray | (925) 930-7287 | 44 | 19 | | | 19 |
| | | | | | 565 | 288 | | | 234 |

Screen Failure Rate: 47%
Early Termination Rate: 49%  All CRFs in
Completion Rate: 48%
Total Study Enrollment: 84%
CRFs In: 87%

[FILE]                              [PAGE]                              [DATE][TIME]

Highly Confidential

ABBT238330

Screen Tracking



Page [PAGE]

Highly Confidential

ABBT238331

## M99-114 Early Terminations

| Investigator | Subject # | Age | Days on Study Drug | Reason for Termination | Comments |
|---|---|---|---|---|---|
| Backonja | 4467 | 37 | 1 | AE | urea nitrogen level high panic at 56 |
| Baumel | 4145 | 85 | 1 | AE | nausea, etc. |
| | 4146 | 76 | 10 | AE | dizziness, weakness, heart palpitations, headaches, blurred vision |
| | 4147 | 85 | 11 | AE | dizziness, weakness, sweating, blurred vision, heartburn, headache |
| | 4226 | 73 | unk | AE | hypoglycemic episode |
| | 4231 | 73 | 27 | AE | hallucinations |
| Biton | 4260 | 82 | | | |
| Bromberg | 4113 | 69 | 10 | AE | nausea, etc |
| | 4115 | 45 | 5 | AE | nausea, etc |
| | 4117 | 50 | 7 | AE | nausea, etc. |
| | 4118 | 49 | 10 | AE | dizziness, vomiting, nausea |
| | 4125 | 85 | 1 | AE | extreme nausea |
| DeBold | 4051 | 71 | 9 | AE | nausea, etc. |
| | 4053 | 52 | 49 | SAE | diabetic ketoacidosis |
| | 4055 | 75 | 15 | AE | int. nausea/vomit since 8/1, int abd bloating & constipation, decr urine stream since 8/28 |
| | 4057 | 72 | 16 | AE | intermittent nausea and vomiting |
| | 4058 | | 3 | AE | dizziness, lethargy, vivid dreams, insomnia, increased neuropathic pain |
| | 4060 | 67 | | | |
| Drucker | 4001 | 72 | 3.5 | AE | joint pain in lower extremities |
| | 4002 | 71 | 3 | SAE | palpitations |
| | 4003 | 76 | 0.5 | AE | blurry vision |
| | 4005 | 46 | | | |
| | 4008 | 72 | 1 | AE | nightmares and intense neuropathic pain after 1st dose, whole body numb, wobbly, weak after 2nd dose |
| Eisner | 4241 | 80 | 1 | AE | nausea, etc.(went to ER) |
| Forde | 4321 | 67 | 5 | AE | disturbing dreams/anxiety |
| Fried | 4053 | 66 | 14 | SAE | syncopal episode related to historical atrial fib (admitted to hospital 5/30) |
| | 4087 | 74 | 4 | AE | diarrhea, GI upset, fatigue, light-headedness (patient took every dose following a meal) |
| | 4089 | 81 | 8 | AE | dizziness |
| Gibson | 4354 | 73 | 1.5 | AE | nausea |
| | 4359 | 31 | 27 | AE | nausea and vomiting |
| | 4367 | 32 | 12 | AE | nausea and vomiting |
| Gleeson | 4164 | 51 | 1 | AE | dizziness, disorientation |
| | 4165 | 51 | | | |
| | 4167 | 70 | | | |
| Haag | 4337 | 43 | 5.5 | AE | dizziness ~2hrs post-dose x 10 episodes |
| | 4340 | 72 | 6 | AE | difficulty falling asleep, awakening more frequently |
| | 4341 | 85 | 36 | AE | mental status changes |
| Hewitt | 4311 | 52 | 8 | AE | nausea and vomiting |
| Holmlund | 4193 | 53 | 7 | AE/SAE | vomiting, fatigue/ broken pelvis |
| | 4195 | 60 | 7 | AE | nausea, vomiting |
| | 4197 | 82 | 4 | SAE | chest pain |
| Kafka | 4417 | 74 | 6 | AE | nausea, vomiting |
| | CMW | | 7 | AE | jaw pain, insomnia, increased BP, heart palpitations, tingling |
| | 4419 | 61 | 46 | AE | nausea and vomiting |
| Kipnes | 4065 | 64 | 3.5 | AE | nausea |
| | 4066 | 55 | 25 | AE | nausea |
| | 4070 | 48 | 10 | SAE | left arm pain |
| | 4072 | 70 | 7 | AE | nausea, etc. |
| | 4075 | 74 | 2 | AE | severe nausea, shakiness |
| Koby | 4176 | 62 | 9 | AE | backache |
| | 4501 | 55 | 9 | AE | unsteady gait, nausea, indigestion |
| Kluge | 4131 | 70 | 8.5 | AE | nausea, etc |
| | 4133 | 66 | 5.5 | SAE | high blood glucose and chest pain due to GI problems (hospitalized 6/6-6/10) |
| McGill | 4387 | 66 | 7 | AE | nightmares, insomnia, nausea |
| | 4390 | 59 | | | |
| Shabaan | 4450 | 56 | 30 | AE | stomach ache |
| | 4451 | 60 | 16 | SAE | chest pain, shoulder pain |
| | 4455 | 66 | 1 | AE | got sick after first day |
| | 4456 | 57 | 7 | AE | headaches, lightheadedness, depression, rectal bleeding, sleeplessness caused by stomach acid |

Highly Confidential

## M99-114 Early Terminations

|  | 4462 | 55 | 10 | AE | vomiting, stomach sickness, diarrhea, fluttering, moaning, crying, shaking, confusion |
|---|---|---|---|---|---|
|  | 4483 | 68 | 6 | AE | depressing dreams, LOE |
|  | 4493 | 61 | 13 | AE | nausea, diarrhea, vomiting, headache |
| Simmons | 4273 | 58 | 11 | AE | GI sx, cognitive dysfunction, unusual dreams, bad taste in mouth, headache, bodyache |
|  | 4275 | 60 | 10 | AE | vomiting, nausea, headache, vivid dreams, diarrhea, chills |
|  | 4276 | 56 | 19 | AE | nausea |
|  | 4277 | 55 | 9 | AE | nausea, vivid dreams |
| Singer | 4401 | 53 |  | AE | angina secondary to coronary artery blockage |
|  | 4402 | 67 | 12 | AE | dizziness, vomiting |
|  | 4463 | 57 | 25 | AE | worsening insomnia |
|  | 4468 | 68 | 8 | AE | vomiting |
| Sivakumar | 4038 | 59 | 3.5 | AE | nausea, etc. |
|  | 4040 | 57 | 7 | AE | apprehensive, irritable, tinnitus, headache, burning eyes, diarrhea, vivid dreams |
|  | 4041 | 51 | 1 | AE | nausea, vomiting, diarrhea |
| Steel | 4209 | 68 | 22 | AE | light-headed, dizzy |
|  | 4210 | 73 | 9 | AE | vomiting |
|  | 4215 | 60 | 10 | AE | severe nausea |
|  | 4216 | 52 |  |  |  |
| Storey | 4099 | 70 | 6 5 | AE | nausea, etc. |
|  | 4100 | 56 | 3 | AE | nightmares |
|  | 4102 | 69 |  |  |  |
| Weinstein | 4020 | 73 |  |  |  |
|  | 4021 | 65 | 13 | AE | coughing, sore throat, cold sx (went to ER) |
|  | 4024 | 63 |  |  |  |
|  | 4466 | 79 | 6 | AE | dizziness, nausea, diarrhea |

|  | 62 | 63.2 | 10 3 |  |  |
|---|---|---|---|---|---|

| TOTAL |  95 |  |  |  |  |
|---|---|---|---|---|---|

ABBT238333

2

Rodda Deposition Exhibit 2

Highly Confidential -- Subject to Protective Order                                                    1

# Summary of Anticipated Expert Testimony

## by

## Dr. Bruce E. Rodda

The following is a summary of the anticipated expert testimony of Dr. Bruce E. Rodda in connection with the action entitled <u>John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and Manulife Insurance Company (f/k/a Investors Partner Insurance Company) v. Abbott Laboratories</u>, U.S.D.C. (Mass.) Civil Action No. 05-11150-DPW. Dr. Rodda has been asked by Munger, Tolles & Olson LLP, on behalf of Abbott Laboratories, to provide the Court with expert testimony regarding the development of new pharmaceutical compounds, including without limitation, the statistical aspects of evaluating and interpreting the results of clinical trials in support of these developmental activities. Dr. Rodda's testimony may include, inter alia, expert testimony regarding the Abbott study referred to as ABT-Protocol M99-114, A Randomized, Double-Blind Placebo-Controlled, Comparison of the Safety and Efficacy of ABT-594 to Placebo in Subjects with Painful Diabetic Polyneuropathy.



26 Feb 07

Highly Confidential — Subject to Protective Order                                2

A summary of Dr. Rodda's training and experience can be found at pages 1-3 of the Summary of Anticipated Expert Testimony by Dr. Bruce E. Rodda served on plaintiffs on January 19, 2007.

This summary of Dr. Rodda's anticipated testimony is expected to include opinions regarding the anticipated testimony of Dr. Barry Gold with regard to statistical issues, the anticipated testimony of Dr. William Fairweather, the clinical protocol and clinical study report for Abbott study ABT-M99-114, and various statistical topics associated with clinical development generally and study ABT-M99-114 in particular.

Dr. Rodda will testify based upon his own experience, using information and materials available in the public domain (including, but not limited to, information from the United States Food and Drug Administration's ("FDA") website and the European Medicines Agency ("EMEA") website), and upon testimony and materials obtained in discovery in this action. During his testimony, Dr. Rodda may make reference to specific evidence contained in documents or witness testimony.

The opinions and analysis contained in this summary of Dr. Rodda's anticipated testimony are based on currently available information. Dr. Rodda's work is continuing and he plans to analyze any new information. Dr. Rodda may modify this summary in light of such new information. The present summary of Dr.

26 Feb 07

Highly Confidential – Subject to Protective Order                                    3

Rodda's anticipated testimony may be supplemented by his deposition testimony.

Dr. Rodda is expected to opine on Dr. Gold's and Dr. Fairweather's anticipated testimony regarding the statistical considerations for Protocol M99-114 and the outcome of that study. He may opine on areas in which he feels either Dr. Gold's anticipated testimony or Dr. Fairweather's anticipated testimony is incorrect, incomplete, or unclear. Some of the comments that Dr. Rodda is expected to make in this regard are as follows.

Dr. Rodda's anticipated testimony may be grouped into three related areas – general considerations, power and sample size considerations, and results and conclusions regarding Study M99-114.

GENERAL – Dr. Rodda may opine that the underlying approach to designing and evaluating a comparative clinical trial is to assume, at the outset, that the treatments under investigation do not differ in their response. This is referred to in statistical terminology as the "null hypothesis". The study is then conducted with the objective of collecting information that will refute this hypothesis if the experimental treatment is, in fact, superior to the control treatment. If a substantial difference favoring the experimental treatment is observed when the study is completed, the conclusion would be that the experimental treatment is superior to the control. On the other hand, if a small difference was observed

26 Feb 07

Highly Confidential — Subject to Protective Order                                    4

that was not inconsistent with the null hypothesis of no difference between the treatments under study, the conclusion would be that any real difference between the experimental and control treatments was too small to be of clinical importance.    In the context of Abbott study M99-114, this means that Abbott planned Study M99-114 with the expectation that ABT-594 was superior (and not equal) to placebo. Abbott designed Study M99-114 to have a high likelihood of producing results that would support the conclusion that ABT-594 was superior to placebo if, in fact, ABT-594 was truly superior. The results of M99-114 provided a substantial difference between each of the three doses of ABT-594 and placebo with respect to the primary variable (Likert pain scale), clearly confirming the superiority of each of the three doses of ABT-594 compared with placebo.

The results of a clinical trial are analyzed by statisticians to provide a basis for reaching conclusions. In his anticipated testimony (p. 15, line 16) Dr. Gold states that after data are "sorted into groups by dose and drug, one or more statistical tests will be applied." Dr. Rodda is expected to provide expert opinion that when the study is completed and the data have been unblinded, the statistical team will perform a complete statistical evaluation of the study results based on a statistical analysis plan (SAP) that was designed prior to unblinding the clinical data. This plan for the statistical analysis will sometimes be included in the body of the protocol or may be written as a standalone document for complex studies. If a standalone SAP is written, it is often appended to the protocol.  The statistical

Highly Confidential -- Subject to Protective Order                              5

analysis will be performed in concert with clinical experts and will be far more extensive than "one or more statistical tests".

With regard to Dr. Gold's anticipated testimony (page 5, line 4) Dr. Rodda may opine that Dr. Gold's use of the term "statistically evaluate" is unclear. Dr. Rodda is expected to discuss that while statistical concepts and techniques are important for the evaluation of safety and efficacy, there are other essential sources of input, e.g., clinical knowledge and experience that are essential in the evaluation of clinical trials.

POWER AND SAMPLE SIZE – Every clinical trial is different and the outcome of each clinical trial is unpredictable. If the identical trial were conducted many times, the results would differ each time for a variety of reasons. In addition to the uncertainty caused by random variation, other factors affect the confidence we have in the inferences made at the conclusion of a study. Some of these factors are the variability of the basic measurement, the size of the true difference between the experimental treatment and control (which is unknown and must be estimated from the study), the probability with which one wishes to detect a true difference if it exists (power), the risk one is prepared to take in declaring a true difference exists when it does not (Type I, or alpha, error), and the number of patients participating in the study.

26 Feb 07

Highly Confidential – Subject to Protective Order                                    6

For example, to estimate the sample size for Protocol M99-114, Abbott used information from Protocol M98-833. That study suggested that a meaningful difference would be 11.4 units on a 100 point Likert scale with an associated standard deviation of 24.4 units, yielding a standardized difference (or treatment effect) of 0.46. Abbott utilized this standardized effect size, a power (or probability of getting a statistically significant outcome if the anticipated difference was real) of at least 0.8, and an acceptance of a 5% risk of falsely declaring ABT-594 superior to placebo, resulting in a planned sample size of approximately 80 patients in each group.

Dr. Rodda is also expected to testify that power is a concept that is only relevant for planning a clinical trial and is of little value in the interpretation of the results of a study.

Organizations sponsor clinical trials because they believe that their experimental treatment will have a clinically important difference over the standard treatment or a negative control. When a sponsor commits to performing a clinical trial, the sponsor wants to minimize the likelihood that the study will be inconclusive. Said differently, if the new treatment has a clinically important effect of $\Delta$, the sponsor wants the study to have a high likelihood (or power) of demonstrating that effect with a "statistically significant" result. That is, the sponsor does not want the study to result in a conclusion of "ineffective" or "inconclusive" if the product really is superior to the control. Intuitively, because a larger trial provides more

26 Feb 07

Highly Confidential – Subject to Protective Order                                    7

information than a similar smaller trial, a larger trial will be more likely to be conclusive than a smaller trial. Because clinical trials are very expensive, it is critical that studies be designed with the proper number of patients to satisfy their goals. Too many patients will result in unnecessary exposure of patients to experimental treatments and will be unnecessarily expensive. Too few patients, on the other hand, may result in an inconclusive study with the potential need to repeat it. For these reasons, a clear strategy must be followed for determining the number of patients required in a clinical trial.

Four basic factors influence the size of a clinical trial.

*Variability* – If an effect is associated with very small variability (i.e. the effect is very consistent), few subjects would need to be evaluated in a clinical trial to have confidence regarding any decisions made about the particular effect of interest. In contrast, if the effect is quite variable or inconsistent, conclusions based on the information provided by the same few patients would be less convincing. To provide the additional information necessary for similar confidence in the two cases, more patients must be evaluated when there is greater variability. For any scientific measure, precision increases and the likelihood of error decreases with additional information. In the clinical trial context, this information corresponds to a decrease in variability and/or an increase in the sample size.

*Clinically Important Difference between the Experimental and Control Treatment* - The second factor that influences the size of a study is the difference between the experimental treatment and the control that is clinically important. If the true (but unknown) difference between the comparative agents is very small, the study will require a large number of patients to provide adequate evidence to conclude that the specified difference is not zero as stated in the null hypothesis, but that a real difference exists between the treatments. On the other hand, if the sponsor believes that its new product is superior to the standard by a substantial margin, fewer patients will be required to obtain a statistically significant result if the true difference between the two treatments is large.

*Risk of a False Positive Conclusion* - The third consideration influencing the size of a clinical trial is the probability of falsely concluding the new treatment is superior when it is not. Consider that even if the experimental treatment and control treatment had inherently identical effects, the results of any specific study could randomly favor the experimental treatment to a degree that the (incorrect) conclusion would be that the experimental treatment is superior to the control treatment. This probability is also called a Type I error or alpha error (also referred to as the level of statistical significance) and is chosen before the study begins. At the conclusion of the study, the null hypothesis is tested against this alpha error standard (e.g. $p < 0.05$), and if the results of the study are more extreme than would be expected if there were no true therapeutic difference, the result would be called "statistically significant (at the $p < 0.05$ level)" and the

Highly Confidential – Subject to Protective Order                9

conclusion would be that the experimental treatment is effective. The probability of making this conclusion in error would be 0.05 (or 1/20) in this example.

The Type I error is usually set at 0.05 (or 5%) and this is a standard recommended by the FDA and other regulatory agencies. Hypothesis tests routinely use this cutoff as the definition of "statistical significance". In the present study, the alpha level was chosen to be 0.05 and was specified in the protocol. At the conclusion of Study M99-114, the results of comparing each dose of ABT-594 with placebo were "statistically significant" (p<0.05), implying that each dose is truly superior to placebo with respect to pain.

*Risk of a False Negative Conclusion/Power* – It is also possible to incorrectly conclude that a clinically important effect is absent. Suppose that the experimental treatment is truly superior to the control treatment by, say Δ units. The results of any study are unpredictable, and even though the experimental treatment is, in fact, superior to the control treatment, the outcome of a particular study might result in a difference that was quite small, just by chance. In that case, the test of the null hypothesis would not be rejected (that is p would be greater than 0.05), and the incorrect conclusion would be that the experimental treatment is not superior to the control treatment. This type of error is referred to as Type II error or Beta error. The probability of correctly concluding that the experimental treatment is superior to the control is one minus the probability of incorrectly concluding the treatment is effective. The probability of correctly

Highly Confidential -- Subject to Protective Order    10

concluding the experimental treatment is superior is termed "power". Sponsors and investigators usually want this probability to be quite high and often select sample sizes that will provide 80% power. In study M99-114, the planned power was 80% power.

The relationships among the various factors contributing to the estimation of the sample size may be clearer by considering the following equation:

$$ n = \frac{2(z_{\alpha/2} + z_\beta)^2 \sigma^2}{\Delta^2} $$

where:  n is the sample size in each treatment group and

$z_{\alpha/2}$ is an index of the risk of a false positive --
the higher $z_{\alpha/2}$ , the lower the risk (1.96 in Study M99-114)

$z_\beta$ is an index of the risk of a false negative --
the higher $z_\beta$, the lower the risk (0.84 in Study M99-114)

$\sigma$ is the standard deviation -- the measure of variability ($\sigma$ = 24.4 from Study M98-833)

$\Delta$ is the difference the study is designed to detect ($\Delta$=11.4 from Study M98-833) (Note that $\Delta / \sigma$ =0.46 is the standardized treatment effect Study M99-114 was designed to detect).

Note that the z-values above are values of standard normal deviates and are indexes of the probabilities; they do not represent the actual probabilities.

Dr. Rodda is expected to opine that the sample size for the Protocol M99-114 was estimated using a standard statistical approach for the comparison of two means. While there are usually several choices that may be appropriate for

Highly Confidential -- Subject to Protective Order                    11

estimating the sample size in any clinical trial, the procedures used in this study were consistent with good statistical practice and the sample size was appropriate for detecting the pre-specified standardized treatment effect of 0.46 in the primary variable with 80% power at an alpha level of 0.05.

.

It should be understood that just because a sample size has been chosen which appears to provide 80% power, it does not imply that there is an 80% chance that a given trial will be successful. Power is a concept that is only relevant for planning a clinical trial and is of little value in the interpretation of the results of a study.

Even if the planning has been appropriate and the calculations are correct consider the following points.

1. The assumptions used to estimate the sample size are approximations. The estimate of variability used in the calculation of sample size is derived from previous experience, often in a different environment than the given study. The variability that will actually occur in the planned study may be greater or less than used in the power calculations. In this case situation, the power would be lower or higher than anticipated.

2. The true difference between the treatments is unknown and the study may result in a higher or lower difference than that used to estimate the sample size.

Highly Confidential – Subject to Protective Order                                12

3. The new treatment may not actually be superior.  (In fact, if a study correctly results in this conclusion, the study has not been a failure. The study has reached the correct conclusion, even though it was not the conclusion that was desired.)

4. Even if the new treatment is superior, the difference actually seen in a particular study may not be conclusive, just by chance.

Dr. Rodda will be prepared to discuss the concept of power as it relates to estimation of sample size and how this is a quantifiable risk chosen at the discretion of the sponsor.  He will also be prepared to discuss the fact that neither "power", nor "statistical significance" is associated with the validity of a study.  The validity of a study is dependent on its design and implementation. Two studies of the same design but of different sizes will both be equally valid if they are properly designed and executed.  The larger study will provide more information and precision regarding the conclusions than the smaller study, but they can be equally valid.

In Dr. Gold's anticipated testimony (page 8, line1 and preceding), he states that variability is an important factor in the determination of the size of a study.  Dr. Rodda is expected to opine that sample size is not determined solely by making certain assumptions about variability in the data.  Sample size is also dependent

26 Feb 07

on three other considerations as described previously:  the risk (probability) of declaring an ineffective treatment to be effective at the conclusion of a study, the risk of not detecting a true clinically important difference at the conclusion of the study (and thereby erroneously concluding that an effective treatment is ineffective), and the magnitude of the clinically important treatment effect the study is designed to detect.

While Dr. Gold's contention (page 8, line 3) that the statistician's duties typically include estimating "very closely" how many patients must be enrolled, the term "very closely" is not correct.  Dr. Rodda is expected to opine that estimating sample size is dependent on both the clinically important difference and the estimated variability of response, in addition to the considerations regarding false positive and false negative errors presented previously.  The variability used in estimating a sample size is often an estimate from other studies and the estimated sample size is only as good as the estimate of the variability used to calculate it.

Beginning on page 8, line 5 of his anticipated testimony, Dr. Gold states that the "power of a study refers to the statistical test they have chosen and the probability that the test will fail to detect a true difference between two groups." Dr. Rodda is expected to opine that the "power" of the study is not only a function of the test to be used in the analysis of the primary variable, but more importantly, refers directly to the probability that the study, as designed, will find

the pre-specified clinically important difference to be statistically significant at a pre-specified risk of a false positive outcome (declaring an ineffective drug to be effective). It is not, as Dr. Gold states, the probability of failing to detect a true, pre-specified, difference; it is the probability of actually detecting that difference. In addition, it is not the statistician who wishes to detect the difference; it is the sponsor, through the project team (and often following discussions with the FDA), who defines the pre-specified difference and is most interested in the outcome.

RESULTS AND CONCLUSIONS OF THE M99-114 STUDY– Dr. Rodda is also expected to testify that both the International Conference on Harmonization (ICH) and the U.S. Food and Drug Administration (FDA) recommend using as complete a dataset as possible for evaluating both safety and efficacy. Any patient that can be evaluated for efficacy should be included in the primary analysis. The analytic approach proposed for protocol for study M99-114 is consistent with the intent of this guidance. In fact, the protocol states that "all subjects receiving at least one dose of study drug with at least one diary-based baseline and at least one post-baseline pain assessment for the diary-based Pain Rating Scale will be included in the intent-to-treat analysis." The description of this dataset is included in the protocol and was defined before the study was begun. This dataset is consistent with ICH E-9 (Statistical Principles for Clinical Trials) which describes such a dataset as being "as complete as possible and as close as possible to the intention-to-treat ideal of including all randomized subjects." The clinical study report for Protocol M99-114 includes 225 of the 266 patients

26 Feb 07

Highly Confidential -- Subject to Protective Order                    15

randomized to treatment in the primary efficacy analysis; all 266 patients are included in the safety analysis.

Patients withdraw from clinical trials for many reasons. Some are random and do not influence or bias the conclusions. However, patients may withdraw from clinical trials for two primary reasons that may be related to the treatment they receive - the adverse events they experience are such that they no longer wish to participate in the study or the treatment they are receiving is insufficiently effective to support their continued participation in the study. In either case, patients who withdraw from a study provide valuable information regarding the safety and efficacy of the product under investigation. Excluding patients from the analysis of clinical trials can substantially bias the conclusions reached. It is for this reason that both ICH guidelines and the FDA recommend using all patients with valuable data in the analysis of safety and efficacy. In reviewing the documentation of Abbott's deliberations prior to terminating enrollment, there was never a reference to using less than all evaluable patients in the appropriate analyses. Dr. Rodda may opine that given the above, Dr. Fairweather's position of considering only 137 patients for evaluation is scientifically inappropriate and inconsistent with ICH and FDA standards. To use only the 137 completing patients as Dr. Fairweather suggests would not be consistent with good scientific practice, would bias the results in favor of ABT-594, and would not be acceptable to the regulatory and scientific community.

26 Feb 07

Highly Confidential — Subject to Protective Order                16

Documents relating to internal meetings at Abbott suggest that Abbott became aware at some point that they would not meet the enrollment goals in the planned enrollment period for Study M99-114. During the period preceding Abbott's decision to terminate enrollment, several activities took place in an effort to determine the impact of these factors on the probability that the study would satisfy its goal of distinguishing ABT-594 from placebo. In addition to efforts targeted at improving enrollment, Abbott evaluated the effect of smaller sample sizes on the probability (power) of detecting their predefined standardized treatment effect of 0.46. This was done in a fully blinded manner and assumed that all patients would be evaluable for efficacy. This activity focused on the following question: if the study concludes with a reduced number of patients, what is the probability (power) of detecting (finding statistically significant, $p<0.05$) the proposed treatment effect of 0.46 between ABT-594 and Placebo? An example of the power considerations of this evaluation is contained in a memo from Mr. James Thomas to Ms. Rebecca L. Brown on 9/28/2000 in preparation for a meeting on the topic. This table is reproduced in part below.

26 Feb 07

| Option | Sample Size | Effect | Power |
|--------|-------------|--------|-------|
| 1 | 20 | .46 | 0.29 |
| 2 | 25 | .46 | 0.36 |
| 3 | 30 | .46 | 0.42 |
| 4 | 35 | .46 | 0.48 |
| 5 | 40 | .46 | 0.53 |
| 6 | 45 | .46 | 0.59 |
| 7 | 50 | .46 | 0.62 |
| 8 | 55 | .46 | 0.67 |
| 9 | 60 | .46 | 0.71 |
| 10 | 65 | .46 | 0.74 |
| 11 | 70 | .46 | 0.77 |
| 12 | 75 | .46 | 0.80 |
| 13 | 80 | .46 | 0.82 |

Entries in this table include possible sample sizes (per group), the hypothesized treatment effect Study M99-114 was designed to detect and the power to detect this difference for each sample size. It can be seen from this table that the actual number of patients at the termination of enrollment (266 or about 65 per group) would provide 74% power to detect the hypothesized 0.46 treatment effect (compared with an initial power of at least 80% as cited in the protocol). This activity provided Abbott with a full understanding of the probabilities of Abbott's detecting their chosen effect for several smaller sample sizes. However, if the true treatment effect was larger than 0.46, the probability of finding this larger difference with the reduced sample size would increase.

It is common in clinical trials for actual enrollment to be less than planned. The only risk of stopping enrollment in a study with fewer patients than planned (as it relates to power) is that the treatment difference between the experimental agent and the control agent may not be statistically significant. In these cases, the

sponsor may accept that the study's power to detect the originally hypothesized difference may be lower than used in estimating the study's size. There are several strategic considerations that may affect the sponsor's decision. Extending a study for an additional year, for example, to acquire the planned sample size may increase the cost to an unacceptable degree or expose the product to a new competitive agent such that the higher risk of extending the study may be unacceptable to the sponsor. In addition, after the study has begun, factors such as safety considerations with the new treatment or the introduction of a new competitor may require that a successful product possess a larger superiority over the control treatment than was originally planned. In this case, a reduced sample size may be consistent with a comparable, or perhaps greater, power than originally planned, since larger effects require smaller sample sizes.

Dr. Fairweather opined that of the 266 patients enrolled in this study, only 137 were "usable". This suggests that the remaining patients provided no information regarding the safety and efficacy of ABT-594. As stated earlier in this summary, those patients who withdraw from a clinical trial provide important information regarding the safety and efficacy of the products under study. ICH guidelines and the FDA would demand that all relevant information be used in the analysis; patients who withdraw cannot be considered "unusable" for either safety or efficacy. In addition, if one were to accept Dr. Fairweather's contention regarding usability, the original sample size of 320 patients would need to be increased by

a factor of 266/137 (1.94), to a total enrollment of 621 patients to net 320 "usable" patients.

Dr. Rodda may opine that although Abbott terminated enrollment before reaching the target of 320 patients, Abbott carefully evaluated the possible outcomes of the study based on the reduced sample size and concluded that the reduced power associated with the originally hypothesized treatment effect was acceptable. Referring to the table above, Abbott knew that its power to detect their original hypothesized treatment effect of 0.46 would be approximately 74%, rather than the planned 80%. Viewed somewhat differently, while the initial plan had an 80% power to detect a treatment effect of 0.46, the actual intent-to-treat sample of 225 patients (Clinical Study Report, Table 11.4a) had an 80% power to detect a treatment effect of 0.56. Since the actual differences observed between the active treatment groups and the placebo group were all in the range of 0.8 to 0.9 units on the 11 point Likert scale (and were all statistically significant at the $p<0.05$ level), the study clearly had adequate power to address the primary objective of the study, and the study should be considered conclusive (successful) in this respect.

Although Abbott did not know the margin by which ABT-594 would be superior to the control when Abbott decided to terminate enrollment in this study, that margin was substantially larger than originally anticipated. This difference was manifested in results that were statistically significant, rendering the question of

Highly Confidential -- Subject to Protective Order                    20

adequate power (i.e. the probability of obtaining a statistically significant result) moot. Although both Dr. Gold and Dr. Fairweather had comments regarding the effective sample size of study M99-114, neither questioned that the study was conclusive in demonstrating that ABT-594 was superior to placebo with respect to the primary efficacy variable, despite a sample size that was somewhat less than originally planned.

**References**

1. European Medicines Agency:   Scientific Guidelines for Human Medicinal Products: ICH E6 – Guideline for Good Clinical Practices. 1996.

2. European Medicines Agency:   Scientific Guidelines for Human Medicinal Products: ICH E9 – Statistical Principles in Clinical Trials. 1998.

3. The World Medical Association:   World Medical Association Declaration of Helsinki – Ethical Principles for Medical Research Involving Human Subjects. 2004

4. 21 CFR 312.40  General requirements for use of an investigational new drug in a clinical investigation

5. Abbott communiqué   Dr. James Thomas to Ms. Rebecca L. Brown – 9/28/2000

6. Summary of proposed expert testimony by Dr. Barry I. Gold

7. Summary of proposed expert testimony by Dr. William R. Fairweather

### Documents Reviewed by Dr. Bruce Rodda

| Bates Nos. | Date | Description |
|---|---|---|
| ----- | 10/13/06 | Expert report of Barry I. Gold |
| ----- | 01/19/07 | Expert report of Dr. William R. Fairweather |
| ----- | 6/23/06 | Supplemental Complaint |
| ----- | 2/6/06 | Hancock's Objections & Responses to Abbott's First Set of Interrogatories |
| ----- | 9/27/06 | Marilyn Collicott deposition transcript |
| ABBT 0004410-0004415 | 4/00/00 | Collicott Exhibit 6 |
| ABBT 0004436 | 8/00/00 | Collicott Exhibit 10 |
| ABBT 0004443-0004447 | 9/00/00 | Collicott Exhibit 12 |
| ABBT 0004448-0004454 | 10/00/00 | Collicott Exhibit 15 |
| ABBT 237155-237159 | 10/9/00 | Collicott Exhibit 16 |
| ABBT 0004455-0004459 | 11/00/00 | Collicott Exhibit 17 |
| ABBT 0004460-0004464 | 12/00/00 | Collicott Exhibit 22 |
| ABBT 0000322-0000327 | 1/00/01 | Collicott Exhibit 27 |
| ABBT 240624 | 1/8/01 | Collicott Exhibit 28 |
| ABBT 242693-242699 | 1/16/01 | Collicott Exhibit 29 |
| ABBT 0001748-0001758 | 4/23/01 | Collicott Exhibit 39 |
| ABBT 335154 | 5/4/01 | Collicott Exhibit 41 |
| ABBT 239029 | 5/18/01 | Collicott Exhibit 42 |
| ABBT 240374-240412 | 10/15/02 | Collicott Exhibit 49 |
| ----- | 9/29/06 | Bruce McCarthy deposition transcript and all exhibits |
| ABBT 0020894-967 | 10/99/99 | Draft 10/7/99 M99-114 Protocol |
| ABBT 0065818-0078893 | ----- | CD containing: Clinical Study Report and Clinical Protocol |
| ----- | ----- | CD containing: Amendment for Study M99-114 |
| ABBT 159274 | 9/3/99 | Email to Waleska from Siber |
| ABBT 51889 | 12/21/99 | Email to Siebert from Thomas |
| ABBT 65818-65896 | 2/8/00 | Protocol M99-114 |
| ABBT 242154 | 5/25/00 | Letter to Hoffstetter from Collicott |
| ABBT 33462-33467 | 5/31/00 | Site breakdown/enrollment for M99-114 |
| ABBT 79825-79826 | 6/20/00 | Emails between Nunn and Thomas |
| ABBT 241296-241297 | 6/27/00 | Emails among McCoy, Rowbotham and Collicott re barrier to enrollment |
| ABBT 161395 | 7/6/00 | Email to Matalonis, et al from Garavalia |
| ABBT 82516 | 7/7/00 | Email to Morris, et al from McCarthy |
| ABBT 239985-239988 | 7/10/00 | Site breakdown/enrollment for M99-114 |
| ABBT 83022 | 7/13/00 | Email to Landsberg, et al from Collicott |
| ABBT 161644-161645 | 7/25/00 | Emails among Biarnesen and Powers |
| ABBT 78935-78941 | 8/7/00 | Email to Thomas from Hansen with patient listing |
| ABBT 335227-335307 | 8/23/00 | ABT-594 Development Plan |
| ABBT 80232-80237 | 8/29/00 | Email to Kacos from Thomas with data for power curves |
| ABBT 241302 | 8/31/00 | Letter prototype to investigators from Collicott |
| ABBT 51907-51908 | 9/28/00 | Power calculations |

| ABBT 82259 | 9/28/00 | Email to Brown from Thomas with power calculations |
|---|---|---|
| ABBT 51892-51905 | 9/28/00 | Email to Brown from Thomas with power calculations |
| ABBT 233741-233749 | 9/28/00 | CT Recruitment and Centralized Screening Program |
| ABBT 237155-237159 | 10/9/00 | Email to Nunn from Collicott with investigator tracking list |
| ABBT 107607-107609 | 10/30/00 | Email to Biarnesen from Silber with list of project review questions |
| ABBT 109399-109400 | 11/22/00 | Email to Morris from McCarthy with items for meeting discussion |
| ABBT 241843-241847 | 11/28/00 | Email to Schanzenbach from Collicott |
| ABBT 81606 | 11/29/00 | Email to Kacos from Thomas with confidence intervals for difference |
| ABBT 242373 | 12/6/00 | Email to Biarnesen from Collicott re randomization goals |
| ABBT 233539-233540 | 12/14/00 | Email to Schanzenbach from Collicott "decided to end enrollment as of 1/5/01 |
| ABBT 240624 | 1/8/01 | Email to Schanzenbach from Collicott |
| ABBT 81459-81460 | 1/12/01 | Email to McCarthy from Thomas with adverse event experience |
| ABBT 233000 | 1/15/01 | Email to Schanzenbach from Collicott |
| ABBT 242693-242699 | 1/16/01 | Meeting agenda with tables of investigators and early terminations |
| ABBT 8169-8176 | Feb 2001 | Descriptive memo on marketing prospects |
| ABBT 246076-246084 | Feb 2001 | Descriptive memo on marketing prospects |
| ABBT 242650 | 2/5/01 | Tracking report |
| ABBT 242503 | 2/12/01 | Tracking report |
| ABBT 242681-242688 | 2/13/01 | Meeting agenda with tables of investigators and early terminations |
| ABBT 237944 | 2/20/01 | Tracking report |
| ABBT 233001 | 2/26/01 | Email from Brownell to Collicott re tracking report |
| ABBT 238329-238335 | 2/27/01 | Meeting handouts with tables of investigators and early terminations |
| ABBT 298380-298385 | 3/5/01 | Meeting minutes: Pain Strategy Decision Analysis |
| ABBT 297530-297555 | 3/7/01 | Abbott Portfolio Review |
| ABBT 238328 | 3/13/01 | Tracking report |
| JH 8074-8211 | 3/13/01 | Research Funding Agreement by Hancock and Abbott |
| ABBT 240978 | 3/20/01 | Tracking report |
| ABBT 79111-79119 | 5/23/01 | Adverse event experience tables |
| ABBT 241331-241560 | 7/31/01 | M99-114 Analysis |
| ABBT 241298-241300 | 8/14/01 | Study enrollment graphs |
| ABBT 80451 | 2/19/02 | Email to Olson from Thomas "screening failure rate 47%" |
| ABBT 79395 | 3/6/02 | Email to Biarnesen from Thomas indicating blind broken 4/23/01 |
| ABBT 51885-51888 | ----- | Power curves |
| ABBT 155581-155587 | ----- | Initial Portfolio Prioritization |

| JH8153 – JH8210 | February 2001 | Descriptive Memoranda |
|---|---|---|
| ABBT0104016-0104017 | 11/21/00 | Email from McCarthy to Silber |
| ABBT01214045-1214046 | 12/18/00 | Email from Biarnesen to Robinson |
| ABBT0122646-0122718 | 11/17/00 | ABT-594 Project Review |