UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> v. <br><br> ABBOTT LABORATORIES, <br><br> Defendant. | CIVIL ACTION NO. 05-11150-DPW |

## ABBOTT'S DEPOSITION DESIGNATIONS AND COUNTER DESIGNATIONS FOR DIANE D'AMICO

Defendant Abbott Laboratories ("Abbott") respectfully submits the attached

deposition designations and counter-designations for the October 26, 2006 and November

28, 2006 depositions of Diane D'Amico, Senior Clinical Project Manager, Abbott

Laboratories.

Dated:  February 18, 2008          Respectfully submitted,

ABBOTT LABORATORIES

By:  __/s/ Eric J. Lorenzini_____
      Eric J. Lorenzini

Jeffrey I. Weinberger (*pro hac vice*)
Gregory D. Phillips (*pro hac vice*)
Eric J. Lorenzini *(pro hac vice)*
Ozge Guzelsu *(pro hac vice)*
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth
Floor
Los Angeles, CA  90071-1560
Tele:  (213) 683-9100

and

Peter E. Gelhaar (BBO#188310)
Michael S. D'Orsi (BBO #566960)
DONNELLY, CONROY &
GELHAAR LLP
1 Beacon St., 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880
peg@dcglaw.com
msd@dcglaw.com


*Counsel for Abbott Laboratories*

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 18, 2008.

Date: February 18, 2008.

_____ /s/ Ozge Guzelsu _____

## Diane D'Amico Deposition Designations

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibi | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 10/26/06 | D'Amico, Diane | 20:5-21:17 | None | | | | |
| 10/26/06 | D'Amico, Diane | | | 9:19-11:18 | | | |
| 10/26/06 | D'Amico, Diane | | | 24:9-27:11 | | | |
| 10/26/06 | D'Amico, Diane | | | 49:21-51:22 | | | |
| 10/26/06 | D'Amico, Diane | | | 67:3-67:19 | | | |
| 10/26/06 | D'Amico, Diane | | | 74:8-75:9 | | | |
| 10/26/06 | D'Amico, Diane | 76:16-77:16 | 76:10-76:15 | | 8 | O | |
| 10/26/06 | D'Amico, Diane | | | 94:21-95:11 | | | |
| 10/26/06 | D'Amico, Diane | 97:24-99:11 | None | | 9 | S | |
| 10/26/06 | D'Amico, Diane | 115:6-115:23 | None | | | | |
| 10/26/06 | D'Amico, Diane | 118:23-120:5 | None | | 10 | AA | |
| 10/26/06 | D'Amico, Diane | | | 150:11-152:15 | | | |
| 10/26/06 | D'Amico, Diane | | | 156:18-157:3 | | | |
| 11/28/06 | D'Amico, Diane | 227:14-228:2 | None | | 27 | N | |
| 11/28/06 | D'Amico, Diane | 228:14-229:3 | None | | 27 | N | |
| 11/28/06 | D'Amico, Diane | 231:1-231:21 | 231:22-232:16 | | 27 | N | |

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibi | Defendant Exhibit |
|-----------|---------|--------------------|--------------------------|-------------------|-------------------|------------------|-------------------|
| 11/28/06 | D'Amico, Diane | 240:8-241:5 | None | | 27 | N | |
| 10/26/06 | D'Amico, Diane | | | 258:16-260:8 | | | |
| 10/26/06 | D'Amico, Diane | | | 276:20-277:13 | | | |
| 11/28/06 | D'Amico, Diane | 294:21-295:4 | 294:15-294:20 | | 32 | 3 | |
| 11/28/06 | D'Amico, Diane | 295:17-296:7 | 295:5-295:16 | | 32 | 3 | |
| 11/28/06 | D'Amico, Diane | 302:10-303:8 | 302:4-302:9 | | 34 | AP | |
| 11/28/06 | D'Amico, Diane | 302:10-303:8 | 303:9-303:12 | | | | |
| 11/28/06 | D'Amico, Diane | 308:7-309:6 | None | | 35 | AQ | |
| 11/28/06 | D'Amico, Diane | 329:3-330:9 | 330:10-331:1 | | 41 | MI | |
| 11/28/06 | D'Amico, Diane | 341:9-341:19 | 341:20-342:16 | | 41 | MI | |
| 11/28/06 | D'Amico, Diane | 374:8-375:5 | None | | 43 | AY | |

# Color Key to Deposition Designations

**Designation by Plaintiffs**

**Counter Designation by Defendants**

**Designation by Defendants**



1              UNITED STATES DISTRICT COURT

2                      FOR THE

3              DISTRICT OF MASSACHUSETTS

4

5    JOHN HANCOCK LIFE INSURANCE    )

6    COMPANY, JOHN HANCOCK          )

7    VARIABLE LIFE INSURANCE        )

8    COMPANY, and MANULIFE          )

9    INSURANCE COMPANY  (f/k/a      )

10   INVESTORS  PARTNER INSURANCE   )  Civil Action No.

11   COMPANY),              )  05-11150-DPW

12          Plaintiffs,    )

13      -vs-               )

14   ABBOTT LABORATORIES,           )

15          Defendant.     )

16

17          The videotaped deposition of DIANE

18   D'AMICO, called for examination, taken pursuant to

19   the Federal Rules of Civil Procedure of the United

20   States District Courts pertaining to the taking of

21   depositions, taken before THERESA A. VORKAPIC, a

22   Notary Public within and for the County of Kane,

23   State of Illinois, and a Certified Shorthand

24   Reporter, CSR No. 84-2589, of said state, at Suite

# PART 2

1    BY MR. ZWICKER:

2        Q.   Do you have knowledge whether your hard

3    files were searched in connection with this

4    litigation?

5        A.   I have no knowledge of that, no.

6        Q.   Do you have knowledge of whether your

7    e-mails were searched in connection with this

8    litigation?

9        A.   I have no knowledge that my particular

10   e-mails were searched.

11       Q.   But you can say that you personally did

12   not search your e-mails and provide them to

13   persons at Abbott, correct?

14       A.   I can definitely say that, yes.

15       Q.   And you can say that you personally did

16   not search your hard files and present those that

17   were relevant to Abbott, correct?

18       A.   Correct.

19       Q.   You're employed by Abbott today?

20       A.   Yes.

21       Q.   What's your job?

22       A.   I'm a senior clinical project manager.

23       Q.   How long have you held that job?

24       A.   At the senior level probably about

1    three years.

2      Q.   Who do you report to now?

3      A.   Patricia Hintzman.

4      Q.   What are your responsibilities as

5    senior clinical program manager?

6      A.   I'm responsible for the oversight and

7    management of multiple clinical trials globally.

8      Q.   When you say "responsible," what do you

9    mean?

10     A.   I manage the like day-to-day activities

11   of conducting a clinical trial.  I am there as a

12   -- you know, to ensure that the project time lines

13   are met for that trial and, you know, I act as a

14   liaison between the investigative sites and like

15   the physicians that are at Abbott.  I'm pretty

16   much -- you know, kind of more in the day-to-day

17   activities of any of the studies that are going

18   on.  I review documents and provide my input.

19     Q.   As of today, how many clinical trials

20   are you supervising?

21     A.   I'd say four.

22     Q.   In what ventures?

23     A.   The oncology venture or the oncology

24   group.

D'Amico, Diane (Vol.1) (Not Linked)  10/26/2008  9:10:00 AM

1      Q.   All of them?

2      A.   Yes.

3      Q.   Before you were senior clinical project

4    manager, what was your job at Abbott?

5      A.   I was just a clinical project manager.

6      Q.   How long did you have that job?

7      A.   Probably about two years approximately.

8      Q.   From when to when?

9      A.   I think I started that role in like

10    late 2000, the end of the year 2000, so then maybe

11    two years after that, so maybe until the end of

12    2002 approximately.

13      Q.   What were your responsibilities as

14    clinical project manager?

15      A.   The responsibilities are essentially

16    very similar.  The difference between the senior

17    is that you have more studies going on at a time

18    potentially.

19      Q.   I'm going to refer to a clinical

20    project manager as a CPM.  Is that okay?

21      A.   Yes.

22      Q.   As a CPM, were you responsible for one

23    clinical trial?

24      A.   At what point?

D'Amico, Diane (Vol.1) (Not Linked)  10/26/2008  9:10:00 AM

1    BY MR. ZWICKER:

2       Q.   Is it fair to say you learned on the

3    job?

4       A.   On-the-job training, yes.

5       Q.   You're familiar with a drug compound

6    known as ABT-518, correct?

7       A.   Yes.

8       Q.   At some point, you became involved in

9    the development of 518?

10      A.   Yes.

11      Q.   When was that?

12      A.   I think it was approximately the end of

13   like 2000, early 2001.  I don't recall the exact

14   timing, but it was probably close to the end of

15   2000.

16      Q.   When you became involved in 518, what

17   were your responsibilities?

18      A.   Well, actually it was my first program

19   that I was a project manager on, so my

20   responsibilities may have included like being

21   involved with crafting the protocol for the first

22   study, taking meeting minutes, scheduling

23   meetings.

24      Q.   When you said it was the first clinical

# PART 3

1    trial that you were responsible for, what does

2    that mean exactly?

3        A.    It was the first trial I was a project

4    manager on.

5        Q.    What did you do as a project manager in

6    connection with 518?

7        A.    Again, I would potentially like for the

8    studies help, you know, work on facilitating the

9    crafting of the protocol, crafting, you know,

10    meeting minutes and agendas and scheduling

11    meetings in order to get the study going,

12    answering, you know -- you work with ancillary

13    groups at Abbott as well so working with like PK

14    groups and things like that ensuring that

15    everything is set up and ready to go and the sites

16    are ready to go and getting the sites ready to go.

17    I actually was involved with that as well.

18        Q.    Were you the contact person between

19    Abbott and the investigative sites?

20        A.    I was one of them.

21        Q.    Who else?

22        A.    There were -- besides myself there was

23    a physician on the program, Todd Janus.

24        Q.    He also acted as a liaison between

1    you have an opinion based on when a clinical trial

2    begins as of the 2001 time frame?

3        MR. LORENZINI:  Objection.

4    BY THE WITNESS:

5        A.    Usually I guess -- I guess when a first

6    patient takes drug, it's officially started in my

7    opinion.

8    BY MR. ZWICKER:

9        Q.    You know what a project team is,

10   correct?

11       A.    Yes.  I guess -- well --

12       Q.    Let me ask you a better question.

13           You have an understanding of the term

14   "project team" as used at Abbott in connection

15   with the development of a drug, right?

16       A.    Yeah.  Now we call them global project

17   teams more than project teams, but, yes.

18       Q.    In 2000, 2001 period, you called them

19   project teams?

20       A.    Probably.

21       Q.    There was a project team for 518?

22       A.    Yes.

23       Q.    As the CPM, you remember the project

24   team?

D'Amico, Diane (Vol.1) (Not Linked)  10/26/2008  9:10:00 AM

1    A.   Yes.

2    Q.   What is the purpose of a project team

3    in 2000, 2001?

4    A.   The project team usually is comprised

5    of folks from all the different like functional

6    groups, for example, the clinical team which I'm a

7    part of is just one part of the project team, but

8    there's, you know, folks from discovery and like

9    PK.

10    Q.   What is PK?  Sorry I cut you off.

11    Continue.

12    A.   Pharmacokinetics.

13    Q.   What does that mean?

14    A.   It's -- in my layman's terms, it's

15    really just assessing like when you administer a

16    drug, you do serial blood draws to see how the

17    drug is distributed throughout the body.

18    Q.   And how long it stays there?

19    A.   Correct, and there's folks from

20    regulatory and all different functional groups

21    that help the program move.

22    Q.   Did every drug under development --

23    strike that.

24    Who did the 518 project team report to

1    in 2000, 2001?

2        A.   I'm not certain if the project team has

3    like a set leader that I can say.  I know my

4    clinical project team that I was a part of, my

5    leader was probably Azme Nabulsi.

6        Q.   He was your leader?

7        A.   He was my venture head at the time,

8    which is what we called them, ventures.

9        Q.   Do you know who Perry Nisen is?

10       A.   Yes.

11       Q.   What was his role in 2000, 2001?  Was

12   he the venture head of oncology?

13       A.   He may have been.  We had two groups

14   that merged and Perry -- and I don't know exact

15   job titles and things like that, but Perry was

16   Azme's boss so he may have actually been above

17   Azme.

18       Q.   Who were the other members of the

19   project team in 2000, 2001?

20       A.   Well, from the clinical team it was

21   myself and there was Paige Gjalstan who was a CRA

22   working underneath me helping me do the day to

23   day.  I believe that the assistant director on the

24   program was Susan Glad Anderson and the clinical

# PART 4

1    team also has an operations element, Diane Bronson

2    was our operations manager and Todd Janus who I

3    already mentioned was the physician overseeing --

4    like a medical monitor for the study and Azme, I'm

5    not sure if he was the venture head then or what

6    his exact title was then.  That was from the

7    clinical team.  And then so from discovery I think

8    Steve Davidson worked on the discovery piece.  I

9    recall Matt Rizer being our PK person.  I'm not

10   sure if I recall who our regulatory rep was at the

11   time.

12       Q.   Who is James Looman?

13       A.   Jim Looman, he is a physician who is

14   based in the Netherlands so he works for the

15   Abbott affiliate so he was the kind of physician

16   that was in the same time zone as the

17   investigative sites for that particular study.

18       Q.   By that particular study, we're talking

19   about the Phase I clinical study for 518, correct?

20       A.   Yes.

21       Q.   That was otherwise known as M-00235,

22   right?

23       A.   Yes.

24       Q.   Was Looman part of the project team.

1    assessment of doing routine blood draws to see how

2    the drug is processed by your body.

3        Q.   The second item is to determine a dose

4    level for Phase II studies.

5            What does that mean?

6        A.   Well, if you give multiple doses to a

7    patient, you're trying to see which dose level

8    will be appropriate to pursue in your future

9    studies like Phase II and III being next, but in

10    Phase II -- so depending upon the data you collect

11    from a Phase I study, it helps you select a dose

12    level for Phase II.

13        Q.   Various doses or single doses?

14        A.   I think you usually try to go with one.

15        Q.   Turn the page to Overall Study Design

16    and Plan.  The very last sentence says:  "Up to 40

17    patients will receive ABT-518 administered

18    orally."

19            Do you see that?

20        A.   Yes.

21        Q.   Does that mean that the target

22    enrollment was 40 patients?

23        MR. LORENZINI:  Objection.

24    BY THE WITNESS:

D'Amico, Diane (Vol.1) (Not Linked)  10/26/2008  9:10:00 AM

1      A.   Not necessarily.  That's what you

2    establish as how many may end up getting it.  You

3    have to kind of state that in the protocol.

4    BY MR. ZWICKER:

5      Q.   Continue your answer.  I'm sorry.

6      A.   Just so there's an idea you have to

7    state what potentially the maximum number of

8    subjects may be in a protocol because you have to

9    then state that in the informed consent for a

10   patient when they sign it so they know how many

11   other people might also participate.

12     Q.   Was there a target enrollment for the

13   00235 clinical study?

14     A.   I think it just depends.  You have

15   enrollments per dose group, so depending upon how

16   those go, you try to do it by dose group so there

17   is an enrollment by dose group.

18     Q.   So there was a maximum -- a target

19   enrollment by dose group?

20     MR. LORENZINI:  Objection.  Mischaracterizes

21   the testimony.

22   BY THE WITNESS:

23     A.   Well, usually and in this study, too,

24   there were three patients per dose group that you

1    tried to clear to keep going to establish your

2    objectives that you set up.

3    BY MR. ZWICKER:

4        Q.   How many dose groups were there?

5        A.   I don't recall unless you want me to

6    read the protocol.

7        Q.   Fair to say, though, if we multiplied

8    the number of dose groups -- of persons and the

9    number of gross groups, we would come up with the

10   target enrollment?

11       MR. LORENZINI:  Objection.

12   BY THE WITNESS:

13       A.   Going into a study, that may be what

14   you plan, but sometimes you have to amend.

15   BY MR. ZWICKER:

16       Q.   So at least your initial target

17   enrollment was the number of persons in a group

18   times the number of groups, right?

19       MR. LORENZINI:  Objection.

20   BY THE WITNESS:

21       A.   Possibly, but if you I guess reached

22   your MTD before that you would have fewer.

23   BY MR. ZWICKER:

24       Q.   You would agree with me generally that

# PART 5

D'Amico, Diane (Vol.1) (Not Linked)  10/26/2008  9:10:00 AM

1    if it was --

2    BY MR. ZWICKER:

3       Q.    Do you recall hearing from anyone at

4    Abbott in 2001 that the results of preclinical

5    trials in any way -- strike that.

6         Do you recall hearing from anyone at

7    Abbott in 2001 that the results of preclinical

8    work cast doubt on the development or version

9    viability of 518?

10       MR. LORENZINI:  Objection.

11    BY THE WITNESS:

12       A.    Not that I recall, no.

13    BY MR. ZWICKER:

14       Q.    It's fair to say that if preclinical

15    work had gone badly, there would not have been a

16    Phase I trial, true?

17       A.    Right.  That's what I meant by pre me.

18    I get in when you start getting into the "in man"

19    studies, so  --

20       Q.    Turn back to Page ABBT 13228 if you

21    would?

22       A.    Okay.

23       Q.    And focus on the first slide.  The date

24    of this document is 3/7 to 3/9, 2001; do you see

1    BY MR. ZWICKER:

2        Q.    Turn to the next page, which is ABBT

3    13230.

4        A.    Okay.

5        Q.    Do you see a slide there that begins

6    Key Project Strengths, Positives?

7        A.    Yes.

8        Q.    Let's start with the line that says

9    Project Attributes, okay.  On the third bullet

10   down says:  "No joint toxicity expected."

11            Do you see that?

12       A.    Yes.

13       Q.    Did you have discussions with persons

14   on the 518 project team regarding expectations for

15   joint toxicity in 518?

16       MR. LORENZINI:  That she can recall sitting

17   here today.

18       MR. ZWICKER:  That's a predicate to every

19   question that ever gets asked in every deposition.

20   BY THE WITNESS:

21       A.    I remember just in general the concept

22   that we weren't expecting joint toxicity in our

23   compound.

24   BY MR. ZWICKER:

1     Q.    Based on those conversations, why did

2     Abbott have that expectation?

3     A.    I believe it had to do with the fact

4     that we were more selective, gel A and gel B

5     selective, whatever that means, I'm not a hundred

6     percent positive.  That was why we thought we

7     weren't going to see that.  I recall hearing that

8     at one of the teams where maybe discovery or

9     somebody was talking about it.

10     Q.    Move down a bullet to Time to Market.

11     Do you see potential for fast track approval?

12     A.    Yes.

13     Q.    Did you have discussions with persons

14     within Abbott regarding fast track approval for

15     518?

16     A.    Not that I recall.

17     Q.    Further down the page is a bullet point

18     called Business Franchise Strength; do you see

19     that?

20     A.    Yes.

21     Q.    It says synergies with HPD and ADD?

22     A.    Yes.

23     Q.    What is HPD?

24     A.    HPD is Abbott's Hospital Products

1    Division.

2      Q.   Do you have an understanding of what

3    the synergies were between 518 and HPD?

4      A.   Yes.

5      Q.   What is ADD?

6      A.   Abbott Diagnostic Division.

7      Q.   Do you have an understanding of what

8    the synergies were between ADD and 518?

9      A.   No.

10           (WHEREUPON, a certain document

11            was marked D'Amico Deposition

12            Exhibit No. 8, for identification,

13            as of 10/26/06.)

14           (WHEREUPON, the document was

15            tendered to the witness.)

16      MR. ZWICKER:  The record should reflect that

17    before the witness is D'Amico Exhibit No. 8, which

18    is a document entitled MMPI Working Group Minutes,

19    March 8, 2001 and it bearing Bates Nos. 300143

20    through 300144.

21    BY MR. ZWICKER:

22      Q.   Ms. D'Amico, do you recognize

23    Exhibit 8?

24      A.   Only the format.  This is a meeting

# PART 6

D'Amico, Diane (Vol.1) (Not Linked)  10/26/2008  9:10:00 AM

1    minutes that would have been put out from the

2    working group meetings, yes.

3       Q.   Was it your responsibility to compile

4    the minutes from the MMPI working group?

5       MR. LORENZINI:  Objection.

6    BY THE WITNESS:

7       A.   Sometimes, yes.

8    BY MR. ZWICKER:

9       Q.   Was it your responsibility to compile

10   the minutes for the March 8 meeting?

11      A.   I don't remember.

12      Q.   Would it have been your responsibility

13   to compile the minutes for the March 8 meeting

14   with respect to the clinical update?

15      A.   To check them that they were accurate

16   potentially if I wasn't the one doing it, yes.

17      Q.   Who took notes?

18      MR. LORENZINI:  Objection.

19   BY THE WITNESS:

20      A.   Who took notes --

21   BY MR. ZWICKER:

22      Q.   At the meeting?

23      A.   -- at the meeting, I suppose anyone

24   that was in attendance, but I don't recall who was

1    A.   I would be told, yeah.

2    Q.   You would be what?

3    A.   I would probably be told.

4    Q.   You would be told?

5    A.   That it would have an impact on my

6    study and what we needed to do.

7    Q.   Let's go back to the minute notes,

8    Exhibit 8.

9    A.   Okay.

10   Q.   It says:  "We will proceed with the

11   Phase I trial."

12        Do you see that?

13   A.   Yes.

14   Q.   What discussions do you recall

15   regarding why Abbott decided to proceed with the

16   Phase I trial for 518?

17        MR. LORENZINI:  Objection.  Lacks foundation.

18   BY THE WITNESS:

19   A.   I don't recall any discussions.

20   BY MR. ZWICKER:

21   Q.   If you look further down, it says:

22   "Preclinically our compound differs from the

23   competition.  In addition, the competitors may

24   have dosed too low.  May have not selected the

1    proper tumor stages and skipped Phase II

2    development."

3        Do you see that?

4        A.   Yes.

5        Q.   Do you recall discussions around

6    distinguishing 518 from its competitors?

7        MR. LORENZINI:  Objection.

8    BY THE WITNESS:

9        A.   Like I said, just what I said earlier

10    that we weren't expecting joint toxicity so we

11    could dose higher.

12    BY MR. ZWICKER:

13        Q.   I'm asking you a different question.

14    I'm asking you whether on March the 8th, 2001

15    whether you recall an effort to distinguish 518

16    from its competitors?

17        A.   I don't recall discussion.

18        Q.   Ms. D'Amico, on or around March the

19    8th, 2001, did you come away from the MMPI working

20    group meeting with a sense that the outlook for

21    the continued development of 518 was not good?

22        MR. LORENZINI:  Objection.  Lacks foundation.

23    BY THE WITNESS:

24        A.   I don't remember being at the meeting.

1    the sites in the Netherlands and tell them that

2    the clinical study had been halted?

3        MR. LORENZINI:  Objection.

4    BY THE WITNESS:

5        A.    I don't recall that.

6    BY MR. ZWICKER:

7        Q.    That would be a pretty big deal,

8    wouldn't it?

9        MR. LORENZINI:  Objection.

10    BY THE WITNESS:

11        A.    I guess if you're stopping the studies,

12    yeah, or a study.

13    BY MR. ZWICKER:

14        Q.    I'm sorry, could you repeat your

15    testimony?

16        A.    If you were stopping a study, I guess,

17    yeah, it would be a big decision.

18    BY MR. ZWICKER:

19        Q.    Abbott's got a lot invested in these

20    clinical studies, right?

21        MR. LORENZINI:  Objection.

22    BY THE WITNESS:

23        A.    Any study is an investment, yes.

24            (WHEREUPON, a certain document

# PART 7

D'Amico, Diane (Vol.1) (Not Linked)  10/26/2008  9:10:00 AM

1          was marked D'Amico Deposition

2          Exhibit No. 9, for identification,

3          as of 10/26/06.)

4          (WHEREUPON, the document was

5          tendered to the witness.)

6      MR. ZWICKER:  The record should reflect that

7    before the witness is Exhibit No. 9 which is an

8    e-mail from Diane D'Amico to various persons dated

9    March the 12th, 2001, subject is M-00235 update.

10    BY MR. ZWICKER:

11      Q.   Do you have that document in front of

12    you?

13      A.   Yes.

14      Q.   Do you recognize it?

15      A.   That it's an e-mail that I sent, yes.

16      Q.   You recognize it as an e-mail that you

17    sent?

18      A.   Yes.

19      Q.   Does it refresh your recollection that

20    on March the 12th you were directed to halt the

21    M-00235 study?

22      MR. LORENZINI:  Objection.

23    BY THE WITNESS:

24      A.   I don't recall having even sent the

D'Amico, Diane (Vol.1) (Not Linked)  10/26/2008  9:10:00 AM

1   e-mail, but per the e-mail it reflects that.

2   BY MR. ZWICKER:

3       Q.   You have no reason to doubt the

4   accuracy of this e-mail, correct?

5       A.   That's correct.

6       Q.   And you have no reason to doubt that

7   you were instructed to halt the M-00235 study,

8   right?

9       MR. LORENZINI:  Objection.

10  BY THE WITNESS:

11      A.   Correct.

12  BY MR. ZWICKER:

13      Q.   You testified earlier that 518 was the

14  first time you ever acted as a CPM, right?

15      A.   Yes.

16      Q.   So I would be right, wouldn't I, that

17  you would not have been the person to have made

18  the decision to halt the 00235 study?

19      A.   Correct.

20      Q.   You would never have authority to do

21  that, would you?

22      A.   No.

23      Q.   Who told you to halt the study?

24      MR. LORENZINI:  Objection.  Mischaracterizes

D'Amico, Diane (Vol.1) (Not Linked)  10/26/2008  9:10:00 AM

1    BY MR. ZWICKER:

2      Q.   Let me ask you a different question.

3    Did you learn in March of 2001 that John Hancock

4    had invested in ABT-518?

5      A.   No.

6      Q.   On March 12, 2001, you wouldn't have

7    invested in 518, would you?

8      MR. LORENZINI:  Excuse me.  Could you read

9    the question back?

10         (WHEREUPON, the record was

11         read by the reporter.)

12     MR. LORENZINI:  Objection.

13   BY MR. ZWICKER:

14     Q.   Would you?

15     MR. LORENZINI:  Objection.  Calls for

16   speculation, hypothetical.  You're asking whether

17   she personally would have invested in 518?

18   BY MR. ZWICKER:

19     Q.   Can you answer the question?

20     MR. LORENZINI:  Objection.

21   BY THE WITNESS:

22     A.   I don't do a lot of investing, but I

23   think I would have waited if it was me personally.

24     MR. LORENZINI:  Can we take a short break?

1    saved it in my inbox, no, that's not my typical

2    process.

3    BY MR. ZWICKER:

4        Q.    What is your process?

5        A.    To put it in a study-related folder.

6        Q.    And you keep those folders?

7        MR. LORENZINI:  Objection.

8    BY THE WITNESS:

9        A.    Electronic on my e-mail.

10   BY MR. ZWICKER:

11       Q.    You keep them?

12       A.    Generally speaking.

13       Q.    But to your knowledge, no one at Abbott

14   searched that file; is that right?

15       MR. LORENZINI:  Objection.  Calls for

16   speculation.  Lacks foundation.

17   BY THE WITNESS:

18       A.    I don't know if anybody searched my

19   e-mails.

20   BY MR. ZWICKER:

21       Q.    You didn't?

22       A.    No.

23       Q.    Let's mark the next exhibit which is

24   ten.

# PART 8

D'Amico, Diane (Vol.1) (Not Linked)  10/26/2008  9:10:00 AM

1      MR. ZWICKER:  The record should reflect that

2    before the witness is D'Amico Exhibit No. 10 which

3    is a chain of e-mails dated March 16 through March

4    19, 2001.

5    BY MR. ZWICKER:

6      Q.   Ms. D'Amico, if you could, take a look

7    at the very last e-mail in the chain, the one

8    dated March 16, 2001 from you to various persons.

9        Do you see that?

10     A.   Yes.

11     Q.   Do you recognize --

12     MR. LORENZINI:  Can the witness have a chance

13    to read the document?  I think in fairness, that

14    would be good.

15     MR. ZWICKER:  Yeah.  Sure.  Take your time

16    reading it.

17     THE WITNESS:  Okay.

18    BY MR. ZWICKER:

19     Q.   Did you see this document in your

20    preparation for your deposition?

21     A.   Yes.

22     Q.   Do you recognize this document?

23     A.   I recognize it as an e-mail, but I

24    don't recall like prior to seeing it again

D'Amico, Diane (Vol.1) (Not Linked)  10/26/2008  9:10:00 AM

1    yesterday, I didn't recall the document.

2        Q.   You have no doubt that it is, however,

3    an e-mail from you to various persons on March the

4    16th, 2001, correct?

5        A.   I have no reason to question that, no.

6        Q.   In the e-mail, you say:  "Dear Jim,

7    Willy and Else, what a long week this has been.

8    Not only was this week long, but it was filled

9    with ups and downs.  Todd, Paige and I came in

10   Monday to learn that the MMPI project had been put

11   on hold.  The next day we learned that the hold

12   had been lifted.  I just hope that the next week

13   will be a little less eventful."

14       Did I read that correctly?

15       A.   Yes.

16       Q.   Who told you that the hold had been

17   lifted?

18       A.   I don't recall.

19       Q.   Was it significant to you that the hold

20   had been lifted?

21       MR. LORENZINI:  Objection.

22   BY THE WITNESS:

23       A.   I don't -- I mean -- I think that

24   there's always like a possibility of back and

1    back or do you have it in mind?

2      MR. ZWICKER:  She's answering it.

3    BY THE WITNESS:

4      A.   You know, I don't know what I would do

5    as a PI.  I guess it would depend on the

6    circumstance surrounding it.  I don't know.

7    BY MR. ZWICKER:

8      Q.   You were the CPM for this study,

9    weren't you?

10     A.   Yes.

11     Q.   And as the CPM, wouldn't you have

12   informed people working for you that the study had

13   been halted?

14     MR. LORENZINI:  Objection.

15   BY THE WITNESS:

16     A.   I think I actually did, but the study

17   -- you know, it was like put on hold and then

18   rereleased from hold like within the next day so I

19   can't -- there couldn't have been a huge impact

20   from that.

21   BY MR. ZWICKER:

22     Q.   You told the people that work with you

23   that there had been a hold put on the study,

24   right?

1        A.    I don't recall that.  I don't recall

2    specifically telling folks.  As a matter of fact,

3    when I -- I mean, looking back at Exhibit 10, the

4    only person that worked for me was Paige and it

5    sounds like she learned at the same time I did.

6    It sounds that way, but I don't recall the

7    conversations so --

8        Q.    You would agree with me that it would

9    be the prudent thing to do to tell people working

10    on a clinical study that the study had been

11    halted, wouldn't you?

12        MR. LORENZINI:  Objection.  Vague, ambiguous.

13    BY THE WITNESS:

14        A.    I think every circumstance is

15    different.  If there was additional information

16    that was forthcoming, other decisions that might

17    impact it you may wait, I don't know.

18    BY MR. ZWICKER:

19        Q.    Your direction to the Netherlands was

20    the study had been halted, right?

21        MR. LORENZINI:  Objection.  Mischaracterizes

22    prior testimony.

23    BY THE WITNESS:

24        A.    Which communication to the Netherlands

# PART 9

D'Amico, Diane (Vol.1) (Not Linked)  10/26/2008  9:10:00 AM

1    are you talking about?

2       Q.   On March 12, 2001, you sent to

3    Professor Schellens:  "As you know, we have been

4    instructed to halt the M-00235 study."

5          Those were your words, right?

6       MR. LORENZINI:  Objection.  Mischaracterizes

7    the document.

8    BY THE WITNESS:

9       A.   Yes, but I also said we would have

10   further instructions the next day.

11   BY MR. ZWICKER:

12      Q.   Ma'am, the first sentence of your

13   e-mail I read correctly, didn't I?

14      A.   Yes, you read it correctly.  But

15   there's more information in the e-mail.

16      Q.   On March the 12th, you didn't tell

17   Professor Schellens that the halt was temporary,

18   right?

19      MR. LORENZINI:  Objection.  Vague, ambiguous.

20   BY THE WITNESS:

21      A.   I told him there would be additional

22   information forthcoming, and at the time he should

23   stop enrolling patients at his site at that time.

24   BY MR. ZWICKER:

1    A.   No, the only reference is to a delay in

2    the timing.

3    Q.   Mr. Deemer says in the second sentence

4    of his e-mail, on the ABT-518 program, he noted

5    that Phase I must have started on December 2000

6    but, in fact, did not start until earlier this

7    month.  Did I read that correctly?

8    A.   Yes.

9    Q.   I think you testified that the first

10   patient had not been enrolled in the study until

11   March 12, correct?

12   MR. LORENZINI:  Objection.  Mischaracterizes

13   prior testimony.

14   BY THE WITNESS:

15   A.   I recall reading --

16   BY MR. ZWICKER:

17   Q.   Take a look at Exhibit No. 7.

18   A.   Yes.  In Exhibit No. 7, it says the

19   first patient was enrolled on March 12, but like I

20   also said, there were a lot of things that went up

21   into getting ready for that first patient to be

22   enrolled, so --

23   Q.   That occurred before March of 2001?

24   A.   Yeah.  Like going over the initiation

1    in February and things like that, so there were

2    certainly activities getting the study started

3    that early.

4        Q.   You were responsible for the portion of

5    Exhibit 7 that relates to the enrollment of the

6    first patient, right?

7        MR. LORENZINI:  Objection.  Lacks foundation.

8    BY THE WITNESS:

9        A.   I may have supplied that information

10    for this report.  I'm aware of when the first

11    patient is enrolled in a study.

12    BY MR. ZWICKER:

13        Q.   Do you think Mr. Deemer's statement

14    that the study started earlier this month is an

15    accurate statement given what you know about the

16    Phase I clinical trial for 518?

17        MR. LORENZINI:  Objection.  Lacks foundation.

18    Calls for speculation, vague, ambiguous.

19    BY THE WITNESS:

20        A.   In some ways it started before that so

21    I don't know before, earlier in the month in

22    February is when I recall being over there,

23    overseas.

24    BY MR. ZWICKER:



# PART 2

D'Amico, Diane (Vol. 2) (Linked)  11/28/2006  9:06:00 AM

```
 1            UNITED STATES DISTRICT COURT

 2                    FOR THE

 3              DISTRICT OF MASSACHUSETTS

 4

 5    JOHN HANCOCK LIFE INSURANCE    )

 6    COMPANY, JOHN HANCOCK          )

 7    VARIABLE LIFE INSURANCE        )

 8    COMPANY, and MANULIFE          )

 9    INSURANCE COMPANY (f/k/a       )

10    INVESTORS  PARTNER INSURANCE   ) Civil Action No.

11    COMPANY),                      ) 05-11150-DPW

12            Plaintiffs,    )

13      -vs-                 )

14    ABBOTT LABORATORIES,           )

15            Defendant.     )

16        H I G H L Y   C O N F I D E N T I A L

17

18            November 28, 2006,

19            9:06 a.m.

20

21        The confidential videotaped deposition

22    of DIANE D'AMICO resumed pursuant to adjournment

23    at Suite 1300, Two North LaSalle Street, Chicago,

24    Illinois.
```

1    So you may want to have a conversation with your

2    colleague to try to gain some consistency on this

3    practice, but for the time being --

4        MR. ZWICKER:  Well, I've reviewed some of

5    those transcripts and I don't agree with your

6    characterization of them, and obviously I disagree

7    with the position you're taking here.

8    BY MR. ZWICKER:

9        Q.   Ms. D'Amico, were you shown documents

10    that contained your handwritten notes that

11    refreshed your recollection regarding discussions

12    of Abbott's competitors in the development of 518?

13        A.   No.

14            (WHEREUPON, a certain document

15             was marked D'Amico Deposition

16             Exhibit No. 27, for identification,

17             as of 11/28/06.)

18            (WHEREUPON, the document was

19             tendered to the witness.)

20        MR. ZWICKER:  The record should reflect that

21    before the witness is a document entitled MMPI

22    Monthly Meeting Agenda dated March 8, 2001.

23    BY MR. ZWICKER:

24        Q.   Ms. D'Amico, would you review Exhibit

1    No. 27 and let me know when you've done so?

2    A.   Yes.

3    MR. LORENZINI:  I'd like to object on the

4    record that there is some highlighting --

5    MR. ZWICKER:  The highlighting is mine.  It

6    was in the wrong color.  It was not as produced.

7    The document produced had no shading on it.

8    MR. LORENZINI:  Thank you for that

9    clarification.

10   MR. ZWICKER:  One of the many skills you

11   learn as a lawyer is that blue highlighting copies

12   and yellow highlighting doesn't.

13   BY MR. ZWICKER:

14   Q.   Ms. D'Amico, do you recognize the

15   handwriting on this document?

16   A.   Yes, it's mine.

17   Q.   All of it?

18   A.   Yes.

19   Q.   Fair to say that you attended the MMPI

20   monthly meeting on March the 8th, 2001?

21   A.   Yes.

22   Q.   And that you were the designated note

23   taker for that meeting?

24   A.   That part I don't recall.

1    Q.    Were other persons taking notes as

2    well?

3    A.    I don't recall.

4    Q.    I think you testified at your last

5    deposition that one person was designated the note

6    taker for meetings involving 518; do you recall

7    that testimony?

8    A.    I don't remember saying that.

9         (WHEREUPON, a certain document

10        was marked D'Amico Deposition

11        Exhibit No. 28, for identification,

12        as of 11/28/06.)

13        (WHEREUPON, the document was

14        tendered to the witness.)

15   BY MR. ZWICKER:

16   Q.    If you wouldn't mind turning to Page 78

17   of your deposition from October 26 beginning with

18   line 2 on Page 78.  Let me know when you're there.

19   A.    Okay.

20   Q.    The question:  "For each MMPI Working

21   Group meeting, was a person designated to take

22   notes?  Answer:  It seems likely, yes, that

23   somebody took notes at each one.  Question:  Were

24   you ever the designated person?  Yeah, I'm sure I

# PART 3

D'Amico, Diane (Vol. 2) (Linked)  11/28/2006  9:06:00 AM

1      Q.   As note taker for the March 8 meeting,

2   is it fair to say that were you tasked with

3   writing down significant statements by attendees

4   at the meeting?

5      MR. LORENZINI:  Objection.

6   BY THE WITNESS:

7      A.   If I was issuing the meeting minutes,

8   then, yes.

9   BY MR. ZWICKER:

10     Q.   Well, you were taking notes, weren't

11  you?

12     A.   It looks like I took notes, yes.

13     Q.   In taking notes, your objective was to

14  write down everything that people said that you

15  viewed was important, right?

16     A.   I took notes indicating what the gist

17  of what was going on, yes.

18     Q.   And you made a judgment to write down

19  things that in your view were important, true?

20     A.   They may have been or may not have

21  been, yes, but --

22     Q.   You weren't out to write things that

23  were unimportant, were you?

24     MR. LORENZINI:  Objection.

1    BY THE WITNESS:

2        A.    You know, whatever was important I

3    guess to me but may not have been important to

4    others.  I don't know.

5    BY MR. ZWICKER:

6        Q.    You were a member of the 518 team,

7    weren't you?

8        A.    Correct.

9        Q.    And you had confidence that you would

10   be able to distinguish an important fact from an

11   irrelevant one, right?

12       A.    I mean, this was kind of new to me.  It

13   was a whole new endeavor being a project manager,

14   so I may have indicated things on here that

15   weren't important, but I was just taking notes for

16   myself.

17       Q.    Did you try to write down everything

18   everybody said?

19       A.    I don't recall.

20       Q.    You tried to write down things that you

21   thought were worth writing down, right?

22       A.    I guess, yes.

23       Q.    Were you then responsible for

24   transcribing your handwritten notes into meeting

1    sure why.  I vary.

2       Q.   So it's your testimony sitting here

3    today that you didn't mean to indicate that

4    something written in capital letters was more

5    important than something written in lower case

6    letters?

7       A.   Correct.

8       Q.   Fair to say you took these notes during

9    the course of your regular business activities at

10    Abbott, right?

11       A.   Yes.

12       Q.   And that these notes to the best of

13    your knowledge accurately reflect what was said

14    during the March 8th meeting?

15       MR. LORENZINI:  Objection.

16    BY THE WITNESS:

17       A.   They certainly reflect my

18    interpretation of what was said, yes.

19    BY MR. ZWICKER:

20       Q.   You intended to capture what people

21    said at the meeting, right?

22       MR. LORENZINI:  Objection.

23    BY MR. ZWICKER:

24       Q.   That was your intention, right?

D'Amico, Diane (Vol. 2) (Linked)  11/28/2006  9:06:00 AM

1      A.   Yes, I would hope to take notes that

2   were correct.

3      Q.   You took these notes during the meeting

4   itself, right?

5      A.   Yes.

6      Q.   Let's focus on Roman numeral No. I,

7   Clinical; do you see that?

8      A.   Yes.

9      Q.   The first typewritten entry on the left

10  side of the document is:  "Leiden portfolio

11  review."

12       Do you see that?

13      A.   Yes.

14      Q.   And immediately to the right of that is

15  3/7, right?

16      A.   Correct.

17      Q.   Do you agree with me that by writing

18  down March 7th that you intended to signify that

19  the Leiden portfolio review for 518 took place on

20  March 7th?

21      A.   Yes.  That's probably what I meant.

22      Q.   Who was the person that summarized the

23  Leiden portfolio review on March 7th?

24      MR. LORENZINI:  Objection.

# PART 4

1    posed the question:  "How can we continue if

2    competition is dropping out?"

3       MR. LORENZINI:  Objection.

4    BY THE WITNESS:

5       A.   No, I don't.

6    BY MR. ZWICKER:

7       Q.   You would agree with me, wouldn't you,

8    that if the question were posed on an MMPI Working

9    Group meeting:  "How can we continue if

10   competition is dropping out" that that would be a

11   significant issue?

12      MR. LORENZINI:  Objection.

13   BY THE WITNESS:

14      A.   I don't know the significance of it.

15   BY MR. ZWICKER:

16      Q.   Ms. D'Amico, on March 8, 2001, the MMPI

17   Working Group is wrestling with the question about

18   whether 518 development should continue, correct?

19      MR. LORENZINI:  Objection.

20   BY THE WITNESS:

21      A.   I don't recall, but based on the

22   meeting minutes, it looks like the team was in

23   support of continuing.

24   BY MR. ZWICKER:

1      Q.   That's not my question.  My question is

2    that on March 8th, the MMPI Working Group was

3    debating whether or not development of 518 should

4    continue, right?

5      MR. LORENZINI:  Objection.

6    BY THE WITNESS:

7      A.   I don't recall.

8    BY MR. ZWICKER:

9      Q.   Look at your notes.  That's what your

10   notes say, doesn't it?

11     MR. LORENZINI:  Objection.

12   BY THE WITNESS:

13     A.   I don't recall any debate.

14   BY MR. ZWICKER:

15     Q.   You would agree with me that someone

16   posed the question:  "How can we continue if

17   competition is dropping out," right?

18     MR. LORENZINI:  Objection.

19   BY MR. ZWICKER:

20     Q.   You would agree with me about that?

21     A.   Based on my notes, it appears as if

22   that question was asked.

23     Q.   You would agree with me that once that

24   question was posed there was a discussion, right?

1      MR. LORENZINI:  Objection.

2    BY THE WITNESS:

3      A.   Based on my notes.

4    BY MR. ZWICKER:

5      Q.   That there was a discussion?

6      A.   Based on my notes, it appears that

7    there were reasons given as to why we should

8    continue.

9      Q.   My question is you would agree with me

10   that there was discussion about whether or not to

11   continue developing 518?

12     MR. LORENZINI:  Objection.

13   BY THE WITNESS:

14     A.   I don't recall if it was a discussion.

15   BY MR. ZWICKER:

16     Q.   Based only on your notes.  Don't your

17   notes reflect a discussion?

18     MR. LORENZINI:  Objection.

19   BY MR. ZWICKER:

20     Q.   I'm asking you about your notes.

21     A.   My notes reflect a question that was

22   asked and rationale given for why we should

23   continue.

24     Q.   Would you agree with me that this was

D'Amico, Diane (Vol. 2) (Linked)  11/28/2006  9:06:00 AM

1     asking?

2     BY MR. ZWICKER:

3         Q.   Beginning -- for Roman numeral No. I,

4     beginning with the sentence:  "How can we continue

5     if competition is dropping out" through the

6     sentence that ends "he'll look at abstracts upon,"

7     does any of the text in that paragraph relate to

8     inappropriate tumor selection?

9         MR. LORENZINI:  Objection.

10    BY THE WITNESS:

11        A.   Just like that phrase, that phrase

12    inappropriate tumor selection, is that

13    reference --

14    BY MR. ZWICKER:

15        Q.   Do you have an understanding of what

16    that phrase means?

17        A.   I'm guessing that you mean it like in

18    respect to the drug development process.  It could

19    be the not right stage tumors.

20        Q.   Ms. D'Amico, it's fair to say that

21    based on your notes, the persons in attendance at

22    the March 8, 2001 monthly MMPI meeting attempted

23    to make a case for continuing development of

24    ABT-518, correct?

# PART 5

1        MR. LORENZINI:  Objection.

2    BY THE WITNESS:

3        A.    Based on my notes, it appears as if

4    rationale was given as to why we felt we should

5    continue development of the compound and a plan of

6    action I should say.

7    BY MR. ZWICKER:

8        Q.    And the rationale was provided by the

9    persons in attendance, correct?

10        MR. LORENZINI:  Objection.

11    BY THE WITNESS:

12        A.    One of the attendees, yes, would have

13    said those things, one or more.

14    BY MR. ZWICKER:

15        Q.    Before I forget, just moving along down

16    Roman numeral I on the typewritten side, you have

17    Vanderbilt conference on 3/12 to discuss the IND

18    study; do you see that?

19        A.    Yes.

20        Q.    Can you explain to me what the

21    Vanderbilt conference is?

22        A.    I recall that University of Vanderbilt

23    was going to perform the IND study so there was

24    apparently a conference call that was going to be

1          Do you see that?

2      A.   Correct.

3      Q.   Do you recall after having reviewed

4    this any conversations that you had with

5    Dr. Nabulsi about any conversations that he had

6    with Professor Schellens?

7      A.   No, I don't.

8      Q.   Who is Laurens Beerepoot?

9      A.   He was someone that worked at one of

10   the sites in the Netherlands.

11     Q.   A site other than the one worked at by

12   Professor Schellens?

13     A.   I don't know which site he was

14   associated with.

15          (WHEREUPON, a certain document

16            was marked D'Amico Deposition

17            Exhibit No. 32, for identification,

18            as of 11/28/06.)

19          (WHEREUPON, the document was

20            tendered to the witness.)

21     MR. ZWICKER:  The record should reflect that

22   before the witness is D'Amico Exhibit No. 32 which

23   is an e-mail from Diane D'Amico to Laurens

24   Beerepoot dated March the 12, 2001 at 2:59 p.m.

1    BY MR. ZWICKER:

2        Q.    Could you review this document,

3    Ms. D'Amico, and let me know when you're done.

4        A.    Okay.

5        Q.    Does this refresh your recollection

6    regarding who Laurens Beerepoot was?

7        A.    He was one of the employees that worked

8    with Dr. Zonnenberg so it would have been the

9    opposite side of Dr. Schellens, the other site.

10       Q.    The second site?

11       A.    They are not really numbered, but, yes,

12   one of the two sites.

13       Q.    There were two sites?

14       A.    Yep.

15       Q.    And he was the PI at the other?

16       A.    No, Zonnenberg was the PI.

17       Q.    He worked for Zonnenberg.  So is it

18   fair to say based on this e-mail that you not only

19   instructed Professor Schellens to halt the trial,

20   but you also instructed Dr. Beerepoot to refrain

21   from enrolling any additional patients in the

22   study at this time, right?

23       A.    From this document, yes, I did instruct

24   Dr. Beerepoot or Beerepoot, I don't know if he's a

D'Amico, Diane (Vol. 2) (Linked)  11/28/2006  9:06:00 AM

1    doctor, to refrain from enrolling additional

2    patients.

3        Q.   So fair to say you were the person at

4    Abbott who instructed the sites not to enroll any

5    additional patients, right?

6        A.   Yes.  I communicated to the sites, both

7    of them, not to enroll any additional patients.

8        Q.   Do you recall getting any response from

9    Dr. Beerepoot?

10       A.   I don't.

11       Q.   Now, Ms. D'Amico, isn't it a fact that

12   Abbott shut down activities relating to the

13   development of 518 over and above the Phase I

14   clinical trial?

15       MR. LORENZINI:  Objection.

16   BY THE WITNESS:

17       A.   I guess I need to know what time period

18   you're talking about.

19   BY MR. ZWICKER:

20       Q.   Prior to the termination, the official

21   termination of ABT-518.

22       MR. LORENZINI:  Objection.

23   BY THE WITNESS:

24       A.   I don't know what activities you're

# PART 6

1    Garavaila ever getting anything wrong when it came

2    to summarizing what you told her, right?

3        A.    I don't recall.

4            (WHEREUPON, a certain document

5            was marked D'Amico Deposition

6            Exhibit No. 34, for identification,

7            as of 11/28/06.)

8            (WHEREUPON, the document was

9            tendered to the witness.)

10        MR. ZWICKER:  The record should reflect that

11    before the witness is Exhibit No. 34, which is a

12    series of e-mails between Diane D'Amico and Lise

13    Loberg and others.

14    BY MR. ZWICKER:

15        Q.    Could you review this chain of e-mails,

16    Ms. D'Amico, and let me know when you're done.

17        A.    Okay.

18        Q.    Just looking at the e-mail dated May

19    25, 2001 at 3:01 p.m., that's an e-mail from you

20    to Diane Bronson with a CC to Lise Loberg, right?

21        A.    Yes.

22        Q.    And the subject is ABT-518 tox, right?

23        A.    Correct.

24        Q.    And tox stands for toxicology, correct?

1    A.    Right.

2    Q.    You write:  "Diane, can Lise proceed

3    with any of the ABT-518 activities that were

4    previously put on hold, (i.e., very long chain

5    fatty acid sample analysis from the six-week rat

6    study and histopath from the three-month rat

7    study?"  I read that correctly, didn't I?

8    A.    Yes.

9    Q.    Does this refresh your recollection

10    that there had been a hold placed on toxicology

11    studies at times prior to May 25, 2001?

12    A.    No.

13    Q.    But you would have no reason to dispute

14    that such a hold was placed on those studies,

15    right, based on what you wrote?

16    A.    Based on what's here, asking on Lise's

17    behalf, it seems like there were activities that

18    were on hold related to toxicology.

19    Q.    In fact, I think you testified earlier

20    that the only toxicology studies that were ongoing

21    were the six-week rat study and the three-month

22    rat study; is that right?

23    A.    Those were referenced in one of the

24    meetings, but I don't know if those are the only

D'Amico, Diane (Vol. 2) (Linked)  11/28/2006  9:06:00 AM

1    BY MR. ZWICKER:

2        Q.   You thought Abbott was acting

3    appropriately with respect to the development of

4    this compound, right?

5        A.   I don't recall that we weren't, so I

6    guess yes.

7            (WHEREUPON, a certain document

8            was marked D'Amico Deposition

9            Exhibit No. 35, for identification,

10           as of 11/28/06.)

11           (WHEREUPON, the document was

12           tendered to the witness.)

13       MR. ZWICKER:  The record should reflect that

14   before the witness is D'Amico Exhibit No. 35,

15   which is an e-mail from Diane Bronson to Diane

16   D'Amico re ABT-518 tox.

17   BY MR. ZWICKER:

18       Q.   And Diane Bronson writes to you:  "I

19   wouldn't authorize it just yesterday.  Bob and

20   Perry are working on some presentation for MMPI to

21   the big dogs.  I'll forward it to you.  If you

22   want to talk to Bob and see if he knows anything

23   new, have at it.  I'll forward the presentation.

24   Diane."

1        Did I read that correctly?

2    A.   Yes.

3    Q.   Now, fair to say this is an e-mail from

4  Diane Bronson instructing you not to authorize

5  Lise Loberg to recommence her toxicology study?

6    A.   It appears to be, yes.

7    Q.   Who is Bob?

8    A.   Robert Hansen.

9    Q.   What did he do?

10   A.   He was in operations.  He also would --

11  like he did like financial -- like the financial

12  operations end of things.

13   Q.   And Perry is Perry Nisen?

14   A.   Yes, Perry Nisen, uh-huh.

15   Q.   There is a reference here for a

16  presentation for MMPI to the big dogs.

17       Who are the big dogs?

18   A.   Upper management.

19   Q.   Who in your mind was upper management?

20   A.   People above Perry I guess.

21   Q.   Did you get a copy of the presentation

22  for the big dogs from Diane Bronson?

23   A.   I don't recall.

24   Q.   Did you have a conversation with Bob

# PART 7

D'Amico, Diane (Vol. 2) (Linked)  11/28/2006  9:06:00 AM

1      A.   I don't recall if I took notes for this

2   meeting or not.

3            (WHEREUPON, a certain document

4            was marked D'Amico Deposition

5            Exhibit No. 41, for identification,

6            as of 11/28/06.)

7            (WHEREUPON, the document was

8            tendered to the witness.)

9       MR. ZWICKER:  The record should reflect that

10   before the witness is D'Amico Exhibit No. 41,

11   which is the agenda for the MMPI monthly meeting

12   for April 12, 2001.

13   BY MR. ZWICKER:

14      Q.   Ms. D'Amico, could you review the

15   document and let me know when you're done?

16      A.   Okay.

17      Q.   You recognize the handwriting on this

18   document?

19      A.   Yes.

20      Q.   Whose is it?

21      A.   Mine.

22      Q.   Is all the handwriting on this document

23   yours?

24      A.   Yes.

D'Amico, Diane (Vol. 2) (Linked)  11/28/2006  9:06:00 AM

1        Q.    Does this refresh your recollection

2    that you were the note taker at the April 12, 2001

3    MMPI Working Group meeting?

4        A.    No.

5        Q.    But you must have been, right?

6        MR. LORENZINI:  Objection.

7    BY THE WITNESS:

8        A.    It appears as if I took notes during

9    the meeting.

10   BY MR. ZWICKER:

11       Q.    What did you do with these notes after

12   you took them?

13       A.    It depends.

14       Q.    On what?

15       A.    Whether I'm tasked with issuing the

16   meeting minutes or not.

17       Q.    If you weren't tasked with the meeting

18   minutes, what would you have done with your notes?

19       A.    Filed them in a drawer.

20       Q.    Who would have prepared the meeting

21   minutes?

22       A.    Potentially one of the other team

23   members.

24       Q.    Based on what notes?

D'Amico, Diane (Vol. 2) (Linked)  11/28/2006  9:06:00 AM

1    A.   Their own.

2    Q.   You testified earlier that there was a

3  primary note taker at these events, didn't you?

4    A.   Typically to issue the meeting minutes

5  someone is tasked with taking the notes, yes.

6    Q.   So as the person tasked with taking the

7  notes, you would have been the person tasked with

8  typing the minutes, right?

9    A.   If somebody was to issue the meeting

10  minutes, that person would have had to take notes.

11    Q.   You took notes for this meeting?

12    A.   Yes, but any meeting attendees could

13  have jotted notes on the agenda if they were going

14  along, but I don't recall if I was specifically

15  tasked with issuing the meeting notes following

16  this particular meeting.

17    Q.   Would you have provided your notes to

18  the person tasked with taking the meeting minutes?

19    A.   I may have if requested.

20    Q.   Do you have any recollection of

21  situations where you took notes at this level of

22  detail where somebody else prepared the minutes?

23    A.   One of other CRA's on the project that

24  were learning, Paige Gjalstan, sometimes put out

1    A.   None of the names listed here would

2    appear to be that, but, again, that's not an

3    attendee list, who was present.  It's just who the

4    speakers were.

5    Q.   Do you have any recollection of those

6    present at this meeting other than those listed on

7    the first page of this document?

8    A.   No, I don't.

9    Q.   Moving to the second line you say and

10   tell me if I've read this right:  "Jeff wants to

11   kill this.  ASCO results neutral dash negative; no

12   plus."

13       Did I read that right?

14   A.   Yes, except the plus really stands for

15   like there is no positive, no positive results at

16   ASCO.

17   Q.   When you wrote "Jeff wants to kill

18   this," you meant Jeff Leiden, right?

19   A.   Yes.

20   Q.   And the second part of the sentence I

21   read says:  "ASCO results neutral, negative, no

22   positive," right?

23   A.   Correct.

24   Q.   When you wrote this, what you meant to

# PART 8

D'Amico, Diane (Vol. 2) (Linked)  11/28/2006  9:06:00 AM

1    say was Jeff Leiden wants to kill this

2    irrespective of whether the ASCO results were

3    neutral, negative or positive?

4        MR. LORENZINI:  Objection.

5    BY THE WITNESS:

6        A.   That's actually not how I read this.

7    BY MR. ZWICKER:

8        Q.   How do you read this?

9        A.   I read it starting with the sentence

10   before Perry planned to kill if Leiden says no go.

11   So he hasn't said no go so there is the

12   possibility he may or may not, and then Jeff wants

13   to kill this basically if the ASCO results are

14   neutral to negative and there is no positive

15   results and then further on there is subsequent

16   possible kill scenarios.

17       Q.   Who was reporting on Jeff Leiden's

18   position regarding the development of 518?

19       A.   I don't recall.

20       Q.   The continuation of your handwriting

21   lays out various options; do you see that?

22       A.   Yes.

23       Q.   Let's start with option zero, do you

24   see that?

1    A.    I can't speak on behalf of Abbott.

2            (WHEREUPON, a certain document

3            was marked D'Amico Deposition

4            Exhibit No. 43, for identification,

5            as of 11/28/06.)

6            (WHEREUPON, the document was

7            tendered to the witness.)

8        MR. ZWICKER:  The record should reflect that

9    before the witness is D'Amico Exhibit No. 43,

10   which is a MMPI monthly meeting agenda for a

11   meeting on June the 7th, 2001.

12   BY MR. ZWICKER:

13       Q.    Ms. D'Amico, would you review it and

14   let me know when you're done?

15       A.    Sure.  Okay.

16       Q.    Do you recognize the handwriting on

17   this document?

18       A.    Yes.

19       Q.    Whose is it?

20       A.    Mine.

21       Q.    All of it?

22       A.    Yes.

23       Q.    So this is now the third agenda where

24   you were the note taker; is that right?

1      MR. LORENZINI:  Objection.

2    BY THE WITNESS:

3      A.   I took notes at this meeting, but I

4    don't know if I was tasked with issuing the

5    meeting minutes for this meeting.

6    BY MR. ZWICKER:

7      Q.   Okay.  But we looked at notes from

8    March 8th and we looked at notes from April 12th

9    and now we've looked at notes from June the

10   seventh and you were the note taker for all three,

11   correct?

12     MR. LORENZINI:  Objection.  Asked and

13   answered.

14   BY THE WITNESS:

15     A.   I took notes at all the meetings.  That

16   doesn't mean I would be the assigned note taker

17   for issuing the minutes.

18   BY MR. ZWICKER:

19     Q.   That wasn't my question.

20        My question was you took the notes for

21   all three of these meetings?

22     A.   I took notes for the meetings.  I don't

23   know if I was the note taker.

24     Q.   Were you the person that took notes at

**8**

D'Amico Deposition Exhibit 8


P's Exhibit O

**MMPI WORKING GROUP MEETING MINUTES**

**3/8/01**

**Objective: Overall Project Update**

Clinical Update                                                                    *Azmi Nabulsi & Diane*
*D'Amico*

- A brief summary of the Leiden Portfolio Review held 3/7/01 – 3/9/01 was presented. Questions were raised regarding ABT-518 since several competitor MMPIs have been discontinued. We will proceed with the phase I trial. Pre-clinically our compound differs from the competition. In addition, the competitors may have dosed too low, may not have selected the proper tumor stages, and skipped Phase II development.
- The two M00-235 sites were initiated in February. Drug was shipped to both sites and the first patient is expected 3/12/01.

Toxicology Review                                                                                    *Lise*
*Loberg*

- An update of the two current toxicology studies was presented (see attached slides – Tox 030801A.xls and Tox 030801B.doc)
- Preliminary results from the three-month oral toxicity study in rats were discussed. Changes were seen in the high dose group (300 mg/kg) including decreased body weight, decreased food intake, dehydration and alopecia.
- The first three-month necropsy is planned for 4/10/01.
- The in-life phase of the six-week study has been completed. The process of integrating the mitochondrial function results with clinical pathology and histopathology has been initiated.

PK                                                                              *Tawakol El-Shourbagy*

- The PK method validation process at Abbott is complete. NKI has not completed their PK method validation process to date. A teleconference will be scheduled within the next few days to determine the status of the PK method validation process at NKI.
- With the PK method validation complete, internal efforts will be directed towards finishing re-analysis of metabolites from toxicology studies conducted last fall; this work is needed for the IND.

PARD                                                                                    *John Cannon*

- An update of clinical supplies was presented (see attached slides – PARD 030801.doc).
- The first 200mg capsule campaign was completed by MDS Pharma Services in Tampa FL. A lower than expected yield rate of 73% resulted in the production of 4,870 acceptable capsules, of which 4,140 capsules will be sent for clinical supply. The low yield rate may be due in part to the larger than expected standard deviation variation for the empty capsules and to the process itself. PARD is looking into the exact cause(s).
- The rejected capsules and recovered bulk drug (deemed experimental) will be used for formulation and process development work. A rework step can be added to future runs to improve yield.

Highly Confidential                                                                    ABBT300143



**MMPI WORKING GROUP MEETING MINUTES**

**3/8/01**

- The next 200mg capsule campaign is planned for June (10,000 capsules, 2 kg bulk drug). Based on the Phase I study in the Netherlands and the IND study design, the possibility of alternate capsule size (i.e., 50 or 100mg) has been discussed. PARD needs a 12-week lead-time from the time of dosing if the capsule size changes from the originally planned 200mg.
- The six-month stability data on 25mg capsules stored in bottles at 40C/75% RH showed some pitting (etiology unknown). At this time, there were no concerns with capsules stored at room temperature.

Highly Confidential

ABBT300144

**9**

D'Amico Deposition Exhibit 9


P's Exhibit S

MAY. 31. 2005  11:34AM                                                    NO. 3057   P. 15



Diane L D'Amico                    To: jbm@nki.nl
03/12/01 10:08 PM                  cc: j.maakara@telescan.nki.nl, kM@telescan.nki.nl, Jim
                                   Loonsen/HOOFDDORP/AA/ABBOTT@ABBOTT, Elso
                                   Meijer/HOOFDDORP/AA/ABBOTT@ABBOTT, Willy
                                   Jansen/HOOFDDORP/AADD/ABBOTT@ABBOTT, Todd J
                                   Jarus/LAKE/PPRD/ABBOTT@ABBOTT, Paige
                                   Gjesten/LAKE/PPRD/ABBOTT@ABBOTT, Lisa V
                                   Rountree/LAKE/PPRD/ABBOTT@ABBOTT, Azmi A
                                   Nabulsi/LAKE/PPRD/ABBOTT@ABBOTT, Diane C
                                   Bronson/LAKE/PPRD/ABBOTT@ABBOTT, Robert
                                   Hansen/LAKE/PPRD/ABBOTT@ABBOTT
                            Subject: M00-235 Update

Dear Professor Schellens,

As you know, we have been instructed to halt the M00-235 study.  I assume that you know that the
AZU enrolled a patient into the study today.

At this time, we have instructed the AZU to proceed with the M00-235 patient per the protocol until
they hear from us otherwise.  We hope to have further instructions by tomorrow (Tuesday, 13Mar01).

We ask that you refrain from enrolling any additional patients at your site at this time.

Thank you for your patience and understanding in this matter.

Best regards,

Diane

PLAINTIFF'S
EXHIBIT
DAm:co 9
10 26 06

CONFIDENTIAL

ABBT 0033104

10

D'Amico Deposition Exhibit 10


P's Exhibit AA

MAY. 31. 2005  11:32AM                                              NO. 3057   P. 7



Diane L. D'Amico
19-03-2001 15:23

To: Willy Jansen/HOOFDDORP/ADD/ABBOTT@ABBOTT
cc: Else Meijer/HOOFDDORP/PI/ABBOTT@ABBOTT, Jim
Looman/HOOFDDORP/PI/ABBOTT@ABBOTT, Paige
Gjelsten/LAKE/PPRD/ABBOTT@ABBOTT, Todd J
Jansel/LAKE/PPRD/ABBOTT@ABBOTT

Subject: Re: M00-235 Update

Dear Willy,

Our original feedback from Jim's early discussions with AZU indicated that the patient had been enrolled and the site would continue with the patient per the protocol. I sent an email to AZU on 12Mar01 confirming our approval that they continue per the protocol until they heard from us otherwise. Azni spoke with Zonnenberg and Voest mid-late last week to notify them that the hold had been lifted.

Based on these correspondences, I assumed Beerepoot would treat the patient per the protocol. If we lost one PG sample, it is not the end of the world. We just need to document what happened.

As Jim mentioned, Azni is planning on meeting with both Voest (25Mar01) and Schellens (26Mar01) at AACR in New Orleans.

Best regards,

Diane

From: Willy Jansen on 03/19/2001 08:32 AM

From:    Willy Jansen on 03/19/2001 08:32 AM
To:      Diane L. D'Amico/LAKE/PPRD/ABBOTT@ABBOTT
cc:      Else Meijer/HOOFDDORP/PI/ABBOTT@ABBOTT, Jim
         Looman/HOOFDDORP/PI/ABBOTT@ABBOTT, Paige Gjelsten/LAKE/PPRD/ABBOTT@ABBOTT,
         Todd J Jansel/LAKE/PPRD/ABBOTT@ABBOTT
Subject: Re: M00-235 Update

Dear Diane,

I'm very glad to hear that the hold for this study has been lifted. I have tried to reach the site to find out how the situation is after the dosing of last week. Unfortunately, dr. Beerepoot is on vacation and I don't have any further information yet from the site. Did the venture spoke with Prof. Voest about the enrollment of this patient? I know that the PG samples has been lost due to hold of the study. Has it been agreed with the site, that all assessments for this patient should be performed as described in the protocol? Please keep me informed about the arrangements with the sites regarding this situation. Thanks for your help.

Kind regards,

Willy
Diane L. D'Amico



Diane L. D'Amico
03/16/01 07:20 PM

To: Else Meijer/HOOFDDORP/PI/ABBOTT@ABBOTT, Willy
Jansen/HOOFDDORP/ADD/ABBOTT@ABBOTT, Jim
Looman/HOOFDDORP/PI/ABBOTT@ABBOTT
cc: Paige Gjelsten/LAKE/PPRD/ABBOTT@ABBOTT, Todd J
Jansel/LAKE/PPRD/ABBOTT@ABBOTT

Subject: M00-235 Update

Dear Jim, Willy and Else,

What a long week this has been! Not only was this week long, but it was filled with ups and downs. Todd, Paige and I came in Monday morning to learn that the MMPI project had been put on hold. The

CONFIDENTIAL

ABBT 0033096



PLAINTIFF'S
EXHIBIT
DAmico10
10-20-06

MAY. 31. 2005   11:32AM                                        NO. 3057   P. 8

next day, we learned that the hold had been lifted.  I just hope that next week will be a little less eventful.  : )

On a high note, one patient was enrolled into the study.  Congratulations!  As you can imagine, we (the MMPI Team) are very excited about pulling out in front of the TSP Team (all in good fun).  We haven't heard any news on the patient, so we assume that "no news is good news".  Presumably the patient was released today.

Did Dr. Scheltens receive his Board of Director Approval?  I know it was expected on the 14th, but we haven't received anything to indicate that the approval was granted.

A teleconference is scheduled with Dr. Hilde Rosing next week Tuesday to discuss the status of their PK validation.  The Abbott PK Team did successfully validate their PK method, so our back-up is in place should it be needed.  We are still optimistic that Dr. Rosing's team will validate soon and be ready for processing the PK samples.

Dr. Beerepoot sent some results to me this week from his PD validation work.  The Abbott PD team is reviewing what Dr. Beerepoot sent.  Dr. Beerepoot reported that he would have more results this week.  So, this is moving along slowly but surely.  No need to push at this time.

That seems to be it for this week.  Please keep us posted on any enrollment activities next week.

Kindest regards,

Diane

P.S.  Both Todd and I will be out the entire week of March 28, so please direct all issues to Paige.

CONFIDENTIAL

ABBT 0033097

27

D'Amico Deposition Exhibit 27


P's Exhibit N

**MMPI MONTHLY MEETING AGENDA**
3/8/2001, 10:30-12:00, AP6A-1A
Objectives: To Review MMPI Project Status

I. **Clinical** – A. Nabulsi / D. D'Amico
- Leiden portfolio review    3/7
- M00-235 sites initiated 2/14 & 2/15
- Drug shipped 2/28 & 3/1
- First patient: Monday (3/12)
- IND timeline being revised (Mtg 3/9)

II. **Toxicology** – K. Loberg
- 6 week rat study completed
- 3 month rat – 1st necropsy 4/10/01

III. **PK** – B. Carr/ M. Rieser / Tawakol
- PK method validation in human plasma is complete for all 7 analytes.
- Finishing re-analysis of metabolites from toxicology studies (last fall).

IV. **PARD** – J. Cannon / T. Garavalia
- Capsule update: Feton run at MDS Pharma) completed; 200mg capsules: 73% yield
- Next finishing run scheduled for 6/01

V. **CAPD** – S. Wittenberg
- No Update

VI. **Discovery** – S. Davidson
- No Update

VII. **Metabolism** – D. Hickman
- No Update

VIII. **Next Team Venture Meeting**
When:    Thursday, April 12, 2001
Where:   AP6A-1A
Time:    10:30 – 12:00

*Handwritten notes (right column):*

- B.H.  PRE-IND Timeline
- TJ  PK Validation
✱ Act if PD data will ever be submitted
NOTES  If so, audit.

① How can we continue if competition is dropping out? Pre-clinical differ. Cmod + low doses, mono - NA? Comp skipped Ph II, not right stage/guidelines
→ Will look @ ASCO & AACR for comp info
→ Will know in...
Will look @ abstracts soon

→ Vanderbilt teleconference on 3/12 to discuss the IND study
✱ Find out Gander type for 1st patient

② 3 months:
↑ high dose group ↓ body weight gain, dehydration, alopecia; similar results to previous study
6 wk: Interim dose, necropsy all assemblies data on mitochondrial assays; high dose group did recover body weight and ↑ food consumption after off drug
• Is there a CNS involvement? Bill Bandmen is concerned w/ ↓ body weight; possibly not just 2° ↓ Food.

③ Call site w/ Matt / Tawakol to discuss status their validation. Needed for IND. When will be available? Bill Bandmen on top of it.

④ – Standard Deviation of empty capsule > than expected
– Dog behaved differently when filling the capsules
– 300 rejects → Use for development work. Must be designated "experimental". Next time – well incorporate rework steps for GMP run.
– June run @ MDS @ 2" IDC facility booked
– ALERT (core stability update, fittings, drug in bottle...

Confidential

ABBT0045253


PLAINTIFF'S EXHIBIT
D'Amico 27
11/28/06

**32**

D'Amico Deposition Exhibit 32


P's Exhibit 3



Diane L
D'Amico /LAKE/PPRD/ABBO
TT
03/12/2001 02:59 PM

To   l.v.beerepoot@azu.nl

cc   b.zonnenberg@azu.nl, E.E.Voest@azu.nl,
aepping@digd.azu.nl, paige.m.gjelsten@abbott.com, Todd
J Janus/LAKE/PPRD/ABBOTT@ABBOTT, Azmi A
Nabulsi/LAKE/PPRD/ABBOTT@ABBOTT, Jim
Looman/HOOFDDORP/AI/ABBOTT@ABBOTT, Willy
Jansen/HOOFDDORP/ADD/ABBOTT@ABBOTT, Else
Meijer/HOOFDDORP/AI/ABBOTT@ABBOTT, Diane C
Bronson/LAKE/PPRD/ABBOTT@ABBOTT, Robert
Hansen/LAKE/PPRD/ABBOTT@ABBOTT, Lori V
Rountree/LAKE/PPRD/ABBOTT@ABBOTT

bcc

Subject   M00-235 Patient

Dear Laurens,

Please proceed with the M00-235 patient per the protocol until you hear from us otherwise.  We hope to
have further instructions for you tomorrow (Tuesday, 13Mar01).

We ask that you refrain from enrolling any additional patients at this time.

Thank you for your patience and understanding in this matter.

Best regards,

Diane



PLAINTIFF'S
EXHIBIT
D'Amico  32
11/28/06

CONFIDENTIAL
ABBT0059464

34

D'Amico Deposition Exhibit 34


P's Exhibit AP



**Diane L.
D'Amico /LAKE/PPRD/ABBO
TT**

05/25/2001 03:52 PM

To  Lise I Loberg/LAKE/PPRD/ABBOTT@ABBOTT
cc  Diane C Bronson/LAKE/PPRD/ABBOTT@ABBOTT
bcc
Subject  Re: ABT-518 Tox

Lise-

Maybe you read the email below wrong. Can we wait until Diane says Yes/No?  I don't want you to start
something that is still on hold.

Thanks,

Diane

Lise I Loberg



**Lise I Loberg**

05/25/01 03:23 PM

To:  Diane L D'Amico/LAKE/PPRD/ABBOTT@ABBOTT
cc:  Diane C Bronson/LAKE/PPRD/ABBOTT@ABBOTT
Subject:  Re: ABT-518 Tox

Will do!
Diane L D'Amico



**Diane L D'Amico**

05/25/01 03:01 PM

To:  Diane C Bronson/LAKE/PPRD/ABBOTT@ABBOTT
cc:  Lise I Loberg/LAKE/PPRD/ABBOTT@ABBOTT
Subject:  ABT-518 Tox

Diane,

Can Lise proceed with any of the ABT-518 activities that were previously put on hold (i.e., very long chain
fatty acid sample analysis from the 6-week rat study and histopath from the 3-month rat study)?

Diane



CONFIDENTIAL
ABBT0061200

35

D'Amico Deposition Exhibit 35


P's Exhibit AQ



**Diane C Bronson/LAKE/PPRD/ABBOTT**
05/28/2001 08:42 PM

To  Diane L D'Amico/LAKE/PPRD/ABBOTT@ABBOTT
cc
bcc
Subject  Re: ABT-518 Tox

I wouldn't authorize it just yet. Bob and Perry are working on some presentation for MMPI to the "big dogs". I'll forward it to you. If you want to talk to Bob and see if he knows anything new have at it I'll forward the presentation.

diane



CONFIDENTIAL
ABBT0057052

**41**

D'Amico Deposition Exhibit 41


P's Exhibit MI

**MMPI MONTHLY MEETING AGENDA**
**4/12/2001, 10:30-12:00, AP6A-1A**
**Objectives: To Review MMPI Project Status**

Anne
Hagey — *Radiologist*
MD

**NOTES**

I. **Toxicology** – L. Loberg

- Results from 6 week rat study
- 3 month rat – (RX phase ends this week)

II. **PK** – B. Carr/ M. Rieser

- No update

III. **PARD** – J. Cannon/ T. Garavalia/ S. Wittenberger

- Capsules analysis, Feton run- 101% against claim
- Process research is making additional drug

IV. **Discovery** – S. Davidson

- No Update

V. **Metabolism** – D. Hickman

- Rat ADME study update

VI. **Clinical**– D. D'Amico

- PK method validation update- Netherlands -Day 1 PK samples from 2 patients collected
- 2 patients enrolled, 1 active
- 2 patishts scheduled to enroll 4/23
- IND document collection continues

**Next Team Venture Meeting**

When: Thursday, May 10, 2001
Where: AP6A-1A
Time: 10:30 – 12:00

ABBT0045243



PLAINTIFF'S
EXHIBIT
D'Amico 41
11/28/06

sulphonic acid → see in rat tissue extracts now – wasn't seen
- presume its sulfonic acid (metabolite that has long ½ life)        before
- why didn't we see sulfonic acid?
We didn't see it in monkeys, etc. → only seeing Ar in rats so far

∴ should w/ new HPLC system to re-analyze rat & monkey
            tissue & plasma samples

In Plasma:  518 & sulphonic acid

In Feces: see others

✳ Should I Δ the protocol to have a w/o for sintrom
        & anti – coagulants

Post Meeting
    Strategy: Borge's Plan to Kill if Leiden Say ~~~~ No Go
            Jeff wants to kill this ; ATCO results neutral – negative; No ⊕

        Opt Ø   KILL – Hard Kill
Shelf  Opt 1   Stop everything – try to out-license (sell) ; keep doing stability, etc pt activity
       Opt 2   Put it on pause until  ???                                          confirm
      Opt 3   Offer pre-emptive plan for development → show how it should/doesn't
            Move forward (Borge's choice)                                        show
                                                                            benefit
Put a plan
in place –                  ↘     Augeron – Add on + therapy
knowing what                             Proximal disease vs advanced disease
they are                                 ? joint effects ?
& what
I will do                 Ⓑ explore non-oncologic indications
                          Ⓒ how do we study proximal vs advanced

                        SAFETY
        If we out his          Ⓐ join  – should answer in Ph I
        non-onc needs          join       ↳ prohibit chronic
        (arthritis & prostate?)              drug administration

                        Activity  – can answer in another Ph I study
Perry wants to give         PD → Intratumor tissues in
Jeff a white               II study   melanoma & head & neck
paper now
                                    xygomorphy . approach
                            ↓                    easily measured
May even work      ←     locally invasive disease
by itself         Creativity/FP  ⓐⒸ • ⒷⒺ Ar, DCIS     high level
                  bias?          early bladder

Page ②

Other possibilities

Non Cancer :    MS         hepatic fibrosis    IPF =
                Fibrosis ── IPF failure     easy to
                polif ⊞ retinopathy       measure

                                          very attractive
                                          field
                                            ↓
Present Plan to John/Jeff now (or May 4, 5th)    "minimodest
                                              franchise"

Nobody has ever gotten approval
for locally invasive disease.
History weak

Marimistat works in MS models. Does ours? Not known.
Can we do some pre-clinical work?

Stan: will give list of non-cancer to Laurie & Perry to
build strategies for both

        Finish Safety Study = $X   Spend
        If we move onto after  ── Gain $ X
        Show Benefit

"Enthusiasm is inversely proportional to knowledge" — Perry

Confidential                                    ABBT0045245

**43**

D'Amico Deposition Exhibit 43


P's Exhibit AY

**MMPI MONTHLY MEETING AGENDA**
6/7/01, 10:30-12:00, AP5A-1A
**Objectives: To Review Activities Necessary to Close Down MMPI Program**

I. **Toxicology** – L. Loberg
   - Ongoing projects
   - Plans/timelines for concluding the project

II. **PK** – B. Carr/ M. Rieser
   - Ongoing projects
   - Plans/timelines for concluding the project

III. **PARD** – J. Cannon/ T. Garavalia/ S. Wittenberger
   - Ongoing projects
   - Plans/timelines for concluding the project

IV. **Discovery** – S. Davidson
   - Ongoing projects
   - Plans/timelines for concluding the project

V. **Metabolism** – D. Hickman
   - Ongoing projects
   - Plans/timelines for concluding the project

VI. **Clinical** – D. D'Amico
   - Ongoing projects
   - Plans/timelines for concluding the project

VII **Regulatory**
   - Ongoing projects
   - Plans/timelines for concluding the project

**Next Team Venture Meeting**

   When:   To be determined

NOTES

Confidential

ABBT0045226



PLAINTIFF'S EXHIBIT
D'Amico 43
11/28/06

Diane D'Amico

HMPI Mentng Mtg                                    6/7/01

Azmis Intl

Ø Funding
Halt All Activities
Patients will be able to continue (those already enrolled)
Enrollment already on hold 2° SAE
If we feel it is safe for other pt to continue — we will
        If not, we will stop all pt
Management concern   2° Class as a whole   3° safety = -rate
                  ↑ budget prioritization

Plan:
    3 active patients :  May go to NCI & sam
    If IF for 25 & 50 mg   sites were close to 1-3 mos/fu
    [Potential for collaboration] ← Ø include

AE:  Dropped Ca, wt-loss, memory, nephrectomy titanic, has a
Patient   hysterectomy (water), liver function fine @ start of
1069    study, creatinine started ↑. They are trying to
    r/o other causes.

Ø communicated to sites re: long-term NDGO decision


# Inv Brochure Revision = YES

Confidential                                    ABBT0045227