UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY, | CIVIL ACTION NO. 05-11150-DPW |
| Plaintiffs, | |
| v. | |
| ABBOTT LABORATORIES, | |
| Defendant. | |

## ABBOTT'S DEPOSITION DESIGNATIONS AND COUNTER DESIGNATIONS FOR JAMES THOMAS,

Defendant Abbott Laboratories ("Abbott") respectfully submits the attached deposition

designations and counter-designation for the April 13, 2007 deposition of James Thomas,

Statistician (ABT-594).

Dated:  February 18, 2008

Respectfully submitted,

ABBOTT LABORATORIES

By:  __/s/ Eric J. Lorenzini_____
     Eric J. Lorenzini

Jeffrey I. Weinberger (*pro hac vice*)
Gregory D. Phillips (*pro hac vice*)
Eric J. Lorenzini *(pro hac vice)*
Ozge Guzelsu *(pro hac vice)*
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth
Floor
Los Angeles, CA  90071-1560
Tele:  (213) 683-9100

and

Peter E. Gelhaar (BBO#188310)
Michael S. D'Orsi (BBO #566960)
DONNELLY, CONROY &
GELHAAR LLP
1 Beacon St., 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880
peg@dcglaw.com
msd@dcglaw.com

*Counsel for Abbott Laboratories*

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 18, 2008.

Date: February 18, 2008.

/s/ Ozge Guzelsu

## James Thomas Deposition Designations

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 04/13/07 | Thomas, James | 5:10-6:1 | | | | | |
| 04/13/07 | Thomas, James | | | 6:21-7:18 | | | |
| 04/13/07 | Thomas, James | | | 7:21-10:4 | | | |
| 04/13/07 | Thomas, James | | | 10:10-12:2 | | | |
| 04/13/07 | Thomas, James | | | 12:18-13:1 | | | |
| 04/13/07 | Thomas, James | | | 13:9-13:17 | | | |
| 04/13/07 | Thomas, James | | | 13:24-14:23 | 1 | | Def. IT |
| 04/13/07 | Thomas, James | | | 17:3-17:8 | | | |
| 04/13/07 | Thomas, James | | | 17:20-19:8 | | | |
| 04/13/07 | Thomas, James | | | 25:2-25:4 | | | |
| 04/13/07 | Thomas, James | | | 25:7-25:12 | | | |
| 04/13/07 | Thomas, James | | | 27:5-27:7 | | | |
| 04/13/07 | Thomas, James | | | 27:11-27:24 | | | |
| 04/13/07 | Thomas, James | | | | | | |
| 04/13/07 | Thomas, James | 28:2-28:5 | 28:1-28:1 | | | | |
| 04/13/07 | Thomas, James | | | 36:19-36:22 | | | |
| 04/13/07 | Thomas, James | | | 37:19-37:22 | | | |
| 04/13/07 | Thomas, James | | | 42:6-42:19 | | | |
| 04/13/07 | Thomas, James | | | 44:1-44:18 | 5 | | 534 |
| 04/13/07 | Thomas, James | | | 59:8-59:15 | | | |
| 04/13/07 | Thomas, James | | | 61:1-61:9 | | | |

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 04/13/07 | Thomas, James | | 61:15-62:2 | | | | |
| 04/13/07 | Thomas, James | 62:3-63:4 | | | | | |
| 04/13/07 | Thomas, James | | | 121:11-121:19 | | | |
| 04/13/07 | Thomas, James | | | 158:16-159:19 | | | |
| 04/13/07 | Thomas, James | | | 180:14-180:20 | | | |
| 04/13/07 | Thomas, James | | | 213:23-214:21 | | | |
| 04/13/07 | Thomas, James | | | 257:8-259:15 | | | |
| 04/13/07 | Thomas, James | | | 266:1-266:9 | | | |

4496150.1

# Color Key to Deposition Designations

<span style="background-color: yellow">                         </span>**Designation by Plaintiffs**

<span style="background-color: blue">                         </span>**Counter Designation by Defendants**

<span style="background-color: green">                         </span>**Designation by Defendants**

Thomas, James (Linked) 4/13/2007 8:05:00 AM

1      THE UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF MASSACHUSETTS

3

4      JOHN HANCOCK LIFE INSURANCE        )

5      COMPANY, JOHN HANCOCK VARIABLE     )

6      LIFE INSURANCE COMPANY, and        )

7      MANULIFE INSURANCE COMPANY         )

8      (f/k/a INVESTORS PARTNER        ) Civil Action

9      INSURANCE COMPANY),            )    No.

10              Plaintiffs,    ) 05-11150-DPW

11           -vs-             )

12     ABBOTT LABORATORIES,           )

13              Defendant.    )

14

15        The videotaped deposition of JAMES THOMAS,

16     called as a witness herein for examination, taken

17     pursuant to the Federal Rules of Civil Procedure of

18     the United States District Courts pertaining to the

19     taking of depositions, taken before ROSANNE M.

20     NUZZO, a Notary Public within and for the County of

21     Will, State of Illinois, and a Certified Shorthand

22     Reporter of said state, at Suite 1300, Two North

23     LaSalle Street, Chicago, Illinois, on the 13th day

24     of April, A.D. 2007, at approximately 8:05 a.m.

1       A.   Okay.

2       Q.   If you need a break at any time, let us

3   know, and we'll try to accommodate you.

4       A.   Okay.

5       MR. ZWICKER:  Okay?

6          Greg, usual stipulations we've done so

7   far?

8       MR. PHILLIPS:  Yes.

9       MR. ZWICKER:  Okay.

10  BY MR. ZWICKER:

11      Q.   Mr. Thomas, where do you work?

12      A.   Abbott Laboratories.

13      Q.   What's your job there?

14      A.   I'm a manager in statistics.

15      Q.   How long have you had that job -- that

16  title?

17      A.   That title?  Two years, roughly.

18      Q.   What are your responsibilities as

19  manager of statistics?

20      A.   I am in charge of reviewing protocols,

21  reviewing case report forms, clinical physical

22  reports, helping design studies for clinical

23  trials in phase 2 and phase 3 studies of new

24  medications and to supervise other statisticians

1     who are working on my project.

2         Q.   In your present job, how many

3     statisticians do you supervise?

4         A.   Currently, four.

5         Q.   Who do you report to in your present

6     job?

7         A.   Yili Pritchet.

8         Q.   Spell it for the record.

9         A.   Y-i-l-i, P-r-i-t-c-h-e-t.

10        Q.   Is David Morris still employed at

11    Abbott?

12        A.   He is not.

13        Q.   You reported to him at some point,

14    didn't you?

15        A.   I did.

16        Q.   How many clinical trials are you

17    working on now?  Approximately?

18        A.   Oh.  Approximately, six.

19        Q.   Before you were manager of

20    statistics -- let me strike that.

21            You began as manager of statistics in

22    approximately 2005?

23        A.   Yes.

24        Q.   Before you were manager of statistics,

1    what was your job at Abbott?

2        A.    The same job, different title.

3        Q.    What was the title?

4        A.    Senior Statistician II, I believe.

5        Q.    Roman numeral II?

6        A.    That's correct.

7        Q.    How long did you hold that job?

8        A.    Approximately three years.

9        Q.    From 2002 to 2005?

10       A.    Approximately.

11       Q.    What were your responsibilities as

12   Senior Statistician II?

13       A.    The same as they are today.

14       Q.    In the 2002 to 2005 period, did you

15   report to David Morris?

16       A.    I do not recall the date that David

17   Morris stopped being my immediate supervisor.  It

18   was in that time frame.

19       Q.    Why did David Morris leave Abbott?

20       A.    I do not know.

21       Q.    What was your job at Abbott prior to

22   being Senior Statistician II?

23       A.    Senior Statistician I.

24       Q.    Makes sense.  What was the period you

1    held that job, ballpark?

2        A.   Probably around three years prior, just

3    starting --

4        Q.   So would you say --

5        A.   -- before my next promotion.

6        Q.   Sorry I cut you off.

7        A.   Sorry.

8        Q.   Finish your answer.

9        A.   Approximately three years prior to my

10   promotion to Senior Stats II.

11       Q.   So in the 1999 to 2002 time period?

12       A.   I believe that's correct.

13       Q.   And your responsibilities as Senior

14   Statistician I?

15       A.   Was to help clinical teams review

16   protocols, case report forms, clinical study

17   reports, design studies, program tables for

18   analysis.

19       Q.   Focusing on your responsibility as a

20   Senior Statistician I, how many people reported to

21   you?

22       A.   None.

23       Q.   You reported to David Morris at that

24   time, right?

1        A.    Yes.

2        Q.    While you were a Senior Statistician I

3    in the period 2000 to 2001, how many clinical

4    trials did you work on?

5        A.    I don't recall.

6        Q.    Approximately?

7        A.    What is the time frame?  I'm sorry.

8        Q.    Let's take 2000/2001.

9        A.    Approximately a dozen.

10       Q.    One of those was the clinical trial

11   known as M99-114, correct?

12       A.    That's correct.

13       Q.    You worked on the 99-114 study during

14   the period 2000/2001, right?

15       A.    Yes.

16       Q.    And during that time, you worked on

17   approximately ten or so additional clinical

18   trials?

19       A.    Yes.

20       Q.    When did you start at Abbott?

21       A.    1995.

22       Q.    From '95 to '99, what were your jobs

23   there?

24       A.    I was a statistician.

1      Q.    Is that a lower title than Senior

2      Statistician I?

3      A.    It was -- I'm sorry.  I would have

4      been hired -- I was hired as an Associate

5      Statistician I, promoted to Senior Statistician I.

6      Q.    Okay.  And that promotion was in '99,

7      right?

8      A.    I don't recall the exact date.  I'm

9      sorry.

10      Q.    Okay.  Before you worked at Abbott,

11      where did you work?

12      A.    Parexel International.

13      Q.    Can you spell that for the record.

14      A.    P-a-r-e-x-e-l.

15      Q.    What did you do there?

16      A.    I was a statistician.

17      Q.    How long were you employed there?

18      A.    Approximately three-and-a-half years.

19      Q.    '92 to '95?

20            Did you have any other jobs as

21      statistician before you worked at Parexel?

22      A.    No.

23      Q.    Can you give me your educational

24      background, beginning with college.

1    A.   I have a Master's and Bachelor's Degree

2    in Statistics from Brigham Young University in

3    Provo, Utah.

4    Q.   What year did you earn it?

5    A.   Which degree?

6    Q.   Let's start with the BA.

7    A.   I'm sorry.  I don't recall the -- the

8    dates.  It was a Bachelor's of Science.

9    I don't -- I'm sorry.  I don't recall the year of

10   graduation.

11   Q.   I guess everybody is getting older.

12        What about the MBA?

13   A.   I have a Master's of Science in MS.

14   Q.   What year did you earn that?

15   A.   I'm sorry.  I don't recall the year

16   that I graduated.

17   Q.   How old are you?

18   A.   Forty-six.

19   Q.   Your Master's in Science, did you have

20   any kind of specialty?

21   A.   Statistics.

22   Q.   Do you have any background in the

23   development of pharmaceutical compounds?

24   A.   Yes.

Thomas, James (Linked)  4/13/2007  8:05:00 AM

1    Q.   In connection with your work at Abbott?

2    A.   Yes.

3    Q.   Other than the work you do in

4    connection with clinical trials on statistics,

5    what work do you do at Abbott presently regarding

6    the development of clinical trials?

7    A.   Could you restate your question?

8    Q.   Yeah.  That's not a very good one.

9        Do you do work with respect to the

10   development of clinical compounds other than with

11   respect to statistics?

12   A.   Again, I don't understand your

13   question.

14   Q.   Other than your work in connection with

15   clinical trials at Abbott, do you do anything else

16   there?

17   A.   No.

18   Q.   In connection with your work on

19   clinical trials, you work with persons at Abbott

20   on the regulatory side, fair?

21   A.   Yes.

22   Q.   On the commercial side, right?

23   A.   Yes.

24   Q.   And on the development side?

1    A.    Yes.  I'm in development.

2    Q.    When did you begin working on the

3    M99-114 study?

4    A.    I don't recall.

5    Q.    What did you do with respect to the

6    M99-114 study?

7    A.    Could you be more specific?  I'm not

8    understanding your question.

9    Q.    What were your responsibilities with

10    respect to the clinical trial known as M99-114?

11    A.    Consulting with the clinical team in

12    development of the protocol, reviewing the case

13    report forms as they were developed, supervising

14    production of analysis for the final study report,

15    consulting with the clinical team ongoing as

16    patients were enrolled, and writing the clinical

17    study report at the end of the -- the trial.

18    Q.    Did you also conduct analyses of the

19    data regarding patients during the study itself?

20    MR. PHILLIPS:  Objection.

21    BY MR. ZWICKER:

22    Q.    Let me ask you a different question.

23    A.    Thank you.

24    Q.    In connection with your

1    responsibilities on 99-114, did you also analyze

2    the data from the clinical science before the

3    study was unblinded?

4        A.   No.

5        Q.   Did you -- did you conduct any analyses

6    of how patients were doing on the study before the

7    study was unblinded?

8        MR. PHILLIPS:  Objection, vague.

9    BY THE WITNESS:

10       A.   In the sense that I would use

11   "analyze," no.

12   BY MR. ZWICKER:

13       Q.   What word would you use?

14       A.   Summarize.

15       Q.   Did you draw conclusions from the data

16   you were reviewing before the study was unblinded?

17       A.   Before it was unblinded?

18       Q.   Yeah.

19       A.   No.

20           (WHEREUPON, a certain document was

21            marked Thomas Deposition Exhibit

22            No. 1, for identification, as of

23            4/13/07.)

24       MR. PHILLIPS:  Joe, we're starting with a new

1    technology, anything is possible, as reproducing

2    pictures and documents.

3        Q.   Mr. Thomas, you were the person that

4    helped create the objectives for the 99-114 study,

5    right?

6        A.   No.

7        Q.   You had some role in them?

8        A.   Objectives?  No.

9        Q.   Let me read you this sentence.  It

10   says:

11          "This study is designed to enroll

12          320 patients (80 patients in each

13          treatment group)."

14          You see that?

15       A.   I do.

16       MR. PHILLIPS:  I think you left out the

17   "approximately" before the "320."

18       MR. ZWICKER:  I'll read it again.

19   BY MR. ZWICKER:

20       Q.   "This study is designed to enroll

21          approximately 320 patients (80 patients

22          in each treatment group).  This sample

23          size will allow for the detection of a

24          .46 effect size in the average Daily

1      Pain Intensity score" from "change from

2      baseline to the final evaluation

3      between any... treatment group and

4      placebo at .05 (two-tailed Type I error)

5      level with at least 80 percent power."

6         Did I read that right?

7      A.   No.

8      Q.   How did I read it wrong?

9      A.   You left a couple words out.

10     Q.   Mr. Thomas, is this your understanding

11  of the design of the M99-114 study?

12     A.   No.  This is not the design.  This is

13  the sample size calculation.

14     Q.   But it's not just the sample size

15  calculation.  It's also the intent to achieve a

16  .46 effect, right?

17     A.   No.

18     Q.   What is it?

19     A.   This is the sample size used to power

20  the study.

21     Q.   What role did you have in coming up

22  with the sample size used to power the study?

23     A.   Worked with the clinical team on

24  different scenarios and ran the calculation to

1    come up with the sample size that was based on the

2    assumptions that were discussed with the clinical

3    team.

4        Q.   What work did you do with the clinical

5    team to come up with the sample size?

6        A.   Met with them.

7        Q.   What else?

8        A.   Reviewed pertinent journal articles.

9        Q.   Whose decision was it to come up with a

10   sample size of 80 patients in each treatment

11   group?

12       A.   I don't recall.

13       Q.   Was it yours?

14       A.   No.

15       Q.   Was it David Morris'?

16       A.   No.

17       Q.   Whose was it?

18       A.   I don't recall.

19       Q.   Whose could it have been?

20       MR. PHILLIPS:  Objection, calls for

21   speculation.

22       BY MR. ZWICKER:

23       Q.   Who else worked on the -- who else

24   worked on the study?

1    BY MR. ZWICKER:

2        Q.    In your experience, does Abbott use

3    phase 2 -- use 80 percent power in phase 2

4    studies?

5        MR. PHILLIPS:  Objection, vague.

6    BY THE WITNESS:

7        A.    Sometimes.  Yes and no.

8    BY MR. ZWICKER:

9        Q.    Have you been involved in clinical

10    trials where the expected power was less than

11    80 percent?

12        A.    Yes.

13        Q.    Did you agree with the decision by

14    Abbott to use 80 percent power in the 99-114

15    study?

16        A.    I believe I answered that question

17    already.  Yes.

18        Q.    You did.  Why did you agree?

19        A.    It's standard for the industry.

20        Q.    Did you believe -- did you personally

21    believe that using 80 percent power would help

22    99-114 move to phase 3 clinical trials?

23        A.    I don't understand the connection.  I'm

24    sorry.

1    Q.   When Abbott plans clinical trials, its

2    objective is to be sure that it gets -- it can use

3    the data from the trials, right?

4    A.   That is correct.

5    Q.   And with respect to this trial, did

6    Abbott believe that an 80 percent power would

7    allow it to use the results of this trial?

8    MR. PHILLIPS:  Objection, lack of foundation;

9    object to the form.

10   BY THE WITNESS:

11   A.   I believed 80 percent power was

12   adequate for us to conduct a study ethically and

13   use the data.

14   BY MR. ZWICKER:

15   Q.   Use the data where?

16   A.   In decisions regarding the compound.

17   Q.   Decisions regarding to move the

18   compound to phase 3?

19   A.   Or whatever Abbott wanted to do with

20   the compound.

21   Q.   What was your understanding of what

22   Abbott wanted to do with the compound?

23   A.   Develop the compound, file an NDA.

24   Q.   And commercialize it?

1      A.   That is correct.

2      Q.   So you believed that an 80 percent

3      power would assist Abbott in commercializing the

4      compound, right?

5      A.   Yes.

6      MR. ZWICKER:  Let's mark this as 2.

7            (WHEREUPON, said document was

8             marked Thomas Deposition Exhibit

9             No. 2, for identification, as of

10            4/13/07.)

11     BY MR. ZWICKER:

12     Q.   Mr. Thomas, before you is a Summary of

13     Anticipated Expert Report by Dr. Bruce E. Rodda.

14     Do you have that?

15     A.   I do.

16     Q.   Have you read this before?

17     A.   I don't know if I read this version.

18     I have read information from Dr. Rodda.

19     Q.   In connection with this lawsuit?

20     A.   Correct.

21     Q.   Turn to page 6 of Dr. Rodda's report,

22     would you.  There's a paragraph that begins with

23     "Organizations."  Do you see that?

24     A.   I do.

1      A.   I was involved with the calculation of

2    the power based on the assumptions given to us by

3    the clinical team.  Is that your question?

4      Q.   How did you determine that a sample

5    size of 80 patients per arm was needed to achieve

6    80 percent power?

7      MR. PHILLIPS:  Objection, assumes facts not

8    in the record.

9      MR. ZWICKER:  Let me -- let me restate that.

10     MR. PHILLIPS:  Sure.

11    BY MR. ZWICKER:

12     Q.   How did you determine the sample size

13    needed to achieve 80 percent power?

14     MR. PHILLIPS:  Object to the form.

15    BY THE WITNESS:

16     A.   I'm -- I don't recall that I actually

17    did that for this study.

18    BY MR. ZWICKER:

19     Q.   When Abbott calculated the sample size,

20    did it assume that all persons enrolled in the

21    study would complete it?

22     A.   No.

23     Q.   What was the assumption made by Abbott

24    at the planning stage regarding whether subjects

1    enrolled in the study would have to complete it to

2    achieve 80 percent power?

3        A.    Could you repeat that, please?

4        Q.    Yeah.  What conclusions did Abbott draw

5    about how many subjects enrolled in the study

6    would have to complete it to achieve 80 percent

7    power?

8        A.    I don't believe a percentage was

9    determined.

10       Q.    Well, what discussions were had

11   regarding the impact of any premature terminations

12   on power at the planning stage of the study?

13       A.    The calculation of the sample size in

14   the -- in the calculation of the dropout rate

15   is -- it's inf- -- it's inferred by the -- the

16   results that were used to help determine the

17   effect size that was used to calculate the sample

18   size.

19       Q.    At the planning stage of the study, did

20   Abbott consider the impact of any dropouts on

21   power?

22       A.    Yes.

23       Q.    What discussions did it have that you

24   were involved in?

Thomas, James (Linked)  4/13/2007  8:05:00 AM

1    BY THE WITNESS:

2        A.   I disagree.

3    BY MR. ZWICKER:

4        Q.   You disagree with that statement?

5        A.   I do.

6        Q.   Okay.  Would you think -- consider a

7    50 percent premature termination rate to be

8    substantial, sir?

9        MR. PHILLIPS:  Objection, incom- -- strike

10   that.

11           Objection, improperly calls for opinion

12   testimony, vague.

13   BY THE WITNESS:

14       A.   No.

15   BY MR. ZWICKER:

16       Q.   You think that's appropriate?

17       MR. PHILLIPS:  Same objections.

18   BY THE WITNESS:

19       A.   In some studies, yes.

20   BY MR. ZWICKER:

21       Q.   In the 99-114 study, was that an

22   appropriate rate of premature termination, sir?

23       A.   I don't recall.

24       MR. PHILLIPS:  Objection.

1           (WHEREUPON, said document was

2               marked Thomas Deposition Exhibit

3               No. 5, for identification, as of

4               4/13/07.)

5       MR. ZWICKER:  The record should reflect that

6   before the witness is a Clinical Protocol for the

7   99-114 study, and it's marked as Exhibit 5.

8   BY MR. ZWICKER:

9       Q.   Mr. Thomas, you recognize this

10  document?

11      A.   Yes.

12      Q.   In fact, you signed for David Morris on

13  it, didn't you?

14      A.   I did.

15      Q.   What role did you have in creating this

16  protocol for the 99-114 study?

17      A.   I worked in conjunction with the

18  clinical team in reviewing the -- the document.

19      Q.   Were you satisfied with the accuracy of

20  the protocol --

21      A.   I was.

22      Q.   -- based on your work?

23      MR. PHILLIPS:  Mr. Thomas, please remember to

24  wait -- wait until Mr. Zwicker completes his

Thomas, James (Linked)  4/13/2007  8:05:00 AM

1    Q.   Okay.  And an intent-to-treat subject

2    is someone who prematurely terminates, right?

3       MR. PHILLIPS:  Objection, mischaracterizes

4    the testimony.

5    BY THE WITNESS:

6    A.   No.

7    BY MR. ZWICKER:

8    Q.   An intent-to-treat subject is someone

9    who receives at least one dose of the study drug?

10    A.   According to the definition in this

11    protocol, an intent-to-treat is, they had to

12    receive at least one dose of study drug at the

13    baseline diary assessment and at least one

14    post-dose diary assessment.  All the completers

15    would, therefore, then be intent-to-treat.

16    Q.   Would you agree with me that there's a

17    difference between someone who prematurely

18    terminates a study and someone who completes it?

19       MR. PHILLIPS:  Objection, vague; objection,

20    calls for improper opinion testimony.

21    BY THE WITNESS:

22    A.   I'm not sure what your question is.

23    I'm sorry.

24    BY MR. ZWICKER:

1     Q.   In your mind, is there a distinction

2     regarding the meaningfulness of the data between a

3     person who completes the study and a person who

4     doesn't?

5        MR. PHILLIPS:  Objection, vague, incomplete

6     hypothetical.

7     BY THE WITNESS:

8        A.   The data are not the -- necessarily the

9     same.  They are both useful.

10    BY MR. ZWICKER:

11       Q.   Okay.  Are they equally useful?

12       MR. PHILLIPS:  Objection to the form.

13    BY MR. ZWICKER:

14       Q.   Let me ask you a different question.

15          For purposes of the 99-114 study, is

16    your view that the data for those two groups is

17    equally useful?

18       MR. PHILLIPS:  Objection, vague.

19    BY THE WITNESS:

20       A.   I'm sorry.  I -- your question is

21    vague.  I don't understand exactly what data we're

22    talking about.  All data?

23    BY MR. ZWICKER:

24       Q.   The data that was collected from the

1    study.

2        A.   Data from both groups is useful.

3        Q.   What would you rather have, Mr. Thomas,

4    a patient who completed the study or a patient who

5    prematurely terminated?

6        MR. PHILLIPS:  Objection, incomplete

7    hypothetical.

8    BY MR. ZWICKER:

9        Q.   And by "the study," I mean the 99-114

10   study.

11       A.   In general, I prefer all patients to

12   complete the study.

13       Q.   Why?

14       A.   They bring more data, and it also shows

15   that the study was -- the drug would be tolerable.

16       Q.   And so the more patients that

17   prematurely terminate for adverse events, the more

18   likely you are to conclude that the drug isn't

19   being tolerated, true?

20       MR. PHILLIPS:  Objection, lack of foundation.

21   BY THE WITNESS:

22       A.   Can you repeat your question?

23   BY MR. ZWICKER:

24       Q.   And so the more patients that

1   prematurely terminate the study for adverse

2   events, the more likely you are to conclude that

3   the drug isn't being tolerated, right?

4      A.   Yes.

5      MR. PHILLIPS:  Counsel, when we get a chance,

6   we have been going about an hour and fifteen

7   minutes, I believe.  If we could take a break?

8      MR. ZWICKER:  Yes.  Let's do it now.

9      MR. PHILLIPS:  Okay.

10     THE VIDEOGRAPHER:  Going off the video record

11  at 9:17 a.m.

12         (WHEREUPON, a recess was had from

13          9:17 a.m. until 9:24 a.m.)

14     THE VIDEOGRAPHER:  And we are back on the

15  video record at 9:24 a.m.  This is Tape 2.

16         (WHEREUPON, a certain document was

17          marked Thomas Deposition Exhibit

18          No. 6, for identification, as of

19          4/13/07.)

20     MR. ZWICKER:  The record should reflect that

21  before the witness is Thomas Exhibit No. 6, which

22  is an e-mail and enclosure from Marilyn Collicott

23  dated August 9th, 2000.

24  BY MR. ZWICKER:

1    A.   Yili Pritchet.

2    Q.   What did you tell her?

3    A.   I needed to be off a couple days to --

4    for deposition.

5    Q.   Mr. Thomas, do you remember being asked

6    to recalculate power calculations in the year 2000

7    in light of the enrollment challenges to the

8    99-114 study?

9    A.   I don't being -- I don't recall being

10    asked to do that.

11    Q.   Do you recall doing any work with

12    respect to the power calculations after the study

13    began enrolling patients?

14    A.   Yes.

15    Q.   What work did you do?

16    A.   Looked at various scenarios of what the

17    power would be with a smaller number of patients

18    than planned.

19    Q.   Why did you do that?

20    A.   It would have been at someone's

21    request.  I don't recall who.

22    Q.   In your own mind, did you believe you

23    were being asked to perform those calculations

24    because Abbott was not reaching its enrollment

1    rate, however, will result in less than

2    80 percent power even if we were to

3    reach our enrollment goal."

4        You see that?

5    A.   I do.

6    Q.   What do you understand that to mean?

7    MR. PHILLIPS:  Objection, lack of foundation,

8    calls for speculation.

9    BY THE WITNESS:

10    A.   This appears to be a draft letter.

11    I do not know if this letter was ever sent to

12    anyone.  I don't know if this letter was ever

13    reviewed.  I don't understand what this sentence

14    is actually trying to put forward.

15    BY MR. ZWICKER:

16    Q.   Do you agree with the proposition that

17    a premature termination rate with respect to the

18    99-114 study will result in less than 80 percent

19    power even if the enrollment goal was reached?

20    MR. PHILLIPS:  Objection, lack of foundation.

21    BY MR. ZWICKER:

22    Q.   Do you agree with that statement?

23    A.   No.

24    Q.   Why not?

1    A.   Because termination -- a termination

2    rate was already built into the power

3    calculations.  This study was assumed to have

4    dropouts.

5    Q.   How many?

6    A.   I don't recall.

7    Q.   Where would it have been written?

8    A.   It would not have been written, to my

9    knowledge.  It's --

10   Q.   Would it have been in the protocol?

11   A.   It's in -- it's in -- used in the

12   calculation of the effect size that was used in

13   determining the sample size that was calculated

14   for the study.

15   Q.   Would it have been in the protocol?

16   A.   The effect size is in the protocol.

17   Q.   No.  Would the -- would the rate of

18   premature terminations been in the protocol?

19   A.   It's in the effect size.

20   Q.   But it's not stated anywhere in the

21   protocol, the number of premature terminations

22   that you can -- you would have anticipated?

23   MR. PHILLIPS:  Objection.  The document

24   speaks for itself, lack of foundation.

1    you ever could make that determination.

2        Q.    In your own mind on December 14th,

3    2000, do you have any doubts about the usefulness

4    of the study in light of the fact that planned

5    power won't be achieved?

6        MR. PHILLIPS:  Are you asking what he --

7        MR. ZWICKER:  As of December 14th, 2000.

8        MR. PHILLIPS:  Objection, assumes facts not

9    in the record.

10    BY THE WITNESS:

11        A.    Would you read back your question,

12    please.

13    BY MR. ZWICKER:

14        Q.    In your own mind, on December 14th,

15    2000, did you have any doubts about the usefulness

16    of the study in light of the fact that planned

17    power would not be achieved?

18        A.    No.

19        Q.    None?

20        A.    No.

21        Q.    So your testimony is that on

22    December 14th, 2000, you viewed the failure to

23    achieve planned power as not relevant to the

24    study?

1    A.    I don't recall.  I would need to look

2    at the analysis tables.

3    BY MR. ZWICKER:

4        Q.    Mr. Thomas, do you recall at the

5    titration meetings that you attended whether

6    Abbott was considering new trials for 594 to

7    address tolerability through different titration

8    schemes?

9        MR. PHILLIPS:  Objection, vague as to time.

10    BY THE WITNESS:

11        A.    I --

12    BY MR. ZWICKER:

13        Q.    Let me say in the 2001 -- around the

14    January 2001 time period.

15        A.    I don't recall the time period; but at

16    some point either during or after the 114 study,

17    discussions -- there were discussions concerning

18    alternate titration schemes than what was used in

19    the 114 study.

20        Q.    And that would have required additional

21    clinical trials, right?

22        A.    That is correct.

23        Q.    Before the data was unblinded,

24    Mr. Thomas, did you come to the conclusion that

1    the results of the ABT -- of the 99-114 study were

2    going to be used to develop follow-on compounds

3    rather than 594?

4        A.    Could you -- could you read that back.

5    I'm sorry.

6        Q.    Before the results were unblinded for

7    the 99-114 study -- can you have that period in

8    mind?

9        A.    Okay.

10        Q.    (Continuing) -- did you form the

11    conclusion that the results of the 99-114 study

12    would be used not for the commercialization of 594

13    but for the development of a follow-on compound

14    for 594?

15        A.    No.

16        Q.    Do you know if anybody else had that

17    view?

18        A.    I don't know other people's views.

19        Q.    I'm just asking if anybody expressed

20    that view to you.

21        A.    No one expressed that view to me.

22        Q.    Do you read Exhibit 23, Mr. Thomas, to

23    contemplate the undertaking of additional clinical

24    trials for 594 with different titration schemes?

1       A.   I didn't actually prepare any

2    presentations.  I'm sorry.  That -- I thought you

3    asked if I had helped in the preparation.  Is that

4    not correct?

5            Could you read the question back.

6       Q.   I'll ask you the question again.

7       A.   I'm sorry.

8       Q.   Did you have any role in preparing

9    presentations to Abbott management regarding the

10   results of the 99-114 study?

11      A.   Yes.

12      Q.   What presentations did you prepare?

13      A.   I didn't actually prepare any

14   presentations.  I prepared data -- all that --

15   I prepared all of the data for the 594 study that

16   was analyzed, and that data was used in

17   presentations.

18      Q.   So you evaluated the unblinded data?

19      A.   Yes.

20      Q.   Is that fair?

21      A.   That is -- that is my role as a

22   statistician, to -- to run the analysis on the

23   unblinded data.

24      Q.   What analyses did you run?

1     A.    Would you like me to go through as much

2     as I can remember?

3     Q.    Go through what you can remember.

4     A.    Okay.  Typically, we start by looking

5     at the number of patients enrolled at each site.

6     We break that down by treatment group.  We look

7     then, generally, at the demographics variables:

8     Gender, age, weight, race, height, ethnicity.  We

9     look at concomitant medication use.  We look at

10    exposure, how long they were on drug.

11          We look at the disposition; how many

12    people prematurely discontinued, for what reasons,

13    overall, over time.  We look at -- we often look

14    at the discontinuations over time and in totality.

15          There were various efficacy measures in

16    this study -- I don't recall them all -- that it

17    was the primary, which was the diary-based pain

18    assessments.  I believe there was a site-based

19    pain assessment, a global assessment of study

20    drug, SF 36.  I don't recall if the study had the

21    neuropathic pain scale.

22          Then we also look at adverse event

23    rates overall.  We look at prevalence -- often

24    look at prevalence incidents.  I don't recall if

1    we did that in this study.  We look at the rel- --

2    the severity of adverse events, the relationship

3    to the study drug of adverse events.  We look at

4    serious adverse events, deaths, adverse events

5    leading to premature discontinuation, hematology,

6    chemistry and urinalysis, mean change from

7    baseline, shift tables, vital signs mean change

8    from baseline to min/max final, sometimes shift

9    tables, I don't recall.

10          We look at laboratory and vital signs

11    that may meet criteria developed prior to blind

12    break of potentially clinically sig- --

13    clinically -- potentially clinically significance.

14          That's usually the standard analysis

15    that we produce.

16    Q.   And do you draw conclusions regarding

17    whether or not an adverse event is statistically

18    significant to a specific dose level?

19    MR. PHILLIPS:  Objection, vague.

20    BY THE WITNESS:

21    A.   I'm not sure what you mean.  I'm sorry.

22    BY MR. ZWICKER:

23    Q.   Well, for example, take the 150 mcg

24    dose level.

1      Q.   It's your testimony that planned power

2    doesn't change even if persons preterminate,

3    correct?

4        MR. PHILLIPS:  Same objection.

5    BY THE WITNESS:

6        A.   I can't speak for all cases; but in the

7    case for this study, the power calculations were

8    based on the effect size, which takes premature

9    discontinuations into account.

10    BY MR. ZWICKER:

11       Q.   If you multiply 56 times four, you get

12    224, right?

13       A.   I believe so.

14       Q.   That's the first thing we've agreed on

15    all day.

16       A.   I'm not good at math.

17       Q.   The number of persons that were

18    enrolled in the study was 266?

19       A.   That's what this slide purports.

20       Q.   Why is there a difference between the

21    persons enrolled and the persons in the group for

22    purposes of power calculation?

23       MR. PHILLIPS:  Objection, lack of foundation.

24    BY THE WITNESS:

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:     Hancock v. Abbott
Dep. Date:     4/13/2007
Deponent:      James Thomas

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reasons Therefore |
|-----|-----|-----------|-------------|-------------------|
| 5 | 21 | clinical physical | clinical statistical | Transcription error |
| 111 | 23 | planned beyond | planned to be | Transcription error |
| 117 | 13 | unblinded | blinded | Transcription error |
| 133 | 15 | or see him | or saw him | Transcription error |
| 179 | 20 | an point | end point | Transcription error |
| 252 | 7 | Sharon Trucer | Shara Druker | Transcription error |
| 258 | 24 | inacidents | Incidence | Transcription error |
| 260 | 14 | incidents | Incidence | Transcription error |

_____
Signature of Deponent

James W. Thomas

1

**James W Thomas**


**12/21/99 08:06 AM**

To:    Fred W Siebert/LAKE/PPRD/ABBOTT@ABBOTT, Kevin J Heuser/LAKE/PPRD/ABBOTT@ABBOTT
cc:    (bcc: James W Thomas/LAKE/PPRD/ABBOTT)
Subject:  114 Sample Size

Below is my attempt at writing up the sample size section of the 114 protocol.

This study is designed to enroll approximately 320 patients (80 patients in each treatment group). This sample size will allow for the detection of a 0.46 effect size in the average Daily Pain Intensity score for change from baseline to the final evaluation between any ABT–594 treatment group and placebo at 0.05 (two– tailed Type I error) level with at least 80% power. This calculation is based on results obtained from ABT–594 study M99–833 and published data using Gabapentin for patients with painful diabetic polyneuropathy (add reference here to Dec 1998 JAMA article) and assuming an 39% and 25% improvement from baseline for ABT–594 and placebo respectively.

Jim

Highly Confidential

ABBT0051889

*Thomas* DEP. EX. NO. *1*
FOR ID., AS OF *4/13/01* *Ross*

5

**ABBOT LABORATORIES**
**Clinical Protocol**

**A Randomized, Double Blind, Placebo-Controlled, Comparison
of the Safety and Efficacy of ABT-594 to Placebo in Subjects
with Painful Diabetic Polyneuropathy**

**Protocol M99-114**

**February 8, 2000**

Fred Siebert, MT-BB (ASCP)                                    2/10/2000
Senior Clinical Research Associate, Analgesia Venture          Date

David Morris, Ph.D.                                           2-11-00
Manager, Clinical Statistics                                   Date

Walid Awni, Ph.D.                                            2/11/00
Manager, Clinical Pharmacokinetics                            Date

Bruce G. McCarthy, M.D.                                       2/10/00
Associate Medical Director, Analgesia Venture                 Date

Christopher J. Silber, M.D.                                   2/10/00
Venture Head, Analgesia Venture                               Date

**a Abbott Laboratories**

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Thomas         DEP. EX. NO. 5                    Confidential
FOR ID., AS OF  4/13/07                          ABBT0065818
                                    Renn

ABT-594
Protocol M99-114
February 8, 2000

i

## 1.0   Title Page

*Abbott Laboratories*
Analgesia Venture, D48Q
Clinical Study

**A Randomized, Double Blind, Placebo-Controlled, Comparison of the Safety and Efficacy of ABT-594 to Placebo in Subjects with Painful Diabetic Polyneuropathy**

*ABT-594/M99-114*
*February 8, 2000*

Development Phase:  II

Investigators:  Multicenter Trial

Estimated Date of First Subject to be Dosed:  April 2000

Estimated Date of Last Subject to Complete Dosing:  November 2000

Sponsor/Emergency Contact:    Christopher J. Silber, M.D.
                                                   Venture Head,
                                                   Analgesia Venture
                                                   Phone:  (847) 938–5236, Fax:  (847) 938–5258
                                                   Department 48Q, Building AP34
                                                   200 Abbott Park Road
                                                   Abbott Park, Illinois 60064–6193

This study will be conducted in compliance with Good Clinical Practice, including the archiving of essential documents.

**Confidential Information**
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000                                                                                ii

## 2.0   Study Synopsis

| Name of Company:<br>Abbott Laboratories<br><br>Name of Finished Product:<br>ABT-594 Hard Gelatin<br>Capsule (HGC)<br><br>Name of Active Ingredient:<br>ABT-594 | Individual Study Table Referring<br>to Part of the Dossier:<br>Not Applicable (N/A)<br><br>Volume: N/A<br><br>Page: N/A | (For National Authority<br>Use Only) |
|---|---|---|

**Title of Study:**

A Randomized, Double Blind, Placebo-Controlled, Comparison of the Safety and Efficacy of ABT-594 to Placebo in Subjects with Painful Diabetic Polyneuropathy

**Investigator(s):** Multicenter Study

**Study Center(s):** 30

**Publication (reference):** N/A

| Study Period (years):<br><br>Estimated Date of First Subject to be Dosed: April, 2000<br><br>Estimated Date of Last Subject to Complete Dosing: November, 2000 | Phase of Development:  II |
|---|---|

**Objectives:**

The objective of this study is to compare the safety and analgesic efficacy of 150 μg, 225 μg, and 300 μg twice daily (BID) of ABT-594 to placebo in subjects who have painful distal symmetric diabetic polyneuropathy, have an average of $\geq$ 4 points on the diary-based Pain Rating Scale (11-Point Likert Scale) during the Baseline Pain Assessment Phase (completed on at least 6 of the 7 days), and have $\geq$ 4 points on the site-based Pain Rating Scale (11-Point Likert) at the Baseline Visit.

**Methodology:**

This is a Phase II, randomized, double-blind, placebo-controlled, multicenter study to examine the safety and analgesic efficacy of ABT-594 in subjects who have painful diabetic polyneuropathy. Approximately 320 subjects will be assigned randomly in an equal ratio to receive 1 of 4 treatments: ABT-594 150 μg, 225 μg, 300 μg, or placebo BID for 49 days on an outpatient basis. Approximately 30 sites will be recruited in order to enroll 320 subjects who meet entry criteria for this study.

Prior to any study-specific procedures at the Screening Visit, an informed consent will be signed and study eligibility determined.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000                                                                                                    iii

---

**Methodology: (Continued)**

Prior to study drug administration, subjects will have discontinued all analgesic medications (at least 7 days prior to the Baseline Pain Assessment Phase) and have completed the 7-day Baseline Pain Assessment Phase. Following the Baseline Pain Assessment Phase, subjects who meet entry criteria, will be randomized to a dose of study medication for 49 days (Primer and Treatment Phases). During the Treatment Phase, subjects will return to the site for Treatment Visits I, II, III and IV (Days 14, 21, 35 and 49, respectively). During the Primer and Treatment Phases, subjects will be allowed to take up to 3 grams of acetaminophen per day or up to 6 grams of acetaminophen per week (but will not be allowed to take acetaminophen within 24 hours prior to a Treatment Visit). Subjects will complete diary-based assessments of their diabetic polyneuropathy pain each day from the 7 days prior to study drug administration (Baseline Pain Assessment Phase) through Day 49 of study drug administration. In addition, subjects will undergo site-based assessments of their neuropathy pain at the Baseline Visit and Treatment Visits I, II, III and IV. Subjects will discontinue study drug administration after Treatment Visit IV and return to the site for the Follow-Up visit 7-10 days later. See Figure 9.1a, Study Schematic, for additional study layout information.

Efficacy and safety assessments will include: the Pain Rating Scale (11-Point Likert), the Neuropathic Pain Scale, SF-36™ Health Status Survey (Acute), and Subject and Clinician Global Impression of Change.

---

**No. of Subjects: 320**

---

**Diagnosis and Main Criteria for Inclusion:**

A subject may be randomized in this study provided that he/she meets all of the Inclusion Criteria outlined below and does not meet any of the Exclusion Criteria in Section 9.3.2.

- Prior to any study specific procedure, voluntary written informed consent must be obtained from the subject after the purpose and nature of the study have been explained.
- The subject must be age 18 or older and in relatively good health with a recent stable medical history.
- The subject's weight must be ≤ 265 pounds.
- A female subject must be non-lactating and:
  - of non-childbearing potential (either postmenopausal for at least 1 year or surgically sterile, including tubal ligation),
    OR
  - of childbearing potential using oral or barrier contraceptive methods for at least 2 months preceding randomization (and must continue contraceptive method through the course of the study).

  All female subjects must have a negative $\beta$ subunit human chorionic gonadotropin ($\beta$-hCG) at the Baseline Visit. Female subjects of childbearing potential must have a negative $\beta$-hCG at all Treatment Visits.
- The subject must have a diagnosis of diabetes mellitus (Type I or Type II) and a diagnosis of distal symmetric diabetic polyneuropathy.
- The subject must have distally and symmetrically decreased or lost vibratory, pin and/or light touch sensation on neurological exam and either decreased (or absent) deep tendon reflexes or documented abnormal nerve conduction study consistent with a distal symmetrical neuropathy.

---

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000                                                                iv

- The location and quality of the pain under study are consistent with distal symmetric diabetic polyneuropathy in the opinion of the investigator.
- The subject has distal symmetric diabetic polyneuropathy symptoms (including pain) which have been stable for at least the last 3 months prior to the Screening Visit (defined by the opinion of the investigator).
- The subject must have an average of $\geq 4$ points on the diary-based Pain Rating Scale (11-Point Likert Scale) everyday during the Baseline Pain Assessment Phase (completed on at least 6 of the 7 days) and $\geq 4$ points on the site-based Pain Rating Scale (11-point Likert Scale) at the Baseline Visit.

**Test Product(s):** ABT-594 75 μg HGC (Formulation A-2)

**Dose:** ABT-594 150 μg, 225 μg, or 300 μg BID (Section 9.4)

**Mode of Administration:** Oral

**Batch Number:**

| Study Drug | Drug Product Lot Number |
|---|---|
| ABT-594 75 μg HGC | 58-293-AR |

**Duration of Treatment:** 49 days

**Reference Therapy:** Placebo for ABT-594 HGC No. 1 Light Gray Opaque (Starch)

**Dose:** Placebo to match test product (see Section 9.4)

**Mode of Administration:** Oral

**Batch Number:**

| Study Drug | Drug Product Lot Number |
|---|---|
| Placebo for ABT-594 HGC | 55-243-AR-01 |

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065822

ABT-594
Protocol M99-114
February 8, 2000                                                                                                    v

---

**Criteria for Evaluations:**

**Efficacy:**

The primary efficacy measurement will be the change from baseline of the average diary-based Pain Rating Scale (11-Point Likert Scale) score from each subject's diary to the corresponding average of the last 7 days on study drug. Additionally, change from baseline to each scheduled evaluation will be analyzed in a similar manner. The baseline pain score for the diary data is defined as the average of the last 7 pain scores prior to Day 1 of the study.

Change from baseline to final and each evaluation will be calculated for each of the following secondary efficacy variables:

- Site-Based Pain Rating Scale (11-Point Likert)
- Neuropathic Pain Scale
- Subject Global Impression of Change
- Clinician Global Impression of Change
- SF-36 ™ Health Status Survey (Acute), including sub-domains [(i) Physical Functioning, (ii) Role Physical, (iii) Bodily Pain, (iv) General Health, (v) Vitality, (vi) Social Functioning, (vii) Role Emotional, (viii) Mental Health] PCS, and MCS.

The efficacy evaluations recorded at the Baseline Visit will be used as the baseline score for efficacy evaluations assessed at the investigative site.

**Safety:**

Safety will be assessed by medical history, physical exam, vital signs, electrocardiogram (ECG), clinical laboratory testing, and adverse event monitoring.

**Pharmacokinetics:**

Blood samples for ABT-594 plasma assay will be taken from all subjects at Treatment Visits I and IV. For the subset of subjects who undergo intensive pharmacokinetic sampling at Treatment Visits I and IV, values of AUC, $C_{max}$, and $C_{trough}$ will be determined.

**Statistical Methods:**

For all safety and efficacy analyses, the primary comparisons will be between each ABT-594 dose and placebo.

Demographic and other baseline characteristic variables will be analyzed to assess the comparability of the treatment groups.

The primary and secondary efficacy variables, including change from baseline diary and site based rating will be analyzed by using appropriate parametric and nonparametric methods. The final global evaluation scores, (Subject and Clinician) will be compared using Cochran-Mantel-Haenszel methodology.

Dose response for ABT-594 will be explored, with and without placebo included. Other efficacy analyses will be performed as appropriate.

Treatment emergent adverse events will be summarized by body system and COSTART term and compared using Fisher's exact test.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000                                                                                               vi

---

**Statistical Methods: (Continued)**

Mean change from baseline to minimum, maximum and final values will be summarized for clinical laboratory, vital sign and ECG data. Additionally, clinical laboratory data identified as below or above limits will be flagged in the data listings. Furthermore, laboratory results which satisfy the criteria for limits for statistical analysis will be identified.

To assess dose proportionally and time invariance (from Visit I to Visit IV), dose-normalized $C_{trough}$ and log-transformed dose-normalized AUC, and $C_{max}$ from the subset of subject participating in intensive pharmacokinetic sampling will be subjected to a mixed effects model analysis with effects for dose level, visit, relevant covariates, and perhaps study center. The logarithmic transformation will be employed for AUC and $C_{max}$. An exploratory analysis will also be performed on the data set obtained from all subjects.

---

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065824

ABT-594
Protocol M99-114
February 8, 2000

vii

## 3.0   Table of Contents

Page

1.0   Title Page . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   i

2.0   Study Synopsis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ii

3.0   Table of Contents  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   vii

4.0   List of Abbreviations and Definitions of Terms  . . . . . . . . . . . . . . . . . .   xi

5.0   Ethics  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

      5.1     Institutional Review Board or Independent Ethics Committee . .   1

      5.2     Ethical Conduct of the Study  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

      5.3     Subject Information and Consent . . . . . . . . . . . . . . . . . . . . . . . . . .   1

      5.4     Subject Confidentiality  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

6.0   Investigators and Study Administrative Structure  . . . . . . . . . . . . . . . .   3

      6.1     Investigative Sites  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

      6.2     Sponsor Information  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

      6.3     Contract Research Organization  . . . . . . . . . . . . . . . . . . . . . . . . . .   3

      6.4     Clinical Supply Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

      6.5     Central Laboratory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

      6.6     Administrative Structure  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

7.0   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

      7.1     Analgesia Today . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

      7.2     ABT-594 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

8.0   Study Objectives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

9.0   Investigational Plan  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

      9.1     Overall Study Design and Plan:  Description  . . . . . . . . . . . . . . .   10

      9.2     Discussion of Study Design, Including the Choice of
              Control Groups . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

      9.3     Selection of Study Population . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000
                                                                                    viii

## Table of Contents (Continued)

                                                                                    **Page**

9.3.1    Inclusion Criteria  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

9.3.2    Exclusion Criteria  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

9.3.3    Removal of Subjects from Therapy  . . . . . . . . . . . . . . . . . .    16

9.4     Treatments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

9.4.1    Treatments Administered . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

9.4.2    Identity of Investigational Products . . . . . . . . . . . . . . . . . .    19

        9.4.2.1   Packaging and Labeling . . . . . . . . . . . . . . . . . . . .    19

        9.4.2.2   Storage and Disposition of Supplies  . . . . . . . . .    19

        9.4.2.3   Drug Accountability  . . . . . . . . . . . . . . . . . . . . . .    20

9.4.3    Method of Assigning Subjects to Treatment Groups . . . .    20

9.4.4    Selection of Doses in the Study  . . . . . . . . . . . . . . . . . . . . .    21

9.4.5    Selection and Timing of Dose for Each Subject  . . . . . . .    21

9.4.6    Blinding  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

9.4.7    Prior and Concomitant Therapy . . . . . . . . . . . . . . . . . . . . .    21

9.4.8    Treatment Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

9.5     Efficacy, Pharmacokinetic and Safety Variables and Other
        Study Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

9.5.1    Efficacy and Safety Measurements Assessed and
        Flow Charts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

        9.5.1.1   Efficacy Measurements  . . . . . . . . . . . . . . . . . . .    25

        9.5.1.2   Safety Measurements and Procedures  . . . . . . . .    26

9.5.2    Appropriateness of Measurements . . . . . . . . . . . . . . . . . . .    34

9.5.3    Efficacy Variables  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    34

        9.5.3.1   Primary Variable(s)  . . . . . . . . . . . . . . . . . . . . . . .    35

        9.5.3.2   Secondary Variable(s)  . . . . . . . . . . . . . . . . . . . . .    35

9.5.4    Drug Concentration Measurements . . . . . . . . . . . . . . . . . .    35

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000

ix

# Table of Contents (Continued)

Page

9.5.4.1 Collection, Processing and Storage of Blood
Samples for ABT-594 Plasma Assay ........ 35

9.5.4.2 Additional Pharmacokinetic Sampling ....... 36

9.5.4.3 Shipment of Plasma Samples .............. 37

9.5.5 Blood Samples for Genetic Polymorphism Analysis .... 37

9.6 Data Quality Assurance ................................. 38

9.7 Statistical Methods and Determination of Sample Size ........ 39

9.7.1 Statistical and Analytical Plans ..................... 39

9.7.1.1 Data Sets Analyzed ....................... 40

9.7.1.2 Demographic and Other Baseline
Characteristics .......................... 40

9.7.1.3 Efficacy Analyses ....................... 40

9.7.1.4 Safety Analyses ......................... 43

9.7.2 Determination of Sample Size ...................... 44

9.7.3 Pharmacokinetics/Pharmacodynamics ............... 44

9.8 Changes in the Conduct of the Study or Planned Analyses ..... 45

9.8.1 Protocol Changes ................................ 45

10.0 Protocol Deviations .......................................... 46

11.0 Use of Information and Publication ........................... 46

12.0 Completion of The Study .................................... 47

13.0 Investigator's Agreement .................................... 48

14.0 References ................................................. 49

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000                                                         x

# Table of Contents (Continued)

Page

## List of Tables

Table 9.4.1a    ABT-594 Dose Escalation ............................    18

Table 9.4.1b    Number and Type of Capsules by Treatment Regimen ....    18

Table 9.4.2a    Identity of Investigational Products ....................    19

Table 9.5a      Study Procedures Flow Chart .........................    24

Table 9.5b      Clinical Laboratory Tests ............................    28

Table 9.5c      Definitions for Investigator Rating of Adverse
                Event Severity ....................................    30

Table 9.5d      Definitions for Investigator Assessment of Adverse
                Event Relationship to Study Drug .....................    31

## List of Figures

Figure 6.6a     Administrative Structure ............................    5

Figure 9.1a     Study Schematic ...................................    13

## List of Appendices

Appendix A    Documents Required Prior to Initiation of the Study .....    50

Appendix B    Declaration of Helsinki ..............................    51

Appendix C    Responsibilities of the Clinical Investigator .............    55

Appendix D    Elements of the Consent Form ........................    56

Appendix E    Sample Abbott Laboratories Drug Accountability Form
              Study M99-114 .....................................    59

Appendix F    Pain Assessments ..................................    60

Appendix G    Neuropathic Pain Scale ..............................    61

Appendix H    Subject Global Impression of Change and
              Clinician Global Impression of Change ................    63

Appendix I    Laboratory Determinations, Vital Signs and
              Electrocardiogram Variables for Statistical Analysis .....    64

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000

xi

## 4.0   List of Abbreviations and Definitions of Terms

| | |
|---|---|
| ABT-594 | [(R)-5-(2-azetidinylmethoxy)-2-chloropyridine] or A-165594 |
| CSI | Clinical Supplies Invoice |
| HGC | Hard Gelatin Capsules |
| IVRS | Interactive Voice Response System |
| nAChRs | Neuronal nicotinic acetylcholine receptors |
| NPRO | New Product Research Order |
| NPS | Neuropathic Pain Scale |

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065829

ABT-594
Protocol M99-114
February 8, 2000                                                                                          1

## 5.0   Ethics

### 5.1   Institutional Review Board or Independent Ethics Committee

Good Clinical Practice (GCP) requires that approval be obtained from a research
committee (e.g., Institutional Review Board [IRB], Independent Ethics Committee
[IEC]), prior to participation of human subjects in research.  The investigator will obtain
a duly constituted IRB/IEC review and approval of the protocol, informed consent form
and all other forms of subject information related to the study (e.g., advertisements used
to recruit subjects).  Abbott Laboratories will receive documentation of the study
approval, the signed signature page from the study protocol, a signed Abbott Financial
Disclosure form, subject informed consent document, a current investigator curriculum
vitae, a signed Food and Drug Administration (FDA) Form 1572 or equivalent document,
a list of members of the IRB committee and their qualifications and affiliations prior to
authorizing the shipment of study drug supplies to the site.  Any amendments to the
protocol will require IRB approval prior to implementation of any changes made to the
study design.  No annual IRB re-approvals are anticipated since the study should be
completed within one year.  A complete list of documents required prior to initiation of
the study is located in Appendix A.

### 5.2   Ethical Conduct of the Study

The study will be conducted in accordance with the protocol, GCP, FDA regulations
governing clinical study conduct, ethical principles that have their origin in the
Declaration of Helsinki (1996 Version, Appendix B) and all applicable local regulations.
The investigator must assure that the study will be conducted in accordance with
prevailing local laws and customs or comply with the provisions as stated in the FDA
guidelines.  Responsibilities of the Investigator are specified in Appendix C.

### 5.3   Subject Information and Consent

The investigator or his/her representative will explain the nature of the study to the
subject, and answer all questions regarding this study.  Prior to any screening procedures
being performed on the subject, the informed consent statement will be reviewed and

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065830

ABT-594
Protocol M99-114
February 8, 2000                                                                              2

signed and dated by the subject and the person who administered the informed consent.
A copy of the informed consent form will be given to the subject and a copy will be
placed in the subject's medical record. An entry must also be made in the subject's dated
source documents to confirm that informed consent was obtained prior to any
study-related procedures and that the subject received a signed copy. Elements of an
Informed Consent are specified in Appendix D.

## 5.4    Subject Confidentiality

All reports and communications relating to subjects in the study will identify each subject
only by the subject's initials (first, middle, last) and by the subject's randomization
number. Case report forms (CRF) will be used to transmit the information collected in
the performance of this study to Abbott Laboratories and to governmental agencies.
Portions of the subject's medical records pertinent to the study will be reviewed by
Abbott Laboratories personnel or their designee and possibly by government personnel to
assure adequate source documentation, accuracy, and completeness of the CRFs.

The site will collect information on the subject per International Council on
Harmonization (ICH) requirements, including subject name, home address, phone
number, and birthdate. In addition, the name, address, and phone number of another
person who can be contacted in an emergency should also be recorded. This information
will be treated with strict adherence to professional standards of confidentiality and will
be filed at the site according to the record retention guidelines outlined in Section 12.0.

Neither the subject, the subject's physician, nor the investigator will be informed of the
subject's pharmacogenetic results, should they be obtained. If performed, results from
individual subjects will be kept confidential and will not be given to anyone not directly
involved with this research study. The deoxyribonucleic acid (DNA) samples will be
stored by Abbott Laboratories in a secure storage space with adequate measures to
protect confidentiality. The DNA samples will be kept by Abbott Laboratories until
destroyed by Abbott when this research is completed or the required sample retention
time has been satisfied.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000

3

## 6.0    Investigators and Study Administrative Structure

### 6.1    Investigative Sites

Investigative sites will be selected by Abbott Laboratories.  Approximately 30 sites will be selected to enroll subjects for this study.

### 6.2    Sponsor Information

The sponsor, Abbott Laboratories, will coordinate the activities for initiating this clinical study.  The protocol, CRFs and sample informed consent form will be generated by Abbott Laboratories.  The database for this study will be created using NOMAD®, a data management system.  Designated statisticians at Abbott Laboratories will be responsible for the statistical analysis of the data.

### 6.3    Contract Research Organization

Abbott Laboratories will delegate prestudy (if necessary) and initiation visits, site monitoring, and post-study site visits to a Contract Research Organization (CRO) for the conduct of this clinical study.  The sponsor and CRO will maintain contact in order to manage adequately the progress of the study.  The CRO will coordinate and perform all site visits and will prepare trip reports, using the Abbott format, for each visit performed. These reports will detail the activities conducted at all investigative sites and will include all relevant observations.  All trip reports will be forwarded to the sponsor in a timely manner to ensure appropriate site management, adhering to Abbott Laboratories Standard Operating Procedures (SOP).

### 6.4    Clinical Supply Management

Clinical supplies will be prepared by Abbott Laboratories (Investigational Drug Services, D-492) for the study and sent to all investigational sites.  Abbott Laboratories will authorize the release of clinical supplies once the appropriate essential documents have been received from the respective site and upon approval by Abbott Laboratories Regulatory Affairs.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99–114
February 8, 2000                                                                                    4

All subjects will be centrally randomized by site and assigned to a treatment group (using a randomization supplied by Abbott Laboratories) using an Interactive Voice Response System (IVRS).  The IVRS will be contracted from:

> ClinPhone Inc.
> 29 Emmons Drive, C40
> Princeton, NJ 08540

Blinded study medication for each randomized subject (using a randomization supplied by Abbott Laboratories) will also be assigned using IVRS.  Each site will keep an accurate inventory of the clinical supplies, including drug shipping and receiving documents, dispensing/accountability records (Appendix E), and records for return of used and unused clinical supplies to Abbott Laboratories.  Clinical Research Associates (CRAs) will check drug accountability records regularly.

## 6.5    Central Laboratory

This study will utilize one central laboratory contracted by, and under the direction of, Abbott Laboratories.  All protocol specified clinical laboratory tests will be performed by the following central laboratory:

> Covance Central Laboratory Services
> 8211 SciCor Drive
> Indianapolis, IN 46214

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99–114
February 8, 2000                                                         5

## 6.6   Administrative Structure

The administrative structure for this study is depicted in Figure 6.6a.



**Figure 6.6a    Administrative Structure**

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065834

ABT-594
Protocol M99–114
February 8, 2000

6

# 7.0    Introduction

## 7.1    Analgesia Today

Pain is one of the most common reasons people consult a physician, representing an extraordinary societal burden. The cost of chronic pain has been estimated to range in the tens of billions of dollars annually.[1]

Currently there are four major groups of therapeutics for pain relief: 1) nonsteroidal anti-inflammatory drugs (NSAIDs/COX-2 inhibitors), 2) opioids, 3) adjuvant analgesics (e.g., tricyclic antidepressants [TCAs]), and 4) centrally acting non-narcotic analgesics (e.g., acetaminophen, tramadol). NSAIDs are most often used to treat mild to moderate pain associated with inflammation, but are ineffective in treating some types of nociceptive and neuropathic pain. Risks associated with NSAIDs include gastrointestinal bleeding and hepatic toxicity. COX-2 inhibitors may improve on this gastrointestinal profile, but other adverse events may become evident. Opioids are used for moderate to severe pain. Clinically significant physical dependence and tolerance to analgesia may occur in subjects receiving opioids regularly. In addition, constipation is a significant side effect. Adjuvant analgesics are commonly used for neuropathic pain. Unlike the other groups, the majority of adjuvant analgesics have a delayed onset of an analgesia because of their mechanism of action and the requirement for dose titration. Therefore, a class of compounds with a broad spectrum clinical activity, efficacy in moderate and severe pain, and without the liabilities of opioids, NSAIDs and other currently available analgesics would represent an important advance in pain relief.

## 7.2    ABT-594

Interest in the potential analgesic activity of compounds acting at neuronal nicotinic acetylcholine receptors (nAChRs) has been enhanced recently by the discovery that (±)-epibatidine, a potent nAChR agonist, is greater than 100-fold more potent than morphine in rodent models of antinociception.[2] The antinociceptive effects of (±)-epibatidine are blocked by the nAChR antagonist mecamylamine, but not by opioid receptor blockade. Thus, (±)-epibatidine appears to be a potent antinociceptive agent that

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065835

ABT–594
Protocol M99–114
February 8, 2000                                                                                                    7

acts via activation of neuronal nAChRs and not through opioid receptors. Unfortunately, ($\pm$)-epibatidine is quite potent at all subtypes of the nAChR (neuronal, ganglionic, and neuromuscular junction) and is quite toxic at antinociceptive doses.[3] Because of nAChR diversity, however, it is possible that nAChR ligands with greater receptor subtype selectivity might have therapeutic utility at doses below those associated with side effects.

ABT–594 [(R)–5–(2–azetidinylmethoxy)–2–chloropyridine], is a non–opioid, non–NSAID analgesic. It is a novel neuronal nAChR ligand that is 30– to 100–fold more potent and equally efficacious to morphine in treating moderate to severe pain in several well–characterized animal models of nociception. ABT–594 modulates pain transmission by interacting with nAChRs, and not opioid receptors, at key regulatory sites along the pain pathway. It has both peripheral and central antinociceptive effects in preclinical models of acute thermal, persistent chemical, and neuropathic pain states.

To date, only systemic treatment with opioids like morphine has been reported to have this broad spectrum of analgesic activity. Like the opioids, ABT–594 can selectively modulate pain transmission by inhibiting substance P release from C–fibers at the level of the dorsal horn, and by activating the brainstem centers that provide descending inhibitory pathways known to gate painful stimuli. In contrast to morphine, repeated treatment with ABT–594 in pre–clinical studies did not produce withdrawal effects at termination of treatment, suggesting an absence of physical dependence liabilities.

In pre–clinical studies, ABT–594 distributes rapidly to the brain following systemic administration and, like morphine, may work at multiple levels in the central and peripheral nervous systems to modulate pain perception. Compounds like ABT–594 that can selectively modulate neuronal nAChR function and possess broad–based antinociceptive activity may provide a novel therapeutic approach to pain management that avoids the liabilities typically associated with opioid analgesics.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000

8

Human clinical trials with ABT-594 began in 1997. Initial clinical trials were conducted using oral solution formulations. Subsequently, a soft elastic capsule (SEC) formulation and, later, a hard gelatin capsule (HGC) formulation were developed and used in clinical trials.

Phase I clinical trials of the oral solution formulations suggested that 150 µg/day would be the maximally tolerated dose. Subsequent experience in Phase I and II trials with the solid formulations (SEC and HGC), however, has suggested that higher doses would be tolerated. Two Phase I studies with the HGC formulation have recently been completed: Study M99-076 ("A Double-Blind, Placebo-Controlled Study of the Safety, Tolerability, and Pharmacokinetics of Ascending Doses of Twice Daily Dosing Regimens of a Hard Gelatin Capsule Formulation of ABT-594 in Healthy Adult Subjects") and M99-120 ("A Double-Blind, Placebo-Controlled Study of the Safety, Tolerability and Pharmacokinetics of Escalating Doses of Twice Daily Dosing of a Hard Gelatin Capsule Formulation of ABT-594 in Adult Subjects in General Good Health"). Study M99-076 demonstrated that the ABT-594 HGC formulation was generally well tolerated at fixed (untitrated) doses up through 300 µg BID for 14 days. Study M99-120 included titrated doses up through 450 µg BID for 5 days. Adverse events, significantly different than placebo, for subjects receiving 300 µg BID for 14 days in Study M99-076 included: dizziness , nausea, vomiting, asthenia and diarrhea (all of which were considered to be mild in the opinion of the investigator). In addition, results from Study M99-120 suggested that a short period of dose escalation at the initiation of therapy improved tolerability. Throughout Phase I studies of ABT-594, subjects generally tolerated ABT-594 better when dosing followed a meal and after 3-4 days of repeated dosing (the period in which most adverse events occur).

Phase II has included (to date) efficacy and safety studies of ABT-594 in molar extraction, osteoarthritis and neuropathic pain. Based upon a study of molar extraction pain (Study M97-772, "A Randomized, Double-Blind, Single Dose Comparison of an Oral Solution of ABT-594, Ibuprofen, and Placebo in a Post-Surgical Dental Pain Model"), 100 µg ABT-594 (single dose oral solution) appeared to be a minimally efficacious dose in acute pain.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000

9

A study of ABT-594 in osteoarthritis (Study M98-826, "A Randomized, Double-Blind, Placebo-Controlled, Comparison of the Safety and Efficacy of ABT-594 and Ibuprofen to Placebo in Patients with Pain Associated with Osteoarthritis of the Knee") evaluated the ABT-594 SEC formulation at doses of 25, 50 and 75 μg BID for 3 weeks and a study of ABT-594 in neuropathic pain (Study M98-833, "A Randomized, Double Blind, Placebo-Controlled, Comparison of the Safety and Efficacy of ABT-594 to Placebo in Patients with Painful Polyneuropathies") evaluated the same formulation at doses of 25 and 75 μg BID for 3 weeks. Both studies suggested a trend towards analgesic effect at 75 μg BID. In addition, 75 μg BID was generally well tolerated. The most common adverse events (greater than or equal to 5%) for subjects receiving 75 μg BID ABT-594 in the osteoarthritis and neuropathic pain studies (combined) were nausea (15%), headache (13%), dizziness (7%), insomnia (6%) and vomiting (5%). ABT-594 appeared to be tolerated better after the first week of therapy (an effect not related to premature terminations).

Data from Phase I and II studies completed to date suggest that ABT-594 will be generally well tolerated at doses higher than previously studied in Phase II trials (higher than 75 μg BID). In addition, data from Phase II trials suggest that, because a trend toward analgesic efficacy was seen at 75 μg BID, a study of higher doses may demonstrate greater analgesic efficacy. The current study, therefore, will be performed to test this hypothesis.

## 8.0    Study Objectives

The objective of this study is to compare the safety and analgesic efficacy of 150 μg, 225 μg, and 300 μg twice daily (BID) of ABT-594 to placebo in subjects who have painful distal symmetric diabetic polyneuropathy, have an average of $\geq 4$ points on the diary-based Pain Rating Scale (11-Point Likert Scale) during the Baseline Pain Assessment Phase (completed on at least 6 of the 7 days), and have $\geq 4$ points on the site-based Pain Rating Scale (11-Point Likert) at the Baseline Visit.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000

10

## 9.0   Investigational Plan

### 9.1   Overall Study Design and Plan: Description

This is a Phase II, randomized, double blind, placebo-controlled, multicenter study to examine the safety and analgesic efficacy of ABT-594 in subjects who have painful diabetic polyneuropathy. Approximately 320 subjects will be assigned randomly in an equal ratio to receive 1 of 4 treatments: ABT-594 150 µg, 225 µg, 300 µg or placebo BID for 49 days on an outpatient basis. Approximately 30 sites will be recruited in order to enroll approximately 320 subjects who meet entry criteria for this study.

The study will be divided into 5 phases: Screening Phase (Day –22 to Day –8), Baseline Pain Assessment Phase (Day –7 to Day –1), Primer Phase (Day 1 to Day 7), Treatment Phase (Day 8 to Day 49) and Post-Treatment Phase (Day 50 to Day 59). Day 1 is the first day of study drug administration. Subjects will be allowed a window of $\pm 3$ days for each study visit. The study design is depicted in Figure 9.1a.

Subjects will review and sign the informed consent prior to the conduct of any study specific procedures. Subjects will then be screened for eligibility by medical history, physical examination, vital sign measurements, and clinical laboratory tests. Those subjects taking tricyclics, serotonin-specific reuptake inhibitors (SSRIs), antiepileptic drugs (AEDs), or other analgesics for the treatment of their pain must have discontinued these drugs at least 7 days prior to the Baseline Pain Assessment Phase (Day –7 to Day –1). During the Baseline Pain Assessment Phase, subjects will complete, at approximately 11 AM each morning, the diary-based Pain Rating Scale (11-Point Likert Scale) of their diabetic polyneuropathy pain intensity. Subjects will not be permitted to take concomitant analgesics, except for limited doses of acetaminophen (as specified in Section 9.4.7) during the Baseline Pain Assessment Phase.

On the day after the Baseline Pain Assessment Phase, subjects will return to the site for their Baseline Visit (Day 1). At this visit, diaries will be collected and reviewed. In addition, subjects will complete the site-based Pain Rating Scale (11-Point Likert Scale). Subjects who meet all entry criteria, including an average of $\geq 4$ points on the

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000

11

diary-based Pain Rating Scale (11-Point Likert) during the Baseline Pain Assessment
Phase (completed on at least 6 of the 7 days) and $\geq$ 4 points on the site-based Pain Rating
Scale (11-Point Likert Scale) during the Baseline Visit, will then complete the
Neuropathic Pain Scale and SF-36™ Health Status Survey (Acute). Subjects will
undergo an interim medical history, physical examination, vital sign measurements, ECG
and clinical laboratory tests.

Subjects who meet all entry criteria at the Baseline Visit will be randomly assigned in an
equal ratio into 1 of 4 treatment groups: ABT-594 150 µg BID, ABT-594 225 µg BID,
ABT-594 300 µg BID, or placebo. Subjects will start study drug at the evening dose on
Day 1 (as specified in Section 9.4.5). During the Primer Phase, subjects randomized to
ABT-594 will receive a fixed dose escalation of ABT-594 (as specified in Section
9.4.1). Following the Primer Phase, subjects will enter the Treatment Phase (Day 8) and
will continue their treatment for a total of 49 days. During the Primer and Treatment
Phases, subjects will not be permitted to take concomitant analgesics, except for limited
doses of acetaminophen (as specified in Section 9.4.7)

Subjects will complete the diary-based Pain Rating Scale each morning (approximately
11 AM), 3 hours after taking their morning dose of study drug. They will return to the
site for study procedures on Day 14 (Treatment Visit I), Day 21 (Treatment Visit II) and
Day 35 (Treatment Visit III) and Day 49 (Treatment Visit IV). Procedures during
Treatment Visits I, II, III, and IV will include collection of diaries (and issuance of the
next set of diaries at Treatment Visits I, II and III) and efficacy and safety assessments:
the site-based Pain Rating Scale, the Neuropathic Pain Scale, the Subject and Clinician
Global Impression of Change (Treatment Visit IV only), the SF-36™ Health Status
Survey (Acute) (Treatment Visit IV only), physical examination (Treatment Visit IV
only), vital sign measurements and clinical laboratory tests (Treatment Visits I, III and
IV), ABT-594 plasma assay collection (Treatment Visits I and IV only) and ECG
(Treatment Visit IV only). A subset of subjects at selected sites will undergo intensive
pharmacokinetic sampling at Treatment Visits I and IV.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065840

ABT-594
Protocol M99-114
February 8, 2000

12

On the day after Treatment Visit IV, subjects will enter the Post-Treatment Phase. Subjects will no longer take study drug or complete pain scales. Subjects may restart all discontinued medications under the guidance of their physician. Subjects will return for study procedures at the Follow-up Visit (7 to 10 days after their final study drug dose). Procedures at the Follow-up Visit will include physical examination, vital sign measurements, recording of any adverse events since Treatment Visit IV and re-examination of any abnormal ECG or clinical laboratory findings present at the previous evaluation.

For those subjects who participate in clinical studies of ABT-594 and who consent, a blood sample will be collected at Treatment Visit I in order to obtain a sample of genetic material (DNA). The DNA sample may be used at a later date to investigate associations between genetic differences (polymorphisms) and differences in the way subjects respond to treatment, in terms of efficacy or side-effects or both. If a genetic factor in response is identified, it may allow the development of a diagnostic test to identify those most likely to benefit before actually taking the drug. The sample may also be used to identify genes involved in painful diabetic polyneuropathy.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.





Figure 9.1a   Study Schematic

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000

13

Confider
ABBT0065.

ABT-594
Protocol M99-114
February 8, 2000                                                                                              14

## 9.2    Discussion of Study Design, Including the Choice of Control Groups

The design of this study provides a placebo control group to assess the analgesic efficacy of ABT-594. Double-blind, parallel group designs are generally acknowledged as standard for unbiased estimates of treatment group differences. Validated pain scales will be employed.

## 9.3    Selection of Study Population

It is anticipated that approximately 320 subjects will be randomized and receive study medication in this study. A subject may be randomized in this study provided that he/she meets all of the inclusion criteria outlined in Section 9.3.1 and does not meet any of the exclusion criteria in Section 9.3.2.

### 9.3.1  Inclusion Criteria

9.3.1.1    Prior to any study specific procedure, voluntary written informed consent must be obtained from the subject after the purpose and nature of the study have been explained.

9.3.1.2    The subject must be age 18 or older and in relatively good health with a recent stable medical history.

9.3.1.3    The subject's weight must be ≤ 265 pounds.

9.3.1.4    A female subject must be non-lactating and:
  – of non–childbearing potential (either postmenopausal for at least 1 year or surgically sterile, including tubal ligation),

  OR

  – of childbearing potential using oral or barrier contraceptive methods for at least 2 months preceding randomization (and must continue contraceptive method through the course of the study).

All female subjects must have a negative β subunit human chorionic gonadotropin (β-hCG) at the Baseline Visit. Female subjects of childbearing potential must have a negative β-hCG at all Treatment Visits.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000                                                                 15

9.3.1.5    The subject must have a diagnosis of diabetes mellitus (Type I or Type II) and
           a diagnosis of distal symmetric diabetic polyneuropathy.

9.3.1.6    The subject must have distally and symmetrically decreased or lost vibratory,
           pin and/or light touch sensation on neurological exam **and** either decreased (or
           absent) deep tendon reflexes or documented abnormal nerve conduction study
           consistent with a distal symmetrical neuropathy.

9.3.1.7    The location and quality of the pain under study are consistent with distal
           symmetric diabetic polyneuropathy in the opinion of the investigator.

9.3.1.8    The subject has distal symmetric diabetic polyneuropathy symptoms
           (including pain) which have been stable for at least the last 3 months prior to
           the Screening Visit (defined by the opinion of the investigator).

9.3.1.9    The subject must have an average of $\geq$ 4 points on the diary–based Pain Rating
           Scale (11–Point Likert Scale) during the Baseline Pain Assessment Phase
           (completed on at least 6 of the 7 days) and $\geq$ 4 points on the site–based Pain
           Rating Scale (11–point Likert Scale) at the Baseline Visit.

**9.3.2    Exclusion Criteria**

9.3.2.1    The subject has positive test results for drugs of abuse or viral hepatitis at the
           Screening Visit, or has a known history of a positive test result for HIV.

9.3.2.2    The subject has recent (< 5 years) history of drug or alcohol abuse or
           dependence.

9.3.2.3    The subject has an acute or chronic renal or hepatic disorder, psychiatric
           disease or disorder or any uncontrolled medical illness.

9.3.2.4    The subject has active malignancy of any type or a history of malignancy
           (excluding basal cell carcinoma that has been treated or other malignancies
           that have been surgically removed and have had no evidence of recurrence for
           a minimum of 5 years prior to study start).

9.3.2.5    The subject has taken an investigational drug within 1 month prior to
           administration of study treatment or is scheduled to receive an investigational
           drug other than ABT–594 during the course of this study.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065844

ABT-594
Protocol M99-114
February 8, 2000                                                    16

9.3.2.6  The subject has a diastolic blood pressure greater than 95 mm Hg and/or a systolic blood pressure greater than 170 mm Hg (sitting) at the Screening Visit.

9.3.2.7  The subject has orthostatic hypotension at the Screening Visit (as defined as a decrease in systolic blood pressure of at least 20 mm Hg or 10 mm Hg in diastolic blood pressure from supine to standing sustained after 1 minute of standing), or a history of syncope or pre-syncopal symptoms.

9.3.2.8  The subject has previously participated in a study involving ABT-594, including the present study.

9.3.2.9  The subject has clinically significant abnormalities in clinical chemistry, hematology, or urinalysis, including AST or ALT $\geq$ 1.5 times the upper limit of the reference range or a serum creatinine > 1.5 mg/dL. Subjects may have elevated serum and urine glucose, but their serum glucose must have been under good control (in the opinion of the investigator) for at least the last 3 months prior to the Screening visit.

9.3.2.10  The subject has clinically significant electrocardiographic abnormalities.

9.3.2.11  The subject has ongoing treatment with or expected treatment with any medication not allowed as described in Section 9.4.7, including at least 7 days prior to the Baseline Pain Assessment Phase.

9.3.2.12  The subject has a diagnosis of fibromyalgia, arthritis, bursitis, tendinitis, vascular disease or other painful disorders affecting the extremities (other than the neuropathy under study) that the subject cannot differentiate from the neuropathy pain.

9.3.2.13  The subject has sympathetically maintained pain (e.g., Reflex Sympathetic Dystrophy, Causalgia), defined by the opinion of the investigator.

9.3.2.14  The subject is unlikely to comply with the study protocol or is unsuitable for any other reason, in the opinion of the investigator.

9.3.3  Removal of Subjects from Therapy

A subject may voluntarily terminate participation in the study at any time. The investigator may also decide, for medical reasons or protocol noncompliance, to

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065845

terminate prematurely a subject's participation. The investigator must notify the CRA within 24 hours and document the reason for premature termination on the appropriate CRF.

Subjects, whose participation is terminated prematurely after signing study consent but before study drug administration, will not require follow-up observations. Subjects, whose participation is terminated prematurely after study drug administration must undergo procedures normally performed at Treatment Visit IV (see Table 9.5a) within 7-10 days following termination from the study.

If, in the judgment of Abbott Laboratories and possibly in consultation with the investigators, continued exposure to a study drug represents a significant risk to subjects, the study will be terminated.

## 9.4    Treatments

### 9.4.1    Treatments Administered

Subjects will be randomly assigned in an equal ratio to 1 of the following 4 treatment groups:

ABT-594 150 µg BID
ABT-594 225 µg BID
ABT-594 300 µg BID
Placebo for ABT-594 BID

ABT-594 and matching placebo will be supplied as Light Gray Opaque No. 1 HGCs.

During the Primer Phase, subjects will receive a fixed dose escalation of ABT-594. ABT-594 will be initiated at 75 µg BID. The dose will increase every 2 days in 75 µg BID increments until subject are taking their assigned treatment dose (150, 225 or 300 µg BID). The ABT-594 dose escalation scheme is presented in Table 9.4.1a.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065846

ABT-594
Protocol M99-114
February 8, 2000                                                                          18

## Table 9.4.1a    ABT-594 Dose Escalation

| Treatment Regimen | Suggested Dosing Time | Days 1-7 | | | | | | | Day 8 |
|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | |
| 150 µg ABT-594 | 8 AM |  | 75 µg | 75 µg | 150 µg | 150 µg | 150 µg | 150 µg | 150 µg |
| | 8 PM | 75 µg | 75 µg | 75 µg | 150 µg | 150 µg | 150 µg | 150 µg | 150 µg |
| 225 µg ABT-594 | 8 AM |  | 75 µg | 75 µg | 150 µg | 150 µg | 225 µg | 225 µg | 225 µg |
| | 8 PM | 75 µg | 75 µg | 75 µg | 150 µg | 150 µg | 225 µg | 225 µg | 225 µg |
| 300 µg ABT-594 | 8 AM |  | 75 µg | 75 µg | 150 µg | 150 µg | 225 µg | 225 µg | 300 µg |
| | 8 PM | 75 µg | 75 µg | 75 µg | 150 µg | 150 µg | 225 µg | 225 µg | 300 µg |

Subjects will start study drug at PM dose on Day 1 (Section 9.4.5).

The number and type of HGCs per dose for the Treatment Phase is presented in Table 9.4.1b.

## Table 9.4.1b    Number and Type of Capsules by Treatment Regimen

| Treatment Regimen | Number of Capsules Per Dose (Days 8–49) | |
|---|---|---|
| | Daily Blister Card (BID doses) | |
| | 75 µg ABT-594 HGC | Placebo ABT-594 HGC |
| ABT-594    150 µg | 2 | 2 |
| ABT-594    225 µg | 3 | 1 |
| ABT-594    300 µg | 4 | 0 |
| Placebo | 0 | 4 |

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000                                                                                          19

### 9.4.2   Identity of Investigational Products

## Table 9.4.2a    Identity of Investigational Products

| Test Preparation Drug Product | Drug Product Lot # | Drug Substance Lot # | Source |
|---|---|---|---|
| ABT-594 75 μg HGC Formulation A-2 | 58-293-AR | 52-015-KD-00 | Abbott[1] |
| Placebo HGC No. 1, Light Gray Opaque (Starch) | 55-243-AR-01 | N/A | Abbott[1] |

[1] Pilot Plant, North Chicago, Illinois

ABT-594 75 μg HGC and placebo HGC are identical in appearance, encapsulated in Light Gray Opaque capsule size No. 1 HGCs.

### 9.4.2.1   Packaging and Labeling

Study drug supplies will be blinded and packaged in blister cards in accordance with a randomization schedule supplied by Abbott Laboratories (Department of Clinical Statistics). Daily study medication cards will be provided to each subject.

Daily study medication cards will be labeled with the Module Number (assigned by Abbott, via IVRS), New Product Research Order (NPRO) number, Abbott address, study number, contents, storage conditions and directions for use.

Space will be provided on the label of each carton containing the daily study medication cards to record the subject initials and subject randomization number.

### 9.4.2.2   Storage and Disposition of Supplies

All clinical supplies must be stored in a secure location until dispensed to a subject or until returned to Abbott Laboratories. All blinded study drug supplies must be stored at controlled room temperature (68-77°F, see USP).

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065848

ABT-594
Protocol M99-114
February 8, 2000                                                                                      20

## 9.4.2.3    Drug Accountability

The investigator or designee will verify that study drug supplies are received intact and in
the correct amounts.  This will be documented by signing and dating the Clinical
Supplies Invoice (CSI) or similar document.  Study drug will be dispensed after
randomization and assignment of study medication by IVRS (Section 9.4.3) for each
subject who meets the enrollment criteria.  The investigator or designee will record the
subject number, subject initials and date dispensed to the subject on the Drug
Accountability Form (Appendix E).  The amount of study drug remaining will be
recorded at Visits I, II, III and IV for each subject on the site Drug Accountability Form.
An accurate running inventory of study drug will be kept and will include the NPRO
number, CSI number(s), the number of modules dispensed and the date study drug was
dispensed for each subject.  An overall accountability of the study drug will be performed
and verified by the CRA throughout the study and at the site close-out visit.  All used
and unused supplies must be inventoried, accounted for and returned to Abbott
Laboratories.  A copy of the Drug Accountability Form, in accordance with the
instructions of the CRA, will also be included in the shipment.  The investigator agrees
not to supply study medication to any persons not enrolled in the study or not named as a
subinvestigator on FDA Form 1572.

## 9.4.3    Method of Assigning Subjects to Treatment Groups

The randomization schedule will be computer-generated before the start of the study by
Abbott Laboratories Department of Clinical Statistics.  All subjects will be centrally
randomized by investigative site using an Interactive Voice Response System (IVRS).
Before the study is initiated, the telephone number and call-in directions for the IVRS
will be provided to each site.

Approximately 320 subjects will be randomized in an equal ratio to receive either
ABT-594 150 µg BID, ABT-594 225 µg BID, ABT-594 300 µg BID or placebo.
Subjects will be assigned randomization numbers in ascending numerical sequence per
investigative site at the Baseline Visit.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000                                                              21

### 9.4.4  Selection of Doses in the Study

ABT-594 doses (150 µg, 225 µg, and 300 µg BID) were selected on the basis of Phase I
and Phase II studies, and represent doses below the maximally tolerated dose. Phase II
data suggested that ABT-594 doses greater than 75 µg BID may be efficacious in the
relief of osteoarthritis and distal symmetrical neuropathy pain.

The selection of BID dosing for ABT-594 was based upon Phase I pharmacokinetic
results. ABT-594 doses for the Primer Phase (75 µg, 150 µg, and 225 µg BID) were
selected based on Phase I safety and pharmacokinetic data.

### 9.4.5  Selection and Timing of Dose for Each Subject

During the Primer Phase, subjects will start study drug at the evening dose on Day 1
within 1 hour following a meal (e.g., 8 PM). Subjects will then take BID doses of
ABT-594 (75 µg, 150 µg, 225 µg or placebo during the Primer Phase and ABT-594
150 µg, 225 µg, 300 µg or placebo during the Treatment Phase) within 1 hour following
a meal (e.g., at 8 AM and 8 PM).

Study drugs should be taken with at least one cup (8 ounces) of water.

### 9.4.6  Blinding

Both the investigator and the subject will remain blinded to the subject's treatment
throughout the course of the study. The study blind may be broken if, in the opinion of
the investigator, it is in the subject's best interest to know the study drug assignment.
The sponsor (Abbott Laboratories) MUST be notified before breaking the blind unless
identification of the study drug is required for emergency therapeutic measures. Blind
breaking information will be provided using IVRS. Before the study is initiated, the
telephone number and call-in directions for the IVRS will be provided to each site. The
sponsor must then be notified within 48 hours of the blind being broken. The date, and
reason for blind breakage must be recorded on the appropriate CRF.

### 9.4.7  Prior and Concomitant Therapy

At the Screening Visit, a history of medications used over the prior 2 weeks will be taken.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT–594
Protocol M99–114
February 8, 2000                                                                                    22

Concomitant analgesics (prescription or over–the–counter [OTC] except aspirin and
acetaminophen as described below), including serotonin–specific reuptake inhibitors,
tricyclic antidepressants, antiepileptic medications, sodium channel blockers (e.g.,
mexilitine), opioids, capsaicin, non–steroidal anti–inflammatory drugs, COX–2
inhibitors, muscle relaxants, TENS and topical analgesics will not be allowed.

Aspirin, 325 mg daily maximum, is permitted if taken for primary prevention of
thromboembolic events and the dose has been stable for $\geq 1$ month prior to the Baseline
Visit. Acetaminophen, 3 grams daily maximum, or 6 grams maximum during the
Baseline Pain Assessment Phase and per week, for each of the 7 weeks of the Primer and
Treatment Phases, is permitted. Subjects will not be allowed to take analgesic
medication (including acetaminophen) within 24 hours of the Baseline Visit and
Treatment Visits I, II, III and IV.

If the administration of any concomitant medication is necessary during the course of this
study, the medication name, dosage information, frequency and dates of administration
must be reported on the CRF. Concomitant analgesic medication use (frequency only)
will be recorded separately on the Concomitant Analgesic Medication Use CRF at the
Baseline Visit and Treatment Visits I, II, III and IV. The concomitant medication use
record will include the number of separate occasions each subject has used
protocol–allowed (limited amounts) acetaminophen and any other analgesic (taken as a
protocol violation) since the subject's previous visit.

### 9.4.8   Treatment Compliance

In order to document compliance with the treatment regimen, subjects will be instructed
to return all medication cards and cartons (even if empty) to the study coordinator at
Treatment Visits I, II, III and IV. Treatment compliance will be documented by the
investigator or designee on the site Drug Accountability Form (Appendix E) and on the
appropriate CRF.

Overdose information will be collected on the appropriate CRF.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000                                                                  23

## 9.5 Efficacy, Pharmacokinetic and Safety Variables and Other Study Procedures

### 9.5.1 Efficacy and Safety Measurements Assessed and Flow Charts

Study procedures will be performed as summarized in Table 9.5a., Study Procedures Flow Chart.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000

24

## Table 9.5a    Study Procedures Flow Chart

| Study Activity | Screening Phase D-22 and D-8 — Screening Visit | Baseline Pain Assessment Phase D-7 to D-1 | Primary Phase D1-D7 — Baseline Visit D1 | D2-D7 | D8-D49 | Treatment Phase D8-D49 — D14 I | D21 II | D35 III | D49 IV | Post-Treatment Phase D50-D59 — Follow-up Visit D56 to D59 |
|---|---|---|---|---|---|---|---|---|---|---|
| Informed Content | X | | | | | | | | | |
| Medical History | X | | | | | | | | | |
| Physical Exam | X^c | | X^b | | | | | | | X |
| Vital Signs | X^d | | X^e | | | X | X | X | X | X |
| ECG | X^d | | X | | | | | | X^d | X^d |
| Clinical Laboratory Tests# | X | | X | | | X | X | X | X | X |
| Viral Hepatitis Screen | X | | | | | | | | | |
| Urine Drug and Alcohol Screen | X | | | | | | | | | |
| Pregnancy Test | X | | X | | | X^a | | X^a | X^a | |
| Genetic Polymorphism Sample (If Applicable) | | | X | | | | | | | |
| ABT-594 Plasma Assay | | | X | | | X | X | X | X | |
| ABT-594 PK Profile' | | | X | | | | | | X | |
| Diary Issued | | | X | | | X | X | X | | |
| Diary Collected | | | X | | | X | X | X | X | |
| Diary-Based Pain Rating Scale | | X | | | | | | | | |
| Site-Based Pain Rating Scale | | | X | | | X | X | X | X | |
| Neuropathic Pain Scale | | | X | | | X | X | X | X | |
| Subject/Clinician Global Impression of Change | | | | | | X | X | X | X | |
| SF-36™ | | | X | | | | | | X | |
| Randomize Patient | | | X | | | | | | | |
| Dispense Study Drug | | | X | | | X^a | X | X | | |
| Analgesic Use Monitoring | | | X | | | X | X | X | X | |
| Adverse Event Monitoring | | | X | X | X | X | X | X | X | X |
| Concomitant Medication Monitoring | | X | X | X | X | X | X | X | X | X |
| Study Drug Accountability | | | X | | | X | X | X | X | X |

Footnotes (left):
- Or upon premature termination.
- a. interim history.
- b. includes height.
- c. Includes orthostatic measurements at Screening Visit only.
- d. Includes orthostatic measurements at Baseline Visit only.
- e. Includes seat temperatures at Baseline Visit only.
- f. Performed only if there are clinically significant abnormalities at the previous evaluation.
- g. Chemistry, hematology and urinalysis.

Footnotes (right):
- Required of all females of child-bearing potential.
- Study drug must be taken in front of study staff. Blood samples from selected subjects will be taken just prior to dosing (0 hour), and at 1, 3, 5, and 8 hours after dosing at selected time only.
- To be completed at approximately 11 a.m. each morning during the Baseline Pain Assessment Phase and approximately 3 hours after the morning dose during the Primary and Treatment Phases.
- Redispense D15-20 study medication after checking drug accountability.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000

25

### 9.5.1.1    Efficacy Measurements

Prior to any efficacy measurements, a trained site observer will instruct the subject on how to perform and record all pain assessments.

The baseline for all efficacy measurements (except for the diary-based Pain Rating Scale) will be the last evaluation performed prior to receiving the first dose of blinded study drug on Day 1. Baseline measurement for the diary-based Pain Rating Scale will be the average of the last 7 pain scores prior to Day 1 of the study.

Efficacy assessments include the diary-based and site-based Pain Rating Scale (11-Point Likert Scale), the Neuropathic Pain Scale and the Subject Global Impression of Change, Clinician Global Impression of Change, and SF-36™ Health Status Survey (Acute).

Efficacy measurements should be performed (when possible) 3-4 hours post dose.

### Pain Rating Scale (11-Point Likert Scale)

Subjects will assess pain intensity daily by completing the Pain Rating Scale (Appendix F) in their diaries. These assessments will be completed daily at approximately the same time each morning (approximately 11 AM) during the Baseline Pain Assessment Phase and daily at the same time each morning (approximately 3 hours after the morning dose of study medication) during the Primer and Treatment phases. Subjects will record the time they completed these assessments in their diaries.

Subjects will also assess pain intensity by completing the Pain Rating Scale at the Investigative Site. These assessments will be completed at the Baseline Visit and at Treatment Visits I, II, III, and IV (or upon premature termination). The time of assessment will be recorded on the appropriate CRF.

### Neuropathic Pain Scale

The Neuropathic Pain Scale (Appendix G) will be completed by subjects at the Baseline Visit and at Visits I, II, III, and IV (or upon premature termination).

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065854

ABT-594
Protocol M99-114
February 8, 2000                                                                          26

**Subject Global Impression of Change**

The Subject Global Impression of Change (Appendix H) of analgesic relief due to study
drug will be performed at Treatment Visit IV (or upon premature termination).

**Clinician Global Impression of Change**

The Clinician Global Impression of Change (Appendix H) of a subject's analgesic relief
due to study drug will be performed at Treatment Visit IV (or upon premature
termination).

**SF-36™ Health Status Survey (Acute)**

The SF-36™ Health Status Survey (Acute) will be completed by each subject at the
Baseline Visit and at Treatment IV (or upon premature termination).

### 9.5.1.2    Safety Measurements and Procedures

**Informed Consent**

The investigator or designated representative will explain the nature of the study to the
subject and answer all questions regarding this study. Prior to any screening procedures
being performed on the subject, the informed consent statement will be reviewed and
signed and dated by the subject and by the person who administered the informed consent.
A copy of the informed consent form will be given to the subject and a copy will be placed
in the subject's medical record. An entry must also be made in the subject's dated source
documents to confirm that informed consent was obtained prior to any study related
procedures and that the subject received a signed copy.

**Medical History**

A complete medical history will be obtained from each subject during the Screening
Visit. In addition, history of tobacco and alcohol use, and medication (prescription or
OTC) use over the 2 weeks prior to screening will be recorded. The medical history will
be updated at the Baseline Visit.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065855

ABT-594
Protocol M99–114
February 8, 2000                                                                                                27

### Physical Examination

A physical examination, including weight, will be performed at the Screening Visit,
Baseline Visit, Treatment Visit IV and at the Follow-up Visit. Height will be measured
at the Baseline Visit only. The physical examination performed at the Baseline Visit will
serve as the baseline physical examination.

### Vital Signs

Blood pressure, pulse rate and respiration rate will be measured at the Screening Visit,
Baseline Visit, Visits I, III, and IV and at the Follow-up Visit. Orthostatic blood pressure
and pulse rate will be measured at the Screening Visit only. Oral temperature will be
taken at the Baseline Visit only. Vital sign measurements at the Baseline Visit will serve
as the baseline vital sign measurements.

Protocol-specified blood pressure and heart rate measurements (except orthostatic)
should be obtained after the subject has been sitting for at least 3 minutes. Orthostatic
measurements should be obtained after 3 minutes in the supine position and then after
1 minute in the standing position. A cuff of suitable size should be applied evenly and
firmly to the exposed upper arm. Subjects should not wear tight sleeves. Ideally, the
subject's blood pressure should be measured in the same arm by the same study
personnel using the same instrument.

Blood pressure and heart rate measurement should precede, not follow, scheduled blood
draws. Subjects should be kept as calm and undisturbed as possible during blood
pressure and heart rate measurements.

### Electrocardiogram (ECG)

A resting 12–lead ECG will be obtained at the Baseline Visit and Treatment Visit IV. An
ECG will be performed at the Follow-up Visit only if clinically significant abnormalities
are present on the previous evaluation. The ECG performed at the Baseline Visit will
serve as the baseline ECG.

A qualified physician will interpret the ECG. One copy of each 12–lead ECG and
physician's report will be retrieved by the CRA with the CRF.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000

28

## Clinical Laboratory Testing

Samples will be obtained for the laboratory tests listed in Table 9.5.b at the Screening Visit, Baseline Visit (Day 1), and Treatment Visits I, III, and IV. Laboratory tests will be obtained at the Follow-up Visit only if clinically significant abnormalities are present on the previous evaluation. The laboratory test results obtained at the Baseline Visit will serve as the baseline results. Blood draws should be performed after pain assessments or vital sign determinations during a visit.

### Table 9.5b    Clinical Laboratory Tests

| Hematology | Clinical Chemistry | Urinalysis |
|---|---|---|
| Hematocrit<br>Hemoglobin<br>Red Blood Cell (RBC) count<br>White Blood Cell (WBC) count<br>Neutrophils<br>Monocytes<br>Bands<br>Basophils<br>Eosinophils<br>Hemoglobin $A_{1c}$ (Baseline Visit Only)<br>Lymphocytes<br>Mean corpuscular hemoglobin concentration (MCHC), mean corpuscular volume (MCV), mean corpuscular hemoglobin (MCH)<br>Platelet count (estimate not acceptable)<br>Prothrombin Time (PT)<br>Partial Thromboplastin Time (PTT) | BUN<br>Creatinine<br>Total bilirubin<br>Alanine aminotransferase/serum glutamic–pyruvic transaminase (ALT/SGPT)<br>Aspartate aminotransferase/serum glutamic–oxaloacetic transminase (AST/SGOT)<br>Lactate Dehydrogenase (LDH)<br>Alkaline phosphatase<br>Sodium<br>Potassium<br>Chloride<br>Calcium<br>Inorganic phosphorus<br>Uric Acid<br>Bicarbonate<br>Cholesterol<br>Total protein<br>Glucose<br>Triglycerides<br>Albumin | Specific gravity<br>Ketones<br>pH<br>Bilirubin<br>Protein<br>Blood<br>Glucose<br>Microscopic evaluation |

A certified laboratory will be utilized to process and provide results for the clinical laboratory tests.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000

29

The investigator will review all laboratory test results and will assess clinical significance for each abnormal result. All laboratory test results that are considered clinically significant by the investigator will be followed to a satisfactory resolution.

A copy of each laboratory report must be included with the CRF.

**Viral Hepatitis Screen**

Subjects will undergo serological evaluation for viral hepatitis (hepatitis A virus IgM antibody, hepatitis B virus surface antigen, and hepatitis C virus antibody) at the Screening Visit. The hepatitis test panel will be performed by the central laboratory.

**Urine Drug Screen and Alcohol Screen**

Urine specimens will be tested for drugs of abuse and alcohol at the Screening Visit and will be performed by the central laboratory.

**Pregnancy Test**

A urine pregnancy test will be performed by designated study personnel at the Baseline Visit for all female subjects and at Visits I, II, III, and IV for female subjects of childbearing potential. A lactating or pregnant female will not be eligible for participation in this study.

**Adverse Events**

An adverse event is defined as any unexpected and unfavorable event such as a disease, syndrome, sign, symptom, and/or laboratory finding associated temporally with the use of a drug in humans, whether or not thought to be drug-related and whether observed by the investigator or reported by the subject.

The subject will be instructed to contact the investigator if an adverse event occurs so that appropriate action can be taken and all adverse events, whether in response to a query, observed by site personnel, or reported spontaneously by the subject, will be reported on the appropriate CRF.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000                                                          30

The investigator will assess and record any adverse event in detail on the adverse event
CRF including the date of onset, description, final diagnosis (if known), severity, time
course, duration and outcome, relationship of the adverse event to study drug, an
alternate etiology for the event, and action taken.  For adverse events to be considered as
sporadic, the events must be of similar nature and severity.

The investigator will use the following definitions to rate the severity of each adverse
event:

**Table 9.5c    Definitions for Investigator Rating of Adverse Event
Severity**

| Rating | Definition |
|---|---|
| Mild | The adverse event is transient and easily tolerated by the subject. |
| Moderate | The adverse event causes the subject discomfort and interrupts the subject's usual activities. |
| Severe | The adverse event causes considerable interference with the subject's usual activities and may be incapacitating or life-threatening. |

The investigator will use the following definitions to assess the relationship of the
adverse event to the use of study drug:

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000                                                           31

## Table 9.5d    Definitions for Investigator Assessment of Adverse Event Relationship to Study Drug

| Rating | Definition |
|---|---|
| Probably Related | An adverse event has a strong temporal relationship to study drug or recurs on rechallenge and another etiology is unlikely or significantly less likely. |
| Possibly Related | An adverse event has a strong temporal relationship to study drug and an alternative etiology is equally or less likely compared to the potential relationship to study drug. |
| Probably Not Related | An adverse event has little or no temporal relationship to the study drug and/or a more likely alternative etiology exists. |
| Not Related | An adverse event is due to an underlying or concurrent illness or effect of another drug and is not related to the study drug (e.g., has no temporal relationship to study drug or has a much more likely alternative etiology). |

If an investigator opinion of possibly, probably not, or not related to study drug is given, an alternate etiology must be provided for the adverse event.

Adverse events will be monitored continuously from the time of study drug administration to the Follow-up Visit. In addition, adverse events spontaneously reported to the investigator after completion of the Treatment Phase (or after premature termination) will be collected up to 30 days after drug discontinuation and reported to Abbott Laboratories. Subjects will be instructed to report to the investigator any other adverse events that occur after Follow-up Visit.

Serious adverse events, as well as adverse events that the investigator considered to be related to study design and/or procedures that occur after signing the Informed Consent and prior to the first dose of study drug will also be collected.

Any abnormal laboratory value or change in vital signs will not be documented as an adverse event unless it is a reason for premature discontinuation from the study, requires treatment, or meets regulatory criteria for a serious adverse event.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065860

ABT-594
Protocol M99-114
February 8, 2000                                                                                       32

Ongoing medical conditions will be considered adverse events if there is an increase in severity or frequency of occurrence. Since measurements of pain intensity are efficacy measurements in this study, an increase in severity or frequency of occurrence of the pain under study will not be considered adverse events for the purposes of this study.

**Serious Adverse Events**

If an adverse event meets any of the following criteria, it is to be reported to Abbott Laboratories as a serious adverse event (SAE) within 24 hours of occurrence or notification to the site:

| | |
|---|---|
| Death of Subject: | An event which results in the death of a subject. |
| Life-Threatening: | An event that, in the opinion of the investigator, would have resulted in fatality if immediate medical intervention had not been taken. This does not include an event that would have been fatal if it had occurred in a more severe form. |
| Hospitalization: | An event that results in an admission to the hospital for any length of time. This does not include an admission to the emergency room or outpatient facility. |
| Prolongation of Hospitalization: | An event which occurs while the study subject is hospitalized and that prolongs the subject's hospital stay. |
| Persistent or Significant Disability/Incapacity: | An event which results in a condition that interferes with the activities of daily living of a study subject (e.g., permanent loss of vision). |

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065861

ABT-594
Protocol M99-114
February 8, 2000                                                    33

| | |
|---|---|
| Congenital Anomaly: | An anomaly detected at or after birth, or any anomaly that results in fetal loss. |
| Important Medical Event Requiring Medical or Surgical Intervention to Prevent Serious Outcome: | An important medical event that, based on medical judgement, may not be immediately life–threatening or result in death or hospitalization, but may jeopardize the subject or require medical or surgical intervention to prevent one of the other outcomes listed in the "serious" definition (e.g., allergic bronchospasm requiring intensive treatment in the home or emergency room, blood dyscrasias, convulsions that do not result in inpatient hospitalization, or the development of drug dependency or drug abuse). |

In addition, miscarriage/spontaneous and elective abortions will be reported to Abbott Laboratories as serious adverse events.

In the event of a serious adverse event, whether related to study drug or not, the investigator and other professional personnel in attendance will be notified as soon as possible for the appropriate action. The investigators will notify by telephone, one of the following people at Abbott Laboratories within 24 hours of being made aware of any serious adverse event.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000

34

Bruce G. McCarthy, M.D.
Associate Medical Director
Analgesia Venture
Dept. 48Q, Bldg. AP34
200 Abbott Park Road
Abbott Park, Illinois 60064–6193
Office: (847) 935–6244
Home: (773) 529–5729
Fax: (847) 938–5258

Christopher J. Silber, M.D.
Venture Head
Analgesia Venture
Dept. 48Q, Bldg. AP34
200 Abbott Park Road
Abbott Park, Illinois 60064–6193
Office: (847) 938–5236
Home: (847) 615–0428
Fax: (847) 938–5258

Fred Siebert
Sr. Clinical Research Associate
Analgesia Venture
Dept. 48Q, Bldg. AP34
200 Abbott Park Road
Abbott Park, Illinois 60064–6193
Office: (847) 938–1167
Home: (847) 298–4682
Fax: (847) 938–5258

In addition, a written confirmation of the occurrence, including any supplementary data, must be sent within 3 days of the telephone report to:

Bruce G. McCarthy, M.D.
Dept. 48Q, Bldg. AP34
Abbott Laboratories
200 Abbott Park Road
Abbott Park, IL  60064–6193
Fax: (847) 938–5258

### 9.5.2   Appropriateness of Measurements

All efficacy measurements in this study are validated and are considered standard for this population.  All clinical and laboratory procedures in this study are standard and generally accepted.

### 9.5.3   Efficacy Variables

All efficacy variables will be derived from the efficacy measurements (Section 9.5.1.1).

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99–114
February 8, 2000

35

### 9.5.3.1    Primary Variable(s)

The primary efficacy measurement will be the change from baseline of the average
diary–based Pain Rating Scale (11–Point Likert Scale) score from each subject's diary to
the corresponding average of the last 7 days on study drug.  The baseline pain score for
the diary data is defined as the average of the last 7 pain scores prior to receiving the first
dose of blinded study drug on Day 1 of the study.

### 9.5.3.2    Secondary Variable(s)

Change from baseline to final and each scheduled evaluation will be calculated for each
of the following secondary efficacy variables:

- Diary–based Pain Rating Scale (11–Point Likert), change from baseline to each
  evaluation only
- Site Based Pain Rating Scale (11–Point Likert)
- Neuropathic Pain Scale
- Subject Global Impression of Change
- Clinician Global Impression of Change
- SF-36™ Health Status Survey (Acute), including sub–domains [(i) Physical
  Functioning, (ii) Role Physical, (iii) Bodily Pain, (iv) General Health, (v) Vitality,
  (vi) Social Functioning, (vii) Role Emotional, (viii) Mental Health][4] PCS, and
  MCS.[5]

The pain evaluations recorded at the Baseline Visit will be used as the baseline score for
pain evaluations assessed at the investigative site.

### 9.5.4    Drug Concentration Measurements

### 9.5.4.1    Collection, Processing and Storage of Blood Samples for ABT–594 Plasma
Assay

Blood samples for ABT–594 plasma assay will be collected from all subjects at
Treatment Visits I and IV.  One blood sample (approximately 7 mL) will be collected into
a sodium heparin evacuated collection tube at each visit.  Blood draws should be

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000

36

performed after any pain assessments or vital sign determinations during a visit. For
subjects who prematurely discontinue, a blood sample will be taken for ABT-594 assay
at the premature discontinuation visit, and the exact times at which the dose was taken
will be recorded.

All blood samples will be immediately stored at 4°C or below. The samples will be
separated by centrifugation within one hour after sample collection. The supernatant will
be transferred by polypropylene pipettes into plastic vials clearly marked as "Assay
Plasma" and labeled with the study drug number, protocol number, subject number,
initials, and date and time of sample collection. This information will also be recorded
on the appropriate CRF. All labeled plastic vials will be placed in a rack to prevent
breakage. **Plasma samples for determination of ABT-594 must be frozen at -5°C or
colder within one hour from centrifugation.** All specimens will be kept frozen at -5°C
or colder until packed in solid carbon dioxide (dry ice) for shipment to Abbott
Laboratories.

The time and date of each subject's morning dose on the day of plasma assay blood draw,
the time and date of the meal eaten prior to the morning dose, and the time and date of
the evening dose on the day prior to the plasma assay blood draw will be recorded in the
CRF.

### 9.5.4.2   Additional Pharmacokinetic Sampling

For those subjects participating in the additional pharmacokinetic sampling for PK
profile (approximately 30 subjects), blood samples will be collected at Treatment Visits I
and IV.

After establishing the time of the Treatment Visit, the subject will be instructed to take
the preceding day's study drug as close as possible to 8 PM. At the office visit, the study
medication will be taken in the presence of the office staff in order to allow proper and
accurate recording of blood collection times relative to dosing. The time of the visit
should accommodate a target time for the morning dose of 12 hours after the preceding
evening's dose. Blood samples will be collected as follows:  just prior to dosing (0 hour)

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000                                                                37

and at 1.5, 3, 5, and 8 hours after the morning dosing. Subjects will receive their 8 PM
dose as scheduled. Subjects will be confined at the site until the blood sample at the
8 hour time point is collected. Pharmacokinetic profile samples will be processed and
stored as specified in Section 9.5.4.1 until shipment to Abbott Laboratories.

### 9.5.4.3    Shipment of Plasma Samples

An inventory list of the samples included in the shipment must accompany the shipment.
The inventory list will include the shipping date, number of samples in the container,
drug identification, Abbott protocol number, subject numbers, sample type, sampling
times, and missing samples. The frozen samples will be packed in dry ice sufficient to
last 2 days during shipping.

Arrangements will be made with Abbott Laboratories for shipping of the plasma samples
to the following Abbott address:

>      Sample Receiving
>      Abbott Laboratories
>      Dept. 4TA, Bldg. AP9
>      100 Abbott Park Road
>      Abbott Park, IL  60064-6122
>      Phone:  (847) 937-0889
>      Fax:  (847) 938-9898

On the day of shipping, a copy of the inventory sheet should be faxed to the Sample
Receiving Department at (847) 938-9898.

### 9.5.5    Blood Samples for Genetic Polymorphism Analysis

Two 10 mL whole blood samples will be collected in purple top (EDTA) tubes at the
Baseline Visit and shipped immediately at ambient or refrigerated temperature to:

>      Covance Central Laboratory Services
>      8211 SciCor Drive
>      Indianapolis, IN  46214

If clear differences in response are noted during the clinical development of ABT-594
and believed to be genetically related, these samples may be analyzed as part of a
multicenter, multistudy project to identify genetic factors involved in the response to

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065866

ABT–594 or drugs of this class. The specific response may be related to efficacy or safety, or both. The results of this potential analysis will not be reported with the study summary. The samples may also be used for development of a diagnostic test for drug response.

The pharmacogenetic analyses involve two methods: one which examines known genes believed to be involved in the particular response (Candidate Gene), and one which uses a high density marker map to locate and identify genes related to the response (Genomic Association) by comparing the marker profile between the subjects with an effect and a corresponding negative control group. The Candidate Gene method includes genes related to drug metabolism, drug targets or target pathways, and others including genes relating to cellular homeostasis. The Genomic Association method utilizes a map of single nucleotide polymorphisms which by themselves are essentially meaningless, but when correlated with groups of two distinct subject groups allow the identification of the gene(s) related to the difference between the groups. For the purpose of pharmacogenetic studies such as this, the difference would be related to the response to the drug or the presence or absence of the disease being tested.

## 9.6    Data Quality Assurance

Prior to the initiation of this protocol, an investigator's meeting will be held with Abbott personnel, the investigators and their study coordinators, the CRO's project manager and CRAs. This meeting will entail a detailed discussion of the protocol, CRF completion, and specimen collection methods. In addition to the investigator's meeting, the study personnel at each site will be trained on the study procedures by a CRA at a study initiation visit and be given a CRF completion workbook for reference. The CRAs will monitor each site approximately every 4 weeks. At each visit, 100% source–document review will be made against the entries on the CRFs and a quality–assurance check will be performed to ensure that the investigator is complying with the protocol and regulations. The investigator must agree to provide Abbott Laboratories (or designee) · access to all source documents in order to verify CRF entries. In addition, after CRFs are retrieved by the CRA, a review of the data will be conducted by a physician and a clinical review team at Abbott Laboratories.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065867

ABT-594
Protocol M99-114
February 8, 2000                                                          39

The SF-36™ Health Status Survey (Acute) will be recorded directly on the CRF and will be considered source data.

All CRFs must be legible and completed in <u>black ball point ink</u>. All corrections must be initialed and dated by the investigator or designated assistant. The investigator will review the CRFs for completeness and accuracy and sign and date the set of case report forms where indicated.

Each CRF will be printed on 3-part NCR paper. The forms consist of a white, yellow and pink copy. The white and yellow copy of the completed, verified CRF will be collected by the CRA and the pink copy retained at the investigative site.

Data captured on the CRF will be entered into the database by a double-key entry procedure at Abbott Laboratories. Discrepancies against the hard-copy CRF will be reviewed and corrected on-line. After completion of the entry process, computer logic checks will be run to check for such items as inconsistent study dates and outlying laboratory values, and any necessary corrections will be made to the database and documented via addenda or audit trail.

The laboratory results will be electronically transferred from the central laboratory to the study database. A final review of all laboratory results will be conducted by a physician and clinical review team at Abbott Laboratories.

## 9.7    Statistical Methods and Determination of Sample Size

### 9.7.1   Statistical and Analytical Plans

All statistical tests will be 2-tailed and considered statistically significant if the P-value (Type 1 error rate) is less than or equal to 0.05 (when rounded to 3 decimal places).

For all efficacy and safety endpoints, comparisons of primary interest will be between each ABT-594 dose group and the placebo group, along with an assessment of ABT-594 linear dose response. Appropriate secondary comparisons will be made as considered necessary. No statistical adjustments will be made for multiple comparisons.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000                                                                                          40

The baseline for all variables (except for the diary–based Pain Rating Scale) will be the
last measurement obtained prior to receiving the first dose of blinded study drug on
Day 1. Baseline measurement for the diary–based Pain Rating Scale will be the average
of the last 7 pain scores prior to receiving the first dose of blinded study drug on Day 1.

### 9.7.1.1    Data Sets Analyzed

Efficacy analyses will be performed for 2 sets of data: intent–to–treat subjects and
evaluable subjects. Subjects receiving at least 1 dose of study drug with at least 1
diary–based baseline and at least 1 post-dose pain assessment for the diary–based Pain
Rating Scale (11–Point Likert) will be included in the intent–to–treat analyses. The
evaluable dataset will include subjects that receive at least 7 days of study drug with at
least 1 baseline and at least 1 post Day 7 pain assessment for the diary–based Pain Rating
Scale. Safety analyses will be performed with all randomized subjects who receive at
least 1 dose of study drug.

### 9.7.1.2    Demographic and Other Baseline Characteristics

Baseline comparability among treatment groups for the reasons for premature
discontinuation, demographic and baseline pain assessment measurements will be
assessed. The analyses will be performed using 1 or more of the following methods:
a 1–way analysis of variance (ANOVA) with treatment group as the main effect for
quantitative variables, the Cochran–Mantel–Haenszel (CMH) test for equal row means
for ordered categorical variables, and the Fisher's exact test (or its generalization to r x c
tables) for qualitative variables.

### 9.7.1.3    Efficacy Analyses

For all efficacy variables (except the diary–based Pain Rating Scale), the baseline
measurement will be the last measurement obtained prior to receiving the first dose of
blinded study drug on Day 1. Baseline for the diary–based Pain Rating Scale will be the
average of the last 7 pain scores prior to Day 1 of the study. Change from baseline to
each scheduled evaluation will be calculated for all efficacy variables (except both
Global Impression of Change scores).

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000                                                                                    41

## Primary Efficacy Analysis

The primary efficacy measurement will be the change from baseline of the average diary-based Pain Rating Scale (11-Point Likert) score from each subject's diary to the corresponding average of the last 7 days on study drug.

Treatment groups differences for the primary efficacy variable will be evaluated using a 2-way ANOVA with factors for treatment group, study center, and the treatment group by study center interaction. If the interaction term is not statistically significant at the 0.10 level, the primary efficacy analysis for the treatment group differences will be the 2-way ANOVA with factors for treatment group and study center, but without the interaction term. If some study centers have fewer than 1 subject per treatment group in the intent-to-treat dataset, data from such centers will be combined for analysis.

## Secondary Efficacy Analysis

Treatment group differences in the mean change from baseline to the final evaluation for the Neuropathic Pain Scale, SF-36™ Health Status Survey (Acute), including 8 sub-domains and PCS and MCS, and the site-based Pain Rating Scale (11-Point Likert) score will be assessed using a 2-way ANOVA as described in the above Primary Efficacy Analysis subsection. The actual scores of each of the Subject and Clinician Global Impression of Change will be analyzed using the CMH test for equal row means with study centers as strata. SF-36™ PCS and MCS may also be analyzed using appropriate regression analysis (with possible factors for demographic variables, treatment and time).

Additionally, treatment group differences in the change from baseline to each scheduled evaluation will be assessed, as described for the change from baseline to the final evaluation for the Neuropathic Pain Scale and the site-based Pain Rating Scale (11-Point Likert). For the diary-based Pain Rating Scale (11-Point Likert), change from baseline to each scheduled evaluation will be analyzed using the last 7 days prior to each scheduled visit. Subject and Clinician Global Impression of Change will be evaluated using CMH methodology on actual scores.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

If indicated, exploratory analyses will be performed on change from baseline pain scores, such as analysis of covariance (ANCOVA), with baseline pain scores as the covariate.

Dose response for ABT-594 will be explored using both a parametric regression model and nonparametric tests, with and without placebo included. If the effect of investigator sites is not significant, then the nonparametric Jonckheere-Terpstra test will be used instead of Page's test to assess dose response of ABT-594.

Other analyses will be performed as appropriate.

**Missing Data**

Two sets of analyses, corresponding to the handling of missing observations, will be performed on the efficacy variables. The "last observation carried forward" (LOCF) analyses will use the completed pain evaluation from the previous visit for site-based pain scores and the pain evaluation from the previous days for diary data as an estimate of the missing data. Thus, in the LOCF analysis, every subject in the analysis will have data for each specified evaluation. This technique reduces the bias caused by subjects who prematurely terminate for lack of efficacy. The "observed cases" (OC) analysis will not estimate the missing evaluation, and a subject who does not have pain evaluation on a scheduled visit will be excluded from the OC analysis for that visit.

In the event of data missing from the individual items in the Neuropathic Pain Scale and SF-36™ Health Status Survey (Acute), the estimated score of the missing item will be calculated, when less than one-half (within the scale of interest) of items are non-missing, as follows:

1. Calculate the ratio of the total score of the scale (the non-missing items) divided by the maximum possible total score for the non-missing items,
2. Multiply the maximum possible scores for the missing item by the ratio obtained in Step 1 above.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000                                                                                    43

### 9.7.1.4    Safety Analyses

All subjects receiving at least 1 dose of study drug will be evaluated for safety.

Adverse events will be coded using the COSTART $V^6$ dictionary. Treatment-emergent
adverse events (i.e., those which begin or worsen in severity after randomized study drug
is taken) will be tabulated by body system and COSTART term for each treatment group.
Treatment group differences will be evaluated using Fisher's exact test for the proportion
of subjects reporting a particular adverse event. A summary of the severity, relationship
to study drug, incidence and prevalence across time of all treatment-emergent adverse
events, tabulated by COSTART term and body system, will be presented for each
treatment group. Analyses by subgroup will be performed as appropriate.

Laboratory data will be analyzed using a 1–way ANOVA with treatment as the main
effect. The primary analyses will be on the change from baseline to the minimum,
maximum and final values during the study for each laboratory variable.

Additionally, the number and percentage of subjects with shifts from baseline to the final
values using criteria for limits for statistical analysis and normal ranges to define
categories (low, normal, high and missing) will be summarized.

Laboratory data values will be categorized as low, normal, or high based on normal
ranges of the central laboratory used in this study. Low or high laboratory values will be
flagged in the data listings. In addition, laboratory results which satisfy the criteria for
limits for statistical analysis (Appendix I) will be identified.

Mean changes from baseline to the minimum, maximum and final values for vital signs
and ECG will be analyzed in a similar manner as described for laboratory data above.
Vital sign and ECG results which satisfy the criteria for below and above limits
(Appendix I) will be identified.

Concurrent medication use will be summarized by treatment group.

Additional safety analyses will be performed as indicated.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

### 9.7.2   Determination of Sample Size

The study is designed to enroll approximately 320 subjects (approximately 80 subjects in each treatment group). This sample size will allow for the detection of a 0.46 effect size in the average diary–based Pain Rating Scale score for change from baseline to the final evaluation between any ABT–594 treatment group and placebo at 0.05 (two–tailed Type I error) level with at least 80% power. This calculation is based on results obtained from Study M98–833 of ABT–594 and published data using Gabapentin for subjects with painful diabetic polyneuropathy[7] and assuming a 39% and 25% improvement from baseline for ABT–594 and placebo, respectively.

### 9.7.3   Pharmacokinetics/Pharmacodynamics

The maximum observed plasma concentration ($C_{max}$), the time to $C_{max}$ ($T_{max}$), and the trough plasma concentration ($C_{trough}$) will be obtained directly from the plasma concentration–time data. The area under the plasma concentration–time curve during a dosing interval (AUC) will be obtained by the trapezoidal rule, using the Hour 0 concentration value for the Hour 12 value, or by some other appropriate methodology.

To assess dose proportionality and time invariance, $T_{max}$, dose–normalized $C_{trough}$ and log–transformed dose–normalized AUC and $C_{max}$ from the subset of subjects participating in the additional pharmacokinetic (PK) sampling will be subjected to a mixed effects model analysis. The model will include dose, visit (Visit I and Visit IV), and dose by visit interaction as fixed effects. Age, body weight, nicotine use status, and other variables that might account for variability in pharmacokinetics will be included as covariates. The study center factor will be included in the initial model, including a center main effect and, as appropriate, interaction of center with other factors. The center factor, or at least the interaction terms involving center, may be dropped from the model if they explain little of the variability in the data. If the number of subjects who have only Visit I data and not Visit IV data exceeds 20% of the subjects with intensive PK sampling, then analyses will also be performed for each visit separately. The hypothesis of invariance with dose will be tested by comparing the 300 μg BID dose vs the 150 μg BID dose. If the hypothesis of dose proportionality is rejected in a comparison, then the

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065873

ABT–594
Protocol M99–114
February 8, 2000

225 µg BID dose will be compared to each of the 150 and 300 µg BID doses. If the visit by dose interaction is statistically significant, then a comparison will be made for each visit.

An exploratory analysis will also be performed on the data set obtained from all subjects (including those who do not participate in the intensive PK sampling). This analysis will appropriately take into account the time of sampling relative to dosing. The questions of dose proportionality and change from Visit I to Visit IV will be considered in this analysis.

If there is some evidence from the data of this study that ABT–594 is efficacious, then the relationship between ABT–594 plasma concentration and the primary efficacy variable will be explored, using data from ABT–594 and placebo treatment groups or from ABT–594 treatment groups alone. One exploration will utilize the data of all subjects. An analysis using only the data of subjects undergoing intensive PK sampling may also be done. The model will include effects for efficacy variable baseline value and for visit. The center factor will be incorporated appropriately. The dependency of the measurements from the same subject will be accounted for.

Other analyses may be performed as necessary.

## 9.8    Changes in the Conduct of the Study or Planned Analyses

### 9.8.1   Protocol Changes

This study will be conducted in accordance with the protocol, GCP, all applicable local, state federal regulations and regulatory requirements. Neither the investigator nor the CRO will modify this protocol without first obtaining the concurrence of Abbott Laboratories. The modification must be documented in writing. Any change in the research activity, except those necessary to remove an apparent immediate hazard to the subject or those of an administrative or clarifying nature, must be reviewed and approved by the Institutional Review Board before implementation. Abbott Laboratories must submit protocol amendments to the FDA and possibly to other government agencies.

This study will be terminated if these conditions are not met.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

## 10.0  Protocol Deviations

When deviation from the protocol is deemed necessary for an individual subject, the investigator or other physician in attendance must contact the site study monitor at the CRO, who will contact Abbott Laboratories. Such contact will be made as soon as possible to permit a decision as to whether or not the subject is to continue in the study. Any departures from the protocol will be authorized only for that one subject. A description of the departure from the protocol and the reason for it will be recorded on the CRF.

## 11.0  Use of Information and Publication

All information concerning ABT–594 and Abbott Laboratories' operations, such as Abbott Laboratories' patent applications, formulas, manufacturing processes, basic scientific data, or formulation information, supplied by Abbott Laboratories and not previously published is considered confidential information.

The information developed during the conduct of this clinical study is also considered confidential and will be used by Abbott Laboratories in connection with the development of ABT–594. This information may be disclosed as deemed necessary by Abbott Laboratories. To allow for the use of the information derived from this clinical study and to ensure complete and thorough analysis, the investigator is obligated to provide Abbott Laboratories with complete test results and all data developed in this study.

This confidential information shall remain the sole property of Abbott Laboratories, shall not be disclosed to others without the written consent of Abbott Laboratories, and shall not be used except in the performance of this study.

Should the investigator choose to publish the results of this study, a copy of the manuscript will be provided to Abbott Laboratories at least 90 days before the date of submission to the intended publisher.

Neither the subject nor their physician will be informed of individual subject pharmacogenetic results, should they be performed, nor will anyone not directly involved in this research. This is due to the fact that, 1) the subject and their physician are already

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065875

aware of the subject's particular response to the drug and the study information would not affect their future medical care, and 2) if an association is established between a genetic sequence and a treatment response, separate studies must be conducted in order to validate or confirm the results and the properties of the test prior to the necessary regulatory approval to use the test for diagnostic purposes. DNA samples from this protocol may be used either for gene identification, validation, or diagnostic test development studies, as well as discovery of genes related to painful diabetic polyneuropathy.

## 12.0    Completion of The Study

The investigator will complete and report this study in satisfactory compliance with the protocol within 9 months after receipt of study supplies. Continuation of the study beyond this time must be mutually agreed upon in writing by both the investigator and Abbott Laboratories. It is agreed that, for reasonable cause, either the investigator or Abbott Laboratories (the sponsor), may terminate this study prematurely provided that written notice is submitted at a reasonable time in advance of the intended termination.

The investigator will retain all essential documents until at least 2 years after the last approval of a marketing application in an ICH region and until there are not pending or contemplated marketing applications in an ICH region or at least 2 years have elapsed since the formal discontinuation of clinical development of the investigational product. These documents should be retained by the applicable regulatory requirements or by an agreement with the sponsor. It is the responsibility of the sponsor to inform the investigator/institution as to when these documents no longer need to be retained.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065876

ABT-594
Protocol M99-114
February 8, 2000

48

## 13.0   Investigator's Agreement

1.   I have received and reviewed the Investigator Brochure for ABT-594.

2.   I have read the protocol and agree to conduct the study as outlined and in accordance with all local, state, and federal regulations.

3.   I agree to maintain the confidentiality of all information received or developed in connection with this protocol.


_____                    _____

Signature of Principal Investigator                                                     Date



_____

Name of Principal Investigator (printed or typed)


IN/R-S/1/ABT594/99114/99114PRO/P25-49
GO2Q143011

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065877

ABT-594
Protocol M99-114
February 8, 2000

49

## 14.0   References

1.  American Academy of Pain Medicine (1997).  The Use of Opioids for the Treatment of Chronic Pain.  pp. 1–4.

2.  **Sullivan JP and Bannon AW.**  Epibatidine:  pharmacologic properties of a novel nicotinic acetylcholine agonist and analgesic agent.  *CNS Drug Rev.* 2(1):21–39, 1996.

3.  **Sullivan JP, Briggs CA, Donnelly-Roberts D, Brioni JD, Radek RJ, McKenna DG, Campbell JE, Arneric SP, Decker MW, Bannon AW.** (±)-Epibatidine can differentially evoke responses mediated by putative subtypes of nicotinic acetylcholine receptors (nAChRs).  *Med Chem Res*, 4:502–516; 1994.

4.  **Ware JE.**  SF-36™ Health Survey Manual and Interpretation Guide.  The Health Institute, New England Medical Center, 1997.

5.  **Ware JE.**  SF-36™ Physical & Mental Health Summary Scales:  A User's Manual. Health Assessment Lab, New England Medical Center, 1994.

6.  "COSTART" Coding Symbols for Thesaurus of Adverse Reaction Terms: Fifth Edition, Department of Health and Human Services, Food and Drug Administration, Rockville, MD, 1995.

7.  **Backonja M, Beydoun A, Edwards KR, Schwartz SL, Fonseca V, Hes M, LaMoreaux L, Garofalo E.** Gabapentin for the symptomatic treatment of painful neuropathy in patients with diabetes mellitus.  **JAMA.** 208(21):1831–1836, 1998.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065878

ABT-594
Protocol M99-114
February 8, 2000                                                                              50

# Appendix A

## Documents Required Prior to Initiation of the Study

As sponsor of a clinical study, Abbott Laboratories has an obligation to ensure that the study will be conducted by a qualified investigator with sufficient resources (of time, personnel, and physical facilities) to conduct the study and to ensure that the investigator understands and agrees to comply with applicable regulations, policies, and procedures. Prior to the beginning of any clinical study, the investigator will be asked to provide the following documentation.

1. A signed protocol for the study.
2. A signed Form FDA 1572 or equivalent document certifying the investigator's agreement to comply with U.S. Federal (21 CFR, ICH GCP Guidelines) regulations governing the conduct of the study.
3. A signed Abbott Financial Disclosure form.
4. A current curriculum vitae of the investigator. If sub-investigators will participate in the study, a curriculum vitae for each.
5. Requirements for the Institutional Review Board (IRB)/Independent Ethics Committee (IEC).
   • A copy of the letter of approval of the IRB/IEC. The letter must specify that both the protocol and consent form were approved.
   • The names and affiliations of the members of the IRB/IEC or assurance number.
   • If the principal and/or sub-investigator is a member of the IRB/IEC, a letter stating that he/she did not participate in the review or approval of the protocol or consent form.
6. A specimen copy of the IRB/IEC-approved informed consent document to be used in the study.
7. A list of normal ranges of values for all laboratory tests specified by the protocol for all laboratories utilized.
8. A copy of the laboratory(ies) certification(s) or the authorization number of the certification(s), the name of the certifying authority, and the period of certification.

As a rule, these documents will be provided in the course of one or more visits to the investigator by an Abbott Laboratories representative. Usually the study cannot begin until all of the documents listed above have been provided.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065879

ABT-594
Protocol M99-114
February 8, 2000

51

# Appendix B

# Declaration of Helsinki

## Recommendations Guiding Physicians in Biomedical Research Involving Human Subjects

Adopted by the 18th World Medical Assembly, Helsinki, Finland, in June 1964.
Amended by the 29th World Medical Assembly, Tokyo, Japan, in October 1975,
35th World Medical Assembly, Venice, Italy, in October 1983,
41st World Medical Assembly, Hong Kong, in September 1989 and
48th General Assembly, Somerset West, Republic of South Africa 1996.

## Introduction

It is the mission of the physician to safeguard the health of the people. His or her knowledge and conscience are dedicated to the fulfillment of this mission.

The Declaration of Geneva of the World Medical Association binds the physician with the words "The health of my patient will be my first consideration" and the International Code of Medical Ethics declares that "A physician shall act only in the patient's interest when providing medical care which might have the effect of weakening the physical and mental condition of the patient."

The purpose of biomedical research involving human subjects must be to improve diagnostic, therapeutic and prophylactic procedures and the understanding of the etiology and pathogenesis of disease.

In current medical practice most diagnostic, therapeutic or prophylactic procedures involve hazards. This applies especially to biomedical research.

Medical progress is based on research which ultimately must rest in part on experimentation involving human subjects.

In the field of biomedical research a fundamental distinction must be recognized between medical research in which the aim is essentially diagnostic or therapeutic for a patient, and medical research, the essential object of which is purely scientific and without implying direct diagnostic or therapeutic value to the person subjected to the research.

Special caution must be exercised in the conduct of research which may affect the environment, and the welfare of animals used for research must be respected.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065880

ABT-594
Protocol M99-114
February 8, 2000

52

## Appendix B (Cont.)

Because it is essential that the results of laboratory experiments be applied to human beings to further scientific knowledge and to help suffering humanity, the World Medical Association has prepared the following recommendations as a guide to every physician in biomedical research involving human subjects. They should be kept under review in the future. It must be stressed that the standards as drafted are only a guide to physicians all over the world. Physicians are not relieved from criminal, civil and ethical responsibilities under the laws of their own countries.

### I.    <u>Basic Principles</u>

1.  Biomedical research involving human subjects must conform to generally accepted scientific principles and should be based on adequately performed laboratory and animal experimentation and on a thorough knowledge of the scientific literature.

2.  The design and performance of each experimental procedure involving human subjects should be clearly formulated in an experimental protocol which should be transmitted for consideration, comment and guidance to a specially appointed committee independent of the investigator and the sponsor provided that this independent committee is in conformity with the laws and regulations of the country in which the research experiment is performed.

3.  Biomedical research involving human subjects should be conducted only by scientifically qualified persons and under the supervision of a clinically competent medical person. The responsibility for the human subject must always rest with a medically qualified person and never rest on the subject of the research, even though the subject has given his or her consent.

4.  Biomedical research involving human subjects cannot legitimately be carried out unless the importance of the objective is in proportion to the inherent risk to the subject.

5.  Every biomedical research project involving human subjects should be preceded by careful assessment of predictable risks in comparison with foreseeable benefits to the subject or to others. Concern for the interests of the subject must always prevail over the interests of science and society.

6.  The right of the research subject to safeguard his or her integrity must always be respected. Every precaution should be taken to respect the privacy of the subject and to minimize the impact of the study on the subject's physical and mental integrity and on the personality of the subject.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000

53

## Appendix B (Cont.)

7. Physicians should abstain from engaging in research projects involving human subjects unless they are satisfied that the hazards involved are believed to be predictable. Physicians should cease any investigation if the hazards are found to outweigh the potential benefits.

8. In publication of the results of his or her research, the physician is obligated to preserve the accuracy of the results. Reports of experimentation not in accordance with the principles laid down in the Declaration should not be accepted for publication.

9. In any research on human beings, each potential subject must be adequately informed of the aims, methods, anticipated benefits and potential hazards of the study and the discomfort it may entail. He or she should be informed that he or she is at liberty to abstain from participation in the study and that he or she is free to withdraw his or her consent to participation at any time. The physician should then obtain the subject's freely given informed consent, preferably in writing.

10. When obtaining informed consent for the research project, the physician should be particularly cautious if the subject is in a dependent relationship to him or her or may consent under duress. In that case the informed consent should be obtained by a physician who is not engaged in the investigation and who is completely independent of this official relationship.

11. In case of legal incompetence, informed consent should be obtained from the legal guardian in accordance with national legislation. Where physical or mental incapacity makes it impossible to obtain informed consent, or when the subject is a minor, permission from the responsible relative replaces that of the subject in accordance with national legislation. Whenever the minor child is in fact able to give a consent, the minor's consent must be obtained in addition to the consent of the minor's legal guardian.

12. The research protocol should always contain a statement of the ethical considerations involved and should indicate that the principles enunciated in the present Declaration are complied with.

II.   **Medical Research Combined with Professional Care (Clinical Research)**

1. In the treatment of the sick person, the physician must be free to use a new diagnostic and therapeutic measure, if in his or her judgment it offers hope of saving life, reestablishing health or alleviating suffering.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065882

ABT-594
Protocol M99-114
February 8, 2000                                                              54

## Appendix  B (Cont.)

2.  The potential benefits, hazards and discomfort of a new method should be weighed against the advantages of the best current diagnostic and therapeutic methods.

3.  In any medical study, every patient – including those of a control group, if any – should be assured of the best proven diagnostic and therapeutic methods.  This does not exclude the use of inert placebo in studies where no proven diagnostic or therapeutic method exists.

4.  The refusal of the patient to participate in a study must never interfere with the physician – patient relationship.

5.  If the physician considers it essential not to obtain informed consent, the specific reasons for this proposal should be stated in the experimental protocol for transmission to the independent committee (I.2).

6.  The physician can combine medical research with professional care, the objective being the acquisition of new medical knowledge, only to the extent that medical research is justified by its potential diagnostic or therapeutic value for the patient.

III.   **Non–Therapeutic Biomedical Research Involving Human Patients (Non–Clinical Biomedical Research)**

1.  In the purely scientific application of medical research carried out on a human being, it is the duty of the physician to remain the protector of the life and health of that person on whom biomedical research is being carried out.

2.  The subjects should be volunteers – either healthy persons or patients for whom the experimental design is not related to the patient's illness.

3.  The investigator or the investigating team should discontinue the research if in his/her or their judgment it may, if continued, be harmful to the individual.

4.  In research on man, the interest of science and society should never take precedence over considerations related to the well–being of the subject.

REASON FOR REVISION:  Revised to correspond to the amendment adopted by the 48th General Assembly of the World Medical Association, Somerset West, Republic of South Africa 1996.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065883

ABT–594
Protocol M99–114
February 8, 2000

55

# Appendix C
## Responsibilities of the Clinical Investigator

Clinical research studies sponsored by Abbott Laboratories are subject to the regulations of the U.S. Food and Drug Administration (FDA). The responsibilities imposed upon investigators by the FDA are summarized in the "Statement of Investigator" (Form FDA 1572), which is actually a form letter addressed to the sponsor (Abbott Laboratories), summarizing the investigators qualifications for the study and their willingness to follow FDA regulations with respect to the study.

In signing a Form FDA 1572, the investigator agrees to assume the following responsibilities:

1. To secure prior approval of the study by an appropriate institutional review board which conforms to FDA regulations.
2. To make at least yearly reports on the progress of the study to the above committee, and a final report within three months of study completion.
3. To maintain current running records of the receipt, administration, and disposition of study medication and to return all unused study medication to Abbott Laboratories.
4. To obtain valid written informed consent from each patient who participates in the study.
5. To prepare and maintain adequate case histories of all persons entered into the study, including case report forms, hospital records, laboratory results, etc., and to maintain these data for a minimum of two years following notification by Abbott Laboratories that all investigations have been discontinued with this drug.
6. To identify all subinvestigators who will also supervise drug administration.
7. To report adverse effects to Abbott Laboratories promptly. In the event of serious or unexpected adverse event, to notify Abbott Laboratories immediately by telephone.
8. To allow possible inspection and copying by the FDA of case reports and records of drug distribution.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065884

ABT-594
Protocol M99-114
February 8, 2000                                                                                                          56

## Appendix D

## Elements of the Consent Form

Abbott Laboratories requires that all informed consent statements used in studies which they sponsor comply with FDA 21 CFR 50 (Protection of Human Subjects) and the ICH Good Clinical Practice Guideline. To ensure compliance, the informed consent itemization listed below is provided to guide the investigator in drafting an acceptable informed consent. Abbott Laboratories will review a proposed informed consent prior to its submission to the Review Committee (Institutional Review Board, Ethics Committee); alternatively, Abbott will supply to the investigator a draft informed consent statement which may be submitted to the review Committee.

For IND Studies, procedures will comply with FDA 21 CFR 50 and the ICH Good Clinical Practice Guideline.

Signed informed consent will be obtained from all patients participating in PPD Clinical Research studies or the patients' legally authorized representative. This consent must include the following items:

1. A statement that the study involves research.

2. An explanation of the purposes of the research.

3. The approximate number of patients involved in the trial.

4. The expected duration of the patient's participation.

5. The trial treatment(s) and the probability for random assignment to each treatment.

6. Identification of experimental procedures.

7. The trial procedures to be followed, including all invasive procedures.

8. The patient's responsibilities.

9. A description of any reasonably foreseeable risks or inconveniences to the patient and, if applicable, to an embryo, fetus, or nursing infant.

10. A statement that may involve risks which are currently unforeseeable.

11. The anticipated expenses, if any, to the patient for participating in the trial.

12. A description of the reasonable expected benefits. If there is no intended clinical benefit to the patient, this should be stated.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065885

ABT-594
Protocol M99-114
February 8, 2000

57

## Appendix D (Cont.)

13. The anticipated prorated payment, if any, to the patient for participating in the trial.

14. The alternative procedure(s) or course(s) of treatment that may be available to the patient, and their important potential benefits and risks.

15. A statement that the patient or the patient's legally acceptable representative will be informed in a timely manner if information becomes available that may be relevant to the patient's willingness to continue participation in the trial.

16. An explanation as to whether any compensation or medical treatment are available if injury occurs. If so, what the compensation consists of and/or where further information may be obtained.

17. Whom to contact about information regarding the trial.

18. Whom to contact about research patient's rights (ideally not the investigator).

19. Whom to contact in the event of trial–related injury of the patient.

20. A statement that the monitor(s), auditor(s), the IRB/EC, and regulatory authorities (e.g., FDA) will be granted direct access to the patients' original medical records for verification of clinical trial procedures and/or data, without violating the confidentiality of the patient, to the extent permitted by the applicable laws and regulations and that, by signing a written consent form, the patient or the patient's legally acceptable representative is authorizing such access.

21. A statement that the site will collect information on the patient per ICH requirements, including patient name, home address, phone number, and birthdate. In addition, the name, address, and phone number of another person who can be contacted in an emergency will also be recorded. This information will be treated with strict adherence to professional standards of confidentiality and will be filed at the site.

22. A statement that the records identifying the patient will be kept confidential and, to the extent permitted by the applicable laws and/or regulations, will not be made publicly available. If the results of the trial are published, the patient's identity will remain confidential.

23. The foreseeable circumstances and/or reasons under which the patients' participation in the trial may be terminated.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99–114
February 8, 2000

58

## Appendix D (Cont.)

24. Procedures for orderly termination of participation.

25. A statement that participation is voluntary.

26. A statement that refusal to participate will involve no penalty or loss of benefits.

27. A statement that the patient may discontinue participation at any time without penalty or loss of benefits.

28. A statement that a signed and dated copy of the consent is given to the patient.

29. The statement, "I agree to participate..."

30. A place for the patient or the patient's legally acceptable representative to sign and date.

31. A place for the person who conducted the informed consent discussion to sign and date.

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065887

# Appendix E
## Sample Abbott Laboratories Drug Accountability Form
### Study M99-114

Subject Randomization Number ◆ _____    Subject Initials: _____    Subject Birthdate: _____

Investigator's Name: _____    Location: _____

| Module Carton Type | Module # ◆ | NPRO # | Clinical Supplies Invoice No. | Date Received (M/D/Y) |
|---|---|---|---|---|
| Baseline Visit | Days 1-7 | | | |
| Baseline Visit | Days 8-49 | | | |
| Visit II | Days 8-49 | | | |
| Visit III | Days 8-49 | | | |

| Visit | Module # ◆ | DISPENSED TO SUBJECT | | | | RETURNED FROM SUBJECT | | | VERIFIED BY CRA | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | # Capsules | Date | By* | Checked By | Date | No. of Capsules Remaining | By* | By* | Date |
| Baseline Visit | Days 1-7 | 52 | | | | | | | | |
| Baseline Visit | Days 8-49 | 144 | | | | | | | | |
| Visit I | Redispense balance of Days 8-49 cards remaining from Baseline Visit | — — — | | | | | | | | |
| Visit II | | 144 | | | | | | | | |
| Visit III | | 144 | | | | | | | | |

* Pharmacist/Coordinator/Nurse    * CRO Monitor    ◆ Assigned by IVRS

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000

59

Confidential
ABBT0065

ABT-594
Protocol M99-114
February 8, 2000

60

## Appendix F
## Pain Assessments

**Pain Rating Scale (11 point Likert)**

The subject's pain intensity will be assessed by completion of the following statement in the daily diaries and at the investigative site.

How severe was your neuropathy pain during the last 24 hours?

| 0<br>No Pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10<br>Worst Pain<br>Possible |
|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065889

ABT-594
Protocol M99-114
February 8, 2000

61

## Appendix G

## Neuropathic Pain Scale

*Instructions:* There are several different aspects of pain which we are interested in measuring: pain sharpness, heat/cold, dullness, intensity, overall unpleasantness, and surface vs. deep pain.

The distinction between these aspects of pain might be clearer if you think of taste. For example, people might agree on how *sweet* a piece of pie might be (the *intensity* of the sweetness), but some might enjoy it more if it were sweeter while others might prefer it to be less sweet. Similarly, people can judge the loudness of music and agree on what is more quiet and what is louder, but disagree on how it makes them feel. Some prefer quiet music and some prefer it more loud. In short, the *intensity* of a sensation is not the same as how it makes you feel. A sound might be unpleasant and still be quiet (think of someone grating their fingernails along a chalkboard). A sound can be quiet and "dull" or loud and "dull."

Pain is the same. Many people are able to tell the difference between many aspects of their pain: for example, *how much* it hurts and *how unpleasant* or annoying it is. Although often the intensity of pain has a strong influence on how unpleasant the experience of pain is, some people are able to experience more pain than others before they feel very bad about it.

There are scales for measuring different aspects of pain. For one patient, a pain might feel extremely hot, but not at all dull, while another patient may not experience any heat, but feel like their pain is very dull. We expect you to rate very high on some of the scales below and very low on others. We want you to use the measures that follow to tell us exactly what you experience.



CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065890

ABT-594
Protocol M99-114
February 8, 2000

62

## Appendix  G (Cont.)

5.  Please use the scale below to tell us how **cold** your pain feels.  Words used to describe very cold pain include "like ice," and "freezing."

Not cold  | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |  The most **cold** sensation imaginable ("freezing")

6.  Please use the scale below to tell us how **sensitive** your skin is to light touch or clothing.  Words used to describe sensitive skin include "like sunburned skin" and "raw skin."

Not sensitive  | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |  The most **sensitive** sensation imaginable ("raw skin")

7.  Please use the scale below to tell us how **itchy** your pain feels.  Words used to describe itchy pain include "like poison oak" and "like a mosquito bite."

Not itchy  | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |  The most **itchy** sensation imaginable ("like poison oak")

8.  Now that you have told us the different physical aspects of your pain, the different types of sensations, we want you to tell us overall how **unpleasant** your pain is to you. Words used to describe very unpleasant pain include "miserable" and "intolerable." Remember, pain can have a low intensity, but still feel extremely unpleasant, and some kinds of pain can have a high intensity but be very tolerable. With this scale, please tell us how **unpleasant** your pain feels.

Not unpleasant  | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |  The most **unpleasant** sensation imaginable ("intolerable")

9.  Lastly, we want you to give us an estimate of the severity of your deep versus surface pain. We want you to rate each location of pain separately. We realize that it can be difficult to make these estimates, and most likely it will be a "best guess," but please give us your best estimate.

### HOW INTENSE IS YOUR *DEEP* PAIN?

No deep pain  | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |  The most **intense deep** pain sensation imaginable

10.  ### HOW INTENSE IS YOUR *SURFACE* PAIN?

No surface pain  | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |  The most **intense surface** pain sensation imaginable

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

ABT-594
Protocol M99-114
February 8, 2000

63

# Appendix H
## Subject Global Impression of Change and
## Clinician Global Impression of Change

**Subject Global Impression of Change**

The subject's impression of pain relief will be assessed by completion of the following statement:

Compared to the Baseline Pain Assessment Phase, how much have you changed overall?

- 1    Much Improved
- 2    Moderately Improved
- 3    Minimally Improved
- 4    No Change
- 5    Minimally Worse
- 6    Moderately Worse
- 7    Much Worse

**Clinician Global Impression of Change**

The clinicians impression of pain relief will be assessed by completion of the following statement:

Rate total improvement whether or not, in your judgement, it is due entirely to drug treatment.

Compared to Baseline, how much has the subject changed overall?

- 1    Much Improved
- 2    Moderately Improved
- 3    Minimally Improved
- 4    No Change
- 5    Minimally Worse
- 6    Moderately Worse
- 7    Much Worse

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065892

ABT-594
Protocol M99–114
February 8, 2000

64

## Appendix I

## Laboratory Determinations, Vital Signs and Electrocardiogram
## Variables for Statistical Analysis

| Hematology | Below Limit | Above Limit |
|---|---|---|
| Hemoglobin (g/dL) | | |
|     Female | $\leq 9.5$ | $\geq 16.5$ |
|     Male | $\leq 11.5$ | $\geq 18.5$ |
| Hematocrit (%) | | |
|     Female | $\leq 32$ | $\geq 50$ |
|     Male | $\leq 37$ | $\geq 55$ |
| Red Blood Cells (x $10^{12}$/L) | | |
|     Female | $\leq 3.5$ | $\geq 6.0$ |
|     Male | $\leq 3.8$ | $\geq 7.0$ |
| White Blood Cells (x $10^9$/L) | $\leq 2.8$ | $\geq 16.0$ |
| Platelet Count (x $10^9$/L) | $\leq 75$ | $\geq 700$ |
| Eosinophils (%) | | $\geq 10$ |
| Basophils (%) | | $\geq 10$ |
| Lymphocytes (%) | | $\geq 75$ |
| Monocytes (%) | | $\geq 15$ |
| Neutrophils (%) | $\leq 15$ | |
| Bands (%) | | $\geq 10$ |
| Mean Corpuscular Volume (fL) | $\leq 0.8$ x LLN | $\geq 1.2$ x ULN |
| Mean Corpuscular Hemoglobin Concentration (g/dL) | $\leq 0.8$ x LLN | $\geq 1.2$ x ULN |
| Atypical Lymphocytes (%) | | $\geq 5$ |
| Prothrombin Time (sec) | | $\geq 2$ ULN |
| Partial Thromboplastin Time (sec) | | $\geq 2$ ULN |

LLN = Lower limit of normal     ULN = Upper limit of normal

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065893

ABT-594
Protocol M99-114
February 8, 2000                                                                                        65

## Appendix I (Cont.)

| Chemistry | Below Limit | Above Limit |
|---|---|---|
| Albumin (g/dL) | ≤ 2.5 | |
| Alkaline Phosphatase (IU/L) | | ≥ 3 x ULN |
| Bicarbonate (mEq/L) | ≤ 12 | ≥ 38 |
| BUN (mg/dL) | | ≥ 30 |
| Calcium (mg/dL) | ≤ 8.2 | ≥ 12 |
| Chloride (mEq/L) | ≤ 90 | ≥ 118 |
| Cholesterol (mg/dL) | | ≥ 600 |
| Creatinine (mg/dL) | | ≥ 2.0 |
| Direct Bilirubin (mg/dL) | | ≥ 2.0 |
| Glucose (mg/dL) | ≤ 45 | ≥ 175 |
| LDH (IU/L) | | ≥ 3 x ULN |
| Inorganic Phosphorus (mg/dL) | ≤ 1.7 | ≥ 5.5 |
| Potassium (mEq/L) | ≤ 3.0 | ≥ 6.0 |
| SGOT/AST (IU/L) | | ≥ 3 x ULN |
| SGPT/ALT (IU/L) | | ≥ 3 x ULN |
| Sodium (mEq/L) | ≤ 126 | ≥ 156 |
| Total Bilirubin (mg/dL) | | ≥ 2.0 |
| Total Protein (g/dL) | ≤ 4.5 | ≥ 10 |
| Triglycerides (mg/dL) | | ≥ 600 |
| Uric acid (mg/dL) Female Male | | ≥ 8.5 ≥ 10.5 |

ULN = Upper limit of normal

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065894

ABT-594
Protocol M99-114
February 8, 2000

66

## Appendix I (Cont.)

| Urinalysis | Below Limit | Above Limit |
|---|---|---|
| Specific Gravity | $\leq 1.001$ | $\geq 1.030$ |
| PH | $\leq 4$ | $\geq 9$ |
| Protein | | $\geq 3+^*$ ($\geq 10$) |
| Ketones | | $\geq 3+^*$ |
| RBC | | |
|     Female | | $\geq 10$/hpf |
|     Male | | $\geq 8$/hpf |
| WBC | | $\geq 10$/hpf ($\geq 2+$) |
| Casts | | $\geq 9$ |
| Glucose | | $\geq 3+^*$ |

| Oral Body Temperature | | |
|---|---|---|
| Temperature | Low: | decreased $\geq 2°F$ from baseline |
| | High: | $\geq 101°F$ |

| Body Weight | | |
|---|---|---|
| Weight | Low: | decreased $\geq 15\%$ from baseline |
| | High: | increased $\geq 15\%$ from baseline |

| Supine or Sitting Vital Signs | | |
|---|---|---|
| Systolic Blood Pressure | Low: | $\leq 90$ mmHg and decreased $\geq 30$ from baseline |
| | High: | $\geq 180$ mmHg and increased $\geq 40$ from baseline |
| Diastolic Blood Pressure | Low: | $\leq 50$ mmHg and decreased $\geq 20$ from baseline |
| | High: | $\geq 105$ mmHg and increased $\geq 30$ from baseline |
| Heart Rate | Low: | $\leq 50$ bpm and decreased $\geq 30$ bpm from baseline |
| | High: | $\geq 120$ bpm and increased $\geq 30$ bpm from baseline |

\*   $\geq 3+$ on a scale with 4+ being the maximum value

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065895

ABT-594
Protocol M99-114
February 8, 2000

67

## Appendix I (Cont.)

| Electrocardiogram | | |
|---|---|---|
| PR Interval | High: | $\geq$ 210 msec |
| QRS Duration | Low: | $\leq$ 50 msec |
| | High: | $\geq$ 150 msec |
| QT Interval | Low: | $\leq$ 200 msec |
| | High: | $\geq$ 500 msec |
| QTc Interval* | Low: | $\leq$ 200 msec |
| | High: | $\geq$ 500 msec |
| Heart Rate | Low: | $\leq$ 50 bpm and decreased $\geq$ 30 bpm from baseline |
| | High: | $\geq$ 120 bpm and increased $\geq$ 30 bpm from baseline |

* QTc calculated as QT divided by the square root of RR interval

CONFIDENTIAL INFORMATION - ABBOTT LABORATORIES
No use or disclosure outside Abbott is permitted without prior written authorization from Abbott.

Confidential
ABBT0065896