UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> v. <br><br> ABBOTT LABORATORIES, <br><br> Defendant. | CIVIL ACTION NO. 05-11150-DPW |

## ABBOTT'S DEPOSITION DESIGNATIONS AND COUNTER DESIGNATIONS FOR JOHN MASTROMARIANO,

Defendant Abbott Laboratories ("Abbott") respectfully submits the attached deposition designations and counter-designation for the October 20, 2006 deposition of John Mastromariano, Chief Risk Officer, Hancock.

.                                                                          .

Dated:  February 18, 2008

Respectfully submitted,

ABBOTT LABORATORIES

By:  __/s/ Eric J. Lorenzini_____
      Eric J. Lorenzini

Jeffrey I. Weinberger (*pro hac vice*)
Gregory D. Phillips (*pro hac vice*)
Eric J. Lorenzini *(pro hac vice)*
Ozge Guzelsu *(pro hac vice)*
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth Floor
Los Angeles, CA  90071-1560
Tele:  (213) 683-9100

and

Peter E. Gelhaar (BBO#188310)
Michael S. D'Orsi (BBO #566960)
DONNELLY, CONROY & GELHAAR LLP
1 Beacon St., 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880
peg@dcglaw.com
msd@dcglaw.com

*Counsel for Abbott Laboratories*

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 18, 2008.

Date: February 18, 2008.

/s/ Ozge Guzelsu

## John Mastromarino Deposition Designations

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 10/20/2006 | Mastromarino, John | | | 7:4-9:14 | | | |
| 10/20/2006 | Mastromarino, John | | | 10:18-11:6 | | | |
| 10/20/2006 | Mastromarino, John | | | 24:20-25:8 | | | |
| 10/20/2006 | Mastromarino, John | | | 28:17-29:8 | 1 | | |
| 10/20/2006 | Mastromarino, John | | | 33:23-35:19 | | | |
| 10/20/2006 | Mastromarino, John | | | 35:24-36:17 | | | |
| 10/20/2006 | Mastromarino, John | | | 36:21-37:18 | | | |
| 10/20/2006 | Mastromarino, John | | | 40:15-41:24 | | | |
| 10/20/2006 | Mastromarino, John | | | 43:10-43:14 | | | |
| 10/20/2006 | Mastromarino, John | | | 49:2-49:17 | | | |

# Color Key to Deposition Designations

Designation by Plaintiffs

Counter Designation by Defendants

Designation by Defendants

Mastromarino, John L. (Linked)  10/20/2006  10:04:00 AM

1              Volume:  1

2              Pages:  1-67

3              Exhibits:  1-4

4          UNITED STATES DISTRICT COURT

5              FOR THE

6          DISTRICT OF MASSACHUSETTS

7     - - - - - - - - - - - - - - - - - - x

8     JOHN HANCOCK LIFE INSURANCE COMPANY,

9     JOHN HANCOCK VARIABLE LIFE INSURANCE

10    COMPANY, and MANULIFE INSURANCE COMPANY

11    (f/k/a INVESTORS PARTNER INSURANCE COMPANY),

12        Plaintiffs,

13    v.          Civil Action No.  05-1150DPW

14    ABBOTT LABORATORIES,

15        Defendant.

16    - - - - - - - - - - - - - - - - - - x

17       VIDEO DEPOSITION OF JOHN L. MASTROMARINO

18          Friday, October 20, 2006

19             10:03 a.m.

20          Donnelly, Conroy & Gelhaar

21             One Beacon Street

22             Boston, Massachusetts

23    Reporter:  Carol A. Pagliaro, CSR/RPR/RMR

24

1    Q. So John Hancock didn't have that position

2    until you arrived on the scene?

3    A. Correct.

4    Q. Did anyone explain to you why John Hancock

5    created the position of Chief Risk Officer?

6    A. Not specifically.

7    Q. What was your understanding of why John

8    Hancock created the position of Chief Risk Officer?

9    A. My belief was that the analyst, the

10    regulatory bodies, were trying to move the

11    insurance industry forward along the same lines of

12    what the banking institutions had created in years

13    past and that they were receiving pressure from the

14    regulatory and others to create this function.

15    Q. And when you say the regulatory bodies were

16    trying to move the insurance companies more in the

17    direction that the banks had moved in, can you

18    explain more what you mean by that?

19    A. Well, the various state regulatory bodies,

20    principally New York, I suppose, because they seem

21    to be the biggest insurance regulator, and to do

22    business in those areas, you know, they tend to like

23    a more robust risk management program, and so my

24    sense was that that was -- there was a number of

1    popular view that boards of directors, as a result

2    of some of the issues that took place in the late

3    eighties, early nineties, wanted a more

4    comprehensive assessment of the overall risk profile

5    in the company, and they wanted to bring all that

6    together, ideally, under one individual.

7        ATTY. DAVIS:  I'm sorry to interrupt.

8    We have the same stipulations that we have had?

9        ATTY. LORENZINI:  Yes.

10       ATTY. DAVIS:  So we are reserving all

11   objections, except as to form; is that correct?

12       ATTY. LORENZINI:  Yes.

13       ATTY. DAVIS:  Motions to Strike also

14   reserved?

15       ATTY. LORENZINI:  Yes.

16       ATTY. DAVIS:  Sorry to interrupt.

17    Q.  What were your responsibilities as Chief

18   Risk Officer of John Hancock?

19    A.  It's a difficult question to answer because

20   there was -- because Hancock was so new to this

21   whole design as Chief Risk Officer, there were no --

22   there was no job description, per se.  There were no

23   clear authorities vested in the new Chief Risk

24   Officer.  It was more a work in process as to do

1    establishing guidelines, refining guidelines,

2    deciding, you know, how these things should total,

3    but it was very much in the discussion phase when I

4    arrived.

5      Q.  That helps clarify things.  So you are not

6    clear -- strike that.  You don't know whether John

7    Hancock had guidelines regarding the aggregate

8    amount of money that could be invested in

9    transactions of a certain risk level prior to your

10   arrival in 2003?

11      ATTY. DAVIS:  Objection.  You can

12   respond.

13      A.  I believe there was some guideline.  I don't

14   recall what that might have been.

15      Q.  And you don't know -- if there was such a

16   guideline prior to your arrival, you don't know if

17   those guidelines were adhered to?

18      ATTY. DAVIS:  Objection.

19      A.  No.

20      Q.  At any time during your employment at John

21   Hancock did you become aware of a Research Funding

22   Agreement between John Hancock and Abbott

23   Laboratories?

24      A.  Yes.

1     Q. When was that?

2     A. My recollection was it was coming up for a

3     review at the Bond and Investment Committee as part

4     of its annual review, and that's when I first read,

5     you know, some of the background on that deal.

6     Q. Is it typical for the Bond Investment

7     Committee to review each investment annually?

8     A. Yes.

9     Q. And is that annually, annually as of the

10    date of the transaction?

11        ATTY. DAVIS:  Objection.  You can

12    respond.

13    A. I don't know.  Don't know.

14    Q. And so were you sitting on the Bond

15    Investment Committee when the Abbott transaction

16    came up for annual review?

17    A. I don't believe I was a formal member of the

18    committee at the time.  I was still a guest at the

19    meeting.

20    Q. And can you recall the approximate date at

21    which the Abbott transaction came up for annual

22    review?

23    A. My only reference is an e-mail that I sent

24    that says it was in April.

1      Q.  Regardless of whether you voiced any

2      comments, did you have any concerns regarding the

3      Abbott transaction at that meeting?

4      A.  At that meeting I think you have to

5      understand I'm an invited guest of the Bond and

6      Investment Committee, and at this early stage in my

7      employment, I'm taking a very back seat role in this

8      committee.  I may make a small point of

9      clarification, but I certainly wasn't offering

10     opinions in the larger group.  I was more an

11     observer at this point in my employment.

12           ATTY. LORENZINI:  I would like to mark

13     as Mastromarino Exhibit 1 a document produced by

14     John Hancock with Bates stamp JH2447, and it's an

15     e-mail from Barry Welch to Stephen Blewitt, and then

16     there is an e-mail below that from Mr. Mastromarino.

17           (Document marked as Exhibit 1

18            for identification.)

19     Q.  Why don't you just take a look first at the

20     bottom e-mail that appears to be from you to Barry

21     Welch and Roger Nastou, dated March 14; do you

22     recognize this e-mail?

23     A.  Yes.

24     Q.  Did you send this e-mail on or about March

1    14?

2    A.  I did.

3    Q.  You state in the e-mail, I read the write-up

4    on the 220MM last night.  What write-up are you

5    referring to in that e-mail?

6    A.  I assume in my own mind that it was the

7    write-up that Steve Blewitt put together for the

8    annual review.

9         ATTY. DAVIS:  I caution you not to

10   speculate.  To the extent you can recall you can

11   testify, but please don't speculate.

12        ATTY. LORENZINI:  I'd like to mark as

13   Mastromarino Exhibit No. 2 another document with

14   Bates numbers JH1185 through 1202, and this is a

15   document with the heading John Hancock Life

16   Insurance Company Bond and Corporate Finance Group.

17        (Document marked as Exhibit 2 for

18            identification.)

19   Q.  Why don't you just take a moment to browse

20   through this document, see if you recognize it?

21        ATTY. DAVIS:  The question is does he

22   recognize it?

23        ATTY. LORENZINI:  I'm just giving him a

24   chance...

1    closely.

2        Your name is not listed on this e-mail

3    chain, but I'm just showing you this to see if it

4    refreshes your recollection of whether Barry Welch

5    passed on to you the memorandum that is attached to

6    the e-mail we marked as Exhibit 3.

7        ATTY. DAVIS:  Objection.  You can

8    respond.

9      Q.  So that the question, just to recap is, do

10   you recall seeing the memorandum attached to the

11   e-mail that we have marked as Exhibit 3.

12     A.  No.

13     Q.  So this memorandum is not the write-up that

14   you referred to in Exhibit 1, correct?

15       ATTY. DAVIS:  Objection.

16     A.  I need to step back here.  I have no

17   specific recollection of what document that e-mail

18   is referring to.  There was various work done in

19   explaining this transaction, but I can't pinpoint

20   whether -- I have no recollection of this document

21   or this document, and I just don't know what

22   document that refers to.

23     Q.  Fair enough.  Let's turn back to

24   Mastromarino Exhibit No. 1.  Did you write this

1    March 14 e-mail prior to the meeting of the Bond

2    Investment Committee at which the Abbott transaction

3    was reviewed?

4        A. I can't say.

5        Q. In the second sentence of your e-mail you

6    write, I must say it is a bit too rich for my taste

7    with too many assumptions and unknowns.  What did

8    you mean when you said that it is a bit too rich for

9    my taste?

10        A. I think this has to be viewed in the context

11    that I had no prior experience with lending and/or

12    investing in drug trials, and I was unfamiliar with

13    the probabilities, the modeling techniques that

14    Steve and others put together on this deal.

15            I recognize that there had been prior

16    deals of similar sort, but personally it was

17    something -- it was new territory for me, and my

18    assessment of rich meaning, boy, it's got a lot of

19    assumptions, it's got a lot of modeling issues, it's

20    a bit over my head in terms of comprehending how

21    this ultimately works in it's collective -- whether

22    one drug moves forward, lays back, goes sideways,

23    and the other one picks up.  There were quite a few

24    moving parts.

1    Keep in mind also I'm looking at a small

2    document for -- you know, and the ability to come up

3    to speed on something that Steve and others had

4    spent months, maybe years, working on.

5    I wasn't -- I didn't expect myself to

6    pick up on this overnight, and so I said, boy, a lot

7    of moving parts, a bit rich.

8    Q.  You mentioned that John Hancock had invested

9    in some other -- had made some other investments in

10    the pharmaceutical industry?

11    A.  (Nod.)

12    Q.  Did any of those transactions, to your

13    knowledge, involve investment in compounds under

14    development in exchange for a royalty on the

15    products if they made it to market?

16    A.  I don't recall.  I mean, I know that they

17    dabbled in pharmaceuticals.  Understand as well,

18    unless it's coming to committee, I'm unaware of the

19    specifics on any of those deals.

20    Q.  Did any other pharmaceutical deals come to

21    the Bond Investment Committee while you were sitting

22    in on those committee meetings?

23    A.  I don't recall.

24    Q.  What were the assumptions and unknowns that

1    you saw in the Hancock Abbott deal?

2       A. At a very high level what I took away from

3    this deal was that there were a number of

4    probabilities based on prior experience, and there

5    were relationships, interrelationships, among and

6    between the different drugs, and I didn't understand

7    how these all came together in an overall package.

8          This was new territory for me, and I was

9    very much in a learning mode in terms of trying to

10   understand how reliable these probabilities were,

11   the assumptions, how accurate were the models.

12      Q. What steps did you take to address those

13   questions you had about the accuracy of the

14   assumptions and the probabilities?

15      A. I had discussions with Barry Welch, Steve

16   Blewitt to understand better their comfort in the

17   assumptions and the models.

18      Q. Did you speak with anyone else regarding the

19   Abbott transaction, other than Welch and Blewitt?

20      A. I don't believe so.

21      Q. If you look back at the e-mail you state in

22   the second sentence, How would I ever explain should

23   it not work out as predicted.

24          To whom would you have to provide an

1    explanation if the Abbott transaction didn't work

2    out as predicted?

3        ATTY. DAVIS:  Objection.

4    A.  I reported to the Chief Financial Officer

5    who was one step further removed from an investment

6    background, and so with all these assumptions, and

7    all these models, and all these intricacies, and

8    correlations, and non-correlations, I wasn't clear

9    in my own mind how they worked or didn't work.

10        I couldn't begin to explain to a CFO who

11    deals in very concrete financial terms how, you

12    know, something like this works, so, I mean, that

13    was part -- I wouldn't know where to begin, and, you

14    know, part of this was my lack of understanding in

15    terms of the business itself.  This was my first

16    experience with this, and I was, you know, trying to

17    get up to speed as to, you know, what really was --

18    how it all worked.

19    Q.  You mentioned in the next sentence of this

20    e-mail that even if I could get comfortable with the

21    legitimacy of it all, the size of this deal is

22    beyond my threshold and certainly beyond the house

23    limit for what is at best a B rated credit risk.

24        What did you mean by beyond my

1    terms, and then let's see where this role really

2    fits longer term, meaning the Chief Risk Officer

3    role, but it was very much a -- it did not carry the

4    traditional authority stature that it had in  the

5    banking world.

6        ATTY. DAVIS:  May we take a break at

7    some point in time?

8        ATTY. LORENZINI:  Why don't we do that

9    now.

10        THE VIDEOGRAPHER:  Going off the record.

11    The time is 11:10 a.m.

12        (Recess taken.)

13        THE VIDEOGRAPHER:  Going back on the

14    record.  The time is 11:20 a.m.

15    Q.  Before we took a break you were mentioning

16    that part of your responsibility was to provoke

17    discussion and perhaps stimulate change in the

18    status quo at John Hancock.  What did you mean by

19    the status quo?

20    A.  House limits was a classic example.  We

21    wanted to look at house limits and bring them down.

22    Q.  Although you testified before that you

23    weren't sure whether there, in fact, were house

24    limits prior to your arrival at John Hancock,

1    correct?

2    A.  I'm not sure what they had.  I know it was a

3    big part of the discussion when I arrived.

4    Q.  So you hoped to create strict house limits

5    for the amount of money Hancock could invest in each

6    particular risk level of investment?

7    A.  This really wasn't my initiative; this was

8    coming from the top of the house.  They wanted

9    smaller limits.

10    Q.  And limits that would actually be adhered

11    to?

12        ATTY. DAVIS:  Objection.

13    A.  Again, these were guidelines.  Limits is too

14    narrow.

15    Q.  So even when you were there it was

16    considered too strict to actually have limits on the

17    aggregate investments for each risk level, correct?

18        ATTY. DAVIS:  Objection.

19    A.  Can you rephrase that?

20    Q.  During your time at John Hancock there was

21    no effort to impose strict limits on the aggregate

22    investment in each particular level of risk in the

23    sense that the limits could never be exceeded?

24    A.  I think that's true.

1    Q.  And did you believe that measurement of the

2    Bond Group's performance created incentives for the

3    Bond Group to enter into transactions that were

4    excessively risky?

5        ATTY. DAVIS:  Objection.

6    A.  No.

7    Q.  Did you believe that measurement created any

8    incentives that you regarded as negative?

9    A.  No.

10    Q.  I take it you thought it was a negative that

11    the size of the Abbott deal was beyond what you were

12    attempting to impose as a house limit on

13    transactions of that type.

14    A.  Yes.

15    Q.  So wasn't it a problem if there was

16    incentives in the Bond Group to enter into

17    transactions of this type?

18        ATTY. DAVIS:  Objection.

19    A.  I don't know what you mean.

20    Q.  In the last sentence of your e-mail you seem

21    to be suggesting that there was some need in the

22    Bond and Corporate Finance Group to continually

23    reach for yield to meet corporate return on equity

24    goals, and you seem to be suggesting that it was

1    of it.

2        Q.  This e-mail also says, he reacted especially

3    to size -- I suggested more like 8 separate bets

4    totalling up to 220 million?

5        A.  Mm-mm.

6        Q.  Do you recall having a conversation with Mr.

7    Welch in which you reacted particularly to the size

8    of the Abbott transaction?

9        A.  I don't specifically recall a conversation

10    with Barry on that point.

11        Q.  But you do recall being concerned about the

12    size of the transaction?

13            ATTY. DAVIS:  Objection.

14        A.  In the context of the house limits, yes.

15        Q.  The house limits that you and others were

16    attempting to impose?

17        A.  Yes.

18        Q.  Do you recall Mr. Welch suggesting that the

19    Abbott transaction was more like 8 separate bets, as

20    opposed to one deal?

21        A.  I don't specifically recall that.

22        Q.  The next line Mr. Welch writes, reviewed low

23    odds that none hit, only one hits, etc.  Do you

24    recall a discussion with Mr. Welch in which he

```
1                    C E R T I F I C A T E

2    I, JOHN L. MASTROMARINO, do hereby certify that I

3    have read the foregoing transcript of my testimony,

4    and further certify that said transcript is a true

5    and accurate record of said testimony (with the

6    exception of the following corrections listed

7    below):

8    Page    Line            Correction/Reason

9    _____   _____    _____

10   _____   _____    _____

11   _____   _____    _____

12   _____   _____    _____

13   _____   _____    _____

14   _____   _____    _____

15   _____   _____    _____

16   _____   _____    _____

17

18

19        Signed under the pains and penalties of perjury

20   this  27  day of  November      , 2006.

21

22              John L. Mastromarino

23              JOHN L. MASTROMARINO

24
```

                                                    66

LegaLink, a Merrill Communications Company
800-826-0277  818-593-2300  Fax 818-593-2301  www.legalink.com

1

FW: Abbott Labs -- Heads up                                          Page 1 of 1

**From:** Welch, Barry [bwelch@jhancock.com]
**Sent:** Friday, March 14, 2003 4:32 PM
**To:** Blewitt, Stephen
**Cc:** Nastou, Roger
**Subject:** FW: Abbott Labs – Heads up

Steve:
I had a good conversation w/ John about
- context of equity investing program (this, project equity, etc.)
- confirmed that we hold on BA schedule, w/ 30% RBC charge
- he reacted especially to size – I suggested more like 8 separate "bets" totaling up to $220mm
- reviewed low odds that none hit, only one hits, etc.

Also suggested that he could probably visit with you a bit more on the background of our thinking about/support for
Odds on drugs at stage x, y, z with FDA of receiving final approval.

Beyond just Abbott, I want him to have a chance to get a better feeling for the strength of our analysts – how we think
about risk, ratings, etc. so we build credibility over time.

Thanks,
Barry

----Original Message----
**From:** Mastromarino, John
**Sent:** Friday, March 14, 2003 8:59 AM
**To:** Welch, Barry; Nastou, Roger
**Subject:** Abbott Labs

Hi guys, well, I read the write-up on the 220MM last night, a very thoughtful piece and certainly a lot of effort and
research went into the approval document. I must say it is a bit too rich for my taste with too many assumptions and
unknowns; and how would I ever explain should it not work out as predicted. But even if I could get comfortable with
the legitimacy of it all, the size of this deal is beyond my threshold, and certainly beyond the house limit for what is, at
best, a B rated credit risk. All driven, no doubt, by our need to continually reach for yield to meet corporate ROE
goals. j

John L. Mastromarino
Chief Risk Officer
Enterprise Risk Management
617-572-6262
617-572-6212 (fax)

**CONFIDENTIAL**
**JH 002447**



EXHIBIT
Mastromarino
/
10/20/06