UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> v. <br><br> ABBOTT LABORATORIES, <br><br> Defendant. | CIVIL ACTION NO. 05-11150-DPW |

## ABBOTT'S CORRECTED DEPOSITION DESIGNATIONS FOR JOHN MASTROMARINO

Defendant Abbott Laboratories ("Abbott") respectfully submits the attached corrected

deposition designations for the October 20, 2006 deposition of John Mastromarino, Chief

Risk Officer, Hancock.

.

Dated:  February 20, 2008                    Respectfully submitted,


ABBOTT LABORATORIES

By:  __/s/ Eric J. Lorenzini_____
        Eric J. Lorenzini

Jeffrey I. Weinberger (*pro hac vice*)
Gregory D. Phillips (*pro hac vice*)
Eric J. Lorenzini *(pro hac vice)*
Ozge Guzelsu *(pro hac vice)*
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth
Floor
Los Angeles, CA  90071-1560
Tele:  (213) 683-9100

and

Peter E. Gelhaar (BBO#188310)
Michael S. D'Orsi (BBO #566960)
DONNELLY, CONROY &
GELHAAR LLP
1 Beacon St., 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880
peg@dcglaw.com
msd@dcglaw.com


*Counsel for Abbott Laboratories*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 20, 2008.

Date: February 20, 2008.

/s/ Ozge Guzelsu

# John Mastromarino Deposition Designations

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 10/20/2006 | Mastromarino, John | | | 7:4-9:14 | | | |
| 10/20/2006 | Mastromarino, John | | | 10:18-11:6 | | | |
| 10/20/2006 | Mastromarino, John | | | 24:20-25:8 | | | |
| 10/20/2006 | Mastromarino, John | | | 28:17-29:8 | 1 | | FS |
| 10/20/2006 | Mastromarino, John | | | 33:23-35:19 | | | |
| 10/20/2006 | Mastromarino, John | | | 35:24-36:17 | | | |
| 10/20/2006 | Mastromarino, John | | | 36:21-37:18 | | | |
| 10/20/2006 | Mastromarino, John | | | 40:15-41:24 | | | |
| 10/20/2006 | Mastromarino, John | | | 43:10-43:14 | | | |
| 10/20/2006 | Mastromarino, John | | | 49:2-49:17 | | | |

# Color Key to Deposition Designations

**Designation by Plaintiffs**

**Counter Designation by Defendants**

**Designation by Defendants**

1                        Volume:  1

2                       Pages:  1-67

3                       Exhibits:  1-4

4            UNITED STATES DISTRICT COURT

5                    FOR THE

6            DISTRICT OF MASSACHUSETTS

7        - - - - - - - - - - - - - - - - - - x

8        JOHN HANCOCK LIFE INSURANCE COMPANY,

9        JOHN HANCOCK VARIABLE LIFE INSURANCE

10       COMPANY, and MANULIFE INSURANCE COMPANY

11       (f/k/a INVESTORS PARTNER INSURANCE COMPANY),

12            Plaintiffs,

13        v.          Civil Action No.  05-1150DPW

14       ABBOTT LABORATORIES,

15            Defendant.

16       - - - - - - - - - - - - - - - - - - x

17            VIDEO DEPOSITION OF JOHN L. MASTROMARINO

18                Friday, October 20, 2006

19                   10:03 a.m.

20             Donnelly, Conroy & Gelhaar

21                One Beacon Street

22                Boston, Massachusetts

23       Reporter:  Carol A. Pagliaro, CSR/RPR/RMR

24

1      Q.  Do you have any other formal degrees, other

2    than the BA?

3      A.  No.

4      Q.  What has been your work experience?  Why

5    don't you start with graduation from college, and

6    work up to the present, and just give me your

7    employer and job title.

8      A.  I was a Junior Accountant at the city of New

9    Haven for a very brief period, 6 months, right out

10   of school.  Subsequently I joined the Comptroller of

11   the Currency in 1978 period and was a National Bank

12   Examiner with them for close to 18 years.  During

13   that period in 1984 I was in Washington, DC on a

14   special developmental program.  I was in London, the

15   London office of the US Embassy in 1986 through '88,

16   '89.  I was the Examiner in charge of the First

17   National Bank of Boston as part of the

18   Multi-national Banking Program for the Comptroller

19   of the Currency in 1989 through 93.  In '93, '94 I

20   went back to London to head the Comptroller's London

21   office at the US Embassy where we reviewed national

22   banks for London, Europe, Middle East and Africa.

23   Throughout my regulatory period I did a number of

24   international assignments, both in Europe and in

Mastromarino, John L. (Linked)  10/20/2006  10:04:00 AM

1    Asia.

2         In 1995 I became the Chief Risk Officer

3    for the First National Bank of Boston, the Bank of

4    Boston Corporation.  I was the Chief Risk Officer

5    there through 1999, the merger with Fleet Bank,

6    which occurred in October of 1999.

7         At that time my role changed to Deputy

8    Chief National Bank Examiner and was promoted to

9    Executive Vice-president of the Corporation in March

10   of 19 -- I think it was 2000 and held various titles

11   and positions until I left in August of 2002.

12        In February of 2003 I became the Chief

13   Risk Officer for John Hancock in Boston and left

14   John Hancock in May of 2004 upon the merger with --

15   or the acquisition by Manulife and subsequently

16   created my own consultancy where I work with

17   troubled companies as a turnaround specialist, and

18   I've been doing that, among other things, over the

19   past 2 plus years.

20     Q.  Thank you.  I want to focus on your position

21   as Chief Risk Officer at John Hancock.  Did the

22   position of Chief Risk Officer exist prior to your

23   arrival at John Hancock?

24     A.  No.

1      Q.  So John Hancock didn't have that position

2    until you arrived on the scene?

3      A.  Correct.

4      Q.  Did anyone explain to you why John Hancock

5    created the position of Chief Risk Officer?

6      A.  Not specifically.

7      Q.  What was your understanding of why John

8    Hancock created the position of Chief Risk Officer?

9      A.  My belief was that the analyst, the

10   regulatory bodies, were trying to move the

11   insurance industry forward along the same lines of

12   what the banking institutions had created in years

13   past and that they were receiving pressure from the

14   regulatory and others to create this function.

15     Q.  And when you say the regulatory bodies were

16   trying to move the insurance companies more in the

17   direction that the banks had moved in, can you

18   explain more what you mean by that?

19     A.  Well, the various state regulatory bodies,

20   principally New York, I suppose, because they seem

21   to be the biggest insurance regulator, and to do

22   business in those areas, you know, they tend to like

23   a more robust risk management program, and so my

24   sense was that that was -- there was a number of

1    things that were pushing Hancock into that role, the

2    creation of that role, and probably equally so the

3    analysts, the insurance analysts, were saying that

4    they liked that role in the bank, we would like to

5    see you adopt something like that in the insurance

6    industry.

7        Q.  So insurance analysts and regulatory

8    agencies had some level of concern that insurance

9    companies were taking on too much risk?

10        ATTY. DAVIS:  Objection.

11        A.  It had little to do with risk, more than

12    organizational governance, that they wanted a

13    governance program similar to where the banks were

14    in the mid-nineties where they created a more

15    holistic collective view of the entire company

16    under, you know, one individual who could serve to

17    opine on various risks within the company.

18        Q.  And the purpose of that new governance

19    structure would be to manage risks?

20        ATTY. DAVIS:  Objection.  You can

21    respond.

22        Q.  More to assess risk, more to how risk is

23    communicated throughout the corporation, what form,

24    what vehicles, how frequent.  It was an increasingly

1    popular view that boards of directors, as a result

2    of some of the issues that took place in the late

3    eighties, early nineties, wanted a more

4    comprehensive assessment of the overall risk profile

5    in the company, and they wanted to bring all that

6    together, ideally, under one individual.

7         ATTY. DAVIS:  I'm sorry to interrupt.

8    We have the same stipulations that we have had?

9         ATTY. LORENZINI:  Yes.

10         ATTY. DAVIS:  So we are reserving all

11    objections, except as to form; is that correct?

12         ATTY. LORENZINI:  Yes.

13         ATTY. DAVIS:  Motions to Strike also

14    reserved?

15         ATTY. LORENZINI:  Yes.

16         ATTY. DAVIS:  Sorry to interrupt.

17    Q.  What were your responsibilities as Chief

18    Risk Officer of John Hancock?

19    A.  It's a difficult question to answer because

20    there was -- because Hancock was so new to this

21    whole design as Chief Risk Officer, there were no --

22    there was no job description, per se.  There were no

23    clear authorities vested in the new Chief Risk

24    Officer.  It was more a work in process as to do

1    establishing guidelines, refining guidelines,

2    deciding, you know, how these things should total,

3    but it was very much in the discussion phase when I

4    arrived.

5        Q.  That helps clarify things.  So you are not

6    clear -- strike that.  You don't know whether John

7    Hancock had guidelines regarding the aggregate

8    amount of money that could be invested in

9    transactions of a certain risk level prior to your

10    arrival in 2003?

11        ATTY. DAVIS:  Objection.  You can

12    respond.

13        A.  I believe there was some guideline.  I don't

14    recall what that might have been.

15        Q.  And you don't know -- if there was such a

16    guideline prior to your arrival, you don't know if

17    those guidelines were adhered to?

18        ATTY. DAVIS:  Objection.

19        A.  No.

20        Q.  At any time during your employment at John

21    Hancock did you become aware of a Research Funding

22    Agreement between John Hancock and Abbott

23    Laboratories?

24        A.  Yes.

1    Q.  When was that?

2    A.  My recollection was it was coming up for a

3    review at the Bond and Investment Committee as part

4    of its annual review, and that's when I first read,

5    you know, some of the background on that deal.

6    Q.  Is it typical for the Bond Investment

7    Committee to review each investment annually?

8    A.  Yes.

9    Q.  And is that annually, annually as of the

10    date of the transaction?

11        ATTY. DAVIS:  Objection.  You can

12    respond.

13    A.  I don't know.  Don't know.

14    Q.  And so were you sitting on the Bond

15    Investment Committee when the Abbott transaction

16    came up for annual review?

17    A.  I don't believe I was a formal member of the

18    committee at the time.  I was still a guest at the

19    meeting.

20    Q.  And can you recall the approximate date at

21    which the Abbott transaction came up for annual

22    review?

23    A.  My only reference is an e-mail that I sent

24    that says it was in April.

1      Q.  Regardless of whether you voiced any

2    comments, did you have any concerns regarding the

3    Abbott transaction at that meeting?

4      A.  At that meeting I think you have to

5    understand I'm an invited guest of the Bond and

6    Investment Committee, and at this early stage in my

7    employment, I'm taking a very back seat role in this

8    committee.  I may make a small point of

9    clarification, but I certainly wasn't offering

10   opinions in the larger group.  I was more an

11   observer at this point in my employment.

12        ATTY. LORENZINI:  I would like to mark

13   as Mastromarino Exhibit 1 a document produced by

14   John Hancock with Bates stamp JH2447, and it's an

15   e-mail from Barry Welch to Stephen Blewitt, and then

16   there is an e-mail below that from Mr. Mastromarino.

17        (Document marked as Exhibit 1

18         for identification.)

19     Q.  Why don't you just take a look first at the

20   bottom e-mail that appears to be from you to Barry

21   Welch and Roger Nastou, dated March 14; do you

22   recognize this e-mail?

23     A.  Yes.

24     Q.  Did you send this e-mail on or about March

Mastromarino, John L. (Linked)  10/20/2006  10:04:00 AM

1    14?

2    A.  I did.

3    Q.  You state in the e-mail, I read the write-up

4    on the 220MM last night.  What write-up are you

5    referring to in that e-mail?

6    A.  I assume in my own mind that it was the

7    write-up that Steve Blewitt put together for the

8    annual review.

9    ATTY. DAVIS:  I caution you not to

10    speculate.  To the extent you can recall you can

11    testify, but please don't speculate.

12    ATTY. LORENZINI:  I'd like to mark as

13    Mastromarino Exhibit No. 2 another document with

14    Bates numbers JH1185 through 1202, and this is a

15    document with the heading John Hancock Life

16    Insurance Company Bond and Corporate Finance Group.

17    (Document marked as Exhibit 2 for

18    identification.)

19    Q.  Why don't you just take a moment to browse

20    through this document, see if you recognize it?

21    ATTY. DAVIS:  The question is does he

22    recognize it?

23    ATTY. LORENZINI:  I'm just giving him a

24    chance...

1    closely.

2          Your name is not listed on this e-mail

3    chain, but I'm just showing you this to see if it

4    refreshes your recollection of whether Barry Welch

5    passed on to you the memorandum that is attached to

6    the e-mail we marked as Exhibit 3.

7          ATTY. DAVIS:  Objection.  You can

8    respond.

9       Q.  So that the question, just to recap is, do

10   you recall seeing the memorandum attached to the

11   e-mail that we have marked as Exhibit 3.

12      A.  No.

13      Q.  So this memorandum is not the write-up that

14   you referred to in Exhibit 1, correct?

15          ATTY. DAVIS:  Objection.

16      A.  I need to step back here.  I have no

17   specific recollection of what document that e-mail

18   is referring to.  There was various work done in

19   explaining this transaction, but I can't pinpoint

20   whether -- I have no recollection of this document

21   or this document, and I just don't know what

22   document that refers to.

23      Q.  Fair enough.  Let's turn back to

24   Mastromarino Exhibit No. 1.  Did you write this

1    March 14 e-mail prior to the meeting of the Bond

2    Investment Committee at which the Abbott transaction

3    was reviewed?

4       A.  I can't say.

5       Q.  In the second sentence of your e-mail you

6    write, I must say it is a bit too rich for my taste

7    with too many assumptions and unknowns.  What did

8    you mean when you said that it is a bit too rich for

9    my taste?

10      A.  I think this has to be viewed in the context

11   that I had no prior experience with lending and/or

12   investing in drug trials, and I was unfamiliar with

13   the probabilities, the modeling techniques that

14   Steve and others put together on this deal.

15          I recognize that there had been prior

16   deals of similar sort, but personally it was

17   something -- it was new territory for me, and my

18   assessment of rich meaning, boy, it's got a lot of

19   assumptions, it's got a lot of modeling issues, it's

20   a bit over my head in terms of comprehending how

21   this ultimately works in it's collective -- whether

22   one drug moves forward, lays back, goes sideways,

23   and the other one picks up.  There were quite a few

24   moving parts.

1          Keep in mind also I'm looking at a small

2     document for -- you know, and the ability to come up

3     to speed on something that Steve and others had

4     spent months, maybe years, working on.

5          I wasn't -- I didn't expect myself to

6     pick up on this overnight, and so I said, boy, a lot

7     of moving parts, a bit rich.

8        Q.  You mentioned that John Hancock had invested

9     in some other -- had made some other investments in

10    the pharmaceutical industry?

11       A.  (Nod.)

12       Q.  Did any of those transactions, to your

13    knowledge, involve investment in compounds under

14    development in exchange for a royalty on the

15    products if they made it to market?

16       A.  I don't recall.  I mean, I know that they

17    dabbled in pharmaceuticals.  Understand as well,

18    unless it's coming to committee, I'm unaware of the

19    specifics on any of those deals.

20       Q.  Did any other pharmaceutical deals come to

21    the Bond Investment Committee while you were sitting

22    in on those committee meetings?

23       A.  I don't recall.

24       Q.  What were the assumptions and unknowns that

1    you saw in the Hancock Abbott deal?

2      A.  At a very high level what I took away from

3    this deal was that there were a number of

4    probabilities based on prior experience, and there

5    were relationships, interrelationships, among and

6    between the different drugs, and I didn't understand

7    how these all came together in an overall package.

8          This was new territory for me, and I was

9    very much in a learning mode in terms of trying to

10   understand how reliable these probabilities were,

11   the assumptions, how accurate were the models.

12     Q.  What steps did you take to address those

13   questions you had about the accuracy of the

14   assumptions and the probabilities?

15     A.  I had discussions with Barry Welch, Steve

16   Blewitt to understand better their comfort in the

17   assumptions and the models.

18     Q.  Did you speak with anyone else regarding the

19   Abbott transaction, other than Welch and Blewitt?

20     A.  I don't believe so.

21     Q.  If you look back at the e-mail you state in

22   the second sentence, How would I ever explain should

23   it not work out as predicted.

24          To whom would you have to provide an

1  explanation if the Abbott transaction didn't work

2  out as predicted?

3      ATTY. DAVIS:  Objection.

4    A.  I reported to the Chief Financial Officer

5  who was one step further removed from an investment

6  background, and so with all these assumptions, and

7  all these models, and all these intricacies, and

8  correlations, and non-correlations, I wasn't clear

9  in my own mind how they worked or didn't work.

10      I couldn't begin to explain to a CFO who

11  deals in very concrete financial terms how, you

12  know, something like this works, so, I mean, that

13  was part -- I wouldn't know where to begin, and, you

14  know, part of this was my lack of understanding in

15  terms of the business itself.  This was my first

16  experience with this, and I was, you know, trying to

17  get up to speed as to, you know, what really was --

18  how it all worked.

19    Q.  You mentioned in the next sentence of this

20  e-mail that even if I could get comfortable with the

21  legitimacy of it all, the size of this deal is

22  beyond my threshold and certainly beyond the house

23  limit for what is at best a B rated credit risk.

24      What did you mean by beyond my

1    terms, and then let's see where this role really

2    fits longer term, meaning the Chief Risk Officer

3    role, but it was very much a -- it did not carry the

4    traditional authority stature that it had in  the

5    banking world.

6            ATTY. DAVIS:  May we take a break at

7    some point in time?

8            ATTY. LORENZINI:  Why don't we do that

9    now.

10           THE VIDEOGRAPHER:  Going off the record.

11   The time is 11:10 a.m.

12           (Recess taken.)

13           THE VIDEOGRAPHER:  Going back on the

14   record.  The time is 11:20 a.m.

15     Q.  Before we took a break you were mentioning

16   that part of your responsibility was to provoke

17   discussion and perhaps stimulate change in the

18   status quo at John Hancock.  What did you mean by

19   the status quo?

20     A.  House limits was a classic example.  We

21   wanted to look at house limits and bring them down.

22     Q.  Although you testified before that you

23   weren't sure whether there, in fact, were house

24   limits prior to your arrival at John Hancock,

1    correct?

2      A.  I'm not sure what they had.  I know it was a

3    big part of the discussion when I arrived.

4      Q.  So you hoped to create strict house limits

5    for the amount of money Hancock could invest in each

6    particular risk level of investment?

7      A.  This really wasn't my initiative; this was

8    coming from the top of the house.  They wanted

9    smaller limits.

10     Q.  And limits that would actually be adhered

11   to?

12          ATTY. DAVIS:  Objection.

13     A.  Again, these were guidelines.  Limits is too

14   narrow.

15     Q.  So even when you were there it was

16   considered too strict to actually have limits on the

17   aggregate investments for each risk level, correct?

18          ATTY. DAVIS:  Objection.

19     A.  Can you rephrase that?

20     Q.  During your time at John Hancock there was

21   no effort to impose strict limits on the aggregate

22   investment in each particular level of risk in the

23   sense that the limits could never be exceeded?

24     A.  I think that's true.

1        Q.  And did you believe that measurement of the

2    Bond Group's performance created incentives for the

3    Bond Group to enter into transactions that were

4    excessively risky?

5            ATTY. DAVIS:  Objection.

6        A.  No.

7        Q.  Did you believe that measurement created any

8    incentives that you regarded as negative?

9        A.  No.

10       Q.  I take it you thought it was a negative that

11   the size of the Abbott deal was beyond what you were

12   attempting to impose as a house limit on

13   transactions of that type.

14       A.  Yes.

15       Q.  So wasn't it a problem if there was

16   incentives in the Bond Group to enter into

17   transactions of this type?

18           ATTY. DAVIS:  Objection.

19       A.  I don't know what you mean.

20       Q.  In the last sentence of your e-mail you seem

21   to be suggesting that there was some need in the

22   Bond and Corporate Finance Group to continually

23   reach for yield to meet corporate return on equity

24   goals, and you seem to be suggesting that it was

Mastromarino, John L. (Linked)  10/20/2006  10:04:00 AM

1   of it.

2       Q.  This e-mail also says, he reacted especially

3   to size -- I suggested more like 8 separate bets

4   totalling up to 220 million?

5       A.  Mm-mm.

6       Q.  Do you recall having a conversation with Mr.

7   Welch in which you reacted particularly to the size

8   of the Abbott transaction?

9       A.  I don't specifically recall a conversation

10  with Barry on that point.

11      Q.  But you do recall being concerned about the

12  size of the transaction?

13          ATTY. DAVIS:  Objection.

14      A.  In the context of the house limits, yes.

15      Q.  The house limits that you and others were

16  attempting to impose?

17      A.  Yes.

18      Q.  Do you recall Mr. Welch suggesting that the

19  Abbott transaction was more like 8 separate bets, as

20  opposed to one deal?

21      A.  I don't specifically recall that.

22      Q.  The next line Mr. Welch writes, reviewed low

23  odds that none hit, only one hits, etc.  Do you

24  recall a discussion with Mr. Welch in which he

1                    C E R T I F I C A T E

2    I, JOHN L. MASTROMARINO, do hereby certify that I

3    have read the foregoing transcript of my testimony,

4    and further certify that said transcript is a true

5    and accurate record of said testimony (with the

6    exception of the following corrections listed

7    below):

8    Page      Line              Correction/Reason

9    _____    _____    _____

10   _____    _____    _____

11   _____    _____    _____

12   _____    _____    _____

13   _____    _____    _____

14   _____    _____    _____

15   _____    _____    _____

16   _____    _____    _____

17

18

19        Signed under the pains and penalties of perjury

20   this  _27_  day of  _november_____, 2006.

21

22                    John L. Mastromarino

23               JOHN L. MASTROMARINO

24

                                                          66

# Mastromarino Deposition Exhibit 1

# D's Exhibit FS

FW: Abbott Labs -- Heads up                                                    Page 1 of 1

---

**From:**   Welch, Barry [bwelch@jhancock.com]
**Sent:**   Friday, March 14, 2003 4:32 PM
**To:**     Blewitt, Stephen
**Cc:**     Nastou, Roger
**Subject: FW: Abbott Labs -- Heads up**

Steve:
I had a good conversation w/ John about
- context of equity investing program (this, project equity, etc.)
- confirmed that we hold on BA schedule, w/ 30% RBC charge
- he reacted especially to size – I suggested more like 8 separate "bets" totaling up to $220mm
- reviewed low odds that none hit, only one hits, etc.

Also suggested that he could probably visit with you a bit more on the background of our thinking about/support for
Odds on drugs at stage x, y, z with FDA of receiving final approval.

Beyond just Abbott, I want him to have a chance to get a better feeling for the strength of our analysts – how we think
about risk, ratings, etc. so we build credibility over time.

Thanks,
Barry

----Original Message----
**From:**  Mastromarino, John
**Sent:**  Friday, March 14, 2003 8:59 AM
**To:**    Welch, Barry; Nastou, Roger
**Subject:**    Abbott Labs

Hi guys, well, I read the write-up on the 220MM last night, a very thoughtful piece and certainly a lot of effort and
research went into the approval document. I must say it is a bit too rich for my taste with too many assumptions and
unknowns; and how would I ever explain should it not work out as predicted. But even if I could get comfortable with
the legitimacy of it all, the size of this deal is beyond my threshold, and certainly beyond the house limit for what is, at
best, a B rated credit risk. All driven, no doubt, by our need to continually reach for yield to meet corporate ROE
goals. j

John L. Mastromarino
Chief Risk Officer
Enterprise Risk Management
617-572-6262
617-572-6212 (fax)



**CONFIDENTIAL
JH 002447**