UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY, | CIVIL ACTION NO. 05-11150-DPW |
| Plaintiffs, | |
| v. | |
| ABBOTT LABORATORIES, | |
| Defendant. | |

## **ABBOTT'S CORRECTED DEPOSITION DESIGNATIONS FOR CHRIS SILBER**

Defendant Abbott Laboratories ("Abbott") respectfully submits the attached corrected

deposition designations and counter-designations for the February 9, 2007 deposition of

Chris Silber, M.D., former Head of the Analgesia Venture (ABT-594).

Dated:  February 21, 2008                    Respectfully submitted,


ABBOTT LABORATORIES

By:  __/s/ Eric J. Lorenzini_____
      Eric J. Lorenzini

Jeffrey I. Weinberger (*pro hac vice*)
Gregory D. Phillips (*pro hac vice*)
Eric J. Lorenzini *(pro hac vice)*
Ozge Guzelsu *(pro hac vice)*
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth
Floor
Los Angeles, CA  90071-1560
Tele:  (213) 683-9100

and

Peter E. Gelhaar (BBO#188310)
Michael S. D'Orsi (BBO #566960)
DONNELLY, CONROY &
GELHAAR LLP
1 Beacon St., 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880
peg@dcglaw.com
msd@dcglaw.com


*Counsel for Abbott Laboratories*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 21, 2008.

Date: February 21, 2008.

_____ /s/ Ozge Guzelsu _____

## Christopher Silber Deposition Designations

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Deposition Exhibit |
|---|---|---|---|---|---|---|---|
| 02/27/07 | Silber, Christopher | | | 5:13-5:15 | | | |
| 02/27/07 | Silber, Christopher | | | 6:16-8:21 | | | |
| 02/27/07 | Silber, Christopher | | | 10:16-13:1 | | | |
| 02/27/07 | Silber, Christopher | | | 21:11-21:18 | | | |
| 02/27/07 | Silber, Christopher | | | 23:3-24:7 | | | |
| 02/27/07 | Silber, Christopher | | | 33:22-34:2 | | | |
| 02/27/07 | Silber, Christopher | | | 35:21-36:1 | | | |
| 02/27/07 | Silber, Christopher | | | 43:9-43:21 | | | |
| 02/27/07 | Silber, Christopher | | | 53:2-53:19 | | | |
| 02/27/07 | Silber, Christopher | | | 54:2-54:8 | | | |
| 02/27/07 | Silber, Christopher | | | 55:3-55:11 | | | |
| 02/27/07 | Silber, Christopher | | | 55:20-55:23 | | | |
| 02/27/07 | Silber, Christopher | | | 68:7-68:12 | | | |
| 02/27/07 | Silber, Christopher | | | 72:6-72:17 | | | |
| 02/27/07 | Silber, Christopher | | | 74:20-75:1 | | | |

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Deposition Exhibit |
|---|---|---|---|---|---|---|---|
| 02/27/07 | Silber, Christopher | | | 104:23-105:3 | | | |
| 02/27/07 | Silber, Christopher | | | 105:10:105:15 | | | |
| 02/27/07 | Silber, Christopher | | | 115:22-116:15 | | | |
| 02/27/07 | Silber, Christopher | | | 117:1-117:20 | | | |
| 02/27/07 | Silber, Christopher | | | 141:17-141:20 | | | |

# Color Key to Deposition Designations

**Designation by Plaintiffs**

**Counter Designation by Defendants**

**Designation by Defendants**

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3     JOHN HANCOCK LIFE INSURANCE     )

4     COMPANY, JOHN HANCOCK VARIABLE  )

5     LIFE INSURANCE COMPANY, and     )

6     MANULIFE INSURANCE COMPANY      )

7     (f/k/a INVESTORS PARTNER        )

8     INSURANCE COMPANY),             )

9          Plaintiffs,        )  Civil Action No.

10        vs.                 )  05-11150-DPW

11    ABBOTT LABORATORIES,            )

12         Defendant.              )

13

14          The videotaped deposition of CHRISTOPHER

15    SILBER, M.D., called for examination, taken pursuant

16    to the provisions of the Federal Rules of Civil

17    Procedure of the United States District Courts

18    pertaining to the taking of depositions for the

19    purpose of discovery, taken before Barbara J.

20    Cramer, CSR No. 84-1700, a Certified Shorthand

21    Reporter of the State of Illinois, at Suite 1300,

22    Two North LaSalle Street, Chicago, Illinois, on the

23    9th day of February, A.D. 2007, at 9:08 a.m.

24

1    PRESENT:

2    CHOATE HALL & STEWART, LLP,

3    (Two International Place,

4    Boston, Massachusetts 02110,

5    617-248-5000), by:

6    MR. BRIAN A. DAVIS,

7        appeared on behalf of the Plaintiffs;

8

9    MUNGER, TOLLES & OLSON LLP,

10    (355 South Grand Avenue, 35th Floor,

11    Los Angeles, California 90071-1560,

12    213-683-9276), by:

13    MR. GREGORY D. PHILLIPS,

14        appeared on behalf of the Defendant and

15        the Deponent.

16

17    VIDEOTAPED BY:

18        MR. WES FRANCE,

19        Esquire Deposition Services.

20

21

22

23    REPORTED BY:  BARBARA CRAMER, C.S.R.

24        CERTIFICATE NO. 84-1700

1      MR. PHILLIPS:  Great, great.

2          Yes, that's fine.

3      MR. DAVIS:  If that proves to be a problem, we

4   usually work these things out.

5      MR. PHILLIPS:  Okay.

6          CHRISTOPHER SILBER, M.D.,

7   called as a witness herein, having been first duly

8   sworn, was examined and testified as follows:

9              EXAMINATION

10  BY MR. DAVIS:

11     Q.   Good morning, Doctor.

12     A.   Good morning.

13     Q.   Would you state your name, please, your

14  full name, for the record?

15     A.   Christopher Silber.

16     Q.   Where do you live, Doctor?

17     A.   124 Sunset Place in Lake Bluff, Illinois.

18     Q.   Doctor, my name is Brian Davis.  I'm the

19  attorney for John Hancock and the other plaintiffs

20  in this action.

21         You understand you're here to be deposed

22  today under oath, and I'm going to ask you a series

23  of questions.  And if at any point in time you don't

24  understand my questions, please just say so, and

1    I'll try to give you a clearer question.  Do you

2    understand that?

3        A.   I do understand.  Thank you.

4        Q.   And as we go forward during the day, you

5    need to articulate your answers to the questions.

6    The court reporter can't record head nods or shakes.

7    Do you understand that?

8        A.   I see.

9        Q.   Okay.

10       A.   Yes.

11       Q.   And if at any point in time you wish to

12   take a -- a break, please let me know, and we'll try

13   to accommodate you as soon as possible thereafter.

14   All right?

15       A.   Thank you.

16       Q.   Doctor, are you currently employed?

17       A.   I am.

18       Q.   Where?

19       A.   Hospira, Incorporated.

20       Q.   Where is that located?  Where are your

21   offices located?

22       A.   275 North Field Drive, and that's in

23   Lake Forest, Illinois.

24       Q.   What is the business of Hospira?

1      A.   The manufacture, commercialization of

2   hospital-based products, injectable drugs.

3      Q.   Now, was Hospira at one point in time

4   part of Abbott?

5      A.   It was.

6      Q.   When did -- when did you first join

7   Hospira?

8      A.   I joined Hospira in February of 2004.  It

9   actually was prior to its formation as a company.

10  But over the subsequent couple of months, it became

11  Hospira officially.

12     Q.   Is it correct that what is now Hospira,

13  at one point in time, was part of Abbott and was

14  spun off by Abbott?

15     A.   That's correct.

16     Q.   And you worked for what is now Hospira

17  before it was spun off by Abbott.  Is that right?

18     A.   I -- prior to -- to that, it was part of

19  Abbott Laboratories.  But, yes, in February of 2004,

20  I -- I worked for the corporation that then became

21  Hospira.

22     Q.   What position do you hold at Hospira?

23     A.   My title is global medical director.

24     Q.   Very briefly, what are your duties as

1  global medical director?

2      A.  I head a function called drug development

3  and medical services, which includes clinical

4  research, medical communication, and medical

5  education.

6      Q.  Have you been global medical director at

7  Hospira since you joined what is now Hospira in

8  February 2004?

9      A.  Yes.

10     Q.  At some point in time, you worked for

11  Abbott.  Correct?

12     A.  That's correct.

13     Q.  When -- over what period of time did you

14  work for Abbott?

15     A.  From 1991 through the period of time that

16  I joined what became Hospira.

17     Q.  So --

18     A.  So February of 2004.

19     Q.  I'm sorry.  I didn't mean to interrupt.

20  So through February of 2004?

21     A.  That's correct.

22     Q.  Very briefly, Doctor, what is your

23  educational background?

24     A.  I went to Tufts University for my

1    Q.    What did you do between 1986 and 1991

2    when you joined Abbott?

3    A.    I did training in family medicine at Duke

4    and thereafter was employed by a company named

5    Forest Laboratories.

6    Q.    What positions did you hold at Forest

7    Laboratories?

8    A.    Assistant director, assistant medical

9    director.

10    Q.    And what was the business of Forest Labs?

11    A.    The development of, primarily, generic

12    drugs, but the pharmaceutical industry.

13    Q.    Were you involved in drug development at

14    Forest Labs?

15    A.    Yes, I was.

16    Q.    And what positions did you hold at Abbott

17    when you worked there?

18    A.    I held a variety of posts at Abbott.

19    Q.    When you first joined Abbott, what

20    positions did you hold back in 1991?

21    A.    Associate director or associate medical

22    director.

23    Q.    What other positions did you hold that

24    you recall?

Silber, M.D., Christopher (Linked)  2/9/2007  9:08:00 AM

1      A.   Um-hmm.  Medical director, venture head,

2   senior director marketed product development, and a

3   role called global project head.

4      Q.   Global project head?

5      A.   Um-hmm.

6      Q.   Was that the last position that you held

7   at Abbott before you joined Hospira?

8      A.   Yes.

9      Q.   Were all the positions that you held at

10   Abbott involved in some way in pharmaceutical drug

11   development?

12      A.   Yes.

13      Q.   One of the positions you held was venture

14   head.  What's a "venture"?

15      A.   A venture was an -- an entity responsible

16   for the development of a drug or a group of drugs.

17   The -- the basic theme of the venture was that it

18   was intended to be, within a large company, an -- an

19   entity that was solely focused on drug development,

20   targeted to -- to speed, being able to develop drugs

21   rapidly.

22      Q.   Was there a particular venture of which

23   you were the head?

24      A.   I headed an entity referred to as the

Silber, M.D., Christopher (Linked)  2/9/2007  9:08:00 AM

1    psychopharmacology venture, and then I had

2    responsibilities for a pain team as well as venture

3    head.

4        Q.   I'm sorry.  You said you had

5    responsibilities for a pain team.  Was that part of

6    the venture?

7        A.   It was a venture, yes.

8        Q.   Was it a separate venture from the

9    psychopharmacology venture?

10       A.   One evolved into the other.

11       Q.   Was one of the compounds that was being

12   developed by the pain team ABT-594?

13       A.   Yes, it was.

14       Q.   For how long were you venture head of

15   the -- of the psychopharma venture or the pain team?

16       A.   I -- I believe I was psychopharmacology

17   venture head on or around 1996 through sometime in

18   1997; and then from 1997 through 2001 was

19   responsible for pain compounds.

20       Q.   When in 2001 did you no longer -- did you

21   cease to be responsible for pain compounds?

22       A.   I'm not certain of the precise date, but

23   somewhere in the range of February or March.

24       Q.   Of 2001?

1    A.   That's correct.

2    Q.   And you moved from that position into the

3    position of senior director of marketed products?

4    A.   That's correct.

5    Q.   What responsibilities did you have as

6    senior director of marketed products?

7    A.   My responsibilities initially had to do

8    with the acquisition of Knoll Pharmaceuticals, so I

9    had responsibilities for neuroscience compounds, as

10   well some of the -- the compounds -- marketed

11   compounds that we were obtaining as part of the

12   Knoll acquisition.

13   Q.   Were you responsible in part for

14   integrating the Knoll acquisition?

15   A.   In part, yes.

16   Q.   Very briefly, what was the Knoll

17   acquisition?

18   A.   Abbott Laboratories had acquired Knoll

19   Pharmaceuticals.  The acquisition process had to do

20   with the transfer of the compounds associated with

21   that company to become part of Abbott.

22   MR. DAVIS:  Let me mark this as Exhibit No. 1,

23   please.

24

1      MR. FRANCE:  We're going off the video record

2    at 9:24 a.m.

3         (WHEREUPON, a recess was had from

4         9:24 a.m. until 9:30 a.m.)

5      MR. PHILLIPS:  I don't know if there was a

6    question pending, but --

7      MR. DAVIS:  I think there was.  We'll go back.

8      MR. FRANCE:  We're going -- we're going back on

9    the video record at 9:30 a.m.

10   BY MR. DAVIS:

11     Q.   Doctor, I think just before we broke

12   there for a moment, I asked you what was -- is or

13   was ABT-594.

14     A.   ABT-594 was a compound that was being

15   developed for the treatment of pain.

16     Q.   And it -- was it an NNR?

17     A.   Its pharmacology was that of a neuronal

18   nicotinic receptor profile, yes.

19     Q.   Now, do you recall having discussions --

20   actually, we'll go back for a moment.

21        This document, Exhibit 2, on the re line,

22   makes reference to the "Analgesia Venture Portfolio

23   Review."  Was the analgesia venture the same as the

24   pain team that you referred to earlier?

1    pharmacologic class, also being considered for

2    development for the treatment of pain.

3        Q.   If you take a look at the second page --

4    oh, I'm sorry.  On the first page, it refers to

5    ABT-5 -- 259 as a follow-on compound.  What is a

6    follow-on compound?

7        A.   In general terms, a follow-on compound

8    would be an additional compound that could be

9    developed or could show different features from what

10   would be referred to as the lead compound in a

11   class.

12       Q.   And what's the lead compound?

13       A.   The first in a class.  In this case,

14   ABT-594 would be the compound I would refer to as a

15   lead.

16       Q.   Would it be fair to say that a follow-on

17   compound is a compound that is being developed or

18   could be developed as a replacement for the lead

19   compound if the decision was made not to further

20   develop the lead compound?

21       MR. PHILLIPS:  Object to the form.

22   BY THE WITNESS:

23       A.   Can you repeat the question?

24       MR. DAVIS:  Yes.  Would you read back the

1    question, please?

2          (WHEREUPON, the record was read by

3          the reporter.)

4    BY THE WITNESS:

5      A.   What I would say is that a -- a follow-on

6    compound would be developed in parallel as part of

7    an overall development effort.

8    BY MR. DAVIS:

9      Q.   With the expectation that both the lead

10   compound on the follow-on compound would be

11   commercialized?

12     MR. PHILLIPS:  Objection; objection to the

13   form.

14   BY THE WITNESS:

15     A.   Can you rephrase that question?

16   BY MR. DAVIS:

17     Q.   Sure.  When -- in your experience, was

18   it -- it typical for Abbott to develop and

19   commercially introduce both the lead compound and a

20   follow-on compound in the same category?

21     A.   I -- I would say it depends.

22     Q.   Okay.  Would you take a look at the

23   second page of Exhibit 2, please?  And the -- please

24   read the very first paragraph that says, "Chris

1    BY THE WITNESS:

2        A.    I -- I don't recall Abbott having an --

3    an opinion with respect to that at all, and I -- I

4    don't recall.

5    BY MR. DAVIS:

6        Q.    You say you don't recall Abbott having an

7    opinion.  You're talking about the corporate entity.

8    Is that right?

9        A.    That's correct.

10        Q.    Okay.  How about you?  Did you know

11    back -- did you have an opinion, back in January

12    1999, whether it was desirable for Abbott to find a

13    follow-on compound for ABT-594 that had a clinically

14    meaningful improvement in GI side effects?

15        A.    I -- I don't recall my opinion at that

16    time.

17        Q.    Um-hmm.  Did you think that the GI side

18    effects associated with ABT-594 might hinder the

19    commercialization of that compound back in January

20    of '99?

21        A.    I do not recall thinking that at all.

22        Q.    Did the GI side effects that you knew

23    existed with ABT-594 back in 1999 cause you any

24    concern about the potential to commercialize that

1    compound?

2        A.    I do not recall having that concern, no.

3        Q.    Would you look, please, at the pages of

4    Exhibit 2 that's titled, "Questions and Answers"?

5        MR. PHILLIPS:  So beginning at 114524?

6        MR. DAVIS:  524, correct.

7    BY MR. DAVIS:

8        Q.    Do you recall participating in any

9    question-and-answer sessions in the course of any

10   portfolio review presentations that you made?

11       MR. PHILLIPS:  At any time?

12       MR. DAVIS:  At Abbott.

13   BY THE WITNESS:

14       A.    I -- I do recall, as a matter of general

15   practice, being asked questions as part of

16   presentations.  I -- I do not recall these specific

17   questions.

18   BY MR. DAVIS:

19       Q.    Who is Dan Norbeck?

20       A.    Dan Norbeck was a senior-ranking member

21   of the drug discovery component of Abbott.

22       Q.    Um-hmm.  At the bottom of the page that's

23   numbered 524, there's a -- it looks -- appears to be

24   a question asked by Dan Norbeck, "Did the AEs

1   include smokers and nonsmokers?"

2        Do you see that?

3   A.   I do see that.

4   Q.   What's an AE?

5   A.   While I'm not certain what was being

6   referenced in the preparation of this document, in

7   general, AE refers to adverse events.

8   Q.   Um-hmm.  And if you look at the top of

9   the very next page, it appears to be an answer to

10  the question, and it says "The AE data for the

11  ABT-594, 100 microgram dose group, including smokers

12  and nonsmokers, was 24 percent for dizziness,

13  32 percent for nausea, and 20 percent for vomiting.

14  Most of the vomiting occurred after rescue

15  medication was given."

16       Do you see that?

17  A.   I -- I do see that.

18  Q.   What's "rescue medication"?

19  A.   I -- I don't recall the context for

20  rescue medication in the document in front of me.

21  Q.   Okay.  Do you recall being concerned in

22  any way by the AE data for ABT-594 back in January

23  of 1999?

24  A.   I do not recall being concerned about it,

1    no.

2        Q.    Do you recall having any discussions with

3    anyone at Abbott back in 1999 regarding whether

4    Abbott should try to develop a follow-on compound

5    that had a better GI side effect profile than

6    ABT-594?

7        A.    I -- I do not recall any such

8    conversation, no.

9        MR. DAVIS:  Let's mark this as the next

10    exhibit.  I think a page fell off there.

11        MR. PHILLIPS:  Thank you.

12            (WHEREUPON, a certain document was

13            marked Silber Deposition Exhibit

14            No. 3, for identification, as of

15            2/9/07.)

16    BY MR. DAVIS:

17        Q.    Now, Dr. Silber, I'll show you briefly

18    what's been marked as Exhibit 3 at your deposition.

19    Would you look at this document just for a moment

20    and tell me if you've seen it before, please?

21        A.    I don't recall this document.

22        Q.    On occasions that you participated in

23    analgesia venture portfolio reviews, did you

24    occasionally use PowerPoint slides as part of

1    Q.    Do you recall any discussions within

2    Abbott why Abbott would decide in mid 1999 to delay

3    any Phase III studies for ABT-594?

4    A.    I just do not recall.

5    Q.    Do you recall generally that delay --

6    Phase III studies for ABT-594 were delayed at some

7    point in time?

8    A.    I do not recall that, either, no.

9    Q.    Were you -- again, ABT-594 was one of the

10   compounds that was in the venture for which you were

11   the head.  Is that right?

12   A.    That's correct.

13   Q.    So is it fair to say that, within Abbott,

14   you were primarily responsible for the development

15   of that compound?

16   A.    I was a member of the team responsible

17   for its development, yes.

18   Q.    You headed the team that was responsible

19   for its development.  Did you not?

20   A.    That's correct, for -- for points in time

21   related to its development.

22   Q.    In the period from 1999 through, say,

23   2001, how many compounds did the pain team or the

24   analgesia venture have under development?

Silber, M.D., Christopher (Linked)  2/9/2007  9:08:00 AM

1    BY MR. DAVIS:

2       Q.    And what did you understand to be the

3    reason why it was desirable or useful for Abbott to

4    explore titration of ABT-594 in those clinical

5    trials?

6       A.    I -- I can't comment on the desirability

7    of it, but my recollection of the -- the path being

8    considered with respect to titration had to do with

9    examining the effect titration would have on the

10   occurrence of events related to the drug.

11      Q.    Adverse events?

12      A.    Both adverse events as well as the

13   opportunity to examine efficacy with titration as

14   well.

15      Q.    Was one of the reasons why Abbott was

16   exploring titration of ABT-594 was an attempt to try

17   to overcome or address the adverse events of nausea,

18   dizziness, and vomiting among patients taking that

19   compound?

20      A.    Can you restate the question?

21      MR. DAVIS:  Yes, would you re-read it, please?

22      THE WITNESS:  Thank you.

23          (WHEREUPON, the record was read by

24          the reporter.)

Silber, M.D., Christopher (Linked)  2/9/2007  9:08:00 AM

1    BY THE WITNESS:

2       A.   I -- I would not say that it was an

3    attempt to overcome or address.  I would say very

4    precisely it was directed to reduce the occurrence

5    of those events.

6    BY MR. DAVIS:

7       Q.   It was related.  The titration was

8    related in some way to the adverse events.  Correct?

9       MR. PHILLIPS:  Object to the form.

10   BY THE WITNESS:

11      A.   Can you -- can you restate that?

12   BY MR. DAVIS:

13      Q.   Sure.  The -- the fact that Abbott was

14   pursuing titration of ABT-594 was related to the

15   adverse events of nausea, dizziness, and vomiting

16   that had been observed among patients who took that

17   compound in clinical trials.  Correct?

18      MR. PHILLIPS:  Object to the form.

19   BY THE WITNESS:

20      A.   I -- I cannot comment about what Abbott

21   was doing or thinking or intending.

22   BY MR. DAVIS:

23      Q.   Well, you knew what was going on with

24   respect to the development of ABT-594.  Correct?

1    A.    My recollection is that -- that, yes, I

2    was very aware.

3        Q.    And based on your understanding, okay, as

4    the gentleman who was in charge of the pain team

5    that was responsible for the development of ABT-594,

6    it was your understanding that the reason why Abbott

7    was exploring titration of ABT-594 was related to

8    the adverse events of nausea, dizziness, and

9    vomiting that had been observed among patients who

10   took that compound in clinical trials.  Is that

11   correct?

12       MR. PHILLIPS:  Objection to the form.

13   BY THE WITNESS:

14       A.    Can you restate that question?

15       MR. DAVIS:  Would you re-read the question,

16   please?

17           (WHEREUPON, the record was read by

18           the reporter.)

19   BY THE WITNESS:

20       A.    I -- I would say no; that titration

21   was -- was being considered to -- to explore fully

22   the range of doses that could be utilized with the

23   drug.

24       MR. DAVIS:  Let's mark this, please, as the

1    performing in trials?

2    MR. PHILLIPS:  Object to -- objection to the

3    form.

4    BY THE WITNESS:

5    A.    Can you restate that question?

6    BY MR. DAVIS:

7    Q.    While you worked at Abbott, did you, on

8    occasion, look at blinded clinical trial data in an

9    attempt to try to determine, even on a preliminary

10   basis, how the trial was progressing?

11   A.    In general, blinded data would not be

12   used for any determination.

13   Q.    But this email makes reference to blinded

14   data that you looked at in this time frame.

15   Correct?

16   MR. PHILLIPS:  Objection to the form;

17   mischaracterizes the document.

18   BY MR. DAVIS:

19   Q.    Well, let me ask it very differently,

20   Doctor.  How did you determine that titration

21   appeared to improve the tolerability of ABT-594 in

22   that trial, although the data remained blinded at

23   that time?

24   A.    I just don't recall.

1    trials.

2    BY MR. DAVIS:

3        Q.    Did that include adverse event data?

4        A.    Among a host of other data with respect

5    to trials.

6        Q.    Why was it that, in your work at Abbott,

7    you would review preliminary data about clinical

8    trials while the trials were still under way?

9        A.    There were a variety of reasons to review

10   data while the course of the study was under way.

11       Q.    What were they?

12       A.    They would include, for example,

13   monitoring the progress of the trial, its pace.

14       Q.    Anything else?

15       A.    A general appreciation for how individual

16   participating sites were progressing or not

17   progressing.

18       Q.    Anything else?

19       A.    I think those are the examples that come

20   to mind.

21       Q.    Did you ever review preliminary data from

22   any clinical trials while the trials were still

23   under way when you worked at Abbott in an attempt to

24   understand how the compound that was being tested in

1    A.   I'm not certain I understand your use of

2    the word "performing."

3    Q.   When Abbott ran clinical trials and you

4    worked there, what was the purpose of the trials --

5    MR. PHILLIPS:  Objection to the form.

6    BY MR. DAVIS:

7    Q.   -- generally?

8    A.   The purpose of the trial would vary by

9    the trial.

10    Q.   The purpose of the trial was to study

11    compounds and determine how the -- well they would

12    perform or be tolerated by patients.  Is that one of

13    the purposes of a clinical trial?

14    MR. PHILLIPS:  Objection to the form.

15    BY THE WITNESS:

16    A.   The -- the general purpose of research is

17    to pose questions and to attempt to collect

18    information to answer those questions.

19    BY MR. DAVIS:

20    Q.   When you worked at Abbott, did you ever

21    review any information that you received concerning

22    clinical trials while the trials were still under

23    way in an attempt to determine what you believed

24    would be the likely results of the trial?

1      A.    I do not recall doing that, no.

2      Q.    And was the -- one of the purposes of the

3    M99-120 trial to try to determine the tolerability

4    of ABT-594?

5      A.    I -- I just do not recall the specifics

6    of that study.

7      MR. DAVIS:  Let's mark this, please, as the

8    next exhibit.

9            (WHEREUPON, a certain document was

10           marked Silber Deposition Exhibit

11           No. 9, for identification, as of

12           2/9/07.)

13   BY MR. DAVIS:

14     Q.    Dr. Silber, you have what's been marked

15   as Exhibit 9 to your deposition.  Would you look at

16   this document and tell me if you've seen this

17   document or documents in this format before when you

18   worked at Abbott?

19     A.    I -- I do not recall this specific

20   document, no.

21     Q.    My question was a little broader than

22   that, though.  Do you recall seeing documents in

23   this format before, when you worked at Abbott?

24     A.    I -- I do not recall seeing documents in

1    plans submitted?

2        A.   I -- I don't recall the specific

3    distribution of the development plans.  But an

4    example would be senior management, the participants

5    of the team, line managers in association with it as

6    well.

7        Q.   Who did you regard as the senior

8    management of Abbott as of August of 2000?

9        A.   I -- I don't recall the -- the specific

10   senior management at that point in time.

11       Q.   Well, in -- at that point in time, say,

12   in the summer of 2000, did you have periodic

13   interaction with Dr. Leonard?

14       A.   I -- I don't recall the specifics of that

15   period of time, but, in general, I would have

16   interactions with Dr. Leonard, yes.

17       Q.   Did you regard him as your immediate

18   superior?

19       A.   Again, I don't recall the specifics of

20   the timing about him being or not being my immediate

21   superior.  But at a point in time, he was my -- my

22   boss, yes.

23       Q.   When you were the head of the pain team

24   or the analgesia venture, who do you recall were

1    your superiors, your immediate superiors?

2    A.   My recollection for some point of that

3    was that Dr. Leonard was that immediate superior.

4    Q.   Do you recall anyone else ever being your

5    immediate superior when you were the head of the

6    pain team or the analgesia venture?

7    A.   During the period of time that we are

8    talking about here, I -- I do not recall others

9    being my superior.

10   Q.   Did you -- when you were the head of the

11   pain team or the analgesia venture, did you

12   occasionally interact with Dr. Jeffrey Leiden?

13   A.   Again, I don't recall the specifics of

14   timing, but I do recall from time to time making

15   presentations with Dr. Leiden, yes.

16   Q.   What did you understand to be

17   Dr. Leiden's position at that time?

18   A.   I -- I don't recall the specifics during,

19   again, any particular point in time.  But in

20   general, my recollection is that the function of

21   senior scientific officer; at some point

22   responsibilities for pharmaceuticals, including

23   pharmaceutical development and discovery.

24   Q.   Do you recall ever having any discussions

1     on the ABT-594 114 study?

2     MR. PHILLIPS:  Objection to the form.

3     BY THE WITNESS:

4     A.   Can you describe what you mean by "trains

5     running"?

6     BY MR. DAVIS:

7     Q.   Okay.  You're not familiar with that

8     term?

9     A.   I'm familiar with trains.

10    Q.   Okay.  As you sit here today, you don't

11    know who at Abbott was responsible on a day-to-day

12    basis for administering the 114 study.

13    A.   Again, I'm not certain of the phrase

14    "administering" or -- or what you mean by that.

15    Q.   Well, who at Abbott was responsible for

16    the 114 study?

17    A.   Members -- in general, members of the

18    clinical research team would have been responsible

19    for the trial.  I just do not recall the -- the

20    responsibilities that any individual member of the

21    team would have had with respect to this study.

22    Q.   What involvement have you had in the past

23    in -- in the personal op- -- personally in the

24    operation of a clinical trial?

1      A.   Over the course of time, my

2    responsibilities have varied considerably with

3    respect to interactions with clinical trials.

4      Q.   What responsibilities have you had?

5      A.   Those would have included, among others,

6    the identification of sites, the review of study

7    progress, elements of study design, summarization of

8    results, interaction with site personnel as well.

9      Q.   Did you ever have any day-to-day

10    responsibility for the operation of a clinical

11    trial?

12      A.   I have never been a participating site in

13    a clinical trial.  But the full scale of my

14    responsibilities over time have been the design,

15    oversight, and conduct of clinical trials.

16      Q.   In what capacity did you -- did you --

17    were you ever responsible at Abbott for the

18    day-to-day oversight of a clinical trial?

19      A.   Again, I'm -- I'm not certain what you

20    mean by "day-to-day oversight" with respect to a

21    clinical trial.

22      Q.   Well, when I say "oversight," I'm

23    referring to the word as you just used it.

24      A.   Okay.

1    Q.   Okay.  You said at times you were

2    responsible for oversight of clinical trials.  My

3    question is:  Did you ever have day-to-day

4    responsibility for the oversight of clinical trials?

5    A.   Yes, I would have.

6    Q.   Okay.  In what capacity?  What position

7    did you hold?

8    A.   In -- as -- as part of my initial

9    responsibilities in joining Abbott in the early

10    1990s, I would have had very direct oversight

11    responsibilities with respect to clinical trials.

12    Q.   Okay.  How many clinical trials did you

13    have direct oversight responsibility for?

14    A.   I -- I do not recall a specific number

15    that -- that I would categorize in the context of

16    direct oversight that we're now talking about.

17    Q.   Generally, how many?

18    A.   Several, many, many.

19    Q.   More than five?

20    A.   Yes.

21    Q.   Um-hmm.  Did any of them involve ABT-594?

22    A.   Not in the context that I am now

23    describing it, no.

24    Q.   What -- what compounds were involved in

1      Q.    Was it, at this point in time, considered

2    by you or others within Abbott, to your knowledge,

3    to be a potential competitor for ABT-594 if ABT-594

4    was introduced for neuropathic pain?

5      A.    I -- I don't remember precisely how it

6    was being considered, other than it was under

7    development and/or being -- it was under development

8    for use in neuropathic pain, as I recall.

9      Q.    All right.  Did you understand ABT-594 to

10    have problems with tolerability as of October 2000?

11    MR. PHILLIPS:  Objection to the form.  Sorry.

12    BY THE WITNESS:

13      A.    I -- I guess I do not agree with the

14    characterization of -- well, the use of the word

15    "problems" with respect to tolerability.

16    BY MR. DAVIS:

17      Q.    So I take it the answer is no, you didn't

18    think that ABT-594 had problems with tolerability as

19    of October 2000.

20      A.    No, I did not.

21      Q.    Next to that box, it says, "Recommend

22    continuation of current trial to allow for complete

23    analysis of findings with originally projected

24    power, despite delay in time lines."

## MUNGER, TOLLES & OLSON LLP

355 SOUTH GRAND AVENUE

THIRTY-FIFTH FLOOR

LOS ANGELES, CALIFORNIA 90071-1560

TELEPHONE (213) 683-9100

FACSIMILE (213) 687-3702

———————

560 MISSION STREET

SAN FRANCISCO, CALIFORNIA 94105-2907

TELEPHONE (415) 512-4000

FACSIMILE (415) 512-4077

PETER R. TAFT[A]
ROBERT K. JOHNSON[A]
ALAN V. FRIEDMAN[A]
RONALD L. OLSON[A]
DENNIS E. KINNAIRD[A]
RICHARD S. VOLPERT
DENNIS C. BROWN[A]
ROBERT E. DENHAM
JEFFREY I. WEINBERGER
ROBERT L. ADLER
CARY B. LERMAN
CHARLES D. SIEGAL
RONALD K. MEYER
GREGORY P. STONE
VILMA S. MARTINEZ
BRAD D. BRIAN
BRADLEY S. PHILLIPS
GEORGE M. GARVEY
WILLIAM D. TEMKO
STEVEN L. GUISE[A]
ROBERT B. KNAUSS
STEPHEN M. KRISTOVICH
JOHN W. SPIEGEL
TERRY E. SANCHEZ
STEVEN M. PERRY
MARK B. HELM
JOSEPH D. LEE
MICHAEL R. DOYEN
MICHAEL E. SOLOFF
GREGORY D. PHILLIPS
LAWRENCE C. BARTH
KATHLEEN M. McDOWELL
GLENN D. POMERANTZ
THOMAS B. WALPER
RONALD C. HAUSMANN
PATRICK J. CAFFERTY, JR.
JAY M. FUJITANI
O'MALLEY M. MILLER
SANDRA A. SEVILLE-JONES
MARK H. EPSTEIN
HENRY WEISSMANN
KEVIN S. ALLRED
MARC A. BECKER
BART H. WILLIAMS
JEFFREY A. HEINTZ
JUDITH T. KITANO

KRISTIN LINSLEY MYLES
MARC T.G. DWORSKY
JEROME C. ROTH
STEPHEN D. ROSE
JEFFREY L. BLEICH
GRANT T. VINCENT
TED DANE
MARK SHINDERMAN
STUART N. SENATOR
MARTIN D. BERN
DANIEL P. COLLINS
STEVEN B. WEISBURD
EDWARD C. HAGEROTT, JR.
RICHARD E. DROOYAN
ROBERT L. DELL ANGELO
BRUCE A. ABBOTT
JONATHAN E. ALTMAN
MARY ANN TODD
MICHAEL J. O'SULLIVAN
KELLY M. KLAUS
DAVID B. GOLDMAN
BURTON A. GROSS
KEVIN S. MASUDA
HOJOON HWANG
KRISTIN S. ESCALANTE
DAVID C. DINIELLI
ANDREA WEISS JEFFRIES
PETER A. DETRE
PAUL J. WATFORD
DANA S. TREISTER
CARL H. MOOR
DAVID M. ROSENZWEIG
DAVID H. FRY
LISA J. DEMSKY
MALCOLM A. HEINICKE
GREGORY J. WEINGART
TAMERLIN J. GODLEY
JAMES C. RUTTEN
J. MARTIN WILLHITE
RICHARD ST. JOHN
ROHIT K. SINGLA
LUIS LI
CAROLYN HOECKER LUEDTKE
C. DAVID LEE
MARK H. KIM
ALLISON B. STEIN

MARSHA HYMANSON
SUSAN R. SZABO
LINDA S. GOLDMAN
NATALIE PAGÈS STONE
BRETT J. RODDA
JOSEPH S. KLAPACH
LISA VANCE CASTLETON
MONIKA S. WIENER
LYNN HEALEY SCADUTO
RANDALL G. SOMMER
AARON M. MAY
SHONT E. MILLER
MARIA SEFERIAN
JASON L. HAAS
MANUEL F. CACHÁN
ERIC J. LORENZINI
MEGAN M. LA BELLE
KATHERINE H. HUANG
SARAH KURTIN
KATHERINE M. FORSTER
ROSEMARIE T. RING
JOSEPH J. YBARRA
AILSA W. CHANG
AMANDA SCHREIBER
BLANCA FROMM YOUNG
ROBERT E. SATTERTHWAITE
ÖZGE GÜZELSU
LINDSAY D. McASKILL
KATE K. ANDERSON
ALISON J. MARKOVITZ
LOREN KESSLER-HIGGINS
E. DORSEY HEINE
SAMUEL N. WEINSTEIN
PAUL M. ROHRER
KIT JOHNSON
JAY K. GHIYA
SUSAN TRAUB BOYD
JOHN C. DAY
JENNIFER L. POLSE
TODD J. ROSEN
DANIEL L. GEYSER
BRIAN R. HOCHLEUTNER
DEAN N. KAWAMOTO
GRANT A. DAVIS-DENNY
E. MARTIN ESTRADA
JASON RANTANEN

AMY C. TOVAR
REBECCA GOSE LYNCH
JONATHAN H. BLAVIN
JOHN R. GRIFFIN
KAREN J. FESSLER
MICHELLE T. FRIEDLAND
J. RAZA LAWRENCE
MICHAEL T. KOVALESKI
LIKA C. MIYAKE
MELINDA EADES LEMOINE
ANDREW W. SONG
DANIEL A. BECK
FREYA K. RUSSELL
YOHANCE C. EDWARDS
JULIE D. CANTOR
SETH GOLDMAN
FADIA ISSAM RAFEEDIE
DANIEL J. POWELL
DANIEL B. LEVIN
DAVID M. GRABLE
JOSHUA P. GROBAN
VICTORIA L. BOESCH
JEFF J. BOWEN
ADAM M. FLAKE
HAILYN J. CHEN
BRAD SCHNEIDER
DAVID W. SWIFT
JEAN Y. RHEE
ALEXANDRA LANG SUSMAN
GENEVIEVE A. COX
MIRIAM KIM
MISTY M. SANFORD
BRIAN P. DUFF
AIMEE FEINBERG
JOEL D. WHITLEY
JEFFREY E. ZINSMEISTER
MONICA DIGGS MANGE

RICHARD D. ESBENSHADE[A]
OF COUNSEL

E. LEROY TOLLES
(RETIRED)

[A] A PROFESSIONAL CORPORATION

March 12, 2007

WRITER'S DIRECT LINE
(213) 683-9276
(213) 683-5176 FAX
Gregory.Phillips@mto.com

*Via U.S. Mail*

Joseph H. Zwicker, Esq.
Choate Hall & Stewart LLP
Two International Place
Boston, MA 02110

Re:    John Hancock Life Insurance Co. *et al.* v. Abbott Laboratories

Dear Joe:

I am enclosing the executed signature page from Dr. Silber's deposition transcript, together with pages from the transcript upon which he has made corrections or changes to his testimony.

Please do not hesitate to contact me if you have any questions or comments.

Sincerely,

Gregory D. Phillips

1248563.1

Page 10

1          Q.    What did you do between 1986 and 1991

2    when you joined Abbott?

3          A.    I did training in family medicine at Duke

4    and thereafter was employed by a company named

5    Forest Laboratories.

6          Q.    What positions did you hold at Forest

7    Laboratories?

8          A.    Assistant director, assistant medical

9    director.

10         Q.    And what was the business of Forest Labs?

11         A.    The development of, primarily, generic

12    drugs, ~~but~~ the pharmaceutical industry.
       *as part of* (Q)

13         Q.    Were you involved in drug development at

14    Forest Labs?

15         A.    Yes, I was.

16         Q.    And what positions did you hold at Abbott

17    when you worked there?

18         A.    I held a variety of posts at Abbott.

19         Q.    When you first joined Abbott, what

20    positions did you hold back in 1991?

21         A.    Associate director or associate medical

22    director.

23         Q.    What other positions did you hold that

24    you recall?

Page 27

```
 1    BY MR. DAVIS:

 2        Q.    Well, this document makes reference to a

 3    proposal that you made for the "GO" -- the "GO"

 4    criteria.  Do you know what "GO" criteria are?

 5        A.    I -- I don't recall what "GO" criteria

 6    meant in the context of that discussion or meeting.

 7        Q.    Have you ever heard the term go/no-go

 8    decision?

 9        A.    I have heard that term, yes.

10        Q.    Is that a term that you used while you

11    were involved in drug development at Abbott?

12        A.    I do recall, from time to time, the use

13    of that term, yes.

14        Q.    What did you mean when you used that term

15    "go/no-go decision" when you were involved in drug

16    development at Abbott?

17        A.    Among other terms, the term -- the phrase

18    "go/no-go" would refer to decision points or

19    potential decision points, depending upon the

20    available information, that would be opportunities

21    to be review information accumulated up to that

22    point in time, revisit them in the broader context

23    of all available information, and a potential

24    decision could follow that.
```

Page 236

1    Q.    Did it change the picture for Abbott in

2  pain in any other way?

3    A.    I -- I do remember a sustained release

4  product as well as part of the Knoll acquisition.

5  Dilaudid Oros was the name project.  That was the

6  only other way that I can recall in general terms

7  discussion about pain compounds as part of Knoll

8  acquisition.

9    MR. DAVIS:  Would you mark this as the next

10  exhibit, please?

11                    (WHEREUPON, a certain document was

12                    marked Silber Deposition Exhibit

13                    No. 50, for identification, as of

14                    2/9/07.)

15    MR. PHILLIPS:  Mr. Videographer, are these

16  getting in your way?

17    MR. FRANCE:  (Indicating.)

18    MR. DAVIS:  This is Exhibit 50?

19  BY MR. DAVIS:

20    Q.    Dr. Silber, you have been handed what has

21  been marked as Exhibit 50, which appears to be an

22  email from you to you about you.

23    MR. PHILLIPS:  Sorry.

24

Page 256

1    IN THE UNITED STATES DISTRICT COURT.

2          FOR THE DISTRICT OF MASSACHUSETTS

3    JOHN HANCOCK LIFE INSURANCE        )

4    COMPANY, et al.,                   )

5          Plaintiffs,                  )    Civil Action No.

6       vs.                             )    05-11150-DPW

7    ABBOTT LABORATORIES,               )

8       Defendant.                      )

9          I hereby certify that I have read the

10   foregoing transcript of my deposition given at the

11   time and place aforesaid, consisting of Pages 1 to

12   255, inclusive, and I do again subscribe and make

13   oath that the same is a true, correct and complete

14   transcript of my deposition so given as aforesaid,

15   and includes changes, if any, so made by me.

16                    *Christopher J. Silber MD 3/8/07*

17

18          CHRISTOPHER SILBER, M.D.

19

20   SUBSCRIBED AND SWORN TO before me

21   this     day of              , A.D. 2007.

22

23          Notary Public

24