UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY, | CIVIL ACTION NO. 05-11150-DPW |
| Plaintiffs, | |
| v. | |
| ABBOTT LABORATORIES, | |
| Defendant. | |

## ABBOTT'S CORRECTED DEPOSITION DESIGNATIONS FOR SCOTT S. HARTZ

Defendant Abbott Laboratories ("Abbott") respectfully submits the attached corrected

deposition designations for the August 19, 2004 and November 10, 2006 deposition of

Scott S. Hartz, Executive Vice President and Chief Investment Officer of John Hancock

Financial Services, Inc.

Dated:  February 22, 2008                 Respectfully submitted,


                                          ABBOTT LABORATORIES

                                          By:  __/s/ Eric J. Lorenzini_____
                                               Eric J. Lorenzini

                                          Jeffrey I. Weinberger (*pro hac vice*)
                                          Gregory D. Phillips (*pro hac vice*)
                                          Eric J. Lorenzini *(pro hac vice)*
                                          Ozge Guzelsu *(pro hac vice)*
                                          MUNGER, TOLLES & OLSON LLP
                                          355 South Grand Avenue, Thirty-Fifth
                                          Floor
                                          Los Angeles, CA  90071-1560
                                          Tele:  (213) 683-9100

                                          and

                                          Peter E. Gelhaar (BBO#188310)
                                          Michael S. D'Orsi (BBO #566960)
                                          DONNELLY, CONROY &
                                          GELHAAR LLP
                                          1 Beacon St., 33rd Floor
                                          Boston, Massachusetts 02108
                                          (617) 720-2880
                                          peg@dcglaw.com
                                          msd@dcglaw.com


                                          *Counsel for Abbott Laboratories*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 22, 2008.

Date: February 22, 2008

_____/s/ Ozge Guzelsu_____

# Scott Hartz Deposition Designations

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 8/19/04 | Hartz, Scott | | | 4:10-4:13 | | | |
| 8/19/04 | Hartz, Scott | | | 6:21-7:11 | | | |
| 8/19/04 | Hartz, Scott | | | 12:5-13:10 | | | |
| 8/19/04 | Hartz, Scott | | | 14:8-14:14 | | | |
| 8/19/04 | Hartz, Scott | | | 42:3-42:13 | | | |
| 8/19/04 | Hartz, Scott | | | 54:8-55:3 | | | |
| 8/19/04 | Hartz, Scott | | | 55:12-56:24 | | | |
| 11/10/06 | Hartz, Scott | | | 9:1-9:7 | | | |
| 11/10/06 | Hartz, Scott | | | 9:11-9:20 | | | |
| 11/10/06 | Hartz, Scott | | | 10:8-11:3 | | | |
| 11/10/06 | Hartz, Scott | | | 11:11-12:16 | | | |
| 11/10/06 | Hartz, Scott | | | 15:17-16:14 | | | |
| 11/10/06 | Hartz, Scott | | | 20:14-21:4 | | | |
| 11/10/06 | Hartz, Scott | | | 23:16-24:14 | | | |
| 11/10/06 | Hartz, Scott | | | 24:19-25:11 | | | |
| 11/10/06 | Hartz, Scott | | | 27:2-27:5 | | | |

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 11/10/06 | Hartz, Scott | | | 30:7-30:13 | | | |
| 11/10/06 | Hartz, Scott | | | 34:18-36:6 | | | |
| 11/10/06 | Hartz, Scott | | | 41:11-42:9 | | | |
| 11/10/06 | Hartz, Scott | | | 43:7-43:23 | | | |
| 11/10/06 | Hartz, Scott | | | 47:10-47:19 | | | |
| 11/10/06 | Hartz, Scott | | | 49:8-50:15 | | | |
| 11/10/06 | Hartz, Scott | | | 54:9-54:22 | | | |
| 11/10/06 | Hartz, Scott | | | 56:8-56:14 | | | |
| 11/10/06 | Hartz, Scott | | | 58:16-59:8 | 2 | | Def. IG |
| 11/10/06 | Hartz, Scott | | | 65:14-66:9 | | | |
| 11/10/06 | Hartz, Scott | | | 66:10-66:23 | 3 | | Def. IH |
| 11/10/06 | Hartz, Scott | | | 67:20-68:14 | | | |
| 11/10/06 | Hartz, Scott | | | 71:15-71:23 | | | |
| 11/10/06 | Hartz, Scott | | | 78:3-78:10 | | | |
| 11/10/06 | Hartz, Scott | | | 86:21-87:9 | | | |
| 11/10/06 | Hartz, Scott | | | 87:14-87:17 | | | |
| 11/10/06 | Hartz, Scott | | | 87:21-88:1 | | | |
| 11/10/06 | Hartz, Scott | | | 104:14-107:9 | | | |

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 11/10/06 | Hartz, Scott | | | 110:3-110:16 | | | |
| 11/10/06 | Hartz, Scott | | | 112:2-113:5 | | | |
| 11/10/06 | Hartz, Scott | | | 114:6-114:15 | | | |
| 11/10/06 | Hartz, Scott | | | 129:16-130:1 | 11 | | Def. II |
| 11/10/06 | Hartz, Scott | | | 130:19-130:24 | | | |
| 11/10/06 | Hartz, Scott | | | 137:5-137:20 | 14 | | Def. IJ |
| 11/10/06 | Hartz, Scott | | | 152:5-153:6 | 18 | | 527 |
| 11/10/06 | Hartz, Scott | | | 157:8-157:22 | | | |
| 11/10/06 | Hartz, Scott | | | 159:6-159:12 | | | |
| 11/10/06 | Hartz, Scott | | | 162:14-164:2 | | | |
| 11/10/06 | Hartz, Scott | | | 172:23-173:1 | | | |
| 11/10/06 | Hartz, Scott | | | 176:20-176:20 | 19 | | Def. IK |
| 11/10/06 | Hartz, Scott | | | 177:1-177:7 | | | |
| 11/10/06 | Hartz, Scott | | | 177:20-178:4 | | | |
| 11/10/06 | Hartz, Scott | | | 200:22-200:22 | 25 | | Def. IL |
| 11/10/06 | Hartz, Scott | | | 201:1-201:15 | | | |
| 11/10/06 | Hartz, Scott | | | 203:16-204:17 | | | |
| 11/10/06 | Hartz, Scott | | | 205:13-207:18 | 26 | | Def. IM |

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 11/10/06 | Hartz, Scott | | | 208:10-209:7 | | | |
| 11/10/06 | Hartz, Scott | | | 209:10-209:20 | | | |
| 11/10/06 | Hartz, Scott | | | 210:17-211:11 | 27 | | Def. IN |
| 11/10/06 | Hartz, Scott | | | 211:16-211:19 | | | |
| 11/10/06 | Hartz, Scott | | | 223:15-224:8 | 32 | | Def. IO |
| 11/10/06 | Hartz, Scott | | | 230:21-231:5 | 37 | | Def. IP |
| 11/10/06 | Hartz, Scott | | | 231:11-232:3 | | | |
| 11/10/06 | Hartz, Scott | | | 232:15-232:23 | 38 | | Def. IQ |
| 11/10/06 | Hartz, Scott | | | 233:5-234:17 | | | |
| 11/10/06 | Hartz, Scott | | | 235:1-236:17 | 39 | | Def. IR |
| 11/10/06 | Hartz, Scott | | | 239:21-240:11 | | | |
| 11/10/06 | Hartz, Scott | | | 246:12-247:11 | 45 | | Def. IS |

# Color Key to Deposition Designations

Designation by Plaintiffs

Counter Designation by Defendants

Designation by Defendants

0001

1                         Volume:  I

2                        Pages :   1 - 257

3                        Exhibits: 1 - 46

4              UNITED STATES DISTRICT COURT

5            FOR THE DISTRICT OF MASSACHUSETTS

6                CIVIL ACTION NO. 05-1150DPW

7     - - - - - - - - - - - - - - - - - - - - - x

8     JOHN HANCOCK LIFE INSURANCE COMPANY,

9     JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY,

10    and MANULIFE INSURANCE COMPANY

11    (f/k/a INVESTORS PARTNER INSURANCE COMPANY),

12             Plaintiffs,

13       V.

14    ABBOTT LABORATORIES,

15             Defendant.

16    - - - - - - - - - - - - - - - - - - - - - x

17             C O N F I D E N T I A L

18    VIDEOTAPED DEPOSITION OF SCOTT S. HARTZ

19      Friday, November 10, 2006,  9:45 a.m.

20         Donnelly, Conroy & Gelhaar

21            One Beacon Street

22           Boston, Massachusetts

23       Reporter:  Rosemary F. Grogan, CSR, RPR

24

1    Q.  Mr. Hartz, what is your current employment?

2    A.  John Hancock Life Insurance Company.

3    Q.  What is your position at John Hancock Life

4  Insurance Company?

5    A.  I'm a senior vice president.

6    Q.  How long have you held that position?

7    A.  For about two years.

8    Q.  Is there anything more to that title like

9  senior vice president of something?

10    A.  Of John Hancock Life Insurance Company.

11    Q.  What's your responsibilities in your current

12  position?

13    A.  I manage the Bond and Corporate Finance Group

14  in John Hancock.

15    Q.  And what is Bond and Corporate Finance Group

16  at John Hancock?

17    A.  It's a group that manages bonds for the

18  company.  It's a group of about 100 people, and we

19  manage about, roughly, $45 billion worth of assets,

20  largely bonds and a little bit of equity.

21    Q.  A little bit of what?

22    A.  Equity.

23    Q.  Who do you report to in your current position?

24    A.  I report to Don Guloien, the chief investment

1      officer.

2          Q.   How do you spell his name?

3          A.   G-U-L-O-I-E-N, I believe.  When you use

4      e-mail, you never have to actually write it.

5          MR. DAVIS:  We won't show him the video.

6          A.   And actually that's fairly recent, too.  I had

7      reported to Warren Thompson until about a month ago.

8          Q.   Is Stephen Blewitt still employed at John

9      Hancock?

10         A.   Yes, he is.

11         Q.   What is his current position, if you know?

12         A.   Yeah, he heads up our -- he's a vice

13     president, is his title, and he heads up the Mezzanine

14     Finance Group within the Bond and Corporate Finance

15     Group.

16         Q.   What is the Mezzanine Finance Group.

17         A.   It's a group that invests in a specific type

18     of investment called mezzanine finance, which I can

19     define if you'd like.

20         Q.   Yes, please do.

21         A.   Mezzanine finance is -- consists of loans

22     to -- usually subordinated loans, to higher-risk type

23     companies, and the return of which is composed of both

24     the coupon on the loan and usually, although not always,

1    an equity components such as warrants.

2        Q.   Does Stephen Blewitt report to you?

3        A.   Yes, he does.

4        Q.   What was your position before you became

5    senior vice president of the Bond and Corporate Finance

6    Group?

7        A.   Well, the title was vice president before

8    senior vice president, but I assume you more mean the

9    function?

10        Q.   Let's just start with the title.

11            Before you became senior vice president,

12    you were vice president?

13        A.   Correct.

14        Q.   And during what years did you hold that

15    position?

16        A.   From 2002 I believe to 2004, so about two

17    years.  Two years ago, I was that for about two years.

18        Q.   And what were your responsibilities as vice

19    president?

20        A.   I was the head portfolio manager in the Bond

21    and Corporate Finance Group.

22        Q.   Can you describe more specifically what your

23    responsibilities were as head portfolio manager in the

24    Bond and Corporate Finance Group?

1      A.  As head portfolio manager, the varied

2    responsibilities, but the role is to, one, make sure

3    that those $45 billion worth of investments, I described

4    earlier, are appropriately put into the various

5    portfolios within the company and that each portfolio is

6    appropriately diversified, and it meets all -- the

7    investments meet all the investments policies and

8    guidelines of the various portfolios.

9            I would act as the main communicator

10   about the portfolio of senior management wanting to know

11   about the portfolio or outside entities wanting to know

12   about the outside portfolio, I would generally be called

13   to talk about it.  Part of the responsibility is also to

14   make sure that the relative value of the individual

15   investments that are being made are appropriate; that

16   we're getting appropriate return for the risk.

17      Q.  Did Stephen Blewitt report to you when you

18   were vice president?

19      A.  No.

20      Q.  What was Stephen Blewitt's position during

21   2002 - 2004?

22      A.  The same position that it is now.

23      Q.  Who did you report to as vice president?

24      A.  I reported to Barry Welch.

1          MR. LORENZINI:  I'm just asking if he reviewed

2     them.

3          MR. DAVIS:  No, to the extent that you can ask

4     him about documents that refreshed his

5     recollection, but I object to asking generally

6     about other documents he was shown.

7          So to the extent you recall reviewing

8     documents that actually refreshed your

9     recollection, you can respond to the question; but

10    otherwise, please exclude -- do not respond to the

11    question.  I instruct you not to respond.

12     A.   So where are we?

13     Q.   I'll just rephrase the question.

14          Did you review any documents in

15    electronic form that refreshed your recollection?

16     A.   No.

17     Q.   Mr. Hartz, during the period from the fall of

18    2000 through March of 2001, what was the process for

19    approval of transactions in the Bond and Corporate

20    Finance Group at John Hancock?

21     A.   Every transaction would need to be looked at

22    by portfolio management, which was my role, to make sure

23    that the return was appropriate for the risk that was

24    being described and that the transaction would fit into

1   one of those portfolios I talked about earlier.  It

2   would fit within those -- and meet, you know, sort of

3   the regulatory tax framework that we exist in.

4         And sort of senior management within the

5   department or I guess our chief credit officer at the

6   time would also look at the transaction and make sure it

7   was something we wanted to proceed with.  And then

8   assuming those parties were in agreement, it would go in

9   front of the Bond and Investment Committee, where --

10   earlier I talked about the informal part.  And the

11   formal approval was at the Bond and Investment Committee

12   which consisted of the -- a number of senior people in

13   the department and the chief investment officer who

14   would formally approve the transaction.

15   Q.  Did -- strike that.

16         Was there a committee at John Hancock

17   known as the Committee of Finance?

18   A.  Yes.

19   Q.  During that period that I just described, fall

20   of 2000 through March of 2001, did the Committee of

21   Finance play a role in the approvals of transaction?

22   A.  Yes, by Mass. statute, they have to see every

23   transaction that's being done.  They can delegate

24   authority on approval of transactions to other groups,

1    expectation that John Hancock might not make anymore

2    money back than it had put in in the first place?

3        A.   Well, it's an economic loss.  So it's not --

4    so if you lent the money and you got all your money back

5    at the end, but no return on it, that would be an

6    economic loss and you would have to factor that into the

7    equation.

8        Q.   Would you also factor into the equation, the

9    risk of not only economic loss, but not receiving any

10    money back from your investment?

11        A.   Absolutely.

12        Q.   And did John Hancock at that time have a

13    list -- strike that.

14            Did John Hancock during this time have

15    any documents that set forth the credit ratings to be

16    assigned to particular expected loss levels?

17        A.   Yes.

18        MR. DAVIS:  This time you mean?

19        MR. LORENZINI:  Late 2000 through early 2001.

20        A.   Yes.

21        Q.   Did that document have a name?  How would you

22    reference that document?

23        A.   It was -- there was one piece of paper that

24    we -- that had two components to it.  It had sort of

Hartz, Scott S. (Linked)  11/10/2006  9:45:00 AM

1   target spreads for giving credit qualities up top and

2   expected losses down at the bottom and that got

3   published on a regular basis and people loosely referred

4   to it as the curve.

5        Q.   When you say, it got published on a regular

6   basis, how frequently in general was that curve updated?

7        A.   Probably, I'm guessing, 25 times a year or so,

8   20 to 25 times a year.  But it was the top part, the

9   spreads, that changed.  The expected losses did not

10  change.  That was a constant that didn't change for

11  years at a time.

12       Q.   And the expected loss portion of that document

13  that you're describing, that was updated based on

14  Standard & Poor's and Moody's ratings of transactions?

15       MR. DAVIS:  Objection.

16       A.   It was based on Moody's Default Study that is

17  done once a year, but since it's based on 30 years of

18  history, it really doesn't change much from year to

19  year.  So we did not change it every year based on the

20  latest Moody's survey.

21       Q.   Does that Moody's study have any more specific

22  name other than the Moody's Default Study?

23       A.   I think it's the Moody's Annual Default Study.

24       Q.   Does John Hancock still maintain a document,

1    McWatters.

2        Q.   Are there any other employees who might have a

3    copy of the document containing the target spreads for

4    that time period, late 2000, early 2001?

5        MR. DAVIS:  Objection.  You may respond.

6        A.   The other person I think might is a portfolio

7    assistant who is Kathy Morrison at the time.

8        Q.   Would -- strike that.

9            Did members of the Bond Investment

10    Committee at that time receive copies of the document

11    containing the target spread and the credit rating

12    listings?

13        A.   No.

14        MR. DAVIS:  Objection.

15    BY MR. LORENZINI:

16        Q.   You mentioned that the document that you're

17    describing included target spreads.

18            Could you please describe with more

19    specificity what you mean by target spreads?

20        A.   These were spreads over treasuries that

21    produced sort of ROE we were looking for based on a

22    given life of a transaction and risk as defined by

23    credit rating of the transaction.

24        Q.   And just to be clear for the record, by

1    treasuries, you mean treasury bonds?

2        A.   Yes, U.S. treasury bonds.

3        Q.   And by ROE, you mean return on equity?

4        A.   Correct.

5        Q.   And how did you determine the return on equity

6    that you were looking for at any given time?

7        MR. DAVIS:  Objection.

8        A.   Corporately mandated.

9        Q.   Who in particular mandated the returns on

10   equity?

11       A.   Chief executive officer.

12       Q.   Were there specific yields mandated by the

13   chief executive officer?

14       A.   No.

15       Q.   In what way would the chief executive officer

16   mandate yields, if not in the form of a specific yield?

17       MR. DAVIS:  Objection.

18       A.   I'm sorry, could you repeat the question?

19       Q.   You mentioned there were specific -- strike

20   that.

21           There were no specific yields mandated by

22   chief executive officer, but the chief executive officer

23   mandated certain returns on equity?

24       A.   Correct.

1      Q.  What was the chief executive officer's mandate

2   on return of equity --

3      A.  Well, it was --

4      Q.   -- at that time?

5      A.  It was a corporate goal of a 16 percent return

6   on equity after tax.

7      Q.  And did that goal change over time?

8      A.  Yeah, and I'm sorry, I think at that time it

9   was 15 percent.  It's currently 16 percent.

10      Q.  So, obviously, the goal did change over time?

11      A.  It did.

12      Q.  During the time you've been at John Hancock,

13   do you know what the range of corporate goals for return

14   on equity has been?

15      A.  It was 15 percent for a long, long time and I

16   don't recall exactly how long.  But it's -- that's

17   16 percent more recently, but that's pretty much the

18   range.

19      Q.  And are there documents that reflect that

20   corporate goal for that time period, the 15 percent

21   return on equity goal?

22      A.  We received a pin at the time we went public

23   that said 15 by 15, and that referred to 15 percent

24   return on equity and 15 percent growth in earnings.  I

1      A.  -- it does not.

2      Q.  Can you just define for me what you mean by

3   return on equity?

4      A.  It's the after-tax rate of return on risk

5   capital.

6      Q.  Please define risk capital for me.

7      A.  Risk capital is the amount of capital you need

8   to set aside to cover the risk of a particular

9   transaction.

10     Q.  How do you determine the amount of capital you

11   need to set aside to cover the risk of a particular

12   transaction?

13         MR. DAVIS:  Objection.  You can respond.

14     A.  There's -- well, capital -- there's a couple

15   of kind of capital.  There's regulatory capital and

16   economic.  Regulatory capital is specified by the

17   regulators.  Economic capital is determined by the

18   company as a best estimate of the amount of capital you

19   would need to survive an extremely, unlikely worst-case

20   scenario.

21     Q.  You mentioned that there were corporate goals

22   regarding the return on equity.

23         Were those goals, aggregate goals?  In

24   other words, that on average, Hancock's transactions --

1        MR. DAVIS:  Objection; asked and answered.

2    You can respond.

3    A.  Yeah, and I did tell you that earlier.  It was

4    10 percent of the invested assets.

5    Q.  I'm sorry.

6    A.  That's okay.

7    Q.  During the period from 2000 to 2001, I know

8    it's a while ago, but to the extent you can recall what

9    was the aggregate total of John Hancock's invested

10   assets?

11   A.  It was a while ago, and so I'm trying to think

12   back to our growth rate.  I'm guessing between 40 and

13   $50 billion.

14   Q.  During your time at John Hancock -- well,

15   strike that.

16        During the last six years, has John

17   Hancock approached the 10-percent limit at any time?

18   A.  Yes.

19   Q.  Has John Hancock ever exceeded the limit

20   during the last six years?

21   A.  Yes.

22   Q.  When did John Hancock exceed the limit?

23   A.  I think it was 2003; and just for clarity, it

24   exceeded in a passive way.  We had bonds that were

1      Q.   The 15 percent corporate goal you referenced

2    earlier, is that the absolute return on equity or the

3    return relative to risk?

4      A.   Well, by definition a return on equity measure

5    is a return relative to the amount of equity you need to

6    hold for it; hence, the amount of risk you see in a

7    transaction.

8      Q.   Were there any other factors other than

9    diversification and return on equity and risk that you

10   as a portfolio manager considered in determining whether

11   to recommend a particular investment?

12     A.   You know, the risk level of the transaction

13   itself and how much risk in aggregate we wanted to take

14   was clearly a factor, but those are the primary drivers.

15     Q.   I just want to go back to the document that

16   you described that included the target spreads?

17     A.   Mm-hmm.

18     Q.   Can you describe for me what this looked like?

19   Was there a chart that graphed -- that charted yields

20   versus risks?

21     A.   The document on the left-hand side would have

22   the credit ratings listed from highest to lowest and up

23   top, it would be maturity from one year out to 30 years,

24   and then it formed a matrix of spreads that filled that

1    in.

2         So, for example, if something was of

3    single A credit with seven-year average life, that would

4    be a target spread for that that would achieve the ROE

5    targets.

6       Q.   Have recommended transactions with expected

7    return on equity below the corporate goal at the time?

8       A.   Yes.

9       Q.   On how many occasions roughly have you made

10   such recommendations?

11      A.   I probably look at and approve 500-plus

12   transactions a year, and I would be speculating I guess,

13   but it's not an insignificant number.

14      Q.   Would you say in any given year if you're

15   approving 500-plus transactions that over 100 of those

16   transactions would have an expected return on equity

17   lower than the corporate goal?

18      A.   That's probably not -- it's in the right

19   ballpark, yes.

20      Q.   Are there some years in which you approve --

21   strike that.  Are there some years in which you

22   recommended approval of transactions where -- I'll start

23   over again.

24         Are there some years in which you

1    recommended more than 200 transactions in which the

2    expected return on equity is lower than the corporate

3    goal?

4        A.  I would guess, yes.  I don't know for certain,

5    but certainly some years are more than other years.

6        MR. DAVIS:  I caution you not to speculate or

7        guess, and you should be careful about that.

8        THE WITNESS:  It's an educated guess.

9        Q.  It's based on your recollection of the

10    transactions that you reviewed?

11        A.  Yeah, as long as we're talking plus or minus a

12    range of 25 percent, then I have a pretty good feel for

13    it, but I don't have the statistics obviously in front

14    of me.

15        Q.  Does John Hancock keep any summaries

16    statistics of the expected return on equity and the risk

17    level of all of the transactions that are entered into

18    in a given period?

19        A.  I'm sorry, I'm not sure what kind of report

20    you mean.

21        Q.  Does John Hancock maintain any summaries that

22    list the expected return on equity and the credit rating

23    of transactions entered into in a given period, say,

24    within the quarter or within the year?

1    A.  The data in it?

2    Q.  Correct.

3    A.  That would be the portfolio management group.

4    Q.  Who is the portfolio management group?

5    A.  There's a lot of people.  Do you want me to

6    reference more the person responsible for this?

7    Q.  Correct.

8    A.  That would be, I believe, because I don't run

9    that group anymore.  It was, and I believe still is,

10   Kathy Morrison.

11     Q.  Did you play a role in evaluating the

12   potential transaction between Abbott and John Hancock

13   that was finalized in March of 2001?

14     A.  Yes.

15     Q.  Could you descrive for me your role in that

16   transaction?

17     A.  It's the same role I've described generically

18   in my role as portfolio manager.  It was to make sure

19   that it was a fit for the liability accounts, that the

20   accounting worked and that the return was appropriate

21   for the risk.

22     Q.  Besides evaluating the accounting and

23   financial aspects of the transaction, did you have any

24   other role with respect to that transaction prior to

1    execution of the agreement?

2      A.  Besides which parts?

3      Q.  Besides analyzing the financial aspects of the

4    deal and the accounting treatment?

5      A.  Financial aspects is a pretty broad term, so I

6    mean I analyzed the risk.  I don't know if you consider

7    that part of the financial aspects, but I would say that

8    capsulizes what I did, but again, financial is a broad

9    term.

10      Q.  Did you have any role in negotiating any

11    aspect of the deal with Abbott?

12      A.  No.

13      Q.  Did you ever look at any term sheets regarding

14    the deal?

15      A.  I believe I did.

16      Q.  Do you recall if you looked at more than one

17    draft?

18      A.  I don't recall.

19      Q.  Did you ever have any meetings or telephone

20    conferences with anyone at Abbott?

21      A.  I was involved early on in one meeting with

22    Abbott.

23      Q.  And you didn't have any other communication

24    with Abbott?

1       A.   Not that I can recall.

2       Q.   Did you ever review any drafts of the contract

3    between Abbott and Hancock?

4       A.   No, and just broadly, as role in portfolio

5    manager, it would be very rare for me to look at legal

6    documents.

7       Q.   Did you have any role with respect to the

8    Abbott/Hancock transaction after the agreement was

9    entered into?

10      A.   The role I had was that of, I would have in

11   all transactions, which was just to monitor it from the

12   sense of has the risk stayed the same; and monitoring it

13   means just getting that information from the analyst

14   responsible for the deal, not sort of directly looking

15   at the deal itself.

16      Q.   What's John Hancock's standard procedure for

17   monitoring transactions that it entered into?

18      A.   Every quarter, the analyst responsible for

19   their transactions are supposed to review them to see if

20   the risk has changed and if it has to communicate that.

21      Q.   Is that procedure followed generally within

22   the corporation?

23      A.   Yes.

24      Q.   If the analyst concludes that the risk level

1    now it's usually just that team leader, maybe a senior

2    analyst who will attend the meeting where it is

3    discussed.  In addition, we have new senior management

4    up in Toronto, the chief investment officer, who is

5    always part of it, although that person changed and

6    Toronto has added a few individuals that sit through

7    that process.

8        Q.   Who would be the team leader responsible for

9    the industry group in which -- strike that.

10           What industry group does the

11   Abbott/Hancock transaction fall into?

12       A.  The Mezzanine Group.

13       Q.  And who is the currently the team leader of

14   that group?

15       A.  Stephen Blewitt.

16       Q.  So if the Abbott transaction was to be

17   reviewed, it would be Steve Blewitt's responsibility for

18   bringing that to the Review Group?

19       A.  Correct.

20       Q.   And who si the current chief investment

21   officer?

22       A.   Don Guloien, my current boss.

23       Q.   And who else is part of that Review Group

24   currently?

1    A.  No.

2    Q.  When you were --

3       MR. DAVIS:  Could we take a break when you get

4    a minute?

5       MR. LORENZINI:  Okay.  I just have a couple of

6    last questions.

7  BY MR. LORENZINI:

8    Q.  When you were analyzing the potential

9  transaction with Abbott, did you consult the document

10  you were describing earlier that reflects the target

11  spreads and the risk ratings?

12    A.  No.

13    Q.  Do you know if anyone evaluating the

14  transaction consulted that document, without

15  speculating?

16    A.  No, no one would have reviewed that document.

17    Q.  How do you know that?

18    A.  Well, because that was my job, and it was not,

19  as we discussed, broadly distributed, that document.  It

20  was largely kept within portfolio management.

21    Q.  Why did you not review that document in

22  evaluating the Abbott transaction?

23    A.  Because the returns -- well, I knew without

24  consulting it, that the returns were well above what we

1   needed to meet our target ROEs, return on equities.

2       Q.   How far above your target return on equities,

3   was the estimated return on the Abbott transaction?

4       A.   I don't know exactly since I didn't consult

5   the chart, but well above.

6       Q.   Several percentage points?

7       A.   Yes, probably more than several percentage

8   points.

9       Q.   More than 10?

10      MR. DAVIS:  Objection.

11      A.   Probably -- yeah, probably not more than 10,

12  not more than 10.

13      MR. DAVIS:  Is that 10 percentage points or

14      basis points?

15      THE WITNESS:  Percentage points.

16      Q.   Are you familiar with the term, hurdle rate?

17      A.   Yes.

18      Q.   Is that a term that is used at John Hancock

19  generally in evaluating potential investments?

20      A.   Yes.

21      Q.   Can you describe what the hurdle rate is as

22  that term is used at John Hancock?

23      A.   Well, I would describe it as the same thing

24  we've been talking about, the ROE, the 15 percent ROE is

Hartz, Scott S. (Linked)  11/10/2006  9:45:00 AM

1    short description on each one, which I did read.

2        Q.   Were these descriptions a paragraph or two on

3    each compound?

4        A.   Yeah, that's about right.

5        Q.   Did you have any role in the selection of

6    compounds to be included in the Research Funding

7    Agreement?

8        A.   No.

9        Q.   Prior to John Hancock entering into the

10   Research Funding Agreement with Abbott in March of 2001,

11   had John Hancock entered into any transactions that you

12   would classify as similar?

13       A.   Yes.

14       Q.   How many transactions were there that John

15   Hancock had entered into that you would classify as

16   similar?

17       A.   Well, there were other sort of -- there were

18   other pharmaceutical-type deals whose outcome depended

19   on success of drugs that were in development.  So I

20   would characterize those as similar.  And there were, I

21   don't know, three or four of those; and then there was

22   one other drug royalty deal which was even more similar.

23       Q.   What were the three or four deals that you

24   just referred to where the outcome depended on the

1          MR. DAVIS:  You still have a bell?

2     Congratulations.

3          THE WITNESS:  Synthetic.

4     Q.   Was there a deal with a company named Cubist

5     that you considered similar?

6     A.   Yeah, that's the one I think I'm referring to

7     in Massachusetts.

8     Q.   And you mentioned there was a drug royalty

9     deal you considered even more similar to the

10    Hancock/Abbott transaction.

11          Which company was that with?

12    A.   That was -- the deal was called

13    Pharma Marketing.  I believe it was -- Elan was the

14    company.

15    Q.   In analyzing the three or four deals that you

16    considered similar because the outcome depended on the

17    performance of the particular compounds, what generally

18    did John Hancock do to evaluate those potential

19    transactions?

20    A.   Well, the John Hancock would have been Steve

21    Blewitt in this case, since he was the analyst in that

22    space, and I don't recall all the factors he used to

23    analyze the risk.

24    Q.   Were you involved with the analysis of any of

1      A.   You know, I don't know any of the specifics

2    because I never read any reports or anything, but it was

3    around the industry of drug development.  That's about

4    as much as I know.

5       (Exhibit No. 1 Marked for Identification)

6    BY MR. LORENZINI:

7       Q.   Mr. Hartz, I've marked as Exhibit 1, a

8    document produced by John Hancock with Bates No. JH 1203

9    through 1220.  It's --

10       MR. LORENZINI:  I'm going to withdraw this

11       exhibit.  I marked the wrong one.

12       MR. DAVIS:  You want to withdraw it or just

13       move on to a different one?

14       MR. LORENZINI:  Yeah, let's just keep this

15       marked and I'll move on to the next one.

16       (Exhibit No. 2 Marked for Identification)

17    BY MR. LORENZINI:

18       Q.   Mr. Hartz, I've marked as Hartz Exhibit No. 2,

19    a document with Bates stamped JHII 012376 through 02388.

20    And it's -- has a title at the top, Pharma Marketing

21    Limited.  And on the first page at the bottom, it

22    states:  Report authors, and it lists, Stephen

23    J. Blewitt and Scott Hartz.

24           Do you recognize this document?

1      A.  Yes.

2      Q.  What is it?

3      A.  It's the, what we call the, yellow report or

4    more generically, underwriting memo or approval document

5    for the Pharma Marketing transaction.

6      Q.  And did John Hancock enter into the

7    transaction that's described in this memorandum?

8      A.  Yes.

9      Q.  Do you know -- strike that.

10          The report date on this document on the

11    first page is listed as June 8, 2000.  Do you know when

12    John Hancock entered into the agreement with

13    Pharma Marketing approximately?

14      A.  I don't specifically, but it would be around

15    this time.

16      Q.  And did you in fact co-author this document

17    with Stephen Blewitt?

18      A.  Well, my name is there, and I certainly talked

19    to Steve about it and reviewed it, but I did not author

20    it, no.

21      Q.  But you played a role in reviewing it?

22      A.  I did.

23      Q.  And did you check the document for accuracy

24    before it was submitted?

1    A.   It's a simulation of possible outcomes.  There

2    are a number of events that have certain probabilities

3    of occurring and you generate a bunch of random numbers

4    to simulate a bunch of possible scenarios.

5    Q.   And this reference in this Exhibit 2 to

6    running a spreadsheet model 500 times to assess

7    outcomes, did you understand that to be a reference to a

8    Monte Carlo simulation?

9    A.   Yes.

10    Q.   And in connection with the Pharma Marketing

11    transaction was that Monte Carlo simulation developed by

12    Steve Blewitt?

13    A.   I don't recall.

14    Q.   Let's turn back to Exhibit No. 1.

15        Mr. Hartz, do you recognize the document

16    that we've marked as Exhibit No. 1?

17    A.   Yes.

18    Q.   What is it?

19    A.   It's a yellow report for the Abbott

20    Laboratories transaction.

21    Q.   And down at the bottom of the page, it lists

22    report authors, Stephen J. Blewitt and Scott Hartz.

23        Were you a co-author of this yellow

24    report for the Abbott transaction?

Hartz, Scott S. (Linked)  11/10/2006  9:45:00 AM

1      A.   I would describe it as the same as I did on

2    Pharma Marketing.  I reviewed what Steve wrote.

3      Q.   Did you write certain sections of this report?

4      A.   I need to look at a little bit to refresh

5    whether that's the case.

6          I believe I wrote the risk analysis

7    section on page 14 or 001216, if you refer.

8          MR. LORENZINI:  I'm going to mark as

9      Exhibit 3, another document.

10     (Exhibit No. 3 Marked for Identification)

11   BY MR. LORENZINI:

12     Q.   Do you -- strike that.  Let me first describe

13   the document.

14          Exhibit 3 is a document JH 003551 through

15   3555, and it's an e-mail from Scott Hartz to Stephen

16   Blewitt dated September 19, 2000; an e-mail with

17   attachment.

18          Do you recognize this document,

19   Mr. Hartz?

20     A.   Yes, I do.

21     Q.   Is this an e-mail you sent to Stephen Blewitt

22   on September 18?

23     A.   Yes, it is.

24          MR. DAVIS:  September 19.

1     A.  September 19, thank you.

2     Q.  Thank you.

3          And shartz@John Hancock.com is your

4   e-mail address?

5     A.  Yes, it is.

6     Q.  Does looking at this document refresh your

7   recollection of the particular portions of the yellow

8   report that you authored?

9     A.  Well, it's -- I mean this part did not get

10  into the yellow report, but again, I believe I authored

11  the stuff on page 14 which addresses similar issues.

12    Q.  And when you just mentioned that this part did

13  not get into the report, which part are you referencing?

14    A.  I mean these exact words from this e-mail,

15  unless I missed it.  Maybe some -- you know, obviously

16  it's not an exact list.  Maybe some of the sentences are

17  the same, so, yeah, I guess that's sort of confirming

18  that I -- unless Steve, you know, cut and pasted from

19  this stuff and added it, but...

20    Q.  So you wrote the material that's attached to

21  the exhibit we've marked Exhibit No. 3?

22    A.  I wrote, yes, the e-mail, Exhibit No. 3, I

23  wrote.

24    Q.  Including the attachment?

1     A.   Yes, I wrote the attachment as well.

2     Q.   And portions of that attachment were

3   incorporated into the final yellow report?

4     A.   A couple of the graphs, yes.

5     Q.   Was this yellow report presented to the Bond

6   Investment Committee?

7     A.   Yes, it was.

8     Q.   And by this yellow report, I should be clear,

9   I'm referencing Exhibit No. 1?

10    A.   Yes.

11    Q.   Did you attend the meeting of the Bond

12   Investment Committee at which the Abbott transaction was

13   considered?

14    A.   Yes.

15    Q.   Were any other documents, to your knowledge,

16   presented to the Bond Investment Committee other than

17   the yellow report?

18    A.   I don't believe so.

19    Q.   In standard practice at John Hancock, is the

20   yellow report generally the only document that's

21   considered by members of the Bond Investment Committee

22   in deciding whether to approve a transaction?

23    A.   Yes.

24    Q.   Was the yellow report also -- strike that.

1    Corporate Finance Group materials were presented by

2    Roger Nastou?

3        A.  Yes.

4        Q.  Was it standard at this time for Roger Nastou

5    to make presentations to the Committee of Finance

6    regarding potential transactions?

7        A.  Yes.

8        Q.  And what was his position at the time?

9        A.  He was the head of the Bond and Corporate

10   Finance Group.

11       Q.  Do you have any recollection of the

12   discussions at the Committee of Finance meeting

13   regarding the Abbott transaction?

14       A.  I do not.

15       Q.  You do recall attending the meeting of the

16   Bond and Invest Committee in which the Abbott

17   transaction was discussed?

18       A.  Yes.

19       Q.  Who -- did someone make an oral presentation

20   to the committee regarding the Abbott transaction?

21       A.  Yes.

22       Q.  Who was that person?

23       A.  Stephen Blewitt.

24       Q.  Did anyone else participate in that oral

1      A.   My recollection is there was a set number.  I

2   don't recall specifically what it was.

3      Q.   Putting aside specific amount, was it your

4   understanding that Abbott was to provide -- strike that.

5          Was it your understanding that Abbott was

6   to spend on development of the compounds in the Research

7   Funding Agreement on a set amount over and above the

8   amount of funds provided by John Hancock?

9          MR. DAVIS:  Objection.

10     A.   Yes.

11     Q.   And was it your understanding the set amount

12   to be spent by Abbott on the development of program

13   compounds was independent of the amount of John

14   Hancock's contribution?

15         MR. DAVIS:  Objection.

16   BY MR. LORENZINI:

17     Q.   Let me rephrase that.

18     A.   Yeah, can you rephrase that.  I'm a little

19   confused.

20     Q.   Was it your understanding that Abbott would be

21   required to spend a set amount of funds on development

22   of the compounds irrespective of the amount of money

23   provided by John Hancock to Abbott?

24         MR. DAVIS:  Objection.

1    question first.

2         Did you have any role in determining the

3    probability of approval of the various compounds

4    described in this yellow report?

5    A.  I think my role was limited to -- well, yes, I

6    guess.

7    Q.   What was your role?

8    A.   My role was to urge -- was to make sure we

9    weren't too aggressive on that assumption.

10         (Interruption from court reporter)

11    A.   My role was to make sure we were not being

12    overly aggressive in these assumptions.

13    Q.   And did you have communications with Stephen

14    Blewitt on that topic?

15    A.   Yes.

16    Q.   Did you actually calculate the probability of

17    approval for the compounds?

18    A.   No.

19    Q.   Who did that?

20    A.   Steve did that.

21    Q.   Did he describe to you the methodology he used

22    to calculate the probability of approval?

23    A.   Yes.

24    Q.   What did he say to you regarding the

1    methodology he used to calculate the probability of

2    approval that is set forth on page 13?

3        A.   Well, he started with a DiMasi results, which

4    were shown on the prior page, and then he built some

5    conservatism in, which was my main concern that he build

6    some conservatism in.

7            I don't recall exactly how much

8    conservatism was built in, so I can't say precisely how

9    he did that.

10       Q.   You don't know the methodology he used to

11   build in the conservatism on the probability of

12   approval?

13       A.   No, I don't remember.

14       Q.   And by the DiMasi results, you're referencing

15   the DiMasi Study that's mentioned in the first paragraph

16   on page 12?

17       A.   Yes.

18       Q.   Did you ever see the DiMasi study that is

19   referenced at the top of page 12?

20       A.   No.

21       Q.   Do you know why John Hancock used the DiMasi

22   Study in determining the probability of success for the

23   compounds?

24       A.   My understanding is that it was the most

1    comprehensive study out there.

2        Q.   And that was based on your conversations with

3    Steve Blewitt?

4        A.   Yes.

5        Q.   Did you have any information regarding the

6    DiMasi Study other than what you learned from Stephen

7    Blewitt?

8        A.   No.

9        Q.   If you look at the top of page 12, it states:

10   Based on the development stage of each compound, we

11   assigned probabilities of success (regulatory approval)

12   and time to success for each compound.  Our

13   probabilities of success come from a 1995 study by

14   Joseph A. DiMasi at the Tufts Center for the Study of

15   Drug Development, and were modified based on our

16   specific knowledge of the program compounds.

17          Do you have any knowledge of what

18   methodology was used to modify the probabilities of

19   success based on John Hancock's specific knowledge of

20   the program compounds?

21       A.   No, I don't recall what was done.

22       Q.   Do you know in fact whether the probabilities

23   of success were modified based on John Hancock's

24   specific knowledge of the program compounds?

1          MR. DAVIS:  Objection.

2     A.   Yeah, I don't think I precisely said that.  I

3     think I said it would be, at least, you know, it would

4     be more than one or two percent above.  So I -- you

5     know, but I -- there's a big range.  That's why I

6     couldn't answer that question precisely either.

7               I don't know exactly what the market

8     conditions were at that time.

9     Q.   I think you did testify before that it was

10    several percentage points above yield.

11         MR. DAVIS:  Objection.  I don't think there's

12         a question pending.

13    BY MR. LORENZINI:

14    Q.   What would you do to verify the percentage

15    points above yield -- above market for this Abbott

16    transaction at that time?

17    A.   I would look back at that time to see what

18    transactions were the same amount of risk were yielding.

19    Q.   Where specifically would you look in John

20    Hancock's files for that information?

21    A.   You need to know what the risk-free rate was

22    at the time for this length of transaction, which you

23    could get on Bloomberg.  You would need to look at what

24    spreads were for bonds of comparable risk at that time,

1    which, you know, we can -- would probably be on one of

2    our internal systems or you can even get market data on

3    that.

4        Q.   Where would you get the market data if you

5    were to go with that approach rather than looking for

6    the data internally?

7        A.   Double B spreads off of Bloomberg.

8        Q.   Is there any other data that would you look at

9    in order to determine what the market yield was for

10   transactions of the same risk as the Abbott transaction

11   at that time?

12       A.   Well, you know, as I said, there are two ways

13   to look at return.  One is sort of this ROE perspective

14   on how much you'll lose, and that's kind of what we've

15   been talking about here; what I've been talking about

16   here.  The other way is to look at what similar

17   transactions in the marketplace returned, which is what

18   I think Steve tried to do earlier on this section; and

19   they give you different results.

20       Q.   Does Hancock generally use one approach versus

21   the other in analyzing transactions?

22       MR. DAVIS:  Objection.

23       A.   No.

24       Q.   Does it generally use both?

1       MR. DAVIS:  Objection.

2       A.  Yes.

3       Q.  And the analysis of comparable transactions,

4   that's the analysis that you were looking at before on

5   page 13, second-to-last paragraph?

6       A.  Yes.

7       Q.  And the analysis at the top of page 11 in

8   which the report states that 17.5 percent is

9   substantially greater than the inherent risk of the

10  transaction, do you understand that to be a reference to

11  the analysis of comparable transactions or analysis of

12  the return on equity compared to the market for bonds of

13  a similar rating?

14      MR. DAVIS:  Objection; calls for speculation.

15      A.  The latter.

16      Q.  And in Hancock's standard practice, how do

17  those two types of analysis interact?  What's the

18  process generally for considering both those types of

19  analysis in order to reach a decision whether to

20  recommend an investment?

21      MR. DAVIS:  Objection.

22      A.  Well, there's no formula, but a number of

23  investments may look good on an ROE basis and are

24  comparable risk.  And some of those comparable risk will

1    have higher returns than others, and you prefer to go

2    with those ones with higher returns rather than others.

3         So you need to factor both in.  Just

4    because you're getting a higher ROE doesn't mean it's a

5    good transaction compared to what's out there.

6    Q.   So it's no formula; it's just a case-by-case

7    basis judgment call?

8         MR. DAVIS:  Objection.

9    A.   Yes.

10   Q.   Are there other factors that play a role in

11   determining whether to enter into a transaction other

12   than those two types of analyses that you've described?

13        MR. DAVIS:  Objection, asked and answered.

14   You can respond.

15        THE WITNESS:  I was waiting for that.

16   A.   Yeah, I mean we did -- we had talked through

17   those, beneath the portfolio, the diversification

18   portfolio, the accounting, those sorts of things.

19   Q.   With respect to the Abbott transaction, were

20   those other factors that you just you mentioned or any

21   of those other factors considered in determining whether

22   to enter into or whether for you to recommend that the

23   company enter into the Abbott transaction?

24        MR. DAVIS:  Considered by him, is that what

1    scientific and business write-ups from Abbott?

2        A.   No, I didn't.

3        Q.   Could you look at the bottom of page 12?  It

4    describes there, a process of using a Monte Carlo

5    simulation to evaluate the Abbott transaction.

6            Did you play any role in using a Monte

7    Carlo simulation to evaluate the Abbott transaction?

8            MR. DAVIS:  Objection.  I think it's been

9        asked and answered.  You can answer once more.

10       A.   Yes, Steve created a Monte Carlo model which I

11   tested, used to verify his work.

12       Q.   In what way did you test the Monte Carlo

13   model?

14       A.   I looked through it to make sure I thought it

15   was created correctly, and I ran it a number of times to

16   see if I came up with similar results to Steve's.

17       (Exhibit No. 5 Marked for Identification) five

18           MR. LORENZINI:  Strike that.  I think this is

19       cutoff at the bottom.

20           MR. DAVIS:  You want this one back?

21           MR. LORENZINI:  Yeah.

22   BY MR. LORENZINI:

23       Q.   If you look at the top of Exhibit 1 on the

24   first page, there's a heading, Purchase Recommendation,

1      A.   No, those are the factors.

2      Q.   If you look at the 14th page of Exhibit 1,

3   there's reference in the second-to-last paragraph of

4   running a downside simulation where probabilities of

5   success are discounted by 25 percent from the DiMasi

6   study and the expected revenues are discounted

7   25 percent from our base case.

8           What was the reason for using those

9   particular discount rates to run the downside

10  simulation?

11     A.   It was probably no scientific reason, but they

12  seemed like -- they seemed like reasonable downside

13  cases.  I don't know if I can be any more specific than

14  that.

15     Q.   What do you mean by reasonable downside cases?

16     A.   Cases where you're pretty comfortable that the

17  vast majority of the scenarios will be better than that.

18     Q.   Are the downside cases -- strike that.

19          Do you also, in choosing a discount for

20  the downside case, do you also want to make sure that

21  it's a case that has some reasonable chance of actually

22  occurring?

23     MR. DAVIS:  Objection.

24     A.   I mean it all depends what's reasonable.  I

1    mean you can tell by the precision of them that it's not

2    very precise.  It's wasn't 17.85 percent we were using.

3    But we wouldn't, on the other hand, use 75 percent

4    either because that's seems like it's way too

5    conservative.

6            So I don't know, can you repeat the

7    question?

8        Q.   Is the goal in choosing -- do you use the word

9    haircut for discount scenarios?

10       A.   We could, yeah, sure.  I don't know if we used

11   it here.

12       Q.   I don't want to use the wrong terminology, but

13   is the 25 percent considered a haircut?

14       MR. DAVIS:  Objection.  You can respond.

15       THE WITNESS:  Oh, I can respond.

16       A.   Seems like an appropriate layman's term to me,

17   yes.

18       Q.   Okay.  In choosing the appropriate haircut

19   level, is the goal to choose something where there's

20   some chance of that downside scenario actually occurring

21   where it's a reasonable possibility that that downside

22   scenario can occur?

23       MR. DAVIS:  Objection; asked and answered.

24       You can respond.

1     A.   Can you define reasonable downside, reasonable

2   chance of occurring?

3     Q.   Maybe I'll ask you to do that.

4     MR. DAVIS:  Objection.

5   BY MR. LORENZINI:

6     Q.   You don't want to choose a discount level or

7   haircut that has no chance of occurring, correct?

8     MR. DAVIS:  Objection.  You can respond.

9     A.   Yeah, put another way, you don't want to be

10   way too conservative.

11     Q.   Right.  But you don't want to, on the other

12   hand, be overly optimistic and then choose a downside

13   scenario that doesn't accurately take into account the

14   risk of a more negative outcome?

15     A.   Yes.

16     MR. DAVIS:  Objection.  You can respond.

17     A.   Yes.

18     Q.   So you try to choose a discount for the

19   downside scenario that is -- that reflects an outcome

20   that is within the range of possible outcomes?

21     MR. DAVIS:  Objection.

22     A.   I mean it's just too vague.  Anything is

23   within a range of possible outcomes.

24     Q.   Let me try it this way.  Do you -- is this a

1    whether the transaction was attractive based on the runs

2    you were seeing?

3        A.   That's correct.

4        Q.   In the second sentence, you state -- actually,

5    it's the third sentence that, it's only if drug 5 or 6

6    are the only one approved, that the returns drop to

7    about zero percent.

8            Is the zero percent there a reference to

9    a total loss of John Hancock's investment or a

10   break-even scenario?

11       MR. DAVIS:  Objection.

12       A.   Well, I would characterize it -- I think it's

13   what you mean by break even.  I'm not sure I would

14   characterize it that way, but yes, you get your money

15   back with no return.

16     (Exhibit No. 11 Marked for Identification)

17   BY MR. LORENZINI:

18      Q.   Mr. Hartz, the court reporter has marked as

19   Exhibit 11, what appears to be an e-mail from you to

20   Stephen Blewitt dated April 19, 2000.

21          Do you recognize this e-mail?

22      A.   Yes.

23      Q.   This is an e-mail you sent to Mr. Blewitt on

24   that date?

1    A.  Yes.

2    Q.  You discuss in this e-mail adding levels of

3    conservatism to Mr. Blewitt's assumptions, and you give

4    some examples of lowering probability of success by

5    25 percent, and then lower your probability of success

6    by half, and then the final sentence states:  While the

7    latter, meaning lower your probability of success by

8    half, is probably too harsh, we're going to have to

9    spend figuring out how good each assumption is and what

10   levels of conservatism to add in.

11            Did you have communications with

12   Mr. Blewitt after this e-mail regarding how good each of

13   the assumptions in the model was?

14   A.  I don't recall.

15   Q.  Did you have any discussions with him

16   regarding what levels of conservatism to add into the

17   model?

18   A.  I don't recall.

19   Q.  You state in the first sentence that, We have

20   to think about levels of conservatism in order to think

21   about how we can rate/size/accrete the bonds.

22            I assume rate means to figure out which

23   credit rating to assign to the transaction?

24   A.  That's correct.

1    produce income on deals that otherwise wouldn't be

2    producing income, and that's not always considered to be

3    a good thing to do; and so that's thought of managing

4    earnings.

5        (Exhibit No. 14 Marked for Identification)

6    BY MR. LORENZINI:

7        Q.  Mr. Hartz, the court reporter has marked as

8    Exhibit 14, documents that appears to be a memorandum

9    from Stephen Blewitt to a series of people including

10   you, dated May 8, 2000 along with attached document

11   entitled, John Hancock/Abbott Laboratories Research and

12   Development transaction.

13          Do you recognize this memorandum and

14   attachment?

15       A.  Yes, I do.

16       Q.  Did you draft any part of this investment

17   analyst analysis that's attached to the memorandum?

18       A.  I certainly drafted the last two pages because

19   they're a repeat of the prior exhibit.  Let me just look

20   at the rest of it.

21          And no, I don't believe I drafted any of

22   the rest of it.

23       Q.  Did you review it -- well, strike that.

24          Do you know who drafted it?

1    time is 2:45.

2         (Short Recess)

3       THE VIDEOGRAPHER:  Going back on the record.

4    The time is 2:5 3:00 p.m.

5     (Exhibit No. 18 Marked for Identification)

6    BY MR. LORENZINI:

7     Q.  Mr. Hartz, the court reporter is marking as

8    Exhibit 18, a spreadsheet printout that is a printout of

9    an electronic Excel file that we received from John

10    Hancock that was Bate stamped JHII 012211.

11         Mr. Hartz, let me first ask, when was the

12    last time that you looked at the Monte Carlo simulation

13    for the Abbott/Hancock transaction?

14     A.  Well, I recall that back in 2000, I did look

15    at it quite a bit and ran it.  What I'm not recalling, I

16    know we did run it later on as the drugs weren't

17    performing as expected, and we needed to run it to get

18    new IRRs on it.

19         And I just can't remember whether I

20    personally did this or whether Deidre in my group did

21    it, so I don't recall if I looked at it again after the

22    year 2000.

23     Q.  To your knowledge, has John Hancock updated

24    the Monte Carlo simulation for the Abbott transaction

1   since entering into the transaction based on new

2   information?

3       A.  You mean the mechanics of it?

4       Q.  No.  I don't mean the formulas and the basic

5   structure of it, but I mean the inputs and assumptions?

6       A.  Oh, absolutely, yes.

7       Q.  Okay.  Since entering into the transaction,

8   has John Hancock, to your knowledge, altered any of the

9   formulas or the structure of the Monte Carlo simulation?

10      A.  I don't believe that's changed at all.

11      Q.  Since the creation of the yellow report in

12  September 21, 2000, did John Hancock make any

13  adjustments to the formulas or structures in the Monte

14  Carlo simulation?

15      MR. DAVIS:  Objection.

16      A.  I'm sorry, is that the same question you just

17  asked me?

18      MR. DAVIS:  Asked and answered, I think.

19  BY MR. LORENZINI:

20      Q.  No, my last question, my previous question was

21  regarding whether there had been any changes to the

22  formula or the structures in the simulation since

23  entering into the agreement in March 13, 2001.

24          My new question is whether, to your

1      A.  No, my understanding was it was replaced with

2   a very similar compound, so there was not a need to

3   rerun the models.

4      Q.  And is that an understanding you got from

5   Stephen Blewitt?

6          MR. DAVIS:  Objection.

7      A.  Yes.

8      Q.  What is John Hancock's standard practice when

9   a transaction has been approved by the Bond and

10  Investment Committee and the Committee of Finance, but

11  there are ongoing negotiations and changes to the

12  details of the agreement?  Is there a standard policy or

13  practice regarding whether the committee needs to

14  reapprove the transaction?

15     A.  Yes, if there are material changes, it needs

16  to be reapproved.

17     Q.  And who decides whether the changes, if any,

18  are material?

19     A.  You know, the analyst first, if the analyst

20  thinks there are changes that aren't material, typically

21  talk to the head of the group about it and make sure

22  it's not considered material.

23     Q.  By Head of the Group, which group do you mean?

24     A.  The head of the Bond Group.

1    and not change your rating and then that would not need

2    to be approved.

3        Q.   Would a change in the rating, say, from Ba1 to

4    Ba2 be considered a material change?

5        A.   Yes.

6        Q.   And is there a particular percentage in the

7    expected return on investment that would be considered

8    material in?  I mean is a .1 percent change in the

9    expected rate of return material?

10        MR. DAVIS:  Objection.

11        A.   No, I wouldn't consider that material in the

12    context of this transaction, for sure.

13        Q.   Is there any guideline regarding what

14    percentage change of the expected rate of return is

15    considered material enough to warrant resubmission of

16    the transaction to the committees?

17        MR. DAVIS:  You're asking his opinion?  You're

18    asking if --

19        MR. LORENZINI:  If there's standard company

20    policy or practice --

21        A.   No, there's no standard company policy.

22        Q.   Turning back to Exhibit 18, we have not

23    received any information from John Hancock regarding the

24    date that this spreadsheet was last updated, so I'm not

1    column A it states, Sales Model?

2         A.   Mm-hmm.

3         Q.   And then column C through K include a No. 2?

4         A.   Yes.

5         Q.   Does that mean to you that the sales pattern

6    in column B is being used to calculate the ramp-up and

7    ramp-down of sales for the drugs listed in column C

8    through L?

9         A.   That would be logical.

10        Q.   And do you know why John Hancock used sales

11   model two rather than sales model three to project the

12   ramp-up and ramp-down of the sale of the compound?

13        A.   No, I don't.

14        Q.   If you look at page 7 of Exhibit 1, there's

15   reference to the sales curve calculated by Lehman

16   Brothers that projects ramp-up and ramp-down for sizable

17   drugs.

18             It states in general this curve shows

19   peak sales being reached seven years after launch.

20   Ramp-up is achieved by five percent of peak sales in the

21   first year, followed by 13 percent, 25 percent,

22   50 percent, 80 percent and 90 percent.  Peak sales are

23   maintained for three years and the compound then

24   achieves 85 percent of peak, 75 percent, 70 percent, et

1    cetera.

2         You'll note that the sales patterns

3    listed in column B of Exhibit 18, appear to differ from

4    that described on page 7 of Exhibit 1; for example, in

5    the third year, on Exhibit 18, it lists .30, whereas the

6    page 17, Exhibit 1 states that the curve predicts

7    25 percent of peak sales in year three.  And then you'll

8    also note that after year -- from year 11 on, in

9    Exhibit 18, there's zeros there, suggesting --

10        Does that suggest to you there's no sales

11   predicted in years 11 through 15?

12        MR. DAVIS:  Objection.

13        A.   That part I actually remember.  I don't know

14   why the 25 and 30 is different, but I do recall Steve

15   suggesting that after 10 years, he was going to assume

16   no more sales.

17        Q.   And did he say why he was going to make that

18   assumption?

19        A.   I think for conservative purposes.

20        Q.   Did he say that?  Did he say he was making

21   that change?

22        MR. DAVIS:  Objection.  You can respond.

23        Q.   -- for conservative reasons?

24        A.   I believe he said that.  That's what I

1    remember.  And I can't remember the specific

2    conversation, but that's what I remember.

3        Q.  If you look at row 19 of Exhibit 18, it has a

4    header on the left that says, Drug, and then column C

5    through K lists names of various items.

6           Those are the names of the compounds,

7    correct?

8        MR. DAVIS:  Objection.  The compounds that

9    existed at that time?  I don't think these are the

10    compounds that are --

11   BY MR. LORENZINI:

12       Q.  I'm not making that representation.

13          Just generally, those are the names of

14    compounds that are being evaluated in this model?

15       A.  I mean I would guess so, but I couldn't recall

16    the names of the compounds, so I can't tell you for sure

17    these are the ones we were looking at; but that's a

18    logical assumption.

19       Q.  And then in the next row, row 20, there's a

20    heading that says, Probability compounds from zero to

21    .75.

22          Do you know what the source is of those

23    probability numbers?

24       A.  Well, those are the probability that gets to

1    Q.  So is it your understanding there were certain

2    ranges of returns that were put into those buckets and

3    that, for example, 21 -- in 21 scenarios, the rate of

4    returns fell into that --

5    A.  Right --

6    Q.  -- particular bucket?

7    A.  -- what I just can't tell if that's the

8    average of the bucket, or that's the bottom of the

9    bucket or it's the top of the bucket.  I'm just not sure

10   what that is, but it is defining buckets somehow here

11   and placing scenarios into those buckets.

12   Q.  In columns D through E, there's a series of

13   words in column D, medium mode, mean X, standard

14   deviation, and then some percentages corresponding to

15   them in column D?

16   A.  Yep.

17   Q.  What do those numbers represent in column D

18   starting with 542 and going through 547?

19   A.  Those are statistics based on the 500

20   observations --

21   Q.  And --

22   A.  -- of returns.

23   Q.  So the median rate of return in this

24   particular run of the simulation is 14.7 percent?

1    A.   Correct.

2    Q.   If you look at the next page, starting with

3  row 555 and going through 565 in columns A through B?

4    A.   Mm-hmm.

5    Q.   There's a series of numbers in both columns.

6  Do those numbers in column A represent the number of

7  scenarios in which the number of drugs reaching the

8  market is what is listed in column B?

9    A.   Yes.

10    Q.   So, in other words, in this run of the

11  simulation, there were 21 scenarios in which zero drugs

12  reached the market?

13    A.   Right.

14    Q.   And that's in row 555?

15    A.   Yep.

16    Q.   And then if you go a little further down,

17  starting with row 568 to 578, again, in column A and B,

18  there's a series of numbers there.

19        What do those numbers represent?

20    A.   I'm not sure what those numbers are.

21    Q.   Is it possible that the numbers in column A

22  represent the number of scenarios in which John

23  Hancock's revenue is within the ranges of revenue

24  represented in column B?

1      Q.   And what about in row 1043, row M through R,

2   do you know what the meaning of the figures in those

3   columns is?

4      A.   No, I don't.

5      Q.   Is it possible that the 245.69 figure listed

6   in row 1043 column R represents the discounted value of

7   the expected cash flows in the future years?

8          MR. DAVIS:  Objection.

9      A.   It's possible.  I mean one of Steve's points

10   was if you sold the thing off at a certain point in time

11   with your IRB, it's possible this is doing that

12   calculation.  But without looking at the formulas, I

13   can't tell for sure.

14         MR. LORENZINI:  Okay.  Let's take a break to

15      change the tape.

16         THE VIDEOGRAPHER:  This marks the end of tape

17      No.  3 in the deposition of Scott R. Hartz.  The

18      time is 3:33.

19             (Short Recess)

20      (Exhibit No. 19 Marked for Identification)

21         THE VIDEOGRAPHER:  Back on the record.  Here

22      marks the beginning of tape No. 4 in the deposition

23      of Scott S. Hartz.  The time is 3:36.

24   BY MR. LORENZINI:

1      Q.   Mr. Hartz, the court reporter has marked as

2    Exhibit 19, what appears to be the minutes of the Bond

3    Investment Committee meeting dated September 21, 2000.

4          Do you recognize this document?

5      A.   No -- again, I don't know what you mean by

6    recognize.  I recognize the form, but I don't believe

7    I've seen this before.

8      Q.   What are the full names of the people listed

9    in the present line of this document?

10     A.   Stephen Blewitt, George Braun, Wilma Davis,

11   Don DeCicco, Fran Falcon, Bruce Metzler and Roger

12   Nastou.

13     Q.   And what about the attorney listed on the next

14   line?

15     A.   Attorney Al Sigassi and I don't know the

16   secretary's first name.

17     Q.   And you did attend the meeting of the Bond

18   Investment Committee on September 21st, 2000?

19     A.   Yes, I did.

20     Q.   You don't recall any of the discussions at

21   that the meeting, though?

22     A.   No --

23        MR. DAVIS:  Let him finish, please.

24     A.   I was just looking down and noticing it was

1    Careen is the secretary's first name.

2            But no, I don't remember sort of

3    specifics from this meeting other than Steve presented

4    the deal and it was approved.

5        Q.   Did you play any role in presenting the deal

6    at that meeting?

7        A.   And I really don't recall.  I mean I had more

8    of a role in this deal than I do in most deals.  And I

9    may have been asked on to talk about the accounting, but

10   I just don't recall.

11       (Exhibit No. 20 Marked for Identification)

12   BY MR. LORENZINI:

13       Q.   Mr. Hartz, the court reporter has marked as

14   Exhibit 20, what appears to be an e-mail from you to

15   George Braun dated September 21, 2000.

16           Do you recognize this e-mail?

17       A.   I do.

18       Q.   That is an e-mail that you sent on that date?

19       A.   Yes, it is.

20       Q.   Why did you send this e-mail?

21       A.   Well, this reminds me of one of the discussion

22   points at the prior meeting.  George had asked about --

23   we went through some of the sensitivities in the

24   transaction, but one thing we didn't do sensitivities

1    Q.  And what is that information used -- what's

2    the purpose of gathering that information?

3    A.  Well, it's used for a number of things.  One

4    is it's one part of the performance measurement system

5    for the group.  It's also, you know, a way that senior

6    management evaluates how we're doing, which is, I guess,

7    part and parcel of the same thing.

8    Q.  And so that analysis of the performance of the

9    entire group would factor into people's compensation

10   levels?

11   A.  Correct.

12   Q.  Is the information generated through this

13   analysis used for any other purpose other than what you

14   testified to?

15   A.  No, I mean it's used for performance

16   measurement.  Part of that is bonus, but part of it is

17   just kind of a scorecard to keep track of how the group

18   is doing.  That's why we talked about beyond just

19   getting to the bonus calculations.

20       THE VIDEOGRAPHER:  Going off the record.  The

21       time is 4:14.

22    (Exhibit No. 25 Marked for Identification)

23       THE VIDEOGRAPHER:  Going back on the record.

24       The time is 4:20.

1    BY MR. LORENZINI:

2        Q.   Mr. Hartz, you have before you what's been

3    marked as Exhibit 25.  It's a memorandum to file

4    regarding Abbott Laboratories.

5            Do you recognize this document?

6        A.   I know what it is.  I don't remember seeing it

7    before, though.

8        Q.   When you say, you know what it is, do you mean

9    you recognize the format of it?

10       A.   Yeah, yeah.

11       Q.   What do you recognize that the purpose of this

12   type of memorandum to be?

13       A.   It's what we were discussing before, when a

14   deal has changed, since it was voted but before it was

15   closed, that the analyst sort of document the changes.

16       Q.   And if a memorandum documenting changes to a

17   deal since approval is just a memorandum to file, as

18   opposed to other people in the company, does that in

19   your standard practice indicate that the changes aren't

20   material --

21           MR. DAVIS:  Objection.

22       Q.   -- enough to warrant re-approval by the

23   committee?

24           MR. DAVIS:  Objection.

1     Q.   If you look at the next paragraph, it states

2     halfway through, we have modeled this contingent

3     additional component of the Phase II compound with a

4     40 percent probability of success, 40 million in peak

5     sales, 2006 launch date.

6          Do you know the basis for those

7     assumptions?

8     A.   No, I don't.

9     Q.   And in the next sentence it states:  We assume

10    the probability of obtaining the contingent additional

11    compound was continent in the basket was approximately

12    84 percent.

13         Do you know the basis for that

14    assumption?

15    A.   No, I don't.

16    Q.   The last paragraph states:  Our initial model

17    without adjustments for conservatism provided a

18    probability of loss of approximately .9 percent and a

19    median return of approximately 17.5 percent.

20         If you look back at the document we

21    marked as Exhibit 1, it starts with the September 21st,

22    2000 yellow report?

23    MR. DAVIS:  Exhibit 1, yes, this is my copy.

24    A.   Oh, I got it here.  It was in middle of all of

1    them.

2        MR. DAVIS:  Which page?

3        MR. LORENZINI:  The first page.

4    BY MR. LORENZINI:

5        Q.   If you look at the last paragraph of

6    Exhibit 1, it states:  The transaction is structured to

7    provide a one-to-two percent probability of total loss

8    combined with a one-to-two percent chance of not earning

9    a return.

10        That appears to me to be different from

11    the statement in what's been marked as Exhibit 25, that

12    our initial model provided a probability of loss of

13    approximately .9 percent.  Do you know what initial

14    model Mr. Blewitt was referencing in this memorandum to

15    file that's been marked as Exhibit 25?

16        MR. DAVIS:  Objection.

17        A.  I don't.

18        Q.   Do you know if he was referring to the initial

19    model used to generate the yellow report, do you have

20    any explanation, educated explanation, based on your

21    experience of why the .9 percent would differ from the

22    one-to-two-percent probability listed in the yellow

23    report?

24        MR. DAVIS:  Objection; caution you not to

1    speculate.

2    A.   Yeah, it would be speculation.

3    Q.   He lists there, the probability of loss, and

4    the median return under the revised model and compares

5    that with the figures in the initial model?

6        MR. DAVIS:  I'm sorry, you're looking back at

7    Exhibit?

8        MR. LORENZINI:  I'm on Exhibit 25.

9        MR. DAVIS:  And where are you?

10        MR. LORENZINI:  Last paragraph.

11        MR. DAVIS:  Yes.

12    BY MR. LORENZINI:

13    Q.   Would those differences between the initial

14    model and the revised model generally have been

15    considered material enough to provide the information to

16    Mr. Nastou?

17        MR. DAVIS:  Objection.  You're asking

18        Mr. Hartz' opinion on that topic?

19        MR. LORENZINI:  Based on his general

20        experience.

21        MR. DAVIS:  Objection.  You can respond.

22    A.   Yeah, my opinion is that Roger should have

23    gotten a copy of this, but the returns are up.  So it

24    was not a, you know, material enough change to warrant

1    having to go back to committee on.

2       (Exhibit No. 26 Marked for Identification)

3    BY MR. LORENZINI:

4       Q.   Mr. Hartz, Exhibit 26 is an e-mail that

5    appears to be from Deidre Mangan to Stephen Blewitt with

6    a copy to you dated March 26, 2002.

7          Do you recognize this e-mail chain?

8       A.   This is from Deidre to Steve.

9       Q.   With a CC to Scott Hartz.

10      A.   With a CC to me.  I remember the discussion

11   around this.  Whether I remember this specific e-mail or

12   not, I'm not sure; but I have no doubt I received it.

13      Q.   Do you remember discussion around this time in

14   2002 about accounting for the Abbott transaction under

15   EITF 9920?

16      A.   We reviewed it fairly regularly because 9920

17   requires every quarter that you review your assumptions,

18   so I -- it was reviewed a number of times.  I can't

19   specifically say I remember this particular time.

20      Q.   How -- strike that.

21          When was the first time after the

22   transaction was executed that you reviewed it for the

23   purposes of 9920?

24      A.   I don't remember.  What specifically do you

1    mean when we reviewed it for 9920?

2        Q.   To determine if there was a need for

3    impairment?

4        A.   I believe it was after this time period, but I

5    don't remember specifically.

6        Q.   Not at this time period?

7        A.   No.

8        Q.   But sometime after that?

9        A.   Yes.

10       Q.   Without speculating, do you know why Deidre

11   Mangan says, we're assuming 13 percent?

12       A.   My recollection is that we used, for

13   accounting purposes, where we wanted to be more

14   conservative we used lower assumptions and hence used a

15   lower rate to accrete income at.

16       Q.   Lower rate than your actual expected rate of

17   return?

18       A.   Exactly.

19       Q.   And how did -- do you remember actually coming

20   up with the rate to use for the purpose of accreting

21   income for the Abbott transaction?

22       A.   No, I don't recall exactly how we got to that

23   rate of 13 percent, what we did to get there.

24       Q.   So just to be clear, under 9920, is there a

1    need to adjust the -- strike that.

2            Is the internal rate of return used for

3    the purposes of determining whether there's a need for

4    impairment, the actual expected rate of return of John

5    Hancock as of the time the transaction was entered into

6    or is it a rate that is set by John Hancock that is more

7    conservative and possibly different than the actual

8    expected rate of return?

9        A.  Could you repeat that?

10       Q.  Just say, hypothetically, in a hypothetical

11   transaction when John Hancock entered into the

12   transaction, it had an expectation of an expected rate

13   of return of 10 percent.

14           Would it necessarily use that 10 percent

15   figure for the purpose of conducting the analysis to

16   determine whether to take an impairment on that

17   transaction?

18           MR. DAVIS:  Objection.

19       A.  No, to determine impairment, you decide what a

20   market rate should be for this type of transaction.  And

21   if the IRR that your book value produces is lower than

22   that IRR, that market return, then you increase your

23   discount rate to that market return that will create a

24   lower book value and you impair down to that book value.

1    Q.   Okay.  So in this e-mail, where Deidre Mangan

2    says, Right now we're assuming 13 percent, that would be

3    her assumption regarding the market rate to use for the

4    Abbott transaction for the purposes of conducting this

5    impairment analysis?

6         MR. DAVIS:  Objection.

7    A.   Yes, I think that's fair.

8    Q.   But you don't know how she came up with that?

9    A.   I don't recall.

10   Q.   Who would have been involved in coming up with

11   the rate to use for the purpose of conducting the

12   impairment analysis under 9920?

13   A.   I would have been involved.

14   Q.   And would that have been something you would

15   have done soon after the transaction was finalized?

16   A.   Yeah, yeah.

17   Q.   Who else would have participated in that

18   process?

19   A.   Probably Steve, since he knew the transaction

20   the best.

21   Q.   And -- but you don't recall actually don't

22   that analysis?

23   A.   I don't remember it, though.

24   Q.   In your general procedure, what would you do

1    to come up with that, that rate to use for purposes of

2    determining analysis?

3         A.   You look at what -- again, what returns you

4    can look at, what deals you can look at in the market

5    that have a similar risk profile, which made it very --

6    would make it very difficult on something like this.

7         Q.   For an unusual transaction like this, what

8    types of deals in the market would you look at typically

9    to come up with the rate to use for the purposes of

10   impairment analysis?

11        MR. DAVIS:  Objection.

12        A.   Well, that's where Steve obviously would be

13   helpful by looking at other -- we would look at other

14   royalty deals and other pharma-type deals, but this is

15   not going to look like any other deal out there, so

16   there's a lot of judgment around that.

17       (Exhibit No. 27 Marked for Identification)

18   BY MR. LORENZINI:

19        Q.   Mr. Hartz, you have before you what's been

20   marked as Exhibit 27; appears to be an e-mail from

21   Stephen Blewitt to Deidre Mangan dated September 30th,

22   2002, which includes below it, an e-mail on which you

23   appeared to be copied, and there's an attached

24   spreadsheet.  Do you recall Mr. Blewitt -- well, strike

1    that.

2         Do you recall receiving the e-mail that's

3    listed first in this chain on Exhibit 27?

4         A.   I don't specifically recall this one, no.

5         Q.   Do you recall Mr. Blewitt conducting analyses

6    or updating the Monte Carlo simulation based on new

7    information after the transaction was entered into?

8         A.   Yes.

9         MR. DAVIS:  Objection; asked and answered.

10        You can respond.

11        A.   Yes.

12        Q.   Do you know specifically what inputs

13   Mr. Blewitt changed in the Monte Carlo simulation after

14   the transaction was entered into?

15        A.   No, I don't.

16        Q.   Do you know if -- do you know if John Hancock

17   impaired the Abbott transaction under 9920 at some

18   point?

19        A.   Yes.

20        Q.   Do you recall when that occurred?

21        A.   No, I'm not 100 percent sure.

22         (Exhibit No. 28 Marked for Identification)

23   BY MR. LORENZINI:

24        Q.   Mr. Hartz, you have before you Exhibit 28

1      Q.   Does anyone who attends these meeting

2    generally take notes?

3      A.   Someone takes minutes, but I don't really know

4    whether -- by notes, you mean their own personal notes?

5      Q.   Right.

6      A.   We've been advised not to do that many times,

7    so probably not.

8      Q.   Who -- I'm not sure if I got the name right,

9    but Rick Alguise, you said takes the minutes?

10     A.   Alguire.

11     Q.   Alguire.  Has he been the person who takes the

12   minutes of these meetings from 2001 to the present?

13     A.   No, no, since the merger.  We've only taken

14   minutes since the merger.

15      (Exhibit No. 32 Marked for Identification)

16   BY MR. LORENZINI:

17      Q.   Mr. Hartz, you have before you what's been

18   marked Exhibit 32, which is an e-mail from Stephen

19   Blewitt to you and Barry Welch dated March 27, 2003 and

20   attached memorandum to you, among other people, from

21   Stephen Blewitt.

22          Do you recognize this e-mail and/or the

23   memoranda?

24     A.   Yes, I remember the memorandum.

1      Q.  What was the purpose for which this memorandum

2   was drafted?

3      A.  It was to update the recipients of the status

4   of the transaction.

5      Q.  Was this part of the quarterly investment

6   review process?

7      A.  I think this was in advance of the quarterly

8   process.

9      Q.  And this memorandum is dated March 27, 2003.

10         Do you know if there was a review of the

11  Abbott transaction at the quarterly investment review

12  prior to that date?

13     A.  I'm not sure.

14     Q.  At the bottom of the memorandum it states:  I

15  look forward to discuss this memorandum with you at your

16  earliest convenience.

17         Did you have a discussion with any of the

18  people listed on this memorandum after receiving it?

19     A.  I don't recall.

20      (Exhibit No. 33 Marked for Identification)

21  BY MR. LORENZINI:

22     Q.  Mr. Hartz, you have before you what's been

23  marked as Exhibit 33, which is an e-mail from you to

24  Stephen Blewitt and Barry Welch dated 2003.

Hartz, Scott S. (Linked) 11/10/2006 9:45:00 AM

1      Q.   In the last sentence, it states:  Under these

2      assumptions, in order to achieve a 13 percent IRR, we

3      would need to reduce the holding value of our investment

4      by approximately 34 million plus accrued interest.

5           Do you know why Mr. Blewitt is

6      referencing achieving a 13 percent IRR in that e-mail?

7      A.   No, I don't, although -- no, I guess I don't.

8      Q.   Is that a change from the 15 percent that was

9      referenced in the prior e-mail?

10          MR. DAVIS:  Objection.

11     A.   Well, it's different, but it doesn't make

12     sense to me that we would use a 13 percent IRR.

13     Q.   Do you know -- so you don't know why he was

14     using -- suggesting using a 13 percent IRR here rather

15     than 15 percent?

16     A.   I don't.

17     Q.   Do you recall having discussions with

18     Mr. Blewitt outside of this e-mail about the performance

19     of ABT-627 or the out-licensing of ABT-773?

20     A.   No, I don't.

21      (Exhibit No. 37 Marked for Identification)

22     BY MR. LORENZINI:

23      Q.   What's been marked as Exhibit 37, is an e-mail

24     from Stephen Blewitt to Scott Hartz and Barry Welch

1      dated June 11, 2003.  This appears to be the

2      continuation of the e-mail chain we just looked at?

3           A.   Mm-hmm.

4           Q.   Do you recognize this e-mail chain?

5           A.   Yes.

6           Q.   Do you recall sending and receiving e-mails in

7      this chain?

8           A.   Not specifically, but...

9           Q.   Generally?

10          A.   Generally, yeah.

11          Q.   You state in the June 10th e-mail, the second

12     one down:  Do you have the PVs at 15 percent and

13     20 percent?

14               Does that mean do you have the present

15     value of the expected cash flows of the investment at a

16     15 percent and 20 percent discount rate?

17          A.   Yes.

18          Q.   And why were you asking for that -- why were

19     you asking that question?

20          A.   Just to get some sensitivities around the

21     value of the different rates.

22          Q.   And what's the purpose of getting those

23     sensitivities?

24          A.   Well, 15 percent, as in my other e-mail, is

1    what we typically use.  But if this got risky enough, we

2    could raise the discount rate up to 20 percent.  So I

3    wanted to see what impact that would have.

4        Q.   There's mention in the June 6th e-mail from

5    Barry Welch to Stephen Blewitt of meeting sometime

6    Monday, 10:00 a.m. with Scott and me, and it states I'm

7    available both before and after the loan review.

8            Did you have a meeting with Barry Welch

9    and Stephen Blewitt around the time of this e-mail

10   regarding the Abbott transaction?

11       A.   I don't recall.

12       Q.   Did you have discussions with Mr. Welch about

13   the Abbott investment around this time?

14       A.   I don't recall.

15        (Exhibit No. 38 Marked for Identification)

16   BY MR. LORENZINI:

17       Q.   Mr. Hartz, you have before you what's marked

18   Exhibit 38, which appears to be the June 17, 2003 e-mail

19   from you -- I'm sorry, from Stephen Blewitt to you

20   entitled, Abbott Valuation with an attached document

21   entitled valuation Methodology.

22            Do you recognize this exhibit?

23       A.   Yes, I remember this one.

24       Q.   What was the -- did you ask Mr. Blewitt to

1    prepare this document?

2        A.  I can't remember if it was me or someone else

3    but yes, we had talked about needing a look at the

4    valuation.

5        Q.  And what was the purpose of Mr. Blewitt

6    conducting the analysis reflected in this document to?

7        A.  To determine what our appropriate carrying

8    values should be.

9        Q.  This is for the 9920 analysis?

10       A.  Yes.

11       Q.  And what are the -- these are different

12   valuation methodologies that are described here:  First

13   being 13 percent internal rate of return, second being

14   royalty transaction, third being public company

15   comparison, and fourth being Abbott stock price

16   analysis?

17       A.  Mm-hmm.

18       Q.  Those are all different ways of valuing the

19   Abbott investment?

20       A.  Right.

21       Q.  And what was the purpose of conducting these

22   various analyses?

23       A.  Well, as we've been discussing, it's a bit of

24   a unique transaction, and it's -- there's no ready

1  comparable out there.  So any time there's not something

2  that looks exactly like what you're trying to value, you

3  try to triangulate in on its value by looking at similar

4  but slightly different things.

5      Q.  And in the first of these methodologies, it

6  appears that Mr. Blewitt uses a 13 percent internal rate

7  of turn to discount the probability weighted cash flows.

8          Do you know why Mr. Blewitt used a

9  13 percent internal rate of return in that analysis?

10      MR. DAVIS:  Objection.

11      A.  I don't, but it's a return we've used in the

12  past, so I assume he just kept using it.

13      Q.  But used in the past for the Abbott

14  transaction?

15      A.  Yes, sorry, yes.

16      Q.  For the 9920 analysis?

17      A.  Yes.

18      Q.  Did you have any comments on this document

19  that you received from Mr. Blewitt?

20      A.  I don't recall if I provided any comments on

21  it.

22      Q.  Was it distributed to anyone else other than

23  you?

24      A.  I don't recall.

1   (Exhibit No. 39 Marked for Identification)

2 BY MR. LORENZINI:

3  Q. Mr. Hartz, you have before you what's been

4 marked Exhibit 39, which appears to be an e-mail from

5 you to Stephen Blewitt dated December 19, 2003.

6    Do you recognize this e-mail?

7  A. Again, I don't specifically recall it, but I

8 have no reason to doubt I sent it.

9  Q. When, in the December 18th e-mail, Deidre

10 Daesen says, we're currently assuming a 12 percent IRR;

11 do you know where she came up with that assumption?

12  A. I don't.  It surprises me a little, but no, I

13 don't.

14  Q. Do you know if that's a reference to the

15 current expected rate of return on the investment or the

16 market rate, internal rate of return, for those types of

17 transaction that's used for the purpose of conducting

18 the impairment test?

19  MR. DAVIS:  Objection.

20  A. I'm not completely sure, but I believe it's

21 the IRR on the deal as it suggests on the cash flows.

22  Q. And why does that number surprise you a

23 little?

24  A. Well, as we see in this chain, I thought we

1    were using 13 percent.  So I'm not quite sure why it's

2    12 percent here.

3        Q.  I thought the 13 percent in the earlier

4    document, Exhibit 38, was the market rate of return that

5    was used for the purpose of conducting the impairment

6    test, not the currently expected rate of return?

7        MR. DAVIS:  Objection.

8        A.  I guess I'm not completely sure, but that

9    could be the difference.

10       Q.  Well, when conducting valuation under the

11   method that Mr. Blewitt describes in Roman numeral I of

12   Exhibit 38, to discount the probability rate of cash

13   flows, would you typically use the expected rate of

14   return on the investment or the market rate of return

15   for investments of that type?

16       MR. DAVIS:  Objection.

17       A.  The market rate of return.

18       Q.  In Miss Daesen's e-mail, I apologize if I'm

19   mispronouncing that, she states:  There used to be a

20   write-up on this deal in the consumer in., I assume it

21   stands for industry, loan review, but I don't see it in

22   there at this time.

23            What did you understand her to mean by

24   the write-up on this deal?

1    Abbott investment?

2       A.   While I'm not completely sure, I believe it

3    was.

4       Q.   And was that the first impairment to the

5    Abbott transaction on the 9920?

6       A.   I believe it was.

7       Q.   And do you know why a discount rate of

8    15 percent was used in this?

9       A.   As I stated before, it's consistent with the

10   discount rates we've used on other assets we've impaired

11   under 9920.  So I think it was mostly used for that

12   consistency.

13      Q.   Do you think it was the expected rate of

14   return of the transaction at this point in time?

15         MR. DAVIS:  Objection.

16      A.   I'm not sure -- well --

17      Q.   Not necessarily?

18      A.   Yeah.

19         MR. DAVIS:  Objection.

20   BY MR. LORENZINI:

21      Q.   Under the standard 9920 impairment, what would

22   you use as the discount rate?

23      A.   15 percent, which is what we used here.

24      Q.   You testified earlier that you have sometimes

1    used 13 percent to conduct the impairment testing?

2       A.  I believe we've used 13 percent before.  It's

3    a function of how stressed an investment is.

4       Q.  And it's a function of how stressed the

5    investment is as of the time the impairment testing is

6    done?

7       A.  Correct.

8       Q.  So it's not based on the inherent risk level

9    of the transaction at the time it was entered in, but

10   the risk as of the time the impairment testing is done?

11      A.  That's right.

12      (Exhibit No. 42 Marked for Identification)

13   BY MR. LORENZINI:

14      Q.  Mr. Hartz, you have before you what's been

15   marked Exhibit 42, which appears to be minutes of

16   Committee of Finance meeting of John Hancock Life

17   Insurance Company dated January 5, 2004.

18          Do you recognize this document?

19      A.  I have not seen this document before, but I

20   recognize what it is.

21      Q.  It's the standard format of Committee of

22   Finance meeting?

23      A.  Yes.

24      Q.  You'll note on the page No. 3, it says, Also

1    the earlier e-mail?

2        A.   I don't know if that was just a typo or

3    whether she had thought the discount rate we used was

4    20 percent.  I don't know.

5        Q.   She does say that 16 percent was used to come

6    up with the impairment below?

7        A.   Right.

8        Q.   Does that suggest to you it was just a

9    typographical error?

10        A.   Yeah, it was a mistake of some sort; probably

11    typographical.

12        (Exhibit No. 45 Marked for Identification)

13    BY MR. LORENZINI:

14        Q.   Mr. Hartz, you have before you what's been

15    marked as Exhibit 45; appears to be an e-mail from you

16    to Mr. Blewitt dated February 24, 2005; states:  End of

17    deal and successful, we would expect our return to be

18    the 16 percent we've modeled on the current BV of

19    approximately 90 million or would we expect additional

20    returns with some of the write-downs we've taken.

21        Do you recognize this e-mail?

22        A.   Yes.

23        Q.   This is an e-mail that you wrote?

24        A.   Yes.

1      Q.   Do you recall what prompted you to write this

2   e-mail?

3      A.   I believe I heard there was good news around

4   and I was wondering whether that would improve the

5   returns on the deal.

6      Q.   When you say the 16 percent we've modeled on

7   the current BV, what did you mean by that?

8      A.   Those are the returns we had modeled at the

9   end of the year.  And my question really was, Will the

10   cash flows be better than that and hence, the return be

11   better than the 16 percent?

12   Q.   Did you get an answer to the question that you

13   posed in this e-mail?

14   A.   I don't remember.

15      MR. LORENZINI:  If we could just take a couple

16   of minutes.

17      THE VIDEOGRAPHER:  Going off the record.  The

18   time is 5:44.

19         (Short Recess)

20    (Exhibit No. 46 Marked for Identification)

21      THE VIDEOGRAPHER:  Back on the record.  The

22   time is 5:48.

23   BY MR. LORENZINI:

24   Q.   Mr. Hartz, the court reporter has handed you

**2**

Deposition Exhibit No. 2

D's Exhibit IG

**JOHN HANCOCK LIFE INSURANCE COMPANY**
**Bond & Corporate Finance Group**
Report Date:                June  8, 2000
Recommendation to B.I.C.:   June  8, 2000
Report to C.O.F.:           July 10, 2000

Private                     <u>Purchase Recommendation</u>
                            GBSA $20.0 million    GBRE  $5.0 million


### PHARMA MARKETING LTD.
Bermuda


We are recommending the purchase of $25 million of a $275 million issuance of common stock of Pharma Marketing Ltd. Pharma Marketing is a newly-formed Bermuda company that, through its wholly-owned subsidiary Pharma Operating Ltd., is establishing a program with two wholly-owned subsidiaries of Elan Corporation, plc ("Elan Subsidiaries") to fund the development and commercialization of seven pharmaceutical products owned by the Elan Subsidiaries. The common stock will carry a dividend yield of 6.50%, payable quarterly, in cash. The purpose of this transaction is reduce the short-term effect on Elan's income statement of launching such a large number of products over the next two years.


Pharma Operating will use the net proceeds of this offering to make payments during the next two years, in accordance with a pre-established budget, to the Elan Subsidiaries in amounts equal to expenditures made by Elan for the development and commercialization of a pool of seven pharmaceutical products. The products represent most the significant products in Elan's near-term product pipeline and four of its new drug launches planned for 2000 and 2001. In return for the development and commercialization payments, the Elan Subsidiaries will agree to pay royalties to Pharma Operating in perpetuity in amounts equal to predetermined percentages of the net sales of the products in the United States and in certain parts of Europe. The Elan Subsidiaries will have the option, but not the obligation, to purchase the Pharma Operating's rights to receive the royalties at a price that would provide an IRR (for a minimum of two years) of 25% to the Investors, or another mutually agreed upon price.


Our recommendation is based upon the substantial likelihood that the Investors will receive a two-year IRR of 25% balanced against a modest risk that Elan's products will not be approved by the FDA or will not generate the level of revenues that we and Elan expect.


<u>Report Authors:</u>
Stephen J. Blewitt, Managing Director
Scott Hartz, Managing Director
(t:\industrials\sjb\yellows\eln2-y01.doc)



HIGHLY CONFIDENTIAL
JHII 012376

JOHN HANCOCK LIFE INSURANCE COMPANY
Bond & Corporate Finance Group
Report Date:                June  8, 2000
Recommendation to B.I.C.:   June  8, 2000
Report to C.O.F.:           July 10, 2000

Private

**Purchase Recommendation**
GBSA $20.0 million   GBRE  $5.0 million

| | |
|---|---|
| **ISSUER:** | **Pharma Marketing Ltd.** ("Pharma Marketing" or "Holdco") |
| **ISSUE:** | $275 million of Common Stock |
| **RATINGS:** | JH: N/R |
| **BROKER:** | Donaldson, Lufkin & Jenrette |
| **DIVIDENDS:** | 6.50%, payable quarterly |
| **SIC CODE:** | 2830 – Drugs |

**PARTICIPANTS:**

| DLJ | $100,000,000 |
|---|---|
| Teachers Insurance | 50,000,000 |
| John Hancock | 25,000,000 |
| Others | $100,000,000 |

**USE OF PROCEEDS:** To fund the development and commercialization of seven pharmaceutical products ("Product Pool") owned by two subsidiaries of Elan Corporation plc. ("Elan Subsidiaries"), to pre-fund two years of dividend payments, and to pay for transaction and administrative expenses.

**STATE OF INC.:** Bermuda

**CIRCLE DATE:** May 30, 2000

**TAKEDOWN DATE:** Upon completion of documentation

**ROYALTIES:** Ninety days after the completion of each calendar quarter occurring between April 1, 2000 and December 31, 2001, the Elan subsidiaries shall pay to the Pharma Operating an amount equal to the applicable percentage of the Net Sales of Zanaflex IR during such quarter.

Thereafter, the Elan Subsidiaries shall pay to the Company, 90 days after the completion of each calendar quarter, an amount equal to the applicable percentage of the Net Sales of all Products in the Pool during such quarter.

**AUCTION PROCESS:** The Elan Subsidiaries may, at their sole option, elect to initiate an auction process with respect to the Company's Royalty Rights under the Program (the "Auction Process") at any time; *provided, however,* that the Auction Process may be initiated by the Company upon the occurrence and during the continuance of an event of default by Elan or the Elan Subsidiaries under the Agreements.

HIGHLY CONFIDENTIAL
JHII 012377

2

The Auction Process will proceed in two steps as follows:

**Step #1: Mutual Agreement.** The Elan Subsidiaries will have the option, but not the obligation, to purchase the Company's Royalty Rights under the Program at a price that would provide an IRR (for a minimum of two years) of 25% to the Investors (the "Net Auction Price"), or other mutually agreed upon price. The Net Auction Price is subject to adjustment if the Company stops making payments to the Elan Subsidiaries.

If the Elan Subsidiaries do not purchase the Company's Royalty Rights under the Program on or prior to the 90th day following the commencement of the Auction Process, the second step will occur.

**Step #2: Hold Period and Liquidation.** The Company will hold and not dispose of its Royalty Rights under the Program, except to the Elan Subsidiaries, prior to the earlier of (i) the third anniversary of the Closing Date or (ii) the earlier of the twelve-month anniversary of (a) the first date on which there are no Available Amounts or (b) the date on which the Auction Process is initiated. Thereafter, the Company may, in its sole discretion, determine to hold or liquidate the Company's Royalty Rights under the Program in whole or in part. In the event the Company elects to liquidate its Royalty Rights in whole or in part, the Company will provide the Elan Subsidiaries with 30 days' prior written notice.

**MANAGEMENT:**

The business and affairs of Pharma Marketing will be managed under the direction of its board of directors (the "Holdco Board"), which will be elected by the holders of the Common Shares.

The Holdco Board act by a simple majority, except as follows:

- The affirmative vote of at least 66-2/3% of the Company Board will be required to amend the Budget Amount for any product (other than a permitted reallocation).
- The affirmative vote of at least 90% of the Company Board will be required to:
  - Change the composition of the Pool;
  - Change the amount or timing of payment of any Royalty;
  - Accept an offer from the Elan Subsidiaries to purchase the Company's Royalty Rights under the Program for less than the Net Auction Price; or
  - Enter into any transaction other than in connection with the Program or a liquidation.

The affirmative vote of the holders of at least 90% of the Common Shares will be required for the Company to stop making Program Payments to the Elan Subsidiaries under the Program.

HIGHLY CONFIDENTIAL
JHII 012378

3

| | |
|---|---|
| **FINANCIAL COVENANTS:** | Including, but not limited to: |

(For Pharma Marketing and Pharma Operating)
    Limitations on indebtedness, limitations on liens, limitations on sales, assignments, licenses or other transfers or dispositions of Royalty Rights, limitations on payments from and investments of Available Amounts and amounts held in the Loan Account and Expense Account;

(For Elan Subsidiaries)
    Limitations on liens, sales, assignments, licenses or other transfers or dispositions of its rights in any Product in the Pool.

| | |
|---|---|
| **GUARANTEE AGREEMENT:** | Elan Corporation plc. will unconditionally guarantee the obligations of the Elan Subsidiaries under the Program Agreement |
| **HANCOCK HOLDINGS:** | None |
| **RELATED HOLDINGS:** | $70,000,000 Elan Corporation plc. |
| **ANALYST:** | Stephen J. Blewitt |
| **HOUSE COUNSEL:** | Malcolm Pittman |
| **SPECIAL COUNSEL:** | Dewey, Ballantine |

<u>Report Authors:</u>
Stephen J. Blewitt, Managing Director
Scott Hartz, Managing Director
(t:\industrials\sjb\yellows\eln2-y01.doc)

HIGHLY CONFIDENTIAL
JHll 012379

4

**TRANSACTION OVERVIEW**

Pharma Marketing Ltd. ("Pharma Marketing" or "Holdco") is a newly-formed Bermuda company. Pharma Marketing, through its wholly-owned subsidiary Pharma Operating Ltd. ("Pharma Operating" or the "Company"), is establishing a program (the "Program") with Elan Pharma International Limited and Axogen Limited (the "Elan Subsidiaries"), subsidiaries of Elan Corporation, plc ("Elan").

Pharma Operating will use the net proceeds of this offering to make payments during the next two years, in accordance with a pre-established budget, to the Elan Subsidiaries in amounts equal to expenditures made by Elan for with the development and commercialization of a pool of seven pharmaceutical products. The products represent most of the significant products in Elan's near-term product pipeline and four of its new drug launches planned for 2000 and 2001. In return for the development and commercialization payments, the Elan Subsidiaries will agree to pay royalties to Pharma Operating in perpetuity in amounts equal to predetermined percentages of the net sales of the products in the United States and in certain parts of Europe. The Elan Subsidiaries will have the option, but not the obligation, to purchase the Pharma Operating's rights to receive the royalties at a price that would provide an IRR (for a minimum of two years) of 25% to the Investors, or another mutually agreed upon price.

<strong>Transaction Summary</strong>



HIGHLY CONFIDENTIAL
JHII 012380

## OVERVIEW OF ELAN CORPORATION

Elan is a worldwide pharmaceutical and biotechnology company. Elan's traditional business is the development of products for pharmaceutical clients utilizing its proprietary drug delivery systems. Elan offers its pharmaceutical clients a range of drug delivery solutions that are designed to improve pharmacokinetics, absorption and dosing convenience. Over the past four years, Elan has pursued a strategy to transition its business to become a fully integrated pharmaceutical and biotechnology company. As of March 31, 2000, Elan has built an approximately 500-person U.S. salesforce that focuses on neurologists, primary care physicians, epileptologists and pain management specialists, together with an approximately 200-person European sales force. Elan's principal research facilities are located in Ireland, the United States and Israel. Elan employs approximately 3,000 people worldwide, with about 770 employees engaged in research and development and related activities.

For the year ended December 31, 1999, Elan had revenues and net income of approximately $1,004 million and $350 million, respectively. Elan currently has investment grade debt ratings from S&P and Moody's of BBB and Baa3, respectively. As of June 70, 2000, Elan had a market capitalization of approximately $10.6 billion.

### ELAN CORPORATION PLC.
### CONSOLIDATED STATEMENT OF OPERATIONS

| ($ in thousands, except per share data) | Fiscal Years Ended December 31, | | |
|---|---|---|---|
| | 1997 | 1998 | 1999 (1) |
| Revenues: | | | |
| Product sales | $215,486 | $342,078 | $552,402 |
| Royalties and fees | 110,906 | 239,133 | 278,524 |
| Research revenues | 57,789 | 95,523 | 173,483 |
| Total revenues | 384,181 | 676,734 | 1,004,409 |
| Costs and expenses: | | | |
| Cost of goods sold | 106,182 | 137,935 | 211,184 |
| Selling, general and administrative | 71,764 | 155,869 | 252,451 |
| Research and development | 75,160 | 143,536 | 233,109 |
| Total operating expenses | 253,106 | 437,340 | 696,744 |
| | | | |
| Operating income before one-time charges | 131,075 | 239,394 | 307,665 |
| Net interest and other income | 40,250 | 17,585 | 49,936 |
| Other charges | – | (1,423,718) (2) | (88,610) (3) |
| Income (loss) before taxation | 171,325 | (1,184,324) | 268,991 |
| Net income (loss) | $170,139 | ($1,170,613) | $261,702 |
| | | | |
| Diluted EPS before other charges (4) | $0.86 | $0.97 | $1.24 |
| Fully diluted EPS | $0.77 | ($4.91) | $0.93 |

(1) Unaudited.
(2) Other charges of $1,423,718 consist of $1,311,149 in connection with the acquisitions of Neurex, Sano, NanoSystems and Carmick; $41,747 of costs related to the rationalization and integration of Sano; $3,322 incurred resulting from a loss on disposal of an investment and loan note which were acquired as proceeds from a sale of a business; and $67,500 incurred resulting from a cash contribution by Elan to Axogen.
(3) Source: Other charges of $88,610 principally in connection with the acquisition of Axogen.
(4) Not per U.S. GAAP.

HIGHLY CONFIDENTIAL
JHII 012381

6

**PHARMA MARKETING LTD.**

## A. PRODUCT POOL

The Product Pool is divided into two subpools. Subpool A consists of five products and subpool B consists of two products. The Pool includes one marketed product, one approved products, three products in registration that Elan expects to launch in 2000 and 2001 and two product in Phase II trials. The products are described more fully below:

| ($ in millions)<br>Product | Indication | Est. Market<br>Size (1) | Stage of Development | |
|---|---|---|---|---|
| *Subpool A:* | | | | |
| Zanaflex IR | Treatment of muscle spasticity in adults | $800 | Development Stage: | Approved |
| | | | Expected Launch: | On Market |
| Zanaflex MR | Treatment of muscle spasticity in adults | $800 | Development Stage: | Phase II-III trials |
| | | | Expected Launch: | 2003 |
| Zonegran | Anti-epilepsy drug (AED) - adjunctive therapy for partial seizures | 1,500 | Development Stage: | Approved |
| | | | Expected Launch: | Q2 2000 |
| Neurobloc | Treatment of cervical dystonia | 176 | Development Stage: | In registration |
| | | | Expected Launch: | Mid-year 2000 |
| Frovatriptan | Acute migraine treatment | 1,000 | Development Stage: | In registration |
| | | | Expected Launch: | Q1 2001 |
| *Subpool B:* | | | | |
| Ziconotide Intrathecal | Severe chronic pain | 500 | Development Stage: | NDA filed Q4 1999; 6-month Priority Review |
| | | | Expected Launch: | 2nd half 2000 |
| Ziconotide Epidural | Acute post-operative pain | 2,000 | Development Stage: | Phase II trials |
| | | | Expected Launch: | 2004 |

## B. SUMMARY OF PROJECTED NET SALES

| ($ in millions)<br>Name | 2000 (2) | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|
| *Subpool A:* | | | | | | |
| Zanaflex IR / MR | $50.3 | $95.1 | $112.2 | $125.9 | $120.3 | $111.0 |
| Zonegran | 25.0 | 35.0 | 43.0 | 57.0 | 74.4 | 96.0 |
| Neurobloc | 30.0 | 47.0 | 76.0 | 131.8 | 188.3 | 245.0 |
| Frovatriptan | — | 45.1 | 76.1 | 115.7 | 141.1 | 149.0 |
| *Subpool B:* | | | | | | |
| Ziconotide Intrathecal | 40.0 | 95.1 | 156.0 | 202.8 | 254.5 | 319.1 |
| Ziconotide Epidural | — | — | — | — | 6.4 | 46.2 |
| **Total Net Sales** | **$145.3** | **$317.3** | **$463.3** | **$633.2** | **$785.0** | **$966.3** |
| *% U.S.* | *95.0%* | *95.7%* | *95.2%* | *94.3%* | *90.4%* | *86.6%* |
| *% Europe* | *5.0%* | *4.3%* | *4.8%* | *5.7%* | *9.6%* | *13.4%* |

(1) Estimated annual sales of therapies addressing market. Source: Elan estimates.
(2) April 1, 2000 to December 31, 2000.

HIGHLY CONFIDENTIAL
JHII 012382

## C. SUMMARY BUDGET

Pharma Operating will make payments to the Elan Subsidiaries in amounts equal to expenditures made by Elan, affiliates of Elan and designated third parties in connection with the commercialization and, to a lesser extent, development of Products in the Pool. Commercialization expenses consist primarily of sales and marketing costs. Development expenses consist primarily of the costs associated with the receipt of U.S. Food and Drug Administration ("FDA") approval for four of the Products. The following table summarizes the Company's expected budget during the Program Period:

| ($ in millions) | 2000E (1) | 2001E | 2002E (2) | Total |
|---|---|---|---|---|
| Beginning Cash Balance | $263.0 (3) | $168.5 | $34.7 | $263.0 |
| Royalties (4) | 0.8 | 3.6 | 1.1 | 5.5 |
| Investment Income | 7.8 | 6.6 | 0.3 | 14.7 |
| Loan Payments | (8.9) | (17.9) | (4.5) | (31.3) |
| Administrative Expenses | (0.2) | (0.3) | (0.1) | (0.6) |
| Program Payments/Commercialization Expenses | (62.3) | (101.3) | (24.7) | (188.3) |
| Program Payments/Development Expenses | (31.7) | (24.5) | (5.3) | (61.5) |
| Ending Cash Balance | $168.5 | $34.7 | $1.5 | $1.5 |

## D. ROYALTY RIGHTS

Under the Program, the Company has the right to receive Royalties from the Elan Subsidiaries in amounts equal to predetermined percentages of the Net Sales generated by the Pool in the United States and, excluding Frovatriptan, in certain parts of Europe. The Royalties will be payable quarterly in arrears. For the period from April 1, 2000 to December 31, 2001, the Company will receive Royalties only in respect of Zanaflex IR. Thereafter, the Company will receive Royalties on the entire Pool. The Royalty calculation includes:

ç   **Increasing Royalty Percentage.** The Royalty rate for Subpool A and Subpool B increases over time and, by 2005, reaches an effective rate of 28.0% and 15.9%, respectively, or a blended effective Royalty rate of 23.4% of the aggregate Net Sales of the entire Pool. Note that, for the period from April 1, 2000 to December 31, 2001, the Royalties will be based exclusively on the Net Sales of Zanaflex IR.

ç   **Portfolio vs. Product Calculation.** After 2001, the Royalties are based on the aggregate Net Sales of all Products in Subpool A and Subpool B, as opposed to the Net Sales of a single Product.

ç   **Two-Tranche Calculation.** The Royalty calculation is split into two tranches for both Subpool A and Subpool B, such that, at 40% of Projected Net Sales of the Products in Subpool A or Subpool B (in each case, the "Hurdle Amount"), the Company receives 75% of the Projected Royalties for such Subpool. The following table highlights the calculation of the Royalties for Subpool A and Subpool B assuming 100% of Projected Net Sales are achieved:

(1) Assumes a closing date of May 31, 2000.
(2) January 1, 2002 to May 31, 2002.
(3) Assumes Transaction Expenses are $12.0 million.
(4) Royalties based only on the Net Sales of Zanaflex IR in years 2000 and 2001. Thereafter, Royalties based on the Net Sales of the entire Pool.

HIGHLY CONFIDENTIAL
JHII 012383

## E. SUMMARY OF PROJECTED ROYALTIES

| ($ in millions) | 2000 (1) | 2001 | 2002 | 2003 | 2004 | 2005 (2) |
|---|---|---|---|---|---|---|
| *Projected Net Sales* | | | | | | |
| Subpool A | $50.3 | $95.1 | $307.3 | $430.4 | $524.1 | $601.0 |
| Subpool B | — | — | 156.0 | 202.8 | 260.9 | 365.3 |
| Total Projected Net Sales | $50.3 (3) | $95.1 (3) | $463.3 | $633.2 | $785.0 | $966.3 |
| Subpool A Hurdle Amount (4) | $20.1 | $38.0 | $122.9 | $172.2 | $209.6 | $240.4 |
| Subpool B Hurdle Amount (4) | — | — | 62.4 | 81.1 | 104.4 | 146.1 |
| *Subpool A:* | | | | | | |
| Royalty Rate up to Hurdle Amount | 4.69% | 8.44% | 15.79% | 27.71% | 41.42% | 52.50% |
| Royalty Rate above Hurdle Amount | 1.04 | 1.88 | 3.51 | 6.16 | 9.20 | 11.67 |
| Effective Rate | 2.50% | 4.50% | 8.42% | 14.78% | 22.09% | 28.00% |
| *Subpool B:* | | | | | | |
| Royalty Rate up to Hurdle Amount | — | — | 7.88% | 9.75% | 13.50% | 29.81% |
| Royalty Rate above Hurdle Amount | — | — | 1.75 | 2.17 | 3.00 | 6.63 |
| Effective Rate | — | — | 4.20% | 5.20% | 7.20% | 15.90% |
| *Subpool A:* | | | | | | |
| Royalties up to Hurdle Amount | $0.9 | $3.2 | $19.4 | $47.7 | $86.8 | $126.2 |
| Royalties above Hurdle Amount | 0.3 | 1.1 | 6.5 | 15.9 | 28.9 | 42.1 |
| Subtotal Royalties | $1.3 | $4.3 | $25.9 | $63.6 | $115.8 | $168.3 |
| *Subpool B:* | | | | | | |
| Royalties up to Hurdle Amount | — | — | $4.9 | $7.9 | $14.1 | $43.6 |
| Royalties above Hurdle Amount | — | — | 1.6 | 2.6 | 4.7 | 14.5 |
| Subtotal Royalties | — | — | $6.6 | $10.5 | $18.8 | $58.1 |
| Total Royalties | $1.3 (3) | $4.3 (3) | $32.4 | $74.2 | $134.6 | $226.4 |

(1) April 1, 2000 to December 31, 2000.
(2) For Subpool A and Subpool B, Royalty rates up to and above Hurdle Amounts for 2005 remain in effect for all years thereafter.
(3) Royalties based only on the Net Sales of Zanaflex IR.
(4) Represents 40% of Projected Net Sales for the Subpool.

HIGHLY CONFIDENTIAL
JHH 012384

9

## TRANSACTION ANALYSIS

The structure of this transaction (which includes a pool of Elan's most significant newly-approved or late-stage products, and a tiered royalty structure) offers a substantial likelihood that the Investors will receive a two-year IRR of 25%. While we do not think that we are taking the risk normally associated with that level of return, we think that the compensation is fair given the short-term nature of the return and the novelty of transaction's structure.

**Expected Return.** At the end of two years, Elan will have the option of buying back the royalty rights at a price that provides the Investors with a 25% IRR – approximately $390 million, or continuing to pay an increasing royalty percentage of net sales to the Investors. Based on our analysis of the products in the Pool, a diligence review by J. Paul Waymack, M.D. (an independent consultant hired by DLJ's mezzanine fund), and pharmaceutical industry standards for likelihood of success and probable sales curves for compounds in different stages of clinical development, **we think that the probability associated with Elan not repurchasing the royalties at a 25% IRR is approximately 2%.** We have reached this conclusion by assigning probabilities of success, levels of peak sales, sales patterns, and years of launch for each product in the Product Pool, and running a spreadsheet model 500 times to assess outcomes. We think that there is a one-half percent chance that we will actually lose money (not more than $50 million of the $275 million invested) and that there is an additional 1½ percent chance that we will receive lower than a 25% IRR.

In our base case, we have made the following assumptions:

| Product | Phase | JH Probability Of Approval | Launch | JH Peak Sales | Comments |
|---|---|---|---|---|---|
| Zanaflex IR | On Mkt. | 100% | 1997 | $110 mm | Patent expires 2003; then generic |
| Zanaflex MR | Phase II | 70% | 2003 | $110 mm | Product extension |
| Zonegran | Approved | 100% | 2000 | $ 80 mm | . |
| Neurobloc | NDA | 90% | 2001 | $100 mm | |
| Frovatriptan | NDA | 50% | 2002 | $100 mm | Assume additional toxicity studies delay launch |
| Ziconotide IE | NDA | 90% | 2001 | $150 mm | |
| Ziconotide E | Phase II | 60% | 2004 | $150 mm | Product extension |

... and calculated the value of the Royalties from the Product Pool, in two years, to be:

| Assumed Elan Disc. Rate | Expected Pool Value | Probability Less than $275 | Probability Less than $390 | Probability $390 - $490 | Probability More than $490 |
|---|---|---|---|---|---|
| 15% | $670 million | 0.5% | 1.5% | 8.0% | 90.0% |

Using a substantially higher discount yield, the likelihood of losing money is still less than 1%, although the probability of receiving a lower than 25% IRR increases significantly to 7%.

| Assumed Elan Disc. Rate | Expected Pool Value | Probability Less than $275 | Probability Less than $390 | Probability $390 - $490 | Probability More than $490 |
|---|---|---|---|---|---|
| 20% | $539 million | 1.0% | 7.0% | 16.0% | 76.0% |

In the event that we need to negotiate a lower Net Auction Price than $390 million, we expect that our yield will not be lower than 6.50%. The 6.50% yield assumes that we eliminate the tiered royalty structure and accept 50% of the net profit of selling the products and allow Elan to keep the remaining 50% (to motivate them to continue selling the Products).

HIGHLY CONFIDENTIAL
JHH 012385

**Risk Analysis.** The fundamental risks of this transaction are whether Elan receives marketing approval from the FDA for a sufficient number of the Pool Products and whether the commercial success of the Products are as we and Elan expect. In developing the *expected return*, we have made a number of reasonable assumptions regarding the probability of obtaining FDA approvals, marketing and sales capabilities of Elan, acceptance of the products in the marketplace and competition. In many cases, our assumptions are significantly more conservative than Elan's. However, as a further stress to the model, we have assumed that Frovatriptan is never launched and that the remaining products generate only 50% of our expected sales levels. In that scenario, we further assume that we eliminate the tiered royalty structure and accept 50% of the net profit of selling the products and allow Elan to keep the remaining 50% (to motivate them to continue selling the Products). The expected results of the "stressed case" are as follows:

| Probabilities of Investment Returns "Stressed Case" |
| --- |
| 3% probability that we will lose $30 – 50 million of the total $275 million invested; |
| 3% probability that we will just get our money back (0% IRR); |
| 35% probability that we will receive a 4% IRR; and |
| 60% probability that we will receive a 6% IRR. |

These results indicate that the downside risk of this structure is modest. The primary reason is that two products are already approved and that three products are in the latest stage of clinical development. We also benefit from the structure being a pool of products, so that if one product fails to receive approval or achieve commercial success, the impact on our return is limited (assuming that the others succeed). We are comfortable with Elan's ability to launch and market products. Elan has transitioned itself from being a technology company that developed drug delivery mechanisms into a fully-integrated pharmaceutical company. Elan currently sells seven pharmaceutical products directly and has built a salesforce that focuses on neurologist and pain specialists – the primary targets for the products in the Pool.

As a result of this analysis, we estimate that the expected risk associated with this transaction is equivalent to an investment grade bond, and that the short-term return of 25% is fair compensation for credit risk and the novelty of the structure.

HIGHLY CONFIDENTIAL
JHII 012386

# APPENDIX
## PRODUCT DESCRIPTIONS

### Zanaflex IR and MR

Zanaflex IR was launched in the U.S. in February 1997 for the treatment of muscle spasticity from multiple sclerosis and spinal cord injury and received an expanded label in December 1997 for all adult spasticity. There are approximately 1.1 million spasticity and painful spasm sufferers in the U.S. and the market is growing at over 20% per annum. Currently there are several treatments for spasticity and painful spasm. However, only three drugs (Baclofen, Dantrium and Zanaflex IR) are specifically indicated for spasticity, and only one, Baclofen, is an oral competitor. These three products generate annual sales of approximately $135.0 million. Valium and Warner Lambert's Neurontin are also used as treatments for spasticity and painful spasm. Elan believes Zanaflex IR is the only anti-spasticity drug actively detailed and sampled in the U.S. As a result of active marketing and its non-narcotic advantages, Zanaflex IR sales continue to grow faster than the overall market.

The rights to Zanaflex were acquired from Novartis in 1991 through an agreement that includes all forms, uses and improvements and also provides a favorable supply arrangement with Novartis. A new Zanaflex IR 2mg tablet was launched in the first quarter of 2000. This smaller convenient tablet will be very useful for titration and in treating patients that need smaller doses.

Products currently in development for spasticity include:

- A modified release formulation, Zanaflex MR
- Eisai's E-646 sperisone, a muscle relaxant currently in Phase II studies
- Parke-Davis' Pregablin, a follow-on product to Neurontin, currently in Phase III clinical trials.

The patent on Zanaflex has expired and New Chemical Entity ("NCE") marketing exclusivity expires at the end of 2001. Zanaflex MR will have three years of marketing exclusivity for any new formulation requiring new clinical studies starting from the first day marketed. Zanaflex has a distinct advantage over most of the competitors in that it is a non-narcotic that relieves spasticity and painful spasm without causing muscle weakness. Furthermore, generic competition is not anticipated before mid-2003.

### Zonegran

Zonegran is an Anti Epilepsy Drug ("AED") developed for use in the U.S. as an adjunctive therapy for partial seizures in epilepsy patients. Zonegran is the third most widely prescribed AED in Japan where it has been approved since 1989. Epilepsy is a disorder of the brain characterized by sudden, recurrent seizures. In the U.S., there are approximately two million epilepsy sufferers and the market is growing at approximately 10% per annum. Despite the introduction of five new AEDs since 1993, approximately one-third of epilepsy patients have seizures that are not controlled with currently available therapies. The market for therapies addressing partial seizures is estimated to be $1.5 billion. Zonegran will be entering a crowded market with six major competing therapies. However, unlike other new AED launches in recent years, the efficacy and safety of Zonegran has not only been established in extensive clinical trials in the U.S., but also in Japan where it has more than one million patient-years of clinical experience.

In March 1997, Elan obtained a license for the U.S. marketing rights for Zonegran from Dainippon Pharmaceuticals. FDA approval of Zonegran 100mg was received in Q1 2000. A supplemental NDA for the 25mg and 50mg capsules was filed with the FDA in April 2000. It is anticipated that these additional dosage strengths will be approved in Q3 2000. Additional development work is being done with Zonegran to further expand its market opportunity. The patent for Zonegran has expired. Zonegran has five years of marketing exclusivity from the Drug Price Competition and Patent Term Restoration Act, also known as Waxman-Hatch for its sponsors. This legislation encourages innovation by the research-based industry through extended patent life in order to compensate for the time lost during the regulatory process.

HIGHLY CONFIDENTIAL
JHII 012387

### Neurobloc

Botulinum toxin is a potent neurotoxin, best known as the cause of the potentially fatal form of bacterial food poisoning called botulism. Over the last ten years, botulinum toxin preparations have been successfully used to treat a wide variety of neuromuscular disorders. Elan's botulinum toxin type B injectable solution, Neurobloc, is being developed initially for the treatment of patients with cervical dystonia ("CD"). The Dystonia Association estimates that 50,000 people in the U.S. have CD. The only other botulinum toxin currently marketed in North America, is Botox (botulinum toxin type A). Botox, marketed by Allergan, Inc., achieved worldwide sales of $176.0 million in 1999; it is currently the only direct competitor to Neurobloc in the U.S. Elan believes Neurobloc represents major advancements over Botox. For example, unlike Botox, Neurobloc does not require reconstitution and freezer storage and comes in multiple vial sizes. In addition, Neurobloc has been shown in clinical studies to be effective for those patients who have developed a resistance to Botox.

In December 1998, Elan filed the Product License Application for Neurobloc with the FDA. Elan expects to launch Neurobloc mid-year 2000. Elan is also considering developing botulinum toxin type B for the treatment of spasticity and other potential indications. The patent on the Neurobloc formulation process expires in 2019. The product has been granted Orphan Drug designation by the FDA and upon marketing approval the product will have seven years of marketing exclusivity under Waxman-Hatch.

### Ziconotide Intrathecal and Epidural

Ziconotide Intrathecal is anticipated to be the first of a new therapeutic class of agents referred to as conopeptides. Ziconotide Intrathecal is being developed for the management of severe chronic pain. There are approximately 1.1 million people in the U.S. suffering from severe chronic pain, of which 30% suffer from malignant pain and 70% suffer from neuropathic pain. Ziconotide will represent the first non-opiate treatment alternative for patients who suffer from severe chronic malignant or non-malignant pain and the only treatment alternative for intractable pain sufferers (i.e., those patients that get no therapeutic benefit from existing chronic pain therapies). Current therapies consists of various opioids and other agents including morphine, used alone or in combination through the intrathecal route. Ziconotide offers several advantages over opioids including the effective treatment of neuropathic pain and tolerance.

Ziconotide was acquired by Elan through its acquisition of Neurex in 1998. Elan filed a New Drug Application ("NDA") with the FDA for Ziconotide Intrathecal in December 1999, and has received priority six-month review status from the FDA for the management of severe chronic pain via the intrathecal route. The Company has a partnership agreement with Medtronic, a leading manufacturer of intrathecal pumps, which will receive royalties and provide added support for Ziconotide's success.

An epidural-based delivery formulation of Ziconotide is currently in Phase II trials for acute post-operative pain. The total market is estimated at $2.0 billion. Ziconotide has patent protection through 2011.

### Frovatriptan

Frovatriptan is a receptor agonist for the acute treatment of migraine. The U.S. migraine market is now estimated to be valued in excess of $1.0 billion. Elan believes the market remains underdeveloped as it is estimated that only 50% of the 23 million migraine sufferers in the U.S. seek treatment.

The migraine market is currently served by four triptans. Glaxo Wellcome plc markets two agents, Imitrex (oral sumatriptan) and Amerge (naratriptan). Zeneca Wilmington Inc. and Merck & Company have recently entered the market launching Zomig and Maxalt, respectively. Pfizer Inc. plans to submit final clinical data to the FDA on the fifth triptan, Relpax, by mid-year 2000. Frovatriptan is a more potent HT10 receptor agonist than sumatriptan, the market leader, and has a longer half-life.

In January 1999, a NDA for Frovatriptan was filed with the FDA, which is currently under review. In October 1999, the FDA requested that additional pre-clinical work be performed, which is currently ongoing. Elan anticipates a launch in Q1 2001.

HIGHLY CONFIDENTIAL
JHII 012388

3

Deposition Exhibit No. 3

D's Exhibit IH

**From:**    Hartz, Scott [shartz@jhancock.com]
**Sent:**    Tuesday, September 19, 2000 3:56 PM
**To:**      Blewitt, Stephen
**Subject:** Abbott



**CONFIDENTIAL**
JH 003551

Modeling the expect returns and expected loss

We've modeled the returns on this portfolio of drugs using a Monte Carlo simulation and assuming their probabilities of success are independent. Let's start, however, with some simplifying assumptions to get better intuition on the risk of the transaction. Assume the probability of success of each drug is 50%, the drugs are independent, and that the success of any one drug will give us a return of 8% on the transaction. In this case, we will lose all our investment only if all the drugs fail. The probability of this is $(1/2)^6 = 1.6\%$. Spread over a 4 year duration, the expected annual loss is 40 bps which implies the same risk as a Baa3 bond. If only one drug is successful, which should occur with the probability of $(1/2)^6 *(6!/1!) = 6/64 = 9.4\%$. In this case, the return, in our simplified model, is 8% on the entire investment. This is approximately 200 bps over Treasuries and a bit of a substandard return on a Baa3 investment. If 2 or more drugs are successful, the structure caps the investment's return at approximately 20%. The probability of this is $1 - 1.6\% - 9.4\% = 89\%$. Hence, the weighted average return on the investment is $1.6\%*0 + 9.4\%*8\% + 89\%*20\% = 18.5\%$.

This example is obviously a simplification. Each of the six drugs has a different probability of success depending upon how far along each is in the approval process. Most of them have a greater than 50% chance of success given most are in phase 3. Also, the revenue profile and hence the royalty stream on each drug is different. To reflect the different probabilities and different revenue streams we've used a 5,000 scenario Monte Carlo simulation. The probability of each drug's success takes the appropriate probability calculated in DiMasi's study and reduces it by 10%. While we believe Abbott's track record is at least as good as average (Abbot's success rate on Phase III drugs is xx% vs the DiMasi study success rate of 63%), the haircut introduces a reasonable level of conservatism. The expected revenue streams used in the simulation are different for each drug and they have been reduced by approximately 25% from Abbott's estimates.

CONFIDENTIAL
JH 003552

The simulation gives us the following return profile:



The average return in this distribution is 17.2%. The bar on the far left shows the probability of no successful drugs and represents 1.7% of the scenarios. There are also a number of scenarios that produce a return of approximately 1% – 2%. These scenarios arise when only a cancer drug is successful. The cancer drugs have lower anticipated revenues, as well as lower probabilities of success, than any of the other drugs. This represents about 1.6% of the scenarios. All other scenarios give us a return of 9% or more. Assuming a 1-2% return represents a loss of half our original investment, the expected loss in this simulation is 1.7% + ½*1.6% = 2.5%. Spread over a 4 year duration, the annual expected loss is 62 bps which corresponds to the risk of a Ba1 rated bond.

We also ran a downside simulation, where the probabilities of success are discounted by 25% from the DiMasi study and the expected revenues are discounted by 25% from our base case.

CONFIDENTIAL
JH 003553

This gives us the following downside return pattern



The average return in this downside scenario is 9.3%. The probability that no drugs are successful rises dramatically to 4.9%. The low return scenario is now even lower (-2%) and also has a higher probability (2.7%). So, the annual expected loss is (4.9% + .6*2.7%)/4 = 165 bps which corresponds to the risk of a B1 rated bond. The average return is also substandard for a B1 rated bond.

The royalty structure of our transaction is designed to limit both the downside and the upside of this investment. As previously described, the appropriate unstructured royalty on an investment in this drug portfolio would be approximately 5%. When we run the model with this flat royalty percentage for our downside case, we get the following pattern of returns:



CONFIDENTIAL
JH 003554

As expected, the return pattern is more dispersed with more downside scenarios as well as more upside scenarios. The average return is only 7%, below the average return with our royalty structure and well below a market clearing return for this sort of risk, which indicates that this must truly be a downside scenario. Using the same methodology as above, the annual expected loss is about 4%, implying CCC or greater risk.

Expected accounting treatment

There have been a number of royalty streams sold off in the form of an asset backed security. The most visible example is the David Bowie bond bought by Prudential Insurance. While this royalty transaction has many similar features, it is also different in that it is funded over a four year period and no royalties are currently being generated. We believe that at the end of the funding period we will be able to obtain a rating on the transaction that will allow it to be placed on our bond schedule. In the meantime, it will appear on our BA schedule. We plan to account for this investment using the guidance in ruling 9920 of the Emerging Issues Task Force. Ruling 9920 requires that each year, or more often if the assumptions change, we will project the expected cash flows and book income equal to the internal rate of return. Any changes to the expected cash flows will be spread over the remaining life of the transaction through the newly calculated IRR. This is the same method we use to account for our CBO equity investments. Initially we expect the IRR on this investment to be approximately 17%.

CONFIDENTIAL
JH 003555

**11**

Deposition Exhibit No. 11

D's Exhibit II

More model

| | |
|---|---|
| **From:** | Hartz, Scott [shartz@jhancock.com] |
| **Sent:** | Wednesday, April 19, 2000 8:02 AM |
| **To:** | Blewitt, Stephen |
| **Subject:** | More model |

We'll have to think about levels of conservatism to add to your assumptions (I assume at this point they are best guesses) in order to think about how we can rate/size/accrete the bonds in the structure. If I lower your probability of success by 25%, the failure case goes up to about 5% and the 0% return case goes up to about 3%. If I cut your probability of success in half (probably too onerous), the failure case goes up to about 17% and the 0% return case goes up to about 6%.

While the latter is probably too harsh, we're going to have to spend some time figuring out how good each assumption is and what levels of conservatism to add in.

EXHIBIT 11
R. Grogan  1/11/06

CONFIDENTIAL
JH 003561

EXHIBIT 18
R. Grogan 11/17/05

Sheet1

**14**

Deposition Exhibit No. 14

D's Exhibit IJ

**John Hancock Financial Services, Inc.**

Bond and Corporate Finance Group

John Hancock Place
Post Office Box 111
Boston, Massachusetts 02117
(617) 572-9624
Fax: (617) 572-1628
E-mail: sblewitt@jhancock.com

**Stephen J. Blewitt**
Managing Director



May 8, 2000

Memorandum To:        Messrs. Aborn, Brown, D'Alessandro, DeCiccio, Hartz, Nastou

Re:                          Proposed John Hancock – Abbott Laboratories Transaction

The attached material is for our meeting on Thursday, May 11th at 2PM.

*Steve Blewitt*

CONFIDENTIAL
JH 002423

**John Hancock - Abbott Laboratories**
Research and Development Transaction

**Investment Analysis**

1.    John Hancock is considering committing [$50 million] per year for a period of four years to fund the development and commercialization of a specified pool of compounds owned by Abbott Laboratories. During the four year period, Abbott will commit three-to-four times John Hancock's investment for those compounds, and will spend over seven times our investment during the term of the transaction. In return, Abbott will agree to pay John Hancock milestone and royalty payments for each compound that reaches regulatory approval and has commercial sales.

This transaction is valuable to Abbott because it allows them to offset R&D expenditures with research and development income – improving their net income. This transaction is valuable to John Hancock because it allows us to generate equity returns in the form of current (royalty) income for a sizeable investment.

Abbott Laboratories is the eight largest pharmaceutical company in the U.S. Its revenues were approximately $13 billion in 1999 and its current market capitalization is approximately $60 billion. Abbott is rated "Aaa" by the major rating agencies.

Our business relationship with Abbott began in 1997 when we funded a $30 million equity investment in a development stage company called Metabolex and received the right to sell our equity to Abbott at a slight premium. Since then, Abbott has introduced us to a number of other proprietary investment opportunities and we have completed one (Idun).

2.    Determining the fair economics of the proposed transaction is highly dependent upon the number of compounds included, the characteristics of the compounds (i.e. status of development, potential sales), the structure of the royalty rates, and an estimation of what is a fair return. To help us answer these questions, we have taken several steps. First, we have researched industry standards for likelihood of success and probable sales curves for compounds in different stages of development. Second, we have developed a spreadsheet model that calculates the rate of return for a chosen portfolio and have developed a minimum number of compounds and associated milestone/royalty payments to provide us with returns that adequately compensate us for the risk we are taking. Third, we have tried to determine what rate of return the capital markets would require for the level of risk that we are willing to take.

3.    The current portfolio of compounds that we are considering consists of five of Abbott's late-stage development compounds and a basket of three pre-clinical cancer compounds. The late-stage compounds range from mid-Phase II to starting Phase-III. Peak annual sales for these compounds range from $400 million to $1.2 billion. With the exception of the "cancer basket", the compounds are independent of each other. We have not completed any diligence on the specific compounds yet other than to read Abbott's press releases and analyst reports. Assuming that Abbott has correctly characterized the development stage of each compound, we have assigned probabilities of success ("regulatory approval") and time to success for each compound. Our probabilities of success come from a 1995 study by Dr. Joseph A. DiMasi at the Tufts Center for the Study of Drug Development. Dr. DiMasi's study is generally accepted by the pharmaceutical industry as an accurate assessment of the probability of success and of the time and costs associated with drug development. Dr. DiMasi looked at a random sample of 93

CONFIDENTIAL
JH 002424

compounds in four broad disease categories from 12 pharmaceutical companies that were first tested in humans between 1970 and 1982.

Dr. DiMasi's results are summarized below:

| Probability of Success | | | | | |
|---|---|---|---|---|---|
| Entering Phase | NSAID | Cardio-vascular | Anti-infective | Neuro-pharm | All |
| I | 22% | 26% | 30% | 20% | 23% |
| II | 30% | 41% | 38% | 22% | 31% |
| III | 71% | 72% | 77% | 51% | 63% |

Dr. DiMasi calculated the average time to approval as 8.75 years for compounds entering Phase I, 7.5 years for compounds entering Phase II, and 5.5 years for compounds entering Phase III. Embedded in these times was an approximately 30-month review process by the FDA. Due to legislative and process changes, the average FDA review time is now approximately 12 months. A revised timeframe for approval (which was been published by TCSDD in 1999), based on accelerated review by the FDA, and quicker processes within the pharmaceutical companies, is 6.0 years for Phase I, 5.0 years for Phase II, and 3.0 years for Phase III.

During the past four years, we have evaluated many equity investments in emerging pharmaceutical and medical device companies, and we have completed several transactions. During that period, we have established relationships with reliable scientific advisors. If we proceed beyond the current step of working with Abbott on the framework of a transaction, we will test Dr. DiMasi's model for reasonableness and we will engage scientific consultants to evaluate the compounds in the portfolio.

4.    In estimating sales projections by compound, we start with expected peak sales for the compound. For now, we have accepted Abbott's number for peak sales. In our diligence process, however, we will look at sales for similar compounds, the relative success of first-to-market drugs versus others, and other factors. Our next step is to use a Sales Curve calculated by Lehman Brothers that projects ramp-up and ramp-down for sizeable drugs. In general, this Curve shows peak sales being reached seven years after launch. Ramp-up is achieved by 5% of peak sales in the first year, followed by 13%, 25%, 50%, 80%, and 90%. Peak sales are maintained for three years, and the compound then achieves 85% of peak, 75%, 70%, etc. As expected, every compound has its own unique curve, and Lehman's is only a general estimate. We have compared the curve to IMS data of prescription sales for individual compounds in a number of drug classes from 1981 to 1999. Our analysis indicates that Lehman's curve is a good fit.

5.    We developed a spreadsheet that incorporates multiple drug compounds (and their specific probability of success, time to launch, and expected sales pattern) and a milestone/royalty structure that is intended to lower our risk in the transaction. Having multiple compounds that are substantially far along in clinical trial, we limit our exposure to the possibility that no compound is approved and that we lose all of our money. Based on the current proposed portfolio, we believe that the risk of losing all of our money is approximately 1%. The second component of our model is to receive a milestone payment from Abbott upon regulatory approval. We have proposed $10 million per compound. This payment is intended to return cash to John Hancock sooner and to somewhat lower the risk that actual sales do not meet projected sales. The third component of our model is to have a tiered royalty structure – such as 8% of the first $400 million of aggregate annual sales, 4% of the next $600 million of aggregate annual sales, and 1% of aggregate annual sales in excess of $1 billion.

CONFIDENTIAL
JH 002425

6.    The last step of our analysis is to determine what a fair economic return for this transaction should be. We have benchmarked this transactions in a number of ways, such as: R&D vehicles for pre-clinical compounds were sold with expected IRRs (over a three-to-five year period) of approximately 40%; Hambrecht & Quist has estimated pharmaceutical IRRs for single phase-II compounds to be 40% and single phase-III compounds to be 25%; the Palisade Partners (Sony movies) transaction that we participated in last year has an expected IRR of 20%; Elan Pharmaceuticals in currently in the market with a pooled transaction with an IRR of 25% (over 18-24 months); and our proprietary analysis of the equity market's IRR for Abbott's entire R&D pipeline of 16-22%. Based on these comparisons, we think that an IRR of 20-25% is reasonable – and Abbott agrees.

We also evaluated the relationship between our investment (and Abbott's) in the entire portfolio and the average royalty rate that we expect to receive – which is approximately 4-5%. We estimate that the current value of the compounds that Abbott is contributing to the transaction is about $1 billion. During the four year investment period, Abbott expects to invest $800 million on the compounds, in addition to our $200 million. Based on these amounts, our investment is approximately 10% of the total invested dollars. Most pharmaceutical companies earn about a 50% pre-tax margin (excluding R&D expenses) on sales. On a net basis, then, our expected royalty should be about 5%.

7.    The current proposed portfolio consists of (1) a mid Phase II compound with projected peak sales of $700 million, (2) a late Phase II with peak sales of $1.2 billion, (3) an early Phase III with peak sales of $700 million, (4) an early Phase III with peak sales of $700 million, (5) an early Phase II with peak sales of $400 million, and (6) a basket of three cancer compounds currently in pre-clinical trials, each of which may have peak sales of $400 million.

John Hancock will fund [$50 million] per year for four years. Milestone payments of $10 million will be paid for each compound that receives regulatory approval. Royalty rates will equal [8%] on the first $400 million in sales, [4%] on the next $600 million of sales, and [1%] on sales in excess of $1 billion. Abbott would also like to build in a provision to limit royalties if our actual IRR exceeds a certain amount.

Based on this portfolio, and running our model 500 times, the probability of losing all of our money is about 1%. There is also about a 1% probability of just getting our money back (with no return). The average return is approximately 20% and tightly bound around that percentage. The maximum return is 25%. Looking at sensitivities to our assumptions, if the $1.2 billion compound generated only $600 million in revenues or if all compounds generated only 75% of projected sales, our IRR would be reduced by approximately 1-2%. Our probability of failure would not change.

It is important to note that the expected IRRs are over a long period of time (10-15 years). Assuming that we could sell our future royalty stream after the fifth year, our five-year IRR would be about 24% (and the maximum return would be about 35%).

A one-percent probability of total loss combined with a one-percent chance of not earning a return is approximately equivalent to a 30 basis point annual loss over five years – or a "Baa" credit rating. The expected return of 20% is attractive relative to the risk that we would be taking.

CONFIDENTIAL
JH 002426

Estimated Cash Flow
($ millions)

| Year | JH Cash Payments | Milestone Payments | Royalty Payments | Aggregate Cash Received | JH Net Cash Flow |
|---|---|---|---|---|---|
| 2000 | (50) | | | | (50) |
| 2001 | (50) | | | | (50) |
| 2002 | (50) | | 6 | 6 | (44) |
| 2003 | (50) | | 18 | 18 | (32) |
| 2004 | | 30 | 35 | 65 | 65 |
| 2005 | | | 48 | 48 | 48 |
| 2006 | | | 58 | 58 | 58 |
| 2007 | | | 62 | 62 | 62 |
| 2008 | | | 65 | 65 | 65 |
| 2009 | | | 65 | 65 | 65 |
| 2010 | | | 66 | 66 | 66 |
| 2011 | | | 64 | 64 | 64 |
| 2012 | | | 61 | 61 | 61 |
| 2013 | | | 32 | 32 | 32 |
| 2014 | | | 14 | 14 | 14 |
| TOTAL | (200) | 30 | 594 | 624 | 424 |

CONFIDENTIAL
JH 002427

<u>Accounting Structure</u>

<u>Anticipated Structure:</u>

We would establish a trust to make the investment and issue one series of certificates backed by the royalty cash flows. Rating agency would rate the certificate to a minimum return (approximately 8 – 10%). In early years, when no cash flow is available, bond would accrete at this minimum return. When cash flow is available it first pays the current period return, then the accreted return, then pays down the bond. If certain targets are hit, some cash flow beyond the minimum return can be designated as excess interest and booked as income.

**Balance sheet treatment:** Bond, with an NAIC 2 or NAIC 3 rating. This requires we get a rating agency to rate the bond.

**Income treatment:** Current, fixed return of minimum rated yield. If deal is successful, excess income in later years.

**Downside scenario:** If the program is performing poorly, bond will be downgraded and ultimately rated category 6. Bond will be written down each period as necessary to reflect drop in value. This will spread the loss over several years and many quarters.

**Issues:**

1) **Can this be considered a bond?**
   Many royalty streams have been securitized in this fashion. The David Bowie bond (bought by Prudential Insurance) is the most visible example, but other musical groups have sold off royalties in bond form and a drug royalty deal is currently being marketed. The SVO will consider it an Asset Backed Security if we get it rated by a reputable rating agency.

2) **Can we accrete income during the first few years when no cash flow is available?**
   There are plenty of examples of accreting bonds. Corporate bonds can be issued on a zero coupon or pay-in-kind (PIK) basis. In the asset-backed arena, principal only strips allow accretion of income. A recent deal backed by film revenues was rated by Duff & Phelps to a minimum yield. This should allow the accretion of income.

CONFIDENTIAL
JH 002428

## Alternative Structure:

If we either cannot get a rating agency comfortable rating this bond or E&Y will not buy off on the structure, we can create a RACERS trust. Our accountants and E&Y do agree that a RACERS structure meets the accounting rules (we spent lots of time exploring the possibility of placing our volatile BA assets in a RACERS trust), with the provision that a 3% equity portion be sold to a third party.. The idea behind a RACERS is to put a zero coupon bond and the contemplated investment in a trust. The zero coupon bond ensures the trust certificate can be rated by the SVO and hence booked as a bond. The RACERS would use structured note accounting, which requires all cash flow be booked as income. We'd create cash flow, and hence income, in the early years by including cash in the trust that can be distributed, according to preset rules, as income. We can dampen the volatility of the income in the later years by structuring a maximum coupon paid by the trust. There are several disadvantages of this structure. First, the cash and zero coupon bond drag down the economics. There are ways to mitigate this, but ultimately there is likely to be some drag. Second, structured notes can draw the attention of the rating agencies and security analysts. This could be viewed as a tool to manage earnings. While it is small relative to John Hancock's total assets, it is a large (ultimately $200 million) transaction. Finally, we would need to find a buyer of the 3% equity. Most buyers would likely demand a very high return for this investment.

CONFIDENTIAL
JH 002429

**18**

Deposition Exhibit No. 18

D's Exhibit 527

EXHIBIT
Ft. Grogan
11/10/06









Sheet

19

Deposition Exhibit No. 19

D's Exhibit IK

EXHIBIT *19*
*Hartz*
R. Grogan *11/10/*06

## BOND INVESTMENT COMMITTEE

September 21, 2000

Present:    Messrs./Mss. Blewitt, Braun, Davis, DeCiccio, Felcon, Metzler and Nastou.
Attorney-Seghezzi.  Secretary Pro Tem-Weber.

I.    PURCHASE RECOMMENDATIONS

    A.    Abbott Laboratories          Recommend purchase of $220 million 20%
        (S. Blewitt)                 (expected) Research and Development
                                     Funding Commitment.

II.    BETWEEN-MEETING TRANSACTIONS

    B.    Report of Purchases          See Yellow Report

    C.    Report of Sales             See Yellow Report

# REDACTED

III.    VOTE REQUEST

IV.    REPORTS FOR INFORMATION

    E.    Swap Report

Also Attending:    Messrs./Mss. Brown, Cavanaugh, DeLeon, Della Piana, Forde, Gelormini,
Harris, Hartz, Hasson, Hodge, Johnson, D., Johnson, J., Kinsley,
Knowlton, Kruez, Lee, Lucido, Martin, McDonough, J., McDonough, K.,
McWatters, Mencis, Morrison, Moses, Nguyen, Parsons, Schaffer, White,
Wise and Wong.

*Corinne L Weber*
SECRETARY PRO TEM

CONFIDENTIAL
JH 005573

Deposition Exhibit No. 25

D's Exhibit IL





Memorandum To:    File

Re:    Abbott Laboratories ("Non-Recourse") 

<u>Background</u>

In October 2000, the Committee of Finance approved a $220 million commitment to fund research and development expenses for a basket of pharmaceutical products currently under development by Abbott Laboratories. During the documentation process, which was completed on March 13, 2001, certain terms of the transaction were modified, although the basic economics were not materially changed. This memorandum describes the significant changes to the transaction compared to the initial report to the Committee of Finance.

<u>Modifications</u>

The <u>Commitment Amount</u> was reduced from $220 million to $214 million.

The <u>basket</u> of pharmaceutical products was modified and increased from eight to nine (see <u>Program Compounds</u> below for further details).

The <u>Program Payments</u> were changed from:

**CONFIDENTIAL**
**JH 001103**

|  | Original | Revised |
|---|---|---|
| December 2000 | $50,000,000 | $            0 |
| December 2001 | $55,000,000 | $50,000,000 |
| December 2002 | $55,000,000 | $54,000,000 |
| December 2003 | $60,000,000 | $58,000,000 |
| December 2004 | $            0 | $52,000,000 |

The <u>Program Term</u> was changed from "commencing December 2000 and ending on December 2004" to "commencing March 2001 and ending on December 2004".

The <u>Milestone Payments Upon NDA Approval by the FDA</u> were changed from $10,000,000 to $20,000,000 for the first Product and $10,000,000 for the second and third Products.

The Aggregate Milestone Payments for all "non-NDA Approval" milestones was changed from $12,000,000 to $8,000,000.

The Royalty Payments were changed from:

|  | Original | Revised |
|---|---|---|
| $0 to $400 million | 8% | 8½% |
| >$400 and ≤ $1,000 million | 4% | 4% |
| >$1,000 and ≤ $2,000 million | 1% | 1% |
| >$2,000 million | ½% | ½% |

The Royalty Payments shall cease on December 31, 2015 instead of December 31, 2014.

The Program Compounds were modified as follows:

Program Compound ABT-980 and the Urokinase Program were removed from the basket. Program Compounds ABT-492 and ABT-751 and the ED Program were added to the basket. The assumptions for the added Program Compounds are:

| Product | Indication | Peak Sales | Stage of Development |
|---|---|---|---|
| ABT-492 | Anti-infective | $400 million | Phase I/2005 |
| ABT-510 | Cancer | $400 million | Phase I/2006 |
| ED | Erectile Dysfunction | $400 million | Pre-clinical/2007 |

In addition, a provision was added that requires Abbott to substitute an additional Phase II compound with no less commercial value than initially expected for ABT-492 and ABT-510 if either ABT-492 or ABT-510 fails to enter a Phase II Clinical Trial. We modeled this contingent additional compound as a Phase II compound with 40% probability of success, $400 million of peak sales, 2006 launch date. We assumed that the probability of obtaining the contingent additional compound in the basket was approximately 84%.

Affect of Modifications on Model Results

Our initial model (without adjustments for conservatism) provided a probability of loss of approximately 0.9% and a median return of approximately 17.5% and a mean return of approximately 15.9%. Our revised model (without adjustments for conservatism) provides a probability of loss of approximately 1.3% and a median return of approximately 18.8% and a mean return of approximately 16.2%.

CONFIDENTIAL
JH 001104

Deposition Exhibit No. 26

D's Exhibit IM

RE: Abbott Labs                                                                    Page 1 of 1

| | |
|---|---|
| **From:** | Mangan, Deirdre [ddaesen@jhancock.com] |
| **Sent:** | Tuesday, March 26, 2002 6:04 PM |
| **To:** | Blewitt, Stephen |
| **Cc:** | Hartz, Scott |
| **Subject:** | RE: Abbott Labs |



Hi Steve,
I just wanted to check back on what IRR to assume when we book income in 1st quarter.  Right now we're assuming 13%.  Is that appropriate?  Thanks.

> -----Original Message-----
> **From:** Mangan, Deirdre
> **Sent:** Monday, March 18, 2002 5:30 PM
> **To:** Blewitt, Stephen
> **Cc:** Hartz, Scott
> **Subject:** Abbott Labs
>
> Hi Steve,
>
> With respect to Abbott Labs, we are trying to project income and had a few questions:
>
> 1) We have already funded $50 million in this deal, but the original report said listed a $220 million commitment.  Do you have any idea how much more will be funded and when?
>
> 2) This investment will probably follow the EITF 99-20 accounting method, which is the method used by the Equity CBOs.  It involves stating an expected IRR and booking income in accordance with that IRR.  Then, cash flow projections are used each quarter to determine whether the Book Value needs to be written down in order to maintain the stated IRR.
>
> What IRR should we assume for booking income on this investment?  Accounting will need to know the IRR in order to book the first quarter income (which they are trying to do during the next week).  Also, at some point we'll need to work out with you a process to obtain cash flow projections each quarter.
>
> Thanks,
>
> Deirdre
>
>
> Deirdre Mangan
> John Hancock Financial Services
> Bond & Corporate Finance
> (617) 572-5542

**CONFIDENTIAL**
**JH 002659**

**27**

Deposition Exhibit No. 27

D's Exhibit IN

RE: Abbott Labs                                                                 Page 1 of 1

---

| | |
|---|---|
| **From:** | Blewitt, Stephen [sblewitt@jhancock.com] |
| **Sent:** | Monday, September 30, 2002 3:36 PM |
| **To:** | Mangan, Deirdre |
| **Subject:** | RE: Abbott Labs |

EXHIBIT 27
Hartz
R. Grogan 11/10/06

<<abt-mod080102.xls>>
Deirdre,

This is the latest model that I have run. The expected returns are still in the low - mid teens but the risk of loss has increased from when we initially closed the transaction.

. Steve.

-----Original Message-----
**From:** Mangan, Deirdre
**Sent:** Monday, September 23, 2002 6:04 PM
**To:** Blewitt, Stephen
**Cc:** Hartz, Scott
**Subject:** Abbott Labs

Hi Steve,

We spoke a few months ago about submitting cash flow projections for Abbott Labs on a quarterly basis. Since we are going to book 3Q income in the next week or so, is there an updated cash flow projection available? Also, what is the IRR currently expected on this investment? Thanks.

Deirdre

Deirdre Mangan
John Hancock Financial Services
Bond & Corporate Finance
(617) 572-5542

**CONFIDENTIAL**
**JH 003142**

CONFIDENTIAL
JH 003143

CONFIDENTIAL
JH 003144

CONFIDENTIAL
JH 003145

CONFIDENTIAL
JH 003146

CONFIDENTIAL
JH 003147

CONFIDENTIAL
JH 003148

CONFIDENTIAL
JH 003149

Sheet1

Page 8

CONFIDENTIAL
JH 003150

Sheet1

Page 6

CONFIDENTIAL
JH 003151

Sheet

Page 10

CONFIDENTIAL
JH 003152

CONFIDENTIAL
JH 003153

CONFIDENTIAL
JH 003154

Sheet

CONFIDENTIAL
JH 003155

CONFIDENTIAL
JH 003156

CONFIDENTIAL
JH 003157

Sheet1

Page 19

CONFIDENTIAL
JH 003158

**32**

Deposition Exhibit No. 32

D's Exhibit IO

Abbott Laboratories Research and Funding Agreement                    Page 1 of 1

---

**From:**     Blewitt, Stephen [sblewitt@jhancock.com]
**Sent:**      Thursday, March 27, 2003 3:14 PM
**To:**        Welch, Barry; Hartz, Scott
**Cc:**         Nastou, Roger
**Subject:**  Abbott Laboratories Research and Funding Agreement

Further to our conversation from yesterday, please see the attached draft memorandum.

<<Abbott.doc>>
Steve.

EXHIBIT 32
Hartz
R. Grogan 11/10/06

CONFIDENTIAL
JH 002407

# DRAFT

March 27, 2003

Memorandum To:    Barry Welch
                  Roger Nastou
                  Scott Hartz

From:             Steve Blewitt

Re:               **Abbott Laboratories Research and Funding Agreement**

In March 2001, John Hancock made a commitment to fund $214 million for research and development expenses for a basket of nine pharmaceutical products that were under development by Abbott Laboratories ("Abbott"). The commitment requires funding over a four-year period (with a potential extension to five years) beginning December 2001 and is subject to Abbott co-funding at least two times our commitment during the same period. The deal was structured to provide us with a 17-18% expected internal rate of return with a probability of losing invested capital equal to approximately 2.5% (which includes a 1.7% probability of losing our entire invested capital).

During 2001, Abbott spent approximately $171 million on the compounds, and in 2002, Abbott spent approximately $142 million. Based on its level of spending in each year, John Hancock funded $50 million in January 2002 and an additional $54 million in January 2003. John Hancock has also received $12 million in management fees and milestone payments from Abbott, resulting in a net funding of $92 million.

The current status of the portfolio is:

> ABT-627 is currently in Phase III clinical trials for prostate cancer. Phase II clinical trials for early prostate cancer, and exploratory Phase II trials for non-prostate cancer. A second Phase III trial for advanced prostate cancer showed efficacy, but did not meet its required endpoint and was terminated in February 2003. Abbott is still projecting approval for the compound in Q4 2004.

> ABT-510 is expected to enter into five Phase II clinical trials for renal, lung, and breast cancer, lymphoma and sarcoma by the end of 2003.

> ABT-751 is currently in three Phase II clinical trials and two Phase I clinical trials for the treatment of renal, colorectal, and lung cancers, as well as collaborative studies in pediatric cancers and adult leukemia.

**CONFIDENTIAL**
**JH 002408**

# DRAFT

ABT-773 was ceased in July 2002 in the U.S. ABT-773 was a Phase III compound as an anti-infective. Phase II clinical trials continue in Japan and Abbott is attempting to out-license the compound for development in the U.S. Abbott has reached an agreement with Elitra Pharmaceuticals, subject to Elitra receiving funding, for Elitra to continue to develop ABT-773. If the transaction with Elitra is consummated, Abbott has agreed to pay a milestone payment to John Hancock of $10 million.

ABT-492 is currently in two Phase II clinical trials for the treatment of community acquired pneumonia. Options for the future of the drug will be evaluated based on the results of the existing Phase II clinical trials.

ABT-724 is currently in a single Phase I clinical trial for the treatment of erectile dysfunction. No new studies are currently being planned for this compound, but may be at a later date.

Based on the current status of the portfolio, our model estimates an 11-12% internal rate of return with a probability of losing all of our invested capital equal to approximately 5 - 10%. A number of different potential scenarios can develop, however, that can result in sudden, and substantial, losses, which we should be aware of. In the short term, I have identified three possible negative scenarios:

(1) If Abbott terminated all existing development programs immediately, we would sustain a loss of $92 million plus accrued interest;

(2) If Abbott terminated development of its lead compound, ABT-627, immediately, but continued to develop the remaining compounds, I project that we would ultimately invest approximately $144 million ($130 million net of milestone payments and management fees). The estimated return on this amount is approximately 10%, however, the probability of loss is approximately 20 – 25%. In this scenario, I anticipate that we would incur an immediate loss of approximately $50 million in order to reach an estimated return of approximately 20% on the remaining compounds.

(3) If Abbott terminated development of all of its remaining compounds except ABT-627, I project that we would ultimately invest approximately $154 million ($140 million net of milestone payments and management fees). The estimated return on this amount is approximately 11%, however, the probability of loss is approximately 25%. In this scenario, I anticipate that we would also incur an immediate loss of approximately $50 million in order to reach an estimated return of approximately 20% on the remaining compound.

I look forward to discussing this memorandum with you at your earliest convenience.

CONFIDENTIAL
JH 002409

37

Deposition Exhibit No. 37

D's Exhibit IP

RE: Abbott Research and Development Agreement                          Page 1 of 3

---

**From:**    Blewitt, Stephen [sblewitt@Jhancock.com]
**Sent:**    Wednesday, June 11, 2003 2:19 PM
**To:**      Hartz, Scott; Welch, Barry
**Subject:**  RE: Abbott Research and Development Agreement

EXHIBIT 37
Hrtz
R. Grogan 11/20/06

Scott,

If we invested $40 million in January 2004 and no more, the internal rate of return would be approximately 15%.

Steve.

-----Original Message-----
**From:** Hartz, Scott
**Sent:** Tuesday, June 10, 2003 8:20 AM
**To:** Blewitt, Stephen; Welch, Barry
**Subject:** RE: Abbott Research and Development Agreement

Steve,
Any writedown will be tied to the 99-20 IRR analysis. It should probably be done assuming we invest $50 million in Jan and no more. Do you have the PV's at 15% and 20%?

-----Original Message-----
**From:** Blewitt, Stephen
**Sent:** Friday, June 06, 2003 4:15 PM
**To:** Welch, Barry; Hartz, Scott
**Subject:** RE: Abbott Research and Development Agreement

Would early AM work?

-----Original Message-----
**From:** Welch, Barry
**Sent:** Friday, June 06, 2003 2:46 PM
**To:** Blewitt, Stephen
**Subject:** RE: Abbott Research and Development Agreement

Why don't you see if there's some time Monday am to get w/ Scott and me
I am available both before and after the Loan Review

Thanks,
Barry

-----Original Message-----
**From:** Blewitt, Stephen
**Sent:** Friday, June 06, 2003 9:08 AM
**To:** Welch, Barry

CONFIDENTIAL
JH 003113

RE: Abbott Research and Development Agreement                                    Page 2 of 3

**Subject:**     RE: Abbott Research and Development Agreement

I should be in Boston on Wednesday and Thursday. I will also be here on Monday morning for Loan Review.

-----Original Message-----
**From:** Welch, Barry
**Sent:** Thursday, June 05, 2003 9:50 AM
**To:** Blewitt, Stephen; Hartz, Scott
**Subject:**     RE: Abbott Research and Development Agreement

We should find time to speak with you about how your model assumptions work, sometime before your loan review.
I didn't see you on the schedule? Can we talk about this next week.
Thanks,
Barry

-----Original Message-----
**From:** Blewitt, Stephen
**Sent:** Wednesday, June 04, 2003 6:08 PM
**To:** Hartz, Scott; Welch, Barry
**Cc:** Blewitt, Stephen
**Subject:**     Abbott Research and Development Agreement

Scott and Barry,

Abbott reported positive data for its cancer compounds last week at its investor conference and this week at the annual oncology meeting. The compound ABT-627 is fully enrolled in the second Phase III trial and data from the first Phase III trial shows positive results when a certain group of patients are excluded. The other two cancer compounds are now in Phase II trials.

The Company believes that it will be too late to market with its second anti-infective compound and expects to out-license it. The Company continues to try and out-license its primary anti-infective (ABT-773) but the most promising purchaser has not been able to receive financing. The Company is also considering out-licensing its sexual dysfunction compound (which is currently in Phase I).

When I model out the remaining portfolio, I generate an internal rate of return of approximately 9.5% - 10.0%. This assumes a conservative peak revenue for ABT-627, no out-licensing for ABT-773 or the other compounds; and fully funding the remaining $110 million under our agreement.

Under these assumptions, in order to achieve a 13% IRR, we would need to reduce the holding value of our investment by approximately $34 million plus accrued interest.

Steve.

**CONFIDENTIAL**
**JH 003114**

RE: Abbott Research and Development Agreement                    Page 3 of 3

CONFIDENTIAL
JH 003115

38

Deposition Exhibit No. 38

D's Exhibit IQ

**From:**    Blewitt, Stephen [sblewitt@jhancock.com]
**Sent:**    Tuesday, June 17, 2003 5:40 PM
**To:**      Hartz, Scott
**Subject:** Abbott Valuation



**HIGHLY
CONFIDENTIAL
JH 003107**

**Valuation Methodologies**

**I.    13% Internal Rate of Return.**

Using our current probabilities of success, estimated market size, estimated year of approval, assumption that the full $214 million commitment will be funded, and discounting the probability-weighted cashflows at a 13% internal rate of return, we calculate a value of approximately **$100 million**.   Using all of the same assumptions, except that no additional funding will be required after January 2004, we calculate a value of approximately **$156 million.**

---

The total portfolio value is approximately **$100 million - $156 million.**

Assuming that we are required to fund $36 million in January 2004, our total investment at that time will be approximately $140 million.  Fees and milestone payments that we have already received are approximately equivalent to a 13% return on our investment.  *The net loss is estimated to be approximately $40 – (16) million.*

---

**HIGHLY
CONFIDENTIAL
JH 003108**

## II.    Royalty transactions.

Royalty payments are frequently sold by universities and inventors and acquired by specialty funds or investment companies. In one similar transaction, Royalty Pharma acquired a 2% royalty in a Phase III compound called Alvimopan for $16 million upfront and $5 million payable in two installments based on certain milestones being achieved. The transaction was completed in March 2002 and the compound was expected to receive approval in the fourth quarter of 2004 and have peak sales of approximately $600 million. The compound is being developed by Adolor, a development stage company, and at the time of the purchase, Adolor did not have a marketing partner for the compound. Based on the $16 million upfront payment and adjusting for the one year of additional development, Royalty Pharma paid approximately $10 million for a 1% royalty in Alvimopan. Using that price, our royalties in Atrasentan (ABT-627) are worth approximately $75 million before including the value of the milestone payment due upon approval. The milestone payment is $20 million and is expected in one year. Using a 20 – 25% discount rate, the milestone payment is worth an additional $16 million. The total value of Atrasentan is approximately **$91 million.**

A Phase II compound is generally worth 50% of a Phase III compound (based on a 67% probability of entering Phase III and an additional year of development). Since Abbott's two Phase II compounds (ABT-510 and ABT-751) are estimated to have approximately 67% of the market potential of Atrasentan in terms of peak revenues and the marginal royalty rate is approximately 16% of the average royalty rate for Atrasentan, the estimated value for the two compounds is approximately $5 million each. In addition, we will receive a $10 million milestone payment upon the approval of each compound. Assuming that each compound is approved in three years, using a 25% discount rate, we estimate the value of the milestone payments to be approximately $5 million for each compound. Since a failure of Atrasentan to receive approval would allow higher royalties on each of the two remaining compounds, there is additional value that we have not calculated. The aggregate value of ABT-510 and ABT-751 is approximately **$20 million.**

No value has been given to out-licensing of ABT-773, ABT-492 or ABT-724.

The total portfolio value is approximately **$111 million.**

Assuming that we are required to fund $36 million in January 2004, our total investment at that time will be approximately $140 million. Fees and milestone payments that we have already received are approximately equivalent to a 13% return on our investment. *The net loss is estimated to be approximately $29 million.*

**HIGHLY CONFIDENTIAL JH 003109**

### III.    Public company comparison.

A number of public companies with a single compound in Phase III clinical trials trade within a range of $200 - $300 million of market capitalization. Direct comparisons are difficult due to public market concerns about liquidity, marketing risk, etc. However, assuming that our royalty rate on Atrasentan (ABT-627) is equivalent to 25 – 33% of the product EBITDA for one of these public companies, the value of Atrasentan is approximately $50 – 100 million before including the value of the milestone payment due upon approval. The milestone payment is $20 million and is expected in one year. Using a 20 – 25% discount rate, the milestone payment is worth an additional $16 million. The total value of Atrasentan is **$66 - $116 million.**

A Phase II compound is generally worth 50% of a Phase III compound (based on a 67% probability of entering Phase III and an additional year of development). Since Abbott's two Phase II compounds (ABT-510 and ABT-751) are estimated to have approximately 67% of the market potential of Atrasentan in terms of peak revenues and the marginal royalty rate is approximately 16% of the average royalty rate for Atrasentan, the estimated value for the two compounds is approximately $4 - 7 million each. In addition, we will receive a $10 million milestone payment upon the approval of each compound. Assuming that each compound is approved in three years, using a 25% discount rate, we estimate the value of the milestone payments to be approximately $5 million for each compound. Since a failure of Atrasentan to receive approval would allow higher royalties on each of the two remaining compounds, there is additional value that we have not calculated. The aggregate value of ABT-510 and ABT-751 is approximately **$18 - 24 million.**

No value has been given to out-licensing of ABT-773, ABT-492 or ABT-724.

---

The total portfolio value is approximately **$84 - 140 million.**

Assuming that we are required to fund $36 million in January 2004, our total investment at that time will be approximately $140 million. Fees and milestone payments that we have already received are approximately equivalent to a 13% return on our investment. *The net loss is estimated to be approximately $56 – (0) million.*

---

**HIGHLY
CONFIDENTIAL
JH 003110**

## IV.    Abbott stock price analysis.

On February 10, 2003, Abbott announced that although Atrasentan (ABT-627) demonstrated certain positive results, it did not meet the primary endpoint for its first Phase III clinical trial. Based on that news, Abbott's stock declined by approximately 6% relative to its peers and the broader S&P 500 Index. Within a few days of the original announcement, Abbott clarified the results of the initial Phase III trial and emphasized that a second Phase III trial was well underway and would continue. Over time, Abbott's stock has recovered and has actually performed better than its peers and the S&P 500 Index.

The 6% decline that Abbott experienced in its stock price was equivalent to approximately $3.3 billion of market value. Assuming an 8% return on market equity (including dividends), a 20 P/E ratio in the fifth year, and a 45% pre-tax margin, this drop in value indicates that the market was expecting approximately $900 million in revenues for Atrasentan in 2008 – significantly above our estimate. Using this same methodology, but assuming a 20 – 25% ROE (to reflect single-product risk), and a 6 P/E (because our royalty rate scales down as revenues increase), we calculate that the value of Atrasentan to us is approximately $65 - $75 million before including the value of the milestone payment due upon approval. The milestone payment is $20 million and is expected in one year. Using a 20 – 25% discount rate, the milestone payment is worth an additional $16 million. The total value of Atrasentan is **$81 - $91 million**.

A Phase II compound is generally worth 50% of a Phase III compound (based on a 67% probability of entering Phase III and an additional year of development). Since Abbott's two Phase II compounds (ABT-510 and ABT-751) are estimated to have approximately 67% of the market potential of Atrasentan in terms of peak revenues and the marginal royalty rate is approximately 16% of the average royalty rate for Atrasentan, the estimated value for the two compounds is approximately $5 million each. In addition, we will receive a $10 million milestone payment upon the approval of each compound. Assuming that each compound is approved in three years, using a 25% discount rate, we estimate the value of the milestone payments to be approximately $5 million for each compound. Since a failure of Atrasentan to receive approval would allow higher royalties on each of the two remaining compounds, there is additional value that we have not calculated. The aggregate value of ABT-510 and ABT-751 is approximately **$20 million**.

No value has been given to out-licensing of ABT-773, ABT-492 or ABT-724.

The total portfolio value is approximately **$101 - 111 million**.

Assuming that we are required to fund $36 million in January 2004, our total investment at that time will be approximately $140 million. Fees and milestone payments that we have already received are approximately equivalent to a 13% return on our investment. *The net loss is estimated to be approximately $29 – 39 million.*

**HIGHLY CONFIDENTIAL JH 003111**

JH 003112

39

Deposition Exhibit No. 39

D's Exhibit IR

Page 1 of 2

| From: | Hartz, Scott [shartz@jhancock.com] |
|---|---|
| Sent: | Friday, December 19, 2003 7:57 AM |
| To: | Blewitt, Stephen |
| Subject: | FW: JOHN HANCOCK vs. ABBOTT LABORATORIES |
| Importance: | High |

EXHIBIT 39
Hutz
R. Grogan 11/12/06

Steve, can you forward your model to Deirdre so she can have documentation for the 99-20 testing we are supposed to do each quarter. Thanks, Scott.

-----Original Message-----
From:   Daesen, Deirdre (Mangan)
Sent:   Thursday, December 18, 2003 10:43 AM
To:     Hartz, Scott
Subject:   FW: JOHN HANCOCK vs. ABBOTT LABORATORIES
Importance:   High

Scott,
Is there any need to revisit our assumptions for 99-20 on this deal (we are currently assuming a 12% IRR, but haven't seen updated cash flow projections in quite a while)?  There used to be a writeup on this deal in the Consumer/Ind Loan Review, but I didn't see it in there this time.

D.

# REDACTED

CONFIDENTIAL
JH 004479

REDACTED

CONFIDENTIAL
JH 004480

45

Deposition Exhibit No. 45

D's Exhibit IS

Page 1 of 1

Abbott

**Gardner, Paul E.**

| | |
|---|---|
| **From:** | Hartz, Scott [shartz@jhancock.com] |
| **Sent:** | Thursday, February 24, 2005 6:16 AM |
| **To:** | Blewitt, Stephen |
| **Subject:** | Abbott |

If Endothelin is successful, would we expect our return to be the 16% we've modelled on the current BV (of roughly 90 million), or would we expect additional return that could offset some of the writedowns we've taken?

Scott Hartz
Senior VP
Bond & Corporate Finance
John Hancock Financial Services
(617) 572-9621



**CONFIDENTIAL**
**JHII 011221**

1/19/2006