UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY, | CIVIL ACTION NO. 05-11150-DPW |
| Plaintiffs, | |
| v. | |
| ABBOTT LABORATORIES, | |
| Defendant. | |

**ABBOTT'S CORRECTED DEPOSITION DESIGNATIONS FOR MARK L. HAIR**

Defendant Abbott Laboratories ("Abbott") respectfully submits the attached corrected

deposition designations for the November 2, 2006 and May 8, 2007 depositions of Mark

L. Hair, Partner, The StoneTurn Group.

.

.

1

Dated:  February 22, 2008                    Respectfully submitted,


ABBOTT LABORATORIES

By:  __/s/ Eric J. Lorenzini_____
        Eric J. Lorenzini

Jeffrey I. Weinberger (*pro hac vice*)
Gregory D. Phillips (*pro hac vice*)
Eric J. Lorenzini *(pro hac vice)*
Ozge Guzelsu *(pro hac vice)*
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth
Floor
Los Angeles, CA  90071-1560
Tele:  (213) 683-9100

and

Peter E. Gelhaar (BBO#188310)
Michael S. D'Orsi (BBO #566960)
DONNELLY, CONROY &
GELHAAR LLP
1 Beacon St., 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880
peg@dcglaw.com
msd@dcglaw.com


*Counsel for Abbott Laboratories*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 22, 2008.

Date: February 22, 2008

_____ /s/ Ozge Guzelsu _____

# Mark Hair Deposition Designations

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 11/02/06 | Hair, Mark | | | 9:3-9:15 | | | |
| 11/02/06 | Hair, Mark | | | 44:19-46:2 | | | |
| 11/02/06 | Hair, Mark | | | 57:17-57:20 | | | |
| 11/02/06 | Hair, Mark | | | 58:2-58:4 | | | |
| 11/02/06 | Hair, Mark | | | 58:16-59:11 | 1 | | 692 |
| 11/02/06 | Hair, Mark | | | 64:17-65:19 | | | |
| 11/02/06 | Hair, Mark | | | 66:8-67:1 | | | |
| 11/02/06 | Hair, Mark | | | 68:13-68:22 | | | |
| 11/02/06 | Hair, Mark | | | 70:17-71:3 | | | |
| 11/02/06 | Hair, Mark | | | 71:7-71:14 | | | |
| 11/02/06 | Hair, Mark | | | 72:16-73:5 | | | |
| 11/02/06 | Hair, Mark | | | 73:13-74:5 | | | |
| 11/02/06 | Hair, Mark | | | 74:13-75:10 | | | |
| 11/02/06 | Hair, Mark | | | 75:17-75:23 | | | |
| 11/02/06 | Hair, Mark | | | 79:14-79:20 | | | |
| 11/02/06 | Hair, Mark | | | 86:10-87:8 | | | |

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 11/02/06 | Hair, Mark | | | 89:1-89:8 | | | |
| 11/02/06 | Hair, Mark | | | 89:12-89:18 | | | |
| 11/02/06 | Hair, Mark | | | 90:1-91:1 | | | |
| 11/02/06 | Hair, Mark | | | 91:6-92:15 | | | |
| 11/02/06 | Hair, Mark | | | 93:15-96:2 | | | |
| 11/02/06 | Hair, Mark | | | 96:9-97:7 | | | |
| 11/02/06 | Hair, Mark | | | 97:12-97:23 | | | |
| 11/02/06 | Hair, Mark | | | 98:8-99:20 | | | |
| 11/02/06 | Hair, Mark | | | 100:15-101:23 | | | |
| 11/02/06 | Hair, Mark | | | 102:6-102:17 | | | |
| 11/02/06 | Hair, Mark | | | 104:14-105:8 | | | |
| 11/02/06 | Hair, Mark | | | 107:3-108:4 | | | |
| 11/02/06 | Hair, Mark | | | 109:8-111:1 | | | |
| 11/02/06 | Hair, Mark | | | 111:11-111:19 | | | |
| 11/02/06 | Hair, Mark | | | 123:13-124:9 | | | |
| 10/03/06 | Hair, Mark | | | 132:8-133:3 | | | |
| 11/02/06 | Hair, Mark | | | 134:24-136:24 | | | |
| 11/02/06 | Hair, Mark | | | 137:17-141:13 | 3 | | Def. HW |

4513407.1

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 11/02/06 | Hair, Mark | | | 142:2-143:8 | | | |
| 11/02/06 | Hair, Mark | | | 143:18-143:20 | | | |
| 11/02/06 | Hair, Mark | | | 144:2-150:22 | 4 | | Def. HX |
| 11/02/06 | Hair, Mark | | | 151:17-155:11 | 2, 5 | | Def. HY Def. HZ |
| 11/02/06 | Hair, Mark | | | 156:9-157:6 | | | |
| 11/02/06 | Hair, Mark | | | 163:8-163:11 | | | |
| 11/02/06 | Hair, Mark | | | 173:12-173:19 | | | |
| 5/8/07 | Hair, Mark | | | 206:8-206:15 | | | |
| 5/8/07 | Hair, Mark | | | 210:5-210:22 | | | |
| 5/8/07 | Hair, Mark | | | 220:19-221:16 | | | |
| 5/8/07 | Hair, Mark | | | 223:13-223:24 | | | |
| 5/8/07 | Hair, Mark | | | 225:2-225:14 | | | |
| 5/8/07 | Hair, Mark | | | 226:10-227:7 | | | |
| 5/8/07 | Hair, Mark | | | 234:17-235:5 | | | |
| 5/8/07 | Hair, Mark | | | 237:14-238:7 | | | |
| 5/8/07 | Hair, Mark | | | 240:22-245:23 | 11 | | LJ |
| 5/8/07 | Hair, Mark | | | 250:9-253:18 | | | |
| 5/8/07 | Hair, Mark | | | 264:10-265:15 | 13 | | LK |

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 5/8/07 | Hair, Mark | | | 267:2-268:4 | | | |
| 5/8/07 | Hair, Mark | | | 270:24-276:15 | 15 | | LL |
| 5/8/07 | Hair, Mark | | | 276:20-277:21 | 16 | | LM |
| 5/8/07 | Hair, Mark | | | 279:16-280:22 | 17 | | MA |
| 5/8/07 | Hair, Mark | | | 282:19-283:14 | | | |
| 5/8/07 | Hair, Mark | | | 286:20-287:15 | | | |
| 5/8/07 | Hair, Mark | | | 288:1-289:23 | | | |
| 5/8/07 | Hair, Mark | | | 291:6-292:24 | | | |
| 5/8/07 | Hair, Mark | | | 294:4-294:10 | | | |
| 5/8/07 | Hair, Mark | | | 296:14-299:15 | 18 | | LN |
| 5/8/07 | Hair, Mark | | | 300:22-302:21 | | | |
| 5/8/07 | Hair, Mark | | | 302:24-307:10 | 19 | | LO |
| 5/8/07 | Hair, Mark | | | 307:12-308:9 | 20 | | LP |
| 5/8/07 | Hair, Mark | | | 309:24-315:9 | 21 | | LQ |
| 5/8/07 | Hair, Mark | | | 315:22-316:18 | | | |
| 5/8/07 | Hair, Mark | | | 318:4-319:23 | 22 | | LR |
| 5/8/07 | Hair, Mark | | | 321:23-325:9 | 23 | | 628 |
| 5/8/07 | Hair, Mark | | | 325:10-326:9 | 24 | | 677 |

4513407.1

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 5/8/07 | Hair, Mark | | | 329:18-330:15 | | | |
| 5/8/07 | Hair, Mark | | | 332:13-332:16 | | | |

# Color Key to Deposition Designations

Designation by Plaintiffs

Counter Designation by Defendants

Designation by Defendants

1              Volume:  I

2              Pages :  1 - 197

3              Exhibits: 1 - 6

4         UNITED STATES DISTRICT COURT

5       FOR THE DISTRICT OF MASSACHUSETTS

6          CIVIL ACTION NO. 05-1150DPW

7    - - - - - - - - - - - - - - - - - - - - - x

8    JOHN HANCOCK LIFE INSURANCE COMPANY,

9    JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY,

10   and MANULIFE INSURANCE COMPANY

11   (f/k/a INVESTORS PARTNER INSURANCE COMPANY),

12            Plaintiffs,

13       V.

14   ABBOTT LABORATORIES,

15            Defendant.

16   - - - - - - - - - - - - - - - - - - - - - x

17          C O N F I D E N T I A L

18      VIDEOTAPED DEPOSITION OF MARK L. HAIR

19      Thursday, November 2, 2006,  9:30 a.m.

20          Donnelly, Conroy & Gelhaar

21            One Beacon Street

22           Boston, Massachusetts

23     Reporter:  Rosemary F. Grogan, CSR, RPR

24

1          MR. GRIESINGER:  Thank you.

2     BY MR. LORENZINI:

3          Q.   Mr. Hair, could you tell me what your

4     education has been since high school?

5          A.   I attended Brigham Young University, where I

6     studied accounting.

7          Q.   Any other education since high school?

8          A.   I received two degrees while attending that

9     university.

10          Q.   What were those two degrees?

11          A.   Bachelor of science in accounting and a

12     master's of accountancy.

13          Q.   And when did you graduate from BYU?

14          A.   Both degrees were awarded concurrently in

15     December of 1995.

16          Q.   And have you had any formal education since

17     1995?

18          A.   I have had a lot of education since 1995.

19     I've attended several courses and trainings, but as far

20     as university, I guess I'm not sure what you're asking.

21          Q.   Have you received any degrees since 1995?

22          A.   I have not received any further degrees since

23     then.

24          Q.   Have you attended any universities since 1995?

1      it --

2          MR. LORENZINI:  Correct.

3          MR. GRIESINGER:  -- or are you just saying --

4      because he already said he wasn't there.  So you

5      know he doesn't personally know anything.

6      BY MR. LORENZINI:

7         Q.   And based on your communications, you don't

8      know the specifics -- you didn't learn anything about

9      the specifics of the communication from others at

10     Deloitte?

11         MS. COLLARI TROAKE:  Objection.  I think he

12     said he didn't recall.

13        A.   I don't recall.

14        Q.   You'll be relieved to know that I'm finally

15     turning to your post-Deloitte work.

16           We have covered all your positions,

17     correct, at Deloitte & Touche; is that correct?

18        A.   Yes.

19        Q.   So senior manager was your last position at

20     Deloitte & Touche?

21        A.   Correct.

22        Q.   What was your next employment after Deloitte &

23     Touche?

24        A.   I left Deloitte & Touche and was hired by

1    StoneTurn Group.

2        Q.   When were you hired by StoneTurn Group?

3        A.   December 2004.

4        Q.   What was your initial position at StoneTurn

5    Group?

6        A.   My initial position was managing director.

7        Q.   And what were your responsibilities as

8    managing director?

9        A.   Generally, a managing director was responsible

10   for supervising staff in a variety of matters that we

11   were involved in and having direct contact with clients,

12   supervising staff as well as the matters.

13       Q.   What was your next position, if any, after

14   managing director?

15       A.   I'm still a managing director today.

16       Q.   Do you know when StoneTurn was formed?

17       A.   It was formed before I was hired.

18       Q.   Do you know how long before you were hired it

19   was formed?

20       A.   I'm told it was sometime around April 2004,

21   perhaps March 2004.  I don't know exactly.

22       Q.   What type of work is performed by StoneTurn?

23       MS. COLLARI TROAKE:  Objection.

24       A.   StoneTurn Group is involved in a variety of

1    consulting-related matters, many of which are dispute

2    consulting related.

3        Q.   What do you mean by dispute consulting

4    related?

5        A.   Similar as to what I discussed about Deloitte

6    & Touche.  Many of us at StoneTurn, although not all,

7    came from Deloitte & Touche and performed similar

8    services and consulting at StoneTurn Group similar to

9    what we provided and did at Deloitte & Touche.

10       Q.   Do you mean similar to the services you

11   provided with respect to disputes?  Let me clarify.

12            You mentioned a number of different

13   responsibilities at Deloitte; some of which involved

14   financial audits; some of which involved consulting

15   companies that were involved in disputes.

16            When you say you did similar work, are

17   you referring to the dispute consulting aspect of the

18   Deloitte & Touche or the financial audit aspect?

19       A.   Generally, the consulting versus or as opposed

20   to the financial audit function.  But again, it's not

21   solely dispute-related, meaning there are other projects

22   that are not necessarily in litigation that we may be

23   involved in.

24       Q.   Do those projects generally involve

1     Q.   Do you know if StoneTurn prepared an expert

2    witness report?

3     A.   I don't believe an expert witness report was

4    prepared in that matter.

5     Q.   I want to turn to the matter involving the

6    dispute between Hancock and Abbott.

7          Did you participate in an audit of Abbott

8    by John Hancock?

9     A.   An audit as defined -- can you define audit?

10     Q.   Let's start a little more broadly.

11          Did there come a time when you performed

12    work that involved a review of the John Hancock and

13    Abbott contract?

14          MS. COLLARI TROAKE:  Objection.

15     A.   Can you ask the question again?  I'm sorry.

16     Q.   Okay.  Maybe I'll go back to the audit first.

17          Did there come a time when StoneTurn was

18    retained by John Hancock or Choate Hall & Stewart to

19    perform work involving a contract with Abbott?

20     A.   That's my understanding, yes.

21     Q.   Do you know, and don't speculate if you don't

22    know, but do you know whether, in that matter, StoneTurn

23    was retained by Choate Hall & Stewart or by John

24    Hancock?

1      A.  I don't know specifically.  I don't recall.

2      Q.   When did your personal involvement in the John

3  Hancock/Abbott matter begin?

4      A.   January 2005.

5      Q.   And when did your involvement in the John

6  Hancock/Abbott matter end, putting aside the deposition

7  today?

8      A.  I don't know if it's ended.  I...

9      Q.   When was the last time you -- again, putting

10  aside preparation for this deposition, when was the last

11  time you billed time to the John Hancock/Abbott matter?

12      MS. COLLARI TROAKE:  Objection.  I'm not clear

13      as to what you mean by the Abbott/Hancock matter.

14      Maybe you can clarify that.

15  BY MR. LORENZINI:

16      Q.   What, to your knowledge, was StoneTurn

17  retained to do with respect to the contract between John

18  Hancock and Abbott?

19      A.   It's my understanding that StoneTurn was

20  retained prior to me even being an employee of

21  StoneTurn, but I would refer back to a letter from John

22  Hancock that was written to Abbott in April of 2004.

23      MR. LORENZINI:  Could you mark this as Hair

24      Exhibit 1?

1          (Exhibit No. 1 Marked for Identification)

2      BY MR. LORENZINI:

3          Q.   Mr. Hair, you have before you a document

4      that's marked as Hair Exhibit No. 1.  It appears to be a

5      letter dated April 12, 2004 from Stephen Blewitt to

6      James Tyree, with an attached Schedule A.

7              Do you recognize this document?

8          A.   Yes.

9          Q.   What is this document?

10         A.   As you described, it's a letter from Stephen

11     Blewitt to James Tyree.

12         Q.   And does this letter describe accurately the

13     purpose of the audit to be conducted by John Hancock of

14     Abbott?

15             MS. COLLARI TROAKE:  Objection.  The letter is

16         four single-spaced pages long.  Did you want to

17         take your time to read it and then answer the

18         question?

19     BY MR. LORENZINI:

20         Q.   Sure, go ahead.  You can review it.

21         A.   And what is the question?

22         Q.   Does this letter accurately describe the scope

23     of the audit requested by John Hancock of Abbott?

24             MS. COLLARI TROAKE:  Objection.

1          MR. GRIESINGER:  Okay.

2          A.  And what is the question?

3          Q.  Was it your understanding that when this

4      sentence says, Attached hereto as Schedule A is a

5      preliminary list of those categories of books and

6      records that John Hancock reasonably expects will be

7      made available for its inspection and audit of these

8      matters, that Of These Matters is a reference to Nos. 1

9      through 7 above?

10          A.  I don't recall in January of '05 what I

11      believe that sentence to mean or not.  I have no

12      recollection of that.

13          Q.  Was it your understanding that the subject

14      matter of the audit -- and I want to be clear here, I'm

15      distinguishing between the books and records requested

16      by John Hancock and the subject matter of the audit.

17              Was it your understanding that the

18      subject matter of the audit is as described in numbers

19      one through seven of this letter?

20          A.  In reading this letter today, as I sit here,

21      it appears as though the letter outlines seven matters

22      which would be the subject of an inspection and audit

23      related to the books and records of Abbott.

24          Q.  And at the time you worked on the audit, were

1    you aware of any other subject matters that were at

2    issue in the audit other than the seven listed here?

3         MS. COLLARI TROAKE:  When he first?

4    BY MR. LORENZINI:

5         Q.   At any time during your audit of that Abbott.

6         A.   So from January 2005 until today, am I aware

7    of any additional matters related to the audit?

8         Q.   Well, let's be a little more precise.

9              In the course of your audit of Abbott --

10        A.   Mm-hmm.

11        Q.   -- was it your understanding that the subject

12   matter of the audit was as set forth in numbers one

13   through seven of this letter?

14        THE WITNESS:  Can you read that question back

15        for me?

16             (Record Read)

17        A.   My understanding was as of April 12, 2004,

18   this was the scope as it related to the inspection and

19   audit of books and records at Abbott.

20        Q.   And during your work on the audit, did the

21   scope ever differ from what is described in numbers one

22   through seven of this letter?

23        A.   There are activities that I was involved in,

24   that are not specifically outlined in these seven items.

1      Q.   I'm not sure what you mean by activities.  But

2    I'm just concerned with the subject matter, not the

3    specific activities that you might have done in

4    performing the audit, but the purpose or the subject

5    matter of the audit.

6            Do you understand the distinction?

7      A.  I'm not sure if I do.

8      Q.   Maybe you can describe for me what activities

9    you understood to be a part of the audit that are not

10   listed in numbers one through seven?

11     A.   I -- my recollection is when I got involved in

12   January 2005, that this letter was provided to me and I

13   understood it as far as what we were looking for, as far

14   as documents in these seven categories or these seven

15   matters as you referred to them.  Additionally, I was

16   familiar with Schedule A and the types of documents that

17   had been specifically requested.

18          This was, I would say generally, our

19   scope as far as what I perceived our tasks to be

20   performed beginning in January of that year.

21     Q.  And you understood that John Hancock had

22   requested the books and records of Abbott and its

23   subcontractors pertaining to these seven subject

24   matters, correct?

1      A.  Based on my reading of this letter, yes.

2      Q.  But outside of this letter, did you have any

3   other understanding regarding the documents that Hancock

4   had requested of Abbott?

5          MS. COLLARI TROAKE:  Objection.

6          MR. GRIESINGER:  Objection.

7          MS. COLLARI TROAKE:  And I would just caution

8      you to the extent your answer would include

9      anything that might reveal attorney-client

10      privilege or work product, you should exclude that

11      from your answer.

12          MR. LORENZINI:  I'll withdraw the question.

13   BY MR. LORENZINI:

14      Q.  Does this letter and attachment accurately

15   describe what you understood to be the books and records

16   requested by John Hancock of Abbott?

17          MS. COLLARI TROAKE:  Objection.

18      A.  As of what time?

19      Q.  Throughout the course of the audit.

20          MS. COLLARI TROAKE:  Objection.

21      A.  At the time that I got involved in this

22   matter, this compliance review, in January of 2005, I

23   had this letter.  And it was my understanding as far as

24   it would be the subject matter for that compliance

1    review.

2            Later, there were additional documents

3    provided in litigation that were not provided during my

4    visits to review these requested documents and I did

5    some additional work reviewing the documents that are

6    Bates numbered that were produced in litigation.

7        Q.   You don't know whether those documents that

8    were produced in litigation, were produced by Abbott

9    pursuant to the audit provision before the time you

10    started working on the audit, correct?

11            MS. COLLARI TROAKE:  Objection.

12        A.   Incorrect.

13        Q.   Are you aware that Abbott produced documents

14    prior to your beginning work on the audit in January of

15    2005?

16        A.   When you say, Produced, do you mean made

17    available in a warehouse or copied and provided to

18    StoneTurn?

19        Q.   I mean made available.

20        A.   I am told and I understand that StoneTurn

21    reviewed Abbott documents prior to my involvement in

22    January 2005.

23        Q.   Are you aware that Abbott made available

24    hundreds of boxes to StoneTurn prior to your joining the

1  January 2005, correct?

2       MS. COLLARI TROAKE:  Objection.

3       A.  My understanding was documents were made

4  available in two separate locations.  I visited one of

5  those locations on two occasions.  In that Mundelein

6  location, there were several pallets which had several

7  boxes, and I was told that those boxes had been made

8  available to StoneTurn previously.  They had been looked

9  at by StoneTurn previously.  And we were told which

10  boxes were new to be reviewed by StoneTurn.

11       So I was -- it was my understanding that

12  the boxes in that warehouse at that location were made

13  available previously to StoneTurn.

14       Q.  But you weren't there when they were

15  originally made available to StoneTurn, correct?

16       A.  Correct, I started.

17       Q.  So you don't know precisely what documents

18  were made available prior to your joining the audit?

19       A.  I don't know precisely.

20       Q.  You mentioned that you visited an Abbott

21  warehouse on two occasions?

22       A.  Correct.

23       Q.  What were those two occasions?  Do you

24  remember the dates?

Hair, Mark L. (Linked)  11/02/2006  9:30:00 AM

1          A.   To the best of my knowledge, it was

2     January 31st and February 1st, 2005, and then again,

3     March 7th through March 9th, 2005.

4          Q.   I'll get to some questions regarding those

5     specific visits, but first I want to ask you some more

6     general questions.

7               Just generally, what was your role with

8     respect to Hancock's audit of Abbott?

9          A.   I viewed my responsibilities as to assist

10    Chris Martinez on the matter.  He had been -- my

11    understanding was he had been retained earlier.  In

12    fact, he's quoted in this April 2004 letter.

13              And I was made available to assist him in

14    any way to go through the compliance review.

15         Q.   And in the course of assisting him, what types

16    of activities did you perform?

17         A.   I went to the facility to look through

18    documents that were made available to StoneTurn.  I also

19    was involved in communicating with some people at Abbott

20    as well with respect to the documents, the timing of

21    production.

22         Q.   Are there any other activities that you

23    performed in the course of your audit of Abbott?

24         A.   Again, I previously referred to some

1    activities that related to documents that were produced

2    in litigation, that Abbott produced in litigation with

3    Bates numbers.  I have also looked at those documents.

4        Q.   And what was the purpose of your looking at

5    those documents that were produced in litigation?

6        A.   Again, to view the documents that had been

7    made available to perform the compliance review, to --

8    and determine what was made available.

9        Q.   StoneTurn didn't copy all of the documents

10   that were made available by Abbott, correct?

11       MS. COLLARI TROAKE:  Objection.

12       MR. GRIESINGER:  They didn't copy any of them;

13   isn't that right?

14       MR. LORENZINI:  Let me rephrase the question.

15   BY MR. LORENZINI:

16     Q.   StoneTurn didn't request that Abbott provide

17   copies of all of the documents that were made available

18   for review by Abbott, correct?

19     A.   That's my understanding, correct.

20     Q.   Who else, to your knowledge, was involved in

21   the audit of Abbott other than yourself and Chris

22   Martinez?

23     A.   At StoneTurn?

24     Q.   At StoneTurn.

1      A.  I, again, individuals worked on the matter

2   prior to me joining StoneTurn, so I don't have direct

3   knowledge of that.  But I'm told Brian Napper was

4   involved.  He's mentioned in this April letter as well.

5   I'm told some other individuals from StoneTurn.

6      Q.  Is there an individual employed or formerly

7   employed by StoneTurn named Simon Platt?

8      A.  Yes.

9      Q.  Do you know if he was involved with the audit

10   of Abbott?

11      A.  He was not involved with the audit of Abbott

12   or the compliance review.

13      Q.  Is there an individual at StoneTurn named Neal

14   Zoltowski?

15      A.  There is.

16      Q.  Do you know if he was involved with the audit

17   of Abbott?

18      A.  Again, I don't have firsthand knowledge of

19   this, but I believe he may have seen some documents, but

20   I don't know for sure.

21      Q.  Is there an individual employed at StoneTurn

22   named Shelley Irvine?

23      A.  There was at the time.  No longer is she

24   employed at StoneTurn.

1    Q.  Do you know if she was involved in any way

2    with the audit of Abbott?

3    A.  Again, I don't have firsthand knowledge of it,

4    but I understand she reviewed some of the documents made

5    available by Abbott.

6    Q.  Do you know if she ever visited the Abbott

7    facilities to review documents?

8    A.  I believe that she did.  I had a conversation

9    with her that she did.

10    Q.  Do you know -- did she tell you what date she

11    visited Abbott facilities?

12    A.  I don't recall.

13    Q.  Are you familiar with the someone named Joshua

14    Dennis?

15    A.  Yes.

16    Q.  Is he employed at StoneTurn?

17    A.  Yes.

18    Q.  Do you know if he was involved with the Abbott

19    audit?

20    A.  Yes.

21    Q.  What was his role with respect to the audit --

22    A.  He was.

23    Q.  -- to your knowledge?

24    A.  He was a staff person that visited the

1    Mundelein warehouse with me in March of 2005.

2        Q.   To your knowledge, did he have any other role

3    in the Abbott audit other than the visit to the facility

4    in March 2005?

5        A.   Certain documents were flagged for Abbott to

6    copy them and make them available to StoneTurn, and I

7    know that he was involved in the collection of the

8    receipt of those documents at StoneTurn and some

9    organization of those documents that had been provided

10   to StoneTurn.

11       Q.   What was Brian Napper's role with respect to

12   the Abbott audit, to your knowledge?

13       A.   I don't know.

14       Q.   Do you know how long he was involved with the

15   Abbott audit?

16       A.   I don't know.

17       Q.   Do you know if Joshua Dennis is a CPA?

18       A.   I don't believe that he is, but I'm not

19   positive of that.

20       Q.   Do you know if Neil Zoltowski is a CPA?

21       A.   I don't believe Neal is a CPA.

22       Q.   Do you know if Shelley Irvine is a CPA?

23       A.   I do not believe that Shelley Irvine is a CPA.

24       Q.   Did you -- strike that.

1      Q.  I assume you're going to follow your

2    attorney's instructions?

3      A.  Yes.

4          MR. GRIESINGER:  To the extent any

5      pass-through is required, those are also my

6      instructions because the client, in this instance

7      represented by Karen has asserted the privilege or

8      the work-product doctrine.

9          So it's my instruction also.

10   BY MR. LORENZINI:

11     Q.  Are you familiar with someone named Michael

12   Arthur Walsh?

13     A.  I don't recall.  I don't know.

14     Q.  In the course of the audit of Abbott, did you

15   have direct contact with individuals employed by Abbott?

16     A.  Yes.

17     Q.  Which individuals at Abbott did you have

18   contact with?

19     A.  I spoke with Carey Crimmens.  I also spoke

20   with Michelle Campbell.  I believe that's all.

21     Q.  For the benefit of the court reporter, could

22   you spell Carey Crimmens' name?

23     A.  C-A-R-E-Y.  Crimmens, C-R-I-M-M-E-N-S, I

24   believe.

1        I don't recall specifically.  Perhaps a

2    box or two started to come in.

3        Q.   And can you describe generally the type of

4    documents that you reviewed -- strike that.

5            Can you describe generally the type of

6    documents produced by Abbott that you reviewed prior to

7    visiting the Abbott facility?

8        A.   I can't recall.

9        Q.   Let's go ahead to your visit to Abbott.

10           What was the date of your first visit to

11   Abbott to review documents?

12       A.   I believe it was January 31st and February

13   1st.

14       Q.   You were there for two days?

15       A.   For two days.

16       Q.   And who, if anyone, other than you made that

17   visit to the Abbott facility?

18       A.   I believe Chris Martinez was with me as well.

19       Q.   Anyone else?

20       A.   I don't recall anyone else at that visit.

21       Q.   How many boxes of documents did Abbott make

22   available for you to review during that visit?

23       A.   I don't recall the number of boxes, although

24   there may be some e-mail correspondence that refer to

1    the number of boxes that were made available, but I

2    don't recall a specific number.

3        Q.   You don't recall there were several boxes made

4    available?

5        A.   I believe there were several, but I don't know

6    how many.  More than one.

7        Q.   More than five?

8        A.   Likely.

9        Q.   What -- strike that.

10            During the first day, January 31st, how

11    long did you spend reviewing the documents?

12       A.   I recall that there were certain hours where

13    we could actually be in the warehouse.  We were somewhat

14    limited to the number of hours we could review.  I don't

15    recall exactly, but I suspect we arrived somewhere

16    between 9:00 and 10:00 in the morning and we left

17    somewhere around 4:00 or 5:00 in the afternoon, so six

18    to eight hours.

19       Q.   And when you returned on February 1st, do you

20    recall how many hours you spent reviewing documents?

21       A.   I don't recall specifically.

22       Q.   Do you recall if it was less than a full day?

23       A.   I don't recall.  It could have been.  I don't

24    know when I traveled, if I traveled that day or the

1       Q.   Why don't you tell me generally the type of

2    documents made available by Abbott at any time that you

3    reviewed?

4       A.   I reviewed some documents that appeared to be

5    financial in nature; appeared to be spreadsheets.  I

6    reviewed some documents that appeared to be PowerPoint

7    presentations.  I reviewed documents that appeared to be

8    word documents or memos.

9       Q.   Any other types of documents?

10       A.   Are you talking about the types of documents

11    or the substance of those?

12       Q.   Let's stick with the types.  Any other types

13    other than financial PowerPoint and word documents?

14       A.   There may have been some system generated,

15    maybe accounting, or other system-generated reports.

16       Q.   Any other --

17       A.   But that's generally the type of documents.

18    At some point I saw some payroll-related documents.

19       Q.   And those had been requested by John Hancock,

20    correct?

21       A.   Yes.

22       Q.   So you've generally described the type of

23    documents.  I want to turn now to the subject matter of

24    the documents.

1          What do you recall generally as the

2      subject matter of the documents that were produced by

3      Abbott?

4          MS. COLLARI TROAKE:  Objection.  That he

5          reviewed?

6      BY MR. LORENZINI:

7          Q.  That you reviewed.

8          A.  I reviewed some documents by their title

9      suggested to be status memos.  Some documents, including

10     Excel spreadsheets, I was unable to determine what they

11     were per say; meaning that a spreadsheet was printed on

12     multiple pages without any column headings or row

13     headings.  It was just a series of pages of numbers.

14          I reviewed documents, PowerPoint

15     documents and others, that in some cases had titles and

16     in other cases didn't.  It was sometimes difficult to

17     determine the complete subject matter because of

18     redactions that had taken place on documents.  So again,

19     some documents appeared to be PowerPoint presentations;

20     some had titles of different groups within Abbott; some

21     I couldn't tell for sure who the audience was or who

22     necessarily prepared the documents.

23          There were research studies.  There were

24     patient documents.  There were studies.  There were

1    correspondence.

2        Q.  Any other documents that you reviewed that

3    were produced by Abbott?

4        A.  Are you looking for titles of documents or for

5    me to describe those documents?

6        Q.  If you can remember the titles, you can

7    provide me with that.  If you only remember the general

8    subject matter, please describe that.

9        A.  I would say I have a better recollection the

10   types of documents and subject matter.  There were in

11   some cases, what appeared to be, Excel spreadsheets that

12   appeared to be somewhat of a monthly summary or status;

13   my words, not necessarily the title of the document.

14           I saw some spreadsheets as it related --

15   it appeared to relate to some costs and expenditures on

16   some of Abbott's program compounds.

17       Q.  Anything else that you can recall?

18       A.  I'm sure there are others.  I don't recall

19   right now.

20       Q.  Specifically?

21       A.  Specifically, no.

22       Q.  Some of the documents that you reviewed that

23   were produced by Abbott concerned clinical trials of the

24   program compounds that were part of the Research Funding

1    Agreement; is that correct?

2      A.  Some of the documents appeared to be related

3    to clinical trials, yes.

4      Q.  And some of the documents reflected

5    expenditures by Abbott on development of the program

6    compounds?

7      A.  Some of the documents included amounts that

8    purported to be expenditures by Abbott.

9      Q.  Did you personally review documents produced

10   by Abbott concerning out-licensing of any of the program

11   compounds?

12     A.  Yes, I reviewed some correspondence, draft

13   correspondence, from Abbott.  And in some cases, I

14   wasn't sure if they were formal or finalized letters,

15   but I saw some letters.

16     Q.  Did you review documents personally concerning

17   Abbott's projected expenditures on development of the

18   program compounds?

19     A.  And this is all in either January or

20   March 2005?

21     Q.  At any point, did you ever --

22     A.  Including the documents that have been

23   provided in litigation?

24     Q.  No, let me clarify.

1          At any point in your personal review of

2     documents produced by Abbott pursuant to the audit

3     provision of the contract, did you review documents

4     concerning Abbott's projected expenditures on the

5     program compounds?

6          MR. GRIESINGER:  And you're including copies

7          that may have been provided that somebody else

8          reviewed that would have been later sent in to

9          StoneTurn?

10    BY MR. LORENZINI:

11        Q.   Yes.  My question concerns your review of

12    documents produced by Abbott as opposed to in the

13    litigation, but I'm not limiting it to your visit to the

14    facility.

15            But at any point did you personally

16    review documents that related to Abbott's projected

17    expenditures on the program compounds?

18        A.  Yes, I reviewed documents; some of them which

19    appeared to be Excel spreadsheets, which included

20    planned spending.

21        Q.  Can you describe those documents with any

22    greater specificity?

23        A.  I recall certain documents seemed to be

24    designated as an APU, which I believe referred to an

1      April planning update.  I recall one of those APU

2      documents, including expected expenditure or spending

3      numbers that included both nominal and expected spending

4      numbers.  I also -- I can't recall if they were provided

5      by Abbott during the course of the audit, but they were

6      the annual research plans that were provided by Abbott

7      that I saw as well.

8              These were the documents that were sent

9      to Hancock that summarized annual spending as well as

10     provided future planned expenditures.

11         Q.   You mentioned that you reviewed some documents

12     made available by Abbott in the audit that were the

13     nature of monthly summaries, correct?

14         A.   Correct, yes.

15         Q.   And were those monthly summaries of the status

16     of various program compounds?

17         A.   Yes, there were, and again, I don't know the

18     official title of the documents that I saw, but it

19     appeared to, based on my review, whether at the facility

20     or subsequent, that they were prepared on a monthly

21     basis and they were for the program compounds.

22         Q.   You mentioned also that you reviewed documents

23     produced by Abbott pursuant to the audit provision that

24     were in the nature of correspondence, correct?

1      A.  I saw some letters, yes.

2      Q.  Do you recall with any greater specificity the

3   subject matter of that correspondence?

4      A.  I recall that there were some letters.  I

5   believe it was related to compound ABT-724 and some

6   potential out-licensing of that compound.  There were

7   other correspondence -- well, there were, at times,

8   monthly -- and again, I'm recalling the substance, not

9   necessarily the actual title of documents.  But there

10   seemed to be internal correspondence within Abbott that

11   there would be a distribution list to several people

12   that appeared to provide some kind of updates with

13   respect to the -- to various compounds, including some

14   of the program compounds as well.

15          So in that sense, since it was

16   distributed, that's a correspondence, I suppose.

17      Q.  Is there any other type of correspondence that

18   you can recall sitting here today that you reviewed that

19   was produced by Abbott pursuant to the audit?

20      A.  I recall there were some letters to some

21   doctors that were involved in some of the studies.

22      Q.  And what do you recall regarding the subject

23   matter of those letters to doctors?

24      A.  I generally recall that it was conversations

1    about the status of the studies or how many patients had

2    been enrolled in the study; general, generally.

3        Q.  Do you recall the subject matter any of the

4    other correspondence produced by Abbott pursuant to the

5    audit that you reviewed?

6        A.  It's likely there were others.  If you have

7    any additional documents to refresh my recollection, I

8    can review those as well.

9        Q.  You mentioned also that you reviewed studies

10   that were produced by Abbott pursuant to the audit.

11           Can you describe the nature of those

12   studies?

13       A.  They were medical studies that were --

14   appeared to be in process and different phases of

15   development, whether they be phase one studies, phase

16   two studies or whatever phases, as defined in the

17   Research Funding Agreement, where various doctors were

18   involved in providing these compounds to various

19   patients.  And it was some of their findings during the

20   course of that -- those studies.

21       Q.  Were there any other types of studies that you

22   recall reviewing that were produced by Abbott?

23       A.  There were IND, Investigational New Drug

24   reports.  I don't know if they're necessarily studies,

1    but they're communications with the FDA as well.

2       Q.   Were there any other types of studies that you

3    recall reviewing that were produced by Abbott during the

4    audit?

5       A.   Again, I know that there were several studies

6    produced; clinical studies, some of the annual reports

7    and plans.  Nothing is coming to mind at the moment.

8       Q.   Nothing more specific you can recall at this

9    time?

10      A.   Not at this time, but if you have some, I

11   would be more than willing to look at them.

12      Q.   Did you personally review any documents

13   produced by Abbott pursuant to the audit that related to

14   the substitution by Abbott of one compound for a

15   terminated compound?

16      A.   I recall some documents.  And again, I've

17   looked at documents that were provided in the warehouse

18   as well as documents that were provided in the

19   litigation.  So at times I'm a little fuzzy which --

20   when they were provided.

21          But I have seen some documents that

22   discussed, internally with Abbott, potential replacement

23   compounds.

24      Q.   And those documents might have been produced

1    in the audit or in the litigation.  You're not sure at

2    this time --

3        A.   They may have been.  I can't recall.

4        Q.   I would like to go back to this January 31st

5    to February 1st visit --

6        A.   Okay.

7        Q.   -- to the Abbott facility.

8            Did you or Mr. Martinez create any sort

9    of index of the documents that were produced by Abbott

10   at that time?

11       A.   Yes.

12       Q.   Who created that index:  You or Mr. Martinez?

13       A.   As I recall, both of us.  The documents that I

14   personally was reviewing, I was indexing, and the

15   documents Chris was reviewing, he indexed.

16       Q.   On your index, did you record information

17   regarding every single document that was made available

18   by Abbott?

19       A.   No.

20       Q.   What percentage roughly of documents that were

21   made available by Abbott did you record on your index?

22           MS. COLLARI TROAKE:  Objection, if you know.

23       A.   That would be extremely difficult, and again,

24   goes back to prior statements I made, that depending on

1    the organization of the documents.  For example, if

2    there was a large study, clinical study, it may or may

3    not have been included together.  It may have even been

4    bound together.  And so an index, in that example, may

5    refer to the study and comprehend multiple pages.

6         There were several individual pieces of

7    paper that were unique documents, and I couldn't tell

8    you what percentage we indexed.

9    Q.   What -- how did you determine which documents

10   to list on your index?

11   A.   Keeping in mind that we had this April 2004

12   letter as well as the attached Schedule A, we were

13   specifically looking for documents that would be

14   responsive to Schedule A.  So if we came across

15   documents, that in our judgment were responsive, we

16   tried to specifically identify and index those.

17        In addition to those we felt were

18   responsive, we also generally tried to identify the

19   substance of each box, although some materials provided

20   were not as relevant as other materials.

21   Q.   When you say that you recorded information

22   regarding whether you believed documents were responsive

23   to Schedule A, did your index specify which section and

24   subsection of Schedule A you believed the documents were

1    responsive to?

2        A.   No.

3            MS. COLLARI TROAKE:  Objection.

4    BY MR. LORENZINI:

5        Q.   Did you record on your index every single

6    document that you believed was responsive to all of the

7    various sections and subsections of Schedule A?

8        A.   When you say, Every Document, meaning if one

9    document has multiple pages, are you referring to that

10   as maybe a document?  I don't know if we indexed every

11   single document that was responsive.  We --

12           The intent was to identify those

13   documents that were responsive to Schedule A and to

14   index those.

15       Q.   But you're not sure if you recorded every

16   single document on the index that was responsive to one

17   of the subsections of --

18       A.   To the best of my knowledge, that was done.

19   If it was relevant to the audit, either a specific

20   document or a section of documents or a box was indexed,

21   that contained relevant information and/or responsive to

22   Schedule A.  I'm not saying that every single piece of

23   paper was indexed.

24       Q.   You understand that Schedule A included a

1    request for timesheets, payroll records, purchase orders

2    and invoices?

3        A.   Yes.

4        Q.   Did you record on your index every timesheet,

5    payroll record, purchase order and invoice that was made

6    available by Abbott?

7        A.   I don't believe so, and again, because what we

8    were doing when we were visiting the warehouse, was not

9    necessarily completing the audit then and there, but

10   indexing and identifying what pallets, what boxes had

11   relevant documents.  We were trying to understand the

12   universe of documents that will be provided such that

13   later we could go back to or drill down further or

14   review in further detail later.

15            So the index was to help us identify --

16   had more than one purpose, but one of those purposes was

17   to help identify what was even in existence; what had

18   been provided to date.

19       Q.   Was a purpose of the index to record the

20   documents that you wanted Abbott to copy for you?

21       A.   I don't know if I would call it the purpose of

22   the index.  However, we would identify on the index if

23   we had requested a document to be copied.

24            MR. GRIESINGER:  He asked A purpose.  I think

1    you heard The purpose.  I think he was asking a

2    purpose.

3        MR. LORENZINI:  Yeah, let me ask a more

4    general question.

5    BY MR. LORENZINI:

6      Q.  What was the procedure you employed for

7    indicating to Abbott which particular documents or boxes

8    of documents you wanted copied?

9      A.  We would have flags that we would stick on to

10   a document, and it would be either an individual

11   document or a paper-clipped set of documents or a bound

12   set of documents; and in some cases, a box in its

13   entirety.  And we would communicate that to -- the two

14   times I visited the warehouse, Carey Crimmens was

15   available.  And we would physically attach flags as well

16   as communicate orally, verbally to Carey, to make sure

17   he understood exactly what we had requested.

18       Q.  And your purpose during your visits to the

19   Abbott facility, I take it, was not to conduct a

20   comprehensive review of the documents you flagged, but

21   to flag those so that you could review them more

22   carefully after they were copied?

23       A.  I don't know if I would agree with that

24   characterization.  We went with the intent of doing as

1    listed in the Research Funding Agreement, correct?

2         A.   Some of the documents referred to compounds

3    that were not program compounds, as defined in the

4    Research Funding Agreement.  Many of the documents that

5    I reviewed were in fact redacted, and I'm assuming

6    referred to other compounds.

7              There were, at times, mention of other

8    compounds.

9         Q.   And those other compounds were not within the

10   scope of the audit, as you understood it, correct?

11        MS. COLLARI TROAKE:  Objection.

12        A.   It could have been based on replacement

13   compounds or they could have been.

14        Q.   Other than a circumstance in which a compound

15   was an actual or potential replacement compound, is it

16   correct to say that compounds other than those listed in

17   the Research Funding Agreement were not within the scope

18   of the audit to be conducted by John Hancock?

19        MS. COLLARI TROAKE:  Objection.

20        A.   I would generally say that would be correct

21   with the caveat that if there were program -- if there

22   compounds provided that could have been replacement

23   compounds, perhaps they would have been relevant as

24   well.

1      Q.   But only to the extent that they were under

2   consideration as a replacement compound?

3         MS. COLLARI TROAKE:  Objection.

4      A.   I would generally agree with that.

5      Q.   You mentioned that during your review of

6   documents at the warehouse, you asked certain questions

7   of Mr. Crimmens and Miss Campbell?

8      A.   Yes.

9      Q.   What types of questions do you recall asking

10  at your initial visit on January 31st and February 1st?

11     A.   We asked several questions.  We asked, when

12  are all the documents going to be provided to us?  When

13  is -- I understood it to be a rolling production, yet

14  when we arrived in January, they said that they were

15  still going to be more documents coming.

16         So some of the questions were, when are

17  we going to be done?  When are we going to see the total

18  universe?  We also asked questions with respect to

19  specific documents.  Some documents, as I mentioned

20  earlier, were printed in a format that were completely

21  unusable.  There were other documents, such as

22  spreadsheets, that didn't have any column headings or

23  row headings and pages and pages of those.

24         There were several other documents that

1    the third section contains subparts A through F, and the

2    fourth section contains subparts A through E.

3        When you say you asked when Abbott would

4    be producing documents responsive to Schedule A, which

5    particular subsection of Schedule A were you

6    referencing?

7    A.  I think we asked generally for Schedule A and

8    we had some specific questions.  For example, 1A, we had

9    not seen any standard policies and procedures related to

10   accounting for project program-related expenditures.  We

11   would ask, we have not yet seen any policies and

12   procedures.  Have they been produced and when do you

13   plan to produce them?

14        So it was both.  It was generally and at

15   times very specifically we would go to Schedule A.

16   Q.  Before asking that question, did you make any

17   effort to review the several hundred boxes of documents

18   that had already been produced by Abbott to determine if

19   those documents included documents responsive to Section

20   1A?

21        MS. COLLARI TROAKE:  Objection.

22   A.  Personally?

23   Q.  Yes.

24   A.  I personally did not go back and rereview

1    those documents.

2       Q.   So you don't personally know whether Abbott

3    had already produced documents responsive to Section 1A?

4       A.   I don't have personal knowledge of that.

5       Q.   Did you ask --

6       A.   Let me just qualify the question.  Prior to

7    what time?

8           You asked the question, do I have

9    personal knowledge they were or were not responsive to

10   Schedule A; is that your question?

11      Q.   Do you have personal knowledge, based on what

12   you've reviewed, of whether the hundreds of box produced

13   by Abbott prior to your starting on the audit in

14   January, included documents responsive to Section 1A?

15      MR. GRIESINGER:  When you say personal

16      knowledge, do you mean personal knowledge by virtue

17      of him having reviewed himself personally all those

18      hundreds of documents or do you mean personal

19      knowledge by view of having information that

20      indicated to him that independently from actually

21      having reviewed the boxes themselves, that they

22      hadn't been provided?

23      MR. LORENZINI:  I'm referring to --

24   BY MR. LORENZINI:

1      Q.   Well, we've established already that you

2    didn't review the hundreds of boxes that were produced

3    by Abbott prior to January 2005, correct?

4         MS. COLLARI TROAKE:  Objection.  He reviewed

5      some of them.  He testified he reviewed some of

6      them.

7    BY MR. LORENZINI:

8      Q.   You only reviewed some of the documents that

9    had been requested for copying and had been copied by

10   Abbott, correct?

11        MS. COLLARI TROAKE:  Objection.

12     A.   Prior to going out in January, I had reviewed

13   some documents.  I did not review personally whatever

14   number of boxes.  You're saying hundreds.  I don't know

15   the count of boxes, but I did not review those boxes

16   personally.

17          I didn't re-review those that had already

18   been reviewed by StoneTurn.

19     Q.   And I think you testified before you

20   personally, before going out to the Abbott facility in

21   January, only reviewed perhaps a couple of boxes of

22   documents?

23     A.   I don't know the exact number, but perhaps a

24   few boxes.

1      Q.   So unless a -- so if a document produced by

2   Abbott concerning standard policies and procedures

3   related to accounting for program-related expenditures

4   was not in those two boxes you reviewed prior to

5   January, you wouldn't know one way or the other if it

6   had been produced by Abbott, correct?

7        MS. COLLARI TROAKE:  Objection, that

8        mischaracterizes his prior testimony.

9        A.   I would have knowledge based on the

10   information that was provided to me by Chris Martinez

11   and others at StoneTurn, but I did not review whatever

12   number of boxes that were reviewed prior to my first

13   visit.

14        Q.   Other than whatever secondhand information you

15   were told by Chris Martinez, you don't have any

16   knowledge regarding the documents produced prior to

17   January, 2005, other than the two boxes you personally

18   reviewed, correct?

19        MS. COLLARI TROAKE:  Objection.

20        A.   I received knowledge from Chris about what was

21   in those -- that number of boxes that were reviewed

22   previously to me as well as I reviewed an index

23   summarizing the contents of those boxes.  So other than

24   those two things, I did not personally rereview those --

1    whatever number of boxes myself.

2        Q.   Did that index you just referenced include

3    every single document produced by Abbott prior to

4    January 2005?

5        A.   The index, to my knowledge, did just that, it

6    indexed the documents that were provided at two

7    facilities, actually; the Mundelein facility, I believe

8    there was a different address that I never went to.  And

9    it would describe the contents of the various boxes that

10   had been provided.

11       Q.   It wasn't your understanding that that index

12   listed every single document in the 900 boxes produced

13   by Abbott, was it?

14       MS. COLLARI TROAKE:  Objection.

15       A.   My understanding was, there wasn't a

16   description of every page and piece of paper in all

17   those boxes, but there was a description and an index of

18   the contents of the boxes.  So generally speaking, it

19   was indexing the contents, not every single document.

20       MR. LORENZINI:  Okay.  I think we better take

21   a lunch break.

22       MS. COLLARI TROAKE:  Okay.  How much more do

23   you think you're going to have?

24       MR. LORENZINI:  Enough to warrant a lunch

1   check and get back to you.

2       Q.   And your understanding was, he was checking

3   with Abbott counsel?

4       A.   He didn't say he was checking.  I don't know.

5       Q.   You were subsequently informed by Abbott

6   counsel that the redactions were of material that was

7   either privileged or related to compounds other than the

8   program compounds, correct?

9       MS. COLLARI TROAKE:  Objection.

10      MR. GRIESINGER:  Him personally?

11  BY MR. LORENZINI:

12      Q.   Let's start with personally.

13      Were you ever personally informed that

14  the reason Abbott was making redactions was because the

15  material was either privileged or it related to

16  compounds other than the program compounds in the

17  agreement between Hancock and Abbott?

18      MR. GRIESINGER:  By Abbott's counsel or?

19      MR. LORENZINI:  Anyone.

20      A.   I believe in the e-mails that have been

21  produced by StoneTurn, that there's an e-mail

22  communication between myself and Michelle Campbell,

23  wherein she relates something to that effect, that some

24  of the documents that I had asked for on a couple of

1    occasions, that still were not coming to us, that they

2    were and again, I can read the words from the e-mail,

3    but generally they were being reviewed for those

4    reasons.

5        Q.   Those reasons being either privileged or

6    relating to compounds other than program compounds?

7        A.   Again, I think that's what the e-mail says.

8    If you have it, I can refresh my recollection, but

9    that's my general understanding.

10       Q.   We may get to that later.  I want to stick

11   first with this initial visit and your communications

12   with Mr. Crimmens at that time.

13            You mentioned that you asked if StoneTurn

14   could talk to Abbott employees --

15       A.   Yes.

16       Q.   -- is that correct?

17            And is that a conversation you had with

18   Mr. Crimmens?

19       A.   Yes.

20       Q.   During the initial visit?

21       A.   And again, my recollection is a little -- I

22   can't remember specifically the conversations that I had

23   on my first visit versus the second visit, but I believe

24   most of the questions were asked on both occasions that

1    seven matters, again, going back to the April 12, 2004

2    letter that we were also interested in; not each of

3    those were specific to expenditures during any year.

4    Some of them related to other aspects of the contract.

5        Q.   And did the other aspects listed in numbers

6    one through seven of the April 12th letter?

7        A.   Yes.

8        Q.   During that initial visit to the Abbott

9    warehouse, please describe either generally or specific,

10    the best you can recall, the type of documents that you

11    did flag for copying?

12        A.   Again, I'm going to have to speak generally

13    and with a little bit of the caveat that some of the

14    documents I reviewed on my first visit and second visit

15    aren't always clear.  But during my two visits, I

16    flagged some documents that seemed to include

17    expenditures for the program compounds.  I flagged some

18    documents that seem to be monthly status reports.  I

19    flagged some documents that seemed to be summary memos.

20    I think some of those memos were called monthly

21    highlight memos; flagging anything that appeared to be

22    responsive to, again, Schedule A to the April 12, 2004

23    letter.

24            I also flagged documents that were so

1    redacted as to being useless to the process because I

2    didn't understand why certain documents were even being

3    provided if they were redacted to a certain level.

4        Q.  And you testified before that you didn't flag

5    documents that were completely redacted.

6            Are you now saying you did flag documents

7    that were completely redacted?

8        MS. COLLARI TROAKE:  Objection.  I think that

9        mischaracterizes his prior testimony.

10   BY MR. LORENZINI:

11       Q.  I don't want to mischaracterize it, so please

12   clarify it.

13       A.  There were, between my two visits, there were

14   several documents that were redacted.  I didn't flag all

15   of them because there wasn't value.  There was nothing

16   to read on these redacted documents.  Some of which had

17   a line drawn through the entire document and a word

18   redacted.  That piece of paper wasn't necessarily

19   valuable in accomplishing the audit.

20           I flagged some documents that were so

21   redacted, just as a reference to show how redacted and

22   how unuseful some of the documents that we were seeing

23   were and what form we were reviewing them in the

24   warehouse.

1    copying during that initial visit, you listed

2    expenditures for program compounds, monthly status

3    reports, summary memos, including monthly highlight

4    memos, certain redacted documents.

5             Are there any other types of documents

6    that you flagged for copying during that initial visit?

7        A.   I recall -- and again, my first visit and

8    second visit, I can't always distinguish between the two

9    as far as specific documents.  I do recall seeing

10   documents that appeared to be spreadsheets and analyses

11   prepared by Abbott that related to a base case, an

12   upside and a low scenarios perhaps related to some of

13   the program compounds.  That was another type of

14   document that we were flagging.

15       Q.   Do you recall any other categories of

16   documents that you flagged for copying?

17       A.   During the first visit or second visit?

18       Q.   Since your recollection isn't clear, let's say

19   during either visit --

20       A.   Fair enough.

21       Q.   -- just other categories of documents you

22   recall flagging?

23       A.   I know that during the second visit on the

24   last day, it would have been March 9th, it was in fact

1    the last box that was provided to us on that day.  I

2    believe it was box No. 17 on the pallet that we were

3    going through.  There were several documents included in

4    that box that related to Abbott's analyses of revenue

5    recognition for the payments that they had received by

6    John Hancock.

7          There were several documents that had --

8    that appeared to be spreadsheets in nature that had

9    Hancock -- the name John Hancock or Hancock somewhere on

10   them that were summarizing the compounds.  So I know for

11   sure the second visit that there were several documents

12   that I flagged for copying.

13      Q.  And those documents related to how Abbott was

14   going to account for revenues received by -- received

15   from Hancock pursuant to the contract?

16      A.  That was part of it.  Some of these

17   spreadsheets summarized the spending or the expenditures

18   that Abbott had during a period of time, and then

19   analyzed the payments received from John Hancock.  And

20   based on some formulas, it was Abbott's determination of

21   how much Abbott could record as revenue.

22          And part of that formula and analysis,

23   Abbott analyzed annual expenditures on the program

24   compounds.

1      Q.   Do you recall the subject matter of any of the

2   other documents that were contained in what was

3   designated box 17?

4      A.   I don't recall specifically sitting here

5   today.  There are several documents that we indexed and

6   flagged for copying.

7      Q.   Did you review, while you were at the

8   warehouse, every single document that was in box 17?

9      A.   My recollection would be yes because I

10   don't -- I'm not positive on that.  But I believe we

11   specifically requested documents within that box rather

12   than simply flagging the box to be copied.  Or at least

13   that's my recollection.

14          So with that said, since individual

15   documents were flagged, I believe that we reviewed the

16   entire box.

17          MR. LORENZINI:  I would like to mark as Hair

18      Exhibit No. 3, a document with Bates No. ABBT 270

19      through 271.

20      (Exhibit No. 3 Marked for Identification)

21   BY MR. LORENZINI:

22      Q.   Do you recognize the document that's been

23   marked as Hair Exhibit No. 3?

24      A.   Yes.

1      Q.   Is this an e-mail chain between you and

2    Miss Campbell?

3      A.   Yes.

4      Q.   And if you look at the e-mail on the bottom,

5    it appears to be from you to Miss Campbell.

6          Is this an e-mail that you wrote?

7      A.   Yes.

8      Q.   The second sentence states:  It appears that

9    some of the documents requested are not included in the

10   copy set.  And then in parentheses it states:  StoneTurn

11   requested a complete set of copies of the entire box?

12     A.   Yes, that refreshes my recollection.

13     Q.   Do you now recall that StoneTurn requested a

14   copy of the entire box 17?

15     A.   It would appear as though we did, the entire

16   box.

17     Q.   Did you personally review box 17?

18     A.   I personally did, yes.

19     Q.   How long did you spend reviewing box 17?

20     A.   My general recollection is longer than any

21   other box.  It was likely a few hours.  And the reason

22   being is --

23     Q.   My question was, how long did you spend

24   reviewing it?  And your answer is longer than the other

1    boxes; likely more than three hours, is that correct?

2       A.  I think I said a few hours, but...

3       Q.  Do you recall whether you looked at every

4    single page of every document in box 17?

5          MS. COLLARI TROAKE:  Objection.  He's already

6       answered that.

7       A.  I know that I reviewed box 17.  I know that

8    there was another individual from StoneTurn with me at

9    the warehouse then.  I don't know if I reviewed box 17

10   in its entirety by myself or if we split that box to be

11   reviewed and indexed.

12      Q.  Of the portion of box 17 that you reviewed, do

13   you recall whether you reviewed every single page of

14   every single document?

15      A.  Yes.

16      Q.  And what do you recall about the documents in

17   box 17 that you reviewed, other than what you've already

18   testified to?

19      A.  I recall that there were many documents that

20   had John Hancock mentioned somewhere on the document and

21   specifically identified program compounds.  Some of them

22   appeared to be summaries of expenditures; some of them

23   in the context of Abbott's revenue recognition analysis;

24   some were different in nature.

1           There were several documents that were of

2     interest to me.  And it took us longer to index that

3     document because we were indexing more documents in that

4     box than probably any other box.  I'm not positive on

5     that, but it took longer because there were so many

6     documents that seemed specifically relevant to the

7     matter.

8          Q.   And those documents generally concerned

9     Abbott's recognition of revenue from the Hancock

10    contract?

11         A.   In -- and I don't have all the documents in

12    front of me right now.  There were some documents

13    related to Abbott's revenue recognition, but the

14    analysis that Abbott had to go through to calculate the

15    amount of revenue to be recognized, included a summary

16    of costs expended by Abbott for the program compounds

17    during different years.

18           Because I saw reports and schedules that

19    summarized the program compounds expenditures, they were

20    relevant and therefore were flagged.

21         Q.   Have you seen documents produced by Abbott in

22    the litigation that are duplicative of what you saw in

23    box 17?

24         A.   Yes, there are several of the items we indexed

1    from box 17 on March 9th, 2005 that we never received

2    until we looked at the documents that were produced in

3    litigation.  And we found many, if not most, of those

4    documents that were previously indexed.

5        Q.   So StoneTurn now has copies of many, if not

6    all, of the documents that were contained in box 17,

7    correct?

8            MS. COLLARI TROAKE:  Objection.

9        A.   I'm not sure if that's exactly the way I said

10   it.  Of the documents that we were aware of that weren't

11   copied for us in March of 2005, we have identified most

12   of that list in the documents that have been produced in

13   litigation.

14       Q.   And approximately when were those documents

15   produced in litigation?

16       A.   I'm not sure.

17       Q.   I understand you wouldn't know necessarily

18   when they were produced.  But when you at StoneTurn

19   receive the documents that you identified as being

20   duplicative of the documents in box 17?

21       A.   This summer we had access to electronic

22   database.

23       Q.   And you don't know when Choate Hall & Stewart

24   received those documents?

1    A.  I have no idea.

2    Q.  I want to just make sure we've covered

3    everything.  You were discussing before documents, the

4    type of documents that you flagged for copying?

5    A.  Yes.

6    Q.  And we had gone through documents reflecting

7    expenditures on the compounds --

8    A.  Yes.

9    Q.  -- monthly status reports, summary memos,

10   spreadsheets and analyses reflecting base case, upside

11   and low scenarios?

12   A.  Yes.

13   Q.  You also had flagged documents regarding

14   revenue recognition for revenue under the Hancock

15   contract?

16   A.  Again, I viewed those documents as summarizing

17   the annual expenditures on program compounds.

18   Q.  Understood.

19       In addition to those categories of

20   documents that you've already described, what other

21   categories of documents do you recall flagging for

22   copying during either of your visits to Abbott?

23   A.  There might be some additional categories.  I

24   just don't recall right now.

1      Q.   Do you recall flagging for copying documents

2    regarding clinical trials?

3      A.   I believe we flagged some.  I know that there

4    were some IND reports, annual reports, that were of

5    interest, specifically some related to ABT-594 and some

6    of those reports that were filed prior to the signing of

7    the agreement.  So those reports were filed in late

8    2000.

9            In going through all the documents, again

10   this goes back to a question you had previously, we

11   asked Carey Crimmens if there were going to be other

12   internal communications, including e-mails which may

13   shed light on some of Abbott's perception of the status

14   of the program compounds.

15     Q.   I'm not asking about communications right now.

16   I'm just asking about documents you flagged for copying.

17     A.   Okay.

18     Q.   Did you flag for copying minutes of Abbott's

19   meetings?

20     A.   Yes, if there were some, yes, yes.

21     Q.   And do you recall that you received from

22   Abbott copies of Advisory Committee meetings?

23     A.   Would that have been the title, Advisory

24   Committee?

1      Q.   Let me rephrase it.

2           Do you recall receiving from Abbott

3    copies of minutes of Advisory Committee meetings?

4      A.   I recall reviewing minutes or summaries of

5    meetings from certain committees, whether it be an

6    Advisory Committee, I don't recall specifically, but

7    there were committees and groups within Abbott that met;

8    and I did see and I believe flagged some of those.

9      Q.   And you received copies of them?

10     A.   Yes.

11     Q.   Okay.  I want to move ahead to the March 7th

12   visit to Abbott's warehouse.

13     A.   Okay.

14     Q.   You did visit the Abbott warehouse to review

15   documents on March 7th?

16     A.   I did.

17     Q.   And who else accompanied you on that visit?

18     A.   I believe on that trip it was Chris Martinez,

19   Josh Dennis and myself.

20     Q.   And who from Abbott was there at the facility

21   at that time?

22     A.   I believe Carey Crimmens again.

23     Q.   And were you at the facility for more than one

24   day?

1    A.  Yes.

2    Q.  How many days were you there?

3    A.  As I recall we were there the 7th, the 8th and

4  the ninth or at least I was there the 7th, 8th and the

5  9th.

6    Q.  And do you recall how many documents were made

7  available for copying by Abbott beginning on March 7th?

8    MR. GRIESINGER:  For his review?

9    MR. LORENZINI:  For review.

10    A.  You mean boxes or the number of pieces of

11  paper?

12    Q.  It's probably easier to speak in terms of

13  boxes.

14    A.  I don't recall the specific number of boxes.

15    Q.  You don't recall there were 17 boxes made

16  available?

17    A.  There could have been.  I don't recall

18  specifically how many.

19    MR. LORENZINI:  I would like to mark a new

20    exhibit.

21    (Exhibit No. 4 Marked for Identification)

22  BY MR. LORENZINI:

23    Q.  This appears to be an e-mail chain between you

24  and Miss Campbell with a Bates range ABBT 273 to 276.

1          Did you recognize this e-mail?

2          MS. COLLARI TROAKE:  All of them or the whole

3      string?

4      BY MR. LORENZINI:

5          Q.   Do you recognize this e-mail chain generally?

6          A.   Yes.

7          Q.   If you look at the top of 275, it appears to

8      be an e-mail from you to Miss Campbell?

9          A.   Yes.

10         Q.   And the second paragraph you state:  This week

11     a total of 17 new boxes were provided for review?

12         A.   Yes.

13         Q.   Does that refresh your recollection that

14     Abbott provided 17 new boxes for StoneTurn to review

15     during the week of March 7th?

16         A.   Yes.

17         Q.   What do you recall about the type of documents

18     that were provided for review during that week of

19     March 7th?

20         A.   I generally recall them being similar in

21     nature as the documents that I had personally reviewed

22     on my earlier trip, January 31st and March -- February

23     1st, if I said those dates, correctly, but for box 17

24     which seemed to be more relevant -- most relevant than I

1    had come across.

2       Q.  How many hours per day did you spend reviewing

3    documents during that trip?

4       A.  I know that we were told that we could only be

5    in the warehouse between certain hours; something like

6    between 8:00 and 5:00 or -- so we were somewhat limited

7    as far as the amount of time we had.  So I believe there

8    was somewhere between or around eight hours per day.

9    And again the third day -- that seemed consistent

10   somewhere around --

11      Q.  Do you recall whether you flew back to Boston

12   on the third day?

13      A.  I know I didn't fly back to Boston, but I

14   don't know when I flew out on the third day.

15      Q.  Where do you work out of, what location?

16      A.  San Francisco.

17      Q.  Did you fly back to San Francisco on the third

18   day?

19      A.  I can't recall, but it's very possible.

20      Q.  So you're not sure if you worked a complete

21   day on the third day of that second visit?

22      A.  I can't recall.

23      Q.  And were Mr. Martinez and Mr. Dennis there for

24   all three days?

1      A.   I believe Chris Martinez was there the first

2   two days, and Josh Dennis and myself were there all

3   three days.

4      Q.   And do you know if Josh left early on the

5   third day?

6      A.   As I recall, we left at the same time.  I

7   believe we were there most of that third day, but I

8   don't recall specifically the time of day that we left.

9      Q.   And did you create an index of the documents

10   that you reviewed?

11      A.   Yes.

12      Q.   And did you follow the same procedure as

13   before regarding indexing?

14      A.   Generally, yes.

15      Q.   So you didn't list every single document you

16   reviewed on the index card?

17      A.   Not every single document.

18      Q.   And did you flag documents for copying?

19      A.   Yes, we flagged documents for copying, and

20   then it appears as though based on the last e-mail, at

21   some point it was determined that we would just assume

22   take the whole box since there was enough relevant

23   information.

24      Q.   Were there other boxes other than box 17 where

1    you requested the entire box?

2    A.  I don't recall.  Yes, when we were leaving on

3    March 9th, Carey Crimmens informed us that there was yet

4    one other box that was being reviewed and/or redacted

5    that wasn't available for StoneTurn's review.  And I

6    asked him if he could send us that box in its entirety,

7    since we wouldn't have the benefit of reviewing it in

8    their warehouse.

9         So in that case, I know we requested that

10   box in its entirety, in addition to box 17.  There may

11   have been other boxes.  I don't recall specifically.

12   Q.  And did Abbott send you a copy of the box that

13   wasn't available for review during your March 17 visit?

14   A.  To the best of my recollection, yes.  And

15   again, I couldn't confirm that since I hadn't seen those

16   documents, but I believe there's some e-mails between

17   myself and Michelle Campbell, where I specifically asked

18   for that box that we hadn't seen.

19        And at some point she replied that it had

20   been sent to us.  So I have no way to confirm that, but

21   that's what --

22   Q.  But you also have no reason to doubt it?

23   A.  I have no reason to doubt it.

24   Q.  Do you recall receiving 11 boxes of documents

1    after the March 7th visit, that is 11 boxes that had

2    been selected for copying and were subsequently

3    delivered?

4        MS. COLLARI TROAKE:  Selected for copying

5        when?

6        MR. LORENZINI:  During the March 7th visit.

7        A.  I don't recall specific numbers, but as I look

8    at this e-mail chain on Exhibit 4, I can see that in an

9    e-mail that I sent to Michelle, we received five boxes

10   on Friday, and another two boxes today.  So that would

11   be 7; another e-mail we received three more boxes today,

12   so now I'm up to 10.

13       Q.  And then you received the box that wasn't

14   available initially?

15       A.  And I don't know if that was included with one

16   of these 10 boxes or not, but I don't have a specific

17   recollection.

18       Q.  But that sounds about right, that you received

19   about 10 or 11 boxes after that visit?

20       A.  Based on these e-mails, I have no reason to

21   believe it was anything different from what it said in

22   here.

23       Q.  Do you recall that you received, other than

24   box 17, you received copies of all of the documents you

1    had selected for copying within a couple of weeks of

2    your visit?

3         MS. COLLARI TROAKE:  Objection.

4         A.   I'm not sure of the time frame you're talking

5    about.  I know that are or I'm told that Chris Martinez

6    visited some Abbott facilities the prior summer.  And I

7    was told that certain documents that were flagged that

8    previous summer hadn't been provided to StoneTurn until

9    I believe it was January of the following year.

10        Q.   I'm only talking about documents that you

11   reviewed during your two visits and that were selected

12   for copying; okay?

13        A.   Okay.

14        Q.   I'm not interested in what you may have heard

15   secondhand from Mr. Martinez about copying after his

16   visits.

17             During your initial visit, January 31st

18   and February 1st, do you recall when you received from

19   Abbott the documents that you had selected for copying

20   during that visit?

21        A.   I don't recall sitting here today the exact

22   timing of when we received those.  I know there were

23   certain e-mail communications that I was confirming to

24   Michelle Campbell when we had received them, but I don't

1    recall the exact dates and timing of receiving e-mails.

2       Q.   You don't have any reason to doubt that it's

3    anything other than what may be reflected in the

4    e-mails?

5       A.   I believe that the e-mails are the best

6    representation of what happened.  If I communicated to

7    Michelle Campbell that I received some boxes, I have no

8    reason to believe anything different.

9          MR. LORENZINI:  I would like to mark a new

10      exhibit.

11       (Exhibit No. 5 Marked for Identification)

12          THE VIDEOGRAPHER:  This marks the end of tape

13      No. 2.  Going off the record at 2:35.

14             (Off Record Discussion)

15          THE VIDEOGRAPHER:  This marks the beginning of

16      tape No. 3.  We are back on the record, 2:37.

17    BY MR. LORENZINI:

18       Q.   Mr. Hair, you have before you what's been

19    marked as Hair Exhibit No. 5, which is an e-mail from

20    Mark Hair to Michelle Campbell dated March 18th, 2005?

21       A.   So of the e-mail string, you're referring to

22    the very top one?

23       Q.   Well, I'm referring generally to the entire

24    e-mail string.

1        Do you recognize this e-mail string?

2     A.  Yes.

3     Q.  This is an e-mail exchange you had with

4  Miss Campbell?

5     A.  Yes.

6     Q.  If you look at the page marked ABBT 278?

7     A.  Yes.

8     Q.  This appears to be an e-mail from March 15th,

9  2005 from you to Miss Campbell stating we received five

10  boxes of documents last Friday and another two boxes

11  today.

12        Does that refresh your recollection of

13  the documents that you had selected for copying during

14  your March 7th through 9th visit, that you received

15  seven boxes by March 15th?

16     A.  Yes.

17     Q.  So that's an accurate statement that you had

18  received, as of the time of this e-mail, five boxes the

19  prior Friday and two boxes on March 15th?

20     A.  Yes.

21     Q.  And if you look at the top of the e-mail

22  string on the first page, that's an e-mail from you to

23  Miss Campbell stating, We received three more boxes

24  yesterday?

1      A.   Yes.

2      Q.   Does that refresh your recollection that you

3   received three additional boxes that you had selected

4   for copying during your second visit to Abbott on

5   March 17th, 2005?

6      A.   Yes.

7      Q.   And so at the time of this e-mail, the only

8   documents you had selected for copying that you hadn't

9   yet received were box 17 and the documents that hadn't

10  been available for copying during your visit?

11     A.   That's basically what this e-mail says, yes.

12     Q.   And then can you turn back to Exhibit -- I'm

13  not sure if I know the exhibit number, but it's the

14  document ABBT 215, e-mail chain beginning with --

15        MS. COLLARI TROAKE:  Exhibit 2.

16     A.   Okay.

17     Q.   And if you'll turn to page five of six of that

18  e-mail string, you may recall this was the March 22nd,

19  e-mail from Miss Campbell to you that we reviewed

20  earlier?

21     A.   Yes.

22     Q.   And you'll note in that e-mail to you,

23  Miss Campbell says, You should receive by the end of

24  this week additional documents less than one box that

1    were not available for review before your team left on

2    Thursday, March 10th?

3        A.   Yes.

4        Q.   Does that refresh your recollection that

5    Abbott sent to StoneTurn the box of documents that

6    weren't available for visit -- for review during that

7    second visit by the end of the week of March 22nd?

8        A.   Again, these are a little out of order, but I

9    think I follow that; that somewhere around the 22nd,

10   this appears to be an e-mail from Michelle confirming

11   that that final box had been copied and provided to us.

12       Q.   So by that week of March 22nd, StoneTurn had

13   received all of the documents that it had selected for

14   copying during that second visit, other than box 17,

15   correct?

16       A.   Well, if you go down to the next paragraph, we

17   had also requested some spreadsheets related ABT-627

18   either in e-mail form or some other form, as well as

19   those documents, similar schedules for other compounds.

20   We hadn't received those either.

21       Q.   Other than the spreadsheets in box 17, though,

22   you had received everything else you had requested

23   during the second visit?

24       MS. COLLARI TROAKE:  Objection.

1     A.  I wouldn't agree with that; meaning that we

2     made several requests for documents, including e-mails,

3     we made requests to see and talk to people.  I don't

4     know if --

5     Q.  Let me clarify --

6     A.  -- I wouldn't characterize we received

7     everything we asked or.

8     Q.  Let me clarify.

9          You received, by the week of March 22nd,

10    putting aside the spreadsheets and box 17, you received

11    everything that you had flagged for copying by the week

12    of March 22nd, correct?

13    A.  I think that's generally true.  There may have

14    been a couple -- there may have been a couple of other

15    documents that we weren't confident that we had received

16    even though they had been flagged; and some of those are

17    going back to prior to my time.

18          So there may have been a couple.

19    Q.  But I'm just talking about documents --

20    A.  Okay.

21    Q.  -- that you had selected for copying during

22    that March visit.

23    A.  Okay; then generally correct.  Aside from the

24    documents in box 17 and aside from these spreadsheets

1    requested for ABT-627 and other compounds for other

2    years, the documents that we had flagged had generally

3    been provided to us, yes.

4        Q.   You didn't make any other visits to Abbott

5    after that week March 7th visit?

6        A.   No.

7        Q.   What type of analysis was performed by

8    StoneTurn, if any, after receiving the documents from

9    Abbott, after receiving the copies of the documents from

10   Abbott?

11          MS. COLLARI TROAKE:  Objection.  What copies

12       from Abbott when?

13   BY MR. LORENZINI:

14       Q.   We're moving beyond the collection phase.

15   We've discussed your initial review of documents at

16   Abbott and your selection of certain documents for

17   copying and Abbott's provision of copies of certain

18   documents to you, and I want to move beyond that.

19          Once you received copies of the documents

20   that were produced by Abbott pursuant to the audit, what

21   type of analysis was performed by StoneTurn of the

22   Abbott documents?

23       A.   There were a few things that we did, and maybe

24   I'll start by just kind of generally summarizing broad

1      A.   Yes, I never started a process to prepare an

2    audit report based on this April 12, 2004 letter in

3    Schedule A based on what we got.  I never started that

4    process.

5      Q.   Do you know if anyone at StoneTurn started the

6    process of preparing an audit report?

7      A.   To the best of my knowledge, I don't know.

8      Q.   Are there plans by StoneTurn to generate an

9    audit report regarding the Hancock/Abbott contract?

10     A.   I'm not aware of any, but I assume at some

11   point I could be asked to.  I have no current plans.

12     Q.   And this audit process began almost a year and

13   a half ago?

14     A.   I assume that this April 12, 2004 letter was

15   the first time indication from John Hancock to Abbott

16   that pursuant to Section 2.5 of the Research Funding

17   Agreement, that a compliance review or audit of the

18   books and records would begin.  That's my understanding.

19   But again that was prior to me joining StoneTurn, so I'm

20   just basing it on that letter.

21     Q.   Are there any other types of reports or

22   analyses that you created other than what you've

23   described?

24          MS. COLLARI TROAKE:  I object.  Again, exclude

1    kind of general categories?  And then we would have

2    conversations, generally speaking, about what we were

3    trying to accomplish, that we're looking for, not only

4    high-level summaries but mid-level summaries as well as

5    some detail if we wanted to go further to do some

6    specific selection in testing.

7        Q.   But you don't recall any conversation

8    discussion with Mr. Crimmens --

9        A.   No.

10        Q.   -- regarding any particular categories?

11        A.   No, not specifically, no.

12        Q.   Did you provide documents that StoneTurn

13    received pursuant to the audit to Choate Hall & Stewart?

14        A.   I think I previously said yes.

15        Q.   These were the compilations that you provided?

16        A.   Yes.

17        Q.   Did you provide all the documents that had

18    been received by StoneTurn to Choate Hall & Stewart?

19        A.   I believe we did.

20        Q.   Did you provide all the documents that you

21    received during the audit to John Hancock directly?

22        A.   I did not, no.

23        Q.   Were you asked in this litigation to collect

24    documents for production to Abbott?

1                    Volume:    II

2                    Exhibits:  7-26

3          UNITED STATES DISTRICT COURT

4        FOR THE DISTRICT OF MASSACHUSETTS

5          CIVIL ACTION NO. 05-11150-DPW

6     - - - - - - - - - - - - - - - - - - - - - - x

7     John Hancock Life Insurance Company,

8     John Hancock Variable Life Insurance Company,

9     and Manulife Insurance Company, (f/k/a Investors

10    Partner Insurance Company),

11              Plaintiffs,

12        v.

13    Abbott Laboratories,

14              Defendant.

15    - - - - - - - - - - - - - - - - - - - - - - x

16

17          DEPOSITION OF MARK L. HAIR

18        Tuesday, May 8, 2007, 1:05 p.m.

19          DONNELLY CONROY & GELHAAR

20        One Beacon Street, 33rd Floor

21              Boston, Massachusetts

22    Reporter:  Lori-Ann London, RPR

23

24

1      Q    Did those subsequent invoices relate to

2    the audit or to the Hancock/Abbott litigation?

3      A    I would say both.  I know that there

4    were certain tasks performed prior -- or

5    subsequent, rather, to April 18th that would have

6    been related to the audit or the compliance

7    review.

8      Q    What tasks subsequent to the April 18th,

9    2005 invoice do you believe were related to the

10    audit?

11      A    I know that last year we evaluated and

12    analyzed some documents that were produced in the

13    litigation, but we used those documents and

14    reviewed those documents in the context of the

15    compliance review as well.

16      Q    Do you know approximately what month of

17    last year you performed that task?

18      A    I believe it was in the spring and

19    summer of last year, or thereabouts.

20      Q    And so you used documents that had been

21    produced in the litigation to -- to conduct the

22    contractual compliance audit?

23          MS. COLLARI TROAKE:  Objection.

24      A    We evaluated the documents that were

1   limited to the documents you had flagged for

2   copying compared to what was produced in the

3   litigation, correct?

4       A   Yes.

5       Q   And did you determine that all of the

6   documents that you had flagged for copying during

7   the audit that you did not receive during the

8   audit were subsequently produced in the

9   litigation?

10          MS. COLLARI TROAKE:  Objection.

11      A   We identified most of the documents in

12  the population of the documents that were provided

13  in litigation.

14      Q   Do you recall any documents that you

15  were not able to identify in the litigation

16  production set -- documents you had flagged

17  previously that were not subsequently produced in

18  litigation, can you identify any particular

19  documents?

20      A   Sitting here now?

21      Q   Yes.

22      A   No.

23          (Document marked as Exhibit No. 8.)

24      Q   Mr. Hair, you have before you what's

1    an organization.

2        Q    Did you organize documents in the

3    binders -- like all documents responsive to

4    category 1A in one section of the binder?

5        A    Yes.

6        Q    And if a document was responsive to more

7    than one category, did you include it in more than

8    one section of the binder?

9        A    I don't recall.

10       Q    And how many binders in total did you

11   compile through this process?

12       A    I don't recall.

13       Q    Can you quantify the amount of documents

14   in those binders in any way?  For example, by how

15   many boxes the binders would take up, how many

16   documents.

17       A    I'm not sure how many binders, but I'm

18   pretty sure there were more than ten.

19       Q    And you mentioned that you performed

20   this task back in the spring of 2006?

21       A    Spring or summer of 2006, of last year.

22       Q    Have you conducted a similar analysis

23   since that time?

24       A    No.

1      Q    So are you aware that there have been

2   additional documents produced in the litigation

3   since spring of last year?

4          MS. COLLARI TROAKE:  Objection, and

5   I'm gonna instruct you not to answer to the extent

6   that your knowledge comes solely from

7   communications with counsel.

8      Q    Strike the question.

9          I'll represent to you that there

10  have been documents produced in the litigation

11  since spring of 2006.  Have you undertaken any

12  attempt to gather additional documents produced in

13  the litigation since that time that you believe

14  are responsive to the audit requests?

15         MS. COLLARI TROAKE:  Objection.

16     A    No.

17     Q    After you had compiled these documents

18  that have been produced in litigation into the

19  binders, did you conduct -- did you do anything

20  else with those documents?

21         MS. COLLARI TROAKE:  Objection.  And

22  to the extent that your answer will reveal any

23  attorney-client communications or work product,

24  you should exclude that from your answer.

1    compliance with the contract.

2         Q    Why did StoneTurn not undertake that

3    analysis?

4         A    I think part of the reason was as a

5    result of our work in January, February and March,

6    and evaluating and analyzing the documents that

7    were provided to us, as well as analyzing and

8    evaluating the documents that had been copied and

9    given to us, that as a result of that analysis and

10   review, it was determined that there weren't

11   sufficient documents to fully complete the

12   compliance review and the audit.

13        Q    But once the litigation began, there was

14   this additional set of documents that were

15   produced and that you and Mr. Martinez have

16   testified were fully available to StoneTurn.  And

17   my question is:  At that time, after you had the

18   additional documents produced in litigation, why

19   didn't StoneTurn conduct an analysis to determine

20   Abbott's compliance with the contractual

21   obligations?

22            MS. COLLARI TROAKE:  Objection.

23        A    It was not requested that we perform a

24   compliance review at that time.

1    compliance review subsequent to that.

2        Q   Do you believe you would be able to

3    conduct a compliance review based on the

4    additional documents and deposition testimony and

5    other information that has been produced in the

6    litigation?

7        A   I have not seen any additional

8    deposition testimony.  I can only speak to the

9    documents that I've seen that we analyzed last

10   spring and summer.  So I don't know if I can

11   adequately answer that question, not seeing

12   everything that's available.

13       Q   So the answer is you don't know?

14       A   I don't know.

15       Q   Are you familiar, generally, with the

16   allegations that John Hancock has made in the

17   current litigation regarding Abbott's alleged

18   failure to comply with its obligation under the

19   audit provision of the contract?

20           MS. COLLARI TROAKE:  Objection.  To

21   the extent that you've only learned that from

22   counsel, I'm gonna instruct you not to answer.

23       A   Then, no.

24           (Document marked as Exhibit No. 9.)

Hair, Mark L.  (Vol. 2) [Linked]  05/08/2007  1:05:00 PM

1        (Document exhibited to witness.)

2    Q   Mr. Hair, you have before you what the

3   court reporter has marked as Exhibit No 9, it's

4   the First Amended Supplemental Complaint filed by

5   John Hancock in this action.  I'd like you to take

6   a look particularly at paragraph 22, including

7   subparagraphs (a) through (k), and please let me

8   know if you have seen Exhibit 9 before.

9    A   Yes, I have seen this section before.

10    Q   In paragraph 22, is it your

11   understanding that -- well, strike that question.

12        Paragraph 2 outlines Hancock's

13   allegations concerning the audit section of the

14   contract, and I want to ask you, referring back to

15   Exhibit No. 7, the set of invoices, have you

16   conducted any analysis to determine what portion,

17   if any, of the expenses and time incurred by

18   StoneTurn in connection with the audit is

19   attributable to Abbott's alleged failures to

20   comply with the audit provision of the contract as

21   alleged in paragraph 22 of Hancock's complaint?

22    A   No.

23    Q   Has anyone, to your knowledge,

24   undertaken that review?

1      A   Not to my knowledge, no.

2      Q   Are you aware of any -- any specific

3   expenses incurred by StoneTurn in connection with

4   the audit that you believe are attributable to

5   Abbott's alleged failure to comply with the audit

6   provisions?

7      A   No.

8           (Document marked as Exhibit No. 10.)

9      Q   Actually, before we move on to that next

10   exhibit, I just want to ask you one more question

11   about the invoice -- the set of invoices.  Are you

12   aware of whether StoneTurn has written off any

13   portion of the invoices that are attached here as

14   Exhibit 7?  In other words --

15      A   Written off the invoices as not

16   collectible or....

17      Q   In any way discounted these invoices.

18   In other words, has StoneTurn informed Choate or

19   Hancock that it doesn't need to pay some portion

20   of these invoices?

21      A   No, not that I'm aware of.

22      Q   Okay.  Please take a look at what's been

23   marked as Hair Exhibit 10.  Do you recognize this

24   document?

1    entered in a lot of the information made available

2    on one of the documents that I was reviewing, and

3    I put that into a file, but generally speaking, we

4    -- I was not creating summaries of the documents

5    while I was at the Abbott warehouse facilities.

6        Q    You mentioned various activities that

7    you performed on the audit that are encompassed

8    within this general category of analysis,

9    including calls with counsel, calls with other

10   members of the StoneTurn team, review of documents

11   at the warehouse, organization of documents,

12   reading documents for substance, preparing

13   summaries of some of the documents.  Do you have

14   any way to determine at this point how many hours

15   were spent on each of those particular tasks?

16       A    No.

17       Q    Have you conducted any analysis of how

18   much of your time incurred on the Abbott matter,

19   if any, is attributable to Abbott's alleged

20   failures to comply with the audit provision of the

21   contract?

22       A    No.

23       Q    Do you believe that any of your time

24   spent on the audit was attributable to failures by

1    Abbott to comply with its audit obligations?

2        A    I don't necessarily believe that the

3    time that I spent was a result of a failure per

4    se.  It was time spent to do all those tasks that

5    we were engaged to perform.

6        Q    And so you would have performed all of

7    the same tasks even if Abbott had responded to

8    your audit requests in a different way?

9            MS. COLLARI TROAKE:  Objection.  I

10   mean, you're asking effectively a hypothetical

11   without any of the -- without a complete

12   description of what the different way is.  I mean

13   there could be a million different ways Abbott

14   could have done it.

15       Q    Do you believe that Abbott should have

16   responded to StoneTurn's audit demands differently

17   than it actually did?

18       A    Yes, I think there are ways that Abbott

19   could have responded differently.

20       Q    What are those different ways you

21   believe Abbott could have responded?

22       A    One important way would be to provide

23   people that we could have talked to to provide

24   context for the documents that we were reviewing,

1       A    Again, based on my experience with

2    audits and compliance reviews, that's -- that's a

3    standard practice.

4       Q    Do you know if John Hancock in its

5    April 12, 2004 letter to Abbott requesting

6    production of documents requested that the

7    documents be produced organized by responsiveness

8    to particular categories?

9          MS. COLLARI TROAKE:  Objection.  The

10    letter speaks for itself.

11       A    I don't recall right now, but if you

12    have the document, I'm more than willing to review

13    it.

14          MR. LORENZINI:  We don't need to

15    mark this one.  It was previously marked as Hair

16    Exhibit No. 1.  I'll just show it to you for the

17    record.

18          (Document exhibited to witness.)

19          (Witness perusing document.)

20       A    I've reviewed the document.

21       Q    Does this refresh your recollection that

22    John Hancock did not ask Abbott to produce

23    documents organized by responsiveness to

24    particular categories?

1          MS. COLLARI TROAKE:  Objection.  I

2     don't think he testified he couldn't recall.  He

3     said he didn't know.

4       A    I don't see specific language in the

5     letter that says that all documents should be

6     provided and organized by these categories in

7     Schedule A.

8       Q    So John Hancock did not request that

9     Abbott produce the documents in that manner?

10          MS. COLLARI TROAKE:  Objection.

11      A    Again, going back to this letter, I

12     don't see those specific words that say that all

13     documents need to be organized in this way;

14     however, these are the types of documents and

15     types of topics that were of relevance -- and

16     requested by John Hancock for the compliance

17     review.

18      Q    You were mentioning ways that you

19     believe Abbott could have responded differently to

20     the document requests and the audit demands by

21     StoneTurn.  You mentioned that Abbott could have

22     provided people to interview regarding the

23     documents; that it could have organized the

24     documents by category.  Are there any other things

Hair, Mark L.  (Vol. 2) [Linked]  05/08/2007  1:05:00 PM

1      Q    Is there anything else that you believe

2      Abbott should have done differently in response to

3      the Abbott -- to the audit?

4      A    The response time probably could have

5      been better.  It seems as though that certain

6      requests were made in 2004, yet it seems at we --

7      StoneTurn continued to review documents into 2005.

8      Q    Isn't it correct that Abbott produced

9      the majority of the documents within the first

10     month or two of production?

11          MS. COLLARI TROAKE:  Objection.

12     A    A majority of the documents that were

13     produced or a majority of the documents that were

14     responsive to the requests?

15     Q    Let's start with the majority of the

16     documents produced.

17     A    I don't have firsthand knowledge of when

18     the boxes were produced, because that happened

19     prior to me joining StoneTurn; however, it's my

20     understanding that several boxes were provided

21     prior to my involvement.

22     Q    Is there anything else you believe

23     Abbott should have done differently in response to

24     the audit?

1     A   Not right now.

2     Q   Is there any portion of your time as

3   recorded on Exhibit 10 that you believe is

4   attributable to Abbott's failure to do those

5   things that you just mentioned?

6         MS. COLLARI TROAKE:  Objection.

7   He's already testified he didn't undertake any

8   kind of analysis in that regard.

9     A   Again, I have not analyzed it that way,

10   but I believe I said previously or generally these

11   tasks were not -- that were performed and the time

12   spent -- that I spent was not necessarily a result

13   of a failure, per se, on Abbott's part, but it was

14   review, organization of documents.

15     Q   So even if Abbott had done all of the

16   things you just mentioned in response to the

17   subpoena that you believe it should have done, you

18   would have spent essentially the same amount of

19   time on the audit?

20         MS. COLLARI TROAKE:  Objection.

21   Again, he's testified he didn't undertake that

22   analysis.

23     A   I -- I didn't analyze it that way, and

24   it's -- it's -- I'm not in a position to know how

1    hypothetically the time would have been spent if,

2    in fact, Abbott would have done things

3    differently.  I don't know if it would have taken

4    longer or less time, perhaps it could have taken

5    longer if we would have had more time with people,

6    perhaps it could have taken less.  I have no way

7    of really answering that.

8        Q   Is there anything that you could do to

9    answer that question?

10            MS. COLLARI TROAKE:  Objection.

11        A   Is the question to potentially attempt

12    to go through the same process that we've already

13    gone through but this time Abbott -- I'm not sure

14    I follow the question.

15        Q   I'm asking at this point in time is

16    there any way that you could determine what time,

17    if any, that you spent on the audit is

18    attributable to any failures on Abbott's part in

19    its response to the audit?

20            MS. COLLARI TROAKE:  Objection.

21        A   Not that I can think of, no.

22            (Document marked as Exhibit No. 11.)

23            (Document marked as Exhibit No. 12.)

24        Q   Mr. Hair, you have before you what's

1    been marked as Exhibit 11, which is an index that

2    I understand was created by StoneTurn during the

3    course of its audit of Abbott.  Do you recognize

4    this document?

5        A   Yes.

6        Q   Is it, in fact, the index that StoneTurn

7    created of the documents made available by Abbott

8    during the audit?

9        A   Yes.

10       Q   Does it include all of the documents

11   made available by Abbott during the audit?

12           MS. COLLARI TROAKE:  Objection.

13       A   No.

14       Q   What categories of documents that were

15   made available in the audit are not included on

16   this index?

17       A   I don't know.

18       Q   Do you know why some documents made

19   available in the audit are not included on this

20   index?

21       A   Partly because of the volume of

22   documents and the number of boxes and the number

23   of documents that were made available.  The index

24   was not intended to index every single piece of

1    paper that was made available, but generally to

2    summarize the contents of boxes or groupings of

3    documents.  So this doesn't necessarily represent

4    an index of every document, but generally the

5    contents made available.

6    Q   So there were additional documents made

7    available by Abbott during the audit that are not

8    reflected on this index?

9    MS. COLLARI TROAKE:  Objection.  I

10    think that mischaracterizes his testimony.

11    A   There were several boxes of documents

12    that contained several -- several pieces of paper,

13    not every piece of paper was included on this

14    index.

15    Q   And you -- you actually entered some of

16    the data in this index, correct?

17    A   Yes.

18    Q   And other StoneTurn reviewers entered

19    other data in this index, correct?

20    A   Correct.

21    Q   And did you work with this index after

22    it was compiled?

23    MS. COLLARI TROAKE:  Objection.

24    Q   Let me put it another way.

1      Are you familiar with this index

2    beyond the particular entries in which you

3    physically entered the data?

4      A   I reviewed the index in its entirety,

5    not necessarily line by line, but I was familiar

6    with the index as a whole, not just the lines that

7    I entered.

8      Q   And in what context did you reference

9    and consult the index as a whole?

10     A   For example, I came across maybe a

11   document that appeared to be of interest to me and

12   I wondered if a similar document had been reviewed

13   by someone else, and so I would look at the rest

14   of the index to see if a similar document existed.

15     Q   And in entering data personally into

16   this index, did you try to be as accurate as

17   possible in describing the document or set of

18   documents?

19     A   Yes.

20     Q   And, to your knowledge, were other

21   members of the StoneTurn team also diligent in

22   recording information accurately in the index?

23     A   To the best of my knowledge, yes.

24     Q   Are there any documents listed on this

1          Are you testifying that you believe

2     that there were some documents produced by Abbott

3     that were responsive generally to this broader

4     request in the April 12th, 2004 cover letter but

5     not necessarily responsive to the specific

6     categories in Schedule A?

7          (Witness perusing document.)

8     A    That could be the case, yes.

9     Q    And, in fact, if you look at page 2 of

10    the letter that's been marked as Hair Exhibit

11    No. 1, it states, John Hancock requests that all

12    books and records of Abbott and its subcontractors

13    pertaining to the above-identified matters be made

14    available for its inspection and audit, regardless

15    of whether such books and records are described on

16    Schedule A.

17          So if a document was not responsive

18    to a particular category on Schedule A, it still

19    may have been responsive to the audit request,

20    correct?

21          MS. COLLARI TROAKE:  Objection.

22    A    Yes.

23    Q    With that in mind, are there any --

24    strike that.

1           With that in mind, do you believe

2      that Abbott produced any documents in the audit

3      that were not responsive to the audit request

4      generally?

5           MS. COLLARI TROAKE:  Objection.

6      A   I believe that there were documents

7      provided and made available by Abbott that were in

8      addition to those documents specifically described

9      on Schedule A.  I don't know if I'd necessarily

10     call them nonresponsive to the audit request

11     generally.

12     Q   So is the answer no, that you don't

13     believe there were any documents made available by

14     Abbott in the audit that weren't responsive at

15     least generally to the audit request?

16     A   And, again, I --

17          MS. COLLARI TROAKE:  Objection.

18     A   I don't know if I'm in a position, since

19     I didn't review all of the documents, to

20     adequately answer that question, since many of the

21     documents were reviewed by people other than

22     myself.

23     Q   But you can't, sitting here today, think

24     of any documents or categories of documents that

1    you believe were not responsive at least in

2    general to the audit request?

3         MS. COLLARI TROAKE:  Objection.

4    A    Sitting here today, I can't specifically

5    think of documents that weren't generally related

6    to the audit requests.

7    Q    And sitting here today, can you think of

8    any documents or categories of documents that you

9    believe Abbott produced in the audit that weren't

10   responsive to Schedule A of the April 2004 letter?

11        MS. COLLARI TROAKE:  Objection.  And

12   are you limiting it to the documents he actually

13   reviewed?

14   Q    No, it could be any documents that

15   you're familiar with that were produced in the

16   audit.

17   A    The question is whether there were

18   documents that were produced that weren't

19   specifically responsive to Schedule A?

20   Q    Correct.

21   A    Yes, there were documents, in my

22   opinion, that were produced that were perhaps

23   related to some of the compounds but not

24   specifically responsive to the Schedule A request.

Hair, Mark L.  (Vol. 2) [Linked]  05/08/2007  1:05:00 PM

1     Q   Which documents were those, or which

2     categories of documents?

3     A   Sitting here today, it's difficult to

4     answer that question.

5     Q   Feel free to reference the exhibit

6     that's been marked as Exhibit 11 if it will help.

7     A   This is just an index of documents, not

8     necessarily the documents themselves, so it's --

9     I'm a little disadvantaged to not have the actual

10    documents in front of me.

11    Q   But sitting here today, you can't think

12    of any type of documents or categories of

13    documents that were produced by Abbott in the

14    audit that you believe are nonresponsive to

15    Schedule A?

16        MS. COLLARI TROAKE:  Objection.

17        (Witness perusing document.)

18    A   I can't think of any at this time.

19        MR. LORENZINI:  Why don't we take a

20    break for five minutes.

21        MS. COLLARI TROAKE:  Okay.

22        (Off record.)

23    Q   Mr. Hair, you have before you a

24    corrected version of Exhibit 8 that we started to

1          MS. COLLARI TROAKE:  Objection.

2     A    Based on all the search criteria, we

3  were unable to identify it or find it in the

4  electronic database.

5     Q    But you didn't review every document in

6  the electronic database to determine if you could

7  locate the documents on Exhibit 8, correct?

8     A    All of the documents were reviewed in

9  the database.

10     Q    StoneTurn reviewed every document in the

11  database of documents produced in the litigation?

12     A    My understanding was that the database

13  was made available to us, and we not only searched

14  for specific documents in the database, but we

15  reviewed what was made available in the database.

16     Q    Every document?

17     A    That's my general understanding, that

18  there may have been multiple-page documents, but

19  each document would have been reviewed in some

20  form.

21          (Document marked as Exhibit No. 13.)

22     Q    Mr. Hair, you have before you what's

23  been marked as Hair Exhibit 13.  It's a document

24  with a title "Documents that were received by

1   StoneTurn but not identifiable or previously

2   included in the Document Index."

3         Do you recognize this document?

4     A   Yes.

5     Q   Did you create this document?

6     A   I don't recall if I created it or if

7   someone in my office created it, but I am familiar

8   with this document.

9     Q   What is it?

10     A   It's, as you described, certain

11   documents had been copied by Abbott or Abbott's

12   counsel and sent to StoneTurn, and these specific

13   documents that we received were not included in

14   the index or had not been previously indexed by

15   StoneTurn.

16     Q   And do you know why they hadn't been

17   included in the index previously?

18     A   It's not for sure, but I know that there

19   were some documents that weren't made available to

20   us during our last visit in March, I forget the

21   exact dates, the 7th, 8th, 9th, somewhere around

22   that time period, that the company -- that Abbott

23   said they would provide to us in their entirety.

24   So it's possible that this listing are those

1    et cetera.

2      Q   And if you look on Exhibit 13, you'll

3    see most of these documents, based on the

4    description, seem to be financial documents,

5    including planned spending and actual spending?

6      A   Yes.  And, again, if I recall correctly,

7    that this set of documents received at the end of

8    March would have been the very last box made

9    available to us, but this is the type of

10    documents, generally speaking, without having them

11    in front of me today, but generally speaking, seem

12    to be responsive specifically related to the

13    Hancock collaboration, the Hancock development and

14    financial in nature.

15      Q   So these were the type of financial

16    documents that you were interested in, the sort of

17    mid-level internal Abbott financial documents

18    related to the program compounds?

19        MS. COLLARI TROAKE:  Objection.

20      A   And, again, I'm looking at an index or a

21    summary of documents, not the document themselves,

22    but based on the description and the file name, I

23    would generally agree that these documents were

24    relevant and responsive, especially those that

1    included summary expenditures related specifically

2    to the Hancock collaboration, the Hancock

3    development, those costs and planned expenditures,

4    yes.

5        Q    Are there any other lists or indices of

6    documents that were received by StoneTurn in the

7    audit, other than this Exhibit 13 and the large

8    index that we were looking at previously that was

9    marked as Exhibit 11?

10       A    I don't believe there are any additional

11   indices.

12           (Document marked as Exhibit No. 14.)

13       Q    Mr. Hair, you have before you what's

14   been marked as Exhibit 14.  It's entitled

15   "(Example of one document reviewed in Mundelein

16   during 3/7/05 to 3/10/05 and not copied for

17   StoneTurn.  Information input by MH at 1060 North

18   High Street Warehouse)."

19           Do you recognize this document?

20       A    Yes.

21       Q    What is it?

22       A    It is a document that I created during

23   that March timeframe that I input based on a

24   document that I reviewed.

1    inputting the information from a piece of paper

2    that I saw into a spreadsheet, the index file.

3        Q    Did you input all of the information

4    from the document?

5        A    My understanding is, yes, that's what

6    this document looked like; that's what this

7    document had available.

8        Q    And did you receive that document -- did

9    you request a copy of that document?

10       A    Yes.

11       Q    Did you receive a copy?

12       A    I don't recall.  However, I can do an

13   analysis, if you'd like, based on the listing of

14   missing documents.

15       Q    If you'd like, if it will help refresh

16   your recollection.

17       A    I don't recall if we received it or not.

18       Q    Do you recall if you received a copy of

19   this or if you located a copy when you searched

20   the electronic database of litigation documents?

21       A    I don't recall actually going back to

22   this document and comparing it to see if we did or

23   not.

24       Q    You did receive copies from Abbott of

1    documents in the audit that reflected 2001 actual

2    spending on the program compounds, correct?

3         MS. COLLARI TROAKE:  Objection.

4     A    There were documents, including this

5    one, that listed the program compounds and amounts

6    that were related to 2001 actual spending.

7     Q    So the answer is yes?

8     A    Yes.

9     Q    And you also did receive copies from

10    Abbott during the audit of documents that

11    reflected 2002 estimated spending, correct?

12         MS. COLLARI TROAKE:  Objection.

13     A    There were some documents that we

14    reviewed in the warehouse like this one that I'm

15    looking at in Exhibit 14 that had listed amounts

16    for 2001 actual spending and projected spending

17    amounts for 2002 and 2003 and other years.  So we

18    reviewed some of those.  We reviewed all that were

19    made available to us.  And we received some,

20    although documents like this one in Exhibit 14 are

21    also included on Exhibit 8, and these documents

22    were not provided during that audit process, that

23    compliance review process.

24     Q    But in addition to the documents that

1    are listed on Exhibit 8, there were documents that

2    reflected 2001 actual expenses and 2002 and 2003

3    planned expenses on the program compounds that

4    were, in fact, copied by Abbott and provided to

5    StoneTurn, correct?

6              MS. COLLARI TROAKE:  Objection.  I

7    mean, are you asking are there documents that

8    stated those numbers, that purported to list those

9    numbers?  I don't know what you mean by

10   "reflected."  You're asking him do they accurately

11   reflect that, or did they just state those

12   numbers?

13       Q    Do you understand the question,

14   Mr. Hair?

15       A    And, again, I'll go back to my prior

16   response.  I saw documents that included amounts

17   listed with the title 2001 Actuals, including this

18   document, and there were other documents as well.

19       Q    And you also saw documents that

20   reflected planned or expected expenditures on the

21   compounds for 2002 and 2003, correct?

22             MS. COLLARI TROAKE:  Objection,

23   again, to the word "reflected."

24       A    There were documents that listed amounts

1    under similar titles, similar headings, yes.

2         Q    And they appeared to be internal Abbott

3    documents, correct?

4         A    Generally, yes.  I do recall some

5    documents that Abbott provided to John Hancock as

6    well that summarized actual spending, as well as

7    estimated or planned spending for future years.

8         Q    But there were also internal Abbott

9    documents?

10        A    But there were also internal Abbott

11   documents.

12        Q    And those documents -- some of those

13   documents were copied and provided to StoneTurn at

14   your request, correct?

15        A    Yes.  We identified and flagged

16   documents to be copied that had similar labels or

17   headings that purported to be actual spending

18   amounts, as well as planned spending amounts.

19        Q    And you received copies of documents of

20   that sort from Abbott, correct?

21        A    We did receive some, yes.

22             (Document marked as Exhibit No. 15.)

23        Q    Mr. Hair, you have before you what's

24   been marked as Exhibit 15.  Do you recognize this

1    document?

2      A   Yes.

3      Q   And for the record, the heading on the

4    document is "Abbott Research Funding Agreement

5    Audit, MH notes, 3/9/05."  What is Exhibit 15?

6      A   It's just that, it appears to be a -- a

7    document that I created based on some of my notes

8    that I took on March 9th, 2005, while I was at the

9    Abbott warehouse.

10     Q   And there's a stamp on this document

11   that says "Redacted."  Do you know what

12   information was redacted?

13     A   I don't recall, no.

14     Q   Were the documents that are described on

15   Exhibit 15 requested for copying by StoneTurn?

16     A   May I look at the index?

17     Q   Sure.

18         (Witness perusing document.)

19     A   Based on the titles of the documents,

20   they also appear in Exhibit 8, so I believe they

21   were, in fact, flagged for copying.

22     Q   And do you know if they were received by

23   StoneTurn during the audit?

24     A   I -- I know that they weren't received

1    in March.  They may have been produced during

2    litigation.  I -- I just don't know specifically

3    if these two were or were not produced in

4    litigation.

5         Q   And whether they were or were not, you

6    captured the information from the documents and

7    summarized it here in Exhibit 15, correct?

8         A   Correct.

9         Q   If you look down at the last bullet

10   point, it says, "The total spending for all

11   compounds is 171,662, which agrees to the 2003

12   Preliminary Annual Research Plan as included in

13   the 12/20/2002 letter from Abbott to John

14   Hancock."

15              Was that comment there -- was that

16   comment there reflective of your analysis of

17   whether Abbott was in compliance with its

18   contractual obligations under the Research Funding

19   Agreement?

20              MS. COLLARI TROAKE:  I'm sorry,

21   could you read that question back, please?

22              (Question read.)

23              MS. COLLARI TROAKE:  Objection.

24        A   I don't -- I wouldn't characterize this

1     as an analysis to determine compliance.  It was

2     more of a factual statement that a document had an

3     amount which was similar to an amount on another

4     document.

5          Q    And to be more specific, you were

6     recording the fact that the total spending for all

7     compounds on a -- on an internal Abbott document

8     matched the amounts on the 2003 Annual Research

9     Plan that Abbott provided to John Hancock pursuant

10    to the agreement, correct?

11              MS. COLLARI TROAKE:  Objection.

12          A    Yes, the total spending on the file 2001

13    Actual, GPRD, Hancock Deal, that file, included an

14    amount which was similar to an amount listed on

15    the other file, yes.

16              MR. LORENZINI:  Can we just take a

17    couple-minute break.  Off the record for a couple

18    minutes.

19              (Off record.)

20              (Document marked as Exhibit No. 16.)

21          Q    Mr. Hair, you have before you what's

22    been marked as Hair Exhibit 16.  It is titled,

23    "Summary of Available Monthly Project Status

24    Reports as of 3/11/05."  Do you recognize this

1    document?

2        A    Yes.

3        Q    What is it?

4        A    It is a summary of certain documents

5    that were indexed at the Abbott warehouse, and it

6    was intended to list all of the program compounds

7    and whether or not this type of document had been

8    made available.

9        Q    And who created this document?

10       A    Either I or one of my staff.

11       Q    And what -- what documents did they

12   reference in creating Exhibit 16?

13       A    Again, based on the date of this

14   document, it was as of March 11th, which was prior

15   to us receiving copies of the documents that had

16   been indexed and flagged to be copied during our

17   visit just a couple days prior.  So the document

18   that would have been referenced was either the

19   index, generally, or a summary of these -- these

20   documents that was prepared to create this, this

21   summary.

22       Q    So there may have been Monthly Project

23   Status Reports received by StoneTurn in the audit

24   after March 11th, 2005 that wouldn't be reflected

1    A   I don't know.  I -- I don't recall an

2    analysis of that nature that was ever performed

3    to -- to confirm that all of these Xs actually had

4    a document associated with it.

5    Q   If you look down at the footnote, it

6    says, "Responses based on index of Abbott

7    documents and not based on actual documents

8    received from documents as of 3/11/05."

9    Mr. Hair, I'm assuming that the

10   second -- or strike that.  I'm assuming that the

11   last use of the word documents in that footnote is

12   an error; is that correct?

13   A   It seems a little confusing.  It may

14   make more sense if the word "Abbott" was inserted

15   rather than the word "documents."

16   Q   This document Exhibit 16 purports to

17   summarize the available Monthly Project Status

18   Reports.  What were the Monthly Project Status

19   Reports?

20   A   I don't know if the files themselves

21   actually had that title on them or not.  They were

22   documents that appeared to provide a status report

23   and appeared to be prepared monthly.  So I'm not

24   sure that that's the title that Abbott used.

1          MR. LORENZINI:  I'd like to mark as

2    Exhibit 17 this document.

3          (Document marked as Exhibit No. 17.)

4      Q    Mr. Hair, you have before you what's

5    been marked as Hair Exhibit 17.  Have you seen

6    documents of this type before?

7      A    Yes.

8      Q    This particular document that's been

9    marked as Exhibit 17 is dated February 2001, and

10    it's for ABT-518.  Is this the type of document

11    that you referred to as Monthly Project Status

12    Reports in Exhibit 16?

13      A    Yes.

14      Q    So am I correct that StoneTurn, as of

15    March 11, 2005, had been provided with access to

16    documents of the type marked as Exhibit 17 for all

17    of the months noted with an X mark on Exhibit 16?

18      A    Yes.  Based on the index and those

19    documents that we had indexed, that's correct.

20      Q    And the Monthly Project Status Reports

21    were responsive to Schedule A, correct?

22      A    I believe they were, yes.

23      Q    Could you take a look back at Hair

24    Exhibit No. 1, in particular at Schedule A?

1    document appears to be responsive, but without

2    having context around this document, it's

3    difficult for me to say if it was, in fact,

4    produced in the normal course.

5        Q    Do you have any reason to believe that

6    Abbott produced documents in the audit that were

7    not created in the normal course of business?

8        A    I have no information to confirm that or

9    otherwise.  I -- I don't know the context of the

10   documents that were provided to us.

11       Q    Abbott didn't tell you it was creating

12   documents that were -- strike that.

13            Abbott didn't tell you it was

14   producing documents in the audit that were

15   something other than documents created in the

16   usual course of business, did they?

17       A    I don't recall Abbott clarifying

18   documents one way or the other.

19       Q    But assuming this document, Exhibit 17,

20   and documents like it were created in the normal

21   course of business, then it would be responsive to

22   Schedule A, 1(k), correct?

23       A    I think the actual words are, "In the

24   normal course of managing the development of each

1     program compound."  If you're telling me that this

2     document and others similar to this document were,

3     in fact, prepared in the normal course of managing

4     the development of each program compound, then I

5     would say, yes, this type of document is

6     responsive to 1(k).  It's one type of document

7     that would be responsive to 1(k), not necessarily

8     all documents that would be responsive to 1(k).

9         Q    Would you agree that this appears to be

10    a document that would have been created in the

11    normal course of managing the development of

12    ABT-518?

13              MS. COLLARI TROAKE:  Objection.

14        A    It -- it could be, yes.

15        Q    And if that is correct, then documents

16    such as Exhibit 17 also would be responsive to

17    category 2(a) of Schedule A, correct?

18        A    Again, I'll answer that question

19    similarly to how I answered a prior question.

20    That this document may be responsive to some of

21    these categories of documents, whether it be 1(k)

22    or 2(a), but is not all the documents that would

23    be responsive to 1(k) and 2(a).

24              For example, this document would

1    other details that would support and provide

2    additional detail to the amounts that are

3    purported to have been spent.

4        Q    Abbott did provide StoneTurn in the

5    audit documents that reflected spending by month

6    or by quarter for the program compounds, did it

7    not?

8            MS. COLLARI TROAKE:  Objection.

9        A    In some instances there were documents

10   that purported to reflect spending amounts by

11   month, and in other cases, I can't recall

12   specifics, there may have been other summaries

13   that were provided by Abbott.  But, again, what --

14   what I've been talking about is not only other

15   documents that may or may not reflect the same

16   numbers and total in aggregate, but documents that

17   would provide support for these amounts that are

18   included on this document, as well as the other

19   documents.

20       Q    Looking back at Schedule A of Hair

21   Exhibit No. 1, would you agree that Monthly

22   Project Status Reports such as Exhibit 17 are

23   responsive to category 2(f) of Schedule A, and in

24   particular -- actually, strike that, strike that

1    question.  I think I have the wrong category.

2         Looking again at Schedule A, would

3    you agree that documents such as Exhibit 17 are

4    responsive to category 4(a) of Schedule A?

5    A    Similar to my prior responses, I believe

6    that this document, Exhibit 17, may be one

7    document that could be responsive to 4(a), meaning

8    that it provides and indicates some stages of

9    development in summary form, but it does not

10   provide all information related to each of the

11   stages and the decisions of the stages and the

12   status of all the stages.  But, yes, this would be

13   one document that could be responsive, not to say

14   that there wouldn't be additional documents also

15   responsive to the same item.

16   Q    To save time, Mr. Hair, I should be

17   clear.  None of my questions here are asking you

18   whether Exhibit 17, or documents of that type, are

19   the only documents responsive to these particular

20   categories.  My questions are just limited to

21   whether documents -- Monthly Project Status

22   Reports such as Exhibit 17 are responsive to these

23   categories.  Do you understand the distinction?

24   A    Yes.

1       Q    Would you agree that documents such as

2    Exhibit 17 are responsive to category 4(c) of

3    Schedule A?

4       A    I believe that this summary report could

5    be responsive to that 4(c) as well, although some

6    of the words, "records indicating," I wouldn't

7    characterize this Exhibit 17 as "records

8    indicating," but what I've characterized as

9    somewhat of a monthly summary report.

10      Q    You don't consider Exhibit 17 a record?

11      A    To me it's -- it could be a record.

12   Records, perhaps, is a -- is an odd word for this,

13   meaning that I would -- I would characterize this

14   as a summary report, but it could be a record as

15   well.

16      Q    You recall that the audit request called

17   for production of Abbott's books and records?

18      A    Correct.

19      Q    Do you consider this a book?

20          MS. COLLARI TROAKE:  Objection.

21          MR. GRIESINGER:  Answer that yes or

22   no.

23      A    No.

24      Q    It's probably more likely a record if

1    you had to put it into one of the two categories?

2        A    Yes.

3        Q    Would you also agree that documents such

4    as Exhibit 17 are responsive to category 4(a),

5    which is, Management reports or other documents

6    prepared in the normal course of business which

7    indicate future prospects and development

8    expectations for each program compound?

9        A    And that's 4A?  I'm sorry?

10          MS. COLLARI TROAKE:  I'm sorry,

11   where are you?

12          MR. LORENZINI:  Did I say 4A?

13          MS. COLLARI TROAKE:  You did.

14       Q    I meant 4(e).

15          MS. COLLARI TROAKE:  4(e).

16       A    So the question is whether this

17   document --

18       Q    Is responsive to 4(e).

19       A    -- is responsive to 4(e).

20       Q    This document and other Monthly Project

21   Status Reports.

22       A    Okay.  I believe this document could be

23   responsive to 4(e).

24       Q    Exhibit 16 includes some shaded areas

1    shaded on Exhibit 16?

2        A    I suspect it would take an analysis of

3    looking through the index to identify whether or

4    not those -- what we're calling Monthly Project

5    Status Reports existed for those two months.

6        Q    StoneTurn and Hancock in their audit

7    demand actually had not requested documents

8    reflecting the status of the compounds as of

9    January or February 2001, correct?

10        MS. COLLARI TROAKE:  Objection.  The

11    request speaks for itself.

12        Q    You may want to reference category 4 of

13    Schedule A, which asks for, "All records and

14    documents concerning the status of each program

15    compound as of March 13, 2001 and currently."

16        Does that refresh your recollection

17    that John Hancock had not requested that Abbott

18    produce documents reflecting the status of the

19    program compounds as of January or February 2001?

20        MS. COLLARI TROAKE:  I'm gonna

21    object.  I don't think he answered whether he

22    remembered or not.

23        A    And the question is whether or not

24    category 4 of Section A was limiting to the status

1    as of March 13th and nothing prior?

2        Q    That's a fair restatement of my

3    question.

4        A    The document request speaks for itself,

5    but specifically in category 4, specifically

6    requests all records and documents concerning the

7    status of each program compound as of that date,

8    March 13th, 2001, and currently.

9        Q    So documents reflecting the status as of

10   January or February of 2001 would not have been

11   responsive to that request?

12       MS. COLLARI TROAKE:  That request

13   being just category 4 in Schedule A?

14       MR. LORENZINI:  Correct.

15       A    Generally speaking, I might agree with

16   that, but I don't know the timing of when these

17   reports were prepared.  So I don't know if the

18   February report will be more reflective of the

19   status as of March 13th, if it was prepared at the

20   end of February or closer to March 13th, versus

21   the March report that was prepared at the end of

22   March or even in April.  So I don't know for sure,

23   but category 4 is specifically asking for

24   documents as of March 13th.

1    require some kind of legal determination, and,

2    again, I'm not -- I'm not in a position to answer

3    that.

4        Q    Do you know whether Monthly Project

5    Status Reports from January to February were

6    responsive to Schedule A, category 2, in your

7    opinion?

8            MS. COLLARI TROAKE:  Objection.

9    Same instruction.

10       A    I don't know.

11       Q    Do you know whether they're responsive

12   to any other categories of Schedule A?

13           MS. COLLARI TROAKE:  Other than what

14   he's already testified to?

15           MR. LORENZINI:  I don't think he's

16   testified that they were responsive to any of the

17   categories.

18           MS. COLLARI TROAKE:  Well, I think

19   your prior question was about Exhibit 17.  It

20   talked about Exhibit 17 --

21           MR. LORENZINI:  No-no-no.

22           MS. COLLARI TROAKE:  -- and similar

23   reports.  Isn't that what you're talking about?

24           MR. LORENZINI:  This specific

1    Exhibit 17 -- Exhibit 16 that Monthly Project

2    Status Reports from those months were,

3    quote-unquote, missing, and I'm asking you, Were

4    documents, Monthly Project Status Reports, from

5    those months even responsive to Schedule A?

6          MS. COLLARI TROAKE:  And, again, I'm

7    going to object because the whole line of

8    questioning about Exhibit 17, about February 2001

9    documents, already covered this.  So if there's

10   anything in addition to what he testified before,

11   he can answer, if you know.

12       A   I don't have anything else to say on

13   that question.  I don't know if it is responsive.

14       Q   And do you know if Abbott created

15   Monthly Project Status Reports after program

16   compounds were terminated?

17       A   I don't know.

18       Q   You'll note on the row on Exhibit 16 for

19   ABT-594 that the months starting with

20   November 2001 are shaded, and, similarly, with

21   respect to ABT-518 the months from October 2001 on

22   are shaded, and on ABT-100 months from March 2002

23   on are shaded, and the shaded, according to this

24   exhibit, means missing.

1          If Abbott had terminated development

2     of 594, 518 and 100 prior to those dates, would

3     that explain perhaps why Abbott didn't produce

4     Monthly Project Status Reports for those compounds

5     after those dates?

6          MS. COLLARI TROAKE:  Objection.

7     A   It could be one possible explanation,

8     but since I didn't talk to anyone at Abbott to

9     confirm that or to corroborate that, I don't know

10    for sure what their normal course was.  I think

11    this document, Exhibit 16, stands for itself; that

12    they just simply weren't available.  I can't tell

13    you why they weren't available.

14    Q   They might just not have existed in

15    Abbott's files?

16    A   They may not have existed.  I just don't

17    know.

18          (Document marked as Exhibit No. 18.)

19    Q   Mr. Hair, you have before you what's

20    been marked as Hair Exhibit 17.  It's a two-page

21    spreadsheet, without a title, that lists --

22          MR. GRIESINGER:  It's 18.

23          MR. LORENZINI:  Sorry.

24    Q   -- that lists a number of documents, and

1    the file names generally include a description of

2    development overview worksheet or development

3    overview.  Do you recognize this document,

4    Exhibit 18?

5        A   Yes.

6        Q   What is it?

7        A   It is a schedule that I believe -- which

8    was prepared for Exhibit 16.  This schedule 18 was

9    taken from the document index that was prepared by

10   StoneTurn and, based on the file names or the

11   descriptions, summarized each of these documents,

12   which later were called "Monthly Project Status

13   Reports."  Here on this Exhibit 18 it appears that

14   they're generally called "Development Overview

15   Worksheets," but it summarized those documents by

16   compound.  And I believe that this document,

17   Exhibit 18, was used to prepare the summary in

18   Exhibit 16.

19       Q   And do you know who created Exhibit 18?

20       A   Again, it was either myself or one of my

21   staff.  I don't know for sure.

22       Q   And your understanding is that it was

23   created either by you or one of your staff at the

24   Abbott warehouse?

1      A   I don't believe so.  Again, I -- I don't

2      know for sure the date that it was prepared, but

3      looking at Exhibit 16, it says as of 3/11.  That's

4      a couple days after we left the Abbott warehouse.

5      I don't want to guess here, but it would make

6      sense that we did this summary, Exhibit 18, around

7      the same time period.

8      Q   And Exhibit 18 reflects a listing of

9      documents that were made available by Abbott in

10     the audit?

11            MS. COLLARI TROAKE:  Objection.

12     A   Exhibit 18 is a summary of the Monthly

13     Project Status Reports, or the development

14     overview worksheets, that StoneTurn had indexed

15     during the various visits at the Abbott warehouse.

16     Q   If you'd turn back to Exhibit 11,

17     please, and specifically turn to the last page of

18     Exhibit 11, please.

19     A   Page 69 of 69?

20     Q   Correct.

21            It appears that the index marked as

22     Exhibit 11 ends with Box 16 of Pallet 19.  Do you

23     see that?

24     A   Yes.

1    Q    And then if you turn back to

2    Exhibit 18 --

3    A    Yes.

4    Q    -- you'll see that Exhibit 18 includes

5    some documents that are listed as being part of

6    Box 17 of Pallet 19?

7    A    Yes.

8    Q    I'm just trying to understand.  Does

9    Exhibit 18 consist, in part, of a -- a

10    supplemental index of documents from Box 17 on

11    Pallet 19?

12    A    I don't know for sure.  I don't believe

13    that this was a supplemental index, that there was

14    one index that may have been broken out to reflect

15    those documents that hadn't been copied and

16    received by StoneTurn, but it -- it's not -- I

17    wouldn't use the word "supplemental."  Exhibit 18

18    is merely a summary of certain types of documents

19    that had been indexed, and I'm not sure -- I can't

20    tell you exactly why some of those aren't

21    reflected on Exhibit 11.

22    Q    So just to be clear, Exhibit 18 does

23    include documents that were -- every document

24    listed on Exhibit 18 was made available to

1    StoneTurn for review, correct?

2        A   That's my understanding, yes.

3        Q   And so if some of those documents aren't

4    listed on Exhibit 11, then to that extent it's a

5    supplemental list of documents made available by

6    Abbott during the audit, correct?

7        A   Potentially, yes.  And, again, I don't

8    recall there being a separate index created.  I --

9    there was one index that may have been summarized

10   differently, but I don't recall there being two

11   made.

12       Q   So Exhibit 18 might have been part of

13   Exhibit 11 originally and was then broken out

14   subsequently?

15       A   Yes.  Yes.  Yes.

16       Q   So just to summarize here, Exhibit 11,

17   which is the large index, Exhibit 18, which is a

18   two-page index of development overview

19   worksheets --

20       A   Yes.

21       Q   -- and Exhibit 13, which is the one-page

22   index of documents received by StoneTurn on

23   March 28th, 2005 --

24       A   Yes.

1        Q    -- that the combination of those three

2    documents constitutes StoneTurn's entire list of

3    documents made available by Abbott in the audit?

4        A    I would generally agree with that

5    without seeing it.  I'm -- I was under the

6    impression that there were additional line items

7    for Box 17 included on this listing, and sitting

8    here today, I can't -- I can't tell you why they

9    don't -- they're not at the bottom of page 69 of

10    69 and running to page 70.  So I don't know

11    exactly; but generally, yes, these would appear to

12    be the whole listing or the whole population of

13    index listings --

14        Q    I believe --

15        A    -- as well as -- let me clarify that

16    last statement -- as well as Exhibit 8 as well,

17    correct, because Exhibit 8 also includes an index

18    and specifically identifies Box 17 on it?

19        Q    Correct.

20        A    So maybe with those four, that -- that

21    may be the universe of the index.

22        Q    Thank you, that's a helpful

23    clarification.

24             And I believe either you or

1    Mr. Martinez testified before that there were some

2    documents that were flagged for copying in Box 17

3    that were not copied by Abbott and delivered to

4    StoneTurn in the audit?

5        A   Yes.

6        Q   And I think we discussed those on

7    Exhibit 8 as well earlier today?

8        A   In connection with Exhibit 8, you're

9    right, we did discuss that.

10       Q   I just want to clarify.  Abbott did copy

11   and deliver to StoneTurn some of the documents

12   from Box 17 on Pallet 19, correct?

13       A   That is my understanding, yes.

14       Q   For example, the Monthly Project Status

15   Reports that were part of Box 17 that are listed

16   on Exhibit 18 were copied and delivered to

17   StoneTurn?

18       A   Yes.

19           (Document marked as Exhibit No. 19.)

20       Q   Mr. Hair, you have before you what's

21   been marked as Hair Exhibit 19.  It's titled,

22   "Summary of Available Monthly Highlights

23   Interoffice Memos, Documents Received as of

24   March 18, 2005."  Do you recognize this document?

1     A   Yes.

2     Q   What is it?

3     A   It's a document prepared by StoneTurn,

4   it appears to be created on March 18th, '05, and

5   it was somewhat similar to a prior exhibit that we

6   looked at.  It was intended to summarize certain

7   documents, which were called by Abbott Monthly

8   Highlight Interoffice Memos, and to identify which

9   ones were available for each of the program

10  compounds.

11    Q   And can you describe the monthly

12  highlights interoffice memos for me?

13    A   I don't have one in front of me, but --

14  and if you do, it would be helpful, but as I

15  recall, there were documents that appeared to be

16  created in Word or something similar, they were

17  memos in nature, and there were summaries of the

18  various compounds in paragraph form that would

19  summarize some of the highlights or the status or

20  relevant events related to the development of

21  those compounds.

22    Q   Could you turn to Exhibit 17, please?

23    A   (Witness complied.)

24    Q   Specifically turn to page 2 of

1    Exhibit 17.  On page 2 of Exhibit 17, one of the

2    top lines says "Monthly Highlights, Key Project

3    Progress"?

4        A   Yes.

5        Q   Is this section of Exhibit 17 that is

6    pages 2 through 6, is that what StoneTurn referred

7    to as monthly highlights interoffice memo?

8        A   No.  As I previously stated, it was a

9    Word document in memo format that had paragraphs

10   that would summarize activities, status -- it

11   would at least summarize events related to the

12   various program compounds.  I believe that the

13   memos themselves had the title "Monthly Highlights

14   Interoffice Memos" on them.  It was a different

15   document, not like Exhibit 17.  It was just

16   another document that seemed relevant and had

17   information that seemed to be responsive.

18       Q   And who were the -- were the memos

19   addressed to a particular individual?

20       A   No, I don't recall specifically.  I

21   don't recall if they were to a distribution list

22   or to specific individuals.

23       Q   And on Exhibit 19, the months that are

24   indicated with X marks, that indicates that Abbott

1    received in the audit copies of a Monthly

2    Highlight Interoffice Memo for that particular

3    month for the particular compound?

4        A    I believe in your question you said

5    "Abbott."  I believe you meant either Hancock or

6    StoneTurn, that these were made available to us,

7    and to be honest, I don't know if, as of this

8    date, this summary was based on physical documents

9    that had been copied and provided to StoneTurn or

10   if, again, this was similar to the prior exhibit,

11   meaning based on the index alone, without seeing

12   the physical document, what documents we had seen

13   and indexed and flagged for copying.

14       Q    I note that Exhibit 19, unlike

15   Exhibit 16, doesn't include the footnote saying

16   responses are based on the index rather than

17   actual documents?

18       A    Correct, I don't see that either, and

19   that's why I'm not sure, sitting here today.  It

20   was as of March 18th.  I don't know how many boxes

21   had been copied and provided to StoneTurn as of

22   that date, so....

23       Q    And if you look at the heading of

24   Exhibit 19 also, it says, "Documents received as

1    of 3/18/05."

2        A    So that may clarify it then.  I have no

3    reason to believe that that description received

4    is anything other than that.

5        Q    So based on that description and the

6    lack of the footnote, you believe that Exhibit 19

7    summarizes documents that had actually been copied

8    and received by StoneTurn as of March 18th, 2005?

9        A    I -- I don't know for sure, but that

10    seems to make sense, yes.

11            (Document marked as Exhibit No. 20.)

12        Q    Mr. Hair, you have before you what's

13    been marked as Exhibit 20.  It's a one-page

14    document entitled, "Summary of Available Monthly

15    Project Status Reports as of 3/16/05."

16        A    Yes.

17        Q    So this is five days later than

18    Exhibit 16.  Do you recognize Exhibit 20?

19        A    Yes.

20        Q    What is it?

21        A    It is a document prepared by StoneTurn,

22    perhaps myself, which was summarizing certain

23    elements or portions of what we've called the

24    Monthly Project Status Reports, similar to that on

1    Exhibit 17, and it was intended to summarize

2    compounds ABT-518 and 594.

3        Q    And was this compiled at the warehouse

4    or back at your offices?

5        A    Back at the StoneTurn office.

6        Q    And do you know who else might have

7    compiled this, if not you?

8        A    If not me, it would have been staff.

9        Q    What staff?

10       A    It may have been Josh Dennis.

11       Q    If you look at Exhibit 16 and compare it

12   to Exhibit 20, I note that Exhibit 20 doesn't list

13   any data for April and May 2001 with respect to

14   ABT-518?

15       A    Correct.

16       Q    And -- are you having trouble finding

17   Exhibit 16?

18       A    I have many exhibits.

19           MR. LORENZINI:  It's this one here.

20   (Indicating.)

21       A    Here we go.

22       Q    On Exhibit 16, according to the X marks,

23   it appears that StoneTurn had available to it

24   Monthly Project Status Reports on 5/18 for April

1    and May of 2001?

2        A    Yes.

3        Q    Do you know why budget numbers for those

4    months were not included on Exhibit 20?

5        A    I don't know for sure.  It may relate to

6    these documents themselves, meaning that these

7    were prepared by me or by my staff at my direction

8    to help summarize what we had thus far, with an

9    understanding that we -- that most of the

10   documents, if not all of the documents, had been

11   provided to us or would shortly be provided to us.

12            So the last few exhibits are

13   attempts to summarize some of the various

14   documents of what we had.  Some of those

15   specifically are the Monthly Project Status

16   Reports that we deemed to be responsive and

17   relevant, that included information that was

18   useful.  And, again, these -- these were never

19   finalized, as you can see in Exhibit 20, but they

20   were just prepared to help figure out and organize

21   what we had and what we didn't have.  They were

22   also intended to show differences between the

23   various monthly reports, if any.

24            (Document marked as Exhibit No. 21.)

1     Q   Mr. Hair, you have before you what's

2   been marked as Exhibit 21.  Do you recognize this

3   document?

4     A   Yes.

5     Q   What is it?

6     A   It's a document prepared by StoneTurn

7   following the visits to the warehouse.  It was

8   generally intended to summarize some of the

9   documents that were available, had been copied and

10   produced to StoneTurn.

11     Q   When -- well, who created this document,

12   first?

13     A   Again, it was either myself or one of my

14   staff at my direction.

15     Q   And when was it prepared?

16     A   I don't know the exact date.  I know

17   that it was prepared after -- after we visited the

18   Abbott warehouse in March of '05.

19     Q   And after Abbott had copied documents?

20     A   And after Abbott had copied documents

21   and made them available to StoneTurn.  There was a

22   process in which we gathered, collected, the

23   documents, noted those that we had requested on

24   the index, identified those dates of the documents

1    that came in, and began organizing in some form or

2    fashion the documents that seemed to be most

3    responsive to the audit requests, and this

4    document here summarizes certain aspects of some

5    of those documents that we deemed responsive.

6        Q    It wasn't a summary of all the

7    documents --

8        A    No.

9        Q    -- that you deemed responsive?

10       A    No.

11       Q    Just the ones that you considered most

12   relevant to the analysis you were conducting?

13       A    Again, I think at this time we were

14   trying to figure out, what do we have, what is

15   available to us, what do the documents say, what

16   are the relevant aspects of the documents.  And so

17   this was an attempt by StoneTurn, at no one's

18   request, to begin to summarize what we had, to see

19   what the documents were telling us.

20       Q    If you'd turn -- well, let me first ask.

21   There's a number of sections here that appear to

22   be redacted.  Do you know what has been redacted?

23       A    I -- I don't recall.  I -- I didn't do

24   the redactions.

1     Q   Was the redacted material created at the

2   request of counsel, do you know?

3         MS. COLLARI TROAKE:  Objection.  And

4   you can answer yes or no.

5     A   No.  This document, as I mentioned

6   earlier, was prepared by StoneTurn at my

7   direction, because it was an attempt to summarize

8   the documents that we had.  Again, I believe this

9   was created -- I don't know the exact month, but

10  shortly after we received the copies from Abbott,

11  and so it was an attempt to summarize those

12  documents and the relevant -- or certain aspects

13  of those documents in a memo form, similar to some

14  of these other exhibits that we've been looking

15  at, summarizing the available Monthly Project

16  Status Reports.  None of these exhibits that we've

17  been looking at just recently were requested by

18  counsel at all.  It was merely an attempt to

19  summarize what we had, to see what we had.

20     Q   And there was no legal analysis in these

21  documents, I assume?

22         MS. COLLARI TROAKE:  Objection.  You

23  can answer yes or no, if you know.

24     A   Not to my knowledge, no.

1    Q   And did you or anyone at StoneTurn

2    provide copies of these summaries to counsel other

3    than in connection with document production in

4    this case?

5    A   I don't recall.  I don't recall.  I --

6    again, since they weren't requested by counsel, I

7    don't think so, but I'm not sure.

8    Q   Could you turn to page 3 of Exhibit 21?

9        MS. COLLARI TROAKE:  Since it

10   doesn't have page numbers, can you give the Bates

11   label?

12   Q   021609.

13   A   Okay.

14   Q   Well, first let me ask a more general

15   question.  Did you consider the documents that

16   were listed here and summarized here in Exhibit 21

17   to all be responsive to Schedule A of Hair Exhibit

18   No. 1?

19       MS. COLLARI TROAKE:  Objection.

20   A   I believe at the time it was an analysis

21   to determine what we had and what seemed to

22   provide meaningful information to us.  So I don't

23   believe there was analysis -- in fact, there was

24   not an analysis to go through each one of these

1    documents listed in Exhibit 21 to determine if

2    they were responsive to Schedule A and what letter

3    and what section of Schedule A.  This was intended

4    to summarize the documents that we were finding

5    that seemed to be relevant to us and provide

6    information that seemed relevant.

7        Q    If you look at paragraph 4 on

8    page 021609, you'll see that it describes this

9    particular document, "Portfolio Analysis of 2001

10   Abbott Global Pharmaceutical Development Assets."

11   It describes that document as including

12   information regarding expected commercial value

13   and expected value.

14            Would you agree that the document

15   described there in paragraph 4 is responsive to

16   section 4(e) of Schedule A?

17       A    I really need to keep that schedule out.

18   So going back to paragraph 4, you just read the

19   second bullet, and based on that statement, the

20   question is:  Because this report appears to

21   provide some commercial value and expected value

22   by source, is it because of that that it might be

23   responsive to 4A; is that your question?

24       Q    Yes.  4(e).

1          MS. COLLARI TROAKE:  Paragraph 4(e).

2      A   4(e).  Yes, this may be one document

3    that would be responsive to 4(e).  And, again,

4    I'll just clarify that.  Without having the

5    document in front of me, based on this summary

6    that I'm reading here, it may, in fact, be

7    responsive.

8      Q   And if you look at the document that's

9    described in paragraph 7 of Exhibit 21 --

10         MS. COLLARI TROAKE:  Just to be

11   clear, you mean the description of the document in

12   paragraph 7.  You said the document.

13         MR. LORENZINI:  Correct.

14         MS. COLLARI TROAKE:  We don't have a

15   document, right?

16         MR. LORENZINI:  Well, I think you

17   have it --

18         MS. COLLARI TROAKE:  We don't have

19   it here.

20         MR. LORENZINI:  -- and StoneTurn has

21   it.  Correct.

22     Q   And the description of that document

23   continues on to the next page as well, and it

24   includes a summary of "Success Probabilities for

Hair, Mark L.  (Vol. 2) [Linked]  05/08/2007  1:05:00 PM

1    Launch" --

2        A   Yes.

3        Q   -- for that particular compound?

4        A   Yes.

5        Q   Would you agree that the document

6    described there in paragraph 7 is responsive to

7    category 4(e) of Schedule A?

8        A   Again, I'll answer this similar to the

9    way I've answered it before.  One, I don't have

10   the document in front of me.  Two, 4(e) is talking

11   about documents that are prepared in the normal

12   course, and I've never -- I don't know if that's,

13   in fact, the case.  But based on what I'm reading

14   here in Exhibit 21, it would appear as though that

15   document reflected information related to success

16   probabilities; and if, in fact, that document was

17   prepared in the normal course of business, it very

18   well could be responsive to 4(e).

19       Q   If you look at the next paragraph of

20   Exhibit 21, paragraph 8, the document is described

21   as "Pharmaceutical Products Division, Sample

22   Direct/Indirect Project Funding Distribution, 2001

23   Plan."  Was that document that was described here

24   in paragraph 8 responsive to category 1(j) of

1    without having the policies and procedures, I

2    don't know if a spreadsheet properly reflected

3    those policies and procedures.  So I have no idea.

4       Q   The document described in paragraph 8

5    certainly would be responsive to section 1(k) of

6    Schedule A, correct?

7       A   Yes.  Again, without seeing the document

8    and without completely understanding normal

9    course, it would appear that there were -- there

10   was a report that reflected spending for two of

11   the program compounds, not all of them, and

12   those -- that report may be responsive to 1(k) as

13   well.  And as I've said earlier, it may be

14   responsive to that category, although not all of

15   the documents that would be responsive to that

16   category.

17          (Document marked as Exhibit No. 22.)

18      Q   Mr. Hair, you have before you what's

19   been marked as Exhibit 22.  Do you recognize this

20   document?

21      A   Yes.

22      Q   What is it?

23      A   It's a document prepared by StoneTurn

24   that is similar in nature to Exhibit 21 but

1    prepared for program compound ABT-594.

2        Q    So Exhibit 22 reflects -- strike that.

3            Exhibit 22 is a summary by StoneTurn

4    of certain documents that were copied and

5    delivered to StoneTurn in the audit?

6        A    Yes.  And, again, similar to Exhibit 21,

7    this was a document prepared at my own initiative

8    to help summarize the documents that we had and

9    some of the -- some of those points listed on

10   those documents that were available at that time.

11       Q    Could you turn to paragraph 3 of

12   Exhibit 22, please?

13           (Witness complied.)

14       A    And to clarify, paragraph 3 is also -- I

15   believe the intent of this document was that's the

16   name of the -- of the file itself that we're

17   summarizing.

18       Q    Correct.  But if -- starting with

19   page 021614 and continuing to the next page --

20       A    Yes.

21       Q    -- it appears to be a summary of that

22   particular document?

23       A    Yes.

24       Q    And you'll note that the summary

1    framework.

2        Q    What did you believe -- what type of

3    documents were you looking for Abbott to produce

4    in response to section 2(f)?

5        A    Well -- and, again, without having the

6    document in front of me, it may be responsive but

7    it may not be.  If 2(f) is specifically asking for

8    Abbott's internal approval framework for

9    determining whether or not, I don't know if this

10   document was describing a framework for the

11   decision or simply the decision or a possible

12   decision.

13          So a framework to me may mean -- it

14   may include a listing of criteria, certain success

15   probabilities, certain test results, but there may

16   be a framework to assist individuals who are

17   making the decision whether or not to -- to

18   continue to fund a program, versus -- I don't know

19   if this document -- I don't have it in front of

20   me, if it, in fact, was a framework or simply some

21   conclusions or summaries of activities that were

22   going to take place.

23       Q   Would you agree that that document

24   described in paragraph 3 is responsive to

1     section 1(f) of Schedule A, which asks for

2     documents concerning, "Summary of the timing of

3     expenditures for each program compound within each

4     year"?  And in particular I'll draw your attention

5     to the bullet point on Exhibit 22 which states

6     that the planned spending of the $11.1 million

7     would be in the third quarter after anticipated

8     June 2001 go, no go decision.

9         A   Without seeing the document, I would say

10    that perhaps it could be responsive to 1(f),

11    providing some information related to anticipated

12    timing of spending, but even in this case, this

13    seems to be specific to one quarter versus the

14    whole expected life of the compound.

15            (Document marked as Exhibit No. 23.)

16        Q   Mr. Hair, you have before you what's

17    been marked as Exhibit 23, which is titled "John

18    Hancock, Abbott Compound Summary, Cholinergic

19    Channel Modulator, ABT-594."  Do you recognize

20    this document?

21        A   Yes.

22        Q   What is it?

23        A   It's a document prepared by StoneTurn,

24    similar to the last two exhibits that we looked

1    at.  It was prepared by us to summarize certain

2    documents that were related to, in this case,

3    ABT-594, and it was summarizing some of those

4    documents by year.

5        Q    And all of the documents summarized in

6    Exhibit 23 were copied and provided to StoneTurn

7    in the audit by Abbott, correct?

8        A    That's my understanding, yes.

9        Q    And all of them are documents that

10   StoneTurn considered particularly responsive to

11   the audit request?

12       A    Again, I don't know if I'd characterize

13   them as particularly responsive, but as we

14   reviewed the documents that had been copied and

15   provided to us, these seemed to be more responsive

16   than others, and so it was an attempt to summarize

17   those documents that were made available to us.

18       Q    If you look at the first page of that

19   exhibit, the second paragraph states, with respect

20   to 594, again, summarizing a document produced by

21   Abbott, it states the dates for start and

22   completion of Phase I trials?

23       A    Yes.

24       Q    Would you agree that the document

1   described in that paragraph is responsive to

2   section 4(c) of Schedule A?

3        A   Without seeing the document, this would

4   appear to provide some information relevant to the

5   timing of when certain phases had occurred by

6   Abbott.  So I think this document could be

7   responsive to 4(c).  This document, like other

8   documents, was dated in 2000, prior to the -- the

9   date of the funding agreement, and so we did see

10  documents prior to that March time frame, and so I

11  guess I'm just making a note of that.

12       Q   Okay.  If you'd turn to the third page

13  of Exhibit 23, there is a summary of a report

14  entitled, "Global Pharmaceutical Research and

15  Development, 2001 April Update, Discovery

16  Commentary"?

17       A   Yes.

18       Q   And it states, "NNRs:  Project is

19  selecting a DDC candidate as an ABT-594 follow-on

20  (with NeuroSearch)."  Would you agree that that

21  document summarized there is responsive to

22  section 3(e) of Schedule A?  And 3(e), for the

23  record, asks for documents identifying potential

24  backup compounds.

1      A   I think without seeing this document in

2   front of me, it potentially could be responsive to

3   3(e); however, 3(e) is talking about records

4   identifying any and all compounds.  I guess

5   perhaps this might be related to identifying one.

6   I don't know if it's -- if it's identifying "any

7   and all" compounds, but it could potentially be

8   responsive.

9          (Document marked as Exhibit No. 24.)

10     Q   Mr. Hair, you have before you what's

11   been marked as Exhibit 24.  It's titled "Abbott

12   Compound Summary, Dopamine Receptor Agonist

13   Program, (ABT-724).  Do you recognize this

14   document?

15     A   Yes.

16     Q   Is this like the other documents we've

17   just recently been reviewing, a summary prepared

18   by StoneTurn of certain documents that were copied

19   and delivered to StoneTurn in the audit?

20     A   Yes.

21     Q   And did you or someone under your

22   direction prepare this document?

23     A   Yes, it would have been me or someone

24   under my direction.

1      Q    And did you consider the documents

2    described in Exhibit 24 to be responsive to the

3    Schedule A of Hancock's audit demand?

4      A    Again, I don't recall that we went

5    through a specific analysis to compare each

6    document back to Schedule A, but generally

7    speaking these were the documents that seemed to

8    have more information on them than others, so

9    perhaps.

10     Q    Are there any documents listed on

11    Exhibit 24 that you believe to be nonresponsive to

12    Schedule A?

13          MS. COLLARI TROAKE:  Objection.  You

14    want him to go just based on the summary there?

15          MR. LORENZINI:  Based on his

16    recollection of the documents, as well as the

17    summary.

18          MS. COLLARI TROAKE:  You want to go

19    through each page of the --

20     A    I don't have a specific recollection of

21    each of these documents.

22     Q    Looking through that summary that's been

23    marked as Exhibit 24, do you see any that appear

24    to be nonresponsive to Schedule A?

1    during the audit?

2              MS. COLLARI TROAKE:  Objection.  Do

3    you want him to read the whole document?

4         A    I have not read this whole document.

5    I -- I saw it today.

6         Q    Okay.  I'll move on to another question.

7              Why don't you take a look at the

8    next document, which has been marked as

9    Exhibit 26.

10        A    Okay.

11        Q    This is a document with the header

12    "Activity/Communication Log Between MH of

13    StoneTurn Group and Abbott Personnel."

14        A    Yes.

15        Q    Is this, in fact, a log created by you

16   of communications with Abbott personnel?

17        A    Yes.

18        Q    Does this log reflect all of your

19   communications with Abbott during the course of

20   the audit?

21        A    No.

22        Q    What communications did you have with

23   Abbott personnel that are not reflected in this

24   log?

1      A   I recall there were certain

2   conversations related to timing of when documents

3   would be provided or timing of when we would be

4   able to go to a warehouse, or administrative-type

5   items that weren't necessarily substantive related

6   to the documents or the compliance review per se.

7      Q   Do you recall any specific

8   communications that are not listed here?

9      A   I believe I had some calls with Michelle

10  Campbell prior to the January 31st, '05 date when

11  Chris Martinez and I showed up to the Abbott

12  warehouse.  I don't think they're all reflected

13  there.  And, again, as I recall, the conversations

14  were about what day to show up, what time to show

15  up, things of that nature.

16      Q   So you think this log captured all of

17  your substantive communications with Abbott

18  personnel?

19      A   Substantive, yes.

20      Q   If you look at the third entry on the

21  log, it states that you requested of Carey

22  Crimmins that certain documents with redacted

23  title pages be made available, and the date of

24  this entry is January 31st, 2005.

1    during our review.

2        Q    But you did receive them in the

3    litigation?

4        A    Well, I don't have the specifics here.

5    Perhaps we could have flagged one of these

6    documents and we may have received a copy in its

7    redacted form, but I don't have any recollection

8    of making a request of Carey or Michelle to say,

9    Is this document available in unredacted form and

10    can you give it to me, and I don't recall that

11    ever happening, that it was given in an unredacted

12    form based on that request.

13        Q    But do you recall that documents that

14    had previously been redacted were made available

15    to you during the litigation?

16        A    Yes, I'm aware of that.

17        Q    Do you know if these specific documents

18    that are referenced in this log were made

19    available?

20        A    I don't know.

21            MS. COLLARI TROAKE:  Objection.

22            MR. LORENZINI:  Just give me 30

23    seconds here.

24            MS. COLLARI TROAKE:  Sure.

**Hair Deposition Exhibit 1**

**D's Exhibit 692**

**John Hancock Financial Services, Inc.**

Bond and Corporate Finance Group

John Hancock Place
Post Office Box 111
Boston, Massachusetts 02117
(617) 572-9624
Fax: (617) 572-1628
E-mail: sblewitt@hancock.com

Stephen J. Blewitt
Senior Managing Director



April 12, 2004

BY FAX (847) 937-6683
CONFIRMATION COPY BY U.S. FIRST CLASS MAIL

Mr. James L. Tyree
Vice President, Global Licensing & New Business Development
Abbott Laboratories
200 Abbott Park Road
Abbott Park, IL 60064-6189

Re:    Research Funding Agreement by and between Abbott Laboratories and John Hancock
       Life Insurance Company, John Hancock Variable Life Insurance Company, and Investors
       Partner Life Insurance Company, dated as of March 13, 2001

Dear Jim:

Pursuant to § 2.5 of the Research Funding Agreement by and between Abbott
Laboratories and John Hancock Life Insurance Company, John Hancock Variable Life Insurance
Company and Investors Partner Life Insurance Company, dated as of March 13, 2001 (the
"Agreement"), John Hancock Life Insurance Company, John Hancock Variable Life Insurance
Company and Investors Partner Life Insurance Company (collectively, "John Hancock") hereby
give notice of the exercise of their right to inspect and audit all books and records of Abbot and
of any Subcontractor[1] of Abbott with respect to the following matters:

1.   All Program Related Costs expended by Abbott during each Program Year;

2.   Compliance by Abbott with its obligations, under § 2.2 of the Agreement, to
     prepare and provide John Hancock with an Annual Research Plan, and to
     conduct the Research Program during each Program Year in accordance with
     the Annual Research Plan for such Program Year;

3.   Compliance by Abbott with its obligation, under § 2.3 of the Agreement, to
     use Commercially Reasonable Efforts to conduct the Research Program in
     accordance with the requirements of § 2.3 of the Agreement;

4.   Compliance by Abbott with its obligation, under § 4.3 of the Agreement, to
     substitute Program Compounds in accordance with the requirements of § 4.3
     of the Agreement;

---

[1] Unless otherwise specified herein, capitalized terms used in this letter and in the attached Schedule A
shall have the same definitions as those set forth in the Agreement.

**CONFIDENTIAL**
**JHII 011883**

5. Compliance by Abbott with its obligation, under § 4.3 of the Agreement, to out-license or divest Ceased Compounds to third parties in accordance with the requirements of § 4.3 of the Agreement;

6. The stage of development and status of each Program Compound as of March 13, 2001; and

7. The current stage of development and status of each Program Compound.

Attached hereto as Schedule A is a preliminary list of those categories of books and records that John Hancock reasonably expects will be made available for its inspection and audit of these matters. The list is provided solely to assist Abbott in complying with this notice, and not by way of limitation. John Hancock requests that all books and records of Abbott and its Subcontractors pertaining to the above-identified matters be made available for its inspection and audit, regardless whether such books and records are described on Schedule A.

John Hancock's inspection and audit of the books and records of Abbott, as set forth herein, shall be conducted by Christopher Martinez, Brian Napper and other employees of the StoneTurn Group, LLP, a firm of independent auditors retained by John Hancock. The audit shall take place during normal business hours commencing on May 12, 2004, and continuing from day to day thereafter until completion, subject to adjournment as may be necessary to accommodate scheduling exigencies. In accordance with § 2.5 of the Agreement, John Hancock reserves its right to designate for copying, at its initial expense (but subject to reimbursement by Abbott in accordance with § 2.5 of the Agreement), any or all of the books and records of Abbott that are subject to its inspection and audit.

Please inform me before the close of business on May 5, 2004 of the specific location at which Abbott will make its books and records available for inspection and audit pursuant to this notice. Please also provide me with the name of the person who the StoneTurn Group's representatives should contact upon their arrival to begin their inspection and audit.

Thank you for your anticipated cooperation.

Very truly yours,

Stephen J. Blewitt

Attachment

cc:    General Counsel (by fax, 847-938-6277; confirmation copy by mail)
       Lawrence R. Desideri, Esq.
       Peter E. Gelhaar, Esq.
       Brian A. Davis, Esq.
       Michael Arthur Walsh, Esq.

3679391v1

CONFIDENTIAL
JHII 011884

## Schedule A

1.    All records and documents indicating expenditures made by Abbott related to any compound that is now or ever was a Program Compound, including the following:

    a.  Abbott's standard policies and procedures related to accounting for project/program related expenditures;

    b.  Abbott's chart of accounts as relevant to accounting for project/program related expenditures;

    c.  Summary of costs/expenditures incurred by Program Compound by year delineating expenditures by nature (*e.g.*, direct costs incurred by Abbott, subcontractor costs, allocated indirect costs, *etc.*);

    d.  Accounting framework for compiling the expenditures presented (*i.e.*, whether cost assembled on an accrual or cash basis of accounting);

    e.  Identification of whether expenditures presented were capitalized or expensed under General Accepted Accounting Procedures ("GAAP") definitions;

    f.  Summary of the timing of expenditures for each Program Compound within each year presented;

    g.  Contracts or other governing documents and information related to all Research Program activities performed by Subcontractors;

    h.  Reconciliations of annual expenditures by Program Compound to the audited financial statements of Abbott;

    i.  Calculations, algorithms, and basis for all allocations included in the total expenditures by Program Compound by year;

    j.  Abbott standard policies and procedures related to allocation of indirect costs;

    k.  Expenditure/Costs summaries and/or reports prepared in the normal course of managing the development of each Program Compound; and

    l.  Underlying supporting records (*e.g.*, timesheets, payroll records, purchase orders, invoices, *etc.*) for all expenditures made related to each Program Compound.

2.    All records and documents discussing or evidencing the implementation and conduct of the Research Program, including but not limited to:

    a.  Reports/Updates/Summaries prepared by Abbott in the normal course of managing the development of the Program Compounds;

    b.  Listing of all reports/updates/summaries typically prepared by Abbott during the normal course of developing an experimental pharmaceutical compound;

    c.  Minutes/Summaries/Notes from all management meetings in which any of the Program Compounds where reviewed or approved for further development funding;

    d.  Analysis and documentation supporting all forward looking projections of expenditures to be incurred for each Program Compound by year;

**CONFIDENTIAL**
**JHII 011885**

e. Abbott policies and guidance as to the appropriate and/or required methods/approaches/procedures for conducting a research program for an experimental pharmaceutical compound;

f. Abbott's internal approval framework for determining whether or not to continue to fund and develop an experimental pharmaceutical compound, including all relevant thresholds for approval along the compound development process; and

g. Minutes/Summaries/Notes from all Abbott meetings regarding continued funding of product development for any Program Compounds.

3. All records and documents concerning Abbott's obligations under § 4.3 of the Agreement, including but not limited to:

a. Records identifying any and all Replacement Compounds;

b. Records identifying any and all Failed Early Stage Program Compounds;

c. Records identifying any and all Ceased Compounds;

d. All documents pertaining to Abbott's consideration or selection of any compound to replace any Failed Early Stage Program Compound;

e. Records identifying any and all compounds that Abbott held out as or considered to be "back up" compounds for the compounds that constituted the Program Compounds (i) on the effective date of the Agreement, and (ii) as of the end of each calendar year 2001 through 2003; and

f. All documents pertaining to the actual or attempted out-licensing or divestiture of any Ceased Compound.

4. All records and documents concerning the status of each Program Compound as of March 13, 2001 and currently, including but not limited to:

a. Reports/Summaries/Meeting Minutes which indicate the stage of development of each compound that originally constituted a Program Compound during the first calendar quarter of 2001;

b. Records describing the various stages into which Abbott generally categorizes the pre-clinical and clinical development of experimental pharmaceutical compounds;

c. Records indicating when each Program Compound reached each stage of pre-clinical or clinical development into which Abbott generally categorizes the pre-clinical and clinical development of experimental pharmaceutical compounds;

d. Reports/Summaries/Meeting Minutes which evidence the current status of each Program Compound; and

e. Management Reports and/or other documents prepared in the normal course of business which indicate future prospects and development expectations for each Program Compound.

3678931v1

CONFIDENTIAL
JHII 011886

# Hair Deposition Exhibit 2

# D's Exhibit HY



-----Original Message-----
**From:** Davis, Brian [mailto:BDavis@choate.com]
**Sent:** Tuesday, April 05, 2005 9:46 AM
**To:** D'Amore, Stephen
**Cc:** cmartinez@stoneturn.com; mhair@stoneturn.com
**Subject:** RE: John Hancock/Abbott - Audit Issues

Steve,

May I have your response to the requests contained in the e-mail message that I sent to you last Tuesday (the text of which is set out below)?  As mentioned in that message, John Hancock would like to bring the current audit to a close as soon as possible.

Thank you.

Brian Davis
CHOATE, HALL & STEWART LLP
Tele: 617-248-5056

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

Steve,

Thank you for your message.  We now have established that Abbott refuses to answer any of the questions contained in Mr. Hair's March 10, 2005 e-mail message to Ms. Campbell.  You still have not addressed the second part of my March 25 inquiry, however.  Is Abbott willing to make knowledgeable Abbott personnel available to representatives of the StoneTurn Group for the purpose of answering questions regarding the books and records that have been produced by Abbott and the subject matter of the audit?  StoneTurn personnel have various audit questions that cannot be answered from an inspection of the materials produced by Abbott, and they wish to obtain answers to those questions as soon as possible.  Furthermore, direct interviews of knowledgeable personnel are a typical part of the audit process, and have been permitted by Abbott in the course of past audits of Abbott performed by StoneTurn representatives.  There is no valid reason why the present audit should be treated any differently.  Once again, I ask that you notify me of Abbott's position on this issue.

With respect to the documents that Abbott removed from the copy set that was sent to StoneTurn, I never agreed that Abbott could refuse to copy books and records that had been designated by StoneTurn on the ground that Abbott subsequently deemed them to be irrelevant.  As previously stated, all of the materials designated by StoneTurn were selected for copying because of their apparent relevance.  I ask again that Abbott abide by its prior agreement to deliver copies of those materials to StoneTurn within "3-5 business days after the day on which they are designated."  I further ask that Abbott (or your office) immediately provide me with a log of any and all documents that were removed by Abbott from the copy set that was sent to StoneTurn (regardless of the basis for that decision) that sets forth: (a) the full title of the document; (b) the date of the document; (c) the full name and title of each author of the document; (d) the full name and title of each recipient of the document; (e) a description of the general subject matter of the document; and (f) an identification of the specific grounds upon which it was removed and withheld by Abbott.  As you know, John Hancock has expressly reserved the right to challenge any claim of attorney-client privilege or work product that Abbott may assert with respect to documents or materials produced during the audit.  John Hancock intends to exercise that right, as appropriate, in the circumstances.

Brian Davis
CHOATE, HALL & STEWART LLP
Tele: 617-248-5056

**CONFIDENTIAL**

4/6/2005

**ABBT 0000215**

Message                                                                      Page 2 of 6

-----Original Message-----
**From:** D'Amore, Stephen [mailto:SDamore@winston.com]
**Sent:** Tuesday, March 29, 2005 10:24 AM
**To:** Davis, Brian
**Subject:** RE: John Hancock/Abbott - Audit Issues

Brian,

I also do not see any value in debating your general question of what obligations, not explicit in the text of the agreement, can be "derived" from Section 2.5's requirement that Abbott's relevant "books and records" shall be "subject to copying, inspection and audit. . . ." The only questions that are ripe to debate at this point are those that were, in fact, asked by StoneTurn in Mark Hair's March 10, 2005 e-mail. In that e-mail, Mr. Hair requested that Abbott undertake the grossly unreasonable and unduly burdensome task of going over the 800-plus boxes containing millions of pages of documents made available and reviewed by StoneTurn to identify by title and location the responsiveness of those documents to the individual items in Hancock's audit request. I am quite confident that you are wrong in your assumption that Section 2.5, or any "typical" form of audit, requires Abbott to undertake that task as part of a "reasonable response" to an audit request.

Concerning the small number of documents designated by StoneTurn from "Box 17" that were not copied, those documents were not copied because they were privileged, subject to attorney work product or were not within the scope of Hancock's audit right or audit request. Your comment about waiver of privilege is baseless. In your January 19, 2005 e-mail concerning, inter alia, audit materials subject to privilege and work product you stated that "John Hancock agrees that Abbott's inadvertent production of such documents or materials shall not constitute a waiver of any claim of attorney-client privilege or work product that Abbott may have with respect to such documents or materials." Moreover, whether or not StoneTurn designated them for copying, Abbott will not provide copies of materials not related to the Research Program under the Agreement or otherwise not responsive to the audit request, even if they were inadvertently made available for inspection by StoneTurn. Copies of this small number of documents, therefore, will not be sent to StoneTurn. The remainder of the contents of Box 17 have already been copied and shipped to StoneTurn.

Finally, your comment about my January 30, 2005 e-mail is a complete distortion of that e-mail. Among other things, the e-mail clearly does not promise to provide Hancock's auditors copies of privileged or non-responsive material under any timeframe.

Sincerely,

Stephen D'Amore
WINSTON & STRAWN LLP
(312) 558-5934


-----Original Message-----
**From:** Davis, Brian [mailto:BDavis@choate.com]
**Sent:** Friday, March 25, 2005 4:29 PM
**To:** D'Amore, Stephen
**Cc:** cmartinez@stoneturn.com; mhair@stoneturn.com; Troake, Karen Collari
**Subject:** RE: John Hancock/Abbott - Audit Issues

Steve,

I received your message. Abbott's obligation to provide reasonable responses to questions posed by John Hancock's independent auditors, the StoneTurn Group, derives from Abbott's explicit agreement in Section 2.5 to subject its books and records concerning the Research Program to "copying, inspection and audit by (and at the

4/6/2005

CONFIDENTIAL
ABBT 0000216

expense of) John Hancock at any time and from time to time." I don't intend to debate the point with you; I'm simply trying to determine Abbott's position. I understand from your response that, notwithstanding the language of Section 2.5, Abbott is not willing to answer questions raised by StoneTurn representatives regarding the materials produced and the subject matter of the audit, and is not prepared to make knowledgeable Abbott personnel available for that purpose. If I am wrong in this regard, please correct me.

Concerning the designated audit documents that Abbott has removed from the copy set sent to StoneTurn, any privilege associated with those documents was waived when Abbott voluntarily produced them for inspection the week of March 7. Furthermore, the documents were designated for copying (and presumably were made available for inspection by Abbott in the first instance) *precisely because they are relevant to the subject matters that StoneTurn is auditing.* Finally, Abbott's refusal to deliver copies of documents designated by StoneTurn personnel in the course of the audit directly violates the promise contained in your January 30, 2005 e-mail message to me, in which you stated that "Abbott will endeavor to have copies of audit materials designated by StoneTurn delivered to StoneTurn 3-5 business days after the day on which they are designated." Accordingly, I ask that Abbott immediately deliver to StoneTurn all materials designated for copying by StoneTurn personnel in the form in which they originally were produced by Abbott. Please let me know by Monday, March 28, whether Abbott will honor this request.

Sincerely,

Brian Davis
CHOATE, HALL & STEWART LLP
Tele: 617-248-5056

-----Original Message-----
**From:** D'Amore, Stephen [mailto:SDamore@winston.com]
**Sent:** Friday, March 25, 2005 4:01 PM
**To:** Davis, Brian
**Subject:** RE: John Hancock/Abbott - Audit Issues

Brian,

I do not share your purported belief that Abbott misunderstands the terms of the Research Funding Agreement and its corresponding obligations. I invite you to identify where in the Agreement, and specifically where in Section 2.5 of the Agreement, Abbott is obligated to provide answers to Mr. Hair's March 10, 2005 email seeking an identification of the location within the production and the responsiveness of the more than 800 boxes containing million of pages of documents that Abbott has made available to StoneTurn for copying, inspection and audit. I, for my own part, cannot find any such obligation in Section 2.5 of the Agreement, and I do not believe any such obligation is contained elsewhere in the Agreement's text or spirit. Having had access to Abbott's audit documentation there is no reason why StoneTurn itself could not have cataloged the location and identified the responsiveness of the millions of pages of documents that Abbott has produced over the course of the last nine or ten months. If those are the questions that StoneTurn would like to have answered, i.e., questions about the location within the production and responsiveness of the millions of pages Abbott has produced (and StoneTurn itself has already reviewed), then Ms. Campbell has accurately articulated Abbott's unwillingness to engage in that exercise.

Additionally, I believe your comments about the spirit of the Agreement and about what is "typical" for a compliance audit are inconsistent with Hancock's refusal to identify the audit documentation that StoneTurn has provided to Hancock's outside litigation counsel during pending litigation, a request that falls clearly within the inherent meaning and spirit of Section 2.5's requirement that the auditors must be independent and reasonably acceptable to Abbott. Moreover, there has been nothing "typical" about the way Hancock has attempted to exercise its audit rights here. I would venture to say that the extraordinarily burdensome and unreasonably broad scope of Hancock's audit request is <u>atypical</u>, if not unprecedented, in Abbott's experience, and is far more akin to a fishing expedition or litigation discovery.

1/6/2005                                    **CONFIDENTIAL**           **ABBT 0000217**

Message

Finally, with respect to the last box of audit documentation designated by StoneTurn for copying during the week of March 7, certain documents contained in that box, and made available to StoneTurn for review, were removed and are being evaluated as potentially privileged or non-responsive to Hancock's audit request because, among other things, they do not address the Program Compounds under the Agreement. I believe Michelle Campbell has already communicated this to Mr. Hair. After evaluation Abbott will send copies of any of these documents that are non-privileged and responsive directly to StoneTurn.

Thank you.

Stephen D'Amore
WINSTON & STRAWN LLP
(312) 558-5934

-----Original Message-----
**From:** Davis, Brian [mailto:BDavis@choate.com]
**Sent:** Thursday, March 24, 2005 10:01 AM
**To:** D'Amore, Stephen
**Cc:** mhair@stoneturn.com; cmartinez@stoneturn.com
**Subject:** John Hancock/Abbott - Audit Issues

Steve,

I have included at the bottom of this message an e-mail that Michelle Campbell sent to Mark Hair of the StoneTurn Group on March 22, 2005. The content of the e-mail is self-explanatory, but I believe that it reflects a misunderstanding of the terms of the Research Funding Agreement and Abbott's corresponding obligations. Section 2.5 of the Agreement provides, in relevant part, that the "books and records of Abbott and each Subcontractor related to the Research Program ... shall be subject to copying, inspection and audit by (and at the expense of) John Hancock at any time and from time to time." Hancock's right to "audit" Abbott's compliance with the Agreement is separate from, and in addition to, its right to inspect and copy Abbott's books and records. An "audit" typically encompasses a comprehensive examination process in which the auditor is free, at a minimum, to ask follow-up questions and obtain relevant information both orally and in written form. Such a view of the audit process also is consistent with the manner in which StoneTurn representatives have performed audits of Abbott's operations in the past (with, I note, Abbott's approval and cooperation).

I understand from Ms. Campbell's March 22 e-mail that Abbott asserts that it has fulfilled its obligations under Section 2.5 simply by making certain written documents requested by John Hancock and StoneTurn available for inspection and copying, and that Abbott now is refusing to answer questions raised by StoneTurn representatives regarding the materials produced and the subject matter of the audit. I ask you to confirm whether Ms. Campbell accurately has stated Abbott's position. If so, I ask that Abbott reconsider its position, which is contrary to both the plain terms, and the spirit, of Section 2.5. If not, I would like to work with you to make the necessary arrangements to allow StoneTurn to complete its compliance audit. We are rapidly approaching the one-year anniversary of John Hancock's initial audit request and Hancock is anxious to bring the audit process to a conclusion as soon as possible. Accordingly, prompt answers to these questions would be appreciated.

On a related note, I have been informed that certain documents produced to StoneTurn by Abbott during the week of March 7 and designated for copying may have been removed from the copy set delivered to StoneTurn. Please confirm that all materials designated for copying by StoneTurn have been delivered to StoneTurn in the form in which they were produced by Abbott.

Thank you. I look forward to your response.

Brian Davis
CHOATE, HALL & STEWART LLP
Tele: 617-248-5056

**CONFIDENTIAL**

•••••••••••••••••••••••••••••••••••••••••••••

**ABBT 0000218**

Hi Mark -

I am responding to your March 10, 2005 e-mail regarding the audit documents. You should have received today the final box of copies of documents from among those designated during the week of March 7, 2005. You should receive by the end of this week additional documents, less than one box, that were not available for review before your team left on Thursday, March 10.

Regarding the spreadsheet for ABT-627 mentioned in your e-mail, I will also try to send either an electronic version of the spreadsheet or a more easily readable print out of the spreadsheet as soon as possible.

Finally, regarding your remaining questions and request for identification of the specific documents that respond to each category of Hancock's audit requests, Abbott has fulfilled its obligation to comply with the audit provision of the contract, subject to the production of the remaining number of documents mentioned above.

Kind Regards,

Michelle

---

Confidentiality Statement:

This Message is transmitted to you by the law firm of Choate, Hall & Stewart LLP. The substance of this message, along with any attachments, may be confidential and legally privileged. If you are not the designated recipient of this message, please destroy it and notify the sender of the error by return e-mail or by calling 1-800-520-2427.

For more information about Choate, Hall & Stewart LLP, please visit us at www.choate.com

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.

---

Confidentiality Statement:

This Message is transmitted to you by the law firm of Choate, Hall & Stewart LLP. The substance of this message, along with any attachments, may be confidential and legally privileged. If you are not the designated recipient of this message, please destroy it and notify the sender of the error by return e-mail or by calling 1-800-520-2427.

For more information about Choate, Hall & Stewart LLP, please visit us at www.choate.com

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege.

4/6/2005

**CONFIDENTIAL**

**ABBT 0000219**

Message

Please do not disseminate this message without
the permission of the author.

Confidentiality Statement:

This Message is transmitted to you by the law firm of Choate, Hall & Stewart LLP.  The substance of this message, along
with any attachments, may be confidential and legally privileged.  If you are not the designated recipient of this message,
please destroy it and notify the sender of the error by return e-mail or by calling 1-800-520-2427.

For more information about Choate, Hall & Stewart LLP, please visit us at www.choate.com

4/6/2005

**CONFIDENTIAL**

**ABBT 0000220**

# Hair Deposition Exhibit 3

# D's Exhibit HW

 **Michelle L Campbell**
03/25/2005 03:05 PM

To: "Mark Hair" <mhair@stoneturn.com>
cc: "Chris Martinez" <cmartinez@stoneturn.com>
Subject: Re: John Hancock Audit 

Hi Mark -

Certain documents were removed, and are being investigated as being either non-responsive to the audit request or privileged.

Have a great holiday.

Michelle L. Campbell
Litigation Paralegal
Abbott Laboratories
Dept. 324  Bldg. AP6D
100 Abbott Park Road
Abbott Park, Illinois 60064
Phone: 847-937-1518
Fax:    847-938-6235

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, use or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by return e-mail , and delete it from his or her computer.

"Mark Hair" <mhair@stoneturn.com>

 **"Mark Hair"**
**<mhair@stoneturn.co**
**m>**
03/23/2005 03:48 PM

To: "Michelle L Campbell" <michelle.campbell@abbott.com>
cc: "Chris Martinez" <cmartinez@stoneturn.com>
Subject: John Hancock Audit

Michelle,

We have gone through the copies of box #17 that we received yesterday. It appears that some of the documents requested are not included in the copy set (StoneTurn requested a complete set of copies of the entire box). Please confirm that all documents from box #17 have been provided or explain why certain documents have not been provided. Your immediate attention to this matter is appreciated. Thank you.

Mark Hair
StoneTurn Group, LLP

Office: 925-974-3376
Fax: 925-974-3338
Mobile: 203-300-3692

**CONFIDENTIAL**

**ABBT 0000270**

mhair@stoneturn.com
www.stoneturn.com

2121 N. California Blvd., Suite 290
Walnut Creek, CA  94596

f

**CONFIDENTIAL**

**ABBT 0000271**

# Hair Deposition Exhibit 4

# D's Exhibit HX



"Mark Hair"
<mhair@stoneturn.co
m>

03/22/2005 11:22 AM

To: "Michelle L Campbell" <michelle.campbell@abbott.com>
Subject: FW: FW: JH - Abbott Audit Documentation

Michelle,

We have not yet received some of the flagged documents from our review during the week of March 7th. We are still waiting for a copy of box #17 and copies of other documents that were not available for our review (Carey said that since they weren't ready to be reviewed when we were there, he would make a complete copy and send to us).  Do you know when we can expect the remaining documents?  Also, do you have responses to the questions in the March 10th email (see below)?  Thanks for your assistance.

-Mark

---

**From:** Mark Hair
**Sent:** Friday, March 18, 2005 2:28 PM
**To:** 'Michelle L Campbell'
**Cc:** Chris Martinez
**Subject:** RE: FW: JH - Abbott Audit Documentation

Michelle,

We received 3 more boxes yesterday.  We are still waiting for copies of box # 17 and the set of documents that were not available for our review last week.  Also, please let us know if you have responses to the questions in last week's email (see below).  Thanks.

-Mark

---

**From:** Michelle L Campbell [mailto:michelle.campbell@abbott.com]
**Sent:** Tuesday, March 15, 2005 2:08 PM
**To:** Mark Hair
**Cc:** Chris Martinez
**Subject:** Re: FW: JH - Abbott Audit Documentation



**CONFIDENTIAL**

**ABBT 0000273**

Mark -

Additional boxes are being copied and will be shipped to you for receipt by the end of the week. I am currently traveling and do not yet have a response to the your e-mail.

Thanks

Michelle L. Campbell
Litigation Paralegal
Abbott Laboratories
Dept. 324 Bldg. AP6D
100 Abbott Park Road
Abbott Park, Illinois 60064
Phone: 847-937-1518
Fax:   847-938-6235

---

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, use or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by return e-mail , and delete it from his or her computer.

---

| "Mark Hair" <mhair@stoneturn.com> | To: | <michelle.campbell@abbott.com> |
|---|---|---|
| 03/15/2005 01:39 PM | cc: | "Chris Martinez" <cmartinez@stoneturn.com> |
| | Subject: | FW: JH - Abbott Audit Documentation |

Michelle,

We received 5 boxes of documents last Friday and another 2 boxes today. Are there more boxes to come? Also, I haven't heard back from you on the email below. Please let us know your responses to the questions below. Thanks for your assistance.

Mark Hair

---

**From:** Mark Hair
**Sent:** Thursday, March 10, 2005 12:21 PM
**To:** Michelle L Campbell
**Cc:** Chris Martinez
**Subject:** JH - Abbott Audit Documentation

CONFIDENTIAL

ABBT 0000274

Michelle,

It was good to meet you briefly yesterday in Mundelein. As I mentioned yesterday, we have some observations and questions related to the documents provided for the audit.

This week, a total of 17 new boxes were provided for review. We flagged documents to be copied, gave requests to Carey Crimmins, and several boxes have already been sent out for copying. When should we plan to receive the copied documents? Please continue to send copies to my attention at the address below.

Also, we noted some financial documents/spreadsheets that appeared to provide cost details for one of the Program Compounds, ABT-627. The formatting of the documents caused various costs to be printed on separate pages from the cost descriptions, making the financial reports unusable. We discussed this issue with Carey and flagged this report as well as other documents for further follow up. We would like electronic copies of these documents or have documents printed in a usable format. Additionally, the above mentioned spreadsheet appears to be only related to program costs incurred for ABT-627 during 2004. Are similar reports available for the other Program Compounds and other years (2000 – 2004)? If so, when will these documents be made available for review?

We also noted that there are no emails included in the boxes related to the Program Compounds. It is our understanding that requests were made for emails to be available for review. Have emails been provided in the available documents? If so, which boxes contain these emails? If they have not yet been produced, when will they be available for review?

As we left the Mundelein facility today, Carey said that there was one additional set of documents (less than one box) that was not available at the time of our review, but that the entire set of documents would be copied and sent to us. Except for this one set of documents, Carey was not aware of any additional documents that were going to be produced for the audit. I wanted to confirm this with you as well. Have all documents been made available for the audit? Are you aware of any additional documents that have not yet been provided to us? If so, when will additional documents be available for review?

Attached is a spreadsheet summarizing John Hancock's requests for information/documentation as included in Schedule A of the April 12, 2004 letter from Steven Blewitt. Are all documents related to these requests included in the documents currently available for review? With respect to each of the requested items from Schedule A, please respond to the following:

(i)      Whether all requested information/documents have been produced for the Audit
(ii)     The titles and descriptions of the responsive documents
(iii)    The location of the documents, including site and box number

Thank you for your assistance, and I look forward to hearing from you.

Mark Hair

**CONFIDENTIAL**

**ABBT 0000275**

StoneTurn Group, LLP

Office: 925-974-3376
Fax: 925-974-3338
Mobile: 203-300-3692
mhair@stoneturn.com
www.stoneturn.com

2121 N. California Blvd., Suite 290
Walnut Creek, CA 94596

**CONFIDENTIAL**

**ABBT 0000276**

# Hair Deposition Exhibit 5

# D's Exhibit HZ



"Mark Hair"
<mhair@stoneturn.co
m>

03/18/2005 04:28 PM

To: "Michelle L Campbell" <michelle.campbell@abbott.com>
Subject: RE: FW: JH - Abbott Audit Documentation

Michelle,

We received 3 more boxes yesterday.  We are still waiting for copies of box # 17 and the set of documents that were not available for our review last week.  Also, please let us know if you have responses to the questions in last week's email (see below).  Thanks.

-Mark

**From:** Michelle L Campbell [mailto:michelle.campbell@abbott.com]
**Sent:** Tuesday, March 15, 2005 2:08 PM
**To:** Mark Hair
**Cc:** Chris Martinez
**Subject:** Re: FW: JH - Abbott Audit Documentation



Mark -

Additional boxes are being copied and will be shipped to you for receipt by the end of the week.  I am currently traveling and do not yet have a response to the your e-mail.

Thanks

Michelle L. Campbell
Litigation Paralegal
Abbott Laboratories
Dept. 324  Bldg. AP6D
100 Abbott Park Road
Abbott Park, Illinois 60064
Phone: 847-937-1518
Fax:    847-938-6235

---

This communication may contain information that is legally privileged, confidential or exempt from disclosure.  If you are not the intended recipient, please note that any dissemination, distribution, use or copying of this communication is strictly prohibited.  Anyone who receives this message in error should notify the sender immediately by return e-mail , and delete it from his or her computer.

---

"Mark Hair" <mhair@stoneturn.com>

03/15/2005 01:39 PM

To:    <michelle.campbell@abbott.com>
cc:    "Chris Martinez" <cmartinez@stoneturn.com>

**CONFIDENTIAL**

**ABBT 0000277**

Subject:    FW: JH - Abbott Audit Documentation

Michelle,

We received 5 boxes of documents last Friday and another 2 boxes today. Are there more boxes to come? Also, I haven't heard back from you on the email below. Please let us know your responses to the questions below. Thanks for your assistance.

Mark Hair

---

**From:** Mark Hair
**Sent:** Thursday, March 10, 2005 12:21 PM
**To:** Michelle L Campbell
**Cc:** Chris Martinez
**Subject:** JH - Abbott Audit Documentation

Michelle,

It was good to meet you briefly yesterday in Mundelein. As I mentioned yesterday, we have some observations and questions related to the documents provided for the audit.

This week, a total of 17 new boxes were provided for review. We flagged documents to be copied, gave requests to Carey Crimmins, and several boxes have already been sent out for copying. When should we plan to receive the copied documents? Please continue to send copies to my attention at the address below.

Also, we noted some financial documents/spreadsheets that appeared to provide cost details for one of the Program Compounds, ABT-627. The formatting of the documents caused various costs to be printed on separate pages from the cost descriptions, making the financial reports unusable. We discussed this issue with Carey and flagged this report as well as other documents for further follow up. We would like electronic copies of these documents or have documents printed in a usable format. Additionally, the above mentioned spreadsheet appears to be only related to program costs incurred for ABT-627 during 2004. Are similar reports available for the other Program Compounds and other years (2000 – 2004)? If so, when will these documents be made available for review?

We also noted that there are no emails included in the boxes related to the Program Compounds. It is our understanding that requests were made for emails to be available for review. Have emails been provided in the available documents? If so, which boxes contain these emails? If they have not yet been produced, when will they be available for review?

As we left the Mundelein facility today, Carey said that there was one additional set of documents (less than one box) that was not available at the time of our review, but that

**CONFIDENTIAL**

**ABBT 0000278**

the entire set of documents would be copied and sent to us. Except for this one set of documents, Carey was not aware of any additional documents that were going to be produced for the audit. I wanted to confirm this with you as well. Have all documents been made available for the audit? Are you aware of any additional documents that have not yet been provided to us? If so, when will additional documents be available for review?

Attached is a spreadsheet summarizing John Hancock's requests for information/documentation as included in Schedule A of the April 12, 2004 letter from Steven Blewitt. Are all documents related to these requests included in the documents currently available for review? With respect to each of the requested items from Schedule A, please respond to the following:

(i)      Whether all requested information/documents have been produced for the Audit
(ii)     The titles and descriptions of the responsive documents
(iii)    The location of the documents, including site and box number

Thank you for your assistance, and I look forward to hearing from you.

Mark Hair
StoneTurn Group, LLP

Office: 925-974-3376
Fax: 925-974-3338
Mobile: 203-300-3692
mhair@stoneturn.com
www.stoneturn.com

2121 N. California Blvd., Suite 290
Walnut Creek, CA 94596

CONFIDENTIAL

ABBT 0000279

# Hair Deposition Exhibit 11

# D's Exhibit LJ
# Part I

John Hancock - Document Index

| Date Indexed | Reviewer | Date Reviewed | Copy Requested | Location | Patent | Box # | Box ID | Document | File Name | Document Type | Date Indexed |
|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021526

EXHIBIT 11
M. Hair
ln 5/9/07

John Hancock - Document Index

| Copy Requested | Date Indexed | Copy Received | Reviewer | Location | Pallet | Box # | Box ID | Compound | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021527

John Hancock - Document Index
Copy Reserved

| Date Indexed | Reviewer | Location | Pallet | Box # | Box ID | Command | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021528

John Hancock Document Index
Copy Requested     Copy Resolved

| Document Type | Date Range | File Name | Comment | Box ID | Folder | Pallet | Location | Reviewer | Date Indexed | Copy Resolved |
|---|---|---|---|---|---|---|---|---|---|---|
| Investigator Package | 2001 | | | | | | | | | |

CONFIDENTIAL
JHII 021529

John Hancock - Document Index

| Copy Requested | Date Indexed | Reviewer | Location | Pallet | Box # | Box ID | Command | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021530

John Hancock - Document Index

| | Copy Requested | Reviewer | Location | Pallet | Box # | Box ID | Command | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021531

John Hancock - Document Index

Copy Requested    Copy Resolved    Date Indexed    Reviewer    Location    Pallet    Box #    Bates ID    Compared    Document Type    File Name    Date Range

CONFIDENTIAL
JHII 021532

John Hancock - Document Index

| Copy Requested | Date Received | Date Indexed | Reviewer | Location | Pallet | Box # | Box ID | Compound | File Name | Document Type | Date Rcvd |
|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021533

# Hair Deposition Exhibit 11

# D's Exhibit LJ
# Part II

John Hancock - Document Index

| Copy Requested | Date Indexed | Reviewer | Location | Pallet | Box # | Box ID | Compound | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021534

John Hancock - Document Index

| Copy Requested | Copy Received | Date Indexed | Reviewer | Location | Paled | Box # | Box ID | Compound | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021535

John Hancock - Document Index

| Copy Acquired | Copy Received | Date Indexed | Reviewer | Location | Pallet | Box # | Box ID | Category | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021536

John Hancock - Document Index

| Copy Requested | Date Received | Reviewer | Location | Pallet | Box # | Box ID | Compound | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021537

Page 12 of 44

John Hancock - Document Index

| Copy Requested | Date Requested | Location | Reviewer | Date Indexed | Copy Received | Point | Box # | Compound | Bates # | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021538

CONFIDENTIAL
JHII 021539

John Hancock - Document Index

| Copy Requested | Copy Received | Date Indexed | Reviewer | Location | Folder | Box # | Box ID | Completed | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021540

John Hancock - Document Index

| Copy Reproduced | Reviewer | Location | Date Indexed | Box ID | Box # | Lot # | Pallet | Command | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021541

John Hancock - Document Index

| Copy Requested | Copy Received | Date Indexed | Reviewer | Location | Pallet | Box # | Box ID | Compound | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021542

John Hancock - Document Index

CONFIDENTIAL
JHII 021543

# Hair Deposition Exhibit 11

# D's Exhibit LJ
# Part III

John Hancock - Document Index

CONFIDENTIAL
JHII 021544

John Hancock - Document Index

| Copy Requested | Date Indexed | Reviewer | Location | Field | Box # | Box ID | Compound | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021545

John Hancock - Document Index

| Copy Requested | Copy Received | Date Entered | Reviewer | Location | Pallet | Box # | Box ID | Compound | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021546

John Hancock - Document Index

| Copy Requested | Copy Received | Reviewer | Location | Date Indexed | Pallet | Box # | Box ID | Company | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021547

John Hancock - Document Index

| Copy Requested | Date Indexed | Reviewer | Location | Pallet | Box # | Compound | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021548

John Hancock - Document Index
Copy Requested    Copy Received    Date Indexed    Reviewer    Location    Pallet    Box #    Box ID    Component    File Name    Document Type    Date Range

CONFIDENTIAL
JHII 021549

John Hancock - Document Index

| Copy Accepted | Location | Reviewer | Date Indexed | Copy Accepted | Folder | Box # | Bax # | Bus ID | Compound | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021550

John Hancock - Document Index

| Copy Reviewed | Date Reviewed | Reviewer | Location | Folder | Box # | Box ID | Control # | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021551

**John Hancock - Document Index**

| Copy Requested | Date Requested | Reviewer | Location | Pallet # | Box # | Test ID | Component | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021552

John Hancock - Document Index

| Copy Requested | Copy Received | Date Received | Reviewer | Location | Pallet | Box # | Box ID | Compound | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021553

# Hair Deposition Exhibit 11

# D's Exhibit LJ
# Part IV

John Hancock - Document Index

| Copy Requested | Date Indexed | Reviewer | Location | Pallet | Box # | Box ID | Compound | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021554

John Hancock - Document Index

| Copy Requested | Copy Received | Location | Reviewer | Date Indexed | Pallet | Box # | Box ID | Compound | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL

JHII 021555

John Hancock - Document Index

CONFIDENTIAL
JHII 021556

John Hancock - Document Index

| Copy Requested | Location | Reviewer | Data Indexed | Copy Received | Box # | Box ID | Category | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021557

John Hancock - Document Index

| Copy Requested | Date Indexed | Copy Requested | Location | Reviewer | Date Returned | Pallet | Box # | Box ID | Comment | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Pallet 14 | 2-247-174 | | | Mar. '02, MAF, OMR,OMR, OMF,OM41,OH41, R49A,RC,RD,RE,RF,RF/RIP1, TAP | Timesheets | 2002 |
| | | | | | | Pallet 14 | 2-247-174 | | | Mar. '02, TIMESHEET MULTI-CAT2 & T3,M45A,N, 1&V, RMF, R49/R49A & N | Timesheets | 2002 |
| | | | | | | Pallet 14 | 2-247-175 | | | Apr.'02, TAP OT AA through OT.46 | Timesheets | 2002 |
| | | | | | | Pallet 14 | 2-247-175 | | | Apr.'02 | Timesheets | 2002 |
| | | | | | | Pallet 14 | 2-247-175 | | | Apr. '02 | Timesheets | 2002 |
| | | | | | | Pallet 14 | 2-247-177 | | | AA, '02, R49U & R49V | Timesheets | 2002 |
| | | | | | | Pallet 14 | 2-247-177 | | | AA, '02, TAP | Timesheets | 2002 |
| | | | | | | Pallet 14 | 2-247-177 | | | AA, '02, TAP | Timesheets | 2002 |
| | | | | | | Pallet 14 | 2-247-177 | | | AA, '02 | Timesheets | 2002 |
| | | | | | | Pallet 14 | 2-247-178 | | | Sep. '02, TAP | Timesheets | 2002 |
| | | | | | | Pallet 14 | 2-247-178 | | | Sep. '02 | Timesheets | 2002 |
| | | | | | | Pallet 14 | 2-247-178 | | | Oct. '02 | Timesheets | 2002 |
| | | | | | | Pallet 14 | 2-247-178 | | | Nov. '02, TAP | Timesheets | 2002 |
| | | | | | | Pallet 14 | 2-247-178 | | | Nov. '02 | Timesheets | 2002 |
| | | | | | | Pallet 14 | 2-247-178 | | | Dec. '02, TAP | Timesheets | 2002 |
| | | | | | | Pallet 14 | 2-247-180 | | | Dec. '02 | Timesheets | 2002 |
| | | | | | | Pallet 14 | 2-247-180 | | | Dec. '02 | Timesheets | 2002 |
| | | | | | | Pallet 14 | 2-247-180 | | | Dec. '02 | Timesheets | 2001 |
| | | | | | | Pallet 14 | 3-109-581 | | | Oct. 2001 Timesheets R49B, R472 | Timesheets | 2001 |
| | | | | | | Pallet 14 | 3-109-581 | | | MVT - R49E - R49 | Timesheets | 2001 |
| | | | | | | Pallet 14 | 3-109-581 | | | Oct. 2001 R4Q8, R49B, R4PA, R472, R4T | | 2001 |
| | | | | | | Pallet 14 | 3-109-581 | | | September - December 2001 | | |
| | | | | | | Pallet 14 | 3-109-582 | | | FEB - MAR Dept Opt R29, R29K | | |
| | | | | | | Pallet 14 | 3-109-582 | | | FEB - MAR Dept 481/483 | | |
| | | | | | | Pallet 14 | 3-109-582 | | | Apr. '02, TAP | | |
| | | | | | | Pallet 14 | 3-109-582 | | | And BPO | | |
| | | | | | | Pallet 14 | 3-109-582 | | | MVT Dept 425/427 | | |
| | | | | | | Pallet 14 | 3-109-582 | | | MVT Dept 429, 429, 429, 5BU | | |
| | | | | | | Pallet 14 | 3-109-582 | | | MVT Dept 481/483 | | |
| | | | | | | Pallet 14 | 3-109-582 | | | MARCH BPO | | |
| | | | | | | Pallet 14 | 3-109-582 | | | FEB - MAR Dept 292 Dept MP3, 494 | | |
| | | | | | | Pallet 14 | 3-109-583 | | | MVT Dept 481 Dept 481 R29R | | 2002 |
| | | | | | | Pallet 14 | 3-109-583 | | | Mar 2002, TAP | | 2002 |
| | | | | | | Pallet 14 | 3-109-583 | | | Mar 2002 R4QA | | 2001 |
| | | | | | | Pallet 14 | 3-109-583 | | | Mar 2002 R4F | | 1998 |
| | | | | | | Pallet 14 | 3-109-584 | | | Apr 2002 R4F | | 1998 |
| | | | | | | Pallet 14 | 3-109-584 | | | June 2002 R478 | | 1998 |
| | | | | | | Pallet 11 | 1A | | A87-584 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 1A | | A87-584 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 3A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 4A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 5A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 6A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 7A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 8A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 9A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 10A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 11A | | A87-573 | Various Technical Studies | Technical Studies | |
| 3/7/09 | | | | | | Pallet 11 | 12A | | A87-573 | MVT Report 1990 to 3296N, Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 13A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 14A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 15A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 16A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 17A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 18A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 19A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 20A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 21A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 22A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 23A | | A87-573 | Various Technical Studies | Technical Studies | |
| 3/7/09 | 3/17/03 | | | | | Pallet 11 | 24A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 25A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 26A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 27A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 28A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 29A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 30A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 31A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 32A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 33A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 34A | | A87-573 | Various Technical Studies | Technical Studies | |
| | | | | | | Pallet 11 | 35A | | A87-573 | Various Technical Studies | Technical Studies | |

CONFIDENTIAL
JHII 021558

John Hancock - Document Index

CONFIDENTIAL
JHII 021559

John Hancock - Document Index

| Copy Received | Date Received | Reviewer | Location | Pallet | Box # | Box ID | Bates Number(s) | File Name | Document Type | Contents | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021560

John Hancock - Document Index
Copy Requested

| Date Indexed | Reviewer | Pallet | Box # | Box ID | Composed | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Drug Metabolism Report | |

CONFIDENTIAL
JHII 021561

John Hancock - Document Index

| Copy Requested | Date Indexed | Reviewer | Date Indexed | Location | Pallet | Box # | Box ID | Compound | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021562

John Hancock - Document Index

| Copy Requested | Date Indexed | Reviewer | Date Reviewed | Location | Pallet | Box # | Item ID | Command | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021563

**Hair Deposition Exhibit 11**

**D's Exhibit LJ**
**Part V**

John Hancock - Document Index

CONFIDENTIAL
JHIII 021564

John Hancock - Document Index

| Copy Requested | Date Indexed | Reviewer | Location | Point | Box # | Box ID | Command | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021565

John Hancock - Document Index

| Copy Requested | Copy Received | Reviewer | Date Indexed | Location | Pallet | Box # | Box ID | Compound | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021566

John Hancock - Document Index

CONFIDENTIAL
JHII 021567

John Hancock - Document Index

| Copy Requested | Copy Received | Date Indexed | Reviewer | Location | Folder | Box# | Box ID | Compound | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|

*(Table contents illegible due to image density and rotation.)*

CONFIDENTIAL
JHII 021568

John Hancock - Document Index

CONFIDENTIAL
JHII 021569

John Hancock Document Index

CONFIDENTIAL
JHII 021570

John Hancock - Document Index

| Copy Requested | Copy Received | Date Imaged | Reviewer | Date Indexed | Line Number | Folder | Box # | Box ID | Document | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021571

John Hancock - Document Index

CONFIDENTIAL
JHII 021572

**John Hancock - Document Index**

| Copy Requested | Date Indexed | Retriever | Location | Pallet | Box # | Bin ID | Compound | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021573

# Hair Deposition Exhibit 11

# D's Exhibit LJ
# Part VI

John Hancock - Document Index

Copy Requested   Date Indexed   Reviewer

| Location | Point | Box # | Bay ID | Compound | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021574

John Hancock - Document Index

| Copy Requested | Date Indexed | Reviewer | Date Reviewed | Copy Reviewed | Location | Pallet | Box # | Box ID | Command | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021575

John Hancock - Document Index

CONFIDENTIAL
JHII 021576

John Hancock - Document Index

| Copy Requested | Copy Received | Date Indexed | Reviewer | Location | Pallet | Box # | Box ID | Command | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021577

John Hancock - Document Index

CONFIDENTIAL
JHII 021578

Case 1:05-cv-11150-DPW    Document 319-8    Filed 02/22/2008    Page 7 of 11

John Hancock - Document Index

| Copy Requested | Date Indexed | Date Reserved | Reviewer | Location | Order | Box # | Run ID | Compound | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 1150 Northwest | Pallet 5 | | | A-181771, M00-242 | Proposed Package Summary | Proposal Package | |

CONFIDENTIAL
JHII 021579

Page 84 of 66

John Hancock - Document Index

| Copy Requested | Date Received | Copy Requested | Date Indexed | Reviewer | Location | Pallet | Box # | Box ID | Compound | File Name | Document Type | Doc Name |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021580

John Hancock - Document Index

CONFIDENTIAL
JHII 021581

John Hancock - Document Index

| Copy Requested | Date Indexed | Reviewer | Box ID | Box # | Folder | Location | Date Composed | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021582

John Hancock - Document Index

CONFIDENTIAL
JHII 021583

# Hair Deposition Exhibit 11

# D's Exhibit LJ
# Part VII

John Hancock - Document Index

CONFIDENTIAL
JHII 021584

John Hancock - Document Index
Copy Requested    Copy Received

CONFIDENTIAL
JHII 021585

John Hancock - Document Index

| Copy Requested | Copy Received | Date Indexed | Reviewer | Location | Bullet | Item ID | Bates # | Document | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021586

John Hancock - Document Index

CONFIDENTIAL
JHII 021587

John Hancock - Document Index

CONFIDENTIAL
JHII 021588

CONFIDENTIAL
JHII 021589

John Hancock - Document Index

CONFIDENTIAL
JHII 021590

John Hancock - Document Index

| Copy Reviewed | Date Reviewed | Reviewer | Location | Pallet | Box # | Box ID | Command | File Name | Document Type | Date Range |
|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL
JHII 021591

John Hancock - Document Index

CONFIDENTIAL
JHII 021592

Page 87 of 466

John Hancock - Document Index

CONFIDENTIAL
JHII 021593

CONFIDENTIAL
JHII 021594

John Hancock - Document Index

**Hair Deposition Exhibit 13**

**D's Exhibit LK**

(Documents that were received by StoneTurn but not identifiable or previously included in the Document Index)

| # Copy Req | Date Received | Date Indexed | Reviewer | Location | Pallet | Box | Box ID | Compound | File Name |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 03/28/05 | 03/28/05 | MH | | | | | NA | John Hancock Portfolio Summary, R&D costs and Development Timeline, 2003 Plan (1 page, 2001 Actuals, 2002 LBE, 2003 PLAN, total cumulative) |
| 2 | 03/28/05 | 03/28/05 | MH | | | | | NA | Global Pharmaceutical Research & Development, Hancock Collaboration, Spending by Program, in millions of dollars (1 page, Q4 2002, Q3 YTD 2003, Q4 LBE 2003) |
| 3 | 03/28/05 | 03/28/05 | MH | | | | | NA | Global Pharmaceutical Research & Development, Hancock Development Collaboration Portfolio, spending by Program (1 page, 2001, 2002, 2003 LBE 2004, plan 2005) |
| 4 | 03/28/05 | 03/28/05 | MH | | | | | NA | John Hancock Funding Agreement, Development Portfolio, Annual Progress Report (November 2004), (1-page word document) |
| 5 | 03/28/05 | 03/28/05 | MH | | | | | NA | Global Pharmaceutical Research & Development, Hancock Collaboration, Spending by Program, in millions of dollars (1-page, Q4 2002, Q3 YTD 2003, Q4 LBE 2003) |
| 6 | 03/28/05 | 03/28/05 | MH | | | | | NA | Global Pharmaceutical Research & Development, Hancock Development Collaboration Portfolio, Spending by Program (1-page, 2001, 2002, 2003, LBE2004, Plan 2005) |
| 7 | 03/28/05 | 03/28/05 | MH | | | | | NA | Global Pharmaceutical Research & Development, Hancock Funding Agreement, Spending by Program, in millions of dollars (1-page, Month 10 YTD 2004, Mo. 11 & 12 LBE 2004) |
| 8 | 03/28/05 | 03/28/05 | MH | | | | | ABT-627 | GPRD 2005 Plan, Atrasentan HRPCA Expanded Access program ABT 627 (1-page) |
| 9 | 03/28/05 | 03/28/05 | MH | | | | | ABT-627 | GPRD 2005 Plan, Atrasentan - Mouse and Rat Carcinogenicity ABT 627 (1-page) |
| 10 | 03/28/05 | 03/28/05 | MH | | | | | ABT-627 | GPRD 2005 Plan, Atrasentan - Non-PCA (IIT, PH II and Japan) ABT 627 (1-page) |
| 11 | 03/28/05 | 03/28/05 | MH | | | | | ABT-627 | GPRD 2005 Plan, Atrasentan - Atrasentan - Early PCA M01-366 LT Extension ABT 627 (1-page) |
| 12 | 03/28/05 | 03/28/05 | MH | | | | | ABT-627 | GPRD 2005 Plan, Atrasentan - HRPC M00-244 Continuation ABT 627 (1-page) |
| 13 | 03/28/05 | 03/28/05 | MH | | | | | ABT-751 | GPRD 2005 Plan, ABT751 - Ph II b and PH III Studies (1-page) |
| 14 | 03/28/05 | 03/28/05 | MH | | | | | ABT-510 | GPRD 2005 Plan, ABT510 TSP Peptide (1-page) |
| 15 | 03/28/05 | 03/28/05 | MH | | | | | ABT-751 | GPRD 2005 Plan, ABT751 Base Program (1-page) |
| 16 | 03/28/05 | 03/28/05 | MH | | | | | ABT-627 | GPRD 2005 Plan, Atrasentan Early PCA ABT627 (1-page) |
| 17 | 03/28/05 | 03/28/05 | MH | | | | | ABT-627 | GPRD 2005 Plan, Atrasentan Base ABT 627 (1-page) |
| 18 | 03/28/05 | 03/28/05 | MH | | | | | ABT-627 | GPRD 2005 Plan, Atrasentan Japan Registration ABT627 (1-page) |
| 19 | 03/28/05 | 03/28/05 | MH | | | | | ABT-627 | GPRD 2005 Plan, Atrasentan nonPCA Cancers (Ph II) ABT627 (1-page) |
| 20 | 03/28/05 | 03/28/05 | MH | | | | | ABT-627 | Global Pharmaceutical Research & Development, Development Portfolio, Hancock funding agreement, Spending by Program, in millions of dollars, Month 10 YTD 2004, Mo. 11 & 12 LBE 2004) |
| 21 | 03/28/05 | 03/28/05 | MH | | | | | NA | John Hancock Funding Agreement, Development Portfolio, Annual Progress Report (November 2004) (2-page Word Document) |
| 22 | 03/28/05 | 03/28/05 | MH | | | | | NA | Abbott / John Hancock Funding Collaboration, 2002 Y/E Estimate for JH Development Portfolio (3MM) (1-page, 2002 Actuals October YTD, Nov LBE, Dec LBE, 2002 LBE Projected Y/E, 2002 Plan JH Submission, Variance, Comments *4 copies) |
| 23 | 03/28/05 | 03/28/05 | MH | | | | | NA | No title, Excel spreadsheet listing John Hancock compounds (1-page, time 2003 actuals) |
| 24 | 03/28/05 | 03/28/05 | MH | | | | | NA | No title, Excel spreadsheet listing John Hancock compounds (1-page, time 2003 actuals) |
| 25 | 03/28/05 | 03/28/05 | MH | | | | | NA | No title, Excel spreadsheet listing JH compounds (1-page, M10 YTD** Actual, LBE Total) |



EXHIBIT 13
M. Har
LFL 5/8/07

CONFIDENTIAL
JHI 021598

# Hair Deposition Exhibit 15

# D's Exhibit LL

**John Hancock**
**Abbott Research Funding Agreement Audit**
**MH Notes – 3/9/05**

# REDACTED

The last box of documents provided to us on 3/9/05 included several spreadsheets related to the "Hancock Deal".

- There are several iterations of a spreadsheet, "2001 APU, Hancock LBE, GPRD" at least one spreadsheet has a date on the lower left corner of **4/16/2001**

| Source | Compound | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **773** | **627** | **594** | **510** | **492** | **100** | **518** | **751** | **724** | **Total** |
| Exhibit 1.6 (3/12/2001) | 91.5 | 38.0 | 35.0 | 9.0 | 25.0 | 6.0 | 7.0 | 10.0 | 6.0 | 227.5 |
| 2001 APU (4/16/2001) | 69.7 | 33.9 | 7.4 | 9.5 | 25.5 | - | 6.0 | 7.4 | - | 159.4 |
| Difference | (21.8) | (4.1) | (27.6) | 0.5 | 0.5 | (6.0) | (1.0) | (2.6) | (6.0) | (68.1) |

- A spreadsheet, "2001 Actual, GPRD, HANCOCK DEAL" reports actual spending for each Program Compound by month. The total spending for all compounds is $171,662, which agrees to the 2003 Preliminary Annual Research Plan as included in the 12/20/2002 letter from Abbott to John Hancock. At the bottom of the spreadsheet, there is a monthly and quarterly analysis of revenue recognition related to the John Hancock funding. Two tests are applied to determine revenue recognition. Test two notes "46 month life of deal" in the revenue calculations and appears to be used to determine the life or period of time to recognize revenue.

EXHIBIT 15

M. Hair
LA 5/8/07

CONFIDENTIAL
JHII 021636

# Hair Deposition Exhibit 16

# D's Exhibit LM

John Hancock / Abbott
Summary of Available Monthly Project Status Reports
As of 3/11/05*

**2001**

| Compounds | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ABT-773 |  | x | x | x | x | x | x | x | x | x | x |  | 9 |
| ABT-627 |  | x | x | x | x | x | x | x | x | x | x | x | 10 |
| ABT-594 |  |  | x | x |  | x | x |  | x | x |  | x | 7 |
| ABT-492 |  | x | x | x | x | x | x | x | x | x |  |  | 9 |
| ABT-510 |  | x | x | x | x | x | x | x | x | x | x | x | 10 |
| ABT-518 |  |  | x | x | x | x |  | x | x |  | x |  | 6 |
| ABT-751 |  | x | x | x | x | x | x | x | x | x | x | x | 10 |
| ABT-100 |  |  |  |  |  |  |  |  | x | x | x | x | 4 |
| ABT-724 |  |  |  |  |  |  |  |  | x | x | x | x | 4 |
| **Total** | 0 | 7 | 7 | 7 | 6 | 5 | 9 | 8 | 6 | 7 |  | 7 |  |

**2002**

| Compounds | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ABT-773 | x | x |  |  | x | x |  | x | x | x |  |  | 7 |
| ABT-627 | x | x |  |  | x | x |  | x | x | x |  |  | 8 |
| ABT-594 | x | x |  |  | x | x |  | x | x | x |  |  | 8 |
| ABT-492 | x | x |  |  | x | x |  | x | x | x |  |  | 8 |
| ABT-510 | x | x |  |  | x | x |  | x | x | x |  |  | 8 |
| ABT-518 | x | x |  |  | x | x |  | x | x | x |  |  | 8 |
| ABT-751 | x | x |  |  |  |  |  |  |  |  |  |  | 2 |
| ABT-100 | x | x |  |  | x | x |  | x | x | x |  |  | 8 |
| ABT-724 |  |  |  |  |  |  |  |  |  |  |  |  |  |
| **Total** | 7 | 7 | 6 | 0 | 6 | 6 | 6 | 0 | 6 | 6 | 0 | 0 |  |

**2003**

| Compounds | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ABT-773 |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
| ABT-627 |  | x |  |  | x |  |  |  |  |  |  |  | 2 |
| ABT-594 |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
| ABT-492 |  | x |  |  |  | x |  |  |  |  |  |  | 1 |
| ABT-510 |  | x |  |  | x |  |  |  |  |  |  |  | 2 |
| ABT-518 |  |  |  |  |  | x |  |  |  |  |  |  | 0 |
| ABT-751 |  | x |  |  |  |  |  |  |  |  |  |  | 2 |
| ABT-100 |  | x |  |  |  |  |  |  |  |  |  |  | 0 |
| ABT-724 |  |  |  |  |  |  |  |  |  |  |  |  | 1 |
| **Total** | 0 | 5 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |

**2004**

| Compounds | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ABT-773 |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
| ABT-627 |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
| ABT-594 |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
| ABT-492 |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
| ABT-510 |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
| ABT-518 |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
| ABT-751 |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
| ABT-100 |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
| ABT-724 |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
| **Total** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |

NOTE:
* Responses based on index of Abbott documents and not based on actual documents received from documents as of 3/11/05


EXHIBIT 6
M. Hair
vr 5/8/07

CONFIDENTIAL
JHII 021637

**Hair Deposition Exhibit 17**

**D's Exhibit MA**

EXHIBIT 17
M. Hair
abbies

# February 2001

# ABT-518

**Feb-01**

## ABT-518   Matrix Metalloproteinase Inhibitor

| Division | Dev Stage | Generic Name | Brand Name |
|---|---|---|---|
| Oncology | Phase I | | |

**Description**

ABT-518 is a metalloproteinase inhibitor that selectively targets MMP-2 and MMP-9, matalloproteinases that have been implicated in the progression of cancer.

In preclinical studies ABT-518 inhibits tumor growth in a variety of murine tumor models when administered alone, or acts synergistically with cytotoxic agents. ABT-518 also blocks blood vessel formation in a murine angiogenesis model.

HIGHLY CONFIDENTIAL — FOR INTERNAL USE ONLY
DISCLOSURE OF ANY PART OF THIS INFORMATION TO ANYONE OUTSIDE THE COMPANY IS STRICTLY FORBIDDEN AND IS A VIOLATION OF FEDERAL LAW AND YOUR EMPLOYMENT AGREEMENT.

HIGHLY CONFIDENTIAL
ABBT 0000343

1 of 1

# February 2001

## ABT-518

### Monthly Highlights – Key Project Progress

- Study initiation visits were conducted on 2/14 and 2/15.

### Next Quarter's Key Progress Markers

| Key Progress Marker | Target Date |
|---|---|
| First patient enrolled | 3/12 |
| Preliminary results from 6-week rat hepatotoxicity study | 3/31 |
| Pre-IND meeting with FDA | 6/1 |
| Preliminary results from 3-month rat chronic toxicity study | 6/30 |

### Key Project Issues and Risks

| Risk or Issue | Potential or Known Impact<br>Check all that apply and Describe Impact | Strategy / Progress | Area /<br>Responsibility | Resolution<br>Date<br>Planned / Actual |
|---|---|---|---|---|
| Identification of FDA requirements for cytostatic agents in oncology drug development. | ☐ Cost ☐ Time ☐ Profile ☑ Regulatory | Phase I IND study to Transition program to solicit FDA input. | Clinical | 6/1/01 |
| Key tox finding was hepatotoxicity in one-month rat study. In-vitro and in-vivo data indicate a potential for mechanism based drug interactions. | ☐ Cost ☐ Time ☑ Profile ☑ Regulatory | The Phase I first-in-man protocol has been designed to address these issues. A 6-week tox and metabolism studies have been completed. Results are under review. A 3-month rat toxicity study is ongoing. | Toxicology/<br>Metabolism | 7/1/01 |

HIGHLY CONFIDENTIAL
ABBT 0000344

HIGHLY CONFIDENTIAL – FOR INTERNAL USE ONLY
DISCLOSURE OF ANY PART OF THIS INFORMATION TO ANYONE OUTSIDE THE COMPANY IS STRICTLY FORBIDDEN AND IS A VIOLATION OF FEDERAL LAW AND YOUR EMPLOYMENT AGREEMENT

February 2001

# ABT-518

## Key Project Issues and Risks

| Risk or Issue | Potential or Known Impact<br>Check all that apply and Describe Impact | Strategy / Progress | Area /<br>Responsibility | Resolution<br>Date<br>Planned / Actual |
|---|---|---|---|---|
| As several competitors are in Phase II/III, ABT-518 product profile will need to demonstrate advantage over the other compounds (i.e., safety/efficacy) | ☐ Cost  ☐ Time  ☑ Profile  ☐ Regulatory | Ongoing analysis and comparison of competition throughout transition. ABT-518 has the potential to be the best in class compound. Pfizer (Agouron) announced 8/4/00 that they were stopping Phase III trials of prinomastat in advanced prostate and NSCLC because "primary efficacy objectives were not met". They are continuing trials in less advanced tumors, e.g., glioma and NSCLC, and will start trials in two additional tumor types. Efficacy was shown with marimastat in less advanced gastric cancer, but British Biotech announced on 9/27/00 that marimastat in combination with carboplatin was no better than carboplatin alone in advanced ovarian cancer. Marimastat development was discontinued on 2/15/01. Both the Pfizer compound and British Biotech's compound are hindered by dose-limiting joint toxicity. | Competitive Environment | |
| | ☐ Cost  ☐ Time  ☐ Profile  ☐ Regulatory | | | |

HIGHLY CONFIDENTIAL – FOR INTERNAL USE ONLY<br>DISCLOSURE OF ANY PART OF THIS INFORMATION TO ANYONE OUTSIDE THE COMPANY IS STRICTLY FORBIDDEN AND IS A VIOLATION OF FEDERAL LAW AND YOUR EMPLOYMENT AGREEMENT

HIGHLY CONFIDENTIAL<br>ABBT 000346

# February 2001

## ABT-518

### Key Activities

#### Commercial

Plan Date: 3/2000

| Activity | Plan | Actual |
|---|---|---|
| Market research to assess commercial potential of cancer types, both US and Ex-US..... | 10/2000 | |
| Assessment of patient compliance (for revision of forecast) | | |
| Assessment of off-label vs. spillover use (for revision of forecast) | | |
| Assessment of cancer market growth (for revision of forecast) | | |
| Assist with advisory planning | | |
| Development of brand and generic names | | |

#### Drug Substance

Plan Date: 3/2000

| Activity | KG | Plan | Actual | LBE | Actual Projected Cost/Kg |
|---|---|---|---|---|---|
| Chem Scien (GLP) | 3.0/1.7 | 6/2000 | 6/16/00 | 4/2001 | $133,300 |
| Chem Scien (GMP) | 2.0/3.8 | 6/2000 | 6/29/00 | 3/2001 | $133,300 |
| Chem Scien | 15.0 | 6/2001 | | 3/2001 | |
| SPD | | | | 4/2001 | |
| SPD | | | | | |
| SPD | | | | Late 2001 | |
| Demo Lot | | | | | |
| NDA Lot #1 | | | | | |
| NDA Lot #2 | | | | | |
| NDA Lot #3 | | | | | |
| Validation Lot | | | | | |

#### Formulation

Plan Date: 3/2000

| Activity | Plan | Actual |
|---|---|---|
| Phase I Formulation | 10/2000 | |
| Phase II Formulation | | |
| Formulation for Bio Study | | |
| Phase III Clinical Supplies Manufactured | | |
| NDA Lots (3) Completed | | |
| Completion of 1 Year Stability for NDA | | |
| Formulation Peer Review | | |

#### Toxicology

Plan Date: 3/2000

| Toxicology Activity | Planned Start | Actual Start Date | Report Completed |
|---|---|---|---|
| Gene Toxicology | 5/2000 | | |
| Acute Studies | 5/2000 | | |
| 2-Week Monkey (non-GLP) | 12/1999 | 12/14/99 | |
| 1-Month Rat (non-GLP screening) | 12/1999 | 12/14/99 | |
| 1 Month Rat (GLP) | 6/2000 | 6/27/00 | |
| 1 Month Monkey (GLP) | 6/2000 | 6/29/00 | |
| 3 Month Rat | 1/2001 | 1/2/01 | |
| 3 Month Mouse MTD | | | |
| SEG I and SEG II | | | |
| SEG III Rat (post natal development) | | | |
| 6 Month Rat | | | |
| 1 Year Monkey | | | |
| Carcinogenicity (2 yr) Rat | | | |
| Carcinogenicity (2 yr) Mouse | | | |

4 of 4

HIGHLY CONFIDENTIAL – FOR INTERNAL USE ONLY
DISCLOSURE OF ANY PART OF THIS INFORMATION TO ANYONE OUTSIDE THE COMPANY IS STRICTLY FORBIDDEN AND IS A VIOLATION OF FEDERAL LAW AND YOUR EMPLOYMENT AGREEMENT

HIGHLY CONFIDENTIAL
ABT 000346

# February 2001

# ABT-518

## All Clinical Studies:

| Protocol Number | Phase | Study Name | Start 1st Pt. Dosed | End (Last CRF In) | Patients Target | Current |
|---|---|---|---|---|---|---|
| M00-235 | I | MO Study in cancer patients | 2/28 | | 40 | |
| TBD | I | IND Study | | | 20 | |

| Protocol Number | Phase | Study Name | Start 1st Pt. Dosed | End (Last CRF In) | Patients Target | Current |
|---|---|---|---|---|---|---|

5 of 5

HIGHLY CONFIDENTIAL – FOR INTERNAL USE ONLY

DISCLOSURE OF ANY PART OF THIS INFORMATION TO ANYONE OUTSIDE THE COMPANY IS STRICTLY FORBIDDEN AND IS A VIOLATION OF FEDERAL LAW AND YOUR EMPLOYMENT AGREEMENT

HIGHLY CONFIDENTIAL
ABBT 0000347

# February 2001

## ABT-518

### Ongoing Clinical Studies (List first time in man, Phase II Dose-Ranging and Pivotal Trials)

**Protocol:** M00-235 - Phase I MD in cancer patients    MXX-XXX – TITLE

**Objective:** Determine MTD and safety profile in cancer patients

**ABT-518 Doses:** 25, 50, 100, 200, 400, 800, 1200, 1600, 2000 mg/day

**Comparator Doses:** N/A

**Target Enrollment:** 40

**Status:** Study initiated, clinical supplies delivered

**Major Findings:**

*(Author:*
*Double click on chart to*
*edit)*

Enrollment



Legend: ■ Actual — Target

X-axis: Mar-01, Apr-01, May-01
Y-axis: 0, 0.1, 0.2, 0.3, 0.4, 0.5, 0.6, 0.7, 0.8, 0.9, 1

D477Z\MPSRs\ABT-518.doc

6 of 6

HIGHLY CONFIDENTIAL – FOR INTERNAL USE ONLY
DISCLOSURE OF ANY PART OF THIS INFORMATION TO ANYONE OUTSIDE THE COMPANY IS STRICTLY FORBIDDEN AND IS A VIOLATION OF FEDERAL LAW AND YOUR EMPLOYMENT AGREEMENT

HIGHLY CONFIDENTIAL
ABBT 0000348

# Hair Deposition Exhibit 18

# D's Exhibit LN

| Reviewer | Pallet | Box | Compound | File Name |
|---|---|---|---|---|
| JD | Pallet 19 | 6 | ABT-100 | ABT-100 Dec 01 Development Overview Worksheet |
| JD | Pallet 19 | 17 | ABT-100 | ABT-100 Feb 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-100 | ABT-100 Jan 02 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-100 | ABT-100 Nov 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-100 | ABT-100 Oct 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-100 | ABT-100 Sep 01 Development Overview Worksheet |
| | | | | |
| JD | Pallet 19 | 6 | ABT-492 | ABT-492 Dec 01 Development Overview Worksheet |
| JD | Pallet 19 | 17 | ABT-492 | ABT-492 Feb 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-492 | ABT-492 Jan 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-492 | ABT-492 Jul 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-492 | ABT-492 Jun 01 Development Overview Worksheet |
| JD | Pallet 19 | 17 | ABT-492 | ABT-492 Jun 02 Development Overview Worksheet - missing first page |
| JD | Pallet 19 | 3 | ABT-492 | ABT-492 Mar 01 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-492 | ABT-492 Mar 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-492 | ABT-492 Mar 03 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-492 | ABT-492 Nov 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-492 | ABT-492 Oct 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-492 | ABT-492 Oct 02 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-492 | ABT-492 Sep 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-492 | ABT-492 Sep 02 Development Overview Worksheet |
| MH | Pallet 19 | 17 | ABT-492 | - Apr-01 ABT-492 (Dev. Overview 5 pages) |
| MH | Pallet 19 | 17 | ABT-492 | - Apr-01 ABT-492 (Dev. Overview, 5 pages) |
| MH | Pallet 19 | 14 | ABT-492 | - Aug-01, ABT-492 (Dev. Overview, 5 pages) |
| MH | Pallet 19 | 17 | ABT-492 | - Aug-02 ABT-492 (Dev. Overview 7 pages) |
| MH | Pallet 19 | 17 | ABT-492 | - May-01, ABT-492 (Dev. Overview, 5 pages) |
| MH | Pallet 19 | 17 | ABT-492 | - May-02 ABT-492 (Dev. Overview 6 pages) |
| | | | | |
| MH | Pallet 19 | 17 | ABT-510 | - Apr-01 ABT-510 (Dev. Overview, 6 pages) |
| MH | Pallet 19 | 14 | ABT-510 | - Aug-01 ABT-510 (Dev. Overview, 5 pages) |
| MH | Pallet 19 | 17 | ABT-510 | - Aug-02 ABT-510 (Dev. Overview 6 pages) |
| MH | Pallet 19 | 14 | ABT-510 | - Jul-01 ABT 510 (Dev. Overview 5-pages) |
| MH | Pallet 19 | 17 | ABT-510 | - June 2003, ABT-510 (Dev. Overview, 5 pages) |
| MH | Pallet 19 | 17 | ABT-510 | - Mar-01, ABT-510 (Dev. Overview, 6 pages) |
| MH | Pallet 19 | 17 | ABT-510 | - May-02 ABT-510 (Dev. Overview 6 pages) |
| JD | Pallet 19 | 6 | ABT-510 | ABT-510 Dec 01 Development Overview Worksheet |
| JD | Pallet 19 | 17 | ABT-510 | ABT-510 Feb 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-510 | ABT-510 Jan 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-510 | ABT-510 Jun 01 Development Overview Worksheet |
| JD | Pallet 19 | 17 | ABT-510 | ABT-510 Jun 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-510 | ABT-510 Mar 01 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-510 | ABT-510 Mar 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-510 | ABT-510 Mar 03 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-510 | ABT-510 May 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-510 | ABT-510 Nov 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-510 | ABT-510 Oct 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-510 | ABT-510 Oct 02 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-510 | ABT-510 Sep 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-510 | ABT-510 Sep 02 Development Overview Worksheet |
| | | | | |
| MH | Pallet 19 | 17 | ABT-518 | - Apr-01 ABT-518 (Dev. Overview, 6 pages) |
| MH | Pallet 19 | 14 | ABT-518 | - Jul-01 ABT 518 (Dev. Overview, 5-pages) |
| MH | Pallet 19 | 17 | ABT-518 | - Mar-01 ABT-518 (Dev. Overview, 6 pages) |
| MH | Pallet 19 | 17 | ABT-518 | - May-01, ABT-518 (Dev. Overview, 6 pages) |
| JD | Pallet 19 | 3 | ABT-518 | ABT-518 Jun 01 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-518 | ABT-518 Mar 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-518 | ABT-518 Sep 01 Development Overview Worksheet |
| | | | | |
| JD | Pallet 19 | 17 | ABT-520 | ABT-520 Feb 02 Development Overview Worksheet |
| | | | | |
| MH | Pallet 19 | 17 | ABT-594 | - Apr-01 ABT-594 (Dev. Overview, 8 pages) |
| MH | Pallet 19 | 14 | ABT-594 | - Jul-01 ABT-594 (Dev. Overview, 7-pages) |
| MH | Pallet 19 | 17 | ABT-594 | - Mar-01 ABT-594 (Dev. Overview, 6 pages) |
| JD | Pallet 19 | 3 | ABT-594 | ABT-594 Jun 01 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-594 | ABT-594 Mar 01 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-594 | ABT-594 May 01 Development Overview Worksheet **LOOK AT LATER |
| JD | Pallet 19 | 6 | ABT-594 | ABT-594 Oct 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-594 | ABT-594 Sep 01 Development Overview Worksheet |
| | | | | |
| MH | Pallet 19 | 17 | ABT-627 | - Apr-01 ABT-627 (Dev. Overview, 7 pages) |
| MH | Pallet 19 | 14 | ABT-627 | - Aug-01 ABT 627 (Dev. Overview, 9 pages) |
| MH | Pallet 19 | 17 | ABT-627 | - Aug-02 ABT-627 (Dev. Overview 9 pages) |
| MH | Pallet 19 | 14 | ABT-627 | - Jul-01 ABT-627 (Dev. Overview, 8-pages) |

CONFIDENTIAL
JHII 021645



EXHIBIT 18

tabber M. Hair

LAL 3/8/05

CONFIDENTIAL
JHII 021646

| | | | | |
|---|---|---|---|---|
| MH | Pallet 19 | 17 | ABT-627 | - June 2003, ABT-627 (Dev. Overview, 8 pages) |
| MH | Pallet 19 | 17 | ABT-627 | - Mar-01 ABT-627 (Dev. Overview, 7 pages) |
| MH | Pallet 19 | 17 | ABT-627 | - May-01, ABT-627 (Dev. Overview, 8 pages) |
| MH | Pallet 19 | 17 | ABT-627 | - May-02 ABT-627 (Dev. Overview 10 pages) |
| JD | Pallet 19 | 6 | ABT-627 | ABT-627 Dec 01 Development Overview Worksheet |
| JD | Pallet 19 | 17 | ABT-627 | ABT-627 Feb 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-627 | ABT-627 Jan 02 Development Overview Worksheet |
| JD | Pallet 19 | 17 | ABT-627 | ABT-627 Jun 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-627 | ABT-627 Mar 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-627 | ABT-627 Mar 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-627 | ABT-627 Mar 03 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-627 | ABT-627 Nov 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-627 | ABT-627 Oct 02 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-627 | ABT-627 Sep 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-627 | ABT-627 Sep 02 Development Overview Worksheet |
| MH | Pallet 19 | 17 | ABT-724 | - Aug-02 ABT-724 (Dev. Overview 5 pages) |
| MH | | 17 | ABT-724 | - May-02 ABT-724 (Dev. Overview 5 pages) |
| JD | Pallet 19 | 6 | ABT-724 | ABT-724 Dec 01 Development Overview Worksheet |
| JD | Pallet 19 | 17 | ABT-724 | ABT-724 Feb 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-724 | ABT-724 Jan 02 Development Overview Worksheet |
| JD | Pallet 19 | 17 | ABT-724 | ABT-724 Jun 02 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-724 | ABT-724 Mar 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-724 | ABT-724 Mar 03 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-724 | ABT-724 Nov 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-724 | ABT-724 Oct 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-724 | ABT-724 Oct 02 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-724 | ABT-724 Sep 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-724 | ABT-724 Sep 02 Development Overview Worksheet |
| MH | Pallet 19 | 17 | ABT-751 | - Apr-01 ABT-751 (Dev. Overview, 5 pages) |
| MH | Pallet 19 | 14 | ABT-751 | - Aug-01, ABT 751 (Dev. Overview, 6 pages) |
| MH | Pallet 19 | 17 | ABT-751 | - Aug-02, ABT-751 (Dev. Overview 6 pages) |
| MH | Pallet 19 | 14 | ABT-751 | - Jul-01 ABT-751 (Dev. Overview, 5-pages) |
| MH | Pallet 19 | 17 | ABT-751 | - June 2003 ABT-751 (Dev. Overview, 8 pages) |
| MH | Pallet 19 | 17 | ABT-751 | - Mar-01 ABT-751 (Dev. Overview, 5 pages) |
| MH | Pallet 19 | 17 | ABT-751 | - May-02 ABT-751 (Dev. Overview 5 pages) |
| JD | Pallet 19 | 6 | ABT-751 | ABT-751 Dec 01 Development Overview Worksheet |
| JD | Pallet 19 | 17 | ABT-751 | ABT-751 Feb 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-751 | ABT-751 Jan 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-751 | ABT-751 Jun 01 Development Overview Worksheet |
| JD | Pallet 19 | 17 | ABT-751 | ABT-751 Jun 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-751 | ABT-751 Mar 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-751 | ABT-751 Mar 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-751 | ABT-751 Mar 03 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-751 | ABT-751 May 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-751 | ABT-751 Nov 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-751 | ABT-751 Oct 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-751 | ABT-751 Oct 02 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-751 | ABT-751 Sep 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-751 | ABT-751 Sep 02 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-773 | ABT-773 Dec 01 Development Overview Worksheet |
| JD | Pallet 19 | 17 | ABT-773 | ABT-773 Feb 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-773 | ABT-773 Jan 02 Development Overview Worksheet |
| JD | Pallet 19 | 3 | ABT-773 | ABT-773 Jun 01 Development Overview Worksheet |
| JD | Pallet 19 | 17 | ABT-773 | ABT-773 Jun 02 Development Overview Worksheet - missing first page |
| JD | Pallet 19 | 3 | ABT-773 | ABT-773 Mar 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-773 | ABT-773 Mar 02 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-773 | ABT-773 Oct 01 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-773 | ABT-773 Oct 02 Development Overview Worksheet |
| JD | Pallet 19 | 6 | ABT-773 | ABT-773 Sep 01 Development Overview Worksheet |
| MH | Pallet 19 | 17 | ABT-773 | Apr-01 ABT-773 (Dev. Overview 11 pages) |
| MH | Pallet 19 | 14 | ABT-773 | Aug-01 ABT-773 (Dev. Overview 9 pages) |
| MH | Pallet 19 | 17 | ABT-773 | Aug-02 ABT-773 (Dev. Overview 9 pages) |
| MH | Pallet 19 | 14 | ABT-773 | Jul-01 ABT 773 (Dev. Overview 10-pages) |
| MH | Pallet 19 | 17 | ABT-773 | Mar-01 ABT-773 (Dev. Overview 10 pages) |
| MH | Pallet 19 | 17 | ABT-773 | May-01, ABT-773 (Dev. Overview, 12 pages) |
| MH | Pallet 19 | 17 | ABT-773 | May-02 ABT-773 (Dev. Overview 10 pages) |

# Hair Deposition Exhibit 19

# D's Exhibit LO

**John Hancock / Abbott**
**Summary of Available Monthly Highlights Interoffice Memos**
**Documents Received As of 3/18/05**

### 2001

| Compounds Available | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ABT-773 | | | | | | | X | X | X | X | X | | 5 |
| ABT-627 | | | | | | X | X | X | X | X | X | | 6 |
| ABT-594 | | | | | | | | | | X | | | 1 |
| ABT-492 | | | | | | X | | X | X | X | X | | 5 |
| ABT-510 | | | | | | X | | X | X | X | X | | 5 |
| ABT-518 | | | | | | | | | | | | | 0 |
| ABT-751 | | | | | | | | X | X | X | X | | 4 |
| ABT-100 | | | | | | | | | X | | X | | 2 |
| ABT-724 | | | | | | | | | X | X | | | 2 |
| **Total** | 0 | 0 | 0 | 0 | 0 | 3 | 2 | 5 | 7 | 7 | 6 | 0 | |

### 2002

| Compounds Available | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ABT-773 | X | | | | | | | | | X | | | 2 |
| ABT-627 | X | | | | | | | | | X | | | 2 |
| ABT-594 | | | | | | | | | | | | | 0 |
| ABT-492 | | X | | | | | | | | X | | | 2 |
| ABT-510 | X | X | | | | | | | | X | | | 3 |
| ABT-518 | | | | | | | | | | | | | 0 |
| ABT-751 | X | X | | | | | | | | X | | | 3 |
| ABT-100 | | X | | | | | | | | | | | 1 |
| ABT-724 | X | X | | | | | | | | X | | | 3 |
| **Total** | 5 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 0 | |

### 2003

| Compounds Available | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ABT-773 | | | | | | | | | | | | | 0 |
| ABT-627 | | | | | | | | | | | | | 0 |
| ABT-594 | | | | | | | | | | | | | 0 |
| ABT-492 | | | | | | | | | | | | | 0 |
| ABT-510 | | | | | | | | | | | | | 0 |
| ABT-518 | | | | | | | | | | | | | 0 |
| ABT-751 | | | | | | | | | | | | | 0 |
| ABT-100 | | | | | | | | | | | | | 0 |
| ABT-724 | | | | | | | | | | | | | 0 |
| **Total** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |

### 2004

| Compounds Available | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ABT-773 | | | | | | | | | | | | | 0 |
| ABT-627 | | | | | | | | | | | | | 0 |
| ABT-594 | | | | | | | | | | | | | 0 |
| ABT-492 | | | | | | | | | | | | | 0 |
| ABT-510 | | | | | | | | | | | | | 0 |
| ABT-518 | | | | | | | | | | | | | 0 |
| ABT-751 | | | | | | | | | | | | | 0 |
| ABT-100 | | | | | | | | | | | | | 0 |
| ABT-724 | | | | | | | | | | | | | 0 |
| **Total** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |



EXHIBIT 19
M. Hair
GA 5/8/07
tobbies

CONFIDENTIAL
JHII 021638

REDACTED

CONFIDENTIAL
JHI 021639



CONFIDENTIAL
JHI 021640

CONFIDENTIAL
JHII 021641

REDACTED

CONFIDENTIAL
JHII 021642

REDACTED

CONFIDENTIAL
JHII 021643

REDACTED

# Hair Deposition Exhibit 20

# D's Exhibit LP

John Hancock / Abbott
Summary of Available Monthly Project Status Reports
As of 3/16/05

**ABT-418**

| | Thru 2000 | 2001 YTD | 2001 Proj. | Budget | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Total | Next Go / No Go | Ph I | Ph II | Ph III | Last Pt | Filing | Approve | Launch Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-01 | | | | | | | | | | | | | | | | | | | | |
| Feb-01 | | | | | | | | | | | | | | | | | | | | |
| Mar-01 | 5.8 | 1.7 | 7.4 | 7.4 | 38.0 | 36.0 | 29.0 | 23.0 | | | | 139.0 | End of Phase I (early 2002) | 1Q2001 | 3Q2002 | 4Q2003 | | 4Q2005 | 2Q2006 | Q2 2006 |
| Apr-01 | | | | | | | | | | | | | | | | | | | | |
| May-01 | | | | | | | | | | | | | | | | | | | | |
| Jun-01 | 5.6 | 3.0 | 7.4 | 7.4 | 38.0 | 36.0 | 29.0 | 23.0 | | | | 139.0 | End of Phase I (early 2002) | 1Q2001 | 3Q2002 | 4Q2003 | | 4Q2005 | 2Q2006 | Q2 2006 |
| Jul-01 | 5.6 | 3.2 | 7.4 | 7.4 | 38.0 | 36.0 | 29.0 | 23.0 | | | | 139.0 | End of Phase I (early 2002) | 1Q2001 | 3Q2002 | 4Q2003 | | 4Q2005 | 2Q2006 | Q2 2006 |
| Aug-01 | | | | | | | | | | | | | | | | | | | | |
| Sep-01 | 5.5 | 3.3 | 7.4 | 7.4 | 38.0 | 36.0 | 29.0 | 23.0 | | | | 139.0 | End of Phase I (early 2002) | 1Q2001 | 3Q2002 | 4Q2003 | | 4Q2005 | 2Q2006 | Q2 2006 |
| Oct-01 | | | | | | | | | | | | | | | | | | | | |
| Nov-01 | | | | | | | | | | | | | | | | | | | | |
| Dec-01 | | | | | | | | | | | | | | | | | | | | |

**ABT-594**

| | Thru 2000 | 2001 YTD | 2001 Proj. | Budget | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Total | Next Go / No Go | Ph I | Ph II | Ph III | Last Pt | Filing | Approve | Launch Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-01 | | | | | | | | | | | | | | | | | | | | |
| Feb-01 | | | | | | | | | | | | | | | | | | | | |
| Mar-01 | 14.0 | 2.9 | 9.3 | 9.3 | 59.6 | 55.7 | 21.9 | 11.5 | | | | 172.0 | End of Phase II (June 01) | 3Q1997 | 3Q1998 | 1Q2002 | | | | Sept. 04 |
| Apr-01 | | | | | | | | | | | | | | | | | | | | |
| May-01 | 14.0 | 2.9 | 9.3 | 9.3 | 59.6 | 55.7 | 21.9 | 11.5 | | | | 172.0 | End of Phase II (June 01) | 3Q1997 | 3Q1998 | 1Q2002 | | | | Sept. 04 |
| Jun-01 | 14.0 | 4.5 | 9.3 | 9.3 | 60.5 | 58.4 | 21.8 | . | | | | 162.0 | End of Phase II (June 01) | 3Q1997 | 3Q1998 | 1Q2002 | | | | Sept. 04 |
| Jul-01 | <MISSING FIRST PAGE> | | | | | | | | | | | NA | | | | | | | | |
| Aug-01 | | | | | | | | | | | | | | | | | | | | |
| Sep-01 | 14.0 | 6.0 | 8.7 | 8.7 | 60.5 | 56.4 | 21.8 | . | | | | 161.4 | End of Phase II (June 01) | 3Q1997 | 3Q1998 | 1Q2002 | | | | Sept. 04 |
| Oct-01 | 14.0 | 6.8 | 8.7 | 8.7 | 60.5 | 56.4 | 21.8 | . | | | | 161.4 | End of Phase II (June 01) | 3Q1997 | 3Q1998 | 1Q2002 | | | | Sept. 04 |
| Nov-01 | | | | | | | | | | | | | | | | | | | | |
| Dec-01 | | | | | | | | | | | | | | | | | | | | |


EXHIBIT 20
M. Haw
VR 5/8/07

CONFIDENTIAL
JHII 021644

# Hair Deposition Exhibit 21

# D's Exhibit LQ

**John Hancock**
**Abbott Compound Summary**
**Matrix Metalloproteinase Inhibitor (MMPI Program), ABT-518**

<u>Overview</u>

# REDACTED

<u>3/13/01 Research Funding Agreement Highlights</u>



**CONFIDENTIAL**
**JHII 021607**

# REDACTED

## Document Summaries

### 1) Monthly Status Reports

| January | NA |
|---|---|
| February | NA |
| March | "First patient enrolled on 3/12. Preliminary results from 6-week rat hepatotoxicity study on 3/31." |
| April | "First patient cohort (25 mg/d oral) completed enrollment 4/23" "PK method validation at Amsterdam site completed 4/25. RQA site audit completed 5/4." ***Received in box 17 – not included in binders*** |
| May | "Decision taken to discontinue Abbott development of ABT-518 due to prioritization." "Collaboration or out-license opportunity will be pursued pending favorable safety and PK review of existing patient data" ***Received in box 17 – not included in binders*** |
| June | "Program discontinued with wrap-up activities ongoing." |
| July | "Wrap-up activities continue with two ongoing patients at 50 mg/day." |
| August | NA |
| September | "Last patient discontinued 8/20. Met with NCI Division of Cancer Prevention on 8/29 to discuss interest in ABT-518" |
| October | NA |
| November | NA |
| December | NA |

### 2) 2001 Plan Review, Portfolio Analysis of Blue Plan Prioritization Options, **February 15, 2001**.

- Highly redacted report
- Last page (report is not numbered) reports the spending plan for ABT-518 of $7.4M. The 3/13/01 First Annual Research Plan in Exhibit 1.6 is $7.0 M.

CONFIDENTIAL
JHII 021608

3) Portfolio Analysis of 2001 Abbott Global Pharmaceutical Development Assets, **April 20, 2001**.

**REDACTED**

- Highly redacted report
- Pages 17-19 report expected values of compounds
- Pages 22-23 report expected commercial values for compounds
- Page 41, reports under one scenario (#2?), ABT-518 would be unfunded
- Page 49, reports under scenario #3, ABT-518 would be funded
- Page 54, "2001-2002 R&D Costs for John Hancock Compounds".
    - 2002 "Nominal" and "Expected" costs

- Page 55, ABT-518
- Page 58, ABT-518
- Page 62, "Abbott programs in blue, Knoll programs in red"
- Page 68, ABT-518
- Page 83, ABT-518
- Page 88, ABT-518

4) Portfolio Analysis of 2001 Abbott Global Pharmaceutical Development Assets, **7/3/01** Update.

- Highly redacted report
- Page 17, reports expected commercial value and expected value by source
- Pages 19-20, reports program expected commercial value by current phase
- Page 27, reports program expected value realized by source and phase

5) Portfolio Analysis Overview:  Abbott 2002 Pharmaceutical Budget Prioritization, **October 8, 2001**, Portfolio analysis and Decision Support Groups.

- Page 3, "ABT-518… Removed Since 7/01"

6) Abbott Pharmaceutical Portfolio Analysis Overview, **November, 2001**.

- [Update]

7) Base, Upside, Low

Available reports have footnotes with file names that reference the following dates:
- February 2001
- April 2001 PA
- 2001 April
- July 2001 PA
- 2001 July

**CONFIDENTIAL**
**JHII 021609**

Highlights

**REDACTED**

- "Success Probabilities" for launch:
    - o 14% - Feb 2001
    - o 13% - Apr 2001 & April 2001 PA
    - o 13% - July 2001 & July 2001 PA


- See Excel analysis file summarizing results (JH – Document Analysis v4.xls)
- 

- 

- In shaded area there is a line for "Exp R&D Cost" with annual amounts.


8) Pharmaceutical Products Division, Sample Direct/Indirect Project Funding Distribution, 2001 Plan ($000).

- This schedule/report appears to only be available for ABT-773 and MMPI (Early Stage) ABT-518
- Total plan spending of $7.1M for 2001 approximates the First Annual Research Plan at 3/13/01 for $7.0 M for 2001.
- Detailed reports available for **June, August, September, October, November, December.** (Other reports for March?, April?, May? Are in box 17)
    - o


9) Phase Balanced Productivity Approach – Phase IV - $0 (old Pls).xls.

- Highly redacted schedule
- 
- Other metrics are similar to metrics in the Base, Upside, Low reports for the February 2001 timeframe
- Planned spending of $7.4 is not significantly different from the First Annual Research Plan at 3/13/2001 for $7.0 M for 2001.
    - o The $7.4 M appears in other reports as well.


10) 2/BB - #39

- Highly redacted document
- Financial information is redacted for months prior to March 2001


CONFIDENTIAL
JHII 021610

11)  PEC Meeting (Dry Run and 10/08/01)

- Page 3, ABT-518 is identified as "T" for terminated

**REDACTED**

12)  NME In Development, **May 2003**.

- Highly redacted report
- Phase I appears to be the last development phase.  No indication that ABT-518 development entered Phase II.

13)  Global Pharmaceutical Research & Development, Summary of R&D Projects, **2001 April Update**.

- Page 2, provides a summary of ABT-518.   2001 Plan approximates First Annual Research Plan as of 3/13/2001.
- Page 6
    o  2001 Plan of $7.1 M is consistent with other documents and the 3/13/2001 First Annual Research Funding Agreement
    o  Identifies Perry Nisen as project leader
    o  Provides additional detail for plan spending
- 2nd Page following yellow page divider, no title on spreadsheet.
    o  Column heading "2002 Costs, Nominal, Expected"
    o  Nominal costs for 2002:  $38.1M
    o  Expected costs for 2002:  $28.6M

2001 FTE and Direct$ Activity Resources for Current Funded Abbott Projects included in Portfolio Analysis

- Pages 7-9, reports certain direct costs for ABT-518

**CONFIDENTIAL**
**JHII 021611**

**Hair Deposition Exhibit 22**

**D's Exhibit LR**

John Hancock
Abbott Compound Summary
Cholinergic Channel Modulator (ABT-594)

<u>Overview</u>

# REDACTED

<u>3/13/01 Research Funding Agreement Highlights</u>



CONFIDENTIAL
JHII 021612

# REDACTED

Document Summaries

1) Monthly Status Reports

| January | NA |
|---|---|
| February | NA |
| March | *Monthly Highlights*: "All case Report Forms were in-house March 15 for M99-114 Painful Diabetic Neuropathy Phase II b study, 8 days ahead of schedule"<br><br>Key Progress Marker: "Break blind on M99-114 Painful Diabetic Neuropathy Phase II b study, target date, 04/30"<br>"Go / No Go target for program, target date 06/30" |
| April | [Box 17] |
| May | *Monthly Highlights*:  [Blank] – No monthly highlights in report.<br><br>*Key Progress Marker*: "Executive Committee review / G0 – No Go target for program, target date 07/11" |
| June | *Monthly Highlights*: "Protocol completed for Rate of Rise Study"<br><br>*Key Progress Marker*: "Executive Committee review / Go – No Go target for program, target date 08/15" |
| July | *Monthly Highlights*: "Maintenance activities only – Program is on hold pending Global Pharmaceutical Executive Committee meeting in August"<br><br>*Key Progress Marker*: "Executive Committee review / Go – No Go target for program, target date 08/21" |
| August | *Monthly Highlights*: "Global Pharmaceutical Executive Committee review moved out to September"<br>"Maintenance activities only – Program is on hold pending Global Pharmaceutical Executive Committee meeting in September"<br><br>*Key Progress Marker*: "Executive Committee review / Go – No Go target for program, target date 09/10" |
| September | *Monthly Highlights*: "Program presented to the Global Pharmaceutical Executive Committee – modified strategy is in development"<br><br>*Key Progress Marker*: "Funding decision for the Phase IIb "intermediate" dose level trial, target date 10/08"<br>"Initiate manufacture scheduling of clinical supplies, target date |

CONFIDENTIAL<br>JHII 021613

...

| | 10/31" | | |
|---|---|---|---|
| October | *Monthly Highlights*: "Program is not funded for 2002 – Outlicensing activities initiated."<br><br>*Key Progress Markers*: [Blank] | | |
| November | NA | | |
| December | NA | | |

- The March 2001 summary states that the "Go / No Go target for program" is projected for 06/30. The Go – No Go decision is delayed in May, June, July, and August.
- 

        There is an August 21, 2001 Pharma Executive Management Committee Review presentation (see item #6 below)

- 

- The October monthly status report indicates that the program is not funded
- It appears that the Executive Committee meeting was postponed from June to August or September.

- 

## 2) Analgesia Venture, 2001 Plan, Final Plan Package (date ?)

- Highly redacted report
- 

- Page 2, footer indicates the name of the Excel file
- Page 2, reflects an annual cost plan for 2001 of $9.3 M and $11.9 M unfunded. The 3/13/01 First Annual Funding Plan indicated that the 2001 plan was $35 M.
- Page 3, "2001 Target" = $9,300K, "2001 Plan" = $9,307 K,

- Page with title, "Blue Plan Summaries" appears to provide detail for the $11.9 M

## 3) 2001 Plan Review, Portfolio Analysis of Blue Plan Prioritization Options, **February 15, 2001**.

# REDACTED

CONFIDENTIAL
JHII 021614

- 
- Page 9, with heading, "Phase Balanced Optimization – 100% Development / 0% Phase IV", reports a "Blue Plan Funding" of $11.1 M. This amount appears to be somewhat consistent with the "blue plan" cost projections of $11.9 as provided in the Analgesia Venture 2001 Plan (see #1 above)
- Page 19, indicates the planned spending of the $11.1 would be in Q3 – after the anticipated June 2001 Go – No Go decision.
- [Blue Plan may represent cost estimates following milestones or Go – No Go decisions]
- Page 20, "Blue Plan Scenario 2" provides a matrix with two scenarios for ABT-594; whether it enters Phase III or not.


- Page 29, again states that ABT-594 plan funding for 2001 is $9.3 M.

# REDACTED

4) Portfolio Analysis of 2001 Abbott Global Pharmaceutical Development Assets, **April 20, 2001.**

- Pages 17-19, graphs show expected value and expected commercial value of 594
- Pages 22-23, additional graphs of expected value
- Page 54, "2001-2002 R&D Costs for John Hancock Compounds".
    o 2002 "Nominal" and "Expected" costs –

- Page 84, "Pain"
    o Graph of probability of success and expected NPV for both ABT-594 CPP and ABT-594 Neuro Pain.
    o Probability of success for ABT-594 CPP is approx. 15%
    o Probability of success for ABT-594 Neuro is approx. 33%
- Page 89, "Phase II Projects"
    o Graph of "probability to launch" and "Expected Commercial Value"

5) Portfolio Analysis of 2001 Abbott Global Pharmaceutical Development Assets, **7/3/01** Update

- Highly redacted
- Page 13, "ABT-594 (revised forecast and probability) (0.5)".

- Page 17, graph shows ABT-594 with minimal Expected Value (in comparison to the values for other compounds)

6) ABT-594, Pharma Executive Management Committee Review, **August 21, 2001**

CONFIDENTIAL
JHII 021615

- Page 3, "ABT-594 has a narrow therapeutic window and efficacious doses are poorly tolerated as dosed currently. Modifications to drug administration have the potential to improve tolerability."
- Page 4, "Dosages that provide meaningful acute relief of pain are not well tolerated"
- Page 7, Tolerability & Safety
  - "Significant Discontinuation Rate: 66% due to AE [adverse event] at 300 mcg BID"
- Page 14, table disclosing Adverse Events (AE) and Total Discontinuation (in percentages) for M99-114
  - 150 mcg – 28% discontinued due to AE
  - 225 mcg – 46% discontinued due to AE
  - 300 mcg – 66% discontinued due to AE
- Page 24, "ABT-594, as administered without additional improvements in tolerability, has a narrow therapeutic window"
- Page 25, ABT-594 options outlined

7) ABT-594, PEC Review Book: Proposal for additional study and background (Nonstandard format), September 27, 2001

- Page 2, Tolerability, "150-300 mcg BID tolerability is unacceptable"
- Page 6, discussion of possible timeline assuming "most of funding starting Jan 2002"
- Pages 12-31 appear to provide similar/same information as the ABT-594 Pharma Executive management committee Review, August 21, 2001 (see item #6 above)

8) Portfolio Analysis Overview: Abbott 2002 Pharmaceutical Budget Prioritization, October 8, 2001

- Highly redacted report
- Page 13, expected value and expected commercial value presented
- Page 14, ABT-594 is listed in the "Strategic Discussion" section of the table
  - Note: ABT-724 and ABT-100 are also included with compounds that are "strategic discussion"
- Page 20, ABT-594 is listed in the "Strategic Discussion" section of the table

9) Abbott Pharmaceutical Portfolio Analysis Overview, November 2001

- Pages 14-15, 20, graphs of expected value and expected commercial value
- Page 42, productivity curve, phase II compounds

10a) Annual IND Report (12192000, Volume 1 of 1), Oct 29, 1999 – Oct 28, 2000

CONFIDENTIAL
JHII 021616

- Report is signed and approved by Marilyn Collicott, Abbott Clinical Project Manager, Bruce McCarthy, Medical Director, and Christopher Silber, Venture Head on 12/19/00.
- Page 8, Phase II study (M99-114) was started in 4/00 with an anticipated completion date of 3/01. As of 10/28/00, there were 69 "subjects entered" into the study with 30 "premature terminations", approx. 43%.
- Page 9, Table 2. Summary of Serious Adverse Events
- Page 45, "General Investigational Plan" (page 45), the report states,
  "Based on information collected from the above mentioned Phase I and II studies, the general investigational plan for ABT-594 for the period October 28, 2001 allows for the continued assessment of tolerability of higher doses and additional Phase II studies of ABT-594. The plan is outlined in Table 7 below:

**Table 7. Planned Clinical Studies**

| Study Number | Study Type | Phase | Planned Number of Subjects | Estimated Start Date |
|---|---|---|---|---|
| M99-115 | Osteoarthritis Pain | II | 575 | 4/01 |
| N/A | fMRI | I | 12 | 8/01 |

-

**10b) A-16594, Annual IND Report (12062001), Volume 1 of 1, Oct 29, 2000 – Oct 28, 2001,**

- Signed and approved by Marilyn Collicott, Abbott Clinical Project Manager, and Bruce McCarthy, Medical Director on 12/06/01.
- Page 1, reports that "A single ABT-594 clinical study was completed during this reporting period",

# REDACTED

- Page 4, A summary table of "Disposition of Subjects" for Phase II Study, Protocol M99-114 includes the following:

| | Treatment Group n (%) | | | |
|---|---|---|---|---|
| | | ABT-594 | | |
| | Placebo | 150 mg BID | 225 mg BID | 300 mg BID |
| Number of Subjects Planned | 80 | 80 | 80 | 80 |
| All Treated Subjects | 65 | 65 | 69 | 67 |
| Completed Study | 51 (78%) | 40 (62%) | 30 (43%) | 17 (25%) |
| Prematurely Discontinued [a] | 14 (22%) | 25 (38%) | 39 (57%) | 50 (75%) |

a  Subjects may have reported more than 1 reason for premature discontinuation, but were counted only once in the total.

CONFIDENTIAL
JHII 021617

- Page 27, "General Investigational Plan" section states:
  - o "The clinical development plan for ABT-594 has been discontinued. No further studies are planned."
- Page 31, there is a reference in the footer to what appears to be a network drive:
  - o "D461\r:\msword\analgesia\abt594\annual reports\2001 annual report.doc"

<u>11) Various Spreadsheets</u>

- Reports for June, August, September, October, November, December 2001
- No "lead sheet" that summarizes 2001 plan by activities/categories (see ABT-518 binder)

<u>12) Base, Upside, Low Spreadsheets</u>

Available reports have footnotes with file names that reference the following dates:
- February 2001
- 2001 April
- April 2001 PA
- July 2001 PA
- 2001 July
- October 2001

**REDACTED**

Highlights
- "Success Probabilities" for launch:
  - o 32% - Feb 2001
  - o 15% - Apr 2001
  - o 15% - July 2001
  - o 23% - October 2001
- See Excel analysis file summarizing results (<u>JH – Document Analysis v4.xls</u>)
- Significant changes in expected valuation (EV) and projected R&D costs between February, April, and July.
- In shaded area there is a line for "Exp R&D Cost" with annual amounts.


<u>13) GPRD 2001 APU, Development Programs ($ Millions)</u>

- Highly redacted report(s)
- First page, 2002 Costs "Nominal" and "Expected"
- Page 2, 2001 Plan for ABT-594 is $9.3 M

  - o Several documents report the 2001 plan spending of $9.3
- Following Yellow Page: Redacted page with Questions and Answers
  - o Question: ABT-594 for Drug Safety Support and Phase I studies: put on hold until we make go/no-go decision.

CONFIDENTIAL
JHII 021618

  o Answer: John Leonard follow up not available

- Page ?, heading, "Global Pharmaceutical Research & Development 2001 Key Plus/(Minus) Risks, 2001 April Upate ($MM)"
  - o ABT-594 (formerly CCM), Milestone Funding
    - ▪ Go/No Go decision is scheduled for May/June 2001. If the decision to continue development is made, additional funding will be needed to continue the program. Probability = "medium"
    - ▪ File name of excel spreadsheet is provided at bottom of page
- Page ?, heading, "Global Pharmaceutical Research & Development, Summary of R&D Projects, 2001 April Update"
  - o Cost thru 2000 = $62.2
  - o 2001 Plan = $9.3 (significantly lower than First Annual Funding Plan)
  - o 2001 APU = $9.3
  - o Cost Until NDA = $71.0
- *** No indication that the Plan for 2001 was $35 M ***

**REDACTED**

<u>14) Various Spreadsheets – No Headings</u>

<u>15) Various Spreadsheets – No Headings</u>

- Highly redacted

- Page 2, 2001 Plan $9.3 M for ABT-594 Neuro Pain and $0 for ABT-594 Chronic Persistent Pain.

-  ———

<u>16) GPRD, 2001 Actuals, project Budget Summary ($MM)</u>

- ABT-594 is blank, redacted?
- File name printed at bottom of page

<u>17) Grant Summaries</u>

- Highly redacted reports
- Pages 1-2, total plan for 2001 of $9.3M

18) Various highly redacted documents – presented as examples of types of reports
19) Various highly redacted documents – presented as examples of types of reports
20) Various highly redacted documents – presented as examples of types of reports

CONFIDENTIAL
JHII 021619

# Hair Deposition Exhibit 23

# D's Exhibit 628

John Hancock
Abbott Compound Summary
Cholinergic Channel Modulator (ABT-594)

**REDACTED**

<u>2000</u>

<u>A-16594, Annual IND Report (12192000), Volume 1 of 1</u>, for the reporting period
October 29, 1999 to **October 28, 2000**, was signed and approved by Marilyn Collicott,
Abbott Clinical Project Manager, Bruce McCarthy, Medical Director, and Christopher
Silber, Venture Head on 12/19/00. The report is a 50-page document that summarizes the
investigational new drug (IND), status and results of clinical studies, and planned studies.

Two Phase I clinical studies were completed during the reporting period: 1) M99-076
was started in 8/99 and completed in 11/99 with a final study report still pending, and 2)
M99-120 was started in 11/99 and completed on 12/99.

One Phase II study (M99-114) was started in 4/00 with an anticipated completion date of
3/01. As of 10/28/00, there were 69 "subjects entered" into the study with 30 "premature
terminations", approx. 43% (page 8).

One reference for the Phase II study is as
follows: "Program Source Code: /thomasj/ABT-594/IND_UPDATE/DEC2000/
TABLES/phase2_aes.sas".

EXHIBIT 23
M. Hair
iAc 5/8/07

CONFIDENTIAL
JHII 021620

Under section, "General Investigational Plan" (page 45), the report states,

"Based on information collected from the above mentioned Phase I and II studies, the general investigational plan for ABT-594 for the period October 28, 2001 allows for the continued assessment of tolerability of higher doses and additional Phase II studies of ABT-594. The plan is outlined in Table 7 below:

| Table 7. Planned Clinical Studies | | | | |
|---|---|---|---|---|
| Study Number | Study Type | Phase | Planned Number of Subjects | Estimated Start Date |
| M99-115 | Osteoarthritis Pain | II | 575 | 4/01 |
| N/A | fMRI | I | 12 | 8/01 |

# REDACTED

A spreadsheet, "Cholinergic Channel Modulator (ABT-594), 2000 AGU Development Cost Summary" shows that Phase II was anticipated to be completed by the end of 2Q2001 with Phase III starting in 3Q2001 and NDA Filing in 2Q2003. 2000 APU costs were $14.992 million and 2000 AGU costs were $14.4 million.

A spreadsheet, "Key Unfunded Projects, PPD R&D, 2000 August Update" shows 2000 APU costs of $10.1 million and 2000 AGU costs of $8.0 million.

## 2001

Exhibit 1.40 to the 3/13/01, Research Funding Agreement, identifies ABT-594 (Cholinergic channel modulator) in "late phase II" of development.

Exhibit 1.6, 3/13/01, First Annual Research Plan, provides the following cost projections:

CONFIDENTIAL
JHII 021621

| 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|
| $35.0M | $45.0M | $32.0M | $15.0M | $12.0M | $139.0M |

Program status and projected timelines included in Exhibit 1.6:

      Phase I: 3Q1997 thru 4Q2002 (22 Qtrs)

      Phase II: 3Q1998 thru 3Q2001 (13 Qtrs)

      Phase III: 4Q2001 thru 4Q2003 (9 Qtrs)

      NDA: 3Q2003

      Launch: 3Q2004

**REDACTED**

Exhibit 12.2(i), <u>Compound Reports, ABT-594 Descriptive Memorandum</u>, dated **February 2001**, states:

    The IND filing of ABT-594 was in December 1998. A Phase IIb (dose ranging) trial began April 2000 in diabetic neuropathic pain. A Go/No Go decision for clinical efficacy is expected June 2001. (page 2)

    A phase IIb study for neuropathic pain at higher, titrated doses of ABT-594 began in April 2000 and ends in June 2001. A total of 320 patients are anticipated to be included in the study. (page 7)

A report, "<u>Global pharmaceutical Research & Development, 2001 April Update, Discovery Commentary</u>" states, "NNRs: Project is selecting a DDC candidate(s) as an ABT-594 follow-on (with NeuroSearch)". At the bottom of one of the pages states:

| DDC's | Timing | Probability |
|---|---|---|
| 1) NNR ABT-594 follow-on (pain) | 4Q01 | 50% |

A spreadsheet, "<u>GPRD, 2001 Actuals, Project Budget Summary, ($MM)</u>" provides 2001 APU (6/22/01) amounts, Blue Plan (8/1/01) amounts, and Rebaseline Adjustments.

An **August 21, 2001**, report, "<u>ABT-594, Pharma Executive Management, Committee Review</u>" provides a development update by Bruce McCarthy, a DSG Analysis by Steve Kuemmerle and Liz Kowaluk, and a presentation on NNR Follow-ons by Michael Meyer. In the "conclusions" section of the document, it states:

- ABT-594 significantly reduces diabetic neuropathic pain

**CONFIDENTIAL**
**JHII 021622**

- ABT-594, as administered without additional improvements in tolerability, has a narrow therapeutic window
- Future subtype selective NNRs for pain may provide meaningful pain relief across all pain types with an acceptable therapeutic window (page 24)

ABT-594 Options
- A: Attempt tolerability improvement with ABT-594
    o Explore more prolonged titration
    o Co-administer anti-emetic
    o Protocol Ready
        ▪ 7, 11, 24 day titrations
        ▪ Co-administered anti-emetic during titration
        ▪ Detailed assessments of adverse events
        ▪ $2.1 MM fully burdened
- B: No additional experiments with ABT-594
- Subtype selective NNR for pain back-up (page 25)

**REDACTED**

A-16594, Annual IND Report (12062001), Volume 1 of 1, for the reporting period October 29, 2000 to **October 28, 2001**, was signed and approved by Marilyn Collicott, Abbott Clinical Project Manager, and Bruce McCarthy, Medical Director on 12/06/01. The report is a 31-page document that summarizes the investigational new drug (IND), status and results of clinical studies, and planned studies.

The document reports that "A single ABT-594 clinical study was completed during this reporting period",

Under section, "Individual Study Information, Phase I Studies", it states:

There were no ongoing Phase I studies during this reporting timeframe. Studies M99-076 and M99-120 were completed and reported in the previous annual report (reporting period October 29, 1999 – October 28, 2000), however, the final study reports are still pending.

**CONFIDENTIAL**
**JHII 021623**

   
A summary table of "Disposition of Subjects" for Phase II Study, Protocol M99-114 (page 4) includes the following:

| | Treatment Group n (%) | | | |
|---|---|---|---|---|
| | | ABT-594 | | |
| | Placebo | 150 mg BID | 225 mg BID | 300 mg BID |
| Number of Subjects Planned | 80 | 80 | 80 | 80 |
| All Treated Subjects | 65 | 65 | 69 | 67 |
| Completed Study | 51 (78%) | 40 (62%) | 30 (43%) | 17 (25%) |
| Prematurely Discontinued [a] | 14 (22%) | 25 (38%) | 39 (57%) | 50 (75%) |
| a   Subjects may have reported more than 1 reason for premature discontinuation, but were counted only once in the total. | | | | |

# REDACTED

The "General Investigational Plan" section of the October 28, 2001 IND Annual Report (page 27) states:

> The clinical development plan for ABT-594 has been discontinued. No further studies are planned.

On page 31, there is a reference in the footer to what appears to be a network drive:

> "D461\r:\msword\analgesia\abt594\annual reports\2001 annual report.doc"

A **November 2, 2001** letter from Tom Lyons, Abbott Laboratories Global Pharmaceutical R&D Controller, to Steve Blewitt, John Hancock Life Insurance Company includes a schedule, "John Hancock Portfolio Summary, R&D Costs and Devemopment Timelines, 2002 Plan". The schedule provides 2002 Plan costs for ABT-594 of "…" and a timeline for 2002 Plan of "N/A".

CONFIDENTIAL
JHII 021624

A letter from Tom Lyons, dated **December 18, 2001**, provides an "<u>Annual Progress Report</u>"                                                      An attached spreadsheet, "Abbott/John Hancock Funding Collaboration, 2001 Y/E Estimate for JH Development Portfolio ($MM)" reports actual spending for ABT-594 through October 2001 of $6.8 million, with $1.0 million planned for November and December 2001 for a total projected Y/E amount of $8.9 million. In a comment field it states, "Program Terminated". (JH001068)

# REDACTED

## 2002

A report, "<u>April 2002, Center for Clinical Assessment Project Status Report</u>" summarizes major areas of activity and associated costs for several compounds. It appears that ABT-594 had $50K of costs in June (2002) with year-to-date costs of $152K and a 12-month plan of $627K.

Three spreadsheets with the same title, "<u>2002 Plan "Other" R&D</u>" include line items for ABT-594. Each spreadsheet shows different values for the "total update", and include: "25", "61", and the third spreadsheet appears to be redacted.

A **December 20, 2002** letter from Tom Lyons (JH001054) provides (i) an "<u>Annual Progress Report (November 2002)</u>" for all current compounds – there are no comments for ABT-594 (JH001055-56), (ii) a "<u>2002 Y/E Estimate for JH Development Portfolio</u>" that shows $1.4 million of costs for ABT-594 during 2002 (JH001057), and (iii) an "<u>R&D Costs and Development Timeline 2003 Plan</u>" that includes projected costs as well as a timeline of projected launch dates (JH001058).

CONFIDENTIAL
JHII 021625

**2003**

A spreadsheet report, "NME In Development, May 2003" includes the following information for ABT-594:

| Category | Metric | ABT 594 CCM |
|---|---|---|
| Thraueutic Area | | Neuroscience |
| | Product Pipeline Status | Terminated Jun-01 |
| Dates | DDC Meeting | Dec-96 |
| | Start of first GLP animal tox study | Mar-97 |
| | First Dose in Human (beg of Phase I) | Jul-97 |
| | First Dose in Patient (beg of Phase II) | Jul-98 |
| | First Dose in Phase III | NA |
| | Last Patient Visit | NA |
| | FDA Filing | NA |
| | EMEA | NA |

Additional rows are included in the spreadsheet related to time, costs, regulatory, manufacturing and other. Several rows are blank for this compound. This report provides information for all nine compounds: 510, 627, 751, 492, 773, 594, 100, 518 & 724.



A spreadsheet report, "Historical NMEs, May 2003" provides similar information as the above spreadsheet, "NME In Development, May 2003".

CONFIDENTIAL
JHII 021626

# Hair Deposition Exhibit 24

# D's Exhibit 677

**John Hancock**
**Abbott Compound Summary**
**Dopamine Receptor Agonist Program (ABT-724)**

REDACTED

**2000**
Project-to-date-spending thru 2000:  $35.0 Million (per 3/13/2001 Annual Development Plan, Exhibit 1.6).

**2001**
At the time of the signing of the <u>Research Funding Agreement</u>, **3/13/2001**, the compound was identified as "ED Program" or "Dopamine Receptor Agonist" and in the pre-clinical program phase.  The compound was later referred to as ABT-724.



Exhibit 1.6, 3/13/01, <u>First Annual Research Plan</u>, provides the following projections for spending by year:

CONFIDENTIAL
JHII 021627

A report, "GPRD, 2001 Actual, Project Budget Summary, ($MM)" reports "2001 APU (6/22/01)" spending for AB-724 as "---" for GPRD Gross and "---" for PPD's Share. A "Blue Plan (8/1/01)" reports GPRD Gross of 0.6 and PPD's share of 0.4. The 0.6 is consistent with the 2001 spending projections in the First Annual Research Plan, Exhibit 1.6 to the Research Funding Agreement.

A report, "Global Pharmaceutical Research & Development, Post-Corporate Review, Project Targets ($000's)" appears to be drafted sometime in 2001. The report provides what appears to be spending projections for 2001 and "*Post-Corporate Review Update (2)". Amounts approximate the November 26, 2001 projections for 2001. ABT-724 is identified on the spreadsheet with no visible amounts (redacted?). The report has a footnote, "*Project target per AMARE/Oracle budget except as noted".

A **November 26, 2001** letter from Tom Lyons, Abbott Global Pharmaceutical R&D Controller, pushes back the projected launch date of ABT-724 from 4Q2007 to 3Q2008 and provides the following comments:

> "ABT-724 is a recently approved DDC [Drug Development Candidate]. In the original deal model, assumptions for ABT-100 were used as the benchmark for all pre-DDC assets. 2002 Plan reflects ABT-724 specific data rather than generic modeling assumptions." (JH000841)

Also included in the **November 26, 2001** letter is an updated Annual Development Plan that identifies program spending by compound by year (JH000854):

|            | 2001   | 2002    | 2003    | 2004    | 2005    | Total   |
|------------|--------|---------|---------|---------|---------|---------|
| (Original) | $6.0M  | $15.0M  | $30.0M  | $30.0M  | $18.0M  | $99.0M  |
| Updated    | $0.6M  | $5.9M   | $7.4M   | $31.8M  | $50.6M  | $96.3M  |

A letter from Tom Lyons, dated **December 18, 2001**, provides an "Annual Progress Report":

> "ABT-724 was presented and approved as a Drug Development Candidate (DDC) in July 2001. Work has since commenced on the manufacture of the bulk active pharmaceutical ingredient to support process chemistry analysis, as well as to provide material for initial toxicology studies and formulation development. In addition, work has been completed on pre-clinical pharmacokinetics that allows for predicting dose ranges for the first-in-human study. The 2002 Plan includes conducting both pre-clinical toxicology and metabolism studies, as well as initiating the first-in-human study for the 3rd quarter."

CONFIDENTIAL
JHII 021629

REDACTED

# REDACTED

## 2002

A document, "Global Pharmaceutical Research and Development, 2002 Update, Project Review (3/19/02) Meeting Action Items, ($000's)" appears to provide a reduction of $1.29M of costs for ABT-724 during 2002. Abbott contacts responsible for reductions include B. Harris and K. Kerls.

A document, "Global Pharmaceutical Research and Development, 2002 Update, Project Review (3/19/02), Proposed Agenda" shows an anticipated 20 minute discussion on ABT-724, the Therapeutic VP/Director was Marleen Verlinden, and Lead participants for the meeting included Bob Harris (Ventures) and Karen Kerls (Finance).

A document, "Global Pharmaceutical Research and Development, 2002 Update, Development Programs Summary (Excluding Phase IV), ($MM)" reflects three different 2002 spending projections for 2002: the original 2002 plan of $5.9M, a 2002 update of $9.1M, and a "revised 2002 update" of $7.8M. The difference between the 2002 Update spending plan and the Revised 2002 Update is the $1.29M spending reduction (see 3/19/02 document above).

A document that appears to be a powerpoint presentation, "GPRD NCE Projected Phase and Filing Timelines as of April 2002", provides timelines (beginning with 1Q2002) for ABT-492, 773, 100, 510, 627 (Atrasentan), and 751, but does not include a timeline for ABT-724.

A graph, "GPRD Funded Projects for April 2002" identifies ABT-724 as one of seven preclinical compounds/projects.

A document, "GPCD Monthly Highlights, April 2002" provides a brief summary of ABT-724: "provided ADME/PK sections for the clinical brochure to the Venture.

A spreadsheet, "ABT-724 Dopamine D4 Agonist" as of April 2002, provides a comprehensive summary of the drug, market, development plans and timeline, and commercial analysis. The document includes annual spending projections that are equal to the year-end 2001 projects (2002 = $5.9, 2003 = $7.4, 2004 = $31.8, 2005 = $50.6, 2006 = $48.1). Anticipated launch date of 2009. A second page of the document provides a timeline for R&D of ABT-724.

CONFIDENTIAL
JHII 021630

# REDACTED

A spreadsheet, "Pharmaceutical Research and Development, 2002 Update, Development Programs Summary, ($MM)" provides an update (increase) to the 2002 spending plan "as of 5/6/02". The 2002 plan is increased from $5.9M to $7.8M.

A spreadsheet entitled, "ABT-724 2002 Update Development Cost Summary – Funded Program", appears to have been prepared by Abbott prior to July 2002 and possibly on **May 21, 2002** (at the bottom of the spreadsheet it states "Corp. Sub 5/21") a "Program Status" is provided:

> Development Plan completed December '01
> FIM Study scheduled for July '02 – Examine PK/tolerability of SL/Oral dosing
> Liquid formulation established for FIM. Dose range 0.1 mg – 10.0 mg
> Tox studies on target – no issues
> Advisory Meeting to be held in September '02
> Proof of Concept Study in patients mild to moderate ED – March '03
> Go / No go decision transition to Phase II:  December '03

Program status and projected timelines are updated/delayed from original estimates provided in Exhibit 1.6:

|  | *Original (3/13/2001)* | *Revised* |
|---|---|---|
| Phase I | 2Q2002 thru 4Q2003 (7 Qtrs) | 3Q2002 – 4Q2003 (6 Qtrs) |
| Phase II | 4Q2003 thru 1Q2005 (6 Qtrs) | 1Q2004 – 3Q2005 (7 Qtrs) |
| Phase III | 1Q2005 thru 4Q2006 (8 Qtrs) | 4Q2005 – 4Q2007 (9 Qtrs) |
| NDA | 1Q2007 | 4Q2007 |
| Launch | 4Q2007 |  |

An "Interoffice Correspondence" on **June 17, 2002** from Rich Pinto to F. Richter, E. Shek, T. Lyons, K. Stiles, K. Kerls, T. Woidat is highly redacted. On page three, ABT-724 is shown by a "(0.14)".

A spreadsheet, "Global Pharmaceutical Research and Development, 2002 Update, Final Project Targets (reflective of 8/02 PEC Funding Reprioritization), ($000's)" refers to a "PEC Funding Reprioritization – 7/2/2002" meeting and provides "Revised LBE" for several compounds including ABT-724, of $7.344M.

A spreadsheet, "GPRD, 2002 Plan Rollforward Changes, Development Projects" reflects a "development projects" change for ABT of (0.1) due to "Lower Phase I Center LU". A reference on the bottom of the page is to "10/8/01 PEC book submission".

CONFIDENTIAL
JHII 021631

A spreadsheet, "Global Pharmaceutical Research and Development, Budget Comparisons, 2002 Plan" provides amounts for four sources for various compounds. The four sources are: Page 100 Summary, Devel. Cost Summary, Power Pt. R&D by Year. and Power Pt. R&D Detail.

A spreadsheet, "Global Pharmaceutical Research and Development, 2002 Update, Project Targets, ($000's)" provides an update to ABT-724 of $7.344M.

A spreadsheet, "Pharmaceutical Products Research & Development, 2002 Plans, ($Millions)" reports ABT-724 to be "5.9".

A spreadsheet, "Global Pharmaceutical Research and Development, 2002 Update, Project Targets, ($000's)" reports and update to the ABT-724 2002 plan from $5.9M to $7.344 million.

A spreadsheet, "Global Pharmaceutical Research & Development, 2002 update, Development ? M P D Program Budget Summary, ($MM)" provides an update to project spending for ABT-724 of 7.8[M] and identifies Bob Harris as having responsibility for development.

September 27-28, 2002, an ABT-724 "Advisory Board Meeting" was held at Sofitel Chicago Water Tower, Chicago, Illinois. Three volumes of meeting minutes are provided for Day 1, Parts A & B, and Day 2.



REDACTED
CONFIDENTIAL
JHII 021632

*Day 1, Part A (133 pages)*
Introduction of attendees, including independent experts and Abbott personnel. Jeff
Leiden, Abbott COO "responsible for anything R&D that happens in Abbott" attended
the meeting. Other Abbott notables include Dr. John Leonard, MD, VP "responsible for
the development of a whole array of therapeutic areas" and Dr. Jim Sullivan, VP of
Discovery Research. First several pages include a technical presentation and discussion
on the biology of ED (erectile dysfunction) and prior studies and experiences with
apomorphine and Uprima to treat ED. ABT-724 is discussed on pages 58 – 106,
including the hypothesis that the compound provides similar efficacy as apomorphine and
Uprima but without the side effects. Discussions include the efficacy of ABT-724, the
results from tests with rats and the desire to begin human testing. Pages 106 – 133
provide global statistics for ED and related medical conditions.

*Day 1, Part B (112 pages)*
Pages 1-76 consist of discussions about the market needs, comparisons to current drugs
(Viagra, Cialis, etc.), market positioning, FDA approval process, drug response times,
clinical drop-out rates, daily dosing for clinical trials, Uprima clinical tests and sales in
Europe. Pages 77-112 includes a presentation and technical discussions related to the
heart, coronary circulations, drug combinations, safety issues, etc.

*Day 2 (129 pages)*
Pages 1-64 discuss market positioning, competitor drugs, debates the need for another ED
drug, lengthy discussions on efficacy of Viagra (used as a benchmark for discussions)
and its market positioning, clinical trial objectives and issues, how to set up clinical trials
for ABT-724, Pages 65-75 discussion of 3 studies: RigiScan study, chronic-use study,
and female study (p. 65), debate over what level of unfavorable results from the RigiScan
compound would "kill" the compound (p. 75-79), possible results of studies compared to Viagra and
Umprima (competitor drugs), discussion of dosage requirements and a 90-day study,
question of 'when's the next meeting', John Leonard, in summarizing the 2-day
meetings:

> First of all at the level of the meeting is very helpful, I think we expanded our
> horizons a little bit, we were going down a pathway that may not have been
> optimal for this type of therapy, and I think the new thinking is very helpful. Now
> it comes back to the company, and I think we have to ask ourselves some tough
> questions about Abbott Laboratories and ED. Is this going to be a 724 story, or is
> this going to be a long-term approach with a D4 in general?

> I can just tell you, this is the season that we go through our planning processes
> and budgeting and all that, and I am glad that Jeff could join us, because I know
> in some private conversations he and I have had we see a focus with therapy
> valuable, thinking about some of the potentials that we hadn't really thought
> about previously, I'd hope that there's avenues to stay engaged with the group,
> and I don't know the urological calendar and things like that in terms of what
> meetings you guys typically go to... (p. 124)

CONFIDENTIAL
JHII 021633

A **December 20, 2002** letter from Tom Lyons (JH001054) provides an "Annual Progress Report (November 2002)" for ongoing compounds, "2002 Y/E Estimate for JH Development Portfolio", and an "R&D Costs and Development Timeline 2003 Plan" that includes projected costs as well as a "Timeline" of projected launch dates (JH001058). The projected launch date in the 2002 Plan was 3Q2008 and the updated 2003 projected launch date is "TBD". The progress report provided for ABT-724 is:

> "ABT-724. Currently there is one Phase I study ongoing with 32 patients enrolled. An extension of this study is expected to begin in December of 2002 and continue into 2003. In addition, 2002 completed studies included both pre-clinical toxicology and metabolism studies. Due to overall funding constraints as well as strategic priorities, **no new studies/work are currently funded in 2003 for ABT-724.** If additional funding does become available, ABT-724 will be considered." [emphasis added]

The updated spending plan for ABT-724 in 2003 is $0.1M (JH001058) or $75,000 on a more detailed worksheet (JH001064).

**2003**

A spreadsheet, "Historical NMEs, May 2003" provides a summary of various compounds. For ABT-724, a "metric" of "Product Pipeline Status" is shown as "terminated, Jul-01". There appear to be other activities that took place in 2002, for example: "DDC Meeting Dec-02" and "Start of first GLP animal tox study Jul-02".

## REDACTED

A report/spreadsheet, "NME In Development, May 2003" is similar to the spreadsheet above.

A letter dated **November 12, 2003** from James L. Tyree, Abbott, Vice President, Global Licensing/New Business Development, (JH001283), provides an update to spending program by compound by year for 2001 through 2005 (JH001284). On the following report "Hancock Collaboration, Spending by Program, in millions of dollars", ABT-724 is not listed with other compounds that incurred expenses in 4Q2002 or for total year spending for 2003 (JH001285).

A schedule, "Global Pharmaceutical Research and Development, **December 2003** Finance Summary, Development Programs Spending, $ (thousands)" reports 2003 actual and 2003 Update for ABT-724 to be 834 and 752, respectively.

CONFIDENTIAL
JHII 021634

# REDACTED

CONFIDENTIAL
JHII 021635