UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> v. <br><br> ABBOTT LABORATORIES, <br><br> Defendant. | CIVIL ACTION NO. 05-11150-DPW |

## ABBOTT'S CORRECTED DEPOSITION DESIGNATIONS AND COUNTER-DESIGNATIONS FOR PHILIP DEEMER

Defendant Abbott Laboratories ("Abbott") respectfully submits the attached deposition

designations and counter-designations for the July 22, 2004 and January 24, 2007

depositions of Philip Deemer Director of Business Development and Licensing, Global

Pharmaceutical Research Division, Abbott Laboratories

1

Dated:  February 22, 2008                    Respectfully submitted,

ABBOTT LABORATORIES

By:  __/s/ Eric J. Lorenzini_____
     Eric J. Lorenzini

Jeffrey I. Weinberger (*pro hac vice*)
Gregory D. Phillips (*pro hac vice*)
Eric J. Lorenzini *(pro hac vice)*
Ozge Guzelsu *(pro hac vice)*
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth Floor
Los Angeles, CA  90071-1560
Tele:  (213) 683-9100

and

Peter E. Gelhaar (BBO#188310)
Michael S. D'Orsi (BBO #566960)
DONNELLY, CONROY & GELHAAR LLP
1 Beacon St., 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880
peg@dcglaw.com
msd@dcglaw.com

*Counsel for Abbott Laboratories*

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 22, 2008.

Date: February 22, 2008

                /s/ Ozge Guzelsu

# Philip Deemer Deposition Designations

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 7/22/04 | Deemer, Philip | | | 5:6-7:2 | | | |
| 7/22/04 | Deemer, Philip | | | 11:3-14:20 | | | |
| 7/22/04 | Deemer, Philip | | | 15:19-22:21 | | | |
| 7/22/04 | Deemer, Philip | | | 23:8-25:12 | | | |
| 7/22/04 | Deemer, Philip | | | 26:7-28:21 | | | |
| 7/22/04 | Deemer, Philip | | | 32:18-35:4 | | | |
| 7/22/04 | Deemer, Philip | | | 38:24-41:13 | | | |
| 7/22/04 | Deemer, Philip | | | 43:11-44:9 | | | |
| 7/22/04 | Deemer, Philip | | | 47:21-53:23 | | | |
| 7/22/04 | Deemer, Philip | | | 59:20-59:24 | | | |
| 7/22/04 | Deemer, Philip | | | 61:16-62:14 | | | |
| 7/22/04 | Deemer, Philip | | | 63:15-64:13 | | | |
| 7/22/04 | Deemer, Philip | | | 74:14-78:8 | | | |
| 7/22/04 | Deemer, Philip | | | 117:5-117:17 | | | |
| 7/22/04 | Deemer, Philip | | | 156:23-158:4 | | | |
| 7/22/04 | Deemer, Philip | | | 179:3-180:20 | | | |

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 10/27/06 | Deemer, Philip | 6:2-7:12 | | | | | |
| 10/27/06 | Deemer, Philip | 10:4-10:9 | | | | | |
| 10/27/06 | Deemer, Philip | | 11:2-11:13 | | | | |
| 10/27/06 | Deemer, Philip | 12:21-13:8 | | | | | |
| 10/27/06 | Deemer, Philip | 15:18-17:3 | | | | | |
| 10/27/06 | Deemer, Philip | 19:6-19:24 | | | | | |
| 10/27/06 | Deemer, Philip | 25:13-26:22 | 26:23-37:18 | | 1 | 53 | |
| 10/27/06 | Deemer, Philip | 37:19-38:23 | 39:1-43:2 | | 1 | 53 | |
| 10/27/06 | Deemer, Philip | 43:3-43:9 | | | | | |
| 10/27/06 | Deemer, Philip | | 45:4-71:19 | | | | |
| 10/27/06 | Deemer, Philip | 73:21-76:9 | | | | | |
| 10/27/06 | Deemer, Philip | | 76:18-76:22 | | 1 | 53 | |
| 10/27/06 | Deemer, Philip | | 80:11-80:18 | | | | |
| 10/27/06 | Deemer, Philip | 81:21-82:6 | | | | | |
| 10/27/06 | Deemer, Philip | 86:11-86:20 | 86:21-92:14 | | | | |
| 10/27/06 | Deemer, Philip | 92:15-104:22 | | | | | |
| 10/27/06 | Deemer, Philip | 105:13-111:5 | 111:6-111:16 | | | | |
| 10/27/06 | Deemer, Philip | 111:17-116:19 | 116:21-117:6 | | | | |

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 10/27/06 | Deemer, Philip | 122:16-123:2 | | | 4 | PE | |
| 10/27/06 | Deemer, Philip | 126:14-127:21 | | | 4 | PE | |
| 10/27/06 | Deemer, Philip | | 129:6-129:14 | | | | |
| 10/27/06 | Deemer, Philip | 129:16-131:16 | 131:17-131:21 | | 4 | PE | |
| 10/27/06 | Deemer, Philip | 134:5-136:4 | | | 5 | KT | |
| 10/27/06 | Deemer, Philip | 139:10-140:1 | | | 6 | CI | |
| 10/27/06 | Deemer, Philip | 145:13-146:22 | 146:23-151:18 | | 6 and 7 | CI and KW | |
| 10/27/06 | Deemer, Philip | 151:19-152:8 | 152:9-156:7 | | 1 and 7 | 53 and KW | |
| 10/27/06 | Deemer, Philip | | | 156:14-160:7 | | | |
| 10/27/06 | Deemer, Philip | 162:2-165:1 | | | 10 and 11 | J and EK | |
| 10/27/06 | Deemer, Philip | | | 165:4-169:11 | | | |
| 10/27/06 | Deemer, Philip | 170:15-173:17 | | | 13 | LZ | |
| 10/27/06 | Deemer, Philip | 174:20-182:22 | 174:3-174:19 | | 14 | M | |
| 10/27/06 | Deemer, Philip | 174:20-182:22 | 182:24-183:10 | | 15 | R | |
| 10/27/06 | Deemer, Philip | | 184:16-185:1 | | | | |
| 10/27/06 | Deemer, Philip | | 186:5-187:7 | | | | |
| 10/27/06 | Deemer, Philip | 191:10-193:23 | | | 18 | AF | |
| 10/27/06 | Deemer, Philip | 206:18-207:11 | 207:18-208:18 | | 21 | ME | |

| Depo Date | Witness | Hancock Designation | Abbott Counter Designation | Abbott Designation | Deposition Exhibit | Plaintiff Exhibit | Defendant Exhibit |
|---|---|---|---|---|---|---|---|
| 10/27/06 | Deemer, Philip | 208:19-224:24 | 225:1-24 | | 21<br>22<br>23<br>24<br>25 | ME<br>LB<br>KZ<br>LD<br>LO | |
| 10/27/06 | Deemer, Philip | 226:1-229:7 | 229:8-20 | | 25 | LO | |
| 10/27/06 | Deemer, Philip | | | 230:5-232:15 | | | |
| 10/27/06 | Deemer, Philip | 232:16-234:16 | 234:17-236:18 | | 27 | MV | |
| 10/27/06 | Deemer, Philip | 236:19-241:23 | 234:17-236:18 | | 27<br>28 | MV<br>MU | |
| 10/27/06 | Deemer, Philip | 236:19-241:23 | 242:1-244:7 | | 27<br>28 | MV<br>MU | |
| 10/27/06 | Deemer, Philip | | | 244:9-249:3 | | | |
| 10/27/06 | Deemer, Philip | 249:4-250:24 | | | 31 | BF | |
| 10/27/06 | Deemer, Philip | | | 255:8-256:1 | | | |
| 10/27/06 | Deemer, Philip | 256:2-259:8 | | | 33 | GK | |
| 10/27/06 | Deemer, Philip | 256:2-259:8 | 259:9-260:15 | | 33 | GK | |
| 10/27/06 | Deemer, Philip | 261:2-263:10 | | | 34 | NB | |
| 10/27/06 | Deemer, Philip | | | 267:17-268:7 | | | |

# Color Key to Deposition Designations

Designation by Plaintiffs

Counter Designation by Defendants

Designation by Defendants

00001

1            UNITED STATES DISTRICT COURT

2                    FOR THE

3            DISTRICT OF MASSACHUSETTS

4      JOHN HANCOCK LIFE INSURANCE    )

5      COMPANY, JOHN HANCOCK VARIABLE  )

6      LIFE INSURANCE COMPANY, and    )

7      INVESTORS PARTNER LIFE INSURANCE)

8      COMPANY,                )

9            Plaintiffs,      ) CIVIL ACTION

10           vs.                No. 03-12501-DPW

11     ABBOTT LABORATORIES,        )

12           Defendant.        )

13         The deposition of PHILIP DEEMER, called for

14     examination, taken pursuant to the Federal Rules

15     of Civil Procedure of the United States District

16     Courts pertaining to the taking of depositions

17     for the purpose of discovery, taken before JUDY

18     ANN MAATMAN, a Notary Public within and for the

19     County of Lake, State of Illinois, and a

20     Certified Shorthand Reporter of said state, at

21     255 East Illinois Road, Lake Forest, Illinois, on

22     the 22nd day of July, 2004 at 9:30 am.

23

24     Job No:940

1   called as a witness herein by the Plaintiff,

2   having been first duly sworn, was examined and

3   testified as follows:

4               DIRECT EXAMINATION

5   BY MR. WALSH:

6       Q.   Would you state your full name,

7   please?

8       A.   Yeah, it's Philip Mansfield Deemer.

9       Q.   Spell your last name?

10      A.   It's D-e-e-m-e-r.

11      Q.   Mr. Deemer, where do you reside?

12      A.   I'm here in Lake Forest.

13      Q.   And could you give me your full

14  address for the record, please?

15      A.   Yeah, it's 1300 North Waukegan,

16  W-a-u-k-e-g-a-n, Road in Lake Forest, Illinois.

17      Q.   Are you employed, sir?

18      A.   I am employed, yes.

19      Q.   By whom?

20      A.   By Abbott Laboratories.

21      Q.   In what capacity?

22      A.   I'm in the Renal Care Franchise and my

23  title there is Director of Global Strategic

24  Operations.

Deemer, Philip  7/22/2004  9:30:00 AM

1      Q.   I missed the first part of your

2   answer?

3      A.   Yeah, it's Renal, kidney disease, so

4   Renal Care Franchise and its Global Strategic

5   Operations.

6      Q.   And when did your employment by Abbott

7   begin?

8      A.   July of 1990.

9      Q.   Do you have an undergraduate degree?

10     A.   Yes, I do.

11     Q.   From what university or college?

12     A.   It's from the University of Michigan.

13     Q.   And what year did you obtain your

14   undergraduate degree?

15     A.   1978.

16     Q.   And what was your major?

17     A.   Chemical engineering.

18     Q.   Have you had any formal education

19   following your undergraduate degree?

20     A.   Yes, I have.

21     Q.   And what education has that been?

22     A.   That's a Master's in Business.

23     Q.   What year, please?

24     A.   1980.

1    Q.    From what institution?

2    A.    It's from Carnegie Mellon.

3    Q.    Any formal education --

4    A.    You know, I'm sorry, it's actually

5    1982.

6    Q.    Okay.

7    A.    From '80 to '82.

8    Q.    Okay. Any formal education following

9    your MBA?

10    A.    Yes.

11    Q.    What was that, please?

12    A.    That was at University of Chicago,

13    their basic program.

14            Let's see, when was that?  About

15    1997 to the year 2000.

16    Q.    And when you say their basic program,

17    would you describe what that is --

18    A.    Yeah, it's a Great Books Program,

19    basic program for continuing education for

20    adults.

21    Q.    Did that lead to any degrees or

22    certificates --

23    A.    No.  No.

24    Q.    And were you employed during that

1    the market. And so I developed a market worldwide

2    for these products.

3        Q.   And how did it come about that you

4    became employed by Abbott in 1990?

5        A.   I responded to an ad in the Wall

6    Street Journal and they hired me.

7        Q.   What was your position initially with

8    Abbott?

9        A.   Yeah, I was Manager of Business

10   Development for the Hospital Products Division.

11       Q.   And for how long did you occupy that

12   position?

13       A.   Four years.

14       Q.   And could you just generally describe

15   your responsibilities and duties during that

16   period?

17       A.   Uh-huh.  Yeah, during that period, we

18   were in-licensing technologies consistent with

19   the strategic direction of the Hospital Products

20   Division, and I was responsible for negotiating

21   business arrangements to bring in new

22   technologies.

23       Q.   And what does it mean to in-license

24   technologies?

Deemer, Philip  7/22/2004  9:30:00 AM

1      A.   That means to really license from both

2   small and big companies technologies and products

3   that the Hospital Products Division of Abbott

4   could either further develop and market or market

5   as is. So market and sell as is.

6      Q.   So it refers to the process of

7   obtaining rights in particular compounds or

8   products from others who have those rights?

9      A.   Correct.

10      Q.   And typically via the vehicle of a

11   license agreement, correct?

12      A.   Correct.

13      Q.   And after that position ended in or

14   about 1994, what was your next position with

15   Abbott?

16      A.   Then I went to Corporate Licensing.

17      Q.   And what was your position in

18   Corporate Licensing?

19      A.   In Corporate Licensing, I was various

20   roles there, but from -- started out as Senior

21   Manager and then became Director of Licensing for

22   the corporation and doing the same kind of work

23   but for -- largely for the Pharmaceutical

24   Division as opposed to the Hospital Products

Deemer, Philip  7/22/2004  9:30:00 AM

1    Division.

2        Q.   And what is the difference between the

3    Hospital Products Division and the Pharmaceutical

4    Division?

5        A.   Yeah, the Hospital Products Division

6    has products that are largely generic ones, and

7    they're all injectable products, whereas the

8    pharmaceutical division is the Ethical

9    Pharmaceutical Group, and most of their products

10   are -- are oral delivery forms.

11       Q.   So the Hospital Products Division is

12   involved in the development of pharmaceutical

13   agents, correct?

14       A.   Yes.  Uh-huh.

15       Q.   And is it chiefly the method of

16   delivery into the human subject that

17   distinguishes them --

18       A.   That's one of the distinctions.

19       Q.   -- that distinguishes them from the

20   Pharmaceutical Products Division?

21       A.   Yes.  That's one of the -- that's one

22   of the distinctions.

23       Q.   Are there any other distinctions?

24       A.   Yeah, the Hospital Products Division

Deemer, Philip  7/22/2004  9:30:00 AM

1    also has devices and nonpharmaceuticals, so it

2    has a broader spectrum of activities generally

3    suited for the hospital environment as opposed to

4    retail drug stores.

5        Q.   And were your duties and

6    responsibilities in the corporate licensing area

7    similar to those that you had during the period

8    that you were in the Hospital Products Division?

9        A.   Yes, they were.

10       Q.   Were you involved mainly in

11   identifying and negotiating in-licensing

12   opportunities?

13       A.   Yes, I was.

14       Q.   And for how long a period did you hold

15   that position?

16       A.   Let's see.  That was about -- that was

17   five years.

18       Q.   So until about 1999; is that fair?

19       A.   Yeah, that's right.  I think it was

20   about until the year 2000. Uh-huh, yeah.

21       Q.   Which reminds me of another rule.  The

22   reporter has to take down everything you say --

23       A.   Uh-huh.

24       Q.   -- so if you speak to yourself before

Deemer, Philip  7/22/2004  9:30:00 AM

1   you begin an answer the way you and I normally

2   would do in ordinary conversation, we might

3   repeat the question or speak kind of to ourselves

4   before we begin an answer, she has to write it

5   down, and when you see it in the transcript or

6   when anybody else sees it, they're not going to

7   know that you were speaking to yourself.

8       A.   Okay.  Yeah.  Okay.  Yeah.

9       Q.   Therefore, if possible, you should

10  keep in mind that everything you say will appear

11  in the transcript as though you are answering the

12  question.

13      A.   Okay.  Yeah.  Okay. So you want me to

14  re-do that part?

15      Q.   No, I think I'll just ask the next

16  question. I don't think we're going to care

17  that --

18      A.   Okay.

19      Q.   So, in or about 1999, you assumed a

20  new position with Abbott, correct?

21      A.   Right.

22      Q.   What was the new position?

23      A.   Yeah, it was actually the year 2000,

24  and that was with the Global Pharmaceutical

1    Research Division, and it was in the same kind of

2    capacity, though, still within the licensing and

3    business development world.  It was probably more

4    of a business development capacity than a

5    licensing capacity.

6        Q.    And what's the difference between

7    those two capacities?

8        A.    Well, one is -- there's really very

9    little difference.  I shouldn't make a big point

10   of that.  But the responses were a little bit

11   broader in that respect then. We were engaged in

12   kinds of transactions with John Hancock, for

13   example, where we were looking at ways to help

14   out in a broader sense than just in-licensing.  I

15   had a lot of out-licensing responsibilities.  I

16   had responsibilities for seeking these kinds of

17   financing arrangements, and so, it was just a

18   little bit broader than just a strict in-license

19   kind of a responsibility.

20       Q.    Okay. Prior to that point in time it's

21   fair to say that your primary responsibilities as

22   an Abbott employee involved negotiating and

23   identifying in-licensing opportunities, correct?

24       A.    Correct.  Correct.

Deemer, Philip  7/22/2004  9:30:00 AM

1    Q.   And then when you assumed this

2    position those responsibilities broadened,

3    correct?

4    A.   Correct.

5    Q.   Did you have a title when you assumed

6    this position?

7    A.   The title was the same. It was --

8    actually the title was Director of Business

9    Development and Licensing, Global Pharmaceutical

10   Research Division.

11   Q.   I didn't quite get all that.  Director

12   of Business Development --

13   A.   Yeah, and Licensing.

14   Q.   And Licensing of what?

15   A.   And the division then was called the

16   Global Pharmaceutical Research Division.

17   Q.   And for how long did you hold that

18   position with that division as so constituted?

19   A.   That was for about a year and a half.

20   Q.   So until roughly the middle of 2001?

21   A.   Yeah, until towards the end of 2001.

22   End of 2001.

23   Q.   And what happened in the end of 2001

24   with respect to your employment?

Deemer, Philip  7/22/2004  9:30:00 AM

1      A.   At the end the 2001 I went to the --

2    back to the Hospital Products Division.

3      Q.   In what capacity?

4      A.   I went there as Director of Business

5    Development and Licensing, same title, a little

6    different function, again, back to -- at that

7    point, though, the hospital -- the Hospital

8    Products Division had some ethical

9    pharmaceuticals also, and so I used my background

10   to help bring in more pharmaceuticals to the

11   emerging business of the Hospital Products

12   Division in their ethical pharmaceutical world.

13     Q.   And what does the expression ethical

14   pharmaceuticals mean?

15     A.   That means by prescription. It means

16   proprietary and by prescription.

17     Q.   And for how long did you hold that

18   position?

19     A.   Until that company was -- until that

20   division was spun off, so that would have been

21   until technically March of 2004.

22     Q.   When you say technically, do you mean

23   to suggest that your responsibilities actually

24   changed sometime before March of 2004?

1      A.   Yes.  January of 2004, we moved over

2    to the Pharmaceutical Division, and my responses

3    (sic) became, as I described them today, Director

4    of Global Strategic Operations.

5      Q.   I'm sorry, your position today is?

6      A.   Director of Global Strategic

7    Operations for the Pharmaceutical Division,

8    really the Renal Care Franchise within the

9    Pharmaceutical Division.

10      Q.   So have you now described for me all

11    of your various positions while an employee at

12    Abbott?

13      A.   Yes.

14      Q.   And let me take you back to that

15    period between 2000 and the end of 2001, when, as

16    I remember your testimony, you testified that you

17    were the Director of Business Development and

18    Licensing for the Global Pharmaceutical Research

19    Division; is that right?

20      A.   Yes.

21      Q.   So you held that position for about a

22    year and a half, correct?

23      A.   Correct.

24      Q.   And to whom did you report during that

1    year and a half?

2       A.   To Ake Johannson.

3       Q.   I'm sorry?

4       A.   It's A-k-e Johannson,

5    J-o-h-a-n-n-s-o-n.

6       Q.   How do you say his first name?

7       A.   You say it Ake even though it's

8    A-k-e.  It's Swedish.

9       Q.   What was Mr. Johannson's position

10   during that period?

11      A.   He was vice-president of our group.

12      Q.   Of Global Pharmaceutical Research?

13      A.   Correct, of the -- no, of Business

14   Development and Licensing.

15      Q.   And to whom did Mr. Johannson report

16   during that period?

17      A.   He reported to Jim Tyree.

18      Q.   First name is?

19      A.   Jim.

20      Q.   Okay.

21      A.   Tyree, T-y-r-e-e.

22      Q.   And what was Mr. Tyree's position?

23      A.   Actually I think during that time he

24   had -- he had a couple of different bosses, now

Deemer, Philip  7/22/2004  9:30:00 AM

1    that I think about that.

2        Q.   Okay. One of them was Mr. Tyree?

3        A.   One of them was Tyree and the other

4    was Jerry Martin.

5        THE REPORTER: Barton?

6    BY THE WITNESS:

7        A.   Yeah, Martin, Gerald Martin.

8    BY MR. WALSH:

9        Q.   And were these bosses of his serving

10   concurrently in that role or was there a change?

11       A.   Yeah, there was a change.

12       Q.   Who was first?

13       A.   Jerry Martin was first, uh-huh.

14       Q.   And what was Mr. Martin's position

15   during that period?

16       A.   He was a -- I would call him a Senior

17   Vice-president of Business Development and

18   Licensing.

19       Q.   And what was Mr. Tyree's position

20   during the period when Mr. Johannson reported to

21   him and while you were still there?

22       A.   Yeah, he was a -- also same title.  He

23   effectively replaced -- Jerry Martin retired and

24   Jim Tyree then assumed those responsibilities.

Deemer, Philip  7/22/2004  9:30:00 AM

1      Q.   And during those periods when you were

2    in that division to whom did Mr. Martin report?

3      A.   He reported to Steve Weger.

4      Q.   Last name is Weger?

5      A.   W-e-g-e-r, Weger.  Steve Weger is the

6    -- or was the -- he's retired also, he was the

7    Corporate Vice-president of Corporate Planning.

8      Q.   And did Mr. Tyree also report to

9    Mr. Weger during that period?

10      A.   No, Mr. Tyree did not.

11      Q.   To whom did Mr. Tyree report --

12      A.   He reported --

13      Q.   Let me finish the question just so

14    it's clear for the record, okay?

15      A.   Okay.

16      Q.   To whom did Mr. Tyree report to during

17    the period when you were the Director of Business

18    Development and Licensing for the Global

19    Pharmaceutical Research Division?

20      A.   Yeah, he reported to -- Mr. Tyree

21    reported to -- to Dr. Jeff Leiden.

22      Q.   What was Dr. Leiden's position during

23    that period?

24      A.   And Dr. Leiden was the -- let's see,

Deemer, Philip  7/22/2004  9:30:00 AM

1    during that period, he was certainly the Chief

2    Scientific Officer and then at one point he

3    assumed the additional responsibility of Co-chief

4    Executive Officer. I think it was during that

5    same time period.

6        Q.   Of the entire corporation?

7        A.   Of the entire corporation.

8        Q.   And so during the period when you were

9    the Director of Business Development and

10   Licensing for the Global Pharmaceutical Research

11   Division, is it fair to say that that -- that the

12   business and development -- strike that -- the

13   business development and licensing function was

14   headed by either Mr. Martin or Mr. Tyree?

15       A.   Yes.

16       Q.   And throughout that period,

17   Mr. Johannson was your boss, correct?

18       A.   Correct.

19       Q.   Did you report to anybody other than

20   Mr. Johannson during that period?

21       A.   No.

22       Q.   And did you have any direct reports

23   during that period apart from the administrative

24   assistance?

Deemer, Philip  7/22/2004  9:30:00 AM

1     A.   No.  No.

2     Q.   And at some point while you were an

3     employee of Abbott you had business dealings with

4     John Hancock, correct?

5     A.   Yes.

6     Q.   And how did that begin?

7     A.   It began about 1998 when we were --

8     when we were seeking to establish a research

9     collaboration with a small biotechnology company,

10    and John Hancock at that time participated in a

11    financing that the biotechnology company was

12    pursuing that would also benefit the research

13    collaboration or the research partnership that I

14    was involved in forming, so I became exposed to

15    John Hancock at that point.

16    Q.   Did you have any direct dealings with

17    John Hancock personnel in connection with that

18    deal?

19    A.   There were some telephone calls.

20    Q.   And who were the John Hancock people

21    or --

22    A.   Steven Blewitt was one name that I

23    remember.

24    Q.   And is it your recollection that you

1   had interactions with more than one John Hancock

2   representative but you just can't remember who

3   else it was other than Mr. Blewitt?

4       A.   He was the principal person and I --

5   it didn't involve us, they were just looking --

6   they had asked us a few questions about the

7   nature of our research program, and so they were

8   doing some due diligence, and so that's how that

9   occurred, so it wasn't -- they were not extensive

10  conversations.

11      Q.   With Mr. Blewitt you're talking about?

12      A.   Correct.

13      THE REPORTER: Can you spell his name?

14      THE WITNESS: Steven Blewitt? It's

15  B-l-e-w-i-t-t.

16      THE REPORTER: Thanks.

17  BY MR. WALSH:

18      Q.   And after that particular series of

19  interactions in connection with that deal, did

20  you and Mr. Blewitt ever speak again?

21      A.   Yes, we did.

22      Q.   And in what context did that occur

23  next?

24      A.   You know, the next conversations were

1    about doing similar kinds of financing.  Steven

2    Blewitt was interested in co-investing in

3    opportunities that we were considering for either

4    investment or for establishing partnerships with,

5    so we had a dialogue over the course of some

6    period of time.

7        Q.   Apart from the particular transaction

8    which is the subject of our meeting here this

9    morning --

10        A.   Uh-huh.

11        Q.   -- were you ever involved in any other

12    deal with John Hancock?

13        A.   Yes.

14        Q.   And what deal was that?

15        A.   Well, as I say, there was an

16    opportunity that we invested in -- Abbott

17    invested in and also formed a research

18    collaboration with a company called Idun.  It's

19    spelled I-d-u-n.  And we bought stock in that

20    company and formed a research collaboration in

21    cancer.

22            And Steve Blewitt contributed I

23    believe it was five million dollars of investment

24    money either immediately following our investment

1       or coincident with the same financing round that

2       that company was making.

3           Q.   So you dealt with Mr. Blewitt in

4       connection with that particular investment?

5           A.   Yes, I did.

6           Q.   Was that a direct investment in Idun?

7           A.   They -- they -- they made a direct

8       investment in Idun and we did also.

9           Q.   Any other deals that you were involved

10      in with John Hancock other than the particular

11      transaction at issue in this case and the one you

12      just described?

13          A.   No.

14          Q.   And did you deal directly with

15      Mr. Blewitt in that -- the Idun transaction?

16          A.   Yes, I did.

17          Q.   Did you deal directly with any other

18      Hancock representatives in that transaction?

19          A.   No.  No.

20          Q.   And in what year did that transaction

21      close?

22          A.   That closed in -- let's see now.  I

23      can't recall exactly, but I believe it was 1999.

24          Q.   And after the closing of that

1    transaction, did you and Mr. Blewitt remain in

2    touch from time to time?

3       A.   Yes, we did.

4       Q.   And was that -- were those business

5    contacts or social contacts?

6       A.   No, no.  They were business contacts

7    along the same lines.

8           Again, John Hancock was interested

9    in investing where we were investing.  They liked

10   what we were doing.  They saw those as good

11   investment opportunities.  And we talked from

12   time to time about other ways for John Hancock to

13   participate in -- in financings like this, and in

14   -- we talked about the idea of this kind of

15   arrangement that we ultimately concluded well in

16   advance of the time in which we actually began

17   formal discussions about it.

18      Q.   When you say the arrangement that we

19   ultimately concluded, are you referring to the

20   arrangement that is embodied in the document

21   that's been marked as Abbott Exhibit No. 1?

22           (WHEREUPON, said document

23             was tendered to the witness.)

24      A.   Yeah.  The Research and License

Deemer, Philip  7/22/2004  9:30:00 AM

1        A.   Correct.

2        Q.   And what was Mr. Blewitt's reaction as

3    expressed to you to that concept at that time?

4        A.   Yeah.  I think he thought it was -- I

5    believe he thought it was an interesting idea and

6    began studying it, began thinking about the

7    logistics of doing that, and thinking about it

8    from a portfolio standpoint and risk and return

9    and rewards.  I think over the course of about a

10   year he thought about this quite seriously and

11   then our conversation evolved.

12       Q.   And which year was this roughly?

13       A.   This all took place during -- I mean I

14   would -- I talked to him periodically during 1999

15   and -- but certainly during the year 2000,

16   beginning of the year 2000 is when our

17   discussions matured.

18       Q.   Okay.  So it's fair to say that during

19   the period of sometime in 1999 and extending into

20   2000, you and Mr. Blewitt were discussing the

21   concept of Abbott receiving money from John

22   Hancock that could be used by Abbott to help

23   underwrite the cost of pharmaceutical research

24   and development, correct?

Deemer, Philip  7/22/2004  9:30:00 AM

1      A.   Correct.

2      Q.   And as those discussions progressed, a

3   portfolio of candidates, of drug candidates was

4   identified, correct?

5      MR. DESIDERI: During 1999?

6   BY MR. WALSH:

7      Q.   No.  At any point.  At some -- at some

8   point?

9      A.   That actually came much later, but in

10   concept that's correct. We did identify a

11   portfolio, but that was actually during mid to

12   late 2000.

13      Q.   And you had said that when these

14   discussions began or at some point after they

15   began, Mr. Blewitt began to do due diligence

16   from, I think your words were, from a portfolio

17   standpoint.  What did you mean by that?

18      MR. DESIDERI: Hang on.  Would you read that

19   back?

20          I don't know if he said started

21   doing due diligence.

22   BY MR. WALSH:

23      Q.   Okay.  Let me -- let me just switch

24   them around.

1          You had -- in one of your earlier

2     answers, you referred to Hancock having an

3     interest from a portfolio standpoint or seeking

4     to move it forward from a portfolio standpoint.

5          Do you remember that testimony?

6     A.    Did I remember the testimony --

7     Q.    Do you remember saying that?

8     A.    Yes.

9     Q.    Okay. What did you mean by from a

10    portfolio standpoint?

11    A.    Steve Blewitt proposed that if there

12    were a number of compounds in a grouping that in

13    order to ameliorate the risk of any one

14    development opportunity, there were a number of

15    these opportunities that -- and knowing that they

16    were risky kinds of -- R & D is a very risky

17    process, that there were sufficient numbers that

18    from a statistical standpoint, it would be -- one

19    could -- and I think with his background, too, in

20    annuities and thinking about probabilities

21    related to life insurance and so on, that he

22    could conceive of a concept where if a number of

23    projects were put into a basket or portfolio that

24    -- and all these things were pursued, that the

1    chance of success of one project would be --

2    would be -- or whatever number would be

3    sufficient then to justify an investment.  So

4    that was his concept.

5        Q.    The process of developing experimental

6    pharmaceutical compounds begins with non-

7    clinical research, right?

8        A.    That's correct.

9        Q.    And from the laboratory the process

10   moves into animal studies, correct?

11       MR. DESIDERI: I'm going to object to lack of

12   foundation.  Are you asking him for his

13   understanding of the general process or --

14       MR. WALSH: Exactly.

15       MR. DESIDERI: -- anything that's specific

16   to --

17   BY MR. WALSH:

18       Q.    Yeah. And that is what I'm asking,

19   your understanding of the general process of how

20   a particular experimental pharmaceutical compound

21   moves from an idea in some -- in some doctor's

22   head into a commercially developed product.

23   Okay?

24           Do you have such an understanding,

1   Basically in my -- if you want more detail about

2   my every day -- my role would have been to

3   orchestrate teams of people and experts, who, as

4   I say, are experts in these various areas, and my

5   job would be to orchestrate a team that would

6   evaluate opportunities and as a team that we

7   would, you know, make recommendations.

8   BY MR. WALSH:

9       Q.   You understand that as a compound

10  moves along the developmental chain, the degree

11  of risk that it won't move to the next step is

12  lessened as it takes the next step, right?

13      MR. DESIDERI: Object to a lack of

14  foundation.  Are you asking him for his belief?

15      MR. WALSH: His understanding.

16      MR. DESIDERI: I object to lack of

17  foundation.  If you have a general understanding,

18  you can answer.

19  BY THE WITNESS:

20      A.   Well, yeah, I mean, I -- okay.

21  Generally I would think that, you know, that

22  would be -- that would be the case.

23  BY MR. WALSH:

24      Q.   I mean, all the things being equal,

1    there's a lot more risk to investing in 20

2    compounds that have never entered the clinic than

3    20 compounds that are in a Phase III clinical

4    trial, right?

5        A.    Generally, yeah, that's -- that --

6    that would be true.

7        Q.    And did Mr. Blewitt indicate to you

8    during these discussions an interest in

9    developing or investing in particular compounds

10   at any point in the spectrum along the

11   developmental process?

12       A.    My understanding is he was interested

13   in a diversified -- in a portfolio that would

14   have the appropriate amount of risk reward for

15   his analysis. And so I think he was -- my

16   understanding is that he was looking for a

17   diversification in that portfolio in terms of

18   projects in various phases.

19       Q.    Did he indicate that Hancock would be

20   willing to invest in a portfolio that included

21   any compounds that had not entered the clinic?

22       A.    Oh, very definitely.

23       Q.    And were some of the compounds

24   identified still in the laboratory at the time of

Deemer, Philip  7/22/2004  9:30:00 AM

1    the Agreement?

2        A.   Oh, yes, absolutely.

3        Q.   How many of them were, do you

4    remember?

5        A.   Oh, geez, I have to go back and look

6    at that.  I'm not really sure.  The portfolio

7    changed a lot, and if you don't -- I can give you

8    an answer -- I mean, I can -- I can -- I believe

9    there were three projects that were not in the

10   clinic yet, I believe that's right.  I have to go

11   back and look at the records.

12       Q.   Okay.  You're talking about at the

13   time that the deal was actually signed?

14       A.   Correct.

15       Q.   Because the portfolio developed during

16   the negotiation process and some compounds were

17   added and some were deleted, right?

18       A.   Correct.  Correct.

19       Q.   And how -- would you describe for me

20   how that process of identifying the compounds

21   that would be subject to this Agreement, how did

22   that work on the Abbott side to the extent you

23   were aware of how it worked?

24       A.   Yeah. Well, we were seeking to --

1    first of all, Abbott had really more really good

2    opportunities than we could pursue. We just

3    weren't able to with the given funding, that we

4    -- that we were able to spend with the company.

5         So the process was really giving

6    priority to what we thought were the best

7    opportunities to fund, and so when we began

8    talking about this portfolio with John Hancock,

9    we were looking around to find the very best

10    opportunities that we thought were the ones that

11    merited funding, and that's how we -- so it was

12    really a process of choosing, you know, the very

13    best things we could.

14        Q.   Was there a scientist or group of

15    scientists involved on the Hancock end in terms

16    of vetting the candidates for inclusion in the

17    portfolio?

18        MR. DESIDERI: I'm going to object on the

19    grounds that this case involves the issue of the

20    contract interpretation and the last two payments

21    under the contract.

22        What does the compound selection

23    process have to do with the issues in the case?

24        And I will tell you because you

1          (WHEREUPON, the record was

2          read by the reporter as

3          requested.)

4    BY THE WITNESS:

5      A.   I'm not aware of exactly what Steve

6    Blewitt did, but he was my main contact.  Again,

7    I was the business guy, he was the business guy,

8    and I believe he had people he talked to.  But I

9    don't -- I did not talk to those people.

10   BY MR. WALSH:

11     Q.   Okay.  Were you aware that there were

12   scientists on the Hancock side or were you just

13   not aware of what he was doing?  You're just

14   making a presumption --

15     A.   I was -- I mean, he had his own

16   process, and I don't know exactly what he was

17   doing.  He had people he talked to.

18          There were some consultants I know

19   he used because I remember we had to set up some

20   meetings, some telephone calls, with some people

21   that he wanted us to talk to and we -- people

22   like that.

23     Q.   That's exactly what I was getting at.

24          Were you involved in the process

Deemer, Philip  7/22/2004  9:30:00 AM

1    of facilitating discussions between Hancock's

2    technical people, whoever they were, and Abbott's

3    technical people, whoever they were, with respect

4    to compounds for inclusion in the portfolio?

5       A.   Yes.  I was involved in some of that,

6    yeah.

7       Q.   And your role was simply to facilitate

8    the discussion?

9       A.   Correct.

10       Q.   And did you have any role in selecting

11    from the Abbott side the compounds for inclusion

12    in the portfolio?

13       A.   No.

14       Q.   Who on the Abbott side was principally

15    responsible for that process?

16       A.   That would have been the head of

17    R & D.

18       Q.   And who was that?

19       A.   That was John Leonard.

20       Q.   And did you interact with Mr. Leonard

21    in connection with that process of identifying

22    portfolio compounds?

23       A.   A little bit, but not -- I mean, he

24    was the main -- he certainly needed to be

1    A.   That really came more from John

2    Leonard.

3    Q.   Okay. So Steve Cohen was the chief

4    financial officer, correct?

5    A.   No.

6    Q.   What was his role at that time?

7    A.   He was the controller of the Research

8    Division.

9    Q.   So he and his staff were running

10   financial models and analysis with respect to

11   particular compounds, correct?

12   A.   I believe that's what they were doing,

13   yes, that type of activity.

14   Q.   They were not providing so far as you

15   understood, scientific input with respect to the

16   merits of particular compounds, correct?

17   A.   That's correct.

18   Q.   You were looking to Mr. Leonard and

19   his people to do that, correct?

20   A.   That's correct.

21   Q.   And did you ever deal with anyone

22   other than Mr. Leonard himself?  When I say deal

23   with, I mean interact directly with, have

24   communications with, on the subject of

1    identifying compounds for inclusion in the

2    Hancock portfolio?

3        MR. DESIDERI: I'm going to object.  Did he

4    ever say he dealt with Leonard in identifying

5    compounds?

6        MR. WALSH: As defined in communications, I

7    think he did, but he can -- if not, you know, if

8    you want to correct it, that's fine.

9    BY THE WITNESS:

10        A.    Yeah.  I mean, I dealt with

11    Mr. Leonard purely -- right, in updating on the

12    status of our negotiations, but Mr. Leonard also

13    was involved in some of the due diligence or the

14     -- not due diligence, but the conversations that

15    occurred between Steve Blewitt and maybe people

16    Steve Blewitt had consultants and so on, and I

17    helped orchestrate some of -- at least one of

18    those meetings I recall.

19    BY MR. WALSH:

20        Q.    Was that a meeting -- a face-to-face

21    meeting?

22        A.    That was by telephone.

23        Q.    And was it your understanding that

24    there were other scientific people within Abbott

1    who were communicating with scientific people at

2    Hancock and who were just not privy to those

3    communications, but you understood that they were

4    going on; is that fair?

5        A.    I'm not aware of that.

6        Q.    Okay. You're not aware one way or the

7    other or was it your -- did you have an

8    understanding that all communications were being

9    coordinated through Leonard?

10       A.    That was my understanding.

11       Q.    Okay. So it's not that there were

12   scientists willy-nilly having discussions with

13   other scientists, right?

14       A.    Not -- there may -- it's possible

15   there was a long course of discussions, and as I

16   reflect back I -- I believe I orchestrated more

17   than one telephone call.  In fact, I do recall

18   another one now.  There was a direct -- the head

19   of one of the programs also had a call with John

20   Hancock and a consultant, so it wasn't -- but I

21   would say that any of those kinds of things would

22   have been orchestrated by me.

23       Q.    And which program was it that you

24   remember the head --

1      A.   That was one, yeah, I remember --

2      THE REPORTER:  I'm sorry, you're talking on

3    top of each other.

4    BY MR. WALSH:

5      Q.   Yeah, that's okay.  It's going to keep

6    happening.

7           Which program was it where you

8    orchestrated communication between the head of

9    that program and John Hancock?

10     A.   Yeah, that was a -- that was a program

11   called -- let's see, Bimoclemol.

12     Q.   Could you spell it?

13     A.   Yeah, I'll try to. It's

14   B-i-m-o-c-l-e-m-o-l, I believe, it's Bimoclemol.

15   And it was a product for diabetes.

16     Q.   Was that compound ultimately included

17   in the portfolio?

18     A.   No.

19     Q.   And at one point it was being

20   considered for inclusion; is that correct?

21     A.   Yes.

22     Q.   Do you remember facilitating or

23   arranging for the head of any other research and

24   development program on a product basis to have

Deemer, Philip  7/22/2004  9:30:00 AM

1    discussions with Hancock?

2        A.   I believe there was one, although I'm

3    not a hundred percent sure. It seems -- I believe

4    that there was one other one in the oncology

5    field.

6        Q.   And which compound was that?

7        A.   And that was -- most of -- many of the

8    compounds were oncology compounds.  And there was

9    a gentleman, Dr. Perry Nisen, and I believe we

10   orchestrated a call with him, and again, this is

11   on the Hancock side.

12       Q.   Okay. Do you remember which compound

13   that was?  You said it was an oncology --

14       A.   Well --

15       Q.   -- product, but you didn't tell me --

16       A.   -- most of that -- most of the

17   compounds in the portfolio were oncology

18   compounds, were cancer drugs.

19       Q.   Right.  Yeah.

20       A.   And so we would have been talking

21   about many of the compounds, not just one.

22       Q.   Oh, okay.  That conversation, in other

23   words, would have encompassed a number of

24   different compounds?

1      A.    Correct.

2      Q.    Would it have encompassed all of the

3    oncology compounds?

4      A.    Likely to have.  These were

5    conversations that Hancock wanted to have and

6    they were -- they basically were asking

7    questions.  So they may have asked more questions

8    about one than another, maybe not at -- you know,

9    not at all of some of them.

10      Q.    And is that a telephone conference

11    call you remember?

12      A.    Yeah, that would have -- yes.

13      Q.    Were you a party to that call?

14      A.    Yes.

15      Q.    Dr. Nisen was as well, correct?

16      A.    Yes.  I believe -- yes, I believe

17    Dr. Nisen was there.

18      Q.    Do you recall any other Abbott

19    representatives in that call?

20      A.    I believe Steve Cohen was on that call

21    also.

22      Q.    Any other Abbott representatives

23    that --

24      A.    I don't recall anybody else.

Deemer, Philip  7/22/2004  9:30:00 AM

1    Q.    And did Dr. Nisen address each of the

2    oncology compounds that was then being considered

3    for inclusion?

4    A.    Well, again, you know, his role was to

5    answer questions that they had, and so, to the

6    extent that he could answer those questions, he

7    did.

8    Q.    Okay. So you don't remember whether

9    those questions would have included all of the

10    oncology compounds or --

11    A.    No, no --

12    Q.    Is that fair?

13    A.    -- I don't.

14        Yeah.

15    Q.    But whatever they asked, you remember

16    he answered?

17    A.    Yes.

18    Q.    And who were the Hancock

19    representatives in that call?

20    A.    I remember it was Steve Blewitt, and

21    again, I don't know who all he had, but he had

22    representatives that I believe he had hired for

23    the occasion.

24    Q.    And as you may remember the deal was

1    and any Hancock representatives regarding the

2    science or the merit of any of the candidates for

3    inclusion in the Hancock portfolio other than the

4    ones you've just described?

5        MR. DESIDERI: Is he aware of them or whether

6     -- are you asking him whether he can recall

7    anymore?

8        MR. WALSH: Well, first -- kind of the second

9    one is within the first, I think.

10    BY MR. WALSH:

11        Q.   Do you know what I'm asking?

12        A.   I can't -- I can't recall any other

13    conversations.

14        Q.   Okay.  That's what I'm asking.

15        A.   Yeah.

16        Q.   On that.  I mean, you recall the

17    conversations, but not on the subject that's

18    identified; is that right?  Fair?

19        A.   Correct.

20        Q.   Now were you the person who was

21    principally responsible on behalf of Abbott for

22    negotiating the business terms of this deal with

23    Hancock?

24        A.   Yes, I was.

1       A.   On the business -- on the business

2    terms, correct.

3       Q.   Right.  Right.

4            And your answer is that to the

5    best of your recollection nobody else was

6    involved in such direct communications, correct?

7       MR. DESIDERI: This is a pretty easy question

8    that seems to be getting complex.  Is your

9    question simply who on the Abbott side is he

10   aware of had contact on the business terms with

11   John Hancock?  Is that the question?

12      MR. WALSH: I'll take that one.

13      MR. DESIDERI: Yeah, because -- do you

14   understand the question?

15      THE WITNESS: Yeah.  Yes.

16      MR. DESIDERI: Who dealt with Hancock on the

17   business terms from the Abbott side?

18      THE WITNESS: Yeah, that was me.

19      MR. DESIDERI: He's asking you anyone else?

20   BY THE WITNESS:

21      A.   Oh, anyone else.

22   BY MR. WALSH:

23      Q.   I thought it was so simple.

24      MR. DESIDERI: It is simple, but for some

1    reason we seem to be all missing each other, so.

2    BY THE WITNESS:

3        A.   I told you my attorney, and Steve

4    Cohen was involved to some extent, but we were --

5    my -- my role was really the direct communication

6    of the negotiations with John Hancock. So I don't

7    -- I don't think there was anybody else that was

8    really material in that respect.

9    BY MR. WALSH:

10       Q.   And did Mr. Cohen, to the best of your

11    knowledge, communicate directly with Hancock

12    representatives regarding business terms of the

13    Agreement?

14       A.   No.

15       Q.   And to the best of your knowledge, did

16    Mr. Smith communicate directly with any

17    representatives of Hancock regarding the terms of

18    the Agreement?  And notice I took the word

19    "business" out.  I'm talking about any terms of

20    the Agreement?

21       A.   Any terms. Well, sure. In terms of

22    negotiating terms, there might have been.  I'm

23    sure there were some legal terms that he was

24    negotiating with with Hancock or Hancock's

Deemer, Philip  7/22/2004  9:30:00 AM

1    representatives.

2        Q.    And who on the Hancock side was

3    involved in communications with Abbott regarding

4    the terms of this Agreement apart from

5    Mr. Blewitt?

6        MR. DESIDERI: And the consultants that you

7    were asking about?

8    BY MR. WALSH:

9        Q.    Well as I remember your testimony, you

10   didn't know of any consultants, but you thought

11   they were out there, but you didn't have direct,

12   personal knowledge about consultants; is that

13   right?

14       A.    That's correct.

15       Q.    Okay. So, who do you know on the --

16   based on your personal knowledge on the Hancock

17   side of the deal other than Mr. Blewitt about

18   whom you've already testified, was involved in

19   discussions with the Abbott representatives about

20   the terms of the Agreement?

21       A.    Well, there would have been Hancock's

22   legal staff.

23       Q.    Do you remember who they were?

24       A.    Well, there was Brewster.

1      Q.   Brewster Lee?

2      A.   Brewster Lee and Kevin Tormey and Amy

3   Weed.

4      THE REPORTER:  Amy who?

5   BY THE WITNESS:

6      A.   Amy Weed, W-e-e-d.

7   BY MR. WALSH:

8      Q.   And are you aware of any other

9   representatives of Hancock who communicated

10   directly with Abbott in connection with the

11   Agreement that's marked as Exhibit Abbott 1?

12      A.   I'm not -- I'm not aware of anybody

13   else.

14      Q.   Let me just show you the -- as part of

15   this process we can serve written questions on

16   each other in the course of discovery,

17   Mr. Deemer.  Those questions are called

18   Interrogatories. And each side gives answers to

19   the Interrogatories.

20      Let me show you Abbott's Answers to

21   what are called Plaintiff's First Set of

22   Interrogatories.

23         (Tendered to witness.)

24         And they're before you now, but

1    have knowledge and you're not certain, but you

2    have heard that he's with a particular one?

3        A.   Yes.

4        Q.   Tell me what you've heard?

5        A.   I know he left the company recently

6    and I was told that he went to work for a company

7    and I believe someone told me what it was and I

8    just can't remember right now what the name of

9    the company is.

10       Q.   Okay. Do you remember where that

11   company is or have an understanding as to where

12   it is?

13       A.   No.

14       Q.   Let me show you a document previously

15   marked in the case as Exhibit Abbott No. 2.  And

16   it's before you now, sir.

17              (Tendered to witness.)

18              What is that document?

19              Let me back up and put the

20   question differently.

21              Is that the initial Term Sheet

22   that you can identify for this particular deal

23   that ultimately culminated in the Agreement

24   that's been marked as Exhibit Abbott 1?

1      A.   It looks like it to me.

2      Q.   You remember that there were a few

3   Term Sheets developed?

4      A.   Yes.

5      Q.   And were you involved in the

6   discussions that led to the initial Term Sheet?

7      A.   No.

8      Q.   And who was involved in the

9   discussions that led to the initial Term Sheet,

10   to the best of your knowledge?

11      A.   I need a little clarification.

12          So you're calling this the initial

13   Term Sheet?

14      Q.   No, you said it looks like it is, but

15   you can't be sure.  That's what I kind of took

16   from your answer.

17      A.   Yeah.  I mean, it looks to me like it

18   is the original Term Sheet.

19      Q.   Yeah, I mean, I can tell you I haven't

20   seen a Term Sheet dated earlier, but you're the

21   witness.  And what I'm now asking is at some

22   point you became aware that there was a Term

23   Sheet, right?

24      A.   Correct.

1       Q.   And regardless of whether it's Exhibit

2    2, Abbott 2 or not, my question is:  Were you

3    involved in the discussions that led to the

4    initial Term Sheet?

5       A.   No.

6       Q.   Who was?

7       A.   Steve Blewitt.

8       Q.   With whom did he have those

9    discussions on the Abbott side?

10      A.   The original -- nobody.

11      Q.   So as I deduce, a Term Sheet was

12   provided by Hancock without any kind of previous

13   discussion, at least to your knowledge, correct?

14      A.   I mean -- yes.

15      Q.   Okay. Is that your recollection of the

16   process?

17          Don't let me tell you.  You were

18   there, I wasn't.

19      A.   I mean, again, my previous testimony,

20   I talked about how we had been talking about a

21   concept like this for some period of time, and

22   then he produced -- my recollection is that he

23   produced this Term Sheet on his own.

24      Q.   Okay.  All right. It's fair to say

Deemer, Philip  7/22/2004  9:30:00 AM

1     that the Term Sheet was reflective of previous

2     discussions that you and he had had on a

3     conceptual basis about potential investments by

4     Hancock and the work of Abbott, correct?

5          MR. DESIDERI: Objection.

6     BY THE WITNESS:

7          A.   Would you repeat the question?

8          MR. WALSH: Why don't you read it back for

9     Mr. Deemer, please?

10              (WHEREUPON, the record was

11              read by the reporter as

12              requested.)

13    BY MR. WALSH:

14         Q.   Yeah, let me rephrase it.

15         A.   Correct.

16         Q.   It's fair to say that the initial Term

17    Sheet that you received from Mr. Blewitt was

18    within the context of the discussions that you

19    and he had previously had on the conceptual level

20    about the terms of a potential investment by

21    Hancock, correct?

22         A.   From a conceptual standpoint, but not

23    from a specific standpoint.

24         Q.   Right.  In other words, the Term Sheet

1    is putting flesh on the conceptual bones that you

2    and he had discussed, if you will.  Okay?  Is

3    that right?

4        A.    Generally I'd say so. There's

5    specifics in here that we hadn't talked about, so

6    I mean, but in terms of -- there's stuff in

7    addition to the concept, but the concept is in

8    here, along with other things.

9        Q.    Yeah. And I'm not meaning to suggest

10   that you had discussed --

11       A.    Right.

12       Q.    -- everything that ended up in this

13   Term Sheet?

14       A.    Yeah, yeah. Okay.  Fine.

15       Q.    I'm just saying this was the next step

16   in those discussions in the process that

17   ultimately led to the execution of the Agreement

18   that's been marked as Abbott Exhibit 1, correct?

19       A.    Yes.

20       Q.    Okay.  And after you received -- was

21   the Term Sheet, the initial Term Sheet, whether

22   it was Exhibit Abbott 2 or any other Term Sheet,

23   was it sent to you?

24       A.    Yes.

Deemer, Philip  7/22/2004  9:30:00 AM

1          read by the reporter as

2          requested.)

3    BY THE WITNESS:

4        A.   I believe they were.

5    BY MR. WALSH:

6        Q.   Okay. Is Program Term defined in this

7    Draft?  And I direct your attention to page

8    AL-147 of the Draft.

9        A.   All right.

10       Q.   You see it?

11       A.   Yes.

12       Q.   So there is a definition, right?

13       A.   Of Program Term?  Yes.

14       Q.   And why don't you read the definition

15   into the record?

16       A.   It says, "Program Term shall mean a

17   period of four program years".

18       Q.   And was it your understanding that

19   under this Draft as originally drafted by

20   Mr. Smith and sent to Hancock that that Program

21   Term could be extended?

22       A.   Yes.

23       Q.   And was it your understanding that it

24   could be extended other than by agreement of the

Deemer, Philip  7/22/2004  9:30:00 AM

1    concern, right?

2        A.    Where does it say the Program Term had

3    ended?

4        Q.    It says "subsequent year commencing

5    immediately after the end of the Program Term."

6    You see that language?

7        A.    Yes.

8        Q.    You were not concerned that by

9    referring to the end of the Program Term that it

10    would actually mean the end of the Program Term

11    as opposed to extension, right?

12        A.    No.

13        Q.    Okay. Now, let me show you a document

14    that hasn't yet been marked, and we'll mark it as

15    Exhibit Deemer 24.

16            (WHEREUPON, said document

17            was marked Deemer

18            Deposition Exhibit No. 24,

19            for identification, as of

20            7/22/04.)

21            (Tendered to witness.)

22    BY MR. WALSH:

23        Q.    And before you now is Exhibit Deemer

24    24. Is that an e-mail that you wrote?

Deemer, Philip  7/22/2004  9:30:00 AM

1      A.    Yes.

2      Q.    And among other things you say in the

3   e-mail that you wanted to alert Hancock to a

4   possible problem in advance of their executive

5   committee meeting.  Do you see that?

6      A.    Yes.

7      Q.    What were you referring to?

8      A.    There were some problems with this

9   drug that were coming up, and I didn't know the

10   details, but I knew that Steve was having a

11   committee meeting, and I wanted to make sure that

12   he was aware of any issues, you know, the fact

13   there might be a problem with this drug before he

14   went to his executive committee meeting.

15      Q.    When you say "this drug", are you

16   referring to 980?

17      A.    Yes.

18      Q.    That's the name for, a shorthand --

19      A.    That's a code name for one of our

20   drugs.

21      Q.    Was that a drug that was then being

22   considered as a candidate for inclusion in the

23   Hancock portfolio?

24      A.    Yes.

Deemer, Philip  7/22/2004  9:30:00 AM

1      Q.   And was that compound actually

2   included in the portfolio?

3      A.   No.  It turns out that -- no, it was

4   not.

5      Q.   Let me show you another document

6   that's been previously marked as Exhibit Abbott

7   7, which is before you now.

8          (Tendered to witness.)

9          Have you seen Abbott 7 before?

10      A.   Yes.

11      Q.   When is the last time you saw this

12   document?

13      A.   I saw this recently when I was

14   reviewing my notes and stuff for this meeting

15   today.

16      Q.   In preparation for the deposition?

17      A.   Uh-huh.

18      Q.   Is that a yes?

19      A.   Yes.

20      Q.   Do you recall having received this

21   document back in or about September of 2000?

22      A.   Yes.

23      Q.   Do you recall discussing any of the

24   provisions in this document with any Hancock

Deemer, Philip  7/22/2004  9:30:00 AM

1     A.   I really don't.  I -- let me -- but --

2     I don't.

3        Q.   Now you said earlier that the

4     alternative structure embodied in these last two

5     Drafts that we've looked at including Exhibit

6     Abbott 16 was rejected by Abbott; is that right?

7        A.   Yes.

8        Q.   And why was it rejected?

9        A.   Well, it wasn't a risk-sharing

10    structure that we were trying to accomplish, and

11    the payments were very drawn out and -- and it

12    was really quite a different concept.

13       Q.   And do you recall whether that

14    alternative deal structure was promptly rejected

15    or was it considered for a period of time?

16       A.   It was considered for a period of

17    time.  The reason -- I think we were in limbo.

18          This was proposed because we were

19    trying to solve a situation we were in, and we

20    were seeking alternatives to arrive at a mutually

21    agreeable structure, and so while we had other

22    conversations about other ways to move forward, I

23    think this is the one that remained on the table

24    for lack of anything better coming forward.

Deemer, Philip  7/22/2004  9:30:00 AM

1         I think that's -- it -- it

2    persisted for awhile even though it wasn't

3    something that we were warm -- warm to at all.

4        Q.   And at some point in time, however,

5    you communicated to Hancock that Abbott would not

6    accept the alternative proposed deal structure,

7    right?

8        A.   Yes.

9        Q.   And after that information was

10   communicated to Hancock, the parties continued to

11   exchange Drafts until ultimately a final version

12   was agreed upon, right?

13       A.   We reverted back to the original

14   structure.

15       Q.   And continued to exchange Drafts,

16   right?

17       A.   Yes.

18       Q.   And ultimately Abbott Exhibit 1 or

19   Exhibit Abbott 1 was executed, right?

20       A.   Correct.

21       Q.   Now before the execution of Exhibit

22   Abbott 1, who at Abbott to your knowledge was

23   involved in approving the deal?

24       A.   The president of the pharmaceutical

1           UNITED STATES DISTRICT COURT

2              FOR THE

3           DISTRICT OF MASSACHUSETTS

4

5      JOHN HANCOCK LIFE INSURANCE   )

6      COMPANY, JOHN HANCOCK      )

7      VARIABLE LIFE INSURANCE     )

8      COMPANY, and MANULIFE       )

9      INSURANCE COMPANY (f/k/a     )

10    INVESTORS  PARTNER INSURANCE  )  Civil Action No.

11    COMPANY),             )  05-11150-DPW

12          Plaintiffs,   )

13       -vs-           )

14    ABBOTT LABORATORIES,      )

15          Defendant.    )

16

17       The videotaped deposition of PHILIP

18    DEEMER, called for examination, taken pursuant to

19    the Federal Rules of Civil Procedure of the United

20    States District Courts pertaining to the taking of

21    depositions, taken before THERESA A. VORKAPIC, a

22    Notary Public within and for the County of Kane,

23    State of Illinois, and a Certified Shorthand

24    Reporter, CSR No. 84-2589, of said state, at Suite

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1      A.   Very good, sir.

2      Q.   Would you state your name, please, for

3   the record?

4      A.   Yes.  Philip Deemer.

5      Q.   Where do you currently live,

6   Mr. Deemer, street address, please?

7      A.   I live at 1300 North Waukegan Road in

8   Lake Forest, Illinois.

9      Q.   What's the zip there?

10     A.   60045.

11     Q.   Mr. Deemer, as I mentioned earlier, you

12   were deposed in related litigation previously.

13   You recall that?

14     A.   Yes, I do.

15     Q.   I think that was in July of 2004.  At

16   that point in time, you were employed by Abbott

17   Laboratories.

18       Are you still employed by Abbott?

19     A.   Yes, I am.

20     Q.   Has your position changed since July of

21   2004?

22     A.   Yes, it has.

23     Q.   How many times has your position

24   changed?

1      A.    Let's see, July 2004, it's changed

2    twice.

3      Q.    What is your current position?

4      A.    Director of Alliance Management.

5      Q.    Are you directly of Alliance Management

6    within a certain public part of Abbott

7    Laboratories?

8      A.    Within the Pharmaceutical Products

9    Division.

10      Q.    How long have you held the position as

11    director of Alliance Management?

12      A.    That has been for ten months.

13      Q.    Who is your immediate superior in that

14    position?

15      A.    His name is Richard Marshak,

16    M-a-r-s-h-a-k.

17      Q.    Who is Mr. Marshak's immediate

18    superior?

19      A.    His superior is Mary Szela, S-z-e-l-a.

20      Q.    What is Mr. Marshak position?

21      A.    He is general manager.

22      Q.    Of the Pharmaceutical Products

23    Division?

24      A.    Of Alliance Management.

1    A.    Other than this John Hancock case?

2    Q.    Yes.

3    A.    No.

4    Q.    I just want to confirm that back in the

5    2000, 2001 time frame, your position was director

6    of business development and licensing for the

7    Global Pharmaceutical Research Division; is that

8    right?

9    A.    Yes.

10    Q.    Is the Global Pharmaceutical Research

11    Division different than the Pharmaceutical

12    Products Division?

13    A.    Yes, it is.

14    Q.    Please explain the differences between

15    those two.

16    A.    One is a Research Division, does

17    research on products.  The other is an operational

18    commercial group.

19    Q.    Would it be fair to say that the

20    Pharmaceutical Products Division is responsible

21    for products, pharmaceutical products, that have

22    been or are being commercialized?

23    A.    Yes.

24    Q.    Is there more to it than that?

1     A.   No.

2     Q.   Back in the 2000, 2001 time frame, and

3   excuse me, I'm about to butcher a name, you

4   reported to Mr. Ake Johannsen?

5     A.   Yes.

6     Q.   Did I butcher that?

7     A.   No.

8     Q.   How do you pronounce it?

9     A.   "Okee".

10    Q.   It's your understanding that

11   Mr. Johannsen then reported to Mr. Tyree; is that

12   correct?

13    A.   Yes, it is.

14    Q.   Have you ever reviewed the transcript

15   of your deposition in the first round of

16   litigation between Hancock and Abbott?

17    A.   Yes.

18    Q.   How recently did you last review that

19   transcript?

20    A.   In preparation for this discussion.

21    Q.   So in the last week or two?

22    A.   Yes.

23    Q.   Did you see anything in that

24   transcript, any responses, answers that you

1    provided that you think were inaccurate in any

2    way?

3        A.   No.

4        Q.   You prepared for your deposition here

5    today by doing what?

6        A.   I reviewed this document that you just

7    referred to and tried to refresh myself with some

8    of the -- with the contract.  I talked to my

9    counsel.

10       Q.   Did you talk to anyone else within

11   Abbott in preparation for your deposition here

12   today?

13       A.   No.  There is an Abbott counsel, I

14   mean, that I talked to, but not of any other

15   consequence.

16       Q.   Who is that Abbott counsel?

17       A.   Peter Witby I think his name is.  I

18   don't know him very well.

19       Q.   Witte?

20       A.   Yes, Peter Witte.

21       Q.   In your position as director of

22   business development and licensing back in the

23   2000, 2001 time frame, your duties included

24   business development; is that fair to say?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1      A.   Yes.

2      Q.   Can you just describe generally what

3    you understand to be encompassed by business

4    development?

5      A.   Yes.  It's identifying new business

6    opportunities, assessing their commercial

7    potential and engaging in in-licensing and

8    out-licensing activities.

9      Q.   I want to ask you a series of questions

10   about your role as business development --

11   director of business development and licensing

12   back in the 2000, 2001 time frame.  If I change

13   the time period about which I'm asking you, I will

14   alert you, but otherwise you can assume that my

15   questions have to do with that position and that

16   time frame.

17        Do you understand that?

18   A.   Yep.

19   Q.   How in that position did you go about

20   identifying potential business development

21   opportunities?

22   A.   Well, largely in conjunction with the

23   research group at the time.  They had very

24   distinct interests in certain technologies and

1    things that -- things that were not part of our

2    research, things that we were thinking of getting

3    into in the future.

4        Q.    You mentioned a business development

5    team.

6            Who was on the business development

7    team at that time?

8        A.    It seems to me it was headed up by

9    Jerry Winker.  There were people like Bob Wyland,

10    Eric Zimmer.  Those are two people I remember,

11    three people I remember.

12        Q.    Was the business development team made

13    up of people with different capabilities,

14    different functions?

15        A.    Yeah.  They had a commercial background

16    whereas my background was more technical, deal

17    making and that sort of thing.

18        Q.    In assessing the commercial potential

19    of the opportunities, did Abbott perform any type

20    of financial projections or analyses?

21        A.    Yes.

22        Q.    Who within Abbott was responsible for

23    putting together those financial projections or

24    analyses?

1      A.    Largely that team I just referred to.

2      Q.    How did Abbott go about putting

3   together those kinds of financial projections or

4   analyses for a particular opportunity?

5      MR. LORENZINI:  Objection.  You can answer if

6   you know.

7   BY THE WITNESS:

8      A.    As I said, that team was really the

9   group responsible for doing that, so it wasn't one

10   of my responsibilities.

11   BY MR. DAVIS:

12      Q.    Did the projections or analyses

13   sometimes include projections in revenue?

14      A.    Oh, I'm sure they did.

15      Q.    Did they sometimes include projections

16   of likely success of a particular venture?

17      A.    I would think so.

18      Q.    For example, in assessing the

19   commercial potential of opportunities, did Abbott

20   sometimes apply success ratios to potential

21   ventures?

22      MR. LORENZINI:  Objection.  Lacks foundation.

23   BY MR. DAVIS:

24      Q.    If you know.

1          A.    Yeah, I'm not sure what they did.  I'm

2     sure they did something, but I don't know what

3     they would have done.

4          Q.    When you would look for information --

5     strike that.

6               When you needed someone on the business

7     development team to undertake an assessment of the

8     commercial potential of a particular opportunity,

9     who did you go to?

10         A.    To the team I just referred you to.

11         Q.    Anyone in particular on that team or

12     the team as a whole?

13         A.    Well, I think people like Eric Zimmer,

14     for example.  He was more focused on oncology

15     products.  That's one I can think of.

16         Q.    You recall occasions when the team

17     actually developed some sort of financial

18     projections with respect to the opportunity?

19         A.    I'm not sure I understand the question.

20         Q.    On the occasions that you had the

21     business development team assess the commercial

22     potential for opportunities, do you recall

23     occasions in which the team then turned around and

24     gave you some sort of financial projections with

1    MR. LORENZINI:  Objection.

2    BY THE WITNESS:

3       A.   I'm not sure I know what you mean by

4    "rely upon."

5    BY MR. DAVIS:

6       Q.   I take it that part of the reason why

7    Abbott would develop financial projections or

8    analyses around a potential opportunity was to try

9    to assess the opportunity, try to determine

10   whether Abbott wished to pursue the opportunity;

11   is that right?

12      A.   Yes.

13      Q.   To your knowledge, when Abbott put

14   together such financial projections, did Abbott,

15   in fact, utilize the projections in its

16   decision-making process to try to determine

17   whether to go forward with the opportunity?

18      A.   I would presume so, but it wasn't

19   something that I would be involved in the analysis

20   of or even having some final decision on.

21      Q.   But to your knowledge, people within

22   Abbott did utilize those projections, utilize

23   those analyses in the decision-making process?

24      A.   Yes.

1    team within the Global Pharmaceutical Research

2    Division?

3        A.   Yes, there is.

4        Q.   Do you know currently who is the head

5    of the business development team?

6        A.   Yes.  That's John Poulos.

7        Q.   John who?

8        A.   John Poulos.

9        Q.   How do you spell the last name?

10       A.   P-o-u-l-o-s.

11       Q.   Is he at Abbott Park?

12       A.   Yes, he is.

13       Q.   Mr. Deemer, I want to direct your

14   attention for a few minutes to -- actually for

15   probably more than a few minutes to the Hancock

16   deal.  I think we established when you were last

17   deposed that you were personally involved in the

18   negotiation of that deal with Hancock, correct?

19       A.   Correct.

20       Q.   Is it fair to say that you were

21   primarily responsible for the negotiation of that

22   deal within Abbott?

23       A.   I was co-responsible for it.

24       Q.   With who?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1       A.   Steve Cohen.

2       Q.   Mr. Cohen no longer works for Abbott?

3       A.   That's correct.

4       Q.   When did he leave Abbott?

5       A.   He left Abbott sometime in 2001.

6       Q.   Do you know where he currently works?

7       A.   I don't.

8       MR. DAVIS:  What I'd like to do is mark this

9    as the first exhibit if we can.

10           (WHEREUPON, a certain document

11           was marked Deemer Deposition

12           Exhibit No. 1, for identification,

13           as of 10/27/06.)

14           (WHEREUPON, the document was

15           tendered to the witness.)

16   BY MR. DAVIS:

17       Q.   Mr. Deemer, you have what's been marked

18   as Exhibit 1 to your deposition, and I would ask

19   you to take a look at it for a moment and tell me

20   if this is a copy of an affidavit that you signed

21   in this litigation on October 15, 2006.

22       A.   Yes, it is.

23       Q.   Did you review this affidavit before

24   you signed it?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    A.    Yes.

2    Q.    Did you believe that the content of the

3    affidavit was accurate at the time that you signed

4    it?

5    A.    Yes, I did.

6    Q.    I'd like to direct your attention to

7    some portions of the affidavit.  If you'd look at

8    Paragraph 7 of the affidavit and please read that

9    paragraph to yourself and tell me when you're

10    done.

11    A.    Okay.  I'm done.

12    Q.    Paragraph 7 discusses some initial

13    contacts that you had with Mr. Blewitt in and

14    about early 2000 concerning a potential investment

15    by Hancock.

16        Do you recall that you first had

17    discussions with Mr. Blewitt about the potential

18    investment, the amount of money that Hancock was

19    interested in investing at that point in time?

20    A.    In early 2000, so I had known Steve

21    Blewitt for a long time and he had done other

22    deals with Abbott, was very happy about those and

23    had thought of an idea of investing, I think his

24    number was around $50 million, but in a completely

1  different way and that was he was looking for

2  Abbott to identify companies that we were

3  interested in investing in, companies that I was

4  doing research projects with which was my primary

5  responsibility and wondering if he could help

6  Abbott and take advantage of knowledge that we

7  were pursuing in terms of research relationships,

8  that maybe he could piggyback on some of the deals

9  that we were doing with John Hancock money as sort

10  of a co-investor in these small companies that we

11  were collaborating with.

12      So that was one of the early

13  conversations we had about a possible money flow

14  that would be or equity participation, if you

15  will, from John Hancock.

16   Q.   The first sentence of Paragraph 7 says

17  that in or about early 2000, Mr. Blewitt proposed

18  to me that Hancock invest in a portfolio of

19  pharmaceutical compounds that were in development

20  at Abbott.

21      Do you see that?

22   A.   Uh-huh, yes.

23   Q.   Did you have an understanding at that

24  point in time as to approximately how much money

1   Hancock was looking to invest in that portfolio of

2   pharmaceutical compounds that were in development

3   at Abbott?

4       A.   Yes.  When we turned our conversation

5   towards that concept, then I think the number

6   right off the bat was somewhere in the

7   neighborhood that we ended up talking about.

8       Q.   Do you recall having a discussion with

9   Mr. Blewitt in which you indicated in words or in

10  substance that in order to do a deal, which had

11  Hancock investing in a portfolio of compounds

12  under development at Abbott, that Abbott would

13  expect an investment larger than $50 million?

14      A.   Yes, completely unrelated things, so,

15  just so you're aware, the 50 million was sort of

16  an equity investment and this was something

17  different, but, yeah, the $50 million equity even

18  if that had been $200 million equity investment,

19  that would be irrelevant to us.  So in this, yeah,

20  that's correct.  Somewhere in that magnitude would

21  have been a more meaningful kind of contribution.

22      Q.   I'm just trying to get back to the

23  discussions that you had with Mr. Blewitt.

24          Do you recall generally telling

1  Mr. Blewitt that if Abbott and Hancock were going

2  to do a deal which had Hancock investing in a

3  portfolio of compounds under development at Abbott

4  that Abbott would require or expect an investment

5  in the range of $200 million or so?

6      MR. LORENZINI:  Objection.  Vague.

7  BY THE WITNESS:

8      A.   I'm not sure exactly how we got the 200

9  million, but that was a number that I remember as

10  being a number we talked about pretty early on.

11  BY MR. DAVIS:

12      Q.   You remember understanding or thinking

13  that $50 million for an investment of that nature

14  would not be enough to attract Abbott's attention?

15      MR. LORENZINI:  Objection.

16  BY THE WITNESS:

17      A.    Yeah.  I think it was pretty

18  complicated.  I think there could have been a

19  scenario where $50 million invested in Abbott R&D

20  could have been -- there could have been a way to

21  structure something like that.

22  BY MR. DAVIS:

23      Q.   Do you recall having discussions with

24  Mr. Blewitt around how could you structure a deal

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    around $50 million?

2        A.   I remember discussing with him the fact

3    that the $50 million we were -- that he had

4    initially proposed to us was for a completely

5    different kind of concept, one, that it wasn't

6    money going to Abbott.  It was money where he

7    would be investing in small Biotech companies and

8    it would indirectly maybe help us, but there was

9    never money coming -- he was looking for ways to

10   invest in companies that we were familiar with,

11   but had he talked about $50 million being invested

12   in a portfolio of compounds at Abbott, that might

13   have been something we could have talked about.

14       Q.   Do you recall having any discussions

15   with Mr. Blewitt about a deal in the amount of $50

16   million that had Hancock investing in a portfolio

17   of compounds under development at Abbott?

18       A.   Don't think so.  Not that I recall.

19       Q.   As you sit here today, you don't recall

20   who first proposed the roughly $200 million

21   investment number?

22       A.   I'm not sure I can.  I can't remember

23   if that was his idea or my idea.  It was sort of

24   -- I think it came about probably at a pretty

1   similar time.  It seems to me that we were both

2   warm to that idea, and I can't honestly tell you

3   whose idea that was.

4     Q.   When you say both warm to the idea, do

5   you mean that an investment of that size was

6   attractive to Abbott at that point in time?

7     A.   Yeah, I think that was probably one way

8   to say that.  I think anything like that requires

9   thinking about a totality of a deal, but, yeah, I

10   think it was something we could work with.

11     Q.   Depending on the circumstances, that

12   amount was attractive to Abbott, correct?

13     A.   Yes.  Correct.

14     Q.   You say further in Paragraph 7:

15   "Specifically the concept of the transaction was

16   that both Abbott and Hancock would commit to

17   investing certain amounts towards the development

18   of a portfolio of compounds with Abbott committing

19   to provide funds on at least a two-to-one basis."

20     First did I read that correctly?

21     A.   Yes.

22     Q.   Is it fair to say that you understood

23   when you were having the discussions with

24   Mr. Blewitt that the deal that was being

1    contemplated was one that would have Abbott or

2    could have Abbott investing on a more than

3    two-to-one basis with Hancock?

4        MR. LORENZINI:  Objection.  Vague.

5    BY THE WITNESS:

6        A.   You're saying that because the word at

7    least?

8    BY MR. DAVIS:

9        Q.   Yes.

10       A.   The idea was a two to one, and that's

11   what our thinking was two to one.

12       Q.   I'm working with your affidavit.

13       A.   Uh-huh.

14       Q.   When you say that the deal that was

15   being contemplated had Abbott committing to

16   provide funds on at least a two-to-one basis, did

17   you mean to say that you understood that there

18   might be circumstances under which Abbott would

19   invest at a more than two-to-one basis or more

20   than a two-to-one ratio with Hancock?

21       MR. LORENZINI:  Objection.  Vague.

22   BY THE WITNESS:

23       A.   If I sit here today and tell you about

24   this, other idea was that it would be a two to

1    one.

2    BY MR. DAVIS:

3        Q.   When you entered into the Research

4    Funding Agreement with John Hancock, did you

5    understand that the spending ratio between Abbott

6    and Hancock was fixed at two to one?

7        MR. LORENZINI:  Objection.  Vague.

8    BY THE WITNESS:

9        A.   I think the concept was a two to one.

10   I don't think it limited us, but it certainly was

11   a -- the concept that we were discussing was

12   two-to-one concept.

13   BY MR. DAVIS:

14       Q.   You understood when you entered into

15   that deal with Hancock that there could be

16   circumstances under which Abbott would invest at

17   more than a two-to-one ratio with Hancock,

18   correct?

19       MR. LORENZINI:  Objection.  Vague.

20   BY THE WITNESS:

21       A.   I think the proper way to say that

22   would be the concept was that it would be a two to

23   one, that in the event -- it was our

24   responsibility to complete the research, assuming

1    the research was meaningful and if that meant that

2    required more than a two-to-one spend, that that

3    could be our responsibility.

4    BY MR. DAVIS:

5        Q.    Is it fair to say that you understood

6    that the ratio of spending would be at least two

7    to one as you state in your affidavit; is that

8    correct?

9        MR. LORENZINI:  Objection.

10    BY THE WITNESS:

11        A.    Well, it could also be exactly two to

12    one.

13    BY MR. DAVIS:

14        Q.    But you understood at the time they

15    entered into the agreement with Hancock that the

16    minimum spending ratio was supposed to be

17    approximately two to one; is that right?

18        A.    Yes.

19        Q.    You understood that there might be

20    circumstances where Abbott would spend at more

21    than two-to-one ratio with Hancock, correct?

22        A.    There could be -- could have been a

23    situation like that.

24        Q.    Did you ever have any discussions with

1    Mr. Blewitt or anyone else at Hancock concerning

2    what would be the maximum spending ratio that

3    Abbott would agree to?

4        A.   I don't recall any discussion like

5    that.

6        Q.   If you would take a look at Paragraph 8

7    of your affidavit, please, and read it to yourself

8    and tell me when you're done.

9        A.   Okay.  I'm done.

10        Q.   You reference in Paragraph 8 that

11    Mr. Blewitt proposed that Abbott spend on the

12    compounds a minimum of 400 million of its own

13    money; do you see that?

14        A.   Yes.

15        Q.   Did you understand at the time that

16    Hancock and Abbott entered into the Research

17    Funding Agreement that Abbott could be called upon

18    in the course of that agreement to spend more than

19    400 million of its own money on the development of

20    the program compounds under the agreement?

21        MR. LORENZINI:  Objection.  Vague.

22    BY THE WITNESS:

23        A.   Could you repeat the question, please.

24        MR. DAVIS:  Sure.  Would you reread it,

1    please.

2            (WHEREUPON, the record was

3            read by the reporter.)

4        MR. DAVIS:  I think I understand why you may

5    not have understood the agreement or the question

6    so let me rephrase it.

7    BY MR. DAVIS:

8        Q.    Is it correct that at the time that

9    Abbott and Hancock entered into the Research

10    Funding Agreement that you understood there might

11    be circumstances under which Abbott could be

12    called upon to spend more than $400 million of its

13    own money under that agreement?

14        MR. LORENZINI:  Objection.

15    BY THE WITNESS:

16        A.    I knew our deal was to spend $2 for

17    every dollar they put in.  That was what we were

18    targeting.

19    BY MR. DAVIS:

20        Q.    Take a look, please, at Paragraph 9.

21    If you could read Paragraph 9 to yourself and tell

22    me, please, when you're done.

23        A.    Okay.  I'm done.

24        Q.    The very first sentence of Paragraph 9

1    states:  "While Mr. Blewitt and I discussed the

2    possibility that Abbott might contribute funds in

3    an amount exceeding 400 million and/or in a ratio

4    exceeding two to one, we agreed that such outcomes

5    could arise based on Abbott's ongoing assessment

6    of the commercial viability of the compounds."

7         Did I read that correctly?

8    A.   Yes.

9    Q.   So it is correct that you had

10   discussions with Mr. Blewitt in which you

11   discussed the possibility that Abbott might

12   contribute funds to the research program in an

13   amount exceeding 400 million; is that correct?

14   A.   Yes.

15   Q.   So you understood that that was a

16   possibility under the agreement?

17   A.   Yeah.  That's just what I told you.

18   Q.   And you also discussed with Mr. Blewitt

19   the possibility that the funding ratio could

20   exceed two to one, correct?

21       MR. LORENZINI:  Objection.  Vague.

22   BY THE WITNESS:

23   A.   In these circumstances.

24   BY MR. DAVIS:

1      Q.    What do you recall about your

2    discussions with Mr. Blewitt on those points?

3      A.    Well, I recall that our arrangement was

4    a two-to-one funding ratio and that just as this

5    statement says that in the event there was ongoing

6    assessment of the viability of compounds that that

7    ratio or that the amount of money could exceed

8    $400 million if there was rationale to do so.

9      Q.    When you say that amount of money, you

10   mean Abbott's contribution, correct?

11     A.    Correct.

12     Q.    Is it fair to say that under the

13   agreement, Abbott was the party that was solely

14   responsible for determining the amount of program

15   spending each year subject to the restriction

16   contained in the agreement?

17     A.    Subject to John Hancock's payment of

18   money of their part of the research spending, yes.

19     Q.    To your knowledge, is there something

20   in the Research Funding Agreement that ties the

21   amount of money that Abbott spends or plans to

22   spend each year to the amount of Hancock's

23   contribution?

24     MR. LORENZINI:  Objection.

1    BY THE WITNESS:

2        A.    Yes, I believe there is.

3        MR. DAVIS:  Let's mark this as the next

4    exhibit, please.  Deemer No. 2.

5            (WHEREUPON, a certain document

6            was marked Deemer Deposition

7            Exhibit No. 2, for identification,

8            as of 10/27/06.)

9            (WHEREUPON, the document was

10            tendered to the witness.)

11    BY MR. DAVIS:

12        Q.    Mr. Deemer, you have what has been

13    marked as Exhibit 2 at your deposition.  I will

14    represent to you that this is a copy of the final

15    Research Funding Agreement that was signed by

16    Hancock and Abbott in March of 2001.  I'll have

17    you take a minute and look at it and you'll need

18    to confirm that for yourself.

19        A.    I believe you.

20        Q.    Can you point to me here in the

21    agreement the provisions that tie the amount of

22    Abbott's planned or actual spending per year to

23    the amount of John Hancock's contribution?

24        A.    I'm not sure I'm going to be able to

1  show you everywhere, but let me begin flipping

2  through this.  In 1.3 I see a place where it does.

3    Q.   That 1.3 is the section titled:  John

4  Hancock's Program Payments.

5    A.   Yeah.  I was looking at the definition

6  1.3.

7    Q.   The definition of 1.3, the aggregate

8  spending target?

9    A.   Uh-huh.

10    Q.   What is it in 1.3 that you understand

11  ties Abbott's actual or planned spending to the

12  amount of Hancock's contribution?

13    MR. LORENZINI:  Objection.

14  BY THE WITNESS:

15    A.   I'm just looking through parts here.  I

16  see John Hancock's spending in that 614 number for

17  example, annual minimum spending target.  I'm

18  going to look at that now.  So in 1.5 definition.

19  BY MR. DAVIS:

20    Q.   Anything else?

21    A.   You want me to keep going through this?

22    MR. LORENZINI:  Take your time.

23  BY MR. DAVIS:

24    Q.   Yeah, if there are provisions of the

1    agreement that you believe tie Abbott's actual or

2    planned spending to the amount of payments

3    received from Hancock, I would ask you to point

4    those out to me, please.

5        A.   3.1.

6        Q.   Anything else?

7        A.   3.2, 3.3, 3.5, probably indirectly

8    Article 6.  There's a lot of issues in Article 6.

9    That's all I see right now.

10       Q.   If you look at back at Paragraph 9 of

11   your affidavit, the first sentence again, you

12   state in part:  "We agreed that such outcomes" --

13   by such outcomes you meant circumstances under

14   which Abbott might contribute under 400 million --

15   "or the ratio could exceed two to one could arise

16   based on Abbott's ongoing assessment of the

17   commercial viability of the compounds;" do you see

18   that?

19       A.   Yes.

20       Q.   What did you mean by that?

21       A.   We were developing these compounds, so

22   to the extent that there were reasons to continue

23   the development of those compounds that required

24   more than $400 million of our money, then that's

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    what that sentence means.  That we would

2    contribute more than $400 million.

3        Q.    Is it fair to say that Abbott -- you

4    understood that Abbott's spending would be based

5    upon Abbott's assessment of how much money, how

6    much spending would be required to exploit what

7    Abbott understood to be the commercial viability

8    of the compounds?

9        A.    Yes.

10       Q.    Take a look, you reference in Paragraph

11   9 an internal Abbott report that you and Mr. Cohen

12   prepared on or about August 2000, which I think is

13   appended to your affidavit at Tab B.

14       Do you see that?

15       A.    Exhibit B, uh-huh, okay.

16       Q.    Exhibit B. In Paragraph 9 you reference

17   some figures on Page 6 of that report.

18       Would you turn, please, to Page 6 of

19   Exhibit B?

20       A.    Okay.

21       Q.    It's a matrix titled John Hancock

22   Funding Collaboration.

23       Do you see that?

24       A.    Yes.

1      A.    Probably the Research Division that was

2   -- that was probably Steve Cohen and his staff

3   that came up with that number.

4      Q.    Would you read Paragraph 11 of your

5   affidavit and tell me when you're done, please.

6      A.    Yes.

7      Q.    In Paragraph 11 you state:  "Ultimately

8   the parties reached agreement on a proposal

9   memorialized in the agreement whereby Abbott would

10   fund 400 million and Hancock would fund 214

11   million."

12          Do you see that?

13      A.    Yes.

14      Q.    You would agree with me that the actual

15   amount of funding to be provided by the parties

16   under the Research Funding Agreement was not

17   static; it could change, correct?

18      MR. LORENZINI:  Objection.  Vague.

19   BY THE WITNESS:

20      A.    Say that again.

21   BY MR. DAVIS:

22      Q.    The actual amount of funding to be

23   provided by the parties under the Research Funding

24   Agreement was not static, it could change,

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    correct?

2        A.    No, I don't think that's correct.

3        Q.    So at the time that Hancock and Abbott

4    entered into the Research Funding Agreement that

5    you understood that Abbott's funding for all

6    purposes was fixed at 400 million?

7        MR. LORENZINI:  Objection.  Vague.

8    BY MR. DAVIS:

9        Q.    And that Hancock's was fixed at 214

10   million?

11       A.    I will agree with that latter part.

12       Q.    You're not aware of any circumstances

13   in the Research Funding Agreement in which

14   Hancock's funding obligations could be less than

15   214 million?

16       A.    Okay.  I see what you're getting at.

17   So there could have been some circumstances when

18   Hancock's contribution could have been less than

19   214 million.

20       Q.    I think we've already established that

21   you understood there were some circumstances in

22   which Abbott's contribution could be more than 400

23   million; is that right?

24       A.    Yes.

1      Q.   So you would agree with me going back

2    to my question a moment ago that the funding that

3    the parties agreed to in the research funding

4    agreement wasn't necessarily fixed at 400 from

5    Abbott and 214 from Hancock, that those numbers

6    could change?

7        MR. LORENZINI:  Objection.

8    BY THE WITNESS:

9        A.   I'm not sure because what you're

10   describing is there is -- certainly the

11   understanding was one where Hancock's payments

12   were fixed and it was only highly unusual

13   circumstances or sort of circumstances where the

14   compounds didn't merit funding in the aggregate or

15   maybe there was some reason why there was a delay

16   in funding or in moving compounds forward for one

17   reason or another and there could be

18   circumstances, you know, exceptional

19   circumstances, where the John Hancock money would

20   be less than 214, but that was not -- that was not

21   the concept.

22          The concept was that we were relying on

23   the $214 million to develop the portfolio.  So I

24   see the John Hancock part as being fixed other

1    than for these highly unusual circumstances that I

2    mentioned.

3        Q.    If those circumstances occurred, you

4    understood that Hancock's contribution could be

5    less than 214?

6        A.    That's correct.

7        Q.    The next paragraph, you state that:

8    "Based on my communications with the Hancock

9    representatives, I understood throughout these

10   negotiations that Abbott would not be obligated to

11   make up for any shortfall in Hancock's funding

12   contributions in order to reach the targeted

13   combined total amount."

14        Do you see that?

15       A.    Yes.

16       Q.    What communications did you have with

17   Hancock representatives on that topic?

18       A.    We were relying on the Hancock money to

19   fund these compounds and so it was clearly

20   understood.

21       Q.    Who are the Hancock representatives

22   that you referred to in that sentence?

23       A.    Steve Blewitt.

24       Q.    Anyone else?

1      A.   No.

2      Q.   What specifically do you recall saying

3   to Mr. Blewitt on this topic and what do you

4   recall Mr. Blewitt saying to you?

5      A.   Well, I specifically recall that Steve

6   Blewitt said that they would be -- they would put

7   in $200 million and that we would be required to

8   put in $2 for every dollar they put in and that

9   was our understanding.  So there was nothing about

10  us -- we never would have entered into an

11  arrangement if they were to renege on their

12  payments that we would have to make them up for

13  some reason.  That wasn't -- that was not part of

14  the thinking at all on this by both of us.

15     Q.   I think we've already established,

16  though, in looking back in Paragraph 9 that you

17  also had discussions with Mr. Blewitt about

18  circumstances under which Abbott's contribution

19  could exceed 400 million, correct?

20     A.   Correct.

21     Q.   You say further in Paragraph 12:  "At

22  no point in these negotiations did the Hancock

23  representatives indicate to me that Hancock's

24  position was or that they understood that Abbott

1    would be required to fund more than 400 million to

2    make up for a shortfall in order to reach the 614

3    million combined target if Hancock funded less

4    than the proposed 214 million."

5         Do you see that?

6    A.   Yeah, I do.

7    Q.   What discussions, if any, do you recall

8    with Hancock representatives on that topic?

9    MR. LORENZINI:  Objection.  Mischaracterizes

10   and confusing.

11   MR. DAVIS:  Let me rephrase the question.

12   BY MR. DAVIS:

13   Q.   Did you actually have any discussions

14   with people at Hancock on that point?

15   A.   We had discussions whereby Stephen

16   Blewitt and John Hancock would contribute $214

17   million and at no time did anybody contemplate

18   that they would not fund their responsibilities.

19   Q.   In the course of the negotiations, did

20   you ever say to Mr. Blewitt or any other Hancock

21   representative in words or in substance that

22   Abbott would not be required to fund more than 400

23   million to make up for a shortfall in order to

24   reach the $614 million combined target if Hancock

1    funded less than the proposed $214 million?

2        MR. LORENZINI:  Objection.

3    BY THE WITNESS:

4        A.   What do I do with --

5        MR. LORENZINI:  You can answer.

6    BY THE WITNESS:

7        A.   Look, I'm not sure if we did or not,

8    but it was certainly clear to him and clear to me

9    that that was not the deal.

10    BY MR. DAVIS:

11        Q.   My question is a little bit different.

12    What I'm trying to get at is the discussions that

13    you actually had with Mr. Blewitt or any other

14    Hancock representative, by Hancock

15    representatives, I mean their counsel, anyone else

16    who was working with Hancock in negotiating this

17    deal; you understand that?

18        A.   Yes.

19        Q.   If I understand from your testimony,

20    you do not recall as you sit here today ever

21    saying in words or substance to anyone at Hancock,

22    any Hancock representative, that Abbott would not

23    be required to fund more than $400 million to make

24    up for any shortfall in order to reach the $614

1  million combined target if Hancock funded less

2  than the proposed $214 million?  Do I have that

3  correct?

4      MR. LORENZINI:  Objection.  Vague.  You can

5  answer.

6  BY THE WITNESS:

7      A.   I don't think that's correct because

8  it's just not a correct characterization of our

9  discussions.  Certainly the whole essence of this

10  was that they were contributing a certain amount

11  and we were to contribute a certain amount.  This

12  whole thing would not even have -- this whole

13  research arrangement would not even have

14  continued, could not continue without both parties

15  funding it.  So I think that was very clear and I

16  think that we, in fact, did have discussions about

17  that subject, that, in fact, if they did not put

18  in the money, this whole thing would collapse.

19       So, yes, in that context I would say

20  that we had very explicit conversations of who was

21  doing what and how it would work.  And so, yes, so

22  they knew very clearly that if they didn't put

23  their money into this, that the overall effort

24  would not be able to proceed.

1    BY MR. DAVIS:

2        Q.    My question is a bit different,

3    Mr. Deemer, and I want you to please focus on my

4    question.

5            My question is did you have discussions

6    at any point in time with any Hancock

7    representatives in which you told the Hancock

8    representatives that Abbott would not be required

9    to fund more than $400 million to make up for a

10   shortfall in order to reach the $614 million

11   combined target if Hancock funded less than the

12   proposed $214 million?

13       A.    Yes, I think we really did.  This is

14   six years ago, but the more you ask me that

15   question, the more I recall conversations that are

16   around this subject that absolutely that, you

17   know, it would not have been expected for us to

18   make up any shortfall in their funding.

19       Q.    So you did have discussions on that

20   topic?

21       A.    Yes.

22       Q.    Who did you have them with?

23       A.    Stephen Blewitt and probably their

24   attorneys, too.

1      Q.   Approximately when did you have those

2   discussions?

3      A.   I think they occurred actually twice

4   now that I think about that.  There was a

5   discussion early on about this concept, as I

6   mentioned in the beginning, just thinking of it as

7   an overall deal structure and then there was a

8   discussion of this when we were actually preparing

9   the agreement in terms of what their

10  responsibilities were and we wanted to make sure

11  that their responsibilities were to fund their

12  part of the deal.  We had other responsibilities,

13  but their responsibilities were to fund the other

14  part of the deal because it was so important,

15  their funding was so important that this whole

16  thing would not have been a totality without their

17  funding.

18     Q.   As best you recall as you sit here

19  today, precisely what did you say to Hancock's

20  representatives on that topic?

21     A.   I can't tell you precisely what I --

22  what our conversation -- it was a long time ago,

23  but I've paraphrased what I can recall our

24  conversations to be.

1    Q.   As you sit here today, can you recall

2    with any greater specificity what you told Hancock

3    representatives on that topic?

4    A.   Only to the extent that it would be a

5    disaster for this arrangement if they did not put

6    in their money.  There was no way that this

7    research project would be a viable research

8    project.

9    Q.   When you say Hancock put in their

10   money, do you mean 214 million?

11   A.   That's what I mean.

12   Q.   So at the time that Abbott entered into

13   this agreement with Hancock, was it your

14   understanding that the agreement would be a

15   disaster or the research program would be a

16   disaster if Hancock contributed anything less than

17   $214 million?

18   MR. LORENZINI:  Objection.  Mischaracterizes

19   the testimony.

20   BY THE WITNESS:

21   A.   Maybe disaster is too strong a word

22   when I reflect on that point, but the point is it

23   was the combined effort that was to make this

24   arrangement a success.

1    BY MR. DAVIS:

2       Q.   Did you ever have any discussions with

3    the folks at Hancock in which you told Hancock

4    that if Hancock did not contribute $214 million

5    that Hancock would not be entitled to receive any

6    payment from Abbott of any unspent aggregate

7    spending target or aggregate carryover amount?

8       A.   You've got to tell me that again.

9       Q.   Actually let me direct your attention

10   to Exhibit 2, please, and if you would look at

11   Section 3.3 B of the Research Funding Agreement.

12          You've seen this provision before,

13   right?

14      A.   Yes.

15      Q.   Is this one of the provisions you

16   looked at before your deposition?

17      A.   Yes.

18      Q.   If you look at 3.3 B, it states in part

19   that if Abbott does not spend the aggregate

20   carryover amount on program-related costs during

21   such subsequent year, Abbott will pay to John

22   Hancock one third of the aggregate carryover

23   amount that remains unspent by Abbott within 30

24   days after the end of such subsequent year.

1        Do you see that?

2     A.   Yes.

3     Q.   Do you recall ever telling Mr. Blewitt

4   or any other Hancock representative that Hancock

5   would not be entitled to receive the one third of

6   the aggregate carryover amount payment referenced

7   here if Hancock did not contribute a full $214

8   million?

9     MR. LORENZINI:  Objection.

10   BY THE WITNESS:

11     A.   Well, that was certainly the thinking

12   of this.  Yeah, I think that's implied.

13   BY MR. DAVIS:

14     Q.   The question is a little bit different,

15   Mr. Deemer.

16        My question is did you ever tell

17   anyone, either Mr. Blewitt or any other Hancock

18   representative, that Hancock would not be entitled

19   to receive that one third payment referenced in

20   Section 3.3 B if Hancock did not make the full

21   $214 million contribution?

22     MR. LORENZINI:  Objection.

23   BY THE WITNESS:

24     A.   I can't recall one way or another of

1    having a specific conversation about that, but it

2    was certainly a topic of conversation on many

3    occasions about this concept, so I would say in

4    general, yes, I can say that, but I can't tell you

5    the specifics.

6    BY MR. DAVIS:

7        Q.    You recall discussions around the

8    question of a one third payment -- payment of one

9    third of the aggregate carryover amount, correct?

10       A.    Yes.

11       Q.    Do you recall with any greater

12   specificity any of the discussions that you or

13   anyone else at Abbott to your knowledge had with

14   any Hancock representatives on that point?

15       A.    I know the attorneys talked about this

16   point a lot.

17       Q.    Do you recall with any greater

18   specificity what was said by one side or the other

19   on that point?

20       MR. LORENZINI:  I'm going to object on

21   vagueness grounds, but you can answer.

22   BY THE WITNESS:

23       A.    Yeah, I can't recall the specifics of

24   it.

1    BY MR. DAVIS:

2        Q.    If you take a look at Paragraph 14 of

3    your affidavit, please, Mr. Deemer, and read that

4    paragraph to yourself and tell me, please, when

5    you're done.

6        MR. LORENZINI:  Would you like the witness to

7    look at this exhibit page that's referenced in

8    that paragraph as well?

9        MR. DAVIS:  He's welcome to if he wishes to.

10    I'm going to ask him now just about the text of

11    Paragraph 14.

12        MR. LORENZINI:  Feel free to -- there is an

13    exhibit referenced there.

14        THE WITNESS:  Okay.

15    BY MR. DAVIS:

16        Q.    Have you read it?

17        A.    Yes, I have.

18        Q.    Directing your attention to the

19    sentence in Paragraph 14 of your affidavit that

20    states:  "I further understood based on my

21    communications with the Hancock representatives

22    that Section 3.3 B assumed that Hancock had made

23    its entire $214 million contribution of program

24    payments and that Hancock would be entitled to a

1    partial refund only if Abbott failed to spend $400

2    million of its own funds in addition to the funds

3    provided by Hancock."

4         Did I read that sentence correctly?

5         A.   Yes.

6         Q.   Are you aware of any provision in the

7    Research Funding Agreement that expressly requires

8    Hancock to make its entire $214 million

9    contribution in order to be entitled to receive a

10   one third payment of any unspent aggregate

11   carryover amount pursuant to Section 3.3 B?

12        MR. LORENZINI:  Objection.

13   BY THE WITNESS:

14        A.   So say that again, please.  I'm sorry.

15        MR. DAVIS:  Would you reread the question,

16   please.

17             (WHEREUPON, the record was

18              read by the reporter.)

19        MR. LORENZINI:  Object.  Vague and ambiguous.

20   BY THE WITNESS:

21        A.   Okay, so, look, you asked me about this

22   section, my communications with John Hancock so we

23   definitely talked about this matter and it was

24   very clear to us that that's what we were talking

1    about.

2    BY MR. DAVIS:

3        Q.   You say in Paragraph 14 that Section

4    3.3 B assumed.  You see that?  My question,

5    Mr. Deemer, is, are you aware of any provision of

6    the Research Funding Agreement that expressly

7    requires Hancock to make a full $214 million

8    contribution in program payments in order to be

9    eligible to receive a one third payment -- or a

10   payment of one third of the unspent aggregate

11   carryover amount pursuant to Section 3.3 B?

12       MR. LORENZINI:  Objection.

13   BY THE WITNESS:

14       A.   I don't know what I'm supposed to do

15   here.  That was my understanding from what I read

16   in the contract and from what I know about this

17   under 3.1, John Hancock was to make its payments,

18   under 3.5, that was -- its obligation was to make

19   its payments.  So I'm not sure what you are asking

20   me because it was very clear to me that they were

21   supposed to make their payments.

22   BY MR. DAVIS:

23       Q.   In order to be eligible to receive the

24   payment of one third of the unspent aggregate

1    carryover amount, correct?

2        A.    Yes, correct.

3        Q.    The question is where does it say that,

4    expressly say that in the agreement?

5        A.    I think it says in 3.5.

6        Q.    What language in 3.5 do you --

7        A.    It says:  "John Hancock's obligation

8    shall be providing the program payments set forth

9    in 3.1 which are $214 million".  It says it there.

10    It says in 3.1, shall make the following payments.

11        Q.    I see those provisions.

12        Do you see any other provision that you

13    understand expressly requires Hancock to make its

14    $214 million contribution in order to be eligible

15    to receive the one third of the unspent aggregate

16    carryover amount?

17        MR. LORENZINI:  Let me get my objection in.

18    Objection.  Vague and ambiguous.

19    BY THE WITNESS:

20        A.    I don't see how you can read this in

21    its entirety, this Article 3, without reading

22    Article 3.1.  You're talking about something in

23    3.3 and you haven't read 3.1.  3.1 says they're

24    going to make their payments.  3.5 says they have

1    to make their payments and now you're picking on

2    something that's in between.  It's bracketed by

3    those two payments that Hancock has to make its

4    payment.

5    BY MR. DAVIS:

6       Q.    Where does it say in Section 3.1 that

7    Hancock must make all four program payments

8    totaling $214 million in order to be eligible to

9    receive a payment of one third of the unspent

10   aggregate carryover amount under Section 3.3 B?

11      MR. LORENZINI:  Objection.

12   BY THE WITNESS:

13      A.    Okay.  So I'm -- I don't read it like

14   that.  So I read it sequentially and I see what it

15   says in 3.1 and that's a fact.  And then you go on

16   and it says, look, assuming they've made those

17   payments in 3.1, then these other things happen.

18   And 3.5 is sort of a finality payment of that

19   paragraph that again requires Hancock to make its

20   payments.  So if you're asking me knowing the

21   context, knowing what was going on here, which we

22   are obviously, I don't read it any other way.

23   That's how I read it and that's how I connect it.

24   BY MR. DAVIS:

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1      Q.    My question is a bit different.

2    Mr. Deemer, I'm not asking sort of what your

3    understanding was or what you assume to be the

4    case.

5          What I'm asking you about is the exact

6    language of the agreement and I'm asking you if

7    you can, please, to identify for me in the

8    agreement where it expressly states that John

9    Hancock must make all four program payments

10    totaling $214 million in order to be eligible to

11    receive one third of the unspent aggregate

12    carryover amount pursuant to Section 3.3 B?  Can

13    you do that?

14      MR. LORENZINI:  Objection.

15    BY THE WITNESS:

16      A.    I think I can.

17    BY MR. DAVIS:

18      Q.    Where is that express language?

19      A.    So I think that express language is

20    embedded in two different things.  It's 3.1 where

21    it says it's got to make its payments.  It's

22    embedded in the fact that the aggregate spending

23    target includes the John Hancock payments.  So the

24    targets themselves include the payments.  They've

1    got to make the payments in 3.1 so in order to get

2    anything back in 3.3 B as you're talking about,

3    they would have had to have made the payments.  I

4    don't see how there's any other way to look at

5    that.

6    BY MR. DAVIS:

7        Q.    You would agree with me that Hancock

8    did make payments under the Research Funding

9    Agreement?

10       A.    They made some payments.

11       Q.    Approximately 104 million in payments;

12   is that correct?

13       A.    I really don't know the total amount of

14   money that they paid.  I know it wasn't all the

15   money.

16       Q.    When you say in Paragraph 14 that

17   Section 3.3 B assumed that Hancock made its entire

18   $214 million contribution of program payments, is

19   it fair to say that Section 3.3 B doesn't

20   expressly say that?

21       MR. LORENZINI:  Objection.  Document speaks

22   for itself.

23   BY THE WITNESS:

24       A.    To me it does, it says it to me.  As I

1    read it I'm thinking of the entire article and the

2    entire article says exactly what I'm saying.

3    BY MR. DAVIS:

4        Q.    Would you read Paragraph 16 of your

5    affidavit to yourself for a moment, please, and

6    tell me when you're done.

7        A.    Okay.  I'm finished.

8        MR. DAVIS:  Actually before I ask you more

9    questions, I think we're going to have to change

10   the tape so why don't we go off the record for a

11   few minutes.

12       THE VIDEOGRAPHER:  Off the record at 10:38.

13          (WHEREUPON, a recess was had.)

14       THE VIDEOGRAPHER:  We are back on the video

15   record at 10:57.

16   BY MR. DAVIS:

17       Q.    Mr. Deemer, before we broke, I directed

18   your attention to Paragraph 16 of your affidavit

19   and I think you had a chance to read it; is that

20   correct?

21       A.    Yes.

22       Q.    Directing your attention to what I

23   think is the second sentence of Paragraph 16, it

24   says:  "I understood based on my discussions with

1    the Hancock representatives that Section 3.4 was

2    the only provision in the agreement addressing the

3    circumstances under which John Hancock's payment

4    obligations would terminate and the only provision

5    in the agreement addressing Hancock's and Abbott's

6    respective rights and obligations in such

7    circumstances."

8         Do you see that?

9    A.   Yes.

10    Q.   What do you recall -- strike that.

11         Do you recall under any greater

12    specificity discussions with John Hancock

13    representatives on that topic one way or the

14    other?

15    A.   Yes.

16    Q.   What do you recall?

17    A.   This came more towards the end of our

18    discussions and they knew they were responsible

19    for the program payments and we were because of

20    the importance of the totality of the research and

21    development aggregate spending total, their

22    contribution and ours, it was extremely important

23    to make sure that there were not circumstances

24    that would prevent them from making their

1    payments.  And so we had a very defined, distinct

2    provisions here that were ones in which the

3    circumstances were that if those circumstances

4    arose that they could not make their payments so

5    we talked about this at a number of different

6    occasions with both of their attorneys and with

7    Stephen Blewitt.

8        Q.    As best you recall, precisely what did

9    the Hancock representatives say on the topic?

10       A.    I don't recall the exact conversations,

11   but certainly they wanted the provisions like this

12   and they seemed acceptable to us knowing that they

13   would be making their full payments, but in the

14   rare circumstances where there could be something

15   because it's research, its unpredictable.  You

16   never know how it's going to turn out.  It's

17   reasonable that they have a provision like this

18   and so we discussed it and came to agreement on

19   it.

20       Q.    Do you recall any more detail about

21   what the Hancock representative said on this topic

22   other than what you've already testified to?

23       MR. LORENZINI:  Objection.  Vague.

24   BY THE WITNESS:

1      A.   I can't think of anything else that is

2    more specific than what I just stated.

3    BY MR. DAVIS:

4      Q.   Further on in Paragraph 16 you state:

5    "The Hancock representatives never indicated to me

6    that Hancock's position was or that they

7    understood that Section 3.4 was not the exclusive

8    provision in the agreement addressing the

9    circumstances under which John Hancock's payment

10   obligations would terminate or that Section 3.4

11   was not the only provision in the agreement

12   addressing Hancock's and Abbott's respective

13   rights and obligations in such circumstances."

14          Other than what you've testified to, do

15   you recall any other discussions with Hancock

16   representatives on that topic?

17     A.   Well, yes.  It's probably part of my

18   earlier testimony as well, but certainly they

19   realized that they were responsible for the

20   program payments and it was in reaction to that

21   that we had this discussion.  They knew they were

22   responsible for those program payments, but they

23   wanted to have an outlet in the event that as I

24   say these real special circumstances occurred that

1    there was a way for them to address those through

2    this section.  So we did have very extensive

3    conversations about this.

4         Q.   As you sit here today, can you recall

5    with any greater specificity the content of those

6    discussions?

7         A.   Not more than what I've just told you.

8         Q.   You go on to say in Paragraph 16 that:

9    "Nor did the Hancock representatives ever indicate

10    to me that they did not understand that Section

11    3.3 assumed and was conditioned on the premise

12    that Hancock would make its planned total payment

13    amount over the course of the program term."

14         Do you see that?

15         A.   Yes.

16         Q.   Other than what you've testified to

17    here today, do you recall with any greater

18    specificity any discussions with Hancock

19    representatives on that topic?

20         MR. LORENZINI:  Objection.  Vague.

21    BY THE WITNESS:

22         A.   Certainly I recall them talking about

23    this being the only way out.  They knew and that's

24    why they wanted to have that in here.  They wanted

1  to have an escape clause because they knew they

2  were responsible for their payments and that's why

3  this all came about.

4      In terms of the exact conversation I

5  had with them, I can't remember the exact language

6  that was used, but that was the essence of those

7  conversations.

8  BY MR. DAVIS:

9      Q.  Do you recall with any greater

10  specificity the exact language that was used other

11  than what you've testified to?

12      A.  I can't recall anything else more

13  specific.

14      Q.  When you referred to escape clause,

15  you're referring to Section 3.4?

16      A.  Yes.

17      Q.  Anything else?

18      A.  No, that was my understanding that was

19  the only part.

20      Q.  At the time that Hancock and Abbott

21  entered into the Research Funding Agreement, did

22  you believe that agreement provided a good

23  investment opportunity for Hancock?

24      MR. LORENZINI:  Objection.

1    BY THE WITNESS:

2        A.   I thought you asked me about John

3    Hancock.

4    BY MR. DAVIS:

5        Q.   I did.

6        A.   I wouldn't have had any way to know

7    what they were thinking, but in terms of Abbott's

8    thinking, and again, I was one low player in this

9    whole thing, but from what I could understand, it

10   seemed like it was a reasonable opportunity for

11   both companies.

12       Q.   Did you think it was an unreasonably

13   risky investment for Hancock to be making?

14       A.   An unreasonably risky for John Hancock?

15       Q.   Investment, correct.

16       MR. LORENZINI:  Objection.

17   BY THE WITNESS:

18       A.   I wouldn't have had any way to know

19   that.  That's their business to make investments.

20   They do that all the time.

21   BY MR. DAVIS:

22       Q.   In the course of obtaining approval of

23   the Research Funding Agreement, you spoke on

24   occasion with higher ups in Abbott?

1      A.   To get approval for this arrangement?

2      Q.   Yes.

3      A.   Yes.

4      Q.   And one of the people you spoke with

5  was Mr. Leiden; is that right?

6      A.   Yes.

7      Q.   Anybody above Mr. Leiden?

8      A.   No.  Not that I can recall.  He was

9  really the person that ultimately he signed the

10  arrangement and, yeah, he was the highest up

11  person that was involved with this.

12      Q.   To your knowledge, did Mr. Leiden have

13  to obtain approval from anyone above him at Abbott

14  in order to enter into the Research Funding

15  Agreement?

16      A.   Yes.  I think he reviewed it with the

17  CEO of the company.

18      Q.   Who was that?

19      A.   That was Miles White.

20      Q.   Did you participate in or were you

21  present at that review?

22      A.   I was present at an earlier review.  I

23  certainly was not present at any final reviews

24  that he would have had with his boss.

1      Q.   When you say you were present at an

2   earlier review, were you present at an earlier

3   review with Mr. White?

4      A.   Yes.  I think Miles White was in the

5   room in that presentation.  I believe so.  There

6   were a number of people there and I think Miles

7   was in that meeting.

8      Q.   Approximately when did that meeting

9   occur?

10      A.   Let's see if there's a date on this

11   document because it will help me.  I'm not sure I

12   would know.  I would have to look back at some

13   documents, but I think it was around the summer of

14   2001 -- year 2000.

15      Q.   Where did the meeting occur as best you

16   recall?

17      A.   It was in the executive suite at

18   Abbott.

19      Q.   Who else attended the meeting as best

20   you recall?

21      A.   Arthur Higgins was there, Jeff Leiden,

22   I'm pretty sure -- I'm not exactly sure who was

23   there.  Steve Weger I believe was there.  Steve

24   Weger, Arthur Higgins, Steve Cohen, me, Jeff

1    Leiden.  Bob Hoffman may have been there.  That's

2    the group I remember.

3        Q.    Approximately how long did the meeting

4    last?

5        A.    I think it was around an hour.

6        Q.    Was the meeting called to your

7    knowledge specifically to discuss the proposed

8    Hancock deal?

9        A.    Yes.

10       Q.    Did you take notes in the course of the

11   meeting?

12       A.    No.

13       Q.    Were there any presentations made in

14   the course of the meeting?

15       A.    Yes.

16       Q.    Were they power point presentations?

17       A.    I can't tell you.

18       Q.    The document that's attached as Exhibit

19   B to your affidavit which is Exhibit 1 of your

20   deposition, was this used in the course of the

21   meeting with Mr. White?

22       A.    Yes.

23       Q.    Any other presentations?

24       A.    Not that I'm aware of.

1      A.   I think it was pretty favorably

2    received actually.

3      Q.   So your answer would be you don't

4    recall anything negative?

5      A.   No, I don't recall anything, no.  I

6    don't recall anything that was -- in what context

7    do you mean, negative about --

8      Q.   Anyone in the meeting saying anything

9    you perceived at the time to be negative?

10     A.   I can't recall anything like that, no.

11     Q.   I take it the purpose of the meeting

12   was to acquaint some of Abbott's senior management

13   with the proposed deal; is that right?

14     A.   That's correct.

15     Q.   So part of the presentation was

16   designed to inform them about what the deal -- you

17   expected the deal would look like, correct?

18     A.   Correct.

19     Q.   What you expected the terms would be,

20   correct?

21     A.   I'm not sure we actually had the exact

22   terms at that time, but we had -- I guess we did.

23   We had most of the terms at that point.

24     Q.   The papers hadn't been signed at that

1    point, correct?

2        A.   Excuse me.

3        Q.   The actual contract had not been

4    signed?

5        A.   Had not been, that's correct.

6        Q.   So part of what you were doing was

7    acquainting Abbott's senior management to the deal

8    in order to ultimately obtain their approval of

9    the deal if and when it was ready to be signed; is

10   that right?

11       MR. LORENZINI:  Objection.

12   BY THE WITNESS:

13       A.   I think in a general sense.  We weren't

14   there seeking their approval.  We were there as

15   you mentioned earlier informing them and

16   acquainting them with the arrangement so it wasn't

17   a time in which we were going there saying, hey,

18   approve this and sign it.  We weren't at that

19   stage yet.  We were more in the acquainting stage.

20   BY MR. DAVIS:

21       Q.   Is it fair to say that what you were

22   seeking from Abbott's senior management was their

23   okay to continue to pursue the deal?

24       A.   That's correct.

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    Q.    Did you receive that okay?

2    A.    Yes, we did.

3    Q.    Who gave you the okay?

4    A.    Arthur Higgins gave me the okay.  I'm

5    not sure who gave the okay to him, but he gave the

6    okay to me.

7    Q.    Did you understand at that point in

8    time that the approval to continue to pursue the

9    deal had come from Abbott's top management?

10    A.    Had come from --

11    MR. LORENZINI:  I'm going to object.

12    Vagueness grounds.

13    BY THE WITNESS:

14    A.    Yeah, I don't know exactly where it

15    came from, but Arthur was the one that I was

16    discussing this with.

17    BY MR. DAVIS:

18    Q.    Did you understand at that time, for

19    example, that Mr. White was in favor of at least

20    continuing to pursue the deal?

21    MR. LORENZINI:  Objection.  Lacks foundation.

22    BY THE WITNESS:

23    A.    I really wouldn't have known that.  I

24    don't know if he was at the meeting, but I would

1      A.    I wouldn't have known that.

2      Q.    Was there an agenda for the meeting

3    that you had with Abbott's senior management at

4    which the presentation materials are attached as

5    Exhibit B to your affidavit were reviewed?

6      A.    It wasn't my meeting so I was asked to

7    come to that, but the agenda was this only, this

8    topic only, but Steve Cohen was the one who

9    orchestrated that meeting and I'm not aware of an

10    agenda other than this document.

11      Q.    Before the Research Funding Agreement

12    was executed, do you recall that there was some

13    due diligence done by John Hancock regarding the

14    program compounds?

15      A.    Yes.

16      Q.    And Abbott made certain descriptive

17    memoranda available to Hancock as part of the deal

18    on describing the various program compounds; is

19    that right?

20      A.    Yes.

21      Q.    Aside from providing the descriptive

22    memoranda, did Abbott make any other of its

23    records pertaining to the program compounds

24    available to Hancock to review for purposes of

1    Hancock's due diligence?

2        MR. LORENZINI:  Objection.  Vague.  You can

3    answer.

4    BY THE WITNESS:

5        A.   I'm not recalling any restrictions on

6    any documents at the time.  I'm not sure that

7    there was anything that was not available to them

8    so I don't think that there was -- yeah, I think

9    everything was available to them.

10   BY MR. DAVIS:

11       Q.   It's your recollection that Abbott

12   offered to let John Hancock look at any and all

13   records that Abbott had pertaining to the program

14   compounds before the deal was executed?

15       MR. LORENZINI:  Objection.

16   BY THE WITNESS:

17       A.   I'm not sure that we actually made that

18   offer, but they were entitled to due diligence and

19   to, you know, produce a list of things that they

20   wanted to look at and there wouldn't have been any

21   reason that they -- to my knowledge, anyway, there

22   wouldn't have been any reason for them to not look

23   at any record they wanted to look at.  There might

24   have been some documents.  I don't know, but I

1    mean, there wasn't anything that I'm aware of that

2    they asked for that we produced or anything like

3    that if that's what you're asking me.

4    BY MR. DAVIS:

5        Q.   My question I think was a little bit

6    different.

7           My question was did Abbott offer to

8    Hancock to the best of your recollection to make

9    any and all of its records concerning these

10   program compounds available?

11       MR. LORENZINI:  Let me get in my vagueness

12   objection.

13   BY MR. DAVIS:

14       Q.   Also let me finish the question.

15       A.   My fault.

16       Q.   Let me go back and restate the

17   question.  I think three of us talking over each

18   other is even worse than two of us talking over

19   each other.

20           To your recollection, did Abbott ever

21   inform Hancock that any and all Abbott records

22   pertaining to the program compounds were available

23   for inspection by Hancock for purposes of its due

24   diligence in advance of the execution of the

1    Research Funding Agreement?

2        MR. LORENZINI:  Objection.  Vague, ambiguous.

3    BY THE WITNESS:

4        A.   I'm not sure it was stated quite as

5    you're stating it, but we certainly made available

6    to them all of our researchers, all of our people.

7    We made available to them outside investigators we

8    were working with.  I don't think there would have

9    been any limitations had we been asked

10   specifically about anything.  We produced

11   documents and I'm not sure that I can sit here and

12   say that we specifically told them that, gee,

13   every single document we have is available for you

14   to look at, but we certainly told them that we

15   were receptive to their doing whatever degree of

16   analysis they would like to do to better acquaint

17   themselves with the research compounds.

18   BY MR. DAVIS:

19       Q.   Did Abbott assemble any sort of data

20   room pertaining to the compounds for inspection by

21   John Hancock pertaining to this deal?

22       A.   John Hancock specifically asked to talk

23   personally with our researchers about their using

24   their consultants and we did what they asked us to

1    do.

2        Q.   My question, Mr. Deemer, is a little

3    bit different.

4            My question is did Abbott put together

5    any sort of data room concerning the program

6    compounds for inspection by John Hancock in

7    advance of the execution of the Research Funding

8    Agreement?

9        A.   A data room was available, but it was

10    not asked for.

11        Q.   Was the data room assembled for

12    purposes of the deal?

13        MR. LORENZINI:  Objection.  Vague, ambiguous.

14    BY THE WITNESS:

15        A.   So my recollection there is that John

16    Hancock was interested in talking with people and

17    doing their own research and I think they did a

18    lot of external research.  I think they were more

19    interested in doing things through their own --

20    their own way.  So I know they did a lot of work,

21    but I'm not sure exactly what it was and certainly

22    whatever they wanted was available to them.

23    BY MR. DAVIS:

24        Q.   Where was the data room that you just

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    referred to maintained?

2        MR. LORENZINI:  Objection.  Mischaracterizes

3    prior testimony.  Vague, ambiguous.

4    BY THE WITNESS:

5        A.   Yes, what I'm getting at there is any

6    data would have been available to them.  Data

7    room, had they wanted to have all the data put

8    into a room, we could have done that.

9    BY MR. DAVIS:

10       Q.   My question is a little bit different.

11   My question is did you do that?  Did Abbott put

12   together a data room concerning the program

13   compounds before the Research Funding Agreement

14   was executed?

15       A.   No, sir.  I'm saying we did what John

16   Hancock asked us to do.

17       Q.   Mr. Deemer, please listen to my

18   question and answer my question if you can,

19   please.

20         My question is did Abbott, in fact, put

21   together a data room concerning the program

22   compounds before the Research Funding Agreement

23   was executed regardless of whether you were asked

24   to or not?

1       A.    You have to describe to me what you

2    mean by data room, data can be a virtual data

3    room.  We had virtual records available to them.

4    Are you saying did we have an office someplace

5    where we put a lot of records and had them come

6    and look?  No, that didn't happen.  They didn't

7    request that.  Had they asked for that it would

8    have been very easy to do that.  We did whatever

9    they wanted us to do.  We had every document

10    available to them that they wanted us to make

11    available, we had every research available to them

12    that they wanted to have available so they could

13    do whatever level of due diligence they wanted to

14    do.

15       Q.    Did you understand before the Research

16    Funding Agreement was signed that was important to

17    Hancock to know the current status of any clinical

18    trials that were under way with respect to any of

19    the program compounds?

20       MR. LORENZINI:  Objection.

21    BY THE WITNESS:

22       A.    I would have thought so.  They had

23    their own procedures and did their own analysis,

24    and as I say, whatever they wanted to learn about

1    and so on, we were happy to accommodate them

2    because it was in our interest as well.

3    BY MR. DAVIS:

4        Q.    Do you recall having discussions with

5    Mr. Blewitt or other people, other Hancock

6    representatives, about the status of clinical

7    trials involving any of the program compounds?

8        A.    Yes.

9        Q.    What do you recall in that regard?

10       A.    We shared with them documents the

11   status of the clinical studies, whether they were

12   in Phase I or II or just where they were in their

13   development process, among other things.

14       Q.    One of the program compounds was

15   ABT-518; do you recall that?

16       A.    Yes.

17       Q.    Were you aware on the day that the

18   Research Funding Agreement was signed, which I

19   will tell you was March 13, 2001, that Abbott had

20   just halted the Phase 1 clinical trial of ABT-518?

21       MR. LORENZINI:  Objection.  Vague, ambiguous,

22   misleading.

23   BY THE WITNESS:

24       A.    Could you state that question again?

1    BY MR. DAVIS:

2        Q.    Sure.  Were you aware on the day that

3    the Research Funding Agreement was signed, March

4    13, 2001, that Abbott had just halted its Phase I

5    clinical trial of ABT-518?

6        MR. LORENZINI:  Objection.  Vague, ambiguous,

7    assumes facts not in evidence.

8    BY THE WITNESS:

9        A.    I was aware of some circumstances

10   around 518.  I'm not sure I was aware of the exact

11   dates of things as you're describing them, but I

12   am aware generally of some events that were

13   happening around the compound ABT-518.

14   BY MR. DAVIS:

15       Q.    Were the events that you were aware of

16   -- did those events include the fact that Abbott

17   had instructed researchers working on that Phase I

18   clinical trial of ABT-518 to halt that trial

19   shortly before the Research Funding Agreement was

20   signed?

21       MR. LORENZINI:  Objection.  Vague, ambiguous,

22   calls for speculation, lacks foundation.

23   BY THE WITNESS:

24       A.    Okay.  So, again, I'm in my role of

1    making -- trying to get the contract going and so

2    on so I would not have been someone who would have

3    been aware of the specifics of what you were just

4    saying.  I was generally aware that that compound

5    had been slowed down.  I don't know exactly the

6    circumstances or who told who to do what, who told

7    whom to do what, but, anyway, but I'm generally

8    aware of that compound being slowed down.

9    BY MR. DAVIS:

10      Q.   Is it your understanding that the fact

11   that ABT-518 was being slowed down included an

12   actual halt of the Phase I clinical trial?

13      MR. LORENZINI:  Objection.  Vague, ambiguous,

14   calls for speculation.

15   BY THE WITNESS:

16      A.   Yes, really because I -- that wasn't my

17   part of the arrangement.  Again, I was aware it

18   was being slowed down and that's really -- I

19   didn't know the details of how it was being slowed

20   down or what that meant.

21   BY MR. DAVIS:

22      Q.   Is it fair to say that the most you

23   knew was that ABT-518 was being slowed down; is

24   that right?

1      MR. LORENZINI:  Objection.  Mischaracterizes

2    the testimony.

3    BY THE WITNESS:

4      A.   The most I knew?

5    BY MR. DAVIS:

6      Q.   Let's go back.

7          You understood before the Research

8    Funding Agreement was signed that the development

9    of ABT-518 was being slowed down in some way by

10   Abbott, correct?

11     A.   Yes, correct.

12     Q.   What, if anything, more did you know

13   specifically about what was happening with respect

14   to ABT-518 before the Research Funding Agreement

15   was signed?

16     MR. LORENZINI:  Objection.  Vague.

17   BY THE WITNESS:

18     A.   In what context?  I mean, in terms of

19   it being a part of the John Hancock program or

20   what are you --

21   BY MR. DAVIS:

22     Q.   No, with respect to it having been

23   slowed down.

24     A.   I didn't know any of the details of

1    what was going on with 518 other than I had heard

2    that it was being slowed down.

3        Q.   Did you ask anybody at Abbott what it

4    meant that ABT-518 was being slowed down?

5        MR. LORENZINI:  Objection.  I think we're --

6    this whole line of questioning I think is vague,

7    ambiguous as to time and exactly what events are

8    being referenced.

9    BY MR. DAVIS:

10       Q.   I don't want you to be misled or I

11   don't want it to be vague in any way, Mr. Deemer.

12   I'm talking about the time period before the

13   Research Funding Agreement was signed and I think

14   we've already established that in that time frame

15   you became aware that Abbott had slowed down

16   development of ABT-518; is that right?

17       A.   Yes.

18       Q.   What I'd like to know first is do you

19   have any greater knowledge, any greater level of

20   specificity regarding what it meant that ABT-518

21   had been slowed down?

22       A.   No, I really don't.

23       Q.   My next question is in that time frame,

24   did you make any inquiries within Abbott to try to

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    determine what it meant that ABT-518 had been

2    slowed down?

3        MR. LORENZINI:  Objection.  Vague.

4    Ambiguous.

5    BY THE WITNESS:

6        A.    I remember having a conversation about

7    why it had been slowed down.  I'm not sure I knew

8    exactly what it meant to having it slowed down.

9    That wasn't the basis of my interest actually.

10    BY MR. DAVIS:

11        Q.    With whom did you have a discussion

12    about why ABT-518 was slowed down?

13        A.    Actually it wasn't why it was.  It was

14    whether or not it was slowed down was sort of my

15    interest at that time.

16        Q.    With whom did you have that

17    conversation?

18        A.    I had a conversation with John Leonard

19    about that letter.

20        Q.    Approximately when did you have that

21    discussion?

22        A.    I think it was not very long before the

23    signing of this agreement, so about in March,

24    early March maybe.

1      Q.   Was it within a few days of the signing

2    of the agreement?

3      A.   You know, I need to look back exactly

4    when it was, but I know it was right around that

5    time.  I don't know if it was a couple of days or

6    a week or two weeks, but it was around that time.

7      Q.   How did you first become aware that

8    ABT-518 had been slowed down?

9      A.   ABT-518 was a cancer compound and I

10   believe I understood that from the cancer -- the

11   cancer team.  I can't tell you exactly who that

12   was, but I heard about that through the cancer

13   team.

14     Q.   Who was on the cancer team at that

15   point in time?

16     A.   Perry Nisen was on the cancer team.  He

17   headed it up and then he had people underneath him

18   so I can't really tell you -- I can't recall

19   exactly who those people were at this point.  They

20   were researchers and it seems to me that someone

21   had mentioned -- there was information about 518

22   not going as fast as it could have been going.

23     Q.   Did you have occasional discussions

24   with -- is it Dr. Nisen?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1      A.   Yes.

2      Q.   With Dr. Nisen regarding the status of

3    ABT-518 before the Research Funding Agreement was

4    signed?

5      A.   Probably not in isolation.  He was one

6    of the head researchers and a lot of the compounds

7    in the portfolio were cancer compounds so in

8    general I had conversations with him about how was

9    the funding arrangement going and that sort of

10   thing, but we didn't -- he wouldn't have discussed

11   any specifics about the compounds themselves from

12   a technical standpoint to me.

13     Q.   As you sit here today, do you believe

14   that it was Dr. Nisen to informed you that ABT-518

15   had been slowed down?

16     A.   I don't think so.  I don't believe it

17   was.  I think it was someone in the group or I

18   just became aware of it generally.  I'm not sure

19   that even -- I'm not sure exactly.  I can't

20   honestly tell you who that was.  I think it seems

21   to me that Perry was traveling somewhere and had

22   not talked with him that much.  He was a pretty

23   busy guy.

24     Q.   If you don't recall who it was that

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    informed you that ABT-518 had been slowed down, do

2    you recall how it was that you became aware of it?

3    Was it via e-mail?  Was it in a discussion?  Was

4    it in a presentation?  Was it any other way?

5        A.   No, I think I had heard about it either

6    in the hallway or something as people talk about

7    things and I wasn't -- that's how it was.  I've

8    looked back at records through previous testimony.

9    There isn't anything that I'm aware of that there

10   was some particular announcement about it.  I

11   remember it was more of a vague hallway kind of

12   conversation.

13       Q.   Going back to make sure I get this one

14   absolutely clear.

15           You don't recall as you sit here today

16   anyone within Abbott ever informing you before the

17   Research Funding Agreement was signed that the

18   Phase I clinical trial of ABT-518 had been halted?

19       A.   Oh, that's correct.  Yeah, because I

20   never knew it was halted.  Was it halted?

21       Q.   I'll represent to you that there's

22   testimony that was halted.

23       MR. LORENZINI:  Objection.  Mischaracterizes

24   facts in evidence.

1      MR. DAVIS:  The testimony will speak for

2   itself.

3   BY MR. DAVIS:

4      Q.   When you heard that ABT-518 had been

5   slowed down, did that cause you any concern?

6      A.   Yes.

7      Q.   Why?

8      A.   Because it was one of the compounds

9   that we were discussing in this portfolio

10   arrangement.

11      Q.   Why did that concern you?

12      MR. LORENZINI:  Objection.

13   BY THE WITNESS:

14      A.   In general the portfolio was comprised

15   of very specific compounds and that was one of the

16   compounds in the portfolio.

17   BY MR. DAVIS:

18      Q.   Did you understand at that point in

19   time that it was important to Hancock to know what

20   the specific compounds in the portfolio were and

21   what their specific status was?

22      MR. LORENZINI:  Objection.  Vague.

23   BY THE WITNESS:

24      A.   I'm not sure what was important to

1    them, but I know it was one of the compounds that

2    was in the portfolio and it would have meant that

3    we would have had a compound missing from the

4    portfolio.

5    BY MR. DAVIS:

6        Q.    Did you understand that that could

7    impact the deal with Hancock?

8        A.    It could have impacted the deal -- it

9    could have -- right, we would have had to figure

10   out another compound or something else probably or

11   I don't know.  Yes, it could have impacted it.

12       Q.    Did you understand that it might have,

13   in fact, killed the deal potentially?

14       MR. LORENZINI:  Objection.  Objection.

15   Vague, ambiguous, calls for speculation based on a

16   hypothetical.

17   BY THE WITNESS:

18       A.    So, yeah, no.  I wouldn't have been

19   aware of that.  We worked very hard at this and

20   this was my job to work at it more if it needed to

21   be worked at more and so we would have -- I don't

22   know what their view of this was, but it certainly

23   was one of the compounds in the portfolio and that

24   portfolio would have had to have been either

1    constructed differently or something different

2    likely would have needed to be changed in order to

3    keep it on track.

4    BY MR. DAVIS:

5        Q.   My question, Mr. Deemer, isn't that it

6    would have killed the deal.  My question is at the

7    time that you learned that 518 was being slowed

8    down, did you understand that if something bad was

9    happening to that compound that it at least had

10    the potential to kill the deal with Hancock?

11        MR. LORENZINI:  Objection.  Incomplete

12    hypothetical.  Calls for speculation.

13    BY THE WITNESS:

14        A.   518 is a really minor compound.  I

15    think what was important to John Hancock was --

16    well, I don't really know what was important to

17    John Hancock, but from what they told me, they

18    were interested in later stage compounds

19    particularly, this compound was a very early stage

20    compound and certainly, though, it was in the

21    portfolio and everything in the portfolio was

22    important.

23    BY MR. DAVIS:

24        Q.   Did you understand that if there was --

1    if Abbott was slowing down the development of 518

2    that that had the potential to delay the execution

3    of the deal with John Hancock for some period of

4    time?

5        MR. LORENZINI:  Objection.  Vague, ambiguous.

6    BY THE WITNESS:

7        A.    I don't know.  Say the question again,

8    in terms of delaying the agreement?

9    BY MR. DAVIS:

10       Q.    My question is did you understand at

11   the time that you learned that 518 was being

12   slowed down -- strike that.

13           You said I think a few moments ago that

14   it did, in fact, concern you when you learned that

15   ABT-518 was being slowed down because you

16   understood that it had the potential to impact the

17   deal with Hancock; is that fair?

18       A.    Had the potential to impact the

19   structure that we were -- yeah, that was on the

20   table, yes.

21       Q.    Did you understand that it had the

22   potential to perhaps delay the deal for some

23   period of time?

24       MR. LORENZINI:  Objection.  Vague, ambiguous,

1  but you can answer if you understand.

2  BY THE WITNESS:

3      A.   I think it may have had the potential

4  -- I mean, I think that, yes, unless there was an

5  alternative compound, we would have found a

6  different compound and so on, it's possible that

7  might have taken some time.  I don't know.  So, we

8  had a structure identified and that was part of

9  the structure is what I'm trying to tell you and

10  to the extent that other compounds were needed in

11  that structure, then we would have gone on to

12  those.  From that context I suppose.

13  BY MR. DAVIS:

14      Q.   You mentioned a few moments ago that

15  after you learned that 518 was being slowed down

16  that you thought you had a discussion with

17  Dr. Leonard on that topic; is that right?

18      A.   Yes.

19      Q.   Specifically what do you recall about

20  that conversation with Dr. Leonard?  Who said what

21  to whom?

22      A.   I remember just asking him to try to

23  understand why that compound was being slowed down

24  and I wanted to make sure he was aware that

1    compound was part of the John Hancock portfolio.

2       Q.   Was he -- was Dr. Leonard aware of the

3    fact that ABT-518 was being slowed down when you

4    had the discussion with him?

5       A.   Yeah, I think he was.

6       Q.   He was already aware?

7       A.   Yes, I think so, yes.

8       Q.   What, if anything, did he tell you

9    about the status of ABT-518 at that point in time?

10      A.   He didn't tell me anything.  He just

11   told me -- I remember we talked about the

12   portfolio and I told him we were getting close to

13   signing and then he said, okay, well, look -- he

14   had been losing patience for a long time so

15   basically our discussions had been dragging out

16   for some time and he was not aware of the -- how

17   imminent we were in terms of agreeing on the

18   structure and terms and so on and so when he

19   learned that, he -- my understanding is he

20   provided the funding, ongoing funding for that

21   program because he was aware that was going to now

22   be a part of the portfolio and so that's what our

23   discussion was about.

24      Q.   What I'm asking you, Mr. Deemer, is as

1    best you recall precisely what did you say to

2    Dr. Leonard and what did Dr. Leonard say to you in

3    the course of that discussion?

4        A.    The primary goal that I had was to make

5    sure that he was aware that we were now getting

6    close to signing this agreement.

7        Q.    What did you say to him?

8        A.    I told him we were very close just as I

9    told you.

10       Q.    What else did you say to him?

11       A.    I don't think there was anything else

12    other than asking him the question saying hey,

13    what's going on with 518 since that's part of our

14    portfolio and we're getting close to signing this

15    thing that this would provide the event for

16    funding to support the entire portfolio that he

17    was interested in.

18       Q.    Including 518?

19       A.    Including 518.

20       Q.    Did you ask him to take any action with

21    respect to 518?

22       A.    No.  He was several levels up from me.

23    I can't tell him what to do.  He can do whatever

24    he wants to do.

1    Q.    My question wasn't did you tell him to

2  do anything.  My question was did you ask him to

3  take any action with respect to 518?

4    MR. LORENZINI:  Objection.  Asked and

5  answered.

6  BY THE WITNESS:

7    A.    I don't think so, no.  I basically

8  informed him what was going on and the status of

9  things, but I would not have been in a position to

10  request that he do one thing or another but I

11  informed him of the status of our negotiations and

12  the fact that 518 was part of that portfolio.

13  BY MR. DAVIS:

14    Q.    Did you explain to him that you thought

15  if Abbott had slowed down ABT-518 that it could

16  impact the deal with Hancock?

17    A.    I think that was probably implied,

18  something like that, that certainly he knew that

19  this had been dragging out for some time so I

20  think he was aware -- I made him aware of the

21  compounds that were in the portfolio anyway.  So

22  he knew that was one of the compounds in the

23  portfolio.

24    Q.    As you sit here today, can you recall

1    with any greater specificity precisely what you

2    said to Dr. Leonard in the course of that

3    discussion?

4        A.   No.  I think I've already told you.

5        Q.   Do you recall with any greater

6    specificity precisely what Dr. Leonard said to you

7    in the course of that discussion?

8        A.   I think he just told me that he would

9    look into it and decide what he wanted to do.  I

10   don't know that he told me anything.  It was more

11   of my informing him and he did whatever he wanted

12   to do, but I don't think he was -- I think it was

13   more of a one-way conversation to be honest with

14   you.

15       Q.   But did you initiate this discussion

16   with Dr. Leonard?

17       A.   Yes, I did.

18       Q.   Where did the discussion take place?

19       A.   It was a telephone call.

20       Q.   You reached him at his office?

21       A.   Yes.

22       Q.   How long did the discussion last?

23       A.   Maybe a minute or two.

24       Q.   Do you recall as you sit here now with

1   any greater specificity anything Dr. Leonard said

2   to you during the course of the discussion?

3       A.   No.  I think he listened to me, and,

4   yes, I don't recall anything that he specifically

5   told me.

6       Q.   Did you have any further discussions

7   with Dr. Leonard concerning ABT-518 before the

8   Research Funding Agreement was signed?

9       A.   I think there was a time in which he

10  needed to update some of the information on 518.

11  I can't remember if he gave that to Steve Cohen

12  who gave it to me.  I can't remember exactly how

13  that happened but there wasn't anything else of

14  any substance that I can recall on 518

15  specifically other than something along those

16  lines.

17      Q.   Did you receive word from anyone within

18  Abbott before the Research Funding Agreement was

19  signed that Abbott had changed the status of 518

20  in any way following your discussion with

21  Dr. Leonard?

22      A.   Yes.  It was my understanding that they

23  started the 518 program back on track where it had

24  been previously.

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1       Q.   From whom or from where did you receive

2    that information?

3       A.   It might have been Steve Cohen.  I

4    can't remember exactly, but I knew about that and

5    I think it could have been from Steve Cohen.

6       Q.   As best you can recall, as you sit here

7    today, what were you told?

8       A.   That 518 was -- they would keep that

9    program going because the funding -- if it was, in

10   fact, true that the agreement was going to get

11   signed, that that would be a compound that could

12   stay as a funded project.

13      Q.   Anything more?

14      A.   No.  I think that's all there was to

15   it.

16      Q.   Other than your discussion with

17   Dr. Leonard, did you speak with anybody else about

18   your concern regarding the decision to slow down

19   the development of ABT-518 before the Research

20   Funding Agreement was signed?

21      A.   I can't recall.  I may have discussed

22   it with Steve Cohen because as I say he was sort

23   of my co-negotiator so he was probably aware of

24   that, too.

1      Q.   What do you recall anything in that

2   regard, if anything?

3      A.   I don't recall anything specific.  I'm

4   just aware that he and I were generally aware --

5   he was closer to the research part of it because

6   he was in the research building and was the

7   controller for the research operation so he was

8   more closely tuned in with those things.  So

9   generally I picked up things through Steve Cohen

10  to be honest with you.

11     Q.   As you sit here today, do you recall

12  having a discussion with Mr. Cohen about the

13  decision to slow down 518?

14     A.   No, I don't.

15     Q.   But you think you may have had that

16  discussion, but you don't recall it for sure?

17     A.   That's correct.  We spoke every day.

18     Q.   You believe from Cohen at some point in

19  time before the research agreement was signed

20  informed you that ABT-518 was back on track; is

21  that right?

22     A.   Yes.

23     Q.   Did he use that terminology, back on

24  track?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1      A.   I can't tell you that.  I don't know

2  that for sure.

3      Q.   What did you understand it to mean when

4  you learned that ABT-518 was back on track?

5      MR. LORENZINI:  Objection.  I object that it

6  mischaracterizes the witness's testimony.

7  BY MR. DAVIS:

8      Q.   If you know.

9      A.   Could you repeat the question, please.

10      Q.   Sure.  Would you reread the question,

11  please?

12         (WHEREUPON, the record was

13           read by the reporter.)

14  BY THE WITNESS:

15      A.   To me it just meant that funding was

16  being provided for it.

17  BY MR. DAVIS:

18      Q.   Funding was being restored.

19      MR. LORENZINI:  Objection.  Vague, ambiguous

20  and assumes facts not in evidence.

21  BY THE WITNESS:

22      A.   Again, I'm not sure I know what it is

23  to be on track or not on track, but the fact is

24  that that was a compound that I characterized as

1    being slowed down, maybe that's the wrong word, I

2    don't know, but to my knowledge it was in its

3    normal state of development.  You used the word

4    restored.  Maybe that isn't a good word.  I don't

5    know.  But it was being part of the development

6    program.  Again, I guess is another way to say

7    that.

8    BY MR. DAVIS:

9        Q.   Did you ever learn why it was that

10   ABT-518 had been slowed down in advance of the

11   execution of the Research Funding Agreement?

12       A.   No, I really didn't.  I had some -- I

13   presumed some things, but I don't know any

14   specifics about it.

15       Q.   What was your understanding or belief

16   at the time as to why it had been slowed down?

17       MR. LORENZINI:  Objection.  Lacks foundation.

18   BY THE WITNESS:

19       A.   My understanding it was simply a matter

20   of not having the funding so it was sort of -- I

21   think I've used the word Catch 22 before.  It was

22   somewhat of a Catch 22.

23   BY MR. DAVIS:

24       Q.   Any greater understanding than that?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1      A.   No.

2      Q.   Did you ever learn who it was that had

3   decided to slow down the development of 518 before

4   the Research Funding Agreement was signed?

5      A.   Who specifically slowed down 518.

6      Q.   Who made the decision to slow down the

7   development of 518 before the Research Funding

8   Agreement was signed?

9      A.   I'm not sure I would know exactly who

10   made the decision, but I know from a portfolio

11   standpoint that usually those are reasonably

12   senior level decisions.

13      Q.   At Dr. Leiden's level?

14      MR. LORENZINI:  Objection.  Calls for

15   speculation.

16   BY THE WITNESS:

17      A.   I wouldn't have known that.  I would

18   have presumed it would have been the research

19   department, but I don't know.

20   BY MR. DAVIS:

21      Q.   Were you aware that Abbott was

22   undertaking a portfolio review of various program

23   compounds including ABT-518 the week before the

24   Research Funding Agreement was signed?

1     A.   No, I'm not aware of that.

2     Q.   Do you know whether the decision to

3   slow down ABT-518 was made in the course of that

4   portfolio review?

5     A.   No.  I have no knowledge of any such

6   meeting.

7     MR. DAVIS:  We'll stop here for a minute.

8     THE VIDEOGRAPHER:  Off the record at 11:53

9         (WHEREUPON, the deposition was

10        recessed until 12:45 p.m., this

11        date, 10/27/06.)

12

13

14

15

16

17

18

19

20

21

22

23

24

1    He might have returned in some international

2    position.  I'm not sure.

3        Q.    In the e-mail you -- this is an e-mail

4    about a meeting you had with Hancock, correct?

5        A.    Yes.

6        Q.    In the e-mail you say among other

7    things:  "The good news is they are definitely

8    talking 200 million in funding."

9            Do you see that?

10       A.    Yes.

11       Q.    Is it fair to say that Abbott did

12   regard that as good news, Abbott regarded that as

13   desirable that and Hancock was willing to invest

14   200 million?

15       A.    Yes.

16       MR. DAVIS:  Let's mark this as the next

17   exhibit, as Exhibit 4.

18            (WHEREUPON, a certain document

19            was marked Deemer Deposition

20            Exhibit No. 4, for identification,

21            as of 10/27/06.)

22            (WHEREUPON, the document was

23            tendered to the witness.)

24   BY MR. DAVIS:

1       Q.    Mr. Deemer, you have what has been

2   marked as Exhibit 4.

3         Would you look at this document for a

4   moment and tell me if you can identify it for me,

5   please?

6       A.    Am I supposed to be able to read this?

7       Q.    This is the form in which it was

8   produced to us, so you are at the same advantage

9   or disadvantage as we are at.

10      A.    Okay, to you, right.

11      MR. LORENZINI:  Take your time.  It's

12   multiple pages.  Flip through it.

13      THE WITNESS:  It gets worse.

14      MR. LORENZINI:  In terms of the quality.

15   BY MR. DAVIS:

16      Q.    I'm not to blame.  I've got to tell

17   you.

18      A.    I've looked at it and I can't tell you

19   that I've read all the numbers because I can't

20   read a good portion of the numbers.  If you direct

21   me to certain things, I will try to focus on those

22   things.

23      Q.    I guess my first question is does

24   Abbott have printers that can print at a font

1    BY MR. DAVIS:

2        Q.    It also implies that you got it.

3        A.    Yep.

4        Q.    Just talking about Page 1 of Exhibit 4,

5    do you recall working with schedules like what you

6    see on Page 16 Exhibit 4 in the course of your

7    negotiations with John Hancock?

8        MR. LORENZINI:  Objection.  Vague and

9    ambiguous.

10    BY THE WITNESS:

11        A.    I'm not sure -- I saw this.  I'm not

12    sure to what extent I worked with this.

13    BY MR. DAVIS:

14        Q.    You do recall seeing documents like

15    this in the course of negotiations?

16        A.    Yes.

17        Q.    For what purpose were they generated?

18        A.    Probably at John Hancock's request, but

19    I don't know specifically.

20        Q.    Were these documents generated by

21    someone within Abbott to the best of your

22    knowledge?

23        MR. LORENZINI:  Objection.  Lacks foundation.

24    BY THE WITNESS:

1      A.    So if I could read this better -- yeah,

2    yes, yes.  It's likely it was produced by somebody

3    at Abbott, yes.

4    BY MR. DAVIS:

5      Q.    Where did Abbott obtain the nominal and

6    expected sales forecast data that's contained on

7    Page 1 of Exhibit 4?

8      MR. LORENZINI:  Objection.  Lacks foundation.

9    BY THE WITNESS:

10      A.    So, yeah, again, this was obviously not

11    my thing, but I would only have to guess that this

12    came from the business development group, but I'm

13    not a hundred percent sure of that.  That was my

14    guess.

15    BY MR. DAVIS:

16      Q.    In your experience, has Abbott's

17    business development group on occasion developed

18    nominal and expected sales forecast data for the

19    purposes of supporting business development

20    activities?

21      A.    Yes.

22      Q.    Have you seen other schedules like this

23    in other deals?

24      A.    No.  I don't think I've ever seen a

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1      Q.    In your experience, is Abbott's

2      Business Development Group reasonably experienced

3      in developing sales forecasts?

4      A.    I think they have done sales

5      forecasting in the past.

6      Q.    Have you, yourself, utilized any sales

7      forecast data developed by the Business

8      Development Group in making decisions about

9      potential business development opportunities?

10      MR. LORENZINI:  Objection.

11      BY THE WITNESS:

12      A.    Most of what I was doing was involved

13      in early stage research that often didn't have

14      sales forecasts associated with them.

15      BY MR. DAVIS:

16      Q.    On occasion in the past, have you

17      utilized sales forecast data developed by Abbott's

18      Business Development Group for purposes of

19      assessing or working on any opportunities,

20      business development opportunities, that you've

21      been involved in?

22      A.    I'd say in a general sense, yes.

23      Q.    Will you take a look at the third page

24      of Exhibit 4?  It is another schedule that's

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    entitled Nominal and Expected Investment Cost.

2        Do you see that?

3    A.    Yes, on page -- yeah, 6863.

4    Q.    6863, correct.

5    A.    Okay.

6    Q.    Do you recall seeing any documents like

7    this in the course of your negotiation of the

8    Hancock Abbott Research Funding Agreement?

9    A.    Yes.  I probably saw something like

10    this.

11    Q.    What's the difference between a nominal

12    investment cost and an expected investment cost?

13    MR. LORENZINI:  Objection.  Lacks foundation.

14    BY THE WITNESS:

15    A.    I'm probably not exactly sure what this

16    is, but my guess is that this would be related to

17    looking at each project individually as a nominal

18    -- on an individual project basis and then

19    expected might be based on some kind of a factor

20    that would be some kind of a discounts for

21    probability of success is my guess at what that

22    would mean, but I think people use those words

23    differently.

24    BY MR. DAVIS:

1      Q.   In working on business development

2    opportunities at Abbott, have you on occasion seen

3    documents which differentiate between nominal

4    investment cost and expected investment cost?

5      A.   Have I?

6      Q.   Yes.

7      A.   When?  In what context?  This deal?

8      Q.   In this development context.

9      A.   In general?

10     Q.   Yes.

11     A.   Well, as I say, the context I'm

12   familiar with these, that kind of description,

13   would be in a portfolio context and so this is a

14   portfolio here, and so, I mean, I just went

15   through it now, but ordinarily I wasn't involved

16   in sort of portfolio decisions and discussions.

17     Q.   On occasions other than the Hancock

18   deal, have you seen forecasts of nominal and

19   expected investment costs?

20     A.   No.  Ordinarily I would not have been

21   exposed to those kinds of things.

22     Q.   If you were trying to determine who

23   within Abbott put together these materials, who

24   would you turn to?

1    we were trying to get updates from Hancock as to

2    how they were proceeding with their analysis that

3    he was involved in some of those updates,

4    telephone calls, that sort of thing.

5        MR. DAVIS:  Let's mark this, please, as the

6    next exhibit, Exhibit 5.

7            (WHEREUPON, a certain document

8            was marked Deemer Deposition

9            Exhibit No. 5, for identification,

10           as of 10/27/06.)

11           (WHEREUPON, the document was

12           tendered to the witness.)

13   BY MR. DAVIS:

14       Q.   Mr. Deemer, you have what has been

15   marked as Exhibit 5.  Take a look at the document

16   for a moment.  In particular, what I'd like you to

17   do is look at the first e-mail in the chain of

18   e-mails which is I think on the second page from

19   Jeffrey A. Ropers to you dated June 6, 2000.

20       MR. LORENZINI:  Feel free to review the

21   entire document if it will help you answer the

22   question.

23   BY THE WITNESS:

24       A.   What did you want me to focus on here?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1   I'm sorry.

2   BY MR. DAVIS:

3       Q.   Particularly the e-mail that's on the

4   second page, the first e-mail in the chain, the

5   one from Jeff Ropers to you dated June 6, 2000.

6       A.   Okay.

7       Q.   Have you finished reading?

8       A.   Yes.

9       Q.   Directing your attention to the first

10  e-mail, the one that appears last in the document,

11  who is Jeffrey Ropers?

12      A.   Jeffrey Ropers, he worked for Steve

13  Cohen I believe in the financial area.

14      Q.   It references E copies of the JH due

15  diligence packages.  JH is John Hancock, correct?

16      A.   Yes.

17      Q.   What were the due diligence packages?

18      A.   Well, I think those were the documents

19  that ended up being the preliminary versions of

20  the attachments to the agreement.

21      Q.   The descriptive memoranda?

22      A.   Yes.

23      Q.   Did you understand that Abbott was

24  preparing and providing those documents to John

1    Hancock for purposes of Hancock's due diligence?

2        A.    For their review, yeah.

3        Q.    As part of Hancock's due diligence?

4        A.    Right.

5        Q.    It says Eric Zimmer -- it makes

6    reference to Eric Zimmer in NPD and we've already

7    established who Mr. Zimmer is.

8            What is NPD?

9        A.    That stands for new product development

10    is what I've been calling business development so

11    it's a similar description.

12        Q.    Who actually prepared the due diligence

13    files that Abbott provided to Hancock with respect

14    to the various compounds?

15        MR. LORENZINI:  Objection.  Lacks foundation.

16    BY THE WITNESS:

17        A.    So, yeah, I mean, Eric Zimmer, I don't

18    know that entirely, but I mean mostly he got them

19    from somebody and probably had a hand in doing

20    some of that.  I don't know.

21    BY MR. DAVIS:

22        Q.    You see in Mr. Roper's e-mail, he sent

23    the due diligence packages to you, correct?

24        A.    Yes.

1    referenced in your e-mail to Mr. Cohen dated

2    June 7, 2000?

3        MR. LORENZINI:  I'm going to object.

4    Misleading without the attachments.

5    BY THE WITNESS:

6        A.   Yeah, because I don't know myself what

7    those were to be honest with you.  It could have

8    been some extraneous compounds or something.  I

9    don't know.

10       MR. DAVIS:  Let's mark this as the next

11   exhibit, Exhibit 6.

12           (WHEREUPON, a certain document

13           was marked Deemer Deposition

14           Exhibit No. 6, for identification,

15           as of 10/27/06.)

16           (WHEREUPON, the document was

17           tendered to the witness.)

18   BY MR. DAVIS:

19       Q.   Mr. Deemer would you look at Exhibit 6

20   and tell me if you've seen this document before?

21       MR. LORENZINI:  I'll note for the record that

22   the witness's name does not appear on the

23   document.

24   BY THE WITNESS:

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1      A.   Yeah, I don't think I have.

2    BY MR. DAVIS:

3      Q.   Were you aware before the Research

4    Funding Agreement was signed that Hancock was

5    interested in knowing the current status of any

6    clinical trials pertaining to the program

7    compounds?

8      MR. LORENZINI:  Objection.  Vague and

9    ambiguous.

10   BY THE WITNESS:

11     A.   I knew they were interested in what

12   phase the drugs were in, for example.

13   BY MR. DAVIS:

14     Q.   Were you aware that Hancock was

15   interested in knowing any interim results of any

16   clinical trials?

17     A.   I think they were interested in some

18   things and not interested in other things

19   obviously.

20     Q.   Were you aware that Hancock was

21   interested in all of the things that are

22   identified by Mr. Blewitt in this e-mail?

23     MR. LORENZINI:  Objection.  Vague and

24   ambiguous.

1    things.  People say, hey, I want A,B,C and D as

2    opposed to having a conversation with you saying

3    hey, you know what, I'm not interested in A,B,C

4    but I am interested in everything else.  Those

5    aren't typical conversations.  You are trying to

6    pin me down on something that wouldn't have been a

7    natural conversation.

8        Q.    Part of the fun of this job is I get to

9    form the questions and you, please -- you have to

10    try to answer the questions to the best of your

11    ability.

12       A.   Okay.

13       Q.    My question, again, is do you recall

14   any instance in which anyone from Hancock, any

15   Hancock representative, ever said, in fact,

16   Hancock does not want any of the information that

17   Mr. Blewitt identified in this e-mail of September

18   7, 2000 to Mr. Cohen that has been marked as

19   Exhibit 6 prior to the Research Funding Agreement?

20       A.   I'm not aware of any such conversation.

21       MR. DAVIS:  Let's mark this as the next

22   exhibit, Exhibit 7.

23           (WHEREUPON, a certain document

24           was marked Deemer Deposition

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1          Exhibit No. 7, for identification,

2          as of 10/27/06.)

3          (WHEREUPON, the document was

4          tendered to the witness.)

5    BY MR. DAVIS:

6        Q.   Mr. Deemer, you have what's been marked

7    as Exhibit 7.  I would ask you to look at the

8    document for a moment and tell me if you've seen

9    this document before.

10       A.   Yes.

11       Q.   When did you last see this document?

12       A.   Can I rephrase my question?

13       MR. LORENZINI:  Can he rephrase his question

14   you mean?

15   BY THE WITNESS:

16       A.   I mean can I rephrase my answer?

17   BY MR. DAVIS:

18       Q.   Certainly.

19       A.   Let me just say it like this.  I see my

20   name on here.  I see I'm a recipient of this so

21   I'm presuming that I received this.  That's seven

22   years ago, six years ago.

23       Q.   There appear to be two e-mails in this

24   document, one from you to Mr. Lockery; is that the

1    correct pronunciation?

2      A.    Yes.

3      Q.    And one to Mr. Cohen dated July 24,

4    2000 and an e-mail back to you and to Mr. Cohen

5    and to a Mr. Gary Flynn from Mr. Lockery on the

6    same day; do you see that?

7      A.    Uh-huh.

8      Q.    Do you recall sending your e-mail to

9    Mr. Lockery on July 24, 2000?

10     A.    I must have.  I can see it's in my

11    e-mail.  I wouldn't have told that you that would

12    have happened had I not seen this.

13     Q.    There is a reference in your e-mail to

14    the calculation for 3.3 small Roman numeral ii, do

15    you see that?

16     A.    Yes.

17     Q.    That in reference to the provision that

18    ultimately became 3.3 B as far as you recall?

19     A.    I need to read this more carefully.

20    Okay.  I've just read it.  Now what was your

21    question?

22     Q.    Do you recall sending this e-mail to

23    Mr. Lockery?

24     A.    I really don't to be honest with you.

1    I obviously sent it so I'm sure I must have.

2        Q.    Do you recall having any discussions or

3    communications with Mr. Lockery regarding how

4    Section 3.3 small Roman numeral ii or Section 3.3

5    B ultimately would be applied?

6        A.    Is that what this is, 3.3 small ii

7    became 3.3 B?

8        Q.    I'll represent to you that in some of

9    the early drafts of the Research Funding Agreement

10   the provision that became 3.3 B was previously

11   numbered 3.3 small Roman numeral ii?

12       A.    I sent this to him so, yeah -- so I

13   must have had -- we must have had an e-mail

14   exchange about this anyway.

15       Q.    Do you recall any of your discussions

16   or communications with Mr. Lockery on this point?

17       A.    No.

18       Q.    Do you recall having discussions with

19   anyone else within Abbott concerning how 3.3 small

20   Roman numeral ii or 3.3 B would be applied?

21       MR. LORENZINI:  Objection.  Vague and

22   ambiguous.

23   BY THE WITNESS:

24       A.    I think this was generally discussion

1    and maybe even specifically discussed in one of

2    those update meetings because I think this concept

3    was incorporated in one of our presentations that

4    we already discussed.

5    BY MR. DAVIS:

6        Q.    By presentations, you mean the internal

7    presentations at Abbott?

8        A.    Yes.

9        Q.    Do you recall with any greater

10    specificity what was said about 3.3 small Roman

11    numeral ii or 3.3 B in the course of any of those

12    presentations?

13        A.    I could take us back to a document.

14        Q.    Please go right ahead.  I think you're

15    talking about Exhibit B to your affidavit?

16        A.    Yeah.  I think that same discussion was

17    in there.  Yeah, it would be on Page 18.

18        Q.    Page 18 of Exhibit B?

19        A.    Exhibit B.

20        Q.    Yep.

21        A.    There are talks about the aggregate

22    amount, the $400 million that we were to spend and

23    the 200 million that would be coming from Hancock

24    and of course this whole thing had to do with

1    flexibility, but in the event that there was a

2    shortfall here in order to maintain this

3    two-to-one ratio that if for some reason -- again,

4    it's research and development -- the amount of

5    money was less than what anybody thought it was

6    going to be, that we would then true up at the end

7    the ratio was two to one.  That's what this is all

8    about.

9        Q.    On this page it references the

10    aggregate amount of 400 million.

11        A.    Right.

12        Q.    The aggregate spending target in the

13    Research Funding Agreement wasn't 400 million,

14    correct?

15        A.    The aggregate spending target was 400

16    million of Abbott's money, and yeah, right, it was

17    214 million of Hancock's money.

18        Q.    The aggregate spending target in the

19    Research Funding Agreement is 614 million; is that

20    right?

21        MR. LORENZINI:  Objection.

22    BY THE WITNESS:

23        A.    As I say, comprised of the 400 and the

24    214.

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    BY MR. DAVIS:

2        Q.   And that's the way Abbott looked at it,

3    right?

4        A.   That's the way Hancock looked at that

5    time.

6        Q.   You didn't work for Hancock, did you?

7        A.   No, I did not work for Hancock.

8        Q.   And this page, Page 18 of this

9    presentation that's attached as Exhibit B to your

10   affidavit, was this shared with John Hancock

11   before the Research Funding Agreement was signed?

12       A.   This was an internal memo for

13   management to explain the deal we were working on.

14       Q.   So I take it the answer would be no, it

15   was not shared with John Hancock?

16       A.   That's correct.  It's just -- the

17   concept was shared and discussed and agreed on

18   with them, but this document was not.

19       Q.   When you say on Page 18 on the bullet

20   point 2:  "If Abbott does not spend the carryover

21   amount in the fifth year, Abbott will refund one

22   third of the remaining shortfall to Hancock."

23       Do I read that correctly?

24       A.   Yes.

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1      Q.    When you say the reference to the

2      carryover amount, you mean the aggregate carryover

3      amount; is that right?

4          MR. LORENZINI:  Objection.

5      BY THE WITNESS:

6          A.    Well, it's the amount of money that was

7      not spent according to the minimum spending

8      requirement.

9      BY MR. DAVIS:

10         Q.    Was the shortfall between Abbott's

11     actual spending and the $614 million aggregate

12     spending target, correct?

13         MR. LORENZINI:  Objection.

14     BY THE WITNESS:

15         A.    I looked at that as if Abbott didn't

16     spend the 400 million as we say in the first

17     paragraph there, if we didn't spend all of the 400

18     million and John Hancock had put in in this case

19     214, then we needed to true up.  That's what

20     number two does there.

21     BY MR. DAVIS:

22         Q.    When you reference in No. 2, the

23     carryover amount, you're referring to the

24     aggregate carryover amount, correct, or are you

1   referring to some other carryover amount?

2       A.   No.  Yes, it refers to this aggregate

3   amount of $400 million.

4       Q.   So that's different than the aggregate

5   carryover amount?

6       MR. LORENZINI:  Are you using some technical

7   definition of aggregate --

8       MR. DAVIS:  I'm using the definition that's

9   contained in the Research Funding Agreement which

10  defines the aggregate carryover amount as the

11  difference between Abbott's actual spending over

12  the four-year program term and the $614 million

13  aggregate spending target.

14      MR. LORENZINI:  Objection.  Vague and

15  ambiguous.

16  BY MR. DAVIS:

17      Q.   So my question, Mr. Deemer, is the

18  carryover amount that you're referring to here, is

19  it the aggregate carryover amount as defined in

20  the agreement or is it some other carryover

21  amount?

22      A.   Well, what I'm defining here is my

23  understanding that this aggregate amount was our

24  $400 million, and if we didn't spend that $400

1    million, that according to our deal which was a

2    two-to-one ratio and they had spent 200 and we had

3    spent 400, we were to have spent 400, if we didn't

4    spend 400, we needed to adjust that so that we

5    would remain in the two-to-one ratio.  That's what

6    this one third -- we'd have to refund one third of

7    the remaining shortfall to Hancock.

8    BY MR. DAVIS:

9        Q.   Mr. Deemer, please, my question is

10   different.

11       My question is is the carryover amount

12   that you referred to in Page 18 of this document

13   the same as the aggregate carryover amount that's

14   defined in the Research Funding Agreement or is it

15   something different?

16       MR. LORENZINI:  Objection.  Asked and

17   answered.

18   BY THE WITNESS:

19       A.   I'm trying to answer.  I don't know a

20   different way to say it than what I'm saying it.

21   I'm just looking at this document and focusing on

22   here and we're talking about the aggregate amount

23   of $400 million and if we don't spend that $400

24   million, then Hancock would have a problem so long

1    as they had paid the 214 million.

2    BY MR. DAVIS:

3        Q.   So you understood the carryover amount

4    to be 400 million?

5        MR. LORENZINI:  Objection.  Mischaracterizes.

6    BY THE WITNESS:

7        A.   The carryover amount as I just said is

8    what would be carried over to make the 400 million

9    whole, so if we didn't spend a total of $400

10   million including that carryover provision, that

11   that's what would trigger this No. 2 clause.

12   BY MR. DAVIS:

13       Q.   That's your understanding of what the

14   agreement says?

15       A.   Correct, it is.

16       Q.   Have you compared what's on this page

17   to what's actually written in the Research Funding

18   Agreement?

19       A.   That's my understanding that the

20   agreement reflects -- this was a reflection of the

21   agreement and vice versa.

22   BY MR. DAVIS:

23       Q.   My question is a little bit different.

24       Have you gone back to compare what's

1    actually on this page to what's contained in the

2    Research Funding Agreement?

3        MR. LORENZINI:  After writing, creating this

4    presentation?

5        MR. DAVIS:  Yes, sure.

6    BY THE WITNESS:

7        A.    I don't know that I have.

8    BY MR. DAVIS:

9        Q.    Are you aware of any differences

10    between what's written on this page and what's

11    actually contained in the terms of the Research

12    Funding Agreement?

13        A.    I'm not.

14        MR. DAVIS:  Let's mark this as the next

15    exhibit, please.

16            (WHEREUPON, a certain document

17            was marked Deemer Deposition

18            Exhibit No. 8, for identification,

19            as of 10/27/06.)

20            (WHEREUPON, the document was

21            tendered to the witness.)

22    BY MR. DAVIS:

23        Q.    Mr. Deemer, would you look at Exhibit 8

24    for a moment and tell me if you've seen that

1    document before?

2       A.   Yes, I have seen this.

3       Q.   Who is Dan Norberg?

4       A.   He was I guess head of discovery,

5    research -- head of research, head of discovery

6    research at Abbott.

7       Q.   Prior to sending this e-mail, had you

8    inquired on the status of ABT-518?

9       MR. LORENZINI:  Objection.  Vague and

10   ambiguous as to time.

11   BY THE WITNESS:

12      A.   I'm sorry.  Would you ask me the

13   question again, please?

14   BY MR. DAVIS:

15      Q.   Sure.  Let me go back.

16         This e-mail references a discussion

17   that you had with Tom Lyons; you see that in the

18   very first paragraph?

19      A.   Yes.

20      Q.   Who is Tom Lyons?

21      A.   Tom Lyons took over for Steve Cohen as

22   the controller of the Research Division.

23      Q.   And it says in your e-mail that he

24   called to say that the ABT-518 program had been

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    terminated; is that right?

2         A.   He called, I guess, yeah.

3         Q.   Prior to receiving that call from

4    Mr. Lyons, had you been notified that the ABT-518

5    program had been terminated?

6         A.   No.  Before I called -- I'm sorry.  Say

7    that again.

8         Q.   Before you received the telephone call

9    from Mr. Lyons that's referenced in this e-mail

10   had you learned that the ABT-518 program had been

11   terminated?

12        A.   I don't - not that I can remember now.

13   I must have heard it from Tom Lyons.

14        Q.   Did Mr. Norberg respond to this e-mail

15   as best you recall?

16        A.   I don't remember.

17        Q.   Do you recall ever being told why the

18   ABT-518 program was terminated by Abbott?

19        A.   I don't think I ever knew.

20        Q.   The answer is you don't recall?

21        A.   I don't recall, no.  To my

22   recollection, I don't know why it was terminated.

23        Q.   Did you ever inquire?

24        A.   Did I inquire as to why it had been

1    terminated or not terminated?

2       Q.   As to why it was terminated?

3       A.   I don't remember doing that.

4       Q.   You say in the second paragraph of this

5    e-mail:  "I've been holding off contacting Hancock

6    since I new a couple of patients were still being

7    dosed."

8          Do you see that?

9       A.   Yes.

10      Q.   Holding off contacting Hancock about

11   what?

12      A.   Well, it was my understanding that

13   because this was a compound in the portfolio that

14   we had certain reporting obligations to them.

15      Q.   Was your understanding as to how

16   quickly Abbott was supposed to notify Hancock if a

17   decision was made within Abbott to terminate a

18   compound?

19      A.   Gosh, I'm not really sure, but I think

20   we needed to use our reasonable commercial efforts

21   and that sort of thing.  I don't really remember

22   what the time frame was there.

23      Q.   To your knowledge, did Abbott ever

24   delay in notifying Hancock that any particular

1     program compounds had been terminated for any

2     reason?

3        MR. LORENZINI:  Objection.  Vague and

4     ambiguous.

5     BY THE WITNESS:

6        A.   Gosh, it wouldn't have been anything

7     that I would have done.

8        MR. DAVIS:  Let's mark this as the next

9     exhibit, please, Exhibit 9.

10            (WHEREUPON, a certain document

11            was marked Deemer Deposition

12            Exhibit No. 9, for identification,

13            as of 10/27/06.)

14            (WHEREUPON, the document was

15            tendered to the witness.)

16     BY MR. DAVIS:

17        Q.   Mr. Deemer, you have what's been marked

18     as Exhibit 9, and I would ask you to take a look

19     at the document for a moment and tell me if you

20     recall ever receiving documents like this in the

21     course of your business development work in the

22     2000, 2001 time frame?

23        MR. LORENZINI:  I'm going to object in that

24     it's vague and ambiguous as to "documents like

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1      A.   I don't.

2          MR. DAVIS:  Mark this, please, as the next

3   exhibit, Exhibit 10.

4              (WHEREUPON, a certain document

5              was marked Deemer Deposition

6              Exhibit No. 10, for identification,

7              as of 10/27/06.)

8              (WHEREUPON, the document was

9              tendered to the witness.)

10  BY MR. DAVIS:

11      Q.   Mr. Deemer, you have what's been marked

12  as Exhibit 10.  I'll represent to you that this is

13  the descriptive memo for ABT-518 that was provided

14  to Hancock in conjunction with the Research

15  Funding Agreement.  You can compare it if you

16  wish.

17      A.   Okay.  I'll take your word for it.

18      Q.   My question is what steps, if any, did

19  Abbott take prior to the execution of the Research

20  Funding Agreement to ensure the completeness and

21  accuracy of the information contained in this

22  descriptive memoranda and other descriptive

23  memoranda that were included as exhibits to the

24  Research Funding Agreement?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1        MR. LORENZINI:  To his knowledge?

2        MR. DAVIS:  To his knowledge.

3     BY THE WITNESS:

4        A.  Well, I was more of a intermediary in

5     these so I was conveying these to Steve.  I didn't

6     really have a hand in producing these so I'm not

7     really sure exactly what all was done here.

8     Generally I read these, but more for -- I think it

9     was more of formatting and that sort of thing as

10    opposed to content, specific content.

11    BY MR. DAVIS:

12       Q.  Do you know what if any steps did

13    Abbott -- other people at Abbott take to ensure

14    the completeness and accuracy of the information

15    in the descriptive memoranda before the Research

16    Funding Agreement was executed?

17       A.  No.  As I said, I received these and

18    forwarded them, so I don't know exactly what

19    actions or steps were taken to do what you're

20    describing.

21       Q.  Who at Abbott was responsible for

22    ensuring the completeness and accuracy of the

23    information contained in the descriptive memoranda

24    before the Research Funding Agreement was

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    executed?

2       A.    So, again, these things were prepared

3    and reviewed by the Business Development Group

4    that I've been talking to you about and by the

5    researchers themselves and research management.

6       Q.    As best you recall, who within Abbott

7    was tasked before the Research Funding Agreement

8    was signed to make sure that these descriptive

9    memoranda were accurate and complete?

10      A.    I think that process was coordinated --

11   let me put it this way.  I don't know the exact

12   answer.  I'm not sure there was a person, but I

13   think the controller's office or the research

14   group, that's Steve Cohen and his office,

15   ultimately they were the ones who forwarded these

16   things on to me as we've even seen in earlier

17   memos you've shown me.  They were ultimately the

18   people that sort of orchestrated or prepared these

19   things, not maybe de novo but certainly

20   coordinated their preparation.

21      Q.    Did you personally have any

22   responsibility in ensuring the completeness and

23   accuracy of the descriptive memoranda before the

24   Research Funding Agreement was signed?

1     A.   Did I personally, no, not at all.

2        MR. DAVIS:  Mark this as the next exhibit,

3  please.

4             (WHEREUPON, a certain document

5             was marked Deemer Deposition

6             Exhibit No. 11, for identification,

7             as of 10/27/06.)

8             (WHEREUPON, the document was

9             tendered to the witness.)

10  BY MR. DAVIS:

11     Q.   Mr. Deemer, you have in front of you

12  what I will represent is a copy of the descriptive

13  memorandum that was provided to John Hancock in

14  conjunction with the Research Funding Agreement

15  for ABT-594?

16     A.   Okay.

17     Q.   This is one of the descriptive memos

18  that you reviewed before the document was signed?

19     A.   Yes, just like the other one.

20     Q.   You recognize ABT-594 as one of the

21  compounds that was encompassed by the Research

22  Funding Agreement, correct?

23     A.   Yes.

24     Q.   If you take a look at Page 7 of this

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    descriptive memorandum, the very last paragraph on

2    the page under clinical studies, it states:  "A

3    Phase II-B study for norpathic pain and higher

4    titrated doses of ABT-594 began in April of 2000

5    and ends in June, 2001.  A total of 320 patients

6    is anticipated to be included in the study."

7          Do you see that?

8      A.   Yes.

9      Q.   To your knowledge, was that statement

10   accurate as of the date that the Research Funding

11   Agreement was signed?

12     MR. LORENZINI:  Objection.  Lacks foundation.

13   BY THE WITNESS:

14     A.   Again, I wouldn't have known that.

15   Again, it was not my role to verify those kinds of

16   -- I wasn't in research.  I did not have any hand

17   in preparing this document.

18   BY MR. DAVIS:

19     Q.   Were you aware prior to March 13, 2001,

20   which, again, is the date on which the Research

21   Funding Agreement was executed that Abbott had

22   prematurely ended enrollment in its Phase II-B

23   study of ABT-594?

24     A.   No.

1      MR. LORENZINI:  Objection to the extent it

2   mischaracterizes the evidence.

3   BY THE WITNESS:

4      A.   No.  I wouldn't have known one way or

5   another.  I don't know if that's a true statement

6   or not a true statement, but I want wasn't aware

7   of that.

8   BY MR. DAVIS:

9      Q.   Were you aware prior to March 13, 2001

10   that Abbott had ended enrollment in that study at

11   less than 320 patients?

12      A.   I don't know what they did and I would

13   not have been -- I did not know that.

14      Q.   If you had wanted to seek out that

15   information, information about the current status

16   of the Phase II-B study as of March 2001, who

17   would you have turned to?

18      A.   I probably would have gone to Steve

19   Cohen.

20      Q.   You expect that he would have known

21   that information?

22      MR. LORENZINI:  Objection.  Calls for

23   speculation.

24   BY THE WITNESS:

1     A.   My guess is that he would not have,

2   because he would have had the right contacts.

3   BY MR. DAVIS:

4     Q.   Would you have turned to Dr. Leonard?

5     A.   No.

6     Q.   Did you hear any -- receive any

7   information about that Phase II-B study that's

8   referenced in the descriptive memorandum for 594

9   before the Research Funding Agreement was signed?

10    MR. LORENZINI:  Objection.  Vague and

11  ambiguous.

12  BY THE WITNESS:

13    A.   Repeat that again.

14  BY MR. DAVIS:

15    Q.   Certainly.  Did you receive any

16  information about the Phase II-B study of ABT-594

17  that's referenced in the descriptive memo before

18  the Research Funding Agreement was signed?

19    A.   Only these kinds of documents,

20  information on these kinds of documents, I

21  wouldn't have had any other insight on my own into

22  any of this stuff.

23    Q.   Did you receive any information about

24  any interim results that Abbott had received

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    concerning that study?

2        A.   Did I, no, not that I can recall.

3        Q.   Did you receive any information

4    concerning any premature patient terminations that

5    were experienced in the course of that study?

6        A.   No.  I was not familiar with that line

7    of activity at all.

8        Q.   Did you receive any information about

9    any adverse events experienced in the course of

10   that study?

11       A.   No not that I'm aware of anyway.

12       MR. DAVIS:  Mark this is as the next exhibit,

13   please, Exhibit 12.

14            (WHEREUPON, a certain document

15            was marked Deemer Deposition

16            Exhibit No. 12, for identification,

17            as of 10/27/06.)

18            (WHEREUPON, the document was

19            tendered to the witness.)

20   BY MR. DAVIS:

21       Q.   Mr. Deemer, you have what's been marked

22   as Exhibit 12.

23            Would you take a moment and look at

24   this document and tell me if you recognize it?

1    A.   I don't.

2    Q.   Do you recognize this as a document

3    generated by Abbott?

4    MR. LORENZINI:  Objection.  Lacks foundation.

5    BY THE WITNESS:

6    A.   I don't think I can even tell you -- I

7    can see that they were Abbott compounds but,

8    again, I don't recall seeing a document like this

9    before.  And I would speculate -- I don't know.

10   BY MR. DAVIS:

11   Q.   So this is not a document or a form of

12   document that you typically use in your duties in

13   business development?

14   A.   No, not at all.

15   MR. DAVIS:  Let's mark this as the next

16   exhibit, Exhibit 13.

17        (WHEREUPON, a certain document

18        was marked Deemer Deposition

19        Exhibit No. 13, for identification,

20        as of 10/27/06.)

21        (WHEREUPON, the document was

22        tendered to the witness.)

23   BY MR. DAVIS:

24   Q.   Mr. Deemer, I'll ask you to look

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    briefly at Exhibit 13 and my first question is

2    simply who is Chris G. Turner?

3        A.   He was on Steve Cohen's staff.

4        Q.   Do you recall why it was that you were

5    sending these exhibits to Mr. Turner back in

6    February of 2001?

7        A.   I think he actually sent these to me

8    and I'm just sending him a note back saying, hey,

9    thanks.  That would be my understanding of this.

10        Again, as I said, he worked for Steve

11    Cohen and Cohen was really the guy who

12    orchestrated the preparation of these.  So my

13    guess is I'm just telling him thank you.

14        Q.   Would you turn to the third page of

15    Exhibit 13.

16        There's a document there entitled ABT

17    773, 2001 Planned Development Cost Summary; do you

18    see that?

19        A.   Yes.

20        Q.   Who prepared this document, this

21    particular page?

22        A.   I don't know exactly who prepared this

23    particular page.  The preparation of this and

24    these other pages was orchestrated by Steve

1    Cohen's office so probably a number of people had

2    their hands in preparing this.  Chris Turner may

3    have been one of those individuals.

4        Q.   Is it your recollection, however, that

5    this document and the other development cost

6    summaries like it were prepared by someone in

7    Mr. Cohen's office?

8        A.   Yes.  I think he was probably the

9    orchestrater and probably turned to people in

10   research and people in analytics and some people

11   forecasting people.  So I think it was sort of a

12   orchestration by a number of people.

13       Q.   Did you play any role in the creation

14   of the cost plan, development cost summaries?

15       A.   I did not.

16       Q.   Do you recall any discussion with

17   anyone at John Hancock regarding the cost

18   summaries?

19       A.   These documents here?

20       Q.   Yes.

21       A.   You've got to say that to me again.

22       Q.   Do you recall any discussions with

23   anyone at Hancock concerning those cost summaries?

24       A.   These particular ones or just in

1    general?

2       Q.   In general those forms of document.

3       A.   I believe these were sent as a -- to be

4    attached to the agreement and I'm not sure there

5    was discussion after these were attached, but I

6    think there are various versions and various

7    drafts of these and so on and I think that as I

8    recall I looked at these things and these were the

9    -- these sort of helped them in terms of their

10   analysis of the arrangement, and they asked

11   questions from time to time, usually not of me

12   because I wasn't the one they were talking to,

13   but, yes, in that context.

14      Q.   Do you recall the specifics of any

15   discussions concerning the development plan cost

16   summaries?

17      A.   No.

18      MR. DAVIS:  Let's mark this as the next

19   exhibit, please.

20           (WHEREUPON, a certain document

21           was marked Deemer Deposition

22           Exhibit No. 14, for identification,

23           as of 10/27/06.)

24           (WHEREUPON, the document was

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1           tendered to the witness.)

2      BY MR. DAVIS:

3           Q.   Mr. Deemer, you have what's been marked

4      as Exhibit 14.

5               Would you look at the document for a

6      moment and tell me if you've ever seen it before?

7           A.   Uh-uh.  I don't recall ever seeing this

8      document.

9           Q.   Did you attend any portfolio review

10     sessions in and around March 7 to 9, 2001?

11          A.   No.

12          Q.   Did you ever get any reports of any --

13     what occurred at any portfolio review sessions

14     within Abbott in that time frame?

15          A.   No, not that I'm aware of.

16          Q.   Did Dr. Nisen ever discuss with you

17     what, if anything, occurred in any portfolio

18     review sessions in early March 2001?

19          A.   No.

20          MR. DAVIS:  Let's mark this as the next

21     exhibit.

22               (WHEREUPON, a certain document

23               was marked Deemer Deposition

24               Exhibit No. 15, for identification,

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1           as of 10/27/06.)

2           (WHEREUPON, the document was

3           tendered to the witness.)

4    BY MR. DAVIS:

5       Q.   Mr. Deemer, please look at Exhibit 15

6    and tell me if the first page of this exhibit is

7    an e-mail that you send to Mr. Blewitt on March

8    12, 2001 at approximately 3:03 p.m.

9       A.   Yes, it is.

10      Q.   The subject of the e-mail is the MMPI

11   program update, the MMPI was ABT-518, correct?

12      A.   Yes.

13      Q.   And the e-mail says -- first line says:

14   "John Leonard looked at all of the documents one

15   last time in preparation for execution and noted

16   an oversight on one of the programs."

17           Did I read that correctly?

18      A.   Yes.

19      Q.   John Leonard, that's Dr. Leonard?

20      A.   Yes.

21      Q.   To your knowledge, did Dr. Leonard, in

22   fact, review all of the descriptive memoranda

23   before the Research Funding Agreement was signed?

24       MR. LORENZINI:  Objection.  Calls for

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    speculation.

2    BY THE WITNESS:

3        A.    I really wouldn't know.  Steve Cohen

4    worked for him.  He might have.  I really don't

5    know.

6    BY MR. DAVIS:

7        Q.    Well, in your e-mail to Mr. Blewitt you

8    say that Dr. Leonard had looked at all of the

9    documents one last time.

10        What documents were you referring to?

11        A.    Well, I'm obviously referring to this

12    518.

13        Q.    What documents pertaining to 518?

14        A.    Well, let's see, are they attached

15    here?

16        Q.    Well, attached to this document as it

17    was produced by Abbott is a copy of the

18    descriptive memo for ABT-518.

19        Is that one of the documents you

20    understood Dr. Leonard reviewed in preparation for

21    the execution of the --

22        A.    Yes, exactly.

23        Q.    To your knowledge, did Dr. Leonard look

24    at any other documents?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1      A.   I don't know.

2      Q.   Who asked Dr. Leonard to review the

3   descriptive memoranda for 518 one last time before

4   the Research Funding Agreement was signed?

5      A.   It must have been Steve Cohen.  Again,

6   he was the guy who orchestrated all of these

7   documents.

8      Q.   It says Dr. Leonard noted an oversight

9   in one of the programs, the oversight relates to

10   ABT-518, is that right?

11      A.   Must have been.

12      Q.   The next sentence says: "On the ABT-518

13   program, he noted that Phase I was to have started

14   on December 2000 (fourth quarter 2000) but, in

15   fact, did not start until earlier this month."

16      Did I read that correctly?

17      A.   Yes.

18      Q.   When you refer to Phase I, you mean

19   Phase 1 clinical trial?

20      MR. LORENZINI:  Objection.  Vague and

21   ambiguous.

22   BY THE WITNESS:

23      Q.   Phase I is kind of a vague and

24   ambiguous.

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    BY MR. DAVIS:

2        Q.   What were you referring to in this

3    e-mail when you said that Dr. Leonard noted that

4    Phase I was to have started on December 2000?

5        A.   Well, just as it is, Phase I.  You

6    qualified that by saying a Phase I clinical study.

7    Phase I generally means the phase after

8    preclinical.

9        Q.   So were you referring to a clinical

10   trial when you referred to Phase I?

11       MR. LORENZINI:  Objection.

12   BY THE WITNESS:

13       A.   It's a phase.  It means just that.  It

14   is a time period or start sort of a status -- I'm

15   not sure I know what your question is.

16   BY MR. DAVIS:

17       Q.   My question is what were you talking

18   about when you referenced the Phase I in the

19   ABT-518 program?  What did Phase I encompass?

20       MR. LORENZINI:  Objection.  Asked and

21   answered.

22   BY THE WITNESS:

23       A.   I was referencing a document so we had

24   put down Phase I as having started fourth quarter

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    2000.  In fact, that was not correct, so we were

2    correcting that oversight.

3    BY MR. DAVIS:

4        Q.    What did you understand to have started

5    earlier that month precisely, what activity?

6        MR. LORENZINI:  Objection.  Lacks foundation.

7    BY THE WITNESS:

8        A.    I don't know the specific activities

9    that would constitute that, but my understanding

10   was, again, we had identified it being the fourth

11   quarter and, in fact, it was not started until,

12   you know, the first quarter.

13   BY MR. DAVIS:

14       Q.    At the time you wrote this e-mail to

15   Mr. Blewitt, did you understand that Abbott had

16   just commenced a Phase I clinical study in March

17   of 2001 concerning ABT-518?

18       A.    No, I didn't know that.

19       Q.    As you sit here today, you don't know

20   precisely what activities started earlier in the

21   month of March 2001?

22       A.    That's correct.

23       Q.    You go on to say:  "This pushed the

24   time line back by a quarter throughout but the

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    launch date is not affected and is actually

2    planned one quarter earlier (second quarter '06)."

3        Did I read that correctly?

4        A.   Yes.

5        Q.   When you say this pushed the time line

6    back by a quarter throughout, is that the slow

7    down that we referred to earlier today, the slow

8    down in the development of ABT-518?

9        MR. LORENZINI:  Objection.  Confusing.

10   BY THE WITNESS:

11       A.   I'm not sure.  This was a time frame

12   that Steve Cohen obviously John Leonard looked at

13   and corrected, and I was referring to a general

14   slow down.  I don't know how it related exactly to

15   this scheduling to be honest with you.

16   BY MR. DAVIS:

17       Q.   Earlier today in your deposition, we

18   discussed shortly before the Research Funding

19   Agreement having been signed your becoming aware

20   of a slow down in the development of ABT-518.

21       Do you recall that?

22       A.   Yes.

23       Q.   Is the fact that you sent this e-mail

24   to Mr. Blewitt on March 12, 2001 related in any

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    way to the information that you received that

2    ABT -- the development of ABT-518 had been slowed

3    down by Abbott?

4        MR. LORENZINI:  Objection.  Vague and

5    ambiguous, but you can answer.

6    BY THE WITNESS:

7        A.   Actually I'm not sure there was.  In my

8    mind, I'm reporting on an inaccuracy in this

9    document that John Leonard corrected.  That's what

10   this is all about.  And I'm really not sure if

11   it's related to the other discussion I was talking

12   about of the 518 compound being slowed down.  I

13   didn't make that connection myself personally.

14   BY MR. DAVIS:

15       Q.   The next sentence in this e-mail, you

16   state:  "Steve, as you know the timing of starting

17   some of these earlier compound studies is related

18   to completing this financing and hence the reason

19   this one got pushed back a little."

20          When you say that the starting of some

21   of these earlier compound studies is related to

22   completing this financing, what did you mean?

23       A.   Well, there I meant that, in fact, the

24   whole program that we were talking about of these

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    compounds in the portfolio, that whole portfolio

2    was contingent upon this financing from John

3    Hancock so, yeah, to the extent that our

4    discussions were dragging on, it was likely some

5    of these programs, like I said, some of these

6    early stage compounds like this one, 518, was a

7    very early stage compound lower priority compound.

8        Q.   Was it your understanding as of March

9    2001 that Abbott would not proceed with the

10   development of ABT-518 if Hancock did not enter

11   into the Research Funding Agreement?

12       MR. LORENZINI:  Objection.  Lacks foundation.

13   BY THE WITNESS:

14       A.   I wouldn't have known -- I mean, I

15   wouldn't -- no, I wouldn't have presumed that at

16   all.  Sometimes things are given different

17   priorities and are delayed in the budget, maybe

18   for a different budget cycle, until some update in

19   the year, they see how things are going with sales

20   in general.  They can allocate more money to R&D

21   and so on.  That kind of stuff happens all the

22   time so you couldn't say is it if it that way.

23   BY MR. DAVIS:

24       Q.   At the time you sent this e-mail to

1    Mr. Blewitt on March 12, 2001, was it your

2    understanding that if Hancock entered into the

3    Research Funding Agreement that would make it

4    financially possible for Abbott to proceed with

5    the development of ABT-518?

6        A.   I think that's a reasonable way to

7    characterize that.

8        Q.   Do you recall receiving any response

9    from Mr. Blewitt to this e-mail?

10       A.   No, I don't think I did.

11       Q.   Did you discuss this e-mail with anyone

12   at Abbott before you sent it?

13       A.   Steve Cohen and I talked about many of

14   these so if anybody it would have been Steve

15   Cohen.

16       Q.   Do you recall any discussions with

17   Mr. Cohen concerning this e-mail?

18       A.   I doesn't.

19       Q.   Do you recall discussions with anybody

20   else at Abbott concerning this e-mail either

21   before or after you sent it?

22       A.   I don't.

23       MR. LORENZINI:  Whenever you have a good time

24   for a break.

1      MR. DAVIS:  We can take break now if you'd

2  like.

3      THE VIDEOGRAPHER:  Off the record at 2:07.

4          (WHEREUPON, a recess was had.)

5      THE VIDEOGRAPHER:  Back on the video record

6  at 2:15.

7      MR. DAVIS:  Let's mark this, please, as the

8  next exhibit.

9          (WHEREUPON, a certain document

10          was marked Deemer Deposition

11          Exhibit No. 16, for identification,

12          as of 10/27/06.)

13          (WHEREUPON, the document was

14          tendered to the witness.)

15  BY MR. DAVIS:

16      Q.  Mr. Deemer, you have what's been marked

17  as Exhibit 16 at your deposition.  I would ask you

18  to look at it and tell me if you recall seeing

19  this document before?

20      A.  I have not.

21      Q.  Did you participate in any portfolio

22  analyses or portfolio reviews?

23      A.  No.  Go ahead.

24      Q.  From 2001?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1      A.   No.

2      Q.   Have you ever been a participant in

3   portfolio analysis or portfolio reviews conducted

4   by Abbott concerning its pharmaceutical compounds?

5      A.   Yes.

6      Q.   On how many occasions?

7      A.   I can remember one time.

8      Q.   When?

9      A.   Maybe let's see, three or four years

10  ago, four years ago maybe.

11     Q.   After the Hancock deal was signed?

12     A.   Uh-huh, yes.

13     Q.   Why was it that you participated in the

14  portfolio review on that occasion?

15     A.   It was in a broad sense.  That's why

16  I'm saying that.  There was a time in which we

17  were presenting a compound to be considered for

18  funding among Abbott's portfolio compounds so in

19  that context it was a review, but it was not sort

20  of a review -- it was a review of a specific

21  compound as opposed to the portfolio, but it was

22  going to be part of a portfolio discussion

23  eventually.  Maybe that's a better way to say it.

24  Maybe I can convince myself that that wasn't

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1  really a true portfolio, but not in the sense

2  where I was a participant or observer of this

3  process of giving priorities to compounds and that

4  sort of thing.

5      Q.   Do you recall that Abbott as of roughly

6  early 2001 had acquired a company by the name of

7  Knoll Pharmaceuticals?

8      A.   Yes.

9      Q.   In 2001, Abbott was integrating Knoll's

10  operations into Abbott's own operations; is that

11  right?

12      A.   Yes.

13      Q.   Do you recall that Abbott in the course

14  of that integration process conducted a review of

15  the various compounds that were under development

16  by Abbott and Knoll?

17      A.   Would you state your question again?

18      Q.   Do you recall that as part of the

19  integration process, Abbott conducted a sort of

20  comprehensive review of the compounds that were

21  under development within Abbott and within Knoll?

22      MR. LORENZINI:  Objection.

23  BY THE WITNESS:

24      A.   No, I'm not surprised that that

1    happened, but I'm not -- was not aware -- I wasn't

2    aware of any specific meetings and so on that went

3    on to do that.

4    BY MR. DAVIS:

5        Q.   Did you participate in any way in that

6    process?

7        A.   No.

8        Q.   Did you participate in any way in the

9    Knoll sort of integration process?

10       A.   Let me think about that.  Maybe in its

11   broadest -- everybody at Abbott was involved so

12   I'm not quite sure.  I wouldn't have been in any

13   part of the strategic aspects of that integration,

14   but we were -- I suppose everybody at Abbott was

15   involved in one way or another.

16       Q.   As you sit here today, do you recall

17   any specific duties that you had in terms of the

18   integration?

19       A.   I had duties to out license some of the

20   compounds that came from the Knoll acquisition so

21   in that respect that was almost sort of like the

22   disintegration as opposed to the integration.  I

23   guess it was integration.  So in that respect,

24   yeah.

1    A.   No, I don't.  Let me just --

2    MR. LORENZINI:  There's no question pending

3    unless you need to clarify your prior answer.

4    BY THE WITNESS:

5    A.   No.

6    BY MR. DAVIS:

7    Q.   You're not aware of any portfolio

8    analysis database?

9    A.   I'm not.

10    MR. DAVIS:  Let's mark this as the next

11    exhibit, 18.

12        (WHEREUPON, a certain document

13        was marked Deemer Deposition

14        Exhibit No. 18, for identification,

15        as of 10/27/06.)

16        (WHEREUPON, the document was

17        tendered to the witness.)

18    BY MR. DAVIS:

19    Q.   Mr. Deemer, I'll show you Exhibit 18

20    and I think we've gone over the subject matter of

21    this to some extent already in the course of your

22    deposition here today.

23        Do you recall sending this e-mail to

24    Mr. Nisen on or about March 20, 2001?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1        A.   Yes.

2        Q.   Does this e-mail refresh your

3     recollection in any way concerning your knowledge

4     of the status of ABT-518 beyond what you've

5     testified to here today?

6        A.   No.

7        Q.   In writing back to you, Dr. Nisen made

8     reference to the 518 debacle, and do you have any

9     further information as you sit here today

10    concerning what the 518 debacle is or was?

11       A.   Not any more than what I've already

12    described or I can describe that again.

13       Q.   Did you ever have any discussion with

14    Dr. Nisen regarding why it is he referred to it as

15    a debacle?

16       A.   No.  Ask me that question again.

17       MR. DAVIS:  Would you reread the question,

18    please.

19            (WHEREUPON, the record was

20            read by the reporter.)

21    BY THE WITNESS:

22       A.   No.  Actually we never did follow up on

23    this memo.

24    BY MR. DAVIS:

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1      Q.    After you received the March 21 e-mail

2    from Dr. Nisen, did you ever have any discussions

3    with him concerning ABT-518?

4      A.    No, I don't think I did.

5      Q.    I just want to confirm the John that

6    you referred to in your e-mail of March 20th to

7    Dr. Nisen, that's John Leonard?

8      A.    Yes.

9      Q.    And when you say:  "I worked with John

10    to protest," how did you work with Dr. Leonard to

11    protest the slow down of ABT-518?

12      A.    I remember calling him and informing

13    him what was going on as we discussed before, so

14    it was really more of a one-way conversation.

15      Q.    That's the full extent of your working

16    with Dr. Leonard as referenced in here?

17      A.    Yeah, it was probably not a very good

18    choice of words when I look back on this.  I

19    recall calling him and telling him that the deal

20    was eminent and that the 518 was part of that

21    portfolio and we were getting the financing and

22    that was really the basis of my quote-unquote

23    working with him.

24      MR. DAVIS:  Let's mark this as the next

1    BY MR. DAVIS:

2        Q.   Mr. Deemer, is that Care Capital

3    agreement still in effect?

4        A.   I really don't know.

5        Q.   If were you looking for a copy of that

6    agreement today, would you go to the

7    Pharmaceutical Division?

8        A.   Probably.

9        Q.   Who within the Pharmaceutical Division

10    would you speak with?

11        A.   That I wouldn't -- I guess a better way

12    to say that is to go to our legal department.

13        Q.   Does Abbott's legal department maintain

14    copies of all the signature contracts that are

15    entered into by the company?

16        A.   That's my general understanding that

17    they do.

18        MR. DAVIS:  Let's mark this as the next

19    exhibit, please, 21.

20            (WHEREUPON, a certain document

21            was marked Deemer Deposition

22            Exhibit No. 21, for identification,

23            as of 10/27/06.)

24            (WHEREUPON, the document was

Deemer, Philip (Linked) 10/27/2006 9:16:00 AM

1              tendered to the witness.)

2    BY MR. DAVIS:

3        Q.   Mr. Deemer, I'll show you what's been

4    marked as Exhibit 21 and ask you if this is the

5    contract summary that you believe you contributed

6    to that you referred to earlier in your testimony

7    today?

8        A.   No.  Well, I mean, I probably

9    contributed to this one, too, but this is not what

10   I was thinking about when I was talking about

11   that.

12       Q.   The contract summary that you recall

13   contributing to, was it in the form of a Power

14   Point presentation or in the form of some sort of

15   memo like this Exhibit 21?

16       A.   It would be more like this, yeah.  It

17   would be more like a Word document probably.

18       Q.   If you take a look of the section of

19   this summary on Page 2 under Research Program

20   Funding, would you read that section, please?

21   Tell me when you're done.

22       A.   Okay.

23       Q.   Is that summary consistent with your

24   understanding of the terms of the Research Funding

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    Agreement?

2       MR. LORENZINI:  Objection.  Vague.

3    BY THE WITNESS:

4       A.   Yeah, could you point out things that

5    you want me to focus on specifically because

6    there's a lot here?

7    BY MR. DAVIS:

8       Q.   Under the section at the very bottom of

9    that section where it says:  "Should Abbott not

10   spend the entire 614 million by the end of the

11   fifth year (12/31/05) Hancock gets one third of

12   the amount remaining unspent back by 1/30/06."

13       Do you see that?

14       A.   Yes.

15       Q.   Is that consistent with your

16   understanding of the terms of the Research Funding

17   Agreement?

18       A.   No.

19       Q.   Do you know who within Abbott prepared

20   this document?

21       A.   Yes.

22       Q.   Who?

23       A.   His name is Don Buell.

24       Q.   Who is Mr. Buell?

1     A.   He was contract administrator.

2     Q.   Have you seen this document before?

3     A.   Yes.

4     Q.   Did you see it in or about 2001?

5     A.   Yes.  I'm sure it was in 2001.

6     Q.   Did you ever have any discussion with

7  Mr. Buell in which you told him that his summary

8  of at least part of the research program funding

9  was inaccurate?

10    A.   I need to give you some context.  His

11  primary responsibility was to make sure that we

12  made milestones and royalties and so on at the

13  appropriate times and so I didn't -- this is not a

14  document that would have been going to senior

15  management.  It was for his own use, and I recall

16  not spending a great deal of time on it and giving

17  a brief review and it seemed like he had the

18  provisions right that I was familiar that he

19  needed to be aware of in terms of his

20  responsibilities of paying milestones and

21  royalties and that sort of thing as an

22  administrator of the agreement.

23    Q.   I take it from your answer that you did

24  not contact Mr. Buell and ask him to correct that

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    statement that we just referred to in his summary?

2        A.   You know, I think I did send him

3    something that said his term sheet was reasonably

4    okay but, no, I don't think I -- I don't recall

5    telling him that there was a problem with specific

6    words in here even though as I look at it today I

7    probably would say otherwise.

8        Q.   This document is entitled an Executive

9    Summary of March 13, 2001 agreement.

10           Was a copy of this document actually

11   distributed to executives at Abbott?

12       A.   Not that I'm aware of.  That would come

13   from our legal document.  Don Buell would not have

14   been -- as I said, he had no role in the agreement

15   itself and was merely after the fact trying to

16   summarize this for his own use and maybe for his

17   -- he probably had a department there for which he

18   was reviewing this or preparing this.

19       Q.   Do you know whether anyone from

20   Abbott's legal department reviewed this executive

21   summary before it was finalized?

22       A.   I don't recall that.

23       Q.   Would you expect typically that someone

24   from Abbott's legal department would review a copy

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    of an executive summary of a contract that Abbott

2    had entered into before it was distributed to

3    Abbott executives?

4        A.   Yes.  Abbott's legal department was

5    responsible for preparing summaries of agreements.

6        MR. DAVIS:  Let's mark this, please, as the

7    next exhibit.

8            (WHEREUPON, a certain document

9            was marked Deemer Deposition

10           Exhibit No. 22, for identification,

11           as of 10/27/06.)

12           (WHEREUPON, the document was

13           tendered to the witness.)

14   BY MR. DAVIS:

15       Q.   Mr. Deemer, would you take a moment and

16   review these two e-mails that have been marked as

17   Exhibit 22 and tell me, please, when you're done.

18       A.   Okay.  I've read it.

19       Q.   Earlier today you testified about a

20   meeting you had with senior Abbott executives

21   concerning the proposed deal with John Hancock and

22   you thought that possibly Mr. Miles White was at

23   one meeting.

24           Do these two e-mails pertain to the

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    scheduling of that meeting?

2         A.    Yes.

3         Q.    I note that the very first e-mail the

4    one actually, the first in time; Mr. Cohen's

5    e-mail to a Julia Bufard, other folks with a CC to

6    you; do you see that?

7         A.    Yes.

8         Q.    Mr. Cohen identifies two groups of

9    people that he thought should be in attendance at

10   the meeting, correct?

11        A.    Yes.

12        Q.    In the A group he regarded as must or

13   almost must be there; do you see that?

14        A.    Yes.

15        Q.    In the A group is a Miles, is that a

16   reference to Miles White?

17        A.    Yes.

18        Q.    Does this refresh your recollection as

19   to whether Mr. Miles actually attended the

20   meetings?

21        A.    I can't really recall.  I think he was

22   there, but I'm not really sure.

23        Q.    Did you regard Mr. White as a must have

24   at the meeting?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1      A.   This is Steve Cohen.  He's setting this

2   thing up.  Did I personally?

3      Q.   Yes.

4      A.   I'm not sure.

5      Q.   Does this document refresh your

6   recollection as to who attended the meeting?

7      A.   No.

8      Q.   Do you recall attending the meeting

9   with Mr. Bill Dempsey to discuss the John Hancock

10   proposal?

11      A.   I can't tell you if Bill was there or

12   not.  I'm not -- I don't think Bill Dempsey was

13   there, but I can't tell you that definitively.

14      Q.   The members of the A group listed here

15   are Miles, Miles is Miles White, correct?

16      A.   Correct.

17      Q.   Jeff is Jeff Leiden?

18      A.   Yes.

19      Q.   Arthur is Arthur Higgins?

20      A.   Yes.

21      Q.   Bill we see is Bill Dempsey, right?

22      A.   Right.

23      Q.   Who is Gary Coughlin?

24      A.   Gary was the CFO at the time.

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1      Q.   Is he still with Abbott?

2      A.   No.

3      Q.   And then the B group we already talked

4    about Steve Weger, correct?

5      A.   Correct.

6      Q.   What was Mr. Weger's position?

7      A.   He was in charge of corporate planning.

8      Q.   Who is Gary Flynn?

9      A.   Gary I think was the treasurer of

10   Abbott, I believe.  Gary Flynn, I think so at that

11   time.

12     Q.   Who is Greg Linder?

13     A.   Greg Linder would have been in account

14   willing.

15     Q.   And the meeting I see is referred to as

16   the Miles John Hancock meeting; do you see that,

17   or as the Miles meeting?

18     A.   Yes.

19     Q.   Is it your recollection that the Miles

20   meeting went forward without Miles?

21     A.   I can't tell you that for certain.

22     Q.   It wouldn't be much of a Miles meeting

23   without Miles there, would it?

24     MR. LORENZINI:  Objection.  Argumentative.

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    BY THE WITNESS:

2        A.   This time you're asking me a question

3    I'm telling you I'm sorry, that I'm not recalling

4    if he was there or not.

5        MR. DAVIS:  Would you mark this as the next

6    exhibit, please.

7            (WHEREUPON, a certain document

8            was marked Deemer Deposition

9            Exhibit No. 23, for identification,

10           as of 10/27/06.)

11           (WHEREUPON, the document was

12           tendered to the witness.)

13   BY MR. DAVIS:

14       Q.   Mr. Deemer, you have what's been marked

15   as Exhibit 23.  The first page appears to be an

16   e-mail from you to a Barbara Powell.

17           Do you see that?

18       A.   Yes.

19       Q.   Who is Barbara Powell?

20       A.   That was my assistant.

21       Q.   Attached to the e-mail are some Power

22   Point slides; is that correct?

23       A.   Yes.

24       Q.   Did you prepare these slides?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1        A.    Yes.

2        Q.    When did you prepare these slides?

3        A.    Obviously around that time, but I can't

4     tell you the exact date, but it was obviously

5     around the time of this memo.

6        Q.    And in preparing the slides, were you

7     attempting to accurately describe what you

8     understood to be the proposed deal between Hancock

9     and Abbott?

10       A.    Well, I was attempting to do that.

11       Q.    The very first slide under John Hancock

12    Life Insurance Company, second bullet point, it

13    says:  "John Hancock is seeking above-average

14    returns on two to four percent of their investment

15    portfolio."

16          Do you see that?

17       A.    Yes.

18       Q.    Is it your understanding that this deal

19    for Hancock was somewhat different from most other

20    deals that Hancock -- most other investments that

21    Hancock made?

22       A.    Well, I really wasn't, of course,

23    familiar with the kind of investments they made

24    obviously, but it seems to me that in terms of

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    investing just in sort of treasury bonds and this

2    sort of thing that this was different from those

3    kinds of investments, yes.

4      Q.   When you say here that Hancock is

5    seeking above average returns on two to four

6    percent of their investment portfolio, what did

7    you mean?

8      A.   It was my understanding here, I mean

9    this is -- this came from Stephen Blewitt, so it

10   was my understanding that what he was trying to

11   tell me was that they apportioned a very small

12   percent of their overall investment portfolio to

13   focus on opportunities that might be very high

14   risk opportunities but provide return that was

15   commensurate with that kind of risk.

16     MR. DAVIS:  Let's mark this as the next

17   exhibit, please.

18           (WHEREUPON, a certain document

19           was marked Deemer Deposition

20           Exhibit No. 24, for identification,

21           as of 10/27/06.)

22           (WHEREUPON, the document was

23           tendered to the witness.)

24   BY MR. DAVIS:

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1      Q.    Mr. Deemer, you have what's been marked

2   as Exhibit 24.

3         Would you read this document for a

4   moment to yourself and tell me when you're done.

5      A.    Okay.  I've read it.

6      Q.    Do you recall sending this e-mail to

7   Dr. Leonard on or about August 25, 2000?

8      A.    Yes.

9      Q.    What was it -- what, if anything, was

10   happening with respect to ABT-980 that caused you

11   to send Dr. Leonard this e-mail?

12      A.    My recollection of this is there was

13   possible issues with the ongoing development of

14   this drug.

15      Q.    Did you believe that had the potential

16   to affect the proposed deal with Hancock?

17      A.    Yes.

18      Q.    That's because ABT 980 was one of the

19   compounds that was being considered for inclusion

20   in the portfolio that would be encompassed by the

21   Hancock deal; is that right?

22      A.    That's correct.

23      Q.    Is that correct that at some point in

24   time ABT-980 -- strike that.

1         At some point in time, Abbott decided

2    to cease development of ABT-980 correct?

3         A.   Yes.

4         Q.   Ha was before the Research Funding

5    Agreement was signed, correct?

6         A.   Yes.

7         Q.   As a result of that decision, there was

8    some period of time where the parties had to

9    restructure the deal in an attempt to make it

10   work, correct?

11        A.   Yes.

12        Q.   Ultimately they went back to the

13   original structure after Abbott and Hancock agreed

14   to add some additional compounds to the portfolio;

15   is that right?

16        A.   This was just a change.  This was a

17   compound that was in very advanced stages, so it

18   was a very sort of high priority compound in the

19   portfolio, Phase III as I recall, one of those

20   that would have a high probability of success.

21   So, yeah, that would have a major impact on the

22   portfolio.  It would have been considered at that

23   point in time.

24        MR. DAVIS:  Let's mark this as the next

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    exhibit, please.

2          (WHEREUPON, a certain document

3          was marked Deemer Deposition

4          Exhibit No. 25, for identification,

5          as of 10/27/06.)

6          (WHEREUPON, the document was

7          tendered to the witness.)

8    BY MR. DAVIS:

9       Q.   Mr. Deemer, I'll show you what's been

10   marked as Exhibit 25 and ask you to look at this

11   document for a moment and tell me if you've seen

12   this document before?

13      A.   Yes.

14      Q.   When did you last see this document?

15      A.   I saw it not too long ago in

16   conjunction with refreshing my memory in

17   preparation for this gathering today.

18      Q.   Is this a fax you sent to Arthur

19   Higgins on or about December 1, 2000?

20      A.   Yes.

21      Q.   Why is it you sent this fax to

22   Mr. Higgins?

23      A.   I'm updating him.

24      Q.   Okay.  Again, the date of the fax is

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1     December 1, 2000, correct?

2        A.   Yes.

3        Q.   You believe that's the date on which

4     you sent it?

5        A.   Yeah.  That would be my guess.

6        Q.   Did Mr. Higgins ask you to provide him

7     with this update?

8        A.   Yeah.  He was interested in the

9     progress, so, yes, he was interested in our -- in

10    progress reports on what was going on so that's

11    what this was.

12       Q.   Had you been -- well, the first item on

13    the fax is a reference to something that you did

14    on November 27; do you see that?

15       A.   Yes.

16       Q.   That was before you sent this fax,

17    correct?

18       A.   Yes.

19       Q.   And in that paragraph you make

20    reference to a new proposed deal structure.

21            Do you see that?

22       A.   Yes.

23       Q.   And the new proposed deal structure

24    that was the structure that resulted from the

1    Abbott's decision to cease development of 980,

2    ABT-980, correct?

3        MR. LORENZINI:  Objection.

4    BY MR. DAVIS:

5        Q.    You can tell me if I'm wrong.

6        A.    Let me just think about it some more.

7    Tell me what your question was again.

8        Q.    The proposed new deal structure that

9    you refer to in this document, what was that?

10       A.    As I recall, they had identified a

11   different way to proceed with the portfolio that

12   we had discussed minus this 980 compound.

13       Q.    Is it correct that the new proposed

14   deal structure was a reaction to Abbott's decision

15   to terminate development of ABT-980 to your

16   knowledge?

17       MR. LORENZINI:  Objection.

18   BY THE WITNESS:

19       A.    I don't know exactly what they were

20   thinking, but my understanding is there was

21   discussion of a new deal structure at that point

22   in time and it was related to the 980 compound.

23   BY MR. DAVIS:

24       Q.    It's correct that after Abbott informed

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1  Hancock that Abbott was discontinuing development

2  of ABT-980, Hancock indicated that Hancock would

3  not move forward with the deal according to the

4  structure that had been discussed up to that point

5  in time, correct?

6      A.    I don't think that's an unreasonable

7  way to say it.  I think they are moving pieces and

8  there was a moving piece on our side and a moving

9  piece on their side, so the issue was to find a

10  way to marry the two different perspectives now on

11  the new world.

12      Q.    The proposed new deal structure was

13  that attempt to try to come up with a structure

14  that would work in the absence of ABT-980; is that

15  right?

16      A.    I think that's reasonably right.

17      Q.    That's on November 27, but you state in

18  the next paragraph that:  "At least by December

19  8th, I feel I need to tell them that our

20  management is less enthusiastic about moving

21  forward due to the new deal structure and to

22  propose a meeting date with them during the week

23  of December 11th to discuss possible options to

24  enhance the effectiveness."

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1        Did I read that correctly?

2    A.   Yes.

3    Q.   So when you sent this fax to

4    Mr. Higgins, you were telling him about something

5    you were going to do in the future, is that right?

6    A.   Yes.

7    Q.   Did you understand at the time that you

8    sent this fax -- did you already understand that

9    Abbott's management was less enthusiastic about

10   moving forward with the new deal structure?

11   A.   I'm not totally sure.  I know he wanted

12   to have a time line of events is obviously what's

13   going on here, and I knew I was not as happy with

14   the deal structure that was proposed and I think

15   our management was not, either, and I was trying

16   to generally convey that I guess.

17   Q.   If appears from this fax what you were

18   doing is providing Mr. Higgins both with an update

19   of something that occurred in the past and then a

20   series of steps that you proposed taking in the

21   future with respect to Hancock; is that right?

22   A.   Yes.

23   Q.   Why is it that you were providing

24   Mr. Higgins with these series of steps?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1      A.   Well, Mr. Higgins wasn't involved in

2   the negotiations or anything and so I think I was

3   giving him a perspective of the time line and

4   obviously this, again, was dragging out over a

5   protracted period of time, and I know he was

6   interested in this thing coming to a conclusion,

7   so I was updating him and telling him steps that I

8   thought were important steps as we went forward to

9   evaluate their new deal structure and a new way to

10   work together.

11      Q.   Why didn't you just tell Hancock

12   everything that was contained in this fax when you

13   spoke with Hancock on November 27?  Why did you

14   stage it out over a period of weeks?

15      A.   I'm not sure I can tell that you in

16   hindsight looking back at this as to why that was,

17   but I think we were still trying to assess how to

18   proceed.  So I think I was informing Mr. Higgins

19   that unless we came up with something different

20   that this was not -- was likely not going to be a

21   workable solution for a lot of reasons.

22      Q.   If you look at the third paragraph of

23   the fax, you state:  "The week of December 18, I

24   assume that I will have pushed them as far as

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    possible with alternative structure options and I

2    will need to tell them that management wants to

3    postpone a final decision until the new year."

4         Did I read that correctly?

5    A.   Yes.

6    Q.   Did you know that as of December 1,

7    2000 that Abbott's management wanted to postpone a

8    final decision on the proposed new deal structure

9    until the new year?

10       MR. LORENZINI:  Objection.  Mischaracterizes

11   the document.

12   BY THE WITNESS:

13   A.   I don't know that I would have known

14   what our management was thinking, but I know we

15   were struggling to try to figure out a way to try

16   to make this work.

17   BY MR. DAVIS:

18   Q.   If I look at this document, Mr. Deemer,

19   it appears to me that somewhere along the line you

20   were instructed by someone within Abbott to drag

21   out the discussions -- let me finish my question,

22   please -- and to stage out providing information

23   to Hancock concerning Abbott's perception of the

24   new proposed deal structure; do I have that

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    correct?

2        MR. LORENZINI:  Objection.  Argumentative,

3    misrepresents facts in evidence.

4    BY THE WITNESS:

5        A.    I don't recall anything like that.  I

6    know we were struggling with this new proposed

7    structure.  We were legitimately trying to figure

8    out a way to try to make it work.

9    BY MR. DAVIS:

10       Q.    How did you know as of December 1, 2000

11   that Abbott's management would eventually want to

12   postpone a final decision on the deal until the

13   new year?

14       MR. LORENZINI:  Objection.  Mischaracterizes

15   the document.

16   BY MR. DAVIS:

17       Q.    I don't know how I would have known

18   that actually.

19   BY MR. DAVIS:

20       Q.    Do you recall having discussions with

21   anyone within Abbott sometime in 2000 in which you

22   were told to try to put off a decision on

23   finalizing the deal with Hancock until sometime in

24   2001?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1     A.   No.  I don't.  In fact, I remember it

2     being a time in which we were trying to -- we were

3     very actively trying to figure out a way to solve

4     the situation.

5     Q.   Do you recall receiving a response to

6     this fax from Mr. Higgins?

7     A.   I don't.

8     Q.   Did Mr. Higgins come back to you and

9     tell you at any point in time don't drag it out in

10    December, go ahead and tell them that we're not

11    happy with the -- or less enthusiastic about the

12    new proposed deal structure right now?

13    A.   I already did that in November.  That's

14    my first paragraph so obviously we already told

15    Hancock the new deal structure wasn't received

16    well.

17    Q.   And then you --

18    A.   That was not the issue.  The issue was

19    trying to figure out something that would work

20    well so they knew the new deal structure was not

21    well received, and we were trying to modify that

22    with them.

23    Q.   Why didn't you then -- when you spoke

24    with Hancock on November 27, why didn't you take

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1   the opportunity to propose with them at that point

2   in time a meeting during the week of December 11

3   as opposed to wait until December 8th?

4       MR. LORENZINI:  Do you understand the

5   question?

6   BY THE WITNESS:

7       A.   Yeah.  I really don't know.

8   BY MR. DAVIS:

9       Q.   Do you recall discussing either this

10  fax or the content of this fax with anyone at

11  Abbott?

12      A.   I don't.

13      Q.   Why was it that you CCd Mr. Weger on

14  this fax, if you know?

15      A.   He was the department head.  He was my

16  boss indirectly.  He was interested in this

17  subject.

18      Q.   You don't recall receiving any feedback

19  from Mr. Weger to this fax?

20      A.   I don't.

21      MR. LORENZINI:  Could we take a break,

22  please?

23      MR. DAVIS:  Sure.  Can you make it relatively

24  quick?

1     THE VIDEOGRAPHER:  Off the record at 3:22.

2          (WHEREUPON, a recess was had.)

3     THE VIDEOGRAPHER:  We're back on the video

4     record at 3:28.

5     MR. DAVIS:  Would you mark this as the next

6     exhibit, please.  I believe it's Exhibit 26.

7          (WHEREUPON, a certain document

8          was marked Deemer Deposition

9          Exhibit No. 26, for identification,

10         as of 10/27/06.)

11         (WHEREUPON, the document was

12         tendered to the witness.)

13    BY MR. DAVIS:

14    Q.   Mr. Deemer, you have what's been marked

15    as Exhibit 26, which is an e-mail from you to

16    Mr. Ake Johannsen, dated 8/22/2001 attaching an

17    executive briefing; do you see that?

18    A.   Yes.

19    Q.   Did you prepare the executive briefing?

20    A.   Can I look at this?

21    Q.   Yes.  Let me ask you, did you play any

22    role in the preparation of this executive

23    briefing?

24    A.   That's why I'm looking through it

1    because I'm not seeing anything yet so that's why.

2       Q.   Let me direct your attention to a

3    particular part of it.  If you look at the page

4    that's Bates numbered in the lower righthand

5    corner that ends in 6401.  It's a slide entitled

6    Out-Licensing Update, Abbott Pipeline.

7       A.   I'm there.

8       Q.   Have you seen that slide before?

9       A.   I'm not sure.

10      Q.   Did you participate in efforts to try

11   to out license ABT-518?

12      A.   Yes.

13      Q.   Was Abbott successful in trying to out

14   license ABT-518?

15      A.   I was not, but I moved on elsewhere and

16   I'm not sure what ever happened to ABT-518.

17      Q.   Did you participate in any efforts to

18   out-license ABT-594?

19      A.   Yes.

20      Q.   Was Abbott successful in trying to

21   out-license ABT-594?

22      A.   I'm not sure of that, either.  I was

23   not and, again, I left during that process so I

24   don't know if it eventually was out-licensed or

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    not.

2        Q.    What steps did you take in an attempt

3    to out-license ABT-518?

4        A.    I contacted a number of pharmaceutical

5    biotech companies to see if they were interested.

6        Q.    Did you provide them with any

7    information regarding ABT-518?

8        A.    Yes.

9        Q.    What information?

10       A.    It seems to me we had a

11   non-confidential description of some kind.  I

12   think we had a confidential agreement also with

13   the company and it seemed like I was leaving about

14   the time -- while those more advanced discussions

15   were taking place.

16      MR. DAVIS:  Let's mark this as the next

17   exhibit, please, Exhibit 27.

18            (WHEREUPON, a certain document

19            was marked Deemer Deposition

20            Exhibit No. 27, for identification,

21            as of 10/27/06.)

22            (WHEREUPON, the document was

23            tendered to the witness.)

24   BY MR. DAVIS:

1      Q.    This appears to be an e-mail to you

2    from Denise Carlson.

3      A.    Uh-huh.

4      Q.    Who is Denise Carlson?

5      A.    Denise I believe was in the Business

6    Development Group, that same group that Eric

7    Zimmer and others were in.

8      Q.    Did she have any role to play in

9    out-licensing?

10      A.    Not that I'm aware.  No, I don't think

11    she did, not at the time anyway that I was around

12    let's put it that way to my knowledge.  I don't

13    think so.

14      Q.    If you take a look at the slide

15    presentation that's attached to the e-mail, it's

16    called Executive Briefing, Global Licensing and

17    New Business Update; do you see that?

18      A.    Yep.

19      Q.    In the slide presentation there are

20    some sort of worksheets or matrices entitled --

21    for different compounds entitled -- typically

22    there is two for each compound, one entitled

23    Preparatory Work and one titled Negotiation and

24    Execution; do you see those?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1        A.    Right.  All right.

2        Q.    Are those worksheets that are used

3    within Abbott for purposes of out-licensing

4    activity?

5        A.    It looks like they were used at that

6    time.  I'm not familiar with those being used

7    today so they're not anything I am involved with

8    right now.

9        Q.    If you look at the lefthand column of

10   the preparatory worksheet, are those -- the items

11   that you see listed in the first column, are those

12   sort of typical steps to preparing to out-license

13   a particular compound?

14       A.    Are they in general?

15       Q.    Yes.

16       A.    They don't seem unreasonable.

17       Q.    If you look at the next page under

18   Negotiation and Execution?

19       A.    That's what I was looking at.  I'm

20   sorry.  You wanted me to look at Preparatory Work.

21       Q.    I see.  It appears there are two slides

22   specific to a compound, one is titled Preparatory

23   Work?

24       A.    Yeah, let me look at that.  I was

1    looking at the other one.  Yes.  I see what those

2    are.  That's sort of a very structured approached.

3    It seems like that looks like it's sort of a

4    process administrator that's preparing that.

5         Q.   Is it a fair description generally of

6    the various preparatory steps that usually or

7    typically are taken in preparing to out-license a

8    particular compound?

9         A.   No, now I look at this, I would say

10    that's probably not -- not something that --

11    probably would not be a path I would have

12    followed.  Let's put it that way.  It seems overly

13    cumbersome and burdensome.

14         Q.   Rather bureaucratic?

15         A.   Yes.

16         Q.   Is one of the typical steps in

17    out-licensing a compound to make a decision to

18    out-license?

19         A.   That's true.

20         Q.   Was a decision made within Abbott to

21    out-license 518?

22         A.   Yes.

23         Q.   Was a decision made within Abbott to

24    out-license ABT-594?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1       A.    Yes.

2       Q.    It says "identify project team."

3             Was there a project team put together

4     within Abbott to out-license ABT-518?

5       A.    It usually didn't require a project

6     team.  That's why I'm taking some argument with

7     this grid, but anyway, it may or may not need a

8     project team.

9       Q.    Do you recall a project team being

10    assembled for ABT-518?

11      MR. LORENZINI:  Objection.  Vague and

12    ambiguous.

13    BY THE WITNESS:

14      A.    For 518, the team -- let me think about

15    this.  Ultimately it's the people that know about

16    the compound that would be involved in the

17    out-license.

18    BY MR. DAVIS:

19      Q.    Was there a project team licensed

20    within Abbott to out-license ABT-518?

21      A.    I was the team leader I guess you could

22    say that.

23      Q.    Was there a team assembled within

24    Abbott to out-license ABT-594?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1      A.   Yes.

2      Q.   Did Abbott prepare a non-confidential

3    data package for ABT-518?

4      A.   Yes.

5      Q.   Was the same done for ABT-594?

6      A.   I think so.

7      Q.   Did Abbott prepare a confidential data

8    package for ABT-518?

9      A.   I think the confidential data package

10   for 518 would have been the this package that

11   existed for the John Hancock agreement, but I

12   think that was mostly prepared already and

13   probably needed to be updated so, yes, I think

14   that that happened.

15     Q.   Did Abbott prepare a confidential data

16   package for ABT-594?

17     A.   I think there was a package for that.

18     Q.   Did Abbott establish the value of

19   ABT-518?

20     MR. LORENZINI:  To his knowledge.

21     MR. DAVIS:  To your knowledge.  He said he

22   was involved in the out-licensing process.

23   BY THE WITNESS:

24     A.   I'm not sure we got to that point.  So

1   you can see it's stage five there on that list of

2   how they -- I'm not sure that we ever got to a

3   point where we were talking about value, usually

4   you have an idea up front, but the value is

5   somewhat subjective.  I don't think we ever got to

6   that at least when I was participating in this I

7   don't believe we advanced this to the stage five

8   box if you will.

9   BY MR. DAVIS:

10       Q.   How about for ABT-594, did you

11   establish a value for that compound?

12       A.   I think that was in a similar kind of

13   time frame.  I'm not sure we got to that box

14   but --

15       Q.   Did you identify potential partners or

16   out-license candidates for ABT-518?

17       A.   Yes.

18       Q.   Did you identify potential partners or

19   out-license candidates for ABT-594?

20       A.   Yes.

21       Q.   Why is it that Abbott didn't license

22   ABT-518?

23       A.   It may have been out-licensed.  I don't

24   know that.  When I was involved, I left that group

1    so I wasn't there to do that so I can only answer

2    during the time that I was involved that we had

3    initiated some discussions, but then they were

4    taken on by other people.

5        Q.   What's your understanding as to why

6    Abbott didn't out-license ABT-518 while you were

7    working on that project?

8        MR. LORENZINI:  Objection.  Asked and

9    answered.

10   BY MR. DAVIS:

11       Q.   Just not enough time?

12       A.   I think there wasn't enough time.

13   There was actually some reasonable interest from

14   other companies.

15       Q.   Why was it that Abbott didn't

16   out-license and ABT-594 while you were working on

17   that project if you know?

18       A.   I think for a similar reason.  These

19   things take quite awhile.

20       MR. DAVIS:  Would you mark this as the next

21   exhibit, please.

22           (WHEREUPON, a certain document

23           was marked Deemer Deposition

24           Exhibit No. 28, for identification,

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1          as of 10/27/06.)

2              (WHEREUPON, the document was

3              tendered to the witness.)

4    BY MR. DAVIS:

5      Q.   Mr. Deemer, you have what's been marked

6    as Exhibit 28 which appears to be an e-mail that

7    you sent to Mr. Johannsen on or about August 27,

8    2001.

9      A.   Okay.

10     Q.   Did you have -- in the course of your

11   work at Abbott, did you periodically send to

12   Mr. Johannsen a weekly update on your activities?

13     A.   Yes.  An update.  I'm not sure if it

14   was weekly or not but, yeah, an update from time

15   to time.

16     Q.   Will you take a look at the third page

17   of the update.  You see there's a point there that

18   says:  "Other lower priority opportunities?"

19     A.   Which page?

20     Q.   The fourth page of the document, but

21   it's the third page of the update.

22     A.   Yes.

23     Q.   Do you see the reference there to other

24   lower priority opportunities?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1        A.   Yes.

2        Q.   If you turn to the next page, you see a

3   reference to ABT-518?

4        A.   Yes.

5        Q.   Did you understand that out-licensing

6   ABT-518 was a lower priority opportunity for

7   Abbott?

8        MR. LORENZINI:  Objection.

9   BY THE WITNESS:

10        A.   Everything is relative.  Priority is

11   relative.  I'm trying to see what's going on here.

12   Yeah, you know, I'm not exactly sure who gave

13   priorities, whether this is just me personally or

14   someone, but as I look back on this list in terms

15   of the priorities and just in terms of the stage

16   of development and so on sort of I guess what I

17   would call indirect or intuitive appreciation for

18   the value of things, it would be a lower priority

19   opportunity.  It was a very early compound, very

20   early cancer compound.  These other are advanced

21   Phase II, Phase III a lot more data behind them

22   and so on and so forth so they would be a lot more

23   valuable assets, for example.

24   BY MR. DAVIS:

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1          Q.    Was out-licensing ABT-594 a lower

2    priority opportunity for Abbott?

3          MR. LORENZINI:  Objection.  Vague, ambiguous.

4    BY THE WITNESS:

5          A.    I don't know where that would fit in in

6    this list of things actually.  Is it on here?

7    BY MR. DAVIS:

8          Q.    I don't see it.  I'm just asking you

9    whether you would regard that as a lower priority

10    opportunity.

11          A.    Again, I mean, I think I was -- people

12    were probably looking at these in terms of the --

13    there's actually a lot of different ways to look

14    at them.  They're not always -- partly you have

15    priorities because you're involved with

16    negotiations.  I start thinking about how these

17    priorities are given.  You also have priorities to

18    do inconsequential things very fast because you're

19    in the middle of a negotiation and you can

20    complete it.  It's hard to just take these out of

21    context and say okay, well, this is a priority

22    because of so and so and so and so.  It's hard for

23    me to say that.

24          Q.    Under this paragraph, it says, the

1  reference to ABT-518, it says:  "We may need to

2  out-license this under the Hancock agreement as we

3  are terminating this program unless Perry can get

4  it funded again."

5       Perry is a reference to Perry Nisen?

6    A.   Yes.

7    Q.   And did you understand that ABT-518 had

8  been terminated on account of funding or lack of

9  funding?

10    A.   It looks like that to me.

11    Q.   Is that consistent with your

12  recollection?

13    MR. LORENZINI:  Objection.

14  BY THE WITNESS:

15    A.   I must be assuming that was what was

16  happening here, but maybe I didn't know.  I don't

17  know.

18  BY MR. DAVIS:

19    Q.   I'm sorry?

20    A.   I was assuming that was what was

21  happening here, but obviously he was the one with

22  knowledge about what's going on, not me.

23    Q.   He being Perry Nisen?

24    A.   Perry Nisen, yeah.

1    Q.    Would you fell Mr. Johannsen that it

2    was being terminated unless Perry can get funded

3    again without having knowledge that it had been

4    terminated for lack of funding?

5        MR. LORENZINI:  Objection.  Vague and

6    ambiguous.

7    BY THE WITNESS:

8        A.    I don't know.  I don't know.

9        MR. DAVIS:  Would you mark this, please, as

10    the next exhibit.

11            (WHEREUPON, a certain document

12            was marked Deemer Deposition

13            Exhibit No. 29, for identification,

14            as of 10/27/06.)

15            (WHEREUPON, the document was

16            tendered to the witness.)

17    BY MR. DAVIS:

18        Q.    Mr. Deemer, you have what's been marked

19    as Exhibit 29 which is an e-mail from to you Susan

20    Glad and/or Curt Whirley?

21        A.    Whirley.

22        Q.    Whirley on September 17, 2001.  Do you

23    recall sending this e-mail?

24        A.    You know, what, I don't recall sending

1    this but I can see that I sent it and I understand

2    what it says.

3        Q.    There's a reference to an

4    investigational brochure.

5        What's that?

6        A.    That is a document that is put together

7    describing all the preclinical work of a compound

8    and its current status of development.

9        Q.    Was an investigational brochure put

10   together for ABT-518?

11       A.    For 518.

12       Q.    518?

13       A.    Yeah, I'm sure -- I presume there was

14   one, yes.  I'm asking for it.

15       Q.    What's a DDC document?

16       A.    That is the DDC stands for Drug

17   Development Committee.

18       Q.    What is a DDC document?

19       A.    A review for compounds for the Drug

20   Development Committee.

21       Q.    Was there one prepared for 518 to your

22   knowledge?

23       A.    Well, look, I don't know that I ever

24   saw either of these, but my presumption is there

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    was one for each of those.

2        Q.    Was there an investigational brochure

3    prepared for ABT-594?

4        A.    I think all compounds have to have

5    investigational brochures.

6        Q.    You believe yes?

7        A.    Yes.  I believe yes.

8        Q.    Was there a DDC document prepared for

9    ABT-594?

10        A.    I believe yes.

11        Q.    Did you have copies of those at any

12    point in time?

13        A.    I don't recall having copies.  I'm

14    asking in this memo, though, for someone to

15    accepted -- I'm asking are they available

16    electronically.  Often they are not, so I don't

17    know.

18        MR. DAVIS:  Would you mark this as the next

19    exhibit, please.

20            (WHEREUPON, a certain document

21             was marked Deemer Deposition

22             Exhibit No. 30, for identification,

23             as of 10/27/06.)

24            (WHEREUPON, the document was

1              tendered to the witness.)

2    BY MR. DAVIS:

3        Q.    Looking at Exhibit 30, Mr. Deemer, that

4    is letter from Daphne Powells to Mr. Blewitt dated

5    September 20, 2001.  Ms. Powells, she was an

6    in-house attorney at Abbott, correct?

7        A.    Correct.

8        Q.    And she participated in the negotiation

9    and drafting of the Research Funding Agreement,

10   correct?

11       A.    Yes, she did.

12       Q.    If you take a look at the last

13   paragraph of this letter, if says:  "Phil Deemer

14   has attempted to schedule a meeting with you to

15   discuss the termination for the MMPI program as

16   well as to introduce you to Tom Lyons, our new

17   controller, Global Pharmaceuticals Research &

18   Development."

19          Did I read that correctly?

20       A.    Yes.

21       Q.    Did that meeting ever take place?

22       A.    You know, I think it took place between

23   Tom and Steve.  I'm not sure I was ever there.

24       Q.    What was it that you intended to tell

1    Mr. Blewitt in the course of that meeting

2    regarding the termination for the MMPI program?

3        A.   I wanted to tell him what was coming in

4    this letter in advance of the letter.

5        Q.   So you just wanted to inform him that

6    the MMPI program had been terminated?

7        A.   Yeah.

8        Q.   Anything more?

9        A.   No.  I would have preferred to have

10   told him in person as opposed to him getting this

11   letter.

12       Q.   Ms. Powell says:  "We look forward to

13   scheduling that meeting soon."

14            I take it there wasn't any need any

15   longer when Mr. Powell sent this letter for a

16   meeting to discuss the termination of the MMPI

17   program?

18       A.   I think there was another reason.

19       Q.   Go ahead answer.

20       A.   Steve Cohen had left and here was this

21   Tom Lyons person who was coming on to take over

22   his responsibilities and that was another

23   objective of that meeting.

24       Q.   You don't recall participating in such

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1   a meeting with Mr. Blewitt?

2       A.   I think they ended up having a

3   telephone conversation.

4       MR. DAVIS:  Mark this as the next exhibit,

5   please.

6               (WHEREUPON, a certain document

7               was marked Deemer Deposition

8               Exhibit No. 31, for identification,

9               as of 10/27/06.)

10              (WHEREUPON, the document was

11              tendered to the witness.)

12  BY MR. DAVIS:

13      Q.   Mr. Deemer, you have what's been marked

14  as Exhibit 31.  It appears to be an e-mail from

15  you to Bruce at Amgen.com at internet; do you see

16  that?

17      A.   Yes.

18      Q.   Who is Bruce B at Amgen?

19      A.   He was a business development

20  individual at another biotechnology company.

21      Q.   Did you actually send this e-mail to

22  him on or about October 11, 2001?

23      A.   Well, I mean, again, I presume I did

24  because it's in front of me here so that's -- to

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    that extent, I presume I did.

2        Q.   I can phrase it differently.

3            Do you have any reason to believe that

4    you didn't send this e-mail?

5        A.   No, I don't.

6        Q.   You say in the e-mail, "Dear Bruce, we

7    have a number of out-licensing opportunities

8    resulting from our acquisition of Knoll and the

9    rationalization of our own timeline.  These

10   include and one of the items is ABT-518."

11           Do you see that?

12       A.   Yes.

13       Q.   Is it correct that Abbott's decision to

14   cease development of ABT-518 as a resulted from

15   its acquisition of Knoll and the rationalization

16   of its own pipeline?

17       MR. LORENZINI:  Objection.  Lacks foundation.

18   BY THE WITNESS:

19       A.   Well, I realize that that's what this

20   memo is inferring so I don't really know the

21   particulars of any of these things, but it's a way

22   to introduce this to give him some rationale I

23   guess is a way to say it of the origin of these

24   opportunities.

08657-00097_Abbott-John Hancock II          None                    Page  250

1    how and when to out-license ABT-594?

2        MR. LORENZINI:  Objection.  Lacks foundation.

3    Calls for speculation.

4    BY THE WITNESS:

5        A.   I'm not aware of what would have

6    happened.  I wasn't aware of any issues myself.

7    BY MR. DAVIS:

8        Q.   Who took over responsibility for

9    out-licensing ABT-518 when you moved on?

10        A.   It was given over to the Business

11    Development Group.  I'm not sure there was

12    identified a specific person, but I think it was

13    given to a number of people there that had

14    responsibilities in general for geographic markets

15    so U.S., Japan, Europe, Middle East and so on.  So

16    I think there were several people involved in

17    those things.  It was more of a matrix as opposed

18    to an individual.

19        Q.   Who took over responsibility for

20    out-licensing of ABT-594?

21        A.   I think it was all those compounds so

22    my position as to specific out-licensing was

23    really one that was no longer a focus and they

24    were matrixed into a number of different groups,

1    number of different people within a group.

2        MR. DAVIS:  Let's mark this as the next

3    exhibit.

4            (WHEREUPON, a certain document

5            was marked Deemer Deposition

6            Exhibit No. 33, for identification,

7            as of 10/27/06.)

8            (WHEREUPON, the document was

9            tendered to the witness.)

10   BY MR. DAVIS:

11       Q.   Mr. Deemer, you have what's been marked

12   as Exhibit 33.  Is this another one of your

13   periodic updates to Mr. Johannsen?

14       A.   Okay.

15       Q.   You agree with that?

16       A.   Yes.

17       Q.   If you take a look at I think it's the

18   fifth page of the document, the fourth page of the

19   update, there's a reference there to ABT-594.

20       Do you see that?

21       A.   Yes.

22       Q.   It says priority six, what does that

23   mean?

24       A.   Again, let me look at these priorities

1   so I understand them myself.  So if you look at

2   this priority one, there was actually an agreement

3   that was being finalized so that would have had

4   priority one because we're right in the midst of a

5   contract.

6       Q.   You're listing the items that you have

7   on your plate in order of priority as you

8   understood it?

9       A.   For me personally.

10      Q.   In this section, it says that it

11  appears to be reasonable value left in this

12  compound to necessitate out-licensing under the

13  terms of the Hancock agreement.

14          Did I read that correctly?

15      A.   Yes.

16      Q.   What did you understand to be the

17  reasonable value left in the compound?

18      A.   Well, to my knowledge the compound was

19  a -- just as I stated there, a potentially

20  valuable development compound and so I believe

21  that our arrangement with Hancock was such that if

22  we felt there was value left that we had an

23  obligation out-license those or at least attempt

24  to use our commercially reasonable efforts to

1    out-license those compound.  That's what I meant

2    by that.

3        Q.    Do you have any more specific

4    understanding of the value left in ABT-594?

5        A.    No.  I didn't know about the clinical

6    details of it or whatever.  I just was aware that

7    there was an asset there that under the terms of

8    our agreement was one that was to have us use our

9    best efforts to out-license.

10        Q.    Were non-confidential packages

11    distributed to each of the possible out-licensing

12    companies listed here for ABT-594?

13        A.    No.

14        MR. LORENZINI:  To all of them?

15        MR. DAVIS:  Let me start there.

16    BY THE WITNESS:

17        A.    No.  Again, we're looking back here six

18    years ago, so it says possible out-licensing

19    companies are as follows, so I'm identifying

20    possible companies here as opposed to companies

21    with whom we've had conversations and so on, so

22    none.

23    BY MR. DAVIS:

24        Q.    The next question were non-confidential

1　packages distributed to any of these companies for

2　ABT-594?

3　　　A.　I would have to look back in my records

4　to see where this went.

5　　　Q.　Do you recall whether non-confidential

6　packages were distributed in any those of those?

7　　　A.　I don't recall that.  Again, I was

8　moving on at that point.

9　　　Q.　If packages were distributed to any of

10　these companies, would you expect that there would

11　be some record of it in Abbott's files?

12　　　MR. LORENZINI:  Objection.  Calls for

13　speculation.

14　BY THE WITNESS:

15　　　A.　I don't know exactly who took over

16　these things and I had some records of my own that

17　involved some of these so I don't know how

18　comprehensive they were.

19　BY MR. DAVIS:

20　　　Q.　How about confidential packages, do you

21　know confidential packages were distributed to any

22　of these potential out-licensing companies?

23　　　MR. LORENZINI:  Objection.  Lacks foundation.

24　BY THE WITNESS:

1       A.   So let me just give a little -- this is

2   October when, end of October and these are

3   companies that were now beginning to identify so

4   this whole process to identify, write letters to,

5   get those companies to think about whether they

6   have any interest, first provide a

7   non-confidential package, then a confidential,

8   that cycle can take six months before the first

9   confidential package goes out to anybody so I

10  think it would have been presumptuous to think we

11  would have had a confidential package going to any

12  of those companies that we were first beginning to

13  identify as potential out-licensing candidates.  I

14  can go back in records and verify that or look for

15  those things.

16      Q.   My question is actually simpler than

17  that.

18          My question is do you recall whether

19  confidential packages were, in fact, distributed

20  to any of these companies?

21      A.   No, I don't.

22      MR. DAVIS:  Let's mark this as the next

23  exhibit.

24              (WHEREUPON, a certain document

1          was marked Deemer Deposition

2          Exhibit No. 34, for identification,

3          as of 10/27/06.)

4          (WHEREUPON, the document was

5          tendered to the witness.)

6      MR. DAVIS:  Why don't we go off for a minute

7   and change the tape.

8      THE VIDEOGRAPHER:  4:08.

9          (WHEREUPON, a recess was had.)

10      THE VIDEOGRAPHER:  Back on the video record

11   with Tape No. 5 at 4:09.

12   BY MR. DAVIS:

13      Q.   Mr. Deemer, you have what's been marked

14   as Exhibit 34.  I would ask you to look at the

15   document and tell me when you're finished

16   reviewing the e-mails that are here.

17      A.   Okay.  I've read it.

18      Q.   The e-mails include an inquiry from

19   Pamela Demain concerning potential out-licensing

20   opportunity involving the MMPI Phase I cancer

21   drug.

22          Do you see that?

23      A.   Yes.

24      Q.   That's a reference to ABT-518, correct?

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1        A.   Yes.

2        Q.   And you responded and by the way,

3    Ms. Demain worked at or works at Merck, correct?

4        A.   Yes.

5        Q.   Which is another pharmaceutical

6    company?

7        A.   Correct.

8        Q.   You responded to her on December 13,

9    2001 that:  "Unfortunately we decided to suspend

10   these initiatives for the time being pending

11   further evaluation of these activities.  We will

12   contact you again as soon as we decide to proceed

13   further with out-licensing these projects.  I

14   apologize for any inconvenience this may have

15   caused."

16        Do you see that?

17        A.   Yes.

18        Q.   What was it that led Abbott to suspend

19   its out-licensing activities for ABT-518?

20        A.   The group was reorganizing and as I

21   said before, they were trying to figure out who

22   was going to be doing what and what the priorities

23   of the group was.  There was a big reorganization

24   going on within the business development and

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    licensing department.

2      Q.   Did Abbott ever reinstitute or

3    recommence out-licensing activities for ABT-518?

4      MR. LORENZINI:  Objection.  Lacks foundation.

5    BY THE WITNESS:

6      A.   That is something I am not familiar

7    with.  I don't know if that happened.  I moved on

8    to a completely different part of the company that

9    had actually no relationship with pharmaceuticals

10   like that anymore.

11     MR. DAVIS:  Mark this as the next exhibit.

12         (WHEREUPON, a certain document

13         was marked Deemer Deposition

14         Exhibit No. 35, for identification,

15         as of 10/27/06.)

16         (WHEREUPON, the document was

17         tendered to the witness.)

18   BY MR. DAVIS:

19     Q.   Mr. Deemer, you have what's been marked

20   as Exhibit 35 which is an e-mail from you to

21   Debbie AP at Marshall from June of 2003.

22         Who is Debbie AP at Marshall?  I note

23   that you are Philip APX Deemer suddenly.

24     A.   E-mail system.  She was an assistant.

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1  entities?

2      A.  I'm not aware of Abbott completing a

3  deal with any of these other companies.

4      Q.  And then there is a reference there to

5  CROs.  What are CROs?

6      A.  Those are clinical research

7  organizations.

8      Q.  Why are they listed under funding

9  initiatives?

10      A.  Sometimes clinical research

11  organizations provide funding to do things.

12      Q.  What are competency partners?

13      A.  Those would be partners who actually

14  perform services in return for different forms of

15  compensation, have some competency in some

16  particular aspect of the pharmaceutical world.

17      Q.  Prior to the execution of the Research

18  Funding Agreement, were you aware of any liver

19  toxicity issues involving ABT-773?

20      A.  No, I was not.

21      Q.  How about any what they call QT or

22  potential heart toxicity issues involving ABT-773?

23      MR. LORENZINI:  I'm going to just object as

24  vague and ambiguous.

Deemer, Philip (Linked)  10/27/2006  9:16:00 AM

1    BY MR. DAVIS:

2        Q.   Were you aware before the Research

3    Funding Agreement was executed of any concerns or

4    potential problems involving QT or heart

5    eurhythmia or heart toxicity issues involving

6    ABT-773?

7        A.   No, I was not.

8        Q.   Are you aware that ABT-773 was --

9    development of that compound by Abbott was

10   terminated after the Research Funding Agreement

11   was signed?

12       A.   Yes, I was aware of that.  That was

13   some years later as I recall.

14       Q.   When was it that Abbott decided to

15   terminate the development of that compound if you

16   know?

17       A.   I have no idea.

18       Q.   Did you participate in any way in

19   out-licensing ABT-773?

20       A.   No.  I think all that happened well

21   after the time that I was gone from that work.

22       Q.   Have you ever participated in any

23   contractual compliance audits of Abbott?

24       A.   Contract compliance?  I don't think so.

Deemer Deposition Exhibit 1


P's Exhibit 53

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, et al.,       )<br>      )<br>      Plaintiffs,    )<br>      )<br>vs.       )<br>      )<br>ABBOTT LABORATORIES,   )<br>      )<br>      Defendant.   )<br>      ) | Civil Action No. 05-11150-DPW<br>Hon. Judge Douglas P. Woodlock |

## AFFIDAVIT OF PHILIP M. DEEMER

## CONFIDENTIAL INFORMATION
## SUBJECT TO PROTECTIVE ORDER ENTERED BY THE COURT

This envelope (or container) containing the above-identified paper
filed by Abbott Laboratories, is not to be opened nor the contents thereof
displayed or revealed except by further Order of the Court or by agreement
of the Parties.



PLAINTIFF'S
EXHIBIT
Deemer 1
10-27-06

SEALED ORIGINAL – DO NOT SCAN

## UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK
VARIABLE LIFE INSURANCE
COMPANY and MANULIFE
INSURANCE COMPANY,

        Plaintiffs,

v.

ABBOTT LABORATORIES,

        Defendant.

CIVIL ACTION NO. 05-11150-DPW

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
FILED UNDER SEAL

## AFFIDAVIT OF PHILIP M. DEEMER

I, Philip M. Deemer, hereby state under oath that:

1.    I am currently employed by Defendant Abbott Laboratories ("Abbott") as Director of Alliance Management.  In that role, I am responsible for evaluating new business opportunities and forming management alliances with other biotechnology and pharmaceutical companies.

2.    I make this affidavit in support of Defendant Abbott Laboratories' Consolidated Reply Memorandum in Support of Its Motion to Dismiss and in Opposition to the Cross Motion for Partial Summary Judgment by John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and Manulife Insurance Company (f/k/a Investors Partner Life Insurance) (collectively, "Hancock").

3.    I am competent to testify and have personal knowledge of the facts set forth in this affidavit.

12714696.1

4.     I have worked for Abbott Laboratories in various positions since 1990. I received a Bachelor's Degree in chemical engineering from the University of Michigan in 1978 and a Master's Degree in Business Administration from the Carnegie Mellon School of Business in 1982.

5.     During 2000-2001, I held the position of Director of Business Development and Licensing for Abbott's Global Pharmaceutical Research Division. I was principally responsible on behalf of Abbott for negotiating the business terms of the Research Funding Agreement (the "Agreement") that I understand is at issue in this lawsuit.

6.     My counterpart at Hancock was Stephen Blewitt, who was principally responsible on behalf of Hancock for negotiating the business terms of the Agreement. In addition to Mr. Blewitt, Brewster Lee, Kevin Tonney, and Amy Weed, outside counsel for Hancock, were involved in the negotiation of the Agreement on behalf of Hancock (collectively, Messrs. Blewitt, Lee, and Tonney, and Ms. Weed, are referred to hereinafter as the "Hancock Representatives").

7.     In or about early 2000, Mr. Blewitt proposed to me that Hancock invest in a portfolio of pharmaceutical compounds that were in development at Abbott. Specifically, the concept of the transaction was that both Abbott and Hancock would commit to investing certain amounts toward the development of a portfolio of compounds, with Abbott committing to provide funds on an at least a two-to-one basis. In exchange, Hancock would receive the right to potential future milestones and royalty payments from any successful commercialization of the compounds.

8.     Initially, Mr. Blewitt proposed that Abbott spend on the compounds a minimum of $400 million of its own money, together with $200 million of Hancock's money, over a fixed "Program Term" for an aggregate minimum of $600 million. This proposal is reflected, for example, in a 1/28/2000 Proposed Summary of Terms, a true and correct copy of which is attached hereto as Exhibit A.

9.     While Mr. Blewitt and I discussed the possibility that Abbott might contribute funds in an amount exceeding $400 million and/or in a ratio exceeding two to one, we agreed that such outcomes could arise based on Abbott's ongoing assessment of the commercial viability of the compounds. For example, in an internal Abbott report that I helped Steve Cohen – then Abbott controller – prepare on or around August 2000, we reported (on page 6), based on the information then available to us regarding a commercial viability assessment of the program compounds, an estimate that Abbott would likely spend $700-800 million on the development of the compounds over the Program Term. A true and correct copy of this presentation, with a cover memorandum from Mr. Cohen (ABBT0006748-68), is attached as Exhibit B.

10.     While I understood that Abbott might, at its discretion, spend more than $400 million over the Program Term based on its ongoing assessments of the commercial viability of the compounds, I did not understand that the Agreement obligated Abbott to spend more than $400 million or contribute funds in a ratio exceeding two to one in order to make up for any shortfall in Hancock's funding contributions. For example, the August 2000 presentation noted that the "John Hancock $ Contribution" was "200 MM" and the "Abbott $ Contribution" was a "cumulative total" of "400 MM." See Ex. B at 7.

11.     During my subsequent negotiations with the Hancock Representatives, the precise proposed mix of funding between Abbott and Hancock varied somewhat over time. Ultimately the parties reached agreement on a proposal, memorialized in the Agreement, whereby Abbott would fund $400 million and Hancock would fund $214 million. The $614 million total planned investment, composed of Abbott's $400 million and Hancock's $214 million, was defined in the Agreement as the "Aggregate Spending Target."

12.     Based on my communications with the Hancock Representatives, I understood throughout these negotiations that Abbott would not be obligated to make up for any shortfall in Hancock's funding contributions in order to reach the targeted combined total amount. And at no point in these negotiations did the Hancock Representatives indicate to me that Hancock's position was, or that they understood, that Abbott would be required to fund more than $400 million to make up for a shortfall in order to reach the $614 million combined target if Hancock funded less than the proposed $214 million. To the contrary, I understood based on our communications that the Hancock Representatives understood that Abbott was obligated only to fund its share of the Aggregate Spending Target. For example, on September 18, 2000, at which time the proposed funding obligations were $400 million for Abbott and $220 million for Hancock, Messrs. Lee and Toomey sent a memorandum to myself and others at Abbott, on which Mr. Blewitt and Ms. Weed were copied, wherein on page 3 they stated that the definition of "Program Related Costs" that was proposed in a particular draft of the Agreement was "inconsistent with their understanding the Abbott would be obligated to fully fund its share of the Aggregate Spending Target (that is, $400,000,000 of the

$620,000,000 total amount)." I reviewed this memorandum and relied on this statement in continuing to understand that Abbott was obligated to fund a $400 million share of the Aggregate spending Target and not obligated to make up for any shortfall in Hancock's spending. A true and correct copy of the September 18, 2000 memorandum, with a cover email (JH 003342-46), is attached hereto as Exhibit C.

13.    During our negotiations, I informed Mr. Blewitt on a number of occasions that Abbott expected that it could reach the aggregate minimum spending target within a four-year Program Term, assuming that Hancock contributed its full anticipated share during that term. Because of the uncertainty in predicting the progress of long-term pharmaceutical projects, however, I informed Mr. Blewitt that it was very important to Abbott to have the flexibility to spend the funds over a five year period should unforeseen circumstances prevent Abbott from making the planned expenditures within the initial four years. During these discussions, Mr. Blewitt informed me that this was acceptable to Hancock, but that Hancock wanted the ability to terminate its payments if at various points in time Abbott did not demonstrate its intent to spend the aggregate minimum.

14.    Ultimately, the parties adopted Section 3.3 of the Agreement ("Carryover Provisions") to memorialize the parties' agreement that Abbott was to have the flexibility to extend by one year the time in which to make the planned expenditures of joint funds on development of the compounds. I understood, based on my communications with the Hancock Representatives, that the last sentence of Section 3.3(b) was negotiated in order to and intended to protect Hancock in the event that, due to unforeseen circumstances, it was impractical for Abbott to expend the aggregate of $614 million in joint Hancock and

1714466.1

Abbott funds during the initial five years of the Agreement. I further understood, based on my communications with the Hancock Representatives, that Section 3.3(b) assumed that Hancock had made its entire $214 million contribution of Program Payments and that Hancock would be entitled to a partial refund only if Abbott failed to spend $400 million of its own funds in addition to the funds provided by Hancock. For example, the August 2000 presentation that I helped prepare noted that Section 3.3(b) would apply only if Abbott "does not spend the Aggregate amount of $400 million by the end of the 4th year (in addition to the John Hancock payments)." *See* Ex. B at 18.

15.    Mr. Blewitt indicated to me that the reason Hancock wanted the ability to terminate its payments under certain circumstances was that Abbott's planned investments in the compounds served as the best barometer of the likely success of the compounds, giving Hancock an ability to reduce its own spending if Abbott's plans revealed that the prospects for the compounds, as reflected in Abbott's spending plans, had diminished.

16.    Mr. Blewitt's statements that Hancock wanted the ability to terminate its payments if Abbott did not demonstrate its intent to spend the aggregate minimum led to the negotiation, and ultimately the inclusion of, Section 3.4 of the Agreement ("Termination of John Hancock's Payment Obligations"). I understood, based on my discussions with the Hancock Representatives, that Section 3.4 was the only provision in the Agreement addressing the circumstances under which John Hancock's payment obligations would terminate, and the only provision in the Agreement addressing Hancock's and Abbott's respective rights and obligations in such circumstances. Based on my discussions with the Hancock Representatives, I understood that Section 3.3

171407.1

assumed and was based on the premise that Hancock would make its planned total Program Payments. The Hancock Representatives never indicated to me that Hancock's position was, or that they understood, that Section 3.4 was not the exclusive provision in the Agreement addressing the circumstances under which John Hancock's payment obligations would terminate, or that Section 3.4 was not the only provision in the Agreement addressing Hancock's and Abbott's respective rights and obligations in such circumstances. Nor did the Hancock Representatives ever indicate to me that they did not understand that Section 3.3 assumed and was conditioned on the premise that Hancock would make its planned total payment amount over the course of the Program Term.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 15, 2006.

Philip M. Deemer

**CERTIFICATE OF SERVICE**

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail by hand

Date: 10/16/06   michael DD

1214608.1

# Exhibit A

Proposed Summary of Terms
1/28/00

| | |
|---|---|
| **Researcher:** | **Abbott Laboratories ("Abbott")** |
| **Funding Source:** | **John Hancock Life Insurance Company ("John Hancock")** |
| **Use of Proceeds:** | Fund research and development programs associated with Program Compounds. |
| **Program Compounds:** | The Compounds specified below and any line extensions, new formulations and combination products in which the same active ingredient is present. |
| **Program Payments:** | During the Program Term, and in consideration of Abbott's continuing performance of the research services under the Research Plan, John Hancock shall make program payments to Abbott in the installments and on the dates set forth below: |

| Date | Payment |
|---|---|
| [May 1,] 2000 | $50,000,000 |
| [May 1,] 2001 | $50,000,000 |
| [May 1,] 2002 | $50,000,000 |
| [May 1,] 2003 | $50,000,000 |

"Program Term" means the period commencing [May 1,] 2000 Date and ending on [April 30,] 2003.

"Research Plan" means a detailed statement of Abbott's objectives, activities, timetable, FTE allocation and budget for the Program Compounds during the Program Term.

During the Program Term, Abbott agrees to spend a minimum of $100 million per year on research and development programs associated with the Program Compounds

If Abbott ceases research and development of all Program Compounds or Abbott does not spend at least [$] million in a year on the research and development of Program Compounds, John Hancock's obligation to continue to make Program Payments shall cease.

CONFIDENTIAL
JH 002312

Abbott shall make the following milestone payments to John Hancock based upon the following events for each Compound:

| Date | Payment |
|------|---------|
| Completion of Phase I | [$] |
| Completion of Phase II | [$] |
| Completion of Phase III | [$] |
| Filing of NDA | [$] |
| Regulatory Approval | [$] |

*[handwritten: Doesn't work b/c then confirm have to expense it]*

*[handwritten: Oh but not necessarily approved]*

Abbott shall pay to John Hancock royalties on Net Sales of Program Compounds at the following rates: *[handwritten: on an aggregate basis]*

| Annual Sales Volume | Royalty Rate |
|---------------------|--------------|
| 0 to [$] million | [%] |
| > [$] million and ≤ [$] million | [%] |
| > [$] million | [%] |

The obligation to make royalty payments shall commence on the date of the First Commercial Sale of a Program Compound [in a given country] and shall continue with respect to Net Sales of such Program Compound [sold in such country] for a period of [] years. *[handwritten: End date for royalties]*

**, Manufacturing,**
**ng Agreements:**
Abbott shall be solely responsible for, and agrees to use reasonable commercial efforts to pursue, the clinical development, government approval, manufacturing, marketing and sales of the Program Compounds.

CONFIDENTIAL
JH 002313

2

# Exhibit B

To: JEFF / ARTHUR

ATTACHED IS THE HANCOCK
PACKAGE WITH THE 3 ADD'L
SCHEDULES.

IN ADDITION I'VE INCLUDED SOME
BACK-UP SLIDES
    o CLARIFICATION SLIDES
    o PROFILING SLIDES
THAT YOU MAY WANT TO INCLUDE

Steve

From:
STEVE COHEN
Comptroller
PPD R&D
D-404, AP9
Ext. 7-3416

ABBT 0006748
HIGHLY CONFIDENTIAL

# ABBOTT - JOHN HANCOCK FUNDING COLLABORATION

- WHY EXTERNAL FUNDING
- WHY JOHN HANCOCK MODEL
- JOHN HANCOCK BACKGROUND
- BASIC COLLABORATION STRUCTURE
- COLLABORATION DESCRIPTION/TERMS SUMMARY
- NEGOTIATION/COMPLETION STATUS
- PERMISSION TO PROCEED TO DEFINITIVE AGREEMENT

1

ABBT 0006749
HIGHLY CONFIDENTIAL

# WHY EXTERNAL FUNDING

- MORE VIABLE DEVELOPMENT OPPORTUNITIES THAN CAN BE AFFORDED WITH PROJECTED INTERNAL FUNDING

2

ABBT 0006750
HIGHLY CONFIDENTIAL

# WHY THIS VEHICLE (JOHN HANCOCK)

- **ABBOTT MAINTAINS DEVELOPMENT CONTROL**
  - *JOHN HANCOCK SHARES IN THE RISK*
- **ABBOTT MAINTAINS COMMERCIAL RIGHTS**
  - *JOHN HANCOCK SHARES IN THE REWARD*
- **MOST FLEXIBLE/STRAIGHT FORWARD COLLABORATION STRUCTURE**
- **LEAST EXPENSIVE EXTERNAL MONEY**

3

ABBT 0006751
HIGHLY CONFIDENTIAL

# JOHN HANCOCK LIFE INSURANCE COMPANY

- ABBOTT HAS DEVELOPED RELATIONSHIP WITH JOHN HANCOCK OVER PAST 4 YEARS
  - METABOLEX (EQUITY UNITS/PUTS)
  - IDUN (PRIVATE EQUITY)
  - PURDUE FREDERICK (SENIOR DEBT)
- JOHN HANCOCK IS SEEKING ABOVE AVERAGE RETURNS ON 2-4% OF THEIR INVESTMENT PORTFOLIO
  - $35B TOTAL INVESTED CAPITAL (PRIMARILY IN HIGH GRADE DEBT)
  - $1.8B IN HEALTH CARE INVESTMENTS OVER PAST 9 YEARS
- MANY JOHN HANCOCK INVESTMENTS ARE NOT PUBLICLY DISCLOSED
  - DOES NOT NEED/PREFERS MINIMAL DISCLOSURE OF INVESTMENTS

4

ABBT 0006752
HIGHLY CONFIDENTIAL



ABBT 0006753
HIGHLY CONFIDENTIAL

JOHN HANCOCK FUNDING COLLABORATION

| CONCEPT | DEVELOPMENT | |
|---|---|---|
| • PORTFOLIO FUNDING COLLABORATION | • ABBOTT COMPOUNDS (WE RETAIN OWNERSHIP) | |
| • ABBOTT PORTFOLIO OF COMPOUNDS | • ABBOTT CONTROLS DEVELOPMENT | |
| • JOHN HANCOCK FUNDING PARTNER | – REGULATORY | |
| – CONTRIBUTES $50 MM/YEAR NET | – MANUFACTURING | |
| – 4 YEARS | • BOTH SHARE IN TECHNICAL / COMMERCIAL RISK | |
| – PAYBACK TO JOHN HANCOCK | • ABBOTT MAINTAINS COMMERCIAL RIGHTS | |
| • MILESTONES AT APPROVAL | | |
| • OTHER MILESTONES/FEES ($20MM) | | |
|   REIMBURSED BY JOHN HANCOCK | | |
| • ROYALTIES | | |
| | | |
| PORTFOLIO | FINANCIALS | |
| • LATE STAGE | • EXPECTED PORTFOLIO REQUIREMENTS 8/00 - 3/04 | $700-900MM |
| – BPH (ABT-980) PHASE III | • JOHN HANCOCK'S CONTRIBUTION | $200 MM |
| – ENDOTHELIN (ABT-627) PHASE II / III | • ABBOTT'S CONTRIBUTION REQUIREMENT | |
| – KETOLIDE (ABT-773) PHASE II / III | – ANNUAL MINIMUM | $50MM |
| – CCM (ABT-594) PHASE II | – CUMMULATIVE - 5 YEARS | $400MM |
| • EARLY TO MID STAGE (ONCOLOGY) | • JOHN HANCOCK RETURN | |
| – ANTI-MITOTIC (RISAJ) PHASE I | – ROYALTIES (WORLDWIDE NET SALES) | |
| – MMPI (ABT-518) PRECLINICAL / I | – PERIOD: - 10 YEARS/PRODUCT | THRU 2014 |
| – FTI PRECLINICAL | – NONE PAID PAST 2014 | |
| – TBD    PRECLINICAL | – RATE (TIERED – 3% TO 8%) | AVG. 3-4% |
| | – MILESTONES @ APPROVAL (CAPPED @ $40mm) | $10MM/CMPND |
| | – ROI | 15-21% |
| | • PROVISIONS FOR: | |
| | – MINIMUM SPEND FAILURE | |
| | – COMPOUND SUBSTITUTION | |

6

ABBT 0006754
HIGHLY CONFIDENTIAL



ABBT 0006755
HIGHLY CONFIDENTIAL

# STATUS

- **DUE DILIGENCE**
  - ONGOING
  - EXPECTED — 8/15
- **CONTRACT**
  - INITIAL DRAFT COMPLETE — 7/17
  - INTERNAL REVIEW
  - SUBMIT TO JOHN HANCOCK
  - REVIEWS COMPLETE
  - TARGET SIGNATURE — 8/31

8

ABBT 0006756
HIGHLY CONFIDENTIAL

DRAFT - FOR DISCUSSION PURPOSES ONLY

DRAFT

# Abbott Laboratories
## PPD R&D Alternative Financing Analysis
## John Hancock Funding Scenarios

### NOMINAL AND EXPECTED SALES FORECAST
(Base Case)

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BPH (ABT-980) | — | — | — | 41 | 72 | 281 | 380 | 440 | 483 | 496 | 493 | 511 | 465 | 468 | 410 | 370 | 310 | 6,200 |
| Ketolide (ABT-773) | — | — | — | — | 106 | 316 | 430 | 651 | 802 | 906 | 931 | 907 | [illegible] | [illegible] | 722 | 678 | 426 | 6,766 |
| Ketolide - IV | — | — | — | — | 17 | 18 | 28 | 48 | 68 | 64 | 58 | [illegible] | [illegible] | [illegible] | 45 | 48 | 38 | [illegible] |
| Endothelin (ABT-627) | — | — | — | 21 | 101 | 139 | 182 | 289 | 371 | 426 | 452 | 400 | 464 | 451 | 417 | 282 | 260 | 4,276 |
| CCM (ABT-594) | — | — | — | — | 78 | 210 | 348 | 827 | 736 | 837 | 833 | 700 | 768 | 728 | 780 | [illegible] | [illegible] | 7,780 |
| FTI | — | — | — | — | — | — | — | 8 | 69 | 143 | 181 | 218 | [illegible] | 228 | 236 | 234 | 212 | 1,749 |
| MMPI (ABT-518) | — | — | — | — | — | — | 8 | 54 | 172 | 377 | 391 | 449 | [illegible] | 440 | 449 | 427 | 378 | 3,699 |
| Antibiotic (EISAI) | — | — | — | — | 1 | 31 | 111 | 225 | 320 | 409 | 449 | 460 | 443 | 423 | 385 | 360 | 325 | 3,844 |
| TBD | — | — | — | — | — | — | — | 5 | 59 | 143 | 181 | 212 | 220 | [illegible] | 230 | 234 | 212 | 1,740 |
| TOTAL NOMINAL SALES | — | — | — | 62 | 361 | 976 | 1,650 | 2,231 | 3,080 | 3,702 | 3,186 | 4,027 | [illegible] | 3,613 | 3,893 | 3,214 | 3,014 | 31,884 |
| TOTAL EXPECTED SALES | — | — | — | 62 | 232 | 608 | 918 | 1,248 | 1,602 | 1,118 | 1,170 | 1,188 | 1,782 | 1,702 | 1,882 | 1,388 | 1,282 | 17,981 |
| TOTAL EXPECTED ROYALTY | — | — | — | 4.2 | 18.4 | 40.3 | 53.0 | 61.8 | 61.6 | 62.6 | 62.9 | 62.8 | 52.8 | 62.8 | 61.4 | — | — | 1010.1 |
| | — | — | — | [illegible] | [illegible] | [illegible] | [illegible] | 4.7% | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | — | — | |
| EXPECTED MILESTONE EXPENSE | — | — | — | — | 25 | 8 | — | 5 | — | — | — | — | — | — | — | — | — | 40.2 |
| | — | — | 26.3% | 7.6% | — | 1.4% | — | 6.1% | — | — | — | — | — | — | — | — | — | 0.2% |

| | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| Partner Investment: | $50 | $50 | $50 | $50 |

| Royalty Percentages | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|
| Oncology Portfolio | 8.0% | 4.0% | 1.0% | 0.5% |
| Endothelin Prostate Cancer | 8.0% | 4.0% | 1.0% | 0.5% |
| Ketolide | 8.0% | 4.0% | 1.0% | 0.5% |
| CCM | 8.0% | 4.0% | 1.0% | 0.5% |
| BPH | 8.0% | 4.0% | 1.0% | 0.5% |
| Milestone Payment | $10.0MM UPON COMMERCIAL LAUNCH PER COMPOUND | | | |

| JOHN HANCOCK RETURN | |
|---|---|
| NPV | [illegible] |
| IRR | 18.2% |

9

ABBT 0006757
HIGHLY CONFIDENTIAL



Abbott Laboratories
PPD R&D Alternative Financing Analysis
John Hancock Funding Scenarios

NOMINAL AND EXPECTED SALES FORECAST
(Update Case)

CONFIDENTIAL

ABBT 0006758
HIGHLY CONFIDENTIAL

BACK-UP

ABBT 0006759
HIGHLY CONFIDENTIAL



ABBT 0806760
HIGHLY CONFIDENTIAL



ABBT 0006761
HIGHLY CONFIDENTIAL

DRAFT

**Abbott Laboratories**
**PPD R&D Alternative Financing Analysis**
**John Hancock Funding Scenarios**

NOMINAL AND EXPECTED INVESTMENT COSTS

| | External/Internal | | Does Not Include Milestone Payments | | | | | | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | |
| | NON PRX ADJUSTED R&D | | | | | | | | | | | | |
| BPH Back-Up | 34 | 49 | 60 | 30 | 30 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 279 |
| Ketolide - Oral Adult | 76 | 90 | 60 | 35 | 35 | 17 | 17 | 17 | 17 | 5 | 10 | 10 | 384 |
| Ketolide - IV | 3 | 7 | 8 | 2 | 2 | 1 | 1 | 1 | 1 | 5 | 2 | 2 | 33 |
| Endothelin - Prostate Cancer | 12 | 34 | 40 | 20 | 18 | 10 | 10 | 10 | 10 | 10 | 1 | 10 | 178 |
| CCM Neuro/Osteo | 15 | 33 | 58 | 50 | 30 | 20 | 20 | 20 | 20 | 10 | 10 | 10 | 208 |
| FTI #2 | 6 | 8 | 20 | 40 | 30 | 20 | 15 | 10 | 5 | 8 | 8 | 4 | 148 |
| MMPI #2 | 6 | 7 | 20 | 35 | 28 | 20 | 16 | 18 | 5 | 4 | 4 | 4 | 167 |
| Antimitotic | 6 | 10 | 36 | 35 | 28 | 18 | 18 | 10 | 8 | 8 | 8 | 5 | 170 |
| TBN | 2 | 5 | 16 | 30 | 36 | 18 | 10 | 6 | 6 | 8 | 5 | 2 | 144 |
| | | | | | | | | | | | | | |
| **TOTAL NOMINAL INVESTMENT** | 166 | 239 | 298 | 290 | 268 | 148 | 116 | 99 | 93 | 80 | 58 | 62 | 1,800 |

| Expected Ratio Analysis | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TOTAL EXPECTED INVESTMENT** | 168 | 216 | 234 | 166 | 60 | 57 | 61 | 39 | 37 | 24 | 23 | 23 | 1,120 |
| | | | | | | | | | | | | | |
| INVESTOR PTR R&D INVESTMENT | 80 | 80 | 60 | 60 | ... | ... | ... | ... | ... | ... | ... | ... | 200 |
| ABBOTT R&D INVESTMENT | 108 | 168 | 168 | 116 | 100 | 57 | 61 | 39 | 37 | 24 | 23 | 23 | 923 |
| ABBOTT CALCULATED RATIO | 2.1 | 3.3 | 3.7 | 2.3 | | | | | | | | | 4.6 |

13

ABBT 0006762
HIGHLY CONFIDENTIAL

B/06/2/0007-47:11 AM

DRAFT - FOR DISCUSSION PURPOSES ONLY

## Success Probabilities

| | Preclin | Ph I | Ph II | Ph III* | Launch |
|---|---|---|---|---|---|
| Abbott (history) | 50% | 64% | 50% | 78% | 12% |
| Lehman/Zeneca | 40% | 70% | 50% | 60% | 8% |
| Tufts/CSDD | 0% | 75% | 48% | 64% | 0% |
| A. Little (L) | 5% | 15% | 20% | 50% | 0% |
| A. Little (M) | 31% | 39% | 50% | 74% | 4% |
| A. Little (H) | 50% | 77% | 67% | 100% | 26% |
| | | | | | |
| ABT Proj. - Base | | | | | 11% |
| ABT Proj. - Upside | | | | | 11% |

* Includes registration

14

ABT 0006763
HIGHLY CONFIDENTIAL

# TERMS – FURTHER BREAKDOWN

- ROYALTIES ON PORTFOLIO SALES ($MM)

  $ 0 – $ 400 – 8%

  $ 401 – $1000 – 4%

  $1001 – $2000 – 1%

  $2001 – – .5%

- MILESTONES

  – UPON COMPOUND NDA APPROVAL
    - $10MM
    - MAXIMUM 4 COMPOUNDS (CAPPED @ $40MM)

  – UPON IND, PHASE I, II, III INITIATION
    - $1–5MM PER COMPOUND
    - $12MM CAP
    - REIMBURSABLE

15

ABBT 0006764
HIGHLY CONFIDENTIAL

# Provisions for Minimum Spend Failure

## Carryover Provision

1.) If Abbott spends the amount provided by John Hancock during a contract year, but spends less than the annual minimum (a further $50 million), Abbott agrees to spend the shortfall in the next contract year in addition to the annual minimum required for that next year.

John Hancock will not be obligated to make an additional payment until Abbott has spent the carryover amount.

16

ABBT 0006765
HIGHLY CONFIDENTIAL

# Provisions for Minimum Spend Failure

2.) Refund to John Hancock

If Abbott does not spend the amount provided by John Hancock in a given contract year, Abbott will refund the amount provided less 1/2 of the amount actually spent by Abbott. For example, if Abbott only spends $25 million, Abbott will refund $37.5 million of Hancock's original $50 million payment.

Subsequent payments by John Hancock will be based on Abbott's ability to reasonably demonstrate its intent to spend the amount to be provided by Hancock in the next year.

17

ABBT 0006766
HIGHLY CONFIDENTIAL

# Provisions for Failure to Spend Aggregate Amount

If in every year of the Agreement Abbott fulfills its minimum spending requirements, but does not spend the Aggregate amount of $400 million by the end of the 4th year (in addition to the John Hancock payments), then the following occurs:

1.) Abbott agrees to spend the shortfall in the 5th year (Aggregate carryover provision)

2.) If Abbott does not spend the carryover amount in the 5th year, Abbott will refund 1/3 of the remaining shortfall to Hancock

(For example, if after the 5th year, Abbott has spent only $500 million total vs $600 target, Abbott refunds $33.3 million to Hancock out of the total Hancock payments of $200 million)

18

ABBT 0006767
HIGHLY CONFIDENTIAL

# Provisions for Compound Substitution

In the event Abbott divests or out-licenses a compound that is in the portfolio, Abbott will substitute an alternative compound with a similar market opportunity and comparable stage of development provided that John Hancock reasonably agrees on the opportunity and stage of development of the alternative compound.

19

ABBT 0006768
HIGHLY CONFIDENTIAL

# Exhibit C

Abbott/Hancock - Memo re: Research Funding Agreement    Page 1 of 1

| | |
|---|---|
| **From:** | Lee, Brewster |
| **Sent:** | Monday, September 18, 2000 5:40 PM |
| **To:** | deborah.young@abbott.com |
| **Cc:** | Kevin M. Tormey; Weed, Amy; Blewitt, Stephen |
| **Subject:** | Abbott/Hancock - Memo re: Research Funding Agreement |

At Brian Smith's request, attached please find our memorandum raising certain issues with respect to the Research Funding Agreement.

**CONFIDENTIAL**
**JH 003342**

# CHOATE, HALL & STEWART

## MEMORANDUM

To:         Brian Smith
            Philip Deemer
            Steve Cohen
            Abbott Laboratories

cc:         Steve Blewitt
            Amy Weed
            John Hancock Life Insurance Company

From:       Brewster Lee and Kevin Tormey

Date:       September 18, 2000

Re:         **Research Funding Agreement between Abbott Laboratories and John
            Hancock Life Insurance Company**

---

       This memorandum is intended to present in summary fashion certain general issues raised
by our review of the 8/17/00 draft of the Research Funding Agreement (the "Agreement").[1]

       1.      Substitute Compounds.  We understand that the parties have agreed that if, as a
result of a merger or acquisition, Abbott (or its successor) obtains a compound that it wishes to
pursue in lieu of one of the Program Compounds, then Abbott must include the new compound
under the program in place of the Program Compound.  We would like to discuss other
circumstances in which Abbott will have a similar obligation to substitute a new compound.  If,
for instance, Abbott acquires or internally develops another compound that it wishes to pursue in
place of a Program Compound, we believe that Abbott should have a similar obligation to
substitute.  This discussion may involve the standard of "commercially reasonable efforts" and
the proviso that appeared in the definition of such phrase in the term sheet (but was omitted from
the Agreement) which was intended to measure Abbott's efforts with respect to each compound
in isolation from other competing compounds (as if, for the sake of such analysis, such
compound was its only asset).  Also, we should discuss what rights Hancock should have with
respect to any new compounds that are identified by Abbott as a result of the research program
financed in part by Hancock.

       On a related topic, section 4.3 of the Agreement provides that Hancock must notify
Abbott of "its nonacceptance of [a] substitute compound within 30 days" of notice.  We believe
that a longer period of time may be necessary to fully assess the merits of a substituted
compound -- in such event, Hancock should have the right to extend that period by an additional

---

[1] We also intend to propose technical revisions by sending a revised version of the Agreement marked to show our
proposed drafting changes.

CONFIDENTIAL
JH 003343

Memorandum
September 18, 2000
Page 2

30-45 days. We also believe that silence should not constitute acceptance -- rather, Hancock must affirmatively approve each substituted compound.

2.    Licensees. The Agreement refers in various provisions to "licensees" and "sublicensees" of Abbott. We would like to discuss how Hancock's rights will be affected by such license arrangements. For instance, what rights will Hancock have with respect to payments received by Abbott on account of a license agreement? (To be sure, we understand that Hancock will receive "full" royalties on sales by such licensees to third parties, not a royalty on the royalty payments paid by the licensees to Abbott). Also, at what point does a license by Abbott constitute an "out-license" for purposes of section 4.3?

3.    Endothelin. The Agreement states that Endothelin is a Program Compound only to the extent that it is used for cancer indications. We understand that Hancock will have an option to "participate" in such non-cancer indications. We would like to discuss the terms of such option, since such terms should be settled by the time the Agreement is signed.

4.    Remedies; Termination; Bankruptcy. We would like to discuss the need for additional remedial rights for Hancock in the event of a breach by Abbott of its obligations under the Agreement. We acknowledge that Article 3 of the Agreement sets forth the consequences of Abbott's failure to fund the Research Program. We would like to discuss, however, the consequences of other defaults on Abbott's part. We note that section 9.4 provides for interest on late payments (which we feel should be higher than prime); we would also like to discuss the concept of a "liquidated damages clause". We believe that section 11.2 inappropriately limits Hancock's rights upon a breach by Abbott to termination of the Agreement -- royalty payments by Abbott should continue notwithstanding Abbott's breach. Conversely, if, after having made one or more Program Payments, Hancock defaults with respect to subsequent Program Payments, Abbott should not have the right to terminate the Agreement and its obligation to pay all of the royalties -- the consequences of such a breach by Hancock need to be discussed. Also, we would like to discuss the need for section 11.4 of the Agreement which permits termination upon a bankruptcy.

5.    Additional Disclosure and Representations. We would like to discuss certain additional representations that we believe should be made by Abbott to Hancock. For instance, Hancock would like to have an exhibit attached to the Agreement that would set forth the following for each compound: full name, detailed description of the current stage of development, indications, status and scope of patent coverage, estimated sales (and peak sales) per year through 2014 and expected milestones and year of product launch. We believe that Abbott should make representations as to the accuracy of such factual information and as to the reasonableness of such projected sales information. We also believe that Abbott should make other representations customarily made in financing transactions, including those confirming Abbott's title to and the validity of all intellectual property rights (patents and the like) related to the Program Compounds (and the absence of any litigation or competing claims) and those as to Abbott's having acquired all necessary governmental and third party consents for this transaction.

CONFIDENTIAL
JH 003344

E-3170376.1

Memorandum
September 18, 2000
Page 3

6.    <u>Arm's-Length Transactions</u>.  We believe that the Agreement should include a general provision to the effect that Abbott will not treat the Program Compounds or any Products (including Combination Products or Bundled Products) any differently on account of Hancock's royalty rights and that all transactions by Abbott involving the Program Compounds and/or any Products will be on arm's-length terms.

7.    <u>Delivery of First Annual Research Plan</u>.  The Agreement now provides that the Annual Research Plan for the first Program Year would not be delivered until 90 days after the Execution Date.  Hancock would like to have a draft of that plan delivered well before closing, with the final plan for the first Program Year attached as an exhibit at the time of signing.

8.    <u>Extension of Term</u>.  If the Research Program term is extended (for instance, if Abbott's expenditures are "carried over" in accordance with section 3.3(ii)), we believe that the Royalty Term should be extended beyond December 31, 2014.

9.    <u>Effective Date</u>.  Section 3.6 of the Agreement permits Abbott to include costs and expenses incurred after March 1, 2000 in determining if it has met its funding obligations.  Hancock does not believe that all of such amounts should be treated as "Program Related Costs" and would like to discuss which, if any, of those payments should be included.  We would also like to know if, since March 1, 2000, any of the milestones specified in section 6.3 have been passed.

On a related topic, the definition of "Program Related Costs" credits Abbott for all amounts paid by Abbott pursuant to Article 6 (e.g., Closing Fee, Management Fees and Milestones Payments) and for any "milestone and license fees paid by Abbott with respect to any Program Compound".  This is inconsistent with our understanding that Abbott would be obligated to fully fund its share of the Aggregate Spending Target (that is, $400,000,000 of the $620,000,000 total amount).

10.    <u>Enforcement Activities</u>.  We would like to discuss section 5.3 of the Agreement insofar as it grants Abbott the "sole right and authority" to pursue infringement claims and entitles Abbott to "all monies" recovered as a result of such enforcement action.  We feel that Abbott should have some obligation to pursue such claims and that Hancock has a right to an appropriate share in monies recovered as a result thereof.

11.    <u>Management Fee</u>.  We understood that the aggregate amount of the management fee would be $8,000,000 -- that is, $2,000,000 for each of the first four years.  Section 6.2 only provides for management fees in an aggregate amount of $6,000,000.

12.    <u>Milestone Payments</u>.  Under section 6.3 of the Agreement, if milestone payments earned in any year exceed the annual cap for such year they are "lost" -- we believe such "excess" milestone payments should be paid to Hancock in subsequent years (up to the annual and aggregate caps for such subsequent years).

**CONFIDENTIAL**
**JH 003345**

E-3170376.1

Memorandum
September 18, 2000
Page 4

13.    <u>Audits and Reports</u>. We would like to discuss the provisions of section 8.2 of the Agreement that prohibit Hancock from auditing records more than two years old. Why must access be so limited? At the very least, if discrepancies are revealed by audit, records from prior years should be open and should not be "conclusively" correct as provided under section 8.2(d). In addition, section 8.2 of the Agreement unnecessarily limits the information that the auditor may furnish to Hancock. Given that Hancock is not in the pharmaceutical business, we consider this limitation to be unduly restrictive.

14.    <u>Legal Restrictions; Withholding Taxes</u>. How can foreign legal restrictions "prevent the prompt remittance" by Abbott of payments due to Hancock (as suggested by section 9.2)? Also, under what circumstances might payments by Abbott to Hancock be subject to withholding taxes (as suggested by section 9.3)?

15.    <u>Indemnification</u>. We think the indemnification provisions set forth in section 12.6 of the Agreement are too narrow. Since Hancock's only obligation is to provide financing for the Program, Abbott's indemnification of Hancock should be comprehensive (and, conversely, Hancock's indemnification obligation should be quite narrow).

16.    <u>Assignment</u>. We believe that Hancock should be free to assign its right to payments from Abbott (though its funding obligations cannot be assigned).

*    *    *    *    *

After you have had a chance to review this memorandum, please feel free to call.

W.B.L.
K.M.T.

CONFIDENTIAL
JH 003346

E-3170376.1

Deemer Deposition Exhibit 4


P's Exhibit PE



Abbott Laboratories
PPD R&D Alternative Financing Analysis
John Hancock Funding Scenarios

NOMINAL AND EXPECTED SALES FORECAST

PLAINTIFF'S EXHIBIT

CONFIDENTIAL

ABBT 0006861



CONFIDENTIAL

ABBT 0006862



CONFIDENTIAL

ABBT 0006863



CONFIDENTIAL          ABBT 0006864

Deemer Deposition Exhibit 5


P's Exhibit KT



**Philip M Deemer**
06/07/2000 10:23 AM

To: Steve Cohen/LAKE/PPRD/ABBOTT@ABBOTT
cc:
Subject: Re: John Hancock/Abbott Funding Collaboration

I didn't get the attachments. Jeff sent me a bunch- some we wnat to sent and some not but I don't have 594 and 980.
Steve Cohen



Steve Cohen
06/07/2000 07:37 AM

To:     Philip M Deemer/LAKE/CORP/ABBOTT@ABBOTT
cc:
Subject:  John Hancock/Abbott Funding Collaboration

If you could forward this to Steve, I'd appreciate it.

Attached are the Due Diligence documents corresponding to the portfolio.  Several things to note:
- The documents for the later stage compounds are largely commercial--markets, our sales-projections, etc.--and not a lot of technical side.  That could probably be better served by some face to face discussions with our development team.
- On the earlier stage compounds, there is a more of the 'science' side as well as the latest projections from the commercial groups.  You will notice that some of these latest sales projections for the earlier stage compounds are somewhat higher than in my latest package to you.  These increases are primarily on the international side and simply reflect the latest projections.  I don't plan to change any of the schedules I've provided to you at this time.
- The Urokinase program has not moved from Discovery to Development.  We've provided a document for this program anyway.  As we move through the final negotiations, if it doesn't appear that this program will produce a development candidate by end of this year or early next year, we'd substitute another early stage compound into the portfolio.  I know this is consistent with our ongoing discussions, but just wanted to reinforce it as we move through this process.

Phil forwarded your most recent voice mail.  It's almost comforting to know that you're as swamped as we are and having the same issues trying to complete the revisions to the terms sheet as we were completing the attached documents.  As you stated we both want to stick to the June 30th date for an 'understanding' that we can move forward or not.  We've communicated our joint commitment to Arthur Higgins on the timing.

Look forward to our next discussion.



PLAINTIFF'S
EXHIBIT 5
Deemer
10-27-06

CONFIDENTIAL
AL 000198



Philip M Deemer
06/07/2000 10:24 AM

To: Steve Cohen/LAKE/PPRD/ABBOTT@ABBOTT
Subject: E-Copies of the JH Due Diligence Packages

This is what Jeff sent me yesterday.

———————— Forwarded by Philip M Deemer/LAKE/CORP/ABBOTT on 06/07/2000 10:23 AM ————————



Jeffrey A Ropers
06/06/2000 02:27 PM

To:       Philip M Deemer/LAKE/CORP/ABBOTT@ABBOTT, Steve Cohen/LAKE/PPRD/ABBOTT@ABBOTT
cc:
Subject:  E-Copies of the JH Due Diligence Packages

Attached please find the John Hancock Due Diligence e-files I received from Erik Zimmer in NPD. These
are the same drafts we reviewed at lunch today.

                       

ABT 271_hancock4.doc  ABT 627 hancock_4.doc  ABT510_hancock4.doc  ABT-518_MMPI4.do





antimitotic_hancock4.do  FTI_hancock4.doc  hancock773profile6_5_00.do  K5-ABT828_hancock 4.do

urokinase inhib hancock_3.dc

Regards,

Jeff
X5.4995

CONFIDENTIAL
AL 000199

Deemer Deposition Exhibit 6


P's Exhibit CI



sblewitt@jhancock.com

07/07/2000 04:23 PM

To: Steve Cohen/LAKE/PPRD/ABBOTT@ABBOTT
Subject: Questions

Steve,

In advance of our call on Monday, for each of the products, I would like to walk through the following information:

Current status of clinical trials (i.e., what is current stage, what were results from prior stage or interim results – specifically, trial design and endpoints, discussions with FDA, Go/NoGo decision points). Potential labeling issues. Potential manufacturing issues. Timeline for completion of trials, NDA filing, Approval.

Commercialization rights and freedom to operate.

Patent status.

Thanks.

Steve.



PLAINTIFF'S
EXHIBIT
Deemer 6
10-27-06

ABBT 0004016
CONFIDENTIAL

Deemer Deposition Exhibit 7


P's Exhibit KW



Frank J Loughery
07/24/2000 12:02 PM

To: Philip M Deemer/LAKE/CORP/ABBOTT@ABBOTT
cc: Steve Cohen/LAKE/PPRD/ABBOTT@ABBOTT, Gary L. Flynn/LAKE/CORP/ABBOTT@ABBOTT
Subject: Re: Hancock Deal

OK--but since we "grossed up" the program spend to cover the management fee toJH, this should theoretically be 32.25%, not 33.3%  (200/620  vs 200/600)

Philip M Deemer



Philip M Deemer
07/24/2000 11:10 AM

To:     Frank J Loughery/LAKE/CORP/ABBOTT@ABBOTT
cc:     Steve Cohen/LAKE/PPRD/ABBOTT@ABBOTT
Subject:  Re: Hancock Deal

Good comments.  We have almost the same list.  The calculation for 3.3 (ii) is as follows:

     assuming Abbott has expended no more than the Annual Spending Target, Abbott will     need to expend $200 Million (Aggregate Carryover Amount) in order to avoid a refund to  Hancock.  If Abbott only spends $100 Million, then we will need to refund to Hancock one  third of $100 Million.

Those are the mechanics we put in in order to have some flexibility in spending timing.  In reality, our projected spend is substantially greater than our required spend.

# Redacted/Privileged



PLAINTIFF'S
EXHIBIT  7
Deemer
10-27-06

CONFIDENTIAL
AL 002064

**DEEMER DEPOSITION EXHIBIT 10**

**PLT'S EXHIBIT J**

*CONFIDENTIAL*

# ABT - 518

## Descriptive Memorandum

*February 2001·*

## Abbott Laboratories

ABBT 0004032
CONFIDENTIAL



PLAINTIFF'S
EXHIBIT

Deemer / U
10·27·06

*MMPI*

*Overview*

Abbott's Matrix Metalloproteinase Inhibitor (MMPI) program represents a novel therapeutic class, with the potential to alter the way that cancer is treated by preventing or modifying disease progression and/or metastases. This more "chronic" approach to therapy has the potential to transform cancer into a disease that patients live with, much like the effect of HIV protease inhibitors on patients with AIDS. It also has the potential to expand the cancer market significantly by increasing the average length of treatment and expanding the pool of patients eligible to receive therapy.

The MMPs comprise a family of enzymes that degrade a wide range of matrix protein substrates. High expression of these enzymes occurs in cancer and is associated with the ability of tumors to grow, invade, develop new blood vessels and metastasize.

MMP inhibitors (MMPIs) may suppress the progression of tumors by several mechanisms:

- Suppress invasion/metastasis by blocking the membrane traversal and access to blood/lymphatic vessels
- Blocking the remodeling of extra-cellular matrix in the vicinity of primary tumors to prevent stroma-bound growth factors from stimulating tumor growth
- Blocking angiogenesis by preventing the proliferation and migration of endothelial cells and neovascularization of tumor.

Experimental evidence suggests that gelatinase A and gelatinase B are particularly important in tumor progression, consequently the project team has targeted gelatinase selective inhibitors for the treatment of cancer. Another reason for targeting highly gelatinase selective MMP inhibitors relates to the side effect profile exhibited by broad-spectrum agents like marimastat. Chronic administration of marimastat causes a dose-limiting side-effect characterized by severe joint pain and stiffness. Since these joint effects may be mediated by inhibition of other MMPs like fibroblast collagenase, highly gelatinase selective agents may be efficacious without producing dose-limiting side effects.

The MMP selectivity profile exhibited by ABT-518 distinguishes it from competitor's compounds. ABT-518 possesses sub-nanomolar inhibition potencies versus both gelatinase A and gelatinase B and is substantially more selective for the inhibition of the gelatinases over fibroblast collagenase than marimastat and prinomastat. Despite its high selectivity, ABT-518 demonstrates antitumor activity equal or superior to prinomastat. Inhibition of tumor growth is dose dependent in both syngeneic and xenograft models. ABT-518 is also effective in blocking vessel formation in a mouse model of angiogenesis. ABT-518 is a stable crystalline solid which can be synthesized in six steps (25% overall yield) from commercial starting material.

ABT-518 gives rise to sustained plasma concentrations following single oral dosing in monkeys, dogs and rats. Bioavailabilities range between 68 and 93% depending on formulation and species. Several metabolites are produced after repeated oral dosing of ABT-518, although their relative amounts varies with gender and species.

ABT-518 displays no meaningful effects in genotoxicity, cytotoxicity and ligand binding assays and its cardiovascular effects in dogs are unremarkable. ABT-518 produces no significant toxic effects in rats treated with 100 mg/kg/day over 28 days. Plasma concentrations generated by ABT-518 in these studies are at least 20-fold higher than those necessary to produce efficacy in cancer animal models. ABT-518 is therefore a compelling development candidate with the potential to

demonstrate antitumor effects superior to the MMP inhibitors currently undergoing clinical trials. Phase 1 clinical trials in cancer patients began March 2001.

*The market*

Currently, cytotoxic agents represent the largest, and fastest growing, class of oncology agents by sales volume. The following chart summarizes the value of the current oncology market.

### Global Sales by Market Segment ($ MM)

|            | 1996 Sales | 1997 Sales | 1998 Sales | 1999 Sales (est) | CAGR '96-'98 |
|------------|-----------|-----------|-----------|------------------|--------------|
| Hormone    | 4,414     | 4,784     | 4,884     | 5,000            | 5.2%         |
| Cytotoxic  | 4,278     | 5,212     | 6,268     | 7,300            | 21.0%        |
| Adjunctive | 3,367     | 3,651     | 4,166     | 4,900            | 11.2%        |
| Total      | 12,059    | 13,647    | 15,318    | 17,200           | 12.7%        |

Source: Datamonitor

### Sales by Region ($ MM)

|        | 1996 Sales | 1997 Sales | 1998 Sales | 1999 Sales (est) | CAGR '96-'98 |
|--------|-----------|-----------|-----------|------------------|--------------|
| US     | 5,564     | 6,276     | 7,422     | 8,500            | 15.5%        |
| Ex- US | 6,495     | 7,370     | 7,896     | 8,700            | 10.3%        |

Source: Datamonitor

Cytostatic agents have the potential to alter the way cancer is treated and presents opportunities for fundamentally new ways of approaching the disease. This cytostatic market does not yet exist, though success of more cytostatic "like" treatments, such as hormonal therapies for prostate and breast cancer, suggest that the market potential for cytostatic agents could be significant.

The ultimate commercial and clinical success of the MMPI will depend on the clinical benefit this product provides in key cancer types compared with current best therapy. These can be benefits provided by dosing this agent in addition to current therapy and/or as an alternative to best therapy, or as a new component of best therapy. All currently available products, including the market leaders such as Taxol, have significant shortcomings in their profiles.

However, as novel therapy, MMPIs will probably be adopted initially as add-on to current chemotherapy. As benefits are proven and clinical experience is gained, these agents may be used in earlier stages of cancer and/or in conjunction with surgery or radiation to prevent the progression of any microscopic disease that remains.

The clinical targets identified for this compound include late stage pancreatic cancer, late stage NSCL cancer (on-label), with late stage ovarian and breast cancer as additional cancer types where efficacy has been demonstrated, but not filed. Other cancer types this compound may be efficacious in include SCL, colorectal, bladder, stomach and prostate. Targets will be refined as we know more about this compound's in-vivo activity.

The following tables summarize the key marketed competitive products by indication (US data only):

| Late Stage Breast | |
|---|---|
| Product | Share |
| Cyclophosphamide/Cytoxan/BMS | 18.7 |
| Doxorubicin/Adriamycin/P&U | 17.11 |
| Docetaxel/Taxotere/RPR | 16.25 |
| Paclitaxel/Taxol/BMS | 16.11 |
| Trastuzumab/Herceptin/Genetech | 11.26 |

| Late Stage NSCL | |
|---|---|
| Product | Share |
| Carboplatin/Paraplatin/BMS | 50.32 |
| Paclitaxel/Taxol/BMS | 44.14 |
| Vinorelbine/Navelbine/Glaxo | 22.78 |
| Gemcitabine/Gemzar/Lilly | 22.14 |
| Cisplatin/Platinol/BMS | 11.28 |

| Late Stage Ovarian | |
|---|---|
| Product | Share |
| Paclitaxel/Taxol/BMS | 47.11 |
| Carboplatin/Paraplatin/BMS | 45.42 |
| Topotecan/Hycamtin/SKB | 22.54 |
| Dox SL/Doxil/Alza | 9.14 |
| Cisplatin/Platinol/BMS | 7.58 |

| Late Stage Pancreas | |
|---|---|
| Product | Share |
| Gemcitabine/Gemzar/Lilly | 78.5 |
| 5-FU/Efudex/ICN Pharma | 21.0 |
| Leucovorin/ | 10.7 |
| Cisplatin/Platinol/BMS | 4.72 |

*Compounds in Development*

The MMP inhibitor field is competitive. More than 30 firms have filed patents claiming small molecule MMP inhibitors over the past 5 years, and several companies have compounds in advanced clinical development. Abbott's compound may be 3rd or 4th to market and will have to demonstrate a competitive advantage to gain the share necessary to support the clinical development of this compound. Companies with compounds in advanced clinical development for the treatment of cancer include Agouron/Warner Lambert/Pfizer, British Biotechnology/Schering Plough and BMS and are listed below. Other companies are targeting this mechanism for arthritis.

**MMPIs in Clinical Development for Cancer**

| Compound | Company | Comments | Phase |
|---|---|---|---|
| Marimistat | BritishBiotechnology/ Schering Plough | Broad spectrum, dose limiting toxicity. Activity seen in gastric cancer, but negative results in pancreatic. | III |
| Prinomastat | Agouron/ Warner Lambert/ Pfizer | Moderate gelatinase selectivity, dose limiting toxicity. May be dosing sub-optimally to avoid toxicity. Efficacy data not available. | III |
| BMS 275291 | BMS | Broad spectrum, joint effects seen in Phase I studies. | II |

Bayer recently dropped development of BAY 12-9566 due to concerns about potential toxicity. Recent results from a study with marimistat in pancreatic cancer, where adding marimistat to Gemzar resulted in no survival advantage, has led to speculation that MMPIs may be more applicable in less aggressive cancer types or earlier stages of the disease. Alternatively, it could be a reflection of the inability to examine higher doses of marimastat due to joint effects.

The joint effects produced by the compounds listed above almost certainly preclude their long-term use, limit compliance and reduce optimal efficacy. Any MMP inhibitor that lacks these side effects will possess a substantial competitive advantage. The musculoskeletal effect produced by marimastat and prinomastat in cancer patients is typically described as arthralgia, myalgia and tendinitis, which occurs predominately in the upper limbs. While mild cases respond to analgesics, interrupting therapy for a period of approximately 2 weeks is necessary when the condition is less well tolerated.

Although Abbott's timing to market is not optimal, the shortcomings of the competitive products provide an opportunity for a compound with an improved SE or efficacy profile. Current animal models seem to predict Abbott's compound is superior to those currently in clinical trials, and has the potential to be best in class.

*Product profile*

The objective of a product profile at this time in the product's development is to provide a target for the types of attributes that will be required to be commercially successful. This profile is based on market research with oncologists and consultation with opinion leaders. This profile will continue to be refined as more is known about this product's profile, development of competitive products and the market continues to evolve.

| | Base | Optimal |
|---|---|---|
| Efficacy | ABT-518, alone or in combination with best therapy, provides at least one of | Provides more than one of the efficacy benefits outlined. |

| | the following benefits in at least one solid tumor type:<br><br>• Increased survival<br>• Tumor regression<br>• Improved quality of life<br>• Increased time to tumor/disease progression | |
|---|---|---|
| Competitive advantage | ABT-518 will need to demonstrate a clinically significant advantage in efficacy (see parameters above) or additive synergistic activity with current/competitive agents or clinically significant advantage in side-effect profile relative to other MMPI agents. | Same |
| Administration | Convenient administration relative to competitive agents. | Same plus reimbursement in US market. |
| COGS | A finished cost of goods that is consistent with at least an 80% standard manufacturing margin. | A finished cost of goods that is consistent with at least a 90% standard manufacturing margin. |

**Marketing overview**

*Product Usage:* Physicians have indicated that they would use MMPIs initially in their more refractory patients, as follow-on or add-on to current best therapy (chemo or surgical). With experience and clinical evidence, they would be willing to use these agents in earlier stages of the disease, where they perceived the greatest benefit to be. The MMPI was regarded as a maintenance therapy to be used in early disease or after primary therapy as a prophylactic process to prevent the spread of malignancy.

*Product Benefits/Efficacy:* Physicians are looking for improvements in time to tumor progression and prevention of metastases with cytostatic agents. The MMPI mechanism has more recently been implicated as having an even more active role in cancer pathogenesis, from preventing primary tumor growth to anti-angiogenic properties. Positive results from competitive agents, such as marimistat in gastric cancer, provides proof of principle for this mechanism.

*Side Effects:* The proposed safety profile of MMPIs (excluding joint toxicity) may enhance usage, as the dose limiting toxicity profiles of most of the other available agents has established a much lower hurdle for demonstrating a preferred profile. However, as chronic therapy, MMPIs may *have* to demonstrate a cleaner profile than cytotoxic agents do to ensure compliance. As the 3rd or 4th MMPI to market, SE hurdles will be even higher for this compound. As a critical Go/No Go decision point, the joint toxicity of this compound will be evaluated in an expanded Phase I multi-dose study.

*Dosing:* Discovery is currently targeting an oral dosage form. In general, oral therapies are acknowledged by physicians and patients as being more convenient to the patient. Chronic oral dosing may also reduce overall costs, as infusion support products and personnel would not be required, enhancing pharmacoeconomic evidence.

*COGS:* Initial estimates on finished cost of drug suggest that drug costs will not be significant for this compound

*Off-label use:* Off label use accounts for between 30-60% of an oncology product's usage. Off-label use is driven by publication of clinical trial results in credible journals, listing in key compendia and/or a peer's experience with the product. Therefore, development spend for off-label use is considerably less than the spend required for regulatory approval of an indication. However, promotion of these off-label uses is limited.

*Competition:* As the 3rd or 4th MMPI to market, Abbott's compound will need to demonstrate a meaningful clinical advantage over compounds that are in more advanced development. Strict Go/No Go criteria will determine if the MMPI can meet these hurdles. If they cannot be met, the compound will not move forward.

*Development/Regulatory:* With a new class of compounds, there is not a clearly defined clinical development path or regulatory guidelines for reference. This hurdle is similar for all the competitive products, but increases the overall development risk profile for these agents. However, with several MMPIs in late stage development, Abbott can learn from their experience.

*Other Approaches:* Other "cytostatic" approaches may present a competitive threat if they are used as substitutes. Due to the complexity of the pathogenesis of cancer, it is more likely that these agents will be used in combinations, but incremental benefits may become more difficult to demonstrate as the number of products and approaches multiply. This will require additional studies, as these other classes become part of standard cancer treatment. However, this threat is not unique to this compound.

*Pricing:* The treatment of cancer is expensive, so there is the potential for a great deal of pricing flexibility in this market. However, as an oral therapy in the US market, there may be additional downward price pressure for this agent. There is also an increasing emphasis on cost-effectiveness studies that will need to be addressed in the development plan.

*Dosing:* Discovery is currently targeting an oral dosage form. In general, oral therapies are preferred by physicians and patients because of the convenience to the patient. However, this form may not be the best choice for some people who already have certain digestive system symptoms (vomiting, diarrhea, or severe nausea), cannot swallow liquids or pills, or cannot remember when or how many pills to take. Additionally, in the US market there are several unique factors that currently do not favor oral therapies. Novel oral therapies are not currently reimbursed by Medicare, a significant payer for the oncology patient population. Also, 40-60% of a community oncologist's income is generated through the administration of IV drugs. An oral therapy would not be a source of revenue to the physician.

*Clinical Studies*

Clinical studies across a wide range of solid tumors will be initiated, including but not limited to breast cancer, non small cell lung cancer, ovarian cancer, pancreatic cancer, etc...

Final indications pursued will depend from the results of the phase II studies.

## MMPI (ABT-518)
## 2001 Plan Development Cost Summary

| Program Status | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|
| Phase I | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 |
| Phase II | | ← DDC | | | | | | |
| Phase III | | | | | | | | |
| NDA | | | | | | | ← NDA | ← Launch |

### Major Development Activities and Costs

| Clinical Program | Total Patients | Enrolled as of 8/00 | Start | End | 2000 ACU Cost | 2001 Plan Cost |
|---|---|---|---|---|---|---|
| Multiple Dose in Cancer Patients | 40 | ... | 1Q/01 | 1Q/02 | $300 | $769 |
| IND Study | 14 | ... | 3Q/01 | 1Q/02 | -- | $500 |
| Other Studies / EVR | | | | | ... | $108 |
| Phase-I Center / PK | | | | | $70 | $65 |
| Venue Management | | | | | $778 | $754 |
| Data Management/Statistics | | | | | $57 | $118 |
| | | | | | $1,205 | $2,314 |

| Chemistry, Manufacturing, and Controls (CMC) | 2000 ACU | 2001 Plan |
|---|---|---|
| Formulation / Analytical | $546 | $1,031 |

| Drug Safety Support | 2000 ACU | 2001 Plan |
|---|---|---|
| Ongoing Drug Safety support | $1,681 | $2,125 |

| Other Support Costs | | |
|---|---|---|
| Discovery | $1,447 | $1,348 |
| Medical Affairs | $5 | $20 |
| Regulatory Affairs / Research Quality Assurance | $26 | $39 |
| Other / In-licensing Fees | $90 | $123 |
| Total Program | $5,000 | $7,000 |

ABBT 0004039
CONFIDENTIAL

**DEEMER DEPOSITION EXHIBIT 11**

**PLT'S EXHIBIT EK**

*CONFIDENTIAL*

# ABT-594

## Descriptive Memorandum

*February 2001*

## Abbott Laboratories

Confidential

ABBT246793



**ABT-594 Opportunity Overview**

ABT-594 is a non-opioid, non-NSAID analgesic that is a potent and selective neuronal nicotinic receptor (NNR) agonist being studied for the treatment of pain. ABT-594 is 30 to 100-fold more potent and equally efficacious to morphine in several well-characterized animal models of pain. The preclinical side effect and dependency liability profile of ABT-594 is superior to that of morphine.

ABT-594 is orally administered, and BID dosing is expected. Its initial targeted indication is symptomatic treatment of diabetic neuropathic pain. It is covered by a composition of matter patent through June of 2016, and also has a use patent pending in analgesia that would provide protection through September of 2017.

The IND filing of ABT-594 was in December 1998. A Phase IIb (dose ranging) trial began April 2000 in diabetic neuropathic pain. A Go/No Go decision for clinical efficacy is expected June 2001. The NDA filing is expected in 3Q 2003. Development of additional formulations is under consideration (parenteral, transdermal, extended-release).

U.S. sales in 1999 for the key neuropathic pain treatments, Neurontin, carbamazepine, and tricyclic antidepressants (TCAs), are estimated to be $350 million. Neurontin sales account for the bulk of this, with an estimated 40% of this antiepileptic drug's sales being for neuropathic pain. Neurontin's 2000 sales are expected to reach $1 billion with perhaps 50% of its use in neuropathic pain. This dollar market value likely underestimates this market's potential due to a number of factors. Only the anticonvulsant, Tegretol (carbamazepine) currently off patent, and Lidoderm, a lidocaine patch, have specific indications for a type of neuropathic pain (trigeminal neuralgia and post-herpetic neuralgia, respectively) in the U.S. Currently, there is an unmet market need for novel neuropathic pain treatments such as ABT-594. Therefore, this compound is likely to be well received in this arena. Outside the U.S., Neurontin recently received an indication in the U.K. for the treatment of neuropathic pain. Despite these opportunities, there has been little to no funding from the pharmaceutical industry to improve diagnosis and treatment of neuropathic pain and drive market growth.

Ex-U.S. sales of carbamazepine and Neurontin for treatment of neuropathic pain are estimated to be approximately $140MM in 1999. Carbamazepine is still the treatment of choice ex-U.S., with estimated sales of approximately $90MM in neuropathic pain. Neurontin has achieved only $53MM in sales for this pain segment, with a price approximately 3-4 times that of carbamazepine, suggesting a patient share of only 10-20%.

Nociceptive pain is categorized by duration (acute or chronic) and by severity (mild, moderate, and severe). The mild and, to a lesser extent, moderate segments have multiple product entries and are generally well satisfied by OTC products such as aspirin, acetaminophen and ibuprofen. The prescription market for nociceptive pain is made up of four key classes of analgesics: NSAIDs, COX-2s, Opioids (and combination products), and Other Non-Opioids. In 1999, sales for these four classes of analgesics exceeded $12BB ($6.7BB U.S., $5.6BB Ex-U.S.)

Confidential

ABBT246794

*Market Size / Prevalence*

Pain is the most common symptom of disease and the most frequent complaint with which patients present to physicians. Chronic pain, including both neuropathic and nociceptive pain, is considered to be the single most common cause of suffering and disability in the industrialized world with an estimated 25-30% of the population experiencing some form of chronic pain.

Neuropathic pain is a frequent sequela of diabetes, cancer, AIDS and other viral infections, as well as entrapment neuropathies such as carpal tunnel syndrome. Diabetes and its associated complications are increasing at an alarming rate in the United States. Despite advances in treatment, the development of diabetic complications such as neuropathy remains significant. The diagnosed prevalence of diabetic neuropathy is estimated to be about 2 to 3 million patients, with at least 10 to 20% of those patients experiencing painful symptoms (~200,000 to 600,000.) AIDS-related neuropathic pain is estimated to affect approximately 40% of HIV-infected individuals (~14 million.) Post-herpetic neuralgia (PHN) is another virally induced neuropathic pain syndrome. Annually, acute herpes zoster infection (shingles) occurs in almost a quarter of a million people over the age of 60 in the U.S. alone. Pain lasting more than one year has been reported in 22% of patients over the age of 55 and in 48% of those over 70 years of age. In cancer, nerves can be damaged by mechanical distortion from a tumor mass, infiltration by tumor, chemotherapy, or radiation therapy and, therefore, neuropathic pain is common. An estimate of the prevalence rate for cancer-related neuropathic pain in the U.S. is 200,000 people.

Chronic nociceptive pain categories include osteoarthritis (OA), chronic back and neck pain, rheumatoid arthritis (RA), and cancer pain. These diagnoses are expected to become more prevalent as the population ages. Current overall prevalence for these disorders is staggering (over 200 million worldwide) and, although the diagnosed and treated populations are lower, improved treatment options and awareness have the potential to drive significant growth. OA is one of the most common nociceptive pain conditions treated by primary care physicians and three-fourths of OA sufferers surveyed indicate that the disease interferes with their daily activities. Chronic back and neck pain are also highly prevalent and represent an estimated 40% of a primary care physician's (PCP's) chronic pain patient population.

Confidential

ABBT246795

*Competition, Current Marketed Products:*

The following tables show the factored U.S. and ex-U.S. prescription and sales volume for key neuropathic pain therapies in 1999.

| 1999 Key Neuropathic Pain Products, Estimated TRxs | | | | |
|---|---|---|---|---|
| Product/Class | 1999 U.S. TRx (MM) | U.S. TRx CAGR '97-'99 | 1999 ex-U.S. TRx (MM) | ex-U.S. TRx CAGR '97-'99 |
| Neurontin | 3.3 | 26.3% | N/A | N/A |
| carbamazepine | 1.0 | 12.6% | N/A | N/A |
| TCAs | 8.2 | 1.1% | N/A | N/A |
| TOTAL | 12.5 | 5.8% | N/A | N/A |
| Source: IMS, factored for neuropathic uses. | | | | |
| N/A = not available | | | | |

| 1999 Key Neuropathic Pain Products, Estimated $ Sales | | | | |
|---|---|---|---|---|
| Product/Class | 1999 U.S. Sales ($MM) | U.S. Sales CAGR '97-'99 | 1999 ex-U.S. Sales ($MM) | ex-U.S. Sales CAGR '97-'99 |
| Neurontin | $308 | 28.7% | $53 | 57.6% |
| carbamazepine | $17 | 13.1% | $87 | 2.5% |
| TCAs | $26 | -3.3% | N/A | N/A |
| TOTAL | $351 | 21.7% | $140 | 10.1% |
| Source: IMS, factored for neuropathic uses; Ex-U.S. data includes retail pharmacy data from all audited markets. | | | | |
| N/A = not available | | | | |

**Competition, Products in Development**

Almost 100 compounds are currently in development for prescription pain management, though some of these compounds are also being developed for non-analgesic indications. Most of the analgesic compounds in the pipeline represent incremental improvements over the opioids or NSAIDs, or consist of new formulations or delivery mechanisms for the standard analgesics. Fewer than 30% of the compounds in development have novel mechanisms of action. Drugs with novel mechanisms are expected to provide the bulk of promoted competition for ABT-594.

In addition to the novel analgesics in the table below, a number of new formulation and combination products, most often containing an opioid, are in development. Second generation COX-2s are also in development but are not likely to represent major breakthroughs on the scale of the first generation products.

Confidential

ABBT246796

| Analgesia Development Pipeline – Key Novel Agents | | | | |
|---|---|---|---|---|
| Product | Company | Mechanism | Phase | Comments |
| pregabalin | Pfizer | Unknown; possibly through (2nd subunit binding | I/II | Neuropathic pain; chronic pain; follow-up to Neurontin |
| saredutant | Sanofi | NK-2 receptor antagonist | II | General pain; MOA losing favor; active program |
| ZD4952, ZD 6416 | Zeneca | Prostaglandin receptor antagonist | II | Moderate to severe pain; neurogenic pain |
| GV196771 | Glaxo | Glycine antagonist | II | Chronic pain; showing promise |
| Tepoxalin | Johnson & Johnson | COX/5-LO inhibitor | II | OA; described as 'steroid replacing anti-inflammatory drug' |
| darbufelone | Parke-Davis | COX/5-LO inhibitor | II | General pain |
| 117mSn DTPA | Brookhaven National Lab/Diatide | Unknown | II | Cancer pain Bone cancer (preclinical) |
| crzolirtine | Esteve | Substance P agonist | II | Analgesia, antipyretic |
| ADD 234037/ harkoseride | Houston University | Glycine NMDA associated antagonist | II | Neurogenic pain |
| LY303870/ laneptiant | Eli Lilly | Neurokinin 1 antagonist | II | Pain (migraine -- discontinued) |
| colykade devacade | Merck | Cholecystokinin B antagonists | II | Pain (UK) |
| RPR 100893 daptiant | Aventis | Neurokinin 1 antagonist | II | Pain (France) |
| prosaptide TX14A | Myelos Neurosciences | Unknown | I/II | Diabetic neuropathies, Pain |
| CNS 5161 | Cambridge NeuroScience | Glutamate antagonist, NMDA receptor antagonist | I | Neurogenic pain |
| HCT-3012 | NicOx | Nitric oxide NSAID | I | Pain and inflammation |
| Sources: ADIS, IMS, Decision Resources, company reports | | | | |

Confidential

ABBT246797

| Analgesia Development Pipeline – Nicotinic Mechanisms | | | |
|---|---|---|---|
| Product | Company | Phase | Comments |
| GTS-21 | Taisho | II | Target is Alzheimer's disease; may have preclinical pain program; looking for partner |
| CMI 980 | Cytomed | Preclinical | Target is pain; epibatidine analog |
| SIB-T1887 | Sibia | Preclinical | Target is pain |
| FID 072021 | Fidia | Preclinical | Target is pain; not actively funding |
| Sources: ADIS, IMS, company reports | | | |

**Unmet Needs**

In general, a significant unmet need exists for safer, non-abusable, non-addicting, non-tolerance-producing, and non-scheduled efficacious oral and parenteral analgesic products for the treatment of moderate to severe neuropathic and chronic nociceptive pain.

| Unmet Market Needs and the Impact of the Pipeline | |
|---|---|
| Unmet Need | Pipeline Impact |
| Efficacy in moderate to severe pain without tolerance, dependence or abuse potential | Novel nicotinic agents like ABT-594 may provide efficacy in more severe pain states without opioid-like liabilities. |
| Efficacy in neuropathic pain | Pregabalin may provide incremental improvement in neuropathic pain efficacy over gabapentin, but may also have increased frequency of adverse events. Novel nicotinic agents like ABT-594 appear to have efficacy in neuropathic pain, based on animal models |
| Reduction in the GI bleeding risk of NSAIDs | COX-2 inhibitors appear to reduce the incidence and severity of GI ulcers and bleeding, second generation COX-2s may increase therapeutic window further; ABT-594 may need to demonstrate low GI complication rate |
| Overcome ceiling effect of NSAIDs | Preclinical studies did not indicate a ceiling effect for novel nicotinic agents like ABT-594. |
| Extended dosage intervals or novel delivery mechanisms for improved compliance and convenience | Once weekly dosing formulations being explored for COX-2s, etc. Transdermal patch technology improvements likely; may need to provide line-extension / alternate formulations for ABT-594 |
| Therapies aimed at disease modification, prevention | Agents that decrease rate of diabetic complications (e.g., aldose reductase inhibitors) or directly treat neuropathy (bimoclomol) may decrease incidence of neuropathic pain; thereby decreasing available market for ABT-594. |

Confidential

ABBT246798

**Product / Development Background**

*Scientific Rationale for ABT-594*

Recent findings in the understanding of pain mechanisms have led to new conceptual approaches to clinical pain and a new understanding of potential novel molecular targets for analgesic drug development. Molecular targets have included modulators of glutamate neurotransmission (NMDA antagonists), ion channel modulators (neuron specific calcium channels, TTX-resistant sodium channels), neurokinin antagonists (NK-1), and novel anti-epileptics targeting the calcium receptor. None of these approaches has yet produced compounds exhibiting broad-spectrum analgesic efficacy with decreased side effect liability.

ABT-594 is a non-opioid, non-NSAID analgesic that is 30- to 100-fold more potent and equally efficacious to morphine in treating moderate to severe pain in several well-characterized animal models of pain. The preclinical side effect and dependence liability profile of ABT-594 is superior to that of morphine. Mechanistically, ABT-594 is a potent and selective neuronal nicotinic receptor (NNR) agonist with high oral bioavailability in rat, dog, and monkey.

In pre-clinical studies, ABT-594 rapidly distributes to the brain following systemic administration and, like morphine, can work at multiple levels in the central and peripheral nervous system to modulate pain perception. ABT-594 produces antinociceptive effects by interacting at both central and peripheral nAChRs. Injections of ABT-594 into brain at doses 1000-fold lower than given peripherally produce marked antinociceptive activity, indicating that ABT-594 can also activate descending pathways from the CNS to modulate pain processing. It also inhibits the release of the primary nociceptive transmitters, substance P and calcitonin gene related peptide (CGRP) *in vitro*, at the level of the dorsal horn of the spinal cord suggesting that ABT-594 can attenuate mechanisms leading to neurogenic inflammation, central sensitization and consolidation of pain-mediated neuronal changes.

ABT-594 is expected to be a highly differentiated product. It is expected to be the first neuronal nicotinic receptor agonist to receive an indication for pain. It has a novel mechanism of action and a potentially broad coverage of chronic pain conditions. In addition, it has an opioid-like efficacy without tolerance, dependence or abuse potential, while having equivalent/superior efficacy to other drugs used to treat neuropathic pain.

*Clinical Studies*

Human clinical trials began in 1997. Phase I trials with an oral solution formulation indicated that 150ug/day would be the maximum tolerated dose. Results from subsequent phase I and phase II trials with soft elastic capsule (SEC) and hard gelatin capsule (HGC) suggest that higher doses would be tolerated. Phase IIa studies with ABT-594 SEC formulation suggest a trend towards analgesic effect at 75ug BID, the maximum dose studied in this protocol. ABT-594 was generally well tolerated in these studies. The most common adverse events for subjects receiving ABT-594 75ug BID were nausea (15%), headache (13%), dizziness (7%), insomnia (6%), and vomiting (5%).

A phase IIb study for neuropathic pain at higher, titrated doses of ABT-594 began in April 2000 and ends in June 2001. A total of 320 patients is anticipated to be included in the study.

Confidential

ABBT246799

*Considerations*

Target Profile:

The current status of ABT-594's profile vs. target profile is summarized in the table below:

| Target Profile Attribute | Probability |
|---|---|
| Not scheduled (DEA) | High |
| Very few abnormal Liver Function Tests | High |
| Few Drug Interactions | High |
| BID / TID dosing | High |
| No reduced efficacy or increased AEs in nicotine users | High |
| Onset of action 1.5 – 2.0 hours | High |
| Neuropathic efficacy | Medium |
| No tolerance, dependence or withdrawal | Medium |
| Other safety OK | Medium |
| No cravings in ex-nicotine users | Medium |
| Low nausea / vomiting | Low |

*Label Strategy:*

BASE:  Indicated for the treatment of diabetic neuropathic pain.

UPSIDE:      1) Treatment of pain associated with OA

2) Treatment of post-herpetic neuralgia

3) Treatment of neuropathic pain

4) Treatment of chronic pain

5) Treatment of cancer pain

*Cost of Goods Sold:*

The projected average daily dose is expected to be a maximum of approximately 600 mcg base equivalent / day.  Based upon this dosage projection and the estimated cost of bulk drug substance of $40M per Kg base equivalent, the estimated cost for drug substance at launch will be approximately $0.024 per day.

Confidential

ABBT246800

*Pricing:*

US: Pricing new, and particularly novel, products at a reasonable premium will likely continue to be the norm in the years leading up to the launch of ABT-594. Current forecast assumptions put the price of ABT-594 at a level comparable to Celebrex and Neurontin, grown at a modest 2% per year to launch year AWP of approximately $95 for a 30 day prescription.

Ex-US: New pain medications must demonstrate a true advantage in efficacy and/or side effects to receive regulatory approval, especially by the European Medicines Evaluation Agency (EMEA); assuming the target efficacy and tolerability profile of ABT-594 is achieved, ABT-594 would meet this requirement. Because ABT-594 may have application in both neuropathic and chronic nociceptive pain, the ex-U.S. pricing assumption for ABT-594 is comparable to COX-2 pricing. The current average price for COX-2's is approximately $1.10 per day; however, this reflects a large percentage of sales in "free-pricing" countries where COX-2s launched first, which tend to have higher than average prices. Therefore, the average ex-U.S. price for ABT-594 is assumed to be $0.90/day.

Confidential

ABBT246801

**Deemer Deposition Exhibit 13**

**P's Exhibit LZ**

**Part 1**

Philip M
Deemer/LAKE/CORP/ABBO
TT

02/15/2001 06:40 PM

To  Chris G Turner/LAKE/PPRD/ABBOTT@ABBOTT

cc

bcc

Subject  Exhibits

FYI and Thank You!
----- Forwarded by Philip M Deemer/LAKE/CORP/ABBOTT on 02/15/01 06:37 PM -----

Philip M Deemer

02/15/01 06:35 PM

To  sblewitt@jhancock.com@internet, aweed@jhancock.com@internet,
wbl@choate.com@internet, Daphne L
Pass/LAKE/CORP/ABBOTT@ABBOTT

cc:

Subject:  Exhibits

## Exhibit 12.2 (i)

ABT-773 201.doc    ABT-627 201.doc    ABT-594 201.doc    ABT-492 201.doc    ABT-510 201.doc

ABT-518 201.doc    ABT-751 201.doc    FTI 201.doc    ED 201.rtf

## Exhibit 1.6

ABT-773 201.wk4    ABT-773 201.xls    ABT-627 201.wk4    ABT-627 201.xls

ABT-594 201.wk4    ABT-594 201.xls    ABT-492 201.wk4    ABT-492 201.xls

ABT-510 201.WK4    ABT-510 201.xls    ABT-518 201.wk4    ABT-518 201.xls

Confidential

ABBT246062





ABT-751 201.wk4  ABT-751 201.xls  FTI 201.WK4  FTI 201.xls  ED 201.WK4  ED 201.xls

Exhibit 1.43

Direct and Indirect Costs 201.x  2001 Key Rates 201 12[



ABBT246123

Confidential

Exaluebin (ABT-627)

2nd Plan Development Cost Summary

| Program Tasks | 1998 | | | | 1999 | | | | 2000 | | | | 2001 | | | | 2002 | | | | 2003 | | | | 2004 | | | | 2005 | | | | 2006 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Phase II | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Phase III | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

Other Development Activities and Costs

| | Total Enrollee | Enrollment as of 6/31/00 | | Start | | End | 2000 ACTU | 2001 Plan Cost |
|---|---|---|---|---|---|---|---|---|
| Clinical Program | | | | | | | | |
| European Pivotal Cancer Study | 704 | 587 | | Oct 1999 | | Dec 2000 | $1,935 | $2.6 |
| Open Protocols of 500 & See Studies | 30 | 105 | | Jun 1998 | | Jan 2002 | | |
| Refractory Malignancies | 10 | 9 | | Jul 1999 | | Dec 2000 | $29 | |
| Phase IV Pivotal Studies | 1,000 | | | 1Q 2001 | | 1Q 2003 | $15 | $2.6 |
| Other Studies / EVR | | | | | | | $4xx.7 | |
| Version Management | | | | | | | | |
| Clinical Pharmacology Support (Drug Interaction Studies) | | | | | | | | |
| Data Management/Statistics | | | | | | | $2.36 | $2x.xx |
| | | | | | | | $2.944 | $2x.xx |
| Chemistry, Manufacturing, and Controls (CMC) | | | | | | | 2000 ACTU | 2001 Plan |
| Formulation & Analytical | | | | | | | $1.59 | $1.x |
| Bulk Drug / Process | | | | | | | $260 | $x.xx |
| | | | | | | | $1.600 | $2.xx |
| Drug Safety Support | | | | | | | 2000 ACTU | 2001 Plan |
| Ongoing Drug Safety support including clinical program support | | | | | | | $661 | $x.xx |
| Other Support Costs | | | | | | | 2000 ACTU | 2001 Plan |
| Discovery | | | | | | | $166 | $1.x |
| Market Alliance | | | | | | | $1.x | <1.x> |
| Regulatory Affairs / Research Quality Assurance | | | | | | | $170 | <1.x> |
| Other | | | | | | | $1.53 | $x.xx |
| Total Program | | | | | | | $11,xxx | $2x.xxx |

ABBT246128

Confidential

ABT-594

2001 Development Cost Summary

ABBT246131

Confidential



ABBT246134

Confidential

## TSP (ABT-510)
### 2001 Plan Development Cost Summary

| Program Status | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|
| | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 |

Phase I
Phase II
Phase III

IND

NDA

**Major Development Activities and Costs**

| Clinical Program | Total Budget | Enrolled as of 2000 | Start | End | 2000 AGU | 2001 Plan |
|---|---|---|---|---|---|---|
| Single Escalating Dose in Healthy Subjects | 18 | 38 | | | $246 | Cost |
| Multiple Dose in Cancer Patients | 40 | | Apr-2000 | Sep-2000 | $390 | $905 |
| 2ND Study | 14 | | Feb-2000 | Sep-2001 | | $592 |
| Other Studies / PK/PD | | | Jun-2001 | Nov-2001 | $307 | $313 |
| Phase I Center | | | | | $151 | $154 |
| Vendor Management | | | | | $301 | $800 |
| Data Management/Statistics | | | | | $129 | $151 |
| | | | | | **$529** | **$595** |

| Chemistry, Manufacturing, and Controls (CMC) | | | | | 2000 AGU | 2001 Plan |
|---|---|---|---|---|---|---|
| Formulatory / Analytical | | | | | $762 | $1,936 |

| Drug Safety Support | | | | | 2000 AGU | 2001 Plan |
|---|---|---|---|---|---|---|
| Ongoing Drug Safety support | | | | | $1,608 | $1,759 |

| Other Support Costs | | | | | 2000 AGU | 2001 Plan |
|---|---|---|---|---|---|---|
| Discovery | | | | | $1,222 | $1,264 |
| Medical Affairs | | | | | $5 | $45 |
| Regulatory Affairs / Research Quality Assurance | | | | | $68 | $37 |
| Other In-Licensing Fees | | | | | $196 | |
| **Total Program** | | | | | **$6,660** | **$9,000** |

Confidential

ABBT246137

## MVPI (ABT-518)
### 2001 Plan Development Cost Summary

| Program Status | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|
| | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 |
| Phase I | | | | | | | | |
| Phase II | | | | | | | | |
| Phase III | | | | | | | | |
| NDA | | ↑ FDC | | | | | ↑ NDA | ↑ Launch |

**Major Development Activities and Cost**

| | Total Patients | Enrolled to FPFM | Start | End | 2000 ACG Cost | 2001 Plan Cost |
|---|---|---|---|---|---|---|
| **Clinical Program** | | | | | | |
| Multiple Dose in Cancer Patients | 40 | | 1/00 | 11/01 | $309 | $754 |
| IND Study | 14 | | 6/01 | 11/01 | | $479 |
| Other Studies / TVR | | | | | | $108 |
| Phase I Clinical PK | | | | | $70 | $65 |
| Vaccine Management | | | | | $578 | $754 |
| Data Management/Statistics | | | | | $27 | $125 |
| | | | | | $1,100 | $2,114 |
| | | | | | **2000 ACG** | **2001 Plan** |
| **Chemistry, Manufacturing, and Controls (CMC)** | | | | | $346 | $1,031 |
| Formulation / Analytical | | | | | | |
| | | | | | **2000 ACG** | **2001 Plan** |
| **Drug Safety Support** | | | | | $1,681 | $2,727 |
| Ongoing Drug Safety support | | | | | | |
| **Other Support Costs** | | | | | | |
| Discovery | | | | | $1,447 | $1,366 |
| Medical Affairs | | | | | $3 | $25 |
| Regulatory Affairs / Research Quality Assurance | | | | | $26 | $35 |
| Other / Licensing Fees | | | | | $90 | $125 |
| **Total Program** | | | | | **$5,506** | **$7,866** |

Confidential

ABBT246140

## Anti-Mitotic (ABT-751)
### 2001 Plan Development Cost Summary

| Program Status | 1998 | | | | 1999 | | | | 2000 | | | | 2001 | | | | 2002 | | | | 2003 | | | | 2004 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Phase I | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Phase II | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Phase III | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

In-license ↑

| Major Development Activities and Costs | Total Patients | Enrolled as of 9/30/00 | Start | End | 2000 AGU | 2001 Plan Cost |
|---|---|---|---|---|---|---|
| **Clinical Program** | | | | | | $000 |
| Multiple Dose in Cancer Patients #1 | 24 | -- | Jan-2001 | Nov-2001 | -- | $456 |
| Multiple Dose in Cancer Patients #2 | 24 | -- | Apr-2001 | May-2002 | -- | $1,092 |
| Safety and Efficacy #1-#6 | 190 | -- | Aug-2001 | Oct-2002 | -- | |
| Other Studies / EVR | | | | | -- | $2,782 |
| Vendor Management | | | | | -- | $613 |
| Data Management/Statistics | | | | | -- | $5,331 |
| | | | | | | |
| **Chemistry, Manufacturing, and Controls (CMC)** | | | | | 2000 AGU | 2001 Plan |
| Formulation / Analytical | | | | | | $2,300 |
| | | | | | | |
| **Drug Safety Support** | | | | | 2000 AGU | 2001 Plan |
| Ongoing Drug Safety support | | | | | | $1,665 |
| | | | | | | |
| **Other Support Costs** | | | | | 2000 AGU | 2001 Plan |
| Discovery | | | | | -- | $7 |
| Medical Affairs | | | | | -- | |
| Regulatory Affairs / Research Quality Assurance | | | | | -- | $461 |
| Other / In-Licensing Fees | | | | | $6,000 | $255 |
| **Total Program** | | | | | $6,000 | $10,000 |

Confidential

ABBT246143

## ONCOLOGY - FTI ABT-xxx
### 2001 Plan Development Cost Summary

| Program Status | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|
| | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 |
| Phase I | | | | | | | | |
| Phase II | | | | | | | | |
| Phase III | | IND | | | | | NDA | Launch |

**Major Development Activities and Costs**

| | Total | | | | | | |
|---|---|---|---|---|---|---|---|
| **Clinical Program** | Patients | | Start | End | | 1999 AGU | 2001 Plan |
| | | | | | | Cost | Cost |
| Phase I Multiple Escalating Dose | 40 | | Dec. 2001 | Nov. 2002 | | N/A | $150 |
| | | | | | | | |
| Phase I Cancer | | | | | | N/A | $370 |
| Vendor Management | | | | | | N/A | $100 |
| Data Management/Statistics | | | | | | N/A | $78 |

| **Chemistry, Manufacturing, and Controls (CMC)** | | | | | 2000 AGU | 2001 Plan |
|---|---|---|---|---|---|---|
| Formulation / Analytical | | | | | N/A | $1,100 |

| **Drug Safety Support** | | | | | 2000 AGU | 2001 Plan |
|---|---|---|---|---|---|---|
| Drug Safety support | | | | | N/A | $2,154 |

| **Other Support Costs** | | | | | 2000 AGU | 2001 Plan |
|---|---|---|---|---|---|---|
| Discovery | | | | | N/A | $2,600 |
| Medical Affairs | | | | | N/A | |
| Regulatory Affairs / Research Quality Assurance | | | | | N/A | |
| Other Costs / In-licensing Fees | | | | | N/A | $130 |
| **Total Program** | | | | | N/A | $6,600 |

ABBT246146

Confidential

Dopamine Receptor Agonist ABT-xxx
2001 Plan Development Cost Summary

| Program Status | 2000 | | | | 2001 | | | | 2002 | | | | 2003 | | | | 2004 | | | | 2006 | | | | 2007 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Phase I | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Phase II | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Phase III | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

EOC → | → Launch | → NDA

| Major Development Activities and Costs | Total | | | 2000 AGU | 2001 Plan |
|---|---|---|---|---|---|
| Clinical Program | Dollars | Launched | Start | End | $xxx |
| Phase I Multiple Escalating Dose | | | | N/A | |
| Phase I Cancer | | | | N/A | |
| Venture Management | | | | N/A | |
| Data Management/Statistics | | | | N/A | $0 |
| Chemistry, Manufacturing, and Controls (CMC) | | | | 2000 AGU | 2001 Plan |
| Formulation / Analytical | | | | N/A | $x |
| Drug Safety Support | | | | 2000 AGU | 2001 Plan |
| Drug Safety support | | | | N/A | $1,000 |
| Other Support Costs | | | | 2000 AGU | 2001 Plan |
| Discovery | | | | N/A | $5,600 |
| Medical Affairs | | | | N/A | |
| Regulatory Affairs / Research Quality Assurance | | | | N/A | $0 |
| Other Costs / In-licensing Fees | | | | N/A | |
| Total Program | | | | N/A | $6,600 |

ABBT246149

Confidential

Pharmaceutical Products Division
Sample Direct/Indirect Rate & Headcount Distribution
2001 Plan

| Rate | Data Management | Toxicology/Pathology | D | E | Total |
|---|---|---|---|---|---|
| **Direct** | | | | | |
| Payroll (Both PMP and Supv/Mgr) | 6,577 | 5,272 | 3,065 | 2,009 | 5,074 |
| Office Supplies | 53 | 51 | 31 | 18 | 49 |
| T & E | 26 | 84 | 51 | 30 | 81 |
| Sem/Edu | 21 | 73 | 10 | 60 | 70 |
| Supplies | 41 | 440 | 197 | 231 | 423 |
| Consultant | 291 | 67 | 21 | 43 | 64 |
| Printing | 73 | 4 | 2 | 2 | 4 |
| Clinical Tracking Costs | 4,075 | | | | |
| Depreciation | 1,031 | 258 | 108 | 140 | 248 |
| UNIX Based Support | 3,453 | 921 | | | |
| Utilities | 62 | | | | |
| Floorspace | 579 | 1,479 | 825 | 597 | 1,472 |
| Housekeeping | 23 | | | | |
| Other | 112 | 389 | 134 | 166 | 300 |
| Sub-Total Direct | 16,416 | 9,042 | | | |
| | | | | | |
| **Indirect** | | | | | |
| Patents & Trademarks | 285 | 388 | 261 | 127 | 388 |
| Corporate Indirect | 697 | 949 | | | |
| PPD Indirect (Mgmt.) | 337 | 458 | | | |
| Department Overhead | 396 | 584 | 584 | | 584 |
| Other | 46 | 62 | 42 | 20 | 62 |
| Sub-Total Indirect | 1,761 | 2,441 | | | |
| | | | | | |
| Total | 18,177 | 11,483 | 5,326 | 3,443 | 8,769 |
| | | | | | |
| % Direct | 90% | 79% | | | |
| % Indirect | 10% | 21% | | | |
| | | | | | |
| **Headcount:** | | | | | |
| | | | | | |
| Direct Headcount | 123 | 88% | 53 | 88% | |
| Indirect Headcount | 17 | 12% | 7 | 12% | |
| | | | | | |
| Total Headcount | 140 | | 60 | | |
| | | | | | |
| Rate | 92.06 | 135.42 | | | |
| Hours | 1,600 | 1,600 | | | |
| Annual Rate | 147,296 | 216,672 | | | |

Confidential

ABBT246150

**Pharmaceutical Products Division**
**Sample Direct/Indirect Project Funding Distribution**
**2001 Plan ($000)**

| | ABT-773 (Late Stage - Phase III) | | | MMH (Early Stage) | | |
|---|---|---|---|---|---|---|
| | Direct | Indirect | Total | Direct | Indirect | Total |
| PPD Investigational Drug | 0.1 | 0.0 | 0.4 | - | - | - |
| Venture Management | 4.8 | 1.5 | 6.5 | 0.6 | 0.2 | 0.9 |
| Discovery | 2.2 | 0.2 | 2.4 | 1.1 | 0.3 | 1.5 |
| Drug Safety | 1.5 | 0.2 | 1.7 | 1.8 | 0.3 | 3.1 |
| PARD | 4.8 | 0.4 | 5.3 | 0.8 | 0.2 | 1.0 |
| Plant / Center | 2.0 | 0.1 | 2.1 | 0.1 | 0.0 | 0.1 |
| Development Operations | 4.2 | 0.5 | 4.6 | 0.1 | 0.0 | 0.1 |
| Regulatory Affairs | 0.2 | 0.0 | 0.3 | 0.0 | 0.0 | 0.0 |
| Medical Affairs | 0.8 | 0.1 | 5.0 | 0.0 | 0.0 | 0.0 |
| Administration | 1.5 | - | 1.6 | 0.1 | - | 0.1 |
| AI Manpower | 6.7 | - | 0.7 | - | - | - |
| Bulk Drug / Process | 15.9 | - | 15.9 | - | - | - |
| Clinical Grants | 43.1 | - | 43.1 | 1.3 | - | 1.3 |
| Total | 83.6 | 3.2 | 86.6 | 6.2 | 0.9 | 7.1 |
| % Split | 96.3% | 3.8% | 100.0% | 86.6% | 13.4% | 100.0% |

ABBT246151

Confidential

*CONFIDENTIAL*

# ABT-594

## Descriptive Memorandum

*February 2001*

Abbott Laboratories

Confidential

ABBT246076

*ABT-594 Opportunity Overview*

ABT-594 is a non-opioid, non-NSAID analgesic that is a potent and selective neuronal nicotinic receptor (NNR) agonist being studied for the treatment of pain. ABT-594 is 30 to 100-fold more potent and equally efficacious to morphine in several well-characterized animal models of pain. The preclinical side effect and dependency liability profile of ABT-594 is superior to that of morphine.

ABT-594 is orally administered, and BID dosing is expected. Its initial targeted indication is symptomatic treatment of diabetic neuropathic pain. It is covered by a composition of matter patent through June of 2016, and also has a use patent pending in analgesia that would provide protection through September of 2017.

The IND filing of ABT-594 was in December 1998. A Phase IIb (dose ranging) trial began April 2000 in diabetic neuropathic pain. A Go/No Go decision for clinical efficacy is expected June 2001. The NDA filing is expected in 3Q2003. Development of additional formulations is under consideration (parenteral, transdermal, extended-release).

U.S. sales in 1999 for the key neuropathic pain treatments, Neurontin, carbamazepine, and tricyclic antidepressants (TCAs), are estimated to be $350 million. Neurontin sales account for the bulk of this, with an estimated 40% of this antiepileptic drug's sales being for neuropathic pain. Neurontin's 2000 sales are expected to reach $1 billion with perhaps 50% of its use in neuropathic pain. This dollar market value likely underestimates this market's potential due to a number of factors. Only the anticonvulsant, Tegretol (carbamazepine), currently off patent, and Lidoderm, a lidocaine patch, have specific indications for a type of neuropathic pain (trigeminal neuralgia and post-herpetic neuralgia, respectively) in the U.S. Currently, there is an unmet market need for novel neuropathic pain treatments such as ABT-594. Therefore, this compound is likely to be well received in this arena. Outside the U.S., Neurontin recently received an indication in the U.K. for the treatment of neuropathic pain. Despite these opportunities, there has been little to no funding from the pharmaceutical industry to improve diagnosis and treatment of neuropathic pain and drive market growth.

Ex-U.S. sales of carbamazepine and Neurontin for treatment of neuropathic pain are estimated to be approximately $140MM in 1999. Carbamazepine is still the treatment of choice ex-U.S., with estimated sales of approximately $90MM in neuropathic pain. Neurontin has achieved only $53MM in sales for this pain segment, with a price approximately 3-4 times that of carbamazepine, suggesting a patient share of only 10-20%.

Nociceptive pain is categorized by duration (acute or chronic) and by severity (mild, moderate, and severe). The mild and, to a lesser extent, moderate segments have multiple product entries and are generally well satisfied by OTC products such as aspirin, acetaminophen and ibuprofen. The prescription market for nociceptive pain is made up of four key classes of analgesics: NSAIDs, COX-2s, Opioids (and combination products), and Other Non-Opioids. In 1999, sales for these four classes of analgesics exceeded $12BB ($6.7BB U.S., $5.6BB Ex-U.S.)

Confidential                                                                ABBT246077

*Market Size / Prevalence*

Pain is the most common symptom of disease and the most frequent complaint with which patients present to physicians. Chronic pain, including both neuropathic and nociceptive pain, is considered to be the single most common cause of suffering and disability in the industrialized world with an estimated 25-30% of the population experiencing some form of chronic pain.

Neuropathic pain is a frequent sequela of diabetes, cancer, AIDS and other viral infections, as well as entrapment neuropathies such as carpal tunnel syndrome. Diabetes and its associated complications are increasing at an alarming rate in the United States. Despite advances in treatment, the development of diabetic complications such as neuropathy remains significant. The diagnosed prevalence of diabetic neuropathy is estimated to be about 2 to 3 million patients, with at least 10 to 20% of those patients experiencing painful symptoms (~200,000 to 600,000.) AIDS-related neuropathic pain is estimated to affect approximately 40% of HIV-infected individuals (~14 million.) Post-herpetic neuralgia (PHN) is another virally induced neuropathic pain syndrome. Annually, acute herpes zoster infection (shingles) occurs in almost a quarter of a million people over the age of 60 in the U.S. alone. Pain lasting more than one year has been reported in 22% of patients over the age of 55 and in 48% of those over 70 years of age. In cancer, nerves can be damaged by mechanical distortion from a tumor mass, infiltration by tumor, chemotherapy, or radiation therapy and, therefore, neuropathic pain is common. An estimate of the prevalence rate for cancer-related neuropathic pain in the U.S. is 200,000 people.

Chronic nociceptive pain categories include osteoarthritis (OA), chronic back and neck pain, rheumatoid arthritis (RA), and cancer pain. These diagnoses are expected to become more prevalent as the population ages. Current overall prevalence for these disorders is staggering (over 200 million worldwide) and, although the diagnosed and treated populations are lower, improved treatment options and awareness have the potential to drive significant growth. OA is one of the most common nociceptive pain conditions treated by primary care physicians and three-fourths of OA sufferers surveyed indicate that the disease interferes with their daily activities. Chronic back and neck pain are also highly prevalent and represent an estimated 40% of a primary care physician's (PCP's) chronic pain patient population.

Confidential

ABBT246078

*Competition, Current Marketed Products:*

The following tables show the factored U.S. and ex-U.S. prescription and sales volume for key neuropathic pain therapies in 1999.

| 1999 Key Neuropathic Pain Products, Estimated TRxs | | | | |
|---|---|---|---|---|
| Product/Class | 1999 U.S. TRx (MM) | U.S. TRx CAGR '97-'99 | 1999 ex-U.S. TRx (MM) | ex-U.S. TRx CAGR '97-'99 |
| Neurontin | 3.3 | 26.3% | N/A | N/A |
| carbamazepine | 1.0 | 12.6% | N/A | N/A |
| TCAs | 8.2 | 1.1% | N/A | N/A |
| TOTAL | 12.5 | 5.6% | N/A | N/A |

Source: IMS, factored for neuropathic uses.

N/A = not available

| 1999 Key Neuropathic Pain Products, Estimated $ Sales | | | | |
|---|---|---|---|---|
| Product/Class | 1999 U.S. Sales ($MM) | U.S. Sales CAGR '97-'99 | 1999 ex-U.S. Sales ($MM) | ex-U.S. Sales CAGR '97-'99 |
| Neurontin | $308 | 26.7% | $53 | 57.6% |
| carbamazepine | $17 | 13.1% | $87 | 2.5% |
| TCAs | $26 | -3.3% | N/A | N/A |
| TOTAL | $351 | 21.7% | $140 | 10.1% |

Source: IMS, factored for neuropathic uses; Ex-U.S. data includes retail pharmacy data from all audited markets

N/A = not available

## Competition, Products in Development

Almost 100 compounds are currently in development for prescription pain management, though some of these compounds are also being developed for non-analgesic indications. Most of the analgesic compounds in the pipeline represent incremental improvements over the opioids or NSAIDs, or consist of new formulations or delivery mechanisms for the standard analgesics. Fewer than 30% of the compounds in development have novel mechanisms of action. Drugs with novel mechanisms are expected to provide the bulk of promoted competition for ABT-594.

In addition to the novel analgesics in the table below, a number of new formulation and combination products, most often containing an opioid, are in development. Second generation COX-2s are also in development but are not likely to represent major breakthroughs on the scale of the first generation products.

Confidential

ABBT246079

| Analgesia Development Pipeline – Key Novel Agents | | | | |
|---|---|---|---|---|
| Product | Company | Mechanism | Phase | Comments |
| pregabalin | Pfizer | Unknown; possibly through (2nd subunit binding | III | Neuropathic pain; chronic pain, follow-up to Neurontin |
| sareduant | Sanofi | NK-2 receptor antagonist | II | General pain; MOA losing favor; active program |
| ZD4952, ZD 6416 | Zeneca | Prostaglandin receptor antagonist | II | Moderate to severe pain, neurogenic pain |
| GV196771 | Glaxo | Glycine antagonist | II | Chronic pain; showing promise |
| Tepoxalin | Johnson & Johnson | COX/5-LO inhibitor | II | OA, described as 'steroid replacing anti-inflammatory drug' |
| darbufelone | Parke-Davis | COX/5-LO inhibitor | II | General pain |
| 117mSn DTPA | Brookhaven National Lab/Diatide | Unknown | II | Cancer pain Bone cancer (preclinical) |
| cizolirtine | Esteve | Substance P agonist | II | Analgesia, antipyretic |
| ADD 234037/ harkoseride | Houston University | Glycine NMDA associated antagonist | II | Neurogenic pain |
| LY303870/ lanepitant | Eli Lilly | Neurokinin 1 antagonist | II | Pain (migraine – discontinued) |
| cotykade deviacade | Merck | Cholecystokinin B antagonists | II | Pain (UK) |
| RPR 100893 dapitant | Aventis | Neurokinin 1 antagonist | II | Pain (France) |
| prosaptide TX14A | Myelos Neurosciences | Unknown | I/II | Diabetic neuropathies, Pain |
| CNS 5161 | Cambridge NeuroScience | Glutamate antagonist, NMDA receptor antagonist | I | Neurogenic pain |
| HCT-3012 | NicOx | Nitric oxide NSAID | I | Pain and inflammation |
| Sources: ADIS, IMS, Decision Resources, company reports | | | | |

Confidential

ABBT246080

| Analgesia Development Pipeline – Nicotinic Mechanisms | | | |
|---|---|---|---|
| Product | Company | Phase | Comments |
| GTS-21 | Taisho | II | Target is Alzheimer's disease; may have preclinical pain program; looking for partner |
| CMI 980 | Cytomed | Preclinical | Target is pain; epibatidine analog |
| SIB-T1887 | Sibia | Preclinical | Target is pain |
| FID 072021 | Fidia | Preclinical | Target is pain; not actively funding |
| Sources: ADIS, IMS, company reports | | | |

### Unmet Needs

In general, a significant unmet need exists for safer, non-abusable, non-addicting, non-tolerance-producing, and non-scheduled efficacious oral and parenteral analgesic products for the treatment of moderate to severe neuropathic and chronic nociceptive pain.

| Unmet Market Needs and the Impact of the Pipeline | |
|---|---|
| Unmet Need | Pipeline Impact |
| Efficacy in moderate to severe pain without tolerance, dependence or abuse potential | Novel nicotinic agents like ABT-594 may provide efficacy in more severe pain states without opioid-like liabilities. |
| Efficacy in neuropathic pain | Pregabalin may provide incremental improvement in neuropathic pain efficacy over gabapentin, but may also have increased frequency of adverse events. Novel nicotinic agents like ABT-594 appear to have efficacy in neuropathic pain, based on animal models. |
| Reduction in the GI bleeding risk of NSAIDs | COX-2 inhibitors appear to reduce the incidence and severity of GI ulcers and bleeding; second generation COX-2s may increase therapeutic window further. ABT-594 may need to demonstrate low G.I. complication rate. |
| Overcome ceiling effect of NSAIDs | Preclinical studies did not indicate a ceiling effect for novel nicotinic agents like ABT-594. |
| Extended dosage intervals or novel delivery mechanisms for improved compliance and convenience | Once weekly dosing formulations being explored for COX-2s, etc. Transdermal patch technology improvements likely; may need to provide line-extension / alternate formulations for ABT-594. |
| Therapies aimed at disease modification, prevention | Agents that decrease rate of diabetic complications (e.g., aldose reductase inhibitors) or directly treat neuropathy (ximoclomol) may decrease incidence of neuropathic pain; thereby decreasing available market for ABT-594. |

Confidential

ABBT246081

*Product / Development Background*

*Scientific Rationale for ABT-594*

Recent findings in the understanding of pain mechanisms have led to new conceptual approaches to clinical pain and a new understanding of potential novel molecular targets for analgesic drug development. Molecular targets have included modulators of glutamate neurotransmission (NMDA antagonists), ion channel modulators (neuron specific calcium channels, TTX-resistant sodium channels), neurokinin antagonists (NK-1), and novel anti-epileptics targeting the calcium receptor. None of these approaches has yet produced compounds exhibiting broad-spectrum analgesic efficacy with decreased side effect liability.

ABT-594 is a non-opioid, non-NSAID analgesic that is 30- to 100-fold more potent and equally efficacious to morphine in treating moderate to severe pain in several well-characterized animal models of pain. The preclinical side effect and dependence liability profile of ABT-594 is superior to that of morphine. Mechanistically, ABT-594 is a potent and selective neuronal nicotinic receptor (NNR) agonist with high oral bioavailability in rat, dog, and monkey.

In pre-clinical studies, ABT-594 rapidly distributes to the brain following systemic administration and, like morphine, can work at multiple levels in the central and peripheral nervous system to modulate pain perception. ABT-594 produces antinociceptive effects by interacting at both central and peripheral nAChRs. Injections of ABT-594 into brain at doses 1000-fold lower than given peripherally produce marked antinociceptive activity, indicating that ABT-594 can also activate descending pathways from the CNS to modulate pain processing. It also inhibits the release of the primary nociceptive transmitters, substance P and calcitonin gene related peptide (CGRP) *in vitro*, at the level of the dorsal horn of the spinal cord suggesting that ABT-594 can attenuate mechanisms leading to neurogenic inflammation, central sensitization and consolidation of pain-mediated neuronal changes.

ABT-594 is expected to be a highly differentiated product. It is expected to be the first neuronal nicotinic receptor agonist to receive an indication for pain. It has a novel mechanism of action and a potentially broad coverage of chronic pain conditions. In addition, it has an opioid-like efficacy without tolerance, dependence or abuse potential, while having equivalent/superior efficacy to other drugs used to treat neuropathic pain.

*Clinical Studies*

Human clinical trials began in 1997. Phase I trials with an oral solution formulation indicated that 150ug/day would be the maximum tolerated dose. Results from subsequent phase I and phase II trials with soft elastic capsule (SEC) and hard gelatin capsule (HGC) suggest that higher doses would be tolerated. Phase IIa studies with ABT-594 SEC formulation suggest a trend towards analgesic effect at 75ug BID, the maximum dose studied in this protocol. ABT-594 was generally well tolerated in these studies. The most common adverse events for subjects receiving ABT-594 75ug BID were nausea (15%), headache (13%), dizziness (7%), insomnia (6%), and vomiting (5%).

A phase IIb study for neuropathic pain at higher, titrated doses of ABT-594 began in April 2000 and ends in June 2001. A total of 320 patients is anticipated to be included in the study.

Confidential

ABBT246082

*Considerations*

Target Profile:

The current status of ABT-594's profile vs. target profile is summarized in the table below:

| Target Profile Attribute | Probability |
|---|---|
| Not scheduled (DEA) | High |
| Very few abnormal Liver Function Tests | High |
| Few Drug Interactions | High |
| BID / TID dosing | High |
| No reduced efficacy or increased AEs in nicotine users | High |
| Onset of action 1.5 – 2.0 hours | High |
| Neuropathic efficacy | Medium |
| No tolerance, dependence or withdrawal | Medium |
| Other safety OK | Medium |
| No cravings in ex-nicotine users | Medium |
| Low nausea / vomiting | Low |

*Label Strategy:*

BASE: Indicated for the treatment of diabetic neuropathic pain.

UPSIDE:    1) Treatment of pain associated with OA

                2) Treatment of post-herpetic neuralgia

                3) Treatment of neuropathic pain

                4) Treatment of chronic pain

                5) Treatment of cancer pain

*Cost of Goods Sold*

The projected average daily dose is expected to be a maximum of approximately 600 mcg base equivalent / day. Based upon this dosage projection and the estimated cost of bulk drug substance of $40M per Kg base equivalent, the estimated cost for drug substance at launch will be approximately $0.024 per day.

Confidential

ABBT246083

*Pricing:*

US: Pricing new, and particularly novel, products at a reasonable premium will likely continue to be the norm in the years leading up to the launch of ABT-594. Current forecast assumptions put the price of ABT-594 at a level comparable to Celebrex and Neurontin, grown at a modest 2% per year to launch year AWP of approximately $85 for a 30 day prescription.

Ex-US: New pain medications must demonstrate a true advantage in efficacy and/or side effects to receive regulatory approval, especially by the European Medicines Evaluation Agency (EMEA); assuming the target efficacy and tolerability profile of ABT-594 is achieved, ABT-594 would meet this requirement. Because ABT-594 may have application in both neuropathic and chronic nociceptive pain, the ex-U.S. pricing assumption for ABT-594 is comparable to COX-2 pricing. The current average price for COX-2's is approximately $1.10 per day; however, this reflects a large percentage of sales in "free-pricing" countries, where COX-2s launched first, which tend to have higher than average prices. Therefore, the average ex-U.S. price for ABT-594 is assumed to be $0.90/day.

Confidential

ABBT246084

*CONFIDENTIAL*

# ABT – 492

## Descriptive Memorandum

*February 2001*

## Abbott Laboratories

## ABT 492

### Overview

The commercial success of fluoroquinolones such as ciprofloxacin and levofloxacin, along with the desire to further improve the properties of these compounds (microbiological spectrum and safety, for example) has led to fierce competition to identify analogs with superior therapeutic properties. In addition, the development of resistance to present antibiotics will drive a continued need for new agents. Goals for a quinolone antibiotic include broad-spectrum indications equal to trovafloxacin, antibacterial activity comparable to trovafloxacin, tolerability comparable to levofloxacin, oral and intravenous formulations, once daily dosing, length of treatment equal to moxifloxacin, and an acceptable cost of goods. ABT-492, an in-licensed compound from the Wakunaga Pharmaceutical Co. is being developed for evaluation to meet these goals.

The in vitro antibacterial activity of ABT-492 was consistently more potent than trovafloxacin against most quinolone-susceptible pathogens, including species responsible for community and nosocomial respiratory tract infections, urinary tract infections, blood stream infections, skin and skin structure infections, and anaerobic infections. The compound has potent activity against multidrug-resistant S. pneumoniae (penicillin-, macrolide-, tetracycline-resistant) and retained activity against S. pneumoniae strains resistant to other quinolones including trovafloxacin. ABT-492 was also highly active against anaerobes and ciprofloxacin-susceptible P. aeruginosa. ABT-492 was as active as trovafloxacin against C. trachomatis, indicating good intracellular penetration. Thus, ABT-492 is likely to be a useful broad-spectrum antibacterial agent. The enhanced antibacterial activity of ABT-492 relative to ciprofloxacin, levofloxacin, and trovafloxacin is likely to be explained, in part, by it's potent interactions with bacterial topoisomerases. ABT-492's equivalent activity against both the DNA gyrase and the topoisomerase IV of pathogens, give ABT-492 a potential for decreased development of resistance.

The in vitro potency data suggests that ABT-492 has the potential to be therapeutically effective at doses comparable to trovafloxacin and superior to levofloxacin. In addition, ABT-492 was consistently more potent than trovafloxacin against MRSA and vancomycin-resistant enterococci. In both these cases, however, therapeutic utility remains to be assessed in the clinical setting.

S. pneumoniae was chosen as the dose-defining pathogen since it is the key pathogen in severe respiratory tract infections and treatment of infections caused by this pathogen has traditionally been a weakness of most quinolones. For treatment of fluoroquinolone-susceptible S. pneumoniae respiratory tract infections, oral dosing may be similar to trovafloxacin based on data generated in lung infection models. Because of the excellent potency of ABT-492 against fluoroquinolone-resistant S. pneumoniae with an $MIC_{90}$ of 0.12 µg/ml, this group of emerging strains may be targeted as a key differentiation point from other quinolones. Also, data from the thigh infection model suggests significantly greater efficacy for ABT-492 than for trovafloxacin.

### The Market

ABT-492 is broad-spectrum anti-infective agent with potential application across a broad range of indications, including respiratory infections, genito-urinary infections, and skin/soft tissue infections. It is assumed that a pediatric formulation would not be a part of the primary development plan due to the known adverse events caused by quinolones in pediatric populations. Nonetheless, reports of quinolone pediatric development has been reported (gatifloxacin), hence the pediatric market should be regarded as a potential upside for this quinolone should its safety profile merit its use in pediatrics.

CONFIDENTIAL                                                          2

Confidential

ABBT246086

**Current Treatment Options**

| Class | Mechanism of Action | Comments |
|---|---|---|
| Penicillins | Cell wall synthesis inhibitor | Mostly generic; class has seen significant decrease as a result of penicillin resistance |
| Cephalosporins | Cell wall synthesis inhibitor | Some generic, class has seen significant decrease in use as a result of prevalence of B-lactamase producing strains and modification of penicillin-binding proteins. |
| Tetracyclines | Protein synthesis inhibitor | Generic agents, relatively high levels of resistance but are still useful in some indications |
| Sulfonamides | Folic acid synthesis | Generic agents, relatively high levels of resistance but are still useful in some indications |
| Macrolides | Protein synthesis inhibitor | Widespread use in RTI, macrolide resistance has been increasing rapidly, but has not yet translated into declines in clinical efficacy; *H. flu* activity continues to be class weakness, along with GI adverse events, drug-drug interactions, & taste perversion |
| Quinolones | DNA synthesis inhibitor | Fastest growing antibiotic class, used in a broad spectrum of indications; class historically associated with poor Gram+ pathogen coverage and sub-optimal safety profiles; newer agents (Levaquin, Tequin, Avelox) have improved dramatically along both spectrum and safety dimensions. |
| Oxazolidinones | Protein synthesis inhibitor | Newest antibiotic class to reach market, due to limited Gram− profile will be used primarily in nosocomial setting |

**U.S. Market**

1999 U.S. antibiotic prescription and sales data are presented in the table below.

| | | | 1995 | 1996 | 1997 | 1998 | 1999 | CAGR₉₅₋₉₉ |
|---|---|---|---|---|---|---|---|---|
| U.S. | TRXs (MM) | Tab/Cap | 220 | 215 | 211 | 208 | 221 | 0.1% |
| | | Oral Susp. | 76 | 66 | 63 | 59 | 61 | -5.3% |
| | | I.V. | NA | NA | NA | NA | NA | NA |
| | Sales ($MM) | Tab/Cap | $4,057 | $4,220 | $4,467 | $4,848 | $5,715 | 8.9% |
| | | Oral Susp. | $1,075 | $979 | $977 | $1,001 | $1,120 | 1.0% |
| | | I.V. | $1,865 | $1,829 | $1,855 | $1,890 | $2,117 | 3.2% |

Tab/cap and oral suspension prescriptions had been declining 1-2% per year in the period of 1995-1998, presumably from increased attention to appropriate prescribing in the face of increasing resistance; however, prescriptions recovered in 1999, though this may be explained at least in part by a relatively late 1998-99 flu season. Even in the face of this negative pressure on antibiotic use, however, sales in the U.S. have continued to increase, particularly in the tab/cap market. This is due to the trend of replacing relatively low-cost generic agents with higher priced premium antibiotics; during 1995-1999, generic tab/cap prescriptions declined by 30MM. So while negative pressure on the use of these antibiotics continues, it appears the market is willing to bear higher costs for agents that meet unmet need. The IV market has grown slightly in terms of sales, also being driven largely by the replacement of generic agents with more costly branded agents.

CONFIDENTIAL.                                             3

Confidential                                                    ABBT246087

Quinolones have seen dramatic growth, with oral and IV sales growing at 17% and 16% compound annual rates, respectively, from 1995-1999. This growth is a function of the newer quinolones successfully penetrating the RTI segment, which was initiated with the 1997 launches of Levaquin and Trovan (withdrawn) and continues with the recent introductions of Tequin and Avelox.

### Ex-U.S. Market

Ex-U.S. sales of antibiotics totaled $11.7 billion in 1999. The tab/cap represents the largest segment, with sales of $9.4 billion on 770 MM TRX. TRX growth has been flat, with a 1996-99 CAGR of 0.5%; the use of antibiotics is predicted to slowly decline due to more judicious use of antibacterials in the face of increasing bacterial resistance.

Ex-US, the quinolone class accounted for 8% (62MM) of total tab/cap market prescriptions and 13% of sales ($1.2 billion). Ciprofloxacin is the market leader ex-US, with approximately 47% of the quinolone market Rxs (29MM) and 44% ($530MM) of sales. Levofloxacin launched in many European markets in 1998/1999 and holds approximately 14% Rx share of the European quinolone market, and 0.8% of the overall tab/cap market. Although grepafloxacin and trovafloxacin also launched in some European countries in 1999, both products were recently pulled from the market due to liver toxicity and other complications. Moxifloxacin launched in Germany in Q4 1999, but has not yet been approved in other markets. In Japan, levofloxacin launched in 1994 and still commands a 65% Rx share of the quinolone market and 10% of the Japanese tab/cap market overall. Japan accounts for approximately 80% of ex-US levofloxacin sales ($370MM).

| Class | 1999 Ex-US Tab/Cap Market | | | | | |
|---|---|---|---|---|---|---|
| | Sales ($MM) | Sales Share | Sales CAGR '96-'99 | TRXs (MM) | TRx Share | TRx CAGR '96-99 |
| Market | $9,346 | - | 3.6% | 770 | - | 0.5% |
| Quinolone Class | $1219 | 13% | -12% | 62 | 8% | NA |
| Cipro | $530 | 5.7% | 4.9% | 29 | 3.8% | NA |
| Levaquin | $466 | 5.0% | NA | 18 | 2.3% | NA |
| Trovan | $12 | 0.1% | NA | 0.5 | 0.1% | NA |

### Competition

The anti-infective pipeline is very competitive, but most of the competition is focused on improving the activity and safety of the quinolones. Ketolide development is the only other area of activity which is in late stage of development. The quinolone compounds in present development may fall out because of safety or lack of activity against resistant pathogens

| Competitive Analysis – Emerging Competition | | | | | |
|---|---|---|---|---|---|
| Product | Company | Class | Phase/Estimated Time to Market | Country | Comment |
| Ketek (telithromycin) | Aventis | Ketolide | Filed 3/00 Est. launch 3/01 | U.S. | Respiratory indications, filed NDA 3/00; 800 mg QD, first in its ketolide class to reach market. |

CONFIDENTIAL                4

Confidential

ABBT246088

| Competitive Analysis – Emerging Competition | | | | | |
|---|---|---|---|---|---|
| Product | Company | Class | Phase/Estimated Time to Market | Country | Comment |
| Factive (gemifloxacin) | SKB | Quinolone | Filed 12/98 Est. launch 12/00 | US | Superior to quinolones for MRSA; highly potent vs. RTI pathogens *H. flu, M. cat,* and *S. pneumo* and UTI pathogens *E. coli* and *P. mirabilis,* CRSP; potency > spar, trov, grepa and ≥ moxi; activity vs. *P. aeruginosa* ?; good atypical and mycoplasma coverage; intracellular penetration; low photo/CNS tox; 700 patient database |
| Sitafloxacin | Daiichi Sclyaku | Quinolone (IV only) | III II Est. launch 2002 | Japan U.S., Europe | Very potent MRSA, pseudomonas and bacteroides activity, diarrhea, ALT, low WBC; still likely to target to severe rather than community infections |
| Bextmafloxacin | Chiel Foods | Quinolone | II Est. launch 2002 | UK | Active against UTI and RTI pathogens; superior to lome and cflo vs. *P. aeruginosa.* T½ = 14-19 hr; will likely be target to severe rather than community infections |
| CS-940 | Sankyo | Quinolone | II Est. launch 2002 | Japan | Active against G+-, excellent activity against *H. flu, z pripna, M. pneuma,* and *C. trachomatis;* greater potency than cipro; t½ ~7 hr; BA~80% |
| T-3811 | Toyama/BMS | Quinolone | I Est. launch 2003 | Japan | Excellent potency and low toxicity |
| DC-756 | Daiichi Pharma | Quinolone | Pre-clin Est. launch 2004 | Japan | Low toxicity; in vitro potency ≥ trova, STFX & HSR-903 |

### Unmet Needs

Overall unmet need in the anti-infective market is low.  Resistance represents the largest unmet need, which will continue to evolve over time.  Satisfaction with other product attributes, such as convenience, spectrum of activity, and tolerability/safety is quite high.  Any improvements in these areas will be incremental and will offer little in the way of differentiation.

ABT-492 is one of the most active agents against the resistant organisms.  It has indications that will have a low propensity for the development of resistance.  ABT-492 will be developed to maximize any opportunities to shorten therapy   ABT-492 was chosen from hundreds of quinolones because of its potential to be well tolerated and safe in humans   ABT-492 will have few interactions with other drugs

| Unmet Need | Pipeline Impact |
|---|---|
| Activity against resistant organisms | *Strep. pneumo,* MRSA, and VRE  represent most problematic pathogens although new quinolones/ketolides do well with most resistant *Strep. pneumo* strains, quinolone-resistant *Strep. pneumo* may develop; pseudomonas resistance is also increasing; resistance will likely continue to be a source of unmet need due to its dynamic nature. |
| Low propensity for resistance development | Given that most compounds in development are from classes of drugs already in use, this need is largely unmet.  Unclear how quickly resistance will build to new classes of drug; gatifloxacin claims 8-methoxy functional group results in lower propensity for resistance development |
| Convenience (duration/frequency) | Standard moves toward 5-7 days of therapy with QD dosing; may start to see 3-day therapies for some indications (AECB) |
| Increased tolerability | While some degree of unmet need exists, increasingly, agents (which have not been withdrawn) are reaching the marketplace with adverse event profiles that approach clinical insignificance; a very clean safety |

CONFIDENTIAL                                                          5

Confidential

ABBT246089

**Deemer Deposition Exhibit 13**

**P's Exhibit LZ**

**Part 2**

| | profile should be regarded as a necessary component rather than a differentiating one |
|---|---|
| Few drug-drug interactions | Quinolones, macrolides, and ketolides all interact with other drugs to varying degrees; a potent drug with no interactions would be a benefit in this market |

*Considerations*

*Product Usage:* Physicians are likely to use ABT-492 for the sicker patients with the most difficult infections to treat. In the outpatient arena it will be used to treat community-acquired pneumonia and acute bacterial exacerbations of chronic bronchitis in the older patients with an underlying illness. It will also be used in the hospital for the community-acquired pneumonia patient who requires hospitalization and for serious nosocomial infections.

While many regard quinolones as agents that should be reserved for 2nd line use, their activity against *H. Influenzae* and resistant *Strep. pneumoniae* (which current macrolides do not offer) have resulted in a high level of acceptance for empiric 1st line use. The improved safety profiles of several recent quinolones have facilitated their use as 1st line agents. Provided that ABT-492 is proven to have a benign safety/adverse event profile, it will likely receive usage in both 1st-line (non-severe) and 2nd-line (severe) infections.

*Side Effects:* The quinolone class has potential prolongation of the QT interval and other cardiovascular effects. There is also increased regulatory scrutiny due to recent quinolone withdrawals from international markets. ABT-492 has been evaluated in the standard *in vivo* models used to evaluate QT interval potentials of other antibiotics and has shown no evidence of increasing QT. Also, compared to marketed quinolones, preclinical studies show no evidence or no increase incidence of CNS drug concentration (ie. less potential for dizziness); phototoxicity; and liver toxicity.

*Off-label use:* It is difficult to predict at this time what off-label uses will be seen for this compound. Initial development will be for the more common respiratory, urinary tract, skin, and hospital infections. Other indications will be evaluated after the primary approval of this compound. Many of the secondary indications will get usage before we have regulatory approval.

*COGS:* The initial cost of goods is in $6000/kg range, but will come down rapidly after the initial starting materials are determined. At time of launch ABT-492 will have a cost of goods in the $1500/kg range which is competitive compared to other quinolones and other new antibiotics.

*Dosing:* Based on animal models and the *in vitro* activity of ABT-492 the dose for most oral indications will be in the range of 100 to 200 mg give once daily.

*Development/Regulatory:* Anti-infective compounds are well understood by regulatory agencies globally and they have clearly defined clinical development path and regulatory guidelines for reference. Abbott Laboratories has been in this arena for many years and has experience with the FDA and European regulatory agencies and so the hurdles to development are well known. ABT-492 has begun but not yet completed its first Phase I study in healthy volunteers.

*Other Approaches:* Because of the well defined development guidelines there are not many options. The major development options are in dosing regiments. ABT-492 is a very potent drug which has demonstrated rapid killing of pathogens *in vitro* and *in vivo*, and the development plan will attempt to shorten treatment durations to increase the competitive advantages of this activity.

CONFIDENTIAL

6

Confidential

ABBT246090

*Pricing:* The community infection market is quite competitive from a pricing standpoint, with recent quinolones priced at approximately $45 per 5-7 days of therapy. The pricing strategy will depend on strengths/weaknesses of the ABT-492 product label, the competitive landscape at launch, and the managed care environment, but current pricing assumption is parity for ABT-492 with respect to other quinolones.

Confidential

ABBT246091

*CONFIDENTIAL*

# ABT – 773

**Descriptive Memorandum**

*February 2001*

Abbott Laboratories

Confidential

ABBT246064

## ABT-773

### Opportunity Overview

ABT-773 pertains to a promising new class of antibiotics known as ketolides. ABT-773 is likely to have activity against resistant strains of bacteria and will, therefore, compete effectively against currently marketed antibiotics. The compound is currently in Phase II/III trials. Phase III clinical trials began in Q4, 2000. ABT-773 has an expected U.S. launch date in Q1, 2004. Ex-U.S. launches are projected in 2004 for Europe and Japan.

Product features such as high efficacy, activity against resistant strains of bacteria and convenience should enable it to compete against both Zithromax and newer agents such as the quinolones. Dosing is expected to be once-a-day. A 5-day convenience pak at a competitive price will help maximize sales.

### The US Market

The overall antibiotic market in the U.S. reached $8.9 billion in sales in 1999. The tab/cap segment is the largest; sales in 1999 were $5.7 billion. The I.V. and oral suspension segments are comparatively smaller; total sales topped $2.1 and $1.1 billion, respectively.

Tab/cap and oral suspension prescription volume had been declining 1-2% per year in the period of 1995-1998, due to more appropriate prescribing in the face of increasing resistance. However, total tab/cap prescription volume recovered in 1999 and grew 6.3%. Even in the face of negative pressure on antibiotic use, dollar sales in the U.S. have continued to increase, particularly in the tab/cap market. This is due to the trend of replacing relatively low-cost generic agents with higher priced premium antibiotics. The market is willing to bear higher costs for agents that satisfy unmet needs. The I.V. market has grown slightly in terms of sales, also being driven largely by the replacement of generic agents with more costly branded agents.

Macrolides, largely fueled by the gains of Zithromax, have seen significant growth in terms of both prescriptions and sales. Zithromax prescriptions far outnumber those of other competitors, while its sales have nearly surpassed those of the sales leader, Cipro. Historically, quinolones saw relatively limited use for community respiratory tract infections (RTIs) because of poor Gram-positive coverage and sub-optimal adverse event profiles. Newer quinolones such as Levaquin have been successful in achieving more widespread use by virtue of its improved activity and adverse event profile. Levaquin currently accounts for approximately 30% of the quinolone market share. It is anticipated that recent quinolone introductions (Avelox, Tequin) will build upon the RTI momentum established by Levaquin. The growth of the macrolide and quinolone classes has come largely at the expense of cephalosporins and generic agents such as erythromycin and penicillin.

The following table shows 1999 tab/cap sales and prescriptions by class/product:

| | Sales | | | TRXs | | |
|---|---|---|---|---|---|---|
| | Sales ($MM) | Share | CAGR₉₅₋₉₉ | TRXs (MM) | Share | CAGR₉₅₋₉₉ |
| Penicillins | $144.3 | 2.6% | -1.0% | 52.5 | 23.7% | -5.6% |
| Cephalosporins | $980.9 | 17.2% | -5.8% | 37.9 | 17.1% | -3.5% |
| Ceftin | $382.9 | 6.7% | 1.9% | 5.6 | 2.5% | 1.0% |
| Cefzil | $184.7 | 3.3% | 12.5% | 2.7 | 1.2% | 13.7% |
| Other | $408.2 | 7.1% | 14.7% | 30.1 | 13.6% | -4.6% |
| Ext. Spec. Macrolides | $1,395.6 | 27.5% | 19.9% | 36.1 | 16.3% | 20.6% |
| Biaxin | $690.3 | 12.1% | 8.1% | 11.3 | 5.1% | 1.2% |
| Zithromax | $991.1 | 15.6% | 42.1% | 24.4 | 11.0% | 41.5% |
| Other | $14.0 | 2.2% | 21.0% | 0.4 | 0.2% | 53.0% |
| Quinolones | $1,622.1 | 28.6% | 17.0% | 24.0 | 10.8% | 11.7% |
| Cipro | $902.5 | 15.6% | 8.3% | 14.1 | 6.4% | -5.1% |
| Levaquin | $529.4 | 9.3% | NA | 7.0 | 3.1% | NA |
| Other | $190.3 | 3.3% | 2.2% | 3.0 | 1.3% | -6.4% |
| Augmentin | $779.1 | 13.8% | 17.8% | 10.7 | 4.8% | 11.8% |
| Other Classes | $596.5 | 10.3% | -1.1% | 60.4 | 27.3% | -4.1% |
| TOTAL TAB/CAP | $5,715.4 | 100.0% | 8.9% | 221.5 | 100.0% | 0.1% |

Confidential

ABBT246065

*U.S. Market Projections*

Resistance to antibiotics is likely to increase, creating opportunities for new agents with activity against resistance. Physicians will be urged to choose agents with an appropriate spectrum of activity relative to the infection being treated. Resistance will increasingly become part of the promotional mix for emerging agents. The ability of an agent to treat resistant strains and the real or perceived ability to slow or prevent resistance development (mutation prevention concentration, low mutation frequency, structure-activity relationships, etc) may confer competitive advantage to such agents.

• Quinolones, which historically have seen limited use in community-acquired respiratory infections, will become a significant class in this segment as new agents from this class are launched that specifically target RTIs.

• The market will become more competitive as new agents enter both the community segment (ketolides, quinolones) as well as the nosocomial segment (oxazolidinones, streptogramins, everninomycins, peptides, others).

• Several key branded antibiotics will lose patent exclusivity over the next three to five years. This may create an opportunity in the pediatric market as the top three pediatric brands (Augmentin, Cefzil, Zithromax) are among those losing patent exclusivity.

Antiviral influenza and cold therapeutics, as well as an increasing number of antibacterial vaccines may have a negative impact on antibiotic prescriptions.

*The Ex-U.S. Market*

Ex-U.S. sales of antibiotics totaled $11.7 billion in 1999. Tab/cap represents the largest segment, with sales of $9.4 billion from 770 million total prescriptions. Total Rx growth has been flat, with a 1996-99 CAGR of 0.5%. The use of antibiotics is predicted to slowly decline due to more judicious use of antibacterials in the face of increasing bacterial resistance.

Ex-U.S., the quinolone class accounted for 8% of total tab/cap market prescriptions (62 million Rxs) and 13% of sales ($1.2 billion). Ciprofloxacin is the market leader ex-U.S. with approximately 47% of the quinolone market Rxs (29 million Rxs) and 44% ($530MM) of sales. Levofloxacin launched in many European markets in 1998/1999 and holds approximately 14% Rx share of the European quinolone market and 0.8% of the overall tab/cap market. Although grepafloxacin and trovafloxacin also launched in some European countries in 1999, both products were recently pulled from the market due to liver toxicity and other complications. Moxifloxacin launched in Germany in Q4 1999, but has not yet been approved in other markets. In Japan, levofloxacin launched in 1994 and still commands a 65% Rx share of the quinolone market and 10% of the Japanese tab/cap market overall. Japan accounts for approximately 80% of ex-U.S. levofloxacin sales ($370MM).

Confidential

ABBT246066

*Scientific Rationale for ABT-773*

The likely profile of ABT-773 justifies further development:
- ABT-773 pertains to a new class of antibiotics.
- Good activity against resistant Gram + organisms, particularly macrolide-resistant *S. pneumoniae*.
- Convenience, safety, and tolerability profile competitive with Z-pak.
- Oral Suspension and I.V. forms enabling penetration into pediatrics and hospital segments.

*Clinical Studies*

The safety and efficacy of ABT-773 in AECB were studied in a multi-center Phase II clinical trial conducted between January and April of 1999. Dosing regimens of 100mg TID and 200mg TID were tested. Of the 169 enrolled patients, 159 were clinically evaluable and 96 were both clinically and bacteriologically evaluable. The following chart summarizes the results.

| Bacterial Eradication | ABT-773 100mg TID | ABT-773 200mg TID | Overall Eradication |
|---|---|---|---|
| *S. pneumoniae* | 100% (13/13) | 90% (9/10) | 96% (22/23) |
| *M. catarrhalis* | 100% (6/6) | 100% (7/7) | 100% (13/13) |
| *H. influenzae* | 96% (23/24) | 92% (24/26) | 92% (47/50) |
| *H. parainfluenzae* | 100% (6/6) | 88% (7/8) | 93% (13/14) |

| Clinical Response | ABT-773 100mg TID | ABT-773 200mg TID |
|---|---|---|
| Cure | 96% (77/80) | 92% (73/79) |
| Failure | 4% (3/80) | 8% (6/79) |

| Clinical and Bacterial Response | ABT-773 100mg TID | ABT-773 200mg TID |
|---|---|---|
| Cure | 96% (46/48) | 94% (45/48) |
| Failure | 4% (2/48) | 6% (3/48) |

| Adverse Events | ABT-773 100mg TID | ABT-773 200mg TID | Overall |
|---|---|---|---|
| Taste Perversion | 5% (4/94) | 8% (7/95) | 6.5% (11/189) |
| Diarrhea | 11% (9/94) | 6% (5/95) | 8% (14/189) |
| Nausea | 2% (2/94) | 2% (2/95) | 2% (4/189) |
| Abdominal Pain | 1% (1/94) | 2% (2/95) | 2% (3/189) |
| Headache | 2% (2/94) | 1% (1/95) | 2% (3/189) |
| Rash | 2% (2/94) | 2% (2/95) | 2% (3/189) |
| Dyspnea | 2% (2/94) | | 1% (2/189) |
| Elev. Liver Funct. Test | 1% (1/94) | 1% (1/95) | 1% (2/189) |
| Fever | | 2% (2/95) | 1% (2/189) |

Confidential

ABBT246067

The safety and efficacy of ABT-773 in AECB were studied in a multi-center Phase IIb clinical trial from October 1999 to March 2000. Doses of 150mg QD, 300mg QD, and 600mg QD were tested. Of the enrolled subjects, 342 were clinically evaluable, and 189 were both clinically and bacteriologically evaluable. The following chart summarizes the results.

| Bacterial Eradication | ABT-773 150mg QD | | ABT-773 300mg QD | | ABT-773 600mg QD | | Overall Eradication | |
|---|---|---|---|---|---|---|---|---|
| S.pneumoniae | 83% | (10/12) | 90% | (9/10) | 100% | (13/13) | 91% | (32/35) |
| M.catarrhalis | 80% | (8/10) | 92% | (12/13) | 91% | (10/11) | 88% | (30/34) |
| H. influenzae | 94% | (17/16) | 89% | (17/19) | 83% | (19/23) | 88% | (53/60) |

| Clinical Response | | | | | | |
|---|---|---|---|---|---|---|
| Cure | 87% | (98/113) | 90% | (105/117) | 90% | (101/112) |
| Failure | 13% | (15/113) | 10% | (12/117) | 10% | (11/112) |

| Clinical & Bacteriological Response | | | | | | |
|---|---|---|---|---|---|---|
| Cure | 84% | (42/50) | 88% | (49/56) | 94% | (59/63) |
| Failure | | | | | | |
| | 16% | (8/50) | 12% | (7/56) | 6% | (4/63) |

| Adverse Events | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Taste Perversion | 5% | (4/84) | 19% | (25/129) | 29% | (37/129) | 17% | (66/384) |
| Diarrhea | 13% | (16/126) | 12% | (15/129) | 21% | (27/129) | 15% | (58/384) |
| Nausea | 7% | (9/126) | 13% | (17/129) | 30% | (38/129) | 17% | (64/384) |
| Vomiting | 2% | (3/126) | 3% | (4/1229) | 11% | (14/129) | 5% | (21/384) |
| Nausea & Vomiting | 0 | (0/126) | <1% | (1/129) | 4% | (5/129) | 2% | (6/384) |
| Abdominal Pain | 4% | (5/126) | 4% | (5/129) | 4% | (5/129) | 4% | (15/384) |

The safety and efficacy of ABT-773 in Acute Bacterial Sinusitis (ABS) were studied in a multi-center Phase IIb clinical trial conducted from October 1999 to March 2000. Dosing regimens of 150mg QD, 300mg QD, and 600mg QD were tested. Of the 292 enrolled subjects, 246 were clinically evaluable. The following chart summarizes the results.

| Bacterial Eradication | ABT-773 150mg QD | ABT-773 300mg QD | ABT-773 600mg QD | Overall Eradication |
|---|---|---|---|---|
| S.pneumonia | 3/3 | 8/8 | 9/12 | 20/23 |
| M. catarrhalis | 8/9 | 3/4 | 4/4 | 15/17 |
| H. influenzae | 3/5 | 7/7 | 5/7 | 15/19 |
| S.aureus | 1/1 | 1/1 | 3/4 | 5/6 |

| Clinical Response | | | | | | |
|---|---|---|---|---|---|---|
| Cure | 89% | (70/79) | 83% | (70/84) | 71% | (59/83) |
| Failure | 11% | (9/79) | 17% | (14/84) | 29% | (24/83) |

| Adverse Events | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Taste Perversion | 1% | (6/97) | 14% | (14/98) | 27% | (26/97) | 14% | (41/292) |
| Diarrhea | 6% | (6/97) | 6% | (9/98) | 17% | (16/97) | 10% | (28/292) |
| Nausea | 3% | (3/97) | 12% | (12/98) | 26% | (25/97) | 14% | (40/292) |
| Vomiting | 1% | (1/97) | 6% | (6/98) | 17% | (15/97) | 8% | (23/292) |

Confidential

ABBT246068

The safety and efficacy of ABT-773 in community-acquired pneumonia (CAP) were studied in a multi-center Phase IIb clinical trial from October 1999 to March 2000. Dosing regimens of 300mg QD and 600mg QD were tested. Of the 187 enrolled subjects, 1248 were clinically evaluable, and 15 were both clinically and bacteriologically evaluable. The following chart summarizes the results.

| Bacterial Eradication | ABT-773 300mg QD | | ABT-773 600mg QD | | Overall Eradication | |
|---|---|---|---|---|---|---|
| S. pneumoniae | 87% | (13/15) | 100% | (7/7) | 91% | (20/22) |
| M. catarrhalis | 75% | (6/8) | 50% | (2/4) | 67% | (8/12) |
| H. influenzae | 100% | (9/9) | 72% | (13/18) | 81% | (22/27) |
| M. pneumoniae | 93% | (13/14) | 93% | (14/15) | 93% | (27/29) |
| C. pneumoniae | 95% | (19/20) | 79% | (19/24) | 86% | (38/144) |
| L. pneumoniae | 100% | (3/3) | 100% | (2/2) | 100% | (5/5) |

| Clinical Response | | | | |
|---|---|---|---|---|
| Cure | 92% | (72/78) | 80% | (56/70) |
| Failure | 8% | (5/78) | 20% | (14/70) |

| Clinical & Bacterial Response | | | | |
|---|---|---|---|---|
| Cure | 92% | (54/59) | 82% | (47/57) |
| Failure | 8% | (5/59) | 18% | (10/57) |

| Adverse Events | | | | | | |
|---|---|---|---|---|---|---|
| Taste Perversion | 17% | (16/95) | 26% | (24/92) | 21% | (40/187) |
| Diarrhea | 14% | (13/95) | 19% | (17/92) | 16% | (30/187) |
| Nausea | 12% | (11/95) | 22% | (20/92) | 17% | (31/187) |
| Vomiting | 10% | (9/95) | 15% | (14/92) | 12% | (23/187) |

- **Appendix 1**

## Key Emerging Competitors

| Generic | Brand | Company | Class | Status |
|---|---|---|---|---|
| moxifloxacin | Avelox | Bayer | Quinolone | Approved by FDA 12/13/00 |
| gatifloxacin | Tequin | BMS | Quinolone | Approved by FDA 12/21/00 |
| gemifloxacin | Factive | SKB | Quinolone | Filed NDA 12/15 |
| T-3811 | TBD | BMS/Toyama | Quinolone | Phase I |
| telithromycin | Ketek | Aventis | Ketolide | Filed NDA 3/00 |
| linezolid | Zyvox | Pharmacia | Oxazolidinone | Approved by FDA Q2 '00 |

Confidential

ABBT246069

Quinolone (ABT-492)
Annual Development Plan
Exhibit 1.5

| Therapeutic Area | Anti-bacterial |
|---|---|
| Indications | - Community acquired respiratory, nosocomial pneumonia, complicated and uncomplicated urinary tract and skin and quinolone resistant strains of S. pneumo |
| Description | - ABT-492 is a potent broad spectrum quinolone with activity against Gram+, Gram-, and atypical pathogens.<br>- Commercial objective is "Trovan-like" activity with "Levaquin-like" safety.<br>- Preliminary in-vitro safety assays suggest good safety profile.<br>- Product will be available in tablet and injectable formulations.<br>- Targeting QD dosing for both formulations (not confirmed)<br>- Targeting >7 day dosing for most indications (not confirmed)<br>- COGS at $1,500-3,200/kg at launch pending chemistry optimization. |

| Current Time Line | Milestone | Date |
|---|---|---|
| | Phase I | 4Q2000 |
| | Phase II | 3Q2001 |
| | Phase III | 3Q2002 |
| | NDA Filing | 4Q2004 |
| | Launch | 4Q2005 |

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|---|
| Projected Spending by Year | 8.8 | 25.0 | 75.0 | 100.0 | 52.0 | 11.0 | 286.8 |

ABBT246132

Confidential

skin/soft tissue infections
including most penicillin, macrolide.

| Spending | $$ |
|---|---|
| Project-to-Date-Spending (thru '00) | 11.3 |
| 2001 Current Projection (Plan) | 25.0* |

* See page 2 for detail.

ABBT246133

Confidential

ABBT246152

## 2001 KEY RATES

| | 2000 | | | 2001 | | | % Change | | |
|---|---|---|---|---|---|---|---|---|---|
| | Rate | Hours | Annual Rate | Rate | Hours | Annual Rate | Hourly Rate | Total Hours | Annual Rate |
| **DRUG SAFETY** | | | | | | | | | |
| Toxicology/Pathology - PMP/TMP | 121.52 | 1,580 | 204,154 | 135.42 | 1,600 | 216,672 | 11.4% | -4.8% | 6.1% |
| Metabolism/Microscopy - PMP/TMP | 144.75 | 1,600 | 231,600 | 141.64 | 1,650 | 233,706 | -2.1% | 3.1% | 0.9% |
| Comparative Medicine - PMP/TMP | 115.60 | 1,768 | 204,381 | 116.88 | 1,850 | 216,228 | 1.1% | 4.6% | 5.8% |
| Strategy & Exploratory - PMP/TMP | 121.52 | 1,680 | 204,154 | 173.56 | 1,600 | 277,696 | 42.8% | -4.8% | 36.0% |
| **PHASE I CENTER** | | | | | | | | | |
| Pharmacokinetics KPK - PMP/TMP | 144.75 | 1,600 | 231,600 | 135.00 | 1,600 | 216,000 | -6.7% | ... | -6.7% |
| Clin. Res. MDs KP - PMP | | | | 180.35 | 1,500 | 270,525 | ... | ... | ... |
| Clin Res. Spec. KPD-PMP/TMP | 113.59 | 1,700 | 193,103 | 123.75 | 1,700 | 210,375 | 8.9% | ... | 8.9% |
| **PARD** | | | | | | | | | |
| Prod Dev - PMP, TMP | 108.54 | 1,800 | 195,372 | 116.71 | 1,800 | 210,078 | 7.5% | ... | 7.5% |
| IDS - PMP, TMP | 160.80 | 1,600 | 257,280 | 162.11 | 1,600 | 259,376 | 0.8% | ... | 0.8% |
| **DEV OPERATIONS** | | | | | | | | | |
| Data Mgmt DM3 - TMP/PMP | 90.04 | 1,600 | 144,064 | 92.06 | 1,600 | 147,296 | 2.2% | ... | 2.2% |
| Stats - PMP/TMP | 97.75 | 1,800 | 175,950 | 99.10 | 1,800 | 178,380 | 1.4% | ... | 1.4% |
| **BA/DA** | | | | | | | | | |
| RADA - PMP & TMP | 125.50 | 1,600 | 200,800 | 134.49 | 1,600 | 215,184 | 7.2% | ... | 7.2% |
| **DISCOVERY** | 137.65 | 1,800 | 247,770 | 142.91 | 1,800 | 257,238 | 3.8% | ... | 3.8% |

Confidential



ABBT246153

Confidential

ABBT246154



For impact of rate change in allowance of this year's TAP rate vs 2006 TAP rate

Confidential

# Ketolide Oral & IV (ABT-773)
## Annual Development Plan
### Exhibit 1.5

| Therapeutic Area | Antibacterial |
|---|---|
| Indications | Adult Tablet    Community acquired respiratory infections    IV    Step-down therapy in community-acquired hosp |
| Description | • ABT-773 is a potent ketolide with strong activity against most macrolide resistant strains, while maintaining th |
|  | • Product will be available as tablet and IV formulation |
|  | • ABT-773 will address the major unmet medical needs of increasing resistance to current empiric agents, par |
|  | • Macrolides claim claim of "Saves the spectrum" (G+, G- atypicals) |
|  | • Cover key G+ resistant strains (S. pneumoniae, S. pyogenes) |
|  | • Tablet dosing is 150mg QD or 150mg BID dosing based on severity of indications. |
|  | • Tablet  5 days for ABECB, pharyngitis, 10 days for AMS and CAP. |
|  | • Incidence of GI side effects equal to clari (assuming comparable drug levels to tablet) |
|  | • COGS target $2,500/kg at launch for tablet |

| Current Time Line | Milestone | Tablet Date | IV Date |
|---|---|---|---|
|  | Phase I | 1Q1997 | 1Q2000 |
|  | Phase IIb | 3Q1999 | N/A |
|  | Phase III | 4Q2000 | 4Q2001 |
|  | NDA Filing | 3Q2002 | 2Q2003 |
|  | Launch | 1Q2004 | 2Q2004 |

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|---|
| Projected Spending by Year | 74.1 | 91.5 | 69.0 | 45.0 | 32.0 | 22.0 | 333.6 |

ABBT246121

Confidential

spitalized pneumonia.
he broad spectrum coverage of clarithromycin

rticularly S pneumonia

| Spending | $$ |
|---|---|
| Project-to-Date Spending (thru '00) | 198.4 |
| 2001 Current Projection (Plan) | 91.5* |

* See page 2 for detail.

ABBT246122

Confidential

*CONFIDENTIAL*

# ABT – 627

**Descriptive Memorandum**

*February 2001*

Abbott Laboratories

November 1st, 2000
Hancock ABT 627

Confidential

ABBT246070

## ABT-627

### Opportunity Overview

ABT-627 is an orally bioavailable endothelin antagonist with a high selectivity for the Eta receptor. The endothelins (ET-1, ET-2, ET-3) are a family of 21 amino acid peptides first identified in 1988. Endothelin is a potent, long acting vasoconstrictor produced by vascular endothelial cells. The known biological effect of ET-1 are believed to be mediated principally through the Eta receptor. These include potent and uniquely sustained vasoconstriction of vascular smooth muscle, positive inotropy of myocardium, and the stimulation of cell proliferation or the hypertrophy in vascular smooth muscle cells, cardiac myocytes, and fibroblasts.

In vitro studies in cultured cells have established that ABT-627 selectively binds to the Eta receptor, and that ABT-627 is a potent inhibitor of ET-1 binding to the Eta receptor.

Studies in cultured human prostate cancer cells and other cultured cells have shown that ABT-627 acts as a functional antagonist of ET-1, and these effects have been confirmed in vivo by assessing the effect of ABT-627 on the ET-1 induced pressor response in rats. Further animal studies have suggested that oral ABT-627 may be effective in the treatment of congestive heart failure, pulmonary hypertension, hypertension, arterial restenosis, and myocardial infarction.

In addition to literature and animal models supporting the role of endothelin antagonists in cardiovascular indications, data exists supporting the role of the ET-1 cytokine as a pathogenic mediator in cancer.

The current role of endothelin in the manifestations of metastatic prostate cancer (PCA) and other tumors have yet to be fully defined. However, Abbott scientists and thought leaders have made multiple observations about endothelin biology which suggest that endothelin may play a role in the biology and pathophysiology of metastatic prostate disease and other metastatic disease such as ovarian, cervical and renal tumors.

ABT-627 has successfully completed Phase II trials for PCA, and the results demonstrate efficacy in hormone refractory PCA. The end of Phase II meeting with the FDA was held on October 4th. The data from Phase II was very favorably received and "best package" comments were made. Fast track designation and rolling NDA were granted. The FDA was conceptually in agreement with preliminary design of Phase III clinicals and clinical end points to measure. While not a dictate, a second Phase III trial will likely be conducted to insure the best opportunity for a successful outcome. The Phase III program is scheduled to commence before year-end. It is expected that filing on ABT 627 will occur in US and ex-US 1Q 2004. The compound is also in Phase I trials for other cancer types. Phase II studies in other cancer types will commence in 2001. Other indications outside of oncology are also being considered, to optimize the commercial potential of this asset.

### The US Market

Prostate cancer is the most common cancer to strike nonsmoking men. The NCI estimates that there are over 1.7 million men living with prostate cancer in the U.S., and another 179,300 will be diagnosed in 1999. Nearly 80% of these cases are men over 60 years of age. It is estimated that the prevalence of prostate cancer is 380,000 in Western Europe and 45,000 in Japan. While the vast majority of these patients will be identified with potentially curable disease (25% in Stage I and 50% in Stage II) in the U.S., half of these patients will go undiagnosed until late stage disease in W. Europe and Japan. The skewed distribution of diagnosed cases ex-U.S. is largely due to less aggressive prostate cancer screening programs compared to the U.S.

Confidential

ABBT246071

Prostate cancer has seen few additions or innovations in treatment regimens in the past two decades. Treatments remain, in general, radical prostatectomy (RP) for localized disease, radiotherapy for locally advanced disease and hormone therapy for advanced disease. Patients receiving hormone therapy become refractory to this treatment after two to three years, although many will continue on hormone therapy. These hormone refractory prostate cancer (HRPCa) patients usually have a life expectancy of approximately 12 months, and no existing standard of care exists for treating these patients. No therapy has shown a significant impact on survival in these patients, although some chemotherapeutic regimens may offer promise.

There is a general trend toward using hormone therapy in earlier stage patients. In some centers, patients are receiving hormone therapy prior to surgery or radiation, in an attempt to improve outcomes in these definitive treatments. Some thought leaders suggest that this earlier utilization has contributed to the overall mortality improvements in PCA. Studies are ongoing looking at different uses for hormone therapy, including intermittent therapy, in an attempt to improve outcomes and mitigate the morbidity associated with hormonal therapy.

Hormone therapy remains the mainstay of prostate cancer treatment in earlier stages. Chemotherapy, however, has gained additional attention in hormone refractory disease as new combinations and regimens offer the potential for greater therapeutic benefit with fewer side-effects. This trend will take several years before clinical trials are completed and community based oncologists adopt these regimens, so the current cytotoxic market in PCA is small.

The total dollar growth of this market has slowed as the two market leaders, Lupron (leuprolide/TAP) and Zoladex (goserelin/Zeneca), have experienced increased price pressures from managed care and Medicare. About half the states are currently reimbursing these therapies at a least cost option (only paying for the cheapest alternative), putting downward price pressures on Lupron ($6,500/yr) to match Zoladex's ($4,500/yr) lower price point. Thus, US Lupron dollar sales declined between 1997 and 1998, despite an increase in patient volume.

Growth has also stagnated due to a lack of innovation in this hormone dominated category. There have been few therapeutic advances in the treatment of PCA in the last 5 years.

The only chemotherapy approved for use in HRPCa patients with pain is Novantrone (mitoxantrone/Immunex), but the marginal benefits this compound delivers is deeply undercut by its severe toxicities and a lifetime cap on dose. Novantrone and steroids significantly reduced the metastatic pain in 40% of patients, but it does not appear to provide a survival advantage. Novantrone is dosed by i.v. infusion every 21 days, at a cost of $560 per treatment, or an annual cost of around $8,000. Use of this agent is associated with significant side-effects, including myelosuppression, cardiac toxicity (which limits dosing) and nausea. It is this negative side-effect profile that inhibits the use of this agent in more patients. Only about 4% of U.S. HRPCa patients received Novantrone therapy in 1998. Novantrone has not been approved ex-US.

Only about 17% of HRPCa patients received any chemotherapy in 1998. The most common drugs included estramustine, paclitaxel and etoposide. These drugs continue to be some of the most studied compounds in HRPCa ongoing research and represent the greatest short-term promise in the cytotoxic treatment of this advanced disease state.

Confidential

ABBT246072

**US Sales of Products to Treat Prostate Cancer**

| Product | 1997 Dollar Sales (MM) | 1998 Dollar Sales (MM) | % chng '97-98 |
|---|---|---|---|
| Lupron (leuprolide/TAP) | $650 | $667 | 2.6% |
| Zoladex (goserelin/Zeneca) | 233 | 296 | 27.3 |
| Casodex (bicalutamide/Zeneca) | 58 | 68 | 17.24 |
| Eulexen (flutamide/Schering) | 74 | 67 | -9.5 |
| Novantrone (mitoxantrone/Immunex) | 33 | 35 | 6.1 |
| Nilandron (nilutamide/Hoechst) | 12 | 24 | 100 |
| Emcyt (estramustine/Pharmacia/Upjohn) | 8 | 14 | 75 |
| Taxol (paclitaxel/BMS) | 4 | 8 | 100 |
| VePesid (etoposide/BMS) | 5 | 4 | 20 |
| Others | 27 | 31 | 14.8 |
| Total | 1,104 | 1,214 | 10% |

Source: Tandem Research and Price Probe

*US Market Projections*
- Novantrone (mitoxantrone/Immunex) is currently the only product approved for the treatment of hormone refractory PCA with pain. It currently falls short on the market needs in terms of efficacy and side-effect profile.

| Attribute | Novantrone Profile |
|---|---|
| Dosing | I.V. infusion cycles |
| Cost | Expensive, ~$10,000/yr |
| Efficacy | Provides marginal improvements in quality of life |
| Reimbursed | Yes |
| Side-effects | Dose limiting toxicities |
| Promo Efforts | 108 oncology reps |
| Targets | Oncologists |

Several surveys indicate that there are over 100 compounds in preclinical and clinical development for prostate cancer and various solid tumors. The compounds listed in the appendix represent compounds that appear to offer the greatest promise and/or potential for competition for ABT-627. However, since the most likely use of ABT-627 will be in combination with best therapy, it is difficult to define the extent of competitive threat that any of these compounds represent. In general, other cytostatic agents probably offer the greatest threat as a replacement for ABT-627. However, even other cytostatic agents may be combined to maximize the activity of the various mechanisms.

To date, PPD is aware of only one other endothelin receptor antagonist in development for cancer, from Yamanouchi, which began Phase I studies in the Fall of 1999. ABT-627 is still poised to be the first endothelin receptor antagonist to reach the market for oncology.

Description Memorandum: ABT - 627    **CONFIDENTIAL**    4

Confidential    ABBT246073

*Scientific Rationale for ABT-627*

There are relatively low hurdles for entry for a product to treat hormone refractory prostate cancer, as no truly effective agents presently exists. Quality of life is paramount in this population, followed by improvements in disease progression and survival. Quality of life parameters could include an impact on pain and/or delay in pain onset or other performance type measures of daily activities. As all hormone therapy ultimately fails, a product that delays disease progression is needed.

| Unmet Need | Pipeline Impact |
|---|---|
| Improvements in QOL | • ABT-627's profile goal is to provide improvements to a patient's QOL or blunt a decrease in QOL<br>• Cytotoxic agents rarely have significant positive impacts on QOL<br>• Other cytostatic agents may offer this benefit |
| Improvements in survival | • It is unlikely that improvements in survival will be seen in our current trials<br>• Cytotoxic agents may offer a survival advantage, perhaps in combination with ABT-627 |
| Improvements in time to disease progression | • Cytostatic and cytotoxic agents offer the greatest promise for this benefit |

Our objective is to provide physicians and patients with a novel option for the treatment of hormone refractory prostate cancer, distinguish ABT-627 from current cytotoxic therapies and encourage the treatment of advanced prostate cancer patients currently only receiving hormonal therapy.

ABT-627 will be positioned as a physician and patient-friendly choice for advanced prostate cancer patients who have failed hormone therapy. ABT-627's novel mechanism of action provides a delay in disease progression and a positive impact on QOL. The oral, QD dosing enhances compliance and minimizes disruptions to daily living.

The message will focus on 3 key attributes:

• Efficacy (defined as increased time to tumor progression) in a patient group with few options
• Improvements in quality of life
• Convenience

Physicians no longer have to choose between *treating* advanced prostate cancer patients and a patient's quality of life. ABT-627 has a positive impact on disease progression and symptoms associated with quality of life, without the baggage of significant side-effects or the inconvenience of parenteral administration associated with current therapy choices.

This message expresses the key features of the agent in terms of patient benefits, as opposed to emphasizing the scientific/clinical aspects. Since prostate cancer is a terminal disease with a relatively long time for disease progression, the quality of a patient's life becomes even more critical. Especially in cancer treatment, where the therapy can often feel worse than the disease, the benefits that ABT-627 will bring, coupled with its benign side-effect profile, will have a significant impact on prostate cancer patients' lives.

Confidential

ABBT246074

Clinical Studies

Phase II trials have been completed and the data are being analyzed. Preliminary results for the primary endpoint of time-to-disease progression and the secondary endpoint of time-to-PSA progression show that ABT-627 favorably delays both phenomena with a benign adverse event profile. The results are summarized below:

Disease Progression: The delay in median time-to-disease progression for evaluable subjects was improved by 52% and 43% for the 10mg and 2.5mg doses respectively over the placebo time-to-disease progression of 4.3 months.

Time-to-PSA Increase: A 150% and 150% improvement in median time-to-PSA progression for evaluable subjects was observed for the 10mg and 2.5mg doses respectively over the time-to-PSA progression placebo of 2 months.

Significant dose related decreases were observed in markers of metastatic bone disease.

## Key Prostate Cancer Competitors

| Product | Company | Phase | Projected NDA Filing | Description | Anticipated impact on ABT-627 |
|---------|---------|-------|---------------------|-------------|-------------------------------|
| AG 3340 | Agouron | III | 2000 | MMPI | In combination with mitoxantrone/prednisone. Unknown impact |
| Marimastat | British Biotech | II | 2001 | MMPI | Side-effect profile significantly worse than ABT-627. Probably minimal impact |
| SU 101 | Sugen | I/II | 2002 | PDGF-TK antagonist | Phase III in combination with mitoxantrone set to start in 1999. Uncertain impact |
| AR 623 | Aronex | II | 2002 | All transretinoic acid | IV liposomal form of ATRA HRPCa trial began November 1996. Probably additive |
| MGI 114 | MGI Pharma | II | 2002 | Alkylating agent | Lead compound in acylfulvenes. If anly toxic. Probably additive |
| Liposomal Encapsulated doxorubicin | NeoPharm and P&U/Alza and others | II | 2002 | Anthracycline | Various forms being developed by various companies. Probably additive |
| Satraplatin | BMS | II/III | 2000 | Platinum complex | Oral platinum analog w/toxicities comparable to carboplat. Probably additive |
| Taxol | BMS | II | 2001 | taxane | In various combinations with other chemo agents. Probably additive |
| Taxotere | RPR | II | 2001 | taxane | In various combinations with other chemo agents. Probably additive. |

Disruptive Measurement: ABT - 627        **CONFIDENTIAL**                                                6

Confidential                                                                    ABBT246075

*CONFIDENTIAL*

# DOPAMINE RECEPTOR AGONIST PROGRAM

## Descriptive Memorandum

*February 2001*

## Abbott Laboratories

CONFIDENTIAL

Confidential

ABBT246117

### D4 Agonists for Male Erectile Dysfunction

*Scientific Overview*

Male erectile dysfunction (MED) is defined as the "inability to maintain an erection sufficient for satisfactory sexual intercourse" (NIH Consensus Panel) and results from physiological (organic), psychogenic causes, or a combination thereof. This disorder is associated with decreased quality of life, including personal well being, and diminished family and social relationships. In 1999, an estimated 77 million men over the age of 40 (52% of men over 40 years-old) in the seven major pharmaceutical markets experienced some degree of MED, and the prevalence increases with age. Approximately 10-20% of patients have severe or complete MED, and the majority of the population suffers from moderate disease. While the introduction of Viagra has increased the diagnosis rate of MED in the U.S., 75% or more of patients do not seek treatment. However, as the "baby boomer" generation ages, MED will become a more prominent concern and a growing number of patients are likely to seek treatment.

Abbott's male erectile dysfunction program targeting D4 dopamine receptors represents a novel therapeutic approach to the rapidly growing male erectile dysfunction (MED) market. The current gold standard for the treatment of MED, Viagra, acts peripherally at the penile smooth muscle level to induce erection by modulating the levels of cGMP. In contrast, a selective D4 dopamine agonist will act in the brain at the sites necessary for initiation of a successful erection. Targeting the D4 receptors in brain offers the potential for efficacy in patients with MED that do not respond to Viagra (for example patients with diabetes). Additionally, targeting D4 receptors should not result in any cardiovascular adverse events unlike Viagra which can cause serious cardiovascular effects in patients who are on nitroglycerine-based medications. Since safety is of paramount importance for any life-style disorder like MED, a new agent that does not have any contraindications or warnings related to safety issues may be positioned to become the gold-standard therapy.

Evidence for the potential of a selective D4 dopamine receptor agonist for the treatment of erectile dysfunction includes:

- The non-selective dopamine receptor agonist apomorphine (Uprima™) has been shown to be effective in phase III clinical trials, and has received scientific approval for market in the EU, for the treatment of MED. This validates the utility of dopaminergic agonists to facilitate penile erections in humans. However, the clinical development of apomorphine for the US market has been hampered by dose limiting side-effects (emesis and syncope).

- Studies at Abbott have established that the efficacy of apomorphine (penile erection) and side-effect (emesis) are mediated by different dopamine receptor subtypes. There are 5 known dopamine receptors. Abbott scientists have discovered that the selective activation of $D_4$ receptors can facilitate penile erection in animals, while the $D_2$ receptor appears to mediate the emetic effect of apomorphine. The discovery of a $D_4$ selective agonist maximizes the possibility to identify a compound with equivalent/superior efficacy to apomorphine but devoid of its side-effect liabilities.

PPD is currently screening the Abbott library of compounds to identify novel and proprietary D4 dopamine receptor compounds. Initial hits have been identified that are as potent as any known D4 dopamine receptor agonist. The strategy is to aggressively profile these hits for selectivity across the five different dopamine receptor subtypes and to ensure that selective agents are effective in a number of preclinical in vivo models of MED and have no emetic or cardiovascular side effects. The D4 dopamine receptor agonist program will be discontinued if selective D4 agonists do not achieve at least a 30-fold separation between efficacy in a model of MED and cardiovascular/emetic side effects.

<div align="center">CONFIDENTIAL</div>

Confidential

Abbott has a competitive advantage in the race to exploit selective D4 dopamine receptor agonists for MED. A patent application covering the use of any selective D4 agonist for the treatment of MED has been filed and no other pharmaceutical company may have the range of preclinical models of efficacy and safety in addition to access to the clinical information gained from the development of apomorphine. Our molecular modeling group has facilitated advances in the design of selective D4 agonists.

*Market Analysis*

The introduction of Viagra combined with increased disease awareness resulted in the MED market in the US exploding from $157MM in 1997 to an estimated $726MM in 2000. Worldwide, this market has seen similar growth, and is estimated at $500MM for ex-US for 2000. Viagra currently dominates the MED market, with more than $1billion in sales in the $1.3 billion worldwide market in 1999, and >95% of the MED prescriptions in the US. The market growth is expected to continue, with an estimated CAGR in the US of 17.9% (2000 – 2005), fueled by increased awareness of MED, expanded use to wider patient segments for relationship or performance enhancement, and the introduction of heavily promoted new agents. Downward pressure on growth will come from continued perceptions of safety concerns, the limited efficacy of Viagra™, and out-of-pocket cost to patients.

Market drivers influencing the potential of a D4 dopamine receptor agonist include:

- <u>Patient Awareness and Demand</u>: Viagra has built considerable awareness of MED. However, in the US, only 10-25% of current MED patients seek treatment for this disorder. Ex-US the percentage of patients seeking treatment is lower (10%). This is mainly due to the lack of DTC promotional campaigns in the ex-US markets. Further market expansion requires continued patient and physician education.

- <u>Product Safety</u>: There are growing patient and regulatory concerns regarding the safety of Viagra. While, physicians currently perceive Viagra™ to be safe, if used by the correct patients, there is significant concern regarding the concomitant use of nitrates for cardiovascular disorders with Viagra. Approximately 10% of Viagra patient deaths have been attributed to use of nitrates. Thus, there is an opportunity to eliminate this concern for physicians and to expand the market.

- <u>Product Efficacy</u>: In clinical trials Viagra allowed successful intercourse in about 50% of attempts. The limited and inconsistent efficacy of the product has resulted in patient dissatisfaction and discontinuation, thus creating a chance to drive Viagra quitters or switchers, as well as new patients, to new, more effective, MED products. The demonstration of efficacy in a broader population of MED patients might also influence physicians to try an alternative product prior to Viagra. The delay in onset (~1hr) and the variability in onset of action from patient to patient is an additional complaint about Viagra. Product features of a selective D4 agonist such as a more rapid onset of action or more reproducible onset will have a positive influence on the market opportunity for MED therapies.

- <u>Additional Indications</u>: Use of a D4 dopamine receptor agonist in other indications such as "relationship enhancement" (female sexual dysfunction and age-related decline in male sexual performance) offers an opportunity to both expand the potential market to include women and non-MED sufferers, and reduce the embarrassment of MED for patients. Additional research is required to identify meaningful endpoints in this expanded indication. Initial studies conducted by Pfizer showed that Viagra™ was not effective to treat female sexual dysfunction.

CONFIDENTIAL

Confidential

ABBT246119

*Competitive Overview*

The following tables summarize the key competitive activities in regard to marketed products and products in the development pipeline. To date there are no reports any other company targeting selective D4 agonists for the treatment of MED, although a number of companies do have activities in the dopamine receptor arena for other indications that could be re-focused to MED if they became aware of Abbott's insights into the D4 receptor.

A. Oral agents

| Approach | Compound/Product | Company(ies) | Status |
|---|---|---|---|
| PDE5 inhibition | Sildenafil (Viagra™) | Pfizer | Marketed |
| DA receptor | Apomorphine (Uprima™) | TAP | NDA filing withdrawn |
| Adrenergic | Phentolamine (Vasomax™) | Schering-Plough/Zonagen | NDA filing on hold (>1 year) |
| PDE5 inhibition | IC351 (Cialis™) | ICOS-Lilly | Phase III |
| PDE5 inhibition | Vardenafil | Bayer | Phase II-III |

B. Intranasal

| Approach | Compound/Product | Company(ies) | Status |
|---|---|---|---|
| DA receptor | Nasal apomorphine | Nastech | Phase II |

C. Intracavernosal agents

| Approach | Compound/Product | Company(ies) | Status |
|---|---|---|---|
| EP receptor | PGE₁ (Caverject™, Edex™) | Pharmacia, Schwarz Pharma | Marketed |
| VIP receptor Adrenergic | VIP-phentolamine (Invicorp™) | Senetek | Marketed outside US |
| K channels | PNU 83757 | Pharmacia | Phase II |

D. Intraurethral agents

| Approach | Compound/Product | Company(ies) | Status |
|---|---|---|---|
| EP receptor | PGE₁ (Muse™) | Vivus, Abbott | Marketed |

E. Topical

| Approach | Compound/Product | Company(ies) | Status |
|---|---|---|---|
| EP receptor | PGE₁ (Alprox-TD, Topiglan) | NexMed, MacroChem | Phase II and III |

CONFIDENTIAL

Confidential

ABBT246120

*CONFIDENTIAL*

# ABT – 510

**Descriptive Memorandum**

*February 2001*

Abbott Laboratories

Confidential

ABBT246092

## ABT 510

### Overview

There is abundant evidence that primary tumor growth and metastatic progression require new blood vessel formation (angiogenesis). Tumors secrete inducer proteins including bFGF and VEGF that activate microvascular endothelial cells (EC) causing them to proliferate, migrate and organize into capillary structures. Activated endothelial cells also enhance malignant progression by producing signal molecules (cytokines) that inhibit programmed cell death (apoptosis) of tumor cells. Since anti-angiogenic therapy targets genetically stable endothelial cells, resistance typically seen following cytotoxic chemotherapy is not observed. Moreover, angiogenesis inhibitors should not have the intrinsic toxicity of anti-proliferative chemotherapy. Angiogenesis is also a feature of several other pathophysiologic states of large unmet medical need (macular degeneration, psoriasis, and arthritis, among others).

Angiogenesis sustains the growth and progression of tumors. Unlike chemotherapy or radiation, both of which can damage normal cells in addition to tumor cells, anti-angiogenic agents are hypothesized to prevent growth of new blood vessels and to disrupt critical tumor survival signals produced by EC. These agents may keep tumors in a dormant state for as long as the compound is administered and tumor regressions may occur. Proof of this principle has been demonstrated in pre-clinical models. Currently, at least thirteen compounds with anti-angiogenic activity in cancer are in various phases of clinical development, however few act directly and specifically on the angiogenesis process. Anti-angiogenesis drugs are not expected to replace or compete with current therapies. Instead, if these agents prove to be effective, it is believed that they will be used as supplemental therapy to prevent metastasis following surgery, cytotoxic chemotherapy or radiotherapy. As for cases where tumors have already metastasized, these agents could slow down disease progression and maintain "disease dormancy".

Thrombospondin-1 (TSP-1) was the first natural angiogenesis inhibitor to be discovered. TSP-1 is a large, multifunctional protein. TSP-1 rapidly inhibits EC migration and increases EC apoptosis through activation of caspase 3-like proteases. The normal tissue expression of TSP-1 limits inappropriate neovascularization, however it is transcriptionally activated by the tumor suppressor gene product p53. Therefore, TSP-1 is down-regulated and under-produced in p53 defective tumors. In rodent models, ectopic overexpression of TSP-1 inhibits the malignant phenotype as does direct administration of TSP-1 in the circulation. However, direct clinical use of TSP-1 is not feasible because of its scarcity, large size and multiple other biological functions.

The angiogenic activity of TSP-1 has been localized to the 50,000 MW N-terminal stalk region of this protein, and more specifically to the properdin (Type-1) repeats within this region. Although small synthetic peptides within this region have only weak antiangiogenic activity, it was discovered that a single D-amino acid replacement in a properdin region peptide led to an increase in activity of greater than 1000-fold. ABT-510 is a parenterally available nonapeptide. Although ABT-510 competes with TSP-1 for binding to the EC, the exact mechanism of anti-angiogenesis is unknown.

ABT-510 is supplied for clinical use as a sterile solution in acetate salt in 5% dextrose. ABT-510 is soluble and stable in water.

In vitro, ABT-510 inhibits chemotactic VEGF/bFGF-stimulated migration of human microvascular endothelial cells (EC) with an IC50 of approximately 0.250 nM. This effect is EC specific. ABT-510 (10mg/kg/day subcutaneously) blocks VEGF-induced corneal vascularization in mice. It potently and selectively competes with TSP-1, binding the CD 36 receptor

Confidential                                                       ABBT246093

ABT 510 inhibits tumor progression in vivo. ABT 510(20mg/kg/day subcutaneous administration) inhibited tumor progression (78% growth inhibition at day 38) in a model of human breast cancer (MDA-MB-435) growing in the breast pads of nude mice. Dose dependent inhibition of B16F10 melanoma lung metastases was observed in a second murine model. ABT 526, a molecule highly similar to ABT 510 (which was not advanced into human trials because of concomitant formation) was administered to 23 companion dogs (25mg SQ BID) with sporadic cancers (head and neck carcinoma, lymphoma, sarcoma, etc) refractory to conventional chemotherapy. Surprisingly, 2 complete responses, 5 partial responses (>= 50% shrinkage) and 6 cases of disease stabilization were observed.

Assays for toxicity, histamine release, hemolysis, T-cell function neutrophil migration, platelet aggregation, receptor (CEREP) screening and CNS function were unremarkable. ABT-510 produced no physiologically significant changes in cardiovascular or hemodynamic function in anesthetized dogs. In addition, there were no physiologically significant changes in clinical blood chemistry profiles or cardiac electrophysiologic function in response to ABT-510. Doses that were many times higher than the predicted efficacious concentration produced a moderate reduction in mean arterial blood pressure in conscious monkeys. ABT-510 was not mutagenic in the Ames assay. It is concluded therefore that ABT-510 has an excellent pre-clinical safety profile.

ABT-510 is currently in Phase I clinical trials. Because of its exceptional safety profile, normal volunteers are being dosed with ABT-510 to establish human safety and pharmacokinetic parameters. Review of these data will lead to a Go/NoGo decision for Phase II trials in the Summer of 2001.

*The market*

Cytotoxic agents represent the largest, and fastest growing, class of oncology agents by sales volume. The following chart summarizes the value of the current oncology market. The market for products to treat cancer is changing rapidly. It is a growing market fueled by:

- Increasing disease incidence
- New product entries
- New therapeutic paradigms
- A growing adjunctive market, which increases the number of patients eligible for chemotherapy
- Intense research and competition

The increase in the aging population in developed countries increases the incidence of cancer. The diagnosed cancer incidence and prevalence in seven major markets, including the U.S., France, Germany, Italy, Spain, U.K. and Japan are close to 3 million and 10 million respectively. The numbers are increasing steadily. Currently, about one-third of the new medicines in development are targeted against cancer

Cancer is not a single disease, but includes more than 100 different disorders, which have at their core uncontrolled cell growth. Of these disorders, the cancer types that offer the greatest commercial opportunity include breast, colorectal, lung, ovarian and prostate (based on incidence/prevalence/unmet need). Treatment of breast, lung and prostate cancers account for more than 50 percent of the direct medical costs of cancer therapies. Other cancer types, specific to one or more of the major international markets, may provide niche opportunities. For instance, stomach (gastric) cancer is relatively common in Japan but not in the U.S. or Europe; similarly, liver cancer has a greater occurrence in Japan, Italy and Spain.

Descriptive Memorandum ABT -510          **CONFIDENTIAL**                          3

Confidential

ABBT246094

Depending on tumor type, cancer can be treated with surgery, radiation, chemotherapy (cytotoxic), hormonal therapy or a combination of any of these. For the purpose of this analysis, we will define the cancer market as chemotherapeutics and the adjunctive therapies used to counter the effects of chemotherapy and radiation therapy. The following charts summarize the global sales for these products.

**Global Sales by Market Segment ($ MM)**

|           | 1996 Sales | 1997 Sales | 1998 Sales | CAGR '96-'98 |
|-----------|------------|------------|------------|--------------|
| Hormone   | 4,414      | 4,784      | 4,884      | 5.2%         |
| Cytotoxic | 4,278      | 5,212      | 6,268      | 21.0%        |
| Adjunctive| 3,367      | 3,651      | 4,166      | 11.2%        |
| Total     | 12,059     | 13,647     | 15,318     | 12.7%        |

Source: Datamonitor

**Sales by Region ($ MM)**

|        | 1996 Sales | 1997 Sales | 1998 Sales | CAGR '96-'98 |
|--------|------------|------------|------------|--------------|
| US     | 5,564      | 6,276      | 7,422      | 15.5%        |
| Ex-US  | 6,495      | 7,370      | 7,896      | 10.3%        |

Source: Datamonitor

*Chemotherapeutic agents*

*Cytotoxic therapies* include classes such as alkylating agents, anti-tumor antibiotics, anti-metabolites and antimitotics (taxanes). These agents are toxic and demonstrate dose-limiting side effects. The commercial value of this segment is significantly understated, as most of the products are available in generic form.

The growth of the cytotoxic segment in the past three years has been driven primarily by the introduction of new, more effective and expensive therapies such as Taxol (paclitaxel/BMS), Gemzar (gemcitabine/Lilly), Taxotere (docetaxel/RPR) and Hycamtin (topotecan/SB). Utilization of these newer agents, however, appears to be dependent on the cost sensitivity of the local market. For example, secondary sources indicate that Taxol has recorded over 60% of its global sales in the US market alone and is prescribed with far less frequency in the more cost sensitive UK, German and French markets.

Most chemotherapeutic agents are indicated for just one or two cancer types, but get significant off-label use once approved. Up to 60% of an oncology product's use is potentially for off-label indications. Much of this use is driven by the publication of data and/or approvals in other countries.

*Hormonal therapies*

Of the top-selling drugs in each major geographical region, *hormone therapies* contribute approximately one-third of the sales ex-US and one-fourth in the US. Hormone therapies for the treatment of cancer include Lupron (leuprolide/TAP), Zoladex (goserelin/Zeneca), Nolvadex (tamoxifen/Zeneca) and other agents used to treat hormone responsive diseases such as prostate and breast cancer. These agents are generally administered chronically and have reduced side effects compared to cytotoxic therapies. Sales of this category are driven primarily by Lupron and Zoladex. The US market has become increasingly cost sensitive in the Medicare sector, which accounts for over 70% of Lupron sales.

*Adjunctive agents*

Confidential

ABBT246095

The availability of effective adjunctive agents also allows the cytotoxic chemotherapeutic agents to be administered at higher doses and/or more frequently, or used in a more palliative role, since the adjunctive therapies can reduce the impact of the chemotherapy on the patient's quality of life. Agents in this class include immunostimulants, anti-emetics and bisphosphonates. The growth of this market is linked to the growth of the cytotoxic market, as the increased use of cytotoxic agents drives an increased use in adjunctive therapy. The highest selling product in this class is Neupogen (filgrastim/Amgen) with 1998 sales of over $1 billion.

*Biologic Therapy*

New therapies under development offer the promise of fulfilling several unmet needs in the treatment of cancer. Experts have predicted that in the future early therapy for breast cancer will be dominated by biological approaches, such as monoclonal antibodies (Herceptin/Genentech), which is widely thought to have strong market potential. Genentech recently reported strong second quarter sales of the product in the US of $48.2 million, and it is estimated that if only half of US women with breast cancer who over-express this gene received Herceptin, sales would top $600 million. In addition to monoclonal antibodies, other biological approaches include vaccines and gene therapy.

*Future Trends*

Emerging science in the past decade offers the potential to radically alter the paradigm for cancer therapy and presents opportunities for fundamentally new ways of approaching the disease. New therapies offer the promise of fulfilling several unmet needs in the treatment of cancer. These include matrix metalloproteinase inhibitors (MMPIs), continued expansion of biologics, photodynamic therapies (PDT), anti-angiogenics, and multiple drug resistance (MDR) modifiers. This market does not yet exist, though success of "cytostatic-like" treatments, such as hormonal therapies for prostate and breast cancer, suggests that the market potential for cytostatic agents could be significant.

*Competition*

The angiogenesis pipeline is very competitive, but this level of intensity is somewhat skewed by the large number of mechanistic approaches that are being claimed to demonstrate angiogenic activity. Furthermore, clear evidence of efficacy for these agents has not yet been demonstrated. For the purposes of this summary, only those compounds considered true anti-angiogenic compounds have been included. Companies with compounds in clinical development include Genentech, Entremed, Sugen, TAP, Magainin and Pharmacia Upjohn.

**Angiogenesis Compounds in Clinical Development**

| Compound | Indications | Company | Phase |
|---|---|---|---|
| Neovastat | Solid tumors | Aeterna | III |
| RhuMab VEGF | Cancer | Genentech | II/III |
| Vitaxin | Arthritis, psoriasis, CVR | Ixsys | II |
| SU-5416 | Cancer | Sugen | II/III |
| TNP 470 | Cancer, arthritis | TAP | II |
| Thalidomide | Cancer | EntreMed/BMS | I |
| Squalamine, squalvs | Cancer | Magainin | I |
| RPI 4610 | Cancer | Ribozyme | I |
| VEGF antagonist | Cancer, retinopathy | NeXstar | I |
| Angiostatin/Endostatin | Cancer | EntreMed | I |

Doxorubicin/ Mesoanalogous ABT-A15          **CONFIDENTIAL**                                5

ABBT246096

## Unmet Needs

Cancer remains the second leading cause of death in the United States, Europe and Japan, and consequently, offers an attractive market opportunity for the pharmaceutical and biotechnology industries. This year about 563,100 Americans are expected to die of cancer, more than 1,500 people a day. In the US, 1 or 4 deaths is due to some form of cancer. In 1999, about 1,221,800 new cancer cases are expected to be diagnosed.

For most cancers, the level of physician satisfaction with current therapies is low. It has long been recognized by researchers, physicians, patients and family members that current treatment options may often be as devastating as the underlying disease.

Unmet needs in this market vary by tumor types and stages, with some tumors responding to treatment with better mortality and/or morbidity results than others. However, cancer is still treated as a terminal illness with significant shortcomings in present treatments. In general, unmet needs include:

| Need | ABT-510 Attribute |
|---|---|
| Enhanced efficacy of therapeutic agents. | Potential for enhanced efficacy |
| Reduced toxicity | Potential for reduced toxicity over current cytotoxic treatment |
| Improvements in drug administration | TBD |
| Improved target delivery of cytotoxics and novel therapeutics | Unknown |
| Proven outcomes data | Quality of Life and Pharmacoeconomics to be assessed |

## Considerations

*Product Usage:* Physicians have indicated that they would use anti-angiogenic agents initially in their more refractory patients, as follow-on or add-on to current best therapy (chemo or surgical). With experience and clinical evidence, they would be willing to use these agents in earlier stages of the disease, where they perceived the greatest benefit to be. Anti-angiogenesis agents are regarded as a maintenance therapy to be used in early disease or after primary therapy as a prophylactic process to prevent the spread of malignancy. Of course, their ultimate use will depend on the benefit provided, which cannot be determined until clinical trials have been completed. Efficacy evidence in humans manifested by tumor response of the magnitude seen in the preliminary dog studies would stimulate tremendous enthusiasm in the oncology community.

*Product Benefits/Efficacy:* Physicians are looking for improvements in time to tumor progression and prevention of metastases with cytostatic agents. There is a great deal of enthusiasm for this mechanism in the scientific and lay audience. The concept is very intuitive. Products, such as ABT-510, that promise a clinical benefit without the usual toxic trade-offs associated with current chemotherapeutic agents, will be enthusiastically received by oncologists.

*Side Effects* The proposed safety profile of anti-angiogenic agents may enhance usage, as the dose limiting toxicity profiles of most of the other available agents has established a much lower hurdle for demonstrating a preferred profile. However, as chronic therapy, anti-angiogenic agents may *have* to demonstrate a cleaner profile than cytotoxic agents do to ensure compliance.

Confidential

ABBT246097

*Off-label use:* Off-label use accounts for between 30-60% of an oncology product's usage. Off-label use is driven by publication of clinical trial results in credible journals, listing in key compendia and/or a peer's experience with the product. Therefore, development spend for off-label use is considerably less than the spend required for regulatory approval of an indication. However, promotion of these off-label uses is limited.

*Other indications:* ABT-510 may be effective in other therapeutic roles, such as arthritic diseases and macular degeneration. These other indications may offer a commercial upside, through internal development or co-development/out-licensing opportunities.

*Competition:* While there are a relatively large number of angiogenesis inhibitors in development, it is unclear whether they will demonstrate a superior efficacy or side-effect profile vs. ABT-510. The mechanism of angiogenesis suggests that multiple anti-angiogenic approaches may be required to maximize the clinical benefit.

*COGS:* Initial estimates on finished cost of drug place it in the range of Lupron costs. Depending on final dosing requirements, the cost of this compound could become a significant obstacle. However, this will need to be considered in light of the pricing flexibility in the oncology market, where there is limited pricing sensitivity for products that are reimbursed. Any financial analysis will need to include royalty obligations to Northwestern University.

*Dosing:* There is still some uncertainty regarding the route of administration and feasible dosage forms for ABT-510. An "inconvenient" formulation leaves this product extremely vulnerable to competitors with more convenient dosage forms. A convenient dosage form, such as a monthly depot, will enhance product adoption over a less convenient form. However, the effect of the various dosage forms on product adoption will be dependent on the benefits the compound provides, side-effect profile and availability of competitive agents with more convenient dosage forms. For chronic therapy, convenience will play an important role in market penetration, given alternative agents. Although less convenient than oral therapy, parenteral therapy (depot, but not self-administered sub-cutaneous) is currently reimbursed by Medicare in the US. Over 60% of all cancer patients have Medicare as their primary healthcare coverage in the US.

*Development/Regulatory:* With a new class of compounds, there is not a clearly defined clinical development path or regulatory guidelines for reference. This hurdle is similar for all the competitive products, but increases the overall development risk profile for these agents. However, with several anti-angiogenic agents in late stage development, Abbott can learn from their experience.

*Other Approaches:* Other "cytostatic" approaches may present a competitive threat if they are used as substitutes. Due to the complexity of the pathogenesis of cancer it is more likely that these agents will be used in combinations, but incremental benefits may become more difficult to demonstrate as the number of products and approaches multiply. This will require additional studies, as these other classes become part of standard cancer treatment. However, this threat is not unique to this compound.

*Pricing:* The treatment of cancer is expensive, so there is the potential for a great deal of pricing flexibility in this market. There is also an increasing emphasis on cost-effectiveness studies that will need to be addressed in the development plan.

Confidential                                                                    ABBT246098

*CONFIDENTIAL*

# ABT - 518

## Descriptive Memorandum

*February 2001*

## Abbott Laboratories

ABBT246099

***MMPI***

*Overview*

Abbott's Matrix Metalloproteinase Inhibitor (MMPI) program represents a novel therapeutic class, with the potential to alter the way that cancer is treated by preventing or modifying disease progression and/or metastases. This more "chronic" approach to therapy has the potential to transform cancer into a disease that patients live with, much like the effect of HIV protease inhibitors on patients with AIDS. It also has the potential to expand the cancer market significantly by increasing the average length of treatment and expanding the pool of patients eligible to receive therapy.

The MMPs comprise a family of enzymes that degrade a wide range of matrix protein substrates. High expression of these enzymes occurs in cancer and is associated with the ability of tumors to grow, invade, develop new blood vessels and metastasize.

MMP inhibitors (MMPIs) may suppress the progression of tumors by several mechanisms:

- Suppress invasion/metastasis by blocking the membrane traversal and access to blood/lymphatic vessels
- Blocking the remodeling of extra-cellular matrix in the vicinity of primary tumors to prevent stroma-bound growth factors from stimulating tumor growth
- Blocking angiogenesis by preventing the proliferation and migration of endothelial cells and neovascularization of tumor.

Experimental evidence suggests that gelatinase A and gelatinase B are particularly important in tumor progression, consequently the project team has targeted gelatinase selective inhibitors for the treatment of cancer. Another reason for targeting highly gelatinase selective MMP inhibitors relates to the side effect profile exhibited by broad-spectrum agents like marimastat. Chronic administration of marimastat causes a dose-limiting side-effect characterized by severe joint pain and stiffness. Since these joint effects may be mediated by inhibition of other MMPs like fibroblast collagenase, highly gelatinase selective agents may be efficacious without producing dose-limiting side effects.

The MMP selectivity profile exhibited by ABT-518 distinguishes it from competitor's compounds. ABT-518 possesses sub-nanomolar inhibition potencies versus both gelatinase A and gelatinase B and is substantially more selective for the inhibition of the gelatinases over fibroblast collagenase than marimastat and prinomastat. Despite its high selectivity, ABT-518 demonstrates antitumor activity equal or superior to prinomastat. Inhibition of tumor growth is dose dependent in both syngeneic and xenograft models. ABT-518 is also effective in blocking vessel formation in a mouse model of angiogenesis. ABT-518 is a stable crystalline solid which can be synthesized in six steps (25% overall yield) from commercial starting material.

ABT-518 gives rise to sustained plasma concentrations following single oral dosing in monkeys, dogs and rats. Bioavailabilities range between 68 and 93% depending on formulation and species. Several metabolites are produced after repeated oral dosing of ABT-518, although their relative amounts varies with gender and species.

ABT-518 displays no meaningful effects in genotoxicity, cytotoxicity and ligand binding assays and its cardiovascular effects in dogs are unremarkable. ABT-518 produces no significant toxic effects in rats treated with 100 mg/kg/day over 28 days. Plasma concentrations generated by ABT-518 in these studies are at least 20-fold higher than those necessary to produce efficacy in cancer animal models. ABT-518 is therefore a compelling development candidate with the

Confidential

ABBT246100

potential to demonstrate antitumor effects superior to the MMP inhibitors currently undergoing clinical trials. Phase 1 clinical trials in cancer patients will be begin December 2000.

*The market*

Currently, cytotoxic agents represent the largest, and fastest growing, class of oncology agents by sales volume. The following chart summarizes the value of the current oncology market.

### Global Sales by Market Segment ($ MM)

|  | 1996 Sales | 1997 Sales | 1998 Sales | 1999 Sales (est) | CAGR '96-'98 |
|---|---|---|---|---|---|
| Hormone | 4,414 | 4,784 | 4,884 | 5,000 | 5.2% |
| Cytotoxic | 4,278 | 5,212 | 6,268 | 7,300 | 21.0% |
| Adjunctive | 3,367 | 3,651 | 4,166 | 4,900 | 11.2% |
| Total | 12,059 | 13,847 | 15,318 | 17,200 | 12.7% |

Source: Datamonitor

### Sales by Region ($ MM)

|  | 1996 Sales | 1997 Sales | 1998 Sales | 1999 Sales (est) | CAGR '96-'98 |
|---|---|---|---|---|---|
| US | 5,564 | 6,276 | 7,422 | 8,500 | 15.5% |
| Ex- US | 6,495 | 7,370 | 7,896 | 8,700 | 10.3% |

Source: Datamonitor

Cytostatic agents have the potential to alter the way cancer is treated and presents opportunities for fundamentally new ways of approaching the disease. This cytostatic market does not yet exist, though success of more cytostatic "like" treatments, such as hormonal therapies for prostate and breast cancer, suggest that the market potential for cytostatic agents could be significant.

The ultimate commercial and clinical success of the MMPI will depend on the clinical benefit this product provides in key cancer types compared with current best therapy. These can be benefits provided by dosing this agent in addition to current therapy and/or as an alternative to best therapy, or as a new component of best therapy. All currently available products, including the market leaders such as Taxol, have significant shortcomings in their profiles.

However, as novel therapy, MMPIs will probably be adopted initially as add-on the current chemotherapy. As benefits are proven and clinical experience is gained, these agents may be used in earlier stages of cancer and/or in conjunction with surgery or radiation to prevent the progression of any microscopic disease that remains.

The clinical targets identified for this compound include late stage pancreatic cancer, late stage NSCL cancer (on-label), with late stage ovarian and breast cancer as additional cancer types where efficacy has been demonstrated, but not filed. Other cancer types this compound may be efficacious in include SCL, colorectal, bladder, stomach and prostate. Targets will be refined as we know more about this compound's in-vivo activity.

Descriptive Memorandum: ABT - 518          **CONFIDENTIAL**                    3

Confidential

ABBT246101

The following tables summarize the key marketed competitive products by indication (US data only):

### Late Stage Breast

| Product | Share |
|---|---|
| Cyclophosphamide/Cytoxan/BMS | 18.7 |
| Doxorubicin/Adriamycin/P&U | 17.11 |
| Docetaxel/Taxotere/RPR | 16.25 |
| Paclitaxel/Taxol/BMS | 18.11 |
| Trastuzumab/Herceptin/Genetech | 11.26 |

### Late Stage NSCL

| Product | Share |
|---|---|
| Carboplatin/Paraplatin/BMS | 50.32 |
| Paclitaxel/Taxol/BMS | 44.14 |
| Vinorelbine/Navelbine/Glaxo | 22.78 |
| Gemcitabine/Gemzar/Lilly | 22.14 |
| Cisplatin/Platinol/BMS | 11.26 |

### Late Stage Ovarian

| Product | Share |
|---|---|
| Paclitaxel/Taxol/BMS | 47.11 |
| Carboplatin/Paraplatin/BMS | 45.42 |
| Topotecan/Hycamtin/SKB | 22.54 |
| Dox SL/Doxil/Alza | 9.14 |
| Cisplatin/Platinol/BMS | 7.58 |

### Late Stage Pancreas

| Product | Share |
|---|---|
| Gemcitabine/Gemzar/Lilly | 78.5 |
| 5-FU/Efudex/ICN Pharma | 21.0 |
| Leucovorin/ | 10.7 |
| Cisplatin/Platinol/BMS | 4.72 |

*Compounds in Development*

The MMP inhibitor field is competitive. More than 30 firms have filed patents claiming small molecule MMP inhibitors over the past 5 years, and several companies have compounds in advanced clinical development. Abbott's compound may be 3rd or 4th to market and will have to demonstrate a competitive advantage to gain the share necessary to support the clinical development of this compound. Companies with compounds in advanced clinical development for the treatment of cancer include Agouron/Warner Lambert/Pfizer, British Biotechnology/Schering Plough and BMS and are listed below. Other companies are targeting this mechanism for arthritis.

Confidential

ABBT246102

**MMPIs in Clinical Development for Cancer**

| Compound | Company | Comments | Phase |
|---|---|---|---|
| Marimistat | BritishBiotechnology/ Schering Plough | Broad spectrum, dose limiting toxicity. Activity seen in gastric cancer, but negative results in pancreatic. | III |
| Prinomastat | Agouron/ Warner Lambert/ Pfizer | Moderate gelatinase selectivity, dose limiting toxicity. May be dosing sub-optimally to avoid toxicity. Efficacy data not available. | III |
| BMS 275291 | BMS | Broad spectrum, joint effects seen in Phase I studies. | II |

Bayer recently dropped development of BAY 12-9566 due to concerns about potential toxicity. Recent results from a study with marimistat in pancreatic cancer, where adding marimistat to Gemzar resulted in no survival advantage, has led to speculation that MMPIs may be more applicable in less aggressive cancer types or earlier stages of the disease. Alternatively, it could be a reflection of the inability to examine higher doses of marimastat due to joint effects.

The joint effects produced by the compounds listed above almost certainly preclude their long-term use, limit compliance and reduce optimal efficacy. Any MMP inhibitor that lacks these side effects will possess a substantial competitive advantage. The musculoskeletal effect produced by marimastat and prinomastat in cancer patients is typically described as arthralgia, myalgia and tendinitis, which occurs predominately in the upper limbs. While mild cases respond to analgesics, interrupting therapy for a period of approximately 2 weeks is necessary when the condition is less well tolerated.

Although Abbott's timing to market is not optimal, the shortcomings of the competitive products provide an opportunity for a compound with an improved SE or efficacy profile. Current animal models seem to predict that Abbott's compound is superior to those currently in clinical trials, and has the potential to be best in class.

*Product profile*

The objective of a product profile at this time in the product's development is to provide a target for the types of attributes that will be required to be commercially successful. This profile is based on market research with oncologists and consultation with opinion leaders. This profile will continue to be refined as more is known about this product's profile, development of competitive products and the market continues to evolve.

Confidential     ABBT246103

| | Base | Optimal |
|---|---|---|
| Efficacy | ABT-518, alone or in combination with best therapy, provides at least one of the following benefits in at least one solid tumor type:<br><br>- Increased survival<br>- Tumor regression<br>- Improved quality of life<br>- Increased time to tumor/disease progression | Provides more than one of the efficacy benefits outlined. |
| Competitive advantage | ABT-518 will need to demonstrate a clinically significant advantage in efficacy (see parameters above) or additive synergistic activity with current/competitive agents or clinically significant advantage in side-effect profile relative to other MMPI agents | Same |
| Administration | Convenient administration relative to competitive agents. | Same plus reimbursement in US market |
| COGS | A finished cost of goods that is consistent with at least an 80% standard manufacturing margin | A finished cost of goods that is consistent with at least a 90% standard manufacturing margin |

*Marketing overview*

*Product Usage:* Physicians have indicated that they would use MMPIs initially in their more refractory patients, as follow-on or add-on to current best therapy (chemo or surgical). With experience and clinical evidence, they would be willing to use these agents in earlier stages of the disease, where they perceived the greatest benefit to be. The MMPI was regarded as a maintenance therapy to be used in early disease or after primary therapy as a prophylactic process to prevent the spread of malignancy.

*Product Benefits/Efficacy:* Physicians are looking for improvements in time to tumor progression and prevention of metastases with cytostatic agents. The MMPI mechanism has more recently been implicated as having an even more active role in cancer pathogenesis, from preventing primary tumor growth to anti-angiogenic properties. Positive results from competitive agents, such as marimastat in gastric cancer, provides proof of principle for this mechanism.

*Side Effects:* The proposed safety profile of MMPIs (excluding joint toxicity) may enhance usage, as the dose limiting toxicity profiles of most of the other available agents has established a much lower hurdle for demonstrating a preferred profile. However, as chronic therapy, MMPIs may have to demonstrate a cleaner profile than cytotoxic agents do to ensure compliance. As the 3rd or 4th MMPI to market, SE hurdles will be even higher for this compound. As a critical Go/No Go decision point, the joint toxicity of this compound will be evaluated in an expanded Phase I multi-dose study.

*Dosing:* Discovery is currently targeting an oral dosage form. In general, oral therapies are acknowledged by physicians and patients as being more convenient to the patient. Chronic oral dosing may also reduce overall costs, as infusion support products and personnel would not be required, enhancing pharmacoeconomic evidence.

Descriptive Memorandum, ABT - 518          **CONFIDENTIAL**                                                    6

Confidential                                                                        ABBT246104

*COGS:* Initial estimates on finished cost of drug suggest that drug costs will not be significant for this compound

*Off-label use:* Off label use accounts for between 30-60% of an oncology product's usage. Off-label use is driven by publication of clinical trial results in credible journals, listing in key compendia and/or a peer's experience with the product. Therefore, development spend for off-label use is considerably less than the spend required for regulatory approval of an indication. However, promotion of these off-label uses is limited.

*Competition:* As the 3rd or 4th MMPI to market, Abbott's compound will need to demonstrate a meaningful clinical advantage over compounds that are in more advanced development. Strict Go/No Go criteria will determine if the MMPI can meet these hurdles. If they cannot be met, the compound will not move forward.

*Development/Regulatory:* With a new class of compounds, there is not a clearly defined clinical development path or regulatory guidelines for reference. This hurdle is similar for all the competitive products, but increases the overall development risk profile for these agents. However, with several MMPIs in late stage development, Abbott can learn from their experience.

*Other Approaches:* Other "cytostatic" approaches may present a competitive threat if they are used as substitutes. Due to the complexity of the pathogenesis of cancer, it is more likely that these agents will be used in combinations, but incremental benefits may become more difficult to demonstrate as the number of products and approaches multiply. This will require additional studies, as these other classes become part of standard cancer treatment. However, this threat is not unique to this compound.

*Pricing:* The treatment of cancer is expensive, so there is the potential for a great deal of pricing flexibility in this market. However, as an oral therapy in the US market, there may be additional downward price pressure for this agent. There is also an increasing emphasis on cost-effectiveness studies that will need to be addressed in the development plan.

*Dosing:* Discovery is currently targeting an oral dosage form. In general, oral therapies are preferred by physicians and patients because of the convenience to the patient. However, this form may not be the best choice for some people who already have certain digestive system symptoms (vomiting, diarrhea, or severe nausea), cannot swallow liquids or pills, or cannot remember when or how many pills to take. Additionally, in the US market there are several unique factors that currently do not favor oral therapies. Novel oral therapies are not currently reimbursed by Medicare, a significant payer for the oncology patient population. Also, 40-60% of a community oncologist's income is generated through the administration of IV drugs. An oral therapy would not be a source of revenue to the physician.

*Clinical Studies*

Clinical studies across a wide range of solid tumors will be initiated, including but not limited to breast cancer, non small cell lung cancer, ovarian cancer, pancreatic cancer, etc..

Final indications pursued will depend from the results of the phase II studies

Confidential                                                            ABBT246105

*CONFIDENTIAL*

# ABT - 751

## Descriptive Memorandum

*February 2001*

| Deleted: November |
| Deleted: 0 |

## Abbott Laboratories

Confidential

ABBT246106

**Deemer Deposition Exhibit 13**

**P's Exhibit LZ**

**Part 3**

## ABT-751

### Opportunity Overview

Cytotoxic agents and hormones constitute the dominant classes of drugs available to treat cancer and are responsible for 96% of the total market. Since 1993, Taxol, a taxane developed and marketed by BMS, has been widely used. Another taxane, Taxotere, developed and marketed by Aventis, was launched in 1996. Combined worldwide sales of these two products were of nearly $2 Billion US in 1999. Clinically, the development of drug resistance is the primary factor that limits the efficacy achievable with these drugs.

Abbott's anti-mitotic agent (ABT-751) is a novel, oral cytotoxic agent that acts by a mechanism similar to that of the taxanes but retains activity against taxane resistant cells. ABT-751 binds to the colchicine site on tubulin and inhibits the in vitro polymerization of microtubules. The interference with normal microtubule dynamics leads to a block in the cell cycle at the G2/M phase that ultimately results in the induction of cellular apoptosis. ABT-751 is a potent antimitotic agent that inhibits the proliferation of a broad spectrum of human tumor derived cell lines including those that are paclitaxel and doxorubicin resistant due to the multidrug-resistant (MDR) phenotype or other genetic changes.

ABT-751 demonstrated impressive oral antitumor activity when evaluated in both synegeic and human xenograft tumor models. The antitumor response was independent of the MDR status of the model, consistent with the activity observed in cell cultures. In sharp contrast with other cytotoxic drugs, the maximum tolerated dosage of ABT-751, on a q.d. 1-5 schedule, could be administered for an extended period (q.d. 1-21 or q.d. 1-28) resulting in a dramatic enhancement of the antitumor activity. These results suggest that the colchicine site ligands, such as ABT-751, will exhibit a broad spectrum of activity that will be distinct from that of other classes of antimitotic drugs. Oral availability of the compound is high. Taxol and Taxotere, in contrast, have no oral bioavailability.

The most significant finding in toxicology studies was a change in systemic and pulmonary vascular resistance following intravenous infusion of ABT-751 to anesthetized dogs. These effects led to an inverse response in cardiac output. Similar changes were observed following infusion of a structurally unrelated colchicine-site ligand, and therefore most likely represent a class effect. Additional toxicology studies focusing on vascular pathology will be performed to further elucidate this finding.

ABT-751 was administered to patients with advanced cancer in Japan in a Phase I study. Toxicities seen after single doses and 5 days of q.d. dosing were nausea, vomiting, diarrhea, epigastric pain, ileus and peripheral neuropathy. Grade 2 toxicity was peripheral neuropathy and associated paresthesias. Pharmacokinetic analyses showed plasma concentrations equivalent to those that affected systemic resistance and cardiac output in the anesthetized dog study. However, no adverse cardiovascular effects were observed in the Japanese Phase I trial. Evidence of ABT-751 efficacy was exhibited in one patient with uterine sarcoma, one patient with NSCLC after single doses, one patient with gastric cancer and one patient with uterine cervical carcinoma demonstrated decreased tumor markers after repeated dosing.

Deleted: ¶

Deleted: ¶

Confidential

ABBT246107

The planned initial Phase I study in the U.S. will determine the maximum tolerated dose and dose-limiting toxicities of ABT-751 given orally once a day or twice daily for multiple cycles in patients with advanced malignancies. In addition, pharmacokinetics in a western population, and optimal dose and schedule will be determined. Phase II studies will be initiated in patients with different cancer types:

- Refractory breast (taxane failures)
- Hormone refractory prostate
- Bladder
- Lung
- Cervical
- Hepatocellular
- Other possibilities: colorectal, sarcoma, renal cell, pancreatic, HNSCC

Cytotoxic agents represent the largest, and fastest growing, class of oncology agents by sales volume. The following chart summarizes the value of the current oncology market.

**Global Sales by Market Segment ($ MM)**

| | 1996 Sales | 1997 Sales | 1998 Sales | 1999 Sales (est) | CAGR '96-'98 |
|---|---|---|---|---|---|
| Hormone | 4,414 | 4,784 | 4,884 | 5,000 | 5.2% |
| Cytotoxic | 4,278 | 5,212 | 6,268 | 7,300 | 21.0% |
| Adjunctive | 3,367 | 3,851 | 4,166 | 4,900 | 11.2% |
| Total | 12,059 | 13,847 | 15,318 | 17,200 | 12.7% |

Source: Datamonitor

**Sales by Region ($ MM)**

| | 1996 Sales | 1997 Sales | 1998 Sales | 1999 Sales (est) | CAGR '96-'98 |
|---|---|---|---|---|---|
| US | 5,564 | 6,276 | 7,422 | 8,500 | 15.5% |
| Ex-US | 6,495 | 7,370 | 7,896 | 8,700 | 10.3% |

Source: Datamonitor

This growth of the cytotoxic segment has been driven primarily by the introduction of new, more effective and expensive therapies such as Taxol (paclitaxel/BMS), Gemzar (gemcitabine/Lilly), Taxotere (docetaxel/RPR) and Hycamtin (topotecan/SB). Uptake of these newer agents, however, can be dependent on the cost sensitivity of the local market.

The clinical targets identified for this compound include late stage breast cancer, late stage NSCL cancer (on-label), with late stage ovarian and pancreatic cancer as additional cancer types where efficacy has been demonstrated, but not filed. This product may also be potentially efficacious in cancers such as gastric, colorectal, prostate, bladder, esophageal, hepatocellular (ex-US), lymphoma, and leukemia. Targets will be refined as we know more about this compound's in-vivo activity.

Confidential

ABBT246108

The following tables summarize the key competitive products by indication (US data only).

**Late Stage Breast**

| Product | Share |
|---|---|
| Cyclophosphamide/Cytoxan/BMS | 18.7 |
| Doxorubicin/Adriamycin/P&U | 17.11 |
| Docetaxel/Taxotere/RPR | 16.25 |
| Paclitaxel/Taxol/BMS | 15.11 |
| Trastuzumab/Herceptin/Genetech | 11.26 |

**Late Stage NSCL**

| Product | Share |
|---|---|
| Carboplatin/Paraplatin/BMS | 50.32 |
| Paclitaxel/Taxol/BMS | 44.14 |
| Vinorelbine/Navelbine/Glaxo | 22.78 |
| Gemcitabine/Gemzar/Lily | 22.14 |
| Cisplatin/Platinol/BMS | 11.26 |

**Late Stage Ovarian**

| Product | Share |
|---|---|
| Paclitaxel/Taxol/BMS | 47.11 |
| Carboplatin/Paraplatin/BMS | 45.42 |
| Topotecan/Hycamtin/SKB | 22.54 |
| Dox SL/Doxil/Alza | 9.14 |
| Cisplatin/Platinol/BMS | 7.58 |

**Late Stage Pancreas**

| Product | Share |
|---|---|
| Gemcitabine/Gemzar/Lily | 78.5 |
| 5-FU/Efudex/ICN Pharma | 21.0 |
| Leucovorin/v | 10.7 |
| Cisplatin/Platinol/BMS | 4.72 |

| Compounds in Development | Deleted: ¶ |
|---|---|

ABT-751 induces a mitotic block by binding to the colchicine site on tubulin and thereby affecting tubulin polymerization. There are no currently available drugs which function by the mechanism described above. However, vinca alkaloids and taxanes fall into the broad category of anti-mitotics although they produce the anti-mitotic effect through different mechanisms. The following table summarizes anti-mitotic compounds in development.

Confidential

ABBT246109

| Company | Compound | Indication | Status of compound | Status of project |
|---|---|---|---|---|
| **Colchicine-site ligands** | | | | |
| Oxigene | combretastatin-A4 phosphate | Tumor vasculature | Phase I | active |
| Tularik | T138067 (phosphate prodrug) | Cancer (unspecified) | Preclinical | active |
| Tularik | 1900607 | Cancer (unspecified) | Preclinical | active |
| ICR/CRC | Amphethinile | Cancer (unspecified) | Phase I (abandoned 1988) | inactive |
| Wacoma Research | 108IC | Cancer (unspecified) | Phase I (abandoned 1998) | inactive |
| Nih | Trimethylcolchicinic acid | Various tumors | Phase I (1990, abandoned) | inactive |
| Parke-Davis | CI-980 | ovarian, colorectal | Phase II (abandoned 2000) | inactive |
| **Vinca alkaloid-site ligands** | | | | |
| BASF | LU103793 (dolastatin 15 analog) | Cancer (unspecified) | Phase II (abandoned) | active |
| Serivar | Vinustline | Cancer (unspecified) | Phase I | unknown |
| NCI | dolastatin 10 | Adv. Cancers | Phase I | unknown |
| Takeda Hormone | TZT-1027 (dolastatin 10 analog) | Cancer (unspecified) | Phase I (Jpn) | unknown |
| Lily | LY 355703 (cryptophycin 52) | Cancer (unspecified) | Preclinical | unknown |
| Takeda | Maitansine | Cancer (unspecified) | Preclinical | unknown |
| **Microtubule stabilizing agents (non-taxanes)** | | | | |
| Sec Biotech Hnc/ Bristol-Myers Squibb | Epothilone | Cancer (unspecified) | Preclinical | active |
| Bristol-Myers Squibb | eleutherobin | Cancer (unspecified) | Preclinical | active |
| Pharmacia & Upjohn | sarcodictyins | Cancer (unspecified) | Preclinical | active |
| Takeda | GS-164 | Cancer (unspecified) | Preclinical | active |

The novelty of this mechanism offers the promise of differentiation that will diminish the threat from potential competitors. However, this novelty is balanced by the similarity to current mechanisms, such as taxanes and vinca alkaloids, which suggests the promise of clinical efficacy. With the opportunity to be first or second to market with an agent that binds to the colchicine site, the competitive situation seems modest.

Confidential

ABBT246110

*CONFIDENTIAL*

# Farnesyltranserase Inhibitor

## Descriptive Memorandum

*February 2001*

## Abbott Laboratories

November 1st, 2000
Hancock FTI

*Overview*

The Ras genes were the first oncogenes of mammalian origin to be discovered. Intensive research over the last decade has led to the elucidation of the normal function of cellular Ras protein, the role of Ras mutations in oncogenic transformation, and the identification of molecular targets, such as the enzyme farnesyltransferase, for inhibiting Ras activity. Although farnesyltransferase inhibitors (FTIs) were initially designed with the intention of inhibiting the posttranslational prenylation, and hence function, of Ras, it is now becoming apparent that farnesylated proteins other than Ras (e.g., RhoB) are also critical for malignant growth and may be the relevant target for inhibition of farnesylation. While it remains controversial whether blocking Ras activity or altering the RhoB prenylation status is the actual function of an FTI, these agents, exemplified by ABT-839 and FTIs in the clinic, exhibit remarkable anticancer activity against a wide variety of tumors in preclinical models. The current FTI program is projected to reach DDC status in January, 2001.

Abbott evaluated one FTI, ABT-839, in normal volunteers, but decided to discontinue development of this drug due to its poor pharmacokinetic profile. Invaluable experience was gained, however, from both the preclinical and clinical studies with this compound. Abbott's second-generation series are novel structures that exhibit significantly improved potency and oral bioavailability.

There continues to be tremendous enthusiasm in the medical community and pharmaceutical industry for this mechanism of action. Farnesyltransferase inhibitors have demonstrated impressive antitumor activity in preclinical models with activity equivalent to or better than that achieved with conventional cytotoxic chemotherapy given at the maximal tolerated dose. These agents appear to inhibit angiogenesis and, consistent with this activity, minimal resistance has been observed in preclinical models. The potential also exists for synergistic activity in combination with cytotoxic chemotherapy.

*The market*

Cancer remains the second leading cause of death in the US, and consequently is an attractive market opportunity for the pharmaceutical/biotechnology industries. Approximately 40% of all Americans will develop cancer in their lifetime.

The worldwide cytotoxic and hormonal cancer therapies market is highly fragmented with only BMS and Zeneca holding a greater than 10% market share. Although the market is not concentrated, the field is highly competitive with more than 60 companies focused on the cancer research area. The growth of the oncology market is fueled by increasing disease incidence, new product entries, new therapeutic approaches, a growing adjunct therapy market that expands the number of patients eligible for chemotherapy, and intensified research competition. The data in Tables 1 and 2 summarize the value of the current oncology market. A great deal of uncertainty surrounds the concept of cytostatic treatment of cancer. Conceptually it may transform the way cancer is treated, allowing patients longer disease free survival and improved quality of life. However, at this point in development, this paradigm does not exist in cancer. Considering market, clinical and patient dynamics factors, breast, colorectal, prostate and non small cell lung cancers are the most attractive targets for development.

Descriptive Memorandum, FTI     CONFIDENTIAL                                    2

Confidential

ABBT246112

Table 1  Global sales by market segment ($ MM)

| | 1996 Sales | 1997 Sales | 1998 Sales | 1999 Sales (est.) | CAGR '96-'98 |
|---|---|---|---|---|---|
| Hormone | 4,414 | 4,784 | 4,884 | 5,000 | 5.2% |
| Cytotoxic | 4,278 | 5,212 | 6,268 | 7,300 | 21.0% |
| Adjunctive | 3,367 | 3,651 | 4,166 | 4,900 | 11.2% |
| Total | 12,059 | 13,647 | 15,318 | 17,200 | 12.7% |

Source: Datamonitor

Table 2.  Sales by region ($ MM)

| | 1996 Sales | 1997 Sales | 1998 Sales | 1999 Sales (est.) | CAGR '96-'98 |
|---|---|---|---|---|---|
| US | 5,564 | 6,276 | 7,422 | 8,500 | 15.5% |
| Ex-US | 6,495 | 7,370 | 7,896 | 8,700 | 10.3% |

Source: Datamonitor

Cytostatic agents have the potential to alter the way cancer is treated and presents opportunities for fundamentally new ways of approaching the disease. This cytostatic market does not yet exist, though success of more cytostatic "like" treatments, such as hormonal therapies for prostate and breast cancer, suggest that the market potential for cytostatic agents could be significant.

The ultimate commercial and clinical success of the FTI will depend on the clinical benefit this product provides in key cancer types compared with current best therapy. These can be benefits provided by dosing this agent in addition to current therapy and/or as an alternative to best therapy, or as a new component of best therapy. All currently available products, including the market leaders such as Taxol, have significant shortcomings in their profiles.

However, as novel therapy, FTIs will probably be adopted initially as add-ons to current chemotherapy. As benefits are proven and clinical experience is gained, these agents may be used in earlier stages of cancer and/or in conjunction with surgery or radiation to prevent the progression of any microscopic disease that remains.

The clinical targets identified for this compound include late stage pancreatic cancer, late stage NSCL cancer (on-label), with late stage ovarian and breast cancer as additional cancer types where efficacy has been demonstrated, but not filed. Other cancer types this compound may be efficacious in include SCL, colorectal, bladder, stomach and prostate. Targets will be refined as we know more about this compound's in-vivo activity.

The following tables summarize the key marketed competitive products by indication (US data only)

Late Stage Breast

| Product | Share |
|---|---|
| Cyclophosphamide/Cytoxan/BMS | 18.7 |
| Doxorubicin/Adriamycin/P&U | 17.11 |
| Docetaxel/Taxotere/RPR | 16.25 |
| Paclitaxel/Taxol/BMS | 16.11 |
| Trastuzumab/Herceptin/Genetech | 11.26 |

Descriptive Memorandum, FTI    CONFIDENTIAL    3

Confidential

ABBT246113

### Late Stage NSCL

| Product | Share |
| --- | --- |
| Carboplatin/Paraplatin/BMS | 50.32 |
| Paclitaxel/Taxol/BMS | 44.14 |
| Vinorelbine/Navelbine/Glaxo | 22.78 |
| Gemcitabine/Gemzar/Lilly | 22.14 |
| Cisplatin/Platinol/BMS | 11.28 |

### Late Stage Ovarian

| Product | Share |
| --- | --- |
| Paclitaxel/Taxol/BMS | 47.11 |
| Carboplatin/Paraplatin/BMS | 45.42 |
| Topotecan/Hycamtin/SKB | 22.54 |
| Dox SL/Doxil/Alza | 9.14 |
| Cisplatin/Platinol/BMS | 7.58 |

### Late Stage Pancreas

| Product | Share |
| --- | --- |
| Gemcitabine/Gemzar/Lilly | 78.5 |
| 5 FU/Efudex/ICN Pharma | 21.0 |
| Leucovorin/ | 10.7 |
| Cisplatin/Platinol/BMS | 4.72 |

Emerging science within the past decade has radically altered the paradigm for cancer therapy and presents opportunities for fundamentally new ways of approaching the disease. Abbott has multiple discovery cytostatic targets, which may improve effective, but we are not alone; more than 200 compounds from other players are in development. The goal of cytostatic therapy is to improve quality of life, controlling the disease and transforming aggressive treatment to a chronic condition, which has been compared to the impact of protease inhibitors on the course of HIV

*Clinical Studies*

Considering all the factors, market, clinical and patient dynamics, breast, colorectal, prostate and non-small cell lung cancer appear to be the most attractive targets for development. The development of cytostatic agents faces a number of challenges as regulatory agencies and physicians evaluate the new emerging paradigm of cancer therapy.

Despite the enormous medical need, drugs for chronic treatment/disease stabilization and improved quality of life for cancer patients do not yet exist. Correspondingly, animal models test efficacy that has not yet been validated as predictive of response in humans. Medical oncologists have historically depended on determination of maximum tolerated dose and response manifested by tumor shrinkage for cancer drug development. These parameters are not relevant to novel "cytostatic" agents. Combination with conventional cytotoxic drugs will be required in the near term and will have to be determined empirically. Intermediate and surrogate measures of biological response will have to be developed. Regulatory agencies are grappling with the same issues.

Descriptive Memorandum, FTI     CONFIDENTIAL.                                    4

Confidential

ABBT246114

Competition:

Within Project Approach

| Company | Compound | Indication | Status of compound | Status of project |
|---|---|---|---|---|
| Janssen Pharmaceutica | R-11577 (A-25107*6) | Cancer (unspecified) | Phase III | active |
| Schering-Plough | Sch66336 (A-66482Z) | Cancer (unspecified) | Phase II | active |
| Merck | L-778123 | Cancer (unspecified) | Phase I [x r] abandoned | unknown |
| Bristol-Myers Squibb | BMS-214662 | Cancer (unspecified) | Phase I | active |
| LG Chemical | LB 42908 | Cancer (unspecified) | preclinical | active |
| Rhone-Poulenc Rorer | quinuclidine derivatives | Cancer (unspecified) | preclinical | active |
| Pfizer | unknown structure | Cancer (unspecified) | preclinical | active |
| Parke-Davis | unknown structure | Cancer (unspecified) | preclinical | abandoned project |
| Roche | peptidomimetics | Cancer (unspecified) | preclinical | abandoned project |
| Eisa | peptidomimetics | Cancer (unspecified) | preclinical | abandoned project |
| Banyu | FPP mimetic | Cancer (unspecified) | preclinical | unknown |
| ISIS | ISIS-2503 (ras antisense) | Cancer (unspecified) | Phase I | active |

Within Therapeutic Area

| Approach | Selected Compounds | Company/ies | Status |
|---|---|---|---|
| antisense | ISIS 5621, ISIS, 5132 | ISIS | phase I |
| cytotoxic agents | camptosar, CI-980, tomotcon, Gemzar, Mycamsin, Irabrubicin, floxuridine, Oncaspar, Capecitine, Tomutex | PBU, Warner-Lambert, Schering, Lilly, SKB, PBU, Immunex, Abbuzil, Roche, Zeneca | most phase III |
| differentiation | targretin, panretin, 5-azacytidine | Ligand, NCI | Ligand in phase I/III |
| drug resistance modifiers | VX-710, 778086, BMP-7, CT-2584 | Vertex, Glaxo Wellcome, Alkermes, Cell Therapeutics | Vertex in phase II |
| gene therapy | Onyx-015, , HEPA-1, GLI-328, IL-2, GW-1301 | Onyx, Introgen, Theron Biologics Theragen, Genetic Therapy, Oydacel, RPR Gencell GeneMedicine, Titan, etc | Restricted to accessible cancers. Most advanced, Phase I/II |
| hormonal therapy | Zoladex, arexion, cetrorelin, Oncaar Plextize, Casodex, leglarnede | Zeneca, Pfizer, Novartis, Janssen, US bioscience | most phase III |
| immunotherapy | | | |
| antibodies | IDEC Y2/4v298, anti-HER2, anti EGFR | IDEC, Genentech, ImClone | IDEC recently approved, others phase III |
| cytokines | IL-12, IL-4, Prolleukin, Roferon-A | Roche, Schering, Chiron, Roche | phase III |
| vaccines | rVigp100, Canvaxin, MGV | Anosion, Theron, Progenics | phase I-III |
| photodynamic | photofrin, proimyon | QLT photo, Aon | phase III |
| radiation sensitizers | Hexv Sensamide, radanil | Organe, Redpris | phase II, III |
| metalloproteinase inhibitors | marimastat, AG-3340, CGS-27025A | British Biotech, Agouron, Novartis, Bayer | BGT in phase III |
| angiogenesis inhibitors | TMP-470, SU-5416, anti-VEGF mAb, thalidomide, DC101 | TAP, Sugen, Genentech, Entremed, ImClone, etc | see angiogenesis project review for details |

Confidential

ABBT246115

Competitive Analysis

The project is on par with others in the industry. While second generation Abbott compounds are not yet in clinic, all of the compounds from other companies that are in clinical trials have deficiencies. While the Schering compound has the best oral PK profile, it is not particularly potent. The Janssen compound is potent, but has a poor PK profile. The Merck compound exhibited QTc prologation and development has been stopped. The Bristol Myers Squib compound, BMS-214662, which is in phase I, is an *in vitro* submicromolar inducer of apoptosis in human tumor cells and appears to be the most potent inducer of apoptosis of the known FTIs. This compound could have a different mechanism of action from the classical FTIs and have its own liabilities. LG42908 from LG Chemical is potent FTI and has good oral bioavailability (F= 91% in monkey), however, it's a CYP3A4 inhibitor and will have significant drug-drug interaction liabilities. Extensive preclinical pharmacology at Abbott has defined optimum parameters for a FTase inhibitor that may not be known to our competitors, or be achievable with the current generation of FTIs. Although not yet established, we anticipate that the Abbott compound will be improved over competitors' compounds with respect to potency, oral bioavailability, half-life, toxicity, efficacy, angiogenesis inhibition, and lack of resistance.

Confidential

ABBT246116

# Endothelin (ABT-627)
## Annual Development Plan
### Exhibit 1.5

| Therapeutic Area | Oncology |
|---|---|
| Indications | - Hormone Refractory Prostate Cancer<br>- Potential for use in early Prostate Cancer and other cancer types |
| Description | - ABT-627 is Abbott's leading endothelin antagonist receptor<br>- ABT-627 is seeking an indication for the treatment of hormone refractory prostate cancer<br>- ABT-627 will probably be used with current therapies<br>- Well tolerated as chronic therapy<br>- Oral administration<br>- No major drug interactions with drugs commonly used in elderly population or hormonal therapy<br>- Demonstrated cost effectiveness at firng |

**Current Time Line**

| Milestone | Date |
|---|---|
| Phase I | 2Q1996 |
| Phase II | 4Q1997 |
| Phase III | 4Q2000 |
| NDA Filing | 2Q2004 |
| Launch | 4Q2004 |

**Projected Spending by Year**

|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|---|
| PC* | 12.0 | 38.0 | 40.0 | 33.0 | 20.0 | 10.0 | 154.0 |
| EP&A* | N/A | 6.0 | 6.0 | 5.0 | 0.0 | 0.0 | 17.0 |
| FE* | N/A | 5.0 | 3.0 | 0.0 | 0.0 | 0.0 | 8.0 |

* End of Phase II meeting with FDA just completed. Budget impact still in process plus discussion of other

ABBT246124

Confidential

| Spending | $S |
|---|---|
| Project-to-Date-Spending (thru '00) | 127.6 |
| 2001 Current Projection (Plan) | 38.0* |

* See page 2 for detail

ABBT246126

Confidential

ABBT246127

Confidential

CCM (ABT-594)
Annual Development Plan
Exhibit 1.5

| Therapeutic Area | Neuroscience |
|---|---|
| Indications | ABT-594 primary target indication is the treatment of neuropathic pain (NP) |
| Description | ABT-594 is a non-opioid, non-NSAID analgesic that is a potent and selective neuronal nicotinic receptor modulator. ABT-594 is effective in nociceptive pain and neuropathic pain. ABT-594 is expected to have a better side effect profile than opioids, no tolerance, no abuse, and no DEA schedule. Pre-clinical data show ABT 594 to be 30 to 100 times more potent and equally efficacious to morphine in treatment models of pain. ABT-594 has a unique mechanism of action which may enable use in combination with other analgesics as well as monotherapy. Slow onset of action (approx. 1.5 - 3 hours) at low doses (also) may suggest limited utility in acute pain types. Favorable safety profile. Oral formulation, BID dosing |

Current
Time Line

| Milestones | Date |
|---|---|
| IND Filing | 4Q1996 |
| Phase I | 3Q1997 |
| Phase II | 3Q1998 |
| Phase III | 4Q2001 |
| NDA Filing | 3Q2003 |
| Launch | 3Q2004 |

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|---|
| Projected Spending by Year | 14.4 | 33.0 | 45.0 | 32.0 | 15.0 | 12.0 | 153.4 |

Confidential

ABBT246129



iulator

heduling

(5mg moderate to severe pain int several well characterized animal

well as monotherapy

s

| Spending | $$ |
|---|---|
| Project-to-Date Spending (thru '00) | 97.3 |
| 2001 Current Projection (Plan) | 35.0* |

* See page 2 for detail.

ABBT246130

Confidential

TSP (ABT-510)
Annual Development Plan
Exhibit 1.5

| Therapeutic Area | Oncology |
| Indications | Solid tumors such as lung, breast, ovary, bladder and pancreas. |

Description
- Thrombospondin peptide
- Novel anti-angiogenesis agent
- Parenteral dosing
- ABT-510 is seeking an indication for the treatment of solid tumors
- Mechanism may prevent the growth of tumors and prevent the spread of metastases by preventing or inhibition supplying blood vessels

Current
Time Line

| Milestone | Date |
| --- | --- |
| DDC | 4Q1998 |
| Phase I | 2Q2000 |
| Phase II | 4Q2001 |
| Phase III | 1Q2003 |
| NDA Filing | 1Q2005 |
| Launch | 1Q2006 |

| Projected Spending by Year | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 6.6 | 9.0 | 37.0 | 29.0 | 23.0 | 15.0 | 119.6 |

Confidential

ABBT246135



hd the growth of nutrient

| Spending | $$ |
|---|---|
| Project-to-Date Spending (thru '00) | 45.6 |
| 2001 Current Projection (Plan) | 0.0¹ |

¹ See page 2 for detail

ABBT246136

Confidential

## MMPI (ABT-518)
## Annual Development Plan
## Exhibit 1.5

| Therapeutic Area | Oncology |
|---|---|
| Indications | Solid tumors such as lung, ovarian, pancreas, breast, colorectal and bladder |

Description
- Novel metalloproteinase inhibitor
- Cytostatic mechanism
- Oral dosing
- May prevent the growth of metastatic lesions and/or inhibit primary tumor growth.
- Superior efficacy or side-effect profile to competitive agents.

Current Time Line

| Milestone | Date |
|---|---|
| DDC | 1Q2000 |
| Phase I | 4Q2000 |
| Phase II | 2Q2002 |
| Phase III | 3Q2003 |
| NDA Filing | 3Q2005 |
| Launch | 3Q2006 |

Projected Spending by Year

| 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|
| 5.0 | 7.0 | 31.0 | 35.0 | 26.0 | 20.0 | 124.0 |

ABBT246138

Confidential



| Spending | $$ |
|---|---|
| Project-to-Date Spending (thru '00) | 49.0 |
| 2001 Current Projection (Plan) | 7.0* |

|* See page 2 for detail

ABBT246139

Confidential

Anti-Mitotic (ABT-751)
Annual Development Plan
Exhibit 1.5

| Therapeutic Area | Oncology |
|---|---|
| Indications | Solid tumors such as breast, lung, colorectal, and ovarian |
| Description | - Novel oral cytotoxic agent that inhibits tumor growth by inhibiting the polymerization of tubulin, similar to the Mc<br>- May be effective in patients resistant to other cytotoxic agents |

| Current Time Line | Milestone | Date |
|---|---|---|
| | In-License | 2Q2000 |
| | Phase I | 1Q2001 |
| | Phase II | 4Q2001 |
| | Phase III | 4Q2002 |
| | NDA Filing | 1Q2005 |
| | Launch | 1Q2006 |

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|---|
| Projected Spending by Year | 6.0 | 10.0 | 27.0 | 35.0 | 25.0 | 12.0 | 115.0 |

ABBT246141

Confidential

ABBT246142

OA of Isoxazoles

| Spending | $$ |
|---|---|
| Project-to-Date Spending (thru '00) | 6.0 |
| 2001 Current Projection (PLAN) | 10.0* |

* See page 2 for detail

Confidential

ABBT2461144

**FTI (ABT-xxx)**
**Annual Development Plan**
**Exhibit 1.5**

| Therapeutic Area | Oncology |
|---|---|
| Indications | Solid tumors such as lung, breast, ovary, bladder and pancreas. |

| Description |
|---|
| - Farnesyltransferase inhibitor |
| - Mechanism of action is unknown, but thought to inhibit farnesylated proteins which are integral for malignant : |

**Current Time Line**

| Milestones | Date |
|---|---|
| DDC | 1Q2001 |
| Phase I | 4Q2001 |
| Phase II | 2Q2003 |
| Phase III | 3Q2004 |
| NDA Filing | 4Q2006 |
| Launch | 4Q2007 |

| Spending |
|---|
| Project-to-Date |
| 2001 Current Pl |
| See Page 2 for |

**Projected Spending by Year**

| | 2000 | 2001 | 2002 | 2003 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|
| | N/A | 6.0 | 15.0 | 30.0 | 30.0 | 18.0 | 99.0 |

Confidential

ABBT246145



tumor growth.

♦Spending (thru '00)

Projection (Plan)

or detail.

| 35 |
| --- |
| 35.0 |
| 6.0* |

Confidential

Dopamine Receptor Agonist (ABT-xxx)
Annual Development Plan
Exhibit 1.5

| Therapeutic Area | Other |
|---|---|
| Indications | Male Erectile Dysfunction (MED) |
| Description | D4 Dopamine Receptor Agonist<br>- Targets D4 receptors in the brain which offers the potential for efficacy in patients with MED that do not respor<br>- Additionally this approach offers opportunity for compounds with improved tolerability relative to other Dopam<br>for MED |

| Current<br>Time Line | Milestones | Date | | | | | | Spending | |
|---|---|---|---|---|---|---|---|---|---|
| | DDC | 4Q/2001 | | | | | | Project-to-Date | |
| | Phase I | 2Q/2002 | | | | | | | |
| | Phase II | 4Q/2003 | | | | | | 2001 Current P: | |
| | Phase III | 1Q/2005 | | | | | | | |
| | NDA Filing | 1Q-2007 | | | | | | - See page 2 for | |
| | Launch | 4Q-2007 | | | | | | | |

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | | Total |
|---|---|---|---|---|---|---|---|---|
| Projected Spending<br>by Year | N/A | 6.0 | 15.0 | 30.0 | 30.0 | 18.0 | | 99.0 |

ABBT246147

ABBT246148



nt to Viagra
nire agents that are clinically used

e-Spending (thru '00)                    $$
                                         38.0
Projection (Plan)                        6.0*

ir detail.

Confidential

**DEEMER DEPOSITION EXHIBIT 14**

**PLT'S EXHIBIT M**

## Abbott Portfolio Review

March 7-9, 2001

- Project              ABT-518

- Compound         Matrix Metalloproteinase Inhibitor

- Presenter          Parry Nisen

- Project Team Members

  A. Nabulsi (VH), T. Janus (MD), D. D'Amico (CPM)

---

### ABT-518

- Target indication: Solid tumors
- Targeted unmet medical need: Cancer
- Target product profile vs. current gold standard:



HIGHLY
CONFIDENTIAL

CONFIDENTIAL

ABBT 0013224



PLAINTIFF'S
EXHIBIT
Neimer 14
10-27-06

## ABT-518

◆ **Key pre-clinical findings:**

- **Pharmacology**
  - Potent and highly selective (gel-A and gel-B) MMP inhibitor
  - Anti-tumor activity seen in numerous murine cancer models
  - Inhibition of tumor growth is dose dependent
  - Blocks vessel formation in a mouse model of angiogenesis
- **Pharmacokinetics / Metabolism in animals**
  - Sustained plasma concentrations following single-dose in monkeys
  - Oral bioavailability between 68 and 93% in animals
  - Multiple metabolites are produced after repeat dosing in rats and dogs
- **Toxicology**
  - No meaningful effects in genotoxicity, cytotoxicity or ligand binding assays
  - No remarkable cardio-vascular effects in dogs
  - Stratosis seen in high-dose rats two weeks after drug stopped

## ABT-518

◆ **Chemistry and Manufacturing**

- **Drug substance**
  - Six steps from commercial starting materials
  - 3-month turnaround time to manufacture
  - Manufactured at Abbott
- **Drug product**
  - Neat drug in a capsule (25 and 200 mg) for Phase I
  - Hand-fill or semi-automation at a third party manufacturing facility (Phase I)
  - Formulation development work will begin post Phase II Go/No Go decision

HIGHLY
CONFIDENTIAL

2
CONFIDENTIAL

ABBT 0013225



HIGHLY
CONFIDENTIAL

CONFIDENTIAL

ABBT 0013226

## ABT-518

♦ Clinical development budget

| Phase | Funding ($MM) |
|-------|---------------|
| Pre-Clinical | 5 |
| Phase I | 12 |
| Phase II | 47 |
| Phase III | 78 |

HIGHLY
CONFIDENTIAL

CONFIDENTIAL

ABBT 0013227

**ABT-518**

♦ **Phase I study:**

**Multiple-dose study in patients with advanced cancer**

- Objectives
  - Establish safety profile
  - Determine the maximum tolerated dose (MTD)
  - Assess PK
  - Determine Phase II dose
- Design
  - 28 days + extension
  - Single-dose of drug administered on Day 1; resume dosing (daily) on Day 4
  - Approximately 40 patients; 3 patients per dose
    - Add 6 or more patients at MTD to collect additional safety information
  - Doses: 25, 50, 100, 200, 400, 800, 1200, 1600, 2000 mg/day

---

**ABT-518**

♦ **Phase I plan:**

**IND Study**

- Objectives
  - PD-guided Phase II dose selection
  - Long-term safety
- Design
  - Multiple dose escalation study
  - Assess MMP activity in accessible tumors
    - Melanoma
    - Head and Neck Cancer
  - Approximately 20 patients

HIGHLY
CONFIDENTIAL

CONFIDENTIAL

ABBT 0013228

---

**ABT-518**

♦ Phase II development plans:

  . 3 Studies

    • 3 Tumor types as defined by Phase I and animal efficacy

    • 150 patients per study

  . Dose finding

  . Assess safety issues identified in Phase I

  . Thirteen month duration

---

**ABT-518**

♦ Phase III plan:

  . Demonstrate improvement in survival or TTP in combination
    with cytotoxic therapies

---

CONFIDENTIAL

HIGHLY
CONFIDENTIAL            ABBT 0013229

ABT-518

| Strategic Summary |

♦ **Key project strengths / positives:**

- **Product attributes**
  - Highly selective for the inhibition of gelatinases A & B
  - Very potent
  - No joint-toxicity expected
  - Potentially best in class
- **Technology / Innovation**
  - Oral, once-a-day dosing
- **Time to market**
  - Potential for fast-track approval
  - Launch 2008
- **Business franchise strength**
  - Comprehensive oncology franchise
  - Synergies with HPD and ADD
- **Other relevant points**
  - Competitors in class
  - Non-oncologic indications
    - Multiple sclerosis
    - Proliferative retinopathy
    - Arthritis



ABT-518

| Strategic Summary |

♦ **Potential issues / Threats / Negatives:**

- **Toxicity / side effects**
  - Metabolites that may accumulate over time
  - Potential mechanism-based drug interaction (CYP3A inducer-inhibitor)
  - Microvesicular and macrovesicular steatosis in rat study
- **Manufacturing / cost of goods** – No issues anticipated
- **Efficacy**
  - Data released from competitors may cast doubt on class
- **Clinical recruitment problems**
  - Extensive protocol prohibited medications list
- **Regulatory risk**
  - No precedent for cytostatic drug approval
  - Undefined clinical endpoints
  - Competitor data may pose additional development hurdles
- **Technical risks** – No issues anticipated
- **Other relevant issue**
  - No good models for selection of dose, regimen and responsive tumor types
  - PD marker selection

HIGHLY
CONFIDENTIAL

2
CONFIDENTIAL

ABBT 0013230

---

**ABT-518**                                    Strategic Summary

♦ Key decisions:

- Important upcoming decisions
  - Transition team Go/No Go Phase II - 12/01

- Proposed budget (2001, and all years to launch)

| Year | R&D per year ($MM) |
|------|--------------------|
| 2001 | 7 |
| 2002 | 38 |
| 2003 | 36 |
| 2004 | 29 |
| 2005 | 23 |
| 2006 | 9 |

---

**ABT-518**                                    Strategic Summary

♦ Key decisions:

- Evaluate safety at multiple doses and dose regimens
- Dose and regimen selection for Phase II
- Tumor type selection for Phase II
- Clinical trial design to demonstrate efficacy

---

HIGHLY
CONFIDENTIAL

3
CONFIDENTIAL

ABBT 0013231

**ABT-518**

Strategic Summary

- Proposed action plans
  - Manufacturing
    - Initiate formulation work post Phase II Go/No Go
  - Nonclinical
    - Additional toxicology and metabolism studies are underway to explore the CYP3A and steatosis issues
  - Clinical
    - Measure metabolites in Phase I
    - Assess bioactivity via PD markers in Phase I
    - Hold a Pre-IND meeting with the FDA to discuss endpoints
  - Contingency plan
    - Pursue alternative indications
      - Multiple sclerosis
      - Proliferative retinopathy
      - Arthritis

HIGHLY CONFIDENTIAL

CONFIDENTIAL

ABBT 0013232

Deemer Deposition Exhibit 15


P's Exhibit R

**Philip M Deemer**              To: sblewitt@jhancock.com@internet

03/12/2001 03:03 PM          Subject: MMPI Program Update

John Leonard looked at all of the documents one last time in preparation for execution and noted an oversight on one of the Programs.   On the ABT-518 program, he noted that Phase I was to have started on December 2000 (4Q2000) but in fact did not start until earlier this month.  This pushed the timeline back by a quarter throughout but the launch date is not affected and is actually planned one quarter earlier (2Q06).   Steve, as you know the timing of starting some of these earlier compound studies is related to completing this financing and hence the reason this one got pushed back a little.

  

ABT-518 0301.doc          ABT-518 0301.WK4          ABT-518 0301.xls

PLAINTIFF'S
EXHIBIT
Deemer 15
10-27-06

CONFIDENTIAL
AL 000379

*CONFIDENTIAL*

# ABT - 518

**Descriptive Memorandum**

*February 2001*

Abbott Laboratories

CONFIDENTIAL
AL 000380

*MMPI*

*Overview*

Abbott's Matrix Metalloproteinase Inhibitor (MMPI) program represents a novel therapeutic class, with the potential to alter the way that cancer is treated by preventing or modifying disease progression and/or metastases. This more "chronic" approach to therapy has the potential to transform cancer into a disease that patients live with, much like the effect of HIV protease inhibitors on patients with AIDS. It also has the potential to expand the cancer market significantly by increasing the average length of treatment and expanding the pool of patients eligible to receive therapy.

The MMPs comprise a family of enzymes that degrade a wide range of matrix protein substrates. High expression of these enzymes occurs in cancer and is associated with the ability of tumors to grow, invade, develop new blood vessels and metastasize.

MMP inhibitors (MMPIs) may suppress the progression of tumors by several mechanisms:

- Suppress invasion/metastasis by blocking the membrane traversal and access to blood/lymphatic vessels
- Blocking the remodeling of extra-cellular matrix in the vicinity of primary tumors to prevent stroma-bound growth factors from stimulating tumor growth
- Blocking angiogenesis by preventing the proliferation and migration of endothelial cells and neovascularization of tumor.

Experimental evidence suggests that gelatinase A and gelatinase B are particularly important in tumor progression, consequently the project team has targeted gelatinase selective inhibitors for the treatment of cancer. Another reason for targeting highly gelatinase selective MMP inhibitors relates to the side effect profile exhibited by broad-spectrum agents like marimastat. Chronic administration of marimastat causes a dose-limiting side-effect characterized by severe joint pain and stiffness. Since these joint effects may be mediated by inhibition of other MMPs like fibroblast collagenase, highly gelatinase selective agents may be efficacious without producing dose-limiting side effects.

The MMP selectivity profile exhibited by ABT-518 distinguishes it from competitor's compounds. ABT-518 possesses sub-nanomolar inhibition potencies versus both gelatinase A and gelatinase B and is substantially more selective for the inhibition of the gelatinases over fibroblast collagenase than marimastat and prinomastat. Despite its high selectivity, ABT-518 demonstrates antitumor activity equal or superior to prinomastat. Inhibition of tumor growth is dose dependent in both syngeneic and xenograft models. ABT-518 is also effective in blocking vessel formation in a mouse model of angiogenesis. ABT-518 is a stable crystalline solid which can be synthesized in six steps (25% overall yield) from commercial starting material.

ABT-518 gives rise to sustained plasma concentrations following single oral dosing in monkeys, dogs and rats. Bioavailabilities range between 68 and 93% depending on formulation and species. Several metabolites are produced after repeated oral dosing of ABT-518, although their relative amounts varies with gender and species.

ABT-518 displays no meaningful effects in genotoxicity, cytotoxicity and ligand binding assays and its cardiovascular effects in dogs are unremarkable. ABT-518 produces no significant toxic effects in rats treated with 100 mg/kg/day over 28 days. Plasma concentrations generated by ABT-518 in these studies are at least 20-fold higher than those necessary to produce efficacy in cancer animal models. ABT-518 is therefore a compelling development candidate with the potential to

demonstrate antitumor effects superior to the MMP inhibitors currently undergoing clinical trials. Phase 1 clinical trials in cancer patients began March 2001.

*The market*

Currently, cytotoxic agents represent the largest, and fastest growing, class of oncology agents by sales volume. The following chart summarizes the value of the current oncology market.

### Global Sales by Market Segment ($ MM)

|            | 1996 Sales | 1997 Sales | 1998 Sales | 1999 Sales (est) | CAGR '96-'98 |
|------------|-----------|-----------|-----------|----------|---------|
| Hormone    | 4,414     | 4,784     | 4,884     | 5,000    | 5.2%    |
| Cytotoxic  | 4,278     | 5,212     | 6,268     | 7,300    | 21.0%   |
| Adjunctive | 3,367     | 3,651     | 4,166     | 4,900    | 11.2%   |
| Total      | 12,059    | 13,647    | 15,318    | 17,200   | 12.7%   |

Source: Datamonitor

### Sales by Region ($ MM)

|        | 1996 Sales | 1997 Sales | 1998 Sales | 1999 Sales (est) | CAGR '96-'98 |
|--------|-----------|-----------|-----------|----------|---------|
| US     | 5,564     | 6,276     | 7,422     | 8,500    | 15.5%   |
| Ex- US | 6,495     | 7,370     | 7,896     | 8,700    | 10.3%   |

Source: Datamonitor

Cytostatic agents have the potential to alter the way cancer is treated and presents opportunities for fundamentally new ways of approaching the disease. This cytostatic market does not yet exist, though success of more cytostatic "like" treatments, such as hormonal therapies for prostate and breast cancer, suggest that the market potential for cytostatic agents could be significant.

The ultimate commercial and clinical success of the MMPI will depend on the clinical benefit this product provides in key cancer types compared with current best therapy. These can be benefits provided by dosing this agent in addition to current therapy and/or as an alternative to best therapy, or as a new component of best therapy. All currently available products, including the market leaders such as Taxol, have significant shortcomings in their profiles.

However, as novel therapy, MMPIs will probably be adopted initially as add-on the current chemotherapy. As benefits are proven and clinical experience is gained, these agents may be used in earlier stages of cancer and/or in conjunction with surgery or radiation to prevent the progression of any microscopic disease that remains.

The clinical targets identified for this compound include late stage pancreatic cancer, late stage NSCL cancer (on-label), with late stage ovarian and breast cancer as additional cancer types where efficacy has been demonstrated, but not filed. Other cancer types this compound may be efficacious in include SCL, colorectal, bladder, stomach and prostate. Targets will be refined as we know more about this compound's in-vivo activity.

The following tables summarize the key marketed competitive products by indication (US data only):

### Late Stage Breast

| Product | Share |
|---|---|
| Cyclophosphamide/Cytoxan/BMS | 18.7 |
| Doxorubicin/Adriamycin/P&U | 17.11 |
| Docetaxel/Taxotere/RPR | 16.25 |
| Paclitaxel/Taxol/BMS | 16.11 |
| Trastuzumab/Herceptin/Genetech | 11.26 |

### Late Stage NSCL

| Product | Share |
|---|---|
| Carboplatin/Paraplatin/BMS | 50.32 |
| Paclitaxel/Taxol/BMS | 44.14 |
| Vinorelbine/Navelbine/Glaxo | 22.78 |
| Gemcitabine/Gemzar/Lilly | 22.14 |
| Cisplatin/Platinol/BMS | 11.28 |

### Late Stage Ovarian

| Product | Share |
|---|---|
| Paclitaxel/Taxol/BMS | 47.11 |
| Carboplatin/Paraplatin/BMS | 45.42 |
| Topotecan/Hycamtin/SKB | 22.54 |
| Dox SL/Doxil/Alza | 9.14 |
| Cisplatin/Platinol/BMS | 7.58 |

### Late Stage Pancreas

| Product | Share |
|---|---|
| Gemcitabine/Gemzar/Lilly | 78.5 |
| 5-FU/Efudex/ICN Pharma | 21.0 |
| Leucovorin/ | 10.7 |
| Cisplatin/Platinol/BMS | 4.72 |

*Compounds in Development*

The MMP inhibitor field is competitive. More than 30 firms have filed patents claiming small molecule MMP inhibitors over the past 5 years, and several companies have compounds in advanced clinical development. Abbott's compound may be 3rd or 4th to market and will have to demonstrate a competitive advantage to gain the share necessary to support the clinical development of this compound. Companies with compounds in advanced clinical development for the treatment of cancer include Agouron/Warner Lambert/Pfizer, British Biotechnology/Schering Plough and BMS and are listed below. Other companies are targeting this mechanism for arthritis.

**MMPIs in Clinical Development for Cancer**

| Compound | Company | Comments | Phase |
|----------|---------|----------|-------|
| Marimistat | BritishBiotechnology/ Schering Plough | Broad spectrum, dose limiting toxicity. Activity seen in gastric cancer, but negative results in pancreatic. | III |
| Prinomastat | Agouron/ Warner Lambert/ Pfizer | Moderate gelatinase selectivity, dose limiting toxicity. May be dosing sub-optimally to avoid toxicity. Efficacy data not available. | III |
| BMS 275291 | BMS | Broad spectrum, joint effects seen in Phase I studies. | II |

Bayer recently dropped development of BAY 12-9566 due to concerns about potential toxicity. Recent results from a study with marimistat in pancreatic cancer, where adding marimistat to Gemzar resulted in no survival advantage, has led to speculation that MMPIs may be more applicable in less aggressive cancer types or earlier stages of the disease. Alternatively, it could be a reflection of the inability to examine higher doses of marimastat due to joint effects.

The joint effects produced by the compounds listed above almost certainly preclude their long-term use, limit compliance and reduce optimal efficacy. Any MMP inhibitor that lacks these side effects will possess a substantial competitive advantage. The musculoskeletal effect produced by marimastat and prinomastat in cancer patients is typically described as arthralgia, myalgia and tendinitis, which occurs predominately in the upper limbs. While mild cases respond to analgesics, interrupting therapy for a period of approximately 2 weeks is necessary when the condition is less well tolerated.

Although Abbott's timing to market is not optimal, the shortcomings of the competitive products provide an opportunity for a compound with an improved SE or efficacy profile. Current animal models seem to predict Abbott's compound is superior to those currently in clinical trials, and has the potential to be best in class.

*Product profile*

The objective of a product profile at this time in the product's development is to provide a target for the types of attributes that will be required to be commercially successful. This profile is based on market research with oncologists and consultation with opinion leaders. This profile will continue to be refined as more is known about this product's profile, development of competitive products and the market continues to evolve.

| | Base | Optimal |
|--|------|---------|
| Efficacy | ABT-518, alone or in combination with best therapy, provides at least one of | Provides more than one of the efficacy benefits outlined. |

| | the following benefits in at least one solid tumor type:<br><br>· Increased survival<br>· Tumor regression<br>· Improved quality of life<br>· Increased time to tumor/disease progression | |
|---|---|---|
| Competitive advantage | ABT-518 will need to demonstrate a clinically significant advantage in efficacy (see parameters above) or additive synergistic activity with current/competitive agents or clinically significant advantage in side-effect profile relative to other MMPI agents. | Same |
| Administration | Convenient administration relative to competitive agents. | Same plus reimbursement in US market. |
| COGS | A finished cost of goods that is consistent with at least an 80% standard manufacturing margin. | A finished cost of goods that is consistent with at least a 90% standard manufacturing margin. |

*Marketing overview*

*Product Usage:* Physicians have indicated that they would use MMPIs initially in their more refractory patients, as follow-on or add-on to current best therapy (chemo or surgical). With experience and clinical evidence, they would be willing to use these agents in earlier stages of the disease, where they perceived the greatest benefit to be. The MMPI was regarded as a maintenance therapy to be used in early disease or after primary therapy as a prophylactic process to prevent the spread of malignancy.

*Product Benefits/Efficacy:* Physicians are looking for improvements in time to tumor progression and prevention of metastases with cytostatic agents. The MMPI mechanism has more recently been implicated as having an even more active role in cancer pathogenesis, from preventing primary tumor growth to anti-angiogenic properties. Positive results from competitive agents, such as marimastat in gastric cancer, provides proof of principle for this mechanism.

*Side Effects:* The proposed safety profile of MMPIs (excluding joint toxicity) may enhance usage, as the dose limiting toxicity profiles of most of the other available agents has established a much lower hurdle for demonstrating a preferred profile. However, as chronic therapy, MMPIs may *have* to demonstrate a cleaner profile than cytotoxic agents do to ensure compliance. As the 3rd or 4th MMPI to market, SE hurdles will be even higher for this compound. As a critical Go/No Go decision point, the joint toxicity of this compound will be evaluated in an expanded Phase I multi-dose study.

*Dosing:* Discovery is currently targeting an oral dosage form. In general, oral therapies are acknowledged by physicians and patients as being more convenient to the patient. Chronic oral dosing may also reduce overall costs, as infusion support products and personnel would not be required, enhancing pharmacoeconomic evidence.

*COGS:* Initial estimates on finished cost of drug suggest that drug costs will not be significant for this compound

CONFIDENTIAL<br>AL 000385

*Off-label use:* Off label use accounts for between 30-60% of an oncology product's usage. Off-label use is driven by publication of clinical trial results in credible journals, listing in key compendia and/or a peer's experience with the product. Therefore, development spend for off-label use is considerably less than the spend required for regulatory approval of an indication. However, promotion of these off-label uses is limited.

*Competition:* As the 3rd or 4th MMPI to market, Abbott's compound will need to demonstrate a meaningful clinical advantage over compounds that are in more advanced development. Strict Go/No Go criteria will determine if the MMPI can meet these hurdles. If they cannot be met, the compound will not move forward.

*Development/Regulatory:* With a new class of compounds, there is not a clearly defined clinical development path or regulatory guidelines for reference. This hurdle is similar for all the competitive products, but increases the overall development risk profile for these agents. However, with several MMPIs in late stage development, Abbott can learn from their experience.

*Other Approaches:* Other "cytostatic" approaches may present a competitive threat if they are used as substitutes. Due to the complexity of the pathogenesis of cancer, it is more likely that these agents will be used in combinations, but incremental benefits may become more difficult to demonstrate as the number of products and approaches multiply. This will require additional studies, as these other classes become part of standard cancer treatment. However, this threat is not unique to this compound.

*Pricing:* The treatment of cancer is expensive, so there is the potential for a great deal of pricing flexibility in this market. However, as an oral therapy in the US market, there may be additional downward price pressure for this agent. There is also an increasing emphasis on cost-effectiveness studies that will need to be addressed in the development plan.

*Dosing:* Discovery is currently targeting an oral dosage form. In general, oral therapies are preferred by physicians and patients because of the convenience to the patient. However, this form may not be the best choice for some people who already have certain digestive system symptoms (vomiting, diarrhea, or severe nausea), cannot swallow liquids or pills, or cannot remember when or how many pills to take. Additionally, in the US market there are several unique factors that currently do not favor oral therapies. Novel oral therapies are not currently reimbursed by Medicare, a significant payer for the oncology patient population. Also, 40-60% of a community oncologist's income is generated through the administration of IV drugs. An oral therapy would not be a source of revenue to the physician.

### Clinical Studies

Clinical studies across a wide range of solid tumors will be initiated, including but not limited to breast cancer, non small cell lung cancer, ovarian cancer, pancreatic cancer, etc…

Final indications pursued will depend from the results of the phase II studies.

CONFIDENTIAL
AL 000386

## MMPI (ABT-518)
### 2001 Plan Development Cost Summary

**Program Status**

| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|
| | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 | Q1 Q2 Q3 Q4 |
| Phase I | | | | | | | | |
| Phase II | | | | | | | | |
| Phase III | | | | | | | | |
| NDA | | DDC | | | | | NDA | Launch |

### Major Development Activities and Costs

**Clinical Program**

| | Total Patients | Enrolled as of 8/00 | Start | End | 2000 AGU Cost | 2001 Plan Cost |
|---|---|---|---|---|---|---|
| Multiple Dose in Cancer Patients | 40 | ... | 1Q/01 | 1Q/02 | $300 | $769 |
| IND Study | 14 | ... | 3Q/01 | 1Q/02 | ... | $500 |
| Other Studies / EVR | | | | | ... | $108 |
| Phase-1 Center / PK | | | | | $70 | $65 |
| Venture Management | | | | | $778 | $754 |
| Data Management/Statistics | | | | | $52 | $118 |
| | | | | | $1,205 | $2,314 |

**Chemistry, Manufacturing, and Controls (CMC)**

| | 2000 AGU | 2001 Plan |
|---|---|---|
| Formulation / Analytical | $546 | $1,031 |

**Drug Safety Support**

| | 2000 AGU | 2001 Plan |
|---|---|---|
| Ongoing Drug Safety support | $1,681 | $2,125 |

**Other Support Costs**

| | 2000 AGU | 2001 Plan |
|---|---|---|
| Discovery | $1,447 | $1,348 |
| Medical Affairs | $5 | $20 |
| Regulatory Affairs / Research Quality Assurance | $26 | $39 |
| Other / In-licensing Fees | $90 | $123 |
| **Total Program** | $5,000 | $7,000 |

CONFIDENTIAL
AL 000387

Deemer Deposition Exhibit 18


P's Exhibit AF



**Philip M Deemer**

03/22/2001 03:34 PM

To: Perry D Nisen/LAKE/PPRD/ABBOTT@ABBOTT
cc:
Subject: Re: Hancock and Alcon 

Perry, thank you for your note. I'm sorry about your sister. I don't want to bother you until you get back from things and vacation but perhaps we could sit down then and catch up. I'm off to Hawaii for a break with my dad and Diane. Best regards to you, Amy and family.

Perry D Nisen

**Perry D Nisen**

03/21/01 10:30 AM

To: Philip M Deemer/LAKE/CORP/ABBOTT@ABBOTT
cc:
Subject: Re: Hancock and Alcon

Phil
Mega mazal tov! You are the most tenacious guy I know- you deserve a new car not just a pen. I know all about the 518 debacle (I tell you more over the phone). Since we killed 839 (this was the FTI) I have no objection to sending them some (talk to Saul). There is much I would like to discuss with you. I'm in LA )(my sister is quite ill), then if she is stable, to Worchester tonight, then Boston, then return Fri night, but out all next week (school break- vacation).
My cell phone is 847 682 7188. I hope you and Diane are well- haven't spoken to you in ages. We need a f/u mtg with Eisai- Azmi has the clinical brochure and protocols- you may want to send those
pn

From: Philip M Deemer on 03/20/2001 09:53 AM

From:   Philip M Deemer on 03/20/2001 09:53 AM
To:     Perry D Nisen/LAKE/PPRD/ABBOTT@ABBOTT
cc:
Subject: Hancock and Alcon

You probably heard that Hancock was signed last week: $214,000,000 over 4 years! A long time coming but finally done. We had a little scare at the end when it looked like 518 was being slowed down which could have been the deathnell to the deal. I worked with John to protest that and I understand it is back on track.

On another matter, Alcon called me looking for 2g of 839. We don't need to work with them if there is no/little synergy. I told them I thought it would be difficult to give them that amount at this time but that I would check with you.

Perry, We should catch up with one another before too long.

Best regards.



PLAINTIFF'S EXHIBIT
Deme 18
10-27-06

CONFIDENTIAL
AL 000403

Deemer Deposition Exhibit 21


P's Exhibit ME

CONFIDENTIAL

## J. HANCOCK RESEARCH FUNDING AGREEMENT FOR ABBOTT PHARMACEUTICAL R&D: EXECUTIVE SUMMARY OF MARCH 13, 2001 AGREEMENT

**OVERVIEW:**

* J. Hancock provides $214 million over 4 years to fund the "Research Program" for specific "Program Compounds", in exchange for future returns via management fees, milestones and royalties;
  - The "Program Compounds" are as follows (note: the indications/therapeutic designations are for informational purposes only; Hancock's interest is not limited by indication):

### PROGRAM COMPOUNDS

| In-License Agreement | Program Compound | Development Phase |
|---|---|---|
| | ABT-627 (Endothelin antagonist, cancer) | Phase III |
| Taisho | ABT-773 (Ketolide antibiotic) | Phase III |
| | ABT-594 (Cholinergic Channel modulator, pain) | Late Phase II |
| Wakunaga | ABT-492 (Quinolone antibiotic) | Phase I |
| Eisai | ABT-751 (Antimitotic, cancer) | Phase I |
| | ABT-510 (Thrombospondin peptide, cancer) | Phase I |

| The First Compounds from these Preclinical Programs: | |
|---|---|
| FTI (farnesyl transferase inhibitors for cancer) | Preclinical |
| ED (dopamine receptor modulators for Erectile Dysfunction) | Preclinical |
| ABT-518 (Matrix metalloproteinase inhibitor, cancer) | Phase I |

* Abbott is solely responsible for all research, development and commercialization activities re: the Program Compounds (article 4.1, p. 13)
* Impact on Business Development:
  - Abbott shall not treat Program compounds, regarding outlicensing, any different from other Abbott compounds (article 4.4, p. 16)
  - Hancock's prior written consent is needed only for a major divestiture or outlicense of a Program Compound:
    o that is, for a deal that is for all of North America, or for a non-North American territory having 2/3 the total population of Japan and the European Union combined
    o consent not to be unreasonable withheld (article 4.3.e, p. 15).
  - Abbott shall not divest, out-license or otherwise transfer any of it rights or interests if that impairs it's ability to meet obligations to Hancock (article 5.1, p. 16-17).
    o Abbott remains responsible for its obligations to Hancock ,and Abbott must require sublicensees to allow Hancock to audit their net sales / royalty calculations (article 8.2.c, p. 20).
  - Abbott can amend or change the inlicense agreements involved here, provided such changes do not materially effect Hancock's interests;
    o otherwise the changes require the prior written consent of Hancock, which is not to be unreasonably withheld (article 4.5, p. 16).

**SPECIFIC COMPOUNDS / PRECLINICAL PROGRAMS COVERED BY RESEARCH FUNDING & MILESTONE / ROYALTY OBLIGATIONS:**

* The compounds listed in the Overview, above (from Exhibit 1.40 of the Agreement)
  - furthermore, if ABT-492 or ABT-510 fail to enter Phase II, Abbott shall substitute another compound of equal commercial value (there is no mention / limitation on therapeutic class) (article 4.3.b, p. 14).
* Re: the preclinical programs, the first compound from each of those programs to enter Phase I becomes a Program Compound
  - if that first compound fails in Phase I (does not proceed to Phase II), the next compound from the preclinical program, including any in-licensed compounds, shall be considered a Program Compound, to a maximum of three such failures / replacements per preclinical program (article 4.3.a, p. 13-14)
* If Abbott ceases developing or marketing any Program Compound as the result of Abbott's acquisition of a "Replacement Compound," then the Replacement Compound becomes a Program Compound (article 4.3.c, p. 14)
  - If the Ceased Compound has been approved for marketing by FDA at the date of acquisition of the Replacement, Hancock has the option of having Abbott maximize the commercial value of the Ceased Compound via outlicensing instead of substituting the Replacement Compound.
* If Abbott ceases development for any reason than Replacement, and the Ceased Compound still has commercial value, Abbott is to maximize the commercial value of the Ceased Compound via outlicensing.; Hancock to get royalties (article 4.3.d, p. 15)
  - Hancock may, but is not obligated to, assist in the outlicensing / divestiture (article 4.3.d.ii, p. 15).



PLAINTIFF'S
EXHIBIT
Kim 81
10-31-06

CONFIDENTIAL
AL 002066

LICENSES: none. Hancock obtains no licenses or other rights to Abbott intellectual property / inventions / developments re: the Program Compounds (article 5.1, p.16) .

TERRITORY: Worldwide, except, for inlicensed compounds like Eisai's ABT-751, territories where Abbott has no marketing rights (article 1.53, p. 9)
- should Abbott obtain those territories, they then become included in this Agreement.

## RESEARCH PROGRAM:

- Conducted by Abbott on the Program Compounds according to an annual Research Plan (article 2.1, p. 9)
  - Abbott is free to manage the compounds as it would any others, including outlicensing - provided Abbott meets its responsibilities to J. Hancock for royalties on the outlicensed compounds. Any outlicensing agreement must give Hancock the right to audit the licensee's net sales / royalty calculations.
- The Research Plan is to be:
  - prepared annually by Abbott (article 2.2, p. 9-10)
  - presented to Hancock 45 days prior to each Program Year (calendar year) until :
    o Abbott either abandons development of, or obtains Regulatory Approval for marketing for, each Program Compound in the US.
  - reported on, to Hancock, 30 days before the end of the year, with the status of projects and the costs.
    o Hancock has the right to audit Abbott and any subcontractors involved in the Research Program (article 2.5, p. 13)
- Re: Regulatory submissions, the expectation is that EU filing will occur within 2 years of FDA filing, and Japan within 5 years (article 4.1, p. 13).
  - marketing to occur within 6 months of regulatory approval (article 4.2, p. 13).

## RESEARCH PROGRAM FUNDING:

- Called "Program Related Costs," which are defined in article 1.43, p. 8 as:
  - all direct and indirect costs and expenses incurred by Abbott on the Research Program
  - all management, milestone and license fees paid by Abbott to
    o Eisai re: ABT-751 (not to exceed $18 million)
    o Wakunaga re: ABT-492 (not to exceed $27.5 million)
    o John Hancock re: management fees and developmental / regulatory submission milestones
- Aggregate Spending Target for the Research Program is $614 million (article 1.3, p. 2).
- Annual Minimum funding shall be:

| Program Year: | From John Hancock: | From Abbott |
|---|---|---|
| First | December 1, 2001: $50 Million | $50 million |
| Second | December 1, 2002: $54 Million | $50, plus any not spend previously* |
| Third | December 1, 2003: $58 million | |
| Fourth | December 1, 2004: $52 Million | |
| Fifth | $0 | Any of the $614 million not spent. |

*Designated the "Carry Over Amount." Hancock's obligation is deferred until such amounts are spent (article 3.3.a, p. 15-16)

Should Abbott not spent the entire $614 million by the end of the fifth year (12/31/05), Hancock gets 1/3 of the amount remaining unspent back by 1/30/06 (article 3.4.b, p. 15).

## MANAGEMENT FEES & MILESTONES PAYMENTS BY ABBOTT TO HANCOCK: (all are in US dollars)

- MANAGEMENT FEES: $2.0 million to Hancock on December 1 of 2002, 2003, and 2004 - a total of $6 million (article 8.2, p. 17).
- MILESTONES: for each Program Compound, Abbott shall pay Hancock, within 30 days of the event:
  - $1 million upon allowance of the IND by the FDA
  - $2 million upon initiation of Phase I
  - $3 million upon initiation of Phase II
  - $4 million upon initiation of Phase III
  - $5 million upon filing of the NDA with the FDA

The aggregate of the above milestones collectively is limited to $8 million (article 6.3, p.18) and also limited by year, as follows:

| Program Year | Calendar Year | Milestone Limit |
|---|---|---|
| First | 2001 | $0 |
| Second | 2002 | $2 million |
| Third | 2003 | $6 million |
| Fourth and beyond | | Any not paid in previous years (to the aggregate maximum of $8 million). |

CONFIDENTIAL
AL 002067

* ADDITIONAL MILESTONES FOR FDA APPROVALS (article 6.3.f, p. 18):
  - $20 million upon FDA approval of the first Program Compound
  - $10 million for the second compound
  - $10 million for the third.

Note that all management fees and milestones are "Program Related Costs" payable out of the Research Program.

* ROYALTIES:

In addition to the above Milestones/Payments, quarterly payments on annual net sales are as follows:

| Royalty Percentage | Yearly Net Sales (in millions) of all Products in the Territory |
|---|---|
| 8.5 % | up to $400 |
| 4 % | in excess of $400 up to $1,000 |
| 1% | in excess of $1,000 up to $2,000 |
| 0.5 % | in excess of $2,000 |

Royalties are paid within 60 days after the close of each quarter. Net sales are aggregated on a calendar basis for the US, and Dec. 1 to Nov. 30, ex-US (article 7.1, p. 19).

Royalty term is on a product by product, country by country basis; royalties terminate the sooner of (a) ten years after date of marketing or (b) 12/31/15 (article 1.50, p. 9).

TERMINATION:

* Hancock may terminate it's research funding in any year Abbott:
  - abandons all the Project Compounds (compounds and preclinical programs)
  - fails to spend at least the Hancock funds
  - does not demonstrate in its Research Plan an intent to expended at least Hancock's share the next year; or
  - does not demonstrate its intent to spend above the aggregate of $614 million over the entire Program (article 3.4, p. 15).

* Either may terminate if the other was ordered by the court to remedy a material breach and failed to do so (article 11.2, p. 23).

* The Agreement expires upon Abbott's fulfillment of royalty / payment obligations (article 11.1, p. 23).

PATENTS

* Abbott totally responsible for prosecutions and filings. Abbott owns all patents and Program information.

* Abbott to inform Hancock of any infringements and share receipts of prosecutions with Hancock in proportion to any lost royalties (article 5.3, p. 17)
  - Exhibit 12.2 contains a list of patents for the Program Compounds.

REPORTING AND NOTIFICATION OBLIGATIONS

* Re: Research Program: Abbott to:
  - present the Research Program to Hancock 45 days prior to each Program Year (calendar year) until :
    o Abbott either abandons development of, or obtains Regulatory Approval for marketing for, each Program Compound in the US.
  - report to Hancock, 30 days before the end of the year, the status of projects and the costs.

* Abbott to notify Hancock of cessation of research, development or marketing of any Program Compound, and provide information on any Replacement Compound (article 4.3.f, p. 16).

* Abbott to notify Hancock of any event that would lead to a milestone payment.

* Abbott to notify Hancock of an infringements (article 5.3, p. 17).

* Royalties: Abbott provides Hancock a quarterly royalty report within 60 days of close of calendar quarter showing:
  - calculation of net sales by country by product
  - royalties payable in dollars; exchange rate used; date of first commercial sale (article 8.1, p. 19-20).

DISCLOSURES:

* Hancock to keep confidential all information on Program Compounds, or any other information supplied by Abbott and marked "confidential," 10 years after the term of the Agreement (article 10.1, p. 22).
  - except as required to be disclosed by law ; Hancock should give Abbott prior written notice (article 10.2, p. 22).

* The Agreement is considered Confidential Information, and none of it is to be disclosed without prior written consent of the other (article 10.3, p. 22-23)

CONFIDENTIAL
AL 002068

- no PR announcement was made.

- Re: public disclosure of Research Program: Abbott may disclose without mentioning Hancock's involvement; Hancock not to disclose unless has prior written consent of Abbott (article 10.3, p. 22-23).

- Abbott has not disclosed the terms of inlicense contracts to Hancock (article 12.1, p. 30).

**ARBITRATION AND APPLICABLE LAW:** Disputes shall attempt to be resolved by the President, PPD, and the Managing Director, Hancock, prior to court action (article 16.7, p. 34)..

- The Agreement is governed by Illinois law. However, Abbott agrees that any suit shall take place in Massachusetts, and both sides give up rights to jury trial. (article 16.2, p. 33).

dcbuall 4/17/01

CONFIDENTIAL
AL 002069

Deemer Deposition Exhibit 22


P's Exhibit LB



**Philip M Deemer**
08/14/2000 11:17 AM

To: Steve Cohen/LAKE/PPRD/ABBOTT@ABBOTT
cc:
Subject: Re:

Steve, Brian seems to want Arthur to see the contract before it first goes to Hancock. Note the proposed March start date for both the Aggregate and the First year target spend. If you are OK with this proposed language I'll proceed.

Steve Cohen



Steve Cohen
08/14/2000 07:07 AM

To:    Julia F Bouffard/LAKE/CORP/ABBOTT@ABBOTT, Diane M Pappianne/LAKE/CORP/ABBOTT@ABBOTT
cc:    Jeff M Leiden/LAKE/CORP/ABBOTT@ABBOTT, Philip M Deemer/LAKE/CORP/ABBOTT@ABBOTT
Subject:

julia, diane; i've grouped the people for the miles-john hancock meeting into 2 groups
        - A group:  must (or almost must be there)
        - B group:  should be there, but not absolutely critical.
schedule around the A group.  B group should be notified as to where and when.  probably should double check with jeff to see if he sees it any differently.

A group:  miles, jeff, arthur, bill (dempsey), gary (coughlan), phil deemer and me (phil and I will almost always make our schedules fit.

B group:  steve weger, gary flynn, greg linder, bob hoffman, john leonard.

jeff, don't know what conversation might have transpired after the update review on friday (regarding john hancock), but while the miles meeting is being set up, i'm going to ask phil to proceed on internal review of the contract and resume final negotiations with hancock.  it's obviously going to take a while and we might as well use this week as effectively as possible.  if you see it any different, please holler.



PLAINTIFF'S
EXHIBIT
Deemer 22
10-27-06

CONFIDENTIAL
AL 000238

Deemer Deposition Exhibit 23


P's Exhibit KZ



Philip M Deemer
08/04/2000 08:42 AM

To:      Barbara A Powell/LAKE/CORP/ABBOTT@ABBOTT
cc:
Subject:

Pls. print out for me a copy of the last Hancock slide you made for me describing John Hancock company.
TY



CONFIDENTIAL
AL 000099

# John Hancock Life Insurance Company

- Abbott has developed relationship with John Hancock over past 4 years

  - Metabolex (Equity units/Puts)

  - Idun (Private equity)

  - Purdue Frederick (Senior debt)

- John Hancock is seeking above average returns on 2-4% of their investment portfolio

  - $35 Billion total invested capital (primarily in high grade debt)

  - $1.8 Billion in health care investments over past 9 years

- Many John Hancock investments are not publicly disclosed

  - Does not need/prefers minimal disclosure of investments

CONFIDENTIAL
AL 000100

# Basic Elements of Financial Structure

- John Hancock invests $200M net over 4 years toward the development of 8 PPD clinical compounds/programs

- Abbott agrees to invest at least $400M, in addition to the Hancock funds, during 5 years toward the development of the 8 clinical compounds/programs

- John Hancock's return is limited to NDA approval milestones ($10M per compound subject to $40M cap) and royalties on the aggregate net sales of the 8 compounds/ programs

- The royalty period is for 10 years for each compound subject to the termination of all royalties by December 31, 2014

- The expected total royalty to John Hancock is 3% of total net sales ($800M royalty on $25B in sales)

- Abbott maintains full control over all aspects of clinical development, regulatory approval, manufacturing and sales.

- Flexible minimum expenditure requirements; provisions for possible Abbott substitution of program compounds

CONFIDENTIAL
AL 000101

# Milestones/Royalty Structure

## Milestones

| Event | $ Amount |
|---|---|
| Upon FDA approval of portfolio compound | $10M ($40M maximum cap) |
| IND, Phase I, Phase II, Phase III and filing milestones | $1-5M per event subject to $12M total cap |

## Royalties *

| Annual WW net sales of aggregate program compounds | Royalty Rate % |
|---|---|
| Net sales up to $400M | 8% |
| On those net sales > $400M and < $1,000M | 4% |
| On those net sales > $1,000M and < $2,000M | 1% |
| On those net sales > $2000M | .5% |

*Royalty term is ten years from initial launch of each program compound subject to termination of all royalties by December 31, 2014.

CONFIDENTIAL
AL 000102

Deemer Deposition Exhibit 24


P's Exhibit LD

**Philip M Deemer**
08/25/2000 04:04 PM

To: John M Leonard/LAKE/PPRD/ABBOTT@ABBOTT
Subject: Hancock

Thanks for writing a few sentences regarding 980. I'll take my computer home over the weekend to receive your email. I've set up a meeting with Brian Smith first thing Monday just to make sure he's in accord with want we are doing. Of course I'm not going to send anything to Hancock. It will all be verbal because I don't want to overly alarm them at this point. But I do want to alert them to a possible problem in advance of their executive committee meeting. My guess is that that meeting will not entail a review of the portfolio. It will probably be top line structure and financial only. At the same time I'm going to tell them that things continue to move along fine on the other projects.

PLAINTIFF'S
EXHIBIT
Deemer 24
10-27-06

CONFIDENTIAL
AL 000983

Deemer Deposition Exhibit 25


P's Exhibit LO

DEC  1  2000  3:15PM   CORPORATE LICENSING                    NO.0012   P.1

## ABBOTT LABORATORIES

**Facsimile Transmittal**

Corporate Licensing
100 Abbott Park Road,
Abbott Park, IL 60064

From:  Philip M. Deemer

Dept.     435 Bldg. AP6D

PHONE NO: (847) 937-4444

FAX NO.  (847) 938-5852

---

TO:   Arthur Higgins

# OF PAGES:     1          (Including Cover Page)

RE:   Hancock

Date:   December 1, 2000

FAX NO:   8-5383

RECEIVED
DEC 1 2000
STEVE J. WEGER, JR.

On November 27, I informed John Hancock that you and other Abbott senior management needed additional time to evaluate the new proposed deal structure. I told them that the new deal structure was received less favorably than the original structure and that there also may be some accounting issues with the new structure (Loughery is OK with it). In addition, I told them that there were a few contract issues to straighten out (not-related to the new deal structure). I told them we would send these proposed revised changes by the end of this week or the beginning of next week and that I would update them as to the status of the senior management review shortly thereafter.

At least by December 8, I feel I need to tell them that our management is less enthusiastic about moving forward due to the new deal structure and to propose a meeting date with them during the week of December 11 to discuss possible options to enhance the effectiveness. I would anticipate receptivity to identifying possible improvement but I would not anticipate reverting back to the original structure unless there is a change in the portfolio or possibly an IOU.

The week of December 18, I assume that I will have pushed them as far as possible with alternative structure options and I will need to tell them that management wants to postpone a final decision until the new year. (I will of course inform you as to how well this is received.)

In January, assuming John Hancock is still interested in going forward, and assuming we decide to proceed, there may be a last opportunity for some modification of the portfolio.

In the event we decide not to proceed, there may be some opportunities with HPD or ADD portfolios to lessen the impact to John Hancock.

CC: Steve Weger
85968

PLAINTIFF'S
EXHIBIT
Deemer 25
10-27-06

**CONFIDENTIAL
AL 001946**

Deemer Deposition Exhibit 27


P's Exhibit MV



|  |  |
|---|---|
| Denise L. Carlson/LAKE/PPRD/ABBOTT | To  Fusako H Bowering/LAKE/CORP/ABBOTT@ABBOTT, Philip M Deemer/LAKE/CORP/ABBOTT@ABBOTT |
| 09/28/2001 09:54 AM | cc |
|  | bcc |
|  | Subject  Template for Outlicensing update |

I made changes to the outlicensing grid. This is based on a meeting with Ake, John and Jim. I have questions on Peg Hirudin.

For each of the active outlicensing activities. Please complete the activity sheets provided in presentation. The more detail in the comment area the better we will be.

Thank you.
Denise



Outlicensing template.pr

Highly Confidential

ABBT245788





October 1, 2001

Executive Briefing

Global Licensing & New Business Update

Highly Confidential

ABBT245789



October 1, 2001

## Out-Licensing Update

Global Licensing & New Business Development

Highly Confidential

ABBT245790

## Licensing Update
## Opt-Licensing Targets

| Compound | Description / MOA | Therapeutic Area | Status | Status/Comments |
|---|---|---|---|---|
| | Combined Dopamine/Norepinephrine / Serotonin reuptake inhibitor | Depression | Phase II | COMPLETE: Ceb received in-license Agreement signed September 23, ... |
| Azusol | Defibrinogenating Agent | Stroke | Phase II | COMPLETE: decision made to back out, in-license from Nordisk. Meeting with other partners... |
| BRF 40609 | Knoll ETA antagonist | CV | Phase II | FINAL PROGRESS: Seeking approval for exclusive rights to Merquin; shared completion by September 20 LH ... |
| BRF 40560 | Knoll ETA/B antagonist | Urology | Phase II | FINAL PROGRESS: Negotiating exclusive rights to Solvus on Phase II compound; completion of contract by November 15 ... |

| Active | | | | |
|---|---|---|---|---|
| Emoxipine | Knoll ETA antagonist | CV | Phase I/II | Discussing with companies in Bayer, Novartis, Roche... Merck, Pharos, Genzyme, Glaxo... Technical and commercial due diligence being conducted by next company following full business; also discussing with Vanguard, Cyclacel and others... |
| Segard US | Mouse anti-TNF Mab | Sepsis | Phase II | Discussions and negotiations with the senior management ... |
| Cmc Dilaudid US | Oros Hydromorphone | Analgesia | Phase II | ... |
| Pro-Mochr | Thrombin inhibitor | Dialysis | Phase II | IPO underway, expect to decide position to Coridon decide rights ... |
| ABT 518 | MMPI | Cancer | Phase I | DDX Alignant first patent ... |
| ABT 494 | Nicotine Modulator | Neuropathic Pain | Phase I | ... |
| ABT 627 | Neuroendocrine inhibitor | Anti-infective | Pre-clinical | CDAce will incorporate into features; diligence meeting scheduled for October 20 ... |

| Closed | | | | |
|---|---|---|---|---|
| ABT 418 | Nicotine Modulator | Alzheimers | Phase II | No interest from Corporate or other parties ... |

Highly Confidential

ABBT245791

Out-Licensing Update
Opportunity: BSF 208075 - Knoll LTA Antagonist

# Preparatory Work

| | Completion Date | Responsible Personnel | Comments |
|---|---|---|---|
| 1. Decision to Out-License | | | |
| 2. Identify Project Team | | | |
| 3. Prepare Non-Confidential Data Package | | | |
| 4. Prepare Confidential Data Package | | | |
| 5. Establish Value of Compound | | | |
| 6. Design Negotiation Guidelines and Obtain Internal Approval | | | |
| 7. Identify Potential Partners | | | |

Highly Confidential

ABBT245792

Out-Licensing Update
Opportunity: BSF 208075 – Knoll ETA Antagonist

## Negotiation and Execution

| | Completion Date | Responsible Personnel | Comments |
|---|---|---|---|
| 1. Negotiate Terms & Conditions | | | |
| 2. Obtain Final Approval if Terms are Less than Approved Guidelines | | | |
| 3. Draft Agreement & Press Release | | | |
| 4. Negotiate Contract Language | | | |
| 5. Execute Agreement & Obtain Approval for Press Release | | | |
| 6. Transfer Material / Data to Licensee | | | |

Highly Confidential

ABBT245793



Highly Confidential

ABBT245794



Highly Confidential

ABBT245795



Highly Confidential

ABBT245796



Out-Licensing Update
Opportunity: <Name of opportunity>

## Negotiation and Execution

| | Completion Date | Responsible Personnel | Comments |
|---|---|---|---|
| 1. Negotiate Terms & Conditions | | | |
| 2. Obtain Final Approval if Terms are Less than Approved Guidelines | | | |
| 3. Draft Agreement & Press Release | | | |
| 4. Negotiate Contract Language | | | |
| 5. Execute Agreement & Obtain Approval for Press Release | | | |
| 6. Transfer Material / Data to Licensee | | | |

Highly Confidential

ABBT245797



Out-Licensing Update
Opportunity: <Name of Opportunity>

## Preparatory Work

| | Completion Date | Responsible Personnel | Comments |
|---|---|---|---|
| 1. Decision to Out-License | | | |
| 2. Identify Project Team | | | |
| 3. Prepare Non-Confidential Data Package | | | |
| 4. Prepare Confidential Data Package | | | |
| 5. Establish Value of Compound | | | |
| 6. Design Negotiation Guidelines and Obtain Internal Approval | | | |
| 7. Identify Potential Partners | | | |

Highly Confidential

ABBT245796



Highly Confidential

ABBT245799

**Out-Licensing Update**
Opportunity: <Name of Opportunity>

# Preparatory Work

| | Completion Date | Responsible Personnel | Comments |
|---|---|---|---|
| 1. Decision to Out-License | | | |
| 2. Identify Project Team | | | |
| 3. Prepare Non-Confidential Data Package | | | |
| 4. Prepare Confidential Data Package | | | |
| 5. Establish Value of Compound | | | |
| 6. Design Negotiation Guidelines and Obtain Internal Approval | | | |
| 7. Identify Potential Partners | | | |

Highly Confidential

ABBT245800



Highly Confidential

ABBT245801



Out-Licensing Update
Opportunity: <Name of Opportunity>

## Preparatory Work

| | Completion Date | Responsible Personnel | Comments |
|---|---|---|---|
| 1. Decision to Out-License | | | |
| 2. Identify Project Team | | | |
| 3. Prepare Non-Confidential Data Package | | | |
| 4. Prepare Confidential Data Package | | | |
| 5. Establish Value of Compound | | | |
| 6. Design Negotiation Guidelines and Obtain Internal Approval | | | |
| 7. Identify Potential Partners | | | |

Highly Confidential

ABBT245802



Out-Licensing Update
Opportunity: <Name of Opportunity>

## Negotiation and Execution

|  | Completion Date | Responsible Personnel | Comments |
|---|---|---|---|
| 1. Negotiate Terms & Conditions |  |  |  |
| 2. Obtain Final Approval if Terms are Less than Approved Guidelines |  |  |  |
| 3. Draft Agreement & Press Release |  |  |  |
| 4. Negotiate Contract Language |  |  |  |
| 5. Execute Agreement & Obtain Approval for Press Release |  |  |  |
| 6. Transfer Material / Data to Licensee |  |  |  |

Highly Confidential

ABBT245803



Highly Confidential

ABBT245804

Out-Licensing Update
Opportunity: <Name of Opportunity>

## Negotiation and Execution

| | Completion Date | Responsible Personnel | Comments |
|---|---|---|---|
| 1. Negotiate Terms & Conditions | | | |
| 2. Obtain Final Approval if Terms are Less than Approved Guidelines | | | |
| 3. Draft Agreement & Press Release | | | |
| 4. Negotiate Contract Language | | | |
| 5. Execute Agreement & Obtain Approval for Press Release | | | |
| 6. Transfer Material / Data to Licensee | | | |

Highly Confidential

ABBT245805

Deemer Deposition Exhibit 28


P's Exhibit MU

Philip M
Deemer/LAKE/CORP/
ABBOTT

08/27/2001 11:29 AM

To   Ake L Johansson/LAKE/CORP/ABBOTT@ABBOTT

cc   Harriet A Mitchell/LAKE/CORP/ABBOTT@ABBOTT, Debra E
     Moore/LAKE/CORP/ABBOTT@ABBOTT

bcc

Subject  Update

Attached is my update for last week



PMDAug27Priorities..lwi

Highly Confidentia

ABBT246324



Phil Deemer                                                    July 20, 2001

## Venture Capital Priority-1

Scope:      Assess opportunity and recommend implementation plan
            for establishing corporate venture fund with $50 million
            capitalization.

Action:     Benchmark with pharma and higher-tech companies.
            Investigate financial, organizational, and tactical aspects of
            potential fund.

Timeframe:  Prepare presentation to management by the end of June.

Update:     Assuming the Venture Capital Fund goes forward, I recommend
that I and other possible members of the group attend the venture capital boot
camp sponsored by the venture capital assn. The training conference takes place
in Atlanta from September 9-13 and costs $4,900 including meals and lodging.

## Dilaudid Oros - Priority-2

Scope:      Divest Dilaudid Oros US - Retain ex-U.S. rights.

Action:     Alza/J&J has stiff financial terms and co-promo
            and manufacturing rights making them a likely partner for
            divestiture. Other potential partners include Elan and Purdue
            Frederick. Other pain management opportunities may also be of
            interest to these partners including ABT963 and
ABT-594.                  Contact Alza to discuss their existing interest (Alza
made a                    proposal 10/00 before the FDA requested an
additional trial).

Timeframe:  Identify partner within 90 days (may involve package of 3
            or more compounds). Complete agreement within 120 days.

Update:
The New Business Development group is modeling the financial aspects of each of
the nine significant possible options identified during the July brainstorming
session to either develop Oros Dilaudid internally or to divest it. No progress since
Rose W. left.

1

Highly Confidential                                     ABBT246325

*Phil Deemer*                                                          *July 20, 2001*

### Devco Priority- 4

    *Scope:*        BTS - 74398 proposed for development by Devco with
buy-back rights or complete out-license. Final decision
to be made following technical review with Devco on
May 18th, 2000.

    *Action:*      Negotiate and complete agreement with Devco following
decision post technical review

    *Timeframe:*  Complete agreement within 90 days after go - ahead
decision.

    *Update:*    A meeting was held with Jim Sullivan to get his input into the
Devco out-license issue of the whole patent vs. The compound.  Jim is not
working with the compound family described in the patent but he would like to
limit the license to the compound with which I strongly concur.  Catherine S. is
out of the office until 8/29 but I will summarize the position for her and I will
inform Devco of our position on 8/28 when they plan to call me to discuss this.
Devco will very opposed to this change but it is not wise to proceed any other
way.  We can warrant that we are not working with this class now but we will not
represent that we will not do so in the future; if we do we will be 3-4 years behind
BTS-74398.

### ETA's - Priority 5

    *Scope:*        Darusentan, BSF 208075, and B420627 are available for
outlicense.

    *Action:*      Identify partners for Darusentan.

                  BSF 208075 is being discussed with Myogen (letter of intent).
Proceed with Myogen to see if there is interest in a complete
in-license.

                  Schwartz Pharma expressed possible interest in B420627.
Follow-up.

                  Cardion and others expressed interest in ETA's. Follow-up.

2

Highly Confidential                                           ABBT246326

Phil Deemer                                                              July 20, 2001

Timeframe: Initiate contact with Myogen and Schwartz
within 30 days and begin identifying candidates for
Darusentan.

Update:    Confidential and/or non-confidential information on Darusentan
has been sent/discussed with Bayer, Novartis, Forest, E Merck, GlaxoSK, and
AstraZeneca. Additional candidate companies have been identified and are being
contacted (no response from my email to John/Bob as to not contacting these
companies): Pfizer, Merck, Lilly, Centocor, Genencor, Roche, J&J, BMS, Aventis,
Pharmacia. I had written Bayer off because of their situation but they responded
last week and told me they were still interested and were using some outside
advisors to help with the evaluation.

The draft contract with Myogen was sent to them on 8/24. Mike Johanneson and
I planning to visit them to discuss it on 8/29 or 8/30. They are getting ready to file
the IND and they signed a side letter saying they will pay for some additional
expenses associated on our part with additional dosage amounts and rat and
mouse MTD studies which we will do.

Catherine Sazdanoff is handing the drafting of the Schwarz agreement off to Dave
Wardell since she is leaving. Unfortunately she was not able to start it and Dave
has been on vacation. I am meeting with him 8/28 to discuss. Schwarz has
requested a technical meeting to address a number of tox and phase I study issues
which they have sent me. This meeting is being planned for September 11 in
Ludwigshaven. I would like to have the final management buy off of the terms for
Schwarz Pharma (sent to you and Jim on 8/14) to finalize with them at this time.

## Other Lower Priority Opportunities

Peg-Hirudin: Clinical studies with Peg-Hirudin are continuing in order to investigate
its bleeding profile and potential use in end stage renal disease. Upon the
conclusion of these studies (end of year) HPD would like the first opportunity to
evaluate the fit with their renal business. The non-confidential package on Hirudin
has been sent to Cardion. Cardion has responded that they are quite interested in
this opportunity and they would like to know what market research data is
available which I am trying to find. Also, HPD (Loreen) has asked me to meet
with her regarding this opportunity on 9/4. I know she wants to reserve this
opportunity for HPD but John L. wants me to proceed to identify outside interests
which I am doing.

Segard: Uli Grau wants full marketing responsibility for his company for Segard
for Sepsis. He believes that a 50-75 person hospital sales force is appropriate and

3

*Phil Deemer*                                                          *July 20, 2001*

he is building this sales force for other hospital products anyway. We are convening a meeting in September to present the technical details of this out licensing program. He is very interested in the opportunity and believes he will have financing by the end of the year. The meeting is confirmed for September 6 and 7 in New Jersey where the whole Segard team is meeting for one of their regular updates.

*Nordmark* is potentially interested in buying the snake farm and licensing Ancrod. Their proposal is to take over the expenses of the snake farm in return for us giving them a paid-up license for Ancrod. The integration team has identified a way to place the snakes elsewhere and close the snake farm. I will work with Nordmark separately on Ancrod. Since the snakes may not be available now, Nordmark may loose interest in Ancrod since the snakes are crucial for this opportunity. I am trying to see if there can be access to a some of the snakes.

*MMPI (ABT-518)*

We may need to out-license this under the Hancock Agreement as we are terminating this program unless Perry can get it funded again. I have a CDA for you to sign with a company that Alan R. is affiliated with (Salmedix) and which is potentially interested in this compound. My preferred way to work on this one would be for Abbott to retain full commercial buy-back rights worldwide following proof of principle in cancer patients.

4

Highly Confidential

ABBT246328

Phil Desmer                                                                                    July 20, 2001

_Venture Capital Priority-1_

> _Scope:_    Assess opportunity and recommend implementation plan
> for establishing corporate venture fund with $50 million
> capitalization.
>
> _Action:_    Benchmark with pharma and higher-tech companies.
> Investigate financial, organizational, and tactical aspects of
> potential fund.
>
> _Timeframe:_  Prepare presentation to management by the end of June.
>
> _Update:_    Assuming the Venture Capital Fund goes forward, I recommend
> that I and other possible members of the group attend the venture capital boot
> camp sponsored by the venture capital assn. The training conference takes place
> in Atlanta from September 9-13 and costs $4,900 including meals and lodging .

_Dilaudid Oros - Priority-2_

> _Scope:_    Divest Dilaudid Oros US - Retain ex-U.S. rights.
>
> _Action:_    Alza/J&J has stiff financial terms and co-promo
> and manufacturing rights making them a likely partner for
> divestiture. Other potential partners include Elan and Purdue
> Frederick. Other pain management opportunities may also be of
> interest to these partners including ABT963 and
> ABT-594,                Contact Alza to discuss their existing interest (Alza
> made a                proposal 10/00 before the FDA requested an
> additional trial).
>
> _Timeframe:_  Identify partner within 90 days (may involve package of 3
> or more compounds).  Complete agreement within 120 days.
>
> _Update:_
> The New Business Development group is modeling the financial aspects of each of
> the nine significant possible options identified during the July brainstorming
> session to either develop Oros Dilaudid internally or to divest it.  No progress since
> Rose W. left.

1

Highly Confidential

ABBT246325

Deemer Deposition Exhibit 31


P's Exhibit BF

Philip M
Deemer /LAKE/CORP/ABBO
TT
10/11/2001 11:18 AM

To    Bruceb@amgen.com@internet

cc

bcc

Subject    Licensing Opportunities

Dear Bruce,

We have a number of out-licensing opportunities resulting from our acquisition of Knoll and the rationalization of our own pipeline. These include Darusentan, a P III endothelin antagonist, Segard, a P III anti-TNF MAb for Sepsis, ABT 518, an MMPI for cancer in Phase I, ABT 677, a P I compound for flu (neuraminidase inhibitor), and possibly some others.

Are you the appropriate person with whom to discuss these?

Best regards,

Phil



PLAINTIFF'S
EXHIBIT
Deemer 31
10-27-06

Highly Confidential

ABBT245651

**DEEMER DEPOSITION EXHIBIT 33**

**PLT'S EXHIBIT GK**

Philip M
Deemer /LAKE/CORP/
ABBOTT

10/24/2001 05:04 PM

To   Ake L Johansson/LAKE/CORP/ABBOTT@ABBOTT

cc   Debra E Moore/LAKE/CORP/ABBOTT@ABBOTT, Harriet A
     Mitchell/LAKE/PPRD/ABBOTT@ABBOTT

bcc

Subject   Update

Attached is my update



PMDOct 24Priorities .lwp



'' dential                                                                   ABBT246338

_ETA's - Priority-1_

   _Scope:_     Darusentan and B420627 are available for outlicense.

   _Action:_    Identify partners for Darusentan.

               Complete Agreement with Schwarz Pharma for BSF 420627.

   _Timeframe:_ Target completion for Schwarz is 11/16/01; Identify and contact at least 30 candidate companies for Darusentan by 12/31/01.

   _Update:_    Status of Darusentan contacts is as follows:

Declined Interest:
Novartis
Merck AG
Forest
Genentech
Roche
BMS
GlaxoSK
AstraZeneca

Awaiting Expression of Interest/Evaluation:
Bayer
Pfizer
Merck
Amgen
Pozen
Boehringer Ingelheim
Actelion
Servier
Sanofi
Celltech
Lilly
Pharmacia
Myomatrix
Aventis

Additional Companies to Contact:

Highly Confidential

ABBT246339

Yamanouchi
Takeda
Schering Plough
J&J
American Home
Elan
Others?

Revised draft being sent to Schwarz Pharma on 10/25. Awaiting SPD's clinical supply costs which could be major issue and which could result in modifying agreement to royalty basis as opposed to transfer price basis. Could be major stumbling block. No other significant out-standing issues.

The BSF 208075 Agreement with Myogen was signed on 10/8/01

*Segard (Priority 2)* Status of Segard contacts is as follows:

Declined interest:
Forest
Roche

Awaiting expression of interest/evaluation:
NABI
BMS
P&U
Pfizer
Sanofi
Genentech
B/I
Amgen
Pozen
Celltech
Devco

Uli Grau's proposal is weak. Phoned Jerry Hirschberg, Uli Grau's business negotiator, 10/24 to tell him our views of the valuation of Segard differed widely and that we would not be interested in his proposal as it currently stan ds. Eugene Sun invited me to a review of the Segard opportunity with HPD on 10/24. Chris Begley and Mary Szela are quite interested and wanted me to delay out-licensing of the drug until they could review the opportunity and make a decision within the next 6-8 weeks. I ask Chris to call Jim Tyree to tell him that they were requesting this. HPD would like me to continue with any efforts that could result in a third party funding the development but HPD having commercial rights.

Highly Confidential

ABBT246340

*ABT-518 (Priority 3)* Status of ABT-518 contacts is as follows:

Declined Interest:
Bristol Myers Squibb

Awaiting expression of interest/evaluation:
Salmedix
Lilly
Servier
Celltech
Amgen
P&U
Pfizer
Sanofi
Genentech
B/I
Pozen

Conference call scheduled with Salmedix on 10/26 to discuss conceptual business interest.

*ABT-677 (Priority 4)* Awaiting non-confidential and confidential information from Bill Kohlbrenner. Status of contacts is as follows:

Awaiting expression of interest/evaluation:
Arrow
Viropharma
Lilly
Celltech
P&U
Pfizer
Servier
BMS
Sanofi
Genentech
B/I
Amgen

Highly Confidential

ABBT246341

***Peg-Hirudin***:  *(Priority 5)* Status of contacts is as follows:

Declined interest
Cardion

Awaiting interest/evaluation:
Lilly
Celltech
Speedel Group
Pharmacia
Pfizer
Pozen
Sanofi
Servier
Genentech

***ABT-594 (Priority 6)***  Appears to be reasonable value left in this compound to
necessitate out-licensing under the terms of the Hancock Agreement.
Non-confidential and Confidential packages are being prepared.  Possible
out-licensing companies are as follows:

Purdue
J&J
Targacept
Icagen
Elan
Mallinkrodt
TAP
Takeda
Endo
Adolor
Pain Therapeutics
Sepracor
Pfizer
Lundbeck
Sanofi-Synthelabo
AstraZeneca
GSK
Boehringer Ingleheim
Novartis
Aventis
Esteve
Cambridge Neuroscience

Highly Confidential

ABBT246342

Taisho

*Cliverine (Priority 7)* Non-confidential and confidential information needs to be obtained and key technical people need to be identified so that th is out-licensing effort can begin. Starting this process now. Talked with Mary Szella to find out why HPD was not interested in this opportunity. She claims it is a dog. It is ready to be filed in the US but HPD is not even interested in pursuing this since the market is expected to be so low it is not worth their while. The patent also expires in 5 years.

*Dilaudid Oros*

*Scope:*    Divest Dilaudid Oros US - Retain ex-U.S. rights.

*Action:*    Alza/J&J has stiff financial terms and co-promo and manufacturing rights making them a likely partner for divestiture. Other potential partners include Elan and Purdue Frederick. Other pain management opportunities may also be of interest to these partners including ABT963 and ABT-594.                 Contact Alza to discuss their existing interest (Alza made a         proposal 10/00 before the FDA requested an additional trial).

*Timeframe:* Identify partner within 90 days (may involve package of 3 or more compounds). Complete agreement within120 days.

*Update:*
The New Business Development group has evaluated the financial alternatives of various scenarios with Oros Dilaudid and is discussing these with senior management.

*Other Knoll Pipeline Opportunities* I have had inquiries from companies for two Knoll pipeline products that were in development but discontinued: BTS 67582 for diabetes (Phase II) and Amonifide for cancer (Phase II). I am having difficulty in obtaining information about these two.

*Nordmark* is no longer interested in *Ancrod* and this opportunity has been closed out.

Highly Confidential

ABBT246343

**Venture Capital**

**Scope:** Assess opportunity and recommend implementation plan for establishing corporate venture fund with $50 million capitalization.

**Action:** Benchmark with pharma and higher-tech companies. Investigate financial, organizational, and tactical aspects of potential fund.

**Timeframe:** Prepare presentation to management by the end of June.

**Update:** Presentation revised and sent to Jim Tyree on 9/20/01

Highly Confidential

ABBT246344

**DEEMER DEPOSITION EXHIBIT 34**

**PLT'S EXHIBIT NB**

Philip M
Deemer /LAKE/GPRD/ABBO
TT

12/13/2001 08:50 AM

To   pamela_demain@merck.com

cc

bcc

Subject   RE: Licensing opportunities

Dear Pamela,

Thank you for following up on these. Unfortunately we have decided to suspend these initiatives for the time being pending further evaluation of these activities. We will contact you again as soon as we decide to proceed further with out-licensing these projects. I apologize for any inconvenience this may have caused.

Best regards,

Phil

pamela_demain@merck.com



pamela_demain@mer
ck.com

12/12/01 03:41 PM

To : Philip M Deemer/LAKE/GPRD/ABBOTT@ABBOTT
cc: irene_eppa@merck.com
Subject: RE  Licensing opportunities

Dear Phil,

I am following-up on the email I sent you several weeks ago. I would like to know the next steps in receiving information on the two opportunities listed below.

Thanks for your help.

Best regards,

Pamela Demain

Pamela Demain
Executive Director, Corporate Licensing
Merck & Co., Inc.
WS2A-25
1 Merck Drive
Whitehouse Station, NJ 08889 USA
908-423-6940 tel
908-735-1202 fax
pamela_demain@merck.com <mailto:pamela_demain@merck.com>

> -----Original Message-----
> From        Demain, Pamela R.
> Sent  Friday, November 16, 2001 1:18 PM
> To     'Philip Deemer'
> Cc:    Eppe, Irene M.
> Subject:       RE: Licensing opportunities

Highly Confidential

ABBT246490



> 
> Dear Phil,
> 
> Thank you very much for your email. I apologize that it has taken me so
> long to respond. I have been on two back-to-back business trips and have
> fallen behind in my correspondence.
> 
> In the interim, I asked my colleagues to review the offerings in your
> email. We would be interested in receiving non-confidential information on
> two of the licensing opportunities you mention below.
> 
> *      the MMPI Phase I cancer drug
> *      the PIII sepsis product
> 
> Thanks for thinking of Merck and giving up the opportunity to review these
> compounds.
> 
> Best regards,
> 
> Pamela Demain
> 
> Pamela R. Demain
> Executive Director  Corporate Licensing
> Merck & Co., Inc.
> 1 Merck Drive, WS2A-25
> Whitehouse Station, NJ 08889
> phone:  (908) 423-6940
> fax:  (908) 735-1202
> pamela_demain@merck.com
> 
> 
> -—-Original Message-—-
> From: Philip Deemer [mailto:Philip.Deemer@ln.ssw.abbott.com]
> Sent: Friday, October 12, 2001 5:05 PM
> To:  pamela_demain@merck.com
> Subject: Licensing opportunities
> 
> Dear Pamela,
> 
> We have a number of licensing opportunities that I thought might be of
> interest to Merck.
> 
> One of these is a phase III compound, Darusentan, from the Knoll pipeline
> for
> cardiovascular indications.  It is an endothelin antagonist for CHF,
> hypertension etc.
> 
> Another is a Phase I cancer drug that is an MMPI different from others
> that
> have been tried.
> 
> A third is a late-preclinical oral anti-viral for influenza.
> 
> Another is a phase III compound for sepsis.

Highly Confidential

ABBT246491

>
> The last is a thrombin inhibitor (Peg-Hirudin) for dialysis patients in
> Phase
> II.
>
> Please let me know if you are interested in receiving information about
> any
> or all of these compounds.
> I am heading up our out-licensing initiatives with these.
>
> Best regards,
>
> Phil
>
> phil.deemer@abbott.com
>

Highly Confidential

ABBT246492