UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>Defendant. | CIVIL ACTION NO. 05-11150-DPW |

### ERRATA RE: ABBOTT'S CORRECTED DEPOSITION DESIGNATIONS FOR SCOTT S. HARTZ

Defendant Abbott Laboratories ("Abbott") respectfully submits this Errata in connection with Abbott's Corrected Deposition Designations for the August 19, 2004 and November 10, 2006 deposition of Scott S. Hartz, Executive Vice President and Chief Investment Officer of John Hancock Financial Services, Inc. Abbott inadvertently omitted the deposition transcript excerpt for the August 19, 2004 deposition of Scott Hartz. A true and correct copy of the deposition excerpt is attached hereto. The courtesy copies of these designations that Abbott is submitting to the Court will include the attached deposition excerpt.

Dated:  February 25, 2008

Respectfully submitted,

ABBOTT LABORATORIES

By:  __/s/ Eric J. Lorenzini_____
     Eric J. Lorenzini

Jeffrey I. Weinberger (*pro hac vice*)
Gregory D. Phillips (*pro hac vice*)
Eric J. Lorenzini *(pro hac vice)*
Ozge Guzelsu *(pro hac vice)*
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth Floor
Los Angeles, CA  90071-1560
Tele:  (213) 683-9100

and

Peter E. Gelhaar (BBO#188310)
Michael S. D'Orsi (BBO #566960)
DONNELLY, CONROY & GELHAAR LLP
1 Beacon St., 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880
peg@dcglaw.com
msd@dcglaw.com

*Counsel for Abbott Laboratories*

**CERTIFICATE OF SERVICE**

      I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 25, 2008.

Date: February 25, 2008

                                                      /s/ Ozge Guzelsu

```
     0001
 1                    Volume:   I
                      Pages:    1 to 98
 2                    Exhibits: 50 to 57
 3
 4          UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
 5
       * * * * * * * * * * * * * * *
 6     JOHN HANCOCK LIFE INSURANCE
       COMPANY, JOHN HANCOCK VARIABLE
 7     LIFE INSURANCE COMPANY, and
       INVESTORS PARTNER LIFE INSURANCE
 8     COMPANY,
                Plaintiffs,
 9
          vs.            Civil Action
10                       No. 03 CV 12501 DPW
       ABBOTT LABORATORIES,
11              Defendant.
       * * * * * * * * * * * * * * *
12
13
14          DEPOSITION OF SCOTT S. HARTZ, a
       witness called on behalf of the Defendant, taken
15     pursuant to the applicable provisions of the
       Federal Rules of Civil Procedure before Cynthia A.
16     Powers, Shorthand Reporter and Notary Public in
       and for the Commonwealth of Massachusetts, at the
17     law offices of Donnelly, Conroy & Gelhaar, LLP,
       One Beacon Street, 33d Floor, Boston,
18     Massachusetts, on Thursday, August 19, 2004,
       commencing at 9:30 a.m.
19
20
                    * * * * * *
21
22
                 KACZYNSKI REPORTING
23           72 CHANDLER STREET, SUITE 3
             BOSTON, MASSACHUSETTS 02116
24                 617 426-6060
```

Hartz, Scott  8/19/2004  9:30:00 AM

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | SCOTT S. HARTZ, |
| 3 | |
| 4 | having been satisfactorily identified |
| 5 | and duly sworn by the Notary Public, |
| 6 | was examined and testified as follows: |
| 7 | |
| 8 | DIRECT EXAMINATION |
| 9 | BY MR. D'AMORE: |
| 10 | Q.   Good morning, Mr. Hartz.  I'm Steve |
| 11 | D'Amore, a lawyer for Abbott Laboratories.  Would |
| 12 | you state your full name for the record? |
| 13 | A.   Scott Sears Hartz. |
| 14 | Q.   For the record would you give your |
| 15 | home address? |
| 16 | A.   15 Torrey Lane, T O R R E Y, in |
| 17 | Duxbury, D U X B U R Y, Mass. |
| 18 | Q.   Mr. Hartz, have you given |
| 19 | deposition testimony before? |
| 20 | A.   No. |
| 21 | Q.   Let me just outline a couple of |
| 22 | procedural rules for lack of a better term.  I'm |
| 23 | going to ask a series of questions, and I'll ask |
| 24 | that you give me answers to those questions.  The |

Hartz, Scott  8/19/2004  9:30:00 AM

1   Hancock since you joined the company in 1983?

2       A.   Sure.  In 1983 I joined the

3   actuarial program which is a rotational program.

4   In my first two years I worked in the retail

5   market and then I rotated to the asset liability

6   management area, I guess that would be 1985, and

7   worked there until 1990 when I moved to my current

8   department, the bond and corporate finance group

9   in the portfolio management area, and that's where

10  I've been until actually very recently, you know,

11  working for sort of the head portfolio manager,

12  and I became the head of the portfolio management

13  group, I think it was in 1992, roughly around

14  there, and had been head of portfolio management

15  until about a month ago when the head of our

16  department left and I became the head of all of

17  bond and corporate finance.

18      Q.   Who was the head of the bond and

19  corporate finance department?

20      A.   Barry Welch.

21      Q.   When you said just recently left,

22  between 1990 and about a month ago when Mr. Welch

23  left John Hancock, did you hold various jobs

24  within the bond and corporate finance group?

1      A.   I was in portfolio management the
2  whole time, and the biggest change really was when
3  I became the head of the group.  We perform a
4  number of tasks, so I did get involved in
5  different tasks over the years, but it was within
6  the same group, within bond and corporate finance.
7      Q.   And you became head of the bond and
8  corporate finance group in 1998; is that correct?
9      A.   No, head of the portfolio
10 management group within bond and corporate
11 finance.
12     Q.   I'm sorry, thank you.  Describe
13 generally for me what the portfolio group does
14 within the bond and corporate finance group?
15     A.   Yeah, the portfolio management
16 group is responsible for opining on whether the
17 pricing of a transaction is correct.  The main
18 thing we do is make corporate loans.  So the
19 analysts in the group determine the risk of the
20 loan, and we determine based on opportunities
21 we're seeing in the market what the right price is
22 for the, what rate should we lend the money.  If
23 it's a bid situation, we'll get involved in what
24 the bid should be on the pricing side.  Then once

Hartz, Scott  8/19/2004  9:30:00 AM

1        A.   I don't believe so.  It's possible

2    that there are parts of this that I would have

3    seen in another form but not labeled as Research

4    funding agreement.

5        Q.   That you said your role in

6    connection with the Research funding agreement was

7    very limited.  More specifically, what was your

8    role?

9        A.   My role had two parts really here.

10   One was the accounting -- this was an unusual

11   transaction for us.  As I said earlier, we mostly

12   make corporate loans and part of -- one job of

13   portfolio management as we're putting investments

14   into portfolios is make sure they fit, and one

15   part of that is the accounting; how does the

16   accounting work, is it working in a manner that

17   works for our various portfolios.  This was

18   unusual, so I needed to research how we would

19   account for this.  A second part was the economics

20   and, as I described earlier, a part of portfolio

21   management is to determine the risk as described

22   by the analyst, what price we should put on that

23   risk.  And again this was an unusual transaction,

24   and to describe the risk Steve Blewitt developed a

1  schotastic model.  And one of the things I did, I

2  spent some time looking at his model to make sure

3  it operated sort of mechanically correctly and,

4  two, based on, based on the output of the model

5  which described -- the idea is to describe the

6  risk of the transaction, usually means credit

7  ratings to describe risk.  The model helped us to

8  find the risk of the transaction.  Part of my role

9  is to opine whether we're getting adequately

10  compensated for the risk.

11      Q.   In your answer you said that, I

12  think you said that Mr. Blewitt prepared a blank

13  type of model and I didn't follow?

14      A.   Prepare a schotastic model which

15  means that he in a probabilistic sense tries to

16  determine a possible outcome of this transaction,

17  and because there were a number of compounds going

18  into this transaction that could or could not be

19  successful, he came up with probabilities around

20  that, and then he developed a model which based on

21  those probabilities would project a set of cash

22  flows that we would receive and use a random

23  number generator to determine which drugs would be

24  successful and then develop I think it was five

Hartz, Scott  8/19/2004  9:30:00 AM

1   hundred different scenarios, and it's those five

2   hundred scenarios that defines schotastic

3   analysis, and based on that you get a distribution

4   of expected returns, in the worse five percent of

5   the scenarios what kinds of return you'll have,

6   that helps you figure out the range of

7   possibilities.

8       Q.   Is it fair to say that what

9   Mr. Blewitt was doing in part through this

10  schotastic modeling was to determine an internal

11  rate of return for John Hancock as part of the

12  Research funding agreement?

13      A.   Yes, each scenario we would

14  calculate into interim rate of return for.

15      Q.   Let me show you John Hancock's

16  responses to interrogatories that Abbott served in

17  the case, and I'm just going to direct your

18  attention to the part of the document that

19  identifies you, Mr. Hartz.  If you would turn to

20  page number five.  And for the record, these are

21  Plaintiff's Responses to Defendant Abbott

22  Laboratories First Set of Interrogatories.  Have

23  you flipped to page five?

24      A.   Yes.

Hartz, Scott  8/19/2004  9:30:00 AM

1  really which drugs were alive was the main driver

2  of the cash flows.

3       Q.   In the document that we looked at a

4  moment ago, Exhibit 55, in the title of the

5  document it identifies Abbott Laboratories and

6  then just to the right of that it says

7  nonrecourse; what does that mean in this context?

8       A.   It means that Abbott Labs, the

9  corporate entity, does not guarantee the return of

10  our investment.

11       Q.   Was that your understanding of the

12  transaction?

13       A.   Yes.

14            MS. TROAKE:  Objection.

15            (Exhibit 56 marked

16             for identification)

17       Q.   Mr. Hartz, I have handed you what

18  we've marked as Abbott Exhibit 56 which consists

19  of two e-mail messages on which you were copied.

20  Do you recognize these e-mail messages?

21            MS. TROAKE:  Objection.

22       A.   Yes.

23       Q.   In the e-mail message dated March

24  26, 2002 on which you are shown as a copy

Hartz, Scott  8/19/2004  9:30:00 AM

1      Q.   Do you recall whether you did that

2   or Deirdre did that verbally or in some kind of a

3   written communication?

4           MS. TROAKE:  Objection.  If you

5   know.

6      A.   Yeah, I don't specifically

7   remember.

8      Q.   Who is John Mastromarino?

9      A.   John Mastromarino was our

10  enterprise risk officer for a period of time.

11     Q.   When did he join John Hancock?

12     A.   Trying to remember, and I wouldn't

13  remember exactly, but if I had to guess I would

14  guess in --

15          MS. TROAKE:  You don't have to

16  guess.  If you don't recall --

17     A.   I can make within a window.

18     Q.   Just give me your best --

19     A.   Recollection.

20     Q.   -- memory of when he joined the

21  company?

22     A.   Early 2002 would be my best

23  recollection.

24     Q.   Is he still with John Hancock?

1       A.   No.

2       Q.   When did he leave the company?

3       A.   Early 2004.

4       Q.   Do you know where he went to work?

5       A.   I don't.

6       Q.   Do you know where he's presently

7  located?

8       A.   I don't.

9       Q.   Have you talked to Mr. Mastromarino

10 since he's left John Hancock?

11      A.   No.

12      Q.   Did you ever talk to Mr.

13 Mastromarino on the subject of the Abbott Research

14 funding agreement?

15      A.   I remember a specific conversation,

16 yes.

17      Q.   When did that occur?

18      A.   I think it was either late 2003 or

19 early 2004, don't specifically remember.

20      Q.   Was it an in person meeting or a

21 telephone call?

22      A.   It was a chance encounter in the

23 hallway kind of conversation.

24      Q.   Just you and he?

1       A.   Yes.

2       Q.   What did he say and what did you

3  say?

4            MS. TROAKE:  Objection.

5       A.   He said we never would have done

6  that transaction if he had been here at the time.

7       Q.   Did he say anything else?

8       A.   That was about it.

9       Q.   Did he tell you why he believed

10  that?

11      A.   He didn't.  He didn't.

12      Q.   What did you say?

13      A.   I said I thought it was a good

14  transaction, probably too large an amount for us

15  to have entered into at 220 odd million, but

16  besides the amount I thought it was a reasonable

17  and a good transaction at the time we did it.

18      Q.   Do you recall anything else that

19  Mr. Mastromarino or you said during that encounter

20  in the hallway in late 2003/early 2004?

21      A.   No.

22      Q.   Did you have any follow up with him

23  on that subject?

24      A.   No.