UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER LIFE INSURANCE COMPANY),<br><br>        Plaintiffs,<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION NO. 05-11150-DPW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## JOHN HANCOCK'S RESPONSE TO ABBOTT'S OBJECTIONS TO THE AFFIDAVIT OF WILLIAM R. FAIRWEATHER, PH.D

Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Manulife Insurance Company (collectively, "John Hancock" or "Hancock") hereby respond to Abbott Laboratories' ("Abbott") objections to the Affidavit of William R. Fairweather, Ph.D (the "Fairweather Affidavit").

Abbott makes two baseless objections to the Fairweather Affidavit.  First, it asserts that Dr. Fairweather is offering opinions not disclosed in his expert report.  Dr. Fairweather's report disclosed his primary opinion:  on March 12, 2001, Abbott's statisticians should have known that the M99-114 clinical trial for ABT-594 would likely be a failed study because it failed to reach its enrollment target, suffered a high premature termination rate, and because its subjects suffered a high rate of adverse events for nausea, vomiting and dizziness.  (Report at 12, attached

4306739v1

to Abbott's Motion as Ex. A.) Moreover, Abbott went ahead on May 31, 2007 and deposed Dr. Fairweather. In response to Abbott's questions, Dr. Fairweather elaborated on the *precise* opinions Abbott now claims he never disclosed; namely, the impact of imputed data in clinical studies and the reaction of the FDA to the M99-114 trial. Second, Abbott incorrectly claims that Dr. Fairweather is opining regarding Abbott's state of mind. On the contrary, he is simply stating, based on more than thirty years experience as a statistician, what a reasonable statistician at a major pharmaceutical company knew or should have known regarding the viability of the M99-114 trial based on the facts available to Abbott. Abbott's objections to his affidavit should be overruled.

## Discussion

I.  BECAUSE ABBOTT HAD FULL NOTICE OF THE OPINIONS CONTAINED IN THE FAIRWEATHER AFFIDAVIT, THOSE OPINIONS ARE TIMELY UNDER THE RULES.

Rule 26(a)(2)(B) requires that an expert report contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Where a party has not complied with Rule 26(a)(2)(B), the testimony should be admitted if the non-disclosure was justified or harmless. *See* Fed. R. Civ. P. 37(c)(1). Significantly, Rules 26(a)(2)(B) and 37(c)(1) "are not designed to prohibit a witness from testifying about anything not explicitly mentioned in [the expert's] Rule 26 disclosure, but rather to protect one party from being blindsided by another party with new opinions never before discussed." *Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*, 2003 WL 1878246 at *4 (S.D.N.Y. April 11, 2003); *see also Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 167 (D.C. Cir. 2007).

Indeed, Rule 26(a)(2)(B) "does not limit an expert's testimony simply to reading his report ... The rule contemplates that the expert will supplement, elaborate upon, [and] explain...

his report in his [trial] testimony." *Muldrow*, 493 F.3d at 167. Moreover, issues explored at an expert's deposition put a party on notice that those issues are among the opinions that the expert might testify to at trial. *See, e.g., Smith v. Tenet Healthsystem SL, Inc.*, 436 F.3d 879 (8th Cir. 2006) (while expert witness did not include reliance on x-rays in his pretrial disclosure, discussion of x-rays during deposition put plaintiff on notice and rendered Rule 26 violation harmless); *Baldauf v. Davidson*, 2007 WL 2155967 at *8 (S.D. Ind. July 24, 2007).

    A.    <u>Dr. Fairweather's Expert Report Placed Abbott On Notice Regarding The Opinions Set Forth In His Affidavit.</u>

Abbott claims that the Fairweather Affidavit (*i.e.*, ¶¶ 25, 29, 41, 42, and 43) states "new opinions that were not disclosed" in his initial expert report. Abbott is attempting to do just what the case law forbids: requiring that an expert report conform precisely with the expert's trial testimony. Dr. Fairweather's report indisputably put Abbott on notice of all the opinions expressed in his trial testimony.

The central opinion expressed in Dr. Fairweather's report is that: "[b]y March 12, 2001, I believe that Abbott's statistical staff were, or should have been, aware that the M99-114 study would be substantially underpowered to reach its objective." (Report at 12). In support of his opinion, Dr. Fairweather explicitly noted that Abbott prematurely terminated enrollment in the study, and that enrolled subjects suffered a high rate of premature terminations for nausea, vomiting and dizziness. (*Id.* at 12-13).

Abbott contends that the Fairweather Affidavit uses a different "usable sample" of subjects than the report. (Motion at 1). This is not correct. Dr. Fairweather opined in his report, and he testifies now, that "actual power would depend on the distribution of these patients among the dose groups [premature terminators and competers], but it would fall between these two values." (Report at 12). Abbott curiously complains that Dr. Fairweather never opined in his

report regarding "the alleged reactions of the FDA to the use of such data." (Motion at 1). In fact, he expressed that very opinion: "From my experience at the FDA, and my review of the documents as of March 12, 2001, it is my opinion that the statisticians at a reasonable pharmaceutical company, such as Abbott Laboratories, would realize that ABT-594 would face serious questions that might, at the very least, delay or prevent its entry into Phase III." (Report at 13).

Although it fails to actually identify any "new opinions," Abbott feigns surprise at the Fairweather Affidavit's use of the clinical protocol for M99-114. His report is replete with references to the protocol. For example, Dr. Fairweather states he "was asked to assess the available statistical analyses and related reports regarding Abbott Laboratories' clinical trial known as M99-114." (Report at 3).

Moreover, Dr. Fairweather indisputably put Abbott on notice that he would further elaborate on and support the opinions in his report based on documents or deposition testimony that he would review prior to trial. (*Id.* at 9). That is exactly what he did. In many cases, Dr. Fairweather is simply identifying Abbott's *own* documents that support his previously expressed opinions. (*See, e.g.,* Fairweather Affidavit ¶ 29 (identifying Abbott documents relating to the M99-114 clinical trial protocol); and ¶ 41 (identifying Abbott documents supporting opinion that Abbott's use of the "intent-to-treat" analysis for subjects who prematurely terminated from the M99-114 study was less reliable than other methods)).

Thus, Abbott's contention that Dr. Fairweather's trial affidavit provided new opinions is without merit.

    B.    Abbott Also Learned About The Opinions In Question During Its Deposition Of Dr. Fairweather.

Abbott's counsel examined Dr. Fairweather on each of his purportedly "new opinions" during his deposition on May 31, 2007. In response to the question by Abbott's counsel "can you go through the each of the opinions that you plan to offer than are contained in your report," Dr. Fairweather gave the following answer:

> Well, as of the date that this contract was signed, the 12th of March 2001, in my opinion, the statisticians at Abbott would know that the study was not going to achieve its enrollment targets and that it would be underpowered.
>
> In this case they would know that it would be substantially underpowered because there were substantial lack of reaching the target.
>
> Moreover, there was a lot of people having adverse events in this study, so that they would know that adjustments would have to be made for the sample-size calculations when the study was analyzed.
>
> When you impute data for a subject in order to do the intent to treat analysis, you can't consider a subject who has imputed data to be the same kind of data as somebody who completes the trial.
>
> And so the power would be reduced from two things, from the lack of enrollment and from the deficit in people actually completing it who start the trial.
>
> The result of that is that getting a P value that is statistically significant at the end of the study for the response variable of primary interest was going to be very difficult. Getting a significant one was going to be difficult.
>
> And that would mean – This is what we call in the trade a failed study. It doesn't mean that there's no information coming out of the study. What it means is you technically have not met the requirements for a statistically significant result.
>
> Given that there are adverse events occurring to the patients, I'm sure that the medical people reviewing a study of this kind would have concerns about the benefit/risk evaluation, are the patients getting enough benefit to justify the risks of adverse events that they would be taking.

> So it would look pretty dim for this. The possibility of going to phase III, as was the hope, I don't see how they would do that.

(Fairweather Trans. at 41-43, attached hereto as Ex. 1).

Moreover, Abbott explored Dr. Fairweather's opinions on the "imputed data and usable sample size under the procedure and methodology set forth in the clinical protocol [for ABT-594]." (Abbott's Motion at 3).

> Q: So then in your opinion, the usable sample size for the M99-114 study was 137 patients; is that correct?
>
> A: I think I would like to modify that … [T]here are only 137 patients who gave complete data. The balance up to – I think it was 250 some-odd that finished the study … were giving partial data. So those patients would also have been usable in the sense of entering into the calculation.

(Fairweather Trans. at 75; *see also* id. at 42-44, 82 85, and 100). Dr. Fairweather also testified regarding the FDA's view on the reliability of imputed data. (*Id.* at 46).

Thus, pursuant to Fed. R. Civ. P. 37(c), none of Dr. Fairweather's opinions should be precluded because Abbott had ample notice of them. As noted above, under Fed. R. Civ. P. 37(c), a "harmless" violation of Rule 26 does not mandate exclusion of the evidence. *Muldrow ex rel. Estate of Muldrow*, 493, F.3d at 167.

II. DR. FAIRWEATHER'S OPINIONS REGARDING THE FACTS OF THIS CASE ARE ADMISSIBLE UNDER FED. R. EVID. 702.

Abbott wrongly contends that Dr. Fairweather is testifying to Abbott's state of mind. (Abbott's Motion at 4). Expert testimony is admissible where: (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. Dr. Fairweather has been offered as an expert in the field of statistical aspects of clinical trials conducted by large pharmaceutical companies such as Abbott.

Abbott's objections to the so-called "state of mind" opinions should be overruled. First, Dr. Fairweather is testifying to the conclusions that a reasonable statistician at a major pharmaceutical company should have drawn regarding the M99-114 trial as of March 12, 2001. The First Circuit has allowed the admissibility of such testimony in a factual setting remarkably similar to this one -- the significance of clinical trial results for drug compounds. *See, Maruho Company, Ltd. v. Miles, Inc.*, 13 F.3d 6, 10 (1st Cir. 1993) (Breyer, J.). (stating that plaintiff may have reached a favorable result had he presented expert testimony on what a reasonable pharmaceutical executive would have thought of an important negative drug study showing adverse events for a sublicensed compound).

Second, Abbott's claim that Dr. Fairweather is testifying about the FDA's "state of mind" is no more warranted. Dr. Fairweather has testified that the "FDA would have had serious questions about any statistical conclusions drawn from...imputed [data]." (Fairweather Affidavit, ¶ 42). Dr. Fairweather spent twenty-five years with the FDA as an "Expert Regulatory Statistician". (Fairweather Affidavit, ¶¶ 9-10). In that capacity, he considered the value of imputed data while examining "statistical...claims made by sponsors of literally hundreds of clinical trials." (*Id.* at ¶ 9). His opinion is the product of reliable principles and constitutes permissible expert testimony. *See In re Prempro Products Liability Litigation*, 2006 WL 5217764 at *6 fn. 59 (E.D. Ark. Sept 13, 2006) ("What FDA officials would have done with certain...information such as ...adverse event reports" is admissible if presented by a qualified expert).

## Conclusion

For the foregoing reasons, John Hancock respectfully requests that the Court overrule Abbott's objections to the Fairweather Affidavit.

Respectfully submitted,

JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY
By their attorneys,

/s/ *Brian A. Davis*
Brian A. Davis (BBO No. 546462)
Joseph H. Zwicker (BBO No. 560219)
Richard C. Abati (BBO No. (BBO No. 651037)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA  02110
Tele: 617-248-5000
Fax: 617-248-4000

Date:  March 3, 2008

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent to those non-registered participants (if any) on March 3, 2008.

/s/ Richard C. Abati
Richard C. Abati

# EXHIBIT 1

Case 1:05-cv-11150-DPW    Document 349-2    Filed 03/03/2008    Page 1 of 10

William R. Fairweather, Ph.D.                                05/31/07

Page 1

VOLUME: II

EXHIBITS: See Index


UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - x

JOHN HANCOCK LIFE INSURANCE COMPANY,

JOHN HANCOCK VARIABLE LIFE INSURANCE

COMPANY, and MANULIFE INSURANCE COMPANY

(f/k/a/ INVESTORS PARTNER INSURANCE COMPANY)

        Plaintiffs         Civil Action

  v.                          No. 05-11150-DPW


ABBOTT LABORATORIES

        Defendant

- - - - - - - - - - - - - - - - - x

VIDEOTAPED DEPOSITION of

WILLIAM R. FAIRWEATHER, PH.D.

Thursday, May 31, 2007

8:05 a.m.

Donnelly, Conroy & Gelhaar, LLP

One Beacon Street

Boston, Massachusetts

Michelle Keegan, Court Reporter

Merrill Legal Solutions

Page 2

1  APPEARANCES:
2
3   CHOATE, HALL & STEWART, LLP
4   By Joseph H. Zwicker, Esq.
5   Two International Place
6   Boston, Massachusetts 02110
7   (617)248-5000
8   Counsel for the Plaintiffs
9
10  MUNGER, TOLLES & OLSON, LLP
11  By Ozge Guzelsu, Esq.
12  355 South Grand Avenue
13  Los Angeles, California 90071
14  (213)683-9100
15  Counsel for the Defendant
16
17 Also Present:
18   Maura Cunningham, Videographer
19
20
21
22
23
24

Page 3

1           INDEX
2  Videotaped
3  Deposition of:              Direct
4  WILLIAM R. FAIRWEATHER, PH.D.
5  By Ms. Guzelsu               5
6
7         EXHIBITS
8  No.                        Page
9  Exh. 1  Report of William R. Fairweather, Ph.D.    7
10 Exh. 2  Printout from Website              15
11 Exh. 3  Letter dated 5/25/07               36
12 Exh. 4  Letter dated 7/7/00                65
13 Exh. 5  Initial Portfolio Prioritization   69
14 Exh. 6  E-Mail                             79
15 Exh. 7  Minutes of Meeting                 87
16
17
18
19     * Original exhibits returned to Ms. Guzelsu *
20
21
22
23
24

Page 4

1       PROCEEDINGS
2         THE VIDEOGRAPHER: Here begins videotape
3  number 1 in the deposition of Dr. William
4  Fairweather, Ph.D., in the matter of Hancock, et al.
5  versus Abbott Laboratories, in the United States
6  District Court for the District of Massachusetts,
7  case number civil action 05-11150-DPW.
8         Today's date is May 31st, 2007. The
9  time on the video monitor is 8:05. The video
10 operator today is Maura Cunningham, contracted by
11 Merrill Legal Solutions, 101 Arch Street, Boston,
12 Massachusetts 02110.
13        This video deposition is taking place at
14 One Beacon Street, Boston, Massachusetts and was
15 noticed by Ozge Guzelsu of Munger, Tolles & Olson.
16        Counsel, please voice-identify
17 yourselves and state whom you represent.
18        MR. ZWICKER: Joseph Zwicker, Choate
19 Hall & Stewart, Boston, Massachusetts, for the
20 plaintiffs and the witness.
21        MS. GUZELSU: Ozge Guzelsu, Munger,
22 Tolles & Olson, for the defendant Abbott
23 Laboratories.
24        THE VIDEOGRAPHER: The court reporter

Page 5

1  today is Michelle Keegan of Merrill Legal Solutions.
2         Would the reporter please swear in the
3  witness.
4         WILLIAM R. FAIRWEATHER, PH.D.
5  having been satisfactorily identified and duly sworn
6  by the Notary Public, was examined and testified as
7  follows:
8         DIRECT EXAMINATION
9  BY MS. GUZELSU:
10    Q. Good morning, Dr. Fairweather.
11    A. Good morning.
12    Q. Could you please state your name for the
13 record.
14    A. My full name is William Ross Fairweather.
15    Q. And what is your current business address?
16    A. 15405 Narcissus Way in Rockville, Maryland.
17    Q. And that's also your home address?
18    A. That is.
19    Q. Have you been deposed before?
20    A. By?
21    Q. Have you been deposed before?
22    A. No.
23    Q. This is your first deposition?
24    A. Yes.

2 (Pages 2 to 5)

William R. Fairweather, Ph.D.                                    05/31/07

Page 30

1  Reese was observing, I think.
2     Q. Tom Reese was in the room. Okay. So you
3  said you've spent 25 hours on the case since you
4  completed your report and about four hours of it was
5  for deposition prep. What were you doing the
6  other --
7     A. Traveling up --
8        MR. ZWICKER: Objection. You can
9  answer.
10       THE WITNESS: Sorry.
11    Q. What were you doing the other 20 hours?
12    A. Traveling up here. I think I read a couple
13 of other depositions, one by Bruce Rhodda and one by
14 I think it's Michael Thomas, Mr. Thomas.
15    Q. You probably read the expert report of Bruce
16 Rhodda; is that correct?
17    A. That's quite possible.
18    Q. And the deposition of James Thomas?
19    A. James Thomas. Okay.
20    Q. Let's turn back to your report. On page 3,
21 under "Task," it says, "I was asked to assess the
22 available statistical analyses and related reports
23 regarding Abbott Laboratories' clinical trial known
24 as M99-114.

Page 31

1    "I have attempted to determine what a
2  reasonable statistician at a pharmaceutical company
3  such as Abbott Laboratories would know about the
4  status and likely outcome of M99-114 as of 12 March
5  2001, the day before the agreement was concluded
6  between John Hancock and Abbott Laboratories." Have
7  I read that correctly?
8     A. Right.
9     Q. Is that the sole issue that you were asked
10 to address when you were retained in this matter?
11    A. Yes. Well, that's the crux of the case,
12 what were the representations that Abbott made to
13 John Hancock before -- up to this date.
14    Q. The representations that were made to John
15 Hancock?
16    A. I guess as to what the potential for profit
17 would be and investing in this set of products that
18 Abbott was developing.
19    Q. I see. And what are the representations
20 regarding M99-114?
21    A. I suppose, in general terms, that this
22 product was going to be a successful product and
23 they were going to develop it.
24    Q. I understand the product, but with regard to

Page 32

1  the clinical trial, what were the -- Are you aware
2  of any representations that were made by Abbott
3  Laboratories to John Hancock regarding the clinical
4  trial M99-114?
5     A. I'm thinking that I can't really answer that
6  question other than in general terms. This is a
7  phase II trial. It's intended to show certain
8  scientific results leading to a phase III trial.
9        I don't have -- I don't recall seeing
10 anything where something specifically was said about
11 that trial to John Hancock.
12       My understanding was that John Hancock
13 is not technically in a position to evaluate that
14 sort of thing, that they relied on Abbott's doing
15 the best it could kind of statement to promote their
16 products.
17    Q. You are aware that John Hancock hired a
18 scientific consultant to aid it in due diligence?
19    A. I'm not -- I don't remember hearing anything
20 about that, if they did or didn't.
21    Q. Okay. Were you asked to render any opinions
22 for this case that you did not feel comfortable
23 giving?
24    A. Not at all.

Page 33

1     Q. Can you describe to me how this report was
2  prepared.
3        MR. ZWICKER: Objection.
4     Q. You can answer.
5     A. How the report was prepared?
6     Q. What did you do from beginning to end to put
7  this report together?
8     A. Okay. What led up to the report. Well, I
9  read through an awful lot of documents, many of
10 which were not terribly relevant to the issue as I
11 stated it here. I thought about what should be the
12 issue and rephrased some things to get it into this
13 form so that I would have something concrete to go
14 after. And at that point I started focusing on
15 documents that would shed light on this particular
16 question. In other words, narrowed down this mass
17 of documents to something that was a little more
18 tractable.
19       And it became obvious that power and
20 sample-size calculations were the issue. And so I
21 thought that it would be useful to have a general
22 statistical statement of what's involved with doing
23 that because to somebody who is not a statistician
24 it's a bit arcane.

William R. Fairweather, Ph.D.                                          05/31/07

Page 38

1  already testified to? Because I don't think you've
2  captured everything he testified to about what he
3  reviewed since.
4      A. I think I would say no.
5      Q. Let's step back. Since you've -- Since you
6  completed your report in January of this year, what
7  additional information have you received regarding
8  this case?
9      A. Other than the documents I've already talked
10 about, I can't recall anything.
11     Q. And the documents we've already talked about
12 is the expert report of Bruce Rhodda and the
13 deposition of Jim Thomas?
14     A. Right. Yesterday I was given another copy
15 of the original -- I think the word is complaint,
16 the legal document that was filed, I guess to
17 refresh my memory, but that was the only thing.
18         MR. ZWICKER: Let's go off the record
19 for a second.
20         THE VIDEOGRAPHER: Going off the record.
21 The time is 8:50.
22         (Recess taken)
23         (Record read)
24         THE VIDEOGRAPHER: Back on the record.

Page 39

1  The time is 8:52.
2      A. I'd like to correct my answer. When I said
3  that I had reviewed the deposition of Jim Thomas, I
4  included all the exhibits as meaning I had reviewed
5  them as well, but they actually were sent to me as a
6  separate stack of documents. Counsel reminds me
7  that is a separate item.
8         Also, he had sent me a -- testimony or a
9  deposition of Dr. McCarthy, which I think was a
10 piece of his total deposition.
11     Q. So you reviewed an excerpt of the deposition
12 of Dr. McCarthy?
13     A. Yes.
14     Q. Subsequent to preparing your report?
15     A. No. Subsequent to, yes.
16     Q. And you don't -- You probably don't --
17     A. Let's see. I guess that's what that list of
18 documents you showed me --
19         MR. ZWICKER: Don't guess, Bill. You
20 can talk about what you reviewed.
21     A. That's what I reviewed. If this is the list
22 of the --
23         MR. ZWICKER: Don't speculate. The
24 question is what you reviewed.

Page 40

1      A. I reviewed the excerpt -- the exhibits of
2  Jim Thomas's deposition, whatever that list is.
3      Q. Full stop?
4      A. Full stop.
5      Q. And has anything that you've reviewed since
6  you prepared your report changed the opinions that
7  you've expressed in that report?
8      A. No. I might like to --
9         MR. ZWICKER: You've answered. It was a
10 yes or no question. You said no. Now she gets to
11 ask another question.
12     Q. You have no intention of changing any of the
13 conclusions that are contained in your report?
14     A. That's correct.
15     Q. Are you planning on submitting a revised
16 report?
17     A. I'm hesitating because I don't know what the
18 procedure is for this.
19     Q. It's not a trick question. If you have
20 current plans to submit a revised report --
21     A. I do not have current plans to submit a
22 revised report.
23     Q. That's good enough. Your report states that
24 it's subject to modification based on your review of

Page 41

1  any additional documents or other information. And
2  as you've testified, the additional documents so far
3  that you reviewed haven't modified any of your
4  opinions, that's correct?
5      A. That's correct.
6      Q. Are you planning on reviewing any other
7  documents in addition to the ones that you reviewed
8  up until today?
9      A. I'm not planning on it. I'm not planning on
10 it.
11     Q. All right. Does your report contain all of
12 the opinions that you expect to testify to at
13 trial -- testify regarding to at trial? Strike the
14 first one.
15     A. Yes. I might restate some of them in better
16 terms or something, clarifications, but basically
17 not changing anything else.
18     Q. Okay. Briefly, can you go through each of
19 the opinions that you plan to offer that are
20 contained in your report.
21         MR. ZWICKER: Objection. Overbroad.
22     Q. You can answer.
23     A. Well, as of the date that this contract was
24 signed, the 12th of March 2001, in my opinion, the

11 (Pages 38 to 41)

William R. Fairweather, Ph.D.                                    05/31/07

Page 42

1  statisticians at Abbott would know that the study
2  was not going to achieve its enrollment targets and
3  that it would be underpowered.
4          In this case they would know that it
5  would be substantially underpowered because there
6  were substantial lack of reaching the target.
7          Moreover, there was a lot of people
8  having adverse events in this study, so that they
9  would know that adjustments would have to be made
10 for the sample-size calculations when the study was
11 analyzed.
12         When you impute data for a subject in
13 order to do the intent to treat analysis, you can't
14 consider a subject who has imputed data to be the
15 same kind of data as somebody who completes the
16 trial.
17         And so the power would be reduced from
18 two things, from the lack of enrollment and from the
19 deficit in people actually completing it who start
20 the trial.
21         The result of that is that getting a P
22 value that is statistically significant at the end
23 of the study for the response variable of primary
24 interest was going to be very difficult. Getting a

Page 43

1  significant one was going to be difficult.
2          And that would mean -- This is what we
3  call in the trade a failed study. It doesn't mean
4  that there's no information coming out of the study.
5  What it means is you technically have not met the
6  requirements for a statistically significant result.
7          Given that there are adverse events
8  occurring to the patients, I'm sure that the medical
9  people reviewing a study of this kind would have
10 concerns about the benefit/risk evaluation, are the
11 patients getting enough benefit to justify the risks
12 of adverse events that they would be taking.
13         So it would look pretty dim for this.
14 The possibility of going to phase III, as was the
15 hope, I don't see how they would do that.
16         You can't have a failed study -- I mean,
17 on the basis of a successful study, you are allowed
18 to go to phase III where you start broadening the
19 patient population, putting larger numbers on the
20 study, trying to get some definitive results for
21 subsequent labeling of the product.
22         And if that requires a successful phase
23 II to do that, logically how do you do that with an
24 unsuccessful study? It doesn't make any sense. In

Page 44

1  fact, it doesn't happen. So they should have known
2  that going to phase III was just not going to work
3  for the study.
4          Based on what I reviewed, the company
5  was clearly looking for alternative methods of
6  delivering the product that could maybe circumvent
7  the adverse events that were occurring and possibly
8  carrying it forward at that point.
9          So it was clear that they were
10 monitoring, in other words. So one would think that
11 statisticians would be explaining to them the
12 consequences if they needed numerical explanations
13 of just how bad it was going to be. So I think they
14 would know that as of that date.
15         Let's see what else I see in here.
16         (Pause)
17    A. I did mention that -- something about
18 another -- If there were any other phase II studies
19 that would have supported this, I didn't notice it
20 in the documents, so I'm not aware of any that was
21 ongoing.
22         So basically, if going to phase III
23 depended on this study, I would have to conclude
24 that that's not a likely event.

Page 45

1     Q. Have you reviewed -- You said you reviewed
2  Dr. Rhodda's rebuttal report?
3     A. Yes.
4     Q. Did your review of that change any of your
5  conclusions or analyses that you reached in your
6  report?
7     A. No. His report did not focus on the key
8  issue, as far as I could see, which is what -- I
9  hate to say it this way, but a what did they know
10 and when did they know it kind of approach.
11         I only went up to this date in March,
12 the 12th or 13th, of 2001, because the study was
13 still blinded at this point, so nobody had the
14 ability to analyze the data, knowing which patients
15 were on which treatments.
16         And he did some analyses in there, I
17 think, talking about analysis of the study and
18 reaching conclusions on the basis of unblinded data.
19    Q. Okay. You didn't look at any data
20 subsequent to March 12th, 2001 for the study?
21    A. I can't say I didn't look at it, but it was
22 irrelevant to the task that I stated, which is what
23 was the status as of that date.
24    Q. So you don't have any opinions regarding

12 (Pages 42 to 45)

Merrill Legal Solutions

William R. Fairweather, Ph.D.                                          05/31/07

Page 46

1  whether the --
2  A. No.
3      MR. ZWICKER: Let her finish the
4  question.
5  A. Sorry.
6  Q. That's okay. You don't have any opinions
7  regarding whether the study reached the
8  statistically significant endpoint?
9  A. No, I don't.
10 Q. And you weren't asked to opine on that?
11 A. No. The one -- Okay.
12     MR. ZWICKER: Do you want to amend your
13 answer? Go ahead.
14 A. I was not asked to opine on it, but I did
15 note in reviewing the documents that I don't believe
16 this project was submitted to the FDA, so they did
17 not get the FDA reviewer's comments back.
18     If I were an FDA reviewer, I would never
19 have allowed imputed data to be treated without an
20 adjustment as it was in the reports that I saw of
21 the analyses. They do not appear to have made any
22 adjustment for the fact that there was so much
23 imputed data. This bothered me, but that was not my
24 task, so I did not deal with it.

Page 47

1  Q. Okay. Let's turn to page 3 of your report,
2  which I don't have numbered but --
3      MR. ZWICKER: Of Exhibit 1.
4  Q. Under "General Statistical Concepts" you
5  have about six and a half pages regarding general
6  statistical concepts.
7  A. Okay.
8  Q. Did you write this off the top of your head?
9  A. Yes.
10     MR. ZWICKER: Objection.
11 A. Yes.
12 Q. You don't refer to any reference materials
13 in creating this section?
14 A. It wasn't necessary. This is standard
15 statistical practice and theory. Every statistician
16 knows this. In fact, it was in Bruce Rhodda's
17 report in somewhat of a different form, but he's
18 essentially saying the same thing.
19 Q. At the bottom of page 8 of your report it
20 says, "In designing a study, it is desirable to
21 maximize the power to the extent possible to ensure
22 that the study has a very good chance of rejecting
23 the null hypothesis, i.e. of demonstrating there is
24 an advantage to the test product." What did you

Page 48

1  mean by "the extent possible"?
2  A. Well, when you do that, the way you do it is
3  to refine your method of measurement to the best of
4  your ability, because that cuts down the variation,
5  and to increase the sample size to the extent that
6  you can because that -- if you take the ratio
7  variance over N, that makes that variable get
8  smaller, which is what you want.
9      The thing is that companies will run
10 into economic restrictions on how many subjects
11 they're willing to put into the study. So that's
12 what I meant by "to the extent possible." To the
13 extent that a company is willing to fund it. That
14 may be a factor of time as well. If it takes a long
15 time to recruit patients, that would be a
16 limitation.
17 Q. On the top of page 9 of your report it says,
18 "One way to decrease," and I believe that's sigma
19 squared, "is to measure the study outcome as
20 precisely as possible." What did you mean by that
21 statement?
22 A. Well, in some cases a sponsor will try to
23 use a rating scale of a certain kind to make their
24 measurements. That's going to be the basis of the

Page 49

1  study, so I've administered this rating scale to the
2  patients.
3      If that's a highly variable instrument,
4  it's maybe not the best one that they could use. If
5  they were to spend some time developing a better
6  scale, they might get less variation, a more
7  reproducible result out of each patient. That would
8  help cut down the variation.
9  Q. And is variation the same thing as standard
10 deviation? Are they sort of referred to as
11 interchangeable terms?
12     MR. ZWICKER: Objection. You can
13 answer.
14 A. They're not interchangeable terms.
15 Technically, variation is the square of the standard
16 deviation. Used colloquially, I guess it would
17 be -- "variation" just means what the common English
18 word means for "variation."
19     If you tried to measure the same thing
20 over and over and over again in a biological
21 material, you don't get the same answer because
22 there is variation.
23 Q. And you're stating that it's important to
24 have this variation measured as precisely as

13 (Pages 46 to 49)

William R. Fairweather, Ph.D.                                    05/31/07

Page 74

1  is not foreign -- These considerations are not
2  foreign to me.
3      Q. Were you retained in this matter as a
4  statistical expert, Dr. Fairweather?
5      A. Technically, I'm not sure about that. I was
6  retained, I believe, as an expert witness. I'm not
7  sure that the -- that a specialty is part of that
8  designation.
9      Q. An expert witness regarding clinical trials
10 generally, pharmaceutical companies?
11         MR. ZWICKER: Objection. You can
12 answer.
13     A. I think it was as an expert witness in this
14 matter. I'm just barely remembering that, but I
15 think that's the case.
16     Q. Okay. Could you turn to page 12 of Exhibit
17 1, which is your report. The first sentence on the
18 top of page 12, "The tracking of enrollment and
19 premature terminations around this time," and then
20 there's a citation, "would have indicated that the
21 usable sample size would be only 137 patients (269
22 enrolled less 132 terminated), not the 320 planned";
23 is that correct? That's what it says here.
24     A. Yes.

Page 75

1      Q. So then in your opinion, the usable sample
2  size for the M99-114 study was 137 patients; is that
3  correct?
4          MR. ZWICKER: Objection.
5      A. I think I would like to modify that. That
6  probably should have been more elaborated to say
7  that the -- there are only 137 patients who gave
8  complete data.
9          The balance up to the -- I think it was
10 250 some-odd that finished the study, which probably
11 wasn't known at that time, were giving partial data.
12 So those patients would also have been usable in the
13 sense of entering into the calculation.
14         How usable would depend on just how much
15 data they were able to provide. Obviously, if they
16 stayed in the study until the end, except for one
17 day, most of their data is there. If they left the
18 study after the first day, most of this data is
19 missing.
20         So the 137 would be a lower limit, if
21 you will, of usable data. I shouldn't have been so
22 succinct with that statement.
23     Q. So if a patient enrolled in a study and
24 stayed in the study for two weeks, they would

Page 76

1  provide some data regarding the efficacy of ABT-594;
2  is that correct?
3          MR. ZWICKER: Objection.
4      A. I'm not remembering exactly the schedule for
5  collecting data, but if data were collected in those
6  two weeks, yes.
7      Q. Okay. Any data -- If any data was
8  collected, it would be --
9      A. We're talking about the primary efficacy
10 response variable here.
11     Q. So the fact that certain patients dropped
12 out of the study didn't necessarily mean that they
13 were not usable in terms of calculating the results
14 from the M99-114 study?
15         MR. ZWICKER: Objection.
16     A. It didn't necessarily mean that, but I
17 didn't have access to exactly when the patients
18 dropped, how much data was available on each one and
19 so on. And besides, that was something after the
20 date that we're talking about in 2001.
21     Q. Sometime after that -- I see. So the fact
22 that there were only 137 usual patients was just as
23 of the date of March 12th, 2001?
24     A. No, I don't believe that's correct. I

Page 77

1  believe that they knew what their enrollment was as
2  of that date. If I'm not mistaken -- I'm not
3  supposed to speculate on that.
4          As of that date they knew that there
5  were more patients who had entered the study than
6  that, so there was some partial amount of data on
7  these other patients. I'm just not aware of how
8  much partial data there was.
9      Q. But that partial data would have been used
10 in Abbott's analysis of the M99-114 study; is that
11 correct?
12     A. Yes.
13         MR. ZWICKER: Objection.
14     A. It would be used but not without adjustment.
15     Q. When would that adjustment occur? After the
16 results had been unblinded?
17     A. Yes. Could I modify that response? It
18 could be used if anybody needed to recalculate the
19 power.
20         In other words, if you start a power
21 calculation saying -- simple case, saying, How many
22 patients do we need if everybody completes the
23 study? That's a very simple calculation. In this
24 case the answer would be 320.

20 (Pages 74 to 77)

Merrill Legal Solutions

William R. Fairweather, Ph.D.                                    05/31/07

Page 82

1  on a particular patient; is that correct?
2        MR. ZWICKER: Objection. You can
3  answer.
4     A. Yes, I believe I stated that.
5     Q. Okay. And in this -- In your report on page
6  12, in the middle paragraph it says, "If, in the
7  more likely scenario, the 137 available patients had
8  been distributed evenly across the dose groups, with
9  approximately 34 in each group, the power would have
10 been less than 50 percent," and then there's a
11 citation. That's what your report states; is that
12 correct?
13    A. Correct.
14    Q. But if there were more than 137 patients
15 with available data, i.e. patients who had
16 terminated but still had some data available, that
17 would change the power of the study at that point,
18 would it not?
19    A. Yes.
20       MR. ZWICKER: Objection.
21    Q. So if there were 150 patients and 13 of
22 them, for example, had terminated halfway through
23 the study but there was still data to be collected,
24 then you would use that data as well, and that would

Page 83

1  change this power calculation?
2        MR. ZWICKER: Objection.
3     A. This was intended to be a worst case
4  scenario, showing the range of possible powers that
5  would have been contemplated as of the date that I
6  looked at the -- In other words, this is saying --
7  I'm trying to put myself in the position of people
8  looking at the information that was available at the
9  time and saying how good could it be, how bad could
10 it be.
11       How bad it could be might be that only
12 137 patients are giving data that is usable. What
13 does that do? What would the power have been if
14 that were the case for the effect size and variation
15 that we thought at the beginning of this study? And
16 that's the calculation.
17       And that was taken, I believe, from
18 close to their own calculations. I believe I did
19 not do those.
20    Q. Although the results of the M99-114 study
21 were double-blinded, would Abbott have had
22 information on whether it had actually collected
23 data from the patients who had dropped out before
24 the end of the study? Just on whether it had

Page 84

1  actually collected data. Not on what the data was,
2  but whether there was a collection of data for any
3  study that had terminated, patient that had
4  terminated early on.
5     A. I don't know that they -- what information
6  they would have on something like that because of
7  the process of -- in a clinical trial of putting the
8  data together. Different companies do it in
9  different ways.
10       So I'm not sure what Abbott would have
11 available to it in terms of how much of the data on
12 the patients who dropped out, how much would be
13 available.
14    Q. So let's assume for a second that Abbott
15 was for each patient that had terminated also
16 keeping track of how many data points they had
17 collected for each of those patients. Under that
18 scenario, would Abbott then be able to estimate how
19 many of the patients that had terminated would have
20 useful data?
21       MR. ZWICKER: Objection.
22    Q. Terminated before the -- preterminated
23 before the end of the study.
24    A. Yes, I would think so.

Page 85

1     Q. And in that case, then, they would be able
2  to say, Although these 50 patients preterminated,
3  they went two, three weeks throughout the study. We
4  can use their data. And that would affect our power
5  calculation as follows?
6        MR. ZWICKER: Objection.
7     A. I believe that that's correct.
8     Q. Okay. So when you say here the 137
9  available patients, that is a worst case scenario
10 assumption?
11    A. Yes.
12    Q. That none of the terminated patients had any
13 available data that could be used for the
14 calculations at the end of the study?
15       MR. ZWICKER: Objection. Go ahead.
16    Q. Is that correct?
17    A. Yes.
18    Q. But that's not necessarily the case. If
19 Abbott had been collecting data points for those
20 terminated patients and knew how many of those
21 patients had data, that number would likely be
22 greater than 137?
23       MR. ZWICKER: Objection.
24    A. Yes, that's correct.

22 (Pages 82 to 85)

Merrill Legal Solutions

William R. Fairweather, Ph.D.                                                    05/31/07

Page 98

1   Q. Is there anywhere in this document that
2   discusses the M99-114 study and the dropout rate?
3       MR. ZWICKER: What document are we
4   talking about, for the record? Exhibit 7?
5       MS. GUZELSU: Exhibit 7.
6   A. I'm not sure that they mention which study
7   they're basing this on, but from the timing of the
8   document I would think that it is that study that is
9   causing them to discuss this. They're talking about
10  the tolerability of that.
11  Q. Wasn't there an earlier study with --
12      MR. ZWICKER: Are you done with your
13  answer, by the way?
14      THE WITNESS: Yes, I am.
15  Q. I'm sorry. Wasn't there an earlier study
16  with completed data that they could also be
17  discussing, the osteoarthritis study that you
18  discussed on page 10 of your report?
19      MR. ZWICKER: Objection. Calls for
20  speculation.
21  A. The earlier study -- I'm not directly
22  answering your question, perhaps, because it is
23  speculation.
24  Q. I don't want you to speculate.

Page 99

1   A. -- did not use doses as high as what they
2   used in this study. They also had a different
3   patient population.
4       So it's possible that in this study they
5   saw more adverse events because the patient
6   population was different and the doses were higher.
7       So I would still believe that they're
8   talking about 114 in this -- as the -- not
9   justification, but they've seen what's going on in
10  114. They're holding this meeting.
11  Q. And that's based solely on the date of the
12  document?
13  A. Dates of the document, yeah.
14  Q. And you're aware that the results in the
15  M99-114 study were double-blinded until April of
16  2001; is that correct?
17  A. I can't swear to the date, but I know they
18  were unblinded as of -- they were blinded up to the
19  point that I was considering it.
20  Q. Okay. So up to the point of March 5th,
21  2001, which is the date of this document, you're
22  aware the results were blinded?
23  A. Yes, I believe that's the case.
24      MR. ZWICKER: Is this a good time for

Page 100

1   him to amend another answer?
2       MS. GUZELSU: His second answer, yes.
3   A. The other document that I saw was a list of
4   patients who were dropping out and the day on which
5   they dropped out.
6       I can't put my finger on the document
7   itself, but I remember the table showed what days
8   people were dropping out and I believe the cause.
9       Now, the disturbing part about that
10  table was that people were dropping out so early in
11  the study. And that would have been disturbing to
12  the people looking at the thing, too, because they
13  were for adverse events.
14      Now, we had talked about the -- how many
15  of the patients were providing -- of the dropouts
16  were providing usable data. And now that I think
17  about it, a lot of those were occurring early on,
18  many of them in the titration phase of the study.
19      So there wouldn't be much data that you
20  could get from those patients on the primary
21  response variable. You'd have their baseline,
22  perhaps. I think they were supposed to go through
23  the titration phase before they started giving data
24  on the primary variable.

Page 101

1       So my figures I think are not all that
2   far off in terms of the power because I don't think
3   you're going to be able to bring back much data from
4   these dropout patients.
5   Q. Let's say you only had one -- you had the
6   baseline piece of data, which is before they've been
7   dosed, and then you have one piece of data after
8   that, and that individual drops out for adverse
9   events. Is it your opinion that that individual's
10  data would not be used in the final analysis of the
11  study?
12      MR. ZWICKER: Objection. Incomplete
13  hypothetical.
14  A. You had one piece of primary response
15  variable data?
16  Q. Yeah.
17  A. That person's data could be used in the
18  study, but it doesn't weigh as much as somebody who
19  completes the study.
20  Q. But you still have to use that person's
21  data? You couldn't just disregard it?
22  A. In fact, you have to use it in the intent to
23  treat analysis. It's how you use it that's the
24  question.

26 (Pages 98 to 101)