UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER LIFE INSURANCE COMPANY), <br><br> Plaintiffs, <br><br> v. <br><br> ABBOTT LABORATORIES, <br><br> Defendant. | CIVIL ACTION NO. 05-11150-DPW |

**PLAINTIFFS' RESPONSE
TO DEFENDANT ABBOTT LABORATORIES'
OBJECTIONS TO AFFIDAVIT OF LYNN KLOTZ, PH.D.**

Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Manulife Insurance Company (collectively, "John Hancock" or the "Plaintiffs"), respectfully submit this Response to defendant Abbott Laboratories' Objections to the Affidavit of Lynn Klotz, Ph.D. (the "Klotz Affidavit"). Abbott's objections are not well-founded and should be overruled for the reasons set forth below.

Dr. Klotz was the independent consultant and advisor retained by John Hancock to review information provided by Abbott and other data regarding the proposed Abbott compounds for the March 2001 Research Funding Agreement (the "Agreement"), including, *inter alia*, ABT-518, ABT-594 and ABT-773. Abbott contends that Paragraphs 35(a)-(f), 36(a)-

(l) and 37(a)-(c) of the Klotz Affidavit -- which describe various misrepresentations and omissions by Abbott which have become apparent to John Hancock since the Agreement was signed -- are inadmissible as "hearsay," or because Dr. Klotz purportedly lacks the "personal knowledge" required for a proper foundation.  (Abbott's Motion at 1).

Dr. Klotz's testimony concerning Abbott's various misrepresentations and omissions is not being offered by John Hancock to prove the truth of what is being asserted, but rather to help establish the factual context for John Hancock's assertion that it relied upon Abbott's misrepresentations and omissions in entering into the Agreement, which, to some extent, depended upon Dr. Klotz's assessment of the compounds and his reliance on information provided by Abbott.  Dr. Klotz, as a consultant to John Hancock's principal negotiator of the Agreement, Mr. Stephen Blewitt, has direct personal knowledge regarding the material information that Abbott did and did not provide to Hancock, and what information Dr. Klotz actually relied upon in advising Hancock whether the true status of the compounds justified entering into the Agreement.

Accordingly, consistent with this Court's holding on March 3, 2008 to overrule Abbott's objections to Mr. Blewitt's Affidavit, Dr. Klotz's testimony is being "offered to show plaintiffs' reliance on [the defendant's] misrepresentations, not the truth of the misrepresented facts" and "therefore [is] not hearsay."  Akin v. Q-L Investments, Inc., 959 F.2d 521, 530 (5th Cir. 1992) (overruling trial court's exclusion of plaintiffs' affidavit testimony describing alleged misrepresentations by defendants on hearsay grounds); see also Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").

Similarly, Abbott's objections to Paragraphs 35(a)-(f), 36(a)-(l) and 37(a)-(c) on the basis that Dr. Klotz was instructed at his deposition on November 16, 2006 not to answer questions regarding events occurring after July 2000, the month Dr. Klotz ceased in his advisory capacity to John Hancock regarding assessment of the compounds, contradicts the record and has no merit. Specifically, Abbott claims that it was prevented from posing questions during its deposition of Dr. Klotz by John Hancock's assertion of attorney work product. (Abbott's Motion at 1).

As acknowledged by Abbott, Dr. Klotz was retained by John Hancock in 2006 as a non-testifying consultant in connection with this litigation. (*Id*. at 2). Although Dr. Klotz was instructed during his deposition to refrain from revealing attorney work product by not answering questions regarding specific tasks he performed as a non-testifying consultant since 2006, counsel for John Hancock stated that Dr. Klotz was "here today and [was] free to discuss with [Abbott's counsel] any work that he did for Hancock prior to that." (Klotz Trans. at 17:5–18:7, attached hereto as Exhibit 1). Hancock's counsel also informed Abbott's counsel that Dr. Klotz was "certainly free to answer any questions about the work that he did pertaining to this transaction before he was retained as an independent consultant." (*Id*. at 15:10-14). Indeed, Abbott acknowledged and followed these parameters, posing questions to Dr. Klotz not only about events prior to July 2000, but also his views on matters well *after* July 2000, such as changes in the proposed compounds in fall 2000, certain Hancock documents created in September 2000 (attached hereto as Exhibit 2), and the Descriptive Memoranda provided to John Hancock in February 2001. (Klotz Trans. at 17:5–18:7 at 158:9-19, 185:2-18 and 204:11-205:14).

For the foregoing reasons, John Hancock respectfully requests that the Court overrule Abbott's objections to the Klotz Affidavit.

<div style="margin-left:40%">

JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY

By their attorneys,

/s/ Brian A. Davis
Brian A. Davis
    (bad@choate.com/BBO No. 546462)
Joseph H. Zwicker
    (jzwicker@choate.com/BBO No. 560219)
Richard C. Abati
    (rabati@choate.com/BBO No. 651037)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Tele: 617-248-5000

</div>

Date: March 3, 2008

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 3, 2008.

<div style="margin-left:40%">

/s/ Richard C. Abati
Richard C. Abati

</div>

# EXHIBIT 1

CERTIFIED
COPY

Volume:  I, Pages 1 - 224    Exhibits: 1 - 19

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-1150DPW

- - - - - - - - - - - - - - - - - - - - - - x

JOHN HANCOCK LIFE INSURANCE COMPANY,

JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY,

and MANULIFE INSURANCE COMPANY,

(f/k/a INVESTORS PARTNER INSURANCE COMPANY),

               Plaintiffs,

    v.

ABBOTT LABORATORIES,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - x


VIDEOTAPED DEPOSITION OF LYNN KLOTZ, Ph.D.

Thursday, November 16, 2006,  9:10 a.m.

Donnelly, Conroy & Gelhaar

One Beacon Street

Boston, Massachusetts


Reporter:  Dana Welch, CSR, RPR


Certified LiveNote Trainer




LEGALINK®

A MERRILL
COMMUNICATIONS
COMPANY

20750 Ventura Blvd
Suite 205
Woodland Hills, CA 91364

tel (818) 593-2300
tel (800) 826-0277
fax (818) 593-2301

www.merrillcorp.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

```
 1      APPEARANCES:

 2

 3      Representing the Plaintiffs:

 4              CHOATE HALL & STEWART LLP

 5              Two International Place

 6              Boston, MA  02110

 7              (617)248-5000

 8              ktroake@choate.com

 9              BY:  Brian A. Davis, Esq.

10

11      Representing the Defendant:

12              MUNGER, TOLLES & OLSON LLP

13              355 South Grand Avenue, 35th Floor

14              Los Angeles, CA  90071-1560

15              (213)683-9207

16              eric.lorenzini@mto.com

17              BY:  Jeffrey I. Weinberger, Esq.

18

19      Also present:  Joshua Snider, Videographer

20

21

22

23

24
```

LegaLink, a Merrill Communications Company
800-826-0277   818-593-2300   Fax 818-593-2301   www.legalink.com

1              THE VIDEOGRAPHER:  The court reporter

2         today is Dana Welch of Merrill Legal

3         Solutions.

4              Would the reporter please swear in the

5         witness.

6                   LYNN KLOTZ, Ph.D.,

7    having been satisfactorily identified by the

8    production of his driver's license, and duly sworn

9    by the Notary Public, was examined and testified as

10   follows:

11                        EXAMINATION

12   BY MR. WEINBERGER:

13        Q.   Good morning.  Could you please state

14   your full name for the record.

15        A.   Lynn Charles Klotz.

16        Q.   And what is your current address?

17        A.   Address?  5 Duley, D-U-L-E-Y, Street in

18   Gloucester, Massachusetts 01930.

19        Q.   Are you currently employed?

20        A.   Self-employed.

21        Q.   What kind of business do you have?

22        A.   90 percent of the time, I'm working on

23   arms control policy, national and international

24   arms control policy and biological chemical

                                                    6

```
 1        Q.  What technical issues were you retained to

 2   look at?

 3          MR. DAVIS:  Objection.  He's not -- we are

 4        not planning on calling him as a testifying

 5        expert.  We have retained him as an

 6        independent consultant non-testifying; so work

 7        that he's done for us we would regard as work

 8        product.

 9          So I'm going to instruct him not to answer

10        questions about that work.  He's certainly

11        free to answer any questions about the work

12        that he did pertaining to this transaction

13        before he was retained as an independent

14        consultant.

15        Q.  All right.  When -- when exactly were you

16   retained; do you know?

17        A.  I can't say exactly.  I'm guess -- spring

18   of 2000 would be my guess.

19        Q.  I mean, in terms of the consultation --

20   strike that.

21          In terms of the retention by Choate

22   Hall --

23        A.  About -- about a year ago.

24        Q.  About a year ago.
```

15

1    weeks.

2        Q.  If you could just answer this yes or no.

3    Did you prepare any -- anything in writing in

4    connection with this --

5        MR. DAVIS:  Objection.  I don't think

6        that -- I instruct him not to answer that

7        question.

8        I mean, again, he's not a testifying

9        expert, so I don't think you're entitled to

10       inquire on work that he's done in a

11       non-testifying basis.

12       MR. WEINBERGER:  Well, yeah, I -- I

13       understand.  But I -- I think that because he

14       is a percipient witness, I'm at least entitled

15       to, without getting into the substance of the

16       work, to test whether that's -- you know, it's

17       a legitimate claim or privilege by asking

18       about the existence of things without going

19       into the substance, I think I'm entitled to do

20       that.

21       MR. DAVIS:  No, I don't think you are.

22       We've disclosed the fact that we retained him

23       as a non-testifying expert.  And actually, I

24       don't think you're entitled to any more than

17

1      that.

2          So I'm going to instruct him not to answer

3      questions about work that he's done for us as

4      a non-testifying expert.  Again, I'm -- he's

5      here today and he's free to discuss with you

6      any work that he did for Hancock prior to

7      that.

8      Q.  Okay.  So I assume you'll follow your

9      counsel's instructions?

10     A.  Yes.

11     Q.  All right.  Now, getting back to the work

12     you did for Hancock -- and actually, I want to ask

13     you something else.

14         Were -- were you asked in connection with

15     this case to pull together any documents, files,

16     e-mails or any other material you have that related

17     to the work you did for John Hancock on this

18     investment?  And I'm not talking about the work,

19     the consulting work you did with Choate Hall, but

20     I'm talking about work you did in 2000.

21     A.  Yes.  All my documents were shared with

22     Steve Blewitt.

23     Q.  Shared in -- shared in what way?

24     A.  I e-mailed them to him as I was doing

18

1    Q.  So you have a clear --

2    A.  But I could be --

3    Q.  -- recollection that after your interview

4    with Dr. Leonard you did no further work?

5    A.  Yes, that is a clear recollection.

6        MR. DAVIS:  Please let him finish the

7    questions, then pause.

8        THE WITNESS:  I thought he had finished.

9    Q.  So were you aware that there was a change

10   in one of the compounds; an additional compound --

11   one compound was discontinued and another was added

12   to the basket af --

13       THE WITNESS:  No, I wasn't.

14       MR. DAVIS:  Let him finish the question.

15       THE WITNESS:  Sorry.

16   Q.  -- after July of 2000?

17       MR. DAVIS:  Objection.  You may respond.

18       THE WITNESS:  No.  I was not aware until I

19   recontacted four or five years later --

20   Q.  Okay.  So in other words are you --

21       (Interruption by the reporter.)

22       THE WITNESS:  Later with Choate Hall and

23   Stewart.

24   Q.  Okay.  So it's quite clear that in your

158

1      Q.  All right.

2          (Exhibit No. 17, JH 001203 - 001220,

3      marked for identification.)

4      Q.  Aside from the consulting work that you

5  are doing with Choate, have you ever seen this

6  document before?

7      A.  No, besides the consulting work.  In

8  fact --

9      Q.  Did you see any -- go ahead.

10     A.  In fact, I think I saw it for the first

11 time either two days ago or this morning.

12     Q.  All right.  Did you -- did you ever see

13 any drafts of this document?

14     A.  No.

15     Q.  Did Mr. Blewitt ever discuss with you a

16 recommendation memo that he was preparing for the

17 investment internally in John Hancock?

18     A.  No.

19     Q.  Over on page 1209 the document has a

20 summary of estimated sales.  Would you take a look

21 at that.

22     A.  Uh-huh.

23     Q.  Did you have any input into any of the

24 information in this paragraph?

185

1     All right.

2         (Exhibit No. 19, JH 008153 - 008209,

3     marked for identification.)

4     Q.  Do you recognize this document?

5     A.  This looks like one of Abbott's

6  descriptive memorandum.  It says it on the front

7  cover, yes.

8     Q.  Actually, I think they're all in there.

9     A.  They're all in there; okay.

10         Yes, I recognize it.

11     Q.  I think you testified earlier you got

12  Abbott's descriptive memorandum before you started

13  your work or when you just started your work?

14     A.  At the beginning, yes.

15     Q.  So you had the ability to read these and

16  ask any questions you wanted that arose out of

17  them, correct?

18         MR. DAVIS:  Objection.  I'm going to note,

19     these ones are dated February '01.

20         MR. WEINBERGER:  Well, these are the ones

21     that were ultimately filed; but for the most

22     part they're the same.

23         THE WITNESS:  Well, I never saw the

24     February 2000.

204

1          Q.  I don't have anything from your files so I

2     can't pin down what you did have and what you

3     didn't have.

4          MR. DAVIS:  You're asking him whether he

5          saw these.  And my point is these are dated

6          from February of '01.  There were a variety of

7          versions of the descriptive memorandum.

8          THE WITNESS:  I have never saw these.

9          Q.  Well, to the extent that they're the same,

10    you saw them.

11         MR. DAVIS:  Objection.  You can respond.

12         THE WITNESS:  To the extent they're the

13         same, I saw them, but I don't know to what

14         extent they're the same.

15         Q.  We can look at that.

16         But you did get descriptive memoranda that

17    look like these in format in --

18         A.  In the --

19         Q.  -- with respect to each of those

20    compounds?

21         (Interruption by the reporter.)

22         Q.  -- that look like these in form for each

23    of the Abbott compounds that you were evaluating

24    before you started your substantive work.

205

# EXHIBIT 2

## Trial Exhibit 125

**JOHN HANCOCK LIFE INSURANCE COMPANY**
Bond & Corporate Finance Group
Report Date:                    September 21, 2000
Recommendation to B.I.C.:        September 21, 2000
Report to C.O.F.:                October 10, 2000

Private

<u>Purchase Recommendation</u>

| | | | |
|---|---|---|---|
| GBSA | $110 mm | GBRE | $20 mm |
| CLDBLK | $ 30 mm | OPNBLK | $ 4 mm |
| PENPAR | $ 9 mm | IQA | $15 mm |
| LOLA | $ 8 mm | GRPLTC | $ 4 mm |
| RETLTC | $ 7 mm | GRPINS | $ 2 mm |
| BOLI | $ 4 mm | UNIVRSL | $ 5 mm |
| IPLI | $ 2 mm | | |

## ABBOTT LABORATORIES ("Non-Recourse")
.North Chicago, IL.

We are recommending a $220 million commitment to fund research and development expenses for a basket of eight pharmaceutical products ("Program Compounds") currently under development by Abbott Laboratories ("Abbott"). The commitment will be funded over a four-year period and will be subject to Abbott Laboratories co-funding at least two times our commitment on the Program Compounds during the same period of time. In return for the research and development payments, Abbott will agree to pay John Hancock milestone and royalty payments for each Compound that reaches regulatory approval and has commercial sales. The purpose of this transaction is to allow Abbott to increase its expenditures on research and development (to generate future growth in revenues and earnings) but to maintain current earnings.

The Program Compounds are a diversified pool of eight compounds owned by Abbott Laboratories and in various stages of clinical development. The Compounds are divided between late-stage and early-stage, including three Phase III, two Phase II, one Phase I, and two pre-clinical compounds. The Compounds are well-diversified from a disease/stage perspective, although several compounds are focused on the cancer market. Even within the cancer market, though, each of the Compounds targets either different types of cancer, or different mechanisms of action. Based on their current stage of development and projected sales levels, we think that the Program Compounds have a current market value of approximately $1 billion. During the term of the transaction, we expect Abbott to spend approximately $1.3 billion (including John Hancock's commitment) on further research and development for the Compounds.

Through the management fee and anticipated milestone payments, we expect to generate at least an 8% return on investment during the initial four years of the transaction. The average return is approximately 17.5% over 15 years. If we assume that we could sell our future royalty stream after the fifth year, our average five-year IRR would be about 22%.

The transaction is structured to provide a one-to two percent probability of total loss combined with a one-to-two percent chance of not earning a return. This is approximately equivalent to a 60 basis point annual loss over five years – or a "Ba1" credit rating. The expected return of 17.50% is attractive relative to the risk of the transaction.

<u>Report Authors:</u>
Stephen J. Blewitt, Managing Director
Scott Hartz, Managing Director
(t:\industrials\sjb\yellows\abbott-yo3.doc)

**CONFIDENTIAL**
**JH 001203**



**JOHN HANCOCK LIFE INSURANCE COMPANY**
Bond & Corporate Finance Group
Report Date:                          September 21, 2000
Recommendation to B.I.C.:    September 21, 2000
Report to C.O.F.:                   October 10, 2000

Private

| Purchase Recommendation | | | |
|---|---|---|---|
| GBSA | $110 mm | GBRE | $20 mm |
| CLDBLK | $ 30 mm | OPNBLK | $ 4 mm |
| PENPAR | $ 9 mm | IQA | $15 mm |
| LOLA | $ 8 mm | GRPLTC | $ 4 mm |
| RETLTC | $ 7 mm | GRPINS | $ 2 mm |
| BOLI | $ 4 mm | UNIVRSL | $ 5 mm |
| IPLI | $ 2 mm | | |

**ISSUER:**          Abbott Laboratories (Non-recourse)

**ISSUE:**            $220 million Research and Development Funding Commitment

**ISSUE RATING:**    JH: Ba2

**BROKER:**          Direct

**SIC CODE:**        2830 – Drugs

**USE OF PROCEEDS:**   To fund the research and development of eight pharmaceutical products ("Program Compounds") owned Abbott, and to pre-fund management fees and projected milestone payments, and to pay for transaction and administrative expenses.

**STATE OF INC.:**   Illinois

**CIRCLE DATE:**     August 31, 2000

**TAKEDOWN DATE:**   Upon completion of documentation

**PROGRAM PAYMENTS:**  During the Program Term, and in consideration of Abbott's continuing performance of the research services under the Research Plan, John Hancock shall make program payments to Abbott in the installments and on the dates set forth below:

| Date | Payment |
|---|---|
| [December,] 2000 | $50,000,000 |
| [December,] 2001 | $55,000,000 |
| [December,] 2002 | $55,000,000 |
| [December,] 2003 | $60,000,000 |

"Program Term" means the period commencing [December,] 2000 Date and ending on [December,] 2004.

"Research Plan" means a detailed statement of Abbott's objectives, activities, timetable, FTE allocation and budget for the Program Compounds during the Program Compounds during each year of the Program Term. Abbott shall provide an updated research plan on an annual basis.

2

CONFIDENTIAL
JH 001204

*Abbott Obligations*

During the Program Term, Abbott agrees to spend, <u>in addition to the funds provided by John Hancock</u>, (i) a minimum of $50 million per year and (ii) a minimum of $400 million in aggregate on research and development programs associated with the Program Compounds.

*Program Payment Termination Provisions*

Unless the parties agree upon an alternative arrangement, if Abbott (a) ceases research and development of all Program Compounds or (b) does not spend at least the amount provided by John Hancock in a year on the research and development of Program Compounds or (c) does not reasonably demonstrate, in its updated research plan, its intent to spend a minimum of the amount provided by John Hancock in the next year of the Program Term or $620 million (including the funds provided by John Hancock) in aggregate, John Hancock's obligation to continue to make Program Payments shall cease. In the case of either (a) or (b) above, Abbott will refund to John Hancock $55 million minus half of the amount actually spent by Abbott during that year.

*Carryover Provisions*

If Abbott spends the amount provided by John Hancock in a year but does not spend at least an additional $50 million, Abbott agrees to spend the difference between $105 million and the amount actually spent in that year (the "Carryover Amount") in the subsequent year. John Hancock's obligation to make Program Payments in the subsequent year, if any, will be deferred until that time that Abbott demonstrates that it has spent the Carryover Amount in that subsequent year.

If Abbott spends the amount provided by John Hancock in each year and at least an additional $50 million in each year, but does not spend a minimum of $620 million (including the funds provided by John Hancock) in aggregate on research and development programs associated with the Program Compounds during the Program Term, Abbott agrees to spend the difference between $620 million and the aggregate amount actually spent (the "Aggregate Carryover Amount") in the subsequent year. If Abbott does not spend the Aggregate Carryover Amount in the subsequent year, Abbott will refund to John Hancock one-third of the difference between (a) $620 million and the amount actually spent.

**MANAGEMENT FEE:**    Commencing with the first anniversary of the Program Term and continuing until the end of the Program Term, Abbott shall pay John Hancock a fee in the amount of $2.0 million per year as compensation for monitoring Abbott's continuing performance of its research services under the Research Plan, the development of the Program Compounds, and to reimburse John Hancock for its ongoing fees and expenses incurred in connection with this transaction.

CONFIDENTIAL
JH 001205

3

**MILESTONE PAYMENTS:**    Abbott shall make the following payments for each compound for each milestone achieved after commencement of the Program Term:

| | |
|---|---|
| Upon the allowance of an IND application by the FDA: | $1,000,000 |
| Upon the initiation of a Phase I Clinical Trial: | $2,000,000 |
| Upon the initiation of a Phase II Clinical Trial: | $3,000,000 |
| Upon the initiation of a Phase III Clinical Trial: | $4,000,000 |
| Upon the filing of an NDA application with the FDA: | $5,000,000 |
| Upon NDA Approval by the FDA: | $10,000,000 |

Aggregate milestone payments paid by Abbott, for all "non-NDA Approval" milestones achieved will not exceed $12 million. Aggregate milestone payments paid by Abbott, for all "NDA Approval" milestones achieved will not exceed $40 million. In addition, "non-NDA Approval" milestone payments will not exceed $3 million in the first year or $6 million in the second year after commencement of the Program Term.

**ROYALTY PAYMENTS:**    Abbott shall pay to John Hancock royalties on aggregate worldwide Net Sales of Program Compounds (all Program Compound sales combined) at the following rates:

| Annualized Net Sales of Aggregate Program Compounds | Royalty Rate |
|---|---|
| $0 to $400 million | 8% |
| >$400 million and ≤ $1,000 million | 4% |
| >$1,000 million and ≤ $2,000 million | 1% |
| >$2,000 million | ½% |

The obligation to make royalty payments shall commence on the date of the First Commercial Sale of a Program Compound and shall continue with respect to Net Sales of such Program Compound for a period of ten years. Not withstanding the foregoing, the obligation to make royalty payments on all Program Compounds shall not begin until after the second anniversary of the Program Term and shall cease at December 31, 2014.

**HANCOCK HOLDINGS:**    None

**RELATED HOLDINGS:**    $29,000,000 Preferred Stock of Metabolex Corporation with Put Rights to Abbott

**ANALYST:**    Stephen J. Blewitt

**HOUSE COUNSEL:**    Amy Weed

**SPECIAL COUNSEL:**    Choate, Hall & Stewart

Report Authors:
Stephen J. Blewitt, Managing Director
Scott Hartz, Managing Director
(t:\industrials\sjb\yellows\abbott-yo3.doc)

CONFIDENTIAL
JH 001206

4

## TRANSACTION OVERVIEW

In December 1999, John Hancock approached Abbott Laboratories, Inc. ("Abbott") with a financial structure that would allow Abbott to increase its research and development expenditures (to generate future growth in revenues and earnings) but maintain current earnings. The structure, which is presented in this investment recommendation, uses probability analysis on a diversified portfolio of drug compounds, supplemented by scientific due diligence, to achieve an investment grade or near investment grade risk for John Hancock and allow us to generate equity returns in the form of current (royalty) income for a sizeable investment.

This transaction requires John Hancock to commit to funding an average of $55 million per year for a period of four years to fund the research and development of a diversified pool of eight compounds ("Program Compounds") owned by Abbott Laboratories. We have valued the Program Compounds today at approximately $1 billion (or five times our investment) and we expect Abbott to spend over seven times our investment during the term of the transaction (during the initial four year period, Abbott will commit two times John Hancock's investment for those compounds). In return for the research and development payments, Abbott will agree to pay John Hancock milestone and royalty payments for each compound that reaches regulatory approval and has commercial sales as well as a management fee.

Through the management fee and anticipated milestone payments, we expect to generate at least an 8% return on investment during the initial four years of the transaction. The average return is approximately 17.5% over 15 years. If we assume that we could sell our future royalty stream after the fifth year, our average five-year IRR would be about 22%.

This transaction is consistent with our approach to investing in the pharmaceutical sector. During the past five years, we have invested approximately $460 million in pharmaceutical companies. Approximately $300 million is invested in straight debt for investment grade companies. The remaining $160 million is invested in equity-oriented transactions where we think that there are opportunities for exceptional value. Although we have invested in a couple of straight equity transactions, approximately $150 million of the $160 million is invested in transactions where our downside risk is protected by either "put rights" to investment grade companies (Metabolex, Nexell), senior note positions (Celgene, Cubist), or structured portfolios of drug candidates (Pharma Marketing). In these transactions, we maintain sizable up-side potential but reduce the probability of losing all of our invested capital through the structure of our investment.

In summary, we think that the structure of this transaction, which has us co-investing with Abbott Laboratories in a diversified pool of their drug compounds, which we believe have a current value of approximately $1 billion, over a four year period, during which time Abbott has to meet co-investment obligations and the drug compounds need to continue to progress in development, allows us to generate substantial current income that exceeds the risk associated with the transaction. Although we are committing to a substantial $220 million investment, our expectation is that our net investment will not exceed $176 million (due to management fees, milestone payments, and royalty payments).

The transaction is structured to provide a one-to-two percent probability of total loss combined with a one-to-two percent chance of not earning a return. This is approximately equivalent to a 60 basis point annual loss over five years – or a "Ba1" credit rating. The expected return of 17.50% is attractive relative to the risk of the transaction.

CONFIDENTIAL
JH 001207

*Expected accounting treatment*

There have been a number of royalty streams sold off in the form of an asset backed security. The most visible example is the David Bowie bond bought by Prudential Insurance. While this royalty transaction has many similar features, it is also different in that it is funded over a four year period and no royalties are currently being generated. We believe that at the end of the funding period we will be able to obtain a rating on the transaction that will allow it to be placed on our bond schedule. In the meantime, it will appear on our BA schedule. We plan to account for this investment using the guidance in ruling 9920 of the Emerging Issues Task Force. Ruling 9920 requires that each year, or more often if the assumptions change, we will project the expected cash flows and book income equal to the internal rate of return. Any changes to the expected cash flows will be spread over the remaining life of the transaction through the newly calculated IRR. This is the same method we use to account for our CBO equity investments. Initially we expect the IRR on this investment to be approximately 17%.

## OVERVIEW OF ABBOTT LABORATORIES

Abbott Laboratories is engaged in the discovery, development, manufacture and sale of healthcare products and services. Abbott has five reporting revenue segments: Pharmaceutical Products, Diagnostic Products, Hospital Products, Ross Products and International. It also has a 50%-owned joint venture, TAP Holdings, Inc. The principal products of the Pharmaceutical Products Division are the anti-infectives clarithromycin, agents for the treatment of epilepsy, migraine and bipolar disorder, including Depakote; urology products, including Flomax for the treatment of BPH; Abbokinase, a thrombolytic drug, and the anti-viral Norvir, a protease inhibitor for the treatment of HIV. The Diagnostic Division's products include diagnostic systems and tests for blood banks, hospitals, and commercial laboratories. The Hospital Products Division sells drugs and drug delivery systems, intensive care products, cardiovascular products, renal products, and intravenous and irrigation solutions. The Ross Products Division sells adult and pediatric nutritionals such as Similac, Isomil, Ensure, Glucerna, and Pedialyte. The International Division's products include a broad line of hospital, pharmaceutical, and adult and pediatric nutritional products marketed and primarily manufactured outside the United States.

For the year ended December 31, 1999, Abbott had revenues and net income of approximately $13.2 billion and $2.4 billion, respectively. Abbott is rated "Aaa" by the major rating agencies. As of September 18, 2000, Abbott had a market capitalization of approximately $74 billion.

### ABBOTT LABORATORIES
### CONSOLIDATED STATEMENT OF OPERATIONS

| ($ in thousands) | Fiscal Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 1997 | 1998 | 1999 |
| Net Sales | $11,889 | $12,512 | $13,177 |
| Costs and expenses: | | | |
| Cost of goods sold | 5,052 | 5,406 | 5,977 |
| Selling, general and administrative | 2,695 | 2,759 | 2,857 |
| Research and development | 1,307 | 1,228 | 1,193 |
| Total operating expenses | 9,055 | 9,395 | 10,028 |
| Operating income | 2,833 | 3,117 | 3,149 |
| Net interest expense | 85 | 102 | 81 |
| Other charges | (186) | (223) | (330) |
| Income (loss) before taxation | 2,934 | 3,241 | 3,396 |
| Net income (loss) | $2,079 | $2,331 | $2,445 |

CONFIDENTIAL
JH 001208

## TRANSACTION DETAILS

### A. PROGRAM COMPOUNDS

There are eight Program Compounds included in this transaction. The Compounds are divided between late-stage and early-stage, including three Phase III, two Phase II, one Phase I, and two pre-clinical compounds. The Compounds are well-diversified from a disease/stage perspective, although several compounds are focused on the cancer market. Even within the cancer market, each of the Compounds targets either different types of cancer, or different mechanisms of action. The products are described more fully below:

| Product | Indication | JH Est. Peak Sales ($mm) | Stage of Development | |
|---------|-----------|--------------------------|----------------------|--|
| ABT 980 (BPH) | Treatment of benign prostatic hyperplasia | 600 | Development Stage: Phase III | Expected Launch: 2003 |
| ABT 773 (Ketolide) | Antibiotic | 800 | Development Stage: Phase III | Expected Launch: 2003 |
| ABT 627 (Endothelin) | Treatment of prostate cancer | 700 | Development Stage: Phase III | Expected Launch: 2003 |
| ABT 594 (CCM) | Non-opiod, non-NSAID analgesic | 700 | Development Stage: Phase II | Expected Launch: 2004 |
| E7010 (Anti-mitotic) | Cancer | 500 | Development Stage: Phase I/II | Expected Launch: 2004 |
| MMPI | Cancer | 400 | Development Stage: Phase I | Expected Launch: 2005 |
| FTI | Cancer | 400 | Development Stage: Pre-clinical | Expected Launch: 2005 |
| Urokinase | Cancer | 400 | Development Stage: Pre-clinical | Expected Launch: 2005 |

### B. SUMMARY OF ESTIMATED SALES

In estimating sales projections by Program Compound, we started with determining the expected peak sales for each Compound. We have conservatively estimated the peak sales for each Compound based on our evaluation of market potential for each Compound relative to results for other similar drugs and expected competitive drugs. In general, our level of peak sales is significantly below Abbott's level (approximately 25%) — but, because of the tiered royalty structure, the relative economic difference is not significant. Our next step was to use a Sales Curve calculated by Lehman Brothers that projects ramp-up and ramp-down for sizeable drugs. In general, this Curve shows peak sales being reached seven years after launch. Ramp-up is achieved by 5% of peak sales in the first year, followed by 13%, 25%, 50%, 80%, and 90%. Peak sales are maintained for three years, and the compound then achieves 85% of peak, 75%, 70%, etc. As expected, every compound has its own unique curve, and Lehman's is only a general estimate. We have compared the curve to IMS data of prescription sales for individual compounds in a number of drug classes from 1981 to 1999. Our analysis indicates that Lehman's curve is a good fit and we have applied that curve. The table below shows projected sales for each Compound and probability-weighted estimated sales for the entire portfolio of Compounds.

7

CONFIDENTIAL
JH 001209

## ESTIMATED SALES PROJECTION

($ in millions)

| Name | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Projected Sales* | | | | | | | | | | | | |
| ABT-980 (BPH) | 30 | 78 | 180 | 300 | 480 | 540 | 600 | 600 | 600 | 510 | 0 | 0 |
| ABT-627 (Endothelin) | 35 | 91 | 210 | 350 | 560 | 630 | 700 | 700 | 700 | 595 | 0 | 0 |
| ABT-773 (Ketolide) | 40 | 104 | 240 | 400 | 640 | 720 | 800 | 800 | 800 | 680 | 0 | 0 |
| ABT-594 | | 35 | 91 | 210 | 350 | 560 | 630 | 700 | 700 | 700 | 595 | 0 |
| E7010 (Anti-mitotic) | | 20 | 52 | 120 | 200 | 320 | 360 | 400 | 400 | 400 | 340 | 0 |
| MMPI | | | | | | | | | | | | |
| FTI | | | 20 | 52 | 120 | 200 | 320 | 360 | 400 | 400 | 400 | 340 |
| Urokinase | | | | | | | | | | | | |
| **Total Projected Sales** | 105 | 328 | 793 | 1,432 | 2,350 | 2,970 | 3,410 | 3,560 | 3,600 | 3,285 | 1,335 | 340 |
| **Estimated Sales** | 76 | 225 | 531 | 932 | 1,510 | 1,837 | 2,068 | 2,129 | 2,138 | 1,908 | 530 | 74 |

*For projection purposes, MMPI, FTI and Urokinase are considered as one Program Compound with a Phase I probability of success.*

## C. MILESTONE AND ROYALTY PAYMENTS

Under the Agreement, Abbott agrees to pay to John Hancock royalties on aggregate worldwide Net Sales of Program Compounds (all Program Compound sales combined) at the following rates: 8% on the first $400 million, 4% on the next $600 million, 1% on the next $1 billion, and ½% on any amount above $2 billion. Abbott's obligation to make royalty payments will commence on the date of the First Commercial Sale of a Program Compound and will continue with respect to Net Sales of such Program Compound for a period of ten years. Not withstanding the foregoing, the obligation to make royalty payments on all Program Compounds will not begin until after the second anniversary of the Program Term and will cease at December 31, 2014. Based on our estimate of aggregate sales for the Program Compounds, we expect the following amounts of Royalty Payments:

($ in millions)

| Name | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Estimated Sales | 76 | 225 | 531 | 932 | 1,510 | 1,837 | 2,068 | 2,129 | 2,138 | 1,908 | 530 | 74 |
| Royalty Payments | | | | | | | | | | | | |
| 8.0% on $400 mm | 6 | 18 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 6 |
| 4.0% on $400-$1,000 | 0 | 0 | 5 | 21 | 24 | 24 | 24 | 24 | 24 | 24 | 5 | 0 |
| 1.0% on $1,000 - $2,0 | 0 | 0 | 0 | 0 | 5 | 8 | 10 | 10 | 10 | 9 | 0 | 0 |
| 0.5% on $2,000+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| **Total Royalty Pymts** | 6 | 18 | 37 | 53 | 61 | 64 | 66 | 67 | 67 | 65 | 37 | 6 |
| (average percent) | 8.0% | 7.0% | 5.7% | 4.0% | 3.5% | 3.2% | 3.1% | 3.1% | 3.1% | 3.4% | 7.0% | 8.0% |

CONFIDENTIAL
JH 001210

8

In addition to the Royalty Payments, Abbott will be obligated to make payments to John Hancock for certain milestones achieved for each compound. The milestone and the corresponding payments are described below. Aggregate milestone payments paid by Abbott, for all "non-NDA Approval" milestones achieved will not exceed $12 million. Aggregate milestone payments paid by Abbott, for all "NDA Approval" milestones achieved will not exceed $40 million. In addition, "non-NDA Approval" milestone payments will not exceed $3 million in the first year or $6 million in the second year after commencement of the Program Term.

| | |
|---|---|
| Upon the allowance of an IND application by the FDA: | $ 1,000,000 |
| Upon the initiation of a Phase I Clinical Trial: | $ 2,000,000 |
| Upon the initiation of a Phase II Clinical Trial: | $ 3,000,000 |
| Upon the initiation of a Phase III Clinical Trial: | $ 4,000,000 |
| Upon the filing of an NDA application with the FDA: | $ 5,000,000 |
| Upon NDA Approval by the FDA: | $10,000,000 |

Based on the number of Compounds in the Program and the number of potential milestones for each Compound, we expect to receive $3 million, $6 million, and $3 million of "non-NDA" milestone payments in the first three years. In addition, we expect to receive $20 million in 2003 and $10 million in 2004 for NDA Approvals.

In aggregate, the management fees, milestone payments, and royalty payments are approximately 4.3% of Net Sales of the Program Compounds. The tiered structure of the royalty payments and the up-front milestone payments, however, substantially reduce the downside of the transaction in the event that aggregate net sales are below our expected case. For example, if sales were 25% below projected, a flat 4.3% royalty rate would yield a loss ratio of 4% versus a loss ratio of 1.6% when using the tiered structure.

## D. ESTIMATED CASH FLOW PROJECTIONS

Based on the calculations of Net Sales and Milestone and Royalty Payments, which are described above, the Cash Flow of this transaction is as presented in the table below. In particular, the structure provides for adequate current income during the first two-to-three years when there are no approved Compounds, and substantial current royalty income based on Net Sales of approved Compounds.

| ($ in millions)<br>Name | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JH Cash Payments | (50) | (55) | (55) | (60) | | | | | | | | | | | |
| Management Fee | 0 | 2 | 2 | 2 | 2 | | | | | | | | | | |
| Milestone Payments | 0 | 3 | 6 | 23 | 10 | | | | | | | | | | |
| Royalty Payments | 0 | 0 | 0 | 6 | 18 | 37 | 53 | 61 | 64 | 66 | 67 | 67 | 65 | 37 | 6 |
| Aggregate Cash Rcv'd | 0 | 5 | 8 | 31 | 30 | 37 | 53 | 61 | 64 | 66 | 67 | 67 | 65 | 37 | 6 |
| JH Net Cash Flow | (50) | (50) | (47) | (29) | 30 | 37 | 53 | 61 | 64 | 66 | 67 | 67 | 65 | 37 | 6 |

The projected bond equivalent yield for this transaction is approximately 17.5% and the cash to invested capital ratio is 2.7 times.

CONFIDENTIAL
JH 001211

9

## E. SUMMARY BUDGET

Abbott will be using the funds from this transaction to invest in the research and development of a specific pool of drug compounds, and to pre-fund management fees and projected milestone payments. These funds will be part of a total investment by Abbott of approximately $1,300 million during the next ten years and $900 million over the four year co-investment period. In addition, based on the stage of the development of the Program Compounds, and their expected sales, we have valued the Program Compounds today at approximately $1 billion. Our valuation is based on our knowledge of "out-licensing" transactions between pharmaceutical companies and the milestone and royalty structure that is market for different stage compounds. In general, out-license transactions provide the licensor with a royalty rate of between 10% (for Phase I compounds) to 30% (for Phase III compounds) and a 50/50 split for compounds that have completed Phase III. Using an average 20% royalty applied to estimated sales and a 15% discount rate, we arrived at a value of approximately $1 billion.

The following table summarizes the Company's expected budget during the Program Period:

| ($ in millions) Name | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Projected Budget* | | | | | | | | | | | | |
| ABT-980 (BPH) | 80 | 40 | 30 | 30 | 20 | 20 | 10 | 10 | 10 | 10 | 10 | 270 |
| ABT-627 (Endothelin) | 40 | 40 | 20 | 20 | 20 | 20 | 20 | 10 | 10 | 10 | 10 | 220 |
| ABT-773 (Ketolide) | 135 | 60 | 42 | 42 | 27 | 27 | 27 | 17 | 17 | 17 | 17 | 428 |
| ABT-594 | 70 | 80 | 30 | 20 | 20 | 20 | 20 | 20 | 10 | 10 | 10 | 310 |
| E7010 (Anti-mitotic) | 20 | 30 | 35 | 20 | 30 | 10 | 10 | 5 | 5 | 5 | 5 | 175 |
| MMPI | 20 | 30 | 35 | 20 | 23 | 15 | 15 | 5 | 5 | 5 | 5 | 178 |
| FTI | 5 | 10 | 37 | 17 | 15 | 15 | 5 | 5 | 5 | 5 | 5 | 124 |
| Urokinase | 15 | 25 | 35 | 33 | 15 | 15 | 5 | 5 | 5 | 5 | 5 | 163 |
| Total Projected Budget | 385 | 315 | 264 | 202 | 170 | 142 | 112 | 77 | 67 | 67 | 67 | 1,868 |
| Estimated Budget | 327 | 250 | 201 | 134 | 90 | 81 | 66 | 45 | 40 | 40 | 40 | 1,314 |

CONFIDENTIAL
JH 001212

10

TRANSACTION ANALYSIS

The structure of this transaction (which includes a diversified pool of eight Abbott compounds, and a tiered royalty structure) offers a substantial likelihood that we will receive a long-term bond equivalent yield of approximately 17.5% which is substantially greater than the inherent risk of the transaction.

Expected Return.

*Methodology*
Determining the fair economics of the proposed transaction is highly dependent upon the number of compounds included, the characteristics of the compounds (i.e. status of development, potential sales), the structure of the royalty rates, and an estimation of what is a fair return. To help us answer these questions, we have taken several steps. First, we have researched industry standards for likelihood of success and probable sales curves for compounds in different stages of development. Second, we have developed a spreadsheet model that calculates the rate of return for a chosen portfolio and have developed a minimum number of compounds and associated milestone/royalty payments to provide us with returns that adequately compensate us for the risk we are taking. Third, we have tried to determine what rate of return the capital markets would require for the level of risk that we are willing to take.

The Program Compounds consist of five of Abbott's late-stage development compounds and a basket of three pre-clinical cancer compounds. The late-stage compounds range from mid-Phase II to starting Phase-III. Peak annual sales for these compounds range from $400 million to $800 million. With the exception of the "cancer basket", the compounds are independent of each other. Our due diligence provided us with results consistent with Abbott's representations and expectations for the Program Compounds, although we have scaled back sales projections significantly.

Our scientific and market diligence for the portfolio of compounds consisted on a number of steps. As a first step, we received internal scientific and business write-ups from Abbott for each Program Compound. The material provided by Abbott demonstrated the scientific rationale for the compounds, results of clinical trials, and a competitive analysis. Through financial reports, we searched for all references to Abbott's compounds and all references to competitive compounds in the same class or same disease category. We used this information to evaluate the potential size of markets for the Program Compounds and their competitive landscape. We engaged Dr. Lynn Klotz to search the major drug and medical databases for scientific reports on the Program Compounds and competitive compounds in the same class or same disease category. We used this information to evaluate, from a scientific perspective, what research information we discovered about the Program Compounds from an efficacy and safety perspective. We also used this information to identify potential experts to contact for additional results. Finally, Dr. Klotz contacted the experts on a non-disclosure basis (not revealing that we were looking at Abbott compounds) and asked the experts to assess the Program Compounds and any potential competitive products from an efficacy and market potential perspective. In summary, none of our diligence revealed any information that was materially different than what Abbott had provided to us.

Dr. Lynn Klotz is a former professor of Biochemistry and Molecular Biology at Harvard University and a former officer of two biotechnology companies, BioTechnica and Codon. Dr. Klotz is currently an independent consultant. His most recent assignment was as a member of a four-person team consulting with the President of Mississippi State University to provide a strategic plan for their Life Sciences Institute.

CONFIDENTIAL
JH 001213

*Probabilities of Success*

Based on the development stage of each compound, we assigned probabilities of success ("regulatory approval") and time to success for each compound. Our probabilities of success come from a 1995 study by Dr. Joseph A. DiMasi at the Tufts Center for the Study of Drug Development, and were modified based on our specific knowledge of the Program Compounds. Dr. DiMasi's study is generally accepted by the pharmaceutical industry as an accurate assessment of the probability of success and of the time and costs associated with drug development. Dr. DiMasi looked at a random sample of 93 compounds in four broad disease categories from 12 pharmaceutical companies that were first tested in humans between 1970 and 1982.

Dr. DiMasi's results are summarized below:

### PROBABILITY OF SUCCESS

| Entering Phase | NSAID | Cardio-vascular | Anti-infective | Neuro-pharm | All |
|---|---|---|---|---|---|
| I | 22% | 26% | 30% | 20% | 23% |
| II | 30% | 41% | 38% | 22% | 31% |
| III | 71% | 72% | 77% | 51% | 63% |

Dr. DiMasi calculated the average time to approval as 8.75 years for compounds entering Phase I, 7.5 years for compounds entering Phase II, and 5.5 years for compounds entering Phase III. Embedded in these times was an approximately 30-month review process by the FDA. Due to legislative and process changes, the average FDA review time is now approximately 12 months. A revised timeframe for approval (which was been published by TCSDD in 1999), based on accelerated review by the FDA, and quicker processes within the pharmaceutical companies, is 6.0 years for Phase I, 5.0 years for Phase II, and 3.0 years for Phase III.

*Sales Estimates*

In estimating sales projections by Program Compound, we started with determining the expected peak sales for each Compound. We have conservatively estimated the peak sales for each Compound based on our evaluation of market potential for each Compound relative to results for other similar drugs and expected competitive drugs. In general, our level of peak sales is significantly below Abbott's level (approximately 25%) -- but, because of the tiered royalty structure, the relative economic difference is not significant. Our next step was to use a Sales Curve calculated by Lehman Brothers that projects ramp-up and ramp-down for sizeable drugs. In general, this Curve shows peak sales being reached seven years after launch. Ramp-up is achieved by 5% of peak sales in the first year, followed by 13%, 25%, 50%, 80%, and 90%. Peak sales are maintained for three years, and the compound then achieves 85% of peak, 75%, 70%, etc. As expected, every compound has its own unique curve, and Lehman's is only a general estimate. We have compared the curve to IMS data of prescription sales for individual compounds in a number of drug classes from 1981 to 1999. Our analysis indicates that Lehman's curve is a good fit and we have applied that curve. The table below shows projected sales for each Compound and probability-weighted estimated sales for the entire portfolio of Compounds.

*Financial Model and Results*

We've modeled the returns on this portfolio of drugs using a Monte Carlo simulation and assuming their probabilities of success are independent. Let's start, however, with some simplifying assumptions to get better intuition on the risk of the transaction. Assume the probability of success of each drug is 50%, the drugs are independent, and that the success of any one drug will give us a return of 8% on the transaction. In this case, we will lose all our investment only if all the drugs fail. The probability of this is $(1/2)^6 = 1.6\%$. Spread over a 4 year duration, the expected annual loss is 40 basis points which implies the same risk as a Baa3 bond. If only one drug is successful, which should occur with the probability of $(1/2)^6 * (6!/11) = 6/64 = 9.4\%$, the return, in our simplified model, is 8% on the entire investment. This is approximately 200 basis points over Treasuries. If two or more drugs are successful, the structure caps the investment's return at

12

CONFIDENTIAL
JH 001214

approximately 20%. The probability of this is 100% –1.6% - 9.4% = 89%. Hence, the weighted average return on the investment is 1.6%*0 + 9.4%*8% + 89%*20% = 18.5%.

This example is obviously a simplification. Each of the drugs has a different probability of success, depending upon how far along each is in the approval process, and a different revenue profile. To reflect the different probabilities and different revenue streams, we developed a spreadsheet model that incorporates multiple drug compounds (and their specific probability of success, time to launch, and expected sales pattern) and a variable milestone/royalty structure. We then ran the spreadsheet model 500 times to provide us a range of outcomes as well as the expected results for returns and losses.

In our base case, we have made the following assumptions·

| Product | Phase | JH Probability Of Approval | Launch | JH Peak Sales |
|---|---|---|---|---|
| BPH | Phase III | 65% | 2003 | $600 mm |
| Ketolide | Phase III | 70% | 2003 | $800 mm |
| Endothelin | Phase III | 70% | 2003 | $700 mm |
| CCM | Phase II | 50% | 2004 | $700 mm |
| Antimitotic | Phase I/II | 40% | 2004 | $500 mm |
| MMPI | Phase I | 10% | 2005 | $400 mm |
| FTI | PC | 10% | 2005 | $400 mm |
| Urokinase | PC | 10% | 2005 | $400 mm |

... and calculated the average bond equivalent yield of this scenario to be approximately 17.3%. It is important to note that the expected IRRs are over a long period of time (15 years). Assuming that we could sell our future royalty stream after the fifth year, our five-year IRR would be about 22%.

Analysis of Return

The last step of our analysis was to determine what a fair economic return for this transaction should be. We have benchmarked this transactions in a number of ways, such as: R&D vehicles for pre-clinical compounds were sold with expected IRRs (over a three-to-five year period) of approximately 40%; Hambrecht & Quist has estimated pharmaceutical IRRs for single phase-II compounds to be 40% and single phase-III compounds to be 25%; the Palisade Partners (Sony movies) transaction that we participated in last year has an expected IRR of 20%; Elan Pharmaceuticals' pooled transaction has an expected five-year IRR of 13%; limited partner equity funds have about a 25% expected net IRR; and our proprietary analysis of the equity market's IRR for Abbott's entire R&D pipeline of 16-22%. Based on these comparisons, we think that an IRR of 17% over a long period of time is reasonable.

We also evaluated the relationship between our investment (and Abbott's) in the entire portfolio and the average royalty rate that we expect to receive – which is approximately 4-5%. We estimate that the current value of the compounds that Abbott is contributing to the transaction is about $1 billion. During the four year investment period, Abbott expects to invest $800 million on the compounds, in addition to our $200 million. Based on these amounts, our investment is approximately 10% of the total invested dollars. Most pharmaceutical companies earn about a 50% pre-tax margin (excluding R&D expenses) on sales. On a net basis, then, our expected royalty and milestone percentage should be about 5%.

13

CONFIDENTIAL
JH 001215

<u>Risk Analysis.</u>

The fundamental risks of this transaction are whether Abbott receives marketing approval from the FDA for a sufficient number of the Program Compounds and whether the commercial success of the Compounds are as we expect. In developing the *expected return*, we have made a number of reasonable assumptions regarding the probability of obtaining FDA approvals, acceptance of the products in the marketplace and competition. In many cases, our assumptions are significantly more conservative than Abbott's.

Again looking at our base case (which is demonstrated in the Chart I on the next page), the probability of no successful drugs is approximately 1.7% (the bar on the left). There are also a number of scenarios that produce a return of approximately 1% — 2%. These scenarios arise when only a cancer drug is successful. The cancer drugs have lower anticipated revenues, as well as lower probabilities of success, than any of the other drugs. This represents about 1.6% of the scenarios. All other scenarios give us a return of 9% or more. Assuming a 1-2% return represents a loss of half our original investment, the expected loss in this simulation is 1.7% + ½*1.6% = 2.5%. Spread over a four year duration, the annual expected loss is 62 basis points which corresponds to the risk of a Ba1 rated bond.

We also ran a downside simulation, where the probabilities of success are discounted by 25% from the DiMasi study and the expected revenues are discounted by 25% from our base case (this is shown in Chart II on the next page).

The average return in this downside scenario is 9.3%. The probability that no drugs are successful rises dramatically to 4.9%. The low return scenario is now even lower (-2%) and also has a higher probability (2.7%). So, the annual expected loss is (4.9% + .6*2.7%)/4 = 165 basis points which corresponds to the risk of a B1 rated bond.

CONFIDENTIAL
JH 001216

14

## CHART I
### BASE CASE



## CHART II
### DOWNSIDE SCENARIO



15

CONFIDENTIAL
JH 001217

# APPENDIX
## PRODUCT DESCRIPTIONS

### ABT-980

ABT-980 is a selective alpha blocker for the treatment of benign prostatic hyperplasia ("BPH"), a disorder that effects approximately 10 million middle-aged and elderly males in the U.S. The primary sympton of BPH is obstruction of urinary outflow and increased frequency of urination. Global sales of BPH products is approximately $2 billion and is expected to continue to grow as the population ages and as better treatments become available. Currently, alpha blockers, including Abbott's Hytrin which recently became generic, are the most frequently prescribed pharmaceutical treatment for BPH. ABT-980 has the benefit of other alpha blockers, but since it only inhibits alpha receptors in the urinary tract, side effects on the cardiovascular system and central nervous system are expected to be reduced substantially.

One other selective alpha blocker, Boehringer Ingelheim's Flomax, the FDA and has been on the market since 1999. Flomax's current sales are approximately $300 million. Abbott completed Phase II clinical trials and entered Phase III trials this past summer. In its Phase II trials, Abbott demonstrated that it is effectively equivalent (based on safety and efficacy) to Flomax.

This month, Abbott has learned that in long-term studies with rats, that about 15% of the rats given ABT-980 developed gallstones. Abbott does not know if these results are applicable to humans and at what frequency; however, there is no evidence of gallstones in humans to-date. In addition to its usual clinical trials, Abbott will try to determine whether gallstones will develop in humans over the long-term and what implications that may have. If ABT-980 fails due to this gallstone issue, Abbott will replace ABT-980 with another compound.

Abbott expects to submit ABT-980 for approval in June 2002 and launch the product in August 2003. The patent on ABT-980 expires in 2016.

### E-7010

E-7010 is a compound that Abbott licensed from Eisai Co. Ltd. in July 2000. E7010 has completed Phase I trials for various oncology applications. E7010 is an oral medication with a unique mechanism of action that enables it to stop cell mitosis with fewer side effects than current cytotoxic therapies. Although financial terms of the Abbott-Eisai agreement have not been publicly disclosed. Abbott is committing $25 million in up-front and milestone payments to Eisai and will pay a double-digit royalty percentage on net sales. As a result of in-licensing E7010, Abbott has discontinued development of its own internally developed "anti-mitotic" compound.

Anti-mitotic compounds are not new. Taxol, the largest selling cancer drug, is an anti-mitotic. E7010, however, binds to a different site of a cell's microtubules than Taxol, and inhibits cell proliferation in a unique manner which is believed to cause fewer side effects.

E7010 has successfully completed Phase I clinical trials in Japan. These trials may be repeated in the U.S. but Abbott expects to move quickly into Phase II trials. Abbott expects to submit E7010 for approval in 2003 and launch the product in 2004. The patent on E7010 expires in 2011.

Our scientific consultants, Dr. Dennis A. Carson, UCSD School of Medicine, and Dr. John Kavanaugh, Jr., MD Anderson Cancer Center, did not have specific knowledge about the Abbott/Eisai compound. However, each researcher provided us with consistent critical benchmarks to evaluate the compound (such as whether the compound has been tested against specific cancer cell lines, whether the compound has been tested in combination with other anti-cancer agents. We have confirmed that Abbott independently addressed these critical benchmark and received positive results.

### ABT-773 (Ketolide)

ABT-773 is a member of a novel group of ketolide antibiotics within the macrolide group of antimicrobials. Ketolides have a similar mechanism of action to other macrolides such as Pfizer's *Zithromax* and Abbott's

16

CONFIDENTIAL
JH 001218

*Biaxin.* Unlike macrolide antibiotics, ketolides are active against *s. pneumonia* and *h. influenza*. The antibiotics market size is approximately $25 billion; macrolides account for approximately 13% and have an increasing market share. Only one ketolide (*Ketek*) is in advanced clinical trials; this compound, discovered by Aventis, was approved for sale in Europe and was been submitted to the FDA for approval in February 2000. Aventis expects to launch *Ketek* in 2001.

ABT-773 entered Phase III clinical trials this past summer. Abbott expects to submit ABT-773 for approval in June 2002 and launch the product in August 2003. The patent on ABT-773 expires in 2016.

Our scientific consultant, Dr. Robert C. Moellering, Jr., Harvard Medical School and Beth Israel Medical Center, confirmed the scientific rationale for ketolides and their market potential. Based on information that he has seen, Dr. Moellering believes that ABT-773 has more promise than Aventis' *Ketek*.

## ABT-594

ABT-594 is a non-opiod, non-NSAID analgesic compound that is orally-administered for the treatment of diabetic neuropathic pain. In animal models, the compound has been shown to be substantially more potent than morphine with a better side effect profile. Neuropathic pain is a substantial and underserved market. Approximately 4-5 million people are thought to suffer from neuropathic pain but only a few medications provide complete pain relief and most medications have significant side effects. As more effective and tolerable medications become available, the neuropathic pain market is expected to experience significant growth.

ABT-594 is currently in Phase II clinical trials. If Phase II and Phase III trials are successful, Abbott expects to submit ABT-594 for approval in May 2003 and launch the product in July 2004. The patent on ABT-594 expires in 2016.

Our scientific consultant, Dr. Mitchell Max, NIH, eliminated an initial concern of ours that the "therapeutic window" of ABT-594 was too short and would potentially block approval. Dr. Max indicated that ABT-594's therapeutic window was acceptable. Dr. Max was not able to fully address toxicity issues raised by two of Abbott's competitors that the compound demonstrated opiod-like side effects in mice. These toxicity issues have not been found by Abbott in its mice or human trials. Dr. Max believed that ABT-594 showed a good profile in mice.

## ABT-627

ABT-627 is an inhibitor of a family of endothelin peptides that cause constriction of vascular muscles and stimulate cell proliferation. ABT-627 is currently being developed by Abbott for the treatment of prostate cancer, and other cancer types.

Prostate cancer ("PCA") is the most common cancer to strike non-smoking men. Approximately 1.7 million men live with prostate cancer in the U.S, and there are approximately 180,000 newly diagnosed cases each year. The primary treatment of advanced stage PCA is hormone therapy. Patients receiving hormone therapy become resistant to this treatment after two to three years and then have a life expectancy of only about twelve months.

The primary benefit of ABT-627 is to reduce the pain associated with PCA and to delay the progression of the disease (but not necessarily improve survival).

ABT-627 is currently in Phase III clinical trials. If Phase III trials are successful, Abbott expects to submit ABT-627 for approval in December 2003 and launch the product in June 2004. The patent on ABT-627 expires in 2015.

Our scientific consultant, Dr. Joel Byron Nelson, MD, University of Pittsburgh, has indicated that ABT-627 is safe, significantly reduces pain associated with PCA, and delays disease progression.

CONFIDENTIAL
JH 001219

## MMPI

MMPI is an inhibitor of enzymes called matrix metalloproteinase that degrade a wide range of protein substrates. High expression of these enzymes occurs in cancer and is associated with the ability of tumors to grow, invade, develop new blood vessels and metastasize.

The MMPI field is competitive. More than 30 firms have filed patents and several companies have compounds in advanced clinical development. Abbott's MMPI has the potential competitive advantage of a better side effect profile. It appears to exhibit less arthritis and tendonitis of the upper joints that its competitors. This compound is currently being evaluated in Phase I clinical trials.

Abbott hopes to submit MMPI for approval in 2004 and launch the product in 2005. The patent on MMPI expires in 2018.

## FTI

FTI is an inhibitor of enzymes called farnesyltransferase that assist certain proteins, such as the Ras protein, which are critical for malignant growths.

The FTI field is competitive. Approximately four compounds are in clinical development, and an additional five are in pre-clinical studies. Abbott has not yet chosen a specific FTI to enter into human clinical trials. It expects to enter human clinical trials in 2001

Abbott hopes to submit FTI for approval in 2004 and launch the product in 2005. The patent on FTI is not expected to expire prior to 2014.

## Urokinase

Urokinase is an inhibitor of enzymes called urokinase which are believed to promote the metastases of tumors by breaking down cell membranese.

The Urokinase field is less well-developed than MMPI and FTI. No compound has currently made it into clinical trials. Abbott is currently evaluating several compounds. If Abbott fails to take a Urokinase compound into clinical trials, Abbott will substitute another Phase I compound into the Program.

Abbott hopes to submit Urokinase for approval in 2004 and launch the product in 2005. The patent on Urokinase is not expected to expire prior to 2014.

Our scientific consultant, Dr. Edward Sausville, National Cancer Institute, has indicated that "cytostatic" therapies such as MMPI, FTI and Urokinase may be useful upon recurrence of cancer as a means to stopping the progression of the disease. He believes that they will be useful in combination with other therapies and may not be exceptional compounds by themselves.

CONFIDENTIAL
JH 001220

18