UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER LIFE INSURANCE COMPANY), | ) ) ) ) ) ) ) |
| | ) CIVIL ACTION NO. 05-11150-DPW |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ABBOTT LABORATORIES, | ) ) |
| Defendant. | ) ) ) |

**PLAINTIFFS' RESPONSE
TO DEFENDANT ABBOTT LABORATORIES'
OBJECTIONS TO AFFIDAVIT OF CHRISTOPHER A. MARTINEZ**

Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Manulife Insurance Company (collectively, "John Hancock" or "Hancock"), respectfully submit this Response to defendant Abbott Laboratories' Objections to the Affidavit of Christopher A. Martinez (the "Martinez Affidavit").

Mr. Martinez is a partner and co-founder of The StoneTurn Group ("StoneTurn"), the independent consulting company hired by John Hancock in 2004 to audit defendant Abbott Laboratories' ("Abbott") compliance with the "Research Funding Agreement" between John Hancock and Abbott, dated March 13, 2001 (the "Research Funding Agreement" or the "Agreement"). In its motion, Abbott first contends that Paragraphs 9 and 10 of the Martinez

4307670v1

Affidavit contain irrelevant and improper expert testimony regarding Mr. Martinez's personal experience conducting compliance audits. Next, Abbott objects to Paragraph 56 on the grounds that Mr. Martinez "has no personal knowledge regarding the timing of Abbott's production of documents to Choate in the litigation." (Abbott's Motion at 2). Finally, Abbott challenges the admissibility of two proposed exhibits (PLs' PS and PLs' SC) on the grounds that both fail to qualify as business records and that PLs' Exhibit PS contains double hearsay.

   None of these objections are warranted.

### *Mr. Martinez's Testimony Regarding His Background Is Neither Irrelevant Nor Improper*

   Abbott's effort to strike Paragraphs 9 and 10 of the Martinez Affidavit should be denied for two reasons. First, Mr. Martinez's testimony of his past audit experience is relevant to provide the Court with the factual background necessary to understand the basis of his view that Abbott failed to comply with John Hancock's audit of Abbott. Indeed, Abbott itself recognized the relevancy of Mr. Martinez's professional background during its deposition of Mr. Martinez, devoting approximately 35 pages of transcript to questions about his prior experience with compliance audits. (*See* Martinez Trans. dated November 3, 2006 at pp. 10-44, attached hereto as Exhibit A). Moreover, Abbott's citation to StoneTurn's Motion to Quash or Modify Subpoena dated April 19, 2007 is immaterial. Here, *John Hancock* is seeking to introduce evidence of Mr. Martinez's prior audit experience. Hancock expressly reserved its right to introduce such evidence in the parties Final Joint Report To The Court Regarding Scope Of Additional Audit Discovery. *See* Docket No. 203.

   Second, the testimony in question does *not* constitute "improper expert testimony." (Abbott's Motion at 2). It is not improper expert testimony to offer evidence of a witness's relevant background. *See* Weinstein's Federal Evidence § 401.04 (Joseph M. McLaughlin ed.,

2d ed. 1997) (collecting cases); *see also Butler v. Dagney*, No. TH98-0196-C-T/H, 2001 WL 521821, at *8-9 (S.D. Ind. Mar. 5, 2001). Nor is it improper expert testimony to offer evidence regarding Mr. Martinez's first-hand experiences concerning the audit, and why he considers Abbott's actions during the audit to be atypical given his background. Mr. Martinez is a percipient witness who was the primary StoneTurn employee involved in the audit and, thus, should be allowed to testify about why he considers Abbott's actions to be atypical given his background.

### *Mr. Martinez Has Personal Knowledge Regarding The Timing Of Abbott's Production Of Documents In This Litigation*

Abbott's objects to Paragraph 56 of the Martinez Affidavit as lacking foundation, claiming that "Mr. Martinez has no personal knowledge regarding the timing of Abbott's production of documents to Choate in the litigation," and that, as a result, he cannot testify to the fact that Abbott documents supporting John Hancock's claims produced during this litigation were not produced during the audit. (Abbott's Motion at 2). Mr. Martinez, however, demonstrated the foundation for such testimony during his deposition, where he stated that StoneTurn was provided access by Choate to an on-line database of documents produced during the litigation, which StoneTurn subsequently used to compare the litigation and audit productions. (*See e.g.,* Ex. A at pp. 68:1-70:18; 130:13-132:5).

### *Abbott's Hearsay Objections To PLs' PS And PLs' SC Are Baseless*

Abbott's hearsay objections to PLs' PS and PLs' SC also fail. Abbott asserts that both documents fail to qualify for the business records exception to the hearsay rule because it contends that the audit was, in fact, a litigation audit rather than a contractual compliance audit pursuant to the Agreement. (*See* Abbott's Motion at 2-3). Not so. First, by this flawed logic, all contractual compliance audits must be considered "in anticipation of litigation." Second, with

4307670v1

respect to PL's PS, Mr. Martinez testified during his deposition that it was created by StoneTurn during the audit and *only* provided to John Hancock's counsel in response to a document request by Abbott in this litigation.  (*See* Martinez Trans. dated March 22, 2007 at 340:3-342:24, attached hereto as Exhibit B).  As for Abbott's additional charge that this document "contains double hearsay" (Abbott's Motion at 3), it, in fact, records Mr. Martinez's first-hand interactions with Abbott personnel during the audit and, therefore, constitutes a "business record" under FRE 803(6).  Specifically, as a real time log of all of Mr. Martinez's communications with Abbott during the audit, it is a record from the files of StoneTurn that was made at or near the time of the matter(s) recorded therein by someone having knowledge of the facts recorded, and was made and is kept in the normal course of StoneTurn's regularly conducted business activities consistent with StoneTurn's regular business practices.

Finally, with respect to PLs' SC, this document is a verbatim transcription of an Abbott document showing the internal spending of Abbott on the program compounds; it is, therefore, a party admission under FRE 801(d)(2).

### *Conclusion*

For the foregoing reasons, John Hancock respectfully requests that the Court overrule Abbott's objections to the Martinez Affidavit.

4307670v1

JOHN HANCOCK LIFE INSURANCE
COMPANY, JOHN HANCOCK VARIABLE
LIFE INSURANCE COMPANY and
MANULIFE INSURANCE COMPANY

By their attorneys,


*/s/ Brian A. Davis*
Brian A. Davis
    (bad@choate.com/BBO No. 546462)
Joseph H. Zwicker
    (jzwicker@choate.com/BBO No. 560219)
Richard C. Abati
    (rabati@choate.com/BBO No. 651037)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts  02110
Date:  March 5, 2008                Tele: 617-248-5000

4307670v1

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 5, 2008.

/s/ Richard C. Abati
Richard C. Abati

# EXHIBIT A

CERTIFIED
COPY

CONFIDENTIAL

1                              Volume:   I

2                              Pages :   1 - 270

3                              Exhibits: 1 - 9

4               UNITED STATES DISTRICT COURT

5            FOR THE DISTRICT OF MASSACHUSETTS

6                      CIVIL ACTION NO. 05-1150DPW

7    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ x

8    JOHN HANCOCK LIFE INSURANCE COMPANY,

9    JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY,

10   and MANULIFE INSURANCE COMPANY

11   (f/k/a INVESTORS PARTNER INSURANCE COMPANY),

12                      Plaintiffs,

13        V.

14   ABBOTT LABORATORIES,

15                      Defendant.

16   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ x

17             C O N F I D E N T I A L

18   VIDEOTAPED DEPOSITION OF CHRISTOPHER A. MARTINEZ

19          Friday, November 3, 2006,  9:10 a.m.

20             Donnelly, Conroy & Gelhaar

21                 One Beacon Street

22               Boston, Massachusetts

23        Reporter:  Rosemary F. Grogan, CSR, RPR

24

LEGALINK
A MERRILL
COMMUNICATIONS
COMPANY

20750 Ventura Blvd          tel (818) 593-2300      www.merrillcorp.com
Suite 205                   tel (800) 826-0277
Woodland Hills, CA 91364    fax (818) 593-2301

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

```
1    APPEARANCES:

2    Representing the Plaintiff:

3              CHOATE HALL & STEWART LLP

4              Two International Place

5              Boston, MA  02110

6              (617)248-5000

7              ktroake@choate.com

8              BY:  KAREN COLLARI TROAKE, ESQUIRE

9              BY:  STACY L. BLASBERG, ESQUIRE (a.m. session)

10

11   Representing the Defendants:

12             MUNGER, TOLLES & OLSON LLP

13             355 South Grand Avenue, 35th Floor

14             Los Angeles, CA  90071-1560

15             (213)683-9207

16             eric.lorenzini@mto.com

17             BY:  ERIC J. LORENZINI, ESQUIRE

18

19   Representing StoneTurn Group and Deponent Hair:

20             GRIESINGER, TIGHE & MAFFEI, LLP

21             176 Federal Street

22             Boston, MA  02110-2214

23             (617)542-9900

24             BY:  ANDREW C. GRIESINGER, P.C.
```

2

1                    THE VIDEOGRAPHER:   The court reporter today is

2         Rosemary Grogan of Merrill Legal Solutions.

3                    Would the reporter please swear in the

4         witness.

5

6                              CHRISTOPHER A. MARTINEZ, having been

7     satisfactorily identified by the production of a

8     driver's license, and duly sworn by the Notary Public,

9     was examined and testified as follows:

10

11                    EXAMINATION BY MR. LORENZINI:

12

13         Q.    Good morning, Mr. Martinez.

14         A.    Good morning.

15         Q.    Have you ever been deposed before?

16         A.    Yes, I have.

17         Q.    So you're familiar with the general procedure

18    of the deposition?

19         A.    Yeah, generally speaking, yes.

20         Q.    I just want to remind you a few things.   We,

21    as you know, have a court reporter taking down

22    everything we say.   So in order to have a clean

23    transcript, it's important that we not interrupt each

24    other.

6

1    think, January of 1990, at which point I went to the

2    firm called Barrington Consulting, which was a split-off

3    group from Peterson; worked there until about September

4    of 19 -- I'm sorry, I'm getting my dates confused.

5                    I worked at Peterson from June of '98 --

6    I'm sorry, let me step back. June of 1998 through

7    January of 1991. January of 1991, I went to Barrington

8    Consulting; worked there from September of '91, at which

9    point I went back to school to the University of

10   California, Los Angeles.

11        Q.   Okay. And was Barrington Consulting also a

12   litigation consulting firm?

13        A.   Yes, it was. And then I was in school from

14   '91 to June of '93; went to work for Coopers & Lybrand,

15   big accounting firm, at the time the big eight

16   accounting firms. I worked at Coopers, gosh,

17   approximately three years.

18                    During the course of that work, I did

19   financial statement audits, started doing contract

20   compliance audits and reviews, among other

21   consulting-type projects. I guess in or about '96, I

22   went back to the Barrington Consulting Group. And in or

23   around 1998, I left Barrington and went to Deloitte &

24   Touche. And Deloitte & Touche was doing consulting,

10

1    providing consulting services, around litigation, around

2    contract compliance.  Was with Deloitte until January of

3    2000, when I went to work for a startup company called

4    Commercegov.com.

5                I worked there until maybe May of that

6    same year, 2000, and I went to work for another start-up

7    firm called Fish Eye; worked at Fish Eye through, I

8    would say, October of 2000, at which point I returned to

9    Deloitte; and I worked at Deloitte from October of 2000

10   through, oh, approximately September, October 2003.

11               I went to work for SBC Knowledge

12   Ventures, which was a wholly-owned subsidiary of SBC

13   Corporation, the phone company; and then in April of

14   2004, I went to work at StoneTurn Group, where I've

15   worked since.

16        Q.   When you were at Coopers & Lybrand from 1993

17   to 1996 -- do I have those years correct?

18        A.   Yeah.

19        Q.   What was your position during that time?

20        A.   I had a number of positions.  I think my final

21   position was a manager in the audit group.

22        Q.   And what were your responsibilities as a

23   manager at Coopers & Lybrand?

24        A.   I was the planning, supervision and

                                                              11

1    performance of audits of one form or another.

2        Q.    Were the audits that you planned and

3    supervised primarily financial statement audits?

4        A.    I would say about 50 percent of them were

5    financial statement audits and the other 50 percent were

6    other types of attest services.

7        Q.    Other types of what services?

8        A.    Attest.

9        Q.    Can you define that term for me?

10       A.    Yeah, attest, in the accounting world,

11   there -- a financial statement audit is considered part

12   of -- considered a subset of an attest engagement,

13   you're attesting to something.  There are a whole --

14   there are many other types of attest services.

15       Q.    What are the other types of attest services

16   that you performed or that you planned and supervised at

17   Coopers & Lybrand?

18       A.    For instance, contract compliance reviews,

19   contract compliance audits, where we would look at a

20   contract, be asked by one party or another to determine

21   whether or not the other party or several other parties

22   to that contract were in compliance, and so we undertake

23   various procedures to corroborate their actions, their

24   activities, including looking at documents, speaking to

12

1    individuals related and had knowledge of those parties'

2    dealings and coming up with an attestation as to

3    compliance one way or another.

4         Q.    What percentage of the audits that you planned

5    and supervised at Coopers & Lybrand consisted of

6    contractual compliance audits?

7         A.    I mean I would say probably 30 percent.

8         Q.    How many contractual compliance reviews did

9    you plan and supervise while at Coopers & Lybrand?

10        A.    I'm going to say probably around a dozen.

11        Q.    And what was your general procedure, if there

12   was one, in planning and supervising those contractual

13   compliance audits while at Coopers and Lybrand?

14        A.    Generally speaking, what we would do is, we

15   would request documentation relative to the contract.  I

16   should step back.  First, we would review the contract

17   at issue.  Second, we would ask information relevant to

18   contract compliance from the parties that we were going

19   to be reviewing.

20              Usually there would be an exchange of

21   information, discussions about what precisely we were

22   looking for, to what level of detail we were looking for

23   that information.  So there was a fair bit of

24   interaction with the parties that we were reviewing.

13

1         We'd request that information.  Once we

2    felt we had that information, satisfactory information,

3    to proceed with the audit, we would then evaluate all

4    the information that was given to us.  We would hold

5    interviews and ask for representations of the parties.

6    We would, depending on what the issues were, we would

7    perform analyses given the information we received both

8    from the people as well as from the documents, and then

9    ultimately we would opine within the form of a report of

10    some nature or another or some cases it was just an oral

11    report we would give to our clients.

12         So that's generally speaking, broadly

13    conceptually speaking, how we would undertake such

14    endeavors.

15         Q.   And did the contractual compliance audit

16    reviews that you planned and supervised at

17    Coopers & Lybrand always follow the same procedure or

18    did they differ depending on the circumstances and the

19    particular contract at issue?

20         A.   Well, I mean clearly given the contract,

21    contracts are all unique, typically unique.  So we would

22    obviously have to modify our approach related to

23    whatever the particulars were for that contract we were

24    looking at.

14

1              However, generally speaking, I think
2       pretty much every contract compliance review I did while
3       at Coopers followed that same pattern, and I think
4       generally speaking with the exception of the contract
5       compliance review that we did on behalf of Hancock for
6       Abbott or on behalf of Hancock of Abbott, they all
7       follow that general scheme.
8          Q.   Okay.  Well, I just want to stick with the
9       audits you did at Coopers & Lybrand for now.
10         A.   Okay.
11         Q.   Can you give me a list of the dozen companies
12      on whose behalf you've conducted contractual compliance
13      audits at Coopers & Lybrand?
14              MS. COLLARI TROAKE:  Just before we do that,
15         as we did yesterday with Mr. Hair, we'll designate
16         this part of the transcript as confidential under
17         the protective order.
18              MR. LORENZINI:  That's fine.
19              THE WITNESS:  Okay.  That was my issue.
20         A.   You mean the parties we were doing on behalf
21      of or the parties we were evaluating?
22         Q.   If you can remember both, that would be good,
23      but just go one at a time.  Why don't you first take the
24      companies on whose behalf you were working and then --

15

1        A.    Sure.

2        Q.    -- the counterparties?

3        A.    I can remember the companies we were working

4    for.   I'm not sure I can remember all the companies we

5    were evaluating.

6              One of the companies we were working for

7    was Behtel Group, Inc., a large construction management

8    firm based in San Francisco; and we were doing probably

9    at least six to eight of those dozen contract compliance

10   reviews related to evaluation of Behtel's subcontractors

11   or vendors, many of which were in the Middle East and

12   all of which -- at least I cannot pronounce their names

13   at the time nor do I remember them as I sit here today.

14       Q.    Are there other companies --

15       A.    And then also I did contract compliance

16   reviews on behalf of another construction firm, Guy F.

17   Atkinson who was based in south San Francisco; and it

18   was their vendors, two of their vendors.   I don't

19   remember their names.

20             And then a third client, an entity that

21   we worked on behalf of, was Lucas Film Limited, and in

22   particular their subsidiary, Lucas Arts Software

23   Company.   And one name I know I did at least a few

24   compliance reviews for Lucas Arts, and one name that

16

 1    comes up is Ubisoft, which is another software

 2    distributor.  There were a few others, but Ubisoft is

 3    the one I remember the name of.

 4        Q.   Ubisoft was the counterparty to the Lucas

 5    Film --

 6        A.   Lucas arts --

 7        Q.   Lucas arts --

 8        A.   -- entity, yes.

 9        Q.   Is that the complete list of companies --

10        A.   That's probably --

11        Q.   Please let me finish the question.

12             Is that the complete list of companies on

13    whose behalf you conducted contractual compliance audits

14    while at Coopers & Lybrand?

15        A.   Yeah, to the best of my recollection, that is

16    the complete list.

17        Q.   And did the contractual compliance audits that

18    you conducted while at Coopers & Lybrand include

19    interviews with employees of the counterparties?

20        A.   Yes, they did, in all cases.

21        Q.   How many interviews were conducted in your

22    contractual compliance review of Lucas Film Limited?

23        A.   Well, we --

24        Q.   I think I misstated the name there --

17

```
 1        A.    On behalf of Lucas --

 2              MR. GRIESINGER:  You guys are talking over

 3        each other, and I'm getting a painful look every

 4        now and then from the stenographer.  So if you

 5        could try not -- you're both doing it.

 6              So if you could try not to do that.  I'm just

 7        doing this for you.

 8   BY MR. LORENZINI:

 9        Q.    Let me first make sure I got the name right.

10   You worked on behalf of Lucas Art -- could you finish

11   the name for me?

12        A.    Lucas Arts is a subsidiary of Lucas Film

13   Limited.  So we were retained by Lucas Film Limited, but

14   we were working on behalf of Lucas Arts, their Lucas

15   Arts entity.

16        Q.    In that engagement, do you recall how many

17   interviews were conducted of the counterparty to that

18   contract?

19              MS. COLLARI TROAKE:  Objection.  Him

20        personally or in that audit?

21   BY MR. LORENZINI:

22        Q.    Based on your personal knowledge, do you know

23   how many interviews were conducted of the counterparty?

24        A.    Well, again, there were probably three
```

18

1    instances where we performed contract compliance audits

2    on behalf of Lucas Arts.  Generally speaking, in each of

3    those, they consisted of more than a few days of

4    meetings with the parties.  So typically, I can think of

5    the Ubisoft example, we had the interaction and

6    discussion with the other party in advance of getting

7    documents and we defined what we needed specifically.

8              We'd usually get more documents and then

9    we'd have more questions about those documents, so we

10   were sure what those documents said and what they

11   intended to say.  And then once we digested that, we

12   would go and have a couple days of actual face-to-face

13   meetings around a conference table passing documents

14   back and forth, you know, making sure we understood what

15   was going on, asking questions.

16             So, I don't know how many -- so to answer

17   your question, how many particular interviews?  I mean

18   there might have been three or four people involved on

19   the other side of the table, but they were ongoing

20   multi-day discussions.

21        Q.   And some of the interviews consisted of

22   communications about what documents were to be provided

23   by the counterparty?

24        A.   Well, I think that was usually the

19

1    prerequisite before the face-to-face meetings where we

2    would have those discussions over the phone.  We talked

3    about what we needed to complete our work.  They talked

4    about what documents were available, and available in

5    the normal course of their business or they could

6    possibly produce for us.

7              So we had the discussion about the

8    documents typically in advance.  There were sometimes

9    some of that discussion when we were meeting

10   face-to-face if there was a misunderstanding about what

11   a particular document conveyed.

12        Q.    In your three engagements on behalf of Lucas

13   Arts, in each of those engagements, how many documents

14   were produced by the counterparty to those contracts?

15        A.    Well, I believe we had access in, at least a

16   couple of those cases, to their entire accounting system

17   records.  So for instance, they said we'll give you some

18   printouts of the types of reports that we can produce

19   because obviously a lot of information is electronic.

20   And so we'll give you information, some example reports

21   but then once you come out to our facility, you know, we

22   can sit there next to the computer, you can ask for

23   queries.  We'll run them.

24              So essentially we had access to their

20

1    entire accounting system, and then we -- that's really

2    what the course of an audit is.  An audit is actually

3    understanding how records are compiled and what they

4    mean, and then testing those records for their accuracy.

5    And so by sitting next to an analyst who's on the

6    computer, writing queries into the accounting system, we

7    can then test the accounting system, what pops out when

8    you do this type of query, and therefore, we can test

9    the accuracy of the information we've been given.

10        Q.    And you think you were given access to the

11   entire accounting system in at least one of your

12   engagements on behalf of --

13        A.    I think at least two, and I would imagine on

14   the third, but I just don't remember on the third.

15        Q.    Besides the access to the accounting system,

16   how many documents were made available by Lucas Arts in

17   each of your three engagements?

18             MR. GRIESINGER:   To Lucas Arts?

19             MS. COLLARI TROAKE:   To Lucas Arts, right?

20             MR. LORENZINI:   Correct.  Let me rephrase

21        that.

22   BY MR. LORENZINI:

23        Q.    In each of your three engagements on behalf of

24   Lucas Arts, how many documents, besides the accounting

21

1    system documents, were made available by the

2    counterparties?

3         A.    Boxes of documents.   I mean I don't recall

4    specifically.   We had fairly stringent documentation

5    requirements, so we would have to document everything.

6              In a formal audit, you would document,

7    what we call, an audit trail; everything that you found

8    and the basis for those findings in the documentary

9    evidence.   So we had a fair bit of documentation, but I

10   would say in the order -- I guess I don't know, a lot of

11   documents.   But I can't -- I don't know what measure

12   you're looking for.

13        Q.    Whatever you can recall, if anything.   If you

14   can measure the number of boxes or pages or documents.

15   I realize this was a long time ago, but to the best of

16   your recollection.

17        A.    I mean typically, again typically, and I

18   remember one of the conference rooms was lined with

19   boxes.   And the course of interaction with the entity,

20   the personnel from that entity were able to define where

21   precisely the information was that we needed, so as to

22   not necessarily need to copy, you know, 50 boxes.

23              At the same time -- I'm not quite -- I'm

24   having trouble with this question because I'm not quite

22

```
 1    sure how to characterize the information that was in the

 2    accounting system that was available electronically.

 3    You know, if you printed it all out, it would be 100

 4    boxes, but we didn't ask for it printed all out because

 5    we were able to query it.  We were able to test the

 6    accuracy of it from an electronic standpoint.

 7             So that's where I'm having a little

 8    trouble answering that question.

 9         Q.   Is it fair to say that the number of documents

10    produced in the contractual compliance audits that you

11    conducted while at Coopers & Lybrand varied based on the

12    particular audit?

13             MS. COLLARI TROAKE:  Objection.  Do you mean

14        by produced the ones made available by the --

15             MR. LORENZINI:  Counterparty.

16             MS. COLLARI TROAKE:  Counterparty.

17         A.   Well, it certainly did vary.  You bring up the

18    whole period of Coopers.  When we would go to, for

19    instance, on behalf of Behtel, and we'd go to these

20    contractors, they had rooms full of boxes, rooms full of

21    paper, reams of papers that were available, and they

22    were much more paper focused.  A lot of software

23    companies we were reviewing on behalf of Lucas Arts were

24    much more electronically driven.
```

23

1          So there was a varying degree, but again,

2    it's hard to compare them apples to apples because

3    what's inside their server, it's hard to know the volume

4    of that for the software companies.

5          Q.   When you conducted contractual compliance

6    audits on behalf of the Behtel Group and the

7    countergroup parties provided you with large quantities

8    of documents, were you given any index to the documents

9    by the counterparties in any of those audits?

10         A.   Yes, we were told boxes 1 through 10 relate to

11   your question No. 1, whatever it was, whatever question

12   No. 1 was, you know, box -- basically, they tried to

13   make it easy on us so we can get in, perform our work,

14   come up with the opinions and leave.

15         So they typically did tell us, box one

16   contains this; box two contains that.

17         Q.   Were those indices that you received from the

18   counterparties to the Behtel Group contract, did they

19   describe every single document that was produced?

20         MS. COLLARI TROAKE:   Objection.

21         A.   I, again, we're generalizing because there was

22   probably half a dozen cases.  I know at least in some

23   cases, we did get an index of all the documents because

24   ·it had that sort of thing electronically.

24

1                In other instances, we had essentially a

2     human index, a person or people, who had knowledge of

3     the documents who were sitting in the room or available

4     to us.  So we would say, Where do we find documents that

5     related to, you know, this issue at issue one?  They

6     would walk us to those documents.  And actually more

7     specifically, they would actually say, This is where

8     they are, but I think what you're really looking for is

9     this document right here.  This will cut to the chase

10    for you.  This is what I think you're looking for.

11               Once we find what we're looking for, then

12    we can test its accuracy.  But they would usually help

13    us get there.  So like I say, I call it human index

14    because there was someone actually answering the

15    questions for us.

16          Q.   I'm not talking any human assistance that

17    might have been available.

18               You mentioned before that in at least in

19    some of the audits you conducted, you were provided with

20    a paper index that described which categories of your

21    request certain boxes were responsive to?

22          A.   Yes.

23          Q.   And I just want to clarify that those indices

24    were at that level of generality and didn't list the

25

1    title of each document within all of the boxes that were

2    produced?

3         A.   I think as I said, I know at least in one

4    instance, there was a very specific index because they

5    had it.  In most cases -- and obviously the level of

6    detail in the indices that we received varied on a

7    case-by-case basis.

8         Q.   And sometimes it was just at a box level --

9         A.   Yes.

10        Q.   -- describing generally what was in the box?

11        A.   At times it was at a box level, yes.

12        Q.   In the contractual compliance audits that you

13   conducted at Coopers & Lybrand, how many people

14   generally were part of the contractual compliance audit

15   team?

16        A.   The time I was -- the team I was in?

17        Q.   Correct.

18        A.   Anywhere from two to six people, I would say,

19   generally speaking.

20        Q.   So generally on each audit, Coopers & Lybrand

21   would have two to six people assigned to conduct that

22   audit?

23        A.   I guess I would say on any audit, two to six

24   people would work on that audit.  They might not have

26

1    been assigned from the very first day, but over the

2    course of the audit, two to six people would touch that

3    audit.

4         Q.   And did those teams of people include people

5    with different types of training and experience?  Let me

6    make it a little more concrete.

7              Was it the practice of Coopers & Lybrand

8    to include an attorney on each of the contractual

9    compliance teams?

10        A.   It was not.

11        Q.   Was it the practice of Coopers & Lybrand to

12   include on the team someone with some prior knowledge or

13   expertise in the industry?

14        A.   I would say it wasn't the practice, though

15   certainly if there was an individual that had industry

16   knowledge, they would be more attractive candidate to

17   work on that matter.

18        Q.   And why is that?

19             MS. COLLARI TROAKE:  Objection; if you know.

20        A.   It made the audit -- it made the questioning

21   of the individuals that we spoke to in the audit

22   sometimes a little smoother.

23        Q.   How long did the production of documents

24   generally take in the contractual compliance audits that

27

1    you conducted while at Coopers & Lybrand?

2         MS. COLLARI TROAKE:  Objection.

3         A.    It varied is the short answer.

4         Q.    What factors would influence the length of the

5    document production period?

6         MS. COLLARI TROAKE:  Objection.

7         A.    I don't know.  That was really on the side of

8    the other party.  I know in some instances under the

9    contract, the party I was working for had the right to

10    show up on a day's notice.  So in those instances, it

11    was a day.  And we showed up and that's what we got what

12    we got.

13         But I don't know the other side, the

14    other side's stories.

15         Q.    I want to turn to your work for Barrington

16    Consulting in 1996 --

17         A.    Yes.

18         Q.    -- through 1998; do I have those dates right?

19         A.    Yeah, I did work for Barrington for a brief

20    period in 1991, but yes, I was there '96 to '98.

21         Q.    What was your position at Barrington in 1991?

22         A.    I was a senior consultant.

23         Q.    What was your responsibility as a senior

24    consultant?

28

1          A.    To plan, manage, execute engagements.

2          Q.    What type of engagements?

3          A.    In 1991, I was working, I think, primarily on

4    litigation support engagements.

5          Q.    What do you mean by Litigation Support?

6          A.    Well, we worked on behalf of -- we worked

7    with -- for lawyers who were involved in litigation.

8          Q.    What types of services did you perform for the

9    lawyers?

10          A.    In some instances, we performed document

11    management services.  In some instance, we performed

12    economic analysis and culminating an expert witness

13    testimony.

14          Q.    What do you mean by Document Management

15    Services?

16          A.    Well, in some of the big litigations, I'm sure

17    you're aware, there's a lot of paper, a lot of

18    documents, especially back in that era.  It was not

19    electronic.  We would help them organize, analyze, find

20    documents that were relevant and that had been produced.

21          Q.    When you returned to Barrington Consulting in

22    1996, what was your position at that time?

23          A.    I was a senior manager.

24          Q.    And what were your responsibilities as senior

29

1    manager?

2        A.    Like, again, to supervise, plan, execute, work

3    in a leadership role within the teams.

4        Q.    And this was, again, providing litigation

5    support services?

6        A.    Yes, generally speaking.

7        Q.    Of the same type you just described?

8        A.    Yes, generally speaking.

9        Q.    Did you act as an expert witness in your

10    employment at Barrington?

11        A.    I did.

12        Q.    On how many occasions?

13        A.    I think just one occasion at Barrington.

14        Q.    Did you conduct any contractual compliance

15    audits while employed at Barrington?

16            MR. GRIESINGER:    We're talking about both

17        times he was employed at Barrington?

18            MR. LORENZINI:    Correct.

19        A.    You know I don't recall.  I don't recall if I

20    did or not at Barrington.

21        Q.    When you were employed by Deloitte & Touche

22    the first time, from 1998 to January 2000, what was your

23    position at that time?

24        A.    I was a senior manager.

30

1          Q.    And what were your responsibilities at senior

2    manager at Deloitte & Touche?

3          A.    Again, to plan, supervise and execute

4    engagements.

5          Q.    What type of engagements?

6          A.    Litigation support, contract compliance

7    engagements.

8          Q.    What percentage of your time do you estimate

9    at Deloitte & Touche in '98 to 2000, was spent on

10   litigation support activities?

11         A.    Roughly 50 percent.

12         Q.    And what percentage of your time roughly at

13   Deloitte from '98 to 2000 was spent on contractual

14   compliance?

15         A.    Roughly 50.

16         Q.    How many engagements did you have in the 1998

17   to 2000 period in which you conducted a contractual

18   compliance audit?

19         A.    I'm having trouble answering the question

20   because I can think of my whole Deloitte experience, but

21   I'm having trouble breaking it up into those periods.

22         Q.    Okay.   Well, let's get some background on your

23   next engagement at Deloitte.

24                         Between October 2000 and September 2003,

31

1    what was your position at Deloitte?

2        A.    Senior manager.

3        Q.    And were your responsibilities the same as

4    when you were employed between '98 and 2000?

5        A.    Yes.

6        Q.    And was the proportion of the time spent on

7    litigation support versus contractual compliance

8    essentially the same?

9        A.    Yes.

10       Q.    Okay.   Why don't you tell me how many

11    contractual compliance audits you conducted while

12    employed at Deloitte & Touche overall, including both

13    periods of employment?

14       A.    Probably conducted 80.

15       Q.    80?

16       A.    80 contract compliance engagements, yes.

17       Q.    Who were the companies on which you conducted

18    contract compliance audits?

19            MS. COLLARI TROAKE:   We'll have the same

20       approach here, that this bit of the transcript will

21       be designated confidential pursuant to the

22       protective order in the case.

23       A.    And again, your question was, who did I

24    perform them on?

32

1      Q.    Let's start with -- just go through, and if
2   you remember the counterparty, tell me; start with the
3   party on whose behalf you conducted the audit, and then
4   if you recall, tell me the counterparty?

5      A.    Okay.  I conducted many on behalf of Incyte
6   Genomics.  I conducted -- and some of the parties to
7   those contracts opposite Inctye were -- included Abbott
8   Pharmaceuticals, Aventis Pharmaceuticals, Millennium
9   Pharmaceuticals, Roche Pharmaceuticals -- or maybe it
10  was Hoffman LaRoche, the holding company.  I can't
11  remember the legal name, but it was ultimately Roche
12  Pharmaceuticals; Astra Zeneca Pharmaceuticals, Genentec,
13  Oxford Glyosciences, Novartis Pharmaceuticals.

14               I think in all, there were probably 20 to
15  25 I did on behalf of Incyte.  I'm just trying to think
16  of all the -- I think Sumotoma was one we did as well
17  from Sumotoma Pharma.

18      Q.    And did Incyte have separate contracts with
19  each of these companies?

20      A.    Yes, they did.

21      Q.    And what type of contracts were at issue in
22  that contractual compliance audit?

23               MS. COLLARI TROAKE:  In which?

24               MR. LORENZINI:  In all of those.

33

1    BY MR. LORENZINI:

2         Q.   Were they similar types of contracts?

3         A.   They were unique contracts, but they were

4    similar.   I mean there was some similarities.

5         Q.   In what -- strike that.

6              Can you just describe generally what

7    types of contracts were at issue in those audits?

8         A.   Yes, Incyte Genomics owned a significant

9    database of genomic information, which they sold on a

10   subscription basis to most of the major drug developers

11   in the world.   Involved in that -- it was a very

12   complicated agreement, but involved in that agreement

13   were various responsibilities on the part of the

14   subscribers to this database to track how and where they

15   were using that information.

16              And ultimately, they were also -- along

17   with that usage, there were various financial

18   obligations and milestone payments and such, and there

19   were also reached through royalty arrangement that also

20   needed to be monitored.   So there were many elements to

21   those contracts that required and the contracts allowed

22   for audit of those performance on those contract

23   elements.

24         Q.   Rather than have you go through the entire --

34

1    continue to go through the entire list of companies on

2    whose behalf you conducted contractual compliance

3    audits, can you tell me whether there were any other

4    contractual compliance audits you conducted while at

5    Deloitte & Touche that involved a pharmaceutical

6    company?

7         A.    I did a contract compliance audit on behalf of

8    the University of Texas, South Western Medical Center, I

9    believe, of Elan Pharmaceuticals.  I know I did a few

10   others.  I did --

11                   You're looking for pharmaceutical

12   companies?

13        Q.    Correct.

14        A.    There was a drug developer here in Boston and

15   I can't remember its name, but I also did that on behalf

16   of A.D. Anderson.  I believe it was A.D. Anderson

17   Medical Center, which is part of the University of Texas

18   system out of Houston, and it was a company here.  I

19   can't remember the name of the company.  It's in

20   Cambridge, I believe.

21                   There was other biotech, other bioscience

22   drug delivery.  Another drug delivery company, and again

23   I don't remember the name, that I did on behalf of the

24   University of Texas.

35

1           That's all I remember off the top of my

2    head.

3           Q.    Did you do any contractual compliance audits

4    on behalf of John Hancock while at Deloitte & Touche?

5           A.    I did not.

6           Q.    And am I correct that the only audit you

7    conducted involving Abbott while at Deloitte, was the

8    audit involving the contract with Incyte Genomics?

9           A.    Correct.

10          Q.    How long did the audit of Abbott on behalf of

11   Incyte Genomics last?

12          A.    I guess from first contact through issuance of

13   report, it was probably two months, maybe three months.

14          Q.    And can you describe the methodology you

15   followed in your contractual compliance audit of Abbott

16   on behalf of Incyte Genomics?

17          A.    Yes, we -- Incyte Genomics notified Abbott of

18   their exercising their rights to audit an independent

19   auditor.    In that correspondence, they introduced

20   Deloitte & Touche; and me, in particular, as the contact

21   person.    Based on that introduction and receiving

22   contact information of the people at Abbott that we

23   needed to initiate the engagement with, we, I believe,

24   wrote a letter to them saying, This is what we're

36

1    looking to do.  Here's a list of documents that we're

2    looking for.  These are the type of people we're going

3    to want to speak to.

4            They received that.  They called us and

5    said, Gosh, we know what you're looking for these type

6    of documents.  We don't have something precisely on

7    point with some of them.  Some of them we know exactly

8    what you mean, but what do you mean by some of them?

9            So there was a dialogue where they were

10   trying to get clarity on what we were looking for.  And

11   really, I think the key in that audit, as in most audits

12   is that you have to come to some understanding with the

13   person as to what you're looking for, so they can

14   provide it.  Usually we find that just giving them a

15   list of documents we're looking for, even if they think

16   they've satisfied that list, a lot of times they haven't

17   because they don't really know what our underlying

18   motivation is in terms of the types of documents we're

19   looking for.

20           So it's usually that process of

21   interchange/interaction with those people that allows us

22   to explain what we're looking for and that allows them

23   to streamline the process.  And so --

24       Q.   I just want to interrupt you right there.

37

1              Is that a process that you generally have

2      followed in your contractual compliance audits of

3      meeting with the counterparties to the contract as soon

4      as possible to have a dialogue about what type of

5      documents you're looking for?

6              MS. COLLARI TROAKE:  Objection.  You mean his

7 '        entire career or his time at Deloitte?

8      BY MR. LORENZINI:

9          Q.    In your entire career of conducting

10     contractual compliance audits, is that a general

11     practice of yours to try to have a meeting as soon as

12     possible in the process, to have a dialogue about what

13     type of documents you are looking for?

14         A.    I mean generally speaking, it really depends

15     on the circumstances.  So it's hard to generalize

16     something of that nature, though I would say, generally

17     speaking, more communication is always been helpful in

18     the process.

19         Q.    And it's better to have that communication

20     happen earlier rather than later in the process,

21     correct?

22         A.    Well, it's good to have it throughout, I guess

23     I would say.

24         Q.    But beginning as early as possible, correct?

38

1          A.    As early as is practical, I would say.

2          Q.    And I think you testified before that it's

3    generally not particularly helpful to just get huge

4    production of documents without having some dialogue

5    first regarding specifically what type of documents are

6    going to be needed for the audit; is that correct?

7          MS. COLLARI TROAKE:    Objection.

8          A.    Yeah, I don't think I quite said that, but I

9    think I've -- I would -- I guess to answer your

10   question, I don't think I said that.

11         Q.    What is your preference in terms of getting --

12   of having a dialogue?   Would you rather have that happen

13   before documents are produced?

14         A.    We're talking generally speaking?

15         Q.    Correct.

16         A.    I guess, I mean generally speaking, it's nice

17   to have a dialogue.   I've been in different situations

18   where, you know, the dialogue has occurred when they

19   produced the documents, and that sometimes helps us hone

20   in, you have 100 boxes here, but these are the 10 that

21   really have the important stuff you're looking for.

22               Generally speaking, yes, again, I fall

23   back, more communication is usually better.   It's nice

24   to have communication.   In effect, the communication can

39

1    take place on many levels and on many paradigms.

2        Q.    I sort of interrupted you there.  You were

3    describing the process that you followed in conducting

4    the audit of Abbott on behalf of Incyte Genomics, and

5    you mentioned you had dialogue early on about what type

6    of documents you were looking for.

7                    What other procedures did you follow in

8    conducting that audit?

9        A.    Well, we then -- I mean as I think I

10   indicated, we looked at the contract.  We had meetings

11   with Incyte to discuss the issues.  We made contact with

12   Abbott.  We created a workplan of objectives and

13   specific procedures we hoped to perform, and then we

14   scheduled --

15                    We look at the documents.  We, again, had

16   that communication, and we scheduled interviews,

17   multi-day interviews with the Abbott personnel who are

18   most knowledgeable about the contract compliance.

19       Q.    Do you know how many Abbott personnel were

20   interviewed in the course of that audit?

21       A.    Oh, gosh, probably three to five, I'm going to

22   guess at.  I don't remember specifically, so I guess

23   that's speculation.  But I know there were at least two

24   folks that met us and I know that other folks came into

40

1    the meeting.

2        Q.    Are there any other procedures you followed in

3    conducting that audit of Abbott?

4        A.    Well, once we had those discussions with the

5    individuals and asked questions, we then asked -- I

6    think we asked for corroborating evidence, meaning

7    you've given us some information.  Now you told us some

8    things.  Can you give us more information that would

9    support whatever those positions are that your procedure

10   is X or Y?

11           We would follow up with those requests.

12   Typically, there are subsequent document requests based

13   on our interviews.

14       Q.    Not always, though?

15       A.    Not always.  I can't say universally, but I

16   think in most cases there are.

17       Q.    Is there any typical procedure you have

18   followed with respect to photocopying documents during

19   the contractual compliance audits?

20           MS. COLLARI TROAKE:  Objection.  Again, do you

21           mean with every job he had:  Coopers, Deloitte

22           Barrington, StoneTurn --

23           MR. LORENZINI:  Yes.

24           MS. COLLARI TROAKE:  -- or while he was at

41

1        Deloitte?  And him personally or what those company

2        procedures were?

3   BY MR. LORENZINI:

4        Q.    Based on your personal experience.

5        A.    Well, based on my personal experience, we

6   always preferred to get copies as we were looking at

7   documents.  So, for instance, in many instances, we

8   would find, you know, we would find a document that was

9   interesting.  We would be allowed to take it over to the

10  copy machine and photocopy it.

11              It made for a little more efficient

12  process because then we didn't have to wait for the

13  document to be copied by someone else.

14       Q.    That was your preferred --

15       A.    That was my preference, yes.

16       Q.    But that -- was that not always possible?

17              MS. COLLARI TROAKE:  Objection.

18       A.    Well, certainly in the Abbott audit that we

19  did that's at issue in this matter, it was not allowed

20  by Abbott.

21       Q.    Putting aside the Abbott matter, were there

22  always photocopiers available for you to make your own

23  copies in the contractual compliance audits that you

24  conducted?

42

1                MS. COLLARI TROAKE:   Objection.

2        A.   Well, in some instances, it might have been a

3    party.   It might have been an employee of the party that

4    we were visiting that would go make the copies.   I think

5    in some instances when it was bulk copying, they would

6    send that copying out.

7        Q.   So in some instances, in your contractual

8    compliance audit experience, the counterparty to the

9    contract would send documents out for copying that you

10   had selected, correct?

11       A.   In some instances, and they're obviously

12   different situations, but in some instances, documents

13   were sent out for convenience.

14       Q.   In the contractual compliance audits that you

15   conducted throughout your career, do you generally

16   produce a report, a written report, to the client?

17       A.   It's really -- generally speaking, there's no

18   rule.   I have done oral reports.   I've done PowerPoint

19   type slide reports.   I've done formal written 20-page,

20   30-page, 40-page text reports.

21                It's really a matter of what is desired

22   by the client.

23       Q.   In your experience, do you always provide some

24   type of report, whether it be oral or written after

43

1    conducting a contractual compliance audit?

2         A.   It's typically upon concluding an audit, a

3    contractual compliance audit, I'll provide some sort of

4    report.

5         Q.   Do you typically provide interim reports prior

6    to conclusion?

7         A.   Typically, no.

8         Q.   Do you sometimes provide interim reports prior

9    to conclusion of the audit?

10        A.   I think there have been instances when we have

11   had trouble -- trouble getting to a conclusion where

12   we've provided interim feedback.

13        Q.   Are there any other circumstances in which you

14   have provided interim reports prior to conclusion of the

15   audit?

16        A.   Again, I wouldn't characterize them as

17   reports, per say.  I think we provided feedback;

18   provided information.  I think it's very rare, and I

19   can't even think of an instance off the top of my head,

20   where we would provide a report for an unfinished --

21   well, a contract compliance evaluation.

22        Q.   Just to carry on here with your work

23   experience, what was your position in 2000 at

24   Commercegov.com?

44

 1       Q.    Has StoneTurn been provided with copies of

 2    documents that Abbott produced in the litigation?

 3       A.    StoneTurn has been given access, I guess some

 4    limited access to, for lack of better term, on-line

 5    database, of the litigation-produced documents.

 6       Q.    And to your knowledge, does that on-line

 7    database include all the documents that have been

 8    produced by Abbott in the litigation?

 9             MS. COLLARI TROAKE:   Objection; and I'm going

10       to -- to the extent you know, but exclude anything

11       that would reveal attorney-client privilege and

12       work product.

13       A.    I don't know if it includes absolutely

14    everything because I know there's work product

15    potentially in that, in the database, therefore, I know

16    we were given some limited access.  I'm not sure to what

17    extent that access was limited, if it's limited to

18    documents or whatnot.

19       Q.    Do you know how many documents are in the

20    database that you are referring to?

21       A.    I don't.

22             MS. COLLARI TROAKE:   Same objection.

23       A.    I don't know how many documents.

24       Q.    Does that database include documents that are

                                                              68

1    stamped confidential?

2            MS. COLLARI TROAKE:   Same objection; if you
3        know.

4        A.   I don't know one way or the other as I sit
5    here.

6        Q.   What is the purpose of your having access to
7    that on-line database other than making comparison of
8    redacted and unredacted documents?

9            MS. COLLARI TROAKE:   Same objection.   You can
10       answer to the extent it wouldn't reveal any
11       attorney-client privilege information or work
12       product.

13            THE WITNESS:   Okay.

14       A.   We also did an analysis of documents that were
15   produced in the course of the litigation that were not
16   produced in the course of the audit, and we used that
17   database for that purpose.

18       Q.   Does StoneTurn have copies of all the
19   documents that were made available by Abbott during the
20   course of the audit?

21       A.   No, we do not.

22       Q.   So when you just mentioned you were doing an
23   analysis of documents produced in the litigation but not
24   in the audit, do you mean you're doing an analysis of

69

1    documents produced in the litigation versus the

2    documents that StoneTurn copied during the audit?

3         A.    No, that's not what I mean.

4         Q.    How are you able to do a comparison of

5    documents produced by Abbott, if you don't have copies

6    of all the documents produced by Abbott?

7         A.    Well, during the course of the audit, we did a

8    very long index of the documents that we were reviewing.

9    In the course of the audit, we essentially endeavored,

10   and we explained this to Abbott at the outset, that we

11   wanted to see all the documents that were available for

12   the audit before we decided which particular documents

13   we would use.

14                     Similar to all the other procedures and

15   all the other audits I have done for the most part, we

16   wanted to see what the universe of information was

17   before we decided which piece of information to use, so

18   we created this index.

19        Q.    And what type of information is on the index

20   that StoneTurn created?

21        A.    Well, description of the documents, if

22   possible, the compound that relates -- that those

23   documents relate to, the period of time that the

24   document relates to.

70

1        Q.    Some of the documents in what you were

2    referring to --

3        A.    Box 7 --

4        Q.    Please let me finish the question, just for

5    the clear record.

6              StoneTurn did eventually receive

7    documents that were contained in what you were referring

8    to as box 17?

9        A.    When we received access to the on-line

10   database documents produced in the litigation between

11   Abbott and Hancock, we looked for some of those

12   documents and found some of those documents, yes.

13       Q.    When did you receive access to the on-line

14   database of documents produced by Abbott in the

15   litigation?

16       A.    I believe it probably would have been this

17   summer, summer of 2006, at some point; July, August,

18   maybe.

19       Q.    Prior to gaining access to the on-line

20   database of Abbott documents, had you been provided with

21   paper copies of documents produced by Abbott in the

22   litigation?

23       A.    I don't know.   I don't know if I had been or

24   not.


130

1        Q.    You're aware that there was an initial

2    litigation involving Hancock and Abbott that started

3    back in 2004?

4        A.    Yes, yes.

5        Q.    And then there was a second action initiated

6    by Hancock in 2005?

7        A.    I'm aware there were two.  I'm not sure of all

8    the particulars of -- I'm not sure if they were separate

9    or the same, but I generally have that understanding.

10       Q.    With that general understanding, in the

11   initial action brought by Hancock in 2004 --

12             MS. COLLARI TROAKE:  Eric, just so we're clear

13        it was '03.

14             MR. LORENZINI:  Thank you.  It was before my

15        involvement in this case.

16   BY MR. LORENZINI:

17       Q.    In that initial action brought by Hancock in

18   2003, do you know if StoneTurn received any documents

19   produced by Abbott in that litigation from Choate Hall &

20   Stewart?

21       A.    See, and that's what -- I don't know.  I don't

22   know if we did or not.

23       Q.    You may have?

24       A.    We may have.

131

1       Q.    But you definitely received documents produced

2   by Abbott in the second litigation?

3       A.    Yes.

4       Q.    And you received those --

5       A.    We had access to the database, yes.

6       Q.    And you may have received paper documents as

7   well?

8       A.    Well, we could print from database, so we can

9   convert the electronic to paper.

10      Q.    What I'm getting at, before that database was

11  created, do you know if Choate Hall & Stewart provided

12  copies of documents produced by Abbott in the

13  litigation?

14      A.    I don't know.  I don't know for sure.

15      Q.    Going back to your selection of documents for

16  copying in the initial visit to Abbott, what was the

17  particular method you used to flag documents for

18  copying?

19      A.    We would, until we find a document we want in

20  a particular box, we would, one, label the box very

21  clearly so we could put it back where it went.  Again,

22  it was very important for us to make sure we could find

23  these boxes later when we needed the documents.

24            So we would flag the box.  The box would

132

# EXHIBIT B

CERTIFIED
COPY

CONFIDENTIAL

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11150-DPW

- - - - - - - - - - - - - - - - - - - - - - - x

JOHN HANCOCK LIFE INSURANCE COMPANY,

JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY,

and MANULIFE INSURANCE COMPANY,

(f/k/a INVESTORS PARTNER INSURANCE COMPANY),

                 Plaintiffs,

     v.

ABBOTT LABORATORIES,

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - x

VOLUME II

DEPOSITION OF CHRIS MARTINEZ

Thursday, March 22, 2007, 9:00 a.m.

Donnelly, Conroy & Gelhaar, LLP

One Beacon Street

Boston, Massachusetts

Reporter:  Dana Welch, CSR, RPR

```
 1    APPEARANCES:

 2    Representing the Plaintiffs:

 3            CHOATE, HALL & STEWART LLP

 4            Two International Place

 5            Boston, Massachusetts  02110

 6            617.248.5000  Fax:  617.248.4000

 7            ktroake@choate.com

 8            BY:  Karen Collari Troake, Esq.

 9

10    Representing the Defendant:

11            MUNGER, TOLLES & OLSON LLP

12            355 South Grand Avenue, 35th Floor

13            Los Angeles, CA  90071-1560

14            213.683.9207  Fax:  213.687.3702

15            eric.lorenzini@mto.com

16            By:  Eric J. Lorenzini, Esq.

17

18     Representing the witness:

19            GRIESINGER, TIGHE & MAFFEI, LLP

20            176 Federal Street

21            Boston, Massachusetts  02110-2214

22            617.542.9900  Fax:  617.542.0900

23            acg@gtmllp.com

24            By:  Andrew C. Griesinger, Esq.
```

272

1                    P R O C E E D I N G S

2                    CHRISTOPHER MARTINEZ,

3       having been satisfactorily identified by the

4       production of his driver's license, and duly sworn

5       by the Notary Public, was examined and testified as

6       follows:

7                    (Exhibit No. 10, JHII 021526 - 594, marked

8              for identification.)

9                                      EXAMINATION

10      BY MR. LORENZINI:

11             Q.   Good morning, Mr. Martinez.

12             A.   Good morning.

13             Q.   You have before you what the court

14      reporter has marked as Exhibit Number 10, Martinez

15      Exhibit Number 10.  Do you recognize this document?

16             A.   Yes, I do.

17             Q.   What is it?

18             A.   This appears to be the index that

19      StoneTurn prepared of the documents we reviewed

20      related to the Abbott so-called audit.

21             Q.   This is the index that you referred to in

22      your testimony in your prior deposition?

23             A.   Yes.

24             Q.   And you participated in the creation of

                                                            275

1          for identification.)

2     BY MR. LORENZINI:

3          Q.   Mr. Martinez, I'm going to return to

4     Exhibit 17 but for now I'd like you to take a look

5     at what's just been marked as Exhibit 18.

6          A.   Yes.

7          Q.   Do you recognize this exhibit?

8          A.   Yes.  This appears -- yes, I do.

9          Q.   And for the record, the heading on

10    Exhibit 18 is, "John Hancock contract compliance

11    inspection of Abbott records related to March 13,

12    2001 research-funding agreement."

13         Do you know who created this document?

14         A.   Yes.  I did.

15         Q.   When did you create this document?

16         A.   I created this on an ongoing basis over

17    the course of the dates listed.

18         Q.   And what was your purpose in creating this

19    document?

20         A.   My purpose was to just keep a record, a

21    high-level record of my communications with Abbott.

22         Q.   Did you record all of your communications

23    with Abbott on Exhibit 18?

24         A.   I don't believe so, no.

340

1       Q.   What -- how did you decide whether to

2   record a communication with Abbott on Exhibit 18?

3       A.   Well, it was my intent to record all of

4   the substantive communications.  There were

5   instances where I -- I didn't record certain

6   communications.

7       Q.   Do you know why?

8       A.   Mostly -- one, because they might not have

9   been substantive or, two, because -- well, weren't

10  substantive, such as a phone call that I just left

11  a message and I never recorded it here, and there

12  were instances of that nature.

13      Q.   What other information did you attempt to

14  record in Exhibit 18 besides communications with

15  Abbott?

16           MS. TROAKE:  Objection.

17      A.   I think that was generally the intent of

18  this, was to record communications.

19      Q.   And what was your purpose in creating this

20  document?

21           MS. TROAKE:  Objection.  He's already

22       answered that.

23      A.   My purpose was to record the

24  communications with Abbott that I had relative to

341

1    this project.

2        Q.  But why did you want to record

3    communications with Abbott relating to this

4    project?

5        A.  Well, I wanted to know what my

6    communications were.  I think it became apparent

7    fairly quickly in the process that things were

8    going to take longer than I had anticipated.

9        Q.  When did you first start creating this

10   document?

11       A.  I think I created the first entry on

12   June 30th.

13       Q.  Did you --

14       A.  June 30th of 2004.  I'm sorry.

15       Q.  Did you provide this document to anyone?

16           MS. TROAKE:  Objection.

17       A.  I provided it --

18       Q.  Other than giving it to counsel to be

19   produced in the litigation?

20       A.  Other than -- no.

21       Q.  You didn't give it to Hancock counsel

22   other than for production in the litigation?

23       A.  I only gave it to Hancock counsel in

24   response to production requests.

342