UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY),<br><br>   Plaintiffs,<br><br>  vs.<br><br>ABBOTT LABORATORIES,<br><br>   Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 05-11150-DPW<br>Hon. Judge Douglas P. Woodlock |

### **CORRECTIONS TO THE AFFIDAVIT OF MICHELLE L. CAMPBELL**

Abbott Laboratories ("Abbott") respectfully submits the attached corrected Affidavit of Michelle L. Campbell, attached hereto as Exhibit A. The corrections are as follows:

  1)  In the heading, paragraph 1, and the signature block "Michelle M. Campbell" was changed to "Michelle L. Campbell";

  2)  In paragraph 9, "contract attorneys" was changed to "contract paralegals";

  3)  In paragraph 17, "the accounting and financial areas" was changed to "the accounting and financial area" and "In the financial areas, shared drives were used" was changed to "In the financial area, the shared drive was used";

  4)  In paragraph 20, "which tracks scientist time entries" was changed to "which tracks external expenditures on development of compounds" and "Project reports were generated

from these two databases . . . and were made available" was changed to "Project reports generated from these two databases . . . were made available"; and

    5)    In paragraph 24, "January 31, 2004" was changed to "January 31, 2005".

Dated:  March 11, 2008                       Respectfully submitted,

                                                   ABBOTT LABORATORIES

                                                   By its attorneys

                                                            /s/ Eric J. Lorenzini
                                                          Eric J. Lorenzini

                                         Michael S. D'Orsi
                                         Peter E. Gelhaar (BBO #188310)
                                         Michael S. D'Orsi (BBO #566960)
                                         DONNELLY, CONROY & GELHAAR LLP
                                         1 Beacon St., 33rd Floor
                                         Boston, Massachusetts 02108
                                         (617) 720-2880

                                         and

                                         Jeffrey I. Weinberger (Admitted Pro Hac Vice)
                                         Gregory D. Phillips (Admitted Pro Hac Vice)
                                         Eric J. Lorenzini (Admitted Pro Hac Vice)
                                         Ozge Guzelsu (Admitted Pro Hac Vice)
                                         MUNGER, TOLLES & OLSON LLP
                                         355 South Grand Avenue, 35th Floor
                                         Los Angeles, CA  90071
                                         (213) 683-9100

                                         *Counsel for Abbott Laboratories*

## CERTIFICATE OF SERVICE

     I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 11, 2008.

Date: March 11, 2008.

                                                                   /s/ Eric J. Lorenzini

4629079.1

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>Defendant. | CIVIL ACTION NO. 05-11150-DPW |

## AFFIDAVIT OF MICHELLE L. CAMPBELL

I, Michelle L. Campbell, hereby declare and say:

1. My name is Michelle L. Campbell. I am over 18 years of age, and suffer from no condition or disability that would impair my ability to give sworn testimony. This affidavit is based upon my own personal knowledge.

Education and Professional Background

2. I received my undergraduate degree in Biology from Northern Illinois University in 1993. I subsequently received my paralegal certificate from Harper College.

3. I have worked for Abbott since approximately 2002, when I became a litigation paralegal in Abbott's Legal Department. Prior to beginning work for Abbott, I worked as a paralegal for two private Chicago law firms. I am currently employed by Abbott as a Senior Paralegal in commercial litigation. My immediate supervisor is Ellen Klaus, Paralegal Supervisor.

1

4.      Since joining Abbott, I have worked on many different general litigation projects, including responses to requests for production of documents, subpoena duces tecum, and general requests for information.

5.      As part of my responsibilities as an Abbott litigation paralegal, I have often been responsible for collecting documents from various departments and individuals at Abbott, including certain central corporate and departmental repositories of documents in hard copy and electronic form.  In the course of performing this work since I joined Abbott, I have become very familiar with the various sources of documents and other information at Abbott.  In addition, I have interviewed many Abbott employees in the course of my collection of information and have become very familiar with the various organizations within Abbott and their respective responsibilities.  This knowledge of Abbott's sources of information, employees and organization has allowed me to perform my job responsibilities at Abbott in responding for requests for information.

The Hancock Contractual Audit

6.      In 2004, one of my responsibilities was to work on Abbott's response to the Hancock audit related to the Research Funding Agreement (the "Agreement") entered into by Abbott and Hancock on March 13, 2001.  Prior to working on the audit, I had been working on projects related to the lawsuit between Hancock and Abbott which is often referred to as "Hancock I," the first of the two civil lawsuits between the parties.  During 2004, I was also responsible for collecting and producing documents in that litigation.

7.      I am aware that Hancock sent an audit demand dated April 12, 2004 to Abbott that included as "Schedule A," a "preliminary list" of 30 or more particular categories of

documents sought by the audit. I was provided with a copy of "Schedule A" to enable me to work on Abbott's production of documents in response to it. A true and correct copy of Hancock's letter to Abbott dated April 12, 2004, including the "Schedule A" with which I am familiar, is attached hereto as D's Exhibit 692.

8.  I was asked by Kenneth Wittenberg, Senior Counsel, Litigation, to participate in the audit by organizing the collection of documents and by being the principal point of contact for Hancock's auditors from the StoneTurn firm for purposes of the audit. Attached hereto as D's Exhibit 798 is a true and correct copy of an email dated April 20, 2004 that I received referencing an Abbott internal meeting with Mr. Wittenberg, me, and Amy Potthoff, Kenneth Stiles, Thomas Woidat and Richard Pinto of Abbott's finance department regarding the Hancock audit that I attended.

9.  I was given principal responsibility at Abbott for collecting, reviewing and producing the documents in response to Hancock's audit demand. I worked on the audit with Mr. Wittenberg, Abbott's outside counsel (Winston & Strawn), and non-legal personnel who participated in the identification, collection, assembly, and copying of documents for production to StoneTurn. We also engaged five outside paralegals through Manpower, Inc. (which works with contract firms such as Special Counsel) to perform the review and redaction of audit documents prior to making them available to StoneTurn. I supervised the contract attorneys from Manpower, Inc., with the assistance an outside contractor, Carey Crimmons, who was also engaged to help with the audit response.

10. I began the process of identifying and collecting documents to be produced in response to Hancock's audit demand soon after I learned of it. Based on my prior

3

experience and knowledge of Abbott and discussions with the individuals who attended the meeting referenced above, I identified Abbott employees who would be able to assist me in focusing my efforts on the most relevant sources of documents. Among the Abbott employees whom I contacted initially in this regard were, in addition to Mr. Stiles, Mr. Pinto, Mr. Woidat, and Ms. Potthoff, were Chris Sopata, Richard Herst and Rhonda Rickey, each of whom worked in one of Abbott's therapeutic areas, and Keith Hendricks, the head of Abbott's Decision Support Group, among others. For example, I recall discussing Hancock's requests for timesheets with Mr. Stiles. He informed me that timesheets were housed in Abbott's Department of Corporate Records in North Chicago.

11.     Within months of receiving the audit demand, we made several hundred boxes of documents available to StoneTurn. The majority of the documents that we collected were made available during normal business hours, at an Abbott facility located in Mundelein, Illinois. The documents included in the initial productions were mostly unredacted. Production of the remaining documents in response to Hancock's audit demand was made throughout the remainder of 2004 and early 2005. We later produced approximately 50 more boxes of documents for StoneTurn's review that required redactions and further sorting before they could be produced because they contained information unrelated to the Program Compounds identified in the Agreement ("Program Compounds"). I reviewed some of the documents being redacted throughout the course of the redaction process. The process of sorting and redaction slowed down the production of materials as compared to previous several hundred boxes of mostly unredacted documents.

12. In total, in response to Hancock's audit demand, we collected and made over 800 boxes of documents available to Hancock for inspection.

13. I worked diligently on collecting and producing the documents responsive to Hancock's audit demand from the time I first learned of the demand until the production was completed in March 2005. At all times, I worked to the best of my ability to ensure that the responsive documents were located, collected, reviewed and produced expeditiously. Based on my work in supervising the team of individuals who assisted collection, review and production of documents, I believe that all those who worked with me also acted in good faith to complete the production on a timely basis. At one point, after Abbott had expended over $100,000 in photocopying costs responding to the audit, I was asked by Mr. Wittenberg to temporarily defer additional photocopying for cost reasons. I was instructed, however, to otherwise continue collecting and making available documents in response to the audit. Within a few weeks, Mr. Wittenberg approved the resumption.

Sources of the Documents Produced in the Audit

14. In determining which potential sources of documents should be searched, we started with the understanding that the goal of our efforts with regard to the audit was to search for, collect and produce all non-privileged documents related to the Program Compounds and responsive to the audit demand in Abbott's custody and possession. Based on my experience with previous productions of documents from Abbott's records, as well as my discussions with Abbott employees following our receipt of Hancock's audit demand, we determined that the materials that would need to be produced in response to the demand were kept and maintained in at least four different ways: (1) at

5

the "RIC" Research Information Center; (2) at Corporate Records; (3) in shared drives among relevant departments; (4) and in databases and portals set up by individual areas. I had had previous knowledge of and experience with the RIC and Corporate Records from my work as a litigation paralegal at Abbott. During the course of my work on the audit, I gained knowledge regarding the shared drives, databases and portals. The specific areas that we searched, and from which we collected and produced documents, and the scope of our efforts to collect documents from each of them are described in the following paragraphs.

15.     Abbott's "RIC," or Research Information Center is a records management service that we use to maintain all of Abbott's clinical/FDA records. It is separate from Corporate Records because it has its own rules that are intended to comply with FDA guidelines for retention and storage. The RIC maintains a large quantify of documents, including the following categories of information: (1) regulatory filings (including INDs, NDAs, supplements, serials, correspondence with regulators); (2) trial master files (including clinical documentation that support a clinical trial, such as informed consent documents, protocols, CVs, 1572 forms (Statements of Investigators), trip reports, CRFs (Case Report Forms), investigator brochures, and clinical agreements); (3) clinical reports (including final clinical reports, preclinical animal studies, analytical reports, and product development reports); (4) specimens (actual animal tissues from preclinical GLP studies); and (5) laboratory notebook supplements. We collected and made available to StoneTurn auditors all materials in the RIC relating to the Program Compounds and the Hancock audit demand with the exception of specimens and laboratory notebooks.

16.    Unlike the RIC records, the documents stored in "Corporate Records" are not limited to a particular kind of document, such as those relating to FDA approval. Instead, any Abbott employee can place any kind of written material into Corporate Records. Examples of some types of documents that typically are housed within Corporate Records, and which generally are not maintained within the RIC, are timesheets, purchase orders, financial documents, and other voluminous data. In addition, Corporate Records includes "governmental submission" documents, such as reports filed with the FDA regarding Abbott's research and development of compounds. We collected and made available all government submissions in Corporate Records pertaining to the Program Compounds, which to some extent might have overlapped with some RIC documents. In addition, as discussed above, we also collected and produced individual time sheets from Corporate Records.

17.    Shared drives are part of our internal computer network and are segregated by department. Each therapeutic area (as well as the accounting and financial area) has a separate shared drive. In the financial area, the shared drive was used to save, among other things, budget proposals, presentations to management related to financial issues, and work papers. In the therapeutic areas, final papers, study protocols, research memoranda and other draft documents were saved. The relevant shared drives were searched for these documents and produced in the audit to the extent they related to the Program Compounds.

18.    We also searched a database which crosses therapeutic areas called the MPSR, which stands for the Monthly Project Status Report database. The MPSR contains various project status reports, including Monthly Highlights Memoranda, Monthly

7

Compound Project Status Reports, PARD reports or other monthly reports. All status reports within the MPSR database for the period March 2001 to the date of the audit production were collected for each of the Program Compounds and made available to Hancock's auditors for inspection.

19.     Abbott's oncology group, which was responsible for four of the nine compounds subject to the Agreement, maintained two other databases that are referred to internally as "portals." Although some of the data contained in these portals is duplicative of the MPSR database, we searched these portals for documents pertaining to the Research Program, and all documents related to the Research Program from these portals were made available to StoneTurn.

20.     We searched three additional databases or systems for financial and accounting documents concerning the Research Program. First, we searched for documents pertaining to the Research Program from our "R/oss" database, which tracks external expenditures on development of compounds. Second, we searched for documents pertaining to the Research Program in the COMPASS database, which stands for Comprehensive Project Accounting System. The COMPASS database tracks all expenses by project. Project reports generated from these two databases for the Research Program were made available to Hancock's auditors in the audit. Third, we searched for relevant materials in the Optika system, which is an accounts payable system into which Administrative Check Request ("ACR") backup is scanned.

21.     We did not generally collect and produce to StoneTurn the emails and individual desk files of all of the many Abbott employees who may or may not have maintained individual files pertaining to the Research Program. Instead, we collected and produced

Abbott's company files, as described above. With respect to documents concerning out-licensing, however, we collected materials responsive to Hancock's audit demand from the desk files of various individuals who we had determined had such materials as a result of our overall search for responsive documents. After these materials were reviewed for privilege, the relevant, non-privileged documents were made available to StoneTurn.

The Photocopying of Documents Selected by StoneTurn

22. I supervised the production and photocopying of the documents produced in the audit. We allowed StoneTurn to review and take notes regarding the documents that we produced and to designate particular documents for photocopying and later delivery. We photocopied the documents, and generally produced them to StoneTurn within a short period. We never intentionally delayed the copying or delivery of any nonprivileged books and records.

23. We copied all of the documents designated by StoneTurn and provided them to StoneTurn, except when Abbott's attorneys determined that certain documents selected for copying were privileged and/or non-responsive and had inadvertently been included for inspection. These documents were not photocopied or delivered to StoneTurn.

24. As reflected in a letter dated January 28, 2005 from Stephen D'Amore to Brian Davis, our original best estimate was that we would complete the audit production by January 31, 2005. However, the large quantity of documents involved, and the need for redactions, caused the production to continue, on a rolling basis, into March 2005. A true and correct copy of Mr. D'Amore's January 28, 2005 letter to Mr. Davis, of which I received a copy, is attached hereto as D's Exhibit 768.

25. On March 22, 2005, at the direction of Abbott's counsel, I sent an email to Mark Hair of StoneTurn informing him that Abbott had fulfilled its obligation with respect to the audit. Attached hereto as D's Exhibit 715 is a true and correct copy of the email dated March 22, 2005, that I sent to Mr. Hair.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct. Executed this 11th day of March 2008, at Boston, Mass.

_____
MICHELLE L. CAMPBELL

4464167.3

10