# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, and MANULIFE INSURANCE COMPANY (f/k/a INVESTORS PARTNER INSURANCE COMPANY), | CIVIL ACTION NO. 05-11150-DPW Hon. Judge Douglas P. Woodlock |
| Plaintiffs, | |
| v. | |
| ABBOTT LABORATORIES, | |
| Defendants. | |

## ABBOTT'S POST-TRIAL SUPPLEMENTAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant Abbott Laboratories respectfully submits the following Post-Trial Supplemental Proposed Findings of Fact and Conclusions of Law regarding defenses on which it may be deemed to have the burden of proof. Abbott does not concede that it has the burden of proof on the issues addressed in the following Post-Trial Supplemental Proposed Findings of Fact and Conclusions of Law but includes them in an abundance of caution. Any finding of fact set forth below that may be deemed a conclusion of law is hereby adopted as a conclusion of law; any conclusion of law set forth below that may be deemed a finding of fact is hereby adopted as a finding of fact.

# I.     PROPOSED FINDINGS OF FACT

## A.     Facts Establishing that Hancock's Claim for Rescission is Barred by Waiver and Judicial Estoppel

### 1.     Hancock Had Actual Knowledge of Alleged Misrepresentations Regarding ABT-594 as of November 2003, But Sought Enforcement of the Agreement, Rather than Rescission

1.     On March 13, 2001, Abbott and John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company and Manulife Insurance Company (f/k/a Investors Partner Life Insurance Company) (collectively, "Hancock") entered into the Research Funding Agreement ("Agreement" or "RFA") in which they committed to co-fund Abbott's development of a portfolio of nine pharmaceutical compounds (the "Program Compounds").

2.     In the fall of 2001, Abbott informed Hancock that it had terminated development of two Program Compounds, ABT-518 and ABT-594.

3.     In 2002, Abbott informed Hancock that it was discontinuing development of ABT-773 in all territories except Japan.

4.     By November 2003, Hancock had knowledge of facts that it alleged constituted fraud by Abbott in connection with the RFA.

5.     During November 2003 conferences with Abbott, Hancock alleged "fraudulent conduct on the part of Abbott" and "claimed to have documentation proving fraud" with respect to ABT-594.

6.     At that time, however, Hancock chose not to seek rescission of the Agreement. Instead, on December 12, 2003, Hancock filed a declaratory relief action in this court seeking interpretation and enforcement of Section 3.4 of the RFA ("*Hancock I*").

7.     Specifically, Hancock's complaint in *Hancock I* sought a final judgment declaring that, pursuant to Section 3.4, Hancock had the right to terminate future payments because

2

Abbott's projected spending fell below a specified threshold and "declaring that the Agreement otherwise is in full force and effect in accordance with its terms."

8.    When Hancock's investment committee approved the agreement with Abbott on September 21, 2000, Hancock estimated it would receive a 17.5% internal rate of return on the deal.

9.    *As of December 19, 2003 -- after accounting for the termination of ABT-518, ABT-594, ABT-773, and the FTI compound, a delay in the launch date of the "lead compound," ABT-627, and negative developments regarding other compounds -- Hancock still estimated that it would receive a 13.5% internal rate of return and assigned the investment a book value of $99.6 million.*[1]

> 2.    **Hancock Had Actual Knowledge of the Alleged Misrepresentations Regarding All Three Relevant Compounds by "Fall/Winter 2004", But Rather than Seek Rescission It Continued to Pursue Judgment in *Hancock I* and *Hancock II* Enforcing and Affirming the Agreement**

10.    In April 2004, Hancock exercised its audit rights under the Agreement for the stated purpose of evaluating compliance with the contract terms and "confirming or refuting" "suspected" "misrepresentations" and other purported "violations[.]"

11.    Between June 2004 and March 2005, Abbott produced over 800 boxes of documents to Hancock pursuant to the audit, including documents regarding the development status, prospects, and budget for ABT-518, ABT-594, and ABT-773.

12.    In 2004, Abbott also produced additional documents to Hancock pursuant to discovery in *Hancock I*.

13.    Hancock had knowledge of the alleged misrepresentations regarding ABT-518 by

---

[1] Pursuant to the Court's request, Abbott has italicized proposed findings of fact that were that were added to or changed from Abbott's pre-trial Supplemental Proposed Additional or Substitute Findings of Fact and Conclusions of Law.

June 2004 from documents produced in *Hancock I*.

14.    Hancock had knowledge of the alleged misrepresentations regarding ABT-518, ABT-594, and ABT-773 no later than "Fall/Winter 2004[,]" based on documents produced in the audit and *Hancock I*.

15.    In April 2005, Hancock provided formal written notice to Abbott, pursuant to the dispute resolution provision of the Agreement, alleging that Abbott misrepresented the development status of ABT-518 and ABT-594.

16.    Hancock's dispute resolution notice did not request rescission, but rather alleged that "Hancock has sustained Losses for which it intends to claim indemnification from Abbott under, *inter alia*, Sections 1.27, 12.6 and 12.8 of the Agreement."

17.    On June 3, 2005, Hancock filed its original Complaint in the present action, alleging fraud, breach of contract, and indemnification.

18.    Hancock's Complaint requested compensatory damages, punitive damages, interest and costs, and indemnification for the alleged fraud and breaches of contract.

19.    Hancock's Complaint did not request rescission of the Agreement.

20.    Hancock's Complaint did not include any allegation that the Agreement was void or voidable due to Abbott's alleged misrepresentations.

21.    Hancock's Complaint alleged that "[t]he Agreement constitutes a valid and binding contract between the parties."

22.    After knowledge of the alleged misrepresentations, Hancock continued to demand and accept performance by Abbott pursuant to the terms of the Agreement.

23.    In December 2003 and December 2004, Hancock accepted Abbott's payment of a total of $4 million in management fees pursuant to Section 6.2 of the RFA.

4

24.     In 2004 and 2005, Hancock continued to demand that Abbott spend in excess of what Hancock contended were the contractually-specified minimum expenditures on development of the Program Compounds.

25.     Hancock continued to demand that Abbott make "Commercially Reasonable efforts" to develop the Program Compounds pursuant to the terms of the Agreement.

26.     Abbott spent approximately $153.8 million of its own funds on development of the Program Compounds in 2004 and 2005.

27.     Pursuant to the Agreement, Abbott continued to provide Annual Research Plans and progress reports to Hancock.

28.     From April 2004 to March 2005, Hancock availed itself of its audit rights pursuant to Section 2.5 of the Agreement.

29.     Abbott committed substantial time and resources of in-house counsel, paralegals, and non-legal employees, as well as contract attorneys and outside counsel, to the collection, review, and production of documents in the audit.

30.     In late 2004, with Hancock's approval, Abbott out-licensed ABT-773 pursuant to Section 4.3(d) of the RFA, in a transaction that provides for Abbott and Hancock to share in any royalties from development of the compound.

31.     In 2006, with Hancock's approval, Abbott divested itself of ABT-492 pursuant to Section 4.3(d), in a transaction that also provides for Abbott and Hancock to share in any royalties from development of the compound.

32.     Abbott's performance of these contractual obligations resulted in benefits to Hancock and costs to Abbott that are difficult to quantify, and it would now be impossible to restore the status quo ante.

33.     In September 2004, Hancock moved for summary judgment in *Hancock I,* requesting a declaration that, pursuant to Section 3.4 of the RFA, Hancock had the right to terminate future payments because Abbott's projected spending fell below a specified threshold and a "declaration that the Agreement otherwise is in full force and effect in accordance with its terms."

34.     On September 16, 2005, the Court granted Hancock's motion, entering a final judgment declaring that Hancock's future funding obligations were terminated pursuant to Section 3.4 and that "[t]he Research and Funding Agreement otherwise is in full force and effect in accordance with its terms."

35.     During 2004 and 2005, Hancock was still estimating an internal rate of return of 12.3% to 15.0% on the RFA, with a probability of loss equal to approximately 10-12%.

36.     For example, as late as September 7, 2005, Hancock still estimated that it would receive a 12.3% internal rate of return on the RFA, with a probability of loss equal to 10 to 12 percent. *At that time, Hancock had taken a write-down due to the termination of a number of compounds, but still assigned the investment a book value of $85.4 million, only slightly lower than its $89.6 million net investment.*

37.     As of September 7, 2005, Hancock estimated that ABT-627 (Endothelin), a Program Compound that Hancock does not allege was misrepresented, had a 70 percent probability of regulatory approval, an estimated launch date of 2006, and estimated peak sales of $500 million per year.

38.     On September 13, 2005, the Food and Drug Administration's ("FDA's") Oncologic Drugs Advisory Committee reviewed Abbott's New Drug Application ("NDA") for ABT-627 and voted 13-0 against recommending approval to the FDA, an event that was

reported to the public by Abbott.

39.     Between September 7, 2005 and December 6, 2005, due to the negative developments with respect to ABT-627, Hancock downgraded its assessment of ABT-627, estimating a probability of regulatory approval of 40 percent, a launch date of 2010, and peak sales of $400 million per year.

40.     Between September 7, 2005 and December 6, 2005, due to the downgraded assessment of ABT-627, Hancock lowered its estimate of the internal rate of return on the RFA to 1%, increased its estimate of the probability of loss to 20 percent.  *Due to the downgraded assessment of ABT-627, Hancock also reduced the book value of the investment to $20 million.*

41.     The Court, pursuant to the parties' joint proposal, set a February 6, 2006 deadline for amendment of pleadings.

42.     On February 3, 2006, Hancock filed an unopposed motion for leave to file a Supplemental Complaint, which added a new breach of contract claim based on interpretation and enforcement of Section 3.3(b) of the Agreement.

43.     The Supplemental Complaint, like the original Complaint, continued to allege that "the Agreement constitutes a valid and binding contract between the parties."

44.     The Supplemental Complaint did not include a request for rescission.

45.     The Supplemental Complaint did not include any allegation that the Agreement was void or voidable.

46.     In its February 6, 2006 interrogatory responses, Hancock purported to "reserve its rights" to seek rescission, however, it did not actually request rescission in its Supplemental Complaint or elsewhere.

47.     On June 23, 2006, after the Court granted its motion for leave, Hancock filed its

7

Supplemental Complaint.

      3.     **After Securing Affirmation in the First Circuit of the *Hancock I* Declaratory Judgment Enforcing the Agreement, Hancock Moved to Amend its Complaint in this Action to Seek Rescission**

48.     In April 2006, Hancock argued to the Court of Appeals for the First Circuit that "the district court's Final Judgment in favor of John Hancock" in *Hancock I* -- including enforcement of Section 3.4 and the Court's declaration that the Agreement is "in full force and effect" -- should "be affirmed in all respects."

49.     The First Circuit affirmed the *Hancock I* judgment on September 28, 2006.

50.     In Fall 2006, after Abbott ceased development of ABT-627 and ABT-510 (TSP) --- two compounds not alleged by Hancock to have been misrepresented -- Hancock downgraded its estimate of the probability of success of those two compounds to zero percent.

51.     On October 24, 2006, having successfully persuaded the courts in *Hancock I* to enforce the Agreement and affirm that it remains "in full force and effect," Hancock filed a motion for leave to file a First Amended Supplemental Complaint in this action that, for the first time, requested rescission.  The First Amended Supplemental Complaint also included allegations of alleged misrepresentations regarding ABT-773.

52.     Abbott initially opposed Hancock's motion for leave to file an amended complaint.

53.     Pursuant to a stipulation resolving various discovery and procedural motions, Abbott withdrew its opposition to Hancock's motion for leave to file an amended complaint but the stipulation expressly provided that Abbott "otherwise reserves the right to contest any and all claims" in the amended complaint.

54.     On December 29, 2006, Hancock filed its First Amended Supplemental Complaint.

55.    The First Amended Supplemental Complaint, for the first time, included a request for rescission.

56.    Hancock's First Amended Supplemental Complaint continued to allege that "the Agreement constitutes a valid and binding contract between the parties" and sought interpretation and enforcement of various provisions of the Agreement.

57.    In January 2007, Abbott filed a motion to strike the prayer for rescission in Hancock's First Amended Supplemental Complaint on the grounds that, based on the facts admitted in the pleadings and other judicially noticeable documents, Hancock was barred as a matter of law from rescission based on the doctrines of judicial estoppel and waiver.

58.    On July 20, 2007, Abbott filed a motion for partial summary judgment on Hancock's rescission claim, based on the doctrines of judicial estoppel and waiver, and the limitation of remedies provisions of the Agreement.  On September 27, 2007, the Court issued a ruling denying Abbott's motion to strike the prayer for rescission and holding that "the question of rescission will be taken up in connection with the dispositive motions currently under advisement."  *On March 14, 2008, the Court ruled that the motion was moot because the issues presented by the motion would be decided as part of the trial.*

59.    On October 30, 2007, pursuant to the Court's request, Abbott and Hancock filed statements confirming that it was appropriate for the Court to rule on Abbott's motion for summary judgment on the rescission claim on a "case stated" basis.

    **4.**    **The Limitation of Remedies Provisions in the Agreement Preclude Rescission in the Present Circumstances**

60.    Section 11.2 of the Agreement provides that:

> It is the parties' express intent that consideration shall be given to remedying any breach of this Agreement through the payment of monetary damages or such other legal and equitable remedies as shall be appropriate under the circumstances and that there shall

only be a limited right to terminate this Agreement under the following circumstances . . . (b) In the event that the court . . . has issued a ruling that Abbott has breached a material obligation under this Agreement, and such ruling specified the actions to be taken by Abbott on account of such breach, and Abbott has failed to comply with the terms of such ruling within the time period specified therein for compliance and the time for any appeal has expired without the submission of an appeal, then, in addition to all other rights available to John Hancock under law and equity, including the right to enforce such ruling in court, John Hancock shall have the right to terminate the Agreement, each as a result of Abbott's failure to abide by the terms of this Agreement and such ruling.

61.    The Agreement does not specify any other circumstances in which Hancock shall have a right to terminate the Agreement.

62.    The Court has not issued any ruling that Abbott has breached a material obligation of the Agreement or that Abbott has failed to comply with any such order.

63.    Section 11.3 of the Agreement provides that "[e]xpiration or, if applicable, termination of this Agreement shall not relieve the parties of any obligation accruing prior to such expiration or termination."

64.    Pursuant to Section 3.1 of the Agreement, Hancock's obligation to make its first and second Program Payments accrued prior to 2004, and Hancock made those payments prior to 2004.

**B.**    **Facts Establishing that Hancock's Proposed Interpretation of Section 3.3(b) Would Render it An Invalid and Unenforceable Penalty Clause**

65.    The parties did not intend Section 3.3(b) to provide a reasonable estimate of anticipated damages from Abbott's failure to spend $614 million on Program Related Costs during the Program Term and following Program Year, particularly where that failure results from Hancock's termination of payments pursuant to Section 3.4.

10

66.    The Agreement does not include any recital or other statement that Section 3.3(b) is intended to provide a reasonable estimate of anticipated damages from Abbott's failure to spend $614 million on Program Related Costs during the Program Term and following Program Year, particularly where that failure results from Hancock's termination of payments pursuant to Section 3.4.

67.    Section 3.3(b) is not a reasonable estimate of anticipated damages from Abbott's failure to spend $614 million on Program Related Costs during the Program Term and following Program Year, particularly where that failure results from Hancock's termination of payments pursuant to Section 3.4.

68.    On October 30, 2007, pursuant to the Court's request, Abbott and Hancock filed statements confirming that it was appropriate for the Court to rule on Abbott's motion to dismiss Hancock's Section 3.3(b) claim and Hancock's motion for partial summary judgment on the same claim on a "case stated" basis.

## II.    PROPOSED CONCLUSIONS OF LAW

### A.    Hancock Is Judicially Estopped from Seeking Rescission Because It Sought and Obtained a Final Declaratory Judgment in *Hancock I* Enforcing the Agreement and Affirming that it is "In Full Force and Effect"

69.    The judicial estoppel doctrine precludes parties from "playing fast and loose with the courts." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal quotations omitted).

70.    The purpose of the judicial estoppel doctrine is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* at 749-50 (internal quotations and citations omitted).

71.    The judicial estoppel doctrine "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Id.* at 749 (quoting 18 Moore's Federal Practice and Procedure § 134.30, p. 134-62 (3d ed. 2000));

*see also Alternative System Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004)

("judicial estoppel applies when a party has adopted one position, secured a favorable decision,

and then taken a contradictory position in search of legal advantage") (internal quotations

omitted).

72.    Hancock is judicially estopped from seeking rescission because, after it

admittedly had knowledge of the alleged misrepresentations, it sought and obtained a final

declaratory judgment in *Hancock I* enforcing the Agreement and affirming that it is "in full

force and effect."  After having used the courts to secure the benefits of that final judgment,

Hancock cannot now for its legal advantage adopt the inconsistent position that the Agreement

is voidable and should be rescinded.

73.    Hancock has argued that it is excused from application of the judicial estoppel

doctrine because the March 30, 2004 scheduling order in *Hancock I* provided that "discovery is

limited to the declaratory judgment as presently framed and the contract interpretation issues . .

." and that "[o]ther disputes, when ripe, may be raised in a separate related action."  Similarly,

Hancock has argued that judicial estoppel is inapplicable because Abbott agreed in *Hancock I*

that it would not preclude Hancock from "raising other disputes concerning the RFA in a

separate action on the ground that those disputes should have been brought in *Hancock I*."

Hancock's argument confuses judicial estoppel with *res judicata*.  Judicial estoppel is a

"discrete doctrine" and is distinct from res judicata.  *New Hampshire*, 532 U.S. at 748-49.

74.    Judicial estoppel does not arise from Hancock's failure to assert claims in

*Hancock I*.  Instead, judicial estoppel arises because Hancock, in *Hancock I,* adopted the

position that the Agreement was "in full force and effect" and should be enforced, secured final

judgment (and affirmation of the judgment by the Court of Appeals) based on that position, and

then took the contradictory position in this case that the Agreement should be rescinded. *Newton v. Aitken*, 260 Ill. App. 3d 717, 754, 633 N.E.2d 213, 216 (1994) ("a remedy based on a theory of disaffirmance of a contract (rescission) is inconsistent with a remedy arising out of its affirmance (e.g., damages)."); *ConnectU LLC v. Zuckerberg*, 482 F. Supp. 2d 3, 12 (D. Mass. 2007) (Woodlock, J.) ("where a party has adopted one position, secured a favorable decision, and then taken a contradictory position in search of legal advantage, the doctrine of judicial estoppel may be invoked" (quoting *Alternative Systems*, 374 F.3d at 33 (internal quotations omitted)), *rev'd on other grounds*, ---- F.3d ----, 2008 WL 902185 (1st Cir. Apr. 3, 2008).

75.    The scheduling order did not provide Hancock immunity from the judicial estoppel doctrine.  It merely provided that "[o]ther disputes, when ripe, may be raised in a separate related action."  Hancock could have filed a claim for rescission in "a separate related action" and withdrawn its request for affirmation and enforcement of the Agreement.  Instead, it chose to secure a final judgment in *Hancock I* relieving it from $110 million in Program Payments based on *enforcement* of the Agreement and affirming that the Agreement remained "in full force and effect."

76.    Abbott is not required to show prejudice to establish that Hancock is judicially estopped from seeking rescission.  "Harm to an opponent is not an invariable prerequisite to judicial estoppel."  *Patriot Cinemas, Inc. v. General Cinemas Corp.*, 834 F.2d 208, 214 (1st Cir. 1987).  "Unlike equitable estoppel, which requires such prejudice, the function of judicial estoppel is to protect the integrity of the courts."  *Id.*  Although courts give consideration to "whether the party asserting the alleged inconsistent position would gain an unfair advantage[,]" this is "not a 'sine qua non to the applicability of judicial estoppel' for it is the court's acceptance of the argument, 'not the benefit flowing from the acceptance, that primarily

implicates judicial integrity.'"  *ConnectU,* 482 F. Supp. 2d at 12 (quoting *Synopsys,* 374 F.3d at 33).

77.    Although a showing of prejudice is not required, Abbott would suffer prejudice from Hancock's change of position.  The situation here is distinguishable from the facts in *Desjardins v. Van Buren Comm. Hosp.*, 37 F.3d 21, 23 (1st Cir. 1994).  In *Desjardins*, the court correctly noted that "there are many situations, *especially at the outset of litigation*, where a party is free to assert a position from which it later withdraws -- or even to assert, in the alternative, two inconsistent positions of its potential claims or defenses." *Desjardins*, 37 F.3d at 23 (emphasis added).  In *Desjardins*, a party was not judicially estopped from changing its initially asserted positions where it abandoned two of the positions prior to a ruling by the court and the other position merely resulted in a temporary stay of an appeal that was not "shown to have caused any serious prejudice to judicial proceedings or the position of the opposing party." *Id.* at 23.  By contrast, Hancock maintained its position in *Hancock I* that the Agreement should be enforced from December 2003, when it filed its complaint, until the First Circuit affirmed the judgment in September 2006.  Also, unlike in *Desjardins*, Hancock did not merely obtain a temporary procedural advantage -- it secured a final judgment excusing it from $110 million in payments and a judicial declaration that Abbott's contractual obligations remained "in full force and effect."

**B.    Hancock is Precluded from Rescission and Refund of Its Prior Program Payments by the Limitation of Remedies Provisions of the Agreement**

78.    Hancock's claim for rescission is barred by the limitation of remedies provisions in the Agreement.

79.    The Agreement provides that Hancock has the right to terminate the Agreement only in specified circumstances set forth in Section 11.2, i.e., where Abbott has failed to comply

with a court ruling specifying remedies for breach of contract.

80.    The limited circumstances set forth in Section 11.2 are not present here, therefore, Hancock has no right to terminate the Agreement.

81.    Hancock's requested remedy of rescission necessarily involves termination of the Agreement. *See Kirchhoff v. Rosen*, 227 Ill. App. 3d 870, 877, 592 N.E.2d 371, 375 (1992) ("'*Rescission' means . . . a termination of a contract* with restitution.") (emphasis added); *Bucciarelli-Tiger v. Victory Records, Inc.*, 488 F. Supp. 2d 702, 712 (N.D. Ill. 2007) ("'Rescission' is an extraordinary remedy that involves the judicial termination of a party's contractual obligation."). By precluding termination in the present circumstances, Section 11.2 necessarily precludes rescission.

82.    Hancock has argued that Section 11.2 preserves rather than precludes Hancock's right to seek rescission, but this is an incorrect reading of this provision. In the limited circumstances set forth in Section 11.2, the Agreement provides that "in addition to all other rights available to Hancock under law and equity . . . John Hancock shall have the right to terminate the Agreement . . ." In all other circumstances, the "limited right to terminate this Agreement" is inapplicable and, instead, "consideration shall be given to remedying any breach of this Agreement through the payment of . . . such *other* legal or equitable remedies as shall be appropriate under the circumstances . . ." *Id.* (emphasis added). If the references to "such other legal or equitable remedies as shall be appropriate" and "all other rights available to John Hancock under law and equity" were read to preserve Hancock's right to seek rescission, it would render the limitation of remedies clause meaningless. *Id.* The only logical reading of the Agreement is that those phrases instead refer to remedies *other than termination* (e.g., damages, specific performance, and declaratory relief).

83.    Furthermore, under Section 11.3 of the Agreement, even if the Agreement were terminated, Hancock would not be entitled to a refund of its first and second Program Payments.

84.    Section 11.3 provides that "[e]xpiration or, if applicable, termination of this Agreement shall not relieve the parties of any obligation accruing prior to such expiration or termination."

85.    Hancock's obligation to make its first and second Program Payments accrued, and was performed, prior to 2004.

86.    Hancock's request for an order rescinding the Agreement and directing "Abbott to refund any and all Program Payments made by John Hancock" is precluded by Section 11.3 because it would retroactively relieve Hancock of its obligation to make its first and second Program Payments, an obligation that has already accrued and been performed.

87.    The limitation of remedies provisions of Section 11.2 and 11.3, applied to preclude rescission and retroactive relief from Hancock's Program Payment obligations, are valid and enforceable as applied to Hancock's breach of warranty claim.

88.    "[C]ontractual limitations are generally held valid in [Illinois], unless it would be against the settled public policy of the State to do so, or there is something in the social relationship of the parties to the contract militating against upholding the agreement." *First Financial Ins. Co. v. Purolator Security, Inc.*, 69 Ill. App. 3d 413, 417, 388 N.E.2d 17, 20 (1979). Therefore, exculpatory clauses are valid to the extent they limit liability for conduct that is not "willful or wanton." *Adams v. Myers*, 250 Ill. App. 3d 477, 486, 620 N.E.2d 1298, 1305 (1993); *Kleinwort Benson North Am., Inc. v. Quantum Fin. Services, Inc.*, 285 Ill. App. 3d 201, 216, 673 N.E.2d 369, 379 (1996) (holding that exculpatory clauses "for *willful and wanton*

16

*conduct*" are void, therefore, exculpatory clause was invalid "insofar as it purports to limit [the defendant's] liability for fraud") (emphasis added).

89.    Breach of warranty is not an intentional tort, and may be premised on innocent or negligent conduct.

90.    Accordingly, in the absence of a finding of "willful and wanton" conduct, the limitation of remedies provisions preclude rescission as a remedy for breach of warranty.

C.    **Hancock Waived Its Right to Seek Rescission by Delaying Its Demand Until Long After It Had Knowledge of the Alleged Fraud**

91.    Despite its knowledge of the alleged misrepresentations as early as November 2003, and admitted knowledge of the alleged misrepresentations regarding all three relevant compounds by "Fall/Winter 2004," Hancock did not seek rescission until October 2006.

92.    The prayer in Hancock's June 2005 Complaint and June 2006 Supplemental Complaint for "such other and further relief as the Court deems just and appropriate," did not constitute a request for rescission.  This vague, boilerplate language did not give any indication that Hancock believed *rescission* was "just and appropriate" or that it intended to seek such a remedy.  It does not satisfy the rule that a party who desires rescission "must *announce his purpose* and adhere to it."  *Kanter v. Ksander*, 344 Ill. 408, 415, 176 N.E. 289, 291 (1931) (emphasis added).

93.    Under Illinois law, Hancock waived its right to seek rescission by unduly delaying long after it had knowledge of the alleged misrepresentations.  "For anyone who seeks to rescind a contract on grounds of fraud in [Illinois], time is clearly of the essence."  *Swartz v. Schaub*, 826 F. Supp. 274, 277 (N.D. Ill. 1993).  "Illinois law has long recognized that the victim of contract fraud who wishes to rescind that contract must not only announce his or her election promptly but must act on that intention with like promptness."  *Id.*  If the allegedly

defrauded party delays or takes actions consistent with affirmance of the contract, the right to

rescission is waived and the party is limited to damages as a remedy for the alleged fraud. *See*

*infra*, ¶¶ 94-97.

94.     In an early case, the Illinois Supreme Court held that:

> [w]here a party desires to rescind upon the ground of mistake or
> fraud, he must, upon discovery of the facts *at once* announce his
> purpose, and adhere to it. If he be silent, and continue to treat the
> property as his own, he will be held to have waived the objection,
> and will be conclusively bound by the contract as if the mistake or
> fraud had not occurred. He is not permitted to play fast and loose.
> Delay and vacillation are fatal to the right which had before
> subsisted.

*Follett v. Brown*, 188 Ill. 244, 248, 58 N.E. 943, 944 (1900) (emphasis added).

95.     On repeated occasions, the Illinois Supreme Court has applied this rule to bar

delayed claims for rescission. *See, e.g.*, *Kanter*, 344 Ill. at 416 ("A party to a contract who

desires to rescind it for fraud must make his election to do so promptly after learning of the

fraud. He must announce his purpose and adhere to it.") (delay of 8 to 11 months barred

rescission); *Wollenberger v. Hoover*, 179 N.E. 42, 55-57 (1931) (plaintiff who originally sued

to enforce a lien for purchase money due under real estate contract could not thereafter rescind

the contract); *Foston v. Swanson*, 306 Ill. 518, 523, 138 N.E. 119, 121 (1923) (sustaining

demurrer to rescission claim where plaintiff delayed twenty-five months after obtaining

knowledge of the alleged fraud); *Huiller v. Ryan*, 306 Ill. 88, 94, 137 N.E. 484 (1922)

(sustaining demurrer to rescission claim where plaintiff delayed eighteen months); *Brown v.*

*Brown*, 142 Ill. 409, 428, 32 N.E. 500, 505 (1892) ("if the party defrauded would disaffirm the

contract, he must do so at the earliest practicable moment after the discovery of the fraud. This

is the time to make [the] election, and it must be done promptly and unreservedly. He must not

hesitate . . .").

96.    In *Eisenberg v. Goldstein*, the Illinois Supreme Court reiterated that:

> A person who has been misled by fraud of misrepresentation is required, as soon as he learns the truth, to disaffirm or abandon the transaction with all reasonable diligence, so as to afford both parties an opportunity to be restored to their original position. If, after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waives all benefit of relief from the misrepresentations.

29 Ill. 2d 617, 622, 195 N.E.2d 184, 186-87 (1963) (delay of one year barred claim for rescission). *See also Booker v. Myler*, No. 06C1184, 2006 WL 1302521, *5-7 (N.D. Ill. 2006) (affirming summary judgment in favor of the defendant where the plaintiff delayed three years after constructive knowledge of the alleged misrepresentation); *Mrotzek v. Gitcho*, 158 Ill. App. 3d 15, 16-18, 510 N.E.2d 1253, 1254-55 (1987) ("A party seeking equitable relief against fraud should commence proceedings for relief as soon as reasonably possible. Acquiescence, consisting of unnecessary delay after such knowledge [of the facts], will defeat the equitable relief."); *Schoenbrod v. Rosenthal*, 36 Ill. App. 2d 112, 120, 183 N.E.2d 188, 192-93 (1962) ("It has been uniformly held in Illinois that anyone seeking to rescind a transaction on the ground of fraud must elect to do so promptly after learning of the fraud, must announce his purpose and must adhere to it.") (citing cases, and affirming summary judgment for the defendant where plaintiff delayed for five years before seeking rescission); 12A Ill. Law & Prac. Contracts § 377 ("A party who desires to rescind a contract on the ground of fraud or false representations must do so promptly, or within a reasonable time on discovery of the fraud, or promptly after learning or hearing of it.").

97.    Courts applying Illinois law frequently have held that plaintiffs are barred from rescission for delays shorter than Hancock's. *See, e.g.*, *Swartz*, 826 F. Supp. at 278 (nine months); *Guy v. Duff & Phelps, Inc.*, 628 F. Supp. 252, 261-62 (N.D. Ill. 1985) (granting

summary judgment, in part because plaintiff delayed for one year before seeking rescission); *Eisenberg*, 29 Ill. 2d at 621 (one year); *Kanter*, 344 Ill. at 416 (8 to 11 months); *Huiller*, 306 Ill. at 94 (1922) (eighteen months); *Follett*, 188 Ill. 244, 253 (1900) (six months).

98.    Hancock has alleged that "[d]iscovering the nature and extent" of the alleged misrepresentations "has been a long, arduous process" and that Abbott "obstruct[ed]" its contractual compliance audit and made "baseless" discovery objections, and argues that this excuses its delay in seeking rescission. Hancock's delay in seeking rescission is not excused by these alleged difficulties. Hancock had knowledge of the alleged misrepresentations and claimed to have "documentation" regarding alleged misrepresentations concerning ABT-594 as early as November 2003. Hancock has admitted in a verified interrogatory response that it had knowledge of the alleged misrepresentations regarding ABT-518 "on or around June 2004," and knowledge of the alleged misrepresentations regarding ABT-594 and ABT-773 in the "Fall/Winter 2004," from documents produced by Abbott in the audit and in discovery. Despite this knowledge, Hancock failed to promptly seek rescission. "Illinois law requires greater diligence." *Booker*, 2006 WL 1302521 at *6. Hancock was "obligated to take action" promptly after "discover[ing] facts suggesting fraud" to preserve its right to seek rescission. *Id.* ("[b]ecause [plaintiff] failed to enforce his rights in a timely fashion despite having notice of [defendant's] fraud, his rescission claim cannot prevail."). *See also Sutter v. Rose*, 64 Ill. App. 263, 1896 WL 2375, *3 (1896) ("[A] party discovering fraud can not lie by until he discovers its full extent before acting. A further discovery of fraud will not give a further election to rescind.").

99.    Cases that Hancock has cited for the proposition that "[a] defendant cannot defeat a rescission claim on grounds of undue delay when the defendant itself is responsible, in whole

or in large part, for the alleged delay," are distinguishable.  For example, in *Evans v. Brooks*, "from the very moment" the plaintiff learned of the fraud he "declined to go further with the contract, and tendered back his deed," but the defendant led the plaintiff "by one promise and another, to believe that things would finally be made right, until finally, . . . [he] secretly left" the state of Missouri, leaving plaintiff in possession of worthless property and "in a destitute condition."  124 P. 599, 601, 603 (Okla. 1912).  These facts are not analogous to the instant case, where Hancock admittedly knew of the alleged misrepresentations by 2004 but failed to pursue rescission and instead obtained a final judgment enforcing the contract.

100.  Hancock's delay in seeking rescission is not excused by the fact that the March 30, 2004 scheduling order in *Hancock I* provided that "discovery is limited to the declaratory judgment as presently framed and the contract interpretation issues . . ." and that "[o]ther disputes, when ripe, may be raised in a separate related action."  The March 30, 2004 scheduling order merely allowed Hancock to raise other disputes in a separate action and did not suggest that Hancock should *delay* in raising such disputes.  The order did not require, or even suggest, that Hancock should wait until final judgment was entered in *Hancock I*, much less wait until it had obtained affirmation of that judgment in the Court of Appeals, before raising other disputes.  Nor did the scheduling order excuse Hancock from the controlling substantive law of Illinois, which provides that a party waives its right to rescission if it delays or takes actions affirming the contract.

101.  Waiver does not arise from Hancock's failure to assert fraud or rescission claims *in Hancock I*, but rather from its delay in asserting a rescission claim in a "*separate related action*" and its decision to secure a final judgment in *Hancock I* enforcing and affirming the Agreement.  *Wollenberger*, 346 Ill. at 539-46, 179 N.E. at 55-57 (plaintiff who sued to enforce

a lien for purchase money due under a contract could not thereafter rescind the contract);

*Anderson v. Chicago Trust & Sav. Bank*, 195 Ill. 341, 352, 63 N.E. 203, 207 (1902) ("when,

after sufficient knowledge of [the] fraud, [plaintiff] elected to" enforce his rights under the

agreement and obtain a preliminary injunction, "he waived his right to rescind"); *Kel-Keef*

*Enter., Inc. v. Quality Components Corp.*, 316 Ill. App. 3d 998, 1008, 738 N.E.2d 524, 531-32

(2000) ("It is clear that the prosecution of one remedial right to judgment or decree constitutes

an election barring subsequent prosecution of inconsistent remedial rights."); *City of Chicago v.*

*Michigan Beach Housing Coop.*, 297 Ill. App. 3d 317, 322, 696 N.E.2d 804, 809 (1998)

(plaintiff that "failed to promptly exercise the option to rescind" and, instead, "sued for

damages" and continued to perform, "remains obligated under [the contract], though still free to

sue for damages").

102.   Abbott did not waive its right to assert an affirmative defense of waiver or

estoppel (or any other proper defense) to Hancock's rescission claim at trial by entering into the

December 21, 2006 Stipulation and Proposed Order .  In the December 21, 2006 Stipulation,

which provided for resolution of various discovery and procedural issues, Abbott merely agreed

to withdraw its opposition to Hancock's motion to amend its complaint.  Abbott expressly

reserved its right to contest the claims asserted in the amended complaint:

> Abbott agrees to withdraw its opposition to John Hancock's
> Motion to Amend. . . . *Abbott otherwise reserves the right to*
> *contest any and all claims asserted in John Hancock's Amended*
> *Supplemental Complaint.*

103.   Similarly, Abbott did not waive its right to assert an affirmative defense of waiver

or estoppel (or any other proper defense) to Hancock's rescission claim at trial by agreeing at

the December 6, 2006 hearing that the stipulation would resolve "anything that ha[d] been filed

or [was] in the gleam in the eye of any of the attorneys." The purpose of the stipulation was to resolve *discovery and procedural motions* that were "pending or that [were] currently threatened," not issues that might be raised in motions for summary judgment or at trial.

104.    Hancock's delay in seeking rescission is not rendered moot by Rule 54(c) of Federal Rules of Civil Procedure. Rule 54(c) merely provides that the Court shall "grant the relief *to which each party is entitled . . .*" Fed. R. Civ. P. 54(c) (emphasis added); *In re Blinds to Go Share Purchase Litig.*, 443 F.3d 1, 3 (1st Cir. 2006) (holding that it was proper to grant rescission where it was "consistent with the contract and with equitable remedial principles"). Because Hancock unduly delayed seeking rescission and took actions affirming the Agreement, according to the substantive law of Illinois, Hancock is not "entitled" to the relief of rescission and such an award would not be "consistent with equitable remedial principles." *Id.* In similar circumstances, federal courts have denied the remedy of rescission because it is not available under the controlling substantive law of Illinois, notwithstanding the purely procedural provisions of Rule 54(c). *See Zeidler v. A & W Restaurants*, No. 99-C-2591, 2001 WL 62571, *7-8 (N.D. Ill. Jan. 25, 2001); *Swartz*, 826 F. Supp. at 277-78; *Guy*, 628 F. Supp. at 261-62; *Booker*, 2006 WL 1302521, at *5-6.

### D.    Hancock Also Waived Its Right to Seek Rescission by Affirming the Agreement After Knowledge of the Alleged Misrepresentations

105.    In addition to its delay, Hancock waived its right to seek rescission by affirming the Agreement after knowledge of the alleged misrepresentations.

106.    After knowledge of the alleged misrepresentations, Hancock demanded and accepted continued performance by Abbott according to the terms of the Agreement, such as payment of management fees, out-licensing of Program Compounds with Hancock's approval, expenditure of hundreds of millions of dollars on development of the Program Compounds,

devotion of substantial time and resources to Hancock's contractual compliance audit, and provision of Hancock with annual plans and progress reports.

107.   Hancock's demand and acceptance of continued performance by Abbott constitutes a waiver of the right to rescission.  *See Brown*, 142 Ill. at 430 (plaintiff was "duty bound to make [its] election [to affirm or rescind the contract] at once, or at least before requiring further performance" by the defendant); *Zeidler*, 2001 WL 62571, at *7 (an "election to proceed with performance on the contract is inconsistent with the remedy of rescission").

108.   Hancock has argued that a party "may seek both its actual damages and rescission of the underlying agreement as alternative remedies," and that there is typically no "election of remedies" until final judgment, therefore, Hancock's demands for performance of the Agreement "do not constitute a waiver or election of remedies."  However, references to alternative pleading and "election of remedies" confuse, rather than clarify, the issue.  *Gannett Co., Inc. v. Register Publ'g Co.*, 428 F. Supp. 818, 825 (D. Conn. 1977).  "It is somewhat misleading to think of the choice an injured party has to make between avoiding and affirming a contract in 'election of remedies' terms."  *Id.*  Although "[a]s a matter of pleading" a party may be permitted to assert a claim for rescission or damages in the alternative, "the real issue is not one of pleading but of substantive contract law":

> One fraudulently induced into a contract, for instance, may, as a matter of substantive law, either affirm or disaffirm the agreement. An election of the substantive right to affirm extinguishes the substantive right to disaffirm.  And so an attempt to invoke the remedy of rescission after an action on the contract may fail, not because of election of inconsistent remedies, but because the plaintiff no longer has the substantive right to disaffirm.

*Id.*  Here, Hancock has lost its substantive right to disaffirm the Agreement by, among things, electing to affirm the contract despite its knowledge of the alleged misrepresentations.

109.   Furthermore, Hancock did not, in fact, promptly "seek both its actual damages

and rescission of the underlying agreement as alternative remedies." Hancock did not seek rescission until long after it had knowledge of the alleged misrepresentations and after it had demanded and accepted continued performance by Abbott. Under Illinois law, Hancock's conduct constitutes an affirmation of the Agreement that waives any subsequent demand for rescission. *Zeidler*, 2001 WL 62571, at \*7 ("A party that wishes to rescind a contract must do so promptly, and an election to proceed with performance on the contract is inconsistent with the remedy of rescission."); *Brown*, 142 Ill. at 430, 32 N.E. at 506 ("[The plaintiff] was in duty bound to make her election at once, or at least before requiring further performance by the other party.").

110. Hancock also affirmed the Agreement by seeking and obtaining a final judgment in *Hancock I* enforcing the Agreement and declaring that it is "in full force and effect[,]" thereby waiving its right to the inconsistent remedy of rescission. *See Wollenberger*, 346 Ill. at 539-47, 179 N.E. at 55-57; *City of Chicago*, 297 Ill. App. 3d at 322 (where, after knowledge of the alleged fraud, plaintiff "failed to promptly exercise the option to rescind the contract" and instead sued for breach of contract and continued to perform under the contract, it waived its right to rescission); *Anderson*, 195 Ill. at 352, 63 N.E. at 204-07 (holding that "when, after sufficient knowledge of [the] fraud, [plaintiff] elected to" enforce his rights under the agreement and obtain a preliminary injunction against the defendant, "he waived his right to rescind."); *Kel-Keef*, 216 Ill. App. 3d at 315, 738 N.E. 2d at 531-32 ("It is clear that the prosecution of one remedial right to judgment or decree constitutes an election barring subsequent prosecution of inconsistent remedial rights.") (internal quotations and citations omitted).

E.    **Hancock's Delay in Seeking Rescission While it Secured Final Judgment Enforcing the Agreement in *Hancock I* and Speculated on the Potential for Profit on the Agreement is an Equitable Factor Weighing Against Rescission**

111.   Hancock's delay is alone sufficient to constitute waiver, irrespective of its motive. Whether Hancock waited because it hoped for a better financial return under the contract, because it first wanted to secure a judgment in *Hancock I*, or some other reason, is beside the point. *See, e.g.*, *Guy*, 628 F. Supp. at 261-62 ("promptness alone will determine whether [the plaintiff] may proceed with his rescission claim . . . [w]hether he viewed the Security Pacific deal as a sure thing, or whether he was unwilling to give up the proceeds of sale, or whether he found the prospect of a return to the Duff & Phelps stockholder fold . . . unattractive, or whether a combination of those and other factors was at work, is a matter on which this Court need not guess."); *DeSantis v. Brauvin Realty Partners*, 248 Ill. App. 3d 930, 937, 618 N.E.2d 548, 553 (1993) (the "doctrine of 'waiver by conduct'" provides that "[a] person who has been misled by fraud or misrepresentation is required, as soon as he learns the truth, to disaffirm or abandon the transaction with all reasonable diligence") (quoting *Eisenberg*, 29 Ill. 2d at 622, 195 N.E.2d at 186-87).

112.   While it is not necessary for defendant to show that the plaintiff's delay was due to speculation regarding potential outcomes, any such speculative motives by the plaintiff constitute an equitable factor weighing against rescission. *See Guy*, 628 F. Supp. at 261-62 ("[u]nder the principles demanding prompt rescission, [plaintiff] cannot switch signals now simply because he has decided" that changed circumstances "rendered rescission more attractive than damages."); *Sutter*, 64 Ill. App. 263, 1896 WL 2375, *3 ("The party will not be permitted to speculate for a time on the probabilities of an advantageous bargain, after he has discovered a cause for rescission, but must act promptly to compel it.").

113.   Hancock delayed seeking rescission while it believed the Agreement might still

be profitable, and while it sought final judgment and affirmation by the First Circuit in *Hancock*

*I*. Hancock moved for leave to file an amended complaint demanding rescission only after the

First Circuit affirmed the declaratory judgment relieving Hancock of $110 million in Program

Payments in *Hancock I* and after Hancock had reduced its estimates of returns on the

Agreement due to factors unrelated to the alleged misrepresentations.

114.    The Illinois Supreme Court has held that:

> It is a settled principle in equity that one who has been misled and
> defrauded, after he learns of the fraud, to
> stand passive, and speculate on the election that the law gives him
> either to rescind the contract or waive the fraud, as the events of
> the future may determine it to be profitable or otherwise for him to
> do.

*Follett*, 188 Ill. at 247, 58 N.E. at 943 (internal quotations omitted).

115.    Similarly, in *DeSantis*, the court rejected a belated claim for rescission, based in

part on the doctrine of waiver, holding that:

> Plaintiff proposes that we turn the Illinois tort system into a
> commodity futures market, thereby allowing investors to hedge
> their investments, when possible, with a cause of action for fraud
> until such time that the investment sours, at which point they
> would be able to cash in on their preserved cause of action for
> fraud . . . Clearly, under the case law touching upon the accrual of
> an action for fraud or the doctrine of waiver, this is not permitted
> in Illinois.

*DeSantis,* 248 Ill. App. 3d at 938, 618 N.E. 2d at 553.  "[I]f [a plaintiff] concludes to abide by

[a contract], as upon the whole advantageous, he shall not afterwards be permitted to question

its validity."  *Brown*, 142 Ill. at 428, 32 N.E. at 505.

**F.    Abbott is Not Required to Show Prejudice, But Abbott Would Be Prejudiced
By Hancock's Delay and Affirmation of the Agreement**

116.    Under Illinois law, delay alone is sufficient to bar a claim for rescission and a

showing of prejudice is generally not required.  *Guy*, 628 F. Supp. at 261.  The "general

rescission doctrine[,]" in Illinois and elsewhere, "focuses almost exclusively on delay." *Id.*

"Most cases stressing the need for the prompt assertion of rescission rights make no reference to

the doctrine of laches, and do not at all mention any need to show prejudice in addition to

delay." *Id.* "Those cases treat the prompt election requirement as an integral component of

rescission doctrine, not dependant on another area of the law." *Id.* "Even those rescission cases

that have made reference to the laches doctrine have downplayed the prejudice element":

> [F]ar greater emphasis is placed on the delay in asserting the claim
> than on a change of circumstances, for an unreasonable lapse of
> time between discovering the supposed fraud and bringing the suit
> is of itself prejudicial to the party charged with fraud.

*Id.* at 261-62 (quoting *Schoenbrod*, 36 Ill. App. 2d at 120, 183 N.E.2d at 192). *See also*

*Gannett*, 428 F. Supp. at 826 ("the 'laches' language used by the parties . . . tends to obscure

the real issue. . . . the power to avoid the transaction is *conditional* on an offer made promptly

after acquiring knowledge of the fraud . . . *the power of avoidance is lost* if the injured party

unreasonably delays manifesting his intention to avoid to the other party, or if he manifests an

intention to affirm, or if he exercises dominion over the object of the contract. The emphasized

words are substantive and not procedural concepts."). *See also Booker*, 2006 WL 1302521 at

*6.

117.   Although a showing of prejudice is not required, Abbott would be prejudiced if

Hancock were allowed to pursue rescission in these circumstances.

118.   After knowledge of the alleged misrepresentations, Hancock secured a final

declaratory judgment excusing it from $110 million in payments and affirming that Abbott's

contractual obligations were "in full force and effect." Consistent with this affirmation of the

Agreement, Hancock continued to demand that Abbott perform its obligations. Accordingly,

Abbott paid Hancock $4 million in management fees, spent over $150 million of its own funds

on development of the Program Compounds in 2004 and 2005 alone, provided progress reports to Hancock, committed time and resources responding to Hancock's contractual compliance audit, and divested ABT-773 and ABT-492 to other companies under terms that provide for Hancock to share any royalties.  Allowing Hancock to rescind the Agreement at this late date would seriously prejudice Abbott.

119.   As the court in *Medcom* explained:

> if a plaintiff were allowed to sue for damages on a contract, the defendant would rightly believe that the plaintiff was affirming the contract.  The defendant would continue to perform other aspects of the contract and would expect performance of the plaintiff.  If, however, the plaintiff could later sue for rescission, the defendant would have been prejudiced by his reliance on the damages suit. . . Forcing the plaintiff to elect the form on the proceedings is merely a requirement erected to prevent the defendant from being prejudiced.

*Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 984 F.2d 223, 229 (7th Cir. 1993).

*See also Booker*, 2006 WL 1302521 at *6 ("an unreasonable lapse of time between discovering the supposed fraud and bringing the suit is of itself prejudicial to the party charged with fraud."); *Brown*, 142 Ill. at 430, 32 N.E. at 506 (plaintiff was "duty bound to make her election [to affirm or rescind the agreement] at once, or at least before requiring further performance by the other party.").

120.   Hancock has incorrectly argued that *Time Warner Sports Merchandising v. Chicagoland Processing Corp,* 974 F. Supp. 1163 (N.D. Ill. 1997) supports its contention that Abbott's performance of the Agreement does not constitute prejudice.  First, *Time Warner* concerned an assertion that the claimant "waived its fraud claim" entirely (*i.e.*, waived the right to monetary damages as well as rescission) and Illinois courts have applied a different (and more stringent) test for waiver in such circumstances.  *Id.* at 1167-68 (citing *Lee v. Heights Bank*, 112 Ill. App. 3d 987, 995, 446 N.E.2d 248, 254 (1983)).  Second, the issue presented in

4881849.1

*Time Warner* was whether continued performance of the agreement *by the party seeking rescission* caused prejudice. *Id.* at 1170. Here, by contrast, Abbott does not contend that prejudice arose from continued performance (if any) by Hancock but from Hancock's demand and acceptance of continued performance by Abbott. Furthermore, there is additional prejudice here because Hancock, unlike the party in *Time Warner*, secured a final judgment enforcing the Agreement before seeking rescission.

121.   Hancock waived its right to seek rescission by unduly delaying and affirming the Agreement after knowledge of the alleged misrepresentations.

122.   Hancock's delay and affirmation of the Agreement also bar Hancock from rescission under the doctrines of delay, ratification, laches, equitable estoppel, and election of remedies.

123.   As stated above, under Illinois law, a party loses the right to seek rescission if it delays in demanding that right. Hancock is not entitled to rescission because of its undue delay. *See, e.g, Guy*, 628 F. Supp. at 261-62; *Kanter*, 344 Ill. 408, 415, 176 N.E. 289, 291; *Swartz*, 826 F. Supp. at 276-78.

124.   Hancock's acceptance of benefits of the Agreement (e.g., final judgment in *Hancock I* and continued performance by Abbott) after knowledge of the alleged fraud constitutes a ratification (i.e., affirmation) of the Agreement and bars Hancock's claim for rescission of the Agreement. *See, e.g., Brown*, 142 Ill. at 430, 32 N.E. at 506 ("[a]ccepting [further performance by the defendant] with knowledge of the the fraud was a ratification which precluded a subsequent rescission").

125.   Hancock's rescission claim is barred by the doctrine of estoppel. As noted above, after it had knowledge of the alleged fraud and voidability of the Agreement, Hancock made

statements and took actions representing that it was demanding enforcement and affirmation of

the Agreement, with the expectation that Abbott would rely on those representations and

actions. Abbott relied on the representations in good faith to its detriment in the litigation and

in the continued performance of its contractual obligations, and would be prejudiced if Hancock

were now permitted to deny that the Agreement should be affirmed and enforced. *Bledsoe v.*

*Carpenter*, 163 Ill. App. 3d 823, 827-28, 516 N.E. 2d 1013, 1015-16 (1987) ("estoppel focuses

not on the party's intent, but rather on the effects of his conduct on the opposing party.

Therefore, even if a party has not waived a known right, he may be estopped from enforcing

it.").

      126.   Because of Hancock's lack of diligence in asserting a right to rescission and the

resulting prejudice to Abbott, Hancock's rescission claim also is barred by the doctrine of

laches. *See Booker*, 2006 WL 1302521 at *5-6; *Shoenbrod v. Rosenthal*, 36 Ill. App. 2d 112,

120-22, 183 N.E. 2d 188, 192-93 (Ill. App. 1982); *Mrotzek*, 158 Ill. App. 3d at 16-18, 510 N.E.

2d at 1254-55.

      127.   Hancock's rescission claim also is barred under the election of remedies doctrine.

As discussed above, in *Hancock I*, Hancock prosecuted to final judgment its claim for a

declaratory judgment enforcing the Agreement and affirming that it was in "full force and

effect." Under the election of remedies doctrine, Hancock is barred from subsequent

prosecution in this action of the inconsistent remedy of rescission, which is based on

disaffirmation of the Agreement. *Kel-Keef*, 316 Ill. App. 3d at 1008, 738 N.E. 2d at 532 ("It is

clear that the 'prosecution of one remedial right to judgment or decree constitutes an election

barring subsequent prosecution of inconsistent remedial rights.'"); *Newton*, 260 Ill. App. 3d at

720, 633 N.E.2d at 216 ("[A] remedy based on a theory of disaffirmance of a contract

(rescission) is inconsistent with a remedy arising out of its affirmance[.]").  *See also Kanter*,

344 Ill. at 415, 176 N.E. at 291; *Wollenberger*, 346 Ill. at 541, 179 N.E. at 55 ("the complainant

has made his election to have the contract of sale remain in full force and effect until long after

the alleged fraudulent sales . . . Therefore, whatever right he may have had to have the contract

of sale declared void . . . he has waived[.]"); *Zeidler*, 2001 WL 62571, *7 ("an election to

proceed with performance on the contract is inconsistent with the remedy of rescission.").

Hancock's election to enforce and affirm the Agreement in *Hancock I* and its demands for

continued performance misled Abbott into believing that Hancock was affirming the Agreement

and continuing to perform its obligations.  Abbott would be prejudiced if Hancock were now

allowed to rescind the Agreement.  *See Medcom*, 984 F.2d at 229 (if plaintiff were allowed to

sue based on enforcement of the contract, "the defendant would rightly believe that the plaintiff

was affirming the contract [and] would continue to perform other aspects of the contract . . . If,

however, the plaintiff could later sue for rescission, the defendant would have been prejudiced"

by his reliance on the plaintiff's position in the earlier action.); *Kel-Keef*, 316 Ill. App. 3d at

1008, 738 N.E. 2d at 531 (election of remedies applies where "the defendant has actually been

misled by the plaintiff's conduct").

### G.    If Section 3.3(b) Were Interpreted As Hancock Suggests, It Would Constitute an Invalid and Unenforceable Penalty Clause Under Illinois Law

#### 1.    Illinois Law Prohibits Enforcement of Penalty Clauses

128.  "Under Illinois law, as in most if not all states, contracting parties cannot agree to

penalty provisions even if the parties are sophisticated corporations."  *USX Corp. v. Int'l*

*Minerals & Chemicals Corp.*, No. 86-C-2254, 1987 WL 20427 at *5 (N.D. Ill.) (citing *Lake*

*River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1289 (7th Cir. 1985) (Posner, J.).  "In

interpreting contract provisions that specify damages, Illinois law draws a distinction between

liquidated damages, which are enforceable, and penalties, which are not." *Checkers Eight Ltd.*

*Partnership v. Hawkins*, 241 F.3d 558, 561 (7th Cir. 2001).

129.   "Whether a contractual provision is a valid liquidated damages clause or a penalty

clause is a question of law." *Med+Plus Neck & Back Pain Ctr. v. Noffsinger, S.C.*, 311 Ill.

App. 3d 853, 860, 726 N.E. 2d 687, 693 (2000).

130.   A liquidated damages clause is valid and enforceable only if "(1) the parties

intended to agree in advance to the settlement of damages that might arise from the breach; (2)

the amount of liquidated damages was reasonable at the time of contracting, bearing some

relation to the damages which might be sustained; and (3) actual damages would be uncertain in

amount and difficult to prove." *Med+Plus*, 311 Ill. App. 3d at 860; *Jameson Realty Group v.*

*Kostiner*, 351 Ill. App. 3d 416, 423 (2004) (noting that the Illinois courts have "parsed [these]

three elements" from section 356 of the Restatement (Second) of Contracts).  "Additionally, the

damages must be for a specific amount for a specific breach; they may not be a penalty to

punish nonperformance or as a threat used to secure performance." *Med+Plus*, 311 Ill. App. at

860.  *See also Jameson*, 351 Ill. App. 3d at 423 ("It is a general rule of contract law that, for

reasons of public policy, a liquidated damages clause which operates as a penalty for

nonperformance or as a threat to secure performance will not be enforced.").

131.   If a liquidated damages "provision is unenforceable, [the plaintiff's] attempt to

recover that amount is dead in the water.  And that is so no matter how unambiguous the

contract language providing for [the payment] may be." *Automotive Finance v. Ridge Chrysler*

*Plymouth LLC*, 219 F. Supp. 2d 945, 949 (N.D. Ill. 2002).

132.   "[C]ontracting parties cannot agree to penalty provisions even if the parties are

sophisticated corporations." *USX Corp.*, 1987 WL 20427 at *5.  "Illinois continues to

invalidate damages provisions in contracts that fail the [liquidated damages/penalties] test . . .

even if both parties are economically sophisticated." *Checkers*, 241 F.3d at 563.

> 2. **Hancock and Abbott Did Not Intend to Agree in Advance to Settlement of Damages that Might Arise from Abbott's Failure to Spend $614 Million Due to Hancock's Termination of Program Payments**

133.   The first consideration in determining whether a contract provision is a valid

liquidated damages provision or a penalty is whether the parties intended to agree in advance to

the settlement of damages that might arise from the breach. *Med+Plus*, 311 Ill. App. 3d at 860.

134.   Section 3.3(b) was not intended by Hancock and Abbott to a settlement of

damages that might arise from Abbott's failure to spend $614 million, particularly where such

failure is attributable to Hancock's termination of Program Payments pursuant to Section 3.4.

135.   While the parties' failure to include a recital in the Agreement stating that Section

3.3(b) is a reasonable estimate of damages from breach of the aggregate spending obligations is

not determinative, it does provide some evidence that the provision was not intended to provide

a reasonable estimate of likely actual damages. *See Rose Marine Transp., Inc. v. Kaiser Alum.

& Chem. Corp.*, 758 F. Supp. 1218, 1223 (1990) (noting that the provision in question does not

"even purport to reflect a reasonable estimate of what the damages might likely be at the time of

breach" and holding that it is an invalid penalty).

> 3. **Actual Damages Are Not Uncertain in Amount and Difficult to Prove**

136.   Section 3.3(b), as interpreted by Hancock, also does not satisfy the requirement

that "actual damages would be uncertain in amount and difficult to prove." *Med+Plus*, 311 Ill.

App. 3d at 860.

137.   Even assuming *arguendo* that, as Hancock contends, the Agreement requires

Abbott to spend $614 million regardless of whether Hancock terminates its Program Payments,

there is no reason why Hancock could not use well established economic tools to prove its damages if Abbott fails to meet this obligation.

138.   If Hancock could establish causation, which is required in every breach of contract case, Hancock would have a number of theories available to it to prove damages.

139.   For example, if the alleged breach by Abbott of its aggregate spending obligations caused Hancock not to achieve its target rate of return, a calculation could be made modeling the "but for" world – what Hancock's return would have been had the alleged breach not occurred.  Of course, if Abbott's alleged breach of the spending obligation did not cause any actual harm, e.g. if the compounds terminated by Abbott were simply no longer viable, and the infusion of another $65.4 million would not have changed this fact, Hancock would not be entitled to *any* damages.  This possibility is not evidence that actual damages are uncertain in amount or difficult to prove, but simply evidence that there might not be any actual damages.[2]

### 4.    The Amount of Liquidated Damages in Section 3.3(b) Was Not a Reasonable Estimate of Actual Damages at The Time of Contracting

140.   A liquidated damages clause is not valid unless the damages constitute a reasonable estimate, at the time of contracting, of the damages which might be sustained. *Med+Plus*, 311 Ill. App. 3d at 860.

141.   If Section 3.3(b) is interpreted as Hancock suggests, the payments purportedly due under that provision would not be a reasonable estimate, as of the time of the Agreement, of potential actual damages for a number of reasons.

142.   For example, it is not a reasonable estimate of damages because it fails to account

---

[2] The possibility that actual damages from Abbott's reduced spending might be minimal or non-existent also illustrates the penal nature of Hancock's proposed interpretation of Section 3.3(b).  Under Hancock's interpretation of Section 3.3(b), Abbott would be required to pay a large penalty not reasonably related to the expected range of actual damages.

for Hancock's cost savings.  Under Hancock's interpretation, Abbott must pay one-third of the

unspent Aggregate Carryover Amount regardless of whether Hancock has made the full

Program Payments of $214 million or has been relieved of a portion of its payments pursuant to

Section 3.4.  In other words, Hancock would receive the *same amount* of "liquidated damages"

regardless of how much it has invested in the program.

143.    This point is best illustrated by comparing two scenarios under Section 3.3.(b).

First, assume that Section 3.4 was not triggered and Hancock made the full Program Payments

of $214 million, but Abbott, due to unforeseen circumstances, only spent $548.6 million during

the Program Term and the subsequent year.  In that case, Abbott's failure to spend $614 million

would not have resulted in any cost savings to Hancock.  Hancock would have incurred $214

million in costs, and been deprived of the benefit, if any, of Abbott spending an additional

$65.4 million on development of the Program Compounds.

144.    In the instant case, however, Hancock claims that the same remedy under Section

3.3(b) should also apply when the shortfall is caused by the termination of Hancock's Program

Payments under Section 3.4.  But it is evident that Hancock's damages, if any, are *far lower* in

this scenario than in the one previously discussed.  Here, Hancock spent only $104 million, not

$214 million.  It has saved $110 million.  Yet, under Hancock's interpretation of Section 3.3(b),

it is entitled to exactly the same amount of "liquidated damages", with no provision for "netting

out" to account for this significant difference.

145.    This type of clause, which specifies the same damages without regard for

potentially major cost savings accrued by the non-breaching party, does not provide a

reasonable estimate of damages and is an invalid and unenforceable penalty under Illinois law.

*Lake River*, 769 F.2d at 1290-91.  *Lake River* involved a contract in which the defendant agreed

to ship a minimum quantity of industrial abrasive power to the plaintiff for bagging. *Id.* at

1286. In order to ensure that the plaintiff could recoup costs of new equipment and make a

profit of 20 percent, the contract provided that if the defendant failed to ship the agreed-upon

minimum, plaintiff could invoice defendant at the prevailing rate for the difference between the

quantity actually bagged and the minimum guaranteed. *Id.* The court held that the provision

was an invalid penalty clause because it failed to account for the costs avoided by the plaintiff

as a result of defendant's breach and thus was not a reasonable estimate of damages. *Id.* at

1290-92. The court explained that:

> When a contract specifies a single sum in damages for any and all
> breaches even though it is apparent that all are not of the same
> gravity, the specification is not a reasonable effort to estimate
> damages; and when in addition the fixed sum greatly exceeds the
> actual damages likely to be inflicted by a minor breach, its
> character as a penalty becomes unmistakable.

*Id.* at 1290. The court held that the clause "is within the gravitational field of these principles

even though the minimum guarantee clause does not fix a single sum as damages." *Id.* In other

words, even though the damages provision in *Lake River* included a formula that accounted for

the defendant's partial performance – rather than requiring payment of a fixed sum for all

breaches – it was not a reasonable estimate of damages because it failed to account for the

plaintiff's cost savings. *Id. See also USX*, 1987 WL 20427 at *2, 6 (alternative compensation

formula that failed to account for the claimant's ability to mitigate by recouping a portion of its

costs was an unenforceable penalty). Similarly, although Section 3.3(b) provides for payment

based on a formula rather than a fixed amount, it is not a reasonable estimate of damages because

it fails to account for Hancock's substantial avoided costs.

146. To be valid, the amount of liquidated damages specified in Section 3.3(b) must

have been "reasonable *at the time of contracting*, bearing some relation to the damages which

*might be sustained.*"  *Med+Plus*, 311 Ill. App. 3d at 860, 726 N.E. 2d at 693 (emphasis added).

*See also Automotive Fin. Corp.*, 219 F. Supp. 2d at 950 (liquidated damages "must be

reasonably related to the anticipated harm likely to come from noncompliance").  Therefore, in

other to determine whether Section 3.3(b) is a unenforceable penalty clause, it is appropriate for

the Court to consider whether Section 3.3(b) would provide a reasonable estimate of damages in

hypothetical scenarios, in addition to considering whether it provides a reasonable estimate of

damages in the present scenario.  *See, e.g., Automotive Finance*, 219 F. Supp. 2d at 952-53;

*Lake River*, 769 F.2d at 1290-91.

     147.  Consideration of hypothetical scenarios demonstrates that Section 3.3(b) is not a

reasonable estimation of damages, but a penalty.  For example, under the Agreement, the

Program Term commences on March 13, 2001, but Hancock is not required to make its initial

payment until December 1, 2001.  The Agreement expressly contemplates that Abbott may

"abandon[] development of all Preclinical Programs and Program Compounds in any Program

Year during the Program Term[,]" including the first Program Year.  If Abbott "abandon[ed]

development" of all Preclinical Programs and Program Compounds before the end of the first

Program Year, e.g., if it determined in good faith that the programs and compounds were no

longer viable, Section 3.4 would relieve Hancock of its *entire* funding obligation.  Under

Hancock's interpretation of the Agreement, in that scenario, Section 3.3(b) would require

Abbott to spend $614 million of its own funds over the remainder of the Program Term and the

subsequent year, even though it had determined the original Preclinical Programs and Program

Compounds were no longer viable.  If Abbott failed to make this expenditure, it would be

required under Section 3.3(b) to pay Hancock one-third of the difference between $614 million

and Abbott's actual spending.  So if Abbott had spent $100 million before abandoning the

Program Compounds, it would be required to pay Hancock one-third of $517 million, or $172 million.  In this example, Hancock would receive a $172 million return on an investment of $0.

148.   Similarly, under Hancock's interpretation of Section 3.3(b), if Abbott decided to abandon development of all compounds after Hancock made its first payment of $50 million and Abbott had spent a total of $125 million (including Hancock's payment), not only would Hancock be relieved of future Program Payments pursuant to Section 3.4(i), but Abbott would be required to either make up the shortfall by spending an additional $489 million of its own funds on compounds it had determined were not viable, or pay $163 million to Hancock. Assuming Abbott decided to pay the penalty rather than make the irrational expenditure, the payment would give Hancock a more than 300 percent return over five years.  Obviously, this damage payout under Section 3.3(b) would bear no relation whatsoever to Hancock's actual expectation damages, since Hancock's originally estimated annual rate of return was approximately 17 percent.  These are hypothetical scenarios, but they are different only in degree from the actual circumstances of this case – where Hancock contends that Abbott, after deciding to reduce its planned spending on the compounds during the Program Term and thereby triggering Hancock's termination rights, was required to *increase* its spending to make up for the shortfall caused by Hancock's termination of payments.

149.   In response to these hypothetical scenarios, Hancock has argued that Section 3.3(b) does not apply if Hancock terminates its payments pursuant to Section 3.4(i), but only applies if Hancock terminates its payments pursuant to the other subsections of Section 3.4. There is no basis in the Agreement to support this construction.  Furthermore, similarly penal results could occur where Hancock terminates its payments under the other subsections of Section 3.4, including subsection (iii), the subsection that Hancock actually relied upon to

terminate its payments.  For example, under Hancock's interpretation of the Agreement, if Abbott submitted an Annual Research Plan prior to December 1, 2002 showing that it intended to spend $613 million over the Program Term -- only $1 million short of the spending target -- it would not merely give Hancock the right under Section 3.4(iii) to terminate its remaining $164 million in Program Payments but also require Abbott to either spend an additional $164 million of its own funds on the Research Program or pay Hancock nearly $55 million pursuant to Section 3.3(b).  This hypothetical illustrates that Section 3.3(b) was not intended to provide a reasonable estimate of damages.  Fifty-five million dollars clearly is not a reasonable estimate of the damages that Hancock would suffer from the shortfall in spending in this hypothetical scenario.

150.   In addition, in the precise situation actually before the Court, the provision operates as a penalty because it does not account for the $110 million Hancock saved by not making its last two payments, and provides Hancock with the same monetary recovery as if it had spent $214 million.  Stated another way, Section 3.3(b) cannot be a reasonable estimate of damages in the current situation because it fails to account for the relief Hancock has already obtained for essentially the same breach.  Pursuant to Section 3.4(iv), Hancock obtained relief worth $110 million because Abbott provided advance notice of its intention to spend less than $614 million during the Program Term.  Under Hancock's interpretation of Section 3.3(b), Abbott would be required to pay damages without any offset for the amount of relief Hancock has already obtained under Section 3.4.  Given Section 3.3(b)'s failure to account for the other very substantial relief Hancock has already obtained, Section 3.3(b) cannot be considered a reasonable measure of damages.

151.   Hancock has argued that, viewed in the abstract, its proposed recovery under

Section 3.3(b) is not an unreasonable estimate of damages given its net investment of $90 million and its original expected rate of return of 17.5 percent. For the reasons stated above, this is not the relevant comparison. Under Hancock's construction of Section 3.3(b), Hancock would be awarded the same damages under Section 3.3(b) on an investment of $214 million so the damages would be invariant to the gravity of the harm. *In addition, the argument assumes, without evidentiary support, that the decrease in Hancock's expected rate of return was caused by Abbott's spending $529.3 million, rather than $614 million, on the compounds.* Far more likely is that if Hancock's return expectations are not met, it will be because the compounds turned out to not be viable. Indeed, Hancock contends that the difference between Hancock's original and current expected rate of return is attributable *not* to Abbott's failure to spend an additional $63 million on development of the compounds, but to alleged undisclosed problems with the compounds. Hancock cannot rely on the decrease in its expected rate of return to argue that Section 3.3(b) provides a reasonable measure of damages for Abbott's failure to spend $614 million, while simultaneously alleging that the decrease is due to factors other than the level of Abbott's spending.

> 5.    **Hancock cannot avoid invalidation of Section 3.3(b) by describing it as a term providing for "alternative performance obligations"**

152.    Hancock cannot avoid invalidation of Section 3.3(b) by describing it as a term providing for "alternative performance obligations" – i.e., a term requiring that Abbott either spend $614 million or pay Hancock one-third of the Aggregate Carryover Amount -- rather than a penalty clause. "Illinois law does not require that a contract provision be categorized as either liquidated damages or compensation. Under either categorization, the payment will not be enforceable if found to be a penalty." *USX*, 1987 WL 20427 at *3 (citing *Joseph v. Lake Michigan Mortgage Co.*, 106 Ill. App. 3d 988, 436 N.E. 2d 663, 666 (1982). Thus, contract

terms providing for "alternate payments, whether purported to be liquidated damages or alternate compensation, are invalid if they are actually a penalty." *Id.* at *5 (holding that an alternate payment provision was an invalid penalty). *See also Automotive Finance*, 219 F. Supp. 2d at 949-50; *Steel v. People's Oil & Gas Co.*, 147 Ill. App. 133, 136 (1909)).

153.    In *Automotive Finance*, the plaintiff, like Hancock, argued that a contract term was not a liquidated damages provision, but merely gave the defendant an alternative means of performance (payment of specified funds to plaintiff), and that it was merely suing for damages based on the defendant's failure to provide the alternative performance. *Automotive Finance*, 219 F. Supp. 2d at 949-50.  The court rejected that argument, holding that "the real question is not whether [the provision] sets damages for a breach, but rather whether that paragraph calls for payment of an unenforceable penalty." *Id.* at 949.  It noted that the agreement set forth the desired method for the defendant's performance and the provision at issue "states what would happen if [the defendant] did not perform in accordance with the stated method." *Id.* at 949-50. Therefore, although defendant's failure to perform as set forth in the agreement "is not technically a breach of the Agreement," the provision at issue "represented a means of creating pressure on [the defendant] to adhere" to those  obligations. *Id.* at 950.  Thus, the court applied the liquidated damages/penalty analysis and held that the provision requiring payment to the plaintiff was an unenforceable penalty. *Id.* at 949-56.  Similarly, Sections 3.2 and 3.3(b) set forth the desired performance by Abbott – spending of the Aggregate Spending Target in the Program Term and subsequent year – and the last sentence of Section 3.3(b) sets forth the consequences for Abbott's failure to satisfy those obligations.  Thus, regardless of how Hancock chooses to characterize the provision, it must be analyzed under the liquidated damages/penalty test. *Id.*

154.    Contrary to Hancock's arguments, *River East Plaza, LLC v. The Variable Annuity Life Co.*, 498 F.3d 718 (7th Cir. 2007) does *not* hold that contract provisions that can be characterized as providing for alternative means of performance are exempt from examination under the liquidated damages/penalties clause framework.  Like *Automotive Finance* and numerous other state and federal cases, *River East* holds that, under Illinois law, courts will not enforce a remedy which is found to be a penalty, regardless of the parties characterization of the clause.  *River East* recognized that "the underlying question is whether this clause is punitive in nature," and that the court must look beyond the form of the provision to its substance.  *Id.* at 722.  "In order to distinguish between [an invalid penalty clause and] a valid provision for alternative performance], 'a court will look to the substance of the agreement to determine whether . . . the parties have attempted to disguise a provision for a penalty that is unenforceable.'"  *Id.* (quoting Restatement (Second) of Contracts § 356 cmt. c) (1981).  The Court held that "'[i]n determining whether a contract is one for alternative performances', as opposed an invalid penalty, 'the relative value of the alternatives may be decisive.'"  *Id.* (quoting Restatement (Second) of Contracts § 356 cmt. c).[3]

155.    Applying the well established principle set forth in the Restatement, *River East* unremarkably concluded that a pre-payment penalty in a commercial real estate loan, calculated by discounting unpaid installments due at the then current Treasury bill rate, was not a penalty.

---

[3] The Restatement comment relied upon by the Seventh Circuit in *River East* notes that:

> Sometimes parties attempt to disguise a provision for a penalty by using language that purports to make payment of the amount an alternative performance under the contract . . . Although the parties may in good faith contract for alternative performances . . . a court will look to the substance of the agreement to determine whether this is the case or whether the parties have attempted to disguise a provision for a penalty that is unenforceable under this Section.

Restatement (Second) of Contracts § 356 cmt. c.

*Id.* at 722-24.  Hancock asserts that the *River East* court reached this conclusion because the cost of performance to the borrower, River East (the party contending that the contract provision was an invalid penalty), was greater than the pre-payment penalty, and it reasons by analogy that the same is true here because it would supposedly be less expensive for Abbott to pay one-third of the "short-fall" under Section 3.3(b) than to spend the entire amount on Program Related Costs.  Hancock's analysis is faulty for at least two reasons.  First, it ignores the possibility that additional expenditures by Abbott on Program Related Costs might produce additional benefits to Abbott which would need to be taken into account when comparing the cost of complying with this provision.  Second, the court *also* compared the benefits to the lender, VALIC (the party seeking enforcement of the contract provision), of receiving payments for the term of the loan to the pre-payment penalty, and concluded that it was not "overcompensated" by receiving the benefits of the latter.  *Id.* at 723-24.  In other words, the court found that the pre-payment fee was a reasonable estimate of the benefit the lender could have obtained if the contract had been fully performed, i.e. the damages it would have suffered from a breach.  This prong of the Court's analysis has long been used to assess whether a remedy is penal.  *See, e.g., Lake River*, 769 F.2d at 1290-91.  Hancock cannot satisfy this test because, under its interpretation of Section 3.3(b), Hancock would receive payments that are unrelated to any benefit it would have obtained had there been no "short fall" (i.e., it would receive payments that are not a reasonable estimate of the damages from any shortfall).

### 6. Section 3.3(b) Cannot Be Upheld Because it is a Penalty to Punish Nonperformance and a Threat to Secure Performance

156.  Section 3.3(b), as interpreted by Hancock, cannot be justified by characterizing it as an incentive to secure performance, as opposed to a penalty for nonperformance.  Any penalty provision can be alternatively characterized as an incentive to secure performance,

44

rather than a penalty for nonperformance, but this does not render it valid. "No matter what label the parties apply to a contractual term, Illinois law states that contract provisions may not serve as a 'threat used to secure performance." *Automotive Finance*, 219 F. Supp. 2d at 950. "It is well-established that 'if the purpose of the clause fixing damages is merely to secure performance of the agreement, it will not be upheld.'" *Id.* *See also Rose-Marine*, 758 F. Supp. at 1224 (under a "long-standing principle" of Illinois law, "if the clause fixing damages is merely to secure performance of the agreement, it will be treated as a penalty and only actual damages proved can be recovered."). Section 3.3(b), as interpreted by Hancock, is not a reasonable estimate of damages but merely a threat to secure performance (or alternatively, a penalty for nonperformance) by Abbott of an obligation to spend additional funds to make up for a shortfall caused by Hancock's termination of payments, even if such expenditure is commercially irrational and unlikely to result in any benefit to Hancock.

7.     **Any Doubt Regarding Whether Section 3.3(b), as Construed by Hancock, Would Constitute a Penalty Should be Resolved in Favor of Non-Enforcement of the Provision in the Current Circumstances**

157. If there is any doubt regarding whether Section 3.3(b), as applied in the present situation, would constitute a penalty, it should be resolved in favor of non-enforcement of the provision. *See Lake River*, 769 F.2d at 1290 ("Illinois courts resolve doubtful cases in favor of classification as a penalty"); *Stride v. 120 West Madison Bldg. Corp.*, 132 Ill. App. 3d 601, 605, 477 N.E. 2d 1318, 1321 (1985) ("In doubtful cases, we are inclined to construe the stipulated sum as a penalty"); *Grossinger Motorcorp, Inc. v. Am. Nat'l Bank & Trust*, 240 Ill. App. 3d 737, 749, 607 N.E. 2d 1337, 1345 (1993).

158. There is no unfairness in Hancock's lack of a remedy under Section 3.3(b) in the present circumstances. Hancock already obtained very substantial relief under Section 3.4 for, in essence, the same breach. After Abbott provided advance notice to Hancock that it planned

45

to spend less than the Aggregate Spending Target in the Program Term, Hancock availed itself

of the remedy provided in Section 3.4 – termination of $110 million in future Program

Payments.  *Also, there is no evidence of any actual damages attributable solely to Abbott's*

*spending $529.3 million, as opposed to $614 million, in the first five years of the ten year*

*Agreement.*

> 8.    **Abbott's Proposed Interpretation of the Agreement Is Consistent with the Intent of the Parties and Gives Effect to All Parts of the Agreement**

159.    "[I]n interpreting provisions which affix the amount of damages in the event of a

breach, courts 'lean toward a construction which excludes the idea of liquidated damages and

permits the parties to recover only damages actually sustained.'"  *Grossinger*, 240 Ill. App. 3d

at 749, 607 N.E. 2d 1345.

160.    Abbott's interpretation of Section 3.3(b) -- that it applies only apply where

Hancock has not terminated its payments pursuant to Section 3.4 -- gives effect both to the

language of the Agreement, when read as a whole, and the intent of the parties.  Stephen

Blewitt, the lead Hancock negotiator, admitted in his deposition in *Hancock I* that Section

3.3(b) "assum[es] that all of the other provisions are met" and that "*Hancock made its payment*

*at the end of the Program Term*[.]"  He testified that, in these situations, Section 3.3(b) would

provide for a refund to ensure that John Hancock does not pay more than one-third of the

amounts spent by Abbott on program-related costs.

161.    Hancock has contributed far less than one-third of the amount spent by Abbott

(Hancock has made a total net contribution of $90 million, while Abbott contributed more than

$400 million during the first five years).  Therefore, there is no need for a refund to maintain

the 2-1 funding ratio intended by the parties.

162.    Similarly, Hancock has admitted that the intent of Section 3.3(b) was for Hancock

to share in Abbott's "cost savings." The "cost-savings" rationale may make sense in situations where Hancock makes its full contribution and Abbott spends less than $400 million of its own funds. But it does not make sense where Hancock terminates its payments pursuant to Section 3.4, thereby saving $110 million, and Abbott spends in excess of $400 million of its own funds. In such situations, *Hancock*, not Abbott, is the party that enjoyed cost savings, and there is no grounds for Hancock to obtain double recovery of its own cost savings.

163.   Since Section 3.3(b), as interpreted by Hancock, would constitute an invalid penalty, the Court denies Hancock's Section 3.3(b) claims.

ABBOTT LABORATORIES

By its attorneys,

_____/s/ Jeffrey I. Weinberger_____

Michael S. D'Orsi
Peter E. Gelhaar (BBO #188310)
Michael S. D'Orsi (BBO #566960)
DONNELLY, CONROY & GELHAAR LLP
1 Beacon St., 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880
and

Jeffrey I. Weinberger (Admitted Pro Hac Vice)
Gregory D. Phillips (Admitted Pro Hac Vice)
Eric J. Lorenzini (Admitted Pro Hac Vice)
Ozge Guzelsu (Admitted Pro Hac Vice)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA  90071
Dated: April 23, 2008        (213) 683-9100

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on April 23, 2008.

Date: April 23, 2008

/s/ Ozge Guzelsu

4881849.1