UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY and MANULIFE INSURANCE COMPANY, | CIVIL ACTION NO. 05-11150-DPW |
| Plaintiffs, | |
| v. | |
| ABBOTT LABORATORIES, | |
| Defendant. | |

## ABBOTT'S POST-TRIAL PROPOSED ADDITIONAL AND SUBSTITUTE FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant Abbott Laboratories ("Abbott") respectfully submits the following Post-Trial Proposed Additional or Substitute Findings of Fact and Conclusions of Law for consideration and adoption by the Court at the trial of this action. Abbott reserves the right to supplement or amend these Post-Trial Proposed Findings and Conclusions at a later time, as Abbott deems necessary, as a result of further submissions or proceedings in this action. For the convenience of the Court, the paragraph numbers in Abbott's Post-Trial Proposed Additional and Substitute Findings of Fact and Conclusions of Law correspond to the paragraph numbers of Plaintiffs' Preliminary Proposed Findings of Fact and Conclusions of Law. Abbott also has added as additional conclusions of law paragraphs 73-78, which are not addressed by Hancock's Preliminary Proposed Findings of Fact and Conclusions of Law.

I.    **PROPOSED FINDINGS OF FACT**

*Background Facts*

The Plaintiffs

1.    No proposed additional or substitute findings.

2.    No proposed additional or substitute findings.

3.    No proposed additional or substitute findings.

4.    No proposed additional or substitute findings.

The Defendant

5.    No proposed additional or substitute findings.

6.    No proposed additional or substitute findings.

7.    No proposed additional or substitute findings.

The Negotiation of the Research Funding Agreement

8.    No proposed additional or substitute findings.

9.    No proposed additional or substitute findings.

10.    Proposed Substitute Findings:  In early 2000, Abbott and Hancock began

discussions regarding a potential investment by Hancock in a portfolio of new

pharmaceutical compounds that Abbott had under development.  Deemer Aff. ¶¶ 9-10;

11/17/06 Blewitt Depo. 43:10-17.

11.    No proposed additional or substitute findings.

12.    Proposed Substitute Findings:  Abbott was interested in a potential

funding agreement with Hancock for general risk sharing and risk mitigation purposes.

Leiden Aff. ¶¶ 8-9; Leonard Aff. ¶ 8; Leonard Depo. 27:18-28:7.  Abbott had already

spent over half a billion dollars of its own funds developing the compounds that were

included in the Research Funding Agreement ("RFA" or "Agreement").  Ex. 32 at

JH008117-34.  Abbott planned to spend in excess of an additional $1 billion developing

the compounds through 2005.  *Id.*  Hancock, in turn, was seeking to commit a portion of

its investment portfolio to an investment with above-average risks and returns.  Blewitt

Aff. ¶ 21; Deemer Depo. 217:4-15.  Hancock was aware before the RFA was entered into

that pharmaceutical drug development is an inherently risky business and that most

pharmaceutical compounds, especially those in early phases of discovery and

development, generally do not make it to market.  Klotz Depo. 170:20-172:5, 177:10-

179:16; Blewitt Tr. 13:16-15:19; Ex. 502 at p. 3; Ex. 125 at pp. 12-13; *see also* Leiden

Aff. ¶ 7.

       13.   <u>Proposed Substitute Findings</u>:  Over time, the parties began to concentrate

their discussions on an investment structure whereby Hancock would invest

approximately $50 million per year over a four-year period to fund the development of a

specified "basket" of pharmaceutical compounds in Abbott's then current research and

development portfolio.  Blewitt Aff. ¶ 22.  There was no fixed number of compounds to

be included in the portfolio and the number of proposed compounds varied during the

course of negotiations.  *See, e.g.*, Ex. 150 at JH002424, ¶ 3; Ex. 30 at p. 1; Ex. 919 at

p. 1; Ex. 543 at p. 2; Ex. 569 at p. 7; Ex. 32 at JH008138.  *Abbott offered Hancock a*

*selection of compounds in different stages of development pursuant to Hancock's request,*

*including compounds such as ABT-773, ABT-594, and ABT-518, which Abbott*

*considered among the most valuable of the dozens of compounds in its portfolio.* [1]

Hendricks Aff. ¶¶ 11-12; Ex. 591 at pp. 19-40.

---

[1] Pursuant to the Court's request, Abbott has italicized new proposed findings of fact that were
added to or changed from Abbott's Preliminary Proposed Additional or Substitute Findings of
Fact and Conclusions of Law.

14.    <u>Proposed Additional Findings</u>:  Hancock wanted to invest in a portfolio of compounds at different stages of development, including higher-risk, early stage compounds.  Blewitt Aff. ¶ 25; Hartz Tr. 492:21-494:1; Blewitt Tr. 16:3-7; 20:14-24.  Hancock wanted to invest in a portfolio that included "high risk" compounds, because they offered greater potential "upside."  Ex. 803 at p. 1; *see also* Blewitt Tr. 15:20-20:12.

15.    No proposed additional or substitute findings.

16.    No proposed additional or substitute findings.

17.    <u>Proposed Substitute Findings</u>:  Hancock knew that ABT-594 and ABT-518 might be terminated in the near future.  Blewitt Tr. 36:19-39:3, 41:3-42:8, 65:13-66:25; Ex. 32 at JH008166, JH008198; Ex. 818 at p.1: Ex. 803 at p. 1.  For example, Hancock knew that ABT-518 was part of a class of novel cancer compounds, and that because it involved "a new untried strategy for everyone, it is high risk."  Blewitt Tr. 36:19-39:3.  Hancock also knew that the risk was compounded by the fact that "most [compounds in the class] are not yet in clinical trials" and "the probability of a particular compound reaching the marketplace is low."  Ex. 803 at p. 1.  When Hancock's senior management approved the investment, it estimated that the probability of success of ABT-518 was only 10 percent.  Blewitt Tr. 19:14-20:22; Ex. 125 at p. 13.  Abbott also disclosed to Hancock in the RFA that compounds in the same class had not demonstrated efficacy and had side effects and that ABT-518:

> will need to demonstrate a meaningful clinical advantage over compounds that are in more advanced development.  Strict Go/No Go criteria will determine if [ABT-518] can meet these hurdles.  If they cannot be met, the compound will not move forward.

Ex. 32 at JH008199.  Abbott also disclosed in the third paragraph of the ABT-594 Descriptive Memorandum that it would make a "Go/NoGo decision" regarding the

compound in June 2001.  Ex. 32 at JH008166; *see also* Ex. 550 at p. 7; Ex. 818 at p. 1

(Dr. Klotz informed Hancock, based on Abbott's disclosures, that "[t]here appears to be

some risk of [ABT-594] not passing phase II clinical trials" and "there are questions in

my mind about whether [ABT-594] will complete clinical trials").

Hancock also knew that even compounds at more advanced stages of

development and a relatively high estimated probability of success, such as ABT-773,

might be terminated for scientific or commercial reasons.  Klotz Depo. 177:17-179:16;

Ex. 32, § 3.4 (the RFA expressly recognized that Abbott might "abandon[] development

of *all* Preclinical Programs and Program Compounds in *any* Program Year during the

Program Term.") (emphasis added).

18.     Proposed Substitute Findings:  John Hancock requested that Abbott

disclose certain material information regarding the compounds that were to be included in

its proposed deal with Abbott, in order to understand and evaluate the deal.  Deemer

Depo. 86:11-87:9; Blewitt Aff. ¶ 30.

19.     Proposed Substitute Findings:  Hancock and its point person on the deal,

Stephen Blewitt, "had substantial experience in evaluating" potential investments in the

pharmaceutical industry including investment in compounds under development.  Blewitt

Aff. ¶¶ 10-17; Blewitt Tr. 12:4-13:15; 11/17/2006 Blewitt Depo. 18:19-20:16, 21:22-

22:12, 22:19-24:4, 24:11-27:23, 28:4-30:7, 31:4-33:6, 35:22-39:3, 56:2-7, 65:4-66:20;

11/10/06 Hartz Depo. 54:9-22, 56:8-14; Ex. 514; Ex. 515; Ex. 516; Ex. 519; Ex. 522; Ex.

523; Ex. 524; Ex. 525; Ex. 549; Ex. 569 at p. 5; Ex. 741 at p. 4.  In the course of

evaluating those prior investments, Mr. Blewitt and Hancock established relationships

with reliable scientific advisors, including Dr. Lynn Klotz, and became experienced in

conducting due diligence regarding pharmaceutical products and compounds under development.  Blewitt Aff. ¶ 15; Klotz Aff. ¶¶ 2, 10-13; 11/17/06 Blewitt Depo. 24:11-26:3, 26:20-27:7, 28:17-30:7, 65:4-66:20; Klotz Depo. 45:9-50:3, 54:15-55:11, 58:16-59:4, 60:5-61:3; Ex. 518; Ex. 802 at JHII012361.  In evaluating the potential Abbott deal, Hancock conducted its own due diligence.  Deemer Aff. ¶ 11 (Abbott informed Hancock that it was open to whatever due diligence Hancock believed was necessary and never declined any request for additional information); Klotz Aff. ¶15; Blewitt Tr. 27:25-29:6; Klotz Tr. 396:3-396:15, 397:5-398:7 (Dr. Klotz understood he could have requested additional information, but was satisfied with the information provided); Klotz Depo. 64:17-66:12; 11/17/06 Blewitt Depo. 125:24-126:11; 5/16/07 Blewitt Depo. 277:17-278:16, 281:23-282:21, 283:1-21, 318:7-17; Ex. 569 at p. 11 (Hancock's "Yellow Report" describing Hancock's due diligence).  It retained Dr. Klotz to conduct an independent analysis of the proposed compounds.  Blewitt Aff. ¶¶ 32, 35; Klotz Aff. ¶¶ 2, 15; 11/17/06 Blewitt Depo. 127:9-130:21; Klotz Depo. 25:8-26:18.  Dr. Klotz conducted a review of publicly available scientific literature relevant to the compounds, including "search[ing] the major drug and medical databases for scientific reports of Program Compounds and competitive [compounds in the same] class or same disease category."  Klotz Aff. ¶ 15; Klotz Tr. 396:21-396:23; Ex. 110; Ex. 569 at p. 11; Ex. 556; Ex. 803; Ex. 804; Ex. 979.[2]  Dr. Klotz also interviewed specialists in particular disease areas to gather additional information relevant to the Program Compounds.  Klotz Aff. ¶ 28; Blewitt Tr. 29:7-33:21; Klotz Tr. 396:24-397:4, 414:7-415:13; Klotz Depo. 71:21-72:15 (Hancock paid independent experts); Ex. 569 at p. 11.  Dr. Klotz gathered information

---

[2] Exhibit numbers which are bracketed indicate exhibits to which Hancock maintains an objection.

from independent experts regarding the status of competitor's clinical trials.  Ex. 803 at

p. 6.  Dr. Klotz provided information to Hancock regarding the risks associated with each

of the compounds.  Klotz Aff. ¶ 29; Klotz Tr. 414:7-415:13; Blewitt Tr. 34:12-55:20,

51:1-53:22; Ex. 62; Ex. 561.

       After conducting due diligence, Hancock interviewed John Leonard, Abbott's

Vice President of Development, to ask follow-up questions.  Leonard Aff. ¶¶ 4, 10;

Blewitt Aff. ¶ 42; Klotz Aff. ¶ 30; Klotz Tr. 415:15-420:3, 429:9-430:23; Ex. 62.  Dr.

Klotz concluded that his "questions were answered satisfactorily" and that there was

"certainly no indication of any deception on Abbott's part."  Ex. 62 at p. 1; *see also*

Blewitt Aff. ¶ 44; Klotz Aff. ¶¶ 32-33; Klotz Tr. 397:13-398:2; 415:15-416:19; 11/17/06

Blewitt Depo. 163:1-12, 164:10-165:5, 166:4-13; Klotz Depo. 66:8-66:11.  In

recommending approval of the deal, Mr. Blewitt stated to Hancock senior management

that "[o]ur due diligence provided us with results consistent with Abbott's representations

and expectations for the Program Compounds. . . ."  Ex. 569 at p. 11.  *For example, with*

*respect to ABT-773, Mr. Blewitt reported:  "Our scientific consultant, Robert C.*

*Moellering, Jr., Harvard Medical School and Beth Israel Medical Center, confirmed the*

*scientific rationale for ketolides and their market potential.*  Ex. 125 at p. 17; *see also* Ex.

823 (Dr. Klotz's notes of Dr. Moellering interview).

       20.   Proposed Substitute Findings:  During negotiations, Abbott provided

Hancock with drafts of Descriptive Memoranda regarding each of the Program

Compounds.  Blewitt Aff. ¶ 30; Blewitt Tr. 56:15-57:17.  The Descriptive Memoranda

were created by Abbott employees, including the development teams for the particular

compound for which the Descriptive Memorandum was created.  Leonard Aff. ¶ 11.

21.    <u>Proposed Substitute Findings</u>:  It would not have been practical for Abbott to disclose every piece of data regarding the Program Compounds, and Abbott was not required by the RFA to do so.  Nisen Depo. 390:5-391:9; Ex. 32, §§ 1.11, 12.2(i). However, the Descriptive Memoranda, as well as the Annual Research Plans ("ARPs"), attached to the RFA contain the material information regarding the status and prospects of each compound and span dozens of pages.  Leonard Aff. ¶¶ 12-13; Nisen Depo. 390:5-391:9; Ex. 32 at JH008116-8136, JH008152-8209; *see also infra,* ¶¶ 64-130.  *Mr. Blewitt did not provide copies of the draft or final versions of the Descriptive Memoranda or ARPs to Mr. Hartz or members of Hancock's Bond and Investment Committee and Committee of Finance.*  Hartz Tr. 491:14-492:20; Davis Depo. 8:17-9:24, 35:22-38:10, 82:16-85:2, 94:20-96:17; Ex. 32 at JH008116-8136, JH008152-8209; Ex. 982 (Ms. Davis was Hancock's Rule 30(b)(6) designee regarding management approval of the deal).

22.    <u>Proposed Substitute Findings</u>:  Drafts of the Descriptive Memoranda created by Abbott employees were circulated to more senior Abbott management personnel, including Dr. Leonard, for review before they were sent to Hancock.  Leonard Aff. ¶¶ 12-13; Leonard Depo. 69:13-69:18; Nisen Depo. 19:16-19, 20:18-21:23, 37:8-39:19, 39:23-40:22.

23.    <u>Proposed Additional Findings</u>:  During negotiations, Abbott also provided Hancock with drafts of its first annual ARP, which included information regarding Abbott's objectives, activities, timetable, and budget on for the Research Program.  Ex. 22; Ex. 278.

24.    <u>Proposed Substitute Findings</u>:  *See supra*, ¶ 19; *infra*, ¶ 32.

25.    <u>Proposed Substitute Findings</u>:  Abbott personnel involved with the deal with Hancock understood that Hancock desired information regarding Abbott's spending objectives and budget on the Program Compounds during the four-year Program Term and, therefore, agreed in the RFA to provide Hancock each year with ARPs that would set forth "a reasonably and consistently detailed statement of the objectives, activities, timetable and budget for the Research Program for every Program Year."  Ex. 32, § 1.6.  The first annual ARP was attached as an exhibit to the RFA.  *Id.*, § 1.6, JH008116-8136.

26.    <u>Proposed Additional Findings</u>:  Dr. Klotz only reviewed initial drafts of the Descriptive Memoranda.  Blewitt Tr. 34:2-36:12; Klotz Tr. 396:16-396:20; Klotz Depo. 215:11-216:23, 231:17-231:19.  After July 2000, Hancock did not provide Dr. Klotz with any documents or information.  Blewitt Tr. 34:2-36:12; Klotz Tr. 398:9-398:17; Klotz Depo. 24:8-25:3, 151:9-151:17; Ex. 62.  Dr. Klotz did not review the November 2000 or February 2000 drafts of the Descriptive Memoranda, or the final versions attached to the RFA.  Blewitt Tr. 34:2-36:12.  Hancock also did not provide Dr. Klotz with Abbott's first annual ARP.  *See, e.g.,* Klotz Depo. 301:14-302:15 (Dr. Klotz did not receive the ABT-773 ARP which disclosed dosing would be QD or BID based on severity of indication); *see also* Klotz Tr. 396:16-20 (Dr. Klotz was not asked by Hancock to perform any work after July 2000); Ex. 22 and Ex. 278 (draft ARPs were provided to Hancock in November 2000 and February 2001).

27.    <u>Proposed Substitute Findings</u>:  Hancock personnel prepared a detailed computer model, known as a "Monte Carlo" simulation, that Hancock used to develop financial projections for the proposed deal with Abbott.  Blewitt Aff. ¶ 36; Blewitt Tr. 21:8-22:1.  Hancock used certain information provided by Abbott to prepare the Monte

Carlo simulation, such as "the general category that [the compounds] were in" (e.g., anti-infective or analgesic), and "the phase they were in" (e.g., preclinical, Phase I, Phase II, or Phase III). 11/17/06 Blewitt Depo. 92:21-93:5. Other information utilized by Hancock was obtained by Hancock from public sources. For example, Hancock's estimate of the anticipated commercial launch date for each compound was based on publicly available studies by Dr. Joseph A. DiMasi of the Tufts Center for the Study of Drug Development regarding the average time to launch for compounds in various stages of development. Davis Depo. 82:8-11; Ex. 569 at p. 12. Similarly, Hancock estimated the peak sales for each compound by "look[ing] at industry data for either similar compounds or compounds being developed." 11/17/06 Blewitt Depo. 100:8-101:6; Davis Depo. 48:9-49:15; *see also* Ex. 569 at pp. 7, 12. Although Abbott had provided Hancock with its own estimates of peak sales for the compounds in early stages of the negotiations, Hancock did not rely on Abbott's estimates and instead built its own number based on industry data. *Id.*; Davis Depo. 48:9-49:15; *see also* Hartz Aff. ¶ 18 (in many instances, Hancock "incorporated more conservative projections than those provided by Abbott in the draft Descriptive Memoranda and other materials provided to Hancock by Abbott, including lower peak sales projections"); Klotz Depo. 89:12-89:23 (Dr. Klotz recommended adjusting sales estimates downward for market risk factors including clinical trial risk factors); Ex. 32, § 12.5 (the parties agreed that information provided by Abbott during negotiations but not included in the final Descriptive Memoranda and ARPs attached to the RFA was excluded from the representations and warranties provision and was "disclaim[ed]".). For estimated probability of success, Hancock relied upon publicly available studies regarding the probability of success for various types of

compounds in different phases of development.  Davis Depo. 48:9-49:15; 11/10/06  Hartz

Depo. 86:21-87:9, 87:14-17, 87:21-88:1 (Hancock started with industry average

probabilities of success from a 1995 study by Dr. DiMasi and then adjusted downward

for conservatism); 11/17/06 Blewitt Depo. 92:5-16, 92:21-93:24; Ex. 569 at p.12.

28.     No proposed additional or substitute findings.

29.     Proposed Additional Findings:  Using its independently developed

assumptions and the royalty rates anticipated to be included in the agreement, Hancock

calculated the estimated milestone and royalty payments that it would receive, its

estimated risk of loss on the transaction, and its estimated annual rate of return on the

transaction.  *See supra*, ¶ 27.

30.     Proposed Additional Findings:  Hancock estimated the peak sales for each

compound by "look[ing] at industry data for either similar compounds or compounds

being developed."  11/17/06 Blewitt Depo. 100:8-101:6; *see also* Ex. 569 at p. 7.  In

general, Hancock's estimated level of peak sales was significantly below Abbott's level

(approximately 25%).  Blewitt Aff. ¶ 39; Blewitt Tr. 22:2-22:12; Ex. 569 at p.7.  To

project ramp-up and ramp-down of sales, Hancock utilized a publicly available "Sales

Curve" prepared by Lehman Brothers.  Ex. 569 at pp. 7, 12.

31.     Proposed Substitute Findings:  The compounds in the basket of

compounds discussed between Abbott and Hancock changed numerous times over the

course of the negotiations and the elimination and/or substitution of one or more

compounds would not necessarily have a significant adverse impact on the results of that

analysis.  Leonard Aff. ¶ 14; *see also supra*, ¶ 13, *infra*, ¶¶ 37-39, 178.

32.  <u>Proposed Additional Findings</u>:  Abbott did not make any representations to Hancock in the RFA regarding Hancock's expected returns on the investment or expected sales of the Program Compounds.  Ex. 32.  *The RFA expressly states that "[n]otwithstanding anything in this Agreement to the contrary, Abbott does not represent, warrant or guarantee that the Research Program will be successful in whole or in part or result in the registration or commercialization of any pharmaceutical products or that any Products receiving regulatory approval will be a commercial success" and that the projected milestones, costs, and NDA filing dates in the ARP "do not constitute any warranty as to the future performance of the Program Compounds and that actual results may vary from such projections."  Id.*, §§ 2.3, 12.2(d).

*In addition, to the extent Hancock is alleging that Abbott made material misrepresentations or omissions in draft versions of the Descriptive Memoranda or ARPs, or in other written or oral statements during negotiation of the Agreement, the parties expressly agreed that such statements were disclaimed and not covered by the representations and warranties provision, therefore, they cannot form the basis for a claim.  Ex. 32, § 12.5.  Section 12.5 of the RFA, which is set forth in capital letters for emphasis, provides that*

> EACH PARTY TO THIS AGREEMENT AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY OTHER REPRESENTATIONS OR WARRANTIES, AND EACH HEREBY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES MADE BY ITSELF OR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, FINANCIAL AND LEGAL ADVISORS OR OTHER REPRESENTATIVES, WITH RESPECT TO THE EXECUTION AND DELIVER OF THIS AGREEMENT, NOTWITHSTANDING THE

DELIVERY OR DISCLOSURE TO THE OTHER OR
THE OTHER'S REPRESENTATIVES OF ANY
DOCUMENTATION OR OTHER INFORMATION
WITH RESPECT TO ANY ONE OR MORE OF THE
FOLLOWING.

*Id.*, § 12.5.

33.    No proposed additional or substitute findings.

34.    Proposed Additional Findings:  During negotiations of the RFA, Abbott

promptly notified Hancock of the potential problems observed in clinical trials of ABT-

980 and Abbott's decision to terminate development of that compound.  Leonard Aff.

¶ 14; Deemer Aff. ¶ 15; 11/17/06 Blewitt Depo. 60:8-61:17; Ex. 128.

35.    No proposed additional or substitute findings.

36.    Proposed Substitute Findings:  *Hancock's original proposal for*

*restructuring the deal was less favorable to Abbott but the parties continued to negotiate*

*and executed the RFA as it was originally structured.  See infra*, ¶ 37.

37.    Proposed Substitute Findings:  Despite the fact that ABT-980, a late stage

compound that accounted for a significant percentage of Hancock's potential investment,

had been discontinued, Abbott and Hancock moved forward with the deal in early 2001

as it was originally structured, and agreed to include ABT-492 and ABT-510 as

replacement compounds for ABT-980.  Leonard Aff. ¶ 14; Deemer Aff. ¶ 15; Blewitt Tr.

134:4-135:23; 11/17/06 Blewitt Depo. 262:10-23; Ex. 512 at JH001104.

38.    Proposed Substitute Findings:  Both parties agreed to the revised basket of

Program Compounds and deal structure.  Deemer Aff. ¶ 15.

39.    Proposed Substitute Findings:  Abbott and Hancock, which were each

represented by counsel, continued to modify and refine the terms of the proposed RFA in

various ways in 2001, but the group of nine Program Compounds was not changed after

the new drug compounds, ABT-492, ABT-510 and the ED Program, were added to the

deal.  Deemer Aff. ¶¶ 7-8, 15; Blewitt Aff. ¶ 64; 11/17/06 Blewitt Depo. 262:10-23; Ex.

512.

Abbott's March 2001 Portfolio Review Meeting

40.    Proposed Substitute Findings:  From March 7–9, 2001, Abbott conducted

an off-site Portfolio Review Meeting during which 10–45 minute presentations were

given regarding over forty Abbott compounds, including the compounds that Abbott had

recently required as part of the Knoll Pharmaceutical Company ("Knoll") acquisition.

Leonard Aff. ¶ 21; Leiden Aff. ¶ 11; Leiden Depo. 74:5-77:14; Ex. 297; Ex. 621.

41.    Proposed Substitute Findings:  Abbott retained the consulting firm

McKinsey & Company ("McKinsey") in or about January 2001 to assist in the Knoll

integration.  Hopfield Depo. 16:4-9, 17:17-18:8; Leiden Depo. 232:7-232:15, 235:10-

235:19; Ex. 323 (McKinsey engagement letter).  Its primary role was assisting Abbott

with governance and organizational issues relating to the integration of Abbott and Knoll

after Abbott's recent acquisition of Knoll.  Hopfield Depo. 18:9-19:12, 20:3-24:5.  The

McKinsey consultants were not familiar with the Abbott compounds and, to the extent

they had involvement with research and development issues, were more focused on the

recently acquired Knoll assets.  Hopfield Depo. 78:6-80:24.

42.    Proposed Substitute Findings:  McKinsey's duties and responsibilities

included attendance at the Portfolio Review Meeting.  Hopfield Depo. 85:1-86:24

(purpose of McKinsey consultants attending meeting was to "get to know the Kroll

executives" and "have a chance to learn about the portfolio," not to document discussions

or decisions).  McKinsey was not tasked with memorializing Abbott's meetings and discussions.  Leiden Depo. 235:20-236:2; Hopfield Depo. 85:1-86:24.

43.    Proposed Substitute Findings:  Jessica Hopfield is one of the lead McKinsey consultants who attended the Portfolio Review Meeting.  Hopfield Depo. 85:1-19 (Ms. Hopfield did not recall whether she attended all three days of meetings).

44.    Proposed Substitute Findings:  *In 2000-01, Dr. Hopfield was a member of McKinsey's pharmaceuticals and medical products practice.*  Hopfield Depo. 8:15-12:12.

45.    Proposed Substitute Findings:  McKinsey participated in the Portfolio Review Meeting as part of its general role assisting in the integration of the Knoll assets. Hopfield Depo. 85:1-86:24.  The purpose of the Portfolio Review Meeting was to review the development status of Abbott's entire portfolio of pharmaceutical compounds. Leonard Aff. ¶ 21; Leiden Aff. ¶ 11.

46.    No proposed additional or substitute findings.

47.    Proposed Substitute Findings:  McKinsey created the document entitled the "Initial Portfolio Prioritization" without direction from or consultation with Abbott. Leiden Aff. ¶ 18; Hopfield Depo. 85:21-86:5.  Abbott did not task McKinsey with memorializing the Portfolio Review Meeting, or request that it do so.  Leiden Aff. ¶ 18; Hopfield Depo. 85:21-86:5.

48.    Proposed Substitute Findings:  The Initial Portfolio Prioritization document was provided to Dr. Leiden via electronic mail from Dr. Hopfield on March 13, 2001.  Ex. 104.  No Abbott employee reviewed the document before it was provided to Dr. Leiden.  Leonard Depo. 445:22-446:17.  Dr. Leiden did not review the document, nor was it forwarded to any other Abbott employees.  Leiden Aff. ¶ 18; Leiden Depo.

236:15-236:22; *see also* Hopfield Depo. 91:22-92:19, 219:22-221:5 (Ms. Hopfield did not know whether the document was distributed to anyone other than Dr. Leiden).

49.    <u>Proposed Additional Findings</u>:  Since Dr. Leiden did not review the Initial Portfolio Prioritization document or forward it to any other Abbott employees, no one from Abbott commented to McKinsey regarding the inaccuracies it contained.  Leiden Aff. ¶ 18; Hopfield Depo. 91:21-92:19; Leonard Tr. 911:16-911:24.  *The document is at a high level of generality and every Abbott witness who attended the meeting and was shown the document testified that they he never seen it before and that it is inaccurate in a number of respects.*  Leiden Aff. ¶ 18; Leiden Tr. 1181:17-1182:15, 1215:11-1218:3 (there was no discussion at the meeting regarding probable termination of ABT-594); Leonard Tr. 889:23-892:20, 896:23-897:4 (same); Leonard Depo. 445:11-446:17; Ex. 142.

The Final Agreement

50.    No proposed additional or substitute findings.

51.    No proposed additional or substitute findings.

52.    <u>Proposed Substitute Findings</u>:  Even if Hancock revises its *projected* financial return based on the failure of some compounds, there is not necessarily an impact on its *actual* financial return.  Hancock's *actual* financial return is dependent on various factors over the course of a multiple year contract, which cannot be predicted with certainty.  Blewitt Aff. ¶ 23; Ex. 32, § 1.5.  In addition, the RFA is structured to reduce Hancock's risk of loss even if some of the Program Compounds fail.  For example, if Abbott reduces its budgeted spending below certain levels (e.g., because of the termination of one or more compounds), Hancock is allowed to terminate its Program

Payments.  Ex. 32, § 3.4.  After Abbott terminated certain compounds, including ABT-518, ABT-594, and ABT-773, Hancock exercised that right and was excused from $110 million in Program Payments.  Ex. 732.

53.    Proposed Additional Findings:  At the time it entered into the RFA, Hancock was aware that the projected launch dates for many of the Program Compounds were many years in the future.  Ex. 32 at JH008117-34.

54.    No proposed additional or substitute findings.

55.    Proposed Substitute Findings:  Mr. Deemer subsequently sent an e-mail dated March 12, 2001 to Mr. Blewitt in which he stated:

> John Leonard looked at all of the documents one last time in preparation for execution and noted an oversight on one of the Programs.  On the ABT-518 program, he noted that Phase I was to have started on December 2000 (4Q2000) but in fact did not start until earlier this month.  This pushed the timeline back by a quarter throughout but the launch date is not affected and is actually planned one quarter earlier (2Q06).  Steve, as you know the timing of starting some of these earlier compound studies is related to completing this financing and hence the reason this one got pushed back a little.

Ex. 70.

56.    Proposed Substitute Findings:  *See supra*, ¶ 55.

57.    Proposed Substitute Findings:  *After February 2001, Abbott revised the ABT-518 Descriptive Memoranda to reflect a delay in start of Phase I trial from 4Q2000 to IQ 2001.*  Ex. 70.  *Thereafter, Abbott did not otherwise revise the February 15, 2001 versions of the Descriptive Memoranda before the RFA was executed by the parties on March 13, 2001.*  Ex. 22.  The representations made by Abbott in the RFA regarding the Program Compounds were accurate and complete in all material respects as of the date of the Agreement.  Leonard Aff. ¶¶ 11-13; *see also infra*, ¶¶ 64-140.

58. <u>Proposed Substitute Findings</u>: No compound was essential to Hancock's decision to enter into the RFA and the portfolio often changed during negotiations. *Supra*, ¶ 31; *infra*, ¶ 85.

59. <u>Proposed Substitute Findings</u>: The final Descriptive Memoranda were attached to, and incorporated in, the RFA as collective Exhibit 12.2(i) and were defined as "Compound Reports." Ex. 32, §§ 1.11, 12.2(i). The RFA does not specify any particular content for the Descriptive Memoranda. *Id.* The RFA simply defines the "Compound Reports" as "the compound reports attached as Exhibit 12.2 hereto." *Id.* Abbott's first "Annual Research Plan" also is attached to, and incorporated in, the RFA as Exhibit 1.6. *Id.*, § 1.6 at JH008116-37. The RFA provides that the ARP sets forth "a reasonably and consistently detailed statement of the objectives, activities, timetable and budget for the Research Program for every Program Year[.]" *Id.*, § 1.6. It also states that the Annual Research Plan provides

> a description of projected milestones and dates thereof, projected year of NDA filing, and projected costs to be incurred by Abbott during the Program Term, for each Program Compound. Such projections were prepared in good faith and with due care based on reasonable assumptions, and represent the reasonable estimate of Abbott based on information available as of the date of such projections and as of the date hereof; it being agreed that such projections do not constitute a warranty as to the future performance of the Program Compounds and that actual results may vary from such projections.

*Id.*

60. <u>Proposed Additional Findings</u>: Hancock expressly agreed in Section 12.5 of the RFA that Abbott's representations and warranties were limited to statements within the written agreement itself (including the final Descriptive Memoranda and ARPs) and excluded any other representations. Ex. 32, § 12.5. Thus, the representations and

warranties exclude draft Descriptive Memoranda, draft ARPs, any other written

documents not included in the RFA, and any oral statements. *Id.* In addition, the

representations and warranties concern disclosure of "material fact[s]," not opinions or

immaterial facts. *Id.*, § 12.2(i). Abbott represented that it had not omitted any "material

fact necessary to make the statements contained herein or therein not misleading." *Id.*

Abbott did not represent that it had included all facts that *might* have a material adverse

effect on the prospects or condition of the compounds, but rather that it had included any

fact that "*has resulted in*, or *could reasonably be expected to result in*, a material adverse

effect." *Id.* (emphasis added). The representations and warranties provision of the RFA

also expressly provide that Abbott is not required to disclose "generally available

information concerning the pharmaceutical industry in general." *Id.* Finally, the parties

also agreed that:

> [n]otwithstanding anything in this Agreement to the
> contrary, Abbott does not represent, warrant or guarantee
> that the Research Program will be successful in whole or in
> part or result in the registration or commercialization of any
> pharmaceutical products or that any Products obtaining
> Regulatory Approval will be a commercial success.

*Id.*, § 2.3.

61.    No proposed additional or substitute facts.

62.    <u>Proposed Substitute Findings</u>: Hancock did not actually and justifiably

rely upon the representations it now alleges were misleading in deciding to enter into the

Agreement on March 13, 2001 on the terms stated. *Based on Abbott's disclosures and its*

*own due diligence, Hancock was aware of the material risks of the compounds. See*

*supra*, ¶¶ 17-19, *infra*, 68, 70, 95-97, 109, 111, 112, 115(a), 115(e), 129. *Mr. Blewitt*

*generally used publicly available information, not information provided by Abbott, to*

*calculate Hancock's expected returns on the deal.  See supra*, ¶¶ 27-30.  *Mr. Blewitt did*

*not  provide copies of the Descriptive Memoranda or ARPs to Mr. Hartz or the Hancock*

*investment committees.  See supra*, ¶¶ 21, 26.  *Abbott and Hancock expressly agreed that*

*the representations and warranties only applied to the final Descriptive Memoranda and*

*ARPs, not prior drafts.  See supra*, ¶¶ 32, 60.  *Although Abbott made new disclosures to*

*Hancock in the November 2000 and final drafts of the Descriptive Memoranda, and in*

*the ARPs (such as the "Low" probability of "law nausea/vomiting" for ABT-594, the*

*nausea and voting rates from prior clinical trials, the lack of funding for ABT-773*

*pediatric program, and the possibility of twice-a-day dosing for ABT-773 for more severe*

*indications), Hancock did not take any discernable action, such as returning to the*

*investment committee or sharing the information with Dr. Klotz.  See supra*, ¶¶ 26, *infra*,

178.

63.    Proposed Substitute Findings  The representations made by Abbott in

Sections 12.2(i) and 12.2(m) were materially accurate and complete and the alleged

misrepresentations and omissions were not material to Hancock's decision to enter into

the RFA on March 13, 2001 on the terms stated.  *Supra*, ¶¶ 50-62, *infra*, ¶¶ 64-140.

### *The Representations Made by Abbott in the RFA Regarding the Status and Prospects of the Program Compounds Were Accurate and Complete In All Material Respects*

64.    Proposed Substitute Findings:  As of March 13, 2001, the status and

prospects of ABT-518, ABT-594, and ABT-773, were the same, in all material respects,

as represented by Abbott to Hancock in the RFA.  *See infra*, ¶¶ 66-130.

65.    Proposed Substitute Findings:  As of March 13, 2001, Abbott's plans for

ABT-518, ABT-594, and ABT-773, were the same, in all material respects, as

represented by Abbott to Hancock in the RFA.  *See infra*, ¶¶ 66-130.

<u>ABT-518</u>

66.     <u>Proposed Substitute Findings</u>:  ABT-518 is a pharmaceutical compound that was under development at Abbott Laboratories in 2000 and 2001.  Leonard Aff. ¶ 16. It is in a class of compounds called Matrix Metalloproteinase Inhibitors ("MMPIs") that are intended to inhibit the growth of cancerous tumors.  Leonard Aff. ¶ 16; Leiden Aff. ¶ 12, Nabulsi Depo. 18:10-11; Nisen Depo. 57:24-59:3.  Through 2000, Abbott had spent $40 million developing ABT-518.  Leonard Aff. ¶ 17; Ex. 32 at JH008127.

67.     No proposed additional or substitute findings.

68.     <u>Proposed Additional Findings</u>:  In the Descriptive Memorandum, Abbott disclosed problems experienced by competitor MMPIs, including that (1) Marimastat had shown "no survival advantage [in pancreatic cancer]" and that other MMPI compounds had not demonstrated efficacy; (2) the competitor compounds, including Marimastat and Prinomastat, had "dose limiting toxicity" that "almost certainly preclude their long-term use, limit compliance and reduce optimal efficacy"; and (3) "Bayer recently dropped development" of its MMPI compound due to concerns about potential toxicity.  Ex. 32 at JH008194-99 (final Descriptive Memorandum); *see also* Ex. 1 at pp. 2-7 (May 2000 draft); Ex. 2 at pp. 2-7 (November 2000 draft); Ex. 22 at ABBT246888-93 (February 2001 draft); Klotz Tr. 398:18-403:11.  In addition, Abbott disclosed that because ABT-518 was at a less advanced stage of development the "[side effect] hurdles will be even higher for this compound."  Ex. 32 at JH008198; *see also* Ex. 1 at p. 6; Ex. 2 at p. 6; Ex. 22 at ABBT246892.

Based on review of the draft Descriptive Memoranda and its own due diligence, Hancock was aware of the material risks associated with ABT-518.  Klotz Tr. 398:18-

409:14, 410:7-413:6 (Dr. Klotz informed Hancock that it should base its investment on

the other compounds and view ABT-518 as an "upside"); Blewitt Tr. 47:20-49:8

(probability of ABT-518 reaching marketplace was low), 59:21-64:2; Klotz Depo.

105:14-105:23, 106:8-107:12 (ABT-518 was a high risk compound), 113:1-114:20,

146:20-148:1; Klotz Tr. 409:6-14 & Ex. 803 at JH003032 (Dr. Klotz informed Hancock

that "the probability of a particular [cytostatic therapy, such as ABT-518] reaching the

market is low"); Ex. 550 at JH002085. For example, Dr. Klotz informed Mr. Blewitt that

since the use of cytostatic cancer agents, such as ABT-518 and other MMPIs, is "a new

untried strategy for everyone, it is high risk. The risk is compounded by the fact that

most are in discovery, not in clinical trials." Ex. 550 at pp. 1, 5 (Dr Klotz's report

classifying ABT-518 as "high" risk); *see also* 11/17/06 Blewitt Depo. 134:15-135:4,

136:2-8, 150:17-151:11, Klotz Depo. 75:12-75:23, 76:4-77:10, 78:1-78:21, 79:3-79:16,

79:20-79:23. Dr. Klotz told Mr. Blewitt, based on the results of his literature search, that

MMPI compounds "are particularly worrisome." Ex. 561 at JH002988; *see also* 11/17/06

Blewitt Depo. 167:20-168:18. Based on Abbott's disclosures and its own due diligence,

Hancock knew that competitor compounds had "underwhelming efficacy," and were

"toxic" and caused "joint problems." Ex. 561 at JH002988; *see also* Klotz Depo. 116:1-

116:7, 116:20-117:14, 119:8-119:22, 180:4-184:12; 11/17/06 Blewitt Depo. 167:20-

168:18, 169:8-21; Ex. 803 at JH003034. Hancock's scientific expert also advised

Hancock that cytostatic agents such as ABT-518 may only be useful as a combination

therapy and "may not be exceptional compounds by themselves." Ex. 125 at p. 18.

  69. <u>Proposed Substitute Findings</u>: The Descriptive Memorandum for ABT-

518 disclosed that "[c]ompanies with compounds in advanced clinical development for

the treatment of cancer include" Agouron/Warner Lambert/Pfizer (developing

Prinomastat), British Biotechnology/Schering Plough (developing Marimastat), and BMS

(developing BMS 275291).  Ex. 32 at JH008196-97.

     70.    <u>Proposed Additional Findings</u>:  Each version of the Descriptive

Memoranda also disclosed to Hancock that:

> As the 3rd or 4th MMPI to market, Abbott's compound will need
> to demonstrate a meaningful clinical advantage over compounds
> that are in more advanced development.  Strict Go/No Go criteria
> will determine if the MMPI can meet these hurdles.  If they cannot
> be met, the compound will not move forward.

Ex. 32 at JH008199; *see also* 11/17/06 Blewitt Depo. 186:22-188:1; Ex. 1 at p. 7 (May

2000 draft); Ex. 2 at p. 7 (November 2000 draft); Ex. 22 at ABBT246893 (February 2001

draft).

     71.    <u>Proposed Substitute Findings</u>.  As of March 13, 2001, Abbott regarded

ABT-518 as a "compelling development candidate" that had the potential to be "best in

class" among a "novel therapeutic class" of similar compounds being developed by a

range of pharmaceutical companies.  Leonard Aff. ¶¶ 16, 18, 20, 22; Nisen Depo. 166:6-

166:17, 184:8-184:15, 185:6-185:11; Ex. 32 at JH008127, JH008193-99; Ex. [973] at

ABBT0057789 (internal 2000 Drug Development Candidate report ("DDC") describing

ABT-518 as "a compelling successor to ABT-770 with the potential to demonstrate

antitumor effects superior to the MMP inhibitors currently undergoing clinical trials");

Ex. 238 at p. 4 (August 2000 internal report stating ABT-518 is "a compelling successor

to ABT-770 with the potential to demonstrate antitumor effects superior to the MMP

inhibitors currently undergoing clinical trials."); Ex. 612 at pp. 1, 3 (March 2001 Monthly

Project Status Report ("MPSR"): "selectivity should allow . ..  potential for higher

efficacy and lower toxicity than other MMPIs such as marimastat and prinomastat" and

"ABT-518 has the potential to be the best in class compound."). *As of the date of the Agreement -- based on all information available to it at the time, including the allegedly undisclosed material adverse information -- Abbott estimated ABT-518 had a 13% probability of success and worldwide peak sales of $496 million, both higher than Hancock's estimates. Compare* Hendricks Aff. ¶¶ 10-15; Ex. 611 at ABBT287554 (3/01 probabilities); Ex. 208 (Friedman Expert Report, Ex. 3.5 (Friedman's reference to Abbott internal sales projections); Ex. 800 at p. 3 (4/6/01 updated probabilities); Ex. 801 at p. A11 (Abbott internal estimates) *with* Ex. 125 at p. 13 (Hancock's estimates).

72.    Proposed Substitute Findings.  The representations made by Abbott in the RFA regarding the prospects and condition of ABT-518 as of the date of the Agreement were accurate and complete in all material respects. *See supra,* ¶¶ 66-71, *infra*, ¶¶ 72-91.

(a)    Proposed Substitute Findings:  On August 7, 2000, Pfizer *publicly* announced that "preliminary results of Phase III clinical trials of prinomastat . . . in advanced hormone refractory prostate cancer and advanced (stage IV) non-small cell lung cancer did not meet primary efficacy objections" and that "Pfizer is halting these two Phase III trials," but that "the company intends to continue exploration of prinomastat in other tumor types and most importantly, in earlier stage disease, where oncologists believe inhibition of angiogenesis may have greater utility."  Ex. 196 at ABBT0061747-48; *see also* Ex. 308 at p. 1 & Ex. 238 at p. 3 (Summer 2000 Abbott documents noting Pfizer is "continuing trials in less advanced tumors, *e.g.*, esophagus, melanoma, breast, glioma, and NSCLC, and will start trials in two additional tumor types"); Ex. 238 at p. 4 (Abbott internal report stating that "MMP Inhibitors in Advanced Clinical Development" include Marimastat and Prinomastat, in "Phase III" development).

Pfizer reported that "four Phase II trials are currently underway and two additional Phase II trials will begin shortly." Ex. 196 at ABBT0061748. In February 2001, it was publicly reported that British Biotech, based on results from a Phase III trial of Marimastat in patients with single cell lung cancer, had decided that it will not to file for approval of marimastat, although ongoing Phase III trials will continue. Ex. [974] at ABBT0026863-64 (March 5, 2001 document from Abbott's files summarizing information released by British Biotech in February; notes that "results [are] anticipated second quarter 2001" from the ongoing Phase III trials and will be analyzed by British Biotech "to determine whether they should continue"). Subsequently, in May 2001, British Biotech reported that "the future direction of Marimastat development is "the subject of ongoing discussion with Shearing-Plough and with external experts." Ex. 952 at ABBT0054231; *see also* Ex. 634 at p. 3 (in addition, British Biotech reported at that time that the survival rate in a two-year gastric cancer trial was three times higher than placebo and that pancreatic cancer trial did not meet stopping criteria). As of the date of the RFA, these companies had not released clinical data from these trials and Abbott's knowledge regarding the status of their programs was limited to the information that had been publicly reported. Leonard Aff. ¶ 28; Leonard Tr. 977:14-981:18; Ex. 238 at pp. 3-4; Ex. 308 at p. 1.

(b)    Proposed Substitute Findings: From March 7–9, 2001, Abbott's senior management held a Portfolio Review Meeting for the purpose of examining the "technical, scientific, medical and commercial" status of compounds under development. Leonard Aff. ¶ 21; Leiden Aff. ¶ 11. Dr. Perry Nisen, the head of Abbott's oncology program, gave a presentation regarding ABT-518. Leonard Aff. ¶ 22; Leiden Aff. ¶¶ 12-

13; Ex. 782 (ABT-518 Presentation). As reflected in the presentation, Abbott believed

ABT-518 had potential advantages over competitor MMPI compounds, such as greater

selectivity in targeting enzymes, greater potency, and lack of joint pain side effects. Ex.

782 (noting ABT-518 is "highly selective", "very potent", with "no joint toxicity

expected" and "potentially best in class."); *see also* Leonard Aff. ¶¶ 22, 25; Leiden Aff.

¶ 14; Leonard Depo. 88:9-88:22; Nisen Depo. 59:4-62:19, 114:5-117:3, 119:2-120:1. As

disclosed to Hancock, however, it was not yet known whether ABT-518 would be able to

demonstrate advantages over the competitor MMPI compounds. Leonard Aff. ¶ 22; Ex.

782 at ABBT0064326-7; Ex. 32 at JH008196. Abbott believed its MMPI compound was

more potent and more selective than the competitor compounds, and hoped to be able to

avoid the problems faced by competitors. Leonard Aff. ¶¶ 16, 22, 25; Leiden Aff. ¶¶ 14-

15; Nabulsi Depo. 72:7-73:1, 96:11-15; Nisen Depo. 59:4-62:19; 63:19-65:5; Ex. 293

("Pre-clinically our compound differs from the competition. In addition, the competition

may have dosed too low, may not have selected the proper tumor stages, and skipped

Phase II development"); Ex. [973] at pp. 9-11. If problems experienced by competitor

compounds were unique to those compounds and were not classwide effects, Abbott

would have a competitive advantage. Leonard Aff. ¶¶ 22, 25; Leiden Aff. ¶¶ 14-15;

Nabulsi Depo. 66:11-67:9; Ex. [973] at pp. 10-11. Abbott could not draw conclusions

regarding the significance of the publicly available information regarding competitor

compounds until it had the scientific data regarding the competitor's recent clinical trials,

which were to be disclosed at a conference of the American Society of Clinical

Oncologists ("ASCO") scheduled for May 12–15, 2001. Leonard Aff. ¶ 28; Leiden Aff.

¶¶ 14-15; Nabulsi Depo. 134:5-135:20; Leiden Depo. 250:16-253:19, 309:2-310:14; Ex.

69 ("We'll look @ ASCO & AACR for comp[etitor] info. We'll know in 3-6 mo. where we stand."); Ex. 730 (ASCO news release).

(c)    <u>Proposed Substitute Findings</u>:  After the Portfolio Review Meeting, Abbott's senior management, led by Dr. Leiden, initially decided to put a temporary hold on the enrollment of patients in the Phase I clinical trial of ABT-518 while awaiting the release of clinical data regarding competitor MMPI compounds at the ASCO meeting in mid-May.  Leonard Aff. ¶ 23; Leiden Aff. ¶ 15; Nisen Depo. 97:2-97:14.  Dr. Leiden's initial decision to place a temporary hold on ABT-518 was based upon limited information—a 15 minute presentation at the Portfolio Review Meeting.  Leonard Aff. ¶ 24; Leiden Aff. ¶¶ 13-15 (the meeting was the first substantive presentation Dr. Leiden had attended regarding ABT-518); Ex. 782.  Others at the meeting, including Dr. Leonard and Dr. Nisen, who were more familiar with the compound than Dr. Leiden, disagreed with the decision.  Leonard Aff. ¶ 24; Leiden Aff. ¶ 16; Leonard Depo. 82:14-82:17, 84:20-86:9.  Dr. Azmi Nabulsi, the medical director for the ABT-518 program, also disagreed with the decision.  Nabulsi Depo. 120:11-121:17, 129:2-131:1, 137:2-8, 137:24-138:9, 151:12-19.

The Initial Portfolio Prioritization document prepared by McKinsey is inconsistent in its purported description of discussions at the Portfolio Review Meeting regarding ABT-518.  *Compare* Ex. 104 at p. 1 *with* Ex. 147 at p. 1.  While one version states "Hold/[T]erminate," other versions simply state "Hold."  Ex. 104; Ex. 147.  Ms. Hopfield could not explain the discrepancy and Abbott personnel who attended the meeting testified that there was no decision at the meeting to terminate ABT-518, but rather to place a hold on the program while awaiting results from ASCO.  Hopfield Depo.

103:10-104:18; *see also* Leiden Aff. ¶ 18; Leonard Aff. ¶ 23; Leonard Tr. 989:16-990:20;

Leiden Depo. 259:4-260:20; Ex. 104 at p. 1; Ex. 726 at MCK00533 (listing ABT-518

prioritization as "Pending," not "Terminate").  Irrespective of the inconsistent

terminology used in different versions of the Initial Portfolio Prioritization document, all

versions indicate that Abbott would not make any decision regarding continued

development of the program until after the ASCO conference.  Ex. 147 at p. 1; Ex. 104 at

p. 1.  All versions of the document state that Abbott will "[w]ait for May results from

Pfizer" at the ASCO conference in order to "save ~ $1 mill" in clinical trial costs, and

that senior management will "re-evaluate" the program after the ASCO conference in

"May."  Ex. 147 at ABBT0155603; Ex. 104 at MCK00425; *see also* Leiden Aff. ¶ 19;

Hopfield Depo. 96:13-98:18.

  Ms. Hopfield did not recall any discussions regarding halting or "stopping

development" of ABT-518.  Hopfield Depo. 81:1-18, 105:16-22.  Ms. Hopfield testified

that "'Hold' meant "do not spend any incremental funds if not required until a decision

was made" and that "halt all further expenditure" meant "any optional clinical or

commercial spend should be stopped until it was clear what was going to happen to the

compound."  Hopfield Depo. 98:20-99:7.  She confirmed that the majority of the

attendees at the meeting, including the executive group, were in favor of either deferring

a decision regarding ABT-518 until after results regarding competitor MMPI compounds

were released at ASCO in May or supporting continuation irrespective of the ASCO

results.  Hopfield Depo. 218:4-219:17.

  (d) <u>Proposed Substitute Findings</u>:  After Dr. Leiden's initial decision to place

a hold on the clinical trial pending release of data at ASCO, doctors in the Netherlands

were instructed to defer enrollment of any additional patients in the Phase I clinical trial. Looman Depo. 50:4-51:16; 53:19-56:18; Ex. 623; Ex. 73 (Dr. Nabulsi telephoned EU Medical Director on March 11, 2001 "to tell him that the M00-235 study should be put on hold"). On March 12, 2001, Abbott told the investigators to continue the study with the one patient who had enrolled and await "further instructions by tomorrow." Ex. 623. The next day, Abbott lifted the hold. Looman Depo. 84:13-86:24, 151:14-152:2; Nabulsi Depo. 215:20-23; Ex. 629 (March 13, 2001 email stating the hold has been lifted); Ex. 72 ("the MOO-235 study hold has been lifted").

      (e)    <u>Proposed Substitute Findings</u>: *Supra*, ¶ 72(d).

      (f)    <u>Proposed Substitute Findings</u>: Dr. Leiden lifted the hold on the development of ABT-518 because Dr. Leonard and Dr. Nisen convinced him that Abbott would not save a lot of money by putting ABT-518 on hold and leaving the study running would save time after the release of ASCO data in May. Leonard Aff. ¶ 25; Leiden Aff. ¶¶ 16-17; Leonard Depo. 97:12-99:23; Leiden Depo. 246:3-247:3, 249:1-249:23, 295:7-298:23. *Dr. Leonard also noted that "we ha[ve] a partner [Hancock] in this program and this [is] part of our general risk mitigation strategy of risk sharing and that we should proceed."* Leonard Depo. 97:12-99:23; *see also* Leonard Tr. 990:22-991:17. *Even if Dr. Leiden had taken this fact into consideration in restarting the trial, that would not have been surprising to Hancock since it knew that the RFA was intended to allow Abbott to develop more compounds than it would if limited to its own internal budget.* 11/17/2006 Blewitt Depo. 40:10-41:17.

      (g)    <u>Proposed Substitute Findings</u>: On March 13, 2001, the one-day hold on the clinical trial for ABT-518 was lifted based on the scientific and commercial

considerations noted above. Leonard Tr. 990:21-991:17; Nisen Depo. 217:17-218:4; Leiden Depo. 256:10-257:17; *see also* Hopfield Depo. 137:9-140:22 (it is "quite common" in the pharmaceutical industry for management to revisit and reverse a decision regarding clinical development of a compound, even over the course of a 24 hour period, because the various individuals working on development have different "point[s] of view" and "people change their minds"). The temporary hold had no material impact on Abbott's development of ABT-518. Leonard Aff. ¶ 26; Nisen Depo. 217:1-217:8; Ex. 78 (hold was lifted within one day and next patient was enrolled within two weeks). On March 13, 2001, Abbott and Hancock also executed the RFA. Ex. 32.

73.     Proposed Substitute Findings: On March 13, 2001, Abbott directed doctors in the Netherlands to continue with the clinical trial as planned. Looman Depo. 84:13-85:24; Ex. 72 (informing Dr. Looman that "the M00-235 study hold has been lifted" and that the investigating physicians "have been contacted"); Ex. 74 (Dr. Nabulsi "did speak to all three [physicians at the sites] on the phone last week with a clear message of 'Go'"); Ex. 78; Ex. 727; Ex. 728; Ex. 729 (letters to clinical sites confirming that the clinical trial "will continue as planned"). The next patient in the clinical trial was enrolled on March 26, 2001. Looman Depo. 97:15-98:2; 102:5-103:5; Ex. 78.

74.     Proposed Substitute Findings: Other development work, including analysis of preclinical toxicology results, continued to be performed after the hold on the clinical trial had been lifted. Loberg Depo. 53:3-9, 53:19-23, 54:21-56:3, 58:22-24, 64:21-24, 67:9-16; Ex. 285; Ex. 612 at p. 2 (March 2001 ABT-518 MSPR states "A 3-month rat toxicity study is ongoing."). Since the Phase I clinical trial was the most important development activity for ABT-518 as of March 2001, it was immaterial to the

critical path for the development of the compound whether or not certain other, less

important activities remained on hold pending the ASCO conference. Nabulsi Depo.

175:10-20, 195:14-196:2, 196:23-197:14; *see also* Loberg Depo. 63:15-64:2.

75.    Proposed Substitute Findings:  *Infra*, ¶¶ 76-81.

76.    Proposed Substitute Findings:  On May 12–15, 2001, members of the

ABT-518 team attended the ASCO conference. Leonard Aff. ¶ 30; Looman Depo. 107:4-

19; Ex. 730. At the conference, detailed scientific information regarding the clinical

trials of other MMPI compounds was presented by scientists in the form of oral

presentations, abstracts, and other documents. Leonard Aff. ¶¶ 31-35; Leiden Aff. ¶ 20;

Leonard Tr. 984:22-986:25; Looman Depo. 109:22-110:9; Hopfield Depo. 96:18-24

(ASCO is "the leading information exchange in the US every year for clinical results");

Ex. 730; Ex. 793; Ex. 849; Ex. 850; Ex. 930. On or around May 28, 2001, after the

ASCO conference, Dr. Nisen made a presentation to senior management summarizing the

MMPI competitor data presented at ASCO and the progress of the Phase I clinical trial to

date. Leonard Aff. ¶ 31; Leiden Aff. ¶¶ 20-21; Nisen Depo. 392:1-397:16, 398:21-

400:20; Ex. 586 (May 28, 2001 presentation regarding ASCO); Ex. 831; Ex. 832. Based

on the ASCO data, Abbott senior management decided to discontinue funding for ABT-

518 and terminate internal development of the compound. Leonard Aff. ¶ 36; Leiden

Aff. ¶ 22; Leonard Tr. 993:2-993:16; Looman Depo. 124:21-125:10; 125:23-127:9; Nisen

Depo. 67:19-69:23, 102:2-102:11, 319:2-319:19, 395:10-22; Leiden Depo. 260:21-261:5;

Ex. 78 ("June 1, 2001 – MMPI project (ABT-518) deemed a No/Go by senior

management"); Ex. 646 at ABBT0026340 (6/7/01 MMPI Working Group Meeting

Minutes). At that point, Abbott generally ended enrollment of patients in the Phase I

clinical trial.  Ex. 646 at ABBT0026340.  Patients already enrolled in the trial were

allowed to continue until reaching the clinical endpoint.  Leonard Aff. ¶ 37; Ex. 651

("Though the study is being terminated, patients currently on study may continue until

the study endpoint has been reached.").

      77.    <u>Proposed Substitute Findings</u>:  *Supra*, ¶ 76.

      78.    <u>Proposed Substitute Findings</u>:  Abbott did not make a decision to

terminate development of ABT-518 at its May 2001 Strategy Retreat.  Leonard Aff. ¶ 27;

Leiden Aff. ¶ 23; Leonard Tr. 902:23-911:21, 980:20-989:15.  *The purpose of the*

*Strategy Retreat was to discuss strategies regarding therapeutic areas, not prioritization*

*or decision-making regarding development of particular compounds.*  Leonard Aff. ¶ 27;

Leiden Aff. ¶ 23; Hopfield Depo. 230:18-232:21; Ex. 755 (Strategy Retreat Oncology

presentation); Ex. [969] at p. 3; Ex. [980] (template for therapeutic area presentations).  A

McKinsey document titled "Strategy Retreat Output" includes a one-word reference to

"Terminate" but Ms. Hopfield testified that there was no decision to terminate ABT-518

at the May Strategy Retreat and that she could not explain the meaning of the reference.

Ex 198 at MCK00410; *see also* Hopfield Depo. 162:19-24, 209:7-211:24 (as of May 25,

2001, ABT-518 had not been terminated), 161:13-162:5 (the Strategy Retreat Output

document was a transcription by McKinsey of notes written on a "flip chart" by an

unknown person who was probably a McKinsey consultant), 224:12-228:20 (discussion

at May meeting was "a thought exercise", in which some compounds were listed as

"terminate" for the purpose of analyzing potential savings if that compound were

terminated).  *The document also contained other inaccuracies.*  Leonard Tr. 991:18-

992:23; *see also id.* 904:1-911:24 (noting inaccuracies in another McKinsey document).

*All of the Abbott documents reflect a consistent plan to make a decision based on the ASCO data to be released in mid-May.  See, e.g.* Ex. 286 at ABBT0045243 ("Leiden wants to make Go/No Go Decision Based on Competitor Data @ ASCO").

79.  <u>Proposed Substitute Findings</u>:  ASCO rules provide that presentations at the conference cannot include previously released data, therefore, by necessity all the clinical data released at ASCO was new.  Leonard Aff. ¶ 29; Leiden Aff. ¶ 20; Nabulsi Depo. 27:4-28:5 (at ASCO, researchers present "new findings, new data on clinical trials…."), 28:15-29:2 ("Typically, …these results are not shared except on the day of the presentations.  There is a book that ASCO releases a few days before or maybe a couple weeks before the meeting that describes some of the results.  But you don't see the details of the results before you attend the meeting."); 245:24-248:1; Nisen Depo. 319:20-320:11, 393:24-395:6.  Abbott learned for the first time at the ASCO conference the scientific data regarding lack of efficacy and side effects in recent clinical trials of competitors' MMPI compounds.  Leiden Aff. ¶ 21; Leonard Aff. ¶¶ 31-35; Leiden Depo. 283:10-287:12; Nisen Depo. 393:18-395:6, 395:23-396:5; Ex. 730 (ASCO news release); Ex. 793 (ASCO abstracts); Ex. 850 (ASCO posters); Ex. 930 (compilation of documents and notes from ASCO conference).  *Some members of the ABT-518, including Dr. Nabulsi and Dr. Nisen, acting as "advocates for a program they had been working on for many years", supported continuing clinical trials of ABT-518 notwithstanding the data released at ASCO, but Dr. Leonard and Dr. Leiden concluded based on that data that the chances of success for ABT-518 were too low to justify continued development.*  Leonard Tr. at 1015:10-22; *see also* Leonard Aff. ¶ 36; Leiden Aff. ¶¶ 21-22.

80.    _Proposed Substitute Findings_:  Dr. Leiden's decision to terminate ABT-518 was conveyed to Abbott employees working on ABT-518 in early June 2001, and to the investigators conducting the trial in mid-June 2001.  Ex. 221 at p. 1; Ex. 10; Ex. 11.

81.    _Proposed Substitute Findings_:  Abbott concluded the ABT-518 clinical trial with the patients enrolled to date and conducted analyses of data from the trial. Leonard Aff. ¶ 37; Ex. 833 (analysis of data from trial); Ex. 774 at ABBT0000382 (last patient discontinued on August 20, 2001).  In Fall 2001, Dr. Nisen presented senior management with a detailed analysis of the data from the clinical trial of ABT-518 and data from ASCO.  Nisen Depo. 337:22-340:22, 341:1-344:18; Ex. 225 (memorandum from Dr. Nisen); Ex. 931.  Abbott management concluded that, although there was still some possibility that ABT-518 could avoid the problems experienced by competitor MMPI compounds, the negative data released at ASCO made continued development too high risk to warrant continued internal funding.  Leonard Aff. ¶ 36; Leiden Aff. ¶ 22; Leonard Tr. 1015:10-1015:22.  In Fall 2001, Abbott made presentations to the National Cancer Institute ("NCI") and the Goodwin Foundation regarding potential collaborative efforts to continue development of ABT-518, but the institutions declined.  Leonard Aff. ¶ 38; Ex. 773 (Sept. 28, 2001 Abbott/NCI Collaboration Presentation); Ex. 774 at ABBT0000382 (meeting with NCI on August 29, 2001); Ex. 847.

82.    _Proposed Substitute Findings_:  On September 20, 2001, in accordance with the RFA, Abbott notified Hancock that it had discontinued its development of ABT-518.  Deemer Aff. ¶ 17; Ex. 13 (Sept. 2001 letter to John Hancock).

83.    _Proposed Additional Findings_:  The RFA did not require Abbott to explain the reason for its decision to terminate ABT-518.  Ex. 32, § 4.3(f).

84.   <u>Proposed Substitute Findings</u>:  Abbott did not believe that the temporary hold on ABT-518 in March 2001 was material or that knowledge of the hold would impact Hancock's willingness to enter into the deal.  Leonard Aff. ¶ 26; Deemer Aff. ¶¶ 15-16.

85.   <u>Proposed Substitute Findings</u>:  Abbott's management personnel did not believe that a slow down in the development of ABT-518 had the potential to impact the structure of the RFA.  *The comments expressed by Mr. Deemer in his March 20, 2001 email to Dr. Nisen were an exaggeration for effect of his actual belief, which was that a slow down of ABT-518 would have delayed finalization of the deal but would not have ultimately prevented finalization of the deal.*  Deemer Aff. ¶ 15; Deemer Tr. at 1509:10-1512:3.  For example, Abbott's disclosure—in an email to Hancock the day before the RFA was executed—that the beginning of Phase I for ABT-518 had been delayed for three months (from 4Q2000 to 1Q2001) had no impact on Hancock's willingness to enter into the RFA.  Ex. 70; *see also* Leonard Aff. ¶ 13.  *Abbott's disclosure in Fall 2000 that it had terminated the Phase III compound ABT-980 did not prevent the parties from reaching agreement, and ABT-518 was a minor component of the deal compared to ABT-980.*  Deemer Aff. ¶ 15; Tucker Aff. ¶¶ 78-83, 86; Deemer Tr. 1510:7-1512:3.

86.   <u>Proposed Substitute Findings</u>:  In an email after the Agreement was signed, Mr. Deemer expressed an opinion that the Agreement could have been impacted if, in fact, ABT-518 was being "slowed down," but he then observed in the same email that ABT-518 is "back on track."  Deemer Aff. ¶¶ 12-16; Ex. 881.  That observation is consistent with the evidence that shows that the hold on ABT-518 lasted only a day and had no material impact on the development of ABT-518.  *See supra*, ¶¶ 72(g), 84.

87.     <u>Proposed Substitute Findings</u>:  Abbott disclosed all material information regarding the prospects and condition of ABT-518 as of March 13, 2001 to Hancock before Hancock entered into the RFA.  *See supra* ¶¶ 66-86.

88.     <u>Proposed Substitute Findings</u>:  Abbott did not misrepresent or fail to disclose any material information concerning the prospects and condition of ABT-518 to Hancock in the Agreement.  *See supra* ¶¶ 66-87.

89.     <u>Proposed Substitute Findings</u>:  Abbott did not misrepresent or fail to disclose any material information concerning the prospects and condition of ABT-518 to Hancock in the Agreement.  Abbott did not engage in any fraudulent or wrongful conduct or act with any fraudulent or wrongful intent.  *See supra* ¶¶ 66-88.

90.     <u>Proposed Substitute Findings</u>:  Disclosure of the temporary hold, the reasons for the hold, and/or the resumption of the clinical trial of ABT-518 to Hancock before execution of the RFA would not have "significantly altered the economics and attractiveness of the proposed funding deal."

ABT-518 represented only $1 million of Hancock's $214 million investment.  Tucker Aff. ¶ 66.  Hancock estimated that ABT-518 had only a 10 percent chance of success and that, even if successful, the royalties would be far in the future.  Tucker Aff. ¶¶ 83-84.  Thus, even the complete elimination of that compound from the Agreement would not have significantly impacted the overall financial attractiveness of the deal.  *See infra,* ¶ 178.

91.     <u>Proposed Substitute Findings</u>:  Hancock has not suffered monetary or other damages due to any alleged misrepresentations, omissions or fraud with regard to ABT-518.  *See supra*, ¶¶ 66-90; *infra*, 178-179.

<u>ABT-594</u>

92.     <u>Proposed Substitute Findings</u>:  ABT-594 is a pharmaceutical compound that was under development at Abbott Laboratories from 1997 through 2001.  Leonard Aff. ¶ 41.  ABT-594 is a cholergenic channel modulator ("CCM") or neuronal nicotinic receptor agent ("NNR").  Leonard Aff. ¶ 42; Leiden Aff. ¶ 24; 9/29/06 McCarthy Depo. 24:22-25:14; Silber Depo. 21:11-21:18; Ex. 16 at pp. 6-9 (background on ABT-594).  Through 2000, Abbott had spent $97.3 million developing ABT-594.  Leonard Aff. ¶ 41; Ex. 32 at JH008121.

93.     No proposed additional or substitute findings.

94.     No proposed additional or substitute findings.

95.     <u>Proposed Additional Findings</u>:  In the November 2000 and the final version of the Descriptive Memorandum, Abbott noted that the likelihood of ABT-594 reaching its target profile of low nausea/vomiting was "Low."  Ex. 32 at JH008172; Ex. 64 at ABBT144607.UR; *see also* Leonard Aff. ¶ 43; Blewitt Tr. 94:5-95:8, 231:21-236:20; 11/17/06 Blewitt Depo. 180:21-181:23.  Abbott also disclosed that during previous clinical trials, the "most common adverse events for subjects receiving 75 µg [micrograms] BID [twice-a-day] were nausea (15%), headache (13%), dizziness (7%), insomnia (6%), and vomiting (5%)."  Ex. 64 at ABBT144606.UR; Ex. 32 at JH008171; *see also* Leonard Aff. ¶ 43; Blewitt Tr. 67:1-70:8; 11/17/06 Blewitt Depo. 179:1-180:173:4.  Abbott disclosed that the therapeutic window (i.e., the ratio between the maximum tolerated dose and the minimum efficacious dose) might be small.  Ex. 64 at ABBT144606.UR; Ex. 32 at JH008171; *see also* Leonard Aff. ¶ 43.  The Descriptive Memoranda state that the Phase IIa studies "suggest a trend towards analgesic effect

[efficacy]" at 75 micrograms twice-a-day and that Phase I studies indicated that the maximum tolerated dose might be as low as 150 micrograms per day.  Ex. 32 at JH008171; *see also* Leonard Aff. ¶ 43; Klotz Tr. 420:18-422:9.  Abbott further disclosed in the RFA that a "Go/No Go" decision for clinical efficacy was expected in June 2001 at the conclusion of the Phase IIb (dose-ranging) trial ("M99-114").  Ex. 32 at JH008166; *see also* Leonard Aff. ¶ 43; Blewitt Tr. 70:10-71:11; 11/17/06 Blewitt Depo. 172:18-173:4.

96.    <u>Proposed Additional Findings</u>:  Abbott disclosed to Hancock in the RFA that there was a "Go/No Go" decision scheduled for ABT-594 in June 2001.  Ex. 32 at JH008166; Leonard Aff. ¶ 43.  Abbott estimated that it would spend $9.3 million on ABT-594 through its "Go/No Go" decision in June 2001, and an additional $5.6 million on ABT-594 after June 2001, provided there was a "Go" decision.  Leonard Aff. ¶¶ 57, 58; Gold Tr. 254:7-255:2; Ex. 616 at p. 31; Ex. 759 at ABBT144633.UR; Ex. 791 at ABBT112987.UR ("Milestone funding from July, 2001 forward."); Ex. 620 at p. 13 ($5.6MM "After Go/NoGo").  The post-June spending was part of Abbott's "blue plan." Leonard Aff. ¶ 58.  Abbott often allocated "blue plan" spending contingent on events such as "Go/No Go" Decisions.  Leonard Aff. ¶ 58; Woidat Depo. 32:12-33:3.

97.    <u>Proposed Substitute Findings</u>:  Hancock did not show Dr. Klotz the November 2000 draft of the Descriptive Memorandum or the final Descriptive Memorandum, which contained the disclosure by Abbott that the likelihood of ABT-594 reaching its target profile of low nausea/vomiting was "Low."  Blewitt Tr. 67:1-74:5; Klotz Depo. 211:22-213:6; Klotz Tr. 430:24-434:13; Ex. 63 (draft April 2000 ABT-594 Descriptive Memorandum provided to Dr. Klotz); Ex. 64 at ABBT144607.UR (ABT-594

November 2000 draft Descriptive Memorandum with disclosure not provided to Dr.

Klotz); Ex. 32 at JH008165-73 (final ABT-594 Descriptive Memorandum).  Dr. Klotz

testified that if he had seen those drafts, that disclosure would have raised "a huge red

flag" for him.  Klotz Depo. 208:23-209:16, 209:24-210:9, 211:6-211:12; Klotz Tr.

430:24-434:13; Blewitt Tr. 236:21-238:25.

   Even based on the April 2000 draft of the Descriptive Memorandum, however,

Dr. Klotz recognized that (1) there "may be a problem with the therapeutic window;" (2)

"10% of patients at 75 µg (micrograms) BID [twice-a-day dosing] had a number of

uncomfortable side effects such as headaches, nausea, etc;" and (3) the therapeutic

window of ABT-594 could be too narrow and that there was "some risk of not passing

phase II clinical trials."  Ex. 61 at pp. 7-8; *see also* Blewitt Tr. 39:4-40:11, 44:14-46:17,

54:12-55:20; Klotz Tr. 420:18-422:6, 424:7-425:11; 11/17/06 Blewitt Depo. 146:22-

147:10, 147:16-148:9, 152:23-153:16, 157:20-160:2; Klotz Depo. 96:1-100:12, 128:11-

129:10; Ex. 818 at p. 1 (Dr. Klotz informed Mr. Blewitt that "there are questions, in my

mind, about whether [ABT-594] will complete clinical trials" because of concerns

regarding the therapeutic window).  The disclosures made by Abbott in the April 2000

draft ABT-594 Descriptive Memorandum regarding adverse events and the therapeutic

window of ABT-594 raised a "red flag" for Dr. Klotz.  Klotz Depo. 101:18-103:23; *see*

*also* Klotz Tr. 420:18-422:17; Ex. 550 at JH002087.  Based on Abbott's disclosures, Dr.

Klotz recommended that Hancock seek the opinion of a pain clinical trials expert and told

Hancock that it was "important that we see a summary of the latest clinical trial data."

Ex. 61 at JH002087; Ex. 818 at JH003014; *see also* Klotz Tr. 422:18-424:6; Klotz Depo.

124:24-125:22.  Although Abbott had offered, and stood ready, to provide Hancock with

access to whatever additional data it requested, Hancock did not request any additional

data because, according to Dr. Klotz, Mr. Blewitt did not think it was necessary.  Klotz

Depo. 68:19-69:24, 70:14-71:5, 96:1-100:12, 126:18-128:10; *see also* Klotz Tr. 425:12-

426:3.  *Although Hancock never requested additional ABT-594 clinical study data,*

*Abbott nonetheless provided such data, including nausea and vomiting rates from*

*completed trials, in subsequent drafts and the final ABT-594 Descriptive Memorandum*

*that were provided to Hancock.*  Ex. 64 at ABBT144606.UR; Ex. 32 at JH008171.  Dr.

Klotz interviewed a clinical trials pain expert, Mitchell Max, M.D., regarding ABT-594.

Klotz Tr. 426:14-429:2; 11/17/06 Blewitt Depo. 160:17-161:12; Ex. 559 (Dr. Klotz's

interview notes with Dr. Max); Ex. 125 at p. 17 (Dr. Max is a neuropathic pain expert at

the National Institute of Health).  Dr. Max stated that, in his opinion, a "therapeutic

window of two [the low end of the range identified by Abbott of two to three] is certainly

acceptable."  Ex. 559 at p. 1, 3 (Dr. Max also explained that all neuropathic pain

medications are "mediocre" and "[f]or chronic pain medications you just don't have good

therapeutic windows"); *see also* Klotz Tr. 427:6-429:2; 11/17/06 Blewitt Depo. 162:20-

24; Klotz Tr. 489:14-490:11 (225 and 300 mcg doses would be therapeutic window of

three or four); Klotz Depo. 138:13-139:6, 139:15-17, 141:15-141:24, 142:22-143:2,

143:23-144:4, 144:10-144:17, 145:24-146:10.  Based on Dr. Max's opinion and its other

due diligence, Hancock was satisfied that the level of risk regarding ABT-594 was

acceptable and approved the deal.  Ex. 125 at p. 17.  The September 21, 2000 Purchase

Recommendation stated "Our scientific consultant, Dr. Mitchell Max, NIH, eliminated an

initial concern of ours that the 'therapeutic window' of ABT-594 was too short and

would potentially block approval."  Ex. 125 at p. 17; Klotz Depo. 200:2-200:12, 203:7-

203:23.  *Hancock alleges that disclosures by Abbott regarding the clinical trial and drop-out rates would have revealed issues regarding nausea and vomiting and thereby changed the attractiveness of the deal.  But when Abbott provided Hancock with an updated Descriptive Memorandum in November 2000 that disclosed a "Low" probability of "low nausea/vomiting" and made other disclosures regarding nausea and vomiting, Mr. Blewitt did not bring these disclosures to the attention of the Hancock investment committees, consult with Dr. Klotz, request additional information from Abbott, or take any action whatsoever.*  Blewitt Tr. 67:1-74:5; Klotz Tr. 431:10-434:13.

98.    Proposed Substitute Findings:  The representations made by Abbott in the RFA regarding the prospects and condition and anticipated spending for ABT-594, as of the date of the Agreement, were accurate and complete in all material respects.  *See supra*, ¶¶ 92-97; *infra*, ¶¶ 98-106.

(a)    Proposed Substitute Findings:  Abbott's Phase IIb trial of ABT-594 for the treatment of diabetic neuropathic pain (known as trial "M99-114") commenced in April 2000.  Ex. 16 at p. i (M99-114 Clinical Protocol); Leonard Aff. ¶ 44; Leiden Aff. ¶ 25.  The trial was initially designed to include 320 "subjects" or patients in a "double-blinded" format.  Leonard Aff. ¶ 45; Leiden Aff. ¶ 26; Rodda Tr. 1288:21-1289:19; Ex. 16 at p. ii (M99-114 Clinical Protocol).  In such studies the investigating physician does not know whether he or she is administering an investigational drug as opposed to a placebo to any particular patient, and the patient and the investigating physician do not know what dose the patient is receiving.  Leonard Aff. ¶ 45; Rodda Aff. ¶¶ 51-55; Leiden Aff. ¶ 26.  The sponsor of the trial (i.e., Abbott) also does not know this information.  Leonard Aff. ¶ 45; Rodda Aff. ¶¶ 51-55; Leiden Aff. ¶ 26.  In order to have a successful

trial, Abbott needed to enroll sufficient patients to achieve a statistically significant result, i.e., one that would allow Abbott to determine whether there was a clinically meaningful difference between each of the three doses of ABT-594 and the placebo.  Leonard Aff. ¶ 47; Rodda Aff. ¶¶ 15-34; Gold Tr. 298:22-299:2; Leiden Aff. ¶ 27.

M99-114 was a dose ranging study to determine the doses at which ABT-594 would be efficacious and well tolerated.  Leonard Aff. ¶ 44; Leiden Aff. ¶ 25; Gold Tr. 305:5-12; 9/29/06 McCarthy Depo. 74:24-75:12; Ex. 16 at p. ii (M99-114 Clinical Protocol).  Therefore, the trial included patients in four different dose groups: placebo, 150 mcg, 225 mcg, and 300 mcg BID (twice-a-day).  Leonard Aff. ¶ 44; Leiden Aff. ¶ 26; 9/29/06 McCarthy Depo. 79:7-81:1; Ex. 16 at p. ii; Ex. 360 at p. 12.  M99-114 was designed to determine a dose at which patients would experience the efficacy of the drug without adverse side effects.  Leonard Aff. ¶ 44; Rodda Aff. ¶¶ 15-16; Leiden Aff. ¶¶ 25-26; Rodda Tr. 1290:9-14; 9/29/06 McCarthy Depo. 74:24-75:12.  Abbott thus expected that at the higher doses there would be drop-outs from side effects; those doses had been selected specifically to define an adverse event profile.  Leonard Aff. ¶ 44; Rodda Aff. ¶ 49; Leiden Aff. ¶ 26; Rodda Tr. 1307:17-1308:2; Leonard Depo. 142:4-142:15.  Abbott did not have any material concerns that the drop-out rate for M99-114 would result in an unsuccessful result before the trial was unblinded in April 2001.  Leonard Aff. ¶ 46, 53-54; Leiden Aff. ¶ 26-29; Leonard Tr. 998:3-999:14; Klotz Depo. 90:13-91:3, 91:10-91:14, 135:2-136:3, 137:11-137:23; Ex. 16 at p. 8-9.

*Dr. Leonard's statement to Mr. Blewitt and Dr. Klotz in a July 2000 conference call with Dr. Klotz and Mr. Blewitt that the side effects of from ABT-594 "aren't dangerous: headache and vomiting" and that "[t]hese minor side effects appear to go*

*away over time" accurately reflected Abbott's knowledge regarding the compound, as evidenced by its own documents.* Ex. 62 at JH002975; Leonard Tr. 914:16-916:23, 998:5-999:11; Leonard Depo. 142:16-143:8 ("I knew that this compound, it's a nicotinic channel modulator, exhibited some of the same pharmacology seen with nicotine which is found in cigarettes that has a well known side effect profile of nausea and vomiting particularly when someone begins smoking.  We also knew that smokers tend have those side effects abate and there was reason to believe and I think we had observed in our trials if I remember right that some of that pharmacology appeared to be playing out for this drug as well, so we wanted to explore it further.").  *For example, Abbott's February 8, 2001 protocol for the M99-114 study reported that adverse events in previous trials "were considered to be mild in the opinion of the investigator", "subjects generally tolerated ABT-594 better . . . after 3-4 days of repeated dosing (the period in which most adverse events occur)" in Phase I trials, and "ABT-594 appeared to be tolerated better after the first week of therapy" in Phase II trials.*  Ex. 16 at p. 8-9; *see also* Ex. 257 (letter to investigators in M99-114 trial stating that patients "may experience nausea, vomiting and/or dizziness at the beginning of the study" but many patients "may go on to develop tolerance to the adverse events over the first week", that "vomiting may resolve" and "more mild adverse events (e.g., mild nausea and dizziness) may also improve over the first week of dosing").  *Similarly, after the conclusion of  the M99-114 trial, Abbott's clinical study report noted that, in that trial, "[m]ost adverse events were mild or moderate in severity."*  Ex. 105 at p. vi.

(b)    Proposed Substitute Findings:  It is not uncommon for clinical trials to experience challenges in reaching target enrollment on schedule.  Leonard Aff. ¶ 47;

Rodda Aff. ¶¶ 41, 43; Gold Tr. 296:13-297:20.  Abbott's challenges in reaching the

original target enrollment for the M99-114 study were due, in large part, to factors

unrelated to adverse events or patient drop-outs, such as the relatively limited numbers of

diagnosed diabetic neuropathy patients, the stringent screening criteria, and the reluctance

of candidates suffering from pain to forgo other pain medication and enroll in a placebo-

controlled study.  Ex. 90 at 2; Gold Tr. 392:21-24 (reasons, besides incidence of adverse

events, that can explain or can cause delays in enrollment in clinical trials); Leiden Aff.

¶ 27.

Hancock's statement that, as of July 7, 2000, 31 of the 78 patients enrolled in

M99-114 had pre-terminated because of "adverse events" is not supported by the

document Hancock relies on, which shows 20 of the 78 patients (26%) had pre-

terminated due to adverse events and does not identify whether the other eleven patients

pre-terminated due to reasons other than adverse events.  Ex. 83; *see also* Rodda Tr.

1314:22-1319:19; 1334:2-16; Gold Tr. 305:13-313:6.  As discussed below, M99-114 was

adequately powered to achieve its clinical objectives despite the drop-out rate.  Rodda

Aff. ¶¶ 17, 26, 44-45; Rodda Tr. 1334:17-1335:6.

(c)    Proposed Substitute Findings:  Since M99-114 was a double-blinded,

dose-ranging study, Abbott could not determine at what doses the adverse events or drop-

outs were occurring until completion of the trial in April 2001.  Leonard Aff. ¶¶ 46, 52-

54; Rodda Aff. ¶¶ 48-55; Rodda Tr. 1314:22-1319:19, 1328:2-1329:1.  It was possible,

for example, that the adverse side effects were occurring at the higher doses and the

lowest dose of 150 mcg would be both efficacious and well tolerated.  Leonard Aff. ¶ 46;

Rodda Aff. ¶¶ 48-55; Rodda Tr. 1314:22-1319:19; Klotz Tr. 434:17-435:5 (not unusual

for adverse events to be present at higher dosage levels of a drug in a dose ranging study).

Also, Abbott expected that, as in any study, patients would pre-terminate for reasons

unrelated to adverse events, including lack of efficacy.  Rodda Aff. ¶ 38; Rodda Tr.

1307:17-1308:2; Leonard Tr. 993:25-994:6.  Drop-outs among the 25 percent of patients

receiving a placebo were especially likely in this study because the patients were

suffering from diabetic neuropathic pain, and under the protocol were not allowed to be

on any other pain medicine.  Leiden Aff. ¶ 29; Leonard Tr. 993:24-995:15; Ex. 16 at p. iii

(M99-114 protocol provided that, with limited exceptions for acetaminophen, patients

had to discontinue all analgesics).

(d)    Proposed Substitute Findings:  Abbott requested that the M99-114 clinical

test sites provide information regarding the types of adverse events patients were

experiencing, but this was not unusual or indicative of a problem with the trial.  Leiden

Aff. ¶ 29; Leonard Aff. ¶ 46; Rodda Tr. 1291:11-16; 1314:22-1319:19; *see also* Ex. 257

(letter to investigators states that "we do not believe the results [of the survey] suggest the

need to change study entry criteria" and notes that, although some patients experience

nasuea, vomiting, or dizziness on Day 1 or 2, the adverse events may "resolve" or

"improve over the first week of dosing" as the patients "develop tolerance").  Also,

because the trial was double blinded, the surveys did not provide Abbott with any data

regarding the doses at which patients were experiencing adverse events.  Leonard Aff. ¶¶

45-46; Gold Tr. 302:19-303.18.

(e)    Proposed Substitute Findings:  Abbott's senior management regarded

compounds in Phase II that did not have statistically significant clinical trial results as

having questionable commercial viability because the likelihood of success of such a

compound was lower than compounds that were in more advanced stages of development. Leiden Depo. 112:15-116:14, 117:11-117:23, 119:11-120:6; Ex. 298; Ex. 299.

(f)    Proposed Substitute Findings: Abbott employees received limited blinded information regarding side effects patients on the drug were experiencing. Rodda Tr. 1291:11-16, 1314:22-1319:19; 9/29/06 McCarthy Depo. 97:9-99:13. Abbott had observed that side effects of nausea and vomiting were dose-related in earlier clinical studies of ABT-594. Leonard Aff. ¶ 46; 9/29/06 McCarthy Depo. 42:24-43:21. The fact that the side effects were dose-related was one of the reasons Abbott could not determine, until after the results of the M99-114 trial were unblinded, whether there was an efficacious dose at which the side effect profile was acceptable. Leonard Aff. ¶ 46; Rodda Aff. ¶¶ 48-55; Rodda Tr. 1328:2-1329:1, 1333:6-24; Gold Tr. 303:19-305:12; 9/29/06 McCarthy Depo. 109:16-110:17.

(g)    Proposed Substitute Findings: In December 2000 Abbott decided not to retain a patient recruitment firm for the M99-114 clinical trial because it had determined that it could enroll sufficient patients to have a successful trial. Leonard Aff. ¶ 47; Leiden Aff. ¶ 26; Rodda Aff. ¶¶ 33, 40, 43-45; *see also* Ex. 92 at p. 1-2 (enrollment was "better than projected" during November -- when Abbott "had anticipated a slow-down" due to the "Holiday season" -- and Abbott exceeded its interim enrollment target).

(h)    Proposed Substitute Findings: In December 2000, Abbott's statisticians determined that enrolling a smaller number of patients than the original target of 320 would still yield a statistically significant result, and thus accomplish the purposes of the study. Leonard Aff. ¶¶ 47, 51; Rodda Aff. ¶¶ 33, 40-45; Leiden Aff. ¶ 27; Gold Tr.

299:3-14, 299:22-302:18; Fairweather Tr. 529:22-530:15 (Abbott could have reasonably assumed as of March 12, 2001 that it would be able to use most of the 266 subjects who had enrolled in the M99-114 trial in its intent-to-treat analysis and its power calculations.); 9/29/06 McCarthy Depo. 145:18-147:2, 158:3-159:17, 164:1-19; Thomas Depo. 121:11-18, 180:14-20; Leonard Depo. 170:18-171:6; Leiden Depo. 140:8-143:16, 146:10-147:7; Rodda Depo. 94:11-14, 94:19-95:16, 96:5-96:20; Ex. 748 at ABBT0002433 ("Width of confidence intervals not meaningfully different between 269 and 320 enrolled patients"); Ex. 179 (power calculations chart by Abbott statistician); Ex. 230 (reflecting power at nearly 70% with only 240 patients); Judicial Notice Doc. 1.  The phrase "prematurely terminated" that is used in Abbott documents simply means that enrollment ended with less patients than originally planned, and does not mean that the study was not conducted to its planned conclusion.  Rodda Aff. ¶¶ 35, 43; Leiden Aff. ¶¶ 27-29 (M99-114 trial was completed).  Abbott determined that this decision was advantageous for the development of ABT-594, because it would allow Abbott to complete its study by April 2001, as planned, and, if the results were positive, maintain its planned timetable for further studies and potential launch in 2003.  Leonard Aff. ¶ 47; Rodda Aff. ¶¶ 33, 40-45; Leiden Aff. ¶ 27; McCarthy Depo. 145:18-147:2, 164:1-19; Ex. 20 (draft letter to investigators).  As predicted by Abbott's statisticians, reducing the number of patients in the M99-114 trial did not have any significant impact on the ability of Abbott to have a successful clinical trial.  Rodda Aff. ¶¶ 17, 26, 33, 40-45; Rodda Tr. 1334:17-1335:6; Fairweather Tr. 523:12-16 (Hancock's statistical expert witness does not have opinion as to whether or not M99-114 trial was successful); Leonard Tr. 999:15-1000:9; 3/16/07 McCarthy Depo. 29:18-30:13 (M99-114 study met the objectives set

forth in M99-114 protocol).  Closing enrollment early only reduced the power of the study by 6 percent, a reduction that was neither meaningful nor significant.  Rodda Aff. ¶¶ 33, 40, 43-45; Rodda Tr. 1296:2-15; Gold Tr. 298:13-21; Thomas Depo. 25:2-12 (Abbott sometimes used less than 80% power in clinical trials), 36:19-22, 37:19-22 (when Abbott calculated power and sample size for M99-114 trial it took the impact on power of drop-outs into account); 158:16-159:19 (same), 180:14-20 (same), 266:1-9 (same); Rodda Depo. 73:15-75:20, 76:20-78:14.  *Prior Phase II clinical trials for ABT-594 utilized planned power of less than 80%.*  Ex. 994 at p. 48 (protocol for M98-826 clinical study planned for 56% power); Ex. 995 at p. 39 (protocol for M98-833 clinical study planned for 56% power); Ex. 996 at p. 57 (protocol for M97-772 clinical study planned for 70% power).

(i)    Proposed Substitute Findings:  Abbott stopped enrollment of patients in its Phase IIb study on January 5, 2001 at 269 subjects, and continued the study to completion.  Rodda Aff. ¶¶ 42-45.

(j)    Proposed Substitute Findings:  The drop-out rate experienced in the M99-114 trial was not unusual for a clinical trial of pain-related compounds and would not have been a concern for Abbott unless it prevented Abbott from adequately powering the clinical trial, which it did not.  Rodda Aff. ¶¶ 38, 49-55; Leiden Aff. ¶ 29; Rodda Tr. 1299:10-1300:1; Leonard Tr. 994:7-996:11 (45% of patients in clinical trial for Vicodin CR dropped out of the study); 9/29/06 McCarthy Depo. 154:19-25, 284:13-19; Thomas Depo. 42:6-19 (in some types of studies, premature termination rate of 50% may be appropriate); Leiden Depo. 154:2-154:12; *see also* Ex. [997] at p. 858, Table 2 (published article regarding drop-out rates and adverse events for oxycodone, FDA approved pain

medication, provides evidence that Abbott would not have had reason to be concerned

with M99-114 drop-out rate). The only "concerns" expressed by some Abbott personnel

in July and August 2000 relate to the potential impact of patient drop-outs on the

enrollment "goal" of 320 patients, not the ultimate results of the study. Ex. 83; Leiden

Aff. ¶¶ 27-28; 9/29/06 McCarthy Depo. 89:8-90:17; Collicott Depo. 206:14-206:21. By

December 2000, any such concerns regarding enrollment were moot because Abbott had

enrolled a sufficient number of patients to have an adequately powered, statistically valid

study. Rodda Aff. ¶¶ 26, 44, 45; Rodda Tr. 1296:2-15, 1334:17-1335:6; 9/29/06

McCarthy Depo. 29:25-30:13; Ex. 862 at pp. 14-20 (Rodda Expert Report).

No valid predictions or conclusions can be based on the number of adverse events

experienced in a double-blinded clinical trial until the data is unblinded. Rodda Aff.

¶¶ 48-55; Leiden Aff. ¶ 29; Rodda Tr. 1328:2-1329:1, 1333:6-24; 9/29/06 McCarthy

Depo. 156:24-158:2; Rodda Depo 96:1-4. Abbott did not make any such predictions or

draw any such conclusions from the blinded M99-114 data. Leonard Aff. ¶ 49; Leiden

Aff. ¶ 30; Rodda Tr. 1328:2-1329:1, 1333:6-24; Gold Tr. 322:10-324:5; 9/29/06

McCarthy Depo. 164:1-165:5, 224:3-7 (ABT-594 Medical Director did not draw any

conclusions one way or the other from the number of adverse vents involving nausea or

vomiting in M99-114 trial before M99-114 data was unblinded), 243:23-244:2; 3/16/07

McCarthy Depo. 102:8-103:3; Thomas Depo. 13:24-14:19, 213:23-214:21; Leonard

Depo. 174:21-175:20; Ex. 750 at p. 12 (in January 2001, Abbott considered ABT-594 to

be one of Abbott's top projects); Ex. 348 (email form Dr. McCarthy to Ms. Landsberg

forwarding blinded data (nausea – 19%; vomiting – 7.8%), but noting that the data "IS

BLINDED . . . THE DATABASE IS NOT CLEAN," other titration schemes will result

in lower adverse event rates, and "THIS IS NOT THE RATE OF NAUSEA AND VOMITING FOR ABT-594 AT LAUNCH."  Blinded data is reviewed by Abbott for the purpose of doing medical checks, not reaching conclusions regarding the ultimate results of the trial.  9/29/06 McCarthy Depo. 189:23-190:10; Rodda Aff. ¶¶ 51-52.  Abbott is ethically obligated to check the blinded data to make sure there are no serious adverse events.  Rodda Aff. ¶ 48; *see also* Meyer Tr. 629:21-632:3 (blinded data is "used to evaluate safety, which is an ongoing requirement of all pharmaceutical companies in drug development").

*Abbott's development of other NNR compounds concurrently with ABT-594 did not reflect a lack of confidence in ABT-594.*  Gold Tr. 255:17-269:24 (development of backup compounds does not necessarily reflect a lack of confidence in lead compound); Silber Depo. 23:3-24:7 (follow-on compounds are developed in parallel as part of an overall development effort); Ex. 861 ("Backup compounds are often developed concurrently with or slightly behind the lead compound(s)").

(k)    Proposed Substitute Findings:  Abbott often discussed ending enrollment in clinical trials early if Abbott believed it would be able to have a successful trial in a shorter period of time.  Leonard Aff. ¶ 47; Leiden Aff. ¶ 27.  Abbott's decision to close enrollment in the M99-114 trial early was driven by (1) its desire to evaluate the outcome of the study early; (2) its realization that it would be able save a significant amount of time and money and still have a successful clinical trial; and (3) the desire to move the compound forward and begin clinical trials that were dependent on the results of the M99-114 trial, including subsequent Phase III trials, if supported by the M99-114 data.

Leonard Aff. ¶ 47; Rodda Aff. ¶¶ 33, 40, 43-45; Leiden Aff. ¶ 27; 9/29/06 McCarthy

Depo. 145:18-147:18, 164:1-19, 186:5-13, 188:19-189:4; Ex. 98 at ABBT0002455.

(l)     Proposed Substitute Findings:  Abbott explored a potential partnership

(i.e., co-development) for ABT-594 with other pharmaceutical companies in late 2000

because it wished to share the overall cost of development of ABT-594.  Leonard Aff.

¶ 48.  Neither the enrollment decision nor Abbott's exploration of a potential co-

development deal were material adverse events in the development of ABT-594.

Leonard Aff. ¶ 48-49; Rodda Aff. ¶¶ 17, 26, 44, 45, 46-47; Leiden Aff. ¶ 8 (Abbott has

often sought out co-development partners); Leonard Depo. 179:4-180:1.

(m)     Proposed Substitute Findings:  Abbott personnel were not concerned about

the potential impact of disclosing nausea and vomiting issues relating to ABT-594 to

possible development partners, as evidenced by Abbott's disclosure to Hancock of the

"Low" probability of achieving "low nausea/vomiting" rates *and Abbott's disclosure to*

*Purdue Pharma of the incidence rates of adverse events from prior clinical trials.*  Ex.

241 at ABBT0102306 (Purdue Pharma presentation); Ex. 32 at JH008172.  Dr.

McCarthy, the medical director of the ABT-594 development team, believed that the

personal concerns  expressed in an email to him from Robert Weiland regarding this issue

were unjustified.  3/16/07 McCarthy Depo. 81:23-82:8.

(n)     Proposed Substitute Findings:  In late 2000, Abbott communicated with

Purdue Pharma regarding a potential co-development deal for ABT-594.  Ex. 91.  Purdue

Pharma decided to defer negotiations regarding a potential deal until the Phase IIb trial

was complete and the clinical data was available.  Ex. 617.

(o)     Proposed Substitute Findings:  Although Abbott reduced its planned spending on ABT-594 for 2001, it simultaneously increased its planned spending on the compound for the years 2002 through 2004.  Leonard Aff. ¶ 59; Gold Tr. 254:7-255.2; Blewitt Tr. 122:4-125:20; Ex. 32 at JH008121; Ex. 620 at p. 13.  For example, the RFA states that Abbott would spend $45 million on ABT-594 in 2002.  Ex. 32 at JH008121. As of March 2001, Abbott's internal estimate of its ABT-594 spending for 2002 was $59.6 million.  Leonard Aff. ¶ 59; Ex. 620 at p. 13.  At the same time, Abbott's 2003 estimated spending increased from the $32 million stated in the RFA to $55.7 million, and its estimate for 2004 was $21.8 million, $6.8 million greater than stated in the RFA. Leonard Aff. ¶ 59; Ex. 32 at JH008121; Ex. 620 at p. 13.  Overall, for calendar years 2001 through 2005, Abbott estimated spending $163.6 million on ABT-594, an amount $24.6 million more than the $139 million Abbott had represented in the RFA that it would spend.  Leonard Aff. ¶ 59; Ex. 32 at JH008121; Ex. 620 at p. 13.

(p)     Proposed Substitute Findings:  As reflected in a presentation to Abbott senior management on March 7–9, 2001, Abbott anticipated commencing the Phase IIb Osteoarthritis Pain study in 2001 for ABT-594.  Ex. 620 at p. 7.  Abbott also planned to fund ABT-594 Phase II and Phase III trials in calendar years 2002 and beyond.  Leonard Aff. ¶ 60; Ex. 620 at p. 7.  Abbott scheduled the Phase IIb study to begin after the results from the M99-114 study were unblinded in April 2001 if a "Go" decision was reached. Ex. 620 at p. 7.  The minor delays in the initiation of Phase III trials cited in Abbott's March 2, 2001 reference package would not have delayed the compound's estimated NDA or launch dates.  Leonard Aff. ¶ 60.  The Phase III trials were delayed only from October 2001 to April 2002 (assuming a "Go" decision after the Phase IIb trial).  Leonard

Aff. ¶ 60; Ex. 616 at p. 31. The reference package provided for a September 2003 New

Drug Application ("NDA") filing date for ABT-594, the same NDA filing date disclosed

to Hancock in the RFA. Ex. 32 at JH008166; Ex. 616 at p. 31. (The NDA is filed with

the FDA to get approval for the commercialization of a pharmaceutical compound.)

Leonard Aff. ¶ 60. The planned start dates for the additional Phase II and III studies

provided to Hancock were the same dates that Dr. McCarthy included in a presentation to

Abbott senior management in March 2001. Ex. 620 at p. 7; Ex. 32 at JH008121-22.

(q)    <u>Proposed Substitute Findings</u>: The ABT-594 development team made a

project review presentation to senior management, including Dr. Leiden, on February 2,

2001. Leonard Aff. ¶ 51; Leiden Aff. ¶ 28; 9/29/06 McCarthy Depo. 181:11-189:4,

190:17-191:20; Ex. 748 (Feb. 2, 2001 Presentation). The only information concerning

the M99-114 clinical trial that was presented to senior management was that the study

was ongoing and included titrated doses up to 300 mcg BID and that the results of the

study would be used to make a Go/No Go decision later that year. Leonard Aff. ¶ 51;

Leiden Aff. ¶ 28; 9/29/06 McCarthy Depo. 181:11-189:4, 190:17-191:20; Ex. 748 at

ABBT0002430-33. The presentation did not include information about adverse events in

the M99-114 study. Leonard Aff. ¶ 51; Leiden Aff. ¶ 28; 9/29/06 McCarthy Depo.

188:9-17; 195:13-19; Ex. 748 at ABBT0002430-33. After the meeting, a

recommendation was made for a comprehensive strategy to address the tolerability issues

that had been observed with the compound in all of its prior preclinical and clinical trials.

Ex. 161. Since Dr. Leiden was reviewing the ABT-594 project in-depth for the first time,

he proposed that a strategy be developed to address the long-standing issues with the

compound. Leiden Aff. ¶ 28; Leiden Depo. 24:6-24:13 (Dr. Leiden joined Abbott in

2000 and was not familiar with the R&D portfolio); Leonard Aff. ¶ 24 (Dr. Leiden had

recently joined Abbott at the time of the presentation and was not familiar with the R&D

portfolio).

(r)    Proposed Substitute Findings:  *Abbott knew, and disclosed to Hancock,*

*that dose-limiting adverse events of nausea, dizziness, and emesis ("vomiting") had been*

*observed in prior clinical trials.*  Leonard Aff. ¶ 46; 9/29/06 McCarthy Depo. 42:24-

43:21, 242:17-19; *supra*, ¶¶ 95, 97 (disclosures to Hancock).  *Abbott did not know, as of*

*February or March 2001, whether it would be able to overcome the dose-limiting side*

*effects by finding a dose that was both efficacious and tolerable in terms of side effects,*

*and disclosed this uncertainty.*  Leonard Aff. ¶ 46; Leiden Aff. ¶¶ 25-26; Silber Depo.

33:22-34:2, 35:21-36:1, 43:9-43:21; *see supra*, ¶¶ 95-97 (disclosures to Hancock that

there was "Low" probability of "low nausea/vomiting", that the therapeutic window was

narrow, and that a Go/No Go decision would be made after conclusion of Phase IIb trial).

(s)    Proposed Substitute Findings:  Abbott reviewed its entire portfolio, over

forty compounds, during the March 7–9, 2001 Portfolio Review Meeting.  Leonard Aff.

¶ 21; Leiden Aff. ¶ 11; Ex. 621.  Abbott believed, as of March 2001, that ABT-594 was a

promising novel pain medication with the potential to be the first compound in its class to

be approved.  Ex. 750 at ABBT0012382 (January 2001 Portfolio Analysis identifies

ABT-594 as one of top 4 projects at Abbott – "same results as July 2000 analysis"); *see*

*also* Hendricks Aff. ¶¶ 10-13; Hendricks Aff. ¶¶ 14-15; Ex. 591 at pp. 26, 31 (in ranking

of all compounds in Abbott's portfolio, ABT-594 ranked first in long-term profit and

sixth in short-term revenue).  *Abbott estimated ABT-594 had a 45% probability of*

*completing Phase II and 70% probability of completing Phase III – which was consistent*

*with CMRI industry averages for Phase II compounds of 51% and 65%, respectively, and*

*consistent with industry averages for Phase II NSAID analgesics of 30% and 71%,*

*respectively – for an overall probability of success of 32%.*  Ex. 125 at p. 12; Ex. 611

(Abbott's March 2001 Probabilities of Success), Ex. 800 at p. 1 (Abbott's Updated April

2001 Probabilities of Success); Ex. 801 at p. A12.  At the Portfolio Review Meeting, Dr.

McCarthy made a presentation regarding ABT-594 that was positive regarding the

prospects of ABT-594 and supported continuation of the program.  9/29/06 McCarthy

Depo. 212:18-25, 213:22-214:18; Ex. 620 (ABT-594 Presentation).  Phase IIb study

adverse events and drop-outs were not discussed at the Portfolio Review Meeting.

Leonard Aff. ¶ 53; Leiden Aff. ¶ 29; Hopfield Depo. 52:6-55:8, 217:3-218:3 (does not

recall any discussion of nausea, vomiting, other adverse events, drop-out rates, the

number of subjects, or other aspects of the M-99-114 trial at the Portfolio Review); Ex.

620 at p. 11 (M99-114 "Data Available 5/2001").

(t)    <u>Proposed Substitute Findings</u>:  Abbott's senior management did not

surmise that the results of the Phase IIb trial would be negative.  Leonard Aff. ¶¶ 51-52;

Leiden Aff. ¶¶ 29-31; Gold Tr. 255:17-269:24; Leonard Tr. 993:17-993:23; Leiden Tr.

1215:19-1217:22; 9/29/06 McCarthy Depo. 224:3-7 (ABT-594 Medical Director did not

draw any conclusions one way or the other from the number of adverse events in M99-

114 trial before data was unblinded).  There was no way for Abbott's senior management

to predict that the outcome of the blinded M99-114 clinical trial would be negative, nor

did it do so.  Leonard Aff. ¶¶ 51-52; Rodda Aff. ¶¶ 48-55; Rodda Tr. 1328:2-1329:1,

1333:6-24; Leonard Tr. 996:12-998:2; 9/29/06 McCarthy Depo. 156:24-158:2, 164:1-

165:5, 208:16-25, 224:3-7; Ex. 726 at MCK00539.  *Although Ms. Hopfield testified that*

*there was a discussion of the possibility of termination at the Portfolio Review meeting,*
*her testimony was contradicted by the attendees of the meeting, and, in any event, Ms.*
*Hopfield testified that the discussion consisted of "guessing" and the participants in the*
*meeting "simply did not know enough to make a decision", therefore, "the program was*
*to continue as planned by the team" pending release of additional information.*  Hopfield
Depo. 99:18-100:7, 101:9-23.  At the March 2001 meeting, participants were polled
regarding their preferences as to whether to continue the development of each compound,
to terminate the compound, or to defer decision.  Hopfield Depo. 212:3-215:2; Ex. 726 at
MCK00539.  Only 14% of the attendees were in favor of "Eliminate/Hold" with respect
to ABT-594; 86% supported either continuing the program outright or deferring any
decision until after release and analysis of the Phase IIb data.  Hopfield Depo. 212:3-
215:2; Ex. 726 at MCK00539.

(u)     Proposed Substitute Findings:  It was not the custom or practice of

Abbott's senior management to make decisions regarding the termination of a compound

based on blinded data from an ongoing clinical trial.  Leiden Aff. ¶ 29; Silber Depo. 68:7-

68:12, 74:20-75:1, 117:1-117:20; *see also* Rodda Aff. ¶¶ 48-55; Rodda Tr. 1333:6-24 (it

also was not industry custom or practice).  Abbott's senior management recognized that

no reliable information on which to base a determination regarding continuation of ABT-

594 would be available until after the unblinding and analysis of the Phase II data

following completion of the study in April.  Leonard Aff. ¶ 52; Leiden Aff. ¶ 29.  The

presentation made to senior management at the March 2001 meeting noted that data from

the Phase IIb trial would not be available until May 2001 and that there would be a

"Go/No Go" decision in June 2001.  Leonard Aff. ¶ 53; 9/29/06 McCarthy Depo. 215:11-

24; Ex. 620 at pp. 11, 14 (ABT-594 Presentation). The presentation also included the

same adverse event rates from prior trials that were disclosed to Hancock in the RFA.

Ex. 620 at p. 11; Ex. 32 at JH008171. Senior management did not believe, as of March

2001, that ABT-594 would probably be terminated. Leonard Aff. ¶ 53; Leiden Aff.

¶¶ 30-31. *As of the time of the RFA, Abbott's estimate of the probability that ABT-594*

*would complete Phase II was substantially the same as the industry average for a*

*compound in Phase II and higher than the industry average for analgesics.* Hendricks

Aff. ¶¶ 14-15; Ex. 611 at ABBT287552 (45% probability of ABT-594 completing Phase

II, compared to CMRI's industry average of 51%); Ex. 125 at p. 12 (industry average

probabilities of a Phase II NSAID completing Phase II is 30%); *see also* Ex. 938 at p. 8 &

Ex. 616 at p. 28 ("Medium" probability of "Go" decision in June 2001).

      99.   <u>Proposed Substitute Findings</u>: After the unblinded M99-114 data became

available to Abbott for the first time in April, Abbott conducted an analysis of the

scientific and commercial prospects of the drug for nearly six months. Leonard Aff.

¶¶ 54-55; Leiden Aff. ¶ 32; 9/29/06 McCarthy Depo. 229:24-230:19, 234:3-15, 236:20-

24, 237:25-238:19; Ex. 245 (M99-114 Study Review); Ex. 661 (Aug. 21, 2001 ABT-594

GPEC Review); Ex. 954; Ex. [967]; Ex. 842; Ex. 839; Ex. 784 at p. 7, 14 (Aug. 2001

ABT-594 Pharmaceutical Executive Committee ("PEC") Review). *The unblinded data*

*provided information regarding the rates of efficacy, nausea, vomiting, other AEs, and*

*discontinuation according to dose group.* Leonard Aff. ¶¶ 32, 54-55; Ex. 784 at p.7, 14;

Ex. 907 at ABBT0001758. *Most adverse events experienced by patients during the trial*

*were "mild or moderate in severity."* Leonard Tr. 998:3-999:11; Ex. 105 at p. vi (M99-

114 Clinical Study Report). During that period, Abbott considered alternative dosing

schemes and formulations that would minimize side effects, including an additional

Phase I trial with a lower dose of ABT-594.  Leiden Aff. ¶ 33; 9/29/06 McCarthy Depo.

229:24-230:19, 266:2-16, 270:5-12; Ex. 840 at ABBT0111239 (October 2001 email from

Dr. Leiden – "ABT-594 – review one additional dosing study").  Ultimately, in October

2001, Abbott decided to discontinue development of ABT-594 after concluding, based on

the unblinded M99-114 data released in April 2001 and its subsequent analysis, that the

therapeutic window of ABT-594 was too narrow to continue its development.  Leiden

Aff. ¶ 32-33; Leonard Aff. ¶ 55; 9/29/06 McCarthy Depo. 263:13-22; 270:13-271:21.

Abbott's final decision was not made until October 2001, six months after the M99-114

results were unblinded.  Leonard Aff. ¶ 55; Leiden Aff. ¶ 33; 9/29/06 McCarthy Depo.

272:14-18; Ex. 23 at p. ABBT0166661.

100.    Proposed Substitute Findings:  Abbott informed its employees in October

2001 that Abbott was discontinuing development of ABT-594.  Ex. 23 at ABBT0166661.

Abbott informed Hancock of its decision in a letter dated November 20, 2001.  Ex. 33

(Nov. 20, 2001 letter to John Hancock).

101.    Proposed Additional Findings:  The RFA does not contain any provisions

requiring Abbott to inform Hancock of the reasons for the termination of any of the

Program Compounds.  Ex. 32, § 4.3(f).

102.    Proposed Substitute Findings:  Abbott disclosed the true material

prospects and conditions of ABT-594 as of March 13, 2001, as well as Abbott's expected

spending on ABT-594.  *See supra*, ¶¶ 92-101.

103.    Proposed Substitute Findings:  Abbott did not misrepresent or fail to disclose material information concerning the prospects and conditions of ABT-594, or its expected spending on that compound, to Hancock in the RFA.  *See supra*, ¶¶ 92-101.

104.    Proposed Substitute Findings:  Abbott did not misrepresent or fail to disclose material information concerning the prospects and conditions of ABT-594, or its expected spending on that compound, to Hancock in the RFA.  *See supra*, ¶¶ 92-103.  Abbott did not engage in any fraudulent or wrongful conduct or act with any fraudulent or wrongful intent.  *See supra*, ¶¶ 92-103.

105.    Proposed Substitute Findings:  The allegedly misrepresented and omitted information regarding ABT-594 was not material and would not have significantly altered the economics and attractiveness of the proposed deal from Hancock's perspective, or caused it to not enter into the agreement.  *See supra*, ¶¶ 90, 92-104.

106.    Proposed Substitute Findings:  Hancock has not suffered monetary or other damages due to any of the alleged misrepresentations, omissions or fraud regarding ABT-594.  *See supra*, ¶¶ 92-105, infra ¶¶ 178-179.

<u>ABT-773</u>

107.    ABT-773 is a pharmaceutical compound that was under development at Abbott Laboratories from 1997 through 2002.  Bukofzer Aff. ¶¶ 5, 15; Fox Aff. ¶ 6; Leonard Aff. ¶ 63.  ABT-773 is an anti-infective compound, in a class of antibiotics known as ketolides, which Abbott believed was promising and likely to have activity against resistant strains of bacteria and to compete effectively against marketed antibiotics.  Bukofzer Aff. ¶¶ 14, 16, 17; Leonard Aff. ¶ 63-64; Leiden Aff. ¶ 34; Hendricks Aff. ¶¶ 10-13; Meyer Tr. 633:23-634:13; Ex. 591 at p. 26 (ABT-773 ranked

second in terms of short term revenue as of January 2001); Ex. 750 at pp. 3, 8, 12 (based

on updated commercial forecasts incorporating all available information, Abbott

"[c]onfirmed" in January 2001 that ABT-773 was one of its "top four projects" in terms

of expected value, the "same results as July 2000 analysis").  Through 2000, Abbott had

spent approximately $188.4 million developing ABT-773.  Leonard Aff. ¶ 63; Ex. 32 at

JH008117.  *As of the time of the RFA, Abbott estimated – based on all available*

*information, including the allegedly undisclosed material adverse facts – that ABT-773*

*had a 72 percent probability of technical success, slightly higher than Hancock's own*

*estimate and consistent with industry averages for Phase III compounds.*  Hendricks Aff.

¶¶ 10-15; Ex. 591 at p. 21; Ex. 611 at ABBT287552; Ex. 800 at p. 1 (Abbott estimate of

72 percent for ABT-773, compared to CMRI industry average of 65 percent for Phase III

compounds); Ex. 801 at p. A3; Ex. 125 at p. 12-13 (DiMasi calculation of 77 percent

industry-wide average for all anti-infectives and Hancock estimate of 70 percent).

     108.    No proposed additional or substitute findings.

     109.    <u>Proposed Additional Findings</u>:  With regard to ABT-773's safety profile,

Abbott disclosed in the Descriptive Memorandum for ABT-773 that during Phase II trials

conducted in 1999, 1% of patients taking both the 100 mg and 200 mg TID (three times a

day) doses of ABT-773 experienced elevated liver function tests.  Ex. 32 at JH008156;

*see also* Blewitt Tr. 103:23-105:1; 7/16/04 Blewitt Depo. 286:9-287:2; Klotz Depo.

235:6-237:17; Ex. 109 at p. 4 (May 2000 draft); Ex. 111 at p. 4 (November 2000 draft).

With regard to the dosing of the compound, Abbott disclosed in the ARP that tablet

dosing for ABT-773 would be "150 mg QD [once-a-day] or 150 mg BID [twice-a-day]

dosing based on severity of indications."  Ex. 32 at JH008117.  With respect to the

pediatric program, the Descriptive Memorandum states that an "oral formulation" would "enabl[e] penetration" into the pediatric market but makes no representations regarding the timing of the program.  Ex. 32 at JH008156; Ex. 278 at JH004986.  Furthermore, the ARP states that the indications for ABT-773 are "Adult Tablet" and "I.V." and reflects that Abbott did not plan to spend any money on pediatric or taste testing studies for the oral formulation in 2001.  Ex. 32 at JH008117-18 ("$0" in 2001 Plan for "Pediatric PK/PD/Taste Testing Studies"); *see also* Blewitt Tr. 99:8-99:25, 101:11-101:15; Ex. 278 at JH004986 (draft ABT-772 ARP sent to Hancock in November 2000); Ex. 22 at ABBT246911 (draft ABT-773 ARP sent to Hancock on February 15, 2002 and sent again on March 9, 2001).

110.    No proposed additional or substitute findings.

111.    <u>Proposed Substitute Findings</u>:  Quinolones are a type of antibiotic with which ABT-773 would potentially compete.  Bukofzer Aff. ¶ 14; Blewitt Aff. ¶ 107.  In the RFA, Abbott disclosed that ABT-773 would compete with quinolones and other types of antibiotics.  Ex. 32 at JH008155.  Abbott and Hancock included ABT-492, a quinolone, as one of the Program Compounds in the RFA.  Ex. 32 at JH008179-85 (ABT-492 Descriptive Memorandum).

112.    <u>Proposed Substitute Findings</u>:  Abbott stated in the Descriptive Memorandum that ABF-773 "dosing is expected to be once-a-day," but disclosed in the ARP that dosing might not be once-a-day for all indications.  Ex. 32 at JH008117, JH008154 ("dosing is 150 mg QD or 150 mg BID dosing based on severity of indications"); Ex. 278 at JH004986 (Nov. 2000 draft ABT-773 ARP sent to Hancock).  *Mr. Blewitt testified that he believed that the disclosure in the ARP meant that all four*

*indications would be approved for once-a-day dosing but in some instances patients might have to take the drug twice-a-day, but he did not offer a basis for a belief that a drug would be offered in that type of variable dosing scheme and he never consulted Dr. Klotz or Abbott regarding the meaning of the disclosure.* Blewitt Tr. 95:9-99:7; *see also* Klotz Depo. 297:24-300:8; 5/16/07 Blewitt Depo. 327:8-328:18 (Mr. Blewitt did not provide a copy of the ARP to Dr. Klotz) .

113.    Proposed Substitute Findings:  Abbott was developing ABT-773 for four indications:  acute bacterial exacerbation of chronic bronchitis, pharyngitis, community-acquired pneumonia ("CAP"), and acute bacterial or maxillary sinusitis.  Bukofzer Aff. ¶¶ 16, 32; Leonard Aff. ¶ 63; Leiden Aff. ¶ 34; Ex. 608 at ABBT204966; Ex. 613 at ABBT0000429.  The most valuable market for ABT-773 was in the two less severe indications, chronic bronchitis and pharyngitis.  Bukofzer Aff. ¶¶ 30, 32; Leiden Aff. ¶ 41.  While it was desirable to have QD dosing for the two less severe indications, Abbott did not believe that BID dosing for the more severe indications would prove a significant commercial challenge because many of the drugs on the market for those indications were twice-a-day or three-times-a-day ("TID") and the market for those indications was smaller.  Bukofzer Aff. ¶¶ 30 (Dr. Bukofzer's understanding of the potential market for ABT-773), 32; Leiden Aff. ¶ 41; Leiden Depo. 339:15-340:12.  Although once-a-day dosing was preferable for the US market, it was only a "minor" factor in markets outside the United States, which were expected to account for nearly half of the total sales of ABT-773.  Bukofzer Aff. ¶¶ 30, 32; Leiden Aff. ¶ 41; Leiden Depo. 344:18-344:20.

114.    Proposed Substitute Findings:  The FDA's "pediatric rule" only requires a drug sponsor to initiate pediatric studies at some time prior to regulatory approval of the adult formulation, or to obtain a waiver from that requirement.  Bukofzer Aff. ¶¶ 34-35; Fox Aff. ¶¶ 19 (Ms. Fox's understanding of the pediatric rule as a member of Abbott's Regulatory Affairs Group), 20, 21; Leonard Aff. ¶ 79; Meyer Aff. ¶¶ 26-27; Ex. 638 at ABBT0000509; Judicial Notice Doc. 2 (Draft Guidance for Industry on Recommendations for Complying with the Pediatric Rule).  The rule does not require successful development of a pediatric program to gain approval of an adult formulation. Bukofzer Aff. ¶¶ 34-35; Fox Aff. ¶¶ 19-21; Leonard Aff. ¶ 79; Fox Tr. 1130:24-1132:4; Gold Tr. 329:5-335:9; 388:6-391:24; Fox Depo. 133:14-21; Judicial Notice Doc. 2.

115.    Proposed Substitute Findings:  The representations Abbott made in the RFA regarding prospects and condition of ABT-773, as of the date of the Agreement were accurate and complete in all material respects.  *See supra*, ¶¶ 107-114, *infra* ¶¶ 115-130.

(a)     Proposed Substitute Findings:  As a result of disclosures by Abbott and information that was publicly available, Hancock was aware that some antibiotics, such as macrolides and quinolones, had abnormal heartbeat (QT prolongation) and/or liver toxicity problems.  Leonard Aff. ¶ 66; Leiden Aff. ¶ 36; Blewitt Tr. 102:23-103:22; 5/16/07 Blewitt Depo. 283:1-18, 305:3-24, 306:20-307:23, 308:11-309:9; Klotz Depo. 268:11-270:20, 271:2-271:7, 272:5-274:1, 274:18-275:2; Ex. 32 at JH008184 (RFA contains disclosures regarding potential QT prolongation problems with quinolones); Ex.979 at p. 28 (Mr. Blewitt testified that, although he does not have a specific recollection, he also "may have" seen public reports regarding potential liver issues with

respect to ketolides); *see also* Ex. [949], Ex. [950] at p. 6; Ex. [947] (published articles regarding QT issues with macrolides and other antibiotics).  Hancock knew that ABT-773, a ketolide, was derived from macrolides and had a similar mechanism of action. Blewitt Tr. 101:20-102:22; Klotz Depo. 229:24-230:22; Ex. 125 at p. 16 (Hancock's Yellow Report noting "Ketolides have a similar mechanism of action to other macrolides . . . .").

     As of March 2001, Abbott did not believe ABT-773 had any QT or hepatoxicity issues that could reasonably be expected to have a material adverse effect on the ABT-773 program.  Bukofzer Aff. ¶¶ 19 (Dr. Bukofzer's understanding of the ABT-773 development team's conclusions regarding the QT prolongation data presented to the FDA as of March 2001), 20, 21, 22; Fox Aff. ¶ 18; Leonard Aff. ¶¶ 67-76; Leonard Tr. 1000:13-1000:18; Ex. 607 at ABBT0576844, ABBT0576847 (March 2001 ABT-773 PEC Presentation); Ex. 608 at ABBT205042-44 (Feb. 2001 ABT-773 Update); Ex. 613 at p. 1 (March 2001 MPSR estimates "High" probability of "No major safety issues/product specific labeling"); Ex. 631 (March 19, 2001 Presentation – "No clinically relevant QT effect in Phase II studies 150-600 mg daily").  Abbott's internal discussion of hepatoxicity stemmed not from any evidence of hepatoxicity with regard to ABT-773, but from the FDA's general concern with the potential for hepatoxicity of *all* pharmaceutical compounds absorbed by the liver, including all antibiotics.  Meyer Aff. ¶ 18; Bukofzer Aff. ¶¶ 20, 21; Fox Aff. ¶¶ 11, 12, 17, 18; Leonard Aff. ¶¶ 67, 74; Bukofzer Tr. 1087:22-1088:4; Meyer Depo. 91:9-92:5; Klotz Depo. 288:9-288:16 ("almost all drugs have some degree of liver toxicity"); Ex. 859.  Information regarding the FDA's concern with liver toxicity issues with regard to all antibiotics was available

on the FDA's website and was well known to the entire pharmaceutical community. Bukofzer Aff. ¶ 20; Fox Aff. ¶ 11; Leonard Aff. ¶¶ 67, 74; Leonard Depo. 405:23-406:4; Ex. 859 (FDA website regarding liver toxicity conference).  After further testing, Abbott concluded that the elevated liver function test ("LFT") results initially observed in one Hawaiian Phase I study were caused by the high caloric diet of the particular Japanese patients in the study, and were not a side effect of ABT-773.  Meyer Aff. ¶¶ 18-19; Bukofzer Aff. ¶ 22; Leonard Aff. ¶ 74; Leiden Aff. ¶¶ 37, 39; Leiden Tr. 1222:15-1223:17; Leonard Tr. 1001:15-1002:3; Fox Depo. 110:9-111:18, 112:17-114:22; Ex. 118; Ex. 587 at pp. 1, 3 (Jan. 2001 MPSR); Ex. 607 at ABBT0576847; Ex. 608 at ABBT205064; Ex. 631 at ABBT120481.UR; Ex. 638 at p. 5.  Abbott had concluded, as of January 2001, that ABT-773 was clear in terms of hepatoxicity profile.  Ex. 587 at pp. 1, 3; *see also* Bukofzer Aff. ¶¶ 21-22; Ex. 607; Leonard Aff. ¶ 74; Meyer Aff. ¶¶ 18-20; Ex. 608 at ABBT205044 ("The results of [the repeat of the bridging study] showed no evidence of any problem with LFTs in the Japanese or Caucasians); Ex. 631 at ABBT120481.UR.  Similarly, Abbott's internal discussion of QT issues did not reflect any concerns specific to ABT-773.  Leiden Aff. ¶ 36; Bukofzer Aff. ¶ 23-27; Fox Aff. ¶ 18; Leonard Aff. ¶¶ 69-73; Meyer aff. ¶ 15; Ex. 608 at ABBT20542-44; Ex. 631 at ABBT120480.UR.  It was simply a reflection of the fact that, as recognized by the pharmaceutical industry as a whole, QT prolongation was a general drug safety issue that needed to be studied in preclinical and clinical trials for antibiotics.  Leiden Aff. ¶ 36; Bukofzer Aff. ¶ 23-27; Fox Aff. ¶¶ 9, 10, 12, 17; Meyer Aff. ¶¶ 10-11, 14-15, 17; Bukofzer Tr. 1078:3-11; Fox Tr. 1116:8-12; Leonard Tr. 1000:19-1001:14; Meyer Depo. 90:14-90:24; Leonard Depo. 405:4-405:11; Ex. 608 at ABBT205042-43.  Abbott had

some data regarding QT prolongation for ABT-773, but only at doses much greater than those that would be prescribed for patients (over 800 mg). Meyer Aff. ¶ 15; Bukofzer Aff. ¶ 24; Leonard Aff. ¶ 69; Leiden Aff. ¶ 36; Klotz Tr. 435:6-438:6 (Dr. Klotz testified that QT effect at 4 to 5 times the recommended dose were probably not a concern); Ex. 608 at ABBT205202; Ex. 631 at ABBT120480.UR. As of March 2001, there were no data indicating that ABT-773 had QT issues at normal doses (150 mg). Bukofzer Aff. ¶¶ 24-29; Leonard Aff. ¶¶ 71-73; Meyer Aff. ¶¶ 13-16; Leiden Aff. ¶¶ 36, 38, 40; Leiden Tr. 1221:4-1222:14; Meyer Tr. 634: 25-635:6; Ex. 631 at ABBT120480.UR; Ex. 608 at ABBT205042-43. Even if ABT-773 had QT or liver issues, which it did not, those issues would not have precluded regulatory approval or commercial success. Bukofzer Aff. ¶ 25, 28-29; Fox Aff. ¶¶ 12, 18; Leiden Aff. ¶ 36; Bukofzer Tr. 1089:19-1090:3, 1104:16-1105:17; Klotz Tr. 438:7-439:22 (many drugs on the market have some degree of liver toxicity); Klotz Depo. 283:22-284:24, 288:9-288:16. Many macrolide and quinolone antibiotics that were available on the market exhibited QT prolongation issues but had still received FDA approval. Bukofzer Aff. ¶ 25; Fox Aff. ¶ 12; Meyer Aff. ¶ 12; Leiden Aff. ¶ 36; Fox Tr. 1130:5-23.

ABT-773 is currently under development as "cethromycin" by Advanced Life Sciences ("ALS"), under a license from Abbott, and ALS announced results from its most recent clinical trial on June 21, 2007. Bukofzer Aff. ¶¶ 50-53; Blewitt Tr. 110:1-113:17; Ex. 703 (ALS License Agreement). Cethromycin "achieved positive safety results in the study" and "liver function tests and electrocardiogram monitoring demonstrated no significant differences between subjects receiving cethromycin and subjects receiving Biaxin," an antibiotic that is currently on the market today. Ex. 732 at

Ex. 99.1 (ALS Form 8-K and June 2007 press release); *see also* Bukofzer Aff. ¶¶ 52-53. ALS has recently confirmed that it is continuing to develop the compound for once-a-day dosing and expects to file for regulatory approval. Bukofzer Aff. ¶¶ 50-53; Blewitt Tr. 110:1-113:17 (ALS has no evidence of QT prolongation or hepatoxicity issues with ABT-773); 5/16/07 Blewitt Depo. 355:15-356:23, 357:9-18, 358:6-8, 358:19-22; Ex. 854; Ex. 855; Ex. 856; Ex. 904 (ALS Form 8-K); Ex. 513 at JHII021957-58 and Ex. [993] (Feb. 19, 2008 article titled "Advanced Life Sciences Announces Successful Thorough QT Study of Cethromycin") (Hancock's most recent projections -- from December 2006, prior to recent positive announcements by ALS -- estimate a 40 percent probability that cethromycin will enter the market and estimate peak sales of $250 million).

(b)    Proposed Substitute Findings:  In discussions with Abbott, the FDA indicated that, prior to approval, it wanted to determine whether ketolides as a class had any of the QT or liver issues that had been experienced by some macrolides. Bukofzer Aff. ¶ 26; Fox Aff. ¶¶ 12, 16, 17; Leonard Aff. ¶ 68; Leonard Depo. 392:2-393:23; Ex. 638 at p. 3; Ex. 781. The FDA therefore requested that Abbott conduct a single two-week additional dog toxicity trial to evaluate the QT potential of ABT-773. Bukofzer Aff. ¶ 26; Fox Aff. ¶¶ 13, 14, 16; Ex. 580 at ABBT0558682. This was not unusual, nor did it raise any concerns regarding the development of ABT-773. Bukofzer Aff. ¶ 26; Fox Aff. ¶¶ 13-14, 16, 17, 18; Fox Depo. 51:7-19; Meyer Depo. 52:10-54:18. In Abbott's experience, it was normal at that early phase that the FDA request additional animal studies. Bukofzer Aff. ¶ 26; Fox Aff. ¶¶ 13-14, 17. During the November 20, 2000, FDA meeting, Abbott noted that there was nothing significant in the safety data from the Phase I and II trials. Fox Aff. ¶¶ 13-14, 16, 17; Ex. 580 at ABBT0558682. The

FDA did not disagree with that assessment.  Fox Aff. ¶¶ 13-14 (Ms. Fox's understanding

with regard to the FDA's position), 16, 17; Ex. 580 at ABBT0558682.  QT and liver

toxicity issues, along with all of the other issues that face drug development compounds,

could not be resolved until the conclusion of the clinical trials, including the Phase III

clinical trials that were being conducted throughout 2001.  Bukofzer Aff. ¶¶ 28-29;

Meyer Depo. 113:2-114:22.  In February 2001, after the meeting with the FDA at the end

of 2000, Abbott had concluded that FDA approval for ABT-773 was not a "major area of

concern" because its data showed "equivalence to competitors."  Ex. 608 at

ABBT205051; *see also* Bukofzer Aff. ¶¶ 23-25; Fox Aff. ¶ 18; Gold Tr. 294:13-296:2

(FDA's "clinical hold" lasted just one week); Meyer Depo. 55:4-55:21 (believed Abbott

was obtaining above and beyond what was thought necessary to satisfy the FDA); Meyer

Aff. ¶ 13.

      (c)    <u>Proposed Substitute Findings</u>:  As of March 2001, Abbott believed there

was a high probability of achieving once-a-day dosing for the two less severe (and more

commercially significant) indications, pharyngitis and chronic bronchitis, with a

possibility of once-a-day dosing for the two more severe indications, CAP (community

acquired pneumonia) and sinusitis (chronic sinus infection).  Bukofzer Aff. ¶¶ 30-32;

Leonard Aff. ¶ 77; Bukofzer Tr. 1065:7-1068:4; Meyer Tr. 634:14-634:24; Bukofzer

Depo. 169:7-17; Ex. 613 at p. 1 (ABT-773 March 2001 MSPR – "ABT-773 will be dosed

QD for 5 days for [chronic bronchitis] and pharyngitis").  Abbott was awaiting data from

an ongoing Phase III trial that was expected to be released in the second quarter of 2001

before deciding whether 150 mg, once-a-day dosing would be viable for the more severe

indications.  Bukofzer Aff. ¶¶ 30-32; Leonard Aff. ¶ 77; Leiden Aff. ¶ 42; Bukofzer Tr.

1059:7-15, 1065:7-1068:18; Ex. 613 at p. 1, 3 ("PK/PD data [and other data] support the decision to proceed with 150 mg QD in mild infections (ABECB and ASP) and select between 150 mg BID and 150 mg QD in CAP and ABS").

(d)    Proposed Substitute Findings:  In July 2001, the clinical data from the Phase III trial was not yet available, and Abbott was faced with a decision of whether to wait for the release and analysis of the data, and lose time on the path to regulatory approval, or make a dose decision for the more severe indications based on the available data.  Bukofzer Aff. ¶ 44; Leonard Aff. ¶ 77; Meyer Aff. ¶ 25; Leiden Aff. ¶ 42; Ex. 788 at pp. 9-16.  In order to minimize risk and avoid delays on the path to regulatory approval, Abbott decided to plan for a launch of CAP and sinusitis with twice-a-day dosing.  Leonard Aff. ¶ 77; Meyer Aff. ¶¶ 21-25; Leiden Aff. ¶ 42; Ex. 843.  Abbott planned to continue to develop once-a-day dosing for those indications, however, and offer once-a-day dosing in the second year after launch.  Bukofzer Aff. ¶ 44; Leonard Aff. ¶ 77; Meyer Aff. ¶ 25; Leiden Aff. ¶ 42; Ex. 857 at p. 15 ("option to follow with a QD line extension").  Abbott also continued to believe that it would be able to achieve once-a-day dosing at launch for the two less severe indications.  Bukofzer Aff. ¶ 44; Leonard Aff. ¶ 77; Meyer Aff. ¶ 24; Leiden Aff. ¶ 42; Ex. 654 at p. 1 (July 2001 ABT-773 MSPR – "ABT-773 will be dosed 150 mg QD . . . for AECB and pharyngitis").

(e)    Proposed Substitute Findings:  The ABT-773 ARP states that the indications for ABT-773 are "Adult Tablet" and "I.V." and that Abbott did not plan to spend any money on pediatric or taste testing studies for the oral formulation in 2001. Ex. 32 at JH008156; *see also* Ex. 22 at ABBT246911.  *Hancock did not give a copy of the Annual Research Plan, which included this disclosure, to Dr. Klotz.*  5/16/07 Blewitt

Depo. 327:8-328:18.  The ABT-773 Descriptive Memorandum states that an "oral formulation" would "enabl[e] penetration" into the pediatric market but makes no representations regarding the timing of the program.  Ex. 32 at JH008156; *see also* Ex. 111 at p. 4 (November 2000 draft).  While the oral suspension formulation had some negative taste issues, Abbott planned to modify the oral suspension formulation to improve the taste.  Bukofzer Aff. ¶¶ 33-35; Leonard Aff. ¶ 78; Meyer Tr. 633:5-633:16; Ex. 638 at p. 2; Ex. 654 at p. 2; Ex. 857 at pp. 45-47.

(f)    Proposed Substitute Findings:  Generally pediatric programs are initiated after a pharmaceutical company has acquired a significant amount of adult data since it is generally judged unacceptable to expose children to products without having demonstrated substantial activity in humans first and safety in adults first.  Bukofzer Aff. ¶ 35; Fox Aff. ¶ 19; Leonard Aff. ¶ 79.  The ABT-773 pediatric program was only temporarily on hold and only "unfunded" for calendar year 2001.  Bukofzer Tr. 1085:12-1087:16; Fox Aff. ¶ 20; Meyer Aff. ¶¶ 26-27; Bukofzer Aff. ¶¶ 33-34; Ex. 638 at ABBT0000509 (May 2001 MSPR – noting July 2001 deadline to finalize plans for pediatric formulation development plan); Ex. 654 at p. 2.  Abbott was projecting spending $9 million on the ABT-773 pediatric program in 2002 and $21.5 million in 2003.  Ex. 638; Ex. 857 at p. 34; *see also* Bukofzer Aff. ¶ 34.  By September 2001, the ABT-773 team believed that formulation work on the pediatric program could begin in mid-October and that Abbott would be able to do the first clinical study six months after that date.  Ex. 837 at ABBT203480; *see also* Bukofzer Aff. ¶ 34; Fox Aff. ¶¶ 20-21; Leonard Aff. ¶ 80; Meyer Aff. ¶ 28; Ex. 841 at ABBT334009; Ex. 789 at p. 2 (Oct. 2001 ABT-773 MSPR noting that "Additional pediatric formulation development is being

undertaken . . . to optimize the initial formulations"); Ex. [970] at ABBT0003482 ("A
pediatric development timeline is being developed with the key objective of initiating a
Phase II study in children prior to the Tablet NDA.").  Abbott was not planning on filing
with the FDA until August 2002, so starting a pediatric trial in 2002 would allow it to
meet that obligation.  Bukofzer Aff. ¶¶ 33-35; Fox Aff. ¶¶ 20-21; Ex. 638 at p. 1 (US,
EU, Japan Filing – Aug-02).

     116.   <u>Proposed Substitute Findings</u>:  The regulatory hurdle with regard to ABT-
773 changed dramatically in April 2001.  Bukofzer Aff. ¶ 36; Fox Aff. ¶¶ 22-26; Leonard
Aff. ¶¶ 82-84; Leiden Aff. ¶¶ 43-46; Ex. 853; Ex. 799 at ABBT203854.  In April 2001,
the FDA held its first advisory meeting for Ketek, a ketolide that was under development
by another pharmaceutical company, Aventis, and was at a more advanced stage of
development than any other ketolide.  Bukofzer Aff. ¶ 36; Fox Aff. ¶ 22; Leonard Aff.
¶¶ 82-84; Meyer Aff. ¶ 29; Leiden Aff. ¶ 43; Ex. 853.  Abbott had expected that the
Ketek advisory would probably be related to concerns about efficacy and not related to
QT concerns.  Bukofzer Aff. ¶¶ 37-38; Fox Aff. ¶ 23; Leonard Aff. ¶ 83; Meyer Aff.
¶ 29; Leiden Tr. 1213:19-1215:9; Ex. 607 at ABBT0576843 (Feb 12, 2001 presentation
noting that Ketek "Advisory Meeting rescheduled to May 2001 probably not related to
QTc concerns"); Ex. 725 C at ST-AUDIT03155 (Ketek expected approval 1Q01).  In
fact, the Ketek advisory focused heavily on the size of Ketek's safety database for both
QT prolongation and liver toxicity.  Bukofzer Aff. ¶ 38; Fox Aff. ¶¶ 23, 24; Leonard Aff.
¶ 83; Meyer Aff. ¶ 29; Leiden Tr. 1213:17-1215:9 (based on comments by the FDA
advisory panel at the Ketek advisory meeting, Abbott believed that they were planning to
take a hard line regarding safety standards for ketolides and Abbott's expectation was

confirmed when the advisory panel issued its recommendations shortly after the meeting); Ex. 853. *The Ketek advisory also increased the hurdle for Abbott to develop a resistance claim for ABT-773.* Meyer Depo. 57:3-58:20, 59:8-61:19, 63:9-63:16, 73:10-74:1, 130:2-131:14. The Ketek advisory raised the bar for the development of ABT-773 significantly by making it clear to Abbott that the FDA would in the future require very greatly increased numbers of patients in clinical trials, in order for a drug company to establish that there were no QT prolongation and liver toxicity issues with its compound. *Compare* Bukofzer Tr. 1092:12-1104:8 & Ex. 211 (Dr. Bukofzer testified that the abbreviated working draft notes taken from discussions regarding elevated liver function tests post-dated Ketek advisory) *with* Ex. 264 (March 2001 ABT-773 MSPR reflecting "High" probability of "No major safety issues/product specific labeling" for ABT-773); *see also* Bukofzer Aff. ¶¶ 38-43; Fox Aff. ¶¶ 24-26; Leonard Aff. ¶¶ 83-84; Meyer Aff. ¶ 29; Leiden Aff. ¶ 44; Bukofzer Depo. 325:16-328:7; Ex. 501 at p. 4; Ex. 614 at pp. 4-5; Ex. 649 at ABBT229437; Ex. 788 at pp. 3, 5. As a result of the Ketek advisory, Abbott also learned that the FDA was increasing the stringency of the regulatory standards that were going to be required for all antibiotics. *Id.* The new regulatory hurdles announced by the Ketek advisory led Abbott to believe that the ABT-773 program would be longer and much more expensive than previously expected. *Id.*; *see also* Meyer Aff. ¶¶ 30-31.

Other unexpected negative information also became available after April 2001. Bukofzer Aff. ¶¶ 44-47; Ex. 673; Ex. 676. For example, in the Fall 2001, ABT-773 failed a key clinical trial for pharyngitis resulting in loss of that commercially important indication. Bukofzer Aff. ¶¶ 45-47; Leiden Aff. ¶¶ 43, 46-47; Ex. 614 at p. 14; Ex. 673 at ABBT207773; Ex. 676 at ABBT220666. In addition, the M01-325 clinical trial, which

began on October 3, 2001, was put on hold due to unexpected liver elevations seen in four patients. Bukofzer Aff. ¶¶ 45-47; Leonard Aff. ¶¶ 76, 83-84; Meyer Aff. ¶ 20; Leiden Aff. ¶ 46; Ex. 667 at ST-AUDIT 13231; Ex. 756 at ABBT0003478. These liver results were unknown to Abbott as of the date of the RFA, and were more significant in light of the new information available to Abbott about the regulatory requirements set forth by the FDA at the April 2001 Ketek advisory meeting. Bukofzer Aff. ¶¶ 45-47; Fox Aff. ¶¶ 25-26; Leonard Aff. ¶¶ 76, 82-84; Meyer Aff. ¶ 20; Leiden Aff. ¶ 46; Meyer Depo. 182:10-183:6; Ex. 654 at ABBT0000592 (current liver data as of July 2001 would not adversely affect approvability according to outside expert); Ex. 673 at ABBT207774-75; Ex. 676 at ABBT220671. For example, Abbott now knew that Ketek had been required to conduct an additional 20,000 patient study because of two incidents of severe liver test results. Bukofzer Aff. ¶¶ 40, 45-47; Leonard Aff. ¶ 83.

Abbott's Pharmaceutical Executive Committee ("PEC") met in December 2001 to discuss the new information that had become available since April 2001 with regard to ABT-773. Bukofzer Aff. ¶ 48; Leonard Aff. ¶ 85; Meyer Aff. ¶ 32; Leiden Aff. ¶¶ 43-46; Leonard Depo. 346:17-348:5; Ex. 673; Ex. 760; Ex. 860 at p. 2 (Dec. 2001 ABT-773 PEC Presentation). Based on that new information, the PEC decided to continue the development of ABT-773 but not to initiate new studies or projects for the compound. Bukofzer Aff. ¶ 48; Leonard Aff. ¶ 85; Meyer Aff. ¶ 32; Ex. 673; Ex. 760 (summary of 12/10/01 PEC Meeting). The ongoing studies were continued through the winter of 2001 and the spring of 2002. Bukofzer Aff. ¶ 49; Leonard Aff. ¶¶ 88-89; Meyer Aff. ¶ 32; Leiden Aff. ¶ 48; Ex. 790 at pp. 2-4; Ex. 845; Ex. 846.

117.   Proposed Substitute Findings:  Abbott's internal documents reflect the impact of the negative information that became available to Abbott after execution of the RFA.  Bukofzer Aff. ¶¶ 36-49; Ex. 501 at p. 4; Ex. 614; Ex. 673; Ex. 676.  In September 2001, a presentation to Abbott's Board of Directors noted that the Ketek advisory had caused a delay in ABT-773 development.  Leiden Aff. ¶ 44; Bukofzer Aff. ¶ 43; Ex. 501 at p. 4.  A January 2002 memorandum prepared for Miles D. White, Abbott's Chief Executive Officer, identified the recent developments, noting, for example, that the mid-April 2001 Ketek advisory required large safety and resistance databases for Ketolide anti-infectives and that the loss of pharyngitis indication impacted the program financially and impacted the regulatory approval process.  Bukofzer Aff. ¶¶ 45-46; Leiden Aff. ¶¶ 5, 47; Ex. 673.  The memorandum concluded that the drug was still technically approvable with cost and time penalties, but the commercial attractiveness had decreased substantially.  Bukofzer Aff. ¶¶ 45-46; Leiden Aff. ¶ 47; Ex. 673.  In January 2002, Mr. White attended a presentation regarding ABT-773 at which it was explained that the expected net present value of ABT-773 had decreased substantially since July 2001.  Bukofzer Aff. ¶¶ 45-49; Leonard Aff. ¶ 86; Leiden Depo. 350:17-351:11; Ex. 673; Ex. 676 (Miles White Presentation); Ex. 844.

118.   Proposed Substitute Findings:  In February 2002, Abbott conveyed to its employees that there would be a delay in the development timeline of ABT-773.  Ex. 175 at ABBT229762 ("ABT-773 Phase III clinical program has been delayed as a result of a changing regulatory environment.").  In February 2002, Abbott developed a "Global Communication Plan" regarding the potential discontinuation of development of ABT-773 but no final decision regarding whether to discontinue to program had been made at

that time, and clinical trials were ongoing. Ex. 175 at ABBT229756, ABBT229761

("Aventis' new Ketolide antibiotic, Ketek, underwent significant regulatory scrutiny

during 2001 … ABT-773 could receive similar regulatory scrutiny. Overall, it is felt that

there is no data generated to date that would exclude ABT-773 from obtaining regulatory

approval, but the cost and timeline to achieve that have changed."); Bukofzer Aff. ¶ 49;

Ex. 845 (noting two ongoing studies and study to re-start at end of February 2002). In an

April 15, 2002 email to Dr. Leonard, Mr. Leiden provided an accurate report regarding

Abbott's internal evaluations with regard to ABT-773 to be conveyed to Hancock. Ex.

292; *see also* Leonard Depo. 378:1-381:2, 384:1-384:14; Leiden Depo. 373:12-373:24.

Through June 2002, there were ongoing Phase III clinical studies for ABT-773 and

Abbott was evaluating the results of those trials. Bukofzer Aff. ¶ 49; Meyer Aff. ¶ 32;

Leiden Aff. ¶ 48; Leonard Aff. ¶¶ 88-89; Ex. 790 at pp. 8-10; Ex. 845; Ex. 846. In the

summer of 2002, Abbott decided to suspend further internal development of ABT-773 in

the United States and Europe, while continuing its collaborative efforts with a Japanese

pharmaceutical company to develop the compound for the Asian market. Bukofzer Aff.

¶ 49; Meyer Aff. ¶ 33; Leonard Aff. ¶¶ 89; Leiden Aff. ¶ 48; Ex. 168 at ABBT203448.

    119.    Proposed Substitute Findings:  *Supra*, ¶ 118.

    120.    Proposed Substitute Findings:  *Supra*, ¶ 118.

    121.    Proposed Additional Findings:  *Supra*, ¶ 118.

    122.    Proposed Substitute Findings:  *Supra*, ¶ 118.

    123.    No proposed additional or substitute facts.

    124.    Proposed Substitute Findings:  *In December 2001, after the December*

*2001 meeting, Thomas Lyons, Controller of Abbott's Global Pharmaceutical and*

*Development Division, informed Mr. Blewitt that ABT-773 was under review and might be terminated.* Blewitt Tr. 113:18-116:1, 116:23-117:24; Ex. 65 at JH001066 (December 2001 Program Status Report sent to Hancock – "Given study results recently received, initiation and continuation of further studies for ABT-773 Tablet/IV is currently under review."). On July 30, 2002, Mr. Lyons informed Hancock by telephone that Abbott would not independently advance the development of ABT-773 in the United States and Europe. Blewitt Aff. ¶ 118; *see also* Ex. 134 at AL001471 (Dec. 20, 2002 Program Status Report noting that Abbott has been "working with John Hancock" to outlicense ABT-773). This oral report satisfied Abbott's obligations under the RFA, because the RFA does not require that Abbott inform Hancock in writing of its decision to terminate a compound. Ex. 32, § 4.3(f).

125.    Proposed Substitute Findings:  Abbott disclosed the true prospects and conditions of ABT-773 to Hancock as of March 2001 in the RFA. *See supra*, ¶¶ 107-124.

126.    Proposed Substitute Findings:  Abbott did not misrepresent or fail to disclose material information concerning the prospects and condition of ABT-773 to Hancock in the RFA. *See supra*, ¶¶ 107-125.

127.    Proposed Substitute Findings:  Abbott did not breach the RFA because it did not misrepresent or fail to disclose material information concerning the prospects and condition of ABT-773 to Hancock in the RFA. *See supra*, ¶¶ 107-126.

128.    Proposed Substitute Findings:  Abbott did not misrepresent or fail to disclose any material information concerning the prospects and condition of ABT-773 to

Hancock in the RFA. Abbott did not engage in any fraudulent or wrongful conduct or act with any fraudulent or wrongful intent. *See supra*, ¶¶ 107-127.

129.    <u>Proposed Substitute Findings</u>: Abbott informed Hancock of the true material prospects and condition of ABT-773 as of March 13, 2001. *See supra*, ¶¶ 107-128. The allegedly misrepresented and omitted information was not material and would not have significantly altered the economics and attractiveness of the proposed deal from Hancock's perspective nor would it have caused Hancock not to enter into the deal in its present form or to decline to enter into any agreement whatsoever. *See, e.g*., Blewitt Tr. 244:12-250:1 (Mr. Blewitt testified he would have been concerned about QT or liver issues relating to ketolides only if there was reason to believe it would slow development of the compound); 5/16/07 Blewitt Depo. 286:9-287:2 (although Abbott disclosed to Hancock that 1 percent of patients in clinical trials had elevated liver function tests, Mr. Blewitt did not recall whether that fact caused him any concern), 313:13-314:24.

For example, ABT-492, a quinolone antibiotic, was a compound in the Hancock basket of program compounds. Blewitt Tr. 103:3-103:8; Ex. 32 at JH008179-85 (ABT-492 Descriptive Memorandum). Unlike ketolides, such as ABT-773, there was evidence of a potential QT and liver toxicity issue with respect to the quinolone class. Leonard Aff. ¶ 66; Blewitt Tr. 102:23-103:2; Ex. 32 at JH008184. Accordingly, in the Descriptive Memorandum for ABT-492, Abbott specifically discussed the potential for both QT prolongation and liver toxicity for the entire quinolone class of antimicrobials. Ex. 32 at JH008184. Despite these disclosures by Abbott regarding the potential for QT prolongation and liver toxicity for the entire quinolone class of antibiotics, recent quinolone withdrawals from the market, and increased regulatory scrutiny regarding

quinolones, Hancock entered into the RFA with ABT-492 as part of the basket of compounds. Blewitt Tr. 105:2-109:25, 244:12-248:4; *see also* Leonard Aff. ¶ 66; Ex. 32 at JH008179.

130.    Proposed Substitute Findings:  Hancock has not suffered monetary or other damages as a result of Abbott's alleged misrepresentations or omissions with regard to ABT-773.  *See supra*, ¶¶ 107-129, *infra* ¶¶ 178-179.

### *Abbott Provided Hancock with Its Intended and Reasonably Expected Spending on the Program Compounds in All of Its Annual Research Plans*

131.    Proposed Substitute Findings:  The RFA provides that the **"**Annual Research plan shall be prepared by Abbott and presented to John Hancock at least forty-five (45) days prior to the start of each Program Year."  The Annual Research Plan is defined in Section 1.6 of the RFA as

> a reasonably and consistently detailed statement of the objectives, activities, timetable and budget for the Research Program for every Program Year remaining in the Program Term, it being understood that less detail shall be required for Program Years that are not the current Program Year. . . .

Ex. 32, § 1.6.

> Abbott also represented that the first ARP attached to the RFA provided a
>
> description of . . . projected costs to be incurred by Abbott during the Program Term, for each Program Compound.  Such projections were prepared in good faith and with due care based on reasonable assumptions, and represent the reasonable estimate of Abbott based on information available as of the date of such projections and as of the date hereof; it being agreed that such projections do not constitute any warranty as to the future performance of the Program Compounds and that actual results may vary from such projections.

Ex. 32, § 12.2(d).

132.    Proposed Substitute Findings:  Section 3.4(iv) of the RFA provides:

> If Abbott: . . . (iv) does not reasonably demonstrate in its Annual
> Research Plan its intent and reasonable expectation to expend on
> Program Related Costs during the Program Term an amount in
> excess of the Aggregate Spending Target, John Hancock's
> obligation to make any remaining Program Payments for any
> succeeding Program Years pursuant to Section 3.1 shall terminate.
> For the avoidance of doubt, the Program Payments for the Program
> Year in which such event occurs shall still be due and payable,
> adjusted only as set forth in the next sentence, if applicable.

Ex. 32, § 3.4(iv).

133.    Proposed Substitute Findings:  Abbott did not misrepresent its planned

expenditures on Program Related Costs in ARPs that it provided to Hancock.  The

Research Program cost projections that Abbott provided to Hancock reflected a

"reasonably and consistently detailed statement of the objectives, activities, timetable and

budget for the Research Program."  Ex. 32, § 1.6.  Abbott was not required under the

RFA to report its risk-adjusted expected spending to Hancock.  Blewitt Tr. 118:4-121:8;

Ex. 32, § 1.6.  *Although Abbott's Decision Support Group uses the term "expected"*

*spending to refer to risk-adjusted spending calculations, these projections are for*

*decision analysis and portfolio analysis purposes and do not represent what Abbott has*

*budgeted or actually intends or expects to spend on a given compound.*  Hendricks Aff.

¶¶ 20-21; Hendricks Tr. at 1400:24-1402:23; Hendricks Depo. 194:19-197:20.

134.    Proposed Substitute Findings:  At all relevant times, the various ARPs,

including the ARP for 2002, provided Hancock with a "reasonably and consistently

detailed statement of the objectives, activities, timetable and budget for the Research

Program."  *See supra*, ¶¶ 131-33.

135.    Proposed Substitute Findings:  Abbott's intent and reasonable expectation

at the end of 2001 was to spend in excess of $614 million on Program Related Costs

during the four-year Program Term.  *See supra*, ¶¶ 131-34.

136.    <u>Proposed Substitute Findings</u>:  Abbott did not misrepresent its intended and reasonable expected spending in the various ARPs, including its ARP for 2002 and Hancock did not actually and justifiably rely on the alleged misrepresentations in the ARPs regarding Abbott's spending.  *See supra*, ¶¶ 131-34.

137.    <u>Proposed Substitute Findings</u>:  Abbott's ARPs did not misrepresent Abbott's intended and reasonably expected spending and Abbott did not breach the RFA.  *See supra*, ¶¶ 131-34.

138.    <u>Proposed Substitute Findings</u>:  Abbott's ARPs did not misrepresent Abbott's intended and reasonably expected spending and Abbott did not act fraudulently or wrongfully.  *See supra*, ¶¶ 131-34.

139.    <u>Proposed Substitute Findings</u>:  Abbott did not misrepresent its intended and reasonably expected spending in the various ARPs, including its ARP for 2002.  *See supra*, ¶¶ 131-34.  Hancock was not excused from making its Second Program Payment in the amount of $54,000,000 in January 2003.  *See supra*, ¶¶ 131-34, *infra*, ¶ 140.

140.    <u>Proposed Substitute Findings</u>:  Abbott reasonably demonstrated in its first and second ARPs its "intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target . . ." pursuant to Section 3.4 of the RFA.  Ex. 32, § 3.4(iv).  Even if Abbott had reported its risk-adjusted spending, as Hancock contends was required under the RFA, Abbott's projected expenditures on Program Related Costs during the Program Term, as of the date of its second ARP, still would have been in excess of $614 million, therefore, Hancock still would have been required to make its Second Program Payment of $54 million.  Tucker Aff. ¶¶ 87-91; Ex. 32; Ex. 670; Ex. 786; Ex. 863; Ex. 885; Ex. 901 (as of

the date of the 2002 ARP, Abbott's actual spending since March 13, 2001 and estimated risk-adjusted projected future spending was well in excess of the $614 million Aggregate Spending Target); *see also* Friedman Tr. 804:1-8 (Mr. Friedman did not offer any opinion regarding Hancock's ARP claim); Blewitt Tr. 120:7-121:8 (Mr. Blewitt did not conduct any analysis to support Hancock's ARP claim). Thus, Hancock has not suffered monetary or other damages due to any alleged misrepresentations, omissions or fraud in Abbott's various ARPs. *Id.*

### Abbott Was Not Required to Spend $614 Million on the Program Compounds After Hancock Was Excused From Making Its Third and Fourth Program Payments

141. <u>Proposed Substitute Findings</u>:  Reading the Agreement as a whole, and giving effect to all its provisions and the intent of the parties, the Aggregate Spending Target of $614 million is comprised of Abbott's required minimum contribution of $400 million and Hancock's maximum contribution of $214 million.  Section 3.1 defines "Program Payments" as a series of installment payments totaling $214 million that Hancock "shall make . . . to Abbott to help support the Research Program."  Ex. 32, § 3.1. Section 3.5 provides that Abbott shall be responsible "for funding all Program Related Costs *in excess of the Program Payments* from John Hancock."  Ex. 32, § 3.5 (emphasis added).  In other words, "Hancock would commit to providing approximately 50 million per year to Abbott over a four year period" and "Abbott would spend at least $100 million of its own funds on the development of the compounds during this same period[.]"  Ex. 738 (*Hancock I*, Sept. 16, 2005, Mem. and Order) at 3.

Section 3.4, titled "Termination of John Hancock's Program Payment Obligation," sets forth the circumstances in which Hancock is relieved of its obligation to

make future installments of its Program Payments, and sets forth the rights and obligations of the parties in such circumstances.  Ex. 32, § 3.4.

142.    No proposed substitute or additional findings.

143.    No proposed substitute or additional findings.

144.    No proposed substitute or additional findings.

145.    <u>Proposed Substitute Findings</u>:  In *Hancock I*, Hancock obtained a declaratory judgment that, under Section 3.4, Hancock was relieved of its obligation to make its third and fourth Program Payments, totaling $110 million.  Ex. 738. Accordingly, Hancock only made $104 million in Program Payments, rather than the maximum of $214 million.  Tucker Aff. ¶ 74.

146.    <u>Proposed Substitute Findings</u>:  Abbott's actual spending on Program Related Costs over the four-year Program Term was approximately $456.3 million (including all milestone and management fees paid by Abbott to Hancock, which qualify as Program Related Costs under Section 1.43 of the RFA).  Stiles Aff. ¶¶ 5-13, 15-17; Stiles Tr. at 1440:2-17, 1444:20-1449:25, 1458:19-1460:2 (basis for amendment to original interrogatory responses); Ex. 329 (amended interrogatory response, attaching 2001 monthly project expense reports); Ex. 330 (January 9, 2008 Poulos letter); Ex. 900 (Mr. Tucker's calculation of $456.3 million in project expenditures from March 13, 2001 through December 31, 2004, excluding January and February expenditures and estimating March expenditures on a pro rata basis); Ex. 901 at p. 1 (Mr. Tucker's calculation of expenditures from March 13, 2001 through December 31, 2001); Ex. 786 (2001 expense reports); Ex. 848 (2002 expense reports); Ex. 863 (2002 expense reports for ABT-594); Ex. 864 (2003 expense reports); Ex. 865 (2004 expense reports); *see also*

Stip. Re: Hancock's Mot. to Compel, filed July 27, 2007 (Dkt. 151) (agreement that

Abbott will provide Hancock with 2001 expenditures by month in amended response to

Second Set of Interrogatories); Martinez Tr. 680:4-683:23 & Ex. 725B (Abbott had

previously provided Hancock with the 2001 monthly project expense reports in the 2004-

05 audit).

   147. <u>Proposed Substitute Findings</u>: In *Hancock I*, Hancock obtained relief

from $110 million in Program Payments pursuant to Section 3.4 after Abbott provided

advance notice to Hancock that it would not spend in excess of $614 million in Program

Related Costs during the Program Term.  Ex. 738.  Abbott was not required to make up

the shortfall caused by Hancock's termination of Program Payments, nor is Hancock

entitled to additional relief under Section 3.3(b).  Tucker Aff. ¶¶ 73-75.

   The parties' intent and understanding of Section 3.3(b) did not require Abbott to

make up for a shortfall caused by Hancock's termination of payments pursuant to Section

3.4 of the RFA.  *Section 3.3(b) was intended to provide Hancock with a refund in*

*situations where it had made its final Program Payments based on Abbott's stated*

*intention to spend more than the Aggregate Spending Target, but Abbott had*

*unexpectedly fallen short of the target in the Program Term and the subsequent year.*

Deemer Depo. 26:10-27:5; Lee Depo. 143:13-24; Ex. 53 (Oct. 15, 2006 Deemer Aff.),

¶¶ 13-14; 7/16/04 Blewitt Depo. 63:6-18 ("Section 3.3(b) allows that *if Hancock made its*

*payment* that some of the [sic], that money could be returned to John Hancock.")

(emphasis added), 64:5-11 ("assuming that all of the other provisions are met and that

*Hancock made its payment at the end of the Program Term,* Abbott may be required to

refund some of that money to John Hancock.") (emphasis added), 64:16-65:14, 74:23-

75:21; 78:18-79:13, 83:4-85:7; *Hancock I*, Statement of Undisputed Facts in Support of Mot. for Summ. Judg. (Dckt No. 48), ¶ 26; Hancock's Mem. in Support of Mot. for Summ. Judg. (Dckt. No. 47) at 9 (Section 3.3(b) "protected Abbott against an *unintended and unexpected* failure to have spent the Aggregate Spending Target during the Program Term *notwithstanding its good faith intent to spend the Aggregate Spending Target during the Program Term* at the commencement of each Program Year during the Program Term.") (emphasis added).

　　　*By contrast, Section 3.4 was intended to address situations in which Abbott provides advance notice of its intent to "reduce its planned spending" below the Aggregate Spending Target.  Hancock I,* Statement of Undisputed Facts (Dckt. No. 48), ¶ 25.  *In such circumstances, Section 3.4 provided that Hancock's remedy would be termination of its Program Payments.*  Deemer Depo. 26:10-27:5; Ex. 53, ¶ 15-16. *During negotiations of the RFA, Hancock never indicated that it believed Abbott would be required by Section 3.3(b) to increase its spending to make up for a shortfall caused by Hancock's termination of payments pursuant to Section 3.4.*  Deemer Depo. 26:10-27:5, 53:2-54:24, 57:3-58:24; Lee Depo. 149:22-150:11; Ex. 53, ¶ 12.

　　　*Other evidence also shows that the parties intended for Abbott to be required to spend $400 million of its own funds, plus Hancock's Program Payments, and did not intend for Abbott to be required under Section 3.3(b) to make up for a shortfall caused by Hancock's termination of payments pursuant to Section 3.4:*

- During negotiation of the Agreement, Hancock's attorneys (Choate, Hall, and Stewart), sent a memorandum to Abbott representatives noting that "our understanding" of the Agreement (which at that time provided for an

Aggregate Spending Target of $620 million) is that "Abbott would be obligated to fully fund its share of the Aggregate Spending Target (that is, $400,000,000 of the $620,000,000 total amount)." Lee Depo. 40:10-23, 41:18-46:10, 58:12-60:19; Deemer Depo. 26:10-27:5; Ex. 53 (Oct. 15, 2006 Deemer Aff.), ¶12; Ex. 567, ¶ 9.

- An internal Abbott summary of the Agreement explained that Section 3.3(b) applies if Abbott "does not spend the Aggregate amount of $400 million by the end of the 4th year (in addition to the John Hancock payments)." Deemer Depo. 26:10-27:5; Ex. 53 (Oct. 15, 2006 Deemer Aff.), ¶ 14; Ex. 294 at p. 18.

- Mr. Blewitt's sworn testimony by affidavit filed in *Hancock I* stated that:

    Abbott, for its part, agreed to spend at least $400 million of its own funds on Program Related Costs over the four-year Program Term, and to make certain milestone and royalty payments to John Hancock depending on the progress and commercial success of the Program Compounds …. The combined total of John Hancock's maximum funding contribution and Abbott's minimum funding contribution (i.e. $614,000,000) is defined in the Agreement as the "Aggregate Spending Target."

    Ex. 834, ¶ 16; *see also* Blewitt Tr. 128:21-131:24; 11/17/06 Blewitt Depo. 219:21-221:14. *Hancock has contended that references to "Abbott's minimum funding contribution" indicated that the parties understood that Abbott might be required to spend more than $400 million of its own funds. However, the reference to "minimum" is more reasonably understood as a reference to the floor on Abbott's contribution, with an understanding that Abbott would spend more than that amount if the compounds continued to be successfully developed.* Ex. 32 at JH008116-

34 (projecting expenditures of over $1 billion from 2001 to the launch of the compounds); Deemer Depo. 35:14-40:1.

- Brewster Lee of Choate Hall & Stewart, Hancock's lead attorney in negotiation and drafting of the Agreement, testified that he understood—based on the wording of the Agreement and his own general understanding of the deal—that Abbott was required to spend a minimum of $400 million of its own funds on development of the Program Compounds, in addition to the funds provided by John Hancock. Lee Depo. 58:12-60:20. He and his colleague, Kevin Tormey, sent a memorandum to Abbott on September 18, 2000 stating that it is "our understanding" that Abbott's share of the Aggregate Spending Target would be $400,000,000 of the $620,000,000 total amount," and he had no reason to doubt the accuracy of that statement. Lee Depo. 40:10-23, 41:18-46:10, 58:12-60:19; Ex. 567, ¶ 9. He testified that the Aggregate Spending Target was comprised of Abbott's share of the Aggregate Spending Target (i.e., $400 million), plus the Hancock Program Payments. *Id.*

- Scott Hartz, Hancock's Head Portfolio Manager who analyzed the proposed deal with Abbott, and helped draft a report recommending its approval by Hancock management, testified that it was his understanding that Abbott was required to spend a set amount of funds on development of the Program Compounds, over and above the amount of funds provided by Hancock. 11/10/06 Hartz Depo. 78:3-79:15.

- The parties routinely adjusted the Aggregate Spending Target during drafting of the Agreement so that it was the total of the Hancock Program Payments (the exact amount of which varied during negotiations) plus Abbott's share of the Aggregate Spending Target (i.e., $400 million). 11/17/2006 Blewitt Depo. 226:5-227:14, 227:19-229:6, 230:10-231:18; Ex. [977], Ex. [978], Ex. [987]. The first draft of the agreement prepared by Abbott defined Program Payments as a series of installment payments totaling $220 million and set the Aggregate Spending Target at $620 million. Ex. 124, §§ 1.2, 3.1. Later, the Program Payments were changed from $200 to $218, and the Aggregate Spending Target was changed from $600 to $618 million. 11/17/06 Blewitt Depo. 228:6-229:13. Finally, the parties changed the Program Payments to $214 million and the Aggregate Spending Target to $614 million. Lee Depo. 138:4-18, 141:8-142:16; Ex. [986], §§ 1.3, 3.1; Ex. 624, § 1.3, 3.1; *see also* Deemer Depo. 26:10-27:5; Ex. 53 at ¶ 11. Mr. Blewitt conceded at his deposition that the Aggregate Spending Target was regularly adjusted so that it equaled $400,000,000 plus the maximum that Hancock was obligated to spend under Section 3.1. 11/17/06 Blewitt Depo. 226:5-227:14, 227:19-229:13, 230:10-231:18.

- During the negotiation of the RFA, the parties decided not to include a term, originally proposed by Hancock, providing that nothing in Section 3.4 would "relieve Abbott of any of its responsibilities under this Agreement." *Compare* Ex. [951] at JH003754, § 3.4 *with* Ex. 32 at JH008092, § 3.4.

- On September 21, 2000, Mr. Blewitt and Mr. Hartz submitted a report to the Bond Investment Committee recommending approval of the terms of a substantially similar prior draft of the Agreement.  Ex. 569.  In the report, Mr. Blewitt and Mr. Hartz explained that they were "recommending a $220 million commitment" by Hancock subject to Abbott "co-funding at least two times our commitment."  Ex. 569 at p. 1.  They noted that Hancock "shall make" Program Payments of $220 million over four years and that "[d]uring the Program Term, Abbott agrees to spend, in addition to the funds provided by John Hancock . . . (ii) a minimum of $400 million in aggregate on research and development programs associated with the Program Compounds."  Ex. 569 at pp. 2-3; *see also* 11/17/06 Blewitt Depo. 89:24-90:19; Ex. 569 at p. 5 ("during the initial four year period, Abbott will commit two times John Hancock's investment for those compounds").

- Similarly, an Abbott presentation prepared by Steve Cohen, then Controller and head of finance for Abbott, with assistance from Mr. Deemer, indicated that the "John Hancock $ Contribution" was $200 MM" and that the "Abbott $ Contribution Requirement" was a "cumulative" total of "$400 MM."  Deemer Depo. 26:10-27:5; Ex. 53 (Oct. 15, 2006 Deemer Aff.), ¶¶ 9-10 & Ex. B; *see also* Ex. 277 at AL000101; Ex. 543 at ABBT0008180 (proposed summary of terms stating "During the Program Term, Abbott agrees to spend a minimum of $400 MM").  *Roger Nastou, the head of Hancock's Bond and Corporate*

*Finance Department who attended Mr. Blewitt's presentation to the Bond*

*Investment Committee and presented the proposed deal to Hancock's*

*Committee of Finance for final approval*, *see* Nastou Depo. 12:15-19,

13:16-18, 14:8-13, 14:18-20, Davis Depo. 82:16-84:9; Ex. 815; Ex. 126,

*testified that he understood that Abbott was required to spend a specified*

*amount of money in addition to the funds invested by John Hancock.*

Nastou Depo. 56:8-17.  Mr. Nastou did not recall any agreement that

Abbott would spend a specific aggregate amount of funds on development

of the Program Compounds, irrespective of the amount of funding

provided by Hancock.  *Id.*

148.     Proposed Substitute Findings:  *Supra*, ¶ 147.

149.     Proposed Substitute Findings:  *Supra*, ¶ 147.  Abbott's actual spending on

Program Related Costs in 2005 was approximately $73.0 million.  Stiles Aff. ¶ 14;

Tucker Aff. ¶ 77; Ex. 329 (amended interrogatory responses); Ex. 866 (2005 project

expense reports); Ex. 900 at p. 2 (Mr. Tucker's calculations).

150.     Proposed Substitute Findings:  *Supra*, ¶¶ 141-49.

151.     Proposed Substitute Findings:  *Supra*, ¶¶ 141-49.

152.     Proposed Substitute Findings:  *Supra*, ¶¶ 141-49.

153.     Proposed Substitute Findings:  Abbott did not breach Section 3.3(b) of the

RFA.  *See supra*, ¶¶ 141-49.  In addition to being inconsistent with the language of the

RFA when read as a whole, Hancock's interpretation of Section 3.3(b) would produce a

commercially irrational result that the parties could not have intended.  If Section 3.3(b)

were interpreted in these circumstances as Hancock urges, it would also constitute a

penalty clause that is unenforceable under Illinois law.  *See* Abbott's Post-Trial Supp.

Proposed Findings of Fact and Conclusions of Law, paragraphs 65-68 and 128 to 132.[3]

154.    Proposed Substitute Findings:  Since Section 3.3(b) of the RFA is

inapplicable, Hancock did not suffer monetary or other damages.  *See supra*, ¶¶ 141-49,

153.  If Section 3.3(b) were applicable and Abbott were liable, the actual damages would

be $28.2 million.  Tucker Aff. ¶¶ 72-77; Ex. 900.

### Abbott Complied With Its Audit Obligations Under the RFA

155.    Proposed Substitute Findings:  Section 2.5 of the Agreement provides, in

part, that:

> Abbott shall, and shall cause each Subcontractor to, maintain
> complete and accurate records, in sufficient detail and in good
> scientific manner appropriate for patent and regulatory purposes
> and for purposes of demonstrating compliance with the terms
> hereof, that fully and properly reflect all work done, results
> achieved and Program Related Costs expended in performance of
> the Research Program.  The books and records of Abbott and each
> Subcontractor related to the Research Program, including, without
> limitation, those related to the expenditure of Program Related
> Costs, shall be subject to copying, inspection and audit by (and at
> the expense of) John Hancock at any time and from time to time.
> Such audit shall occur on reasonable notice and during normal
> business hours by an independent auditor selected by John
> Hancock and reasonably acceptable to Abbott.  John Hancock and
> its independent auditor shall maintain such records and information
> of Abbott in confidence in accordance with Article 10 and shall not
> use such records or information except to the extent permitted by
> this Agreement, including any enforcement of the provisions
> hereof.  In the event that such audit reveals any material breach of

---

[3] Pursuant to the Court's Second Amended Order Regulating Non-Jury Trial, each party is required to file Proposed Findings of Fact and Conclusions of Law on any claim or defense for which it has the burden of proof.  *See* Second Am. Order, January 15, 2008 (Dckt. No. 217). Abbott's Post-Trial Supp. Proposed Findings of Fact and Conclusions of Law sets forth Abbott's argument that Hancock's interpretation of Section 3.3(b) would constitute an unenforceable penalty.  Abbott does not concede, by including this argument, and other arguments, in its Post-Trial Supp. Proposed Findings of Fact and Conclusions of Law, that it bears the burden of proof on these issues.  However, in an abundance of caution, Abbott has included the arguments in its Post-Trial Supp. Proposed Findings of Fact and Conclusions of Law.

> Abbott's responsibilities hereunder, Abbott shall (i) pay the
> reasonable fees and expenses charged by such auditor, and
> (ii) fully and promptly cure such breach.

Ex. 32, § 2.5.

156.    <u>Proposed Substitute Findings</u>:  At a March 30, 2004 hearing in *Hancock I*,

Hancock sought generalized discovery concerning the Program Compounds, stating that

it hoped such discovery would provide the basis for additional claims against Abbott.  Ex.

[971] at 5:11-6:16, 8:15-20 (March 30, 2004 hearing transcript).  The Court denied

Hancock's request, holding that the *Hancock I* complaint was "not a vehicle for providing

generalized discovery into the parties relationship."  *Id*. at 9:11-10:1, 15:21-16:19.  Two

weeks later, Hancock made a demand for an audit under Section 2.5 of the Agreement in

a letter dated April 12, 2004.  Ex. 136.  The audit demand identified individuals from the

StoneTurn Group, LLP, including Christopher Martinez and Brian Napper, as the

"independent auditors retained by John Hancock" pursuant to Section 2.5 of the

Agreement.  *Id*. at JH011884.

157.    <u>Proposed Substitute Findings</u>:  Although Section 2.5 of the Agreement

does not specify any particular documents that must be created or maintained by Abbott,

Hancock's April 12, 2004 audit demand included as "Schedule A," a "preliminary list" of

30 or more particular categories of documents sought by the audit.  Ex. 136.  Hancock's

audit demands were unduly burdensome and overbroad.  *Id*.  For example, among other

things, the "preliminary list" provided by Hancock sought "[u]nderlying supporting

records (*e.g.,* timesheets, payroll records, purchase orders, invoices, etc.) for all

expenditures made related to each Program Compound."  *Id*., Sch. A, ¶ 1(l).  During the

period 2001–2004, Abbott had made expenditures of nearly a half a billion dollars on the

Research Program.  Ex. 32 at JH008116-34; Ex. 1.6 (first Annual Research Plan).  Thus,

even this one category of the audit demand alone sought a massive quantity of documents. Ex. 58; Ex. [992] (Abbott counsel informed Hancock counsel that it believed this single request would involve production of approximately 24 boxes of documents).

158.    Proposed Substitute Findings:  Hancock's audit demand unilaterally set the date of May 12, 2004, which was 30 days from the date of the demand, for commencement of the audit.  Ex. 136 at JH011884; *see also* Ex. 35 at JH011833; Ex. 58; Ex. [971] at 15:21-16:19 (although Hancock insisted that Abbott produce documents within 30 days, it had not acted promptly itself; Hancock did not issue the audit demand until several months after it had first raised the possibility of an audit and filed the initial *Hancock I* complaint).

159.    Proposed Substitute Findings:  Hancock's audit demands were unreasonable, unduly burdensome, and made for litigation purposes, rather than for purposes of a contractual compliance audit.  *See supra*, ¶¶ 155-58, *infra* 160(i), (n). Abbott's response to the audit was reasonable and in compliance with Section 2.5 of the Agreement.  *See infra*, ¶¶ 160-66.

160.    Proposed Substitute Findings:  In response to Hancock's audit demand, Abbott acted reasonably and in compliance with its obligations under Section 2.5 of the Agreement.  *See supra*, ¶¶ 155-159, *infra,* ¶¶ 160-166.

(a)    Proposed Substitute Findings: Abbott's outside counsel Winston & Strawn LLP ("Abbott's counsel") consulted with outside counsel for Hancock, Choate, Hall & Stewart LLP ("Hancock's counsel") regarding Hancock's selection of The StoneTurn Group ("StoneTurn") as Hancock's "independent auditor."  Ex. 35 at JH011833; Ex. 58 at p. 2.  Section 2.5 of the Agreement required that Hancock's selection of an auditor be

"reasonably acceptable" to Abbott. Ex. 32, § 2.5. After it was disclosed that other representatives from StoneTurn, while at a different firm, had rendered services to Hancock's counsel on other matters, there was a joint telephone conference among the representatives of StoneTurn, Hancock's counsel, and Abbott's counsel. Ex. 984. The joint telephone conference revealed to Abbott, among other things, that StoneTurn was principally in the business of providing litigation support and expert witness services to law firms, rather than conducting independent audits. Martinez Depo. 53:15-57:16; Ex. 984. In the course of this telephone conference, Abbott objected to StoneTurn and Messrs. Martinez and Napper as independent auditors, but to avoid further debate with Hancock, offered to permit them to proceed with their audit with certain understandings. Ex. 984 at p. 2. Without waiving its objections to StoneTurn, but rather to avoid further debate and to allow the audit to proceed, Abbott's counsel informed Hancock's counsel, in a letter dated June 23, 2004, that Abbott was willing to allow StoneTurn to proceed, beginning on June 30, 2004. Martinez Aff. ¶ 16; Ex. 36. Hancock was notified that Abbott would begin making documents available for inspection on June 30, 2004, during normal business hours, at a facility located in Mundelein, Illinois, and that Abbott paralegal Michelle Campbell would act as StoneTurn's contact at Abbott for purposes of the audit. Ex. 36.

(b)    Proposed Substitute Findings:  After Abbott received Hancock's April 12, 2004 audit demand, Abbott's counsel communicated with Hancock's counsel for the purposes of attempting to negotiate the scope and timing of Hancock's audit demand. Ex. 35; Ex. 44 at pp. 2-3; Ex. 58; *see also* Ex. 992 at pp. 1-2. In a letter dated May 3, 2004, Abbott's counsel notified Hancock's counsel of Abbott's belief that the audit

demand was overly broad and unduly burdensome, and requested a meeting with
Hancock to explore whether less burdensome alternatives existed to certain requests
made by Hancock that would still provide Hancock the information it needed, as well as
to discuss a more realistic timeframe to gather and produce the materials Hancock
requested.  Ex. 35; *see also* Ex. 58; Ex. 992 at pp. 1-2.  In response, Hancock's counsel
wrote that Hancock would be willing to consider whether less burdensome alternatives to
its audit demand existed *only after* Hancock's auditors obtained access to the information
sought by Hancock's audit demand, beginning on the original date chosen by Hancock,
and then provided that information to Hancock.  Ex. 58; *see also* Ex. 992 at pp. 1-2.

Shortly after receipt of the audit demand, Abbott began the process of identifying
and collecting documents to be produced in response to Hancock's audit demand.
Campbell Aff. ¶¶ 6-11; Campbell Depo. 47:22-49:5, 60:9-13, 68:3-69:19, 72:4-73:23,
74:20-75:20, 78:14-20; Ex. 798; Ex. [988], Ex. [989], Ex. [990].  Documents responsive
to Hancock's audit demand were made available to StoneTurn beginning on June 30,
2004.  Martinez Tr. at 685:1-686:4; Martinez Depo. 103:1-17, 105:19-106:5, 110:13-
111:11, 112:10-16, 113:3-10, 113:15-114:23 (in initial waves of production Abbott
produced approximately 450 boxes, including Investigative New Drug ("IND") and other
regulatory filings containing information "related to all elements of the development of
those drugs," documents regarding preclinical studies, as well as timesheets and payroll
records that were specifically requested by Hancock in Schedule A of the audit demand).
Because of the large volume of materials involved, and the commercial sensitivity and
need for confidentiality of many of the materials, the production of audit materials
occurred on a rolling basis through the first week of March 2005.  Campbell Aff. ¶¶ 11-

13, 24; Ex. 768.  Abbott had originally expected to be completed with its audit production by January 31, 2005, but was not able to do so because of the extensive scope of Hancock's audit demand and the complicated nature of the redaction necessary to ensure the protection of Abbott's highly confidential information unrelated to the Research Program.  Campbell Aff. ¶ 24; Ex. 701; Ex. 768.

The first group of the documents produced in response to Hancock's audit demand was inspected by individuals from StoneTurn on June 30, July 1, 7, 8, and 9, 2004.  Martinez Tr. 685:1-687:11.  By the end of July 2004, Abbott had made approximately 750 boxes of documents available to StoneTurn.  Campbell Aff. ¶ 11; Martinez Tr. 685:1-688:11.  Production of the remaining documents in response to Hancock's audit demand was made throughout the remainder of 2004 and early 2005.  Campbell Aff. ¶ 11; Hair Tr. 708:25-709:11-20.  Portions of the remaining materials contained information unrelated to the Research Program, which required additional sorting and redaction that slowed down the production of materials as compared to the initial wave of production of predominantly unredacted materials.  Campbell Aff. ¶ 11.  This consisted of approximately an additional 50 boxes of documents made available for inspection and from which Hancock's auditors identified documents for copying and delivery.  Campbell Aff. ¶ 11.

(c)    <u>Proposed Substitute Findings</u>:  In total, in response to Hancock's audit demand, Abbott collected and made over 800 boxes of documents available to Hancock for inspection.  Campbell Aff. ¶ 12; Martinez Tr. at 688:12-14.  After a reasonable investigation, Abbott determined that the relevant books and records of Abbott to be produced in the audit were kept and maintained in at least four different ways:  (1) at the

"RIC" Research Information Center; (2) at Corporate Records; (3) in shared drives among relevant departments; (4) and in databases and portals set up by individual areas. Campbell Aff. ¶ 14.

Each of these specific areas in which relevant records were housed, and the scope of Abbott's collection of records from those areas, is described below:

- **RIC.** The RIC, or Research Information Center, of Abbott is a records management service that Abbott uses to maintain all of its clinical/FDA records. Campbell Aff. ¶ 15. It is separate from Corporate Records because it has its own rules that are intended to comply with FDA guidelines for retention and storage. Campbell Aff. ¶ 15. The RIC maintains extensive materials regarding Abbott's clinical programs, including regulatory filings, trial master files, clinical reports, specimens, and laboratory notebook supplements. Campbell Aff. ¶ 15; Campbell Tr. at 1255:12-1256:5. Abbott collected and made available to Hancock's auditors all materials in the RIC relating to the Research Program with the exception of specimens and laboratory notebooks, which were not responsive to the audit. Campbell Aff. ¶ 15; Campbell Tr. at 1255:12-1256:12 (Ms. Campbell specifically confirmed with RIC personnel that they produced documents regarding the M99-114 clinical trial); *see also* Martinez Tr. 685:1-686:4, 685:12-688:8; Martinez Depo. 153:21-154:7; Hair Depo. 96:9-97:7 (Abbott produced documents regarding clinical trials, including Investigative New Drug reports and annual reports); Ex. 724A (listing IND reports, protocols, investigator packages, annual reports, case report forms, and other preclinical and clinical reports and records produced by Abbott).

- **Corporate Records.** Unlike the RIC records, the documents stored in "Corporate Records" are not limited to a particular kind of document or

document(s), such as those relating to FDA approval. Campbell Aff. ¶ 16. Instead, any

Abbott employee can place any kind of written material into Corporate Records.

Campbell Aff. ¶ 16. Examples of some types of documents that typically are housed

within Corporate Records, and which generally are not maintained within the RIC, are

timesheets, underlying expense back up, invoices, purchase orders and other voluminous

data. Campbell Aff. ¶ 16; *see also* Martinez Depo. 153:12-20, 167:23-168:16 (Abbott

produced contracts related to clinical studies, which were responsive to Schedule A). In

addition, corporate records includes "governmental submission" documents, such as

reports filed with the FDA regarding Abbott's research and development of compounds.

Campbell Aff. ¶ 16. Abbott collected and made available all relevant government

submissions in Corporate Records, which to some extent may have overlapped with some

RIC documents. Campbell Aff. ¶ 16; Campbell Depo. 55:19-56:15 ("I said [to Corporate

Records personnel] give me everything you have pertaining to the compounds" and she

produced the documents to StoneTurn without prior review). Additionally, Abbott

collected individual time sheets from Corporate Records, and those time sheets were

initially produced to Hancock's auditors, until Abbott was instructed by Hancock's

counsel and auditors to stop producing this category of information. Campbell Aff. ¶ 10,

16; Ex. 724A at p. 32-33.

- **Shared Drives.** Shared drives are computer hard drives located on

Abbott's internal computer network that are segregated within Abbott by department.

Campbell Aff. ¶ 17. Each therapeutic area (as well as the accounting and financial areas)

have a separate shared drive. Campbell Aff. ¶ 17. In the financial areas, shared drives

were used to save, among other things, budget proposals, presentations to management

related to financial issues, and work papers.  Campbell Aff. ¶ 17.  In the therapeutic

areas, final papers, study protocols, research memoranda and other draft documents were

saved.  Campbell Aff. ¶ 17.  The relevant shared drives were searched for these

documents and produced in the audit to the extent they related to the Research Program.

Campbell Depo. 96:19-98:1, 98:19-24 (searched shared drives, including the Global

Pharmaceutical Research and Development ("GPRD") Finance, Portfolio Analysis,

MPSR, and therapeutic area shared drives); Campbell Depo. 153:23-157:9 (in June 2004,

Ms. Campbell reviewed documents on the shared drives and copied to CDs responsive

documents for vendor to print); Campbell Aff. ¶ 17; Hair Depo. 89:1-8 (Abbott produced

memoranda, presentations, and financial documents); Hair Tr. 712:21-713:19; Ex. 725C

(Abbott produced Powerpoint presentations to senior management regarding Program

Compounds, *e.g.*, the 107-page December 5, 2000 ABT-773 Portfolio Review discussing

status of liver and QT safety, dosing, and pediatric program); Hair Depo. 95:17-96:2

(Abbott produced correspondence between investigating physicians and Abbott regarding

subjects such as "the status of the studies or how many patients had been enrolled in the

study").

> • **Databases and Portals.**  Another source of documents for the

audit was a database which crosses therapeutic areas called the MPSR, which stands for

the Monthly Project Status Report database.  Campbell Aff. ¶ 18.  The MPSR contains

project status reports, including Monthly Highlights Memoranda, Monthly Compound

Project Status Reports, PARD reports or other monthly reports.  Campbell Aff. ¶ 18.  All

status reports within the MPSR database for the period March 2001 to the date of the

audit production were collected for each of the compounds in the Research Program and

made available to Hancock's auditors for inspection.  Campbell Aff. ¶ 18; Campbell Tr.

at 1254:11-1255:11; *see also* Hair Depo. 144:2-10 (Abbott produced minutes or

summaries of Abbott meetings), 94:11-95:16, 276:20-277:21, 282:19-283:14, 286:20-

287:15, 288:1-289:23, 291:6-292:24, 294:4-10, 296:14-299:15, 303:19-304:21, 306:23-

308:9; Ex. 67; Ex. 507; Ex. 710; Ex. 712, and Ex. 933 (Abbott produced Monthly Project

Status Reports, minutes and summaries of Abbott meetings, and internal correspondence

regarding the status of the Program Compounds, including Monthly Highlights

Interoffice Memoranda).

Abbott's oncology group, which was responsible for four of the nine compounds

subject to the Agreement, "maintained two other databases that are referred to internally

as 'portals.'"  Campbell Aff. ¶ 19.  Some of the data contained in these portals is

duplicative of the MPSR database.  Campbell Aff. ¶ 19.  Nevertheless, these portals were

searched for documents pertaining to the Research Program, and relevant documents

from these portals were made available to Hancock's auditors for inspection.  Campbell

Aff. ¶ 19.

With respect to financial and accounting documents, there were three additional

databases or systems that were searched for documents concerning the Research

Program.  Campbell Aff. ¶ 20.  First, Abbott searched for documents pertaining to the

Research Program from the so-called "R/oss" database, which tracks *external*

*expenditures on development of compounds.*  Campbell Aff. ¶ 20; Campbell Depo. 85:2-

86:4, 98:14-18.  Second, Abbott searched for documents pertaining to the Research

Program in the COMPASS database, which stands for Comprehensive Project

Accounting System.  Campbell Aff. ¶ 20.  The COMPASS database tracks all expenses

by project.  Campbell Aff. ¶ 20; Stiles Aff. ¶ 8.  Project reports were generated from

these two databases for the Research Program and were made available to Hancock's

auditors in the audit.  Campbell Aff. ¶ 20.  Third, Abbott searched for relevant materials

in the Optika system, which is an accounts payable system into which Administrative

Check Request ("ACR") backup is scanned.  Campbell Aff. ¶ 20; Campbell Depo. 98:2-

13.

> • **Desk Files.**  Abbott did not as a general matter collect and produce

to Hancock's auditors the emails and individual desk files of the numerous Abbott

employees who may or may not have maintained individual files pertaining to the

Research Program.  Campbell Aff. ¶ 21.  Rather, Abbott collected and produced its

company files, as described above, which were sufficient to "fully and properly reflect all

work done, results achieved and Program Related Costs expended in performance of the

Research Program" under the Agreement.  Campbell Aff. ¶ 21; Ex. 32, § 2.5.  These

company files constitute complete and accurate records, maintained in the routine course

of Abbott's business, in sufficient detail and in good scientific manner appropriate for

patent and regulatory purposes and for purposes of demonstrating compliance with the

terms of the Agreement.  *See supra* ¶ 160(c).  Hancock's counsel was informed that

Abbott's audit production did not include the desk files of individual Abbott employees.

Ex. 701 at p. 1.

For out-licensing materials, unlike the therapeutic and financial/accounting areas

discussed above, there was not a database or a shared drive containing company files;

accordingly, relevant files were gathered from the individuals John Moore, Tony Deahl,

Steve Mickel, Kevin Constable, and Michele Parks.  Campbell Depo. 82:16-83:5, 85:2-

14, 99:1-99:2; 99:6-101:9, 103:8-23, 104:17-23, 105:3-8, 108:1-13, 232:18-24, 279:1-8.

In addition, some files were collected from Stan Bukofzer and Tom Woidat.  Campbell

Aff. ¶ 21; Campbell Depo. 76:5-11, 85:2-14, 105:23-106:14, 107:6-13.  These

individuals' files were reviewed for privilege and then the relevant, non-privileged

documents were made available to Hancock's auditors for inspection.  Campbell Aff.

¶ 21; *see also* Martinez Tr. at 688:19-689:1 (Abbott copied and delivered to StoneTurn a

copy of the "Project Odin" binder regarding outlicensing of ABT-773); Hair Depo. 92:9-

15 (Abbott produced correspondence regarding outlicensing).

        In 2004–05, while the audit was in progress, Abbott also produced documents,

including emails and desk files, to Hancock in *Hancock I*.  Campbell Aff. ¶ 6; Campbell

Tr. at 1253:12-1254:10.  Hancock has admitted in an interrogatory response that it gained

knowledge of the alleged misrepresentations regarding ABT-518 in June 2004 from

documents produced in *Hancock I* and knowledge of the alleged misrepresentations

regarding ABT-594 and ABT-773 in "Fall/Winter 2004" from documents produced by

Abbott in the audit.  Ex. 740 at pp. 1, 3, 5; Ex. 746 at pp. 27-31; *see also* Martinez Tr.

693:1-12; 11/17/06 Blewitt Depo. 256:11-257:12.  Abbott also made witnesses available

for deposition in the *Hancock I* action.  In addition, in June 2005, shortly after completion

of the audit, Hancock filed the present action, in which it obtained additional discovery

regarding Abbott's compliance with the Agreement.  Complaint, *Hancock II*, filed June 3,

2005 (Dkt. No. 1).

        (d)     Proposed Substitute Findings:  Once Abbott gathered documents,

depending on the type of document or source, it made a judgment as to whether the

documents reasonably could be determined to be related only to the Research Program.

Campbell Aff. ¶¶ 9, 11.  If that was the case, the records were made available for

inspection by Hancock's auditors without further review or redaction by Abbott.

Campbell Aff. ¶ 11.  Documents of this nature, which did not require further review or

redaction, were produced first, which was the most efficient manner in which to proceed,

particularly given Hancock's timing demands.  Campbell Aff. ¶ 11.  If Abbott believed

there existed a risk of disclosure of confidential information pertaining to compounds

other than the Research Program, such as when information concerning the Research

Program was contained in documents that also provided information about non-Research

Program activities, the documents were reviewed and information unrelated to the

Research Program was redacted.  Campbell Aff. ¶ 11; *see also* Hair Depo. 104:14-105:4

(with the limited exception of potential replacement compounds, compounds other than

Program Compounds were not within the scope of the audit); Martinez Depo. 298:9-15;

Ex. 724A (StoneTurn's standard practice was to record on the index whether a document

was redacted, and the index indicates only a small percentage of the documents produced

by Abbott were redacted); Ex. 44 at p. 2.  In the present action, pursuant to a discovery

request, Abbott produced to Hancock—subject to the confidentiality provisions of the

Protective Order—unredacted copies of documents it had previously provided to

StoneTurn in redacted form.  *Cf.* Campbell Depo. 273:9-16; Martinez Depo. 66:5-67:24.

(e)     <u>Proposed Substitute Findings</u>:  Section 2.5 only required Abbott to make

available books and records "related to the Research Program," not records relating to

other aspects of Abbott's business.  Ex. 32, § 2.5.  Abbott's withholding of documents

unrelated to the Research Program, and redaction of portions of documents that were

unrelated to the Research Program, was reasonable and did not constitute a breach of

Section 2.5.  Ex. 32, § 2.5; Ex. 44 at p. 2.  *Although Messrs. Martinez and Hair referred to a "GPRD Quality Assurance Monthly Highlights" document from December 2003 that was produced in redacted form, there is no evidence that the unredacted document contained any significant relevant information regarding the Program Compounds.*  Martinez Aff. ¶ 43; Hair Aff. ¶ 17; Ex. 188.  *More generally, although StoneTurn (at the direction of Hancock's counsel) compared redacted documents produced in the audit to unredacted documents produced in the litigation to determine the relevance of information that was redacted,* Martinez Depo. 66:5-67:24, *the StoneTurn witnesses did not offer any specific examples of relevant and responsive information regarding the Program Compounds that was redacted.*  Martinez Aff. ¶ 43; Hair Aff. ¶ 17.  In addition, Abbott had no obligation under Section 2.5 to disclose information protected by the attorney-client privilege or work product, therefore, its withholding and/or redaction of such information was not a breach of Section 2.5.  Ex. 32, § 2.5.

(f)    <u>Proposed Substitute Findings</u>:  Abbott's counsel explained to Hancock's counsel that Abbott was withholding various documents that were unrelated to the Research Program or privileged, and redacting of portions of documents that were unrelated to the Research Program or privileged, in order to protect commercially sensitive and/or privileged information.  Hair Depo. 123:13-124:9; Ex. 44 at p. 2.  Abbott did not have an obligation under Section 2.5 to provide a log of such documents or redactions.  Ex. 32, § 2.5.

(g)    <u>Proposed Substitute Findings</u>:  Hancock's April 12, 2004 audit demand requested that documents be "made available for its inspection and audit."  Ex. 136 at JHII011884.  Hancock did not initially request that it be allowed to make its own

photocopies of the books and records, but instead stated that "[i]n accordance with

Section 2.5 of the Agreement, John Hancock reserves the right to *designate for copying*

. . . any or all of the books and records of Abbott that are subject to its inspection and

audit." (emphasis added). Ex. 136 at JHII011884. Abbott permitted Hancock's auditors

to physically review and take notes regarding the documents produced by Abbott and to

designate particular documents for photocopying and later delivery. Campbell Aff. ¶ 22.

Only after the audit was underway did Hancock request the ability to bring its own

photocopying equipment into Abbott's facilities for the purpose of making copies of the

audit documentation produced by Abbott. Ex. 768 at p. 2. In order to ensure that Abbott

maintained proper control over the copying and removal of its materials from its

premises, Abbott's counsel informed Hancock's counsel that Abbott would continue to

make arrangements to copy materials designated by StoneTurn and to deliver such copies

to StoneTurn. *Id.*

   (h)  <u>Proposed Substitute Findings</u>: Abbott generally copied documents

selected by StoneTurn promptly and did not intentionally or unreasonably delay copying

of any nonprivileged books and records that were properly subject to inspection under

Section 2.5 and designated for copying by Hancock. Campbell Aff. ¶ 22; Hair Tr.

711:21-712:20; Hair Depo. 152:11-152:20; Ex. 724A at 69-74 (documents flagged for

copying on March 10, 2005 were produced within twelve calendar days); Ex. 918.

   (i)  <u>Proposed Substitute Findings</u>: Abbott copied all of the documents

designated by StoneTurn and provided them to StoneTurn, except where Abbott

determined that certain privileged and/or non-responsive documents, inadvertently

included for inspection in a so-called "Box 17," were selected for copying by Hancock's

auditors.  Campbell Aff. ¶ 23; Campbell Tr. at 1256:13-1257:3 (documents from Box 17 determined to be responsive and non-privileged were copied and delivered to StoneTurn); Martinez Tr. at 672:12–675:14 (acknowledging that Exhibit 190, referenced in his affidavit, is not the complete and final index because it does not include the documents Abbott "subsequently sent to StoneTurn", which included "the majority" of documents in Box 17 that StoneTurn had flagged for copying); Campbell Depo. 109:9-24, 111:10-13 ("Project Odin" binder was copied and delivered to StoneTurn after completion of privilege review); Hair Depo. 135:23-136:12 (certain documents relating to Abbott's recognition of revenue from the Hancock deal were withheld as privileged and/or non-responsive); Ex. 724A at pp. 69-74 (most of the documents from Box 17 flagged for copying were copied and delivered to StoneTurn).  These certain documents were ultimately withheld from copying and production to Hancock's auditors, and Hancock's counsel was informed of the bases for the removal of those documents from the production to Hancock's auditors.  Campbell Aff. ¶ 23.

(j)    Proposed Substitute Findings:  Abbott did not unduly delay completion of its audit response.  Campbell Aff. ¶¶ 13, 23-24.  Abbott made reasonable efforts to comply with its stated goals regarding the date of completion of its audit production.  Campbell Aff. ¶ 24.  For example, Abbott had originally informed Hancock that it expected to be completed with its audit production by January 31, 2005, but was not able to do so because of the extensive scope of Hancock's audit demand and the complicated nature of the redaction of confidential information unrelated to the Program Compounds.  Campbell Aff. ¶ 24; Ex. 46; Ex. 701; Ex. 768.  Abbott completed its production by March 22, 2005.  Campbell Aff. ¶ 25; Martinez Depo. 202:12-21.

(k)    Proposed Substitute Findings:  During the course of the audit, StoneTurn demanded that Abbott take actions that were not required by Section 2.5.  For example, Hancock's auditors and Hancock's outside counsel requested, in addition to Abbott's production of its books and records, that Abbott prepare a log identifying the title, location, and responsiveness to Hancock's "preliminary list" of April 12, 2004 of each of the documents within the approximately 800 boxes made available to Hancock's auditors for inspection.  Hair Depo. 237:14-238:7 (Hancock's initial audit demand did not request production organized by categories; Hancock demanded a log by category at the conclusion of the audit); Ex. 32, § 2.5 (audit provision does not require Abbott to create an index of documents produced); Ex. 48; Ex. 692.  Because Abbott concluded that this request exceeded the scope of the audit rights set forth in Section 2.5 of the Agreement and was unduly burdensome in nature, Abbott declined to comply with the request and communicated its response to Hancock's counsel.  Campbell Aff. ¶ 25; Ex. 715.  In addition, StoneTurn representatives had prepared their own index of the materials produced by Abbott in connection with the audit.  Ex. 724A.

(l)    Proposed Substitute Findings:  Section 2.5 requires Abbott to make its "books and records" available for "copying, inspection, and audit."  It does not require Abbott to make its personnel available for interviews.  Ex. 32, § 2.5.  Consistent with Section 2.5, Hancock's initial April 12, 2004 audit demand only requested access to "books and records" and did not request interviews with Abbott employees or the provision of any other non-documentary information.  Ex. 136.  However, StoneTurn and Hancock's counsel subsequently requested interviews of Abbott personnel to ask questions that purportedly could not be answered from an inspection of the materials

produced by Abbott during the audit.  Ex. 50; Ex. 917 at pp. 2-3.  Abbott's counsel

informed Hancock's counsel (e.g., in an April 21, 2005 letter) that, because the

Agreement did not require Abbott to provide such interviews, and because Abbott

believed Hancock was attempting to utilize the audit process as a tool for conducting

litigation-motivated discovery in the aid of a threatened lawsuit, Abbott declined to

provide the interviews requested by Hancock's counsel.  Ex. 50; Ex. 917 at pp. 2-3.

Although Abbott did not voluntarily make witnesses available for interviews in the audit,

Hancock has obtained testimony from dozens of current and former Abbott employees in

depositions in *Hancock I* and the present action.

(m)    Proposed Substitute Findings:  Abbott did not knowingly or intentionally

under-fund or under-staff its response to Hancock's audit demand so as to delay the audit.

Campbell Aff. ¶¶ 8-9.  To the contrary, Abbott devoted substantial resources to

compliance with Hancock's audit demand, including the time of Ms. Campbell, in-house

counsel Kenneth Wittenberg, Abbott's outside counsel, and non-legal personnel who

participated in identification, collection, assembly, and copying of documents for

production to StoneTurn.  Campbell Aff. ¶¶ 8-10.  Because of the breadth and complexity

of the audit production, Abbott engaged five outside contract paralegals through

Manpower, Inc. (which works with contract firms such as Special Counsel) to perform

the review and redaction of audit documents prior to making them available to Hancock's

auditors for inspection.  Campbell Aff. ¶ 9.  The contract paralegals from Manpower, Inc.

were supervised by Ms. Campbell with supervisory assistance from an outside contractor,

Carey Crimmons, who was also engaged to assist in the response to Hancock's audit

demand.  Campbell Aff. ¶ 9.  In addition, Abbott incurred significant photocopying

expenses.  Campbell Aff. ¶¶ 13.

(n)    Proposed Substitute Findings:  While Hancock has asserted that Abbott

acted in a manner contrary to the usual course of contractual compliance audits, and

contrary to Abbott's own conduct in reasonably similar circumstances in the past, *Mr.*

*Martinez's testimony on this point was not supported by any documentary evidence (e.g.,*

*documents reflecting the policies, practices, or procedures of StoneTurn and/or Mr.*

*Martinez in prior audits).*  Martinez Aff. ¶ 9.  In addition, StoneTurn's audit of Abbott

was not a "usual" audit and the circumstances were not reasonably similar to a typical

audit.  The audit was conducted during pending litigation by Hancock against Abbott

arising out of the RFA (*Hancock I*) for the express purpose of gathering documents

relevant to potential new claims.  Martinez Tr. at 668:5-669:25.  The auditor selected by

Hancock was StoneTurn, which primarily provides litigation consulting services, not

auditing services.  Martinez Tr. at 670:15-671:13 (at time of audit, law firms made up

90% of StoneTurn's clientele and 80–90% of its work consisted of litigation support

service; in addition, no one at StoneTurn had a medical degree or science expertise); *see*

*also* Martinez Depo. 48:7-49:4 (even today, nearly half of StoneTurn's current work

consists of litigation support).  During the course of the audit, StoneTurn coordinated its

efforts with Hancock's counsel in the *Hancock I* litigation and provided documents

produced in the audit to Hancock's counsel.  Martinez Tr. at 669:2-670:14; Martinez

Depo. 64:10-65:16, 79:13-20, 81:10-82:22, 83:8-84:5 (StoneTurn was retained by

Hancock's litigation counsel and, other than a single initial meeting with Mr. Blewitt, Mr.

Martinez does not recall any substantive discussions with John Hancock, only with

litigation counsel); Martinez Depo. 350:6-16 ("our whole project was directed by counsel"). After Abbott became aware that StoneTurn was providing copies of documents produced by Abbott directly to Hancock's counsel, Abbott's counsel requested an identification of all such documents, but Hancock refused to provide the information. Ex. 917 at p. 3. In addition, the audit was not Hancock's only means of obtaining information regarding the Research Program. Hancock was simultaneously obtaining discovery in *Hancock I* while conducting the audit. Campbell Aff. ¶ 6; Campbell Tr. 1253:12-1254:10. Shortly after completion of the audit, Hancock obtained additional discovery in the present action.

161.    Proposed Substitute Findings:  On March 22, 2005, Abbott notified Hancock that Abbott had fulfilled its obligation with respect to the audit. Campbell Aff. ¶ 25; Ex. 715.

162.    Proposed Substitute Findings:  Hancock's audit demands exceeded the legitimate rights of Hancock under Section 2.5 of the Agreement. *See supra*, ¶¶ 155-166. In response to Hancock's demands, Abbott provided the books and records it was obligated to make available under Section 2.5, which records were sufficient for Hancock and StoneTurn to determine Abbott's compliance with the terms of the Agreement. *Id.*

163.    Proposed Substitute Findings:  Abbott provided all of the documentation that was required under the Agreement and necessary for StoneTurn to complete its audit. *Id.* Abbott's response to Hancock's audit demand allowed Hancock and StoneTurn to audit Abbott's compliance with the terms of the Agreement. Campbell Aff. ¶¶ 14-24. *Abbott produced documents relating to all of the Program Compounds.* Hair Tr. 729:25-730:16; Martinez Depo. 285:14-286:9, 286:17-287:5, 287:16-289:4, 290:11-292:24,

293:17-297:11, 298:9-299:7 (describing information recorded in StoneTurn index); Ex.

724A (StoneTurn index); *see also* Martinez Depo. 209:15-22 (noting that Abbott also

produced documents that StoneTurn did not specifically identify in the index); Ex. 724

(electronic version of StoneTurn index). *All of the documents produced by Abbott were*

*responsive to the audit demand.* Hair Depo. 250:9-253:18.

*Abbott produced numerous documents relating to the pre-clinical and clinical*

*trials of all the Program Compounds, including ABT-518, ABT-594, and ABT-773. See*,

*e.g.*, Martinez Depo. 366:14-23 (Abbott produced investigator packages for clinical

trials), 113:15-114:20 (Abbott produced meeting notes and files of clinical trial

coordinators that contained "[a]ll of the feedback they were getting [from] the physicians;

the summary level, the interim summary level, you know, some final reports, some

interim reports"); Ex. 724A. *Abbott produced presentations, reports, minutes and other*

*documents relating to Abbott's development and decision-making regarding the Program*

*Compounds.* Martinez Depo. 118:12-119:2 (monthly reports with information regarding

development costs, milestones, and Go/No Go decision points), 243:18-22 (reports,

updates, and summaries regarding Program Compounds), 368:19-369:5 (meeting

minutes); 408:15-411:6 (documents relating to the PEC), 417:4-19 (documents relating to

Abbott's "decision analysis"); Ex. 724A at p. 57-74; Ex. 915 at pp. 6-7 (advisory board

meeting minutes). *Abbott produced documents reflecting development timelines.* Ex.

915 at pp. 4-5.

*Abbott's production in the audit included documents reflecting the facts at issue*

*in this case. For example, Abbott produced documents regarding the M99-114 trial,*

*including documents reflecting interim drop-out rates, closure of enrollment in M99-114*

*trial at 269 patents, the final results of the M99-114 trial, case report forms, medical review notes, and screen failure reports.*  Campbell Tr. at 1255:12-1256:12, Martinez Tr. 705:23-706:22; 11/17/06 Blewitt Depo. 256:11-257:12; Hair Depo. 143:1-8; Martinez Depo. 404:19-407:12; Ex. 530; Ex. 625 at JHII021615-17; Ex. 677 at pp. 1, 5; Ex. 724A at pp. 13, 15; Ex. 725A at pp. 5-6.  *Abbott produced documents reflecting its 2001 budgeted and "Blue Plan" expenditures for ABT-594.  See, e.g.*, Ex. 625 at JHII021614-15, JHII021619; Ex. 712; Ex. 724A at p. 67; Ex. 725A at p. 1.  *With respect to ABT-594, Abbott also produced documents regarding potential follow-on compounds, internal development timelines, and efforts to improve tolerability.*  Ex. 677 at pp. 2-4, 7.  *Abbott produced documents regarding the status of ABT-773 with respect to liver and QT safety, dosing, and the pediatric program.  See, e.g.*, Hair Tr. 712:21-713:19; Ex. 724A at pp. 50, 60-63; Ex. 725C at pp. 4, 52, 65, 68-78, 85-91.  *Abbott produced documents reflecting the status of ABT-518 and competitor MMPI compounds as of March 2001. See, e.g.*, Ex. 710, 712, and 724A at p. 69 (fourth line from bottom of page) (Abbott produced ABT-518 MPSRs, including March 2001 MPSR); Ex. 612 at p. 3 (March 2001 ABT-518 MPSR reported the status of competitor compounds).  *Abbott produced commercial forecasts reflecting "a base case, an upside and low scenarios", probabilities of success, commercial value, and expected commercial value for Program Compounds.*  Hair Tr. 719:24-720:2; Hair Depo. 134:24-135:14, 267:2-268:4, 313:14-315:9, 315:22-316:18, Martinez Depo. 198:6-11; Ex. 625 at JH021615-16, 18; Ex. 627 at JHII021609-10; Ex. 725A.  *Abbott produced documents reflecting its budgeted and projected expenditures on Program Compounds.*  Hair Tr. 731:4-732:7; Martinez Tr. at 676:13-677:22, 680:4-683:23; Martinez Depo. 411:17-413:4, Hair Depo. 93:15-94:10;

Ex. 724A at p. 58, 64, 67-68 (GPRD budget documents); Ex. 725A at p. 1; Ex. 627 at

JHII021608, JHII021610-11; Ex. 712; Ex. 725A at p. 1; Ex. 915 at pp. 3-6, 8; Ex. 932.

*Abbott produced documents reflecting its risk-adjusted "expected" spending.* Martinez

Depo. 417:4-19; Hair Depo. 93:15-94:10; Ex. 625 at JHII021618; Ex. 627 at

JHII021611. *Abbott produced documents reflecting its actual expenditures on the*

*Program Compounds, including project expense reports that delineate expenditures by*

*month and function.* Campbell Aff. ¶ 20; Martinez Tr. 680:4-683:23; Hair Depo. 270:24-

271:8, 272:19-273:21; Campbell Depo. 85:2-86:4, 98:2-18; Ex. 70; Ex. 677 at p. 6; Ex.

725B (2001 monthly project expense report); Ex. 932; Stiles Aff. ¶ 8 (project expense

reports are generated in the ordinary course of business and constitute Abbott's official

records of expenditures on each project).

      *Although Hancock alleges that StoneTurn was unable to prepare an audit report,*

*StoneTurn and Hancock did analyze and use the information produced by Abbott in the*

*audit; StoneTurn provided Hancock litigation counsel with copies of documents produced*

*by Abbott in the audit and prepared summaries and analyses of the documents.* Martinez

Tr. at 692:7-17; Hair Tr. 715:23-719:22; Martinez Depo. 371:1-376:19; Hair Depo.

173:12-19, 310:1-311:24, 322:15-326:9; Ex. 530; Ex. 625; Ex. 627; Ex. 677; Ex. 712; Ex.

915 (summaries and analyses prepared by StoneTurn and produced in redacted form by

Hancock).

      164.   <u>Proposed Substitute Findings</u>:  Abbott complied with its obligations to

Hancock under the Agreement, including its obligations under Section 2.5.  *See supra*, ¶¶

155-63; *see also* 155-163.

165.    Proposed Substitute Findings:  Abbott did not hinder, delay, or obstruct
Hancock's audit, and did not act with the intent to conceal alleged misrepresentations,
omissions, or fraud.  *See supra,* Martinez Tr. at 689:2-20 (Abbott informed Hancock that
some documents being made available in the audit were originals and, therefore, would
need to be moved during the course of the audit); Campbell Depo. 55:6-18, 160:14-
161:11 (Abbott made originals of documents from Corporate Records available for
review by StoneTurn).  *The StoneTurn auditors, Christopher Martinez and Mark Hair,
testified that Ms. Campbell and a contract attorney retained to assist with audit response
did not respond directly to various inquiries, but instead promised to forward the
questions to someone in Abbott with more authority.  See, e.g.*, Hair Aff. ¶¶ 18-20.
*However, Abbott's outside counsel, Winston & Strawn, was in regular communication
with Hancock's outside counsel, Choate, Hall & Stewart, and provided responses to the
questions raised by Hancock and its auditors regarding the audit.  See, e.g.*, Hair Tr.
730:17-24; Ex. 917; Ex. 992.

166.    Proposed Substitute Findings:  Hancock did not suffer any monetary or
other damages from Abbott's alleged efforts to "hinder, delay and obstruct" the audit.
Martinez Tr. at 694:21-695:12; Hair Tr. 720:3-12 (there is no correlation between the
time StoneTurn spent on the audit and alleged deficiencies in Abbott's response to the
audit); Martinez Depo. 326:2-18, 385:1-7, 389:10-391:5 (Mr. Martinez did not make any
attempt to determine the amount of time or fees spend on the audit that are attributable to
the alleged delays in Abbott's audit response, and did not know how that analysis could
be done); Martinez Depo. 318:17-319:17, 319:23-322:8, 348:20-349:5, 350:6-16, 397:15-
18 (StoneTurn's invoices did not distinguish work on the audit from work on the

litigation and Mr. Martinez testified that "I don't have a clear distinction in my mind between the two"); Hair Depo. 226:10-227:7, 234:17-235:5, 240:22-242:21, 264:10-20; Martinez Depo. 132:1-5, 305:1-307:21 (StoneTurn was given access by Hancock's litigation counsel to database of documents produced in the litigation and reviewed all the documents); Hair Depo. 140:21-141:13, 206:8-15, 210:5-22, 220:19-221:16 (many documents initially withheld during audit on grounds of privilege or non-responsiveness were subsequently re-reviewed by Abbott and produced pursuant to document requests in the present case); Hair Depo. 223:13-24, 225:2-14 (even after StoneTurn had access to additional documents produced in the litigation, Hancock never requested that StoneTurn prepare an audit report).

### Abbott Compiled With Its Contractual Obligations Under Section 4.3 Regarding Out-Licensing of ABT-518 and ABT-594

167.    <u>Proposed Additional Findings</u>:  Section 4.1 of the RFA provides that:

> The obligations of Abbott, its Affiliates and Licensees with respect to any Product under this Article 4 are expressly conditioned upon the safety, efficacy, and commercial feasibility of each Product, consistent with using Commercially Reasonable Efforts.

Ex. 32, § 4.1; *see also id.*, § 4.3(d)(i) (the outlicensing obligations arise under Article 4).

"Commercially Reasonable Efforts" are defined in the RFA as

> efforts which are consistent with those normally used by other pharmaceutical companies with respect to other pharmaceutical compounds or products which are of comparable potential commercial value and market potential at a similar stage of development or product life, taking into account, without limitation, issues of safety and efficacy, compound or product profile, proprietary status, the regulatory environment and the status of the compound or product and other relevant scientific factors.

Ex. 32, § 1.10.

Section 4.4 of the RFA provides that

> *Abbott shall not research, develop, manufacture, market, sell, distribute, out-license or otherwise treat any Program Compounds or Product differently, as compared to any other Abbott compounds or products, on account of any of John Hancock's rights hereunder."* (emphasis added).

Ex. 32, § 4.4.

Thus, the "obligations of Abbott" with respect to outlicensing Ceased Compounds are not absolute. *Id.*, §§ 1.10, 4.1, 4.3(d)(i), 4.4. Abbott's obligations "are expressly conditioned upon the safety, efficacy and commercial feasibility of each Product, consistent with using Commercially Reasonable Efforts." Ex. 32, § 4.1. Furthermore, the Agreement provides that any license or divestiture is intended to benefit "both parties," not merely Hancock. *Id.*, § 4.3(d)(i). Finally, the RFA provides that with respect to the sale or out-licensing of Program Compounds, Abbott is not to treat the Program Compounds differently than its other compounds, on account of Hancock's rights under the Agreement. *Id.*, § 4.4.

168.    No proposed additional or substitute findings.

169.    <u>Proposed Substitute Findings</u>: Abbott made commercially reasonable efforts to out-license ABT-518. Leonard Aff. ¶¶ 38-39; Deemer Aff. ¶¶ 18-23; Nisen Depo. 360:7-361:9, 372:21-373:18, 386:6-387:16; Ex. 663; Ex. 774 at ABBT0000382 (Sept. 2001 MSPR – "Meeting with NCI . . . to discuss interest in ABT-518"); Ex. 830 at ABBT334840 (summary of out-licensing efforts); Ex. 847; Ex. 867; Ex. 868; Ex. 869; Ex. 870; Ex. 871; Ex. 872; Ex. 873; Ex. 874 at ABBT0542889 ("Meeting held in San Francisco to review data with Salmedix. They have declined the opportunity to license ABT-518."); Ex. 875; Ex. 876; Ex. 877; Ex. 879 at ABBT0167635; Ex. 880; Ex. 773 (NCI/Abbott Collaboration Presentation dated Sept. 28, 2001). Despite those efforts,

Abbott was unable to out-license or divest ABT-518 to a third party.  Leonard Aff. ¶¶ 38-39; Ex. 847; Blewitt Tr. 125:21-126:20.

170.    Proposed Substitute Findings:  Abbott complied with its contractual obligations with regard to the out-licensing of ABT-518 and did not breach the RFA. *Supra*, ¶¶ 167-69.

171.    No proposed additional or substitute findings.

172.    Proposed Substitute Findings:  Abbott has not out-licensed or divested ABT-594 to a third party.  Leonard Aff. ¶ 61.

173.    No proposed additional or substitute findings.

174.    No proposed additional or substitute findings.

175.    No proposed additional or substitute findings.

176.    Proposed Substitute Findings:  After Abbott discontinued its development of ABT-594, only one potential licensee, Bayer Animal Health, ever expressed interest in licensing the compound, and that was for its potential development as a drug for animals.  Leonard Aff. ¶ 61.  It would not have been commercially reasonable for Abbott to out-license or divest ABT-594 to Bayer Animal Health or another pharmaceutical company, particularly for development as a drug for animal health, while Abbott was developing other pain compounds (such as ABT-894) with the same mechanism of action for use in humans.  Leonard Aff. ¶ 61.  Licensing in those circumstances also would have required Abbott to treat the out-licensing of ABT-594 differently, as compared to other Abbott compounds, on account of the agreement with Hancock, contrary to Section 4.4 of the RFA.  Ex. 32, § 4.4.

177.    <u>Proposed Substitute Findings</u>:  Abbott complied with its obligations under the RFA with respect to out-licensing of ABT-518 and ABT-594, and Hancock has not suffered monetary or other damages as a result of the breaches alleged by Hancock. *Supra,* ¶¶ 167, 171-76.  *Hancock did not introduce any evidence of the fact or the amount of damages from Abbott's alleged breach of its outlicensing allegations.  See, e.g.,* Friedman Aff. ¶ 80; Friedman Tr. 804:1-8 (Mr. Friedman did not offer an opinion regarding alleged outlicensing damages).  *Although numerous companies were developing compounds in the same class as ABT-594 (i.e., NNRs) at the time of the RFA, there is no evidence that any NNR compound has been approved by the FDA and marketed to the public.*  Blewitt Tr. 126:21-128:20.  *There is no evidence that Bayer Animal Health or any other company would have been interested in outlicensing or purchasing ABT-594 after receiving confidential information regarding the compound (including the negative results of the Phase IIb trial), what the terms of any such agreement would have been, or what royalty or milestone payments Hancock would have received under any such agreement.*

### Hancock Has Not Demonstrated that It Is Entitled To Damages

178.    <u>Proposed Substitute Findings</u>:  Abbott did not breach the RFA or engage in fraud.  *See supra*, ¶¶ 1-177.  *Even if Hancock could prove breach of the Agreement and/or misrepresentations, the alleged misrepresentations are not of such a nature and such importance that the Agreement would not have been approved without them.  See supra*, ¶¶ 66-177, *infra*, ¶ 178.

*Even if the allegedly omitted material information regarding ABT-518, ABT-594, and ABT-773 would have caused Hancock to assign a lower expected rate or higher risk to the deal, Hancock would still have entered into the deal.*  When Hancock's

management approved the deal in September 2000, it projected an average return of 17.5

percent over 15 years or, assuming it sold its future royalty stream after the fifth year, an

average rate of return of 22 percent over five years.  Davis Depo. 36:12-37:3; Ex. 125 at

p. 11.  "[T]he returns were well above what [Hancock] needed to meet [its] target ROEs,

return on equities."  11/10/06  Hartz Depo. 49:21-50:15; *see also* Tucker Aff. ¶ 86; Hartz

Tr. 494:2-14; 11/10/06  Hartz Depo. 20:14-21:4, 23:16-23, 34:15-36:5, 49:8-50:15

(expected rate of return was "probably more than several percentage points" above

Hancock's target for transactions of comparable risk), Davis Depo. 52:14-20, 55:6-56:4,

57:9-58:3; Ex. 125 at p. 11 (long-term yield of 17.5% "is substantially greater than the

inherent risk of the transaction"); Ex. 652.  Hancock's projected rate of return on the deal

also was well above the "target return" of 12.6 percent that it used to assess the

performance of the investment for management performance review purposes.  Ex. 672

("target return" of "12.6%"); Daeson Depo. 43:19-44:15, 47:23-48:5 ("target return" is a

benchmark return used by Hancock to measure performance of investments), 49:1-52:11,

62:4-63:8, 63:16-23, 64:13-65:1.  According to Hancock documents, around the date of

the Agreement, there was a 5.13 percent yield on Treasuries and a 286 basis point spread

over treasuries for investments, such as the Abbott investment, with a BA1 credit rating

and average life of 15 years, therefore, the expected yield on such investments was 7.99

percent.  Ex. 652 (Hancock document reflecting Treasury rate and target spreads over

treasuries as of mid-2001); Davis Depo. 52:14-20, 55:6-56:4, 57:9-58:3, 60:13-61:14 &

11/10/06 Hartz Depo. 20:14-21:4, 23:16-23, 34:15-35:5 (explaining that the document

reflecting target spreads over Treasuries, also known as "the curve", is used to determine

market rate of return for investments with a given credit risk); Ex. 125 at p. 1 (Abbott

deal has a Ba1 credit rating and a 15-year life); *see also* 5/16/07 Blewitt Depo. 380:18-

381:20 & Ex. 568 (pricing for a 15-year bond with a BA1 credit rating as of the time of

committee approval of the Abbott deal was 8.87%); Hartz Depo. 49:8-50:15 (Mr. Hartz

testified he did not reference "the curve" when evaluating the Abbott deal because "I

knew without consulting it, that the returns [on the Abbott deal] were well above what we

needed to meet our target ROE, return on equities"). By the time the deal was modified

and executed on March 13, 2001, Hancock's expected annual rate of return on the deal

had increased to 18.8 percent over 15 years, even further above its target rate of return.

Ex. 145 at JH001104.

Hancock had no required minimum expected rate of return for the

recommendation and approval of investments such as the Abbott transaction. Blewitt Tr.

25:21-27:24; 11/10/06 Hartz Depo. 35:6-36:5 (Mr. Hartz frequently recommended

approval of transactions with expected returns on equity below the corporate goal);

11/17/06 Blewitt Depo. 42:4-43:9, 53:7-15, 54:13-55:10; Davis Depo. 98:1-7; Nastou

Depo. 17:20-18:23. *Mr. Nastou, the head of Hancock's Bond and Corporate Finance*

*Department who presented the proposed deal to the Committee of Finance for approval,*

*explained that "many times we took investments where we knew we were going to get less*

*than [the levels we were hoping to achieve] . . . Because we had more money to invest*

*than we had investments that presented themselves, and, on average, if it achieved the*

*company's requirements, then everything worked."* Nastou Depo. 17:20-18:23; Davis

Depo. 82:16-84:9 & Ex. 126 (Mr. Nastou presented the deal to the Committee of

Finance). *Mr. Nastou testified that Hancock would have declined the Abbott investment*

*only if the expected return was "lower than anything else for the risk" available in the*

*marketplace.* Nastou Depo. 75:18-77:13. Hancock entered into transactions with similar

risk profiles with significantly lower expected rates of return. *See, e.g.*, Ex. 515

(purchase recommendation for Alza promissory notes with Baa3 rating and 4.4 year

average life, with 7.28 percent yield); Ex. 519 at p.1-2; Ex. 524 at p. 2-3 (purchase

recommendations for Celgene senior notes with B2 credit rating and the "potential to

earn an attractive 14-15% IRR during the next 3-5 years"); *compare* Ex. 125 (purchase

recommendation for Abbott deal with credit rating of Ba1 and expected rate of return of

17.5 percent over 15 years or 22% over five years).

> *Furthermore, it was not essential to the deal that the portfolio include the nine*
> *specific compounds that were actually included in the RFA. During the course of*
> *negotiations of the RFA, the proposed portfolio varied over time in both the number and*
> *phases of development of the compounds. See supra*, ¶ 13. *During the negotiations,*
> *when Abbott terminated ABT-980 – a Phase III compound with a more significant impact*
> *on expected returns than earlier phase compounds – Abbott and Hancock replaced it*
> *with two early phase compounds and proceeded to finalize the deal.* Hartz Tr. 494:15-
> 496:4; *see also supra,* ¶ 37.

> *In addition, under Hancock's policies and practices, "if there are material*
> *changes" to the proposed deal after approval by the Bond and Investment Committee and*
> *Committee of Finance, "it needs to be reapproved."* 11/10/06 Hartz Depo. 157:8-22.
> *Abbott made numerous disclosures to Hancock after the committees approved the deal in*
> *October 2000. See, e.g.*, Ex. 64 at ABBT144607.UR ("Low" probability of achieving
> target of "Low nausea/vomiting"); Ex. 22 at ABBT246909-11 ("quinolone class [of
> which ABT-492 was a member] has potential prolongation of the QT interval") at

ABBT246878 ("Tablet dosing is 150mg QD or 150mg BID dosing based on severity of indications" and "Pediatric PK/PD/Taste Testing Studies" are unfunded for 2001).  *Those disclosures did not prompt Mr. Blewitt to take the deal back to the investment committees for reapproval or undertake further due diligence.  See supr*a, ¶¶ 97, 112, 115(e); 7/16/04 Blewitt Depo. 27:14-28:14; 11/17/06 Blewitt Depo. 262:10-23; Ex. 512; Blewitt Tr. 67:1-73:4.  *Indeed, when Mr. Blewitt drafted a memorandum to file documenting the "significant changes to the transaction compared to the initial report to the Committee of Finance", he only mentioned changes in the contract terms and did not even note the new information regarding the Program Compounds that Abbott had disclosed.*  7/16/04 Blewitt Depo. 27:14-28:14; 11/17/06 Blewitt Depo. 262:10-21; Ex. 512.

        *Finally, ABT-518 and, to a lesser extent ABT-594, represented only a small portion of Hancock's total investment and expected return.*  Tucker Aff. ¶¶ 83, 84 (ABT-518 represented less than 1 percent of the expected value of future cash flows to Hancock and ABT-594 represented less than 12 percent of the value Hancock attributed to the Agreement); Friedman Aff. ¶ 79 & Friedman Tr. 802:5-21 (ABT-518 represents approximately 2 percent of Hancock's claimed damages).  *Even though ABT-773 was more significant, in 2002, after Abbott had terminated ABT-518, ABT-594, and ABT-773, Hancock was still accruing income on the deal over and above its "target income."*  Daeson Depo. 55:18-19, 56:1-60:3; Ex. 672 at JHII021498.  *John Mastromarino analyzed the deal soon after joining Hancock as Chief Risk Officer in February 2003.*  Mastromarino Depo. 8:12-9:14, 28:17-29:8, 33:25-35:19, 35:24-36:17, 36:21-37:18; Ex. 682.  *Although Abbott had terminated ABT-518, ABT-594, ABT-773, and other compounds by that time, Barry Welch (Senior Vice President of Hancock's Bond and*

*Corporate Finance Group) told Mr. Mastromarino he remained "pretty positive" about*

*the deal and Mr. Hartz told Mr. Mastromarino that "I thought it was a good*

*transaction."* Mastromarino Depo. 64:10-22; 8/19/04 Hartz Depo. 5:23-6:20 (Mr. Welch

was head of Hancock's Bond and Corporate Finance Group), 55:12-56:24; *see also* Ex.

682.

179. <u>Proposed Substitute Findings</u>: Hancock's expert witness, Mr. Alan

Friedman, has failed to calculate Hancock's damages with reasonable certainty. Tucker

Aff. ¶¶ 1-91. Mr. Friedman's damages analysis is contrary to law and without economic

foundation. *See, e.g.*, Tucker Aff. ¶ 24-29; Friedman Tr. 753:5-9. Mr. Friedman's

damages calculation is barred under Illinois law which prohibits the recovery of "lost

profits" for new products in untested markets. Tucker Aff. ¶ 24; *see infra*, Concl. of

Law, ¶ 8.

*Mr. Friedman's analysis also relies on improper probability-weighted analysis to*

*calculate lost profits.* Tucker Aff. ¶¶ 24-29. *Mr. Friedman was unable to identify any*

*other cases in which he has used a probability-weighted analysis.* Friedman Tr. 757:13-

758:23. *Although probability-weighted calculations of future revenue are used for*

*certain purposes, they are not a proper economic method to measure damages with*

*reasonable certainty.* Tucker Aff. ¶¶ 24-29; Hendricks Tr. at 1411:23-1414:4; Friedman

Tr. 760:22-761:12, 820:9-822:2 (Abbott, and pharmaceutical companies generally, do

not carry developmental compounds as assets on their books); Tucker Tr. 1553:14-20,

1556:3-10, 1583:4-1586:9, 1596:9-1603:3, 1606:10-1607:2; Blewitt Tr. 22:17-25:19.

*The articles that Hancock relied upon in support of the probability-weighted approach*

*actually show that it is not an accepted method of proving lost profits due to alleged*

*misrepresentations.* Tucker Tr. 1552:21-1553:20, 1596:9-1598:1 (Section 348 of the Restatement relates to damages in the context of a breach of promise conditioned on a "fortuitous" event, i.e., a gambling contract; a promise for royalties from successful development of pharmaceutical compounds is not conditioned on a "fortuitous" event), 1598:2-1599:20, 1606:7-1608:8 (Baltimore Law Review student note states that "loss of chance" doctrine has not gained general acceptance by the courts and is not the "American rule"), 1599:21-1601:6 (UCLA Law Review article refers to situations involving small firms unable to sufficiently aggregate risks and insufficiently sophisticated to bargain for contractual allocation of loss and other factors not present here; article also notes that the role of probability and chance have not yet been converted into explicit doctrine).

*Mr. Friedman also failed to demonstrate that the claimed damages were caused by the alleged misrepresentation. For example, Mr. Friedman did not analyze the actual impact of the alleged misrepresentations on expected sales, simply assuming, without foundation, that the entire decline from original projections is attributable to the alleged misrepresentations.* Friedman Tr. at 772:8-779:11; *see also* Tucker Aff. ¶¶ 31-38; Tucker Tr. 1603:4-1604:4; Friedman Tr. at 754:9-757:12 (the probability that ABT-518, ABT-594, and ABT-773 all would have been approved but for the alleged misrepresentations is 3 percent), Tucker Tr. 1595:17-1596:8 (the probability that ABT-518, ABT-594, and ABT-773 all would have failed but for the alleged misrepresentations was five times higher than the probability that they all would have succeeded). *In fact, Abbott's estimated probabilities of success and projected sales were demonstrably not accurate predictors of future events (i.e., not a reliable predictor of what would have*

*happened "but for" the alleged misrepresentations).* Hendricks Aff. ¶¶ 16-19; Tucker

Tr. 1604:20-1605:7; Hendricks Tr. at 1413:4-1414:4 & Ex. 310 at MCK0035 (all but two

of the dozens of compounds in Abbott's portfolio in June 2001, for which Abbott

calculated an "Expected Commercial Value" for comparative purposes, were

subsequently terminated and, therefore, will generate no actual revenue). *A proper*

*calculation of Hancock's lost profits, if lost profits were available and if a probability-*

*weighted calculation of lost profits were appropriate, would calculate the value of the*

*compounds as of the date of the RFA "but for" the allegedly undisclosed negative facts,*

*less the actual value of the compounds as of the time of the RFA in light of the negative*

*facts.* Tucker Aff. ¶ 39.

Mr. Friedman does not properly calculate either the "but for" or the "actual"

scenario. Tucker Aff. ¶¶ 21-23, 39-53. He uses as his "but for" scenario Abbott's

internal projections, which would already reflect any negative information that was

known to Abbott. Tucker Aff. ¶¶ 39-40; Hendricks Aff. ¶¶ 7-15; Hendricks Tr. at

1403:2-1411:21, 1418:18-1419:2; Friedman Tr. 761:13-762:10, 779:12-791:16. *The*

*internal Abbott commercial forecasts that Mr. Friedman assumes represent what the*

*compounds would have been worth "but for" the allegedly undisclosed material adverse*

*facts, actually were updated in early 2001 (after Hancock alleges Abbott had undisclosed*

*knowledge of adverse facts) in connection with Abbott's portfolio prioritization and*

*budget process and reflect all adverse information known to Abbott at that time.*

Hendricks Aff. ¶¶ 8-13; Ex. 92 at p. 2 (November 2000 ABT-594 MPSR noting that an

updated ABT-594 forecast is being developed for the January 2001 prioritization

meeting); Ex. 240 at ABBT0000323 (January 2001 ABT-594 MPSR noting that

"forecasts have been updated" for the January 29, 2001 portfolio analysis meeting); Ex. 195 (January 25, 2001 email from Ms. Kowaluk to other Decision Support Group and Portfolio Analysis Group personnel attaching chart of success probabilities for "the current round of portfolio analysis"); Ex. 591 (January 25, 2001 memorandum from Ms. Dart enclosing "project forecasts that form the basis of the 2001 APU Prioritization Meeting"). *Furthermore, Abbott further updated its forecasts for an April 2001 portfolio review meeting -- again incorporating all adverse information known to Abbott at that time -- and the revised forecasts for the compounds are virtually identical to the success probabilities projected at the time of the Agreement (used by Mr. Friedman in his "but for" scenario).* Hendricks Aff. ¶¶ 14-15; Ex. 611 (March 2001 "Summary of Success Probabilities"); Ex. 800 (March 2001 "Summary of Success Probabilities," with headings indicating probabilities were updated on "4/3/01" and "4/6/01"); Ex. 801 (April 20, 2001 Portfolio Analysis presentation incorporating updated forecasts).

*Mr. Friedman actual scenario is also improper because it is not assessed as of the date of the Agreement.* Tucker Aff. ¶ 41. *Instead, Mr. Friedman uses as his "actual" scenario the status of the compounds at a later date, which reflects diminution in value due to post-contractual developments unrelated to the alleged fraud.* Tucker Aff. ¶¶ 41-43, Chart IV. Mr. *Friedman assumed, without study and contrary to evidence, that the projections would have gone to zero based on the allegedly undisclosed adverse information known to Abbott. Id.*; Friedman Tr. 772:12-779:11. *As noted above, however, the internal Abbott projections Mr. Friedman uses for his "but for" scenario already consider all factors known to Abbott at the time of the Agreement and, therefore, represent the true "actual" scenario.* Tucker Aff. ¶¶ 41-43, Chart IV. *In addition, Mr.*

*Friedman did not analyze whether factors other than the alleged misrepresentations, such as information that became available to Abbott after March 13, 2001 (e.g., the MMPI data released at the ASCO conference, the unblinding and analysis of data from the clinical trial of ABT-594, and changes in the regulatory environment and subsequent clinical trial results regarding ABT-773), caused the compounds at issue to fail.* Tucker Aff. ¶¶ 31-33; Friedman Tr. 772:12-779:11. *For example, of the six Program Compounds that are not alleged to have been misrepresented, five have been terminated and current projections for the remaining compound are substantially below Abbott's projections as of the time of the Agreement.* Tucker Aff. ¶¶ 34-38. *Despite a dramatic reduction in the expected sales for these compounds for reasons that Hancock acknowledges are unrelated to alleged misrepresentations, Mr. Friedman inconsistently assumes that there was no reduction in the expected sales for ABT-518, ABT-594, and ABT-773 for reasons other than the alleged misrepresentations. Id.*; Friedman Tr. 772:12-779:11, 791:21-793:22.

*In addition, Mr. Friedman's but-for scenario is inconsistent with Hancock's original claim of what would have happened in the absence of the alleged misrepresentations.* Tucker Aff. ¶¶ 44-53. *Hancock's complaint alleges that had Hancock known the "true development status and prospects" of the compounds, it "would have demanded different terms, such as the substitution of another compounds with a comparable projected value or more favorable financial terms with respect to the remaining Program Compounds" or not entered into the Agreement. Id.* ¶ 45 (quoting Hancock's Second Am. Supp. Cmplt., ¶¶ 27, 30, 33). *With the exception of his rescission calculation, Mr. Friedman did not analyze any of the circumstances that Hancock alleges*

*would have occurred (e.g., what compounds would have been substituted or how terms would have been altered) or how Hancock's profits, if any, under such scenarios would compare to the actual results. Id.*

*Mr. Friedman's damage calculations also contain numerous other errors. For example, he uses an improperly low discount rate that fails to account for the risk of not achieving the royalties and milestone payments. Tucker Aff. ¶¶ 54-59; Friedman Tr. 793:23-798:17; Tucker Tr. 1581:22-1582:15. He failed to offset the claimed damages to reflect the additional $110 million in Program Payments that Hancock would have been required to make in the "but for" scenario. Tucker Aff. ¶¶ 60-62.[4] He failed to account for Hancock's projected revenues from out-licensing of ABT-773 to Advanced Life Sciences. Tucker Aff. ¶ 64. Finally, his damage claims are unreasonably high in relation to Hancock's original expectations. Tucker Aff. ¶¶ 65-68.*

*Mr. Tucker illustrated the significance of the errors by demonstrating the dramatic effect of correction of certain of Mr. Friedman's errors. Tucker Aff. ¶¶ 69-71. For example, (and ignoring for discussion purposes Mr. Friedman's other errors) adjusting only for (1) Mr. Friedman's failure to consider that actual results declined materially from the original projections on compounds in the deal, but not at issue in the case; (2) Mr. Friedman's failure to properly consider the delays in anticipated launch dates experienced on the compounds under development; and (3) the improper use of a risk free discount rate, with these adjustments, Mr. Tucker calculated that the alleged lost royalty and milestone payments for all three compounds would be $3.2 million in the Low*

---

[4] *Mr. Friedman's original affidavit also improperly double-counted damages from the alleged lost royalty and milestone payments with claimed damages from the alleged Aggregate Carryover Amount Claim. His corrected affidavit acknowledged and corrected that error. Tucker Aff. ¶ 63; Friedman Tr. 801:10-802:4.*

*Case and $28.1 million in the Base Case.*  Tucker Aff. ¶¶ 69-70; Ex. 891; Ex. 892; Ex. 893; Ex. 894; Ex. 895; Ex. 896; Ex. 897; Ex. 898.  *For illustration purposes, Mr. Tucker also calculated the impact of a hypothetical renegotiation of a royalty rate, required to maintain Hancock's originally projected internal rate of return, under a hypothetical assumption that ABT-518, ABT-594 and ABT-773 were eliminated from the portfolio in March 2001, which is consistent with what Hancock alleges in its Second Amended Complaint would have occurred.*  Tucker Aff. ¶ 71.  *That hypothetical scenario would generate an increase in expected royalties of $1 million in the Low Case and $14 million in the Base Case over and above the currently expected royalties based on the actual agreed upon rates.  Id.*; Ex. 899.

Therefore, Mr. Friedman's testimony is unreliable and speculative.

180.    <u>Proposed Substitute Findings</u>:  Abbott did not breach the RFA or engage in fraud with regard to ABT-518 and Hancock has not suffered actual monetary damages with regard to this claim.  *See supra*, ¶¶ 66-91, 178-179.

181.    <u>Proposed Substitute Findings</u>:  Abbott did not breach the RFA or engage in fraud with regard to ABT-594 and Hancock has not suffered actual monetary damages with regard to this claim.  *See supra*, ¶¶ 92-106, 178-179.

182.    <u>Proposed Substitute Findings</u>:  Abbott did not breach the RFA or engage in fraud with regard to ABT-773 and Hancock has not suffered actual monetary damages with regard to this claim.  *See supra*, ¶¶ 107-130, 178-179.

183.    <u>Proposed Substitute Findings</u>:  Abbott did not breach the RFA or engage in fraud with regard to the Annual Research Plans Abbott provided to Hancock, and

Hancock has not suffered actual monetary damages with regard to this claim. *See supra*, ¶¶ 131-40, 178-182.

184.    Proposed Substitute Findings: Abbott did not breach the contract because it had no obligation to pay Hancock pursuant to Section 3.3(b) of the RFA after Hancock was excused from making its third and fourth program payments. Tucker Aff. ¶¶ 72-75. Hancock has not suffered actual monetary damages with regard to this alleged breach. *See supra*, ¶¶ 141-154. *If Abbott were liable for a breach of Section 3.3(b), the damages would be $28.2 million, rather than the $33.0 million claimed by Hancock.* Tucker Aff. ¶¶ 76-77; Ex. 900. *Hancock bases its claim for $33.0 million on the spending reported by Abbott in a Research Plan Funding Update dated November 20, 2007.* Tucker Aff. ¶¶ 76-77. *However, Abbott subsequently informed Hancock that the report understated certain expenditures and that the correct spending numbers were contained in Abbott's amended interrogatory responses.* Tucker Aff. ¶ 77; Ex. 329; Ex. 330. *Abbott also has produced its internal Project Expense Reports, which are generated in the ordinary course of business to track expenditures on each compound, and from which the spending amounts in the Amended interrogatory responses are derived.* Stiles Aff. ¶¶ 9-14; Ex. 786; Ex. 848; Ex. 863; Ex. 864; Ex. 865; Ex. 866.

185.    Proposed Substitute Findings: Abbott did not breach the RFA with regard to Hancock's audit pursuant to the RFA and Hancock has not suffered actual monetary damages with regard to this alleged breach. *See supra,* ¶¶ 155-166, 178-179.

186.    Proposed Substitute Findings: Abbott did not breach its obligations with respect to efforts to out-license or divest ABT-518 to a third party and Hancock has not suffered monetary damages with regard to this alleged breach. *Supra*, ¶¶ 167-179.

187.    Proposed Substitute Findings:  Abbott did not breach its obligations with respect to efforts to out-license or divest ABT-594 to a third party and Hancock has not suffered monetary damages with regard to this alleged breach.  *Supra*, ¶¶ 167-179.

188.    Proposed Substitute Findings:  Hancock has not suffered any compensable Losses under the RFA.  *See supra*, ¶¶ 1-187, Concl. of Law ¶ 35-38.

189.    Proposed Substitute Findings:  Hancock has not suffered any compensable Losses under the RFA and is not entitled to prejudgment interest.  *See supra,* ¶¶ 1-187, *infra*, Concl. of Law ¶¶ 35-38.

## II.    PROPOSED CONCLUSIONS OF LAW

### *Jurisdiction, Venue, and Choice of Law*

1.    No proposed substitute or additional conclusions of law.

2.    No proposed substitute or additional conclusions of law.

3.    No proposed substitute or additional conclusions of law.

### *Abbott Did Not Engage In Fraudulent Conduct (Count I)*

4.    Proposed Substitute Conclusions:  Count I of Hancock's Second Amended Complaint (the "Complaint") asserts a cause of action against Abbott for fraud.  "Under Illinois law, to establish actionable fraud, a plaintiff must prove: that defendants, with the intent to induce plaintiffs to act, made a false statement of material fact which defendants knew or believed to be false. Plaintiffs must also show they justifiably relied on the statement and suffered damages resulting from that reliance. Most importantly, fraud must be proved by clear and convincing evidence."  *Ass'n Ben. Services, Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 852-53 (7th Cir. 2007) (internal citations omitted).

5.    Proposed Substitute Conclusions:  Under Illinois law, a misrepresentation or omission is "material" only if the plaintiff "would have acted differently" had he been

aware of it.  *Perlman v. Time, Inc.*, 64 Ill. App. 3d 190, 197, 380 N.E.2d 1040, 1046

(1978); *see also North American Fin. Group, Ltd. v. S.M.R. Enters., Inc.*, 583 F. Supp.

691, 698 (N.D. Ill. 1984) (to be material, a "concealed fact must be such that had the

plaintiff known the truth, he would have acted differently"); *Mack v. Plaza Dewitt Ltd.*

*P'ship*, 137 Ill. App. 3d 343, 350-51, 484 N.E.2d 900, 906 (1985).  If a misrepresented

condition is relatively minor and "only one of many features to be considered" in making

an investment decision, then it is not material.  *Mack*, 137 Ill. App. 3d at 351.

6.    Proposed Substitute Conclusions:  Pursuant to the RFA, Abbott was not

required to disclose "generally available information concerning the pharmaceutical

industry in general."  Ex. 32, § 12.2(i).  "[T]he requirement of ordinary care in

discovering the truth or falsity of the representations is imposed on the party claiming

fraud in order to establish justifiable reliance.  The background, special expertise or

education of the plaintiff also may be considered incident to the reasonable reliance

element."  *See North American Fin. Group, Ltd. v. S.M.R. Enters., Inc.*, 583 F. Supp. 691,

697-8 (N.D. Ill. 1984) (internal citations omitted).  "Regarding the requirement that the

misrepresentation must be a past or present fact, usually mere expressions of opinion of

future occurrences, especially of future profitability, are not actionable."  *Id.*  "Finally,

regarding the materiality requirement, a misrepresentation, regardless of how intentional,

cannot be material if it makes no difference. The fact must be essential to the inducement

of the plaintiff's action. The concealed fact must be such that had the plaintiff known the

truth, he would have acted differently."  *Id.*

7.    Proposed Substitute Conclusions:  While Illinois generally follows the

"benefit-of-the-bargain" approach to damages for fraud, "[i]t has been recognized . . . that

a benefit-of-the-bargain measure may not be appropriate in all circumstances." *See*

*Giammanco v. Giammanco*, 253 Ill. App. 3d 750, 760 (Ill. Ct. App. 1993).

      8.    <u>Proposed Substitute Conclusions</u>:  Under Illinois law, a party claiming

damage "bears the burden of proving those damages to a reasonable degree of certainty"

and speculative damages are not recoverable.  *TAS Distrib. Co. v. Cummins Engine Co.,*

*Inc.*, 491 F.3d 625, 632 (7th Cir. 2007).  A corollary of this rule is that lost profits are not

available for a new business or a new product of an existing business.  *See id.*; *Stuart*

*Park Assocs. Ltd. P'ship v. Ameritech Pension Trust*, 51 F.3d 1319, 1328 (7th Cir. 1995);

*Kinesoft Dev. Corp. v. Softbank Holdings, Inc.*, 139 F. Supp. 2d 869, 908 (N.D. Ill. 2001)

("Under Illinois law, a new business, or an existing business with a new product, cannot

recover lost profits because the future profits of a new business cannot be ascertained

with any degree of certainty.") (internal citations omitted); *Alphamed Pharmaceuticals*

*Corp. v. Arriva Pharmaceuticals, Inc.*, 432 F. Supp. 2d 1319, 1340 n.36 (S.D. Fla. 2006)

(noting Illinois has absolute bar to recovery of lost profits under the "new business" rule).

Even where a plaintiff has shown that the company has a record of success in previous

endeavors, Illinois courts refuse to allow recovery of lost profits for a new product in a

new market.  *Kinesoft*, 139 F. Supp. 2d at 909-10.  The Seventh Circuit in *Stuart Park*

reached the same result when real estate partnerships sought to recover profits they

allegedly lost from an apartment complex that was never built.  51 F.3d at 1328.  In

affirming a verdict against the partnerships, the Seventh Circuit noted that their successes

with other apartment buildings were irrelevant because they were "different pieces of real

estate from different markets," and provided no useful basis for comparison.  *Id.*  Put

differently, the partnerships were selling different products in a new, different market.  In

the rare cases where lost profits have been awarded for a new business or product, courts have required evidence of an established market for the product. *Milex Prods. Inc. v. Alra Labs. Inc.*, 603 N.E. 2d 1226, 1236-37 (Ill. Ct. App. 1992).

Since Hancock is seeking lost profits for new products—ABT-518, ABT-594, and ABT-773, which were experimental compounds never before approved or marketed—it is barred under the Illinois new business or new products rule from recovering lost profits. *See Alphamed Pharmaceuticals Corp.*, 432 F. Supp. 2d at 1345-46 ("reliance on a multitude of assumptions is endemic to any valuation of the prospective profitability of new pharmaceutical products. . . . This inherent uncertainty makes the recovery of lost profits for anticipated sales of a new drug exceedingly difficult.").

9.      No proposed additional or substitute conclusions of law.

10.      Proposed Substitute Conclusions:  Hancock has not satisfied its burden of proving fraud by clear and convincing evidence in this case.

11.      Proposed Substitute Conclusions:  Based on the foregoing findings of fact, the Court concludes that Abbott did not fraudulently or intentionally induce Hancock to enter into the RFA.

12.      Proposed Substitute Conclusions:  The Court concludes that Abbott did not make any material fraudulent misrepresentations or omissions.

13.      Proposed Substitute Conclusions:  The Court concludes that Abbott did not make any material misrepresentations or omissions and Hancock did not justifiably rely on any alleged fraudulent misrepresentations or omissions by Abbott.

14.      Proposed Substitute Conclusions:  The Court concludes that Abbott's ARPs were complete and accurate in all material respects, and Hancock did not rely on

any alleged fraudulent misrepresentations or omissions by Abbott in making its Second

Program Payment in the amount of $54,000,000 in January 2003.

15.    Proposed Substitute Conclusions:  The Court concludes that Abbott was

not required to disclose to Hancock generally available information concerning the

pharmaceutical industry in general.  Ex. 32, § 12.2(i).

16.    Proposed Substitute Conclusions:  The Court concludes that Hancock has

not suffered actual, compensable harm.

17.    Proposed Substitute Conclusions:  Since Hancock has not suffered actual,

compensable harm, Abbott is not obligated to compensate Hancock.

18.    Proposed Substitute Conclusions:  The Court concludes that punitive

damages are not warranted in this case.

### Abbott Did Not Breach the RFA (Count II)

19.    Proposed Substitute Conclusions:  Count II of Hancock's Complaint

asserts a cause of action against Abbott for breach of contract.  Under Illinois law, an

action for breach requires: (1) the existence of a valid and enforceable contract; (2)

breach of the contract by plaintiff; (3) performance of the contract by defendant; and (4) a

resulting injury to the defendant ( i.e., damages proximately caused by the breach).

*Kinesoft Development Corp. v. Softbank Holdings Inc.*, No. 99C7428, 2000 WL 1898577,

at *3 (N.D. Ill. Dec. 20, 2000).

20.    No proposed additional or substitute conclusions.

21.    No proposed additional or substitute conclusions.

22.    No proposed additional or substitute conclusions.

23.    Proposed Additional Conclusions:  " . . . Illinois law does not recognize

independent claims based on breaches of any implied duties of good faith."  *Echo, Inc. v.*

*Whitson Co., Inc.*, 121 F.3d 1099, 1105-06 (7th Cir. 1997); *see also Johnstone v. Bank of America, N.A.*, 173 F. Supp. 2d 809, 817-818 (N.D. Ill. 2001) ("The Supreme Court of Illinois has held that there is no independent cause of action for breach of the duty of good faith and fair dealing.") (internal citation omitted).

24.    Proposed Substitute Conclusions:  Breach of an express representation or warranty only constitutes a breach of contract if all of the elements of a breach of contract claim are met, including that the plaintiff relied on the express representation or warranty. *Spectramed Inc. v. Gould Inc.*, 304 Ill. App. 3d 762, 774-75, 710 N.E.2d 1, 9-10 (1998) (a party's actual knowledge of the omitted information "may result in waiver of the contract's warranties.").

25.    Proposed Substitute Conclusions:  Hancock must show actual reliance on the representations.  *See id.*; *Chamberlain Mfg. Corp. v. Maremont Corp.*, No. 92-0356, 1995 WL 103803, at *2 (N.D. Ill. Mar. 6, 1995) (proof of actual reliance is required under Illinois law).

26.    Proposed Substitute Conclusions:  While Illinois generally follows the "benefit-of-the-bargain" approach to damages for fraud, it has been recognized that a benefit-of-the-bargain measure may not be appropriate in all circumstance.  *Real Estate Value Co. v. USAir, Inc.*, 979 F. Supp. 731, 740-41 (N.D. Ill. 1997).

27.    Proposed Substitute Conclusions:  *Supra*, ¶ 8.

28.    No proposed additional or substitute conclusions.

29.    Proposed Substitute Conclusions:  Hancock has not demonstrated that Abbott breached the RFA by a preponderance of evidence in this case.

30.     <u>Proposed Substitute Conclusions</u>:  The Court concludes that Abbott has not breached the RFA.

31.     <u>Proposed Substitute Conclusions</u>:  The Court concludes that misrepresentations, omissions and breaches of the RFA alleged by Hancock did not result in, or could not have been expected to result in, a material adverse effect on the prospects or condition of the Research Program or any of the Program Compounds.

32.     <u>Proposed Substitute Conclusions</u>:  The Court concludes that Hancock has not suffered any harm as a result of Abbott's alleged breaches of the RFA.

33.     <u>Proposed Substitute Conclusions</u>:  Since Hancock has not suffered any damages, Abbott is not obligated to compensate Hancock.

34.     <u>Proposed Substitute Conclusions</u>:  The Court concludes that punitive damages are not warranted in this case.

### *Indemnification by Abbott (Count III)*

35.     <u>Proposed Substitute Conclusions</u>:  Count III of Hancock's Complaint asserts a cause of Action against Abbott for indemnification pursuant to the RFA.  The plain language of the RFA limits Hancock's indemnity rights to claims by third parties.

Section 12.6 of the RFA provides:

> <u>General Indemnification of John Hancock</u>.  Abbott shall indemnify and hold John Hancock and its Affiliates, agents, directors and employees harmless, and hereby forever releases and discharges John Hancock and its Affiliates, agents, directors and employees, from and against all Losses related to or arising out of, directly or indirectly, (i) any negligence, recklessness or intentional misconduct of Abbott or its Affiliates, agents, directors, employees, Subcontractors, licensees (including Licensees) or sublicensees in connection with the Research Program, Program Compounds or Products, or (ii) any manufacture, use, storage, distribution or sale of the Program Compounds or Products by anyone, including without limitation all Losses related to any personal injury or death, or (iii) any breach by Abbott of its

representations, warranties or obligations hereunder, or (iv) the consummation of the transactions contemplated hereby, except, in each case, to the extent any such Losses are the result of (A) any breach by John Hancock of its representations, warranties or obligations hereunder, or (B) any negligence, recklessness, or intentional misconduct by John Hancock or its Affiliates, agents, directors, employees.

Ex. 32, § 12.6.

Section 12.8 of the RFA provides the procedure by which Hancock may claim

indemnification:

Procedure.    If John Hancock or any of its Affiliates, agents, directors or employees (each, an "Indemnitee") intends to claim indemnification under this Article 12, it shall promptly notify Abbott (the "Indemnitor") of any Loss or action in respect of which the Indemnitee intends to claim such indemnification, and the Indemnitor shall have the right to participate in, and, to the extent the Indemnitor so desires, to assume the defense thereof with counsel selected by the Indemnitor; provided, however, that an Indemnitee shall have the right to retain its own counsel, with the fees and expenses of such counsel to be paid by the Indemnitor, if representation of such Indemnitee by the counsel retained by the Indemnitor would be inappropriate due to actual or potential differing interests between such Indemnitee and any other party represented by such counsel in such proceedings.    The indemnity obligation in this Article 12 shall not apply to amounts paid in settlement of any loss, claim, damage, liability or action if such settlement is effected without the consent of the Indemnitor, which consent shall not be withheld unreasonably or delayed.    The failure to deliver notice to the Indemnitor within a reasonable time after the commencement of any such action, if materially prejudicial to its ability to defend such action, shall relieve the Indemnitor of any liability to the Indemnitee under this Article 12 only to the extent arising from the tardiness or absence of such notice, but the omission so to deliver notice to the Indemnitor will not relieve it of any liability that it may have to any Indemnitee otherwise than under this Article 12.    The Indemnitee shall cooperate fully with the Indemnitor and its legal representatives in the investigation of any action, claim or liability covered by indemnification under this Article 12, at the expense of the Indemnitor.

Ex. 32, § 12.8.

36.    <u>Proposed Substitute Conclusions</u>:  Section 1.27 defines "Losses" as "any claims, demands, liabilities, costs, damages, judgments, settlement *and* other reasonable expenses (including attorneys' fees)."  Ex. 32, § 1.27 (emphasis added).  In construing a contractual indemnity provision, the goal is to ascertain and give effect to the parties' intent.  *Eichengreen v. Rollins, Inc.*, 325 Ill. App. 3d 517, 521, 757 N.E.2d 952, 956 (Ill. App. 2001).

"An indemnity agreement is an agreement whereby the indemnitor agrees to protect the indemnitee from claims asserted against the indemnitee by third persons." *Magnus v. Lutheran General Health Care System*, 235 Ill. App. 3d 173, 185, 601 N.E.2d 907, 915 (Ill. App. 1992); *Ferguson v. Wozniak Industries, Inc.*, 931 S.W.2d 919, 923 (Mo. App. S.D. 1996) ("In general, an agreement to indemnify another is an agreement by one person to hold another harmless from loss or damage as may be specified in the agreement or in which the indemnitor promises to reimburse his indemnitee for loss suffered.  Under Illinois law, that loss is generally associated with liability to a third person.") (citations omitted).

37.    <u>Proposed Substitute Conclusions</u>:  The Court concludes that Hancock did not suffer compensable Losses in this case.  The Court also concludes that the Indemnity Provision of the RFA is limited to indemnification for third-party claims and is not applicable to Hancock's claims against Abbott.

38.    <u>Proposed Substitute Conclusions</u>:  Since the Indemnity provision is inapplicable to Hancock's claims and Hancock did not suffer compensable Losses in this case, Abbott is not obligated to indemnify Hancock.

*Hancock is Barred from the Alternative Remedy of Rescission (Prayer (e))*

39.    <u>Proposed Substitute Conclusions</u>:  Rescission is an equitable remedy to which plaintiffs are never entitled as a matter of right.  *Luciani v. Bestor*, 106 Ill. App. 3d 878, 882, 436 N.E.2d 251, 254-55 (1982).  *See also Pension Benefit Guar. Corp. v. Ziffer*, No. 91C7762, 1994 U.S. Dist. LEXIS 87, *28 (N.D. Ill. Jan. 4, 1994) ("[d]ifferent considerations are taken into account as part of [an] inquiry into whether a contract should be rescinded"); *Giacomazzi v. Urban Search Corp.*, 86 Ill. App. 3d 429, 432, 407 N.E.2d 621, 623-24 (1980) (factual issues such as "reliance, materiality, due care, knowledge, and intent of the parties" are relevant); *see also Pension Benefit*, 1994 U.S. Dist. LEXIS at *28 (a plaintiff seeking rescission must demonstrate both actual and reasonable reliance).

40.    <u>Proposed Additional Conclusions</u>:  Hancock's claim for rescission is barred by the limitations of remedies provision in the RFA.  *See* Abbott's Post-Trial Supp. Proposed Findings of Fact and Concl. of Law, paragraphs 1-64, filed on May 5, 2008 (addressing Sections 11.2 and 11.3 of the RFA).[5]  Hancock is also barred from rescinding the RFA under the doctrines of waiver and judicial estoppel.  *Id.* at 1-60, 69-127.  (Although Abbott has set forth its argument that Hancock is not entitled to rescission in its Post-Trial Supp. Proposed Findings of Fact and Conclusions of Law in an excess of caution, Hancock bears the burden of establishing a right to the equitable

_____

[5] Pursuant to the Court's Second Amended Order Regulating Non-Jury Trial, each party is required to file Proposed Findings of Fact and Conclusions of Law on any claim or defense for which it has the burden of proof.  Abbott's Post-Trial Supp. Proposed Findings of Fact and Conclusions of Law sets forth Abbott's argument that Hancock is barred from rescinding the RFA under the doctrines of waiver and judicial estoppel.  Abbott does not concede, by including this argument, and other arguments, in its Post-Trial Supp. Proposed Findings of Fact and Conclusions of Law, that it bears the burden of proof on these issues.  However, in an abundance of caution, Abbott has included the arguments in its Post-Trial Supp. Proposed Findings of Fact and Conclusions of Law.

remedy of rescission (including the burden of showing that its delay and affirmation of the RFA, after knowledge of the alleged fraud, and the limitation of remedies provision of the RFA, do not preclude its claim for rescission).)

41.    Proposed Substitute Conclusions:  The Court concludes that Abbott did not breach the RFA or engage in fraudulent conduct, and that the misrepresentations and omissions alleged by Hancock are not material and not of such a nature that the RFA would not have been made without them.  Tucker Aff. ¶¶ 78-86; Friedman Tr. 798:18-799:17.

42.    Proposed Substitute Conclusions:  The Court concludes that Hancock is not entitled to the alternative remedy of rescission.

### Abbott's Affirmative Defenses

Proposed Substitute and Additional Conclusions:  Paragraphs 43-71 of Hancock's Proposed Findings of Fact and Conclusions of Law are addressed by Abbott's Post-Trial Supp. Proposed Findings of Fact and Conclusions of Law, filed on May 5, 2008.

72.    Proposed Substitute Conclusions:  Judgment shall enter in favor of Defendant Abbott Laboratories.

### Abbott Was Not Required to Spend $614 Million on the Program Compounds After Hancock Was Excused From Making Its Third and Fourth Program Payments

73.    Proposed Additional Conclusions:  Under Illinois law, "[i]t is well settled that a court, when construing a contract, should ascertain the intent of the parties and give effect to that intent."  *Eichengreen v. Rollins, Inc.*, 325 Ill. App. 3d 517, 521, 757 N.E. 2d 952, 956 (1st Dist. 2001) (citing *In re Marriage of Olsen*, 124 Ill. 2d 19, 25-26 (1988). When interpreting the terms of a contract, a court "must consider the document as a whole, rather than focusing on isolated portions."  *Premier Title Co. v. Donahue*, 328 Ill.

App. 3d 161, 164, 765 N.E. 2d 513, 516 (2nd Dist. 2002).  "It is fundamental in contract

construction that, if possible, effect must be given *to all of the language* so that

provisions which appear to be conflicting or inconsistent may be reconciled or

harmonized."  *In re Halas*, 104 Ill.2d 83, 92, 470 N.E.2d 960, 964 (Ill. 1984) (emphasis

added).

> Under Illinois law and standard rules of contract interpretation, the RFA does not

require Abbott to spend $614 million in the event that Hancock is excused from making

its Program Payments.  *See supra,* Findings of Fact, ¶¶ 141-53.

> 74.     Proposed Additional Conclusions:   The doctrine of judicial estoppel

"precludes a party from asserting a position in one legal proceeding which is contrary to a

position it has already asserted in another."  *Patriot Cinemas, Inc. v. General Cinema

Corp.*, 834 F.2d 208, 212 (1st Cir. 1987); *see also New Hampshire v. Maine*, 532 U.S.

742, 749 (2001).  For judicial estoppel to attach, two condition must be satisfied.  First,

"the estopping position and the estoped position must be directly inconsistent, that is,

mutually exclusive."  *Alternative Sys. Concepts, Inc. v. Synopsy, Inc.*, 374 F.3d 23, 33

(1st Cir. 2004).  Second, "the responsible party must have succeeded in persuading a

court to accept its prior position."  *Id.*  Together, the presence of these two elements gives

the impression that "either the first court has been misled or the second court will be

misled, thus raising the specter of inconsistent determinations and endangering the

integrity of the judicial process."  *Id.*

> 75.     Proposed Additional Conclusions:  Hancock's claim pursuant to Section

3.3(b) is premised on the assumption that Abbott must spend the $614 million

irrespective of Hancock's payments.  Hancock took a contrary position in *Hancock I*,

arguing that the Aggregate Spending Target represents the "combined total" of the parties' defined minimum and maximum contributions, i.e., $400 million from Abbott and approximately $200 million from Hancock, and that the very purpose of the Agreement was for them to share the financial burdens of pharmaceutical development in that two-to-one ratio.  Ex. 834.

76.     Proposed Additional Conclusions:  Hancock is judicially estopped from arguing that it is entitled payments pursuant to Section 3.3(b) of the RFA.

77.     Proposed Additional Conclusions:  "Contract interpretations that produce commercially unreasonable results are disfavored, not as a matter of policy but simply because they are implausible to impute to the parties."  *XCO Int'l, Inc. v. Pacific Scientific Co.*, 369 F.3d 998, 1005 (7th Cir. 2004).  "[I]t is a fundamental principle of contract interpretation that courts read language to make business sense whenever possible."  *Gerow v. Rohm & Haas Co.*, 308 F.3d 721, 725 (7th Cir. 2002).  Hancock's interpretation of Section 3.3(b) of the RFA would produce a commercially irrational result that the parties could not have intended.  *See* Abbott's Post-Trial Supp. Prop. Findings of Fact and Concl. of Law, filed May 5, 2008, ¶¶ 142-51.

In addition, Section 3.3(b) of the RFA, as interpreted by Hancock, is an invalid and unenforceable penalty provision under Illinois law, Hancock's claim pursuant to Section 3.3(b) of the RFA is barred under Illinois law.  *See* Abbott's Post-Trial Supp. Prop. Findings of Fact and Concl. of Law, paragraphs 65-68 and 128-163.[6]

---

[6] Pursuant to the Court's Second Amended Order Regulating Non-Jury Trial, each party is required to file Proposed Findings of Fact and Conclusions of Law on any claim or defense for which it has the burden of proof.  Abbott's Post-Trial Supp. Proposed Findings of Fact and Conclusions of Law sets forth Abbott's argument that Hancock's interpretation of Section 3.3(b) would constitute an unenforceable penalty.  Abbott does not concede, by including this argument, and other arguments, in its Post-Trial Supp. Proposed Findings of Fact and Conclusions of Law,

***Abbott Was Not Required to Provide Hancock With Its Risk-Adjusted Expected
Spending in Its First Annual and Subsequent Annual Research Plans
Pursuant to Section 3.4(iv) of the RFA***

78.    <u>Proposed Additional Conclusions</u>:  The RFA defines the ARP as

reasonably and consistently detailed statement of the objectives,
activities, timetable and budget for the Research Program for every
Program Year remaining in the Program Term ....

Ex. 32, § 1.6.

Abbott represented that the first ARP provided a

a description of projected milestones and dates thereof, projected
year of NDA filing, and projected costs to be incurred by Abbott
during the Program Term, for each Program Compound.  *Such
projections were prepared in good faith and with due care based
on reasonable assumptions, and represent the reasonable estimate
of Abbott based on information available as of the date of such
projections and as of the date hereof; if being agreed that such
projections do not constitute any warranty as to the future
performance of the Program Compounds and that actual results
may vary from such projections.*

Ex. 32, § 12.2(d).

Abbott's ARPs provided Hancock with Abbott's "budget" and "projected costs"

for the Program Term.  The RFA did not require Abbott to provide Hancock with its risk-

adjusted expected spending in its First ARP or its subsequent ARPs, including the ARP

for 2002.  Pursuant to Section 3.4(iv) of the RFA, Abbott

reasonably demonstrate[d] in its Annual Research Plan its intent
and reasonable expectation to expend in Program Related Costs
during the Program Term an amount in excess of the Aggregate
Spending Target.

Ex. 32, § 3.4(iv).

---

that it bears the burden of proof on these issues.  However, in an abundance of caution, Abbott
has included the arguments in its Post-Trial Supp. Proposed Findings of Fact and Conclusions of
Law.

Therefore, Hancock was not excused from making its first and second Program Payments to Abbott.

Dated:  May 5, 2008

Respectfully submitted,

ABBOTT LABORATORIES

By:  /s/    Jeffrey I. Weinberger_____

Jeffrey I. Weinberger (*pro hac vice*)
Gregory D. Phillips (*pro hac vice*)
Eric J. Lorenzini *(pro hac vice)*
Ozge Guzelsu *(pro hac vice)*
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth Floor
Los Angeles, CA  90071-1560
Telephone:  (213) 683-9100

and

Peter E. Gelhaar (BBO#188310)
Michael S. D'Orsi (BBO #566960)
DONNELLY, CONROY & GELHAAR LLP
1 Beacon St., 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880
peg@dcglaw.com
msd@dcglaw.com

*Counsel for Abbott Laboratories*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on May 5, 2008.

Date: May 5, 2008.

_____ /s/ Eric J. Lorenzini _____