UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


JOHN HANCOCK LIFE INSURANCE     )
COMPANY, JOHN HANCOCK           )
VARIABLE LIFE INSURANCE         )
COMPANY, and MANULIFE           )
INSURANCE COMPANY (f/k/a        )          CIVIL ACTION NO.
INVESTORS PARTNER LIFE          )          05-11150-DPW
INSURANCE COMPANY),             )
                                )
          Plaintiffs,           )
                                )
v.                              )
                                )
ABBOTT LABORATORIES, INC.       )
                                )
          Defendant.            )


MEMORANDUM AND ORDER
April 29, 2016

**I. INTRODUCTION**...................................................... 5

**II. FINDINGS OF FACT**............................................... 6

*A. The Parties* ...................................................... 6

*B. The Negotiations for the Agreement* ...................... 6

  1.  Early Negotiations ..................................... 6

  2.  Negotiations in Late 2000 and Early 2001 .............. 9

  3.  Abbott's March 2001 Portfolio Review Meeting .......... 10

*C. The Final Agreement* ...................................... 12

  1.  General Structure of The Agreement ................... 12

  2.  Specific Provisions of The Agreement ................. 13

    a.  Representations and Warranties - Article 12 ........ 13

    b.  Annual Research Programs - Section 2.2 ............. 15

    c.  Audit - Section 2.5 ................................ 16

    d.  Outlicensing - Section 4.3 ........................ 16

    e.  The Spending Obligations - Article 3 ............... 17

     (i)  Hancock's Obligations ............................ 17

     (ii)  Abbott's Obligations ........................... 19

  3.  Representations Regarding the Relevant ................ 22

  Program Compounds ........................................ 22

    a.  ABT-518 ........................................... 22

     (i)  Abbott's Disclosures ............................. 22

     (ii) Review of ABT-518 at the Portfolio Prioritization .. 25

     Meeting and Subsequent Events ......................... 25

     (iii) ASCO Conference and Termination ................... 26

    b.  ABT-594 ........................................... 27

     (i) Abbott's Disclosures ............................. 27

     (ii)  Hancock's Due Diligence ......................... 29

     (iii) The Initial Portfolio Review .................... 30

     (iv)  Phase IIb Trial ................................. 31

     (v) Reduction In Planned Spending For 2001 ............. 33

     (vi)  Termination ................................... 34

    c.  ABT-773 ........................................... 34

     (i)  Abbott's Disclosures ............................. 34

     (ii)  Dosing of ABT-773 .............................. 35

(iii) Liver Toxicity and QT Prolongation Issues ......... 37

(iv)   The Pediatric Program ........................... 39

(v)   Termination ...................................... 40

4.   Hancock's Attempted Audit ........................... 42

5.   Abbott's Outlicensing Efforts Regarding ABT-518 and ABT-594 ................................................. 45

III. CONCLUSIONS OF LAW .................................... 45

A.   Illinois Law Applies ................................ 46

B.   Abbott's Rule 12(f) Motion to Strike Hancock's ...... 46

Prayer for Rescission in the Amended Complaint ............. 46

1.   Hancock's Procedural Challenge to the Motion to Strike 47

2.   The Merits of Abbott's Motion to Strike .............. 48

a.   Election of Remedies ............................... 48

b.   Undue Delay ........................................ 51

c.   Judicial Estoppel .................................. 52

3.   Conclusion .......................................... 54

C.   Breach of Contract .................................. 54

1.   Representations and Warranties Regarding Section 12 ... 56

a.   ABT-518 ............................................ 57

b.   ABT-594 ............................................ 60

(i)   Number of Patients in the Phase IIb Clinical  Trial 60

(ii)   Failure to Disclose that Patients Dropped Out .... 63

of the Phase IIb Trial Because of Side Effects .......... 63

(iii) Projected Spending ............................... 65

(iv)   March 2001 Termination Consideration ............. 66

c.   ABT-773 ............................................ 67

(i) QT Prolongation and Liver Toxicity Issues ........... 67

(iii) The Pediatric Program ............................ 71

d.   Damages ............................................ 72

(i)   Hancock's Lost Royalty and Milestone Damage ....... 73

(ii)   The New Business Rule ............................ 75

(iii) Hancock's Damages Theory is Speculative .......... 76

2.   Outlicensing Required by Section 4.3 ................ 80

3.   Spending Projections Required by Section 2.2 ......... 81

3

a.    Breach .............................................. 81

b.    Damages ............................................ 83

4.    Audit Obligations under Section 2.5 .................. 84

5.    Aggregate Carryover Spending Required by Section 3.3 .. 85

a.    Application of Section 3.3 ......................... 86

(i) Estoppel ........................................... 87

(ii) Interpretation of Section 3.3 ..................... 89

(iii) Whether Abbott's Performance was Contingent ....... 91

(iv) Unenforceable Penalty ............................. 97

D.  *Fraud* .................................................. 103

E.  *Indemnification* ....................................... 105

**IV. CONCLUSION** ........................................... 110

## I. INTRODUCTION

In this litigation a disappointed investor group, which has successfully limited its obligation to continue contributions, is pursuing additional remedies after a joint venture to develop pharmaceutical compounds turned unsuccessful.  Plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and Manulife Insurance Company (collectively "Hancock") and Defendant Abbott Laboratories, Inc. ("Abbott") entered into a Research Funding Agreement (the "Agreement") on March 13, 2001.  Under the Agreement, Abbott agreed to develop a Research Program for a portfolio of nine compounds in exchange for a funding contribution by Hancock.  Hancock, in return, was to receive royalties on any commercially successful compound as well as milestone payments when a compound advanced to a particular stage in its development.

Shortly after the parties signed the Agreement it became clear that some of the compounds would not be successfully developed.  Hancock prevailed in its first lawsuit against Abbott, securing a declaration that it could terminate its funding contributions under the Agreement.  *John Hancock Life Ins. Co*. v. *Abbott Labs.*, No. 03-12501, 2005 WL 2323166 (D. Mass.) ("*Hancock I*") *aff'd,* 478 F.3d 1 (1st Cir. 2006) ("*Hancock II*").  Hancock initiated this second case as a vehicle to raise

5

further contract and fraud claims and ultimately a rescission

claim stemming from the RFA.   Following a non-jury trial, I make

these Findings of Fact and Conclusions of Law pursuant to Fed.

R. Civ. P. 52.

## II. FINDINGS OF FACT

### A.   *The Parties*

Hancock provides various financial services.   Abbott

develops, among other things, pharmaceutical compounds.   Prior

to entering into the Agreement, Hancock and Abbott had developed

a business relationship based upon a series of joint investments

in pharmaceutical and biotech companies.

### B.   *The Negotiations for the Agreement*

#### 1.   Early Negotiations

In late 1999 or early 2000, Abbott and Hancock began

discussions about a possible investment by Hancock in a

portfolio of pharmaceutical compounds that Abbott had under

development.   Most of the preliminary discussions regarding the

Agreement were between Stephen Blewitt, a Managing Director at

Hancock, and Phillip Deemer, the Director of Abbott's Corporate

Licensing Department.   Hancock sought an investment opportunity

that would provide above-average returns with a reasonable level

of risk.   Abbott was interested in a deal that could limit its

risk and share the costs associated with pharmaceutical

development.   As negotiations progressed, the parties focused

their discussions on an investment structure through which Hancock would invest approximately $50 million per year over a four-year period to fund the development of a basket of pharmaceutical compounds ("Program Compounds") in Abbott's research and development portfolio.  In exchange for this funding, Abbott would compensate Hancock through a series of milestone and royalty payments that would become due if the compounds were commercialized.  Abbott would also invest a contractually-agreed amount of money in the compounds over the four-year period.

In mid-2000, the parties began to identify pharmaceutical compounds to be included in the deal and to develop a royalty payment structure.  Hancock requested a diversified basket of compounds reflecting a variety of therapeutic indications, at different stages of development, and with different projected sales.  Among the proposed Program Compounds were ABT-518, a Matrix Metalloproteinase Inhibitor (MMPI) for the treatment of cancer; ABT-594, a selective neuronal nicotinic receptor (NNR) agonist for the treatment of chronic pain; ABT-773, one of a new class of antibiotics known as ketolides; and ABT-980, a selective alpha blocker for the treatment of urinary tract blockages.  Hancock required that Abbott formally represent and

warrant the status, condition, and plans for the proposed
Program Compounds.

During the negotiations, Abbott provided Hancock with a
Descriptive Memorandum regarding each of the proposed Program
Compounds.  The Descriptive Memoranda were prepared by Abbott
and included information regarding: 1) the development status
and technical merits of each compound; 2) the specific
indications for which each compound was being developed; 3) the
nature and severity of any known side effects associated with
each compound; 4) the estimated size of the commercial markets
for each compound; and 5) the identity of any actual or
potential competing products from other pharmaceutical
companies.  Drafts of the Descriptive Memoranda were reviewed by
Deemer and Dr. John Leonard, Abbott's Vice President of
Development, before they were sent to Hancock.

Abbott also provided Hancock with information regarding
Abbott's anticipated development spending on the proposed
compounds through projections and drafts of Abbott's first
Annual Research Program ("ARP").  The ARP drafts included
information regarding Abbott's objectives, activities, and
budget for each of the proposed compounds over the life of the
Agreement.

To verify the accuracy of Abbott's Descriptive Memoranda, Hancock conducted its own research assessment regarding each of the proposed Program Compounds.  Hancock retained Dr. Lynn Klotz, an independent consultant with expertise in biotechnology, to review the Descriptive Memoranda and to verify the accuracy of the information that Abbott supplied in those documents.  Klotz reviewed publicly available information related to the compounds and interviewed independent researchers and physicians who he believed could offer useful information about the compounds.  He also interviewed Leonard and asked him a series of questions regarding the proposed Program Compounds.

Klotz finished his research in mid-July 2000 and provided Blewitt with summaries of his preliminary findings.  Klotz ultimately concluded there was no "indication of deception on Abbott's part" in the Descriptive Memoranda.  However, Klotz reviewed only the June 2000 Descriptive Memoranda; Blewitt did not ask Klotz to review the November 2000, February 2001, or final versions of the Descriptive Memoranda.  Klotz also did not review Abbott's first ARP.

2.  Negotiations in Late 2000 and Early 2001

Hancock and Abbott continued to negotiate in the fall of 2000.  In October 2000, Abbott notified Hancock that it had discontinued development of ABT-980, one of the proposed Program

9

Compounds.  In response to the discontinuance of ABT-980, the
parties negotiated through the end of 2000 to modify the terms
of the proposed deal.  In early 2001, the parties agreed to
replace ABT-980 in the basket with two other compounds, ABT-510
and ABT-492.  Abbott and Hancock continued to modify and refine
the terms of their proposed Agreement in various ways, but the
group of nine Program Compounds remained unaltered through the
execution of the Agreement on March 13, 2001.

    3.   Abbott's March 2001 Portfolio Review Meeting

From March 7-9, 2001, Abbott conducted an off-site
Portfolio Review Meeting.  At this meeting, Abbott reviewed all
the pharmaceutical compounds that it had in development,
including the compounds Abbott had acquired as a result of its
acquisition of the Knoll Pharmaceutical Division of BASF
Corporation ("Knoll") in late 2000.  Dr. Jeffrey Leiden, the
Executive Vice President of Abbott's Pharmaceuticals Division
and its Chief Scientific Officer; Leonard, and other Abbott
employees attended the meeting.  ABT-518, ABT-594, and ABT-773
were three of the compounds reviewed by Abbott at that time.

In late 2000 or early 2001, Abbott had retained the
consulting firm McKinsey & Company ("McKinsey") for the purpose
of managing its integration with Knoll.  Jessica Hopfield, a
member of McKinsey's pharmaceuticals and medical products

practice, was involved in the Knoll integration.  She also
attended the Portfolio Review Meeting.  The purpose of the
attendance of Hopfield and other McKinsey employees at this
meeting was to learn about Abbott's portfolio of pharmaceutical
compounds and to observe the senior leadership of Knoll.

After the meeting, Hopfield created a document titled
"Initial Portfolio Prioritization" that purports to summarize
the status of various compounds Abbott reviewed at the meeting.
Hopfield characterized ABT-594's priority as "pending" and
stated Abbott's next step was to "[a]wait results from ongoing
PII trial – probabl[y] T[erminate]."  Hopfield characterized
ABT-773's priority as "continue" and identified the next step as
undertaking to "[a]ssess side effects issues with expert review
(QTc and liver tox.)."  Finally, Hopfield characterized the
status of ABT-518 as "Hold," and stated the next steps were to
"[w]ait for May results from Pfizer" and "[h]alt all further
expenditures" in the interim.  Hopfield emailed her Initial
Portfolio Prioritization document to Leiden on March 13, 2001.
In the email, Hopfield explained the document was "a detailed
list of the next steps by project" and invited him to make
changes "before it is more broadly distributed."  No one at
Abbott informed Hopfield that the information contained in the
document was not accurate.  Leiden testified that he never

reviewed the document or forwarded it to any other Abbott employee.  Both Leonard and Leiden testified that the information contained in the document Hopfield prepared was not accurate with respect to ABT-594.

I do not credit the document prepared by Hopfield as accurately reflecting Abbott's position at or following the meeting.  The information in the document is directly contradicted in material respects by the testimony of Abbott personnel regarding the status of the compounds and the decisions that were made at the Portfolio Review Meeting.  As will appear below, I credit the testimony of those personnel.

**C.    *The Final Agreement***

    1.   General Structure of The Agreement

The final version of the Agreement was executed by Blewitt for Hancock and Leiden for Abbott on March 13, 2001.  The terms of the Agreement called for Hancock to invest up to $214 million over four years in the development of nine compounds including ABT-518, ABT-594, and ABT-773.  Hancock's return on its investment in the Program Compounds was made dependent on the commercial success of those compounds.  Hancock would only share in revenues generated by the Program Compounds for a set number of years.  In consideration for Hancock's financial contribution, Abbott promised to continue to research and

12

develop the nine compounds and pay Hancock royalties and milestone payments for the commercially successfully drugs. Both the final Descriptive Memoranda and Abbott's first ARP are attached to, and incorporated in, the Agreement as Exhibit 12.2(i) and Exhibit 1.6, respectively.

Deemer sent the final versions of the Descriptive Memoranda for each of the Program Compounds and the first ARP to Hancock on February 15, 2001.  On March 12, 2001, Deemer emailed Blewitt and said that "Leonard looked at all of the documents one last time in preparation for execution."  Leonard noted only one oversight relating to the Program Compounds.  Specifically, the Phase I trial for ABT-518 had not started as scheduled on December 2000, but began in March 2001.  This delay was not anticipated to push back the planned launch date for the compound.  Abbott did not identify any other inaccuracies in the final Descriptive Memoranda on March 13, 2001.

        2.   Specific Provisions of The Agreement

        a.   *Representations and Warranties - Article 12*

Abbott expressly represented and warranted the information contained in its Descriptive Memoranda and in its first ARP in Article 12 of the Agreement as true.  Specifically, Abbott represented and warranted to Hancock in Section 12.2(i) of the Agreement that

neither this Agreement nor any Exhibit to this Agreement
(including the compound reports attached as Exhibit 12.2(i)
hereto (the "Compound Reports")) contains any untrue
statement of material fact or omits to state any material
fact necessary to make the statements contained herein or
therein not misleading.  There is no fact known to Abbott
(other than generally available information concerning the
pharmaceutical industry in general) as of the date of this
Agreement that has not been disclosed in this Agreement or
any Exhibit to this Agreement which has resulted in, or
could reasonably be expected to result in, a material
adverse effect on the prospects or condition (including
safety, efficacy, scientific viability or commercial
[viability]) of the Research Program or any of the Program
Compounds.[1]

Additionally, in Section 12.2(m), Abbott represented and

warranted

[w]ith respect to each Program Compound, since the date of
its respective Compound Report, no condition, circumstance
or fact has arisen (other than generally available
information concerning the pharmaceutical industry in
general) nor has Abbott made any change in the conduct of
the Research Program which, individually or in the
aggregate, has resulted in, or could reasonably be
expect[ed] to result in, a material adverse effect on the
prospects or condition (including safety, efficacy,
scientific viability or commercial [viability]) of such
Program Compounds.

---

[1] Section 12.5 of the Agreement limited the scope of the
representations and warranties Abbott made:
EACH PARTY TO THIS AGREEMENT AGREES THAT, EXCEPT FOR THE
REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT,
NEITHER PARTY MAKES ANY OTHER REPRESENTATIONS OR
WARRANTIES, AND EACH HEREBY DISCLAIMS ANY OTHER
REPRESENTATIONS OR WARRANTIES MADE BY ITSELF OR ANY OF ITS
OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, FINANCIAL AND LEGAL
ADVISORS OR OTHER REPRESENTATIVES, WITH RESPECT TO THE
EXECUTION AND DELIVERY OF THIS AGREEMENT, NOTWITHSTANDING
THE DELIVERY OR DISCLOSURE TO THE OTHER OR THE OTHER'S
REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION
WITH RESPECT TO ANY ONE OR MORE OF THE FOLLOWING.
(capitalization in original).

14

Hancock relied on Abbott's representations and warranties when deciding to enter into the Agreement.

   b.   *Annual Research Programs - Section 2.2*

   Section 2.2 of the Agreement required Abbott, *inter alia*, to provide Hancock, at least forty-five days (45) prior to the start of each Program Year, with a written ARP.  The ARP is defined in the Agreement as

> a reasonably and consistently detailed statement of the objectives, activities, timetable and budget for the Research Program for every Program Year remaining in the Program Term, it being understood that less detail shall be required for Program Years that are not the current Program Year . . . .

Abbott also represented that the first ARP provided a

> description of . . . projected costs to be incurred by Abbott during the Program Term, for each Program Compound. Such projections were prepared in good faith and with due care based on reasonable assumptions, and represent the reasonable estimate of Abbott based on information available as of the date of such projections and as of the date hereof; it being agreed that such projections do not constitute any warranty as to the future performance of the Program Compounds and that actual results may vary from such projections.

Agreement § 12.2(d).

   The ARP had important consequences for the obligations of the parties under the Agreement.  Pursuant to Section 3.4(iv) of the Agreement,

> [i]f Abbott . . . (iv) does not reasonably demonstrate in its Annual Research Plan its intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate

15

Spending Target, John Hancock's obligation to make any
remaining Program Payments for any succeeding Program
Years pursuant to Section 3.1 shall terminate.  For
the avoidance of doubt, the Program Payments for the
Program Year in which such event occurs shall still be
due and payable . . . .

c.    *Audit – Section 2.5*

Section 2.5 of the Agreement provides:

Abbott shall and shall cause each Subcontractor to,
maintain complete and accurate records, in sufficient
detail and in good scientific manner appropriate for patent
and regulatory purposes and for purposes of demonstrating
compliance with the terms hereof, that fully and properly
reflect all work done, results achieved and Program Related
Costs expended in performance of the Research Program.  The
books and records of Abbott and each Subcontractor related
to the Research Program, including, without limitation,
those related to the expenditure of Program Related Costs,
shall be subject to copying, inspection and audit by (and
at the expense of) John Hancock at any time and from time
to time.  Such audit shall occur on reasonable notice and
during normal business hours by an independent auditor
selected by John Hancock and reasonably acceptable to
Abbott.  John Hancock and its independent auditor shall
maintain such records and information of Abbott in
confidence in accordance with Article 10 and shall not use
such records or information except to the extent permitted
by this Agreement, including any enforcement of the
provisions hereof.  In the event that such audit reveals
any material breach of Abbott's responsibilities hereunder,
Abbott shall (i) pay the reasonable fees and expenses
charged by such auditor, and (ii) fully and promptly cure
such breach.

d.    *Outlicensing – Section 4.3*

Section 4.3(d) of the Agreement provides that, "as soon

as is practicable, Abbott shall maximize the commercial value,

if any, of [a] Ceased Compound" (defined in the Agreement as a

Program Compound that Abbott has "substantially cease[d]

developing, marketing or selling") to "both parties by out-

licensing or divesting such Ceased Compound to a third party."

Abbott thereafter shall

> remunerate Hancock based on sales of such Ceased
> Compound by the third party that has acquired or
> licensed the Ceased Compound . . . in a manner most
> consistent with the allocation that would have applied
> hereunder had such Ceased Compound not been so out-
> licensed or divested . . . .

This contractual obligation was further outlined by Section

4.1 of the Agreement which required that Abbott develop and

market the product using

> efforts which are consistent with those normally used by
> other pharmaceutical companies with respect to other
> pharmaceutical compounds or products which are of
> comparable potential commercial value and market potential
> at a similar stage of development or product life, taking
> into account, without limitation, issues of safety and
> efficacy, compound or product profile, proprietary status,
> the regulatory environment and the status of the compound
> or product and other relevant scientific factors.

Section 4.4 of the Agreement limited any disparities in

Abbott's treatment of compounds and products:

> Abbott shall not research, develop, manufacture, market,
> sell, distribute, out-license or otherwise treat any
> Program Compounds or Product differently, as compared to
> any other Abbott compounds or products, on account of any
> of John Hancock's rights hereunder.

> e.   *The Spending Obligations - Article 3*

> > (i)  Hancock's Obligations

The parties agreed that during a four-year period of research and development of the nine compounds (the "Program Term"):

> John Hancock shall make the following installment payments on the applicable payment date (the "Payment Date"), for the applicable Program Year, to Abbott to help support the Research Program (the "Program Payments") program payments to Abbott in the installments and on the dates set forth below:

| Payment Date | Amount | Program Year |
|---|---|---|
| December 1, 2001 | $50,000,000 | First |
| December 1, 2002 | $54,000,000 | Second |
| December 1, 2003 | $58,000,000 | Third |
| December 1, 2004 | $52,000,000 | Fourth |

Agreement 3.1.  Thus, Hancock promised to pay Abbott a total of $214 million in four installment payments over a period of four years.

Hancock's obligation to Abbott was explicitly contingent, however, on several events.  Section 3.4 of the Agreement provided that Hancock could terminate its obligation under the Agreement in any of four circumstances:

> If Abbott:

> (i) abandons development of all Preclinical Programs and Program Compounds in any Program Year during the Program Term . . .

18

(ii) does not spend . . . the full amount of the Program
Payment made by John Hancock for such Program Year;[2]

(iii) does not reasonably demonstrate in its Annual
Research Plan, its intent and reasonable expectation to
expend . . . an amount in excess of the Program Payment to
be provided by John Hancock for that year; or

(iv) does not reasonably demonstrate in its Annual Research
Plan its intent and reasonable expectation to expend . . .
an amount in excess of the Aggregate Spending Target.

In *Hancock I*, I found that Abbott had not met the last

condition and that Hancock's obligation to make the Third and

Fourth Program Payments had terminated according to Section

3.4(iv) of the Agreement.  Consequently, Hancock's required

contributions of $104 million have been satisfied.

(ii) Abbott's Obligations

In consideration of Hancock's contribution, the parties

agreed that Abbott would have two spending obligations:

Abbott shall spend on Program Related Costs: (i) during
each Program Year, at least the Annual Minimum Spending
Target for such Program Year and (ii) at least the
Aggregate Spending Target during the Program Term.

---

[2] The clause later states that "in the case of either (i) or (ii)
above, Abbott shall (not later than the 10th day following such
event) pay to John Hancock (x) the amount, if any, by which the
Program Payment made by John Hancock for such year (in the case
of (I) above meaning the Program Year in which all Preclinical
Programs and Program Compounds were finally abandoned), if any,
exceeds one-half of the Program Related Costs actually spent by
Abbott during that Program Year and (y) such additional amount
that, after giving effect to the payments referred to in this
sentence, causes the Program Related Costs for all years in the
Program Term to date to have been funded one-third (1/3) by John
Hancock and two-thirds (2/3) by Abbott."

Agreement § 3.2.  The "Annual Minimum Spending Target" is defined within the Agreement as "the sum of (i) the Program Payment of John Hancock for such Program Year as specified in Section 3.1, (ii) Fifty Million Dollars ($50,000,000), and (iii) any Annual Carryover Amount for the prior Program Year pursuant to Section 3.3."  Agreement § 1.5.  The "Aggregate Spending Target" is defined in the Agreement as $614,000,000.  Agreement § 1.3.

   The Agreement explicitly gave some leeway to Abbott to underspend for one year and carryover the amount it underspent to the next year.  Under Section 3.3, entitled "Carryover Provisions,"

> Abbott shall be permitted to change its funding obligations under Section 3.2 only as follows:
>
> (a) If in any Program Year Abbott spends on Program Related Costs, the full amount of the Program Payment provided by John Hancock for such Program Year, but does not spend the full amount of the Annual Minimum Spending Target for such Program Year (including any Annual Carryover Amounts from any prior Program Years), Abbott will spend on Program Related Costs the difference between its expenditure on Program Related Costs for such Program Year and the Annual Minimum Spending Target for such Program Year (the "Annual Carryover Amount") in the subsequent Program Year.  John Hancock's obligation to make any Program Payment for such subsequent Program Year, if any, pursuant to Section 4.2, shall be deferred until the time that Abbott has spent and notifies John Hancock that it has spent the Annual Carryover Amount in such subsequent Program Year . . . .

In other words, Section 3.3(a) allowed Abbott to underspend in any Program Year as long as: 1) it spent *at least* the amount it

received from Hancock that year; and, 2) it spent the rest of the Annual Spending Target in the subsequent year.

Abbott could also extend the Program Term an extra fifth year to spend any carryover amount from the fourth year:

> (b) If Abbott does not expend on Program Related Costs the full amount of the Aggregate Spending Target during the Program Term, Abbott will expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the "Aggregate Carryover Amount") on Program Related Costs during the subsequent year commencing immediately after the end of the Program Term . . . .

Agreement § 3.3(b).

I find Abbott's actual spending on Program Related Costs over the four-year Program Term to have been $514.9 million. This figure is derived from Abbott's 2008 ARP and includes Abbott's reported spending during the four program term of $442 million and $72.9 million in the fifth year, 2005.[3]  The amount

---

[3] The evidence as to this figure is confounding.  In its August 3, 2007 interrogatory responses, Abbott reported $456.2 million had been expended during the four year program period.  However, in its November 20, 2007 interrogatory responses Abbott reported just $442 million had been expended during the four year period. Then on January 9, 2008, Abbott reported that its report of November 20, 2007 — less than two months earlier — had been incorrect and that its August 3, 2007 number was accurate. Neither party sought to clarify the reasons for the different number and Hancock proceeded to provide alternative calculations based upon both. In making this finding, I choose, in the absence of further particularization from Abbott, to hold Abbott to the highest figure it reported.  It should be noted further that this finding is contingent in light of the conclusion in Section III.C.5 that no damages are available under Section 3.3 for the Aggregate Carryover Spending Shortfall. I make this

reflects Abbott's historically-reported spending on Program Related Costs, adjusted *pro rata* to exclude spending pre-dating the commencement of the Program Term on March 13, 2001. Subtracting 514.9 million from $614 million leaves an aggregate carryover amount of $99.1 million unexpended as January 30, 2006.

   3.   Representations Regarding the Relevant
        Program Compounds

   Of the nine compounds included in the Portfolio, Hancock alleges that Abbott made material misrepresentations and omissions regarding three: ABT-518, ABT-594, and ABT-773.[4]

   a.   *ABT-518*

   ABT-518 is a Matrix Metalloproteinase Inhibitor (MMPIs) that is intended to inhibit the growth of cancerous tumors.

        (i)  Abbott's Disclosures

   The final version of the Descriptive Memorandum stated that "Abbott's Matrix Metalloproteinase Inhibitor (MMPI) program

---

finding so that the judgment in this case can be reconfigured should that conclusion be found to be in error.
[4] During negotiations, Abbott provided Hancock with three versions of its Descriptive Memoranda for ABT-518, ABT-594, and ABT-773: an initial draft dated May 31, 2000, an updated draft dated November 1, 2000, and the final version dated February 2001.  The final version was also included as part of the Agreement and in Abbott's representations and Warranties.  As a result, my analysis focuses on the final memoranda.  The status of each of these three Program Compounds as of March 13, 2001 will be discussed separately.

represents a novel therapeutic class, with the potential to
alter the way cancer is treated by preventing or modifying
disease progression and/or metastases." Abbott also believed
the "selectivity profile exhibited by ABT-518 distinguishes it
from competitor's compounds." Abbott viewed ABT-518 as "a
compelling development candidate with the potential to
demonstrate antitumor effects superior to the [other] MMP
inhibitors currently undergoing clinical trials."

The Descriptive Memorandum also disclosed that other
companies had MMPIs in clinical development. On this point, the
Descriptive Memorandum stated that

> although Abbott's timing to market is not optimal, the
> shortcomings of the competitive products provide an
> opportunity for a compound with an improved SE or efficacy
> profile. Current animal models seem to predict [ABT-518]
> is superior to those currently in clinical trials, and has
> the potential to be best in class.

Abbott disclosed various risks associated with ABT-518 in
the Descriptive Memorandum. For example, Abbott disclosed that
the competitor MMPIs had experienced various problems, including
that 1) a competitor compound, Marimstat, had shown "no survival
advantage [in pancreatic cancer]" and that other MMPI compounds
had not demonstrated efficacy; 2) competitor compounds had "dose
limiting toxicity" that "almost certainly preclude their long-
term use, limit compliance and reduce optimal efficacy"; and 3)

"Bayer recently dropped development of its MMPI compound due to concerns about potential toxicity."

In addition, Abbott also disclosed that ABT-518 was at a less advanced stage of development than the competitor compounds, so the side-effect obstacles would be even higher for ABT-518 than they had been for other compounds.  Specifically, Abbott disclosed

> [a]s the 3rd or 4th MMPI to market, Abbott's compound will need to demonstrate a meaningful clinical advantage over compounds that are in more advanced development.  Strict Go/No Go criteria will determine if the MMPI can meet these hurdles.  If they cannot be met, the compound will not move forward.

As of March 13, 2001, Abbott estimated that ABT-518 had a 13% technical probability of success and worldwide peak sales of $496 million.

Hancock's due diligence effort also made it aware that risks were associated with the development of ABT-518.  For example, Klotz prepared a memorandum for Hancock that included his observations regarding ABT-518.  In the memorandum, he identified ABT-518 as a "high" risk compound.  That is, he believed there was a low probability of the compound ever reaching the market.  By the same token, Klotz also suggested Hancock should view ABT-518 as having "more of an up-side" than the other compounds in the basket.

24

(ii) Review of ABT-518 at the Portfolio Prioritization
Meeting and Subsequent Events

A presentation was made regarding ABT-518 at the Portfolio
Prioritization Meeting in March 2001.  Shortly after the
meeting, Leiden put a hold on the enrollment of patients in the
Phase I clinical trial of ABT-518.  Leiden ordered the hold to
await the release of clinical data regarding competitor MMPI
compounds at the American Society of Clinical Oncology ("ASCO")
conference on May 12-15, 2001.  Abbott personnel working on ABT-
518 were instructed on March 11, 2001 to "stop all development
activities immediately."  Dr. Azmi Nabulsi, an Abbott employee
who was working on the Phase I study of ABT-518 in the
Netherlands, notified his counterpart in Europe on March 11,
2001 that "we are not proceeding with the trial as a result of
the [ABT-518] project's re-prioritization following the
acquisition of Knoll."  On March 12, 2001, Abbott told
investigators to continue the study with the one patient who had
enrolled in the clinical study but to halt all further
enrollment.

Following Leiden's initial hold decision, Leonard had a
discussion with him.  Leonard urged Leiden to lift the hold for
various reasons, including that ABT-518 was distinguishable from
competitor compounds, that a delay could put ABT-518 at a

25

strategic disadvantage, and that the cost savings in halting
development until after the ASCO conference were relatively
minor.  Leonard also told Leiden that Hancock was a partner for
ABT-518.

On March 13, 2001, Leiden lifted the hold of the Phase I
trial.  The trial did not resume immediately, however.  On March
20, Deemer sent Dr. Perry Nisen, the head of Abbott's Oncology
R&D Program, an email stating

> You probably heard that Hancock was signed last week:
> $214,000,000 over 4 years!  A long time coming but
> finally done.  We had a little scare at the end when
> it looked like 518 was being slowed down which could
> have been the deathnell [sic] to the deal.  I worked
> with John [Leonard] to protest that and I understand
> it is back on track.

The first new patient enrolled in the clinical trial on March
26, 2001.  Other development work on ABT-518, including various
toxicology tests and analyses, were kept on hold pending the
ASCO conference.  These tests and analyses never were resumed.

(iii) ASCO Conference and Termination

On May 12-15, 2001, Abbott employees attended the ASCO
conference.  At the conference, new information regarding the
clinical trials of other MMPI compounds was presented.  From the
presentations, Abbott became aware of scientific data regarding
lack of efficacy and side effect problems in clinical trials of
competitors' MMPI compounds.  After learning of these results,

some Abbott employees who worked on ABT-518 recommended continuing clinical trials of ABT-518.  However, Leonard and Leiden ultimately decided to terminate the development of ABT-518 based on the information presented at the ASCO conference. This decision was conveyed to Abbott employees working on ABT-518 in early June 2001 and to the investigators conducting the trial in mid-June 2001.  Abbott notified Hancock of its decision to terminate ABT-518 on September 20, 2001.

As a result of Abbott's decision to terminate the ABT-518 clinical trial in May 2001, no pharmacodynamic analyses or formal efficacy analyses could be completed, and no safety conclusions could be drawn from the Phase I clinical study. Thus, Abbott could not tell if ABT-518 had certain advantages that competitor compounds lacked.

*b.   ABT-594*

ABT-594 is a selective neuronal nicotinic receptor (NNR) agonist, intended to treat moderate to severe pain, including neuropathic pain.

(i) Abbott's Disclosures

The final version of the Descriptive Memorandum included these statements regarding ABT-594: 1) "a phase IIb study for neuropathic pain at higher, titrated doses of ABT-594 began in April 2000 and ends in June 2001.  A total of 320 patients is

anticipated to be included in the study"; 2) Abbott "expected"
ABT-594 "to be the first neuronal nicotinic receptor agonist to
receive an indication for pain.  It has a novel mechanism of
action and a potentially broad coverage of chronic pain
conditions.  In addition, it has an opioid-like efficacy without
tolerance, dependence, or abuse potential, while having
equivalent/superior efficacy to other drugs used to treat
neuropathic pain"; 3) ABT-594 was "generally well tolerated" in
the prior Phase I and Phase II studies conducted by Abbott, with
the "most common adverse events subjects receiving ABT-594"
experienced being "dizziness, nausea, vomiting, asthenia and
diarrhea, all of which [according to Abbott's initial draft
Descriptive Memorandum for ABT-594] were considered mild by
investigators."

Abbott also disclosed various problems and potential
problems associated with the development of ABT-594 in the
Descriptive Memorandum including: 1) that the likelihood of ABT-
594 reaching its target profile of low nausea/vomiting was
"Low"; 2) that during clinical trials, the "most common adverse
events for subjects receiving 75 [micrograms twice-a-day] were
nausea (15%), headache (13%), dizziness (7%), insomnia (6%), and

28

vomiting (5%)"; and 3) that the therapeutic window[5] might be small because the Phase IIa studies "suggest a trend towards analgesic effect [efficacy]" at 75 micrograms twice-a-day and that Phase I studies indicated that the maximum tolerated dose might be as low as 150 micrograms per day.  Abbott also disclosed in the Agreement that a "Go/No Go" decision for clinical efficacy was expected in June 2001 at the conclusion of the Phase IIB trial.

In the first ARP, Abbott represented that its "2001 Current Projection (Plan)" for spending on ABT-594 was "35.0" million dollars, including over $11.5 million for additional Phase II and Phase III studies that Abbott planned to commence in the 2001 calendar year.

(ii) Hancock's Due Diligence

Hancock's due diligence also revealed potential obstacles to development.  After his review of the April 2000 version of the Descriptive Memorandum for ABT-594, Klotz recognized that: 1) there "may be a problem with the therapeutic window"; 2) "10% of patients at 75 [micrograms on twice-a-day dosing] had a number of uncomfortable side effects such as headaches, nausea, etc"; 3) the therapeutic window of ABT-594 could be too narrow

---

[5] The therapeutic window is the ratio between the minimum efficacious dose and the maximum tolerated dose.

and that there was "some risk of not passing phase II clinical trials."  Based on the information in the Descriptive Memorandum, Klotz recommended that Hancock seek the opinion of pain clinical trials experts and advised Hancock it was important to "see a summary of the latest clinical trial data." At Hancock's request, Klotz proceeded to interview Dr. Mitchell Max, a clinical trials pain expert, regarding ABT-594.  Max opined that a "therapeutic window of two is certainly acceptable" for chronic pain medications like ABT-594.  Max's opinion alleviated Hancock's concern that the therapeutic window was too short.

The November 2000 Descriptive Memorandum first disclosed that Abbott expected a "low" probability of "low nausea/vomiting" for ABT-594.  This information was not in the April 2000 Descriptive Memorandum that Klotz reviewed.  Blewitt did not bring this newly disclosed information to the attention of the Hancock investment committee or Klotz.  Klotz testified that this information would have raised a "huge red flag" for him if he had been made aware of it.

(iii) The Initial Portfolio Review

During the Initial Portfolio Review, Abbott estimated ABT-594 had a 45% probability of completing Phase II and would then have a 70% probability of completing Phase III for neuropathic

30

pain.  These numbers were roughly the same as the industry average for a compound in Phase II.  Similarly, Abbott estimated that ABT-594 had a 50% probability of completing Phase II and a 32% probability of completing Phase III for chronic persistent pain.  Abbott's senior management did not predict the Phase IIb trial would end negatively.  It also was not the practice of Abbott's senior management to make decisions regarding the termination of a compound based on blinded data from an ongoing clinical trial.

        (iv) Phase IIb Trial

    Abbott's Phase IIb trial of ABT-594 for the treatment of diabetic neuropathic pain ("M99-114[6]) began in April 2000.  The Phase IIb trial was designed to include 320 patients in a "double-blinded" format.  The purpose of the trial was to determine the doses at which ABT-594 would be efficacious and well-tolerated.  The trial was set up such that patients were placed in four different dose groups: placebo, 150 micrograms twice-a-day, 225 micrograms twice-a-day, and 300 micrograms twice-a-day.

    Shortly after the trial began, a number of patients dropped out of the program.  As of July 7, 2000, 31 of the 78 patients enrolled in the trial had prematurely terminated their

---

[6] The Phase IIb trial was referred to as the "M99-114" trial.

involvement in the study.  Twenty of the 78 patients pre-
terminated due to adverse events "typical of [ABT-594] (nausea,
vomiting and/or dizziness)."  The other 11 patients who pre-
terminated did not indicate why they left the trial.  In August
2000, the ABT-594 Product Development Team expressed concern
about the dropout rate in the trial.

Abbott tried various measures in the summer and fall of
2000 to address the premature termination and enrollment
problem.  It extended the enrollment deadline for the trial from
September 22, 2000 to March 2, 2001.  It also considered the use
of outside patient recruitment firms to increase enrollment.
The firms were informed that the Phase IIb study had a "high
study dropout rate of 34% primarily due to side effects of the
investigational drug."  Ultimately, however, Abbott decided not
to retain a patient recruitment firm.

In the fall of 2000, Abbott's senior management regarded
ABT-594 as having "questionable commercial viability."  In mid-
to-late 2000, Abbott employees with responsibility for
supervising the Phase IIb trial of ABT-594 reviewed preliminary,
blinded trial data.  Abbott considered, but ultimately rejected,
revising the trial to eliminate the highest dosage group in an
attempt to reduce the side effects that participants suffered.

In December 2000, Abbott decided to conclude the trial as
of January 5, 2001, two months ahead of its planned end-date of
March 5, 2001.  As a result, Abbott enrolled a total of 269
patients, of whom 266 received treatment, instead of the planned
320.  This decrease reduced the power of the study by 6 percent,
to a level of less than 80% power.  Nonetheless, Abbott
personnel believed stopping short of the planned number of
patients would still result in an adequately powered,
statistically valid trial.  The study turned out to be
successful in that "there was a clear distinction between each
of the active doses and placebo with respect to the placebo
efficacy, and there was a clear distinction between each of the
active doses and placebo with respect to tolerability."

(v) Reduction In Planned Spending For 2001

During roughly the same time period, Abbott reduced its
ABT-594 planned spending for 2001 to approximately $9.3 million.
The 2001 spending included funding to complete a "Go/No Go"
decision regarding ABT-594, but did not include funding for
additional trials.  Abbott assumed that a "No Go" decision would
be made on ABT-594 during the second quarter of 2001.  If a "Go"
decision were to be made, Abbott had budgeted an additional
$45.3 million for further development of ABT-594 in 2001.  For
the years 2002-2004, however, Abbott did increase its planned

spending on the compound.  Overall, for calendar years 2001

through 2005, assuming a "Go" decision were made, Abbott

estimated spending $163.6 million on ABT-594, an amount $24.6

million more than the $139 million Abbott had represented in the

Agreement that it would spend.

(vi) Termination

The unblinded data from the M99-114 trial became available

in April 2001.  The unblinded data provided information

regarding the rates of efficacy, nausea, vomiting, other adverse

effects, and discontinuation according to dose group.  After

analyzing the data in October 2001, Abbott decided to

discontinue development of ABT-594.  Abbott took this step

because ABT-594's therapeutic window was too narrow and the

compound did not display an acceptable tolerability profile.

Although Abbott informed its employees in October 2001 that it

was discontinuing development, it did not inform Hancock until

November 20, 2001.

c.   ABT-773

ABT-773 is an anti-infective compound, in a class of

antibiotics known as ketolides.

(i)  Abbott's Disclosures

The final version of the Descriptive Memorandum included

these statements: 1) "Product features such as high efficacy,

34

activity against resistant strains of bacteria and convenience should enable [ABT-773] to compete against both Zithromax and newer agents such as quinolones"; 2) "Dosing is expected to be once-a-day.  A 5-day convenience pak at a competitive price will maximize sales"; 3) "The likely profile of ABT-773 justifies further developments: ABT-773 pertains to a new class of antibiotics; Good activity against resistant Gram+ organisms, particularly macrolide-resistant S. pneumoniae; Convenience, safety and tolerability profile competitive with [Zithromax]; Oral suspension and I.V. forms enabling penetration into pediatrics and hospital segments"; and 4) the "oral formulation" would "enabl[e] penetration" into the pediatric market.

Abbott also disclosed various risks to development.  With regard to the safety profile of ABT-773, Abbott disclosed that during Phase II trials conducted in 1999, 1% of patients taking both the 100 mg and 200 mg three-times-a-day experienced elevated liver function tests.  The Memorandum also disclosed that the indications for ABT-773 are "Adult Tablet" and "I.V."

(ii) Dosing of ABT-773

Abbott developed ABT-773 to treat four distinct indications: acute bacterial exacerbation of chronic bronchitis, pharyngitis, community-acquired pneumonia ("CAP"), and acute bacterial or maxillary sinusitis.  The most valuable market for

ABT-773 was perceived to be in the two less severe indications: chronic bronchitis and pharyngitis.  Abbott viewed not having once-a-day dosing in the U.S. market for these two indications as "representing a significant commercial hurdle."  However, once-a-day dosing was less important in foreign markets, which were expected to account for nearly half of the total sales of ABT-773.  Additionally, Abbott believed twice-a-day dosing for the two more severe indications would not be a significant commercial challenge because other drugs on the market for those indications were twice-a-day.

In the final Descriptive Memorandum, Abbott represented that ABT-773 "dosing is expected to be once-a-day."  However, the Agreement indicated that dosing might not be once-a-day for all indications.  Specifically, the Agreement stated that tablet dosing for ABT-773 would be "150 mg QD [once-a-day] or 150 mg BID [twice-a-day] dosing based on severity of indications." Blewitt testified that he believed that all four indications would be approved for once-a-day dosing, but that patients might have to take the drug twice a day for the more severe indications.

Although data from a Phase II clinical trial indicated in February 2001, that 300 mg, once-a-day dosing was not viable for any indication, as of March 2001, Abbott believed there was a

high probability of achieving once-a-day dosing for the two less severe indications (pharyngitis and chronic bronchitis). However, Abbott remained uncertain whether once-a-day dosing would be achieved for the two more severe indications.  Abbott was awaiting data from an ongoing Phase III trial that was expected to become available in the second quarter of 2001 to determine whether 150 mg, once-a-day dosing would be viable for the more severe indications.  Abbott recognized that the "[a]bsence of consistent [once-a-day] dosing for all indications" presented "a significant commercial hurdle" for ABT-773 in the United States.

In July 2001, the clinical data from the Phase III trial was not yet available.  Abbott decided to plan for a launch of ABT-773 for treatment of CAP and sinusitis with twice-a-day dosing.  Abbott believed proceeding with the twice-a-day dosing would expedite approval and leave open the possibility of introducing once-a-day dosing at a later point in time.

(iii) Liver Toxicity and QT Prolongation Issues

Abbott personnel had discussions concerning ABT-773 with representatives of the FDA in late 2000 regarding liver toxicity and QT prolongation.  In these conversations, the FDA alerted Abbott that they were concerned about liver toxicity.  The FDA requested that Abbott undertake additional toxicology testing of

ABT-773 focused on those issues.  By February 2001, Abbott internally identified "QTc Issues" and "Liver Toxicity Issues" as "Key Issues Facing the ABT-773 development program."  Abbott had also observed a "possible dose effect in Phase I [clinical data] at total daily dose [greater than or equal to] 800 mg."

Before the signing of the Agreement, Abbott had internal discussions regarding liver toxicity and QT prolongation.  The FDA had shown concern regarding liver toxicity for all compounds that were absorbed by the liver.  Abbott had observed elevated liver function results in a Phase I study of ABT-773 that took place in Hawaii.  After further testing, however, Abbott concluded that the elevated liver function tests were caused by the high caloric diet of the particular Japanese patients in the study and were not a side effect of ABT-773.  Thereafter, further discussions at Abbott involved generalized concerns regarding liver toxicity, as well as the issue of QT prolongation.

At the time of trial, ABT-773 was under development as "cethromycin" by Advanced Life Sciences ("ALS"), under a license from Abbott, and ALS announced results from its most recent clinical trial on June 21, 2007.  Cethromycin "achieved positive safety results in the study" and "liver function tests and electrocardiogram monitoring demonstrated no significant

38

differences between subjects receiving cethromycin and subjects
receiving Biaxin," an antibiotic that is currently on the market
today.  ALS confirmed that it is continuing to develop the
compound for once-a-day dosing and expects to file for
regulatory approval.

(iv) The Pediatric Program

In 1998, the United States Food and Drug Administration
("FDA") issued the "pediatric rule."  Pursuant to the pediatric
rule, the FDA generally required a drug sponsor to conduct
studies in pediatrics as part of the overall approval process
for new pharmaceutical compounds.  However, the pediatric rule
requires a drug sponsor only to initiate pediatric studies at
some time prior to regulatory approval of the adult formulation,
or to obtain a waiver from that requirement.  Abbott personnel
believed that the FDA would have approved an adult formulation
even if the pediatric program was not completed at the time it
sought approval.  Prior to the signing of the Agreement, Abbott
knew that the development of a pediatric oral-suspension
formulation of ABT-773 would be "very difficult," because tests
showed the compound to be "5 to 7 times more bitter than
clarithromycin," another antibiotic that Abbott already
marketed.

In 2001, Abbott's entire pediatric oral suspension program was "on hold" and unfunded.  However, Abbott projected spending $9 million on the pediatric program in 2002 and $21.5 million in 2003.  In September 2001, the ABT-773 team believed that formulation work on the pediatric program could begin in mid-October and that the first clinical study would begin six months after that.

(v)  Termination

In April 2001, the FDA held its first advisory meeting for Ketek, a ketolide that was under development by another pharmaceutical company and was at a more advanced stage of development than any other ketolide.  The Ketek advisory focused on the size of Ketek's safety database for QT prolongation and liver toxicity.  Abbott had not expected this focus.  From the Ketek advisory, Abbott concluded that the FDA would require higher numbers of patients in clinical trials to establish that there were no QT prolongation and/or liver toxicity issues.  Given this information, Abbott concluded that the ABT-773 program would be longer and more expensive than previously expected.

In the fall of 2001, ABT-773 failed a clinical trial for pharyngitis.  Additionally, another clinical trial that began on October 3, 2001, was put on hold following the observation of

liver elevations in four patients.  In December 2001, Abbott's Pharmaceutical Executive Committee ("PEC") met to discuss the new information that had become available since April 2001.  The PEC recommended putting the ABT-773 development project "on hold" but to continue the ongoing studies.  The PEC also recommended that Abbott take steps to "aggressively pursue out-licensing or selling the compound."

In a January 2002 memo to Miles D. White, Abbott's CEO, Leonard and Leiden justified the PEC recommendation by identifying certain problems associated with the development of ABT-773: 1) "Once daily dosing has not been achieved in 3 of 4 respiratory indications," which resulted in a "corresponding decrease in the commercial value; particularly given the global trend toward once-a-day/shorter course therapy"; 2) ABT-773 had "[u]nresolved potential safety issues," including "QT prolongation . . . [that] has not been fully characterized and remains a potential liability," as well as "[s]ignificant liver enzyme elevations [that] have been observed in a few subjects in clinical trials to date, most recently in a study to evaluate QT prolongation"; and 3) ABT-773's "emerging side effect profile," which Leiden and Leonard described as "neither significantly better nor worse than clarithromycin in terms of taste and the potential for drug-to-drug interactions."  The memo concluded

that the drug was still technically approvable, but the commercial attractiveness had decreased substantially.

In early 2002, Abbott's senior management decided to suspend further development of ABT-773 in the United States. In January 2002, Abbott informed a Japanese pharmaceutical company that Abbott had "decid[ed] to stop the global development of ABT-773 except for the Japan market place." In February 2002, Abbott informed its employees and other groups that it was suspending development of ABT-773. No final decision regarding whether to continue or terminate development of ABT-773 was made at that time. In the summer of 2002, Abbott decided to suspend further development of ABT-773 in the United States and Europe, but to continue development of ABT-773 for the Asian market. On July 30, 2002, Abbott informed Hancock that it was terminating the development of ABT-773 in the United States and Europe.

### 4.   Hancock's Attempted Audit

On April 12, 2004, Hancock notified Abbott in writing that it was exercising its right under Section 2.5 of the Agreement to audit Abbott. Hancock designated The StoneTurn Group ("StoneTurn"), a consulting firm, as its independent auditor. The purpose of the audit was to examine and assess Abbott's fulfillment of its obligations under the Agreement and its conduct in developing the "Program Compounds." More

specifically, Hancock sought to assess the accuracy and completeness of Abbott's ARPs.

Hancock's April 12, 2004 notification letter included, as "Schedule A," a "preliminary list" of various documents and information that StoneTurn personnel wished to inspect and copy, including materials concerning Abbott's development of the Program Compounds, its termination of various Program Compounds, its expenditures on Program Related Costs, and the status of each Program Compound as of March 13, 2001.  In total, approximately thirty categories of documents were sought for the audit.  Hancock's letter requested that Abbott make the requested documents and information available to StoneTurn by May 12, 2004.

Abbott approved StoneTurn as an independent auditor on June 23, 2004.  Section 2.5 of the Agreement required that Hancock's selection of an auditor be "reasonably acceptable" to Abbott. Abbott learned that StoneTurn had rendered services to Choate, Hall & Stewart ("Choate"), Hancock's counsel, on other matters. Abbott raised its concerns about the relationship between StoneTurn and Choate to Hancock, but eventually agreed to allow StoneTurn to proceed with the audit at the end of June 2004. The audit continued throughout 2004, and Abbott ultimately notified Hancock that it believed it had fulfilled its audit

43

obligations under the Agreement on March 22, 2005.  I find, however, that Abbott did not provide, as requested, sufficient information and materials for StoneTurn successfully to conduct the level of audit contemplated by the Agreement.

First, Abbott did not provide Hancock with an index of the documents enclosed or summary-level documents that allowed StoneTurn to make sense of the hundreds of boxes Abbott provided for the audit.  Hancock requested such documents or the opportunity to speak with specific Abbott employees to help categorize the various documents, but Abbott refused both requests.  Ordinarily, in the course of an audit the contracting party will provide an index or documents and make relevant employees available for interviews.

Second, from the documents that Abbott provided, StoneTurn did not have enough information to conduct an audit.  Abbott did provide StoneTurn with some relevant documents.  However, I find StoneTurn did not receive from Abbott information that would allow it to assess even some of the compounds, much less all of the compounds, for the periods of actual spending represented in the research plans.

As a result of Abbott's shortcomings, StoneTurn was unable to conduct a compliant audit. Abbott's notice of March 22, 2005

establishes that Abbott declined to take further action to cure any breach.

The parties agree that Hancock paid StoneTurn fees and expenses for the audit totaling $198,731.49.

### 5.   Abbott's Outlicensing Efforts Regarding ABT-518 and ABT-594

Abbott stopped developing ABT-518 in 2001.  Thus, ABT-518 is a "Ceased Compound" for purposes of Section 4.3(d) of the Agreement.  Abbott made efforts to out-license ABT-518 to several different pharmaceutical companies, but ultimately was unsuccessful.

ABT-594 is also a "Ceased Compound."  After terminating the development of ABT-594, Abbott has not outlicensed it.  One company, Bayer Animal Health, expressed interest in developing the compound as a drug for animals.  However, Abbott indicated that the compound was not available for license for that purpose.  Abbott was reluctant to outlicense ABT-594 because it "may have [a] negative impact upon the value of follow-ons, independent of the likelihood of success of out-licensing." Specifically, ABT-894 is a follow-on compound to ABT-594 that is currently under development by Abbott.

### III. CONCLUSIONS OF LAW

## A.    Illinois Law Applies

The parties included a choice of law provision in the
Agreement providing that Illinois law would govern any dispute
that arose from the contract.  This choice of law provision,
which I applied in *Hancock I*, 2005 WL 2323166, at *12, has been
upheld by the First Circuit.  *Hancock II*, 478 F.3d at 6.
Consequently, I continue to apply Illinois law in this case.

## B.    Abbott's Rule 12(f) Motion to Strike Hancock's
## Prayer for Rescission in the Amended Complaint

Hancock alleges in Count I of the complaint that Abbott
fraudulently misrepresented the commercial viability of some of
its compounds at the time the parties entered into the
Agreement.  Pursuant to a stipulated January 5, 2007 order
granting its motion to amend, Hancock amended the original
supplemental complaint to include a prayer for rescission of the
contract as a remedy for fraud.  The original complaint
requested only compensatory damages and "such other and further
relief as the Court deems just and appropriate in the
circumstances."  Abbott filed a motion to strike the prayer for
rescission asserting that Hancock cannot seek equitable relief
because 1) Illinois law regarding the election of remedies bars
Hancock from seeking rescission; and 2) Hancock elected to

enforce the Agreement after it learned of the alleged fraud and is judicially estopped from now seeking rescission.[7]

### 1.   Hancock's Procedural Challenge to the Motion to Strike

Before analyzing the merits of Abbott's motion, I first address Hancock's preliminary argument that Abbott may not properly move to strike its prayer for rescission. Specifically, Hancock contends that Abbott waived its argument to strike when it agreed to the stipulated order allowing for amendment of the complaint at the December 5, 2006 hearing. I disagree.

I will not bar Abbott from raising its motion to strike on this basis. Abbott objected to the motion to amend prior to the December hearing, but subsequently agreed to a stipulated order allowing the amendment under pressure from me to resolve the large number of discovery motions pending at the time of the hearing. The stipulation was not an admission that rescission is a proper remedy in this case. The question of appropriate relief was not resolved when Hancock amended its complaint to seek rescission, nor has it been settled or litigated by the

---

[7] Abbott also argues unpersuasively that striking the prayer for rescission is appropriate because the limitation of remedies provisions of the Agreement do not allow for rescission. However, because I conclude that the prayer should be stricken on other grounds, I will not address this argument in depth.

parties to conclusion at this point.  Indeed, even if Abbott had failed completely to oppose the amendment of the complaint, its motion to strike would still be proper.  I find Hancock's argument in this regard unpersuasive.

### 2.    The Merits of Abbott's Motion to Strike[8]

*a.   Election of Remedies*

Under Illinois law, where there are two different remedies available for breach of contract, a party chooses one to "the abandonment of the other."  *Overton* v. *Kingsbrooke Dev., Inc.*, 788 N.E.2d 1212, 1220 (Ill. App. Ct. 2003) ("The remedy of rescission necessitates disaffirming the contract to allow the parties to return to the status quo. . . . A party must elect a remedy based on the affirmance or disaffirmance of the contract, but the election of one is the abandonment of the other.") (citations omitted); *see O'Donnell & Duer Bavarian Brewing Co.* v. *Farrar*, 45 N.E. 283, 286 (Ill. 1896) (stating that "a party attempting to declare a rescission of the contract, who afterwards exercises acts of ownership over the subject-matter of the contract, treating it as his own, will be held to have waived his right to rescind.").

---

[8] I note that a court may strike inappropriate pleadings at any time *sua sponte*.  *See* Fed. R. Civ. 12(f).  The fact that I consider this matter as a result of Abbott's motion is thus immaterial.

In 2006, Hancock elected to enforce the terms of the Agreement in the *Hancock I* litigation even though it knew it had a potential claim of fraud that could form the basis for rescission of the contract.  Hancock filed its complaint in the instant case on June 3, 2005, while *Hancock I* was still pending. At the time, Hancock did not include a specific prayer for rescission in the complaint as requested relief.  On the same day, it wrote the court a letter stating that this action would not contradict or interfere with *Hancock I*.  The letter did not ask the court to stay the declaratory judgment action enforcing the contract, nor did it inform the court that the remedy it would be seeking for fraud would be inconsistent with the remedy in *Hancock I*.  Thus, there was no indication that Hancock sought to void the contract at the time.  I declared in September 2005, three months after Hancock filed a claim for fraud, that the contract would be enforced according to its terms, granting Hancock the contractual relief it sought.  *See Hancock I*, 2015 WL 2323166, at *28.  Hancock's failure to withdraw or stay the declaratory judgment in that action was an election of a remedy inconsistent with rescission.  Thus, I find that the prayer for rescission is now barred.

For the sake of clarity, I must emphasize that I do not conclude that Hancock is precluded from bringing the *claim* for

fraud in this case merely because it failed to bring it in
*Hancock I*.  Indeed, on March 30, 2004, during the course of
*Hancock I*, I explicitly instructed Hancock to bring claims other
than the termination issue in a separate action in this court.
The question of claim or issue preclusion is distinct from the
issue of election of remedies, although the two doctrines rest
upon similar principles of judicial efficiency.  The important
question here is not whether Hancock is precluded from seeking
the remedy of rescission, but rather whether Hancock, by
allowing me to issue a declaratory judgment enforcing the
contract as valid, elected *to the abandonment of other remedies*
to enforce the Agreement according to its terms.  *See Overton,*
788 N.E.2d at 1220.  I find that it did, and thus that Hancock
is precluded from voiding the Agreement in this case.

        Although I am prepared to strike pleadings only in the
narrow circumstance where the pleading is wholly irrelevant or
impertinent to the complaint, this pleading is within that
category.  Rule 12(f) states that upon the motion of a party
"the court may order stricken from any pleading any insufficient
defense or any redundant, immaterial, impertinent, or scandalous
matter."  Given that Hancock elected to enforce the contract as
valid in *Hancock I* knowing that it might also have a claim for

invalidating the contract, Hancock cannot now choose to seek rescission.  Thus, I will strike the prayer from the complaint.

>    *b.   Undue Delay*

Abbott also argues that the prayer for rescission should be stricken because Hancock delayed in seeking rescission after it learned of Abbott's alleged misrepresentations.  "Illinois law has long recognized that the victim of contract fraud who wishes to rescind that contract must not only announce his or her election promptly but must *act* on that intention with like promptness."  *Swartz* v. *Schaub*, 826 F. Supp. 274, 277 (N.D. Ill. 1993) (emphasis in original).  Timeliness is especially important in cases where rescission is sought on the basis of fraud:

>    In cases based on fraud far greater emphasis is placed
>    on the delay in asserting the claim than on a change
>    of circumstances, for an unreasonable lapse of time
>    between discovering the supposed fraud and bringing
>    the suit is of itself prejudicial to the party charged
>    with fraud.

*Id*. (quoting *Schoenbrod* v. *Rosenthal*, 183 N.E.2d 188, 192 (Ill. App. Ct. 1962)).  Illinois courts have consistently barred claims for rescission that are belatedly made.  *See, e.g., Madison Assoc.* v. *Bass*, 511 N.E.2d 690, 699-700 (Ill. App. Ct. 1987) (denying rescission claims because of six month delay from the date the alleged fraud was discovered and the time rescission was sought); *Kanter* v. *Ksander*, 176 N.E. 289, 291

(Ill. 1931) (denying rescission relief because of delay of eleven months).

In this case, Hancock filed its original complaint in this action for fraud, breach of contract, and indemnification on June 3, 2005.  At that time, Hancock sought only monetary damages, not rescission.  It was also pursuing a separate contract remedy in *Hancock I*.  On October 24, 2006, sixteen months after it filed its original complaint in this action — and months after I entered judgment in *Hancock I* providing a contract remedy — Hancock sought leave to amend its supplemental complaint to include a request for a rescission.  I find this delay to be excessive and conclude that Abbott's motion to strike could properly be granted on this basis as well.

  c.  *Judicial Estoppel*

Finally, Abbott argues that Hancock's claim for rescission should be stricken because of judicial estoppel as well.  The judicial estoppel doctrine "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *New Hampshire* v. *Maine*, 532 U.S. 742, 749 (2001) (quoting 18 Moore's Federal Practice § 134.30, p. 134-62 (3d ed. 2000)).  The purpose of the doctrine is "to protect the integrity of the judicial process

. . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id*. at 749-50 (internal quotation marks and citations omitted).

Although there is no hard and fast rule for assessing when the judicial estoppel doctrine applies, the Supreme Court has identified three illustrative factors that are helpful in making this determination. First, is the party's position in the pending litigation "'clearly inconsistent' with its earlier position"? *New Hampshire*, 532 U.S. at 750. Second, did the party succeed "in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled"? *Id.* Third, would "the party seeking to assert an inconsistent position . . . derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped"? *Id*. at 751.

Analysis for judicial estoppel is similar to analysis for election of remedies and suggests that Hancock should be barred from seeking rescission. In this case, Hancock is seeking to take a position inconsistent with the position it took in *Hancock I*. Specifically, in *Hancock I*, Hancock successfully sought enforcement of the Agreement it now seeks to rescind. *See generally Newton* v. *Aitken*, 633 N.E.2d 213, 216 (Ill. App.

Ct. 1994) ("[A] remedy based on a theory of disaffirmance of a contract (rescission) is inconsistent with a remedy arising out of its affirmance (e.g., damages)."). Moreover, I accepted Hancock's position in *Hancock I* and issued a declaratory judgment in its favor. Therefore, Hancock's prayer for rescission is judicially estopped.

### 3.   Conclusion

Having fully considered the appropriateness of a rescission remedy, I conclude that Hancock is barred from seeking to void the contract as a result of fraud on the part of Abbott. Thus, I will grant Abbott's motion, and Hancock's prayer for rescission will be stricken.

### C.   *Breach of Contract*

In Count II of the Second Amended Supplemental Complaint, Hancock asserts a cause of action against Abbott for breach of contract. Under Illinois law, to establish breach of contract a plaintiff must prove: "1) the existence of a valid and enforceable contract; 2) the performance of the contract by the plaintiff; 3) the breach of the contract by [the] defendant; and 4) a resulting injury to plaintiff." *Priebe* v. *Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001); *Hickox* v. *Bell*, 552 N.E.2d 1133, 1143 (Ill. App. Ct. 1990). The plaintiff must prove the elements of a breach of contract claim by a preponderance of the

evidence.  *Mannion* v. *Stallings & Co.*, 561 N.E.2d 1134, 1137-8
(Ill. App. Ct. 1990).  A "minor" breach is compensable with
damages, whereas a "material" breach relieves the non-breaching
party of its duty of counterperformance.  *Circle Sec. Agency,
Inc.* v. *Ross*, 437 N.E.2d 667, 672 (Ill. App. 1982).

In *Hancock I*, I found, and the First Circuit agreed, that
the Agreement was a valid and enforceable contract.  *Hancock II*,
478 F.3d at 6; *Hancock I*, 2015 WL 2323166, at *14, *28.  There
is no dispute that Hancock adequately performed its obligations
under the Agreement.  *Hancock II*, 478 F.3d at 12.  Thus, the
only elements that require analysis in this case are whether
Abbott breached the contract and whether Hancock suffered
damages as a result of that breach.

Hancock alleges Abbott breached the Agreement by 1)
violating the representations and warranties of Section 12; 2)
failing to outlicense the Program Compounds as required by
Section 4.3; 3) failing to provide Hancock with its expected
spending projections as required by Section 2.2; 4) failing to
comply with its audit obligations pursuant to Section 2.5; and
5) failing to pay Hancock one-third of the Aggregate Carryover
amount as required by Section 3.3.  I consider each allegation
in turn.  I note that Hancock also claims that Abbott somehow
breached the Agreement by "exercising its discretion under the

Agreement unreasonably, with improper motive, arbitrarily,
capriciously, and in a manner inconsistent with the reasonable
expectations of the parties." Hancock does not explain this
allegation or identify what provisions of the Agreement Abbott
breached in this regard. Perhaps it is referring to the
projections Abbott provided under Section 2.2 as discussed in
Section III.c.3., *infra*. In any event, that claimed breach as
phrased lacks evidentiary support and sustained argument, and I
will address it no further.

1.    Representations and Warranties Regarding Section 12

Hancock asserts that Abbott breached the contract by
violating the express representations and warranties in Section
12.2(i). In that section, Abbott represented and warranted that
the Agreement and attached exhibits did not "contain[] any
untrue statement of material fact or omit[] to state any
material fact necessary to make the statements contained [in the
Agreement] not misleading." Additionally, Abbott represented
and warranted that "[t]here is no fact known to Abbott (other
than generally available information concerning the
pharmaceutical industry in general) as of the date of this
Agreement that has not been disclosed in this Agreement or any
Exhibit to this Agreement which has resulted in, or could

reasonably be expected to result in, a material adverse effect
on . . . the Program Compounds."

Provided the other elements of a breach of contract claim
are met, the breach of an express representation or warranty
constitutes a breach of contract. *Trustees of Indiana Univ*. v.
*Aetna Cas. & Surety Co.*, 920 F.2d 429, 435 n.7 (7th Cir. 1990)
(under Indiana law that is not disputed by the parties as
inconsistent with Illinois law), *abrogated on other grounds by
Watson* v. *Amedco Steel, Inc.*, 29 F.3d 274, 278 (7th Cir. 1994).
Hancock need not prove that it actually relied on the warranties
and representation of Section 12.2(i), because "proof of
reliance is unnecessary when the existence of a contractual
warranty is undisputed." *Mowbray* v. *Waste Mgmt. Holdings, Inc.*,
45 F. Supp. 2d 132, 137 (D. Mass. 1999) (applying Illinois law);
*see also Wikoff* v. *Vanderveld*, 897 F.2d 232, 241 (7th Cir.
1990).

   a.   *ABT-518*

Hancock alleges that Abbott breached the Agreement by
representing that ABT-518 was a "compelling development
candidate" even though Abbott had halted development of ABT-518
two days before the Agreement was signed.  Similarly, Hancock
claims Abbott breached the Agreement by failing to disclose to
Hancock that it had halted development of ABT-518 on March 11,

2001.  Hancock contends that both the alleged misrepresentation and omission are material.  Abbott does not dispute that Leiden ordered the halt of ABT-518 on March 11, 2001 and that it did not disclose this information to Hancock.  Rather, it argues that short-lived halt in the development of ABT-518 did not materially affect the development prospects for ABT-518.

I conclude that Abbott's omission was material for several reasons.[9]  First, internal documents show that Abbott considered the halt to be important.  In an email shortly after the Agreement was signed, Deemer emailed another Abbott employee and explained: "We had a little scare at the end when it looked like 518 was being slowed down which could have been the deathnell [sic] to the deal.  I worked with John [Leonard] to protest that and I understand it is back on track."  The fact that Deemer, the Abbott employee responsible for negotiating the Agreement, opined that the halt of ABT-518 could have killed the deal clearly demonstrates this information was important to the parties.  While Deemer went to great lengths in his affidavit and during re-direct examination to downplay the significance of

---

[9] Because I conclude Abbott omitted material information I will not address in detail whether Abbott misrepresented the status of ABT-518 by identifying it as a "compelling developmental candidate."  Rather, I simply conclude that such a statement was a material misrepresentation for essentially the same reasons that Abbott's failure to disclose the halt was an omission.

the phrase "deathnell to the deal," I find his after-the-fact explanations to be insufficient to overcome the plain language of his email.

Second, in parallel circumstances, the termination of ABT-980 affected the construction of the Agreement. Following the termination of ABT-980 in the fall of 2000, the two parties negotiated for five months before they agreed on an alternate structure. Because of the relatively small number of Program Compounds and the large amount of money Hancock was investing, significant changes in the status of any of the Program Compounds would have been seen as extremely important. The fact that Abbott halted the development of ABT-518 was significant and very well may have led Hancock to reconsider the terms and structure of the Agreement, just as it had done following the termination of ABT-980.

Third, the fact that Abbott quickly resumed the ABT-518 program does not mean the earlier halt was not important. Leonard sought to convince Leiden to reconsider his decision by informing him that Hancock was a partner in the development of the compound. I find this fact significant because it suggests, and I find, that the pending Agreement played some part in Leiden's decision. Leonard testified that he urged Leiden not to halt the ABT-518 program in part because the cost-savings

59

associated with halting the development until after the ASCO
conference were minimal.  This does not mean that Abbott did not
have concerns regarding new information being released at the
ASCO conference that would be detrimental to the development of
ABT-518.  Rather, it suggests that Leonard, and eventually
Leiden, thought continuing the project was worth the risk that
unfavorable information would be released because the potential
financial loss of continuing was small.  For all of these
reasons I conclude that Abbott breached Section 12.2 in relation
to ABT-518.

> b.  *ABT-594*

>> (i)  Number of Patients in the Phase IIb Clinical
>>      Trial

In the Descriptive Memorandum for ABT-594, Abbott stated "a
phase IIb study for neuropathic pain at higher, titrated doses
of ABT-594 began in April 2000 and ends in June 2001.  A total
of 320 patients is anticipated to be included in the study."
Hancock claims the statement was a misrepresentation because
Abbott stopped enrollment in January 2001 with a total of 269
patients.  Along the same lines, Hancock contends that Abbott
breached the contract by not disclosing that enrollment was
stopped at 269 patients.  Abbott does not contest that it
terminated enrollment short of the planned 320 subjects, but

rather argues that having a lower number of subjects was not material because it did not have a statistically meaningful effect on the outcome of the clinical trial.

The key issue here is whether Abbott's decision to stop enrollment affected the validity of the clinical trial.  I find that it did not.  Abbott statisticians concluded in December 2000 that stopping enrollment short of 320 patients would yield a statistically significant result from the study.  More specifically, Abbott statisticians concluded that ending enrollment with 269 patients instead of 320 patients would decrease the "power"[10] from 80% to 74%.  Based on this modest reduction in power, Abbott concluded that terminating enrollment short of the 320 patient goal was its best strategic decision, because it would allow Abbott to complete the trial by April 2001 and maintain its planned timetable for developing ABT-594.

Hancock argues that "Abbott personnel understood, or should have understood, as of December 2000 that prematurely discontinuing Abbott's Phase IIb study of ABT-594 at less than

---

[10] Power is the probability of observing a statistically significant difference between a placebo and a drug in a trial. Given the predefined standardized treatment effect of 0.46 used in the study, the trial was designed to have a power of 80% if 320 patients enrolled.  That meant there was an eighty percent chance that the differences observed between each of three doses and the placebo would be due to the varying dosage levels and not other factors.

320 subjects would undermine the statistical validity of that study and render it effectively useless." This contention is not supported by the evidence in the record. To be sure, Dr. William Fairweather, Hancock's statistics expert, argues that the power of the study was less than 50% because only 138 subjects completed the trial in its entirety. However, Dr. Fairweather fails to consider that Abbott used imputed data from patients who had terminated early, and had informed Hancock of the procedure before the parties entered into the Agreement. Fairweather conceded that when the imputed data is taken into account, the expected power of the trial rises to 74%, just as Abbott's statisticians asserted.

Hancock does not dispute that it knew that Abbott planned to use imputed data or contend that such a practice was unusual. Instead, Hancock suggests that the FDA might have been skeptical of Abbott's heavy reliance on imputed data. Even if this were true, it would be irrelevant, because the relevant party is Hancock. Hancock knew that Abbott was going to use imputed data and that the use of such data did not reduce the power of the trial when it entered the Agreement. The question of FDA skepticism *vel non* was not the subject of representations and warranties.

I conclude that terminating the trial with 269 people was not material.  My conclusion is supported by the fact that the clinical trial turned out to be successful.  That is, the data from the trial showed a statistically significant difference in effect size between the placebo and each of the three doses tested.  Even Hancock's expert, Fairweather, did not testify that the trial was unsuccessful.  Although the ultimate results of the trial may have been disappointing, the data from the trial showed what it was intended to.[11]

### (ii) Failure to Disclose that Patients Dropped Out of the Phase IIb Trial Because of Side Effects

In a related argument, Hancock asserts that Abbott's failure to disclose the reasons why patients dropped out of the Phase IIb trial — primarily because of adverse effects involving nausea, vomiting, and dizziness — was a material omission.  Abbott claims it did disclose information indicating that ABT-594 had issues with potential side effects.  Furthermore, Abbott claims that the importance of the drop-outs due to side effects was either not known to Abbott or not material.

---

[11] Hancock correctly observes that Abbott did not know the trial was going to be a success until it looked at the unblinded data.  But that is not the issue here.  Rather, the issue is whether Abbott's failures to disclose to Hancock that it was stopping enrollment short of 320 patients was material because it reduced the power of the trial.

I find that Abbott did disclose that ABT-594 had problems with side effects.   In the Descriptive Memorandum for ABT-594, Abbott disclosed that during previous clinical trials, the "most common adverse events for subjects receiving 75 [micrograms twice-a-day] were nausea (15%), headache (13%), dizziness (7%), insomnia (6%), and vomiting (5%)."   More importantly, in both the November 2000 and the final Descriptive Memoranda, Abbott indicated that the likelihood of ABT-594 reaching its target profile of low nausea/vomiting was "Low."

I find these disclosures to be significant.   Hancock did not show either Descriptive Memorandum to its consultant for analysis.   Klotz testified that if he had seen this representation it would have raised a "huge red flag."   Thus, while Abbott may not have disclosed the specific reason why patients had prematurely left the Phase IIb trial, it had disclosed in general terms that side effects were a potential hurdle to the successful development of ABT-594.   Hancock knew this information, but chose not to pursue its implications or obtain expert guidance.

In any event, I conclude that the fact that patients dropped out of the Phase IIb study was not material as of March 13, 2001.   The Phase IIb trial was a double-blind trial.   The unblinded data regarding the Phase IIb trial was not available

64

until April 2001.  When the parties signed the Agreement, Abbott was aware that a high number of patients had left the trial before its completion.  Abbott also knew that a reason many patients gave for leaving the study concerned side effects.  However, Abbott was not aware what doses the patients who dropped out were receiving until the data became unblinded in April 2001.  Thus, the high drop-out rate was not necessarily a concern.  Especially in light of the fact that the purpose of the Phase IIb trial was to determine the dosage of ABT-594 that would be most efficacious, it was to be expected that some of the patients receiving higher dosages (i.e., 300 micrograms) would have had side effects.  Therefore, I conclude that Abbott's failure to disclose the drop-out rate from the specific trial was not a material omission.

(iii) Projected Spending

In the first ARP, Abbott represented that it planned to spend $35,005,000 during 2001 in developing ABT-594.  Hancock asserts this is a misrepresentation because Abbott reduced its planned spending for 2001 before the Agreement was signed.  Abbott budgeted $9.3 million for ABT-594 through a "Go/No Go" decision in May 2001.  Abbott assumed that a "No Go" decision would be made in May 2001.  If a "Go" decision were made, however, Abbott budgeted an additional $5.3 million for

development.  Abbott does not dispute that it reduced its actual spending on ABT-594 in 2001.  However, it claims that the reduction is immaterial because it increased its planned spending for the entire period between 2002 and 2005 so that it planned on spending a total of $24.6 million more than it reported in the ARP.

There is no question that Abbott's failure to disclose the reduction in spending in 2001 and the assumption that a "No Go" decision would be made that year were material.  Planned spending on a compound is an indicator of a company's belief that the compound has the potential to succeed.  By representing to Hancock in the ARP that it intended to spend over $35 million on developing ABT-594 in 2001, Abbott conveyed the message that it believed ABT-594 had potential.  This implicit message was expressly conveyed in the Descriptive Memorandum, which stated that ABT-594 was expected to be the first NNR agonist to receive an indication for pain.  By assuming a "No Go" decision would be made, significantly reducing spending for 2001, Abbott demonstrated that it was less optimistic about the development prospects for this compound.  Therefore, I conclude this misrepresentation by omission was material.

(iv) March 2001 Termination Consideration

In the Descriptive Memorandum, Abbott stated ABT-594 "is expected to be the first neuronal nicotinic receptor agonist to receive an indication for pain." Hancock asserts that Abbott's statement was a misrepresentation because the Initial Portfolio Prioritization Review prepared by Hopfield characterized the next step for ABT-594 as probable termination of the compound's development. Similarly, Hancock claims Abbott omitted material information by not informing it that it planned to probably terminate the compound when the parties entered the Agreement.

In my Findings of Fact above, I determined that the document prepared by Hopfield was not an accurate memorialization of the decisions Abbott management made at the Portfolio Review Meeting. Because I have found that Abbott did not decide to "probably terminate" the compound in early March 2001, this cannot be the basis for a breach.

c.  *ABT-773*

(i) QT Prolongation and Liver Toxicity Issues

In the Descriptive Memorandum for ABT-773, Abbott stated that the "likely profile" of ABT-773 would be "convenience, safety, and [a] tolerability profile competitive with [Zithromax]," an FDA-approved compound. Hancock asserts this statement was a misrepresentation because there were significant, unresolved issues regarding the safety of ABT-773

67

at the time the statement was made, particularly with respect to heart prolongation and liver toxicity.[12]  Abbott responds there were no specific, unresolved issues concerning the safety of ABT-773 as of March 2001.

I conclude that there were no material issues regarding these topics.  To be sure, Abbott had conversations with the FDA and internal discussions regarding QT prolongation and liver toxicity.  However, these discussions appear to have been prompted by the FDA's general concern with these safety issues, not specific issues associated with ABT-773.  The only specific concern Abbott had regarding liver toxicity with ABT-773 was that certain patients taking part in a Phase I study had shown elevated liver function results.  However, that issue was resolved by Abbott before March 13, 2001, when it concluded that the elevated liver function tests were caused by diets of the patients in the study, not by ABT-773.

Additionally, ABT-773 has not shown any QT prolongation or liver toxicity problems since the parties entered into the Agreement.  At the time of trial, ABT-773 was under development as "cethromycin."  Indeed, in June 2007, results from a clinical

---

[12] Hancock also claims that by failing to disclose the QT prolongation and liver toxicity issues, Abbott omitted a material fact.  Because the analysis for this alleged omission is essentially the same as the analysis for this misrepresentation, I will not discuss it separately.

trial were announced that stated "liver function tests and electrocardiogram monitoring demonstrated no significant differences between subjects receiving cethromycin and subjects receiving Biaxin," an antibiotic that is already on the market. Therefore, I conclude Abbott did not breach the Agreement through misrepresentation or omission in this regard.

(ii) Once-a-Day Dosing

In the Descriptive Memorandum for ABT-773, Abbott stated that "dosing is expected to be once-a-day."[13]  Hancock asserts this was a misrepresentation because Abbott had not concluded that once-a-day dosing was possible for the four indications that ABT-773 was designed to treat.

As of March 13, 2001, Abbott believed once-a-day dosing was expected for treating pharyngitis and chronic bronchitis, two less severe indications.  However, Abbott did not have enough information to determine whether once-a-day dosing would be possible for CAP and sinusitis, two more severe indications.

---

[13] Abbott does not dispute the Descriptive Memorandum contains this statement, but asserts that the phrase does not constitute Abbott's position on dosing in its entirety.  In the ARP, Abbott stated that dosing for ABT-773 would be 150 mg QD or 150 mg BID based on the severity of the indication.  However, I find that Abbott did represent simply that "dosing is expected to be once-a-day."  This description of ABT-773 was trumpeted in the beginning of the first page of the Descriptive Memorandum for ABT-773.  In contrast, the statement that ABT-773 dosing would be 150mg QD or twice-a-day was embedded in the middle of a chart in the ARP.

Abbott claims that the misrepresentation regarding CAP and sinusitis was not material.  I conclude that it was.  Abbott had long recognized the importance of once-a-day dosing.  For example, in May 1999 Abbott had observed that "[once-a-day] dosing for adult tab/cap is necessary for commercial success. Market share impact of QD is high."  Similarly, in a strategic marketing plan, Abbott noted that the "[a]bsence of consistent [once-a-day] dosing for *all indications* represents a significant commercial hurdle" and "[o]ptimal strategy for U.S. may be to pursue [once-a-day] dosing for CAP/sinusitis."  Dr. Stanley Bukofzer, an Abbott executive, also made clear that once-a-day dosing was the preferred dosing for all four indications. Abbott plainly considered once-a-day dosing to be an important characteristic for commercial success for all of the indications.  In none of these publications did it distinguish between indications as to the importance of once-a-day dosing compared with twice-a-day dosing.

Abbott presented various proofs to support its position that this misrepresentation was not material, none of which is persuasive.  For example, the potential market was smaller for the more severe indications than it was for the two less severe indications.  Thus, Abbott suggests, once-a-day dosing for those indications was less important.  But simply because the other

70

two indications had a larger potential market does not mean that
the consequence of twice-a-day dosing for CAP and sinusitis
would not have a significant impact on sales.  This is
especially true when competitor drugs had once-a-day dosing for
these indications.  Therefore, I conclude Abbott's
misrepresentation about daily dosing was material.

        (iii) The Pediatric Program

    Abbott stated the "likely profile" of ABT-773 included
"[o]ral suspension and I.V. forms enabling penetration into
pediatrics."  Hancock claims this statement was a
misrepresentation because Abbott had recognized in February 2001
that the taste of ABT-773 would make "the development of an
acceptable [pediatric] formulation very difficult."  Moreover,
Abbott's pediatric oral suspension program for ABT-773 was on
hold and unfunded for 2001.  Abbott disputes it made any
misrepresentation regarding the pediatric program.  Abbott
points out that it disclosed in the ARP that ABT-773 would be
made available in an "Adult Tablet" and "I.V." and that it did
not budget money in 2001 for the pediatric program or taste
testing.  The Descriptive Memorandum also stated that an oral
formulation would enable penetration into the pediatric market,
but did not identify a date when such a formulation would be

available.  Abbott planned to seek ways to overcome the taste aversion.

I conclude that this was not a material misrepresentation. As discussed more fully in the Findings of Fact, Abbott believed that it could have received approval from the FDA for the adult formulation even if the pediatric program was not complete. Additionally, Abbott was planning to spend $9 million in 2002 and $21.5 million in 2003 on the pediatric program.  In September 2001, Abbott estimated that it would be able to conduct a clinical trial for the pediatric program in early 2002.  In light of what Abbott represented in the Descriptive Memorandum, its future plans for a pediatric program, and the fact that the lack of a pediatric program did not seem likely to delay approval of the adult formulation, I conclude this was neither false nor material.

d. *Damages*

Having found certain material breaches of Section 12, I must determine whether Hancock has proved damages sufficiently. To recover for breach of contract, a plaintiff "must establish both 'that he sustained damages . . . [and] a reasonable basis for computation of those damages.'" *TAS Distrib. Co*. v. *Cummins Engine Co*., 491 F.3d 625, 632 (7th Cir. 2007) (quoting *Ellens* v. *Chi. Area Office Fed. Credit Union*, 578 N.E.2d 263, 267 (Ill.

App. Ct. 1991)).  Speculative damages based merely on

"hypothesis, conjecture, or whim" are not sufficient.  *De Koven*

*Drug Co.* v. *First Nat'l Bank of Evergreen Park*, 327 N.E.2d 378,

380 (Ill. App. Ct. 1975).  Specifically, "[l]ost profits will be

allowed only if: their loss is proved with a reasonable degree

of certainty; the court is satisfied that the wrongful act of

the defendant caused the lost profits; and the profits were

reasonably within the contemplation of the defaulting party at

the time the contract was entered into."  *TAS Distrib.*, 491 F.3d

at 632 (quoting *Milex Prods., Inc.* v. *Alra Labs., Inc.*, 603

N.E.2d 1226, 1235 (Ill. App. Ct. 1992)).

>    (i)  Hancock's Lost Royalty and Milestone Damage
>         Calculations

Before analyzing the sufficiency of Hancock's damage claims

and calculations, I first summarize how Dr. Alan Friedman,

Hancock's damages expert, calculated Hancock's lost royalty and

milestone payments.  For the calculations of damages relating to

misrepresentations and breach of warranties, Friedman assumed

that "Abbott breached its obligations to John Hancock" and that

"Abbott misrepresented or failed to disclose information about

the status and prospects for at least the Misrepresented

Compounds, and that those misrepresentations and omissions were

material to John Hancock's decision to enter into the

Agreement."

73

Friedman concluded that Hancock's damages from lost royalties are the difference between the "But-for Expected Royalty Payments" (the royalty payments Hancock would have received if the compounds were as viable as Abbott represented them to be) and "Actual Expected Royalty Payments" (the royalty payments Hancock will actually receive). For the "but-for" scenario, Friedman used Abbott's nominal sales projections[14] as of March 2001 and what Abbott believed its probability of success was in March 2001 to calculate an expected sales figure. He then took that Expected Sales figure and multiplied it by the royalty rate for each compound to calculate the But-for Expected Royalty Payments. For the actual expected royalty payments, he multipled the nominal sales projections as of March 2001 by the probability of achieving FDA approval as of December 2005. Because all three of the compounds (ABT-518, ABT-594, and ABT-773) had been terminated by December 2005, he calculated that Actual Expected Royalty payments to be zero. Friedman then took the difference of the But-for Expected Royalty Payments and the Actual Expected Royalty payments to calculate the value of the

---

[14] Friedman used two different figures to approximate nominal sales: the "Base Case" and the "Low Case." For the Base Case, Friedman used Abbott's internal sales projection created at the time of the Agreement. For the Low Case, Friedman used industry average probabilities of success for the compounds based on the indication the compound was designed to treat and the stage of development of the compound (i.e., Phase I, Phase II, Phase II).

Lost Royalty Payments.  He used a similar method to calculate lost milestone payments.

Dr. Friedman assumed that no misrepresentations were made for the other six Program Compounds.  Five of the six compounds were terminated following the signing of the Agreement.  Thus, the lost royalty payments, at least as relevant to this analysis, for those five compounds, are zero dollars (because the compounds failed for reasons unrelated to any misrepresentation).  The sixth compound remains under development.  For that compound, the value under the "but-for" scenario and the "actual" scenario is the same.

(ii) The New Business Rule

Under the Illinois "new business rule," "expected profits of a new commercial business are considered too uncertain, specific and remote to permit recovery." *TAS Distrib*., 491 F.3d at 633.  The prohibition also applies to "new product lines in established businesses when profits are difficult to measure." *Id*.  There are exceptions to this rule.  For example, when "experts have provided convincing and non-speculative evidence sufficient to prove lost profits," the new business rule does not apply.  *Id*.

Hancock argues that Friedman has provided a reasonably certain calculation of damages.  Abbott disputes the validity of

Friedman's calculations and consequently claims that Hancock is barred from recovery under the new business rule.  I conclude that Hancock is not *per se* prohibited from recovering damages pursuant to the new business rule.  Nevertheless, for the reasons discussed more fully below, I find the methods Friedman employed to calculate damages speculative and unconvincing, and accordingly conclude that Hancock is barred from recovering.

> (iii) Hancock's Damages Theory is Speculative

The requirement of proving damages to a reasonable degree of certainty is relaxed somewhat when a party seeks lost profits.  "[B]ecause lost profits are prospective, these damages will be inherently uncertain and incapable of calculation with mathematical certainty.  Nevertheless, the evidence presented must afford a reasonable basis for the computation of damages." *TAS Distrib. Co.*, 491 F.3d at 632-33 (internal citations omitted).

Abbott makes two distinctive arguments in this regard. Abbott first claims the probability-weighted calculation is an improper method of calculating damages and renders Hancock's damages speculative.  Specifically, Dr. Abram Tucker, Abbott's damages expert, testified that "the use of a probability-weighted approach is not a generally accepted economic method to measure damages."  Tucker's main reservation about this approach

is that it results in "fictional" predicted outcomes.  By using the probability-weighted calculation, Hancock is estimating what the final royalty and milestone payments would be based on averages.  In reality, the possible results are more binary: either the compound will not be commercially developed and Hancock would receive zero dollars, or the compound will be commercially developed and Hancock would receive more than the estimated average royalty and milestone payments.  Tucker also claims that he has never seen the probability-weighted calculation for damages used in litigation.  Friedman implicitly agreed with this proposition, as he could not identify any cases in which he had previously used this method to calculate damages.

While neither party has identified any case that has employed the probability-weighted calculation to measure damages, I do not find this approach to be categorically improper.  At the time that the parties signed the Agreement, it was clear that these compounds had significant value and potential for future return.  What is more, the parties weighed, balanced and priced the risks involved when selecting which compounds would be placed in the basket.  Given the uncertainty associated with the compounds' eventual development and approval by the FDA, a probability-weighted approach, if conducted

properly, might be reasonable. *See* Restatement (Second) of Contracts § 348(3) ("If a breach is of a promise conditioned on a fortuitous event and it is uncertain whether the event would have occurred had there been no breach, the injured party may recover damages based on the value of the conditional right at the time of breach."). Therefore, I conclude the damages are not speculative simply because Hancock employed the probability-weighted calculation.

Abbott's second argument is that, even if the probability-weighted calculations method is appropriate, Hancock did not correctly compute damages using this method. Specifically, Abbott claims that the alleged damages are unconvincing and speculative because Friedman used the wrong information to calculate the "but-for" and "actual" scenarios. I agree with Abbott on this point.

Friedman's but-for scenario is improper because it reflected the actual result rather than the one that would have followed proper contractual performance by Abbott. Tucker correctly points out that a "proper comparison would compare (1) a but-for scenario based on projections prepared without incorporating the alleged undisclosed materially adverse information (the value of the compounds "as represented") to (2) projections at or around the time of the Agreement incorporating

78

the alleged undisclosed materially adverse information (the
value of the compounds "with the defect"), but without
incorporating other factors or information not yet known to
Abbott at the time of the Agreement."  Conceptually, this
approach makes significant sense.  However, while Friedman gave
lip service to this model, he did not properly employ it.  His
but-for scenario is based on internal Abbott projections
prepared at the time of the Agreement.  These projections
necessarily incorporated the undisclosed information that was
the subject of Abbott's misrepresentations and omissions.  Thus,
his "but-for" scenario is flawed because that calculation is
really the 'actual' scenario.

Similarly, Friedman's actual scenario is improper because
it is not based on probabilities of success for each of the
compounds that account for the misrepresentations Abbott made to
Hancock *as of the date of the Agreement*.  Rather, for his
"actual" scenario, Friedman used projections for the three
compounds as of December 2005.  By December 2005, Abbott had
already terminated the compounds so their probability of success
was zero.  However, Hancock has not proven that the actual
probability of success for the three compounds was zero as of
the time the Agreement *was signed*.  In fact, Abbott's internal
projections suggest otherwise.  Friedman's "actual" scenario

calculation is also flawed.  Because Hancock did not properly calculate the "but-for" and "actual" scenarios underlying its probability-weighted damages calculation, it has not offered "a reasonable basis for the computation of damages," and its lost profits are not reasonably certain.  *See TAS Distrib. Co.*, 491 F.3d at 632-33.[15]

### 2.   Outlicensing Required by Section 4.3

Hancock alleges that Abbott breached Section 4.3 of the Agreement by failing to outlicense ABT-518 and ABT-594 after terminating development of those compounds.  Both ABT-518 and ABT-594 are "Ceased Compounds" as defined by the Agreement and thus subject to the outlicense provision.

I conclude that Abbott did not breach the Agreement by failing to outlicense ABT-518.  Abbott made efforts to outlicense this compound but was ultimately unsuccessful.  Hancock has not presented any evidence showing that Abbott's efforts were unreasonable.  Therefore, Hancock's claim fails as to ABT-518.

I also conclude that Abbott did not breach this provision of the Agreement with respect to ABT-594.  To be sure, Bayer

---

[15] For similar reasons, Hancock has not shown causation.  Just as the extent of the damages flowing from the misrepresentations is unclear and unproven, the causative relationship between those representations and the damages, if any, is as well.

Animal Health expressed an interest in developing the compound, but Abbott informed Bayer that it was not available for outlicensing.  Abbott was reluctant to outlicense the compound because doing so could negatively impact the value of follow-on compounds to ABT-594.  In relevant part, the Agreement provided that Abbott shall maximize the commercial value to *both parties*. Additionally, the Agreement does not permit Abbott to treat any Program Compounds "differently, as compared to other Abbott compounds or products, on account of John Hancock's rights." Because Abbott was not allowed to treat Program Compounds differently than others it had under development, and outlicensing to Bayer Animal Health would have had a commercially detrimental impact on Abbott's follow-on compounds, Abbott did not breach the Agreement by not making ABT-594 available for outlicensing.

3.   Spending Projections Required by Section 2.2

a.   *Breach*

The parties dispute whether Abbott was required to provide Hancock with its "expected" spending projections or its "nominal" spending projections.  Nominal spending projections assume that each compound will pass various hurdles to development and ultimately be approved by the FDA.  By contrast, expected spending projections are adjusted to take into account

81

the risk that a compound will not pass a specific stage of development and will be terminated.  Nominal spending projections are usually lower than expected spending.

In the ARP, Abbott provided Hancock with its nominal planned expenditures for the compounds.  Abbott claims it was not required to provide Hancock with its expected spending because Section 1.6 of the Agreement only requires it provide Hancock with a "reasonably and consistently detailed statement of the objectives, activities, timetable and budget for the Research Program."  By contrast, Hancock argues that Abbott was required to disclose its risk-adjusted planned spending.  To support this position, Hancock points to language from Section 3.4 of the Agreement: "If Abbott . . . does not reasonably demonstrate in its Annual Research Plan its *intent and reasonable expectation* to expend . . . ."

I conclude that Abbott was required to provide Hancock with its expected spending plans.  Section 1.6 of the Agreement suggests that Abbott may provide Hancock with either its nominal or expected spending.  However, Section 3.4(iv) indicates that Abbott must disclose what it intends and reasonably expects to spend.  The "intent and reasonable expectation" language suggests that Abbott must provide Hancock with its expected spending.  This conclusion is bolstered by the fact that

82

internally Abbott used the term "expected" spending to refer to risk-adjusted spending calculations.

Abbott attempts to avoid this conclusion by claiming that an expected spending figure does not actually represent what it intends to spend.  Specifically, Abbott's actual spending will equal its nominal spending projection if the compound passes all of the relevant milestones.  By contrast, Abbott's actual spending will be zero dollars in the event that the compound does not pass a milestone.  Plainly, this proposition is correct.  However, expected spending provided a better estimate of Abbott's future spending than nominal spending because it accounts for calculation of the risk that a compound might not reach a certain stage of development.  Thus, I do not view Abbott's argument in this regard persuasive.  Instead, I conclude that because Abbott did not provide Hancock with its expected spending, it did not provide Hancock with its "intended and reasonably expected" spending for Program Related Costs in the ARP, as required by Section 2.2.

b. *Damages*

Hancock's argument with regard to damages as to this form of breach is not entirely clear.  Hancock appears to claim that if Abbott had disclosed that it used nominal spending figures in the ARP instead of expected spending figures, Hancock would not

have made its Second Program Payment of $54 million.   Thus, Hancock now seeks $54 million as a result of Abbott's breach.

In order to establish that Hancock was excused from making the Second Program Payment, Hancock must show that Abbott's *expected* spending was less than $614 million (the Aggregate Carryover Amount Abbott was required to spend).   Hancock has not done so.   During cross examination, Blewitt conceded that neither he nor Friedman made such a calculation.[16]   By contrast, Abbott has submitted evidence, which I credit, that its *expected* spending in 2002 was in fact more than $614 million.   I conclude that Hancock has not proved damages as to its spending projections claim.

### 4.   Audit Obligations under Section 2.5

Hancock contends that Abbott did not fulfill its contractual obligations under this provision for a multitude of reasons.   I have found that Abbott did not fulfill several

---

[16] Friedman used the probabilities of success (i.e., FDA approval) for various compounds and multiplied them by Abbott's nominal spending to calculate Abbott's expected spending.   This approach does not make sense.   Rather, to compute expected spending correctly, Friedman would have had to use a decision-tree type analysis to calculate the probability that the compound makes it past certain stages of development (i.e., phase I, phase II, phase III).   Clearly, the probability that a compound would be approved by the FDA is less than the probability that the compound will make it past phase I trials.   Because Friedman's calculation is arbitrary, I do not credit, or rely on it.

significant obligations imposed by Section 2.5 of the Agreement,
amounting to a failure to provide information and material
necessary for Hancock's vendor StoneTurn successfully to conduct
an audit.

The damages for such a breach are clearly set forth in the
Agreement.  Section 2.5 of the Agreement provides that in the
event of a breach of this provision, Abbott is required to pay
"the reasonable fees and expenses charged by [the third-party
auditor]."  Therefore, I conclude Abbott must pay StoneTurn's
fees and costs of $198,731.

### 5.  Aggregate Carryover Spending Required by Section 3.3

Hancock's spending under the Agreement was conditional upon
— among other things — Abbott's providing an adequate ARP.
Although Hancock made the first two program payments under the
Agreement, Abbott failed to provide Hancock with an adequate
ARP.  As a result, I found that Hancock's obligation to provide
the final two installment payments to Abbott terminated and I
entered a declaratory judgment to that effect in an earlier
incarnation of this litigation.  *Hancock I*, No. 03-12501, 2005
WL 2323166, at *28.  The judgment declared that Hancock's
obligation to make any remaining Program Payments under the
Agreement had terminated in accordance with the terms of the
contract, that Hancock's withholding of the final two payments

did not constitute breach of contract, and that the agreement was "otherwise in full force and effect" in accordance with its terms. *See id.*

Hancock now asserts that Abbott has breached Section 3.3(b) of the Agreement. Neither party disputes that Abbott failed to spend the Aggregate Carryover Amount (defined as $614 million) during the time allotted. I have found as a matter of fact that Abbott spent only $514.9 million, including $104 million of Hancock's money composed of the two installment payments made before its obligation terminated, and $442 million of Abbott's own money. Thus, Abbott missed the aggregate spending target by $99.1 million.

a. Application of Section 3.3

Hancock claims that Abbott owes Hancock one-third of the 99.1 million, or roughly $33 million, in accordance with 3.3(b). Section 3.3(b) directs that, in the event that Abbott did not reach the total spending target —including Hancock's expected contribution — on its research and development during the spending period, Abbott would be required to pay Hancock a partial refund of its contributions equal to one-third of the difference between $614 million and the amount Abbott actually spent. Hancock's asserts that Abbott's failure to pay Hancock roughly $33 million accordingly constitutes a breach of

contract.  The sole question is whether Section 3.3(b) applies to these circumstances, where Hancock provided only two of the four scheduled installment payments.

Abbott does not dispute that the plain language of Section 3.3(b) requires it to pay one-third of the unspent portion of $614 million to Hancock.  Instead, Abbott argues that Hancock cannot enforce Section 3.3(b) for four reasons.  First, Abbott asserts that Hancock is estopped from claiming that Abbott owes it a portion of the unspent $614 million because it took a contradictory position in *Hancock I*.  Second, Abbott argues that the other terms of the contract limit Abbott's spending obligations such that Section 3.3(b) does not apply here. Third, Abbott contends that its obligations under § 3.3(b) is conditional upon Hancock contributing all of its planned payments under the contract (i.e. the full $214 million under Section 3.1).  Because Hancock's obligation to pay Abbott the full $214 million terminated after the second year of the program term, Abbott contends it was not obliged to pay Hancock a portion of the unspent funds.  Fourth, Abbott argues that enforcing Section 3.3(b) in this situation would constitute an unenforceable penalty.  I will address each of these arguments separately.

(i) Estoppel

87

Abbott argues that Hancock is estopped from claiming that Abbott owes it a portion of the spending shortfall because of a series of statements made by Hancock that it engaged in a "shared" funding operation.  These statements, however, are consistent with Hancock's current position that Abbott owes it a portion of the unspent funds pursuant to Section 3.3(b).  The "sharing" between the parties is in accordance with a formula that does not necessarily contemplate a fixed ratio of contributions.  Hancock never represented in previous litigation that the contract required Hancock to contribute funds in a fixed ratio.  Indeed, Hancock explicitly argued in *Hancock I* that the $214 million contribution was a *maximum*, and that Abbott's $400 million contribution was a *minimum*.[17]  Likewise, Hancock never stated that the *only* way that funds could be expended under the contract was by a combined contribution from Hancock and Abbott.  Thus, Hancock's position, which I have accepted, that the Aggregate Spending Target was a "combined" or "shared" total does not prevent Hancock from taking the position that Abbott owes it a portion of the unspent money.  Therefore, Hancock is not estopped from claiming that Abbott owes Hancock a portion of the unspent $614 million.

---

[17] I do not conclude here that the *contract language* supports Hancock's contention, but only note that Hancock is not estopped from making the argument.

(ii) Interpretation of Section 3.3
in light of other Sections

Abbott claims that Section 3.5 of the Agreement limits
Abbott's obligations to spend to $400 million.  Specifically,
Abbott argues that when Sections 3.1 and 3.5 are read together,
the only logical interpretation is that Abbott is not required
to spend more than its minimum $400 million share of the $614
million Aggregate Spending Target.  I disagree with Abbott's
proposed interpretation.  Pursuant to Section 3.2 of the
Agreement, which is titled "Abbott Funding Obligation", Abbott
is required to spend: "(i) during each Program Year, at least
the Annual Minimum Spending Target for such Program Year and
(ii) at least the Aggregate Spending Target during the Program
Term."  The Aggregate Spending Target is defined in the
Agreement as $614 million.  This Section does not limit Abbott's
spending to $400 million.  Additionally, Section 3.5 states in
relevant part: "Abbott *shall be solely responsible* for funding
all Program Related Costs in excess of the Program Payments from
John Hancock (emphasis added)."  Program Payments are defined in
the contract under Section 3.1 as the four Hancock payments
totaling $214 million.

I read Section 3.5 as requiring that Abbott should be the
*only party responsible* for making payments in excess of
Hancock's contribution, not that Abbott should be responsible

89

for paying *only the excess* of the Program Payments.  Indeed, the "solely responsible" reference is in the second sentence of a section which begins "John Hancock's entire obligation hereunder shall be limited to providing the Program Payments set forth in Section 3.1."  The fact that the next sentence reads, "Abbott shall be solely responsible for . . ." supports an interpretation that the purpose of this section was to clarify that Abbott *would be alone* in the obligation to fund above the Hancock contribution of $214 million.  This interpretation is supported by the fact that the title of Section 3.5 is "Hancock Funding Obligation."  Abbott's funding obligation, by contrast, is contained in an entirely different section of the contract, Section 3.2.  Thus, I interpret the Agreement such that Abbott is "solely responsible for funding" any excess of the Program Payments.  The construction of Section 3.5 is consistent with the overall structure of the contract and grammatical.[18]

Given my construction of Section 3.5, I conclude that the language of Section 3.3(b) is not ambiguous in what it requires.

---

[18] I recognize that adverbs like "solely" and "only" may be used without careful regard for what might be considered proper grammar.  I recognize further that language is dynamic, and it is not clear when a common misuse has become an accepted one. Were the sentence standing alone, outside the context of Section 3.4, I might treat the statement as ambiguous.  Because the context does not support Abbott's interpretation, however, I adopt the more customary grammatical construction.

To the extent Abbott points to evidence obeying the four corners
of the Agreement in support of its position, that evidence is
inadmissible.  *See Benedict* v. *Fed. Kemper Life Assur. Co.*, 759
N.E.2d 23, 26 (Ill. App. Ct. 2001).

> (iii) Whether Abbott's Performance was Contingent
>       on Full Payment

Abbott next argues that its obligation under Section 3.3(b)
is contingent upon Hancock's contribution of the full $214
million under Section 3.1.  The plain language of Section 3.3(b)
contains no such condition, although other provisions in the
contract explicitly state that Abbott is obligated to comply
with Section 3.3(b) only if Hancock contributes all four of the
Program Payments.  I am reluctant to add terms to a contract
where, as here, sophisticated parties drafted the contract.  *See*
*Am. States Ins. Co.* v. *A.J. Maggio Co.*, 593 N.E.2d 1083, 1086
(Ill. App. Ct. 1992) ("[N]o word can be added to or taken from
the agreement to change the plain meaning of the parties as
expressed therein."), superceded by statute on other grounds, as
stated in *Gallagher* v. *Union Square Condo. Homeowner's Ass'n*,
922 N.E.2d 1201, 1207 (Ill. App. Ct. 2010).

The thrust of Abbott's argument, nevertheless, requires
some further analysis.  Relevant authority supports the
proposition that in *all* contracts the performance of one party
can be discharged when the other party fails to perform,

regardless of whether the lack of performance was justified by the nonoccurrence of a condition. *See* Restatement Contracts (2d) § 239(1) ("A party's failure to render or to offer performance may . . . affect the other party's duties . . . even though failure is justified by the non-occurrence of a condition."). Thus, the issue here is what result is consistent with the common law rules of discharge of contractual duty, not whether there are implicit terms in a contract. *See* Corbin on Contracts § 35.1 (explaining that the question of discharge in partially performed installment contracts is not a matter of contract interpretation).

The proposition that one party's failure to perform excuses the other party from performing is intuitive. Assume, for example, that party A agrees to pay party B $5 million today in exchange for B's promise to pay A $6 million next year. Assume also that a provision in the agreement states that A's obligation to perform is contingent on B providing A with a bank account statement. The contract is signed and B fails to provide A with a bank account statement by the due date. A's duties under the agreement are rightly terminated and A is discharged of its obligation to pay B $5 million. How much does B owe A? If B's duty to perform is not excused, B owes A $6 million in the subsequent year even though A paid B nothing.

92

This result does not make sense.  By contrast, the conclusion that B owes A nothing, even though A did not breach,[19] seems more logical.

There are of course certain differences between the hypothetical and the present case. For example, unlike party A in the hypothetical, Hancock did pay something.  Hancock *partially performed* by contributing $104 million of the $214 million it expected to pay.  Thus, while Hancock did not fully perform, it also did not fail to perform entirely.

There seems to be no Illinois case that stands for the conclusion that Abbott's performance under Section 3.3(b) is implicitly conditional on Hancock's (complete) performance. There is, however, out-of-state authority for the basic proposition governing my hypothetical.  *See, e.g., Kaufman* v. *Byers*, 823 N.E.2d 530, 537 (Ohio Ct. App. 2004) ("When promises in a bilateral contract are mutually dependent and concurrent, a party's promises are constructive conditions to the other party's performance . . . .").  Moreover, the Illinois courts will recognize even implied conditions to performance where "the intent to create such a condition is apparent on the face of the agreement." *Catholic Charities* v. *Thorpe*, 741 N.E.2d 651, 653-

---

[19] Another option is that B owes A $1 million, which is A's actual damages.

54 (Ill. App. 2000).  I find such an apparent implied condition here.

It is important to note that in almost every situation where Hancock fully performs and Abbott underspends, Section 3.3(b) leaves the parties with the same contribution rate: 65% by Abbott and 35% by Hancock.  The 65/35 funding ratio applies if Abbott and Hancock each fully perform the agreement ($400 million to $214 million), and if Abbott underspends.  Assume, for example, that Hancock contributes all four installment payments and Abbott spends only $350 million of its own money.  The total spent would be $564 million, and Hancock would have contributed 38% of the funding to the program, more than its expected share, and Abbott only 62%.  Applying Section 3.3(b), however, Abbott would be required to refund Hancock $17 million (1/3 of $614 million, minus $564 million).  Thus, the resulting funding ratio becomes 65%/35%.  After doing a number of these calculations under various scenarios, I have found very few exceptions[20] to the rule that Section § 3.3(b) provides Hancock with a 65% contribution where Hancock has fully performed and Abbott has underspent.

---

[20] Where Abbott's spending gets very close to zero, which the parties argue is an unlikely scenario, Hancock's funding ratio actually gets up to 38% even with the Section 3.3(b) refund.

In other words, Section 3.3(b) appears to be drafted to maintain the original ratio of funding in most circumstances in which Abbott fails to spend enough of its own money.  In this case, however, where Hancock has justifiably withheld two installment payments and Abbott has spent $514.9 million, Hancock's contribution is only 17% of the total funding anticipated.  If I were to enforce Section 3.3(b) in this circumstance, and Abbott refunded Hancock $33 million, Hancock's funding contribution would decrease even further to less than 11% of the total spending.

Hancock argues that the parties contemplated funding ratios of the kind that would result from enforcing Section 3.3(b) in this case: 85%/15%.  But nowhere does the Agreement contemplate an 85%/15% ratio in this circumstance unless I construe Section 3.3(b) as applying in cases where Hancock only partially performs.  Although it may be true that in negotiations the parties considered many different funding scenarios, those negotiations are ultimately irrelevant and inadmissible because the contract language is unambiguous.  *See Benedict*, 759 N.E.2d at 26-27.

Moreover, the rest of the contract supports the interpretation that the purpose of Section 3.3(b) is to maintain a 65%/35% spending ratio among the parties under circumstances

other than those present here.  For example, Section 3.4
provides that in the event that Abbott abandons the development
of all of its compounds, Abbott would return to Hancock the
"amount, if any, by which the Program Payment made by Hancock .
. . exceeds one-half of the Program Related Costs actually spent
by Abbott. . . and any additional amount that . . . causes the
Program Related Costs for all years in the Program Term to date
to have been funded one-third by Hancock and two-thirds by
Abbott."  Section 3.3(b) contains similar language and appears
to have been written to limit Hancock's liability exposure to
approximately one-third of the total amount spent.

I conclude the Agreement was not intended for Section
3.3(b) to apply in situations where Hancock contributed
substantially less than 35% of the total funding.  Under such an
Agreement, the less Hancock contributed, the more Abbott would
have to contribute, even though Hancock would still be entitled
to the same amount of royalties and milestone payments.  Given
the structure of the Agreement, I find such an interpretation
perverse.  Rather, I conclude the parties structured the
contract such that Hancock would not be forced to contribute
more than roughly one-third of the total funds to Abbott's
research and development program.

96

Hancock expected to pay four installments totaling $214 million, not more than 35% of the total funding costs, and to receive a refund where Abbott failed to spend enough of its own money.  Given that Abbott has underspent, Hancock is entitled to be placed in as good a position as it would have been in had the contract been fully performed.  But, "a plaintiff is not entitled to a windfall." *Roboserve*, 78 F.3d at 278.  Since it would have been unreasonable for the parties to agree that Section 3.3(b) would govern even in the case where Hancock had contributed only 17% to the Research Program and avoided $112 million in costs, I find that the clause does not apply in this case and Hancock is not entitled to $33 million in damages.

I conclude that once Hancock justifiably chose to stop making contributions, Abbott was relieved of its duty of counter-performance under Section 3.3(b).

(iv) Unenforceable Penalty

I turn now, as an alternative grounds for summary judgment, to Abbott's final argument that any damages amount that results from Section 3.3(b) constitutes an unenforceable penalty. Hancock argues that Abbott owes it one-third of the underspent amount, roughly $33 million, as a result of Abbott's failure to meet the spending target.  Hancock claims, essentially, that these are its damages because the Agreement provides for it.

Abbott, however, argues that Section 3.3(b), if it is to be read as providing a substitute for actual damages in the event that Abbott underspends, is an unenforceable penalty because the clause bears no reasonable relation to Hancock's actual damages.

Illinois law distinguishes between penalty provisions and liquidated damages provisions. *Checker Eight Ltd. P'ship* v. *Hawkins*, 241 F.3d 558, 561 (7th Cir. 2001) ("In interpreting contract provisions that specify damages, Illinois law draws a distinction between liquidated damages, which are enforceable, and penalties, which are not."); *see Jameson Realty Grp.* v. *Kostiner*, 813 N.E.2d 1124, 1130 (Ill. App. Ct. 2004). A liquidated damages clause is enforceable when:

> (1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained; and (3) actual damages would be uncertain in amount and difficult to prove.

Jameson, 813 N.E.2d at 1130 (internal quotation marks and citations omitted). Furthermore, the "damages must be for a specific amount for a specific breach." *Med+Plus Neck & Back Pain* v. *Noffsinger*, 726 N.E.2d 687, 693 (Ill. App. Ct. 2000).

By contrast, penalty provisions are *per se* unenforceable in Illinois. *See Lake River Corp.* v. *Carborundum Co.*, 769 F.2d 1284, 1288-90 (7th Cir. 1985). A clause providing for damages in the event of breach is enforceable "only at an amount that is

reasonable in light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss; a term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty." *Kinkel* v. *Cingular Wireless*, 859 N.E.2d 250, 268 (Ill. 2006) (internal citations omitted) (adopting the Restatement (Second) of Contracts § 356).

Actual damages in this case are inherently difficult to quantify. Abbott's failure to spend the additional $99 million anticipated might have decreased the probability that any of the nine compounds would succeed. For example, Abbott's failure to spend may have led to lower expected profits, royalties or milestone payments for Hancock. But the dimensions of that decrease, if any, are unknowable. Moreover, Hancock's obligation terminated halfway through the Program Period, so any actual damages it did sustain would be offset by the additional $110 million it avoided having to pay as a result of the contract not being performed. *See* Restatement (2nd) Contracts § 347 (stating that the proper measure of actual damages is equal to the profits the plaintiff expected had the contract been fully performed by both parties minus the amount of costs it avoided); *See Gaiser* v. Village of Skokie, 648 N.E.2d 205, 213 (Ill. App. Ct. 1995) ("The general rule of contract damages is that the person who is injured is to be placed in the position

he would have been in had the contract been performed, but not in a better position.").

However, construing the Agreement to obligate Abbott to pay Hancock the Section 3.3(b) refund regardless of whether Hancock made all of the installment payments would entitle Hancock to a refund of more than it contributed in the first place in some cases.[21]  This is a commercially unreasonable result that neither party could have intended, for the same reasons discussed in Section III(C)(5)(iii) of this memorandum.  Another way of stating it is that the damages under Section 3.3(b) in certain circumstances (the circumstances where Hancock's avoided costs clearly outweigh its damages) would amount to a penalty for breach, not compensation for actual damages.  This is not to say that Section 3.3(b) would be unenforceable in all cases, but only that a reasonable reading of the provisions dictates that it not apply in the factual circumstances presented here.[22]  *See*

---

[21] For example, where Hancock only contributes one payment, and then Abbott spends only $100 million, under Hancock's reading of Section 3.3(b), Hancock would have contributed negative dollars to the research program.  Hancock claims the purpose of the clause is "cost savings," but it does not explain how the clause fulfills that purpose where Hancock gets back *more* than it contributed in costs.

[22] Hancock argues that Abbott is estopped from claiming that Section 3.3(b) is an unenforceable penalty because Abbott's in-house counsel wrote an opinion letter that "the Research Funding Agreement has been duly and validly authorized by [Abbott] . . . and constitutes a valid and binding legal obligation of [Abbott] enforceable against it in accordance with its terms."  I find

*XCO Int., Inc.* v. *Pac. Scientific Co.*, 369 F.3d 998, 1004 (7th Cir. 2004) (explaining that if a clause seems reasonable in some cases but not in others, "it is an argument not for invalidating the clause but for interpreting it reasonably").

Hancock attempts to avoid the characterization of the provision as a penalty clause by arguing that it is an alternative performance clause. In support of its position, Hancock cites two Illinois appeals court decisions that are readily distinguishable.

In *McClure Engineering Associates, Inc.* v. *Reuben H. Donnelley Corp.*, 95 Ill.2d 68, 71 (Ill. 1983) an exculpatory clause limiting damages to exclude consequential and incidental damages was held enforceable. But that case involved whether the clause was void as violating public policy in the context of allegedly monopolistic behavior. It did not involve, and the court did not discuss, penalty provisions, which are unenforceable for separate and additional reasons. For example, one of the main reasons for refusing to enforce penalty provisions, even between sophisticated parties, is that

---

this argument unpersuasive. I do not find Section 3.3(b) simply to be an unenforceable penalty provision. Rather, I have concluded that Section 3.3(b) does not apply to this particular set of facts. Thus, Hancock's estoppel argument is irrelevant.

penalties deter efficient breach. *See Lake River Corp.*, 769 F.2d at 1289.

*Fleet Business Credit, LLC*, v. *Entrasys Networks, Inc.*, 816 N.E.2d 619 (Ill. App. Ct. 2004) does not support Hancock's position either.  In *Fleet*, the court decided that an "alternative performance" or "risk allocation" clause was enforceable because it was not a "liquidated damages" clause. *Id.* at 633.  More specifically, the court found the relevant provision applicable because it provided that the aggrieved party would "recover only an amount that would put it in the same position it was in prior to agreeing to [the contract]." *Id*. at 632.  Moreover, the contract at issue there, unlike here, imposed a purchase requirement rather than a liquidated sum, a distinction that court found important.  *Id.*

By contrast, several other Illinois cases support the proposition that a clause cannot be enforced if it grants damages to a party vastly greater than any reasonable calculation of the actual damages the party suffers.  *See USX Corp.* v. *Int. Minerals & Chem. Corp.,* No. 86 C 2254 (N.D. Ill. Nov. 24, 1987); *People ex rel. Dep't of Public Health* v. *Wiley*, 843 N.E.2d 259, 271 (Ill. 2006); *M.I.G. Invs., Inc.* v. *Marsala*, 414 N.E.2d 1381, 1386 (Ill. App. Ct. 1981) (use or absence of the term "liquidated damages" is not determinative).  Although

the wisdom and full force of this common law rule may be diminished as a general proposition in light of the trend toward freedom of contract, *see XCO Int'l*, 369 F.3d 1004 and *Lake River*, 769 F.2d 1289, the ban on penalty provisions remains the settled law of Illinois.  I conclude that it must be applied here to deny Hancock further contract damages.

In sum, I conclude enforcing Section 3.3(b) of the Agreement in this situation would constitute a penalty, a punishment that is not reasonably related to the actual damages Hancock suffered as a result of Abbott underspending by $99 million.

## D.    *Fraud*

In Count I of its second amended supplemental complaint, Hancock brings a fraud claim.  To establish fraud, a plaintiff must prove: 1) the defendant "made a false statement of material fact which defendants knew or believed to be false"; 2) the plaintiff "justifiably relied on the statement"; 3) the plaintiff "suffered damages resulting from that reliance"; and 4) the defendants made the statement with the "intent to induce plaintiffs to act."  *Ass'n Benefit Serv., Inc.* v. *Caremark RX, Inc.*, 493 F.3d 841, 852-53 (7th Cir. 2007) (citation omitted); *see Board of Ed. of Chicago* v. *A, C & S, Inc.*, 546 N.E.2d 580, 591 (Ill. 1989); *Soules* v. *Gen. Motors Corp.*, 402 N.E.2d 599,

601 (Ill. 1980).[23]  Each element of the fraud claim must be
proved by clear and convincing evidence.  *Ass'n Benefit
Services, Inc.* v. *Caremark RX, Inc.*, 493 F.3d at 852-53.

Hancock alleges that Abbott made four intentional
misrepresentations that constitute fraud concerning the
prospects and condition respectively of ABT-518, ABT-594, and
ABT-773, and concerning Abbott's intended and reasonably
expected spending plans in its ARPs.  I described and analyzed
the relevant facts surrounding each of these alleged
misrepresentations in the breach of contract analysis.  Because
this claim is based on the same underlying facts, I will not
rehearse that discussion again here.

It is unnecessary to analyze each of the alleged fraudulent
misrepresentations separately because Hancock has not met its
burden of proof with regard to any of them.  Although I have
concluded that some of Abbott's misrepresentations were
material, I do not find that Hancock proved by clear and
convincing evidence that Abbott knowingly made any
misrepresentations with an intent to induce Hancock to enter the
Agreement.  Rather, I conclude that Abbott's misrepresentations

---

[23] Hancock claims that either a false statement of fact or
omission of material fact can properly form the basis for a
fraud claim.  However, it does not cite any case law that
supports that proposition.

were the product of carelessness and oversight.  Because Hancock
failed to prove this element, the fraud claim must fail.

Additionally, as discussed in the breach of contract
analysis, Hancock has failed to prove damages.  Both parties
concede, and I agree, that the damage analysis for fraud is
essentially the same as the damage analysis for breach of
contract.  Because Hancock failed to prove reasonably certain
damages with one exception, the fraud claim fails as well.

## E.   *Indemnification*

Finally, in Count III of its complaint, Hancock asserts a
claim for indemnification pursuant to Sections 12.6 and 12.8 of
the Agreement.  Specifically, Hancock contends that it suffered
"Losses" as defined by the Agreement, it properly informed
Abbott that it had sustained losses, and thus it is entitled to
be indemnified by Abbott.

Several provisions of the Agreement are relevant for
resolving this claim.  Section 12.6 of the Agreement provides in
relevant part:

> General Indemnification of John Hancock. Abbott shall
> indemnify and hold John Hancock and its Affiliates, agents,
> directors and employees harmless, and hereby forever
> releases and discharges John Hancock and its Affiliates,
> agents, directors and employees, from and against all
> Losses related to or arising out of, directly or indirectly
> . . . (iii) any breach by Abbott of its representations,
> warranties or obligations hereunder . . . .

Section 12.8 of the Agreement also relates to

indemnification:

> Procedure.  If John Hancock or any of its Affiliates,
> agents, directors or employees (each, an "Indemnitee")
> intends to claim indemnification under this Article 12, it
> shall promptly notify Abbott (the "Indemnitor") of any Loss
> or action in respect of which the Indemnitee intends to
> claim such indemnification, and the Indemnitor shall have
> the right to participate in, and, to the extent the
> Indemnitor so desires, to assume the defense thereof with
> counsel selected by the Indemnitor; provided, however, that
> an Indemnitee shall have the right to retain its own
> counsel, with the fees and expenses of such counsel to be
> paid by the Indemnitor, if representation of such
> Indemnitee by the counsel retained by the Indemnitor would
> be inappropriate due to actual or potential differing
> interests between such Indemnitee and any other party
> represented by such counsel in such proceedings. The
> indemnity obligation in this Article 12 shall not apply to
> amounts paid in settlement of any loss, claim, damage,
> liability or action if such settlement is effected without
> the consent of the Indemnitor, which consent shall not be
> withheld unreasonably or delayed. The failure to deliver
> notice to the Indemnitor within a reasonable time after the
> commencement of any such action, if materially prejudicial
> to its ability to defend such action, shall relieve the
> Indemnitor of any liability to the Indemnitee under this
> Article 12 only to the extent arising from the tardiness or
> absence of such notice, but the omission so to deliver
> notice to the Indemnitor will not relieve it of any
> liability that it may have to any Indemnitee otherwise than
> under this Article 12. The Indemnitee shall cooperate fully
> with the Indemnitor and its legal representatives in the
> investigation of any action, claim or liability covered by
> indemnification under this Article 12, at the expense of
> the Indemnitor.

"Losses" are defined in the Agreement as "any claims,

demands, liabilities, costs, damages, judgments, settlements and

other reasonable expenses (including attorneys' fees)."

Agreement § 1.27.

106

Abbott offers two arguments for why it is not responsible for indemnifying Hancock for any losses that resulted from its breach.  First, relying on *Magnus* v. *Lutheran Gen. Health Care Sys.*, 601 N.E.2d 907 (Ill. App. Ct. 1992), Abbott claims that covering costs Hancock incurred is not within the scope of an indemnity agreement.  In *Magnus*, the court stated that "[a]n indemnity agreement is an agreement whereby the indemnitor agrees to protect the indemnitee from claims asserted against the indemnitee *by third persons*."  *Id*. at 915 (emphasis added).[24] Because Hancock is the indemnitee, Abbott claims that it is not responsible for covering its losses.

However, the court in *Magnus* did not conclude the defendant was not entitled to be reimbursed for attorney's fees it incurred by the plaintiffs because it was not a third party making a claim.  Instead, it held that the defendant was not entitled to indemnification because the particular "indemnity clause [did] not include the costs [the defendant] incurred in defending itself against [plaintiff's] claims."  *Id*. at 915.

---

[24] Abbott cites similar language from *Ferguson v. Wozniak Indus., Inc.*, 931 S.W.2d 919 (Mo. Ct. App. 1996).  Relying primarily on the teachings of *Magnus*, the court in *Ferguson* explained that, "[i]n general, an agreement to indemnify another is an agreement by one person to hold another harmless from loss or damage as may be specified in the agreement or in which the indemnitor promises to reimburse his indemnitee for loss suffered.  Under Illinois law, that loss is generally associated with liability to a third person."  *Id*. at 923.

Thus, the court found that the indemnity provision did not apply on its own contractual terms, not as a general matter of law. Therefore, the language that Abbott relies on is not determinative in resolving this case.

In fact, Illinois courts have expressly recognized the validity of indemnity provisions where the indemnitor agrees to protect the indemnitee against expenses the indemnitee incurs as a result of the indemnitor's actions.  For example, in *Lewis X. Cohen Insurance Trust* v. *Stern*, 696 N.E.2d 743 (Ill. Aop. Ct. 1998), the plaintiffs sought indemnification from the defendant based on an indemnification provision.  In relevant part, the indemnification provision read

> (a) [defendants] agree to indemnify [plaintiffs] harmless from and against any and all claims, obligations, liabilities, losses, damages, costs and expenses (including reasonable legal fees and expenses) which [plaintiffs] may incur or suffer as a result of or in connection with (i) any violation or breach of any representation, warranty, covenant or agreement of [defendants] contained herein or (ii) any breach of this Agreement by [defendants].

*Id*. at 750.  The defendants argued that they were not responsible for indemnifying plaintiffs because an indemnity agreement is, by definition, an agreement where the indemnitor protects an indemnitee against claims made by third parties. *Id*.  Like Abbott, the defendants relied on *Magnus* to support their position.  *Id*.  The court rejected this argument and held that the defendants were responsible for indemnifying the

plaintiffs because the plaintiffs' claim fell squarely within the indemnity provision. *Id.* The court reasoned that the defendant could not "sidestep the express terms of the indemnification provision." *Id.* Thus, under Illinois law an indemnification provision may be structured such that an indemnitor agrees to protect the indemnitee from losses it suffers as a result of the indemnitor's actions.

Abbott's second argument is that the specific indemnity provision in the Agreement only protects Hancock from third-party claims. As previously discussed, the plain language of Section 12.6 indicates that Hancock is to be indemnified by Abbott for any "losses" that stem from Abbott's breaches of its representations, warranties or obligations. Agreement § 12.6. This suggests that the indemnity provision encompasses more than just third-party claims. However, Section 12.8 indicates the indemnity provision is more limited. It provides that after Hancock gives notice of a claimed right to indemnification, 1) Abbott has "the right to participate in, and . . . to assume the defense" of the action; 2) Hancock must "cooperate fully with [Abbott] and its legal representatives in the investigation of any action, claim or liability covered by indemnification;" and 3) Abbott may approve settlement of any such action. Agreement § 12.8. Abbott argues that those requirements would not make

109

sense if the indemnity provision was intended to cover claims between the parties.

I agree.  The bulk of the language in Section 12.8 would not make sense if the indemnity provision were designed to cover claims between the parties.  While Section 12.6 appears to leave open the possibility that the indemnity provision applies to losses incurred by Hancock as a result of Abbott's breach of the applicable representations and warranties, this interpretation does not make sense in light of Section 12.8.  Therefore, I find in favor of Abbott on this count.[25]

### IV. CONCLUSION

On the basis of these Findings of Facts and Conclusions of Law, I direct that (A) judgment enter for Abbott on Count I (rescission), Count III (fraud), and Count IV (indemnification); (B) judgment enter for the plaintiff on Count II (breach of contract) only to the extent of the defendant's breach of the audit provision; and (C) that the Final Judgment award to Hancock against Abbott consist of damages in the amount of

---

[25] I note that Hancock has offered no substantive argument or analysis regarding the indemnification issue.  Hancock did not even mention the indemnification count in its trial brief and essentially offered no support for this count in its proposed findings of fact and conclusion of law.  Additionally, Hancock did not present evidence regarding this issue or make an argument regarding it during trial.

$198,731.00[26] together with pre-judgment interest, running from March 22, 2006 to this date at a rate in accordance with the Agreement of the parties as of this date,[27] in the amount of

---

[26] Because the Agreement does not provide for attorneys' fees for breach of the audit provision, but only the fees and expenses of the audit firm, I have declined awarding attorneys' fees of Hancock's law firm which Hancock has claimed.

[27] Section 9.3 of the Agreement.

$110,395.34 for a total judgment of $309,126.34, with post-judgment interest to accrue hereafter in accordance with the Agreement of the parties.


**_Douglas P. Woodlock_**
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE